Patrick J. Neligan, Jr.
State Bar. No. 14866000
Douglas J. Buncher
State Bar No. 03342700
John D. Gaither
State Bar No. 24055516
NELIGAN LLP
325 North St. Paul, Suite 3600
Dallas, Texas 75201
Telephone:  214-840-5333
Facsimile:  214-840-5301
pneligan@neliganlaw.com
dbuncher@neliganlaw.com
jgaither@neliganlaw.com

**PROPOSED COUNSEL FOR DEBTORS**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § § | CHAPTER 11 |
| NATIONAL RIFLE ASSOCIATION OF AMERICA and SEA GIRT LLC | § § § § | CASE NO. 21-30085-____ |
| DEBTORS[1] | § § | Joint Administration Requested |

**DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING PAYMENT OF PREPETITION EMPLOYEE WAGES, COMPENSATION, AND EMPLOYEE BENEFITS <u>AND GRANTING RELATED RELIEF</u>**

The National Rifle Association of America (the "<u>NRA</u>") and Sea Girt LLC ("<u>Sea Girt</u>") (collectively, the "<u>Debtors</u>"), as debtors and debtors-in-possession, file this motion (the "<u>Motion</u>") pursuant to Sections 105, 363, and 507 of the Bankruptcy Code[2] to request entry of interim and final orders, substantially in the form attached hereto as **Exhibit A**, authorizing the payment of prepetition wages, compensation, and employee benefits, and in support state as follows:

---

[1] The last four digits of the Debtors' taxpayer identification numbers are:  6130 (NRA) and 5681 (Sea Girt).  The Debtors' mailing address is 11250 Waples Mill Road, Fairfax, Virginia 22030.
[2] 11 U.S.C. §§ 101, *et seq*.  Unless otherwise noted, all statutory references are to the Bankruptcy Code.

## I. BACKGROUND

1. On January 15, 2021 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtors remain in possession of their property and are operating their business as debtors-in-possession in accordance with Sections 1107 and 1108 of the Bankruptcy Code. A detailed description of the Debtors' business, capital structure, and the events leading to the Debtors' bankruptcy is set forth in the Debtors' Information Brief and the Declarations of Sonya Rowling, Shawne Soto, and Robert Owens (collectively, the "First Day Declarations"), which are being filed with the Court and are incorporated herein by reference.

## II. RELIEF REQUESTED

2. Prior to the Petition Date and in the ordinary course of its business, the NRA paid its employees wages, salaries, and other compensation and benefits. As those obligations accrue on an ongoing and continuous basis, but are paid periodically, the Debtors' intervening chapter 11 filing has resulted in the accrual of unpaid pre-petition wages, salaries, and commissions, and/or other compensation owed to employees and related third parties.

3. By this Motion, the NRA seeks authority to pay certain pre-petition obligations owed to its employees and certain third parties, including, but not limited to: (i) amounts owed to employees for wages and salaries, (ii) maintenance of employee health and benefit plans; (iii) reimbursement of employee expenses; (iv) other miscellaneous employee expenses and benefits, including paid time off and retirement benefits; and (v) certain payroll processing and administrative obligations owed to third party vendors (collectively, the "Prepetition Employee Obligations").

### III. THE PRE-PETITION EMPLOYEE OBLIGATIONS

**A.     Employee Wages, Associated Tax Obligations, and Employee Withholding**

4.     As of the Petition Date, the NRA had 490 active employees as of the Petition Date, with 381 employees due to be paid during the next payroll cycle. The NRA's employees are paid bi-weekly, on every other Thursday, for the two-week period ending on the preceding Saturday. The NRA's payroll is processed through third-party administrator Ultimate Software ("UltiPro"), which calculates the NRA's bi-weekly payroll obligations and debits the NRA's payroll account on the Tuesday prior to biweekly payroll to employees. Approximately 90% of NRA employees are paid via direct deposit, and the remainder are paid via check. As of the Petition Date, the NRA's average biweekly payroll obligation, including applicable employee and employer tax obligations and various deductions and remittances, was approximately $1,720,000.

5.     As of the Petition Date, the NRA was current on all bi-weekly payroll obligations. The NRA's next payday is January 21, 2021, which covers wages earned during the period from January 3, 2021 to January 16, 2021. Accordingly, the NRA's next payday includes amounts owed to employees for work performed prior to the Petition Date. The NRA estimates that its total employee wage and tax obligation for the January 21, 2021 payroll will be $1,820,000, generally consisting of $865,000 in gross wages, $460,000 in employer and employee tax obligations, and various employee deductions and withholdings. The NRA seeks authority to satisfy its full payroll obligation on January 21, 2021, including the amounts owed on account of prepetition wages and taxes, in the ordinary course of business.

6.     During each pay period, the NRA also withholds certain amounts from employees' gross earnings related to various benefit programs and garnishments. The NRA estimates that its aggregated employee withholding obligation for the January 21, 2021 payroll

will be approximately $211,000. The NRA seeks authority to collect and remit these various withholdings in the ordinary course of business.

B.     **NRA Event Staff**

7.     The NRA has a network of non-employee independent contractors that provide support for NRA events throughout the year ("NRA Event Staff"). The NRA does not currently owe any amounts to NRA Event Staff for prepetition services and does not seek to pay such amounts under this Motion. However, the NRA seeks authority to continue to utilize and compensate non-employee NRA Event Staff in its discretion in the ordinary course of business.

C.     **Health, Dental, and Disability Insurance and Related Benefits**

8.     The NRA provides regular, full time eligible employees, and their eligible dependents with access to group health, vision, dental, short- and long-term disability, and life insurance plans, administered by CIGNA (health, dental), UNUM (life, disability), and other third-party benefit providers. The NRA's health and dental insurance policies are self-funded and backstopped by a stop-loss policy. The NRA funds approximately 67% of the monthly costs for employees with the remaining 33% funded by participating employees through payroll deductions.

9.     Because the NRA's plan is self-funded, it is not possible to predict the amount of claims that the NRA might be required to pay in a given period. In the ordinary course of business, the NRA pays health and dental claims on a daily basis through its claims submission process, with average daily claims ranging from approximately $10,000 to $50,000 per day depending on the volume of claims. The NRA's stop-loss insurance premiums paid to Cigna varies depending on the number of employees participating in the NRA's benefit plans. The NRA's approximate average monthly premium and administrative fee to Cigna in connection with the health and dental plan and stop-loss insurance is between $90,000 to $125,000.

10. The NRA provides employees with short-term disability coverage through a self-funded short-term disability plan administered via UNUM. The monthly administration cost for this program is approximately $1,200. Accrued claims are processed via UNUM and paid through the NRA's payroll process. The NRA also provides long-term disability insurance, group and supplemental/dependent life insurance, and accidental death and dismemberment insurance, each of which is fully insured through UNUM. The NRA's aggregate monthly cost for this program is $40,000 per month, inclusive of premiums and administrative costs, which is partially paid via employee payroll deductions in the approximate amount of $9,800 per month.

11. The NRA also provides employees with the opportunity to participate in certain voluntary benefit programs for which premiums are fully funded through deductions from participating employees' payroll. These programs include vision, prepaid legal, group home/auto insurance, and pet insurance, and the associated withholding and premium remittances are approximately $3,800 per pay period, which are paid to the plan administrators on a monthly basis. The NRA anticipates that its withholding and remittance obligations in connection with these voluntary benefit programs for the January 21, 2021 payroll will be approximately $3,800.

12. The NRA seeks authority to continue providing each of the foregoing insurance and benefit programs and making the associated payments and performing its obligations in the ordinary course of business.

**D.     Flexible Spending Accounts**

13. The NRA also provides employees with access to employee flexible spending accounts (the "FSAs"). The NRA's FSA program permits eligible employees to contribute funds on a pretax basis, subject to an annual cap, to accounts used to pay qualifying medical expenses throughout the year. The FSAs are administered in-house and funded via deductions from

employees' biweekly pay. Employees are then reimbursed from their FSA upon submitting qualified expenses to the NRA's in-house FSA administrator. The NRA's FSA claims obligations are approximately $5,000 to $9,000 per week depending on the claims that are submitted. The NRA seeks authority to continue maintaining the FSAs and paying qualifying FSA claims in the ordinary course of business.

E. **Vacation and Paid Time Off**

14. All regular, full time employees of the NRA are eligible for paid vacation based on length of employment. Employees initially accrue 2.88 hours per pay period worked, which can increase to 7.21 hours per pay period depending on length of service and position held. Generally, the NRA's employees accrue 10 days of vacation during their first year of employment. Unused vacation is rolled over into the next calendar year, but employees' accrual of unused vacation is capped at 225 hours. Unused accrued vacation is payable upon the termination or resignation of employment. The NRA estimates that its total outstanding vacation obligation as of the Petition Date is approximately $3,600,000.

15. The NRA requests authorization to continue its vacation policy post-petition and to honor vacation liabilities to its employees that may have arisen prior to the Petition Date. The NRA anticipates that many employees will continue to use accrued vacation in the ordinary course of business without causing any material cash flow requirements beyond the NRA's normal payroll obligations. The NRA requests authority to continue to pay all qualifying employee vacation obligations, including obligations arising in connection with the employee departures, as they arise in the ordinary course of business.

F. **Retirement Benefits**

16. The NRA also maintains a company 401k plan (the "401k Plan") for certain eligible employees. The 401k Plan is administered by Fidelity. Employee contributions are

processed with each payroll and deducted from participating employees' paycheck. The NRA does not match employee contributions. The NRA does not currently owe any amounts to Fidelity for the administration of the 401k Plan, but requests authority to continue to maintain the 401k Plan and satisfy any obligations that may arise in connection with therewith in the ordinary course of business.

17. The NRA also maintains a defined benefit retirement plan that is administered by Fidelity (the "Pension Plan"). The NRA is periodically required to make certain minimum contributions to the Pension Plan. As of the Petition Date, the NRA was current on its required minimum contributions to the Pension Plan. The next required minimum contribution will be due on April 15. The NRA seeks authority to continue to maintain the Pension Plan, and to make the required minimum contribution payments, in the ordinary course of business.

18. In addition, the NRA also provides a limited number of nonqualified 457F/B retirement plans (the "Nonqualified Retirement Plans") for certain employees; these plans are 100% funded by bi-weekly employee payroll deductions. These Nonqualified Retirement Plans are maintained by the NRA and administered by the Newport Group, which invoices the NRA approximately $10,000 per year for administration and record keeping functions. In the event a plan participant leaves the employment of the NRA, the balance of the participant's nonqualified retirement account is paid out to the employee by the NRA as part of the payroll process. The NRA seeks authority to continue to maintain and administer the Nonqualified Retirement Plans, and to pay any associated obligations, in the ordinary course of business.

G. Employee Expense Reimbursement and Company Phones

19. The NRA occasionally reimburses certain business-related expenses incurred by employees incurred in the scope of their employment, some of which were incurred but not yet reimbursed as of the Petition Date (collectively, the "Reimbursable Expenses"). Reimbursable

Expenses generally relate to business travel, transportation, lodging, meals, cell phones, supplies, and other miscellaneous expenses incurred during employees' normal business activities. The NRA's employees incur such expenses in reliance upon the understanding that such expenses will be reimbursed. Failure to reimburse employees for the Reimbursable Expenses would impact employee morale and cause them financial hardship.

20. In order to be reimbursed, employees are required to submit receipts and expense reports for qualifying Reimbursable Expenses to the appropriate department for review and approval. Upon approval, Reimbursable Expenses are processed as part of the NRA's ordinary course accounts payable process.[3] As of the Petition Date, the NRA estimates that its obligation to employees on account of Reimbursable Expenses is approximately $30,000. However, because additional Reimbursable Expenses may have been incurred but not reported as of the Petition Date, the NRA seeks authority to pay all qualifying Reimbursable Expenses in the ordinary course of business.

H.    **Payroll Processing, Software, and Administration Expenses**

21. As noted above, the NRA utilizes UltiPro to process and administer its payroll. The NRA's obligation to UltiPro for processing services and support is approximately $45,000 per quarter. The NRA also utilizes software provided by Web Benefits Design in connection with the various employee benefit programs described above. This software enables the NRA to manage employee benefit enrollment and elections and is critical to the maintenance and operation of the NRA's employee benefits program. The NRA's approximately monthly

---

[3] The NRA and its Institute for Legislative Action ("ILA") maintain separate procedures for the processing and payment of Reimbursable Expenses. Reimbursable Expenses associated with ILA are generally submitted by Sundays for the preceding week, reviewed and approved on Mondays and Tuesdays, and paid on Thursdays via ILA's ordinary accounts payable process. Reimbursable Expenses associated with the NRA are submitted, reviewed, and approved periodically on a rolling basis and are paid through the NRA's accounts payable process.

licensing fee for the use of this Web Benefits Design software is approximately $3,000 per month. In connection with the FSA program described above, the NRA utilizes software provided by Travis Software, at an approximate annual cost of $1,400. The NRA seeks authority to continue to maintain each of these programs and to pay the associated liabilities in the ordinary course of business.

22. In addition, the NRA utilizes Benefit Resources, Inc. to provide various benefit consulting services to the NRA and its employees. These services are critical to the NRA's ability to maintain plan compliance and to efficiently administer their employee benefit programs. Absent the services provided by Benefit Resources, Inc., the NRA's employee benefit programs could be disrupted or become non-compliant. The NRA's monthly obligation in connection with these services is approximately $12,500. As of the Petition Date, the NRA was current with Benefit Resources, Inc. but seeks authority to continue to retain their services and pay their monthly invoices in the ordinary course of business.

**I.      Miscellaneous Employee Obligations and Expenses**

23. The NRA provides company phones to certain eligible employees in connection with their employment. In connection with this employee phone program, the NRA maintains corporate accounts with both AT&T and Verizon Wireless. The NRA estimates that its aggregate monthly cost for providing company phones under these two plans is approximately $7,000. The NRA was current on its obligations in connection with the company phone program as of the Petition Date but seeks authority to continue to maintain the company phone program and to pay the associated invoices as they come due in the ordinary course of business.

24. In addition, the NRA is obligated under federal regulations to provide employees who are exposed to lead and noise with periodic blood and hearing tests, which are provided by third-party testing agencies. The cost of individual tests is de minimis (less than $100). While

the NRA was current on all obligations related to such testing as of the Petition Date, there may have been tests conducted shortly prior to the Petition Date for which payment will not become due until post-petition. The NRA seeks authority to continue to administer this testing program in accordance with applicable federal regulations and to pay any associated expenses as they come due in the ordinary course of business.

25. The NRA also maintains an employee assistance program that provides employees with access to various counseling, therapeutic, and rehabilitative services. The cost of this program is approximately $13,000 per year, paid annually in June. As of the Petition Date, the NRA was current on its obligations with respect to the employee assistance program but seeks authority to maintain the program and perform any associated obligations in the ordinary course of business.

## IV. BASIS FOR REQUESTED RELIEF

**A.     The NRA's Employees are Indispensable and Critical to its Continued Operations.**

26. To maintain the continuity of the NRA's business operations, and to preserve the morale of employees, it is important that the NRA be permitted to pay the Prepetition Employee Obligations at its discretion in the ordinary course of business. The continued loyalty of a debtor's employees is a necessary component to any successful Chapter 11 case. The filing of a Chapter 11 petition is a stressful and uncertain time for a debtor's employees and such stress and uncertainty often cause poor employee morale at a time when a debtor needs its employees to be most loyal. If employees do not receive payment for work performed prepetition, the NRA could lose a significant number of its employees with little or no notice. Moreover, any employees living paycheck to paycheck would suffer severe adverse consequences if they did not receive their full compensation.

27. Likewise, the NRA would suffer immediate and irreparable harm as a result of any loss of morale, departures of employees, disruption to its operations, decreased revenue, and resulting damage to goodwill. The NRA's ability to continue operating is largely contingent on its employees and their willingness and ability to continue managing and running the NRA's business. Honoring the Prepetition Employee Obligations will minimize the hardship that employees will certainly endure if payroll is interrupted and will prevent the substantial disruption to the NRA's operations that could result if employees lost the reasonable expectation that they will be paid for their work. Accordingly, the NRA believes that it is in the best interest of its estate to honor the Prepetition Employee Obligations.

**B.    The Requested Relief is Appropriate Under Sections 507(a)(4)-(5).**

28. The requested relief is appropriate under Sections 507(a)(4) and (a)(5) of the Bankruptcy Code, which provide for priority payment up to $13,650 per individual for pre-petition claims for wages, salaries, commissions, vacation and sick leave, and claims for contributions to employee benefit plans. The NRA is not currently seeking authority to pay any Prepetition Employee Obligations to employee wages in excess of the $13,650 statutory cap. Thus, all employee wages for all but one employee covered by this Motion are entitled to priority under sections 507(a)(4) and (a)(5).

29. The Debtors expect to propose a plan of reorganization in this case that pays allowed claims in full. Because claims under Sections 507(a)(4) and (a)(5) are already entitled to priority payment under a reorganization plan pursuant to Section 1129(a)(9)(B), and because the Debtors' plan will propose to pay all allowed claims in full, the NRA's payment of the Prepetition Employee Obligations to employees in the ordinary course of business should neither prejudice creditors nor materially affect the NRA's estates. The Debtors therefore submit that

payment of the Prepetition Employee Obligations is consistent with the applicable provisions of the Bankruptcy Code and should be approved.

**C.    Payment of the Prepetition Employee Obligations is Permissible Under Sections 105(a), 363(b), and the Necessity of Payment Doctrine.**

30.    To the extent any of the Prepetition Employee Obligations are not entitled to priority under Section 507(a)(4) and (5), payment of those obligations should be authorized under Sections 105(a), 363(b), and the necessity of payment doctrine.  Courts have authorized payment of prepetition obligations under Sections 105(a) and 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so.  *See, e.g., In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (finding that a sound business justification existed to justify payment of prepetition wages); *c.f. In re Tusa-Expo Holdings, Inc.*, No. 08-45057-DML-11, 2008 WL 4857954, at *2 (Bankr. N.D. Tex. Nov. 7, 2008) (finding that "[e]ven if the claims of employees were not entitled to priority, the employees meet the *CoServ* test for payment of their prepetition claims").  For the reasons set forth above, the NRA has determined in its business judgment that payment of the Prepetition Employee Obligations is not only appropriate, but necessary, to maintain its current operations and maximize the value of its estate for the benefit of all parties in interest.

31.    The relief requested herein is also authorized under Section 105(a) of the Bankruptcy Code, which authorizes the Court "to issue any order . . . necessary or appropriate to carry out the provisions" of the Bankruptcy Code, and the "necessity of payment" rule, under which courts may authorize the payment of certain prepetition claims when such payment is essential to the debtor's continued operations.  *See, e.g., In re CoServ, LLC*, 273 B.R. 487, 494 (Bankr. N.D. Tex. 2002); *In re Gulf Air, Inc.*, 112 B.R. 152, 153-54 (Bankr. W.D. La. 1989); *Mich. Bureau of Workers' Disability Comp. v. Chateauguay Corp. (In re Chateauguay Corp.)*,

80 B.R. 279, 285-86 (S.D.N.Y. 1987).  In *CoServ*, the court observed that there are certain instances in which a debtor can fulfill its fiduciary duty to protect and preserve the value of the estate "only . . . by the preplan satisfaction of a pre-petition claim."  273 B.R. at 497.  The court articulated a three-pronged test for determining whether a preplan payment on account of a pre-petition claim is appropriate under the circumstances:

> First, it must be critical that the debtor deal with the claimant.  Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimants' prepetition claim.  Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id*. at 498.

32.     The payment of the Prepetition Employee Obligations here is necessary to prevent the risk of damage to the NRA's estate, which would adversely affect all parties in interest.  As explained above, the continued services and cooperation of the NRA's employees is integral and necessary to the NRA's continued operations and reorganization.  If the NRA is unable to assure its employees that they will be paid timely, or if employees are not immediately assured of uninterrupted, critical payments to which they are entitled, the NRA's post-petition operations would be seriously jeopardized.  In addition, many of the NRA's employees have years of experience and institutional knowledge, are highly valuable to the NRA, and would be difficult to replace, especially on short notice.  The disruption to the NRA's operations caused by the loss of experienced employees would be extremely and irreparably detrimental to the NRA's estate.

33.     The NRA has not identified a practical alternative to payment of the Prepetition Employee Obligations that would not result in a significant disruption of its business and harm to the estate.  Because the potential harm and economic disadvantage that would result from the NRA's failure to pay the Prepetition Employee Obligations is grossly disproportionate to the

amount of any pre-petition claim that may be paid, the Debtors therefore submit that each prong of the *Coserv* test is satisfied in this case.

34. Bankruptcy courts in this district have frequently authorized the payment of prepetition employee wage and benefit obligations in the ordinary course of business to avoid disruption to the debtors' operations during the transition into Chapter 11. *See, e.g., In re J. Hilburn, Inc.*, Case No. 20-31308 (HDH) (Bankr. N.D. Tex. May 22, 2020); *In re ADPT DFW Holdings LLL*, Case No. 17-31432 (SGJ) (Bankr. N.D. Tex. May 19, 2017); *In re Reddy Ice Holdings, Inc.*, Case No. 12-32349 (SGJ) (Bankr. N.D. Tex. Apr. 17, 2012); *In re Erickson Retirement Communities, LLC*, Case No 09-37030 (SGJ) (Bankr. N.D. Tex. Oct. 22, 2009); *In re Tusa-Expo Holdings, Inc., et al.*, Case No. 08-45057 (DML) (Bankr. N.D. Tex. Nov. 7, 2008). The Debtors submit that similar relief is appropriate in this case.

D. **Payment of Certain of the Prepetition Employee Obligations is Required by Law.**

35. The NRA also seeks authority to pay payroll taxes and other deductions included in the Prepetition Employee Obligations to the appropriate entities. These amounts principally represent employee earnings that state and local governments, employees, and/or judicial authorities have designated for deduction from employees' paychecks. Certain deductions, such as contributions to employee benefits programs (including the 401k Plan, for example) and child support and alimony payments, are not property of the NRA's estate because the NRA has withheld such amounts from employees' paychecks on behalf of other parties. 11 U.S.C. § 541(b).

36. Further, federal and state laws require the NRA to withhold certain tax payments from employees' paychecks and to pay such amounts to the appropriate taxing authorities. *See, e.g., Beiger v IRS*, 496 U.S. 53, 61 (1990) (finding that federal law requiring a debtor to withhold federal tax from employee wages created a trust relationship between the debtor and the United

States); *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95-97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes); *Matter of Al Copeland Enterprises, Inc.*, 991 F.2d 233, 235 (5th Cir. 1993) (sales-tax revenues are merely held in trust for the state by the estate). Because the payroll taxes and deductions are not property of the NRA's estate, the NRA requests that the Court authorize it to transmit the payroll taxes and deductions to the proper parties in the ordinary course of business.

E.  **Satisfaction of Bankruptcy Rule 6003(b) and Waiver of Notice and Stay Under Bankruptcy Rules 6004(a) and (h)**

37. Bankruptcy Rule 6003(b) empowers this Court to grant relief regarding a motion to pay all or part of a prepetition claim within 21 days after the Petition Date if the relief is necessary to avoid immediate and irreparable harm. Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten its future as a going concern. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001); *see also In re Dennis*, No. 10-33891-HDH-11, 2010 WL 5209258, at *3 (Bankr. N.D. Tex. Oct. 6, 2010) (holding that the relief sought by debtors was necessary for the debtors "to operate their business" and thus satisfied the "immediate and irreparable harm" standard).

38. Payment of the Prepetition Employee Obligations is necessary to maintain and ensure the NRA's ongoing operations. Specifically, failure to pay the NRA's employees in the ordinary course of business on January 21, 2021 could result in the loss of employees and dramatically impair the NRA's ability to continue operating its business. Accordingly, the NRA

submits that payment of the Prepetition Employee Obligations as requested in this Motion is necessary to avoid immediate and irreparable harm to the NRA and its estate. As noted earlier in this Motion, similar relief is typically granted on an expedited basis by courts in this district.

39. Because the relief requested herein is necessary to avoid immediate and irreparable harm, to the extent required for the immediate implementation of the relief requested herein, the Debtors seek a waiver of (i) the notice requirements under Bankruptcy Rule 6004(a) and (ii) the stay of the order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## V. NOTICE

40. The Debtors will provide notice of this Motion to: (i) the Office of the United States Trustee; (ii) the Debtors' secured creditors; (iii) each of the Debtors' 20 largest unsecured creditors; (iv) governmental agencies having a regulatory or statutory interest in the Debtors' cases; and (v) to the extent applicable, any party whose interests are directly affected by this specific pleading. The Debtors submit that, in light of the nature of the relief requested and the urgency of the circumstances surrounding this Motion, no other or further notice need be given.

## VI. CONCLUSION AND PRAYER

41. For the reasons set forth above, the Debtors request that the Court enter an order (i) authorizing the payment of the Prepetition Employee Obligations as requested herein; and (ii) granting any further relief the Court deems appropriate.

Dated: January 18, 2021 	Respectfully submitted,

*/s/ Patrick J. Neligan, Jr.*
Patrick J. Neligan, Jr.
State Bar. No. 14866000
Douglas J. Buncher
State Bar No. 03342700
John D. Gaither
State Bar No. 24055516
**NELIGAN, LLP**
325 North St. Paul, Suite 3600
Dallas, Texas 75201
Telephone: 214-840-5333
Facsimile: 214-840-5301
pneligan@neliganlaw.com
dbuncher@neliganlaw.com
jgaither@neliganlaw.com

**PROPOSED COUNSEL FOR DEBTORS**