Patrick J. Neligan, Jr.
State Bar. No. 14866000
Douglas J. Buncher
State Bar No. 03342700
John D. Gaither
State Bar No. 24055516
NELIGAN LLP
325 North St. Paul, Suite 3600
Dallas, Texas 75201
Telephone:  214-840-5333
Facsimile:  214-840-5301
pneligan@neliganlaw.com
dbuncher@neliganlaw.com
jgaither@neliganlaw.com

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: § | § | CHAPTER 11 |
| NATIONAL RIFLE ASSOCIATION OF AMERICA and SEA GIRT LLC § § § | § § § | CASE NO. 21-30085-____ |
| DEBTORS[1] | § | Joint Administration Requested |

### DEBTORS' INFORMATIONAL BRIEF IN CONNECTION WITH VOLUNTARY CHAPTER 11 PETITIONS

The National Rifle Association of America (the "NRA" or the "Association") and Sea Girt LLC ("Sea Girt") (collectively, the "Debtors") file the following informational brief for the Court's consideration in connection with the Debtors' voluntary chapter 11 petitions and first day pleadings to provide the Court background information regarding the Debtors, their organizational structure, financial overview and capital structure, the events leading to the filing of these cases, and the Debtors' general intention with respect to their chapter 11 cases.

---

[1] The last four digits of the Debtors' taxpayer identification numbers are:  6130 (NRA) and 5681 (Sea Girt). The Debtors' mailing address is 11250 Waples Mill Road, Fairfax, Virginia 22030.

1

I.

**PRELIMINARY STATEMENT**

1.      Even in a polarized America where political opponents too-often behave like existential enemies, the partisan attacks the NRA confronts in New York stand out as condemnable.  Efforts to weaponize state and local government power against the NRA, in order to suppress its speech and choke off its funding, have elicited alarm from constitutional scholars, the ACLU,[2] sixteen state attorneys general,[3] and press outlets across the political spectrum.[4] These attacks began in earnest in 2017, when New York Governor Andrew Cuomo and New York State's chief financial regulator, working hand-in-glove with an anti-NRA pressure group, began to publicly and privately exhort banks and insurance companies that they should blacklist the NRA—or else.  The same year, the NRA received a warning from a highly placed source that other, similar efforts were afoot in New York State, and were designed to weaken the NRA in advance of the 2020 elections.

2.      The NRA went all-out to fortify itself against escalating government hostilities, including by conducting an unsparing examination of its own governance, internal controls, and business practices.  The NRA addressed the potential infirmities it found, but its commitment to good governance came with costs.  The NRA now confronts considerable litigation—against hostile government actors, as well as former vendors and executives with whom the NRA determined had abused its trust.  And in late 2020, as the NRA fought for its future on multiple fronts, the New York State Office of the Attorney General delivered an attempted *coup de grace*:

---

[2] *See* discussion *infra* note 21.

[3] *See id.*

[4] *See, e.g.*, Matt Ford, Andrew Cuomo's Trumpian War on the NRA, *The New Republic*, Aug. 28, 2018, https://newrepublic.com/article/150933/andrew-cuomos-trumpian-war-nra.

a lawsuit that seeks to annul the NRA's corporate existence and redistribute its assets to politically favored charities. Ironically postured as a regulatory-supervisory effort to promote good governance by charities, the NYAG's litigation instead leverages the NRA's own transparency and reform efforts against it.

3. The NRA instituted this chapter 11 reorganization proceeding to establish a centralized, neutral forum in which it can streamline, resolve, and address all outstanding claims and preserve its ability to pursue its constitutionally protected mission as a going concern. The United States Constitution guarantees all citizens the right to speak freely, bear arms in defense of themselves and their families, and seek a fresh start in bankruptcy court where appropriate. The NRA's successful reorganization in Texas will affirm and advance all of these rights.

II.

**OVERVIEW OF THE DEBTORS' OPERATIONS AND CAPITAL STRUCTURE**

A. **General Background**

4. Chartered in 1871, the NRA is an educational, recreational, and public service organization dedicated to the right of the individual citizen to own and use firearms for recreation and defense. The NRA provides gun-safety and marksmanship training for both civilians and law enforcement and is the nation's foremost defender of the Second Amendment to the United States Constitution. The NRA cooperates with all branches of the United States Armed Forces, and federal agencies, state and local governments interested in teaching firearm safety to American citizens. For example, during World War II NRA members taught over 1.7 million Americans the correct use of small arms in pre-induction training courses.

5. The NRA is a not-for-profit corporation supported by membership dues and private contributions from members and other donors throughout the United States. Past presidents of the NRA include United States President Ulysses S. Grant and General Philip H.

Sheridan. Other notable members include eight past Presidents of the United States, two Vice Presidents of the United States, two Chief Justices of the Supreme Court of the United States, and numerous United States Senators and Representatives. The NRA currently has roughly 5 million members and its programs reach millions more.

**B.     Organizational Structure**

6.      The NRA is a not-for-profit corporation organized under the New York Not-For-Profit Corporation Law, and is a tax-exempt entity under Section 501(c)(4) of the Internal Revenue Code (the "IRC"). Sea Girt is a single-member limited liability company organized under Texas law, and is wholly owned by the NRA. The NRA and Sea Girt currently maintain their headquarters and principal place of business in Fairfax, Virginia. As discussed more fully below, the NRA intends to restructure through a plan of reorganization that provides for the reorganized NRA to emerge from these chapter 11 cases as a Texas nonprofit entity.

7.      The NRA is governed by a 76-member board of directors elected by its members. The NRA Board is led by President Carolyn D. Meadows, First Vice President Charles L. Cotton, and Second Vice President Willes K. Lee, and the NRA's affairs are directed by Executive Vice President Wayne LaPierre. The NRA employs approximately 490 people, primarily at its corporate headquarters in Virginia. Sea Girt's operations are directed by the NRA as its sole managing member.

8.      Although the NRA is a section 501(c)(4) membership association under the IRC, as noted above, it has set up four section 501(c)(3) public charities and a section 527 political action committee, which holds separate segregated funds for its use. Neither the NRA's charitable subsidiaries nor its political action committee are debtors in this proceeding. The NRA's 501(c)(3) charities consist of the following entities, which are affiliated with the NRA by virtue of control vested with the NRA Board of Directors to appoint trustees of each charity:

- The NRA Foundation, a 501(c)(3) corporation that raises tax-deductible contributions in support of firearm-related public interest activities, including firearms and hunting safety education;

- The NRA Special Contribution Fund, a 501(c)(3) corporation that provides education and training in firearms safety, marksmanship, and wildlife conservation and operates an educational and recreational shooting facility known as the Whittington Center;

- The NRA Civil Rights Defense Fund, a 501(c)(3) corporation that sponsors legal research, education, and litigation concerning firearms-related legal issues; and

- The NRA Freedom Action Foundation, a 501(c)(3) corporation that educates Americans with respect to their individual rights as citizens with particular emphasis on the Second Amendment of the United States Constitution.

9.    The NRA Institute for Legislative Action ("NRA-ILA") is an internal division of the NRA which engages in legislative advocacy on behalf of gun owners. Since its creation in 1975, NRA-ILA has operated with a financial infrastructure distinct from that of the rest of the NRA—including its own bank accounts, Fiscal Officer, accounting staff, budget, and books.

C.    **Financial Overview and Capital Structure**

10.    As of the Petition Date, the NRA had total assets of approximately $203 million and aggregate liabilities of approximately $153 million.  The NRA's assets consist primarily of cash, investments, accounts receivable and its headquarters in Fairfax, Virginia (the "Headquarters"). Its liabilities generally consist of accounts payable, obligations related to a defined benefit plan, and secured debt.  The NRA's total net assets are approximately $50 million.

11.    As of the Petition Date, the NRA has total outstanding secured debt of approximately $31 million, which consists of three separately secured loans from Atlantic Union Bank ("AUB").  Under the terms of a Loan and Security Agreement dated September 27, 2018 (and as subsequently amended in June and August 2020), AUB provides the NRA with a revolving credit facility with total borrowing availability of $28 million, secured by a lien on

certain NRA investment accounts at Morgan Stanley (the "Marketable Securities Line of Credit").[5] Proceeds of the Marketable Securities Line of Credit are used for general business purposes and to fund the NRA's working capital needs. As of the Petition Date, the NRA has drawn approximately $14 million under the Marketable Securities Line of Credit.

12. Under the terms of two separate Loan and Security Agreements, each dated March 13, 2019 (and amended in June 2020), AUB also provides the NRA with a real estate-backed revolving credit facility (the "Real Estate Line of Credit") in the amount of $10 million (including an expansion to $20 million from June 2020 to June 2021; $10 million thereafter) and a building loan in the amount of $18 million (the "Building Loan"). The Real Estate Line of Credit and Building Loan are each secured by a lien on the NRA Headquarters, which had an appraised market value of $61 million as of January 7, 2019. The Real Estate Line of Credit is used to fund the NRA's general working capital needs, and the Building Loan was used to refinance existing indebtedness. As of the Petition Date, there were no outstanding amounts owed under the Real Estate Line of Credit; the balance of the Building Loan was approximately $17 million.

13. The NRA is current on all obligations to AUB, and there has been no event of default. AUB's cash and real estate collateral significantly exceed the NRA's debt obligations of approximately $31 million, and the Debtors do not presently anticipate needing to draw down on the AUB lines of credit during the pendency of these chapter 11 proceedings. If circumstances

---

[5] Under the applicable Loan and Security Agreement, the NRA is required to maintain at least $60 million on consolidated basis in total cash and investment securities in AUB deposit accounts and its pledged Morgan Stanley investment accounts, respectively, measured as of the last day of each fiscal year and tested no later than the date that is one hundred twenty (120) days after the end of such fiscal year. As of the Petition Date, the combined balance in the NRA's AUB and in the Morgan Stanley investment accounts exceeded this threshold.

change and a need arises for either use of cash collateral or debtor-in-possession financing, the Debtors will file the appropriate motion and provide the requisite notice to parties-in-interest.

14. As has become self-evident, the adverse impact of the Coronavirus (and the accompanying global pandemic) on businesses throughout the United States in 2020 was significant. Numerous businesses throughout this country filed chapter 11 bankruptcies, and many shut down or liquidated without seeking bankruptcy. Tax exempt non-profits and charities faced even greater challenges during 2020. However, a loyal and active base of members and donors benefited the NRA as its revenues in 2020 were only down by approximately seven percent (7%) as compared to the preceding year. In addition, the NRA permanently reduced expenses by twenty-three percent (23%) in the last fiscal year and asked employees who remained on the job to take reduced salaries. To a person, each employee willingly took a salary/wage reduction during 2020 to ensure the viability of the NRA and its affiliated entities.

15. As of the Petition Date, the NRA's books and records reflect that undisputed general unsecured claims are approximately $25 million.

### III.

### EVENTS LEADING TO CHAPTER 11 FILINGS

A. **The NRA Contends with Voluminous, Overlapping Litigation and Politicized Attacks In Its Domicile State.**

16. In mid-2017 the NRA learned that high-ranking New York State Democratic officials intended to weaponize the state government's regulatory powers against it in order to weaken it as a political force before the 2020 election. One intended cudgel was the New York State Office of the Attorney General (the "NYAG"), which had broad supervisory authority over not-for-profits that are domiciled in New York, like the NRA. New York's former Attorney General, Eric Schneiderman, was apparently so troubled by this campaign that he warned the

NRA about it. Despite believing it was operating in compliance with New York law, the NRA undertook an internal review of its controls, compliance and governance—to inform and prepare its strategy in the anticipated litigation. .

17. Simultaneously, another arm of the New York State government attacked. Beginning in late 2017, New York's financial regulator, the New York Department of Financial Services ("DFS"), began to publicly and privately exhort banks and insurers to withdraw services from the NRA—lest they incur the regulator's displeasure.[6] DFS punctuated its threats with retaliatory, multi-million dollar penalties levied against several firms that did business with the NRA. On May 11, 2018, the NRA filed suit against DFS, New York Governor Andrew Cuomo and DFS's former superintendent, alleging violations of the First Amendment of the United States Constitution.[7] DFS's efforts disrupted several key business relationships; among other things, more than a dozen lawful NRA-related insurance programs were stripped of underwriting. Moreover, as the NRA fended off DFS, and prepared for possible litigation by the NYAG, the NRA uncovered certain executive and vendor misconduct that it moved swiftly to excise.

18. For example, the NRA determined that its largest vendor, advertising agency Ackerman McQueen ("Ackerman"), was systematically overcharging the NRA and falsifying invoices, as well as misrepresenting the benefits of a significant amount of the services it provided. The NRA filed suit against Ackerman in April 2019 (such litigation, the "Ackerman

---

[6] *See, e.g.*, Alison Frankel, In NRA v. N.Y., *a timely reminder that officials can't use their power to squelch speech*, REUTERS (Nov. 7, 2018), https://www.reuters.com/article/us-otc-nra/in-nra-v-n-y-a-timely-reminder-that-officials-cant-use-their-power-to-squelch-speech-idUSKCN1NC2TI.

[7] *See The Nat'l Rifle Ass'n v. Cuomo*, Case No. 1:18-cv-566 (N.D.N.Y. 2018).

Litigation").[8] In the Ackerman Litigation, the NRA contends that Ackerman provided misleading, inflated viewership metrics for NRATV, the digital video streaming channel it pitched, produced and scripted, where costs were skyrocketing and programming wandered far afield from the Second Amendment. Ackerman is also alleged to have engaged in a practice of pass-through block billing that obscured the purpose and amount of certain expenditures, including payments to the NRA's new president, Oliver North, purportedly in connection with his role in an NRA-TV series. When the NRA sought additional documentation from Ackerman, Ackerman refused to provide it, leading to the litigation between the NRA and Ackerman. The NRA's resulting claims against Ackerman for fraud and breach of fiduciary duty remain pending.[9]

19. The fallout from the Ackerman Litigation has included retaliatory, and false, public accusations by Ackerman of financial and governance improprieties at the NRA. In August 2019, upon learning of these allegations against the NRA, an NRA donor commenced a putative class action on behalf of all NRA donors in the Middle District of Tennessee that mirrored Ackerman's assertions (the "Dell'Aquila Litigation").[10] The Dell'Aquila Litigation overlaps substantively with the Ackerman Litigation: both the Ackerman counterclaims, and the

---

[8] Although the NRA first filed suit against Ackerman in Virginia state court, the consolidated lawsuits commenced in Virginia are currently stayed. *See The National Rifle Association v. Ackerman McQueen, Inc. et al.*, Case No. CL19001757 (Va. Cir. Ct. 2019); *The National Rifle Association v. Ackerman McQueen, Inc. et al.*, Case No. CL19002067 (Va. Cir. Ct. 2019). However, there is a third, active lawsuit comprising the Ackerman Litigation which is pending in the United States District Court for the Northern District of Texas: *The National Rifle Association v. Ackerman McQueen, Inc. et al.*, Case. No. 3:19-cv-2074 (N.D. Tex. 2019).

[9] Preliminary document discovery has occurred. A Scheduling Order was entered on October 14, 2020, and depositions began in November 2020.

[10] *See Dell'Aquila v. Nat'l Rifle Ass'n*, *et al.*, Civ. Case No. 3:19-cv-00679 (M.D. Tn. 2019), Dkt. 1 ¶ 14 ("Plaintiff . . . has learned this information from an investigation conducted by the NRA's former President, Lt. Col. Oliver North."); *id.* ¶¶ 27-28 ("LaPierre terminated the NRA's agreement with . . . Ackerman McQueen . . . . Ackerman . . . responded to the breach by disclosing information concerning certain financial improprieties raised in this lawsuit.").

Dell'Aquila class action claims, center on allegations regarding purported NRA executive spending,[11] legal fees,[12] and payments to Ackerman.[13]  The Dell'Aquila Litigation seeks refunds of contributions on the basis of alleged fraud and RICO violations.  No class has been certified and the Dell'Aquila case remains pending.

20. In addition, a former Ackerman employee, Grant Stinchfield, filed an affidavit in the Ackerman Litigation attesting to corrupt practices he witnessed during his employment.  As a result, on December 20, 2019, Ackerman sued Stinchfield in the United States District Court for the Northern District of Texas in retaliation for his testimony—ostensibly challenging its veracity (such lawsuit, the "Stinchfield Litigation").  The truthfulness of Stinchfield's statements about Ackerman's dealings with the NRA is centrally at issue in the Stinchfield Litigation; thus, discovery is expected to overlap extensively with the discovery in the other lawsuits.

21. In the meantime, Schneiderman resigned from the office of the NYAG.  His successor, Letitia James, made the destruction of the NRA a central theme of her campaign for office.  James was explicit about her motivation: she saw "no distinction"[14] between the NRA's charitable existence and its ability to engage in pro-gun political speech (characterized by James as "deadly propaganda").[15]  James promised voters she would leverage her constitutional powers as New York's attorney general to pursue the NRA (footnote 17) which she characterized as a

---

[11] *Id.* ¶ 45c, d, and h.

[12] *Id.* ¶ 45a and b.

[13] *Id.* ¶ 45e.

[14] *See* Jordan Laird, *Annual NRA Fundraiser Sparks Protests*, LI HERALD (Oct. 25, 2018), http://liherald.com/ stories/nassau-protests-nra-fundraiser,107617.

[15] *See* Tish James Announces Attorney General Platform to Protect New Yorkers from Gun Violence (July 12, 2018), https://www.tishjames2018.com/press-releases/2018/7/12/taking-on-the-scourge-of-gun-violence-and-keeping-new-yorkers-safe/ (last visited June 11, 2020).

"terrorist organization" and a "criminal enterprise," and vowed that its supporters would be pursued by law enforcement.[16,17]

22. James took office in January 2019, and as promised, launched a sweeping investigation of the NRA. The investigation included taking testimony and obtaining evidence from nearly 90 witnesses located in 27 states. It focused frequently on ***the exact same transactions and issues*** that the NRA targeted in its own compliance review, many of which were ***already the subject of litigation*** commenced by the NRA to recover funds from faithless former agents like Ackerman. Inevitably, that investigation culminated in a dissolution lawsuit that seeks to terminate the NRA's corporate existence and redistribute its donors' funds to charities preferred by New York State Democrats. James's dissolution lawsuit (the "NYAG State Action")[18] was filed August 10, 2020,[19] in New York state court. The NYAG State Action has been roundly criticized by legal scholars, the ACLU, and sixteen *amici* state attorneys general as an extraordinary, unconstitutional abuse of power.[20]

---

[16] *See Attorney General Candidate, Public Advocate Letitia James*, OUR TIME PRESS (Sept. 6, 2018), http://www.ourtimepress.com/attorney-general-candidate-public-advocate-letitia-james/ (emphasis added).

[17] *See* Teddy Grant, *Letitia 'Tish' James on Becoming New York's Next Attorney General*, EBONY (Oct. 31, 2018), https://www.ebony.com/news/letitia-tish-james-on-becoming-new-yorks-next-attorney-general/.

[18] See People of the State of New York v. The National Rifle Association et al., Index. No. 451625/2020 (Sup. Ct. N.Y.).

[19] James purported to commence the NYAG State Action on August 6, 2020, but the verification that accompanied that filing was defective. *See People v. Nat'l Rifle Ass'n of Am.*, *et al.*, Index No. 451625/2020 (Sup. Ct. N.Y. Cnty. 2020), Dkt. Nos 10-11.

[20] *See, e.g.*, Editorial, *How Did Caribbean Yacht Vacations Promote the Second Amendment? We May Find Out in Court*, WASH. POST. (Aug. 8, 2020), https://www.washingtonpost.com/opinions/is-this-really-the-right-penalty-for-the-nra/2020/08/07/f81778fc-d8e2-11ea-930e-d88518c57dcc_story.html ("We question whether dissolution is the right penalty, even if the charges are proved in court."); Henry Olsen, *New York's Lawsuit to Dissolve the NRA is Outrageous*, WASH. POST. (Opinion, Aug. 7, 2020), https://www.washingtonpost.com/opinions/2020/08/07/new-yorks-lawsuit-dissolve-nra-is-outrageous/ ("James's allegations . . . would certainly be damning if true. . . . None of this, however, justifies destroying the organization itself. The NRA is still supported by millions of people and has substantial assets. It is neither broke nor derelict."); Ruth Marcus, *The NRA is a Cesspool. That Doesn't Mean It Should Be Dissolved*, WASH. POST. (Opinion, Aug. 9, 2020), https://www.washingtonpost.com/opinions/2020/08/09/nra-is-cesspool-that-doesnt-mean-it-should-be-dissolved/; Noah Feldman, *New York's Attorney General Shouldn't Dismantle the NRA*, BLOOMBERG (Opinion,

23. On the same day that the NYAG commenced the NYAG State Action, the Washington, D.C. Office of the Attorney General (the "DCAG") commenced a parallel proceeding against the NRA Foundation (the "NRAF"), a non-debtor 501(c)(3) charitable subsidiary of the NRA that is domiciled in the District of Columbia (such litigation, the "DCAG Action").[21] Like the NYAG State Action, the DCAG Action is politically motivated, and seeks to interfere with the operations and commandeer assets of the NRAF. The NRA was originally named as a co-defendant in the DCAG Action, but all counts pleaded against the NRA were dismissed by the District of Columbia Superior Court on December 21, 2020.[22] The DCAG has moved to amend its complaint to assert fresh claims against the NRA.[23]

24. On August 6, 2020, the NRA filed a Section 1983 suit against James in the Northern District of New York alleging infringement of the NRA's First and Fourteenth Amendment rights on the ground that James' hostilities represented retaliation for the NRA's protected political advocacy and constituted selective enforcement of New York's not-for-profit

---

Aug. 6, 2020), https://www.bloomberg.com/opinion/articles/2020-08-06/new-york-s-attorney-general-shouldn-t-dismantle-nra-in-lawsuit; David Cole, *The NRA Has a Right to Exist*, WALL ST. J. (Opinion, Aug. 26, 2020), https://www.wsj.com/articles/the-nra-has-a-right-to-exist-11598457143?mod=opinion_lead_pos7 ("The American Civil Liberties Union rarely finds itself on the same side as the National Rifle Association in policy debates or political disputes. Still, we are disturbed by New York Attorney General Letitia James's recent effort to dissolve the NRA."); Jonathan Turley, *The Tragic Irony of the New York State Lawsuit Against the NRA*, THE HILL (Opinion, Aug. 8, 2020), https://thehill.com/opinion/judiciary/511155-the-tragic-irony-of-the-new-york-state-lawsuit-against-the-national-rifle-association ("Trying to dissolve an organization engaged in political speech should not occur absent overwhelming proof that it is a criminal enterprise, which is why this has never happened with a group like the NRA."); Alan Z. Rozenshtein, *The Attempt to Dissolve the NRA Threatens Democratic Norms*, LAWFARE (Opinion, Aug. 11, 2020), https://www.lawfareblog.com/attempt-dissolve-nra-threatens-democratic-norms ("I personally can't stand [the NRA] . . . . [b]ut that said . . . . James's attempt to dissolve the NRA in its entirety is a violation of key democratic and rule-of-law norms."); Jordan Williams, *Republican AGs back NRA in legal battle against New York*, THE HILL, Dec. 22, 2020, https://thehill.com/regulation/court-battles/531380-republican-ags-back-nra-in-legal-battle-against-new-york.

[21] *See District of Columbia v. NRA Foundation, Inc.* et al, Case No. 2020 CA 003454 B (D.C. Sup. 2020).

[22] *See id.*, Dkt. no. 34.

[23] *See id.*, Dkt. no. 41.

law (such litigation, the "NYAG Federal Action" and collectively with the NYAG State Action, the "NYAG Litigation").[24]

25. The NRA is litigating similar issues on other fronts. Contrary to the NYAG's allegation that the NRA is unable or unwilling to govern itself, the NRA has pursued the same executive and vendor misconduct alleged by the NYAG in multiple proceedings that predate the NYAG Litigation. These include: a confidential arbitration against a former executive who extracted unauthorized excess benefits from the NRA;[25] a state-court lawsuit against an Ackerman-related vendor, Under Wild Skies, Inc., which issued misleading invoices to the NRA;[26] and, a state-court action for fraud and breach of fiduciary duty against the NRA's former counsel, Mark Dycio, and his law firm, which issued misleading invoices to the NRA.[27] Moreover, additional legal proceedings may be filed in the near future  The overlapping and duplicative litigation the NRA confronts has, understandably, proved costly and disruptive.

**B.    The NRA Will Utilize Chapter 11 To Resolve Pending Claims, Rationalize Contractual Relationships, And Relocate To Texas**

26. Despite the devastating impact of the COVID-19 pandemic on charities, the NRA over this last year has attracted hundreds of thousands of new members and remains committed to pursuing its missions of providing gun safety education, protecting the rights of gun owners, and working with other groups throughout this country to protect all citizens' Second Amendment rights. Despite the efforts of politicians in New York and elsewhere to styfle the NRA's efforts, multiple states, including Texas, have beckoned the NRA to leave New York and the toxic political environment which has increasingly infringed on the NRA's ability to fulfil its

---

[24] *Nat'l Rifle Ass'n of Am. v. James*, Civ. Case No. 1:20-cv-00889 (N.D.N.Y. 2020).

[25] Confidential Arbitration, CPLR Case No. 1340018083 (2019).

[26] Under Wild Skies, Inc. v. National Rifle Association, Case No. 19-12530 (Va. Cir. Ct. 2019)

[27] The National Rifle Association et al. v. Mark R. Dycio et al., Case No. 2019-17571 (Va. Cir. Ct. 2019).

mission to its members. To be clear: the NRA is not seeking to escape regulatory oversight. However, it cannot allow its constitutional rights to be trampled or its existence destroyed by a political vendetta. The NYAG has consistently stated her office will take any and all steps necessary to prevent the NRA from moving its domicile while simultaneously seeking to disenfranchise NRA members by dissolving a 150 year American institution and taking the NRA's assets, including membership dues and donor contributions, for redistribution. The on-going attack by New York state politicians goes far beyond ensuring compliance with New York law by a non-profit entity. In addition, separate and apart from the on-going disputes with the NYAG, the NRA seeks to avail itself of the protections of the Bankruptcy Code in order to continue its efforts to reduce operating costs and to address the ever-increasing litigation being filed against the NRA. Contrary to the NYAG's press releases, the NRA is not seeking to evade regulatory oversight; rather it seeks, and is entitled, to being treated fairly by regulators providing that oversight. The NRA does not only aim to move its corporate domicile—it is also in the process of relocating its principal place of business to Texas. As has been widely reported, Texas welcomes the NRA with open arms.[28]

## IV.

## THE PLAN OF REORGANIZATION

27.    The NRA and Sea Girt intend to propose a plan of reorganization that pays all of the allowed claims of the NRA's creditors in full and provides a mechanism for adjudicating and/or resolving the claims of the NYAG and any other creditor with contingent, unliquidated

---

[28] *See, e.g.*, *NRA Announces Move to Texas*, Dallas Morning News (Jan. 16, 2021) (reporting remarks by Gov. Greg Abbott and Attorney General Ken Paxton).

and disputed claims. Pursuant to the plan, the NRA will exit chapter 11 as a Texas nonprofit organization.

Dated: January 19, 2021

Respectfully submitted,

*/s/ Patrick J. Neligan, Jr.*
Patrick J. Neligan, Jr.
State Bar. No. 14866000
Douglas J. Buncher
State Bar No. 03342700
John D. Gaither
State Bar No. 24055516
**NELIGAN, LLP**
325 North St. Paul, Suite 3600
Dallas, Texas 75201
Telephone: 214-840-5333
Facsimile: 214-840-5301
pneligan@neliganlaw.com
dbuncher@neliganlaw.com
jgaither@neliganlaw.com

**PROPOSED COUNSEL FOR DEBTORS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 19th day of January 2021 a true and correct copy of the foregoing was served via this Court's CM/ECF notification system.

*/s/ Douglas J. Buncher*
Douglas J. Buncher

90317v.2