M. Jermaine Watson
Texas Bar I.D. No. 24063055
Joshua N. Eppich
Texas Bar I.D. No. 24050567
H. Brandon Jones
Texas State Bar No. 24060043
Clay M. Taylor
Texas Bar I.D. No. 24033261
J. Robertson Clarke
Texas Bar I.D. No. 24108098
**BONDS ELLIS EPPICH SCHAFER JONES LLP**
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: jermaine.watson@bondsellis.com
Email: joshua@bondsellis.com
Email: brandon@bondsellis.com
Email: clay.taylor@bondsellis.com
Email: robbie.clarke@bondsellis.com

**ATTORNEYS FOR THE HONORABLE PHILLIP JOURNEY**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| NATIONAL RIFLE ASSOCIATION | § | Case No. 21-30085-hdh11 |
| OF AMERICA and SEA GIRT LLC | § | |
| | § | |
| Debtors[1] | § | Jointly Administered |

**NO HEARING WILL BE CONDUCTED HEREON UNLESS A WRITTEN RESPONSE IS FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AT THE EARLE CABELL FEDERAL BUILDING, 1100 COMMERCE ST., RM. 1254, DALLAS, TX 75242-1496 BEFORE CLOSE OF BUSINESS ON MARCH 1, 2021, WHICH IS AT LEAST 21 DAYS FROM THE DATE OF SERVICE HEREOF.**

**ANY RESPONSE SHALL BE IN WRITING AND FILED WITH THE CLERK, AND A COPY SHALL BE SERVED UPON COUNSEL FOR THE MOVING PARTY PRIOR TO THE DATE AND TIME SET FORTH HEREIN. IF A RESPONSE IS FILED A HEARING MAY BE HELD WITH NOTICE ONLY TO THE OBJECTING PARTY.**

---

[1] The last four digits of the Debtors' taxpayer identification numbers are: 6130 (NRA) and 5681 (Sea Girt). The Debtors' mailing address is 11250 Waples Mill Road, Fairfax, Virginia 22030.

**IF NO HEARING ON SUCH NOTICE OR MOTION IS TIMELY REQUESTED, THE RELIEF REQUESTED SHALL BE DEEMED TO BE UNOPPOSED, AND THE COURT MAY ENTER AN ORDER GRANTING THE RELIEF SOUGHT OR THE NOTICED ACTION MAY BE TAKEN.**

## MOTION FOR APPOINTMENT OF EXAMINER

Phillip Journey ("Movant"), pursuant to §§ 105(a), 1104(c), and 1106(b) of title 11 of the United States Code (as amended, the "Bankruptcy Code") and Federal Rule of Bankruptcy Procedure 2007.1, hereby files this motion (the "Motion") for the entry of an order appointing an independent examiner with special duties and powers to investigate the governance of the Debtors and the actions of its management. In support of the Motion, Movant respectfully states as follows:

## PRELIMINARY STATEMENT

The Debtors have plainly announced that the goal of these bankruptcy cases is to terminate the National Rifle Association of America's (the "NRA") corporate existence in New York and reconstitute the organization under Texas law.[2] If successful, the Debtors wish to avoid the ongoing challenges to its corporate charter brought by the State of New York and other ongoing litigation. Movant is not necessarily opposed to the NRA being organized as a Texas entity. Movant is, however, highly concerned that the underlying managerial and operational problems of the NRA as alleged by member(s) of the Creditor's Committee and the Attorneys General of the District of Columbia and the State of New York will continue to hinder the NRA's mission of defending and celebrating the Second Amendment of the United States Constitution through education, training and sport if reorganization of the NRA as a Texas entity is the sole focus of this bankruptcy proceeding. To be clear, as a longstanding member, donor, director, and volunteer,

---

[2] *See, e.g.*, Debtors' Informational Brief in Connection with Voluntary Chapter 11 Petitions at 4 ("[T]he NRA intends to restructure through a plan of reorganization that provides for the reorganized NRA to emerge from these chapter 11 cases as a Texas nonprofit entity.").

the Movant wholeheartedly supports the NRA's originalist principles and philosophies. It is his dedication to the NRA and its basic ideals that inspires this Motion. Accordingly, Movant seeks the appointment of an examiner to bring to light the veracity of the alleged fraud, dishonesty, incompetence, and gross mismanagement that has plagued the NRA's reputation, caused significant alienation of the Association's members and supporters, and hampered its ability to fulfill its core organizational purpose.

The best path to ensure that the NRA seizes upon the opportunity before it to recommit to its most historical ideals is to appoint an independent examiner to add transparency and confidence to the bankruptcy process. To that end, Movant requests the appointment of an examiner to examine and investigate: (i) the actions of Debtors' pre- and post-petition management; (ii) the management practices being employed in the operation of the non-profit organization; (iii) the compensation of management; (iv) the benefits and perks being provided to the Debtors' management team; and (v) the propriety of arrangements with certain vendors.

## I.
## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are Bankruptcy Code §§ 105(a), 1104(c), and 1106(b).

## II.
## RELIEF REQUESTED

2.     Movant requests that the Court enter an order appointing an examiner in these chapter 11 cases and establishing the proper and sufficient scope and timing of the examiner's responsibilities and investigation.

## III.
## BACKGROUND

3.      Movant is a longstanding member, donor, director, and volunteer of the NRA. Professionally, he currently serves as the Division 1 Judge of the 18th Judicial District Court of Kansas. Prior to this, he served in the Kansas Senate, having been appointed in 2003 and elected in 2004. With respect to the NRA, Movant served on the NRA Board of Directors from 1995 to 1998, and also served on the Kansas State Rifle Association Board for over 20 years, including as President in 2003. Movant is also an author and commentator on guns rights and governmental issues. Finally, Movant is an active 4-H rifle and pistol instructor and a CMP Master High Power Rifle Instructor in Sedgwick County, Kansas. Movant is a creditor of the Debtors holding both a liquidated claim and a contingent unliquidated claim.

4.      The Debtors filed their petitions for relief under the Bankruptcy Code on January 15, 2021.

5.      Upon information and belief, the Debtors have been engaged in placing the interests of their existing management over the interests of the Debtors.

6.      Upon information and belief, the NRA has engaged in actions that violate its fiduciary duties under the laws of New York and upon reason and belief many of such violations would also be violative of Texas law.

7.      There have been separate lawsuits filed by the Attorneys General of both the District of Columbia, and most notably, the State of New York for, inter alia, misappropriation of funds, failure to provide oversight, and breach of fiduciary duty.[3]  These lawsuits set forth numerous of the allegations against the Debtors and their management cited in this Motion. Movant agrees that proper and full investigation and potential prosecution of these allegations rests

---

[3] Copies of the referenced complaints are attached hereto as **Exhibits A and B**.

with the District of Columbia and the State of New York or by a party with authority appointed or directed by this Court. However, the highlighting of these allegations and their seriousness directly support the immediate need for the appointment of the Examiner if for nothing more than to further support the restructuring process.

8. The Debtors have improperly paid excessive compensation to current management in base salaries, and, perhaps more troubling, via a series of excessive perks that were wholly for the Debtors' insiders' personal benefit. The Debtors' insiders received this hidden compensation for items via direct payment of purely personal costs. This includes the Debtors paying for purely personal travel costs for private chartered airplane trips for the Debtors' insiders and extended family members and friends. *See New York Complaint* at p. 35–45. It also includes the use of luxury high end yachts sometimes paid for by the Debtors (via a donation made by the Debtors to the yacht owners' designated charity) or other luxury items and services "gratuitously" offered to the insiders by the Debtors' vendors, who in turn would receive above-market contracts from the Debtors. *See id*. at 55.

9. The Debtors used vendors to hide improper expenses, self-dealing, and related party transactions. As an example, the Debtors worked with Ackerman McQueen ("Ackerman") and its wholly owned subsidiary, the Mercury Group. *See id*. at 60–72. Upon information and belief, the Debtors paid Ackerman $11,739,688 in 2017 and $6,337,508 in 2018 for out-of-pocket expenditures for media, outside vendor costs, and reimbursement of travel and business expenses. *See id*. at 71. Upon information and belief, these expenditures were incurred in violation of the Debtors' policies, without proper oversight, and in many instances for the personal benefit of insiders.

10. Upon information and belief, the Debtors failed to conduct adequate oversight of Ackerman's activities and billings. The Debtors pleaded in a complaint against Ackerman that:

"[o]ver the parties' decades-long course of dealing, underlying receipts and other support for [Ackerman's] expenses were not transmitted to the NRA alongside [Ackerman's] invoices, but rather, were supposedly maintained at [Ackerman's] offices." *See id.* at 73. Upon information and belief, the Debtors agreed to the arrangement, abrogating its oversight responsibility over its primary vendor and facilitating a process whereby it paid invoices with minimal detail and little supporting documentation.

11. Upon information and belief, the Debtors engaged in the practice of passing expenses through Akerman to conceal personal expenses by the Debtors' insiders. *See id*. at 60–72. Upon information and belief, the scheme operated by Ackerman included the submission of non-itemized invoices to the Debtors for out-of-pocket expenses, which aggregated expenses into a lump sum amount with no details on the nature or purpose of the expense in order to hide the improper expenses of insiders. Upon information and belief, the Ackerman invoices included a one-line description that read "Out of Pocket Expenses" and a total amount. Upon information and belief, Akerman took no steps to verify whether the out-of-pocket expenses were compliant with the Debtors' policies or applicable law.

12. Further along these lines, the Debtors and Ackerman engaged in a pass-through expense arrangement whereby expenses would be paid by the Debtor without written approvals, receipts, or supporting business purpose documentation under the Debtors' policies and not disclosed to internal review by the Debtors' internal audit committee. Upon information and belief, the Debtors' payment of these invoices violated applicable law.

13. Upon information and belief, this scheme further paid for expensive meals at restaurants, tips, travel, private club memberships, and services for the Debtors' insiders which were passed on to the Debtors by their vendors.

14. Upon information and belief, the scheme was used to directly benefit an insider of the Debtors. Upon information and belief, the insiders incurred personal expenses related to NASCAR events, country music events, and even medical visits, all of which were eventually billed to and paid for by the Debtors. *See New York Complaint* at 76.

15. At least one former board member has knowledge that the NRA routinely failed to follow its own bylaws by employing an internal auditor to monitor the expenditures of the organization. Other former and current board members have grave concerns about the overall propriety and oversight that the NRA's board used to exercise over the Debtor gradually shrinking over the recent past few years to the point that prior to filing and continuing to this day, has reduced its role to merely that as a "figure head" while management steered the Debtors' overall direction.

16. In direct violation of its own bylaws, the NRA did not disclose to the board of directors its intent to seek Chapter 11 relief. In further violation of the bylaws, no solicitation to the board for votes of approval of the filing was conducted.[4] In fact, one or more board members only became aware of this case through media outlets.

17. New York law, the NRA bylaws, and Robert's Rules of Order were routinely violated by the NRA's management. These egregious violations have led to the resignation of one or more board members. They may also be related the recent resignation of the NRA's chief

---

[4] "At least annually, the Executive Director shall prepare and submit to the Board of Directors for approval a detailed plan of action in the following areas:

…

(c) Legal action.

…." The National Rifle Association of America Bylaws, Section X, Section 3(c).

"The Board of Directors by resolution from time to time set the . . . legal action . . . of the Association relating to the defense or furtherance of the right to keep and bear arms, and shall give specific directions to the Institute in these and such other matter as the Board shall deem advisable." The National Rifle Association of America Bylaws, Section X, Section 5.

financial officer and the failure of the Reorganization Manager requested by the Debtor to assume his appointment.

18. Also, in direct violation of the NRA's own bylaws, the board of directors did not approve the formation of Sea Girt, LLC, the new corporation created by the NRA to bootstrap this filing into this district and venue.[5]

19. NRA management failed to answer routine questions raised by board members in the wake of the allegations of the New York Attorney General. In fact, the attorney hired by NRA management to represent the board of directors on at least one occasion reprimanded, admonished, and dismissed board members who raised questions with respect to the NRA's governance. On one occasion, the board's attorney ostensibly told a board member to sit back, shut her mouth, stop asking questions, and trust that NRA management had everything under control. Other board members who had grave concerns about management were informed by the board's lawyer, that he specifically, was privy to information that would clear up everything. But any such "clarifying information" was never provided to the board members expressing their concerns.

20. NRA's management, and the board's own lawyer, withheld information from board members, which prevented them from fulfilling their fiduciary duties.

---

[5] "The Executive Committee shall exercise all of the powers of the Board of Directors when said Board is not in session, other than the power to:

…

(i) Present a petition for judicial dissolution, or to adopt plans of merger, consolidation, or nonjudicial dissolution;

…

(k) Formulate such other corporate policy decisions or perform corporate activities of the Association of such major significance as to warrant action by the full Board of Directors." National Rifle Association of America Bylaws, Section VI, Sections 2(i) and 2(k).

21.   NRA management's routine violation of its own bylaws caused it to fail to maintain proper corporate governance. Existing management remains in control of the debtor in possession, to the detriment of the estate, its creditors, and parties in interest in this case.

## IV.
## ARGUMENT

22.   Section 1104(c) of the Bankruptcy Code mandates the appointment of an examiner under circumstances such as those present here:

> (c) If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States Trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, **including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor**, if
>
> (1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or
>
> (2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. § 1104(c) (emphasis added). Here, the appointment of an Examiner is mandatory upon a proper request being filed. This District has previously observed that "[m]any courts have been confronted with this issue and have held yes—an examiner is required whenever the $5 million unsecured debt threshold of Section 1104(c)(2) is met." *In re Erickson Retirement Cmtys.*, LLC, 425 B.R. 309, 312 (Bankr. N.D. Tex. 2010). The Court in *Erickson* then confirmed that "[t]his

court agrees with such courts that, where the $5 million unsecured debt threshold is met, a bankruptcy court ordinarily has no discretion [in the appointment of an examiner]." *Id.*[6]

23.     The statute's requirements for the mandatory appointment of an examiner are that: (1) no trustee has been appointed; (2) no plan has been confirmed; (3) a party in interest or the United States Trustee (the "U.S. Trustee") has requested an examiner; and (4) either (i) appointment of an examiner is in the interests of the creditors of the estate—or—(ii) the debtor's fixed, liquidated, unsecured debts to non-insiders exceed $5 million. 11 U.S.C. § 1104(c); *In re Schepps Food Stores, Inc.*, 148 B.R. 27, 39-30 (S.D. Tex. 1992) (the provision is mandatory, but right to request an examiner may be waived); *In re Revco D.S. Inc.*, 898 F.2d 498, 500-01 (6th Cir. 1990) ("The provision plainly means that the bankruptcy court 'shall' order the appointment of an examiner when the total fixed, liquidated, unsecured debt exceeds $5 million.").

24.     If the four requirements are met, appointment of an examiner is mandatory (although the Court retains discretion in respect of the scope of the examination). *See In re UAL Corp.*, 307 B.R. 80, 84 (Bankr. N.D. Ill. 2004). The list of investigations in Bankruptcy Code § 1104(c) is illustrative, not exhaustive. *See, e.g., In re Gordon Props., LLC*, 514 B.R. 449, 458 (Bankr. E.D. Va. 2013).

25.     Alternatively, there is cause to appoint an examiner under Bankruptcy Code § 1104(c)(1) because such appointment is in the interests of creditors and other interests of the estate. In light of the facts and circumstances set forth above, an examiner would be "a neutral watch-dog . . . offer[ing] to all constituencies the comfort of ensured transparency and a fair

---

[6] The *Erickson* court subsequently denied the request for an examiner because of the movant's waiver of such relief via a subordination agreement and because the dispute did not involve "allegations of wrongdoing" but instead centered on valuation issues. Neither of these factors are present in this case, and in fact there are very serious allegations of wrongdoing that merit the appointment of an examiner.

reorganization process." *In re Mirant Corp.*, No. 03-46590, 2004 Bankr. LEXIS 1283, at *10 n.10 (Bankr. N.D. Tex. Sep. 2, 2004).

I. **Section 1104(c)(2) Requires the Appointment of an Examiner.**

26. The Bankruptcy Court for the Northern District of Texas has previously indicated that it would join numerous other courts holding that the appointment of an examiner under § 1104(c)(2) "is mandatory" where it is sought by a party in interest for a debtor with the threshold amount of qualifying debt. *See In re Erickson Retirement Cmtys.*, LLC, 425 B.R. 309, 312 (Bankr. N.D. Tex. 2010. In addition, bankruptcy courts in the Southern District of Texas and other courts have held that appointment is mandatory where the minimum debt amount is reached. *See, e.g. In re Schepps Food Stores, Inc.*, 148 B.R. 27, 31 (S.D. Tex. 1992) (holding that "[t]he section on appointment of an examiner at the request of a party in interest is mandatory"); *In re Sanchez Corporation, et. al.*, Case No. 19-34508 (MI) (Bankr. S.D. Tex., Aug. 11, 2019) [Docket No. 735] and Dkt. 666 (Bankr. S.D. Tex. Nov. 27, 2019; Hr'g Tr. at 161:16-25; 162:13-15 ("[T]he Court having determined that appointment of an examiner in the Debtors' chapter 11 cases is mandatory as the statutory predicates of . . . 11 U.S.C. § 1104(c)(2) have been satisfied."); *see also In re Revco D.S., Inc.*, 898 F.2d 498, 500-01 (6th Cir. 1990); *Walton v. Cornerstone Ministries Invs., Inc.*, 398 B.R. 77, 81-82 (N.D. Ga. 2008); *In re Loral Space & Commc'ns, Ltd.*, No. 04 C.V. 8645RPP, 2004 WL 2979785, at *5 (S.D.N.Y. Dec. 23, 2004); *In re Enron Corp.*, No. 01-16034 (AJG), 2002 WL 32150478, at *4 (Bankr. S.D.N.Y. Feb. 13, 2002); *In re Rutenberg*, 158 B.R. 230, 232 (Bankr. M.D. Fla. 1993); *In re Asarco, LLC*, No. 05-21207 (Bankr. S.D. Tex. Mar. 4, 2008) [Dkt. 7081]; *In re Parker Drilling Co.*, No. 18-36958 (MI) (Bankr. S.D. Tex. Feb. 25, 2019) [Dkt. No. 412].

27. Here, there is no dispute that the Debtors' fixed, liquidated, non-insider unsecured debts exceed $5 million. Accordingly, appointment of an examiner is required under Bankruptcy Code § 1104(c)(2).

28. The nonprofit nature of one of the Debtors does not alter the analysis and should not alter the outcome of this Motion. *See Woodlawn Cmty. Dev. Corp. v. Official Comm. of Unsecured Creditors (In re Woodlawn Cmty. Dev. Corp.)*, 613 B.R. 671 (N.D. Ill. 2020) (appointing a chapter 11 trustee for a nonprofit debtor where a president and CEO "singlehandedly ran the organization with nearly unlimited discretion" and committed "gross mismanagement, fraud, and self-dealing"). In the *Woodlawn* case, the Court stated as follows: "If Congress wanted bankruptcy courts to apply different standards to nonprofit debtors, it would have said so in the statute, as it did elsewhere in the bankruptcy code. At least for purposes of § 1104, mismanagement is mismanagement, regardless of the underlying purpose of the organization." *Id.* at 690.

II.     **Appointment of an Examiner Is Necessary Under Section 1104(c)(1).**

29. Not only is the appointment of an examiner mandatory, but it is also necessary under § 1104(c)(1), which requires an examiner if "such appointment is in the interests of creditors, any equity security holders, and other interests of the estate." 11 U.S.C. § 1104(c)(1). Appointment of an examiner has been found to be in the best interests of debtor estates where "such appointment allows for a thorough, independent, and expeditious examination to be made into serious allegations." *See In re JNL Funding Corp.*, No. 10-73724, 2010 WL 3448221, at *3 (Bankr. E.D.N.Y. Aug. 26, 2010). The potential for avoidance claims against an insider presents "a textbook case calling for the appointment of an examiner in the interest of creditors." *In re Keene Corp.*, 164 B.R. 844, 856 (Bankr. S.D.N.Y. 1994).

30. An independent investigation is in the interest of creditors and the estate.

31. An Official Committee of Unsecured Creditors has recently been appointed. Movant is hopeful that he can work with the Committee to gain its support of this Motion.

### III. The Court Should Provide the Examiner With A Broad Mandate.

32. Although the appointment of an examiner is required under § 1104(c), the Court nevertheless retains discretion to define the "nature, extent and duration" of the investigation "as is appropriate." *See In re Revco*, 898 F.2d at 501; 11 U.S.C. § 1104(c).

33. Section 1104(c) "allows the court to determine the scope, length, and conduct of the investigation." *Schepps Food Stores*, 148 B.R. at 30. An examiner has the authority of a trustee, "except to the extent that the court orders otherwise, [to] investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan." 11 U.S.C. §1106(b).

34. Movant respectfully submits that the scope of the examiner's role should be set by the Court after considering input from the parties in this case, including Movant, the Committee, the United States Trustee, the Debtors and the other major constituents in this case. The scope here should, in any event, include the specific responsibilities enumerated in Bankruptcy Code § 1106(b). *See* 11 U.S.C. § 1106(b) (specifying the responsibilities of an examiner to include two of the seven duties assigned to a trustee under § 1106(a), including to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operations of the debtor's business…and any other matter relevant to the case or the formulation of a plan" under § 1106(a)(3)).

35. The examiner should be given a sufficient budget given the size of these cases and the potential amounts at issue and should report to the Court and the public on the issues described herein. Movant respectfully requests that the Court direct the examiner to provide a preliminary report within 45 days after appointment with a final report to be provided 120 days after appointment. As the information contained in the examiner's report will be critical to the proposed

plan in these cases, appointing the examiner immediately will help speed these cases to a resolution.

36. Setting the proper scope of the examiner's investigation here should be consistent with orders appointing examiners in other chapter 11 cases where pre-petition insider transactions were at issue. *See, e.g., In re Caesars Entertainment Operating Company, Inc.*, Case No. 15-01145 (ABG) (Bankr. S.D.N.Y. 2015) [Docket No. 675] (directing the appointment of an examiner to investigate, inter alia, fifteen sometimes related pre-petition transactions between debtors and other entities controlled by the debtor's and the LBO Sponsors and possible conflicts related to debtor's counsel and its representation of debtor and the LBO Sponsors pre-petition); *In re Dynegy Holdings, LLC*, Case No. 11-38111 (CGM) (Bankr. S.D.N.Y. 2011) [Docket No. 276] (directing the appointment of examiner to investigate, inter alia, the conduct and transactions related to the pre-petition restructuring of the debtor and their non-debtor affiliates and professional conflicts of debtor's counsel due to its representation of each entity within the Dynegy organization in connection with the pre-petition restructuring); *In re Residential Capital, Inc.*, Case No. 12-12020 (MG) (Bankr. S.D.N.Y. 2012) [Docket No. 454] (directing the appointment of an examiner to investigate certain pre-petition transactions between the debtors and other entities controlled by its parent and the LBO Sponsors); *In re Dade Behring Holdings Inc.*, Case No. 02-29020 (BWB) (Bankr. N.D. Ill. 2002) [Docket No. 99] (directing appointment of examiner to investigate the events and transactions surrounding the debtors' entry into a pre-petition recapitalization agreement); *In re SemCrude, L.P.*, Case No. 08-11525 (BLS) (Bankr. D. Del. 2008) [Docket No. 1295] (directing examiner to investigate certain specific transactions related to the debtors' chapter 11 cases); *In re Tribune Co.*, Case No. 08-13141 (KJC) (Bankr. D. Del. 2008) [Docket No. 4120] (directing appointment of examiner to investigate the nature, extent, and value of any claims or causes of action that the debtors propose to release, convey, or settle pursuant to their proposed

chapter 11 plan); *In re Washington Mutual, Inc.*, Case No. 08-12229 (MFW) (Bankr. D. Del. July 22, 2010) [Docket No. 5120] (ordering appointment of examiner to investigate and report on potential causes of action belonging to estates).

37. Although § 1104(c) does not expressly authorize the employment of professional persons by an examiner, § 105(a) authorizes the Court to issue any order necessary or appropriate to carry out the provisions of the code. *In re Southmark Corp.*, 113 B.R. 280, 281 (Bankr. N.D. Tex. 1990) (approving examiner's employment of professionals). As the *Southmark* court explained: "In a complex, mega-case the investigation [of the examiner] may require the services of lawyers, accountant and other professionals. . .. [F]ailure to authorize the examiner to employ professional persons may work a hardship on the estate or result in the practical inability of the examiner to perform the investigation." *Id.* at 282–83. Movant does not know at this point whether the examiner will need to hire a professional, but they should have the ability to do so if needed.[7]

## RESERVATION OF RIGHTS

38. Movant reserves all of his rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Motion, to seek discovery, and to raise additional statements at the hearing on this Motion.

## CONCLUSION

39. Movant respectfully requests that the Court enter an order, substantially in the form attached hereto: (i) appointing an examiner in these Chapter 11 cases; (ii) authorizing the examiner to conduct an investigation on the terms and conditions to be set by the Court; and (iii) granting Movant such other and further relief as is just and proper.

---

[7] Movant submits that perhaps the perfect candidate is an insolvency professional who is a CPA, has a background, or is accredited, in forensic accounting, and is also familiar with procedures and policies of implementation of corporate governance. An added bonus would be if that person had any specialty in understanding the proper policies and procedures of corporate governance and management of a non-profit organization.

Dated: February 8, 2021

Respectfully submitted by,

*/s/ M. Jermaine Watson*
M. Jermaine Watson
Texas Bar I.D. No. 24063055
Joshua N. Eppich
Texas Bar I.D. No. 24050567
H. Brandon Jones
Texas State Bar No. 24060043
Clay M. Taylor
Texas Bar I.D. No. 24033261
J. Robertson Clarke
Texas Bar I.D. No. 24108098
**BONDS ELLIS EPPICH SCHAFER JONES LLP**
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: jermaine.watson@bondsellis.com
Email: joshua@bondsellis.com
Email: brandon@bondsellis.com
Email: clay.taylor@bondsellis.com
Email: robbie.clarke@bondsellis.com

**ATTORNEYS FOR THE HONORABLE PHILLIP JOURNEY**

## CERTIFICATE OF CONFERENCE

I hereby certify that on February 8, 2021, I conferred by e-mail and telephone with counsel to the Debtors, Mr. Patrick Neligan, Jr. regarding the relief requested in this motion and that he is continuing to evaluate his clients' position with respect thereto.

*/s/ Joshua N. Eppich*
Joshua N. Eppich

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 8, 2021, a copy of the foregoing document was served on all parties requesting service via the Court's ECF system.

*/s/ J. Robertson Clarke*
J. Robertson Clarke