**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 21-30085-hdh-11** |
| **NATIONAL RIFLE ASSOCIATION** | § | |
| **OF AMERICA and SEA GIRT LLC,** | § | **CHAPTER 11** |
| | § | |
| Debtors.[1] | § | **Jointly Administered** |

**THE STATE OF NEW YORK'S MEMORANDUM OF LAW
AND BRIEF IN SUPPORT OF MOTION TO DISMISS,
OR, IN THE ALTERNATIVE, TO APPOINT CHAPTER 11 TRUSTEE**

Gerrit M. Pronske
State Bar No. 16351640
Eric M. Van Horn
State Bar No. 24051465
Jason P. Kathman
State Bar No. 24070036
**SPENCER FANE LLP**
2200 Ross Avenue, Suite 4800 West
Dallas, TX 75201
(214) 750-3610 – Telephone
(214) 750-3612 – Telecopier
-and-
5700 Granite Parkway, Suite 650
Plano, TX 75024
(972) 324-0300 – Telephone
(972) 324-0301 – Telecopier
Email: gpronske@spencerfane.com
Email: ericvanhorn@spencerfane.com
Email: jkathman@spencerfane.com

**COUNSEL FOR THE PEOPLE OF
THE STATE OF NEW YORK, BY
LETITIA JAMES, ATTORNEY GENERAL
OF THE STATE OF NEW YORK**

James Sheehan
*Pro Hac Vice*
Emily Stern
*Pro Hac Vice*
Monica Connell
*Pro Hac Vice*
Stephen Thompson
*Pro Hac Vice*
**OFFICE OF THE ATTORNEY GENERAL OF
THE STATE OF NEW YORK**
28 Liberty Street
New York, NY 10005
(212) 416-8401
Email: James.Sheehan@ag.ny.gov
Email: Emily.Stern@ag.ny.gov
Email: Monica.Connell@ag.ny.gov
Email: Steven.Thompson@ag.ny.gov

**COUNSEL FOR THE PEOPLE OF
THE STATE OF NEW YORK, BY
LETITIA JAMES, ATTORNEY GENERAL
OF THE STATE OF NEW YORK**

---

[1] The last four digits of the Debtors' taxpayer identification numbers are: 6130 (NRA) and 5681 (Sea Girt). The Debtors' mailing address is 11250 Waples Mill Road, Fairfax, Virginia 22030.

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................Error! Bookmark not defined.

TABLE OF AUTHORITIES .................................................................................................iii

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ..................................................................................................................... 2

    I.       The NYAG's Regulatory Enforcement Action .......................................................... 2

    II.     The NRA's Attempts and Failure to Delay and Prevent Litigation of the NYAG Enforcement Action in the NY State Court ............................................................. 4

          A.   The NRA attempts to litigate counterclaims to the NYAG Enforcement in the Northern District of New York ........................................................................ 4

          B.   The NRA attempts, and fails, to ...................................................................... 4

          C.   The NRA attempts, and fails, to move the NYAG Enforcement Action to the United States District Court for the Northern District of Texas through the Judicial Panel on Multidistrict Litigation. ...................................................... 5

    III.    The NRA's Bankruptcy Petition to "Primarily" Avoid the NYAG's Enforcement Action ...................................................................................................................... 6

    IV.    New York's Regulation of the Dissolution of New York Charities ......................... 8

ARGUMENT AND AUTHORITIES .................................................................................... 9

    I.       The Debtor's Cases Should Be Dismissed for Cause Because They Were Not Filed in Good Faith ............................................................................................... 9

          A.   Lack of good faith as a basis for dismissal. ................................................... 9

          B.   The Debtor's cases were filed to obtain a litigation advantage. ..................... 12

    II.     Alternatively, the Court Should Appoint a Chapter 11 Trustee. ......................... 15

          A.   Cause exists to appoint a Chapter 11 trustee under 11 U.S.C. § 1104(a)(1). . 17

          B.   Appointment of a trustee is also appropriate under § 1104(a)(2) .................. 33

    CONCLUSION ..................................................................................................... 34

# TABLE OF AUTHORITIES

## Cases

*Citizens United v. Schneiderman*,
882 F.3d 374 (2d Cir. 2018) ............................................................. 32

*Commodity Futures Trading Comm'n v. Weintraub*,
471 U.S. 343 (1985) ........................................................................ 17

*Matter of Elmwood Dev.*,
964 F.2d 508 (5th Cir. 1992) ..................................................... 11,12

*In re 1031 Tax Group, LLC*,
374 B.R. 78 (Bankr. S.D.N.Y. 2007) ............................................... 18

*In re Antelope Techs., Inc.*,
431 Fed. Appx. 272 (5th Cir. 2011) ................................................. 13

*In re Art Midwest, Inc.*,
No. 04-91225-RFN-11, 2006 WL 306894 (Bankr. N.D. Tex. Jan. 5, 2006) ....................... 11

*In re Bibo, Inc.*,
76 F.3d 256 (9th Cir. 1996) ............................................................. 20

*In re Cajun Elec. Power Co-op, Inc.*,
69 F.3d 746 (5th Cir. 1995) ............................................................. 18

*In re Cedar Shore Resort, Inc.*,
235 F.3d 375 (8th Cir. 2000) ...................................................... 11,12

*In re Delta Ag Grp., LLC*,
596 B.R. 186, (Bankr. W.D. La. 2019) ............................................. 12

*In re Evans*,
48 B.R. 46 (Bankr. W.D. Tex. 1985) ..................................... 18,31,36

*In re G-I Holdings, Inc.*,
385 F.3d 313 (3d Cir. 2004) ............................................................. 19

*In re Humble Place Joint Venture*,
936 F.2d 814 (5th Cir. 1991) ........................................................... 10

*In re Ionosphere Clubs, Inc.*,
113 B.R. 164 (Bankr. S.D.N.Y. 1990) ............................................. 36

*In re Liberate Techs.*,
    314 B.R. 206 (Bankr. N.D. Cal. 2004) ................................................................ 16

*In re Little Creek Dev. Co.*,
    779 F. 2d 1068 (5th Cir. 1986) ........................................................................... 10

*In re Marvel Entm't Group, Inc.*
    140 F.3d 463 (3d Cir. 1998) ....................................................................... 18,19,37

*In re Mirant*,
    No. 03-46590, 2005 WL 2148362 (Bankr. N.D. Tex. Jan. 26, 2005) .................. 14

*In re Patman Drilling Int'l, Inc.*,
    No. 07-34622-SGJ, 2008 WL 724086 (Bankr. N.D. Tex. 2008) .......................... 18

*In re Professional Accountants Referral Svcs., Inc.*,
    142 B.R. 424 (Bankr. D. Color. 1992) ............................................................... 20

*In re PRS Insurance Group, Inc.*,
    274 B.R. 381 (Bankr. D. Del. 2001) ................................................................... 20

*In re SGL Carbon Corp.*,
    200 F.3d 154 (3d Cir. 1999) ....................................................................... 14,15,16

*In re Sharon Steel Corp.*,
    871 F.2d 1217(3d Cir. 1989) ..................................................................... 18,19,20

*In re Sherwood Enterprises, Inc.*,
    112 B.R. 165 (Bankr. S.D. Tex. 1989) ............................................................... 12

*In re Silberkaus*,
    253 B.R. 890 (Bankr. C.D. Cal. 2000) ............................................................... 14

*Investors Group, LLC v. Pottorff*,
    518 B.R. 380 (N.D. Tex. 2014) ......................................................................... 13

*Pipkins-Thomas v. United States*,
    223 Fed. Appx. 310 (5th Cir. 2007) ................................................................... 11

### Statutes

11 U.S.C. § 1104(a)(1) ........................................................................................ 17
11 U.S.C. § 1112(b)(1) ..................................................................................... 9,12
11 U.S.C. § 1112(b)(2) ........................................................................................ 13
11 U.S.C. §1112(b)(4) .......................................................................................... 9
EPTL § 8-1.9 ...................................................................................................... 32
N-PCL § 715 ....................................................................................................... 33

N-PCL § 715-a ........................................................................................................... 32, 33

N-PCL § 907-a ................................................................................................................. 8

N-PCL § 907-b ................................................................................................................. 8

N-PCL § 1001(d)(3)……………………….....………………………………………..9

N-PCL § 1008(a)(15) ....................................................................................................... 9

N-PCL § 1115(a) .............................................................................................................. 9

**TO THE HONORABLE HARLIN D. HALE,**
**CHIEF UNITED STATES BANKRUPTCY JUDGE:**

The People of the State of New York, by Letitia James, Attorney General of the State of

New York ("**NYAG**"), a party in interest in the above-referenced bankruptcy case, hereby submit

this *Memorandum of Law and Brief* ("**Brief**") *in Support of Motion to Dismiss, or, in the*

*Alternative, Appoint Chapter 11 Trustee* ("**Motion**"). In support of the Motion, the NYAG

respectfully states as follows:

### PRELIMINARY STATEMENT

1.      The NYAG asks this Court to dismiss these bankruptcy cases as having been filed

in bad faith pursuant to 11 U.S.C. § 1112. In the alternative, the NYAG asks that the Court to order

the appointment a Chapter 11 trustee pursuant to 11 U.S.C. § 1104(a). Such relief is called for

given the extraordinary facts present here.

2.      The National Rifle Association of America, Inc. ("**NRA**") seeks bankruptcy

protection while claiming to be solvent and "in its strongest financial condition in years." It invokes

the jurisdiction of this Court while publicly proclaiming that it filed its petition because it is

"dumping New York," "utilizing the protection of the bankruptcy court," and "organizing its legal

and regulatory matters in an efficient forum," essentially fleeing or seeking an end run around a

pending regulatory enforcement action in New York ("**NYAG Enforcement Action**").

3.      The NRA's bankruptcy petition, and that of its wholly-owned shell company Sea

Girt LLC ("**Sea Girt**"), established in Texas three months ago as a toehold for these proceedings,

were signed by the NRA's highest officer, Executive Vice President, Wayne LaPierre

("**LaPierre**"). LaPierre is himself charged in the NYAG Enforcement Action with having

"exploited the organization for his financial benefit, and the benefit of a close circle of NRA staff,

board members, and vendors," engaging in extensive self-dealing and corruption, and undertaking

---

**BRIEF IN SUPPORT OF MOTION TO DISMISS, OR, IN THE ALTERNATIVE APPOINT CHAPTER 11 TRUSTEE – PAGE 1**

efforts "to intimidate, punish, and expel anyone at a senior level who raised concerns about his conduct." LaPierre is accused of looting the NRA, yet he has made the determination and signed the petitions in an effort to use the bankruptcy court to remove the NRA from regulatory oversight. The NYAG respectfully submits that the NRA's conduct in filing this bankruptcy while claiming solvency and seeking to evade regulatory oversight is in bad faith such that dismissal under 11 U.S.C. § 1112 is appropriate under well-settled law.

4.      Further the NYAG Enforcement Action sets forth extensive allegations of pervasive and persistent illegal conduct by the NRA and the individual defendants therein, including LaPierre and current Secretary and General Counsel John Frazer ("**Frazer**"). The action has survived motions to dismiss, as well as multiple efforts by the NRA to halt or transfer it, and is now in discovery. Based upon the facts alleged in the NYAG Enforcement Action, including those set forth below, and given the demonstrated dishonesty, fraud, and gross mismanagement by the NRA's current management, including LaPierre and Frazer, if these bankruptcy cases are not dismissed, appointment of a trustee is appropriate under 11 U.S.C. § 1104(a).

## BACKGROUND

### I.      The NYAG's Regulatory Enforcement Action.

5.      On August 6, 2020, after a fifteen-month-long investigation that involved the examination of numerous witnesses, including current and former NRA officers and employees, and review of tens of thousands of documents, the NYAG commenced the action styled *People of the State of New York, by Letitia James, Attorney General of the State of New York v. The National Rifle Association of America, Inc., et. al.*¸ Index No. 451625/2020. The 163-page Verified Complaint ("**NYAG Enforcement Complaint**") filed in the Supreme Court of the State of New York (the "**NY State Court**") presents detailed factual allegations of pervasive illegal conduct at

the NRA that, when taken together, reflect a system of widespread misuse of assets by LaPierre and his circle of insiders for their own private benefit. Inadequate internal controls, weak financial management systems easily susceptible to override, and lack of appropriate Board oversight lead to tens of millions of dollars being diverted away from the NRA's charitable mission and accordingly the reduction in expenditures for core program services. Further, the NRA consistently ignored, and in some cases retaliated against, those who raised concerns about its operation and finances, including members of its finance staff, multiple board members, and one former NRA President.[2]

6.       As a result of the persistent violations of law alleged in the NYAG Enforcement Action, the NYAG asserted eighteen (18) distinct causes of action against both the NRA and certain individual defendants, including LaPierre, Frazer, Wilson Phillips, and Joshua Powell.[3] The NYAG Enforcement Complaint seeks the following forms of relief: restitution of funds improperly paid to current and former officers, which will be returned to the NRA; a ban on certain current and former officers, including LaPierre and Frazer, from serving as fiduciaries of any New York charity; voiding of certain transactions; and, if a court determines that it is in the best interest of the NRA's members and the public, the dissolution of the NRA, in which case the NRA's restricted assets will be distributed to organizations pursuing a mission similar to the one the NRA purports to pursue.

---

[2] *See generally* NYAG Enforcement Complaint, attached as Exhibit 1 to the Appendix in Support of the New York Attorney General's Motion to Dismiss, or in the Alternative, to Appoint Chapter 11 Trustee ("**Appendix**"). All page number citations for the Appendix refer to the "Appx." number stamped in the bottom right hand corner.
[3] Wayne LaPierre, Wilson Phillips, John Frazer, and Joshua Powell shall be collectively referred to as the "**Individual Defendants**."

## II. The NRA's Unsuccessful Attempts to Interfere with Litigation of the NYAG Enforcement Action in the NY State Court.

7.      As of the January 15, 2021 petition date herein ("**Petition Date**"), the NRA had commenced two other federal proceedings and made multiple motions in an effort to avoid litigating the merits of the NYAG Enforcement Action in NY State Court. Those efforts have been rejected by two courts, while a third court considers the NYAG's fully briefed motion to dismiss.

### A. The NRA attempts to litigate counterclaims to the NYAG Enforcement Action in the Northern District of New York.

8.      On August 6, 2020, hours after the NYAG Enforcement Action was commenced, the NRA filed a countersuit against the NYAG in the United States District Court for the Northern District of New York ("**NDNY Action**").[4] In the NDNY Action, the NRA asserts claims, *inter alia*, under the First and Fourteenth Amendments arising out of the NYAG's investigation and request for dissolution in the NYAG Enforcement Action. The NYAG's motion to dismiss that federal action was fully briefed as of January 4, 2021.

### B. The NRA attempts, and fails, to "remove" the NYAG Enforcement Action through motions to change venue and dismiss.

9.      In addition to filing the NDNY Action, the NRA sought to prevent the NYAG Enforcement Action from proceeding in NY State Court with various procedural challenges designed to transfer the NYAG's state law claims to federal court.

10.      Six days after the Petition Date, on January 21, 2021, the NY State Court held a hearing on the NRA's motions, and after hearing the arguments of the parties, denied the NRA's requests to dismiss, transfer, or stay the NYAG Enforcement Action in their entirety.[5] The NY State Court held: "[T]his is an action by New York's Chief Law Enforcement Officer pursuant to

---

[4] *See National Rifle Association of America v. Letitia James*, Case No, 20-cv-00889, currently pending before the United States District Court for the Northern District of New York.

[5] Appendix Exhibit 2 at 235-50, which contains a true and correct copy of the transcript of the hearing held on January 21, 2021 in the NYAG Enforcement Action.

her supervisory authority over a New York not-for-profit corporation for violation of New York law. . . . I'm not aware and the parties have not cited any case applying *forum non conveniens* to move a case from a state court to a federal court in the same state. And that is not what *forum non conveniens* is about."[6] The court concluded, "it would be inappropriate, in these circumstances, to find that the Attorney General cannot pursue her claims in state court because one of the defendants would prefer to proceed in federal court."[7] Discovery is now proceeding in that action.

### C.    The NRA attempts, and fails, to move the NYAG Enforcement Action to the United States District Court for the Northern District of Texas through the Judicial Panel on Multidistrict Litigation.

11.    On October 20, 2020—a day after the NRA demanded a change of venue in the NYAG Enforcement Action—the NRA filed an application before the Judicial Panel on Multidistrict Litigation ("**JPML**") to transfer and consolidate four cases in the United States District Court for the Northern District of Texas.[8] Although the NYAG Enforcement Action was not identified on the schedule of actions the NRA sought to consolidate in Texas (because the NYAG Enforcement Action was pending in state court and thus not subject to immediate consolidation), the NRA's ultimate intention to move and consolidate the NYAG Enforcement Action into federal court in the Northern District of New York and then in Texas was apparent from its effort to conflate the NYAG Enforcement Action with the NDNY Action by referring to the two action collectively as the "NYAG Litigation."[9] By order dated February 4, 2021, the JPML denied the NRA's application to consolidate, holding in relevant part:

> There are just four actions pending in three districts, and proponents have not demonstrated any attempt at informal coordination or transfer via other means before seeking Section 1407 centralization.

---

[6] Appendix Exhibit 2 at 244-45.
[7] Appendix Exhibit 2 at 248.
[8] *See In Re National Rifle Association Business Expenditures Litigation*, JPML Case No. 2979, Dkt. 5-1 (Amended Schedule of Cases).
[9] *See id.,* Dkt. Nos. 1-1 and 1-4.

The NRA claims there exist 'other, related actions that are likely to be removed to federal court.' But it appears the New York state court enforcement action will remain in state court, as that court recently denied defendants' motion to dismiss on *forum non conveniens* grounds. The Panel has been 'disinclined to take into account the mere possibility of future filings in [its] centralization calculus.'[10]

12.     The JPML also found that while

[t]here may be factual overlap among some of the actions as to particular expenditures by the NRA and its relationship with Ackerman, . . . it appears to be limited and overshadowed by the many individual questions presented by the alleged facts, claims, and parties in each action. . . . In the Northern District of New York action . . . , the NRA alleges the New York Attorney General's investigation and an underlying New York state court enforcement action constitute retaliation for the NRA's political advocacy and selective enforcement of New York's not-for-profit law. That state court action concerns far broader allegations that the NRA is not serving the interests of its members and advancing its charitable mission. It asserts that the NRA was not governed properly, failed to follow state and federal laws, failed to institute an effective compliance program, and filed false regulatory statements.[11]

## III.    The NRA's Bankruptcy Petition to "Primarily" Avoid the NYAG's Enforcement Action

13.     On January 15, 2021, the NRA, along with Sea Girt, filed its voluntary petition for bankruptcy under chapter 11—its third federal proceeding and attempt to avoid litigating the NYAG Enforcement Action in the NY State Court.

14.     On the same day that it filed for bankruptcy, the NRA launched a website—NRAForward.org—aimed at educating its members and the general public about the reason the NRA filed for bankruptcy: "The plan can be summed up quite simply: We are DUMPING New York, and we are pursuing plans to reincorporate the NRA in Texas."[12]

---

[10] Appendix Exhibit 3 at 273-74, which contains a true and correct copy of the Order Denying Transfer in *In re: National Rifle Association Business Expenditures Litigation*, MDL No. 2979 (Feb. 04, 2021).
[11] Appendix Exhibit 3 at 272-73.
[12] *See* Appendix Exhibit 4 at 276-78, a true and correct copy of the "letter from W. LaPierre to NRA members and supporters dated Jan. 15, 2021, found at https://www.nraforward.org/wayne;sletter.

15.     That theme—"dumping" New York—is consistently repeated in the NRA's public-facing statements.

16.     In LaPierre's letter to NRA members, he stated that the NRA "seek[s] protection from New York officials who illegally abused and weaponized the powers they wield against the NRA and its members."[13]

17.     On a question & answer ("Q&A") page of the NRAForward.org website, in response to a question about whether the NRA admits that it mismanaged donor funds, comes this answer: "This action is necessitated primarily by one thing: the unhinged and political attack against the NRA by the New York Attorney General.-"—that is to say, "primarily" because of the NYAG Enforcement Action.[14]

18.     In the press release that accompanied the NRA's petition, the NRA stated that its "plan, which involves utilizing the protection of the bankruptcy court, has the Association dumping New York and organizing its legal and regulatory matters in an efficient forum. The move comes at a time when the NRA is in its strongest financial condition in years."[15] The press release quotes LaPierre as saying, "Obviously, an important part of this plan is 'dumping New York.'"[16] It further quotes NRA proposed special counsel, William A. Brewer III, as saying, "Under this plan, the Association wisely seeks protection from New York officials who it believes have illegally weaponized their powers against the NRA and its members."[17]

19.     In an interview about the bankruptcy petition, NRA Director Bob Barr stated that the bankruptcy is "a reorganization . . . to protect ourselves and our members from the abuse of

---

[13] Appendix Exhibit 4 277-78.
[14] *See* Appendix Exhibit 6 at 284, a true and correct copy of the "Questions & Answers" page at https://www.nraforward.org/questionsanswers.
[15] *See* Appendix Exhibit 5 at 279, a true and correct copy of the press release dated Jan. 15, 2021 found at https://www.nraforward.org/press-release.
[16] Appendix Exhibit 5 at 280.
[17] Appendix Exhibit 5 at 281.

power by New York. It has nothing to do with the NRA's financial posture—which is very strong. . . . It simply is a legal vehicle . . . to escape the abuse by the New York authorities."[18]

20.     In an effort to walk back its statements about the reasons it filed for bankruptcy ("casual," in the words of proposed special counsel for the NRA) the NRA argued in its informational brief that it "is not seeking to escape regulatory oversight."[19] However, in its description of its plan for reorganization, the NRA represented that it will propose to pay "all of the allowed claims of the NRA's creditors in full and provide[] a mechanism for adjudicating and/or resolving the claims of the [New York Attorney General] and any other creditors with contingent, unliquidated and disputed claims," making it clear that resolution of the NYAG Enforcement Action is its primary motivation for its petition.[20]

## IV.     New York's Regulation of the Dissolution of New York Charities

21.     New York's Not-for-Profit Corporation Law ("**N-PCL**") provides the NYAG and New York courts with broad supervision and gatekeeping authority of all major events in a New York charity's existence, including its merger, consolidation, and dissolution.

22.     A New York charity may merge or consolidate with another organization only with the approval of either the New York Supreme Court or the NYAG. N-PCL §§ 907-a, 907-b. If court approval is sought, the NYAG must be provided with notice and an opportunity to object to a charity's proposed plan of merger or consolidation. *Id.* § 907-a(b). Any restricted assets held by the charity designated for use for a charitable purpose will, at the court's discretion, either be transferred with the same conditions to the newly merged or consolidated entity, or transferred to an organization "engaged in substantially similar activit[y]." *Id.* § 907-a(c).

---

[18] *See* Newsmax Interview with Bob Barr, https://www.nraforward.org/news at time stamp 2:40.
[19] Debtor's Information Brief in Connection With Voluntary Chapter 11 Petitions, Dkt. 31 ("**Informational Brief**") at ¶26.
[20] Informational Brief at 14-15.

23.    Similar supervisory and approval authority is given to the NYAG and New York Supreme Court with respect to the dissolution of a New York charity. *Id.* Arts. 10 & 11. Where dissolution is voluntary, the dissolving charity is required to prepare and submit to the NYAG for approval a plan of dissolution that, among other things, plans for the proper distribution of assets held by the charity for a charitable purpose. *Id.* § 1001(d)(3). Whether or not dissolution is voluntary, the New York Supreme Court has the authority to oversee and approve the appropriate distribution of assets held for a charitable purpose by the dissolving entity. *Id.* §§ 1008(a)(15), 1115(a).

## ARGUMENT AND AUTHORITY

### I.    The Debtors' Cases Should be Dismissed for Cause Because They Were Not Filed in Good Faith.

24.    By its own admission, the NRA filed its petition in this Court "primarily" because of the NYAG Enforcement Action. Filing a petition for bankruptcy for the primary purpose of seeking a litigation advantage in another forum constitutes bad faith and warrants dismissal. This is particularly true where, as here, the NRA invokes the jurisdiction of the Bankruptcy Court to avoid regulatory oversight.

#### A.    Lack of good faith is a basis for dismissal.

25.    Under § 1112(b) of the Bankruptcy Code, on the request of a party in interest, a court shall convert a case to one under Chapter 7 "or dismiss a case . . . whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1). While the Bankruptcy Code does not define "cause," Section 1112(b)(4) provides a non-exhaustive list of examples of "cause" that support dismissal or conversion, including "gross mismanagement of the estate." 11 U.S.C. §1112(b)(4).

26.     Filing a bankruptcy petition in bad faith is one of the non-enumerated bases for dismissing a case. "Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings." *In re Little Creek Dev. Co.,* 779 F. 2d 1068, 1071 (5th Cir. 1986) (citations omitted); *see also In re Humble Place Joint Venture*, 936 F.2d 814, 817 (5th Cir. 1991) (following *Little Creek*).

27.     The Fifth Circuit emphasizes "[t]he good faith standard protects the integrity of the bankruptcy courts and prohibits a debtor's misuse of the process where the overriding motive is to delay creditors without any possible benefit, or to achieve a reprehensible purpose through manipulation of the bankruptcy laws." *Matter of Elmwood Dev.*, 964 F.2d 508, 510 (5th Cir. 1992). "[G]ood faith implies an honest intent and genuine desire on the part of the petitioner to use the statutory process to effect a plan of reorganization and not merely as a device to serve some sinister or unworthy purpose." *In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 379 (8th Cir. 2000) (quoting *In re Metropolitan Realty Corp.*, 433 F.2d 676, 678 (5th Cir. 1970)). Importantly, because bankruptcy provides debtors with "powerful equitable weapons," the Fifth Circuit recognizes the critical gatekeeping function that the good faith standard serves to protect the "jurisdictional integrity of the bankruptcy courts" by limiting its access only to those debtors and creditors "with clean hands." *Little Creek*, 779 F.2d at 1072.

28.     As courts of equity, bankruptcy courts are "enabled to frustrate fraud and work complete justice." *Pipkins-Thomas v. United States*, 223 Fed. Appx. 310, 313 (5th Cir. 2007) (*quoting Tex. Co. v. Miller*, 165 F.2d 111, 116 (5th Cir. 1947)). To safeguard and prevent abuse, they are empowered with a variety of tools, including Section 105(a)'s broad statutory power and expansive authority to dismiss an action *sua sponte* when filed in bad faith. *See In re Art Midwest*,

*Inc*., No. 04-91225-RFN-11, 2006 WL 306894, at *3 (Bankr. N.D. Tex. Jan. 5, 2006) (noting the Fifth Circuit in *Little Creek* "instructed bankruptcy courts to be vigilant for those cases where the rehabilitative purposes of chapter 11 will not be served," in such cases courts are duty bound to dismiss, and holding that even if the parties seeking dismissal had no standing, the court, pursuant to section 105(a) may *sua sponte* dismiss a bankruptcy case filed in bad faith.") (citation omitted).

29.     Courts evaluate the "totality of the circumstances" to determine whether a debtor demonstrates the requisite good faith to access the privileges and equitable powers of bankruptcy. *See, e.g. Cedar Shore*, 235 F.3d at 379 (*citing Little Creek*, 779 F.2d at 1072). The Fifth Circuit instructs bankruptcy courts on how to analyze the facts and circumstances to properly exercise its equitable powers and discretion to protect the bankruptcy system from a debtor's abuse:

> The good faith determination depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities. A collation of factors, rather than any single datum, controls resolution of this issue. In determining whether a petition was filed with the requisite good faith, the court must examine the facts and circumstances germane to each particular case.

*Elmwood Dev.*, 964 F.2d at 510. Courts make this evaluation by looking objectively at the primary purposes of a debtor's filing to determine whether it met the requirements of a good faith standard. *See Elmwood Dev.*, 964 F.2d 508, 512 (5th Cir. 1992) ("Because the good faith standard is an objective one, the court was not constrained to entertain and give dispositive weight to testimony as to the subjective state of mind of Elmwood's manager.").

30.     "In attacking the Debtor's good faith in filing, movant must establish a prima facie case, after which the Debtor has the burden of proving that the petition was filed in good faith." *In re Sherwood Enterprises*, *Inc*., 112 B.R. 165, 170–71 (Bankr. S.D. Tex. 1989). Further, if the debtor intends to rely on an exception to dismissal or conversion provided in § 1112(b)(2), the debtor bears the burden of proving that it satisfies the two elements: First, the debtor must "specifically identify unusual circumstances" establishing that dismissing the bankruptcy case is

not in the best interests of creditors. 11 U.S.C. § 1112(b)(2). Second, the debtor must prove all of

the following:

> (1) there is a reasonable likelihood that a plan will be confirmed within a reasonable time; (2) the "cause" for dismissal or conversion is something other than a continuing loss or diminution of the estate under § 1112(b)(4)(A); (3) there is reasonable justification or excuse for a debtor's act or omission; and (4) the act or omission will be cured within a reasonable time.

*In re Delta Ag Grp.*, *LLC*, 596 B.R. 186, 197 (Bankr. W.D. La. 2019)(citing 11 U.S.C. §§ 1112 (b)(2)(A)-(B)).

### B.    The Debtors' cases were filed to obtain a litigation advantage.

31.    Dismissal of a bankruptcy petition for lack of good faith is warranted where "the

purpose of the petition was not primarily to reorganize or respond to financial crisis but instead

was to gain unfair advantage" in litigation. *In re Antelope Techs.*, *Inc.*, 431 Fed. Appx. 272, 275

(5th Cir. 2011) (affirming dismissal of petition that was "filed to gain an advantage in . . .

shareholder litigation rather than for reorganization"). While "[m]erely obtaining a litigation

advantage by pursuing bankruptcy is not dispositive of bad faith, . . . when a bankruptcy court

finds a party pursues bankruptcy for the purpose of securing litigation advantage in another forum,

such intent is dispositive: it establishes bad faith and necessitates dismissal." *Investors Group*, *LLC*

*v. Pottorff*, 518 B.R. 380, 384 (N.D. Tex. 2014) (internal quotation marks and citation omitted). In

so holding, the Fifth Circuit has joined courts across the country in holding that "it constitutes bad

faith to file bankruptcy to impede, delay, forum shop, or obtain a tactical advantage regarding

litigation ongoing in [a] nonbankruptcy forum—whether that nonbankruptcy forum is a state court

or a federal district court.*" In re Silberkaus*, 253 B.R. 890, 905 (Bankr. C.D. Cal. 2000) (holding

that debtor filed petition to delay pending state court specific performance litigation and to have

that litigation decided in bankruptcy court) (collecting cases), *aff'd*, 336 F.3d 864 (9th Cir. 2003).

32.     When considering whether a bankruptcy petition was filed as a litigation tactic, courts look to the timing of the petition and the surrounding circumstances. Thus, in *Investors Group*, the court was persuaded that the debtor had filed in bad faith because (1) the debtor was not under any immediate financial pressure when it filed its petition and (2) "[w]hat pressured [the debtor] was the impending state court litigation." 518 B.R. at 384.

33.     Particularly persuasive and analogous to the facts before this Court is the Third Circuit's decision in *In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999). *See also In re Mirant*, No. 03-46590, 2005 WL 2148362, at *5 (Bankr. N.D. Tex. Jan. 26, 2005) (collecting cases including *In re SGL* and *Little Creek* for the proposition that "many courts have held that lack of good faith is appropriate cause for dismissal under" § 1112(b)). In *SGL*, the debtor publicly stated that it was filing for bankruptcy to gain a tactical advantage over plaintiffs in antitrust lawsuits filed against the debtor, in an effort to "change the negotiating platform" with those plaintiffs. 200 F.3d at 158. The debtor had said that it was otherwise financially healthy and did not present any evidence that a judgment in the antitrust lawsuit would result in it going out of business. *Id.* at 162-63. Furthermore, the debtor's proposed plan of reorganization had it paying all its creditors in full except for judgment creditors in the antitrust lawsuits, who "would be required to accept limited-time credits to purchase [debtor's] products." *Id.* at 167. The Third Circuit held that filing "merely to obtain tactical litigation advantages is not within the legitimate scope of the bankruptcy laws[.]" *Id.* at 165 (internal quotation marks omitted). Observing that "[c]ourts . . . have consistently dismissed Chapter 11 petitions filed by financially healthy companies with no need to reorganize under the protection of Chapter 11," the *SGL* court dismissed the debtor's petition for lack of "a valid reorganizational purpose." *Id.* at 166-69.

34.     Here, the NRA announced to its members and the public that it was filing for bankruptcy not just to gain a tactical litigation advantage but "primarily" to evade regulatory enforcement by the NYAG.[21] It declared its intention to use this Court to "DUMP[] New York,"[22] and its petition as a "legal vehicle . . . to escape the abuse by the New York authorities."[23] This bad faith filing should not be permitted.

35.     Further, the NRA's petition in this Court is the latest in its series of unsuccessful attempts to impede or evade litigation of the merits of the NYAG Enforcement Action in the NY State Court. First, it filed a countersuit in federal court in the Northern District of New York; second, the NRA unsuccessfully attempted to "remove" the NYAG Enforcement Action through motions to change venue or dismiss in NYAG Enforcement Action; and third, the NRA filed an application before the JPML to transfer and consolidate the NDNY Action and NYAG Enforcement Action in federal court in Texas. The bankruptcy petition and this Court is just the most recent venue in a list of forums the NRA has been shopping for approximately six months.

36.     At the same time, the NRA maintains that, as of the Petition Date, its "total net assets are approximately $50 million."[24] Indeed, the NRA claims that "[t]he [petition] comes at a time when the NRA is in its strongest financial condition in years."[25] As in *SGL*, the NRA's purpose for filing this petition was to "change the negotiating platform" with the NYAG. *See* 200 F.3d at 158. And, without presenting any evidence of financial distress that warrant the filing of this petition, the NRA is using this Court "merely to obtain tactical litigation advantages." *Id.* at 165.

---

[21] Appendix Exhibit 6 at 284.
[22] Appendix Exhibit 4 at 276-78.
[23] Newsmax interview with Bob Barr, https://www.nraforward.org/news (at time stamp 2:40).
[24] Informational Brief at ¶ 10.
[25] *See* Appendix Exhibit 5 at 279.

37.     Any claim of contingent insolvency the NRA may make based on the pending litigation against it would not save its petition. In *SGL*, the Third Circuit held that the pending antitrust litigation against the debtor "did not pose a sufficient *present* threat to justify bankruptcy relief." *In re Liberate Techs*., 314 B.R. 206, 212 (Bankr. N.D. Cal. 2004) (summarizing *SGL*, and similarly holding that the debtor faced a limited number of lawsuits with indeterminate outcomes such that its bankruptcy petition was not warranted). Furthermore, "[b]ecause the lawsuits were contested and had not yet been tried, debtor might never suffer any such liability." *Id.* Here, the outcome of the various litigations the NRA is involved in are indeterminate. No judgment has been entered against the NRA; no trials have begun, let alone verdicts rendered. The NRA's bankruptcy petition is at best premature.[26] Furthermore, several of the NYAG's claims in the NYAG Enforcement Action would, if successful, result in a benefit to the NRA, including the NYAG's claims for restitution and recovery of unauthorized compensation directed at the individual defendants in that action.[27]

38.     For the foregoing reasons, the Attorney General requests that the Court dismiss the NRA's petition for being filed absent the requisite good faith.

## II.     Alternatively, the Court Should Appoint a Chapter 11 Trustee.

39.     If the Court does not dismiss the petitions as filed in bad faith, it is respectfully submitted that it should alternatively appoint a Chapter 11 trustee pursuant to 11 U.S.C.§ 1104.

---

[26] To the extent that the NRA hinted at the first day hearing that it has filed for bankruptcy to consolidate pending lawsuits, it publicly states otherwise and has failed to set forth the groundwork for the same. Thus far the NRA has only identified sixteen (16) pending lawsuits, in connection with its application for approval of special counsel. Dkt. 84-2. But ten of those cases were commenced by the NRA. A number have been consolidated for litigation. Further, one proceeding has been dismissed with no opportunity for appeal (the JPML application), another is on appeal (*NRA v. Cuomo*, 20-cv-385 (N.D.N.Y.) (a suit challenging COVID-related restrictions)), and another has been stayed pending the outcome of the NYAG Enforcement Action (*NRA v. North*, Index No. 903843-20 (Sup. Ct. Albany Cnty.)). Moreover, the NRA already argued that it should be permitted to consolidate litigation and the JPML denied its application, finding a lack of sufficient relationship between the lawsuits. Appendix Exhibit 3 at 272-74.

[27] *See* Appendix Exhibit 1 at 147-165 (Counts Three through Thirteen and Eighteen).

Appointment of a trustee is appropriate where, as here, there is evidence of fraud, dishonesty, incompetence and mismanagement by the debtor's current leadership. Further, there is significant evidence that appointment of a trustee would be in the interests of the NRA's creditors and the estate.

40.     Courts will leave a debtor in possession in place only where current management "can be depended upon to carry out the fiduciary responsibilities of a trustee." *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) (quoting *Wolf v. Weinstein*, 372 U.S. 633, 651 (1963)). Where management is incapable of performing these duties, or where the confidence of creditors evaporates, a Chapter 11 trustee must be appointed. *See In re Marvel Entm't Group, Inc.* 140 F.3d 463, 473 (3d Cir. 1998).

41.     Appointment of a Chapter 11 trustee is an extraordinary remedy and accordingly there is a presumption in favor of allowing the debtor to remain in possession. *See, e.g., In re 1031 Tax Group, LLC*, 374 B.R. 78, 85 (Bankr. S.D.N.Y. 2007) (citing *In re Euro-American Lodging Corp.*, 365 B.R. 421, 426 (Bankr. S.D.N.Y. 2007)); *In re Sharon Steel Corp.*, 871 F.2d 1217, 1225-26 (3d Cir. 1989); *In re Evans*, 48 B.R. 46, 47 (Bankr. W.D. Tex. 1985).

42.     The party seeking appointment of a trustee must prove its case by a clear and convincing standard based upon the particular facts before the court. *See In re Cajun Elec. Power Co-op, Inc.*, 69 F.3d 746, 750 (5th Cir. 1995), *withdrawn in part on reh'g*, 74 F.3d 599 (5th Cir. 1996) (adopting earlier dissent's reasoning on conflicts constituting sufficient cause to appoint trustee), *cert. denied*, 519 U.S. 808 (1996); *In re Patman Drilling Int'l, Inc.*, Case No. 07-34622-SGJ, 2008 WL 724086 (Bankr. N.D. Tex. 2008).

43.    However, "[i]f a court finds that the moving party has discharged this burden, it 'shall' appoint a trustee." *In re G-I Holdings, Inc.*, 385 F.3d 313, 318 (3d Cir. 2004) (citing 11 U.S.C. § 1104(a)(1)); *see also Marvel*, 140 F.3d at 471; *Sharon Steel*, 871 F.2d at 1225-26.

### A.    Cause exists to appoint a Chapter 11 trustee under 11 U.S.C. § 1104(a)(1).

44.    Section 1104(a)(1) provides that "on request of a party in interest or the United States Trustee…the court *shall* order the appointment of a trustee…for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either *before* or after the commencement of the case[.]" 11 U.S.C. § 1104(a)(1) (emphasis added). The categories enumerated in Section 1104(a)(1) are illustrative and not exclusive. *See Marvel*, 140 F.3d at 472.

45.    There is cause for appointment of a trustee under § 1104(a)(1) due to the ample evidence of fraud, dishonesty, incompetency and gross mismanagement of the NRA's affairs. Allegations of such misconduct are set out at length in the 163-page NYAG Enforcement Complaint.[28] Those allegations are the result of a more than year-long investigation which yielded proof of such misconduct from admissions in sworn testimony from current and former NRA officers and directors, the NRA's business records, and the NRA's regulatory filings. Indeed, the NRA confirmed certain of the NYAG's investigatory findings in regulatory disclosures made in November 2020, after the NYAG commenced the NYAG Enforcement Action. The NYAG Enforcement Complaint sets out allegations of pervasive and persistent violations of New York laws governing charitable not-for-profit entities, only a sample of which constitute cause for appointment of a trustee. Representative examples of such misconduct, as described below, provide sufficient cause for appointment of a trustee.

---

[28] Appendix pp. 1-169.

   *i.*   ***Management's use of the NRA's charitable assets to benefit themselves and other insiders constitutes the type of fraud, dishonesty, and gross mismanagement that suffice as cause to appoint a trustee.***

46.  "Diversion of funds and misuse of corporate assets constitutes fraud or dishonesty sufficient to warrant appointment of a trustee under section 1104(a)(1)." *In re PRS Insurance Group, Inc.*, 274 B.R. 381, 385 (Bankr. D. Del. 2001); *see also In re Professional Accountants Referral Svcs., Inc.*, 142 B.R. 424, 428-29 (Bankr. D. Color. 1992) (diversion of corporate assets for personal use constitutes dishonesty or gross mismanagement which required the appointment of a trustee); *In re Bibo, Inc.*, 76 F.3d 256, 257 (9th Cir. 1996) (court had "ample basis" for appointing a trustee where management had siphoned funds from the debtor through kickbacks); *Sharon Steel*, 871 F.2d at 1228 (systemic syphoning of debtor's assets to other companies under shareholder's common control constituted cause for appoint of trustee).

47.  The NYAG Enforcement Complaint is replete with examples of LaPierre's and his lieutenants' siphoning of tens of millions of dollars out of the NRA to use for their own purposes while failing to disclose such payments on regulatory filings and blatantly violating the NRA's reimbursement, procurement, and expense policies.[29]

48.  As one example of this type of conduct, the NRA has incurred substantial costs paying for LaPierre's private air travel and the private air travel of his family for non-business purposes and in violation of NRA policies and practices. Charging personal expenses, including travel expenses, to a business has been found to constitute gross mismanagement.

49.  From May 2015 to April 2019 (the most recent date for which the NYAG has such NRA records), the NRA incurred over $1 million in expenses for private flights when LaPierre was not a passenger. For example, in February 2018, LaPierre authorized a private flight for an

---

[29] *See* Appendix Exhibit 1 at 39-76.

NRA spokesperson, her husband, and an Ackerman employee from Dallas, TX to Fort Lauderdale, FL and Washington D.C. These flights cost $107,775.

50.     In addition, the NRA incurred costs for private chartered jets for travel by LaPierre's family that lacked a reasonable business purpose or do not appear to have been approved by the NRA Board. Some instances include:

a.   In August 2016, LaPierre authorized a private flight for his niece and her husband to fly from Dallas, TX, to their home in North Platte, NE at the cost of almost $12,000.

b.   In October 2016, LaPierre authorized a private flight for his wife to fly alone from Madison, WI, to Kearney, NE, near his niece's home, at a cost of more than $8,800.

c.   In January 2017, LaPierre authorized a private jet to pick up his niece's husband in Nebraska, on the way to Las Vegas for a Safari Club convention in order "to help babysit" while LaPierre's niece worked "because there was nobody else to do it." LaPierre also authorized a private flight to fly his niece's husband back to Nebraska two days before his niece returned at a cost of about $15,000.

d.   In July 2017, LaPierre authorized a private flight for his niece and her daughter to fly from Dallas, TX, to Orlando, FL, testifying "She had tried to travel commercial. All the commercial flights they had – there was a mechanical problem." The cost of the flight was more than $26,995.

e.   In November 2018, LaPierre and his wife took a private roundtrip flight from Washington D.C. to Dallas, TX, and stopped in North Platte, NE, on each leg of the trip to pick up and drop off LaPierre's niece and grandniece. These flights cost $59,790.

f.   LaPierre and his family took NRA-funded private flights to and from the Bahamas, often stopping in Nebraska on each leg of the trip to pick up and drop off his niece and her family. The NRA paid over half a million dollars for each of these flights.

51.     The NRA's former Chief Financial Officer ("**CFO**") Craig Spray[30] testified that, in the fall of 2018, as one of his efforts to cut spending, the NRA eliminated "all non-mission-critical

---

[30] Craig Spray was hired first as the NRA's CFO in 2018 and subsequently appointed as Treasurer by the Board. He was re-appointed at the October 2020 NRA Annual Board Meeting. However, upon information and belief, Mr. Spray

travel" to reduce the NRA's expenses. But NRA records establish that it continued to pay for private flights with no apparent business purpose. For example, in March 2019, LaPierre and his wife Susan took a private flight from Washington D.C. to Orlando, FL, and stopped in North Platte, NE, on the way back to drop off his niece and grandniece. These flights cost $78,900. In April 2019, LaPierre and his wife took a private flight from Washington D.C. to Tulsa, OK, making additional stops in Omaha and North Platte, NE. These flights cost $49,535. When presented with an invoice showing that LaPierre, his wife, his niece, and his grand-niece travelled in 2019 by charter plane to/from Washington, D.C.; Orlando, FL; and North Platte, NE, for approximately $71,000, the NRA's former CFO testified that he did not know what business purpose would be served by private flights to or from North Platte, NE.

52.    In fact, the former NRA CFO learned for the first time that LaPierre's wife travels by private charter alone at the NRA's expense when counsel informed him the night before he was examined by the NYAG in June 2020.

53.    These and other personal travel expenses were not properly reported on the NRA's required regulatory disclosures. In its annual filings with the NYAG for 2014 to 2018, the NRA inaccurately asserted that it required substantiation prior to reimbursing these expenses. But in its IRS Form 990 for 2019 (publicly filed in November 2020 *after* the NYAG Enforcement Action alleged flagrant disregard by NRA senior executives of the NRA's travel and other expense reimbursement policies) the NRA reversed itself and admitted that it did not require substantiation of a business purpose for private flights billed to the NRA prior to payment or reimbursement.

54.    NRA funds were also used to pay for an expensive private travel consultant for LaPierre. From August 2014 to January 2020, the NRA paid LaPierre's personal travel consultant

---

resigned since the filing of the bankruptcy petitions. Counsel for the NRA informed the Court at a hearing on February 10, 2021 that Sonya Rowling, an NRA employee, now holds the position of CFO.

more than $13.5 million. For almost the entirety of this time, the consultant worked without a contract, without having been subject to competitive bidding and without Board approval. Once the travel consultant's contract was finally subject to competitive bidding, the price of the services dropped to a fraction of what they had been before.

55. These examples relate not only to LaPierre's abuse of private travel but serve to demonstrate how the lack of oversight, minimal governance, and absence of honest reporting resulted in waste of charitable resources.

56. Following commencement of the NYAG Enforcement Action in August 2020, the NRA finally acknowledged that it improperly paid for LaPierre's personal travel expenses, and only disputes the amount of those payments. For example, in its 2019 IRS Form 990, the NRA admitted (for the first time) to paying LaPierre approximately $300,000 in travel-related excess benefits.[31]

57. In the same filing, the NRA reported paying two former senior executives more than $1 million in excess benefits over a five-year period, including for personal travel, club, and meal expenses.[32] None of those benefits were timely reported in the NRA's annual IRS Form 990 and CHAR500 filings as required under federal and New York law. The NRA also reported (again for the first time) that other NRA executives and board members may have used first or business class travel without authorization in violation of the NRA's travel policy, but that it was currently "unable to estimate the amount of excess costs incurred."[33]

---

[31] See Appendix Exhibit 8 at 444, which contains a true and correct copy of the NRA's IRS Form 990 for 2019. The NYAG disputes this figure as insufficient to cover improper travel expenses and other personal expenses paid by the NRA but notes that throughout its 2019 IRS Form 990 filing, the NRA admits that it made improper payments and failed to disclose the same in earlier filings. The NRA has not stated that it is going to correct its earlier filings, perform a full investigation or seek to recoup all such monies wrongly paid.

[32] Appendix Exhibit 8 at 443 (reporting payments to Executive Director Chris Cox of more than $1 million in excess benefits, and to former Deputy Executive Director David Lehman for "personal travel, club, and meal expenses in the aggregate amount of at least $87,595.83").

[33] See Appendix Exhibit 8 at 444.

58.     This is in accord with LaPierre's consistent failure to implement, follow, and ensure compliance with NRA policy. At LaPierre's instigation, for example, between 2013 and 2017, LaPierre was reimbursed for more than $1.2 million in expenses.[34] These reimbursements include over $65,000 just for Christmas gifts from LaPierre. Each of the covered gifts far exceeded the $25 limit permitted under federal regulations and should have been reported as W-2 income to LaPierre.[35]

59.     Nor are LaPierre's reimbursements limited to Christmas gifts. They include NRA payments on items as varied as $800 mosquito control treatments outside his home for "security purposes"; baby shower gifts for his executive assistant's daughter-in-law for $237.04; a $1,260 hostess gift for the wife of a vendor; glass sculptures for Susan LaPierre's executive assistant for $381.60; and membership and participation fees for Susan LaPierre for the Shikar Safari Club International, which cost thousands of dollars annually.

60.     LaPierre has also routinely expensed his niece's lodging and airfare for events that were allegedly related to NRA business. As an NRA employee, LaPierre's niece was required to follow NRA policies and procedures for seeking approval and reimbursement for her work-related expenses and limits on such costs. Instead, LaPierre submitted reimbursement requests for his niece's travel expenses on numerous occasions. For example, in early 2017, LaPierre expensed $6,561.90 for his niece's 5-night stay at the Beverly Hills Hotel in Beverly Hills, CA. The nightly rate for the room was $1,075. From 2015 to 2017, LaPierre was reimbursed tens of thousands of dollars in expenses for his niece's airfare and lodging.

61.     LaPierre and other officers and directors also engaged in improper related party and conflict of interest transactions to benefit themselves, their families and other insiders. The NYAG

---

[34] Appendix Exhibit 1 at 51, ¶ 190.
[35] *See, e.g.,* 26 U.S.C. § 274(b); *see also* IRS Publication 463 Travel, Gift, and Car Expenses.

Enforcement Complaint has numerous examples of such transactions but a few are set forth to illustrate the lack of honesty, care and consideration of fiduciary duties by NRA executives and board members that warrants appointment of a trustee.

62. During LaPierre's trips to the Bahamas, he often utilized a 108-foot yacht owned by one of the NRA's large vendors. The yacht, named *Illusions*, is equipped with four staterooms, a 16-foot jet boat, and two jet skis. LaPierre testified that neither he nor the NRA paid for the use of *Illusions*. LaPierre also used *Illusions* for Mediterranean vacations.[36]



63. LaPierre has never disclosed his use of the *Illusions* yacht on the NRA Financial Disclosure Questionnaires that he, as an officer and *ex officio* director of the NRA, must submit to the NRA Secretary annually. Question 4 of the questionnaire asks:

> Have you or any relative received, or do you or any relative expect to receive, any gift, gratuity, personal favor, or entertainment with either a retail price of fair market value in excess of $250 from any person or entity that has or is seeking to have a business relationship with, or received funds from, NRA or any NRA Entity?

---

[36] Image taken from https://www.yachtcharterfleet.com/luxury-charter-yacht-36386/illusions.htm, last accessed February 10, 2021.

LaPierre answered no to this question in every questionnaire he submitted from 2008 to 2018 (the most recent questionnaire produced by the NRA to the OAG). Despite receiving luxury yacht vacations courtesy of a top NRA vendor, LaPierre similarly testified that he has never received a gift of value in excess of $250 from an NRA contractor or employee of an NRA contractor. Entities affiliated with this vendor were paid in excess of $100 million by the NRA between 2014 and 2019.

64.     LaPierre has also directed or overseen the diversion of NRA funds for purposes unrelated to the organization's mission. For example, between 2015 and 2018, the NRA paid $450,000 to a charity for which Susan LaPierre was a board member. That figure excludes amounts paid indirectly to the charity by being billed through NRA vendors. That charity's mission had no overlap with the NRA's charitable mission. In 2019, the NRA Audit Committee retroactively found that the $450,000 in direct payments to the charity were "fair, reasonable, and in the best interest of the NRA," but it failed to assess how donating such funds advanced the NRA's charitable purposes or the propriety of the other benefits LaPierre indirectly funneled to the charity.

65.     While the NRA is currently engaged in litigation with Ackerman McQueen in which it has accused Ackerman of improper invoicing and billing, the two had a close business relationship for three decades. The NRA's management, including LaPierre, negotiated and approved contracts with Ackerman, paying the public relations and advertising firm up to $42,682,439.97 per year. LaPierre admitted knowing that expenses were being passed through Ackerman. He further testified that prior to 2018, it was his understanding that *once per year*, former NRA Treasurer and CFO Wilson "Woody" Phillips would travel to Ackerman McQueen's headquarters to "look at their receipts" and he "just assumed as treasurer, [Phillips] was doing what he was supposed to." It was the NRA's obligation to ensure compliance with laws applicable to

not-for-profit entities and its pass through of expenses and oversight of payments clearly demonstrate, at a minimum, gross mismanagement and an almost total lack of oversight.

66.     The Brewer firm's retention and billing weigh in favor of the appointment of a trustee, serving as evidence of the gross mismanagement of the affairs of the NRA by current management. In retaining and determining the scope of work for the Brewer firm, LaPierre and the NRA failed to follow basic retention procedure. Most critically, LaPierre did not seek alternative bids to perform the work, review the financial terms of the firm's engagement, or undertake any consideration of project-based pricing as an alternative to hourly-based pricing.[37] Instead, the process of negotiating the engagement letter and the pricing, and reviewing and approving the firm's invoices, was left entirely to General Counsel John Frazer, despite the fact that he possessed little, if any, relevant experience. When he negotiated the original engagement letter with the Brewer firm, Frazer did not comply with the NRA's internal controls and policies by failing to obtain the requisite written approval from the NRA President and one Vice President.

67.     Over the course of the engagement itself, the Brewer firm has charged—and caused the NRA to incur—exorbitant legal fees. More specifically, according to NRA regulatory disclosures, the NRA has authorized and expended significant institutional funds—in excess of $38,621,386 million between March 2018 and December 2019—for payments to the Brewer firm. Upon information and belief that figure excludes billing for much of 2020 and does not include the $794,582.50 for services that solely "relate to the chapter 11 filings" in these bankruptcy cases.[38] That fee has been fully paid. In addition, the Brewer firm was paid a $2,551,039.54 retainer for anticipated work as special counsel in connection with this bankruptcy.[39]

---

[37] The Brewer firm's involvement here raises the specter of potential conflicts as well. The firm represented Wayne LaPierre in the course of the Attorney General's investigation.
[38] See Dkt. 84-5.
[39] See Dkt. 84-5.

ii.        **The NRA's consistent practice of filing false and misleading regulatory filings constitutes cause to appoint a trustee.**

68.        As a New York not-for-profit corporation holding charitable assets and operating in New York, the NRA must register and file accurate and complete annual reports with the Charities Bureau of the Office of the Attorney General. *See* N.Y. EPTL §§ 8-1.4(d) and (f). In addition to these registration requirements, as a charitable organization soliciting contributions in New York, the NRA must also register and file accurate and complete annual reports under Article 7-A of the Executive Law. N.Y. Exec. § 172-b. These annual reports, commonly referred to as CHAR500s, must include copies of an organization's annual IRS Form 990, and, for organizations like the NRA, copies of the organization's audited financial statements. *Id.* Further, the CHAR500s must be signed by: (i) the organization's President or Authorized Officer and (ii) its Chief Financial Officer or Treasurer, both of whom, by their signatures, certify under penalties of perjury that the report, including all attachments, is true and accurate. *See id.* New York law expressly provides that no person shall "[m]ake any material statement which is untrue in…[a] financial report or any other form or documents required to be filed" with the Attorney General's office pursuant to Article 7-A of the Executive Law. *See* N.Y. Exec. § 172-d(1).

69.        The NRA made materially false and misleading statements and omissions in its 2015, 2016, 2017, and 2018 CHAR500 filings with the Attorney General.[40] These statements included, but were not limited to, false statements about compensation and benefits for officers and directors, false statements about diversion of corporate assets, false statements about enforcement of its conflict of interest policy, false statements about its process for determining

---

[40] The NRA's 2019 IRS Form 990 was filed in November 2020. On its face, that form raises substantial questions about its accuracy and completeness. For example, the NRA admits on the form that it has "identified what it believes are excess benefit transactions in which it engaged in 2019 and in prior calendar years of which it became aware but were not reported in its prior forms 990." Appendix Exhibit 8 at 443. The NRA further indicated that these unspecified transactions were "still under review" and the NRA was unable at the time of filing to say whether the transactions constituted excess benefit transactions. *Id.*

compensation of officers, false statements about compensation and benefits of directors, false statements about compensation policies and reviews, and false statements about transactions with interested persons.[41] The NYAG Enforcement Complaint contains examples of false and misleading statements the NRA has filed in contravention of its obligations under New York Law during the period 2015-2018.[42] The NRA's consistent dishonesty in its regulatory filings constitutes cause to appoint a trustee.

70.     By way of example, for years, under the control of LaPierre, Frazer and other NRA officers and directors instituted a practice whereby millions of dollars in entertainment and travel expenses incurred by NRA executives were billed to the NRA as disbursements by the NRA's largest vendor, Ackerman McQueen. This evaded both the NRA's own accounting and IRS requirements for expense reimbursement and reporting.

71.     LaPierre and other insiders regularly used this Ackerman McQueen pass-through arrangement to conceal private travel and other costs that were largely personal in nature, wasting substantial charitable resources and exposing the NRA to potential liability for violation of IRS reporting requirements. In its mandated filings, such as in 2018, the NRA indicated that it required substantiation of all expenses prior to reimbursing or paying for expenses incurred by all directors, trustees and officers. But in its most recent filing, the 2019 IRS from 990, filed in November 2020, the NRA disclosed that in fact it did not require substantiation prior to reimbursing or allowing expenses incurred by all directors, trustees, and officers, including the CEO/Executive Director.[43]

72.     Misuse of NRA funds has continued even after the NRA was aware of the NYAG's investigation in April 2019. After the NYAG confronted the then-CFO with evidence relating to

---

[41] *See* Appendix Exhibit 1 at 136-40.
[42] *See* Appendix Exhibit 1 at 136-40.
[43] See Appendix Exhibit 8 at 434 (2019 Form 990, Schedule J, Part 1, Line 2).

the falseness of the NRA's previous filings, in its filing in November 2020, the NRA was forced to admit that it did not follow its written policy regarding payment or reimbursement for expenses including tax indemnification and gross-up payments, housing allowance or residence for personal use, and health or social club dues or initiation fees.

73.     In its November 2020 filing, the NRA further admitted that it engaged in excess benefit transactions with disqualified persons (of the kind alleged in the NYAG Enforcement Action) that had not been disclosed in earlier IRS filings, as required by law.[44] An excess benefit transaction is a transaction in which an economic benefit is provided by a not-for-profit entity, directly or indirectly, to a "disqualified person," and the value of the economic benefit provided by the organization exceeds the value of the consideration received by the organization. 26 CFR § 53.4958-4. A disqualified person is a person "in a position to exercise substantial influence over the affairs" of the not for profit. *Id.* § 53.4958-3 (citing 26 U.S.C. 4958(f)(1)(A)). In its 2019 IRS Form 990, the NRA further admits that has it has engaged in what it believes are excess benefit transactions in 2019 and earlier years, some of which were not reported in prior Form 990s.[45]

74.     These failures demonstrate dishonesty, fraud, and/or gross incompetence which could subject the NRA to sanctions, fines and tax exposure and are cause for appointment of a trustee. *See, e.g., Evans*, 48 B.R. at 47-49 (appointing Chapter 11 trustee where debtor in possession provided no excuse for failing to file tax returns, subjecting estate to possible interest and penalties, and failed to investigate potential preferential transfers).

---

[44] See Appendix Exhibit 8 at 398 (2019 Form 990, Part IV, quest 25(a) and (b)).
[45] See Appendix Exhibit 8 at 443-44 (Schedule L).

       ***iii.***        ***The NRA General Counsel's lack of oversight constitutes cause to appoint a trustee.***

75.     As a New York not-for-profit corporation exempt under the Internal Revenue Code § 501(c)(4), the NRA is a charity subject to the authority of the New York Attorney General. *See Citizens United v. Schneiderman*, 882 F.3d 374 (2d Cir. 2018). The NRA's use of its assets and institutional funds, its governance and operations, and the fiduciary duties of its officers and directors, are governed by the N-PCL and Estates Powers & Trusts Law ("**EPTL**"). The NRA's fundraising activities are governed by the Executive Law.

76.     Under New York law, the NRA's Board was required to adopt, implement and assure compliance with a conflict of interest policy that ensures the NRA's trustees, directors, officers and key persons act in the corporation's best interest and comply with legal requirements, including those concerning related party transactions. *See* N-PCL § 715-a; EPTL § 8-1.9. Likewise, the NRA and its Board of Directors were legally required to adopt, oversee and ensure compliance with a policy providing for an effective process to receive and consider whistleblower concerns and for protecting whistleblowers. *See* N-PCL § 715-b; EPTL § 8-1.9.

77.     In his capacity as Secretary and General Counsel, Frazer had the duty to be aware of these legal requirements and assure that appropriate changes were timely made in the NRA's governance procedures to comply with these requirements. From 2014 to 2018, Frazer failed to make the necessary changes to board governance procedures, or to advise officers and directors of the needed changes. He failed to ensure that related party transactions were being appropriately addressed in accordance with N-PCL § 715; failed to enforce compliance with the NRA's Conflict of Interest Policy for years; and failed to ensure that the NRA was in compliance with laws and policies governing whistleblowers.

iv.     **The NRA Board failed to appropriately review and approve lucrative contracts with insiders.**

78.     The NRA's lack of oversight resulted in the waste of millions of dollars in charitable assets. One example is in the awarding of lucrative contracts to insiders and entities providing personal benefits to the LaPierres without proper review and authorization of such transactions by the NRA Board. In some instances, such contracts have constituted related party transactions that the Board was required to approve upon contemporaneous proof that the transaction was fair, reasonable and in the corporation's best interest at the time of such determination. N-PCL § 715. Further, the NRA Board was required to adopt and ensure compliance with a conflict of interest policy to ensure that its directors, officers and key persons act in the corporation's best interest and comply with applicable legal requirements. N-PCL § 715-a. The Board failed to carry out these duties in many ways, including in regard to overseeing lucrative contracts to current and former NRA officers and employees and other insiders.

79.     Pursuant to the NRA Bylaws, the compensation of the executive vice president, the general counsel and the treasurer are set by the Board. These officers are not permitted to receive any compensation without specific Board authorization. Further, compensation must be accurately disclosed on regulatory filings. In addition, contracts above $100,000 in total payments require certain authorizations. Yet the NRA has awarded rich post-employment "consulting" contracts to its senior officers with little to no oversight or compliance with internal policies and without any real assessment of benefits to the NRA.

80.     As one instance of this conduct, LaPierre himself had a post-employment contract which provided for payments in excess of $1 million per year after his tenure as executive vice president ends due to retirement or losing a re-election bid. Originally signed in 2013, the contract was not properly ratified, reviewed, or reported to the Board or the government on regulatory

filings. The contract was amended a number of times. In each amendment, the duration and compensation provided in the contract increased. The NRA was obligated to continue to pay LaPierre for years after he lost re-election or retired and at a higher rate than his compensation as executive vice president. Pursuant to the April 30, 2018 amendment (the last amendment provided to the AG in its investigation), the contract provided for a 7-year compensation schedule paying $1,300,000 in 2019, and $1,500,000 for the next 6 years (2020-2025) with an additional five years (2026-2030) at similar rates.

81.     As another example, the NRA's former longtime treasurer and CFO, Wilson Phillips, before retiring, was awarded an independent consulting agreement under which he would be paid $30,000 per month for five years after his retirement, for unspecified consulting services, with no deliverables. This contract was signed by the then NRA President and First Vice President.[46] Carolyn Meadows was the First Vice President at that time; she is now NRA President. There is no evidence that the contract was properly reviewed or approved in conformance with NRA Bylaws and policies. The Chair of the Audit Committee testified that if the contract constituted a related party transaction and had been presented to the Audit Committee, "I can guarantee you my committee would not have approved that."

82.     In another instance, when the NRA terminated its former executive director of general operations, LaPierre directed the NRA to agree to pay the terminated officer for "consulting services" totaling approximately $1.8 million. This contract was not subject to competitive bidding, internal review or required approvals. Nor, upon information and belief, were services rendered under the contract, although the contract was paid.

---

[46] Ms. Meadows is part of the NRA Special Litigation Committee that LaPierre consulted to commence this bankruptcy case. *See* Dkt. 1.

83.     Such contracts are self-dealing, demonstrate a lack of compliance with internal policies and a lack of meaningful oversight, and constitute a waste of charitable assets. Yet these and similar contracts were not reviewed or approved appropriately or were retroactively approved without the required thorough analysis.[47]

> ***v.     The NRA also failed to properly implement required policies for whistleblower complaints.***

84.     Under New York law, an organization of the NRA's size must "adopt, and oversee the implementation of, and compliance with, a whistleblower policy to protect from retaliation persons who report suspected improper conduct." N-PCL § 715-b. The NRA failed in this obligation as well, stifling internal reform efforts.

85.     For example, in July 2018, a group of senior level staff in the Office of the Treasurer acted as whistleblowers when they created a "List of Top Concerns for the Audit Committee" which enumerated their concerns relating to financial conflicts of interest, senior management override of internal controls, and vague and deceptive billing practices. On July 30, 2018, the Audit Committee held an emergency meeting at which the concerns were presented. The Report of the Audit Committee documenting the July 30, 2018 meeting makes no mention of the fact that whistleblowers came forward. In contrast, it was the usual practice of the Audit Committee to expressly note in its committee reports when "there were no instances of whistleblowing reported." Upon information and belief, NRA personnel failed to take appropriate steps to protect the whistleblowers and took affirmative steps to conceal the nature and scope of the NRA whistleblower' concerns from its external auditors.[48]

---

[47] *See* Appendix Exhibit 1 at 85-91.
[48] See also Appendix Exhibit 1 at 121-24.

**B.      Appointment of a trustee is also appropriate under § 1104(a)(2).**

86.      Courts have broad discretion to appoint a Chapter 11 trustee even absent a finding

of "cause," when such "appointment is in the interests of creditors, any equity security holders,

and other interests of the estate…." *See* 11 U.S.C. § 1104(a)(2). In making its determination of

whether to exercise its equitable powers to appoint a trustee under Section 1104(a)(2), courts "look

to the practical realities and necessities inescapably involved in reconciling competing interests."

*See In re Hotel Assocs., Inc.*, 3 B.R. 343, 345 (Bankr. E.D. Pa. 1980).

87.      In deciding whether a trustee should be appointed under Section 1104(a)(2), courts

commonly consider the following factors: (1) the debtor's trustworthiness; (2) past and present

performance and the potential for reorganization; (3) whether creditors have confidence in present

management; and (4) the benefits of appointing a trustee balanced against the cost of appointment.

*See In re Morningstar Marketplace, Ltd.*, 544 B.R. 297, 304 (Bankr. M.D. Pa. 2016)(*citing*

*Europark Indus., Inc.*, 424 B.R. at 621); *In re Ionosphere Clubs, Inc.*, 113 B.R. 164 (Bankr.

S.D.N.Y. 1990); *see also Evans*, 48 B.R. at 48.

88.      In this case, consideration of the factors weighs in favor of a trustee. As discussed

above, the NRA, LaPierre and the management teams he has put into place have a long-standing

history of failing in their fiduciary duties to the NRA and lacking honesty and care in their

oversight of the NRA's charitable assets. These facts, including a history of filing false and

misleading regulatory filings, leads to the conclusion that the NRA's current top management

cannot be trusted. Similarly, the NRA's past performance—management's abuse of expense and

reimbursement policies, disregard of New York regulatory laws, and failure to establish any

meaningful oversight—should be considered and weighed in determining the equity of appointing

a chapter 11 trustee. The lack of trust in the current management is further demonstrated by, for

example, former NRA Board member Phillip Journey's filing of a request for appointment of an

examiner[49] and commencement of an NRA member class action against the NRA in the Middle District of Tennessee.[50] Where, as here, a debtor's "inherent conflicts extend beyond the healthy conflicts that always exist between debtor and creditor," a trustee is warranted. *See Marvel* 140 F.3d at 472-73 and 474 (*citing and relying on Cajun Elec.*, 74 F.3d at 600 (adopting dissent 69 F.3d at 751)).

89.     In light of the fraud, dishonesty, false filings, and gross mismanagement, it is respectfully submitted that a trustee should be appointed under 11 U.S.C. § 1104(a)(1). Further, given the contentious litigation, the conduct demonstrated in relation to the filing of these bankruptcy cases, and the lack of trust in the NRA's current management, a trustee is necessary to serve the best interests of the estate and the creditors under § 1104(a)(2).

## CONCLUSION

90.     This case presents an extraordinary and unique set of facts. In the face of the substantial allegations of illegal conduct in the state in which it is chartered, and a pending enforcement action there, the NRA has decided that it can cross state borders with its assets and open up in a different jurisdiction to evade law enforcement action. It has filed for bankruptcy using a newly formed subsidiary, while claiming to be financially solvent, to avoid regulation in the state where is chartered and subject to oversight.

91.     Given the particular facts before the Court, it is respectfully submitted that this bankruptcy proceeding was brought in bad faith and should be dismissed. In the alternative, a trustee should be appointed for cause based upon the demonstration of fraud, dishonesty, and gross mismanagement by the current management, and to protect the interests of creditors and the estate itself.

---

[49] *See* Motion for Appointment of Examiner [Docket No. 114].
[50] *See Dell'Aquila v. NRA,* M.D. Tenn. Case. No. 19-cv-00679.

Dated: February 12, 2021.                      Respectfully submitted,

                                               */s/ Gerrit M. Pronske*
                                               Gerrit M. Pronske
                                               State Bar No. 16351640
                                               Eric M. Van Horn
                                               State Bar No. 24051465
                                               Jason P. Kathman
                                               State Bar No. 24070036
                                               **SPENCER FANE LLP**
                                               2200 Ross Avenue, Suite 4800 West
                                               Dallas, Texas 75201
                                               (214) 750-3610 – Telephone
                                               (214) 750-3612 – Telecopier
                                               -and-
                                               5700 Granite Parkway, Suite 650
                                               Plano, Texas 75024
                                               (972) 324-0300 – Telephone
                                               (972) 324-0301 – Telecopier
                                               Email: gpronske@spencerfane.com
                                               Email: ericvanhorn@spencerfane.com
                                               Email: jkathman@spencerfane.com

                                                       -- And –

                                               */s/ James Sheehan*
                                               James Sheehan
                                               *Pro Hac Vice*
                                               Emily Stern
                                               *Pro Hac Vice*
                                               Monica Connell
                                               *Pro Hac Vice*
                                               Stephen Thompson
                                               *Pro Hac Vice*
                                               28 Liberty Street
                                               New York, NY 10005
                                               (212) 416-8401
                                               Email: James.Sheehan@ag.ny.gov
                                               Email: Emily.Stern@ag.ny.gov
                                               Email: Monica.Connell@ag.ny.gov
                                               Email: Stephen.Thompson@ag.ny.gov

                                               **COUNSEL FOR THE PEOPLE OF
                                               THE STATE OF NEW YORK, BY
                                               LETITIA JAMES, ATTORNEY GENERAL
                                               OF THE STATE OF NEW YORK**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 12, 2021, a true and correct copy of the foregoing was served upon all parties entitled to notice, including the Debtors and United States Trustee, via the Court's electronic transmission facilities.

*/s/ Gerrit M. Pronske*
Gerrit M. Pronske