Gerrit M. Pronske
State Bar No. 16351640
Eric M. Van Horn
State Bar No. 24051465
Jason P. Kathman
State Bar No. 24070036
**SPENCER FANE LLP**
2200 Ross Avenue, Suite 4800 West
Dallas, TX 75201
(214) 750-3610 – Telephone
(214) 750-3612 – Telecopier
-and-
5700 Granite Parkway, Suite 650
Plano, TX 75024
(972) 324-0300 – Telephone
(972) 324-0301 – Telecopier
Email: gpronske@spencerfane.com
Email: ericvanhorn@spencerfane.com
Email: jkathman@spencerfane.com

**COUNSEL FOR THE PEOPLE OF
THE STATE OF NEW YORK, BY
LETITIA JAMES, ATTORNEY GENERAL
OF THE STATE OF NEW YORK**

James Sheehan
*Pro Hac Vice*
Emily Stern
*Pro Hac Vice*
Monica Connell
*Pro Hac Vice*
Stephen Thompson
*Pro Hac Vice*
**OFFICE OF THE ATTORNEY GENERAL
OF THE STATE NEW OF NEW YORK**
28 Liberty Street
New York, NY 10005
(212) 416-8401 – Telephone
Email: James.Sheehan@ag.ny.gov
Email: Emily.Stern@ag.ny.gov
Email: Monica.Connell@ag.ny.gov
Email: Stephen.Thompson@ag.ny.gov

**COUNSEL FOR THE PEOPLE OF
THE STATE OF NEW YORK, BY
LETITIA JAMES, ATTORNEY GENERAL**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **CASE NO. 21-30085-hdh-11** |
| **NATIONAL RIFLE ASSOCIATION** | § | |
| **OF AMERICA and SEA GIRT LLC,** | § | **CHAPTER 11** |
| | § | |
| Debtors.[1] | § | **Jointly Administered** |

## APPENDIX TO THE STATE OF NEW YORK'S MOTION TO DISMISS, OR, IN THE ALTERNATIVE, TO APPOINT CHAPTER 11 TRUSTEE

---

[1] The last four digits of the Debtors' taxpayer identification numbers are: 6130 (NRA) and 5681 (Sea Girt). The Debtors' mailing address is 11250 Waples Mill Road, Fairfax, Virginia 22030.

---

## APPENDIX

| EXHIBIT | DOCUMENT DESCRIPTION | PAGE NUMBER |
|---|---|---|
| 1. | NYAG State Enforcement Action Complaint<br>People v. NRA, No. 451625/2020 (Sup. Ct. N.Y. Cnty.) | Appx. 1-169 |
| 2. | Transcript containing order on motions to change venue or dismiss<br>People v. NRA, No. 451625/2020 (Sup. Ct. N.Y. Cnty.) | Appx. 170-271 |
| 3. | Order Denying Transfer<br>In re: NRA Business Expenditures Litigation, MDL No. 2979 | Appx. 272-275 |
| 4. | "Letter from Wayne" dated Jan. 15, 2021, www.NRAForward.org | Appx. 276-278 |
| 5. | Press Release dated Jan. 15, 2021, www.NRAForward.org | Appx. 279-282 |
| 6. | "Questions & Answers", www.NRAForward.org | Appx. 283-286 |
| 7. | NRA IRS Form 990 for 2018 | Appx. 286-394 |
| 8. | NRA IRS Form 990 for 2019 | Appx. 395-459 |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK, | Index No. |
| Plaintiff, | **Summons** |
| v. | Date Index No. Purchased: August 6, 2020 |
| THE NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., WAYNE LAPIERRE, WILSON PHILLIPS, JOHN FRAZER, and JOSHUA POWELL, | |
| Defendants. | |

TO THE ABOVE NAMED DEFENDANTS:

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue pursuant to CPLR § 503(a) is that Plaintiff is located in New York County, with its address at 28 Liberty Street, New York, New York 10005, and because the office of defendant The National Rifle Association of America, Inc. is in New York County as set forth in its certificate of incorporation, pursuant to N-PCL §§ 1110 and 102(a)(11).

Dated: New York, New York
August 6, 2020

LETITIA JAMES
Attorney General of the State of New York
*Attorney for Plaintiff*

By: _____
James Sheehan
Charities Bureau Chief
28 Liberty Street
New York, New York 10005
Tel. (212) 416-8401

Appx. 1

THE NATIONAL RIFLE ASSOCIATION OF AMERICA, INC.
11250 Waples Mill Road
Fairfax, Virginia 22030


WAYNE LAPIERRE
c/o The National Rifle Association of America, Inc.
11250 Waples Mill Road
Fairfax, Virginia 22030


WILSON PHILLIPS
*Address withheld for privacy reasons


JOHN FRAZER
c/o The National Rifle Association of America, Inc.
11250 Waples Mill Road
Fairfax, Virginia 22030


JOSHUA POWELL
*Address withheld for privacy reasons

Appx. 2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PEOPLE OF THE STATE OF NEW YORK, BY
LETITIA JAMES, ATTORNEY GENERAL OF
THE STATE OF NEW YORK,

                              Plaintiff,

              v.

THE NATIONAL RIFLE ASSOCIATION OF
AMERICA, INC., WAYNE LAPIERRE,
WILSON PHILLIPS, JOHN FRAZER, and
JOSHUA POWELL

                              Defendants.

Index No.

**Verified Complaint**

Appx. 3

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

PART ONE - THE PARTIES..................................................................................6

PART TWO - JURISDICTION AND VENUE..................................................................8

PART THREE - APPLICABLE LAW..................................................................9

I.   Attorney General's Statutory Authority to Bring Actions to Dissolve Not-for-Profit Corporations, to Remove Board Members, and to Seek an Accounting of Misspent Funds........................................................................................ 9

II.  Legal Requirements for New York Not-for-Profit Corporations and their Officers, Directors and Key Persons.......................................................................... 10

III. Registration and Reporting Requirements for New York Not-for-Profit Corporations ...... 13

IV.  Legal Obligations Under the New York Prudent Management of Institutional Funds Act................................................................................................ 14

PART FOUR - THE NRA'S HISTORY AND INTERNAL GOVERNANCE............................15

I.   The NRA's History ..................................................................................... 15

II.  The NRA's Internal Structure and Governance.................................................. 16

     A.   The NRA's Organizational Structure....................................................... 16

     B.   The NRA's Bylaws ......................................................................... 17

     C.   The NRA's Policy and Procedures on Hiring, Spending, Procurement, Travel Reimbursement, Conflicts of Interest, and Related Party Transactions .................... 25

PART FIVE - DEFENDANTS' VIOLATIONS OF NEW YORK LAW..................................34

I.   Widespread Violations of Law of the NRA's Senior Management under the Leadership and Direction of Wayne LaPierre ..................................................................... 34

     A.   LaPierre's Improper Spending and Expensing ........................................... 35

     B.   Wilson "Woody" Phillips's Conflicts of Interest, Related Party Transactions, and Self-Dealing .................................................................................... 52

     C.   Joshua Powell's Conflicts of Interest, Related Party Transactions, and Negligence.. 58

     D.   John Frazer's Negligence and Certifications of False or Misleading Annual Filings 65

     E.   Improper Expenditures by LaPierre's Senior Assistant and Direct Report ............... 68

II.  The NRA's Use of Longtime Vendors and Consulting Agreements to Hide Improper Expenditures, Self-Dealing, and Related Party Transactions ............................................. 71

     A.   Ackerman McQueen and Mercury Group ................................................. 71

     B.   Consulting Agreements with Former Employees ........................................ 80

     C.   Related Party Transactions with Board Members ...................................... 86

III. The Individual Defendants Received Excessive Compensation that the NRA Did Not Accurately Disclose ........................................................................... 93

i

A.    The NRA Board Failed to Follow an Appropriate Process to Determine Reasonable Compensation for NRA Executives.......................................................................... 93

B.    The Officers Compensation Committee and the NRA Board Failed to Consider or Approve LaPierre's and Phillips's Complete Compensation Prior to Making Compensation Determinations..................................................................................... 98

C.    LaPierre Failed to Properly Determine Powell's Compensation............................. 101

D.    The NRA's Compensation Disclosures to the Attorney General and the Internal Revenue Service Were False or Misleading ............................................................ 102

IV.   The NRA's Retaliation Against Dissidents on the Board ................................................. 106

A.    Dissident No. 1........................................................................................................ 106

B.    Dissident Board Members........................................................................................ 113

V.    The NRA Board's Failures Resulting in Violations of Law.............................................. 114

A.    Audit Committee's Failure to Respond Adequately to Whistleblowers.................. 116

B.    Audit Committee's Failure to Appropriately Review and Approve Related Party Transactions and Conflicts of Interest ..................................................................... 119

C.    Audit Committee's Failure to Oversee Adequately the External Auditors ............. 125

D.    The Audit Committee Acted *Ultra Vires* in Indemnifying Officers, Directors, and Employees................................................................................................................ 128

VI.   The NRA's Failure to Institute an Effective Compliance Program................................... 129

VII.  The NRA's False Regulatory Filings ............................................................................... 131

VIII. The NRA's Violation of its Duties under the New York Prudent Management of Institutional Funds Act .................................................................................................... 135

CAUSES OF ACTION..............................................................................................................138

PRAYER FOR RELIEF ............................................................................................................161

VERIFICATION.......................................................................................................................164

ii

The People of the State of New York, by their attorney, Letitia James, Attorney General of the State of New York, respectfully allege as follows:

## PRELIMINARY STATEMENT

1.      For 149 years, the National Rifle Association of America, Inc. (the "NRA" or the "Association") has operated as a New York not-for-profit, charitable membership corporation. As a New York charity, the NRA is legally required to serve the interests of its membership and advance its charitable mission.

2.      For nearly three decades, Wayne LaPierre has served as the chief executive officer of the NRA and has exploited the organization for his financial benefit, and the benefit of a close circle of NRA staff, board members, and vendors. Contrary to his statutory duties of care, loyalty and obedience to the mission of the charity, LaPierre has undertaken a series of actions to consolidate his position; to exploit that position for his personal benefit and that of his family; to continue, by use of a secret "poison pill contract," his employment even after removal and ensuring NRA income for life; and to intimidate, punish, and expel anyone at a senior level who raised concerns about his conduct. The effect has been to divert millions of dollars away from the charitable mission, imposing substantial reductions in its expenditures for core program services, including gun safety, education, training, member services and public affairs. During the period 2015 to 2018, the NRA has reported a reduction in unrestricted net assets by $63 million.

3.      In his role as Executive Vice President, LaPierre has significant discretion and authority in hiring, promoting, and retaining NRA employees, in nominating directors to the NRA Board, and in contracting with vendors. LaPierre has a fiduciary obligation to exercise that discretion and authority in the best interests of the organization. Instead, LaPierre often hired and retained individuals in senior positions at the NRA, or as NRA contractors, whom he believed

1

Appx. 6

would aid and enable him to control the organization, regardless of their skills, experience, integrity or contribution to the charitable mission.

4.      Among the senior executives that LaPierre handpicked to facilitate his misuse of charitable assets were Defendants Wilson "Woody" Phillips, Joshua Powell, and John Frazer (together with LaPierre, the "Individual Defendants"). LaPierre hired and retained each of them despite their lack of skills or experience for their respective roles and responsibilities. Despite their lack of experience, LaPierre entrusted them with substantial authority for managing and administering the NRA's charitable assets and bearing responsibility for the NRA's legal compliance. In accordance with the NRA bylaws, each of them was under LaPierre's authority and within the scope of his responsibility. Like LaPierre, each of them regularly ignored, overrode or otherwise violated the bylaws and internal policies and procedures that they were charged with enforcing. As a result of these repeated violations, charitable assets were diverted to benefit NRA insiders and favored vendors.

5.      At LaPierre's direction, Phillips, the former Treasurer and Chief Financial Officer, instituted a practice whereby millions of dollars in entertainment and travel expenses incurred by NRA executives were billed to the NRA as disbursements by the NRA's largest vendor. This practice evaded both the NRA's own accounting and Board-established expense reimbursement process, and IRS requirements for proper expense reimbursement. LaPierre, Phillips, and Powell regularly used this pass-through arrangement to conceal private travel and other costs that were largely personal in nature, wasting substantial charitable resources and exposing the NRA to millions of dollars of potential liability for violation of IRS reporting requirements.

6.      Powell, Chief of Staff and the Executive Vice President of Operations, was given pay increases, at LaPierre's direction, that nearly tripled his salary in a less than three years, despite

2

complaints of abusive behavior, and evidence of illegal conduct and inappropriate spending. Within a year after LaPierre designated Powell to lead the NRA's compliance program, he was fired for falsifying his travel expenses.

7.    LaPierre's choice as General Counsel, Frazer, had only a brief 18-month tenure in private practice and was unprepared to manage the legal and regulatory affairs of the NRA. Frazer also serves as the corporation's Secretary but has little apparent knowledge of the requirements of New York law governing not-for-profit corporations. For example, Frazer repeatedly failed to ensure that the NRA's many related party transactions with NRA insiders were being reviewed or properly considered by NRA officers and directors in accordance with New York law. He also failed to maintain and enforce whistleblower and conflict of interest policies that met the requirements of applicable law.

8.    With the assistance of Phillips, Powell and Frazer, LaPierre abused his position as a fiduciary to the NRA to obtain millions of dollars in personal benefits in the form of undisclosed, excessive compensation, which includes in-kind benefits and reimbursements from the NRA and its vendors. For example,

a.    LaPierre has spent millions of dollars of the NRA's charitable assets for private plane trips for himself and his family, including trips for his family when he was not present.

b.    In the last five years, LaPierre and his family have visited the Bahamas by private air charter on at least eight occasions, at a cost of more than $500,000 to the NRA. On many of those trips, LaPierre and his family were gifted the use of a 107-foot yacht owned by an NRA vendor.

c.    LaPierre received hundreds of thousands of dollars in gifts from another NRA vendor in the form of complimentary safaris in Africa and other world-wide locations for himself and his spouse.

9.    LaPierre, with the aid of Phillips, Powell and Frazer, procured personal financial benefits for board members, vendors and even former employees. In doing so, they violated NRA

Appx. 8

policy on contracting and business ethics, as well as legal mandates on conflicts of interest, related party transactions, and prohibitions on *ex gratia* payments. For instance, LaPierre and Phillips entered into post-employment agreements with departing officers and employees that provided excessive payments in exchange for little, if any, services and non-disclosure/non-disparagement agreements. Powell secured contracts that benefited his family members without disclosure of his familial relationship. And Frazer permitted the NRA to secretly pay millions of dollars to several board members through consulting arrangements that were neither disclosed to, nor approved by, the NRA Board.

10. Efforts to question or challenge LaPierre's leadership were quashed or ignored. LaPierre retaliated against the NRA President after personally lobbying him to take on the position. LaPierre withdrew his critical support after the President began to independently assess the governance of the NRA upon learning of complaints by whistleblowers, senior staff and donors. Senior members of the NRA's financial staff jointly made a formal whistleblower complaint to the Audit Committee of the NRA Board in 2018 itemizing numerous practices that abused NRA assets. Employees also complained about Powell's practices and behavior, which LaPierre, himself, described as "abusive." But these complaints were never properly investigated or meaningfully addressed. Defendants failed to comply with, maintain, and ensure compliance with whistleblower policies consistent with New York law and permitted or personally retaliated against those who questioned their wrongdoing.

11. As a result of these failures, the NRA, at the direction of the Individual Defendants and with a series of failures of required oversight by its Board, has persistently engaged in illegal and unauthorized activities in the conduct and transaction of its business. Individual Defendants—in their roles as officers and directors—routinely circumvented internal controls; condoned or

Appx. 9

partook in expenditures that were an inappropriate and wasteful use of charitable assets; and concealed or misreported relevant information, rendering the NRA's annual reports filed with the Attorney General materially false and misleading. Defendants abdicated all responsibility for ensuring that the NRA's assets were managed prudently and in good faith.

12.     As a result of these persistent violations of law by the Defendants, the Attorney General seeks a finding by this Court that the NRA is liable to be dissolved pursuant to (a) N-PCL § 1101(a)(2) based upon the NRA's pattern of conducting its business in a persistently fraudulent or illegal manner, abusing its powers contrary to public policy of New York and its tax exempt status, and failing to provide for the proper administration of its trust assets and institutional funds; and/or (b) N-PCL § 1102(a)(2) because directors or members in control of the NRA have looted or wasted the corporation assets, have operated the NRA solely for their personal benefit, or have otherwise acted in an illegal, oppressive or fraudulent manner. The Attorney General requests that this Court determine, in the exercise of its discretion under Section 1109(b)(1) of the N-PCL, that the interest of the public and the members of the NRA supports a decision to dissolve the NRA.

13.     The Attorney General also seeks an order, pursuant to the Not-for-Profit Corporation Law ("N-PCL"), Estates Powers & Trusts Law ("EPTL"), and Executive Law ("Exec. Law") (i) directing the Individual Defendants to account, make restitution and pay all penalties resulting from the breach of fiduciary duties and their misuse of charitable assets for their own benefit and interests; (ii) removing LaPierre for cause as a director and as Executive Vice President of the NRA; (iii) removing Frazer for cause as a director and Secretary of the NRA; (iv) enjoining the Individual Defendants from future service as an officer, director or trustee, or in any other capacity as a fiduciary of any not-for-profit or charitable organization incorporated or authorized to conduct business in the State of New York, or which solicits charitable donations in the State

of New York, or which holds charitable assets in New York; (v) rescinding related party transactions by the Defendants and directing the Individual Defendants to account for their profits and to pay the NRA up to double the value of each benefit improperly bestowed by such transactions; (vi) directing the NRA to account for its official conduct with respect to management of the NRA's institutional funds; and (vii) ordering restitution from the Individual Defendant to recover illegal, unauthorized or *ultra vires* compensation, reimbursements, benefits or amounts unjustly paid to the Individual Defendants.

## **PART ONE - THE PARTIES**

14.      The Attorney General is responsible for overseeing the activities of New York not-for-profit corporations and the conduct of their officers and directors, in accordance with the N-PCL, the EPTL, the New York Prudent Management of Institutional Funds Act ("NYPMIFA"), and the New York Executive Law.

15.      The National Rifle Association of America, Inc. is a charitable not-for-profit corporation chartered by a special act of the State of New York Legislature on November 17, 1871. Throughout its history, it has been legally domiciled in the State of New York and is subject to New York law in the governance of its internal affairs. The NRA has members and engages in fundraising throughout the United States, including in New York, where it is registered with the Charities Bureau of the Office of the Attorney General to conduct business and solicit donations.

16.      The NRA's principal place of business is at 11250 Waples Mill Road, Fairfax, Virginia 22030. The NRA is recognized as tax-exempt under Section 501(c)(4) of the Internal Revenue Code.

17.      As set forth in its bylaws, the NRA's stated mission is comprised of five purposes and objectives:

a.  "To protect and defend the Constitution of the United States, especially with reference to the God-given inalienable right of the individual American citizen guaranteed by such Constitution to acquire, possess, collect, exhibit, transport, carry, transfer ownership of, and enjoy the right to use, keep and bear arms, in order that the people may exercise their individual rights of self-preservation and defense of family, person, and property, and to serve in the militia of all law-abiding men and women for the defense of the Republic and the individual liberty of the citizens of our communities, our states and our great nation;

b.  To promote public safety, law and order, and the national defense;

c.  To train members of law enforcement agencies, the armed forces, the National Guard, the militia, and people of good repute in marksmanship and in the safe handling and efficient use of small arms;

d.  To foster, promote and support the shooting sports, including the advancement of amateur and junior competitions in marksmanship at the local, state, regional, national, international, and Olympic levels; and

e.  To promote hunter safety, and to promote and defend hunting as a shooting sport, for subsistence, and as a viable and necessary method of fostering the propagation, growth and conservation, and wise use of our renewable wildlife resources."

18.     Defendant Wayne LaPierre is the Executive Vice President ("EVP") of the NRA and has held that position since the early 1990s. He acts as the Chief Executive Officer of the NRA. As EVP, LaPierre is responsible, pursuant to the NRA bylaws, Article V, Section 2(c), to "direct all of the affairs of the Association in accordance with the programs and policies established by the Board of Directors." Defendant LaPierre is and has been at all relevant times an *ex officio* member of the Board of Directors, and of the Executive Committee. LaPierre maintains an office address at National Rifle Association of America, 11250 Waples Mill Road, Fairfax, VA 22030.

19.     Defendant Joshua Powell was formerly and at all times relevant herein an officer, *de facto* officer or "key person" within the meaning of N-PCL § 102(a)(25), of the NRA and held the positions of Chief of Staff, Executive Director of General Operations, head of Compliance, and "Senior Strategist." As Executive Director of General Operations, Defendant Powell served

7

Appx. 12

as an *ex officio* member of the Board of Directors. Defendant Powell's employment with the NRA was terminated in January 2020. Powell retains a residence in Michigan.

20. Defendant Wilson "Woody" Phillips served as *ex officio* Director, Treasurer and Chief Financial Officer and key person of the NRA between 1993 and 2018, when he retired. Phillips maintains a residence in Texas.

21. Defendant John Frazer has been the Secretary and General Counsel and *ex officio* director of the NRA since 2015 and has worked at the NRA since 1993. Frazer maintains an office address at National Rifle Association of America, 11250 Waples Mill Road, Fairfax, VA 22030.

## PART TWO - JURISDICTION AND VENUE

22. The Attorney General brings this action on behalf of the People of the State of New York under the EPTL, the N-PCL, NYPMIFA, and the Executive Law.

23. This Court has personal jurisdiction over the NRA because it is a New York not-for-profit corporation and has purposely availed itself of the opportunity to do business, solicit funds, recruit members and serve its charitable mission and beneficiaries in New York.

24. This Court has personal jurisdiction over Defendants LaPierre, Powell, Phillips and Frazer pursuant to N-PCL § 309 because "by becoming a director, officer, key person or agent of a corporation [each Individual Defendant] is subject to the personal jurisdiction of the supreme court of the state of New York, and in an action or proceeding by the attorney general under [the N-PCL] the process may be served….as provided in [CPLR § 313]."

25. This Court also has personal jurisdiction over the Individual Defendants pursuant to CPLR § 302(a). Each of the Individual Defendants, in their roles as officers, directors and key persons of the NRA, has transacted business within the state on behalf of a New York chartered corporation and purposefully availed themselves of the privileges and protections, and assumed the obligations, of New York law. Plaintiff's claims in this matter, as alleged herein against each

of the Individual Defendants, including for breach of their fiduciary duties to the NRA, waste of

the NRA's charitable assets, participation in prohibited related party transactions, and causing false

and materially misleading filings to be made in New York State, among others, arise out of the

Individual Defendants' purposeful conduct and transaction of business in New York, and each of

the Individual Defendants' conduct has caused harm in New York.

26.     Venue is properly set in New York County pursuant to (a) CPLR § 503 because the

Attorney General has an office in the county; and (b) N-PCL §§ 1110 and 102(a)(11), because the

office of the NRA is in New York County as set forth in the NRA's certificate of incorporation.

<b>PART THREE - APPLICABLE LAW</b>

**I.      Attorney General's Statutory Authority to Bring Actions to Dissolve Not-for-Profit
Corporations, to Remove Board Members, and to Seek an Accounting of Misspent
Funds**

27.     The Attorney General has a wide range of supervisory powers over charitable

corporations, and over the trustees of property held for charitable purposes, including over a not-

for-profit corporation, such as the NRA, organized in New York as a charity. The NRA, as a

501(c)(4) corporation under the Internal Revenue Code, is a charity under the N-PCL, subject to

the authority of the Attorney General. *Citizens United v. Schneiderman*, 882 F. 3d 374 (2d Cir.

2018)

28.     The Attorney General's regulatory oversight of charitable nonprofit corporations,

and their officers, directors, and key persons, includes the authority to bring actions under Section

112 and Article 7 of the N-PCL, to dissolve a corporation, remove officers and directors, obtain

relief as a result of prohibited related party transactions, ensure adequate protections for

whistleblowers, to enforce any right given to members, or an officer or a director of a charitable

corporation and, under Section 623(a) of the N-PCL, to bring a derivative action "in the right of a

9

domestic or foreign corporation" to procure a judgment in favor of the corporation and against officers, directors, or third parties.

29.      New York law further provides the Attorney General with authority over any "trustee" of any not-for-profit corporation organized under the laws of New York for charitable purposes. EPTL § 8-1.4. The Individual Defendants are each a trustee under New York law. The Attorney General has the legal authority "to institute appropriate proceedings…to secure the proper administration of any trust, corporation, or other relationship to which this section applies." EPTL § 8-1.4(m).

30.      In addition, the EPTL provides that the Attorney General is authorized to regulate and investigate trustees and the trustees' administration of property held for charitable purposes, and that authority "shall apply regardless of any contrary provisions of any instrument and shall be liberally construed so as to effectuate its general purposes of protecting the public interest in charitable uses, purposes, and dispositions." EPTL § 8-1.4(n).

## II.      Legal Requirements for New York Not-for-Profit Corporations and their Officers, Directors and Key Persons

31.      New York law sets forth the duties and powers of the NRA as a charitable not-for-profit corporation, and the duties, powers, and liabilities of the NRA's officers, directors, key persons, and members.

32.      The NRA's use of its assets and institutional funds, and the fiduciary duties of its officers and directors with respect to those assets and institutional funds are governed by the N-PCL and the EPTL. The governance and fiduciary duties of its officers and directors generally are governed by the N-PCL; oversight of its charitable assets is generally governed by the EPTL; and its fundraising activities by the Executive Law.

10

Appx. 15

33.     Pursuant to N-PCL §§ 701, 713 and 714, a not-for-profit corporation "shall be managed by its board of directors," which has the power to elect officers and remove them, with or without cause.

34.     Pursuant to N-PCL § 717(a), directors, officers and key persons of not-for-profit entities such as the NRA are required to "discharge the duties of their respective positions in good faith and with the care an ordinarily prudent person in a like position would exercise under similar circumstances."

35.     In addition, N-PCL § 552 require directors and officers of a not-for-profit corporation such as the NRA to act with undivided loyalty to the corporation in the management and investment of the institutional funds of the corporation.

36.     Under N-PCL § 720, directors, officers, or key persons may be compelled to explain or be liable for the "neglect of, or failure to perform, or other violation of [ ] duties in the management and disposition of corporate assets committed to his charge" or "[t]he acquisition by himself, transfer to others, loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties."

37.     As a New York not-for-profit corporation, the NRA may only pay "compensation in a reasonable amount" to officers, directors, or members for services actually rendered. N-PCL § 515(a).

38.     As a New York not-for-profit corporation, the NRA is barred by law from paying dividends and from distributing "any part of its income or profit to its members, directors, or officers." N-PCL § 515(a). Such distributions exceed the authority conferred upon the NRA by law, is beyond the capacity or power of the NRA under the N-PCL, and could subject it to annulment or dissolution under Sections 112(a)(1) and 1101(a)(2) of the N-PCL.

11

Appx. 16

39. Under N-PCL § 715 and EPTL § 8-1.9, the NRA is prohibited from entering into any related party transaction unless the transaction is determined and documented by the Board or an authorized committee of the Board to be fair, reasonable, and in the corporation's best interest at the time of the determination in compliance with that section.

40. In addition, every director, officer, trustee, or key employee who has an interest in a related party transaction must disclose in good faith to the Board or an authorized committee of the Board "the material facts concerning such interest," and the corporation must conduct a process before approving a related party transaction and document that process. N-PCL § 715; EPTL § 8-1.9

41. Similarly, the NRA's Board is required to adopt, implement and assure compliance with a conflict of interest policy that ensures that the NRA's trustees, directors, officers and key persons act in the corporation's best interest and comply with applicable legal requirements, including those concerning related party transactions. N-PCL § 715-a; EPTL § 8-1.9. The policy must provide for annual conflict of interest disclosures by trustees and directors, and procedures for the disclosure and determination of conflicts of interest, which must prevent the person with the conflict from influencing the determination. *Id.* The policy also imposes recordkeeping requirements on the existence and resolution of conflicts. *Id.*

42. The NRA and its Board of Directors are also legally required to adopt, oversee and ensure compliance with a policy providing for an effective process to receive and consider whistleblower concerns and for protecting whistleblowers. N-PCL § 715-b; EPTL § 8-1.9. This policy must provide that no director, officer, trustee, employee or volunteer of a corporation who in good faith reports any action or suspected action taken by the corporation that is illegal, fraudulent, or in violation of any adopted policy of the corporation shall suffer, intimidation,

12

Appx. 17

harassment, discrimination, or other retaliation. *Id.* The law further requires that a trustee, director, officer or employee be designated to administer the whistleblower policy and to report to the board or an authorized committee. *Id.*

### III. Registration and Reporting Requirements for New York Not-for-Profit Corporations

43.     Under New York law, certain not-for-profit organizations, including the NRA, holding charitable assets and operating in New York must register and file accurate and complete reports with the Attorney General. *See* EPTL §§ 8-1.4(d) and (f). The Charities Bureau oversees that function on behalf of the Attorney General. In addition to these registration requirements, charitable organizations soliciting contributions in New York must also register and file accurate and complete annual reports under Article 7-A of the Executive Law. These annual reports, commonly referred to as CHAR500s, must include copies of an organization's annual information return, the IRS Form 990, and, for organizations like the NRA, copies of the organization's audited financial statements.

44.     The annual reports filed with the Charities Bureau must also include the identities of the fundraisers with whom an entity contracts, as well as information about the services they provide and the compensation they receive.

45.     CHAR500s must be signed by: (i) the organization's President or Authorized Officer and (ii) its Chief Financial Officer or Treasurer, both of whom, by their signatures expressly certify, under penalties of perjury, that the report, including all attachments, is true and accurate.

46.     Registration with the Charities Bureau enables the Attorney General to exercise her statutory oversight of not-for-profit entities that conduct activities, hold charitable assets, or solicit charitable contributions in New York. Registration is further required to ensure that any funds

entrusted to such organizations are properly administered and to discourage and prevent misuse of charitable assets and fraud.

47. In addition, the Attorney General's registry serves as an important source to the public of information concerning not-for-profit organizations. The failure of an organization to file accurate reports impedes the Attorney General's exercise of her statutory authority to oversee such organizations and further deprives New Yorkers of access to truthful information about not-for-profits operating in this State.

48. Pursuant to Executive Law § 172-d, no person shall "[m]ake any material statement which is untrue in…[a] financial report or any other forms or documents required to be filed" with the Attorney General's office pursuant to Executive Law, Article 7-A.

49. Pursuant to Executive Law § 175(2), the Attorney General is authorized to bring an action against a charitable organization or any other persons acting for or on its behalf, to, in relevant part, "enjoin such organization and/or persons from continuing the solicitation or collection of funds," whenever "the [A]ttorney [G]eneral shall have reason to believe that the charitable organization or other person has made a material false statement in an application, registration or statement required to be filed pursuant to this article."

## IV. Legal Obligations Under the New York Prudent Management of Institutional Funds Act

50. Article 5-a of the N-PCL, NYPMIFA establishes the standard of conduct applicable to the NRA in managing and investing an institutional fund. The NRA is an "institution" as that term is used in NYPMIFA, which holds and manages "institutional funds" as that term is used in NYPMIFA. N-PCL § 551(d) & (e).

51. Under NYPMIFA, the obligations of the NRA are also imposed upon the governing Board of Directors of the NRA.

52.     In managing institutional funds, pursuant to NYPMIFA, the NRA, through its directors and officers, (a) must, subject to the intent of a donor expressed in a gift instrument, consider the purposes of the NRA and the purposes of its institutional funds; and (b) shall manage institutional funds "in good faith and with care an ordinarily prudent person in a like position would exercise under similar circumstances. N-PCL § 552. Each person responsible for the management of institutional funds also has a duty of loyalty to the mission of the corporation, imposed by law. *Id.*

53.     In managing institutional funds, under NYPMIFA, the NRA and the governing Board shall make a reasonable effort to verify facts relevant to management of the fund.

54.     The "institutional funds" of the NRA include investments, cash balances, funds derived from pledging NRA assets or credit, income derived from rents to third parties, and funds held by or paid out to vendors. "Institutional funds" also include funds in the hands of third parties in which the NRA has a valid claim, such as improper payments of personal expenses, funds diverted from the NRA, and funds paid *ultra vires*.

## PART FOUR - THE NRA'S HISTORY AND INTERNAL GOVERNANCE

**I.      The NRA's History**

55.     The NRA was founded in 1871, immediately following the Civil War "to promote the introduction of a system of army drill and rifle practice, as part of the military drill of the National Guard of this and other states, and for those purposes to provide a suitable range…In the vicinity of the City of New York."

56.     In addition to creating the NRA's corporate existence by a special act, the New York Legislature provided a grant to the NRA of $25,000 of public funds for purchase in 1872 of the Creed farm in Queens County, New York, later known as Creedmoor, as a rifle range for the NRA and the New York National Guard.

15

57.     Over the course of 149 years, the NRA established itself as one of the largest, and

oldest, social-welfare charitable organizations in the country. The NRA is exempt from federal

and certain state taxation pursuant to Section 501(c)(4) of the Internal Revenue Code and New

York law. This tax exemption is conditioned upon compliance with certain statutory requirements.

As relevant here, the NRA, as a 501(c)(4) organization, cannot be organized for profit; must be

operated exclusively or primarily to further the common good and general welfare of the

community; and cannot permit its income to inure to the benefit of any private individual. 26 U.S.C

§ 501(c)(4).

58.     The NRA has four affiliated tax-exempt charitable organizations that were set up

under Section 501(c)(3) of the Internal Revenue Code: the NRA Foundation, the Civil Rights

Defense Fund, the Freedom Action Foundation, and the Special Contribution Fund. As 501(c)(3)

organizations, each of these affiliated entities must be organized and operated exclusively for

charitable purposes and must refrain from engaging in political activities. 26 USC § 501(c)(3). The

NRA also has a political action committee, the Political Victory Fund, which contributes money

to political candidates.

59.     The NRA's history as an organization is well documented and need not be recited

here. For purposes of this complaint, the focus is on the governance of the organization under the

leadership of Wayne LaPierre, who over the course of his nearly 30-year tenure as the chief

executive of the organization, has consolidated his power and control over the organization.

## II.     The NRA's Internal Structure and Governance

### A.  The NRA's Organizational Structure

60.     The NRA is comprised of several divisions, all of which are overseen by the

Executive Vice President. The NRA divisions are: (a) Membership; (b) Affinity and Licensing

Programs; (c) Information Services; (d) Publications; (e) Public Affairs; (f) Advancement;

(g) Office of the Treasurer; (h) Institute for Legislative Action ("NRA-ILA"); (i) General Operations; (j) Office of the General Counsel, and (k) Human Resources.

61.    NRA-ILA has "sole responsibility to administer the legislative, legal, informational and fundraising activities of the Association relating to the defense or furtherance of the right to keep and bear arms." Funds donated to or designated to be used by NRA-ILA are kept separate from the NRA's General Operations accounts. NRA-ILA is prohibited from making contributions to political campaigns, candidates, and political committees.

### B. The NRA's Bylaws

62.    Not-for-profit corporations in New York may adopt bylaws under the N-PCL. N-PCL § 602. Bylaws govern the internal affairs of the corporation. For membership organizations like the NRA, bylaws are both a contract between the organization and its members, and among the members themselves. Once properly adopted, bylaws carry the force of law with respect to the corporation's internal affairs. Officers and directors have a legal duty to adhere to a corporation's bylaws. Failure to do so constitutes a breach of the fiduciary duties owed to the corporation and the corporation's members and violates New York law. N-PCL § 717,

63.    Under its bylaws, the NRA has established the following governance structure. The description below is current with the bylaws, as amended, adopted by the NRA Board in September 2019 and annexed as Exhibit 1 to this complaint. The provisions of the bylaws are materially the same from the period of 2014 to 2019, unless otherwise indicated:

### i. Board of Directors

64.    In accordance with the N-PCL § 701 and the NRA's certificate of incorporation, the NRA is managed by a Board of Directors comprised of 76 directors, 75 of whom are elected for three-year terms, and one of whom is elected for a one-year term at the annual meeting of NRA

members. The Board "shall formulate the policies and govern and have general oversight of the affairs and property of the Association."

65.     The NRA bylaws provide that "[n]o director or member of the Executive Council shall receive any salary or other private benefit unless specifically authorized by resolution of the Board of Directors or an authorized committee thereof, but all such persons shall be entitled to reimbursement for expenses incurred on behalf of the [NRA]."

### ii.  NRA Officers

66.     The NRA's bylaws establish a leadership structure consisting of eight officers: a President, two Vice Presidents, an Executive Vice President, a Secretary, a Treasurer, and an Executive Director each of General Operations and NRA-ILA. With the exception of the two Executive Directors, the officers are elected annually by the Board.

67.     The Executive Vice President, the Secretary, the Treasurer, the Executive Director of General Operations, and the Executive Director of NRA-ILA are *ex officio* members, with voice but without vote, on all Board committees, except for the Nominating Committee, the Committee on Hearings, the Officers Compensation Committee, and the Committee on Elections.

68.     Officers must "conduct the affairs of their organization…in accordance with their organization bylaws, and such programs and regulations … adopted by the organization." Officers must also "maintain proper records and shall properly render such reports concerning membership, finances, facilities, and activities as may be requested … by the NRA."

### a.     Executive Vice President

69.     The Executive Vice President is functionally the chief executive of the NRA and is elected annually by the NRA Board. The bylaws provide that the Executive Vice President "shall direct all the affairs of the Association in accordance with the programs and policies established by the Board of Directors." The Executive Vice President is empowered to appoint, suspend, or

18

Appx. 23

remove the Executive Directors of General Operations and NRA-ILA; to suspend with pay the Secretary or Treasurer; and to employ, suspend, or dismiss any employee. The Executive Vice President is an *ex officio* member, but without voting power, of the NRA Board and its Committees except for the Nominating Committee, the Committee on Hearings, the Officers Compensation Committee, and the Committee on Elections.

70.     In 2016, the NRA bylaws were amended to expressly provide the Executive Vice President with the authority to set the compensation for the Executive Directors of General Operations and NRA-ILA. Before 2016, there was no explicit statement regarding the Executive Director compensation in the bylaws.

71.     Wayne LaPierre has been the Executive Vice President since he was elected by the Board of Directors to that position in the early 1990s. He has been with the NRA since 1978, where he started with NRA-ILA, the NRA's lobbying arm. LaPierre started out as a state liaison and was subsequently promoted to be NRA-ILA's Director of State & Local Affairs and then its Director of Federal Affairs. In 1986, LaPierre became the Executive Director of NRA-ILA.

72.     In his almost thirty years of leadership, LaPierre has established himself as the individual who is responsible for the affairs of the NRA at every level. Among other responsibilities, LaPierre oversees the charitable assets that the NRA is responsible for managing, in accordance with New York law. On its most recent audited financial statement, the NRA reported responsibility for $197,212,080 in total assets as of December 31, 2018, which, as a New York charity, it is required to use to serve the interests of its membership and to advance its charitable mission.

**b.     President**

73.     The President is an *ex officio* member, with voting power, of the NRA Board and its Committees with the exception of the Nominating Committee, the Committee on Hearings, and

the Committee on Elections. The President is empowered, with some exceptions, to appoint members of all of the NRA Board's standing and special committees, and to "establish such special committees…as may be deemed necessary." The President also serves as the Chair of the Officers Compensation Committee, which determines, on an annual basis, the compensations of the Executive Vice President, Secretary, and Treasurer.

74.     The President is also responsible for designating members of the Committee on Elections.

75.     The President serves in an unpaid capacity and has responsibility for oversight of the NRA management, including the Executive Vice President, who manages the day-to-day affairs of the organization.

<strong>c.     Vice Presidents</strong>

76.     The NRA's Vice Presidents perform the President's duties in his or her absence or at the request of the President, and, in the event that the Presidency is vacant for whatever reason, the First Vice President takes the Presidency until the next election. The Vice Presidents also serve as *ex officio* members, with voting power, of all committees except the Nominating Committee, the Committee on Hearings, and the Committee on Elections.

<strong>d.     Treasurer / Secretary / Executive Directors</strong>

77.     The Treasurer is an *ex officio* member of the NRA Board, and "operate[s] in accordance with the financial policies set forth by the Board of Directors or the Executive Committee, and shall have charge of the books of account and financial operations of the [NRA]." The Treasurer is obligated to regularly report to the NRA Board, Finance Committee, Executive Vice President, and Executive Committee on the financial affairs of the NRA and must also assist the NRA's external auditor with the annual audit. The Treasurer is also required to perform an

20

Appx. 25

internal audit of the NRA-ILA once per year and report on its financial condition. Defendant Phillips served as the Treasurer until 2018.

78.     The Secretary is elected by the Board annually and serves under the Executive Vice President. The Secretary is an *ex officio* member of the NRA Board, tasked with having "charge of the archives" of the NRA and attending "to the proper publication of official notices and reports," and also serves as the secretary of the NRA Board's Executive Committee, Nominating Committee, and Committee on Elections. Defendant Frazer has served as the Secretary since 2015.

79.     The Executive Director of General Operations is under the supervision of the Executive Vice President and has "such powers and duties as delegated to him from time to time by the Executive Vice President."

80.     The Executive Director of NRA-ILA is charged with conducting the "legislative, legal, informational, fund raising activities, operational, administrative and financial affairs" of the NRA-ILA under the direction of the Executive Vice President and in accordance with the programs and policies established by the Board. The Executive Director of NRA-ILA also is charged with appointing a fiscal officer to oversee NRA-ILA's finances, which are segregated from the NRA's General Operations accounts, and assist in the annual audit of the NRA.

81.     Both Executive Directors are *ex officio* members, but without voting power, of the Board of Directors and of all NRA Board Committees except for the Nominating Committee, Committee on Hearings, Officers Compensation Committee, and Committee on Elections. They are also not authorized to attend the executive session of any committee unless invited to do so.

### iii.   Standing and Special Committees

82.     The NRA has dozens of standing and special Committees of the Board, but a select few hold the primary governing authority.

Appx. 26

### a. Officers Compensation Committee

83.     The Officers Compensation Committee, which consists of the President and Vice Presidents, must establish by resolution each Fall the authorized compensation for all "elected salaried officers." That is, the Executive Vice President, the Secretary, and the Treasurer. All deliberations by the Board about the compensation for these officers "shall be held in an executive session, at which none of the officers whose compensation is to be or is being established may attend, except for the limited time and limited purpose of answering questions asked by any member of the Board of Directors at the meeting."

### b. Executive Committee and Executive Council

84.     The Executive Committee is composed of the President, Vice Presidents, and 20 board members nominated by the Nominating Committee or from the floor at any meeting of the Board. The members are elected annually. The Executive Committee exercises all of the powers of the full Board—with exceptions for powers that are restricted to the full Board, such as the power to repeal or amend the bylaws or authorize indemnification of officers or directors. These limitations are extended to all standing and special committees of the Board.

85.     The Executive Council serves an advisory role to the Executive Committee and is composed of "[a]ny member of [the NRA] whose advice and counsel, in the opinion of the Board of Directors, will be valuable to the continuing welfare of the [NRA]." Members are elected by the Board for life, subject to removal for cause.

### c. Nominating Committee

86.     The NRA Board's Nominating Committee is composed of nine members—only six of whom can be members of the Board or the Executive Council—elected by the Board by secret ballot after the NRA's annual meeting of members.

22

Appx. 27

87.     The Nominating Committee is responsible for receiving recommendations from the NRA membership for candidates for the Board, and ultimately prepares the ballot from which the NRA membership votes on board members. Members may also petition to have a candidate added to the ballot by having a sponsor obtain the signatures from members totaling 0.5% of the number of ballots cast in the most recent election.

### d.     Audit Committee

88.     The Audit Committee's responsibilities are set forth in N-PCL § 712, the Audit Committee Charter, the NRA's bylaws, and internal policy. Among the Audit Committee's primary responsibilities are managing external audits, overseeing internal controls, evaluating potential conflicts of interest, and addressing whistleblower complaints.

89.     The Audit Committee Charter, which was adopted by Board resolution, prescribes that the Committee "shall be comprised of five NRA Directors." Members of the Committee are to be independent and should possess a "working familiarity with basic finance and accounting practices." Members are selected annually by the NRA President.

90.     Pursuant to the Audit Committee Charter Mission Statement, "the primary function of the Audit Committee is to assist the Board of Directors in its oversight of the integrity of financial information, its review of the adequacy of the system of internal controls established by the Association, and it's monitoring of the audit process."

91.     In carrying out these functions, the Audit Committee must "review the Association's financial reporting process and internal controls, review and appraise the audit efforts of the Association's independent auditors, and provide open means of communication between the Directors, the independent auditors, and the financial and senior management of the Association." The Charter also sets forth the Audit Committee's responsibility for overseeing compliance with both regulatory and business ethics requirements.

Appx. 28

92.     Pursuant to the Audit Committee's charter and the NRA's Policy Manual, the Audit Committee is charged with the oversight of conflicts of interest and related party transactions. "The NRA Audit Committee will review all transactions that involve potential conflicts of interest and determine whether to approve or ratify such transactions."

93.     The Audit Committee is also responsible for collecting and reviewing disclosures of financial interests of officers and directors on a regular basis. NRA policy requires that such disclosures be made "in advance, before any action is taken on the matter." In its 2017 IRS 990, the NRA represents that "Regardless of how they are reported, related party issues and issues of apparent conflict of interest are presented to the body designated by the Board of Directors (the Audit Committee) for approval, disapproval, or precautionary measures as needed."

94.     The Audit Committee is designated as one of several recipients of whistleblower complaints within the NRA under the Statement of Corporate Ethics. The Statement provided the following: "Employees who in good faith believe that an officer or a member of the Board of Directors is engaged in any financial irregularity affecting the Association or has a conflict of interest are encouraged to bring the information on which their belief is based to the attention of the Audit Committee." It also provides that whistleblowers may contact either the Head of Human Resources or the General Counsel.

### iv.  Disclosure Requirements and Prohibitions on Private Benefits and Reimbursements Absent Board Approval

95.     The NRA's bylaws require "[a]ny Director, officer, or employee of [the NRA] who is also a member of the governing body of any business, corporate, or other entity (whether as trustee, director, sole-owner, officer, partner, or the like) which receives from [the NRA] any payment(s) for goods or services which total in excess of $2,000 either within a year or pursuant to any contract or contracts originating within a year shall immediately file a written statement of

all such business as to the nature and amount thereof, to the best of his or her knowledge, with the Secretary who shall transmit such statement to the Board of Directors at its next meeting and who shall include all such statements in the Secretary's report at the next Annual Meeting of Members."

96.     The NRA's bylaws further provide that "[n]o Director or member of the Executive Council shall receive any salary or other private benefit unless specifically authorized by resolution of the Board of Directors or an authorized committee thereof, but all such persons shall be entitled to reimbursement for expenses incurred on behalf of the Association, to such extent as may be authorized or approved by the Board of Directors."

97.     Under the NRA's bylaws, officers, directors, and members of the Executive Council "shall be entitled to reimbursement for expenses incurred on behalf of the Association," but only "to such extent as may be authorized or approved by the Board of Directors."

### C. The NRA's Policy and Procedures on Hiring, Spending, Procurement, Travel Reimbursement, Conflicts of Interest, and Related Party Transactions

98.     Most of the NRA's policies and procedures are found in one of two documents— the NRA Employee Handbook or the NRA Policy Manual. (A copy of each of the Employee Handbook and the Policy Manual are annexed as, respectively, Exhibits 2 and 3). The Employee Handbook sets out the NRA's policies and procedures on employee selection, compensation, time off, work environment standards, and insurance and pension benefits. The Policy Manual is a compendium of resolutions passed by the NRA Board since the 1960s. Annexed to the Policy Manual are several policies ratified by the Board, including the Audit Committee Charter, Statement of Corporate Ethics, NRA Purchase Policy, and Officer and Board of Directors Policy on Disclosure of Financial Interests.

### i. Contract Review Policy

99.     In a series of resolutions between 1988 and 1998, the Board adopted a policy on contracts and agreements entered into by the NRA and its agents. ("Contract Review Policy"). Under this policy, beginning in 1988, any agreement by the NRA or NRA-ILA in excess of $50,000—later raised in 1991 to $100,000—cannot be executed without the "approval" of the President and one of the two Vice Presidents.

100.     In 1997, the Board adopted a policy that "all contracts involving over $100k in a 12-month period are required to have a business case analysis performed and no contract will begin before the required sign-off approval as is required."

101.     In 1998, the Board adopted a policy that "[a]ll purchase agreements or contracts requiring payments greater than $100,000 in any twelve-month period, must have the prior written approval of the President and the First or Second Vice Presidents before execution or renewal." Certain exceptions exist for routine expenses, but the President, Vice President(s), and Finance Committee chair must be provided with updates about any such exceptions on a quarterly basis.

102.     In 2012, LaPierre issued a memorandum to all NRA staff codifying the procedures for complying with these Board resolutions:

   a.  When a contract is in excess of $100,000, "a packet consisting of a copy of the contract, a completed business case analysis, and a contract review signature sheet will be prepared."

   b.  Once all of the appropriate in-house approvals are secured, the packet will be presented by the Office of the Secretary to the President and the First and Second Vice Presidents.

   c.  The packet will then be returned to the responsible NRA officer for finalization and distribution of the original and/or copies of the packet to (1) the Office of General Counsel; (2) the Office of the Treasurer; (3) the Chief of Staff; and (4) the Office of the Secretary.

103.     These requirements have not changed since the memorandum was issued in 2012.

26

Appx. 31

### ii. Employment Policies

104.     The NRA has several policies on hiring, evaluating, and retaining employees. As

relevant here, these policies provide:

   a.  Only the Executive Vice President and the Human Resources Division (with approval
      of the Executive Vice President) has the authority to extend job offers.

   b.  The NRA policy is to "conduct reference checks on applicants who are under serious
      consideration for employment." In certain cases, credit and full background checks of
      the applicant will also be conducted, depending on the duties and responsibilities of the
      position.

   c.  The reimbursement of relocation expenses for new hires is expressly limited to a 30-
      day temporary living allowance and $7,500 in moving expenses.

105.     The NRA has no written policy on employee bonuses. Bonuses are generally

awarded on a discretionary basis.

### iii. Independent Contractors

106.     NRA policy provides that an independent contractor should only be retained when

(i) the existing staff does not have the requisite skills to achieve the task; (ii) the nature of the

assignment can be paid by the project, day, or hour; and (iii) the General Counsel has been

consulted and has established that they qualify after being provided a draft contract agreement for

review and sign-off.

### iv. Travel and Business Expense Reimbursement Policy

107.     The stated purpose of the NRA's Travel and Business Expense Reimbursement

Policy is to "incur the lowest practical and reasonable expense while completing the travel process

in an efficient and timely manner. Persons traveling on NRA business have the duty to exercise

care and avoid impropriety, or even the appearance of impropriety in any travel expense." This

policy applies to all employees and non-employees (including volunteers and paid consultants)

traveling on NRA business.

108.     Under this policy, expenses must be business related—that is, "necessary to meet organizational objectives"—and must be in the NRA's interest. The person authorized to approve an employee's expense report is responsible for understanding the need for the expense, substantiating the expense, and determining whether it is appropriate and correctly reported. Furthermore, "[t]ravelers are expected to use the same care in incurring expenses that a prudent person would use while traveling for personal reasons, considering the purpose and amount of the expenditure."

109.     With respect to airfare, "[o]nly coach class tickets … are generally reimbursable for domestic travel." Exceptions must be explained, approved in writing and submitted with the expense report.

110.     With respect to rental cars, "[e]mployees should use public transportation (taxicabs, airport limousines, and local transits) in preference to renting a car when such means of transportation is cost-effective, and there are no other business reasons for renting a car."

111.     As to lodging and meals, "[d]aily expenses are reasonable charges for lodging, meals, tips and other incidental expenses necessary to sustain an employee while…is away from home." Original receipts for expenses over $50.00 must be attached to the expense report.

112.     Reimbursable entertainment expenses "must be directly and principally related to NRA's business, expected to produce a specific business benefit, and attended by both the employee and business associate."

### v.  Statement of Corporate Ethics

113.     Adopted in 2006, the Statement of Corporate Ethics prohibits conflicts of interest, illegal or unethical actions, and requires the maintenance of accurate books and records. The policy requires "[e]mployees who are officers, directors, division directors or activity supervisor[s]" to "insure that these policies are annually communicated to the employees reporting to them";

28

Appx. 33

"clarify and explain said policies when necessary"; "monitor compliance there with"; and "report all known (or suspected violations of said policies to the Executive Vice President of the Association, the Treasurer of the Association, and to other persons whom they designate as appropriate."

114.    The policy, which the NRA considered to be its whistleblower policy, provides that "[e]mployees who in good faith believe that a fellow employee, supervisor, manager, or director is in violation of this policy are encouraged to bring the information on which their belief is based to the attention of the General Counsel. Employees who in good faith believe that an officer or member of the Board of Directors is engaged in any financial irregularity affecting the Association or has a conflict of interest are encouraged to bring the information on which their belief is based to the Audit Committee…The taking of such action in good faith will not result in retribution or reprisal against the employment of any employee."

115.    In January 2020, nine months after the Attorney General commenced its investigation, the NRA Board adopted a new version of the Statement of Corporate Ethics that separated out and expanded upon the whistleblower protections therein. Until it did so, the policy was missing provisions required by N-PCL § 715-b regarding whistleblower policies, such as a procedure for maintaining the confidentiality of whistleblower complaints and a requirement that the person who is the subject of a whistleblower complaint not be present during discussions of the complaint. The updated policy is annexed as Exhibit 4.

### vi.  Purchasing Policy

116.    Adopted in 2006, the Purchasing Policy was created to "provide[] general policy guidance for efficient and cost-effective procurement of goods and services necessary to support the goals, objectives and work of the [NRA] while ensuring [NRA] resources are protected and maximized." The policy's stated goal is to provide a system that delivers reasonably priced, high-

quality goods and services to end users, while preserving organizational, financial and ethical responsibility."

117.    The policy prohibits NRA employees, officers, and directors from using "their position with the [NRA] in a manner that may create a conflict, or the appearance of a conflict, between the individual's personal interest and those of the Association," and directs that they "refrain from knowingly engaging in any outside matters of financial interest incompatible with the impartial, objective, and effective performance of their duties." The policy also prohibits related party transactions without written authorization by the NRA.

118.    It also provides that "[a]nyone who suspects violations of this code has an obligation to report their concerns to their immediate supervisor, the Office of the Treasurer, the Audit Committee Chair or NRA's General Counsel," and that "[n]o adverse action shall be taken or permitted against anyone for communicating legitimate concerns to the appropriate persons. However, malicious and unfounded accusations will not be tolerated and will be dealt with accordingly."

119.    The policy is missing provisions required by N-PCL § 715-a regarding conflict of interest policies, such as:

    a.  The policy does not require that the person with a conflict of interest not be present at or participate in Board or committee deliberations or vote on the matter giving rise to the conflict of interest;

    b.  The policy does not contain a prohibition against any attempt by the person with the conflict of interest from improperly influencing the deliberation or voting on the matter giving rise to the conflict of interest.

120.    The policy requires the use of a "request for proposal" process when a purchase is contemplated that is equal to or above $100,000, but certain types of purchases are exempt from that process—namely, "[p]urchases or services directly related to legal counsel, political strategy,

public relations, membership, fundraising and marketing." Exempt purchases and services do not require a request for proposal or competitive bid, but must "be reported to Finance Committee on an annual basis."

121. The Purchasing Policy also sets out levels of approval necessary for contracts exceeding certain thresholds:

a. If the contract requires payments equal to or greater than $100,000 in any twelve month period, it must have the written approval of the appropriate NRA division director, the Executive Vice President, and the Treasurer, with signatures acknowledging the contract by the President and one Vice President.

b. If the contract requires payments between $50,000 and $100,000, it must have the written approval of the appropriate NRA division director and one officer (the Executive Vice President, Treasurer, Secretary, or one of the Executive Directors of NRA-ILA or General Operations).

c. If the contract requires payments under $50,000, it requires the approval of the appropriate NRA division director or his or her staff designated with such approval authority.

### vii. Officers and Board of Directors Policy – Disclosure of Financial Interests

122. Adopted in 2007, the "Officers and Board of Directors Policy – Disclosure of Financial Interests" requires NRA officers, board members, and members of the Executive Council to file with the Audit Committee a disclosure of their own and their immediate family members' financial interests.

123. The Policy requires disclosure of the following:

a. Any remuneration received from the NRA other than for routine expense reimbursements;

b. Any relationship with an entity that has a business relationship with, or receives any funds from, the NRA that does or could result in the receipt of remuneration other than routine expense reimbursements;

c. Any relationship with an entity that is seeking to have a business relationship with or receive funds from the NRA;

31

Appx. 36

d. Any gift, gratuity, personal favor or entertainment with either a retail price or fair-market value in excess of $300 received from any entity or person associated with any entity that has a business relationship with, or is seeking to do business with, or receives any funds from the NRA;

e. Any ownership interest in excess of 10% of its class in any entity that has or is seeking to have a business relationship with, or that does or is seeking to receive funds from, the NRA.

124. The policy requires that disclosures related to any of the above be filed in January of each year. Since at least 2008, the NRA has required all officers and directors to fill out and submit a standard questionnaire each year reporting any related party transactions or conflicts of interest that require disclosure under this policy ("Financial Disclosure Questionnaire"). In addition to these annual disclosures, the Executive Vice President has an independent obligation to "report to the Audit Committee any financial interest of an officer or director (or immediate family member) that comes to his knowledge or the knowledge of his office as well as any financial transactions between the NRA…and other individuals and/or organizations that present or might present the possibility of a conflict of interest."

125. The NRA has represented in public filings that the Secretary and General Counsel is responsible for receiving and reviewing the annual conflict of interest questionnaires.

126. The policy does not comply with the requirements of N-PCL § 715-a regarding conflict of interest policies for the same reasons as described in Part Four, Section II(C)(vi) above regarding the NRA's Purchasing Policy.

### viii. Conflict of Interest and Related Party Transaction Policy

127. It was not until January 2016 that the NRA Board adopted a comprehensive Conflict of Interest and Related Party Transaction Policy. The policy is not included in the NRA's Employee Handbook and, upon information and belief, is not provided to new employees at the time of hire.

128.    With respect to related party transactions, the 2016 policy hews closely to the requirements of N-PCL § 715, and defines conflicts of interest more broadly as any situation where "the interests of the NRA come into conflict with a financial or personal interest of [an officer, director, or key employee], or otherwise whenever [an officer, director, or key employee's] personal or financial interest could be reasonably viewed as affecting his or her objectivity or independence in fulfilling their duties to the NRA."

129.    The policy provides that "[t]he NRA Audit Committee is responsible for providing oversight of the adoption and implementation of, and compliance with this policy."

130.    Under the policy, the Audit Committee must "review all transactions that involve potential conflicts of interest" to "determine whether to approve or ratify such transactions," and "may only approve the [] transaction if it determines that such transaction, under the terms and within the circumstances presented, is fair, reasonable, and in the best interests of the NRA."

131.    The Audit Committee must document its consideration of any conflicts of interest and related party transactions, including, but not limited to, (1) "[a]lternative transactions to the extent available," (2) "[t]he NRA's mission and resources," (3) "[t]he possibility of creating an appearance of impropriety that might impair the confidence in, or the reputation of, the NRA (even if there is no actual conflict or wrongdoing)," and (4) "[w]hether the conflict may result in any private inurement, excess benefit transaction, or impermissible private benefit under laws applicable to tax-exempt organizations."

132.    The Audit Committee's meeting minutes are required to contain certain information concerning the consideration of conflicts of interest and related party transactions, including "the name of the [officer, director, or key employee], the nature of the conflict, and details of the deliberations of the disinterested directors (such as documents reviewed, any alternatives

33

Appx. 38

considered, comparative costs or bids, market value information, and other factors considered in deliberations)."

## **PART FIVE - DEFENDANTS' VIOLATIONS OF NEW YORK LAW**

**I.      Widespread Violations of Law of the NRA's Senior Management under the Leadership and Direction of Wayne LaPierre**

133.     Wayne LaPierre has been the Executive Vice President of the NRA since the early 1990s. As the Executive Vice President, LaPierre is responsible for overseeing all of the divisions and the day-to-day affairs of the NRA.

134.     The head of each NRA division reports directly to LaPierre. LaPierre's direct reports include the Treasurer, the Executive Director of NRA-ILA; the Executive Director of General Operations; the Secretary; the General Counsel; the Executive Director of Advancement; the Executive Director of Publications; the Managing Director of Public Affairs; the Executive Director of Membership & Affinity Licensing Programs; the Director of Security; and the Executive Director of Human Resources.

135.     Until recent cuts to its workforce, the NRA had approximately 550 full-time employees.

136.     One of LaPierre's first acts as Executive Vice President was to hire Defendant Wilson "Woody" Phillips to serve as Treasurer—a position that Phillips would hold for the next 26 years, until his retirement in 2018. At all times, LaPierre was responsible for oversight of Phillips.

137.     LaPierre also hired Defendant John Frazer as the NRA's General Counsel in 2015. Frazer was elected Secretary of the NRA by the NRA Board that same year. At all times, LaPierre has been responsible for oversight of Frazer who continues in the role of General Counsel.

Appx. 39

138.    LaPierre hired Defendant Joshua Powell as his Chief of Staff in 2016 and appointed

him the Executive Director of General Operations in January 2017. In December 2018, LaPierre

gave Powell the newly created title of "Senior Strategist." Powell was employed by the NRA until

he was terminated in January 2020. At all times, LaPierre was responsible for oversight of Powell.

139.    LaPierre, together with his direct reports, including Defendants Phillips, Frazer and

Powell, instituted a culture of self-dealing, mismanagement, and negligent oversight at the NRA.

They overrode and evaded internal controls to allow themselves, their families, favored board

members, employees and vendors to benefit through reimbursed expenses, related party

transactions, excess compensation, side deals, and waste of charitable assets without regard to the

NRA's best interests.

## A.  LaPierre's Improper Spending and Expensing

140.    LaPierre routinely abused his authority as Executive Vice President of the NRA to

cause the NRA to improperly incur and reimburse LaPierre for expenses that were entirely for

LaPierre's personal benefit and violated NRA policy, including private jet travel for purely

personal reasons; trips to the Bahamas to vacation on a yacht owned by the principal of numerous

NRA vendors; use of a travel consultant for costly black car services; gifts for favored friends and

vendors; lucrative consulting contracts for ex-employees and board members; and excessive

security costs.

141.    LaPierre's misuse of NRA funds involve the Women's Leadership Forum, a special

recognition society within the Office of Advancement. LaPierre's wife is the founder and

permanent co-chair of the Women's Leadership Forum. LaPierre testified that his wife has served

in this role as a volunteer for 15 years. In December 2015, at his wife's behest, LaPierre hired his

niece to work on Women's Leadership Forum events and projects.

NYSCEF DOC. NO. 11    Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21    Entered 02/12/21 16:34:29    Page 43 of
461                                                           RECEIVED NYSCEF: 08/10/2020

INDEX NO. 451625/2020

142.    LaPierre had access to, and abused, the budget allocated to the Office of the
Executive Vice President ("EVP Office") to fund personal expenses and consulting contracts for
NRA insiders. The EVP Office, like each division of the NRA, has its own budget, cost center,
and staff. The EVP Office includes LaPierre, his Chief of Staff, and a handful of senior advisors
and office assistants. Expenditures associated with the EVP Office, such as EVP Office staff
salaries, are allocated to the EVP Office budget. In 2018, the overall EVP Office budget was
approximately $16 million.

### i.  LaPierre's Private Flights

143.    The NRA incurs substantial costs for LaPierre's private air travel. LaPierre testified
that it is NRA policy that he travel by private aircraft at all times for security reasons. He testified
further that he is not aware of any limits under this policy on the kind of plane he can charter, how
far he can go, or the amount of money he can spend on the flights.

144.    NRA records show that between June 2016 and February 2018, the organization
paid for numerous private flights for LaPierre's wife and extended family when he was not a
passenger. LaPierre admitted that he authorized at least some of these flights. Upon information
and belief, none of these flights was approved for security reasons, nor were they approved by the
NRA Board. Several examples of these flights are highlighted below:

145.    In August 2016, LaPierre authorized a private flight for his niece and her husband
to fly from Dallas, TX, to North Platte, NE. LaPierre's niece and her family live in Nebraska about
60 miles from North Platte. Asked why he authorized this flight, LaPierre did not identify any
security issues, but testified "I think it's hard. There are not many flights to Kearney….She had a
child and I think that [the travel agent] had -- probably NRA, probably me, said that, okay, in this
instance, it's okay to get her back that way. Our annual meeting was coming up down there. She

Appx. 41

was working on the Women's Leadership Forum with people in Dallas and … it's the advantage of the NRA to have her … do that work." The cost of the flight was more than $11,435.

146.    In July 2017, LaPierre authorized a private flight for his niece and her daughter to fly from Dallas, TX, to Orlando, FL. LaPierre testified that this "was another example where I was getting [my niece] together with my wife to work on the Women's Leadership Forum events. She had tried to travel commercial. All the commercial flights they had – there was a mechanical problem. She was stuck there at the airport until 12:30 or 1:00 at night with a child trying to fly commercial." The cost of the flight was more than $26,995.

147.    In October 2016, LaPierre authorized a private flight for his wife to fly alone from Madison, WI, to Kearney, NE. Asked why she did not use a commercial airline, LaPierre testified "I think it was probably easier to fly private, more convenient, and probably the flights -- there probably are not many flights into Kearney from that area and we wanted to get her there, and I thought it was appropriate given the return NRA is getting on" the Women's Leadership Forum program. The cost of the flight was more than $8,800.

148.    In January 2017, LaPierre authorized a private jet to pick up his niece's husband in North Platte, NE, on the way to Las Vegas for a Safari Club convention. LaPierre testified that his niece "was working the entire time" attending various donor meetings at the convention, so he authorized a flight to bring her husband "over [to] help babysit the child while the mother was working because there was nobody else to do it." LaPierre also authorized a private flight to fly his niece's husband back to Nebraska two days before his niece was ready to return. Asked whether this flight, which cost about $15,000, was in the NRA's best interest, LaPierre testified that it was. "[I]t's really almost very hard to get commercial flights back," LaPierre explained, and his niece's

37

Appx. 42

husband "had to get back to work." LaPierre later authorized a private jet to fly his niece back to Nebraska two days later.

149.    In February 2017, LaPierre authorized a private flight for his niece and her daughter to fly from Atlanta, GA, to Kearney, NE. LaPierre testified his niece was in Atlanta for a "planning meeting on the Women's Leadership Forum," and he is "sure [he] authorized it … to get them back." The cost of the flight was more than $15,000.

150.    LaPierre has also repeatedly directed private aircraft to make additional stops in Nebraska to pick up or drop off family members. Upon information and belief, additional stops and additional passengers on a private flight usually increase the cost of the flight.

151.    For example, in November 2018, LaPierre and his wife took a private roundtrip flight from Washington D.C. to Dallas, TX, and stopped in North Platte, NE, on each leg of the trip to pick up and drop off LaPierre's niece and grandniece. These flights cost $59,790.

152.    In March 2019, LaPierre and his wife took a private flight from Washington D.C. to Orlando, FL, and stopped in North Platte, NE, on the way back to drop off his niece and grandniece. These flights cost $78,900. In April 2019, LaPierre and his wife took a private flight from Washington D.C. to Tulsa, OK, making additional stops in Omaha and North Platte, NE. These flights cost $49,535.

153.    The current Treasurer testified that he did not know of any NRA business purpose that would be served by private flights to or from North Platte, NE.

154.    LaPierre has also authorized private flights for NRA employees when he was not a passenger. For example, in February 2018, LaPierre authorized a private flight for an NRA spokesperson, her husband, and an employee of a vendor from Dallas, TX to Fort Lauderdale, FL and Washington D.C. These flights cost $107,775.

155.    From May 2015 to April 2019, the NRA incurred over one million dollars in expenses for private flights when LaPierre was not a passenger. Upon information and belief, these expenditures were neither authorized by nor consented to by the NRA Board.

156.    The current Treasurer testified that, in the fall of 2018, the NRA eliminated "all non-mission-critical travel" to reduce the NRA's expenses. Following the elimination of non-mission critical travel, payments to LaPierre's Travel Consultant dropped by nearly 50%—from $2.9 million in 2017 to $1.5 million in 2019.

157.    In its annual filings with the Attorney General for 2014 to 2018, the NRA asserted that it required substantiation prior to reimbursing these expenses. The Attorney General has not found any evidence that the private flights and related business uses were substantiated prior to reimbursement.

158.    In fact, the current Treasurer learned for the first time that LaPierre's wife travels alone by private charter at the NRA's expense when counsel informed him the night before he was examined by the Attorney General in June 2020.

### ii.  LaPierre's Bahamas and Yachting Trips

159.    Since June 2015, LaPierre and his family took private flights to and from the Bahamas on at least eight occasions. On most of those trips, LaPierre stopped in Nebraska on each leg of the trip to pick up and drop off his niece and her family. The NRA paid over half a million dollars for these flights.

160.    LaPierre testified that he often visits the Bahamas in December to attend a "celebrity retreat" organized by an individual who is, upon information and belief, the principal stakeholder in several businesses that have business relationships with the NRA ("MMP Principal"). These businesses include Associated Television International, Inc. ("ATI"),

INDEX NO. 451625/2020

RECEIVED NYSCEF: 08/10/2020

Membership Marketing Partners ("MMP"), Allegiance Creative Group ("Allegiance"), and Concord Social & Public Relations ("Concord").

161.     Upon information and belief, MMP, Allegiance, and Concord entered into contracts with the NRA on the same day in December 2011. They also share the same Chief Executive Officer and business address, which is located in the same Fairfax, VA office building where the NRA is headquartered.

162.     Together, MMP, Concord, Allegiance, and ATI have received over $100 million from the NRA.

163.     In recent years, MMP and Concord have been among the NRA's largest vendors. Since 2014, the NRA has paid MMP over $60 million for fundraising, printing, and mailing services. Over the same period, the NRA paid Concord over $22 million for public relations services.

164.     Allegiance has been reported as a professional fundraiser in the NRA's regulatory filings for many years. In its 2018 Form 990, the NRA described Allegiance's services as providing "counsel and promotion planning for marketing and direct response mail and phone programs." Since 2014, the NRA has paid Allegiance over $4.5 million.

165.     ATI partnered with the NRA from 1997 to 2019 to produce and distribute a television series called Crime Strike. Since 2014, the NRA has paid ATI nearly $17 million. For most of its run, Crime Strike was hosted by LaPierre. LaPierre testified he last hosted the program in 2017 or 2018. From January 2018 to May 2019, the NRA paid ATI $4.7 million.

166.     From 2012 to 2018, the NRA paid MMP, Allegiance, Concord, and ATI more than $10 million in fees not contemplated by the terms of the underlying contracts. LaPierre denied

40

having any role in negotiating the contracts with these businesses, but he personally signed most of the contracts on behalf of the NRA.

167.    LaPierre frequently meets with the MMP Principal. According to his reimbursement requests, LaPierre took private flights to California on at least 20 occasions between late 2013 and early 2017—usually staying several days at a five-star historic hotel on Sunset Boulevard in Beverly Hills—to meet with the MMP Principal, often over lunch or dinner. Between 2013 and 2016, the MMP Principal, his wife, and their daughter received over $6,700 in Christmas and birthday gifts from the LaPierres, at the NRA's expense.

168.    LaPierre also regularly attends "celebrity retreats" organized by the MMP Principal. When LaPierre attends these retreats, which are normally held annually in the Bahamas in December, he stays at the Atlantis resort on Paradise Island. His lodging is paid for by the MMP Principal. LaPierre testified that the MMP Principal does not pass these expenses on to the NRA.

169.    LaPierre often visits the Bahamas in the summer as well. During these trips, he stays on a 108-foot yacht owned by the MMP Principal. The yacht, named Illusions, is equipped with four staterooms, a 16-foot jet boat, and two jet skis. LaPierre described Illusions as "a big, big yacht" with a crew that includes a chef. LaPierre testified that "[o]ccasionally one of our other family members" has stayed on the yacht with him and his wife, including his sister and her husband, and perhaps others.

170.    LaPierre has never disclosed his use of the MMP Principal's yacht on the NRA Financial Disclosure Questionnaires that he, as an officer and *ex officio* director of the NRA, must submit to the NRA Secretary annually. Question 4 of this questionnaire asks:

> Have you or any relative received, or do you or any relative expect to receive, any gift, gratuity, personal favor, or entertainment with either a retail price or fair market value in excess of $250 from any person or entity that has or is seeking to have a business relationship with, or received funds from, NRA or any NRA Entity?

41

Appx. 46

171.     LaPierre answered no to this question in every questionnaire he submitted from 2008 to 2018 (the most recent questionnaire produced by the NRA to the Attorney General). LaPierre similarly testified that he has never received a gift of value in excess of $250 from an NRA contractor or employee of an NRA contractor.

172.     LaPierre's use of the MMP Principal's yacht constituted a gift from an NRA contractor in excess of $250 requiring disclosure under NRA policy. It also constituted a private benefit to LaPierre in violation of NRA policy.

173.     In his testimony to the Attorney General, LaPierre said that the reason he failed to disclose the use of the yacht was for security reasons and because he considered the yacht to have been used for a legitimate business purpose. Though LaPierre acknowledged that the NRA questionnaires only go to the NRA Secretary, he said he "was concerned about everybody on security, everything leaks." LaPierre also testified that he considered the use of the yacht as "a safe place to do [business], and [] didn't consider it a gift." LaPierre further testified that these trips to the Bahamas were beneficial to the NRA because they provided an opportunity for his wife and niece to discuss the Women's Leadership Forum:

> … any time I get the two of them together anywhere, there is a benefit for the NRA. It could be in Nebraska, it could be like a corporate retreat in Aspen. It could be a -- you know, I mean, I consider it a good thing to get them together. Yeah, they got together in the Bahamas. They – it could have been in Washington. It just -- it's -- it -- but keeping [his wife's] head [in] the game on this and getting her with [my niece], there is a substantial benefit to the NRA that is -- that is in the -- proof is in the dollars that come into the NRA. I mean, did they enjoy being there, yeah. I mean, on the other hand, did NRA get a benefit of them being together, yes, absolutely.

174.     LaPierre testified that neither he nor the NRA paid the MMP Principal for the use of Illusions. He also testified that he has stayed on Illusions during two European trips for the purpose of recruiting celebrities for the NRA.

Appx. 47

175. LaPierre claimed without identifying any evidentiary support that many of the costs incurred in connection with his travel and entertainment expenses—like the trips to the Bahamas and other locations with his wife, niece and family members—were justified as an investment in donor cultivation.

### iii. LaPierre's Personal Travel Consultant

176. LaPierre uses his own personal travel consultant to arrange his private air travel and other accommodations. This practice deviates from NRA policy and results in substantial additional expenses to the NRA.

177. The NRA Travel Policy provides that employees must use the NRA's official travel agent to make travel reservations unless otherwise approved by the Executive Vice President.

178. Since being elected Executive Vice President, LaPierre has not used the NRA's official travel agent to make his travel arrangements for decades, if ever. Instead, since the 1990s, LaPierre has booked his travel through a travel consultant based in Woodland Hills, CA. The travel consultant bills the NRA through two companies: Inventive Incentive & Insurance Services Inc. and GS2 Enterprises (collectively, "LaPierre's Travel Consultant"). LaPierre testified that when his travel consultant bills services to the NRA, it is for NRA business and in furtherance of the NRA's mission.

179. Upon information and belief, LaPierre, one of his senior advisors, and the Executive Director of Advancement are the only current NRA employees who have used LaPierre's Travel Consultant to make travel arrangements. LaPierre testified that "some of the [NRA-ILA] people have used her," as well as some board members and donors, but he did not recall who specifically. Asked who would need to authorize that, LaPierre testified "I would usually."

180. For several years, the NRA has paid LaPierre's Travel Consultant on a fixed-fee basis. In 2014, the fixed fee for the travel agent's services was $15,000 a month, which was billed

through separate monthly invoices to the NRA (for $10,000) and NRA-ILA (for $5,000). Upon information and belief, these invoices were for the same travel booking services. Beginning in May 2015, LaPierre's Travel Consultant's monthly fee increased to $19,000, which continued to be billed through separate monthly invoices to the NRA ($12,000) and NRA-ILA ($7,000). Upon information and belief, the nature and scope of the travel consultant's services remained unchanged during this period.

181.    Upon information and belief, no competitive bidding process was conducted for the services provided by the LaPierre's Travel Consultant until 2019, and no written contract was executed memorializing this increase in her compensation until 2020. From 2016 to early 2019, the NRA paid LaPierre's Travel Consultant a fixed fee of $19,000 a month. The Director of Purchasing testified that, under NRA policy, the procurement of transportation services should go through a competitive bidding process administered by the Purchasing Department, but that during her 27 years at the NRA, that had never occurred.

182.    From 2005 to 2019, the NRA paid LaPierre's Travel Consultant more than $100,000 annually without a written contract, and without written authorization from the NRA President or a Vice President. This arrangement violated the NRA Purchasing Policy. Upon information and belief, LaPierre and Phillips were aware of this arrangement.

183.    From February 2013 to July 2018, Ackerman McQueen ("Ackerman"), the NRA's public relations and advertising marketing firm, also paid LaPierre's Travel Consultant a $4,000 monthly fee at the direction of LaPierre and Phillips, which was in addition to the monthly fees the NRA paid to her directly. Ackerman passed these expenses on to the NRA. Upon information and belief, LaPierre was repeatedly told that his travel consultant charged excessive fees for the services she provided and for the vendors she engaged on behalf of the NRA.

Appx. 49

184.    After Defendant Phillips stepped down as Treasurer, in March 2019, the NRA entered into a one-year contract with LaPierre's Travel Consultant increasing her annual pay to $318,000. Upon information and belief, this was the first written contract the NRA entered into with LaPierre's Travel Consultant. In an accompanying business case analysis, it provides that "[f]or the security of our principals, in this sensitive environment we sometimes face, we believe there is no other company that can provide the service and discretion that [LaPierre's Travel Consultant] offers." There is no evidence that the NRA considered bids from competing companies.

185.    The analysis does not address the increase in LaPierre's Travel Consultant's monthly fixed fee from $19,000 to $26,500. Services under the contract "include making travel arrangements as directed by the NRA's Executive Vice President or his designee." On March 15, 2019, LaPierre authorized this contract.

186.    Less than a year later, in early 2020, the NRA conducted a competitive bidding process for the services offered by LaPierre's Travel Consultant. Upon information and belief, the NRA accepted LaPierre's Travel Consultant's bid, under which she provides the same services she previously provided for a fixed monthly fee of $7,000.

187.    LaPierre testified that he was not involved in the business case analysis prepared in early 2019, or the competitive bidding process that was conducted. "[T]he treasurer's office handled it. … I stayed completely, completely out of it."

188.    From August 2014 to January 2020, the NRA paid LaPierre's Travel Consultant more than $13.5 million. In 2018, the NRA paid LaPierre's Travel Consultant $2,630,531.71. In the first six months of 2019 alone, the NRA paid LaPierre's Travel Consultant $1,007,597.80.

45

Appx. 50

#### iv. LaPierre's Personal Expense Reimbursements

189.    At LaPierre's instigation, the NRA reimbursed him for other expenses that were personal, including gifts to friends and favored employees.

190.    Between 2013 and 2017, LaPierre was reimbursed for more than $1.2 million in expenses.

191.    From 2013 to 2017, LaPierre was reimbursed over $65,000 for Christmas gifts for his staff, various donors, and friends. Most of his direct reports and executive staff would receive an ice cream gift basket each year from a retailer called Graeters. But those in his inner circle received gifts from retailers like Neiman Marcus and Bergdorf Goodman. For example, at the NRA's expense, in December 2015, LaPierre sent gifts from Neiman Marcus to his travel consultant ($648.55), his senior assistant ($349.80), and his prior Chief of Staff ($413.40). In December 2016, LaPierre sent Christmas gifts to the co-founder of Ackerman ($1,590), his travel consultant ($350), his senior assistant ($350), and Phillips ($377.79). In November 2017, LaPierre expensed gifts to his travel consultant ($443.48), his prior Chief of Staff ($310.65), Phillips ($282.53), and his senior assistant ($238.50), among others. Each of these gifts was substantially in excess of the $25 limit permitted by the IRS for business gifts, and reimbursement for such gifts should have been reported as W-2 income to LaPierre.

192.    Gifts were especially common for those affiliated with the Women's Leadership Forum. In December 2014, for example, the executive assistant to LaPierre's spouse received a $381 birthday gift expensed to the NRA. In September 2016, LaPierre expensed $1,500 in birthday, wedding anniversary, and baby shower gifts for five Women's Leadership Forum volunteers. In May 2017, LaPierre expensed a $418.70 gift for the wife of the MMP Principal for her support of the Women's Leadership Forum.

Appx. 51

193.    In May 2017, LaPierre's wife was appointed to the Board of Directors of the National Park Service Foundation (NPSF). Over the next few months, LaPierre submitted expense reports for $13,874.46 in expense reimbursements for trips taken with his wife and niece to NPSF events in Alaska and Arizona. This was in addition to the private flights used to get them to the NPSF events, which cost in excess of $150,000.

194.    LaPierre has routinely submitted expense reports seeking reimbursements for his niece's lodging and airfare for events that are allegedly related to NRA business. As an NRA employee, LaPierre's niece was required to follow NRA policies and procedures for seeking approval and reimbursement for her work-related expenses. Instead, LaPierre submitted reimbursement requests for his niece's travel expenses on numerous occasions. For example, in early 2017, LaPierre expensed $12,332.75 for his niece's 8-night stay at the Four Seasons Hotel in Dallas, TX. The nightly rate for the room was $1,350. In 2016 and 2017, LaPierre was reimbursed over $38,000 in expenses for his niece's airfare and lodging.

195.    LaPierre has also been reimbursed for expenses incurred travelling to and from film shoots for Under Wild Skies—a television program discussed in detail in Part V, Section II(A) below—in Europe and Africa. LaPierre had a decades-long friendship with the principal of Under Wild Skies, Inc. ("UWS"), the corporate entity that produces the program. For example, in 2013, LaPierre was reimbursed by the NRA $37,084.66 for airfare, lodging, and related expenses that he and his wife incurred travelling to Botswana and Mozambique for an Under Wild Skies film shoot on safari.

196.    Between 2009 and 2017, LaPierre expensed over a hundred thousand dollars in membership fees for a golf club located in the Washington D.C. area. LaPierre testified that he uses the golf course for both personal and business reasons. In its annual filings with the Attorney

General for 2014 to 2018, the NRA asserted that it required substantiation prior to reimbursing these expenses. The Attorney General has not found any evidence that the golf membership fees and related business uses were substantiated prior to reimbursement.

197.    In early 2019, the current Treasurer learned from LaPierre that LaPierre's expense reimbursements were historically handled by NRA-ILA, regardless of whether they related to the activities of that division. Pursuant to the bylaws, NRA-ILA's finances are maintained separately from those of NRA General Operations. LaPierre's expenses were also processed by a lower level employee in NRA-ILA. Because that employee was out of the office on sick leave, the current Treasurer took the opportunity to "reengineer" the process for reviewing LaPierre's expenses to "make it as robust and appropriate" as possible.

198.    But this new process does not capture any personal expenses incurred by LaPierre that are billed by vendors directly to the NRA. So, when LaPierre's travel expenses are billed directly to the NRA, such as by LaPierre's Travel Consultant, as discussed above in Part Five, Section I(A)(iii), they are only subject to review by a lower level employee.

### v.  LaPierre's Consulting Budget

199.    Since at least 1999, the EVP Office has had its own consulting budget ("EVP Consulting Budget"). Historically, this budget has included 20 to 30 consulting arrangements the NRA has entered into at the direction of LaPierre or Phillips, while Phillips was Treasurer. In recent years, the budget has included consulting arrangements totaling $2 to $3 million in annual expenditures.

200.    Upon information and belief, the EVP Consulting Budget is prepared each year by the Financial Services Division ("FSD") based on historical data on what the consultants were paid in the previous calendar year, and guidance from the Finance Director and the Treasurer on what LaPierre wants to keep in the budget for the upcoming calendar year.

201.    Under the NRA Contract Policy in effect since 2012, copies of all contracts in excess of $100,000 annually must be distributed to the Office of the General Counsel and the FSD. Upon information and belief, during Woody Phillips's tenure as Treasurer, such contracts were routinely withheld from the FSD. Consequently, the FSD processed invoices without having access to or knowledge of the terms of the underlying contract, if a contract existed at all. Upon information and belief, when staff in the FSD requested copies of contracts, Phillips often directed his staff to refuse the request on privacy grounds, or on the basis that there was no requirement to furnish them.

202.    For this reason, during Woody Phillips's time as Treasurer, the FSD did not have copies of several consulting agreements that were included in the EVP Consulting Budget.

203.    Upon information in belief, the invoices for several consultants included in the EVP Consulting Budget were processed and paid for several years without written contracts in place or access to contracts if they existed. EVP Office consultants who were regularly paid without written contracts included the consulting firm, McKenna & Associates, Inc. ("McKenna"), several board members, consultants who worked with LaPierre's wife on Women's Leadership Forum-related events, and LaPierre's Travel Consultant. LaPierre disclaimed knowledge of several of the consulting arrangements in the EVP Consulting Budget during his examination by the Attorney General, testifying that the budget and negotiations for those agreements were handled by Phillips.

204.    The EVP Consulting Budget includes several Women's Leadership Forum staff members who worked closely with LaPierre's wife. For example, from 2014 to 2018, a Women's Leadership Forum staff member serving as the executive assistant to LaPierre's wife was paid $594,711.53 for consulting services. From 2016 to 2018, a Women's Leadership Forum staff

49

Appx. 54

member with the title of "Communications Consultant/NRA Special Projects" was paid approximately $250,000 for consulting work.

205.    The EVP Consulting Budget also includes consulting arrangements with several former NRA presidents and board members, which are discussed in detail in Part Five, Section II(C) below. In several instances, the board members were paid for consulting services without a written contract in place. These arrangements were not reviewed and approved by the Audit Committee in advance of their execution, as required by New York law governing related party transactions and NRA policy.

### vi.  LaPierre's Security Costs

206.    From 2013 to 2018, the EVP Office budget allocated several million dollars each year to LaPierre's personal and home security. LaPierre testified that he does not "control the people that manage my security … I let the Director of Security run that and make the decisions." The Director of Security reports directly to LaPierre. LaPierre testified that he does not "know everything [the Director of Security]'s spending money on," but that the "treasurer does."

207.    Upon information and belief, the Director of Security procured an armored vehicle for LaPierre without notifying the Purchasing Division or complying with the NRA Purchasing Policy. The Director of Purchasing testified that this was not the first time the Director of Security had made procurements in contravention of NRA policy, noting that he "has a habit of—he will just go and do whatever he needs to get done."

208.    LaPierre testified that, after the Parkland, FL shooting in February 2018, his Director of Security advised him to leave the Washington D.C. area because of a number of threats that had been made against him. Shortly thereafter, according to LaPierre, the co-founder of Ackerman proposed having a real-estate investment company that he owned purchase a house that LaPierre and his wife could "use … as a safe house from time to time."

50

Appx. 55

209.     Over a three-week period in April 2018, LaPierre and his wife looked at several homes in the Dallas, TX area with a realtor and an Ackerman executive. LaPierre and his wife identified a home in the suburb of Westlake that, at the time, was valued at approximately $6.5 million.

210.     On May 11, 2018, Phillips and an Ackerman executive executed an agreement to establish a limited liability company named WBB Investments, LLC. Under this agreement, the NRA agreed to invest $6,500,000 for a 99% interest in the company.

211.     On May 21, 2018, an Ackerman executive sent an email to the Ackerman CFO, copying LaPierre's wife, stating "[LaPierre's wife] (copied here) and I spoke this morning. Following are my notes from the conversation to assist you in the offer document." The email lists "Equipment/Furnishings to retain as part of offer" on the Westlake home and then provides:

> Also, can we request from owner **a listing of all service vendors** for various aspects of the house. When we last looked, it appeared the homeowner was making a binder of all relevant information-we would like that documentation.
>
> **Home Improvements Prior to move-in:**
>
> - This wouldn't affect the offer, but a security gate needs to be designed and installed for the driveway.
> - The men's master bathroom and closet need some changes. There isn't much closet space and the cabinetry needs to be changed. [LaPierre's wife] will have specific input here and can probably work with the eventual Interior Designer to get this work accomplished.
>
> We need to discuss how to acquire a **Social Membership to the Club**. Is a **July 1 Closing** possible so that an **August move-in** could be anticipated (time to get some rooms furnished and the above improvements completed prior to move-in). **Two vehicles** will need to be purchased prior to move in as well.

212.     The same day, WBB Investments, LLC sent an invoice to the NRA for $70,000 for "Investment in Security Assets." Under NRA policy, the FSD cannot issue payment to a vendor without having a valid Form W-9 on file.

51

Appx. 56

213.     Upon receipt of the invoice from WBB Investments, LLC, on May 25, 2018, staff in the FSD informed staff in the Treasurer's Office that a W-9 was needed for WBB Investments before the invoice could be processed.

214.     In response, Phillips and his successor, who had become the CFO by that time, told FSD staff, in sum and substance, that payment was urgent, and to cut the check immediately. The Director of Financial Reporting and Accounting wrote in an email, "[a]s we discussed, cut without w9 for now even though it's against policy per treasurer's office."

215.     On May 30, 2018, WBB Investments, LLC deposited the NRA's check for $70,000. Shortly thereafter, the deal was called off, and the money was returned. LaPierre and Ackerman dispute the reasons why the house sale was not completed. LaPierre claims that it was because he realized that Ackerman wanted the NRA to pay for the house. LaPierre did not explain why Ackerman would have invested in the property for his use.

### B. Wilson "Woody" Phillips's Conflicts of Interest, Related Party Transactions, and Self-Dealing

216.     From 1992 to 2018, Phillips served as the Treasurer of the NRA. The Treasurer is responsible for overseeing the financial affairs of the NRA. In addition to his own staff, the Treasurer oversees several divisions, including Purchasing, Financial Services, and Information Services. At all times during his tenure at the NRA, Phillips was supervised by and reported directly to LaPierre. As detailed below and throughout this complaint, Phillips failed as Treasurer to adhere to internal financial controls and misused NRA assets to enrich himself and other NRA officers and directors.

217.     In the course of Phillips's successor's transition into the position of Treasurer, he found that Phillips was an absentee Treasurer, and felt that the NRA did not have "boots on the ground as it relates to finance." Phillips's successor also described his predecessor as having a

"non-robust process" for reviewing NRA employees' credit card expenditures, which included

having junior employees responsible for reviewing and signing off on the expenses of more senior

employees.

218.    In early 2018, an FSD staffer reported to her supervisor that she was worried about

being fired for requesting missing receipts from certain NRA staff, and that she would frequently

be told, "Woody said to pay this as submitted," or "Josh [Powell] will throw a fit," or "We don't

want this to reach Wayne [LaPierre]." Her supervisor handed this report to the head of Human

Resources, but was not aware of any action taken by Human Resources in response.

219.    Under Phillips, FSD staff had complaints about being frequently directed to process

payments in contravention of NRA policy on the basis that "Woody wants this done," or "Wayne

[LaPierre] or Woody or Josh [Powell] said that these are okay."

220.    Ultimately, and as detailed in Part Five, Section V below, several of Phillips's staff

became whistleblowers in the summer of 2018, disclosing to the NRA Audit Committee

longstanding failures by NRA senior executives, including Phillips and Powell, to comply with

NRA financial policies and procedures, and to ensure adequate internal controls. These

whistleblowers are collectively referred to hereafter as the "NRA Whistleblowers."

### i.    Phillips's Conflict of Interest with Respect to HomeTelos

221.    From 2014 to 2017, the NRA paid $1.4 million to HomeTelos, L.P, an information

technology company based in Dallas, TX. At the time of the contract, Phillips had a longstanding

personal relationship with HomeTelos's CEO. Phillips did not disclose that relationship despite

NRA policy, which requires that all material facts related to conflicts of interest be disclosed in

good faith and in writing to the Audit Committee before any related action.

222.   In September 2014, LaPierre and Phillips authorized the HomeTelos contract. Neither LaPierre nor Phillips disclosed Phillips's potential conflict of interest to the Board before the contract was executed.

223.   LaPierre and Phillips similarly failed to disclose Phillips's potential conflict of interest to those tasked with vetting the HomeTelos contract. Upon information and belief, LaPierre and Phillips failed to disclose this conflict to the then NRA President and First Vice President at the time they provided written authorization for the contract. The Managing Director of Information Services, who assisted Phillips in the contract negotiation, was unaware of the relationship between Phillips and the HomeTelos CEO when he agreed to engage HomeTelos.

224.   Phillips also failed to disclose his personal relationship with the HomeTelos CEO on his conflict of interest disclosure forms for 2016, 2017, and 2018. Phillips answered 'no' to the form's question, "To the best of your knowledge, is there any transaction…in which the NRA is a participant and in which you might have a conflicting interest."

225.   The NRA first questioned the propriety of the HomeTelos contract in spring 2018, after the current Treasurer replaced Phillips as CFO and the agreement ended.

226.   In July 2018, the NRA Whistleblowers identified Phillips's relationship with the HomeTelos CEO as an example of a "'Financial Conflict of Interest at the Senior Management and Board of Directors Level."

227.   Upon information and belief, Phillips disclosed this relationship for the first time in September 2018. On September 6, 2018, the Audit Committee retroactively approved the NRA's engagement of HomeTelos for the period from September 2014 to May 2017, for total compensation of approximately $1.36 million. The Audit Committee acknowledged that Phillips's

54

Appx. 59

relationship with the HomeTelos CEO "posed [a] potential conflict of interest" and "should have been disclosed and approved in advance."

### ii. Phillips's July 2018 Trip on Grand Illusion

228.     In July 2018, while Phillips was still the NRA Treasurer, he organized a trip with several people he knew in the Dallas/Fort Worth area. Part of this trip involved spending one week (July 12-19, 2018) on the Grand Illusion—a yacht owned by the MMP Principal. Although LaPierre testified that Phillips negotiated the millions of dollars of contracts with the MMP Principal's companies, Phillips neither disclosed nor received Board approval for this trip in advance.

229.     In August 2018, after the trip had already occurred, Phillips disclosed the trip in his annual Financial Disclosure Questionnaire, stating that in July 2018 he organized a trip involving the use of "a boat belonging to [the MMP Principal], a contractor in our membership renewal programs." Phillips explained that "[t]he boat is not available for charter," but that he "purchased its use through a $25,000 donation to the MS (Multiple Sclerosis Society)."

230.     Phillips's references to a "boat" in his Financial Disclosure Questionnaire was to the Grand Illusion. In September 2018, the Audit Committee retroactively ratified and approved Phillips's "participation in the July 2018 sailing trip." However, the Audit Committee's approval did not disclose any material details about the trip, including the name of the contractor, the length of the trip, or the value of the trip.

### iii. Phillips's Consulting Agreement

231.     In 2017, the NRA began to plan for Phillips's retirement and the introduction of his replacement. As *ex officio* director, Treasurer and CFO, Phillips's compensation was required to be set by the NRA Board or an authorized committee. He was not permitted to receive any additional compensation without specific Board authorization. However, the NRA's President and

55

Appx. 60

First Vice President gave Phillips a post-employment compensation benefit in the form of a consulting agreement without such authorization.

232.    On May 5, 2018, while Phillips was still the Treasurer of the NRA, Phillips entered into an independent consulting agreement to continue to be paid by the NRA following his retirement. The contract was executed by the NRA President and First Vice President. Pursuant to the contract, the NRA agreed to pay Phillips $30,000 per month for five years for consulting services. In exchange for this monthly payment, Phillips was to "provide advisory services and the benefit of his expertise in all appropriate areas, including, but not limited to, areas related to his prior duties as CFO and Treasurer of the Organization." As a consultant, Phillips would "coordinate activities with the NRA's Executive Vice President, Treasurer and CFO, and Executive Director, Office of Advancement to build and maintain relationships with major gifts donors, identify and cultivate relationships with fundraising partners, and identify prospective high net worth individuals to solicit for major gifts." The contract was signed by the NRA President and one Vice President.

233.    There is no evidence that the Audit Committee reviewed or approved Phillips's consulting contract prior to its execution. The Vice Chair testified that he did not recall the contract coming before the Audit Committee for approval. The Chair did not recall seeing the contract either; he testified that he believed that "it would not be a related party transaction…so, it would not come to the Audit Committee vis-à-vis that." He further testified, "If, in fact, that were a related party transaction…and come to the Audit Committee, I can guarantee you my committee would not have approved that."

56

234.    Upon information and belief, Phillips has provided no consulting services to the NRA under this agreement. Payments made to Phillips under this agreement are *ex gratia* payments and a waste of charitable assets.

235.    The current Treasurer testified, "[Woody] wasn't my consultant...Woody never consulted for me....I don't have direct conversations with Woody about anything." His understanding was that Phillips was being paid to consult with the Office of Advancement. LaPierre, for his part, claimed he "didn't even know about" the contract until his lawyers told him about it several months after Phillips's departure, and that he did not know whether Phillips provided any consulting services under the contract. The Vice Chair of the Audit Committee testified that Phillips was engaged as a consultant because "he has a lot of institutional knowledge, and that is helpful to... the current treasurer," but admitted that he did not know whether the current Treasurer actually consults with Phillips. He acknowledged that he did not have any knowledge of work performed under the contract.

236.    The Chair of the Audit Committee also testified that Phillips is not paid a flat monthly rate as the May 2018 agreement suggests, but is instead paid a minimal hourly fee that is only for work performed. He testified, "I personally don't like flat-rate contracts unless someone is going to be working a lot...if someone has a flat-rate contract and someone is going to be...working a good number of hours to justify that, that's okay. But as I understood Woody's deal, it was going to be—he was going to be there as—as a consultant for [the Current Treasurer] if and when he ran into issues." The Chair's understanding was that the flat-rate contract was "never triggered," and that it was replaced by an hourly contract.

237.    Phillips has continued to submit monthly invoices to the NRA for $33,500 to be paid to Phillips through a corporate entity called WHIP LLC. These invoices specify that they are

for monthly billing under the original contract dated May 5, 2018. In the first 7 months of 2019,

NRA records reflect payments to WHIP LLC for $170,692.37.

### C. Joshua Powell's Conflicts of Interest, Related Party Transactions, and Negligence

238.    In 2016, LaPierre hired Powell—who had been a board member of the NRA shortly

before he was hired—to be his Chief of Staff. Powell was hired to oversee business practice

changes and improvements within the NRA. LaPierre testified that he hired Powell as a "change

agent" who would "modernize the NRA" and "improve business practices." LaPierre explained

that his "former chief of staff had retired and we were specifically looking for someone with a

business background to bring in to work on the … various business aspects of the NRA …."

LaPierre believed Powell had good ideas on potential areas of growth for the NRA, and that "along

with [his] other business experience," Powell was a "good choice for the NRA." Asked about this

other business experience, LaPierre testified that Powell "had a catalog that he had worked with

and … as far as I knew, [it] was successful." The catalogues were not successful. Upon information

and belief, both ventures were short-lived, neither was profitable, and Powell has been sued

numerous times in connection with the catalogues over the non-payment of debt.

239.    Powell came to be—along with NRA outside counsel Brewer, Attorneys &

Counselors (the "Brewer firm")—in charge of the NRA's compliance efforts. This was despite

Powell's routine disregard for and violation of NRA policies and procedures regarding contracts

and expenses, as well as his abusive behavior towards NRA and vendor staff.

240.    Powell held the position of Executive Director of General Operations until

December 2018, when he was removed from that position. At that time, he was named "Senior

Strategist"—a newly created position—to coordinate with the Brewer firm "in its campaign

against the State of New York." Upon information and belief, Powell retained his then salary, and also retained his position as LaPierre's Chief of Staff.

241.    LaPierre acknowledged that, by the end of 2018, it had become "obvious to [him] that" Powell was "abusive to the way he was treating some employees, and he was not well liked among a lot of employees based on that treatment." But instead of terminating Powell, LaPierre gave him the position of Senior Strategist, which LaPierre described as a promotion in a firmwide announcement.

242.    In January 2020, Powell was terminated for, among other things, misappropriating NRA funds during his entire tenure at the NRA.

### i. Powell's Compensation

243.    Powell's salary was set at the discretion of LaPierre. When he first joined the NRA in June 2016, Powell's salary was set at $250,000. A month later, it was retroactively increased to $500,000 by Phillips and LaPierre. A revised employment agreement memorializing the $500,000 salary was signed by Powell, Phillips, and LaPierre in November 2017. In comparison, Powell's predecessor as Chief of Staff, who had been at the NRA for over 35 years, had a base salary of approximately $350,000 at the time of her retirement.

244.    Powell's November 2017 employment contract included a housing allowance to be negotiated by the NRA and Powell annually. From August 2016 to June 2019, the NRA paid or reimbursed Powell for over $130,000 in rent for his Virginia residence. In 2018 alone, Phillips approved lease payments of $54,000 to Powell's landlord. Powell was also regularly reimbursed for his cellphone, as well as his utilities, parking, cable, and internet charges for his Virginia residence. The NRA policy on relocation expenses provides for a maximum temporary living expense allowance of thirty days and a maximum $7,500 in relocation expense reimbursement.

245.    After Powell had been at the NRA for approximately a year, in the third quarter of 2017, Powell's salary was increased to $650,000, again by Phillips and LaPierre.

246.    In March 2018, Phillips and LaPierre retroactively raised Powell's salary again to $800,000 as of January 1, 2018. There was no change in his position at that time.

### ii.  Powell's Spending and Reimbursement Requests

247.    Powell routinely violated the NRA's expense reimbursement requirements and policies concerning travel expenses, both on his NRA-issued credit card and by passing expenses through NRA vendors.

248.    Powell charged expenses for travel and entertainment to his NRA-issued credit card. For example, between mid-February and mid-March 2019 alone, Powell charged approximately $13,000 in lodging, food, and travel to his NRA credit card.

249.    One of the NRA's vendors, Ackerman, in a letter to the current Treasurer also detailed approximately $32,000 in food and travel expenses incurred by Powell—the vast majority of which were incurred at a high-end Italian restaurant in Alexandria, VA—that Ackerman passed through to the NRA between October 2016 and December 2018. After receiving this letter, the current Treasurer sent it to the Brewer firm and did nothing to follow up on the spending allegations.

250.    It was not until October 2019 that the current Treasurer began examining Powell's expenses himself, which, upon information and belief, he did independently of any investigation the Brewer firm was conducting in response to the allegations of excessive spending and reimbursement alleged in the press and the May 2019 Ackerman letter.

251.    The NRA terminated Powell in January 2020 after it claims to have found that, between 2016 and 2019, Powell had charged the NRA over $33,000 in improper travel expenses, including travel for his wife and children; an average of approximately $500 per month in AT&T

60

Appx. 65

expenses; and over $4,000 in improper technology expenses, in addition to miscellaneous improper housing, parking, relocation, utility, and other expenses.

252.     Powell ultimately paid the NRA $40,760.20 to settle the dispute over his expenses.

### iii.   Powell's and Phillips's Negligence in Entering into Multimillion-Dollar Verbal Contracts

253.     In or about mid-2017, Powell, Phillips, and LaPierre engaged in discussions with longtime NRA fundraising consultant McKenna about a large-scale project that would encompass (1) a search for a new NRA CFO in anticipation of Phillips's retirement in 2018; (2) a search for a new or refreshed banking relationship for the NRA; and (3) a possible restructuring of the NRA's corporate structure and advancement of its affinity insurance program. The name for the project that encompassed all of this work ultimately became "Project Ben-Hur."

254.     At the direction of Powell, the NRA engaged McKenna to perform the services contemplated by Project Ben-Hur without entering into a written contract or obtaining written approval in advance from the NRA President or Vice Presidents.

255.     McKenna was a consultant for the NRA from approximately 2012 until 2019. Up until the Project Ben-Hur discussions in 2017, McKenna's consulting for the NRA had mostly consisted of donor cultivation work with high net worth individuals. Between 2013 and 2017, the NRA paid McKenna anywhere from approximately $800,000 to $1.8 million per year. In or about June 2017, the NRA and McKenna entered into an amended agreement that lowered the monthly consulting fee paid to McKenna from $40,000 to $20,000 per month.

256.     The fees paid under that written agreement, however, represented a small fraction of what the NRA was paying McKenna.

257.     Upon information and belief, most of the services that McKenna performed for the NRA (and the fees that it charged) were based on oral agreements entered into by LaPierre,

Phillips, and Powell. For example, no written contract regarding Project Ben-Hur was ever executed—instead, Powell and Phillips entered into an oral contract to pay McKenna between $160,000 and $250,000 per month in 2018, in violation of the NRA's contract approval and conflict of interest policies. This monthly fee did not include an additional, approximately $375,000 in legal fees and $200,000 in food, travel, and other out of pocket expenses that McKenna requested reimbursement for from the NRA in 2018.

258.     In 2018, Powell also approved a verbal contract with LookingGlass, a cybersecurity firm that McKenna recommended to him—and in which McKenna is an investor. That verbal contract violated the NRA's contract approval requirements and was for services that were later found to be overpriced. The contract ultimately cost the NRA approximately $500,000 before it could be terminated.

### iv.   Powell's Conflict of Interest Concerning His Wife's Employment

259.     After Powell became an NRA executive, his wife was employed by McKenna.

260.     As the Project Ben-Hur discussions described above in Part Five, Section I(C)(iii) progressed, on or about December 15, 2017, McKenna hired Powell's wife as an independent contractor, through a newly formed company called SPECTRE, to assist with the project. Although Powell's wife worked on McKenna client accounts apart from the NRA, her monthly consulting fee of $30,000 was passed through in its entirety to the NRA with a $5,000 markup for McKenna beginning in or about January 2018 through approximately December 2018.

261.     Shortly after Powell's wife was hired as an independent consultant for McKenna, Powell authorized a contractual amendment to increase McKenna's monthly retainer for donor cultivation from $20,000 to $25,000 per month for 2018. That written amendment was signed by Phillips and Powell in January 2018.

Appx. 67

262.    Prior to signing the amendment, Powell did not disclose the conflict of interest posed by his wife's work for McKenna to the NRA General Counsel or the Audit Committee. In fact, upon information and belief, Powell instructed his wife not to attend meetings when Frazer would be present to avoid drawing Frazer's attention to the fact that she worked at McKenna. In doing so, Powell not only disregarded his disclosure obligations under the NRA's conflict-of-interest policy, but took affirmative steps to hide the conflict from the NRA officer he was supposed to disclose it to.

263.    Upon information and belief, it was not until the current Treasurer confronted Powell about the relationship in mid-2018—as the NRA Whistleblowers were preparing to disclose the conflict to the Audit Committee—that Powell disclosed it to Frazer.

264.    On July 26, 2018—four days before the NRA Whistleblowers presented the NRA Audit Committee with evidence of Powell's conflicts of interest—Powell introduced a "refresher" presentation to NRA upper management on compliance and governance issues, which included training on conflicts of interest and related party transactions.

265.    While NRA officers and board members are required by NRA policy to disclose conflicts of interest on at least an annual basis, Powell did not submit a completed Financial Disclosure Questionnaire for 2018 until September 6, 2018—the date that the NRA Audit Committee discussed and voted on Powell's conflicts.

### v.  Powell's Related Party Transaction with His Father

266.    In 2017, Powell requested that Ackerman add his father, a photographer based in Colorado, to its photographer rotation for NRA events. Ackerman complied with Powell's request, and proceeded to pass through at least $93,000 in expenses for his father's services to the NRA. Shortly thereafter, in or about September 2017, Powell instructed NRA personnel to pay his father for his services directly, ultimately resulting in approximately $10,000 being paid to his father.

According to NRA personnel, Powell's father's services were more expensive than the quote provided by another photographer. It was not until the NRA Whistleblowers brought the relationship to the attention of the Audit Committee in July 2018 that it was disclosed as a conflict. The Audit Committee then summarily ratified the transaction in September 2018.

### vi. Powell's Record of Alleged Sexual Harassment and Discrimination

267.    On June 8, 2017, after having been terminated a week earlier, a former NRA employee, through counsel, lodged a sex discrimination complaint against Powell with the NRA Human Resources Director. The NRA Human Resources Director forwarded the complaint to the General Counsel's Office for investigation.

268.    The complainant, a former NRA employee, alleged that Powell disparaged her in front of her colleagues by stating that she sounded like Powell's wife when she asked a question during a meeting. The complainant also alleged that Powell had frozen her out of the NRA by outsourcing her job duties to vendors after she raised concerns about Ackerman's fees during a meeting with its CEO. According to the complainant, Powell directed her to meet him at a bar the following day, where he berated her, accused her of being "emotional," and told her that Ackerman could spend as much money as it wanted, even if the charges were "made up."

269.    In or about June 2018, the NRA settled the potential sexual discrimination claim made against the NRA for Powell's conduct for $89,000.

270.    Powell was also accused by at least one Ackerman employee of sexual harassment in or about October 2018. That Ackerman employee raised her accusation with LaPierre, which resulted in Powell being removed as the NRA's designated point of contact for Ackerman but otherwise, upon information and belief, did not result in any investigation or disciplinary action regarding Powell's behavior.

### D. John Frazer's Negligence and Certifications of False or Misleading Annual Filings

271.    John Frazer has been the Secretary and General Counsel of the NRA since 2015. LaPierre hired Frazer as General Counsel in January 2015 and the Board appointed him as Secretary in April 2015. In his capacities as Secretary and General Counsel, Frazer reports directly to LaPierre.

272.    Frazer began his career with the NRA in 1993 as an information specialist in the research and information division of NRA-ILA. Frazer was not a lawyer at the time and he was primarily responsible for "answering mail and phone calls from members and the general public about legislative and Second Amendment issues."

273.    Frazer obtained his law degree in 2008 from George Mason University and became licensed to practice in Virginia that same year. While attending law school, Frazer continued his non-legal work for the NRA. Once he became a licensed attorney in 2008, Frazer remained in a non-legal position at the NRA until 2013. During that period, Frazer served as the Director of the research and information division of NRA-ILA.

274.    In September 2013, Frazer left the NRA to work in private practice as a solo practitioner. He practiced independently for approximately a year-and-a-half. During his brief time working in private practice, Frazer practiced firearms-related law. Frazer left private practice in January 2015 and returned to the NRA full-time as General Counsel. Frazer was subsequently appointed by the NRA Board as Secretary in April 2015. At that time, Frazer received a salary of $272,578, along with additional compensation of $55,870. In or around September 2017, Frazer's salary was increased to $360,000, with additional compensation of $54,100.

275.    At the time of his appointment as Secretary and General Counsel, Frazer had been licensed as an attorney for seven years, and had been in private practice in his own firm for 18

65

months. There is no indication from Frazer's seven years with a law license—only 18 months of which entailed representing clients—that he had relevant legal experience in corporate governance, corporate compliance, tax exempt organization requirements, not-for-profit organization requirements, or the law governing boards and board procedure. There is also no indication that Frazer, based on his experience, had familiarity or legal experience with the N-PCL, the governance requirements of the New York Nonprofit Revitalization Act, the EPTL, the requirements of the Internal Revenue Code with respect to 501(c)(3) or (c)(4) nonprofits, reporting, transactions with disqualified persons, or excise tax reporting and payment obligations.

276.    LaPierre hired Frazer as General Counsel without reviewing his qualifications or determining whether he had sufficient legal expertise and experience for the role. LaPierre admitted that he "didn't know" that Frazer hadn't graduated from law school until 2008. LaPierre further admitted that he did not know how familiar Frazer was with New York nonprofit law, or with the law governing tax exempt organizations. LaPierre did not make any inquiry of Frazer to determine whether he had those areas of expertise when hiring him as General Counsel. Instead, LaPierre "assumed, as any other attorney, he would be aware of…general things like that."

277.    LaPierre did not consult an executive search firm to assist in identifying qualified candidates for the General Counsel position prior to hiring Frazer. LaPierre did not ask that a search be conducted of Frazer's prior legal writings or of lawsuits in which he was involved. Nor did LaPierre take steps to ensure that a credit or social-media check was conducted for Frazer before hiring him as General Counsel. LaPierre testified, "I assumed that stuff is done by our human resources department. I didn't do it."

### i.    Failure to Comply with Relevant Governance Requirements

278.    As of July 1, 2014, the New York Nonprofit Revitalization Act of 2013 imposed significant governance requirements on New York charitable corporations, including the NRA.

Appx. 71

These requirements concerned, among other things, audit oversight by a committee of independent directors, the substance and procedures for addressing related party transactions, and requirements to have conflict of interest and whistleblower policies. In his capacity as Secretary and General Counsel, Frazer had the duty to be aware of these legal requirements, determine what the NRA was required to do to comply with these governance requirements, and ensure that appropriate changes were timely made in the NRA's governance procedures to comply with these requirements.

279.    From 2014 to 2018, Frazer failed to make the necessary changes to board governance procedures, or to advise officers and directors of the needed changes. Frazer repeatedly failed to ensure that related party transactions were being addressed by NRA officers and directors in accordance with N-PCL § 715; failed to enforce compliance with the NRA's Conflict of Interest Policy for years; and failed to ensure that the NRA was in compliance with laws and policies governing whistleblowers. For example, in connection with related party transactions, the Audit Committee Chair testified, "there were some [related party transactions] that should have been given to us, should have been captured into the [disclosure of financial interest] forms, should have been presented to us by Frazer and they weren't."

### ii.  Certification of False or Misleading Annual Filings

280.    In his capacity as Secretary, Frazer is responsible for executing and certifying the NRA's annual CHAR 500, which includes the NRA's IRS Form 990, with the New York Charities Bureau. On an annual basis, Frazer certified under penalty of perjury that he "reviewed this report, together with all attachments," and that to the best of his knowledge and belief "they are true, correct, and complete in accordance with the laws of the State of New York applicable to this report."

281.    In each year from 2015 until the NRA's most recent filing in 2019, Frazer executed

an identical certification attesting to the accuracy of the NRA's annual filings. As detailed in Part

Five, Section VII below, the NRA made materially false and misleading statements and omissions

in its 2016 and 2017 filings with the Attorney General, which Frazer falsely certified were true,

correct, and complete. Frazer either knew or negligently failed to learn that the filings of the NRA

with the New York Charities Bureau were not "true, correct, and complete in accordance with laws

of State of New York applicable to this report."

### E. Improper Expenditures by LaPierre's Senior Assistant and Direct Report

282.    LaPierre hired one of his longest serving and key employees in 1995 to work in the

EVP Office as his assistant. For the last 25 years, this employee has been one of LaPierre's closest

and most trusted advisors. This employee is hereinafter referred to as "LaPierre's Senior

Assistant."

283.    LaPierre's Senior Assistant joined the NRA with a criminal record of embezzling

from a non-profit where she had worked in the 1980s.

284.    LaPierre's Senior Assistant has held various job titles during her NRA career, all

of which have entailed working closely with and reporting directly to LaPierre. In general,

LaPierre's Senior Assistant acts as a liaison between LaPierre and the NRA Board, attends

meetings with LaPierre and also speaks about the NRA or acts as a representative of the NRA at

events around the country. LaPierre's Senior Assistant's current salary is $250,000.

285.    At some point in the 2000s, LaPierre's Senior Assistant was accused of diverting

money from the NRA to use for personal expenses. This prompted an investigation by the NRA

Board and an external auditor, which resulted in LaPierre's Senior Assistant's NRA credit card

being taken away. However, even though her corporate credit card was taken away, she continued

to have access to and use of other NRA employees' corporate credit cards, including the CFO's.

68

Appx. 73

286. After LaPierre's Senior Assistant's credit card privileges were revoked, LaPierre and Phillips tasked an executive assistant in the Treasurer's Office ("Executive Assistant No. 1") with the responsibility of reviewing LaPierre's Senior Assistant's expenses and reimbursement requests. Executive Assistant No. 1 was more junior than LaPierre's Senior Assistant and lacked sufficient supervision and institutional authority to rein in LaPierre's Senior Assistant's inappropriate spending.

287. LaPierre's Senior Assistant still had the authority to incur up to approximately $15,000 to $20,000 per month for business travel expenses, sponsorships, and event attendance.

288. In 2012, upon information and belief, LaPierre's Senior Assistant had the NRA pay for approximately $18,000 in expenses incurred in connection with her son's wedding in Minnesota. Executive Assistant No. 1, who was responsible for processing these expenses, testified that this was consistent with LaPierre's Senior Assistant's longstanding practice of expensing personal items to the NRA that she would later ostensibly reimburse. According to Executive Assistant No. 1, these wedding expenses never were reimbursed by LaPierre's Senior Assistant. In fact, LaPierre's Senior Assistant directed Executive Assistant No. 1 to remove information from the wedding invoices that would identify them as being personal in nature.

289. LaPierre also authorized his Senior Assistant to book flights and black car services through LaPierre's Travel Consultant, which she frequently did. LaPierre's Senior Assistant abused this privilege and violated the NRA's travel policy. She routinely hired black cars to ferry her to and from airports and NRA events at substantial expense, and often extended this courtesy to her family as well.

290. As one example, on a single day, LaPierre's Senior Assistant incurred over $1,100 in black car bills for her husband's trips to and from airports.

69

Appx. 74

291.    On another occasion, the employee incurred almost $1,300 in black car bills on a single day for her son, to transport him from New York to Washington D.C.

292.    In August 2018, over the course of a two-week fundraising excursion in France, LaPierre's Senior Assistant authorized approximately $100,000 in black car expenses for two chauffeured vehicles.

293.    In January 2019, the Audit Committee learned that LaPierre's Senior Assistant's son had been paid on two occasions as a sound stage manager for the NRA's annual conventions in 2017 and 2018, and on one occasion as a performer at an NRA Advancement event. While the Audit Committee retroactively approved that arrangement—along with approving her son's future services on similar terms—there is no evidence that the Committee reviewed any information that would support its determination that his employment was "fair, reasonable, and in the best interest of the NRA." For example, the Report of the Audit Committee fails to document any review of the usual and customary price for these services, or the price for LaPierre's Senior Assistant's son's travel in connection with his work for the NRA.

294.    LaPierre's Senior Assistant's expenditures were recently called into question again. The current Treasurer learned that LaPierre's Senior Assistant used other NRA employees' credit cards—including the CFO's—to charge personal expenses. When asked about this, LaPierre admitted that there "are some things right now that we are investigating that look to be suspicious."

295.    For the past 25 years, LaPierre's Senior Assistant has reported directly to LaPierre. Her salary and expenses are included in the budget for EVP Office, and she has never answered to a different supervisor. In his role as his Senior Assistant's direct supervisor and the chief executive of the NRA, LaPierre has a fiduciary duty to oversee her. LaPierre's Senior Assistant's

INDEX NO. 451625/2020

NYSCEF DOC. NO. 11    Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21    Entered 02/12/21 16:34:29    Page 78 of    RECEIVED NYSCEF: 08/10/2020

461

misconduct, including her long history of inappropriate spending, reflects negligent oversight on the part of LaPierre.

## II.    The NRA's Use of Longtime Vendors and Consulting Agreements to Hide Improper Expenditures, Self-Dealing, and Related Party Transactions

296.    For decades, LaPierre has retained vendors and contractors without appropriate oversight of contract performance, expenses, or payments. During Phillips's tenure at the NRA, he aided and supported LaPierre in these efforts.

### A.  Ackerman McQueen and Mercury Group

#### i.  The NRA's Decades-Long Relationship with Ackerman

297.    The NRA worked with Ackerman, an Oklahoma-based advertising and public relations firm, for over three decades. The NRA also worked with Mercury Group, a wholly owned subsidiary of Ackerman that is headquartered in Alexandria, VA, since the mid-1990s.

298.    From 1992 to 2018, Ackerman was the NRA's largest vendor. The NRA reported paying Ackerman $20,324,364, in 2017, and $31,994,168, in 2018 for "public relations and advertising" services. Mercury Group separately received over $5.5 million from the NRA in 2017. The NRA did not publicly disclose the fees it paid the Mercury Group in 2018.

299.    In addition, the NRA paid Ackerman $11,739,668 in 2017, and $6,337,508 in 2018 for "out of pocket expenditures" on behalf of the NRA for "media, outside vendor costs, and reimbursement of travel and business expenses." These expenses were incurred in violation of NRA policy, without proper oversight, and in many instances for the personal benefit of NRA insiders.

300.    At the heart of this business relationship was the personal relationship between LaPierre and the co-founder of Ackerman. For decades, LaPierre relied on the Ackerman co-founder for advice on organizational branding, strategic communication, and crisis management.

Until the co-founder's death in 2019, he and LaPierre would often speak on a daily basis and, depending on current events, they might speak multiple times per day.

301.    LaPierre similarly had a close relationship with the president of Mercury Group, who was a personal friend and advisor of LaPierre, dating back 30 years. LaPierre considered him a "brother" and enjoyed a lucrative business relationship with him for years through the entities he led, including Mercury Group and UWS. LaPierre also hired him as a paid consultant to the NRA.

302.    In mid-to-late 2018, the relationship between the NRA and Ackerman/Mercury Group eroded and the NRA and Ackerman/Mercury Group are now engaged in litigation.

### ii.    The NRA's Practices Concerning Ackerman's Budgeting and Invoicing

303.    For at least two decades, the relationship between the NRA and Ackerman was formalized through a written agreement (the "Services Agreement"). The most recent iteration of the Services Agreement was entered into in April 2017 and amended in May 2018.

304.    The Services Agreement provided that LaPierre or his designee were the "only persons within the NRA" with the authority to issue written communications upon which Ackerman was authorized to act.

305.    Upon information and belief, LaPierre was directly involved in managing the scope and cost of Ackerman's services. Upon information and belief, he met annually with Ackerman's co-founder to negotiate the budget for the upcoming fiscal year and Phillips typically joined these meetings.

306.    Ackerman would then develop a budget document that would govern its relationship with the NRA for the upcoming fiscal year. Upon information and belief, the budget was reviewed and approved each year by LaPierre and Phillips.

NYSCEF DOC. NO. 11    Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21    Entered 02/12/21 16:34:29    Page 80 of
461                                                                          RECEIVED NYSCEF: 08/10/2020

INDEX NO. 451625/2020

307.     Once the annual budget was finalized, Ackerman initiated projects and invoiced the

NRA monthly for services rendered. Upon information and belief, LaPierre requested that invoices

from Ackerman to the NRA FSD contain very little detail about the work performed or services

rendered.

308.     Upon information and belief, the NRA failed to conduct adequate oversight of

Ackerman's activities and billing. As the NRA itself pleaded in its complaint against Ackerman,

"[o]ver the parties' decades-long course of dealing, underlying receipts and other support for

[Ackerman's] expenses were not transmitted to the NRA alongside [Ackerman's] invoices, but,

rather, were supposedly maintained at [Ackerman's] offices." The NRA agreed to the arrangement,

abrogating its oversight responsibility over its primary vendor and facilitating a process whereby

it paid invoices with minimal detail and little supporting documentation.

### iii.  NRA Executives' Misuse of Out of Pocket Expenses

309.     In addition to the services that Ackerman provided to the NRA pursuant to the

Services Agreement, Ackerman also paid for a variety of unrelated out of pocket expenses and

passed those expenses through to the NRA. The NRA used this arrangement to conceal

expenditures by NRA executives—including LaPierre and Powell—many of which were personal

or lacked documentation required by IRS publication 463 to permit the NRA to avoid reporting

such expenses as taxable income.

310.     Upon information and belief, the practice of passing expenses through Ackerman

started decades ago as an informal agreement between LaPierre and Ackerman's co-founder, and

continued until the two companies severed ties in 2019.

311.     Ackerman billed the NRA for out of pocket expenses by submitting non-

particularized invoices that aggregated the expenses into a lump sum amount and provided no

details on the nature or purpose of the expenses. The invoices that Ackerman submitted to the

73

NRA typically included a one-line description that read "Out of Pocket Expenses" and a total amount. Upon information and belief, Ackerman took no steps to verify whether the out of pocket expenses were compliant with NRA policies governing travel and entertainment.

312.    The expenses billed to the NRA for out of pocket expenses did not comply with IRS requirements governing "accountable plans." As a result, all such expenses should have been included by the NRA in the taxable personal income for each recipient.

313.    The NRA's annual budget with Ackerman included an aggregate line-item for "Pass-through Expenses." The amount earmarked for this purpose in the Ackerman/NRA budget increased over time. In 2018, the annual budget allocated $950,000 exclusively for this purpose.

314.    The effect of the pass-through expense arrangement was that these expenses would be paid for by the NRA without written approvals, receipts, or supporting business purpose documentation in accordance with NRA policies and procedures, and without disclosure to or internal review by the NRA FSD. Payment of these expenses also violated IRS rules governing reporting of income for each of the recipients on their W-2 forms, exposing the NRA to penalties for false filings and for under-withholding of taxes due. In addition, with respect to LaPierre, the false reporting exposed the NRA to tax and penalty liability for 21% of the amount of his income exceeding $1 million pursuant to the Tax Cuts and Jobs Act, and permitted him to file false personal tax returns with the IRS.

315.    Under the umbrella of "Pass-through Expenses," the NRA paid for millions of dollars in entertainment and travel expenses incurred by NRA executives and associates— including LaPierre and Powell—without scrutiny from within the organization. Examples of this practice include, without limitation, the following:

74

Appx. 79

316.    The NRA used the pass-through arrangement with Ackerman to pay for expensive meals for NRA executives at an upscale Italian restaurant in Alexandria, VA. NRA executives—including Powell and the Executive Director of Advancement—regularly charged these meals to the Mercury Group president's account. The charges were then passed on to the NRA. The NRA also directed Ackerman to purchase several memberships to a members-only cigar bar affiliated with the upscale Italian restaurant in Alexandria, VA.

317.    Upon information and belief, over a five-year period, Ackerman paid, and the NRA reimbursed, more than $250,000—at a rate of $4,000 per month—in access fees to LaPierre's Travel Consultant. Like the other expenses passed through Ackerman, this $4,000 monthly fee was unrelated to the services that Ackerman provided to the NRA under the Services Agreement. Upon information and belief, Ackerman itself rarely used LaPierre's Travel Consultant's services.

318.    The NRA used the pass-through arrangement to pay for extensive travel expenses, including via private aircraft, incurred by the president of Mercury Group on behalf of LaPierre. Upon information and belief, when the president of Mercury Group travelled with LaPierre, he travelled by private aircraft at the direction of LaPierre. LaPierre would also direct the president of Mercury Group to incur various charges—including hotel rooms, meals, cars, tips, and gifts for himself and VIP donors—and to submit those expenses to the NRA for reimbursement through the 'out of pocket' arrangement.

319.    In relation to the NRA annual meetings, LaPierre asked the president of Mercury Group to pay for LaPierre and others—including LaPierre's family—to stay at a luxury private hotel, apart from the host hotel at which NRA employees and board members were staying. These costs were paid for by Ackerman and billed to the NRA as pass-through expenses. For example, in 2016, the president of Mercury Group—at LaPierre's direction—paid $37,337 for "Guest

75

Appx. 80

Lodging confidential per WLP" at a boutique hotel in Louisville, KY for LaPierre's family, guests, and his security guards.

320.    LaPierre also used the pass-through arrangement to conceal private travel and trips that were largely personal in nature. Upon information and belief, LaPierre directed Ackerman to pay for expenses related to NASCAR events, country music events, and even medical visits, and bill those through to the NRA. For example, in 2018, LaPierre asked the president of Mercury Group to accompany him on a visit to a medical clinic. In connection with this visit, the president of Mercury Group and LaPierre flew on a private charter and stayed at the Four Seasons for several days. The cost of this hotel for both the president of Mercury Group and LaPierre was paid for by Ackerman, but ultimately borne by the NRA. The lodging alone cost the NRA $9,550. The NRA also directly paid for the private travel associated with this visit to the medical clinic.

321.    The NRA also directed Ackerman to pay for a variety of other costs in connection with LaPierre's travel and bill those costs to the NRA as pass-through expenses. When he travelled, LaPierre often required an individual from Ackerman to travel with him to provide logistical and administrative support. That individual would be responsible for the payment of meals and gratuities for waiters, drivers, bellhops, hotel concierges, housekeepers, and others. Upon information and belief, the individuals who travelled with LaPierre instituted a practice of taking large cash advances—often several thousand dollars each at a time—to cover the cost of gratuities that LaPierre would direct him to pay.

322.    The NRA's Executive Director of Advancement used the pass-through arrangement to pay for travel and entertainment-related expenses. He possessed an Ackerman-issued corporate credit card and the charges that he incurred on this card were billed to Ackerman and passed through to the NRA. Among other charges, the credit-card statements for the Executive

Director of Advancement frequently included stays at luxury hotels like the Four Seasons, the St. Regis, the Ritz Carlton, and the Beverly Hills Hotel. He routinely stayed in suites costing over $1,500 a night. Upon information and belief, LaPierre was aware of and endorsed these expenses being billed through Ackerman.

323.    In connection with NRA annual meetings and Women's Leadership Forum meetings, LaPierre's wife would incur thousands of dollars of expenses per event for hair and makeup services, which were billed through Ackerman as out of pocket expenses. For example, between May 2016 and May 2017, the NRA paid one artist $16,359 for three events for LaPierre's wife. Upon information and belief, both LaPierre and his wife were aware of the cost of these makeup services.

324.    The NRA also used the pass-through arrangement with Ackerman to pay for expenses related to a charity whose affiliation to the NRA was not through its mission, but rather through LaPierre's wife, who served as the president of its Board of Trustees in 2017 and 2018.

### iv. The NRA's Failure to Conduct Proper Oversight of Ackerman Billing

325.    Upon information and belief, LaPierre, Phillips, and Powell were fully aware of both the process of passing expenses through Ackerman to the NRA and the nature of the charges that fell into this category of expenses.

326.    Upon information and belief, the NRA's oversight of the out of pocket expenses routed through Ackerman was limited to annual audits by Phillips and the Managing Director of Finance at Ackerman's headquarters in Oklahoma City, OK. This review was conducted off-site at the direction of LaPierre. The NRA did not inform its Audit Committee or its external auditors about the out of pocket arrangement.

Appx. 82

### v. The Benefits of Under Wild Skies Television Programming

327.     The president of the Mercury Group was also the president of UWS.

328.     UWS produces a television program of the same name that is focused on hunting and is hosted by the president of Mercury Group and UWS. Upon information and belief, since 2010, the NRA has paid UWS over $18 million.

329.     In 2016, the NRA entered into concurrent advertising and sponsorship agreements with UWS that would govern the relationship for the next nine years. These agreements were both negotiated and executed by LaPierre. These agreements provided for significant payments to UWS in exchange for sponsorships and various forms of advertising during the televised program. For the fiscal year 2019 alone, the NRA's internal records report that it paid UWS $1,957,500 for advertising and sponsorship of the program. UWS also enjoyed the right to free airing of Under Wild Skies on NRA-TV.

330.     LaPierre and his wife regularly appeared in episodes of Under Wild Skies, traveling to and participating in big game hunts in the United States, Botswana, Tanzania, South Africa, Zimbabwe, Mozambique, Argentina, and Uruguay. The expenses associated with these trips— including professional hunter costs, camps, chartered in-continent travel, food and beverages, hunting licenses, trophy fees, and taxidermy—were incurred by UWS. According to the president of Mercury Group and UWS, a single game hunt of this nature could cost upwards of $100,000.

331.     LaPierre also directed the president of Mercury Group and UWS to pay for various NRA board members and officers and their spouses—including the former Executive Director of NRA-ILA and his spouse, current board members, and the Executive Director of Advancement— to participate in big game hunts around the world. Upon information and belief, these trips were not authorized by resolution of the NRA Board or an authorized committee.

332.     These expenses constituted private benefits and gifts in excess of authorized amounts pursuant to NRA policy to LaPierre and his wife. These expenses also constituted private benefits to NRA board members in violation of Article V, Section 5(a) of the NRA bylaws.

### vi.    The NRA's Supplemental Income Payments to Under Wild Skies' Principal

333.     In addition to payments related to the Under Wild Skies program, the NRA, with the knowledge and consent of LaPierre and Phillips, also paid the president of Mercury Group and UWS close to $50,000 a month, or approximately $600,000 annually, in "supplemental" fees to identify and cultivate high dollar donors for the NRA. Upon information and belief, the president of Mercury Group and UWS received these fees from approximately 2009 to 2019.

334.     At the instruction of Phillips, this supplemental payment was made to the president of Mercury Group and UWS through the UWS entity, even though the services did not relate to the Under Wild Skies program.

335.     Upon information and belief, this supplemental agreement was never formalized as a written contract. The amount paid to the president of Mercury Group and UWS under this agreement was negotiated exclusively between the president of Mercury Group and UWS, LaPierre and Phillips. No formal bidding process was conducted for the services that the president of Mercury Group and UWS provided under this oral agreement, and the agreement was never approved in writing by either the NRA President or the Vice Presidents.

336.     Payments to the president of Mercury Group and UWS under this supplemental agreement were made every two months, in installments of $97,500. Upon information and belief, Phillips instructed the president of Mercury Group and UWS as to the language to use in the invoices for such payments. The invoices each contain a one-line description that reads "Supplemental Invoice."

79

Appx. 84

337.    In negotiating and approving this arrangement, LaPierre and Phillips violated the NRA's internal policy concerning contracts over $10,000, which are required to be in writing.

### B.  Consulting Agreements with Former Employees

338.    In the last 15 years, LaPierre has directed the NRA to pay officers, directors, and former employees millions of dollars in "consulting" agreements without Board approval and in violation of the bylaw prohibition on salary or other private benefits to directors without Board authorization. In some instances, officers executed such agreements without Board authorization. Such agreements were frequently entered into in violation of NRA policy concerning contract approvals, independent contractors, and procurement and without proper documentation and sign-off. In some cases, former employees were paid far in excess of reasonable compensation and did not actually provide the NRA with corresponding consulting services. In other cases, the NRA failed to properly disclose the compensation in its regulatory filings.

### i.  Consulting Agreement with Former Executive Director of General Operations

339.    In late 2016, Powell, with the authorization of LaPierre, terminated the then Executive Director of General Operations, who had been in that role from 2012 to 2016. Upon information and belief, NRA security personnel publicly escorted him out of the building.

340.    After the Executive Director was terminated, LaPierre directed the NRA to enter into an agreement under which the NRA agreed to pay the former Executive Director $60,000 a month over a two-year period (January 2017 to December 2018) for "consulting services." The agreement also provided for a "final payment for consulting services" of $240,000 to be made by January 31, 2019. In all, the Executive Director was paid approximately $1.8 million under the agreement.

Appx. 85

341.    The agreement did not define what the term "consulting services" entailed, nor did it provide any justification for the engagement of the former Executive Director to provide such services, in violation of the NRA's policy on independent contractors, which specifies that such contracts "should be well defined in content, duration and outcome."

342.    The agreement did not undergo a competitive bid process, in violation of the NRA Purchasing Policy, which requires buyers and users "to solicit competitive bids/pricing for goods or services valued at or above $5,000" unless an exception applies, in which case the contract must still be reported to the Finance Committee on an annual basis.

343.    The agreement was signed by Phillips on November 8, 2016. Upon information and belief, the agreement was not supported by a business case analysis and was not approved by the NRA's President and one of the two Vice Presidents, in violation of NRA policy. It also did not receive written approval of the Executive Vice President, as required by NRA policy.

344.    The agreement states: "NRA agrees to make twenty-four (24) monthly payments, payable January 2017 through December 2018, in the amount of $60,000 per month for consulting services." LaPierre, however, testified that he was under the impression that it was a severance agreement, and that he authorized it out of concern that the former Executive Director might disparage the NRA. The agreement had a non-disparagement clause, binding the former NRA officer, his spouse and children, and also imposed a confidentiality obligation. The agreement expressly provided that "Confidentiality and Non-Disparagement are among the important terms of this Agreement. Violation by the Executive Director of [these] terms…shall require [the former Executive Director] to return all payments made" under the agreement. LaPierre explained, "even though…I didn't think he was the right guy, I wanted to treat him fair, so we retained goodwill with him." When asked about the $1.8 million paid under this agreement, he maintained, "I think

81

Appx. 86

it…was a prudent use of NRA funds to retain that goodwill on the part of [the former Executive

Director] and prevent damage from happening that he could have done in the outdoor community

to the NRA."

345.    LaPierre was not aware of any consulting services provided to the NRA pursuant

to this agreement. When asked directly whether the former Executive Director provided services

after his termination, LaPierre testified, "I don't know whether he did or didn't. I think it was just

more of a severance." When the current Treasurer was asked the same question about what

consulting services, if any, were provided to the NRA in 2018, he testified, "I don't know if that

was consulting or some sort of severance or what it was. I just don't know." Upon information and

belief, no consulting services were provided to the NRA under this agreement.

### ii.  Consulting Agreement with Former NRA Employee / NRA Foundation Executive Director

346.    H.W.S. Consulting, Inc. ("H.W.S.") is an entity through which the NRA paid a

former NRA employee, who assumed the role of Executive Director of the NRA Foundation after

he retired from the NRA in 2008 after more than 35 years as an employee (the "Foundation

Executive"). Under a post-retirement consulting agreement, the NRA paid the Foundation

Executive $30,000 a month, as a fundraising consultant through H.W.S. In addition to the monthly

payment, the consulting agreement provided for a "Variable Success Fee." The minimum amount

of the Variable Success Fee was $125,000 annually, according to the consulting agreement. The

Foundation Executive was unaware of how this fee was calculated but understood that it was paid

to him every year during the term of the agreement. Additionally, the Foundation Executive's

"actual reasonable and necessary expenditures, which are directly related to the consulting

services" were to be reimbursed.

Appx. 87

347.   The consulting agreement was entered into without engaging in a competitive bidding process, without proper approval or sign-off, and in violation of NRA policy concerning contract approvals for independent contractors or consultants.

348.   The payments made under the consulting agreement were not disclosed on the NRA's IRS Form 990 as fundraising expenses between 2008 and 2015. The payments made under the agreement were first disclosed on the NRA's IRS Form 990 for the year 2016.

349.   The consulting agreement states that the Foundation Executive was engaged to "provide services in connection with fundraising efforts of the NRA … to build relationships with major gifts donors, identify and cultivate relationships with fundraising partners and identify prospective high net worth individuals to solicit for major gifts."

350.   On July 25, 2016, for the first time, H.W.S. filed a Fundraising Counsel Registration Statement on Form CHAR014 with New York State as a Fundraising Counsel. A fundraising counsel is retained to advise with respect to strategy of fundraising but not to conduct actual solicitation.

351.   The Foundation Executive testified that he conducted fundraising and solicited contributions. He identified three major areas of duties: (1) relationship maintenance or development, (2) strategy around fundraising, and (3) fundraising itself.

352.   The Foundation Executive admitted that he did not keep accurate records of fundraising he conducted. He agreed that his position was not subject to quantifiable outcomes or any form of metrics even though he was paid a success fee.

353.   At the direction of Phillips, from the outset of his consulting agreement, the Foundation Executive would submit a form for expense reimbursements without providing specific receipts (other than a credit card statement) or business purpose for the expense. H.W.S.

INDEX NO. 451625/2020
RECEIVED NYSCEF: 08/10/2020

did not prepare invoices to the NRA, instead, an NRA employee would prepare the invoice and pay H.W.S. for the amount identified in the invoice. The monthly payments would also be paid in advance of each month.

354. Under the consulting agreement, "actual reasonable and necessary expenditures, which are directly related to the consulting services" were to be reimbursed. As an example, in 2016, according to H.W.S.'s records, $148,314 worth of expenses were submitted and reimbursed by the NRA. The NRA reimbursed H.W.S for expenses including monthly truck leases, internet service at the Foundation Executive's home, the costs of membership in fraternal organizations including the International Order of St. Hubertus and the Camp Fire Club, and the costs and expenses of attending various hunting trips both domestically and internationally.

355. When the expense reimbursement policy changed in 2018, the Foundation Executive had difficulty providing receipts for expenses incurred prior to the change in policy. Despite not providing receipts for certain expense reimbursement requests in mid-2018, his expense reimbursements were never denied, only delayed. Finally, the Foundation Executive decided to end his consulting agreement at the conclusion of 2018.

### iii. Consulting Agreement with Former NRA Managing Director of Affinity and Licensing

356. The NRA entered into a post-employment incentive compensation agreement with its Managing Director of Affinity and Licensing, which provided for him to receive payments from both the NRA and Lockton Affinity LLC ("Lockton Affinity"), the insurance broker that the NRA had engaged for various purposes over many years, including to administer its Carry Guard program. While at the NRA, the Managing Director was responsible for overseeing the NRA's relationship with Lockton Affinity.

84

Appx. 89

357. The Managing Director retired from the NRA in January 2016. According to the NRA's Form 990 for that year, he was paid a full year's salary—approximately $630,000. He was also paid by the NRA after his retirement—$713,000 in 2017 and $535,000 in 2018.

358. During this same period, the Managing Director was also being paid by Lockton Affinity. In 2016, Lockton Affinity paid the Managing Director $455,753, and in 2017, he was paid $522,426.

359. Payments from the NRA were made pursuant to a July 2014 agreement with the Managing Director. This agreement, which was signed by Phillips, superseded an agreement from October 2012 (signed by both LaPierre and Phillips) and was entered into over a year before the Managing Director retired. The draft of the agreement had a signature line for LaPierre, which was removed prior to being finalized. The agreement provided for an "Employment Longevity Incentive" where the Managing Director would receive "3% of gross affinity revenue for a five year period." In exchange, he agreed to "give assistance to the Director, Affinity and Licensing programs or other related associates at their request, not to exceed 7.5 hours a month." The agreement also recognized that the "NRA has encouraged [you] to and recognizes that you will be consulting for Lockton Affinity on the NRA Program for a 5 year period after your official retirement" and provided that a portion of the money owed under his agreement with the NRA would "be paid monthly to [the Managing Director] by Lockton Affinity under [his] consulting arrangement with them."

360. This agreement was amended twice and ultimately entitled the Managing Director to receive $43,000 per month starting in February 2018 and ending in January 2022. It also confirmed that prior payments had been "made by Lockton Affinity at our direction."

361. Payments from Lockton Affinity to the Managing Director were made pursuant to an agreement between Lockton and the NRA that was executed on January 7, 2016. That agreement acknowledged that Lockton Affinity entered into an agreement with the Managing Director to pay him fees and provided that "Client [the NRA] agrees that Lockton shall receive credits against amounts it owes client pursuant to [this agreement] in amounts equal to the [Managing Director's] Fees at such times as [such] Fee is paid to [the Managing Director]."

362. When LaPierre was asked whether he thought it was prudent for a charitable nonprofit organization to have an executive negotiate with a vendor while also being paid by that vendor, he admitted, "there are serious questions surrounding that type of situation." He further testified, "I think there were problems with that whole area [with the Managing Director]."

363. In November 2017, the NRA's external tax preparer reviewed the agreement with the Managing Director and commented, "This agreement is not a good agreement and I have never seen such an agreement before and I bet [the NRA employee] who preps the 990 knows nothing about this agreement either…..I think that they got a lot bigger issues than trying to get out of NY State with this agreement alone…."

364. In 2018, the NRA's external auditors tested the Managing Director's consulting contract as part of test work to see whether the NRA Purchasing Policy was being followed and found, "Approval signatures not identifiable. No business case support available."

### C. Related Party Transactions with Board Members

365. The NRA routinely entered into agreements with board members without adhering to applicable requirements under NRA policy and New York law requiring a Board determination in advance that the transaction was fair, reasonable and in the NRA's best interest. Some examples of the many related party transactions that the NRA executed with board members are discussed

below. Additional transactions with board members are discussed in Part Five, Section V below, addressing the Audit Committee's failures to comply with required procedures.

### i. Board Member No. 1

366.    Board Member No. 1 is a former professional football player who played in the National Football League from 1973 to 1988. Since his retirement from the NFL, Board Member No. 1 has worked as a freelance motivational speaker and product spokesperson.

367.    Board Member No. 1 has served as an NRA board member since at least 2009. For most of his tenure as an NRA director, Board Member No. 1 has been paid $150,000 per year as an "independent contractor." In addition to the flat fee, Board Member No. 1 was also reimbursed for expenses.

368.    The agreement between Board Member No. 1 and the NRA was entered into in 2002 and extended in 2016. The 2002 contract was signed by Phillips on behalf of the NRA. It provided that, in exchange for a monthly flat fee of $12,500, Board Member No. 1 would provide consulting services, including conducting fundraising activities and identifying and cultivating new or potential donors.

369.    Upon information and belief, Board Member No. 1 never registered as a professional fundraiser or fundraising counsel in New York State.

370.    Under the terms of the 2002 contract, Board Member No. 1 was supposed to provide the NRA with "Monthly Status Reports" on his fundraising activities. In response to a subpoena, the NRA failed to provide the Attorney General with any documentation regarding the services actually provided by Board Member No. 1 pursuant to the 2002 contract.

371.    Upon information and belief, Board Member No. 1's consulting agreement with the NRA was not approved in advance by the Audit Committee as a related party transaction or by

any other committee of the Board. The unapproved agreement violated the bylaw prohibition on salary or other private benefits to directors unless specifically authorized by the Board.

372.     According to draft meeting minutes for a September 2016 Audit Committee meeting, the Audit Committee considered Board Member No. 1's contract as part of a review of "substantial" related party transactions. The draft minutes reflect the Committee's conclusion that Board Member No. 1 was "uniquely well suited" to perform the tasks set out in his annual contract with the NRA, which, according to the Committee, were "to provide services related to public relations, training, and outreach … to collegiate and professional athletes." The draft minutes do not reflect any discussion or consideration of Board Member No. 1's purported fundraising services. The draft minutes are also silent on the services Board Member No. 1 actually provided to the NRA and on the amount of the contract. The Audit Committee did not issue a resolution at the September 2016 meeting approving the agreement with Board Member No. 1.

373.     In 2018, the NRA reduced Board Member No. 1's annual fee to $100,000.

374.     In February 2019, the Audit Committee passed a resolution to modify Board Member No. 1's compensation from an annual flat-fee basis to a daily event fee of $7,000. According to the Audit Committee Report, "the officers of the NRA have evaluated [Board Member No. 1's] services and determined that a per-appearance fee is more suited to the variable need for [his] services." There is no evidence that the Audit Committee considered whether a daily fee of $7,000 was reasonable in light of the services being performed.

### ii.  Board Member No. 2

375.     Board Member No. 2 is a retired police officer from Iowa. He has served as an NRA board member since at least 2009. Among other positions, Board Member No. 2 has served as Chair of the Gun Collectors Committee, Vice Chair of the Military and Veteran Affairs

88

Committee, and as a member of the Finance Committee. Board Member No. 2 was not re-nominated in 2020.

376.     Beginning in July 2009, Board Member No. 2 has been paid by the NRA for the provision of consulting services. Under his agreement with the NRA, Board Member No. 2's services were "limited to development activities with potential gifts of firearms on behalf of NRA's Office of Advancement and the National Firearms Museum." In exchange for such services, the NRA agreed to pay Board Member No. 2 a monthly flat fee of $7,500, along with payment for out of pocket business expenses. The agreement provided that, Board Member No. 2 would "act under the direction of and report to the NRA Executive Vice President and the Executive Director, Office of Advancement."

377.     While the NRA's contract with Board Member No. 2 provided for a term that began in January 2010, upon information and belief, it was not signed until January 2016.

378.     Upon information and belief, Board Member No. 2's consulting agreement with the NRA was not approved in advance by the Audit Committee as a related party transaction or by any other committee of the Board. The unapproved agreement violated the bylaw prohibition on salary or other private benefits to directors unless specifically authorized by the Board.

379.     Upon information and belief, the Audit Committee did not consider the Board Member No. 2 arrangement until a September 2016 review of related party transactions. The draft minutes from the meeting reflect the Committee's finding that Board Member No. 2 "has personal relationships in [the gun collecting community] that uniquely qualify him to provide these services, and that his services have been important to the NRA's outreach and related fundraising efforts." The Audit Committee did not issue a resolution at the September 2016 meeting approving the agreement with Board Member No. 2.

89

380.    At the January 11, 2018 Audit Committee meeting, the Audit Committee approved

the following motion: "the Committee finds the transaction with [Board Member No. 2] for

outreach to gun collectors is fair, reasonable, and in the best interests of the NRA."

### iii.  Board Member No. 3

381.    Board Member No. 3 is a political consultant and NRA Board member. Board

Member No. 3 served as NRA president from 2011 to 2013.

382.    Beginning in March 2017, Board Member No. 3 received $4,000 per month for

public speaking and consulting. The NRA reported that it paid [Board Member No. 3] $32,000 in

2017 and $40,000 in 2018.

383.    A Consultant List prepared by the NRA for 2019 allocated $48,000 from the EVP

budget for Board Member No. 3 for 2019 and indicated that "no contract information" was

available for the arrangement.

384.    Upon information and belief, the Audit Committee did not review the arrangement

with Board Member No. 3 until after it was already under way. At the January 11, 2018 Audit

Committee meeting, the Committee approved the minutes of the December 7, 2017 meeting at

which the following motion was adopted: "The Committee finds the transaction with [Board

Member No. 3] for public speaking appearances is fair, reasonable, and in the best interest of the

NRA." The motion did not document a basis for the Committee's finding—other than the fact that

[Board Member No. 3] was "frequently requested as a speaker by NRA-affiliated and outside

groups"—and did not document whether any alternative transactions had been considered, as

required under New York Law.

385.    On May 15, 2019, another Board Member reached out to the current Treasurer to

ask, "What 'back up' is there for [Board Member No. 3's] monthly invoices of $4,000?" Executive

Assistant No. 1 informed the current Treasurer, "I do not receive anything. It was reviewed by

90

Appx. 95

Audit [Committee] and John Frazer told me we were good to pay. I assumed this had been discussed and he was providing info to the EVP's [O]ffice or Secretary's [O]ffice as to what he was doing each month." When the current Treasurer followed up to ask whether there was a contract between the NRA and Board Member No. 3, the assistant explained, "No contract that I have been privileged to see. That is why the invoice went to John [Frazer] originally when we began the compliance refresh."

### iv. Board Member No. 4

386. Board Member No. 4 is a lawyer, lobbyist, and NRA Board Member. She has served on the Board since 1992 and is a former president of the NRA.

387. From 2011 to 2016, the NRA paid Board Member No. 4 $45,180 per year for public speaking services. The NRA paid Board Member No. 4 $39,680 and $13,060 for public speaking services in 2017 and 2018 respectively.

388. In May 2016, Frazer requested a copy of Board Member No. 4's compensation agreement which was "missing from the contracts safe." The accounts payable manager reported, "We were not furnished a copy of her contract. We pay her $3,765.04 monthly based on invoices submitted by the Treasurer's office, which are approved by Woody/[Woody's assistant]."

389. Upon information and belief, the Audit Committee did not review the transaction before it was entered into by the NRA. The Committee reviewed the transaction in September 2016 and highlighted Board Member No. 4's "unique qualifications" as justification for why she was properly being compensated by the NRA. The Audit Committee did not issue a resolution at the September 2016 meeting approving the agreement with Board Member No. 4.

390. At the January 11, 2018 Audit Committee meeting, the Audit Committee approved the minutes of the December 7, 2017 meeting at the following motion was adopted: "the Committee finds that the transaction with [Board Member No. 4] for public speaking services is

fair, reasonable, and in the best interests of the NRA." The Committee claimed that Board Member No. 4 had "unique qualifications to provide these outreach services to the NRA." The Committee did not document whether it considered alternative transactions.

391.    Board Member No. 4 also serves as a compensated member of the Board of Directors of Sturm, Ruger & Co. ("Ruger"), "a well-known manufacturer of firearms, which has dealt with the National Rifle Association for many years." Among its dealings with the NRA, Ruger purchases advertising in NRA publications and provides donations and support to NRA programs. The NRA also licenses its logo for use on special promotion Ruger firearms, which results in royalties to the NRA.

392.    At its meeting on April 28, 2019, the Audit Committee resolved that it had reviewed Board Member No. 4's relationship with Ruger and found "no conflict of interest in her continuing service on both Boards," so long as she exerts no control over decisions of the Ruger Board involving the NRA and recuses herself from relevant deliberations or voting.

### v.  Board Member No. 5

393.    Board Member No. 5 is a past NRA President and current NRA board member and has been paid under the EVP Consulting Budget since 2004. From 2014 to 2017, Board Member No. 5 was paid an average of approximately $150,000 a year. In December 2017, LaPierre and Board Member No. 5 executed a one-year contract for $168,000 annually. In April 2018, LaPierre and Board Member No. 5 executed a 10-year contract for $220,000 annually. LaPierre testified that he negotiated these contracts.

394.    Upon information and belief, LaPierre did not notify or receive approval from the Audit Committee in advance of executing the April 2018 contract. Upon information and belief, LaPierre did not receive written approval in advance from the President or a Vice President before executing the December 2017 or April 2018 contracts. Board Member No. 5 also receives

92

Appx. 97

compensation from NRA-ILA and through grants paid to an organization called the Unified

Sportsmen of Florida. LaPierre testified that, combined, Board Member No. 5 receives about

$400,000 in annual compensation from the NRA.

395. LaPierre did not follow appropriate legal and internal procedures, including

obtaining proper review and approval by the Audit Committee, in advance of executing contracts

with Board Member No. 5.

## III. The Individual Defendants Received Excessive Compensation that the NRA Did Not Accurately Disclose

### A. The NRA Board Failed to Follow an Appropriate Process to Determine Reasonable Compensation for NRA Executives

396. Pursuant to New York law, the NRA may only pay "compensation in a reasonable

amount" to its employees for services actually rendered.

397. Federal law similarly limits the NRA to payment of reasonable compensation. The

NRA and individual defendants (defined as "disqualified persons") are subject to excise taxes

pursuant to 26 U.S.C. § 4958 for compensation that is unreasonable, that is, where "the value of

the economic benefit provided exceeds the value of the consideration (including the performance

of services) received for providing such benefit."

398. The Internal Revenue Service ("IRS") creates a rebuttable presumption that

compensation is reasonable if (1) the authorized body within the organization made up of

independent individuals approves the compensation in advance; (2) the authorized body relies on

appropriate data as to comparability; and (3) the authorized body adequately and timely documents

the basis for their determination concurrently with making that determination. The documentation

"should include the terms of the transaction and the date of its approval, the members of the

authorized body present during the debate and vote on the transaction, the comparability data

obtained and relied upon, the actions of any members of the authorized body having a conflict of interest, and documentation of the basis for the determination."

399.    The NRA bylaws require the NRA Board to set annually the authorized compensation for the Executive Vice President, Treasurer and Secretary. Under the bylaws, the Officers Compensation Committee ("OCC"), which consists of the NRA President and First and Second Vice Presidents, is responsible for making a recommendation as to the officers' compensation to the full Board at the fall board meeting each year. At that same meeting, the Board must establish by resolution the authorized compensation for the next budget year.

400.    In its official filings, the NRA made misleading representations regarding its practices for setting executive compensation. For example, in its IRS Form 990 for each year from 2015 to 2018, the NRA represented that "compensation of the NRA's top management officials is established by methods including independent compensation consultants, compensation surveys and studies, and comparability data." The NRA further represented in its filings that "[i]n addition, under the NRA Bylaws, compensation of certain elected officers (including the Executive Vice President) must be approved by the Board of Directors, based on recommendations by the compensation committee. All decisions are properly documented."

401.    Upon information and belief, contrary to the NRA's representations, the NRA Board set the compensation for LaPierre, Phillips and Frazer during the period 2015 to 2018 without relying upon or properly consulting a compensation consultant, considering reliable compensation surveys or obtaining appropriate comparability data. The Board also did not maintain adequate documentation of the process of determining officer compensation.

402.    For example, in or about late August 2017, the OCC hired an executive compensation consultant to prepare a report which would, among other things, compile

94

competitive market compensation levels for NRA executives based on comparable positions in comparable organizations. The report was to be completed for consideration by the OCC at its September 7, 2017 meeting in preparation for making 2018 officer compensation recommendations to the Board as provided in the NRA bylaws. The OCC, however, made a recommendation on salary and bonus awards for LaPierre, Phillips and Frazer without awaiting a report or even comparability data from the consultant prior to making a recommendation.

403. On September 5, 2017, even though his own salary was being considered, defendant Phillips provided the OCC Chair with compensation information that he prepared for the OCC's analysis and consideration. Phillips's proposal consisted of a handful of trade and business-related entities that he selected for salary comparisons for each executive position. No charitable organizations were considered. Phillips provided his comparability data and "peer comparison" noting to the OCC Chair, "[f]or CEO, we can change some out if you like others instead."

404. Phillips additionally prepared and provided to the OCC Chair talking points for the Board's consideration of the OCC's recommendations, including a statement that the OCC considered outside compensation consultant reports "[i]n developing its recommendation to the Board," without disclosing that it did not have an executive compensation consultant report for 2017. Upon information and belief, Phillips's proposals were used by the OCC in preparation of its recommendation and presentation to the Board, including the representation that in conducting its due diligence, the OCC relied upon executive compensation consultant reports.

405. On September 7, 2017, the OCC met and recommended increases in cash compensation for each of LaPierre, Phillips and Frazer. It recommended that LaPierre's compensation be increased from approximately $1.43 million in 2017, to approximately $1.78 million in 2018, which included an increase in his bonus from $150,000, the amount he had been

awarded each year from 2015 to 2017, to $455,000 in 2018. The OCC recommended that Phillips's total compensation be increased from approximately $669,000 in 2017, to approximately $830,000 in 2018, which included a bonus of $210,000. It also recommended that Frazer's compensation be increased from 2017 levels, when his reported total compensation was $375,000 to approximately $414,000 for 2018, which included a bonus of $54,100. No benchmarks or specific performance achievements were set out in regard to the recommended bonuses. Furthermore, as detailed below, the amount reported as compensation in the NRA's IRS Form 990 for 2018 paid to LaPierre, Phillips, and Frazer was more than what was authorized by the OCC. In addition, as also discussed below, the reported amounts did not reflect the full compensation for LaPierre, Phillips, and Frazer.

406.   At the September 9, 2017 meeting of the NRA Board, the directors went into executive session for 35 minutes to consider the reports of three committees: the OCC, the Committee on Hearings and the Finance Committee. Board minutes reflect merely that it entirely adopted the OCC's recommendations, including a pay raise of more than $300,000 for LaPierre. There is no evidence that LaPierre's, Phillips's, or Frazer's performance or the overall state of the NRA were considered or that the Board was presented with information about any other aspects of the officers' compensation beyond their base salary and bonus, such as reimbursement for personal expenses and in kind benefits, as discussed below.

407.   Upon information and belief, the process that the OCC and the Board followed to determine 2018 officer compensation is just one example of the lack of due diligence, full disclosure, and proper documentation in regard to senior officer compensation at the NRA. Neither the OCC nor the Board performed adequate due diligence in assessing the reasonableness of NRA senior officer compensation or relied upon appropriate comparability data. Nor did they adequately and contemporaneously document the basis for their determinations.

Appx. 101

408.     A review of NRA records between 2013 and 2018 demonstrates cursory OCC reports to the Board, usually less than a full page, pro forma approval of OCC recommendations, and little time for debate or consideration in executive sessions at Board meetings.

409.     The OCC did not carry out its duties under the NRA bylaws, New York or federal law in regard to ensuring that only reasonable compensation is paid, and exposed the NRA to liability for federal excise tax based upon unreasonable and excessive compensation and distributions to disqualified persons.

410.     Pursuant to the NRA bylaws, the Board has the obligation at the fall Board meeting to approve all compensation, emoluments, or other income paid to certain of its executives. The majority of the Board of Directors in each year alleged herein participated in, authorized, or approved the transactions described herein. Here, the NRA Board did not fully inform themselves about the executive compensation recommendations to the extent reasonably appropriate under the circumstances.

411.     The majority of the NRA Board disregarded their responsibilities under the bylaws and governing law concerning oversight of compensation of corporate officers for the purpose of accommodating defendant LaPierre and his senior officers. Upon information and belief, the NRA Board failed to inquire into excessive and inappropriate payments to LaPierre and Phillips.

412.     Furthermore, LaPierre effectively dominates and controls the NRA Board as a whole through his control of business, patronage and special payment opportunities for board members, and his public allegations to the NRA membership of a "criminal conspiracy" against board members and officers who question his activities.

Appx. 102

**B. The Officers Compensation Committee and the NRA Board Failed to Consider or Approve LaPierre's and Phillips's Complete Compensation Prior to Making Compensation Determinations**

413.     The OCC and the NRA Board also did not take into account the entirety of LaPierre's compensation when assessing the reasonableness of his compensation.

414.     Reimbursement or payment for expenses for NRA employees, including officers, may only be treated as nontaxable if the NRA maintains and complies with an IRS-mandated "Accountable Plan." The plan must, at a minimum, (1) require that reimbursed expenses have a documented business connection; (2) require employees to account for such expenses within a reasonable period of time; and (3) require employees to return any excess reimbursements or allowance within a reasonable period of time.

415.     When determining LaPierre's compensation during the period 2015 to 2018, the OCC did not consider the benefits that LaPierre received for the value of personal travel for LaPierre and his family to vacation on the yacht Illusions in the Bahamas, as described above, and other expense reimbursements to LaPierre or on LaPierre's behalf. As discussed above, the NRA paid these expenses without complying with the Accountable Plan requirements of documenting the business purpose of the expense, requiring LaPierre to account for the expense within a reasonable time and requiring him to return excess expense allowances within a reasonable time. The value of the benefit that LaPierre received for payment or reimbursement of these expenses, in whole or substantial part, constituted taxable compensation to LaPierre.

416.     The NRA also failed to enforce a reasonable time period for LaPierre to submit other expense reimbursement requests. LaPierre was permitted to submit his expense reimbursement requests months or years after the fact. For example, in June 2019, the employee responsible for handling LaPierre's expenses was still waiting to receive receipts from April of

2018. These late reimbursements failed to meet the requirements of an Accountable Plan, and should have been considered taxable income to LaPierre.

417.    The OCC also did not consider payments or expense reimbursements to or on behalf of LaPierre that were passed-through Ackerman McQueen or the Mercury Group, as described in Part Five, Section II(A)(iii).

418.    In addition, the OCC did not consider or disclose the value of a post-employment contract that the NRA gave defendant LaPierre, which provides for payments in excess of $1 million per year after LaPierre's tenure as EVP ends due to retirement or losing a re-election bid.

419.    This post-employment contract was signed in 2013 by the then-NRA President, Phillips, and LaPierre (hereinafter, together with any subsequent amendments or reiterations, the "LaPierre Post-Employment Contract"). Neither the First nor Second Vice President signed the contract, as required by NRA policy governing procurement. There is no evidence that the NRA Board or a designated committee reviewed or approved the LaPierre Post-Employment Contract. LaPierre testified that he did not know whether his post-employment contract was approved by the OCC, or whether it was disclosed to NRA membership or the NRA Board.

420.    Under the terms of the LaPierre Post-Employment Contract, if LaPierre retired or lost reelection in 2014, his annual compensation from the NRA would increase. In each amendment to LaPierre's Post-Employment Contract, which extended the terms and the amount of compensation, the NRA was obligated to continue to pay LaPierre for years after he lost re-election or retired and at a higher rate than his compensation as Executive Vice President. LaPierre testified that he was aware of this feature of the contract: "I noticed that and kind of shook my head at it when I saw it," LaPierre recalled, "I didn't ask for this contract. It's what was presented to me and I signed it and it never went into effect because I stayed on as EVP."

421.    By letter agreement dated March 16, 2015, the NRA President extended the term of the LaPierre Post-Employment Contract by two years, to 2020, with annual compensation in 2019 of $1,150,000, and in 2020 of $1,200,000. The letter was signed by the NRA President and Phillips. There is no evidence that any other NRA officer, the NRA Board, the OCC, the Audit Committee or any other Board committee reviewed or approved this letter agreement.

422.    By memorandum dated April 30, 2018, the NRA President advised LaPierre that the NRA "would like to extend and modify" the LaPierre Post-Employment Contract due to, among other things, "security concerns." The memorandum proposes a 7-year compensation schedule paying $1,300,000 in 2019, and $1,500,000 for the next 6 years (2020-2025).

423.    The memorandum further provides that "we continue to believe it is in the best interest of the NRA that we maintain control over your name and likeness. For that reason we seek to contract with you for an additional five years (2026-2030) as a consultant. During this five year period, the NRA will have use of your name and likeness as mutually agreed upon. You agree to make personal appearances that are reasonable in terms of advance notice and convenience of the location." The annual compensation for these consulting services is $1,500,000 per year for three years (2026-2028), followed by $1,300,000 per year for two years (2029-2030). The memorandum agreement is signed by LaPierre, Phillips, the then NRA President, and then NRA Second Vice President. There is no evidence that any other NRA officer, the NRA Board, the OCC, the Audit Committee or any other Board committee reviewed or approved this 2018 extension of the memorandum agreement.

424.    LaPierre testified that this contract extension and modification was prompted by a desire to retain rights over his name and likeness. "They wanted to tie my likeness, my name, my brand, my signature up for years given the fact that the signature raises so much money in terms

of the identity with sportsmen and Second Amendment enthusiasts and all that." LaPierre testified

that he did not have any plans to use his likeness for any other purpose after his departure from the

NRA. The unapproved contracts, and their promise of post-employment payments, violated New

York law and the NRA's bylaws and policies.

425.     The OCC did not consider or disclose the value of Phillips's post-employment

contract with the NRA as described in Part Five, Section I(B)(iii) above. Like LaPierre, there is no

evidence that the NRA Board, including by the OCC, the Audit Committee or any other Board

committee reviewed or approved Phillips's post-employment contract.

426.     Phillips had an NRA-issued credit card, which he allowed other NRA employees

to use to incur personal expenses. Upon information and belief, Phillips may have also used the

credit card for personal uses that were inappropriately reimbursed by the NRA and not reported as

taxable income.

427.     Because of the failure of the OCC and the NRA Board to consider the value of all

of the components of LaPierre's and Phillips's compensation packages, the Board's approval of

their compensation is not entitled to a presumption of reasonableness.

## C.  LaPierre Failed to Properly Determine Powell's Compensation

428.     Pursuant to the NRA bylaws, LaPierre was authorized to determine and approve

Powell's compensation as Chief of Staff, Executive Director of General Operations and Senior

Strategist.

429.     As discussed in Part Five, Section I(C)(i) above, in the course of less than a two-

year period, Powell's salary increased from his June 2016 starting salary, which was $250,000

annually, to $800,000 annually. This salary does not include other benefits and compensation

received by Powell, including those passed through Ackerman as described in Part Five, Section

II(A)(iii) above.

Appx. 106

430. The NRA represented in Schedule O to the 2017 IRS Form 990, the first year that the NRA disclosed Powell's compensation as an NRA officer, that "compensation of NRA's top management officials is established by methods including compensation consultants, compensation surveys and studies, and comparability data." The NRA made a similar representation in its IRS Form 990 for 2018. There is no evidence that any such methodology was used by LaPierre in determining Powell's compensation, that all of his benefits and sources of compensation were considered, or that LaPierre adequately and timely documented the basis for his determination of Powell's compensation concurrently with making determinations to raise Powell's compensation.

### D. The NRA's Compensation Disclosures to the Attorney General and the Internal Revenue Service Were False or Misleading

431. As a charitable nonprofit, the NRA is required to "report [on the IRS Form 990] compensation for both current and former officers, directors, key employees, and highest compensated employees." The IRS compensation disclosure requirements include, without limitation, base salary, bonuses (paid or deferred during the reporting period), incentive compensation, contributions to retirement plans, the value of benefits such as health, disability, long term care, and life insurance (including split dollar plans), housing and automobile allowances, and taxable travel, meals and entertainment expenses.

432. The NRA certifies the accuracy of its compensation disclosures in its annual CHAR500 filing with the Attorney General, which annexes the organization's annual IRS Form 990 and all accompanying schedules, including Schedule J, which specifically addresses aspects of the organization's compensation scheme.

Appx. 107

433. From 2015 to 2018, the NRA reported paying LaPierre $10,191,728 in total compensation, an average of $2,547,932 a year. In its annual IRS Form 990 filings, the NRA reported the following breakdown of LaPierre's compensation for 2015 through 2018:

|  | Breakdown of W-2 and/or 1099-MISC compensation | | | Retirement & other deferred compensation | Nontaxable benefits | Total compensation |
|---|---|---|---|---|---|---|
|  | Base compensation | Bonus & incentive compensation | Other reportable compensation | | | |
| 2015 | $1,090,515 | $150,000 | $3,810,734 | $19,605 | $40,131 | $5,110,985 |
| 2016 | $1,165,062 | $150,000 | $43,904 | $19,610 | $43,763 | $1,422,339 |
| 2017 | $1,172,166 | $150,000 | $44,522 | $19,680 | $47,609 | $1,433,977 |
| 2018 | $1,267,878 | $455,000 | $427,756 | $20,280 | $53,513 | $2,224,427 |

434. But, as discussed in Part Five, Section I(A)(i), the NRA pays or reimburses LaPierre's personal travel by charter plane, and personal travel for family members. LaPierre is also reimbursed for other expenses that are not submitted within a reasonable time. The value of these travel and other reimbursed expenses constitutes taxable income to LaPierre that was required to be reported.

435. With respect to Powell, from 2017 and 2018, the NRA reported paying Powell $1,699,035 in total compensation, an average of $849,517.50 a year. In its annual IRS Form 990 filings, the NRA reported the following breakdown of Powell's compensation for 2017 and 2018:

|  | Breakdown of W-2 and/or 1099-MISC compensation | | | Retirement & other deferred compensation | Nontaxable benefits | Total compensation |
|---|---|---|---|---|---|---|
|  | Base compensation | Bonus & incentive compensation | Other reportable compensation | | | |
| 2017 | $557,172 | $50,000 | $104,224 | $15,900 | $51,770 | $779,066 |
| 2018 | $782,739 | $0 | $61,398 | $16,500 | $59,332 | $919,969 |

436. As noted above in Part Five, Section I(C)(ii), Powell similarly failed to provide sufficient justification for his reimbursement requests for travel and meal expenditures, and those

Appx. 108

expenditures should have been included as taxable income in his compensation because they were paid or reimbursed without complying with an Accountable Plan.

437.   From 2015 to 2018, the NRA reported paying Phillips $3,090,256 in total compensation, an average of $772,564 a year. In its annual IRS Form 990 filings, the NRA reported the following breakdown of Phillips's compensation for 2015 through September 13, 2018:

| | Breakdown of W-2 and/or 1099-MISC compensation | | | Retirement & other deferred compensation | Nontaxable benefits | Total compensation |
|---|---|---|---|---|---|---|
| | Base compensation | Bonus & incentive compensation | Other reportable compensation | | | |
| 2015 | $423,048 | $94,265 | $31,956 | $19,610 | $22,328 | $591,207 |
| 2016 | $524,396 | $100,000 | $172,490 | $19,610 | $23,788 | $840,284 |
| 2017 | $525,942 | $100,000 | $38,371 | $19,680 | $26,003 | $709,996 |
| 2018 (ending 9/13/2018) | $573,567 | $210,000 | $116,970 | $20,280 | $27,952 | $948,769 |

438.   From 2015 to 2018, the NRA reported paying Frazer $1,702,798 in total compensation, an average of $425,699.50 a year. In its annual IRS Form 990 filings, the NRA reported the following breakdown of Frazer's compensation for 2015 through 2018:

| | Breakdown of W-2 and/or 1099-MISC compensation | | | Retirement & other deferred compensation | Nontaxable benefits | Total compensation |
|---|---|---|---|---|---|---|
| | Base compensation | Bonus & incentive compensation | Other reportable compensation | | | |
| 2015 | $264,879 | $0 | $7,697 | $15,208 | $40,662 | $328,446 |
| 2016 | $317,716 | $25,000 | $30,557 | $15,900 | $50,295 | $439,468 |
| 2017 | $318,621 | $25,000 | $31,711 | $15,900 | $53,999 | $445,231 |
| 2018 | $325,953 | $54,100 | $33,023 | $16,500 | $60,077 | $489,653 |

439.   The NRA's compensation disclosures in its IRS Form 990s for the period 2015 to 2018 as they related to each of the Individual Defendants' compensation falsely represented the NRA Board's process and deliberations on setting their compensation as officers as described above.

440.    The NRA's filings included false or misleading statements relating to compensation and benefits conveyed to top employees and officers. For example, the IRS requires that certain employment benefits provided to persons listed on the IRS Form 990 Part VI as officers or highly compensated employees be reported on Schedule J. The benefits include "first class or charter travel", "travel for companions," and health or social club dues. On Schedule J to the 2018 IRS Form 990, the NRA represented that it provided "first class travel," "travel for companions," and "health or social club dues." For each such benefit the NRA represented that the "organization follow(ed) a written policy regarding payment or reimbursement or provision of all the expenses" listed. This representation, certified by defendant Frazer, was false.

441.    In another example of a false or misleading representation in the NRA's employee benefit disclosures, in the NRA 2017 IRS Form 990, the NRA acknowledged providing "first class or charter travel" and "health or social club dues." "Travel for companions" was not acknowledged as an employee benefit even though the NRA provided "travel for companions" during 2017. For each such benefit, the NRA represented on the 2017 IRS Form 990 that the "organization follow(ed) a written policy regarding payment or reimbursement or provision of all the expenses" listed. This representation, certified by defendant Frazer, was false.

442.    The IRS requires that any "diversion of assets" in excess of $250,000 be reported on IRS Form 990, Section VI. A "diversion of assets" under IRS rules includes "any unauthorized conversion or use of the organization's assets other than for the organization's authorized purposes." The IRS further notes that "[a] diversion of assets can in some cases be inurement of the organization's net earnings. … [I]t can also be an excess benefit transaction under section 4958 and reportable on Schedule L" of the IRS Form 990.

105

443.     During the period 2015 to 2018, the NRA has not reported on its IRS Form 990 a diversion of assets in the form of an excess benefit transactions despite having paid unreasonable compensation to some or all of the Individual Defendants, as alleged in Part Five, Section I above.

## IV.     The NRA's Retaliation Against Dissidents on the Board

### A.  Dissident No. 1

#### i.   LaPierre Recruits Dissident No. 1 as President and Negotiates Ackerman Contract

444.     In spring 2018, LaPierre recruited Dissident No. 1 to run for NRA President. At the time, the plan was for Dissident No. 1 to complete the remainder of the outgoing President's term. He would then be re-nominated by the Board to serve out a full term as President.

445.     At the time Dissident No. 1 was recruited by LaPierre, he had a contract at Fox News to provide multiple episodes of a program called "American Heroes" under which he received significant compensation and health benefits. The NRA bylaws did not permit Dissident No. 1 to receive a salary from the NRA as NRA President, and Fox News was unwilling to retain Dissident No. 1's contract for "American Heroes" if he became President of the NRA.

446.     To persuade Dissident No. 1 to accept the unpaid position, LaPierre negotiated a contract with Ackerman to take over the "American Heroes" program. Under this contract, Dissident No. 1 would be guaranteed a salary and benefits comparable to what he was receiving from Fox. In a December 2019 deposition, Dissident No. 1 testified, "LaPierre suggested as the means of making me the president of the NRA that I take the job with Ackerman McQueen." He further testified that, had he not received a contract from Ackerman providing the requisite benefits, "I would not have taken on the mantle of president of the NRA."

447.     On at least two occasions, LaPierre met with Dissident No. 1 about the request for him to become NRA President and the associated plan for him to be employed by Ackerman. On

106

Appx. 111

April 22, 2018, Dissident No. 1 sent LaPierre's Senior Assistant a fax containing the "Deal Points for NRA & [Dissident No. 1]" and requested that the message be passed "only to the parties we agreed on 22 April 2018." The deal points articulated a "two phase plan" for Dissident No. 1 to become employed by Ackerman while also stepping into the role of NRA President, and included options for employment status, compensation, and benefits. In a December 2019 deposition, Dissident No. 1 testified that this term sheet "had been discussed twice now at that point with Wayne LaPierre," and "reflected what [he] wanted me to do for the specified amount of money as an employee of … Ackerman [] working for NRA-TV … these are the points that came out of those discussions with Wayne LaPierre in April [2018] before we got to the annual meeting in May [2018] and they were very well known to certainly the people closest to Wayne."

448.    Before entering into a contract with Dissident No. 1, Ackerman required the NRA to contractually guarantee it would pay the compensation owed under the contract. On May 6, 2018, the NRA and Ackerman amended their 2017 Services Agreement to provide: "All service fee billing under this Service Agreement for talent and employees who work through [Ackerman] for NRA and its affiliates, including, but not limited to [Dissident No. 1] shall be invoiced by Ackerman …which invoice shall be payable by NRA to Ackerman." The amendment was signed by Phillips and the outgoing President, and was attested to by the First and Second Vice Presidents.

449.    Eight days later, on May 15, 2018, Dissident No. 1 entered into an employment contract with Ackerman. Under the terms of the contract, Dissident No. 1 agreed to serve as the host of an NRA-TV documentary series also titled "American Heroes" for twelve episodes per year for three years. He would receive a base salary of $2,100,000 in year one, $2,300,000 in year two, and $2,500,000 in year three. As an employee, Dissident No. 1 would also be entitled to healthcare and life insurance benefits.

107

450. Upon information and belief, Phillips and LaPierre were aware of the material terms of Dissident No. 1's employment agreement with Ackerman at the time it was executed.

451. In May 2018, Dissident No. 1 was nominated, with LaPierre's support, to be NRA President and was elected by the Board. Dissident No. 1 did not immediately take office because he needed to address outstanding issues concerning his contracts with Fox and Ackerman. Between May 2018, when Dissident No. 1 was elected president, and September 2018, when he took office, an interim President served in his place.

### ii. Dissident No. 1 Undertakes His Fiduciary Responsibilities as NRA President

452. As duly elected President, Dissident No. 1 viewed it as his fiduciary duty to ensure that the finances of the NRA were being managed prudently. Almost immediately after taking charge as NRA President in September 2018, Dissident No. 1 started looking closely at the operations of the NRA. At this time, he was also alerted to certain problems by internal whistleblowers, NRA board members, and major donors.

453. In October 2018, Dissident No. 1 convened a group of advisors to "provid[e] advice and recommendations to the President and Executive Vice President on matters crucial to the good governance of the Association." In an agenda for an October 24, 2018 meeting of its members, Dissident No. 1 identified a series of key questions, including: "(a) where did Josh [Powell] come from? who vetted Josh? are rumors about Josh and sexual harassment true; (b) what is the status of the 'whistleblower' accusations; and (d) how is [the current Treasurer] working out as Treasurer?" This agenda provides insight into the types of issues that Dissident No. 1 was trying to address in the performance of his responsibilities as President.

454.    As his presidency progressed, Dissident No. 1 became concerned about the fact that the NRA was paying the Brewer firm about $2 million per month in fees that were not properly authorized or reviewed.

455.    The Brewer firm was initially retained by the NRA in March 2018 to address issues involving NRA affinity partners.

456.    Later in 2018, LaPierre, with the assistance of Frazer and NRA Board Counsel, expanded the mandate of the Brewer Firm, selecting it to undertake a top-down "compliance review" of the NRA. LaPierre did not seek alternative bids to perform this work. LaPierre did not ask any other clients of the firm about their experience. He did not identify any metrics or analytics that he applied in making the decision to retain the Brewer firm for this compliance review. He did not review the financial terms of the Brewer engagement and did not "get into" any consideration of project-based pricing as opposed to hourly-based pricing. Instead, he left any inquiry into these issues to the discretion of the General Counsel's Office.

457.    Despite having less than two years of experience in private practice, and little experience engaging or negotiating with outside counsel for large-scale litigation and internal investigation work, Frazer was responsible for negotiating the engagement letter and the pricing. Frazer prepared the business case analysis, which estimated monthly charges of approximately $1.25 million, based on hourly billing, and indicated that there were no other bidders for the legal services. Frazer was also responsible for reviewing and approving the Brewer firm's invoices while the engagement was ongoing. Between March 2018 and February 2019, the Brewer firm charged the NRA approximately $19,000,000 in legal fees.

458.    By Board resolution adopted on March 8, 2019, the Audit Committee determined that the original contract between the NRA and the Brewer firm did not "comply with the internal

Appx. 114

controls and policies established by the NRA." When executing the original engagement letter with the Brewer firm, Frazer did not obtain written approval from the President and a Vice President, as required by NRA policy. When asked why he did not comply with NRA policy in entering into this contract with the Brewer firm, Frazer testified, "It was an error on my part."

459.    In light of the internal control issues with the Brewer firm's engagements and the fees being charged and paid under those engagements, Dissident No. 1 began to demand more comprehensive reviews of the firm's retainer agreements and invoices.

460.    In March 2019, Dissident No. 1 sent a series of letters and memoranda to the NRA Board Counsel, Audit Committee, and General Counsel raising concerns about the Brewer firm's engagement and its billing practices. In a March 11, 2019 letter, Dissident No. 1 directed the NRA Board Counsel to notify the Brewer firm that none of its retainer agreements with the NRA had been reviewed or approved by the NRA's elected non-salaried officers. A few days later, Dissident No. 1 sent a similar letter to Frazer asking him to request from the Brewer firm copies of "all relevant engagement letters."

461.    On March 22, 2019, Dissident No. 1 sent a memo to the Audit Committee raising concerns about the reasonableness and basis of the Brewer firm's legal fees, and requesting that it "initiate an outside, independent review of these expenditures to ensure that such services and fees charged are reasonable and appropriate." And on April 18, 2019, Dissident No. 1, along with the First Vice President, wrote to Frazer and the Audit Committee Chair about the "extraordinary legal fees the NRA has incurred" by the Brewer firm, and reiterating his request that the NRA engage an outside, independent expert to review the payments to Brewer.

462.    Despite Dissident No. 1's demands, neither the Audit Committee nor others on the NRA Board were permitted to conduct a review of the Brewer firm's invoices. Instead, Frazer

110

Appx. 115

retained an outside law firm to review the Brewer engagement. However, the firm's review was limited to determining whether NRA management had the authority to hire the Brewer firm. It did not examine the reasonableness of the legal fees that the firm was charging, or whether the legal services performed were consistent with the scope of the engagement. The firm concluded that the NRA's payments "to the Brewer firm and the services the Brewer firm have provided to the Association to date are … authorized, absent a finding that the legal services were not in fact performed or legal services were performed that exceeded the scope of the engagement." The firm also noted that the NRA "is entitled to review the services … incurred on its behalf by the firm to determine whether they are accurate and within the scope of the engagement," and advised "it may well be in the [NRA]'s interest to obtain a full accounting of the Brewer firm's time charges to date."

### iii.   LaPierre Voices Concern about Dissident No. 1's Contract

463.    When Dissident No. 1 began making inquiries into the Brewer firm's billings and the operations of the NRA, LaPierre impeded his participation in the NRA's affairs, and took steps to ensure he would not be reelected as President.

464.    LaPierre believed that Dissident No. 1's inquiries into the NRA's affairs exceeded the purview of the NRA President, which LaPierre sees as a "largely ceremonial" position. LaPierre testified that Dissident No. 1 "started to interfere in … in a lot of things that weren't under the role of the president. They were actually more the day-to-day management stuff." In a September 2019 deposition, LaPierre recalled telling Dissident No. 1 that he "cannot keep interfering in all of the day-to-day affairs … of the NRA. That's my job. And you need to stay out of it to protect yourself, but it's also my job, not yours …."

465.    In late 2018, LaPierre started raising concerns about Dissident No. 1's relationship with Ackerman, which LaPierre had been instrumental in arranging. LaPierre claimed to have been

Appx. 116

unaware of Dissident No. 1's employment at Ackerman, and ultimately used it to retaliate against Dissident No. 1 and to prevent any scrutiny of Brewer's legal fees.

466.    LaPierre repeatedly denied Dissident No. 1 access to Brewer's retention agreements and invoices. On at least two occasions, LaPierre sent cease-and-desist letters to Dissident No. 1 demanding he stop looking into the matter. LaPierre also repeatedly denied Dissident No. 1's request for an independent audit of Brewer.

467.    In a February 26, 2019 letter to Dissident No. 1, LaPierre wrote that it was his "duty as CEO and EVP to direct the day-to-day affairs of the Association," including to oversee the Brewer investigation, and that Dissident No 1's status as an Ackerman employee posed a "conflict of interest" that precluded him from seeking information about the Brewer engagement. One month later, in late March, LaPierre sent a follow-up letter demanding that Dissident No. 1, as a "highly compensated full-time employee of Ackerman McQueen" with an "obvious conflict of interest, … desist immediately" from his attempts to "burden or obstruct the NRA's engagement of outside counsel on matters pertaining to Ackerman."

468.    On April 24, 2019, LaPierre's Senior Assistant informed Dissident No. 1 that LaPierre "will not support you in [your] term as NRA President." In a September 2019 deposition, LaPierre testified that he withdrew his support after learning that Dissident No. 1 "was working to stack" the Audit Committee to "get[] rid of Brewer," which LaPierre "wasn't going to let [] happen." While the Nominating Committee has formal responsibility under the bylaws for nominating NRA officers, in practice, LaPierre wields tremendous influence over who was elected to the officer positions. As such, his decision not to support Dissident No. 1's re-nomination effectively guaranteed that Dissident No. 1 would not be re-nominated.

112

Appx. 117

469.     On April 25, 2019, Dissident No. 1 wrote to the Executive Committee. He asserted that the NRA was facing "a crisis that could affect its ability to operate as a nonprofit organization" and that it was his "fiduciary duty to respond to this crisis." He stated his intention to form a "Crisis Management Committee" pursuant to NRA bylaw Article V, Section 2. One of the tasks the proposed Crisis Management Committee would undertake would be to "supervise an outside independent review of the invoices submitted by Brewer Attorneys & Counselors, which total more than $24 million over a short period of time."

470.     Just days later, Dissident No. 1 announced his resignation during the NRA's annual meeting in Indianapolis. In a letter read to NRA members, Dissident No. 1 stated, "I hoped to be with you today as NRA president endorsed for re-election. I'm now informed that that will not happen. … There is clearly a crisis. It needs to be dealt with immediately and responsibly, so the NRA can continue to focus on protecting the 2nd Amendment."

471.     Despite resigning from his position as NRA President, Dissident No. 1 did not resign from the NRA wholesale; rather, he continued on the NRA Board and remained part of the NRA's membership. The NRA is currently conducting an internal expulsion proceeding against Dissident No. 1, which, upon information and belief, was undertaken in retaliation for his exercise of fiduciary responsibilities in violation of its whistleblower policy. In June 2020, the NRA filed an action in New York State Court seeking a declaratory judgement that the expulsion of Dissident No. 1 is proper. Litigation related to that action is ongoing.

### B.  Dissident Board Members

472.     By a July 22, 2019 letter, four NRA board members requested that an independent audit be conducted into allegations of financial misconduct at the NRA and the payments made to the Brewer firm for legal fees. The board members also requested pursuant to Article IV, Section 2 of the NRA bylaws, that an outside independent special committee be formed to investigate and

address issues the board members describe in their letter. Upon information and belief, the dissenting board members requested additional information concerning compensation paid to other board members, salaries paid to executive officers including Powell, and the justification for expanding the scope of the Brewer firm's engagement.

473. Upon information and belief, those inquiries were not answered to the satisfaction of the dissenting board members. According to those board members, their requests were rebuffed or ignored and they were "stonewalled, accused of disloyalty, stripped of committee assignments, and denied effective counsel necessary to properly discharge [their] responsibilities as board members."

474. Upon information and belief, those board members who publicly (either through correspondence or social media posts) expressed concern about the NRA's actions or who called for an independent audit of the NRA, were subsequently denied the committee assignments they requested following the NRA's annual member meeting in 2019.

475. Subsequently, several board members resigned in the summer of 2019.

## V. The NRA Board's Failures Resulting in Violations of Law

476. The culture of noncompliance and disregard for the internal controls was evident within the NRA Audit Committee, which similarly failed to fulfill its obligation to oversee internal controls. This lack of oversight resulted in waste and loss of the NRA's charitable assets and contributed to the NRA reaching its currently deteriorated financial state.

477. Under New York law, the Audit Committee is responsible for overseeing the accounting and financial reporting processes of the organization and the audit of its financial statements. The Audit Committee may also be the committee designated to oversee the implementation of an organization's conflict of interest and whistleblower policies, and to review and vote on proposed related party transactions. The NRA's Audit Committee was subject to New

York law, and, under the NRA's internal policies, was the committee designated with oversight of those policies.

478. Further, the Mission Statement for the NRA's Audit Committee, set out in its Charter, provides that:

> The primary function of the Audit Committee is to assist the Board of Directors in its oversight of the integrity of financial information, its review of the adequacy of the system of internal controls established by the Association, and its monitoring of the audit process. In performing these functions, the Audit Committee shall review the Association's financial reporting process and internal controls, review and appraise the audit efforts of the Association's independent auditors, and provide open means of communication between the Directors, the independent auditors, and the financial and senior management of the Association. In addition, the Audit Committee will provide oversight of regulatory compliance and business ethics compliance.

479. In his testimony to the Attorney General, the Audit Committee Chair said that he had no knowledge of New York law governing audit committees, whistleblowers, or conflicts of interest, and could not recall the last time he had seen the Charter. He also testified that, in his view and contrary to the Charter, the Audit Committee had no role in oversight of internal controls and that its role was significantly more limited than the role set out for the Committee in its Charter. He testified, "Responsibility of the audit committee is to interact with the external auditors. And by that, I mean meet with them, planning the audit. We have one meeting during the pendency of the audit. And then when the audit is over, we have what I refer to as an exit meeting. We discuss their findings. We discuss anything that might be in the management letter, just to see if there's anything that we need to follow up on after they're through auditing."

480. In practice, the Audit Committee failed to oversee the organization's internal controls. The Committee Chair testified that "there is no internal auditing" within the NRA. When asked why, he testified, "[i]f there is a specific reason, I don't know it. It hasn't had [an internal auditor] the whole nineteen years I've been on the Board."

Appx. 120

481.    The Audit Committee Vice Chair testified that on at least two occasions prior to 2018, he had a discussion with Phillips and the Managing Director of Finance in which he proposed creating an internal audit function. The Vice Chair testified that "the thought process was that was very expensive, and I received assurances from both of them that we had solid documentation …" He recalled being told by Phillips and the Managing Director of Finance, "we don't necessarily see a cost benefit to it, and with … the assurances we received from a top tier national accounting firm … they were able to render an opinion based on our system of internal control."

482.    This explanation ignores the fact that the opinions rendered by the NRA's auditors always explicitly stated that the auditors "express no opinion" on the adequacy of the entity's internal controls.

483.    The Vice Chair also testified that discussions about establishing an internal audit function have been "ongoing" between himself, the Audit Committee Chair, and the current Treasurer since whistleblowers came forward in 2018. He admitted, however, that the Audit Committee has not taken any steps to recommend that the Board direct the creation of an internal audit function.

## A. Audit Committee's Failure to Respond Adequately to Whistleblowers

484.    Under New York law, an organization of the NRA's size must "adopt, and oversee the implementation of, and compliance with, a whistleblower policy to protect from retaliation persons who report suspected improper conduct." N-PCL § 715-b.

485.    Under the NRA's Statement of Corporate Ethics, the Audit Committee was tasked with receiving whistleblower complaints concerning any financial irregularities or conflicts of interest related to NRA employees or board members.

486.    In violation of its obligations under New York law and NRA policy, the Audit Committee failed to respond adequately to whistleblowers. Along with Defendants Powell, Frazer,

116

and Phillips, members of the Audit Committee were on notice of serious complaints by the NRA Whistleblowers and failed to take appropriate action.

487. While the Audit Committee Chair acknowledged that it was the Committee's responsibility to address whistleblower complaints, when pressing issues concerning the financial mismanagement and failure to follow internal controls of the NRA were brought to its attention, the Audit Committee failed to take appropriate action, instead referring the complaints to their outside counsel, with no effort to follow up thereafter in a timely or meaningful manner.

488. As detailed above, in late 2017, a group of senior level staff in the Office of the Treasurer (who would go on to become the NRA Whistleblowers) began an independent review of certain transactions and violations of NRA policy. Their work culminated in a memo titled "List of Top Concerns for the Audit Committee" that they prepared in July 2018 (the "Top Concerns Memo"). The Top Concerns Memo enumerated the NRA Whistleblowers' concerns related to financial conflicts of interest, senior management override of internal controls, and vague and deceptive billing practices.

489. On July 30, 2018, the Audit Committee held an emergency meeting at which the concerns raised in the Top Concerns Memo were presented. According to both the Chair and the Vice Chair of the Audit Committee, there was no dispute that the individuals who presented these concerns had come forward in the capacity of whistleblowers. Wayne LaPierre also testified that he regarded these individuals as whistleblowers.

490. The Audit Committee Chair testified that he was aware that serious whistleblower concerns would be raised at the July 30, 2018 meeting. Despite this awareness, the Chair left the meeting prior to the presentation from the NRA Whistleblowers.

491.    In connection with this July 30, 2018 meeting, one of the NRA Whistleblowers penned a "personal statement" in which she formally announced herself as a whistleblower and documented her belief that the meeting was "being manipulated in a way as to try to explain away our issues or try to claim the items on the list are 'fixed' before we can present them as whistleblowing." The personal statement described the items in the Top Concerns Memo as "a sample of the types of issues we face daily and not to be considered all inclusive." The personal statement also asserted that, "in the past, our complaints and concerns were dismissed or 'explained away.'"

492.    The Report of the Audit Committee documenting the July 30, 2018 meeting makes no mention of the fact that whistleblowers came forward. In contrast, it was the usual practice of the Audit Committee to expressly note in its committee reports when "there were no instances of whistleblowing reported."

493.    Upon information and belief, NRA personnel took affirmative steps to conceal the nature and scope of the NRA Whistleblower' concerns from its external auditors.

494.    No one from RSM, the NRA's external audit firm, was present at the July 30, 2018 meeting, although the official report of the meeting erroneously indicates that the RSM Audit Partner attended. The Audit Committee also did not inform the NRA's external auditors about the nature and scope of the whistleblowers' complaints, nor did it alert them to the existence, or provide them with a copy, of the Top Concerns Memo. This was in spite of the fact that, as the current Treasurer testified, external auditors would routinely ask about whistleblower concerns during the audit process.

495.    In connection with its audit of the NRA's 2018 financial statements (the "2018 Audit"), RSM conducted interviews of Audit Committee members and finance staff regarding the

risk of fraud and internal control deficiencies. All of the interviews occurred after the July 30, 2018 meeting, so NRA personnel were well aware of the whistleblowers concerns. According to RSM's work papers, none of the NRA personnel interviewed reported any instances of whistleblowing or suspicious activity to the auditors.

496.    In the period following the July 30, 2018 meeting, the Audit Committee relied exclusively on the Brewer firm to investigate the NRA Whistleblowers' claims.

497.    Upon information and belief, the Vice Chair was made aware that at least one of the NRA Whistleblowers felt threatened and harassed because of the whistleblower complaints. The Vice Chair admitted that the Audit Committee did not undertake any measures to determine whether any of the NRA Whistleblowers who came forward at the July 30, 2018 meeting were subject to threats or harassment, including by anyone from the Brewer firm. The Vice Chair further testified that the Brewer firm did not engage in an inquiry as to whether the NRA Whistleblowers were threatened or harassed.

### B.  Audit Committee's Failure to Appropriately Review and Approve Related Party Transactions and Conflicts of Interest

498.    The Audit Committee failed to exercise proper duty of care in reviewing and approving related party transactions and conflicts of interest between the NRA and its officers, directors, and key employees.

499.    The Audit Committee is responsible for supervising the NRA's compliance with its Conflicts of Interest and Related Party Transaction Policy. A "conflict of interest" under the NRA's internal policy is broader than a "related party transaction" as that term is defined in the N-PCL, and encompasses all situations where an officer's, director's, or key employee's "personal or financial interest could be reasonably viewed as affecting his or her objectivity or independence in fulfilling their duties to the NRA."

119

Appx. 124

500.    The Audit Committee is responsible for reviewing "all transactions that involve potential conflicts of interest" in order to "determine whether to approve or ratify such transactions. The NRA Audit Committee may only approve the underlying transaction if it determines that such transaction, under the terms and within the circumstances and conditions presented, is fair, reasonable, and in the best interests of the NRA."

501.    When determining the fairness and reasonableness of a transaction, the Audit Committee is required to consider, among other things, alternative transactions to the extent available and the NRA's mission and resources.

502.    The Audit Committee is required to document the disclosure of potential and actual conflicts of interest in its meeting minutes, and must include (1) the name of the person whose conflict is disclosed, (2) the nature of the conflict, and (3) details of the deliberations of the disinterested directors, such as documents reviewed, any alternatives considered, comparative costs or bids, market value information, and other factors considered in deliberations.

503.    Under Section 715 of the N-PCL, the NRA is prohibited from entering into any related party transaction unless the transaction is determined and documented by the Board or a designated committee of the Board to be fair, reasonable, and in the corporation's best interest at the time of the determination. The law also requires that every director, officer, or key person who has an interest in a related party transaction "shall disclose in good faith to the [B]oard … the material facts concerning such interest," and the corporation must undertake a process before approving a related party transaction and document that process.

504.    For years, the Audit Committee failed to adequately address related party transactions or conflicts of interest, in violation of both the N-PCL and the NRA's internal policy governing conflicts of interest. Upon information and belief, the Audit Committee also failed to

Appx. 125

put in place procedures to ensure that the NRA would comply with New York Law governing related party transactions in the future. N-PCL § 715(j).

505.   In 2016, for example, according to records of the Audit Committee and the Secretary of the Board, the Audit Committee apparently had notice of at least eight related party transactions amounting to approximately $668,000 to be paid to NRA board members. Among the transactions the Audit Committee had notice of were:

a.   Payments totaling $150,000 to Board Member No. 1;

b.   Payments totaling $45,180 to Board Member No. 4's law firm; and

c.   Payments totaling $256,000 to Board Member No. 5.

506.   Upon information and belief, the Audit Committee maintained no records in 2016 establishing whether the Committee considered market value information, alternative transactions or other information in its deliberations concerning the conflicts of interest and related party transactions. There is no resolution by the Audit Committee approving the transactions on a finding that the transactions were fair, reasonable and in the best interests of the NRA.

507.   According to the NRA's internal documents, in 2017, the Audit Committee had notice of multiple substantive related party transactions amounting to at least $730,000 to be paid to NRA board members and employees in 2017. Among the transactions the Audit Committee had notice of were:

a.   Payments totaling $150,000 to Board Member No. 1;

b.   Payments totaling $123,248.43 to RCR Enterprises, which is owned by a former NRA Vice President;

c.   Payments totaling $40,000 to Board Member No. 3;

d.   Payments totaling $45,180 to Board Member No. 4's law firm; and

121

Appx. 126

  e.  Payments totaling $134,000 to Board Member No. 5.

  508.  In September 2018, the Audit Committee acknowledged in a committee report that there were "[s]everal instances in which transactions that posed conflicts of interest (and thus, should have been disclosed and approved in advance) were disclosed after the fact." The Audit Committee Chair also testified, "there were some [related party transactions] that should have been given to us, should have been captured into the [disclosure of financial interest] forms, should have been presented to us by Frazer and they weren't. That's the reason we [had] to do them after the fact." He suggested, "It may be that some of these contracts were entered into, and John [Frazer] never knew. They never disclosed it on the form."

  509.  The Audit Committee then purported to ratify seven related party transactions and conflicts of interest at its September 2018 meeting, in contravention of both N-PCL § 715 and internal NRA policy. In attempting to retroactively approve the transactions at this meeting, the Audit Committee did not review any documents, including any underlying contracts, before purportedly determining that each was "fair, reasonable, and in the best interest of the NRA." There is no evidence that the Audit Committee considered alternative transactions, the NRA's need for the particular transactions, or whether the amounts NRA directors were charging was comparable to other vendors or to what those directors generally charged for those services.

  510.  One of the related party transactions that the Audit Committee ratified at its September 2018 meeting was the contract between Dissident No. 1 and Ackerman.

  511.  While the fact of this contract with Ackerman, along with its material terms, was known to both LaPierre and Phillips at the time it was executed, the Audit Committee was not made aware of the arrangement at that time. The Audit Committee did not review the contract prior to its execution as required by the N-PCL § 715 and the NRA Policy Manual.

122

Appx. 127

512.    The Audit Committee Chair also admitted to relying on only a summary of the
contract terms presented to it by the NRA Board Counsel. Members of the Audit Committee could
not recall whether they were informed of the value of the contract at the time they purported to
formally ratify it.

513.    The Audit Committee concluded that it was "fair, reasonable, and in the best
interest of the NRA to approve and ratify [Dissident No. 1's] continued participation in the
[Ackerman] Contract during his service on the NRA Board and as an NRA officer." When asked
how the Audit Committee could determine whether the contract was in the best interest of the
NRA if it didn't know the contract's value, the Chair of the Audit Committee testified, "it was a
contract between [Ackerman] and [Dissident No. 1], not the NRA" and stated, "We don't care
what [Ackerman] was paying [Dissident No. 1]."

514.    This characterization of the contract was false, since the payments to the
incoming president were ultimately paid for by the NRA, not Ackerman.

515.    At the same meeting on September 6, 2018, the Audit Committee also purported
to ratify several other transactions without considering market rate information for the contracted
services or otherwise making anything other than a conclusory determination of the fairness,
reasonableness and benefits of the transactions to the NRA. These transactions included:

   a.    A consulting agreement between the NRA and Board Member No. 5, increasing the
         board member's fee from $168,000 to $220,000 per year.

   b.    The payment of $1.36 million to HomeTelos between September 2014 and May 2017,
         which, as discussed above, should have been previously disclosed to and approved by
         the Audit Committee due to Phillips's long term personal relationship with the vendor's
         Chief Executive Officer.

   c.    The engagement of McKenna as a vendor despite Powell's belated disclosure, as
         discussed above, that his wife had been an independent contractor for McKenna since
         late 2017. The NRA paid McKenna $25,000 per month pursuant to a written contract
         in 2018 signed by Powell, and between $160,000 and $250,000 per month pursuant to

a verbal contract agreed to by Powell, exclusive of other expenses passed through to the NRA by McKenna.

516.    In 2019 and 2020, the Audit Committee again purported to retroactively approve existing NRA contracts with related parties or that presented conflicts of interest, some dating back to their inception more than fifteen years ago. At the same time, the Committee approved new contracts with many of the same vendors. The Committee, however, did not comply with the requirements of NRA policy and applicable law requiring consideration of alternative transactions and it did not properly document the Audit Committee's determination. The Committee also did not put in place procedures to prevent future related party transactions occurring without obtaining prior Board approval. Examples of the related party transactions and conflicts of interest that were improperly approved by the Audit Committee include:

a.  On April 28, 2019, the Committee retroactively approved approximately $3,692,000 paid by the NRA to Unified Sportsmen of Florida over a *nineteen-year period*. Board Member No. 5 is the Executive Director of Unified Sportsmen of Florida. At the same meeting, the Committee also prospectively approved future payments by the NRA to Unified Sportsmen of Florida.

b.  On April 28, 2019, the Committee retroactively approved approximately $326,000 in grants from the NRA to the New Jersey Rifle and Pistol Clubs, Inc. *over a fourteen-year period*. The president of the New Jersey Rifle and Pistol Clubs, Inc. is a board member of the NRA. At the same meeting, the Committee also prospectively approved new transactions between the New Jersey Rifle and Pistol Clubs, Inc. and the NRA.

c.  On April 28, 2019, the Audit Committee retroactively approved transactions between SpiritWild Productions and the NRA amounting to approximately $120,000 over a two-year period. The President and Director of SpiritWild Productions is the wife of a board member of the NRA. On May 30, 2019, and again on January 9, 2020, the Audit Committee prospectively approved new transactions with SpiritWild Productions.

517.    Upon information and belief, since 2016, with the exception of the agreement with Dissident No. 1, none of the official reports of the Audit Committee reflect a consideration and rejection of a conflict of interest or related party transaction presented to it, and the Audit

124

Appx. 129

Committee has never refused to approve prospectively any conflict of interest or related party transaction presented to it.

### C. Audit Committee's Failure to Oversee Adequately the External Auditors

518.     The Audit Committee failed to properly oversee and supervise the NRA's external auditors as mandated by the Committee's Charter and by the requirements of the N-PCL.

519.     The Audit Committee Charter sets forth the Committee's specific responsibilities with respect to "review[ing] and apprais[ing] the audit efforts of the Association's independent auditors." The Charter places the responsibility for "review[ing] the performance of the external auditors" squarely within the purview of the Audit Committee.

520.     RSM was the NRA's external auditor between 2008 and 2019. Over the course of the decade-long relationship, the Audit Committee failed to exercise the requisite level of oversight or accountability prescribed in its Charter and by the N-PCL.

521.     While, pursuant to its Charter, the Audit Committee is supposed to "provide open means of communication between the Directors, the independent auditors, and the financial and senior management of the Association," the Audit Committee itself failed to communicate essential information to RSM that may have materially impacted the quality of the audit.

522.     For example, as detailed above, the Audit Committee never informed RSM about the existence of whistleblower allegations in July 2018. RSM was not invited to participate in the July 30, 2018 emergency Audit Committee meeting. Following the meeting, the Audit Committee failed to inform RSM of the concerns raised by the NRA Whistleblowers and failed to provide RSM with a copy of the Top Concerns Memo. The only information that the Committee conveyed to RSM about the meeting was the fact that various related party transactions had been raised and would be addressed further at the September 2018 meeting. The Audit Committee failed to provide information to RSM relevant to its audit. As the RSM audit partner who was in charge of the

125

engagement acknowledged, had his team been aware of the Top Concerns Memo while the 2018 Audit was ongoing, it likely would have performed additional audit testing around certain transactions.

523.    Additionally, upon information and belief, the Audit Committee never communicated to RSM anything about the NRA's practice of passing expenses incurred by NRA executives through Ackerman. RSM was not aware that Ackerman was covering substantial expenses for NRA executives, including travel-related costs incurred by NRA executives and charges on credit cards billed to Ackerman, which the NRA was then reimbursing Ackerman for as "out of pocket expenses."

524.    Both the Chair and the Vice Chair of the Audit Committee testified that they were not aware—even as of the dates of their testimony before the Attorney General in June 2020—that RSM never interviewed LaPierre during the course of their external audits. Both expected that a standard audit would include an interview of the CEO. The Audit Committee Chair testified that, as a former auditor, he "[couldn't] imagine that [RSM] would not interview the CEO." The Vice Chair testified that, as a CPA who has conducted audits, he "can't see … not meeting with the chief executive officer. To me, that would not be appropriate."

525.    Similarly, both the Chair and the Vice Chair claimed to be unfamiliar with the NRA's practice of not having its CEO sign the management representation letter. They also were unaware that the basis for RSM not insisting that LaPierre sign the letter was because of a standing memo in RSM's work papers, which stated that LaPierre functions only as the NRA's "leading lobbyist", and "is not involved in the daily operations or finances" of the NRA.

526.   The Audit Committee further failed to ensure that RSM was undertaking appropriate audit testing, particularly with respect to oversight of senior management, related party transactions, employee expenses and reimbursements, and major vendors.

527.   For example, the Vice Chair of the Audit Committee testified that he did not feel the need to ask RSM for external oversight of LaPierre's expenses because he "personally [had] a great deal of trust in Wayne LaPierre" and he didn't believe that LaPierre "expends money unnecessarily." The Chair of the Audit Committee claimed to have no knowledge of whether RSM ever tested LaPierre's expenses, although he also insisted that he "couldn't imagine" that RSM would not have selected LaPierre's expenses for testing. He also had no recollection of whether the Audit Committee ever asked the external auditors to test LaPierre's expenses, nor did he have a recollection of whether the external auditors ever reported to the Audit Committee on Mr. LaPierre's expenses. In fact, RSM failed to conduct any comprehensive expense testing related to LaPierre.

528.   The Chair of the Audit Committee did not know whether the NRA's external auditors ever tested Ackerman invoices, even though he testified that he would have expected them to be tested in the ordinary course of an audit. He also did not recall ever telling the external auditors to conduct testing on Ackerman.

529.   RSM's annual audit planning presentations informed the Audit Committee that "[a]n audit is not designed to provide assurance on internal control or to identify significant deficiencies or material weaknesses. Our review and understanding of NRA's internal control is not undertaken for the purpose of expressing an opinion on the effectiveness of internal control."

530.   Despite the fact that RSM affirmatively did not test the effectiveness of the NRA's internal controls as part of its annual audits, the Audit Committee Chair and Vice Chair relied on

127

Appx. 132

them to do so; the Audit Committee itself did little or nothing else to oversee internal controls themselves. In the testimony that he provided in connection with the Attorney General's investigation, the Vice Chair of the Committee testified, "It is the role of the audit committee to insist that proper controls be followed over any expenditure." When asked what the Committee did to fulfill that role, he explained, "We have an external audit that verifies based on their study and analysis of internal controls that procedures are, in fact, followed." When pressed as to whether the Audit Committee did anything to verify whether policy is followed, he reiterated, "Engage external auditors to do the testing of our transactions." He testified that the Committee did not do anything other than engage the external auditors because it "did not feel the need." As a result, the Audit Committee failed to take adequate action.

531.    The Audit Committee failed to perform its statutory, bylaw, and charter responsibilities as set forth in the preceding paragraphs. As a result, the Board was unable to exercise its responsibilities to maintain a system that was reasonably effective in identifying violations of law. In turn, the Board displayed a sustained and systematic failure to exercise their oversight function and stood by as various laws were violated by the NRA, including violations of the NRA's tax exempt status, false reporting on annual filings with the IRS and the Attorney General's Charities Bureau, improper expense documentation, improper wage reporting, improper income tax withholding, failure to make required excise tax reporting and payment, payments in excess of reasonable compensation to disqualified persons, and waste of NRA assets.

### D.  The Audit Committee Acted *Ultra Vires* in Indemnifying Officers, Directors, and Employees

532.    On March 8, 2019, the Audit Committee met and acted *ultra vires* by resolving to indemnify board members, officers, and employees for legal fees in connection with an investigation being conducted by the U.S. Department of Justice. In accordance with the NRA's

128

bylaws, the decision to indemnify board members and officers cannot be made by the Audit
Committee as a standing committee.

533.    On August 7, 2019, the Audit Committee met and acted *ultra vires* by resolving to
indemnify a board member for legal fees. In accordance with the NRA's bylaws, the decision to
indemnify a board member cannot be made by the Audit Committee as a standing committee.

## VI.    The NRA's Failure to Institute an Effective Compliance Program

534.    Since at least 2014, the NRA has failed to put in place an effective compliance
program to ensure that NRA officers, directors, and employees comply with New York law and
the NRA's internal policy.

535.    Upon information and belief, the NRA does not have and has never had a dedicated
compliance officer. However, in or about late 2018, LaPierre tasked Powell with handling
"compliance issues." Upon information and belief, Powell's tenure in that role lasted until he was
suspended in October 2019 from working at the NRA pending an investigation into his improper
use of NRA money. The NRA's current Treasurer testified that Powell "certainly … was not a
good choice for compliance."

536.    Neither the Chair nor Vice Chair of the Audit Committee could identify or describe
an existing compliance program at the NRA. The Vice Chair identified a single presentation
developed by the Brewer firm, the Chair referred to "compliance seminars, ethics seminars,
whatever you want to call it. We do that," and both the Chair and Vice Chair were not familiar
with who in the organization bore responsibility for compliance. The Chair of the Audit Committee
identified Defendant Frazer as responsible for "regulatory compliance," whereas the Vice Chair
of the Committee admitted "no specific knowledge" of the placement of a compliance function.

537.    Upon information and belief, NRA employees did not receive meaningful training
on compliance with the NRA's conflicts of interest or whistleblower policies and procedures. And,

129

upon information and belief, the Brewer firm's presentation mentioned by the Audit Committee Vice Chair was given to NRA staff by Defendants Powell and Frazer, both of whom, as detailed above in Part 5, Sections I(C) and (D), were ill equipped to train anyone on compliance with New York law, IRS requirements for nonprofit organizations, and the NRA's policy. Both Powell and Frazer lacked the necessary knowledge, training, experience, skills and temperament for senior roles overseeing compliance. Each and failed to comply or enforce NRA policies and procedures, including concerning conflicts of interest.

538. As detailed in Part Five, Section V(B), the NRA Audit Committee failed to comply with its obligations to diligently review and approve (and document such review and approval of) related party transactions and conflicts of interest between the NRA and NRA officers, directors, and key persons.

539. In fact, as detailed in Part V, Section V(B), the NRA Audit Committee failed in its basic duty to put in place policies and procedures to ensure (1) that conflicts of interest and related party transactions would be reported to the Audit Committee in the first instance before transactions occurred, and (2) that failures to report any such conflicts of interest or related party transactions to the Audit Committee would not be repeated in the future.

540. For example, for years, Defendant Frazer failed to comply with his obligation under the NRA bylaws and internal policy to collect and submit to the NRA Audit Committee the annual Financial Disclosure Questionnaires that NRA board members and officers are required to fill out. As the Audit Committee Chair testified, "there were some [related party transactions] that should have been given to us, should have been captured into the [disclosure of financial interest] forms, should have been presented to us by Frazer and they weren't. That's the reason we [had] to [ratify] them after the fact."

Appx. 135

541.    Relatedly, as detailed in Part Five, Sections I and II, Defendant LaPierre failed in his obligation to "independently report to the Audit Committee any financial interest of an officer or director (or immediate family member) that comes to his knowledge or the knowledge of his office as well as any financial transactions between the NRA … and other individuals and/or organizations that present or might present the possibility of a conflict of interest."

542.    As detailed in Part Four, Section II(C), until 2020, the NRA did not have a whistleblower policy that complied with New York law. For example, the Audit Committee was designated to address whistleblower complaints, but the Chair of the Committee testified that he did not know whether there was a procedure through which whistleblowers could submit their complaints anonymously to the Audit Committee.

543.    And even with respect to the deficient whistleblower policy that was not modified until the NRA was under investigation by the Attorney General, as detailed in Part Four, Section II(C), the NRA Audit Committee failed to adequately supervise the implementation of that policy. For example, two of the five Audit Committee members—the Chair and the interim President of the NRA—left the July 30, 2018 Audit Committee meeting before the whistleblowers gave their presentation. Also, the minutes for that meeting fail to record the fact and substance of the complaints from whistleblowers. The Committee Chair was not even provided a copy of the Top Concerns Memo by the Vice Chair after the meeting. The Audit Committee has not maintained any record of steps taken to investigate and address the whistleblower complaints, other than to state that the Brewer firm was conducting an investigation.

## VII.    The NRA's False Regulatory Filings

544.    As a New York not-for-profit corporation holding charitable assets and operating in New York, the NRA must register and file accurate and complete annual reports with the Charities Bureau. In addition to these registration requirements, charitable organizations soliciting

contributions in New York must also register and file accurate and complete annual reports under Article 7-A of the Executive Law. These annual reports, commonly referred to as CHAR500s, must include copies of an organization's annual IRS Form 990, and, for organizations like the NRA, copies of the organization's audited financial statements.

545.    CHAR500s must be signed by: (i) the organization's President or Authorized Officer and (ii) its Chief Financial Officer or Treasurer, both of whom, by their signatures, certify under penalties of perjury that the report, including all attachments, is true and accurate.

546.    Phillips signed the NRA's CHAR500s for 2015 and 2016. Frazer signed the NRA's CHAR500s for 2015, 2016, 2017, and 2018. Frazer and Phillips knew that those CHAR500s, and their attachments, included materially misleading information concerning the NRA's financial condition, and falsely attested to the accuracy of the information provided, under penalty of perjury.

547.    Defendant NRA made materially false and misleading statements and omissions in its 2015, 2016, 2017, and 2018 CHAR500 filings with the Attorney General. These statements included, but were not limited to, false statements about compensation and benefits for officers and directors, false statements about diversion of corporate assets, false statements about enforcement of its conflict of interest policy, false statements about its processes for determining compensation of officers, false statements about compensation and benefits to directors, false statements about compensation policies and reviews, and false statements about transactions with interested persons.

548.    The false and misleading statements or omissions included, without limitation:

a.    **False statements and omissions about transactions with interested persons. For example:**

132

Appx. 137

i. Defendant NRA never disclosed any of the numerous payments to officers and directors in the "Related Party Transactions" note to its audited financial statements.

ii. In its Forms 990 for 2015, 2016, 2017, and 2018, the NRA falsely reported that it was not a party to business transactions with current or former officers, directors, relatives thereof or entities affiliated therewith and failed to disclose those transactions on Schedules L and/or R of its IRS Forms 990. As set forth above, the NRA has been a party to multiple business transactions with current or former officers, directors, relatives thereof or entities affiliated therewith that the NRA failed to report.

iii. In its Forms 990 before 2017, the NRA overstated the number of independent board members because it did not properly omit all board members engaged in a business transaction with the organization for which payments of over $100,000 were received, or board members who were paid more than $10,000 as independent contractors, or board members engaged in a single transaction with the organization over $10,000.

b. **False statements and omissions regarding compensation and to Officers and Directors. For example:**

i. In its Forms 990 for the relevant time period, Defendant NRA failed to disclose the complete amounts paid to LaPierre in the form of gifts from vendors, "out of pocket" expenses originally paid for by Ackerman and then paid for by the NRA, and other forms of compensation.

ii. In its Forms 990 for at least 2014 to 2018, the NRA failed to disclose taxable personal income for LaPierre, Phillips, and Powell. For example, as set forth above, LaPierre and Phillips permitted NRA executives and personnel to use vendor credit cards, alter ego accounts, and vendor charges to disguise payments to LaPierre, on LaPierre's behalf, for LaPierre's personal benefit, and as reimbursements of LaPierre's personal and family expenses, inconsistent with the reporting requirements of Section 527 of the Internal Revenue Code.

iii. In its Forms 990 for the relevant time period, the NRA failed to disclose in response to question 25a in Part IV of the IRS 990 for each relevant year that it engaged in an excess benefit transaction with a disqualified person during the year, and failed to file Form 4720 reporting such transactions pursuant to Section 4958 of the Internal Revenue Code, which governs excise taxes for excess benefit transactions.

iv. Until 2017, Defendant NRA failed to disclose payments made to a former NRA president in the form of payments to Crow Shooting, an entity owned by the former president. While these payments were disclosed in the NRA

Appx. 138

Foundation's Form 990 for 2017, the NRA failed to properly disclose these payments in its 2017 Form 990.

v.   In its Form 990 for 2016, Defendant NRA failed to disclose a $455,753 payment by Lockton Affinity to the NRA's Managing Director of Licensing and Marketing.

vi.  In its Forms 990 for 2015, 2016, 2017, and 2018, Defendant NRA answered "No" to the question "Did the organization engage in an excess benefit transaction with a disqualified person during the year?" In fact, Defendant NRA engaged in multiple excess benefit transactions, including without limitation the compensation paid to Defendants LaPierre and Powell, and a former President.

vii. In its Forms 990 for 2015, 2016, 2017, and 2018, Defendant NRA made false statements in Part VI, line 16 about its process for determining the compensation of officers and directors.

c.   **False statements and omissions regarding payments to vendors. For example:**

i.   In its Forms 990 prior to 2017, Defendant NRA failed to disclose the amount paid to Ackerman McQueen for "out of pocket" expenditures. In in Form 990 for 2017, the NRA disclosed that this amount was over $11 million. At that time, the NRA also disclosed that it had paid over $5 million to Mercury Group, a company wholly owned by Ackerman McQueen. Previous filings therefore significantly underrepresented the total amount that the NRA paid to Ackerman McQueen on an annual basis.

ii.  Until 2017, the NRA failed to disclose in its Form 990 the amount it paid to Under Wild Skies, Inc., even though Defendant LaPierre and his spouse were receiving free services in the form of hunting trips from the company. In its Form 990 for 2017, the NRA disclosed on Schedule O that it had paid $2,635,000 to Under Wild Skies.

d.   **Additional false statements in Part VI of the Form 990 regarding governance, management and disclosure. For example:**

i.   In its Form 990 for 2018, Defendant NRA answered "No" to the question "Did the organization become aware of a significant diversion of the organization's assets." This statement was false, since the organization did become aware of significant diversions through whistleblower reports and its own inquiries into billing by Ackerman and McKenna.

ii.  In its Forms 990 for the relevant time period, Defendant NRA answered "Yes" to the question "Did the organization regularly and consistently monitor enforcement with [its conflict of interest policy]." Based on the evidence

134

Appx. 139

gathered in the Attorney General's investigation, as set forth above, this statement was false, as Defendant NRA repeatedly permitted violations of its conflict of interest policy, including, without limitation, by Defendant LaPierre.

iii.    In its Forms 990 for the relevant time period, the NRA filed false and/or materially incomplete responses on Schedule J, which reports information on compensation for officers, directors, key employees, and highly compensated employees, including without limitation:

1.    Failing to report that the NRA paid for travel for companions until its 2018 Form 990, when in fact the NRA repeatedly paid for travel for LaPierre's wife and other family members;

2.    Failing to report that it provided a housing allowance until its 2017 Form 990, when in fact it paid for housing for certain officers; and

3.    Reporting that it in fact had a policy regarding tax indemnification and gross-up payments, when, upon information and belief, the NRA had no such written policy.

e.    **Failure to disclose all fundraising expenses, fundraisers and amounts paid thereto. For example:**

i.    Upon information and belief, in its Forms 990 for the relevant time period, the NRA underreported its spending on fundraising in its allocation of functional expenses, since it failed to fully report fundraising expenses that were routed through third party vendors.

ii.    In its 2016 Form 990, the NRA failed to disclose MMP as a fundraiser. MMP is not registered with the OAG as a fundraiser to solicit in New York State. In its 2016 Form 990, the NRA reported that it had paid MMP $10 million in 2016 for fundraising, printing, and mailing, but failed to report MMP or any amounts raised by it in the section dedicated to the NRA's top ten fundraisers. Instead, the NRA listed MMP, which also shares a physical address at NRA Headquarters, as an independent contractor.

**VIII.    The NRA's Violation of its Duties under the New York Prudent Management of Institutional Funds Act**

549.    The NRA is an "institution" as that term is used in Article 5-A, Section 551(d) of NYPMIFA since it is "a person, other than an individual, organized and operated exclusively for charitable purposes."

Appx. 140

550.    Under NYPMIFA, the obligations of the NRA are also imposed upon the governing board of directors of the NRA.

551.    The NRA holds and manages "institutional funds" as that term is used in NYPMIFA, Section 551(e).

552.    In managing institutional funds, the NRA must consider the purposes of the NRA and the purposes of its institutional funds.

553.    In managing institutional funds, pursuant to NYPMIFA, the NRA must manage institutional funds in good faith and with the care an ordinarily prudent person in a like position would exercise under similar circumstances.

554.    In managing institutional funds, under NYPMIFA, the NRA must make a reasonable effort to verify facts relevant to management of the funds.

555.    Each person at the NRA with responsibility for managing and investing institutional funds must comply with the duty of loyalty in exercising that responsibility.

556.    Each person responsible for managing and investing institutional funds is required to manage and invest the funds in good faith and with the care an ordinarily prudent person in a like position would exercise under similar circumstances

557.    The institutional funds of the NRA include investments, cash balances, funds derived from pledging NRA assets, funds obtained by pledging the credit of the NRA, income derived from rents to third parties, and funds held by or paid out to vendors.

558.    The NRA has failed to manage its institutional funds in accordance with the standards set forth in Section 552 of NYPMIFA. Specifically:

a.  It has permitted unrestricted net assets on its balance sheet to decrease from a surplus (unrestricted assets less liabilities) of $27,802,714 at year-end 2015, to a net deficit at year-end 2016 of $14 million, to a net deficit at year-end 2017 of $31,779,599, to a net deficit at year-end 2018 of $36,276,779. The total reduction in unrestricted assets over

136

Appx. 141

the three-year period exceeds $63 million. The Board minutes of the NRA do not reflect any consideration of this precipitous decline, or consideration of the factors set forth in NYPMIFA, with respect to this use of institutional funds. The Attorney General, upon information and belief, alleges that this decline in unrestricted assets continues to the present time.

b. The NRA, during the period 2015 to the present, did not manage its institutional funds in good faith, or with the care and prudence an ordinarily prudent person would exercise under similar circumstances.

c. The NRA has failed to incur only costs that are appropriate and reasonable in relation to its assets and the purposes of the NRA.

d. The NRA has failed to make reasonable efforts to verify facts relevant to management of its institutional funds.

e. The NRA has failed to make reasonable efforts to keep its Board and relevant committees of the Board apprised of the financial status, risks, and commitments of institutional funds.

f. The NRA has authorized and expended significant institutional funds (in excess of $54 million) for payments to the Brewer firm without consideration of the factors set forth in 552(e)(1).

g. The NRA has imprudently pledged capital assets to obtain loans for current expenses.

h. The NRA has undertaken covenants associated with its credit agreement and lines of credit agreements, requiring minimum cash and investment balances, and breached such covenants.

i. The NRA has taken loans in excess of $5 million from the separately maintained funds of the NRA-ILA, in violation of its bylaws.

j. The NRA has permitted the use of NRA-ILA funds for payment of travel expenses of LaPierre, outside the NRA expense reimbursement system.

k. The NRA has twice pledged its accounts receivable as collateral in order to obtain two $5 million loans from the related entity NRA Foundation. The second loan has not been repaid, and the NRA has permitted its officers to engage in related party transactions with respect to those transactions, exposing them to liability to the NRA Foundation.

l. The NRA has permitted its Audit Committee to fail to evaluate or report on the requirements of NYPMIFA, and the NRA's compliance with those requirements.

m. The NRA has permitted its auditor to fail to evaluate or report on the requirements of NYPMIFA, and the NRA's compliance with those requirements

137

Appx. 142

n.  The NRA has failed to assure that institutional funds are not subject to waste or
misappropriation.

o.  The NRA has engaged "faithless fiduciaries" including Defendants LaPierre, Powell,
and Phillips, who were given authority to manage and invest institutional funds, but
failed to do so prudently.

p.  The NRA has committed the NRA to undertake undisclosed future obligations to senior
executives, including a ten-year post-employment obligation to Defendant LaPierre at
an amount per year in excess of $1 million, a no-show consulting contract with
Defendant Phillips, and a no-show consulting contract with the former Executive
Director of General Operations.

559.  The failure of the NRA to perform its duties under NYPMIFA, as described here,
require that this Court enter an appropriate order to secure the proper administration of these
charitable funds, and to order an accounting by the NRA and appropriate officers, directors or key
employees for their official conduct with respect to institutional funds.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Dissolution of the NRA – N-PCL §§ 112(a)(1), 112(a)(5), 1101(a)(2)
### (Against Defendant NRA)

560.  The Attorney General repeats and re-alleges the allegations set forth in paragraphs
1 through 559 above as though fully set forth herein.

561.  Under N-PCL § 112(a)(1), the Attorney General is authorized to maintain an action
or special proceeding to dissolve a corporation that has acted beyond its capacity or power or to
restrain it from carrying on unauthorized activities.

562.  Under N-PCL § 112(a)(5), the Attorney General is authorized to maintain an action
or special proceeding to dissolve a corporation under Article 11 (Judicial dissolution).

563.  Under N-PCL § 1101(a)(2), the Attorney General may bring an action seeking the
dissolution of a charitable corporation when "the corporation has exceeded the authority conferred
upon it by law, or … has carried on, conducted or transacted its business in a persistently fraudulent

138

Appx. 143

or illegal manner, or by the abuse of its powers contrary to public policy of the state has become liable to be dissolved."

564.    N-PCL § 102(a)(5) bars a not-for-profit corporation from permitting its assets, income or profit to inure to the benefit of an officer or director of the corporation. N-PCL§ 515(a) of the N-PCL prohibits the distribution of any part of the income of a not-for-profit corporation to the directors or officers of the corporation. The NRA violated these provisions by permitting its assets to be used for the benefit of its officers and directors, their families and other insiders.

565.    N-PCL § 515(b) limits a not-for-profit corporation to the payment of reasonable, not excessive, compensation to directors and officers and prohibits any person who may benefit from such compensation from being present or participating in the deliberation or vote to approve compensation. The NRA, through its Compensation Committee as it relates to LaPierre, Phillips and Frazer, and through LaPierre as it relates to Powell, violated these provisions in determining the compensation of the Individual Defendants. The salary, bonuses, other cash and non-cash compensation and other benefits to the Individual Defendants were excessive and constitute a waste of NRA's charitable assets, and an illegal and unauthorized activity under the N-PCL.

566.    Under N-PCL § 715-a and EPTL § 8-1.9(d), the NRA was required to adopt a conflict of interest policy to ensure that its directors and officers act in the corporation's best interest. The NRA failed to adopt and enforce a policy that met the statutory requirements and, accordingly, the NRA violated N-PCL § 715-a and EPTL § 8-1.9(d).

567.    Under N-PCL § 715-b and EPTL § 8-19(e), the NRA was required to adopt a whistleblower policy to protect people who report improper conduct from retaliation. The NRA failed to adopt and enforce a policy that met the statutory requirements and, accordingly, violated N-PCL § 715-b and EPTL § 8-1.9(e).

Appx. 144

568.    Pursuant to EPTL §§ 8-1.4(d) and (f), not-for-profit organizations holding charitable assets and operating in New York must register and file annual reports with the Charities Bureau. Charitable organizations soliciting contributions in New York must also register and file annual reports called "CHAR 500s" under Article 7-A of the Executive Law. The CHAR500s must include copies of an organization's annual IRS Form 990, and, for organizations such as the NRA, copies of the organization's audited financial statements. CHAR500s must be signed by: (i) the organization's President or Authorized Officer and (ii) its Chief Financial Officer or Treasurer, both of whom, by their signatures certify, under penalties of perjury, that the report, including all attachments, is true and accurate.

569.    The annual reports filed with the Charities Bureau must also include the identities of the fundraisers with whom an entity contracts, as well as information about the services they provide and the compensation they receive.

570.    Sections 172 and 175 of the Executive Law prohibit material false statements in any application, or any registration required to be filed with the Attorney General pursuant to Article 7-A of the Executive Law.

571.    From 2015 to 2018, the CHAR500s, with accompanying IRS Form 990s, filed by the NRA with the Attorney General contained numerous material false statements.

572.    As detailed in preceding paragraphs, the NRA and its individual trustees, as that term is used in the EPTL, failed to secure the proper administration of the charitable assets in their possession and control, and violated the duties of prudence in the management of institutional funds.

573.    As a result of the foregoing, the NRA has acted beyond its capacity by persistently disregarding the limitations in its certificate of incorporation and the law, and it has conducted its

140

Appx. 145

business in a persistently illegal manner and abused its powers contrary to the public policy of the State of New York by operating without effective oversight or control by its officers and directors.

574. Accordingly, this Court should dissolve the NRA pursuant to N-PCL § 1109(b)(1) and distribute its remaining and future assets to be applied to charitable uses consistent with the mission set forth in the NRA's certificate of incorporation, pursuant to N-PCL §§ 1115(a) and 1008(a)(15).

## SECOND CAUSE OF ACTION
### Dissolution of the NRA – N-PCL §§ 112(a)(7), 1102(a)(2)(D)
### (Against Defendant NRA)

575. The Attorney General repeats and re-alleges the allegations in paragraphs 1 through 574 above as though fully set forth herein.

576. Under N-PCL § 112(a)(7), the Attorney General is authorized to maintain an action or special proceeding to enforce rights granted by statute to a director or officer of a charitable corporation.

577. Pursuant to N-PCL § 1102(a)(2)(D), directors or members, as authorized, may petition the court for judicial dissolution where the "directors or members in control of the corporation have "looted or wasted the corporate assets, have perpetuated the corporation solely for their personal benefit, or have otherwise acted in an illegal, oppressive or fraudulent manner."

578. Directors or members in control of the NRA have looted or wasted the corporate assets, have perpetuated the corporation solely for their personal benefit, or have otherwise acted in an illegal, oppressive or fraudulent manner.

579. Accordingly, this Court should dissolve the NRA pursuant to N-PCL § 1109(b)(1) and Order that that its remaining and future assets should be applied to charitable uses consistent

Appx. 146

with the mission set forth in the NRA's certificate of incorporation, pursuant to N-PCL §§ 1115(a) and 1008(a)(15).

## THIRD CAUSE OF ACTION
### For Breach of Fiduciary Duty Under N-PCL §§ 717 and 720 and Removal Under N- PCL §§ 706(d) and 714(c)
### (Against Defendant LaPierre)

580.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 579 above as though fully set forth herein.

581.    LaPierre breached his fiduciary duties of loyalty, care and obedience to the NRA by using his powers as an officer and *ex officio* director of the NRA to obtain illegal compensation and benefits, to convert NRA funds for his own benefit, and to dominate, control, and direct the NRA to obtain private benefit for himself, his family members and for certain other insiders, including Defendants Phillips and Powell in contravention of NRA bylaws, policies and procedures, and applicable laws.

582.    LaPierre's breaches of fiduciary duty have damaged the NRA by, among other things, causing its assets to be diverted for non-NRA purposes and be wasted and by exposing the NRA to liability for failure to report taxable income, failure to withhold payroll taxes, failure to report and pay excise taxes due pursuant to Section 4958 of the Internal Revenue Code, and jeopardizing the NRA's tax exempt status and authority to conduct business for failure to comply with regulatory reporting obligations.

583.    Accordingly, LaPierre is liable under N-PCL § 720(a)(l) to account and pay restitution and/or damages, including returning the salary he received while breaching his fiduciary duties to the NRA, plus interest at the statutory rate of 9%, and rescission of any agreements providing for compensation following his employment as Executive Vice President of the NRA, for his conduct in the neglect and violation of his duties in the management and disposition of the

NRA's charitable assets and in causing loss and waste of those assets by his breaches of fiduciary duty.

584.    LaPierre should be removed for cause under N-PCL §§ 706 and 714 and be barred from re-election of reappointment as a director or officer of the NRA.

### FOURTH CAUSE OF ACTION
### For Breach of Fiduciary Duty to the NRA Under N-PCL §§ 717 and 720 and Removal Under N-PCL §§ 706(d) and 714(c)
### (Against Defendant Frazer)

585.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 584 above as though more fully set forth herein.

586.    Frazer is an attorney who owes a fiduciary duty to the NRA and is also bound by professional ethics in his conduct towards his client. Frazer failed to discharge his duties as an officer of the NRA, both as General Counsel and as Secretary, with the degree of care, skill, prudence, diligence and undivided loyalty required. Frazer breached his fiduciary duties of loyalty, care and obedience to the NRA.

587.    Upon information and belief, and based on his actions or failures to act on the matters detailed above, Frazer violated his professional responsibility to his client, the NRA, by failing to provide competent representation, in that he failed to act with reasonable diligence in representing the NRA and to use the thoroughness and preparation reasonably necessary for the representation of the NRA throughout his tenure, including by failing to make sufficient inquiry into and analysis of the factual and legal problems under his responsibility, and by failing to use methods and procedures meeting the standards of competent practitioners.

588.    Frazer's breaches of fiduciary duty have damaged the NRA by, among other things, causing its assets to be diverted for non-NRA purposes and be wasted; exposing the NRA to liability for failure to report taxable income, failure to withhold payroll taxes, and failure to report

143

and pay excise taxes due pursuant to Section 4958 of the Internal Revenue Code; and jeopardizing the NRA's tax exempt status and authority to conduct business for failure to comply with regulatory reporting obligations.

589.     Accordingly, Frazer is liable under N-PCL § 720(a)(l) to account and pay restitution and/or damages, including the return of salary he received while breaching his fiduciary duties to the NRA, plus interest at the statutory rate of 9%, for his conduct in the neglect and violation of his duties in the management and disposition of the NRA's charitable assets and in causing loss and waste of those assets by his breaches of fiduciary duty. Frazer should be removed for cause under N-PCL §§ 706 and 714 and barred from re-election or reappointment as an officer or director of the NRA.

### FIFTH CAUSE OF ACTION
### For Breach of Fiduciary Duty to the NRA Under N-PCL §§ 717 and 720
### (Against Defendant Phillips)

590.     The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 589 above as though fully set forth herein.

591.     Phillips breached his fiduciary duties of loyalty, care and obedience to the NRA by using his powers as an officer and *ex officio* director of the NRA to obtain illegal compensation and benefits, to convert NRA funds for his own benefit, and to dominate, control, and direct the NRA to obtain private benefit for himself, his personal friends, and other NRA insiders, including Defendants LaPierre and Powell, in contravention of NRA bylaws, policies and procedures and applicable laws.

592.     Phillips's breaches of fiduciary duty have damaged the NRA by, among other things, causing its assets to be diverted for non-NRA purposes and be wasted; exposing the NRA to liability for failure to report taxable income, failure to withhold payroll taxes, and failure to

Appx. 149

report and pay excise taxes due pursuant to Section 4958 of the Internal Revenue Code; and

jeopardizing the NRA's tax exempt status and authority to conduct business for failure to comply

with regulatory reporting obligations.

593.    Accordingly, Phillips is liable under N-PCL § 720(a)(l) to account and pay

restitution and/or damages, including the return of salary he received while breaching his fiduciary

duties to the NRA, plus interest at the statutory rate of 9%, the rescission of any agreements

providing for compensation following his employment as Treasurer and Chief Financial Officer

of the NRA, for his conduct in the neglect and violation of his duties in the management and

disposition of the NRA's charitable assets and in causing loss and waste of those assets by his

breaches of fiduciary duty.

## SIXTH CAUSE OF ACTION
### For Breach of Fiduciary Duty to the NRA Under N-PCL §§ 717 and 720
### (Against Defendant Powell)

594.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs

1 through 593 above as though fully set forth herein.

595.    Powell breached his fiduciary duties of loyalty, care and obedience to the NRA by

using his powers as an officer and senior executive of the NRA to obtain illegal compensation and

benefits, to convert NRA funds for his own benefit, and to dominate, control, and direct the NRA

to obtain private benefit for himself and for his family members in contravention of NRA bylaws,

policies and procedures and applicable.

596.    Powell's breaches of fiduciary duty have damaged the NRA by, among other

things, causing its assets to be diverted for the benefit of Powell and other individuals and be

wasted.

597.    Accordingly, Powell is liable under N-PCL §§ 720(a)(l) to account and pay restitution and/or damages, including the return of salary he received while breaching his fiduciary duties to the NRA, plus interest at the statutory rate of 9%, for his conduct in the neglect and violation of his duties in the management and disposition of the NRA's charitable assets and in causing loss and waste of those assets by his breaches of fiduciary duty.

## SEVENTH CAUSE OF ACTION
### For Breach of EPTL § 8-1.4
### (Against Defendant LaPierre)

598.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 597 above as though fully set forth herein.

599.    Section 8-1.4(m) of the EPTL authorizes the Attorney General to institute appropriate proceedings to secure the proper administration of any not-for-profit corporation organized under the laws of this State for charitable purposes.

600.    LaPierre, in his capacity as the Executive Vice President of the NRA was a trustee pursuant to EPTL § 8-1.4 because he held and administered property for charitable purposes in the State of New York.

601.    As set forth in the preceding paragraphs, LaPierre failed to administer the charitable assets of the NRA entrusted to his care properly and, as a result, should be ordered to account for his breaches and to make restitution and/or pay damages, plus interest at the statutory rate of 9%, to the NRA. In addition, LaPierre should be permanently barred from serving as an officer, director or trustee of any not-for-profit or charitable organization incorporated or authorized to conduct business in the State of New York.

146

Appx. 151

## EIGHTH CAUSE OF ACTION
## For Breach of EPTL § 8-1.4
### (Against Defendant Frazer)

602.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 601 above as though fully set forth herein.

603.    Section 8-1.4(m) of the EPTL authorizes the Attorney General to institute appropriate proceedings to secure the proper administration of any not-for-profit corporation organized under the laws of this State for charitable purposes.

604.    Frazer, in his capacity as the Secretary and General Counsel of the NRA, was at all times a trustee pursuant to EPTL § 8-1.4 because he was responsible for holding and administering property for charitable purposes in the State of New York.

605.    As set forth in the preceding paragraphs, Frazer failed to administer the charitable assets of the NRA entrusted to his care properly and, as a result, should be ordered to account for his breaches and to make restitution and/or pay damages, plus interest at the statutory rate of 9%, to the NRA. In addition, Frazer should be permanently barred from serving as an officer, director or trustee of any not-for-profit or charitable organization incorporated or authorized to conduct business in the State of New York.

## NINTH CAUSE OF ACTION
## For Breach of EPTL § 8-1.4
### (Against Defendant Phillips)

606.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 605 above as though fully set forth herein.

607.    Section 8-1.4(m) of the EPTL authorizes the Attorney General to institute appropriate proceedings to secure the proper administration of any not-for-profit corporation organized under the laws of this State for charitable purposes.

147

Appx. 152

608. Phillips, in his capacity as the Treasurer and Chief Financial Officer of the NRA was a trustee pursuant to EPTL § 8-1.4 because he held and administered property for charitable purposes in the State of New York.

609. As set forth in the preceding paragraphs, Phillips failed to administer the charitable assets of the NRA entrusted to his care properly and, as a result, should be ordered to account for his breaches and to make restitution and/or pay damages, plus interest at the statutory rate of 9%, to the NRA. In addition, Phillips should be permanently barred from serving as an officer, director or trustee of any not-for-profit or charitable organization incorporated or authorized to conduct business in the State of New York.

### TENTH CAUSE OF ACTION
### For Breach of EPTL § 8-1.4
### (Against Defendant Powell)

610. The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 609 above as though fully set forth herein.

611. Section 8-1.4(m) of the EPTL authorizes the Attorney General to institute appropriate proceedings to secure the proper administration of any not-for-profit corporation organized under the laws of this State for charitable purposes.

612. Powell, in his capacity as an officer and a de facto officer, was a trustee pursuant to EPTL § 8-1.4 because he was responsible for holding and administering property for charitable purposes in the State of New York.

613. As set forth in the preceding paragraphs, Powell failed to administer the charitable assets of the NRA entrusted to his care properly and, as a result, should be ordered to account for his breaches and to make restitution and/or pay damages, plus interest at the statutory rate of 9%, to the NRA. In addition, Powell should be permanently barred from serving as an officer, director

148

Appx. 153

or trustee of any not-for-profit or charitable organization incorporated or authorized to conduct business in the State of New York.

## ELEVENTH CAUSE OF ACTION
### Wrongful Related-Party Transactions – N-PCL §§ 112(a)(10), 715(f) and EPTL § 8-1.9(c)(4)
### (Against Defendant LaPierre)

614.     The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 613 above as though fully set forth herein.

615.     As described in detail in the preceding paragraphs, LaPierre caused the NRA to enter into a post-employment contract and amendments thereto as described above (collectively, the "LaPierre Post Employment Contract") in which he had a financial interest without obtaining authorization from the Board or a determination by the Board that the transaction was fair, reasonable and in the NRA's best interest at the time of the transactions.

616.     LaPierre's conduct was willful and intentional with respect to the Post-Employment Contract in that as an officer of the NRA, he fully understood and intended the financial benefits he would derive from the transaction.

617.     By the foregoing acts and omissions, LaPierre is liable under N-PCL § 715(f) and EPTL § 8-1.9(c), to account for profits from the LaPierre Post Employment Contract not already accounted for; to the extent not already paid, pay the NRA the value of charitable assets used in the LaPierre Post Employment Contract; return assets lost to the NRA as a result of the Post Employment Contract, to the extent not already returned; pay the NRA an amount up to double the value of the amount of each benefit improperly bestowed by the LaPierre Post Employment Contract; and should be enjoined from serving as an officer, director or trustee, or in any similar capacity, of any not-for-profit charitable organization incorporated or authorized to conduct business or solicit charitable donations in the State of New York.

149

## TWELFTH CAUSE OF ACTION
### Wrongful Related-Party Transactions – N-PCL §§ 112(a)(10), 715(f) and EPTL § 8-1.9(c)(4)
### (Against Defendant Powell)

618. The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 617 above as though fully set forth herein.

619. Powell caused the NRA to enter into transactions in which he or his family members had a financial interest without obtaining authorization from the Board for those transactions or a determination by the Board that the transactions were fair, reasonable and in the NRA's best interest at the time of the transactions.

620. Powell's conduct was willful and intentional with respect to these transactions in that as an officer and senior executive of the NRA, he fully understood and intended the financial benefits he and his family members would derive from the transactions.

621. By the foregoing acts and omissions, Powell is liable under N-PCL § 715(f) and EPTL § 8-1.9(c), to account for profits from related party transactions not already accounted for; to the extent not already paid, pay the NRA the value of charitable assets used in such transactions; to return assets lost to the NRA as a result of the transactions, to the extent not already returned; to pay the NRA an amount up to double the value of the amount of each benefit improperly bestowed by a transaction occurring after July 1, 2014; and should be enjoined from serving as an officer, director or trustee, or in any similar capacity, of any not-for-profit charitable organization incorporated or authorized to conduct business or solicit charitable donations in the State of New York.

150

## THIRTEENTH CAUSE OF ACTION
### Wrongful Related-Party Transactions – N-PCL §§ 112(a)(10), 715(f)
### and EPTL § 8-1.9(c)(4)
### (Against Defendant Phillips)

622.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 621 above as though fully set forth herein.

623.    As described in detail in the preceding paragraphs, Phillips caused the NRA to enter into a consulting agreement with the NRA following his retirement (the "Phillips Post-Employment Consulting Agreement"), in which he had a financial interest without obtaining authorization from the Board or a determination by the Board that the Phillips Post-Employment Consulting Agreement was fair, reasonable and in the NRA's best interest at the time of the transactions.

624.    Phillips's conduct was willful and intentional with respect to the Phillips Post-Employment Consulting Agreement in that as an officer of the NRA, he fully understood and intended the financial benefits he would derive from the transaction.

625.    By the foregoing acts and omissions, Phillips is liable under N-PCL § 715(f) and EPTL § 8-1.9(c), to account for profits from the Phillips Post-Employment Consulting Agreement not already accounted for; to the extent not already paid, pay the NRA the value of charitable assets used in the Phillips Post-Employment Consulting Agreement; to return assets lost to the NRA as a result of the Phillips Post-Employment Consulting Agreement, to the extent not already returned; to pay the NRA an amount up to double the value of the amount of each benefit improperly bestowed by Phillips Post-Employment Consulting Agreement; and should be enjoined from serving as an officer, director or trustee, or in any similar capacity, of any not-for-profit charitable organization incorporated or authorized to conduct business or solicit charitable donations in the State of New York.

Appx. 156

## FOURTEENTH CAUSE OF ACTION
### Wrongful Related-Party Transactions – N-PCL §§ 112(a)(10), 715(f) and EPTL § 8-1.9(c)(4)
### (Against Defendant NRA)

626.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 625 above as though fully set forth herein.

627.    Pursuant to N-PCL § 112(a)(10), the Attorney General may bring an action to "enjoin, void or rescind any related party transaction, seek damages and other appropriate remedies, in law or equity."

628.    N-PCL § 715 and EPTL § 8-1.9 provide that no corporation shall enter into any related party transaction unless the transaction is determined by the Board or an authorized committee to be fair, reasonable, and in the corporation's best interest at the time of the determination.

629.    Under N-PCL § 715 and EPTL § 8-1.9, every director, trustee, officer, and key employee of the NRA who has an interest in a related party transaction is required to disclose in good faith to the Board or an authorized committee the material facts concerning such interest.

630.    Under N-PCL § 715 and EPTL § 8-1.9, the NRA must conduct a process prior to approving a related party transaction and to contemporaneously document that process. For related party transactions that were not subject to advance approval, N-PCL § 715 and EPTL § 8-1.9 require that the NRA conduct a process for ratification of the transaction, to contemporaneously document in writing the nature of the violations of N-PCL § 715 and EPTL 8-1.9, and to put in place procedures to ensure that the NRA complies with the statutory requirements governing related party transactions in the future. For the related party transactions described in this complaint, the processes required by N-PCL § 715 and EPTL § 8-1.9 were not followed prior to

Appx. 157

entering the transaction, or in an effort to ratify the transaction, and each such transaction violated these provisions, and was not reasonable and in the best interests of the NRA.

631.     The NRA entered into numerous unlawful related party transactions in violation of N-PCL § 715 and EPTL § 8-1.9, including those detailed above. These transactions were outside of the NRA's authorized corporate purposes.

632.     The Court should enjoin, void or rescind the unlawful related party transactions, and award damages and such other appropriate remedies, in law or equity to ensure compliance with the requirements of the law.

## FIFTEENTH CAUSE OF ACTION
### Violation of the Whistleblower Protections of N-PCL § 715-b and EPTL § 8-1.9
### (Against Defendant NRA)

633.     The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 632 above as though fully set forth herein.

634.     N-PCL § 715-b and EPTL § 8-1.9(e) require that the NRA adopt and maintain a policy protecting whistleblowers, and providing that no director, officer, trustee, employee or volunteer of the corporation who in good faith reports any action or suspected action taken by the corporation that is illegal, fraudulent, or in violation of any adopted policy of the corporation shall suffer, intimidation, harassment, discrimination, or other retaliation.

635.     N-PCL § 715-b and EPTL § 8-1.9(e) require that a trustee, director, officer, or employee be designated by the NRA to administer the whistleblower policy and to report to the Audit Committee.

636.     The NRA did not adopt a policy protecting whistleblowers as required. Although the NRA had a purported policy, the NRA and its officers and directors did not comply with the policy. In fact, whistleblowers were harassed and retaliated against. Board members who raised

issues covered by the policy suffered intimidation, harassment, discrimination, or other retaliation, including attempted revocation of NRA membership. Defendant Powell retaliated against suspected whistleblowers. Defendant Frazer failed to perform his responsibilities as the dedicated employee with responsibility for whistleblower reporting. Defendant LaPierre retaliated against directors, including Dissident No.1, who raised issues covered by the policy, by opposing their reelection or by stripping them of committee assignments. The Audit Committee failed to make any record or take any action responding to whistleblower concerns.

637.    The Attorney General seeks removal for cause of each officer, director, and trustee who violated the whistleblower policy required by N-PCL § 715-b and EPTL § 8-1.9.

## SIXTEENTH CAUSE OF ACTION
### For Breach of NYPMIFA, Article 5-A of the N-PCL
#### (Against Defendant NRA)

638.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 637 above as though fully set forth herein.

639.    Pursuant to Article 5-A of the N-PCL Prudent Management of Institutional Funds Act ("NYPMIFA"), "each person responsible for managing and investing an institutional fund shall manage and invest the fund in good faith and with the care an ordinarily prudent person in a like position would exercise under similar circumstances." N-PCL § 552. Pursuant to Section 557 of the N-PCL, NYPMIFA applied to all institutional funds in existence at the time of its enactment. NYPMIFA, in Section 551 of the N-PCL, defines an institutional fund to include any funds held by a charity, but excludes program-related assets, such as real property owned by a charity that is used for its operations (and not as an investment).

640.    The NRA is an "institution" as that term is used in NYPMIFA and holds and manages "institutional funds" as that term is used in NYPMIFA.

154

Appx. 159

641.     As set discussed above, the NRA has failed to manage its institutional funds in accordance with the standards set forth in Section 552 of NYPMIFA.

642.     The failure of the NRA to perform its duties under NYPMIFA, as described here, requires that this Court enter an appropriate order to secure the proper administration of these charitable funds, and to order an accounting by the NRA and appropriate officers, directors or key employees for their official conduct with respect to institutional funds.

## SEVENTEENTH CAUSE OF ACTION
### For False Filings Under Executive Law §§ 172-d(1) and 175(2)(d)
### (Against Defendant NRA and Frazer)

643.     The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 642 above as though fully set forth herein.

644.     The NRA made materially false and misleading statements and omissions in the annual reports the organization filed with the Attorney General. Defendant Frazer signed and certified such reports notwithstanding the number of falsehoods therein, of which he was or should have been aware.

645.     As a result, the NRA and Frazer violated Section 172-d(1) of the Executive Law and, pursuant to Section 175(2)(d) of the Executive Law should be enjoined from soliciting or collecting funds on behalf of any charitable organization operating in this State and Frazer should be enjoined from serving as an officer, director or trustee of any not-for-profit or charitable organization incorporated or authorized to conduct business in the State of New York.

## EIGHTEENTH CAUSE OF ACTION
### For Unjust Enrichment Derivatively in Favor of the NRA Under
### N-PCL § 623 and common law
### (Against LaPierre, Phillips, Frazer and Powell)

646.     The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 645 above as though fully set forth herein.

Appx. 160

647.    Under N-PCL § 112(a)(7), the Attorney General may bring an action to enforce any right given under the N-PCL to members of the Corporation.

648.    Under N-PCL § 623, the Attorney General may bring an action to enforce rights given to members of the corporation to procure a judgment in favor of the Corporation. The Attorney General, acting as a member pursuant to N-PCL § 623, may call upon the Board to secure the initiation of an action by the Board of the corporation on behalf of the corporation.

649.    Acting pursuant to her authority under N-PCL § 623, the Attorney General initiates this action pursuant to N-PCL § 515, on behalf of the NRA and against Defendants LaPierre, Phillips, Frazer, and Powell for the illegal conduct set forth in this Complaint, including conduct set forth in N-PCL § 720(a).

650.    This unjust enrichment claim seeks to recover excessive, unreasonable, and/or unauthorized compensation to Defendants LaPierre, Phillips, Frazer, and Powell, as well as payments or reimbursements to them made in violation of IRS requirements and NRA bylaws and policy.

651.    Defendants LaPierre, Phillips, Frazer, and Powell were "disqualified persons" as that term is used in the Internal Revenue Code. Each received payments in excess of reasonable compensation from the NRA.

652.    Under Internal Revenue Code Section 4958, "disqualified persons" in a 501 (c)(4) organization who participate in an "excess benefit" transaction are subject to a federal excise tax. The tax on the disqualified person is 25% of the "excess benefit." A tax will also be imposed on an "organization manager" who participated in the excess benefit transaction.

653.    Under the Internal Revenue Code Section 4958, the term "disqualified person" means, with respect to any transaction— (a) any person who was, at any time during the 5-year

Appx. 161

period ending on the date of such transaction, in a position to exercise substantial influence over the affairs of the organization. Defendants LaPierre, Phillips, and Frazer were at all relevant times between 2015 and the present date, disqualified persons under Section 4958. Defendant Powell has been a disqualified person under Section 4958 at least since July 2016, and continues to be a disqualified person.

654.    Payments or reimbursements of travel and entertainment expenses which are not made pursuant to an accountable plan are reportable and treated by the IRS as taxable income. Upon information and belief, a substantial portion of the travel expenses for defendants LaPierre, Phillips, and Powell were not made pursuant to an accountable plan.

655.    Under Section 53-4958-4 of the Internal Revenue Service regulations, amounts paid for travel and entertainment for a disqualified person other than under an accountable plan as that term is used in IRS Publication 463, and the reimbursements or payments to disqualified persons that are not based upon written contemporaneous substantiation are to be treated as automatic "excess benefit transactions" by the Internal Revenue Service. IRS Regulation 53.4958-4(c)(1). In equity and in law, a disqualified person may not receive or retain the proceeds of excess benefits transactions.

656.    The excise tax is due, and the excise tax return must be filed by the organization and each disqualified person owing the tax, whenever an excess benefit is provided by the organization, directly or indirectly to, or for the use of, any disqualified person.

657.    Schedule I of Form IRS 4720 requires reporting of the excess benefit transaction and computation of the tax liability due, a signature under penalty of perjury, and payment of the amount of the excise tax due to the IRS. Defendants were required to file Form 4720 and pay the excise tax due by May 15 following the completion of the calendar year.

Appx. 162

658. For each year 2015 to 2018, the NRA represented in response to IRS 990 question 25(a) of Part IV that it was not a party to an excess benefit transaction during the year. Each such representation was false. Plaintiff alleges, upon information and belief, that neither the NRA nor any of Defendants LaPierre, Powell, Phillips, or Frazer filed forms 4720 nor paid the excise tax due on excess benefit transactions.

659. Defendants LaPierre, Phillips, Powell, and Frazer received illegal compensation by causing the NRA to pay, or permitting themselves to receive, compensation or reimbursements in excess of amounts permitted by law or by the bylaws and policies of the NRA.

660. Defendants LaPierre, Phillips, Powell, and Frazer obtained a benefit that in equity and good conscience should be paid to the NRA.

661. As the result of compensation, including salary, bonuses, expense payments, reimbursements and other benefits, which were paid in violation of law and NRA bylaws and policies, Defendants LaPierre, Phillips, Powell, and Frazer were unjustly enriched.

662. The Attorney General brings this derivative action on behalf of the NRA against Defendants LaPierre, Phillips, Frazer, and Powell to recover excessive, unreasonable compensation and excess benefits.

663. The Attorney General represents and avers that making demand upon the NRA Board for the initiation of an action by the Board for the benefit of the NRA would be futile, as that term is used in Section 623 of the N-PCL based upon the following facts:

a. The Board of Directors and its committees did not fully inform themselves about the challenged transactions to the extent reasonably appropriate under the circumstances. These failures to obtain information about the transactions included:

i. The failure to inquire into excessive and inappropriate payments to or on behalf of Defendant LaPierre, and his family members, even after notice of allegations

158

Appx. 163

of such payments in media reports, complaints from some NRA board members, complaints from NRA members, and complaints from NRA employees;

ii.    The failure of the Audit Committee, as set forth in Part Five, Section V to conduct or assure any system of internal controls at the NRA, and the failure of the Board to assure that a system was in place and was being reasonably complied with, including internal controls over payments and expenditures for LaPierre, Phillips, and Powell;

iii.    The failure of the Audit Committee or the Board to address adequately the 2018 memorandum from the NRA Whistleblowers—the Top Concerns Memo—detailing concerns with insider transactions;

iv.    The failure of the OCC to conduct compensation reviews and determinations in the manner described in the NRA's IRS Form 990 reports, as detailed in Part Five, Section III above, the failure of the Board to confirm and document that such reviews and determinations were appropriately conducted and the failure of the Board to set reasonable compensation;

v.    The failure of the NRA Board to address the improper reimbursement of expenses for NRA officers by Ackerman even after being put on notice by the vendor;

vi.    The failure of the NRA Board to address the improper use of credit cards by defendant Phillips even after being put on notice that Phillips had approved improper expenditures on such cards for others;

vii.    The failure to evaluate the necessity for and the lack of oversight of, expenditures made outside the existing contracting and accounts payable process at the discretion of the Director of Security;

viii.    The failure to inquire into the false representations set forth on Schedule J of IRS 990s during 2015 to 2018, concerning written policies and reviews relating to charter travel, travel for companions, and social club dues; and

ix.    The failure to record or report in any minutes of any board committee, or the board itself, of the complaints of the NRA Whistleblowers presented to the Audit Committee in July 2018.

b.    The Board of Directors, including allegedly "independent directors" and the relevant committees of the Board, passively rubberstamped the decisions of the officer-defendants, to the detriment of the NRA. For example:

159

Appx. 164

i.  Defendant LaPierre effectively dominates and controls the Board of Directors as a whole through his control of business, patronage and special payment opportunities for board members, and his public allegations to the NRA membership of a "criminal conspiracy" against board members and officers who question his activities.

ii.  As set forth in Part Five, Section III, the board members and the members of the OCC did nothing to evaluate the full extent of the compensation paid to or on behalf of Defendants LaPierre and Phillips;

iii.  The failure to conduct reviews of related party transactions specifically required by the N-PCL until September 2018, followed by an Audit Committee "review" and approval of all related party transactions before them, with minimal inquiry or detail;

iv.  The failure of the Board to respond to requests by Dissenter No. 1, as well as the First and Second Vice Presidents for an audit or outside review of the bills submitted and compensation paid to its primary outside law firm; and

v.  The threats and retaliation by the NRA against Dissenter No. 1, including an action to remove him from membership in the NRA, based upon his requesting an audit or review of the outside law firm payments.

664.  The allegations of this complaint involve wrongdoing of substantial magnitude and duration.

665.  The NRA exceeded the scope of its authority pursuant to N-PCL § 202, and violated N-PCL§ 515, by paying compensation to officers LaPierre, Phillips, Frazer and Powell, in excess of a reasonable amount during the periods of time and for the reasons detailed in the preceding paragraphs.

666.  Accordingly, this Court should require Defendants LaPierre, Phillips, Frazer and Powell to repay to the NRA all excessive, unreasonable, and/or unauthorized compensation paid to them, as well as payments or reimbursements to them made in violation of IRS requirements and the NRA's bylaws, policy and procedures, and/or without the authorizations required by the NRA's bylaws, policy, and procedures.

## PRAYER FOR RELIEF

WHEREFORE, the Attorney General requests judgment against the Defendants for the following relief:

A.    Dissolving the NRA and directing that its remaining assets and any future assets be applied to charitable uses consistent with the mission set forth in the NRA's certificate of incorporation pursuant to <u>N-PCL §§ 112(a)(1), 112(a)(5), 112(a)(7), 1101(a)(2), 1102(a)(2)(D) and 1109.</u>

B.    Declaring that the NRA has exceeded the authority conferred upon it by law, has carried on, conducted, or transacted its business in a persistently fraudulent or illegal manner, or has abused its powers contrary to the public policy of the State of New York, and determining, in the court's discretion, that it is in the interest of the public to dissolve the NRA pursuant to <u>N-PCL §§ 112(a)(1), 112(a)(5), 1101(a)(2), 1109, and C.P.L.R. § 3001</u>;

C.    Declaring that directors or members in control of the NRA have looted or wasted the NRA's charitable assets, have perpetuated the corporation solely for their personal benefit, or have otherwise acted in an illegal, oppressive or fraudulent manner, and determining, in the court's discretion, that it is in the interest of the members to dissolve the NRA pursuant <u>to N-PCL §§ 112(a)(7), 1102(a)(2)(D), 1109 and C.P.L.R. § 3001</u>;

D.    Removing LaPierre for cause from his position as Executive Vice President of the NRA, and permanently barring his re-election or appointment as an NRA officer or director pursuant to <u>N-PCL §§ 706(d), 714(c), and 717 and EPTL §8-1.4</u>;

E.    Removing Frazer for cause from his position as General Counsel and Secretary of the NRA, and permanently barring his re-election or appointment as an NRA officer or director pursuant to N-PCL <u>§§ 706(d), 714(c), and 717, EPTL § 8-1.4, and Executive</u>

161

Appx. 166

Law § 175(2)(d);

F.     Permanently barring the Individual Defendants from serving as officers, directors, or trustees of any not-for-profit or charitable organization incorporated or authorized to conduct business or solicit charitable donations in the State of New York pursuant to EPTL §8-1.4;

G.     Directing the Individual Defendants to account for their conduct in failing to perform their duties in managing the NRA's charitable assets; to pay full restitution to the NRA for the waste and misuse of its charitable assets, including the return of salary received while breaching their fiduciary duties to the NRA, plus interest at the statutory rate; and to pay damages to the NRA arising from the breach of fiduciary duties pursuant to N-PCL §§ 720 and EPTL §8-1.4;

H.     Enjoining, voiding or rescinding the related party transactions entered into or proposed by Defendants; directing the Individual Defendants to account for profits made from and the value of charitable assets used in those transactions, to the extent not already paid; and due to their willful and intentional conduct as alleged, directing the Individual Defendants to pay the NRA an amount up to double the value of each benefit improperly bestowed by such transactions occurring after July 1, 2014 pursuant to pursuant to N-PCL §§ 112(a)(10), 715(f) and EPTL § 8-1.9(c)(4);

I.     Enjoining the NRA and Frazer from soliciting or collecting funds on behalf of any charitable organization operating in this State pursuant to Executive Law § 175(2)(d);

J.     Directing the Individual Defendants to pay the NRA restitution for all excessive, unreasonable, and excess benefits that were paid to and unjustly enriched the Individual Defendants in violation of law and NRA bylaws and policies;

162

Appx. 167

K.   Directing the NRA, through its governing Board of Directors, to provide an accounting for its official conduct with respect to the NRA's institutional funds pursuant to N-PCL § 552; and

L.   Granting such other and further relief as the Court deems just and proper.

Dated:      New York, New York
            August 6, 2020

                                   LETITIA JAMES
                                   Attorney General of the
                                   State of New York

                           By: _____
                                   James Sheehan
                                   Charities Bureau Chief
                                   28 Liberty Street
                                   New York, New York 10005
                                   Tel. (212) 416-8401

JENNIFER LEVY, *First Deputy Attorney General*
MEGHAN FAUX, *Chief Deputy Attorney General for Social Justice*
EMILY STERN, *Co-Chief of Enforcement Section, Charities Bureau*

*Of Counsel*

163

## VERIFICATION

STATE OF NEW YORK    )
                     ) ss.
COUNTY OF NEW YORK )

JAMES SHEEHAN, being duly sworn, deposes and says:

I am an Assistant Attorney General in the office of Letitia James, Attorney General of the State of New York (the "Attorney General"). I am duly authorized to make this verification.

I have read the foregoing complaint and am acquainted with the facts alleged therein based on the Attorney General's investigation of the transactions upon which the complaint is based, the annual filings and other reports made by the National Rifle Association of America, Inc. with the Charities Bureau of the Attorney General's office, and the investigative materials contained in the files of the Attorney General's office. To my knowledge based on such acquaintance with the facts, the complaint is true, except as to those allegations made upon information and belief, and as to those allegations, I believe them to be true.

The reason this verification is not made by plaintiff is that plaintiff is a body politic and the Attorney General is its duly authorized representative.

_James B. Sheehan_
James Sheehan
Charities Bureau Chief

NOTARY PUBLIC

_Roxanne E. Wild_

Sworn to before me this
10th day of August, 2020

ROXANNE E. WILD
NOTARY PUBLIC, STATE OF NEW YORK
NO. 02WI6378871
QUALIFIED IN NEW YORK COUNTY
MY COMMISSION EXPIRES AUG. 6, 2022

*[handwritten notes:]* Audio - Video
8/10/2020 4:44 pm
ID - Known tone.
JS: Albany County
REW: NY County

Verification on NRA complaint.

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM   INDEX NO. 451625/2020
NYSCEF DOC. NO.: 220   Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21   Entered 02/12/21 16:34:29   Page 172 of   RECEIVED NYSCEF: 02/03/2021
461

1

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK - CIVIL TERM - PART 3
 2   - - - - - - - - - - - - - - - - - - - -X

 3    PEOPLE OF THE STATE OF NEW YORK, BY LETITIA
      JAMES, ATTORNEY GENERAL OF THE STATE OF NEW
 4    YORK,
                                            INDEX
 5                    Plaintiff,            NUMBER:
                                            451625/2020
 6    v.

 7    THE NATIONAL RIFLE ASSOCIATION OF AMERICA,
      INC., WAYNE LAPIERRE, WILSON PHILLIPS, JOHN
 8    FRAZER, and JOSHUA POWELL,

 9                    Defendants.
     - - - - - - - - - - - - - - - - - - - -X

10
                                 Teams Meeting
11    Motions                    New York, New York
                                 January 21, 2021
12

13   B E F O R E :

14         HON. JOEL M. COHEN, J.S.C.

15
     A P P E A R A N C E S :
16
           NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
17         Attorneys for the Plaintiff
           28 Liberty Street
18         New York, New York  10005
           BY: JAMES SHEEHAN, ESQ.
19             EMILY STERN, ESQ.
               JONATHAN CONLEY, ESQ.
20             MONICA CONNELL, ESQ.

21         BREWER, ATTORNEYS AND COUNSELORS
           Attorneys for the Defendant - NRA
22         750 Lexington Avenue, `14th Floor
           New York, New York  10022
23         BY:  SARAH B. ROGERS, ESQ.
                JENNIFER BLECHER, ESQ.
24
     (Continues)
25
```

cb

Appx. 170

```
 1   A P P E A R A N C E S: (Continued)

 2         CORRELL LAW GROUP
           Attorneys for the Defendant - W. LaPierre
 3         250 Park Avenue - 7th Floor
           New York, New York  10177
 4         BY:  P. KENT CORRELL, ESQ.

 5         GAGE SPENCER & FLEMING
           Attorneys for the Defendant - J. Frazer
 6         410 Park Avenue, Suite 810
           New York, New York  10022
 7         BY:  WILLIAM B. FLEMING, ESQ.

 8         WINSTON & STRAWN LLP
           Attorneys for the Defendant - W. Phillips
 9         Met Life Building
           200 Park Avenue
10         New York, New York 10166
           BY:  SETH FARBER, ESQ.
11              MARK WERBNER, ESQ.

12

13

14

15

16
                              CAROLYN BARNA
17                            SENIOR COURT REPORTER

18

19

20

21

22

23

24

25
                        cb
```

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM
INDEX NO. 451625/2020
NYSCEF DOC. NO. 220
RECEIVED NYSCEF: 02/03/2021

Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 174 of
461

3

Proceedings

1

2          THE COURT:  Counsel, I'd like to take appearances,

3    beginning with the plaintiff.

4          MR. SHEEHAN:  This is Jim Sheehan, Chief of the

5    Charities Bureau, Assistant Attorney General.

6              Thank you for having the hearing today.

7          MS. STERN:  Good morning, your Honor.

8              This is Emily Stern, Assistant Attorney General and

9    Co-Section Chief of the Enforcement Section of the Charities

10   Bureau.

11         THE COURT:  Good morning.

12         MR. CONLEY:  Good morning, your Honor.

13             This is Jonathan Conley, Assistant Attorney

14   General, with the New York State Attorney General's Office.

15         THE COURT:  Good morning.

16         MS. CONNELL:  Good morning, your Honor.

17             Monica Connell, Assistant Attorney General, Special

18   Counsel for the plaintiff.  Thank you.

19         THE COURT:  Good morning.

20             And who is going to be the principal spokesperson

21   for the State this morning?

22         MR. CONLEY:  Your Honor, Jonathan Conley.  I'll be

23   handling the argument today.

24         THE COURT:  Okay.

25             Your video doesn't seem to be operating, which will

cb

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM          INDEX NO. 451625/2020

NYSCEF DOC. NO. 220          Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21   Entered 02/12/21 16:34:29   Page 175 of          RECEIVED NYSCEF: 02/03/2021

461

4

Proceedings

1     make it a little difficult for the court reporters.

2          Anybody else see Mr. Conley or is it just me?

3          THE COURT REPORTER:  I don't see him, Judge.

4          MR. SHEEHAN:  We can see him.

5          MS. CONNELL:  Your Honor, this is Monica Connell.

6     We saw him by video until a second ago and now I see just a

7     picture.

8          THE COURT:  In the meantime, let's take appearances

9     for the defendant, starting with the NRA.

10         MS. ROGERS:  Good morning.

11         This is Sarah Rogers.  I'm appearing today on

12    behalf of the defendant, The National Rifle Association.

13         I'm joined by my colleague, who you may also be

14    able to see to my left, Jennifer Blecher.

15         MS. BLECHER:  Good morning, your Honor.

16         THE COURT:  Good morning.

17         MS. ROGERS:  And we are also joined separately by

18    counsel for Mr. LaPierre, who will make his appearance.

19         MR. CORRELL:  Your Honor, Kent Correll, for Wayne

20    LaPierre.

21         THE COURT:  Good morning.

22         MR. FLEMING:  Your Honor, William Fleming, for

23    defendant John Frazer.

24         THE COURT:  Good morning, Mr. Fleming.

25         MR. FLEMING:  Good morning.

cb

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM          INDEX NO. 451625/2020
NYSCEF DOC. NO.: 220     Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21   Entered 02/12/21 16:34:29   Page 176 of          RECEIVED NYSCEF: 02/03/2021
461

5

Proceedings

1              MR. FARBER:  Good morning, your Honor.  Seth Farber

2    from Winston & Strawn.

3              I'm joined by my colleague Mark Werbner, who is

4    also on separately from Winston & Strawn, on behalf of

5    defendant Wilson Phillips.

6              THE COURT:  Okay.

7              Mr. Farber, you cut out a little bit.

8              MR. FARBER:  Is this better?

9              THE COURT:  Yes.

10             MR. FARBER:  What I was saying, Seth Farber from

11   Winston & Strawn.

12             Also on separately is my colleague Mark Werbner

13   from Winston and Strawn, for the defendant Wilson Phillips.

14             THE COURT:  Okay.

15             Anyone else?  I hear some echos which is par for

16   the course today so far.  Let's see how we do.

17             Good morning, everyone.

18             Before turning to the motions on the agenda today,

19   I want to address briefly the NRA's Notice of Bankruptcy on

20   Friday.  I asked the parties to submit their views on the

21   impact of the bankruptcy filing on the issues to be decided

22   at the hearing, which they did by letter yesterday.

23             The Attorney General takes the position that

24   although bankruptcy filings usually require that any

25   lawsuits against the debtor be stayed, this case is covered

cb

Appx. 174

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM    INDEX NO. 451625/2020

NYSCEF DOC. NO. 220    Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21    Entered 02/12/21 16:34:29    Page 177 of    RECEIVED NYSCEF: 02/03/2021

461

6

Proceedings

1    by statutory exception to that rule because it is an action

2    by a governmental entity to enforce police or regulatory

3    powers.

4         The NRA stated it had no objection to proceeding

5    with this hearing today, but took no immediate position with

6    respect to the bankruptcy stay and, instead, reserved the

7    right to seek further orders from the Bankruptcy Court at a

8    later date.  The other defendants conveyed similar

9    positions.

10        So, with that, I will proceed with the argument on

11    the pending motions.  I will say that I would not be

12    proceeding unless I was comfortable, based on my own

13    research, that there were reasonable grounds for doing so

14    under federal law.

15        As you know, both federal and New York courts have

16    found that state courts have authority to determine the

17    applicability of a bankruptcy stay to cases that are pending

18    before them.  It is not the exclusive province of the

19    Bankruptcy Court.

20        With that introduction, let's proceed.  I would

21    like to follow this agenda to keep things organized.  Rather

22    than doing all of the motions in series for the parties and

23    then responses, I'd like to break it into two.

24        The first part would be the venue, the statutory

25    venue motion, which, to me, is a statutory argument that

cb

Appx. 175

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM    INDEX NO. 451625/2020
NYSCEF DOC. NO.: 220    Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21    Entered 02/12/21 16:34:29    Page 178 of    RECEIVED NYSCEF: 02/03/2021
461

7

Proceedings

1    dismissal or transfer to Albany is mandated by statute, and

2    then have the back and forth on that.

3         And then turn to the second set of grounds which

4    are discretionary grounds for dismissing or staying the case

5    because of, among other things, the pendency of other

6    litigation in Albany.

7         So, if we can do it that way, I would appreciate

8    it.

9         So, given that these are the defendants' motions,

10   Ms. Rogers, I don't know if you want to go first, if we can

11   start with the statutory venue motion.

12         MS. ROGERS:  Thank you, your Honor.

13         I believe I am unmuted, so can everyone hear me?

14         THE COURT:  I can.

15         MS. ROGERS:  Thank you very much.

16         So, let's start with venue.  We agree that's the

17   appropriate place to start because, as courts have held,

18   once you determine that the case is in the wrong court, all

19   remaining substantive issues go to the correct court.  And

20   this case is in the wrong court.

21         Now, given the choice of where to commence its

22   capital case against this particular political target, it's

23   no surprise that the Attorney General would prefer

24   Manhattan, but they're not given that choice.  And, in fact,

25   the statutory scheme that made this lawsuit possible takes

cb

Appx. 176

Proceedings

1     that choice away.

2          So, it was a deliberate choice by the New York

3     State Legislature to depart from the parallel statutory

4     scheme of the General Corporation Law which grants the

5     Attorney General broad discretion as to where to venue a

6     dissolution case.

7          Instead, the mandatory venue for a dissolution case

8     under the N-CPL is prescribed in N-CPL 1110 and it's very

9     simple and it's very discrete.  And there's a verbatim

10    definition that I will read that we've set forth in our

11    papers.

12         So, this action has to venued in the judicial

13    district in which the office of the corporation is located.

14    And according to the definition section of the same statute,

15    the term office means the office, the location of which is

16    stated in the Certificate of Incorporation.

17         That's very simple.  That's very black and white

18    language.  It does not call for a Gestalt contacts analysis;

19    a principal place of business analysis.  The question is,

20    you look at the Certificate of Incorporation, which is

21    defined to include amendments thereto, and you identify the

22    office stated therein.

23         If you look at the NRA's Certificate of

24    Incorporation, the only office stated therein is 80 State

25    Street in Albany.  Now, when we raised this challenge, the

cb

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM    INDEX NO. 451625/2020
NYSCEF DOC. NO. 220    Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21   Entered 02/12/21 16:34:29   Page 180 of    RECEIVED NYSCEF: 02/03/2021
461

9

Proceedings

1    Attorney General responded with a number of, you know,

2    creative defenses of the New York county venue, which I will

3    get to in a moment, but you can tell that they likewise

4    acknowledge the sort of mandatory black and white language

5    of this venue prescription because in their complaint they

6    verified under penalty of perjury in paragraph 26, they

7    allege that venue is proper because:

8        "The office of the NRA is in New York county as set

9    forth in the Certificate of Incorporation."

10       But there is no office of the NRA in New York

11   county set forth in the Certificate of Incorporation.  The

12   Attorney General knew that was a mandatory condition for

13   venuing the case here, that's why they made that verified

14   allegation, but that verified allegation is inaccurate.

15       Now, this isn't a mere technicality.  It is an

16   important substantive right that the legislature chose to

17   confer on not-for-profit corporations when it drafted N-PCL

18   1110.  If you're a nonprofit and you are fighting for your

19   very existence, you have the right to have that fight in the

20   backyard that you chose.  The location that you inscribed in

21   your formation documents.

22       Now, admittedly, this case is a bit unique because

23   if you form a nonprofit in New York nowadays, the statute

24   requires a newly filed Certificate of Incorporation

25   designate both an office location and a registered agent.

cb

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM          INDEX NO. 451625/2020
NYSCEF DOC. NO. 220          Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21   Entered 02/12/21 16:34:29   Page 181 of
461          RECEIVED NYSCEF: 02/03/2021

10

Proceedings

1    But because the NRA was formed so early, so early on in the

2    course of New York Corporate Law, there was no such

3    requirement.

4         So, when the NRA lodged a Certificate of

5    Incorporation with the Secretary of State in Albany, it did

6    not designate an office location.  It certainly did not

7    designate one in Manhattan.  And, over subsequent years,

8    although the statute evolved to require a more specific

9    designation, that requirement was never retroactive.

10        Now, the response to this from the Attorney

11   General, I will characterize, is three-fold.  The first

12   argument, as I see it, is that you sort of acted like a New

13   York county corporation, even if you didn't designate a New

14   York office in your certificate as the statute requires.

15        So, for example, in 1871, when the founders of the

16   NRA who, by the way, were military men stationed by the

17   government that would later try to dissolve their

18   organization, that happened to be in Manhattan and the

19   signatures from a judge in Manhattan, the Attorney General

20   argues that you were an active New York City corporation

21   then, so you're a New York City corporation now.

22        The Attorney General further argues that because

23   the NRA had continued to lodge copies of items that it filed

24   over the years such as amendments in New York county, it

25   acted like a New York county corporation so there must be a

cb

Appx. 179

Proceedings

1    constructive office here, even if there is not an actual

2    office here.

3           But none of the conducts that the Attorney General

4    alleges amounts to a waiver by the NRA of its crucial

5    substantive right to face and fight dissolution in the

6    judicial district it chose and it inscribed on its governing

7    document.

8           The waiver of that right would have to be a known

9    relinquishment, that's black letter law.  And that's not

10   what any of this amounts to.  The Attorney General cannot

11   allege that we've waived this right and established some

12   illusory office in New York county.

13          And if we have, then my question for the Attorney

14   General would be okay, you have alleged in your verified

15   complaint that "The office of the NRA is in New York

16   county", so where is that office?  If you want to serve us

17   with dissolution papers, where do you bring them?  If you

18   want to send us mail, where do you send it?

19          There is literally no office in New York county,

20   certainly none designated on the Certificate of

21   Incorporation or any prior iterations of it.

22          And we have filed with the Court as exhibits to our

23   motion papers an exhaustive record of all of the documents

24   lodged with the Secretary of State by the NRA since the

25   NRA's initial formation in 1871.  There's never been an

cb

Appx. 180

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM    INDEX NO. 451625/2020

NYSCEF DOC. NO. 220    Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21    Entered 02/12/21 16:34:29    Page 183 of    RECEIVED NYSCEF: 02/03/2021

461

12

Proceedings

1    address in New York county designated.  By the plain terms

2    of the statute, venue is improper in New York county.

3         Another cluster argument the Attorney General makes

4    essentially is that, you know, there are other claims in

5    this case, too.  So, even if there is a statutory mandatory

6    venue for dissolution action in Albany or the Third Judicial

7    District, they have also lodged claims against certain

8    individual defendants, current and former executives, and

9    those who form flexible venue under CPLR 503, and where

10    there are conflicting venue provisions, the Attorney General

11    gets more leeway.

12         The problem with that argument is that every single

13    shred of authority on which the Attorney General relies

14    involves cases where there is a genuine conflict in venue.

15    For example, you have a case brought, you get two claims

16    brought simultaneously, one could only have been brought in

17    New York county, one could have only been brought in Albany

18    County, there is no conflict here.

19         The Attorney General concedes it is a resident of

20    any county, so unless there is a narrower statutory

21    prescription as here, the Attorney General could have

22    brought these claims anywhere it liked.  And it could bring

23    its claims against the individual defendants in the Third

24    Judicial District where the dissolution claim belongs.

25         So, we think that that dispatches with the argument

cb

Appx. 181

Proceedings

1    about conflicting venue and how even throwing in additional

2    claims lets you bring dissolution in New York county, but

3    we're certainly happy to discuss that further if the Court

4    would like.

5            THE COURT:  Let me ask you a question.

6            Let's assume, hypothetically, you know, the

7    organization was formed in 1871 and then there was not a

8    single piece of paper filed from then until now, where would

9    venue be appropriate?

10           MS. ROGERS:  That's an interesting hypothetical.

11   Fortunately, not the one before this Court.  By the terms of

12   the statute, venue would be appropriate at the office stated

13   on the Certificate of Incorporation.

14           THE COURT:  By definition there isn't one, so then

15   what happens?

16           MS. ROGERS:  So, my recommendation would be, your

17   Honor, that you treat the NRA as sort of the way you would

18   treat a nonresident or a corporation that does not have an

19   office in the state.  That seems to be the closest analog in

20   that hypothetical.

21           THE COURT:  And the result of that would be that

22   the State Attorney General could sue in any county it wanted

23   to; correct?

24           MS. ROGERS:  Well, or as in the *Gilinsky* case that

25   we cite in our reply is that you revert to the place where

cb

Appx. 182

Proceedings

1      the registered agent is.

2            But I understand in your hypothetical --

3            THE COURT:  In other words, if there is no "office

4      of the corporation", you just revert back to the regular

5      venue statute; correct?

6            MS. ROGERS:  I think the reason you can't revert

7      back to 503 is that by the terms of the CPLR and controlling

8      Court of Appeals authority, the narrower prescriptive

9      statute that overlays and supersedes 503 has to be given

10     deference.

11           THE COURT:  I know, but right now I'm hypothesizing

12     that there is no office of the corporation.  And so the way

13     I look at 503 is it tells you where the venue is, unless

14     another venue is prescribed by law.

15           So, what I'm getting at is, if there is no office

16     of the corporation, therefore, the other statue doesn't seem

17     to apply, then, the regular venue rules would apply.

18           I recognize we're going to get to the next question

19     I have for you which is to talk about what happened in the

20     150 years, but just analytically, if there is no office of

21     the corporation, it seems to me that you're back to the

22     regular venue statute.

23           MS. ROGERS:  Analytically, if the NRA had never

24     amended a Certificate of Incorporation to contain an

25     address, then I think that approach could be viable.

cb

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM          INDEX NO. 451625/2020

NYSCEF DOC. NO. 220    Case 21-30085-hdn11 Doc 156-1 Filed 02/12/21   Entered 02/12/21 16:34:29   Page 186 of   RECEIVED NYSCEF: 02/03/2021
461

15

Proceedings

1            THE COURT:  Let's talk about the evidence that you

2      pointed to.  I think you started with that there is an

3      office designated in Albany.  Why don't you just walk

4      through what that evidence is.

5            MS. ROGERS:  Certainly.

6            So, I apologize, your Honor, I don't recall which

7      exhibit it is, but I would be happy to pull it up.  We

8      filed, in connection with our transfer motion, copies of all

9      of the documents we've lodged for the Secretary of State

10     over the years.

11           One of those, which if memory serves, was lodged in

12     1985, designates the address of 80 State Street in Albany --

13     sorry, in 2002, your Honor.  It designated the State Street

14     address for two separate purposes; that is the address of

15     the registered agent and the address for mailing documents

16     which are technically distinctive categories under the

17     statute at that time.  But that is, you know, that is the

18     address that we -- the way the Certificate of Incorporation

19     is defined under the N-PCL, and it's inclusive of amendments

20     and documents.  And I have that document here, your Honor.

21           THE COURT:  I think it's NYSCEF 109; correct?

22           MS. ROGERS:  I believe that is correct.  My copy,

23     unfortunately, doesn't have the stamp on it, but I think

24     that is correct.

25           THE COURT:  Okay.

cb

Appx. 184

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM    INDEX NO. 451625/2020
NYSCEF DOC. NO. 220    Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21   Entered 02/12/21 16:34:29   Page 187 of    RECEIVED NYSCEF: 02/03/2021
461

16

Proceedings

1          And so the document you're talking about, I think

2     it's 29 or so pages in, is the one where an agent for

3     service of process was named; is that correct?

4          MS. ROGERS:  Yes.  There's an agent for service of

5     process named in the 2002 Certificate of Change, that's the

6     official title of the document.

7          And there's two designations made you can see on

8     this document.  We designate a registered agent towards the

9     bottom of the page.  It says destination of registered

10     agent, the corporation, service of company, 80 State Street.

11          And then separately, apart from your registered

12     agent, you have to designate an address where the Secretary

13     of State is supposed to forward documents that are addressed

14     to you.

15          THE COURT:  Above those two, which I'm sure is a

16     question that you're expecting, so the company specifically

17     checked boxes to change the address to forward copies of

18     process, and it specifically checked a box to designate an

19     entity to be the registered agent, but it left blank the box

20     directly above it in which a company is permitted to change

21     the "county location within this state in which the office

22     of the corporation is located", which is the exact statutory

23     definition, that was not checked.

24          So, the Attorney General argues, certainly, there

25     seems to be some force behind that if the NRA intended to

cb

Appx. 185

Proceedings

1    designate an office of the corporation, they could have

2    easily done so, and the fact that it didn't, arguably cuts

3    the other way.

4            MS. ROGERS:  Your Honor, obviously the NRA was not

5    required to designate an office.  Again, this is just a

6    historical anomaly.  If the NRA had been formed five or ten

7    years later, they would have had to designate an office and

8    that office would have been the office, unless we changed it

9    via this form.  But that's not what happened.

10           THE COURT:  Right.  But this is, as I read your

11   papers, the only piece of evidence that you rely on for an

12   Albany address, or a principal one.

13           And, in this one, it very specifically, I think,

14   does not designate an office of the corporation.  So, I

15   don't know how you connect the two because the office of the

16   corporation is a statutory phrase and the only thing that

17   this provision, this form does, is it designates an agent

18   for service of process.  Which, I understand the point that,

19   you know it has its certain meaning, but it's not the words

20   of the statute.

21           MS. ROGERS:  Your Honor, two responses to that.

22   First, it's not technically true that the 2002 Certificate

23   of Change is the only piece of evidence that we're citing.

24           We also filed a Certificate of Amendment in 1985,

25   and that's also an exhibit to our brief.  And in the

cb

Proceedings

1    Certificate of Amendment, paragraph 2 and paragraph 6, we

2    designate the Secretary of State as the agent for service of

3    process which, again, it's the agent for service of process,

4    but the Secretary of State is located in Albany.  There's

5    two separate documents that designate an address in Albany.

6    There are zero documents that designate an address in New

7    York City.

8           Now, the Court may wonder, okay, aren't a

9    registered agent and principal office distinct concepts.

10   And that's ideally true, but we've seen courts, in imperfect

11   situations like this, in the *Gilinsky* case we cite, we've

12   seen them look to the registered agent when there is not a

13   designated principal office.

14          THE COURT:  You are using that word principal

15   office as a careful lawyer because that is a phrase that has

16   some relevance outside of the statutory context in trying to

17   figure other things out for venue.  But I have a statute to

18   apply, so principal office is not the word.  Service of

19   process agent is not the word.  It is "office of the

20   corporation."  So, I don't really understand how those cases

21   are relevant.

22          MS. ROGERS:  Well, your Honor, I think from a

23   straight textual approach, the actual language is, "The

24   office, the location of which is stated in the Certificate

25   of Incorporation."

cb

Proceedings

1              And the Certificate of Incorporation is defined to

2       include amendments like the one that I just cited.

3              So, applying the statute most strictly by plain

4       terms, you first look to the Certificate of Incorporation

5       for an address, for a location that is stated.  And the only

6       location that is stated in any of the documents that

7       comprise our Certificate of Incorporation as defined under

8       the statute is the 80 State Street, Albany address.

9              The statutory framework and the legislature's

10      deliberate choice to depart from the General Corporation Law

11      scheme which gives the AG more discretion as to where to

12      venue a case, but we would argue should guide the Court's

13      interpretation.

14             The NRA is fighting for its very existence.  And to

15      the extent that there's any ambiguity, why not let us fight

16      for our existence in the place we chose, not the place that

17      is sort of constructively construed; not a place where we

18      throw up our hands and say well, this is a historical

19      anomaly so the AG can sue anywhere it wants.

20             Venue is clearly proper in Albany.  It's not

21      clearly proper in New York county.  So, we would urge the

22      Court to sort of vindicate the intent of 1110, which is, you

23      know, not to resort to these other constructs that exist

24      under 503 or that exists under the Business Corporation Law.

25             THE COURT:  Look, you have discretionary arguments

cb

Appx. 188

Proceedings

1      to come, and I get that, but this is not discretionary.  The

2      venue statute says that it's the normal venue unless

3      otherwise prescribed by law.  That is not some judge

4      deciding what, you know, what makes sense.  It's either

5      prescribed by law or it isn't.  It's binary, I think, on

6      this one.

7           There's a discretionary venue argument that you

8      make later, which we'll get to.  You know, I can't straddle

9      here, this one.  This is one or the other.

10          MS. ROGERS:  We agree, your Honor, and we think the

11     most straightforward reading of the text is, is there a

12     venue prescribed by law.  Clearly, yes.  That is the obvious

13     purpose and effect.  And it prescribes a venue as a matter

14     of statute.  What does the statute say?  It says that

15     dissolution can only be brought in the judicial district or

16     the offices.  An office means the location of which is

17     stated in the Certificate of Incorporation.

18          So what the statute prescribes is that this

19     dissolution case can only be brought in the judicial

20     district, the location of which is stated in the Certificate

21     of Incorporation.  There is only one location stated in our

22     Certificate of Incorporation, and that's 80 State Street,

23     Albany.

24          THE COURT:  You were just reading from the

25     statutory definition of the phrase "office of the

cb

Appx. 189

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM
INDEX NO. 451625/2020
NYSCEF DOC. NO. 220
RECEIVED NYSCEF: 02/03/2021

Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 192 of
461

21

Proceedings

1    corporation"; right?

2              MS. ROGERS:  That's correct.  Yes.

3              THE COURT:  And the State gives companies a form to

4    change the office of the corporation.  So, whatever the

5    embedded definition of it is, there was a way to do it, and

6    you didn't.

7              MS. ROGERS:  There would have been a way to be even

8    more explicit about it, but I don't think it changes the

9    straightforward application of the statute.  There is a

10   location stated in the Certificate of Incorporation and

11   that's Albany.

12             THE COURT:  Okay.

13             Anything else on this issue before I turn to the

14   Attorney General?  Do you or any of the other defendants

15   have anything to add?

16             MS. ROGERS:  One moment, your Honor.

17             (Pause in proceedings.)

18             MS. ROGERS:  One additional thing, your Honor.

19             We don't think this ought to be dispositive, but

20   the New York Attorney General in its papers references, you

21   know, if you go to the Secretary of State website, that

22   there are certain menu options you can toggle to produce a

23   New York county address, but -- actually, I'm just going to

24   let my co-defendant counsel address this because he's spent

25   more time on the website than I have.

cb

22

Proceedings

1          MR. CORRELL:  Your Honor, the Certificate of

2     Incorporation is the only document that the Court should be

3     looking at, but if the Court wants the color on that, the

4     Attorney General has put into the record a printout,

5     something that purports to be a printout of the website of

6     the New York State Department of State.

7          And under selected entity address, the selected

8     entity being National Rifle Association, it shows the

9     address 80 State Street, Albany, New York.

10          So, apparently, the New York State Department of

11     State regards the address of the NRA as 80 State Street,

12     Albany, New York and that's -- -

13          THE COURT:  Doesn't the website also -- and I may

14     be confusing things in the record, and I'm sure the Attorney

15     General will correct me, but I thought there was something

16     on the website that you actually disputed because it lists

17     the office of the corporation in New York county.  I may be

18     misremembering.

19          MR. CORRELL:  Your Honor, we dispute the

20     characterization that the Attorney General has put on that

21     document, but they've read a line that says date of, I

22     believe it's the date of filing of the original Certificate

23     of Incorporation, and it's listed as November 20, 1871, and

24     then below that it says county, New York.

25          And the fact is that the original Certificate of

cb

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM
INDEX NO. 451625/2020
NYSCEF DOC. NO. 220
Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 194 of
461
RECEIVED NYSCEF: 02/03/2021

23

Proceedings

1    Incorporation was filed in New York county on November 17,

2    1871, so that date is incorrect.  But the filing in New York

3    county, that's an inference they are trying to draw from

4    those two things which are not, in our view, connected.  I

5    think it's a misreading of the information set forth on the

6    website.

7            THE COURT:  Okay.  I appreciate that.

8            Anything else before I turn to Mr. Conley, whose

9    image has now --

10           MS. ROGERS:  Vanished to me, but if you can see

11    him, your Honor, that's the important part.

12           THE COURT:  I can.  It appears to be somewhat of an

13    aberration.

14           Anyway, as long as Carolyn, can you see Mr. Conley?

15           THE COURT REPORTER:  I can.  Thank you.

16           THE COURT:  All right.

17           Fire away.

18           MR. CONLEY:  Thank you, your Honor.

19           To take a step back, the defendants do not dispute

20    16 of the 18 causes of action asserted in the complaint are

21    properly venued in this court.  The defendants are

22    challenging venue for the two dissolution causes of action

23    which are governed by a separate venue provision and N-PCL

24    1110.

25           Under N-PCL 1110, the proper venue for a

cb

Proceedings

1    dissolution action is in the Supreme Court in the judicial

2    district in which the office of the corporation is located.

3         And for purposes of this statute, the location of

4    the office of the corporation is determined by an

5    organization Certificate of Incorporation.  As we

6    established in our opposition papers, the NRA's office of

7    the corporation is, and has always been, located in New York

8    county.

9         Under the law in effect at the time of its

10   formation, the NRA was required to file a Certificate of

11   Incorporation in the office of the clerk of the county in

12   which the office of such society shall be situated.

13        In accordance with this law, the NRA filed a

14   Certificate of Incorporation in New York county, thereby

15   designating it the county location of its office of the

16   corporation.  The NRA repeatedly reaffirmed that choice in

17   later amendments to its Certificates of Incorporation which

18   were filed in New York county and approved by justices of

19   the First Department.

20        This designation of New York county is also

21   reflected in current Department of State records for the

22   NRA, the accuracy of which the defendants did not dispute in

23   their reply papers.

24        And I do contest a couple of points made about the

25   database records, which I'll get to in a moment.  But, in

cb

Appx. 193

Proceedings

1    any event, venue is a matter of the plaintiff's choice.  And

2    on a motion to change venue, it's the defendant's burden to

3    establish that the plaintiff's choice of venue is improper

4    and that the defendant's choice of venue is proper.  And the

5    defendants have not established either here.

6        They put forth no credible evidence to establish

7    that its office of corporation is in Albany county.  To the

8    contrary, the NRA's incorporations, both its historical and

9    modern, reflected its office of corporation as in New York

10   county.

11       Now, the defendants argue that the NRA has never

12   had a physical office in the State of New York and the venue

13   should, therefore, default to where its registered agent is

14   located in Albany county, but this argument is flawed in

15   several respects.

16       First, the N-PCL expressly states that an entity's

17   office of the corporation is distinct from the physical

18   location where an entity engages in business.  That the NRA

19   never had a physical location in New York has no bearing on

20   venue.

21       Second, the defendant's argument that the NRA was

22   never required to designate a county location for its office

23   of the corporation ignores the legal effect of filing its

24   original certificate in New York county.  The act of filing

25   its incorporation papers in the county where its office was

cb

Proceedings

1    to be located was a condition precedent to the NRA's

2    creation and corporate existence.  It is as essential to its

3    formation as setting out its name and core purposes.

4           THE COURT:  The difficulty -- the difficulty with

5    relying on an 1871 Act or action is that the statute I'm

6    dealing with now didn't exist then and it references a

7    statutory phrase, "office of the corporation", that didn't

8    exist as a statutory definition until later.

9           So, I'm not sure how much value you get out of, you

10   know, the initial thing.  But I understand the point.  It is

11   some piece of evidence.

12          MR. CONLEY:  Yes, your Honor.

13          And, again, in later amendments to its Certificate

14   of Incorporation, the NRA was required to get approvals for

15   changes to amendments to its Certificate of Incorporation by

16   getting approval from justices in the judicial district in

17   which its office was located.  And the NRA got approval for

18   those amendments from justices of the First Department.

19          Also, while the defendants focus a great deal on

20   the location of the NRA's registered agent, they fail to

21   cite to any legal authority that says the location of a

22   corporation's registered agent is relevant, let alone

23   conclusive evidence of where an entity's office of the

24   corporation is located under N-PCL 1110.

25          And, as your Honor noted, if the NRA had wanted to

cb

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM
NYSCEF DOC. NO. 220

INDEX NO. 451625/2020
RECEIVED NYSCEF: 02/03/2021

Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 198 of
461

27

Proceedings

1    change its county location by designating a registered agent

2    in Albany, it could have easily done so. The 2002 form had

3    an option for changing its county location, but the NRA

4    declined to make that change.

5           Since its formation, the NRA has been able to

6    change its county location to wherever it wanted, but never

7    has, instead electing to keep it fixed in New York county.

8           The Attorney General brought this action in New

9    York county because venue is proper here.  All along, the

10   Attorney General has adhered to the statutory venue

11   provision in the N-PCL by bringing and defending its choice

12   to bring dissolution claims here.

13          THE COURT:  Well, let me ask you the same question

14   I asked Ms. Rogers.  What if there is no office of the

15   corporation, you know, it didn't have to have one when it

16   first started, and let's just assume that all of these

17   shreds of evidence that both sides sort of bring up don't

18   really establish an office of the corporation, what do I do

19   then?

20          MR. CONLEY:  Your Honor, under the venue citing

21   provisions in Article 5 of the CPLR, it would be treated

22   like a foreign corporation and venue would be proper in any

23   county that the Attorney General chose.

24          THE COURT:  Okay.

25          Anything else on the venue motion?

cb

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM    INDEX NO. 451625/2020

NYSCEF DOC. NO. 220    Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21   Entered 02/12/21 16:34:29   Page 199 of    RECEIVED NYSCEF: 02/03/2021
461

28

Proceedings

1    MR. CONLEY:  I will just note that the Court can

2    resolve the instant venue motions without determining the

3    location of the office of the corporation.  Even if venue

4    were improper for the two dissolution claims, which they are

5    not, the Court may and should retain this entire action.

6    N-PCL 1110 doesn't deprive this Court over

7    jurisdiction over the dissolution claims.  And in the

8    interest of judicial economy and efficiency, it plainly

9    weighs in favor of retaining this entire case.

10    THE COURT:  That argument I don't understand as

11    well.  I mean, if the statute has a mandatory venue

12    provision for claims A and B, how do I just ignore that?

13    I'm not aware of anything in here that says I have

14    discretion to ignore something that's prescribed by law.

15    MR. CONLEY:  If the Court were to find that the two

16    dissolution claims were improperly venued, the Court may

17    still find that because of the other 16 of 18 causes of

18    actions are proper in New York county, the Court does have

19    the ability and the authority to keep the entire action.

20    It's not robbed of jurisdiction as the defendants insinuate.

21    THE COURT:  The cases you cite for this

22    proposition, at least my recollection is all or almost all

23    of them, they did not have a mandatory venue provision that

24    the Court was just sort of riding rough shot over.  This one

25    does.

cb

Appx. 197

Proceedings

1      MR. CONLEY:  I believe the *Tashenberg* decision in

2    the Third Department, your Honor, did involve a dissolution

3    claim.  And in that case it held that if venue was proper

4    for one claim, it's proper for all of them.

5          THE COURT:  Okay.  All right.

6          Why don't I see if Ms. Rogers has anything to add

7    and then she can move on to the other branches of the

8    motion.

9          MS. ROGERS:  Yes, your Honor.  I would like to

10   address the *Tashenberg* case.  This is a 38 year old cursory

11   opinion in another judicial department and it's

12   distinguishable on a number of grounds.

13         THE COURT:  I now have lost your picture, but I can

14   --

15         MS. ROGERS:  Hold on.  Let me see if I can --

16         THE COURT:  I'll do the best I can to imagine it.

17         MS. ROGERS:  I'm here.

18         THE COURT:  Okay.  There you go.

19         MS. ROGERS:  Your Honor, I want to address the

20   *Tashenberg* case because it is the only case that defendant

21   -- I'm sorry, that the plaintiff marshals that you could

22   struggle to construe as being apposite and there are severe

23   flaws in plaintiff's reliance on it.

24         So, *Tashenberg* is a 38 year old cursory opinion in

25   another judicial department.  We actually tried to track

cb

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM
INDEX NO. 451625/2020
NYSCEF DOC. NO. 220
RECEIVED NYSCEF: 02/03/2021

Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 201 of
461

30

Proceedings

1    down the underlying papers and submissions that led to this

2    ruling and we couldn't because the case is so old.

3              In *Tashenberg*, it's important that the Court notes

4    that this is an action by a stockholder, director and

5    officer, so an insider action for dissolution, not an

6    adversarial one by the State, was essentially -- the essence

7    of the case was that it sought various types of relief for

8    the stockholder, director and officer and, therefore, you

9    know, it can be brought in a district where the stockholder,

10   director and officer resides.

11             But that's not the case here.  Here, we are dealing

12   with a statutory mandatory venue provision that, when it was

13   drafted, the legislature made a decision to strip the

14   discretion that the AG would have as for for profit

15   corporations.

16             But the nonprofit corporation, unlike under the

17   General Corporation Law, you can't bring it in any county in

18   which you want.  It has to be the location of the office,

19   the location of which is stated in the Certificate of

20   Incorporation.  That's one reason *Tashenberg* is inapposite.

21             I also want to point to you, this is a case we cite

22   on page 7 of our reply, controlling Court of Appeals

23   authority in *Lazarow, Rettig, & Sundel v. Castle*, and that's

24   at 49 NY2D 508, and that's construing --

25             THE COURT REPORTER:  Excuse me.

cb

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM    INDEX NO. 451625/2020

NYSCEF DOC. NO. 220    Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 202 of    RECEIVED NYSCEF: 02/03/2021

461

31

Proceedings

1    THE COURT:  You faded out a bit.

2    MS. ROGERS:  I'm sorry.

3    The *Lazarow* case, which is controlling Court of

4    Appeals authority, construes a different statutory mandatory

5    venue provision, one applying to banks, but it provides some

6    insight on how the Court of Appeals treats these provisions.

7    They treat them as this protection that is afforded to the

8    entity being sued.

9    The Court of Appeals says in Lazarow:

10    "The rule that an actual bank may only be sued in

11    the district or the county in which it is established was

12    prescribed for the convenience of those institutions and to

13    prevent interruption in their business that might result

14    from their books being sent to distant counties.  The

15    mandatory character of the statute may not be blunted by

16    judicially created exceptions."

17    This is pretty similar.  The N-PCL 1110 was derived

18    very closely from a parallel provision of the General

19    Corporation Law, but the allowance was intentionally

20    narrowed so that a nonprofit could only face the prospect of

21    a corporate death sentence in the judicial district where it

22    identifies where there is an office, the location of which

23    is stated in the Certificate of Incorporation.

24    THE COURT:  Okay.

25    Why don't you move on to the other branches of the

cb

Appx. 200

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM                INDEX NO. 451625/2020

NYSCEF DOC. NO. 220    Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21   Entered 02/12/21 16:34:29   Page 203 of    RECEIVED NYSCEF: 02/03/2021
                                                    461

32

Proceedings

1    motion.

2              MS. ROGERS:  Certainly, your Honor.

3              MR. CORRELL:  Your Honor, if I may address this one

4    narrow point going to *Tashenberg* before we move on.

5              The *Tashenberg* opinion was four sentences long.

6    And saying that it's cryptic is an understatement.  It's

7    really hard to know exactly what the Court was doing there,

8    but the Court did cite Section 503 of the CPLR without

9    quoting the language and without referencing the exception

10   in that provision.

11             And it also cited, I believe, CPLR 502 without

12   acknowledging the limiting language of that provision which

13   specifically limits its application to situations where

14   there is a conflict of provisions under Article 5 of the

15   CPLR.

16             So, our view is that CPLR 502 operates to give the

17   Court discretion to resolve conflicts between venue

18   provisions in Article 5 of the CPLR, but it doesn't give a

19   court discretion to basically ignore a mandatory

20   jurisdiction provision in another statute.

21             And that analysis is consistent with CPLR Section

22   101 which says the CPLR applies except where its procedure

23   is regulated by an inconsistent statute.

24             We don't view the Not-for-Profit Corporation Law as

25   inconsistent with the CPLR.  If you read them properly,

cb

Appx. 201

33

Proceedings

1    they're consistent.  But the Attorney General seems to be

2    reading them in a way that produces a conflict, and if

3    that's so, then they run up against the bar of CPLR 101

4    which is if there is conflict, then the Not-for-Profit

5    Corporation Law preempts the CPLR and takes precedence.

6         On that basis, all of the cases they have relied on

7    are distinguishable in that the parties did not raise those

8    issues and did not cite CPLR Section 101.

9         And there is Supreme Court authority on that point

10   that where a separate statute sets forth a comprehensive

11   procedural scheme, as the not-for-profit corporation does

12   here, that the Court must give precedence to that other

13   scheme.

14        And that's kind of an extension of the old rule

15   that if you have a general statute and a specific statute,

16   the specific one applies, not the general one.

17        THE COURT:  Right.

18        MR. CORRELL:  Thank you, your Honor.

19        THE COURT:  I think I have what I need on the venue

20   motion.

21        Now, the remaining motions, I think we can argue as

22   a group.  Ms. Rogers, you can take us -- and it's hard to

23   group them together, but it's forum non conveniens and, you

24   know, dismissal based on the pending federal action.  Those

25   are somewhat related.  So, I'll let you argue them however

cb

Appx. 202

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM    INDEX NO. 451625/2020
NYSCEF DOC. NO. 220    Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21   Entered 02/12/21 16:34:29   Page 205 of    RECEIVED NYSCEF: 02/03/2021
461

34

Proceedings

1    you would like, but --

2              MS. ROGERS:  Your Honor, it seems that the concepts

3    implicated in the motions are overlapping and it makes sense

4    to argue them simultaneously.

5              So, we now depart the land of strict statutory

6    construction to analyze a number of provisions where the

7    Court has a lot of discretion to determine what the interest

8    of substantial justice favors and where good cause exists.

9              So, the forum non conveniens doctrine simply

10   requires, you know, is there a more convenient forum and

11   would it serve the interest of substantial justice for the

12   action to be heard there.

13             This action is not only technically commenced after

14   our lawsuit against the New York AG which was commenced on

15   August 6th, it's only the latest in a tangled nest of

16   litigation that is pending largely in federal court, some of

17   it in state court, that raised overlapping factual and legal

18   issues about the NRA's business expenditures.

19             A lot of the transactions and events that are

20   alleged in this complaint relate to the NRA's dealing with

21   Ackerman McQueen.  For example, these travel expenses, these

22   expenses that have garnered a lot of ink in the press, those

23   were all incurred, to the extent they were indeed incurred,

24   were incurred by Ackerman McQueen.

25             There is a previously pending federal litigation

cb

Appx. 203

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM    INDEX NO. 451625/2020

NYSCEF DOC. NO. 220    Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21    Entered 02/12/21 16:34:29    Page 206 of    RECEIVED NYSCEF: 02/03/2021
461

35

Proceedings

1    between the NRA and Ackerman McQueen where all of the issues

2    are in play.  And that's in the Northern District of Texas.

3    That's one of the many federal cases that we are in the

4    process of moving to consolidate in an MDL proceeding.

5         There is also an ancillary litigation.  We had a

6    former Ackerman employee come forward and provide

7    essentially whistleblower testimony that Ackerman was lying

8    to the NRA about the nature of the expenditures.  He

9    testified in that NRA Ackerman litigation.  Ackerman filed

10   oddly a distinct lawsuit against him, and that's also

11   pending in federal court.

12        Then, we have the Delatil (sic) litigation pending

13   in the Middle District of Tennessee, exact same issues,

14   previously filed action, already in federal court, already

15   in discovery.

16        The constitutional dispute between the NRA and the

17   New York State of the Office of the Attorney General has

18   been brewing for a while.  It was commenced by the NRA in

19   the Northern District of New York on August 6, 2020, and I

20   don't need to belabor, and I won't, but I'll mention because

21   it's so salient, you know, this is a case of historical

22   constitutional importance because the ACLU weighed in for

23   us.

24        We've had 16 amici states weigh in for us, wave a

25   red flag and say, you know, what the AG is doing here is

cb

Appx. 204

Proceedings

1   unusual and wrong. Multiple constitutional scholars;

2   Jonathan Turley; Feldman, we cite them in our brief, have

3   come out and said look, even if some of these allegations

4   were true, it is clear that this effort to dissolve the NRA

5   is unconstitutional.

6          Now, we understand that, you know, that's going to

7   be argued and the AG has a different view on it, but those

8   Article 3 constitutional claims were brought in a federal

9   forum and deserve to be heard there. And it's not that we

10  doubt the sophistication of the Court to hear those claims,

11  but they were technically first filed and there are

12  efficiencies to be gained from trying all of these

13  interrelated cases in a federal forum, especially because

14  some of the most salient claims here are the NRA's

15  constitutional claims which are federal questioned claims.

16         There are --

17         THE COURT: You said -- you may have used the words

18  technically filed first. I'm not sure what that means. I

19  think it is uncontested that the papers were filed by the

20  Attorney General here first. Then, later, I think in the

21  same day, the NRA filed in federal court.

22         And, you know, I understand that there was an

23  amendment or a change to the verification, but it wasn't

24  actually filed first; right?

25         MS. ROGERS: Well, so technically, your Honor, the

cb

Proceedings

1    AG's case was filed first, but it wasn't commenced first.

2    And that's the difference ---

3                THE COURT:  Your reference to technically filed

4    earlier, and I'm just trying to figure out what you meant.

5    It was technically filed here, the question is whether that

6    matters.

7                MS. ROGERS:  Right.

8                Your Honor, it was technically filed here, but the

9    action filed here was a nullity.  That's the term in the

10   CPLR and we are entitled to treat that complaint as a

11   nullity under the CPLR because it was improperly verified.

12               Now, the AG in its papers urges the Court to

13   exercise its discretion to disregard what it characterizes

14   as something in the nature of a typographical error, but, in

15   fact, that deficit in the verification is not just

16   technical.

17               It is not a technicality when the Attorney General

18   of the State of New York files a 168 pages of corruption

19   accusations, the statute requires it to verify it at least

20   believes those allegations are true.  That's what was left

21   out of the initial filing.

22               We were entitled to treat it as a nullity if we

23   followed the appropriate procedure; we gave immediate

24   notice, which we did, and an amended filing was made, but

25   the NRA's federal action, when you consider that the

cb

Appx. 206

Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 209 of 461

38

Proceedings

1    attempted filing of the State action on August 6th was a

2    nullity, then the first filed of these two overlapping cases

3    is the NRA federal case which was filed and successfully

4    commenced the morning of August 6th a few minutes after

5    Letitia James commenced her press conference announcing that

6    she was going to destroy the National Rifle Association.

7         THE COURT:  One thing I guess I have to note,

8    because it was in front of me, when the NRA decided to bring

9    a lawsuit last year, it brought it in Manhattan, in fact, in

10   front of me.  So, it didn't seem terribly inconvenient to

11   litigate in New York City at that point.

12        MS. ROGERS:  Your Honor, I have a couple of

13   responses to that.

14        I mean, I understand that you're raising this in

15   the context of the forum non conveniens and dismissal

16   arguments, but obviously that plays no role in the statutory

17   venue analysis because you can't change the plain text of

18   the venue provision based on some kind of purposeful

19   availment argument.

20        THE COURT:  That's why I'm raising it now.

21        MS. ROGERS:  I apologize, your Honor.  I just

22   wanted to cover that for the record.

23        But we were in a different posture then.  Several

24   of the federal cases that we're now seeking to consolidate

25   in a multidistrict litigation either didn't exist or were

cb

Appx. 207

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM
INDEX NO. 451625/2020
NYSCEF DOC. NO. 220
RECEIVED NYSCEF: 02/03/2021

Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 210 of
461

39

Proceedings

1    much, much less advanced at the time.

2              Also, we have another federal constitutional case

3    pending in Albany. We filed ours as a related case, so the

4    dispute that was in front of your Honor was a pretty narrow

5    indemnity dispute with a director. It did not implicate the

6    broader First Amendment and the Fourteenth Amendment issues

7    which are already being tried in a related case in Albany.

8              THE COURT: So, your point is not that Manhattan is

9    just inherently inconvenient. It's that there's sort of a

10   locus in Albany of other cases; is that what your argument

11   is?

12             MS. ROGERS: That's one strand of my argument, your

13   Honor. It's not that Manhattan is harder to fly to than

14   Albany.

15             THE COURT: That's often, when you seek forum non

16   conveniens, it's more along those lines that we're being

17   asked to go to a location distant and hard to get to and

18   it's going to cost all sorts of money and the like. That

19   typically would send you toward a major city center that's

20   easier to travel in and out of rather than away from.

21             MS. ROGERS: We understand, your Honor. We

22   understand that it's not a typical forum non conveniens

23   argument, but we think that it's one that comes within the

24   statute and the doctrine.

25             Another aspect of the forum non conveniens argument

cb

Appx. 208

Proceedings

1    is that it would be more convenient to be not just in the

2    Northern District, but in federal court where these

3    interrelated actions are pending, where we have the

4    efficiencies of the multidistrict litigation mechanisms and

5    where this case, which has an incredible footprint, and we

6    attach to our motion just a partial list, just based on the

7    AG's allegations, but we have dozens of witnesses and

8    documents in other states, other countries.

9         Now, we know that the Commercial Division in

10   Manhattan has tried complex cases before, but it's difficult

11   to deny, at least from my perspective, that federal court is

12   designed for this and there are inherent efficiencies there

13   that will make the case more efficient and least costly,

14   among those being the ability to serve subpoenas across

15   state lines.

16        So, that's another reason the federal forum is more

17   convenient and, you know, we are already going up to Albany

18   for two other constitutional lawsuits against the State.

19        THE COURT:  The federal court thing raises a sort

20   of a different issue, sort of more under the broadened

21   umbrella of federalism.  You know, your motion is basically

22   saying that the Chief Law Enforcement Officer of New York

23   potentially shouldn't be able to maintain an action in state

24   court.

25        You know, we spent the first part of this argument

cb

Proceedings

1    with you telling me that the statute mandated that it be

2    filed with the state court, albeit a different one, and now

3    your argument is well, it actually shouldn't be in state

4    court at all, it should all be swept under the federal case.

5    And I don't know how you square all of that.  It's a big

6    lift to ask that the State Attorney General cannot bring

7    suit in state court.

8              MS. ROGERS:  Well, your Honor, this is a unique set

9    of circumstances.  One of those circumstances being the

10   existence of a parallel and previously filed federal action

11   litigating these exact same facts.  And, you know, when the

12   State Attorney General is being, you know, is credibly

13   alleged to unconstitutionally have targeted the defendant,

14   perhaps the federal court is an even better forum.

15             Certainly, in the cases that state law enforcement

16   officers routinely find themselves litigating in federal

17   court against claimants and defendants and objects of their

18   law enforcement activity who allege that they have behaved

19   unconstitutionally, you know, that is the purpose of Section

20   --

21             THE COURT:  As you know, state courts under our

22   federal system have the ability to address and resolve

23   federal constitutional claims unless congress has granted

24   exclusive jurisdiction to the federal court.  So, you do

25   have a forum for it in state court as well.

cb

Appx. 210

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM
INDEX NO. 451625/2020

NYSCEF DOC. NO. 220
Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 213 of
461
RECEIVED NYSCEF: 02/03/2021

42

Proceedings

1          But, look, I get your point.  You're not saying

2     that it is mandated to go to federal court.  You're saying

3     that I should exercise my discretion to essentially cause it

4     to be put in a position where it might be consolidated with

5     the federal action.

6          You're making a discretionary argument, but to the

7     extent it's based on you need a different forum to raise

8     constitutional arguments, I don't think that's accurate.

9     This may not be the preferred forum, but it's, you know, our

10     doors are open.

11          MS. ROGERS:  Well, certainly, your Honor, we would

12     never contend that the Court isn't equipped or couldn't hear

13     federal constitutional arguments, only that the interest of

14     substantial justice designate federal court as the optimal

15     most convenient forum.

16          I also wanted to address the idea of a

17     contradictory and inconsistency between the venue argument

18     and the jurisdiction argument.  We are already locked in

19     multiple federal lawsuits against the State of New York

20     based on conduct that highly placed New York State officials

21     announced in the press years before we got to court that

22     they were going to target the NRA; they were going to go

23     after the NRA and investors; the NRA is a terrorist

24     organization.  And that's what the State of New York did.

25          Unsurprisingly, we are now up in Albany in our case

cb

Appx. 211

43

Proceedings

1    against Governor Cuomo and the Department of Financial

2    Services and we have our case about, you know, gun stores

3    and COVID and now we have this one.  So, we're already in

4    federal court in Albany on several of these actions.

5         The latest case is technically, the AG's claim is

6    technically a compulsory counterclaim.  They're claiming

7    they are technically compulsory counterclaims in our federal

8    action, makes sense to put it there, and although the state

9    court can hear federal constitutional claims, it is also

10   clear that a federal court can adjudicate issues under state

11   corporate law.

12        THE COURT:  Your position is that the dissolution

13   claims in this case would be a compulsory counterclaim in

14   your federal case?

15        MS. ROGERS:  Well, if you read the language of

16   Federal Rule 13, they arise from the same facts and

17   circumstances as the previously filed claims.

18        We do cite a case, and I'll find it right now, that

19   basically argues that where the New York court basically

20   determines, that is the *Mosdos Chofetz* case that's cited on

21   page 16 of our motion to dismiss, where the Southern

22   District of New York determined that Section 1983 claims

23   were compulsory counterclaims in a state enforcement action.

24   This involved, I believe it was the health department

25   against an Orthodox Jewish Organization.

cb

Appx. 212

Proceedings

1        And so if our claims are compulsory counterclaims

2    in their first- filed case, then their claims should be

3    compulsory counterclaims in our first-filed case is another

4    argument.

5        But just to get back briefly to this idea that our

6    forum and venue arguments are inconsistent, we think the

7    best optimal place for these claims is the place where the

8    same facts, the same legal issues are already being

9    litigated, and that's our Third District of New York action.

10       It is also, you know, consistent with, even though

11   technically -- because it's federal court, it's not

12   technically, but it is consistent with the mandatory venue

13   provision.  The only location we have identified in our

14   Certificate of Incorporation was Albany, that needs to be

15   litigated in Albany, it would fit.

16       Now, if the case were going to be in state court,

17   obviously we would oppose that, but we think that the best

18   and most rational state court would be the Albany state

19   court consistent with 1110 and it would be, as we previously

20   requested, the Commercial Division given the breadth and the

21   complexity of the matter.

22       THE COURT:  Okay.

23       I'd like to give Carolyn's fingers a few minutes to

24   cool down, so why don't we take five and then we'll pick up

25   with the rest of the defendants and then back to the

cb

Appx. 213

45

Proceedings

1    Attorney General and see if we can't get close to finishing

2    up.

3          Let's reconvene at 11:30.  Don't sign off.  You can

4    just turn your microphones off and your cameras off.

5          (Brief recess is held.)

6          THE COURT:  Ms. Rogers, before I leave you and go

7    to see if any other defendants want to discuss, are there

8    any cases that you are aware of where a forum non conveniens

9    motion was granted on the ground that a federal forum in the

10   same state is more convenient than a state forum?

11         MS. ROGERS:  Not that we've identified, your Honor.

12   We also haven't identified any authority opposing that.

13         THE COURT:  All right.

14         Are there any other defense counsel who want to be

15   heard on the motions to dismiss or transfer?

16         MR. CORRELL:  Your Honor, I would just like to ask

17   Ms. Rogers to make one point that we did discuss during the

18   break that I thought might inform the Court on one of the

19   issues the Court had raised.

20         THE COURT:  Sure.

21         MS. ROGERS:  Thank you.

22         There is a case that we cite -- actually, it's a

23   case that the Attorney General cites on page 26 of their

24   opposition, that's *Astarita v. Acme Bus Corp.*,55 Misc. 3d

25   767, and they cite this for the proposition Secretary of

cb

Proceedings

1        State --

2                 THE COURT:  Hang on.

3                 If folks who are not talking can go on mute; we're

4        getting lots of feedback.  So, stay on mute until we can

5        hear Ms. Rogers.

6                 MS. ROGERS:  Thank you, your Honor.

7                 So, there's actually this sort of policy analysis

8        contained in that opinion talking about why Secretary of

9        State records are dispositive and it's noted that

10       corporations often failed to amend their office location

11       over time.  So, that's not unusual.

12                The language is:

13                "Business entities often failed to amend even after

14       relocating."

15                And the implication is that the sort of very

16       straightforward black and white reliance on what the

17       Certificate of Incorporation says is intentional by the

18       state, even knowing that, you know, people might fail to

19       file amendments.  There might be opportunity to say what the

20       real location is and you fail to.

21                Nonetheless, under 1110, you look at the judicial

22       district of the office, the location of which is stated in

23       the Certificate of Incorporation under the definition

24       section of the same statute.

25                The Certificate of Incorporation is defined to

cb

Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 218 of 461

Proceedings

1    include amendments.  The 1985 and 2002 documents are part of

2    that four corners that your Honor is supposed to look at.

3    There is only one location stated there and it's 80 State

4    Street in Albany.

5              MR. CORRELL:  And, your Honor, the frustration here

6    is that the way this should have worked is the Attorney

7    General should have typed in NRA into the website and looked

8    at the selected entity address which would have been 80

9    State Street, Albany, New York, and then, because they are

10   good and careful lawyers, they should have ordered up the

11   documents and checked to make sure that that was accurate,

12   that's what was actually stated in the Certificate of

13   Incorporation, and then they would be done.

14             And the legislature intended to create a front line

15   task that was easily applicable, very easy to apply.  And I

16   think that this Court, by ruling in our favor, could create

17   a precedent that would create clarity around that issue and

18   encourage people to not get involved in motion practice like

19   this that required people to go back 150 years and be

20   reading handwritten documents from 1871 to try to discern

21   the address of the entity.

22             THE COURT:  One quirky thing about this case is it

23   may be one of a kind in that we're talking about an entity

24   that was created before the statute even existed, and maybe

25   there are others, that both were created before that time

cb

Appx. 216

48

Proceedings

1    and where there is no clear amendment changing the office of

2    incorporation.  And so I'm not sure if this is going to be

3    precedent setting, really, in any direction.  But I get the

4    point.

5            I suppose you could say that, you know, careful

6    lawyers representing the company would have also been able

7    to see on the website it does list New York county and

8    didn't take steps to change that either.

9            Anyway, I guess it's over to the State to respond

10   on the remaining motions to dismiss, stay or transfer on

11   discretionary grounds.  Is that you again, Mr. Conley?

12           MR. CORRELL:  Your Honor, before we move on, if I

13   may address that last point that you made, which is the

14   reading of the printout on the website.

15           Again, if you read that printout, it is fair to

16   read that as the New York county referring to the county in

17   which the original Certificate of Incorporation was filed as

18   opposed to the county in which the current office of the

19   corporation is located.

20           And the statute Section 1110 is very precise in

21   saying it's the -- you have to file in the Supreme Court in

22   the judicial district in which the office of the corporation

23   was located at the time of service on the corporation of the

24   summons and the action.

25           So, there's a temporal component there that really

cb

Appx. 217

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM    INDEX NO. 451625/2020
NYSCEF DOC. NO. 220    Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21    Entered 02/12/21 16:34:29    Page 220 of    RECEIVED NYSCEF: 02/03/2021
461

49

Proceedings

1    makes those two lines in the printout irrelevant because

2    what happened 150 years ago in what county is sort of

3    irrelevant under this statutory test.

4        The real question is what is the address of the NRA

5    currently.  And it has been, since 2002, the only address of

6    the NRA listed in the New York State Department of State

7    website or information database is 80 State Street, Albany

8    county.

9        THE COURT:  I mean, not to be too persnickety, but

10   the word address is not in the statute.  It's the office of

11   the corporation, you know.  And I'm trying to be very

12   precise here.

13       Mr. Conley, I still can't see your picture; you

14   seem to have vanished again, but why don't you start talking

15   and we'll see if you get back on the screen; otherwise, we

16   will make do.

17       MR. CONLEY:  Okay, your Honor.

18       Do you see me yet?

19       THE COURT:  No, I don't.  If others can, I will

20   just --

21       MS. ROGERS:  The NRA, we can see Mr. Conley.

22       THE COURT:  Carolyn, can you?

23       THE COURT REPORTER:  I cannot.

24       THE COURT:  It's also more for Carolyn, but if

25   you're the only one talking then, and hopefully we can

cb

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM INDEX NO. 451625/2020
NYSCEF DOC. NO. 220 Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 RECEIVED NYSCEF: 02/03/2021
461 Page 221 of

50

Proceedings

1    figure this out.

2              So, go ahead, Mr. Conley.

3              MR. CONLEY:  Thank you, your Honor.

4              The defendants' forum non conveniens arguments boil

5    down to their preference for federal court, but that's not a

6    legitimate basis for dismissing or staying the State

7    enforcement action.  This action has a substantial nexus to

8    New York and this Court is clearly the proper forum to

9    adjudicate this case.

10             Under New York law, the plaintiff's choice of forum

11   should rarely be disturbed and the defendants have not met

12   the heavy burden required to upset that choice here.  The

13   State of New York and this Court have a vital interest in

14   retaining this State enforcement action.

15             The New York Attorney General brings this action in

16   the name and on behalf of the People of The State of New

17   York, pursuant to her supervisory authority of her New York

18   charities and their fiduciaries.

19             The complaint is premised entirely on New York law.

20   Adjudicating the merits of this action will require the

21   interpretation and application of New York law that was

22   enacted by the legislature to safeguard the public against

23   fraud and misconduct and ensure New York charities and their

24   assets are not misused or abused.

25             This action implicates public interest and

cb

Proceedings

1   questions of state law that are of critical importance to

2   this state and this Court.

3       The defendants argue that the federal countersuit

4   pending in the Northern District of New York is a suitable

5   alternative forum to litigate the merits of the State

6   enforcement action, but that federal court has no nexus to

7   jurisdiction over or interest in the merits of this case.

8       The defendants' unsupported argument that a federal

9   court could, in theory, exercise supplemental jurisdiction

10  over this case ignores what federal courts have done in

11  practice for the last century.

12      The defendants have failed to identify a single

13  instance where a federal court has exercised supplemental

14  jurisdiction over a State enforcement action brought by a

15  State Attorney General.

16      THE COURT:  Mr. Conley, can you just talk a little

17  more slowly.  I'm watching Carolyn and I trying to --

18      MR. CONLEY:  Of course, your Honor.  Yes.

19      And every federal court that has confronted a state

20  law dissolution claim in the Second Circuit has either

21  declined jurisdiction on abstention grounds or noted

22  abstention would be appropriate if jurisdiction existed in

23  order to avoid improper interference with the strong

24  interest that New York has in regulating corporations formed

25  under its own laws.

cb

Appx. 220

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM          INDEX NO. 451625/2020

NYSCEF DOC. NO. 220          Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21   Entered 02/12/21 16:34:29   Page 223 of          RECEIVED NYSCEF: 02/03/2021
461

52

Proceedings

1          As this Department has recognized, business

2     entities are creatures of state law and the state under

3     whose law and entity was created should be the place that

4     determines whether its existence should be terminated.

5          None of the other applicable factors in a forum non

6     conveniens analysis weigh in the defendants' favor.  It is

7     undisputed that there are no potential witnesses or relevant

8     evidence in Albany.  None of the underlying transactions

9     took place there.  And litigating this action in this Court

10    will impose no hardship on the defendants.

11         The defendants focus a lot on the need for out of

12    state discovery, but that's not a legitimate basis for

13    dismissing a case in a New York State court on forum non

14    conveniens grounds.

15         As your Honor observed, New York courts have

16    procedures in place that are used every day to deal with out

17    of state non-party witnesses and discovery.  And complex

18    disputes frequently involve out of state discovery.

19         The scope and complexity of a matter has never been

20    deemed a legitimate ground for dismissal under the forum non

21    conveniens doctrine.  And there's a good reason for that.

22    Because if that's all it took to upset a plaintiff's choice

23    of forum, the doctrine would quickly morph into a de facto

24    federal removal statute invoked any time a defendant needed

25    an alternative vehicle to move a case to federal court.

cb

Appx. 221

Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21   Entered 02/12/21 16:34:29   Page 224 of
461

53

Proceedings

1          That's not what the doctrine was intended to do

2     which is why there is no precedent for what the defendants

3     are asking of this Court.  No New York State court has ever

4     dismissed a case on forum non grounds in favor of a federal

5     court located in the same State.  And this Court should

6     reject the defendants' invitation to be the first.

7          And notwithstanding the defendants' claims in their

8     motion papers, this Court is perfectly capable of

9     adjudicating this action fairly.

10         Also unavailing is the defendants' false claim that

11    this action would place unnecessary burdens on this Court.

12    The Commercial Division routinely adjudicates complex

13    disputes which the defendants are well aware of, given

14    that's why they petitioned to have the action here.  And

15    there is no reason to believe this action would place an

16    undue burden on this Court.

17         The forum non conveniens doctrine is intended to

18    give defendants hailed into a foreign jurisdiction a

19    procedural device to move for dismissal in the interest of

20    substantial justice.  It is not a tool to force a state

21    court action into federal court simply because that is where

22    the defendant would prefer to be.

23         This Court should reject the defendants' invitation

24    to fundamentally alter and expand the scope of the forum non

25    conveniens doctrine as it asks the Court to depart from

cb

Appx. 222

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM          INDEX NO. 451625/2020

NYSCEF DOC. NO. 220          Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21   Entered 02/12/21 16:34:29   Page 225 of          RECEIVED NYSCEF: 02/03/2021

461

54

Proceedings

1    settled precedent and to undermine the comity of the state

2    courts and the respect properly accorded to a sovereign

3    state prosecuting violations of its own laws.

4           Turning briefly to the Rule of 3211(a)(4) motions.

5    The same equitable factors that are relevant in a forum non

6    conveniens analysis apply here as well.  And it similarly

7    militate against dismissing or staying this action.  There

8    is no legal or equitable basis for the NRA's collateral

9    lawsuit challenging this enforcement action to take

10   precedent over the State enforcement action itself.

11          The motions also fail for several independent

12   reasons that are fully set out in our opposition papers.

13          But the federal countersuit that the NRA filed

14   against the Attorney General in the Northern District of New

15   York was filed after this action was commenced.  A necessary

16   but not sufficient factor for moving for dismissal under

17   3211(a)(4) is that the NRA's federal action must have been

18   already pending.  It was not, so the defendants' motions

19   fail.

20          The defendants argue that an error in the original

21   verification somehow nullify the commencement of this

22   action, but that's wrong as a matter of law.  The defendants

23   were not entitled to a verified complaint, and even if they

24   were, the CPLR provides that actions are commenced by the

25   filing of a summons and complaint.  And an error in the

cb

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM
INDEX NO. 451625/2020
NYSCEF DOC. NO. 220
Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 226 of
461
RECEIVED NYSCEF: 02/03/2021

55

Proceedings

1    original verification did not change that.

2         The defendants have failed to rebut in their reply

3    papers that that type of error in the verification is

4    properly ignored under the CPLR.  CPLR 3026 provides that an

5    error of this nature should be ignored absent a showing of

6    substantial prejudice and does not nullify the commencement

7    of this action.

8         The defendants have not identified any prejudice

9    that resulted from the original verification and their claim

10   that the defective verification itself affects the

11   substantial right runs counter to the plain language of CPLR

12   3026 and lacks any support in the case law.

13        The defendants' elevation of form over substance

14   finds no home in the liberal pleading standards of the CPLR.

15   Rule 3026 in 2001 admonished against precisely this type of

16   rigid reading of the law by providing proof of prejudice by

17   the defect and form which the defendants have not shown

18   here.

19        THE COURT:  Let me ask you a practical question

20   about how these two cases are going to work if they both

21   proceed.  So, the defendants here, the plaintiffs in the

22   federal case, are making a bunch of arguments that would

23   undermine or undercut or outright say this present action

24   cannot go forward.

25        Now, they may, if this case proceeds here, raise

cb

Appx. 224

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM
INDEX NO. 451625/2020
NYSCEF DOC. NO.: 220
Case 21-30085-hdn11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 227 of
461
RECEIVED NYSCEF: 02/03/2021

56

Proceedings

1   those defenses here, but you're then going to have two

2   courts working on the same sets of issues.  How do you --

3   and that happens from time to time, but how do you -- why

4   does it make sense and how would I do that?

5            MR. CONLEY:  Your Honor, while the NDNY action

6   arises from and is related to this action, the two cases are

7   not the same.  This action is brought under state law to

8   enforce state law against an entity and individuals who are

9   subject to state oversight.

10           It's a regulatory law enforcement action.  It seeks

11  multiple forms of relief including restitution; an

12  accounting; removal of defendants LaPierre and Frazer, and

13  judicial dissolution.

14           The NDNY action involves none of the individual

15  defendants --

16           THE COURT:  You're saying N-D-N-Y; right?

17           MR. CONLEY:  Yes.

18           THE COURT:  Okay.

19           MR. CONLEY:  The federal action involves none of

20  the individual defendants and it raises distinct

21  constitutional claims that collaterally challenge --

22           THE COURT:  You have to go slower.

23           MR. CONLEY:  Challenge the propriety of the

24  Attorney General's investigation into the NRA and the

25  propriety of bringing dissolution claims here.

cb

Appx. 225

Proceedings

1          Now, in the NDNY action, the Attorney General has

2     moved to dismiss on multiple dispositive grounds, including

3     that on abstention, the NRA's constitutional claims should

4     be raised, if at all, before this Court on a proper record.

5          We fully expect the federal court will dismiss the

6     action because this court will assess and determine whether

7     the Attorney General's claims against the NRA have merit.

8     That federal action is a textbook case for abstention under

9     the Younger and Burford abstention doctrines.

10         But to the extent there are any overlapping factual

11    or legal issues, those can be dealt with, and that case does

12    proceed, those can be dealt with with well settled doctrines

13    of preclusion and res judicata.  It certainly doesn't

14    warrant staying or dismissing this case and giving

15    precedence to collateral challenge to the state enforcement

16    action itself.

17         THE COURT:  Okay.

18         MR. CONLEY:  Just to turn back briefly, opposing

19    counsel mentioned the nullity point.  I think the defendants

20    fundamentally misunderstand the relief that is available to

21    them in the event of a defective verification.

22         The defendants assume that their filing of a notice

23    to treat the complaint as a nullity, in fact, rendered the

24    complaint a nullity.  And this is not the case.  Instead, if

25    the defendants were entitled to a verification and if it had

cb

Appx. 226

58

Proceedings

1    been defective and never corrected, then the complaint would

2    have been susceptible to a motion to dismiss, but the

3    defendants were not entitled to a verification.  And they

4    did, in fact, receive a corrected verification.  So, there

5    is no basis for dismissal on that ground.

6         And the defendants unsupported claim that the

7    filing of the corrected verification altered when this case

8    was first commenced is meritless and finds no support in the

9    law.

10        THE COURT:  Thank you, Mr. Conley.

11        Anything further from the defense before we take a

12   short break for me to consider and see if I have any other

13   questions?

14        MS. ROGERS:  Yes, your Honor.  I would just like to

15   respond to a few points Mr. Conley raised.

16        Mr. Conley argues --

17        THE COURT:  Can you turn your video on just so we

18   can try to follow along?

19        MS. ROGERS:  Unfortunately, I have my video on.

20   I'll try again.  Can you see me now?

21        THE COURT:  No.

22        You can Just go ahead.

23        MS. ROGERS:  Your Honor, Mr. Conley argues that a

24   defective verification does not violate a substantial right.

25   Courts have held otherwise.  We cited some of these cases.

cb

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM
INDEX NO. 451625/2020
NYSCEF DOC. NO. 220
Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 230 of
461
RECEIVED NYSCEF: 02/03/2021

59

Proceedings

1    One is *Alden v. Gambino*, that's 2016 NY Slip Op. 51394.

2    That, in turn, cites *Jack Vogel Associates v. Color Edge*,

3    2008 Slip Op. 31509.

4            I'll quote language from the *Alden v. Gambino* case:

5            "The failure to sign a verified complaint affects a

6    substantial right of the defendant in that the plaintiff's

7    claims cannot be challenged as false."

8            THE COURT:  When you're reading, you have to read

9    more slowly to enable the reporter to get it down.  Sorry.

10           MS. ROGERS:  I apologize.

11           Well, I'll reread and emphasize this language.:

12           "The failure to sign a verified complaint affects a

13   substantial right of the defendant."

14           That is the holding in multiple state cases that we

15   have cited.  And it makes sense here.  The case was lodged

16   with unprecedented fanfare, very lurid accusations, and did

17   not verify in the first instance that the AG believed the

18   accusations were true.

19           THE COURT:  Well, let's hang on a second.

20           This was not filed with no verification; right?  I

21   mean, the verification was sort of garbled and incomplete

22   for whatever reason, but it had a verification that just

23   wasn't finished.  As I have it, and you tell me if I'm

24   wrong, it says:

25           "To my knowledge, based on such acquaintance with

cb

Appx. 228

Proceedings

1     the fact, the complaint is true, except as to those

2     allegations made upon information and belief.  And as to

3     those allegations", and then it sort of ends.

4          You know, I don't think you can read that as saying

5     they weren't trying to verify.  It's just something seems to

6     have gone wrong.  This doesn't seem to be a plaintiff that

7     is backing away from understanding that it should verify the

8     accuracy.

9          So, I mean, I understand your point and sometimes

10    technicalities matter, but I don't think you can stretch it

11    to the point of somebody trying to distance themselves from

12    having to stand by the allegation that they were very

13    publicly adopting.

14          MS. ROGERS:  Well, your Honor, we do note that

15    after, you know, in accordance with the CPLR, we promptly

16    served notice of our election to treat the defectively

17    verified complaint as a nullity, then the verification was

18    corrected.  So, the AG obviously chose to stand behind

19    rather than back away from its initial allegations, but,

20    nonetheless, given the profile and the nature of the

21    allegation, we are reluctant to reduce the verification

22    requirement or even a partial failure to satisfy it to a

23    mere technicality.

24          And it's not like this was a semi colon.  It is

25    language that, you know, whether admitted unintentionally or

cb

Appx. 229

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM
INDEX NO. 451625/2020
NYSCEF DOC. NO. 220
RECEIVED NYSCEF: 02/03/2021

Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 232 of
461

61

Proceedings

1    not, has substance of importance especially in respect to a

2    weekend contending with media who were willing to take the

3    AG at their word.

4          I also want to address that we are entitled to a

5    verification because a petition and complaint are different

6    under the CPLR.  Under CPLR 105, that's not true.  I can

7    read the definition.  CPLR 105 (b), Action and Special

8    Proceedings:

9          "The word action includes a special proceeding.

10   The words plaintiff and defendant include petitioner and

11   respondent respectfully.  Any special proceeding the word

12   summons and complaint includes notice of petition and

13   petition."

14         So, the idea that if this had been a summary

15   proceeding, you would have had to verify the truth of the

16   allegation, but because this is a 168 page complaint, they

17   don't.  We don't think that's supported by the CPLR.

18         You know, we didn't have to bring a motion to

19   dismiss.  We can, quote, "elect to treat a defective

20   verified complaint as a nullity", which we did.

21         THE COURT:  You can elect to treat it as one; until

22   a court says it is one, it's not.

23         MS. ROGERS:  We would argue that the election

24   language sort of vests, puts the ball in our court.  Not

25   that it, you know, the Court is deprived of discretion, but

cb

Appx. 230

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM
INDEX NO. 451625/2020
NYSCEF DOC. NO. 220
Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 233 of
461
RECEIVED NYSCEF: 02/03/2021

62

Proceedings

1    that we had the election and we took it.

2            I separately would like to address the argument Mr.

3    Conley made that state dissolution claims are never heard in

4    federal court and that federal court would be an

5    inappropriate forum.

6            We cite in our briefing one specific instance of a

7    case, *Nutronics Imaging v. Danan* in the Second Circuit where

8    they were entertaining a state dissolution cause of action.

9    The Attorney General points out that abstention arguments

10   were later made in that case.  And in other cases similarly

11   federal courts have not indicated that they don't have

12   jurisdiction over state law dissolution claims, but they

13   have chosen to abstain.

14           The problem with that argument is that there's a

15   giant and deliberate carve out in the Younger abstention

16   doctrine that occurs, and I'm quoting here, 401 US 37 at

17   pages 45, 46:

18           "A refusal to abstain is justified where a

19   prosecution or proceeding has been brought to retaliate or

20   to deter constitutionally protected conduct, or where

21   prosecution and proceeding are otherwise brought in bad

22   faith or for the purpose to harass."

23           So, this is sort of -- we are not questioning the

24   fairness or competence of this Court, but it cannot be

25   denied that in a situation like this one which, as the Court

cb

Appx. 231

Proceedings

1   has said, is a one of a kind case, you know, this is part of

2   what federal courts exist for.  The situation where you have

3   Eric Schneiderman warning the NRA that the highest level of

4   the New York State government are going to come after it;

5   the NRA bringing constitutional claims in response to the

6   multi-pronged hostilities against it from multiple state

7   agencies which ensued.

8        We don't impugn this Court whatsoever, but we have

9   real constitutional claims here that we filed promptly and

10  Mr. Conley's effort to diminish or deny the factual overlap

11  vis-a-vis this action, I don't think, would stand scrutiny.

12       I mean, we've made a selective enforcement claim.

13  And we've already got a selective enforcement claim, another

14  one, against the State of New York based on its financial

15  blacklisting.  It's not central here, but it's in discovery.

16  So, we've experienced litigation; it's a recent experience.

17       What the State of New York is going to do is

18  they're going to allege that all of the comparators, the,

19  you know, five page chart of other situations we have

20  analogized where entities that were not the form of

21  political enemies, Governor Cuomo would treat it

22  differently, and would distinguish the fact that the NRA was

23  worse somehow, and they already do that in their abstention

24  briefing in the federal case.  They argue that this case is

25  different because the culpable executives are still at the

cb

Appx. 232

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM    INDEX NO. 451625/2020
NYSCEF DOC. NO. 220    Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21    Entered 02/12/21 16:34:29    Page 235 of    RECEIVED NYSCEF: 02/03/2021
461

64

Proceedings

 1    helm.

 2         So, the factual question of the specific executive

 3    culpability is going to be litigated here, it's going to be

 4    litigated there.  We brought a First Amendment retaliation

 5    claim.  I think its highly likely that the State will argue

 6    that even, but for the NRA's constitutionally protected

 7    activity, it would have taken the same enforcement action.

 8    That's what they typically do in response to retaliation

 9    claims.

10         So, we're going to litigate were there real

11    violations of the law, to what extent do they exist.  We're

12    going to litigate both of those factual issues in turn and

13    implicate the intent level of the individual defendants and

14    individual executives.

15         If a transaction was processed through Ackerman

16    McQueen, who knew about it, or who directed it.  That's an

17    issue that is being litigated in a previously filed federal

18    case that was filed in 2018 which is the Ackerman

19    litigation.  It's also being litigated in the Delatil (sic)

20    litigation.

21         The point is it's very difficult to overt the

22    overlapping inconsistent adjudication problem.  And the

23    notion that we should rely on collateral estoppel and res

24    judicata when there's two cases progressing on an almost

25    identical timeline, is not one that is tenable to us and we

cb

Appx. 233

Proceedings

1    think it raises very thorny issues.

2         And the federal court is competent to hear these

3    claims.  And perhaps state court is too.  But, again, we're

4    not making argument that this Court is incompetent.  We're

5    making argument that the interest of substantial justice

6    favor litigating this latest case arising out of the same

7    facts as all of those other cases in a forum where it can be

8    efficiently consolidated and managed with those other cases

9    in an Article 3 forum where the NRA's Section 1983 claims

10   are, you know, fundamentally designed to be heard.

11        THE COURT:  Well, one could ask that if the main

12   concern, and I'll put aside the state versus federal

13   competence, I'll take you at your word that you acknowledge

14   that I can do it, and I assume you recognize that the

15   judiciary and executive branches are separate and

16   independent, but if the NRA wanted to avoid litigating in

17   two places, why didn't it just bring its case here to have

18   them be in the same place?

19        The duplicativeness or the existence of a second

20   case in a different place was the NRA's doing, not the

21   State.

22        MS. ROGERS:  A couple of points, your Honor.

23        First, this isn't really even the second case

24   because, as I mentioned, there are multiple federal actions

25   that have been pending since 2018 that raise similar issues.

cb

Appx. 234

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM
INDEX NO. 451625/2020

NYSCEF DOC. NO. 220

Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 237 of
461

RECEIVED NYSCEF: 02/03/2021

66

Proceedings

1    One of those is a federal action against Governor Cuomo and

2    the Department of Financial Services that was already

3    pending in the Northern District.  We filed this case as a

4    related case to that one.

5         So, this was not arbitrary.  This was consistent

6    with the pattern that has emerged over the course of the

7    past few years as these same exact factual and legal issues

8    have been contested in other forums before the AG brought

9    its case.

10         THE COURT:  Okay.  All right.

11         I think I have everybody's argument well in hand.

12    I can't see if Mr. Conley is waving his arms at me, so I'll

13    assume he's not.

14         I'd like to take a ten-minute break to look through

15    my notes and then I'll be back with you.

16         Is somebody on the -- I see a blue light flashing

17    on Ms. Rogers' screen.  Are you trying to say something?

18         MS. ROGERS:  No, your Honor.  I must be some kind

19    of aberration as well.

20         THE COURT:  You have some sort of a gremlin.

21         Anyway, I'll be back in about ten minutes, so why

22    don't we assume 12:10.

23         Thank you very much.

24         (Brief recess is held.)

25         THE COURT:  Look, I appreciate everybody's hard

cb

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM    INDEX NO. 451625/2020

NYSCEF DOC. NO. 220    Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21   Entered 02/12/21 16:34:29   Page 238 of   RECEIVED NYSCEF: 02/03/2021

461

67

Proceedings

1    work.  Your briefs were exceptional.  Your arguments were

2    exceptional.  I am ready to render a decision that I will

3    describe for you now.

4          After a careful review of one of the larger records

5    I've seen on motions to dismiss, the defendants' various

6    motions to dismiss, transfer or stay this action, which

7    involve a number of interrelated issues, are denied.  I will

8    file a written order, but in the meantime will provide my

9    reasons on the record.

10          At the outset, I note that these motions relate

11    only to whether the Attorney General can maintain this

12    action in this court or some other court.  They have nothing

13    to do with the underlying merits of the case, which are not

14    before me today.

15          I'd like to start with the statutory motion to

16    either dismiss or transfer because of venue.  Analytically,

17    starting with the first point.  Venue is appropriate in New

18    York county unless another venue is prescribed by law.

19          Under the CPLR, the place of trial of an action

20    shall be in the county designated by the plaintiff, that's

21    CPLR 509, and then you turn to CPLR 503(a) which provides

22    that the place of trial shall be in the county in which one

23    of the parties resided when it was commenced, except where

24    otherwise prescribed by law.

25          So, it's undisputed that the Attorney General is

cb

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM    INDEX NO. 451625/2020
NYSCEF DOC. NO. 220    Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21   Entered 02/12/21 16:34:29   Page 239 of   RECEIVED NYSCEF: 02/03/2021
461

68

Proceedings

1    deemed to be a resident of New York county as well as every

2    other county, so venue here is proper under CPLR 509 and

3    503, unless another venue is "prescribed by law".

4         So, the question here is whether the New York

5    Not-for-Profit Corporation Law prescribes a different venue

6    with respect to the claims for dissolution of the NRA.  I

7    find it does not.

8         Under Section 1110 of the Not-for-Profit

9    Corporation Law:

10        "An action or special proceeding for dissolution

11   shall be brought in the Supreme Court in the judicial

12   district in which the office of the corporation is located

13   at the time of the service on the corporation."

14        And, as counsel had pointed out during the

15   argument:

16        The "office of the corporation" is further defined

17   as the office, the office location of which is stated in the

18   Certificate of Incorporation.

19        And continuing down the line of definitions:

20        The Certificate of Incorporation is defined to

21   include the original Certificate of Incorporation or any

22   other instrument filed or issued under any statute to form a

23   domestic or foreign corporation as amended, supplemented or

24   restated by Certificate of amendment, merger or

25   consolidation, or other certificate or instruments filed or

cb

Appx. 237

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM
INDEX NO. 451625/2020

NYSCEF DOC. NO. 220
Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 240 of 461
RECEIVED NYSCEF: 02/03/2021

69

Proceedings

1   issued under any statute.

2           That's enough of the quoting.

3           For these purposes, the parties agree that the

4   NRA's actual headquarters, at least currently, are in

5   Virginia, but that that's irrelevant.  Only its statutorily

6   designated New York office, if it has one, is relevant to

7   which court can hear this case.

8           Now, both sides, exhaustively and very

9   impressively, combed the historical records from 1871 to

10  present to find any shred of evidence as to the location of

11  the NRA's corporate office in New York.

12          While interesting, ultimately I find that all of

13  that is beside the point.  The definition of the "office of

14  the corporation" is statutory and very specific.  It has to

15  be the location designated in the Certificate of

16  Incorporation as amended.

17          The quirk here, as I mentioned earlier, is that the

18  NRA was formed under an 1865 statute that didn't require

19  designation of a specific office, so the original

20  corporation didn't do so.  And it has not been amended to do

21  so, based on my review of the record in the 150 years since.

22          Under the plain language of the statute, then, the

23  NRA does not have an "office of the corporation", and was

24  not required to have one, let alone that mandates venue in

25  Albany.

cb

Proceedings

1          The NRA relies heavily on a 2002 filing which we

2     discussed during the argument which is NYSCEF Document 109,

3     in which it specifically changed the address to which the

4     Secretary of State shall forward copies of process accepted

5     on behalf of the corporation to an address in Albany, and

6     also named CSC as its designated agent to receive process.

7          But in that very same form, immediately above the

8     boxes that were checked by the NRA, includes the option to

9     change the "county location within this state in which the

10    office of the corporation is located."

11         In other words, the exact statutory language that

12    is set forth in the Not-for-Profit Corporation Law venue

13    provision.  The NRA left that space blank.

14         In my judgment, that disposes of the argument that,

15    you know, in the remainder of the form designating an agent

16    for service of process was intended or had the effect of

17    designating for the first time an "office of the

18    corporation" in any county.

19         So, while the defendants cite to cases that appear

20    to equate the location of the registered agent with the

21    residence of a party under CPLR 503, those cases are not in

22    the context of the statutory language at issue here, which I

23    am bound to follow.

24         That is especially true, given that the same form

25    permitted the NRA to change its agent for service of

cb

Appx. 239

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM
INDEX NO. 451625/2020
NYSCEF DOC. NO. 220
RECEIVED NYSCEF: 02/03/2021

Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 242 of
461

71

Proceedings

1    process, gave it an easy means of changing the location of

2    the office of the corporation.

3           So, they clearly are not the same for statutory

4    purposes.  Service of process and agent is a different piece

5    on the amendment of the corporate documents.  So, to argue

6    now that they're the same, I think, just conflicts the plain

7    language of the amendment itself.

8           I note, as the parties have gone back and forth,

9    that the New York Department of State Division of

10   Corporation lists the NRA's "county" to be New York.  You

11   know, the NRA presumably could have changed it if it felt it

12   wasn't accurate, but it didn't.  I don't give tremendous

13   weight to that.  It's just an indicia that because no

14   changes had been made, certainly not checking the boxes I

15   described, then there was no change in the State's records.

16          By contrast, as the defendants point out, there is

17   the reference to the Albany address with respect to service

18   of process which is, again, consistent with the 2002 form

19   that it changed.

20          The bottom line, in my view, is that there is no

21   statutory basis to conclude that the NRA's "office of the

22   corporation" is in Albany.  In fact, as far as I can tell,

23   the NRA has never designated an office of corporation and

24   wasn't required to.

25          As discussed with both counsel during the argument,

cb

Appx. 240

Proceedings

1    in the absence of any office of incorporation in any

2    particular county, the default provisions of the CPLR

3    control and venue in New York county is permissible.

4         Now, even if I were inclined to consider the

5    historical evidence, which I, again, don't think is

6    necessary because there is no office of the corporation, I

7    would deny the motion to change venue anyway.

8         The 1865 Act under which the NRA was launched

9    required the Certificate of Incorporation to be filed "in

10   the office of the clerk of the county in which the office of

11   the corporation shall be situated."

12        So, similar language to what ended up being in the

13   subsequent statute.  By that measure, the NRA chose New York

14   county as its office location by filing its certificate at

15   the very beginning with the clerk in New York county.

16        There is also no evidence that the NRA chose --

17   there was also some evidence, at least, that the NRA chose

18   New York county as the location of its office by seeking and

19   obtaining approval for certain corporate changes by justices

20   in this county when the law required the approval of "a

21   justice of the Supreme Court in the judicial district in

22   which the office of the corporation is located."

23        So, again, just inferring from that language which

24   ends up in the currently applicable statute, the NRA took

25   certain steps long ago which indicated that if there is an

cb

Proceedings

1    office of the corporation, the weight of the evidence is

2    that it is New York county.

3            In 1956, for example, when the NRA first amended

4    its corporate purposes, it sought approval of the amendment

5    certificate from a justice in this judicial district.

6            The NRA did something similar in 1977 when it

7    sought and received approval by a justice in this district

8    as well.

9            The NRA argues that the probative value of these

10   filings is limited because they were required under the 1865

11   statute to continue making filings where they made their

12   first one.  And, frankly, that's a fair point.  But if we're

13   in the business of trying to define the location of the

14   corporate office by historical precedent, these filings that

15   I just went through tip in favor of New York county.

16           And, again, the main argument the NRA really raises

17   here and relies on is the 2002 filing where they created an

18   Albany address for service of process.  And I've already

19   gone through why I think that is not persuasive.  And, in

20   fact, I think it cuts the other way, the fact that they

21   chose an Albany address for one purpose and did not choose

22   it for purposes of designating an office of corporation, to

23   me, cuts against them.

24           So, all things considered, I believe the Attorney

25   General has the better of the argument that if we go to

cb

Appx. 242

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM    INDEX NO. 451625/2020
NYSCEF DOC. NO. 220    Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21   Entered 02/12/21 16:34:29   Page 245 of    RECEIVED NYSCEF: 02/03/2021
461

74

Proceedings

1    historical precedent, the NRA has an office of the

2    corporation, and if the NRA has an office of the

3    corporation, then it would be New York county, unless and

4    until the NRA amends their Certificate of Incorporation or

5    otherwise.

6         So, the bottom line is that even using the

7    historical evidence here, I don't see a mandatory venue in

8    Albany county.  Given that ruling, I need not, and do not,

9    reach the alternative argument that the Attorney General has

10   made, that even if the statute mandated venue in Albany for

11   the dissolution claims, that I could still retain all of her

12   claims, including that one as a matter of discretion, I'm

13   just not going to reach that, which I think is unnecessary

14   since I'm keeping the NRA claim here anyway.

15        All right.  So that's the statutory venue motion.

16        Moving on to the motion to dismiss on grounds of

17   forum non conveniens, the doctrine which has now been

18   codified in CPLR 327 (a) permits a court to dismiss an

19   action when, although it may have jurisdiction over a claim,

20   the court determines that in the interest of substantial

21   justice the action should be heard in another forum.

22        And the factors that courts consider are well

23   established.  They include the residence of the parties; the

24   situs of the underlying transaction; the existence of an

25   adequate alternative forum; the location of potential

cb

Appx. 243

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM INDEX NO. 451625/2020

NYSCEF DOC. NO. 220   Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21   Entered 02/12/21 16:34:29   Page 246 of 461   RECEIVED NYSCEF: 02/03/2021

75

Proceedings

1    witnesses and relevant evidence; potential hardship to the

2    defendant, and the burden on the New York courts.

3         In this setting, the plaintiff's choice of forum is

4    entitled to strong deference.  The cases make clear that the

5    defendants bear a heavy burden of demonstrating that the

6    plaintiff's selection of New York was not in the interest of

7    substantial justice, and unless the balance tips strongly in

8    favor of the defendants, then the plaintiff's choice of

9    forum will not be disturbed.

10        And here's why I don't think that the defendants

11   meet that burden:

12        First, this is an action by New York's Chief Law

13   Enforcement Officer pursuant to her supervisory authority

14   over a New York not-for-profit corporation for violating New

15   York law.

16        To be sure, some witnesses and evidence may be

17   located outside of New York.  Albany is a great, great city.

18   It's hard to argue that it is easier to get to Albany from

19   out of state than it is to get to New York City.

20        To this extent that defendants must bear the

21   burden, or at least the NRA must bear the burden of

22   litigating in two New York courts at the same time, this

23   one, and the federal court in Albany, that is something that

24   the NRA could have chosen to do otherwise by bringing its

25   action here.

cb

Appx. 244

Proceedings

1    I'm not saying it had to, but if it's going to say

2    that it's inconvenient to litigate in two places at the same

3    time, it could have avoided that.

4        In many ways, the defendants are really arguing for

5    removal of this case to federal court.  I'm not aware and

6    the parties have not cited any case applying forum non

7    conveniens to move a case from a state court to a federal

8    court in the same state.  And that is not what forum non

9    conveniens is about.

10       And what the defendants are really doing are moving

11   for removal and forum non conveniens is not a removal

12   statute.  The doctrine is concerned with geographic

13   convenience largely, not choosing between state and federal

14   courts within the same state.

15       In any event, I'm confident I'll be able to work

16   with the parties and whatever other courts have cases that

17   are in any way related to coordinate discovery to minimize

18   inefficiencies and duplication of effort.  This Court does

19   that in many, many cases and I have no doubt we can do that

20   here.

21       Turning next to the motion to dismiss based on CPLR

22   3211 (a)(4) which provides for a dismissal of a cause of

23   action when "there is another action pending between the

24   same parties for the same cause of action in a court of any

25   state or the United States, the court need not dismiss upon

cb

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM    INDEX NO. 451625/2020
NYSCEF DOC. NO. 220    Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29   RECEIVED NYSCEF: 02/03/2021
461    Page 248 of

77

Proceedings

1     this ground, but may make such order as justice requires".

2              So, here, the defendant places enormous weight on

3     the fact that the Attorney General's initial complaint

4     omitted or garbled certain words from its verification

5     statement.  This is, in my judgment, placing far too much

6     weight on what was obviously a nonsubstantive error that was

7     quickly fixed.

8              The original verification, which was signed,

9     includes a sentence that sort of ends before completion.  It

10    says, in part:

11             "To my knowledge, based on such acquaintance with

12    the facts, the complaint is true, except as to those

13    allegations made upon information and belief, and as to

14    those allegations", and then it trails off and the rest of

15    the words are missing.

16             In the defendants' view, this typo, which was

17    promptly corrected, requires the dismissal of this action

18    because the federal case was already pending by the time the

19    OAG corrected it.  I just flatly disagree with that.

20             The Attorney General filed first.  One cannot say

21    that the other action was pending at that time.  The fact

22    that the verification was later amended doesn't change the

23    priority of the filings.  The federal action was not pending

24    when this case began.

25             In any event, even if one assumes contrary to those

cb

Appx. 246

Proceedings

1    facts that the federal case was pending, dismissal would not

2    be appropriate anyway.  The first-filed rule is not a rule

3    at all, especially when the timing of the two cases is very

4    close in time, it's a matter of discretion.  And, here, for

5    a variety of reasons, I don't think discretion favors

6    dismissing or staying the case.

7           And some of these are similar to the forum non

8    conveniens.  In fact, the First Department, in *White Light*

9    *Productions*, 231 AD2d 90 {First Dept. 1997} says explicitly

10   that the inquiry under this pending action statute is

11   similar to that undertaking in applying the doctrine of

12   forum non conveniens, that is, whether the litigations and

13   the parties have sufficient contact with the State to

14   justify burdens imposed on our system.

15          And, again, the first-filed factor is particularly

16   weak when they're essentially contemporaneous.

17          So, here are factors I think warrant denial of this

18   motion:

19          First, there are, in my opinion, basic questions of

20   federal literature.  The Attorney General is the Chief Law

21   Enforcement of the State of New York.  She's enforcing a New

22   York State statute against a not-for-profit company and its

23   officer organized under the laws of the State of New York.

24          Indeed, as the NRA argued, the statute under which

25   the Attorney General sues specifically envisions filing in a

cb

Appx. 247

Proceedings

1    state court.

2           And I think it would be inappropriate, in these

3    circumstances, to find that the Attorney General cannot

4    pursue her claims in state court just because one of the

5    defendants would prefer to proceed in federal court.

6           You know, again, to the point about, you know,

7    state and federal courts, you know, I don't take any umbrage

8    in any of those statements, but whatever one's views may be,

9    we're all part of a federal system and the state courts have

10   their role to play, particularly when enforcing state law.

11   And to the extent that any constitutional arguments need to

12   be raised or will be raised here, you know, that's something

13   that this Court and others do on a regular basis and there's

14   no, you know, legal requirement that that be done in federal

15   court.

16          Beyond that, the federal cases that exist don't

17   address many of the claims in this case and the individuals

18   here are not parties in the federal case that's in Albany at

19   least.  In light of these factors, dismissing this action as

20   second in time would elate form over substance and would, in

21   my view, not be appropriate.

22          Again, I would work with the parties to coordinate

23   discovery and other matters and minimize inefficiency and

24   avoid duplication of effort.

25          Last, and we didn't address this too much in the

cb

80

Proceedings

1    argument, but it's in the papers, the motion to stay this

2    case based on the pending Ackerman action in Texas, under

3    Section CPLR 2201 is also denied.

4          CPLR 2201 permits me to grant a stay in a proper

5    case upon such terms as may be just.  Obviously, it's a

6    discretionary call.  And, as a general matter, this will be

7    done in one action -- I'm sorry.

8          "In general, only where the decision in one action

9    will determine all of the questions in the other action, and

10   the judgment on one trial will dispose of the controversy in

11   both, is a stay justified.  This requires the complete

12   identity of the parties, the causes of action, and the

13   judgment sought."

14         That is a quote from the *952 Associates* case, 52

15   AD3d 236 {First Dept. 2008}.

16         That is not an ironclad rule, but it certainly is

17   important guidance.  Here, the AG and the individual

18   defendants are not parties to the NRA's action against

19   Ackerman, and the defendants failed to identify how

20   resolution of that action will dispose of, you know, any of

21   these issues in the complaint, let alone the entirety of the

22   complaint.  Therefore, defendants are not entitled to a stay

23   under CPLR 2201.

24         I'll file a written order confirming the result on

25   these motions.

cb

Appx. 249

Proceedings

1      I'll ask the parties to upload the transcript upon

2    receipt from the court reporter. I'll ask you to stay on

3    after we're done to get Carolyn's information to do so.

4      So, with the resolution of those motions, we now

5    have to talk about next steps in the litigation. I

6    understood from one of the letters that the parties were

7    planning to Meet and Confer, maybe as early as tomorrow,

8    with respect to proceeding with the action. So, why don't I

9    hear from the parties as to what the plan would be, in light

10   of this decision.

11      Let me start with the Attorney General.

12      MR. SHEEHAN: Your Honor, this is Jim Sheehan, the

13   Charities Bureau Chief.

14      I think what we would like to see happen, based

15   upon the Court's decision today, is, number 1, we would like

16   to proceed with the Meet and Confer, which is planned for

17   tomorrow. There are a number of issues that we addressed

18   during that meeting and we are planning to have the

19   parties (inaudible) --

20      THE COURT: You just went on mute. And I'm sorry,

21   I was the culprit. I was trying to get your picture to

22   appear.

23      So, Mr. Sheehan, you're going to have to unmute

24   yourself.

25      MR. SHEEHAN: I just did, your Honor. Thank you.

cb

Appx. 250

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM    INDEX NO. 451625/2020
NYSCEF DOC. NO. 220    Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21  Entered 02/12/21 16:34:29  Page 253 of    RECEIVED NYSCEF: 02/03/2021
461

82

Proceedings

1          Your Honor, what we would like to see, at this

2     point, based upon the Court's decision here, is first we

3     would like to proceed with the Meet and Confer which is

4     scheduled for tomorrow, that the parties could proceed in

5     good faith with the guidance we obtained from this decision

6     today and plan out a schedule for discovery in this case

7     that will bring the case to a trial in early 2022.

8          The second thing we would like to see is that an

9     order be entered, and we would like to discuss this with the

10    Court and the parties, if there are any additional motions

11    to dismiss, that they be consolidated into one proceeding as

12    opposed to seriatim.

13         And I think the third is that they will keep the

14    Bankruptcy Court advised as to the current status of this

15    litigation because it may affect other events that are going

16    on in that court.

17         THE COURT:  Okay.

18         And for the defendants.

19         MS. ROGERS:  Thank you, your Honor.

20         I don't know if you can see me, but I hope you can

21    hear me.

22         The NRA has no objection to proceeding with the

23    Meet and Confer tomorrow.  I leave it to Mr. Fleming as to

24    whether Mr. Frazer is in a position to discuss long term

25    discovery and case schedules and things like that until he

cb

Appx. 251

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM
INDEX NO. 451625/2020

NYSCEF DOC. NO. 220
Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 254 of
461
RECEIVED NYSCEF: 02/03/2021

83

Proceedings

1    obtains replacement counsel, but that's not an issue for the

2    NRA, per se.

3            We also have no objection to informing the

4    Bankruptcy Court of developments as appropriate.

5            As to whether future motions will be consolidated,

6    we obviously think that depends upon who is bringing them

7    and the substance of them and we would, you know, reserve

8    our rights on that.

9            THE COURT:  I mean, the CPLR does not envision any

10   sort of an endless series of motions under 3211, so I don't

11   know what motions people are talking about, but I certainly

12   would like to, you know, coordinate and organize so that we

13   don't have another wave.  I would like to get moving on the

14   case.

15           So, are you aware, as you sit here now, of motions

16   to dismiss?  I mean, the complaint hasn't changed.  What are

17   you talking about?

18           MS. ROGERS:  Your Honor, that's just it.  Sitting

19   here, I don't have a discrete intention to bring a specific

20   motion, but Mr. Sheehan has proposed that any future motions

21   be consolidated, and I'm simply saying that I don't know

22   what the other defendants are doing, but we would approach

23   that on a case by case basis.

24           THE COURT:  Well, let me take it one step at a

25   time.

cb

Appx. 252

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM
INDEX NO. 451625/2020
NYSCEF DOC. NO. 220
RECEIVED NYSCEF: 02/03/2021

Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 255 of
461

84

Proceedings

1    And has there been an answer?

2    MS. ROGERS:  My understanding is one defendant or

3    maybe two defendants have answered.

4    THE COURT:  I should set a schedule for answers now

5    that the motions to dismiss have been denied.  I know it's a

6    long complaint, but you've had it for quite a while.  I

7    would normally say 20 days.  Let me know if that works.

8    MS. ROGERS:  Given the volume of the complaint and

9    the fact that we anticipate coordination among the

10   defendants, and one of the defendants is currently searching

11   for substitute counsel, we would request 30 days rather than

12   20, if that's agreeable to the Court.

13   THE COURT:  30 days is fine.

14   MS. ROGERS:  Thank you, your Honor.

15   THE COURT:  And then we should also set a

16   preliminary conference for this case.  That should not get

17   in the way of you all meeting and conferring and working on

18   a schedule, because that's going to be an important part of

19   the preliminary conference anyway.

20   How about March 9th?  March 9th at 11:30?

21   MR. SHEEHAN:  That's satisfactory to the

22   plaintiffs, your Honor.

23   MS. ROGERS:  That works for the NRA, your Honor.

24   THE COURT:  Okay.

25   Thank you very much.

cb

Appx. 253

85

Proceedings

1          Again, I will issue an order on today's decision.

2    And I do appreciate all of your hard work and patience

3    through the technical and other pitfalls.

4          Is there anything else I need to address for today

5    for anyone?

6          MS. ROGERS:  Not for the NRA, your Honor.

7          THE COURT:  Okay.

8          Thank you, all.

9          (Record is closed.)

10

11                    **          **          **

12          This is certified to be a true and accurate

13    transcription of my stenographic notes.

14

15

16    _____

17          CAROLYN BARNA
          SENIOR COURT REPORTER

18

19

20

21

22

23

24

25

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM
INDEX NO. 451625/2020
NYSCEF DOC. NO. 220
Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 257 of
461
RECEIVED NYSCEF: 02/03/2021

1

**1**

**1** [1] - 81:15
**10005** [1] - 1:18
**10022** [2] - 1:22, 2:6
**101** [3] - 32:22, 33:3, 33:8
**10166** [1] - 2:10
**10177** [1] - 2:3
**105** [2] - 61:6, 61:7
**109** [2] - 15:21, 70:2
**1110** [12] - 8:8, 9:18, 19:22, 23:24, 23:25, 26:24, 28:6, 31:17, 44:19, 46:21, 48:20, 68:8
**11:30** [2] - 45:3, 84:20
**12:10** [1] - 66:22
**13** [1] - 43:16
**14th** [1] - 1:22
**150** [4] - 14:20, 47:19, 49:2, 69:21
**16** [4] - 23:20, 28:17, 35:24, 43:21
**168** [2] - 37:18, 61:16
**17** [1] - 23:1
**18** [2] - 23:20, 28:17
**1865** [3] - 69:18, 72:8, 73:10
**1871** [8] - 10:15, 11:25, 13:7, 22:23, 23:2, 26:5, 47:20, 69:9
**1956** [1] - 73:3
**1977** [1] - 73:6
**1983** [2] - 43:22, 65:9
**1985** [3] - 15:12, 17:24, 47:1
**1997** [1] - 78:9

**2**

**2** [1] - 18:1
**20** [3] - 22:23, 84:7, 84:12
**200** [1] - 2:9
**2001** [1] - 55:15
**2002** [9] - 15:13, 16:5, 17:22, 27:2, 47:1, 49:5, 70:1, 71:18, 73:17
**2008** [1] - 59:3
**2008}** [1] - 80:15
**2016** [1] - 59:1
**2018** [2] - 64:18, 65:25
**2020** [1] - 35:19

**2021** [1] - 1:11
**2022** [1] - 82:7
**21** [1] - 1:11
**2201** [3] - 80:3, 80:4, 80:23
**231** [1] - 78:9
**236** [1] - 80:15
**250** [1] - 2:3
**26** [2] - 9:6, 45:23
**28** [1] - 1:17
**29** [1] - 16:2

**3**

**3** [3] - 1:1, 36:8, 65:9
**30** [2] - 84:11, 84:13
**3026** [3] - 55:4, 55:12, 55:15
**31509** [1] - 59:3
**3211** [2] - 76:22, 83:10
**3211(a)(4** [2] - 54:4, 54:17
**327** [1] - 74:18
**37** [1] - 62:16
**38** [2] - 29:10, 29:24
**3d** [1] - 45:24

**4**

**401** [1] - 62:16
**410** [1] - 2:6
**45** [1] - 62:17
**451625/2020** [1] - 1:5
**46** [1] - 62:17
**49** [1] - 30:24

**5**

**5** [3] - 27:21, 32:14, 32:18
**502** [2] - 32:11, 32:16
**503** [8] - 12:9, 14:7, 14:9, 14:13, 19:24, 32:8, 68:3, 70:21
**503(a** [1] - 67:21
**508** [1] - 30:24
**509** [2] - 67:21, 68:2
**51394** [1] - 59:1
**52** [1] - 80:14

**6**

**6** [2] - 18:1, 35:19
**6th** [3] - 34:15, 38:1, 38:4

**7**

**7** [1] - 30:22
**750** [1] - 1:22
**767** [1] - 45:25
**7th** [1] - 2:3

**8**

**80** [10] - 8:24, 15:12, 16:10, 19:8, 20:22, 22:9, 22:11, 47:3, 47:8, 49:7
**810** [1] - 2:6

**9**

**90** [1] - 78:9
**952** [1] - 80:14
**9th** [2] - 84:20

**A**

**a)(4** [1] - 76:22
**aberration** [2] - 23:13, 66:19
**ability** [3] - 28:19, 40:14, 41:22
**able** [5] - 4:14, 27:5, 40:23, 48:6, 76:15
**absence** [1] - 72:1
**absent** [1] - 55:5
**abstain** [2] - 62:13, 62:18
**abstention** [8] - 51:21, 51:22, 57:3, 57:8, 57:9, 62:9, 62:15, 63:23
**abused** [1] - 50:24
**accepted** [1] - 70:4
**accordance** [2] - 24:13, 60:15
**accorded** [1] - 54:2
**according** [1] - 8:14
**accounting** [1] - 56:12
**accuracy** [2] - 24:22, 60:8
**accurate** [4] - 42:8, 47:11, 71:12, 85:12
**accusations** [3] - 37:19, 59:16, 59:18
**Ackerman** [11] - 34:21, 34:24, 35:1, 35:3, 35:7, 35:9, 64:15, 64:18, 80:2, 80:19

**acknowledge** [2] - 9:4, 65:13
**acknowledging** [1] - 32:12
**ACLU** [1] - 35:22
**Acme** [1] - 45:24
**acquaintance** [2] - 59:25, 77:11
**act** [1] - 25:24
**Act** [2] - 26:5, 72:8
**acted** [2] - 10:12, 10:25
**action** [87] - 6:1, 8:12, 12:6, 23:20, 23:22, 24:1, 26:5, 27:8, 28:5, 28:19, 30:4, 30:5, 33:24, 34:12, 34:13, 35:14, 37:9, 37:25, 38:1, 40:23, 41:10, 42:5, 43:8, 43:23, 44:9, 48:24, 50:7, 50:14, 50:15, 50:20, 50:25, 51:6, 51:14, 52:9, 53:9, 53:11, 53:14, 53:15, 53:21, 54:7, 54:9, 54:10, 54:15, 54:17, 54:22, 55:7, 55:23, 56:5, 56:6, 56:7, 56:10, 56:14, 56:19, 57:1, 57:6, 57:8, 57:16, 61:9, 62:8, 63:11, 64:7, 66:1, 67:6, 67:12, 67:19, 68:10, 74:19, 74:21, 75:12, 75:25, 76:23, 76:24, 77:17, 77:21, 77:23, 78:10, 79:19, 80:2, 80:7, 80:8, 80:9, 80:12, 80:18, 80:20, 81:8
**Action** [1] - 61:7
**actions** [5] - 28:18, 40:3, 43:4, 54:24, 65:24
**active** [1] - 10:20
**activity** [2] - 41:18, 64:7
**actual** [4] - 11:1, 18:23, 31:10, 69:4
**actually** [8] - 21:23, 22:16, 29:25, 36:24, 41:3, 45:22, 46:7, 47:12
**AD2d** [1] - 78:9
**AD3d** [1] - 80:15
**add** [2] - 21:15, 29:6
**additional** [3] - 13:1, 21:18, 82:10
**address** [41] - 5:19,

12:1, 14:25, 15:12, 15:14, 15:15, 15:18, 16:12, 16:17, 17:12, 18:5, 18:6, 19:5, 19:8, 21:23, 21:24, 22:7, 22:9, 22:11, 29:10, 29:19, 32:3, 41:22, 42:16, 47:8, 47:21, 48:13, 49:4, 49:5, 49:10, 61:4, 62:2, 70:3, 70:5, 71:17, 73:18, 73:21, 79:17, 79:25, 85:4
**addressed** [2] - 16:13, 81:17
**adequate** [1] - 74:25
**adhered** [1] - 27:10
**adjudicate** [2] - 43:10, 50:9
**adjudicates** [1] - 53:12
**adjudicating** [2] - 50:20, 53:9
**adjudication** [1] - 64:22
**admitted** [1] - 60:25
**admittedly** [1] - 9:22
**admonished** [1] - 55:15
**adopting** [1] - 60:13
**advanced** [1] - 39:1
**adversarial** [1] - 30:6
**advised** [1] - 82:14
**affect** [1] - 82:15
**affects** [3] - 55:10, 59:5, 59:12
**afforded** [1] - 31:7
**AG** [12] - 19:11, 19:19, 30:14, 34:14, 35:25, 36:7, 37:12, 59:17, 60:18, 61:3, 66:8, 80:17
**AG's** [3] - 37:1, 40:7, 43:5
**against** [24] - 5:25, 7:22, 12:7, 12:23, 33:3, 34:14, 35:10, 40:18, 41:17, 42:19, 43:1, 43:25, 50:22, 54:7, 54:14, 55:15, 56:8, 57:7, 63:6, 63:14, 66:1, 73:23, 78:22, 80:18
**agencies** [1] - 63:7
**agenda** [2] - 5:18, 6:21
**agent** [24] - 9:25, 14:1, 15:15, 16:2, 16:4, 16:8, 16:10, 16:12, 16:19, 17:17,

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM
INDEX NO. 451625/2020
NYSCEF DOC. NO. 220
Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 258 of
461
RECEIVED NYSCEF: 02/03/2021

2

18:2, 18:3, 18:9, 18:12, 18:19, 25:13, 26:20, 26:22, 27:1, 70:6, 70:15, 70:20, 70:25, 71:4

**ago** [3] - 4:6, 49:2, 72:25

**agree** [3] - 7:16, 20:10, 69:3

**agreeable** [1] - 84:12

**ahead** [2] - 50:2, 58:22

**Albany** [46] - 7:1, 7:6, 8:25, 10:5, 12:6, 12:17, 15:3, 15:12, 17:12, 18:4, 18:5, 19:8, 19:20, 20:23, 21:11, 22:9, 22:12, 25:7, 25:14, 27:2, 39:3, 39:7, 39:10, 39:14, 40:17, 42:25, 43:4, 44:14, 44:15, 44:18, 47:4, 47:9, 49:7, 52:8, 69:25, 70:5, 71:17, 71:22, 73:18, 73:21, 74:8, 74:10, 75:17, 75:18, 75:23, 79:18

**albeit** [1] - 41:2

**Alden** [2] - 59:1, 59:4

**allegation** [5] - 9:14, 60:12, 60:21, 61:16

**allegations** [8] - 36:3, 37:20, 40:7, 60:2, 60:3, 60:19, 77:13, 77:14

**allege** [4] - 9:7, 11:11, 41:18, 63:18

**alleged** [3] - 11:14, 34:20, 41:13

**alleges** [1] - 11:4

**allowance** [1] - 31:19

**almost** [2] - 28:22, 64:24

**alone** [3] - 26:22, 69:24, 80:21

**along** [3] - 27:9, 39:16, 58:18

**alter** [1] - 53:24

**altered** [1] - 58:7

**alternative** [4] - 51:5, 52:25, 74:9, 74:25

**although** [4] - 5:24, 10:8, 43:8, 74:19

**always** [1] - 24:7

**ambiguity** [1] - 19:15

**amend** [2] - 46:10, 46:13

**amended** [7] - 14:24, 37:24, 68:23, 69:16,

69:20, 73:3, 77:22

**amendment** [6] - 36:23, 48:1, 68:24, 71:5, 71:7, 73:4

**Amendment** [5] - 17:24, 18:1, 39:6, 64:4

**amendments** [10] - 8:21, 10:24, 15:19, 19:2, 24:17, 26:13, 26:15, 26:18, 46:19, 47:1

**amends** [1] - 74:4

**AMERICA** [1] - 1:7

**amici** [1] - 35:24

**amounts** [2] - 11:4, 11:10

**analog** [1] - 13:19

**analogized** [1] - 63:20

**analysis** [7] - 8:18, 8:19, 32:21, 38:17, 46:7, 52:6, 54:6

**analytically** [3] - 14:20, 14:23, 67:16

**analyze** [1] - 34:6

**ancillary** [1] - 35:5

**AND** [1] - 1:21

**announced** [1] - 42:21

**announcing** [1] - 38:5

**anomaly** [2] - 17:6, 19:19

**answer** [1] - 84:1

**answered** [1] - 84:3

**answers** [1] - 84:4

**anticipate** [1] - 84:9

**anyway** [7] - 23:14, 48:9, 66:21, 72:7, 74:14, 78:2, 84:19

**apart** [1] - 16:11

**apologize** [3] - 15:6, 38:21, 59:10

**Appeals** [5] - 14:8, 30:22, 31:4, 31:6, 31:9

**appear** [2] - 70:19, 81:22

**appearance** [1] - 4:18

**appearances** [2] - 3:2, 4:8

**appearing** [1] - 4:11

**applicability** [1] - 6:17

**applicable** [3] - 47:15, 52:5, 72:24

**application** [3] - 21:9, 32:13, 50:21

**applies** [2] - 32:22, 33:16

**apply** [5] - 14:17, 18:18, 47:15, 54:6

**applying** [4] - 19:3, 31:5, 76:6, 78:11

**apposite** [1] - 29:22

**appreciate** [4] - 7:7, 23:7, 66:25, 85:2

**approach** [3] - 14:25, 18:23, 83:22

**appropriate** [9] - 7:17, 13:9, 13:12, 37:23, 51:22, 67:17, 78:2, 79:21, 83:4

**approval** [6] - 26:16, 26:17, 72:19, 72:20, 73:4, 73:7

**approvals** [1] - 26:14

**approved** [1] - 24:18

**arbitrary** [1] - 66:5

**arguably** [1] - 17:2

**argue** [2] - 19:12, 25:11, 33:21, 33:25, 34:4, 51:3, 54:20, 61:23, 63:24, 64:5, 71:5, 75:18

**argued** [2] - 36:7, 78:24

**argues** [7] - 10:20, 10:22, 16:24, 43:19, 58:16, 58:23, 73:9

**arguing** [1] - 76:4

**argument** [36] - 3:23, 6:10, 6:25, 10:12, 12:3, 12:12, 12:25, 20:7, 25:14, 25:21, 28:10, 38:19, 39:10, 39:12, 39:23, 39:25, 40:25, 41:3, 42:6, 42:17, 42:18, 44:4, 51:8, 62:2, 62:14, 65:4, 65:5, 66:11, 68:15, 70:2, 70:14, 71:25, 73:16, 73:25, 74:9, 80:1

**arguments** [10] - 19:25, 38:16, 42:8, 42:13, 44:6, 50:4, 55:22, 62:9, 67:1, 79:11

**arise** [1] - 43:16

**arises** [1] - 56:6

**arising** [1] - 65:6

**arms** [1] - 66:12

**Article** [5] - 27:21, 32:14, 32:18, 36:8, 65:9

**aside** [1] - 65:12

**aspect** [1] - 39:25

**asserted** [1] - 23:20

**assess** [1] - 57:6

**assets** [1] - 50:24

**Assistant** [4] - 3:5, 3:8, 3:13, 3:17

**Associates** [2] - 59:2, 80:14

**ASSOCIATION** [1] - 1:7

**Association** [3] - 4:12, 22:8, 38:6

**assume** [6] - 13:6, 27:16, 57:22, 65:14, 66:13, 66:22

**assumes** [1] - 77:25

**Astarita** [1] - 45:24

**attach** [1] - 40:6

**attempted** [1] - 38:1

**Attorney** [57] - 3:5, 3:8, 3:13, 3:14, 3:17, 5:23, 7:23, 8:5, 9:1, 9:12, 10:10, 10:19, 10:22, 11:3, 11:10, 11:13, 12:3, 12:10, 12:13, 12:19, 12:21, 13:22, 16:24, 21:14, 21:20, 22:4, 22:14, 22:20, 27:8, 27:10, 27:23, 33:1, 35:17, 36:20, 37:17, 41:6, 41:12, 45:1, 45:23, 47:6, 50:15, 51:15, 54:14, 56:24, 57:1, 57:7, 62:9, 67:11, 67:25, 73:24, 74:9, 77:3, 77:20, 78:20, 78:25, 79:3, 81:11

**ATTORNEY** [2] - 1:3, 1:16

**ATTORNEYS** [1] - 1:21

**Attorneys** [5] - 1:17, 1:21, 2:2, 2:5, 2:8

**August** [4] - 34:15, 35:19, 38:1, 38:4

**authority** [11] - 6:16, 12:13, 14:8, 26:21, 28:19, 30:23, 31:4, 33:9, 45:12, 50:17, 75:13

**available** [1] - 57:20

**availment** [1] - 38:19

**Avenue** [4] - 1:22, 2:3, 2:6, 2:9

**avoid** [3] - 51:23, 65:16, 79:24

**avoided** [1] - 76:3

**aware** [5] - 28:13, 45:8, 53:13, 76:5, 83:15

**B**

**backing** [1] - 60:7

**backyard** [1] - 9:20

**bad** [1] - 62:21

**balance** [1] - 75:7

**ball** [1] - 61:24

**bank** [1] - 31:10

**Bankruptcy** [5] - 5:19, 6:7, 6:19, 82:14, 83:4

**bankruptcy** [4] - 5:21, 5:24, 6:6, 6:17

**banks** [1] - 31:5

**bar** [1] - 33:3

**BARNA** [2] - 2:15, 85:16

**based** [14] - 6:12, 33:24, 38:18, 40:6, 42:7, 42:20, 59:25, 63:14, 69:21, 76:21, 77:11, 80:2, 81:14, 82:2

**basic** [1] - 78:19

**basis** [8] - 33:6, 50:6, 52:12, 54:8, 58:5, 71:21, 79:13, 83:23

**bear** [3] - 75:5, 75:20, 75:21

**bearing** [1] - 25:19

**began** [1] - 77:24

**beginning** [2] - 3:3, 72:15

**behalf** [4] - 4:12, 5:4, 50:16, 70:5

**behaved** [1] - 41:18

**behind** [2] - 16:25, 60:18

**being** [13] - 22:8, 29:22, 31:8, 31:14, 39:7, 39:16, 40:14, 41:9, 41:12, 44:8, 64:17, 64:19, 72:12

**belabor** [1] - 35:20

**belief** [2] - 60:2, 77:13

**believe** [8] - 7:13, 15:22, 22:22, 29:1, 32:11, 43:24, 53:15, 73:24

**believed** [1] - 59:17

**believes** [1] - 37:20

**belongs** [1] - 12:24

**below** [1] - 22:24

**beside** [1] - 69:13

**best** [3] - 29:16, 44:7, 44:17

**better** [3] - 5:8, 41:14, 73:25

**between** [6] - 32:17, 35:1, 35:16, 42:17, 76:13, 76:23

**beyond** [1] - 79:16

**big** [1] - 41:5

**binary** [1] - 20:5

**bit** [3] - 5:7, 9:22, 31:1

**black** [4] - 8:17, 9:4, 11:9, 46:16

**blacklisting** [1] - 63:15

**blank** [1] - 16:19, 70:13

**BLECHER** [2] - 1:23, 4:15

**Blecher** [1] - 4:14

**blue** [1] - 66:16

**blunted** [1] - 31:15

**boil** [1] - 50:4

**books** [1] - 31:1

**both** [10] - 6:15, 9:25, 25:8, 27:17, 47:25, 55:20, 64:12, 69:8, 71:25, 80:11

**bottom** [3] - 16:9, 71:20, 74:6

**bound** [1] - 70:23

**box** [2] - 16:18, 16:19

**boxes** [3] - 16:17, 70:8, 71:14

**branches** [3] - 29:7, 31:25, 65:15

**breadth** [1] - 44:20

**break** [4] - 6:23, 45:18, 58:12, 66:14

**BREWER** [1] - 1:21

**brewing** [1] - 35:18

**brief** [4] - 17:25, 36:2, 45:5, 66:24

**briefing** [2] - 62:6, 63:24

**briefly** [4] - 5:19, 44:5, 54:4, 57:18

**briefs** [1] - 67:1

**bring** [12] - 11:17, 12:22, 13:2, 27:12, 27:17, 30:17, 38:8, 41:6, 61:18, 65:17, 82:7, 83:19

**bringing** [5] - 27:11, 56:25, 63:5, 75:24, 83:6

**brings** [1] - 50:15

**broad** [1] - 8:5

**broadened** [1] - 40:20

**broader** [1] - 39:6

**brought** [18] - 12:15,

**between** / **by** columns:

12:16, 12:17, 12:22, 20:15, 20:19, 27:8, 30:9, 36:8, 38:9, 51:14, 56:7, 62:19, 62:21, 64:4, 66:8, 68:11

**Building** [1] - 2:9

**bunch** [1] - 55:22

**burden** [8] - 25:2, 50:12, 53:16, 75:2, 75:5, 75:11, 75:21

**burdens** [2] - 53:11, 78:14

**Bureau** [3] - 3:5, 3:10, 81:13

**Burford** [1] - 57:9

**Bus** [1] - 45:24

**business** [6] - 8:19, 25:18, 31:13, 34:18, 52:1, 73:13

**Business** [2] - 19:24, 46:13

**but** [108] - 6:5, 7:24, 9:3, 9:10, 9:14, 10:1, 11:3, 13:2, 14:2, 14:11, 14:20, 15:7, 15:17, 15:23, 16:19, 17:9, 17:10, 17:19, 18:4, 18:10, 18:17, 19:12, 20:1, 21:8, 21:19, 21:23, 22:3, 22:15, 22:21, 23:2, 23:10, 24:25, 25:14, 26:10, 27:3, 27:6, 29:13, 30:11, 30:16, 31:5, 31:19, 32:8, 32:18, 33:1, 33:23, 34:1, 35:20, 36:7, 36:11, 36:23, 37:1, 37:8, 37:14, 37:24, 38:16, 38:23, 39:23, 40:2, 40:7, 40:10, 42:1, 42:6, 42:9, 44:5, 44:12, 44:17, 48:3, 49:9, 49:14, 49:24, 50:5, 51:6, 52:12, 54:13, 54:16, 54:22, 56:1, 56:3, 57:10, 58:2, 59:22, 60:10, 60:19, 61:16, 61:25, 62:12, 62:24, 63:8, 63:15, 64:6, 65:3, 65:16, 67:8, 69:5, 70:7, 71:12, 73:12, 76:1, 77:1, 79:8, 80:1, 80:16, 82:20, 83:1, 83:11, 83:20, 83:22, 84:6

**BY** [6] - 1:3, 1:18, 1:23, 2:4, 2:7, 2:10

**by** [62] - 4:6, 4:13, 4:17, 5:3, 5:22, 6:1, 6:2, 7:1, 8:2, 10:16, 11:4, 11:24, 12:1, 13:11, 13:14, 14:7, 14:14, 19:3, 20:3, 20:5, 20:12, 23:23, 24:4, 24:18, 26:15, 27:1, 27:11, 28:14, 30:4, 30:6, 31:15, 32:23, 34:24, 35:18, 36:19, 46:17, 47:16, 50:22, 51:14, 54:24, 55:16, 60:12, 61:17, 67:18, 67:20, 67:24, 68:3, 68:24, 70:8, 71:16, 72:13, 72:14, 72:18, 72:19, 73:7, 73:14, 75:12, 75:24, 77:18, 83:23

**C**

**C** [2] - 1:15, 2:1

**call** [2] - 8:18, 80:6

**cameras** [1] - 45:4

**can** [52] - 4:4, 7:7, 7:10, 7:13, 7:14, 9:3, 16:7, 19:19, 20:15, 20:19, 21:22, 23:10, 23:12, 23:14, 23:15, 28:1, 29:7, 29:13, 29:15, 29:16, 30:9, 33:21, 33:22, 43:9, 43:10, 45:3, 46:3, 46:4, 49:19, 49:21, 49:22, 49:25, 51:16, 57:11, 57:12, 58:17, 58:18, 58:20, 58:22, 60:4, 60:10, 61:6, 61:9, 61:21, 65:7, 65:14, 67:11, 69:7, 71:22, 76:19, 82:20

**can't** [7] - 14:6, 20:8, 30:17, 38:17, 45:1, 49:13, 66:12

**cannot** [8] - 11:10, 41:6, 49:23, 55:24, 59:7, 62:24, 77:20, 79:3

**capable** [1] - 53:8

**capital** [1] - 7:22

**careful** [4] - 18:15, 47:10, 48:5, 67:4

**CAROLYN** [2] - 2:15, 85:16

**Carolyn** [4] - 23:14, 49:22, 49:24, 51:17

**Carolyn's** [1] - 44:23, 81:3

**carve** [1] - 62:15

**case** [97] - 5:25, 7:4, 7:18, 7:20, 7:22, 8:6, 8:7, 9:13, 9:22, 12:5, 12:15, 13:24, 18:11, 19:12, 20:19, 28:9, 29:3, 29:10, 29:20, 30:2, 30:7, 30:11, 30:21, 31:3, 35:21, 37:1, 38:3, 39:2, 39:3, 39:7, 40:5, 40:13, 41:4, 42:25, 43:2, 43:5, 43:13, 43:14, 43:18, 43:20, 44:2, 44:3, 44:16, 45:22, 45:23, 47:22, 50:9, 51:7, 51:10, 52:13, 52:25, 53:4, 55:12, 55:22, 55:25, 57:8, 57:11, 57:14, 57:24, 58:7, 59:4, 59:15, 62:7, 62:10, 63:1, 63:24, 64:18, 65:6, 65:17, 65:20, 65:23, 66:3, 66:4, 66:9, 67:13, 69:7, 76:5, 76:6, 76:7, 77:18, 77:24, 78:1, 78:6, 79:17, 79:18, 80:2, 80:5, 80:14, 82:6, 82:7, 82:25, 83:14, 83:23, 84:16

**cases** [28] - 6:17, 12:14, 18:20, 28:21, 33:6, 35:3, 36:13, 38:2, 38:24, 39:10, 40:10, 41:15, 45:8, 55:20, 56:6, 58:25, 59:14, 62:10, 64:24, 65:7, 65:8, 70:19, 70:21, 75:4, 76:16, 76:19, 78:3, 79:16

**Castle** [1] - 30:23

**categories** [1] - 15:16

**cause** [5] - 34:8, 42:3, 62:8, 76:22, 76:24

**causes** [4] - 23:20, 23:22, 28:17, 80:12

**center** [1] - 39:19

**central** [1] - 63:15

**century** [1] - 51:11

**certain** [6] - 12:7, 17:19, 21:22, 72:19, 72:25, 77:4

**Certainly** [1] - 15:5

**certainly** [11] - 10:6, 11:20, 13:3, 16:24, 32:2, 41:15, 42:11,

**carve** / **checking** columns:

57:13, 71:14, 80:16, 83:11

**Certificate** [46] - 8:16, 8:20, 8:23, 9:9, 9:11, 9:24, 10:4, 11:20, 13:13, 14:24, 15:18, 16:5, 17:22, 17:24, 18:1, 18:24, 19:1, 19:4, 19:7, 20:17, 20:20, 20:22, 21:10, 22:1, 22:22, 22:25, 24:5, 24:10, 24:14, 26:13, 26:15, 30:19, 31:23, 44:14, 46:17, 46:23, 46:25, 47:12, 48:17, 68:18, 68:20, 68:21, 68:24, 69:15, 72:9, 74:4

**certificate** [5] - 10:14, 15:24, 68:25, 72:14, 73:5

**Certificates** [1] - 24:17

**certified** [1] - 85:12

**challenge** [4] - 8:25, 56:21, 56:23, 57:15

**challenged** [1] - 59:7

**challenging** [2] - 23:22, 54:9

**Change** [2] - 16:5, 17:23

**change** [16] - 16:17, 16:20, 21:4, 25:2, 27:1, 27:4, 27:6, 36:23, 38:17, 48:8, 55:1, 70:9, 70:25, 71:15, 72:7, 77:22

**changed** [5] - 17:8, 70:3, 71:11, 71:19, 83:16

**changes** [4] - 21:8, 26:15, 71:14, 72:19

**changing** [3] - 27:3, 48:1, 71:1

**character** [1] - 31:15

**characterization** [1] - 22:20

**characterize** [1] - 10:11

**characterizes** [1] - 37:13

**Charities** [3] - 3:5, 3:9, 81:13

**charities** [2] - 50:18, 50:23

**chart** [1] - 63:19

**checked** [5] - 16:17, 16:18, 16:23, 47:11, 70:8

**checking** [1] - 71:14

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM
INDEX NO. 451625/2020
NYSCEF DOC. NO. 220
Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 260 of
461
RECEIVED NYSCEF: 02/03/2021

4

**Chief** [6] - 3:4, 3:9, 40:22, 75:12, 78:20, 81:13
**Chofetz** [1] - 43:20
**choice** [15] - 7:21, 7:24, 8:1, 8:2, 19:10, 24:16, 25:1, 25:3, 25:4, 27:11, 50:10, 50:12, 52:22, 75:3, 75:8
**choose** [1] - 73:21
**choosing** [1] - 76:13
**chose** [10] - 9:16, 9:20, 11:6, 19:16, 27:23, 60:18, 72:13, 72:16, 72:17, 73:21
**chosen** [2] - 62:13, 75:24
**Circuit** [2] - 51:20, 62:7
**circumstances** [4] - 41:9, 43:17, 79:3
**cite** [13] - 13:25, 18:11, 26:21, 28:21, 30:21, 32:8, 33:8, 36:2, 43:18, 45:22, 45:25, 62:6, 70:19
**cited** [6] - 19:2, 32:11, 43:20, 58:25, 59:15, 76:6
**cites** [2] - 45:23, 59:2
**citing** [2] - 17:23, 27:20
**city** [2] - 39:19, 75:17
**City** [5] - 10:20, 10:21, 18:7, 38:11, 75:19
**CIVIL** [1] - 1:1
**claim** [13] - 12:24, 29:3, 29:4, 43:5, 51:20, 53:10, 55:9, 58:6, 63:12, 63:13, 64:5, 74:14, 74:19
**claimants** [1] - 41:17
**claiming** [1] - 43:6
**claims** [42] - 12:4, 12:7, 12:15, 12:22, 12:23, 13:2, 27:12, 28:4, 28:7, 28:12, 28:16, 36:8, 36:10, 36:14, 36:15, 41:23, 43:9, 43:13, 43:17, 43:22, 44:1, 44:2, 44:7, 53:7, 56:21, 56:25, 57:3, 57:7, 59:7, 62:3, 62:12, 63:5, 63:9, 64:9, 65:3, 65:9, 68:6, 74:11, 74:12, 79:4, 79:17
**clarity** [1] - 47:17

**clear** [4] - 36:4, 43:10, 48:1, 75:4
**clearly** [5] - 19:20, 19:21, 20:12, 50:8, 71:3
**clerk** [3] - 24:11, 72:10, 72:15
**close** [2] - 45:1, 78:4
**closed** [1] - 85:9
**closely** [1] - 31:18
**closest** [1] - 13:19
**cluster** [1] - 12:3
**Co** [1] - 3:9
**co** [1] - 21:24
**co-defendant** [1] - 21:24
**Co-Section** [1] - 3:9
**codified** [1] - 74:18
**COHEN** [1] - 1:14
**collateral** [3] - 54:8, 57:15, 64:23
**collaterally** [1] - 56:21
**colleague** [3] - 4:13, 5:3, 5:12
**colon** [1] - 60:24
**color** [1] - 22:3
**Color** [1] - 59:2
**combed** [1] - 69:9
**come** [4] - 20:1, 35:6, 36:3, 63:4
**comes** [1] - 39:23
**comfortable** [1] - 6:12
**comity** [1] - 54:1
**commence** [1] - 7:21
**commenced** [10] - 34:13, 34:14, 35:18, 37:1, 38:4, 38:5, 54:15, 54:24, 58:8, 67:23
**commencement** [2] - 54:21, 55:6
**Commercial** [3] - 40:9, 44:20, 53:12
**companies** [1] - 21:3
**company** [5] - 16:10, 16:16, 16:20, 48:6, 78:22
**comparators** [1] - 63:18
**competence** [2] - 62:24, 65:13
**competent** [1] - 65:2
**complaint** [26] - 9:5, 11:15, 23:20, 34:20, 37:10, 50:19, 54:23, 54:25, 57:23, 57:24, 58:1, 59:5, 59:12, 60:1, 60:17, 61:5,

61:12, 61:16, 61:20, 77:3, 77:12, 80:21, 80:22, 83:16, 84:6, 84:8
**complete** [1] - 80:11
**completion** [1] - 77:9
**complex** [3] - 40:10, 52:17, 53:12
**complexity** [2] - 44:21, 52:19
**component** [1] - 48:25
**comprehensive** [1] - 33:10
**comprise** [1] - 19:7
**compulsory** [6] - 43:6, 43:7, 43:13, 43:23, 44:1, 44:3
**concedes** [1] - 12:19
**concepts** [2] - 18:9, 34:2
**concern** [1] - 65:12
**concerned** [1] - 76:12
**conclude** [1] - 71:21
**conclusive** [1] - 26:23
**condition** [2] - 9:12, 26:1
**conduct** [2] - 42:20, 62:20
**conducts** [1] - 11:3
**Confer** [4] - 81:7, 81:16, 82:3, 82:23
**confer** [1] - 9:17
**conference** [3] - 38:5, 84:16, 84:19
**conferring** [1] - 84:17
**confident** [1] - 76:15
**confirming** [1] - 80:24
**conflict** [5] - 12:14, 12:18, 32:14, 33:2, 33:4
**conflicting** [2] - 12:10, 13:1
**conflicts** [2] - 32:17, 71:6
**confronted** [1] - 51:19
**confusing** [1] - 22:14
**congress** [1] - 41:23
**Conley** [9] - 3:13, 3:22, 4:2, 23:8, 23:14, 49:21, 50:2, 51:16, 62:3
**CONLEY** [17] - 1:19, 3:12, 3:22, 23:18, 26:12, 27:20, 28:1,

28:15, 29:1, 49:17, 50:3, 51:18, 56:5, 56:17, 56:19, 56:23, 57:18
**conley** [7] - 48:11, 49:13, 58:10, 58:15, 58:16, 58:23, 66:12
**conley's** [1] - 63:10
**connect** [1] - 17:15
**connected** [1] - 23:4
**connection** [1] - 15:8
**Connell** [2] - 3:17, 4:5
**CONNELL** [3] - 1:20, 3:16, 4:5
**conley** - see
**consider** [4] - 37:25, 58:12, 72:4, 74:22
**considered** [1] - 73:24
**consistent** [7] - 32:21, 33:1, 44:10, 44:12, 44:19, 66:5, 71:18
**consolidate** [2] - 35:4, 38:24
**consolidated** [5] - 42:4, 65:8, 82:11, 83:5, 83:21
**consolidation** [1] - 68:25
**constitutional** [16] - 35:16, 35:22, 36:1, 36:8, 36:15, 39:2, 40:18, 41:23, 42:8, 42:13, 43:9, 56:21, 57:3, 63:5, 63:9, 79:11
**constitutionally** [2] - 62:20, 64:6
**construction** [1] - 34:6
**constructive** [1] - 11:1
**constructively** [1] - 19:17
**constructs** [1] - 19:23
**construe** [1] - 29:22
**construed** [1] - 19:17
**construes** [1] - 31:4
**construing** [1] - 30:24
**contact** [1] - 78:13
**contacts** [1] - 8:18
**contain** [1] - 14:24
**contained** [1] - 46:8
**contemporaneous** [1] - 78:16
**contend** [1] - 42:12

**contending** [1] - 61:2
**contest** [1] - 24:24
**contested** [1] - 66:8
**context** [3] - 18:16, 38:15, 70:22
**continue** [1] - 73:11
**continued** [1] - 10:23
**Continued** [1] - 2:1
**Continues** [1] - 1:24
**continuing** [1] - 68:19
**contradictory** [1] - 42:17
**contrary** [2] - 25:8, 77:25
**contrast** [1] - 71:16
**control** [1] - 72:3
**controlling** [3] - 14:7, 30:22, 31:3
**controversy** [1] - 80:10
**convenience** [2] - 31:12, 76:13
**conveniens** [20] - 33:23, 34:9, 38:15, 39:16, 39:22, 39:25, 45:8, 50:4, 52:6, 52:14, 52:21, 53:17, 53:25, 54:6, 74:17, 76:7, 76:9, 76:11, 78:8, 78:12
**convenient** [5] - 34:10, 40:1, 40:17, 42:15, 45:10
**conveyed** [1] - 6:8
**cool** [1] - 44:24
**coordinate** [1] - 76:17, 79:22, 83:12
**coordination** [1] - 84:9
**copies** [4] - 10:23, 15:8, 16:15, 16:17, 70:4
**copy** [1] - 15:22
**core** [1] - 26:3
**corners** [1] - 47:2
**Corp.,55** [1] - 45:24
**Corporate** [1] - 10:2
**corporate** [8] - 26:2, 31:21, 43:11, 69:11, 71:5, 72:19, 73:4, 73:14
**Corporation** [11] - 8:4, 19:10, 19:24, 30:17, 31:19, 32:24, 33:5, 68:5, 68:9, 70:12, 71:10
**corporation** [60] - 8:13, 10:13, 10:20, 10:21, 10:25, 13:18,

cb

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM

INDEX NO. 451625/2020

NYSCEF DOC. NO. 220

Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 261 of
461

RECEIVED NYSCEF: 02/03/2021

5

14:4, 14:12, 14:16,
14:21, 16:10, 16:22,
17:1, 17:14, 17:16,
18:20, 21:1, 21:4,
22:17, 24:2, 24:4,
24:7, 24:16, 25:7,
25:9, 25:17, 25:23,
26:7, 26:24, 27:15,
27:18, 27:22, 28:3,
30:16, 33:11, 48:19,
48:22, 48:23, 49:11,
68:12, 68:13, 68:16,
68:23, 69:14, 69:20,
69:23, 70:5, 70:10,
70:18, 71:2, 71:22,
71:23, 72:6, 72:11,
72:22, 73:1, 73:22,
74:2, 74:3, 75:14
   **corporation's** [1] -
26:22
   **corporations** [4] -
9:17, 30:15, 46:10,
51:24
   **correct** [9] - 7:19,
13:23, 14:5, 15:21,
15:22, 15:24, 16:3,
21:2, 22:15
   **corrected** [6] - 58:1,
58:4, 58:7, 60:18,
77:17, 77:19
   **CORRELL** [10] - 2:2,
2:4, 4:19, 22:1, 22:19,
32:3, 33:18, 45:16,
47:5, 48:12
   **Correll** [1] - 4:19
   **corruption** [1] -
37:18
   **cost** [1] - 39:18
   **costly** [1] - 40:13
   **could** [19] - 12:16,
12:17, 12:21, 12:22,
13:22, 14:25, 17:1,
27:2, 29:21, 31:20,
47:16, 48:5, 51:9,
65:11, 71:11, 74:11,
75:24, 76:3, 82:4
   **couldn't** [2] - 30:2,
42:12
   **counsel** [9] - 3:2,
4:18, 21:24, 45:14,
57:19, 68:14, 71:25,
83:1, 84:11
   **Counsel** [1] - 3:18
   **COUNSELORS** [1] -
1:21
   **counter** [1] - 55:11
   **counterclaim** [2] -
43:6, 43:13
   **counterclaims** [4] -
43:7, 43:23, 44:1,

44:3
   **countersuit** [2] -
51:3, 54:13
   **counties** [1] - 31:14
   **countries** [1] - 40:8
   **County** [1] - 12:18
   **county** [68] - 9:2, 9:8,
9:11, 10:13, 10:24,
10:25, 11:12, 11:16,
11:19, 12:1, 12:2,
12:17, 12:20, 13:2,
13:22, 16:21, 19:21,
21:23, 22:17, 22:24,
23:1, 23:3, 24:8,
24:11, 24:14, 24:15,
24:18, 24:20, 25:7,
25:10, 25:14, 25:22,
25:24, 25:25, 27:1,
27:3, 27:6, 27:7, 27:9,
27:23, 28:18, 30:17,
31:11, 48:7, 48:16,
48:18, 49:2, 49:8,
67:18, 67:20, 67:22,
68:1, 68:2, 70:9,
70:18, 71:10, 72:2,
72:3, 72:10, 72:14,
72:15, 72:18, 72:20,
73:2, 73:15, 74:3,
74:8
   **COUNTY** [1] - 1:1
   **couple** [3] - 24:24,
38:12, 65:22
   **course** [4] - 5:16,
10:2, 51:18, 66:6
   **Court** [61] - 6:7, 6:19,
11:22, 13:3, 13:11,
14:8, 18:8, 19:22,
22:2, 22:3, 24:1, 28:1,
28:5, 28:6, 28:15,
28:16, 28:18, 28:24,
30:3, 30:22, 31:3,
31:6, 31:9, 32:7, 32:8,
32:17, 33:9, 33:12,
34:7, 36:10, 37:12,
42:12, 45:18, 45:19,
47:16, 48:21, 50:8,
50:13, 51:2, 52:9,
53:3, 53:5, 53:8,
53:11, 53:16, 53:23,
53:25, 57:4, 61:25,
62:24, 62:25, 63:8,
65:4, 68:11, 72:21,
76:18, 79:13, 82:10,
82:14, 83:4, 84:12
   **court** [69] - 4:1, 7:18,
7:19, 7:20, 23:21,
32:19, 34:16, 34:17,
35:11, 35:14, 36:21,
40:2, 40:11, 40:19,
40:24, 41:2, 41:4,

41:7, 41:14, 41:17,
41:24, 41:25, 42:2,
42:14, 42:21, 43:4,
43:9, 43:10, 43:19,
44:11, 44:16, 44:18,
44:19, 50:5, 51:6,
51:9, 51:13, 51:19,
52:13, 52:25, 53:3,
53:5, 53:21, 57:5,
57:6, 61:22, 61:24,
62:4, 65:2, 65:3,
67:12, 69:7, 74:18,
74:20, 75:23, 76:5,
76:7, 76:8, 76:24,
76:25, 79:1, 79:4,
79:5, 79:15, 81:2,
82:16
   **COURT** [96] - 1:1,
2:15, 3:2, 3:11, 3:15,
3:19, 3:24, 4:3, 4:8,
4:16, 4:21, 4:24, 5:6,
5:9, 5:14, 7:14, 13:5,
13:14, 13:21, 14:3,
14:11, 15:1, 15:21,
15:25, 16:15, 17:10,
18:14, 19:25, 20:24,
21:3, 21:12, 22:13,
23:7, 23:12, 23:15,
23:16, 26:4, 27:13,
27:24, 28:10, 28:21,
29:5, 29:13, 29:16,
29:18, 30:25, 31:1,
31:24, 33:17, 33:19,
36:17, 37:3, 38:7,
38:20, 39:8, 39:15,
40:19, 41:21, 43:12,
44:22, 45:6, 45:13,
45:20, 46:2, 47:22,
49:9, 49:19, 49:22,
49:23, 49:24, 51:16,
55:19, 56:16, 56:18,
56:22, 57:17, 58:10,
58:17, 58:21, 59:8,
59:19, 61:21, 65:11,
66:10, 66:20, 66:25,
81:20, 82:17, 83:9,
83:24, 84:4, 84:13,
84:15, 84:24, 85:7,
85:17
   **Court's** [3] - 19:12,
81:15, 82:2
   **courts** [19] - 6:15,
6:16, 7:17, 18:10,
41:21, 51:10, 52:15,
54:2, 56:2, 58:25,
62:11, 63:2, 74:22,
75:2, 75:22, 76:14,
76:16, 79:7, 79:9
   **cover** [1] - 38:22
   **covered** [1] - 5:25

**COVID** [1] - 43:3
   **CPL** [2] - 8:8
   **CPLR** [38] - 12:9,
14:7, 27:21, 32:8,
32:11, 32:15, 32:16,
32:18, 32:21, 32:22,
32:25, 33:3, 33:5,
33:8, 37:10, 37:11,
54:24, 55:4, 55:11,
55:14, 60:15, 61:6,
61:7, 61:17, 67:19,
67:21, 68:2, 70:21,
72:2, 74:18, 76:21,
80:3, 80:4, 80:23,
83:9
   **create** [3] - 47:14,
47:16, 47:17
   **created** [5] - 31:16,
47:24, 47:25, 52:3,
73:17
   **creation** [1] - 26:2
   **creative** [1] - 9:2
   **creatures** [1] - 52:2
   **credible** [1] - 25:6
   **credibly** [1] - 41:12
   **critical** [1] - 51:1
   **crucial** [1] - 11:4
   **cryptic** [1] - 32:6
   **CSC** [1] - 70:6
   **culpability** [1] - 64:3
   **culpable** [1] - 63:25
   **culprit** [1] - 81:21
   **Cuomo** [3] - 43:1,
63:21, 66:1
   **current** [4] - 12:8,
24:21, 48:18, 82:14
   **currently** [4] - 49:5,
69:4, 72:24, 84:10
   **cursory** [2] - 29:10,
29:24
   **cut** [1] - 5:7
   **cuts** [3] - 17:2,
73:20, 73:23

**D**

   **Danan** [1] - 62:7
   **database** [2] - 24:25,
49:7
   **date** [4] - 6:8, 22:21,
22:22, 23:2
   **day** [2] - 36:21, 52:16
   **days** [3] - 84:7,
84:11, 84:13
   **de** [1] - 52:23
   **deal** [2] - 26:19,
52:16
   **dealing** [2] - 26:6,
30:11, 34:20

   **dealt** [2] - 57:11,
57:12
   **death** [1] - 31:21
   **debtor** [1] - 5:25
   **decided** [2] - 5:21,
38:8
   **deciding** [1] - 20:4
   **decision** [9] - 29:1,
30:13, 67:2, 80:8,
81:10, 81:15, 82:2,
82:5, 85:1
   **declined** [2] - 27:4,
51:21
   **deemed** [2] - 52:20,
68:1
   **default** [2] - 25:13,
72:2
   **defect** [1] - 55:17
   **defective** [5] - 55:10,
57:21, 58:1, 58:24,
61:19
   **defectively** [1] -
60:16
   **defendant** [16] - 4:9,
4:12, 4:23, 5:5, 5:13,
21:24, 29:20, 41:13,
52:24, 53:22, 59:6,
59:13, 61:10, 75:2,
77:2, 84:2
   **Defendant** [4] - 1:21,
2:2, 2:5, 2:8
   **defendant's** [3] -
25:2, 25:4, 25:21
   **Defendants** [1] - 1:9
   **defendants** [54] -
6:8, 12:8, 12:23,
21:14, 23:19, 23:21,
24:22, 25:5, 25:11,
26:19, 28:20, 41:17,
44:25, 45:7, 50:11,
51:3, 51:12, 52:10,
52:11, 53:2, 53:13,
53:18, 54:20, 54:22,
55:2, 55:8, 55:17,
55:21, 56:12, 56:15,
56:20, 57:19, 57:22,
57:25, 58:3, 58:6,
64:13, 70:19, 71:16,
75:5, 75:8, 75:10,
75:20, 76:4, 76:10,
79:5, 80:18, 80:19,
80:22, 82:18, 83:22,
84:3, 84:10
   **defendants'** [12] -
7:9, 50:4, 51:8, 52:6,
53:6, 53:7, 53:10,
53:23, 54:18, 55:13,
67:5, 77:16
   **defending** [1] - 27:11
   **defense** [2] - 45:14,

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM
INDEX NO. 451625/2020
NYSCEF DOC. NO. 220
Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 262 of
461
RECEIVED NYSCEF: 02/03/2021

6

58:11

**defenses** [2] - 9:2, 56:1

**deference** [2] - 14:10, 75:4

**deficit** [1] - 37:15

**define** [1] - 73:13

**defined** [7] - 8:21, 15:19, 19:1, 19:7, 46:25, 68:16, 68:20

**definition** [10] - 8:10, 8:14, 13:14, 16:23, 20:25, 21:5, 26:8, 46:23, 61:7, 69:13

**definitions** [1] - 68:19

**Delatil** [2] - 35:12, 64:19

**deliberate** [3] - 8:2, 19:10, 62:15

**demonstrating** [1] - 75:5

**denial** [1] - 78:17

**denied** [4] - 62:25, 67:7, 80:3, 84:5

**deny** [3] - 40:11, 63:10, 72:7

**depart** [4] - 8:3, 19:10, 34:5, 53:25

**Department** [12] - 22:6, 22:10, 24:19, 24:21, 26:18, 29:2, 43:1, 49:6, 52:1, 66:2, 71:9, 78:8

**department** [3] - 29:11, 29:25, 43:24

**depends** [1] - 83:6

**deprive** [1] - 28:6

**deprived** [1] - 61:25

**derived** [1] - 31:17

**describe** [1] - 67:3

**described** [1] - 71:15

**deserve** [1] - 36:9

**designate** [16] - 9:25, 10:6, 10:7, 10:13, 16:8, 16:12, 16:18, 17:1, 17:5, 17:7, 17:14, 18:2, 18:5, 18:6, 25:22, 42:14

**designated** [10] - 11:20, 12:1, 15:3, 15:13, 18:13, 67:20, 69:6, 69:15, 70:6, 71:23

**designates** [2] - 15:12, 17:17

**designating** [5] - 24:15, 27:1, 70:15,

70:17, 73:22

**designation** [3] - 10:9, 24:20, 69:19

**designations** [1] - 16:7

**designed** [2] - 40:12, 65:10

**destination** [1] - 16:9

**destroy** [1] - 38:6

**deter** [1] - 62:20

**determine** [5] - 6:16, 7:18, 34:7, 57:6, 80:9

**determined** [2] - 24:4, 43:22

**determines** [3] - 43:20, 52:4, 74:20

**determining** [1] - 28:2

**developments** [1] - 83:4

**device** [1] - 53:19

**did** [20] - 5:22, 10:5, 10:6, 24:22, 28:23, 29:2, 32:8, 33:7, 33:8, 37:24, 39:5, 42:24, 45:17, 55:1, 58:4, 59:16, 61:20, 73:6, 73:21, 81:25

**didn't** [15] - 10:13, 17:2, 21:6, 26:6, 26:7, 27:15, 38:10, 38:25, 48:8, 61:18, 65:17, 69:18, 69:20, 71:12, 79:25

**difference** [1] - 37:2

**different** [11] - 31:4, 36:7, 38:23, 40:20, 41:2, 42:7, 61:5, 63:25, 65:20, 68:5, 71:4

**differently** [1] - 63:22

**difficult** [3] - 4:1, 40:10, 64:21

**difficulty** [2] - 26:4

**diminish** [1] - 63:10

**directed** [1] - 64:16

**direction** [1] - 48:3

**directly** [1] - 16:20

**director** [4] - 30:4, 30:8, 30:10, 39:5

**disagree** [1] - 77:19

**discern** [1] - 47:20

**discovery** [9] - 35:15, 52:12, 52:17, 52:18, 63:15, 76:17, 79:23, 82:6, 82:25

**discrete** [2] - 8:9, 83:19

**discretion** [13] - 8:5,

19:11, 28:14, 30:14, 32:17, 32:19, 34:7, 37:13, 42:3, 61:25, 74:12, 78:4, 78:5

**discretionary** [7] - 7:4, 19:25, 20:1, 20:7, 42:6, 48:11, 80:6

**discuss** [5] - 13:3, 45:7, 45:17, 82:9, 82:24

**discussed** [2] - 70:2, 71:25

**dismiss** [17] - 43:21, 45:15, 48:10, 57:2, 57:5, 58:2, 61:19, 67:5, 67:6, 67:16, 74:16, 74:18, 76:21, 76:25, 82:11, 83:16, 84:5

**dismissal** [10] - 7:1, 33:24, 38:15, 52:20, 53:19, 54:16, 58:5, 76:22, 77:17, 78:1

**dismissed** [1] - 53:4

**dismissing** [7] - 7:4, 50:6, 52:13, 54:7, 57:14, 78:6, 79:19

**dispatches** [1] - 12:25

**dispose** [2] - 80:10, 80:20

**disposes** [1] - 70:14

**dispositive** [3] - 21:19, 46:9, 57:2

**dispute** [6] - 22:19, 23:19, 24:22, 35:16, 39:4, 39:5

**disputed** [1] - 22:16

**disputes** [2] - 52:18, 53:13

**disregard** [1] - 37:13

**dissolution** [27] - 8:6, 8:7, 11:5, 11:17, 12:6, 12:24, 13:2, 20:15, 20:19, 23:22, 24:1, 27:12, 28:4, 28:7, 28:16, 29:2, 30:5, 43:12, 51:20, 56:13, 56:25, 62:3, 62:8, 62:12, 68:6, 68:10, 74:11

**dissolve** [2] - 10:17, 36:4

**distance** [1] - 60:11

**distant** [2] - 31:14, 39:17

**distinct** [4] - 18:9, 25:17, 35:10, 56:20

**distinctive** [1] - 15:16

**distinguish** [1] - 63:22

**distinguishable** [2] - 29:12, 33:7

**district** [15] - 8:13, 11:6, 20:15, 20:20, 24:2, 26:16, 30:9, 31:11, 31:21, 46:22, 48:22, 68:12, 72:21, 73:5, 73:7

**District** [11] - 12:7, 12:24, 35:2, 35:13, 35:19, 40:2, 43:22, 44:9, 51:4, 54:14, 66:3

**disturbed** [2] - 50:11, 75:9

**Division** [4] - 40:9, 44:20, 53:12, 71:9

**do** [35] - 5:16, 7:7, 11:17, 11:18, 21:5, 21:14, 23:19, 24:24, 27:18, 28:12, 29:16, 41:24, 43:18, 49:16, 49:18, 53:1, 56:2, 56:3, 56:4, 60:14, 63:17, 63:23, 64:8, 64:11, 65:14, 67:13, 69:20, 74:8, 75:24, 76:19, 79:13, 81:3, 85:2

**doctrine** [11] - 34:9, 39:24, 52:21, 52:23, 53:1, 53:17, 53:25, 62:16, 74:17, 76:12, 78:11

**doctrines** [2] - 57:9, 57:12

**Document** [1] - 70:2

**document** [7] - 11:7, 15:20, 16:1, 16:6, 16:8, 22:2, 22:21

**documents** [14] - 9:21, 11:23, 15:9, 15:15, 15:20, 16:13, 18:5, 18:6, 19:6, 40:8, 47:1, 47:11, 47:20, 71:5

**does** [17] - 8:18, 13:18, 17:14, 17:17, 20:14, 28:18, 28:25, 33:11, 48:7, 55:6, 56:4, 57:11, 58:24, 68:7, 69:23, 76:18, 83:9

**doesn't** [9] - 3:25, 14:16, 15:23, 22:13, 28:6, 32:18, 57:13, 60:6, 77:22

**doing** [7] - 6:13,

6:22, 32:7, 35:25, 65:20, 76:10, 83:22

**domestic** [1] - 68:23

**don't** [41] - 4:3, 7:10, 15:3, 15:6, 17:15, 18:20, 21:8, 21:19, 27:17, 28:10, 29:6, 31:25, 32:24, 35:20, 41:5, 42:8, 44:24, 45:3, 49:14, 49:19, 60:4, 60:10, 61:17, 62:11, 63:8, 63:11, 66:22, 71:12, 72:5, 74:7, 75:10, 78:5, 79:7, 79:16, 81:8, 82:20, 83:10, 83:13, 83:19, 83:21

**done** [7] - 17:2, 27:2, 47:13, 51:10, 79:14, 80:7, 81:3

**doors** [1] - 42:10

**doubt** [2] - 36:10, 76:19

**down** [5] - 30:1, 44:24, 50:5, 59:9, 68:19

**dozens** [1] - 40:7

**drafted** [2] - 9:17, 30:13

**draw** [1] - 23:3

**duplication** [2] - 76:18, 79:24

**duplicativeness** [1] - 65:19

**during** [5] - 45:17, 68:14, 70:2, 71:25, 81:18

---

**E**

**E** [6] - 1:13, 1:15, 2:1

**earlier** [2] - 37:4, 69:17

**early** [4] - 10:1, 81:7, 82:7

**easier** [2] - 39:20, 75:18

**easily** [3] - 17:2, 27:2, 47:15

**easy** [2] - 47:15, 71:1

**echos** [1] - 5:15

**economy** [1] - 28:8

**Edge** [1] - 59:2

**effect** [4] - 20:13, 24:9, 25:23, 70:16

**efficiencies** [3] - 36:12, 40:4, 40:12

**efficiency** [1] - 28:8

**efficient** [1] - 40:13

cb

Appx. 260

efficiently [1] - 65:8
effort [4] - 36:4, 63:10, 76:18, 79:24
either [6] - 20:4, 25:5, 38:25, 48:8, 51:20, 67:16
elate [1] - 79:20
elect [2] - 61:19, 61:21
electing [1] - 27:7
election [3] - 60:16, 61:23, 62:1
elevation [1] - 55:13
embedded [1] - 21:5
emerged [1] - 66:6
Emily [1] - 3:8
EMILY [1] - 1:19
emphasize [1] - 59:11
employee [1] - 35:6
enable [1] - 59:9
enacted [1] - 50:22
encourage [1] - 47:18
ended [1] - 72:12
endless [1] - 83:10
ends [3] - 60:3, 72:24, 77:9
enemies [1] - 63:21
enforce [2] - 6:2, 56:8
Enforcement [4] - 3:9, 40:22, 75:13, 78:21
enforcement [14] - 41:15, 41:18, 43:23, 50:7, 50:14, 51:6, 51:14, 54:9, 54:10, 56:10, 57:15, 63:12, 63:13, 64:7
enforcing [2] - 78:21, 79:10
engages [1] - 25:18
enormous [1] - 77:2
enough [1] - 69:2
ensued [1] - 63:7
ensure [1] - 50:23
entered [1] - 82:9
entertaining [1] - 62:8
entire [3] - 28:5, 28:9, 28:19
entirely [1] - 50:19
entirety [1] - 80:21
entities [3] - 46:13, 52:2, 63:20
entitled [8] - 37:10, 37:22, 54:23, 57:25, 58:3, 61:4, 75:4, 80:22

entity [11] - 6:2, 16:19, 22:7, 22:8, 25:18, 31:8, 47:8, 47:21, 47:23, 52:3, 56:8
entity's [2] - 25:16, 26:23
envision [1] - 83:9
envisions [1] - 78:25
equate [1] - 70:20
equipped [1] - 42:12
equitable [2] - 54:5, 54:8
Eric [1] - 63:3
error [6] - 37:14, 54:20, 54:25, 55:3, 55:5, 77:6
especially [4] - 36:13, 61:1, 70:24, 78:3
ESQ [10] - 1:18, 1:19, 1:19, 1:20, 1:23, 1:23, 2:4, 2:7, 2:10, 2:11
essence [1] - 30:6
essential [1] - 26:2
essentially [5] - 12:4, 30:6, 35:7, 42:3, 78:16
establish [3] - 25:3, 25:6, 27:18
established [5] - 11:11, 24:6, 25:5, 31:11, 74:23
estoppel [1] - 64:23
even [20] - 10:13, 11:1, 12:5, 13:1, 21:7, 28:3, 36:3, 41:14, 44:10, 46:13, 46:18, 47:24, 54:23, 60:22, 64:6, 65:23, 72:4, 74:6, 74:10, 77:25
event [4] - 25:1, 57:21, 76:15, 77:25
events [2] - 34:19, 82:15
ever [1] - 53:3
every [4] - 12:12, 51:19, 52:16, 68:1
everybody's [2] - 66:11, 66:25
everyone [2] - 5:17, 7:13
evidence [17] - 15:1, 15:4, 17:11, 17:23, 25:6, 26:11, 26:23, 27:17, 52:8, 69:10, 72:5, 72:16, 72:17, 73:1, 74:7, 75:1, 75:16
evolved [1] - 10:8

exact [5] - 16:22, 35:13, 41:11, 66:7, 70:11
exactly [1] - 32:7
example [4] - 10:15, 12:15, 34:21, 73:3
except [4] - 32:22, 60:1, 67:23, 77:12
exception [2] - 6:1, 32:9
exceptional [2] - 67:1, 67:2
exceptions [1] - 31:16
exclusive [2] - 6:18, 41:24
excuse [1] - 30:25
executive [2] - 64:2, 65:15
executives [3] - 12:8, 63:25, 64:14
exercise [3] - 37:13, 42:3, 51:9
exercised [1] - 51:13
exhaustive [1] - 11:23
exhaustively [1] - 69:8
exhibit [2] - 15:7, 17:25
exhibits [1] - 11:22
exist [7] - 19:23, 26:6, 26:8, 38:25, 63:2, 64:11, 79:16
existed [2] - 47:24, 51:22
existence [8] - 9:19, 19:14, 19:16, 26:2, 41:10, 52:4, 65:19, 74:24
exists [2] - 19:24, 34:8
expand [1] - 53:24
expect [1] - 57:5
expecting [1] - 16:16
expenditures [2] - 34:18, 35:8
expenses [2] - 34:21, 34:22
experience [1] - 63:16
experienced [1] - 63:16
explicit [1] - 21:8
explicitly [1] - 78:9
expressly [1] - 25:16
extension [1] - 33:14
extent [3] - 19:15, 34:23, 42:7, 57:10, 64:11, 75:20, 79:11

F

F [1] - 1:13
face [2] - 11:5, 31:20
fact [16] - 7:24, 17:2, 22:25, 37:15, 38:9, 57:23, 58:4, 60:1, 63:22, 71:22, 73:20, 77:3, 77:21, 78:8, 84:9
facto [1] - 52:23
factor [2] - 54:16, 78:15
factors [5] - 52:5, 54:5, 74:22, 78:17, 79:19
facts [6] - 41:11, 43:16, 44:8, 65:7, 77:12, 78:1
factual [6] - 34:17, 57:10, 63:10, 64:2, 64:12, 66:7
faded [1] - 31:1
fail [5] - 26:20, 46:18, 46:20, 54:11, 54:19
failed [5] - 46:10, 46:13, 51:12, 55:2, 80:19
failure [1] - 59:5, 59:12, 60:22
fair [2] - 48:15, 73:12
fairly [1] - 53:9
fairness [1] - 62:24
faith [2] - 62:22, 82:5
false [2] - 53:10, 59:7
fanfare [1] - 59:16
far [3] - 5:16, 71:22, 77:5
FARBER [4] - 2:10, 5:1, 5:8, 5:10
Farber [2] - 5:1, 5:10
farber [1] - 5:7
favor [7] - 28:9, 47:16, 52:6, 53:4, 65:6, 73:15, 75:8
favors [2] - 34:8, 78:5
federal [80] - 6:14, 6:15, 33:24, 34:16, 34:25, 35:3, 35:11, 35:14, 36:8, 36:13, 36:15, 36:21, 37:25, 38:3, 38:24, 39:2, 40:2, 40:11, 40:16, 40:19, 41:4, 41:10, 41:14, 41:16, 41:22, 41:23, 41:24, 42:2, 42:5, 42:13, 42:14, 42:19, 43:4, 43:7,

43:9, 43:10, 43:14, 44:11, 45:9, 50:5, 51:3, 51:6, 51:8, 51:10, 51:13, 51:19, 52:24, 52:25, 53:4, 53:21, 54:13, 54:17, 55:22, 56:19, 57:5, 57:8, 62:4, 62:11, 63:2, 63:24, 64:17, 65:2, 65:12, 65:24, 66:1, 75:23, 76:5, 76:7, 76:13, 77:18, 77:23, 78:1, 78:20, 79:5, 79:7, 79:9, 79:14, 79:16, 79:18
Federal [1] - 43:16
federalism [1] - 40:21
feedback [1] - 46:4
Feldman [1] - 36:2
felt [1] - 71:11
few [4] - 38:4, 44:23, 58:15, 66:7
fiduciaries [1] - 50:18
fight [3] - 9:19, 11:5, 19:15
fighting [2] - 9:18, 19:14
figure [3] - 18:17, 37:4, 50:1
file [5] - 24:10, 46:19, 48:21, 67:8, 80:24
filed [43] - 9:24, 10:23, 11:22, 13:8, 15:8, 17:24, 23:1, 24:13, 24:18, 35:9, 35:14, 36:11, 36:18, 36:19, 36:21, 36:24, 37:1, 37:3, 37:5, 37:8, 37:9, 38:2, 38:3, 39:3, 41:2, 41:10, 43:17, 44:2, 44:3, 48:17, 54:13, 54:15, 59:20, 63:9, 64:17, 64:18, 66:3, 68:22, 68:25, 72:9, 77:20, 78:2, 78:15
files [1] - 37:18
filing [15] - 5:21, 22:22, 23:2, 25:23, 25:24, 37:21, 37:24, 38:1, 54:25, 57:22, 58:7, 70:1, 72:14, 73:17, 78:25
filings [5] - 5:24, 73:10, 73:11, 73:14, 77:23
Financial [2] - 43:1, 66:2

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM

INDEX NO. 451625/2020

NYSCEF DOC. NO. 220

Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 264 of
461

RECEIVED NYSCEF: 02/03/2021

8

financial [1] - 63:14
find [8] - 28:15, 28:17, 41:16, 43:18, 68:7, 69:10, 69:12, 79:3
finds [2] - 55:14, 58:8
fine [1] - 84:13
fingers [1] - 44:23
finished [1] - 59:23
finishing [1] - 45:1
Fire [1] - 23:17
first [31] - 6:24, 7:10, 10:11, 17:22, 19:4, 25:16, 27:16, 36:11, 36:18, 36:20, 36:24, 37:1, 38:2, 40:25, 44:2, 44:3, 53:6, 58:8, 59:17, 65:23, 67:17, 70:17, 73:3, 73:12, 75:12, 77:20, 78:2, 78:15, 78:19, 82:2
First [7] - 24:19, 26:18, 39:6, 64:4, 78:8, 78:9, 80:15
first-filed [3] - 44:3, 78:2, 78:15
fit [1] - 44:15
five [3] - 17:6, 44:24, 63:19
fixed [2] - 27:7, 77:7
flag [1] - 35:25
flashing [1] - 66:16
flatly [1] - 77:19
flawed [1] - 25:14
flaws [1] - 29:23
Fleming [3] - 4:22, 4:24, 82:23
FLEMING [4] - 2:5, 2:7, 4:22, 4:25
flexible [1] - 12:9
Floor [2] - 1:22, 2:3
fly [1] - 39:13
focus [2] - 26:19, 52:11
fold [1] - 10:11
folks [1] - 46:3
follow [3] - 6:21, 58:18, 70:23
followed [1] - 37:23
footprint [1] - 40:5
for [133] - 1:17, 1:21, 2:2, 2:5, 2:8, 3:6, 3:18, 3:21, 4:1, 4:9, 4:18, 4:19, 4:22, 5:13, 5:15, 6:13, 6:22, 7:4, 8:7, 8:18, 9:12, 9:17, 9:18, 10:15, 11:13, 12:6, 12:15, 14:19, 15:9, 15:14, 15:15,

16:2, 16:4, 17:11, 17:18, 18:2, 18:3, 18:17, 19:5, 19:14, 19:16, 23:22, 23:25, 24:3, 24:21, 25:22, 26:14, 26:17, 27:3, 28:4, 28:12, 28:21, 29:4, 30:5, 30:7, 30:14, 31:12, 32:24, 33:4, 33:11, 34:11, 34:21, 35:18, 35:22, 35:24, 38:22, 40:12, 40:18, 41:25, 44:7, 45:25, 49:24, 50:5, 50:6, 51:11, 52:11, 52:12, 52:20, 52:21, 53:2, 53:19, 54:8, 54:11, 54:16, 57:8, 58:5, 58:12, 59:22, 62:22, 63:2, 64:6, 67:3, 68:5, 68:6, 68:8, 68:10, 69:3, 70:12, 70:16, 70:17, 70:25, 71:3, 72:19, 73:3, 73:18, 73:21, 73:22, 74:10, 75:14, 76:4, 76:11, 76:22, 76:24, 78:4, 78:22, 81:16, 82:4, 82:6, 82:18, 83:1, 84:4, 84:6, 84:11, 84:16, 84:23, 85:4, 85:5, 85:6
force [2] - 16:25, 53:20
foreign [3] - 27:22, 53:18, 68:23
form [15] - 9:23, 12:9, 17:9, 17:17, 21:3, 27:2, 55:13, 55:17, 63:20, 68:22, 70:7, 70:15, 70:24, 71:18, 79:20
formation [5] - 9:21, 11:25, 24:10, 26:3, 27:5
formed [5] - 10:1, 13:7, 17:6, 51:24, 69:18
former [2] - 12:8, 35:6
forms [1] - 56:11
forth [9] - 7:2, 8:10, 9:9, 9:11, 23:5, 25:6, 33:10, 70:12, 71:8
fortunately [1] - 13:11
forum [44] - 33:23, 34:9, 34:10, 36:9, 36:13, 38:15, 39:15, 39:22, 39:25, 40:16,

41:14, 41:25, 42:7, 42:9, 42:15, 44:6, 45:8, 45:9, 45:10, 50:4, 50:8, 50:10, 51:5, 52:5, 52:13, 52:20, 52:23, 53:4, 53:17, 53:24, 54:5, 62:5, 65:7, 65:9, 74:17, 74:21, 74:25, 75:3, 75:9, 76:6, 76:8, 76:11, 78:7, 78:12
forums [1] - 66:8
forward [5] - 16:13, 16:17, 35:6, 55:24, 70:4
found [1] - 6:16
founders [1] - 10:15
four [2] - 32:5, 47:2
Fourteenth [1] - 39:6
framework [1] - 19:9
frankly [1] - 73:12
fraud [1] - 50:23
FRAZER [1] - 1:8
Frazer [4] - 2:5, 4:23, 56:12, 82:24
frequently [1] - 52:18
Friday [1] - 5:20
from [45] - 5:2, 5:4, 5:10, 5:13, 6:7, 8:3, 10:10, 10:19, 13:8, 16:11, 18:22, 19:10, 20:24, 23:3, 25:17, 26:16, 26:18, 31:14, 31:18, 36:12, 39:20, 40:11, 43:16, 47:20, 53:25, 55:9, 56:3, 56:6, 58:11, 59:4, 60:7, 60:11, 60:19, 63:6, 69:9, 72:23, 73:5, 75:18, 76:7, 77:4, 80:14, 81:2, 81:6, 81:9, 82:5
front [4] - 38:8, 38:10, 39:4, 47:14
frustration [1] - 47:5
fully [2] - 54:12, 57:5
fundamentally [3] - 53:24, 57:20, 65:10
further [5] - 6:7, 10:22, 13:3, 58:11, 68:16
future [2] - 83:5, 83:20

G

GAGE [1] - 2:5
gained [1] - 36:12

Gambino [2] - 59:1, 59:4
garbled [2] - 59:21, 77:4
garnered [1] - 34:22
gave [2] - 37:23, 71:1
General [57] - 3:5, 3:8, 3:14, 3:17, 5:23, 7:23, 8:4, 8:5, 9:1, 9:12, 10:11, 10:19, 10:22, 11:3, 11:10, 11:14, 12:3, 12:10, 12:13, 12:19, 12:21, 13:22, 16:24, 19:10, 21:14, 21:20, 22:4, 22:15, 22:20, 27:8, 27:10, 27:23, 30:17, 31:18, 33:1, 35:17, 36:20, 37:17, 41:6, 41:12, 45:1, 45:23, 47:7, 50:15, 51:15, 54:14, 57:1, 62:9, 67:11, 67:25, 73:25, 74:9, 77:20, 78:20, 78:25, 79:3, 81:11
GENERAL [2] - 1:3, 1:16
general [4] - 33:15, 33:16, 80:6, 80:8
General's [4] - 3:14, 56:24, 57:7, 77:3
genuine [1] - 12:14
geographic [1] - 76:12
Gestalt [1] - 8:18
get [22] - 9:3, 12:15, 14:18, 20:1, 20:8, 24:25, 26:9, 26:14, 39:17, 42:1, 44:5, 45:1, 47:18, 48:3, 49:15, 59:9, 75:18, 75:19, 81:3, 81:21, 83:13, 84:16
gets [1] - 12:11
getting [3] - 14:15, 26:16, 46:4
giant [1] - 62:15
Gilinsky [2] - 13:24, 18:11
give [6] - 32:16, 32:18, 33:12, 44:23, 53:18, 71:12
given [10] - 7:9, 7:21, 7:24, 14:9, 44:20, 53:13, 60:20, 70:24, 74:8, 84:8
gives [2] - 19:11, 21:3
giving [1] - 57:14
go [15] - 7:10, 7:19,

21:21, 29:18, 39:17, 42:2, 42:22, 45:6, 46:3, 47:19, 50:2, 55:24, 56:22, 58:22, 73:25
going [26] - 3:20, 14:18, 21:23, 32:4, 36:6, 38:6, 39:18, 40:17, 42:22, 44:16, 48:2, 55:20, 56:1, 63:4, 63:17, 63:18, 64:3, 64:10, 64:12, 74:13, 76:1, 81:23, 82:15, 84:18
gone [3] - 60:6, 71:8, 73:19
good [14] - 3:7, 3:11, 3:19, 4:10, 4:15, 4:21, 4:24, 4:25, 5:1, 5:17, 34:8, 47:10, 52:21, 82:5
Good [4] - 3:12, 3:15, 3:16, 4:16
got [3] - 26:17, 42:21, 63:13
governed [1] - 23:23
governing [1] - 11:6
government [2] - 10:17, 63:4
governmental [1] - 6:2
Governor [3] - 43:1, 63:21, 66:1
grant [1] - 80:4
granted [2] - 41:23, 45:9
grants [1] - 8:4
great [3] - 26:19, 75:17
gremlin [1] - 66:20
ground [4] - 45:9, 52:20, 58:5, 77:1
grounds [10] - 6:13, 7:3, 7:4, 29:12, 48:11, 51:21, 52:14, 53:4, 57:2, 74:16
GROUP [1] - 2:2
group [2] - 33:22, 33:23
guess [2] - 38:7, 48:9
guidance [2] - 80:17, 82:5
guide [1] - 19:12
gun [1] - 43:2

H

hailed [1] - 53:18

**hand** [1] - 66:11
**handling** [1] - 3:23
**hands** [1] - 19:18
**handwritten** [1] - 47:20
**hang** [1] - 46:2, 59:19
**happen** [1] - 81:14
**happened** [4] - 10:18, 14:19, 17:9, 49:2
**happens** [2] - 13:15, 56:3
**happy** [2] - 13:3, 15:7
**harass** [1] - 62:22
**hard** [6] - 32:7, 33:22, 39:17, 66:25, 75:18, 85:2
**harder** [1] - 39:13
**hardship** [2] - 52:10, 75:1
**headquarters** [1] - 69:4
**health** [1] - 43:24
**hear** [10] - 5:15, 7:13, 36:10, 42:12, 43:9, 46:5, 65:2, 69:7, 81:9, 82:21
**heard** [6] - 34:12, 36:9, 45:15, 62:3, 65:10, 74:21
**hearing** [3] - 3:6, 5:22, 6:5
**heavily** [1] - 70:1
**heavy** [2] - 50:12, 75:5
**held** [5] - 7:17, 29:3, 45:5, 58:25, 66:24
**helm** [1] - 64:1
**highest** [1] - 63:3
**highly** [2] - 42:20, 64:5
**historical** [9] - 17:6, 19:18, 25:8, 35:21, 69:9, 72:5, 73:14, 74:1, 74:7
**hold** [1] - 29:15
**holding** [1] - 59:14
**home** [1] - 55:14
**hON** [1] - 1:14
**Honor** [68] - 3:7, 3:12, 3:16, 3:22, 4:5, 4:15, 4:19, 4:22, 5:1, 7:12, 13:17, 15:6, 15:13, 15:20, 17:4, 17:21, 18:22, 20:10, 21:16, 21:18, 22:1, 22:19, 23:11, 23:18, 26:12, 26:25, 27:20,

29:2, 29:9, 29:19, 32:2, 32:3, 33:18, 34:2, 36:25, 37:8, 38:12, 38:21, 39:4, 39:13, 39:21, 41:8, 42:11, 45:11, 45:16, 46:6, 47:2, 47:5, 48:12, 49:17, 50:3, 51:18, 52:15, 56:5, 58:14, 58:23, 60:14, 65:22, 66:18, 81:12, 81:25, 82:1, 82:19, 83:18, 84:14, 84:22, 84:23, 85:6
**hope** [1] - 82:20
**hopefully** [1] - 49:25
**hostilities** [1] - 63:6
**hypothesizing** [1] - 14:11
**hypothetical** [3] - 13:10, 13:20, 14:2
**hypothetically** [1] - 13:6

## I

**idea** [3] - 42:16, 44:5, 61:14
**ideally** [1] - 18:10
**identical** [1] - 64:25
**identified** [4] - 44:13, 45:11, 45:12, 55:8
**identifies** [1] - 31:22
**identify** [3] - 8:21, 51:12, 80:19
**identity** [1] - 80:12
**ignore** [3] - 28:12, 28:14, 32:19
**ignored** [2] - 55:4, 55:5
**ignores** [2] - 25:23, 51:10
**illusory** [1] - 11:12
**image** [1] - 23:9
**imagine** [1] - 29:16
**Imaging** [1] - 62:7
**immediate** [2] - 6:5, 37:23
**immediately** [1] - 70:7
**impact** [1] - 5:21
**imperfect** [1] - 18:10
**implicate** [2] - 39:5, 64:13
**implicated** [1] - 34:3
**implicates** [1] - 50:25
**implication** [1] - 46:15

**importance** [3] - 35:22, 51:1, 61:1
**important** [5] - 9:16, 23:11, 30:3, 80:17, 84:18
**impose** [1] - 52:10
**imposed** [1] - 78:14
**impressively** [1] - 69:9
**improper** [4] - 12:2, 25:3, 28:4, 51:23
**improperly** [2] - 28:16, 37:11
**impugn** [1] - 63:8
**inaccurate** [1] - 9:14
**inapposite** [1] - 30:20
**inappropriate** [2] - 62:5, 79:2
**inaudible** [1] - 81:19
**INC** [1] - 1:7
**inclined** [1] - 72:4
**include** [6] - 8:21, 19:2, 47:1, 61:10, 68:21, 74:23
**includes** [4] - 61:9, 61:12, 70:8, 77:9
**including** [3] - 56:11, 57:2, 74:12
**inclusive** [1] - 15:19
**incompetent** [1] - 65:4
**incomplete** [1] - 59:21
**inconsistency** [1] - 42:17
**inconsistent** [4] - 32:23, 32:25, 44:6, 64:22
**inconvenient** [3] - 38:10, 39:9, 76:2
**Incorporation** [42] - 8:16, 8:20, 8:24, 9:9, 9:11, 9:24, 10:5, 11:21, 13:13, 14:24, 15:18, 18:25, 19:1, 19:4, 19:7, 20:17, 20:21, 20:22, 21:10, 22:2, 22:23, 23:1, 24:5, 24:11, 24:14, 24:17, 26:14, 26:15, 30:20, 31:23, 44:14, 46:17, 46:23, 46:25, 47:13, 48:17, 68:18, 68:20, 68:21, 69:16, 72:9, 74:4
**incorporation** [3] - 25:25, 48:2, 72:1
**incorporations** [1] - 25:8

**incorrect** [1] - 23:2
**incredible** [1] - 40:5
**incurred** [3] - 34:23, 34:24
**indeed** [3] - 34:23, 78:24
**indemnity** [1] - 39:5
**independent** [2] - 54:11, 65:16
**INDEX** [1] - 1:4
**indicated** [2] - 62:11, 72:25
**indicia** [1] - 71:13
**individual** [7] - 12:8, 12:23, 56:14, 56:20, 64:13, 64:14, 80:17
**individuals** [2] - 56:8, 79:17
**inefficiencies** [1] - 76:18
**inefficiency** [1] - 79:23
**inference** [1] - 23:3
**inferring** [1] - 72:23
**inform** [1] - 45:18
**information** [5] - 23:5, 49:7, 60:2, 77:13, 81:3
**informing** [1] - 83:3
**inherent** [1] - 40:12
**inherently** [1] - 39:9
**initial** [5] - 11:25, 26:10, 37:21, 60:19, 77:3
**ink** [1] - 34:22
**inquiry** [1] - 78:10
**inscribed** [2] - 9:20, 11:6
**insider** [1] - 30:5
**insight** [1] - 31:6
**insinuate** [1] - 28:20
**instance** [3] - 51:13, 59:17, 62:6
**instant** [1] - 28:2
**instead** [4] - 6:6, 8:7, 27:7, 57:24
**institutions** [1] - 31:12
**instrument** [1] - 68:22
**instruments** [1] - 68:25
**intended** [5] - 16:25, 47:14, 53:1, 53:17, 70:16
**intent** [2] - 19:22, 64:13
**intention** [1] - 83:19
**intentional** [1] - 46:17

**intentionally** [1] - 31:19
**interest** [12] - 28:8, 34:7, 34:11, 42:13, 50:13, 50:25, 51:7, 51:24, 53:19, 65:5, 74:20, 75:6
**interesting** [2] - 13:10, 69:12
**interference** [1] - 51:23
**interpretation** [2] - 19:13, 50:21
**interrelated** [3] - 36:13, 40:3, 67:7
**interruption** [1] - 31:13
**introduction** [1] - 6:20
**investigation** [1] - 56:24
**investors** [1] - 42:23
**invitation** [2] - 53:6, 53:23
**invoked** [1] - 52:24
**involve** [3] - 29:2, 52:18, 67:7
**involved** [2] - 43:24, 47:18
**involves** [3] - 12:14, 56:14, 56:19
**ironclad** [1] - 80:16
**irrelevant** [3] - 49:1, 49:3, 69:5
**issue** [7] - 21:13, 40:20, 47:17, 64:17, 70:22, 83:1, 85:1
**issued** [2] - 68:22, 69:1
**issues** [19] - 5:21, 7:19, 33:8, 34:18, 35:1, 35:13, 39:6, 43:10, 44:8, 45:19, 56:2, 57:11, 64:12, 65:1, 65:25, 66:7, 67:7, 80:21, 81:17
**items** [1] - 10:23
**iterations** [1] - 11:21
**itself** [4] - 54:10, 55:10, 57:16, 71:7

## J

**J.S.C** [1] - 1:14
**Jack** [1] - 59:2
**James** [1] - 38:5
**JAMES** [2] - 1:3, 1:18
**January** [1] - 1:11
**Jennifer** [1] - 4:14

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM INDEX NO. 451625/2020
NYSCEF DOC. NO. 220
Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 266 of
461
RECEIVED NYSCEF: 02/03/2021

10

**JENNIFER** [1] - 1:23
**Jewish** [1] - 43:25
**Jim** [2] - 3:4, 81:12
**JOEL** [1] - 1:14
**John** [1] - 4:23
**JOHN** [1] - 1:7
**joined** [3] - 4:13, 4:17, 5:3
**JONATHAN** [1] - 1:19
**Jonathan** [3] - 3:13, 3:22, 36:2
**JOSHUA** [1] - 1:8
**judge** [2] - 10:19, 20:3
**Judge** [1] - 4:3
**judgment** [4] - 70:14, 77:5, 80:10, 80:13
**judicata** [2] - 57:13, 64:24
**Judicial** [2] - 12:6, 12:24
**judicial** [16] - 8:12, 11:6, 20:15, 20:19, 24:1, 26:16, 28:8, 29:11, 29:25, 31:21, 46:21, 48:22, 56:13, 68:11, 72:21, 73:5
**judicially** [1] - 31:16
**judiciary** [1] - 65:15
**jurisdiction** [13] - 28:7, 28:20, 32:20, 41:24, 42:18, 51:7, 51:9, 51:14, 51:21, 51:22, 53:18, 62:12, 74:19
**justice** [11] - 34:8, 34:11, 42:14, 53:20, 65:5, 72:21, 73:5, 73:7, 74:21, 75:7, 77:1
**justices** [4] - 24:18, 26:16, 26:18, 72:19
**justified** [2] - 62:18, 80:11
**justify** [1] - 78:14

**K**

**keep** [4] - 6:21, 27:7, 28:19, 82:13
**keeping** [1] - 74:14
**KENT** [1] - 2:4
**Kent** [1] - 4:19
**kind** [5] - 33:14, 38:18, 47:23, 63:1, 66:18
**knowing** [1] - 46:18
**knowledge** [2] -

59:25, 77:11
**known** [1] - 11:8

**L**

**lacks** [1] - 55:12
**land** [1] - 34:5
**language** [18] - 8:18, 9:4, 18:23, 32:9, 32:12, 43:15, 46:12, 55:11, 59:4, 59:11, 60:25, 61:24, 69:22, 70:11, 70:22, 71:7, 72:12, 72:23
**LAPIERRE** [1] - 1:7
**LaPierre** [4] - 2:2, 4:18, 4:20, 56:12
**largely** [1] - 34:16, 76:13
**larger** [1] - 67:4
**last** [4] - 38:9, 48:13, 51:11, 79:25
**latest** [1] - 34:15, 43:5, 65:6
**launched** [1] - 72:8
**Law** [14] - 8:4, 10:2, 19:10, 19:24, 30:17, 31:19, 32:24, 33:5, 40:22, 68:5, 68:9, 70:12, 75:12, 78:20
**LAW** [1] - 2:2
**law** [33] - 6:14, 11:9, 14:14, 20:3, 20:5, 20:12, 24:9, 24:13, 28:14, 41:15, 41:18, 43:11, 50:10, 50:19, 50:21, 51:1, 51:20, 52:2, 52:3, 54:22, 55:12, 55:16, 56:7, 56:8, 56:10, 58:9, 62:12, 64:11, 67:18, 67:24, 72:20, 75:15, 79:10
**law"** [1] - 68:3
**laws** [3] - 51:25, 54:3, 78:23
**lawsuit** [5] - 7:25, 34:14, 35:10, 38:9, 54:9
**lawsuits** [3] - 5:25, 40:18, 42:19
**lawyer** [1] - 18:15
**lawyers** [2] - 47:10, 48:6
**Lazarow** [3] - 30:23, 31:3, 31:9
**least** [8] - 28:22, 37:19, 40:11, 40:13, 69:4, 72:17, 75:21,

79:19
**leave** [2] - 45:6, 82:23
**led** [1] - 30:1
**leeway** [1] - 12:11
**left** [4] - 4:14, 16:19, 37:20, 70:13
**legal** [8] - 25:23, 26:21, 34:17, 44:8, 54:8, 57:11, 66:7, 79:14
**legislature** [4] - 9:16, 30:13, 47:14, 50:22
**Legislature** [1] - 8:3
**legislature's** [1] - 19:9
**legitimate** [3] - 50:6, 52:12, 52:20
**less** [1] - 39:1
**LETITIA** [1] - 1:3
**Letitia** [1] - 38:5
**letter** [2] - 5:22, 11:9
**letters** [1] - 81:6
**level** [2] - 63:3, 64:13
**Lexington** [1] - 1:22
**liberal** [1] - 55:14
**Liberty** [1] - 1:17
**Life** [1] - 2:9
**lift** [1] - 41:6
**Light** [1] - 78:8
**light** [3] - 66:16, 79:19, 81:9
**likely** [1] - 64:5
**likewise** [1] - 9:3
**limited** [1] - 73:10
**limiting** [1] - 32:12
**limits** [1] - 32:13
**line** [5] - 22:21, 47:14, 68:19, 71:20, 74:6
**lines** [3] - 39:16, 40:15, 49:1
**list** [2] - 40:6, 48:7
**listed** [2] - 22:23, 49:6
**lists** [2] - 22:16, 71:10
**literally** [1] - 11:19
**literature** [1] - 78:20
**litigate** [5] - 38:11, 51:5, 64:10, 64:12, 76:2
**litigated** [6] - 44:9, 44:15, 64:3, 64:4, 64:17, 64:19
**litigating** [6] - 41:11, 41:16, 52:9, 65:6, 65:16, 75:22
**litigation** [13] - 7:6, 34:16, 34:25, 35:5,

35:9, 35:12, 38:25, 40:4, 63:16, 64:19, 64:20, 81:5, 82:15
**litigations** [1] - 78:12
**LLP** [1] - 2:8
**located** [16] - 8:13, 16:22, 18:4, 24:2, 24:7, 25:14, 26:1, 26:17, 26:24, 48:19, 48:23, 53:5, 68:12, 70:10, 72:22, 75:17
**location** [42] - 8:15, 9:20, 9:25, 10:6, 16:21, 18:24, 19:5, 19:6, 20:16, 20:20, 20:21, 21:10, 24:3, 24:15, 25:18, 25:19, 25:22, 26:20, 26:21, 27:1, 27:3, 27:6, 28:3, 30:18, 30:19, 31:22, 39:17, 44:13, 46:10, 46:20, 46:22, 47:3, 68:17, 69:10, 69:15, 70:9, 70:20, 71:1, 72:14, 72:18, 73:13, 74:25
**locked** [1] - 42:18
**locus** [1] - 39:10
**lodge** [1] - 10:23
**lodged** [6] - 10:4, 11:24, 12:7, 15:9, 15:11, 59:15
**look** [12] - 8:20, 8:23, 14:13, 18:12, 19:4, 19:25, 36:3, 42:1, 46:21, 47:2, 66:14, 66:25
**looked** [1] - 47:7
**looking** [1] - 22:3
**lost** [1] - 29:13
**lurid** [1] - 59:16
**lying** [1] - 35:7

**M**

**mail** [1] - 11:18
**mailing** [1] - 15:15
**main** [2] - 65:11, 73:16
**maintain** [2] - 40:23, 67:11
**major** [1] - 39:19
**managed** [1] - 65:8
**mandated** [4] - 7:1, 41:1, 42:2, 74:10
**mandates** [1] - 69:24
**mandatory** [12] - 8:7, 9:4, 9:12, 12:5, 28:11, 28:23, 30:12, 31:4,

35:9, 35:12, 38:25, 40:4, 63:16, 64:19, 64:20, 81:5, 82:15

35:9, 35:12, 38:25, 40:4, 63:16, 64:19,

31:15, 32:19, 44:12, 74:7
**Manhattan** [8] - 7:24, 10:7, 10:18, 10:19, 38:9, 39:8, 39:13, 40:10
**March** [2] - 84:20
**Mark** [2] - 5:3, 5:12
**MARK** [1] - 2:11
**marshals** [1] - 29:21
**matter** [9] - 20:13, 25:1, 44:21, 52:19, 54:22, 60:10, 74:12, 78:4, 80:6
**matters** [1] - 37:6, 79:23
**McQueen** [4] - 34:21, 34:24, 35:1, 64:16
**MDL** [1] - 35:4
**mean** [8] - 28:11, 38:14, 49:9, 59:21, 60:9, 63:12, 83:9, 83:16
**meaning** [1] - 17:19
**means** [4] - 8:15, 20:16, 36:18, 71:1
**meant** [1] - 37:4
**meantime** [2] - 4:8, 67:8
**measure** [1] - 72:13
**mechanisms** [1] - 40:4
**media** [1] - 61:2
**meet** [1] - 75:11
**Meet** [4] - 81:7, 81:16, 82:3, 82:23
**Meeting** [1] - 1:10
**meeting** [2] - 81:18, 84:17
**memory** [1] - 15:11
**men** [1] - 10:16
**mention** [1] - 35:20
**mentioned** [3] - 57:19, 65:24, 69:17
**menu** [1] - 21:22
**mere** [2] - 9:15, 60:23
**merger** [1] - 68:24
**merit** [1] - 57:7
**meritless** [1] - 58:8
**merits** [4] - 50:20, 51:5, 51:7, 67:13
**Met** [1] - 2:9
**met** [1] - 50:11
**microphones** [1] - 45:4
**Middle** [1] - 35:13
**might** [5] - 31:13, 42:4, 45:18, 46:18, 46:19

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM
INDEX NO. 451625/2020
NYSCEF DOC. NO. 220
Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 267 of
461
RECEIVED NYSCEF: 02/03/2021

11

**military** [1] - 10:16

**militate** [1] - 54:7

**minimize** [2] - 76:17, 79:23

**minute** [1] - 66:14

**minutes** [3] - 38:4, 44:23, 66:21

**Misc** [1] - 45:24

**misconduct** [1] - 50:23

**misreading** [1] - 23:5

**misremembering** [1] - 22:18

**missing** [1] - 77:15

**misunderstand** [1] - 57:20

**misused** [1] - 50:24

**modern** [1] - 25:9

**moment** [3] - 9:3, 21:16, 24:25

**money** [1] - 39:18

**MONICA** [1] - 1:20

**Monica** [2] - 3:17, 4:5

**morning** [16] - 3:7, 3:11, 3:12, 3:15, 3:16, 3:19, 3:21, 4:10, 4:15, 4:16, 4:21, 4:24, 4:25, 5:1, 5:17, 38:4

**morph** [1] - 52:23

**Mosdos** [1] - 43:20

**most** [5] - 19:3, 20:11, 36:14, 42:15, 44:18

**motion** [25] - 6:25, 7:11, 11:23, 15:8, 25:2, 27:25, 29:8, 32:1, 33:20, 40:6, 40:21, 43:21, 45:9, 47:18, 53:8, 58:2, 61:18, 67:15, 72:7, 74:15, 74:16, 76:21, 78:18, 80:1, 83:20

**motions** [24] - 5:18, 6:11, 6:22, 7:9, 28:2, 33:21, 34:3, 45:15, 48:10, 54:4, 54:11, 54:18, 67:5, 67:6, 67:10, 80:25, 81:4, 82:10, 83:5, 83:10, 83:11, 83:15, 83:20, 84:5

**Motions** [1] - 1:11

**move** [7] - 29:7, 31:25, 32:4, 48:12, 52:25, 53:19, 76:7

**moved** [1] - 57:2

**moving** [5] - 35:4, 54:16, 74:16, 76:10, 83:13

**MR** [34] - 3:4, 3:12, 3:22, 4:4, 4:19, 4:22, 4:25, 5:1, 5:8, 5:10, 22:1, 22:19, 23:18, 26:12, 27:20, 28:1, 28:15, 29:1, 32:3, 33:18, 45:16, 47:5, 48:12, 49:17, 50:3, 51:18, 56:5, 56:17, 56:19, 56:23, 57:18, 81:12, 81:25, 84:21

**MS** [60] - 3:7, 3:16, 4:5, 4:10, 4:15, 4:17, 7:12, 7:15, 13:10, 13:16, 13:24, 14:6, 14:23, 15:5, 15:22, 16:4, 17:4, 17:21, 18:22, 20:10, 21:2, 21:7, 21:16, 21:18, 23:10, 29:9, 29:15, 29:17, 29:19, 31:2, 32:2, 34:2, 36:25, 37:7, 38:12, 38:21, 39:12, 39:21, 41:8, 42:11, 43:15, 45:11, 45:21, 46:6, 49:21, 58:14, 58:19, 58:23, 59:10, 60:14, 61:23, 65:22, 66:18, 82:19, 83:18, 84:2, 84:8, 84:14, 84:23, 85:6

**multi** [1] - 63:6

**multi-pronged** [1] - 63:6

**multidistrict** [2] - 38:25, 40:4

**multiple** [7] - 36:1, 42:19, 56:11, 57:2, 59:14, 63:6, 65:24

**must** [6] - 10:5, 33:12, 54:17, 66:18, 75:20, 75:21

**mute** [3] - 46:3, 46:4, 81:20

**N**

**N-CPL** [2] - 8:8

**N-PCL** [5] - 9:17, 15:19, 23:23, 23:25, 25:16, 26:24, 27:11, 28:6, 31:17

**name** [2] - 26:3, 50:16

**named** [3] - 16:3, 16:5, 70:6

**narrow** [2] - 32:4, 39:4

**narrowed** [1] - 31:20

**narrower** [2] - 12:20,

14:8

**NATIONAL** [1] - 1:7

**National** [3] - 4:12, 22:8, 38:6

**nature** [4] - 35:8, 37:14, 55:5, 60:20

**NDNY** [4] - 56:5, 56:14, 56:16, 57:1

**necessary** [2] - 54:15, 72:6

**need** [8] - 33:19, 35:20, 42:7, 52:11, 74:8, 76:25, 79:11, 85:4

**needed** [1] - 52:24

**needs** [1] - 44:14

**nest** [1] - 34:15

**never** [12] - 10:9, 11:25, 14:23, 25:11, 25:19, 25:22, 27:6, 42:12, 52:19, 58:1, 62:3, 71:23

**new** [2] - 2:6, 2:10

**NEW** [5] - 1:1, 1:1, 1:3, 1:3, 1:16

**New** [113] - 1:11, 1:18, 1:22, 2:3, 2:6, 2:10, 3:14, 6:15, 8:2, 9:2, 9:8, 9:10, 9:23, 10:2, 10:12, 10:13, 10:20, 10:21, 10:24, 10:25, 11:12, 11:15, 11:19, 12:1, 12:2, 12:17, 13:2, 18:6, 19:21, 21:20, 21:23, 22:6, 22:9, 22:10, 22:12, 22:17, 22:24, 23:1, 23:2, 24:7, 24:14, 24:18, 24:20, 25:9, 25:12, 25:19, 25:24, 27:7, 27:8, 28:18, 34:14, 35:17, 35:19, 37:18, 38:11, 40:22, 42:19, 42:20, 42:24, 43:19, 43:22, 44:9, 47:9, 48:7, 48:16, 49:6, 50:8, 50:10, 50:13, 50:15, 50:16, 50:17, 50:19, 50:21, 50:23, 51:4, 51:24, 52:13, 52:15, 53:3, 54:14, 63:4, 63:14, 63:17, 67:17, 68:1, 68:4, 69:6, 69:11, 71:9, 71:10, 72:3, 72:13, 72:15, 72:18, 73:2, 73:15, 74:3, 75:2, 75:6, 75:12, 75:14, 75:17, 75:19, 75:22, 78:21,

78:23

**newly** [1] - 9:24

**next** [3] - 14:18, 76:21, 81:5

**nexus** [2] - 50:7, 51:6

**non** [22] - 33:23, 34:9, 38:15, 39:15, 39:22, 39:25, 45:8, 50:4, 52:5, 52:13, 52:17, 52:20, 53:4, 53:17, 53:24, 54:5, 74:17, 76:6, 76:8, 76:11, 78:7, 78:12

**non-party** [1] - 52:17

**none** [6] - 11:3, 11:20, 52:5, 52:8, 56:14, 56:19

**nonetheless** [2] - 46:21, 60:20

**nonprofit** [4] - 9:18, 9:23, 30:16, 31:20

**nonresident** [1] - 13:18

**nonsubstantive** [1] - 77:6

**normal** [1] - 20:2

**normally** [1] - 84:7

**Northern** [6] - 35:2, 35:19, 40:2, 51:4, 54:14, 66:3

**not-for-profit** [4] - 9:17, 33:11, 75:14, 78:22

**Not-for-Profit** [5] - 32:24, 33:4, 68:5, 68:8, 70:12

**note** [5] - 28:1, 38:7, 60:14, 67:10, 71:8

**noted** [3] - 26:25, 46:9, 51:21

**notes** [3] - 30:3, 66:15, 85:13

**nothing** [1] - 67:12

**notice** [4] - 37:24, 57:22, 60:16, 61:12

**Notice** [1] - 5:19

**notion** [1] - 64:23

**notwithstanding** [1] - 53:7

**November** [2] - 22:23, 23:1

**nowadays** [1] - 9:23

**NRA** [83] - 1:21, 4:9, 6:4, 9:8, 9:10, 10:1, 10:4, 10:16, 10:23, 11:4, 11:15, 11:24, 13:17, 14:23, 16:25, 17:4, 17:6, 19:14, 22:11, 24:10, 24:13,

24:16, 24:22, 25:11, 25:18, 25:21, 26:14, 26:17, 26:25, 27:3, 27:5, 35:1, 35:8, 35:9, 35:16, 35:18, 36:4, 36:21, 38:3, 38:8, 42:22, 42:23, 47:7, 49:4, 49:6, 49:21, 54:13, 56:24, 57:7, 63:3, 63:5, 63:22, 65:16, 68:6, 69:18, 69:23, 70:1, 70:8, 70:13, 70:25, 71:11, 71:23, 72:8, 72:13, 72:16, 72:17, 72:24, 73:3, 73:6, 73:9, 73:16, 74:1, 74:2, 74:4, 74:14, 75:21, 75:24, 78:24, 82:22, 83:2, 84:23, 85:6

**NRA's** [22] - 5:19, 8:23, 11:25, 24:6, 25:8, 26:1, 26:20, 34:18, 34:20, 36:14, 37:25, 54:8, 54:17, 57:3, 64:6, 65:9, 65:20, 69:4, 69:11, 71:10, 71:21, 80:18

**nullify** [2] - 54:21, 55:6

**nullity** [9] - 37:9, 37:11, 37:22, 38:2, 57:19, 57:23, 57:24, 60:17, 61:20

**NUMBER** [1] - 1:5

**number** [6] - 9:1, 29:12, 34:6, 67:7, 81:15, 81:17

**Nutronics** [1] - 62:7

**NY** [1] - 59:1

**NY2D** [1] - 30:24

**NYSCEF** [2] - 15:21, 70:2

**O**

**OAG** [1] - 77:19

**objection** [3] - 6:4, 82:22, 83:3

**objects** [1] - 41:17

**observed** [1] - 52:15

**obtained** [1] - 82:5

**obtaining** [1] - 72:19

**obtains** [1] - 83:1

**obvious** [1] - 20:12

**obviously** [7] - 17:4, 38:16, 44:17, 60:18, 77:6, 80:5, 83:6

**occurs** [1] - 62:16

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM
INDEX NO. 451625/2020
NYSCEF DOC. NO. 220
Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 268 of 461
RECEIVED NYSCEF: 02/03/2021

12

oddly [1] - 35:10
OF [9] - 1:1, 1:1, 1:3, 1:3, 1:7, 1:16
office [93] - 8:13, 8:15, 8:22, 8:24, 9:8, 9:10, 9:25, 10:6, 10:14, 11:1, 11:2, 11:12, 11:15, 11:16, 11:19, 13:12, 13:19, 14:3, 14:12, 14:15, 14:20, 15:3, 16:21, 17:1, 17:5, 17:7, 17:8, 17:14, 17:15, 18:9, 18:13, 18:15, 18:18, 18:19, 18:24, 20:16, 20:25, 21:4, 22:17, 24:2, 24:4, 24:6, 24:11, 24:12, 24:15, 25:7, 25:9, 25:12, 25:17, 25:22, 25:25, 26:7, 26:17, 26:23, 27:14, 27:18, 28:3, 30:18, 31:22, 46:10, 46:22, 48:1, 48:18, 48:22, 49:10, 68:12, 68:16, 68:17, 69:6, 69:11, 69:13, 69:19, 69:23, 70:10, 70:17, 71:2, 71:21, 71:23, 72:1, 72:6, 72:10, 72:14, 72:18, 72:22, 73:1, 73:14, 73:22, 74:1, 74:2
Office [2] - 3:14, 35:17
OFFICE [1] - 1:16
Officer [2] - 40:22, 75:13
officer [4] - 30:5, 30:8, 30:10, 78:23
officers [1] - 41:16
offices [1] - 20:16
official [1] - 16:6
officials [1] - 42:20
often [3] - 39:15, 46:10, 46:13
old [4] - 29:10, 29:24, 30:2, 33:14
omitted [1] - 77:4
once [1] - 7:18
one [68] - 10:7, 12:16, 12:17, 13:11, 13:14, 15:11, 16:2, 17:12, 17:13, 19:2, 20:6, 20:9, 20:21, 21:16, 21:18, 27:15, 28:24, 29:4, 30:6, 30:20, 31:5, 32:3, 33:16, 35:3, 38:7, 39:12, 39:23, 41:2,

41:9, 43:3, 45:17, 45:18, 47:3, 47:22, 47:23, 49:25, 59:1, 61:21, 61:22, 62:6, 62:25, 63:1, 63:14, 64:25, 65:11, 66:1, 66:4, 67:4, 67:22, 69:6, 69:24, 73:12, 73:21, 74:12, 75:23, 77:20, 77:25, 79:4, 80:7, 80:8, 80:10, 81:6, 82:11, 83:24, 84:2, 84:10
one's [1] - 79:8
Op [2] - 59:1, 59:3
open [1] - 42:10
operates [1] - 32:16
operating [1] - 3:25
opinion [5] - 29:11, 29:24, 32:5, 46:8, 78:19
opportunity [1] - 46:19
oppose [1] - 44:17
opposed [2] - 48:18, 82:12
opposing [2] - 45:12, 57:18
opposition [3] - 24:6, 45:24, 54:12
optimal [2] - 42:14, 44:7
option [2] - 27:3, 70:8
options [1] - 21:22
order [6] - 51:23, 67:8, 77:1, 80:24, 82:9, 85:1
ordered [1] - 47:10
orders [1] - 6:7
Organization [1] - 43:25
organization [4] - 10:18, 13:7, 24:5, 42:24
organize [1] - 83:12
organized [2] - 6:21, 78:23
original [10] - 22:22, 22:25, 25:24, 48:17, 54:20, 55:1, 55:9, 68:21, 69:19, 77:8
Orthodox [1] - 43:25
otherwise [7] - 20:3, 49:15, 58:25, 62:21, 67:24, 74:5, 75:24
ought [1] - 21:19
outright [1] - 55:23
outset [1] - 67:10
outside [2] - 18:16,

75:17
overlap [1] - 63:10
overlapping [5] - 34:3, 34:17, 38:2, 57:10, 64:22
overlays [1] - 14:9
oversight [1] - 56:9
overt [1] - 64:21
own [3] - 6:12, 51:25, 54:3

P

page [6] - 16:9, 30:22, 43:21, 45:23, 61:16, 63:19
pages [3] - 16:2, 37:18, 62:17
paper [1] - 13:8
papers [15] - 8:11, 11:17, 11:23, 17:11, 21:20, 24:6, 24:23, 25:25, 30:1, 36:19, 37:12, 53:8, 54:12, 55:3, 80:1
par [1] - 5:15
paragraph [3] - 9:6, 18:1
parallel [3] - 8:3, 31:18, 41:10
Park [3] - 2:3, 2:6, 2:9
PART [1] - 1:1
part [8] - 6:24, 23:11, 40:25, 47:1, 63:1, 77:10, 79:9, 84:18
partial [2] - 40:6, 60:22
particular [2] - 7:22, 72:2
particularly [2] - 78:15, 79:10
parties [21] - 5:20, 6:22, 33:7, 67:23, 69:3, 71:8, 74:23, 76:6, 76:16, 76:24, 78:13, 79:18, 79:22, 80:12, 80:18, 81:1, 81:6, 81:9, 81:19, 82:4, 82:10
party [2] - 52:17, 70:21
past [1] - 66:7
patience [1] - 85:2
pattern [1] - 66:6
Pause [1] - 21:17
PCL [9] - 9:17, 15:19, 23:23, 23:25, 25:16, 26:24, 27:11, 28:6,

31:17
penalty [1] - 9:6
pendency [1] - 7:5
pending [20] - 6:11, 6:17, 33:24, 34:16, 34:25, 35:11, 35:12, 39:3, 40:3, 51:4, 54:18, 65:25, 66:3, 76:23, 77:18, 77:21, 77:23, 78:1, 78:10, 80:2
PEOPLE [1] - 1:3
People [1] - 50:16
people [4] - 46:18, 47:18, 47:19, 83:11
per [1] - 83:2
perfectly [1] - 53:8
perhaps [2] - 41:14, 65:3
perjury [1] - 9:6
permissible [1] - 72:3
permits [2] - 74:18, 80:4
permitted [2] - 16:20, 70:25
persnickety [1] - 49:9
perspective [1] - 40:11
persuasive [1] - 73:19
petition [3] - 61:5, 61:12, 61:13
petitioned [1] - 53:14
petitioner [1] - 61:10
Phillips [3] - 2:8, 5:5, 5:13
PHILLIPS [1] - 1:7
phrase [4] - 17:16, 18:15, 20:25, 26:7
physical [3] - 25:12, 25:17, 25:19
pick [1] - 44:24
picture [4] - 4:7, 29:13, 49:13, 81:21
piece [5] - 13:8, 17:11, 17:23, 26:11, 71:4
pitfalls [1] - 85:3
place [17] - 7:17, 8:19, 13:25, 19:16, 19:17, 44:7, 52:3, 52:9, 52:16, 53:11, 53:15, 65:18, 65:20, 67:19, 67:22
placed [1] - 42:20
places [2] - 65:17, 76:2, 77:2
placing [1] - 77:5

plain [6] - 12:1, 19:3, 38:17, 55:11, 69:22, 71:6
plainly [1] - 28:8
Plaintiff [2] - 1:5, 1:17
plaintiff [6] - 3:3, 3:18, 29:21, 60:6, 61:10, 67:20
plaintiff's [9] - 25:1, 25:3, 29:23, 50:10, 52:22, 59:6, 75:3, 75:6, 75:8
plaintiffs [1] - 55:21, 84:22
plan [2] - 81:9, 82:6
planned [1] - 81:16
planning [2] - 81:7, 81:18
play [2] - 35:2, 79:10
plays [1] - 38:16
pleading [1] - 55:14
point [21] - 17:18, 26:10, 30:21, 32:4, 33:9, 38:11, 39:8, 42:1, 45:17, 48:4, 48:13, 57:19, 60:9, 60:11, 64:21, 67:17, 69:13, 71:16, 73:12, 79:6, 82:2
pointed [2] - 15:2, 68:14
points [4] - 24:24, 58:15, 62:9, 65:22
police [1] - 6:2
policy [1] - 46:7
political [2] - 7:22, 63:21
position [5] - 5:23, 6:5, 42:4, 43:12, 82:24
positions [1] - 6:9
possible [1] - 7:25
posture [1] - 38:23
potential [3] - 52:7, 74:25, 75:1
potentially [1] - 40:23
POWELL [1] - 1:8
powers [1] - 6:3
practical [1] - 55:19
practice [2] - 47:18, 51:11
precedence [3] - 33:5, 33:12, 57:15
precedent [8] - 26:1, 47:17, 48:3, 53:2, 54:1, 54:10, 73:14, 74:1
precise [1] - 48:20,

49:12
**precisely** [1] - 55:15
**preclusion** [1] - 57:13
**preempts** [1] - 33:5
**prefer** [3] - 7:23, 53:22, 79:5
**preference** [1] - 50:5
**preferred** [1] - 42:9
**prejudice** [3] - 55:6, 55:8, 55:16
**preliminary** [2] - 84:16, 84:19
**premised** [1] - 50:19
**prescribed** [10] - 8:8, 14:14, 20:3, 20:5, 20:12, 28:14, 31:12, 67:18, 67:24, 68:3
**prescribes** [3] - 20:13, 20:18, 68:5
**prescription** [2] - 9:5, 12:21
**prescriptive** [1] - 14:8
**present** [2] - 55:23, 69:10
**press** [3] - 34:22, 38:5, 42:21
**presumably** [1] - 71:11
**pretty** [2] - 31:17, 39:4
**prevent** [1] - 31:13
**previously** [6] - 34:25, 35:14, 41:10, 43:17, 44:19, 64:17
**principal** [7] - 3:20, 8:19, 17:12, 18:9, 18:13, 18:14, 18:18
**printout** [5] - 22:4, 22:5, 48:14, 48:15, 49:1
**priority** [1] - 77:23
**probative** [1] - 73:9
**problem** [3] - 12:12, 62:14, 64:22
**procedural** [2] - 33:11, 53:19
**procedure** [2] - 32:22, 37:23
**procedures** [1] - 52:16
**proceed** [8] - 6:10, 6:20, 55:21, 57:12, 79:5, 81:16, 82:3, 82:4
**proceeding** [12] - 6:4, 6:12, 35:4, 61:9, 61:11, 61:15, 62:19, 62:21, 68:10, 81:8,

82:11, 82:22
**proceedings** [1] - 21:17
**Proceedings** [1] - 61:8
**proceeds** [1] - 55:25
**process** [15] - 16:3, 16:5, 16:18, 17:18, 18:3, 18:19, 35:4, 70:4, 70:6, 70:16, 71:1, 71:4, 71:18, 73:18
**processed** [1] - 64:15
**produce** [1] - 21:22
**produces** [1] - 33:2
**Productions** [1] - 78:9
**profile** [1] - 60:20
**profit** [5] - 9:17, 30:14, 33:11, 75:14, 78:22
**Profit** [5] - 32:24, 33:4, 68:5, 68:8, 70:12
**progressing** [1] - 64:24
**promptly** [3] - 60:15, 63:9, 77:17
**pronged** [1] - 63:6
**proof** [1] - 55:16
**proper** [14] - 9:7, 19:20, 19:21, 23:25, 25:4, 27:9, 27:22, 28:18, 29:3, 29:4, 50:8, 57:4, 68:2, 80:4
**properly** [4] - 23:21, 32:25, 54:2, 55:4
**proposed** [1] - 83:20
**proposition** [2] - 28:22, 45:25
**propriety** [2] - 56:23, 56:25
**prosecuting** [1] - 54:3
**prosecution** [2] - 62:19, 62:21
**prospect** [1] - 31:20
**protected** [2] - 62:20, 64:6
**protection** [1] - 31:7
**provide** [2] - 35:6, 67:8
**provides** [5] - 31:5, 54:24, 55:4, 67:21, 76:22
**providing** [1] - 55:16
**province** [1] - 6:18
**provision** [14] - 17:17, 23:23, 27:11,

28:12, 28:23, 30:12, 31:5, 31:18, 32:10, 32:12, 32:20, 38:18, 44:13, 70:13
**provisions** [7] - 12:10, 27:21, 31:6, 32:14, 32:18, 34:6, 72:2
**public** [2] - 50:22, 50:25
**publicly** [1] - 60:13
**pull** [1] - 15:7
**purports** [1] - 22:5
**purpose** [4] - 20:13, 41:19, 62:22, 73:21
**purposeful** [1] - 38:18
**purposes** [7] - 15:14, 24:3, 26:3, 69:3, 71:4, 73:4, 73:22
**pursuant** [2] - 50:17, 75:13
**pursue** [1] - 79:4
**put** [6] - 22:4, 22:20, 25:6, 42:4, 43:8, 65:12
**puts** [1] - 61:24

**Q**

**questioned** [1] - 36:15
**questioning** [1] - 62:23
**questions** [4] - 51:1, 58:13, 78:19, 80:9
**quickly** [2] - 52:23, 77:7
**quirk** [1] - 69:17
**quirky** [1] - 47:22
**quite** [1] - 84:6
**quote** [3] - 59:4, 61:19, 80:14
**quoting** [3] - 32:9, 62:16, 69:2

**R**

**raise** [4] - 33:7, 42:7, 55:25, 65:25
**raised** [7] - 8:25, 34:17, 45:19, 57:4, 58:15, 79:12
**raises** [4] - 40:19, 56:20, 65:1, 73:16
**raising** [2] - 38:14, 38:20
**rarely** [1] - 50:11
**rather** [4] - 6:21,

39:20, 60:19, 84:11
**rational** [1] - 44:18
**reach** [2] - 74:9, 74:13
**read** [10] - 8:10, 17:10, 22:21, 32:25, 43:15, 48:15, 48:16, 59:8, 60:4, 61:7
**reading** [7] - 20:11, 20:24, 33:2, 47:20, 48:14, 55:16, 59:8
**ready** [1] - 67:2
**reaffirmed** [1] - 24:16
**real** [4] - 46:20, 49:4, 63:9, 64:10
**really** [9] - 18:20, 27:18, 32:7, 48:3, 48:25, 65:23, 73:16, 76:4, 76:10
**reason** [6] - 14:6, 30:20, 40:16, 52:21, 53:15, 59:22
**reasonable** [1] - 6:13
**reasons** [3] - 54:12, 67:9, 78:5
**rebut** [1] - 55:2
**receipt** [1] - 81:2
**receive** [2] - 58:4, 70:6
**received** [1] - 73:7
**recent** [1] - 63:16
**recess** [2] - 45:5, 66:24
**recognize** [2] - 14:18, 65:14
**recognized** [1] - 52:1
**recollection** [1] - 28:22
**recommendation** [1] - 13:16
**reconvene** [1] - 45:3
**record** [7] - 11:23, 22:4, 22:14, 38:22, 57:4, 67:9, 69:21
**Record** [1] - 85:9
**records** [6] - 24:21, 24:25, 46:9, 67:4, 69:9, 71:15
**red** [1] - 35:25
**reduce** [1] - 60:21
**reference** [2] - 37:3, 71:17
**references** [2] - 21:20, 26:6
**referencing** [1] - 32:9
**referring** [1] - 48:16
**reflected** [2] - 24:21, 25:9

**refusal** [1] - 62:18
**regards** [1] - 22:11
**registered** [14] - 9:25, 14:1, 15:15, 16:8, 16:9, 16:11, 16:19, 18:9, 18:12, 25:13, 26:20, 26:22, 27:1, 70:20
**regular** [4] - 14:4, 14:17, 14:22, 79:13
**regulated** [1] - 32:23
**regulating** [1] - 51:24
**regulatory** [2] - 6:2, 56:10
**reject** [2] - 53:6, 53:23
**relate** [2] - 34:20, 67:10
**related** [6] - 33:25, 39:3, 39:7, 56:6, 66:4, 76:17
**relevance** [1] - 18:16
**relevant** [6] - 18:21, 26:22, 52:7, 54:5, 69:6, 75:1
**reliance** [2] - 29:23, 46:16
**relied** [1] - 33:6
**relief** [3] - 30:7, 56:11, 57:20
**relies** [2] - 12:13, 70:1, 73:17
**relinquishment** [1] - 11:9
**relocating** [1] - 46:14
**reluctant** [1] - 60:21
**rely** [2] - 17:11, 64:23
**relying** [1] - 26:5
**remainder** [1] - 70:15
**remaining** [3] - 7:19, 33:21, 48:10
**removal** [5] - 52:24, 56:12, 76:5, 76:11
**render** [1] - 67:2
**rendered** [1] - 57:23
**repeatedly** [1] - 24:16
**replacement** [1] - 83:1
**reply** [4] - 13:25, 24:23, 30:22, 55:2
**REPORTER** [6] - 2:15, 4:3, 23:15, 30:25, 49:23, 85:17
**reporter** [2] - 59:9, 81:2
**reporters** [1] - 4:1
**representing** [1] -

Appx. 267

48:6

**request** [1] - 84:11
**requested** [1] - 44:20
**require** [4] - 5:24, 10:8, 50:20, 69:18
**required** [11] - 17:5, 24:10, 25:22, 26:14, 47:19, 50:12, 69:24, 71:24, 72:9, 72:20, 73:10
**requirement** [4] - 10:3, 10:9, 60:22, 79:14
**requires** [6] - 9:24, 10:14, 34:10, 37:19, 77:17, 80:11
**requires"** [1] - 77:1
**reread** [1] - 59:11
**res** [2] - 57:13, 64:23
**research** [1] - 6:13
**reserve** [1] - 83:7
**reserved** [1] - 6:6
**resided** [1] - 67:23
**residence** [2] - 70:21, 74:23
**resident** [2] - 12:19, 68:1
**resides** [1] - 30:10
**resolution** [2] - 80:20, 81:4
**resolve** [1] - 28:2, 32:17, 41:22
**resort** [1] - 19:23
**respect** [6] - 6:6, 54:2, 61:1, 68:6, 71:17, 81:8
**respectfully** [1] - 61:11
**respects** [1] - 25:15
**respond** [2] - 48:9, 58:15
**responded** [1] - 9:1
**respondent** [1] - 61:11
**response** [3] - 10:10, 63:5, 64:8
**responses** [3] - 6:23, 17:21, 38:13
**rest** [2] - 44:25, 77:14
**restated** [1] - 68:24
**restitution** [1] - 56:11
**result** [3] - 13:21, 31:13, 80:24
**resulted** [1] - 55:9
**retain** [2] - 28:5, 74:11
**retaining** [2] - 28:9, 50:14

**retaliate** [1] - 62:19
**retaliation** [2] - 64:4, 64:8
**retroactive** [1] - 10:9
**Rettig** [1] - 30:23
**revert** [3] - 13:25, 14:4, 14:6
**review** [2] - 67:4, 69:21
**riding** [1] - 28:24
**Rifle** [3] - 4:12, 22:8, 38:6
**RIFLE** [1] - 1:7
**rights** [1] - 83:8
**rigid** [1] - 55:16
**robbed** [1] - 28:20
**ROGERS** [57] - 1:23, 4:10, 4:17, 7:12, 7:15, 13:10, 13:16, 13:24, 14:6, 14:23, 15:5, 15:22, 16:4, 17:4, 17:21, 18:22, 20:10, 21:2, 21:7, 21:16, 21:18, 23:10, 29:9, 29:15, 29:17, 29:19, 31:2, 32:2, 34:2, 36:25, 37:7, 38:12, 38:21, 39:12, 39:21, 41:8, 42:11, 43:15, 45:11, 45:21, 46:6, 49:21, 58:14, 58:19, 58:23, 59:10, 60:14, 61:23, 65:22, 66:18, 82:19, 83:18, 84:2, 84:8, 84:14, 84:23, 85:6
**Rogers** [8] - 4:11, 7:10, 27:14, 29:6, 33:22, 45:6, 45:17, 46:5
**Rogers'** [1] - 66:17
**role** [2] - 38:16, 79:10
**rough** [1] - 28:24
**routinely** [2] - 41:16, 53:12
**rule** [2] - 6:1, 31:10, 33:14, 55:15, 78:2, 80:16
**Rule** [2] - 43:16, 54:4
**rules** [1] - 14:17
**ruling** [3] - 30:2, 47:16, 74:8
**run** [1] - 33:3
**runs** [1] - 55:11

**S**

**safeguard** [1] - 50:22

**salient** [2] - 35:21, 36:14
**SARAH** [1] - 1:23
**Sarah** [1] - 4:11
**satisfactory** [1] - 84:21
**satisfy** [1] - 60:22
**saw** [1] - 4:6
**schedule** [3] - 82:6, 84:4, 84:18
**scheduled** [1] - 82:4
**schedules** [1] - 82:25
**scheme** [5] - 7:25, 8:4, 19:11, 33:11, 33:13
**Schneiderman** [1] - 63:3
**scholars** [1] - 36:1
**scope** [2] - 52:19, 53:24
**screen** [2] - 49:15, 66:17
**scrutiny** [1] - 63:11
**se** [1] - 83:2
**searching** [1] - 84:10
**second** [8] - 4:6, 7:3, 25:21, 59:19, 65:19, 65:23, 79:20, 82:8
**Second** [2] - 51:20, 62:7
**Secretary** [10] - 10:5, 11:24, 15:9, 16:12, 18:2, 18:4, 21:21, 45:25, 46:8, 70:4
**section** [2] - 8:14, 46:24
**Section** [11] - 3:9, 32:8, 32:21, 33:8, 41:19, 43:22, 48:20, 65:9, 68:8, 80:3
**see** [28] - 4:2, 4:3, 4:4, 4:6, 4:14, 5:16, 10:12, 16:7, 23:10, 23:14, 29:6, 29:15, 45:1, 45:7, 48:7, 49:13, 49:15, 49:18, 49:21, 58:12, 58:20, 66:12, 66:16, 74:7, 81:14, 82:1, 82:8, 82:20
**seek** [2] - 6:7, 39:15
**seeking** [2] - 38:24, 72:18
**seeks** [1] - 56:10
**seem** [3] - 3:25, 14:16, 38:10, 49:14, 60:6
**selected** [3] - 22:7, 47:8

**selection** [1] - 75:6
**selective** [2] - 63:12, 63:13
**semi** [1] - 60:24
**send** [3] - 11:18, 39:19
**SENIOR** [2] - 2:15, 85:17
**sense** [5] - 20:4, 34:3, 43:8, 56:4, 59:15
**sent** [1] - 31:14
**sentence** [2] - 31:21, 77:9
**sentences** [1] - 32:5
**separate** [5] - 15:14, 18:5, 23:23, 33:10, 65:15
**separately** [5] - 4:17, 5:4, 5:12, 16:11, 62:2
**seriatim** [1] - 82:12
**series** [2] - 6:22, 83:10
**serve** [3] - 11:16, 34:11, 40:14
**served** [1] - 60:16
**serves** [1] - 15:11
**service** [14] - 16:3, 16:4, 16:10, 17:18, 18:2, 18:3, 18:18, 48:23, 68:13, 70:16, 70:25, 71:4, 71:17, 73:18
**Services** [2] - 43:2, 66:2
**set** [10] - 7:3, 8:10, 9:8, 9:11, 23:5, 41:8, 54:12, 70:12, 84:4, 84:15
**SETH** [1] - 2:10
**Seth** [2] - 5:1, 5:10
**sets** [2] - 33:10, 56:2
**setting** [3] - 26:3, 48:3, 75:3
**settled** [2] - 54:1, 57:12
**several** [4] - 25:15, 38:23, 43:4, 54:11
**severe** [1] - 29:22
**shall** [6] - 24:12, 67:20, 67:22, 68:11, 70:4, 72:11
**SHEEHAN** [6] - 1:18, 3:4, 4:4, 81:12, 81:25, 84:21
**Sheehan** [4] - 3:4, 81:12, 81:23, 83:20
**short** [1] - 58:12
**shot** [1] - 28:24
**showing** [1] - 55:5

**shown** [1] - 55:17
**shows** [1] - 22:8
**shred** [2] - 12:13, 69:10
**shreds** [1] - 27:17
**sic** [2] - 35:12, 64:19
**sides** [2] - 27:17, 69:8
**sign** [3] - 45:3, 59:5, 59:12
**signatures** [1] - 10:19
**signed** [1] - 77:8
**similar** [7] - 6:8, 31:17, 65:25, 72:12, 73:6, 78:7, 78:11
**similarly** [2] - 54:6, 62:10
**simple** [2] - 8:9, 8:17
**simply** [3] - 34:9, 53:21, 83:21
**simultaneously** [2] - 12:16, 34:4
**single** [3] - 12:12, 13:8, 51:12
**sit** [1] - 83:15
**sitting** [1] - 83:18
**situated** [2] - 24:12, 72:11
**situation** [2] - 62:25, 63:2
**situations** [3] - 18:11, 32:13, 63:19
**situs** [1] - 74:24
**Slip** [2] - 59:1, 59:3
**slower** [1] - 56:22
**slowly** [2] - 51:17, 59:9
**society** [1] - 24:12
**some** [18] - 5:15, 11:11, 16:25, 18:16, 20:3, 26:11, 31:5, 34:16, 36:3, 36:14, 38:18, 58:25, 66:18, 66:20, 67:12, 72:17, 75:16, 78:7
**somebody** [2] - 60:11, 66:16
**somehow** [2] - 54:21, 63:23
**something** [9] - 22:5, 22:15, 28:14, 37:14, 60:5, 66:17, 73:6, 75:23, 79:12
**sometimes** [1] - 60:9
**somewhat** [2] - 23:12, 33:25
**sophistication** [1] - 36:10
**sorry** [6] - 15:13,

FILED: NEW YORK COUNTY CLERK 02/03/2021 02:42 PM INDEX NO. 451625/2020
NYSCEF DOC. NO. 220
Case 21-30085-hdh11 Doc 156-1 Filed 02/12/21 Entered 02/12/21 16:34:29 Page 271 of
461
RECEIVED NYSCEF: 02/03/2021

15

29:21, 31:2, 59:9, 80:7, 81:20

**sort** [20] - 9:4, 10:12, 13:17, 19:17, 19:22, 27:17, 28:24, 39:9, 40:19, 40:20, 46:7, 46:15, 49:2, 59:21, 60:3, 61:24, 62:23, 66:20, 77:9, 83:10

**sorts** [1] - 39:18

**sought** [4] - 30:7, 73:4, 73:7, 80:13

**Southern** [1] - 43:21

**sovereign** [1] - 54:2

**space** [1] - 70:13

**special** [3] - 61:9, 61:11, 68:10

**Special** [2] - 3:17, 61:7

**specific** [8] - 10:8, 33:15, 33:16, 62:6, 64:2, 69:14, 69:19, 83:19

**specifically** [6] - 16:16, 16:18, 17:13, 32:13, 70:3, 78:25

**SPENCER** [1] - 2:5

**spent** [2] - 21:24, 40:25

**spokesperson** [1] - 3:20

**square** [1] - 41:5

**stamp** [1] - 15:23

**stand** [3] - 60:12, 60:18, 63:11

**standards** [1] - 55:14

**start** [6] - 7:11, 7:16, 7:17, 49:14, 67:15, 81:11

**started** [2] - 15:2, 27:16

**starting** [2] - 4:9, 67:17

**STATE** [4] - 1:1, 1:3, 1:3, 1:16

**state** [55] - 6:16, 13:19, 16:21, 34:17, 40:15, 40:23, 41:2, 41:3, 41:7, 41:15, 41:21, 41:25, 43:8, 43:10, 43:23, 44:16, 44:18, 45:10, 46:18, 51:1, 51:2, 51:19, 52:2, 52:12, 52:17, 52:18, 53:20, 54:1, 54:3, 56:7, 56:8, 56:9, 57:15, 59:14, 62:3, 62:8, 62:12, 63:6, 65:3, 65:12, 70:9, 75:19, 76:7, 76:8,

76:13, 76:14, 76:25, 79:1, 79:4, 79:7, 79:9, 79:10

**State** [66] - 3:14, 3:21, 8:3, 8:24, 10:5, 11:24, 13:22, 15:9, 15:12, 15:13, 16:10, 16:13, 18:2, 18:4, 19:8, 20:22, 21:3, 21:21, 22:6, 22:9, 22:10, 22:11, 24:21, 25:12, 30:6, 35:17, 37:18, 38:1, 40:18, 41:6, 41:12, 42:19, 42:20, 42:24, 46:1, 46:9, 47:3, 47:9, 48:9, 49:6, 49:7, 50:6, 50:13, 50:14, 50:16, 51:5, 51:14, 51:15, 52:13, 53:3, 53:5, 54:10, 63:4, 63:14, 63:17, 64:5, 65:21, 70:4, 71:9, 78:13, 78:21, 78:22, 78:23

**State's** [1] - 71:15

**stated** [18] - 6:4, 8:16, 8:22, 8:24, 13:12, 18:24, 19:5, 19:6, 20:17, 20:20, 20:21, 21:10, 30:19, 31:23, 46:22, 47:3, 47:12, 68:17

**statement** [1] - 77:5

**statements** [1] - 79:8

**states** [3] - 25:16, 35:24, 40:8

**States** [1] - 76:25

**stationed** [1] - 10:16

**statue** [1] - 14:16

**status** [1] - 82:14

**statute** [49] - 7:1, 8:14, 9:23, 10:8, 10:14, 12:2, 13:12, 14:5, 14:9, 14:22, 15:17, 17:20, 18:17, 19:3, 19:8, 20:2, 20:14, 20:18, 21:9, 24:3, 26:5, 28:11, 31:15, 32:20, 32:23, 33:10, 33:15, 37:19, 39:24, 41:1, 46:24, 47:24, 48:20, 49:10, 52:24, 68:22, 69:1, 69:18, 69:22, 72:13, 72:24, 73:11, 74:10, 76:12, 78:10, 78:22, 78:24

**statutorily** [1] - 69:5

**statutory** [28] - 6:1, 6:24, 6:25, 7:11, 7:25,

8:3, 12:5, 12:20, 16:22, 17:16, 18:16, 19:9, 20:25, 26:7, 26:8, 27:10, 30:12, 31:4, 34:5, 38:16, 49:3, 67:15, 69:14, 70:11, 70:22, 71:3, 71:21, 74:15

**stay** [10] - 6:6, 6:17, 46:4, 48:10, 67:6, 80:1, 80:4, 80:11, 80:22, 81:2

**stayed** [1] - 5:25

**staying** [5] - 7:4, 50:6, 54:7, 57:14, 78:6

**stenographic** [1] - 85:13

**step** [2] - 23:19, 83:24

**steps** [3] - 48:8, 72:25, 81:5

**Stern** [1] - 3:8

**STERN** [2] - 1:19, 3:7

**still** [4] - 28:17, 49:13, 63:25, 74:11

**stockholder** [3] - 30:4, 30:8, 30:9

**stores** [1] - 43:2

**straddle** [1] - 20:8

**straight** [1] - 18:23

**straightforward** [3] - 20:11, 21:9, 46:16

**strand** [1] - 39:12

**STRAWN** [1] - 2:8

**Strawn** [4] - 5:2, 5:4, 5:11, 5:13

**Street** [12] - 1:17, 8:25, 15:12, 15:13, 16:10, 19:8, 20:22, 22:9, 22:11, 47:4, 47:9, 49:7

**stretch** [1] - 60:10

**strict** [1] - 34:5

**strictly** [1] - 19:3

**strip** [1] - 30:13

**strong** [2] - 51:23, 75:4

**strongly** [1] - 75:7

**struggle** [1] - 29:22

**subject** [1] - 56:9

**submissions** [1] - 30:1

**submit** [1] - 5:20

**subpoenas** [1] - 40:14

**subsequent** [2] - 10:7, 72:13

**substance** [4] - 55:13, 61:1, 79:20,

83:7

**substantial** [13] - 34:8, 34:11, 42:14, 50:7, 53:20, 55:6, 55:11, 58:24, 59:6, 59:13, 65:5, 74:20, 75:7

**substantive** [3] - 7:19, 9:16, 11:5

**substitute** [1] - 84:11

**successfully** [1] - 38:3

**sue** [2] - 13:22, 19:19

**sued** [2] - 31:8, 31:10

**sues** [1] - 78:25

**sufficient** [2] - 54:16, 78:13

**suit** [1] - 41:7

**suitable** [1] - 51:4

**Suite** [1] - 2:6

**summary** [1] - 61:14

**summons** [3] - 48:24, 54:25, 61:12

**Sundel** [1] - 30:23

**supersedes** [1] - 14:9

**supervisory** [2] - 50:17, 75:13

**supplemental** [2] - 51:9, 51:13

**supplemented** [1] - 68:23

**support** [2] - 55:12, 58:8

**supported** [1] - 61:17

**suppose** [1] - 48:5

**supposed** [2] - 16:13, 47:2

**SUPREME** [1] - 1:1

**Supreme** [5] - 24:1, 33:9, 48:21, 68:11, 72:21

**surprise** [1] - 7:23

**susceptible** [1] - 58:2

**swept** [1] - 41:4

**system** [3] - 41:22, 78:14, 79:9

---

# T

**talk** [4] - 14:19, 15:1, 51:16, 81:5

**talking** [8] - 16:1, 46:3, 46:8, 47:23, 49:14, 49:25, 83:11, 83:17

**tangled** [1] - 34:15

**target** [2] - 7:22, 42:22

**targeted** [1] - 41:13

**Tashenberg** [8] - 29:1, 29:10, 29:20, 29:24, 30:3, 30:20, 32:4, 32:5

**task** [1] - 47:15

**Teams** [1] - 1:10

**technical** [2] - 37:16, 85:3

**technicalities** [1] - 60:10

**technicality** [3] - 9:15, 17:12, 60:23

**technically** [14] - 15:16, 17:22, 34:13, 36:11, 36:18, 36:25, 37:3, 37:5, 37:8, 43:5, 43:6, 43:7, 44:11, 44:12

**telling** [1] - 41:1

**temporal** [1] - 48:25

**ten** [3] - 17:6, 66:14, 66:21

**ten-minute** [1] - 66:14

**tenable** [1] - 64:25

**Tennessee** [1] - 35:13

**term** [3] - 8:15, 37:9, 82:24

**TERM** [1] - 1:1

**terminated** [1] - 52:4

**terms** [5] - 12:1, 13:11, 14:7, 19:4, 80:5

**terribly** [1] - 38:10

**terrorist** [1] - 42:23

**test** [1] - 49:3

**testified** [1] - 35:9

**testimony** [1] - 35:7

**Texas** [2] - 35:2, 80:2

**text** [2] - 20:11, 38:17

**textbook** [1] - 57:8

**textual** [1] - 18:23

**THE** [98] - 1:1, 1:3, 1:3, 1:7, 1:16, 3:2, 3:11, 3:15, 3:19, 3:24, 4:3, 4:8, 4:16, 4:21, 4:24, 5:6, 5:9, 5:14, 7:14, 13:5, 13:14, 13:21, 14:3, 14:11, 15:1, 15:21, 15:25, 16:15, 17:10, 18:14, 19:25, 20:24, 21:3, 21:12, 22:13, 23:7, 23:12, 23:15, 23:16,

26:4, 27:13, 27:24, 28:10, 28:21, 29:5, 29:13, 29:16, 29:18, 30:25, 31:1, 31:24, 33:17, 33:19, 36:17, 37:3, 38:7, 38:20, 39:8, 39:15, 40:19, 41:21, 43:12, 44:22, 45:6, 45:13, 45:20, 46:2, 47:22, 49:9, 49:19, 49:22, 49:23, 49:24, 51:16, 55:19, 56:16, 56:18, 56:22, 57:17, 58:10, 58:17, 58:21, 59:8, 59:19, 61:21, 65:11, 66:10, 66:20, 66:25, 81:20, 82:17, 83:9, 83:24, 84:4, 84:13, 84:15, 84:24, 85:7

**themselves** [2] - 41:16, 60:11

**theory** [1] - 51:9

**thereby** [1] - 24:14

**therefore** [4] - 14:16, 25:13, 30:8, 80:22

**therein** [2] - 8:22, 8:24

**thereto** [1] - 8:21

**they've** [1] - 22:21

**third** [1] - 82:13

**Third** [4] - 12:6, 12:23, 29:2, 44:9

**thorny** [1] - 65:1

**three** [1] - 10:11

**three-fold** [1] - 10:11

**throw** [1] - 19:18

**throwing** [1] - 13:1

**time** [19] - 15:17, 21:25, 24:9, 39:1, 46:11, 47:25, 48:23, 52:24, 56:3, 68:13, 70:17, 75:22, 76:3, 77:18, 77:21, 78:4, 79:20, 83:25

**timeline** [1] - 64:25

**timing** [1] - 78:3

**tip** [1] - 73:15

**tips** [1] - 75:7

**title** [1] - 16:6

**today** [10] - 3:6, 3:23, 4:11, 5:16, 5:18, 6:5, 67:14, 81:15, 82:6, 85:4

**today's** [1] - 85:1

**together** [1] - 33:23

**toggle** [1] - 21:22

**tomorrow** [4] - 81:7, 81:17, 82:4, 82:23

**took** [5] - 6:5, 52:9,

52:22, 62:1, 72:24

**tool** [1] - 53:20

**toward** [1] - 39:19

**towards** [1] - 16:8

**track** [1] - 29:25

**trails** [1] - 77:14

**transaction** [2] - 64:15, 74:24

**transactions** [2] - 34:19, 52:8

**transcript** [1] - 81:1

**transcription** [1] - 85:13

**transfer** [6] - 7:1, 15:8, 45:15, 48:10, 67:6, 67:16

**travel** [2] - 34:21, 39:20

**treat** [10] - 13:17, 13:18, 31:7, 37:10, 37:22, 57:23, 60:16, 61:19, 61:21, 63:21

**treated** [1] - 27:21

**treats** [1] - 31:6

**tremendous** [1] - 71:12

**trial** [4] - 67:19, 67:22, 80:10, 82:7

**tried** [3] - 29:25, 39:7, 40:10

**true** [10] - 17:22, 18:10, 36:4, 37:20, 59:18, 60:1, 61:6, 70:24, 77:12, 85:12

**truth** [1] - 61:15

**try** [4] - 10:17, 47:20, 58:18, 58:20

**trying** [11] - 18:16, 23:3, 36:12, 37:4, 49:11, 51:17, 60:5, 60:11, 66:17, 73:13, 81:21

**Turley** [1] - 36:2

**turn** [9] - 7:3, 21:13, 23:8, 45:4, 57:18, 58:17, 59:2, 64:12, 67:21

**turning** [3] - 5:18, 54:4, 76:21

**two** [24] - 6:23, 12:15, 15:14, 16:7, 16:15, 17:15, 17:21, 18:5, 23:4, 23:22, 28:4, 28:15, 38:2, 40:18, 49:1, 55:20, 56:1, 56:6, 64:24, 65:17, 75:22, 76:2, 78:3, 84:3

**type** [2] - 55:3, 55:15

**typed** [1] - 47:7

**types** [1] - 30:7

**typical** [1] - 39:22

**typically** [2] - 39:19, 64:8

**typo** [1] - 77:16

**typographical** [1] - 37:14

## U

**ultimately** [1] - 69:12

**umbrage** [1] - 79:7

**umbrella** [1] - 40:21

**unavailing** [1] - 53:10

**unconstitutional** [1] - 36:5

**unconstitutionally** [2] - 41:13, 41:19

**uncontested** [1] - 36:19

**Under** [1] - 23:25

**under** [49] - 6:14, 8:8, 9:6, 12:9, 15:16, 15:19, 19:7, 19:24, 22:7, 24:9, 26:24, 27:20, 30:16, 32:14, 37:11, 40:20, 41:4, 41:21, 43:10, 46:21, 46:23, 49:3, 50:10, 51:25, 52:2, 52:20, 54:16, 55:4, 56:7, 57:8, 61:6, 67:19, 68:2, 68:8, 68:22, 69:1, 69:18, 69:22, 70:21, 72:8, 73:10, 78:10, 78:23, 78:24, 80:2, 80:23, 83:10

**undercut** [1] - 55:23

**underlying** [4] - 30:1, 52:8, 67:13, 74:24

**undermine** [2] - 54:1, 55:23

**understand** [11] - 14:2, 17:18, 18:20, 26:10, 28:10, 36:6, 36:22, 38:14, 39:21, 39:22, 60:9

**understanding** [2] - 60:7, 84:2

**understatement** [1] - 32:6

**understood** [1] - 81:6

**undertaking** [1] - 78:11

**undisputed** [2] - 52:7, 67:25

**undue** [1] - 53:16

**unfortunately** [2] - 15:23, 58:19

**unintentionally** [1] - 60:25

**unique** [2] - 9:22, 41:8

**United** [1] - 76:25

**unless** [10] - 6:12, 12:20, 14:13, 17:8, 20:2, 41:23, 67:18, 68:3, 74:3, 75:7

**unlike** [1] - 30:16

**unmute** [1] - 81:23

**unmuted** [1] - 7:13

**unnecessary** [2] - 53:11, 74:13

**unprecedented** [1] - 59:16

**unsupported** [2] - 51:8, 58:6

**unsurprisingly** [1] - 42:25

**unusual** [2] - 36:1, 46:11

**up** [11] - 15:7, 19:18, 27:17, 33:3, 40:17, 42:25, 44:24, 45:2, 47:10, 72:12, 72:24

**upload** [1] - 81:1

**upset** [2] - 50:12, 52:22

**urge** [1] - 19:21

**urges** [1] - 37:12

**US** [1] - 62:16

**usually** [1] - 5:24

## V

**value** [2] - 26:9, 73:9

**vanished** [2] - 23:10, 49:14

**variety** [1] - 78:5

**various** [2] - 30:7, 67:5

**vehicle** [1] - 52:25

**venue** [71] - 6:24, 6:25, 7:11, 7:16, 8:5, 8:7, 9:2, 9:5, 9:7, 12:2, 12:6, 12:9, 12:10, 12:14, 13:1, 13:9, 13:12, 14:5, 14:13, 14:14, 14:17, 14:22, 18:17, 19:12, 19:20, 20:2, 20:7, 20:12, 20:13, 23:22, 23:23, 23:25, 25:1, 25:2, 25:3, 25:4, 25:12, 25:20, 27:9,

**undue** [1] - 53:16

**venued** [3] - 8:12, 23:21, 28:16

**venuing** [1] - 9:13

**verbatim** [1] - 8:9

**verification** [22] - 36:23, 37:15, 54:21, 55:1, 55:3, 55:9, 55:10, 57:21, 57:25, 58:3, 58:4, 58:7, 58:24, 59:20, 59:21, 59:22, 60:17, 60:21, 61:5, 77:4, 77:8, 77:22

**verified** [9] - 9:6, 9:13, 9:14, 11:14, 37:11, 54:23, 59:5, 59:12, 60:17, 61:20

**verify** [3] - 37:19, 59:17, 60:5, 60:7, 61:15

**versus** [1] - 65:12

**vests** [1] - 61:24

**via** [1] - 17:9

**viable** [1] - 14:25

**video** [3] - 3:25, 4:6, 58:17, 58:19

**view** [7] - 23:4, 32:16, 32:24, 36:7, 71:20, 77:16, 79:21

**views** [2] - 5:20, 79:8

**vindicate** [1] - 19:22

**violate** [1] - 58:24

**violating** [1] - 75:14

**violations** [2] - 54:3, 64:11

**Virginia** [1] - 69:5

**vis** [2] - 63:11

**vis-a-vis** [1] - 63:11

**vital** [1] - 50:13

**Vogel** [1] - 59:2

**volume** [1] - 84:8

## W

**waived** [1] - 11:11

**waiver** [2] - 11:4, 11:8

**walk** [1] - 15:3

**wants** [2] - 19:19, 22:3
**warning** [1] - 63:3
**warrant** [2] - 57:14, 78:17
**watching** [1] - 51:17
**wave** [2] - 35:24, 83:13
**waving** [1] - 66:12
**Wayne** [1] - 4:19
**WAYNE** [1] - 1:7
**ways** [1] - 76:4
**weak** [1] - 78:16
**website** [10] - 21:21, 21:25, 22:5, 22:13, 22:16, 23:6, 47:7, 48:7, 48:14, 49:7
**weekend** [1] - 61:2
**weigh** [2] - 35:24, 52:6
**weighed** [1] - 35:22
**weighs** [1] - 28:9
**weight** [4] - 71:13, 73:1, 77:2, 77:6
**Werbner** [2] - 5:3, 5:12
**WERBNER** [1] - 2:11
**whatever** [4] - 21:4, 59:22, 76:16, 79:8
**whatsoever** [1] - 63:8
**wherever** [1] - 27:6
**whistleblower** [1] - 35:7
**White** [1] - 78:8
**white** [3] - 8:17, 9:4, 46:16
**WILLIAM** [1] - 2:7
**William** [1] - 4:22
**willing** [1] - 61:2
**Wilson** [2] - 5:5, 5:13
**WILSON** [1] - 1:7
**WINSTON** [1] - 2:8
**Winston** [4] - 5:2, 5:4, 5:11, 5:13
**within** [4] - 16:21, 39:23, 70:9, 76:14
**without** [4] - 28:2, 32:8, 32:9, 32:11
**witnesses** [5] - 40:7, 52:7, 52:17, 75:1, 75:16
**wonder** [1] - 18:8
**word** [8] - 18:14, 18:18, 18:19, 49:10, 61:3, 61:9, 61:11, 65:13
**words** [7] - 14:3, 17:19, 36:17, 61:10, 70:11, 77:4, 77:15

**worked** [1] - 47:6
**working** [2] - 56:2, 84:17
**works** [2] - 84:7, 84:23
**worse** [1] - 63:23
**would** [78] - 6:11, 6:20, 6:24, 7:7, 7:23, 10:17, 11:8, 11:14, 13:4, 13:8, 13:12, 13:16, 13:17, 13:21, 14:17, 15:7, 17:7, 17:8, 19:12, 19:21, 21:7, 27:21, 27:22, 29:9, 30:14, 34:1, 34:11, 39:19, 40:1, 42:11, 43:13, 44:15, 44:17, 44:18, 44:19, 45:16, 47:8, 47:13, 47:17, 48:6, 51:22, 52:23, 53:11, 53:15, 53:22, 55:22, 56:4, 58:1, 58:14, 61:15, 61:23, 62:2, 62:4, 64:7, 72:7, 74:3, 78:1, 79:2, 79:5, 79:20, 79:22, 81:9, 81:14, 81:15, 82:1, 82:3, 82:8, 82:9, 83:7, 83:12, 83:13, 83:22, 84:7, 84:11
**written** [2] - 67:8, 80:24
**wrong** [6] - 7:18, 7:20, 36:1, 54:22, 59:24, 60:6

## Y

**year** [3] - 29:10, 29:24, 38:9
**years** [10] - 10:7, 10:24, 14:20, 15:10, 17:7, 42:21, 47:19, 49:2, 66:7, 69:21
**yesterday** [1] - 5:22
**YORK** [5] - 1:1, 1:1, 1:3, 1:4, 1:16
**York** [114] - 1:11, 1:18, 1:22, 2:3, 2:6, 2:10, 3:14, 6:15, 8:2, 9:2, 9:8, 9:10, 9:23, 10:2, 10:13, 10:14, 10:20, 10:21, 10:24, 10:25, 11:12, 11:15, 11:19, 12:1, 12:2, 12:17, 13:2, 18:7, 19:21, 21:20, 21:23, 22:6, 22:9, 22:10,

22:12, 22:17, 22:24, 23:1, 23:2, 24:7, 24:14, 24:18, 24:20, 25:9, 25:12, 25:19, 25:24, 27:7, 27:9, 28:18, 34:14, 35:17, 35:19, 37:18, 38:11, 40:22, 42:19, 42:20, 42:24, 43:19, 43:22, 44:9, 47:9, 48:7, 48:16, 49:6, 50:8, 50:10, 50:13, 50:15, 50:17, 50:19, 50:21, 50:23, 51:4, 51:24, 52:13, 52:15, 53:3, 54:15, 63:4, 63:14, 63:17, 67:18, 68:1, 68:4, 69:6, 69:11, 71:9, 71:10, 72:3, 72:13, 72:15, 72:18, 73:2, 73:15, 74:3, 75:2, 75:6, 75:14, 75:15, 75:17, 75:19, 75:22, 78:21, 78:22, 78:23
**York's** [1] - 75:12
**Younger** [2] - 57:9, 62:15
**yourself** [1] - 81:24

## Z

**zero** [1] - 18:6

# UNITED STATES JUDICIAL PANEL
## on
## MULTIDISTRICT LITIGATION

**IN RE: NATIONAL RIFLE ASSOCIATION
BUSINESS EXPENDITURES LITIGATION**                    MDL No. 2979

## ORDER DENYING TRANSFER

**Before the Panel**:[*]  The National Rifle Association (NRA)—plaintiff in two actions and defendant in a third—moves under 28 U.S.C. § 1407 to centralize this litigation in the Northern District of Texas or, alternatively, states in its reply brief that it is unopposed to centralization in the Northern District of New York.  This litigation currently consists of four actions pending in three districts, as listed on Schedule A.  Defendant in the Northern District of Texas *Stinchfield* action supports the motion.  All remaining responding parties oppose centralization, including (1) the New York Attorney General, who is defendant to the Northern District of New York action; (2) plaintiffs in the Middle District of Tennessee action; and (3) the Ackerman parties,[1] who are defendants in one Northern District of Texas action and one of which is plaintiff in another.

On the basis of the papers filed and the hearing session held,[2] we are not persuaded that centralization is necessary for the convenience of the parties and witnesses or to further the just and efficient conduct of this litigation.  The NRA argues that the actions share factual questions regarding the NRA's governance, policies, procedures, and spending; its fiduciary relationships; the manner in which it has used its donations; and "efforts by various adversaries to commandeer the NRA's assets and the NRA's future."  The NRA also argues that the actions flow from the NRA's efforts to prepare itself for the New York Attorney General's investigation of the NRA.

There may be factual overlap among some of the actions as to particular expenditures by the NRA and its relationship with Ackerman, but it appears to be limited and overshadowed by the many individual questions presented by the alleged facts, claims, and parties in each action.  For example, in the Northern District of Texas *Ackerman* action, the NRA alleges that Ackerman's

---

[*]     One or more Panel members who could be members of the putative class in this litigation have renounced their participation in this class and have participated in this decision.

[1]     Ackerman McQueen, Inc. (Ackerman), Mercury Group, Inc., Henry Martin, Melanie Montgomery, William Winkler, and Jesse Greenberg.

[2]     In light of the concerns about the spread of COVID-19 virus (coronavirus), the Panel heard oral argument by videoconference at its hearing session of January 28, 2021.  *See* Suppl. Notice of Hearing Session, MDL No. 2979 (J.P.M.L. Jan. 11, 2021), ECF No. 40.

- 2 -

website presents a false association between itself and the NRA.  The *Ackerman* action also will examine the parties' obligations under their services agreement, including the applicability of a confidentiality provision.   The other Northern District of Texas action (*Stinchfield*) is a straightforward defamation action in which the NRA is not named as a party.  *Stinchfield* centers on a narrow issue: whether the defendant—a former NRATV host—falsely stated in an affidavit that Ackerman made misrepresentations to the NRA about NRATV and its viewership metrics.  In the Northern District of New York action (*James*), the NRA alleges the New York Attorney General's investigation and an underlying New York state court enforcement action[3] constitute retaliation for the NRA's political advocacy and selective enforcement of New York's not-for-profit law.  That state court action concerns far broader allegations that the NRA is not serving the interests of its members and advancing its charitable mission.  It asserts that the NRA was not governed properly, failed to follow state and federal laws, failed to institute an effective compliance program, and filed false regulatory statements.  Finally, plaintiffs in the Middle District of Tennessee action (*Dell'Aquila*) claim the NRA fraudulently induced donations to the organization.  *Dell'Aquila* is the only action brought as a putative class action and, therefore, will entail class certification proceedings not applicable to the other three actions.   In these circumstances, we are not persuaded that the purported factual overlap is sufficient to overcome the differences in these actions, which each will involve some different discovery and pretrial proceedings.

The differences in these actions also extend to their procedural postures.  The two Northern District of Texas actions are less complex and, therefore, likely to resolve sooner without the added burden of additional parties and proceedings.  Discovery currently is set to close in *Stinchfield* this month and, as to the claims against the Ackerman parties in *Ackerman*, this June.  Trials in both actions are set for 2021—*Stinchfield* in May and *Ackerman* in September.  In contrast, while discovery was set to close in *Dell'Aquila* in August 2021, trial in that action was not scheduled until approximately one year later.  The NRA's recent Chapter 11 bankruptcy filing is likely to further impact the disparities in progression among these cases.  The Middle District of Tennessee has stayed and administratively closed *Dell'Aquila* and the Northern District of Texas has closed the counterclaims against the NRA in *Ackerman* pursuant to 11 U.S.C. § 362.

We have held that where, as here, "only a minimal number of actions are involved, the proponent of centralization bears a heavier burden to demonstrate that centralization is appropriate." *In re Hyundai & Kia GDI Engine Mktg., Sales Practices, & Prods. Liab. Litig.*, 412 F. Supp. 3d 1341, 1343 (J.P.M.L. 2019).  And parties should attempt informal means of coordination "before resorting to Panel intervention." *In re Gap, Inc., COVID-19 Lease Payment Litig.*, __ F. Supp. 3d __, 2020 WL 5884789, at *2 (J.P.M.L. Oct. 2, 2020).  There are just four actions pending in three districts, and proponents have not demonstrated any attempt at informal coordination or transfer via other means before seeking Section 1407 centralization.  The NRA claims there exist "other, related actions that are likely to be removed to federal court."  But it appears the New York state court enforcement action will remain in state court, as that court recently denied defendants' motion to dismiss on *forum non conveniens* grounds.  The Panel has

---

[3] *See People v. Nat'l Rifle Ass'n of Am., et al.*, Index No. 451625/2020 (Sup. Ct. N.Y. Cnty.).

- 3 -

been "disinclined to take into account the mere possibility of future filings in [its] centralization calculus." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.*, 959 F. Supp. 2d 1375, 1376 (J.P.M.L. 2013). The NRA and the Ackerman parties each are represented by common counsel in all actions in which they are parties, and the *Stinchfield* defendant is represented by counsel affiliated with the NRA's counsel. This "should facilitate informal coordination of this relatively small number of actions." *In re Covidien Hernia Mesh Prod. Liab. Litig.*, MDL No. 2953, 2020 WL 4670694, at *2 (J.P.M.L. Aug. 7, 2020).

IT IS THEREFORE ORDERED that the motion for centralization of these actions is denied.

PANEL ON MULTIDISTRICT LITIGATION

_____
Karen K. Caldwell
Chair

| | |
|---|---|
| Catherine D. Perry | Nathaniel M. Gorton |
| Matthew F. Kennelly | David C. Norton |
| Roger T. Benitez | Dale A. Kimball |

**IN RE: NATIONAL RIFLE ASSOCIATION
BUSINESS EXPENDITURES LITIGATION** MDL No. 2979

## SCHEDULE A

Northern District of New York

NATIONAL RIFLE ASSOCIATION OF AMERICA v. JAMES, C.A. No. 1:20-00889

Middle District of Tennessee

DELL'AQUILA v. LAPIERRE, ET AL., C.A. No. 3:19-00679

Northern District of Texas

NATIONAL RIFLE ASSOCIATION OF AMERICA v. ACKERMAN MCQUEEN,
INC., ET AL., C.A. No. 3:19-02074
ACKERMAN MCQUEEN, INC. v. STINCHFIELD, C.A. No. 3:19-03016



Home    Wayne's Letter    Q&A    News    Press Releases

Vendors    Quotes    Media    Contact    Join NRA

Letter from Wayne

Friday, Jan. 15, 2021

# Dear NRA Members & Supporters:

Today, the NRA announced a restructuring plan that positions us for the long-term and ensures our continued success as the nation's leading advocate for constitutional freedom — free from the toxic political environment of New York.

The plan can be summed up quite simply: We are DUMPING New York, and we are pursuing plans to reincorporate the NRA in Texas.

To facilitate the strategic plan and restructuring, the NRA and one of its subsidiaries have filed voluntary chapter 11 petitions in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division. As you may know, chapter 11 proceedings are often utilized by businesses, nonprofits and organizations of all kinds to streamline legal and financial affairs.

Under the plan, the NRA will continue what we've always done — confronting anti-gun, anti-self-defense and anti-hunting activities and promoting constitutional advocacy that helps law-abiding Americans. Our work will continue as it always has. No major changes are expected to the NRA's operations or workforce.

**Importantly, our plans do not impact your membership at any level.**

NRA supporters will continue to enjoy all their full member benefits – from new members to Life Members to Benefactor Members. We will continue to publish and deliver your magazines. We will continue to train Americans and teach them firearm safety. We will continue to teach hunter safety. But most importantly, we will continue to fight for your freedom and the freedom of all Americans – as we have for all these years. In fact, we are expanding our national platform.

The plan aims to streamline costs and expenses, proceed with pending litigation in a coordinated and structured manner, and realize many financial and strategic advantages.

You know that our opponents will try to seize upon this news and distort the truth. Don't believe what you read from our enemies. The NRA is not "bankrupt" or "going out of business." The NRA is not insolvent. **We are as financially strong as we have been in years.**

But they know today's announcement makes us bigger, stronger and more prepared for the fight for freedom.

We are leaving the state of an attorney general who, just a few months ago, vowed to put us out of business through an abuse of legal and regulatory power. In fact, the gross overreach of the New York Attorney General and New York Governor has been resoundingly criticized by powerful national groups like the ACLU and a host of prominent legal scholars.

**Subject to court approval, the NRA is pursuing plans to reincorporate in the State of Texas. The Lone Star State is home to more than 400,000 NRA Members and the site of our 2021 Annual Meeting being held in Houston.**

Texas values the contributions of the NRA, celebrates our law-abiding members, and joins us as a partner in upholding constitutional freedom.

Under this plan, we seek protection from New York officials who illegally abused and weaponized the powers they wield against the NRA and its members. You can be assured the Association will continue the fight to protect your interests in New York – and all forums where the NRA is unlawfully singled out for its Second Amendment advocacy.

**This plan represents a pathway to opportunity, growth and progress.**

This is the most transformational moment in the history of the NRA. And it involves all of you.

The NRA will continue to promote its Second Amendment advocacy, sponsor firearms training, and work with its network of instructors and volunteers in furtherance of its mission. This plan actually

Appx. 277

streamlines all of the NRA's activities and improves our operational processes.

I know we have welcomed many of you to our headquarters in Fairfax, Virginia. We have no immediate plans to relocate, but we are forming a special committee to explore our strategic options in this regard. We want to determine if there are advantages to relocating our HQ operations to another state. I have asked our leadership team to explore all options that benefit the NRA and its members.

What's most important is leading the fight for Second Amendment freedom and serving our members. **We will do that from anywhere that works best for you and for our cause.**

All membership dues and financial donations will be fully dedicated to supporting our operations and public advocacy. This plan actually improves our business. It protects us from costly, distracting and unprincipled attacks from anti-2A politicians aimed at attacking the NRA because we are a potent political force. We know that the gun ban lobby will never stop – fueled by a hatred of your freedoms and by wealthy benefactors. **Our plan is the best way to confront them.**

We are now prepared for a better future. In fact, to me, it feels like the dawn of a new day.

We are revitalized, well-positioned, and steadfast in our commitment to fight for you. To learn more, please visit www.nra.org/forward.

Thank you for your unwavering spirit and being part of the NRA's future. Both hold incredible promise for our country – and the freedoms in which it believes.

*Wayne La Pierre*

Wayne LaPierre

© 2021 National Rifle Association of America. This may be reproduced. This may not be reproduced for commercial purposes. Privacy Policy

Appx. 278



FOR IMMEDIATE RELEASE

Jan. 15, 2021

# NRA Leaves New York to Reincorporate in Texas, Announces New Strategic Plan

### *NRA Plans to Exit New York to Pursue Opportunity, Growth and Progress in Texas; Plan Benefits Association, Its Millions of Members, and All Supporters of the Second Amendment*

Fairfax, VA – The National Rifle Association of America ("NRA") today announced it will restructure the Association as a Texas nonprofit to exit what it believes is a corrupt political and regulatory environment in New York. The move will enable long-term, sustainable growth and ensure the NRA's continued success as the nation's leading advocate for constitutional freedom – free from the toxic political environment of New York.

The NRA plan, which involves utilizing the protection of the bankruptcy court, has the Association dumping New York and organizing its legal and regulatory matters in an efficient forum. The move comes at a time when the NRA is in its strongest financial condition in years.

Appx. 279

The NRA will continue with the forward advancement of the enterprise – confronting anti-Second Amendment activities, promoting firearm safety and training, and advancing public programs across the United States. There will be no immediate changes to the NRA's operations or workforce.

The Association will seek court approval to reincorporate the Association in the State of Texas – home to more than 400,000 NRA members and site of the 2021 NRA Annual Meeting in Houston.

"This strategic plan represents a pathway to opportunity, growth and progress," says NRA CEO & EVP Wayne LaPierre. "Obviously, an important part of this plan is 'dumping New York.' The NRA is pursuing reincorporating in a state that values the contributions of the NRA, celebrates our law-abiding members, and will join us as a partner in upholding constitutional freedom. This is a transformational moment in the history of the NRA."

The restructuring plan aims to streamline costs and expenses, proceed with pending litigation in a coordinated and structured manner, and realize many financial and strategic advantages.

**The Path Forward**

The NRA will move quickly through the restructuring process. Its day-to-day operations, training programs, and Second Amendment advocacy will continue as usual.

By exiting New York, where the NRA has been incorporated for approximately 150 years, the NRA abandons a state where elected officials have weaponized the legal and regulatory powers they wield to penalize the Association and its members for purely political purposes.

In the summer of 2018, then New York Attorney General candidate Letitia James vowed that, if elected, she would use the powers of her office to investigate the "legitimacy" of the NRA.

Without a shred of evidence to support the claim, she called the Association a "terrorist organization" and a "criminal enterprise." As promised, she commenced an "investigation" upon being elected to the Office of NYAG and, predictably, filed a lawsuit seeking to dissolve the NRA just prior to the November 2020 national election.

The NRA filed a lawsuit in August 2020 against the NYAG similar to its lawsuit against New York Governor Andrew Cuomo and the New York State Department of Financial Services, filed in 2018. The NRA pursues the defendants for attempting to "blacklist" the organization and its financial partners in violation of their First Amendment rights. The NRA will continue those legal actions.

Appx. 280

"Under this plan, the Association wisely seeks protection from New York officials who it believes have illegally weaponized their powers against the NRA and its members," says William A. Brewer III, counsel to the NRA in those cases. "The NRA will continue the fight to protect the interests of its members in New York – and all forums where the NRA is unlawfully singled out for its Second Amendment advocacy."

With respect to its headquarters, the NRA has formed a committee to study opportunities for relocating segments of its business operations to Texas or other states. The Association will analyze whether a move of its headquarters, now located in Fairfax, Virginia, is in the best interests of its members. In the meantime, the NRA's general business operations will remain in Fairfax.

To facilitate its strategic plan and restructuring, the NRA and one of its subsidiaries filed voluntary chapter 11 petitions in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division. Chapter 11 proceedings are routinely utilized by businesses, nonprofits and organizations of all kinds to streamline legal and financial affairs.

The NRA also announced Marschall Smith will serve as Chief Restructuring Officer. A former Senior Vice President and General Counsel of 3M Company, Smith has more than 35 years of legal and business experience with an emphasis on compliance, corporate finance, and corporate governance.

"I am honored to join the nation's oldest and largest civil rights organization during this important time," Smith says. "Our goal is to work through the restructuring process efficiently and quickly – even as NRA leadership approaches 2021 with renewed energy and an expanding national platform. This plan has no impact on the NRA's most important goal:  serving its membership and protecting the Second Amendment."

The NRA will propose a plan that provides for payment in full of all valid creditors' claims. The Association expects to uphold commitments to employees, vendors, members, and other community stakeholders.

"The plan allows us to protect the NRA and go forward with a renewed focus on Second Amendment advocacy," says NRA President Carolyn Meadows. "We will continue to honor the trust placed in us by employees, members and other stakeholders – following a blueprint that allows us to become the strongest NRA ever known."

**Additional Information:**

Patrick J. Neligan of Neligan LLP, Dallas, Texas, is serving as debtor's counsel; William (Wit) Davis is counsel to the NRA Board of Directors and its Special Litigation Committee; Brewer, Attorneys & Counselors, Dallas, Texas, serves as special counsel to the NRA. To learn more, please visit www.nra.org/forward.

**About the NRA:**

Established in 1871, the National Rifle Association is America's largest and oldest civil rights organization. Approximately five million members strong, NRA continues its mission to uphold Second Amendment rights and is the leader in firearm education and training for law-abiding gun owners, law enforcement and the military. The NRA's 2021 Annual Meetings and Exhibits will be held September 3 – 5, 2021 at the George R. Brown Convention Center in Houston, Texas. Follow the NRA on Facebook, Instagram, and Twitter.

*For more information contact:*

Andrew Arulanandam, Managing Director, NRA Public Affairs, (703) 943 7152, aarulanandam@nrahq.org

Travis J. Carter, on behalf of Brewer, Attorneys & Counselors and the NRA, (214) 653 4856, tcarter@brewerattorneys.com

© 2021 National Rifle Association of America. This may be reproduced. This may not be reproduced for commercial purposes. Privacy Policy

**NRA**

## Questions & Answers

Home

Wayne's Letter

# What did the NRA announce?

This is a transformational moment for the NRA. We announced a new strategic plan called Project Freedom.

The NRA's new strategic plan involves pursuing reincorporating the Association from the State of New York to the State of Texas – home to more than 400,000 NRA members and site of the 2021 NRA Annual Meeting being held in Houston.

The NRA's restructuring plan also aims to help the NRA streamline costs and expenses, proceed with pending litigation in a coordinated and structured manner, and realize many financial and strategic advantages.

We believe the restructuring plan positions our organization for the future – and ensures our continued success as the nation's leading advocate for constitutional freedom.

# Is the NRA going "bankrupt?"

No. In fact, this move comes at a time when the NRA is in its strongest financial condition in years.

To facilitate its reorganization, the NRA and one of its subsidiaries filed voluntary chapter 11 petitions in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division. The NRA is not insolvent.

We expect no impacts to NRA programming.

Nothing is more important to the NRA than protecting the Second Amendment rights of our law-abiding members. We will

Appx. 283

be as effective as ever in advocating for your rights, promoting firearms education and training, and engaging in public endeavors.

# What happens to my NRA membership?

Nothing. Your membership remains intact.

NRA supporters will continue to enjoy all their full member benefits – from new members to Life Members to Benefactor Members. We will continue to publish and deliver your magazines. We will continue to train Americans and teach them firearms safety. We will continue to teach hunter safety.

But most importantly, we will continue to fight for your freedom as we have for all these years. In fact, we are expanding our national platform.

# Can people still join the NRA – and why should they?

Absolutely! There could not be a more exciting time to join the NRA. We are expanding our national platform, and our future is bright and secure. We invite all law-abiding gun owners and all Americans to be part of it. Click here to JOIN NRA!

# By filing for chapter 11, is the NRA admitting it mismanaged donor funds?

Not at all. We have utilized all donor contributions in furtherance of the NRA's mission. This action is necessitated primarily by one thing:  the unhinged and political attack against the NRA by the New York Attorney General.

Appx. 284

A restructuring plan is a proven mechanism for streamlining legal and business affairs. All membership fees and donations will continue to be used in furtherance of our Second Amendment advocacy.

# Can you guarantee member donations will be used to protect our Second Amendment rights?

All donations are used for the purpose of advancing the NRA's mission, period.

# Should I donate to the NRA during the chapter 11 process, or should I wait until the Association emerges from the restructuring process?

We need your support now – as we confront a Biden Administration that has vowed to attack your Second Amendment freedoms. All donations are used in furtherance of our mission.

# Will there be impacts to endowed funds?

No. Endowed funds will still be used to support the NRA's core mission: protecting the Second Amendment.

Appx. 285

file:///pdcprmsfrd01/FolderRedirection/SThompso/Downloads/Q&A — NRA Dumps New York to Reincorporate in Texas.html[2/10/2021 9:33:37 PM]

# When will the restructuring process be completed?

This process begins immediately. The NRA is expected to emerge from these proceedings within the next six months.

# What can I do to support the NRA?

Join today. Promote our cause. Get fully engaged. We must continue to win the fight for constitutional freedom.

© 2021 National Rifle Association of America. This may be reproduced. This may not be reproduced for commercial purposes. Privacy Policy

Appx. 286

file:///pdcprmsfrd01/FolderRedirection/SThompso/Downloads/Q&A — NRA Dumps New York to Reincorporate in Texas.html[2/10/2021 9:33:37 PM]



Group Check ID    G201911190000026

# CHAR500

NYS Annual Filing for Charitable Organizations
www.CharitiesNYS.com

Send with fee and attachments to:
NYS Office of the Attorney General
Charities Bureau Registration Section
28 Liberty Street
New York, NY 10005

## 2018
Open to Public Inspection

## 1 General Information

For Fiscal Year Beginning (mm/dd/yyyy) 01 / 01 / 2018 and Ending (mm/dd/yyyy) 12 / 31 / 2018

Check if Applicable:
- ☐ Address Change
- ☐ Name Change
- ☐ Initial Filing
- ☐ Final Filing
- ☐ Amended Filing
- ☐ Reg ID Pending

Name of Organization:
**National Rifle Association of America**

Mailing Address:
**11250 Waples Mill Road,**

City / State / Zip:
**Fairfax, VA 22030**

Website:
**www.nra.org**

Employer Identification Number (EIN):
5 3 0 1 1 6 1 3 0

NY Registration Number:
0 2 - 2 1 - 6 4

Telephone:
**703-267-1250**

Email:
**GCOUNSEL@NRAHQ.ORG**

Check your organization's registration category:
☐ 7A only  ☐ EPTL only  ☒ DUAL (7A & EPTL)  ☐ EXEMPT*

Confirm your Registration Category in the Charities Registry at www.CharitiesNYS.com.

## 2 Certification

See Instructions for certification requirements. Improper certification is a violation of law that may be subject to penalties. The certification requires two signatories.

We certify under penalties of perjury that we reviewed this report, including all attachments, and to the best of our knowledge and belief, they are true, correct and complete in accordance with the laws of the State of New York applicable to this report.

Treasurer
President or Authorized Officer: Signature
Craig B. Spray Treasurer $ Date 11/13/19
Print Name and Title

Secretary
Chief Financial Officer or Treasurer: Signature
John C. Frazer, Secretary C.F.O. Date 11/13/19
Print Name and Title

## 3 Annual Reporting Exemption

Check the exemption(s) that apply to your filing. If your organization is claiming an exemption under one category (7A or EPTL only filers) or both categories (DUAL filers) that apply to your registration, complete only parts 1, 2, and 3, and submit the certified Char500. No fee, schedules, or additional attachments are required. If you cannot claim an exemption or are a DUAL filer that claims only one exemption, you must file applicable schedules and attachments and pay applicable fees.

☐ **3a. 7A filing exemption:** Total contributions from NY State including residents, foundations, government agencies, etc. did not exceed $25,000 and the organization did not engage a professional fund raiser (PFR) or fund raising counsel (FRC) to solicit contributions during the fiscal year.

☐ **3b. EPTL filing exemption:** Gross receipts did not exceed $25,000 and the market value of assets did not exceed $25,000 at any time during the fiscal year.

## 4. Schedules and Attachments

See the following page for a checklist of schedules and attachments to complete your filing.

☒ Yes  ☐ No  **4a.** Did your organization use a professional fund raiser, fund raising counsel or commercial co-venturer for fund raising activity in NY State? If yes, complete Schedule 4a.

☐ Yes  ☒ No  **4b.** Did the organization receive government grants? If yes, complete Schedule 4b.

## 5 Fee

See the checklist on the next page to calculate your fee(s). Indicate fee(s) you are submitting here:

| 7A filing fee: | EPTL filing fee: | Total fee: | Make a single check or money order payable to: |
|---|---|---|---|
| $ 25 | $ 750 | $ 775 | **"Department of Law"** |

CHAR500 Annual Filing for Charitable Organizations (Updated January 2019)
*The "Exempt" category refers to an organization's NYS registration status. It does not refer to its IRS tax designation.

Page 1

# CHAR500

**Annual Filing Checklist**

Simply submit the certified CHAR500 with no fee, schedule, or additional attachments IF:
- Your organization is registered as 7A only and you marked the 7A filing exemption in Part 3.
- Your organization is registered as EPTL only and you marked the EPTL filing exemption in Part 3.
- Your organization is registered as DUAL and you marked <u>both</u> the 7A and EPTL filing exemption in Part 3.

## Checklist of Schedules and Attachments

Check the schedules you must submit with your CHAR500 as described in Part 4:

- [x] If you answered "yes" in Part 4a, submit Schedule 4a: Professional Fund Raisers (PFR), Fund Raising Counsel (FRC), Commercial Co-Venturers (CCV)
- [ ] If you answered "yes" in Part 4b, submit Schedule 4b: Government Grants

Check the financial attachments you must submit with your CHAR500:

- [x] IRS Form 990, 990-EZ, or 990-PF, and 990-T if applicable
- [x] All additional IRS Form 990 Schedules, including Schedule B (Schedule of Contributors). Schedule B of public charities is exempt from disclosure and will not be available for public review.
- [ ] Our organization was eligible for and filed an IRS 990-N e-postcard. Our revenue exceeded $25,000 and/or our assets exceeded $25,000 in the filing year. We have included an IRS Form 990-EZ for state purposes only.

If you are a 7A only or DUAL filer, submit the applicable Independent Certified Public Accountant's Review or Audit Report:

- [ ] Review Report if you received total revenue and support greater than $250,000 and up to $750,000.
- [x] Audit Report if you received total revenue and support greater than $750,000
- [ ] No Review Report or Audit Report is required because total revenue and support is less than $250,000
- [ ] We are a DUAL filer and checked box 3a, no Review Report or Audit Report is required

## Calculate Your Fee

For 7A and DUAL filers, calculate the 7A fee:

- [ ] $0, if you checked the 7A exemption in Part 3a
- [ ] $25, if you did not check the 7A exemption in Part 3a

For EPTL and DUAL filers, calculate the EPTL fee:

- [ ] $0, if you checked the EPTL exemption in Part 3b
- [ ] $25, if the NET WORTH is less than $50,000
- [ ] $50, if the NET WORTH is $50,000 or more but less than $250,000
- [ ] $100, if the NET WORTH is $250,000 or more but less than $1,000,000
- [ ] $250, if the NET WORTH is $1,000,000 or more but less than $10,000,000
- [ ] $750, if the NET WORTH is $10,000,000 or more but less than $50,000,000
- [ ] $1500, if the NET WORTH is $50,000,000 or more

## Send Your Filing

Send your CHAR500, all schedules and attachments, and total fee to:

NYS Office of the Attorney General
Charities Bureau Registration Section
28 Liberty Street
New York, NY 10005

**Need Assistance?**
Visit: www.CharitiesNYS.com
Call: (212) 416-8401
Email: Charities.Bureau@ag.ny.gov

*Is my Registration Category 7A, EPTL, DUAL or EXEMPT?*
Organizations are assigned a Registration Category upon registration with the NY Charities Bureau:

**7A** filers are registered to solicit contributions in New York under Article 7-A of the Executive Law ("7A")

**EPTL** filers are registered under the Estates, Powers & Trusts Law ("EPTL") because they hold assets and/or conduct activites for charitable purposes in NY.

**DUAL** filers are registered under both 7A and EPTL.

**EXEMPT** filers have registered with the NY Charities Bureau and meet conditions in **Schedule E - Registration Exemption for Charitable Organizations**. These organizations are not required to file annual financial reports but may do so voluntarily.

Confirm your Registration Category and learn more about NY law at www.CharitiesNYS.com.

*Where do I find my organization's NET WORTH?*
NET WORTH for fee purposes is calculated on:
- IRS From 990 Part I, line 22
- IRS Form 990 EZ Part I line 21
- IRS Form 990 PF, calculate the difference between Total Assets at Fair Market Value (Part II, line 16(c)) and Total Liabilities (Part II, line 23(b)).

Appx. 289

# CHAR500

**Schedule 4a: Professional Fund Raisers, Fund Raising Counsels, Commercial Co-Venturers**
www.CharitiesNYS.com

## 2018
### Open to Public Inspection

If you checked the box in question 4a in Part 4 on the CHAR500 Annual Filing for Charitable Organizations, complete this schedule for EACH Professional Fund Raiser (PFR), Fund Raising Counsel (FRC) or Commercial Co-Venturer (CCV) that the organization engaged for fund raising activity in NY State. The PFR or FRC should provide its NY Registration Number to you. Include this schedule with your certified CHAR500 NYS Annual Filing for Charitable Organizations and use additional pages if necessary.

## Definitions

A **Professional Fund Raiser (PFR)**, in addition to other activities, conducts solicitation of contributions and/or handles the donations (Article 7A, 171-a.4).
A **Fund Raising Counsel (FRC)** does not solicit or handle contributions but limits activities to advising or assisting a charitable organization to perform such functions for itself (Article 7A, 171-a.9).
A **Commercial Co-Venturer (CCV)** is an individual or for-profit company that is regularly and primarily engaged in trade or commerce other than raising funds for a charitable organization and who advertises that the purchase or use of goods, services, entertainment or any other thing of value will benefit a charitable organization (Article 7A, 171-a.6).
**Professional fund raising** does not include activities by an organization's development staff, volunteers, or a grantwriter who has been hired solely to draft applications for funding from a government agency or tax exempt organization.

## 1. Organization Information

| Name of Organization: **National Rifle Association of America** | NY Registration Number: **0 2 - 2 1 - 6 4** |

## 2. Professional Fund Raiser, Fund Raising Counsel, Commercial Co-Venturer Information

Fund Raising Professional type:

☐ Professional Fund Raiser
☒ Fund Raising Counsel
☐ Commercial Co-Venturer

Name of FRP: **501c Solutions LLC**

Mailing Address: **2530 Meridian Parkway, suite 300**

City / State / Zip: **Research Triangle, NC 27713**

NY Registration Number: **4 5 - 5 3 - 0 3**

Telephone: **(9 1 9) 8 0 6 - 4 7 5 8**

## 3. Contract Information

| Contract Start Date: **1/1/2019** | Contract End Date: **12/31/2019** |

## 4. Description of Services

Services provided by FRP:

**Provides counsel and planning of events and programs as well as strategy development and research.**

## 5. Description of Compensation

Compensation arrangement with FRP:

**Compensation by flat fee and/or net costs reimbursement.**

Amount Paid to FRP:

**616,000**

## 6. Commercial Co-Venturer (CCV) Report

☐ Yes ☐ No   If services were provided by a CCV, did the CCV provide the charitable organization with the interim or closing report(s) required by Section 173(a) part 3 of the Executive Law Article 7A?

Appx. 290

# CHAR500

**2018**
Open to Public
Inspection

Schedule 4a: Professional Fund Raisers, Fund Raising Counsels, Commercial Co-Venturers
www.CharitiesNYS.com

If you checked the box in question 4a in Part 4 on the CHAR500 Annual Filing for Charitable Organizations, complete this schedule for EACH Professional Fund Raiser (PFR), Fund Raising Counsel (FRC) or Commercial Co-Venturer (CCV) that the organization engaged for fund raising activity in NY State. The PFR or FRC should provide its NY Registration Number to you. Include this schedule with your certified CHAR500 NYS Annual Filing for Charitable Organizations and use additional pages if necessary.

## Definitions

A **Professional Fund Raiser (PFR)**, in addition to other activities, conducts solicitation of contributions and/or handles the donations (Article 7A, 171-a.4).
A **Fund Raising Counsel (FRC)** does not solicit or handle contributions but limits activities to advising or assisting a charitable organization to perform such functions for itself (Article 7A, 171-a.9).
A **Commercial Co-Venturer (CCV)** is an individual or for-profit company that is regularly and primarily engaged in trade or commerce other than raising funds for a charitable organization and who advertises that the purchase or use of goods, services, entertainment or any other thing of value will benefit a charitable organization (Article 7A, 171-a.6).
**Professional fund raising** does not include activities by an organization's development staff, volunteers, or a grantwriter who has been hired solely to draft applications for funding from a government agency or tax exempt organization.

## 1. Organization Information

Name of Organization: **National Rifle Association of America**

NY Registration Number:
**0 2 - 2 1 - 6 4**

## 2. Professional Fund Raiser, Fund Raising Counsel, Commercial Co-Venturer Information

Fund Raising Professional type:

☒ Professional Fund Raiser
☐ Fund Raising Counsel
☐ Commercial Co-Venturer

Name of FRP:
**InfoCision Management Corp.**

Mailing Address:
**325 Springside Drive**

City / State / Zip:
**Akron, OH 44333**

NY Registration Number:
**3 2 - 5 7 - 0 9**

Telephone:
**(3 3 0) 6 6 8 - 1 4 0 0**

## 3. Contract Information

Contract Start Date:
**8/1/2011**

Contract End Date:
**6/30/2020**

## 4. Description of Services

Services provided by FRP:

**To plan, prepare, manage, and conduct a nationally directed outbound telemarketing development campaign to active, lapsed, or potential members/donors.**

## 5. Description of Compensation

Compensation arrangement with FRP:

**per call basis**

Amount Paid to FRP:

**4,840,658**

## 6. Commercial Co-Venturer (CCV) Report

☐ Yes ☐ No   If services were provided by a CCV, did the CCV provide the charitable organization with the interim or closing report(s) required by Section 173(a) part 3 of the Executive Law Article 7A?

Appx. 291

# CHAR500

**2018**

Open to Public Inspection

Schedule 4a: Professional Fund Raisers, Fund Raising Counsels, Commercial Co-Venturers
www.CharitiesNYS.com

If you checked the box in question 4a in Part 4 on the CHAR500 Annual Filing for Charitable Organizations, complete this schedule for EACH Professional Fund Raiser (PFR), Fund Raising Counsel (FRC) or Commercial Co-Venturer (CCV) that the organization engaged for fund raising activity in NY State. The PFR or FRC should provide its NY Registration Number to you. Include this schedule with your certified CHAR500 NYS Annual Filing for Charitable Organizations and use additional pages if necessary.

## Definitions

A **Professional Fund Raiser (PFR)**, in addition to other activities, conducts solicitation of contributions and/or handles the donations (Article 7A, 171-a.4).
A **Fund Raising Counsel (FRC)** does not solicit or handle contributions but limits activities to advising or assisting a charitable organization to perform such functions for itself (Article 7A, 171-a.9).
A **Commercial Co-Venturer (CCV)** is an individual or for-profit company that is regularly and primarily engaged in trade or commerce other than raising funds for a charitable organization and who advertises that the purchase or use of goods, services, entertainment or any other thing of value will benefit a charitable organization (Article 7A, 171-a.6).
**Professional fund raising** does not include activities by an organization's development staff, volunteers, or a grantwriter who has been hired solely to draft applications for funding from a government agency or tax exempt organization.

## 1. Organization Information

Name of Organization: **National Rifle Association of America**

NY Registration Number:

**0 2 - 2 1 - 6 4**

## 2. Professional Fund Raiser, Fund Raising Counsel, Commercial Co-Venturer Information

Fund Raising Professional type:

- [ ] Professional Fund Raiser
- [x] Fund Raising Counsel
- [ ] Commercial Co-Venturer

Name of FRP:

**Allegiance Creative Group**

Mailing Address:

**11250 Waples Mill Road**

City / State / Zip:

**Fairfax, VA 22030**

NY Registration Number:

**4 2 - 9 7 - 0 6**

Telephone:

**( 7 0 3 ) 2 6 7 - 1 0 0 0**

## 3. Contract Information

Contract Start Date:

**12/1/2011**

Contract End Date:

**12/1/2021**

## 4. Description of Services

Services provided by FRP:

**Provides counsel and promotion planning for marketing and direct response mail and phone programs.**

## 5. Description of Compensation

Compensation arrangement with FRP:

**Compensation by management commission fee and/or net costs.**

Amount Paid to FRP:

**1,070,000**

## 6. Commercial Co-Venturer (CCV) Report

- [ ] Yes [ ] No If services were provided by a CCV, did the CCV provide the charitable organization with the interim or closing report(s) required by Section 173(a) part 3 of the Executive Law Article 7A?

CHAR500 Schedule 4a: Professional Fund Raisers, Fund Raising Counsels, Commercial Co-Venturers (Updated January 2019) Page 1

Appx. 292

# CHAR500

**Schedule 4a: Professional Fund Raisers, Fund Raising Counsels, Commercial Co-Venturers**
www.CharitiesNYS.com

### 2018
Open to Public Inspection

If you checked the box in question 4a in Part 4 on the CHAR500 Annual Filing for Charitable Organizations, complete this schedule for EACH Professional Fund Raiser (PFR), Fund Raising Counsel (FRC) or Commercial Co-Venturer (CCV) that the organization engaged for fund raising activity in NY State. The PFR or FRC should provide its NY Registration Number to you. Include this schedule with your certified CHAR500 NYS Annual Filing for Charitable Organizations and use additional pages if necessary.

## Definitions

A **Professional Fund Raiser (PFR)**, in addition to other activities, conducts solicitation of contributions and/or handles the donations (Article 7A, 171-a.4).
A **Fund Raising Counsel (FRC)** does not solicit or handle contributions but limits activities to advising or assisting a charitable organization to perform such functions for itself (Article 7A, 171-a.9).
A **Commercial Co-Venturer (CCV)** is an individual or for-profit company that is regularly and primarily engaged in trade or commerce other than raising funds for a charitable organization and who advertises that the purchase or use of goods, services, entertainment or any other thing of value will benefit a charitable organization (Article 7A, 171-a.6).
**Professional fund raising** does not include activities by an organization's development staff, volunteers, or a grantwriter who has been hired solely to draft applications for funding from a government agency or tax exempt organization.

## 1. Organization Information

Name of Organization: **National Rifle Association of America**

NY Registration Number:
**0 2 - 2 1 - 6 4**

## 2. Professional Fund Raiser, Fund Raising Counsel, Commercial Co-Venturer Information

Fund Raising Professional type:

☐ Professional Fund Raiser
☒ Fund Raising Counsel
☐ Commercial Co-Venturer

Name of FRP:
**McKenna & Associates, LLC**

Mailing Address:
**1220 N. Fillmore Street, Suite 300**

City / State / Zip:
**Arlington, VA 22201**

NY Registration Number:
**4 2 - 7 7 - 5 4**

Telephone:
**( 5 7 1 ) 3 1 2 - 1 4 6 5**

## 3. Contract Information

Contract Start Date:
**1/1/2019**

Contract End Date:
**12/31/2019**

## 4. Description of Services

Services provided by FRP:
**Provides consulting services in the area of general gift cultivation and major donor development.**

## 5. Description of Compensation

Compensation arrangement with FRP:
**Compensation by flat fee and/or net costs reimbursement.**

Amount Paid to FRP:
**$300,000**

## 6. Commercial Co-Venturer (CCV) Report

☐ Yes ☐ No   If services were provided by a CCV, did the CCV provide the charitable organization with the interim or closing report(s) required by Section 173(a) part 3 of the Executive Law Article 7A?

CHAR500 Schedule 4a: Professional Fund Raisers, Fund Raising Counsels, Commercial Co-Venturers (Updated January 2019)      Page 1

# CHAR500

**2018**

Open to Public Inspection

**Schedule 4a: Professional Fund Raisers, Fund Raising Counsels, Commercial Co-Venturers**
www.CharitiesNYS.com

If you checked the box in question 4a in Part 4 on the CHAR500 Annual Filing for Charitable Organizations, complete this schedule for EACH Professional Fund Raiser (PFR), Fund Raising Counsel (FRC) or Commercial Co-Venturer (CCV) that the organization engaged for fund raising activity in NY State. The PFR or FRC should provide its NY Registration Number to you. Include this schedule with your certified CHAR500 NYS Annual Filing for Charitable Organizations and use additional pages if necessary.

## Definitions

A **Professional Fund Raiser (PFR)**, in addition to other activities, conducts solicitation of contributions and/or handles the donations (Article 7A, 171-a.4).
A **Fund Raising Counsel (FRC)** does not solicit or handle contributions but limits activities to advising or assisting a charitable organization to perform such functions for itself (Article 7A, 171-a.9).
A **Commercial Co-Venturer (CCV)** is an individual or for-profit company that is regularly and primarily engaged in trade or commerce other than raising funds for a charitable organization and who advertises that the purchase or use of goods, services, entertainment or any other thing of value will benefit a charitable organization (Article 7A, 171-a.6).
**Professional fund raising** does not include activities by an organization's development staff, volunteers, or a grantwriter who has been hired solely to draft applications for funding from a government agency or tax exempt organization.

## 1. Organization Information

Name of Organization: **National Rifle Association of America**

NY Registration Number:

**0 2 - 2 1 - 6 4**

## 2. Professional Fund Raiser, Fund Raising Counsel, Commercial Co-Venturer Information

Fund Raising Professional type:

☐ Professional Fund Raiser
☐ Fund Raising Counsel
☒ Commercial Co-Venturer

Name of FRP:
**Rio Ammunition, Inc.**

Mailing Address:
**433 East Las Colinas Blvd., Suite 900**

City / State / Zip:
**Irving, TX 75039**

NY Registration Number:
☐☐ - ☐☐ - ☐☐

Telephone:
(**2 1 4**) **3 8 9** - **1 8 9 6**

## 3. Contract Information

Contract Start Date:
**6/15/18**

Contract End Date:
**6/14/19**

## 4. Description of Services

Services provided by FRP:
**Sales promotion of specific ammunition that contains the NRA logo.**

## 5. Description of Compensation

Compensation arrangement with FRP:
**N/A**

Amount Paid to FRP:
**0**

## 6. Commercial Co-Venturer (CCV) Report

☒ Yes  ☐ No   If services were provided by a CCV, did the CCV provide the charitable organization with the interim or closing report(s) required by Section 173(a) part 3 of the Executive Law Article 7A?

Appx. 294

# CHAR500

**Schedule 4a: Professional Fund Raisers, Fund Raising Counsels, Commercial Co-Venturers**
www.CharitiesNYS.com

## 2018
Open to Public Inspection

If you checked the box in question 4a in Part 4 on the CHAR500 Annual Filing for Charitable Organizations, complete this schedule for EACH Professional Fund Raiser (PFR), Fund Raising Counsel (FRC) or Commercial Co-Venturer (CCV) that the organization engaged for fund raising activity in NY State. The PFR or FRC should provide its NY Registration Number to you. Include this schedule with your certified CHAR500 NYS Annual Filing for Charitable Organizations and use additional pages if necessary.

## Definitions

A **Professional Fund Raiser (PFR)**, in addition to other activities, conducts solicitation of contributions and/or handles the donations (Article 7A, 171-a.4).
A **Fund Raising Counsel (FRC)** does not solicit or handle contributions but limits activities to advising or assisting a charitable organization to perform such functions for itself (Article 7A, 171-a.9).
A **Commercial Co-Venturer (CCV)** is an individual or for-profit company that is regularly and primarily engaged in trade or commerce other than raising funds for a charitable organization and who advertises that the purchase or use of goods, services, entertainment or any other thing of value will benefit a charitable organization (Article 7A, 171-a.6).
**Professional fund raising** does not include activities by an organization's development staff, volunteers, or a grantwriter who has been hired solely to draft applications for funding from a government agency or tax exempt organization.

## 1. Organization Information

Name of Organization: **National Rifle Association of America**

NY Registration Number:
**0 2 - 2 1 - 6 4**

## 2. Professional Fund Raiser, Fund Raising Counsel, Commercial Co-Venturer Information

Fund Raising Professional type:

☐ Professional Fund Raiser
☒ Fund Raising Counsel
☐ Commercial Co-Venturer

Name of FRP:
**H.W.S. Consulting, Inc.**

Mailing Address:
**221 Homeport Drive**

City / State / Zip:
**Grasonville, MD 21638**

NY Registration Number:
**4 5 - 5 6 - 8 7**

Telephone:
( ) -

## 3. Contract Information

Contract Start Date:
**7/1/2016**

Contract End Date:
**4/1/2023 - contract terminated 12/31/2018**

## 4. Description of Services

Services provided by FRP:
**Provides consulting services in the area of general gift cultivation and major donor development.**

## 5. Description of Compensation

Compensation arrangement with FRP:
**Compensation by flat fee and/or net costs reimbursement.**

Amount Paid to FRP:
**360,000**

## 6. Commercial Co-Venturer (CCV) Report

☐ Yes ☐ No   If services were provided by a CCV, did the CCV provide the charitable organization with the interim or closing report(s) required by Section 173(a) part 3 of the Executive Law Article 7A?

CHAR500 Schedule 4a: Professional Fund Raisers, Fund Raising Counsels, Commercial Co-Venturers (Updated January 2019)   Page 1

Appx. 295

# CHAR500

Instructions for Completing Your NY Annual Filing
www.CharitiesNYS.com

*Need Assistance?*
Visit: www.CharitiesNYS.com
Call: (212) 416-8401
Email: Charities.Bureau@ag.ny.gov

**2018**
Open to Public
Inspection

## Before You Begin

Visit www.CharitiesNYS.com and search the Charities Registry to find your organization's NY State Registration Number (##-##-##) and Registration Category (7A, EPTL, DUAL, or EXEMPT). Knowing your organization's Registration Category will help you respond to Sections 1 and 3, determine the required attachments to the CHAR500 and calculate your filing fee. If your organization is not registered with the Charities Bureau, please complete CHAR410 "Registration Statement for Charitable Organizations".

## 1. General Information

Enter the accounting period covered by the report. Provide the best contact information for your organization. This information will be publicly available in the Charities Registry and will be used for communication to your organization. If your organization is registered and this is your regular annual filing, check *Initial Filing*. If your contact information needs to be updated, check *Address Change* and/or *Name Change*. Check *Amended Filing* if you are making a change to a previous filing. If you have submitted a CHAR410 - Registration Statement for Charitable Organizations - but do not yet have a NY State Registration Number, check *NY Reg Pending*. If this is a final filing and the organization is seeking dissolution or ceasing operations, check *Final Filing* and submit all applicable IRS schedules and attachments. If your organization is a NY corporation, visit www.CharitiesNYS.com for information on how to dissolve. Check the Charities Bureau Registration Category of your organization (7A, EPTL, DUAL, or EXEMPT). EXEMPT organizations are those that have registered with the NY Charities Bureau and meet conditions in Schedule E - Registration Exemption for Charitable Organizations - but have registered and file voluntarily.

## 2. Certification

When you have completed the form, sign and print the name, title and date. For 7A and DUAL filers, the CHAR500 must be signed by both the president or another authorized officer and the chief financial officer or treasurer. These must be different individuals. EPTL filers have the option of a single signature if the certification is by a banking institution or a trustee of a trust. Clearly state the title of the representative (e.g. "President," "CEO", Treasurer," "CFO," "Bank Vice President" or "Trustee").

## 3. Annual Reporting Exemption

You may claim an exemption from the reporting and fee requirements if you meet the filing exemptions applicable to your organization. If claiming an exemption under one statute (7A and EPTL only filers) or both statutes (DUAL filers) that apply to your registration, complete only parts 1, 2, and 3, and submit the certified Char500. No fee, schedule, or additional attachments are required. Otherwise, file all required schedules and attachments and pay applicable fees.

Note: A 7A or DUAL filer with contributions over $25,000 that did not contract with a professional fund raiser may check the 7A filing exemption in Part 3 if it (i) received all or substantially all of its contributions from a single government agency to which it submitted an annual report similar to that required by Executive Law Article 7A, or (ii) it received an allocation from a federated fund, United Way or incorporated community appeal and contributions from all other sources did not exceed $25,000.

## 4. Schedules and Attachments

If you do not qualify for the reporting exemptions as described in Part 3, review the checklist of schedules and attachments required to complete your filing. If your organization qualified for and submitted an IRS 990-N "e-Postcard," you must complete and submit an IRS Form 990-EZ to the NY Charities Bureau for reporting purposes. The NY Charities Bureau will not accept an IRS 990-N "e-postcard" because it does not contain sufficient financial information.

## 5. Fee

Your total fee is based on your registration category (7A, EPTL or DUAL). 7A or EPTL filers only pay the fee that applies to the statute under which they have registered unless they have claimed an exemption in Part 3. DUAL filers must pay both fees, unless they have claimed an exemption in Part 3. Consult the CHAR500 to calculate your fee or contact the NY Charities Bureau if you have additional questions.

## When to Submit Your Filing

7A and DUAL filers: postmarked within 4 1/2 months after the organization's accounting period ends. For example, fiscal year end December 31 reports are due by May 15th of the following year. EPTL filers: postmarked within 6 months after the organization's accounting period ends. An additional 180 day extension is automatically granted. Information regarding extensions is available at www.CharitiesNYS.com.

## Where to Submit Your Filing

Payment must be made to the **"Department of Law"**. Send the complete filing with payment to:
**NYS Office of the Attorney General, Charities Bureau Registration Section, 28 Liberty Street, New York, NY 10005.**

## Penalties

The Attorney General may cancel the registration of or seek civil penalties from an organization that fails to comply with the filing requirements.

Appx. 296

** PUBLIC DISCLOSURE COPY **

Form **990**

Department of the Treasury
Internal Revenue Service

# Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)

▶ Do not enter social security numbers on this form as it may be made public.

▶ Go to *www.irs.gov/Form990* for instructions and the latest information.

OMB No. 1545-0047

**2018**

Open to Public Inspection

**A** For the 2018 calendar year, or tax year beginning _____ and ending _____

**B** Check if applicable:
- [ ] Address change
- [ ] Name change
- [ ] Initial return
- [ ] Final return/terminated
- [ ] Amended return
- [ ] Application pending

**C** Name of organization

**NATIONAL RIFLE ASSOCIATION OF AMERICA**

Doing business as

Number and street (or P.O. box if mail is not delivered to street address) | Room/suite
**11250 WAPLES MILL ROAD**

City or town, state or province, country, and ZIP or foreign postal code
**FAIRFAX, VA 22030**

**F** Name and address of principal officer: **CRAIG B. SPRAY**
**SAME AS C ABOVE**

**D** Employer identification number

**53-0116130**

**E** Telephone number
**703-267-1000**

**G** Gross receipts $ **367,702,748.**

**H(a)** Is this a group return for subordinates? ...... [ ] Yes [X] No

**H(b)** Are all subordinates included? [ ] Yes [ ] No
If "No," attach a list. (see instructions)

**I** Tax-exempt status: [ ] 501(c)(3) [X] 501(c)( **4** ) (insert no.) [ ] 4947(a)(1) or [ ] 527

**J** Website: ▶ **WWW.NRA.ORG**

**H(c)** Group exemption number ▶

**K** Form of organization: [X] Corporation [ ] Trust [ ] Association [ ] Other ▶ | **L** Year of formation: **1871** | **M** State of legal domicile: **NY**

## Part I | Summary

| | | | |
|---|---|---|---|
| Activities & Governance | **1** Briefly describe the organization's mission or most significant activities: FIREARMS SAFETY, EDUCATION, AND TRAINING; AND ADVOCACY ON BEHALF OF SAFE AND RESPONSIBLE GUN OWNERS | | |
| | **2** Check this box ▶ [ ] if the organization discontinued its operations or disposed of more than 25% of its net assets. | | |
| | **3** Number of voting members of the governing body (Part VI, line 1a) | **3** | 76 |
| | **4** Number of independent voting members of the governing body (Part VI, line 1b) | **4** | 67 |
| | **5** Total number of individuals employed in calendar year 2018 (Part V, line 2a) | **5** | 816 |
| | **6** Total number of volunteers (estimate if necessary) | **6** | 150000 |
| | **7 a** Total unrelated business revenue from Part VIII, column (C), line 12 | **7a** | 23,943,194. |
| | **b** Net unrelated business taxable income from Form 990-T, line 38 | **7b** | 0. |

| | | Prior Year | Current Year |
|---|---|---|---|
| Revenue | **8** Contributions and grants (Part VIII, line 1h) | 98,026,531. | 108,599,726. |
| | **9** Program service revenue (Part VIII, line 2g) | 146,955,303. | 193,010,155. |
| | **10** Investment income (Part VIII, column (A), lines 3, 4, and 7d) | 4,893,990. | 2,192,041. |
| | **11** Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 62,111,910. | 48,748,942. |
| | **12** Total revenue - add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 311,987,734. | 352,550,864. |
| Expenses | **13** Grants and similar amounts paid (Part IX, column (A), lines 1-3) | 93,334. | 75,661. |
| | **14** Benefits paid to or for members (Part IX, column (A), line 4) | 0. | 0. |
| | **15** Salaries, other compensation, employee benefits (Part IX, column (A), lines 5-10) | 66,789,561. | 63,864,842. |
| | **16a** Professional fundraising fees (Part IX, column (A), line 11e) | 8,943,038. | 7,798,658. |
| | **b** Total fundraising expenses (Part IX, column (D), line 25) ▶ 48,091,585. | | |
| | **17** Other expenses (Part IX, column (A), lines 11a-11d, 11f-24e) | 254,005,718. | 283,536,156. |
| | **18** Total expenses. Add lines 13-17 (must equal Part IX, column (A), line 25) | 329,831,651. | 355,275,317. |
| | **19** Revenue less expenses. Subtract line 18 from line 12 | -17,843,917. | -2,724,453. |

| | | Beginning of Current Year | End of Year |
|---|---|---|---|
| Net Assets or Fund Balances | **20** Total assets (Part X, line 16) | 196,125,681. | 197,212,080. |
| | **21** Total liabilities (Part X, line 26) | 171,175,478. | 181,180,554. |
| | **22** Net assets or fund balances. Subtract line 21 from line 20 | 24,950,203. | 16,031,526. |

## Part II | Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

| Sign Here | ▶ Signature of officer | Date 11/14/19 |
|---|---|---|
| | ▶ CRAIG B. SPRAY, TREASURER | |
| | Type or print name and title | |

| Paid Preparer Use Only | Print/Type preparer's name ZACK FORTSCH, CPA | Preparer's signature Zack Fortsch | Date 11/14/19 | Check [ ] if self-employed | PTIN P00052725 |
|---|---|---|---|---|---|
| | Firm's name ▶ RSM US LLP | | | Firm's EIN ▶ 42-0714325 | |
| | Firm's address ▶ ONE SOUTH WACKER DR STE 800 CHICAGO, IL 60606-3392 | | | Phone no. 312-634-3400 | |

May the IRS discuss this return with the preparer shown above? (see instructions) ............... [X] Yes [ ] No

832001 12-31-18 LHA **For Paperwork Reduction Act Notice, see the separate instructions.** Form **990** (2018)

SEE SCHEDULE O FOR ORGANIZATION MISSION STATEMENT CONTINUATION

Appx. 297

Form 990 (2018)   NATIONAL RIFLE ASSOCIATION OF AMERICA   53-0116130   Page **2**

**Part III** | **Statement of Program Service Accomplishments**

Check if Schedule O contains a response or note to any line in this Part III ........................................ [X]

1 Briefly describe the organization's mission:

PER NRA BYLAWS, TO PROTECT AND DEFEND THE U.S. CONSTITUTION; TO
PROMOTE PUBLIC SAFETY, LAW AND ORDER, AND NATIONAL DEFENSE; TO TRAIN
LAW ENFORCEMENT AGENCIES AND CIVILIANS IN MARKSMANSHIP; TO PROMOTE
SHOOTING SPORTS AND HUNTING.

2 Did the organization undertake any significant program services during the year which were not listed on the
prior Form 990 or 990-EZ? .................................................................... ☐ Yes ☒ No
If "Yes," describe these new services on Schedule O.

3 Did the organization cease conducting, or make significant changes in how it conducts, any program services? ............ ☐ Yes ☒ No
If "Yes," describe these changes on Schedule O.

4 Describe the organization's program service accomplishments for each of its three largest program services, as measured by expenses.
Section 501(c)(3) and 501(c)(4) organizations are required to report the amount of grants and allocations to others, the total expenses, and
revenue, if any, for each program service reported.

4a (Code: _____ ) (Expenses $ 140,238,506. including grants of $ 75,661. ) (Revenue $ 203,053,219. )
NRA MEMBERSHIP SUPPORT INCLUDES PUBLICATIONS, EDUCATION AND TRAINING,
FIELD SERVICES, COMPETITIVE SHOOTING, LAW ENFORCEMENT, HUNTER SERVICES,
MEMBER COMMUNICATIONS SERVICES, MEMBER PROGRAMS, MEMBER SERVICES, AND
FULFILLMENT OF MEMBER SERVICES. THE CHIEF VALUE OF NRA MEMBERSHIP IS IN
GUN SAFETY AND TRAINING ALONG WITH REGULAR REINFORCEMENT OF THESE
LESSONS AND PRINCIPLES BY KEEPING ENGAGED WITH THE COMMUNITY OF OUTDOOR
LOVERS AND SAFE AND RESPONSIBLE SHOOTING ENTHUSIASTS. NRA MEMBERSHIP
SUPPORT AND FULFILLMENT ARE DEDICATED TO PROVIDING NRA MEMBERS WITH
HIGH QUALITY SUPPORT AS WELL AS CONTENT DELIVERED THROUGH MANY
PLATFORMS. SAFE AND RESPONSIBLE GUN OWNERSHIP REMAINS THE CORNERSTONE
OF EVERYTHING THE ASSOCIATION PROVIDES FOR MEMBERS.

4b (Code: _____ ) (Expenses $ 32,507,712. including grants of $ 0. ) (Revenue $ 0. )
THE NRA INSTITUTE FOR LEGISLATIVE ACTION ADVOCATES ON BEHALF OF SAFE
AND RESPONSIBLE GUN OWNERS. AS THE FOREMOST PROTECTOR AND DEFENDER OF
THE SECOND AMENDMENT, THE NRA PROMOTES FIREARMS SAFETY, ADVOCATES
AGAINST EFFORTS TO ERODE GUN RIGHTS AND FREEDOMS, FIGHTS FOR
INITIATIVES AIMED AT REDUCING VIOLENT CRIME, AND PROMOTES
HUNTERS'RIGHTS AND CONSERVATION EFFORTS. NRA MEMBERS RECOGNIZE THIS
VITAL IMPORTANCE OF NRAILA'S TRUE GRASSROOTS WORK TO PRESERVE THE
SECOND AMENDMENT FOR FUTURE GENERATIONS OF SHOOTERS AND OUTDOOR
SPORTSMEN AND SPORTSWOMEN. THIS LEGION OF ENGAGED AND MOTIVATED MEMBERS
IS THE REASON FOR THE NRA'S STRENGTH.

4c (Code: _____ ) (Expenses $ 18,732,003. including grants of $ _____ ) (Revenue $ 20,582,280. )
NRA SHOWS AND EXHIBITS INCLUDE THE NRA ANNUAL MEETINGS AND MEMBERS
EXHIBIT HALL, HELD IN A DIFFERENT CITY EACH YEAR, AND OTHER SHOWS
AROUND THE COUNTRY. THE ANNUAL MEETINGS AND EXHIBITS ARE PRESENTED AS A
CELEBRATION OF AMERICAN FREEDOM FEATURING ACRES OF EXHIBITS, PREMIER
EVENTS, EDUCATIONAL SEMINARS AND WORKSHOPS, AND FUN-FILLED ACTIVITIES
FOR THE ENTIRE FAMILY. DALLAS, TEXAS WAS THE 2018 HOST CITY. OTHER NRA
HOSTED SHOWS INCLUDED THE GREAT AMERICAN OUTDOOR SHOW HELD IN
HARRISBURG, PENNSYLVANIA.

4d Other program services (Describe in Schedule O.)
(Expenses $ 59,426,544. including grants of $ 0. ) (Revenue $ 1,330,515. )
4e Total program service expenses ▶ 250,904,765.

Form **990** (2018)
832002 12-31-18

Appx. 298

Form 990 (2018)    **NATIONAL RIFLE ASSOCIATION OF AMERICA**    53-0116130    Page **3**

| **Part IV** | **Checklist of Required Schedules** | | | |
|---|---|---|---|---|
| | | | Yes | No |
| 1 | Is the organization described in section 501(c)(3) or 4947(a)(1) (other than a private foundation)? | | | |
| | If "Yes," complete Schedule A ................................................................ | **1** | | X |
| 2 | Is the organization required to complete *Schedule B, Schedule of Contributors*? ........................... | **2** | X | |
| 3 | Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for | | | |
| | public office? If "Yes," complete Schedule C, Part I ................................................. | **3** | X | |
| 4 | **Section 501(c)(3) organizations.** Did the organization engage in lobbying activities, or have a section 501(h) election in effect | | | |
| | during the tax year? If "Yes," complete Schedule C, Part II ............................................ | **4** | | |
| 5 | Is the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization that receives membership dues, assessments, or | | | |
| | similar amounts as defined in Revenue Procedure 98-19? If "Yes," complete Schedule C, Part III ................... | **5** | X | |
| 6 | Did the organization maintain any donor advised funds or any similar funds or accounts for which donors have the right to | | | |
| | provide advice on the distribution or investment of amounts in such funds or accounts? If "Yes," complete Schedule D, Part I | **6** | | X |
| 7 | Did the organization receive or hold a conservation easement, including easements to preserve open space, | | | |
| | the environment, historic land areas, or historic structures? If "Yes," complete Schedule D, Part II ............... | **7** | | X |
| 8 | Did the organization maintain collections of works of art, historical treasures, or other similar assets? If "Yes," complete | | | |
| | Schedule D, Part III ..................................................................... | **8** | X | |
| 9 | Did the organization report an amount in Part X, line 21, for escrow or custodial account liability, serve as a custodian for | | | |
| | amounts not listed in Part X; or provide credit counseling, debt management, credit repair, or debt negotiation services? | | | |
| | If "Yes," complete Schedule D, Part IV ........................................................ | **9** | | X |
| 10 | Did the organization, directly or through a related organization, hold assets in temporarily restricted endowments, permanent | | | |
| | endowments, or quasi-endowments? If "Yes," complete Schedule D, Part V ............................... | **10** | X | |
| 11 | If the organization's answer to any of the following questions is "Yes," then complete Schedule D, Parts VI, VII, VIII, IX, or X | | | |
| | as applicable. | | | |
| a | Did the organization report an amount for land, buildings, and equipment in Part X, line 10? If "Yes," complete Schedule D, | | | |
| | Part VI .............................................................................. | **11a** | X | |
| b | Did the organization report an amount for investments - other securities in Part X, line 12 that is 5% or more of its total | | | |
| | assets reported in Part X, line 16? If "Yes," complete Schedule D, Part VII ............................... | **11b** | | X |
| c | Did the organization report an amount for investments - program related in Part X, line 13 that is 5% or more of its total | | | |
| | assets reported in Part X, line 16? If "Yes," complete Schedule D, Part VIII .............................. | **11c** | | X |
| d | Did the organization report an amount for other assets in Part X, line 15 that is 5% of its total assets reported in | | | |
| | Part X, line 16? If "Yes," complete Schedule D, Part IX .............................................. | **11d** | | X |
| e | Did the organization report an amount for other liabilities in Part X, line 25? If "Yes," complete Schedule D, Part X ......... | **11e** | X | |
| f | Did the organization's separate or consolidated financial statements for the tax year include a footnote that addresses | | | |
| | the organization's liability for uncertain tax positions under FIN 48 (ASC 740)? If "Yes," complete Schedule D, Part X | **11f** | X | |
| 12a | Did the organization obtain separate, independent audited financial statements for the tax year? If "Yes," complete | | | |
| | Schedule D, Parts XI and XII ............................................................... | **12a** | X | |
| b | Was the organization included in consolidated, independent audited financial statements for the tax year? | | | |
| | If "Yes," and if the organization answered "No" to line 12a, then completing Schedule D, Parts XI and XII is optional ......... | **12b** | X | |
| 13 | Is the organization a school described in section 170(b)(1)(A)(ii)? If "Yes," complete Schedule E .................. | **13** | | X |
| 14a | Did the organization maintain an office, employees, or agents outside of the United States? .................... | **14a** | | X |
| b | Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, | | | |
| | investment, and program service activities outside the United States, or aggregate foreign investments valued at $100,000 | | | |
| | or more? If "Yes," complete Schedule F, Parts I and IV ............................................. | **14b** | X | |
| 15 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or other assistance to or for any | | | |
| | foreign organization? If "Yes," complete Schedule F, Parts II and IV ................................... | **15** | | X |
| 16 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or other assistance to | | | |
| | or for foreign individuals? If "Yes," complete Schedule F, Parts III and IV .............................. | **16** | | X |
| 17 | Did the organization report a total of more than $15,000 of expenses for professional fundraising services on Part IX, | | | |
| | column (A), lines 6 and 11e? If "Yes," complete Schedule G, Part I .................................... | **17** | X | |
| 18 | Did the organization report more than $15,000 total of fundraising event gross income and contributions on Part VIII, lines | | | |
| | 1c and 8a? If "Yes," complete Schedule G, Part II ................................................ | **18** | X | |
| 19 | Did the organization report more than $15,000 of gross income from gaming activities on Part VIII, line 9a? If "Yes," | | | |
| | complete Schedule G, Part III ............................................................... | **19** | | X |
| 20a | Did the organization operate one or more hospital facilities? If "Yes," complete Schedule H ................... | **20a** | | X |
| b | If "Yes" to line 20a, did the organization attach a copy of its audited financial statements to this return? ............ | **20b** | | |
| 21 | Did the organization report more than $5,000 of grants or other assistance to any domestic organization or | | | |
| | domestic government on Part IX, column (A), line 1? If "Yes," complete Schedule I, Parts I and II ................. | **21** | X | |

832003 12-31-18    Form **990** (2018)

Appx. 299

Form 990 (2018)    **NATIONAL RIFLE ASSOCIATION OF AMERICA**    53-0116130    Page **4**

**Part IV** | **Checklist of Required Schedules** *(continued)*

|  |  |  | Yes | No |
|---|---|---|---|---|
| 22 | Did the organization report more than $5,000 of grants or other assistance to or for domestic individuals on Part IX, column (A), line 2? *If "Yes," complete Schedule I, Parts I and III* | **22** | X |  |
| 23 | Did the organization answer "Yes" to Part VII, Section A, line 3, 4, or 5 about compensation of the organization's current and former officers, directors, trustees, key employees, and highest compensated employees? *If "Yes," complete Schedule J* | **23** | X |  |
| 24a | Did the organization have a tax-exempt bond issue with an outstanding principal amount of more than $100,000 as of the last day of the year, that was issued after December 31, 2002? *If "Yes," answer lines 24b through 24d and complete Schedule K. If "No," go to line 25a* | **24a** |  | X |
| b | Did the organization invest any proceeds of tax-exempt bonds beyond a temporary period exception? | **24b** |  |  |
| c | Did the organization maintain an escrow account other than a refunding escrow at any time during the year to defease any tax-exempt bonds? | **24c** |  |  |
| d | Did the organization act as an "on behalf of" issuer for bonds outstanding at any time during the year? | **24d** |  |  |
| 25a | **Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations.** Did the organization engage in an excess benefit transaction with a disqualified person during the year? *If "Yes," complete Schedule L, Part I* | **25a** |  | X |
| b | Is the organization aware that it engaged in an excess benefit transaction with a disqualified person in a prior year, and that the transaction has not been reported on any of the organization's prior Forms 990 or 990-EZ? *If "Yes," complete Schedule L, Part I* | **25b** |  | X |
| 26 | Did the organization report any amount on Part X, line 5, 6, or 22 for receivables from or payables to any current or former officers, directors, trustees, key employees, highest compensated employees, or disqualified persons? *If "Yes," complete Schedule L, Part II* | **26** |  | X |
| 27 | Did the organization provide a grant or other assistance to an officer, director, trustee, key employee, substantial contributor or employee thereof, a grant selection committee member, or to a 35% controlled entity or family member of any of these persons? *If "Yes," complete Schedule L, Part III* | **27** |  | X |
| 28 | Was the organization a party to a business transaction with one of the following parties (see Schedule L, Part IV instructions for applicable filing thresholds, conditions, and exceptions): |  |  |  |
| a | A current or former officer, director, trustee, or key employee? *If "Yes," complete Schedule L, Part IV* | **28a** | X |  |
| b | A family member of a current or former officer, director, trustee, or key employee? *If "Yes," complete Schedule L, Part IV* | **28b** |  | X |
| c | An entity of which a current or former officer, director, trustee, or key employee (or a family member thereof) was an officer, director, trustee, or direct or indirect owner? *If "Yes," complete Schedule L, Part IV* | **28c** | X |  |
| 29 | Did the organization receive more than $25,000 in non-cash contributions? *If "Yes," complete Schedule M* | **29** | X |  |
| 30 | Did the organization receive contributions of art, historical treasures, or other similar assets, or qualified conservation contributions? *If "Yes," complete Schedule M* | **30** |  | X |
| 31 | Did the organization liquidate, terminate, or dissolve and cease operations? *If "Yes," complete Schedule N, Part I* | **31** |  | X |
| 32 | Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets? *If "Yes," complete Schedule N, Part II* | **32** |  | X |
| 33 | Did the organization own 100% of an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? *If "Yes," complete Schedule R, Part I* | **33** |  | X |
| 34 | Was the organization related to any tax-exempt or taxable entity? *If "Yes," complete Schedule R, Part II, III, or IV, and Part V, line 1* | **34** | X |  |
| 35a | Did the organization have a controlled entity within the meaning of section 512(b)(13)? | **35a** | X |  |
| b | If "Yes" to line 35a, did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? *If "Yes," complete Schedule R, Part V, line 2* | **35b** | X |  |
| 36 | **Section 501(c)(3) organizations.** Did the organization make any transfers to an exempt non-charitable related organization? *If "Yes," complete Schedule R, Part V, line 2* | **36** |  |  |
| 37 | Did the organization conduct more than 5% of its activities through an entity that is not a related organization and that is treated as a partnership for federal income tax purposes? *If "Yes," complete Schedule R, Part VI* | **37** |  | X |
| 38 | Did the organization complete Schedule O and provide explanations in Schedule O for Part VI, lines 11b and 19? **Note.** All Form 990 filers are required to complete Schedule O | **38** | X |  |

**Part V** | **Statements Regarding Other IRS Filings and Tax Compliance**

Check if Schedule O contains a response or note to any line in this Part V ........................................... ☐

|  |  |  | Yes | No |
|---|---|---|---|---|
| 1a | Enter the number reported in Box 3 of Form 1096. Enter -0- if not applicable ......... **1a**   1176 |  |  |  |
| b | Enter the number of Forms W-2G included in line 1a. Enter -0- if not applicable ......... **1b**   0 |  |  |  |
| c | Did the organization comply with backup withholding rules for reportable payments to vendors and reportable gaming (gambling) winnings to prize winners? | **1c** | X |  |

832004 12-31-18                  Form **990** (2018)

Form 990 (2018)     NATIONAL RIFLE ASSOCIATION OF AMERICA     53-0116130    Page **5**

**Part V** | **Statements Regarding Other IRS Filings and Tax Compliance** *(continued)*

| | | | Yes | No |
|---|---|---|---|---|
| **2a** Enter the number of employees reported on Form W-3, Transmittal of Wage and Tax Statements, filed for the calendar year ending with or within the year covered by this return | **2a** | 816 | | |
| **b** If at least one is reported on line 2a, did the organization file all required federal employment tax returns? | **2b** | | X | |
| **Note.** If the sum of lines 1a and 2a is greater than 250, you may be required to *e-file* (see instructions) | | | | |
| **3a** Did the organization have unrelated business gross income of $1,000 or more during the year? | **3a** | | X | |
| **b** If "Yes," has it filed a Form 990-T for this year? *If "No" to line 3b, provide an explanation in Schedule O* | **3b** | | X | |
| **4a** At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)? | **4a** | | | X |
| **b** If "Yes," enter the name of the foreign country: ▶ | | | | |
| See instructions for filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR). | | | | |
| **5a** Was the organization a party to a prohibited tax shelter transaction at any time during the tax year? | **5a** | | | X |
| **b** Did any taxable party notify the organization that it was or is a party to a prohibited tax shelter transaction? | **5b** | | | X |
| **c** If "Yes" to line 5a or 5b, did the organization file Form 8886-T? | **5c** | | | |
| **6a** Does the organization have annual gross receipts that are normally greater than $100,000, and did the organization solicit any contributions that were not tax deductible as charitable contributions? | **6a** | | X | |
| **b** If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? | **6b** | | X | |
| **7** **Organizations that may receive deductible contributions under section 170(c).** | | | | |
| **a** Did the organization receive a payment in excess of $75 made partly as a contribution and partly for goods and services provided to the payor? | **7a** | | | |
| **b** If "Yes," did the organization notify the donor of the value of the goods or services provided? | **7b** | | | |
| **c** Did the organization sell, exchange, or otherwise dispose of tangible personal property for which it was required to file Form 8282? | **7c** | | | |
| **d** If "Yes," indicate the number of Forms 8282 filed during the year | **7d** | | | |
| **e** Did the organization receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? | **7e** | | | |
| **f** Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? | **7f** | | | |
| **g** If the organization received a contribution of qualified intellectual property, did the organization file Form 8899 as required? | **7g** | | | |
| **h** If the organization received a contribution of cars, boats, airplanes, or other vehicles, did the organization file a Form 1098-C? | **7h** | | | |
| **8** **Sponsoring organizations maintaining donor advised funds.** Did a donor advised fund maintained by the sponsoring organization have excess business holdings at any time during the year? | **8** | | | |
| **9** **Sponsoring organizations maintaining donor advised funds.** | | | | |
| **a** Did the sponsoring organization make any taxable distributions under section 4966? | **9a** | | | |
| **b** Did the sponsoring organization make a distribution to a donor, donor advisor, or related person? | **9b** | | | |
| **10** **Section 501(c)(7) organizations.** Enter: | | | | |
| **a** Initiation fees and capital contributions included on Part VIII, line 12 | **10a** | | | |
| **b** Gross receipts, included on Form 990, Part VIII, line 12, for public use of club facilities | **10b** | | | |
| **11** **Section 501(c)(12) organizations.** Enter: | | | | |
| **a** Gross income from members or shareholders | **11a** | | | |
| **b** Gross income from other sources (Do not net amounts due or paid to other sources against amounts due or received from them.) | **11b** | | | |
| **12a** **Section 4947(a)(1) non-exempt charitable trusts.** Is the organization filing Form 990 in lieu of Form 1041? | **12a** | | | |
| **b** If "Yes," enter the amount of tax-exempt interest received or accrued during the year | **12b** | | | |
| **13** **Section 501(c)(29) qualified nonprofit health insurance issuers.** | | | | |
| **a** Is the organization licensed to issue qualified health plans in more than one state? | **13a** | | | |
| **Note.** See the instructions for additional information the organization must report on Schedule O. | | | | |
| **b** Enter the amount of reserves the organization is required to maintain by the states in which the organization is licensed to issue qualified health plans | **13b** | | | |
| **c** Enter the amount of reserves on hand | **13c** | | | |
| **14a** Did the organization receive any payments for indoor tanning services during the tax year? | **14a** | | | X |
| **b** If "Yes," has it filed a Form 720 to report these payments? *If "No," provide an explanation in Schedule O* | **14b** | | | |
| **15** Is the organization subject to the section 4960 tax on payment(s) of more than $1,000,000 in remuneration or excess parachute payment(s) during the year? | **15** | | X | |
| If "Yes," see instructions and file Form 4720, Schedule N. | | | | |
| **16** Is the organization an educational institution subject to the section 4968 excise tax on net investment income? | **16** | | | X |
| If "Yes," complete Form 4720, Schedule O. | | | | |

Form **990** (2018)

832005 12-31-18

Form 990 (2018)     **NATIONAL RIFLE ASSOCIATION OF AMERICA**     53-0116130    Page **6**

| **Part VI** | **Governance, Management, and Disclosure** *For each "Yes" response to lines 2 through 7b below, and for a "No" response to line 8a, 8b, or 10b below, describe the circumstances, processes, or changes in Schedule O. See instructions.* |

Check if Schedule O contains a response or note to any line in this Part VI .................................................. ☒

### Section A. Governing Body and Management

|  |  | | Yes | No |
|---|---|---|---|---|
| **1a** | Enter the number of voting members of the governing body at the end of the tax year ............ | **1a** | 76 | | |
|  | If there are material differences in voting rights among members of the governing body, or if the governing body delegated broad authority to an executive committee or similar committee, explain in Schedule O. | | | | |
| **b** | Enter the number of voting members included in line 1a, above, who are independent ............. | **1b** | 67 | | |
| **2** | Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? .................................................. | **2** | | X | |
| **3** | Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors, or trustees, or key employees to a management company or other person? ................... | **3** | | | X |
| **4** | Did the organization make any significant changes to its governing documents since the prior Form 990 was filed? .............. | **4** | | | X |
| **5** | Did the organization become aware during the year of a significant diversion of the organization's assets? ........ | **5** | | | X |
| **6** | Did the organization have members or stockholders? .................................................. | **6** | | X | |
| **7a** | Did the organization have members, stockholders, or other persons who had the power to elect or appoint one or more members of the governing body? .................................................. | **7a** | | X | |
| **b** | Are any governance decisions of the organization reserved to (or subject to approval by) members, stockholders, or persons other than the governing body? .................................................. | **7b** | | X | |
| **8** | Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following: | | | | |
| **a** | The governing body? .................................................. | **8a** | | X | |
| **b** | Each committee with authority to act on behalf of the governing body? .................................................. | **8b** | | X | |
| **9** | Is there any officer, director, trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? *If "Yes," provide the names and addresses in Schedule O* .................. | **9** | | | X |

### Section B. Policies *(This Section B requests information about policies not required by the Internal Revenue Code.)*

|  |  | | Yes | No |
|---|---|---|---|---|
| **10a** | Did the organization have local chapters, branches, or affiliates? .................................................. | **10a** | | | X |
| **b** | If "Yes," did the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with the organization's exempt purposes? | **10b** | | | |
| **11a** | Has the organization provided a complete copy of this Form 990 to all members of its governing body before filing the form? | **11a** | | X | |
| **b** | Describe in Schedule O the process, if any, used by the organization to review this Form 990. | | | | |
| **12a** | Did the organization have a written conflict of interest policy? *If "No," go to line 13* .................................................. | **12a** | | X | |
| **b** | Were officers, directors, or trustees, and key employees required to disclose annually interests that could give rise to conflicts? ........... | **12b** | | X | |
| **c** | Did the organization regularly and consistently monitor and enforce compliance with the policy? *If "Yes," describe in Schedule O how this was done* .................................................. | **12c** | | X | |
| **13** | Did the organization have a written whistleblower policy? .................................................. | **13** | | X | |
| **14** | Did the organization have a written document retention and destruction policy? .................................................. | **14** | | X | |
| **15** | Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? | | | | |
| **a** | The organization's CEO, Executive Director, or top management official .................................................. | **15a** | | X | |
| **b** | Other officers or key employees of the organization .................................................. | **15b** | | X | |
|  | If "Yes" to line 15a or 15b, describe the process in Schedule O (see instructions). | | | | |
| **16a** | Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? .................................................. | **16a** | | | X |
| **b** | If "Yes," did the organization follow a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and take steps to safeguard the organization's exempt status with respect to such arrangements? .................................................. | **16b** | | | |

### Section C. Disclosure

**17** List the states with which a copy of this Form 990 is required to be filed ▶AL,AZ,AR,CA,CO,CT,DC,FL,GA,HI,ID,IL

**18** Section 6104 requires an organization to make its Forms 1023 (1024 or 1024-A if applicable), 990, and 990-T (Section 501(c)(3)s only) available for public inspection. Indicate how you made these available. Check all that apply.
   ☐ Own website    ☐ Another's website    ☒ Upon request    ☐ Other *(explain in Schedule O)* .

**19** Describe in Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year.

**20** State the name, address, and telephone number of the person who possesses the organization's books and records ▶
   CRAIG B. SPRAY, TREASURER - 703-267-1000
   11250 WAPLES MILL RD, FAIRFAX, VA 22030

832006 12-31-18      **SEE SCHEDULE O FOR FULL LIST OF STATES**      Form **990** (2018)

Form 990 (2018)    **NATIONAL RIFLE ASSOCIATION OF AMERICA**    53-0116130   Page **7**

| **Part VII** | Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors |

Check if Schedule O contains a response or note to any line in this Part VII .................................................... [X]

**Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

**1a** Complete this table for all persons required to be listed. Report compensation for the calendar year ending with or within the organization's tax year.

● List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation. Enter -0- in columns (D), (E), and (F) if no compensation was paid.

● List all of the organization's **current** key employees, if any. See instructions for definition of "key employee."

● List the organization's five **current** highest compensated employees (other than an officer, director, trustee, or key employee) who received reportable compensation (Box 5 of Form W-2 and/or Box 7 of Form 1099-MISC) of more than $100,000 from the organization and any related organizations.

● List all of the organization's **former** officers, key employees, and highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations.

● List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations.

List persons in the following order: individual trustees or directors; institutional trustees; officers; key employees; highest compensated employees; and former such persons.

[ ] Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee.

| (A) Name and Title | (B) Average hours per week (list any hours for related organizations below line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (1) RICHARD CHILDRESS<br>1ST VICE PRESIDENT | 10.00<br>1.00 | X | | X | | | | 0. | 0. | 0. |
| (2) CAROLYN D. MEADOWS<br>2ND VICE PRESIDENT | 10.00<br>1.00 | X | | X | | | | 0. | 0. | 0. |
| (3) JOE M. ALLBAUGH<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (4) WILLIAM H. ALLEN<br>DIRECTOR (ENDING 6/1/2018) | 1.00 | X | | | | | | 0. | 0. | 0. |
| (5) THOMAS P. ARVAS<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (6) PAUL BABAZ<br>DIRECTOR (STARTING 6/1/2018) | 1.00 | X | | | | | | 0. | 0. | 0. |
| (7) SCOTT L. BACH<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (8) WILLIAM A. BACHENBERG<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (9) BOB BARR<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (10) RONNIE G. BARRETT<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (11) CLEL BAUDLER<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (12) J. KENNETH BLACKWELL<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (13) MATT BLUNT<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (14) DAN BOREN<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (15) ROBERT K. BROWN<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (16) PETE R. BROWNELL<br>DIRECTOR | 1.00<br>1.00 | X | | | | | | 2,997. | 0. | 0. |
| (17) DAVID BUTZ<br>DIRECTOR | 5.00 | X | | | | | | 100,000. | 0. | 0. |

832007 12-31-18

Form 990 (2018) NATIONAL RIFLE ASSOCIATION OF AMERICA 53-0116130 Page **8**

**Part VII** Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees *(continued)*

| (A)<br>Name and title | (B)<br>Average hours per week (list any hours for related organizations below line) | (C)<br>Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D)<br>Reportable compensation from the organization (W-2/1099-MISC) | (E)<br>Reportable compensation from related organizations (W-2/1099-MISC) | (F)<br>Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (18) DEAN CAIN<br>DIRECTOR (STARTING 5/5/2018) | 1.00 | X | | | | | | 0. | 0. | 0. |
| (19) TED W. CARTER<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (20) PATRICIA A. CLARK<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (21) ALLAN D. CORS<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (22) CHARLES L. COTTON<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (23) DAVID G. COY<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (24) LARRY E. CRAIG<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (25) JOHN L CUSHMAN<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (26) R. LEE ERMEY<br>DIRECTOR (ENDING 4/15/2018) | 1.00 | X | | | | | | 0. | 0. | 0. |

| | | | | | |
|---|---|---|---|---|---|
| **1b Sub-total** ▶ | | | | 102,997. | 0. | 0. |
| **c Total from continuation sheets to Part VII, Section A** ▶ | | | | 12,820,292. | 0. | 756,013. |
| **d Total (add lines 1b and 1c)** ▶ | | | | 12,923,289. | 0. | 756,013. |

**2** Total number of individuals (including but not limited to those listed above) who received more than $100,000 of reportable compensation from the organization ▶ 122

| | | Yes | No |
|---|---|---|---|
| **3** Did the organization list any *former* officer, director, or trustee, key employee, or highest compensated employee on line 1a? *If "Yes," complete Schedule J for such individual* | **3** | | X |
| **4** For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? *If "Yes," complete Schedule J for such individual* | **4** | | X |
| **5** Did any person listed on line 1a receive or accrue compensation from any unrelated organization or individual for services rendered to the organization? *If "Yes," complete Schedule J for such person* | **5** | | X |

**Section B. Independent Contractors**

**1** Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization. Report compensation for the calendar year ending with or within the organization's tax year.

| (A)<br>Name and business address | (B)<br>Description of services | (C)<br>Compensation |
|---|---|---|
| ACKERMAN MCQUEEN INC<br>1601 NW EXPRESSWAY, OKLAHOMA CITY, OK 73118 | PUBLIC RELATIONS AND ADVERTISING | 31,994,168. |
| INFOCISION MANAGEMENT CORP<br>325 SPRINGSIDE DR, AKRON, OH 44333 | MEMBERSHIP PROCESSING AND CONTR | 25,727,854. |
| BREWER ATTORNEYS AND COUNSELORS<br>1717 MAIN ST, SUITE 5900, DALLAS, TX 75201 | LEGAL SERVICES | 13,832,060. |
| MEMBERSHIP MARKETING PARTNERS LLC, 11250<br>WAPLES MILL TD, SUITE 310, FAIRFAX, VA | FUNDRAISING PRINTING AND MAILING | 12,561,213. |
| VALTIM INC<br>1095 VENTURE DR, FOREST, VA 24551 | FULFILLMENT CENTER | 8,836,104. |

**2** Total number of independent contractors (including but not limited to those listed above) who received more than $100,000 of compensation from the organization ▶ 123

SEE PART VII, SECTION A CONTINUATION SHEETS

Form **990** (2018)

832008 12-31-18

Appx. 304

Form 990        **NATIONAL RIFLE ASSOCIATION OF AMERICA**    53-0116130

**Part VII** Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees *(continued)*

| (A) Name and title | (B) Average hours per week (list any hours for related organizations below line) | (C) Position (check all that apply) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (27) EDIE P. FLEEMAN DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (28) CAROL FRAMPTON DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (29) JOEL FRIEDMAN DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (30) SANDRA S. FROMAN DIRECTOR | 5.00 | X | | | | | | 13,060. | 0. | 0. |
| (31) JULIE GOLOB DIRECTOR (STARTING 5/5/2018) | 5.00 | X | | | | | | 28,661. | 0. | 0. |
| (32) MARIA HEIL DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (33) GRAHAM HILL DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (34) STEVE HORNADY DIRECTOR (ENDING 5/5/2018) | 1.00 | X | | | | | | 0. | 0. | 0. |
| (35) SUSAN HOWARD DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (36) CURTIS S. JENKINS DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (37) DAVID A. KEENE DIRECTOR | 1.00 | X | | | | | | 40,000. | 0. | 0. |
| (38) TOM KING DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (39) TIMOTHY KNIGHT DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (40) HERBERT A. LANFORD JR. DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (41) WILLES K. LEE DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (42) CARRIE LIGHTFOOT DIRECTOR (STARTING 5/5/2018) | 1.00 | X | | | | | | 2,907. | 0. | 0. |
| (43) DUANE LIPTAK, JR DIRECTOR (STARTING 5/5/2018) | 1.00 | X | | | | | | 0. | 0. | 0. |
| (44) KARL A. MALONE DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (45) SEAN MALONEY DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (46) ROBERT E. MANSELL DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |

Total to Part VII, Section A, line 1c ......................................................

832201
04-01-18

Appx. 305

Form 990     **NATIONAL RIFLE ASSOCIATION OF AMERICA**     53-0116130

**Part VII**   Section A.   Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees *(continued)*

| (A) Name and title | (B) Average hours per week (list any hours for related organizations below line) | (C) Position (check all that apply) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (47) BILL MILLER<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (48) OWEN BUZ MILLS<br>DIRECTOR | 1.00 | X | | | | | | 5,553. | 0. | 0. |
| (49) CRAIG MORGAN<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (50) IL LING NEW<br>DIRECTOR (STARTING 5/5/2018) | 1.00 | X | | | | | | 0. | 0. | 0. |
| (51) GROVER NORQUIST<br>DIRECTOR (ENDING 5/5/2018) | 1.00 | X | | | | | | 0. | 0. | 0. |
| (52) ROBERT A. NOSLER<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (53) JOHNNY NUGENT<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (54) TED NUGENT<br>DIRECTOR | 1.00 | X | | | | | | 64,234. | 0. | 0. |
| (55) LANCE OLSON<br>DIRECTOR | 5.00 | X | | | | | | 75,000. | 0. | 0. |
| (56) MELANIE PEPPER<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (57) JAMES W. PORTER II<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (58) JAY PRINTZ<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (59) TODD J. RATHNER<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (60) KIM RHODE<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (61) WAYNE ANTHONY ROSS<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (62) CARL T. ROWAN, JR.<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (63) DON SABA<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (64) WILLIAM H. SATTERFIELD<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (65) RONALD L. SCHMEITS<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (66) ESTHER Q. SCHNEIDER<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |

Total to Part VII, Section A, line 1c ................................................

832201
04-01-18

Form 990     **NATIONAL RIFLE ASSOCIATION OF AMERICA**     53-0116130

**Part VII**   Section A.   Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees *(continued)*

| (A)<br>Name and title | (B)<br>Average hours per week (list any hours for related organizations below line) | (C)<br>Position<br>(check all that apply) | | | | | | (D)<br>Reportable compensation from the organization (W-2/1099-MISC) | (E)<br>Reportable compensation from related organizations (W-2/1099-MISC) | (F)<br>Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (67) STEVEN C. SCHREINER<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (68) TOM SELLECK<br>DIRECTOR (ENDING 9/8/2018) | 1.00 | X | | | | | | 0. | 0. | 0. |
| (69) JOHN C. SIGLER<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (70) LEROY SISCO<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (71) BART SKELTON<br>DIRECTOR | 5.00 | X | | | | | | 15,000. | 0. | 0. |
| (72) STEPHANIE SPIKA<br>DIRECTOR (4/15/2018-5/5/2018) | 1.00 | X | | | | | | 0. | 0. | 0. |
| (73) KRISTY TITUS<br>DIRECTOR (STARTING 5/5/2018) | 1.00 | X | | | | | | 0. | 0. | 0. |
| (74) DWIGHT D. VAN HORN<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (75) BLAINE E. WADE<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (76) LINDA L. WALKER<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (77) HOWARD J. WALTER<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (78) HEIDI E. WASHINGTON<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (79) ALLEN B. WEST<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (80) ROBERT J. WOS<br>DIRECTOR (ENDING 5/5/2018) | 1.00 | X | | | | | | 0. | 0. | 0. |
| (81) DONALD E. YOUNG<br>DIRECTOR | 1.00 | X | | | | | | 0. | 0. | 0. |
| (82) WAYNE LAPIERRE<br>CEO AND EXECUTIVE VICE PRESIDENT | 60.00<br>1.00 | | | X | | | | 2,150,634. | 0. | 73,793. |
| (83) CHRIS W. COX<br>EXECUTIVE DIRECTOR, NRAILA | 49.00<br>1.00 | | | X | | | | 1,285,318. | 0. | 107,350. |
| (84) WILSON H. PHILLIPS<br>TREASURER (ENDING 9/13/2018) | 29.00<br>11.00 | | | X | | | | 900,537. | 0. | 48,232. |
| (85) JOSHUA L. POWELL<br>CHIEF OF STAFF AND EXEC. DIR | 40.00 | | | X | | | | 844,137. | 0. | 75,832. |
| (86) CRAIG B. SPRAY<br>TREASURER (FROM 9/13/2018) | 39.00<br>11.00 | | | X | | | | 596,958. | 0. | 51,257. |

Total to Part VII, Section A, line 1c .................................................

832201
04-01-18

Form 990 **NATIONAL RIFLE ASSOCIATION OF AMERICA** 53-0116130

**Part VII** | Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees *(continued)*

| (A)<br>Name and title | (B)<br>Average hours per week (list any hours for related organizations below line) | (C)<br>Position<br>(check all that apply) | | | | | | (D)<br>Reportable compensation from the organization (W-2/1099-MISC) | (E)<br>Reportable compensation from related organizations (W-2/1099-MISC) | (F)<br>Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (87) JOHN C. FRAZER<br>SECRETARY AND GENERAL COUNSEL | 50.00<br>1.00 | | | X | | | | 413,076. | 0. | 76,577. |
| (88) JOSEPH P. DEBERGALIS, JR.<br>EXEC DIR, GENERAL OPS (STARTING 12/3 | 50.00 | | | X | | | | 403,226. | 0. | 57,802. |
| (89) TYLER SCHROPP<br>MANAGING DIRECTOR, ADVANCEMENT | 50.00<br>1.00 | | | | | X | | 733,145. | 0. | 73,623. |
| (90) TODD GRABLE<br>EXECUTIVE DIRECTOR, MEMBERSHIP | 50.00 | | | | | X | | 667,386. | 0. | 66,154. |
| (91) DOUGLAS HAMLIN<br>EXECUTIVE DIRECTOR, PUBLICATIONS | 50.00 | | | | | X | | 581,321. | 0. | 74,409. |
| (92) DAVID LEHMAN<br>DEPUTY EXECUTIVE DIRECTOR, NRAILA | 50.00<br>1.00 | | | | | X | | 571,732. | 0. | 31,121. |
| (93) ERIC FROHARDT<br>DIRECTOR, EDUCATION AND TRAINING | 40.00 | | | | | X | | 525,745. | 0. | 19,863. |
| (94) ROBERT K. WEAVER<br>FMR EXE. DIR, GENERAL OPERATIONS | 0.00 | | | | | | X | 720,000. | 0. | 0. |
| (95) MICHEL MARCELLIN<br>FMR MANAGING DIR, AFFINITY AND LICEN | 0.00 | | | | | | X | 535,045. | 0. | 0. |
| (96) OLIVER L. NORTH<br>PRESIDENT | 20.00<br>1.00 | X | | X | | | | 1,377,617. | 0. | 0. |
| (97) MARION P. HAMMER<br>DIRECTOR | 5.00 | X | | | | | | 270,000. | 0. | 0. |
| | | | | | | | | | | |
| | | | | | | | | | | |
| **Total to Part VII, Section A, line 1c** | | | | | | | | **12,820,292.** | | **756,013.** |

832201
04-01-18

Form 990 (2018)     **NATIONAL RIFLE ASSOCIATION OF AMERICA**     53-0116130    Page **9**

| **Part VIII** | **Statement of Revenue** |
| --- | --- |

Check if Schedule O contains a response or note to any line in this Part VIII .......................................... ☒

| | | | **(A)** Total revenue | **(B)** Related or exempt function revenue | **(C)** Unrelated business revenue | **(D)** Revenue excluded from tax under sections 512 - 514 |
| --- | --- | --- | --- | --- | --- | --- |
| **Contributions, Gifts, Grants and Other Similar Amounts** | **1 a** Federated campaigns | **1a** | | | | |
| | **b** Membership dues | **1b** | | | | |
| | **c** Fundraising events | **1c** | | | | |
| | **d** Related organizations | **1d** | 13,959,442. | | | |
| | **e** Government grants (contributions) | **1e** | | | | |
| | **f** All other contributions, gifts, grants, and similar amounts not included above | **1f** | 94,640,284. | | | |
| | **g** Noncash contributions included in lines 1a-1f $ | | 407,352. | | | |
| | **h** Total. Add lines 1a-1f ........................ ▶ | | 108,599,726. | | | |
| **Program Service Revenue** | | **Business Code** | | | | |
| | **2 a** MEMBER DUES | 813410 | 170,391,374. | 170,391,374. | | |
| | **b** PROGRAM FEES | 813410 | 22,618,781. | 22,618,781. | | |
| | **c** | | | | | |
| | **d** | | | | | |
| | **e** | | | | | |
| | **f** All other program service revenue | | | | | |
| | **g** Total. Add lines 2a-2f ........................ ▶ | | 193,010,155. | | | |
| **Other Revenue** | **3** Investment income (including dividends, interest, and other similar amounts) ........................ ▶ | | 1,193,705. | | | 1,193,705. |
| | **4** Income from investment of tax-exempt bond proceeds ▶ | | | | | |
| | **5** Royalties ........................ ▶ | | 16,532,433. | | | 16,532,433. |
| | | **(i) Real** | **(ii) Personal** | | | | |
| | **6 a** Gross rents | 1,357,108. | | | | | |
| | **b** Less: rental expenses | 2,203,501. | | | | | |
| | **c** Rental income or (loss) | -846,393. | | | | | |
| | **d** Net rental income or (loss) ........................ ▶ | | -846,393. | | | -846,393. |
| | | **(i) Securities** | **(ii) Other** | | | | |
| | **7 a** Gross amount from sales of assets other than inventory | 9,261,323. | | | | | |
| | **b** Less: cost or other basis and sales expenses | 8,262,987. | | | | | |
| | **c** Gain or (loss) | 998,336. | | | | | |
| | **d** Net gain or (loss) ........................ ▶ | | 998,336. | | | 998,336. |
| | **8 a** Gross income from fundraising events (not including $ _____ of contributions reported on line 1c). See Part IV, line 18 ........................ **a** | | 1,403,289. | | | | |
| | **b** Less: direct expenses ........................ **b** | | 296,246. | | | | |
| | **c** Net income or (loss) from fundraising events ........ ▶ | | 1,107,043. | | | 1,107,043. |
| | **9 a** Gross income from gaming activities. See Part IV, line 19 ........................ **a** | | | | | | |
| | **b** Less: direct expenses ........................ **b** | | | | | | |
| | **c** Net income or (loss) from gaming activities ........ ▶ | | | | | |
| | **10 a** Gross sales of inventory, less returns and allowances ........................ **a** | | 10,853,015. | | | | |
| | **b** Less: cost of goods sold ........................ **b** | | 4,389,150. | | | | |
| | **c** Net income or (loss) from sales of inventory ........ ▶ | | 6,463,865. | 7,513,384. | -1,049,519. | |
| | Miscellaneous Revenue | **Business Code** | | | | |
| | **11 a** ADVERTISING | 541800 | 23,881,546. | | 23,881,546. | |
| | **b** OTHER UNRELATED BUSINESS ACTIVITY | 900004 | 1,111,167. | | 1,111,167. | |
| | **c** CAFE SALES | 722320 | 361,429. | | | 361,429. |
| | **d** All other revenue | 900009 | 137,852. | 137,852. | | |
| | **e** Total. Add lines 11a-11d ........................ ▶ | | 25,491,994. | | | |
| | **12** Total revenue. See instructions ........................ ▶ | | 352,550,864. | 200,661,391. | 23,943,194. | 19,346,553. |

832009 12-31-18                               Form **990** (2018)

Form 990 (2018)    **NATIONAL RIFLE ASSOCIATION OF AMERICA**    53-0116130   Page **10**

| Part IX | Statement of Functional Expenses |

*Section 501(c)(3) and 501(c)(4) organizations must complete all columns. All other organizations must complete column (A).*

Check if Schedule O contains a response or note to any line in this Part IX ......................................................... [X]

| *Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII.* | **(A)** Total expenses | **(B)** Program service expenses | **(C)** Management and general expenses | **(D)** Fundraising expenses |
|---|---|---|---|---|
| **1** Grants and other assistance to domestic organizations and domestic governments. See Part IV, line 21 ... | 13,328. | 13,328. | | |
| **2** Grants and other assistance to domestic individuals. See Part IV, line 22 ................. | 62,333. | 62,333. | | |
| **3** Grants and other assistance to foreign organizations, foreign governments, and foreign individuals. See Part IV, lines 15 and 16 ........ | | | | |
| **4** Benefits paid to or for members ................ | | | | |
| **5** Compensation of current officers, directors, trustees, and key employees ............ | 7,673,480. | 2,458,981. | 4,792,957. | 421,542. |
| **6** Compensation not included above, to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) | 720,000. | | 720,000. | |
| **7** Other salaries and wages ...... | 40,314,676. | 25,980,846. | 11,606,692. | 2,727,138. |
| **8** Pension plan accruals and contributions (include section 401(k) and 403(b) employer contributions) | 7,988,421. | 4,512,549. | 2,921,394. | 554,478. |
| **9** Other employee benefits ................ | 4,538,230. | 2,878,218. | 1,345,012. | 315,000. |
| **10** Payroll taxes ................................ | 2,630,035. | 1,668,010. | 779,474. | 182,551. |
| **11** Fees for services (non-employees): | | | | |
| **a** Management ................................ | | | | |
| **b** Legal ................................ | 25,064,761. | 8,633,178. | 16,431,583. | |
| **c** Accounting ................................ | 164,730. | | 164,730. | |
| **d** Lobbying ................................ | 618,525. | 618,525. | | |
| **e** Professional fundraising services. See Part IV, line 17 | 7,798,658. | | | 7,798,658. |
| **f** Investment management fees ................ | 197,342. | | 197,342. | |
| **g** Other. (If line 11g amount exceeds 10% of line 25, column (A) amount, list line 11g expenses on Sch O.) | 17,858,262. | 17,858,262. | | |
| **12** Advertising and promotion ................ | 50,197,599. | 38,815,749. | | 11,381,850. |
| **13** Office expenses ................................ | 6,668,186. | 3,553,053. | 3,115,133. | |
| **14** Information technology ................ | 11,707,133. | 6,794,820. | 4,912,313. | |
| **15** Royalties ................................ | | | | |
| **16** Occupancy ................................ | 1,936,953. | 1,067,454. | 869,499. | |
| **17** Travel ................................ | 8,472,207. | 6,123,416. | 2,348,791. | |
| **18** Payments of travel or entertainment expenses for any federal, state, or local public officials ... | | | | |
| **19** Conferences, conventions, and meetings ... | 8,076,852. | 5,848,020. | 2,228,832. | |
| **20** Interest ................................ | 1,645,869. | 876,110. | 769,759. | |
| **21** Payments to affiliates ................ | | | | |
| **22** Depreciation, depletion, and amortization ...... | 4,065,900. | 2,900,998. | 1,164,902. | |
| **23** Insurance ................................ | 1,772,834. | 1,772,834. | | |
| **24** Other expenses. Itemize expenses not covered above. (List miscellaneous expenses in line 24e. If line 24e amount exceeds 10% of line 25, column (A) amount, list line 24e expenses on Schedule O.) | | | | |
| **a** ADD'L MEMBER COMMUNICAT | 62,702,161. | 41,126,865. | | 21,575,296. |
| **b** ADD'L TRAINING AND COMM | 34,628,656. | 34,628,656. | | |
| **c** ADD'L PRINTING AND PUBL | 25,296,137. | 25,296,137. | | |
| **d** ADD'L ILA LEGISLATIVE P | 10,600,121. | 10,600,121. | | |
| **e** All other expenses ................ | 11,861,928. | 6,816,302. | 1,910,554. | 3,135,072. |
| **25** Total functional expenses. Add lines 1 through 24e | 355,275,317. | 250,904,765. | 56,278,967. | 48,091,585. |
| **26** Joint costs. Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation. Check here ▶ ☐ if following SOP 98-2 (ASC 958-720) | | | | |

832010 12-31-18            Form **990** (2018)

Form 990 (2018)  **NATIONAL RIFLE ASSOCIATION OF AMERICA**  53-0116130  Page **11**

| **Part X** | **Balance Sheet** |
|---|---|

Check if Schedule O contains a response or note to any line in this Part X .................................... ☐

| | | | **(A)** Beginning of year | | **(B)** End of year |
|---|---|---|---|---|---|
| **Assets** | 1 | Cash - non-interest-bearing .................................... | | 1 | |
| | 2 | Savings and temporary cash investments .................... | 17,764,563. | 2 | 23,937,821. |
| | 3 | Pledges and grants receivable, net .......................... | 1,184,593. | 3 | 841,562. |
| | 4 | Accounts receivable, net ...................................... | 66,861,150. | 4 | 70,154,574. |
| | 5 | Loans and other receivables from current and former officers, directors, trustees, key employees, and highest compensated employees. Complete Part II of Schedule L .......................... | | 5 | |
| | 6 | Loans and other receivables from other disqualified persons (as defined under section 4958(f)(1)), persons described in section 4958(c)(3)(B), and contributing employers and sponsoring organizations of section 501(c)(9) voluntary employees' beneficiary organizations (see instr). Complete Part II of Sch L ..... | | 6 | |
| | 7 | Notes and loans receivable, net ............................... | 3,000,000. | 7 | 3,000,000. |
| | 8 | Inventories for sale or use .................................... | 13,639,054. | 8 | 10,632,177. |
| | 9 | Prepaid expenses and deferred charges ...................... | 3,277,662. | 9 | 3,179,694. |
| | 10a | Land, buildings, and equipment: cost or other basis. Complete Part VI of Schedule D ... **10a** 79,426,001. | | | |
| | b | Less: accumulated depreciation ............ **10b** 46,716,970. | 34,475,160. | 10c | 32,709,031. |
| | 11 | Investments - publicly traded securities ...................... | 47,415,094. | 11 | 44,066,394. |
| | 12 | Investments - other securities. See Part IV, line 11 ......... | 646,822. | 12 | 871,077. |
| | 13 | Investments - program-related. See Part IV, line 11 ......... | | 13 | |
| | 14 | Intangible assets .............................................. | | 14 | |
| | 15 | Other assets. See Part IV, line 11 .......................... | 7,861,583. | 15 | 7,819,750. |
| | 16 | **Total assets.** Add lines 1 through 15 (must equal line 34) ..... | 196,125,681. | 16 | 197,212,080. |
| **Liabilities** | 17 | Accounts payable and accrued expenses ...................... | 90,339,532. | 17 | 84,837,717. |
| | 18 | Grants payable ................................................ | | 18 | |
| | 19 | Deferred revenue .............................................. | 31,402,766. | 19 | 46,580,520. |
| | 20 | Tax-exempt bond liabilities .................................... | | 20 | |
| | 21 | Escrow or custodial account liability. Complete Part IV of Schedule D ... | | 21 | |
| | 22 | Loans and other payables to current and former officers, directors, trustees, key employees, highest compensated employees, and disqualified persons. Complete Part II of Schedule L .......................... | | 22 | |
| | 23 | Secured mortgages and notes payable to unrelated third parties ... | 47,121,100. | 23 | 43,138,412. |
| | 24 | Unsecured notes and loans payable to unrelated third parties ...... | | 24 | |
| | 25 | Other liabilities (including federal income tax, payables to related third parties, and other liabilities not included on lines 17-24). Complete Part X of Schedule D ... | 2,312,080. | 25 | 6,623,905. |
| | 26 | **Total liabilities.** Add lines 17 through 25 ................... | 171,175,478. | 26 | 181,180,554. |
| **Net Assets or Fund Balances** | | Organizations that follow SFAS 117 (ASC 958), check here ▶ ☒ and complete lines 27 through 29, and lines 33 and 34. | | | |
| | 27 | Unrestricted net assets ...................................... | -31,779,579. | 27 | -36,276,779. |
| | 28 | Temporarily restricted net assets ............................ | 11,398,818. | 28 | 5,268,615. |
| | 29 | Permanently restricted net assets ........................... | 45,330,964. | 29 | 47,039,690. |
| | | Organizations that do not follow SFAS 117 (ASC 958), check here ▶ ☐ and complete lines 30 through 34. | | | |
| | 30 | Capital stock or trust principal, or current funds ............ | | 30 | |
| | 31 | Paid-in or capital surplus, or land, building, or equipment fund ... | | 31 | |
| | 32 | Retained earnings, endowment, accumulated income, or other funds ... | | 32 | |
| | 33 | Total net assets or fund balances ........................... | 24,950,203. | 33 | 16,031,526. |
| | 34 | Total liabilities and net assets/fund balances .............. | 196,125,681. | 34 | 197,212,080. |

Form **990** (2018)

832011 12-31-18

Form 990 (2018)     NATIONAL RIFLE ASSOCIATION OF AMERICA     53-0116130   Page **12**

## Part XI | Reconciliation of Net Assets

Check if Schedule O contains a response or note to any line in this Part XI ........................................................... ☒

| | | |
|---|---|---:|
| 1 | Total revenue (must equal Part VIII, column (A), line 12) .................... **1** | 352,550,864. |
| 2 | Total expenses (must equal Part IX, column (A), line 25) .................... **2** | 355,275,317. |
| 3 | Revenue less expenses. Subtract line 2 from line 1 ........................ **3** | -2,724,453. |
| 4 | Net assets or fund balances at beginning of year (must equal Part X, line 33, column (A)) ............... **4** | 24,950,203. |
| 5 | Net unrealized gains (losses) on investments ................................ **5** | -5,029,267. |
| 6 | Donated services and use of facilities ...................................... **6** | |
| 7 | Investment expenses ...................................................... **7** | |
| 8 | Prior period adjustments .................................................. **8** | |
| 9 | Other changes in net assets or fund balances (explain in Schedule O) ...... **9** | -1,164,957. |
| 10 | Net assets or fund balances at end of year. Combine lines 3 through 9 (must equal Part X, line 33, column (B)) ......... **10** | 16,031,526. |

## Part XII | Financial Statements and Reporting

Check if Schedule O contains a response or note to any line in this Part XII ....................................................... ☐

| | | Yes | No |
|---|---|:-:|:-:|
| 1 | Accounting method used to prepare the Form 990: ☐ Cash ☒ Accrual ☐ Other _____ | | |
| | If the organization changed its method of accounting from a prior year or checked "Other," explain in Schedule O. | | |
| 2a | Were the organization's financial statements compiled or reviewed by an independent accountant? ............... **2a** | | X |
| | If "Yes," check a box below to indicate whether the financial statements for the year were compiled or reviewed on a separate basis, consolidated basis, or both: | | |
| | ☐ Separate basis ☐ Consolidated basis ☐ Both consolidated and separate basis | | |
| b | Were the organization's financial statements audited by an independent accountant? ..................... **2b** | X | |
| | If "Yes," check a box below to indicate whether the financial statements for the year were audited on a separate basis, consolidated basis, or both: | | |
| | ☐ Separate basis ☐ Consolidated basis ☒ Both consolidated and separate basis | | |
| c | If "Yes" to line 2a or 2b, does the organization have a committee that assumes responsibility for oversight of the audit, review, or compilation of its financial statements and selection of an independent accountant? ............... **2c** | X | |
| | If the organization changed either its oversight process or selection process during the tax year, explain in Schedule O. | | |
| 3a | As a result of a federal award, was the organization required to undergo an audit or audits as set forth in the Single Audit Act and OMB Circular A-133? ................................................................. **3a** | | X |
| b | If "Yes," did the organization undergo the required audit or audits? If the organization did not undergo the required audit or audits, explain why in Schedule O and describe any steps taken to undergo such audits ............... **3b** | | |

Form **990** (2018)

832012 12-31-18

SCHEDULE C
(Form 990 or 990-EZ)

Department of the Treasury
Internal Revenue Service

# Political Campaign and Lobbying Activities

**For Organizations Exempt From Income Tax Under section 501(c) and section 527**
▶ Complete if the organization is described below.  ▶ Attach to Form 990 or Form 990-EZ.
▶ Go to www.irs.gov/Form990 for instructions and the latest information.

OMB No. 1545-0047

## 2018

Open to Public
Inspection

**If the organization answered "Yes," on Form 990, Part IV, line 3, or Form 990-EZ, Part V, line 46 (Political Campaign Activities), then**
- Section 501(c)(3) organizations: Complete Parts I-A and B. Do not complete Part I-C.
- Section 501(c) (other than section 501(c)(3)) organizations: Complete Parts I-A and C below. Do not complete Part I-B.
- Section 527 organizations: Complete Part I-A only.

**If the organization answered "Yes," on Form 990, Part IV, line 4, or Form 990-EZ, Part VI, line 47 (Lobbying Activities), then**
- Section 501(c)(3) organizations that have filed Form 5768 (election under section 501(h)): Complete Part II-A. Do not complete Part II-B.
- Section 501(c)(3) organizations that have NOT filed Form 5768 (election under section 501(h)): Complete Part II-B. Do not complete Part II-A.

**If the organization answered "Yes," on Form 990, Part IV, line 5 (Proxy Tax) (see separate instructions) or Form 990-EZ, Part V, line 35c (Proxy Tax) (see separate instructions), then**
- Section 501(c)(4), (5), or (6) organizations: Complete Part III.

| Name of organization | Employer identification number |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130 |

| **Part I-A** | **Complete if the organization is exempt under section 501(c) or is a section 527 organization.** |
|---|---|

1 Provide a description of the organization's direct and indirect political campaign activities in Part IV.

2 Political campaign activity expenditures ................................................................ ▶ $ **4,319,458.**

3 Volunteer hours for political campaign activities ................................................... **10,000.**

| **Part I-B** | **Complete if the organization is exempt under section 501(c)(3).** |
|---|---|

1 Enter the amount of any excise tax incurred by the organization under section 4955 ............... ▶ $ _____

2 Enter the amount of any excise tax incurred by organization managers under section 4955 ......... ▶ $ _____

3 If the organization incurred a section 4955 tax, did it file Form 4720 for this year? ............... ☐ Yes ☐ No

4a Was a correction made? ........................................................................ ☐ Yes ☐ No

b If "Yes," describe in Part IV.

| **Part I-C** | **Complete if the organization is exempt under section 501(c), except section 501(c)(3).** |
|---|---|

1 Enter the amount directly expended by the filing organization for section 527 exempt function activities ▶ $ **785,548.**

2 Enter the amount of the filing organization's funds contributed to other organizations for section 527
exempt function activities ...................................................................... ▶ $ **0.**

3 Total exempt function expenditures. Add lines 1 and 2. Enter here and on Form 1120-POL,
line 17b .......................................................................................... ▶ $ **785,548.**

4 Did the filing organization file **Form 1120-POL** for this year? ................................... ☒ Yes ☐ No

5 Enter the names, addresses and employer identification number (EIN) of all section 527 political organizations to which the filing organization
made payments. For each organization listed, enter the amount paid from the filing organization's funds. Also enter the amount of political
contributions received that were promptly and directly delivered to a separate political organization, such as a separate segregated fund or a
political action committee (PAC). If additional space is needed, provide information in Part IV.

| (a) Name | (b) Address | (c) EIN | (d) Amount paid from filing organization's funds. If none, enter -0-. | (e) Amount of political contributions received and promptly and directly delivered to a separate political organization. If none, enter -0-. |
|---|---|---|---|---|
| REPUBLICAN ATTORNEYS GENERAL ASSOCI | WASHINGTON, DC 20006 | 46-4501717 | 85,000. | 0. |
| REPUBLICAN GOVERNORS ASSOCIATION | WASHINGTON, DC 20006 | 11-3655877 | 135,000. | 0. |
| COLORADO REPUBLICAN COMMITTEE | GREENWOOD VILLAGE, CO 80111 | 84-0690399 | 120. | 0. |
| NRA POLITICAL VICTORY FUND (SEE PA | FAIRFAX, VA 22030 | 52-1083020 | 0. | 3,078. |
| | | | | |
| | | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.          Schedule C (Form 990 or 990-EZ) 2018

LHA                                          **SEE PART IV FOR CONTINUATION**

832041 11-08-18

Appx. 313

Schedule C (Form 990 or 990-EZ) 2018 **NATIONAL RIFLE ASSOCIATION OF AMERICA** 53-0116130 Page **2**

**Part II-A** Complete if the organization is exempt under section 501(c)(3) and filed Form 5768 (election under section 501(h)).

A  Check ▶ ☐  if the filing organization belongs to an affiliated group (and list in Part IV each affiliated group member's name, address, EIN, expenses, and share of excess lobbying expenditures).

B  Check ▶ ☐  if the filing organization checked box A and "limited control" provisions apply.

| Limits on Lobbying Expenditures (The term "expenditures" means amounts paid or incurred.) | (a) Filing organization's totals | (b) Affiliated group totals |
|---|---|---|
| **1a** Total lobbying expenditures to influence public opinion (grass roots lobbying) | | |
| **b** Total lobbying expenditures to influence a legislative body (direct lobbying) | | |
| **c** Total lobbying expenditures (add lines 1a and 1b) | | |
| **d** Other exempt purpose expenditures | | |
| **e** Total exempt purpose expenditures (add lines 1c and 1d) | | |
| **f** Lobbying nontaxable amount. Enter the amount from the following table in both columns. | | |

| If the amount on line 1e, column (a) or (b) is: | The lobbying nontaxable amount is: |
|---|---|
| Not over $500,000 | 20% of the amount on line 1e. |
| Over $500,000 but not over $1,000,000 | $100,000 plus 15% of the excess over $500,000. |
| Over $1,000,000 but not over $1,500,000 | $175,000 plus 10% of the excess over $1,000,000. |
| Over $1,500,000 but not over $17,000,000 | $225,000 plus 5% of the excess over $1,500,000. |
| Over $17,000,000 | $1,000,000. |

| | | |
|---|---|---|
| **g** Grassroots nontaxable amount (enter 25% of line 1f) | | |
| **h** Subtract line 1g from line 1a. If zero or less, enter -0- | | |
| **i** Subtract line 1f from line 1c. If zero or less, enter -0- | | |
| **j** If there is an amount other than zero on either line 1h or line 1i, did the organization file Form 4720 reporting section 4911 tax for this year? | ☐ Yes | ☐ No |

**4-Year Averaging Period Under Section 501(h)**
(Some organizations that made a section 501(h) election do not have to complete all of the five columns below.
See the separate instructions for lines 2a through 2f.)

**Lobbying Expenditures During 4-Year Averaging Period**

| Calendar year (or fiscal year beginning in) | (a) 2015 | (b) 2016 | (c) 2017 | (d) 2018 | (e) Total |
|---|---|---|---|---|---|
| **2a** Lobbying nontaxable amount | | | | | |
| **b** Lobbying ceiling amount (150% of line 2a, column(e)) | | | | | |
| **c** Total lobbying expenditures | | | | | |
| **d** Grassroots nontaxable amount | | | | | |
| **e** Grassroots ceiling amount (150% of line 2d, column (e)) | | | | | |
| **f** Grassroots lobbying expenditures | | | | | |

Schedule C (Form 990 or 990-EZ) 2018

832042 11-08-18

Appx. 314

Schedule C (Form 990 or 990-EZ) 2018 **NATIONAL RIFLE ASSOCIATION OF AMERICA** **53-0116130** Page **3**

| **Part II-B** | Complete if the organization is exempt under section 501(c)(3) and has NOT filed Form 5768 (election under section 501(h)). |
|---|---|

| For each "Yes," response on lines 1a through 1i below, provide in Part IV a detailed description of the lobbying activity. | (a) | | (b) |
|---|---|---|---|
| | Yes | No | Amount |
| **1** During the year, did the filing organization attempt to influence foreign, national, state, or local legislation, including any attempt to influence public opinion on a legislative matter or referendum, through the use of: | | | |
| **a** Volunteers? | | | |
| **b** Paid staff or management (include compensation in expenses reported on lines 1c through 1i)? | | | |
| **c** Media advertisements? | | | |
| **d** Mailings to members, legislators, or the public? | | | |
| **e** Publications, or published or broadcast statements? | | | |
| **f** Grants to other organizations for lobbying purposes? | | | |
| **g** Direct contact with legislators, their staffs, government officials, or a legislative body? | | | |
| **h** Rallies, demonstrations, seminars, conventions, speeches, lectures, or any similar means? | | | |
| **i** Other activities? | | | |
| **j** Total. Add lines 1c through 1i | | | |
| **2a** Did the activities in line 1 cause the organization to be not described in section 501(c)(3)? | | | |
| **b** If "Yes," enter the amount of any tax incurred under section 4912 | | | |
| **c** If "Yes," enter the amount of any tax incurred by organization managers under section 4912 | | | |
| **d** If the filing organization incurred a section 4912 tax, did it file Form 4720 for this year? | | | |

| **Part III-A** | Complete if the organization is exempt under section 501(c)(4), section 501(c)(5), or section 501(c)(6). |
|---|---|

| | | | Yes | No |
|---|---|---|---|---|
| **1** | Were substantially all (90% or more) dues received nondeductible by members? | **1** | X | |
| **2** | Did the organization make only in-house lobbying expenditures of $2,000 or less? | **2** | | X |
| **3** | Did the organization agree to carry over lobbying and political campaign activity expenditures from the prior year? | **3** | | X |

| **Part III-B** | Complete if the organization is exempt under section 501(c)(4), section 501(c)(5), or section 501(c)(6) and if either (a) BOTH Part III-A, lines 1 and 2, are answered "No," OR (b) Part III-A, line 3, is answered "Yes." |
|---|---|

| | | | |
|---|---|---|---|
| **1** | Dues, assessments and similar amounts from members | **1** | |
| **2** | Section 162(e) nondeductible lobbying and political expenditures (do not include amounts of political expenses for which the section 527(f) tax was paid). | | |
| **a** | Current year | **2a** | |
| **b** | Carryover from last year | **2b** | |
| **c** | Total | **2c** | |
| **3** | Aggregate amount reported in section 6033(e)(1)(A) notices of nondeductible section 162(e) dues | **3** | |
| **4** | If notices were sent and the amount on line 2c exceeds the amount on line 3, what portion of the excess does the organization agree to carryover to the reasonable estimate of nondeductible lobbying and political expenditure next year? | **4** | |
| **5** | Taxable amount of lobbying and political expenditures (see instructions) | **5** | |

| **Part IV** | **Supplemental Information** |
|---|---|

Provide the descriptions required for Part I-A, line 1; Part I-B, line 4; Part I-C, line 5; Part II-A (affiliated group list); Part II-A, lines 1 and 2 (see instructions); and Part II-B, line 1. Also, complete this part for any additional information.

PART I-A, LINE 1:

SUPPORT FOR FUNDRAISING AND ADMINISTRATIVE EXPENSES OF A SEPARATE

SEGREGATED FUND IS INDUSTRY STANDARD FOR NONPROFIT ORGANIZATIONS LIKE

THE NRA, AS ALLOWED BY LAW. IN 2018, THE NRA PAID $4,319,459

FUNDRAISING AND ADMINISTRATIVE EXPENSES FOR THE SEPARATE SEGREGATED

FUND, NRA POLITICAL VICTORY FUND, AS ALLOWED BY LAW. THE NRA ENGAGED IN

Schedule C (Form 990 or 990-EZ) 2018

832043 11-08-18

Schedule C (Form 990 or 990-EZ) 2018 NATIONAL RIFLE ASSOCIATION OF AMERICA    53-0116130 Page 4

| Part IV | Supplemental Information (continued) |

ACTIVITIES IN SUPPORT OF ITS MISSION, WHICH INCLUDES PROTECTING AND

DEFENDING THE CONSTITUTION OF THE UNITED STATES, ESPECIALLY WITH

REFERENCE TO THE INALIENABLE RIGHT OF INDIVIDUAL AMERICAN CITIZEN

GUARANTEED BY SUCH CONSTITUTION TO ACQUIRE, POSSESS, COLLECT, EXHIBIT,

TRANSPORT, CARRY, TRANSFER OWNERSHIP OF, AND ENJOY THE RIGHT TO USE

ARMS, IN ORDER THAT THE PEOPLE MAY ALWAYS BE IN A POSITION TO EXERCISE

THEIR LEGITIMATE INDIVIDUAL RIGHTS OF SELF PRESERVATION AND DEFENSE OF

FAMILY, PERSON, AND PROPERTY. IN PURSUIT OF THESE GOALS OF THE

ASSOCIATION, THE NRA SPENT FUNDS DIRECTLY AND INDIRECTLY ON POLITICAL

ACTIVITIES, WHICH WERE NOT THE PRIMARY ACTIVITIES OF THE ORGANIZATION.

THE NRA IS ORGANIZED PRIMARILY TO PROMOTE SOCIAL WELFARE AND CAN ALSO

ENGAGE IN POLITICAL ACTIVITIES ON BEHALF OF OR IN OPPOSITION TO

CANDIDATES FOR POLITICAL OFFICE, AS ALLOWED BY LAW. BY ANY MEASURE, THE

PERCENTAGE OF FUNDS SPENT BY THE NRA ON POLITICAL ACTIVATES IS MODEST

IN COMPARISON TO THE BUDGET DEVOTED TO THE PRIMARY ACTIVITIES OF THE

NRA. FOR INSTANCE, ALL EXPENDITURES NOTED ON PART I-A AND I-C OF

SCHEDULE C AMOUNTED TO ABOUT 1% OF THE NRA'S TOTAL EXPENSES IN 2018, AS

APPLIED TO TOTAL EXPENSES REPORTED ON FORM 990, PART IX, LINE 25.

REPORTERS AND OTHER READERS ARE ALSO KINDLY REMINDED THAT THE SEPARATE

SEGREGATED FUND IS A SEPARATE ENTITY FOR TAX PURPOSES.


PART I-C CONTINUATION FOR INCOMPLETE NAME/ADDRESS INFORMATION:

REPUBLICAN ATTORNEYS GENERAL ASSOCIATION

1747 PENNSYLVANIA AVE NW STE 800 WASHINGTON, DC 20006


REPUBLICAN GOVERNORS ASSOCIATION

1747 PENNSYLVANIA AVE NW STE 250 WASHINGTON, DC 20006

832044 11-08-18

| Part IV | Supplemental Information (continued) |

COLORADO REPUBLICAN COMMITTEE

59505 S WILLOW DR GREENWOOD VILLAGE, CO 80111


NRA POLITICAL VICTORY FUND (SEE PARTS I-A AND IV)

11250 WAPLES MILL RD FAIRFAX, VA 22030


PART I-C LINE 4

THIS INFORMATION NOTE REGARDS THE NRA'S TAXES. THE NRA SEPARATELY FILES

FORM 1120-POL, WHICH IS NOT SUBJECT TO PUBLIC DISCLOSURE. THE FOLLOWING

INFORMATION ABOUT TAXES PAID WITH THE NRA'S FORMS 1120-POL IS SHARED HERE

ON A VOLUNTARY BASIS AS A SERVICE TO READERS AND TO DEMONSTRATE IN GOOD

FAITH THAT THE ORGANIZATION IS A TAXPAYER IN GOOD STANDING. 527(F) PROXY

TAX IS PAID ON THE LESSER OF NET INVESTMENT INCOME OR CERTAIN POLITICAL

EXPENDITURES AS DEFINED BY THE FEDERAL TAX CODE, SUCH AS WHEN CERTAIN

POLITICAL COMMUNICATIONS EXPRESSLY ADVOCATE THE ELECTION OR DEFEAT OF A

CANDIDATE AND ARE MADE BY THE NRA ITSELF RATHER THAN BY THE NRA'S SEPARATE

SEGREGATED FUND.  THE AMOUNT OF 527 (F) PROXY TAX PAID WITH THE NRA'S 2018

FORM 1120-POL WAS $164,944. HISTORICALLY, NO 527(F) PROXY TAX WAS REQUIRED

TO BE PAID FOR 2017; THE AMOUNT OF 527(F) PROXY TAX PAID WITH THE NRA'S

2016 FORM 1120-POL WAS $20,835; THE AMOUNT PAID WITH THE NRA'S 2015 FORM

1120-POL WAS $21,817. AS ANOTHER POLITE REMINDER TO REPORTERS AND OTHER

READERS, FORM 990 INFORMATION IS NOT NECESSARILY EXPECTED TO TIE TO

FEDERAL ELECTION COMMISSION (FEC) REPORTING DUE TO DIFFERENT DEFINITIONS

AND EXCLUSIONS IN THE DIFFERENT REGULATORY REGIMES.


PART I-C LINE 5

THE NRA POLITICAL VICTORY FUND, AND AN INDEPENDENT POLITICAL ACTION

COMMITTEE (PAC) OF THE NRA, DIRECTLY RECEIVED CONTRIBUTIONS DURING 2018 OF

832044 11-08-18

Schedule C (Form 990 or 990-EZ) 2018 NATIONAL RIFLE ASSOCIATION OF AMERICA 53-0116130 Page 4

**Part IV** Supplemental Information *(continued)*

$12,938,624.

832044 11-08-18

# SCHEDULE D
(Form 990)

Department of the Treasury
Internal Revenue Service

# Supplemental Financial Statements

▶ Complete if the organization answered "Yes" on Form 990,
Part IV, line 6, 7, 8, 9, 10, 11a, 11b, 11c, 11d, 11e, 11f, 12a, or 12b.
▶ Attach to Form 990.
▶ Go to www.irs.gov/Form990 for instructions and the latest information.

OMB No. 1545-0047

## 2018
Open to Public
Inspection

**Name of the organization**

NATIONAL RIFLE ASSOCIATION OF AMERICA

**Employer identification number**

53-0116130

| Part I | Organizations Maintaining Donor Advised Funds or Other Similar Funds or Accounts. Complete if the organization answered "Yes" on Form 990, Part IV, line 6. |

|  | | (a) Donor advised funds | (b) Funds and other accounts |
|---|---|---|---|
| 1 | Total number at end of year ............... | | |
| 2 | Aggregate value of contributions to (during year) ........... | | |
| 3 | Aggregate value of grants from (during year) ............... | | |
| 4 | Aggregate value at end of year ............... | | |

5 Did the organization inform all donors and donor advisors in writing that the assets held in donor advised funds
are the organization's property, subject to the organization's exclusive legal control? ...................... ☐ Yes ☐ No

6 Did the organization inform all grantees, donors, and donor advisors in writing that grant funds can be used only
for charitable purposes and not for the benefit of the donor or donor advisor, or for any other purpose conferring
impermissible private benefit? ...................... ☐ Yes ☐ No

| Part II | Conservation Easements. Complete if the organization answered "Yes" on Form 990, Part IV, line 7. |

1 Purpose(s) of conservation easements held by the organization (check all that apply).
☐ Preservation of land for public use (e.g., recreation or education) ☐ Preservation of a historically important land area
☐ Protection of natural habitat ☐ Preservation of a certified historic structure
☐ Preservation of open space

2 Complete lines 2a through 2d if the organization held a qualified conservation contribution in the form of a conservation easement on the last
day of the tax year.

| | | | Held at the End of the Tax Year |
|---|---|---|---|
| a | Total number of conservation easements .................. | 2a | |
| b | Total acreage restricted by conservation easements .................. | 2b | |
| c | Number of conservation easements on a certified historic structure included in (a) .................. | 2c | |
| d | Number of conservation easements included in (c) acquired after 7/25/06, and not on a historic structure listed in the National Register | 2d | |

3 Number of conservation easements modified, transferred, released, extinguished, or terminated by the organization during the tax
year ▶ 

4 Number of states where property subject to conservation easement is located ▶ 

5 Does the organization have a written policy regarding the periodic monitoring, inspection, handling of
violations, and enforcement of the conservation easements it holds? ...................... ☐ Yes ☐ No

6 Staff and volunteer hours devoted to monitoring, inspecting, handling of violations, and enforcing conservation easements during the year
▶ 

7 Amount of expenses incurred in monitoring, inspecting, handling of violations, and enforcing conservation easements during the year
▶ $ 

8 Does each conservation easement reported on line 2(d) above satisfy the requirements of section 170(h)(4)(B)(i)
and section 170(h)(4)(B)(ii)? ...................... ☐ Yes ☐ No

9 In Part XIII, describe how the organization reports conservation easements in its revenue and expense statement, and balance sheet, and
include, if applicable, the text of the footnote to the organization's financial statements that describes the organization's accounting for
conservation easements.

| Part III | Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets. |

Complete if the organization answered "Yes" on Form 990, Part IV, line 8.

1a If the organization elected, as permitted under SFAS 116 (ASC 958), not to report in its revenue statement and balance sheet works of art,
historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide, in Part XIII,
the text of the footnote to its financial statements that describes these items.

b If the organization elected, as permitted under SFAS 116 (ASC 958), to report in its revenue statement and balance sheet works of art, historical
treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide the following amounts
relating to these items:

(i) Revenue included on Form 990, Part VIII, line 1 .................. ▶ $ 

(ii) Assets included in Form 990, Part X .................. ▶ $ 

2 If the organization received or held works of art, historical treasures, or other similar assets for financial gain, provide
the following amounts required to be reported under SFAS 116 (ASC 958) relating to these items:

a Revenue included on Form 990, Part VIII, line 1 .................. ▶ $ 

b Assets included in Form 990, Part X .................. ▶ $ 

LHA For Paperwork Reduction Act Notice, see the Instructions for Form 990.

Schedule D (Form 990) 2018

832051 10-29-18

Schedule D (Form 990) 2018    **NATIONAL RIFLE ASSOCIATION OF AMERICA**    53-0116130   Page **2**

## Part III | Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets *(continued)*

**3**   Using the organization's acquisition, accession, and other records, check any of the following that are a significant use of its collection items (check all that apply):

**a** [X] Public exhibition      **d** [X] Loan or exchange programs

**b** [X] Scholarly research      **e** [ ] Other _____

**c** [X] Preservation for future generations

**4**   Provide a description of the organization's collections and explain how they further the organization's exempt purpose in Part XIII.

**5**   During the year, did the organization solicit or receive donations of art, historical treasures, or other similar assets
to be sold to raise funds rather than to be maintained as part of the organization's collection? ......................... [X] Yes   [ ] No

## Part IV | Escrow and Custodial Arrangements. Complete if the organization answered "Yes" on Form 990, Part IV, line 9, or reported an amount on Form 990, Part X, line 21.

**1a**   Is the organization an agent, trustee, custodian or other intermediary for contributions or other assets not included
on Form 990, Part X? .............................................................................................. [ ] Yes   [ ] No

**b**   If "Yes," explain the arrangement in Part XIII and complete the following table:

| | | Amount |
|---|---|---|
| **c** Beginning balance ..................................................... | **1c** | |
| **d** Additions during the year ............................................ | **1d** | |
| **e** Distributions during the year ....................................... | **1e** | |
| **f** Ending balance ....................................................... | **1f** | |

**2a**   Did the organization include an amount on Form 990, Part X, line 21, for escrow or custodial account liability? ............... [ ] Yes   [ ] No

**b**   If "Yes," explain the arrangement in Part XIII. Check here if the explanation has been provided on Part XIII ................. [ ]

## Part V | Endowment Funds. Complete if the organization answered "Yes" on Form 990, Part IV, line 10.

| | (a) Current year | (b) Prior year | (c) Two years back | (d) Three years back | (e) Four years back |
|---|---|---|---|---|---|
| **1a** Beginning of year balance .......... | 20,556,237. | 19,520,783. | 17,657,500. | 16,738,628. | 15,706,221. |
| **b** Contributions .......................... | 1,603,940. | 1,371,910. | 1,482,504. | 1,988,178. | 1,346,379. |
| **c** Net investment earnings, gains, and losses | -886,512. | 625,818. | 1,204,551. | -266,970. | 366,395. |
| **d** Grants or scholarships ............... | | | | | |
| **e** Other expenditures for facilities and programs | 940,564. | 916,400. | 786,344. | 772,538. | 642,077. |
| **f** Administrative expenses .............. | 49,737. | 35,574. | 37,728. | 29,798. | 38,290. |
| **g** End of year balance ................... | 20,283,364. | 20,566,537. | 19,520,483. | 17,657,500. | 16,738,628. |

**2**   Provide the estimated percentage of the current year end balance (line 1g, column (a)) held as:

**a**   Board designated or quasi-endowment ▶ _____ %

**b**   Permanent endowment ▶   100.00   %

**c**   Temporarily restricted endowment ▶ _____ %

The percentages on lines 2a, 2b, and 2c should equal 100%.

**3a**   Are there endowment funds not in the possession of the organization that are held and administered for the organization
by:

| | | Yes | No |
|---|---|---|---|
| (i) unrelated organizations ....................................................................................... | 3a(i) | | X |
| (ii) related organizations ......................................................................................... | 3a(ii) | X | |
| **b** If "Yes" on line 3a(ii), are the related organizations listed as required on Schedule R? .............................. | 3b | X | |

**4**   Describe in Part XIII the intended uses of the organization's endowment funds.

## Part VI | Land, Buildings, and Equipment.

Complete if the organization answered "Yes" on Form 990, Part IV, line 11a. See Form 990, Part X, line 10.

| Description of property | (a) Cost or other basis (investment) | (b) Cost or other basis (other) | (c) Accumulated depreciation | (d) Book value |
|---|---|---|---|---|
| **1a** Land ......................................... | | 5,380,792. | | 5,380,792. |
| **b** Buildings ................................... | | 55,410,753. | 32,259,301. | 23,151,452. |
| **c** Leasehold improvements ............... | | | | |
| **d** Equipment ................................. | | 18,634,456. | 14,457,669. | 4,176,787. |
| **e** Other ....................................... | | | | |

**Total.** Add lines 1a through 1e. *(Column (d) must equal Form 990, Part X, column (B), line 10c.)* ............................ ▶   32,709,031.

Schedule D (Form 990) 2018

832052 10-29-18

Schedule D (Form 990) 2018     NATIONAL RIFLE ASSOCIATION OF AMERICA     53-0116130   Page **3**

| **Part VII** | Investments - Other Securities. |
|---|---|

Complete if the organization answered "Yes" on Form 990, Part IV, line 11b. See Form 990, Part X, line 12.

| (a) Description of security or category (including name of security) | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| **(1)** Financial derivatives | | |
| **(2)** Closely-held equity interests | | |
| **(3)** Other | | |
| (A) | | |
| (B) | | |
| (C) | | |
| (D) | | |
| (E) | | |
| (F) | | |
| (G) | | |
| (H) | | |
| Total. (Col. (b) must equal Form 990, Part X, col. (B) line 12.) ▶ | | |

| **Part VIII** | Investments - Program Related. |
|---|---|

Complete if the organization answered "Yes" on Form 990, Part IV, line 11c. See Form 990, Part X, line 13.

| (a) Description of investment | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| (1) | | |
| (2) | | |
| (3) | | |
| (4) | | |
| (5) | | |
| (6) | | |
| (7) | | |
| (8) | | |
| (9) | | |
| Total. (Col. (b) must equal Form 990, Part X, col. (B) line 13.) ▶ | | |

| **Part IX** | Other Assets. |
|---|---|

Complete if the organization answered "Yes" on Form 990, Part IV, line 11d. See Form 990, Part X, line 15.

| (a) Description | (b) Book value |
|---|---|
| (1) | |
| (2) | |
| (3) | |
| (4) | |
| (5) | |
| (6) | |
| (7) | |
| (8) | |
| (9) | |
| Total. (Column (b) must equal Form 990, Part X, col. (B) line 15.) ........................ ▶ | |

| **Part X** | Other Liabilities. |
|---|---|

Complete if the organization answered "Yes" on Form 990, Part IV, line 11e or 11f. See Form 990, Part X, line 25.

| **1.** | (a) Description of liability | (b) Book value |
|---|---|---|
| (1) | Federal income taxes | |
| (2) | NOTE PAYABLE - NRA FOUNDATION | 5,000,000. |
| (3) | CAPITAL LEASE ARRANGEMENT | 1,037,889. |
| (4) | DERIVATIVE INSTRUMENT MARKET | |
| (5) | VALUATION | 429,922. |
| (6) | ACCRUED SALES AND USE TAXES | 149,220. |
| (7) | COUPON LIABILITY | 6,874. |
| (8) | | |
| (9) | | |
| Total. (Column (b) must equal Form 990, Part X, col. (B) line 25.) ............... ▶ | | 6,623,905. |

**2.** Liability for uncertain tax positions. In Part XIII, provide the text of the footnote to the organization's financial statements that reports the organization's liability for uncertain tax positions under FIN 48 (ASC 740). Check here if the text of the footnote has been provided in Part XIII   [ X ]

Schedule D (Form 990) 2018

832053 10-29-18

Schedule D (Form 990) 2018    NATIONAL RIFLE ASSOCIATION OF AMERICA    53-0116130   Page **4**

**Part XI** | **Reconciliation of Revenue per Audited Financial Statements With Revenue per Return.**

Complete if the organization answered "Yes" on Form 990, Part IV, line 12a.

| | | | |
|---|---|---:|---:|
| 1 | Total revenue, gains, and other support per audited financial statements | **1** | 352,886,958. |
| 2 | Amounts included on line 1 but not on Form 990, Part VIII, line 12: | | |
| a | Net unrealized gains (losses) on investments   **2a** | -5,029,267. | |
| b | Donated services and use of facilities   **2b** | | |
| c | Recoveries of prior year grants   **2c** | | |
| d | Other (Describe in Part XIII.)   **2d** | -1,164,957. | |
| e | Add lines 2a through 2d | **2e** | -6,194,224. |
| 3 | Subtract line 2e from line 1 | **3** | 359,081,182. |
| 4 | Amounts included on Form 990, Part VIII, line 12, but not on line 1: | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b   **4a** | | |
| b | Other (Describe in Part XIII.)   **4b** | -6,530,318. | |
| c | Add lines 4a and 4b | **4c** | -6,530,318. |
| 5 | Total revenue. Add lines 3 and 4c. *(This must equal Form 990, Part I, line 12.)* | **5** | 352,550,864. |

**Part XII** | **Reconciliation of Expenses per Audited Financial Statements With Expenses per Return.**

Complete if the organization answered "Yes" on Form 990, Part IV, line 12a.

| | | | |
|---|---|---:|---:|
| 1 | Total expenses and losses per audited financial statements | **1** | 361,805,635. |
| 2 | Amounts included on line 1 but not on Form 990, Part IX, line 25: | | |
| a | Donated services and use of facilities   **2a** | | |
| b | Prior year adjustments   **2b** | | |
| c | Other losses   **2c** | | |
| d | Other (Describe in Part XIII.)   **2d** | 6,592,651. | |
| e | Add lines 2a through 2d | **2e** | 6,592,651. |
| 3 | Subtract line 2e from line 1 | **3** | 355,212,984. |
| 4 | Amounts included on Form 990, Part IX, line 25, but not on line 1: | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b   **4a** | | |
| b | Other (Describe in Part XIII.)   **4b** | 62,333. | |
| c | Add lines 4a and 4b | **4c** | 62,333. |
| 5 | Total expenses. Add lines 3 and 4c. *(This must equal Form 990, Part I, line 18.)* | **5** | 355,275,317. |

**Part XIII** | **Supplemental Information.**

Provide the descriptions required for Part II, lines 3, 5, and 9; Part III, lines 1a and 4; Part IV, lines 1b and 2b; Part V, line 4; Part X, line 2; Part XI, lines 2d and 4b; and Part XII, lines 2d and 4b. Also complete this part to provide any additional information.


PART III, LINE 4:

THIS RESPONSE DESCRIBES THE MUSEUM COLLECTIONS WHICH ARE HELD BY THE NRA'S

RELATED ORGANIZATIONS AND CURATED BY NRA EMPLOYEES. THE NRA MUSEUMS

PROMOTE GUN COLLECTING AND PRESERVATION OF HISTORY THOUGH FIREARMS. THE

NRA MUSEUMS INCLUDE THE NATIONAL FIREARMS MUSEUM IN FAIRFAX, VIRGINIA: THE

FRANK BROWNELL MUSEUM OF THE SOUTHWEST IN RATON, NEW MEXICO; AND THE NRA

NATIONAL SPORTING ARMS MUSEUM AT BASS PRO SHOPS IN SPRINGFIELD, MISSOURI.

TO MAKE THE NRA MUSEUMS THE FINEST POSSIBLE RESOURCE FOR THE PUBLIC, THE

NRA AND ITS AFFILIATED CHARITIES RELY ON GENEROUS SUPPORTERS TO BUILD THE

EXHIBITION AND RESEARCH COLLECTIONS THROUGH COLLECTIONS OF HISTORICALLY

SIGNIFICANT FOREARMS. PLEASE VISIT NRAMUSEUMS.ORG FOR CURRENT INFORMATION

ON THE MUSEUM GALLERIES.

832054 10-29-18

Schedule D (Form 990) 2018

Schedule D (Form 990) 2018    NATIONAL RIFLE ASSOCIATION OF AMERICA    53-0116130   Page 5

**Part XIII** | **Supplemental Information** *(continued)*

LINE 5 THIS RESPONSE EXPLAINS WHY THE NRA MAY SOLICIT OR RECEIVE ASSETS

THAT SOME DONORS INTEND TO BE SOLD RATHER THAN MAINTAINED PERMANENTLY.

WHEN DONORS INTEND THEIR GIFTS OF FIREARMS TO BE SOLD RATHER THEN HELD FOR

EXHIBITION OR RESEARCH IN THE COLLECTIONS OF THE NRA MUSEUM, THE NRA

PARTNERS WITH AUCTION HOUSES. DONORS MAY CHOOSE TO HAVE GUNS SOLD FOR

VARIOUS REASONS, SUCH AS TO SUPPORT CURRENT PROGRAM SERVICES OR TO FUND A

CHARITABLE GIFT ANNUITY OR CHARITABLE TRUST WITH ONE OF THE NRA'S

AFFILIATED CHARITIES. THE PHILANTHROPIC INTENT OF EACH DONOR DETERMINES

HOW A GIFT IS HANDLED.


PART V, LINE 4:

THIS RESPONSE DESCRIBES THE INTENDED USES OF THE ORGANIZATION'S ENDOWMENT

FUNDS. THE ENDOWMENT FUNDS BENEFIT A DIVERSE RANGE OF PHILANTHROPIC

INTERESTS, INCLUDING TRAINING IN MARKSMANSHIP, NATIONAL SHOOTING

CHAMPIONSHIPS, WOMEN'S LEADERSHIP, HUNTERS'LEADERSHIP, RECREATIONAL

SHOOTING, LAW ENFORCEMENT, NRA MUSEUMS, AND THE NATIONAL ENDOWMENT FOR THE

PROTECTION OF THE SECOND AMENDMENT.


PART X, LINE 2:

THIS RESPONSE PROVIDES THE TEXT OF THE FOOTNOTE TO THE ORGANIZATION'S

FINANCIAL STATEMENTS IN ACCORDANCE WITH FASB ASC 740. MANAGEMENT

EVALUATED THE NRA'S TAX POSITIONS AND CONCLUDED THAT THE NRA HAD TAKEN NO

UNCERTAIN TAX POSITIONS THAT REQUIRE ADJUSTMENT TO THE FINANCIAL

STATEMENTS TO COMPLY WITH THE PROVISIONS OF THIS GUIDANCE. GENERALLY, THE

NRA IS NO LONGER SUBJECT TO INCOME TAX EXAMINATIONS BY THE U.S. FEDERAL,

STATE, OR LOCAL AUTHORITIES FOR YEARS BEFORE 2015, WHICH IS THE STANDARD

STATUTE OF LIMITATIONS LOOKBACK PERIOD.

Schedule D (Form 990) 2018

832055 10-29-18

Schedule D (Form 990) 2018    NATIONAL RIFLE ASSOCIATION OF AMERICA    53-0116130   Page 5

| Part XIII | Supplemental Information *(continued)* |

PART XI, LINE 2D - OTHER ADJUSTMENTS:

| | |
|---|---|
| AGENCY TRANSACTIONS BETWEEN THE NRA AND NRA FOUNDATION | -1,910,739. |
| UNREALIZED GAIN ON DERIVATIVE INSTRUMENT | 745,782. |
| TOTAL TO SCHEDULE D, PART XI, LINE 2D | -1,164,957. |

PART XI, LINE 4B - OTHER ADJUSTMENTS:

| | |
|---|---|
| COST OF GOODS SOLD | -4,389,150. |
| RENTAL EXPENSE | -2,203,501. |
| INTEREST ON ENDOWMENT GRANTS | 62,333. |
| TOTAL TO SCHEDULE D, PART XI, LINE 4B | -6,530,318. |

PART XII, LINE 2D - OTHER ADJUSTMENTS:

| | |
|---|---|
| COST OF GOODS SOLD | 4,389,150. |
| RENTAL EXPENSE | 2,203,501. |
| TOTAL TO SCHEDULE D, PART XII, LINE 2D | 6,592,651. |

PART XII, LINE 4B - OTHER ADJUSTMENTS:

| | |
|---|---|
| INTEREST ON ENDOWMENT GRANTS | 62,333. |

PART X

LINE 1(4) THIS INFORMATIONAL NOTE PROVIDES CONTEXT FOR THE DERIVATIVE

FINANCIALS INSTRUMENT DISCLOSED AS A LIABILITY. INTEREST RATE SWAPS ARE

ENTERED INTO TO MANAGE INTEREST RATE RISKS ASSOCIATED WITH THE NRA'S

BORROWING, AND INTEREST RATE SWAPS ARE ACCOUNTED FOR IN ACCORDANCE WITH

FASB ASC 815. THE NRA'S INTEREST RATE SWAP IS RECORDED IN THE BALANCE

SHEET AT FAIR VALUE, WITH FAIR VALUE CHANGES RECORDED AS UNREALIZED GAIN

OR LOSS ON DERIVATIVE INSTRUMENT. AS OF MARCH 2019, THE NRA NO LONGER HAS

Schedule D (Form 990) 2018

832055 10-29-18

NATIONAL RIFLE ASSOCIATION OF AMERICA 53-0116130 Page 5

| Part XIII | Supplemental Information (continued) |

AN INTEREST RATE SWAP ARRANGEMENT.

LINE 1(6) THIS INFORMATIONAL NOTE REGARDS THE NRA'S TAXES. THE NRA IS A

SUBSTANTIAL TAXPAYER AND REMAINS IN GOOD STANDING WITH THE TAX

AUTHORITIES. STATE AND LOCAL TAXES PAID BY THE NRA INCLUDE SALES AND USE

TAXES, REAL ESTATE AND PERSONAL PROPERTY TAXES, AMUSEMENT TAXES, AND STATE

UNEMPLOYMENT TAXES. THE LIABILITY SHOWN ON SCHEDULE D, PART X FOR ACCRUED

SALES AND USE TAXES RELATES TO TIMING AND IS A SMALL FRACTION OF TAXES

PAID DURING THE YEAR. ADDITIONAL NOTES REGARDING THE NRA'S TAXES ARE

SHARED ON SCHEDULE C REGARDING 527(F) PROXY TAXES AND ON SCHEDULE O

REGRADING UNRELATED BUSINESS INCOME TAXES. THE NRA CHOOSES TO SHARE THIS

ADDITIONAL INFORMATION ABOUT THE NRA'S TOTAL TAXES TO DEMONSTRATE IN GOOD

FAITH THAT THE ORGANIZATION IS A TAXPAYER IN GOOD STANDING.

832055 10-29-18

**SCHEDULE F**
**(Form 990)**

Department of the Treasury
Internal Revenue Service

# Statement of Activities Outside the United States

▶ Complete if the organization answered "Yes" on Form 990, Part IV, line 14b, 15, or 16.
▶ Attach to Form 990.
▶ Go to www.irs.gov/Form990 for instructions and the latest information.

OMB No. 1545-0047

**2018**

**Open to Public Inspection**

| Name of the organization | Employer identification number |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130 |

**Part I** **General Information on Activities Outside the United States.** Complete if the organization answered "Yes" on Form 990, Part IV, line 14b.

**1** **For grantmakers.** Does the organization maintain records to substantiate the amount of its grants and other assistance, the grantees' eligibility for the grants or assistance, and the selection criteria used to award the grants or assistance? ......... ☐ **Yes** ☐ **No**

**2** **For grantmakers.** Describe in Part V the organization's procedures for monitoring the use of its grants and other assistance outside the United States.

**3** Activities per Region. (The following Part I, line 3 table can be duplicated if additional space is needed.)

| (a) Region | (b) Number of offices in the region | (c) Number of employees, agents, and independent contractors in the region | (d) Activities conducted in the region (by type) (such as, fundraising, program services, investments, grants to recipients located in the region) | (e) If activity listed in (d) is a program service, describe specific type of service(s) in the region | (f) Total expenditures for and investments in the region |
|---|---|---|---|---|---|
| CENTRAL AMERICA AND THE CARIBBEAN | 0 | 0 | INVESTMENTS | | 3,021,000. |
| CENTRAL AMERICA AND THE CARIBBEAN | 0 | 0 | PROGRAM SERVICES | PUBLICATIONS | 4,000. |
| EAST ASIA AND THE PACIFIC | 0 | 0 | PROGRAM SERVICES | PUBLICATIONS | 5,000. |
| EUROPE (INCLUDING ICELAND & GREENLAND) | 0 | 0 | FUNDRAISING | | 9,000. |
| EUROPE (INCLUDING ICELAND & GREENLAND) | 0 | 0 | PROGRAM SERVICES | PUBLICATIONS | 21,000. |
| MIDDLE EAST AND NORTH AFRICA | 0 | 0 | FUNDRAISING | | 5,000. |
| NORTH AMERICA | 0 | 0 | FUNDRAISING | | 6,000. |
| NORTH AMERICA | 0 | 0 | PROGRAM SERVICES | PUBLICATIONS | 10,000. |
| **3 a** Subtotal ................ | 0 | 0 | | | 3,081,000. |
| **b** Total from continuation sheets to Part I ......... | 0 | 0 | | | 56,000. |
| **c** Totals (add lines 3a and 3b) ................ | 0 | 0 | | | 3,137,000. |

LHA  **For Paperwork Reduction Act Notice, see the Instructions for Form 990.**            **Schedule F (Form 990) 2018**

832071 10-31-18

Appx. 326

Schedule F (Form 990)  **NATIONAL RIFLE ASSOCIATION OF AMERICA**  53-0116130  Page 1

| Part I | Continuation of Activities per Region. (Schedule F (Form 990), Part I, line 3) |

| (a) Region | (b) Number of offices in the region | (c) Number of employees or agents in region | (d) Activities conducted in region (by type) (i.e., fundraising, program services, grants to recipients located in the region) | (e) If activity listed in (d) is a program service, describe specific type of service(s) in region | (f) Total expenditures for region |
|---|---|---|---|---|---|
| NORTH AMERICA | | | PROGRAM SERVICES | NRA OUTDOORS | 37,000. |
| SOUTH AMERICA | 0 | 0 | FUNDRAISING | | 4,000. |
| SOUTH AMERICA | 0 | 0 | PROGRAM SERVICES | PUBLICATIONS | 8,000. |
| SUB-SAHARAN AFRICA | | | PROGRAM SERVICES | NRA OUTDOORS | 7,000. |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Totals ............ ▶ | | | | | 56,000. |

832181
04-01-18

Schedule F (Form 990) 2018    NATIONAL RIFLE ASSOCIATION OF AMERICA    53-0116130    Page 2

**Part II**   Grants and Other Assistance to Organizations or Entities Outside the United States. Complete if the organization answered "Yes" on Form 990, Part IV, line 15, for any recipient who received more than $5,000. Part II can be duplicated if additional space is needed.

| 1 (a) Name of organization | (b) IRS code section and EIN (if applicable) | (c) Region | (d) Purpose of grant | (e) Amount of cash grant | (f) Manner of cash disbursement | (g) Amount of noncash assistance | (h) Description of noncash assistance | (i) Method of valuation (book, FMV, appraisal, other) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

2   Enter total number of recipient organizations listed above that are recognized as charities by the foreign country, recognized as tax-exempt by the IRS, or for which the grantee or counsel has provided a section 501(c)(3) equivalency letter ▲

3   Enter total number of other organizations or entities ▲

Schedule F (Form 990) 2018

832072 10-31-18

Appx. 328

Schedule F (Form 990) 2018    NATIONAL RIFLE ASSOCIATION OF AMERICA    53-0116130    Page 3

**Part III** Grants and Other Assistance to Individuals Outside the United States. Complete if the organization answered "Yes" on Form 990, Part IV, line 16.
Part III can be duplicated if additional space is needed.

| (a) Type of grant or assistance | (b) Region | (c) Number of recipients | (d) Amount of cash grant | (e) Manner of cash disbursement | (f) Amount of noncash assistance | (g) Description of noncash assistance | (h) Method of valuation (book, FMV, appraisal, other) |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Schedule F (Form 990) 2018

832073 10-31-18

Appx. 329

Schedule F (Form 990) 2018   **NATIONAL RIFLE ASSOCIATION OF AMERICA**      53-0116130   Page 4

**Part IV**   **Foreign Forms**

**1**   Was the organization a U.S. transferor of property to a foreign corporation during the tax year? *If "Yes," the organization may be required to file Form 926, Return by a U.S. Transferor of Property to a Foreign Corporation (see Instructions for Form 926)* ............................................................................... ☐ Yes ☒ No

**2**   Did the organization have an interest in a foreign trust during the tax year? *If "Yes," the organization may be required to separately file Form 3520, Annual Return To Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts, and/or Form 3520-A, Annual Information Return of Foreign Trust With a U.S. Owner (see Instructions for Forms 3520 and 3520-A; don't file with Form 990)* ................................ ☐ Yes ☒ No

**3**   Did the organization have an ownership interest in a foreign corporation during the tax year? *If "Yes," the organization may be required to file Form 5471, Information Return of U.S. Persons With Respect To Certain Foreign Corporations (see Instructions for Form 5471)* ............................................... ☐ Yes ☒ No

**4**   Was the organization a direct or indirect shareholder of a passive foreign investment company or a qualified electing fund during the tax year? *If "Yes," the organization may be required to file Form 8621, Information Return by a Shareholder of a Passive Foreign Investment Company or Qualified Electing Fund (see Instructions for Form 8621)* ............................................................................... ☐ Yes ☒ No

**5**   Did the organization have an ownership interest in a foreign partnership during the tax year? *If "Yes," the organization may be required to file Form 8865, Return of U.S. Persons With Respect to Certain Foreign Partnerships (see Instructions for Form 8865)* .......................................................... ☐ Yes ☒ No

**6**   Did the organization have any operations in or related to any boycotting countries during the tax year? *If "Yes," the organization may be required to separately file Form 5713, International Boycott Report (see Instructions for Form 5713; don't file with Form 990)* .............................................. ☐ Yes ☒ No

Schedule F (Form 990) 2018

832074 10-31-18

Appx. 330

Schedule F (Form 990) 2018    NATIONAL RIFLE ASSOCIATION OF AMERICA    53-0116130    Page 5

| Part V | Supplemental Information |

Provide the information required by Part I, line 2 (monitoring of funds); Part I, line 3, column (f) (accounting method; amounts of investments vs. expenditures per region); Part II, line 1 (accounting method); Part III (accounting method); and Part III, column (c) (estimated number of recipients), as applicable. Also complete this part to provide any additional information. See instructions.

PART I, LINE 3:

THE NRA'S OFFSHORE INVESTMENTS FOLLOW INDUSTRY STANDARD BEST PRACTICES IN RISK MANAGEMENT FOR NATIONAL NONPROFIT INSTITUTIONAL INVESTORS. ALTERNATIVE INVESTMENTS REDUCE OVERALL PORTFOLIO RISK BY REDUCING VOLATILITY AND IMPROVING DIVERSIFICATION. THE NRA MAINTAINS SEVERAL INVESTMENT ACCOUNTS THAT ARE MULTI-STRATEGY FUNDS OF FUNDS. INCOME FROM PASSIVE INVESTMENTS, WHEN APPROPRIATELY STRUCTURED, IS EXCLUDED FROM UNRELATED BUSINESS INCOME BY LAW. THIS TYPE OF INVESTMENT POSTURE IS COMMONLY ACCEPTED IN THE U.S. EXEMPT ORGANIZATION INDUSTRY. 100% OF THE AMOUNT IS THE TOTAL BOOK VALUE OF INVESTMENTS FOR THAT REGION.

SCHEDULE F, PART I, LINE 3

THIS DISCLOSURE REFERS TO FOREIGN FUNDRAISING. 100% OF THE AMOUNT IS THE CASH VALUE OF EXPENDITURES MADE BY THE NRA FOR NECESSARY TRAVEL, ACCOMMODATIONS, AND RELATED EXPENSES.

THIS DISCLOSURE OF PROGRAM SERVICES REFERS TO NRA PUBLICATIONS DIVISION'S FOREIGN TRAVEL EXPENSES RELATING TO GATHERING MATERIALS FOR NRA MAGAZINES. 100% OF THE AMOUNT IS THE CASH VALUE OF EXPENDITURES MADE BY THE NRA FOR NECESSARY TRAVEL, ACCOMMODATIONS, AND RELATED EXPENSES.

**SCHEDULE G**
(Form 990 or 990-EZ)

Department of the Treasury
Internal Revenue Service

**Supplemental Information Regarding Fundraising or Gaming Activities**

Complete if the organization answered "Yes" on Form 990, Part IV, line 17, 18, or 19, or if the organization entered more than $15,000 on Form 990-EZ, line 6a.

▶ Attach to Form 990 or Form 990-EZ.
▶ Go to www.irs.gov/Form990 for instructions and the latest information.

OMB No. 1545-0047

**2018**

Open to Public Inspection

| Name of the organization | Employer identification number |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130 |

**Part I**  **Fundraising Activities.** Complete if the organization answered "Yes" on Form 990, Part IV, line 17. Form 990-EZ filers are not required to complete this part.

**1** Indicate whether the organization raised funds through any of the following activities. Check all that apply.

a [X] Mail solicitations
b [X] Internet and email solicitations
c [X] Phone solicitations
d [ ] In-person solicitations

e [ ] Solicitation of non-government grants
f [ ] Solicitation of government grants
g [ ] Special fundraising events

**2 a** Did the organization have a written or oral agreement with any individual (including officers, directors, trustees, or key employees listed in Form 990, Part VII) or entity in connection with professional fundraising services? [X] Yes [ ] No

**b** If "Yes," list the 10 highest paid individuals or entities (fundraisers) pursuant to agreements under which the fundraiser is to be compensated at least $5,000 by the organization.

| (i) Name and address of individual or entity (fundraiser) | (ii) Activity | (iii) Did fundraiser have custody or control of contributions? | | (iv) Gross receipts from activity | (v) Amount paid to (or retained by) fundraiser listed in col. (i) | (vi) Amount paid to (or retained by) organization |
|---|---|---|---|---|---|---|
| | | Yes | No | | | |
| ALLEGIANCE DBA MEMBERSHIP ADVISORS - 11250 WAPLES MILL | FUNDRAISING CONSULTANT | | X | 42,370,456. | 1,070,000. | 41,300,456. |
| INFOCISION MANAGEMENT CORP - 325 SPRINGSIDE DR, AKRON, OH | PAID SOLICITOR | | X | 9,521,431. | 4,840,658. | 4,680,773. |
| 501C SOLUTIONS - 2530 MERIDIAN PKWY STE 300, | FUNDRAISING CONSULTANT | | X | 0. | 616,000. | 0. |
| SHARPE GROUP - 855 RIDGE LAKE BLVD STE 300, MEMPHIS, TN | FUNDRAISING CONSULTANT | | X | 0. | 480,000. | 0. |
| HWS CONSULTING - 221 HOMEPORT DR, GRASONVILLE, MD 21638 | FUNDRAISING CONSULTANT | | X | 0. | 360,000. | 0. |
| MCKENNA & ASSOCIATES - 2000 CALRENDON BLVD STE 200, | FUNDRAISING CONSULTANT | | X | 0. | 300,000. | 0. |
| KEY & ASSOCIATES - 12176 CHANCERY STATION CIR, RESTON, | FUNDRAISING CONSULTANT | | X | 0. | 72,000. | 0. |
| COMMONWEALTH GROUP PARTNERS - 1579 MONROE SR STE F-341, | FUNDRAISING CONSULTANT | | X | 0. | 60,000. | 0. |
| | | | | | | |
| | | | | | | |
| Total | | | ▶ | 51,891,887. | 7,798,658. | 45,981,229. |

**3** List all states in which the organization is registered or licensed to solicit contributions or has been notified it is exempt from registration or licensing.

AL,AK,AZ,AR,CA,CO,CT,FL,DC,GA,HI,IL,KS,KY,LA,MA,MD,ME,MI,MN,MO,MS,NC,ND,NH
NJ,NM,NY,OK,OH,OR,PA,RI,SC,TN,UT,VA,WA,WI,WV

LHA  For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.  Schedule G (Form 990 or 990-EZ) 2018
SEE PART IV FOR CONTINUATIONS

832081 10-03-18

Schedule G (Form 990 or 990-EZ) 2018 NATIONAL RIFLE ASSOCIATION OF AMERICA 53-0116130 Page 2

**Part II** **Fundraising Events.** Complete if the organization answered "Yes" on Form 990, Part IV, line 18, or reported more than $15,000 of fundraising event contributions and gross income on Form 990-EZ, lines 1 and 6b. List events with gross receipts greater than $5,000.

| | | (a) Event #1<br>NRAILA<br>(event type) | (b) Event #2<br><br>(event type) | (c) Other events<br>NONE<br>(total number) | (d) Total events<br>(add col. (a) through<br>col. (c)) |
|---|---|---|---|---|---|
| Revenue | 1 Gross receipts | 1,403,289. | | | 1,403,289. |
| | 2 Less: Contributions | | | | |
| | 3 Gross income (line 1 minus line 2) | 1,403,289. | | | 1,403,289. |
| Direct Expenses | 4 Cash prizes | | | | |
| | 5 Noncash prizes | | | | |
| | 6 Rent/facility costs | 54,440. | | | 54,440. |
| | 7 Food and beverages | 154,712. | | | 154,712. |
| | 8 Entertainment | 38,776. | | | 38,776. |
| | 9 Other direct expenses | 48,318. | | | 48,318. |
| | 10 Direct expense summary. Add lines 4 through 9 in column (d) ▶ | | | | 296,246. |
| | 11 Net income summary. Subtract line 10 from line 3. column (d) ▶ | | | | 1,107,043. |

**Part III** **Gaming.** Complete if the organization answered "Yes" on Form 990, Part IV, line 19, or reported more than $15,000 on Form 990-EZ, line 6a.

| | | (a) Bingo | (b) Pull tabs/instant<br>bingo/progressive bingo | (c) Other gaming | (d) Total gaming (add<br>col. (a) through col. (c)) |
|---|---|---|---|---|---|
| Revenue | 1 Gross revenue | | | | |
| Direct Expenses | 2 Cash prizes | | | | |
| | 3 Noncash prizes | | | | |
| | 4 Rent/facility costs | | | | |
| | 5 Other direct expenses | | | | |
| | 6 Volunteer labor | ☐ Yes_____ %<br>☐ No | ☐ Yes_____ %<br>☐ No | ☐ Yes_____ %<br>☐ No | |
| | 7 Direct expense summary. Add lines 2 through 5 in column (d) ▶ | | | | |
| | 8 Net gaming income summary. Subtract line 7 from line 1, column (d) ▶ | | | | |

9 Enter the state(s) in which the organization conducts gaming activities: _____

a Is the organization licensed to conduct gaming activities in each of these states? ............................ ☐ Yes ☐ No

b If "No," explain: _____

10a Were any of the organization's gaming licenses revoked, suspended, or terminated during the tax year? ..................... ☐ Yes ☐ No

b If "Yes," explain: _____

832082 10-03-18
Schedule G (Form 990 or 990-EZ) 2018

Schedule G (Form 990 or 990-EZ) 2018 NATIONAL RIFLE ASSOCIATION OF AMERICA 53-0116130 Page 3

| | | | |
|---|---|---|---|
| 11 | Does the organization conduct gaming activities with nonmembers? | ☐ Yes | ☐ No |
| 12 | Is the organization a grantor, beneficiary or trustee of a trust, or a member of a partnership or other entity formed to administer charitable gaming? | ☐ Yes | ☐ No |

13 Indicate the percentage of gaming activity conducted in:

| | | |
|---|---|---|
| a The organization's facility | 13a | % |
| b An outside facility | 13b | % |

14 Enter the name and address of the person who prepares the organization's gaming/special events books and records:

Name ▶ _____

Address ▶ _____

15a Does the organization have a contract with a third party from whom the organization receives gaming revenue? ☐ Yes ☐ No

b If "Yes," enter the amount of gaming revenue received by the organization ▶ $ _____ and the amount
of gaming revenue retained by the third party ▶ $ _____

c If "Yes," enter name and address of the third party:

Name ▶ _____

Address ▶ _____

16 Gaming manager information:

Name ▶ _____

Gaming manager compensation ▶ $ _____

Description of services provided ▶ _____

☐ Director/officer    ☐ Employee    ☐ Independent contractor

17 Mandatory distributions:

a Is the organization required under state law to make charitable distributions from the gaming proceeds to
retain the state gaming license? ☐ Yes ☐ No

b Enter the amount of distributions required under state law to be distributed to other exempt organizations or spent in the
organization's own exempt activities during the tax year ▶ $

| Part IV | Supplemental Information. Provide the explanations required by Part I, line 2b, columns (iii) and (v); and Part III, lines 9, 9b, 10b, 15b, 15c, 16, and 17b, as applicable. Also provide any additional information. See instructions. |
|---|---|

SCHEDULE G, PART I, LINE 2B, LIST OF TEN HIGHEST PAID FUNDRAISERS:

(I) NAME OF FUNDRAISER: ALLEGIANCE DBA MEMBERSHIP ADVISORS

(I) ADDRESS OF FUNDRAISER: 11250 WAPLES MILL RD, FAIRFAX, VA 22030

(I) NAME OF FUNDRAISER: INFOCISION MANAGEMENT CORP

(I) ADDRESS OF FUNDRAISER: 325 SPRINGSIDE DR, AKRON, OH 44333

(I) NAME OF FUNDRAISER: 501C SOLUTIONS

Appx. 334

Schedule G (Form 990 or 990-EZ)     NATIONAL RIFLE ASSOCIATION OF AMERICA     53-0116130  Page 4

| Part IV | Supplemental Information (continued) |

(I) ADDRESS OF FUNDRAISER:

2530 MERIDIAN PKWY STE 300, RESEARCH TRIANGLE PARK , NC  27713


(I) NAME OF FUNDRAISER: SHARPE GROUP

(I) ADDRESS OF FUNDRAISER: 855 RIDGE LAKE BLVD STE 300, MEMPHIS, TN  38120


(I) NAME OF FUNDRAISER: MCKENNA & ASSOCIATES

(I) ADDRESS OF FUNDRAISER:

2000 CALRENDON BLVD STE 200, ARLINGTON, VA  22201


(I) NAME OF FUNDRAISER: KEY & ASSOCIATES

(I) ADDRESS OF FUNDRAISER: 12176 CHANCERY STATION CIR, RESTON, VA  20190


(I) NAME OF FUNDRAISER: COMMONWEALTH GROUP PARTNERS

(I) ADDRESS OF FUNDRAISER: 1579 MONROE SR STE F-341, ATLANTA, GA  30324


PART I LINE 2B(2)

THIS SUPPLEMENTAL INFORMATION NOTES THE DISTINCTION BETWEEN 990 CORE

FORM PART VIII SECTION B LINE 1 AND SCHEDULE G PART I LINE 2B(2) FOR

THE FILING ORGANIZATION'S VENDOR INFOCISION MANAGEMENT CORP. THE VENDOR

INFOCISION PROVIDED SERVICES TO THE FILING ORGANIZATION FOR BOTH

MEMBERSHIPS AND CONTRIBUTIONS SOLICITATIONS, AS SHOWN ON 990 CORE FORM

PART VIII SECTION B LINE 1. SCHEDULE G IS SPECIFIC TO THE VENDOR'S WORK

AS A PAID SOLICITOR PROVIDING PROFESSIONAL FUNDRAISING SERVICES.

THEREFORE, THE SCHEDULE G DISCLOSURE EXCLUDES THE MEMBERSHIP PROCESSING

SERVICES.


Schedule G (Form 990 or 990-EZ)

832084 04-01-18

**SCHEDULE I**
**(Form 990)**

Department of the Treasury
Internal Revenue Service

# Grants and Other Assistance to Organizations, Governments, and Individuals in the United States

Complete if the organization answered "Yes" on Form 990, Part IV, line 21 or 22.

▶ Attach to Form 990.

▶ Go to www.irs.gov/Form990 for the latest information.

OMB No. 1545-0047

# 2018

**Open to Public Inspection**

Name of the organization

NATIONAL RIFLE ASSOCIATION OF AMERICA

**Employer identification number**

53-0116130

| Part I | General Information on Grants and Assistance |

1  Does the organization maintain records to substantiate the amount of the grants or assistance, the grantees' eligibility for the grants or assistance, and the selection criteria used to award the grants or assistance? .................................................................. ☒ Yes ☐ No

2  Describe in Part IV the organization's procedures for monitoring the use of grant funds in the United States.

| Part II | Grants and Other Assistance to Domestic Organizations and Domestic Governments. Complete if the organization answered "Yes" on Form 990, Part IV, line 21, for any recipient that received more than $5,000. Part II can be duplicated if additional space is needed. |

| **1 (a)** Name and address of organization or government | **(b)** EIN | **(c)** IRC section (if applicable) | **(d)** Amount of cash grant | **(e)** Amount of non-cash assistance | **(f)** Method of valuation (book, FMV, appraisal, other) | **(g)** Description of noncash assistance | **(h)** Purpose of grant or assistance |
|---|---|---|---|---|---|---|---|
| NATIONAL FOUNDATION FOR WOMEN LEGISLATORS - 910 16TH ST NW - WASHINGTON, DC 20006 | 52-1480785 | 501(C)(3) | 13,328. | 0. | | | UNDERGRADUATE COLLEGE SCHOLARSHIPS |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

2  Enter total number of section 501(c)(3) and government organizations listed in the line 1 table .................................................. ▶ 1.

3  Enter total number of other organizations listed in the line 1 table .................................................. ▶ 0.

LHA  For Paperwork Reduction Act Notice, see the Instructions for Form 990.

832101 11-02-18

Schedule I (Form 990) (2018)

Appx. 336

Schedule I (Form 990) (2018)     NATIONAL RIFLE ASSOCIATION OF AMERICA     53-0116130    Page **2**

**Part III**   Grants and Other Assistance to Domestic Individuals. Complete if the organization answered "Yes" on Form 990, Part IV, line 22.
Part III can be duplicated if additional space is needed.

| (a) Type of grant or assistance | (b) Number of recipients | (c) Amount of cash grant | (d) Amount of non-cash assistance | (e) Method of valuation (book, FMV, appraisal, other) | (f) Description of noncash assistance |
|---|---|---|---|---|---|
| NRA JEANNE E BRAY MEMORIAL SCHOLARSHIP AWARDS | 20 | 62,333. | 0. | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**Part IV**   Supplemental Information. Provide the information required in Part I, line 2; Part III, column (b); and any other additional information.

PART I, LINE 2:

PART I LINE 2 THE NATIONAL FOUNDATION FOR WOMEN LEGISLATORS PARTNERS WITH

THE NATIONAL RIFLE ASSOCIATION FOR THE ANNUAL NFWL/NRA BILL OF RIGHTS ESSAY

SCHOLARSHIP CONTEST FOR FEMALE HIGH SCHOOL JUNIORS AND SENIORS. THE NRA

ACTIVELY ASSISTS NATIONAL FOUNDATION OF WOMEN LEGISLATORS IN THE SELECTION

AND ADMINISTRATION OF NFWL SCHOLARSHIPS FOR COLLEGE. NFWL SCHOLARSHIP

APPLICATIONS ARE ASSESSED ON THE ELEMENTS OF HISTORICAL RESEARCH, INSIGHT

AND PERSPECTIVE, DEMONSTRATED UNDERSTANDING OF THE AMERICAN CONSTITUTION,

INSPIRATIONAL QUALITY, AND MEANINGFUL PERSONAL CONNECTION. SCHOLARSHIP

832102 11-02-18                                             Schedule I (Form 990) (2018)

Schedule I (Form 990)   NATIONAL RIFLE ASSOCIATION OF AMERICA   53-0116130 Page 2

**Part IV** Supplemental Information

AWARDS ARE PAID DIRECTLY TO THE EDUCATIONAL INSTITUTION.

PART III LINE 1

THE NRA JEANNE E. BRAY MEMORIAL SCHOLARSHIP AWARDS PROGRAM IS NAMED IN
HONOR AND RECOGNITION OF THE GROUNDBREAKING POLICE OFFICER JEANNE E.
BRAY, A SHOOTING CHAMPION AND PAST MEMBER OF THE NRA BOARD OF
DIRECTORS. JEANNE E. BRAY WAS THE FIRST FEMALE DETECTIVE ON BURGLARY
SQUAD, WHICH HAS EVOLVED INTO TODAY'S MODERN SWAT TEAMS. SHE WAS THE
FIRST FEMALE POLICE OFFICER TO EARN THE NRA POLICE MARKSMANSHIP
"DISTINGUISHED" BAR, AND SHE WON THE NATIONAL WOMEN'S POLICE PISTOL
COMBAT CHAMPIONSHIP FIVE TIMES FROM 1962 TO 1967. THE PROGRAM OFFERS
SCHOLARSHIPS OF UP TO $2,500 PER SEMESTER, UP TO $5,000 PER YEAR FOR A
MAXIMUM OF FOUR YEARS, TO DEPENDENT CHILDREN OF ANY PUBLIC LAW
ENFORCEMENT OFFICER KILLED IN THE LINE OF DUTY WHO WAS AN NRA MEMBER AT
THE TIME OF DEATH, AND TO DEPENDENT CHILDREN OF ANY CURRENT OR RETIRED
LAW ENFORCEMENT OFFICERS WHO ARE LIVING AND HAVE CURRENT NRA
MEMBERSHIP. THE MEMBERSHIP RESTRICTION IS PERMITTED BY LAW BECAUSE THE
NRA JEANNE E. BRAY MEMORIAL SCHOLARSHIP AWARDS PROGRAM IS A 501(C)(4)
PROGRAM. SCHOLARSHIP AWARDS ARE PAID DIRECTLY TO THE EDUCATIONAL
INSTITUTION.

Schedule I (Form 990)

832291
04-01-18

| SCHEDULE J (Form 990) | **Compensation Information** | OMB No. 1545-0047 |
|---|---|---|
| | For certain Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees | **2018** |
| Department of the Treasury Internal Revenue Service | ▶ Complete if the organization answered "Yes" on Form 990, Part IV, line 23. ▶ Attach to Form 990. ▶ Go to www.irs.gov/Form990 for instructions and the latest information. | Open to Public Inspection |

| Name of the organization | Employer identification number |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130 |

**Part I** | **Questions Regarding Compensation**

|  |  | Yes | No |
|---|---|---|---|
| **1a** Check the appropriate box(es) if the organization provided any of the following to or for a person listed on Form 990, Part VII, Section A, line 1a. Complete Part III to provide any relevant information regarding these items. | | | |

    [X] First-class or charter travel             [X] Housing allowance or residence for personal use
    [X] Travel for companions                   [ ] Payments for business use of personal residence
    [X] Tax indemnification and gross-up payments     [X] Health or social club dues or initiation fees
    [ ] Discretionary spending account             [ ] Personal services (such as maid, chauffeur, chef)

|  |  | Yes | No |
|---|---|---|---|
| **b** If any of the boxes on line 1a are checked, did the organization follow a written policy regarding payment or reimbursement or provision of all of the expenses described above? If "No," complete Part III to explain | **1b** | X | |
| **2** Did the organization require substantiation prior to reimbursing or allowing expenses incurred by all directors, trustees, and officers, including the CEO/Executive Director, regarding the items checked on line 1a? | **2** | X | |

**3** Indicate which, if any, of the following the filing organization used to establish the compensation of the organization's CEO/Executive Director. Check all that apply. Do not check any boxes for methods used by a related organization to establish compensation of the CEO/Executive Director, but explain in Part III.

    [X] Compensation committee            [X] Written employment contract
    [X] Independent compensation consultant     [X] Compensation survey or study
    [ ] Form 990 of other organizations        [X] Approval by the board or compensation committee

|  |  | Yes | No |
|---|---|---|---|
| **4** During the year, did any person listed on Form 990, Part VII, Section A, line 1a, with respect to the filing organization or a related organization: | | | |
| **a** Receive a severance payment or change-of-control payment? | **4a** | X | |
| **b** Participate in, or receive payment from, a supplemental nonqualified retirement plan? | **4b** | X | |
| **c** Participate in, or receive payment from, an equity-based compensation arrangement? | **4c** | | X |
| If "Yes" to any of lines 4a-c, list the persons and provide the applicable amounts for each item in Part III. | | | |
| **Only section 501(c)(3), 501(c)(4), and 501(c)(29) organizations must complete lines 5-9.** | | | |
| **5** For persons listed on Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the revenues of: | | | |
| **a** The organization? | **5a** | | X |
| **b** Any related organization? | **5b** | | X |
| If "Yes" on line 5a or 5b, describe in Part III. | | | |
| **6** For persons listed on Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the net earnings of: | | | |
| **a** The organization? | **6a** | | X |
| **b** Any related organization? | **6b** | | X |
| If "Yes" on line 6a or 6b, describe in Part III. | | | |
| **7** For persons listed on Form 990, Part VII, Section A, line 1a, did the organization provide any nonfixed payments not described on lines 5 and 6? If "Yes," describe in Part III | **7** | | X |
| **8** Were any amounts reported on Form 990, Part VII, paid or accrued pursuant to a contract that was subject to the initial contract exception described in Regulations section 53.4958-4(a)(3)? If "Yes," describe in Part III | **8** | | X |
| **9** If "Yes" on line 8, did the organization also follow the rebuttable presumption procedure described in Regulations section 53.4958-6(c)? | **9** | | |

LHA For Paperwork Reduction Act Notice, see the Instructions for Form 990.        Schedule J (Form 990) 2018

832111 10-26-18

**Schedule J (Form 990) 2018**   NATIONAL RIFLE ASSOCIATION OF AMERICA   53-0116130   Page **2**

**Part II | Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees.** Use duplicate copies if additional space is needed.

For each individual whose compensation must be reported on Schedule J, report compensation from the organization on row (i) and from related organizations, described in the instructions, on row (ii). Do not list any individuals that aren't listed on Form 990, Part VII.

**Note:** The sum of columns (B)(i)-(iii) for each listed individual must equal the total amount of Form 990, Part VII, Section A, line 1a, applicable column (D) and (E) amounts for that individual.

| (A) Name and Title | | (B) Breakdown of W2 and/or 1099-MISC compensation | | | (C) Retirement and other deferred compensation | (D) Nontaxable benefits | (E) Total of columns (B)(i)-(D) | (F) Compensation in column (B) reported as deferred on prior Form 990 |
|---|---|---|---|---|---|---|---|---|
| | | (i) Base compensation | (ii) Bonus & incentive compensation | (iii) Other reportable compensation | | | | |
| (1) WAYNE LAPIERRE | (i) | 1,267,878. | 455,000. | 427,755. | 20,280. | 53,513. | 2,224,427. | 0. |
| CEO AND EXECUTIVE VICE PRESIDENT | (ii) | 0. | 0. | 0. | 0. | 0. | 0. | 0. |
| (2) CHRIS W. COX | (i) | 1,057,586. | 200,000. | 27,732. | 35,484. | 71,866. | 1,392,668. | 0. |
| EXECUTIVE DIRECTOR, NRAILA | (ii) | 0. | 0. | 0. | 0. | 0. | 0. | 0. |
| (3) WILSON H. PHILLIPS | (i) | 573,567. | 210,000. | 116,970. | 20,280. | 27,952. | 948,769. | 0. |
| TREASURER (ENDING 9/13/2018) | (ii) | 0. | 0. | 0. | 0. | 0. | 0. | 0. |
| (4) JOSHUA L. POWELL | (i) | 782,739. | 0. | 61,398. | 16,500. | 59,332. | 919,969. | 0. |
| CHIEF OF STAFF AND EXEC. DIR | (ii) | 0. | 0. | 0. | 0. | 0. | 0. | 0. |
| (5) CRAIG B. SPRAY | (i) | 401,111. | 0. | 195,847. | 16,500. | 34,757. | 648,215. | 0. |
| TREASURER (FROM 9/13/2018) | (ii) | 0. | 0. | 0. | 0. | 0. | 0. | 0. |
| (6) JOHN C. FRAZER | (i) | 325,953. | 54,100. | 33,023. | 16,500. | 60,077. | 489,653. | 0. |
| SECRETARY AND GENERAL COUNSEL | (ii) | 0. | 0. | 0. | 0. | 0. | 0. | 0. |
| (7) JOSEPH P. DEBERGALIS, JR. | (i) | 347,452. | 0. | 55,774. | 16,500. | 41,302. | 461,028. | 0. |
| EXEC DIR, GENERAL OPS (STARTING 12/3 | (ii) | 0. | 0. | 0. | 0. | 0. | 0. | 0. |
| (8) TYLER SCHROPP | (i) | 604,803. | 122,206. | 6,136. | 16,500. | 57,123. | 806,768. | 0. |
| MANAGING DIRECTOR, ADVANCEMENT | (ii) | 0. | 0. | 0. | 0. | 0. | 0. | 0. |
| (9) TODD GRABLE | (i) | 438,703. | 217,553. | 11,130. | 16,500. | 49,654. | 733,540. | 0. |
| EXECUTIVE DIRECTOR, MEMBERSHIP | (ii) | 0. | 0. | 0. | 0. | 0. | 0. | 0. |
| (10) DOUGLAS HAMLIN | (i) | 443,585. | 80,000. | 57,736. | 16,443. | 57,966. | 655,730. | 0. |
| EXECUTIVE DIRECTOR, PUBLICATIONS | (ii) | 0. | 0. | 0. | 0. | 0. | 0. | 0. |
| (11) DAVID LEHMAN | (i) | 450,057. | 50,000. | 71,675. | 16,500. | 14,621. | 602,853. | 0. |
| DEPUTY EXECUTIVE DIRECTOR, NRAILA | (ii) | 0. | 0. | 0. | 0. | 0. | 0. | 0. |
| (12) ERIC FROHARDT | (i) | 500,000. | 0. | 25,745. | 15,000. | 4,863. | 545,608. | 0. |
| DIRECTOR, EDUCATION AND TRAINING | (ii) | 0. | 0. | 0. | 0. | 0. | 0. | 0. |
| (13) ROBERT K. WEAVER | (i) | 0. | 0. | 720,000. | 0. | 0. | 720,000. | 0. |
| FMR EXE. DIR, GENERAL OPERATIONS | (ii) | 0. | 0. | 0. | 0. | 0. | 0. | 0. |
| (14) MICHEL MARCELLIN | (i) | 0. | 0. | 535,045. | 0. | 0. | 535,045. | 0. |
| FMR MANAGING DIR, AFFINITY AND LICEN | (ii) | 0. | 0. | 0. | 0. | 0. | 0. | 0. |
| (15) OLIVER L. NORTH | (i) | 1,377,617. | 0. | 0. | 0. | 0. | 1,377,617. | 0. |
| PRESIDENT | (ii) | 0. | 0. | 0. | 0. | 0. | 0. | 0. |
| (16) MARION P. HAMMER | (i) | 270,000. | 0. | 0. | 0. | 0. | 270,000. | 0. |
| DIRECTOR | (ii) | 0. | 0. | 0. | 0. | 0. | 0. | 0. |

832112 10-26-18

**Schedule J (Form 990) 2018**

Appx. 340

Schedule J (Form 990) 2018

53-0116130    Page 3

NATIONAL RIFLE ASSOCIATION OF AMERICA

**Part III Supplemental Information**

Provide the information, explanation, or descriptions required for Part I, lines 1a, 1b, 3, 4a, 4b, 4c, 5a, 5b, 6a, 6b, 7, and 8, and for Part II. Also complete this part for any additional information.

PART I, LINE 1A:

CHARTER TRAVEL WAS USED ON OCCASIONS WHEN TRAVEL LOGISTICS OR SECURITY

CONCERNS PRECLUDED OTHER AVAILABLE OPTIONS. COMPANIONS OCCASIONALLY TRAVEL

VIA PRIVATE AIRCRAFT WITH NRA OFFICIALS AND VENDORS IN CONNECTION WITH

THEIR PROFESSIONAL RESPONSIBILITIES. CERTAIN COMPENSATION ELEMENTS WERE

GROSSED UP FOR ONE INDIVIDUAL FOR ONE TIME RELOCATION COSTS AND THE TAX

GROSS UP WAS PROPERLY INCLUDED IN TAXABLE COMPENSATION . HOUSING EXPENSES

WERE PROVIDED FOR FIVE INDIVIDUALS AND WERE PROPERLY INCLUDED IN TAXABLE

COMPENSATION. DUES FOR CLUBS USED FOR BUSINESS PURPOSES WERE PROPERLY

EXCLUDED FROM TAXABLE COMPENSATION.

PART I, LINE 3:

COMPENSATION OF THE NRA'S TOP MANAGEMENT OFFICIALS IS ESTABLISHED BY

METHODS INCLUDING INDEPENDENT COMPENSATION CONSULTANTS, COMPENSATION

SURVEYS AND STUDIES, AND COMPARABILITY DATA. IN ADDITION, UNDER THE NRA

BYLAWS COMPENSATION OF CERTAIN ELECTED OFFICERS (INCLUDING THE EXECUTIVE

VICE PRESIDENT) MUST BE APPROVED BY THE BOARD OF DIRECTORS, BASED ON

RECOMMENDATIONS BY THE COMPENSATION COMMITTEE. ALL DECISIONS ARE PROPERLY

DOCUMENTED.

Schedule J (Form 990) 2018

Schedule J (Form 990) 2018     NATIONAL RIFLE ASSOCIATION OF AMERICA     53-0116130     Page **3**

**Part III | Supplemental Information**

Provide the information, explanation, or descriptions required for Part I, lines 1a, 1b, 3, 4a, 4b, 4c, 5a, 5b, 6a, 6b, 7, and 8, and for Part II. Also complete this part for any additional information.

**PART I, LINES 4A-B:**

ROBERT K. WEAVER'S EMPLOYMENT AS EXECUTIVE DIRECTOR OF GENERAL OPERATIONS

ENDED IN 2016 AND DURING CALENDAR YEAR 2018 MR. WEAVER RECEIVED TAXABLE

COMPENSATION OF $720,000.


MICHEL MARCELLIN'S EMPLOYMENT AS MANAGING DIRECTOR OF AFFINITY AND

LICENSING ENDED IN 2016 AND DURING CALENDAR YEAR 2018 MR. MARCELLIN

RECEIVED TAXABLE COMPENSATION OF $535,045.


THE NRA HAS DEFERRED COMPENSATION RETIREMENT BENEFIT PLANS FOR CERTAIN

EMPLOYEES AND NONQUALIFIED SUPPLEMENTAL EXECUTIVE RETIREMENT PLANS FOR

CERTAIN EMPLOYEES. FOR NONQUALIFIED PLANS, THE FILING ORGANIZATION DECIDES

THE BENEFIT AMOUNT AND TIMEFRAME FOR VESTING OF EACH PARTICIPANT USING

DIFFERENT FACTORS PARTICULAR TO EACH RELEVANT INDIVIDUAL AND HIS OR HER

SPECIFIC CIRCUMSTANCES. PAYOUTS ARE PROPERLY INCLUDED IN TAXABLE WAGES AND

REPORTED IN W-2 INCOME.


**PART II**

832113 10-26-18                Schedule J (Form 990) 2018

53-0116130

**Schedule J (Form 990) 2018** NATIONAL RIFLE ASSOCIATION OF AMERICA

**Part III** Supplemental Information

Provide the information, explanation, or descriptions required for Part I, lines 1a, 1b, 3, 4a, 4b, 4c, 5a, 5b, 6a, 6b, 7, and 8, and for Part II. Also complete this part for any additional information.

COLUMN B(I) MR. NORTH RECEIVED $1,377,617 PAID BY AN UNRELATED

ORGANIZATION, ACKERMAN MCQUEEN (AS FURTHER DETAILED ON SCHEDULE O).

COLUMN B(III) OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR

MR. LAPIERRE INCLUDED $365,909 457(F) PAYOUT, $38,862 GROUP LIFE

INSURANCE, $18,500 457(B) PLAN, AND $4,485 TAXABLE PERSONAL EXPENSES.

OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. COX INCLUDED

$18,500 457(B) PLAN, $7,830 GROUP LIFE INSURANCE, AND $1,402 TAXABLE

PERSONAL EXPENSES. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES

FOR MR. PHILLIPS INCLUDED $73,978 457(F) PAYOUT, $21,012 GROUP LIFE

INSURANCE, $18,500 457(B) PLAN, AND $3,480 TAXABLE PERSONAL EXPENSES.

OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. POWELL

INCLUDED $57,168 TAXABLE PERSONAL EXPENSES AND $4,230 GROUP LIFE

INSURANCE. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR.

SPRAY INCLUDED $175,174 ONE-TIME RELOCATION COSTS AND TEMPORARY LIVING

EXPENSES, $18,500 457(B) PLAN, AND $2,173 GROUP LIFE INSURANCE. OTHER

REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. FRAZER INCLUDED

$18,500 457(B) PLAN, $10,681 TAXABLE PERSONAL EXPENSES, AND $3,842

GROUP LIFE INSURANCE. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE

832113 10-26-18

Schedule J (Form 990) 2018

NATIONAL RIFLE ASSOCIATION OF AMERICA

53-0116130

**Part III** Supplemental Information

Provide the information, explanation, or descriptions required for Part I, lines 1a, 1b, 3, 4a, 4b, 4c, 5a, 5b, 6a, 6b, 7, and 8, and for Part II. Also complete this part for any additional information.

WAGES FOR MR. DEBBERGALIS INCLUDED $35,342 TAXABLE PERSONAL EXPENSES,

$18,500 457(B) PLAN, AND $1,932 GROUP LIFE INSURANCE. OTHER REPORTABLE

COMPENSATION WITHIN TAXABLE WAGES FOR MR. SCHROPP INCLUDED $1,530 GROUP

LIFE INSURANCE AND $2,842 TAXABLE PERSONAL EXPENSES. OTHER REPORTABLE

COMPENSATION WITHIN TAXABLE WAGES FOR MR. GRABLE INCLUDED $9,600

TAXABLE PERSONAL EXPENSES AND $1,530 GROUP LIFE INSURANCE. OTHER

REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. HAMLIN INCLUDED

$24,505 TAXABLE PERSONAL EXPENSES, $18,500 457(B) PLAN, AND $14,731

GROUP LIFE INSURANCE. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE

WAGES FOR MR. LEHMAN INCLUDED $50,691 457(F) PAYOUT, $18,500 457(B)

PLAN, AND $2,484 GROUP LIFE INSURANCE. OTHER REPORTABLE COMPENSATION

WITHIN TAXABLE WAGES FOR MR. FROHARDT INCLUDED $24,605 TAXABLE PERSONAL

EXPENSES AND $1,140 GROUP LIFE INSURANCE.

COLUMN C EMPLOYER DEPOSITS TOWARD BENEFITS THAT WILL NOT BE PAID UNTIL

A FUTURE DATE ARE SHOWN IN COLUMN C. THE AMOUNT FOR MR. LAPIERRE

INCLUDED $16,500 401(K) AND $3,780 PENSION PLAN. THE AMOUNT FOR MR. COX

INCLUDED $16,500 401(K), $15,204 457(F), AND $3,780 PENSION PLAN. THE

AMOUNT FOR MR. PHILLIPS INCLUDED $16,500 401(K) AND $3,780 PENSION

PLAN. THE AMOUNT FOR MR. POWELL INCLUDED $16,500 401(K). THE AMOUNT FOR

Schedule J (Form 990) 2018

Schedule J (Form 990) 2018

53-0116130

Page 3

**NATIONAL RIFLE ASSOCIATION OF AMERICA**

**Part III | Supplemental Information**

Provide the information, explanation, or descriptions required for Part I, lines 1a, 1b, 3, 4a, 4b, 4c, 5a, 5b, 6a, 6b, 7, and 8, and for Part II. Also complete this part for any additional information.

MR. SPRAY INCLUDED $16,500 401(K). THE AMOUNT FOR MR. FRAZER INCLUDED

$16,500 401(K). THE AMOUNT FOR MR. DEBERGALIS INCLUDED $16,500 401(K).

THE AMOUNT FOR MR. SCHROPP INCLUDED $16,500 401(K). THE AMOUNT FOR MR.

GRABLE INCLUDED $16,500 401(K). THE AMOUNT FOR MR. HAMLIN INCLUDED

$16,443 401(K). THE AMOUNT FOR MR. LEHMAN INCLUDED $16,500 401(K). THE

AMOUNT FOR MR. FROHARDT INCLUDED $15,000 401(K).


COLUMN D NONTAXABLE BENEFITS ARE PROVIDED TO EMPLOYEES CONSISTENT WITH

ASSOCIATION INDUSTRY STANDARDS AND BEST PRACTICES. STANDARD NONTAXABLE

BENEFITS INCLUDE EMPLOYEE BENEFITS SUCH AS THE EMPLOYER PAID PORTIONS

OF MEDICAL AND DENTAL PLANS AND LONG-TERM AND SHORT-TERM DISABILITY

PLANS.

Schedule J (Form 990) 2018

832113 10-26-18

**SCHEDULE L**
(Form 990 or 990-EZ)

Department of the Treasury
Internal Revenue Service

# Transactions With Interested Persons

▶ Complete if the organization answered "Yes" on Form 990, Part IV, line 25a, 25b, 26, 27, 28a, 28b, or 28c, or Form 990-EZ, Part V, line 38a or 40b.
▶ Attach to Form 990 or Form 990-EZ.
▶ Go to www.irs.gov/Form990 for instructions and the latest information.

OMB No. 1545-0047

**2018**

Open To Public
Inspection

Name of the organization

NATIONAL RIFLE ASSOCIATION OF AMERICA

Employer identification number

53-0116130

## Part I — Excess Benefit Transactions (section 501(c)(3), section 501(c)(4), and 501(c)(29) organizations only).

Complete if the organization answered "Yes" on Form 990, Part IV, line 25a or 25b, or Form 990-EZ, Part V, line 40b.

| 1 (a) Name of disqualified person | (b) Relationship between disqualified person and organization | (c) Description of transaction | (d) Corrected? Yes | No |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

2  Enter the amount of tax incurred by the organization managers or disqualified persons during the year under section 4958 ▶ $ _____

3  Enter the amount of tax, if any, on line 2, above, reimbursed by the organization ▶ $ _____

## Part II — Loans to and/or From Interested Persons.

Complete if the organization answered "Yes" on Form 990-EZ, Part V, line 38a or Form 990, Part IV, line 26; or if the organization reported an amount on Form 990, Part X, line 5, 6, or 22.

| (a) Name of interested person | (b) Relationship with organization | (c) Purpose of loan | (d) Loan to or from the organization? To | From | (e) Original principal amount | (f) Balance due | (g) In default? Yes | No | (h) Approved by board or committee? Yes | No | (i) Written agreement? Yes | No |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

Total ▶ $

## Part III — Grants or Assistance Benefiting Interested Persons.

Complete if the organization answered "Yes" on Form 990, Part IV, line 27.

| (a) Name of interested person | (b) Relationship between interested person and the organization | (c) Amount of assistance | (d) Type of assistance | (e) Purpose of assistance |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

LHA  For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.  Schedule L (Form 990 or 990-EZ) 2018

832131 10-25-18

Schedule L (Form 990 or 990-EZ) 2018 **NATIONAL RIFLE ASSOCIATION OF AMERICA** 53-0116130 Page **2**

| Part IV | Business Transactions Involving Interested Persons. |
|---|---|

Complete if the organization answered "Yes" on Form 990, Part IV, line 28a, 28b, or 28c.

| (a) Name of interested person | (b) Relationship between interested person and the organization | (c) Amount of transaction | (d) Description of transaction | (e) Sharing of organization's revenues? | |
|---|---|---|---|---|---|
| | | | | Yes | No |
| TOM SELLECK | SEE PART V | 476,000. | SEE PART V | | X |
| JIM POWELL ADVER.PHOTOGRAP | SEE PART V | 11,513. | SEE PART V | | X |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| Part V | Supplemental Information. |
|---|---|

Provide additional information for responses to questions on Schedule L (see instructions).

SCH L, PART IV, BUSINESS TRANSACTIONS INVOLVING INTERESTED PERSONS:

(A) NAME OF PERSON: JIM POWELL ADVER.PHOTOGRAPHY


SCH L, PART IV, BUSINESS TRANSACTIONS INVOLVING INTERESTED PERSONS:

(A) NAME OF PERSON: TOM SELLECK

(B) RELATIONSHIP BETWEEN INTERESTED PERSON AND ORGANIZATION:

BOARD MEMBER

(D) DESCRIPTION OF TRANSACTION: THE NRA PURCHASED A GROUP OF

COLLECTIBLE FIREARMS THAT ORIGINATED FROM THE COLLECTION OF THEN-BOARD

MEMBER TOM SELLECK FOR $476,000. THE NRA INTENDS TO RESELL THE FIREARMS

OR OTHERWISE USE THEM IN NRA FUNDRAISING EFFORTS. BOARD MEMBER LANCE

OLSON,A LICENSED FIREARMS DEALER WHO PROVIDED CONSULTING SERVICES TO

THE NRA ON GUN COLLECTOR OUTREACH,ASSISTED IN THE TRANSACTION.


(A) NAME OF PERSON: JIM POWELL ADVERTISING PHOTOGRAPHY

(B) RELATIONSHIP BETWEEN INTERESTED PERSON AND ORGANIZATION:

OWNER IS AN OFFICER'S RELATIVE

(D) DESCRIPTION OF TRANSACTION: THE NRA PURCHASED JIM POWELL

ADVERTISING PHOTOGRAPY SERVICES FOR NRA COMPETITIONS EVENTS. THE OWNER

OF THE PHOTOGRAPHY SERVICES COMPANY, JIM POWELL, IS THE FATHER OF NRA

Schedule L (Form 990 or 990-EZ) 2018

832132 10-25-18

Schedule L (Form 990 or 990-EZ)   **NATIONAL RIFLE ASSOCIATION OF AMERICA**    53-0116130  Page **2**

| Part V | Supplemental Information |

Complete this part to provide additional information for responses to questions on Schedule L (see instructions).

OFFICER JOSH POWELL.

| SCHEDULE M (Form 990) | **Noncash Contributions** | OMB No. 1545-0047 |
|---|---|---|

**Noncash Contributions**

Department of the Treasury
Internal Revenue Service

▶ Complete if the organizations answered "Yes" on Form 990, Part IV, lines 29 or 30.
▶ Attach to Form 990.
▶ Go to www.irs.gov/Form990 for instructions and the latest information.

**2018**

Open to Public Inspection

| Name of the organization | Employer identification number |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130 |

## Part I | Types of Property

| | | (a) Check if applicable | (b) Number of contributions or items contributed | (c) Noncash contribution amounts reported on Form 990, Part VIII, line 1g | (d) Method of determining noncash contribution amounts |
|---|---|---|---|---|---|
| 1 | Art - Works of art | | | | |
| 2 | Art - Historical treasures | | | | |
| 3 | Art - Fractional interests | | | | |
| 4 | Books and publications | | | | |
| 5 | Clothing and household goods | | | | |
| 6 | Cars and other vehicles | | | | |
| 7 | Boats and planes | | | | |
| 8 | Intellectual property | | | | |
| 9 | Securities - Publicly traded | X | 11,600 | 407,352. | FMV |
| 10 | Securities - Closely held stock | | | | |
| 11 | Securities - Partnership, LLC, or trust interests | | | | |
| 12 | Securities - Miscellaneous | | | | |
| 13 | Qualified conservation contribution - Historic structures | | | | |
| 14 | Qualified conservation contribution - Other | | | | |
| 15 | Real estate - Residential | | | | |
| 16 | Real estate - Commercial | | | | |
| 17 | Real estate - Other | | | | |
| 18 | Collectibles | | | | |
| 19 | Food inventory | | | | |
| 20 | Drugs and medical supplies | | | | |
| 21 | Taxidermy | | | | |
| 22 | Historical artifacts | | | | |
| 23 | Scientific specimens | | | | |
| 24 | Archeological artifacts | | | | |
| 25 | Other ▶ ( _____ ) | | | | |
| 26 | Other ▶ ( _____ ) | | | | |
| 27 | Other ▶ ( _____ ) | | | | |
| 28 | Other ▶ ( _____ ) | | | | |

29 Number of Forms 8283 received by the organization during the tax year for contributions for which the organization completed Form 8283, Part IV, Donee Acknowledgement ......... | **29** |

| | | Yes | No |
|---|---|---|---|
| 30a | During the year, did the organization receive by contribution any property reported in Part I, lines 1 through 28, that it must hold for at least three years from the date of the initial contribution, and which isn't required to be used for exempt purposes for the entire holding period? | | X |
| b | If "Yes," describe the arrangement in Part II. | | |
| 31 | Does the organization have a gift acceptance policy that requires the review of any nonstandard contributions? | X | |
| 32a | Does the organization hire or use third parties or related organizations to solicit, process, or sell noncash contributions? | X | |
| b | If "Yes," describe in Part II. | | |
| 33 | If the organization didn't report an amount in column (c) for a type of property for which column (a) is checked, describe in Part II. | | |

LHA    For Paperwork Reduction Act Notice, see the Instructions for Form 990.

Schedule M (Form 990) 2018

832141 10-18-18

Appx. 349

Schedule M (Form 990) 2018  NATIONAL RIFLE ASSOCIATION OF AMERICA    53-0116130    Page 2

| Part II | Supplemental Information. Provide the information required by Part I, lines 30b, 32b, and 33, and whether the organization is reporting in Part I, column (b), the number of contributions, the number of items received, or a combination of both. Also complete this part for any additional information.

SCHEDULE M, LINE 32B:

ON OCCASION AND AS APPROPRIATE, SECURITIES AND OTHER DONATED LIQUID OR

ILLIQUID ASSETS CAN BE CONVERTED INTO CASH BY THE OUTSIDE THIRD PARTY

SPECIALISTS THAT PARTNER WITH THE NRA TO FULFILL THE PHILANTHROPIC

INTENTIONS OF THE DONORS.

832142 10-18-18

Schedule M (Form 990) 2018

Appx. 350

**SCHEDULE O**

(Form 990 or 990-EZ)

Department of the Treasury
Internal Revenue Service

**Supplemental Information to Form 990 or 990-EZ**

Complete to provide information for responses to specific questions on
Form 990 or 990-EZ or to provide any additional information.
▶ Attach to Form 990 or 990-EZ.
▶ Go to www.irs.gov/Form990 for the latest information.

OMB No. 1545-0047

**2018**

Open to Public
Inspection

Name of the organization | Employer identification number

NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130

FORM 990, PART I, SECTION 1, LINE 1

THE NRA IS A 501(C)(4) MEMBERSHIP ASSOCIATION WITH FOUR 501(C)(3)

PUBLIC CHARITIES AND A SECTION 527 POLITICAL ACTION COMMITTEE (PAC)

WHICH IS A SEPARATE SEGREGATED FUND. THE FOUR CHARITIES AFFILIATED WITH

THE NRA ARE NRA CIVIL RIGHTS DEFENSE FUND, NRA FOUNDATION INC, NRA

FREEDOM ACTION FOUNDATION, AND NRA SPECIAL CONTRIBUTION FUND DBA NRA

WHITTINGTON CENTER. THE POLITICAL ACTION COMMITTEE IS NRA POLITICAL

VICTORY FUND. SEE SCHEDULE R, PART II.


FORM 990, PART I, LINE 7

THIS INFORMATIONAL NOTE REGARDS THE NRA'S UNRELATED BUSINESS INCOME.

FORM 990 PAGE 1 SHOWS GROSS UNRELATED BUSINESS REVENUE ON LINE 7A AND

NET UNRELATED BUSINESS TAXABLE INCOME ON LINE 7B. THE NRA DID NOT OWE

UNRELATED BUSINESS INCOME TAX FOR THE YEAR 2018 BECAUSE DIRECTLY

CONNECTED DEDUCTIONS WERE GREATER THAN THE ASSOCIATED INCOME IN 2018.

THE MAIN SOURCES OF NRA UNRELATED BUSINESS INCOME, AS SHOWN ON 990 PART

VIII, COLUMN C, ARE CERTAIN MERCHANDISE SALES FROM THE E-COMMERCE

PLATFORMS, ADVERTISING, AND OTHER ACTIVITIES NOT RELATED TO THE NRA'S

TAX EXEMPT PURPOSES. ADDITIONAL INFORMATIONAL NOTES RELATED TO THE

NRA'S TAXES ARE SHARED ON SCHEDULE C REGARDING 527(F) PROXY TAXES AND

SCHEDULE D REGARDING STATE AND LOCAL TAXES. THE NRA CHOOSES TO SHARE

THIS EXTRA INFORMATION ABOUT THE TAXES IN ORDER TO DEMONSTRATE IN GOOD

FAITH THAT THE ORGANIZATION IS A TAXPAYER IN GOOD STANDING.


FORM 990 PART I, LINE 8

LHA  For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.    Schedule O (Form 990 or 990-EZ) (2018)

832211 10-10-18

| Name of the organization | Employer identification number |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130 |

THIS INFORMATIONAL NOTE REGARDS THE NRA'S CONTRIBUTION REVENUE. THE

VAST MAJORITY OF CONTRIBUTIONS TO THE NRA COMES FROM MILLIONS OF SMALL

INDIVIDUAL DONORS. GIFTS FROM COMPANIES AND EXECUTIVES IN THE FIREARMS,

HUNTING, AND SHOOTING SPORTS INDUSTRIES INDUSTRIES TYPICALLY COMPRISE

LESS THAN 5% OF THE NRA'S CONTRIBUTION REVENUE EVERY YEAR, AS APPLIED

TO CONTRIBUTION REVENUE REPORTED ON FORM 990, PART VIII, LINE 1.


FORM 990, PART III, LINE 4D, OTHER PROGRAM SERVICES:

THIS NOTE PROVIDES FURTHER INFORMATION ON PART III PROGRAM SERVICE

ACCOMPLISHMENTS. NRA PROGRAM SERVICES ARE CENTERED ON THE NRA'S CORE

MISSION OF FIREARMS SAFETY, EDUCATION, AND TRAINING, INCLUDING

MESSAGING THAT PROMOTES FREEDOM AND LIBERTY. THE ADDITIONAL PROGRAM

SERVICE EXPENSES OF $59,426,544 NOTED ON 990 CORE FORM PART III LINE 4D

INCLUDE THE PROGRAM SERVICES COMPONENTS OF PUBLIC AFFAIRS, EXECUTIVE,

AND ADVANCEMENT OPERATIONS. 990 READERS ARE ENCOURAGED TO ACCESS

NRA.ORG FOR OPPORTUNITIES TO CONTINUE TO ENGAGE WITH THE NRA.

EXPENSES $ 59,426,544.   INCLUDING GRANTS OF $ 0.   REVENUE $ 1,330,515.


FORM 990, PART VI, SECTION A, LINE 2:

SEVERAL NRA DIRECTORS ARE EMPLOYED IN THE FIREARMS INDUSTRY AS

MANUFACTURERS OR SELLERS OF FIREARMS, AMMUNITION, OR COMPONENTS THEREOF.

THESE BOARD MEMBERS ROUTINELY BUY AND SELL PRODUCTS FROM ONE ANOTHER IN THE

ORDINARY COURSE OF BUSINESS.


FORM 990, PART VI, SECTION A, LINE 6:

THE NATIONAL RIFLE ASSOCIATION IS A MEMBERSHIP ASSOCIATION THAT REPRESENTS

ONLY INDIVIDUAL CITIZENS. MEMBERSHIP DUES ARE PROPERLY REPORTED ON FORM

Schedule O (Form 990 or 990-EZ) (2018)                                                    Page 2

| Name of the organization | Employer identification number |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130 |

990, PART VIII, LINE 2 PURSUANT TO THE INSTRUCTIONS FOR SUCH REPORTING.


FORM 990, PART VI, SECTION A, LINE 7A:

NRA MEMBERS ELECT ALL 76 MEMBERS OF THE NRA BOARD OF DIRECTORS. 75

DIRECTORS ARE ELECTED FOR STAGGERED THREE YEAR TERMS, AND THE 76TH DIRECTOR

IS ELECTED FOR ONE YEAR TERM ON THE OCCASION OF EACH ANNUAL MEETING OF

MEMBERS.


FORM 990, PART VI, SECTION A, LINE 7B:

CERTAIN BOARD OF DIRECTORS DECISIONS ARE SUBJECT TO MEMBERSHIP APPROVAL PER

NRA BYLAWS AND NEW YORK NOT FOR PROFIT CORPORATE LAW.


FORM 990, PART VI, SECTION B, LINE 11B:

FORM 990 IS REVIEWED BY THE EXTERNAL AUDITING FIRM, PRESENTED TO THE NRA

BOARD OF DIRECTORS AUDIT COMMITTEE, AND MADE AVAILABLE TO THE FULL NRA

BOARD OF DIRECTORS, BEFORE IT IS FILED WITH THE IRS.


FORM 990, PART VI, SECTION B, LINE 12C:

THE ORGANIZATION'S CONFLICT OF INTEREST POLICY APPLIES TO OFFICERS,

DIRECTORS, AND KEY EMPLOYEES OF THE FILING ORGANIZATION AND ITS AFFILIATES,

AS WELL AS TO THEIR RELATIVES. RELATED PARTY TRANSACTIONS AND POTENTIAL

CONFLICTS ARE SELF-REPORTED ON A QUESTIONNAIRE THAT IS DISTRIBUTED AT LEAST

ANNUALLY AND REVIEWED BY THE SECRETARY AND GENERAL COUNSEL. ISSUES MAY ALSO

BE REPORTED THROUGH OTHER MEANS OR INDEPENDENTLY DISCOVERED BY STAFF.

REGARDLESS OF HOW THEY ARE REPORTED, RELATED PARTY TRANSACTIONS AND ISSUES

OF APPARENT CONFLICT ARE PRESENTED TO THE BODY DESIGNATED BY THE BOARD OF

DIRECTORS (THE AUDIT COMMITTEE) FOR APPROVAL, DISAPPROVAL, OR PRECAUTIONARY

MEASURES AS NEEDED.

832212 10-10-18                                       Schedule O (Form 990 or 990-EZ) (2018)

Schedule O (Form 990 or 990-EZ) (2018)

| Name of the organization | Employer identification number |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130 |

FORM 990, PART VI, SECTION B, LINE 15:

COMPENSATION OF THE NRA'S TOP MANAGEMENT OFFICIALS IS ESTABLISHED BY

METHODS INCLUDING INDEPENDENT COMPENSATION CONSULTANTS, COMPENSATION

SURVEYS AND STUDIES, AND COMPARABILITY DATA. IN ADDITION, UNDER THE NRA

BYLAWS COMPENSATION OF CERTAIN ELECTED OFFICERS (INCLUDING THE EXECUTIVE

VICE PRESIDENT) MUST BE APPROVED BY THE BOARD OF DIRECTORS, BASED ON

RECOMMENDATIONS BY THE COMPENSATION COMMITTEE. ALL DECISIONS ARE PROPERLY

DOCUMENTED.


FORM 990, PART VI, LINE 17, LIST OF STATES RECEIVING COPY OF FORM 990:

AL,AZ,AR,CA,CO,CT,DC,FL,GA,HI,ID,IL,IN,IA,KS,KY,LA,ME,MD,MA,MI,MN,MS,MO,NE

NV,NH,NJ,MT,NM,NY,ND,NC,OH,OK,OR,PA,PR,RI,SC,DE,SD,TN,TX,UT,VT,VA,WV,WA,WI,

WY


FORM 990, PART VI, SECTION C, LINE 19:

THE ORGANIZATION'S CONFLICT OF INTEREST POLICY APPLIES TO OFFICERS,

DIRECTORS, AND KEY EMPLOYEES OF THE FILING ORGANIZATION AND ITS AFFILIATES,

AS WELL AS TO THEIR RELATIVES. RELATED PARTY TRANSACTIONS AND POTENTIAL

CONFLICTS ARE SELF-REPORTED ON A QUESTIONNAIRE THAT IS DISTRIBUTED AT LEAST

ANNUALLY AND REVIEWED BY THE SECRETARY AND GENERAL COUNSEL. ISSUES MAY ALSO

BE REPORTED THROUGH OTHER MEANS OR INDEPENDENTLY DISCOVERED BY STAFF.

REGARDLESS OF HOW THEY ARE REPORTED, RELATED PARTY TRANSACTIONS AND ISSUES

OF APPARENT CONFLICT ARE PRESENTED TO THE BODY DESIGNATED BY THE BOARD OF

DIRECTORS (THE AUDIT COMMITTEE) FOR APPROVAL, DISAPPROVAL, OR PRECAUTIONARY

MEASURES AS NEEDED.


FORM 990, PART VI, SECTION C, LINE 18

Schedule O (Form 990 or 990-EZ) (2018)                                    **Page 2**

| Name of the organization | Employer identification number |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130 |

READERS ARE POLITELY REMINDED THE NRA WAS FOUNDED 147 YEARS AGO, IN 1871. THE NRA'S 1944 DETERMINATION LETTER FROM THE INTERNAL REVENUE SERVICE IS AVAILABLE ON GUIDESTAR.ORG AND CAN ALSO BE REQUESTED DIRECTLY FROM THE NRA AS REQUIRED BY LAW. FORMS 990 CAN BE REQUESTED DIRECTLY FROM THE NRA AS REQUIRED BY LAW.

FORM 990, PART VII, SECTION A, LINE 1

THIS INFORMATIONAL NOTE REGARDS SERVICE ON THE NRA BOARD OF DIRECTORS, WHICH IS NOT COMPENSATED. BOARD MEMBERS WHO RECEIVED COMPENSATION IN 2018 WERE COMPENSATED FOR OTHER REASONS, NOT FOR THEIR VOLUNTARY BOARD SERVICE. MR. BUTZ, MS. FROMAN, MS. GOLOB, MS. HAMMER, MR. KEENE, MR. NUGENT, MR. OLSON, AND MR. SKELTON WERE COMPENSATED FOR OTHER PROFESSIONAL SERVICES THEY PERFORMED FOR THE ORGANIZATION. MR. BROWNELL, MS. LIGHTFOOT, AND MR. MILLS, AND MR. TED NUGENT RECEIVED MEMBERSHIP RECRUITING COMMISSIONS THAT WERE PAID TO THEIR COMPANIES. FOR THE PURPOSE OF DETERMINING THE COUNT OF INDEPENDENT DIRECTORS AS OF DECEMBER 31, 2018 SHOWN ON PART I LINE 3 AND PART VI LINE 1B, THE NINE DIRECTORS NOT CONSIDERED INDEPENDENT FOR 2018 WERE MR. BUTZ, MS. FROMAN, MS. GOLOB, MS. HAMMER, MR. KEENE, MR. NORTH, MR. NUGENT, MR. OLSON, AND MR. SKELTON.

FORM 990, PART VII, SECTION A, LINE 5

IN 2018, MR. NORTH RECEIVED NO COMPENSATION FROM THE NRA FOR HIS 20 HOURS PER WEEK AS NRA PRESIDENT. THE PAYMENTS OF $1,377,617 WERE FROM AN UNRELATED ORGANIZATION, ACKERMAN MCQUEEN INC. CERTAIN OF THESE PAYMENTS ARE DISPUTED AND SUBJECT TO ONGOING LITIGATION. IN 2018. MS. GOLOB WAS ALSO COMPENSATED BY AN UNRELATED ORGANIZATION, ACKERMAN

| Name of the organization | Employer identification number |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130 |

MCQUEEN INC, $28,661 FOR PROFESSIONAL SERVICES PERFORMED ON NRA DIGITAL

MEDIA PROJECTS.


FORM 990, PART VII SECTION B, LINE 1

THIS INFORMATIONAL NOTE PROVIDES ADDITIONAL DETAIL ABOUT AMOUNTS PAID

TO OUTSIDE SERVICES PROVIDERS. THE FILING ORGANIZATION REPORTS

COMPENSATION PAID TO SERVICES PROVIDERS EXCLUSIVE OF ADVERTISING AND

OTHER MEDIA PLACED ON BEHALF OF THE FILING ORGANIZATION AND EXPENSES

INCURRED ON BEHALF OF THE FILING ORGANIZATION. FOR EXAMPLE, THE FIGURE

OF $31,994,168 STATED ON PART VII SECTION B LINE 1 REFLECTS

COMPENSATION FOR SERVICES PAID TO ACKERMAN MCQUEEN INC. IT EXCLUDES

$6,337,508 INCURRED FOR OUT OF POCKET EXPENDITURES ON BEHALF OF THE

FILING ORGANIZATION INCLUDING MEDIA, OUTSIDE VENDOR COSTS, AND

REIMBURSEMENT OF TRAVEL AND BUSINESS EXPENSES.


FORM 990, PART VIII, LINE 2B

THIS INFORMATIONAL NOTE REGARDS THE REPORTING OF MEMBER DUES ON FORM

990. LINE 1B OF THE REVENUE STATEMENT IS PROPERLY LEFT BLANK. PURSUANT

TO 990 INSTRUCTIONS, MEMBERSHIP DUES THAT ARE NOT CONTRIBUTIONS BECAUSE

THEY COMPARE REASONABLY WITH AVAILABLE BENEFITS ARE SHOWN ON LINE 2.

THUS, ALL NRA MEMBER DUES ARE PROPERLY SHOWN ON THE 990 REVENUE

STATEMENT AS PROGRAM SERVICE REVENUE ON LINE 2, OTHER THAN NRA

LIFE-PLUS CONTRIBUTIONS WHICH ARE PROPERLY COUNTED AS CONTRIBUTION

REVENUE IN LINE 1F OF THE 990 REVENUE STATEMENT.


FORM 990, PART IX, LINE 11

| Name of the organization | Employer identification number |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130 |

THIS INFORMATIONAL NOTE REGARDS THE NRA'S PAYMENT OF FEES FOR OUTSIDE
PROFESSIONAL SERVICES AS STATED ON LINE 11 OF THE 990 EXPENSE
STATEMENT. LINE 11B REPORTS LEGAL FEES PAID TO OUTSIDE ATTORNEYS, SUCH
AS FOR SECOND AMENDMENT CASE WORK AND RELATED LITIGATION AT THE FEDERAL
AND STATE LEVELS AND FOR REGULATORY AND COMPLIANCE MATTERS. LINE 11C
REPORTS ACCOUNTING FEES PAID TO THE OUTSIDE CPA FIRM THAT PROVIDES THE
NRA'S AUDITING AND TAX SERVICES. LINE 11D REPORTS LOBBYING EXPENSE PAID
TO EXTERNAL REGISTERED LOBBYISTS. LINE 11E REPORTS FUNDRAISING COSTS
PAID TO THE AUTHORIZED VENDORS LISTED ON SCHEDULE G. LINE 11F REPORTS
INVESTMENT MANAGEMENT FEES PAID TO INVESTMENT ADVISORS THAT MANAGE THE
NRA'S PORTFOLIOS. LINE 11G SHOWS TELEMARKETING COSTS FOR MEMBERSHIP
SERVICING. PROFESSIONAL SERVICES PERFORMED BY NRA EMPLOYEES (IN HOUSE
COUNSEL, IN HOUSE ACCOUNTANTS, IN HOUSE LOBBYISTS, IN HOUSE
FUNDRAISERS, AND IN HOUSE INVESTMENT MANAGERS, RESPECTIVELY) ARE
PROPERLY REPORTED WITHIN LINES 5-7 OF THE 990 EXPENSE STATEMENT, AS
REQUIRED BY 990 FORM INSTRUCTIONS. PROFESSIONAL SERVICES PERFORMED BY
THE TELEMARKETING VENDOR FOR FUNDRAISING PURPOSES, RATHER THAN FOR
MEMBERSHIP, ARE PROPERLY REPORTED WITHIN LINE 11E, AS REQUIRED BY 990
FORM INSTRUCTIONS.


FORM 990, PART IX, LINE 24E
THIS RESPONSE EXPLAINS $12,581,928 OF OTHER EXPENSES STATED ON LINE 24E
OF THE 990, PART IX EXPENSE STATEMENT WHICH WERE NOT ACCOMMODATED BY
OTHER EXPENSE LINE DESCRIPTIONS. THIS FIGURE INCLUDES $9,204,256 OF
FULFILLMENT MATERIALS, $5,747,802 BANKING FEES, $1,276,567 MEMBERSHIP
PREMIUMS, $560,407 OF NON-PAYROLL TAXES, AND ($4,927,105) FASB ASC 715
PENSION ACCOUNTING VALUATION ADJUSTMENT.

Page **2**

| Name of the organization | Employer identification number |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130 |

FORM 990, PART XI, LINE 9, CHANGES IN NET ASSETS:

AGENCY TRANSACTIONS                                          -1,910,739.

UNREALIZED GAIN ON DERIVATIVE INSTRUMENT                      745,782.

TOTAL TO FORM 990, PART XI, LINE 9                          -1,164,957.


FORM 990, PART XI, LINE 9

THIS RESPONSE EXPLAINS ($1,164,957) OF OTHER CHANGES IN THE NET ASSETS

RECONCILIATION SCHEDULE. THE FIGURE INCLUDES ($1,910,739) AGENCY

TRANSACTIONS BETWEEN THE NRA AND NRA FOUNDATION AND $745,782 UNREALIZED

GAIN ON DERIVATIVE INSTRUMENT. THE AGENCY TRANSACTIONS FIGURE OF

($1,910,739) INCLUDES ENDOWMENT CONTRIBUTIONS AND ENDOWMENT EARNINGS

DESIGNATED BY NRA FOUNDATION DONORS FOR ELIGIBLE NRA PROGRAMS. AN

INFORMATION NOTE REGARDING THE PURPOSE OF THE DERIVATIVE INSTRUMENT IS

INCLUDED WITH SCHEDULE D PART X, LINE 1(2).

| SCHEDULE R (Form 990) | | OMB No. 1545-0047 |
|---|---|---|
| | **Related Organizations and Unrelated Partnerships** | **2018** |
| Department of the Treasury Internal Revenue Service | ▶ Complete if the organization answered "Yes" on Form 990, Part IV, line 33, 34, 35b, 36, or 37.<br>▶ Attach to Form 990.<br>▶ Go to www.irs.gov/Form990 for instructions and the latest information. | Open to Public Inspection |

Name of the organization: NATIONAL RIFLE ASSOCIATION OF AMERICA

Employer identification number: 53-0116130

**Part I** Identification of Disregarded Entities. Complete if the organization answered "Yes" on Form 990, Part IV, line 33.

| (a) Name, address, and EIN (if applicable) of disregarded entity | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Total income | (e) End-of-year assets | (f) Direct controlling entity |
|---|---|---|---|---|---|
| LEXINGTON CONCORD HOLDINGS LLC - 83-1798978<br>11250 WAPLES MILL RD<br>FAIRFAX, VA 22030 | DEVELOPMENT PHASE | DELAWARE | 0. | 0. | NRA |
| | | | | | |
| | | | | | |
| | | | | | |

**Part II** Identification of Related Tax-Exempt Organizations. Complete if the organization answered "Yes" on Form 990, Part IV, line 34, because it had one or more related tax-exempt organizations during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Exempt Code section | (e) Public charity status (if section 501(c)(3)) | (f) Direct controlling entity | (g) Section 512(b)(13) controlled entity? Yes | No |
|---|---|---|---|---|---|---|---|
| NRA FOUNDATION INC - 52-1710886<br>11250 WAPLES MILL RD<br>FAIRFAX, VA 22030 | CHARITABLE | DISTRICT OF COLUMBIA | 501(C)(3) | LINE 7 | NRA | | X |
| NRA SPECIAL CONTRIBUTION FUND - 23-7367534<br>11250 WAPLES MILL RD<br>FAIRFAX, VA 22030 | CHARITABLE | NEW MEXICO | 501(C)(3) | LINE 7 | NRA | | X |
| NRA CIVIL RIGHTS DEFENSE FUND - 52-1136665<br>11250 WAPLES MILL RD<br>FAIRFAX, VA 22030 | CHARITABLE | VIRGINIA | 501(C)(3) | LINE 7 | NRA | | X |
| NRA FREEDOM ACTION FOUNDATION - 26-1277941<br>11250 WAPLES MILL RD<br>FAIRFAX, VA 22030 | CHARITABLE | VIRGINIA | 501(C)(3) | LINE 7 | NRA | | X |

For Paperwork Reduction Act Notice, see the Instructions for Form 990.

Schedule R (Form 990) 2018

832161 10-02-18    LHA

Schedule R (Form 990)  NATIONAL RIFLE ASSOCIATION OF AMERICA  53-0116130

**Part II** Continuation of Identification of Related Tax-Exempt Organizations

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Exempt Code section | (e) Public charity status (if section 501(c)(3)) | (f) Direct controlling entity | (g) Section 512(b)(13) controlled organization? Yes | No |
|---|---|---|---|---|---|---|---|
| NRA POLITICAL VICTORY FUND - 52-1083020 11250 WAPLES MILL RD FAIRFAX, VA  22030 | PAC/SSF | VIRGINIA | 527 | | NRA | X | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

832222 04-01-18

Appx. 360

Schedule R (Form 990) 2018    NATIONAL RIFLE ASSOCIATION OF AMERICA    53-0116130    Page 2

**Part III**   Identification of Related Organizations Taxable as a Partnership. Complete if the organization answered "Yes" on Form 990, Part IV, line 34, because it had one or more related organizations treated as a partnership during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Direct controlling entity | (e) Predominant income (related, unrelated, excluded from tax under sections 512-514) | (f) Share of total income | (g) Share of end-of-year assets | (h) Disproportionate allocations? Yes | No | (i) Code V-UBI amount in box 20 of Schedule K-1 (Form 1065) | (j) General or managing partner? Yes | No | (k) Percentage ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WBB INVESTMENTS, LLC - 32-0569014, 11250 WAPLES MILL RD, FAIRFAX, VA 22030 | INVESTMENT | DE | NRA | 0 | 0. | 0. | | X | N/A | X | | 99.00% |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

**Part IV**   Identification of Related Organizations Taxable as a Corporation or Trust. Complete if the organization answered "Yes" on Form 990, Part IV, line 34, because it had one or more related organizations treated as a corporation or trust during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Direct controlling entity | (e) Type of entity (C corp, S corp, or trust) | (f) Share of total income | (g) Share of end-of-year assets | (h) Percentage ownership | (i) Section 512(b)(13) controlled entity? Yes | No |
|---|---|---|---|---|---|---|---|---|---|
| WINGATE CHURCH INSURANCE SERVICES INC 11250 WAPLES MILL RD FAIRFAX, VA 22030 | DEVELOPMENT PHASE | DE | NRA | C CORP | 0. | 0. | 100% | | X |
| NRA HOLDINGS COMPANY INC - 02-0558658 11250 WAPLES MILL RD FAIRFAX, VA 22030 | MANAGEMENT SERVICES | VA | NRA | C CORP | 0. | 0. | 100% | | X |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

832162 10-02-18      Schedule R (Form 990) 2018

Schedule R (Form 990) 2018    NATIONAL RIFLE ASSOCIATION OF AMERICA     53-0116130   Page 3

**Part V**   Transactions With Related Organizations. Complete if the organization answered "Yes" on Form 990, Part IV, line 34, 35b, or 36.

**Note:** Complete line 1 if any entity is listed in Parts II, III, or IV of this schedule.

| | | Yes | No |
|---|---|---|---|
| 1 During the tax year, did the organization engage in any of the following transactions with one or more related organizations listed in Parts II–IV? | | | |
| a   Receipt of (i) interest, (ii) annuities, (iii) royalties, or (iv) rent from a controlled entity | 1a | | X |
| b   Gift, grant, or capital contribution to related organization(s) | 1b | | X |
| c   Gift, grant, or capital contribution from related organization(s) | 1c | X | |
| d   Loans or loan guarantees to or for related organization(s) | 1d | | X |
| e   Loans or loan guarantees by related organization(s) | 1e | | X |
| f   Dividends from related organization(s) | 1f | | X |
| g   Sale of assets to related organization(s) | 1g | | X |
| h   Purchase of assets from related organization(s) | 1h | | X |
| i   Exchange of assets with related organization(s) | 1i | | X |
| j   Lease of facilities, equipment, or other assets to related organization(s) | 1j | | X |
| k   Lease of facilities, equipment, or other assets from related organization(s) | 1k | | X |
| l   Performance of services or membership or fundraising solicitations for related organization(s) | 1l | X | |
| m   Performance of services or membership or fundraising solicitations by related organization(s) | 1m | | X |
| n   Sharing of facilities, equipment, mailing lists, or other assets with related organization(s) | 1n | | X |
| o   Sharing of paid employees with related organization(s) | 1o | | X |
| p   Reimbursement paid to related organization(s) for expenses | 1p | X | |
| q   Reimbursement paid by related organization(s) for expenses | 1q | X | |
| r   Other transfer of cash or property to related organization(s) | 1r | X | |
| s   Other transfer of cash or property from related organization(s) | 1s | | X |

2   If the answer to any of the above is "Yes," see the instructions for information on who must complete this line, including covered relationships and transaction thresholds.

| (a)<br>Name of related organization | (b)<br>Transaction type (a-s) | (c)<br>Amount involved | (d)<br>Method of determining amount involved |
|---|---|---|---|
| (1) NRA FOUNDATION INC | A | 180,000. | CASH VALUE |
| (2) NRA FOUNDATION INC | C | 13,525,570. | CASH VALUE |
| (3) NRA FOUNDATION INC | B | 5,000,000. | CASH VALUE |
| (4) NRA FOUNDATION INC | O | 13,083,925. | CASH VALUE |
| (5) NRA FOUNDATION INC | Q | 4,218,390. | CASH VALUE |
| (6) NRA CIVIL RIGHTS DEFENSE FUND | C | 433,872. | CASH VALUE |

832163 10-02-18            Schedule R (Form 990) 2018

Schedule R (Form 990)     NATIONAL RIFLE ASSOCIATION OF AMERICA                    53-0116130

**Part V** Continuation of Transactions With Related Organizations (Schedule R (Form 990), Part V, line 2)

| (a)<br>Name of other organization | (b)<br>Transaction<br>type (a-r) | (c)<br>Amount involved | (d)<br>Method of determining<br>amount involved |
|---|---|---|---|
| (7) NRA CIVIL RIGHTS DEFENSE FUND | Q | 39,431. | CASH VALUE |
| (8) NRA SPECIAL CONTRIBUTION FUND | A | 120,000. | CASH VALUE |
| (9) NRA SPECIAL CONTRIBUTION FUND | Q | 1,805,930. | CASH VALUE |
| (10) NRA POLITICAL VICTORY FUND | R | 3,078. | CASH VALUE |
| (11) LEXINGTON CONCORD HOLDINGS LLC | Q | 88,410. | CASH VALUE |
| (12) | | | |
| (13) | | | |
| (14) | | | |
| (15) | | | |
| (16) | | | |
| (17) | | | |
| (18) | | | |
| (19) | | | |
| (20) | | | |
| (21) | | | |
| (22) | | | |
| (23) | | | |
| (24) | | | |

832225
04-01-18

Appx. 363

Schedule R (Form 990) 2018    NATIONAL RIFLE ASSOCIATION OF AMERICA    53-0116130    Page 4

**Part VI** Unrelated Organizations Taxable as a Partnership. Complete if the organization answered "Yes" on Form 990, Part IV, line 37.

Provide the following information for each entity taxed as a partnership through which the organization conducted more than five percent of its activities (measured by total assets or gross revenue) that was not a related organization. See instructions regarding exclusion for certain investment partnerships.

| (a) Name, address, and EIN of entity | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Predominant income (related, unrelated, excluded from tax under sections 512-514) | (e) Are all partners sec. 501(c)(3) orgs.? | | (f) Share of total income | (g) Share of end-of-year assets | (h) Disproportionate allocations? | | (i) Code V-UBI amount in box 20 of Schedule K-1 (Form 1065) | (j) General or managing partner? | | (k) Percentage ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Yes | No | | | Yes | No | | Yes | No | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

832164 10-02-18

Schedule R (Form 990) 2018

Appx. 364

Schedule R (Form 990) 2018    NATIONAL RIFLE ASSOCIATION OF AMERICA    53-0116130  Page 5

**Part VII** **Supplemental Information.**

Provide additional information for responses to questions on Schedule R. See instructions.

PART II

THE NRA IS A 501(C)(4) MEMBERSHIP ASSOCIATION WITH FOUR 501(C)(3)

PUBLIC CHARITIES AND A SECTION 527 POLITICAL ACTION COMMITTEE (PAC)

WHICH IS A SEPARATE SEGREGATED FUND. THE FOUR CHARITIES AFFILIATED WITH

THE NRA ARE NRA CIVIL RIGHTS DEFENSE FUND, NRA FOUNDATION INC, NRA

FREEDOM ACTION FOUNDATION, AND NRA SPECIAL CONTRIBUTION FUND DBA NRA

WHITTINGTON CENTER. THE POLITICAL ACTION COMMITTEE IS NRA POLITICAL

VICTORY FUND; NRAPVF IS A SEPARATE UNINCORPORATED PAC OF THE NRA. IN

THE EVENT THAT ANY FUNDS ARE RECEIVED BY THE NRA AND EARMARKED TO THE

PAC, THE NRA HAS SYSTEMS IN PLACE TO ENSURE ANY SUCH RECEIPTS ARE

PROMPTLY AND IMMEDIATELY DEPOSITED INTO THE SEPARATE SEGREGATED FUND'S

ACCOUNT.


PART III

WBB INVESTMENTS,LLC WAS FORMED IN CONNECTION WITH A POSSIBLE

TRANSACTION THAT WAS NEVER ULTIMATELY EXECUTED. A CERTIFICATE OF

CANCELLATION HAS BEEN FILED TO DISSOLVE THE COMPANY.


PART V

LINE 1C THIS INFORMATIONAL NOTE REGARDS QUALIFIED CHARITABLE GRANT

MAKING. ALL GRANTS MADE BY NRA FOUNDATION AND NRA CIVIL RIGHTS DEFENSE

FUND TO THE NRA ARE SUBJECT TO STRINGENT REVIEW PROCESSES REQUIRING

THAT THE GRANTS BE MADE AND USED ONLY FOR QUALIFIED CHARITABLE PURPOSE

PROGRAMS. THE NRA IS REQUIRED TO PROVIDE AN ACCOUNTING TO THE CHARITIES

AS DOCUMENTATION THAT PROCEEDS WERE USED BY THE NRA FOR QUALIFIED

CHARITABLE PURPOSES AS SET FORTH IN THE GRANT DOCUMENTS.


LINE 1E DURING 2018, THE NRA ENTERED A SECURED LOAN AGREEMENT WITH THE

Appx. 365

| Part VII | Supplemental Information. |

Provide additional information for responses to questions on Schedule R. See instructions.

NRA FOUNDATION. THE $5,000,000 LOAN IS PAYABLE TO THE NRA FOUNDATION AT

A FAIR VALUE INTEREST RATE. THE NRA MAKES MONTHLY INTEREST PAYMENTS OF

7%.

**NATIONAL RIFLE ASSOCIATION OF AMERICA**

---

**FINANCIAL STATEMENTS**

**as of December 31, 2018 and 2017**

**AND**

**REPORT THEREON**

---

## NATIONAL RIFLE ASSOCIATION OF AMERICA

### TABLE OF CONTENTS

|  | Page |
|---|---|
| Report of Independent Auditors | 1 |
| Financial Statements: | |
|     Statements of Financial Position | 2 |
|     Statements of Activities | 3 |
|     Statements of Functional Expenses | 4 |
|     Statements of Cash Flows | 5 |
|     Notes to Financial Statements | 6 - 25 |

Report of Independent Auditors

To the Board of Directors and Members of the
National Rifle Association of America

**Report on the Financial Statements**

We have audited the accompanying financial statements of National Rifle Association of America (NRA), which comprise the statements of financial position as of December 31, 2018 and 2017, the related statements of activities, functional expenses, and cash flows for the years then ended, and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of National Rifle Association of America as of December 31, 2018 and 2017, and the changes in its net assets and its cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

**Emphasis of Matters**

As disclosed in Note 1 to the financial statements, the NRA adopted the Financial Accounting Standards Board (FASB) issued Accounting Standards Update (ASU) No. 2016-14, *Not-for-Profit Entities (Topic 958): Presentation of Financial Statements of Not-for-Profit Entities*. The adoption of this standard resulted in the issuance of the statement of functional expenses and additional footnote disclosures and changes to the classification of net assets. Our opinion is not modified with respect to this matter.

As discussed in Note 1 to the financial statements, the accompanying financial statements are those of National Rifle Association of America only and are not those of the primary reporting entity. The consolidated financial statements of NRA and its affiliates have been issued as the general purpose financial statements of the reporting entity and should be read in conjunction with the parent-only statements. Our opinion is not modified with respect to this matter.

*RSM US LLP*

McLean, Virginia
March 13, 2019

1

**NATIONAL RIFLE ASSOCIATION OF AMERICA**
**STATEMENTS OF FINANCIAL POSITION**
**as of December 31, 2018 and 2017**

### ASSETS

| | 2018 | 2017 |
|---|---|---|
| Cash and cash equivalents | $ 23,780,301 | $ 17,123,743 |
| Investments | 45,094,991 | 48,702,736 |
| Pledges receivable, net | 841,562 | 1,184,593 |
| Accounts receivable, net | 41,458,041 | 36,129,175 |
| Due from affiliates | 28,696,533 | 30,731,975 |
| Inventories and supplies, net | 10,632,177 | 13,639,054 |
| Prepaid expenses | 3,179,694 | 3,277,662 |
| Notes receivable, net | 3,000,000 | 3,000,000 |
| Property and equipment, net | 32,709,031 | 34,475,160 |
| Other assets | 7,819,750 | 7,861,583 |
| **Total assets** | **$ 197,212,080** | **$ 196,125,681** |

### LIABILITIES AND NET ASSETS

| | 2018 | 2017 |
|---|---|---|
| Accounts payable | $ 31,190,974 | $ 29,837,446 |
| Accrued liabilities | 55,270,648 | 62,814,166 |
| Note payable and line of credits | 48,138,412 | 47,121,100 |
| Deferred revenue | 46,580,520 | 31,402,766 |
| **Total liabilities** | **181,180,554** | **171,175,478** |
| Net assets (deficit): | | |
| Without donor restrictions | | |
| Net assets without donor restrictions | (16,665,676) | 2,897,932 |
| Cumulative pension liability | (19,611,103) | (33,256,864) |
| Total net deficit without donor restrictions | (36,276,779) | (30,358,932) |
| With donor restrictions | 52,308,305 | 55,309,135 |
| **Total net assets** | **16,031,526** | **24,950,203** |
| **Total liabilities and net assets** | **$ 197,212,080** | **$ 196,125,681** |

The accompanying notes are an integral
part of these financial statements.

2

**NATIONAL RIFLE ASSOCIATION OF AMERICA**
**STATEMENTS OF ACTIVITIES**
**for the years ended December 31, 2018 and 2017**

| | 2018 Without Donor Restrictions | 2018 With Donor Restrictions | 2018 Total | 2017 Without Donor Restrictions | 2017 With Donor Restrictions | 2017 Total |
|---|---|---|---|---|---|---|
| **Revenue and other support** | | | | | | |
| Members' dues | $ 170,391,374 | $ - | $ 170,391,374 | $ 128,209,303 | $ - | $ 128,209,303 |
| Program fees | 8,119,717 | - | 8,119,717 | 10,081,009 | - | 10,081,009 |
| Contributions | 93,618,315 | 16,658,239 | 110,276,554 | 74,999,176 | 24,160,917 | 99,160,093 |
| Advertising | 25,023,714 | - | 25,023,714 | 28,344,743 | - | 28,344,743 |
| Member sales | 3,667,968 | - | 3,667,968 | 3,758,418 | - | 3,758,418 |
| Shows and exhibits | 20,516,030 | - | 20,516,030 | 21,204,275 | - | 21,204,275 |
| Investment income, net | 1,694,315 | 435,393 | 2,129,708 | 4,544,301 | 271,355 | 4,815,656 |
| Insurance administration fees | 12,625,210 | - | 12,625,210 | 14,563,405 | - | 14,563,405 |
| Rental income | 1,357,108 | - | 1,357,108 | 1,255,235 | - | 1,255,235 |
| Other | 6,127,175 | (650,091) | 5,477,084 | 7,206,826 | 772,800 | 7,978,626 |
| Assets released from restrictions | 18,481,638 | (18,481,638) | - | 20,230,894 | (20,230,894) | - |
| Total revenue and other support | 361,622,564 | (2,038,097) | 359,584,467 | 314,395,585 | 4,974,178 | 319,370,763 |
| **Expenses:** | | | | | | |
| **Program services:** | | | | | | |
| Legislative programs | 43,376,477 | | 43,376,477 | 36,740,357 | | 36,740,357 |
| Publications | 36,460,363 | | 36,460,363 | 36,904,080 | | 36,904,080 |
| Public affairs | 37,931,825 | | 37,931,825 | 44,138,732 | | 44,138,732 |
| Shows and exhibits | 17,786,603 | | 17,786,603 | 18,909,415 | | 18,909,415 |
| Competitions | 4,586,644 | | 4,586,644 | 4,702,453 | | 4,702,453 |
| Education and training | 6,022,846 | | 6,022,846 | 7,686,318 | | 7,686,318 |
| Hunter services | 1,558,662 | | 1,558,662 | 3,598,334 | | 3,598,334 |
| Field services | 5,659,291 | | 5,659,291 | 11,882,064 | | 11,882,064 |
| Law enforcement | 3,853,649 | | 3,853,649 | 3,805,344 | | 3,805,344 |
| Recreational shooting | 7,327,265 | | 7,327,265 | 7,200,332 | | 7,200,332 |
| | 164,763,625 | | 164,763,625 | 175,927,429 | | 175,927,429 |
| Member services and acquisition | 77,898,138 | | 77,898,138 | 76,546,402 | | 76,546,402 |
| Administrative | 27,860,599 | | 27,860,599 | 10,125,180 | | 10,125,180 |
| Executive office | 39,052,148 | | 39,052,148 | 32,077,548 | | 32,077,548 |
| Fundraising | 57,158,230 | | 57,158,230 | 48,581,269 | | 48,581,269 |
| Total expenses | 366,732,740 | | 366,732,740 | 343,257,828 | | 343,257,828 |
| Change in net assets before other changes | (5,110,176) | (2,038,097) | (7,148,273) | (28,861,243) | 4,974,178 | (23,887,065) |
| Unrealized (loss) gain on investments, net | (4,066,534) | (962,733) | (5,029,267) | 1,472,290 | 787,771 | 2,260,061 |
| Unrealized gain on derivative instrument | 745,782 | | 745,782 | 952,998 | | 952,998 |
| (Loss) gain on interest in intermediated entity | (2,414,024) | | (2,414,024) | 2,731,203 | | 2,731,203 |
| Net gain on retirement obligation | 4,927,105 | | 4,927,105 | 6,778,316 | | 6,778,316 |
| Change in net assets | (5,917,847) | (3,000,830) | (8,918,677) | (16,926,436) | 5,761,949 | (11,164,487) |
| Net assets (deficit), beginning of year as previously presented | (30,358,932) | 55,309,135 | 24,950,203 | (14,853,143) | 50,967,833 | 36,114,690 |
| Reclassification to implement ASU 2016-14 | | | | 1,420,647 | (1,420,647) | - |
| Underwater endowments | | | | | | |
| Net assets (deficit), end of year as reclassified | $ (35,276,779) | $ 52,308,305 | $ 16,031,526 | $ (30,358,932) | $ 55,309,135 | $ 24,950,203 |

The accompanying notes are an integral part of these financial statements.

3

NATIONAL RIFLE ASSOCIATION OF AMERICA
STATEMENTS OF FUNCTIONAL EXPENSES
for the years ended December 31, 2018 and 2017

## 2018

| | Legislative | Publications | Public Affairs | Shows & Exhibits | Competitions | Education & Training | Hunter Services | Field Services | Law Enforcement | Recreational Shooting | Total Program Expenses | Member Svc & Acq. | Administrative | Executive | Advancement/ Fundraising | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Salaries, benefits and taxes | $15,518,932 | $8,338,069 | $ - | $2,538,945 | $1,630,311 | $1,656,151 | $499,582 | $1,305,682 | $1,680,552 | $2,776,605 | $36,351,669 | $4,950,560 | $3,315,637 | $14,277,182 | $3,681,033 | $62,555,087 |
| Office supplies | 2,131,164 | 138,276 | - | 1,947,194 | 446,787 | 117,169 | 16,725 | 548,027 | 149,836 | 304,930 | 5,498,108 | 189,106 | 88,200 | 326,097 | 589,660 | 6,668,184 |
| Travel & entertainment | 2,401,868 | 597,119 | - | 488,465 | 384,330 | 222,612 | 37,981 | 860,604 | 601,658 | 207,311 | 5,905,946 | 217,469 | 127,692 | 1,260,942 | 929,957 | 8,472,206 |
| Fulfillment material | - | - | - | - | 68,955 | 322,387 | - | - | 113,283 | 67,701 | 572,346 | 7,838,029 | - | - | 2,072,449 | 10,480,623 |
| Occupancy | 662,745 | 346,741 | - | 60,512 | 133,200 | 260,776 | 7,894 | 128,707 | 142,154 | 1,128,567 | 2,891,108 | 418,269 | 651,700 | 444,231 | 397,167 | 4,802,502 |
| Data processing | 909,041 | 677,843 | - | 566,625 | 681,547 | 1,105,153 | - | 1,381,442 | 489,529 | 531,503 | 6,544,286 | 1,160,177 | 283,313 | 2,834,297 | 685,059 | 11,707,131 |
| Printing and publications | - | 25,286,139 | - | - | - | - | - | - | - | - | 25,286,139 | - | - | - | - | 25,286,139 |
| Member communications | - | - | - | - | - | - | - | - | - | - | - | 58,985,128 | - | - | 29,373,954 | 88,359,082 |
| Advertising | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 11,381,850 | 11,381,850 |
| Committee & annual mtgs | - | - | - | - | - | - | - | - | - | - | - | - | - | 3,169,779 | - | 3,169,779 |
| Legal, audit and taxes | 8,633,178 | - | - | - | - | - | - | - | - | - | 8,633,178 | - | 21,558,748 | - | 1,170,467 | 31,382,393 |
| Professional services and other | 12,542,220 | 682,399 | 37,565,494 | 6,912,528 | 883,489 | 1,321,499 | 980,501 | 878,213 | 286,794 | 1,034,986 | 65,098,143 | 3,389,639 | 379,291 | 18,127,555 | 6,283,486 | 91,268,125 |
| Depreciation & amortization | 357,283 | 270,229 | 426,331 | 77,550 | 95,999 | 105,598 | 13,203 | 560,003 | 85,657 | 612,937 | 2,938,510 | 616,234 | 910,191 | 379,281 | 281,829 | 4,678,550 |
| Cost of merchandise sold | - | - | - | 3,477,651 | 50,722 | 624,782 | - | - | 44,811 | 235,203 | 4,389,150 | - | - | - | - | 4,389,150 |
| Interest expense | 219,425 | 114,801 | - | 20,034 | - | 86,339 | 2,544 | 42,613 | 47,655 | 373,501 | 937,044 | 138,482 | 565,679 | 147,078 | 131,496 | 1,939,740 |
| | $43,376,477 | $38,460,363 | $37,931,825 | $17,788,663 | $4,568,844 | $6,022,846 | $1,556,662 | $5,859,291 | $3,653,649 | $7,327,265 | $164,763,625 | $77,889,138 | $27,680,599 | $39,052,146 | $57,156,200 | $388,732,740 |

## 2017

| | Legislative | Publications | Public Affairs | Shows & Exhibits | Competitions | Education & Training | Hunter Services | Field Services | Law Enforcement | Recreational Shooting | Total Program Expenses | Member Svc & Acq. | Administrative | Executive | Advancement/ Fundraising | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Salaries, benefits and taxes | $13,713,230 | $8,544,090 | $ - | $2,119,332 | $1,796,030 | $2,538,456 | $676,355 | $2,406,603 | $1,697,321 | $2,637,283 | $41,626,700 | $4,888,592 | $3,286,130 | $13,030,022 | $3,058,226 | $66,789,562 |
| Office supplies | 1,632,532 | 154,864 | - | 1,554,684 | 615,305 | 182,283 | 71,747 | 583,359 | 140,335 | 382,933 | 5,577,530 | 182,465 | 91,916 | 325,672 | 540,919 | 6,668,495 |
| Travel & entertainment | 2,091,359 | 674,177 | - | 601,751 | 376,650 | 260,024 | 74,738 | 1,088,148 | 557,453 | 286,550 | 6,002,893 | 270,687 | 102,519 | 1,199,728 | 1,101,240 | 8,083,247 |
| Fulfillment material | - | - | - | - | 47,529 | 420,492 | - | - | 147,047 | 73,557 | 688,625 | 7,588,592 | - | - | 2,073,008 | 10,350,275 |
| Occupancy | 604,018 | 316,015 | - | 55,149 | 139,624 | 351,906 | 7,003 | 117,302 | 129,557 | 1,208,563 | 2,749,157 | 381,232 | 618,800 | 392,812 | 235,042 | 4,376,943 |
| Data processing | 728,244 | 815,247 | - | 383,123 | 763,890 | 1,450,044 | - | 1,228,630 | 437,161 | 557,678 | 6,171,817 | 1,075,181 | 286,835 | 2,401,703 | 803,432 | 10,741,068 |
| Printing and publications | - | 25,348,243 | - | - | - | - | - | - | - | - | 25,348,243 | - | - | - | - | 25,348,243 |
| Member communications | - | - | - | - | - | - | - | - | - | - | - | 58,718,873 | - | - | 21,162,242 | 78,681,115 |
| Advertising | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 10,243,229 | 10,243,229 |
| Committee & annual mtgs | - | - | - | - | - | - | - | - | - | - | - | - | - | 2,561,307 | - | 2,561,307 |
| Legal, audit and taxes | 6,612,772 | - | - | - | - | - | - | - | - | - | 6,612,772 | - | 4,356,063 | - | 923,660 | 11,892,525 |
| Professional services and other | 10,770,399 | 716,266 | 43,767,728 | 10,243,198 | 800,454 | 1,609,332 | 3,104,763 | 1,770,528 | 310,477 | 937,253 | 73,040,421 | 2,703,402 | 158,650 | 11,575,161 | 7,173,832 | 94,749,465 |
| Depreciation & amortization | 378,782 | 244,864 | 351,004 | 74,390 | 99,139 | 108,545 | 21,085 | 638,508 | 85,774 | 592,333 | 2,590,204 | 598,037 | 892,553 | 353,266 | 284,255 | 4,718,295 |
| Cost of merchandise sold | - | - | - | 3,549,119 | 15,948 | 645,682 | 199 | 0 | 54,952 | 293,043 | 4,558,840 | - | - | - | - | 4,558,840 |
| Interest expense | 211,041 | 110,414 | - | 19,269 | 49,784 | 122,954 | 2,447 | 40,685 | 45,287 | 359,076 | 960,297 | 133,201 | 362,482 | 137,177 | 82,122 | 1,675,219 |
| | $36,740,357 | $38,904,090 | $44,138,732 | $18,600,015 | $4,702,453 | $7,689,318 | $3,958,334 | $7,882,084 | $3,805,344 | $7,200,332 | $175,927,429 | $76,586,402 | $10,125,180 | $32,077,548 | $48,381,289 | $345,257,828 |

The accompanying notes are an integral part of these financial statements.

**NATIONAL RIFLE ASSOCIATION OF AMERICA**
**STATEMENTS OF CASH FLOWS**
**for the years ended December 31, 2018 and 2017**

| | 2018 | 2017 |
|---|---|---|
| Cash flows from operating activities: | | |
| Change in net assets | $ (8,918,677) | $ (11,164,487) |
| Adjustments to reconcile change in net assets to net cash provided by (used in) operating activities: | | |
| Depreciation and amortization | 4,879,550 | 4,718,295 |
| Provision for losses on pledges receivable | 10,961 | 7,711 |
| Provision for losses on accounts receivable | 4,671,652 | 6,324,662 |
| Provision for losses on inventory | 150,000 | 360,692 |
| Contributions restricted for long-term investment | (1,781,726) | (2,144,164) |
| Net unrealized and realized loss (gain) on investments | 4,030,931 | (6,313,424) |
| Unrealized gain on derivative instrument | (745,782) | (952,998) |
| Net gain on pension obligation | (4,927,105) | (6,778,316) |
| Net loss on disposal of assets | 249,751 | 31,495 |
| Changes in assets and liabilities: | | |
| Decrease in pledges receivable | 332,070 | 323,999 |
| (Increase) decrease in accounts receivable, net | (10,000,518) | 7,094,143 |
| Decrease (increase) in due from affiliates | 2,035,442 | (3,327,840) |
| Decrease in inventories and supplies, net | 2,856,877 | 3,209,377 |
| Decrease in prepaid expenses | 97,968 | 510,355 |
| Decrease (increase) in other assets | 41,833 | (425,438) |
| Increase (decrease) in accounts payable | 1,353,528 | (5,351,028) |
| (Decrease) increase in accrued liabilities | (1,870,631) | 6,974,744 |
| Increase (decrease) in deferred revenue | 15,177,754 | (8,021,797) |
| Total adjustments | 16,562,555 | (3,759,532) |
| Net cash provided by (used in) operating activities | 7,643,878 | (14,924,019) |
| Cash flows from investing activities: | | |
| Sales of investments | 9,261,323 | 27,222,671 |
| Purchases of investments | (9,684,509) | (16,431,830) |
| Purchases of property and equipment | (3,363,172) | (1,888,920) |
| Net cash (used in) provided by investing activities | (3,786,358) | 8,901,921 |
| Cash flows from financing activities: | | |
| Principal payments on note payable | (1,107,008) | (1,039,944) |
| Principal payments on lines of credit | (150,171,240) | (132,737,519) |
| Draw downs on lines of credit and proceeds on note payable | 152,295,560 | 138,060,439 |
| Proceeds from life insurance policy loans | 3,500,000 | 3,500,000 |
| Principal payments on life insurance policy loans | (3,500,000) | - |
| Contributions restricted for long-term investment | 1,781,726 | 2,144,164 |
| Net cash provided by financing activities | 2,799,038 | 9,927,140 |
| Net increase in cash and cash equivalents | 6,656,558 | 3,905,042 |
| Cash and cash equivalents at beginning of year | 17,123,743 | 13,218,701 |
| Cash and cash equivalents at end of year | $ 23,780,301 | $ 17,123,743 |
| Supplemental disclosure of cash flow information: | | |
| Cash paid during the year for interest | $ 1,945,983 | $ 1,680,243 |

The accompanying notes are an integral
part of these financial statements.

5

**NATIONAL RIFLE ASSOCIATION OF AMERICA**
**NOTES TO FINANCIAL STATEMENTS**

1.  NATURE OF ACTIVITIES AND SIGNIFICANT ACCOUNTING POLICIES

The National Rifle Association of America (NRA), founded in 1871, is a not-for-profit corporation supported by the membership fees of public-minded citizens and clubs. Its primary purpose is to protect and defend the Constitution of the United States of America, especially the political, civil and inalienable rights of the American people to keep and bear arms as a common law and Constitutional right of the individual citizen.

The NRA's Board of Directors formed the Institute for Legislative Action (ILA) in 1975 as an internal division of the NRA. The purpose of ILA is to prevent the passage of laws and regulations restricting firearms ownership, as well as pursuing changes to existing restrictions imposed by federal, state and local governments. ILA is supported principally by contributions from NRA members.

Basis of Presentation

The NRA publishes financial statements in the NRA's annual report that include the financial statements of certain affiliated entities, which are its primary financial statements for the years ended December 31, 2018 and 2017. These financial statements for the years ended December 31, 2018 and 2017 are not intended to be the general purpose financial statements of the NRA and have been prepared in conformity with accounting principles that would otherwise be considered a departure from accounting principles generally accepted in the United States of America because certain affiliated organizations are not consolidated.

Affiliates of the NRA whose financial activities are not included in these financial statements of the NRA include the following: the NRA Foundation, Inc. (Foundation), the NRA Civil Rights Defense Fund (CRDF), the NRA Political Victory Fund (PVF), the NRA Special Contribution Fund (SCF) and the NRA Freedom Action Foundation (FAF).

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities as of the date of the financial statements and the reported amounts of revenue and other support and expenses during the reporting period. Actual results could differ from those estimates.

Certain amounts from the prior year have been reclassified to conform with the current year presentation. These reclassifications had no effect on the previously reported net assets or change in net assets.

Classification of Net Assets

To identify the observance of limitations and restrictions placed on the use of the resources available to the NRA, the accounts of the NRA are maintained in two separate classes of net assets: without donor restrictions, and with donor restrictions, based on the existence or absence of donor-imposed restrictions.

Net assets without donor restrictions represent resources that are not restricted by donor-imposed stipulations. They are available for support of the NRA's general operations.

Net assets with donor restrictions represent contributions and other inflows of assets whose use by the NRA for its programs are limited by donor-imposed stipulations. Some donor-imposed restrictions are temporary in that they either expire by passage of time or can be fulfilled and removed by actions of the NRA pursuant to those stipulations. Other donor restrictions are perpetual in nature, where by the donor has stipulated the funds be maintained in perpetuity.

Appx. 374

**NATIONAL RIFLE ASSOCIATION OF AMERICA**
**NOTES TO FINANCIAL STATEMENTS**

Cash and Cash Equivalents

Highly liquid investments, consisting principally of money market funds, under the control of the NRA's investment managers, are considered investments. However, the NRA considers any other investments with an original maturity of three months or less at the date of purchase to be cash equivalents. The NRA generally invests these excess funds in repurchase agreements for U.S. government securities. The maturity date of these repurchase agreements is the next day of business. Due to the short-term nature of these agreements, the NRA does not take possession of the securities, which are instead held by the NRA's principal bank from which it purchases the securities. The carrying value of the investments approximates fair value because of the short maturity of the agencies. The NRA believes that it is not exposed to any significant risk on its investments in repurchase agreements. Substantially all the cash and cash equivalents were held at one financial institution in Virginia at December 31, 2018 and 2017.

Concentrations of Credit Risk

The NRA maintains a cash balance in excess of federally insured limits in an interest bearing account. The NRA's policy is to deposit funds only in financially sound institutions. Nevertheless, these deposits are subject to some degree of credit risk. Investments are maintained in financial institutions.

Concentrations of credit risk with respect to accounts receivable that are not collateralized are limited due to the large number of members comprising the NRA's membership base and their dispersion across many different geographies.

The NRA invests in a professionally managed portfolio that primarily contains money market funds, equity securities, fixed income securities, and alternative investments. Such investments are exposed to various risks, such as market and credit. Due to the level of risk associated with such investments, and the level of uncertainty related to changes in the value of such investments, it is at least reasonably possible that changes in risk in the near term would materially affect investment balances and the amounts reported in the financial statements.

Investments

Investments consist primarily of money market funds, equity securities, fixed income securities, and alternative investments. Investments in money market funds, equity securities and fixed income securities are carried at fair value as determined by an independent market valuation service using the closing prices at the end of the period. In calculating realized gains and losses, the cost of securities sold is determined by the specific-identification method. To adjust the carrying value of the investments, the change in fair value is included in other changes in the statements of activities. Interest income and dividends are recorded on the accrual basis.

Alternative investments are valued at fair value based on the applicable net asset value per share as of the measurement date, which is a practical expedient, as determined by the NRA. In determining fair value, the NRA utilizes valuations provided by the fund managers. The underlying investments value securities and other financial instruments on a fair value basis of accounting. The estimated fair values of certain investments of the underlying investments, which may include private placements and other securities for which prices are not readily available, are determined by the general partner of the investment and may not reflect amounts that could be realized upon immediate sale, nor amounts that ultimately may be realized. Accordingly, the estimated fair values may differ significantly from the values that would have been used had a ready market existed for these

7

**NATIONAL RIFLE ASSOCIATION OF AMERICA**
**NOTES TO FINANCIAL STATEMENTS**

investments. The fair value of the NRA's alternative investments generally represents the amount the NRA would expect to receive if it were to liquidate its investment excluding any redemption charges that may apply.

Pledges Receivable

Pledges receivable due in more than one year have been recorded at the present value of estimated cash flows. An allowance for uncollectible pledges receivable is provided based upon management's judgment of potential defaults.

Accounts Receivable

Membership dues, advertising and other accounts receivable are recorded at the invoiced amount and do not bear interest. Membership contributions receivables are recorded when received. The allowance for doubtful accounts is the NRA's best estimate of the amount of probable credit losses in existing accounts receivable. The NRA determines the membership dues accounts receivable allowance based on the aging of accounts receivable, where three or more monthly or quarterly invoices are past due. The NRA determines all other allowances based on historical write-off experience and specific identification. The allowances for doubtful accounts are reviewed monthly and accounts receivable balances are written off against the allowance when the NRA feels probable the receivable will not be recovered.

Inventories and Supplies

Inventories and supplies are stated at the lower of cost or net realizable value, with costs determined using the first-in, first-out method. Provisions are made to reduce the inventories to net realizable value in cases of obsolescence.

Property and Equipment

Property and equipment are stated at cost, less accumulated depreciation. Donated assets are recorded at the appraised or estimated fair value at the time of donation. Expenditures for maintenance and repairs, which do not prolong the useful lives of the assets, are expensed. Depreciation is computed on the straight-line method over the assets' estimated useful lives. Buildings and improvements are depreciated over useful lives ranging from 20 to 45 years, other property and equipment is depreciated over two to ten years. The NRA capitalizes complete desktop and laptop computers greater than $500 and all other fixed assets greater than $1,500.

Members' Dues

A portion of members' dues that represents the present value of the cost of the magazine that is a benefit of membership for the given membership term is deferred and amortized over the life of the membership. The portion considered a contribution is recorded as dues revenue when the membership is received.

Contributions

Unconditional contributions, whether without donor restrictions or with donor restrictions, are recognized as revenue when received and classified in the appropriate net asset category. When the temporary restrictions are met by the NRA which were specified by the donor, contributions with restrictions are released from restriction and are recognized in the net asset without restrictions category.

8

**NATIONAL RIFLE ASSOCIATION OF AMERICA
NOTES TO FINANCIAL STATEMENTS**

Revenue Recognition

Program fees, advertising, member sales, shows and exhibit sales, and insurance administration fees are recognized as revenue when earned. Rental income is recognized on a straight-line basis over the term of the lease.

Derivative Financial Instruments

Interest rate swaps are entered into to manage interest rate risks associated with the NRA's borrowing. Interest rate swaps are accounted for in accordance with the Financial Accounting Standards Board Accounting Standard Codification (the Codification) topic, *Derivatives and Hedging,* under which the NRA is not allowed to use cash flow hedging. Therefore, the interest rate swap is recorded in the statements of financial position at fair value with fair value changes recorded as an unrealized gain on derivative instrument on the statements of activities and statements of cash flows (Note 9).

Valuation of Long-Lived Assets

Long-lived assets and certain identifiable intangible assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of long-lived assets is measured by a comparison of the carrying amount of the asset to future undiscounted net cash flows expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the estimated fair value of the assets. Assets to be disposed of are reportable at the lower of the carrying amount or fair value, less cost to sell. The NRA had no impairments of long-lived assets during 2018 or 2017.

Outstanding Legacies

The NRA is the beneficiary under various wills and other agreements, the total realizable amounts of which are not presently determinable. The NRA's share of such amounts is not recorded until the NRA has an irrevocable right to the bequest and the proceeds are measurable.

Functional Allocation of Expenses

The costs of providing program services and supporting activities have been accounted for on a functional basis in the statements of activities. Accordingly, certain costs have been allocated among the program services and supporting activities. Such allocations are determined by management on an equitable basis. Occupancy and interest expenses are allocated based on square footage. Certain depreciation is directly charged to applicable areas and certain depreciation is allocated based on square footage or number of employees. Data processing and certain executive salaries and benefits are allocated based on time and effort.

Adopted accounting pronouncement

In August 2016, the FASB issued ASU No. 2016-14, Not-for-Profit Entities (Topic 958): Presentation of Financial Statements of Not-for-Profit Entities. The amendments in this ASU are intended to make improvements to the information provided in the financial statements and the accompanying notes of not-for-profit entities. The amendments set forth the FASB's improvements to net asset classification requirements and the information presented about a not-for-profit entity's liquidity, financial performance and cash flows. The ASU was adopted by the NRA in 2018.

9

**NATIONAL RIFLE ASSOCIATION OF AMERICA**
**NOTES TO FINANCIAL STATEMENTS**

_____

Pending accounting pronouncements

In February 2016, FASB issued Accounting Standards Update (ASU) No. 2016-02, Leases (Topic 842). The guidance in this ASU supersedes the leasing guidance in Topic 840, Leases. Under the new guidance, lessees are required to recognize lease assets and lease liabilities on the statement of financial position for all leases with terms longer than 12 months. Leases will be classified as either finance or operating, with classification affecting the pattern of expense recognition in the statement of activities. The new standard is effective for fiscal years beginning after December 15, 2019.In May 2014, the FASB issued ASU No. 2014-09, Revenue from Contracts with Customers (Topic 606), requiring an entity to recognize the amount of revenue to which it expects to be entitled for the transfer of promised goods or services to customers. The updated standard will replace most existing revenue recognition guidance in generally accepted accounting principles in the United States of America (U.S. GAAP) when it becomes effective and permits the use of either a full retrospective or retrospective with cumulative effect transition method. In August 2015, the FASB issued ASU No. 2015-14, which defers the effective date of ASU No. 2014-09 one year, making it effective for annual reporting periods beginning after December 15, 2018. The NRA has not yet selected a transition method and is currently evaluating the effect that the standard will have on the financial statements.

In June 2018, the FASB issued ASU No. 2018-08, Not-for-Profit Entities (Topic 958): Clarifying the Scope and the Accounting Guidance for Contributions Received and Contributions Made, which provides additional guidance on characterizing grants and similar contracts with resource providers as either exchange transactions or contributions, as well as distinguishing between conditional contributions and unconditional contributions. The updated standard will be effective for resource recipients for annual reporting periods beginning after December 15, 2018 and resource providers one year later. Management is currently evaluating the effect on the financial statements.

Tax Status

The NRA is exempt from federal income taxes under Section 501(c)(4) of the Internal Revenue Code and from state income taxes. The NRA activities that cause imposition of the unrelated business income tax provision of the Code result in no significant tax liability.

The NRA follows the accounting standard on accounting for uncertainty in income taxes, which addresses the determination of whether tax benefits claimed or expected to be claimed on a tax return should be recorded in the financial statements. Under this guidance, the NRA may recognize the tax benefit from an uncertain tax position only if it is more-likely-than-not that the tax position will be sustained on examination by taxing authorities, based on the technical merits of the position. The tax benefits recognized in the financial statements from such a position are measured based on the largest benefit that has a greater than 50% likelihood of being realized upon ultimate settlement. The guidance on accounting for uncertainty in income taxes also addresses de-recognition, classification, interest and penalties on income taxes, and accounting in interim periods.

Management evaluated the NRA's tax positions and concluded that the NRA had taken no uncertain tax positions that require adjustment to the financial statements to comply with the provisions of this guidance.

Subsequent Events

The NRA evaluated subsequent events through March 13, 2019, which is the date the financial statements were available to be issued.

### NATIONAL RIFLE ASSOCIATION OF AMERICA
### NOTES TO FINANCIAL STATEMENTS

2.  AVAILABILITY AND LIQUIDITY

The following represents NRA's financial assets and liquidity resources at December 31, 2018 and 2017:

| | 2018 | 2017 |
|---|---|---|
| Financial assets at year-end: | | |
| Cash and cash equivalents | $ 23,780,301 | $ 17,123,743 |
| Accounts receivable available within one year, net | 14,310,969 | 12,463,413 |
| Due from affiliates | 5,315,563 | 7,854,291 |
| Investments | 45,094,991 | 48,702,736 |
| Total financial assets | $ 88,501,824 | $ 86,144,183 |
| | | |
| Less amounts not available to be used within one year: | | |
| Net assets with donor restrictions | 28,927,335 | 32,431,451 |
| | 28,927,335 | 32,431,451 |
| Financial assets available to meet general expenditures over the next twelve months | $ 59,574,489 | $ 53,712,732 |

The NRA maintains a policy of structuring its financial assets to be available as its general operating expenses come due. In addition, to manage liquidity the NRA maintains a line of credit with a bank that is drawn upon as needed during the year to manage cash flows.

3.  INVESTMENTS

Investments as of December 31, 2018 and 2017 consist of:

| | 2018 | 2017 |
|---|---|---|
| Money market funds | $ 157,520 | $ 640,820 |
| Equity securities | 32,640,202 | 38,484,411 |
| Fixed income securities | 8,021,148 | 3,056,353 |
| Alternative investments | 3,405,044 | 5,874,330 |
| Other | 871,077 | 646,822 |
| | $ 45,094,991 | $ 48,702,736 |

Investment (loss) income for the years ended December 31, 2018 and 2017 includes the following:

| | 2018 | 2017 |
|---|---|---|
| Realized gains, net | $ 998,336 | $ 4,053,363 |
| Dividends and interest | 1,131,372 | 762,293 |
| | 2,129,708 | 4,815,656 |
| Unrealized (losses) gains, net | (5,029,267) | 2,260,061 |
| | $ (2,899,559) | $ 7,075,717 |

Interest income of $120,000 and $120,000, earned from notes receivable for 2018 and 2017, respectively, is included in dividends and interest.

11

Appx. 379

**NATIONAL RIFLE ASSOCIATION OF AMERICA**
**NOTES TO FINANCIAL STATEMENTS**

4.    PLEDGES RECEIVABLE

At December 31, 2018 and 2017, donors to the NRA have unconditionally promised to give amounts as follows:

|  | 2018 | 2017 |
|---|---|---|
| Within one year | $ 112,900 | $ 197,286 |
| One to five years | 116,537 | 298,006 |
| More than five years | 621,799 | 753,169 |
|  | 851,236 | 1,248,461 |
| Less: discount of pledges receivable | (362) | (18,595) |
|  | 850,874 | 1,229,866 |
| Less: allowance for uncollectible pledges | (9,312) | (45,273) |
|  | $ 841,562 | $ 1,184,593 |

Pledges due in more than one year have been recorded at the present value of estimated cash flows, discounted by rates ranging from 0.88% to 2.22%.

5.    ACCOUNTS RECEIVABLE

Accounts receivable as of December 31, 2018 and 2017 consist of:

|  | 2018 | 2017 |
|---|---|---|
| Membership | $ 48,428,577 | $ 40,354,236 |
| Contributions | 3,603,517 | 3,119,379 |
| Advertising | 3,149,717 | 3,412,352 |
| Other | 1,274,664 | 1,353,358 |
|  | 56,456,475 | 48,239,325 |
| Less: allowance for doubtful accounts | 14,998,434 | 12,110,150 |
|  | $ 41,458,041 | $ 36,129,175 |

Following are the changes in the allowance for doubtful accounts during the years ended December 31, 2018 and 2017, respectively:

|  | 2018 | 2017 |
|---|---|---|
| Allowance at beginning of year | $ 12,110,150 | $ 16,478,863 |
| Provision for losses on accounts receivable | 4,671,652 | 6,324,662 |
| Write-offs, net of recoveries | (1,783,368) | (10,693,375) |
| Allowance at end of year | $ 14,998,434 | $ 12,110,150 |

Appx. 380

**NATIONAL RIFLE ASSOCIATION OF AMERICA**
**NOTES TO FINANCIAL STATEMENTS**

6.  INVENTORIES AND SUPPLIES

Inventories and supplies as of December 31, 2018 and 2017 consist of:

|  | 2018 | 2017 |
|---|---|---|
| Sales inventories | $ 2,549,261 | $ 3,667,792 |
| Supplies: | | |
| Magazine paper | 1,997,175 | 1,650,439 |
| Fulfillment and promotional materials | 6,066,869 | 9,048,870 |
| Other | 967,588 | 63,664 |
| | 11,580,893 | 14,430,765 |
| Less: obsolescence allowance | 948,716 | 791,711 |
| | $ 10,632,177 | $ 13,639,054 |

7.  NOTES RECEIVABLE

Notes receivable as of December 31, 2018 and 2017 consist of:

|  | Interest Rate | 2018 | 2017 |
|---|---|---|---|
| NRA Special Contribution Fund | 4.0% | $ 3,000,000 | $ 3,000,000 |

The note receivable from the SCF is a demand note, collateralized by a first deed of trust on approximately 33,300 acres of land south of Raton, New Mexico. During the years ended December 31, 2018 and 2017, interest in the amount of $120,000 and $120,000 respectively, was recorded. The total interest receivable remaining at December 31, 2018 and 2017, respectively, is $3,639,073 and is included in other assets in the statements of financial position.

8.  PROPERTY AND EQUIPMENT

Property and equipment as of December 31, 2018 and 2017 consist of:

|  | 2018 | 2017 |
|---|---|---|
| Land | $ 5,380,792 | $ 5,380,792 |
| Buildings and improvements | 55,410,753 | 54,253,187 |
| Furniture, fixtures and equipment | 18,634,456 | 17,994,728 |
| | 79,426,001 | 77,628,707 |
| Less: accumulated depreciation | 46,716,970 | 43,153,547 |
| | $ 32,709,031 | $ 34,475,160 |

Depreciation expense for the years ended December 31, 2018 and 2017 was $4,879,550 and $4,718,295, respectively.

**NATIONAL RIFLE ASSOCIATION OF AMERICA**
**NOTES TO FINANCIAL STATEMENTS**

_____

9.   NOTES PAYABLE AND CREDIT AGREEMENTS

At December 31, 2018 and 2017, $17,680,174 and $18,787,182, respectively, was payable under a credit agreement with a bank, which expires on October 1, 2019.  Under the terms of this agreement, the NRA pays a fixed rate of 6.08%.

This credit agreement incorporates an interest rate swap agreement.  This swap agreement is recognized on the statements of financial position in accrued liabilities at its fair value of $429,922 and $1,175,704 as of December 31, 2018 and 2017, respectively.

The NRA maintained a $25,000,000 line of credit agreement which expired on September 27, 2018. Under the terms of this agreement, the NRA made monthly interest payments on the daily outstanding principal at a variable rate based on the 30-day LIBOR rate, plus 0.60%. On September 27, 2018, the NRA entered into a $28,000,000 line of credit agreement which expires September 27, 2021.  Under the terms of this agreement, the NRA makes monthly interest payments on the daily outstanding principal at a variable rate based on the 30-day LIBOR rate, plus 0.70%.  At December 31, 2018 and 2017, $25,458,238 and $23,333,918 was payable under the different agreements at interest rates of 3.10% and 2.16%, respectively.

During 2017, the NRA entered a secured loan agreement with the Foundation where the NRA's accounts receivable served as collateral, which expired on February 2, 2018.   Under the terms of this agreement, the NRA made annual interest payments of 7.00%.  In January 2018, the agreement was amended to extend the loan to June 2, 2018 with interest to be paid monthly. The loan, however, was repaid in March 2018. During 2018, the NRA entered another secured loan agreement with the Foundation where the NRA's accounts receivable serve as collateral, which expires October 3, 2019.  Under the terms of this agreement, the NRA makes monthly interest payments of 7.00%.  At December 31, 2018 and 2017, $5,000,000 was payable under the agreement.

On the $28,000,000 line of credit agreement, the NRA has pledged as collateral $34,741,486 at December 31, 2018, in cash and investments held in certain custodial accounts by the bank.  For the credit agreement, the NRA has also pledged as collateral a Deed of Trust on the NRA Headquarters Building.

The NRA is subject to financial covenants associated with the credit agreement and lines of credit agreements. The NRA must maintain minimum cash and investment balances.

The annual minimum payments related to these obligations at December 31, 2018 are as follows:

| | |
|---|---|
| 2019 | $ 22,680,173 |
| 2020 | - |
| 2021 | 25,458,239 |
| Total minimum future payments | $ 48,138,412 |

Interest expense for the years ended December 31, 2018 and 2017, was $1,830,724 and $1,585,858, respectively.

NATIONAL RIFLE ASSOCIATION OF AMERICA
NOTES TO FINANCIAL STATEMENTS

10. FAIR VALUE MEASUREMENTS

The NRA follows the Codification on *Fair Value Measurement,* which defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date and sets out a fair value hierarchy. The fair value hierarchy gives the highest priority to quoted prices in active markets for identical assets or liabilities (Level 1) and the lowest priority to unobservable inputs (Level 3). Inputs are broadly defined as assumptions market participants would use in pricing an asset or liability. The three levels of the fair value hierarchy are described below:

Level 1: Unadjusted quoted prices in active markets for identical assets or liabilities that the reporting entity has the ability to access at the measurement date.

Level 2: Inputs other than quoted prices within Level 1 that are observable for the asset or liability, either directly or indirectly; and fair value is determined through the use of models or other valuation methodologies.

Level 3: Inputs are unobservable for the asset or liability and include situations where there is little, if any, market activity for the asset or liability. The inputs into the determination of fair value are based upon the best information in the circumstances and may require significant management judgment or estimation.

In certain cases, the inputs used to measure fair value may fall into different levels of the fair value hierarchy. In such cases, an investment's level within the fair value hierarchy is based on the lowest level of input that is significant to the fair value measurement. The NRA's assessment of the significance of a particular input to the fair value measurement in its entirety requires judgment, and considers factors specific to the investment.

In determining the appropriate levels, the NRA performs a detailed analysis of the assets and liabilities that are subject to fair value measurements. At each reporting period, all assets and liabilities for which the fair value measurement is based on significant unobservable inputs are classified as Level 3.

The estimated fair values of the NRA's short-term financial instruments, including receivables and payables arising in the ordinary course of operations, approximate their individual carrying amounts due to the relatively short period of time between their origination and expected realization.

The carrying value of the NRA's note payable and credit agreement approximates fair value as the interest rate on the credit agreement's underlying instruments fluctuate with market rates.

15

**NATIONAL RIFLE ASSOCIATION OF AMERICA**
**NOTES TO FINANCIAL STATEMENTS**

The tables below present the balances of each class of assets and liabilities measured at fair value on a recurring basis by level within the hierarchy.

|  | As of December 31, 2018 | | |
|---|---|---|---|
|  | Total | Level 1 | Level 2 |
| Available-for-sale equity securities: |  |  |  |
| Consumer discretionary | $ 254,630 | $ 254,630 | $ - |
| Consumer staples | 425,035 | 425,035 | - |
| Energy | 945,645 | 945,645 | - |
| Financial services | 97,545 | 97,545 | - |
| Healthcare | 382,118 | 382,118 | - |
| Industrials | 246,862 | 246,862 | - |
| Information technology | 815,491 | 815,491 | - |
| Materials | 1,594,010 | 1,594,010 | - |
| Multi-strategy mutual funds | 27,601,940 | 27,601,940 | - |
| Telecommunications | 276,926 | 276,926 | - |
| Total available-for-sale equity securities | 32,640,202 | 32,640,202 | - |
| Available-for-sale fixed income securities: |  |  |  |
| Multi-strategy bond funds | 8,021,148 | 8,021,148 | - |
| Money market | 157,520 | 157,520 | - |
| Alternative investments: |  |  |  |
| Multi-strategy fund-of-funds [measured using a net asset value per share (or its equivalent) practical expedient] | 3,405,044 | - | - |
| Investments at fair value | $ 44,223,914 | $ 40,818,870 | $ - |
| Other investments | 871,077 |  |  |
| Total investments | $ 45,094,991 |  |  |
| Other assets – multi-strategy mutual funds: |  |  |  |
| Deferred compensation plan | $ 2,949,908 | $ 2,949,908 | $ - |
| Supplemental executive retirement plan | 1,055,242 | 1,055,242 | - |
| Total other assets | $ 4,005,150 | $ 4,005,150 | $ - |
| Total assets | $ 49,100,141 | $ 44,824,020 | $ - |
| Interest rate swap | $ (429,922) | $ - | $ (429,922) |
| Deferred compensation liability | (2,949,908) | - | (2,949,908) |
| Supplemental executive retirement liability | (1,055,242) | - | (1,055,242) |
| Total liabilities | $ (4,435,072) | $ - | $ (4,435,072) |

16

**NATIONAL RIFLE ASSOCIATION OF AMERICA**
**NOTES TO FINANCIAL STATEMENTS**

|  | As of December 31, 2017 | | |
|---|---|---|---|
|  | Total | Level 1 | Level 2 |
| Available-for-sale equity securities: |  |  |  |
| Consumer discretionary | $ 312,920 | $ 312,920 | $ - |
| Consumer staples | 583,095 | 583,095 | - |
| Energy | 441,004 | 441,004 | - |
| Financial services | 21,721 | 21,721 | - |
| Healthcare | 355,704 | 355,704 | - |
| Industrials | 347,757 | 347,757 | - |
| Information technology | 1,356,506 | 1,356,506 | - |
| Materials | 1,837,405 | 1,837,405 | - |
| Multi-strategy mutual funds | 33,097,623 | 33,097,623 | - |
| Telecommunications | 130,676 | 130,676 | - |
| Total available-for-sale equity securities | 38,484,411 | 38,484,411 | - |
| Available-for-sale fixed income securities: |  |  |  |
| Multi-strategy bond funds | 3,056,353 | 3,056,353 | - |
| Money market | 640,820 | 640,820 | - |
| Alternative investments: |  |  |  |
| Multi-strategy fund-of-funds [measured using a net asset value per share (or its equivalent) practical expedient] | 5,874,330 | - | - |
| Investments at fair value | $ 48,055,914 | $ 42,181,584 | $ - |
| Other investments | 646,822 |  |  |
| Total investments | $ 48,702,736 |  |  |
| Other assets – multi-strategy mutual funds: |  |  |  |
| Deferred compensation plan | $ 2,886,533 | $ 2,886,533 | $ - |
| Supplemental executive retirement plan | 1,156,982 | 1,156,982 | - |
| Total other assets | $ 4,043,515 | $ 4,043,515 | $ - |
| Total assets | $ 52,746,251 | $ 46,225,099 | $ - |
| Interest rate swap | $ ( 1,175,704) | $ - | $ (1,175,704) |
| Deferred compensation liability | (2,886,533) | - | (2,886,533) |
| Supplemental executive retirement liability | (1,156,982) | - | (1,156,982) |
| Total liabilities | $ (5,219,219) | $ - | $ (5,219,219) |

Appx. 385

### NATIONAL RIFLE ASSOCIATION OF AMERICA
### NOTES TO FINANCIAL STATEMENTS

Money market funds, equity securities and fixed income securities are classified as Level 1 instruments as they are actively traded on public exchanges.

Deferred compensation plan and supplemental executive retirement plan assets are based upon the fair market value of those assets, which are observable inputs and classified as Level 1. The deferred compensation liability is not publically traded and is, therefore, considered Level 2.

The NRA's swap agreement is valued based on quoted values stated by the bank's mark-to-market estimate using stated fixed rate and LIBOR interest ratings. The interest rate is observable at commonly quoted indexes for the full term of the instrument and is, therefore, considered a Level 2 item.

The table below presents additional information regarding the alternative investments.

| | 2018 Fair Value | 2017 Fair Value | Unfunded Commitments | Redemption Frequency | Redemption Notice Period |
|---|---|---|---|---|---|
| Multi-strategy fund-of-funds (a) | $ - | $ 2,408,648 | $ - | quarterly | 65 days |
| Multi-strategy fund-of-funds (b) | 3,020,588 | 3,043,894 | - | semi-annually | 105 days |
| Multi-strategy fund (c) | 384,456 | 421,788 | - | daily | 1 day |
| | $ 3,405,044 | $ 5,874,330 | $ - | | |

(a) This class invests in hedge funds that pursue multiple strategies to diversify risks and reduce volatility. The hedge funds' composite portfolio for this class includes investments in long, short equity portfolio funds (investments in emerging markets and multiple sectors), directional macro strategy funds (investments in trade futures, options, futures and foreign exchange contracts, and diversified markets), event driven portfolio funds (investments in risk arbitrage, distressed and special situations, and opportunistic investing), relative value portfolio funds (investments in arbitrage, commodity trading advisors and market neutral strategies), and global asset allocation portfolio funds (investment in currencies, bonds, global equities and equity indices). The fair value of the investments in this class have been estimated using the net asset value per share of the investments.

(b) This class invests in hedge funds that pursue multiple strategies to diversify risks and reduce volatility. The hedge fund-of-funds' composite portfolio for this class includes investments in private investment companies (investment in global, distressed/credit, domestic healthcare and other) and securities (common stock). The fair value of the investments in this class have been estimated using the net asset value per share of the investments.

(c) This class invests in a managed futures product that pursue multiple strategies to diversify risks and reduce volatility. The multi-strategy fund composite portfolio for this class includes investments in private investment companies (investment in currency, bonds, interest rates, commodities and other) and securities (common stock). The fair value of the investments in this class have been estimated using the net asset value per share of the investment.

18

**NATIONAL RIFLE ASSOCIATION OF AMERICA**
**NOTES TO FINANCIAL STATEMENTS**

11.    NET ASSETS WITH DONOR RESTRICTIONS AND DONOR RESTRICTED ENDOWMENT

Net assets with donor restrictions are available for the following purposes:

|  | 2018 | 2017 |
|---|---|---|
| Legislative programs | $ 21,246,525 | $ 21,468,256 |
| National Firearms Museum | 9,101,835 | 10,139,854 |
| Education and training | 6,298,991 | 6,641,962 |
| Recreational Shooting | 2,973,902 | 3,270,389 |
| Hunter services | 5,546,494 | 5,769,085 |
| Competitions | 1,492,184 | 1,481,987 |
| Field services | 255,055 | 283,422 |
| Law enforcement | 819,764 | 712,791 |
| Community outreach | 76,385 | 61,663 |
| Other | 4,424,698 | 4,687,453 |
| Other, passage of time | 72,472 | 792,273 |
| Total | $ 52,308,305 | $ 55,309,135 |

The NRA follows the Codification subtopic *Reporting endowment funds.* The Codification addresses accounting issues related to guidelines in the Uniform Prudent Management of Institutional Funds Act of 2006 (UPMIFA), which was adopted by the National Conferences of Commissioners on Uniform State Laws in July 2006 and enacted in the Commonwealth of Virginia on July 1, 2008 and by the State of New York on September 17, 2010. The Management of the NRA has interpreted UPMIFA as requiring the preservation of the fair value of original donor-restricted endowment gifts as of the date of the gift absent explicit donor stipulations to the contrary. As a result of this interpretation, the NRA classifies as net assets with donor restrictions (a) the original value of cash gifts donated to permanent donor restricted endowment and (b) the discounted value of future gifts promised to permanent donor restricted endowment, net of allowance for uncollectible pledges. The remaining portion of donor restricted endowment funds not classified in net assets with donor restrictions is classified as net assets with donor restrictions until those amounts are appropriated for expenditure by the NRA in a manner consistent with the standard of prudence prescribed by UPMIFA. In accordance with UPMIFA, the NRA considers the following factors in making a determination to appropriate or accumulate donor-restricted endowment funds:

- The duration and preservation of the fund
- The purposes of the NRA and donor-restricted endowment fund
- General economic conditions
- The possible effect of inflation and deflation
- The expected total return from income and the appreciation of investments
- Other resources of the NRA
- The investment policies of the NRA

The NRA has adopted investment and spending policies for donor-restricted endowment assets that attempt to provide a predictable stream of funding to the programs supported by its endowment while seeking to maintain purchasing power of the endowment assets. The investment policy of the NRA is to achieve, at a minimum, a real (inflation adjusted) total net return that exceeds spending policy requirements. Investments are diversified both by asset class and within asset classes. The purpose of diversification is to minimize unsystematic risk and to provide reasonable assurance that no single security or class of securities will have a disproportionate impact on the total portfolio. The amount appropriated for expenditure from the endowment fund's fair value as of the end of the preceding year, as long as the value of the endowment does not drop below the original contribution(s). All earnings of the endowment are reflected as net assets with donor restrictions until appropriated for expenditure in the form of program spending.

19

**NATIONAL RIFLE ASSOCIATION OF AMERICA**
**NOTES TO FINANCIAL STATEMENTS**

The NRA's endowment is composed solely of donor restricted funds. The changes in endowment net assets for the years ended December 31, 2018 and 2017 are as follows:

|  | 2018 | 2017 |
|---|---|---|
| Endowment net assets, beginning of year | $51,889,998 | $ 46,569,526 |
| Interest and dividends, net | 475,047 | 1,725,921 |
| Net (depreciation) appreciation | (3,618,641) | 3,279,468 |
| Contributions | 1,708,726 | 2,107,078 |
| Amount appropriated for expenditure | (1,780,774) | (1,791,995) |
| Endowment net assets, end of year | $48,674,356 | $ 51,889,998 |

The related assets are included in due from affiliates, investments and pledges receivable.

From time to time, the fair value of assets associated with individual donor-restricted endowment funds may fall below the level that the donor or UPMIFA requires the NRA to retain as a fund of perpetual duration. In accordance with accounting principles generally accepted in the United States, deficiencies of this nature that are reported in net assets with donor restrictions as of December 31, 2018 and 2017, were $2,053,356 and $396,736, respectively. The deficiencies in the donor-restricted endowment funds at December 31, 2018 and 2017, resulted from unfavorable market fluctuations and the continued appropriation of endowment assets, which was deemed prudent by the NRA. The total amount of the original gifts that have fallen below the level that the donor requires as of December 31, 2018 and 2017, were $21,058,804 and $17,735,887, respectively.

The NRA has reclassified $1,420,647 of underwater endowments, from net assets without donor restrictions to net assets with donor restrictions as of January 1, 2017 to conform with the new standards as required by ASU 2016-14.

12. RETIREMENT PLANS

Certain NRA employees participate in a non-contributory, defined benefit retirement plan (the Plan). Benefits under the Plan are generally based on years of service and final average pay. The NRA's policy is to fund pension costs as accrued. Effective January 1, 2008, the NRA amended the Plan so that employees hired on or after January 1, 2008, will not be eligible to participate in the Plan. Effective December 31, 2018, the NRA froze the Plan and employees will no longer earn additional benefits under the Plan.

The primary investment objectives of the Plan are to provide a long-term, risk-controlled approach using diversified investment options. The NRA may consider all asset classes allowed by the Employee Retirement Income Security Act of 1974 and other applicable law as acceptable investment options.

Appx. 388

**NATIONAL RIFLE ASSOCIATION OF AMERICA**
**NOTES TO FINANCIAL STATEMENTS**

The net periodic pension costs for the years ended December 31, 2018 and 2017 consist of the following:

|  | 2018 | 2017 |
|---|---|---|
| Service cost - benefits earned during the year | $ 3,344,289 | $ 3,303,061 |
| Interest cost on projected benefit obligation | 6,011,108 | 5,648,941 |
| Return on plan assets | (7,552,421) | (6,244,120) |
| Recognized net actuarial loss | 2,253,340 | 3,450,270 |
| Net amortization and deferral | 1,362,712 | 98,035 |
| Net periodic benefit cost | 5,419,028 | 6,256,187 |
| Recognized curtailment loss | 8,718,656 | - |
| Other changes | (13,645,761) | (6,778,316) |
| Net recognized curtailment loss and other changes | (4,927,105) | (6,778,316) |
| Total recognized in statements of activities | $ 491,923 | $ (522,129) |

The following table sets forth the changes in the defined benefit pension plan's funded status and the amount of accrued pension costs for the plan years ended December 31, 2018 and 2017 (utilizing a measurement date of December 31):

|  | 2018 | 2017 |
|---|---|---|
| **Change in benefit obligation:** | | |
| Projected benefit obligation at beginning of year | $ 147,957,262 | $ 137,051,874 |
| Service cost | 3,344,289 | 3,303,061 |
| Interest cost | 6,011,108 | 5,648,941 |
| Actuarial (gain) loss | (13,322,876) | 5,519,857 |
| Benefits paid | (6,452,460) | (3,771,868) |
| Plan amendments | 9,309,837 | 205,397 |
| Plan curtailments | (12,728,696) | - |
| Projected benefit obligation at end of year | $ 134,118,464 | $ 147,957,262 |
| | | |
| **Change in plan assets:** | | |
| Fair value of plan assets at beginning of year | $ 98,260,092 | $ 86,832,575 |
| Actual return on plan assets | (7,878,261) | 15,199,385 |
| Employer contributions | 7,600,000 | - |
| Benefits paid | (6,452,460) | (3,771,868) |
| Fair value of plan assets at end of year | 91,529,371 | 98,260,092 |
| | | |
| Accrued pension costs reflected in the statements of financial position in accrued liabilities | $ (42,589,093) | $ (49,697,170) |
| | | |
| Accumulated benefit obligation | $ (134,118,464) | $ (132,178,862) |
| | | |
| **Amounts recognized in net assets without donor restrictions:** | | |
| Total net loss | $ 19,611,103 | $ 32,485,333 |
| Prior service cost | - | 771,531 |
| Total | $ 19,611,103 | $ 33,256,864 |

The total net loss and prior service cost for the defined pension plan that will be amortized from net assets into the net periodic benefit cost over the next year are $880,576 and $0, respectively.

21

## NATIONAL RIFLE ASSOCIATION OF AMERICA
## NOTES TO FINANCIAL STATEMENTS

The following weighted-average assumptions were used in calculating the above benefit obligations, net periodic benefit cost and fair value of plan assets at December 31, 2018 and 2017:

|  | 2018 | 2017 |
|---|---|---|
| Discount rate used to determine benefit obligation | 4.45% | 3.90% |
| Discount rate used to determine net periodic benefit cost | 3.90% | 4.15% |
| Rate of compensation increase | 4.00% | 4.00% |
| Expected return on plan assets | 8.00% | 8.00% |

The basis used to determine the overall expected long-term rate of return on assets utilizing the target asset allocations established within the plan is based on historical returns.

The asset allocation strategy is based on several factors including:

- The relationship between the current and projected assets of the Plan and the projected actuarial liability stream;
- The historical performance of capital markets adjusted for the perception of future short- and long-term capital market performance;
- The perception of future economic conditions, including inflation and interest rate assumptions.

The asset allocation strategy shall identify target allocations to eligible asset classes and, where appropriate, suitable ranges within which each asset class can fluctuate as a percent of the total fund. Each asset class is to remain suitably invested at all times in either cash (or cash equivalents) or permitted securities within each asset class. The asset classes may be rebalanced from time to time to take advantage of tactical misvaluations across major asset classes or investment styles, or to align the current asset mix with strategic targets.

Following is a description of the valuation methodologies used for assets measured at fair value at December 31, 2018 and 2017.

*Multi-strategy equity and fixed income mutual funds and Pooled separate accounts*: Primarily valued at the net asset value (NAV) per share based on quoted market prices of the underlying investments as reported by the investment advisor using the audited financial statements of the underlying investments. The individual annuities invest in separate accounts, which track the performance of the specific underlying mutual funds. A valuation agent is selected for each mutual fund and PSA. The valuation of the net assets is calculated on each open market day.

The methods described above may produce a fair value calculation that may not be indicative of net realizable value or reflective of future fair values. Furthermore, while the Plan believes its valuation methods are appropriate and consistent with other market participants, the use of different methodologies or assumptions to determine the fair value of certain results in a different fair value measurement at the reporting date.

Investments measured at net asset value (or equivalent) as a practical expedient have not been classified in the fair value hierarchy. The amounts of investments are included below.

Appx. 390

### NATIONAL RIFLE ASSOCIATION OF AMERICA
### NOTES TO FINANCIAL STATEMENTS

At December 31, 2018 and 2017, the fair value and the asset allocation of the NRA's pension plan assets was as follows:

|  | 2018 | | 2017 | |
|---|---|---|---|---|
| Asset category: | | | | |
| Multi-strategy equity Mutual funds/PSAs | $ 55,411,934 | 60.5% | $ 61,965,743 | 63.0% |
| Multi-strategy fixed income Mutual funds/ PSAs | 35,569,933 | 38.9 | 36,014,604 | 36.7 |
| Cash | 547,504 | 0.6 | 279,745 | 0.3 |
|  | $ 91,529,371 | 100.0% | $ 98,260,092 | 100.0% |

The NRA contributes to the plan based on actuarially determined amounts necessary to provide assets sufficient to meet benefits to be paid to plan members. NRA annually funds the minimum required contribution. Expected contributions for the plan year ending December 31, 2019 are $4,500,000.

The following plan year benefit payments, which reflect expected future service, as appropriate, are expected to be paid over the next 10 fiscal years:

| | |
|---|---|
| 2019 | $ 6,012,421 |
| 2020 | $ 6,246,760 |
| 2021 | $ 6,700,276 |
| 2022 | $ 6,849,292 |
| 2023 | $ 7,182,166 |
| 2024 – 2028 (total) | $ 38,557,012 |

In addition, in 1997, the NRA established a 401(k) plan for employees. The plan, available to all employees after 90 days of service, permits participants to contribute a portion of their salary on a pre-tax basis. The NRA matches participant contributions based on plan provisions. Participants are 100% vested in employer contributions after three years of service. The vested balance is available to participants at termination, retirement, death, disability, hardships or through eligible loans. Employer contributions to the 401(k) plan totaled $2,569,393 and $2,430,068 for the years ended December 31, 2018 and 2017, respectively.

The NRA also maintains a deferred compensation agreement (the Agreement) for certain officers and employees. The Agreement is offered at the sole discretion of its Board of Directors, which may amend or terminate the Agreement at any time. The Agreement is funded through whole life insurance policies on the plan beneficiaries. The NRA is the policy owner and beneficiary.

Currently, several key employees are enrolled in the Agreement. Management believes that no unfunded liability exists under the Agreement. At December 31, 2018 and 2017, the NRA had assets relating to the cash surrender values of the whole life insurance policies of $4,406,082 and $4,182,192, respectively. At December 31, 2018 and 2017, the NRA had loans against the whole life insurance policies of $3,535,004 and $3,535,370, respectively, with the net included in investments on the statement of financial position. The policies serve as the underlying collateral for the loans and interest on the loans is accrued at rates between 4.20% and 4.25%. The NRA had an accrued postretirement liability of $278,958 and $275,795 at December 31, 2018 and 2017, respectively. Deferred compensation expense for the years ended December 31, 2018 and 2017 was $(30,955) and $71,973 respectively.

23

## NATIONAL RIFLE ASSOCIATION OF AMERICA
## NOTES TO FINANCIAL STATEMENTS

The NRA has established a 457(b) deferred compensation plan for the benefit of certain employees. This plan is employee funded, and therefore, the NRA did not contribute to this plan during the years ended December 31, 2018 and 2017. At December 31, 2018 and 2017, the NRA held assets, and had related obligations, relating to this plan of $2,949,908 and $2,886,533, respectively.

The NRA has also established a 457(f) supplemental executive retirement plan for the benefit of certain executives. At December 31, 2018 and 2017, the NRA held assets, and had related obligations, relating to the plan of $1,055,242 and $1,156,982, respectively. The NRA incurred deferred compensation expense of $206,700 for the years ended December 31, 2018 and 2017.

For both plans, the assets are included in other assets and the liabilities are included in accrued liabilities on the statements of financial position.

13. RENTAL OPERATIONS AS LESSOR

The NRA leases a portion of its headquarters building and adjacent property to tenants under various operating leases. These leases include renewal options and escalation clauses and require that the tenants pay for their prorated share of the building operating expenses.

The following is a schedule of minimum future rentals on non-cancellable operating leases as of December 31, 2018:

|  |  |
|---|---|
| 2019 | $ 1,179,547 |
| 2020 | 878,796 |
| 2021 | 775,193 |
| 2022 | 752,222 |
| 2023 | 913,527 |
| 2024 & Thereafter | 2,079,638 |
| Total minimum future rentals | $ 6,578,923 |

Total rental income for the years ended December 31, 2018 and 2017 was $1,357,108 and $1,255,235, respectively.

14. COMMITMENTS AND CONTINGENCIES

Leases

The NRA leases warehouse, office space and equipment under non-cancellable operating leases with terms expiring through 2022. The lease agreements for various office space include renewal options and escalation clauses and require that the NRA pay for shared operating expenses.

24

**NATIONAL RIFLE ASSOCIATION OF AMERICA**
**NOTES TO FINANCIAL STATEMENTS**

The annual minimum payments related to these obligations as of December 31, 2018 are as follows:

|  |  |  |
|---|---|---|
| 2019 | $ | 1,414,035 |
| 2020 |  | 821,277 |
| 2021 |  | 458,502 |
| 2022 |  | 194,912 |
| Total minimum payments required | $ | 2,888,726 |

Total lease expense for the years ended December 31, 2018 and 2017 was $1,410,079 and $1,298,089, respectively.

Litigation and claims

NRA is subject to various legal proceedings as well as federal and state government agency inquires. In the opinion of the management of the NRA, there are no material pending legal proceedings to which the NRA will be found liable. Management also believes the federal and state inquiries have no merit and will be resolved to the benefit of the NRA.

15.   RELATED PARTIES

The NRA and the NRA Foundation are financially interrelated entities as the NRA is able to influence the Foundation's operating and financial decisions as well as the NRA having ongoing economic interest in the net assets of the Foundation. The NRA is affiliated with CRDF, SCF and the FAF by virtue of the control vested with the NRA's Board of Directors to appoint the Board of Trustees of each affiliate. The PVF is a separately unincorporated political action committee of the NRA whose five officers are NRA employees. The NRA provides certain benefits to the affiliates at no cost, among which are the use of office space and other administrative and support services. Management has determined that the fair value of these benefits is minimal, and accordingly, no amounts are reflected in these financial statements.

The Foundation reimburses the NRA for certain expenses, such as salaries, benefits, and general operating expenses, paid by the NRA on the Foundation's behalf. These expenses totaled $17,482,315 and $6,017,801 for the years ended December 31, 2018 and 2017, respectively. As of December 31, 2018 and 2017, $28,501,182 and $29,542,563 respectively, was owed to the NRA and included in due from affiliates for reimbursements and pass through funds still held by the Foundation. In addition, certain qualified NRA programs were funded by Foundation grants totaling $13,498,464 and $18,812,141 for the years ended December 31, 2018 and 2017, respectively.

The CRDF reimburses the NRA for general operating expenses paid by the NRA on the CRDF's behalf. As of December 31, 2018 and 2017, $3,161 and $1,040,733, respectively, was owed to the NRA for general operating expenses and included in due from affiliates.

All permanent employees of the SCF are maintained as employees of the NRA and the SCF reimburses the NRA for the total employee costs including benefits. The SCF reimburses the NRA for certain other expenses paid by the NRA on the SCF's behalf. As of December 31, 2018 and 2017, $192,190 and $148,679, respectively, was owed to the NRA for salaries, insurance and benefits net of certain other expenses owed by the NRA to the SCF and included in due from affiliates. See also Note 6.

The NRA paid administrative and fundraising expenses of $5,105,006 and $2,968,011 for the years ended December 31, 2018 and 2017, respectively, on behalf of the PVF.

25

COPY OF WITHIN PAPER
RECEIVED

NOV 15 2019

NYS OFFICE OF THE ATTORNEY GENERAL
CHARITIES BUREAU

Form **990**

OMB No. 1545-0047

## Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)

▶ Do not enter social security numbers on this form as it may be made public.

▶ Go to *www.irs.gov/Form990* for instructions and the latest information.

Department of the Treasury
Internal Revenue Service

**2019**

**Open to Public Inspection**

**A** For the 2019 calendar year, or tax year beginning _____ , 2019, and ending _____ , 20 ____

| B Check if applicable: | C Name of organization NATIONAL RIFLE ASSOCIATION OF AMERICA | | D Employer identification number |
|---|---|---|---|
| ☐ Address change | Doing business as | | 53-0116130 |
| ☐ Name change | Number and street (or P.O. box if mail is not delivered to street address) | Room/suite | E Telephone number |
| ☐ Initial return | 11250 WAPLES MILL ROAD | | (703) 267-1000 |
| ☐ Final return/terminated | City or town, state or province, country, and ZIP or foreign postal code | | |
| ☐ Amended return | FAIRFAX, VA 22030 | | G Gross receipts $ 302,740,488 |
| ☐ Application pending | F Name and address of principal officer: WAYNE R LAPIERRE | | H(a) Is this a group return for subordinates? ☐ Yes ☑ No |
| | SAME AS C ABOVE | | H(b) Are all subordinates included? ☐ Yes ☐ No |
| I Tax-exempt status: ☐ 501(c)(3) ☑ 501(c) ( 4 ) ◀ (insert no.) ☐ 4947(a)(1) or ☐ 527 | | | If "No," attach a list. (see instructions) |
| J Website: ▶ WWW.NRA.ORG | | | H(c) Group exemption number ▶ |

**K** Form of organization: ☑ Corporation ☐ Trust ☐ Association ☐ Other ▶ _____ **L** Year of formation: 1871 **M** State of legal domicile: NY

## Part I Summary

**1** Briefly describe the organization's mission or most significant activities: FIREARMS SAFETY, EDUCATION, AND TRAINING; AND ADVOCACY ON BEHALF OF SAFE AND RESPONSIBLE GUN OWNERS

**2** Check this box ▶ ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets.

| | | | |
|---|---|---|---|
| **3** | Number of voting members of the governing body (Part VI, line 1a) | **3** | 73 |
| **4** | Number of independent voting members of the governing body (Part VI, line 1b) | **4** | 63 |
| **5** | Total number of individuals employed in calendar year 2019 (Part V, line 2a) | **5** | 770 |
| **6** | Total number of volunteers (estimate if necessary) | **6** | 150,000 |
| **7a** | Total unrelated business revenue from Part VIII, column (C), line 12 | **7a** | 22,618,742 |
| **b** | Net unrelated business taxable income from Form 990-T, line 39 | **7b** | 0 |

| | | Prior Year | Current Year |
|---|---|---|---|
| Revenue | **8** Contributions and grants (Part VIII, line 1h) | 108,599,726 | 109,439,440 |
| | **9** Program service revenue (Part VIII, line 2g) | 193,010,155 | 134,011,736 |
| | **10** Investment income (Part VIII, column (A), lines 3, 4, and 7d) | 2,192,041 | 5,035,760 |
| | **11** Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 48,748,942 | 42,668,528 |
| | **12** Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 352,550,864 | 291,155,464 |
| Expenses | **13** Grants and similar amounts paid (Part IX, column (A), lines 1–3) | 75,661 | 103,491 |
| | **14** Benefits paid to or for members (Part IX, column (A), line 4) | 0 | 0 |
| | **15** Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | 63,864,842 | 56,740,325 |
| | **16a** Professional fundraising fees (Part IX, column (A), line 11e) | 7,798,658 | 5,269,873 |
| | **b** Total fundraising expenses (Part IX, column (D), line 25) ▶ 45,441,923 | | |
| | **17** Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) | 283,536,156 | 241,273,626 |
| | **18** Total expenses. Add lines 13–17 (must equal Part IX, column (A), line 25) | 355,275,317 | 303,387,315 |
| | **19** Revenue less expenses. Subtract line 18 from line 12 | (2,724,453) | (12,231,851) |

| | | Beginning of Current Year | End of Year |
|---|---|---|---|
| Net Assets or Fund Balances | **20** Total assets (Part X, line 16) | 197,212,080 | 198,746,752 |
| | **21** Total liabilities (Part X, line 26) | 181,180,554 | 189,092,595 |
| | **22** Net assets or fund balances. Subtract line 21 from line 20 | 16,031,526 | 9,654,157 |

## Part II Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

| Sign Here | Signature of officer | Date |
|---|---|---|
| | WAYNE R LAPIERRE, EXECUTIVE VICE PRESIDENT | |
| | Type or print name and title | |

| Paid Preparer Use Only | Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|---|
| | Firm's name ▶ | | | Firm's EIN ▶ | |
| | Firm's address ▶ | | | Phone no. | |

May the IRS discuss this return with the preparer shown above? (see instructions) . . . . . . . . . ☐ Yes ☐ No

For Paperwork Reduction Act Notice, see the separate instructions. Cat. No. 11282Y Form **990** (2019)

Form 990 (2019)                                                                                                    Page **2**

| **Part III** | **Statement of Program Service Accomplishments** | |
|---|---|---|

Check if Schedule O contains a response or note to any line in this Part III . . . . . . . . . . . . . ☑

**1** Briefly describe the organization's mission:

PER NRA BYLAWS, TO PROTECT AND DEFEND THE U.S. CONSTITUTION; TO PROMOTE PUBLIC SAFETY, LAW AND
ORDER, AND NATIONAL DEFENSE; TO TRAIN LAW ENFORCEMENT AGENCIES AND CIVILIANS IN MARKSMANSHIP; TO
PROMOTE SHOOTING SPORTS AND HUNTING.

**2** Did the organization undertake any significant program services during the year which were not listed on the
prior Form 990 or 990-EZ? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☑ **No**
If "Yes," describe these new services on Schedule O.

**3** Did the organization cease conducting, or make significant changes in how it conducts, any program
services? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☑ **No**
If "Yes," describe these changes on Schedule O.

**4** Describe the organization's program service accomplishments for each of its three largest program services, as measured by
expenses. Section 501(c)(3) and 501(c)(4) organizations are required to report the amount of grants and allocations to others,
the total expenses, and revenue, if any, for each program service reported.

**4a** (Code: _____ ) (Expenses $ _____121,344,093 including grants of $ _____103,491 ) (Revenue $ _____120,556,156 )
NRA MEMBERSHIP SUPPORT INCLUDES PUBLICATIONS, EDUCATION AND TRAINING, FIELD SERVICES, COMPETITIVE
SHOOTING, LAW ENFORCEMENT, HUNTER SERVICES, MEMBER COMMUNICATIONS SERVICES, MEMBER PROGRAMS, MEMBER
SERVICES, AND FULFILLMENT OF MEMBER SERVICES. THE CHIEF VALUE OF NRA MEMBERSHIP IS IN GUN SAFETY AND
TRAINING ALONG WITH REGULAR REINFORCEMENT OF THESE LESSONS AND PRINCIPLES BY KEEPING ENGAGED WITH
THE COMMUNITY OF OUTDOOR LOVERS AND SAFE AND RESPONSIBLE SHOOTING ENTHUSIASTS. NRA MEMBERSHIP
SUPPORT AND FULFILLMENT ARE DEDICATED TO PROVIDING NRA MEMBERS WITH HIGH QUALITY SUPPORT AS WELL AS
CONTENT DELIVERED THROUGH MANY PLATFORMS. SAFE AND RESPONSIBLE GUN OWNERSHIP REMAINS THE CORNERSTONE
OF EVERYTHING THE ASSOCIATION PROVIDES FOR MEMBERS.

**4b** (Code: _____ ) (Expenses $ _____27,138,998 including grants of $ _____0 ) (Revenue $ _____0 )
THE NRA INSTITUTE FOR LEGISLATIVE ACTION ADVOCATES ON BEHALF OF SAFE AND RESPONSIBLE GUN OWNERS. AS
THE FOREMOST PROTECTOR AND DEFENDER OF THE SECOND AMENDMENT, THE NRA PROMOTES FIREARMS SAFETY,
ADVOCATES AGAINST EFFORTS TO ERODE GUN RIGHTS AND FREEDOMS, FIGHTS FOR INITIATIVES AIMED AT REDUCING
VIOLENT CRIME, AND PROMOTES HUNTERS'RIGHTS AND CONSERVATION EFFORTS. NRA MEMBERS RECOGNIZE THIS
VITAL IMPORTANCE OF NRAILA'S TRUE GRASSROOTS WORK TO PRESERVE THE SECOND AMENDMENT FOR FUTURE
GENERATIONS OF SHOOTERS AND OUTDOOR SPORTSMEN AND SPORTSWOMEN. THIS LEGION OF ENGAGED AND MOTIVATED
MEMBERS IS THE REASON FOR THE NRA'S STRENGTH.

**4c** (Code: _____ ) (Expenses $ _____16,001,367 including grants of $ _____0 ) (Revenue $ _____19,828,137 )
NRA SHOWS AND EXHIBITS INCLUDE THE NRA ANNUAL MEETINGS AND MEMBERS EXHIBIT HALL, HELD IN A DIFFERENT
CITY EACH YEAR, AND OTHER SHOWS AROUND THE COUNTRY. THE ANNUAL MEETINGS AND EXHIBITS ARE PRESENTED
AS A CELEBRATION OF AMERICAN FREEDOM FEATURING ACRES OF EXHIBITS, PREMIER EVENTS, EDUCATIONAL
SEMINARS AND WORKSHOPS, AND FUN-FILLED ACTIVITIES FOR THE ENTIRE FAMILY. INDIANAPOLIS, INDIANA WAS
THE 2019 HOST CITY. OTHER NRA HOSTED SHOWS INCLUDED THE GREAT AMERICAN OUTDOOR SHOW HELD IN
HARRISBURG, PENNSYLVANIA.

**4d** Other program services (Describe on Schedule O.)
(Expenses $ _____31,766,483 including grants of $ _____0 ) (Revenue $ _____564,907 )
**4e** Total program service expenses ▶ _____196,250,941

Form **990** (2019)

Form 990 (2019)                                                                    Page **3**

| **Part IV** | **Checklist of Required Schedules** |

|  |  | | Yes | No |
|---|---|---|---|---|
| 1 | Is the organization described in section 501(c)(3) or 4947(a)(1) (other than a private foundation)? *If "Yes,"* complete Schedule A . . . . . . . . . . . . . . . . . . . . . . | **1** |  | ✓ |
| 2 | Is the organization required to complete *Schedule B, Schedule of Contributors* (see instructions)? . . . | **2** | ✓ |  |
| 3 | Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office? *If "Yes," complete Schedule C, Part I* . . . . . . . . . . . . . | **3** | ✓ |  |
| 4 | **Section 501(c)(3) organizations.** Did the organization engage in lobbying activities, or have a section 501(h) election in effect during the tax year? *If "Yes," complete Schedule C, Part II* . . . . . . . . . | **4** |  |  |
| 5 | Is the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization that receives membership dues, assessments, or similar amounts as defined in Revenue Procedure 98-19? *If "Yes," complete Schedule C, Part III* | **5** | ✓ |  |
| 6 | Did the organization maintain any donor advised funds or any similar funds or accounts for which donors have the right to provide advice on the distribution or investment of amounts in such funds or accounts? *If "Yes," complete Schedule D, Part I* . . . . . . . . . . . . . . . . . . . . . | **6** |  | ✓ |
| 7 | Did the organization receive or hold a conservation easement, including easements to preserve open space, the environment, historic land areas, or historic structures? *If "Yes," complete Schedule D, Part II* . . . | **7** |  | ✓ |
| 8 | Did the organization maintain collections of works of art, historical treasures, or other similar assets? *If "Yes," complete Schedule D, Part III* . . . . . . . . . . . . . . . . . . . . . | **8** | ✓ |  |
| 9 | Did the organization report an amount in Part X, line 21, for escrow or custodial account liability, serve as a custodian for amounts not listed in Part X; or provide credit counseling, debt management, credit repair, or debt negotiation services? *If "Yes," complete Schedule D, Part IV* . . . . . . . . . . . . | **9** |  | ✓ |
| 10 | Did the organization, directly or through a related organization, hold assets in donor-restricted endowments or in quasi endowments? *If "Yes," complete Schedule D, Part V* . . . . . . . . . . . . . | **10** | ✓ |  |
| 11 | If the organization's answer to any of the following questions is "Yes," then complete Schedule D, Parts VI, VII, VIII, IX, or X as applicable. | | | |
| a | Did the organization report an amount for land, buildings, and equipment in Part X, line 10? *If "Yes," complete Schedule D, Part VI* . . . . . . . . . . . . . . . . . . . . . . | **11a** | ✓ |  |
| b | Did the organization report an amount for investments—other securities in Part X, line 12, that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VII* . . . . . . | **11b** |  | ✓ |
| c | Did the organization report an amount for investments—program related in Part X, line 13, that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VIII* . . . . . | **11c** |  | ✓ |
| d | Did the organization report an amount for other assets in Part X, line 15, that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part IX* . . . . . . . . . . | **11d** | ✓ |  |
| e | Did the organization report an amount for other liabilities in Part X, line 25? *If "Yes," complete Schedule D, Part X* | **11e** | ✓ |  |
| f | Did the organization's separate or consolidated financial statements for the tax year include a footnote that addresses the organization's liability for uncertain tax positions under FIN 48 (ASC 740)? *If "Yes," complete Schedule D, Part X* | **11f** | ✓ |  |
| 12a | Did the organization obtain separate, independent audited financial statements for the tax year? *If "Yes," complete Schedule D, Parts XI and XII* . . . . . . . . . . . . . . . . . . . | **12a** | ✓ |  |
| b | Was the organization included in consolidated, independent audited financial statements for the tax year? *If "Yes," and if the organization answered "No" to line 12a, then completing Schedule D, Parts XI and XII is optional* | **12b** | ✓ |  |
| 13 | Is the organization a school described in section 170(b)(1)(A)(ii)? *If "Yes," complete Schedule E* . . . . | **13** |  | ✓ |
| 14a | Did the organization maintain an office, employees, or agents outside of the United States? . . . . | **14a** |  | ✓ |
| b | Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, investment, and program service activities outside the United States, or aggregate foreign investments valued at $100,000 or more? *If "Yes," complete Schedule F, Parts I and IV.* . . . . | **14b** | ✓ |  |
| 15 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or other assistance to or for any foreign organization? *If "Yes," complete Schedule F, Parts II and IV* . . . . . . . . . | **15** |  | ✓ |
| 16 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or other assistance to or for foreign individuals? *If "Yes," complete Schedule F, Parts III and IV.* . . . . . . | **16** |  | ✓ |
| 17 | Did the organization report a total of more than $15,000 of expenses for professional fundraising services on Part IX, column (A), lines 6 and 11e? *If "Yes," complete Schedule G, Part I* (see instructions) . . . . | **17** | ✓ |  |
| 18 | Did the organization report more than $15,000 total of fundraising event gross income and contributions on Part VIII, lines 1c and 8a? *If "Yes," complete Schedule G, Part II* . . . . . . . . . . . . | **18** | ✓ |  |
| 19 | Did the organization report more than $15,000 of gross income from gaming activities on Part VIII, line 9a? *If "Yes," complete Schedule G, Part III* . . . . . . . . . . . . . . . . . . . . | **19** |  | ✓ |
| 20a | Did the organization operate one or more hospital facilities? *If "Yes," complete Schedule H* . . . . . | **20a** |  | ✓ |
| b | If "Yes" to line 20a, did the organization attach a copy of its audited financial statements to this return? . . | **20b** |  |  |
| 21 | Did the organization report more than $5,000 of grants or other assistance to any domestic organization or domestic government on Part IX, column (A), line 1? *If "Yes," complete Schedule I, Parts I and II* . . . . | **21** | ✓ |  |

Form **990** (2019)

Appx. 397

Form 990 (2019)

Page **4**

| **Part IV** | **Checklist of Required Schedules** *(continued)* | | | |
|---|---|---|---|---|
| | | | Yes | No |
| 22 | Did the organization report more than $5,000 of grants or other assistance to or for domestic individuals on Part IX, column (A), line 2? *If "Yes," complete Schedule I, Parts I and III* . . . . . . . . . | 22 | ✓ | |
| 23 | Did the organization answer "Yes" to Part VII, Section A, line 3, 4, or 5 about compensation of the organization's current and former officers, directors, trustees, key employees, and highest compensated employees? *If "Yes," complete Schedule J* . . . . . . . . . . . . . . . . . . | 23 | ✓ | |
| 24a | Did the organization have a tax-exempt bond issue with an outstanding principal amount of more than $100,000 as of the last day of the year, that was issued after December 31, 2002? *If "Yes," answer lines 24b through 24d and complete Schedule K. If "No," go to line 25a* . . . . . . . . . . . | 24a | | ✓ |
| b | Did the organization invest any proceeds of tax-exempt bonds beyond a temporary period exception? . . | 24b | | |
| c | Did the organization maintain an escrow account other than a refunding escrow at any time during the year to defease any tax-exempt bonds? . . . . . . . . . . . . . . . . . . . . | 24c | | |
| d | Did the organization act as an "on behalf of" issuer for bonds outstanding at any time during the year? . | 24d | | |
| 25a | **Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations.** Did the organization engage in an excess benefit transaction with a disqualified person during the year? *If "Yes," complete Schedule L, Part I* . . . . . | 25a | ✓ | |
| b | Is the organization aware that it engaged in an excess benefit transaction with a disqualified person in a prior year, and that the transaction has not been reported on any of the organization's prior Forms 990 or 990-EZ? *If "Yes," complete Schedule L, Part I* . . . . . . . . . . . . . . . . . | 25b | | ✓ |
| 26 | Did the organization report any amount on Part X, line 5 or 22, for receivables from or payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons? *If "Yes," complete Schedule L, Part II* . . . | 26 | | ✓ |
| 27 | Did the organization provide a grant or other assistance to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor or employee thereof, a grant selection committee member, or to a 35% controlled entity (including an employee thereof) or family member of any of these persons? *If "Yes," complete Schedule L, Part III* . . . . . . . . . . . . . . . | 27 | | ✓ |
| 28 | Was the organization a party to a business transaction with one of the following parties (see Schedule L, Part IV instructions, for applicable filing thresholds, conditions, and exceptions): | | | |
| a | A current or former officer, director, trustee, key employee, creator or founder, or substantial contributor? *If "Yes," complete Schedule L, Part IV* . . . . . . . . . . . . . . . . . . | 28a | ✓ | |
| b | A family member of any individual described in line 28a? *If "Yes," complete Schedule L, Part IV* . . . | 28b | | ✓ |
| c | A 35% controlled entity of one or more individuals and/or organizations described in lines 28a or 28b? *If "Yes," complete Schedule L, Part IV* . . . . . . . . . . . . . . . . . . . | 28c | | ✓ |
| 29 | Did the organization receive more than $25,000 in non-cash contributions? *If "Yes," complete Schedule M* | 29 | ✓ | |
| 30 | Did the organization receive contributions of art, historical treasures, or other similar assets, or qualified conservation contributions? *If "Yes," complete Schedule M* . . . . . . . . . . . . | 30 | ✓ | |
| 31 | Did the organization liquidate, terminate, or dissolve and cease operations? *If "Yes," complete Schedule N, Part I* | 31 | | ✓ |
| 32 | Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets? *If "Yes," complete Schedule N, Part II* . . . . . . . . . . . . . . . . . . . . . | 32 | | ✓ |
| 33 | Did the organization own 100% of an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? *If "Yes," complete Schedule R, Part I* . . . . . . . . | 33 | | ✓ |
| 34 | Was the organization related to any tax-exempt or taxable entity? *If "Yes," complete Schedule R, Part II, III, or IV, and Part V, line 1* . . . . . . . . . . . . . . . . . . . . . . | 34 | ✓ | |
| 35a | Did the organization have a controlled entity within the meaning of section 512(b)(13)? . . . . . | 35a | ✓ | |
| b | If "Yes" to line 35a, did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? *If "Yes," complete Schedule R, Part V, line 2* . | 35b | ✓ | |
| 36 | **Section 501(c)(3) organizations.** Did the organization make any transfers to an exempt non-charitable related organization? *If "Yes," complete Schedule R, Part V, line 2* . . . . . . . . . . . | 36 | | |
| 37 | Did the organization conduct more than 5% of its activities through an entity that is not a related organization and that is treated as a partnership for federal income tax purposes? *If "Yes," complete Schedule R, Part VI* | 37 | | ✓ |
| 38 | Did the organization complete Schedule O and provide explanations in Schedule O for Part VI, lines 11b and 19? **Note:** All Form 990 filers are required to complete Schedule O. . . . . . . . . . | 38 | ✓ | |

| **Part V** | **Statements Regarding Other IRS Filings and Tax Compliance** | | | |
|---|---|---|---|---|
| | Check if Schedule O contains a response or note to any line in this Part V . . . . . . . . . . . . . □ | | | |
| | | | Yes | No |
| 1a | Enter the number reported in Box 3 of Form 1096. Enter -0- if not applicable . . . | 1a | 968 | | |
| b | Enter the number of Forms W-2G included in line 1a. Enter -0- if not applicable . . . . | 1b | 0 | | |
| c | Did the organization comply with backup withholding rules for reportable payments to vendors and reportable gaming (gambling) winnings to prize winners? . . . . . . . . . . . . . | 1c | ✓ | |

Form 990 (2019)                                                                     Page **5**

| **Part V** | **Statements Regarding Other IRS Filings and Tax Compliance** *(continued)* | | | |
|---|---|---|---|---|
| | | | **Yes** | **No** |
| **2a** | Enter the number of employees reported on Form W-3, Transmittal of Wage and Tax Statements, filed for the calendar year ending with or within the year covered by this return   **2a**   770 | | | |
| **b** | If at least one is reported on line 2a, did the organization file all required federal employment tax returns? . | **2b** | ✓ | |
| | **Note:** If the sum of lines 1a and 2a is greater than 250, you may be required to *e-file* (see instructions) . . | | | |
| **3a** | Did the organization have unrelated business gross income of $1,000 or more during the year? . . . | **3a** | | ✓ |
| **b** | If "Yes," has it filed a Form 990-T for this year? *If "No" to line 3b, provide an explanation on Schedule O* . | **3b** | ✓ | |
| **4a** | At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)? | **4a** | | ✓ |
| **b** | If "Yes," enter the name of the foreign country ▶ | | | |
| | See instructions for filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR). | | | |
| **5a** | Was the organization a party to a prohibited tax shelter transaction at any time during the tax year? . . . | **5a** | | ✓ |
| **b** | Did any taxable party notify the organization that it was or is a party to a prohibited tax shelter transaction? | **5b** | | ✓ |
| **c** | If "Yes" to line 5a or 5b, did the organization file Form 8886-T? | **5c** | | |
| **6a** | Does the organization have annual gross receipts that are normally greater than $100,000, and did the organization solicit any contributions that were not tax deductible as charitable contributions? . . . . . | **6a** | ✓ | |
| **b** | If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? . . . . . . . . . . . . . . . . . . . . . . | **6b** | ✓ | |
| **7** | **Organizations that may receive deductible contributions under section 170(c).** | | | |
| **a** | Did the organization receive a payment in excess of $75 made partly as a contribution and partly for goods and services provided to the payor? . . . . . . . . . . . . . . . . . . . . | **7a** | | |
| **b** | If "Yes," did the organization notify the donor of the value of the goods or services provided? . . . | **7b** | | |
| **c** | Did the organization sell, exchange, or otherwise dispose of tangible personal property for which it was required to file Form 8282? . . . . . . . . . . . . . . . . . . . . . . . | **7c** | | |
| **d** | If "Yes," indicate the number of Forms 8282 filed during the year . . . . . .   **7d** | | | |
| **e** | Did the organization receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? | **7e** | | |
| **f** | Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? . | **7f** | | |
| **g** | If the organization received a contribution of qualified intellectual property, did the organization file Form 8899 as required? | **7g** | | |
| **h** | If the organization received a contribution of cars, boats, airplanes, or other vehicles, did the organization file a Form 1098-C? | **7h** | | |
| **8** | **Sponsoring organizations maintaining donor advised funds.** Did a donor advised fund maintained by the sponsoring organization have excess business holdings at any time during the year? . . . . . . . | **8** | | |
| **9** | **Sponsoring organizations maintaining donor advised funds.** | | | |
| **a** | Did the sponsoring organization make any taxable distributions under section 4966? . . . . . . | **9a** | | |
| **b** | Did the sponsoring organization make a distribution to a donor, donor advisor, or related person? . . . | **9b** | | |
| **10** | **Section 501(c)(7) organizations.** Enter: | | | |
| **a** | Initiation fees and capital contributions included on Part VIII, line 12 . . . . . .   **10a** | | | |
| **b** | Gross receipts, included on Form 990, Part VIII, line 12, for public use of club facilities .   **10b** | | | |
| **11** | **Section 501(c)(12) organizations.** Enter: | | | |
| **a** | Gross income from members or shareholders . . . . . . . . . . . .   **11a** | | | |
| **b** | Gross income from other sources (Do not net amounts due or paid to other sources against amounts due or received from them.) . . . . . . . . . .   **11b** | | | |
| **12a** | **Section 4947(a)(1) non-exempt charitable trusts.** Is the organization filing Form 990 in lieu of Form 1041? | **12a** | | |
| **b** | If "Yes," enter the amount of tax-exempt interest received or accrued during the year .   **12b** | | | |
| **13** | **Section 501(c)(29) qualified nonprofit health insurance issuers.** | | | |
| **a** | Is the organization licensed to issue qualified health plans in more than one state? . . . . . . . | **13a** | | |
| | **Note:** See the instructions for additional information the organization must report on Schedule O. | | | |
| **b** | Enter the amount of reserves the organization is required to maintain by the states in which the organization is licensed to issue qualified health plans . . . . . .   **13b** | | | |
| **c** | Enter the amount of reserves on hand . . . . . . . . . . . .   **13c** | | | |
| **14a** | Did the organization receive any payments for indoor tanning services during the tax year? . . . . | **14a** | | ✓ |
| **b** | If "Yes," has it filed a Form 720 to report these payments? *If "No," provide an explanation on Schedule O* . | **14b** | | |
| **15** | Is the organization subject to the section 4960 tax on payment(s) of more than $1,000,000 in remuneration or excess parachute payment(s) during the year? . . . . . . . . . . . . . . . . . | **15** | ✓ | |
| | If "Yes," see instructions and file Form 4720, Schedule N. | | | |
| **16** | Is the organization an educational institution subject to the section 4968 excise tax on net investment income? | **16** | | ✓ |
| | If "Yes," complete Form 4720, Schedule O. | | | |

Form **990** (2019)

Appx. 399

Form 990 (2019)

Page **6**

| **Part VI** | **Governance, Management, and Disclosure** *For each "Yes" response to lines 2 through 7b below, and for a "No" response to line 8a, 8b, or 10b below, describe the circumstances, processes, or changes on Schedule O. See instructions.* |

Check if Schedule O contains a response or note to any line in this Part VI . . . . . . . . . ☑

### Section A. Governing Body and Management

| | | | Yes | No |
|---|---|---|---|---|
| 1a | Enter the number of voting members of the governing body at the end of the tax year . . | 1a | 73 | |
| | If there are material differences in voting rights among members of the governing body, or if the governing body delegated broad authority to an executive committee or similar committee, explain on Schedule O. | | | |
| b | Enter the number of voting members included on line 1a, above, who are independent . | 1b | 63 | |
| 2 | Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? . . . . . . . . . . . . | 2 | ✓ | |
| 3 | Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors, trustees, or key employees to a management company or other person? . | 3 | | ✓ |
| 4 | Did the organization make any significant changes to its governing documents since the prior Form 990 was filed? | 4 | ✓ | |
| 5 | Did the organization become aware during the year of a significant diversion of the organization's assets? . | 5 | ✓ | |
| 6 | Did the organization have members or stockholders? . . . . . . . . . . . . . . . | 6 | ✓ | |
| 7a | Did the organization have members, stockholders, or other persons who had the power to elect or appoint one or more members of the governing body? . . . . . . . . . . . . . . . | 7a | ✓ | |
| b | Are any governance decisions of the organization reserved to (or subject to approval by) members, stockholders, or persons other than the governing body? . . . . . . . . . . . . | 7b | | ✓ |
| 8 | Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following: | | | |
| a | The governing body? . . . . . . . . . . . . . . . . . . . . . . . . | 8a | ✓ | |
| b | Each committee with authority to act on behalf of the governing body? . . . . . . . . . | 8b | ✓ | |
| 9 | Is there any officer, director, trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? *If "Yes," provide the names and addresses on Schedule O* . . . . | 9 | | ✓ |

### Section B. Policies *(This Section B requests information about policies not required by the Internal Revenue Code.)*

| | | | Yes | No |
|---|---|---|---|---|
| 10a | Did the organization have local chapters, branches, or affiliates? . . . . . . . . . . | 10a | | ✓ |
| b | If "Yes," did the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with the organization's exempt purposes? | 10b | | |
| 11a | Has the organization provided a complete copy of this Form 990 to all members of its governing body before filing the form? | 11a | | ✓ |
| b | Describe in Schedule O the process, if any, used by the organization to review this Form 990. | | | |
| 12a | Did the organization have a written conflict of interest policy? *If "No," go to line 13* . . . . . . | 12a | ✓ | |
| b | Were officers, directors, or trustees, and key employees required to disclose annually interests that could give rise to conflicts? | 12b | ✓ | |
| c | Did the organization regularly and consistently monitor and enforce compliance with the policy? *If "Yes," describe in Schedule O how this was done* . . . . . . . . . . . . . . . . . | 12c | ✓ | |
| 13 | Did the organization have a written whistleblower policy? . . . . . . . . . . . . . | 13 | ✓ | |
| 14 | Did the organization have a written document retention and destruction policy? . . . . . . . | 14 | ✓ | |
| 15 | Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? | | | |
| a | The organization's CEO, Executive Director, or top management official . . . . . . . . | 15a | ✓ | |
| b | Other officers or key employees of the organization . . . . . . . . . . . . . . | 15b | ✓ | |
| | If "Yes" to line 15a or 15b, describe the process in Schedule O (see instructions). | | | |
| 16a | Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? . . . . . . . . . . . . . . . . . | 16a | | ✓ |
| b | If "Yes," did the organization follow a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and take steps to safeguard the organization's exempt status with respect to such arrangements? . . . . . . . . . . | 16b | | |

### Section C. Disclosure

| 17 | List the states with which a copy of this Form 990 is required to be filed ▶ AL, AR, AZ, CA, (CONTINUED ON SCHEDULE O) |
|---|---|
| 18 | Section 6104 requires an organization to make its Forms 1023 (1024 or 1024-A, if applicable), 990, and 990-T (Section 501(c) (3)s only) available for public inspection. Indicate how you made these available. Check all that apply. |

☐ Own website  ☐ Another's website  ☑ Upon request  ☐ Other *(explain on Schedule O)*

| 19 | Describe on Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year. |
|---|---|
| 20 | State the name, address, and telephone number of the person who possesses the organization's books and records ▶ |

CRAIG B. SPRAY, TREASURER, 11250 WAPLES MILL RD, FAIRFAX, VA 22030, (703) 267-1000

Appx. 400

Form 990 (2019)                                                                                                    Page **7**

| **Part VII** | **Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors** |

Check if Schedule O contains a response or note to any line in this Part VII . . . . . . . . . . . . . ☑

**Section A.  Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

**1a** Complete this table for all persons required to be listed. Report compensation for the calendar year ending with or within the organization's tax year.

• List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation. Enter -0- in columns (D), (E), and (F) if no compensation was paid.

• List all of the organization's **current** key employees, if any. See instructions for definition of "key employee."

• List the organization's five **current** highest compensated employees (other than an officer, director, trustee, or key employee) who received reportable compensation (Box 5 of Form W-2 and/or Box 7 of Form 1099-MISC) of more than $100,000 from the organization and any related organizations.

• List all of the organization's **former** officers, key employees, and highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations.

• List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations.

See instructions for the order in which to list the persons above.

☐ Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee.

| (A) Name and title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| **(1)** WAYNE R LAPIERRE <br> EXECUTIVE VICE PRESIDENT | 60.0 <br> 1.0 | | | ✓ | | | | 1,810,571 | 0 | 74,138 |
| **(2)** CHRIS COX <br> EXECUTIVE DIRECTOR ILA 6/26/2019 | 58.0 <br> 1.0 | | | ✓ | | | | 1,512,582 | 0 | 59,943 |
| **(3)** OLIVER L NORTH <br> BOARD DIRECTOR | 1.0 <br> 1.0 | ✓ | | | | | | 986,015 | 0 | 0 |
| **(4)** JOSHUA L POWELL <br> CHIEF OF STAFF AND SENIOR STRATEGIST | 50.0 <br> 0.0 | | | | | ✓ | | 858,930 | 0 | 76,151 |
| **(5)** CRAIG B SPRAY <br> TREASURER | 37.0 <br> 13.0 | | | ✓ | | | | 805,711 | 0 | 70,027 |
| **(6)** TYLER SCHROPP <br> EXECUTIVE DIRECTOR, ADVANCEMENT | 50.0 <br> 0.0 | | | | | ✓ | | 801,340 | 0 | 68,673 |
| **(7)** TODD GRABLE <br> EXECUTIVE DIRECTOR, MEMBERSHIP | 50.0 <br> 0.0 | | | | ✓ | | | 636,832 | 0 | 65,109 |
| **(8)** DOUG HAMLIN <br> EXECUTIVE DIRECTOR, PUBLICATIONS | 50.0 <br> 0.0 | | | | ✓ | | | 616,832 | 0 | 79,582 |
| **(9)** WILSON H PHILLIPS <br> FORMER TREASURER 9/13/2018 | 1.5 <br> 0.0 | | | | | | ✓ | 659,386 | 0 | 4,985 |
| **(10)** DAVID LEHMAN <br> DEPUTY EXECUTIVE DIRECTOR 9/13/2019 | 50.0 <br> 1.0 | | | | | ✓ | | 635,736 | 0 | 23,920 |
| **(11)** JOHN C FRAZER <br> SECRETARY | 50.0 <br> 0.0 | | | ✓ | | | | 414,585 | 0 | 75,884 |
| **(12)** JOSEPH P DEBERGALIS, JR <br> EXECUTIVE DIRECTOR GO | 50.0 <br> 0.0 | | | ✓ | | | | 422,340 | 0 | 54,016 |
| **(13)** JASON OUIMET <br> EXECUTIVE DIRECTOR ILA | 40.0 <br> 1.0 | | | ✓ | | | | 397,104 | 0 | 65,164 |
| **(14)** THOMAS R TEDRICK <br> MANAGING DIRECTOR FINANCE | 30.0 <br> 20.0 | | | | | ✓ | | 397,314 | 0 | 45,123 |

Form **990** (2019)

Appx. 401

Form 990 (2019)                                                                                    Page **8**

**Part VII** **Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees** *(continued)*

| (A) Name and title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| **(15)** JOHN G PERREN | 37.5 | | | | | | | | | |
| SR. ADVISOR TO THE EVP | 0.0 | | | | | ✓ | | 359,906 | 0 | 12,296 |
| **(16)** ROBERT K WEAVER | 0.0 | | | | | | | | | |
| FORMER EXECUTIVE FORMER DIRECTOR GO 10/25/2016 | 0.0 | | | | | | ✓ | 240,000 | 0 | 0 |
| **(17)** MARION P HAMMER | 5.0 | | | | | | | | | |
| BOARD DIRECTOR | 0.0 | ✓ | | | | | | 220,350 | 0 | 0 |
| **(18)** DAVID A KEENE | 1.0 | | | | | | | | | |
| BOARD DIRECTOR | 0.0 | ✓ | | | | | | 57,592 | 0 | 0 |
| **(19)** TED NUGENT | 5.0 | | | | | | | | | |
| BOARD DIRECTOR | 0.0 | ✓ | | | | | | 45,474 | 0 | 0 |
| **(20)** DAVE BUTZ | 5.0 | | | | | | | | | |
| BOARD DIRECTOR | 0.0 | ✓ | | | | | | 21,000 | 0 | 0 |
| **(21)** JULIE GOLOB | 1.0 | | | | | | | | | |
| BOARD DIRECTOR 8/11/2019 | 0.0 | ✓ | | | | | | 16,119 | 0 | 0 |
| **(22)** LANCE OLSON | 5.0 | | | | | | | | | |
| BOARD DIRECTOR | 0.0 | ✓ | | | | | | 15,000 | 0 | 0 |
| **(23)** BART SKELTON | 1.0 | | | | | | | | | |
| BOARD DIRECTOR | 0.0 | ✓ | | | | | | 13,750 | 0 | 0 |
| **(24)** OWEN BUZ MILLS | 1.0 | | | | | | | | | |
| BOARD DIRECTOR | 0.0 | ✓ | | | | | | 6,852 | 0 | 0 |
| **(25)** (SEE STATEMENT) | | | | | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| **1b** | **Subtotal** . . . . . . . . . . . . . ▶ | | 11,951,321 | 0 | 775,011 |
| **c** | **Total from continuation sheets to Part VII, Section A** . . . . ▶ | | 2,465 | 0 | 0 |
| **d** | **Total (add lines 1b and 1c)** . . . . . . . . . . ▶ | | 11,953,786 | 0 | 775,011 |

**2** Total number of individuals (including but not limited to those listed above) who received more than $100,000 of reportable compensation from the organization ▶ 149

| | | Yes | No |
|---|---|---|---|
| **3** | Did the organization list any **former** officer, director, trustee, key employee, or highest compensated employee on line 1a? *If "Yes," complete Schedule J for such individual* . . . . . . . . . . . | **3** | ✓ | |
| **4** | For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? *If "Yes," complete Schedule J for such individual* . . . . . . . . . . . . . . . . . . . . . | **4** | ✓ | |
| **5** | Did any person listed on line 1a receive or accrue compensation from any unrelated organization or individual for services rendered to the organization? *If "Yes," complete Schedule J for such person* . . . . . . | **5** | ✓ | |

**Section B. Independent Contractors**

**1** Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization. Report compensation for the calendar year ending with or within the organization's tax year.

| (A) Name and business address | (B) Description of services | (C) Compensation |
|---|---|---|
| BREWER ATTORNEYS AND COUNSELORS, 1717 MAIN ST, SUITE 5900, DALLAS, TX 75201 | LEGAL SERVICES | 24,789,326 |
| INFOCISION MANAGEMENT CORP, 325 SPRINGSIDE DR, AKRON, OH 44333 | MEMBERSHIP PROCESSING AND CONTROL | 21,723,870 |
| MEMBERSHIP MARKETING PARTNERS LLC, 11250 WAPLES MILL TD, SUITE 310, FAIRFAX, VA 22030 | FUNDRAISING PRINTING AND MAILING | 11,560,154 |
| VALTIM INC, 1095 VENTURE DR, FOREST, VA 24551 | FULFILLMENT CENTER | 8,957,907 |
| ACKERMAN MCQUEEN, 1601 NW EXPRESSWAY, OKLAHOMA CITY, OK 73118 | PUBLIC RELATIONS AND ADVERTISING | 7,317,206 |

**2** Total number of independent contractors (including but not limited to those listed above) who received more than $100,000 of compensation from the organization ▶ 141

Form **990** (2019)

NATIONAL RIFLE ASSOCIATION OF AMERICA
53-0116130                                                 8          11/18/2020 9:47:17 AM

Appx. 402

Form 990 (2019)

Page **9**

## Part VIII  Statement of Revenue

Check if Schedule O contains a response or note to any line in this Part VIII . . . . . . . . . . ☑

| | | | | | (A)<br>Total revenue | (B)<br>Related or exempt<br>function revenue | (C)<br>Unrelated<br>business revenue | (D)<br>Revenue excluded<br>from tax under<br>sections 512–514 |
|---|---|---|---|---|---|---|---|---|
| **Contributions, Gifts, Grants and Other Similar Amounts** | 1a | Federated campaigns | 1a | 0 | | | | |
| | b | Membership dues | 1b | 0 | | | | |
| | c | Fundraising events | 1c | 0 | | | | |
| | d | Related organizations | 1d | 13,703,287 | | | | |
| | e | Government grants (contributions) | 1e | 0 | | | | |
| | f | All other contributions, gifts, grants, and similar amounts not included above | 1f | 95,736,153 | | | | |
| | g | Noncash contributions included in lines 1a–1f | 1g | $ 247,980 | | | | |
| | h | **Total.** Add lines 1a–1f ▶ | | | 109,439,440 | | | |
| **Program Service Revenue** | | | Business Code | | | | | |
| | 2a | MEMBER DUES | 813410 | | 112,969,564 | 112,969,564 | 0 | 0 |
| | b | PROGRAM FEES | 813410 | | 21,042,172 | 21,042,172 | 0 | 0 |
| | c | | | | 0 | 0 | 0 | 0 |
| | d | | | | 0 | 0 | 0 | 0 |
| | e | | | | 0 | 0 | 0 | 0 |
| | f | All other program service revenue | | | 0 | 0 | 0 | 0 |
| | g | **Total.** Add lines 2a–2f ▶ | | | 134,011,736 | | | |
| **Other Revenue** | 3 | Investment income (including dividends, interest, and other similar amounts) ▶ | | | 3,926,185 | 0 | 0 | 3,926,185 |
| | 4 | Income from investment of tax-exempt bond proceeds ▶ | | | 0 | 0 | 0 | 0 |
| | 5 | Royalties ▶ | | | 13,081,645 | 0 | 0 | 13,081,645 |
| | | | (i) Real | (ii) Personal | | | | |
| | 6a | Gross rents | 6a 1,317,211 | 0 | | | | |
| | b | Less: rental expenses | 6b 1,941,872 | 0 | | | | |
| | c | Rental income or (loss) | 6c (624,661) | 0 | | | | |
| | d | Net rental income or (loss) ▶ | | | (624,661) | 0 | 0 | (624,661) |
| | | | (i) Securities | (ii) Other | | | | |
| | 7a | Gross amount from sales of assets other than inventory | 7a 6,722,597 | | | | | |
| | b | Less: cost or other basis and sales expenses | 7b 5,613,022 | | | | | |
| | c | Gain or (loss) | 7c 1,109,575 | | | | | |
| | d | Net gain or (loss) ▶ | | | 1,109,575 | 0 | 0 | 1,109,575 |
| | 8a | Gross income from fundraising events (not including $ 0 of contributions reported on line 1c). See Part IV, line 18 | 8a | 758,465 | | | | |
| | b | Less: direct expenses | 8b | 445,004 | | | | |
| | c | Net income or (loss) from fundraising events ▶ | | | 313,461 | | | 313,461 |
| | 9a | Gross income from gaming activities. See Part IV, line 19 | 9a | | | | | |
| | b | Less: direct expenses | 9b | | | | | |
| | c | Net income or (loss) from gaming activities ▶ | | | 0 | | | 0 |
| | 10a | Gross sales of inventory, less returns and allowances | 10a | 8,838,051 | | | | |
| | b | Less: cost of goods sold | 10b | 3,585,126 | | | | |
| | c | Net income or (loss) from sales of inventory ▶ | | | 5,252,925 | 6,148,472 | (895,547) | 0 |
| **Miscellaneous Revenue** | | | Business Code | | | | | |
| | 11a | ADVERTISING | 541800 | | 23,232,856 | 0 | 23,232,856 | 0 |
| | b | OTHER UNRELATED BUSINESS ACTIVITY | 900004 | | 281,433 | 0 | 281,433 | 0 |
| | c | CAFE SALES | 722320 | | 341,877 | 0 | 0 | 341,877 |
| | d | All other revenue | 900009 | | 788,992 | 788,992 | 0 | 0 |
| | e | **Total.** Add lines 11a–11d ▶ | | | 24,645,158 | | | |
| | 12 | **Total revenue.** See instructions ▶ | | | 291,155,464 | 140,949,200 | 22,618,742 | 18,148,082 |

Appx. 403

Form 990 (2019) Page **10**

### Part IX Statement of Functional Expenses

*Section 501(c)(3) and 501(c)(4) organizations must complete all columns. All other organizations must complete column (A).*

Check if Schedule O contains a response or note to any line in this Part IX . . . . . . . . . . . ☑

| | *Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII.* | (A)<br>Total expenses | (B)<br>Program service expenses | (C)<br>Management and general expenses | (D)<br>Fundraising expenses |
|---|---|---|---|---|---|
| 1 | Grants and other assistance to domestic organizations and domestic governments. See Part IV, line 21 . | 12,000 | 12,000 | | |
| 2 | Grants and other assistance to domestic individuals. See Part IV, line 22 . | 91,491 | 91,491 | | |
| 3 | Grants and other assistance to foreign organizations, foreign governments, and foreign individuals. See Part IV, lines 15 and 16 | 0 | 0 | | |
| 4 | Benefits paid to or for members . . . . | 0 | 0 | | |
| 5 | Compensation of current officers, directors, trustees, and key employees . | 7,543,034 | 3,143,368 | 3,729,868 | 669,798 |
| 6 | Compensation not included above to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) . | 497,914 | 497,914 | 0 | 0 |
| 7 | Other salaries and wages . | 37,992,679 | 24,618,895 | 10,709,461 | 2,664,323 |
| 8 | Pension plan accruals and contributions (include section 401(k) and 403(b) employer contributions) | 3,150,056 | 1,832,778 | 1,065,207 | 252,071 |
| 9 | Other employee benefits . . . . . . | 4,806,782 | 3,084,252 | 1,337,884 | 384,646 |
| 10 | Payroll taxes . . . . . . . . . | 2,749,860 | 1,764,436 | 765,377 | 220,047 |
| 11 | Fees for services (nonemployees): | | | | |
| a | Management . . . . . . . . . | 0 | 0 | 0 | 0 |
| b | Legal . . . . . . . . . . . | 38,584,656 | 10,033,895 | 28,550,761 | |
| c | Accounting . . . . . . . . . | 270,583 | 0 | 270,583 | |
| d | Lobbying . . . . . . . . . . | 665,200 | 665,200 | 0 | |
| e | Professional fundraising services. See Part IV, line 17 | 5,269,873 | | | 5,269,873 |
| f | Investment management fees . . . . | 205,442 | 0 | 205,442 | 0 |
| g | Other. (If line 11g amount exceeds 10% of line 25, column (A) amount, list line 11g expenses on Schedule O.) | 2,281,693 | 2,281,693 | 0 | 0 |
| 12 | Advertising and promotion . . . . . | 26,147,357 | 18,894,976 | 0 | 7,252,381 |
| 13 | Office expenses . . . . . . . . | 5,054,084 | 3,221,695 | 1,832,389 | 0 |
| 14 | Information technology . . . . . . | 7,100,417 | 3,692,926 | 3,407,491 | 0 |
| 15 | Royalties . . . . . . . . . . | 0 | 0 | 0 | 0 |
| 16 | Occupancy . . . . . . . . . | 1,757,002 | 968,459 | 788,543 | 0 |
| 17 | Travel . . . . . . . . . . . | 7,017,420 | 5,285,695 | 1,731,725 | 0 |
| 18 | Payments of travel or entertainment expenses for any federal, state, or local public officials | 0 | 0 | 0 | 0 |
| 19 | Conferences, conventions, and meetings . | 6,758,731 | 5,031,745 | 1,726,986 | 0 |
| 20 | Interest . . . . . . . . . . . | 1,689,348 | 904,181 | 785,167 | 0 |
| 21 | Payments to affiliates . . . . . . | 0 | 0 | 0 | 0 |
| 22 | Depreciation, depletion, and amortization . | 3,709,911 | 2,573,868 | 1,136,043 | 0 |
| 23 | Insurance . . . . . . . . . . | 2,282,669 | 2,282,669 | 0 | 0 |
| 24 | Other expenses. Itemize expenses not covered above (List miscellaneous expenses on line 24e. If line 24e amount exceeds 10% of line 25, column (A) amount, list line 24e expenses on Schedule O.) | | | | |
| a | ADD'L MEMBER COMMUNICATIONS | 70,373,725 | 44,217,918 | 0 | 26,155,807 |
| b | ADD'L TRAINING AND COMMUNICATIONS | 24,985,588 | 24,985,588 | 0 | 0 |
| c | ADD'L PRINTING AND PUBLICATIONS | 23,378,939 | 23,378,939 | | |
| d | ADD'L ILA LEGISLATIVE PROGRAM EXP | 5,752,450 | 5,752,450 | | |
| e | All other expenses | 13,258,411 | 7,033,910 | 3,651,524 | 2,572,977 |
| 25 | **Total functional expenses.** Add lines 1 through 24e | 303,387,315 | 196,250,941 | 61,694,451 | 45,441,923 |
| 26 | **Joint costs.** Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation. Check here ▶ ☐ if following SOP 98-2 (ASC 958-720) . . . | 0 | 0 | 0 | 0 |

10 11/18/2020 9:47:17 AM Form **990** (2019)

Appx. 404

Form 990 (2019)

Page **11**

**Part X** **Balance Sheet**

Check if Schedule O contains a response or note to any line in this Part X . . . . . . . . . . . ☑

| | | | (A) Beginning of year | | (B) End of year |
|---|---|---|---|---|---|
| **Assets** | 1 | Cash—non-interest-bearing . . . . . . . . . . . . . . | 0 | **1** | 0 |
| | 2 | Savings and temporary cash investments . . . . . . . . . | 23,937,821 | **2** | 23,935,152 |
| | 3 | Pledges and grants receivable, net . . . . . . . . . . | 841,562 | **3** | 932,766 |
| | 4 | Accounts receivable, net . . . . . . . . . . . . . | 41,458,041 | **4** | 31,138,285 |
| | 5 | Loans and other receivables from any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons . . . . | 0 | **5** | 0 |
| | 6 | Loans and other receivables from other disqualified persons (as defined under section 4958(f)(1)), and persons described in section 4958(c)(3)(B) . | 0 | **6** | 0 |
| | 7 | Notes and loans receivable, net . . . . . . . . . . . | 6,639,073 | **7** | 8,479,327 |
| | 8 | Inventories for sale or use . . . . . . . . . . . . | 10,632,177 | **8** | 11,716,358 |
| | 9 | Prepaid expenses and deferred charges . . . . . . . . . | 3,179,694 | **9** | 2,887,414 |
| | 10a | Land, buildings, and equipment: cost or other basis. Complete Part VI of Schedule D . . . **10a** 80,004,902 | | | |
| | b | Less: accumulated depreciation . . . . **10b** 49,947,784 | 32,709,031 | **10c** | 30,057,118 |
| | 11 | Investments—publicly traded securities . . . . . . . . . | 44,066,394 | **11** | 52,490,847 |
| | 12 | Investments—other securities. See Part IV, line 11 . . . . . | 871,077 | **12** | 543,604 |
| | 13 | Investments—program-related. See Part IV, line 11 . . . . | 0 | **13** | 0 |
| | 14 | Intangible assets . . . . . . . . . . . . . . . | 0 | **14** | 0 |
| | 15 | Other assets. See Part IV, line 11 . . . . . . . . . . | 32,877,210 | **15** | 36,565,881 |
| | 16 | **Total assets.** Add lines 1 through 15 (must equal line 33) . . . | 197,212,080 | **16** | 198,746,752 |
| **Liabilities** | 17 | Accounts payable and accrued expenses . . . . . . . . | 84,837,717 | **17** | 83,446,471 |
| | 18 | Grants payable . . . . . . . . . . . . . . . . | 0 | **18** | 0 |
| | 19 | Deferred revenue . . . . . . . . . . . . . . . | 46,580,520 | **19** | 47,257,288 |
| | 20 | Tax-exempt bond liabilities . . . . . . . . . . . . | 0 | **20** | 0 |
| | 21 | Escrow or custodial account liability. Complete Part IV of Schedule D . | 0 | **21** | 0 |
| | 22 | Loans and other payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons . . . . | 0 | **22** | 0 |
| | 23 | Secured mortgages and notes payable to unrelated third parties . . | 43,138,412 | **23** | 52,320,718 |
| | 24 | Unsecured notes and loans payable to unrelated third parties . . . | 0 | **24** | 0 |
| | 25 | Other liabilities (including federal income tax, payables to related third parties, and other liabilities not included on lines 17–24). Complete Part X of Schedule D . . . . . . . . . . . . . . . | 6,623,905 | **25** | 6,068,118 |
| | 26 | **Total liabilities.** Add lines 17 through 25 . . . . . . . . | 181,180,554 | **26** | 189,092,595 |
| **Net Assets or Fund Balances** | | **Organizations that follow FASB ASC 958, check here ▶** ☑ **and complete lines 27, 28, 32, and 33.** | | | |
| | 27 | Net assets without donor restrictions . . . . . . . . . | (36,276,779) | **27** | (49,641,823) |
| | 28 | Net assets with donor restrictions . . . . . . . . . . | 52,308,305 | **28** | 59,295,980 |
| | | **Organizations that do not follow FASB ASC 958, check here ▶** ☐ **and complete lines 29 through 33.** | | | |
| | 29 | Capital stock or trust principal, or current funds . . . . . . | | **29** | |
| | 30 | Paid-in or capital surplus, or land, building, or equipment fund . . . | | **30** | |
| | 31 | Retained earnings, endowment, accumulated income, or other funds . | | **31** | |
| | 32 | Total net assets or fund balances . . . . . . . . . . | 16,031,526 | **32** | 9,654,157 |
| | 33 | Total liabilities and net assets/fund balances . . . . . . . | 197,212,080 | **33** | 198,746,752 |

Form **990** (2019)

Appx. 405

Form 990 (2019)                                                                          Page **12**

## Part XI   Reconciliation of Net Assets

Check if Schedule O contains a response or note to any line in this Part XI . . . . . . . . . . . . ☑

| | | | |
|---|---|---|---|
| 1 | Total revenue (must equal Part VIII, column (A), line 12) . . . . . . . . | **1** | 291,155,464 |
| 2 | Total expenses (must equal Part IX, column (A), line 25) . . . . . . . | **2** | 303,387,315 |
| 3 | Revenue less expenses. Subtract line 2 from line 1 . . . . . . . . | **3** | (12,231,851) |
| 4 | Net assets or fund balances at beginning of year (must equal Part X, line 32, column (A)) . . . | **4** | 16,031,526 |
| 5 | Net unrealized gains (losses) on investments . . . . . . . . . | **5** | 6,605,046 |
| 6 | Donated services and use of facilities . . . . . . . . . | **6** | 0 |
| 7 | Investment expenses . . . . . . . . . . . | **7** | 0 |
| 8 | Prior period adjustments . . . . . . . . . . | **8** | 0 |
| 9 | Other changes in net assets or fund balances (explain on Schedule O) . . . . . . . . | **9** | (750,564) |
| 10 | Net assets or fund balances at end of year. Combine lines 3 through 9 (must equal Part X, line 32, column (B)) | **10** | 9,654,157 |

## Part XII   Financial Statements and Reporting

Check if Schedule O contains a response or note to any line in this Part XII . . . . . . . . . . . ☐

| | | Yes | No |
|---|---|---|---|
| 1 | Accounting method used to prepare the Form 990: ☐ Cash  ☑ Accrual  ☐ Other _____ <br> If the organization changed its method of accounting from a prior year or checked "Other," explain in Schedule O. | | |
| 2a | Were the organization's financial statements compiled or reviewed by an independent accountant? . . . | **2a** | | ✓ |
| | If "Yes," check a box below to indicate whether the financial statements for the year were compiled or reviewed on a separate basis, consolidated basis, or both: <br> ☐ Separate basis  ☐ Consolidated basis  ☐ Both consolidated and separate basis | | |
| b | Were the organization's financial statements audited by an independent accountant? . . . . . . . | **2b** | ✓ | |
| | If "Yes," check a box below to indicate whether the financial statements for the year were audited on a separate basis, consolidated basis, or both: <br> ☐ Separate basis  ☐ Consolidated basis  ☑ Both consolidated and separate basis | | |
| c | If "Yes" to line 2a or 2b, does the organization have a committee that assumes responsibility for oversight of the audit, review, or compilation of its financial statements and selection of an independent accountant? . | **2c** | ✓ | |
| | If the organization changed either its oversight process or selection process during the tax year, explain on Schedule O. | | |
| 3a | As a result of a federal award, was the organization required to undergo an audit or audits as set forth in the Single Audit Act and OMB Circular A-133? . . . . . . . . . . . . . | **3a** | | ✓ |
| b | If "Yes," did the organization undergo the required audit or audits? If the organization did not undergo the required audit or audits, explain why on Schedule O and describe any steps taken to undergo such audits . | **3b** | | |

Form **990** (2019)

Appx. 406

**Part VII**    Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees (continued)

| (A) Name and Title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (Check all that apply) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (25) CARRIE LIGHTFOOT | 1.0 | ✓ | | | | | | 1,666 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (26) PETE R BROWNELL | 1.0 | ✓ | | | | | | 527 | 0 | 0 |
| BOARD DIRECTOR 05/29/2019 | 1.0 | | | | | | | | | |
| (27) SCOTT L BACH | 1.0 | ✓ | | | | | | 236 | 0 | 0 |
| BOARD DIRECTOR | 1.0 | | | | | | | | | |
| (28) CHARLES L COTTON | 1.0 | ✓ | | ✓ | | | | 18 | 0 | 0 |
| 1ST VICE PRESIDENT | 1.0 | | | | | | | | | |
| (29) LINDA L WALKER | 1.0 | ✓ | | | | | | 18 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (30) CAROLYN D MEADOWS | 10.0 | ✓ | | ✓ | | | | 0 | 0 | 0 |
| PRESIDENT | 1.0 | | | | | | | | | |
| (31) WILLES K LEE | 1.0 | ✓ | | ✓ | | | | 0 | 0 | 0 |
| 2ND VICE PRESIDENT | 0.0 | | | | | | | | | |
| (32) ALLAN D CORS | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 1.0 | | | | | | | | | |
| (33) ALLEN B WEST | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (34) ANTHONY P COLANDRO | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (35) BILL MILLER | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (36) BLAINE WADE | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (37) BOB BARR | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (38) CARL T ROWAN, JR | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (39) CAROL FRAMPTON | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 1.0 | | | | | | | | | |
| (40) CLEL BAUDLER | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (41) CRAIG MORGAN | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR 8/19/2019 | 0.0 | | | | | | | | | |
| (42) CURTIS S JENKINS | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 1.0 | | | | | | | | | |
| (43) DAN BOREN | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR 11/1/2019 | 0.0 | | | | | | | | | |
| (44) DAVID G COY | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |

| (A) Name and Title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (Check all that apply) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (45) DEAN CAIN | 1.0 | ✓ | | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (46) DON SABA | 1.0 | ✓ | | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (47) DONALD E YOUNG | 1.0 | ✓ | | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (48) DR. JOHN THODOS | 1.0 | ✓ | | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR 10/4/2019 | 0.0 | | | | | | | | | |
| (49) DUANE LIPTAK, JR | 1.0 | ✓ | | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (50) DWIGHT D VAN HORN | 1.0 | ✓ | | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 1.0 | | | | | | | | | |
| (51) EDIE P FLEEMAN | 1.0 | ✓ | | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (52) ESTHER SCHNEIDER | 1.0 | ✓ | | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR 8/1/2019 | 0.0 | | | | | | | | | |
| (53) GRAHAM HILL | 1.0 | ✓ | | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (54) HEIDI E WASHINGTON | 1.0 | ✓ | | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (55) HERBERT A LANFORD, JR | 1.0 | ✓ | | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (56) HOWARD J WALTER | 1.0 | ✓ | | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (57) IL LING NEW | 1.0 | ✓ | | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (58) J. KENNETH BLACKWELL | 1.0 | ✓ | | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (59) JAMES W PORTER II | 1.0 | ✓ | | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 2.0 | | | | | | | | | |
| (60) JAY PRINTZ | 1.0 | ✓ | | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (61) JOE M ALLBAUGH | 1.0 | ✓ | | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (62) JOEL FRIEDMAN | 1.0 | ✓ | | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 1.0 | | | | | | | | | |
| (63) JOHN C SIGLER | 1.0 | ✓ | | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 1.0 | | | | | | | | | |
| (64) JOHN L CUSHMAN | 1.0 | ✓ | | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR 4/27/2019 | 0.0 | | | | | | | | | |
| (65) JOHNNY NUGENT | 1.0 | ✓ | | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |

| (A) Name and Title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (Check all that apply) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (66) KARL A MALONE | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (67) KEVIN HOGAN | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (68) KIM RHODE | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (69) KRISTY TITUS | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (70) LARRY E CRAIG | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (71) LEROY SISCO | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (72) MARIA HEIL | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (73) MARK E VAUGHAN | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (74) MARK GEIST | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (75) MARK ROBINSON | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (76) MATT BLUNT | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (77) MELANIE PEPPER | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (78) PATRICIA A CLARK | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (79) PAUL D BABAZ | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (80) RICHARD R CHILDRESS | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR 8/19/2019 | 1.0 | | | | | | | | | |
| (81) RICK S FIGUEROA | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (82) ROBERT A NOSLER | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 2.0 | | | | | | | | | |
| (83) ROBERT E MANSELL | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (84) ROBERT K BROWN | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 1.0 | | | | | | | | | |
| (85) RONALD L SCHMEITS | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 1.0 | | | | | | | | | |
| (86) RONNIE G BARRETT | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |

| (A) Name and Title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (Check all that apply) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (87) SANDRA S FROMAN | 5.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (88) SEAN MALONEY | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR 8/1/2019 | 0.0 | | | | | | | | | |
| (89) STEVEN C SCHREINER | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (90) SUSAN HOWARD | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 1.0 | | | | | | | | | |
| (91) TED W CARTER | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (92) THOMAS P ARVAS | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 1.0 | | | | | | | | | |
| (93) TIMOTHY KNIGHT | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR 8/1/2019 | 0.0 | | | | | | | | | |
| (94) TODD J RATHNER | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (95) TOM KING | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 2.0 | | | | | | | | | |
| (96) WAYNE ANTHONY ROSS | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (97) WILLIAM A BACHENBERG | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 1.0 | | | | | | | | | |
| (98) WILLIAM H SATTERFIELD | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 2.0 | | | | | | | | | |

| SCHEDULE C | **Political Campaign and Lobbying Activities** | OMB No. 1545-0047 |
|---|---|---|
| (Form 990 or 990-EZ) | | **20**19 |

**For Organizations Exempt From Income Tax Under section 501(c) and section 527**

Department of the Treasury
Internal Revenue Service

▶ **Complete if the organization is described below.** ▶ **Attach to Form 990 or Form 990-EZ.**
▶ **Go to** *www.irs.gov/Form990* **for instructions and the latest information.**

**Open to Public Inspection**

**If the organization answered "Yes," on Form 990, Part IV, line 3, or Form 990-EZ, Part V, line 46 (Political Campaign Activities), then**
- Section 501(c)(3) organizations: Complete Parts I-A and B. Do not complete Part I-C.
- Section 501(c) (other than section 501(c)(3)) organizations: Complete Parts I-A and C below. Do not complete Part I-B.
- Section 527 organizations: Complete Part I-A only.

**If the organization answered "Yes," on Form 990, Part IV, line 4, or Form 990-EZ, Part VI, line 47 (Lobbying Activities), then**
- Section 501(c)(3) organizations that have filed Form 5768 (election under section 501(h)): Complete Part II-A. Do not complete Part II-B.
- Section 501(c)(3) organizations that have NOT filed Form 5768 (election under section 501(h)): Complete Part II-B. Do not complete Part II-A.

**If the organization answered "Yes," on Form 990, Part IV, line 5 (Proxy Tax) (see separate instructions) or Form 990-EZ, Part V, line 35c (Proxy Tax) (see separate instructions), then**
- Section 501(c)(4), (5), or (6) organizations: Complete Part III.

| Name of organization | Employer identification number |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130 |

**Part I-A** — **Complete if the organization is exempt under section 501(c) or is a section 527 organization.**

1 Provide a description of the organization's direct and indirect political campaign activities in Part IV. (see instructions for definition of "political campaign activities")

2 Political campaign activity expenditures (see instructions) . . . . . . . . . ▶ $     2,971,894

3 Volunteer hours for political campaign activities (see instructions) . . . . . . . .     5,348

**Part I-B** — **Complete if the organization is exempt under section 501(c)(3).**

1 Enter the amount of any excise tax incurred by the organization under section 4955 . . . ▶ $

2 Enter the amount of any excise tax incurred by organization managers under section 4955 . . ▶ $

3 If the organization incurred a section 4955 tax, did it file Form 4720 for this year? . . . . ☐ Yes ☐ No

4a Was a correction made? . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No

  b If "Yes," describe in Part IV.

**Part I-C** — **Complete if the organization is exempt under section 501(c), except section 501(c)(3).**

1 Enter the amount directly expended by the filing organization for section 527 exempt function activities . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ $     0

2 Enter the amount of the filing organization's funds contributed to other organizations for section 527 exempt function activities . . . . . . . . . . . . . . . . . . ▶ $     0

3 Total exempt function expenditures. Add lines 1 and 2. Enter here and on Form 1120-POL, line 17b . . . . . . . . . . . . . . . . . . . . . . . . . ▶ $     0

4 Did the filing organization file **Form 1120-POL** for this year? . . . . . . . . . . . ☑ Yes ☐ No

5 Enter the names, addresses and employer identification number (EIN) of all section 527 political organizations to which the filing organization made payments. For each organization listed, enter the amount paid from the filing organization's funds. Also enter the amount of political contributions received that were promptly and directly delivered to a separate political organization, such as a separate segregated fund or a political action committee (PAC). If additional space is needed, provide information in Part IV.

| (a) Name | (b) Address | (c) EIN | (d) Amount paid from filing organization's funds. If none, enter -0-. | (e) Amount of political contributions received and promptly and directly delivered to a separate political organization. If none, enter -0-. |
|---|---|---|---|---|
| (1) (SEE STATEMENT) | | | | |
| (2) | | | | |
| (3) | | | | |
| (4) | | | | |
| (5) | | | | |
| (6) | | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.      Cat. No. 50084S      Schedule C (Form 990 or 990-EZ) 2019

Schedule C (Form 990 or 990-EZ) 2019                                                                    Page **2**

| **Part II-A** | Complete if the organization is exempt under section 501(c)(3) and filed Form 5768 (election under section 501(h)). |
|---|---|

**A**   Check ▶ ☐ if the filing organization belongs to an affiliated group (and list in Part IV each affiliated group member's name, address, EIN, expenses, and share of excess lobbying expenditures).

**B**   Check ▶ ☐ if the filing organization checked box A and "limited control" provisions apply.

| | **Limits on Lobbying Expenditures**<br>**(The term "expenditures" means amounts paid or incurred.)** | **(a)** Filing organization's totals | **(b)** Affiliated group totals |
|---|---|---|---|
| **1a** | Total lobbying expenditures to influence public opinion (grassroots lobbying) . . . . | | |
| **b** | Total lobbying expenditures to influence a legislative body (direct lobbying) . . . . . | | |
| **c** | Total lobbying expenditures (add lines 1a and 1b) . . . . . . . . . . . . . | | |
| **d** | Other exempt purpose expenditures . . . . . . . . . . . . . . . . . | | |
| **e** | Total exempt purpose expenditures (add lines 1c and 1d) . . . . . . . . . . . | | |
| **f** | Lobbying nontaxable amount. Enter the amount from the following table in both columns. | | |

| If the amount on line 1e, column (a) or (b) is: | The lobbying nontaxable amount is: |
|---|---|
| Not over $500,000 | 20% of the amount on line 1e. |
| Over $500,000 but not over $1,000,000 | $100,000 plus 15% of the excess over $500,000. |
| Over $1,000,000 but not over $1,500,000 | $175,000 plus 10% of the excess over $1,000,000. |
| Over $1,500,000 but not over $17,000,000 | $225,000 plus 5% of the excess over $1,500,000. |
| Over $17,000,000 | $1,000,000. |

| | | | |
|---|---|---|---|
| **g** | Grassroots nontaxable amount (enter 25% of line 1f) . . . . . . . . . . . | | |
| **h** | Subtract line 1g from line 1a. If zero or less, enter -0- . . . . . . . . . . . | | |
| **i** | Subtract line 1f from line 1c. If zero or less, enter -0- . . . . . . . . . . . | | |
| **j** | If there is an amount other than zero on either line 1h or line 1i, did the organization file Form 4720 reporting section 4911 tax for this year? . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No | | |

**4-Year Averaging Period Under Section 501(h)**
**(Some organizations that made a section 501(h) election do not have to complete all of the five columns below.**
**See the separate instructions for lines 2a through 2f.)**

| **Lobbying Expenditures During 4-Year Averaging Period** | | | | | |
|---|---|---|---|---|---|
| Calendar year (or fiscal year beginning in) | **(a)** 2016 | **(b)** 2017 | **(c)** 2018 | **(d)** 2019 | **(e)** Total |
| **2a**   Lobbying nontaxable amount | | | | | |
| **b**   Lobbying ceiling amount (150% of line 2a, column (e)) | | | | | |
| **c**   Total lobbying expenditures | | | | | |
| **d**   Grassroots nontaxable amount | | | | | |
| **e**   Grassroots ceiling amount (150% of line 2d, column (e)) | | | | | |
| **f**   Grassroots lobbying expenditures | | | | | |

Schedule C (Form 990 or 990-EZ) 2019

**NATIONAL RIFLE ASSOCIATION OF AMERICA**              55        11/18/2020 9:47:17 AM
**53-0116130**

Appx. 412

Schedule C (Form 990 or 990-EZ) 2019                                     Page **3**

**Part II-B**   **Complete if the organization is exempt under section 501(c)(3) and has NOT filed Form 5768 (election under section 501(h)).**

*For each "Yes" response on lines 1a through 1i below, provide in Part IV a detailed description of the lobbying activity.*

| | | (a) | | (b) |
|---|---|:---:|:---:|:---:|
| | | Yes | No | Amount |
| **1** | During the year, did the filing organization attempt to influence foreign, national, state, or local legislation, including any attempt to influence public opinion on a legislative matter or referendum, through the use of: | | | |
| **a** | Volunteers? | | | |
| **b** | Paid staff or management (include compensation in expenses reported on lines 1c through 1i)? | | | |
| **c** | Media advertisements? | | | |
| **d** | Mailings to members, legislators, or the public? | | | |
| **e** | Publications, or published or broadcast statements? | | | |
| **f** | Grants to other organizations for lobbying purposes? | | | |
| **g** | Direct contact with legislators, their staffs, government officials, or a legislative body? | | | |
| **h** | Rallies, demonstrations, seminars, conventions, speeches, lectures, or any similar means? | | | |
| **i** | Other activities? | | | |
| **j** | Total. Add lines 1c through 1i | | | |
| **2a** | Did the activities in line 1 cause the organization to be not described in section 501(c)(3)? | | | |
| **b** | If "Yes," enter the amount of any tax incurred under section 4912 | | | |
| **c** | If "Yes," enter the amount of any tax incurred by organization managers under section 4912 | | | |
| **d** | If the filing organization incurred a section 4912 tax, did it file Form 4720 for this year? | | | |

**Part III-A**   **Complete if the organization is exempt under section 501(c)(4), section 501(c)(5), or section 501(c)(6).**

| | | | Yes | No |
|---|---|---|:---:|:---:|
| **1** | Were substantially all (90% or more) dues received nondeductible by members? | **1** | ✓ | |
| **2** | Did the organization make only in-house lobbying expenditures of $2,000 or less? | **2** | | ✓ |
| **3** | Did the organization agree to carry over lobbying and political campaign activity expenditures from the prior year? | **3** | | ✓ |

**Part III-B**   **Complete if the organization is exempt under section 501(c)(4), section 501(c)(5), or section 501(c)(6) and if either (a) BOTH Part III-A, lines 1 and 2, are answered "No" OR (b) Part III-A, line 3, is answered "Yes."**

| | | | |
|---|---|---|---|
| **1** | Dues, assessments and similar amounts from members | **1** | |
| **2** | Section 162(e) nondeductible lobbying and political expenditures **(do not include amounts of political expenses for which the section 527(f) tax was paid).** | | |
| **a** | Current year | **2a** | |
| **b** | Carryover from last year | **2b** | |
| **c** | Total | **2c** | |
| **3** | Aggregate amount reported in section 6033(e)(1)(A) notices of nondeductible section 162(e) dues | **3** | |
| **4** | If notices were sent and the amount on line 2c exceeds the amount on line 3, what portion of the excess does the organization agree to carryover to the reasonable estimate of nondeductible lobbying and political expenditure next year? | **4** | |
| **5** | Taxable amount of lobbying and political expenditures (see instructions) | **5** | |

**Part IV**   **Supplemental Information**

Provide the descriptions required for Part I-A, line 1; Part I-B, line 4; Part I-C, line 5; Part II-A (affiliated group list); Part II-A, lines 1 and 2 (see instructions); and Part II-B, line 1. Also, complete this part for any additional information.

SEE NEXT PAGE

NATIONAL RIFLE ASSOCIATION OF AMERICA            56        11/18/2020 9:47:17 AM
53-0116130

Appx. 413

| Part IV | Supplemental Information. Provide the descriptions required for Part I-A, line 1; Part I-B, line 4; Part I-C, line 5; Part II-A (affiliated group list); Part II-A, lines 1 and 2 (see instructions); and Part II-B, line 1. Also, complete this part for any additional information. |
|---|---|

| Return Reference - Identifier | Explanation |
|---|---|
| SCHEDULE C, PART I-A, LINE 1 - DESCRIPTION OF POLITICAL ACTIVITIES | SUPPORT FOR FUNDRAISING AND ADMINISTRATIVE EXPENSES OF A SEPARATE SEGREGATED FUND IS INDUSTRY STANDARD FOR NONPROFIT ORGANIZATIONS LIKE THE NRA, AS ALLOWED BY LAW. IN 2019, THE NRA PAID $2,971,894 FUNDRAISING AND ADMINISTRATIVE EXPENSES FOR THE SEPARATE SEGREGATED FUND, NRA POLITICAL VICTORY FUND, AS ALLOWED BY LAW. THE NRA ENGAGED IN ACTIVITIES IN SUPPORT OF ITS MISSION, WHICH INCLUDES PROTECTING AND DEFENDING THE CONSTITUTION OF THE UNITED STATES, ESPECIALLY WITH REFERENCE TO THE INALIENABLE RIGHT OF INDIVIDUAL AMERICAN CITIZEN GUARANTEED BY SUCH CONSTITUTION TO ACQUIRE, POSSESS, COLLECT, EXHIBIT, TRANSPORT, CARRY, TRANSFER OWNERSHIP OF, AND ENJOY THE RIGHT TO USE ARMS, IN ORDER THAT THE PEOPLE MAY ALWAYS BE IN A POSITION TO EXERCISE THEIR LEGITIMATE INDIVIDUAL RIGHTS OF SELF PRESERVATION AND DEFENSE OF FAMILY, PERSON, AND PROPERTY. IN PURSUIT OF THESE GOALS OF THE ASSOCIATION, THE NRA SPENT FUNDS DIRECTLY AND INDIRECTLY ON POLITICAL ACTIVITIES, WHICH WERE NOT THE PRIMARY ACTIVITIES OF THE ORGANIZATION. THE NRA IS ORGANIZED PRIMARILY TO PROMOTE SOCIAL WELFARE AND CAN ALSO ENGAGE IN POLITICAL ACTIVITIES ON BEHALF OF OR IN OPPOSITION TO CANDIDATES FOR POLITICAL OFFICE, AS ALLOWED BY LAW. BY ANY MEASURE, THE PERCENTAGE OF FUNDS SPENT BY THE NRA ON POLITICAL ACTIVATES IS MODEST IN COMPARISON TO THE BUDGET DEVOTED TO THE PRIMARY ACTIVITIES OF THE NRA. FOR INSTANCE, ALL EXPENDITURES NOTED ON PART I-A AND I-C OF SCHEDULE C AMOUNTED TO ABOUT 1% OF THE NRA'S TOTAL EXPENSES IN 2019, AS APPLIED TO TOTAL EXPENSES REPORTED ON FORM 990, PART IX, LINE 25. REPORTERS AND OTHER READERS ARE ALSO KINDLY REMINDED THAT THE SEPARATE SEGREGATED FUND IS A SEPARATE ENTITY FOR TAX PURPOSES. |
| SCHEDULE C, PART I-C, LINE 4 - FORM 1120-POL | THIS INFORMATION NOTE REGARDS THE NRA'S TAXES. THE NRA SEPARATELY FILES FORM 1120-POL, WHICH IS NOT SUBJECT TO PUBLIC DISCLOSURE. THE FOLLOWING INFORMATION ABOUT TAXES PAID WITH THE NRA'S FORMS 1120-POL IS SHARED HERE ON A VOLUNTARY BASIS AS A SERVICE TO READERS AND TO DEMONSTRATE IN GOOD FAITH THAT THE ORGANIZATION IS A TAXPAYER IN GOOD STANDING. 527(F) PROXY TAX IS PAID ON THE LESSER OF NET INVESTMENT INCOME OR CERTAIN POLITICAL EXPENDITURES AS DEFINED BY THE FEDERAL TAX CODE, SUCH AS WHEN CERTAIN POLITICAL COMMUNICATIONS EXPRESSLY ADVOCATE THE ELECTION OR DEFEAT OF A CANDIDATE AND ARE MADE BY THE NRA ITSELF RATHER THAN BY THE NRA'S SEPARATE SEGREGATED FUND. THE AMOUNT OF 527 (F) PROXY TAX PAID WITH THE NRA'S 2019 FORM 1120-POL WAS ZERO. HISTORICALLY, 527(F) PROXY TAX WAS REQUIRED TO BE PAID FOR 2018 WAS $164,944; NO 527(F) PROXY TAX WAS REQUIRED TO BE PAID FOR 2017; THE AMOUNT OF 527(F) PROXY TAX PAID WITH THE NRA'S 2016 FORM 1120-POL WAS $20,835; THE AMOUNT PAID WITH THE NRA'S 2015 FORM 1120-POL WAS $21,817. AS ANOTHER POLITE REMINDER TO REPORTERS AND OTHER READERS, FORM 990 INFORMATION IS NOT NECESSARILY EXPECTED TO TIE TO FEDERAL ELECTION COMMISSION (FEC) REPORTING DUE TO DIFFERENT DEFINITIONS AND EXCLUSIONS IN THE DIFFERENT REGULATORY REGIMES. |
| SCHEDULE C, PART I-C, LINE 5 - POLITICAL ACTION COMMITTEE | THE NRA POLITICAL VICTORY FUND, AN INDEPENDENT POLITICAL ACTION COMMITTEE (PAC) OF THE NRA, DIRECTLY RECEIVED CONTRIBUTIONS DURING 2019 OF $10,713,253. |

| PartI-C | Line 5. **Enter the names, addresses and employer identification number (EIN) of all section 527 political organizations to which the filing organization made payments.** (continued) |
|---|---|

| (a)<br><br>Name | (b)<br><br>Address | (c)<br><br>EIN | (d)<br><br>Amount paid from filing organization's funds. If none, enter -0-. | (e)<br><br>Amount of political contributions received and promptly and directly delivered to a separate political organization. If none, enter -0-. |
|---|---|---|---|---|
| REPUBLICAN ATTORNEYS GENERAL ASSOCIATION | 1747 PENNSYLVANIA AVE, NW STE 800 WASHINGTON, DC 20006 | 46-4501717 | 90,000 | 0 |
| REPUBLICAN GOVERNORS ASSOCIATION | 1747 PENNSYLVANIA AVE, NW STE 250 WASHINGTON, DC 20006 | 11-3655877 | 145,000 | 0 |
| NRA POLITICAL VICTORY FUND (SEE PARTS I-A AND IV) | 11250 WAPLES MILL RD FAIRFAX, VA 22030 | 52-1083020 | 0 | 3,952 |

OMB No. 1545-0047

**SCHEDULE D**
**(Form 990)**

# Supplemental Financial Statements

▶ Complete if the organization answered "Yes" on Form 990,
Part IV, line 6, 7, 8, 9, 10, 11a, 11b, 11c, 11d, 11e, 11f, 12a, or 12b.
▶ Attach to Form 990.
▶ Go to *www.irs.gov/Form990* for instructions and the latest information.

20**19**

Department of the Treasury
Internal Revenue Service

**Open to Public
Inspection**

| Name of the organization | Employer identification number |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130 |

**Part I**    **Organizations Maintaining Donor Advised Funds or Other Similar Funds or Accounts.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 6.

| | | (a) Donor advised funds | (b) Funds and other accounts |
|---|---|---|---|
| 1 | Total number at end of year . . . . . . . | | |
| 2 | Aggregate value of contributions to (during year) . | | |
| 3 | Aggregate value of grants from (during year) . . | | |
| 4 | Aggregate value at end of year . . . . . . | | |

5   Did the organization inform all donors and donor advisors in writing that the assets held in donor advised funds are the organization's property, subject to the organization's exclusive legal control? . . . . . .   ☐ Yes ☐ No

6   Did the organization inform all grantees, donors, and donor advisors in writing that grant funds can be used only for charitable purposes and not for the benefit of the donor or donor advisor, or for any other purpose conferring impermissible private benefit? . . . . . . . . . . . . . . . . . . .   ☐ Yes ☐ No

**Part II**    **Conservation Easements.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 7.

1   Purpose(s) of conservation easements held by the organization (check all that apply).
   ☐ Preservation of land for public use (for example, recreation or education)    ☐ Preservation of a historically important land area
   ☐ Protection of natural habitat    ☐ Preservation of a certified historic structure
   ☐ Preservation of open space

2   Complete lines 2a through 2d if the organization held a qualified conservation contribution in the form of a conservation easement on the last day of the tax year.

| | | | Held at the End of the Tax Year |
|---|---|---|---|
| a | Total number of conservation easements . . . . . . . . . . | **2a** | |
| b | Total acreage restricted by conservation easements . . . . . . | **2b** | |
| c | Number of conservation easements on a certified historic structure included in (a) . . . . | **2c** | |
| d | Number of conservation easements included in (c) acquired after 7/25/06, and not on a historic structure listed in the National Register . . . . . . . . | **2d** | |

3   Number of conservation easements modified, transferred, released, extinguished, or terminated by the organization during the tax year ▶ _____

4   Number of states where property subject to conservation easement is located ▶ _____

5   Does the organization have a written policy regarding the periodic monitoring, inspection, handling of violations, and enforcement of the conservation easements it holds? . . . . . . . . . . . .   ☐ Yes ☐ No

6   Staff and volunteer hours devoted to monitoring, inspecting, handling of violations, and enforcing conservation easements during the year
   ▶ _____

7   Amount of expenses incurred in monitoring, inspecting, handling of violations, and enforcing conservation easements during the year
   ▶ $ _____

8   Does each conservation easement reported on line 2(d) above satisfy the requirements of section 170(h)(4)(B)(i) and section 170(h)(4)(B)(ii)? . . . . . . . . . . . . . . . . . . . . . . .   ☐ Yes ☐ No

9   In Part XIII, describe how the organization reports conservation easements in its revenue and expense statement and balance sheet, and include, if applicable, the text of the footnote to the organization's financial statements that describes the organization's accounting for conservation easements.

**Part III**    **Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 8.

1a   If the organization elected, as permitted under FASB ASC 958, not to report in its revenue statement and balance sheet works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide in Part XIII the text of the footnote to its financial statements that describes these items.

  b   If the organization elected, as permitted under FASB ASC 958, to report in its revenue statement and balance sheet works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide the following amounts relating to these items:

    (i)   Revenue included on Form 990, Part VIII, line 1 . . . . . . . . . . . .   ▶ $ _____
    (ii)   Assets included in Form 990, Part X . . . . . . . . . . . . . .   ▶ $ _____

2   If the organization received or held works of art, historical treasures, or other similar assets for financial gain, provide the following amounts required to be reported under FASB ASC 958 relating to these items:

  a   Revenue included on Form 990, Part VIII, line 1 . . . . . . . . . . . . .   ▶ $ _____
  b   Assets included in Form 990, Part X . . . . . . . . . . . . . . .   ▶ $ _____

For Paperwork Reduction Act Notice, see the Instructions for Form 990.    Cat. No. 52283D    Schedule D (Form 990) 2019
NATIONAL RIFLE ASSOCIATION OF AMERICA    59    11/18/2020 9:47:17 AM
53-0116130

| **Part III** | **Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets** *(continued)* |
|---|---|

**3** Using the organization's acquisition, accession, and other records, check any of the following that make significant use of its collection items (check all that apply):

**a** ☑ Public exhibition      **d** ☑ Loan or exchange program

**b** ☑ Scholarly research      **e** ☐ Other _____

**c** ☑ Preservation for future generations

**4** Provide a description of the organization's collections and explain how they further the organization's exempt purpose in Part XIII.

**5** During the year, did the organization solicit or receive donations of art, historical treasures, or other similar assets to be sold to raise funds rather than to be maintained as part of the organization's collection? . . ☑ Yes ☐ No

| **Part IV** | **Escrow and Custodial Arrangements.** |
|---|---|

Complete if the organization answered "Yes" on Form 990, Part IV, line 9, or reported an amount on Form 990, Part X, line 21.

**1a** Is the organization an agent, trustee, custodian or other intermediary for contributions or other assets not included on Form 990, Part X? . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No

**b** If "Yes," explain the arrangement in Part XIII and complete the following table:

| | | Amount |
|---|---|---|
| **c** Beginning balance . . . . . . . . . . . | **1c** | |
| **d** Additions during the year . . . . . . . | **1d** | |
| **e** Distributions during the year . . . . . | **1e** | |
| **f** Ending balance . . . . . . . . . . . | **1f** | |

**2a** Did the organization include an amount on Form 990, Part X, line 21, for escrow or custodial account liability? ☐ Yes ☐ No

**b** If "Yes," explain the arrangement in Part XIII. Check here if the explanation has been provided on Part XIII . . . . ☐

| **Part V** | **Endowment Funds.** |
|---|---|

Complete if the organization answered "Yes" on Form 990, Part IV, line 10.

| | | (a) Current year | (b) Prior year | (c) Two years back | (d) Three years back | (e) Four years back |
|---|---|---|---|---|---|---|
| **1a** | Beginning of year balance . . . | 20,293,364 | 20,566,237 | 19,520,483 | 17,657,500 | 16,738,084 |
| **b** | Contributions . . . . . . . | 1,152,173 | 1,603,940 | 1,371,910 | 1,482,504 | 1,988,178 |
| **c** | Net investment earnings, gains, and losses . . . . . . . . . . . | 2,118,475 | (886,512) | 625,818 | 1,204,551 | (266,970) |
| **d** | Grants or scholarships . . . . | 0 | 0 | | | |
| **e** | Other expenditures for facilities and programs . . . . . . . . . . | 0 | 940,564 | 916,400 | 786,344 | 772,538 |
| **f** | Administrative expenses . . . . | 51,474 | 49,737 | 35,574 | 37,728 | 29,798 |
| **g** | End of year balance . . . . . | 23,512,538 | 20,293,364 | 20,566,237 | 19,520,483 | 17,657,500 |

**2** Provide the estimated percentage of the current year end balance (line 1g, column (a)) held as:

**a** Board designated or quasi-endowment ▶ _____ 0.00 %

**b** Permanent endowment ▶ _____ 100.00 %

**c** Term endowment ▶ _____ 0.00 %

The percentages on lines 2a, 2b, and 2c should equal 100%.

**3a** Are there endowment funds not in the possession of the organization that are held and administered for the organization by:

| | | Yes | No |
|---|---|---|---|
| **(i)** Unrelated organizations . . . . . . . . . . . . . . . . . . . . . . | **3a(i)** | | ✓ |
| **(ii)** Related organizations . . . . . . . . . . . . . . . . . . . . . . | **3a(ii)** | ✓ | |
| **b** If "Yes" on line 3a(ii), are the related organizations listed as required on Schedule R? . . . . . . | **3b** | ✓ | |

**4** Describe in Part XIII the intended uses of the organization's endowment funds.

| **Part VI** | **Land, Buildings, and Equipment.** |
|---|---|

Complete if the organization answered "Yes" on Form 990, Part IV, line 11a. See Form 990, Part X, line 10.

| Description of property | (a) Cost or other basis (investment) | (b) Cost or other basis (other) | (c) Accumulated depreciation | (d) Book value |
|---|---|---|---|---|
| **1a** Land . . . . . . . . . . . | 0 | 5,380,792 | | 5,380,792 |
| **b** Buildings . . . . . . . . . | | 55,907,362 | 34,155,156 | 21,752,206 |
| **c** Leasehold improvements . . . . | | | | |
| **d** Equipment . . . . . . . . . | | 18,716,748 | 15,792,628 | 2,924,120 |
| **e** Other . . . . . . . . . . | | | | |
| **Total.** Add lines 1a through 1e. *(Column (d) must equal Form 990, Part X, column (B), line 10c.)* . . . . . ▶ | | | | 30,057,118 |

Schedule D (Form 990) 2019

Schedule D (Form 990) 2019                                                                 Page **3**

### Part VII   Investments—Other Securities.

Complete if the organization answered "Yes" on Form 990, Part IV, line 11b. See Form 990, Part X, line 12.

| (a) Description of security or category (including name of security) | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| **(1)** Financial derivatives . . . . . . . . . . . | | |
| **(2)** Closely held equity interests . . . . . . . . | | |
| **(3)** Other | | |
| (A) | | |
| (B) | | |
| (C) | | |
| (D) | | |
| (E) | | |
| (F) | | |
| (G) | | |
| (H) | | |
| **Total.** *(Column (b) must equal Form 990, Part X, col. (B) line 12.)* ▶ | | |

### Part VIII   Investments—Program Related.

Complete if the organization answered "Yes" on Form 990, Part IV, line 11c. See Form 990, Part X, line 13.

| (a) Description of investment | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| **(1)** | | |
| **(2)** | | |
| **(3)** | | |
| **(4)** | | |
| **(5)** | | |
| **(6)** | | |
| **(7)** | | |
| **(8)** | | |
| **(9)** | | |
| **Total.** *(Column (b) must equal Form 990, Part X, col. (B) line 13.)* ▶ | | |

### Part IX   Other Assets.

Complete if the organization answered "Yes" on Form 990, Part IV, line 11d. See Form 990, Part X, line 15.

| (a) Description | (b) Book value |
|---|---|
| **(1)** OTHER | 3,970,243 |
| **(2)** DUE FROM NRA FOUNDATION | 32,252,080 |
| **(3)** DUE FROM NRA CIVIL RIGHTS DEFFENSE FUND | 1,374 |
| **(4)** DUE FROM NRA SPECIAL CONTRIBUTION FUND | 342,184 |
| **(5)** | |
| **(6)** | |
| **(7)** | |
| **(8)** | |
| **(9)** | |
| **Total.** *(Column (b) must equal Form 990, Part X, col. (B) line 15.)* . . . . . . . . . . ▶ | 36,565,881 |

### Part X   Other Liabilities.

Complete if the organization answered "Yes" on Form 990, Part IV, line 11e or 11f. See Form 990, Part X, line 25.

| **1.** (a) Description of liability | (b) Book value |
|---|---|
| (1) Federal income taxes | |
| (2) NOTE PAYABLE - NRA FOUNDATION | 5,000,000 |
| (3) CAPITAL LEASE ARRANGEMENT | 918,898 |
| (4) ACCRUED SALES AND USE TAXES | 149,220 |
| (5) COUPON LIABILITY | 0 |
| (6) DERIVATIVE INSTRUMENT MARKET VALUATION | 0 |
| (7) | |
| (8) | |
| (9) | |
| **Total.** *(Column (b) must equal Form 990, Part X, col. (B) line 25.)* . . . . . . . . . . ▶ | 6,068,118 |

**2.** Liability for uncertain tax positions. In Part XIII, provide the text of the footnote to the organization's financial statements that reports the organization's liability for uncertain tax positions under FASB ASC 740. Check here if the text of the footnote has been provided in Part XIII . ☑

**NATIONAL RIFLE ASSOCIATION OF AMERICA**                61        11/18/2020 9:47:17 AM        Schedule D (Form 990) 2019
53-0116130

Schedule D (Form 990) 2019          Page **4**

**Part XI**   **Reconciliation of Revenue per Audited Financial Statements With Revenue per Return.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 12a.

| | | | | |
|---|---|---|---|---|
| 1 | Total revenue, gains, and other support per audited financial statements . . . . . . . . | | **1** | 306,852,309 |
| 2 | Amounts included on line 1 but not on Form 990, Part VIII, line 12: | | | |
| a | Net unrealized gains (losses) on investments . . . . . . . . | **2a** | 6,605,046 | |
| b | Donated services and use of facilities . . . . . . . . | **2b** | 0 | |
| c | Recoveries of prior year grants . . . . . . . . | **2c** | 0 | |
| d | Other (Describe in Part XIII.) . . . . . . . . | **2d** | 3,656,292 | |
| e | Add lines **2a** through **2d** . . . . . . . . . . . . . . . | | | **2e** | 10,261,338 |
| 3 | Subtract line **2e** from line **1** . . . . . . . . . . . . . . | | **3** | 296,590,971 |
| 4 | Amounts included on Form 990, Part VIII, line 12, but not on line 1: | | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b . . | **4a** | | |
| b | Other (Describe in Part XIII.) . . . . . . . . | **4b** | (5,435,507) | |
| c | Add lines **4a** and **4b** . . . . . . . . . . . . . . . . | | | **4c** | (5,435,507) |
| 5 | Total revenue. Add lines **3** and **4c**. *(This must equal Form 990, Part I, line 12.)* . . . . . . . | | **5** | 291,155,464 |

**Part XII**   **Reconciliation of Expenses per Audited Financial Statements With Expenses per Return.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 12a.

| | | | | |
|---|---|---|---|---|
| 1 | Total expenses and losses per audited financial statements . . . . . . . | | **1** | 308,822,822 |
| 2 | Amounts included on line 1 but not on Form 990, Part IX, line 25: | | | |
| a | Donated services and use of facilities . . . . . . . . | **2a** | 0 | |
| b | Prior year adjustments . . . . . . . . | **2b** | 0 | |
| c | Other losses . . . . . . . . | **2c** | 0 | |
| d | Other (Describe in Part XIII.) . . . . . . . . | **2d** | 5,526,998 | |
| e | Add lines **2a** through **2d** . . . . . . . . . . . . . . . | | | **2e** | 5,526,998 |
| 3 | Subtract line **2e** from line **1** . . . . . . . . . . . . . . | | **3** | 303,295,824 |
| 4 | Amounts included on Form 990, Part IX, line 25, but not on line 1: | | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b . . | **4a** | | |
| b | Other (Describe in Part XIII.) . . . . . . . . | **4b** | 91,491 | |
| c | Add lines **4a** and **4b** . . . . . . . . . . . . . . . . | | | **4c** | 91,491 |
| 5 | Total expenses. Add lines **3** and **4c**. *(This must equal Form 990, Part I, line 18.)* . . . . . . . | | **5** | 303,387,315 |

**Part XIII**   **Supplemental Information.**

Provide the descriptions required for Part II, lines 3, 5, and 9; Part III, lines 1a and 4; Part IV, lines 1b and 2b; Part V, line 4; Part X, line 2; Part XI, lines 2d and 4b; and Part XII, lines 2d and 4b. Also complete this part to provide any additional information.

SEE STATEMENT

----

----

----

----

----

----

----

----

----

----

----

----

NATIONAL RIFLE ASSOCIATION OF AMERICA      62      11/18/2020 9:47:17 AM
53-0116130

Appx. 419

| Part XIII | Provide the descriptions required for Part II, lines 3, 5, and 9; Part III, lines 1a and 4; Part IV, lines 1b and 2b; Part V, line 4; Part X, line 2; Part XI, lines 2d and 4b; and Part XII, lines 2d and 4b. Also complete this part to provide any additional information. |
|---|---|

| Return Reference - Identifier | Explanation | |
|---|---|---|
| SCHEDULE D, PART XI, LINE 2(D) - OTHER REVENUES IN AUDITED FINANCIAL STATEMENTS NOT IN FORM 990 | **(a)** Description | **(b)** Amount |
| | OTHER- AGENCY TRANSACTIONS | 3,534,160 |
| | OTHER-UNREALIZED GAIN (LOSS) ON DERIVATIVE INSTRUMENT | 122,132 |
| SCHEDULE D, PART XI, LINE 4(B) - OTHER REVENUE | **(a)** Description | **(b)** Amount |
| | GRANTS PAID | 91,491 |
| | RENT EXPENSE | - 1,941,872 |
| | COST OF GOOD SOLD-MEMBERSHIP | - 3,585,126 |
| SCHEDULE D, PART XII, LINE 2(D) - OTHER EXPENSES IN AUDITED FINANCIAL STATEMENTS NOT IN FORM 990 | **(a)** Description | **(b)** Amount |
| | RENTAL EXPENSE | 1,941,872 |
| | COST OF GOODS SOLD-MEMBERSHIP | 3,585,126 |
| SCHEDULE D, PART XII, LINE 4(B) - OTHER EXPENSES | **(a)** Description | **(b)** Amount |
| | INTEREST ON ENDOWMENTS - GRANTS | 91,491 |

| Part XIII | **Supplemental Information.** Provide the descriptions required for Part II, lines 3, 5, and 9; Part III, lines 1a and 4; Part IV, lines 1b and 2b; Part V, line 4; Part X, line 2; Part XI, lines 2d and 4b; and Part XII, lines 2d and 4b. Also complete this part to provide any additional information. |
|---|---|

| Return Reference - Identifier | Explanation |
|---|---|
| SCHEDULE D, PART III, LINE 4 - COLLECTIONS OF ART - DESCRIPTION OF COLLECTIONS | THIS RESPONSE DESCRIBES THE MUSEUM COLLECTIONS WHICH ARE HELD BY THE NRA'S RELATED ORGANIZATIONS AND CURATED BY NRA EMPLOYEES. THE NRA MUSEUMS PROMOTE GUN COLLECTING AND PRESERVATION OF HISTORY THOUGH FIREARMS. THE NRA MUSEUMS INCLUDE THE NATIONAL FIREARMS MUSEUM IN FAIRFAX, VIRGINIA; THE FRANK BROWNELL MUSEUM OF THE SOUTHWEST IN RATON, NEW MEXICO; AND THE NRA NATIONAL SPORTING ARMS MUSEUM AT BASS PRO SHOPS IN SPRINGFIELD, MISSOURI. TO MAKE THE NRA MUSEUMS THE FINEST POSSIBLE RESOURCE FOR THE PUBLIC, THE NRA AND ITS AFFILIATED CHARITIES RELY ON GENEROUS SUPPORTERS TO BUILD THE EXHIBITION AND RESEARCH COLLECTIONS THROUGH COLLECTIONS OF HISTORICALLY SIGNIFICANT FIREARMS. PLEASE VISIT NRAMUSEUMS.ORG FOR CURRENT INFORMATION ON THE MUSEUM GALLERIES. |
| SCHEDULE D, PART III, LINE 5 - DONATIONS | THIS RESPONSE EXPLAINS WHY THE NRA MAY SOLICIT OR RECEIVE ASSETS THAT SOME DONORS INTEND TO BE SOLD RATHER THAN MAINTAINED PERMANENTLY. WHEN DONORS INTEND THEIR GIFTS OF FIREARMS TO BE SOLD RATHER THEN HELD FOR EXHIBITION OR RESEARCH IN THE COLLECTIONS OF THE NRA MUSEUM, THE NRA PARTNERS WITH AUCTION HOUSES. DONORS MAY CHOOSE TO HAVE GUNS SOLD FOR VARIOUS REASONS, SUCH AS TO SUPPORT CURRENT PROGRAM SERVICES OR TO FUND A CHARITABLE GIFT ANNUITY OR CHARITABLE TRUST WITH ONE OF THE NRA'S AFFILIATED CHARITIES. THE PHILANTHROPIC INTENT OF EACH DONOR DETERMINES HOW A GIFT IS HANDLED. |
| SCHEDULE D, PART V, LINE 4 - INTENDED USES OF ENDOWMENT FUNDS | THIS RESPONSE DESCRIBES THE INTENDED USES OF THE ORGANIZATION'S ENDOWMENT FUNDS. THE ENDOWMENT FUNDS BENEFIT A DIVERSE RANGE OF PHILANTHROPIC INTERESTS, INCLUDING TRAINING IN MARKSMANSHIP, NATIONAL SHOOTING CHAMPIONSHIPS, WOMEN'S LEADERSHIP, HUNTERS'LEADERSHIP, RECREATIONAL SHOOTING, LAW ENFORCEMENT, NRA MUSEUMS, AND THE NATIONAL ENDOWMENT FOR THE PROTECTION OF THE SECOND AMENDMENT. |
| SCHEDULE D, PART X, LINE 1 - OTHER LIABILITIES-TAXES | THIS INFORMATIONAL NOTE REGARDS THE NRA'S TAXES. THE NRA IS A SUBSTANTIAL TAXPAYER AND REMAINS IN GOOD STANDING WITH THE TAX AUTHORITIES. STATE AND LOCAL TAXES PAID BY THE NRA INCLUDE SALES AND USE TAXES, REAL ESTATE AND PERSONAL PROPERTY TAXES, AMUSEMENT TAXES, AND STATE UNEMPLOYMENT TAXES. THE LIABILITY SHOWN ON SCHEDULE D, PART X FOR ACCRUED SALES AND USE TAXES RELATES TO TIMING AND IS A SMALL FRACTION OF TAXES PAID DURING THE YEAR. ADDITIONAL NOTES REGARDING THE NRA'S TAXES ARE SHARED ON SCHEDULE C REGARDING 527(F) PROXY TAXES AND ON SCHEDULE O REGRADING UNRELATED BUSINESS INCOME TAXES. THE NRA CHOOSES TO SHARE THIS ADDITIONAL INFORMATION ABOUT THE NRA'S TOTAL TAXES TO DEMONSTRATE IN GOOD FAITH THAT THE ORGANIZATION IS A TAXPAYER IN GOOD STANDING. |
| SCHEDULE D, PART X, LINE 2 - FIN 48 (ASC 740) FOOTNOTE | THIS RESPONSE PROVIDES THE TEXT OF THE FOOTNOTE TO THE ORGANIZATION'S FINANCIAL STATEMENTS IN ACCORDANCE WITH FASB ASC 740 THE NRA IS EXEMPT FROM FEDERAL INCOME TAXES UNDER SECTION 501(C)(4) OF THE INTERNAL REVENUE CODE AND FROM STATE INCOME TAXES. THE NRA ACTIVITIES THAT CAUSE IMPOSITION OF THE UNRELATED BUSINESS INCOME TAX PROVISION OF THE CODE RESULT IN NO SIGNIFICANT TAX LIABILITY. THE NRA FOLLOWS THE ACCOUNTING STANDARD ON ACCOUNTING FOR UNCERTAINTY IN INCOME TAXES, WHICH ADDRESSES THE DETERMINATION OF WHETHER TAX BENEFITS CLAIMED OR EXPECTED TO BE CLAIMED ON A TAX RETURN SHOULD BE RECORDED IN THE FINANCIAL STATEMENTS. UNDER THIS GUIDANCE, THE NRA MAY RECOGNIZE THE TAX BENEFIT FROM AN UNCERTAIN TAX POSITION ONLY IF IT IS MORE-LIKELY-THAN-NOT THAT THE TAX POSITION WILL BE SUSTAINED ON EXAMINATION BY TAXING AUTHORITIES, BASED ON THE TECHNICAL MERITS OF THE POSITION. THE TAX BENEFITS RECOGNIZED IN THE FINANCIAL STATEMENTS FROM SUCH A POSITION ARE MEASURED BASED ON THE LARGEST BENEFIT THAT HAS A GREATER THAN 50% LIKELIHOOD OF BEING REALIZED UPON ULTIMATE SETTLEMENT. THE GUIDANCE ON ACCOUNTING FOR UNCERTAINTY IN INCOME TAXES ALSO ADDRESSES DE-RECOGNITION, CLASSIFICATION, INTEREST AND PENALTIES ON INCOME TAXES, AND ACCOUNTING IN INTERIM PERIODS. MANAGEMENT EVALUATED THE NRA'S TAX POSITIONS AND CONCLUDED THAT THE NRA HAD TAKEN NO UNCERTAIN TAX POSITIONS THAT REQUIRE ADJUSTMENT TO THE FINANCIAL STATEMENTS TO COMPLY WITH THE PROVISIONS OF THIS GUIDANCE. TAX YEARS FROM 2016 THROUGH THE CURRENT YEAR REMAIN OPEN FOR EXAMINATION BY TAX AUTHORITIES. |

**SCHEDULE F**
**(Form 990)**

Department of the Treasury
Internal Revenue Service

# Statement of Activities Outside the United States

▶ **Complete if the organization answered "Yes" on Form 990, Part IV, line 14b, 15, or 16.**
▶ **Attach to Form 990.**
▶ **Go to *www.irs.gov/Form990* for instructions and the latest information.**

OMB No. 1545-0047

**2019**

**Open to Public Inspection**

| Name of the organization | Employer identification number |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130 |

**Part I**    **General Information on Activities Outside the United States.** Complete if the organization answered "Yes" on Form 990, Part IV, line 14b.

**1**   **For grantmakers.** Does the organization maintain records to substantiate the amount of its grants and other assistance, the grantees' eligibility for the grants or assistance, and the selection criteria used to award the grants or assistance?   . . . . . . . . . . . . . . . . . . . . .   ☐ **Yes** ☐ **No**

**2**   **For grantmakers.** Describe in Part V the organization's procedures for monitoring the use of its grants and other assistance outside the United States.

**3**   Activities per Region. (The following Part I, line 3 table can be duplicated if additional space is needed.)

| (a) Region | (b) Number of offices in the region | (c) Number of employees, agents, and independent contractors in the region | (d) Activities conducted in the region (by type) (such as, fundraising, program services, investments, grants to recipients located in the region) | (e) If activity listed in (d) is a program service, describe specific type of service(s) in the region | (f) Total expenditures for and investments in the region |
|---|---|---|---|---|---|
| **(1)** CENTRAL AMERICA AND THE CARIBBEAN | 0 | 0 | INVESTMENTS | | 3,352,620 |
| **(2)** EAST ASIA AND THE PACIFIC | 0 | 0 | PROGRAM SERVICES | PUBLICATIONS | 600 |
| **(3)** EUROPE (INCLUDING ICELAND AND GREENLAND) | 0 | 0 | FUNDRAISING | | 4,800 |
| **(4)** EUROPE (INCLUDING ICELAND AND GREENLAND) | 0 | 0 | PROGRAM SERVICES | PUBLICATIONS | 15,600 |
| **(5)** MIDDLE EAST AND NORTH AFRICA | 0 | 0 | FUNDRAISING | | 315 |
| **(6)** NORTH AMERICA (CANADA & MEXICO ONLY) | 0 | 0 | PROGRAM SERVICES | PUBLICATIONS | 21,500 |
| **(7)** NORTH AMERICA (CANADA & MEXICO ONLY) | 0 | 0 | FUNDRAISING | NRA OUTDOORS | 2,800 |
| **(8)** SUB-SAHARAN AFRICA | 0 | 0 | PROGRAM SERVICES | NRA OUTDOORS | 3,700 |
| **(9)** EAST ASIA AND THE PACIFIC | 0 | 0 | FUNDRAISING | | 14 |
| **(10)** | | | | | |
| **(11)** | | | | | |
| **(12)** | | | | | |
| **(13)** | | | | | |
| **(14)** | | | | | |
| **(15)** | | | | | |
| **(16)** | | | | | |
| **(17)** | | | | | |
| **3a** Subtotal . . . . . | 0 | 0 | | | 3,401,949 |
| **b** Total from continuation sheets to Part I . . . | 0 | 0 | | | 0 |
| **c** **Totals** (add lines 3a and 3b) | 0 | 0 | | | 3,401,949 |

**For Paperwork Reduction Act Notice, see the Instructions for Form 990.**     Cat. No. 50082W     **Schedule F (Form 990) 2019**

Schedule F (Form 990) 2019

Page **2**

## Part II — Grants and Other Assistance to Organizations or Entities Outside the United States.

Complete if the organization answered "Yes" on Form 990, Part IV, line 15, for any recipient who received more than $5,000. Part II can be duplicated if additional space is needed.

| 1 | (a) Name of organization | (b) IRS code section and EIN (if applicable) | (c) Region | (d) Purpose of grant | (e) Amount of cash grant | (f) Manner of cash disbursement | (g) Amount of noncash assistance | (h) Description of noncash assistance | (i) Method of valuation (book, FMV, appraisal, other) |
|---|---|---|---|---|---|---|---|---|---|
| (1) | | | | | | | | | |
| (2) | | | | | | | | | |
| (3) | | | | | | | | | |
| (4) | | | | | | | | | |
| (5) | | | | | | | | | |
| (6) | | | | | | | | | |
| (7) | | | | | | | | | |
| (8) | | | | | | | | | |
| (9) | | | | | | | | | |
| (10) | | | | | | | | | |
| (11) | | | | | | | | | |
| (12) | | | | | | | | | |
| (13) | | | | | | | | | |
| (14) | | | | | | | | | |
| (15) | | | | | | | | | |
| (16) | | | | | | | | | |

2 Enter total number of recipient organizations listed above that are recognized as charities by the foreign country, recognized as tax-exempt by the IRS, or for which the grantee or counsel has provided a section 501(c)(3) equivalency letter . . . . . . . . . . . . ▲

3 Enter total number of other organizations or entities . . . . . . . . . . . . . . . . . ▲

Schedule F (Form 990) 2019

NATIONAL RIFLE ASSOCIATION OF AMERICA
53-0116130

66                11/18/2020 9:47:17 AM

Appx. 423

Schedule F (Form 990) 2019

**Page 3**

**Part III** **Grants and Other Assistance to Individuals Outside the United States.** Complete if the organization answered "Yes" on Form 990, Part IV, line 16.
Part III can be duplicated if additional space is needed.

| (a) Type of grant or assistance | (b) Region | (c) Number of recipients | (d) Amount of cash grant | (e) Manner of cash disbursement | (f) Amount of noncash assistance | (g) Description of noncash assistance | (h) Method of valuation (book, FMV, appraisal, other) |
|---|---|---|---|---|---|---|---|
| (1) | | | | | | | |
| (2) | | | | | | | |
| (3) | | | | | | | |
| (4) | | | | | | | |
| (5) | | | | | | | |
| (6) | | | | | | | |
| (7) | | | | | | | |
| (8) | | | | | | | |
| (9) | | | | | | | |
| (10) | | | | | | | |
| (11) | | | | | | | |
| (12) | | | | | | | |
| (13) | | | | | | | |
| (14) | | | | | | | |
| (15) | | | | | | | |
| (16) | | | | | | | |
| (17) | | | | | | | |
| (18) | | | | | | | |

Schedule F (Form 990) 2019

NATIONAL RIFLE ASSOCIATION OF AMERICA
53-0116130

67          11/18/2020 9:47:17 AM

| Part IV | Foreign Forms |
|---|---|

**1** Was the organization a U.S. transferor of property to a foreign corporation during the tax year? *If "Yes," the organization may be required to file Form 926, Return by a U.S. Transferor of Property to a Foreign Corporation (see Instructions for Form 926)* . . . . . . . . . . . . . . . . . . ☐ **Yes** ☑ **No**

**2** Did the organization have an interest in a foreign trust during the tax year? *If "Yes," the organization may be required to separately file Form 3520, Annual Return To Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts, and/or Form 3520-A, Annual Information Return of Foreign Trust With a U.S. Owner (see Instructions for Forms 3520 and 3520-A; don't file with Form 990)* . . . . . . . ☐ **Yes** ☑ **No**

**3** Did the organization have an ownership interest in a foreign corporation during the tax year? *If "Yes," the organization may be required to file Form 5471, Information Return of U.S. Persons With Respect to Certain Foreign Corporations (see Instructions for Form 5471)* . . . . . . . . . . . . . ☐ **Yes** ☑ **No**

**4** Was the organization a direct or indirect shareholder of a passive foreign investment company or a qualified electing fund during the tax year? *If "Yes," the organization may be required to file Form 8621, Information Return by a Shareholder of a Passive Foreign Investment Company or Qualified Electing Fund (see Instructions for Form 8621)* . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☑ **No**

**5** Did the organization have an ownership interest in a foreign partnership during the tax year? *If "Yes," the organization may be required to file Form 8865, Return of U.S. Persons With Respect to Certain Foreign Partnerships (see Instructions for Form 8865)* . . . . . . . . . . . . ☐ **Yes** ☑ **No**

**6** Did the organization have any operations in or related to any boycotting countries during the tax year? *If "Yes," the organization may be required to separately file Form 5713, International Boycott Report (see Instructions for Form 5713; don't file with Form 990)* . . . . . . . . . . . . . . . . ☐ **Yes** ☑ **No**

| Part V | | Supplemental Information. Provide the information required by Part I, line 2 (monitoring of funds); Part I, line 3, column (f) (accounting method;amounts of investments vs. expenditures per region); Part II, line 1 (accounting method); Part III (accounting method); andPart III, column (c) (estimated number of recipients), as applicable. Also complete this part to provide any additional information (see instructions). |

| Return Reference - Identifier | Explanation |
|---|---|
| SCHEDULE F, PART I, LINE 3 - 1. ACTIVITIES PER REGION-OFFSHORE INVESTMENTS | THE NRA'S OFFSHORE INVESTMENTS FOLLOW INDUSTRY STANDARD BEST PRACTICES IN RISK MANAGEMENT FOR NATIONAL NONPROFIT INSTITUTIONAL INVESTORS. ALTERNATIVE INVESTMENTS REDUCE OVERALL PORTFOLIO RISK BY REDUCING VOLATILITY AND IMPROVING DIVERSIFICATION. THE NRA MAINTAINS SEVERAL INVESTMENT ACCOUNTS THAT ARE MULTI-STRATEGY FUNDS OF FUNDS. INCOME FROM PASSIVE INVESTMENTS, WHEN APPROPRIATELY STRUCTURED, IS EXCLUDED FROM UNRELATED BUSINESS INCOME BY LAW. THIS TYPE OF INVESTMENT POSTURE IS COMMONLY ACCEPTED IN THE U.S. EXEMPT ORGANIZATION INDUSTRY. 100% OF THE AMOUNT IS THE TOTAL BOOK VALUE OF INVESTMENTS FOR THAT REGION. |
| SCHEDULE F, PART I, LINE 3 - ACTIVITIES PER REGION | THIS DISCLOSURE REFERS TO FOREIGN FUNDRAISING. 100% OF THE AMOUNT IS THE CASH VALUE OF EXPENDITURES MADE BY THE NRA FOR NECESSARY TRAVEL, ACCOMMODATIONS, AND RELATED EXPENSES. |
| SCHEDULE F, PART I, LINE 3 - ACTIVITIES PER REGION-PROGRAM SERVICES | THIS DISCLOSURE OF PROGRAM SERVICES REFERS TO NRA PUBLICATIONS DIVISION'S FOREIGN TRAVEL EXPENSES RELATING TO GATHERING MATERIALS FOR NRA MAGAZINES. 100% OF THE AMOUNT IS THE CASH VALUE OF EXPENDITURES MADE BY THE NRA FOR NECESSARY TRAVEL, ACCOMMODATIONS, AND RELATED EXPENSES. |
| SCHEDULE F, PART I, LINE 3 - METHOD TO ACCOUNT FOR EXPENDITURES ON ORG'S FINANCIAL STATEMENTS | CENTRAL AMERICA AND THE CARIBBEAN: ACCRUAL<br>EAST ASIA AND THE PACIFIC: ACCRUAL<br>EUROPE (INCLUDING ICELAND AND GREENLAND): ACCRUAL<br>MIDDLE EAST AND NORTH AFRICA: ACCRUAL<br>NORTH AMERICA (CANADA & MEXICO ONLY): ACCRUAL<br>SUB-SAHARAN AFRICA: ACCRUAL |

**SCHEDULE G**
**(Form 990 or 990-EZ)**

**Supplemental Information Regarding Fundraising or Gaming Activities**

Complete if the organization answered "Yes" on Form 990, Part IV, line 17, 18, or 19, or if the organization entered more than $15,000 on Form 990-EZ, line 6a.
► Attach to Form 990 or Form 990-EZ.
► Go to *www.irs.gov/Form990* for instructions and the latest information.

Department of the Treasury
Internal Revenue Service

OMB No. 1545-0047

**2019**

Open to Public Inspection

| Name of the organization | Employer identification number |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130 |

**Part I**   **Fundraising Activities.** Complete if the organization answered "Yes" on Form 990, Part IV, line 17. Form 990-EZ filers are not required to complete this part.

1   Indicate whether the organization raised funds through any of the following activities. Check all that apply.

- a ☑ Mail solicitations
- b ☑ Internet and email solicitations
- c ☑ Phone solicitations
- d ☐ In-person solicitations
- e ☐ Solicitation of non-government grants
- f ☐ Solicitation of government grants
- g ☐ Special fundraising events

2a   Did the organization have a written or oral agreement with any individual (including officers, directors, trustees, or key employees listed in Form 990, Part VII) or entity in connection with professional fundraising services?   ☑ Yes ☐ No

b   If "Yes," list the 10 highest paid individuals or entities (fundraisers) pursuant to agreements under which the fundraiser is to be compensated at least $5,000 by the organization.

| (i) Name and address of individual or entity (fundraiser) | (ii) Activity | (iii) Did fundraiser have custody or control of contributions? | | (iv) Gross receipts from activity | (v) Amount paid to (or retained by) fundraiser listed in col. (i) | (vi) Amount paid to (or retained by) organization |
|---|---|---|---|---|---|---|
| | | Yes | No | | | |
| 1 ALLEGIANCE DBA MEMBERSHIP ADVISORS, 11250 WAPLES MILL RD, FAIRFAX, VA 22030 | FUNDRAISING CONSULTANT | | ✓ | 47,634,979 | 1,080,000 | 46,554,979 |
| 2 INFOCISION MANAGEMENT CORP, 325 SPRINGSIDE DR, AKRON, OH 44333 | PAID SOLICITOR | | ✓ | 7,044,115 | 3,437,873 | 3,606,242 |
| 3 501C SOLUTIONS, 2530 MERIDIAN PKWY, STE 300, RESEARCH TRIANGLE PARK, NC 27713 | FUNDRAISING CONSULTANT | | ✓ | 0 | 320,000 | (320,000) |
| 4 MCKENNA & ASSOCIATES, 2001 CALRENDON BLVD, STE 201, ARLINGTON, VA 22202 | FUNDRAISING CONSULTANT | | ✓ | 0 | 300,000 | (300,000) |
| 5 KEY & ASSOCIATES, 12177 CHANCERY STATION CIR, RESTON, VA 20191 | FUNDRAISING CONSULTANT | | ✓ | 0 | 72,000 | (72,000) |
| 6 COMMONWEALTH GROUP PARTNERS, 1579 MONROE SR, STE F-341, ATLANTA, GA 30324 | FUNDRAISING CONSULTANT | | ✓ | 0 | 60,000 | (60,000) |
| 7 | | | | | | |
| 8 | | | | | | |
| 9 | | | | | | |
| 10 | | | | | | |
| Total  ········► | | | | 54,679,094 | 5,269,873 | 49,409,221 |

3   List all states in which the organization is registered or licensed to solicit contributions or has been notified it is exempt from registration or licensing.

AL, AK, AZ, AR, CA, CO, CT, DC, FL, GA, HI, IL, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, NH, NJ, NM, NY, NC, ND,
OH, OK, OR, PA, RI, SC, TN, UT, VA, WA, WV, WI

For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.    Cat. No. 50083H    **Schedule G (Form 990 or 990-EZ) 2019**

Schedule G (Form 990 or 990-EZ) 2019 · · · · · · · · · · · Page **2**

**Part II** **Fundraising Events.** Complete if the organization answered "Yes" on Form 990, Part IV, line 18, or reported more than $15,000 of fundraising event contributions and gross income on Form 990-EZ, lines 1 and 6b. List events with gross receipts greater than $5,000.

| | | **(a)** Event #1 NRAILA AUCTION (event type) | **(b)** Event #2 (event type) | **(c)** Other events (total number) | **(d)** Total events (add col. **(a)** through col. **(c)**) |
|---|---|---|---|---|---|
| Revenue | 1 Gross receipts . . . . | 758,465 | 0 | | 758,465 |
| | 2 Less: Contributions . . | 0 | 0 | | 0 |
| | 3 Gross income (line 1 minus line 2) . . . . . . . | 758,465 | 0 | 0 | 758,465 |
| Direct Expenses | 4 Cash prizes . . . . . | 0 | 0 | 0 | 0 |
| | 5 Noncash prizes . . . | 0 | 0 | 0 | 0 |
| | 6 Rent/facility costs . . . | 42,908 | | | 42,908 |
| | 7 Food and beverages . . | 193,500 | | | 193,500 |
| | 8 Entertainment . . . . | 147,899 | | | 147,899 |
| | 9 Other direct expenses . | 60,697 | | | 60,697 |
| | 10 Direct expense summary. Add lines 4 through 9 in column (d) . . . . . ▶ | | | | 445,004 |
| | 11 Net income summary. Subtract line 10 from line 3, column (d) . . . . . . ▶ | | | | 313,461 |

**Part III** **Gaming.** Complete if the organization answered "Yes" on Form 990, Part IV, line 19, or reported more than $15,000 on Form 990-EZ, line 6a.

| | | **(a)** Bingo | **(b)** Pull tabs/instant bingo/progressive bingo | **(c)** Other gaming | **(d)** Total gaming (add col. **(a)** through col. **(c)**) |
|---|---|---|---|---|---|
| Revenue | 1 Gross revenue . . . . | | | | |
| Direct Expenses | 2 Cash prizes . . . . . | | | | |
| | 3 Noncash prizes . . . | | | | |
| | 4 Rent/facility costs . . . | | | | |
| | 5 Other direct expenses . | | | | |
| | 6 Volunteer labor . . . . | ☐ Yes _____ % ☐ No | ☐ Yes _____ % ☐ No | ☐ Yes _____ % ☐ No | |
| | 7 Direct expense summary. Add lines 2 through 5 in column (d) . . . . . . ▶ | | | | |
| | 8 Net gaming income summary. Subtract line 7 from line 1, column (d) . . . . . . ▶ | | | | |

9 Enter the state(s) in which the organization conducts gaming activities: _____
a Is the organization licensed to conduct gaming activities in each of these states? . . . . . . . . . ☐ Yes ☐ No
b If "No," explain: _____
_____

10a Were any of the organization's gaming licenses revoked, suspended, or terminated during the tax year? . ☐ Yes ☐ No
b If "Yes," explain: _____
_____

Schedule G (Form 990 or 990-EZ) 2019

**NATIONAL RIFLE ASSOCIATION OF AMERICA**
**53-0116130**
71          11/18/2020 9:47:17 AM

Schedule G (Form 990 or 990-EZ) 2019       Page **3**

| | | | | |
|---|---|---|---|---|
| **11** | Does the organization conduct gaming activities with nonmembers? . . . . . . . . . . . . | | ☐ Yes | ☐ No |
| **12** | Is the organization a grantor, beneficiary or trustee of a trust, or a member of a partnership or other entity formed to administer charitable gaming? . . . . . . . . . . . . . . . | | ☐ Yes | ☐ No |
| **13** | Indicate the percentage of gaming activity conducted in: | | | |
| **a** | The organization's facility . . . . . . . . . . . . . . . . | **13a** | | % |
| **b** | An outside facility . . . . . . . . . . . . . . . | **13b** | | % |
| **14** | Enter the name and address of the person who prepares the organization's gaming/special events books and records: | | | |

Name ▶ --------------------------------------------------------

Address ▶ --------------------------------------------------------

| | | | | |
|---|---|---|---|---|
| **15a** | Does the organization have a contract with a third party from whom the organization receives gaming revenue? . . . . . . . . . . . . . . . . | | ☐ Yes | ☐ No |
| **b** | If "Yes," enter the amount of gaming revenue received by the organization ▶   $ ---------------- and the amount of gaming revenue retained by the third party ▶   $ ----------------- | | | |
| **c** | If "Yes," enter name and address of the third party: | | | |

Name ▶ --------------------------------------------------------

Address ▶ --------------------------------------------------------

**16** Gaming manager information:

Name ▶ --------------------------------------------------------

Gaming manager compensation ▶   $ ----------------------

Description of services provided ▶ -----------------------------------------

☐ Director/officer      ☐ Employee      ☐ Independent contractor

| | | | | |
|---|---|---|---|---|
| **17** | Mandatory distributions: | | | |
| **a** | Is the organization required under state law to make charitable distributions from the gaming proceeds to retain the state gaming license? . . . . . . . . . . . . | | ☐ Yes | ☐ No |
| **b** | Enter the amount of distributions required under state law to be distributed to other exempt organizations or spent in the organization's own exempt activities during the tax year ▶   $ | | | |

**Part IV**   **Supplemental Information.** Provide the explanations required by Part I, line 2b, columns (iii) and (v); and Part III, lines 9, 9b, 10b, 15b, 15c, 16, and 17b, as applicable. Also provide any additional information. See instructions.

SEE NEXT PAGE

------------------------------------------------------------------------
------------------------------------------------------------------------
------------------------------------------------------------------------
------------------------------------------------------------------------
------------------------------------------------------------------------
------------------------------------------------------------------------
------------------------------------------------------------------------
------------------------------------------------------------------------
------------------------------------------------------------------------
------------------------------------------------------------------------

Schedule G (Form 990 or 990-EZ) 2019

| Part IV | **Supplemental Information.** Provide the explanations required by Part I, line 2b, columns (iii) and (v), and Part III, lines 9, 9b, 10b, 15b, 15c, 16, and 17b, as applicable. Also provide any additional information (see instructions). |

| Return Reference - Identifier | Explanation |
|---|---|
| SCHEDULE G, PART I, LINE 2B(II) - VENDOR INFOCISION MANAGEMENT CORP | THIS SUPPLEMENTAL INFORMATION NOTES THE DISTINCTION BETWEEN 990 CORE FORM PART VII SECTION B LINE 1 (2) AND SCHEDULE G PART I LINE 2B(2) FOR THE FILING ORGANIZATION'S VENDOR INFOCISION MANAGEMENT CORP. THE VENDOR INFOCISION PROVIDED SERVICES TO THE FILING ORGANIZATION FOR BOTH MEMBERSHIPS AND CONTRIBUTIONS SOLICITATIONS, AS SHOWN ON 990 CORE FORM PART VIII SECTION B LINE 1. SCHEDULE G IS SPECIFIC TO THE VENDOR'S WORK AS A PAID SOLICITOR PROVIDING PROFESSIONAL FUNDRAISING SERVICES. THEREFORE, THE SCHEDULE G DISCLOSURE EXCLUDES THE MEMBERSHIP PROCESSING SERVICES. |

**SCHEDULE I**
**(Form 990)**

Department of the Treasury
Internal Revenue Service

# Grants and Other Assistance to Organizations, Governments, and Individuals in the United States

Complete if the organization answered "Yes" on Form 990, Part IV, line 21 or 22.

▶ Attach to Form 990.

▶ Go to *www.irs.gov/Form990* for the latest information.

OMB No. 1545-0047

**2019**

**Open to Public Inspection**

Name of the organization

NATIONAL RIFLE ASSOCIATION OF AMERICA

Employer identification number

53-0116130

## Part I General Information on Grants and Assistance

1 Does the organization maintain records to substantiate the amount of the grants or assistance, the grantees' eligibility for the grants or assistance, and the selection criteria used to award the grants or assistance? . . . . . . . . . . . . . . . . . . . . . . . . . ☑ Yes ☐ No

2 Describe in Part IV the organization's procedures for monitoring the use of grant funds in the United States.

## Part II Grants and Other Assistance to Domestic Organizations and Domestic Governments. Complete if the organization answered "Yes" on Form 990, Part IV, line 21, for any recipient that received more than $5,000. Part II can be duplicated if additional space is needed.

| 1 (a) Name and address of organization or government | (b) EIN | (c) IRC section (if applicable) | (d) Amount of cash grant | (e) Amount of non-cash assistance | (f) Method of valuation (book, FMV, appraisal, other) | (g) Description of noncash assistance | (h) Purpose of grant or assistance |
|---|---|---|---|---|---|---|---|
| (1) (SEE STATEMENT) | 52-1480785 | 501(C)(3) | 12,000 | | | | (SEE STATEMENT) |
| (2) | | | | | | | |
| (3) | | | | | | | |
| (4) | | | | | | | |
| (5) | | | | | | | |
| (6) | | | | | | | |
| (7) | | | | | | | |
| (8) | | | | | | | |
| (9) | | | | | | | |
| (10) | | | | | | | |
| (11) | | | | | | | |
| (12) | | | | | | | |

2 Enter total number of section 501(c)(3) and government organizations listed in the line 1 table . . . . . . . . . . . . ▲ 1

3 Enter total number of other organizations listed in the line 1 table . . . . . . . . . . . . . . . . . . . . . . ▲ 0

For Paperwork Reduction Act Notice, see the Instructions for Form 990.     Cat. No. 50055P     **Schedule I (Form 990) (2019)**

74     11/18/2020 9:47:17 AM

NATIONAL RIFLE ASSOCIATION OF AMERICA
53-0116130

Schedule I (Form 990) (2019)

Page **2**

**Part III** Grants and Other Assistance to **Domestic Individuals.** Complete if the organization answered "Yes" on Form 990, Part IV, line 22.
Part III can be duplicated if additional space is needed.

| (a) Type of grant or assistance | (b) Number of recipients | (c) Amount of cash grant | (d) Amount of noncash assistance | (e) Method of valuation (book, FMV, appraisal, other) | (f) Description of noncash assistance |
|---|---|---|---|---|---|
| 1  (SEE STATEMENT) | 22 | 91,491 | 0 | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |

**Part IV** Supplemental Information. Provide the information required in Part I, line 2; Part III, column (b); and any other additional information.

(SEE STATEMENT)

Schedule I (Form 990) (2019)

NATIONAL RIFLE ASSOCIATION OF AMERICA
53-0116130

75

11/18/2020 9:47:17 AM

| Part IV | **Supplemental Information.** Provide the information required in Part I, line 2, Part III, column (b), and any other additional information. |
| --- | --- |

| Return Reference - Identifier | Explanation |
| --- | --- |
| SCHEDULE I, PART I, LINE 2 - PROCEDURES FOR MONITORING USE OF GRANT FUNDS. | THE NATIONAL FOUNDATION FOR WOMEN LEGISLATORS PARTNERS WITH THE NATIONAL RIFLE ASSOCIATION FOR THE ANNUAL NFWL/NRA BILL OF RIGHTS ESSAY SCHOLARSHIP CONTEST FOR FEMALE HIGH SCHOOL JUNIORS AND SENIORS. THE NRA ACTIVELY ASSISTS NATIONAL FOUNDATION OF WOMEN LEGISLATORS IN THE SELECTION AND ADMINISTRATION OF NFWL SCHOLARSHIPS FOR COLLEGE. NFWL SCHOLARSHIP APPLICATIONS ARE ASSESSED ON THE ELEMENTS OF HISTORICAL RESEARCH, INSIGHT AND PERSPECTIVE, DEMONSTRATED UNDERSTANDING OF THE AMERICAN CONSTITUTION, INSPIRATIONAL QUALITY, AND MEANINGFUL PERSONAL CONNECTION. SCHOLARSHIP AWARDS ARE PAID DIRECTLY TO THE EDUCATIONAL INSTITUTION. |
| SCHEDULE I, PART II, COLUMN A - NAME AND ADDRESS OF ORGANIZATION OR GOVERNMENT | NATIONAL FOUNDATION FOR WOMEN LEGISLATORS<br><br>910 16TH ST NW, WASHINGTON, DC 20006-2900 |
| SCHEDULE I, PART II , COLUMN H - PURPOSE OF GRANT OR ASSISTANCE | NATIONAL FOUNDATION FOR WOMEN LEGISLATORS:<br><br>UNDERGRADUATE COLLEGE SCHOLARSHIP |
| SCHEDULE I, PART III - LINE 1 | THE NRA JEANNE E. BRAY MEMORIAL SCHOLARSHIP AWARDS PROGRAM IS NAMED IN HONOR AND RECOGNITION OF THE GROUNDBREAKING POLICE OFFICER JEANNE E. BRAY, A SHOOTING CHAMPION AND PAST MEMBER OF THE NRA BOARD OF DIRECTORS. JEANNE E. BRAY WAS THE FIRST FEMALE DETECTIVE ON BURGLARY SQUAD, WHICH HAS EVOLVED INTO TODAY'S MODERN SWAT TEAMS. SHE WAS THE FIRST FEMALE POLICE OFFICER TO EARN THE NRA POLICE MARKSMANSHIP "DISTINGUISHED" BAR, AND SHE WON THE NATIONAL WOMEN'S POLICE PISTOL COMBAT CHAMPIONSHIP FIVE TIMES FROM 1962 TO 1967. THE PROGRAM OFFERS SCHOLARSHIPS OF UP TO $2,500 PER SEMESTER, UP TO $5,000 PER YEAR FOR A MAXIMUM OF FOUR YEARS, TO DEPENDENT CHILDREN OF ANY PUBLIC LAW ENFORCEMENT OFFICER KILLED IN THE LINE OF DUTY WHO WAS AN NRA MEMBER AT THE TIME OF DEATH, AND TO DEPENDENT CHILDREN OF ANY CURRENT OR RETIRED LAW ENFORCEMENT OFFICERS WHO ARE LIVING AND HAVE CURRENT NRA MEMBERSHIP. THE MEMBERSHIP RESTRICTION IS PERMITTED BY LAW BECAUSE THE NRA JEANNE E. BRAY MEMORIAL SCHOLARSHIP AWARDS PROGRAM IS A 501(C)(4) PROGRAM. SCHOLARSHIP AWARDS ARE PAID DIRECTLY TO THE EDUCATIONAL INSTITUTION. |
| SCHEDULE I, PART III, COLUMN A - TYPE OF GRANT | NRA JEANNE E BRAY MEMORIAL SCHOLARSHIP AWARDS |

**SCHEDULE J**
**(Form 990)**

Department of the Treasury
Internal Revenue Service

# Compensation Information

**For certain Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

▶ Complete if the organization answered "Yes" on Form 990, Part IV, line 23.
▶ Attach to Form 990.
▶ Go to *www.irs.gov/Form990* for instructions and the latest information.

OMB No. 1545-0047

**20****19**

**Open to Public Inspection**

| Name of the organization | Employer identification number |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130 |

**Part I** **Questions Regarding Compensation**

| | | Yes | No |
|---|---|---|---|
| **1a** | Check the appropriate box(es) if the organization provided any of the following to or for a person listed on Form 990, Part VII, Section A, line 1a. Complete Part III to provide any relevant information regarding these items. | | |

☑ First-class or charter travel ☑ Housing allowance or residence for personal use
☑ Travel for companions ☐ Payments for business use of personal residence
☑ Tax indemnification and gross-up payments ☑ Health or social club dues or initiation fees
☐ Discretionary spending account ☐ Personal services (such as maid, chauffeur, chef)

| | | | | Yes | No |
|---|---|---|---|---|---|
| **b** | If any of the boxes on line 1a are checked, did the organization follow a written policy regarding payment or reimbursement or provision of all of the expenses described above? If "No," complete Part III to explain . . . . . . . . . . . . . . . | | **1b** | | ✓ |
| **2** | Did the organization require substantiation prior to reimbursing or allowing expenses incurred by all directors, trustees, and officers, including the CEO/Executive Director, regarding the items checked on line 1a? . . . . . . . . . . . . . . . | | **2** | | ✓ |

| **3** | Indicate which, if any, of the following the organization used to establish the compensation of the organization's CEO/Executive Director. Check all that apply. Do not check any boxes for methods used by a related organization to establish compensation of the CEO/Executive Director, but explain in Part III. |
|---|---|

☑ Compensation committee ☑ Written employment contract
☐ Independent compensation consultant ☑ Compensation survey or study
☐ Form 990 of other organizations ☑ Approval by the board or compensation committee

| | | | Yes | No |
|---|---|---|---|---|
| **4** | During the year, did any person listed on Form 990, Part VII, Section A, line 1a, with respect to the filing organization or a related organization: | | | |
| **a** | Receive a severance payment or change-of-control payment? . . . . . . . . . | **4a** | ✓ | |
| **b** | Participate in, or receive payment from, a supplemental nonqualified retirement plan? . . . | **4b** | ✓ | |
| **c** | Participate in, or receive payment from, an equity-based compensation arrangement? . . . | **4c** | | ✓ |
| | If "Yes" to any of lines 4a–c, list the persons and provide the applicable amounts for each item in Part III. | | | |
| | **Only section 501(c)(3), 501(c)(4), and 501(c)(29) organizations must complete lines 5–9.** | | | |
| **5** | For persons listed on Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the revenues of: | | | |
| **a** | The organization? . . . . . . . . . . . . . . . . . . . . . | **5a** | ✓ | |
| **b** | Any related organization? . . . . . . . . . . . . . . . . . . . | **5b** | | ✓ |
| | If "Yes" on line 5a or 5b, describe in Part III. | | | |
| **6** | For persons listed on Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the net earnings of: | | | |
| **a** | The organization? . . . . . . . . . . . . . . . . . . . . . | **6a** | | ✓ |
| **b** | Any related organization? . . . . . . . . . . . . . . . . . . . | **6b** | | ✓ |
| | If "Yes" on line 6a or 6b, describe in Part III. | | | |
| **7** | For persons listed on Form 990, Part VII, Section A, line 1a, did the organization provide any nonfixed payments not described on lines 5 and 6? If "Yes," describe in Part III . . . . . . | **7** | ✓ | |
| **8** | Were any amounts reported on Form 990, Part VII, paid or accrued pursuant to a contract that was subject to the initial contract exception described in Regulations section 53.4958-4(a)(3)? If "Yes," describe in Part III . . . . . . . . . . . . . . . . . . . . . | **8** | | ✓ |
| **9** | If "Yes" on line 8, did the organization also follow the rebuttable presumption procedure described in Regulations section 53.4958-6(c)? . . . . . . . . . . . . . . . | **9** | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 990. Cat. No. 50053T **Schedule J (Form 990) 2019**

Schedule J (Form 990) 2019

Page **2**

## Part II Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees. Use duplicate copies if additional space is needed.

For each individual whose compensation must be reported on Schedule J, report compensation from the organization on row (i) and from related organizations, described in the instructions, on row (ii). Do not list any individuals that aren't listed on Form 990, Part VII.

Note: The sum of columns (B)(i)–(iii) for each listed individual must equal the total amount of Form 990, Part VII, Section A, line 1a, applicable column (D) and (E) amounts for that individual.

| (A) Name and Title | | (B) Breakdown of W-2 and/or 1099-MISC compensation | | | (C) Retirement and other deferred compensation | (D) Nontaxable benefits | (E) Total of columns (B)(i)–(D) | (F) Compensation in column (B) reported as deferred on prior Form 990 |
|---|---|---|---|---|---|---|---|---|
| | | (i) Base compensation | (ii) Bonus & incentive compensation | (iii) Other reportable compensation | | | | |
| MARION P HAMMER **1** BOARD DIRECTOR | (i) | 220,350 | 0 | 0 | 0 | 0 | 220,350 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| OLIVER L NORTH **2** BOARD DIRECTOR | (i) | 986,015 | 0 | 0 | 0 | 0 | 986,015 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CHRIS COX **3** EXECUTIVE DIRECTOR ILA 6/26/2019 | (i) | 744,676 | 0 | 767,906 | 16,800 | 43,143 | 1,572,525 | 652,997 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| JOSEPH P DEBERGALIS, JR **4** EXECUTIVE DIRECTOR GO | (i) | 346,490 | 0 | 75,850 | 16,800 | 37,216 | 476,356 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| JOHN C FRAZER **5** SECRETARY | (i) | 324,989 | 54,100 | 35,496 | 16,800 | 59,084 | 490,469 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| WAYNE R LAPIERRE **6** EXECUTIVE VICE PRESIDENT | (i) | 1,268,790 | 455,000 | 86,781 | 16,800 | 57,338 | 1,884,709 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| JASON OUIMET **7** EXECUTIVE DIRECTOR ILA | (i) | 393,922 | 0 | 3,182 | 16,574 | 48,590 | 462,268 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CRAIG B SPRAY **8** TREASURER | (i) | 566,437 | 210,000 | 29,274 | 16,800 | 53,227 | 875,738 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TODD GRABLE **9** EXECUTIVE DIRECTOR, MEMBERSHIP | (i) | 437,958 | 187,744 | 11,130 | 16,800 | 48,309 | 701,941 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DOUG HAMLIN **10** EXECUTIVE DIRECTOR, PUBLICATIONS | (i) | 455,666 | 100,000 | 61,166 | 16,800 | 62,782 | 696,414 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DAVID LEHMAN **11** DEPUTY EXECUTIVE DIRECTOR 9/13/2019 | (i) | 384,381 | 0 | 251,355 | 16,800 | 7,120 | 659,656 | 235,810 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| JOSHUA L POWELL **12** CHIEF OF STAFF AND SENIOR STRATEGIST | (i) | 784,652 | 0 | 74,278 | 16,800 | 59,351 | 935,081 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TYLER SCHROPP **13** EXECUTIVE DIRECTOR, ADVANCEMENT | (i) | 718,429 | 75,000 | 7,911 | 16,784 | 51,889 | 870,013 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| THOMAS R TEDRICK **14** MANAGING DIRECTOR FINANCE | (i) | 389,316 | 0 | 7,998 | 16,800 | 28,323 | 442,437 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| JOHN G PERREN **15** SR. ADVISOR TO THE EVP | (i) | 350,000 | 0 | 9,906 | 8,885 | 3,411 | 372,202 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| (SEE STATEMENT) **16** | (i) | | | | | | | |
| | (ii) | | | | | | | |

Schedule J (Form 990) 2019

NATIONAL RIFLE ASSOCIATION OF AMERICA
53-0116130

78

11/18/2020 9:47:17 AM

Appx. 435

**Part II**   Officers, Directors, Trustees, Key Employees and Highest Compensated Employees (continued)

| (a) Name | | (b) Breakdown of W-2 and/or 1099-MISC compensation | | | (c) Retirement and other deferred compensation | (d) Nontaxable benefits | (e) Total of columns (b)(i)–(d) | (f) Compensation reported in prior Form 990 or Form 990-EZ |
|---|---|---|---|---|---|---|---|---|
| | | (i) Base Compensation | (ii) Bonus & incentive compensation | (iii) Other reportable compensation | | | | |
| (16) WILSON H PHILLIPS FORMER TREASURER 9/13/2018 | (i) | 232,366 | 0 | 427,020 | 4,985 | 0 | 664,371 | 426,309 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| (17) ROBERT K WEAVER FORMER EXECUTIVE FORMER DIRECTOR GO 10/25/2016 | (i) | 0 | 0 | 240,000 | 0 | 0 | 240,000 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| Part III | Supplemental Information. Provide the information, explanation, or descriptions required for Part I, lines 1a, 1b, 3, 4a, 4b, 4c, 5a, 5b, 6a, 6b, 7, and 8, and for Part II. Also complete this part for any additional information. |
| --- | --- |

| Return Reference - Identifier | Explanation |
| --- | --- |
| SCHEDULE J, PART I, LINE 1A- FIRST-CLASS OR CHARTER TRAVEL | CHARTER TRAVEL WAS USED ON OCCASIONS WHEN TRAVEL LOGISTICS OR SECURITY CONCERNS PRECLUDED OTHER AVAILABLE OPTIONS, AND TRAVEL WAS PROPERLY EXCLUDED FROM TAXABLE COMPENSATION. |
| SCHEDULE J, PART I, LINE 1A - HEALTH OR SOCIAL CLUB DUES OR INITIATION FEES | DUES FOR CERTAIN EMPLOYEES MAINTAINING MEMBERSHIPS IN CLUBS FOR BUSINESS PURPOSES, ARE APPROVED THROUGH THE NRA'S STANDARD EXPENSE REIMBURSEMENT PROCESS. |
| SCHEDULE J, PART I, LINE 1A - HOUSING ALLOWANCE OR RESIDENCE FOR PERSONAL USE | HOUSING EXPENSES WERE PROVIDED FOR FOUR INDIVIDUALS AND WERE PROPERLY INCLUDED IN TAXABLE COMPENSATION. DOUG HAMLIN $20,901, JOSHUA POWELL $69,299, JOSEPH DEBERGALIS $52,983, AND CRAIG B SPRAY $3,500. |
| SCHEDULE J, PART I, LINE 1A - TAX INDEMNIFICATION AND GROSS-UP PAYMENTS | ONE INDIVIDUAL (TYLER SCHROPP) RECEIVED A DISCRETIONARY BONUS THAT WAS GROSSED UP. THE BONUS WAS TREATED AS TAXABLE COMPENSATION |
| SCHEDULE J, PART I, LINE 1A - TRAVEL FOR COMPANIONS | COMPANIONS OCCASIONALLY TRAVEL WITH NRA OFFICIALS. TRAVELS WERE PROPERLY EXCLUDED FROM TAXABLE COMPENSATION WHEN TRAVELING ON NRA BUSINESS. SEE SCHEDULE L FOR ADDITIONAL DISCLOSURES. |
| SCHEDULE J, PART I, LINE 1B - WRITTEN POLICY REGARDING PAYMENT OR REIMBURSEMENT OF EXPENSES | THE NRA HAS A WRITTEN POLICY FOR FIRST-CLASS TRAVEL. |
| SCHEDULE J, PART I, LINE 3 - METHODS USED TO ESTABLISH THE COMPENSATION | COMPENSATION OF THE NRA'S TOP MANAGEMENT OFFICIAL IS ESTABLISHED BY METHODS INCLUDING COMPENSATION SURVEYS AND STUDIES, AND COMPARABILITY DATA. COMPENSATION OF THE TOP MANAGEMENT OFFICIAL MUST BE APPROVED BY THE BOARD OF DIRECTORS, BASED ON RECOMMENDATIONS BY THE COMPENSATION COMMITTEE. ALL DECISIONS ARE PROPERLY DOCUMENTED. |
| SCHEDULE J, PART I, LINE 4A - SEVERANCE OR CHANGE-OF-CONTROL PAYMENT | ROBERT K. WEAVER'S EMPLOYMENT AS EXECUTIVE DIRECTOR OF GENERAL OPERATIONS ENDED IN 2016 AND DURING CALENDAR YEAR 2019 MR. WEAVER RECEIVED TAXABLE COMPENSATION OF $240,000 AS YEAR 4 OF A 4 YEAR SEVERANCE AGREEMENT. |
| SCHEDULE J, PART I, LINE 4B - SUPPLEMENTAL NONQUALIFIED RETIREMENT PLAN | THE NRA HAS DEFERRED COMPENSATION RETIREMENT BENEFIT PLANS FOR CERTAIN EMPLOYEES AND NONQUALIFIED SUPPLEMENTAL EXECUTIVE RETIREMENT PLANS FOR CERTAIN EMPLOYEES. FOR NONQUALIFIED PLANS, THE FILING ORGANIZATION DECIDES THE BENEFIT AMOUNT AND TIMEFRAME FOR VESTING OF EACH PARTICIPANT USING DIFFERENT FACTORS PARTICULAR TO EACH RELEVANT INDIVIDUAL AND HIS OR HER SPECIFIC CIRCUMSTANCES. PAYOUTS ARE PROPERLY INCLUDED IN TAXABLE WAGES AND REPORTED IN W-2 INCOME. THE AMOUNT FOR MR. COX INCLUDE $246,031 457(F) DISBURSEMENT, FOR MR. PHILLIPS $19,853 457(F) DISBURSEMENT, AND MR. LEHMAN $51,213 457(F) DISBURSEMENT. |
| SCHEDULE J, PART I, LINE 5A - COMPENSATION CONTINGENT ON REVENUES OF THE ORGANIZATION | ONE INDIVIDUAL LISTED ON FORM 990, PART VII, SECTION A, LINE 1A, TODD GRABLE, RECEIVES INCENTIVE COMPENSATION BASED ON REVENUES RECEIVED FROM CERTAIN MARKETING, RECRUITING, AND LICENSING PROGRAMS. |
| SCHEDULE J, PART I, LINE 7 - NON-FIXED PAYMENTS | THREE INDIVIDUALS LISTED ON FORM 990, PART VII, SECTION A, LINE 1A (MR. LAPIERRE, MR. SPRAY AND MR. FRAZER) RECEIVED DISCRETIONARY BONUSES APPROVED BY THE BOARD OF DIRECTORS. TWO INDIVIDUALS (MR. SCHROPP AND MR. HAMLIN) RECEIVED DISCRETIONARY BONUSES APPROVED BY THEIR SUPERVISOR. |
| SCHEDULE J, PART II, COLUMN (B)(I) - OLIVER L NORTH | OLIVER L. NORTH RECEIVED $986,015 PAID BY AN UNRELATED ORGANIZATION, ACKERMAN MCQUEEN (AS FURTHER DETAILED ON SCHEDULE O). JULIE GOLOB RECEIVED $16,119 PAID BY AN UNRELATED ORGANIZATION, ACKERMAN MCQUEEN (AS FURTHER DETAILED ON SCHEDULE O) |
| SCHEDULE J, PART II, COLUMN (B)(III) - OTHER REPORTABLE COMPENSATION | OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. LAPIERRE INCLUDED $63,036 GROUP LIFE INSURANCE, $19,000 457(B) PLAN, AND $4,745 TAXABLE PERSONAL EXPENSES. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. COX INCLUDED $406,965 457(B) PAYOUT, $246,031 457(F) PAYOUT, $10,234 457(B) PLAN, $3,735 GROUP LIFE INSURANCE, AND $940 TAXABLE PERSONAL EXPENSES. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. PHILLIPS INCLUDED $406,456 457(B) PAYOUT, $19,853 457(F) PAYOUT, AND $711 457(B) PLAN. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. POWELL INCLUDED $70,048 TAXABLE PERSONAL EXPENSES AND $4,230 GROUP LIFE INSURANCE. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. SPRAY INCLUDED $19,000 457(B) PLAN, $7,100 TAXABLE PERSONAL EXPENSE, AND $3,174 GROUP LIFE INSURANCE. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. FRAZER INCLUDED $19,000 457(B) PLAN, $12,652 TAXABLE PERSONAL EXPENSES, AND $3,845 GROUP LIFE INSURANCE. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. DEBERGALIS INCLUDED $53,238 TAXABLE PERSONAL EXPENSES, $19,000 457(B) PLAN, AND $3,612 GROUP LIFE INSURANCE. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. OUIMET INCLUDED $930 GROUP LIFE INSURANCE AND $2,252 TAXABLE PERSONAL EXPENSES. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. SCHROPP INCLUDED $4,545 GROUP LIFE INSURANCE AND $3,366 TAXABLE PERSONAL EXPENSES. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. GRABLE INCLUDED $9,600 TAXABLE PERSONAL EXPENSES AND $1,530 GROUP LIFE INSURANCE. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. HAMLIN INCLUDED $26,901 TAXABLE PERSONAL EXPENSES, $19,000 457(B) PLAN, AND $15,265 GROUP LIFE INSURANCE. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. LEHMAN INCLUDED $51,213 457(F) PAYOUT, $13,889 457(B) PLAN CONTRIBUTION, 457(B) PAYOUT 184,597, AND $1,656 GROUP LIFE INSURANCE. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. TEDRICK INCLUDED $7,998 GROUP LIFE INSURANCE. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. PERREN INCLUDED $9,906 GROUP LIFE INSURANCE. |

| Return Reference - Identifier | Explanation |
|---|---|
| SCHEDULE J, PART II, COLUMN (C) - RETIREMENT AND OTHER DEFERRED COMPENSATION | EMPLOYER DEPOSITS TOWARD BENEFITS THAT WILL NOT BE PAID UNTIL A FUTURE DATE ARE SHOWN IN COLUMN C. THE AMOUNT FOR MR. LAPIERRE INCLUDED $16,800 401(K). THE AMOUNT FOR MR. COX INCLUDED $16,800 401(K). THE AMOUNT FOR MR. PHILLIPS INCLUDED $4,985 401(K). THE AMOUNT FOR MR. POWELL INCLUDED $16,800 401(K). THE AMOUNT FOR MR. SPRAY INCLUDED $16,800 401(K). THE AMOUNT FOR MR. FRAZER INCLUDED $16,800 401(K). THE AMOUNT FOR MR. DEBERGALIS INCLUDED $16,800 401(K). THE AMOUNT FOR MR. SCHROPP INCLUDED $16,784 401(K). THE AMOUNT FOR MR. GRABLE INCLUDED $16,800 401(K). THE AMOUNT FOR MR. HAMLIN INCLUDED $16,800 401(K). THE AMOUNT FOR MR. LEHMAN INCLUDED $16,800 401(K). THE AMOUNT FOR MR. QUIMET INCLUDED $16,574 401(K). THE AMOUNT FOR MR. TEDRICK INCLUDED $16,800. THE AMOUNT FOR MR. PERREN INCLUDED $8,885 |
| SCHEDULE J, PART II, COLUMN (D) - NONTAXABLE BENEFITS | COLUMN D NONTAXABLE BENEFITS ARE PROVIDED TO EMPLOYEES CONSISTENT WITH ASSOCIATION INDUSTRY STANDARDS AND BEST PRACTICES. STANDARD NONTAXABLE BENEFITS INCLUDE EMPLOYEE BENEFITS SUCH AS THE EMPLOYER PAID PORTIONS OF MEDICAL AND DENTAL PLANS AND LONG-TERM AND SHORT-TERM DISABILITY PLANS. |

**SCHEDULE L**
**(Form 990 or 990-EZ)**

Department of the Treasury
Internal Revenue Service

# Transactions With Interested Persons

▶ Complete if the organization answered "Yes" on Form 990, Part IV, line 25a, 25b, 26, 27, 28a, 28b, or 28c, or Form 990-EZ, Part V, line 38a or 40b.
▶ Attach to Form 990 or Form 990-EZ.
▶ Go to *www.irs.gov/Form990* for instructions and the latest information.

OMB No. 1545-0047

**2019**

**Open To Public Inspection**

Name of the organization

NATIONAL RIFLE ASSOCIATION OF AMERICA

Employer identification number

53-0116130

**Part I** | **Excess Benefit Transactions** (section 501(c)(3), section 501(c)(4), and section 501(c)(29) organizations only).
Complete if the organization answered "Yes" on Form 990, Part IV, line 25a or 25b, or Form 990-EZ, Part V, line 40b.

| 1 | (a) Name of disqualified person | (b) Relationship between disqualified person and organization | (c) Description of transaction | (d) Corrected? | |
|---|---|---|---|---|---|
| | | | | Yes | No |
| (1) | JOSHUA POWELL | FORMER OFFICER | SEE PART V | | ✓ |
| (2) | CHRISTOPHER COX | OFFICER | SEE PART V | | ✓ |
| (3) | DAVID LEHMAN | HIGHEST COMPENSATED EMPLOYEE | SEE PART V | | ✓ |
| (4) | WAYNE LAPIERRE | OFFICER | SEE PART V | ✓ | |
| (5) | WILSON PHILLIPS | FORMER OFFICER | SEE PART V | | ✓ |
| (6) | (SEE STATEMENT) | | | | |

2   Enter the amount of tax incurred by the organization managers or disqualified persons during the year under section 4958 . . . . . . . . . . . . . . . . . . ▶ $

3   Enter the amount of tax, if any, on line 2, above, reimbursed by the organization . . . . . . . . ▶ $

**Part II** | **Loans to and/or From Interested Persons.**
Complete if the organization answered "Yes" on Form 990-EZ, Part V, line 38a or Form 990, Part IV, line 26; or if the organization reported an amount on Form 990, Part X, line 5, 6, or 22.

| (a) Name of interested person | (b) Relationship with organization | (c) Purpose of loan | (d) Loan to or from the organization? | | (e) Original principal amount | (f) Balance due | (g) In default? | | (h) Approved by board or committee? | | (i) Written agreement? | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | To | From | | | Yes | No | Yes | No | Yes | No |
| (1) | | | | | | | | | | | | |
| (2) | | | | | | | | | | | | |
| (3) | | | | | | | | | | | | |
| (4) | | | | | | | | | | | | |
| (5) | | | | | | | | | | | | |
| (6) | | | | | | | | | | | | |
| (7) | | | | | | | | | | | | |
| (8) | | | | | | | | | | | | |
| (9) | | | | | | | | | | | | |
| (10) | | | | | | | | | | | | |
| **Total** | | | | ▶ | $ | | | | | | | |

**Part III** | **Grants or Assistance Benefiting Interested Persons.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 27.

| (a) Name of interested person | (b) Relationship between interested person and the organization | (c) Amount of assistance | (d) Type of assistance | (e) Purpose of assistance |
|---|---|---|---|---|
| (1) | | | | |
| (2) | | | | |
| (3) | | | | |
| (4) | | | | |
| (5) | | | | |
| (6) | | | | |
| (7) | | | | |
| (8) | | | | |
| (9) | | | | |
| (10) | | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.     Cat. No. 50056A     **Schedule L (Form 990 or 990-EZ) 2019**

Appx. 439

Schedule L (Form 990 or 990-EZ) 2019          Page **2**

**Part IV**    **Business Transactions Involving Interested Persons.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 28a, 28b, or 28c.

| (a) Name of interested person | (b) Relationship between interested person and the organization | (c) Amount of transaction | (d) Description of transaction | (e) Sharing of organization's revenues? | |
|---|---|---|---|---|---|
| | | | | Yes | No |
| **(1)** (SEE STATEMENT) | | | | | |
| **(2)** | | | | | |
| **(3)** | | | | | |
| **(4)** | | | | | |
| **(5)** | | | | | |
| **(6)** | | | | | |
| **(7)** | | | | | |
| **(8)** | | | | | |
| **(9)** | | | | | |
| **(10)** | | | | | |

**Part V**    **Supplemental Information.**
Provide additional information for responses to questions on Schedule L (see instructions).

(SEE STATEMENT)

Schedule L (Form 990 or 990-EZ) 2019

**NATIONAL RIFLE ASSOCIATION OF AMERICA**
**53-0116130**          83          11/18/2020 9:47:17 AM

**Part I**    Excess Benefit Transactions (continued)

| (a) Name of disqualified person | (b) Relationship between disqualified person and organization | (c) Description of transaction | (d) Corrected? Yes | No |
|---|---|---|---|---|
| (6) JOHN FRAZER | OFFICER | SEE PART V | | ✓ |
| (7) OLIVER NORTH | DIRECTOR | SEE PART V | | ✓ |
| (8) JOSEPH P DEBERGALIS, JR | OFFICER | SEE PART V | | ✓ |

11/18/2020 9:47:17 AM

NATIONAL RIFLE ASSOCIATION OF AMERICA
53-0116130

**Part IV** Business Transactions Involving Interested Persons (continued)

| (a) Name of interested person | (b) Relationship between interested person and the organization | (c) Amount of transaction | (d) Description of transaction | (e) Sharing of organization's revenues? Yes | (e) Sharing of organization's revenues? No |
|---|---|---|---|---|---|
| (1) MARION P HAMMER | BOARD DIRECTOR | $220,000 | MARION P HAMMER PROVIDED CONSULTING SERVICES IN THE FORM OF ADVICE, ANALYSIS AND OTHER DUTIES REASONABLY ASSIGNED BY THE EXECUTIVE VICE PRESIDENT OF THE NRA AND EXECUTIVE DIRECTOR OF ILA DURING 2019. | | ✓ |

NATIONAL RIFLE ASSOCIATION OF AMERICA
53-0116130

85

11/18/2020 9:47:17 AM

| Part V | Supplemental Information. Provide additional information for responses to questions on Schedule L (see instructions). |
|---|---|

| Return Reference - Identifier | Explanation |
|---|---|
| SCHEDULE L, PART I, LINE 1 - 1A. EXCESS BENEFIT TRANSACTIONS | THE NATIONAL RIFLE ASSOCIATION HAS IDENTIFIED WHAT IT BELIEVES ARE EXCESS BENEFIT TRANSACTIONS IN WHICH IT ENGAGED IN 2019 AND IN PRIOR CALENDAR YEARS OF WHICH IT BECAME AWARE BUT WERE NOT REPORTED ON ITS PRIOR FORMS 990. THESE TRANSACTIONS ARE EXPLAINED BELOW. THERE ARE OTHER TRANSACTIONS IN 2019 AND PRIOR CALENDAR YEARS THAT ARE STILL UNDER REVIEW BY THE NRA AND/OR ARE CURRENTLY SUBJECT TO DISPUTE IN THE FOLLOWING LEGAL PROCEEDINGS:<br><br>1.PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK V. THE NATIONAL RIFLE ASSOCIATION OF AMERICAN, INC., WAYNE LAPIERRE, WILSON PHILLIPS, JOHN FRAZER AND JOSHUA POWELL, PENDING IN THE SUPREME COURT OF THE STATE OF NEW YORK, [ALBANY COUNTY] INDEX NO. 451625/2020;<br><br>2.THE NATIONAL RIFLE ASSOCIATION OF AMERICA V. OLIVER NORTH, PENDING IN THE SUPREME COURT OF THE STATE OF NEW YORK, [ALBANY COUNTY] INDEX NO. 903843-20;<br><br>3.THE NATIONAL RIFLE ASSOCIATION OF AMERICA AND WAYNE LAPIERRE V. ACKERMAN MCQUEEN, INC., ET. AL., PENDING IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION, CIVIL ACTION NO. 3:19-CV-02074-G; AND<br><br>4.NATIONAL RIFLE ASSOCIATION OF AMERICA V. AMC MCQUEEN, INC. AND MERCURY GROUP, INC., PENDING IN THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA, [VIRGINIA], CASE NOS.: CL19001757, CL19002067 AND CL19002886.<br><br>THE NRA CANNOT AT THE TIME THIS FORM 990 IS FILED DETERMINE WHETHER THESE OTHER TRANSACTIONS ARE EXCESS BENEFIT TRANSACTIONS. |
| SCHEDULE L, PART I, LINE 1 - 1B. EXCESS BENEFIT TRANSACTIONS: JOSHUA POWELL | FROM 2016 THROUGH JANUARY 30, 2020, MR. POWELL SERVED THE NRA IN NUMEROUS CAPACITIES: EXECUTIVE DIRECTOR OF GENERAL OPERATIONS, CHIEF OF STAFF AND SENIOR STRATEGIST. THE NRA BELIEVES MR. POWELL WAS IN A POSITION TO SUBSTANTIALLY INFLUENCE ITS AFFAIRS BY EXERCISING OR SHARING THE RESPONSIBILITY FOR SUPERVISION, MANAGEMENT OR ADMINISTRATION OF ITS OPERATIONS. THEREFORE, THE NRA BELIEVES THAT MR. POWELL WAS A DISQUALIFIED PERSON WITHIN THE INTENDMENT OF SECTION 4958 OF THE INTERNAL REVENUE CODE ("CODE"). SEE TREAS. REG. SECT. 53.4958-3(E)(2).<br><br>MR. POWELL CHARGED TO THE NRA, OR HAD REIMBURSED BY THE NRA, VARIOUS PERSONAL TRAVEL, CELLULAR AND OTHER EXPENSES WHICH MR. POWELL KNEW OR SHOULD HAVE KNOWN WERE NOT APPROPRIATE TO SUBMIT AS BUSINESS EXPENSES. PAYMENT OF THESE EXPENSES WERE NOT INTENDED BY THE NRA TO BE PART OF MR. POWELL'S COMPENSATION AND CONSTITUTE AUTOMATIC EXCESS BENEFITS UNDER TREASURY REGULATIONS SECTION 53.4958-4(C). THE AGGREGATE EXCESS BENEFIT DETERMINED TO BE PROVIDED TO MR. POWELL FROM 2016 THROUGH 2019 WAS $54,904.45. ON MARCH 15, 2020, THE NRA MADE DEMAND FOR REPAYMENT OF $57,522.12 (WHICH INCLUDED INTEREST). ON OR ABOUT JULY 9, 2020, MR. POWELL TENDERED A CHECK TO THE NRA FOR $40,760.20, IN PURPORTED FULL SETTLEMENT. THE NRA HAS REJECTED THE CHECK, SO CORRECTION OF THE EXCESS BENEFIT HAS NOT YET BEEN MADE. THE AMOUNT OF EXCISE TAX DUE UNDER SECTION 4958 BY MR. POWELL IS DETERMINED TO BE $13,726.11. IN ADDITION, THE NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL HAS CHALLENGED, AS UNREASONABLE, COMPENSATION PAID TO MR. POWELL DURING THE PERIOD FROM 2016 THROUGH 2019. |
| SCHEDULE L, PART I, LINE 1 - 2. EXCESS BENEFIT TRANSACTIONS: CHRISTOPHER COX | FROM 2002 THROUGH JUNE 26, 2019, MR. COX SERVED AS THE EXECUTIVE DIRECTOR OF THE INSTITUTE FOR LEGISLATIVE ACTION ("ILA"), WHICH IS THE LEGISLATIVE AND POLITICAL DIVISION OF THE NATIONAL RIFLE ASSOCIATION. MR. COX WAS ALSO AN OFFICER OF THE NRA. BECAUSE (I) ILA'S FINANCES WERE MAINTAINED SEPARATELY FROM THOSE OF THE OTHER NRA DIVISIONS, (II) ILA MAINTAINED ITS OWN FISCAL STAFF, AND (III) MR. COX WAS AN OFFICER OF THE ORGANIZATION, THE NRA BELIEVES MR. COX WAS IN A POSITION TO SUBSTANTIALLY INFLUENCE ITS AFFAIRS AND IS THUS A DISQUALIFIED PERSON WITHIN THE INTENDMENT OF CODE SECTION 4958. TREAS. REG. SECT. 53.4958-3(E)(2)(IV), (V).<br><br>THE NRA HAS BECOME AWARE THAT MR. COX IMPROPERLY USED ASSOCIATION FUNDS TO PAY PERSONAL EXPENSES CHARGED ON HIS PERSONAL CREDIT CARD, AMOUNTING TO UNAUTHORIZED INTEREST-FREE ADVANCES TO HIMSELF. IN ADDITION, MR. COX CAUSED EXPENSES TO BE PAID BY THE NRA, OR REIMBURSED TO HIM, FOR PERSONAL AND FAMILY TRAVEL, BUSINESS TRIPS UTILIZING UNAPPROVED CHARTER OR FIRST CLASS TRAVEL, TICKETS TO SPORTING/ENTERTAINMENT EVENTS, AND MEALS AND HOTEL EXPENSES WHICH WERE NOT APPROVED BY THE NRA. PAYMENT OF THESE EXPENSES WERE NOT INTENDED BY THE NRA TO BE PART OF MR. COX'S COMPENSATION AND THEREFORE CONSTITUTED AN AUTOMATIC EXCESS BENEFIT UNDER TREASURY REGULATIONS SECTION 53.4958-4(C).<br><br>TO DATE, THE AGGREGATE EXCESS BENEFIT FROM 2015 TO JUNE 26, 2019, DETERMINED TO BE PROVIDED TO MR. COX IS IN EXCESS OF $1 MILLION, WHICH THE NRA IS SEEKING TO RECOVER. THIS IS BEING DISPUTED BY MR. COX AND, TO DATE, ANY EXCESS BENEFIT RECEIVED BY MR. COX HAS NOT BEEN CORRECTED. THE NRA BELIEVES THAT THE AMOUNT OF EXCISE TAX DUE UNDER CODE SECTION 4958 BY MR. COX WOULD BE APPROXIMATELY $328,001.50. |
| SCHEDULE L, PART I, LINE 1 - 3. EXCESS BENEFIT TRANSACTION: DAVID LEHMAN | FROM 2002 THROUGH SEPTEMBER 13, 2019, MR. LEHMAN SERVED AS DEPUTY EXECUTIVE DIRECTOR. AS SUCH, THE NRA BELIEVES MR. LEHMAN WAS IN A POSITION TO SUBSTANTIALLY INFLUENCE ITS AFFAIRS AND ILA'S AFFAIRS BY EXERCISING OR SHARING RESPONSIBILITY FOR SUPERVISION, MANAGEMENT OR ADMINISTRATION OF THEIR OPERATIONS. THEREFORE, THE NRA BELIEVES MR. LEHMAN WAS A DISQUALIFIED PERSON WITHIN THE INTENDMENT OF CODE SECTION 4958. TREAS. REG. SECT. 53.4958-3(E)(2).<br><br>UPON INFORMATION AND BELIEF, FROM 2015 TO SEPTEMBER 13, 2019, MR. LEHMAN CAUSED THE NRA TO PAY FOR PERSONAL TRAVEL, CLUB, AND MEAL EXPENSES IN THE AGGREGATE AMOUNT OF AT LEAST $87,595.83. THE NRA HAS NOT YET COMPLETED ITS INVESTIGATION OF THE EXTENT TO WHICH MR. LEHMAN MAY HAVE RECEIVED IMPROPER BENEFITS, BUT IF SUCH EXPENSES ARE SUBSTANTIATED, THEY WERE LIKELY NOT APPROVED NOR INTENDED TO BE COMPENSATION TO MR. LEHMAN BY THE NRA, AND WOULD THUS LIKELY CONSTITUTE AUTOMATIC EXCESS BENEFITS UNDER TREASURY REGULATIONS SECTION 53.4958-4(C). |

| Return Reference - Identifier | Explanation |
|---|---|
| SCHEDULE L, PART I, LINE 1 - 4. EXCESS BENEFIT TRANSACTION: WAYNE LAPIERRE | MR. LAPIERRE IS THE EXECUTIVE VICE PRESIDENT AND CHIEF EXECUTIVE OFFICER OF THE NRA. HE IS AN OFFICER AND IS THUS A DISQUALIFIED PERSON WITHIN THE INTENDMENT OF CODE SECTION 4958. TREAS. REG. SECT. 53.4958-3(C)(2). FROM 2015 THROUGH 2019, THE NRA ESTIMATES THAT IT PAID ON BEHALF OF MR. LAPIERRE, DIRECTLY OR INDIRECTLY, TRAVEL EXPENSES FOR MR. LAPIERRE IN THE AGGREGATE AMOUNT OF $299,778.78. THE NRA HAS DETERMINED TO TREAT THE PAYMENTS AS AUTOMATIC EXCESS BENEFITS UNDER TREASURY REGULATIONS SECTION 53.4958-4(C). MR. LAPIERRE HAS REPAID THIS EXCESS BENEFIT TO NATIONAL RIFLE ASSOCIATION, PLUS INTEREST, AND THEREFORE THE EXCESS BENEFIT HAS BEEN CORRECTED. THE AMOUNT OF EXCISE TAX DUE UNDER CODE SECTION 4958 BY MR. LAPIERRE HAS BEEN ESTIMATED TO BE $74,944.70. IN ADDITION, THE NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL HAS CHALLENGED, AS UNREASONABLE, COMPENSATION PAID TO MR. LAPIERRE DURING HIS TENURE. |
| SCHEDULE L, PART I, LINE 1 - 5. EXCESS BENEFIT TRANSACTION: WILSON PHILLIPS | FROM 1993 THROUGH SEPTEMBER 13, 2018, MR. PHILLIPS SERVED AS TREASURER AND CHIEF FINANCIAL OFFICER OF THE NRA. AS SUCH, MR. PHILLIPS WAS A DISQUALIFIED PERSON WITHIN THE INTENDMENT OF CODE SECTION 4958. TREAS. REG. SECT. 53.4958-3(C)(3). THE NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL HAS ALLEGED THAT COMPENSATION PAID TO MR. PHILLIPS DURING AND AFTER TENURE HIS TENURE WAS UNREASONABLE. |
| SCHEDULE L, PART I, LINE 1 - 6. EXCESS BENEFIT TRANSACTION: JOHN FRAZER | FROM 2015 THROUGH THE PRESENT, MR. FRAZER HAS SERVED AS SECRETARY AND GENERAL COUNSEL OF THE NRA. AS SUCH, MR. FRAZER MAY BE A DISQUALIFIED PERSON WITHIN THE INTENDMENT OF CODE SECTION 4958. TREAS. REG. SECT. 53.4958-3(E)(2). THE NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL HAS ALLEGED THAT COMPENSATION PAID TO MR. FRAZER HAS BEEN UNREASONABLE. |
| SCHEDULE L, PART I, LINE 1 - 7. EXCESS BENEFIT TRANSACTION: OLIVER NORTH | LT. COL. NORTH SERVED AS PRESIDENT OF THE NATIONAL RIFLE ASSOCIATION AT TIMES IN 2018 AND 2019. WITHIN THE FIVE PRIOR YEARS, HE WAS ALSO A VOTING MEMBER OF ITS BOARD OF DIRECTORS. AS SUCH, MR. NORTH WAS A DISQUALIFIED PERSON WITHIN THE INTENDMENT OF CODE SECTION 4958. TREAS. REG. SECT. 53.4958-3(C)(1), (2). UPON INFORMATION AND BELIEF, DURING CERTAIN TIMES IN 2018 AND 2019, MR. NORTH WAS EMPLOYED BY ACKERMAN MCQUEEN, INC. ("AM"), A THIRD-PARTY VENDOR OF THE NATIONAL RIFLE ASSOCIATION, TO HOST A TELEVISION SHOW PRODUCED BY AM. DURING THE SAME PERIOD, AM INVOICED THE NRA FOR A VARIETY OF EXPENSES WHICH ARE NOW THE SUBJECT OF LITIGATION, BUT ARE BELIEVED TO HAVE INCLUDED SALARY, BENEFITS, AND RELATED PERQUISITES FURNISHED BY AM TO NORTH IN CONNECTION WITH NORTH'S EMPLOYMENT BY AM. NRA PAID ALL THESE INVOICES TO AM. SUCH PAYMENTS MAY CONSTITUTE AN INDIRECT BENEFIT FROM NATIONAL RIFLE ASSOCIATION TO MR. NORTH. TREAS. REG. SECT. 53.4958-4(A)(2)(III). AS FURTHER SET FORTH IN THE SAME LITIGATION, THE NRA HAS REASON TO BELIEVE THAT NORTH FAILED TO PERFORM THE SERVICES FOR WHICH HE HAD BEEN CONTRACTED BY AM, AND FOR WHICH HE MAY HAVE BEEN INDIRECTLY COMPENSATED BY THE NRA. IF THAT IS TRUE, THEN ALL OR PART OF NORTH'S COMPENSATION BY AM, PAID INDIRECTLY BY THE NRA, WOULD CONSTITUTE AN EXCESS BENEFIT PROVIDED BY TO THE NRA TO NORTH. THE PENDING LITIGATION IN WHICH THE FOREGOING MATTERS ARE ALLEGED AND CONTESTED CONSISTS PRINCIPALLY OF: PEOPLE V. NAT'L RIFLE ASS'N OF AM., ET AL., INDEX NO. 451625/2020 (SUP. CT. N.Y. CNTY.); NAT'L RIFLE ASS'N OF AM. V. ACKERMAN MCQUEEN, INC. AND MERCURY GROUP, INC., CONS. CASE NOS. CL19002067; CL19001757; CL19002886 (VA. CIR. CT.); AND, NAT'L RIFLE ASS'N OF AM. V. ACKERMAN MCQUEEN, INC., ET AL., CIV. CASE NO. 3-19-CV-02074-G (N.D. TEX.). |
| SCHEDULE L, PART I, LINE 1 - 8. EXCESS BENEFIT TRANSACTION: JOSEPH P DEBERGALIS, JR | FROM 2015 THROUGH EARLY 2017, JOSEPH P. DEBERGALIS, JR. WAS AN NRA DIRECTOR. FROM JANUARY 25, 2017 TO THE PRESENT, MR. DEBERGALIS HAS SERVED AS AN NRA EXECUTIVE AND OFFICER, INCLUDING AS THE EXECUTIVE DIRECTOR OF GENERAL OPERATIONS. AS SUCH, MR. DEBERGALIS MAY, AT SOME OR ALL TIMES, HAVE BEEN A DISQUALIFIED PERSON WITHIN THE INTENDMENT OF CODE SECTION 4958. TREAS. REG. SECT. 53.4958-3(C) (1), (E) (2) (IV), (V). THE NRA IS CURRENTLY REVIEWING WHETHER MR. DEBERGALIS MAY HAVE USED BUSINESS CLASS TRAVEL WITHOUT AUTHORIZATION REQUIRED UNDER THE NRA'S TRAVEL POLICY. AT THE TIME OF FILING, THE NRA IS UNABLE TO ESTIMATE THE AMOUNT OF EXCESS COSTS INCURRED, IF ANY. IF SUCH EXPENSES ARE SUBSTANTIATED, THEY WERE LIKELY NOT APPROVED NOR INTENDED TO BE COMPENSATION TO MR. DEBERGALIS BY THE NRA, AND WOULD THUS LIKELY CONSTITUTE AUTOMATIC EXCESS BENEFITS UNDER TREASURY REGULATIONS SECTION 53.4958-4(C). |
| SCHEDULE L, PART I, LINE 1 - 9. BOARD MEMBER TRAVEL | THE NRA IS CURRENTLY REVIEWING WHETHER IN 2019 AND PRIOR YEARS, VARIOUS BOARD MEMBERS MAY HAVE USED FIRST CLASS OR BUSINESS CLASS TRAVEL WITHOUT AUTHORIZATION REQUIRED UNDER THE NRA'S TRAVEL POLICY. AT THE TIME OF FILING, THE NRA IS UNABLE TO ESTIMATE THE AMOUNT OF EXCESS COSTS INCURRED, IF ANY. SUCH BOARD MEMBERS WOULD HAVE BEEN DISQUALIFIED PERSONS WITHIN THE INTENDMENT OF TREAS. REG. SECT. 53.4958-3(C)(1). IF SUCH EXCESS COSTS ARE SUBSTANTIATED, THEY WOULD THUS LIKELY CONSTITUTE EXCESS BENEFITS UNDER CODE SECTION 4958. |

# SCHEDULE M
# (Form 990)

## Noncash Contributions

OMB No. 1545-0047

**2019**

▶ Complete if the organizations answered "Yes" on Form 990, Part IV, lines 29 or 30.
▶ Attach to Form 990.
▶ Go to *www.irs.gov/Form990* for instructions and the latest information.

Department of the Treasury
Internal Revenue Service

**Open to Public Inspection**

Name of the organization
NATIONAL RIFLE ASSOCIATION OF AMERICA

Employer identification number
53-0116130

## Part I   Types of Property

| | | (a) Check if applicable | (b) Number of contributions or items contributed | (c) Noncash contribution amounts reported on Form 990, Part VIII, line 1g | (d) Method of determining noncash contribution amounts |
|---|---|---|---|---|---|
| 1 | Art—Works of art | ✓ | 1 | 5,000 | MARKET VALUE |
| 2 | Art—Historical treasures | | | | |
| 3 | Art—Fractional interests | | | | |
| 4 | Books and publications | | | | |
| 5 | Clothing and household goods | | | | |
| 6 | Cars and other vehicles | | | | |
| 7 | Boats and planes | | | | |
| 8 | Intellectual property | | | | |
| 9 | Securities—Publicly traded | | | | |
| 10 | Securities—Closely held stock | | | | |
| 11 | Securities—Partnership, LLC, or trust interests | | | | |
| 12 | Securities—Miscellaneous | | | | |
| 13 | Qualified conservation contribution—Historic structures | | | | |
| 14 | Qualified conservation contribution—Other | | | | |
| 15 | Real estate—Residential | | | | |
| 16 | Real estate—Commercial | | | | |
| 17 | Real estate—Other | | | | |
| 18 | Collectibles | | | | |
| 19 | Food inventory | | | | |
| 20 | Drugs and medical supplies | | | | |
| 21 | Taxidermy | | | | |
| 22 | Historical artifacts | | | | |
| 23 | Scientific specimens | | | | |
| 24 | Archeological artifacts | | | | |
| 25 | Other ▶ ( SEE STATEMENT ) | | | | |
| 26 | Other ▶ ( _____ ) | | | | |
| 27 | Other ▶ ( _____ ) | | | | |
| 28 | Other ▶ ( _____ ) | | | | |

| | | | Yes | No |
|---|---|---|---|---|
| 29 | Number of Forms 8283 received by the organization during the tax year for contributions for which the organization completed Form 8283, Part IV, Donee Acknowledgement **29**  0 | | | |
| 30a | During the year, did the organization receive by contribution any property reported in Part I, lines 1 through 28, that it must hold for at least three years from the date of the initial contribution, and which isn't required to be used for exempt purposes for the entire holding period? | 30a | | ✓ |
| b | If "Yes," describe the arrangement in Part II. | | | |
| 31 | Does the organization have a gift acceptance policy that requires the review of any nonstandard contributions? | 31 | ✓ | |
| 32a | Does the organization hire or use third parties or related organizations to solicit, process, or sell noncash contributions? | 32a | ✓ | |
| b | If "Yes," describe in Part II. | | | |
| 33 | If the organization didn't report an amount in column (c) for a type of property for which column (a) is checked, describe in Part II. | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 990.          Cat. No. 51227J          Schedule M (Form 990) 2019

| Part I | Types of Property  (continued) |
|---|---|

| Property Type | (a) Check If Applicable | (b) Number of contributions or items contributed | (c) Noncash contribution amounts reported on Form 990, Part VIII, line 1g | (d) Method of determining noncash contribution amounts |
|---|---|---|---|---|
| ENGRAVED CUSTOM MADE KNIFE | ✓ | 1 | 19,000 | MARKET VALUE |
| SL3 OVER/UNDER SHOTGUN | ✓ | 1 | 18,800 | MARKET VALUE |
| WINCHESTER MODEL 1873 RIFLE | ✓ | 1 | 18,300 | MARKET VALUE |
| K-20 VICTORIA SOVEREIGN GRADE & LADIES ACCESSORY PACKAGE | ✓ | 1 | 17,000 | MARKET VALUE |
| ULTIMATE FDE PACKAGE | ✓ | 1 | 15,000 | MARKET VALUE |
| 2 GUN PACKAGE - MRAD & M107 | ✓ | 2 | 12,000 | MARKET VALUE |
| CUSTOM MADE LONG RANGE RIFLE TOPPED WITH NIGHTFORCE SCOPE CERTIFICATE | ✓ | 1 | 12,000 | MARKET VALUE |
| MID ASIAN OR ALTAY IBEX HUNT FOR 1 HUNTER - SPAIN IBEX HUNT FOR 1 & IBEX MOUNT CERTIFICATE | ✓ | 1 | 10,500 | MARKET VALUE |
| NEW ZEALAND RED STAG HUNT (2 STAGS) | ✓ | 1 | 10,000 | MARKET VALUE |
| TWO CUSTOM PISTOLS & HOLSTER PACKAGE | ✓ | 2 | 9,630 | MARKET VALUE |
| SET OF TWO UPPER AR RIFLE PACKAGE IN .224 VALKYRIE AND .223 | ✓ | 1 | 8,500 | MARKET VALUE |
| RAGING HUNTER WITH ENHANCEMENS BY DARK ALLIANCE, TRIJICON SCOPE AND SHOOTING EXPERIENCE | ✓ | 1 | 8,500 | MARKET VALUE |
| TOUR PLANT, CUSTOM BUILT RIFLE PACKAGE | ✓ | 1 | 8,000 | MARKET VALUE |
| SPECIAL EDITION SWAT MODEL TWO RIFLE PACKAGE | ✓ | 1 | 8,000 | MARKET VALUE |
| MODEL 1873 LEVER ACTION RIFLE | ✓ | 1 | 8,000 | MARKET VALUE |
| NEW ZEALAND TAHR HUNT | ✓ | 1 | 8,000 | MARKET VALUE |
| GOLD PLATED AK AND ADDITIONAL AK PACKAGE | ✓ | 1 | 7,500 | MARKET VALUE |
| SPECIAL EDITION PAIR OF FAL RIFLES & CASE | ✓ | 1 | 7,500 | MARKET VALUE |
| CERTIFICATE FOR A FOOD PLOT IMPLEMENT | ✓ | 1 | 7,500 | MARKET VALUE |
| 2 DAY ALL-INCLUSIVE PHEASANT HUNT FOR 2 HUNTERS | ✓ | 1 | 7,500 | MARKET VALUE |
| HUNGARY WILD BOAR HUNT | ✓ | 1 | 7,500 | MARKET VALUE |
| CUSTOM TURNBULL EDITION M1911 PISTOL | ✓ | 1 | 7,250 | MARKET VALUE |
| ESPACAZA SPAIN RED STAG HUNT | ✓ | 1 | 7,000 | MARKET VALUE |

Appx. 446

| Part II | **Supplemental Information.** Provide the information required by Part I, lines 30b, 32b, and 33, and whether the organization is reporting in Part I, column (b), the number of contributions, the number of items received, or a combination of both. Also complete this part for any additional information. |
|---|---|

| Return Reference - Identifier | Explanation |
|---|---|
| SCHEDULE M, PART I, LINE 1 - THE NUMBER OF CONTRIBUTIONS OR THE NUMBER OF ITEMS | THE NATIONAL RIFLE ASSOCIATION IS REPORTING THE NUMBER OF ITEMS RECEIVED ON PART I, COLUMN B. |
| SCHEDULE M, PART I, LINE 32B - THIRD PARTIES USED TO SOLICIT, PROCESS, OR SELL NONCASH CONTRIBUTIONS | ON OCCASION AND AS APPROPRIATE, SECURITIES AND OTHER DONATED LIQUID OR ILLIQUID ASSETS CAN BE CONVERTED INTO CASH BY THE OUTSIDE THIRD PARTY SPECIALISTS THAT PARTNER WITH THE NRA TO FULFILL THE PHILANTHROPIC INTENTIONS OF THE DONORS. |

| SCHEDULE O | | OMB No. 1545-0047 |
|---|---|---|
| **(Form 990 or 990-EZ)** | **Supplemental Information to Form 990 or 990-EZ** | **2019** |
| | Complete to provide information for responses to specific questions on Form 990 or 990-EZ or to provide any additional information. | |
| Department of Treasury Internal Revenue Service | ▶ Attach to Form 990 or 990-EZ.  ▶ Go to www.irs.gov/Form990 for the latest information. | Open to Public Inspection |

| Name of the Organization | Employer Identification Number |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130 |

| Return Reference - Identifier | Explanation |
|---|---|
| FORM 990, PART I, LINE 1 - THE ORGANIZATION'S MISSION OR MOST SIGNIFICANT ACTIVITIES | THE NRA IS A 501(C)(4) MEMBERSHIP ASSOCIATION WITH FOUR 501(C)(3) PUBLIC CHARITIES AND A SECTION 527 POLITICAL ACTION COMMITTEE (PAC) WHICH IS A SEPARATE SEGREGATED FUND. THE FOUR CHARITIES AFFILIATED WITH THE NRA ARE NRA CIVIL RIGHTS DEFENSE FUND, NRA FOUNDATION INC, NRA FREEDOM ACTION FOUNDATION, AND NRA SPECIAL CONTRIBUTION FUND DBA NRA WHITTINGTON CENTER. THE POLITICAL ACTION COMMITTEE IS NRA POLITICAL VICTORY FUND. SEE SCHEDULE R, PART II. |
| FORM 990, PART I, LINE 7A - UNRELATED BUSINESS REVENUE | THIS INFORMATIONAL NOTE REGARDS THE NRA'S UNRELATED BUSINESS INCOME. FORM 990 PAGE 1 SHOWS GROSS UNRELATED BUSINESS REVENUE ON LINE 7A AND NET UNRELATED BUSINESS TAXABLE INCOME ON LINE 7B. THE NRA DID NOT OWE UNRELATED BUSINESS INCOME TAX FOR THE YEAR 2019 BECAUSE DIRECTLY CONNECTED DEDUCTIONS WERE GREATER THAN THE ASSOCIATED INCOME IN 2019. THE MAIN SOURCES OF NRA UNRELATED BUSINESS INCOME, AS SHOWN ON 990 PART VIII, COLUMN C, ARE CERTAIN MERCHANDISE SALES FROM THE E COMMERCE PLATFORMS, ADVERTISING, AND OTHER ACTIVITIES NOT RELATED TO THE NRA'S TAX EXEMPT PURPOSES. ADDITIONAL INFORMATIONAL NOTES RELATED TO THE NRA'S TAXES ARE SHARED ON SCHEDULE C REGARDING 527(F) PROXY TAXES AND SCHEDULED REGARDING STATE AND LOCAL TAXES. THE NRA CHOOSES TO SHARE THIS EXTRA INFORMATION ABOUT THE TAXES IN ORDER TO DEMONSTRATE IN GOOD FAITH THAT THE ORGANIZATION IS A TAXPAYER IN GOOD STANDING. |
| FORM 990, PART I, LINE 8 - CONTRIBUTIONS AND GRANTS | THIS INFORMATIONAL NOTE REGARDS THE NRA'S CONTRIBUTION REVENUE. THE VAST MAJORITY OF CONTRIBUTIONS TO THE NRA COMES FROM MILLIONS OF SMALL INDIVIDUAL DONORS. GIFTS FROM COMPANIES AND EXECUTIVES IN THE FIREARMS, HUNTING, AND SHOOTING SPORTS INDUSTRIES TYPICALLY COMPRISE LESS THAN 5% OF THE NRA'S CONTRIBUTION REVENUE EVERY YEAR, AS APPLIED TO CONTRIBUTION REVENUE REPORTED ON FORM 990, PART VIII, LINE 1. |
| FORM 990, PART III, LINE 4D - OTHER PROGRAM SERVICES | THIS NOTE PROVIDES FURTHER INFORMATION ON PART III PROGRAM SERVICE ACCOMPLISHMENTS. NRA PROGRAM SERVICES ARE CENTERED ON THE NRA'S CORE MISSION OF FIREARMS SAFETY, EDUCATION, AND TRAINING, INCLUDING MESSAGING THAT PROMOTES FREEDOM AND LIBERTY. THE ADDITIONAL PROGRAM SERVICE EXPENSES OF $31,766,483 NOTED ON 990 CORE FORM PART III LINE 4D INCLUDE THE PROGRAM SERVICES COMPONENTS OF PUBLIC AFFAIRS, EXECUTIVE, AND ADVANCEMENT OPERATIONS. 990 READERS ARE ENCOURAGED TO ACCESS NRA.ORG FOR OPPORTUNITIES TO CONTINUE TO ENGAGE WITH THE NRA. |
| FORM 990, PART VI, LINE 1A - GOVERNING BODY | UNDER THE NRA'S BYLAWS, THE BOARD OF DIRECTORS ELECTS 20 DIRECTORS ANNUALLY TO SERVE ON AN EXECUTIVE COMMITTEE. THE PRESIDENT AND VICE-PRESIDENTS ALSO SERVE ON THE COMMITTEE, FOR A CURRENT TOTAL OF 23 MEMBERS. THE BYLAWS ALLOW THE COMMITTEE TO EXERCISE ALL POWERS OF THE BOARD WHEN THE BOARD IS NOT IN SESSION, WITH CERTAIN ENUMERATED EXCEPTIONS. THE LAWS OF NEW YORK GOVERNING NOT-FOR-PROFIT CORPORATIONS ALSO PROVIDE LIMITS ON THE AUTHORITY OF EXECUTIVE COMMITTEES. |
| FORM 990, PART VI, LINE 2 - FAMILY/BUSINESS RELATIONSHIPS AMONGST INTERESTED PERSONS | CARRIE LIGHTFOOT & OWEN MILLS - BUSINESS RELATIONSHIP<br>IL LING NEW & OWEN MILLS - BUSINESS RELATIONSHIP<br>KRISTY TITUS & SANDRA FROMAN - BUSINESS RELATIONSHIP |
| FORM 990, PART VI, LINE 2 - OFFICER, DIRECTOR, TRUSTEE, OR KEY EMPLOYEE RELATIONSHIP | SEVERAL NRA DIRECTORS ARE EMPLOYED IN THE FIREARMS INDUSTRY AS MANUFACTURERS OR SELLERS OF FIREARMS, AMMUNITION, OR COMPONENTS THEREOF. THESE BOARD MEMBERS ROUTINELY BUY AND SELL PRODUCTS FROM ONE ANOTHER IN THE ORDINARY COURSE OF BUSINESS. |
| FORM 990, PART VI, LINE 4 - SIGNIFICANT CHANGES TO ORGANIZATIONAL DOCUMENTS | THE NATIONAL RIFLE ASSOCIATION AMENDED THE BYLAWS IN 2019 TO CHANGE THE QUALIFICATIONS TO BE ON THE BOARD OF DIRECTORS. IN ADDITION TO PREVIOUS QUALIFICATIONS, THE INDIVIDUAL MUST ALSO BE A LIFETIME MEMBER OF THE ASSOCIATION FOR A MINIMUM OF FIVE YEARS AT THE TIME OF NOMINATION FOR THE BOARD OF DIRECTORS |
| FORM 990, PART VI, LINE 5 - DIVERSION OF ORGANIZATION ASSETS | THE NATIONAL RIFLE ASSOCIATION BECAME AWARE DURING 2019 OF A SIGNIFICANT DIVERSION OF ITS ASSETS DURING 2019 AND FOR PRIOR CALENDAR YEARS. SEE SCHEDULE L, PART V FOR AN EXPLANATION. IN ADDITION, A STAFF EMPLOYEE (WHO WAS NOT A DISQUALIFIED PERSON, MANAGER, KEY EMPLOYEE OR HIGHLY COMPENSATED EMPLOYEE) DIVERTED $41,820.37 FROM THE NRA BUT HAS FULLY REPAID THE ORGANIZATION, INCLUDING INTEREST, FOR A TOTAL OF $56,241.35. |
| FORM 990, PART VI, LINE 6 - CLASSES OF MEMBERS OR STOCKHOLDERS | THE NATIONAL RIFLE ASSOCIATION IS A MEMBERSHIP ASSOCIATION THAT REPRESENTS ONLY INDIVIDUAL CITIZENS. MEMBERSHIP DUES ARE PROPERLY REPORTED ON FORM 990, PART VIII, LINE 2 PURSUANT TO THE INSTRUCTIONS FOR SUCH REPORTING. |
| FORM 990, PART VI, LINE 7A - MEMBERS OR STOCKHOLDERS ELECTING MEMBERS OF GOVERNING BODY | NRA MEMBERS ELECT ALL 76 MEMBERS OF THE NRA BOARD OF DIRECTORS. 75 DIRECTORS ARE ELECTED FOR STAGGERED THREE YEAR TERMS, AND THE 76TH DIRECTOR IS ELECTED FOR ONE YEAR TERM ON THE OCCASION OF EACH ANNUAL MEETING OF MEMBERS. AT THE END OF 2019, NRA HAD 73 DIRECTORS DUE TO UNFILLED VACANCIES. |

Appx. 448

| Return Reference - Identifier | Explanation |
|---|---|
| FORM 990, PART VI, LINE 7B - DECISIONS REQUIRING APPROVAL BY MEMBERS OR STOCKHOLDERS | CERTAIN RECOMMENDATIONS BY THE BOARD OF DIRECTORS ARE SUBJECT TO MEMBERSHIP APPROVAL PER NRA BYLAWS AND NEW YORK NOT FOR PROFIT CORPORATE LAW |
| FORM 990, PART VI, LINE 11B - REVIEW OF FORM 990 BY GOVERNING BODY | DRAFTS OF FORM 990 ARE REVIEWED BY THE EXTERNAL ACCOUNTING FIRM, PRESENTED TO THE NRA BOARD OF DIRECTORS AUDIT COMMITTEE, AND MADE AVAILABLE TO BOARD MEMBERS ATTENDING THE BOARD OF DIRECTORS MEETING. THE NRA'S ELECTED OFFICERS AND AUDIT COMMITTEE LEADERSHIP REVIEW A FINAL DRAFT BEFORE FILING. |
| FORM 990, PART VI, LINE 12C - CONFLICT OF INTEREST POLICY | THE ORGANIZATION'S CONFLICT OF INTEREST POLICY APPLIES TO OFFICERS, DIRECTORS, AND KEY EMPLOYEES OF THE FILING ORGANIZATION AND ITS AFFILIATES, AS WELL AS TO THEIR RELATIVES. RELATED PARTY TRANSACTIONS AND POTENTIAL CONFLICTS ARE SELF-REPORTED ON A QUESTIONNAIRE THAT IS DISTRIBUTED AT LEAST ANNUALLY AND REVIEWED BY THE SECRETARY AND GENERAL COUNSEL. |
| FORM 990, PART VI, LINE 15A - PROCESS TO ESTABLISH COMPENSATION OF TOP MANAGEMENT OFFICIAL | COMPENSATION OF THE NRA'S TOP MANAGEMENT OFFICIAL IS ESTABLISHED BY METHODS INCLUDING COMPENSATION SURVEYS AND STUDIES, AND COMPARABILITY DATA. COMPENSATION OF THE TOP MANAGEMENT OFFICIAL MUST BE APPROVED BY THE BOARD OF DIRECTORS, BASED ON RECOMMENDATIONS BY THE COMPENSATION COMMITTEE. ALL DECISIONS ARE PROPERLY DOCUMENTED. |
| FORM 990, PART VI, LINE 15B - PROCESS TO ESTABLISH COMPENSATION OF OTHER OFFICERS OR KEY EMPLOYEES | COMPENSATION OF SALARIED OFFICERS AND KEY EMPLOYEES OTHER THAN THE NRA'S TOP MANAGEMENT OFFICIAL IS ESTABLISHED BY METHODS INCLUDING (DEPENDING ON THE POSITION) COMPENSATION SURVEYS AND STUDIES, AND COMPARABILITY DATA. COMPENSATION OF THE SECRETARY AND THE TREASURER MUST BE APPROVED BY THE BOARD OF DIRECTORS, BASED ON RECOMMENDATIONS BY THE COMPENSATION COMMITTEE. ALL DECISIONS ARE PROPERLY DOCUMENTED. |
| FORM 990, PART VI, LINE 17 - STATES WITH WHICH A COPY OF THIS FORM 990 IS REQUIRED TO BE FILED | CO, CT, DE, FL, GA, HI, IA, ID, IL, IN, KS, KY, LA, MA, MD, ME, MI, MN, MO, MS, MT, NC, ND, NE, NH, NJ, NM, NV, NY, OH, OK, OR, PA, PR, RI, SC, SD, TN, TX, UT, VA, VT, WA, WI, WV, WY |
| FORM 990, PART VI, LINE 18 - AVAILABILITY OF 990 FOR PUBLIC INSPECTION | READERS ARE POLITELY REMINDED THE NRA WAS FOUNDED 148 YEARS AGO, IN 1871. THE NRA'S 1944 DETERMINATION LETTER FROM THE INTERNAL REVENUE SERVICE IS AVAILABLE ON GUIDESTAR.ORG AND CAN ALSO BE REQUESTED DIRECTLY FROM THE NRA AS REQUIRED BY LAW. FORMS 990 CAN BE REQUESTED DIRECTLY FROM THE NRA AS REQUIRED BY LAW. |
| FORM 990, PART VI, LINE 19 - REQUIRED DOCUMENTS AVAILABLE TO THE PUBLIC | THE ORGANIZATION'S ANNUAL REPORT (INCLUDING AUDITED FINANCIAL STATEMENTS) IS AVAILABLE UPON REQUEST. ITS ARTICLES OF INCORPORATION ARE A PUBLIC RECORD AVAILABLE FROM THE STATE OF NEW YORK, AND ITS BYLAWS ARE AVAILABLE TO MEMBERS BY MAIL UPON REQUEST. THE NRA'S CONFLICT OF INTEREST POLICY IS NOT AVAILABLE TO THE PUBLIC.. |
| FORM 990, PART VII, SECTION A, LINE 1A - THE NRA BOARD OF DIRECTORS COMPENSATION | THIS INFORMATIONAL NOTE REGARDS SERVICE ON THE NRA BOARD OF DIRECTORS, WHICH IS NOT COMPENSATED. BOARD MEMBERS WHO RECEIVED COMPENSATION IN 2019 WERE COMPENSATED FOR OTHER REASONS, NOT FOR THEIR VOLUNTARY BOARD SERVICE. MR. BUTZ, MS. HAMMER, MR. KEENE, MR. NUGENT, MR. OLSON, AND MR. SKELTON WERE COMPENSATED FOR OTHER PROFESSIONAL SERVICES THEY PERFORMED FOR THE ORGANIZATION. MR. BACH MR. BROWNELL, MR. COTTON, MS. LIGHTFOOT, MR. MILLS, MR. TED NUGENT, AND MS. WALKER RECEIVED MEMBERSHIP RECRUITING COMMISSIONS THAT WERE PAID TO THEIR COMPANIES. FOR THE PURPOSE OF DETERMINING THE COUNT OF INDEPENDENT DIRECTORS AS OF DECEMBER 31, 2019 SHOWN ON PART I LINE 3 AND PART VI LINE 1B, THE TEN DIRECTORS NOT CONSIDERED INDEPENDENT FOR 2019 WERE MR. NORTH, MS. HAMMER, MR. KEENE, MR. NUGENT, MR. BUTZ, MS. GOLOB, MR. OLSON, MR. SKELTON, MR. NOSLER, AND MR. BROWNELL |
| FORM 990, PART VII, SECTION A, LINE 5 - COMPENSATION FROM UNRELATED ORGANIZATION | THE NRA HAS COMPLETED SCHEDULE J REPORTING FOR DIRECTOR OLIVER NORTH, WHO REPORTED COMPENSATION OF $986,015 FROM AN UNRELATED ORGANIZATION, ACKERMAN MCQUEEN, INC., FOR PROFESSIONAL SERVICES RELATED TO PRODUCTION AND HOSTING OF AN ONLINE VIDEO SERIES FOR THE NRA. UPON INFORMATION AND BELIEF, THE NRA ESTIMATES THAT THIS SELF-REPORTED AMOUNT IS ONLY A FRACTION OF THE ACTUAL AMOUNT PAID BY THE NRA TO ACKERMAN MCQUEEN FOR COL. NORTH'S SERVICES, AND THAT THE TOTAL PAID EXCEEDS THE VALUE RECEIVED DUE TO (AMONG OTHER THINGS) ACKERMAN'S FAILURE TO PRODUCE ALL OF THE EPISODES FOR WHICH THE NRA CONTRACTED. THE RELATIONSHIP BETWEEN COL. NORTH, ACKERMAN MCQUEEN, AND THE NRA IS CURRENTLY THE SUBJECT OF LITIGATION IN THE CASES LISTED ON SCHEDULE L.

THE NRA HAS ALSO COMPLETED SCHEDULE J REPORTING FOR DIRECTOR JULIE GOLOB, WHO REPORTED COMPENSATION OF $16,119 FROM ACKERMAN MCQUEEN FOR PROFESSIONAL SERVICES PERFORMED ON NRA DIGITAL MEDIA PROJECTS. |
| FORM 990, PART VII, SECTION B, LINE 1 - HIGHEST COMPENSATED INDEPENDENT CONTRACTORS | THIS INFORMATIONAL NOTE PROVIDES ADDITIONAL DETAIL ABOUT AMOUNTS PAID TO OUTSIDE SERVICES PROVIDERS. THE FILING ORGANIZATION REPORTS COMPENSATION PAID TO SERVICES PROVIDERS EXCLUSIVE OF ADVERTISING AND OTHER MEDIA PLACED ON BEHALF OF THE FILING ORGANIZATION AND EXPENSES INCURRED ON BEHALF OF THE FILING ORGANIZATION. FOR EXAMPLE, THE FIGURE OF $7,317,206 STATED ON PART VII SECTION B LINE 1 REFLECTS COMPENSATION FOR SERVICES PAID TO ACKERMAN MCQUEEN INC. |

| Return Reference - Identifier | Explanation |
|---|---|
| FORM 990, PART VIII, LINE 2B - MEMBERSHIP DUES | THIS INFORMATIONAL NOTE REGARDS THE REPORTING OF MEMBER DUES ON FORM 990. LINE 1B OF THE REVENUE STATEMENT IS PROPERLY LEFT BLANK. PURSUANT TO 990 INSTRUCTIONS, MEMBERSHIP DUES THAT ARE NOT CONTRIBUTIONS BECAUSE THEY COMPARE REASONABLY WITH AVAILABLE BENEFITS ARE SHOWN ON LINE 2. THUS, ALL NRA MEMBER DUES ARE PROPERLY SHOWN ON THE 990 REVENUE STATEMENT AS PROGRAM SERVICE REVENUE ON LINE 2, OTHER THAN NRA LIFE-PLUS CONTRIBUTIONS WHICH ARE PROPERLY COUNTED AS CONTRIBUTION REVENUE IN LINE 1F OF THE 990 REVENUE STATEMENT. |
| FORM 990, PART IX, LINE 11 - FEES FOR SERVICES | THIS INFORMATIONAL NOTE REGARDS THE NRA'S PAYMENT OF FEES FOR OUTSIDE PROFESSIONAL SERVICES AS STATED ON LINE 11 OF THE 990 EXPENSE STATEMENT. LINE 11B REPORTS LEGAL FEES PAID TO OUTSIDE ATTORNEYS, SUCH AS FOR SECOND AMENDMENT CASE WORK AND RELATED LITIGATION AT THE FEDERAL AND STATE LEVELS AND FOR REGULATORY, COMPLIANCE MATTERS, AND CORPORATE LITIGATION. LINE 11C REPORTS ACCOUNTING FEES PAID TO THE OUTSIDE CPA FIRM THAT PROVIDES THE NRA'S AUDITING AND TAX SERVICES. LINE 11D REPORTS LOBBYING EXPENSE PAID TO EXTERNAL REGISTERED LOBBYISTS. LINE 11E REPORTS FUNDRAISING COSTS PAID TO THE AUTHORIZED VENDORS LISTED ON SCHEDULE G. LINE 11F REPORTS INVESTMENT MANAGEMENT FEES PAID TO INVESTMENT ADVISORS THAT MANAGE THE NRA'S PORTFOLIOS. LINE 11G SHOWS TELEMARKETING COSTS FOR MEMBERSHIP SERVICING. PROFESSIONAL SERVICES PERFORMED BY NRA EMPLOYEES (IN HOUSE COUNSEL, IN HOUSE ACCOUNTANTS, IN HOUSE LOBBYISTS, IN HOUSE FUNDRAISERS, AND IN HOUSE INVESTMENT MANAGERS, RESPECTIVELY) ARE PROPERLY REPORTED WITHIN LINES 5-7 OF THE 990 EXPENSE STATEMENT, AS REQUIRED BY 990 FORM INSTRUCTIONS. PROFESSIONAL SERVICES PERFORMED BY THE TELEMARKETING VENDOR FOR FUNDRAISING PURPOSES, RATHER THAN FOR MEMBERSHIP, ARE PROPERLY REPORTED WITHIN LINE 11E, AS REQUIRED BY 990 FORM INSTRUCTIONS. |
| FORM 990, PART IX, LINE 24E - ALL OTHER EXPENSES | THIS RESPONSE EXPLAINS $13,258,411 OF OTHER EXPENSES STATED ON LINE 24E OF THE 990, PART IX EXPENSE STATEMENT WHICH WERE NOT ACCOMMODATED BY OTHER EXPENSE LINE DESCRIPTIONS. THIS FIGURE INCLUDES $7,229,130 OF FULFILLMENT MATERIALS, $4,261,888 BANKING FEES, $1,032,468 MEMBERSHIP PREMIUMS, $328,452 OF NON-PAYROLL TAXES |
| FORM 990, PART X, LINE 15 - OTHER ASSETS | THIS INFORMATIONAL NOTE PROVIDES ADDITIONAL DETAIL ABOUT OTHER ASSETS. DUE FROM AFFILIATES INCLUDED IN ACCOUNTS RECEIVABLE IN THE PRIOR YEAR HAVE BEEN RECLASSIFIED TO OTHER ASSETS TO CONFORM WITH CURRENT YEAR PRESENTATION |
| FORM 990, PART XI, LINE 9 - OTHER CHANGES IN NET ASSETS OR FUND BALANCES | THIS RESPONSE EXPLAINS $(750,566) OF OTHER CHANGES IN THE NET ASSETS RECONCILIATION SCHEDULE. THE FIGURE INCLUDES $3,534,160 AGENCY TRANSACTIONS BETWEEN THE NRA AND NRA FOUNDATION; $2,040,070 ADOPTION OF ASC 606, AND $122,132 UNREALIZED GAIN ON DERIVATIVE INSTRUMENT, AND OTHER NET PENSION PLAN LOSS (6,446,928). THE AGENCY TRANSACTIONS FIGURE OF $3,534,160 INCLUDES ENDOWMENT CONTRIBUTIONS AND ENDOWMENT EARNINGS DESIGNATED BY NRA FOUNDATION DONORS FOR ELIGIBLE NRA PROGRAMS. |

| FORM 990, PART XI, LINE 9 - OTHER CHANGES IN NET ASSETS OR FUND BALANCES | (a) Description | (b) Amount |
|---|---|---|
| | AGENCY TRANSACTIONS BETWEEN THE NRA AND NRA FOUNDATION | 3,534,162 |
| | UNREALIZED GAIN ON DERIVATIVE INSTRUMENT | 122,132 |
| | ADOPTION OF ASC 606 | 2,040,070 |
| | OTHER NET PENSION PLAN LOSS | - 6,446,928 |

**SCHEDULE R (Form 990)**

Department of the Treasury
Internal Revenue Service

# Related Organizations and Unrelated Partnerships

► Complete if the organization answered "Yes" on Form 990, Part IV, line 33, 34, 35b, 36, or 37.
► Attach to Form 990.
► Go to *www.irs.gov/Form990* for instructions and the latest information.

OMB No. 1545-0047

**2019**

Open to Public Inspection

Name of the organization
NATIONAL RIFLE ASSOCIATION OF AMERICA

Employer identification number
53-0116130

**Part I** Identification of Disregarded Entities. Complete if the organization answered "Yes" on Form 990, Part IV, line 33.

| (a) Name, address, and EIN (if applicable) of disregarded entity | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Total income | (e) End-of-year assets | (f) Direct controlling entity |
|---|---|---|---|---|---|
| (1) | | | | | |
| (2) | | | | | |
| (3) | | | | | |
| (4) | | | | | |
| (5) | | | | | |
| (6) | | | | | |

**Part II** Identification of Related Tax-Exempt Organizations. Complete if the organization answered "Yes" on Form 990, Part IV, line 34, because it had one or more related tax-exempt organizations during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Exempt Code section | (e) Public charity status (if section 501(c)(3)) | (f) Direct controlling entity | (g) Section 512(b)(13) controlled entity? Yes | No |
|---|---|---|---|---|---|---|---|
| (1) NRA FOUNDATION INC (52-1710886) 11250 WAPLES MILL RD, FAIRFAX, VA 22030 | CHARITABLE | DC | 501(C)(3) | 7 | NRA | ✓ | |
| (2) NRA SPECIAL CONTRIBUTION FUND (23-7367534) 11251 WAPLES MILL RD, FAIRFAX, VA 22031 | CHARITABLE | NM | 501(C)(3) | 7 | NRA | ✓ | |
| (3) NRA CIVIL RIGHTS DEFENSE FUND (52-1136665) 11252 WAPLES MILL RD, FAIRFAX, VA 22032 | CHARITABLE | VA | 501(C)(3) | 7 | NRA | ✓ | |
| (4) NRA FREEDOM ACTION FOUNDATION (26-1277941) 11253 WAPLES MILL RD, FAIRFAX, VA 22033 | CHARITABLE | VA | 501(C)(3) | 7 | NRA | ✓ | |
| (5) NRA POLITICAL VICTORY FUND (52-1083020) 11254 WAPLES MILL RD, FAIRFAX, VA 22034 | PAC/SSF | VA | 527 POL. ORG. | | NRA | ✓ | |
| (6) | | | | | | | |
| (7) | | | | | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 990.

Cat. No. 50135Y

94

Schedule R (Form 990) 2019

11/18/2020 9:47:17 AM

NATIONAL RIFLE ASSOCIATION OF AMERICA
53-0116130

Schedule R (Form 990) 2019

**Part III** **Identification of Related Organizations Taxable as a Partnership. Complete if the organization answered "Yes" on Form 990, Part IV, line 34, because it had one or more related organizations treated as a partnership during the tax year.**

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Direct controlling entity | (e) Predominant income (related, unrelated, excluded from tax under sections 512–514) | (f) Share of total income | (g) Share of end-of-year assets | (h) Disproportionate allocations? Yes | No | (i) Code V—UBI amount in box 20 of Schedule K-1 (Form 1065) | (j) General or managing partner? Yes | No | (k) Percentage ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **(1)** (SEE STATEMENT) | | | | | | | | | | | | |
| **(2)** | | | | | | | | | | | | |
| **(3)** | | | | | | | | | | | | |
| **(4)** | | | | | | | | | | | | |
| **(5)** | | | | | | | | | | | | |
| **(6)** | | | | | | | | | | | | |
| **(7)** | | | | | | | | | | | | |

**Part IV** **Identification of Related Organizations Taxable as a Corporation or Trust. Complete if the organization answered "Yes" on Form 990, Part IV, line 34, because it had one or more related organizations treated as a corporation or trust during the tax year.**

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Direct controlling entity | (e) Type of entity (C corp, S corp, or trust) | (f) Share of total income | (g) Share of end-of-year assets | (h) Percentage ownership | (i) Section 512(b)(13) controlled entity? Yes | No |
|---|---|---|---|---|---|---|---|---|---|
| **(1)** (SEE STATEMENT) | | | | | | | | | |
| **(2)** | | | | | | | | | |
| **(3)** | | | | | | | | | |
| **(4)** | | | | | | | | | |
| **(5)** | | | | | | | | | |
| **(6)** | | | | | | | | | |
| **(7)** | | | | | | | | | |

Schedule R (Form 990) 2019

Schedule R (Form 990) 2019

Page **3**

## Part V  Transactions With Related Organizations. Complete if the organization answered "Yes" on Form 990, Part IV, line 34, 35b, or 36.

**Note:** Complete line 1 if any entity is listed in Parts II, III, or IV of this schedule.

| | | Yes | No |
|---|---|---|---|
| **1** During the tax year, did the organization engage in any of the following transactions with one or more related organizations listed in Parts II–IV? | | | |
| **a** Receipt of **(i)** interest, **(ii)** annuities, **(iii)** royalties, or **(iv)** rent from a controlled entity | 1a | | |
| **b** Gift, grant, or capital contribution to related organization(s) | 1b | | ✓ |
| **c** Gift, grant, or capital contribution from related organization(s) | 1c | | ✓ |
| **d** Loans or loan guarantees to or for related organization(s) | 1d | | ✓ |
| **e** Loans or loan guarantees by related organization(s) | 1e | | ✓ |
| | | | |
| **f** Dividends from related organization(s) | 1f | | ✓ |
| **g** Sale of assets to related organization(s) | 1g | | ✓ |
| **h** Purchase of assets from related organization(s) | 1h | | ✓ |
| **i** Exchange of assets with related organization(s) | 1i | | ✓ |
| **j** Lease of facilities, equipment, or other assets to related organization(s) | 1j | | ✓ |
| | | | |
| **k** Lease of facilities, equipment, or other assets from related organization(s) | 1k | | ✓ |
| **l** Performance of services or membership or fundraising solicitations for related organization(s) | 1l | ✓ | |
| **m** Performance of services or membership or fundraising solicitations by related organization(s) | 1m | | ✓ |
| **n** Sharing of facilities, equipment, mailing lists, or other assets with related organization(s) | 1n | ✓ | |
| **o** Sharing of paid employees with related organization(s) | 1o | | ✓ |
| | | | |
| **p** Reimbursement paid to related organization(s) for expenses | 1p | | ✓ |
| **q** Reimbursement paid by related organization(s) for expenses | 1q | ✓ | |
| | | | |
| **r** Other transfer of cash or property to related organization(s) | 1r | ✓ | |
| **s** Other transfer of cash or property from related organization(s) | 1s | | ✓ |
| **2** If the answer to any of the above is "Yes," see the instructions for information on who must complete this line, including covered relationships and transaction thresholds. | | | |

| **(a)** Name of related organization | **(b)** Transaction type (a–s) | **(c)** Amount involved | **(d)** Method of determining amount involved |
|---|---|---|---|
| **(1)** NRA FOUNDATION INC | A | 180,000 | CASH VALUE |
| **(2)** NRA FOUNDATION INC | C | 12,073,526 | CASH VALUE |
| **(3)** NRA FOUNDATION INC | E | 5,000,000 | CASH VALUE |
| **(4)** NRA FOUNDATION INC | O | 11,088,682 | CASH VALUE |
| **(5)** NRA FOUNDATION INC | Q | 4,109,204 | CASH VALUE |
| **(6)** (SEE STATEMENT) | | | |

Schedule R (Form 990) 2019

11/18/2020 9:47:17 AM

NATIONAL RIFLE ASSOCIATION OF AMERICA
53-0116130

Appx. 453

Schedule R (Form 990) 2019

Page **4**

**Part VI** | **Unrelated Organizations Taxable as a Partnership.** Complete if the organization answered "Yes" on Form 990, Part IV, line 37.

Provide the following information for each entity taxed as a partnership through which the organization conducted more than five percent of its activities (measured by total assets or gross revenue) that was not a related organization. See instructions regarding exclusion for certain investment partnerships.

| (a) Name, address, and EIN of entity | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Predominant income (related, unrelated, excluded from tax under sections 512–514) | (e) Are all partners section 501(c)(3) organizations? | | (f) Share of total income | (g) Share of end-of-year assets | (h) Disproportionate allocations? | | (i) Code V—UBI amount in box 20 of Schedule K-1 (Form 1065) | (j) General or managing partner? | | (k) Percentage ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Yes | No | | | Yes | No | | Yes | No | |
| (1) | | | | | | | | | | | | | |
| (2) | | | | | | | | | | | | | |
| (3) | | | | | | | | | | | | | |
| (4) | | | | | | | | | | | | | |
| (5) | | | | | | | | | | | | | |
| (6) | | | | | | | | | | | | | |
| (7) | | | | | | | | | | | | | |
| (8) | | | | | | | | | | | | | |
| (9) | | | | | | | | | | | | | |
| (10) | | | | | | | | | | | | | |
| (11) | | | | | | | | | | | | | |
| (12) | | | | | | | | | | | | | |
| (13) | | | | | | | | | | | | | |
| (14) | | | | | | | | | | | | | |
| (15) | | | | | | | | | | | | | |
| (16) | | | | | | | | | | | | | |

Schedule R (Form 990) 2019

11/18/2020 9:47:17 AM    97

NATIONAL RIFLE ASSOCIATION OF AMERICA
53-0116130

Appx. 454

**Part III** — Identification of Related Organizations Taxable as a Partnership (continued)

| (a) Name, address and EIN of related organization | (b) Primary Activity | (c) Legal domicile (state or foreign country) | (d) Direct controlling entity | (e) Predominant income (related, unrelated, excluded from tax under sections 512-514) | (f) Share of total income | (g) Share of end-of-year assets | (h) Disproportionate allocations? Yes / No | (i) Code V - UBI amount in box 20 of Schedule K-1 (Form 1065) | (j) General or managing partner? Yes / No | (k) Percentage ownership |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) WBB INVESTMENTS, LLC (32-0569014) 11250 WAPLES MILL RD, FAIRFAX, VA 22030 | INVESTMENT | DE | NRA | N/A | 0 | 0 | No ✓ | | ✓ | 99.00 |

NATIONAL RIFLE ASSOCIATION OF AMERICA
53-0116130

98

11/18/2020 9:47:17 AM

**Part IV**    Identification of Related Organizations Taxable as a Corporation or Trust (continued)

| (a) Name, address and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Direct controlling entity | (e) Type of entity (C-corp, S-corp or trust) | (f) Share of total income | (g) Share of end-of-year assets | (h) Percentage ownership | (i) Section 512(b)(13) controlled entity? Yes | No |
|---|---|---|---|---|---|---|---|---|---|
| (1) LEXINGTON CONCORD HOLDINGS LLC (83-1798978) 11250 WAPLES MILL RD, FAIRFAX, VA 22030 | DEVELOPMENT PHASE | DE | NRA | C CORPORATION | | 0 | 100.00 | ✓ | |
| (2) NRA HOLDINGS COMPANY INC (02-0558658) 11250 WAPLES MILL RD, FAIRFAX, VA 22030 | MANAGEMENT SERVICES | VA | NRA | C CORPORATION | | 0 | 100.00 | ✓ | |

**Part V** | Transactions with Related Organizations (continued)

| (a) Name of other organization | (b) Transaction type (a-s) | (c) Amount Involved | (d) Method of determining amount involved |
|---|---|---|---|
| (6) NRA CIVIL RIGHTS DEFENSE FUND | C | 652,384 | CASH VALUE |
| (7) NRA CIVIL RIGHTS DEFENSE FUND | Q | 41,831 | CASH VALUE |
| (8) NRA SPECIAL CONTRIBUTION FUND | A | 353,051 | CASH VALUE |
| (9) NRA SPECIAL CONTRIBUTION FUND | Q | 1,881,719 | CASH VALUE |
| (10) NRA POLITICAL VICTORY FUND | R | 3,952 | CASH VALUE |
| (11) LEXINGTON CONCORD HOLDINGS LLC | Q | 98,926 | CASH VALUE |
| (12) NRA FREEDOM ACTION FOUNDATION | Q | 977,377 | CASH VALUE |
| (13) NRA POLITICAL VICTORY FUND | Q | 2,908,114 | CASH VALUE |

11/18/2020 9:47:17 AM

100

**NATIONAL RIFLE ASSOCIATION OF AMERICA**
53-0116130

| Part VII | Supplemental Information. Provide additional information for responses to questions on Schedule R (see instructions). |
|---|---|

| Return Reference - Identifier | Explanation |
|---|---|
| SCHEDULE R, PART II - IDENTIFICATION OF RELATED TAX-EXEMPT ORGANIZATIONS | THE NRA IS A 501(C)(4) MEMBERSHIP ASSOCIATION WITH FOUR 501(C)(3) PUBLIC CHARITIES AND A SECTION 527 POLITICAL ACTION COMMITTEE (PAC) WHICH IS A SEPARATE SEGREGATED FUND. THE FOUR CHARITIES AFFILIATED WITH THE NRA ARE NRA CIVIL RIGHTS DEFENSE FUND, NRA FOUNDATION INC, NRA FREEDOM ACTION FOUNDATION, AND NRA SPECIAL CONTRIBUTION FUND DBA NRA WHITTINGTON CENTER. THE POLITICAL ACTION COMMITTEE IS NRA POLITICAL VICTORY FUND; NRAPVF IS A SEPARATE UNINCORPORATED PAC OF THE NRA. IN THE EVENT THAT ANY FUNDS ARE RECEIVED BY THE NRA AND EARMARKED TO THE PAC, THE NRA HAS SYSTEMS IN PLACE TO ENSURE ANY SUCH RECEIPTS ARE PROMPTLY AND IMMEDIATELY DEPOSITED INTO THE SEPARATE SEGREGATED FUND'S ACCOUNT. |
| SCHEDULE R, PART III - WBB INVESTMENTS, LLC | WBB INVESTMENTS, LLC WAS FORMED IN CONNECTION WITH A POSSIBLE TRANSACTION THAT WAS NEVER ULTIMATELY EXECUTED. A CERTIFICATE OF CANCELLATION HAS BEEN FILED AND THE ENTITY WAS DISSOLVED IN 2019. |
| SCHEDULE R, PART V, LINE 1C - GIFT, GRANT, OR CAPITAL CONTRIBUTION FROM RELATED ORGANIZATION | THIS INFORMATIONAL NOTE REGARDS QUALIFIED CHARITABLE GRANT MAKING. ALL GRANTS MADE BY NRA FOUNDATION, NRA CIVIL RIGHTS DEFENSE FUND, AND NRA FREEDOM ACTION FOUNDATION TO THE NRA ARE SUBJECT TO STRINGENT REVIEW PROCESSES REQUIRING THAT THE GRANTS BE MADE AND USED ONLY FOR QUALIFIED CHARITABLE PURPOSE PROGRAMS. THE NRA IS REQUIRED TO PROVIDE DOCUMENTATION TO THE CHARITIES THAT PROCEEDS WERE USED BY THE NRA FOR QUALIFIED CHARITABLE PURPOSES AS SET FORTH IN THE GRANT DOCUMENTS. |
| SCHEDULE R, PART V, LINE 1E - LOANS OR LOAN GUARANTEES BY RELATED ORGANIZATION | THE NRA ENTERED A SECURED LOAN AGREEMENT WITH THE NRA FOUNDATION. THE $5,000,000 LOAN IS PAYABLE TO THE NRA FOUNDATION AT A FAIR VALUE INTEREST RATE. THE NRA MAKES MONTHLY INTEREST PAYMENTS OF 7%. |

Appx. 458

Form **8453-EO**

### Exempt Organization Declaration and Signature for Electronic Filing

For calendar year 2019, or tax year beginning _____, 2019, and ending _____, 20 _____

### For use with Forms 990, 990-EZ, 990-PF, 1120-POL, and 8868

OMB No. 1545-0047

**2019**

Department of the Treasury
Internal Revenue Service

| Name of exempt organization | Employer identification number |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130 |

**Part I**   **Type of Return and Return Information** (Whole Dollars Only)

Check the box for the type of return being filed with Form 8453-EO and enter the applicable amount, if any, from the return. If you check the box on line 1a, 2a, 3a, 4a, or 5a below and the amount on that line of the return being filed with this form was blank, then leave line **1b, 2b, 3b, 4b,** or **5b,** whichever is applicable, blank (do not enter -0-). If you entered -0- on the return, then enter -0- on the applicable line below. **Do not** complete more than one line in Part I.

| | | | | | | |
|---|---|---|---|---|---|---|
| **1a** | **Form 990** check here ▶ | ☑ | **b** | **Total revenue,** if any (Form 990, Part VIII, column (A), line 12) . . | **1b** | 291,155,464 |
| **2a** | **Form 990-EZ** check here ▶ | ☐ | **b** | **Total revenue,** if any (Form 990-EZ, line 9) . . . . . . . . | **2b** | |
| **3a** | **Form 1120-POL** check here ▶ | ☐ | **b** | **Total tax** (Form 1120-POL, line 22) . . . . . . . . . . | **3b** | |
| **4a** | **Form 990-PF** check here ▶ | ☐ | **b** | **Tax based on investment income** (Form 990-PF, Part VI, line 5) . | **4b** | |
| **5a** | **Form 8868** check here ▶ | ☐ | **b** | **Balance due** (Form 8868, line 3c) . . . . . . . . . . | **5b** | |

**Part II**   **Declaration of Officer**

**6**   ☑   I authorize the U.S. Treasury and its designated Financial Agent to initiate an Automated Clearing House (ACH) electronic funds withdrawal (direct debit) entry to the financial institution account indicated in the tax preparation software for payment of the organization's federal taxes owed on this return, and the financial institution to debit the entry to this account. To revoke a payment, I must contact the U.S. Treasury Financial Agent at 1-888-353-4537 no later than 2 business days prior to the payment (settlement) date. I also authorize the financial institutions involved in the processing of the electronic payment of taxes to receive confidential information necessary to answer inquiries and resolve issues related to the payment.

☑   If a copy of this return is being filed with a state agency(ies) regulating charities as part of the IRS Fed/State program, I certify that I executed the electronic disclosure consent contained within this return allowing disclosure by the IRS of this Form 990/990-EZ/ 990-PF (as specifically identified in Part I above) to the selected state agency(ies).

Under penalties of perjury, I declare that I am an officer of the above named organization and that I have examined a copy of the organization's 2019 electronic return and accompanying schedules and statements, and, to the best of my knowledge and belief, they are true, correct, and complete. I further declare that the amount in Part I above is the amount shown on the copy of the organization's electronic return. I consent to allow my intermediate service provider, transmitter, or electronic return originator (ERO) to send the organization's return to the IRS and to receive from the IRS **(a)** an acknowledgement of receipt or reason for rejection of the transmission, **(b)** the reason for any delay in processing the return or refund, and **(c)** the date of any refund.

**Sign Here** ▶

| Signature of officer | Date | Title |
|---|---|---|
| *[signature]* | 11/17/20 | EXECUTIVE VICE PRESIDENT |

**Part III**   **Declaration of Electronic Return Originator (ERO) and Paid Preparer** (see instructions)

I declare that I have reviewed the above organization's return and that the entries on Form 8453-EO are complete and correct to the best of my knowledge. If I am only a collector, I am not responsible for reviewing the return and only declare that this form accurately reflects the data on the return. The organization officer will have signed this form before I submit the return. I will give the officer a copy of all forms and information to be filed with the IRS, and have followed all other requirements in Pub. 4163, Modernized e-File (MeF) Information for Authorized IRS *e-file* Providers for Business Returns. If I am also the Paid Preparer, under penalties of perjury I declare that I have examined the above organization's return and accompanying schedules and statements, and, to the best of my knowledge and belief, they are true, correct, and complete. This Paid Preparer declaration is based on all information of which I have any knowledge.

| **ERO's Use Only** | ERO's signature ▶ | | Date | | Check if also paid preparer ☐ | Check if self-employed ☐ | ERO's SSN or PTIN |
|---|---|---|---|---|---|---|---|
| | Firm's name (or yours if self-employed), address, and ZIP code ▶ | | | | | | EIN |
| | | | | | | | Phone no. |

Under penalties of perjury, I declare that I have examined the above return and accompanying schedules and statements, and, to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer is based on all information of which the preparer has any knowledge.

| **Paid Preparer Use Only** | Print/Type preparer's name | Preparer's signature | Date | Check if self-employed ☐ | PTIN |
|---|---|---|---|---|---|
| | Firm's name ▶ | | | Firm's EIN ▶ | |
| | Firm's address ▶ | | | Phone no. | |

For Privacy Act and Paperwork Reduction Act Notice, see back of form.    Cat. No. 36606Q    Form **8453-EO** (2019)