United States Department of Justice
Office of the United States Trustee
1100 Commerce St.  Room 976
Dallas, Texas  75242
(214) 767-8967

Lisa L. Lambert
Tx Bar. No. 11844250 (also NY)
Juliet Sarkessian
PA Bar No. 57872 (also NY)
for the United States Trustee

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| **In re:**<br><br>**NATIONAL RIFLE ASSOCIATION OF AMERICA and  SEA GIRT LLC**<br><br>**Debtors.** | **Chapter 11**<br>**Case No. 21-30085-hdh11**<br>**Jointly Administered**<br>**Hearing Date: 2/24/2021**<br>**Hearing Time: 2:00 p.m.** |

**UNITED STATES TRUSTEE'S OBJECTION TO DEBTORS' APPLICATION FOR
ENTRY OF ORDER PURSUANT TO SECTIONS 105 (A), 327(E), 329 AND 1107(B)
OF THE BANKRUPTCY CODE AUTHORIZING AND APPROVING
THE EMPLOYMENT AND RETENTION EFFECTIVE AS OF THE
PETITION DATE OF BREWER, ATTORNEYS & COUNSELORS AS
SPECIAL COUNSEL FOR THE DEBTORS AND DEBTORS IN POSSESSION**

TO THE HONORABLE HARLIN D. HALE,
UNITED STATES BANKRUPTCY JUDGE:

The United States Trustee for Region 6 files this Objection to the Debtors'

Application for Entry of Order Pursuant to sections 105 (a), 327(e), 329, and 1107(b) of the

Bankruptcy Code Authorizing and Approving the Employment and Retention Effective as of the

Petition Date of Brewer, Attorneys & Counselors as Special Counsel for the Debtors and Debtors

in Possession (the "Application") and respectfully states:

## OVERVIEW

1.      Debtors seek to retain the law firm of Brewer, Attorneys & Counselors ("BAC") as "special counsel" under section 327(e) of the Code. Not only should the Application be denied because the broad scope of services to be provided do not fit within section 327(e)'s constraints, but BAC also has divided loyalties and conflicts of interest. These disqualifying conflicts are compounded by BAC's failure to disclose them in the Application and by BAC's failure to disclose all of its pre-petition compensation. Each of these deficiencies is an independent basis to deny the Application, and collectively they demonstrate that BAC is not eligible for employment by the NRA.

2.      Ethics rules governing counsel in bankruptcy cases are stricter than those that apply in ordinary civil litigation—and for good reason. Bankruptcy cases affect a multiplicity of interests that often diverge from one another, and the estate itself is obligated as a fiduciary to all stakeholders. Accordingly, counsel generally representing the estate must be employed under section 327(a) and satisfy a broad disinterestedness standard. Special counsel for limited purposes under section 327(e) still must "be free of the slightest personal interest" and must exhibit a "high degree of impartiality and detached judgment." *I.G. Petroleum, L.L.C. v. Fenasci (In re West Delta Oil Co.)*, 432 F.3d 347, 355 (5th Cir. 2005) (internal quotations omitted). BAC fails these standards in multiple ways because, among other things, it and its named partner are deeply entangled in numerous disputes at the core of the NRA's bankruptcy cases.

3.      Debtors have freely admitted that they filed these bankruptcy cases primarily, if not solely, to address the New York Attorney General lawsuit filed in August 2020

2

against the debtor the National Rifle Association ("NRA"), its CEO and EVP (Wayne LaPierre), its General Counsel, and other NRA executives.  *People of the State of New York v. The National Rifle Ass'n of Am., et al.*, Index No. 451625/2020 (Sup. Ct. N.Y. Cnty. 2020) (the "NYAG Action").  Twenty (20) paragraphs of that lawsuit relate to allegations of billing improprieties by BAC in its NRA representations that were raised by a former NRA president and four NRA board members.  Thus, the NRA seeks to retain BAC to represent it on the very matter that precipitated the filing of these bankruptcy cases and in which BAC's conduct is directly at issue.  Similarly, William Brewer, the only named partner of BAC, is married to Skye McQueen Brewer, the sister of Ackerman McQueen's CEO, Revan McQueen, and the daughter of the late CEO and long-time patriarch of the firm that bears his name, Angus McQueen.  Ackerman McQueen is the NRA's largest creditor, a defendant in three lawsuits brought by the NRA, and a co-defendant with the NRA in another action brought by the State of New York.  Mr. Brewer has been banned from personally appearing in court on behalf of the NRA in one of the NRA-Ackerman McQueen lawsuits.

4.      In addition to the NYAG and Ackerman McQueen litigation, the Application identifies twelve other litigation matters and nine other categories of tasks for which the NRA seeks to employ BAC.  Although the NRA seeks to employ BAC under section 327(e) with its narrower scope of disqualifying adverse interests, BAC does not qualify as section 327(e) counsel because of the broad scope of the services it has provided—*and will continue to provide post-petition*—for the Debtors.  In the pre-petition period, for example, BAC performed core bankruptcy services for the Debtors, including preparation of the petitions, the first day motions, and the Debtors' schedules and statement of financial affairs.  For such services, the Debtors paid BAC significantly more than they paid the Neligan law firm, which the Debtors

seek to retain as their section 327(a) general bankruptcy counsel to conduct the case. BAC also holds a retainer of $2.5 million, which is two and a half times that held by the Neligan firm.

5. But whether the Court evaluates BAC under section 327(a) or 327(e) of the Bankruptcy Code, BAC cannot be retained as counsel for the Debtors because it holds or represents interests adverse to those of the Debtors' estates, including on the matters upon which BAC is to be retained. These adverse interests include:

a. potential claims by the Debtors' estates against BAC for fraudulent conveyance based on allegations of billing improprieties raised by a former NRA president, a First VP, four members of the NRA's Board of Directors, and the NYAG Action;

b. conflicted loyalties BAC may have between its own interests and those of the NRA in the NYAG Action, as well as in an action the NRA brought against its former president, Oliver North, in which Mr. North alleges he suffered retaliation from the NRA leadership when he raised concerns over BAC's legal fees (the "Oliver North Action");

c. conflicted loyalties BAC may have in the NYAG Action and generally between the interests of the NRA and those of Mr. LaPierre, based on BAC's prior representations of Mr. LaPierre, and the steps Mr. LaPierre is alleged to have taken to stonewall internal inquiries regarding BAC's fees; and

d. conflicted loyalties BAC may have because Ackerman McQueen is adverse to the Debtors in at least three lawsuits for which BAC is sought to be retained to represent the Debtors, when BAC's named partner is married to the sister of Ackerman McQueen's CEO.

6.       The Application to employ BAC should also be denied because of BAC's failure to make material disclosures required under Bankruptcy Rule 2014.  The U.S. Trustee is aware of *at least* three such disclosures that BAC failed to make, and there may be others.   First, BAC failed to disclose that the NYAG Action and the Oliver North Action—two cases in which the NRA seeks to hire BAC to represent it—include allegations of wrongdoing by BAC, including billing improprieties.  Second, BAC failed to provide sufficiently detailed disclosure that Mr. Brewer's wife is the brother of the current CEO of the Ackerman McQueen firm and the daughter of that firm's deceased patriarch and CEO, Angus McQueen.  Third, BAC did not disclose that Mr. Brewer has been prohibited by order of the United States District for the Northern District of Texas from acting as counsel to the NRA in any trial or hearing in one of the Ackerman McQueen actions (the "Disqualification Order").  The law is well established that neither the U.S. Trustee nor the Court should have to "ferret out" complete disclosures from a debtor's counsel, and counsel's disclosure failures are an independent basis for denying the Application.

7.       BAC also failed to make the full disclosures required under section 329.  It was not sufficient for BAC to disclose, as it did, only those payments from the Debtors in the year before the bankruptcy filing "that relate to the chapter 11 filings."  Rather, because the NYAG Action, and the other litigation being handled by BAC, were the precipitating cause of the Debtors' bankruptcy, the payments received by BAC from the Debtors on those actions must be disclosed.  Such disclosure is especially critical where, as here, there have been multiple allegations of billing improprieties by BAC.

8.       Failure of a professional to make all disclosures required under Bankruptcy Rule 2014 or section 329 of the Code prevents the Court, the U.S. Trustee, and

parties from understanding all relevant facts necessary to determine if BAC is qualified as a professional for retention in these cases. Nevertheless, even the incomplete disclosures demonstrate BAC's deep entanglement in the fulcrum of these cases and its lack of independence and impartiality that disqualifies it from serving as counsel to the estate. The Application should be denied.

## FACTUAL STATEMENT

### *Background of the Filing of the Bankruptcy Cases*

9. On January 15, 2021 (the "Petition Date"), the NRA and its subsidiary, Sea Girt, LLC, filed petitions for relief under Title 11 of the Bankruptcy Code.

10. The Debtors state their reasons for filing bankruptcy in the Debtors' Information Brief in Connection with Voluntary Chapter 11 Petitions (the "Information Brief," D.I. 31). In the Information Brief, the Debtors assert that they are not insolvent and have total net assets of approximately $50 million. *See id.* at ¶ 10. The Debtors also describe the events they say led to the filing of their chapter 11 cases. These events are solely legal actions and related investigations, most significantly the NYAG Action filed on August 10, 2020, as well as other actions involving New York State Officials and the District of Columbia. *See id.* at ¶¶ 16-25. All of these actions are included among the actions for which the Debtors seek to retain BAC. *See* Schedule 1 to Ex. B to Application.

11. That the bankruptcy filing was driven by the legal actions to be handled by BAC, and most particularly the NYAG Action, was demonstrated by a statement issued by Mr. LaPierre to the NRA's members, which indicated that the purpose of the restructuring plan is to "seek protection from New York officials who illegally abused and weaponized the powers they wield against the NRA and its members." *See Letter from Wayne,*

6

WWW.NRAFORWARD.ORG (Jan. 15, 2021), https://www.nra forward.org/waynesletter. Similarly, a statement on the NRA's website explained that the chapter 11 filing was "necessitated primarily by one thing: the unhinged and political attack against the NRA by the New York Attorney General." *See Questions & Answer*, www.nraforward.org, https://www.nraforward.org/questionsanswers.

12. The complaint in the NYAG Action, which is attached as **<u>Exhibit A</u>**, comprises 169 pages and alleges extensive wrongdoing by the NRA and certain of its officers, including the NRA's Chief Executive Officer and Executive Vice President, Wayne LaPierre, and the NRA's General Counsel, John Frazer, as well as allegations relating to BAC and its billing practices, discussed in detail below. Among the relief sought in the NYAG Action is a finding by the court that the NRA should be dissolved under New York law:

> based upon the NRA's pattern of conducting its business in a persistently fraudulent or illegal manner, abusing its powers contrary to public policy of New York and its tax exempt status, and failing to provide for the proper administration of its trust assets and institutional funds; and/or . . . because directors or members in control of the NRA have looted or wasted the corporation assets, have operated the NRA solely for their personal benefit, or have otherwise acted in an illegal, oppressive or fraudulent manner.

*See* Ex. A, ¶ 12.

### *The Debtors' Application to Retain BAC in the Bankruptcy Cases*

13. On January 29, 2021, the Debtors filed the Application to retain BAC as "special counsel" pursuant to section 327(e) of the Bankruptcy Code.

14. In his declaration in support of the Application, the NRA's General Counsel, John C. Frazer, states that the NRA first retained BAC fewer than three years ago, in March of 2018. Ex. D to Application, ¶ 2. Since that time, however, BAC has become the NRA's "primary outside litigation counsel." *Id.* at ¶ 3.

15.     The declaration of BAC partner Michael Collins submitted in support of the Application stated that the Debtors first retained BAC in early 2018 "to fend off the unconstitutional hostilities from the State of New York that have now materialized in [the NYAG Action]." *See* Ex. B to Application, ¶ 3. Mr. Collins further described the NYAG Action as "one of the most significant matters comprising the BAC Pre-Petition Litigation." *Id.*

16.     By the Application, the Debtors seek to retain BAC as litigation counsel on sixteen separate actions listed on Schedule 1 to Exhibit B to the Application (the "Litigation Schedule"). The sixteen cases include the NYAG Action and four other actions in which New York State Officials are parties. *See* Schedule 1 to Ex. B to Application, items 1, 8, 10, 14 and 15. Also included is an action brought by the Washington D.C. Office of the Attorney General against the NRA Foundation, Inc. and the NRA,[1] which the Debtors have described as a "parallel proceeding" to the NYAG Action. *See id.* item 13 on Litigation Schedule, and Debtors' Information Brief, D.I. 31, ¶ 23.

17.     In addition to the sixteen litigation matters, the Application identifies nine other categories of tasks for which the Debtors seek to retain BAC. These additional tasks include, but are not limited to, advice and representation regarding potential claims against departed executives, former counsel and other fiduciaries; compliance with the laws and regulations governing charitable and non-profit organizations; potential actions concerning matters arising from the United States Senate Committee on Finance Minority Staff Report, titled *The NRA and Russia*; corporate and director and officer insurance coverage; and media coverage

---

[1]     The Debtors represent that all counts pleaded against the NRA itself were dismissed by the District of Columbia Superior Court on December 21, 2020, but that the D.C. Office of the Attorney General has moved to amend its complaint to assert fresh claims against the NRA. *See* Information Brief, D.I. 31, ¶ 23.

and media outreach. *See* Ex. B to Application, ¶ 2. The list also includes the following broad

category:

> Assistance to Debtors' bankruptcy counsel, to facilitate the efficient handling of matters in these Cases that implicate BAC's institutional knowledge and pre-petition work.

*Id.*, final bullet point.

### The Pre-Petition Legal Services Performed by BAC in Connection with the Bankruptcy Cases and the Fees the Debtors Paid

18.     In the Disclosure Pursuant to 11 U.S.C. § 329 and Rule 2016(b) of the

Federal Rules of Bankruptcy Procedure of Compensation to Brewer, Attorneys & Counselors

(the "section 329 Declaration"), which was attached to the Application, Michael Collins, a BAC

partner, disclosed the pre-petition services provided by BAC related to the chapter 11 filings.

Those services were "(a) [s]trategic advice . . . in conjunction with contemplated chapter 11

filings; and (b) [p]reparation of petitions, First Day Motions, schedules, statement of financial

affairs and other documents and court filings." Ex. E. to Application, ¶ 8.

19.     In payment of those pre-petition services "that relate to the chapter 11

filings," Mr. Collins represented that the Debtors paid BAC $794,582.50. *Id.* at ¶ 6. Mr.

Collins also disclosed that BAC holds a retainer in excess of $2.5 million. *Id.* at ¶11.

20.     BAC disclosed no pre-petition fees paid by the Debtors other than those

"that relate to the chapter 11 filings." For example, BAC did not disclose any fees that the

Debtors paid to BAC in connection with their representation of the NRA in the sixteen cases on

the Litigation Schedule.

### The Allegations Regarding BAC's Fees Set Forth in the NYAG Action

21.    The complaint in the NYAG Action includes over 20 paragraphs of allegations relating to BAC's fees.  *See* NYAG Action, Ex. A, ¶¶ 454- 474.  Those allegations include the following:

a. That the individual who took office as President of the NRA in September 2018, referenced as "Dissident No. 1" in the complaint (the "Dissident NRA President") "became concerned about the fact that the NRA was paying the Brewer firm about $2 million per month in fees that were not properly authorized or reviewed." *Id.* at ¶¶ 452, 454.

b. "Between March 2018 and February 2019, the Brewer firm charged the NRA approximately $ 19,000,000 in legal fees." *Id.* at ¶ 457.

c. "The NRA has authorized and expended significant institutional funds (in *excess of $54 million*) for payments to the Brewer firm . . . ."  *Id.* at ¶ 558 (f) (emphasis added).

d. In March of 2019, the Dissident NRA President sent letters and a memo to the NRA Board Counsel, Audit Committee, and General Counsel "raising concerns about the Brewer firm's engagement and its billing practices," and "the reasonableness and basis of the Brewer firm's legal fees." *Id.* at ¶¶ 460, 461.

e. In addition, on April 18, 2019, the Dissident NRA President, along with the First Vice President, wrote to the NRA's General Counsel (John Frazer, who is also a defendant in the NYAG Action) and the Audit Committee Chair "about the 'extraordinary legal fees the NRA has

10

incurred' by the Brewer firm, and requested the NRA engage an outside, independent expert to review the payments to Brewer." *Id.* at ¶ 461.

f. No independent review of the payments to BAC was undertaken. Rather, an outside law firm was retained to determine whether NRA management had the authority to hire the Brewer firm. While that firm determined that such retention, and the payments made to BAC, were authorized, it "advised 'it may well be in the [NRA]'s interest to obtain a full accounting of the Brewer firm's time charges to date.'" *Id.* at ¶ 462.

g. "By a July 22, 2019 letter, four NRA board members requested that an independent audit be conducted into allegations of financial misconduct at the NRA and the payments made to the Brewer firm for legal fees." According to those board members, however, "their requests were rebuffed or ignored and they were 'stonewalled, accused of disloyalty, stripped of committee assignments and denied effective counsel necessary to properly discharge [their] responsibilities as board members.'" *Id.* at ¶¶ 472, 473.

h. The Dissident NRA President learned in April 2019 that Mr. LaPierre would not support him in his term as NRA President, and shortly thereafter the Dissident NRA President resigned. *Id.* at ¶¶ 468, 470. The NRA is conducting an internal proceeding to expel the Dissident NRA President in his role as a member of the NRA Board, and in June 2020, filed an action in New York State Court for a declaratory judgment that such expulsion is proper. *Id.* at ¶ 471.

***The Allegations Against Mr. LaPierre in the NYAG Action***
***and the Steps He Took to Prevent Any Inquiry into BAC's Fees***

22. The complaint in the NYAG Action includes extensive allegations against Mr. LaPierre, who is a named defendant, in his role as CEO and EVP of the NRA, including self-dealing, mismanagement, and negligent oversight of the NRA, excess compensation, and use of NRA funds to reimburse millions of dollars in personal expenses. *See id.* at ¶¶ 139-215.

23. The NYAG complaint also includes allegations of Mr. LaPierre's actions to halt all inquiries into BAC's fees. Those allegations include the following:

a. That when Dissident NRA President "began making inquiries into the Brewer firm's billings and the operations of the NRA, LaPierre impeded his participation in the NRA's affairs, and took steps to ensure [that the Dissident NRA President] would not be reelected as President." *Id.* at ¶ 463.

b. "LaPierre repeatedly denied [the Dissident NRA President] access to Brewer's retention agreements and invoices," and at least twice, "LaPierre sent cease-and-desist letters to [the Dissident NRA President] demanding he stop looking into the matter." *Id.* at ¶ 466.

c. "In a September 2019 deposition, LaPierre testified that he withdrew his support [for the Dissident NRA President] after learning that [the Dissident NRA President] 'was working to stack' the Audit Committee to 'get[] rid of Brewer,' which LaPierre 'wasn't going to let [] happen.'" *Id.* at ¶ 468.

24. These allegations are echoed in the answer filed by Oliver North in the lawsuit filed against him by the NRA. As described by the Court in *The National Rifle Ass'n of Am. v. North*, 903843-20, 2020 N.Y. Slip Op. 51109(U), 130 N.Y.S. 3d 925 (Table), 2020 N.Y. Misc. LEXIS 6979, at * 8-9 (Sup. Ct. Albany Cnty, Oct. 2, 2020):

a. "North alleges that, around the time he took office as NRA president in September 2018, 'he heard disgusting allegations of financial misconduct related to the use of NRA member dues' ([Answer, D.I. 41], ¶ 4). In particular, North claims to have 'discovered that the NRA had been making extraordinary payments to the law firm of its outside counsel William A. Brewer III based on enormous legal bills submitted by Brewer's law firm' (*id.*). These payments amounted to 'over $1 million per month beginning in April 2018,' increased to $1.8 million per month beginning in July 2018, with total billings reaching '$54 million between April 2018 and June 2020' (*id.*)."

b. "'Shocked by the magnitude of these legal fees, North sought the advice of the then-NRA Board Counsel and exercised his fiduciary duty to the NRA's Board, members, and donors by reporting these potentially excessive legal fees to other officers and directors of the NRA, and demanding the NRA conduct an outside, independent, confidential investigation' (*id.*, ¶ 5)."

c. "Allegedly upset by North's reporting of these matters to others within the NRA, including the Audit Committee, as well as by North's formation of a special committee of the board of directors to investigate the legal fees

> paid to Brewer, LaPierre and Brewer allegedly acted to protect their own interests by blocking each of North's investigative attempts and 'also embark[ing] on a scheme to denounce North, to defame him, and to expel him from the NRA' (*id.*, ¶¶ 6-7].

*The National Rifle Ass'n of Am. v. North*, 2020 N.Y. Misc. LEXIS 6979, at *8-9.

### BAC's Representations of Mr. LaPierre

25.     In its disclosures made in connection with the Application, BAC attached a schedule of representations of potential parties in interest.  *See* Schedule 2 to Ex. B to Application.  On that schedule, BAC listed prior representations of Mr. La Pierre in two actions filed in 2019, in which both Mr. LaPierre  and the NRA were parties.  BAC states that in one of the actions it stopped representing Mr. La Pierre in November 2020, when he substituted his own counsel.[2]  Such substitution may have been in recognition that the interests of the NRA and Mr. LaPierre may not be aligned when they are co-defendants in an action.  In the other, BAC states that the representation ceased in September 2020, when the claims against Mr. LaPierre were dismissed.  *See id.*

### The Connection Between Mr. Brewer and Ackerman McQueen and the Disqualification Order

26.     Three of the actions in which the Debtors seek to retain BAC were brought by the NRA against Ackerman McQueen, which previously provided public relations and advertising services to the NRA.  Another action was brought by the State of New York against the NRA and Ackerman McQueen as co-defendants.  *See* Schedule 1 to Ex. B to

---

[2]     The NRA brought this particular action against Ackerman McQueen and others.  Ackerman McQueen asserted a counterclaim against the NRA and a third-party claim against Mr. LaPierre.  *See* Schedule 2 to Ex. B to Application; Disqualification Order.

Application, items 2, 3, 5 and 8. Thus, in three of the four actions, the NRA is directly adverse to Ackerman McQueen.

27. The named partner of BAC, William Brewer, is married to Skye McQueen Brewer, the sister of Ackerman McQueen's current CEO and the daughter of that firm's deceased patriarch and former CEO. *See* Disqualification Order (Memorandum Opinion and Order), D.I. 166 in *National Rifle Ass'n of Am. v. Ackerman McQueen, Inc., et al.*, Case No. 3:19-cv-2074 (N.D. Tex.) (the "Texas Ackerman Action"), p. 3. Skye McQueen Brewer's late father, Angus McQueen, was the "long-time patriarch and CEO of [Ackerman McQueen]." *Id.* The current CEO of Ackerman McQueen is Mrs. Brewer's brother, Revan McQueen. *Id.* Ackerman McQueen has asserted that Mr. Brewer has a "personal history of animosity" toward the McQueen family, and that "Brewer's familial relation and animosity toward [his wife's family] influences Brewer's actions on behalf of the NRA." *Id.* at 3, 14.

28. In the Texas Ackerman Action, Ackerman McQueen moved to disqualify Mr. Brewer and BAC based on allegations that they violated various ethical rules. Although the court denied the motion, it did order that "Brewer is prohibited from appearing on behalf of the plaintiff at any hearing or trial in this case." *See id.*, pp. 1-2.

29. BAC's disclosure on this matter stated only that Mr. Brewer is "related by marriage to an executive of Ackerman McQueen, Inc. . . . , which is the NRA's former vendor and a current litigation counterparty." *See* Ex. B to Application, ¶ 9. Although the Debtors referenced the Disqualification Order's ruling that the relationship between Mr. Brewer and Ackerman did not give rise to a conflict that foreclosed the firm's representation of the NRA in that case, BAC did not disclose that the Order prohibited Mr. Brewer from appearing on behalf of the plaintiff at any hearing or trial in the case. *See id.*

15

## APPLICABLE LAW AND LEGAL ARGUMENT

### A. *The Scope of BAC's Proposed Retention Exceeds that of Section 327(e) of the Bankruptcy Code*

30.    The range of services proposed in the Application to be provided by BAC to the Debtors is beyond those permissible under section 327(e) of the Code.  That section of the Code provides:

> The trustee, with the court's approval, may employ, *for a specified special purpose, other than to represent the trustee in conducting the case,* an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

11 U.S.C. § 327(e) (emphasis added).

31.    The "specified special purpose" for which counsel may be retained under section 327(e) must be "unrelated to the reorganization[.]"  *In re Johnson*, 433 B.R. 626, 637 (Bankr. S.D. Tex. 2010) (citing *In re Goldstein*, 383 B.R. 496, 501 (Bankr. C.D. Cal. 2007)); *In re Congoleum Corp.*, 426 F.3d 675, 689 (3d Cir. 2005); *see also In re Running Horse, L.L.C.*, 371 B.R. 446, 451 (Bankr. E.D. Cal. 2007).  A law firm may not be employed under section 327(e) if it is to represent the trustee, or debtor in possession, "in conducting the case."  11 U.S.C. § 327(e).  In such instance, the debtors can employ the law firm only if the firm qualifies for retention under section 327(a) of the Code.  *See In re Neumann*, 138 B.R. 683 (S.D.N.Y. 1992).

32.    The Debtors have the burden of proof to show that the employment under section 327(e) is proper.  *In re Johnson*, 433 B.R. at 635 (citing *Needler v. Rendlen (In re Big Mac Marine)*, 326 B.R. 150, 154 (B.A.P.  8th Cir. 2005)); *In re Running Horse,* 371 B.R. at 451.

33.    The BAC Application is styled as one under section 327(e) of the Code, but the scope of BAC's proposed retention is too broad for section 327(e) counsel.  BAC will

16

represent the Debtors "in conducting the case" and therefore cannot be employed under section 327(e). In fact, BAC's services relate to the matters that are at the very heart of these bankruptcy cases.

34. The Application states that the services BAC will provide include representing the Debtors in sixteen separate litigation matters listed on Schedule 1 to Exhibit B to the Application. Those cases include the NYAG Action, and related actions, which were the reason the Debtors filed these bankruptcy cases. The Application also states that BAC will perform services in nine other categories, one of which is broadly stated as "Assistance to Debtors' bankruptcy counsel, to facilitate the efficient handling of matters in these Cases that implicate BAC's institutional knowledge and pre-petition work." Ex. B to Application, ¶ 2, final bullet point.

35. The services provided by BAC before the petition date underscore BAC's role as post-petition section 327(a) general bankruptcy counsel. Michael Collins of BAC represented in his section 329 Declaration that, before the bankruptcy filing, BAC prepared the following documents for the Debtors: "*petitions, First Day Motions, schedules, statement of financial affairs* and other documents and court filings." Ex. E. to Application, ¶ 8 (b) (emphasis added). Each of these documents is a standard bankruptcy document prepared and filed by section 327(a) bankruptcy general counsel, not section 327(e) special counsel.

36. In his section 329 Declaration, Mr. Collins further stated that, before the bankruptcy filing, BAC also provided "[s]trategic advice . . . in conjunction with contemplated chapter 11 filings." *Id.* at ¶ 8 (a). Such advice, especially when coupled with BAC's preparation of standard bankruptcy documents, demonstrates that BAC is representing the Debtors "in conducting the case" and therefore falls outside of the scope of section 327(e) counsel.

17

37. BAC's pre-petition billings and the amount of retainer it holds also reflect BAC's role as lead counsel in these bankruptcy cases, rather than auxiliary counsel for a limited purpose. Pre-petition, the Debtors paid BAC $794,582.50 for what BAC describes as "services that relate to the chapter 11 filings." *Id.* ¶ 6. This amount appears not to include what the Debtors paid BAC for other pre-petition services, including representing the NRA in the NYAG Action and the fifteen other actions on the Litigation Schedule. In contrast, the Neligan firm, which the Debtors have applied to retain as section 327(a) counsel, received only $448,600 in payments from the Debtors during the pre-petition period.[3] *See* Neligan Retention Application, D.I. 82-2, ¶ 9. In addition, BAC holds a retainer in excess of $2.5 million, which is more than two and a half times the $1 million retainer held by Neligan. *See* section 329 Declaration (BAC), ¶11, and D.I. 82-2, ¶ 10.

38. Because of the breadth and nature of BAC's pre-petition services and contemplated post-petition services, the Application exceeds the purview of section 327(e).

39. If BAC wishes to perform the numerous services identified in the Application, then the firm must be retained under section 327(a) with its attendant standards:

> Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a). *See also Running Horse,* 371 B.R. at 452 ("A professional whose services may be vital to the debtor's reorganization effort, but who is not 'disinterested' and eligible for

---

[3] Mr. Neligan's declaration states that any pre-petition fees and expenses in excess of $448,600 were written off by his firm. *See* D.I. 82-2 ¶ 9. Similarly, Mr. Collin's section 329 Declaration states that any fees or expenses "in excess of pre-petition payments to BAC were written off." *See* Ex. E to App., ¶ 12.

employment under § 327(a), cannot circumvent that requirement by trying to characterize the employment as 'special counsel' under § 327(e).") (citing *In re Tidewater Memorial Hospital, Inc.*, 110 B.R. 221, 228 (Bankr. E.D. Va. 1989)).

### B. BAC Cannot Be Retained under Section 327(a) Because It is Not Disinterested

40.     BAC apparently anticipated that it would be employed as section 327(a) counsel because Mr. Collins's declaration in support of the Application included factual assertions that track the disinterestedness test of section 101(14) of the Code. *See* Ex. B to Application, ¶ 16. BAC also included in the proposed form of order findings that "BAC does not hold or represent an interest adverse to the Debtors' estates," which is standard under section 327(a) of the Code, and findings that track the definition of disinterestedness under the Code. *See* Ex. A to Application, p. 2, subsections (a), and (c) - (e).

41.     But these assertions and proposed factual findings are not accurate. BAC *does* hold an interest adverse to the Debtors' estates, namely the estates may have fraudulent conveyance claims against BAC related to its pre-petition fees and potentially other claims related to the allegations asserted against BAC in the NYAG Action. In addition, BAC previously represented Mr. LaPierre, who is a co-defendant with the NRA in the NYAG Action. The complaint in that action alleges that Mr. LaPierre took extraordinary steps to prevent any audit of BAC's fees, including sending cease-and-desist letters to the Dissident NRA President demanding that he stop inquiring into BAC's fees and preventing the Dissident NRA President from being reelected. *See* NYAG Complaint, Ex. A, ¶ ¶ 463, 466.

42.     Under section 327(a), the Debtor's attorney has the burden of proof to establish that (a) the firm is "disinterested" and (b) does not hold or represent an interest adverse to the estate. 11 U.S.C. §327(a); *see, e.g., In re Big Mac Marine, Inc.*, 326 B.R. 150, 154 (B.A.P. 8th Cir. 2005) (addressing burden of proof for employment under section 327(a)).

43.     To be "disinterested," a professional must, *inter alia*, "not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reasons of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason."  11 U.S.C. §101(14).

44.     The Fifth Circuit cited favorably to the following definition of "adverse interest" as being either:

> a.  to possess or assert an economic interest that would tend to lessen the value of the bankruptcy estate or that would create either *an actual or potential dispute in which the estate is a rival claimant*; or
>
> b.  to possess a predisposition under circumstances that render such a bias against the estate.

*I.G. Petroleum, L.L.C. v. Fenasci (In re West Delta Oil Co.),* 432 F.3d 347, 356 (5th Cir. 2005) (citation omitted, emphasis added).

45.     Here, there is "an actual or potential dispute in which the estate is a rival claimant," namely potential causes of action held by the estate against BAC, including potential claims for fraudulent conveyance.  *West Delta Oil Co.,* 432 F.3d at 356.  Therefore, the Debtors' Application to retain BAC should be denied, or at minimum an evidentiary hearing held to determine whether BAC received any payments from the Debtors that could give rise to a fraudulent conveyance claim.  *See Diamond Lumber v. Unsecured Creditors' Committee (In re Diamond Lumber),* 88 B.R. 773, 779 (N.D. Tex. 1988) (holding that "any large or unusual payments by a debtor to its counsel within the preference period are relevant to a conflicts analysis and therefore warrant scrutiny by the bankruptcy court when approval is sought to employ pre-petition counsel post-petition."); *In re Pillowtex, Inc.*, 304 F.3d 246, 255 (3d Cir. 2002) (on an appeal from an order authorizing the retention of Jones Day as the debtor's bankruptcy counsel, given a facially plausible claim of a substantial preference, the Circuit Court

remanded the action to the District Court, stating, "[b]ecause there has never been a judicial

determination whether Jones Day received a preference, it is unclear at this time whether the

preference, if there were one, presents a conflict which would require Jones Day's

disqualification."); *In re First Jersey Securities, Inc.*, 180 F.3d 504, 509 (3d Cir. 1999) ("A

preferential transfer to [debtor's counsel] would constitute *an actual conflict of interest* between

counsel and the debtor, and would require the firm's disqualification.") (emphasis added); *In re*

*Fleming Companies, Inc.*, 305 B.R. 389, 393 (Bankr. D. Del. 2004) ("Receipt of a preferential

transfer . . . does constitute *an actual conflict of interest requiring disqualification.*") (emphasis

added, citations omitted); *see also American Int'l Refinery, Inc. v. Adams and Reese, L.L.P. (In*

*re American Int'l. Refinery, Inc.),* 676 F.3d 455, 464-65 (5th Cir. 2012) (although counsel is not

necessarily disqualified from employment under section 327(a) solely because it represented a

debtor prior to commencement of the case, "courts have held that that the nature of the

representation can still create a disqualifying conflict under section 327(a), such as where the

attorney may be required to review his own legal work in the course of the bankruptcy action")

(citations omitted).

   46. The decision in *In re Republic Financial*, 128 B.R. 793 (Bankr. N.D.

Okla. 1991) is especially instructive.  There, the court denied the request of debtors' counsel for

compensation for services, finding that counsel had not been forthcoming in its disclosures

regarding the transfers it received from the debtors and their affiliates in the period leading up to

the filing of the petitions.  *Id.* at 804.  The court stated that, to the extent counsel "was itself the

recipient of transfers from [the debtors] that were or might be preferential or fraudulent under 11

U.S.C. §§ 547, 548, [counsel] could not be a disinterested person." *Id.* at 803.  The court further

advised that "[i]f full and timely disclosure had been made, the court would not, and obviously

could not, have approved [counsel]'s employment as attorneys for [the debtors] in the first place." *Id.* Similarly, BAC cannot be a disinterested person if it received transfers from the Debtors "that were or might be preferential or fraudulent." *Id.*

47. BAC also is not disinterested for the separate reason that BAC "possess[es] a predisposition under circumstances that render such a bias against the estate." *West Delta Oil,* 432 F.3d at 356. This predisposition is due to BAC's longstanding relationship with Mr. LaPierre and the steps Mr. LaPierre is alleged to have taken to prevent any inquiries into BAC's fees within the NRA. Although it appears that BAC is not representing Mr. LaPierre in the NYAG Action, the relationship between BAC and Mr. LaPierre makes it highly unlikely that, as the NRA's counsel, BAC would investigate or advocate the NRA to pursue cross-claims the NRA may have against Mr. LaPierre based on the allegations against him in the NYAG Action. The ethical standards for attorneys are relevant on this point. In the Fifth Circuit, local rules engrafting state rules do not control the ethical standards. Rather, the federal ethical standards are determined from multiple sources. *In re Dresser Indus.*, 972 F.2d 540, 543-44, n. 5 (5th Cir. 1992) (determining reliance on local rules engrafting Texas ethical standards was legal error and referring to fee disgorgement as an appropriate remedy for conflicts of interest in bankruptcy).

48. The Fifth Circuit has evaluated federal ethical standards for conflicts of interest. The duties of loyalty and care also are at issue when evaluating conflicts. The appearance of impropriety standard imposed by Canon 9 has been clarified and supplanted in the Model Code through definitions about the duty of loyalty. *In re American Airlines, Inc.*, 972 F. 2d 605, 618 (5th Cir. 1992) (issuing writ of mandamus requiring district court to disqualify law

firm that had been retained by Northwest Airlines but previously represented American Airlines).

49. The rationale for the holding of *American Airlines* is that confidences and loyalties must be kept. *American Airlines*, 972 F.2d at 619-20; *see also Humble Place Joint Venture v. Fory (In re Fory),* 936 F.2d 814, 819 (5th Cir. 1991). The Debtors' estates need legal representation that is loyal solely to the Debtors' estates and not to any particular officer of the Debtors. This is especially true where, as here, the NRA seeks to employ BAC in the NYAG Action brought against the NRA and its officer, Mr. LaPierre, which include serious allegations of misconduct by Mr. LaPierre that could give rise to claims by the estates against him.

50. For these reasons, BAC is not a "disinterested person" and therefore cannot be retained under section 327(a) of the Code.

### C. Even if the Scope of BAC's Duties Were Limited, BAC Would Not Qualify as Section 327(e) Counsel

51. Even if BAC's duties were not as expansive as they are and such duties did not go to the heart of these bankruptcy cases, as they do, BAC could not be retained under section 327(e) of the Code because it does not meet the standards of that section.

52. An attorney may represent a debtor pursuant to section 327(e) only if "(1) employment of the attorney must be for a specified special purpose, which does not include representing the trustee in conducting the case, (2) the attorney must have previously represented the debtor, (3) the employment of the attorney must be in the best interest of the estate, and (4) the attorney must not have any interest adverse to the debtor or the estate with respect to the matter on which special counsel is to be employed." *In re Johnson*, 433 B.R. at 635; *see also In re Woodworkers Warehouse, Inc.*, 323 B.R. 403, 406 (D. Del. 2005).

53.     The Fifth Circuit Court of Appeals in *West Delta Oil* opined as follows regarding the standard of section 327(e) of the Code: "We have observed that these standards [of section 327(e)] are strict and that attorneys engaged in the conduct of a bankruptcy case should be free of the s*lightest personal interest* which might be reflected in their decisions concerning matters of the debtor's estate or *which might impair the high degree of impartiality and detached judgment* expected of them during the course of administration."  432 F.3d at 355 (internal quotations omitted, emphasis added). The court went on to state that "[a]ccordingly, we are sensitive to preventing conflicts of interest and require a painstaking analysis of the facts and precise application of precedent when inquiring into alleged conflicts. If an actual conflict of interest is present, no more need be shown . . . to support a denial of compensation." *Id.* (internal quotations omitted).

54.     For the reasons set forth below, BAC may not be retained under section 327(e).

(i)     BAC *Does* Hold or Represent Interests Adverse To The Debtors and Their Estates With Respect To The Matters On Which BAC Is To Be Employed.

55.     BAC cannot be retained under section 327(e) because it cannot establish that it "does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed." 11 U.S.C § 327(e).  To the contrary, BAC is conflicted in connection with many of the lawsuits as to which it is sought to be retained. As detailed above, the complaint in the NYAG Action includes numerous allegations of BAC's wrongdoing.  BAC, therefore, cannot satisfy the Fifth Circuit's requirement in *West Delta Oil* that it be "free of the *slightest personal interest* which might be reflected in their decisions concerning matters of the debtor's estate or which might impair the *high degree of impartiality and detached judgment.*  *Id.* (emphasis added).  To the contrary, BAC has a "personal interest"

24

in the NYAG Action and cannot have "impartial[] and detached judgment" due to the allegations against BAC itself.  Independent counsel needs to be retained to represent NRA in the NYAG Action and the related actions to determine whether to bring third party claims against BAC.

56.     There are four other lawsuits the NRA proposes BAC to handle that include New York State officials and may involve some of the same issues raised in the NYAG Action.  *See* Schedule 1 to Ex. B to Application, items 1, 8, 10 and 15.   In addition, the Debtors have asserted that another lawsuit on that list, *District of Columbia v. NRA Foundation, Inc., et al.*, is a "parallel proceeding" to that of the NYAG Action.  *See* Information Brief, D.I. 31, ¶ 23. That action therefore may involve allegations against BAC as well or allegations relating to actions in which BAC had some involvement.

57.     Another action among those that the NRA proposes BAC handle is *NRA v. North*, No. 903843-20 (N.Y. Sup. Ct. 2019), where the defendant, Oliver North, a former NRA president, alleges that he suffered retaliation from the NRA leadership when he raised concerns over BAC's legal fees.  *See The National Rifle Ass'n of Am. v. North*, 2020 N.Y. Misc. LEXIS 6979, at *8-9.  Such allegations create a conflict between BAC and the Debtors' estates as to this particular matter on which BAC is sought to be retained.

58.     A different type of conflict arises in four other actions involving Ackerman McQueen.  *See* Schedule 1 to Ex. B to Application, items 2, 3, 5 and 8.   William Brewer, the named partner of BAC, is married to Skye McQueen Brewer.  Skye McQueen Brewer's late father was the "long-time patriarch and CEO of [Ackerman McQueen]," and the current CEO of Ackerman McQueen is Mrs. Brewer's brother.  Moreover, Ackerman McQueen has asserted that Mr. Brewer has a "personal history of animosity" toward his wife's family, and

that "Brewer's familial relation and animosity toward [his wife's family] influences Brewer's actions on behalf of the NRA." *See* Disqualification Order, pp. 3, 14.

59. As to the four Ackerman McQueen actions included on the Litigation Schedule, the personal familial relationship between BAC's named partner and the current and former CEO of Ackerman McQueen prevents BAC from meeting the strict standard set forth in *West Delta Oil. West Delta Oil*, 432 F.3d at 355.

60. Although the Disqualification Order did not disqualify BAC from representing the NRA in the Texas Ackerman Action, it did bar Mr. B,rewer from appearing at any trial or hearing in the case. Moreover, the standard for retention of section 327(e) counsel is not the same as the standard for disqualification in ordinary civil litigation. This is highlighted by the district court's statement in the Disqualification Order that "to the extent that BAC's representation of the NRA is or may become adversely impacted by Brewer's personal interests, *that harm is suffered* not by the defendants but *'by the [NRA]* who may terminate [Brewer] at any time.'" Disqualification Order (pp. 16-17) (emphasis added) (citing RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 125, cmt. a (2000)). Because the NRA would suffer harm from BAC's retention, that is highly relevant to whether the estate should be permitted to retain BAC, regardless of whether it is grounds for disqualification of the firm in a non-bankruptcy action. Simply put, ethical standards for bankruptcy counsel are necessarily more rigorous given the multiplicity of interests affected and the estate's fiduciary duty to stakeholders.

61. In sum, in many of the actions where Debtors seek to retain BAC, BAC *does* hold or represent an interest adverse to the estates "with respect to the matter on which such

attorney is to be employed."[4]  Therefore, BAC does not qualify to be retained under section 327(e) of the Code.  *See In re Johnson*, 433 B.R. at 635.

    ii.    <u>Retention of BAC is Not in the Best Interest of the Estate.</u>

       62.    In addition to the requirement that section 327(e) counsel not hold or represent an interest adverse to the debtor or the estate with respect to the matter on which special counsel is to be employed, appointment of such counsel must also be "in the best interest of the estate." 11 U.S.C. § 327(e); *In re Johnson*, 433 B.R. at 635.

       63.    BAC's employment does not satisfy the best interest requirement here. Based on the allegations in the NYAG Action, in the three years BAC has represented the NRA, the NRA has paid BAC $54 million in fees.  It is not in the best interest of the estates to retain counsel whose fees and billing practices have raised concerns and requests for fee audits by many insiders, including the Dissident NRA President, the First Vice President, and four members of the NRA Board.  *See* NYAG Complaint, Ex. A hereto, ¶¶ 454-474.  Nor is it in the best interest of the estates to retain counsel against whom the estate may have significant fraudulent conveyance claims.  It also cannot be in the estates' best interest to retain a law firm to represent them in litigation that alleges wrongdoing by that same law firm or whose loyalties may be divided between the NRA and its current CEO.   Nor is it in the best interest of the estates to retain counsel whose brother-in-law is the CEO of a company that is adverse to the Debtors in multiple lawsuits and is their single-largest creditor.  Finally, it is not in the best interest of the estates to retain a law firm that has failed to satisfy its disclosure obligations under either Bankruptcy Rule 2014 or Code section 329, as explained in more detail below.

    **D.  The Application Should be Denied Because BAC Has Failed to Comply**

---

[4]    There may be conflicts that BAC has in other matters on the Litigation Schedule that are as of yet unknown to the U.S. Trustee.

**With its Disclosure Obligations under Bankruptcy Rule 2014**

64.     Federal Rule of Bankruptcy Procedure 2014(a) requires both an application and a verified statement to address specified information, including "all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee."  Fed. R. Bankr. P. 2014(a).

65.     Disclosures under Bankruptcy Rule 2014(a) must be made by professionals seeking to be employed under any subsection of section 327 of the Code, including under section 327(e).  *See* Fed. R. Bankr. P. 2014(a); *In re Ferguson*, 445 B.R. 744, 756 n. 17 (Bankr. N.D. Tex. 2011) ("Even attorneys employed under section 327(e) must make the disclosures required by Rules 2014 and 2016").

66.     In *West Delta Oil,* the Fifth Circuit Court of Appeals explained that the disclosure obligations under Bankruptcy Rule 2014 (a) "require any professional applying for employment to set forth to the best of the applicant's knowledge all known connections of the applicant with the debtor, creditors, or any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee."  *West Delta Oil*, 432 F.3d at 355 (internal quotations omitted).  The court went on to observe that "[t]hough this provision allows the fox to guard the proverbial hen house, counsel who fail to disclose timely and completely their connections proceed at their own risk because failure to disclose is sufficient grounds to revoke an employment order and deny compensation." *Id.* (internal quotations omitted).

67.     The U.S. Trustee is currently aware of at least three separate disclosures required under Bankruptcy Rule 2014(a) that BAC failed to make:

a. First, BAC failed to disclose that the NYAG Action, which is the key action on which they are seeking to be retained, and the answer in the Oliver North Action, include allegations relating to BAC's billing improprieties.

b. Second, BAC failed to disclose adequately the connection between its named partner, Mr. Brewer, and the Ackerman McQueen firm, which is a party to four of the actions in which BAC is sought to be retained. In three of those actions, the NRA is directly adverse to Ackerman McQueen; in the fourth one they are co-defendants. The sole disclosure in this regard was that Mr. Brewer is "related by marriage to an executive of Ackerman McQueen, Inc. . . . , which is the NRA's former vendor and a current litigation counterparty." Ex. B to Application, ¶ 9. "Related by marriage" is a broad category that covers numerous relationships, both close and distant. In fact, the relation "by marriage" is a very close one. Mr. Brewer's wife is the sister of the current C.E.O. of Ackerman McQueen and the daughter of the long-time former C.E.O. of the company. Mrs. Brewer's maiden name, McQueen, is even part of Ackerman McQueen's company name. All of these facts should have been included in the BAC disclosures. In addition, BAC should have disclosed whether Mrs. Brewer holds any stock in Ackerman McQueen or whether she or Mr. Brewer otherwise have financial ties to the company.

c. Third, BAC failed to disclose that the district court's Disqualification Order in the Texas Ackerman Action prohibits Mr. Brewer from appearing on behalf of NRA at any hearing or trial in that case.

68.    In *Exco Resources Corp. v. Milbank, Tweed, Hadley & McCloy LLP (In re Enron Corp.)*, No. 02 Civ 5638, 2003 WL 223455, at *4 (S.D.N.Y. Feb. 3, 2003), the court observed: "The purpose of Rule 2014(a) is to provide the court and the United States trustee with information to determine whether the professional's employment is in the best interests of the estate."   For that reason, the duty of disclosure is not merely critical; it is sacrosanct.  *In re eToys, Inc.*, 331 B.R. 176, 189 (Bankr. D. Del. 2005).

69.    The professional must disclose all connections; he may not pick and choose which connections to disclose and which to ignore as unimportant or trivial.  *In re Jore Corporation*, 298 B.R. 703, 726 (Bankr. D. Mont. 2003).  The reason is simple: "[t]he decision as to what facts may be relevant should not be left up to the professional, 'whose judgment may be clouded by the benefits of potential employment.'"  *In re Fibermark, Inc.*, No. 04-10463, 2006 WL 723495 at *8 (Bankr. D. Vt. March 11, 2006) (quoting *In re Lee*, 94 B.R. 172, 177 (Bankr. C.D. Cal. 1988)).  "Coy or incomplete disclosures which leave the court to ferret out pertinent information from other sources are not sufficient."  *In re Saturley*, 131 B.R. 509, 517 (Bankr. D. Me. 1991) (citations omitted).  The professional may not leave the court or other parties-in-interest to search the record for such relationships or otherwise to ferret them out.  *In re BH & P, Inc.*, 949 F.2d 1300, 1317-18 (3d Cir. 1991).

70.    The disclosure required by professionals in bankruptcy cases "goes to the heart of the integrity of the bankruptcy system . . . ."  *In re Universal Bldg. Products*, 486 B.R. 650, 663 (Bankr. D. Del. 2010) (quoting *In re B.E.S. Concrete Prods., Inc.*, 93 B.R. 228, 236–38 (Bankr. E.D. Cal. 1988)).  The professional must disclose all connections.  *Id.* (citing, *inter alia*, *In re BH & P, Inc.,* 949 F.2d 1300, 1317–18 (3d Cir. 1991)).

71.    Failure to disclose connections is itself enough to warrant counsel's disqualification.  *Id. (*citing*, inter alia*, *In re Crivello*, 134 F.3d 831, 839 (7th Cir. 1998)).  The court need not find intent.  *See, e.g. In re Independent Eng'g Co., Inc.,* 232 B.R. 529, 532 (B.A.P. 1st Cir. 1999); *see also Arens v. Boughton (In re Prudhomme)*, 43 F.3d 1000, 1003-04, n. 2 (5th Cir. 1995) (affirmed fee disgorgement because the disclosure was insufficient both as to fees and as to disinterest).

72.    BAC failed to make material disclosures required by Bankruptcy Rule 2014.  They were not included in BAC's Application or any of the declarations submitted in support and, therefore, the Application should be denied.

**E.  The Application Should be Denied Because BAC Has Failed to Comply With its Disclosure Requirements under Section 329 of the Code**

73.    Section 329 (a) of the Code provides as follows:

> Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered *in contemplation of or in connection with* the case by such attorney, and the source of such compensation.

11 U.S.C.§ 329(a) (emphasis added).

74.    The court in *In re Mayeaux*, 269 B.R. 614 (Bankr. E.D. Tex. 2001), explained that most courts have interpreted the term "in contemplation of or in connection with the case by such attorney" as incorporating two different concepts, each with a separate standard. *Id*. at 622 (citations omitted).  A fee payment is made "in contemplation of" a bankruptcy case "if the underlying professional services were rendered at a time when the debtor was contemplating bankruptcy." *Id.*  The test is subjective "based upon the state of mind of the debtor." *Id.*

75.     In contrast, in determining whether the legal services rendered by the Debtor's counsel were "in connection with" the bankruptcy case, a more objective standard applies. *Id.* at 623. "If it can be objectively determined that the services rendered or to be rendered by the attorney *have or will have an impact on the bankruptcy case*, then such services are deemed to have been rendered in connection with the bankruptcy case and the attorney has a duty to disclose any compensation received or to be received for such services." *Id.* (emphasis added) (citing *In re Keller Fin. Serv. of Fla., Inc.,* 248 B.R. 859, 879 (Bankr. M.D. Fla. 2000) and *Cohn v. U.S. Trustee (In re Ostas)*, 158 B.R. 312, 321 (N.D.N.Y. 1993)).

76.     The *Mayeaux* Court also cited to *In re Prudhomme*, 43 F.3d 1000 (5th Cir. 1995), indicating that the Fifth Circuit had focused more on objective factors to determine whether disclosure of pre-petition fees was mandated by section 329, namely: (1) the financial condition of the debtors upon their first consultation with the attorneys; (2) the fact that the debtors were seeking the attorney representation to resolve their disputes with their largest creditor; and (3) the fact that the debtors "were unsuccessful in resolving such disputes in a non-bankruptcy context, *thus leading to the bankruptcy filing*." *Mayeaux*, 269 B.R. at 624 (citing *Prudhomme*, 43 F.3d at 1004) (emphasis added). On the basis of those factors, the *Prudhomme* Court concluded that the attorneys' failure to disclose the payments received for the pre-petition services justified disgorgement of the fees. 43 F.3d at 1003-04.

77.     Similarly, the *Mayeaux* Court determined that pre-petition payment by the debtor to his counsel for services related to a civil lawsuit and criminal law advice did fall under both the subjective and objective test under section 329 in part because the services "directly related to the precipitating cause of the bankruptcy filing and directly had an impact on the bankruptcy case." *Mayeaux*, 269 B.R. at 625. *See also In re Command Services Corp.*, 85 B.R.

230, 232 (Bankr. N.D.N.Y. 1988) (holding that the services of a debtor's attorney who was retained to collect accounts receivable were rendered "in connection with" a bankruptcy proceeding where the debtor's failure to collect on those accounts was the precipitating cause of the debtor's eventual bankruptcy).

78.     Applying the objective test to the facts here, it was not sufficient under section 329 for BAC to disclose, as it did, only those payments from the Debtors in the year prior to the bankruptcy filing "that relate to the chapter 11 filings." Ex. E. to Application, ¶ 6. Rather, because the NYAG Action, and the other litigations being handled by BAC, were the "precipitating cause of the [Debtors'] bankruptcy filing," the payments received by BAC from the Debtors on those actions must be disclosed. *Mayeaux*, 269 B.R. at 625.

79.     As explained by the *Mayeaux* Court, the purpose of section 329(a)'s fee disclosure requirement, together with Bankruptcy Rule 2017,[5] is to allow the Court to "determin[e] whether such payments [to counsel] were excessive and [] order[] the return of all or any part of such payments." 269 B.R. at 621. Such disclosure could also uncover any preferential payment, which is relevant to disinterestedness. *See In re Diamond Lumber,* 88 B.R. at 779. Where, as here, there are allegations of billing improprieties, such disclosure is even more vital.

---

[5]     Rule 2017(a) provides as follows:

> On motion by any party in interest or on the court's own initiative, the court after notice and a hearing may determine whether any payment of money or any transfer of property by the debtor, made directly or indirectly and in contemplation of the filing of a petition under the Code by or against the debtor or before entry of the order for relief in an involuntary case, to an attorney for services rendered or to be rendered is excessive.

Fed. R. Bankr. Proc. 2017(a).

80.     In light of BAC's failure to disclose all fees required to be disclosed under section 329 of the Code, the Application should be denied.  In addition, BAC should be directed to file a statement of all fees paid to it in the year prior to bankruptcy, with information sufficient to determine whether any such payments were preferential or could give rise to claims for fraudulent conveyance.

## CONCLUSION

For the reasons set forth above, the United States Trustee respectfully requests that the Court deny the BAC Application and grant further proper relief.

DATED: February 16, 2021                     Respectfully submitted,

WILLIAM T. NEARY
UNITED STATES TRUSTEE

By:  /s/  Lisa L. Lambert
Lisa L. Lambert
Assistant U.S. Trustee - Dallas
Tx Bar No. 11844250 (also NY)
Office of the United States Trustee
1100 Commerce Street, Room 976
Dallas, Texas  75242
(214) 767-8967
Lisa.L.Lambert@usdoj.gov


By:  /s/   Juliet Sarkessian
Juliet Sarkessian
Trial Attorney
PA Bar No. 57873 (also NY)
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491
Juliet.M.Sarkessian@usdoj.gov

### Certificate of Service

I certify that on February 16, 2021, I served a true copy of this document either by

electronic case filing and/or by email on the following parties and on those requesting

ECF notice.


By      */s/ Lisa L. Lambert*
       Lisa L. Lambert


Patrick J. Neligan, Jr.
Douglas J. Buncher
John D. Gaither
**NELIGAN, LLP**
325 North St. Paul, Suite 3600
Dallas, Texas 75201
pneligan@neliganlaw.com
dbuncher@neliganlaw.com
jgaither@neliganlaw.com

Michael J. Collins
**BREWER, ATTORNEYS & COUNSELORS**
1717 Main Street, Suite 5900
Dallas, Texas 75201
MJC@brewerattorneys.com