**NELIGAN LLP**
PATRICK J. NELIGAN, JR.
State Bar No. 14866000
DOUGLAS J. BUNCHER
State Bar No. 03342700
JOHN D. GAITHER
State Bar No. 24055516
325 North St. Paul, Suite 3600
Dallas, Texas 75201
Telephone: 214-840-5333
Facsimile: 214-840-5301
pneligan@neliganlaw.com
dbuncher@neliganlaw.com
jgaither@neliganlaw.com
*Counsel for Debtors and*
*Debtors-in-Possession*

**GARMAN TURNER GORDON LLP**
GREGORY E. GARMAN
Nevada Bar No. 6654, admitted *pro hac vice*
Email: ggarman@gtg.legal
TALITHA GRAY KOZLOWSKI
Nevada Bar No. 9040, *pro hac vice* pending
E-mail: tgray@gtg.legal
TERESA M. PILATOWICZ
Nevada Bar No. 9605, admitted *pro hac vice*
Email: tpilatowicz@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Telephone: 725-777-3000
Facsimile: 725-777-3112
*Counsel for Debtors*
*and Debtors-in-Possession*

**BREWER ATTORNEYS & COUNSELORS**
WILLIAM A. BREWER III
State Bar No. 02967035
SARAH B. ROGERS
New York Bar No. 4755252, admitted *pro hac vice*
Email: sbr@brewerattorneys.com
Email: wab@brewerattorneys.com
1717 Main Street, Suite 5900
Dallas, Texas 75201
Telephone: 214-653-4000
Facsimile: 214-653-1015
*Special Counsel for Debtors*
*and Debtors-in-Possession*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | **CHAPTER 11** |
| | § | |
| **NATIONAL RIFLE ASSOCIATION OF** | § | **CASE NO. 21-30085-hdh11** |
| **AMERICA and SEA GIRT LLC,** | § | |
| | § | |
| **DEBTORS**[1] | § | **Jointly Administered** |
| | § | |

---

[1] The last four digits of the Debtors' taxpayer identification numbers are: 6130 (Association) and 5681 (Sea Girt). The Debtors' mailing address is 11250 Waples Mill Road, Fairfax, Virginia 22030.

---

**Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, (2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11 Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11 Trustee**

**OMNIBUS OPPOSITION TO (1) ACKERMAN MCQUEEN, INC.'S MOTION TO DISMISS THE CHAPTER 11 BANKRUPTCY PETITION, OR, IN THE ALTERNATIVE, MOTION FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE, (2) THE STATE OF NEW YORK'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO APPOINT CHAPTER 11 TRUSTEE, AND (3) THE DISTRICT OF COLUMBIA'S MOTION TO APPOINT CHAPTER 11 TRUSTEE**

National Rifle Association of America ("NRA") and Sea Girt ("Sea Girt" and together with NRA, the "Debtors"), debtors and debtors-in-possession, hereby submit this omnibus opposition (the "Opposition") to *Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, and Brief in Support* [ECF No. 131] (the "AMc Motion"), filed by Ackerman McQueen, Inc. ("AMc") on February 10, 2021, the *State of New York's Motion to Dismiss or in the Alternative, to Appoint Chapter 11 Trustee* and memorandum in support thereof (the "NYAG Motion") [ECF Nos. 155, 156], filed by Letitia James, Attorney General of the State of New York on February 12, 2021 (the "NYAG"), and *The District of Columbia's Motion in Support in the State of New York's Motion to Appoint Chapter 11 Trustee* [ECF No 214], filed by Karl Racine, Attorney General for the District of Columbia (the "DCAG," and together with AMc and NYAG, the "Movants") on February 23, 2021.

This Opposition is made upon the memorandum of points and authorities set forth below, the pleadings, papers, and other records on file with the clerk of the above-captioned Court, judicial notice of which is hereby respectfully requested under Federal Rule of Evidence 201, and the evidence and argument of counsel entertained by the Court at the time of the trial on the motions.

**Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, (2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11 Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11 Trustee**

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................ 1

II.     JURISDICTION ................................................................................ 2

III.    PERTINENT FACTS ..........................................................................3

        A. THE NRA IS A 150-YEAR-OLD ORGANIZATION DEDICATED TO
           PROTECTING CONSTITUTIONAL RIGHTS ........................................3

        B. THE NRA COMES UNDER ATTACK IN NEW YORK ...........................5

        C. THE NRA ACTS TO PROTECT ITSELF AND ITS MEMBERS BUT FACES
           ESCALATING RESISTANCE FROM AMc ..........................................6

        D. A SCORNED VENDOR AND A POLITICAL ADVERSARY JOIN FORCES TO
           DESTROY THE NRA ...................................................................9

        E. THE NRA FACES OTHER LEGAL ACTIONS WHICH, IN AGGREGATE,
           INTERFERE WITH ITS ABILITY TO FULFILL ITS MISSION .................11

        F. DEBTORS FILE THEIR CHAPTER 11 PETITION IN GOOD FAITH TO
           ADDRESS THE MULTITUDE OF PENDING CLAIMS, RESOLVE
           EXISTENTIAL THREATS, AND REORGANIZE THEIR OPERATIONS AND
           FINANCIAL AFFAIRS .................................................................. 12

IV.     LEGAL ARGUMENT .........................................................................14

        A. THE CHAPTER 11 CASES WERE FILED IN GOOD FAITH AND SHOULD NOT
           BE DISMISSED .......................................................................... 14

           1.  Standard for Dismissal of a Chapter 11 Case .....................................14

           2.  Movants Cannot Meet Their Burden .................................................17

           3.  The Totality of the Circumstances Demonstrate that the Chapter 11 Cases Were
               Filed in Good Faith ...................................................................18

               a.  The NRA Is Not Required to Be Insolvent .................................... 19

               b.  The NRA Did Not File to Obtain a Litigation Advantage, Nor Has It Gained
                   One .................................................................................20

        c. The NRA Is Not Violating New York Law by Seeking Protection Under the Bankruptcy Code and Seeking to Propose a Plan ………………………… 26

        d. The Debtors' Chapter 11 Cases Are Not Fraudulent ………………………31

        e. Venue of the Chapter 11 Cases Is Proper in This District and Not Bad Faith .…………………………………………………………………………34

    B. THE MOVANTS' UNSUPPORTED ALLEGATIONS ARE INSUFFICIENT TO MANDATE APPOINTMENT OF A TRUSTEE ………………………………..36

      1. Standards for the Appointment of a Trustee ……………………………………38

      2. The NYAG's Allegations Are Outdated and Disputed …………………………40

V.    CONCLUSION ………………………………………………………………………42

## **TABLE OF AUTHORITIES**

**Cases**

*American United Mut. Life Ins. Co. v. City of Avon Park*, 311 U.S. 138, 145, 61 S. Ct. 157, 161 (1940) .................................................................................................................. 15

*Carolin Corp. v. Miller*, 886 F.2d 693, 703-05 (4th Cir.1989) ..................................... 25

*Chao v. Hosp. Staffing Servs., Inc.*, 270 F.3d 374, 389 (6th Cir. 2001) ....................... 29

*Chitex Communication, Inc. v. Kramer*, 168 B.R. 587, 591 (S.D. Tex. 1994) ............. 16

*Cruzan by Cruzan v. Dir., Missouri Dep't of Health,* 497 U.S. 261, 285 n.11, 110 S.Ct. 2841 (1990) ................................................................................................................... 39

*Dalkon Shield Claimants v. A.H. Robbins, Inc*., 828 F.2d 239, 240-41 (4th Cir. 1987).............. 38

*Dell'Aquila v. LaPierre et al., Civ.* Case No. 3:19-cv-00679 (M.D. Tn.) ................................... 11

*District of Columbia v. NRA Foundation, Inc.* et al, Case No. 2020 CA 003454 B (D.C. Sup. Ct. 2020) ..................................................................................................................... 11

*Durland v. United States*, 161 U.S. 306, 16 S. Ct. 508 (1896) ..................................... 34

*Fields Station LLC v. Capitol Food Corp. (In re Capitol Food Corp.)*, 490 F.3d 21, 25 (1st Cir. 2007) ..................................................................................................................... 19

*Hazel-Atlas Glass Co. v. Hartford-Empire Co*., 322 U.S. 238 (1944) ......................... 33

*In re 1701 Commerce, LLC*, 477 B.R. 652, 657-58 (Bankr. N.D. Tex. 2012) ............. 16

*In re Adelphia Communications Corp*, 336 B.R. 610, 655 (Bankr. S.D.N.Y 2006) *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006) ...................................................................................... 37, 38

*In re Alexandra Trust*, 526 B.R. 668, 679-80 (Bankr. N.D. Tex. 2015)........................ 26

*In re Antelope Techs, Inc*., 07-31159-HS-11, 2010 WL 2901017, *5 (S.D. Tex. July 21, 2010) ..................................................................................................................... 21, 25

*In re Asanda Air II LLC*, 600 B.R. 714 (Bankr. N.D. Ga. 2019)................................... 33

*In re Bayou Group, LLC*, 564 F.3d 541, 546 (2d Cir. 2009) ................................... 39, 40

*In re Cardwell*, No. 09-43121, 2017, 2017 WL 2304220, *4 (Bankr. E.D. Tex. 2017)............... 33

*In re Cedar Shore Resort, Inc*., 235 F.3d 375, 379 (8th Cir. 2000)........................................ 18, 26

*In re Charles George Land Reclamation Tr*., 30 B.R. 918, 924 (Bankr. D. Mass. 1983)............ 31

*In re Costa Bonita Beach Resort Inc*., 479 B.R. 14, 44-45 (Bankr. D.P.R. 2012) ...................... 17

*In re Dunmore Homes, Inc.*, 380 B.R. 663, 670-71 (Bankr. S.D.N.Y. 2008) .............................. 35

*In re Euro- American Lodging Corp.* 365 B.R. 421, 426 (Bankr. S.D.N.Y. 2007)..................... 38

*In re Evans*, 48 B.R. 46, 47 (Bankr. W.D.Tx. 1985) ............................................................... 38, 39

*In re First Financial Enterprises, Inc.* 99 B.R. 751, 753 (Bankr. W.D. Tex. 1989) ................... 16

*In re Forest Hill Funeral Home & Memorial Park*, 362 B.R. 808, 819 (Bankr. E.D. Okla. 2007)

.................................................................................................................................................... 17

*In re G3 Marina Adventures LLC*, 2010 WL 4736212, at *3 (Bankr. E.D. Okla. 2010) ............ 17

*In re Halo Wireless, Inc.*, 684 F.3d 581, 587 (5th Cir. 2012)...................................................... 28

*In re HHH Choices Health Plan, LLC*, 554 B.R. 697, 700-701 (Bankr. S.D.N.Y. 2016)...... 27, 30

*In re Houghton Mifflin Harcourt Publ'g Co.*, 474 B.R. 122 (Bankr. S.D.N.Y. 2012)................ 33

*In re Humble Place Joint Venture*, 936 F.2d 814, 818 (5th Cir. 1991) ....................................... 16

*In re Irasel Sand, LLC*, 569 B.R. 433, 440 (Bankr. S.D. Tex. 2017) .......................................... 16

*In re James Wilson Assocs.*, 965 F.2d 160, 170 (7th Cir. 1992).................................................. 19

*In re Johns-Manville Corp*., 36 B.R. 727, 736 (Bankr. S.D.N.Y. 1984) ...................................... 19

*In re Kickapoo Kennels, LLC*, No. 12-39321-H3-11, 2013 WL 3148656 *2 (Bankr. S.D. Tex.

Jun. 19, 2013)............................................................................................................................ 26

*In re Lionel Corp*., 24 B.R. 141, 143 (Bankr. S.D.N.Y. 1982).................................................... 35

*In re Manville Forest Prod. Corp*., 896 F.2d 1384, 1391 (2nd Cir. 2002) .................................. 35

*In re McMullen*, 386 F.3d 320, 325 (1st Cir. 2004)..................................................................... 29

*In re Medrano*, 956 F.2d 101, 102 (5th Cir. 1992) ...................................................................... 39

*In re Metropolitan Realty Corp*., 433 F.2d 676, 678 (5th Cir. 1970) .......................................... 18

*In re Nortel Networks, Inc.*, 669 F.3d 128, 139-140 (3d Cir. 2011) ............................................. 28

*In re Northstar Contracting Corp.*, 128 B.R. 66, 70 (Bankr. S.D.N.Y. 1991) ............................ 39

*In re Patman Drilling International, Inc.*, Case No. 07-34622-SGJ, 2008 WL 724086 (Bankr.

N.D.Tx. March 14, 2008)............................................................................................................... 38

*In re Patriot Coal Corp.*, 482 B.R. 718, 728 (Bankr. S.D.N.Y. 2012)......................................... 35

*In re ProFlo Industries, LLC*, Case No. 17–33184, 2018 WL 615122, *4, 8 (Bankr. N.D. Ohio

Jan. 29, 2018)................................................................................................................................. 40

*In re RGV Smiles By Rocky L. Salinas D.D.S. P.A.*, No. 20-70209, 2021 WL 112182, at *4

(Bankr. S.D. Tex. Jan. 6, 2021) ................................................................................................... 28

*In re RHA Stroud, Inc.*, Case No. 20-13482-SAH, 2020 WL 7787034, *10 (Bankr. W.D. Okla.

Dec. 30, 2020)................................................................................................................................ 17

*In re Silberkraus,* 253 B.R. 890, 905 (Bankr. C.D. Cal. 2000)............................................... 21, 22

*In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D. N.Y. 2001) ..................................................... 40

*In re Smith*, No. 11–08865–8–JRL, 2012 WL 1854240, *3 (Bankr. E.D.N.C. May 21, 2012) ... 40

*In re Southern Healthcare Systems, Inc.*, 2003 WL 24027460, *2 (Bankr. M.D. La. Jan. 6, 2003)

....................................................................................................................................................... 23

*In re Stone Resources, Inc.***,** 448 B.R. 361, 367 (Bankr. E.D. Pa. 2011) ...................................... 25

*In re The 1031 Tax Group, LLC*, 374 B.R. 78, 85 (Bankr. S.D.N.Y. 2007).......................... 38, 40

*In re West Virginia High Technology Consortium Foundation*, Case No. 16–bk–806, 2017 WL

1437067, *5 (Bankr. N.D. W. Va. 2017)............................................................................... 37, 40

*In re Wigley*, 557 B.R. 671, 677-78 (8th Cir. 2016) ..................................................................... 26

*In re Zed, Inc.*, 20 B.R. 462 (Bankr. N.D. Cal. 1982).............................................................. 33, 35

*In re: CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)............................................. 33

*In re: Office Prods. of Am., Inc.*, 136 B.R. 983(Bankr. W.D. Tex. 1992).................................... 33

*In re: Sharon Steel Corp.*, 872 F.2d 1225 (3d Cir. 1989).......................................................... 38

**Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11
Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee,
(2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11
Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11 Trustee    PAGE V**

*In the Matter of Cajun Electric Power Cooperative, Inc.*, 69 F.3d 747, 749 (5th Cir. 1995)  38, 39

*In the Matter of Little Creek Development Company*, 779 F.2d 1068 (5th Cir. 1986)....................

................................................................................................................... 14, 15, 16, 18, 23

*Investors Group, LLC v. Pottorff*, 518 B.R. 380, 384 (N.D. Tex. 2014) ......................... 21, 22, 33

*Krueger v. Torres (In re Kruger),* 812 F.3d 365, 373-74 (5th Cir. 2016) ................................... 16

*Ky. Emple. Ret. Sys. v. Seven Cntys. Servs.,* 823 Fed.Appx. 300 (6th Cir. 2020)........................ 31

*Lackawaxen Telecom, Inc. v. S. Canaan Cellular Invs., LLC (In re S. Canaan Cellular Invs.,
LLC)*, 420 B.R. 625, 631 (E.D. Pa. 2009)................................................................. 16

*Marshall v. Marshall (In re Marshall)*, 721 F.3d 1046, 1062 (9th Cir. 2013) ............................ 19

*Matter of Anchorage Boat Sales, Inc.*, 4 B.R. 635 (Bankr. E.D.N.Y. 1980) ............................... 39

*Matter of Elmwood Development Co.,* 964 F.2d 508, 513 (5th Cir. 1992)................................... 16

*In re Draughon Training Institute, Inc., 119 B.R. 921* (Bankr. W.D. La. Apr. 10, 1990)............ 31

*Nat'l Rifle Ass'n of Am. v. Ackerman McQueen, Inc., et al.,* Civ. Case No. 3-19-cv-02074-G
(N.D. Tex.)................................................................................................................... 9

*New Millennium Mgt. LLC*, No. 13-35719-H3-11, 2014 WL 792115 *5 (Bankr. S.D. Tex. Feb.
25, 2014) ................................................................................................................... 39

*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express,
Inc.)*, 384 F.3d 108, 121 (3d Cir. 2004) ................................................................... 19

*Official Comm. of Asbestos Pers. Injury Claimants v Sealed Air Corp* (*In re W.R. Grace*), 285
B.R. 148, 158 (Bankr. D.Del. 2002) ........................................................................ 38

*Official Comm. Of Unsecured Creditors of Cybergenics Corp., ex. rel. Chinery*, 330 F.3d 548,
577 (3rd Cir. 2003) ................................................................................................... 38

*Official Comm. of Unsecured Creditors v. Dow Chem. Corp. (In re Dow Corning Corp.)*, 456
F.3d 668, 671 (6th Cir. 2006) ................................................................................... 19

**Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11
Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee,
(2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11
Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11 Trustee   PAGE VI**

*Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 165 (3d Cir. 1999) ................................................................................................. 19

*Palmer v. Dau*, No. 6:10-cv-248-Orl-19KRS, 2010 U.S. Dist. LEXIS 69329, at *6 (M.D. Fla. July 12, 2010 ................................................................................................................ 33

*Patel v. Mukasey*, 526 F.3d 800 (5th Cir. 2008) ..................................................... 32, 34

*Perez v. Campbell*, 402 U.S. 637, 652, 91 S.Ct. 1704, 1712 (1971) ............................. 27

*Perlin v. Hitachi Capital Am. Corp.*, 497 F.3d 364, 373 (3d Cir. 2007) ...................... 16

*Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir. 1978) .................................. 33

*Schuster v. Dragone*, 266 B.R. 268, 271 (Bankr. D. Conn. 2001) .............................. 38

*SEC v. United States Realty & Improvement Co.*, 310 U.S. 434, 455, 60 S. Ct. 1044, 1053 (1940) ................................................................................................................. 15

*Soto v. Contreras*, 880 F.3d 706, 711 (5th Cir. 2018) ................................................. 39

*The National Rifle Association et al. v. Mark R. Dycio et al.,* Case No. 2019-17571 (Va. Cir. Ct. 2019) ................................................................................................................ 11

*The National Rifle Association v. Ackerman McQueen, Inc. et al.,* Case No. CL19001757 (Va. Cir. Ct. 2019) ......................................................................................................... 9

*The National Rifle Association v. Andrew Cuomo*, Case No. 1:18-cv-566 (N.D.N.Y. 2018) ........ 5

*U.S. v. Louderman*, 576 F.2d 1383 (9th Cir. 1978) ..................................................... 34

*U.S. v. McNeive*, 536 F.2d 1245 (8th Cir. 1976) .......................................................... 34

*U.S.A. v. DeSantis*, 237 F.3d 607 (6th Cir. 2001) ....................................................... 34

*Under Wild Skies, Inc. v. National Rifle Association*, Case No. 19-12530 (Va. Cir. Ct. 2019) ... 10

*United States Surety & Indem. Co. v. Lopez-Munoz (In re Lopez-Munoz)*, 553 B.R. 179, n. 5 (BAP 1st Cir. 2016) ....................................................................................................... 40

*United States v. Chaker*, 820 F.3d 204, 210 (5th Cir. 2016) ........................................ 33

*United States v. Spurlin*, 664 F.3d 954, 956 (5th Cir. 2011) ........................................ 33

*United States v. Spurlock*, 214 Fed. Appx. 382, 387 (5th Cir. 2007) ........................................... 33

*United States v. Van Dyke*, 605 F.2d 220 (6th Cir. 1979)........................................................ 34

*Vista Foods U.S.A. Inc. v. Official Unsecured Creditors Committee* (*In re Vista Foods U.S.A. Inc.*), 226 B.R. 284, (10th Cir. BAP 1997) ................................................................................ 17

## Statutes

11 U.S.C § 157........................................................................................................................ 34

11 U.S.C. § 101(2). ................................................................................................................ 35

11 U.S.C. § 1104(a)(2)........................................................................................................... 17

11 U.S.C. § 105 ....................................................................................................................... 3

11 U.S.C. §§ 1107 and 1108 .................................................................................................. 38

11 U.S.C. § 1112................................................................................................................ passim

11 U.S.C. § 1104 ............................................................................................................... 38-42

11 U.S.C. §1129(a)(16)........................................................................................................... 27

18 U.S.C. § 157...................................................................................................................... 32

28 U.S.C § 1408 ............................................................................................................... 34, 35

28 U.S.C. § 157 ....................................................................................................................... 3

28 U.S.C. § 959...................................................................................................................... 31

28 U.S.C. §§ 1408 and 1409 ................................................................................................... 3

28 U.S.C. §§ 157 and 1334 ...................................................................................................... 3

## Other Authorities

Black's Law Dictionary 413, 670 (7th ed. 1999)..................................................................... 32

H.R. Rep. No. 595, 95th Cong., 1st Sess. 220 (1997) ...................................................19, 28

5 LAWRENCE KING, COLLIER ON BANKRUPTCY 1104.01[b], (15th ed. 1995) .............. 39

7 COLLIERS ON BANKRUPTCY ¶ 1104.02[3][c][i] (15th ed.)............................................. 40

7 COLLIERS ON BANKRUPTCY ¶ 1112.07[4] (16th 2020).................................................. 16

7 LAWRENCE KING, COLLIER ON BANKRUPTCY 1104.02 [1], 1104.02[3][d][i] (16th Ed.)

................................................................................................................................. 38

## MEMORANDUM OF POINTS AND AUTHORITIES
## I.
## <u>INTRODUCTION</u>

The NRA's petition for relief before this Bankruptcy Court is one grounded in over a hundred years of bankruptcy jurisprudence.  Apart from unliquidated claims, the NRA is solvent—but has a legitimate need to restructure its debts, repay its creditors, and reorganize under chapter 11.  The NRA properly seeks protection from this Court to reorganize its affairs and finances by, among other things, establishing a centralized, neutral forum in which it can streamline, resolve, and address the outstanding claims against it, and ultimately propose a plan that provides for payments in accordance with the Bankruptcy Code's priority scheme.  The NRA properly seeks to continue its rich 150-year history as a going concern, preserve its ability to pursue its constitutionally protected mission, and maintain the goodwill and continued loyalty of its millions of members, hundreds of thousands of donors, and vendors.  The NRA's case is properly venued in this District, and the reorganized NRA will continue to operate to the benefit of its mission, its members, and its legitimate creditors—in a state where its presence is welcomed.

The Movants, on the other hand, ask this Court to pre-judge a plan that has not yet been filed and rule that the NRA cannot, under any circumstances, reorganize.  Importantly, the Movants are unlike most parties in interest in most bankruptcies:  they do not seek to resolve disputes with the NRA, nor do they seek to collect any discrete debt.  Instead, they seek the NRA's destruction as an end unto itself.  For this reason, they interpose pretextual allegations of "bad faith" in the hope of stopping this reorganization before it starts and obviating the NRA's constitutional right to bankruptcy.  In truth, AMc, which was formerly the NRA's largest vendor, was fired by the Association in 2019—after it stonewalled record-inspection requests for months, and then tried to extinguish the resulting record-inspection lawsuit through blackmail.  New

**Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, (2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11 Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11 Trustee**

York Attorney General Letitia James, meanwhile, vowed to shut down the NRA as a political campaign pledge—before she even assumed office, and absent a shred of evidence that the NRA had done anything wrong. Indeed, the increasingly hostile political environment and the willingness of New York State's highest elected officials to turn regulatory powers against the NRA was so significant, and the constitutional implications of such conduct so troubling, that Ms. James' elected predecessor, Eric Schneiderman, actually warned the NRA to prepare for hostilities.

The facts are that the NRA, acting in the wake of Mr. Schneiderman's warning and based on its own determination to effect good governance, conducted a deep examination of its internal controls and vendor relationships years ago, and took steps to redress or obviate nearly every item the NYAG cites in its dissolution lawsuit. Having taken these corrective measures over the last few years, the NRA, consistent with the best interests of its millions of members and vendors, as well as its true creditors, now properly avails itself of the protections of this Court to effectuate a restructuring under chapter 11. Neither dismissal nor appointment of a trustee is warranted. The Motions should be denied, and the NRA permitted to pursue reorganization in accordance with the provisions of the Bankruptcy Code.

## II.
## JURISDICTION

1.  On January 15, 2021 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned cases (the "Chapter 11 Cases").

2.  On January 20, 2021, the Court entered an *Order Granting Debtors' Emergency Motion for Joint Administration of Chapter 11 Cases. See* ECF No. 36.

**Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, (2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11 Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11 Trustee     PAGE 2**

3. This Court has jurisdiction to consider the motions under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). The Debtors consent to entry of a final order under Article III of the United States Constitution.

4. Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409.

5. The Debtors remain in possession of their property and are operating their businesses as debtors-in-possession in accordance with Sections 1107 and 1108 of the Bankruptcy Code.

6. On February 4, 2020, the United States Trustee filed her *Appointment of the Official Unsecured Creditors' Committee*, thereby creating a committee (the "Committee") of five purported unsecured creditors, including AMc. *See* ECF No. 105.

7. The statutory predicates for the relief requested in the motions are Bankruptcy Code[2] Sections 105(a), 1104, 1112 and Rules 1017, 2002, 9013, 9014 of the Federal Rules of Bankruptcy Procedure.

### III.
### PERTINENT FACTS

**A.**   **THE NRA IS A 150-YEAR-OLD ORGANIZATION DEDICATED TO PROTECTING CONSTITUTIONAL RIGHTS.[3]**

8. The NRA was chartered in 1871 and may be the oldest continuously operating charted educational, recreational, and public service organization in America. The NRA is dedicated to the rights of Americans to own and safely use firearms for their personal protection and recreational use. The mission and function of the NRA is focused upon gun-safety and it is the nation's foremost defender of the Second Amendment of the United States Constitution.[4]

---

[2] 11 U.S.C. §§ 105, et seq. Unless otherwise indicated, all statutory references are to the Bankruptcy Code.

[3] A detailed description of the Debtors' business, capital structure, and the events leading to the Debtors' bankruptcy is set forth in the Declarations of Shawne E. Soto [ECF No. 10], Robert G. Owens [ECF No. 11], and Sonya B. Rowling [ECF No. 12] (the "First-Day Declarations") and Debtors' Informational Brief in Connection with Voluntary Chapter 11 Petitions [ECF No. 31] filed on January 20, 2021, which are incorporated herein by reference.

[4] "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." United States Constitution, Amendment II, (1791).

---

**Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, (2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11 Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11 Trustee     PAGE 3**

9.     The NRA is a not-for-profit corporation organized under New York not-for-profit corporation law and is tax-exempt under Section 501(c)(4) of the Internal Revenue Code (the "IRC").  The NRA is supported by membership dues and private contributions from members and other donors throughout the United States.  Past presidents of the NRA include United States President Ulysses S. Grant and General Philip H. Sheridan.  Other notable members include eight past Presidents of the United States, two Vice Presidents of the United States, two Chief Justices of the Supreme Court of the United States, and numerous United States Senators and Representatives. The NRA currently has approximately five million members and its programs reach millions more.

10.     As of the Petition Date, the NRA had total assets of approximately $250 million and aggregate liquidated liabilities of approximately $110 million.  However, the largest asserted claims against the NRA remain unliquidated.  Moreover, the NYAG seeks to distribute the assets of these estates to other non-profits over the objection of the NRA's membership.

11.     The NRA's assets consist primarily of cash, investments, accounts receivable, and its headquarters in Fairfax, Virginia (the "Headquarters").  Its liabilities generally consist of accounts payable, obligations related to a defined benefit plan, and secured debt.

12.     The NRA has outstanding secured debt of approximately $45 million, which consists primarily of three separately secured loans from Atlantic Union Bank ("AUB"), unsecured claims of approximately $65 million, and contingent and unliquidated disputed claims, that could render the NRA unquestionably insolvent.

13.     The NRA employs approximately 490 people, primarily at its corporate headquarters in Virginia.  Sea Girt's operations are directed by the NRA as its sole managing member.

**Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, (2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11 Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11 Trustee     PAGE 4**

14.      The NRA is governed by a 76-member Board of Directors, 75 of whom[5] are elected to three-year terms by mail-in ballots transmitted among the NRA's millions of members. All of the NRA's directors are non-employee volunteers, and the Board's membership is diverse—encompassing retired law enforcement officers, competitive shooters, actors and musicians, state and federal elected officials, and grassroots gun owners dedicated to advancing the Second Amendment.

15.      The NRA Board is led by President Carolyn D. Meadows, First Vice President Charles L. Cotton, and Second Vice President Willes K. Lee, and the NRA's affairs are directed by Executive Vice President Wayne LaPierre.

16.      Although the NRA is a section 501(c)(4) membership association under the IRC, it has set up four section 501(c)(3) public charities and a section 527 political action committee, which holds separate segregated funds for its use.  Neither the NRA's charitable subsidiaries nor its political action committee are debtors in these proceedings.

## B.      THE NRA COMES UNDER ATTACK IN NEW YORK.

17.      In mid-2017, the NRA learned that high-ranking New York State officials intended to target the NRA for adverse regulatory action, in order to weaken it as a political force in advance of the 2020 election.  Among the powers these officials intended to use was the broad supervisory authority of the Office of the Attorney General over not-for-profits that are domiciled in New York, like the NRA.[6]   New York's former Attorney General, Eric

---

[5] The election process referenced above applies to 75 of the NRA's 76 directors.  A seventy-sixth director is elected annually by members present at the NRA's Annual Meeting of Members.

[6] Importantly, the hostilities that materialized in New York were ***not*** limited to those emanating from the NYAG. The NRA is engaged in distinct litigation—raising almost entirely distinct issues—arising from a campaign by New York's chief financial regulatory, the New York Department of Financial Services, to coerce banks and insurance companies to cut ties with the NRA.  *See The National Rifle Association v. Andrew Cuomo*, Case No. 1:18-cv-566 (N.D.N.Y. 2018) (the "Cuomo/DFS Litigation").  ***None*** of the allegations in the Cuomo/DFS Litigation involve the NRA's governance.  Instead, the case focuses on whether regulators' exhortations to financial institutions violate the First Amendment of the United States Constitution.

---

**Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, (2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11 Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11 Trustee      PAGE 5**

Schneiderman, was apparently so troubled by the coalescing campaign against the NRA that he warned the NRA about it. In a telephone call to an NRA director, Mr. Schneiderman advised that the NRA should prepare for an offensive.

18. Despite believing it was operating in compliance with New York law, the NRA undertook an internal review of its controls, compliance, and governance.

19. The NRA's efforts ultimately led it to determine that its largest vendor, AMc, was systematically overcharging the NRA and falsifying invoices, as well as misrepresenting the benefits of the services it provided.

20. For example, AMc provided misleading, inflated viewership metrics for NRATV, the digital media platform it pitched, produced, and scripted, where costs were skyrocketing and programming inexplicably wandered far afield from the NRA's mission. AMc also engaged in a practice of pass-through block billing that obscured the purpose and amount of certain expenditures, including payments to the NRA's then president, Oliver North ("North"), purportedly in connection with his role in an NRATV documentary series. When the NRA sought documentation from AMc to support these charges, AMc refused to provide it.

## C.    THE NRA ACTS TO PROTECT ITSELF AND ITS MEMBERS BUT FACES ESCALATING RESISTANCE FROM AMc.

21. The NRA's ensuing struggle to coax compliance and clarity from AMc is detailed in the parties' pending lawsuit.[7] When the NRA attempted its first on-site record inspection in September 2018, AMc interposed outside counsel, concealed records it promised to furnish, and suggested that the parties' relationship had become adverse.

22. At the time, AMc had a multi-million-dollar contract with the NRA's then-president, North. The contract was a related-party transaction among an NRA officer and the NRA's largest vendor, and unambiguously needed to be disclosed. Although North initially

---

[7] *See* Exhibit A hereto (Second Amended Complaint (ECF No. 201-1), *Nat'l Rifle Ass'n Am. v. Ackerman McQueen, Inc. et al.*, Case. No. 3:19-cv-2074 (N.D. Tex. 2019)).

**Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, (2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11 Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11 Trustee     PAGE 6**

appeared to authorize disclosure in September 2018, AMc's lawyers swiftly interceded and suggested that North had not truly meant what he said. Thereafter, AMc and North delayed disclosure of the terms of the contract to the Board as North repeatedly promised he would disclose the contract as soon as authorization was obtained from AMc; and AMc, for its part, insisted it needed authorization from North. At one point, AMc decreed that even if dual authorizations could be obtained and the contract made available, the attorney reviewing it would be prohibited from retaining any notes she made, and the NRA could not have a copy of the contract for its files—even though the NRA was effectively making payments under the contract. This gamesmanship continued for six months.

23. The NRA had similar difficulty obtaining receipts or other substantiation for millions in "out-of-pocket" expenses regularly incurred by AMc. During February 2019, six months after the NRA first tried to exercise its record-inspection right under the parties' contract in order to access such documents, the NRA was able to conduct a partial forensic review of AMc's "out-of-pocket" expense records. It then discovered, among other things, that one AMc executive regularly invoiced large cash withdrawals, which he purportedly required in order to pay unexplained tips and gratuities. Other "out-of-pocket" expenses regularly invoiced by AMc without the NRA's knowledge included private jet travel, lavish meals, liquor, and cigars at a local club.

24. AMc went to similar lengths to conceal the true performance of NRATV. As late as April 2019, AMc continued to tout viewership metrics and valuations of NRATV that it knew were false and misleading. Yet when NRA employees—including a digital analytics expert hired from Silicon Valley and the NRA's Managing Director of Public Affairs—pressed for specific information such as unique-viewership data, AMc evaded or refused to provide it. An independent analysis by the *New York Times* in June 2019 determined that NRATV's traffic was

miniscule, with 49,000 unique visitors in January [2019]"[8]—compared to the millions of visitors claimed by AMc. Tellingly, when the NRA later fired AMc in the summer of 2019 and shut down NRATV, not a single purported sponsor or viewer complained. As the NRA's scrutiny of AMc intensified, the agency persisted in its efforts to rebuff questions and sideline the executives and professionals who asked them. In a private communication to Mr. LaPierre, AMc intoned ominously that the NRA should not want to see the records its counsel requested—because documents transmitted to the NRA might be subpoenaed by New York regulators. Simultaneously, AMc and its counsel reiterated assurances that the NRA received from AMc for years, but would discover were false: namely, that AMc "maintain[ed] complete files of all expenses incurred" in connection with NRA business, and that expenditures incurred by AMc and processes for invoicing them were "totally consistent with" federal and state laws, regulations, and practices. But AMc's increasing defensiveness, and its warning that the NRA avoid creating "paper trails," suggested otherwise.

25. Ultimately, the NRA was forced to sue AMc in April 2019 for specific performance of the record-inspection right in the party's contract. The agency's response was explosive. Through its employee, North, AMc delivered an ultimatum to NRA Executive Vice President Wayne LaPierre: drop the lawsuit against AMc and resign immediately, or AMc would disclose purportedly embarrassing information which, incorrectly, it maintained in the same expense files it concealed during the NRA's attempted forensic audit of AMc's spending. Instead of accepting the corrupt proposal, Mr. LaPierre relayed AMc's threat, and North's involvement to the entire NRA Board of Directors. Four days later, the Board of Directors unanimously re-elected Mr. LaPierre. The NRA then fired AMc.

---

[8] Danny Hakim, *N.R.A. Shuts Down Production of NRATV, and Its No. 2 Official Resigns*, THE NEW YORK TIMES (June 25, 2019), https://www.nytimes.com/2019/06/25/us/nra-nratv-ackerman-mcqueen.html.

**Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, (2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11 Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11 Trustee      PAGE 8**

26.     Unfortunately, the NRA's multiple decades of deep trust and confidence in AMc, and the aftershocks of AMc's catastrophic breaches of that trust (and the sundering of the parties' relationship) continue to burden Debtors.  The NRA's initial, discrete record-inspection lawsuit against AMc mushroomed into three overlapping lawsuits—two in Virginia state court which were stayed pre-petition,[9] and one in this District (the latter, the "AMc Litigation").[10]   In the AMc Litigation, the NRA's claims for fraud and breach of fiduciary duty are currently in discovery.  AMc has asserted counterclaims nominally totaling $40 million in the AMc Litigation, which the NRA must defend.

**D.     A SCORNED VENDOR AND A POLITICAL ADVERSARY JOIN FORCES TO DESTROY THE NRA.**

27.     As the NRA made its internal push for transparency in 2018, AMc tried to thwart those efforts, including by concealing records that it feared would reveal compliance violations by the agency or spur the NRA to rein in AMc's budget.

28.     During the course of the same April 2019 Board meeting where AMc relayed its extortion threat to Mr. LaPierre, the NYAG announced that it was officially commencing the investigation of which Mr. Schneiderman had warned.  In an effort to avert charges for its own conduct and punish the NRA for ending the parties' relationship, AMc sought to join forces with the NYAG.  Unlike the NRA's trade creditors,' Movants' motives are not commercial.  They seek the NRA's destruction.

29.     For the next year and a half, the NYAG conducted a sweeping, invasive investigation of the NRA.  It did not find evidence (because none existed) that the NRA was a sham charity, a fraudulent enterprise, or any other facts warranting dissolution under New York law.  But the NYAG's motives were political, so its enforcement response was too: on August 6,

---

[9] *See The National Rifle Association v. Ackerman McQueen, Inc. et al.,* Case No. CL19001757 (Va. Cir. Ct. 2019); *The National Rifle Association v. Ackerman McQueen, Inc. et al.*, Case No. CL19002067 (Va. Cir. Ct. 2019).

[10] *Nat'l Rifle Ass'n of Am. v. Ackerman McQueen, Inc., et al.,* Civ. Case No. 3-19-cv-02074-G (N.D. Tex.).

2020, the NYAG filed a 666-paragraph, 168-page complaint (the "NYAG State Action")[11] that largely adopted AMc's narratives and demanded the NRA be shut down, so its assets could be redistributed to other charities preferred by the NYAG. When a reporter asked the Attorney General whether there had been efforts to settle the state's claims or negotiate reforms at the NRA, she flatly rebuffed any such possibility.[12]

30. The American Civil Liberties Union and sixteen state attorneys general have condemned the NYAG State Action as overtly unconstitutional.[13]

31. As part of the NYAG State Action, the NYAG alleges that pursuing governance reform, or disgorgement from corrupt former vendors via the NRA Board of Directors would be futile.

32. Before the commencement of the NYAG State Action, the NRA pursued the same executive and vendor misconduct alleged by the NYAG. These include: a confidential arbitration against a former executive who extracted unauthorized excess benefits from the NRA;[14] a state-court lawsuit against an Ackerman-related vendor, Under Wild Skies, Inc., which for years issued misleading invoices to the NRA;[15] and, a state-court action for fraud and breach

---

[11] Of note, the NYAG State Action contains nearly 100 assertions made "upon information and belief."

[12] NY Attorney General Letitia James Sues NRA, Press Conference, August 6, 2020, video available at: https://www.youtube.com/watch?v=KOl1ltT-WSQ.

[13] See David Cole, *The NRA Has a Right to Exist*, WALL ST. J. (Aug. 26, 2020), https://www.wsj.com/ articles/the-nra-has-a-right-to-exist-11598457143 ("The American Civil Liberties Union rarely finds itself on the same side as the National Rifle Association . . . [s]till, we are disturbed by New York Attorney General Letitia James's recent effort to dissolve the NRA. . . . You may have your own opinions about the NRA, but all Americans should be concerned about this sort of overreach.")] and sixteen state attorneys general [*See NRA v. James*, Civ. No. 1:20-cv-00889-MAD-TWD (Dkt. No. 25) (Brief of States of Arkansas, Alaska, Georgia, Idaho, Mississippi, Oklahoma, Kansas, Kentucky, Louisiana, Missouri, Ohio, South Carolina, South Dakota, Texas, Utah and West Virginia as Amici Curiae in Support of Plaintiff and in Opposition to Dismissal) ("The New York AG's actions threaten the civil rights of five million members, including citizens of the Amici states.)]

[14] Confidential Arbitration, CPLR Case No. 1340018083 (2019).

[15] *Under Wild Skies, Inc. v. National Rifle Association*, Case No. 19-12530 (Va. Cir. Ct. 2019).

---

**Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, (2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11 Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11 Trustee  PAGE 10**

of fiduciary duty against the NRA's former counsel, Mark Dycio,[16] and his law firm, which issued misleading invoices to the NRA.

## E.    THE NRA FACES OTHER LEGAL ACTIONS WHICH, IN AGGREGATE, INTERFERE WITH ITS ABILITY TO FULFILL ITS MISSION.

33.    In addition to the NYAG State Action and the document-intensive counterclaims in the AMc Litigation, the NRA is engaged in multiple additional legal matters—some as plaintiff, and some as a defendant or potential defendant—which create aggregate burdens that weigh in favor of reorganization.

34.    The DCAG conducted an investigation that encompassed the NRA, but focused on its D.C.-domiciled affiliate (the "NRA Foundation"),[17] which overlapped with the pendency of the NYAG investigation.  On the same day that the NYAG filed the NYAG State Action, the DCAG commenced a similar proceeding (the "DCAG Action") against the NRA Foundation and named the NRA as a defendant.[18]  Although the DCAG's claims against the NRA were dismissed in their entirety in that case, the DCAG is attempting to re-plead them.  The DCAG Action is currently automatically stayed; but, if it resumes and if the DCAG's attempt at re-pleading is successful, the action will assert additional claims on the NRA's assets.

35.    Upon learning of AMc's false allegations against the NRA, a purported NRA donor commenced a putative class action on behalf of all NRA donors in the Middle District of Tennessee (the "Dell'Aquila Litigation").[19]  The class action complaint specifically references

---

[16] *The National Rifle Association et al. v. Mark R. Dycio et al.,* Case No. 2019-17571 (Va. Cir. Ct. 2019).

[17] The NRA Foundation is not a debtor in this proceeding.

[18] *District of Columbia v. NRA Foundation, Inc.* et al, Case No. 2020 CA 003454 B (D.C. Sup. Ct. 2020).

[19] *See Dell'Aquila v. LaPierre et al., Civ.* Case No. 3:19-cv-00679 (M.D. Tn.), Dkt.  1 at ¶ 14 ("Plaintiff . . . has learned this information from an investigation conducted by the NRA's former President, Lt. Col. Oliver North."); *id.* at ¶¶ 27-28 ("LaPierre terminated the NRA's agreement with . . . Ackerman McQueen . . . .  Ackerman . . . McQueen responded to the breach by disclosing information concerning certain financial improprieties raised in this lawsuit.").

allegations made by North concerning Mr. LaPierre's spending as well as excessive payments to AMc, and seeks refunds of contributions on the basis of alleged fraud and RICO violations.

36.     Separately, the NRA has fielded inquiries from multiple congressional committees regarding alleged interactions with the Trump administration and certain purported Russian agents.  It is reasonably likely that such inquiries will resume during the Biden administration.

**F.      DEBTORS FILE THEIR CHAPTER 11 PETITIONS IN GOOD FAITH TO ADDRESS THE MULTITUDE OF PENDING CLAIMS, RESOLVE EXISTENTIAL THREATS, AND REORGANIZE THEIR OPERATIONS AND FINANCIAL AFFAIRS.**

37.     The overlapping and duplicative litigation the NRA confronts has, understandably, proved costly and disruptive.  Thus, facing the AMc Counter-Litigation, NYAG State Action, and the multitude of other cases, and the burden that they are imposing on the NRA's operations, the NRA took the steps necessary for protection, including complying with the burdens, of the Bankruptcy Code.

38.     Specifically, on November 24, 2020, Sea Girt was formed as a Texas limited liability company to facilitate the NRA's desire to relocate to Texas.  As a for-profit Texas company, Sea Grit could locate and acquire office space and real property within Texas, which is a necessary step in relocating of the NRA's sizeable operations.  And Texas was a logical choice for the NRA given its business-friendly environment, its booming economy, and its millions of citizens who actively exercise their Second Amendment freedoms.

39.     The NRA has deep roots and a bright future in Texas: hundreds of thousands of NRA members reside here, and the NRA is working actively with Governor Abbott's office to facilitate its reorganization.  Months ago, the NRA commenced reorganization efforts to centralize operations in Texas.

40.     On January 15, 2021, the Debtors filed their chapter 11 petitions with a series of goals:

**Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, (2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11 Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11 Trustee      PAGE  12**

a. The Debtors seek to streamline the barrage of litigation they are facing. Although the Debtors expect to ultimately prevail on the merits in many pending cases, the disruption and expense of such litigation creates significant burdens for the NRA.

b. The organizational structure of the NRA is based on a 150-year-old charter that has not been updated in over a century. Given the size and impact that the NRA now has, the organization would benefit from the modernization to ensure its continued existence as a going concern for the benefit of the NRA's creditors and members.

c. While this case is certainly unique, ultimately, the NRA is not unlike a typical chapter 11 debtor grappling with the typical operational strains with which chapter 11 is designed to assist. The NRA seeks to reduce operating expenses, address burdensome executory contracts and unexpired leases, maintain its employees and operations, and institute and effectuate a streamlined claims process to address the multitude of claims and repayment through a confirmed plan of reorganization.

d. The NRA seeks to move its corporate domicile and its principal place of business to Texas which, as has been widely reported, welcomes the NRA with open arms.[20]

41. This Court, and the chapter 11 process, presents the most efficient and effective forum to achieve these goals and restructure the NRA so that it can honor its obligations and emerge a reorganized entity.

---

[20] *See, e.g., NRA Announces Move to Texas,* Dallas Morning News (Jan. 16, 2021) (reporting remarks by Gov. Greg Abbott and Attorney General Ken Paxton).

**Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, (2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11 Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11 Trustee**     **PAGE 13**

## IV.
## LEGAL ARGUMENT

**A.** **THE CHAPTER 11 CASES WERE FILED IN GOOD FAITH AND SHOULD NOT BE DISMISSED.**

**1.** **Standard for Dismissal of a Chapter 11 Case.**

1. In the Fifth Circuit, motions to dismiss chapter 11 cases for bad faith pursuant to Section 1112 are governed by the holding of the Fifth Circuit Court of Appeals in the case of *In the Matter of Little Creek Development Company*, 779 F.2d 1068 (5th Cir. 1986) ("Little Creek").

2. In *Little Creek*, the Fifth Circuit was confronted with a single asset real estate debtor that had been dismissed by the bankruptcy court for bad faith. The bankruptcy court granted the mortgagee stay relief based upon the fact that this was a single asset case where the debtor enjoyed no equity, with only one meaningful creditor, and based upon the admissions of debtor's counsel that the bankruptcy was a last-ditch effort to forestall the foreclosure. The bankruptcy court found that the filing was in bad faith and constituted cause under section 362(b) and found "that Little Creek lacked good faith in filing the petition."[21]

3. The Fifth Circuit reversed the bankruptcy court's dismissal ruling, admonished the bankruptcy court for failing to undertake "an examination of all of the particular facts and circumstances of [the] case,"[22] and established the criteria for dismissal of chapter 11 cases for bad faith in the Fifth Circuit, explaining that:

> Bankruptcy is an equitable remedy whereby a debtor is clothed with the protection of the automatic stay, preventing his creditors from acting against him for a period of time, in order to facilitate rehabilitation or reorganization of his finances and to promote a "fresh start" through the orderly disposition of assets to satisfy his creditors. [internal citations omitted].[23]

---

[21] *Little Creek,* 779 F.2d at 1071.

[22] *Id.* at 1072-10744.

[23] *Id.*

---

**Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, (2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11 Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11 Trustee** PAGE 14

4.    The question asked by the *Little Creek* court was whether the "overriding motive . . . [of the debtor was] to delay creditors without benefiting them in any way or to achieve reprehensible purposes."[24]   The court added that the good faith requirement was also aimed at insulating the "jurisdictional integrity" of the court.[25]

5.    As bankruptcy courts are courts of equity, the *Little Creek* court relied upon the United States Supreme Court holding in *American United Mut. Life Ins. Co. v. City of Avon Park*, 311 U.S. 138, 145, 61 S. Ct. 157, 161 (1940) (quoting *SEC v. United States Realty & Improvement Co.*, 310 U.S. 434, 455, 60 S. Ct. 1044, 1053 (1940)) for the proposition that:

> A court of equity may in its discretion in the exercise of the jurisdiction committed to it grant or deny relief upon performance of a condition which will safeguard the public interest . . . These principles are a part of the control which the court has over the whole process of formulation and approval of plans of composition or reorganization . . . [26]

6.    The *Little Creek* court made clear that the presence or absence of bad faith is based on a "conglomeration of factors rather than on any single datum."[27]   And where there is a going concern to preserve, employees to protect, and other indica of a purposeful and appropriate utilization the bankruptcy laws, based upon the court's analysis of a "conglomeration of factors" presented and a showing that the debtor was not invoking bankruptcy relief for "reprehensible purposes," a case should not be dismissed.

---

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.* at 1073.

**Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, (2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11 Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11 Trustee     PAGE 15**

7.    Ultimately, "courts have broad discretion in determining whether there is sufficient bad faith to constitute cause to dismiss a case."[28]  The court's findings are a factual determination reviewed for clear error, which is "a formidable standard."[29]

8.    At the same time, bankruptcy courts "should not lightly infer a lack of good faith and should utilize its powers of dismissal on this basis only in egregious cases."[30]

9.    The Debtors acknowledge that the list of causes for dismissal is not exhaustive.[31] Nonetheless, the purposes underlying these filings, as comprehensively set forth in the *Debtors' Informational Brief in Connection with Voluntary Chapter 11 Petitions* ("Informational Brief") [ECF No. 10] and further addressed herein, belie any assertions[32] by the Movants that there was any offending purpose underlying the filing of these cases that would run afoul of *Little Creek* or any of its progeny.

---

[28]  7 COLLIERS ON BANKRUPTCY ¶ 1112.07[4] (16th 2020) (entitled, "Discretion of the Court to Withhold Relief").

[29]  *Krueger v. Torres (In re Kruger),* 812 F.3d 365, 373-74 (5th Cir. 2016) (dismissal of chapter 7 warranted where, among other things, the debtor perjured himself and threatened witnesses).

[30]  *Lackawaxen Telecom, Inc. v. S. Canaan Cellular Invs., LLC (In re S. Canaan Cellular Invs., LLC)*, 420 B.R. 625, 631 (E.D. Pa. 2009) (citing *Perlin v. Hitachi Capital Am. Corp*., 497 F.3d 364, 373 (3d Cir. 2007)).

[31]  *Little Creek,* 779 F.2d at 1072 (cause is undefined to afford flexibility to the bankruptcy courts to assure that their jurisdiction is not misused).

[32]  It is instructive to review the types of cases that do, in fact, result in dismissals for bad faith, many of which are single asset cases or two-party disputes.  They are *not* these Chapter 11 Cases.  For example, *see In re Irasel Sand, LLC*., 569 B.R. 433, 440 (Bankr. S.D. Tex. 2017) (the inability of the debtor to secure post-petition financing rendered the case a bad faith filing)*; In re First Financial Enterprises, Inc.* 99 B.R. 751, 753 (Bankr. W.D. Tex. 1989) (debtor was without employees, no direct income, no dedicated office, and failed to engage in its business-the sale of annuities); *Chitex Communication, Inc. v. Kramer*, 168 B.R. 587, 591 (S.D. Tex. 1994) (absence of lawful authority to file and filing done on the eve of foreclosure); *Matter of Elmwood Development Co.,* 964 F.2d 508, 513 (5th Cir. 1992) (serial filing purposefully designed to skirt prohibition against attempted modification of plan in prior case that was substantially consummated); *In re Humble Place Joint Venture*, 936 F.2d 814, 818 (5th Cir. 1991) ("There is no 'business' to reorganize nor unsecured creditors who need protection...'"); and *In re 1701 Commerce, LLC*, 477 B.R. 652, 657-58 (Bankr. N.D. Tex. 2012) ("Courts have identified a number of factors indicative of a bad faith filing, including: (1) the debtor has one asset, such as either undeveloped or developed real property, encumbered by secured creditors' liens, (2) debtor has engaged in improper pre-petition conduct, (3) the debtor's property has been posted for foreclosure, and the debtor has tried unsuccessfully to prevent this foreclosure in state court, (4) the filing of bankruptcy enabled the debtor to evade court orders, (5) the debtor employs few or zero employees other than its principals, (6) there is little or no cash flow or source of income to sustain a reorganization, and (7) there are few if any unsecured creditors and their claims are relatively small.").

---

**2.      Movants Cannot Meet Their Burden.**

10.      The burden to demonstrate that the filing was not in good faith and should be dismissed under Section 1112 rests on the Movants:

> The burden of proof to show cause for dismissal of a chapter 11 case rests on the movant by a preponderance of the evidence. *In re G3 Marina Adventures LLC*, 2010 WL 4736212, at *3 (Bankr. E.D. Okla. 2010) (*citing In re Forest Hill Funeral Home & Memorial Park*, 362 B.R. 808, 819 (Bankr. E.D. Okla. 2007)). If 'cause' for conversion or dismissal under Section 1112(b) is established by the moving party, the debtor must show that, despite such cause, there exists a reasonable prospect of reorganization within a reasonable amount of time. *Vista Foods U.S.A. Inc. v. Official Unsecured Creditors Committee* (*In re Vista Foods U.S.A. Inc.*), 226 B.R. 284, (10th Cir. BAP 1997) (citations omitted).[33]

11.      Movants cannot meet their burden.   Instead of presenting actual evidence, Movants rest on disputed and unproven allegations made by the NYAG in her complaint filed in the NYAG State Action (the "NYAG Complaint").[34]

12.      As an initial matter, AMc cannot in good faith come before this Court and contend that the NYAG's allegations are true when it surely disputes the allegations that the NYAG has made against it.

13.      Furthermore, the allegations against the NRA are simply untrue.  As set forth in further detail herein, the alleged facts in the NYAG Complaint are either incorrect, exaggerated, or describe conduct remedied by the NRA without any government involvement prior to the NYAG Complaint being filed.

14.      Finally, even if true, the allegations relate almost exclusively to events that occurred over three years ago and, as discussed above, have been the focus of intense and deliberate corrective measures by the NRA.   There are no allegations, much less proof, of

---

[33] *In re RHA Stroud, Inc.*, Case No. 20-13482-SAH, 2020 WL 7787034, *10 (Bankr. W.D. Okla. Dec. 30, 2020).

[34] *See, e.g., In re Costa Bonita Beach Resort Inc.*, 479 B.R. 14, 44-45 (Bankr. D.P.R. 2012) ("[T]his court finds that [creditor] has not satisfied its burden of proof regarding the appointment of a trustee based on 'cause' since it relied on self-serving allegations . . . [and creditor] failed to explain how the appointment of a trustee under 11 U.S.C. § 1104(a)(2) would benefit the interests of creditors, any equity security holders and other interests of the estate.").

improper conduct at the time the Chapter 11 Cases were filed or thereafter. Stale accusations are not a basis for dismissal of these good faith Chapter 11 Cases.

15. Moreover, the Debtors have more than a reasonable prospect of reorganization within a reasonable time. As such, even if Movants could establish the requisite cause (which they cannot), the Debtors' reasonable prospect of effectuating a reorganization that repays their creditors, resolves their challenging leases, reorganizes the NRA in the State of Texas, and ensures the continuance of this 150-year-old institution with millions of members, precludes dismissal.

### 3. The Totality of the Circumstances Demonstrate that the Chapter 11 Cases Were Filed in Good Faith.

16. "[G]ood faith implies an honest intent and genuine desire on the part of the petitioner to use the statutory process to effect a plan of reorganization and not merely as a device to serve some sinister or unworthy purpose."[35]

17. Courts evaluate the "totality of the circumstances" to determine whether a debtor demonstrates the requisite good faith to access the privileges and equitable powers of bankruptcy.[36]

18. Ignoring the legitime goals of the NRA to address all the pending litigation against it, reorganize its internal structural and financial affairs, and emerge as a continued going concern for the benefit of its creditors and members, Movants collectively focus on five alleged signs of bad faith: (1) the NRA is not insolvent; (2) the NRA filed the Chapter 11 Cases as a litigation tactic; (3) the NRA will not comply with New York law; (4) the NRA and its counsel are perpetrating a fraud on this Court by pursuing relief under chapter 11; and (5) by filing their

---

[35] *In re Cedar Shore Resort, Inc*., 235 F.3d 375, 379 (8th Cir. 2000) (quoting *In re Metropolitan Realty Corp*., 433 F.2d 676, 678 (5th Cir. 1970)).

[36] *See, e.g. Cedar Shore*, 235 F.3d at 379 (citing *Little Creek*, 779 F.2d at 1072).

**Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, (2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11 Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11 Trustee     PAGE 18**

Chapter 11 Cases in a proper forum, the Debtors have forum shopped. None of the allegations have merit.

        a.   <u>The NRA Is Not Required to Be Insolvent</u>.

19.    Bankruptcy laws does not require that a bankruptcy debtor be insolvent. *See Marshall v. Marshall (In re Marshall)*, 721 F.3d 1046, 1062 (9th Cir. 2013); *Fields Station LLC v. Capitol Food Corp. (In re Capitol Food Corp.)*, 490 F.3d 21, 25 (1st Cir. 2007) ("A debtor need not be insolvent before filing a bankruptcy petition, however, provided it is experiencing some type of financial distress.") (internal quotations omitted); *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 121 (3d Cir. 2004) ("To be sure, a debtor need not be insolvent before filing for bankruptcy protection."); *In re James Wilson Assocs*., 965 F.2d 160, 170 (7th Cir. 1992) ("[T]he Bankruptcy Code permits an individual or firm that has debts to declare bankruptcy even though he (or it) is not insolvent.").

20.    Indeed, the drafters of the Bankruptcy Code "envisioned that a financially beleaguered debtor with real debt and real creditors should not be required to wait until the economic situation is beyond repair in order to file a reorganization petition," because the "'[b]elated commencement of a case may kill an opportunity for reorganization or arrangement."[37]

21.    Thus, notwithstanding solvency, a bankruptcy filing is proper where it seeks to achieve permissible uses of the Bankruptcy Code, including addressing numerous pending litigation claims against the debtor.[38]

---

[37] *In re Johns-Manville Corp*., 36 B.R. 727, 736 (Bankr. S.D.N.Y. 1984)(quoting Report of the Commission of the Bankruptcy Laws of the United States, H.R. Doc No. 137, Part II, 93rd Cong., 1st Sess. 75, 79 (1973); H.R. Rep. No. 595, 95th Cong., 1st Sess. 220 (1977)).

[38] *See Official Comm. of Unsecured Creditors v. Dow Chem. Corp. (In re Dow Corning Corp.)*, 456 F.3d 668, 671 (6th Cir. 2006); *Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 165 (3d Cir. 1999) ("Courts have allowed companies to seek the protections of bankruptcy when faced with pending litigation that posed a serious threat to the company's long-term viability.")

22.     Here, and as made clear in the pleadings on file since the outset of these Chapter 11 Cases,[39] the Debtors seek to address the magnitude of claims in which the NRA is a party as the costs related to the litigation are mounting and starting to adversely affect its operations. Doing so will permit a streamlined process that permits the NRA to honor it valid obligations and address the actions against it in a timely and efficient manner while, at the same time, preserving the NRA's long-term viability.

23.     While the Debtors anticipate being able confirm a plan of reorganization that permits them to repay their creditors in full, mounting litigation claims (and potential liabilities and expenses) mean there is no guarantee that the Debtors will be able to do so.

24.     Because the Debtors come to this Court seeking to reorganize in accordance with the provisions and purposes of the Bankruptcy Code, the possible solvency of the NRA is irrelevant.

b.  The NRA Did Not File to Obtain a Litigation Advantage, Nor Has It Gained One.

25.     The Movants argue that, as it relates to the NYAG State Action,[40] the NRA filed its Chapter 11 Case to somehow avoid the NYAG State Action or to obtain a litigation advantage. That argument is wrong. As made clear since the inception of this case, the NRA is not seeking to evade regulatory oversight; rather it seeks, and is entitled, to be treated fairly by regulators providing that oversight. *See* ECF No. 31, ¶ 26.

26.     As proof, and as Movants conveniently ignore, the NYAG State Action is proceeding, and the NRA intends to fully address the claims therein. As the NYAG State Action

---

[39] "The NRA instituted this chapter 11 reorganization proceeding to establish a centralized, neutral forum in which it can streamline, resolve, and address all outstanding claims and preserve its ability to pursue its constitutionally protected mission as a going concern." *See* ECF No. 31, ¶ 3.

[40] Other than cursory allegations that the Chapter 11 Cases were filed before an amended counterclaim was due in the AMc Litigation, the Movants do not meaningful contend that the NRA is seeking to obtain some litigation advantage with respect to the AMc Litigation.

**Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, (2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11 Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11 Trustee     PAGE 20**

remains pending, it is unclear what litigation advantage the NYAG contends the Debtors sought in exchange for opening its books to the world.

27.     Thus, this is not like the cases on which Movants' rely. *See* AMc Motion, pp. 22-25, NYAG Motion, pp. 17-18 (citing *In re Antelope Techs, Inc*., 431 Fed. Appx. 272, 275 (5th Cir. 2011), *Investors Group, LLC v. Pottorff*, 518 B.R. 380, 384 (N.D. Tex. 2014), *In re Silberkraus,* 253 B.R. 890, 905 (Bankr. C.D. Cal. 2000)).

28.     First, in *In re Antelope Techs, Inc*., 431 Fed. App. at 275, the bankruptcy court dismissed a chapter 11 case based on its conclusion that the bankruptcy was filed "to gain unfair advantage" in a shareholder derivative action that had been pending for years. The Fifth Circuit affirmed the District Court's holding which cited the critical facts that: (a) the debtor did not file until two years after the corporate resolution authorizing it to do so was signed; (b) the debtor's plan of reorganization, filed the same day it filed its petition, served to both keep the principal that was the target of the shareholder derivative action while at the same time releasing him from any liability, and (c) the "admission [of the interim CEO] that the upcoming trial [in the shareholder derivative action] prompted the filing." *Id*. (referencing the District Court findings, *In re Antelope Techs, Inc*., 07-31159-HS-11, 2010 WL 2901017, *5 (S.D. Tex. July 21, 2010) (quoting bankruptcy court's findings)).

29.     Here, unlike in *Antelope Techs*, the NYAG State Action was filed in August 2020, just five months ago, and no advantage has been obtained, much less one that can be deemed unfair. Importantly, there has not been any plan filed that seeks to release any parties from liability thereunder. Furthermore, there has been no admission that these Chapter 11 Cases were filed to avoid the NYAG State Action.

30.     Second, in *Pottorff*, 518 B.R. at 384, the chapter 11 case was filed less than two weeks before the trial of a $5 million derivative action was scheduled to commence. Further, the debtor appellant in *Pottorff* admitted "that it filed bankruptcy to obtain the settlement to which

Appellees [creditors] stood as the sole roadblocks to disbursement and to resolve the derivative suit by circumventing the over 27-month-old state case." *Id*.

31.     Here, unlike in *Pottorff,* the NYAG State Action remains in its early stages and trial has not been scheduled. And, the NRA did not seek bankruptcy protection to extract a settlement. To the contrary, the NYAG State Action is proceeding.

32.     Third, in *In re Silberkraus,* the debtor filed a chapter 11 case on the eve of a scheduled status conference at which trial dates for various litigations that had been pending for over a year were to be set. 253 B.R. at 905. Ultimately, the debtor sought to have the bankruptcy court, not the state court, decide the matters that were at issue in that state court litigation. *Id*. at 897-898. Here, the NYAG State Action is not trial ready and Debtors have not requested that this Court decide the merits of that case.

33.     Finally, while the NYAG contends that *In re SGL Carbon Corp*. is "particularly persuasive and analogous to the facts before this Court,"[41] *SGL Carbon Corp.* instead highlights the propriety of the Debtors' actions in these Chapter 11 Cases. The NYAG describes the findings of *SGL Carbon Corp.*, stating that: "In SGL, the debtor publicly stated that it was filing for bankruptcy to gain a tactical advantage over plaintiffs in antitrust lawsuits filed against the debtor, in an effort to 'change the negotiating platform' with those plaintiffs. 200 F.3d at 158. The debtor had said that it was otherwise financially healthy **and did not present any evidence that a judgment in the antitrust lawsuit would result in it going out of business**. [42] The NYAG goes on to say that "Any claim of contingent insolvency the NRA may make based on the pending litigation against it would not save its petition. In *SGL*, the Third Circuit held that

---

[41] NYAG Motion, p. 18, ¶ 33.

[42] NYAG Motion, p. 13, ¶ 33.

**Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, (2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11 Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11 Trustee     PAGE 22**

the pending antitrust litigation against the debtor **'did not pose a sufficient present threat to justify bankruptcy relief**.'"[43]

34. These Chapter 11 Cases are clearly distinguishable from that in *SGL Carbon*. Here, the NYAG's lawsuit seeks to put the NRA "out of business." Chapter 11 is intended to preserve the estate in the face of an existential crisis, which is exactly what the Debtors are doing, in good faith. Indeed, *SGL Carbon* itself accounted for this scenario, stating: "We do not hold that a company cannot file a valid chapter 11 petition until after a massive judgment has been entered against it. Courts have allowed companies to seek the protections of bankruptcy when faced with **pending litigation that posed a serious threat to the companies' long-term viability**. In those cases, however, **debtors experienced serious financial and/or managerial difficulties at the time of filing**."[44] The Debtors here are, among things, properly using chapter 11 to preserve their long-term viability and to reorganize the NRA' antiquated corporate structure to address serious concerns that have been raised in the past few years.

35. Other authority supports the Debtors. In *In re Southern Healthcare Systems, Inc.*, the debtor, which owned nursing home facilities, filed for bankruptcy shortly after a Georgia state court had enjoined it from operating its facilities and had threatened to appoint a third-party receiver.[45] A creditor moved to dismiss the chapter 11 filing under Section 1112(b) on "bad faith" grounds. The bankruptcy court noted that in order to dismiss a bankruptcy case for bad faith, the Fifth Circuit in *Little Creek* instructed that the "facts of a particular case must rise to certain 'level of egregiousness' in order to find that the chapter 11 process is being 'perverted.'"[46] The bankruptcy court further noted that dismissal should be used "sparingly,"

---

[43] *Id*. at p. 15, ¶ 37.

[44] *SGL Carbon*, 200 F.3d at 164 (emphasis added).

[45] No. 02–11621, 2003 WL 24027460, *2 (Bankr. M.D. La. Jan. 6, 2003).

[46] *Id*. at *2 (citing *Little Creek,* 779 F.2d at 1073).

and that the "mere fact that a bankruptcy proceeding is filed in response to a state court judgment is not alone reason to dismiss."[47]   The bankruptcy court denied the motion to dismiss, crediting the debtor's position that the state court's appointment of a receiver would "increase its operating costs," and that the expense of litigating had affected the debtor's cash flow.[48]   The court further found that the "debtor has ongoing operations, numerous employees and hundreds of residents in its homes whose interests all bear consideration and protection."[49]

36.     Here too, the NRA has unequivocally been affected by the numerous litigation proceedings and resulting expense, has nearly 500 employees, millions of members, numerous vendors, and secured and unsecured creditors, all of whom are best served by a successful restructuring that ensures the continued operation of the reorganized NRA and the payment of claims in accordance with the Bankruptcy Code's priority scheme.

37.     Similarly, in *In re Greenwood Supply Co.*, certain minority shareholders of the debtor moved to dismiss its chapter 11 petition under Section 1112(b) as a bad faith attempt to avoid pending civil litigation by the minority shareholders seeking judicial dissolution of the debtor.[50]   The minority shareholders argued that the debtor's bankruptcy filing at the last minute before the trial of the state court action, when it was solvent, "supports a finding of bad faith, as the bankruptcy filing is simply a litigation tactic designed to stall" that action.[51]   The debtor argued it filed its case in good faith, seeking "to address the issues the Minority Shareholders have raised in the Bankruptcy Court while, at the same time, preserving its business to ensure payments to creditors . . . [and] the bankruptcy filing was not a litigation tactic but that [debtor]

---

[47] *Id*. at *3.

[48] *Id.* at *2.

[49] *Id*.

[50] 295 B.R. 787, 791 (Bankr. D.S.C. 2002).

[51] *Id*. at 793.

**Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, (2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11 Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11 Trustee     PAGE  24**

feared the disruption likely in the event of a judgment being entered against it."[52] The bankruptcy court denied the motion to dismiss the chapter 11 case, holding that while there were "some indicia" of bad faith, including filing on the morning the state court action was scheduled for trial, the debtor had filed in good faith because it had more than one asset, its ownership of real property and inventory were both significant, it conducted an ongoing business, employed a number of employees, it had accounts with several trade creditors, and maintained lines of credit with a bank, all indicating there was "a realistic prospect for reorganization."[53]

38.     Here, the NRA is one of the nation's oldest civil rights organizations with ongoing operations, numerous assets, hundreds of employees, and millions of members. The NRA filed for protection under chapter 11 in good faith, not to circumvent judgments in other courts (in fact, no judgments have been rendered), nor to escape an impending trial (because there is none), but because it is in a situation where it must be able to continue its operations in the face of existential threats, in order to maximize the value of its estate and to protect the interests of its members, employees, vendors, and legitimate creditors.

39.     Further, like in *Pottorff*, the court in *SGL Carbon Corp.* found that the chapter 11 case there was not filed to reorganize, "but rather to put pressure on antitrust plaintiffs to accept the company's settlement terms." *Id*. at 167. Like in *Antelope Techs*, the debtor filed a reorganization plan with a petition that was designed to pressure the litigant creditors. *Id*.

---

[52] *Id*. at 793-794.

[53] *Id*. at 794 (citing *Carolin Corp. v. Miller*, 886 F.2d 693, 703-05 (4th Cir.1989)). *See also In re Stone Resources, Inc.*, 448 B.R. 361, 367 (Bankr. E.D. Pa. 2011), *rev'd in part*, 458 B.R. 823 (E.D. Pa. 2011) (holding that debtor filed for chapter 11 in good faith two days after another court upheld its injunctive ruling requiring the debtor to cease its business operations and turnover certain assets to the opposing party; the bankruptcy court held, citing *SGL Carbon*, that "adverse litigation that places the debtor in financial distress constitutes a legitimate reason for filing bankruptcy," and that the debtor "was attempting to preserve its value as a going concern that would in turn maximize the value of the bankruptcy estate"). *See also In re Stone Resources, Inc.*, 448 B.R. 361, 367 (Bankr. E.D. Pa. 2011), rev'd in part, 458 B.R. 823 (E.D. Pa. 2011) (holding that debtor filed for chapter 11 in good faith two days after another court upheld its injunctive ruling requiring the debtor to cease its business operations and turnover certain assets to the opposing party; the bankruptcy court held, citing *SGL Carbon*, that "adverse litigation that places the debtor in financial distress constitutes a legitimate reason for filing bankruptcy," and that the debtor "was attempting to preserve its value as a going concern that would in turn maximize the value of the bankruptcy estate").

Additionally, the debtor's officers "expressly and repeatedly acknowledged" that the bankruptcy "was filed solely to gain tactical litigation advantages." *Id.* By contrast, these Chapter 11 Cases were not filed for the purpose of pressing any claimant to accept a settlement offer or solely to gain a tactical litigation advantage. The Debtors are simply asking for the opportunity to do what the Bankruptcy Code allows—propose and confirm a plan that restructures the NRA, maintains its employees and operations, and repays its creditors.[54]

      c.   <u>The NRA Is Not Violating New York Law by Seeking Protection Under the Bankruptcy Code and Seeking to Propose a Plan.</u>

40.     The Debtors are cognizant of New York law and their obligations under the Bankruptcy Code, and the Debtors will address and comply with their obligations in a proposed plan.

41.     The Movants, however, ask this Court to reject the yet unfiled plan by contending (incorrectly) that under no circumstances can the Debtors reorganize. Foremost, this Court cannot, and should not, judge a plan that has not been filed. But this Court can find that the Movants' arguments under New York law are incorrect.

42.     First, the Movants' essentially argue that New York law bars a non-profit New York entity from seeking bankruptcy protection, which, if true, would be unconstitutional.

43.     Specifically, the Bankruptcy Clause of the United States Constitution grants authority to Congress to establish a uniform federal law of bankruptcy. U.S. Const. art. I, § 8, cl.

---

[54] AMc's reliance on *In re Cedar Shore Resort, Inc.* is misplaced. There, the chapter 11 filing was dismissed as being in bad faith "because it was made for the purpose of preventing creditors from pursuing claims in state court, rather than to effectuate a valid bankruptcy purpose." *See In re Wigley*, 557 B.R. 671, 677-78 (8th Cir. 2016) (discussing *Cedar Shore Resort*). Here, to the contrary, the Debtors are doing no such thing with respect to any creditor. Other authority cited by AMc is also inapposite. *See In re Alexandra Trust*, 526 B.R. 668, 679-80 (Bankr. N.D. Tex. 2015) (dismissing chapter 11 case, finding that the debtor had no operations, employees, or income, and that the debtor claimed to seek bankruptcy protection to consolidate litigation in a single forum, when in fact, there was only one pending litigation); *In re Kickapoo Kennels, LLC*, No. 12-39321-H3-11, 2013 WL 3148656 *2 (Bankr. S.D. Tex. Jun. 19, 2013) (bankruptcy court held that the case appeared to have been filed in order to gain an unfair advantage in a two-party dispute, by delaying implementation" of another court's judgment while an appeal was pending).

4. The Supremacy Clause of the Constitution mandates that federal laws, such as those concerning bankruptcy, "shall be the supreme Law of the Land; . . . [the] Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2.

44. When the purpose or effect of a state statute interferes with the effectiveness of a federal statute, the United States Supreme Court has said that the state statute may be rendered invalid.[55]

45. Here, the Movants argue that the New York Court, and only the New York Court, has authority over a non-profit entity's assets. If true, that would mean that a non-profit formed under New York law could never seek bankruptcy protection or avail itself of the protections of the Bankruptcy Code. Clearly, this is not the law and violative of the Supremacy Clause.

46. This issue was also addressed in 2005 with BAPCPA. 11 U.S.C. § 1129(a)(16) expressly provides that bankruptcy courts are not required to defer to state courts on matters of state law. Instead, bankruptcy courts are expressly empowered to decide state law issues.[56]

47. Furthermore, the NYAG State Action is in its infancy. Although a complaint was filed, the NRA filed counterclaims and discovery is just beginning. The New York Court has not made any findings as to the NRA's assets or a potential dissolution or otherwise exercised control over the NRA's assets.

48. The NRA's assets remain property of this estate and are properly administered by this Court in accordance with the terms of the Bankruptcy Code.

49. An action that is in its early states does not equate to, and cannot, transmute property of the estate to property under the control of the New York Court or the NYAG.

---

[55] *Perez v. Campbell*, 402 U.S. 637, 652, 91 S.Ct. 1704, 1712 (1971).

[56] *See In re HHH Choices Health Plan, LLC*, 554 B.R. 697, 700-701 (Bankr. S.D.N.Y. 2016) (holding that in the case of an insolvent not-for-profit corporation, section 511 of the New York Not-For-Profit Corporation Law ordinarily would require the approval of the New York State Supreme Court for a transfer of assets, but post-bankruptcy filing, it is the bankruptcy court and not the New York State Supreme Court that must apply the applicable state law).

50.     Beyond the estate property issue, the Debtors do not concede that the NYAG's efforts to dissolve and distribute all of the NRA's assets is simply a regulatory action not subject to the automatic stay.

51.     Legislative history provides insight into the scope and purpose of the "police or regulatory power" exception to the automatic stay. "As stated in the accompanying House Report, 'where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay.'"[57]

52.     "Courts employ two separate, but related tests in determining whether a governmental unit is enforcing its police or regulatory powers: the pecuniary interest test and the public policy test."[58]

53.     "The pecuniary purpose test asks whether the government primarily seeks to protect a pecuniary governmental interest in the debtor's property, as opposed to protecting the public safety and health."[59]

54.     "The public policy test asks whether the government is effectuating public policy rather than adjudicating private rights."[60]

55.     According to the Fifth Circuit, "[t]he pecuniary purpose and public policy tests both 'contemplate that the bankruptcy court, after assessing the totality of the circumstances, [will] determine whether the particular regulatory proceeding at issue is designed primarily to

---

[57] *In re Halo Wireless, Inc.*, 684 F.3d 581, 587 (5th Cir. 2012) (quoting H.R. Rep. No. 95–595, at 343).

[58] *In re RGV Smiles By Rocky L. Salinas D.D.S. P.A.*, No. 20-70209, 2021 WL 112182, at *4 (Bankr. S.D. Tex. Jan. 6, 2021) (citing *In re Halo Wireless, Inc.*, 684 F.3d at 588).

[59] *In re Halo Wireless, Inc.*, 684 F.3d at 588 (quoting *In re Nortel Networks, Inc.*, 669 F.3d 128, 139-140 (3d Cir. 2011)).

[60] *Id.*

**Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, (2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11 Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11 Trustee     PAGE 28**

protect the public safety and welfare, **or represents a governmental attempt to recover from property of the debtor estate, whether on its own claim, or on the nongovernmental debts of private parties**.'"[61]

56.      As detailed above, in the New York Action, the NYAG seeks the extraordinary remedy of dissolving the NRA and distributing its assets, not to its members, but to other non-profit corporations of the NYAG's choosing.   This does not qualify as a valid "police or regulatory power" as it runs afoul of the pecuniary purpose test in that it is primarily an attempt to recover from property of the Debtors' estates.

57.      The Fifth Circuit has recognized that the pecuniary purpose and public policy tests are "designed to sort out cases in which the government is bringing suit in furtherance of either its own or certain private parties' interest in obtaining a pecuniary advantage over other creditors."[62]  Obviously, allowing the NYAG to take possession of all of the Debtors' assets and distribute them to other companies would severely harm and disadvantage the Debtors' creditors, vendors, employees, and members.

58.      The NYAG has admitted that the purpose of the NYAG State Action is to take the money and assets in the possession of the NRA and give it to others.   The NYAG is undeterred by the fact that the NRA is now a chapter 11 debtor, and following the commencement of this reorganization proceeding, the NYAG announced that "we will not allow the NRA to use this or any other tactic to evade accountability and [her] office's oversight."[63]   If the NYAG's true intention in filing the NYAG State Action was to stop violations of New York law, she would be supportive of the NRA's planned move to Texas.   However, her comments since the filing show

---

[61] *In re Halo Wireless, Inc.*, 684 F.3d at 588 (emphasis added) (quoting *In re McMullen*, 386 F.3d 320, 325 (1st Cir. 2004)).

[62] *Id.* (quoting *Chao v. Hosp. Staffing Servs., Inc.*, 270 F.3d 374, 389 (6th Cir. 2001)).

[63] https://ag.ny.gov/press-release/2021/nras-financial-status-finally-matches-moral-status-bankrupt.

**Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, (2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11 Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11 Trustee     PAGE  29**

that the NYAG State Action is motivated, primarily, by a desire to obtain control of the NRA's assets.

59. Fundamentally, the NYAG seeks to divest this Court of its authority to control the assets that make up the Debtors' estates. However, the protections for state law regulators in the Bankruptcy Code do not deprive bankruptcy courts of jurisdiction over estate assets.[64] It is difficult to imagine a more clear-cut instance where the protections afforded by the Bankruptcy Code must be applied.

60. Alternatively, the Movants, and particularly AMc, skew the requirements under New York law by repeatedly suggesting that the permission of the NYAG is required before an entity can dissolve, consolidate, or merge. *See* AMc Motion, p. 27, ¶ 58. Although that is one way a dissolution or merger can occur, the law also provides a mechanism for dissolution or merger with the approval of the New York Supreme Court. *See* N-PCL 1002, NY CLS N-PCL 907 (the "<u>Non-Profit Laws</u>"). In any event, the NYAG's ire for the NRA is not a bar to its continued existence.

61. Specifically, as the NYAG admits, the relief ultimately sought in the NYAG State Action is dissolution, stating "if a court determines that it is in the best interest of the NRA's members and the public, the dissolution of the NRA." *See* NYAG Motion, p. 3, ¶ 6.

62. And as discussed above and made clear in *In re HHH Choices Health Plan,* 554 B.R. at 700-701, the Bankruptcy Code empowers this Court to apply the Non-Profit Laws to effectuate a merger or dissolution.

63. However, this Court is best positioned to address the concerns of the creditors, members, and public. Members and creditors can appear here, file claims and pleadings, and express their interests and views concerning the NRA's reorganization and its future. As this Court is aware, these cases have already been actively followed by members and the public who

---

[64] *See In re HHH Choices Health Plan, LLC*, 554 B.R. 697 (Bankr. S.D.N.Y. 2016).

have called into and participated in hearings and the meeting of creditors. The ability of the Bankruptcy Court to receive and consider the voices of parties in interest makes this the most sensible forum to determine how best to reorganize the NRA for the future.

64. Indeed, while AMc cites to 28 U.S.C. § 959 and states that "noncompliance with applicable state law and regulations constitutes grounds for dismissal," neither of the two cases upon which it relies, *Ky. Emple. Ret. Sys. v. Seven Cntys. Servs.,* 823 Fed.Appx. 300 (6th Cir. 2020) (whether debtor was a governmental unit statutorily barred from seeking chapter 11 relief) and *In re Draughon Training Institute, Inc., 119 B.R. 921* (Bankr. W.D. La. Apr. 10, 1990) (considering denial to debtor of certificate of approval from Texas Education Association), even deals with dismissal of a bankruptcy proceeding on those grounds. *See* AMc Motion, pp. 28-29, ¶¶ 59-61.[65]

    d. <u>The Debtors' Chapter 11 Cases Are Not Fraudulent.</u>

65. AMc argues vehemently, but without evidence, that the NRA, and its counsel, are involved in a scheme to defraud this Court because "the NRA states it is not insolvent, is not experiencing any financial hardship, and it is filing to streamline litigation and avoid the NYAG. The scheme or artifice is exposed by the fact that the NRA is using the equitable relief of

---

[65] The only case cited by AMc that deals with dismissal for non-compliance with state law is *In re Charles George Land Reclamation Tr.*, 30 B.R. 918, 924 (Bankr. D. Mass. 1983). (See AMc Motion, p. 29, ¶ 61, fn. 154). There, the debtor owned a waste disposal facility that was leaking hazardous waste into river water and was subject to a pre-petition judgment concerning its environmental issues. The US Trustee moved to dismiss the bankruptcy, supported by the State of Massachusetts, arguing that the debtor's operations had been the subject of the active and constant supervision of a state court judge prior to filing. 30 B.R. at 922. The State argued that the state court was in the best position to resume control and render a "speedy cleanup." Id. The bankruptcy court sought to appoint the US Trustee as interim trustee over the debtor, but the US Trustee refused, citing potential liability in connection with the environmental issues. Id. at 923. The bankruptcy court ultimately held that the bankruptcy case was not one "where assets could be liquidated, claims adjudicated and a distribution made within a relatively short period of time, but rather it was and is an ongoing environmental nuisance that threatens the health, safety and well-being of the people who surround it . . . [and] the appropriate forum to redress and correct this environmental nuisance in the most expeditious and efficient manner" was state court. Id. The bankruptcy court further stated that it "had neither the resources, the expertise or, for that matter, a suitably qualified trustee with experience in hazardous waste management, to do other than to allow the resolution of this matter by the continuing efforts of the appropriate state court." Id. at 924. Debtors' Chapter 11 Cases here are obviously distinguishable. There is no ongoing environmental disaster that would require the expertise and attention of a state court, or a state or federal agency, that had been handling those issues pre-petition. The NYAG State Action is most certainly not such a matter.

---

bankruptcy to do what is it otherwise prevented from doing – dissolving without NYAG approval in contravention of New York law." AMc Motion, p. 31, ¶ 66.

66.     Not only are AMc's arguments belied by the law stated herein that (1) a debtor need not be insolvent; (2) streamlining of litigation is a proper bankruptcy purpose; and (3) NYAG approval is not required to dissolve or consolidate, AMc's argument ignores the transparency with which the Debtors have come before this Court.

67.     Ultimately, and proving their candor to this Court, Debtors, knowing full well the scrutiny they would face, voluntarily filed these Chapter 11 Cases. They did so with full disclosures of their assets, liabilities, litigation, and books and records. On February 15, 2021, just one month into this highly complicated reorganization, the Debtors filed complete disclosures of their assets and liabilities through their schedules and SOFA.

68.     Furthermore, the allegations, even if true, do not rise to the level of fraud which courts find actionable under 18 U.S.C. § 157. Instead, when assessing fraud, in *Patel v. Mukasey*, 526 F.3d 800 (5th Cir. 2008), the Fifth Circuit has stated that "Black's Law Dictionary defines fraud 'as a knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment . . .' Black's Law Dictionary 413, 670 (7th ed. 1999)."

69.     In the over 50 times that AMc gratuitously uses the word: "fraud" or "fraudulently" in its pleading, not once does such usage implicate "a knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment." *Id*. Multiple recitation of the *word* does not magically make it true.

. . .

. . .

. . .

**Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, (2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11 Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11 Trustee     PAGE 32**

70. None of the cases cited by AMc to undergird it specious allegations of fraud raise the specter of "a knowing misrepresentation of the truth or concealment of a material fact to induce another to art to his or her detriment." *Id.* In fact, most are entirely irrelevant:[66]

- In *United States v. Spurlin*, 664 F.3d 954, 956 (5th Cir. 2011), the issue was the debtor's knowing and fraudulent withholding of their interests in certain properties from their bankruptcy filings, and false oaths and statements in bankruptcy and theft of escrow funds.

- *United States v. Chaker*, 820 F.3d 204, 210 (5th Cir. 2016), involved an actual fraud with an identifiable victim and purposeful misrepresentations to the court.

- In *In re Cardwell*, No. 09-43121, 2017, 2017 WL 2304220, *4 (Bankr. E.D. Tex. 2017), the court specifically stated that:

  Generally speaking, only the most egregious misconduct, such as bribery of a judge or members of a jury, or the fabrication of evidence by a party in which an attorney is implicated, will constitute a fraud on the court. *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir. 1978) (*citing Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944)). 'Less egregious misconduct, such as nondisclosure to the court of facts allegedly pertinent to the matter before it, will not ordinarily rise to the level of fraud on the court.'

---

[66] The other cases cited by AMc are equally inapposite. *See, e.g. In re Zed, Inc.*, 20 B.R. 462 (Bankr. N.D. Cal. 1982) (stay relief, not bankruptcy crimes), *Pottorff*, 518 B.R. 380 (dismissal not §157); *United States v. Spurlock*, 214 Fed. Appx. 382, 387 (5th Cir. 2007) (not decided under §157 and involved the insufficiency of a criminal indictment in a non-bankruptcy case); *In re Houghton Mifflin Harcourt Publ'g Co.*, 474 B.R. 122, (Bankr. S.D.N.Y. 2012) (venue case not decided under §157); *In re Asanda Air II LLC*, 600 B.R. 714 (Bankr. N.D. Ga. 2019) (not decided under §157, but rather under Section 1112 based upon the debtor's failure to comply with court orders); *Palmer v. Dau*, No. 6:10-cv-248-Orl-19KRS, 2010 U.S. Dist. LEXIS 69329, at *6 (M.D. Fla. July 12, 2010) (was a dismissal case not implicating §157); *In re: Hall, Bayoutree Associates, Ltd.*, 939 F.2d 802 (9th Cir. 1991) (also a venue case and not decided under §157); *Phillips v. Illinois Cent. Gulf R.R.*, 874 F.2d 984 (5th Cir. 1989) (not a bankruptcy case and the discussion was primarily about statutes of limitation, not applicable here); *In re: CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of prepetition claims, not decided under §157); and *In re: Office Prods. of Am., Inc.*, 136 B.R. 983(Bankr. W.D. Tex. 1992) (a professional compensation case).

---

- In *U.S.A. v. DeSantis*, 237 F.3d 607 (6th Cir. 2001), the court was dealing with a money laundering scheme, forgery, and witness tampering.

- *U.S. v. Louderman*, 576 F.2d 1383 (9th Cir. 1978), dealt with wire fraud and impersonation of a postal employee.

- Similarly, *Durland v. United States*, 161 U.S. 306, 16 S. Ct. 508 (1896), *United States v. Van Dyke*, 605 F.2d 220 (6th Cir. 1979), and *U.S. v. McNeive*, 536 F.2d 1245 (8th Cir. 1976) all dealt with mail fraud and were not bankruptcy cases implicating 11 U.S.C § 157.

71.    In short, AMc attempts to weave an anemic tale trying to pigeon-hole the unique facts of these Chapter 11 Cases into otherwise defined boxes, but the attempts fail.  The Debtors have not committed fraud, and AMc has not sufficiently plead fraud consistent with the decision of the Fifth Circuit in *Patel v. Mukasey*, 526 F.3d 800.

72.    It is no secret that the Movants are not pleased with the Debtors' filings.  But their accusations that Debtors participated in a fraud on this Court are unfounded and offensive.

     e.    <u>Venue of the Chapter 11 Cases Is Proper in This District and Not Bad Faith.</u>

73.    As AMc concedes, venue in the Northern District of Texas is wholly proper.[67]  28 U.S.C. Section 1408(2), provides, in pertinent part, that bankruptcy venue properly resides:

(1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one-hundred-and-eighty-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district; or

(2) in which there is pending a case under title 11 concerning such person's affiliate, general partner, or partnership.

---

[67] AMc concedes that venue is proper ("Sea Girt's petition was arguably filed in a proper forum because it is an organization formed in Texas."  *See* AMc Motion, p. 35, ¶ 77),

28 U.S.C § 1408.

74.     The NRA's wholly owned affiliate, Sea Girt, is a legal, existing corporation under Texas laws, and on January 15, 2021, exercised its right to file a chapter 11 case in this District, and subjected itself to the jurisdiction of this Court.

75.     Although Sea Girt was only recently created, the creation of an entity for proper venue has been found to be good faith and, in fact, consistent with a debtor's fiduciary duties. *See In re Patriot Coal Corp.*,[68] 482 B.R. 718, 728 (Bankr. S.D.N.Y. 2012) (acknowledging that the debtors' determination to create a New York entity to establish venue was not bad faith and indeed, arguably "entirely consistent with, or even required, by the Debtors' fiduciary duties.")

76.     Sea Girt is the NRA's affiliate.  *See* 11 U.S.C. § 101(2).

77.     Courts have uniformly held that a debtor's choice of venue must be afforded "great weight."[69]

78.     Nonetheless, and notwithstanding that AMc concedes that venue is indeed proper, AMc requests dismissal by relying on cases where venue is *improper*.

79.     AMc first relies on *In re Zed, Inc.,* 20 B.R. 462 and contends that the bankruptcy court dismissed on bad faith grounds for a litany of reasons that AMc contends are akin to this case.  AMc Motion, at pp. 35-36.  However, contrary to AMc's representation,[70] *Zed* does not even deal with a dismissal request, a venue issue, or an affiliate filing.  At issue in *Zed* was a request for relief from stay when Lehrer & Sons, Inc. essentially fraudulently transferred real

---

[68] The court ultimately determined to transfer venue based on a request by parties in interest.  No such request has been made here and, to the extent such a request is made, the Debtors reserve their rights and request the opportunity to further brief the issue.

[69] *In re Dunmore Homes, Inc.*, 380 B.R. 663, 670-71 (Bankr. S.D.N.Y. (2008); *In re Manville Forest Prod. Corp.*, 896 F.2d 1384, 1391 (2nd Cir. 2002) ( ". . [t]he district in which the underlying bankruptcy case is pending is presumed to be the appropriate district for hearing and determination of a proceeding in bankruptcy. *In re Lionel Corp.*, 24 B.R. 141, 143 (Bankr. S.D.N.Y. 1982).

[70] AMc contends "In *In re Zed, Inc.*, a bankruptcy court dismissed a bad faith filing where the debtor . . ."  *See* AMc Motion, p. 35.

---

**Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, (2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11 Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11 Trustee     PAGE 35**

property to a shell entity "to cure the financial problems of Lehrer & Sons, Inc., without the need for Lehrer & Sons, Inc. to file a petition pursuant to chapter 11 on its own behalf and thereby commit the assets of Lehrer & Sons, Inc." *Id*. at 463-464. The court, understandably, granted stay relief. It did not, however, even discuss dismissal or discuss any facts that are in any way relevant to this case.

80.     AMc also relies on *In re Hall, Bayoutree Assc., Ltd*., which is also inapposite to the facts of this case. AMc Motion, at p. 36. In *Hall*, the bankruptcy court held that venue was improper, (i.e., the case could not be filed in Arizona under Section 1408) and therefore, dismissed the case. Here, venue is proper under Section 1408 because Sea Girt is a Texas entity – a point AMc admits.

**B.     THE MOVANTS' UNSUPPORTED ALLEGATIONS ARE INSUFFICIENT TO MANDATE APPOINTMENT OF A TRUSTEE.**

81.     In the alternative of dismissal, the Movants asks this Court to issue the extreme sanction of displacing the debtors in possession and appointing a trustee, despite the extensive acts that the NRA has already taken to remedy any alleged wrongdoing, the oversight of the Committee, and the oversight of this Court.

82.     The NRA is an enormous enterprise and to displace current management and install a trustee based upon a politically driven agenda would cause extraordinary disruption to the vast and diverse operations of the NRA. A trustee would confront a herculin task in any attempt to functionally assimilate the operations of the Debtors and install new controls over the Debtors, all to the detriment of the creditors and its members.

83.     Moreover, the NRA is funded by its members. The removal of the members' selected leadership and the instillation of a third-party trustee appointed by the government will have a devastating impact on the NRA's ability to collect dues and raise donations from its members, which dues and donations are necessary for Debtors' existence and reorganization.

84.     Indeed, this is not a vanilla case.  It is a unique case with novel legal and political issues.  While the bankruptcy issues are not necessarily complex, the impact of those issues will be elevated and take on an increased level of import.

85.     Thus, bringing in a total outsider to the business model and the Debtors' philosophy on firearms runs the very real risk of investing some unknown individual with control over the nation's largest proponent of Second Amendment rights, who may harbor intense animosity to the mission of the Debtors.

86.     The creditors and five million members of the NRA should not be required to suffer uncertainty that the individual charged with operational authority over the Debtors may harbor political and social animus towards the NRA and its mission—indeed, its very purpose for existence.[71]

87.     Moreover, the NRA is funded by its members.  Uncertainty in leadership after 150 years, will have a devastating economic impact on the NRA's existence and ability to reorganize.[72]

88.     If the Trustee Motion was even a close call, this undeniable factor would auger against the installation of a trustee.  Here, where the Movants have fallen woefully short of

---

[71] *See, e.g., In re West Virginia High Technology Consortium Foundation*, Case No. 16–bk–806, 2017 WL 1437067, *5 (Bankr. N.D. W. Va. 2017) (denying motion to appoint trustee for non-profit debtors because a trustee "would need time to become familiar with the Debtors' business and operations," and there would be a risk that the appointment of a trustee "would jeopardize the ability of the Debtors to carry on their charitable missions").

[72] The reasoning of the court as expressed in the *WorldCom* bankruptcy is particularly apt here, given the unique issues and pressures that are presented in Debtors' Chapter 11 Cases:

> The appointment of a trustee would be very costly to the Debtors and their estates, with no apparent benefit. Given the size and complexity of the Debtors and their operations, the delay and expense that would be caused by the trustee's (and new professionals') need to learn about the Debtors' assets, liabilities, businesses, and chapter 11 cases would be substantial and would likely seriously and adversely affect the prospects of rehabilitation. The appointment of a trustee would severely impede the Debtors' ability to confirm a consensual chapter 11 plan of reorganization within the next few months.

*In re Adelphia Communications Corp.*, 336 B.R. 610, 663 (Bankr. S.D.N.Y. 2006) (quoting Worldcom).

**Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, (2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11 Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11 Trustee     PAGE 37**

presenting the required "clear and convincing" evidence, as discussed below, the risk of such an appointment would be devastating.

### 1. Standards for the Appointment of a Trustee.

89. The law is uniform throughout the country that the appointment of a chapter 11 trustee is an extraordinary remedy.[73]

90. In light of the strong legislative intent for a debtor to remain in possession, courts have uniformly held that there is an elevated presumption that facilitates a debtor-in possession having a fair opportunity to reorganize. *See* 11 U.S.C. §§ 1107 and 1108, *see also, e.g., Schuster v. Dragone*, 266 B.R. 268, 271 (Bankr. D. Conn. 2001):

> Inasmuch as Chapter 11 is designed to give the debtor an opportunity to rehabilitate through reorganization, the Bankruptcy Code favors allowing the debtor to remain in possession and operate the business. Moreover, the process of rehabilitation is generally most effective under current management who are familiar with the operations of the business involved.

(internal cites omitted); *see also Dalkon Shield Claimants v. A.H. Robbins, Inc.*, 828 F.2d 239, 240-41 (4th Cir. 1987):

---

[73] *In the Matter of Cajun Electric Power Cooperative, Inc.*, 69 F.3d 747, 749 (5th Cir. 1995), *withdrawn in part on rehearing*, 74 F. 3d 599 (5th Cir. 1999) (withdrawing section IV and adopting reasoning of dissent in prior opinion), *see also, In re Patman Drilling International, Inc.*, Case No. 07-34622-SGJ, 2008 WL 724086 (Bankr. N.D.Tx. March 14, 2008) ("Appointment of a chapter 11 trustee is a draconian remedy. A strong presumption exists that a chapter 11 debtor should be permitted to remain in possession"), *In re Evans*, (48 B.R. 46, 47) (Bankr. W.D.Tx. 1985), *In re Adelphia Communications Corp*, 336 B.R. 610, 655 (Bankr. S.D.N.Y 2006) *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006) ("It is settled that appointment of a trustee should be the exception, rather than the rule…") (quoting *In re: Sharon Steel Corp.*, 872 F.2d 1225 (3d. Cir. 1989)), *In re Euro- American Lodging Corp.* 365 B.R. 421, 426 (Bankr. S.D.N.Y. 2007), *Official Comm. of Asbestos Pers. Injury Claimants v Sealed Air Corp* (*In re W.R. Grace*), 285 B.R. 148, 158 (Bankr. D.Del. 2002) ("appointing a trustee must be considered as a last resort"), *In re The 1031 Tax Grp. LLC*, 374 B.R. 78, 85 (Bankr. S.D.N.Y. 2007), *In re Hotel Associates, Inc.*, 3 B.R. 343, 345 (Bankr. E.D. Pa. 1980), *In re Marvel Entm't Group, In*c, 140 F.2d 463, 471 (3rd Cir. 1998), *Official Comm. Of Unsecured Creditors of Cybergenics Corp., ex. rel. Chinery*, 330 F.3d 548, 577 (3rd Cir. 2003)(*en banc*), and 7 LAWRENCE KING, COLLIER ON BANKRUPTCY Sections 1104.02 [1], 1104.02 [3][d][i] (16th Ed.). *See also In re Adelphia Communications Corp.*, where the bankruptcy court surveyed many of the largest (and most notorious) bankruptcies in U.S. history and concluded that trustees were rarely appointed, and where they were, "the driving factor was . . . the management vacuum at the affected debtor, by reason of the resignations of all of its officers and directors." 336 B.R. at 645-53.

---

The overriding philosophy of Chapter 11 . . . is to give a debtor a second chance. Consistent with such philosophy is this court's findings that current management should be permitted to identify and correct its past mistakes.

91.     Because of this overarching philosophy embedded in the Bankruptcy Code, parties seeking to dispossess a debtor-in possession bears the burden of proof. [74]

92.     And the evidentiary burden is "very" high.[75] Courts have established that a party seeking to displace the debtor in possession must establish the elements of Section 1104 by clear and convincing evidence as opposed to the more forgiving standard of a preponderance of the evidence.[76] Courts review the facts presented on a case-by-case basis.[77]

93.     The Fifth Circuit has described the clear and convincing evidence standard as:

that weight of proof which 'produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct, and weighty and convincing as to enable [the fact finder] to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case.[78]

94.     Thus, the Movants must show this Court "clear, direct, weighty and convincing" facts so that the Court can make its decision "without hesitancy" that the burden of proof has been met. Here, the Movants have fallen woefully short.

. . .

---

[74] *See In re Cajun Electric Power Cooperative, Inc.*, 69 F.3d at 749.

[75] *In re Bayou Group, LLC*, 564 F.3d 541, 546 (2d Cir. 2009).

[76] *See Cajon Electric Power Cooperative,* 69 F.3d at 749 (The parties moving for the appointment of a trustee have the burden of proof, which they must meet by clear and convincing evidence), *New Millennium Mgt. LLC*, No. 13-35719-H3-11, 2014 WL 792115 *5 (Bankr. S.D. Tex. Feb. 25, 2014). *See also* 5 LAWRENCE KING, COLLIER ON BANKRUPTCY Sections 1104.01 [b], (15th ed. 1995).

[77] *In re Northstar Contracting Corp.*, 128 B.R. 66, 70 (Bankr. S.D.N.Y. 1991) ("The Courts must weigh all of the factors and interests carefully because of the appointment of a trustee and expenses involved"). "Courts have required a finding of more than simple mismanagement or incompetence." *Evans,* 48 B.R. at 47 (citing *Matter of Anchorage Boat Sales, Inc.*, 4 B.R. 635 (Bankr. E.D.N.Y. 1980).

[78] *Soto v. Contreras*, 880 F.3d 706, 711 (5th Cir. 2018), (citing *In re Medrano*, 956 F.2d 101, 102 (5th Cir. 1992))(quoting *Cruzan by Cruzan v. Dir., Missouri Dep't of Health,* 497 U.S. 261, 285 n.11, 110 S.Ct. 2841 (1990)).

---

## 2.    The NYAG's Allegations Are Outdated and Disputed.

95.    "[O]n a motion for the appointment of a trustee, the focus is on the debtor's current activities, not past misconduct."[79]    Thus, "[t]here must be some temporal connection between past fraudulent conduct and the current management of the debtor.    At some point, the debtor should be entitled to an inference that the effects of past fraud have sufficiently dissipated so that he is not barred from being a debtor in possession."[80]

96.    "In other words, the fact that the debtor's prior management might have been guilty of fraud, dishonesty, incompetence, or gross mismanagement does not necessarily provide grounds for the appointment of a trustee under § 1104(a)(l), as long as a court is satisfied that the current management is free from the taint of prior management."[81]    Furthermore, "speculation that a debtor may do something in the future does not overcome the strong presumption that a debtor should be permitted to remain in possession in a chapter 11 case or justify the additional costs of a trustee."[82]

97.    In that regard, the court is to analyze whether the alleged pre-petition misconduct had a deleterious post-petition impact on creditors.[83]    Here, even if all of the allegations of the

---

[79] *See In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D. N.Y. 2001) (citing 7 COLLIERS ON BANKRUPTCY ¶ 1104.02[3][c][i] (15th ed.); *see also In re Bayou Grp.*, 564 F.3d at 547 n.3 (finding that a court cannot impute prior management misconduct on the debtor's current management to find cause to appoint a trustee under Section 1104(a)(l)).

[80] *In re Smith*, No. 11–08865–8–JRL, 2012 WL 1854240, *3 (Bankr. E.D.N.C. May 21, 2012) (denying motion to appoint trustee when the debtor pled guilty during the bankruptcy to charges of defrauding the government and other crimes that occurred pre-petition).

[81] *In re The 1031 Tax Group, LLC*, 374 B.R. at 86. *See also In re West Virginia High Technology Consortium Foundation*, 2017 WL 1437067 at*5 (denying motion to appoint trustee for non-profit debtor when debtor's CEO was accused of, among other things, making false statements about whether the debtor's real estate was encumbered, finding that the CEO had been entitled to rely on the advice of his General Counsel).

[82] *In re Slettland*, 260 B.R. at 672 (citations omitted).

[83] *See United States Surety & Indem. Co. v. Lopez-Munoz (In re Lopez-Munoz)*, 553 B.R. 179, n. 5 (BAP 1st Cir. 2016); *see also In re ProFlo Industries, LLC*, Case No. 17–33184, 2018 WL 615122, *4, 8 (Bankr. N.D. Ohio Jan. 29, 2018) (denying creditor's motion to appoint a trustee when the current president and sole member of the debtor allegedly, *inter alia*, employed counsel with conflicts of interest, failed to disclose financial information in debtor's

---

NYAG are taken as true, the NRA anticipates filing a plan that provides for the full repayment of all allowed claims.

98.     Furthermore, not only are the NYAG's allegations just that (allegations)[84]—they solely concern pre-petition conduct that has been remedied.  The NYAG State Action was filed in August 2020, and yet, its allegations are backward-looking.  Indeed, two of the executives whose purported misconduct supposedly mandates the dissolution of the NRA are no longer employed by the NRA.  Similarly:

- The NYAG State Action focuses extensively on expenses invoiced by and through AMc, but the AMc relationship was terminated by the NRA for precisely such reasons, and the NRA is actively engaged in litigation to recover funds from AMc.

- The NYAG State Action alleges excess benefits to Mr. LaPierre and certain of his family members in connection with security-mandated private jet travel, but those excess benefits occurred prior to 2020 were reimbursed to the NRA in 2020 and disclosed to the IRS.

- The NYAG State Action alleges misuse of funds by a senior aide in the Executive Vice President's office, but those funds were reimbursed by the aide with interest.

- The NYAG State Action alleges retaliation against whistleblowers, but multiple whistleblowers testified to the NYAG to the contrary.  One whistleblower was promoted, and now oversees many of the control functions that the NYAG State Action alleges were formerly deficient.

- The NYAG State Action alleges that for years, the NRA paid invoices without confirming they conformed to underlying contracts.  But contract management has now been centralized.

- The NYAG State Action alleges a surfeit of related-party contracts, nearly every single one of which was discontinued long before the NYAG State Action was filed.

- The NYAG State Action alleges that annual audits of the NRA's financial statements were incomplete, or that auditors proceeded in the absence of key information.  But

---

bankruptcy schedules and engaged in self-dealing, holding that "the harm of imposing an additional layer of substantial costs upon Debtor by appointing a trustee to run the business is not warranted").

[84] The NRA firmly denies the vast majority of the NYAG's allegations.  *See* Exhibit B hereto (NRA Answer and Counterclaim in the NYAG State Action).

**Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, (2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11 Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11 Trustee      PAGE 41**

during the pendency of the NYAG's investigation, the NRA retained a new outside audit firm which issued yet another "clean" audit in 2020—having reviewed the exact documents, and having spoken with the exact personnel that the NYAG alleges were excluded from prior audits.

99.     Furthermore, in addition to having been remedied prior to the NYAG State Action and the Petition Date, the actions complained of were perpetrated by actors that are no longer involved in the operations of the NRA, most notably, AMc.

100.    Finally, as this Court is well aware, the Committee and the United States Trustee have been actively involved in these Chapter 11 Cases and, no doubt, will continue to closely monitor the Debtors, therefore serving as a further check on the Debtors' operations negating the need for a trustee.

## V.
## <u>CONCLUSION</u>

Movants have woefully failed to meet their burdens to establish cause for a dismissal or to appoint a chapter 11 Trustee. Wherefore, the Debtors respectfully request that this Court enter an Order:

A.      Denying the Motions; and

B.      Granting such other and further relief as may be just and proper.

DATED:  March 5, 2021

                        GARMAN TURNER GORDON LLP

                        By: <u>/s/  Gregory E. Garman</u>
                            GREGORY E. GARMAN
                            TALITHA GRAY KOZLOWSKI
                            TERESA M. PILATOWICZ
                            7251 Amigo Street, Suite 210
                            Las Vegas, Nevada 89119

                            and

NELIGAN LLP
PATRICK J. NELIGAN, JR.
DOUGLAS J. BUNCHER
JOHN D. GAITHER
325 North St. Paul, Suite 3600
Dallas, Texas 75201

*Attorneys for Debtors and
Debtors-in-Possession*

and

BREWER ATTORNEYS &
COUNSELORS
WILLIAM BREWER III
SARAH B. ROGERS
1717 Main Street, Suite 5900
Dallas, Texas 75201

*Special Counsel for Debtors and
Debtors-in-Possession*