# EXHIBIT A

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § | |
| | § | |
| | § | |
| **Plaintiff and Counter-Defendant** | § | |
| | § | |
| **and** | § | |
| | § | |
| **WAYNE LAPIERRE,** | § | |
| | § | |
| **Third-Party Defendant,** | § | |
| | § | |
| **v.** | § | Civil Action No. 3:19-cv-02074-G |
| | § | |
| **ACKERMAN MCQUEEN, INC.,** | § | |
| | § | |
| **Defendant and Counter-Plaintiff,** | § | |
| | § | |
| **and** | § | |
| | § | |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, and MELANIE MONTGOMERY** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiff National Rifle Association of America (the "NRA" or the "Association") files this Second Amended Complaint against Defendants Ackerman McQueen, Inc. ("Ackerman"), Mercury Group, Inc. ("Mercury" and, together with Ackerman, "AMc"), Henry Martin ("Martin"), William Winkler ("Winkler"), and Melanie Montgomery ("Montgomery" together with Martin, Winkler, and AMc, the "Defendants"), on personal knowledge as to its own actions and on information and belief as to all other matters.

# I.

## <u>PRELIMINARY STATEMENTS</u>

This lawsuit redresses a startling pattern of corruption by the NRA's former vendor, AMc, which continues to come to light. Since the NRA terminated its relationship with AMc in Spring 2019, text messages, emails, and former-employee testimonials obtained through discovery and otherwise have made two things regrettably clear. *First*, AMc exploited decades of trust in order to siphon assets from the NRA, lining its pockets at the expense of its client and in violation of the law. *Second*, AMc has gone to outrageous lengths to sustain and conceal its grift, deploying scorched-earth tactics against anyone who scrutinized its activities or spending. When the NRA's CEO, Wayne LaPierre, threw his weight behind efforts to gain transparency into AMc's business practices, the agency orchestrated a brazen attempt to oust him from the NRA. Fortunately, the NRA Board of Directors' supported LaPierre's inquiries about AMc and thwarted that scheme. Despite its continued efforts to scapegoat, smear, and sue anyone who provides evidence against it, AMc now faces a long-overdue reckoning.

Until 2018, the NRA could never have predicted that it would find itself at odds with its longtime fiduciary. Since at least the 1980s, the NRA relied on AMc as its agent to develop media communications, place advertising, and assist it in times of crisis. For a time, AMc's strategic input and messaging, reflected in its work with Charlton Heston, served the NRA's mission. But, by the late 2010s, as AMc attempted to transform itself into a digital broadcasting platform financed by the NRA, its invoices skyrocketed, and questions arose about the efficacy of an expensive new product that AMc developed and urged the NRA to adopt: the branded digital streaming network NRATV. And, as AMc's invoices skyrocketed, the network's programming became laced with

content unrelated to gun rights, which was increasingly viewed by NRA leadership as distasteful and racist.

During Spring and Summer 2018, several tributary factors converged to prompt the NRA to increase its scrutiny of its relationship with AMc. *First*, the NRA was engaged in litigation to stanch a blacklisting campaign it faced after the Parkland tragedy. *Second*, it was warned to expect escalating, partisan attacks by regulators in its domicile state of New York in advance of the 2020 election.[1]  Although the NRA had no reason to believe it was not operating lawfully, it sought to identify and correct any vulnerabilities that hostile regulators might exploit. This was prudent because New York had recently amended its not-for-profit statutes, imposing new compliance obligations. Thus, the Association began to strengthen its procedures for documentation and verification of compliance by vendors, including AMc, with governing contracts and NRA internal controls. *Third*, the NRA's now-former Treasurer and CFO, Wilson "Woody" Phillips, retired the same year.  Phillips had previously served as the chief overseer of the NRA's financial affairs and its dealings with AMc. His departure naturally facilitated a fresh look at the NRA's relationship

---

[1] Indeed, then-New York Attorney General Eric Schneiderman, warned the NRA that he was being urged to use his office in support of these politically motivated efforts. In a telephone call to Tom King, an NRA director, in mid-2017, Schneiderman emphasized that while he opposed the NRA's positions on the Second Amendment, he was troubled by, extraordinary pressures being placed on him to weaken the NRA as a political force in 2020. Schneiderman advised King to "get ready." *See National Rifle Association of America v. Letitia James*, Case No. 1:20-cv-889 (MAD/TWD) (N.D.N.Y.), ECF No. 15, at ¶ 14. This risk has now materialized: the New York State Office of the Attorney General seeks to dissolve the NRA, a brazenly unconstitutional overreach condemned by the ACLU and sixteen amici states.  *See* David Cole, The NRA Has a Right to Exist, WALL ST. J. (Opinion, Aug. 26, 2020), https://www.wsj.com/articles/the-nra-hasa-right-to-exist-11598457143?mod=opinion_lead_pos7  ("The American Civil Liberties Union rarely finds itself on the same side as the National Rifle Association in policy debates or political disputes. Still, we are disturbed by New York Attorney General Letitia James's recent effort to dissolve the NRA"); and *National Rifle Association of America v. Letitia James*, Case No. 1:20-cv-889 (MAD/TWD) (N.D.N.Y.), ECF No. 27, Brief of the States of Arkansas, Alaska, Georgia, Idaho, Mississippi, Oklahoma, Kansas, Kentucky, Louisiana, Missouri, Ohio, South Carolina, South Dakota, Texas, Utah, and West Virginia as Amici Curiae in Support of Plaintiff and in Opposition to Dismissal.

with its largest vendor. In sum, the NRA had good reasons to seek greater transparency into AMc's practices and records—as was the NRA's right under the parties' contract.[2]

At the outset, the NRA expected that its inquiries of AMc would affirm its decades of trust in the agency. Instead, the opposite occurred. When the NRA took steps to implement oversight of AMc, including by exercising a contractual record-inspection right, AMc's response was explosive. For example, after an introductory meeting wherein Phillips' successor (the NRA's new CFO) asked high-level questions about the agency's spending, AMc demanded that the CFO be fired and stated to the Association's leadership that it "would not work with" him.[3] Later that year, AMc similarly demanded that the NRA fire outside counsel who dared to ask questions about AMc's invoices and billing practices.[4] Thereafter, AMc interposed its own outside counsel when the NRA sought backup for AMc's invoices, and made escalating, baseless threats.[5]

It is now clear that the agency did so because it found itself cornered. The truth is that AMc had secretly been defrauding the NRA for years, including by billing the NRA for work performed for non-NRA clients[6] and promoting contrived and misleading viewership metrics for NRATV.[7] It knew that complying with the NRA's record requests would reveal its misconduct and end its relationship with its largest client. However, AMc also believed that it had leverage over Phillips and, by extension, NRA Executive Vice President Wayne LaPierre. Decades of close interactions with NRA leadership had vested AMc with sensitive confidences pertaining to the

---

[2] As discussed *infra* at paragraphs 60-61, the NRA's contract with AMc contained a broad record-inspection clause that entitled the NRA to review AMc's NRA-related business records.

[3] *See* discussion *infra* at ¶ 60.

[4] *See* discussion *infra* at ¶ 67.

[5] *See* discussion *infra* at ¶ 65-69.

[6] *See* discussion *infra* at ¶ 88-89.

[7] *See* discussion *infra* at ¶ 27-48.

NRA, which the agency believed it could use if the parties' relationship frayed. In a private communication to LaPierre, AMc's CEO intoned that LaPierre should not *want* access to AMc's historical records, because anything transmitted to the NRA could be subpoenaed by New York regulators. Undaunted, LaPierre reiterated that the NRA's push for transparency was genuine: whatever information AMc's documents contained, the NRA wanted to see them. AMc ignored LaPierre and continued its evasions, tantrums, and threats.

After AMc stonewalled the NRA's document requests for months, the NRA sued AMc for specific performance of the parties' contractual record-inspection right in April 2019.[8] Finally realizing that it could not coerce LaPierre into abandoning the NRA's transparency effort, AMc conspired to remove him from the NRA. Days before the NRA's Spring 2019 board meeting, AMc unearthed portions of purported expense records pertaining to items like executive travel and entertainment—documents that the NRA had repeatedly requested since August 2018, but which AMc had concealed. Enlisting its own employee (who was on the NRA Board) and another disloyal director as messengers, AMc relayed an extortion threat to LaPierre: withdraw the record-inspection lawsuit, resign immediately, and support AMc's chosen NRA leadership slate, or embarrassing historical information would be released.[9] In response, LaPierre wrote a letter to the entire NRA Board of Directors that summarized AMc's payload of purportedly damaging "facts" and recounted AMc's extortion threat. LaPierre vowed that so long as the Board and membership retained confidence in him, he would continue to lead the NRA. The NRA re-elected LaPierre by acclamation and, soon thereafter, fired AMc.

---

[8] *See the National Rifle Association v. Ackerman McQueen, Inc. et al.,* Case No. CL19001757 (Va. Cir. Ct. 2019) .

[9] *See* discussion *infra* at ¶ 81-85.

The erosion of the NRA-AMc business relationship did not end the parties' conflict. Although the NRA was now its litigation adversary (not its client), AMc continued to display content on its website that infringed the NRA's intellectual property rights and deceptively implied an ongoing relationship between the parties. Throughout 2019 and 2020, AMc continued to breach its surviving nondisclosure obligations to the NRA, and continued to wage a scorched-earth vendetta against the NRA and LaPierre. During the same period, AMc's former employees[10] and clients[11] came forward to corroborate the NRA's claims and AMc's remaining business dwindled.

Today, AMc's advertising and public relations functions are diminished, and it appears determined to dedicate its remaining resources to waging false, futile reputational attacks on the NRA. The NRA brings this lawsuit to redress AMc's breaches of its duties and subdue AMc's ongoing bad acts, so that it can close this regrettable chapter of its history.

## II.

## PARTIES AND RELEVANT NON-PARTIES

### A. Plaintiff And Counter-Defendant The NRA

1. Plaintiff the NRA is a not-for-profit corporation organized under the laws of the State of New York with its principal place of business located in Fairfax, Virginia. The NRA is America's leading provider of gun-safety and marksmanship education for civilians and law enforcement. It is also the foremost defender of the Second Amendment of the United States Constitution. A 501(c)(4) tax-exempt organization, the NRA has approximately five million

---

[10] *See* discussion *infra* at ¶¶ 39-40.

[11] *See* discussion *infra* at ¶¶ 37; 154-155.

members and hundreds of thousands of donors. Its programs and advocacy reach many millions more.

2.       The NRA is the Counter-Defendant to the Counterclaims and Third-Party Claims filed by AMc on October 1, 2019.

**B.       Defendants**

3.       Ackerman is a for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business located in Oklahoma City, Oklahoma.[12]  It admits that it is an advertising and public relations agency that counted the NRA as its largest client for more than 30 years.[13]  At the time this case was initially filed, Ackerman maintained a principal office in Dallas, Texas, out of which the NRA's account was serviced.  That office was located at 1717 McKinney Avenue, Suite 1800, Dallas, Texas 75202, but upon information and belief, that office closed during the pendency of this litigation.  Ackerman is a defendant in the original action filed by the NRA on August 30, 2019 and is a defendant to the additional causes of action asserted in the First Amended Complaint and this Second Amended Complaint. It is also a counterclaimant and third-party plaintiff in connection with the counterclaims and third-party claims it filed on October 1, 2019.

4.       Defendant Mercury is a for-profit business corporation organized under the laws of the State of Oklahoma. Its last known principal place of business as of June 30, 2020, was located in Alexandria, Virginia.  Mercury is a wholly owned subsidiary of Ackerman and specializes in public communications strategy, including on behalf of advocacy groups such as the NRA. Mercury was a party to the Services Agreement (defined below) with the NRA.  At the time this

---

[12]  ECF No. 12 at p. 4 (Answer to ¶ 7).

[13]  ECF No. 12 at p. 4 (Answer to ¶ 7).

case was originally filed, Mercury maintained a principal office in Dallas, Texas, from which it serviced the NRA's account. In particular, that office was located at the same address as Ackerman's Dallas office—1717 McKinney Avenue, Suite 1800, Dallas, Texas 75202, but closed during the pendency of this litigation. Mercury engaged in all the wrongful conduct detailed in this Second Amended Complaint, including conducting a fire sale of NRA-owned property in its possession (in violation of surviving contract provisions and equitable common-law doctrines).

5. Defendant Winkler resides in Edmond, Oklahoma. Winkler is affiliated with business entities located in this District, including DJ Investments LLC, which operates in this District under the assumed name of 3905 Amherst Ave UPT, LLC and owned property at 3905 Amherst Ave Dallas (University Park), Texas 75225, and WBB Investments LLC, a Texas limited liability company. During the relevant time period, Winkler served in the senior leadership of Ackerman as Chief Financial Officer. He is also a certified public accountant. During the relevant time period, Winkler and other senior AMc officers and employees travelled to this District for meetings with NRA officials at Ackerman's Dallas offices and/or other locations within this District. These activities are relevant to the claims asserted herein because they concerned, among other things, AMc's billing practices and representations about NRATV's performance and viewership. Winkler engaged in wrongful conduct detailed in this amended complaint.

6. Defendant Montgomery resides in Dallas County, Texas with her place of business located at Ackerman's Dallas, Texas offices. During the relevant time period, Montgomery held several roles, including the Executive Vice President/Management Supervisor, and, as stated on

Case 21-30085-hdh11 Doc 307-1 Filed 03/06/21    Entered 03/06/21 05:43:57    Page 10 of
Case 3:19-cv-02074-G-BK   Document 201-1   Filed 02/11/21    Page 9 of 106   PageID 10321
107

Ackerman's website, has "work[ed] on the [NRA] account."[14]  Montgomery engaged in wrongful

conduct detailed in this Second Amended Complaint.

7.      Defendant Martin is an individual who resides in Dallas County, Texas.  Martin has

served as Ackerman's Chief Creative Officer since 2010.  During the relevant time period, Martin

participated in the conduct which forms the basis of this suit, including, but not limited to, his

participation and work in connection with the NRATV website and digital platform.

**C.      <u>Non-Party Co-Conspirators And Other Relevant Non-Parties.</u>**

8.      Angus McQueen ("Angus") served as Ackerman's chief executive officer until his

death in July 2019.  Until the NRA-AMc relationship deteriorated in 2018, Angus served as one

of the NRA's most trusted strategic and creative advisors.  Angus played a prominent role in

AMc's course of dealing with the NRA, such that important or sensitive messages were often

relayed privately by Angus to LaPierre or Phillips on behalf of AMc.

9.      Revan McQueen ("Revan") succeeded his father, Angus, as CEO of Ackerman.

Revan participated in numerous important meetings and communications, including the 2019

Budget Meeting.[15]

10.      Dan Boren ("Boren") is a former member of the NRA Board of Directors and was

an executive of AMc's largest surviving client, the Chickasaw Nation. Boren entered into an

agreement, combination, and/or conspiracy with Defendants for the purpose of relaying an

extortion threat to NRA leadership in April 2019, that sought to coerce the NRA to drop its record-

---

[14] *See Melanie Montgomery Bio*, Ackerman McQueen, Inc.'s former website, (formerly available at: https://www.am.com/our-team/?id=melanie-montgomery). After the NRA filed its Original Complaint against Defendants, and sometime in Fall 2019, the Ackerman website was heavily modified to remove certain information, including Montgomery's bio. A screenshot of the former website, dated July 16, 2019, is available via the Wayback Machine Internet Archive, at: https://web.archive.org/web/20190716083032if_/https://www.am.com/our-team/?id=melanie-montgomery (last visited: Feb. 11, 2021).

[15] *See* discussion *infra* at ¶ 89.

inspection lawsuit against AMc—and, thus, ensure evidence of the agency's fraud would remain suppressed. Because Boren held a leadership position with a non-NRA client of AMc, he was well-positioned to know about AMc's fraudulent practice of billing the NRA for employee time dedicated to other clients, including Boren's former employer. Despite his fiduciary duty to the NRA, Boren joined AMc's conspiracy to oust LaPierre, deter the NRA's transparency efforts, and thereby conceal AMc's grift.

11. Tony Makris ("Makris") is the President of Mercury and an individual residing in South Carolina. Makris was part of a cadre of AMc leadership who advised the NRA on crisis communications and strategic matters. By 2018, Makris' services were billed by AMc to the NRA at an annual rate of $1,241,500. In consideration for this sum, the NRA believed that it was receiving services from a faithful agent and fiduciary. But unbeknownst to the NRA, Makris, with the knowledge and support of Defendants and non-party co-conspirators Angus, Revan, and Tavangar, charged lavish lifestyle expenses to the Association—including private jet travel during the holidays, personal purchases of wine, liquor, and cigars, and large cash withdrawals.

12. Nader Tavangar ("Tavangar") is an employee of Mercury and an individual residing in Oklahoma. By 2018, the NRA paid AMc $448,850 annually for Tavangar's time; in consideration for this sum, the NRA understood that it was receiving services from a faithful agent and fiduciary. It was not. Like Makris, Tavangar participated directly in incurring, and concealing, travel, entertainment, and other luxury expenditures that the NRA never approved, and which were not encompassed within AMc's contract.

13. Jesse Greenberg ("Greenberg") is a former employee of AMc who resides in Dallas County, Texas. During the relevant time period, Greenberg served as Ackerman's Chief Strategy Officer. Greenberg participated in the conduct which forms the basis of this suit, including, but

10

not limited to, his participation and work in connection with the NRATV website and digital

platform.

14.     Lt. Col. Oliver North (Ret.) ("North") is an individual who resides in South

Carolina and/or the Commonwealth of Virginia. Until recently, North was a full-time employee

of Ackerman. Even as he assumed the presidency of the NRA in 2018, North conspired with

Ackerman to conceal details of his contractual relationship with the agency, including (i) a

supervening duty of loyalty that required him to place Ackerman's interests ahead of those of the

NRA; and (ii) details of the full economic burden borne by the NRA by reason of his employment.

As the NRA confronted AMc's misconduct and pressed for transparency in late 2018 and early

2019, North sided with the agency and eventually helped to deliver its extortion threat to LaPierre.

15.     Wilson H. "Woody" Phillips ("Phillips") ex officio director, Treasurer, and Chief

Financial Officer of the NRA between 1993 and 2018. He is a resident of the State of Texas.

Defendants intentionally concealed certain expenses and activities from NRA accounting staff, by

directing documentation solely to Phillips.

### III.

### JURISDICTION AND VENUE

16.     The Court has original subject matter jurisdiction over this action pursuant to 28

U.S.C. §§ 1331 and 1338, because this is a civil action involving claims arising under the laws of

the United States.

17.     The Court has supplemental jurisdiction over the state law claims in this action

pursuant to 28 U.S.C. § 1367, because the state law claims are sufficiently related to the other

claims in the action subject to original jurisdiction that they form part of the same case or

controversy under Article III of the United States Constitution.

11

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.  As stated above, during the relevant time period, NRA senior officers and employees would regularly travel to this District to hold meetings with Defendants.  These meetings are relevant to claims asserted herein and concerned Defendants billing practices and NRATV.  Defendant AMc has also admitted that it maintains a principal office in Dallas, Texas, out of which the NRA's account was serviced.[16] Three Individual Defendants worked out of that office, which also doubles as a corporate office for Defendant Mercury.

### IV.

### FACTUAL BACKGROUND

**A.     For Decades, The NRA Relied On Ackerman To Perform A Suite of Services Requiring A High Level of Trust.**

19.     The NRA and AMc worked closely together for more than 30 years. In 2017 alone, the NRA paid more than $38 million to AMc and Mercury. Over that decades-long relationship, the NRA reposed extensive trust and confidence in AMc to perform a wide range of services, including: public relations and strategic marketing; planning and placement of media; management of digital media and websites; crisis advice, and the management of NRATV, a digital-media platform frequently perceived by the public as the "voice" of the NRA.[17]  By its nature, this work was sensitive and required the NRA to entrust AMc with confidential, and on occasion, privileged information, as AMc facilitated legal advice from NRA counsel.

---

[16] ECF No. 12 at p. 4 (Answer to ¶ 7).

[17] *See, e.g.*, Jeremy W. Peters & Katie Benner, *Where the N.R.A. Speaks First and Loudest*, THE NEW YORK TIMES (Feb. 21, 2018), https://www.nytimes.com/2018/02/21/us/politics/nratv-nra-news-media-operation.html.

20.     AMc's work on behalf of the NRA was governed by successive incarnations of a Services Agreement containing detailed specifications for how various types of work performed by Ackerman should be budgeted and billed. Each Services Agreement provided that certain categories of services, such as Owned Media and Internet Services, would be compensated with an agreed annual fee, while other services were required to be invoiced on an ad hoc basis based on bona fide estimates furnished by AMc and approved in advance by the NRA.  For categories of work billed pursuant to annual budgets, AMc's budget was built upon the workforce  that was required to accomplish this NRA work. Budget figures reflected the sums of the salaries of employees who worked for the NRA on the designated project categories (such employees, "NRA-Dedicated Employees").

21.     Accordingly, AMc invoiced the NRA monthly basis for a wide variety of work and expenses.  Consistent with the substantial scope and dollar value of the services rendered by AMc for the NRA, the Services Agreement contained detailed guidelines identifying categories of expenses that could be invoiced to the NRA, and conditions for their reimbursement.  For example, out of town travel expenses were supposed to be authorized in writing, in advance, by the NRA. Over the parties' decades-long course of dealing, underlying receipts and other support for AMc's expenses were not transmitted to the NRA alongside AMc's invoices but, rather, were supposedly maintained at AMc's offices.  This practice was followed at AMc's suggestion, in order to ensure that AMc's work pertaining to matters such as strategic planning, and legal items remained confidential.

22.     Of course, AMc executives, including Angus, Revan, Montgomery, Makris, and Tavangar, *repeatedly* assured the NRA that appropriate documentation for all of AMc's expenses was retained by AMc and could be audited anytime at the NRA's request. Indeed, AMc insisted

not only that its recordkeeping was secure and accurate, but that AMc was the ***most*** secure repository for travel itineraries, donor-identifying materials, and other documents raising potential security issues. It is now known that these representations were false when made, with a specific intent to induce the NRA to increase its reliance on AMc. In truth, for much of Phillips' tenure, ***no one*** kept or maintained reasonable documentation that would justify or support the accuracy of numerous expenditures invoiced to the NRA by AMc.

23. Consistent with the sensitive nature of AMc's services, the Services Agreement strictly limited (and its surviving provisions strictly limit)[18] use and disclosure, by AMc and its individual employees (who were themselves fiduciaries of the NRA), of information acquired during AMc's work on behalf of the NRA. Specifically, Section IV of the Services Agreement provides that AMc "shall not disclose, directly or indirectly, to any third party, any . . . data, materials or information ... made known to AMc as a result of AMc's providing [contracted-for services] . . . without the prior express written permission of [the] NRA."[19] AMc could use the NRA's confidential information "only for the limited purpose of providing its [s]ervices to the NRA."[20] AMc and its individual "employees and agents" were obliged to comply with these confidentiality provisions;[21] relatedly, AMc "warrant[ed] and agree[d] to prevent disclosure of Confidential Information by its employees, agents, successors, assigns and subcontractors."[22]

---

[18] AMc's confidentiality obligations survive termination of the 2017 version of the Services Agreement. *See* Services Agreement § X.E.

[19] *Id.* at § IV.A.I.

[20] *Id.* at § IV.A.3.

[21] *Id.* at § IV.B.

[22] *Id.* at § IV.A.4.

24. Notably, AMc served as the NRA's agent for several purposes pursuant to the Services Agreement and as a consequence of the trust and confidence placed in AMc by the Association. Therefore, AMc owed fiduciary duties to the NRA. For example, the Services Agreement provides for AMc to act "on [the] NRA's behalf," and subject to the NRA's control, with respect to purchasing, planning, and placement of media[23]—activities that required the NRA to entrust AMc with nonpublic information about its communication strategy. Consistent with the parties' agency relationship, the NRA also had the right to oversee the means and details of AMc's work. For example, the Services Agreement contemplated that AMc would provide the NRA with preliminary "storyboard" or "demo" versions[24] of its creative work product so that the NRA could inspect its progress, prescribe interim instructions, suggestions, or alterations,[25] or determine that proposed projects be shelved entirely. The NRA worked iteratively with AMc to closely oversee, and provide feedback on, drafts of speeches and similar strategic communications prepared by AMc.[26] The Services Agreement gave the NRA the power to control the use and disclosure of NRA-related information entrusted to AMc,[27] as well as NRA-related creative product developed by AMc.[28] Moreover, as part of the annual budget process, AMc made detailed representations to the NRA about the identities of staff who would devote their time to its projects and the amount

---

[23] *Id.* at §§ I.C, II.B.

[24] *See, e.g., id.* at § II.B.3 (providing for materials to be submitted at the "storyboard [or] demo" stage, and expressly contemplating that the NRA could make changes to job specifications, with prices adjusted accordingly).

[25] *See, id.*

[26] Such services were frequently encompassed within Services Agreement § I.A, which contemplated that AMc would coordinate continuously with internal NRA public relations staff, the NRA Executive Office, and the NRA Institute for Legislative Action, and would perform research and similar tasks "at [the] NRA's request and approval." *See id.* § I.A.

[27] *See id.* § IV.

[28] *See* id. § VI.

of time each person would spend; the NRA had the right to modify or veto such proposals and thereby control who worked on its account, and how much time would be devoted to various aspects of the work.[29]   In its capacity as the NRA's agent, AMc was required to demonstrate "the same high standard of good faith and loyalty" to the NRA as would be "required ... of an attorney to his client."  Indeed, owing to the parties' decades of close collaboration, their relationship of trust and confidence existed prior to, and apart from, the execution of the Services Agreement. AMc's common-law duties of loyalty were further codified and buttressed by contractual confidentiality provisions.

25.      In addition, the individual Defendants served as agents with fiduciary duties to the NRA by virtue of AMc appointing them to the NRA's account.  Each of the Individual Defendants interacted often with NRA officials and, given their senior leadership roles in AMc and the importance of the NRA account, were expected and understood to be familiar with the terms and conditions of the Services Agreement.

26.      Given its responsibilities, AMc took an active role in shaping the public image of the NRA's principals and executives, including LaPierre.  Based on AMc's advice, and subject to billing procedures AMc established, LaPierre, over a fifteen-year period, incurred wardrobe and related expenses for countless television appearances, filming of commercials, and other outward-facing brand development activities.  Although the NRA had the right to direct and oversee AMc's activities under the Services Agreement, over their decades-long collaboration, the NRA vested significant trust in AMc regarding communication, branding, political, regulatory, and reputational strategies, and afforded the agency deference and discretion regarding each of these activities.  As

---

[29] Notwithstanding the NRA's broad rights to oversee AMc's work, the NRA would later learn that AMc had subverted its control by making false representations and contriving false documents, including fraudulent staffing and budget proposals.  *See* discussion *infra* at ¶¶ 88-92.

such, expenses in these categories were often initiated at AMc's direction and records relating

thereto were maintained by AMc. Of course, AMc should not have incurred (let alone sought

reimbursement for) any expenses which it believed inappropriate.

**B.      Branded News—The Growth of NRATV.**

27.      During the late 1990s, AMc decided to alter its business from that of a traditional

ad agency to a creator and broadcaster of original media content.  AMc saw the growth of digital

media and networks as an opportunity for large entities to craft and advance their own brand

messaging through television production.  It believed that the content-production business was

lucrative, and cutting-edge, but did not accurately assess whether its clients would actually benefit

from such services.  Thus, AMc determined to hawk "television-style production" at a profit to its

clients— which could pay for it.

28.      AMc touted its new business digital media philosophy as follows:

> **EVERY BUSINESS AND INDIVIDUAL HAS THE ABILITY
> TO BECOME A MEDIA COMPANY**
>
> If you have an audience that cares about what you have to say, you
> can create and distribute content with complete autonomy.  No one
> else should capture or distribute those stories better than you.  **And
> in this era of communication, it has never been more affordable
> or efficient for you to begin**.

29.      Of course, fundamental to AMc's optimism about its "new" direction was its belief

that it could convince its largest client, the NRA, to buy into the concept.  Thus, in the early 2000s,

AMc set out to induce the NRA to provide the funds for the infrastructure needed to create its own

branded news platform.  Plying the NRA with glowing prognostications about the lucrative

benefits of "owned media," AMc persuaded the NRA to launch its initial digital-video platform

known as "NRA News" in 2004.  The NRA had long relied on AMc to place advertising via

traditional media, including conventional television channels.  However, AMc came to view each

dollar of NRA funding remitted to a real media outlet as a lost opportunity—a dollar that could be "invested" in building studios and other assets from which AMc could profit. NRA News was the beginning of AMc's effort to redirect these funds by exploiting the NRA's trust in order to enrich itself.

30. The annual budget for NRA News substantially climbed, from less than $2 million in 2004 to nearly $5 million by 2014. During that period, there was some evidence that NRA News was attracting the viewership AMc promised: even late at night, live programs with call-in components "reportedly" received promising call volume. AMc generated glossy, confidential PowerPoint presentations—which it would display for the NRA executives such as LaPierre at meeting—that claimed that NRA News attracted tens of millions of valuable views.

31. Based on the claimed success of NRA News, the NRA agreed to experiment with an expanded version of the platform. Beginning in 2016, Angus began lobbying LaPierre with ecstatic projections about the benefits of expanded programming on an NRA-branded digital livestream platform. Seeking to induce the NRA to substantially increase its investment in the media segment, Angus extolled the rise of digital media and successfully persuaded LaPierre that developing an enhanced digital platform was simply "part of being a 21st century company." Importantly, Angus urged that the NRA would lose viewers if it "let the status quo continue" without developing its own livestreaming infrastructure.

32. Not only did AMc promise the NRA that NRATV would be economically viable— Angus forecasted profits that would cure or offset "the entire economic under-performance" of other NRA efforts. Angus diagnosed a "need[] to find new ways to make money," and assured LaPierre and others that the proposed digital platform presented "a good opportunity to generate revenue." Indeed, Angus and the other Defendants assured the NRA that a substantial investment

in NRATV would "pay for itself" in short order, via a combination of "soft" and "hard" monetization, including paid commercial sponsorships for the live programs. In fact, AMc assured the NRA, purportedly based on experience with other clients that had undertaken similar projects, that NRATV would "pay for itself" within three years or less. In reliance on these representations, the NRA agreed to fund and launch NRATV. The platform debuted in 2016.

33.     Although the creative content generated for NRATV constituted work for hire for intellectual property purposes (and was owned by the NRA), NRATV's talent was hired and supervised, and its programming scripted, by AMc.[30] From the outset, NRATV was expensive, costing approximately $12 million in its first full year. But, AMc claimed that the largest subset of this expense, which pertained to live programming, was "the key" to the success of the platform. Having served the NRA for decades, AMc knew what its client desired in the digital media space: (1) outreach to new potential members (especially of a younger generational cohort), (2) a self-sustaining platform, and (3) a vehicle to advance its mission and Second Amendment advocacy. AMc committed that NRATV would be built and managed to serve these purposes.

34.     However, within NRATV's first year, AMc falsely reported that the platform generated millions of "engagements" and views. Noting the NRA's keen interest in the platform's viewership and sponsorship figures, AMc promised to engage a consulting firm, Performance Improvement Partners ("PIP"), to provide "data analytics and insights" to track NRATV's performance. In the interim, AMc purported to update the NRA regularly on NRATV's metrics.

---

[30] AMc's secretive management of many aspects of NRATV contravened its obligations to its principal of full and fair disclosure of material information,. As one NRATV employee, Grant Stinchfield, noticed. When Stinchfield grew concerned about whether the NRA was being kept fully informed, he was "told by Angus McQueen, 'the NRA is not your boss—I am.'" *See* Stinchfield Affidavit, at ¶ 6. Of course, this was false: the NRA was AMc's client and principal and the ultimate "boss." It is now clear that the NRA's attempts at oversight were deceptively deflected and subverted by AMc, including through AMc's provision of misleading digital metrics.

During meetings held on the following dates, and at the following locations, AMc staff—generally

consisting of Angus McQueen, Nader Tavangar, Peter Farrel, Revan McQueen, Defendant

Montgomery, and other AMc employees—delivered PowerPoint presentations boasting that

NRATV consistently generated millions of views, including "completed" and "engaged" views:

**Table 1.1**

| Meeting Date | Meeting Location |
|---|---|
| October 24, 2017 | Teleconference/Polycom |
| November 28, 2017 | Mercury Group Offices |
| January 3, 2018 | Ackerman Offices (Dallas, Texas) |
| February 1, 2018 | Las Vegas, Nevada |
| February 19, 2018 | Ackerman Offices (Dallas, Texas) |
| April 11, 2018 | Ackerman Offices (Dallas, Texas) |
| September 4, 2018 | Teleconference/Polycom |
| October 11, 2018 | Ackerman Offices (Dallas, Texas) |
| October 23, 2018 | Teleconference/Polycom |
| October 30, 2018 | Ackerman Offices (Dallas, Texas) |
| November 28, 2018 | Teleconference/Polycom |
| December 5, 2018 | Teleconference/Polycom |
| January 18, 2019 | Ackerman Offices (Dallas, Texas) |

35. In these closed-door meetings (which Ackerman insisted upon, ostensibly for

reasons of "confidentiality"),[31] with LaPierre and sometimes others from the NRA leadership in

attendance, Defendant Montgomery and others made purposely inflated sponsorship and

viewership claims now known to be false in order to induce the NRA to continue investing millions

upon millions in NRATV and, by extension, AMc. In each of the 13 meetings listed in the above

chart, Defendants led the NRA to believe that NRATV's viewership numbered in the millions and

that Defendants were generating many millions of dollars in value for the NRA. During one such

---

[31] This was despite the fact that the NRA owned the NRATV platform and associated data.

meeting, Defendants insisted that NRATV's viewership was so broad that its economic value exceeded that of primetime cable shows such as Anderson Cooper 360˚ on CNN. Defendants made these misrepresentations as part of a carefully coordinated scheme to deceive the NRA's leadership into continuing to invest in NRATV.

36. Critically, AMc representatives—consisting of Angus McQueen, Revan McQueen, Nader Tavangar, Defendant Montgomery, Tony Makris, and others—concealed that *from the dawn of NRA News, the figures AMc presented were fraudulently inflated and distorted.* The NRA now believes that a substantial portion of the call volume generated by infomercial-style segments on NRA News was staged, or faked, by AMc—*i.e.*, real calls were received, but the calls came from AMc employees, contractors, or associates who were recruited to bolster response rates. Similarly, as AMc trumpeted the total views and engagements generated by its web content, it consistently omitted a core metric prized by digital media experts: the number of *unique* visitors. Touting total views, but concealing the comparatively small number of unique views, permitted AMc to orchestrate automated or repetitive web traffic while misleading the NRA about NRATV's true reach.

37. Importantly, AMc representatives—consisting of Angus McQueen, Revan McQueen, Nader Tavangar, Defendant Montgomery, Tony Makris, and others—who worked in concert with them, had reason to know that even the most conservative projections shared for NRATV were fanciful. By 2016, when NRATV debuted, another AMc client had already agreed to experiment with the "owned media" concept—and it was an unmitigated failure. The American Clean Skies Foundation ("ACSF"), an energy-industry advocacy group, hired Ackerman beginning in roughly 2008, and was promptly sold a bill of goods similar to the one pitched by AMc to the NRA, including an "owned media" digital-video channel. ACSF's ensuing experience

with Ackerman, and the resulting "Clean Skies TV" product, was so disastrous that ACSF's former

general counsel contacted the NRA and offered assistance with this lawsuit, noting: "I'm pleased

to see AM get called on their practices finally." After ACSF's reasonable requests for information

about Clean Skies TV's budgets and operations went unanswered, ACSF fired Ackerman in 2009.

Even as it made elaborate representations to the NRA that digital-video "owned media" was the

future of public relations, and that steep costs associated with NRATV would easily be recouped,

AMc intentionally concealed the failure of Clean Skies TV.

38. During January 2017, the NRA hired a digital analytics expert, previously

employed by a major Silicon Valley technology company, to bolster its in-house expertise in online

outreach. Immediately, the employee surfaced a number of questions and concerns regarding the

nature of AMc's services (including NRATV), the actual value being generated, and the

corresponding amounts charged. The employee voiced these questions during a meeting with

Revan McQueen, and other AMc employees, on February 7, 2017. (Hours after the meeting,

frustrated and flummoxed by Revan's obvious evasions, the employee lamented that the vendor

was going down "rabbit holes" and recounted AMc's untenable claim that YouTube performance

was "not measurable.") Rather than answer its client's questions, AMc's senior executives—

including Angus, Makris, and Defendant Montgomery—telephoned senior executives at the NRA

(including Woody Phillips) to report a purported personality conflict with the new staffer—then

forbade the staffer from attending future meetings with AMc or engaging, in any way, with its

work. Due to the scope and breadth of services rendered by AMc for the NRA, the vendor's refusal

to engage with a staff member was highly disruptive. The NRA tried to find other projects for its

new hire, and obliviously continued to pay for NRATV.

39.     Although AMc successfully concealed NRATV's underperformance from NRA executives, AMc's own employees noticed something was amiss.  In December 2019, Grant Stinchfield ("Stinchfield"), an Emmy award-winning investigative journalist who had worked for NRATV, set forth written testimony in the form of an affidavit in this litigation that recounted NRATV's poor viewership and his frustrations about AMc's opaque and non-existent disclosures to the NRA.  Among other things, Stinchfield recalled that he had specifically raised concerns about the limited digital "reach" being achieved by the NRA per dollar spent, pointing out that YouTube videos would have been more cost-effective.  AMc executives harshly dismissed Stinchfield's concerns.[32]

40.     Illustrating the sad idiom that no good deed goes unpunished, Stinchfield became the latest casualty of AMc's pattern of retaliation and concealment of evidence.  Days after Stinchfield executed his affidavit, AMc contrived to sue him, in a separate proceeding in this District, for libel and business disparagement in a transparent attempt to retaliate against Stinchfield for his truthful testimony.  Tellingly, AMc did not avail itself of any of the customary remedies afforded to litigants who confront purportedly-false testimony, such as impeachment or sanctions—because AMc knows that Stinchfield's testimony is true.  Instead, the commencement of a distinct lawsuit is a device to intimidate other employees who may come forward.  AMc has similarly blocked the NRA's lawful efforts to obtain information from other former-NRATV employees, such as Ms. Tamara (Tammy) Payne.[33]

---

[32] *See* Stinchfield Aff. ¶¶ 6-7; *see also Ackerman McQueen, Inc., v. Grant Stinchfield*, Case No. 3:19-cv-03016-X (N.D. Tex.).

[33] Indeed, Defendants moved to quash the NRA's subpoena to Ms. Payne. *See Ackerman McQueen, Inc., et al., v. National Rifle Association of America, et al.*, Misc. Case No. 5:20-mc-00009-PRW (W.D. Ok.), ECF No. 1. Although the motion is fully briefed and awaiting resolution, the miscellaneous matter was automatically stayed upon the NRA's filing of a petition for bankruptcy under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, on January 15, 2021. *See id.,* ECF No. 11.

41.     Of course, viewership is the *raison d'etre* of digital advertising and content

creation. By creating attention-catching content, digital creators and their marketing firms aim to

develop a base of loyal viewers who will eventually support the organizations who create it.  This,

in turn, attracts advertisers and sponsors for the programming or other digital content, which pay

based on the number of *unique* "eyeballs" or "click-throughs" provided by the content.  As digital

marketing has become increasingly important for businesses and non-profits alike, an entire

industry has arisen which collects, aggregates, analyzes, and presents viewership data.  That data—

which can be so granular as to identify *distinct individual viewers* of digital media—can provide

valuable insight to organizations seeking to develop their brand and win the loyalty of the viewing

public.  However, due to content creators' heavy reliance on these digital metrics, inaccuracies can

be consequential and damning. [34]

42.     Over the course of more than thirteen meetings and countless emails, Defendants

and the non-party co-conspirators (excluding Boren) systematically misrepresented and overstated

the viewership and financial performance of NRATV. In response to the consistent inquiries of

NRA leadership generally, and LaPierre specifically, Defendants fabricated or massaged data in

an intentionally misleading fashion to falsely suggest a robust, growing viewership for NRATV

while simultaneously omitting unflattering financial performance in certain periods. Defendants

found it inconvenient to explain that NRATV corporate sponsorship was not rapidly growing –

rather, it was rapidly declining. Despite strong ties to the NRA and an initial openness to work

with  NRATV,  for  profit  corporations  found  it  untenable  to  continue  funding  unprofitable

---

[34] For example, Facebook recently paid $40 million to settle a lawsuit by advertisers who alleged that it
inflated view counts for certain videos—pleading that they relied extensively and detrimentally on Facebook's false
figures.  David Paul Morris, *Facebook to Pay $40 Million to Settle Advertiser Lawsuit Over Inflated Video Views*,
TIME (Oct. 8, 2019), http://time.com/5694910/facebook-settle-advertiser-lawsuit-videos/.

advertising investments. In reality, AMc knew—based on underlying, unvarnished, fulsome metrics that it intentionally withheld from the NRA and on the bleak financial outlook it did not discuss—that NRATV was an abject failure.

43.    Defendants and the non-party co-conspirators (excluding Boren) contrived, cherry-picked figures misrepresented NRATV's viewership data in at least two respects.

44.    ***First***, the figures presented by Defendants and the non-party co-conspirators fraudulently misrepresented or omitted the number of distinct viewers of NRATV content.  It is fundamental that the nominal quantity of "clicks," or "views," achieved by particular digital content is of minimal informative value, because, *inter alia*, each "click" or "view" does not necessarily represent a unique user.  For example, a user's web browser might automatically refresh a video or a page at routine intervals, simulating hundreds or thousands of views; less egregiously, a single user might intentionally click on a piece of content multiple times—which is favorable, but not as valuable as clicks from several separate viewers.   Accordingly, responsible media companies disaggregate their total click figures and discern, using data provided by Google and other analytics services, the total number of distinct users.  AMc declined to abide by such industry standards practices, despite the fact that it conceded in September 2019 that it possessed "access" to Google Analytics, as well as other more granular data analytics sources.  Instead of providing an accurate account of the number of distinct users—a number which Defendants and the non-party co-conspirators knew would raise the alarm that NRATV was failing—AMc provided only aggregate data, thereby creating the false impression that NRATV had substantially more unique viewers than it actually did.  That false representation was intended to induce the NRA to continue its investment in NRATV and, by extension, AMc, and to obscure and mask the agency's true performance with its costly platform.

45.    **Second**, the figures presented by Defendants and the non-party co-conspirators fraudulently inflated NRATV's viewership figures by failing to rigorously differentiate between genuine views and merely incidental ones.  Genuine views represent instances in which a user encounters content and then volitionally interacts with it in some way—rather than immediately navigating elsewhere.  Merely incidental views, by contrast, are "views" which occur only because an individual user happens to scroll past NRATV content on a webpage.  The importance of this distinction is obvious. While genuine viewers represent people who actually watch NRATV content and thus are exposed to the NRA's messaging, merely incidental views do not.  Although Defendants and the non-party co-conspirators occasionally purported to distinguish total views from "engaged" views, its calculations overrepresented the number of "engaged" views.

46.    The presentation made by senior corporate executives of Defendants and the non-party co-conspirators to the NRA leadership on October 30, 2018 (one of the meetings identified in Table 1.1) is illustrative of the agency's efforts to hoodwink the NRA through distorted, fraudulent statistics and misleading generalizations about the platform's performance.  As in previous meetings, AMc produced a glossy PowerPoint presentation (the "October 2018 Presentation") which purported to present "all things NRATV," including comprehensive "analytics" when it did nothing of the sort.  Rather than candidly discuss NRATV's disastrous performance (known internally to Defendants), AMc falsely touted its success with outrageous representations that the total viewership of NRATV during the year received over *two-hundred million views*, equivalent in size to two-thirds of the United States population.  This representation, like the many others made during the course of AMc's meetings with NRA executives regarding NRATV, was fraudulent and false—and AMc knew it.

26

47.    Apparently not content to hide from the NRA the platform's actual viewership figures, Defendants also concocted a series of "valuations" which had no basis in reality. For example, in Q3 2018, representatives from the NRA and AMc, including Revan, Montgomery, Martin, Tavangar, and Greenberg, held a meeting to discuss the valuation of NRATV.  Defendants touted a proprietary "AM Conservative Approach" formula, which it insisted provided a conservative estimate of the Earned Media Value (EMV) generated by NRATV in excess of $13 million.[35]  Adopting a separate, less-conservative formula, Defendants represented that NRATV should actually be valued at over $45 million. Rather than stating valuations were based on highly subjective assumptions, Defendants intentionally deceived the NRA into believing that its substantial investment in NRATV was generating outstanding returns when, in fact, the primary beneficiaries of the initiative were the Defendants.  Each of Revan, Montgomery, Martin, Tavangar, and Greenberg was present at the meeting, and either affirmatively made the foregoing misstatements or knowingly allowed the misstatements to be conveyed without correcting them. Each of Montgomery, Martin, and Greenberg profited from AMc's overbilling, duplicative billing, and fraudulent billing of the NRA and intended for such conduct to continue.

48.    Further illustrating AMc's slipshod and dishonest approach to valuation, in the meetings held in October, and in correspondence dated May 13, 2019, Defendant Montgomery made representations that purported to calculate the value of the NRA's digital media presence. Using a formula based solely on the "cost to get . . . published"—that is, the cost to AMc— Montgomery presented a valuation based, not on the value the NRA received, but on putative costs incurred by AMc.  In doing so, Montgomery effectively represented on behalf of Defendants that,

---

[35] Contrary to industry-standard practices, AMc also contrived "earned media" valuations that failed to distinguish between favorable and unfavorable coverage.

in paying AMc to conduct digital media operations, the NRA was receiving substantial value on its investment.  That representation was not based upon any reliable measure of the benefit the NRA received due to its digital media presence; the sole measure of the "value" used by AMc was its own profitability.

## C.     <u>Troubled Waters: The Demise of NRATV.</u>

49.     By 2017, the annual budget for NRATV grew to $14 million annually—a number that was viewed by NRA leadership—especially LaPierre—as unsustainable without tangible proof that the platform would soon monetize itself.  Therefore, in 2017, the NRA began to further press AMc for actual, reliable proof that the platform was reaching its projected objectives or deliverables—membership growth, actual unique viewership information, and/or signs that others (*e.g.,* advertisers or sponsors) would invest in the platform.

50.     At the same time, the leadership of the NRA—especially LaPierre—began to question whether the messaging associated with NRATV's live programming actually benefitted the Association's mission.  As NRATV often became viewed as a dystopian cultural rant that deterred membership growth and created reputational risk for the NRA, NRA leadership requested greater directional control and coordination over the content of NRATV programming.

51.     As these factors coalesced, the ownership at AMc (especially Angus and Revan McQueen)—fearing the loss of its most important income-producing activity—became increasingly secretive, hostile, and determined to protect its financial relationship with the NRA at all costs.

52.     In what has turned out to be an unfortunate "public reveal" of AMc, it is now known that NRATV was, by the beginning of 2018, a reflection of what AMc itself had become—an economic burden to the NRA.  Irrespective of whether, or how valuably, AMc's work served the

NRA, the agency's leadership seemingly felt entitled to an unfettered flow of tens of millions of dollars from its largest client and would preserve its grift by any means necessary.

53.     As the trial in this matter will reveal, the NRA was victimized by its most trusted vendor, agent and fiduciary.  And in many ways, the unravelling of NRATV provides useful insight into the demise of AMc.

54.     On. May 13, 2019, AMc finally responded in writing to the latest of numerous requests by the NRA for unique live viewership figures for NRATV.  Incredibly, AMc's response still did not disclose unique viewers for NRATV platforms.  Instead, an accompanying letter from Defendant Montgomery disclaimed years of assurances regarding the monetization potential of NRATV.   In the most direct response offered by AMc to date regarding the NRA's requests for unique-viewer data, Montgomery simply stated: "[L]ive production is in place for several reasons, *not one of which was to accumulate massive live viewership numbers*."  Of course, this is nonsense: since 2016, AMc touted NRATV's purported viewership numbers as a primary driver of its claimed valuation.  AMc knew that there was no logical reason for the NRA to invest in NRATV, other than to gain and sustain viewership; without significant numbers of viewers, NRATV could not possibly advance membership or sponsorship goals.  But all of the goals and promises associated with NRATV proved illusory—a hoax.

55.     Ultimately, facing a "wind-down" of its services and cessation of payments from the NRA, AMc finally admitted that the NRA "*could conceivably stop the live stream component of NRATV without significantly affecting the network's viewership performance*[.]" In other words, the most expensive component of NRATV (and thus the most profitable for AMc) was generating *de minimis* viewership and, therefore, *de minimis* value for the NRA.

56.     During 2019, *The New York Times* commissioned and published an independent assessment of NRATV's unique viewership figures.  That assessment determined that NRATV's "web traffic was miniscule, with 49,000 unique visitors in January [2019]"[36]—compared to the millions of visitors claimed by AMc.  Stunningly, even these paltry numbers may have been overstated.  When the Association shut down NRATV in June 2019, not a single purported viewer or sponsor complained or inquired about the channel's demise.

D.     **The NRA's Transparency Efforts and Ackerman's Response.**

57.     In recent years, the State of New York amended its Not-for-Profit Corporation Law (the "NPCL") to clarify requirements for director independence and the ratification of related-party contracts, among other items. After updating its internal policies and controls to reflect these amendments, the NRA undertook to strengthen its procedures for documentation and verification of compliance by vendors with their contracts.  The NRA also had reason to expect that even minimal weaknesses in its compliance processes, if they existed, would be detrimentally exploited: it received a warning, from a highly placed source, that New York regulators planned to investigate or prosecute the NRA in order to weaken it in advance of the 2020 election.  Acting on these concerns and in furtherance of its strategy in ongoing litigation, the NRA began to seek increased invoice detail and documentation from vendors, including AMc.  In August 2018, the NRA sent letters to more than a hundred vendors—including AMc—that set forth updated invoice-support requirements and provided detailed guidance regarding, for example, expense reimbursement procedures.

---

[36] Danny Hakim, *N.R.A. Shuts Down Production of NRATV, and Its No. 2 Official Resigns*, THE NEW YORK TIMES (June 25, 2019), https://www.nytimes.com/2019/06/25/us/nra-nratv-ackerman-mcqueen.html.

58.     Simultaneously, as the NRA's now-former Treasurer and CFO prepared to retire and the NRA leadership ranks shifted, multiple employees began to voice recommendations regarding opportunities for improvement at the NRA.  Combined with the NRA's compliance efforts, numerous employees came forward with complaints about AMc.

59.     Specifically, the NRA was compelled to investigate multiple concerns about AMc:

- "Out-of-pocket" expenses that lacked meaningful documentation of NRA approvals, receipts, or other support, despite the requirements set forth in the Services Agreement;

- Immense growth in AMc's annual budgets, coupled with a lack of transparency regarding how the budgets were calculated or whether AMc adhered to them;

- Lack of transparency regarding AMc's compliance with its contractual obligation to ensure that certain services were provided at "fair market value";

- Concerns that AMc was invoicing the NRA for the entire salaries attributable to budgeted NRA-Dedicated Personnel, despite certain budgeted NRA-Dedicated Personnel allocating substantial time to *non*-NRA clients; and

- Refusal by AMc to provide data "in writing" (such as unique visitors, viewership numbers, clickthrough rates, or related performance metrics) that enable the NRA to analyze the return on its substantial investment since 2016 in NRATV.[37]

60.     Early cause for concern arose when the NRA's new CFO, who was slated to succeed Philips, attended an introductory meeting with AMc in Dallas in June 2018.  When the new CFO made basic inquiries about AMc's budget, AMc representatives evaded the questions and became extremely agitated. The next day, AMc demanded that the NRA's new CFO be fired. Of course, the NRA did not fire its recently hired CFO. When apprised of the incident shortly thereafter, LaPierre was puzzled, but presumed there had been a personality conflict.  Instead,

---

[37] In addition, certain NRA stakeholders were also concerned that NRATV's messaging—on topics far afield of the Second Amendment— deviated from the NRA's core mission and values.

AMc's audacious and bizarre attempt to repudiate and replace the NRA's CFO was a sign of things to come.

61.    Consistent with the broad scope and critical nature of the services performed by AMc for the NRA, the NRA bargained for transparency into AMc's files, books and records pursuant to the Services Agreement. Both the previous Services Agreement and the current iteration incorporate Records-Examination Clauses that require AMc to open its files for the NRA's inspection upon reasonable notice. The full text of the Records-Examination Clause in the Services Agreement appears below:

| **Services Agreement** |
| --- |
| <ul><li>Dated April 30, 2017 (as amended May 6, 2018)</li><li>Between the NRA and "AMc" (defined to include both Ackerman and Mercury)</li></ul> |
| **VIII.  EXAMINATION OF RECORDS**<br>During the term of this Services Agreement, AMc authorizes NRA, upon reasonable notice, to examine AMc and Mercury's files, books and records, with respect to matters covered under this Services Agreement. |

62.    During early- and mid-2018, the NRA sought information from AMc pursuant to the Records-Examination Clause on a common-interest basis to advance parties' mutual interests relating to an ongoing lawsuit. However, after the NRA began to request access to records that would shed light on concerns regarding AMc's business and accounting practices, AMc became evasive and even hostile.

63.    In August 2018, within days after the NRA announced that it would now require supporting documentation to be transmitted contemporaneously with vendor invoices, a media

Case 21-30085-hdh11 Doc 307-1 Filed 03/06/21 Entered 03/06/21 05:43:57 Page 34 of
107
Case 3:19-cv-02074-G-BK Document 201-1 Filed 02/11/21 Page 33 of 106 PageID 10345

outlet quoted "an anonymous source at Ackerman McQueen"[38]–creating serious concerns about

AMc's compliance with its confidentiality obligations.

64.     On or about August 22, 2018, Angus placed a telephone call to LaPierre to convey

a brutally candid, corrupt warning: LaPierre should not want AMc to comply with the NRA's

records requests, Angus intoned, because any documents the NRA was allowed to obtain could

then be subpoenaed by New York regulators.  Absurdly, Angus insisted that records residing

within AMc's own files would be impervious to a New York subpoena, since Ackerman was

headquartered in Oklahoma.  This telephone call coincided with a letter from Ackerman's outside

counsel, Stephen Ryan of McDermott Will & Emery, to the NRA's outside counsel, Bill Brewer,

delivered by hand on or about August 22, 2018.  Carefully, Ryan echoed the same message Angus

had relayed: he warned that that transmitting "excessive contractual documentation [] to the NRA

on a regular basis" could "create[] paper trails" which state tax authorities, Congress, or other

regulators would  be "all too happy " to subpoena.[39]  Ryan also reiterated assurances that the NRA

received from AMc for years, but would soon discover were false: namely, that AMc "maintain[ed]

complete files of all expenses incurred" in connection with NRA business, and that the nature of

expenditures incurred by AMc and processes for invoicing them were "totally consistent with"

federal and state laws, regulations, and practices.[40]

65.     Similarly, on August 27, 2018, Defendant Winkler sent a letter to the NRA which

purported to comply with the NRA's request for a more comprehensive audit of Ackerman's

---

[38] Dylan Matthews, *The National Rifle Association, America's most powerful lobby, claims it's in financial crisis. What?*, VOX (Aug. 3, 2018, 4:50pm), https://www.vox.com/2018/8/3/17648960/nra-national-rifle-association-companies-support-boycott-new-york-lawsuit.

[39] *See* Exhibit E, attached hereto.

[40] *See id.* at 2.

expense records. The letter pointedly identified several categories of items, some relating to travel and entertainment, which it warned would be encompassed in a full production of those records— perhaps believing that the threat of such disclosure would dampen the NRA's demands for transparency. Viewed in light of the documents and details that would later surface concerning AMc's fraud, Winkler's tacit warning to Phillips—that if AMc complied with the NRA's record-inspection requests, expenditures at Landini Brothers and elsewhere would be exposed— evidenced Winkler's knowledge that improper expenses were incurred and his attempt to enlist Phillips to help conceal them. Separately, the NRA was undeterred, and its leadership— especially LaPierre—insisted upon reviewing and verifying details of expenses incurred.

66.     In September 2018, for the first time in the parties' decades-long course of dealing, AMc demanded that its outside counsel supervise any document review conducted under the Records-Examination Clause, then demanded payment of outside counsel's legal fees as a precondition for delivery of video footage it produced and for which AMc had already invoiced the NRA. During a telephone call on September 19, 2018, after AMc's counsel insisted that the NRA pay AMc's legal fees without any insight into why the fees were incurred, the NRA's counsel observed that AMc's posture seemed more consistent with an adverse than a common-interest relationship. AMc's counsel then made a startling statement: "Ackerman views the relationship as adverse."

67.     During the same time, an NRA executive asked AMc for a copy of an audit purportedly conducted by PIP, one of the independent digital-analytics vendors purportedly retained by AMc, regarding the value of NRATV.  Departing sharply from prior conversations, the AMc executive cursorily informed the executive that no audit had been performed, and no copies of any documents would be provided.  Rather than audit AMc's reported viewership

metrics, the AMc executive explained that PIP had "worked with" AMc to create a purported

"dashboard" of digital analytics; AMc promised it would "go through all of that" during an

upcoming live meeting.

68.     Thereafter, AMc, through the individual Defendants and the non-party co-

conspirators (excluding Boren) strenuously resisted the NRA's efforts to enforce the Services

Agreement, including by embarking on a campaign to "kill the messenger" when the NRA

continued to seek access to documents or proposed reductions in AMc's budget.  At first, AMc

scapegoated the NRA's outside counsel—refusing to interface with counsel.  Then, over ensuing

months, AMc also refused to respond to basic information requests from NRA executives. After

the NRA retained a third-party forensic accounting firm to interface with AMc in an effort to

appease AMc and gain its compliance in January 2019, AMc indicated it would cooperate.

Unfortunately, that pledge of cooperation was short-lived, as AMc (especially Defendants and the

non-party co-conspirators (excluding Boren)) purported to forbid the accountants from disclosing

simple, material information to the NRA—including copies of annual budgets against which AMc

was invoicing that the NRA still seeks in discovery to this day. When the NRA's General Counsel

sought additional information in follow-up to the forensic audit, AMc ignored his letters.

69.     Instead, AMc continued to stonewall the NRA's requests for documents and

tensions between the parties rose.  As this occurred, the NRA was contacted with increasing

frequency by journalists acting on purported "leaks" relating to matters on which AMc had

worked.  The contents of these "leaks" reflected a malicious, out-of-context use of the NRA's

confidential information, with an apparent intent to inflict reputational damage on the NRA.

70.     To resolve its concerns regarding these disclosures, on May 6, 2019, the NRA

requested that several key AMc employees execute sworn declarations attesting that they had not

violated their confidentiality obligations under the Services Agreement. The NRA tailored its requests narrowly—seeking declarations only from senior executives who had exposure to the information at issue—and demanded simply that these executives affirm they had complied, and would continue to comply, with their clear legal duties. To the NRA's dismay, AMc flatly refused to provide any cooperation or assurances whatsoever.

**E.**     **Among the Records Unlawfully Withheld By AMc: A Major Related-Party Contract.**

71.     Non-party North is a veteran of the United States Marine Corps and the Reagan Administration. North is a member of the NRA Board of Directors. During May 2018, the NRA announced that North was slated to serve as its next President—a largely ceremonial but high-profile position famously occupied by Charlton Heston during the late 1990s. As North prepared to assume the presidency of the NRA, he separately discussed a potential engagement by AMc as the host of an NRATV documentary series. On May 6, 2018, the NRA and AMc amended the Services Agreement (such amendment, the "May 2018 Amendment") to affirm that any contract between AMc and North would be considered an AMc-Third Party NRA Contract, for which outstanding compensation would be owed by the NRA to AMc if the Services Agreement was terminated. Importantly, the amendment treated North as a third-party contractor—but not, necessarily, an employee—of AMc.

72.     North and AMc assured the NRA that North's profile and "brand" would be actively leveraged to elicit sponsorships for the documentary series. This was of material interest because during recent years, the NRA had spent substantial sums on NRATV based on AMc's advice and representations regarding achievable benefits of an owned-media platform. However, measured against any of the desired outcomes, the returns on the NRA's investment in NRATV were non-existent. Accordingly, if the North documentary series attracted sponsorships or sparked viewership and membership growth, then the costs associated with NRATV could be defrayed.

73.    New York law requires that the NRA Board of Directors, or an authorized committee thereof, review and approve "any transaction, agreement, or any other arrangement in which [a director or officer of the NRA] has a financial interest and in which the [NRA or an affiliate] is a participant."[41]  Guidance published by the New York Attorney General notes that a board of directors may define additional restrictions on transactions giving rise to potential conflicts of interest;[42] and, consistent with best practices, the NRA's Conflict of Interest Policy requires disclosure of contracts between NRA leadership and vendors, like AMc, that receive funds from the NRA.

74.    Aware that North entered into a contract with AMc (the "North Contract"), the NRA, with the cooperation and authority of the Audit Committee, diligently sought to comply with its obligations concerning analysis and approval of the North Contract.  During September 2018, the Audit Committee of the NRA Board of Directors (the "Audit Committee") reviewed a purported summary of the material terms of the North Contract and ratified the relationship pursuant to New York law—subject to carefully drawn provisos designed to avoid any conflicts of interest.

75.    At the time the Audit Committee ratified North's continued service as an NRA director and President given his relationship with AMc, it was assured that the NRA's counsel would review the North Contract in full.  But that turned out to be false, at least for the duration of 2018, as AMc continued to refuse to provide the North Contract pursuant to the Records-Examination Clause.  Meanwhile, North indicated via counsel that he could only disclose a copy

---

[41] *See* N.Y. N-PCL § 715.

[42] *Conflicts of Interest Policies Under the Not-for-Profit Corporation Law*, CHARITIES BUREAU, N.Y. STATE OFFICE OF THE ATTORNEY GENERAL (2018), https://www.charitiesnys.com/pdfs/Charities_Conflict_of_Interest.pdf, at 3.

of the contract to the NRA subject to AMc's consent. This back-and-forth persisted for nearly six months.

76. Eventually, in February 2019, AMc acceded to a brief, circumscribed, live review of the North Contract (but no retention of any copies) by the General Counsel of the NRA. This review raised concerns about whether the previous summary of the North Contract, which was provided to the Audit Committee, had been complete and accurate. Among other things, the NRA's brief, limited review of the North Contract—along with other information disclosed for the first time by North—gave rise to questions regarding: (i) whether North was a third-party contractor of AMc or, conversely, a full-time employee with fiduciary duties to AMc that superseded his duties to the NRA; (ii) whether the previously disclosed costs borne by the NRA in connection with the North Contract were complete and accurate; and (iii) whether the contract imposed obligations on North that prevent him from communicating fully and honestly with other NRA fiduciaries about AMc. Against this backdrop of escalating concerns about AMc's compliance with the Services Agreement and applicable law, the NRA became determined to resolve these issues.

77. By separate letters dated March 25 and 26, 2019, the NRA's General Counsel again sought visibility regarding the North Contract and related business arrangements, as well as copies of other material business records, pursuant to the Services Agreement. Specifically, the NRA requested:

- A chance to conduct a follow-up review of the North Contract (the NRA's General Counsel even volunteered to conduct the review at AMc's attorney's offices, for AMc's convenience);

- Information about total costs relating to AMc's engagement of North;

- Copies of any additional AMc-Third Party NRA Contracts currently in existence;

- Information about which AMc personnel purportedly constituted "NRA-Dedicated Personnel," such that their salaries or severance were alleged to be reimbursable by the NRA, and business records sufficient to show whether these personnel were in fact dedicated to NRA projects; and

- Copies of the annual budget documents provided to the NRA's forensic accountants.

78.     The NRA made clear that it sought the above information "in whatever form [wa]s most convenient" for AMc, and hoped to obtain access to ordinary-course business records as contemplated under the Records-Examination Clause.  Although AMc immediately acknowledged receipt of the letters and promised to respond substantively, it did not.

79.     Meanwhile, the NRA began to grow increasingly concerned that the information it previously received regarding the North Contract was misleading.  The May 2018 Amendment to the NRA Services Agreement classified North as a third-party contractor of AMc—but in actuality, the North Contract treated him as a full-time employee, with legal duties to Ackerman that superseded his duties to the NRA.  Moreover, AMc originally advised the NRA that it had contracted North to host "[t]welve episodes" of an NRATV documentary series, to be produced "during each 12 months of a three-year [a]greement," commencing during or about May 2018. Yet by April 22, 2019—eleven months into North's engagement—only three episodes were available, and none were "feature-length."

80.     On April 11, 2019, North finally disclosed his contract to the NRA—even as AMc continued to rebuff the NRA's similar requests.  AMc has also withheld documents regarding sponsorships secured for the North documentary series, and thus, there is no evidence of any

substantial sponsorships, contrary to AMc's rosy predictions. Viewed in light of the series' production shortfalls and the North-AMc contract, these facts have troubling implications for AMc and North.  The NRA agreed to shoulder a specific financial burden in connection with a specific digital-media project—not to allow its President to be compensated by a for-profit advertising agency for performing generic leadership functions.  More to the point, AMc could continue to pay North substantial sums of money over multiple years for performing essentially no work on NRATV (itself a violation of the North-AMc contract), relying on the guarantee of the NRA's financial backstop.  Importantly, the NRA's Bylaws do not provide for the President to receive a salary.

81.     In the wake of these developments, the NRA again requested that AMc allow it to examine business records that would shed light on "what, exactly, [the NRA] is paying for—and what it is getting."  AMc never responded.

**F.      The NRA Takes Legal Action, and AMc And North Respond With Illegal Extortion.**

82.     On April 12, 2019, having exhausted its good faith efforts to access key records pursuant to the Services Agreement, the NRA filed a narrowly tailored action in Virginia state court seeking specific performance by AMc of its obligation to share relevant records with the NRA.  In retaliation, rather than provide the requested records directly to the NRA (as the NRA had sought for months), AMc conspired with others to disseminate select, out-of-context portions of those records—many obsolete or dated—to a subset of the NRA  Board  of Directors,  in order to sow false impressions regarding the NRA's spending and lend support for a possible executive coup.

83.     On April 22, 2019, days before the NRA's Annual Meeting of Members, Defendant

Winkler doubled down on the tactic he previewed in his August 27, 2018 letter.[43] In

communications to select NRA executives, he referenced and excerpted certain expense records

which had previously been withheld from the NRA. Importantly, Winkler did not contend—nor

does the NRA believe—that any of the referenced expenses were improper.[44] Nonetheless, they

were obviously selected by Defendants to foster salacious, misleading impressions of the NRA's

spending practices. Winkler's letters carried an implicit threat, made explicit in a subsequent series

of telephone calls: If the NRA failed to withdraw its lawsuit seeking access to AMc's records,

AMc would publicize portions of those records tailored to cause maximum reputational damage

to the leadership of the NRA. In other words, the agency would deploy a smear campaign with

malicious intent to damage the NRA.

84.     On April 24, 2019, AMc caused its employee, North, to telephone an aide of

LaPierre and relay the contents of yet another letter that AMc purportedly planned to disseminate.

North emphasized that the letter would be "bad" for LaPierre and the NRA, and he described a

laundry list of allegations the letter would contain: an unfavorable (and untrue) depiction of the

NRA's finances; sexual harassment accusations against an NRA staff member; and, as previewed

in Defendant Winkler's letters, excerpts of wardrobe, travel, and entertainment expenses paid by

AMc and then invoiced by it to the NRA over the years.

85.     Tellingly, several categories of information referenced by North consisted of the

same information the NRA had tried, but failed, to elicit from AMc under the Record-Examination

---

[43] *See* discussion *supra* at ¶ 64.

[44] Indeed, if Defendant Winkler or anyone at AMc had believed the expenses were improper, then AMc's
fiduciary obligations required it to inform the NRA of suspected accounting improprieties. Instead, for more than a
decade, AMc invoiced the NRA for the expenses without any such comment.

Case 21-30085-hdh11 Doc 307-1 Filed 03/06/21 Entered 03/06/21 05:43:57 Page 43 of
Case 3:19-cv-02074-G-BK Document 201-1 Filed 02/11/21 Page 42 of 106 PageID 10354
107

Clause. After withholding this information for more than six months in an attempt to stonewall the NRA's compliance efforts, AMc now threatened to strategically, selectively publicize the information in a manner calculated to cause harm to LaPierre and the Association. North stated that AMc would forbear from publicizing the "bad" letter if LaPierre agreed to withdraw the NRA's lawsuit seeking access to AMc's records, resign immediately from the NRA, and support North's continued tenure as NRA President. If LaPierre cooperated, North indicated that he could "negotiate with" Ackerman co-CEO Angus McQueen to secure an "excellent retirement" for LaPierre.

86. The NRA does not take kindly to threats, and neither did LaPierre. Rather than accede to AMc's extortion, LaPierre wrote a letter to the NRA's Board of Directors that gave a transparent account of AMc's threat and concluded "so long as I have your confidence . . . I will not back down." As became widely publicized, LaPierre prevailed—and AMc's coup attempt failed.

**G.    Extortion's Aftermath:    Evidence Vindicates the NRA's Concerns, And AMc Continues Its Attacks.**

87. The NRA hoped that in the wake of these events, AMc would resume faithfully serving the NRA as the Services Agreement and Virginia law required. Unfortunately, the NRA continued to receive media inquiries that strongly suggested there were misleading, defamatory "leaks" emanating from AMc. In other words, the NRA believed that AMc was delivering on its extortion threat. Tellingly, much of the information "leaked" by AMc concerned travel, wardrobe, and other expenses incurred in connection with AMc projects, based on AMc's advice, or on trips with itineraries crafted by AMc. Although it disseminated select portions of these records in an effort to convey misleading impressions about spending activities by the NRA's leadership, AMc

knows full well that these particular expenses were proper because it was deeply involved in their occurrence.

88.     Discovery has corroborated one of the NRA's worst fears about AMc's billing practices—specifically, that AMc was double-billing multiple clients for the same work, or simply billing the NRA for time logged by its employees on non-NRA projects. Dan Boren, an executive of Ackerman's second-largest client, the Chickasaw Nation, admitted by email dated April 15, 2019: "I bet Ackerman is in trouble on this one. They can't produce the backup to the invoices and were allocating full salary to these employees that may have been working on our [Chickasaw Nation's] accounts."

89.     Other discovery corroborates Boren's observation. As only one example, on or about October 11, 2018, Angus, Revan and Montgomery met with LaPierre and with Phillips' successor, the NRA's new CFO, at Ackerman's office in Dallas, Texas to discuss the agency's budget for the 2019 fiscal year (such meeting, the "2019 Budget Meeting"). Consistent with the parties' custom and practice, AMc presented a list of projected expenditures that it explained encompassed salaries for NRA-dedicated personnel. "Appendix C" to the budget identified NRA-dedicated personnel including a photographer, Stephen Walters, whose entire salary ($135,000) and related overhead ($114,750) were billed to the NRA. Yet, archived versions of Walters' own website reveal significant, then-contemporaneous work for other AMc clients, including Chesapeake Energy and the Chickasaw Nation. Similarly, the materials presented at the 2019 Budget Meeting classified Carl Warner, an Executive Vice President and Creative Director, as entirely dedicated to NRA work, such that his entire salary ($225,000) and related overhead ($168,750) were part of the NRA staffing budget. But Warner, too, was performing work for multiple clients, not dedicated to NRA projects as AMc promised. Other AMc employees who

were claimed to be NRA-dedicated, but were actually staffed on non-NRA projects, included Ariana Azimi and Jason Parsons. AMc's fraudulent representations regarding its budget and staffing subverted and undermined the NRA's legal right, as principal, to oversee the means, methods and details of AMc's work.

90.     It is now known that Defendant Winkler played a central role in AMc's practice of issuing inflated invoices to the NRA. At the end of each billing period, Winkler would examine time entries logged by AMc personnel, and look for work not clearly attributable to a specific client or project. Winkler would query personnel in an attempt to identify a basis to "sweep" these time entries onto the NRA's bills, often under the category "Special Projects." Winkler engaged in this practice without any good faith belief that the work being "swept" onto the NRA's invoices had actually been performed, or related costs incurred, within the parameters prescribed by the Services Agreement—and indeed, without any good faith belief that the activities being billed to the NRA had benefitted the NRA whatsoever.

91.     During the 2019 Budget Meeting, when LaPierre expressed the view that AMc's budget should be reined in, both Angus and Revan reacted with unveiled, unmitigated rage. In abusive and vulgar tirades, the McQueen's told LaPierre that he was "dead to [them]" and they had already written off the NRA and moved on. This meeting was telling in many ways, most notably that AMc was desperately attempting to avoid the NRA's scrutiny of its eight-figure annual budget.

92.     For the purpose of defaming, intimidating, and undermining the NRA leaders who had fired the agency, AMc issued a press release on September 13, 2019, that made a number of material and damaging misstatements. For example, the press release stated that:

- "Ackerman McQueen cooperated with every single audit NRA requested;"

- "Ackerman McQueen never overcharged the NRA and retains records of all the work to prove it;"

- "Every expense incurred on behalf of the [NRA] was directed by the NRA at the highest level, always with personal knowledge and approval of Wayne LaPierre;" and

- Outside counsel for the NRA "pursues . . . frivolous lawsuits" against AMc "for PR purposes and to serve as a distraction from the failure of NRA executives and its board to properly fulfill its oversight duties."

93.    Indeed, AMc's own former employees have exposed these statements as lies. Stinchfield, for example, grew concerned about AMc's failure to inform the NRA about key decisions being made at NRATV, and was brusquely reminded that AMc, not NRA, was "the boss." Another alleged former AMc employee appeared on the podcast "Gangster Capitalism" on May 6, 2020, to detail numerous deceptions and improprieties relating to the so-called AMc "out-of-pocket" expenses invoiced by the agency to the NRA. Using the pseudonym "Alex," the former employee recounted that AMc intentionally diverted its "out-of-pocket" expense invoices from the NRA's ordinary accounts-payable channels, instead directing them to Phillips individually. Alex stated his understanding was that the invoices were directed to Phillips to keep them "out of the normal process at the NRA"—*i.e.*, prevent the NRA from detecting the opaque, unexplained spending by Ackerman and Mercury. One major vector for inappropriate out-of-pocket expenses was Makris' American Express card, which was billed indirectly to the NRA via inclusion in "out-of-pocket" expense invoices. Over many years including, without limitation, 2015-2018, Makris incurred five- and six-figure expenses at a restaurant and cigar bar, known as Landini Brothers, purportedly for "wining and dining" NRA executives. Yet according to "Alex," Ackerman and

45

Mercury employees also "wined and dined" themselves and one another at Landini Brothers (with no NRA representatives in attendance) using Makris' AmEx card. Although Alex told the podcast's hosts that he believed most expenses were incurred with client consent, he admitted that AMc took deliberate steps to circumvent NRA accounting controls.

94.     Makris likewise fraudulently invoiced the NRA, via Mercury, for luxury travel expenses. For example, on January 2, 2018, Makris chartered a private jet from Aspen, Colorado to Dallas, Texas, at a cost of roughly $19,000. Although Makris participated in NRA-related activities in Dallas that year, Makris never received authorization from the NRA to charter a private plane, nor was there any business purpose for the same. Makris concealed this exorbitant expense as an "out-of-pocket" expense within Mercury's invoices, and Mercury fraudulently obtained reimbursement from the NRA.

**H.     The Services Agreement Provides That The NRA Is The Owner Of All Creative Works And Intellectual Property Previously Developed And Used By AMc.**

95.     As noted above, since at least 1999, AMc's work on behalf of the NRA was governed by successive iterations of the Services Agreement, which specified the types of work that AMc performed for the NRA.

96.     Section VI of the final Services Agreement is entitled "Ownership of Products." It provides: All creative works developed by AMc in fulfilling its obligations under this Services Agreement . . . shall be the property of the NRA." It continues: "All other, and further, intellectual property . . .  created or developed by AMc in fulfilling its obligations under this Services Agreement, are NRA's sole and exclusive property, and AMc does hereby assign all right, title and interest in same to NRA . . . ."

97.     Section VI of the Services Agreement also requires AMc to transfer and assign to the NRA the ownership of all the intellectual property or other graphics developed by AMc for the NRA, if those works were not otherwise encompassed by the Copyright Act.

98.     In addition, the NRA separately owns numerous copyrights and trademarks, including trademarks for "NRA" and "National Rifle Association," attached hereto as Exhibit A.

**I.      Despite The Services Agreement's Termination, Defendants Continued To Prominently Reference The NRA And NRATV On AMc's Website, Infringing the NRA's Copyrights and Trademarks, and Causing Consumer Confusion.**

99.     By letter dated June 25, 2019, the NRA terminated the Services Agreement effective "immediately."  Notably, AMc also purported to terminate the agreement by letter dated June 27, 2019, also effective "immediately."

100.    Despite the termination of the Services Agreement, Defendants continued to make unauthorized and unlicensed references, directly and indirectly, to the NRA, the National Rifle Association, and NRATV on its website, and continued to infringe and make unlicensed and unauthorized use of the NRA's trademarks, copyrights, and intellectual property rights.  Attached hereto as Exhibit B are depictions of the NRA references and associated intellectual property on AMc's website as of August 29, 2019, and attached hereto as Exhibit C, are additional graphics added since that date, as of October 17, 2019, respectively.  Specifically, AMc's website, directly and indirectly, continued to reference in an unauthorized and unlicensed manner the NRA and/or NRATV and continued to misuse the NRA's associated intellectual property, as follows:

- As previously noted, attached hereto as Exhibit A are the registered service marks issued to the Association for "NRA," "National Rifle Association," and "National Rifle Association of America," for which unlicensed and infringing uses causing abounded AMc's website and the excerpts shown in Exhibits B and C;

- Attached here as Exhibit D are federal copyrights registered to the NRA (Registration Nos. VA 2-182-373, NRA Eagle; VA 2-182-376, NRA Girl in Hoodie; and VA 2-183-309, NRA NOIR).  Digital graphics that infringed these valid copyrights are located among the graphics set forth in Exhibits B and C;

- As late as September 4, 2019, AMc's homepage describing the agency and its work touted AMc's representation of a "gun rights organization" and stated that the agency "built media companies on behalf of … the Second Amendment to the Constitution;"

- As late as September 4, 2019, on a page entitled "Our Media Evolution," the website provided a timeline of projects for AMc clients that contained multiple NRATV videos and insinuated an ongoing relationship with the NRA;

- As late as September 4, 2019, on a page entitled "Our Team," a photo appeared with the caption "NRA Life of Duty," deceptively referencing an AMc campaign for the NRA that had long been discontinued;[45] and

- As late as September 4, 2019, on pages entitled "Gallery" and "Clients," a total of fifteen different references to the NRA and NRATV appeared, which represented a greater number of references to the NRA than to any other AMc client.

101.    The portions of the AMc website submitted by Defendants in the Appendix supporting their Motion to Dismiss support these conclusions.[46]

102.    In addition, this multitude of references and related intellectual property, alone and taken together, fostered consumer and customer confusion insofar as they falsely suggested to the

---

[45]  ECF No. 10 ¶¶ 7, 11.

[46] ECF No. 30.

public that the NRA remained an AMc client and endorsed the services provided by AMc.  To the

contrary, the NRA ceased to be an AMc client in Spring 2019 by reason of its serious concerns

about AMc, including AMc's tortious and criminal extortion conduct, and its fraudulent billing.

103.    Similarly, as late as September 2019, AMc's website falsely proclaimed that

NRATV was the "world's most comprehensive video coverage of freedom-related news, events

and culture," creating the misimpression that NRATV was a successful endeavor that the NRA

endorsed.  In actuality, the NRA had shuttered NRATV precisely because it realized the falsity of

AMc's claims about the platform's reach and prominence.

104.    As late as September 4, 2019, AMc's website also prominently featured infringing

and unlicensed NRA-owned photos, and referenced the NRA with greater frequency than any other

AMc client.   The prominent and infringing display of the registered NRA trademark and its

associated intellectual property on AMc's website fostered a strong, confusing, false inference that

the NRA endorsed AMc or its services.

105.    The NRA first pleaded a similar version of the foregoing allegations in its Amended

Complaint dated October 25, 2019.[47] During or about October 2019, AMc slightly modified its

website by affixing the label "LEGACY" to certain NRA-related content.  But this did not dispel,

or "moot," [48] any false associations within the meaning of the Lanham Act: a visitor to the site

could easily have inferred that the images were from specific ad campaigns that were no longer

running—whereas in fact, the entire NRA-AMc relationship had been severed and disavowed, and

NRATV discontinued, by reason of AMc's gross abuses of its client's trust.

---

[47] ECF No. 18.

[48] ECF No. 10 ¶ 25.

106.    During Fall 2019,[49] AMc shuttered its entire website, replacing the site with a minimalist landing page that does not link, display, or reference any of AMc's ad campaigns or clients.  AMc provided no notice to the NRA that its website, the contents of which were the subject of specific claims in this lawsuit, was slated to be dismantled, and the NRA reserves all rights with respect to any spoliation of evidence.

## V.

### CLAIMS FOR RELIEF

**A.    Count One: Claims For False Association Under The Lanham Act, 15 U.S.C. § 1125(a)(1)(A) (Against All Defendants).**

107.    The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

108.    By intentionally maintaining numerous references to, and images of, the NRA and NRATV on AMc's website, Defendants are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of the NRA with AMc, or as to the NRA's approval of the services or commercial activities by Defendants, in violation 15 U.S.C. § 1125(a)(1)(A).

109.    Defendants are involved in interstate commerce.

110.    Defendants directly participated in, or are at least the moving force behind, AMc's website continuing to provide or otherwise create the false impression that the NRA (1) remains or continued to be an AMc client after the termination of the Services Agreement; and (2) endorses the services provided by AMc, in particular NRATV.

---

[49] Specifically, Internet Archive records suggest this change occurred between September 4, 2019, and November 23, 2019.  *See* Wayback Machine Internet Archive for www.am.com for September 4, 2019, and November 23, 2019, *available at*: https://web.archive.org/web/20190904185252/https://www.am.com/; *and,* https://web.archive.org/web/20191206124820/https://www.am.com/, respectively (last visited: February 9, 2021).

111.     The foregoing misconduct is without any legal justification and constitutes a knowing and willful violation of applicable law, including 15 U.S.C. § 1125(a)(1)(A).

112.     The NRA falls within the zone of interests protected by the Lanham Act, a lenient and flexible standard where doubts are resolved in favor of the plaintiff.  *In Lexmark*, the United States Supreme Court recently held that, in order to determine whether a plaintiff has standing to sue under the Lanham Act (or any other federal statute), courts must apply the "[1] zone-of-interest test and [2] proximate-cause requirement," which the Court made clear mandates courts to consider all the individualized facts and circumstances of the particular case.[50]  In accordance with *Lexmark*, the NRA has alleged multiple injuries that fall within the zone-of-interests protected by Lanham Act, the second one of which Defendants do not appear to dispute, namely reputational harm. In connection with their proximate-causation challenge, Defendants also concede that the NRA's first theory of alleged injury—the diminution in the value of the NRA's trademarks and its brand/goodwill, including likely lost profits—satisfies the applicable standard. Thus, the NRA has standing to sue under the Lanham Act.

113.     The NRA is not required under the law to have only suffered an injury to a "commercial interest" to have standing under the Act. As to a false association claim presented here, the *Lexmark* Court described "the interests protected by the Lanham Act" are *broader* than just the "commercial interests" implicated by a claim of false advertising.[51] The zone-of-interests protected by a false-association claim are much broader than mere injuries to commercial interests.

---

[50] *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 134, 129-130, n.5 (2014).

[51] *Id.* at 131 ("[A] typical false-advertising case will implicate only the Act's goal of protecting persons engaged in commerce . . . against unfair competition," an interest that "concerned . . . injuries to business reputation and present and future sales") (emphasis added). In sharp contrast, in assessing the interests protected overall, the Court noted that "most of the enumerated purposes [of the statute] are relevant to false association cases."  *Id.* (emphasis added).

114.    The NRA has stated a claim for false association because the NRA has plausibly
alleged that it has sufficient injuries subject to the Lanham Act.  Section 1127 manifests the
Lanham Act's purpose to "mak[e] actionable the deceptive and misleading use of marks." The
NRA plausibly meets this standard because the NRA more than sufficiently alleges that
Defendants used the NRA's trademarks in a deceptive, infringing, and misleading manner to create
a false association with and false appearance that the NRA was endorsing Defendants.

115.    Another purpose of the Lanham Act is "to prevent fraud and deception . . . by the
use of reproductions, copies, . . . or colorable imitations of registered marks."[52] The NRA's
allegations satisfy this standard because the NRA alleges that Defendants' infringing and
unauthorized reproductions and copying of the "NRA" and "National Rifle Association"
trademarks, as well graphics incorporating those marks, amount to false association and
endorsement, causing harm to the NRA.

116.    The NRA's interests are sufficiently related to the interests protected under 15
U.S.C. §§ 1125(a)(1)(A) and 1127 because Defendants used words, statements, and reproductions
of the NRA's intellectual property in an unauthorized and unlicensed manner to create a false
association between the NRA and AMc as to whether the NRA (1) remains or continues to be an
AMc client; and (2) endorses or approves of the services provided by AMc—in particular NRATV.
The NRA is suing not as a deceived consumer or as a direct competitor to Defendants, but as a
person engaged in commerce within the control of Congress whose commercial position has
suffered economic and/or reputational injury proximately caused by Defendants' false associations
outlined above and their acts of unfair competition.  These interests plainly fall within the zone of

---

[52] 15 U.S.C. § 1127.

interests protected by the Lanham Act, in keeping with the Supreme Court's holding that "most of enumerated" purposes of the Act "are relevant to false association cases."[53]

117.    The NRA has been injured and has suffered damages by the infringing, unauthorized, and unlicensed words, statements, and/or use of the NRA's intellectual property that created the false impression of association with AMc, and the false endorsement of AMc's services.  Defendants prioritized their own financial interest in acquiring new customers and gaining additional profits through engaging in deceptive conduct, at a time when it had lost its largest client, the NRA.  It did so at the expense of the NRA's lawful right to restrict and to limit the use of its name and related intellectual property rights in a non-misleading manner, thereby diminishing the NRA's value and causing financial injury to the NRA, including lost royalties, both presently and in the future.  In addition, Defendants' Lanham Act violations caused and/or will likely cause the NRA to suffer reputational harm and the loss of goodwill.  Accordingly, the NRA has suffered injuries that negatively impact its ability to compete in the marketplace.

118.    Such persistent and bad faith misconduct should be preliminarily and permanently enjoined given AMc's recent decision to shutter their flag-ship website, and refusal to state their intentions going forward (even absent proof of damages).  The NRA should also be awarded damages and/or equitable relief, including but not limited to, forfeiture and disgorgement of the ill-gotten revenues and/or profits earned by Defendants as a result of their violation(s) of 15 U.S.C. § 1125(a)(1)(A), in an amount to be proven at trial.[54]

---

[53] *See Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014).

[54] *See, e.g.*, §§ 1116-1117.

119.    In addition, as a result of such misconduct, the NRA has been required to retain the undersigned counsel to prosecute the claims herein.  Pursuant to 15 U.S.C. § 1117, the NRA seeks to recover its attorneys' fees and costs incurred in this action.

**B.      Count Two: Trademark Infringement (Against All Defendants).**

120.    The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

121.    Attached here as Exhibit D are federal copyrights registered to the NRA (Registration Nos. VA 2-182-373, American Eagle; VA 2-182-376, NRA Girl in Hoodie; and VA 2-183-309, NRA NOIR).  Digital graphics that infringed these valid copyrights are located among the graphics set forth in Exhibits B and C.

122.    As previously noted, attached hereto as Exhibit A are the registered service marks issued to the Association for "NRA," "National Rifle Association," and "National Rifle Association of America," the unlicensed and infringing uses of which were used on AMc's website, shown in Exhibits B and C.

123.    Defendants directly participated in, or were are at least the moving force behind, AMc's decision to use, copy, and publish unauthorized, infringing, unlicensed trademarked works owned by the NRA.  Defendants violated Section 1144 of the Lanham Act by using, without the consent of the NRA, the NRA's own works that constituted reproductions, counterfeits, copies, or a colorable imitation of a registered mark in connection with the sale, distribution, or advertising of any services or in connection with such a use that is likely to cause consumer confusion.  As is clearly shown in Exhibits B and C, attached hereto, the plethora of infringing uses of the trademarks "NRA," "National Rifle Association," and "National Rifle Association of America" satisfy the improper conduct proscribed by Section 1144.

124.    The NRA has standing to raise a claim for trademark infringement under the act because the protection of registered trademarks and the use of those marks in a manner that causes confusion are primary purposes of the Lanham Act.[55]

125.    In light of the high degree of infringing activity on AMc's website, and Defendants' knowledge of the termination of the Services Agreement, Defendants have engaged in willful infringement of the NRA's trademarks.  Accordingly, the NRA is entitled to (1) the Defendant's profits, (2) any damages sustained by the NRA (*e.g*., lost royalties, royalty opportunities, and diminution of goodwill and reputation), (3) and the costs of this action, including reasonable attorneys' fees, expenses, and costs.[56]

126.    In addition, the NRA is entitled to preliminary and permanent injunctive relief requiring Defendants to refrain from using the copyrighted material on any Defendant-affiliated website, and to return all original and copies the NRA's copyrighted works.  This remedy is necessary to return and restore to the NRA the legal right to decide for itself whether and, if so, how to license, restrict, or otherwise limit the dissemination of its trademarks in commerce.

## C.    Count Three: Conversion (Against All Defendants).

127.    The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

128.    In addition to its claims for false association under the Lanham Act and infringement under the Lanham Act, the NRA asserts the cause of action of conversion.

129.    The NRA is the exclusive owner of, and holds all right, title, and interest to, all confidential information, creative works, and intellectual property developed and used by AMc in

---

[55] 15 U.S.C. § 1127.

[56] 15 U.S.C. § 1117.

fulfilling its obligations to the NRA under the Services Agreement, in particular those not registered as trademarks and copyrights at this time.

130.    Pursuant to multiple provisions of the Services Agreement, on the NRA's behalf and subject to the NRA's control, AMc entered into contracts and arrangements for the purchase, planning, and placement of media—activities that required AMc to be entrusted with sensitive confidential information pertaining to the NRA. Defendants, thus, acquired, retained, and used confidential information owned by the NRA.

131.    Despite the NRA's demands (see, for example, Exhibits B and C), Defendants have refused to remove from its website and return all such confidential information, along with creative works and intellectual property of the NRA. As a result, Defendants unlawfully and without authorization continue to exercise control and dominion over the NRA's valuable confidential information, and related creative works and intellectual property.

132.    Defendants' unauthorized use and publication of the NRA's confidential information constitutes intentional acts causing substantial interference, if not outright destruction, of the NRA's valuable property rights, to the detriment and harm of the NRA.

133.    Defendants additionally misused the NRA's confidential information on multiple occasions when they directly or indirectly disclosed to third parties the NRA's confidential information, including by conspiring to effect an out-of-context, partial disclosure of certain NRA confidential information to (i) a handpicked group of outside directors of the NRA, as well as (ii) the news media as part of its attempted extortion plot, and to end the NRA's investigation into AMc for the malicious purpose of smearing the NRA's reputation and facilitating its ultimately foiled coup plot.

134.    In addition, the NRA is entitled to an award of damages, including damages for the full value of the stolen property, and punitive damages attributable to Defendants' wrongful refusal to return its valuable confidential information in an amount to be proven at trial.

135.    The tort of conversion is not pre-empted by the Copyright Act or Trade Secrets Acts.  The rights and damages that the owner—here, the NRA—seeks to enforce under the common law doctrine of conversion are *not* equivalent to or the same as the rights sought or provided pursuant to the Copyright Act or Trade Secret Act(s).  Here, the NRA seeks to recover the total value of the confidential information "converted," property that Defendants misappropriated.  By paying the full value of the property converted, the tortfeasor makes the NRA whole.

136.    In contrast, in its claim for trademark infringement under the Lanham Act the NRA seeks the return of the originals and illegal copies of the copyrighted materials, which includes all the rights inherent in trademark.  In addition, the NRA seeks damages in the form of lost royalties *for the limited period of time* that AMc infringed its trademarks.  In a claim for trademark infringement, the return of the original trademarked material, all infringing copies, and damages in the form of lost profits and royalties will often make the trademark holder whole.

137.    None of these remedies apply to the relief afforded and sought by the NRA with respect to its claim of conversion of confidential information. In sharp contrast, the remedies for conversion allow the tortfeasor (1) to keep and use the subject property for his/her own benefit, (2) not to return the converted property to its rightful owner, but (3) pay damages for the total loss of value for the property.  In short, the remedies associated with a claim for federal copyright and trademark infringement and for common law conversion are *not* equivalent or substantially the

same and serve two very different purposes, thereby precluding any notion that the Copyright or

Trade Secret Acts could pre-empt the NRA's claim for conversion.

**D.**     **Count Four: Fraud (Against All Defendants).**

138.     The NRA incorporates the allegations in the preceding paragraphs as if fully set

forth herein.

139.     As alleged above, Defendants have engaged in an overarching scheme to defraud

and extort plaintiff NRA, thereby causing it harm and putting it (and other AMc clients) at

imminent risk of harm.  Accordingly, Defendants are liable for their misleading representations

and/or non-disclosure of material facts.

140.     Beginning in at least 2016 and continuing through 2018, Defendants, in connection

with the "annual budgeting process,"[57] described by Ackerman—and in particular Defendants

Winkler and Montgomery, as well as former CEO Angus McQueen—represented on multiple

occasions that appropriate back-up documentation was retained by AMc for purposes of justifying

and substantiating their billing statements, and that such documentation could be audited at the

NRA's request.  Defendants—in particular, Defendants Winkler and Montgomery—and McQueen

likewise represented that their record-keeping was accurate.  These representations were made

with the specific intent to have the NRA maintain or increase the annual budget for Ackerman and

were made over the course of this "annual budgeting process," which occurred in the fourth quarter

of the preceding budgetary year (i.e., the process for the 2017 budget would have occurred in Q4

2016). These representations were false when made, with a specific intent to induce the NRA to

maintain or increase the annual budget for Ackerman.  As the NRA later discovered, for years ***no***

***one*** at AMc kept or maintained reasonable documentation that would justify or support the

---

[57] ECF No. 12, at p. 23 ¶ 11.

accuracy of the sums of money AMc represented it was owed in the billing statements it sent to

the NRA. In addition, absent such record-keeping, a complete audit could not occur. For these

reasons, AMc's record-keeping was not accurate, contrary to Defendants' representations.

141. Angus and Revan McQueen, and Defendants Winkler and Montgomery, held

senior executive positions at AMc and—as Ackerman admits—were specifically responsible for

"budgetary compliance, invoicing, and payments" to the NRA.[58] Accordingly, there is more than

ample reason to believe that they must have known about, or consciously disregarded, the gross

failure to maintain reasonable backup and supporting document in connection with their billing

practices.

142. These representations were material and reasonably and justifiably relied upon

insofar as the NRA would never have agreed to a budget, much less the same or a greater budget,

had it known the complete truth.

143. Defendants also failed to disclose certain facts to the NRA during the "annual

budgeting process." In particular, they knowingly failed to disclose the fact that AMc often

double-billed multiple clients for the same work, or simply billed the NRA for time logged by

employees supposedly "dedicated" the NRA account for work they performed on non-NRA

projects. As Dan Boren, an executive of Ackerman's second-largest client, the Chickasaw Nation,

revealed by email dated April 15, 2019: "I bet Ackerman is in trouble on this one. They can't

produce the backup to the invoices and were allocating full salary to these employees that may

have been working on our [Chickasaw Nation's] accounts." Defendants also failed to disclose that

AMc had fraudulently billed the NRA, and perhaps other clients, for equipment in addition to

---

[58] ECF No. 12, at p. 23 ¶ 12.

personnel.  By failing to disclose these facts, Defendants intended to induce the NRA to maintain

or increase the amounts NRA paid to Defendants.

144.    Defendants had a duty to disclose these facts because (1) they were fiduciaries of

the NRA, as was AMc, in light of the (a) contractual language in the Services Agreement

appointing it the agent of the NRA for purposes of public relations and advertising and/or (b) the

longstanding relationship of trust and confidence in which the NRA relied on AMc that was

separate and apart from the Services Agreement, and (2) they had the obligation not to tell "half-

truths."

145.    Defendants knew that the NRA was ignorant of these facts and did not have an

equal opportunity to discover the facts.

146.    Defendants Winkler and Montgomery held senior executive positions at AMc and,

as Ackerman admits, were specifically responsible for "budgetary compliance, invoicing, and

payments" with respect to the NRA account.[59]  Therefore, there is more than a reasonable basis to

believe that they knew about, and consciously disregarded the practice of overbilling with regards

to personnel and equipment.  Accordingly, the false representations were made knowingly or

recklessly, and with knowledge of the truth.  For similar reasons, Defendants knew that there was

information that they did not disclose to the NRA, and they were deliberately silent when they had

a duty to speak.

147.    These false representations and/or fraudulent non-disclosures were material and

actually, reasonably, and justifiably relied on upon the NRA.  As a result, the NRA has suffered

injury and damages, in an amount to be proven at trial.  Had it known the complete truth, the NRA

---

[59] ECF No. 12, at p. 23 ¶ 12.

would never have agreed to an annual budget, much less the same or a greater budget, would have

terminated AMc as its agent, and would have ceased conducting business with the agency.

148.    ***Fraudulent Billing.***    Beginning in at least 2016 and continuing through 2019,

Defendants and AMc employee Nader Tavangar would, on at least a monthly basis (and sometimes

more often), issue and send billing statements and invoices to NRA counterparts, representing that

the NRA owed AMc certain amounts of money.   Given the fraudulent nature of the annual

budgeting process, it should come as no surprise that many of the emailed billing statements were

not only inaccurate, but false and misleading. These representations were made with the specific

intent to have the NRA pay the amounts it purportedly owed.

149.    The billing statements were misleading in at least five principal respects.  *First*,

Defendants caused sham bills to be sent that purported to seek payment for services that were

never provided to the NRA.   *Second*, they caused bills to be sent to the NRA which sought

reimbursements in excess of the actual cost to AMc. *Third*, they caused bills to be sent to the NRA

that were wholly unsubstantiated by any receipt or document, or any other shred of evidence.

*Fourth*, although AMc represented explicitly in the Services Agreement that it would formulate

cost quotations for art concepts, design layout, photography, and other special projects[60] at "fair

market value" or "fair market price"—a determination informed by "the usual and customary

charges for such services or expenses in the industry"[61]—AMc forbore from conducting any due

diligence to determine market value and, indeed, intentionally charged the NRA inflated,

unsupported prices. *Fifth*, the invoices issued by AMc reflected and effected its fraudulent practice

---

[60] *See* Services Agreement § II.B.

[61] *See* Services Agreement § III.D.

of billing the NRA for entire salaries attributable to employees who were purportedly dedicated to

NRA projects, but actually performing work for other AMc clients.  These practices permeated

invoices issued by both Ackerman and Mercury.

150.    As but one example, on September 17, 2018, Defendants emailed NRA Chief

Financial Officer ("CFO") and Treasurer Craig Spray three "production invoices for [the month]."

Upon review of the vague, cursory, and unsubstantiated invoices, Spray responded and advised

Defendants that they may not be following "best practices/compliance requirements," where

"typically [a] three-way match process for processing a vendor invoice is required."  As explained

to Defendants, the objective of "an audit compliant process" is "to ensure" that a vendor's request

for payment "is complete and accurate" and "to highlight any discrepancies" in the supporting

documentation.  At the time, Spray found Defendants' slip-shod billing practices concerning.  And

for good reason.  Absent necessary backup documentation, a vendor has no factual basis to justify

requesting the amounts of money provided on the billing statement or invoice.

151.    Defendants had a duty to disclose these facts because (1) they were fiduciaries of

the NRA, as was AMc, in light of (a) the contractual language in the Services Agreement

appointing it the agent of the NRA for purposes of public relations and advertising, and/or (b) the

longstanding relationship of trust and confidence in which the NRA relied on AMc that was

separate and apart from the Services Agreement,  and (2) they had the obligation not to tell "half-

truths."

152.    Defendants knew the NRA was ignorant of these facts and did not have an equal

opportunity to discover the facts.

153.    Defendants and AMc employee Tavangar were responsible for the routine

generation and transmission of fraudulent billing statements to the NRA, and Defendants Winkler

and Montgomery were specifically responsible for "budgetary compliance, invoicing, and payments" with respect to the NRA account.[62] Therefore, there is more than a reasonable basis to believe that they knew, or consciously disregarded, the truth, particularly with respect to the issuance of fraudulent billing statements and invoices that were wholly unsubstantiated due to the lack of back-up documentation. Accordingly, the false representations were made knowingly or recklessly and without knowledge of the truth. For similar reasons, Defendants knew the information that they did not disclose to the NRA, and remained deliberately silent when they had a duty to speak.

154. These false representations and/or fraudulent non-disclosures have caused the NRA to suffer injury and damages, in an amount to be proven at trial. Had it known the complete truth, the NRA would never have agreed to pay the billing statements and invoices, would have terminated AMc as its agent, and would have ceased conducting business with the agency. For these reasons, these representations and/or non-disclosures were material and actually, reasonably, and justifiably relied upon by the NRA.

155. ***NRATV Fraudulent Misstatements and Non-Disclosures.*** Beginning in at least 2016, and continuing through 2019 Defendants—including but not limited to Defendants Montgomery and Martin, and non-party Greenberg—made various fraudulent statements and/or failed to disclose material information in connection with NRATV. Among other things, as alleged herein, Ackerman, in early 2016, through its CEO Angus McQueen, made multiple representations to the NRA that the proposed "owned media" digital platform known as NRATV, presented "a good opportunity to generate revenue" and that developing and launching such a platform would "pay for itself," including paid commercial sponsorships for live programs. In

---

[62] ECF No. 12, at p. 23 ¶ 12.

addition, at the thirteen specific meetings and in other communications to the NRA identified

above, including communications made on May 13, 2019 and late October 2018 Defendants touted

NRATV's performance and represented that the platform had certain valuations and generated

millions of engagements and views.  These statements were made for the purpose of inducing the

NRA to expand its investment in NRATV, to the benefit of AMc.

156.    These representations and omissions were false and misleading for multiple

reasons.  First, the NRATV digital platform did not generate revenue and was never going to pay

for itself, as demonstrated by the dismal viewership and sponsorship numbers that it generated in

reality, consistent with the previous failure of a similar project with The American Clean Skies

Foundation. Defendants knew that the dire failure of a previous, similar project was a material fact

the NRA would have wished to consider when deciding whether to invest millions in NRATV,

and Defendants intentionally withheld this fact from the NRA in violation of their fiduciary duties.

In addition, Defendants' repeated representations that the NRATV platform generated millions of

viewers and touting of the platform's performance and valuation were in fact based on out-of-

context statistics predicated on, among other things, aggregate viewership numbers that failed to

differentiate between genuine views and merely incidental ones, and counted all of the views from

an individual, rather than the distinct number of viewers of NRATV content.  At no point did

Defendants disclose that their purported viewership numbers were not based on actual data of the

number of unique and genuine viewers.  Defendants mislead the NRA and failed to make such

disclosures in order to continue to perpetrate their ongoing fraud and conceal NRATV's true

viewership levels, in particular with respect to its inefficient and costly live streaming component.

Moreover, Defendants' inconsistent and contradictory viewership statistics, the statements on the

topic of viewership numbers, and the actual numbers themselves demonstrate the falsity of the statements.

157.    Defendants knew about the failure of the similar digital platform that AMc had developed and operated for The American Clean Skies Foundation and, therefore, also knew that embarking upon a similar venture for the NRA would not present a good opportunity for revenue generation, or pay for itself.  Defendants understood that their development (in particular, their creation by Greenberg) and subsequent touting of NRATV viewership performance and valuations was not based on actual data comprising *unique* views, and likewise understood such data is readily available from third-party vendors—given that Defendants hold themselves out as ostensible experts in digital marketing and advertising.  Therefore, there is more than a reasonable basis to believe that Defendants knew, or consciously disregarded, the truth about these matters.  Accordingly, the false representations were made knowingly or recklessly and with knowledge of the truth.

158.    Defendants had a duty to disclose these facts because (1) they were fiduciaries of the NRA by reason of (a) contractual language in the Services Agreement appointing it the agent of the NRA for purposes of public relations and advertising and/or (b) the NRA's longstanding relationship of trust and confidence in Ackerman, Mercury, and the Individual Defendants.  As a consequence of their fiduciary duties, each and all of the Defendants were obligated to be loyal to the NRA and disclose material facts relevant their business with the NRA.

159.    Defendants knew that the NRA was unaware of the foregoing facts and had not had the same opportunity to discover become apprised of them which Defendants enjoyed.  For example, Defendants knew that the underlying details of, and receipts and other "backup" for,

160.    Mercury is responsible for the false representations and/or fraudulent non-disclosures made by its employees, Makris and Tavangar, in the course of their work.  For example, Mercury is responsible for Makris's unauthorized, fraudulent incurrence and invoicing of luxury dining and liquor charges (at Landini Brothers and elsewhere) and private jet charges, impermissibly billed to the NRA.  and embodied within misleading invoices that it issued to the NRA.  Mercury, through its employees Makris and Tavangar, also knew about and assisted in the fraudulent conduct and contractual breaches perpetrated by Ackerman.

161.    The false representations and/or fraudulent non-disclosures have caused the NRA to suffer injury and damage, in an amount to be proven at trial.  Had it known the complete truth about NRATV, the NRA would never have invested a dollar in the project, and would have terminated AMc as its agent, and ceased conducting business with the agency.  For these reasons, these representations and/or non-disclosures were material and were actually, reasonably, and justifiably relied upon by the NRA.

**E.**    **Count Five:  Breaches of Fiduciary Duties (Against Ackerman and Mercury).**

162.    The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

163.    Over the course of more than thirty years of close collaboration (including decades that precluded the Services Agreement), the NRA reposed extensive trust and confidence in, and relied upon, AMc.  Defendants, therefore, owed fiduciary duties to put the NRA's interests first when rendering services to the NRA.  These fiduciary duties arose both by reason of the Services Agreement (which memorialized the NRA's reposure of trust and confidence in AMc) and at common law, as a consequence of the parties' decades-long relationship.

164.    In addition, AMc incurred fiduciary duties to the NRA when it acted as the NRA's agent pursuant to multiple provisions of the Services Agreement.  For example, on the NRA's

behalf and subject to the NRA's control, AMc entered into contracts and arrangements for the purchase, planning, and placement of media—activities that required AMc to be entrusted with sensitive confidential information pertaining to the NRA. The Services Agreement unambiguously gave the NRA the right to control the means, methods, and details of AMc's work—notwithstanding that AMc subverted the NRA's right of control by misleading the NRA.

165.    Given their high-ranking positions at AMc and the importance of the NRA as its biggest client, Defendants and the non-party co-conspirators (excluding Boren) were aware of the Services Agreement and understood the substance of its provisions and, therefore, served as agents and fiduciaries too.

166.    Because they acted in a fiduciary capacity, Defendants had a duty of loyalty to the NRA, which forbade it from misusing the NRA's confidential information—especially with the malicious intent to damage the NRA.

167.    Furthermore, because they acted in a fiduciary capacity, Defendants had a duty of candor and a duty to disclose all material facts to the NRA regarding the advice and services they provided. Defendants breached their fiduciary duties when they failed to disclose material facts to the NRA, including but not limited to failing to disclose in the following instances:

- Facts regarding AMc's billing and invoicing practices—for example by failing to disclose that appropriate support documentation was not retained by AMc and could not be audited by NRA at any time;

- Facts regarding NRATV performance, by withholding crucial performance metrics like "unique" and "genuine" individualized viewership data, and relatedly failing to disclose material facts regarding the inaccurate valuation of NRATV;

- Facts regarding the prior and failed "owned-media" project, Clean Skies TV;

Case 21-30085-hdh11 Doc 307-1 Filed 03/06/21    Entered 03/06/21 05:43:57    Page 69 of
Case 3:19-cv-02074-G-BK   Document 201-1   Filed 02/11/21    Page 68 of 106   PageID 10380
107

- Facts that AMc often double-billed multiple clients for the same work, or simply billed the NRA for time logged by employees who were supposed to be fully "dedicated" to the NRA;

- Facts that AMc used equipment, billed to the NRA, for other clients' projects;

- Facts that bills emailed and mailed to the NRA contained inaccurate and false information, for example, bills seeking reimbursement for services that were never performed, that were in excess of the actual costs to AMc, and that were wholly unsubstantiated by supporting documentation; and

- Facts regarding the North Contract—for example, that North had legal duties to AMc that superseded those he had to the NRA while NRA President, and the failure to produce the digital documentary series as specified.

168.    In addition, Defendants, as fiduciaries of the NRA, had a duty of fair, honest dealing and a duty to act with integrity of the strictest kind.  Defendants breached these fiduciary duties when they engaged in the following conduct:

- Attempting to obstruct or to stop an investigation of Ackerman and its billing practices and NRATV by the NRA, including by repeatedly and flatly refusing to respond to legitimate and basic information requests from NRA executives;

- The first attempt of extortion undertaken by Defendant Winkler on August 27, 2018, which amounted to a violation of the criminal laws;[63]

---

[63] Tex. Penal Code §§ 15.01, 31.01, 31.03; Va. Code Ann. §§ 18.2-26, 18.2-28, 18.2-59; Ok. Stat. Ann. §§ 1481-83, 1486.

- The second attempt of extortion undertaken by Defendant Winkler on April 22, 2019, which amounted to a violation of the criminal laws; and[64]

- The attempted extortion undertaken by Oliver North on April 24, 2019, which amounted to a violation of the criminal laws.[65]

169.    As a direct and proximate cause of Defendants' breaches of their fiduciary duties, the NRA has suffered injury and incurred damages in an amount to be proven at trial.

170.    The NRA also seeks forfeiture and disgorgement of all amounts wrongfully obtained by Defendant on account of their breaches of their fiduciary duties, including, without limitation, all fees paid by the NRA to AMc since the date such breaches began, and at minimum forfeiture and disgorgement of any ill-gotten gain.

## F.      Count Six: Conspiracy (Against All Defendants).

171.    Each Defendant was a member of a combination or conspiracy involving two or more persons, one of whom, Dan Boren, was an individual not employed by Defendants.

172.    The object of the combination or conspiracy was to commit the fraudulent behavior, to derail the resulting NRA investigation, and attempt to extort LaPierre and the NRA as alleged herein.  The members of the combination or conspiracy had a meeting of the minds concerning the object of the combination or conspiracy or the course of action.

173.    One or more of the members committed an unlawful and overt act to further the object or course of action, including but not limited to the Defendants' fraudulent acts described in Count Four and the breaches of fiduciary duty described immediately above.

---

[64] Tex. Penal Code §§ 15.01, 31.01, 31.03; Va. Code Ann. §§ 18.2-26, 18.2-28, 18.2-59; Ok. Stat. Ann. §§ 1481-83, 1486; In. Code §§ 35-45-2-1, 35-43-4-2, 35-43-4-2.

[65] Tex. Penal Code §§ 15.01, 31.01, 31.03; Va. Code Ann. §§ 18.2-26, 18.2-28, 18.2-59; Ok. Stat. Ann. §§ 1481-83, 1486; In. Code §§ 35-45-2-1, 35-43-4-2, 35-43-4-2.

174.     The NRA has suffered injury and sustained damages as a result of the conspiracy, in an amount to be proven at trial.

**G.     Count Seven: Breach of Fiduciary Duty of Loyalty (Against Ackerman and Mercury).**

175.     The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

176.     In the alternative, the NRA asserts the claims for breach of fiduciary duty and breach of contract that are now presently stayed in Virginia state court litigation ("the Virginia Claims").   Through the filing of its Counterclaim and Third-Party Complaint, *see* ECF No. 12, however, Ackerman has broadened this dispute to encompass a host of subject matters not directly raised in the Original Complaint.  Ackerman broadly contends that the NRA's original claims in this action "mandate[ ] . . . an inquiry into the NRA's and LaPierre's conduct" allegedly comprising "sinister and intentional efforts to destroy AMc's business" and "makes relevant an examination of the real reasons behind termination of the parties' [Services Agreement] . . . and an examination of the creation, operation and [allegedly] unquestioned success of NRATV."[66]   According to Ackerman, this "mandate[d]" inquiry includes the three allegedly "frivolous" lawsuits comprising the Virginia Claims.[67]  Based on Ackerman's logic, the NRA's Virginia Claims likely arise out of the same transactions or occurrences that are the subject matters of Ackerman's Counterclaim and Third-Party Complaint, and it is likely that the Virginia Claims would be considered compulsory counterclaims to this action.  In short, the Virginia Claims have been put at issue by Ackerman's Counterclaim and Third-Party Complaint.

---

[66] ECF No. 12 p. 19, ¶ 1.

[67] *Id.* at p. 19 ¶ 2, pp. 31-32 ¶ 35.

177.     Over the course of more than thirty years of close collaboration (including decades that precluded the Services Agreement), the NRA reposed extensive trust and confidence in, and relied upon, AMc. Defendants, and the non-party co-conspirators (excluding Boren), therefore, owed fiduciary duties to put the NRA's interests first when rendering services to the NRA.

178.     In addition, AMc incurred fiduciary duties to the NRA when it acted as the NRA's agent pursuant to multiple provisions of the Services Agreement. For example, on the NRA's behalf and subject to the NRA's control, AMc entered into contracts and arrangements for the purchase, planning, and placement of media—activities that required AMc to be entrusted with sensitive confidential information pertaining to the NRA.

179.     Given their high-ranking positions at AMc, and the importance of the NRA as its biggest client, Defendants were aware of the Services Agreement and understood the substance of its provisions and, therefore, served as agents and fiduciaries too.

180.     Because they acted in a fiduciary capacity, Defendants and the non-party co-conspirators (excluding Boren), had a duty of loyalty to the NRA which forbade it from misusing the NRA's confidential information—especially with the malicious intent to damage the NRA. Defendants breached this duty on multiple occasions when they conspired to affect an out-of-context, partial disclosure of certain NRA confidential information to (i) a handpicked group of outside directors of the NRA, as well as (ii) the news media as part of its attempted extortion plot and to end the NRA's investigation into AMc for the malicious purpose of smearing the NRA's reputation and facilitating its ultimately foiled coup plot.

181.     As a direct and proximate cause of Defendants' breaches of their fiduciary duties, the NRA has suffered injury and incurred damages in an amount to be proven at trial.

182.    The NRA also seeks forfeiture and disgorgement of all amounts wrongfully

obtained by Defendants on account of their breaches of their fiduciary duties, including, without

limitation, all fees paid by the NRA to AMc since the date such breaches began, and at minimum

forfeiture and disgorgement of any ill-gotten gain.

183.    The NRA also seeks injunctive relief to prevent future disclosures of the NRA's

confidential information.

H.      **Count Eight:  Breach of Contract (Against Defendants AMc and Mercury Group).**

184.    The NRA incorporates the allegations in the preceding paragraphs as if fully set

forth herein.

185.    For the reasons explained in paragraph 174, *supra*, in the alternative, the NRA

asserts this breach of contract claim that is also part of Virginia Claims.

186.    The Services Agreement is a legally enforceable contract, and the NRA has

performed all of its obligations under the Services Agreement.

187.    ***The Records-Inspection Clause***.  The Records-Examination Clause is

unambiguous.  The NRA has performed all of its obligations under the Services Agreement,

including its obligation to provide reasonable notice pursuant to the Records-Examination Clause.

188.    Ackerman and Mercury have breached the Records-Examination Clause of the

Services Agreement. Specifically, Ackerman, acting at all times on behalf of both itself and

Mercury, pursuant to the Services Agreement, has repeatedly failed or refused to permit the NRA

to examine specified categories of books and records with respect to matters covered under the

Services Agreement.

189.    There is no adequate remedy at law for AMc's refusal to permit examination of

records (whether they reside at Ackerman or Mercury) pursuant to the Services Agreement.  The

information sought by the NRA pursuant to the Records-Examination Clause resides uniquely

within the possession of Ackerman and/or Mercury, and cannot be acquired by the NRA on the open market for any sum of money.

190.    The nature of the obligation imposed by the Records-Examination Clause makes specific performance equitable and practical because the Court need only order AMc to furnish to the NRA: (i) copies of any AMc-Third Party NRA Contracts, including the North Contract; and (ii) business records, in whatever form they were generated in the ordinary course of AMc's business, which are sufficient to convey the information sought by the NRA as described in the paragraphs above.

191.    Defendants' breaches of the Services Agreement have damaged—and threaten to imminently, irreparably harm—the NRA's legitimate operational interests as a not-for-profit organization. By denying the NRA access to basic information regarding the nature of the services being performed, the putative budgets for these services, and the material terms of third-party contracts for which the NRA is purportedly liable, Defendants have jeopardized the NRA's ability to steward its funds in pursuit of its public mission. Moreover, AMc's continued and baseless refusal to disclose material information relating to the North Contract threatens to impede the NRA's corporate governance.

192.    By reason of the foregoing, the NRA requests that this Court order specific performance by Defendants of their obligations pursuant to the Records-Examination Clause of the Services Agreement.

193.    **_The Confidentiality Clause._**  Defendants have breached the provisions of Section IV of the Services Agreement by directly or indirectly disclosing, to third parties, information made known to AMc as a result of AMc's providing Services (as defined under the Services Agreement).

194.    Defendants' breaches have damaged the NRA. Among other things, the NRA has incurred significant reputational damage, and professional fees, as a result of Defendants' bad faith, out-of-context "leaks" to reporters. For example, the NRA's attorneys and public affairs professionals have spent extensive hours fielding inquiries from journalists in an effort to correct the misleading impressions sown by AMc.

195.    Defendants' breaches are escalating, and there can be little doubt that if its collaborator of multiple decades continues to maliciously disseminate its confidential information, the NRA will be irreparably harmed. The NRA is entitled to injunctive relief to avert or minimize this irreparable harm.

196.    Moreover, AMc's breaches are material—by seeking to destroy the NRA's reputation, AMc has destroyed the purpose of the Services Agreement. Accordingly, the NRA is entitled to damages based on all of its remaining rights to performance under the Services Agreement.

## VI.

## DEMAND FOR JURY TRIAL

197.    The NRA hereby demands a trial by jury on all issues of fact to which it is entitled to a jury trial in this action.

## VII.

## PRAYER

198.    For all the foregoing reasons, the NRA requests that the Court enter judgment in its favor and award it the following relief against AMc and the other Defendants:

    a.    Preliminary and permanent injunctive relief prohibiting Defendants, and each of their agents, servants and employees, and those persons in active concert or participation with any of them, in an unauthorized and unlicensed

manner from: (1) showing any references to the NRA on AMc's website and in any other form of media; (2) using or displaying any logos or symbols affiliated with the NRA in connection with advertising, distribution, or display for sale of any product or service associated with AMc; (3) making in any manner whatsoever any statement or representation, or performing any act, likely to lead members of the public to believe that AMc is in any manner, currently directly or indirectly, associated, affiliated, connected with, authorized or approved by the NRA; and (4) taking any action, directly or indirectly, in any form or manner whatsoever that is likely to tarnish or disparage the business reputation of the NRA;

b.      Compensatory damages for injuries sustained as a result of Defendants' wrongful conduct, in at least the amount of $100 million;

c.      Punitive or exemplary damages in an amount to be determined at trial;

d.      Forfeiture and disgorgement in amounts to be determined by the Court;

e.      Costs of court;

f.      Reasonable and necessary attorneys' fees;

g.      Pre-judgment and post-judgment interest at the highest lawful rate; and

h.      Such other relief, at law or in equity, to which it may be justly entitled.

199.      In the alternative, the NRA requests judgment in its favor against Defendants with respect to the following concerning the breach of the Confidentiality Clause in the Services Agreement, and the breach of the fiduciary duty of loyalty:

a.      Granting it preliminary and permanent injunctive relief, as well as other equitable relief such as disgorgement or forfeiture;

     b.      Granting it compensatory damages for material, total breach of contract, and

breach of the fiduciary duty of loyalty, totaling $40 million;

     c.      Granting it punitive or exemplary damages; and

     d.      Granting such other and further relief as the Court deems just and proper.

200.    In the alternative, the NRA requests judgment in its favor against Defendants with respect to the following on the breach of the Records-Examination Clause in the Services Agreement:

     a.      A judgment against each of Ackerman and Mercury for breach of contract;

     b.      An award of specific performance to the NRA requiring that:

         a.      AMc furnish copies of all AMc-Third Party NRA Contracts to the

NRA within three (3) business days of the entry of such order; and

         b.      Within ten (10) business days of the entry of such order, AMc

furnish to the NRA:

            i.      Copies of annual budgets for the years 2016-2018, which

AMc alleges were approved by the NRA and were

previously provided to the NRA's forensic accountants;

           ii.      A list of all current NRA-Dedicated Personnel (as defined

in the NRA's letter correspondence) and, for each such

employee, copies of business records sufficient to show the

amount or percentage of the employee's time that was

dedicated to NRA projects during the period from January

1, 2018, to present;

       iii.      Copies of business of records sufficient to show the extent of any costs invoiced to the NRA or the NRA Foundation, during the period from January 1, 2018, to April 1, 2019, which costs were incurred by reason of:

             1.      The production of the NRATV documentary series "American Heroes;" or

             2.      Cash or non-cash compensation to North or North-related Staff; or

             3.      Office space and other perquisites provided to North or North-related Staff; and

             4.      Whether each item was billed specifically to the NRA, the NRA Foundation, or both entities; and

c.      Copies of business records (if any) reflecting North's availability to film American Heroes, any modifications to the American Heroes production schedule during the period from May 2018 to present, and the reasons for those modifications; and

d.      Such other and further relief to which the NRA may be entitled at law or in equity.

Dated: February 11, 2021      Respectfully submitted,

**BREWER, ATTORNEYS & COUNSELORS**

By: */s/ Alessandra P. Allegretto*
     Michael J. Collins
     State Bar No. 00785493
     mjc@brewerattorneys.com
     Alessandra P. Allegretto
     State Bar No. 24109575
     apa@brewerattorneys.com
     1717 Main Street, Suite 5900
     Dallas, Texas 75201
     Telephone: (214) 653-4000
     Facsimile: (214) 653-1015

**ATTORNEYS FOR PLAINTIFF THE
NATIONAL RIFLE ASSOCIATION OF
AMERICA**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon

counsel of record in the above cause via ECF in accordance with the Federal Rules of Civil

Procedure and the Local Rules on this 11th day of February 2021.

         */s/ Alessandra P. Allegretto*
         Alessandra P. Allegretto

# Exhibit A



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

December 06, 2019

THE ATTACHED U.S. TRADEMARK REGISTRATION *1,680,653* IS
CERTIFIED TO BE A TRUE COPY WHICH IS IN FULL FORCE AND
EFFECT WITH NOTATIONS OF ALL STATUTORY ACTIONS TAKEN
THEREON AS DISCLOSED BY THE RECORDS OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE.

REGISTERED FOR A TERM OF *10* YEARS FROM  *March 24, 1992*
*2nd* RENEWAL FOR A TERM OF *10* YEARS FROM  *March 24, 2012*
SECTION 8 & 15
SAID RECORDS SHOW TITLE TO BE IN:
  *Registrant*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

P. R. GRANT
Certifying Officer

Int. Cls.: 41 and 42

Prior U.S. Cls.: 100 and 107

**United States Patent and Trademark Office**

Reg. No. 1,680,653
Registered Mar. 24, 1992

## SERVICE MARK
### PRINCIPAL REGISTER

## NATIONAL RIFLE ASSOCIATION OF AMERICA

NATIONAL RIFLE ASSOCIATION OF AMER-
ICA (NEW YORK CORPORATION)
1600 RHODE ISLAND AVENUE, N.W.
WASHINGTON, DC 20036

FOR: EDUCATIONAL SERVICES; NAMELY,
CONDUCTING COURSES OF INSTRUCTION
ON FIREARMS AND WILD LIFE CONSERVA-
TION; AND PUBLICATION SERVICES;
NAMELY, PUBLISHING MAGAZINES, TEXT
BOOKS, MANUALS, TARGETS, RULE BOOKS
AND OTHER BOOKS AND ARTICLES OF IN-
TEREST TO HUNTERS, COLLECTORS, COM-
PETITIVE SHOOTERS AND OTHER GUN
OWNERS, IN CLASS 41 (U.S. CL. 107).
FIRST USE 12-0-1871; IN COMMERCE
12-0-1871.

FOR: ASSOCIATION SERVICES; NAMELY,
PROMOTING THE INTERESTS OF OWNERS
OF FIREARMS; AND RESEARCH SERVICES
IN THE FIELD OF FIREARM DEVELOPMENT
AND IMPROVEMENT, IN CLASS 42 (U.S. CL.
100).
FIRST USE 12-0-1871; IN COMMERCE
12-0-1871.
NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "RIFLE ASSOCIATION",
APART FROM THE MARK AS SHOWN.
SEC. 2(F).

SER. NO. 74-130,108, FILED 1-14-1991.

M. L. HERSHKOWITZ, EXAMINING ATTOR-
NEY



8026293

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

December 06, 2019

THE ATTACHED U.S. TRADEMARK REGISTRATION *1,683,307* IS
CERTIFIED TO BE A TRUE COPY WHICH IS IN FULL FORCE AND
EFFECT WITH NOTATIONS OF ALL STATUTORY ACTIONS TAKEN
THEREON AS DISCLOSED BY THE RECORDS OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE.

REGISTERED FOR A TERM OF *10* YEARS FROM *April 14, 1992*
*2nd* RENEWAL FOR A TERM OF *10* YEARS FROM *April 14, 2012*
SECTION 8 & 15
SAID RECORDS SHOW TITLE TO BE IN:
*Registrant*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

P. R. GRANT
Certifying Officer



Int. Cls.: 41 and 42

Prior U.S. Cls.: 100 and 107

## United States Patent and Trademark Office

Reg. No. 1,683,307
Registered Apr. 14, 1992

### SERVICE MARK
### PRINCIPAL REGISTER

## NATIONAL RIFLE ASSOCIATION

NATIONAL RIFLE ASSOCIATION OF AMER-ICA (NEW YORK CORPORATION)
1600 RHODE ISLAND AVENUE, N.W.
WASHINGTON, DC 20036

FOR: EDUCATIONAL SERVICES; NAMELY, CONDUCTING COURSES OF INSTRUCTION ON FIREARM AND WILD LIFE CONSERVA-TION; AND PUBLICATION SERVICES; NAMELY, PUBLISHING MAGAZINES, TEXT BOOKS, MANUALS, TARGETS, RULE BOOKS AND OTHER BOOKS AND ARTICLES OF IN-TEREST TO HUNTERS, COLLECTORS, COM-PETITIVE SHOOTERS AND OTHER GUN OWNERS, IN CLASS 41 (U.S. CL. 107).

FIRST USE 12-0-1871; IN COMMERCE 12-0-1871.

FOR: ASSOCIATION SERVICES; NAMELY, PROMOTING THE INTERESTS OF OWNERS OF FIREARMS, AND RESEARCH SERVICES IN THE FIELD OF FIREARM DEVELOPMENT AND IMPROVEMENT, IN CLASS 42 (U.S. CL. 100).

FIRST USE 12-0-1871; IN COMMERCE 12-0-1871.

OWNER OF U.S. REG. NOS. 516,346, 528,555, AND 1,612,184.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "RIFLE ASSOCIATION", APART FROM THE MARK AS SHOWN.

SEC. 2(F).

SER. NO. 74–127,724, FILED 1–3–1991.

M. L. HERSHKOWITZ, EXAMINING ATTOR-NEY





# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS; SHALL COME;

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

December 06, 2019

THE ATTACHED U.S. TRADEMARK REGISTRATION *5,538,391* IS
CERTIFIED TO BE A TRUE COPY OF THE REGISTRATION ISSUED BY
THE UNITED STATES PATENT AND TRADEMARK OFFICE WHICH
REGISTRATION IS IN FULL FORCE AND EFFECT.

REGISTERED FOR A TERM OF *10* YEARS FROM  *August 14, 2018*
SAID RECORDS SHOW TITLE TO BE IN:  *Registrant*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

P. R.  GRANT
Certifying Officer



# United States of America

## United States Patent and Trademark Office

# NRA

**Reg. No. 5,538,391**

**Registered Aug. 14, 2018**

**Int. Cl.: 8, 9, 11, 13, 14, 16, 18, 25, 28, 35, 36, 41**

**Service Mark**

**Trademark**

**Principal Register**

NATIONAL RIFLE ASSOCIATION OF AMERICA (NEW YORK CORPORATION)
11250 Waples Mill Road
Fairfax, VIRGINIA 22030

CLASS 8: hunting knives

FIRST USE 9-6-2011; IN COMMERCE 9-6-2011

CLASS 9: Downloadable podcasts and video recordings in the field of firearms, gun safety, marksmanship, hunting and shooting sports; Downloadable electronic publications in the nature magazines and newsletters in the field of firearms, gun safety, marksmanship, hunting and shooting sports; glasses, namely, sunglasses and shooting glasses in the nature of safety eyewear

FIRST USE 12-31-2012; IN COMMERCE 12-31-2012

CLASS 11: Flashlights

FIRST USE 6-21-2016; IN COMMERCE 6-21-2016

CLASS 13: Rifles; Range bags especially adapted to carry firearms and munitions to gun ranges

FIRST USE 6-14-2017; IN COMMERCE 6-14-2017

CLASS 14: Jewelry; bolo ties with precious metal tips; rings; watches; chronological instruments, namely, clocks; lapel pins

FIRST USE 2-2-1998; IN COMMERCE 2-2-1998

CLASS 16: Printed publications, namely, magazines, pamphlets and books in the field of firearms; printed paper signs; stickers; posters

FIRST USE 12-31-1923; IN COMMERCE 12-31-1923

CLASS 18: Bags, namely, backpacks, carry-all bags

FIRST USE 6-14-2017; IN COMMERCE 6-14-2017

CLASS 25: Shirts, pants, shorts, leggings, belts, hats, footwear, vests, coats, ties, jackets, bolo ties

FIRST USE 4-1-1982; IN COMMERCE 4-1-1982

CLASS 28: Targets for pistols, targets for rifles



Director of the United States
Patent and Trademark Office

FIRST USE 1-1-1922; IN COMMERCE 1-1-1922

CLASS 35: Association services to promote awareness of the Second Amendment right to keep and bear arms; promoting public awareness in the fields of firearms, hunting, shooting sports; promoting the interests of owners of firearms; Online retail store services featuring clothing, hunting, shooting and firearm gear, jewelry, watches, books, dvds, and gifts for home, office and outdoor activities; providing a website featuring consumer information in the field of firearms and firearm gear and information about the Second Amendment right to keep and bear arms; promoting legislative action, advocacy, and public awareness of the Second Amendment right to the U.S. Constitution

FIRST USE 12-31-1871; IN COMMERCE 12-31-1871

CLASS 36: Charitable fundraising services

FIRST USE 3-15-1992; IN COMMERCE 3-15-1992

CLASS 41: Association services in the nature of an education and entertainment web site featuring current events, news and charitable events in the fields of firearms, hunting, shooting sports, and the Second Amendment right to keep and bear arms; Providing on-line non-downloadable videos, podcasts and publications, namely, e-magazines in the fields of firearms, hunting, shooting sports, and the Second Amendment right to keep and bear arms; Providing and publishing online non-downloadable magazines featuring articles in the fields, fashion, art, culture, current events, fitness, and general lifestyles; conducting educational programs featuring outdoor shooting sports and hunting activities and firearm training courses and instruction; Providing a web site featuring recreational and sporting information and news in the field of firearms, hunting, shooting sports, firearm training; providing current event news on legislative action on the Second Amendment right to the U.S. Constitution; Providing on-line non-downloadable magazines, videos, and podcasts in the field of firearms, namely, marksmanship, hunting and shooting sports; Providing a website for entertainment purposes featuring videos about firearms, namely, marksmanship, hunting, shooting sports, sports training, sports education, and self-defense; Entertainment services, namely, providing non-downloadable podcasts and video podcasts in the field of gun safety; museum services; educational services, namely, conducting courses of instruction on firearm and wild life conservation

FIRST USE 12-31-2012; IN COMMERCE 12-31-2012

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

SER. NO. 87-487,150, FILED 06-14-2017

## REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION

### WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.

**Requirements in the First Ten Years***
**What and When to File:**

- *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. See 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. See 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. See 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at h** ttp://www.uspto.gov.

**NOTE: A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms available at** http://www.uspto.gov.

# Exhibit B

The following images were obtained from the Homepage of the Ackerman McQueen website on August 29, 2019.[1]

Perhaps their vision motivated future peers to take control. Today, our leading voice for *motivation* comes from a shoe brand. *Independence* is owned by a computer company. *Extreme adventure* is presented by an energy drink. *Freedom* is the territory of a gun rights organization.

That's the one we created.

The best brands have always understood that the key to retaining influence was to control the narrative. But what they haven't always controlled was the means in which to distribute it.

This is where Ackerman McQueen's modern story begins.

## WE HAVE FOUND OURSELVES AT ODDS WITH MANY IN OUR INDUSTRY.

Those who crave mass impressions, viral videos or short-term results have never understood the lasting value of this type of media investment. Those who believe in this concept see it as the most efficient and unique means by which to build influence over time.

As we waited for the media industry to catch up, we honed our craft. We built media companies on behalf of theme parks, indigenous cultures, personal legacies, the Second Amendment to the Constitution and more. Each of these endeavors didn't grow their influence through full-page spreads, social media posts or TV spots alone. They recognized that there was white space in a narrative that they could control with years-long dedication to owned storytelling.

---

[1] Ackerman McQueen, Inc. website, *Homepage*, https://www.am.com/. These and the below images were obtained on August 29, 2019. The website has since been modified.

1

The following images were obtained from the Ackerman Website webpage entitled "Our Media Evolution"[2] on August 29, 2019:



## 2016

# NRATV

*Broadcasting Second Amendment-related programming in live streaming HD, 24 hours a day, 7 days a week.*

NRATV offers the world's most comprehensive video coverage of freedom-related news, events and culture. No one else in the news media can match NRATV's authority, expertise and perspective on Second Amendment issues.

The NRATV network is comprised of four channels — NRA News presented by Ruger, NRA Women presented by Smith & Wesson, NRA Country and NRA Hunting — and features nearly three dozen original shows that include 20+ hours of live news and commentary, as well as investigative reports, lifestyle pieces, profiles and more. Every episode of every show is available on demand.

NRATV is available online, on Apple TV and Roku, and through Google Chromecast or Amazon Fire TV.

---

[2] Ackerman McQueen website, *Our Media Evolution*, https://www.am.com/projects/nratv-project/·

The following image was obtained from the page entitled "Our Team" on the Ackerman McQueen website[3] on August 29, 2019:



The following images were obtained from the page entitled "Gallery" on the Ackerman McQueen website[4] on August 29, 2019:

 

---

[3] Ackerman McQueen website, Our Team, https://www.am.com/our-team/.
[4] Ackerman McQueen website, *Gallery*, https://www.am.com/gallery/.

3



























# Exhibit C

Case 21-30085-hdh11 Doc 307-1 Filed 03/06/21    Entered 03/06/21 05:43:57    Page 97 of
Case 3:19-cv-02074-G-BK   Document 201-1   Filed 02/11/21   Page 96 of 106   PageID 10408
107

The following images were obtained October 17, 2019 from the Ackerman Website webpage entitled "Our Media Evolution"[1]













---

[1] Ackerman McQueen website, *Our Media Evolution*, https://www.am.com/projects/nra-news-project/ and https://www.am.com/projects/nratv-project/. These images were obtained on October 17, 2019. The website has since been modified.









# Exhibit D

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Karyn A. Temple*

United States Register of Copyrights and Director

**Registration Number**

**VA 2-182-373**

**Effective Date of Registration:**
December 11, 2019
**Registration Decision Date:**
December 12, 2019

---

## Title _____

**Title of Work:** NRA Eagle

## Completion/Publication _____

**Year of Completion:** 2006
**Date of 1st Publication:** December 22, 2006
**Nation of 1st Publication:** United States

## Author _____

- **Author:** National Rifle Association of America
- **Author Created:** 2-D artwork
- **Work made for hire:** Yes
- **Domiciled in:** United States

## Copyright Claimant _____

**Copyright Claimant:** National Rifle Association of America
11250 Waples Mill Road, Fairfax, VA, 22030, United States

## Rights and Permissions _____

**Organization Name:** National Rifle Association of America
**Address:** 11250 Waples Mill Road
Fairfax, VA 22030 United States

## Certification _____

**Name:** Jason C. McKenney
**Date:** December 11, 2019

Page 1 of 2

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code,*
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kacy A. Teala*

United States Register of Copyrights and Director

**Registration Number**

# VA 2-182-376

**Effective Date of Registration:**
December 11, 2019
**Registration Decision Date:**
December 12, 2019

---

## Title
_____

Title of Work: NRA Girl in Hoodie

## Completion/Publication
_____

Year of Completion: 2014
Date of 1st Publication: May 29, 2014
Nation of 1st Publication: United States

## Author
_____

- Author: National Rifle Association of America
  Author Created: photograph, 2-D artwork
  Work made for hire: Yes
  Domiciled in: United States

## Copyright Claimant
_____

Copyright Claimant: National Rifle Association of America
11250 Waples Mill Road, Fairfax, VA, 22030, United States

## Rights and Permissions
_____

Organization Name: National Rifle Association of America
Address: 11250 Waples Mill Road
Fairfax, VA 22030 United States

## Certification
_____

Name: Jason C. McKenney
Date: December 11, 2019

Page 1 of 2

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kay A. Cole*

United States Register of Copyrights and Director

**Registration Number**

## VA 2-183-309

**Effective Date of Registration:**
December 16, 2019
**Registration Decision Date:**
December 19, 2019

## Title

Title of Work: NRA NOIR

## Completion/Publication

Year of Completion: 2013
Date of 1st Publication: March 18, 2013
Nation of 1st Publication: United States

## Author

- **Author:** National Rifle Association of America
  **Author Created:** photograph, 2-D artwork
  **Work made for hire:** Yes
  **Domiciled in:** United States

## Copyright Claimant

Copyright Claimant: National Rifle Association of America
11250 Waples Mill Road, Fairfax, VA 22030, United States

## Rights and Permissions

Organization Name: Brewer Attorneys and Counselors
Name: Jason C. McKenney
Email: jcm@brewerattorneys.com
Telephone: (214) 653-4837
Address: 1717 Main Street STE 5900
Dallas, TX 75201 United States

## Certification

**Name:** Jason C. McKenney
**Date:** December 14, 2019

# Exhibit E

# McDermott
# Will & Emery

Boston  Brussels  Chicago  Dallas  Düsseldorf  Frankfurt  Houston  London  Los Angeles  Miami

Milan  Munich  New York  Orange County  Paris  San Francisco  Seoul  Silicon Valley  Washington, DC

Strategic alliance with MWE China Law Offices (Shanghai)

Stephen Ryan
Attorney at Law
sryan@mwe.com
+1 202 756 8333

August 22, 2018

BY EMAIL AND U.S. MAIL

William A. Brewer, III
Brewer, Attorneys & Counselors
1717 Main Street
Suite #5900
Dallas, TX  75201

Dear Mr. Brewer:

McDermott Will & Emery has been engaged to represent Ackerman McQueen, and to assist the
Dorsey law firm with regard to any and all NRA requirements with respect to two NRA litigation
matters - the first in the Federal court in New York and second, in the Eastern District of
Virginia, as well as any changes in the NRA-Ackerman contract and procedures. As NRA
chooses to adopt any new system of required documentation requested from Ackerman,
Ackerman will comply with NRA's commercially reasonable requirements.

The past multi-decade business relationship between the NRA and Ackerman has been
extraordinarily useful to the NRA in crisis communications and many related public relations
management issues. At its most senior levels, NRA leadership has had detailed understanding of
not only the budgeting process, but also the management of a very complex set of deliverables
that include fundraising strategy, crisis communication, media company development and
management, public relations management, event transformation, coordination and design, as
well as many projects that specifically address the NRA's continued need to transform itself
from a gun rights organization to a freedom organization among countless other projects. The
history of this relationship should be respected for its complexity and unparalleled success that
can only be determined by the strength of the NRA brand today as opposed to where it was
decades ago. The positive and cooperative multi-decade impact that Ackerman McQueen has
had on every communication objective the NRA has pursued is substantial.

The NRA-Ackerman relationship is premised on NRA's contractual rights to evaluate its own
needs in budgeting and directing Ackerman's activities, and NRA auditing detailed expenditures
Ackerman is directed to undertake for the NRA. The NRA-Ackerman budgeting process gives
the NRA greater control than any retrospective review after the funds are expended on third
party vendors and Ackerman activity.

It is my understanding that in the two litigation matters where you are acting for NRA,
Ackerman has provided your firm (and NRA) every document you have represented is needed

McDermott
Will & Emery

William H. Brewer
August 22, 2018
Page 2

for the litigations now underway. In fact, Ackerman chose to provide documents that might
prove helpful that went beyond the scope of the requests. The backup materials you have
demanded regarding invoices relating to the CarryGuard program have been provided to Mr.
Powell and other NRA personnel. There were also numerous contemporaneous phone
conversations and meetings that clearly outlined the work that would be done, the progress that
was being made, and the NRA client approvals that were received. Requesting the creation of
new documents that did not previously exist such as creating invoices in the form of hours
worked on the project and scope changes that were repeatedly made by the NRA client is not
possible.

Ackerman believes the manner in which the NRA-Ackerman agreement has been managed for
decades is totally consistent with Federal IRS law, regulations and practice.  The contract
procedures do not impinge or violate any IRS or State Department of Revenue (DOR)
requirements it is aware of, and nothing has been specifically brought to its attention. Ackerman
sees no basis for concern that the past or amended directions for managing the NRA-Ackerman
contract will adversely impact NRA's venerable New York state non-profit charter. The NRA
fully knows that Ackerman maintains complete files of all expenses incurred with third parties
on behalf of the NRA consistent with IRS guidelines and regulations. This documentation is
routinely utilized in audits by senior NRA officials and authorized staff.

In the near future, NRA-Ackerman documentation may be subject to new congressional, state
attorney general or third party plaintiff lawyer litigation subpoenas. Therefore, NRA may wish to
proceed with caution in creating paper trails the New York State DOR, or other state DORs may
pour over and publish for political purposes.  Come November, the political climate could be
very different than today if the U.S. House of Representatives, or less likely, the Senate changes
hands. Creating excessive contractual documentation transmitted to NRA on a regular basis may
not serve NRA's management needs, as the aforementioned third parties will be all too happy to
have access to such detailed billing information. Any documentation that exceeds NRA's needs
for contract management creates additional concerns for NRA legal management, and threatens
NRA's other competing needs. However, the ability to comply requires precision in the
description. Any direction to change the NRA-Ackerman contractual requirements for
documentation at the very time NRA is engaged in litigation with a State in two courts where
such exchanges of correspondence may be demanded and obtained in
discovery by the State of New York in the two ongoing matters seems an unlikely course of
action to buttress NRA's litigation positions. Demanding any such billing procedure changes and
documentation at this time, or retrospectively, is worthy of careful consideration. But Ackerman
will do its best to follow any additional NRA requirements for changes to the NRA-Ackerman
contract.

McDermott
Will & Emery

William H. Brewer
August 22, 2018
Page 3


Your personal views regarding the NRA-Ackerman business relationships that you have
expressed to NRA personnel as well as the Dorsey firm, which was subsequently reported to
Ackerman, have been exceptionally critical. Your comments and views are not consistent with
the contemporaneous communications of NRA leadership and staff to Ackerman. Since
Ackerman is, and has been a represented party, you are requested to contact Ackerman through
me, other members of my firm you meet, or a member of the Dorsey firm, Ms. Gina Betts, if I
cannot be immediately reached. We look forward to maintaining the NRA-Ackerman
relationship through this period.

Sincerely,

Stephen M. Ryan
Attorney for Ackerman McQueen


cc: Gina Betts, Esquire