Louis R. Strubeck, Jr. (SBT 19425600)
Kristian W. Gluck (SBT 24038921)
Scott P. Drake (SBT 24026812)
Laura L. Smith (SBT 24066039)
Nick Hendrix (SBT 24087708)
NORTON ROSE FULBRIGHT US LLP
2200 Ross Avenue, Suite 3600
Dallas, TX 75201-7932
Telephone: (214) 855-8000
Facsimile: (214) 855-8200
louis.strubeck@nortonrosefulbright.com
kristian.gluck@nortonrosefulbright.com
scott.drake@nortonrosefulbright.com
laura.smith@nortonrosefulbright.com
nick.hendrix@nortonrosefulbright.com

*Proposed Counsel for The Official
Committee of Unsecured Creditors*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| NATIONAL RIFLE ASSOCIATION OF AMERICA AND SEA GIRT LLC, | § | Case No. 21-30085-hdh11 |
| | § | |
| | § | |
| Debtors[1]. | § | Jointly Administered |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OMNIBUS
RESPONSE TO (I) ACKERMAN MCQUEEN INC.'S MOTION TO DISMISS THE
CHAPTER 11 BANKRUPTCY PETITION, OR, IN THE ALTERNATIVE, MOTION
FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE, AND BRIEF IN SUPPORT,
(II) THE STATE OF NEW YORK'S MOTION TO DISMISS, OR, IN THE
ALTERNATIVE, TO APPOINT A CHAPTER 11 TRUSTEE AND
(III) THE DISTRICT OF COLUMBIA'S MOTION IN SUPPORT IN THE
STATE OF NEW YORK'S MOTION TO APPOINT CHAPTER 11 TRUSTEE**

TO THE HONORABLE HARLIN D. HALE,
UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors (the "Committee") in the above-captioned

chapter 11 cases (the "Chapter 11 Cases") filed by the National Rifle Association of America (the

---

[1] The last four digits of the Debtors' taxpayer identification numbers are: 6130 (NRA) and 5681 (Sea Girt). The Debtors' mailing address is 11250 Waples Mill Road, Fairfax, Virginia 22030.

"NRA") and Sea Girt LLC ("Sea Girt" and collectively with the NRA, the "Debtors"), through the Committee's proposed counsel, Norton Rose Fulbright US LLP, respectfully submits this omnibus response (the "Response") to (i) the *Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, and Brief in Support* (the "Ackerman Motion") filed by Ackerman McQueen, Inc. ("Ackerman") [Dkt. No. 131], (ii) *The State of New York's Motion to Dismiss, or, in the Alternative, to Appoint a Chapter 11 Trustee* (the "NYAG Motion") filed by the People of the State of New York, by Letitia James, Attorney General of the State of New York ("NYAG") [Dkt. Nos. 155 & 156],[2] and (iii) *The District of Columbia's Motion in Support in the State of New York's Motion to Appoint Chapter 11 Trustee* (the "District Motion," together with the Ackerman Motion and the NYAG Motion, the "Motions") filed by the District of Columbia, through its Attorney General (the "District," together with Ackerman and the NYAG, the "Moving Parties") [Dkt. No. 214].[3]   In further support of the Response, the Committee respectfully represents as follows:

## PRELIMINARY STATEMENT

1.     By the Motions, the Moving Parties[4] seek the extraordinary remedies of having these Chapter 11 Cases dismissed or, in the alternative, appointing a Chapter 11 trustee to replace the Debtors' management, remove the Debtors as debtors in possession, and take control over the

---

[2]    The NYAG appears to have filed an identical and duplicative motion at docket number 163.  The defined term NYAG Motion shall include both motions and this Response shall apply to both filings.

[3]    The Response also responds to any joinders to the Motions, including, without limitation, the joinder of Christopher W. Cox to the Ackerman Motion and NYAG Motion, that was filed on February 17, 2021 [Dkt. No. 172].

[4]    The Committee notes, without itself contending, that political considerations and motivations have been ascribed to the litigation initiated by the NYAG and the District against the Debtors.  The Committee further notes that Ackerman and the Debtors are parties to especially contentious litigation pending before the United States District Court for the Northern District of Texas.  Aside from these litigation parties, no other party has requested the dismissal of these Chapter 11 Cases or for the appointment of a Chapter 11 trustee.

bankruptcy process.[5] The thrust of the Moving Parties' argument for dismissal is that the bankruptcy filing was merely a litigation ploy orchestrated by the NRA to obfuscate, and avoid the consequences of, the NYAG's regulatory action. As such, and because the Debtors contend that they are financially healthy, the Moving Parties argue that the Chapter 11 Cases were filed in "bad faith" and not in furtherance of a "valid bankruptcy purpose."

2. The Committee independently represents the interests of thousands of creditor constituencies holding millions of dollars of claims in these Chapter 11 Cases and is charged not only with the duty of maximizing recoveries for creditors, but here, because of the Debtors' financial situation, also maximizing the prospects for the Debtors' successful reorganization and emergence from bankruptcy so that creditors, members and other interested parties can continue to do business with the NRA and support the NRA's overarching mission to advocate for gun rights and protect and defend the Second Amendment to the United States Constitution. After carefully and thoughtfully considering the Motions and arguments of the Moving Parties, the Committee strongly believes that these Chapter 11 cases should not be dismissed, and should remain pending under the auspices of this Court's oversight and the watchful and discerning eyes of the Committee and the United States Trustee.

3. The dismissal of these Chapter 11 Cases could be the first step down an inexorable path towards the dissolution and disbanding of the NRA, an outcome that the NYAG seeks as part of its regulatory action.[6] Eviscerating and dissolving the NRA would be an abject disaster, resulting in not only the loss of jobs to the NRA's employees but also the loss of a venerable long-

---

[5] The District has not moved to dismiss the Chapter 11 Cases, but only seeks the appointment of a Chapter 11 trustee if the Court does not dismiss the Chapter 11 Cases.

[6] *See* NYAG Motion at ¶ 6 (summarizing the relief sought in the NYAG Action, including "the dissolution of the NRA").

standing institution that has served, and continues to serve important political, educational and charitable roles in this country.  Dissolution of the NRA clearly is not in the best interests of creditors, especially those creditors (and other parties in interest) that value its mission and continue to conduct business with the NRA.

4.      If the allegations of mismanagement and misconduct against the NRA are proven, continuation of the bankruptcy process is the optimal path to facilitate the operational and governance restructuring needed to insure that such mismanagement and misconduct concerns are appropriately addressed.  This would serve to protect the organization's future operations, financial health, and would perpetuate, renew, and/or instill public confidence in the NRA.  The procedures provided for under Chapter 11 offer the best possible, if not the only, path forward for the NRA to accomplish these goals and to emerge as a viable entity with trustworthy management and proper and effective internal governance controls in place.

5.      The Committee also opposes the Moving Parties' alternative request for the appointment of a Chapter 11 trustee.  However, unlike the dismissal request, which turns on whether there is an objectively legitimate purpose to the bankruptcy filing, the request for a Chapter 11 trustee turns solely on the conduct of the Debtors and its management.  Therefore, the Committee believes the question of whether to appoint a Chapter 11 trustee is a closer call.[7]  The serious allegations that have been made by the Moving Parties against the NRA's current management raise critical questions about whether: (i) the measures and controls the Debtors

---

[7]    The Committee believes that the Debtors' retention of a chief restructuring officer ("CRO"), with the appropriate authority and scope of responsibility, would obviate the need for any consideration involving the appointment of a Chapter 11 trustee.  CROs often are retained in large, complex cases such as these to assist management, which typically has no experience with Chapter 11.  Not only is such experience needed here, but an officer with authority that does not have the taint of the allegations in the Motions would instill confidence in the Committee that these Chapter 11 Cases will be run for the benefit of unsecured creditors.  Despite the Committee's urging the Debtors to consider retaining a CRO since shortly following its formation, a CRO has still not been retained.

contend were adopted and implemented prior to the commencement of these Chapter 11 Cases to ensure that the alleged conduct would not be repeated were actually effective; and (ii) the Debtors' decision makers can be trusted to comply with their fiduciary duties to act in the best interests of creditors and other parties in interest going forward.

6.        Despite the Committee's concerns regarding these allegations, given the NRA's unique nature and the severe impact that could befall the Chapter 11 Cases at this juncture, the Committee does not support the complete displacement of the Debtors' current management, which would be a consequence of appointing a Chapter 11 trustee.  The Committee is eager to better understand the Debtors' plan for emerging from bankruptcy and has provided the Debtors with input regarding what it would expect to see in a plan.  The Committee is informed that the filing of a plan of reorganization, which the Committee firmly believes must include major changes to the NRA's current governance, is forthcoming.  Further, the Committee is concerned about the additional and substantial administrative expenses that necessarily will be incurred, as well as the significant delay in the Debtors' emergence from bankruptcy that will result from the appointment of a Chapter 11 trustee.

7.        As such, on balance, the Committee believes that current management can remain in place with appropriate safeguards; the risk of future management misconduct is far outweighed by the increased costs, delay and associated burdens of appointing a trustee.  This is particularly true given that the risk of future management misconduct in these cases is minimal due to the Court's judicial oversight, and the important and proactive watchdog role that the Committee, the U.S. Trustee and other vigilant parties in interest (including the Moving Parties) are playing.  The Committee has been extremely diligent, active and engaged in these Chapter 11 Cases, and its involvement and oversight of the Debtors' affairs will only increase as time progresses.  The

Committee opposes an across the board displacement of the Debtors' current management and believes that doing so would not be in the best interests of creditors.[8] If, however, the Court were inclined to appoint a Chapter 11 trustee, the Committee believes that an alternative and less drastic action is available and should seriously be considered to address creditor concerns and provide further assurances that the Debtors faithfully and properly will fulfill their fiduciary duties to act in the best interests of creditors and parties in interest, especially in light of the serious allegations raised by the Moving Parties.

8.      Specifically, the Court is empowered to appoint a Chapter 11 trustee with limited powers, who can work in concert with, rather than displacing, the Debtors' management and professionals.  The appointment of a trustee with limited powers would immediately help foster a culture of managerial independence that seemingly would address the "conflict" concerns raised by the Moving Parties.  At the same time, this approach would cause minimal disruption to the Debtors' business, including its ability to fundraise and otherwise garner support and continued participation from its membership, and minimize the delay and additional administrative expenses necessarily resulting from the appointment of a Chapter 11 trustee.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction over the Chapter 11 Cases and the Motions pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

10.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[8] The Committee has also objected [Dkt. No. 353] (the "Retention Objection") to the Debtors' application to retain Brewer, Attorneys & Counselors (the "Brewer Firm").  As set forth in the Retention Objection, the Committee argues that if the Brewer Firm has any role in these Chapter 11 Cases, it should be very narrow, and should not involve any bankruptcy advice to the Debtors.  The Committee's opposition to an across the board displacement of the Debtors' current management is predicated on the Brewer Firm having no influence on the NRA's governance or the day to day management of the Debtors' bankruptcy cases.

11.     The statutory predicates for the relief sought in the Motions are sections 105, 1104, 1106, and 1112 of the Bankruptcy Code and Rules 1017, 2002, 9013, and 9014 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

12.     On January 15, 2021 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief pursuant to chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court").

13.     The Debtors continue to operate their business as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

14.     On February 4, 2021, the United States Trustee for the Northern District of Texas (the "U.S. Trustee") appointed the Committee pursuant to section 1102 of the Bankruptcy Code.[9] *See* Dkt. No. 105.

15.     On February 8, 2021, the Committee selected Norton Rose Fulbright US LLP as counsel, subject to Court approval.  On February 11, 2021, the Committee selected AlixPartners, LLP as its financial advisor, subject to Court approval.

16.     On February 10, 2021, Ackerman filed the Ackerman Motion seeking an order dismissing the Debtors' Chapter 11 Cases or, in the alternative, appointing a Chapter 11 trustee.

17.     On February 12, 2021, the NYAG filed the NYAG Motion also seeking an order dismissing the Debtors' Chapter 11 Cases or, in the alternative, appointing a Chapter 11 trustee.

---

[9]     The Committee is comprised of the following entities: (a) the Pension Benefit Guaranty Corp.; (b) Ackerman McQueen, Inc.; (c) InfoCision, Inc.; (d) Stone River Gear, LLC; and (e) David Dell'Aquila [Dkt. No. 105].

18.     On February 23, 2021, the District filed the District Motion supporting the NYAG Motion insofar as it seeks the appointment of a Chapter 11 trustee. The District has not moved to dismiss the Chapter 11 Cases, but only seeks the appointment of a Chapter 11 trustee if the Court declines to dismiss the Chapter 11 Cases.

19.     On March 5, 2021, the Debtors filed their *Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, (2) The State of New York's Motion to Dismiss or, in The Alternative, to Appoint Chapter 11 Trustee, and (3) The District of Columbia's Motion to Appoint Chapter 11 Trustee* (the "NRA Objection") [Dkt. No. 307].[10]

## SUMMARY OF ARGUMENTS MADE BY MOVING PARTIES

20.     The Motions contain extensive background facts intended to establish that "cause" exists under section 1112(b) of the Bankruptcy Code to dismiss the Chapter 11 Cases or, alternatively, to appoint a Chapter 11 trustee. The Ackerman Motion and NYAG Motion are similar in nature and contain several common or related arguments, which can be summarized as follows:

- The Chapter 11 Cases have been filed in "bad faith" and are nothing more than a litigation ploy intended to allow the NRA to gain an unfair advantage in litigation and to circumvent the NYAG Action. *See* Ackerman Motion at ¶¶ 32-56; NYAG Motion at ¶¶ 31-38;

- The Debtors' "bad faith" filing is evidenced by the fact that the NRA's primary objective of "relocating" to Texas and reincorporating as a Texas not-for-profit cannot be accomplished through the Chapter 11 Cases because it would run afoul of applicable New York state law. *See* Ackerman Motion at ¶¶ 57-61;

- The Debtors have committed bankruptcy fraud (and engaged in improper venue shopping) by, among other things, commencing the Chapter 11 Cases in Texas, as

---

[10]     On March 5, 2021, Phillip Journey also filed a *Limited Objection to the Motions to Dismiss or the Appointment of Trustee* (the "Limited Objection") [Dkt. No. 306]. The Committee has largely addressed the Limited Objection as part of the *Official Committee of Unsecured Creditors' Objection to the Motion for Appointment of Examiner* [Dkt No. 354].

the NRA has no connections to the state other than its affiliation with Sea Girt, which was recently formed in Texas solely for the purpose of manufacturing jurisdiction in Texas for the NRA bankruptcy filing. *See* Ackerman Motion at ¶¶ 62-79; and

- The misdeeds and pervasive misconduct of the Debtors' management constitutes "cause" under section 1104 of the Bankruptcy Code that mandates the appointment of a Chapter 11 trustee. *See* Ackerman Motion at ¶¶ 80-86; NYAG Motion at ¶¶ 39-89.

## **RESPONSE**

### A.  **Cause Does Not Exist to Dismiss the Chapter 11 Cases**

21.  Both Ackerman and the NYAG seek to dismiss the Chapter 11 Cases for "cause," based upon the Debtors' alleged bad faith in filing the Chapter 11 Cases. Although the Bankruptcy Code does not expressly include filing in "bad faith" as "cause" for dismissing a Chapter 11 case, *see* 11 U.S.C. § 1112(b)(4), the Fifth Circuit has held that bad faith in filing a chapter 11 petition can constitute grounds for dismissing the case. *See Humble Place Joint Venture v. Fory (In re Humble Place Joint Venture),* 936 F.2d 814, 816-17 (5th Cir. 1991).

22.  Dismissal of a chapter 11 case based on bad faith is an extraordinary remedy that should be "***granted sparingly.***" *In re S. Healthcare Sys.*, No. 02-11621, 2003 Bankr. LEXIS 2133, at *9 (Bankr. M.D. La. Jan. 6, 2003) (citing *Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989)) (emphasis added). In this regard, dismissal is appropriate only if the facts of the particular case reach a certain "***level of egregiousness***" such that the chapter 11 process is being "***perverted.***" *In re Little Creek Dev. Co*., 779 F. 2d 1068, 1073 (5th Cir. 1986) (emphasis added).

23.  Moreover, the "bad faith" factors[11] are not to be applied in a rigid way; instead, the job of the bankruptcy court is to assess the particular facts and circumstances of the chapter 11

---

[11]  Courts have identified the following as indicia of a bad-faith filing:

(1) the debtor has one asset, such as either undeveloped or developed real property, encumbered by secured creditors' liens,

(2) debtor has engaged in improper pre-petition conduct,

case and determine whether the case was commenced for a "valid bankruptcy purpose." *See In re Mirant Corp.*, No. 03-46590, 2005 Bankr. LEXIS 1686, at *25 (Bankr. N.D. Tex. Jan. 26, 2005); *see also In re Morgan*, No. 01- 50250-11, 2001 Bankr. LEXIS 2254, at *9 n.1 (Bankr. N.D. Tex. June 18, 2001) (determination of good faith in filing chapter 11 petition "necessarily turns on the totality of the circumstances of each individual case . . . .").

  i.  *The Moving Parties Have Failed to Establish That the Chapter 11 Cases Were Filed in Bad Faith*

24.  In seeking the dismissal of these Chapter 11 Cases, the Moving Parties conflate the concept of litigation gamesmanship with prudent liability management. The Debtors filed these bankruptcy cases not to gain a tactical litigation advantage, but to implement a strategy ***to survive*** in the event of a potential adverse ruling in the NYAG Action. As described below, there could not be a more fundamental and proper use of the federal bankruptcy laws than preservation of and as a going-concern.

25.  The prime consideration under section 1112 of the Bankruptcy Code in assessing a motion to dismiss is whether the Chapter 11 case will serve a legitimate purpose and whether "the United States bankruptcy courts present a proper and suitable forum for addressing the needs of [the] Debtor and its creditors and equity security holders." *See In re Yukos Oil Co.*, 321 B.R. 396 (Bankr. S.D. Tex. 2005).

---

(3) the debtor's property has been posted for foreclosure, and the debtor has tried unsuccessfully to prevent this foreclosure in state court,

(4) the filing of bankruptcy enabled the debtor to evade court orders,

(5) the debtor employs few or zero employees other than its principals,

(6) there is little or no cash flow or source of income to sustain a reorganization, and

(7) there are few if any unsecured creditors and their claims are relatively small.

*See 1701 Commerce*, 477 B.R. 652, 657-58 (Bankr. N.D. Tex. 2012) (citing *Little Creek*, 779 F. 2d at 1072-73; *see also Matter of Elmwood Dev.*, 964 F.2d 508, 510 (5th Cir. 1992)).

26. Importantly, "[t]o dismiss a bankruptcy petition as a bad faith filing requires findings of **both** objective futility of the reorganization process **and** subjective bad faith in filing the petition." *Gremillion v. HealthEdge Inv. Fund, L.P. (In re Gremillion)*, 547 B.R. 196, 197-98 (Bankr. E.D. La. 2016) (emphasis added and citations omitted); *Davis v. M&M Developer, LLC (In re MBM Entm't, LLC)*, 531 B.R. 363, 408 (Bankr. S.D.N.Y. 2015) (quoting *In re General Growth Props., Inc.*, 409 B.R. 43, 56 (Bankr. S.D.N.Y. 2009)).  Mere bad acts by a debtor in filing a case will not, by itself, warrant dismissal.  *Gremillion*, 547 B.R. at 200 (noting that factual misrepresentations and omissions on bankruptcy schedules, although evidence of lack of good faith, are insufficient to justify a dismissal of a bankruptcy case).  Here, the Moving Parties have neither established the Debtors' subjective bad faith, nor have they established the objective futility of the Chapter 11 Cases.[12]

27. The Moving Parties seek to establish the Debtors' bad faith by arguing that the bankruptcy filing was nothing more than a litigation ploy intended to give the NRA an unfair tactical litigation advantage with respect to the pending NYAG Action.  *See* Ackerman Motion at ¶¶ 46-56; NYAG Motion at ¶¶ 31-38.

28. In support of this argument, the Moving Parties provide extensive details regarding the NRA's purported prior failed efforts to move the NYAG Action out of New York state court.  However, despite the NRA's apparent pre-bankruptcy efforts to move the litigation, it remains unclear exactly what, if any, litigation advantage the NRA has obtained by commencing the Chapter 11 Cases.  Indeed, other than referencing public relation statements that the NRA

---

[12] The Moving Parties have the initial burden to establish, by a preponderance of the evidence, that bad faith exists for dismissal of the Chapter 11 Cases under section 1112(b) of the Bankruptcy Code.  *See In re Mirant Corp.*, No. 03-46590, 2005 Bankr. LEXIS 1686, at *27 n.20 (Bankr. N.D. Tex. Jan. 26, 2005 ("The movant has the initial burden to present a prima facie case alleging bad faith; once achieved, the burden shifts to the debtor to prove that the petition was filed in good faith."); *see also In re Sherwood Enterprises, Inc.*, 112 B.R. 165, 170-71 (Bankr. S.D. Tex. 1989) (same); 7 COLLIER ON BANKRUPTCY ¶ 1112.04[4] (16th ed. 2020).

apparently made to its member constituents about filing for bankruptcy to "avoid New York," the Moving Parties have not specifically identified any advantage gained by the NRA and, as far as the Committee is aware, the Debtors have not sought to stay the NYAG Action. In short, innocuous (albeit ill advised) public relation statements made by the Debtors fall woefully short of establishing that the bankruptcy filings are "bad faith" litigation ploys, and do not come anywhere close to establishing grounds to otherwise dismiss the Chapter 11 Cases.

29. Additionally, even if the Moving Parties could establish that the bankruptcy filings were intended to provide the Debtors with an unfair litigation advantage, which they have not, the Moving Parties have failed to meet their burden of establishing that the reorganization process serves no legitimate purpose and would be objectively futile. *See Gremillion*, 547 B.R. at 197-98.

30. Given the NYAG's overt desire to dissolve and disband the NRA, the Chapter 11 Cases are essential and may present the only path to ensure that the NRA continues as a going concern. It is hard to fathom a more legitimate purpose for a bankruptcy filing than preservation of a debtor and its business. Indeed, the core purpose of Chapter 11 is to prevent the dissolution or liquidation of an otherwise viable company. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984) ("The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources.") (citing H. R. Rep. No. 95-595, p. 220 (1977)); *In re Shockley Forest Indus., Inc*., 5 B.R. 160, 162 (Bankr. N.D. Ga. 1980) ("Chapter 11 is designed for the purpose of preventing the unnecessary dissolution of an otherwise viable corporation."). For this reason, and because creditors and other parties in interest can seek remedies and other protections during a bankruptcy case, courts are generally reluctant to dismiss a case for lack of good faith at the initial stages of a case before a debtor has had a reasonable opportunity to advance its restructuring plan. *See In re Fox*, 232 B.R. 229, 236

(Bankr. D. Kan. 1999) ("Decisions denying access at the very portals of bankruptcy, before an ongoing proceeding has even begun to develop the total shape of the debtor's situation, are inherently drastic and not lightly to be made. . . . Dismissal on grounds of bad faith filing should not be judicially [employed] as an easy alternative to other post-petition creditor remedies, thereby[] subverting the reorganization and confirmation scheme of the Code.") (quoting *Carolin Corp. v. Miller*, 886 F.2d 693, 700 (4th Cir. 1989)).

31.     In addition to protecting the NRA from dissolution, these Chapter 11 Cases also offer the NRA an opportunity to implement corporate governance changes that will promote transparency and increase public confidence in the way the NRA handles its finances, conducts business with vendors and customers, and safeguards against future mismanagement. The alleged internal governance and management problems identified by the Moving Parties should not and cannot be the linchpin for cratering the entire NRA organization. Indeed, it would be perverse to punish the NRA's members and public-at-large, for whose benefit the not-for-profit organization exists, by allowing the NRA (and its important mission) to dissolve, based on the alleged bad acts of a few.

32.     Unlike the situation here, none of the cases relied upon by the Moving Parties present facts where a debtor filed for bankruptcy for a legitimate restructuring purpose, much less for the fundamental purpose of staving off a potential liquidation or dissolution. For example, in the *SGL Carbon* case, which the NYAG erroneously touts as being "particularly persuasive and analogous to the facts before this Court," the debtor was subject to a civil class action antitrust lawsuit seeking monetary damages, not a regulatory lawsuit brought by a state government agency seeking dissolution. *See* NYAG Motion at ¶ 33; *In re SGL Carbon Corp.*, 200 F3d 154, (3d. Cir 1999). Significantly, the court granted the creditors' committee motion to dismiss based on the

court's determination that there was no evidence that the possible antitrust judgments could force the debtor out of business. *SGL Carbon*, 200 F3d at 159-162. This is in stark contrast to the situation facing the NRA, as the NYAG Action, if successful, would put the NRA "out of business." *See* fn. 5, *supra*. Accordingly, *SGL Carbon* does not support dismissal of the Chapter 11 Cases.[13]

33.     The Moving Parties are also incorrect in arguing that the Debtors' currently strong financial position is evidence that the Chapter 11 Cases were filed in bad faith. The Debtors' financial condition does not undercut the fundamental and legitimate bankruptcy objectives stated above. As the Debtors correctly note in the NRA Objection, insolvency is not, and never has been, a prerequisite for a bankruptcy filing. *See* NRA Objection at ¶ 19; *see, e.g., In re James Wilson Assocs.*, 965 F.2d 160, 170 (7th Cir. 1992) ("[T]he Bankruptcy Code permits an individual or firm that has debts to declare bankruptcy even though he (or it) is not insolvent."). Notably, section 109(d) of the Bankruptcy Code, which sets forth the eligibility requirements for an entity to file for chapter 11 relief, neither requires nor is premised upon a requirement that the entity be insolvent. *See* 11 U.S.C. § 109(d). Moreover, the examples of "cause" justifying dismissal under section 1112 of the Bankruptcy Code do not include solvency of the debtor. *See* 11 U.S.C. § 1112(b)(4). Finally, there are also numerous examples of Chapter 11 Cases filed by solvent debtors where the bankruptcy court denied motions to dismiss. *See Fields Station LLC v. Capital Food Corp. of Fields Corner (In re Capital Foods Corp. of Fields Corner)*, 490 F.3d 21 (1st Cir. 2007) (solvent debtor commenced bankruptcy to forestall forfeiture of valuable leasehold interest and bankruptcy court denied motion to dismiss finding that bankruptcy filing served the purpose

---

[13]     In the NRA Objection, the Debtors have distinguished the other cases relied upon by the Moving Parties that purportedly support dismissal. For the sake of avoiding redundancy, the Committee will not repeat that exercise, but hereby adopts and incorporates the Debtors' arguments in opposition to dismissal.

of preserving debtor's going concern business and maximizing recoveries for creditors); *In re General Growth Props., Inc.*, 409 B.R. 43 (Bankr. S.D.N.Y. 2009) (court denied motion to dismiss solvent debtor bankruptcy case that was filed based on debtor's inability to refinance debt).

34.     Finally, the Debtors have alleged that a primary reason for the filing is to streamline overlapping and duplicative litigation that has become costly and disruptive to the organization. *See* NRA Objection at ¶¶ 37, 40.  It is well established, and the Moving Parties do not attempt to dispute, that the filing of a bankruptcy case for the purpose of managing and centralizing complex litigation serves a legitimate bankruptcy purpose.  Rather, the Moving Parties have alleged that the Debtors' "self-created quagmire of litigation" is of its own doing and, thus, cannot provide a justification for the bankruptcy filing.  *See* Ackerman Motion at ¶ 16.

35.     It is not the Committee's role to assess the genesis of, nor the interplay between, the various litigation matters in which the NRA is involved.  Regardless, to the extent that those lawsuits have common or overlapping facts and/or legal issues, then the Chapter 11 Cases could provide a useful platform to allow the Debtors to efficiently and cost-effectively address those claims.  *See, e.g., Aancor Holdings, Inc. v. NGC Settlement Trust & Asbestos Claims Mgt. Corp. (In re Nat'l Gypsum Co.)*, 118 F.3d 1056, 1069 (5th Cir. 1997) (purpose of bankruptcy includes protecting debtor and creditors from excessive costs and distractions of "piecemeal litigation").  This could provide a tangible benefit to the Debtors' creditors as it would help ensure that the Debtors remain solvent and are able to pay creditors in full.

36.     In short, the Chapter 11 Cases are not only critical to ensure the NRA's survival, but also offer the NRA a useful platform to economically and effectively resolve its on-going complex litigation.

      *ii.*      *The Moving Parties Have Failed to Establish that the Court Can't Grant Effective Relief in These Chapter 11 Cases*

37.    Rather than acknowledge the legitimacy of the Debtors' bankruptcy filing, which is ultimately aimed at ensuring that the NRA survives and emerges as a going concern, Ackerman instead alleges that the Debtors' plan to relocate to Texas is just further evidence of bad faith because it would "violate New York state law, which requires either the NYAG's or NY Supreme Court's approval to dissolve or merge into or consolidate with a foreign nonprofit incorporated in another state." Ackerman Motion at ¶¶ 57-61 (citing NY CLS N-PCL § 907). In support of its argument, Ackerman relies on 28 U.S.C. § 959 to establish the unremarkable proposition that the Debtors are required to comply with state law in "managing and operating" the company during the bankruptcy. Ackerman Motion at ¶ 57.

38.    This argument, which the NYAG tellingly does not itself advance, should be rejected out of hand. For starters, it is premature, as the Debtors have not yet put forward a Chapter 11 plan. Beyond the very general notion that the Debtors intend to "relocate" the NRA to Texas, no one knows exactly what the Debtors intend to propose under a plan of reorganization, much less what might be required to implement such plan. The premature and speculative nature of Ackerman's argument is evidenced by the fact that Ackerman's complaints relate to what the NRA "presumably" might ask for in the future. Ackerman Motion at ¶ 58. As the Debtors correctly note, potential future bad acts do not provide a basis to dismiss a bankruptcy case. *See* NRA Objection at ¶96 (citing to *In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001)).

39.    To the extent that Ackerman's argument is meant to imply that **the Court** cannot apply New York State law or grant effective relief to the Debtors, that argument fails as a matter of law. As the Debtors correctly note, Ackerman's argument, if true, would effectively preclude not-for-profit entities from ever availing themselves of the protections of bankruptcy; a result that

is clearly incorrect and demonstrably at odds with the Bankruptcy Code and bankruptcy jurisprudence.

40.     It is well established that bankruptcy courts are authorized to apply state law in administering a Chapter 11 case, including applicable non-profit state law. Notably, section 363(d)(1) of the Bankruptcy Code not only authorizes a bankruptcy court to apply applicable non-profit state law when approving a transfer or distribution of a not-for-profit debtor's assets, but also requires the court's compliance with such law. 11 U.S.C. § 363(d)(1); *see also In re HHH Choices Health Plan, LLC*, 554 B.R. 697 (Bankr. S.D.N.Y. 2016) (applying section 511 of New York's not-for-profit corporate law in approving sale of substantially all of debtor's assets). Section 1129(a)(16) of the Bankruptcy Code contains the same requirements for the transfer of a not-for-profit debtor's assets under a plan. *See* 11 U.S.C. § 1129(a)(16).

41.     Although the Bankruptcy Court is required to apply applicable non-profit state law, the Court is not constrained by the requirements of New York law that require either the NYAG's or New York Supreme Court's approval for a dissolution or merger.

42.     Specifically, U.S. federal courts adjudicating state law issues apply state substantive law, but federal procedural law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). "'Questions of venue . . . are essentially procedural, rather than substantive, in nature,' and therefore should be governed by federal law." *Martinez v. Bloomberg LP*, 740 F.3d 211, 220 (2d Cir. 2014) (quoting *Jones v. Weibrecht*, 901 F.2d 17, 19 (2d Cir. 1990)); *see also Bd. of Dirs. of Hopewell Intern. Ins. Ltd.*, 238 B.R. 25, 46-47 (Bankr. S.D.N.Y. 1999) ("Questions of venue are procedural in nature and are governed by federal law where provided, including federal common law where it exists.") (internal citations omitted). A venue statute is one that "concern[s] the place where judicial authority may be exercised." *U.S. ex rel. Thistlethwaite v. Dowty Woodville*

*Polymer, Ltd*., 110 F.3d 861, 864 (2d Cir. 1997) (quoting *Lindahl v. Office of Personnel Mgmt*., 470 U.S. 768, 793 n.30 (1985)).[14]

43.    The sections of New York's Not-for-Profit Corporation Law relied upon by the Moving Parties fall squarely within this definition as it addresses "the place where judicial authority may be exercised."  Thus, it is a venue statute (and consequently procedural in nature) and may be disregarded by the Court.

44.    This analysis is further demonstrated by the court's decision in *Perforaciones Martímas Mexicanas S.A de C.V. v. Grupo TMM S.A. de C.V*, 2007 WL 1428654 (S.D. Tex. 2007). In *Perforaciones*, the district court applied Mexican substantive law to a dispute arising from a shipping collision off the coast of Mexico.  *Id*. at *5.  Mexican law, however, purportedly limited the plaintiff to seeking redress before a particular Mexican court.  *Id*. at *6. The defendant asserted that the forum limitation provision of the Mexican statute was controlling, and moved to dismiss the U.S. litigation on that basis.  *Id*.  The district court correctly rejected the defendant's argument, finding that foreign statutory provisions directing that a remedy be sought only in a particular foreign court are procedural in nature, and are therefore disregarded by U.S. courts in favor of U.S. procedural law.  *Id*. at *7 ("Since U.S. courts apply U.S. procedural law, the instant claim does not have to be heard in the same court in which the Mexican Limitation is pending."); *see also Hosking v. TPG Capital Mgmt., L.P. (In re Hellas Telecomms. (Lux.) II SCA)*, 535 B.R. 543, 566 (Bankr. S.D.N.Y. 2015) (noting in *dicta* that "A state may entertain action even though the state of the applicable law has provided that action on the particular claim shall not be brought outside its territory").

---

[14]    Venue of the Chapter 11 Cases is properly considered under 28 U.S.C. §§ 1408 and 1409.

45. The same analysis in *Perforaciones* would apply here. Any purported requirement in the New York Not-For-Profit Law that dissolution of the NRA must be approved in New York (*i.e.*, by either the NYAG or New York Supreme Court) is procedural and should properly be disregarded by the Court.

46. In short, Ackerman's argument that this Court can't grant the Debtors effective relief or that the Debtors cannot comply with applicable New York state law is premature, speculative and in the end legally unsupportable.

iii. *The Circumstances Leading to the Bankruptcy Filing Do Not Amount to Fraud or Improper Forum Shopping Thereby Warranting Dismissal*

47. Ackerman's final argument is that the same allegations of debtor misconduct that warrant dismissal of the Chapter 11 Cases based upon "bad faith," also rise to the level of "bankruptcy fraud" under 18 U.S.C. § 157, which could expose the Debtors (and their counsel) to civil or even criminal penalties. Ackerman further argues that the creation and use of Sea Girt to allegedly manufacture venue in Texas was in furtherance of the Debtors' fraudulent scheme and also amounts to improper forum shopping that warrants dismissal of these cases.[15]

48. Ackerman's argument that the NRA's creation of Sea Girt to manufacture venue in Texas thereby necessitating dismissal is erroneous and can easily be disposed of.

49. In *Patriot Coal*, a debtor parent company and 98 of its affiliates commenced bankruptcy proceedings in the Southern District of New York bankruptcy court. *See In re Patriot Coal Corp.*, 482 B.R. 718 (Bankr. S.D.N.Y. 2012). In order to ensure compliance with the venue

---

[15] The Committee believes that the Debtors have already adequately responded to Ackerman's accusations that the Debtors have committed "bankruptcy fraud" under 18 U.S.C. § 157 and have nothing additional to add. *See* NRA Objection at ¶¶ 68-72. Moreover, Ackerman's allegations in connection with its argument that the Debtors' actions rise to the level of "bankruptcy fraud" are largely subsumed within Ackerman's previous argument that the Debtors' alleged misconduct amounts to bad faith and constitutes "cause" to dismiss the Chapter 11 Cases, which has already been responded to by the Committee as noted above.

statute, the parent created two New York companies on the eve of bankruptcy and used their New York affiliation as the basis for venue for the entire group. Although the cases were ultimately transferred to the Eastern District of Missouri,[16] which was the location of the debtors' corporate headquarters, the court expressly considered and rejected the notion that the bankruptcy filing was done in bad faith. *Patriot Coal*, 482 B.R at 742. To the contrary, the court found that the parents' creation of the New York subsidiaries to establish venue was, arguably, "entirely consistent with, or even required, by the Debtors' fiduciary duties." *Id.*

50.     It is clear from *Patriot Coal* that the creation of Sea Girt to establish venue for the Debtors in Texas does not amount to "bad faith" and, therefore, cannot constitute "cause" warranting dismissal of the Chapter 11 Cases. In fact, given the Debtors' purported objective to relocate to Texas — thus establishing a genuine and compelling reason to have these Chapter 11 Cases heard by this Court — it is arguable that the creation of entity to establish venue in Texas was "consistent with, or even required, by the Debtors' fiduciary duties." *Id.*

## B.     The Appointment of a Chapter 11 Trustee At This Time is Neither Warranted Nor in the Best Interests of the Estates

51.     In the event the Court denies dismissal of the Chapter 11 Cases, the Moving Parties have alternatively requested the appointment of a Chapter 11 trustee. Unlike a motion to dismiss, which ultimately turns on whether there is a legitimate bankruptcy purpose for filing, the grounds for appointment of a Chapter 11 trustee under section 1104(a) focus solely on the conduct of the Debtors' management. Specifically, the decision turns on whether there is "fraud, dishonesty,

---

[16]     The Moving Parties have not sought to transfer venue of the Chapter 11 Cases to another bankruptcy court. If a motion or other request is made to transfer venue, the Committee reserves its right to be heard on and submit arguments related to such a request.

incompetence or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case. . . ." 11 U.S.C.§ 1104(a).

52. Because of the "strong presumption" that debtors-in-possession should be afforded a fair opportunity to reorganize, the appointment of a Chapter 11 trustee is viewed as an "*extraordinary*" remedy that should only be granted when the misconduct enumerated in section 1104(a) of the Bankruptcy Code is established by "*clear and convincing*" evidence. *See In the Matter of Cajun Electric Power Cooperative, Inc*., 69 F.3d 747, 749 (5th Cir. 1995), *withdrawn in part on rehearing*, 74 F. 3d 599 (5th Cir. 1999) (finding the appointment of a trustee to be an extraordinary remedy that requires cause to be established by clear and convincing evidence) (emphasis added); *see also In re Patman Drilling International, Inc.*, Case No. 07-34622-SGJ, 2008 WL 724086 (Bankr. N.D. Tex. March 14, 2008) ("Appointment of a chapter 11 trustee is a draconian remedy. A strong presumption exists that a chapter 11 debtor should be permitted to remain in possession"); *United States Surety & Indem. Co. v. Lopez-Munoz (In re Lopez-Munoz)*, 553 B.R. 179, 189 (BAP 1st Cir. 2016) ("The presumption in chapter 11 cases is that current management is generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate.") (internal citations and quotations omitted).

53. Here, in support of their argument that a Chapter 11 trustee should be appointed, the Moving Parties rely primarily upon the allegations raised by the NYAG and the District in their respective pre-petition state court litigations against the Debtors and their management, which include claims of systematic misappropriation of funds, failure to provide oversight and breaches of fiduciary duty, many of which are alleged to have occurred in 2018 and 2019.

54. The Debtors have countered that the allegations of management misconduct are unfounded, unproven and disputed. The Debtors further allege that the allegations raised are stale,

as the alleged bad acts occurred several years ago and measures have since been taken by the NRA to prevent any further wrongdoings. Thus, the Debtors argue, none of the alleged acts of prior misconduct impact the ability of the Debtors' current management to carry out their duties in these Chapter 11 Cases. *See* NRA Objection ¶¶ 95-99.

55. After reading the Moving Parties respective pleadings, the Committee is rightfully concerned about the serious allegations of rampant misconduct directed at the NRA's management which, if proven, could warrant the appointment of a Chapter 11 trustee. This is particularly true given that certain individuals implicated in the NYAG Action, including most notably the NRA's current Executive Vice President Wayne LaPierre, and the NRA's current General Counsel John Frazer, remain active and play prominent and influential roles within the NRA. The Committee believes that these allegations will be further developed during discovery that has just commenced and which will continue up until the hearing on the Motions.

56. Despite these concerns, the Committee's primary objective in these cases is to ensure that creditors get paid and that the NRA emerges from Chapter 11 as a healthy and viable going-concern. With this objective in mind, at this time, the Committee is apprehensive to support the wholesale displacement of management by a Chapter 11 trustee, particularly at such an early stage of these cases and given the unique nature of the NRA. The Committee is eager to better understand the Debtors' plan for emergence from bankruptcy and understands that the filing of a plan of reorganization will be forthcoming. Moreover, the Committee has proactively shared with the Debtors its initial thoughts regarding key elements of a plan, including changes in the NRA's governance. The Committee has further recommended to the Debtors that, in addition to appointing a CRO, they engage an expert on best governing practices for not for profit entities and understands that the Debtors are preparing to engage such an expert. The Committee is also very

concerned that the appointment of a Chapter 11 trustee will, at a minimum, result in the incurrence of significant additional costs to the estate and cause undue delay regarding the Debtors' emergence from bankruptcy. Finally, from a practical standpoint, it is difficult for the Committee to envision a Chapter 11 trustee successfully displacing management given the complex and unique nature of the NRA and the regulatory challenges facing the organization.

57.     Based on these concerns, and consistent with the especially high burden on the Moving Parties for establishing the appointment of a Chapter 11 trustee, the Committee believes that the risk of future management misconduct is far outweighed by the increased costs, delay and other associated risks that would come along with the appointment of a Chapter 11 a trustee. *See In re Blue Stone Real Estate, Constr. & Dev. Corp.*, 392 B.R. 897, 904-05 (Bankr. M.D. Fla. 2008) ("The court may order appointment [of a Chapter 11 trustee] *only* if the protection afforded by a trustee is needed and expenses of a trustee would not be disproportionately higher than the value of the protection afforded.") (citing House Report No. 95-595, 95th Cong., 1st Sess. (1977), U.S. Code Cong. & Admin. News 1978, at 5963, 6358) (emphasis added). This is especially true given the Court's judicial oversight of the Debtors and the active involvement of the Committee and the U.S. Trustee in these cases, all of which should effectively safeguard against management misconduct during the pendency of the Chapter 11 Cases.

58.     Although the Committee does not believe that a wholesale displacement of management would be in the best interest of creditors and other parties in interest, the Committee believes that the appointment of an independent fiduciary, with the appropriate authority and scope of responsibility, to assist and work with the Debtors' existing management could benefit the estate

and quell many of the concerns shared by the Committee and creditors.[17]  In this regard, unique

situations require creative solutions and if the Court believes that the facts and circumstances of

these cases require the appointment of a Chapter 11 trustee, then the Committee would urge the

Court to appoint a Chapter 11 trustee *with limited powers*.

59.     Notably, case law supports the view that the Court has the authority to appoint a

Chapter 11 with limited powers:

> an examination of the Code reveals that the statutory basis, beyond the notions of
> the equity powers or the inherent authority of the bankruptcy court, lies in 11 U.S.C.
> § 1107 which gives the debtor-in-possession certain rights and powers "subject to
> . . . such limitations or conditions *as the court prescribes* . . ."  Similarly, 11 U.S.C.
> § 1108 provides that "***unless the court*** . . . ***orders otherwise***, the trustee [or debtor-
> in-possession] may operate the debtor's business."  Both sections grant the court
> broad authority to tailor and define the rights of a debtor-in-possession or a trustee
> if one is appointed to operate the debtor's business.

*In re Nartron Corp*., 330 B.R. 573, 594 (Bankr. W.D. Mi. 2005) (emphasis added).  Although

certainly not the norm, bankruptcy courts have appointed Chapter 11 trustees with limited powers

to work in tandem with a debtor's existing management, often bifurcating responsibilities between

operational tasks, that remain with current management, and financial management and other

related tasks, that are overseen by a Chapter 11 trustee.  This is particularly true when the debtor's

business is specialized or unique, but there is, nonetheless, substantiated evidence of management

misconduct or conflicts of interest.  *Id*. at 573, 594 (court found appointment of a trustee with

limited powers appropriate where debtor offered and produced sophisticated products); *In re

Celeritas Techs., LLC*, 446 B.R. 514, 521 (Bankr. Kan. 2011) (court appointed trustee with limited

powers, with current management to use operational expertise in keeping the businesses

---

[17]     In fact, the Committee, since its appointment, has encouraged the Debtors to retain a CRO in these Chapter 11
Cases.  The Committee believes that the appointment of a CRO would likely address the concerns raised by the
Moving Parties in the Motions and obviate their request for a Chapter 11 Trustee.

profitable); *In re Intercat, Inc.*, 247 B.R. 911, 925 (Bankr. S.D. Ga. 2000) (court appointed a Chapter 11 trustee with limited powers where the debtor was a highly-specialized business); *In re G&G Transp., Inc.*, No. 98-308660, 1998 WL 898835, at *4-5 (Bankr. E.D. Pa. Dec. 22, 1998) (based upon evidence that the debtor was in a competitive industry where customer loyalty was tied to personal relationships, the court appointed a Chapter 11 trustee to manage the finances of the debtor while leaving in place management as the trustee's employee to operate the business); *Chesapeake R & D Ltd. P'ship v. N. Am. Commc'ns., Inc.*, 138 B.R. 175, 180 (Bankr. W.D. Pa. 1992) (management was removed only with respect to decisions pertaining to utilization and expenditure of estate assets based upon the sophisticated nature of the debtor's business).

60.     In the absence of the Debtors retaining a CRO with appropriate authority and scope of responsibility, the Committee believes that, should the Court be inclined to appoint a Chapter 11 trustee, the appointment of a Chapter 11 trustee with limited powers would be a suitable compromise that adequately addresses many of the concerns of the Moving Parties, including concerns about allegedly "conflicted" management being able to comply with their fiduciary duties, while also allowing the NRA to continue its specialized mission to advocate for gun rights and protect and defend the Second Amendment to the United States Constitution, a mission largely dependent on the continued donations from and support of its membership.

## CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court enter an order: (i) denying the Motions insofar as they seek dismissal of the Chapter 11 Cases; (ii) denying the Motions insofar as they seek the appointment of a Chapter 11 trustee subject to the Committee's

additional comments noted above; and (iii) granting such other and further relief as is just and proper.

Dated: March 16, 2021          Respectfully submitted,

NORTON ROSE FULBRIGHT US LLP

By: */s/ Louis R. Strubeck, Jr.*
Louis R. Strubeck, Jr. (SBT 19425600)
Kristian W. Gluck (SBT 24038921)
Scott P. Drake (SBT 24026812)
Laura L. Smith (SBT 24066039)
Nick Hendrix (SBT 24087708)
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201-7932
Tel: (214) 855-8000
Facsimile: (214) 855-8200
louis.strubeck@nortonrosefulbright.com
kristian.gluck@nortonrosefulbright.com
scott.drake@nortonrosefulbright.com
laura.smith@nortonrosefulbright.com
nick.hendrix@nortonrosefulbright.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that a true and correct copy of the foregoing document was served electronically through the Bankruptcy Court's Electronic Case Filing System on those parties that have consented to such service, on the 16th day of March, 2021.

*/s/ Louis R. Strubeck, Jr.*
Louis R. Strubeck, Jr.