**G. Michael Gruber**
State Bar. No. 08555400
gruber.mike@dorsey.com
**H. Joseph Acosta**
State Bar No. 24006731
acosta.joseph@dorsey.com
**Brian E. Mason**
State Bar No. 24079906
mason.brian@dorsey.com
**DORSEY & WHITNEY LLP**
300 Crescent Court, Suite 400
Dallas, TX 75201
Tel.: (214) 981-9900
Fax: (214) 981-9901
*Attorneys for Ackerman McQueen, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **CHAPTER 11** |
| | § | |
| **NATIONAL RIFLE ASSOCIATION** | § | **Case No. 21-30085-hdh-11** |
| **OF AMERICA and SEA GIRT LLC,** | § | |
| | § | |
| **DEBTORS.** | § | **JOINTLY ADMINISTERED** |

**ACKERMAN MCQUEEN, INC.'S MOTION TO COMPEL DISCOVERY**

COMES NOW Ackerman McQueen, Inc., the largest unsecured creditor in the above-captioned case ("***AMc***"), and hereby files its *Motion to Compel Discovery* (the "***Motion***"), pursuant to Federal Rules of Civil Procedure 26 and 34, as incorporated by Federal Rules of Bankruptcy Procedure 7026, 7034 and 9014.  In support hereof, AMc would respectfully show the Court as follows.

**PRELIMINARY STATEMENT**

1.      When NRA officers are prevented from testifying—upon instruction of counsel—whether the NRA's governing body approved this bankruptcy, there is a big problem.

---

2.     When the Secretary and General Counsel is not present at the board meeting where the NRA board purportedly voted to file bankruptcy, there is a big problem.

3.     When one or more members of the board of directors cannot be allowed—based on offensive use of the attorney-client privilege—to testify as to what he voted on in respect to a bankruptcy filing, there is a big problem.

4.     When the NRA's acting CFO cannot answer simple questions about the financial affairs of the NRA, like why doesn't approximately $12 million in insider compensation not appear in the Statement of Financial Affairs, there is a very big problem.

5.     There are too many fundamental problems with these bankruptcy cases that need to be explored and rectified very shortly.  While the NRA agreed to expedited discovery in th meanwhile, it never disclosed that it would be hiding behind the attorney-client privilege or obfuscation to mask these problems.  The inappropriate and offensive use of the privilege and other strategic objections should be rejected outright, and this motion to compel should be granted.

## I.     JURISDICTION AND VENUE

6.     This Court has jurisdiction over the Bankruptcy Case and Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Debtors assert that venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7.     The legal predicates for the relief sought herein are Federal Rules 26 and 34, and Bankruptcy Rules 7026 and 7034.

## II.     BACKGROUND FACTS

8.     On January 15, 2021 (the "***Petition Date***"), the National Rifle Association of America ("***NRA***") and its shell subsidiary, Sea Girt, LLC ("***Sea Girt***," and together with the NRA,

the "***Debtors***"), filed two voluntary petitions for relief under Title 11 of the Bankruptcy Code.[1]

The NRA is operating as a debtor-in-possession, pursuant to 11 U.S.C. §§ 1107 and 1109. Sea

Girt has no operations, but is still considered to be a debtor in possession (until further

investigation). No one is really sure why Sea Girt, which was formed less than 3 months before

the Petition Date, is in bankruptcy.

9.     On February 4, 2021, the U.S. Trustee for the Northern District of Texas appointed

an official committee of unsecured creditors, comprised of (a) two of the NRA's primary vendors

(InfoCision, Inc.[2] and Stone River Gear, LLC), (b) two litigants against the NRA (AMc and Dell

'Aquila), and (b) a claimant whose claim is listed on the Debtors' bankruptcy schedules as

contingent based purely on accounting principles (PBGC)[3].

10.     On February 8, 2021, Judge Phillip Journey, a board member of the NRA

("***Journey***"), filed a motion to appoint an examiner in these cases (the "***Examiner Motion***") [Dkt.

No. 114] based, among other things, on (a) the suits brought by the New York Attorney General

("***NYAG***") and District of Columbia Attorney General ("***DCAG***"), alleging by *sworn* complaints

*inter alia*, that NRA insiders misuse of corporate assets, commit self-dealing and dishonesty, and

fail to implement sufficient internal controls, in violation of New York nonprofit corporate law

and the NRA's own bylaws. *See* Examiner Mot. ¶¶ 7-19.

11.     On February 10, 2021, AMc filed its *Motion to Dismiss the Chapter 11 Bankruptcy*

*Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, and Brief in*

---

[1]     The separate petition filed by Sea Girt is herein referred to as "***Sea Girt Bankr.***" Citations to the NRA's petition are referred to as "***NRA Bankr.***"

[2]     According to the NRA's 2019 990 tax form, the NRA paid MMP $11,560,154, only smaller than the payments to Brewer ($24,789,326) and InfoCision Management Corp. ($21,723,870).

[3]     Sonya Rowling (CFO of the NRA) testified that this contingent debt arise from accounting principles related to pension obligation, but that the NRA has never been in default of its pension obligations and never expected to be in default.

*Support* (the "***AMc MTD***") [Dkt. No. 131], primarily requesting the dismissal of these cases on bad faith grounds, based on, *inter alia*, the (a) lack of valid restructuring purpose, (b) litigation tactics, (c) noncompliance with New York state law, (d) use of the bankruptcy system to advance an illicit scheme, and (e) improper venue shopping for litigation.  *See* AMc MTD ¶¶ 46-79.[4]

12.    On February 12, 2021, the NYAG filed its own motion to dismiss and, alternatively, request for a trustee ("***NYAG MTD***") [Dkt. Nos. 155, 156], alleging by a verified complaint, *inter alia*, that the Debtors' cases were filed primarily to avoid the NYAG's enforcement action in New York, which action exposed (after a fifteen-month investigation) gross-mismanagement, self-dealing, and fraud by the current management of the NRA.  *See* NYAG MTD ¶¶ 13-20.

13.    Other parties have filed joinders to the AMc MTD and/or NYAG MTD, including the DCAG [Dkt. No. 214] and Christopher Cox, a former officer of the NRA [Dkt. No. 172].

14.    The Debtors, NYAG, and AMc entered into stipulation for expedited discovery to determine the merits of the NYAG MTD and AMc MTD (the "**Discovery Stipulation**").

15.    On March 6, 2021, the Debtors filed their response to AMc's MTD and NYAG's MTD (the "***MTD Response***"), arguing in large part, without a shred of evidence, that relief requested should be denied because "A SCORNED VENDOR AND A POLITICAL ADVERSARY JOIN FORCES TO DETROY THE NRA."  MTD Resp., Subsection D, at 9.  The clear reference is to AMc and the NYAG.  *See id.*

16.    On March 12, 2021, the Debtors' filed a response to the Examiner Motion [Dkt No. 358], pleading that an examiner is not needed, in part, because purportedly "the Debtors are

---

[4]    AMc estimates that the NRA has approximately 13 or more lawsuits in which Dorser is primary litigation counsel

presently in extensive discovery in connection with the pending dismissal and trustee motions set for hearing on March 29." Resp. Examiner Mot. ¶ 3. The Debtors also contest Journey's allegation that the bankruptcy "was not properly approved by the NRA's board." *Id.* at ¶ 9.[5]

17.    The UCC filed a response to the AMc MTD and NYAG MTD (the "***UCC Response***") [Dkt. No. 368.]. On information and belief, the UCC is still in the process of investigating all of the allegations against the Debtors and has not developed a firm opinion on the allegations against AMc and NYAG.

18.    Through the recent discovery process under the Discovery Stipulation, including the depositions of Journey (NRA board member), Wilson Phillips (a former Treasurer of the NRA), John Frazer (the Secretary and General Counsel of the NRA), and Sonya Rowling (the interim CFO of NRA), the good faith filing of the NRA has been further called into question. In particular, in addition to the grounds raised in the NYAG MTD and AMc MTD,

      a.  A former officer recently pleaded the 5th amendment to questions about the financial affairs of the NRA;

      b.  Journey claimed he did not vote for a bankruptcy filing;

      c.  Mr. Frazer, as an officer of the NRA, cannot testify, due to numerous privilege and speaking objections, whether the NRA Board voted for a bankruptcy filing; and

      d.  Ms. Rowling does not even know her current role with the NRA and was precluded, due to numerous privilege and speaking objections, from testifying about the NRA's financial affairs.

19.    There are two obvious abuses in the current discovery process: (a) the deposed witnesses (with the help of counsel) are inappropriately hiding behind the attorney-client privilege,

---

[5]     Mr. LaPierre's official title is Executive Vice President.

and (b) the NRA's attorneys are playing fast and loose with the discovery rules.  Both tactics prevent the disclosure of necessary facts relevant to the merits of NYAG MTD and AMc MTD.

### *No Authority to File Bankruptcy*

20.    Pursuant to the Discovery Stipulation, AMc and the NYAG noticed the deposition of (a) John Frazer (NRA Secretary and General Counsel) on March 15, 2021 and March 18, 2021, (b) Journey (NRA Board member) on March 18, 2021, and (c) Sonya Rowling (NRA CFO) on March 19, 2021.  In all instances, the NRA has hidden facts directly relevant to this bankruptcy and financial affair of the NRA, improperly claiming the attorney-client privilege and using numerous speaking objections (despite several warnings).  These tactics deserve the Court's attention.

21.    Discovery has revealed that, notwithstanding the purported resolution attached to each of the Debtors' voluntary petitions (the "***Bankruptcy Resolution***"), it appears that the Debtors did not have corporate authority to file bankruptcy or a select group of the NRA's management completely misled the NRA's board by hiding a vague clause in an employment agreement.

22.    Pursuant to the Bankruptcy Resolution, the authority to file bankruptcy came from Mr. Wayne LaPierre's employment agreement (the "***Employment Agreement***"), which was approved on January 7, 2021.  A true and correct copy of the Employment Agreement is attached hereto as **Exhibit A** and incorporated herein by reference.  That Employment Agreement contains vague language in Paragraph 2(a), providing:

> Employee shall be empowered to exercise corporate authority in furtherance of the mission and interests of the NRA, including without limitation to reorganize or restructure the affairs of the Association for purposes of cost-minimization, regulatory compliance or otherwise.

**Ex. A**, Emp. Agm't. ¶ 2(a).  *The NRA would have the Court and others believe that this vague language authorized the NRA and Sea Girt to file bankruptcy.*

23.    The fundamental problem is that the board members were not told—or misled-as to what this vague provision meant at the January 7, 2021 board meeting, where Employment Agreement was voted on.  This fact is reflected in the NRA board minutes of the January 7, 2021 board meeting.  *See* **Ex. B**, NRA Bd. Mins. at 5;[6] *see also* **Ex. D**, Journey Dep. at 26:11-21.  Indeed, on January 15, 2021, when the bankruptcy petitions were filed, after Mr. Frazer announced the bankruptcy filing to the NRA board by email, one or more board members responded to Mr. Frazer's email, mystified by the bankruptcy filing.  Several days later, at least one known board member resigned as a result.  *See* **Ex. C**, Resignation.

24.    Another board member, Journey, made public statements decrying the actions of the NRA in filing bankruptcy without proper board approval.  In a public statement issued on March 9, 2021, Journey stated that the bankruptcy filing "was a fraud perpetrated on the court" because the board was not aware of the plan to file bankruptcy, the "[NRA] lawyers intentionally left them in the dark," and ***Journey only became aware after the Petition Date***.  *See* **Ex. E**, Journey Press Release.[7]  As discussed below, Journey further testified on March 18, 2021 that the board was never asked to vote for a bankruptcy at the January 7 board meeting; thus the NRA board, which governs the organization, could not have approved such a drastic action.

---

[6]        Exhibit B contains a truncated portion of the January 7 board minutes, which contain voluminous committee reports (which do not change the substance of the resolutions contained in the minutes).
[7] Journey reaffirmed these statements at his deposition.  *See* **Ex. D**, Journey Dep. at 49:8-25, 50:4-8, 50:19-51:8, 53:18-54:9.

### *Frazer*

25.     Notwithstanding that good faith is front and center of these bankruptcies, and that the proper corporate authority to file bankruptcy has been pointed out several times in these nascent cases, the NRA's bankruptcy counsel would not let the NRA's management answer when specifically asked whether the terms "bankruptcy or "Chapter 11" were ever discussed at the January 7, 2021 board.  Debtors' counsel instructed Ms. Rowling, David Warren (CFO for For-Profit Entities for the National Rifle Association), and Mr. Frazer (as the NRA General Counsel and Secretary) not to answer.

> MR. KATHMAN:· Okay.· Thank you.· Were the words "bankruptcy" or "Chapter 11" ever said during any part of the January 7th board meeting, including in the Executive Session?
>
> MR. BUNCHER:· All right.· Objection, calls for attorney-client communication.· Instruct the witnesses not to re -- to respond.· The question—
>
> US TRUSTEE (Inaudible)
>
> MR. BUNCHER –necessarily—the—the question necessareily would lead to disclosure of privileged communications.
>
> MR. KATHMAN:· Okay.· And, Mr. Buncher, just to clarify the record, are you instructing the witnesses not to answer?
>
> MR. BUNCHER:· I just did.· Yes.
>
> MR. KATHMAN:· All right.· And are the witnesses taking the attorney's advice and not answering the question?
>
> MR. FRAZER:· I am.

**Ex. F**, 341 Meeting Tr. 12:22-25, 13:1-7 (Mar. 12, 2021).

26.     At the deposition of the NRA's 30(b)(6) witness on March 15, 2021, Mr. Frazer was asked whether the word "bankruptcy" was ever discussed or mentioned at the January 7, 2021 board meeting, where the board supposedly authorized the bankruptcy filing.  This is how the NRA's counsel and Mr. Frazer responded:

---

> Q. (MASON): Were there any discussions during that executive session [at the January 7, 2021 board meeting] relating to Mr. LaPierre's employment agreement and specifically the language discussing reorganization?
>
> MR. CICILIANO (VIA ZOOM): I just object on attorney-client privilege and direct you not to answer.
>
> Q. (MASON): Are you going to follow your counsel's instruction?
>
> A. (FRAZER): Yes, I'm going to follow advice.

**Ex. G.**, Frazer Dep. at 302:15-24. AMc's counsel, again, requested an explanation of what the NRA board was told about the bankruptcy filing:

> Q. (MASON): Mr. Frazer, at the time Mr. LaPierre's employment agreement was approved at the January 7th board meeting, did you personally know that the language in that agreement was going to be used as a basis for filing bankruptcy?
>
> MR. CICILIANO (VIA ZOOM): Object to the extent it calls for attorney-client privilege or work product. Direct you not to answer.
>
> Q. (MASON): I am asking you [Frazer] personally?
>
> MR. CICILIANO (VIA ZOOM): Same answer—or same objection.

*See id.* at 302:25-303:10. Attempting to further hide the fact that these cases are entirely litigation driven and steered by litigation counsel, the NRA's counsel will not even allow corporate officers to answer the question of who hired the NRA's bankruptcy counsel to commence doing work for the Debtors in the Fall 2020, *see id.* at 307:5-14, or how much work special litigation committee is currently doing for the Debtors, *see id.* at 311:13-22. The NRA took this position, even though Journey candidly had spoken with many people, including non-NRA board members, about the bankruptcy and the authorization to file. *See* **Ex. D**, Journey Dep. at 30:18-31:15, 32:1-33:11.

### *Journey*

27. The NRA's objections spilled over to questions to NRA board members, in particular Journey, who opined that he did not believe that the NRA could file without

---

knowledgeable board approval, which cannot be delegated. *See* **Ex. D**, Journey Dep. at 43:8-17, 44:7-22.

28.     When Journey (who was never provided with a copy of Mr. LaPierre's Employment Agreement) was asked at his deposition on March 18, 2021 whether anyone discussed the authority to file for bankruptcy in connection with the approval of the Employment Agreement, the NRA's, followed by his own counsel, instructed him not to answer such questions. The questions, answers and objections are quite revealing:

> Q. (PRONSKE):  Was there a discussion in that [executive] session of authority to file for bankruptcy?
>
> MR. CICILIANO: I would just object pursuant to the attorney/client privilege and direct the witness not to answer.
>
> MR. WATSON: And I, too, am going to direct you not to answer that, Judge Journey.
>
> THE WITNESS: Okay.
>
> A. (JOURNEY):  Okay. I can't tell you what they did say, but I think I can tell you what they didn't say. And nobody during that --
>
> MR. CICILIANO: I would object -- I would object, Judge, and direct you that what was said or was not said is covered by the attorney/client privilege, and I would direct you not to answer. The NRA is not waiving that privilege.
>
> THE WITNESS: Okay.

**Ex. D**, Journey Dep. at 23:22-24:4.  When the NYAG tried to ask about whether the term "reorganization" was discussed at the executive session over the Employment Contract, he was rebuffed again:

> Q. (BY MR. PRONSKE) Was the word "reorganization" used in that executive session?
>
> MR. CICILIANO: I will once again object and direct the witness not to answer pursuant to the attorney/client privilege.
>
> MR. WATSON: I will direct you not to answer, Judge Journey.
>
> THE WITNESS: Thank you.

> Q. (BY MR. PRONSKE) Are you refusing to answer, Judge Journey?
>
> A. (BY JUDGE JOURNEY) I reluctantly am, yeah.

**Ex. D**, Journey Dep. at 26:11-21. The NRA's counsel would not even let Journey discuss (a) whether the term "court" was used at the executive session, *see id.* at 26:22-27:5, (b) whether there was any discussion about the ambiguous provision in Paragraph 2(a) of the Employment Agreement, *see id.* at 27:14-22, or (c) what his understanding of Paragraph 2(a) meant, *see id.* at 28:2-13.[8] Yet, there is no issue that Journey, as a board member, would have wanted to know if he had authorized a bankruptcy filing.

> Q. (BY MR. PRONSKE) Well, let ask you this, and let me make it more simple. As a board member, would you have liked to have known that the entity that you're a board member of was going to file bankruptcy?
>
> A. (BY MR. JOURNEY) That's obvious, yes.

*Id.* at 45:21-25. There is also no question that Journey felt deceived by the lack of information provided by management and felt that the NRA advisors breached their duties at the January 7, 2021 board meeting, *see id.* at 65:1-13, 97:9-13, because "he thought board and counsel have a duty to disclose things like filing bankruptcy . . . I think it's the board's decision." *Id.* at 96:16-18.[9]

### *Rowling*

29.     The acting CFO, Ms. Rowling, and NRA counsel take nondisclosure to a different level. When the NYAG asked her to describe her current role as the acting CFO of the NRA, Ms. Rowling states that "my focus has been on these proceedings with respect to the bankruptcy." (**Ex.**

---

[8] Journey readily admits that he believes only the board could authorize a bankruptcy filing. *See* **Ex. D**, Journey Dep. at 3:22-25, 34:1-8, 34:24, 35:1-19.

[9] Journey further stated in his deposition: "Let me be clear. The January 15th filing was not the governance failure. It was an indication of it, that the governance failure I believe occurred happened at the January 7th board meeting. And the fact that the board was not informed." *Id.* at 154:20-24.

**H**, Rowling Depo. at 105:17-22. And Ms. Rowling rightfully should be focused, as she is admittedly the head of the Treasury department at the NRA (*see id.* at 211: 16-24), which department is in charge of the financial accountability of the NRA. But, when asked a very simple question of whether she reviewed the NRA's Bankruptcy Schedules for accuracy, Ms. Rowling and her counsel were quick to disclaim the responsibility, as demonstrated below:

> Q. (BY MR. ACOSTA) Do you recognize this document?
>
> A. (BY MS. ROWLING) Yes.
>
> Q. (BY MR. ACOSTA) It's the schedules that the NRA prepared in connection with the bankruptcy?
>
> A. (BY MS. ROWLING) Yes.
>
> Q. (BY MS. ROWLING) Did you -- Mr. Warren prepared this document. Did you help Mr. Warren?
>
> A. I reviewed what Mr. Warren had put together.
>
> Q. For what purpose?
>
> A. In my capacity as CFO.
>
> Q. Did you want to check the accuracy of the things that he was stating in this document?
>
> MS. KOZLOWSKI: Objection, form, foundation, argumentative.

(**Ex. H**, Rowling Dep. at 226: 24-24; 227:1-13.) Consistent with her disclaimer of responsibility, Ms. Rowling claimed:

- She was not aware of the bankruptcy filing until the Petition Date (*see id.* at 110: 23-25; 111: 1-2.)

- She was not aware that approximately $74 million was paid to creditors/vendors within 90 days of the bankruptcy filing (*see id.* at 224: 15-21);

- She was not aware whether the NRA followed an internal documentation process for paying these preference vendors (*id.* at 229:18-25; 230: 1-10; 180: 15-21.)

Significantly, despite Ms. Rowling's role at the NRA and her focus on the bankruptcy, she did not know about the reporting requirements for insiders in the NRA's Statement of Financial Affairs? (*See id.* at 233:2-12). When asked whether the compensation of the Executive Vice President (LaPierre), former Treasurer (Spray) and General Counsel (Frazer) should be reported in the Question 30 of the Statement of Financial Affairs (as amended "***SOFA***"), the NRA's counsel again objected based on legal conclusion. *See id.* at 223: 19-20. While Ms. Rowling was not aware that the day before her deposition (March 19, 2021) that the compensation information for these insiders was removed in an amendment to the SOFA [Dkt. 376] (*see id.* at 234: 6-11), she should have at least been aware, in light of IRS reporting guidelines (which her department is in charge of complying with), that insider compensation belonged on the NRA's SOFA disclosure. *See id.* at 236:14-25; 237: 1-20; *see also* 248: 15-24; 249:14-16; . But, again, the NRA's attorney steps in and asserts an objection to testimony, based on attorney-client privilege and legal conclusion. (*See id.* at 238: 1-25; 239: 1-6.). And after sufficient prompting, Ms. Rowling says "I don't know" in respect to NRA insider compensation disclosure. (*See id.* at 239: 3-5.) Even though the term "budgets" are common the non-profit world, Ms. Rowling cannot even discuss the NRA's budget for 2021 without an objection of counsel.

> Q. Now the NRA, like most nonprofits, does budgeting for the following year. Is that accurate?
>
> A. At a particular point in time, yes, budgeting is done for the next year.
>
> Q. Did the NRA do budgeting in the fall of 2020 for 2021?
>
> A. Yes.
>
> Q. And is the budgeting significantly different than those numbers right there that you see on page 7 of the statement of financial affairs?
>
> MS. KOZLOWSKI: Objection, form.

(*See id.* at 235: 7-17.) The Court and others can surmise Ms. Rowling's response was afterwards.

30. The speaking objections intensified as the NRA's counsel was asked about Brewer's fees. On the one hand, Ms. Rowling testified that Brewer always gets paid per his contract. (*See id.* at 224: 11-12) ("We paid the Brewer firm in terms of their contract . . .") On the other hand, speaking objections intensified when the head of the NRA's Treasury department, with assistance of counsel, were asked about the Brewer firm's expenditures:

> Q. (ACOSTA) And I represent to you that the statement of financial affairs, you listed Brewer received 17.5 million within the last 90 days. And I represent to you that the 1099 [sic] for 2019 shows that the Brewer firm received $26 million. And I would represent to you that the 2018 990 says the Brewer firm received approximately $14 million. Now you do the math. That's over $50 million in the last three years, last two years. Is that accurate, or am I a little off on my numbers?

> (MS. KOZLOWSKI) Objection as to –objection as to form, to the extent it calls for speculation, to the extent -- to the extent that you're asking the witness whether if you add those numbers up it exceeds 50. I suppose she can testify as to what that mathematical equation would be.

> (MR. ACOSTA) Could you let her testify, please?

*Id.* at 260: 16-25; 261: 1-18.

31. Without considering the healthy objections to the NYAG's questioning (which went first), the limited testimony of Ms. Rowling, due in large part to numerous objections, left an enormous amount of financial information undisclosed. While this may be par for the course in typical non-bankruptcy litigation, it is not typical in a bankruptcy proceeding where a debtor is required to be transparent, at a minimum, for the sake of seeking a genuine reorganization.

## **RELIEF REQUESTED**

32. AMc seeks two types of relief. First, it seeks relief from the excuse, waiver, inappropriate and offensive use of the attorney-client privilege. Second, it seeks discovery of

relevant information about the financial affairs of the Debtors, which have been hindered by the Debtors.

33.     The party resisting discovery must show specifically how each discovery request is not relevant or otherwise objectionable. *See McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990). And a party who has objected to a discovery request must, in response to a motion to compel, urge and argue in support of his objection to a request, and, if he does not, he waives the objection. *See Sonnino v. Univ. of Kansas Hosp. Auth.*, 221 F.R.D. 661, 670–71 (D. Kan. 2004). A party resisting discovery must show how the requested discovery was overly broad, burdensome, or oppressive by submitting affidavits or offering evidence revealing the nature of the burden. *See Merrill v. Waffle House, Inc.*, 227 F.R.D. 475, 477 (N.D. Tex. 2005); *see also S.E.C. v. Brady*, 238 F.R.D. 429, 437 (N.D. Tex. 2006) ("A party asserting undue burden typically must present an affidavit or other evidentiary proof of the time or expense involved in responding to the discovery request.").

34.     In addition, as the party asserting privilege, Debtors bear the burden of demonstrating privilege. *United States v. Rodriguez*, 948 F.2d 914, 916 (5th Cir. 1991) (abrogated on other grounds by *United States v. Dixon*, 509 U.S. 688, 113 S. Ct. 2849, 125 L. Ed. 2d 556 (1993)).  In particular, inquiry of whether underlying facts in confidential communications with clients are not privileged is highly specific, and the party asserting the privilege bears the burden of proving its applicability.  *United States v. Kelly*, 569 F.2d 928, 938 (5th Cir. 1978).  Here, the burden is on the Debtors to prove that the privilege applies to AMc and the NYAG's legitimate requests for underlying facts and waived privilege.

### *Underlying Facts*

35.     No contention can be made that the attorney-client privilege precludes disclosure of factual information. *Sedco Int'l, S. A. v. Cory*, 683 F.2d 1201, 1206 (8th Cir. 1982); *Stoffels v. SBC Communs., Inc.,* 263 F.R.D. 406, 416 (W.D. Tex. 2009) ("documents such as emails that do not contain legal opinions nor reflect attorney/client-specific communications (and where it merely sets out facts) are not privileged."); *Elec. Data Sys. Corp. v. Steingraber*, No. 4:02 CV 225, 2003 U.S. Dist. LEXIS 11818, at *6-7 (E.D. Tex. July 9, 2003) ("It is clear that the attorney-client privilege 'only protects disclosure of confidential communications between the client and attorney; it does not protect the disclosure of underlying facts.'").  The privilege does not protect facts communicated to an attorney.  *Upjohn Co. v. United States*, 449 U.S. 383, 395-96, 66 L. Ed. 2d 584, 101 S. Ct. 677 (1981).  Clients cannot refuse to disclose facts that their attorneys conveyed to them and that the attorneys obtained from independent sources.  *Hickman v. Taylor*, 329 U.S. 495, 508, 91 L. Ed. 451, 67 S. Ct. 385 (1947); *Mariner Health Care Inc. v. Indem. Ins. Co. of N. Am., Inc. (In re Subpoena of Curran)*, No. 3:04-MC-039-M, 2004 U.S. Dist. LEXIS 29914, at *15 (N.D. Tex. Sep. 17, 2004) (The court held that defendants may not use attorney-client privilege to protect letters and conversations by attorneys with third parties in order to obtain facts.)

36.     In this case, it is clear that the NRA management does not wish to disclose what NRA board members actually voted on at the January 7, 2021 board meeting, despite the fact that the good faith basis for filing these cases (including whether the NRA had appropriate authority) is at issue.  Especially in light of an ambiguous provision in the Employment Agreement, what the NRA board members knew, what materials they reviewed, what they were informed, and what they considered in casting a vote on such document—which does not expressly authorize a bankruptcy filing—cannot be hidden using the attorney-client privilege.  The board vote itself

cannot be hidden because it is an underlying fact. Yet, the board vote at the January 7th meeting cannot be determined unless there is an understanding of what board members thought they were voting on.

37.     Thus, AMc and the NYAG must be allowed to explore the circumstance surrounding the January 7 board vote on the Employment Agreement. To hold otherwise would be akin to throwing away the ballots (the underlying evidence) for an election, irrespective of whether lawyers prepared those ballots. In this case, it appears that the NRA management wants to throw away such ballots, so they can proceed unchecked. The Court should not allow them to do so.

### *Offensive Use Doctrine*

38.     The Fifth Circuit Court of Appeals and other courts have held that, where the privilege is being used offensively against divulging information for the owner's benefit, the privilege is deemed to have been waived. This doctrine is known as the in-issue doctrine. It is a doctrine that recognizes that a privilege is meant to be used defensively as a shield against divulging privileged information, rather than offensively as a sword. *See Willy v. Admin. Review Bd.*, 423 F.3d 483, 497 (5th Cir. 2005) ("In other words, when a party entitled to claim the attorney-client privilege uses confidential information against his adversary (the sword), he implicitly waives its use protectively (the shield) under that privilege."); *Conkling v. Turner*, 883 F.2d 431 (5th Cir. 1989) ("[T]he attorney-client privilege is waived when a litigant 'place[s] information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party.'"); *Am. Med. Sys. v. Nat'l Union Fire Ins. Co.*, CIVIL ACTION NO: 98-1788 SECTION: "C" (4), 1999 U.S. Dist. LEXIS 16854, at *8 (E.D. La. Oct. 22, 1999) ("[T]he in-issue doctrine

precludes AMS from seeking the protection of either the attorney-client privilege or the work-product doctrine regarding the notice of claims and reasonableness of the settlements," because AMS placed the issues of notice of claims and reasonableness at issue when it raised them.); *see also Pillsbury Winthrop Shaw Pittman LLP v. Brown Sims, P.C.,* No. 4:09-mc-365, 2010 U.S. Dist. LEXIS 715, 2010 WL 56045, at *5 (S.D. Tex. Jan. 6, 2010) ("[A] party seeking affirmative relief against another cannot maintain the action and at the same time utilize privileges to protect critical material from discovery."). Thus, once the holder of the privilege places the information at issue, the privilege no longer protects the documents at issue. *See generally* 8 Fed. Prac. & Proc. § 2016.6 (3d ed. updated Apr. 2017); 2 The New Wigmore: A Treatise on Evidence § 6.12.4(b)(2) (3d ed. 2017); 81 Am. Jur. 2d Witnesses § 329 (2d ed. updated Nov. 2017); 1 McCormick On Evidence § 93 (7th ed. updated June 2016).

39.     Here, the Debtors placed the corporate authority to commence these bankruptcies at issue when they filed their voluntary petitions and attached a resolution that purported to give a select few officers the authority to place the Debtors under bankruptcy protection.  The bankruptcy relief has allowed the Debtors to obtain affirmative relief against all their creditors, including AMc and NYAG, in the form of the automatic stay, as well as other protections afforded under the Code. Creditors have every right to question the Debtors' standing to commence these bankruptcy cases, just like they have a right to verify the Debtors' qualifications under section 109 of the Code or the proper venue of these cases under 28 U.S.C. §§ 1408 and 1409.

40.     The irrefutable facts are that one person—and one person alone—took it upon himself to commence these cases, even though the NRA's bylaws strictly confer such authority to the NRA's board of directors.  Whether the NRA's board properly authorized the Executive Vice President—or whether that is even possible—is highly relevant in these cases.  The only manner

to investigate these facts is to explore all the circumstances surrounding the board vote on January 7, 2021. Everyone, including board members, NRA members, and creditors, will be prejudiced unless such an investigation is allowed to proceed. But, the NRA's management seeks to suppress these circumstances, using the attorney-client privilege as a sword. The Court should not allow the Debtors to get away with such approach.

### *Public Filings Waives Attorney-Client Privilege*

41.     The Fifth Circuit – along with most other circuits – has recognized that the attorney-client doctrine does not protect documents provided and then used for public filings because there is no expectation of privacy. *See e.g. United States v. El Paso*, 682 F.2d 530, 538 (5th Cir. 1982) (string citation omitted). This rule applies to bankruptcy schedules and statements of financial affairs, tax returns, and real estate closing documents. *United States v. White*, 950 F.2d 726 (7th Cir. 1991) (seminal case bankruptcy documents); *El Paso,* 682 F.2d at 538 (involving tax returns). By disclosing such communications to third parties—such as by revealing them in open court— the client waives the privilege. *See e.g.*, *United States v. Woodall*, 438 F.2d 1317, 1324-25 (5th Cir. 1970) (en banc).

42.     The Debtors have filed voluntary petitions, bankruptcy schedules, statement of financial affairs, and numerous other pleadings in this case to advance their goals of remaining in bankruptcy. Under clear Fifth Circuit law, the information contained in those filings waives the privilege as to the subject matter of those filings. Accordingly, AMc and NYAG, as well as other parties in interest, should be allowed to explore the information contained in those public filings, including:

> a)  How much corporate authority did the NRA board of directors delegate to the Special Litigation Committee ("**SLC**"), as of the January 7, 2021 board meeting;

b) How much corporate authority did the NRA board of directors delegate to the Executive Vice President, as of the January 7, 2021 board meeting;

c) What information was provided to the NRA board of directors as of the January 7, 2021 board meeting, including executive sessions, regarding these bankruptcies;

d) What did the members of the board of the NRA know about the matters they were voting on as of the January 7, 2021 meeting;

e) What authority was granted by the Debtors' governance body to commence these cases;

f) Who or what comprises the Debtors' governance body;

g) What did the Debtors' governance body actually authorize at a board meeting on January 7, 2021;

h) What is the business purposes of these chapter 11 cases;

i) What information demonstrates that the Debtors' filed these cases in good faith;

j) What is the back-up or basis for the information provided in the Debtors' bankruptcy schedules and statement of financial affairs;

k) How much have the Debtors spent on litigation;

l) How much does litigation financially or operationally impact the Debtors;

m) What is the current projected NRA budget for 2021;

n) What is the litigation budget (either for ILA, NRA or any NRA affiliate) for 2021 with respect to any litigation;

o) What is the budget in which the SLC is in charge of;

p) How much corporate authority did the NRA board of directors delegate to the SLC; and

q) How much influence do law firms have over the NRA.

There are likely more questions similar to the above regarding governance, financial affairs and reorganization efforts or the Debtors. But the Court would be surprised how little progress has

---

been made on the above questions. The Court should order that the Debtors and its officers and representatives should be required to answer such questions, without objection.

### *Excessive Deposition Objections*

43.     Federal Rule 26(b)(1) now provides that, "[u]nless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1).

44.     The questions asked of Ms. Rowling were directly related to these bankruptcy cases in that they relate to public financial disclosures made to this Court as well as the circumstances that lead to the NRA's bankruptcy. Given that the NRA is asset and cash rich and only has $14 million in unsecured debt (discounting the contingent $48.4 million PBGC alleged liability that is only reported for accounting purposes)[10] and given that the NRA admittedly filed bankruptcy to "escape New York," the financial health of the NRA is highly relevant to the good faith nature of these bankruptcy cases and the litigation tactics of the NRA. The numerous prompting and speaking objections by NRA's counsel during the afore-mentioned depositions, however, are only intended to hinder discovery and disclosure on very relevant issues in this bankruptcy cases.

---

[10]     Ms. Rowling admits that the NRA has never been in default of pension obligations and has only reported the PBGC liability for accounting purposes. *See* Ex. H, Rowling Dep. at 256:16-20; 257: 2-4.

45. The Court should do something to curb the NRA's discovery practice. The Debtors need to realize that financial transparency is paramount in bankruptcy. If the Debtors are not willing to provide such transparency, then they should consider whether they belong in bankruptcy and the Court should consider their efforts.

WHEREFORE, AMc respectfully requests the Court enter an Order, substantially in the form attached hereto as Exhibit A, granting this Motion, and allowing AMc, NYAG, and other parties in interest to discover necessary facts surrounding these bankruptcy filings. The Court should also grant such other and further relief to which AMc may be entitled.

Date: March 24, 2021

Respectfully submitted,

**DORSEY & WHITNEY LLP**

*/s/ H. Joseph Acosta*
**G. MICHAEL GRUBER**
State Bar No. 08555400
gruber.mike@dorsey.com
**H. JOSEPH ACOSTA**
State Bar No. 24006731
acosta.joseph@dorsey.com
**BRIAN E. MASON**
Texas Bar No. 24079906
mason.brian@dorsey.com
300 Crescent Court, Suite 400
Dallas, Texas 75201
Phone: (214) 981.9900
Facsimile: (214) 981.9901

**ATTORNEYS FOR ACKERMAN MCQUEEN, INC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document has been served upon all parties named on the attached Master Service List by first-class U.S. Mail, and all parties receiving notice by and through the Court's CM/ECF system on March 24, 2021.

*/s/ H. Joseph Acosta*
H. JOSEPH ACOSTA

**EXHIBIT A**

# EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT is made by and between the National Rifle Association of America (the "NRA" or the "Association") and Wayne R. LaPierre ("Employee").

1.    Employment.  The Association hereby employs Employee, and Employee hereby accepts employment with the Association, upon the terms and conditions hereinafter set forth. Terms used herein that are also used in the Bylaws of the Association shall have the same meaning ascribed to them in the Bylaws of the Association.

2.    Duties and Compensation.

(a)    Employee shall serve as the Executive Vice President of the Association and shall direct all the affairs of the Association in accordance with the programs and policies established by the Board of Directors. Among his authorities, Employee shall be empowered to exercise corporate authority in furtherance of the mission and interests of the NRA, including without limitation to reorganize or restructure the affairs of the Association for purposes of cost-minimization, regulatory compliance or otherwise. Employee shall devote his full time to performing the customary duties of such position and such other commensurate duties as may be assigned from time to time by the Board of Directors. Employee agrees to abide by the reasonable rules, regulations, instructions, personnel practices, employment manuals, and policies of the Association, as they may exist or be modified from time to time by the Association.

(b)    Employee shall be compensated by the Association for all services to be rendered pursuant to this Agreement, as follows:

(1)    The Association shall pay Employee a base salary at the rate of $1,300,000 per year (the "Base Salary").

(2)    The Association shall review the Base Salary at least annually. The Association may recommend changes to the Base Salary which the Officers Compensation Committee of the Board of Directors of the Association (the "OCC") reasonably determines to be in the best interest of the Association, taking into account Employee's performance, input obtained from independent compensation consultants, and other relevant factors. Employee's consent to any salary modification recommended by the OCC shall not be unreasonably withheld.

(3)    Employee shall be eligible for an annual performance bonus determined at the sole discretion of the OCC (provided, however, that any performance bonus recommended by the OCC must be approved by the full Board of Directors of the Association).

(c)    The Association shall provide the Employee with the following benefits:

(1)    Paid vacation time as customarily provided to the Association's other comparable employees;

(2)    Paid holidays as customarily provided to the Association's other comparable employees;

(3)    Life insurance as customarily provided to the Association's other comparable employees;

(d)    Medical and/or dental coverage as may be provided by the Association in

1

AMc DEPOSITION
EXHIBIT
12

its sole discretion.

(e)     Reimbursement for all reasonable expenses incurred by Employee during the term of this Agreement for advancing the Association's business, provided that such expenses comply with, and are documented and submitted pursuant to, applicable NRA policies and guidelines.

(f)     Employee's eligibility for any benefit provided herein shall be subject to Employee's compliance with the reasonable requests of, and to Employee's meeting the underwriting criteria used by, any insurance company providing any of the benefits specified herein to the Association's employees. Employee agrees to submit to any medical examination and to provide and complete any documentation (including medical records) required by any such insurance company. All benefits provided for hereunder are taxable to Employee to the extent required by applicable tax laws.

3.     Term of Employment. Employee was elected to his present employment on October 24, 2020, and shall serve until the expiration of his elected term in accordance with the NRA Bylaws. This Employment Agreement, once executed, shall become effective immediately upon authorization by the NRA Board of Directors, and shall terminate effective immediately if the NRA declines to re-elect Employee to the position of Executive Vice President at the next annual election pursuant to NRA Bylaws Art. V, Sec. 1, and may additionally be terminated by the Association:

(a)     Upon 10 days written notice for Cause (as defined below); or

(b)     Effective immediately upon Employee's death or disability.

For purposes of this Paragraph 3, "Cause" shall mean: (i) material failure to perform the duties of Employee's position; (ii) fraud, misappropriation, embezzlement or acts of similar dishonesty; (iii) conviction of a felony involving moral turpitude; (iv) illegal use of drugs or excessive use of alcohol in the workplace; (v) intentional and willful misconduct that may subject the NRA to criminal or civil liability; (vi) breach of Employee's duty of loyalty by diversion or usurpation of corporate opportunities properly belonging to the NRA; or (vii) any material breach of this Agreement.

4.     Confidentiality and Noncompetition. In consideration of the employment of Employee by the Association, Employee agrees as follows:

(a)     Employee shall not, during the period of his employment with the Association or at any time thereafter, regardless of the reason for the cessation of his employment: (1) use any Confidential Information (as hereinafter defined) for his own benefit or for the benefit of any person or entity other than the Association; (2) disclose to any other person or entity any Confidential Information; or (3) remove from the Association's premises or make copies of any Confidential Information, in any form; except, in each case, as may be required within the scope of Employee's duties during the course of his employment by the Association.

(b)     Upon termination of employment, or at any such time as the Association may request, Employee will deliver to the Association all copies in his possession of any Confidential Information, in any form. Employee shall not at any time assert any rights in or with respect to any Confidential Information.

(c)     "Confidential Information" means (i) any and all specifications, drawings, designs, techniques, processes, know-how, research, customer lists, customer needs, prices, costs

2

and marketing, sales and financial information, and (ii) any similar or other trade secret or confidential information of the Association or any member, vendor, supplier, distributor, or customer of the Association, regardless of how acquired or developed by the Association or any such member, vendor, supplier, distributor, or customer, concerning any of their respective businesses, policies, research, processes, inventions, products, business operations or business methods. Confidential Information does not include information, knowledge, or data which Employee can prove was in his possession prior to the commencement of employment with the Association or information, knowledge, or data which was or is in the public domain by reason other than the wrongful acts of Employee.

(d)     In the event that Employee is required by applicable law, regulation or legal process to disclose any Confidential Information, Employee shall promptly notify the Association in writing so that the Association may seek a protective order or other appropriate remedy; moreover, Employee shall cooperate reasonably with the Association to facilitate the Association's efforts to prevent or limit disclosure and assert any applicable privileges. Nothing herein shall be deemed to prevent Employee from honoring a subpoena (or governmental order) that seeks discovery of Confidential Information if (a) a motion for a protective order, motion to quash and/or other motion filed to prevent the production or disclosure of the Confidential Information has been denied or is not made; provided, however, that the Employee may disclose only that particular Confidential Information which Employee's legal counsel advises is legally required and that Employee exercises commercially reasonable efforts to preserve the confidentiality of all other Confidential Information; or (b) the Association consents to the disclosure in writing.

(e)     During the period of employment with the Association and for two (2) years thereafter, Employee shall not, for himself or on behalf of any other person or entity, in any way compete with the business then done or intended to be done by the Association, including calling upon any current, former or potential member, vendor or customer of the Association for the purpose of soliciting or providing to any such individual or entity any products or services which are the same as or similar to those provided or intended to be provided by the Association.

5.     Option to License Name and Likeness; Post-Employment Services. For a period of two (2) years commencing upon termination of Employee's employment pursuant to this Agreement (the "Post-Employment Period"), the Association may, at its sole option:

(a) Utilize Employee's name, likeness, and signature for fundraising, public relations, and membership purposes; provided, however, that (i) the Association shall exercise such option in good faith and shall not deploy Employee's name, likeness, or signature in any manner which the Association reasonably foresees may harm Employee's reputation, and (ii) the Association shall pay Employee a reasonable royalty in exchange for such use, not to exceed $500,000 per calendar year.

(b) Engage Employee for in-person public appearances, for which Employee will be compensated at a rate of $750 per hour.

6.     Intellectual Property. Employee agrees that any intellectual property developed during the term of this Agreement, including, without limitation, trademarks, copyrights, and patents ("Intellectual Property"), and any products, processes, know-how, inventions or devices, or any improvements to any of the foregoing whether patentable or not ("Inventions"), discovered or developed during the course of his employment with the Association which are (i) related to the Association's business; (ii) in the course of development by the Association; or (iii) made with the

3

use of the Association's time, materials or facilities, shall belong to the Association. Employee hereby assigns and transfers to the Association all right, title, and interest to any and all such Intellectual Property and Inventions.

7.     Injunctive Relief. In the event of a breach or threatened breach of any of the terms of this Agreement, the Association shall be entitled to an injunction restraining Employee from committing any breach of this Agreement without showing or proving any actual damages and without diminishing any other right or remedy which the Association may have at law or in equity to enforce the provisions of this Agreement. Employee waives any right Employee may have to require the Association to post a bond or other security with respect to obtaining or continuing any injunction or temporary restraining order, releases the Association and its officers and directors from, and waives any claim for, damages against them which Employee may have with respect to the Association's obtaining any injunction or restraining order pursuant to this Agreement, and waives any claim that the Association has an adequate remedy at law.

8.     General Terms.

(a)     Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties hereto, their personal representatives, and permitted successors, and assigns.

(b)     Assignment. This Agreement may not be assigned, in whole or in part, by any party hereto without the prior written consent of all other parties.

(c)     Entire Agreement. This Agreement contains the entire understanding between the parties hereto and supersedes any prior understanding, memoranda, or other written or oral agreements between them respecting the within subject matter. There are no representations, agreements, arrangements, or understandings, oral or written, between the parties relating to the subject matter of this Agreement which are not fully expressed herein.

(d)     Modifications; Waiver. No modification or waiver of this Agreement or any part hereof shall be effective unless in writing and signed by the party or parties sought to be charged therewith. No waiver of any breach or condition of this Agreement shall be deemed to be a waiver of any other or subsequent breach or condition, whether of like or different nature.

(e)     No Third-Party Beneficiary. None of the provisions of this Agreement shall be for the benefit of, or enforceable by, any person or entity not a party hereto.

(f)     Partial Invalidity. If any provision of this Agreement shall be held invalid or unenforceable by competent authority, such provision shall be construed so as to be limited or reduced to be enforceable to the maximum extent compatible with the law as it shall then appear. The total invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

(g)     Notices. Any notice or other communication required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given if it is delivered, either personally, by facsimile transmission, or by registered, certified or express mail, return receipt requested, postage prepaid, to the address for such party specified below or to such other address as the party may from time to time advise the other party, and shall be deemed given and received as actual personal delivery, on the first business day after the date of delivery shown on any such facsimile transmission or upon the date of actual receipt shown on any return receipt if registered, certified or express mail is used, as the case may be.

4

Notice to the National Rifle Association of America shall be sent to:

> John Frazer, Esq.
> General Counsel
> National Rifle Association of America
> 11250 Waples Mill Road
> Fairfax, VA 22030

with a copy to:

> William A. Brewer, III, Esq.
> Brewer Attorneys & Counselors
> 750 Lexington Avenue, 14th Floor
> New York, NY 10022

Notice to Wayne R. LaPierre shall be sent to:

> Wayne R. LaPierre
> Executive Vice President
> National Rifle Association of America
> 11250 Waples Mill Road
> Fairfax, VA 22030

with a copy to:

> P. Kent Correll, Esq.
> Correll Law Group
> 250 Park Avenue, 7th Floor
> New York, NY 10177.

    (h)   <u>Arbitration</u>. In the event that any disagreement or dispute should arise between the parties hereto with respect to this Agreement or Employee's tenure at the NRA, then such disagreement or dispute shall be submitted to arbitration in accordance with the rules then pertaining to the American Arbitration Association with respect to commercial disputes. Judgment upon any resulting award may, after its rendering, be entered in any court of competent jurisdiction by any party. **The place of arbitration, and the forum and venue for enforcement of any award, shall be Dallas, Texas.**

    **(i)**   **<u>Governing Law</u>. This Agreement, and all claims or causes of action (whether in contract, tort or statute) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any alleged representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), or which otherwise arise out of or relate to Employee's employment by the NRA, shall be governed by, and enforced in accordance with, the internal laws of the State of Texas, without giving effect to conflict-of-laws principles thereof. This document shall be**

**construed as a contract negotiated and executed in the State of Texas.**

      (j)    <u>Effect of Termination</u>. Unless otherwise specifically agreed in writing, the terms of Paragraphs 4, 5, 6, 7 and 8 shall survive any termination, cancellation, repudiation, or rescission of this Agreement, and under such circumstances the parties may continue to enforce such terms as if this Agreement were otherwise in full force and effect.

      (k)    <u>Headings</u>. The headings contained in this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

      (l)    <u>Fair Meaning</u>. This Agreement shall be construed according to its fair meaning, the language used shall be deemed the language chosen by the parties hereto to express their mutual intent, and no presumption or rule of strict construction will be applied against any party hereto.

      (m)    <u>Gender</u>. Whenever the context may require, any pronoun used herein shall include the corresponding masculine, feminine, or neuter forms and the singular of nouns, pronouns, and verbs shall include the plural and vice versa.

      (n)    <u>Counterparts</u>. This Agreement may be executed in several counterparts, each of which shall be deemed an original, and all of said counterparts together shall constitute but one and the same instrument.

      (o)    <u>Further Assurances</u>. The parties hereto shall execute and deliver any and all additional writings, instruments, and other documents and shall take all such further actions as shall be reasonably required in order to effect the terms and conditions of this Agreement.

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement as of January __, 2020.

ASSOCIATION:

By: _____
Name: CHARLES L. COTTON
Title: First Vice-President

EMPLOYEE:

_____
Wayne R. LaPierre

**EXHIBIT B**

*minutes*
*of the meeting of the*
*board of directors*
*of the*
# NATIONAL RIFLE ASSOCIATION

*January 7, 2021*

# MINUTES OF THE MEETING OF THE BOARD OF DIRECTORS
## OF THE
## NATIONAL RIFLE ASSOCIATION OF AMERICA
### JANUARY 7, 2021
### OMNI DALLAS HOTEL

**INDEX**                                                                      **PAGE NO.**

MINUTES...........................................................................................................1

REPORT OF THE FIRST VICE PRESIDENT............................................................7

REPORT OF THE SECOND VICE PRESIDENT .......................................................9

REPORT OF THE EXECUTIVE VICE PRESIDENT ...............................................11

REPORT OF THE SECRETARY...............................................................................31

REPORT OF THE TREASURER................................................................................34

REPORT OF THE EXECUTIVE DIRECTOR,
GENERAL OPERATIONS ........................................................................................36

REPORT OF THE EXECUTIVE DIRECTOR,
INSTITUTE FOR LEGISLATIVE ACTION .............................................................69

REPORT OF THE LEGAL AFFAIRS COMMITTEE ..............................................136

REPORT OF THE EXECUTIVE COMMITTEE .......................................................137

REPORT OF THE BYLAWS & RESOLUTIONS COMMITTEE ............................140

RESOLUTION MEMORIALIZING MR. ROBERT J. KUKLA.................................146

REPORT OF THE LEGISLATIVE POLICY COMMITTEE.....................................147

REPORT OF THE NOMINATING COMMITTEE.....................................................148

REPORT OF THE SMALLBORE RIFLE COMMITTEE..........................................150

REPORT OF THE NRA CIVIL RIGHTS DEFENSE FUND .....................................152

NATIONAL RIFLE ASSOCIATION OF AMERICA
MINUTES OF THE MEETING OF THE BOARD OF DIRECTORS
JANUARY 7, 2021

The Board of Directors and the Executive Council of the National Rifle Association of America convened at 9:00 a.m. in Dallas Ballrooms D/H of the Omni Dallas Hotel, Dallas, Texas, on Thursday, January 7, 2021. NRA First Vice President Charles L. Cotton presided.

The Chair called the meeting to order and recognized Chief J. William Carter for the opening prayer. Chief Carter led the Body in the Pledge of Allegiance to the Flag.

At the request of the Chair, the Secretary called the roll. The following members of the Board of Directors and Executive Council were present, and the existence of a quorum was established:

BOARD OF DIRECTORS
JOE M. ALLBAUGH
BOB BARR
RONNIE BARRETT
MATT BLUNT
J. WILLIAM CARTER
TED W. CARTER
ANTHONY P. COLANDRO
CHARLES L. COTTON
DAVID G. COY
TODD R. ELLIS
RICHARD S. FIGUEROA
EDIE P. FLEEMAN
JOEL FRIEDMAN
SANDRA S. FROMAN
MARK GEIST
MARIA HEIL
NIGER INNIS
PHILLIP B. JOURNEY
DAVID A. KEENE
HERBERT A. LANFORD, JR.
WILLES K. LEE
DUANE LIPTAK, JR.
BILL MILLER
JOHNNY NUGENT
JAMES W. PORTER II
JAY PRINTZ
TODD J. RATHNER

BARBARA RUMPEL
DON SABA
RONALD L. SCHMEITS
STEVEN C. SCHREINER
BART SKELTON
KRISTY TITUS
MARK E. VAUGHAN
LINDA L. WALKER
JAMES L. WALLACE
JUDI WHITE

EX OFFICIO
JOHN C. FRAZER
WAYNE R. LAPIERRE

EXECUTIVE COUNCIL
KAYNE ROBINSON

*These minutes are being provided to you as a record of the most recent Board meeting. In accordance with *Roberts Rules of Order, Newly Revised 12th Edition*, these minutes will be considered a DRAFT until the Board of Directors corrects or approves them during the next Board meeting. At that time they will become the OFFICIAL record for the meeting.

Also present for the meeting were outside counsel William Davis; several members of the executive and administrative staff; and guests.

The Secretary provided information about the reasons for absences. The Chair granted excused absences to the following members: Dr. Thomas P. Arvas; Mr. Paul Babaz; Scott L. Bach, Esq.; Mr. William A. Bachenberg; The Honorable Clel Baudler; The Honorable J. Kenneth Blackwell; Lt. Col. Robert K. Brown; Mr. Dave Butz; Ms. Patricia A. Clark; The Honorable Robert K. Corbin; Mr. Allan D. Cors; The Honorable Larry E. Craig; Mrs. Carol Frampton; Ms. Marion P. Hammer; Mr. Graham Hill; Ms. Susan Howard; The Honorable Curtis S. Jenkins; Mr. Tom King; Ms. Carrie Lightfoot; Mr. Robert E. Mansell; Mrs. Carolyn D. Meadows; Mr. Owen Buz Mills; Ms. Il Ling New; Mr. Ted Nugent; Ms. Kim Rhode; Mr. Mark Robinson; Colonel Wayne Anthony Ross; Mr. William H. Satterfield; Captain John C. Sigler; Deputy Dwight D. Van Horn; Chief Blaine Wade; Mr. Howard J. Walter; Lt. Col. Allen B. West; and the Honorable Donald E. Young.

The Chair asked for any amendments to the proposed agenda that had been distributed. Hearing none, the Chair announced that the agenda was adopted as presented.

The Chair called for the approval of the minutes of the October 24, 2020, meeting of the Board of Directors. Hearing no corrections, the President announced that the minutes were approved as presented.

The Chair called NRA Board member James L. Wallace forward to receive the oath of office, which was administered by the NRA Secretary.

The Chair presented the Report of the First Vice President. A copy of the report is attached to and made a part of these minutes.

The Chair called for the Report of the Second Vice President, which was presented by Lt. Col. Willes K. Lee. A copy of the report is attached to and made a part of these minutes.

The Chair called for the Report of the Executive Vice President, which was presented by Mr. Wayne LaPierre. A copy of the report is attached to and made a part of these minutes.

The Chair called for the Report of the Secretary, which was presented by Mr. John C. Frazer. A copy of the report is attached to and made a part of these minutes.

(Secretary's Note: The printed reports of the Treasurer, the Executive Director of General Operations and the Executive Director of the Institute for Legislative Action were distributed. Copies of these reports are attached to and made a part of these minutes.)

The Chair called for the Report of the Legal Affairs Committee, which was presented by the Committee Chairman, Ms. Sandra S. Froman. A copy of the report is attached to and made a part of these minutes.

The Chair presented the Report of the Executive Committee. A copy of the report is attached to and made a part of these minutes.

The Chair presented the Report of the Bylaws & Resolutions Committee. A copy of the report is attached to and made a part of these minutes.

Mr. Cotton:

> "MOVED, That the NRA adopt the proposed amendments to the NRA Board Policy for Board Member Attendance as identified in the document attached to this report."

The motion carried.

Mr. Cotton:

> "MOVED, The adoption of the following memorial resolution:
>
> 'WHEREAS, Robert J. Kukla, of Park Ridge, Illinois, a former Executive Director of the NRA Institute for Legislative Action and member of the Board of Directors of the National Rifle Association of America, passed away on November 4, 2020, at the age of 87; and
>
> WHEREAS, Robert was born on December 1, 1932, in Chicago, Illinois; he graduated from Northwestern University in 1957 with a Juris Doctor degree; he wore many professional hats throughout his life; he worked as casualty adjuster at Allstate Insurance Company, a trial attorney at the firm Fitzgerald, Petrucelli & Simon, and as Director of Marketing Sales and Distribution at Sears, Roebuck and Company; he was a self-employed author, teacher, consultant, television and radio personality; and
>
> WHEREAS, Robert was a man with great integrity; he received a certificate of merit from Chicago Mayor Richard J. Daley in 1970, for his demonstration of good citizenship in action for aiding and assisting a victim of assault and robbery; he helped form and was President of the 'Logan Square Neighborhood Association,' an organization formed to resist crime in the area; he had a deep appreciation for the law and decided to share his passion and knowledge by teaching law courses at Triton College, Oakton College, and Roosevelt University; and
>
> WHEREAS, Robert was an NRA Life member at the time of his death; he was Executive Director of NRA-ILA from 1977 to 1978; he served on the NRA Board of Directors from 1966-1976; he served on the Firearms Legislative Committee, Bylaws & Resolutions Committee, Range Facilities

3

Committee, Protest Committee, and State Association Committee; and

WHEREAS, Robert was an ardent supporter of firearms and the Second Amendment; he was a skilled marksman and renowned pistol shooter; he served as Vice President and Legislative Committee Chairman of the Illinois State Rifle Association; he served as Vice President of the Tri-County Pistol and Revolver League; he was a member of the Northwest Gun Club, Inc.; he wrote on firearms matters, including a landmark gun rights book, "Gun Control," which is still relevant and referenced today; he was a skilled debater and made over 300 media appearances on behalf of the NRA; now, therefore, be it

RESOLVED, That the Board of Directors of the National Rifle Association of America, at its meeting on January 7, 2021, in Dallas, Texas, in recognition of Robert Kukla and his long years of service to the National Rifle Association of America, hereby expresses its profound sense of loss occasioned by his passing, and extends its sincere sympathy to his family; and, be it further

RESOLVED, That the text of this resolution be spread upon the minutes of the meeting, and that a copy, suitably engrossed, be forwarded to his beloved children Robert and Jay.'"

The motion passed.

The Chair called for the Report of the Legislative Policy Committee, which was presented by the Committee Chairman, Mr. Kayne Robinson. A copy of the report is attached to and made a part of these minutes.

The Chair called for the Report of the Nominating Committee, which was presented by the Committee Chairman, Congressman Bob Barr. A copy of the report is attached to and made a part of these minutes.

The Chair called for the Report of the Smallbore Rifle Committee, which was presented by Ms. Edie P. Fleeman, a member of the committee. A copy of the report is attached to and made a part of these minutes.

Ms. Fleeman:

"MOVED, That the 2021 Pershing Team Match and the Goodwill Randle Team Match be rescheduled to the 2022 National Matches at Camp Atterbury in order to allow for team selection and preparation by visiting teams. The match schedule will return to the every eight year schedule with the next Pershing and Goodwill Randle Team Matches fired in 2029."

4

The motion passed.

The Chair called for the body to go into executive session to consider the report of the Officers Compensation Committee. Before the executive session, Ms. Sandra Froman asked for the record to reflect that she was not present for, and took no part in the discussion or on the adoption of, the committee's report.

Without objection, the body entered into executive session at 10:00 a.m. The body returned to open session at 10:52 a.m.

The Chair announced that during the executive session, the Board of Directors adopted the following resolution:

> RESOLVED that the Employment Agreement between the NRA and Mr. LaPierre be approved by the NRA Board of Directors, subject to the addition of a choice of law and venue provision to be negotiated between the parties, and

> RESOLVED FURTHER, that Mr. Cotton is authorized to execute the Employment Agreement on behalf of the NRA.

The Chair called for the Report of the NRA Civil Rights Defense Fund, which was presented by the Fund Chairman, Mr. James W. Porter II. A copy of the report is attached to and made a part of these minutes.

The Chair called for new business. Mr. Frazer stated that he had received one resolution, as follows:

> "WHEREAS, on September 10th, 2020, NRA President Carolyn Meadows announced the appointment of a Special Litigation Committee (the SLC) to oversee the prosecution and defense of certain litigation; and

> WHEREAS, the Board desires that the SLC in furtherance of its mission and responsibilities, be vested with corporate authority as a committee of the Board pursuant to New York Not-For-Profit Corporation Law Section 712(a); now, therefore be it

> RESOLVED, that a Special Litigation Committee of the NRA Board of Directors is hereby appointed, and that the members of such committee shall be Carolyn Meadows, Charles Cotton, and Willes Lee, each of whom has been determined to be independent and disinterested in all respects relevant to their service on the SLC; and be it further

RESOLVED, That the Special Litigation Committee shall exercise corporate authority on behalf of the NRA with respect to the prosecution and defense of

(i) The litigation captioned People of the State of New York versus the National Rifle Association, et al., Index Number 451625/2020 (Supreme Court of New York);

(ii) The litigation captioned the National Rifle Association versus Letitia James, Case Number 1:20-cv-889 (Northern District of New York, 2020);

(iii) The litigation captioned District of Columbia versus NRA Foundation, Inc., et al.; this is Case Number 2020-CA-003545B; and

(iv) Any additional legal proceedings arising from the same facts, circumstances, or allegations as the foregoing, wherein the potential for an actual or apparent conflict of interest favors recusal by one or more NRA executives who would customarily oversee such proceedings."

Mr. Todd Rathner moved to adopt the resolution. Professor Coy seconded the motion.

The Chair called for the body to go into executive session to discuss the resolution and legal matters.

Without objection, the body entered into executive session at 11:05 a.m. The body returned to open session at 11:39 a.m.

The Chair announced that during executive session, the Board of Directors passed the resolution formalizing the Special Litigation Committee. Mr. Cotton noted that Ms. Froman abstained from the vote.

There were no comments or announcements for the good of the order.

At the Chair's request, Chief J. William Carter presented the closing prayer.

There being no further business to come before the body, the meeting was adjourned at approximately 11:41 a.m., January 7, 2021.

Respectfully submitted,

John C. Frazer
Secretary

6

# REPORT
## OF THE
## FIRST VICE PRESIDENT
## TO THE
## BOARD OF DIRECTORS
## NATIONAL RIFLE ASSOCIATION OF AMERICA

**Dallas, Texas**                                                 **January 7, 2021**

Members of the Board, Officers, Staff and Guests:

It is time for the Officer Reports now.

Twice in a row now I will do something completely out of character for me and I will be brief.

A lot of folks are probably wondering why now, why Dallas, why no committee meetings or no in-person committee meetings.

And the short version of that is—actually we could make Jim our poster child—the short version of that is COVID.

The hotel in Tysons Corner shut down everything for the month of January, and it will probably be extended beyond that, so we were going to lose our meeting date and spot. We had to have some—we had to get something done.

As you all will recall, we were scrambling last year trying to get in our Annual Meeting of the Members because it is required by the bylaws. And since Letitia James, the New York AG, is, throwing everything she can at us, we just wanted to make sure we did not give her a bylaw violation to add to the list.

We decided we are not going to let—we are not going to start off 2021 in the hole in terms of meetings. So that is the reason we said we are going to go ahead and have it in January.

We do not know what is going to happen with COVID. I mean if what we are hearing on the news and what we are seeing locally is accurate, we have no idea what it is going to be like.

We are going to schedule meetings and attend those meetings when we can.

Now, as for committee meetings, I am not crazy about telephonic meetings any more than probably a lot of you folks are, but it is a sign of the times right now.

Every time I drive past a restaurant that I used to really like to go to and patronize good folks that have built their businesses for years and I see it closed because of what we are going through now, it breaks my heart to see what is going on.

But that is the reality that we are facing now and will face until this COVID situation is over.

I am not going to get into vaccines or is it going to help or not; we do not know. We just flat do not know.

But that is the reason we are here now, that is the reason we thought we are going to get the January meeting under our belts, so that means by the bylaws we have to have two more before the end of the year, and hopefully our Annual Meeting, our annual convention, and all that that brings will actually be held in September.

As you already know, we had to move it to September because everything in the George R. Brown Convention Center in Houston for that month was canceled, literally everything, so we were able to move it to September 4 I believe it is.

And again, we are hoping we can get that done as well. If not, we will have an Annual Meeting of the Members someplace and we will have our second Board Meeting.

In all likelihood—and a lot of folks are not going to like hearing this—but in all likelihood we are going to have to continue with committee meetings either telephonically or, you know, by WebEx or something like that.

It is certainly less than optimal. I mean let's face it, a lot of the business that we do is outside of the formal committee meetings. It is gathering around tables and having coffee or lunch together and discussing issues, and then we—I guess it is a little bit of an overstatement to say we formalize it in the committee meetings before the Board Meeting, but that is the way it works.

That is the way legislatures work. And we have been correctly described as much more of a legislature than a board of directors because of our size and the varying scope of our responsibilities.

So that is why we are here today, that is why we are so sparsely populated is the COVID problem as well, and that is why our committee meetings are being held telephonically.

If any committee chairs want to have telephonic or WebEx meetings—and we have the ability for WebEx, folks—just let Carolyn know, let the President know, and we will get them done. I mean they will be approved for you; that will not be an issue.

Okay. That is all I got. Let me put my eyes back on here and make sure I do not get anyone out of order.

**EXHIBIT C**

January 19, 2021

President Meadows, et. al.
11250 Waples Mill Rd
Fairfax, VA 22030

President Meadows, Officers, and fellow Board Members,

It has been my great honor to serve on the board of the nation's oldest civil rights organization, and to serve with the other members of this board whom I respect and whose friendships I value. I will always support the goals of the organization with respect to protecting and furthering the Second Amendment, and I will continue to support the efforts of this organization in those pursuits wherever they align. However, in the current organizational environment, I am no longer able to effectively perform the duties of a director with what I feel is the appropriate level of oversight required. I hereby resign my position as a director on the board of the National Rifle Association, and request that I not be on the ballot for re-election consideration this year. I wish for nothing but success for the Association, and look forward to future opportunities to serve the organization under different circumstances.

Sincerely,

Duane Liptak, Jr

**EXHIBIT D**

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1                UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF TEXAS

3                     DALLAS DIVISION

4

5

   IN RE:                        )

6                                )

                                 )

7    NATIONAL RIFLE              ) Case No.

     ASSOCIATION OF AMERICA      ) 21-30085-hdh-11

8    AND SEA GIRT, LLC,          )

                                 )

9        Debtors.                )

10

11   ********************************************************

12        REMOTE ORAL AND VIDEOTAPED DEPOSITION OF

13             HONORABLE PHILLIP JOURNEY

14                  MARCH 18, 2021

15    CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

16   ********************************************************

17

18

19

20

21

22

23

24

25

                                         Page 1

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1    REMOTE ORAL AND VIDEOTAPED DEPOSITION OF HONORABLE

2 PHILLIP JOURNEY, produced as a witness at the instance

3 of the New York State Office of the Attorney General,

4 and duly sworn, was taken remotely in the above-styled

5 and numbered cause on the 18th day of March, 2021, from

6 4:10 p.m. to 7:57 p.m., via Zoom, before Julie C.

7 Brandt, RMR, CRR, and CSR in and for the State of Texas,

8 reported by machine shorthand, with the witness located

9 in Wichita, Kansas, pursuant to the Federal Rules of

10 Civil Procedure and the provisions stated on the record

11 or attached hereto.

Page 2

1 FOR THE NATIONAL RIFLE ASSOCIATION OF AMERICA:
2    Dylan Ciciliano
     William Noall
3    Talitha Gray Kozlowski
     GARMAN TURNER GORDON LLP
4    7521 Amigo Street, Suite 210
     Las Vegas, Nevada 89119
5    702.777.3000
     dciciliano@gtg.legal
6
7 FOR THE PEOPLE OF THE STATE OF NEW YORK:
8    Lucas McNamara
     Monica Connell
9    Yael Fuchs
     OFFICE OF THE ATTORNEY GENERAL OF THE
10        STATE OF NEW YORK
     28 Liberty Street, 18th Floor
11   New York, New York 10005
     212.416.8401
12   lucas.mcnamara@ag.ny.gov
13   Jonathan Conley
     NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
14   The Capitol
     Albany, New York 12224
15   212.416.8108
     jonathan.conley@ag.ny.gov
16
17 FOR THE OFFICE OF THE U.S. TRUSTEE:
18   Lisa L. Lambert
     Marc F. Salitore
19   UNITED STATES TRUSTEE PROGRAM
     1100 Commerce Street, Room 976
20   Dallas, Texas 75242
     214.767.8967
21   lisa.l.lambert@usdoj.gov
22
23 FOR THE PROPOSED SPECIAL COUNSEL FOR DEBTORS:
     Svetlana M. Eisenberg
24   BREWER ATTORNEYS & COUNSELORS
     750 Lexington Avenue, 14th Floor
25   New York, New York 10022

Page 4

1    REMOTE APPEARANCES
2
3 FOR THE NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL:
4    Gerrit Pronske
     Eric Van Horn
5    Jason Kathman
     SPENCER FANE LLP
6    2200 Ross Avenue, Suite 4800 West
     Dallas, Texas 75201
7    214.750.3610
     gpronske@spencerfane.com
8
9 FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:
10   Nick Hendrix
     Emma Persson
11   NORTON ROSE FULBRIGHT US LLP
     2200 Ross Avenue, Suite 3600
12   Dallas, Texas 75201
     214.855.8341
13   nick.hendrix@nortonrosefulbright.com
14
     FOR THE HONORABLE PHILLIP JOURNEY:
15
     Jermaine Watson
16   BONDS ELLIS EPPICH SCHAFER JONES LLP
     420 Throckmorton Street, Suite 1000
17   Fort Worth, Texas 76102
     817.529.2724
18   jermaine.watson@bondsellis.com
19
     FOR ACKERMAN MCQUEEN, INC.:
20
     Brian Mason
21   Joseph Acosta
     DORSEY & WHITNEY LLP
22   300 Crescent Court, Suite 400
     Dallas, Texas 75201
23   214.981.9929
     mason.brian@dorsey.com
24
25

Page 3

1    212.224.8817
     sme@brewerattorneys.com
2
3 ALSO PRESENT:
4    Jennifer Jones
5    Jeremy Economos
6    Dave Hamrick
7    Dave Webster
8    David Dell'Aquila
9
     VIDEOGRAPHER:
10
     Zack Mata - Veritext
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

2 (Pages 2 - 5)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

INDEX
PAGE

Appearances.................................... 3
Proceedings................................... 7
Stipulations.................................. 8

HONORABLE PHILLIP JOURNEY
Examination by Mr. Pronske................ 10
Examination by Mr. Mason.................. 86
Examination by Mr. Ciciliano............. 100
Further Examination by Mr. Pronske....... 148
Further Examination by Mr. Mason......... 165
Signature and Changes......................... 171
Reporter's Certificate........................ 173

DEPOSITION EXHIBITS                    IDENTIFIED
Exhibit 1    NRA Bylaws as Amended
             September 14, 2019.............. 37

Exhibit 2    Employment Agreement of Wayne
             R. LaPierre.................... 41

Page 6

PROCEEDINGS

THE VIDEOGRAPHER: Today's date is March 18, 2021. The time is 4:10, and we are on the record. This is the beginning of the remote video deposition of the Honorable Phillip Journey.

This deposition is being held via Zoom due to the COVID-19 pandemic.

My name is Zack Mata from the firm Legal Video of Texas. And I am the videographer. The court reporter is Julie from the firm Veritext. I am not authorized to administer an oath. I am not related to any party in this action, nor am I financially interested in the outcome.

Counsel and all present in the room and everyone attending remotely will now state their appearances and affiliations for the record. If there are any objections to this proceeding being held via Zoom, please state them at the time of your appearance, beginning with the noticing attorney.

MR. PRONSKE: I am Gerrit Pronske. And I represent the New York Attorney General, along with Eric Van Horn and Jason Kathman; all three of us with the law firm of Spencer Fane. And we have on the line with us Monica Connell, who is an attorney at the New York Attorney General's office.

Page 7

MR. WATSON: Jermaine Watson. I represent Judge Journey. I'll be defending this deposition. I am a partner at Bonds Ellis Eppich Schafer Jones, LLP.

And before we go any further, I wanted to point out to all the parties that we agreed to do this on very short notice. My client is a sitting judge, and he had a docket today. And we only made him available with the understanding or the agreement, rather, that he would be subjected to two hours or up to two hours, is what is explained to me. We don't have an official agreement with any party to go beyond that. To the extent necessary, I will check with my client at the end of two hours and see if he wants to continue. But I am not going to promise parties that we're going to keep him much longer than that unless he consents. So with that, I will let everyone else make their appearance.

MR. CICILIANO: This is Dylan Ciciliano from Garman Turner Gordon on behalf of the Debtors. Along with me are Talitha Gray Kozlowski and William Noall. As well to add to that objection, I do believe that we've discussed in this case remote videographers may or may not be admissible. I would also object. And this is with speaking to the judge before the deposition. He doesn't have an additional means to --

Page 8

to transmit his video, but we do have an objection to it being from the courtroom just on appearance sake. I don't imagine I am going to stop the deposition from going forward, but I do want to preserve that just for the appearance sake. Thank you.

MS. EISENBERG: Good afternoon. I'm Svetlana Eisenberg from Brewer Attorneys and Counselors, Proposed Special Counsel for the Debtors.

MR. HENDRIX: Nick Hendrix, Norton Rose Fulbright, here on behalf of the Official Committee of Unsecured Creditors. And I am joined by several members of the committee as well.

MR. ACOSTA: This is Joe Acosta. I am here with Brian Mason. We represent Ackerman McQueen.

MR. MCNAMARA: Good afternoon. This is Lucas McNamara. I'm Assistant Attorney General with the New York State Office of Attorney General.

THE REPORTER: Anyone else want to identify?

MR. WATSON: I think one of the trial attorneys from the UST's office is logging in. Lisa, are you going to enter your appearance? Lisa?

Could you mute her?

Lisa, can you hear us?

MS. LAMBERT: Yes, I can hear you.

Page 9

3 (Pages 6 - 9)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1    MR. WATSON: Okay. Are you going to
2 identify yourself for the deposition?
3    MS. LAMBERT: This is Lisa Lambert with
4 the Office of the United States Trustee, representing
5 William Neary, the US Trustee.
6    THE REPORTER: Okay. If that's everyone,
7 I will swear in the judge.
8    (Witness sworn.)
9    MR. PRONSKE: Okay. Are you ready for me to
10 proceed?
11    THE REPORTER: Ready.
12    HONORABLE PHILLIP JOURNEY,
13 having been first duly sworn and having confirmed that
14 he is The Honorable Phillip Journey, testified remotely
15 as follows:
16    EXAMINATION
17 BY MR. PRONSKE:
18    Q. Judge Journey, my name is Gerrit Pronske. I'm
19 with the law firm of Spencer Fane and represent the New
20 York Attorney General.
21    Could you -- and actually, as Mr. Ciciliano
22 was objecting, I was thinking that you have a really
23 beautiful courtroom there. So congratulations for that.
24    A. Thank you. It's one of the newer ones. The
25 reason I chose the courtroom was they just spent $40,000

Page 10

1 on sound equipment so y'all can hear me nice and clear.
2 And I tried doing it in chambers and I couldn't get the
3 camera to work, so I gave up this morning.
4    Q. Well, we can -- we can hear you very well, so
5 thanks for that.
6    Can you please state your name for the record?
7    A. Phillip Journey.
8    Q. And can you tell the Court what, if anything,
9 that you did to prepare for this deposition?
10    A. I reviewed the motion, looked through some of
11 the files on my computers. You know, I mean, it's a
12 pretty narrow scope, so I didn't think there was a whole
13 lot to do. And I've had a really crazy week, so right
14 now I am trying to clear up the one on the 29th, if I
15 can, so we'll see.
16    Q. Okay. And I am not going to give you all the
17 normal depo instructions since you're a jurist, but I
18 will ask that we both be particularly cognizant of not
19 talking over one another, given this video format. Can
20 we have that agreement?
21    A. Sure. You sound just like me every day.
22    Q. And we're both wearing blue shirts, you know,
23 so go figure.
24    A. Yeah.
25    Q. So can you tell the Court approximately what

Page 11

1 year you were elected to the board?
2    A. Okay. The first time I was elected, it was
3 from -- for a period of time from 1995 to '98, so about
4 25 years ago.
5    Q. Okay.
6    A. And then I was elected in the 2020 election,
7 but I wasn't able to be sworn in until after the annual
8 meeting had been postponed twice. So I officially
9 joined the board on October 24th of 2020.
10    Q. Okay. And how long is that term?
11    A. It's a three-year term.
12    Q. Okay. Thank you.
13    Are you appointed to any committees of the NRA
14 board?
15    A. I just got my notice. I know it was
16 grassroots and youth development.
17    Q. Okay. And do you sit on the executive
18 committee as well?
19    A. No.
20    Q. Okay. So I'm going to refer to a board
21 meeting that was held on January 7, 2021 and the
22 executive sessions of that board meeting. I'm just
23 going to refer to that as the board meeting. Can we
24 have that agreement?
25    A. Sure.

Page 12

1    Q. It's my understanding from a deposition taken
2 of John Frazer at this morning's session, he
3 characterized that board meeting as having been
4 separated into three sections that he called the full
5 board meeting; and the executive session one, which
6 dealt with the Wayne LaPierre employment contract
7 approval; and then the executive session two, which was
8 the formation of the special litigation committee.
9    Does that sound accurate?
10    A. That's pretty close. There was a lot of
11 little stuff we did at the beginning and then wrapped
12 up. You know, it only took about an hour and a half.
13    Q. Okay. The -- and you attended that board
14 meeting. Correct?
15    A. Yes.
16    Q. The minutes show -- of that board meeting show
17 that there were 37 members of the 76 board members
18 present. Does that sound correct to your view?
19    A. Well, I didn't count noses, but that's
20 probably about right.
21    Q. And was that both attendance by remotely and
22 physically present?
23    A. The only thing I remember was a video
24 presentation by Carolyn Meadows, but that was not a live
25 link from what I could see.

Page 13

4 (Pages 10 - 13)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1    Q.  Were the rest of the board members there
2  physically present there?
3    A.  Yes.
4    Q.  Okay.  Can you tell the Court, looking at page
5  4 of the minutes -- we don't need to go to that, but did
6  you hear a request by Ms. Froman that the record reflect
7  that she was not present?
8    A.  Yes.
9    Q.  And can you provide any context on that
10  statement that was put into the record?
11    A.  I am not sure what you're asking for.
12    Q.  Do you know the reason that she requested that
13  the record reflect that she was not present?
14        MR. WATSON:  Objection, speculation.
15        You can answer, Judge Journey, if you know.
16        THE WITNESS:  Thank you.
17    A.  I am uncertain as to why she did that.
18    Q.  (BY MR. PRONSKE)  Okay.  Can you tell the
19  Court in general terms what is the difference between
20  the function of the full board and the executive
21  committee?
22        MR. CICILIANO:  Objection, lack of
23  foundation.
24        MR. WATSON:  Did we get your objection,
25  Mr. Ciciliano?

Page 14

1        MR. CICILIANO:  I would just generally
2  object on foundation.  Go ahead.
3        MR. WATSON:  Okay.  Go ahead.
4    A.  It's my recollection that the executive
5  committee's purpose is basically to fill in when the
6  board is not in session to make decisions or provide
7  guidance to staff through resolutions.
8    Q.  (BY MR. PRONSKE)  Okay.  And have you reviewed
9  the bylaws of the National Rifle Association?
10    A.  Which version?  You know, they change about
11  every week, it seems like, but at least every three or
12  four months.
13    Q.  I would be talking about the version that
14  would be effective as of the board meeting.
15    A.  I have not gotten a copy of the bylaws as they
16  were amended in the October 24th meeting.
17    Q.  Okay.  Would the bylaws -- do you know that if
18  the bylaws were significantly changed at that point in
19  time?
20        MR. CICILIANO:  Objection, form.
21        MR. WATSON:  And you can answer, Judge.
22    A.  I'm sorry.  Ask the question again.
23    Q.  (BY MR. PRONSKE)  Yeah.  You said you hadn't
24  seen that most recent version of the bylaws, and I'm
25  asking you if you know whether there were significant

Page 15

1  changes made for that version?
2    A.  I remember there were two bylaws events that
3  were voted on in the October 24th meeting.  I do not
4  recall the topics.  I do recall that I voted for both of
5  them.
6    Q.  Okay.  And now let's go to that board meeting,
7  and I want to ask you when the board broke up to have
8  the executive session relating to the Wayne LaPierre
9  employment contract, were you present in that executive
10  session?
11    A.  Yes.
12    Q.  And can you tell the Court, was the sole
13  purpose of that executive session to review and approve
14  the employment contract of Wayne LaPierre?
15        MR. WATSON:  Objection.  There may be a
16  privilege here, but I'll let the NRA assert that
17  privilege.
18        MR. CICILIANO:  Yeah, I would likewise
19  object to the extent that it calls for the disclosure of
20  attorney/client communications or work product.  I would
21  direct you not to answer on behalf of the NRA, but
22  generally --
23        MR. WATSON:  I'm sorry.  Are you done,
24  Dylan?
25        MR. CICILIANO:  Yes.

Page 16

1        MR. WATSON:  I am going to instruct you
2  not to answer that, Judge --
3        THE WITNESS:  Thank you.
4        MR. WATSON:  -- on that basis.
5    Q.  (BY MR. PRONSKE)  So Judge Journey, are you
6  refusing to answer that question?
7    A.  I'm sorry, what?
8    Q.  Are you refusing to answer that question on
9  your attorney's advice?
10    A.  I think I should rely on my counsel's advice,
11  yes.
12    Q.  Okay.  So were -- was -- when that committee
13  broke up -- broke into session, was the full board told
14  that this -- that there was going to be an executive
15  session?
16    A.  Generally, an executive session is moved by
17  one of the members of the board and then voted on
18  whether they should go into executive session.  So it's
19  not like anybody tells you except by making the motion.
20    Q.  Okay.  And that motion was made in the full
21  board session.  Is that right?
22    A.  Yes.
23    Q.  And the full board would have had all of the
24  board of directors and other individuals that would
25  have -- there would have been attorneys and then there

Page 17

5 (Pages 14 - 17)

1 would have been other individuals there. Is that
2 correct?
3 A. Yes. There were -- there's the board counsel,
4 Wit. And then, of course, there's the general counsel,
5 the secretary. They were both present, and I believe
6 Mr. Brewer was present also. I know he came in and out
7 of the room a couple times.
8 Q. Would there -- would that -- would the full
9 board session be a session that would be considered
10 privileged?
11 MR. CICILIANO: Objection, calls for a
12 legal conclusion.
13 Q. (BY MR. PRONSKE) Or just the executive
14 session?
15 MR. WATSON: I'm going to object. It
16 does call for a legal conclusion.
17 Q. (BY MR. PRONSKE) You can answer, if you know.
18 MR. WATSON: You can answer. You can go
19 ahead and answer, Judge.
20 A. Okay. What was the question again?
21 Q. (BY MR. PRONSKE) The question is it just
22 the executive sessions that are considered to be
23 privileged, or is the full board session also considered
24 privileged?
25 A. I --

Page 18

1 object to the extent that it requires the judge to
2 actually opine as to what was discussed in a privileged
3 session in order to answer the question, as it
4 presupposes the privilege, the nature of the
5 communication.
6 Q. (BY MR. PRONSKE) You can answer the question.
7 A. The board goes into executive session when a
8 member of the board makes a motion and it's seconded,
9 and then the board votes on that motion. If the
10 board -- so someone would bring up the topic, and then
11 someone would say let's go into executive session, and
12 then the board votes, and they go into executive session
13 if it passes. I mean, it's not like they say we're
14 going to do this at that time and we'll be here.
15 Q. Was the board aware that there was going to be
16 an executive session where the Wayne LaPierre employment
17 contract was going to be discussed and approved?
18 MR. WATSON: Objection, asked and
19 answered or --
20 Could you restate the question, Gerrit?
21 A. I don't think there was any advance notice
22 like an agenda. You know, you all have copies of the
23 agenda. It doesn't say we're going into executive
24 session here.
25 Q. (BY MR. PRONSKE) Okay. Can you tell the

Page 20

1 MR. WATSON: I'm going to object. Same
2 objection.
3 Before you answer, Judge, let me object.
4 THE WITNESS: Okay.
5 MR. WATSON: Calls for a legal
6 conclusion.
7 But you can answer.
8 A. It's my understanding that the regular board
9 meeting is reflected in the minutes and, therefore, it's
10 not privileged because everybody has access to the
11 minutes.
12 Q. (BY MR. PRONSKE) Okay.
13 A. So I believe the privilege extends to the
14 executive session.
15 Q. Okay. So then I'm going to go back to my
16 original question that was objected to, which is did the
17 full board -- was the full board aware that there was
18 going to be an executive session where the sole issue to
19 be reviewed would be the Wayne LaPierre employment
20 contract?
21 MR. WATSON: Same objection, calls for
22 speculation. He can't testify to what the other board
23 members knew. He can only testify to what he observed
24 or his impression of what happened.
25 MR. CICILIANO: And I would further

Page 19

1 Court which attorneys were present in the executive
2 session to discuss the employment contract?
3 MR. CICILIANO: I would just object on
4 the same point to the nature of the question and
5 presupposing what was discussed.
6 You can answer who was at the executive
7 session, what attorneys.
8 A. I don't remember if Brewer was in the room
9 during that conversation, but I believe Mr. Frazer was.
10 He was there the entire time. And I believe board
11 counsel was present.
12 Q. (BY MR. PRONSKE) Is that William Davis?
13 A. Yes.
14 Q. Okay.
15 A. That's Wit. That's all I know, Wit. Yeah,
16 you're right, William Davis, okay.
17 Q. And was Sara Rogers present?
18 A. I'm not sure.
19 Q. Were there any staff members present in that
20 executive session?
21 MR. CICILIANO: Objection, vague.
22 A. You presume I know everybody. I don't know.
23 Q. (BY MR. PRONSKE) Okay. During that executive
24 session, were the members that were sitting in that
25 session provided with a copy of Mr. LaPierre's

Page 21

6 (Pages 18 - 21)

1 employment contract to be approved?
2    A. They were not given a copy, no. There were
3 two copies at two tables, and you had to sit there and
4 read it and turn it back in.
5    Q. And did you go over and open that contract and
6 review it?
7    A. Yes, I read it.
8    Q. Was there a presentation made by someone with
9 respect to that contract?
10    A. Mr. Cotton was the -- is the first vice
11 president of the NRA, and as President Meadows was not
12 at the board meeting, he ran the meeting. So there was
13 another lawyer in the room, too, by the way. You know,
14 you'll have to ask him what he said.
15    Q. Okay. And was Mr. LaPierre present in that
16 session?
17    A. No. No.
18    Q. This morning --
19    A. Mr. LaPierre came for about three minutes and
20 left and did not return to the board meeting.
21    Q. Okay. So he attended the full board meeting
22 or this executive session?
23    A. He was not in either of the executive
24 sessions.
25    Q. Okay. So Mr. Frazer testified this morning he
Page 22

1 was in that executive session. Is he just incorrect on
2 that?
3      MR. WATSON: Objection, assumes facts not
4 in evidence. Judge Journey wasn't present this morning
5 at Mr. Frazer's deposition.
6    Q. (BY MR. PRONSKE) Let me rephrase that.
7      If Mr. Frazer said at a deposition this
8 morning that Mr. LaPierre was in that session, would he
9 be incorrect?
10    A. My recollection is that the way the board
11 meeting runs is we all go in and we do the roll call and
12 then the officers give us their reports, like the EVP,
13 Mr. LaPierre. And he came in, gave his report. It was
14 very short. And he left. And I don't remember seeing
15 him enter the room again --
16    Q. Okay.
17    A. -- during the board meeting.
18      So you know, maybe Frazer -- but I'm looking
19 forward and Frazer is looking back. So he may have
20 entered behind me and I had not seen it. I don't know.
21 All I know is what I saw in front of me.
22    Q. Was there a discussion in that session of
23 authority to file for bankruptcy?
24      MR. CICILIANO: I would just object
25 pursuant to the attorney/client privilege and direct the
Page 23

1 witness not to answer.
2      MR. WATSON: And I, too, am going to
3 direct you not to answer that, Judge Journey.
4      THE WITNESS: Okay.
5    A. Okay. I can't tell you what they did say, but
6 I think I can tell you what they didn't say. And nobody
7 during that --
8      MR. CICILIANO: I would object -- I would
9 object, Judge, and direct you that what was said or was
10 not said is covered by the attorney/client privilege,
11 and I would direct you not to answer. The NRA is not
12 waiving that privilege.
13      THE WITNESS: Okay.
14    A. Nobody said the word "bankruptcy."
15    Q. (BY MR. PRONSKE) Okay. And did anyone say
16 the word -- and let me ask you this question. As far as
17 not answering the question regarding a discussion about
18 authority to file bankruptcy, are you refusing to answer
19 that question?
20    A. No. You know, I think my motion speaks for
21 itself.
22    Q. Okay.
23    A. Doesn't it?
24      MR. CICILIANO: Mr. Pronski, we ought to
25 be clear here that the privilege is not his to assert or
Page 24

1 to waive. The privilege is for the NRA to assert and
2 waive. And if you are going to insist on getting -- and
3 with respect to Mr. Journey, he may want to talk about
4 it.
5      But to the extent you're going to insist that
6 he break or attempt to break the privilege that's owned
7 by the NRA, I will have to shut the deposition down to
8 seek a protective order under Rule 3OG or 30D.
9      I don't intend to interfere with the rest of
10 his testimony. So if that's your intent to do so, I say
11 we draw a box around this and move on to other subject
12 matters.
13      MR. PRONSKE: Well, I think you're going
14 to have a hard time shutting the deposition down because
15 I'm insisting on something when all I've done,
16 Mr. Ciciliano, is ask questions, and I am going to
17 continue to ask questions, and I am going to ask him --
18 when he doesn't want to answer a question, I am going to
19 ask him if he refuses to answer the question. If you
20 interpret that as insisting, then by all means file
21 whatever you need to file.
22    Q. (BY MR. PRONSKE) Judge Journey, can you tell
23 the Court, you've said that the word "bankruptcy" was
24 not used in that session. Was the word "Chapter 11"
25 used in that session?
Page 25

1 MR. CICILIANO: I am going to object and
2 direct you not to answer pursuant to the attorney/client
3 privilege, and if you insist on answering, the
4 deposition will be terminated right now.
5 Q. (BY MR. PRONSKE) Are you refusing to answer
6 that question, Judge Journey?
7 MR. WATSON: I am going to direct you not
8 to answer, Judge Journey.
9 THE WITNESS: Okay. Okay. All right, I
10 will follow your lead, Mr. Watson.
11 Q. (BY MR. PRONSKE) Was the word
12 "reorganization" used in that executive session?
13 MR. CICILIANO: I will once again object
14 and direct the witness not to answer pursuant to the
15 attorney/client privilege.
16 MR. WATSON: I will direct you not to
17 answer, Judge Journey.
18 THE WITNESS: Thank you.
19 Q. (BY MR. PRONSKE) Are you refusing to answer,
20 Judge Journey?
21 A. I reluctantly am, yeah.
22 Q. Was the word -- were either the word "court"
23 or the word "filing" used in that executive session?
24 MR. CICILIANO: I will once again object
25 pursuant to the attorney/client privilege and direct the
Page 26

1 judge not to answer.
2 MR. WATSON: Judge, don't answer the
3 question. I'm instructing you not to answer.
4 THE WITNESS: Okay.
5 A. I'm sorry, I have to say no, I can't answer.
6 Q. (BY MR. PRONSKE) Judge Journey, as you -- as
7 you know, the LaPierre employment agreement says -- that
8 was approved says that Wayne LaPierre is empowered,
9 quote, to reorganize or restructure the affairs of the
10 association for purposes of cost minimization,
11 regulatory compliance or otherwise, closed quote. Are
12 you aware of that language?
13 A. Yes.
14 Q. Was there any discussion during the executive
15 committee session whatsoever regarding that sentence of
16 the agreement?
17 MR. CICILIANO: I am going to object
18 pursuant to the attorney/client privilege and direct the
19 judge not to answer.
20 MR. WATSON: Yeah, Judge, don't -- I'm
21 going to instruct you not to answer that question.
22 THE WITNESS: All right. That's fine.
23 Q. (BY MR. PRONSKE) Your testimony, I believe,
24 Judge Journey, is that you did read the entire agreement
25 before it was approved?
Page 27

1 A. That's correct.
2 Q. As a board member of the NRA, do you believe
3 that those -- that that sentence approved or authorized
4 the filing of a bankruptcy by the NRA?
5 MR. CICILIANO: I would just object, and
6 to the extent that your belief is based on what has been
7 told to you by the counsel of the NRA, I would direct
8 you not to answer. To the extent you have an individual
9 recollection, you may.
10 MR. WATSON: Judge Journey, you can
11 answer based on your -- based on your knowledge or
12 observations.
13 THE WITNESS: Okay.
14 A. So what was the question again? You guys, I'm
15 having too much fun watching y'all. I'm sorry, I'm
16 distracted, okay.
17 Q. (BY MR. PRONSKE) The question, Judge Journey,
18 is that that sentence that I read from the employment
19 contract, do you believe that those words authorized or
20 approved a bankruptcy filing of the NRA?
21 A. You know, when I read that -- we reorganize
22 the NRA all the time. We create committees, and we do
23 all kinds of things that are not what would have been
24 contemplated as what occurred. So, you know, I did
25 not -- I'm a little mad at myself because I didn't make
Page 28

1 that link.
2 Q. You didn't make that connection. There was
3 certainly no discussion of bankruptcy that would have
4 allowed you to make that connection. Is that right?
5 MR. CICILIANO: I am going to object
6 pursuant to the attorney/client privilege and direct the
7 witness not to answer what occurred in the executive
8 session.
9 MR. WATSON: Yes, Judge, don't -- don't
10 answer the question.
11 A. Yeah, I don't have to answer that one. That's
12 self-apparent.
13 Q. (BY MR. PRONSKE) So to be apparent and to be
14 clear, your testimony is, am I correct, Judge Journey,
15 that you did not make any correction -- any correlation
16 in your mind between that sentence of the employment
17 contract or any other sentence in the employment
18 contract and the filing of a bankruptcy. Is that
19 correct?
20 MR. CICILIANO: I would just to -- I
21 would just object. To the extent that that requires you
22 to divulge what's in your mind with respect to what was
23 informed to you by counsel of the NRA, I would direct
24 you not to answer to that extent.
25 MR. WATSON: Judge, you can answer the
Page 29

8 (Pages 26 - 29)

1 question based upon what you know and your recollection.
2 THE WITNESS: Thank you.
3 A. You know, I just want to say "sustained" or
4 "overruled." I don't know.
5 But anyway, you know, there was -- there was
6 no hint in my little feeble mind that anyone was
7 contemplating bankruptcy.
8 Q. (BY MR. PRONSKE) All right. And was the
9 resolution to approve the employment contract ultimately
10 adopted by the executive session?
11 A. It was adopted, and then it was reflected in
12 the minutes when we came out.
13 Q. And was that adoption unanimous?
14 A. I -- I know I voted for it, but I'm not sure.
15 I suppose so. I don't remember anybody sticking
16 their -- else sticking their head out of the trench.
17 Q. Right.
18 Do you -- have you had any discussions with
19 board members about the bankruptcy filing after it was
20 filed?
21 A. Sure.
22 Q. How many would you say you've spoken with?
23 A. (Laughter.) I talk to a lot of people. I
24 mean, you know, I called the US Trustee for Kansas, who
25 just retired who is a really good friend of mine. I
Page 30

1 talked to him. I talked to lots of people after the
2 filing of the bankruptcy, sure.
3 Q. So can you -- let's drill down on that
4 conversation with the US Trustee. Can you tell me about
5 that conversation?
6 A. He is a really good friend, been my friend for
7 over 30 years, Ed Nazar. He just retired as the trustee
8 for the district of Kansas. And I talked to him about
9 the bankruptcy. And he was so kind. He sent me
10 mountains of research, and I learned all about
11 Chapter 11 in about four days.
12 Q. Did you have any discussion with that United
13 States trustee about any concerns that you had that that
14 bankruptcy was not authorized in the board meeting?
15 A. Yes.
16 MR. WATSON: Objection.
17 THE WITNESS: Sorry.
18 MR. WATSON: Objection. It calls for
19 speculation, and it calls for a legal conclusion based
20 upon -- to the extent it calls for a legal conclusion, I
21 am instructing him not to answer, but he can answer
22 generally as to what his understanding is of how
23 bankruptcy works.
24 Q. (BY MR. PRONSKE) Actually, that's not the
25 question. The question is what was discussed with the
Page 31

1 US Trustee as far as the authorization issue?
2 A. That -- that was one of the questions, was how
3 corporations authorize the filing of a bankruptcy.
4 Q. What was the substance of that conversation
5 regarding authorization?
6 A. Oh, my gosh. That was so long ago. That was
7 like on January 16, you know. We had -- we had many
8 conversations over the next three days, because I would
9 seek clarification and he would send me more research.
10 I thought he was going to send me his Colyers and just
11 get it over with, you know.
12 Q. Did you tell that -- did you tell that US
13 Trustee during any of those conversations that you
14 believed that the filing of the bankruptcy by the NRA
15 was not authorized?
16 MR. WATSON: Objection, calls for a legal
17 conclusion.
18 You can answer.
19 A. That was my impression, yes, and that was what
20 I related to Mr. Nazar.
21 Q. (BY MR. PRONSKE) And did you tell the United
22 States Trustee during those conversations that the
23 filing of bankruptcy was not discussed in the board
24 meetings?
25 MR. CICILIANO: I would just object here.
Page 32

1 First of all, I think you're mischaracterizing. He
2 wasn't the US Trustee.
3 But second of all, to the extent that you did
4 disclose anything covered by the attorney/client
5 privilege, I would direct you not to disclose it again.
6 That's not a waiver. You don't have the ability to
7 waive it.
8 THE WITNESS: Thank you. One thing I
9 would like to clarify --
10 MR. WATSON: I instruct you not to answer
11 the question, Judge.
12 THE WITNESS: I just want to make sure
13 they say the retired trustee, because he's retired and
14 playing with his grandkids in Kansas City, and that's
15 where I found him, you know. He -- he retired like six
16 months ago or something like that. He had been a
17 trustee for 30 years ago.
18 Q. (BY MR. PRONSKE) So are you refusing to
19 answer that question under advice of counsel?
20 A. I think we could go there for that, for this
21 one right now, yeah.
22 Q. Okay. Do you believe, Judge Journey, as a
23 board member that only the full board of directors of
24 the NRA can authorize a bankruptcy filing?
25 MR. WATSON: Objection, calls for legal
Page 33

9 (Pages 30 - 33)

1 conclusion.
2       But you can answer, Judge.
3       MR. CICILIANO: Yeah, I would just object
4 to the extent you've been informed by counsel one way or
5 the other of the NRA; but to the extent you have a
6 personal opinion, go ahead.
7    A.  My personal review of the statutes and the
8 case law tells me that the board has to authorize it.
9    Q.  (BY MR. PRONSKE) Okay. And do you think that
10 the filing of bankruptcy can be delegated to the
11 executive committee?
12       MR. WATSON: Same objection, calls for a
13 legal conclusion.
14       MR. CICILIANO: Same.
15       And to the extent that it's informed by
16 counsel, don't answer that, but in your personal
17 knowledge, go ahead.
18    A.  I think it's possible that the board can
19 delegate some authority under the bylaws. And whether
20 that delegation occurred properly under the bylaws and
21 whether that delegation was done knowingly, of course,
22 is a question of fact somebody we all know is going to
23 end up answering.
24    Q.  (BY MR. PRONSKE) Would you -- Judge, would
25 you consider the filing of a bankruptcy petition -- as a

Page 34

1    A.  If a Chapter 11 is converted to a Chapter 7,
2 it does require dissolution, as I understand the
3 statutes, or if it goes back to New York. That's what
4 the Attorney General of New York wants.
5    Q.  (BY MR. PRONSKE) Let's look at --
6       MR. PRONSKE: If we could go ahead and
7 put up page 17 of the bylaws.
8       MR. VAN HORN: Okay. One second.
9       MR. CICILIANO: And Gerrit, are you
10 moving to introduce the entire set of the bylaws or are
11 you just going to do one page?
12       MR. PRONSKE: We'll go ahead and admit
13 the entire set of the bylaws.
14       MR. VAN HORN: All right. Almost there.
15 Okay. Bylaws should be in the marked exhibit folder.
16       (Exhibit 1 marked.)
17       MR. VAN HORN: And while we're waiting to
18 do the screen share, there's an agreement on the record
19 for the prior deposition about objecting only to form or
20 objection to privilege. While I'm waiting to get this
21 on screen share, can that agreement be reached for
22 purposes of this deposition?
23       MR. WATSON: No, not on our side. Sorry.
24 And I will try to keep my objections short.
25       MR. VAN HORN: Okay. Does everyone see

Page 36

1 MR. WATSON: And speculation.
2       (Reporter clarification.)
3       MR. WATSON: Yes, Judge, could you wait
4 until I'm done objecting?
5       THE WITNESS: Okay.
6       MR. WATSON: Okay. Now you can answer.
7    A.  I don't think that the bankruptcy petition was
8 a petition to dissolve the NRA.
9    Q.  (BY MR. PRONSKE) If you know the answer to
10 this. If the bankruptcy of the NRA, if it's potentially
11 unsuccessful, for example, if it's converted to a case
12 under Chapter 7, could the filing of the bankruptcy
13 result in a dissolution?
14       MR. WATSON: Same objection. That calls
15 for legal conclusion. Judge Journey is not a bankruptcy
16 practitioner or an expert in bankruptcy.
17       But you can answer the question to the extent
18 you know --
19    A.  If it gets converted to --
20       MR. WATSON: Hold on, Judge. Hold on.
21       THE WITNESS: Okay.
22       MR. WATSON: To the extent that your
23 opinion is informed by other than counsel, your counsel
24 or the NRA's counsel, you can answer.
25       THE WITNESS: Thank you.

Page 36

1 board member, would you consider the filing of a
2 bankruptcy petition of the NRA to be the performance of
3 a corporate activity of the NRA of such major
4 significance as to warrant action by the full board?
5       MR. CICILIANO: I would --
6       MR. WATSON: Same objection. Hold on,
7 Dylan. Same objection, calls for a legal conclusion.
8 Go ahead.
9       MR. CICILIANO: I would similarly object.
10 Furthermore, I would object to the extent that that's
11 informed by the legal advice of counsel of the NRA.
12       But in your personal opinion, I guess go
13 ahead.
14    A.  If I had thought otherwise, I don't think I
15 would have filed the motion, do you, Gerrit?
16    Q.  (BY MR. PRONSKE) Well, I'm asking you. So
17 your answer is that you believe that the filing would be
18 a corporate activity of major significance?
19    A.  Yes.
20    Q.  Okay. Would you consider the filing of a
21 bankruptcy petition of the NRA to qualify as a petition
22 for a judicial dissolution?
23       MR. WATSON: Objection, calls for a legal
24 conclusion.
25       MR. CICILIANO: Join.

Page 35

1 the bylaws?
2          MR. CICILIANO: Yes.
3          MR. VAN HORN: Okay. And what page,
4 Gerrit?
5          THE WITNESS: Those are not the version
6 that was in effect at the time of the meeting. That's
7 September 2019, I think, or September '19. Go back --
8 yeah, it's the 2019 version. They've been amended at
9 least three times since then. So why are we asking me
10 questions about the wrong set?
11      Q. (BY MR. PRONSKE) Do you have any reason,
12 Judge Journey, to believe -- and I want you to look at
13 paragraph C on page 17 and ask you think that has
14 been -- if the duties of the vice president have been
15 altered from the year prior bylaws?
16          MR. WATSON: I am going to object. He
17 has already indicated that this isn't the most recent
18 version, and to get him to answer would be speculative
19 and it's not the best evidence because it's not the
20 actual version of the bylaws.
21          I'm not trying to be an obstructionist, but --
22 Dylan, do you have a copy of it?
23          MR. CICILIANO: These are the bylaws that
24 were produced by the NRA pursuant to the 341 meeting of
25 creditors after the first meeting on February 22. And I

Page 38

1 understand there was amendments that were also produced
2 with a red line after that meeting, and that was also
3 produced to the parties at the 341 meeting. And that's
4 the only -- those are the documents the NRA provided as
5 being representative of the current version of the
6 bylaws, this set that we're looking at and then the red
7 line of a provision that we're not talking about right
8 now.
9          MR. WATSON: Okay. And I am not trying
10 to take up much more time, guys, but with that
11 representation, Judge, I will let you answer the
12 question.
13          THE WITNESS: Okay.
14          MR. WATSON: But we didn't get a copy of
15 it. So -- and we were at the 341 meeting.
16          Can either Dylan or you, Gerrit, or Eric
17 provide me with a copy of it, please.
18          MR. VAN HORN: I'll email it right now,
19 but it's also in the Exhibit Share folder.
20          MR. WATSON: That's good enough for me.
21          With that representation, Judge, you can
22 answer the question.
23          Could you repeat -- could you read back the
24 question for Judge Journey, Julie?
25          MR. PRONSKE: There isn't a question. I

Page 39

1 am about to ask the question.
2      Q. (BY MR. PRONSKE) Judge Journey, if you could
3 please look at subparagraph C, which is the duties of
4 the executive vice president. Do you see that?
5      A. Yes.
6      Q. Do you see anything in the duties of the vice
7 president that -- that would authorize the executive
8 vice president to approve a bankruptcy filing?
9      A. No.
10      Q. And I want you to look at subparagraph D,
11 which is the -- the duties of the secretary. And --
12 yeah, and let's look at specifically subparagraph 3. Do
13 you see that subparagraph 3?
14      A. Yes.
15      Q. And do you see that that gives the secretary
16 the -- the secretary's duties would include duties as
17 may be assigned by the board of directors?
18      A. Yes.
19      Q. Do you see that same provision in the
20 executive vice president's duties, in other words,
21 allowing the executive vice president to perform tasks
22 that are assigned or delegated by the board of
23 directors?
24      A. To belabor the obvious, no.
25      Q. Do you believe that the board of directors has

Page 40

1 the ability to delegate the corporate authority to file
2 bankruptcy to the executive vice president?
3          MR. CICILIANO: I would just object,
4 calls for a legal conclusion.
5          MR. WATSON: You can answer, Judge.
6      A. No.
7      Q. (BY MR. PRONSKE) Okay.
8          MR. PRONSKE: Eric, you can take that off
9 the sharing. Thank you.
10          So Eric, can you put up the employment
11 contract, the first page of it, please, the one that was
12 approved?
13          MR. VAN HORN: Yes.
14          (Exhibit 2 marked.)
15          THE WITNESS: Wow, I haven't got to see
16 this in a long time.
17          MR. CICILIANO: And Gerrit, just as he's
18 putting it up, we have the agreement for this deposition
19 to go forward that we were entitled to half the time. I
20 know Judge Journey's indicated you maybe only have two
21 hours. I just want to make sure we're still good with
22 that agreement, how to handle it so that we don't just
23 invalidate the entire deposition.
24          MR. PRONSKE: Yeah, well, we have a
25 notice of deposition that's noticed specifically for

Page 41

11 (Pages 38 - 41)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1 four hours, and we have an agreement with you to share
2 that time. We intend to go two hours.
3          MR. CICILIANO: Okay. I mean, if we're
4 denied the opportunity to cross, it's a violation of the
5 agreement we had.
6          MR. WATSON: We weren't a part of that
7 agreement, and that's all I'm trying to get you guys to
8 see. We'll see how he feels after two hours and see if
9 we can continue. We're not trying to deny either side
10 equal time. It's just that he had a docket today. And
11 the agreement that I reached with the New York AG was
12 for two hours.
13          MR. CICILIANO: And I appreciate that,
14 Jermaine. And my only point was we were unaware that
15 when they noticed it for four, there wasn't actually an
16 agreement for four. I assumed that that was cleared
17 with you guys, so that's a little bit of a surprise to
18 hear that.
19          MR. WATSON: Well, Gerrit made it known
20 on the record yesterday at yesterday's hearing, but we
21 don't need to get into that.
22          You can go ahead, Gerrit.
23          MR. PRONSKE: Okay. Thank you.
24     Q.   (BY MR. PRONSKE) All right. Do you see,
25 Judge Journey, in paragraph 2A of the contract, the

Page 42

1 second sentence of that clause in paragraph 2A says that
2 among his authorities, employee shall be empowered to
3 exercise corporate authority in furtherance of the
4 mission and interests of the NRA, including without
5 limitation to reorganize or restructure the affairs.
6          Do you see that?
7     A.   Yes.
8     Q.   So to the extent that this employee is being
9 empowered to exercise corporate authority and to the
10 extent that that corporate authority is to file
11 bankruptcy, do you believe that the board has the
12 authority under the bylaws to delegate that corporate
13 authority to the executive vice president?
14          MR. WATSON: I am going to object because
15 it calls for a legal conclusion.
16          But you can answer, Judge.
17     A.   I do not believe so.
18     Q.   (BY MR. PRONSKE) Okay. Judge Journey, in
19 your opinion as a board member, would in the event -- I
20 am not asking you to testify as to what happened at the
21 meeting. But in the event that that provision being
22 used -- or let me ask you this way.
23          Would the lack of pointing out this provision
24 or having a discussion about it add to its
25 inappropriateness?

Page 43

1          MR. WATSON: Objection, calls for
2 speculation.
3          But you can answer, Judge.
4          MR. CICILIANO: And I would further
5 object to form.
6     A.   Yeah, that one's a little tough to answer.
7     Q.   (BY MR. PRONSKE) Okay. What I'm asking you
8 is that if there was no discussion or if that provision
9 was not pointed out in that session as being something
10 that was authorizing bankruptcy, would that, in your
11 opinion, be inappropriate and add to the
12 inappropriateness of that delegation of corporate
13 authority?
14          MR. WATSON: Same objection. I think
15 it's speculative.
16          MR. CICILIANO: Objection, form.
17          MR. PRONSKE: It's only speculating
18 because you won't let him answer.
19          MR. WATSON: No, he can answer. I'm just
20 doing my job, Gerrit. Go ahead.
21          THE WITNESS: Okay. Okay.
22     A.   No.
23     Q.   (BY MR. PRONSKE) Is the filing of the
24 bankruptcy of the NRA something that could potentially
25 have impacted you as a board member?

Page 44

1          MR. CICILIANO: Objection, calls for
2 legal conclusion and speculation.
3          MR. WATSON: You can answer, Judge.
4     A.   I am trying to figure out where you're going
5 with that one. I'm not sure what you mean by affect.
6     Q.   (BY MR. PRONSKE) Yeah, let me give you an
7 example. Sometimes when an individual is seeking a loan
8 from a bank, you're going to have to answer a question
9 whether you are involved in a corporation or a board
10 member of a corporation that filed bankruptcy.
11          My question to you is, is the filing of the
12 bankruptcy of the NRA something that you believe could
13 potentially have negatively impacted you?
14          MR. CICILIANO: Object --
15          MR. WATSON: Hold on. Hold on.
16 Objection, speculation.
17          MR. CICILIANO: Form and foundation as
18 well, and characterization that counsel made.
19     A.   I'm going to tell you I had not considered
20 that possibility, but I see where you're going.
21     Q.   (BY MR. PRONSKE) Well, let me ask you this, and
22 let me make it more simple. As a board member, would
23 you have liked to have known that the entity that you're
24 a board member of was going to file bankruptcy?
25     A.   That's obvious, yes.

Page 45

12 (Pages 42 - 45)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1  Q.  The board minutes --
2       MR. PRONSKE:  And Eric, you can take down
3  the bylaws.  Thank you.
4  Q.  (BY MR. PRONSKE)  The board minutes of the NRA
5  say that the full board -- or that the full board
6  approved the employment contract.  So would it be
7  correct to say that that employment contract was
8  approved both by the executive session and by the full
9  board?
10  A.  When -- okay.  So the board goes into
11  executive session.  It votes.  And then when we go out
12  of executive session, they record in the full board
13  meeting, as you describe it, what happened.
14  Q.  Okay.
15  A.  So we don't vote on it twice.
16  Q.  Okay.  What other board members have you
17  spoken to about the -- or let me ask this question.
18       Is the first time that you knew that the NRA
19  was going to file bankruptcy after the bankruptcy was
20  filed?
21  A.  Yes.
22  Q.  And have you spoken to any other board members
23  about the bankruptcy filing of the NRA since its filing?
24  A.  Yes.
25  Q.  And which board members have you spoken to?

Page 46

1  A.  Not that I'm aware of.  I mean, I don't know
2  who was on the other end of the phone, but, you know --
3  Q.  And your -- your opinion or displeasure, or
4  just factually, was it discussed with any of those board
5  members that bankruptcy was not discussed during the
6  board meeting?
7       MR. CICILIANO:  I would just object to
8  the extent that it calls for attorney/client privilege
9  and instruct you not to answer.
10       MR. WATSON:  Yeah, I am not going to let
11  you answer it.
12       Could you rephrase the question, Gerrit?
13       MR. PRONSKE:  Yeah.
14  Q.  (BY MR. PRONSKE)  And I'm asking you, Judge
15  Journey, not to divulge any attorney/client privilege.
16  I am asking you to -- you were speaking board member to
17  board member with no attorney present, and I am asking
18  you during those conversations was it ever discussed,
19  with no lawyer present again, that there was no
20  discussion of the filing of bankruptcy at the time that
21  this employment contract was approved by the board?
22       MR. CICILIANO:  I would similarly object
23  and state that the NRA asserts that even communications
24  between board members regarding attorney/client
25  privileged communications are still privileged.  They're

Page 48

1  A.  I need a book so I can, like, go through the
2  names with you.
3  Q.  Is it a number of them?
4  A.  A lot, yeah.  As many as I could get ahold of.
5  Q.  And can you give me one example?
6  A.  Todd Rathner was probably the first one I
7  called and then Sandy Froman.
8  Q.  Can you repeat the name?  I'm sorry.
9  A.  Todd Rathner.
10  Q.  Okay.
11  A.  And Sandy Froman.  I am trying to remember.
12  Colonel Brown.  Buzz -- Buzz, Buzz, Buzz -- I think it's
13  Davis.  There's a bunch of them I don't know.  There's a
14  lot of them that I knew from when I was on the board 25
15  years, so I basically went to the older ones that I had
16  known longer first.
17  Q.  And were those discussions by telephone?
18  A.  Yes.
19  Q.  And I'm assuming there were no other persons
20  present other than you and the other person to the
21  telephone call during those conversations.  Is that
22  correct?
23  A.  Not that I'm aware of.
24  Q.  And certainly no lawyers present.  Is that
25  right?

Page 47

1  within the privilege group.  I would direct him not to
2  answer.
3       MR. WATSON:  Yeah, Judge, I'm going to
4  direct you not to answer that.
5       THE WITNESS:  Thank you.
6  Q.  (BY MR. PRONSKE)  Are you --
7  A.  I'm afraid I will have to do that, not answer.
8  Q.  Judge Journey, are you familiar with a
9  Washington Free Beacon article dated March the 9th, 2021
10  that was published at 5:00 a.m. on that date?
11  A.  Yes.
12  Q.  Okay.  And for purposes of this discussion, I
13  am going to refer to the Washington Free Beacon as the
14  WFB.  Can we have that understanding?
15  A.  Sure.
16  Q.  Did you speak to -- prior to that article
17  being published, did you speak with a reporter from the
18  WFB?
19  A.  Yes.
20  Q.  When was that discussion in relation to the
21  date of the publication of the article?
22  A.  Immediately preceding.
23  Q.  The same day or the day before?
24  A.  Day before.
25  Q.  Day before.

Page 49

13 (Pages 46 - 49)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1 And the person that you spoke to, was that
2 Stephen Gutowski, the author of the article?
3 A. That's who he represented himself to be, yes.
4 Q. Okay. So that WFB article says, quote, Board
5 member Phillip Journey accused NRA lawyers of misleading
6 the board about the creation of the special litigation
7 committee and the bankruptcy in a court filing, closed
8 quote.
9 Are you quoted correctly by the WFB in that
10 sentence?
11 MR. CICILIANO: I would just object.
12 But go ahead.
13 I would object to form. And also, it's in the
14 third person, so it didn't sound quite right without
15 seeing the article.
16 MR. WATSON: And I would object that the
17 article itself would speak for itself. I mean, it's
18 been published.
19 A. I do believe that quote was accurate.
20 Q. (BY MR. PRONSKE) And when you said that NRA
21 lawyers misled the board, which NRA lawyers are you
22 referring to?
23 A. I think that that would be -- assuming -- that
24 assumes that they knew, which information I have
25 received subsequently tells me that Mr. Davis may not
Page 50

1 have known about the bankruptcy filing. So if we take
2 him out, then I'm looking at Cotton and Brewer who were
3 in the room.
4 Q. So your testimony is that you believe Cotton
5 and Brewer misled the board about the filing of the
6 bankruptcy. Is that correct?
7 A. Presuming that they knew the filing was going
8 to happen.
9 MR. CICILIANO: I would object to the
10 extent it calls for attorney/client privilege. You're
11 asking him what people he was referencing in the
12 article, and he can testify to that, but not to the
13 content of what happened at that board meeting.
14 MR. PRONSKE: Well, if he's testifying to
15 misleading and fraud, there's a fraud exception in
16 attorney/client privilege, Mr. Ciciliano.
17 MR. CICILIANO: Mr. Pronske, you don't
18 get to blow through the fraud privilege by merely
19 asserting it. It has to be demonstrated to the Court,
20 which hasn't been done, and that also has different
21 standards, so you haven't proven the fraud privilege.
22 Go ahead.
23 Q. (BY MR. PRONSKE) Judge Journey, the article
24 goes on to say, quote, Journey, a Kansas City family
25 court judge, told the Free Beacon that the board was not
Page 51

1 made aware of the bankruptcy plan when it voted to
2 empower the committee in a January 7, 2021 meeting. He
3 said he found out about it when his daughter texted him
4 a news story, closed quote.
5 Are you correctly quoted by the WFB in that
6 sentence?
7 A. Well, I know I'm not a Kansas City judge, but
8 other than that, I believe that was accurate.
9 Q. I'm sorry, I actually misread that. It says
10 a Kansas family court judge. Is that --
11 A. Oh, okay.
12 Q. Is that correct?
13 A. Kansas City is a long ways away from where I'm
14 at, yeah.
15 Q. What part of Kansas are you in?
16 A. I'm in the largest city in the state, Wichita.
17 Q. Okay. Okay. I have a lot of family in Kansas
18 myself. They're all farmers.
19 A. That means they're way out west, yeah.
20 Q. So when the -- when the article says that you
21 found out about the bankruptcy when your daughter texted
22 you a news story, is that a correct statement?
23 A. Yes.
24 Q. And presumably that was after the bankruptcy
25 filing. Is that right?
Page 52

1 A. Yes.
2 Q. But you didn't know about the bankruptcy
3 filing until after the bankruptcy was filed. Is that
4 correct?
5 A. I had not checked my email when I left work
6 that day, and I was on my way home.
7 Q. And did you receive an email about the filing
8 of the bankruptcy?
9 A. Yes, from Mr. Frazer.
10 Q. And was that email sent after the bankruptcy
11 was filed?
12 A. I believe so. It was about 4 o'clock that
13 afternoon on the 15th.
14 Q. So even if you had been checking your email
15 that day, you still wouldn't have known about the
16 bankruptcy until after it was filed. Is that right?
17 A. That's accurate.
18 Q. Okay. The next I am going to call it colorful
19 quote from the WFB article says, quote, You could have
20 seen the top of my car blow off with my head, Journey
21 said, quote, because I knew what that meant. It meant
22 that those three lawyers committed a lie of omission as
23 to material facts to the board of directors. Nobody
24 said bankruptcy, closed quote.
25 Is that quote that's attributed to you
Page 53

14 (Pages 50 - 53)

1 accurately attributed?
2     A.  I think so.  I would have modified it, and I
3 would have said at least up to three instead of all
4 three, because I think one may not deserve that.
5     Q.  And that quote then instead of saying three
6 lawyers, up to three lawyers, that would be -- that
7 would include Mr. Cotton and Mr. Brewer.  Is that
8 correct?
9     A.  Yes.
10     Q.  And when you said in that quote nobody said
11 bankruptcy, I'm assuming that means in the board meeting
12 or the executive session of the board meeting.  Is that
13 correct?
14         MR. WATSON:  Objection.  Objection.
15     Mr. Ciciliano, do you have a privilege to
16 assert on behalf of the NRA?
17         MR. CICILIANO:  Yeah, I am objecting to
18 the extent it's calling for the disclosure of what
19 occurred during the board meeting.
20     If you're asking him what he said to the
21 newspaper guy, I guess that's just verifying the quote.
22         MR. PRONSKE:  Actually, here is what I am
23 doing.  And listen to me for a minute, all right?  I am
24 not asking him what happened, and I am not asking him
25 about anything that he said that -- where an attorney

Page 54

1 was present.
2     I'm saying that when he said nobody said
3 bankruptcy, I'm asking him did he mean at that -- when
4 he said that to a reporter with no lawyer present -- and
5 let me pause for just a minute.
6     Q.  (BY MR. PRONSKE)  Judge Journey, was a lawyer
7 present when you spoke to the WFB?
8     A.  No.
9     Q.  Okay.  So --
10     A.  At least not one that was mine.
11         MR. PRONSKE:  The question I'm asking is
12 that when he said nobody said bankruptcy to the reporter
13 with no attorney present, did he mean, when he used
14 those words to the reporter, that nobody said bankruptcy
15 in the board meeting?
16         MR. WATSON:  I believe that question's
17 been asked and answered at least a few times.  I think
18 you've already gotten it in, Gerrit.
19         MR. PRONSKE:  Okay.
20     Q.  (BY MR. PRONSKE)  You can answer, Judge
21 Journey.
22     A.  I think anybody who reads that would come to
23 that same conclusion, I think, yes.
24     Q.  And I'm sorry, I didn't hear the last part --
25     A.  I said anybody would come to that same

Page 55

1 conclusion you're seeking, yes.
2     Q.  Okay.
3         MR. WATSON:  Gerrit, could you let us
4 know when you're at a stopping point?  I need to check
5 in on the judge, because we want to be fair to everyone
6 and give everyone equal time.  But I do want you to
7 finish, so I need to check on him, if that's okay.
8         MR. PRONSKE:  I've got a few more
9 relating to this article --
10         MR. WATSON:  Okay.
11         MR. PRONSKE:  -- and then that's a good
12 point.  Not finishing point, but breaking point.
13         MR. WATSON:  Right, breaking point for
14 like five minutes or so.
15     Q.  (BY MR. PRONSKE)  So Judge Journey,
16 paragraph -- switching over just for a moment to your
17 motion to appoint examiner, paragraph 16 of your motion
18 says, quote, In direct violation of its own bylaws, the
19 NRA did not disclose to the board of directors its
20 intent to seek Chapter 11 relief.  In further violation
21 of those bylaws, no solicitation for -- to the board for
22 votes of approval of the filing was conducted.  In fact,
23 one or more board members only became aware of this case
24 through media outlets, closed quote.
25     Is that an accurate statement that's contained

Page 56

1 in your motion?
2     A.  I signed it, yes.
3     Q.  Okay.  And do you believe, Judge Journey, that
4 the board of directors would have approved of the filing
5 of bankruptcy on January 7 if they had been asked to
6 approve it?
7     A.  We may never know, but we'll see what happens
8 on the 28th.
9         MR. CICILIANO:  I would just object,
10 calls for speculation.
11         MR. WATSON:  Yeah, it does call for
12 speculation.
13     Q.  (BY MR. PRONSKE)  And what -- since -- yeah,
14 what happens on the 28th, Judge Journey?
15     A.  New board meeting.
16     Q.  And have you received any kind of written
17 materials on the board meeting that is going to take
18 place on the 28th?
19     A.  All I've gotten so far is the email of the
20 notice.
21     Q.  And does it contain any information as to an
22 agenda or what will take place at that board meeting?
23     A.  I don't know.  I've been busy all day.  I only
24 had 15 hearings, you know.
25     Q.  Did that notice come today?

Page 57

15 (Pages 54 - 57)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1  A.  Yes, a few moments ago.
2  Q.  Okay.  Do you have it in front of you, if you
3  could review it?
4  A.  If I close your screen down, I might be able
5  to.  Let me look.  Let's see.
6  MR. CICILIANO:  I am just going to
7  object.  Without the benefit, we're unable to assert
8  privilege over it, depending on what it says.
9  MR. WATSON:  Yeah, we're not able to look
10  at it either.  I haven't seen it.
11  MR. PRONSKE:  Well, let's ask him if a
12  lawyer signed it.
13  THE WITNESS:  Mr. Frazer, I mean, you
14  guys just had him in his deposition.  You should have
15  asked him.  He's the one that sent it, I think.  It has
16  gone out, but I have not seen it.
17  MR. CICILIANO:  So Mr. Frazer is a
18  lawyer.  I am going to direct him prophylactically not
19  to respond.
20  THE WITNESS:  Thank you.
21  MR. WATSON:  Yes.  Judge, don't answer
22  that.
23  THE WITNESS:  Okay.
24  Q.  (BY MR. PRONSKE)  You're refusing to answer
25  that question, Judge Journey?

Page 58

1  A.  Thank you.  Yeah.
2  Q.  Okay.
3  A.  All right.
4  Q.  The WFB article quotes Bill Brewer as saying,
5  quote, This plan -- meaning the filing of the
6  bankruptcy -- this plan was undertaken in full
7  compliance with NRA policy, closed quote.
8  Do you agree with Bill Brewer that the
9  bankruptcy filing was in full compliance with NRA
10  policy?
11  MR. CICILIANO:  And I would just object
12  to the extent it calls for you to rely upon
13  attorney/client privileged communications communicated
14  by the NRA.
15  MR. WATSON:  And I would add to that that
16  it's speculative and calls for a legal conclusion as
17  well.
18  But you can answer, Judge.
19  A.  I don't agree with Mr. Brewer, no.
20  Q.  (BY MR. PRONSKE)  The article also says that
21  Brewer said, quote, The plan -- again, the bankruptcy
22  filing -- has been widely endorsed by NRA board members,
23  NRA members, elected officials and other key
24  stakeholders.
25  Is that statement true as to NRA board

Page 59

1  members?
2  MR. WATSON:  Objection, calls for
3  speculation.
4  A.  All I --
5  Q.  (BY MR. PRONSKE)  Okay.
6  A.  All I know is nobody's told me.
7  Q.  Okay.  The article further says, quote,
8  Journey said that he had voted to support the committee
9  but no -- but had no idea the group's leadership and
10  legal advisors had planned to go into bankruptcy, closed
11  quote.
12  Are you correctly quoted by the WFB with that
13  sentence?
14  A.  I believe so, yes.
15  Q.  And is that statement accurate?
16  MR. CICILIANO:  I would just object to
17  the extent it calls for you to rely on attorney/client
18  communications and direct you not to answer.
19  MR. WATSON:  You can answer, Judge.  You
20  can answer.
21  A.  If you're saying it was an accurate rendition
22  of the quote, I believe that's so.
23  Q.  (BY MR. PRONSKE)  No, it's a different
24  question.  There was two questions.  There was that
25  question, whether it was the accurate rendition of the

Page 60

1  quote, and then the second statement is is that
2  statement an accurate statement?
3  MR. CICILIANO:  And same objection.  I
4  direct you not to answer to the extent it requires you
5  to rely upon attorney/client communications and work
6  product.
7  MR. WATSON:  You can answer to the best
8  of your knowledge or your impression of it, Judge.  With
9  that qualification, you can answer.
10  A.  I'm sorry.  What was it again?
11  Q.  (BY MR. PRONSKE)  The quote says, Journey said
12  he had voted to support the committee but had no idea
13  the group's leadership and legal advisors had planned to
14  go into bankruptcy, closed quote.
15  And my question is, is that statement
16  accurate?
17  A.  Yes.
18  Q.  The article goes on to say that -- I'm sorry,
19  I don't need to ask that.
20  All right.  The article goes on to quote you
21  again saying, quote, It certainly was a fraud
22  perpetrated on the Court.  Journey said, quote, I told
23  them when I got on the board, look, I'm a judge, I'm a
24  mandatory reporter.  Whatever we do, we've got to be on
25  the up and up.

Page 61

16 (Pages 58 - 61)

1 The question is, is that -- are you accurately
2 quoted by the WFB in that sentence?
3 A. Yes.
4 Q. Okay.
5 MR. PRONSKE: I can take a break right
6 now if you want to -- this is a good time.
7 MR. WATSON: Okay. Good. Go off the
8 record for five minutes. Do you need more time than
9 that, Judge?
10 THE WITNESS: No, I'm good.
11 MR. WATSON: Okay. Five minutes. Off
12 the record.
13 THE VIDEOGRAPHER: The time is 5:15. We
14 are off the record.
15 (Break from 5:15 to 5:27 p.m.)
16 THE VIDEOGRAPHER: The time is 5:27.
17 We're back on the record.
18 MR. PRONSKE: Okay. For the record, I
19 wanted to state that I believe that many of the
20 objections that have been made are improper. They're
21 improper speaking objections. The privilege objections
22 are beyond the pale as to not allowing witnesses to
23 answer questions like what subject matters of
24 discussions were or basically anything that happened in
25 executive session. It's way beyond what should be

Page 62

1 objected to, and so we're going to reserve our rights to
2 come back after a discussion of the privilege issues
3 with the Court.
4 So moving forward --
5 MR. CICILIANO: And I would, likewise,
6 place on the record that it's absurd to ask questions,
7 was this word said, was that word said with counsel.
8 That's absurd as well, but go ahead.
9 MR. PRONSKE: I note your opinion.
10 Q. (BY MR. PRONSKE) Judge Journey, do you
11 believe that Wayne LaPierre and/or other officers of the
12 NRA deliberately failed to disclose material facts to
13 the board or the executive session regarding the
14 impending filing of bankruptcy of the NRA?
15 MR. CICILIANO: I would just object,
16 number one, calls for speculation, foundation.
17 I also direct you not to answer to the extent
18 that calls for you to disclose what occurred at the
19 executive session as it was covered by the
20 attorney/client privilege.
21 MR. WATSON: Yeah, I am going to instruct
22 you not to answer to the extent of the executive
23 session, Judge.
24 THE WITNESS: All right.
25 A. I will have to say I can't answer that on

Page 63

1 advice of counsel. Thank you.
2 MR. PRONSKE: So is the position that you
3 all are taking is that anything that was discussed in
4 executive session is privileged by the attorney/client
5 privilege, every single thing that was said in that
6 session?
7 MR. CICILIANO: No, Gerrit. What I would
8 say is the executive sessions by themselves are not
9 inherently privileged. However, if you do look at the
10 declaration of William Davis that was submitted, along
11 with the motion, is that during the executive sessions
12 at issue, that's all that was discussed, were things
13 that were based on the advice of counsel. So in this
14 instance, they would be privileged, but not in all
15 instances.
16 Q. (BY MR. PRONSKE) Judge Journey, do you
17 believe that Wayne LaPierre and/or other officers of the
18 NRA knew that they needed board approval to file
19 bankruptcy?
20 MR. CICILIANO: I would just object to
21 the extent it calls for you to disclose attorney/client
22 privilege and also just object to speculation.
23 MR. WATSON: Yeah, I object to
24 speculation.
25 But go ahead, you can answer, Judge.

Page 64

1 A. I have no idea --
2 Q. (BY MR. PRONSKE) Do you believe --
3 A. -- what other people thought, you know.
4 Q. Do you believe that Wayne LaPierre and/or
5 other officers of the NRA had a duty to disclose the
6 facts that they intended to file bankruptcy to the
7 board?
8 MR. CICILIANO: I would just object,
9 calls for legal conclusion.
10 MR. WATSON: Yeah, same here.
11 But you can answer, Judge.
12 A. I do believe they had a duty to advise the
13 board on that and so many other things.
14 Q. (BY MR. PRONSKE) As of the date of the board
15 meeting, was the board of directors ignorant of the
16 plans of LaPierre and/or the officers -- other officers
17 to file bankruptcy for the NRA?
18 MR. CICILIANO: I would just object to
19 the extent it calls for speculation. Further object to
20 the extent that it calls for you to reveal
21 attorney/client communications, as well as work product,
22 and would direct you not to answer on those grounds.
23 MR. WATSON: And I would carry on to say
24 that, you know, board members is kind of broad, and it's
25 speculative to ask Judge Journey what the other board

Page 65

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1 members thought.
2 Q. (BY MR. PRONSKE) Go ahead, Judge.
3 A. Okay. Okay. Somebody like got in or got out,
4 and the tone from their jumping in and out of the
5 hearing kept me from hearing your question. So if you
6 would please repeat it for me, I'm sure they can simply
7 just continue their objection.
8 Q. Okay. I am going to ask you first the
9 question, were you ignorant of the plans of LaPierre and
10 other officers to file a bankruptcy for the NRA as of
11 the date of the board meeting?
12 MR. CICILIANO: I would just object to
13 the extent it calls for attorney/client communications
14 and direct you not to answer.
15 MR. WATSON: You can answer, Judge.
16 A. I appreciate your description other than
17 ignorant, but I had not been informed of any plans.
18 Q. (BY MR. PRONSKE) To your knowledge, Judge
19 Journey, would the answer to that question be the same
20 as to other board members?
21 MR. CICILIANO: I would just object it
22 calls for speculation, as well as I would direct you not
23 to answer to the extent it requires you to disclose
24 attorney/client communications of what happened in any
25 executive board session with counsel.

Page 66

1 MR. WATSON: And I object because it's
2 speculative.
3 But you can answer, Judge, if you know.
4 A. You know, the board operates with different
5 levels of access, and there are some that have access
6 and some that do not. And I'm one that does not, and I
7 have no idea what those that may have access might know.
8 Q. (BY MR. PRONSKE) So let me ask you this way,
9 Judge. Are you aware of any board member that had
10 knowledge of the plans to file bankruptcy as of the date
11 of the board meeting?
12 MR. CICILIANO: I would just object that
13 it calls for speculation and, furthermore, to the extent
14 it requires you to divulge attorney/client
15 communications or how that other board member learned
16 them.
17 MR. WATSON: You can answer, Judge, if
18 you know.
19 A. I do not know of any board member that was
20 aware of the filing prior to the board meeting or prior
21 to the filing.
22 Q. (BY MR. PRONSKE) Do you believe as a board
23 member, Judge Journey, that you authorized the filing of
24 a bankruptcy proceeding of the NRA on the date of the
25 board meeting?

Page 67

1 MR. CICILIANO: I would just object to
2 the extent that it causes you to reveal attorney/client
3 communications.
4 MR. WATSON: You can answer, Judge.
5 A. The answer is no.
6 Q. (BY MR. PRONSKE) Were you present for the
7 entire executive session?
8 A. Yes.
9 MR. CICILIANO: Objection, vague.
10 Q. (BY MR. PRONSKE) Pardon me?
11 MR. CICILIANO: Vague was the objection.
12 A. Yes, I was there.
13 Q. (BY MR. PRONSKE) Paragraph 18 of your motion
14 to appoint an examiner says, quote, Also in direct
15 violation of the NRA's own bylaws, the board of
16 directors did not approve the formation of Sea Girt,
17 LLC, the new corporation created by the NRA to bootstrap
18 the filing into this district and venue, closed quote.
19 Is that a correct statement of fact?
20 MR. CICILIANO: I will just object to the
21 extent that it causes you to reveal attorney/client
22 communications. The document speaks for itself.
23 And don't testify to what was told to you by
24 counsel for the NRA. NRA is not waiving that privilege.
25 Q. (BY MR. PRONSKE) You can answer.

Page 68

1 MR. CICILIANO: Subject to the objection.
2 THE WITNESS: Thank you.
3 A. I think the paragraph is accurate.
4 Q. (BY MR. PRONSKE) Okay. And what facts do you
5 base that paragraph on?
6 A. My personal observation.
7 MR. CICILIANO: Once again, let me
8 interpose the objection that you're not to disclose
9 communications between the NRA's counsel and the board
10 members, including those that occurred during the
11 executive session. Outside of that, you can answer.
12 MR. WATSON: You can answer, Judge.
13 THE WITNESS: Thank you.
14 A. What was it again?
15 Q. (BY MR. PRONSKE) It said -- do you want me to
16 read the quote again or the question?
17 A. Oh. On paragraph 18?
18 Q. Yeah.
19 A. The question regarding paragraph 18 was?
20 Q. The question is what are the facts that you
21 base paragraph 18, that sentence on?
22 A. Oh. Like I said, my personal observation.
23 Q. Okay. In paragraph 6 of your motion to
24 appoint examiner, you said quote, Upon information and
25 belief, the NRA has engaged in actions that violate its

Page 69

18 (Pages 66 - 69)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1 fiduciary duties under New York law, closed quote.
2          Do you believe that to be a correct statement?
3          MR. CICILIANO: Objection, vague.
4          MR. WATSON: You can answer, Judge.
5     A.  I think that's based upon my review of the New
6 York AG's petition in August.
7     Q.  (BY MR. PRONSKE) Okay.  In paragraph 8 of
8 your motion you stated that, quote, The debtors have
9 improperly paid excessive compensation to current
10 management in base salaries, and perhaps more troubling,
11 via a series of excessive perks that were wholly for the
12 debtors' insiders' personal benefit, closed quote.
13          Is that a -- do you believe that to be a
14 correct statement?
15          MR. CICILIANO: Objection, foundation.
16          MR. WATSON: You can answer, Judge.
17     A.  That paragraph is also based upon news reports
18 and the New York Attorney General's petition along with
19 the petition by the District -- District of Columbia's
20 Attorney General.
21     Q.  (BY MR. PRONSKE) Also in paragraph 8 you say,
22 quote, The debtors' insiders received hidden
23 compensation for items via direct payment of purely
24 personal costs, closed quote.
25          Do you believe that to be a correct statement?

Page 70

1     A.  Yes, based upon my review of those documents I
2 previously referenced.
3     Q.  (BY MR. PRONSKE) Okay.  And in paragraph 12
4 you say, The debtors -- quote, The debtors and Ackerman
5 engaged in a pass-through expense arrangement whereby
6 expenses would be paid by the debtor without written
7 approvals, receipts or supporting business purpose
8 documentation under the debtors' policies and not
9 disclosed to internal review by the debtors' internal
10 audit committee, closed quote.
11          Do you believe that to be a correct statement?
12          MR. CICILIANO: Objection, foundation.
13          MR. WATSON: You can answer, Judge.
14          THE WITNESS: Thank you.
15     A.  Yes.  Once again, it's based upon my review of
16 the documents we have previously referenced.
17     Q.  (BY MR. PRONSKE) Okay.  Thank you.
18          And in paragraph 17 of your motion to appoint
19 examiner, you state, quote, New York law, the NRA bylaws
20 and Robert's Rules of Order were routinely violated by
21 the NRA's management, closed quote.
22          Is that a correct statement?
23          MR. CICILIANO: Objection, foundation,
24 calls for a legal conclusion.
25          MR. WATSON: You can answer, Judge, to

Page 72

1          MR. CICILIANO: Objection, foundation.
2          MR. WATSON: You can answer, Judge.
3          THE WITNESS: Thank you.
4     A.  Yes.  That also is based upon my review of
5 news reports, attorney generals' petitions from both New
6 York and Washington, D.C.
7     Q.  (BY MR. PRONSKE) Okay.  But you do believe
8 that to be a correct statement.  Is that right?
9     A.  Based upon what was in those petitions, I do
10 believe that is accurate, because it was apparent to me
11 from reviewing the New York Attorney General's petition
12 that that was based upon depositions, documents produced
13 in discovery or interviews by the attorney general
14 staff.
15     Q.  Okay.  And then in paragraph 11 you say,
16 quote, Upon information and belief, the debtors engaged
17 in the practice of passing expenses through Ackerman to
18 conceal personal expenses by the debtors' insiders.  Do
19 you believe that -- closed quote.
20          Do you believe that to be a correct statement?
21          MR. CICILIANO: I would object.  I would
22 object, lack of foundation.  Go ahead.
23          MR. WATSON: You can answer, Judge.  Go
24 ahead.
25          THE WITNESS: Thank you.

Page 71

1 the extent of your impression or personal knowledge.
2          THE WITNESS: Thank you.
3     A.  Yes, I believe that's accurate based upon my
4 review and personal knowledge.
5     Q.  (BY MR. PRONSKE) And what in particular would
6 you have personal knowledge of as to those violations?
7          MR. CICILIANO: Objection to the extent
8 it calls for you to disclose what occurred during board
9 meetings and/or executive board meetings where counsel
10 is present and legal advice was given.
11          MR. WATSON: You can answer, Judge, to
12 the extent of your personal knowledge and the basis of
13 your personal knowledge.
14     A.  Well, based upon my personal knowledge, from
15 the review of those articles and the petitions and the
16 legal documents, I believe that that statement in
17 paragraph 17 is accurate.  My personal knowledge does
18 not go back very far, but based on my review of the
19 bylaws that I have access to, I do believe they exceeded
20 their authority.
21     Q.  (BY MR. PRONSKE) Okay.  I want to ask you a
22 few questions about the financial condition of the NRA
23 as a board member.  Is the board regularly informed and
24 advised regarding the financial condition of the NRA? or
25          MR. CICILIANO: Objection, vague -- or

Page 73

19 (Pages 70 - 73)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1 form. Go ahead.
2     MR. WATSON: You can answer, Judge.
3     THE WITNESS: Thank you.
4   A. I believe they are advised to the extent that
5 the CFO or others under their control produce
6 information or documents to the board.
7   Q. (BY MR. PRONSKE) And Judge Journey, have you
8 seen anything in the past 12 months that shows you that
9 the NRA has any financial problems?
10     MR. CICILIANO: Objection, calls for
11 speculation, form.
12     MR. WATSON: You can answer, Judge.
13     THE WITNESS: Okay.
14   A. You guys, I know you don't know me, but I got
15 my first degree in accounting, all right, before I went
16 to law school. And I said, oh, my God, this is boring,
17 I am not doing this for the rest of my life and went on
18 to law school. So, you know, I can read a financial
19 statement. I can review a balance sheet or a cash flow
20 statement and have some comprehension of what it's
21 trying to impart into us.
22     I have to say that I have always felt that the
23 financial statements provided to the board have been
24 lacking in clarity and especially under Mr. Phillips
25 when I was on the board the first time. I have no

Page 74

1 knowledge that NRA is in dire financial straits or
2 insolvent at this time. All the representations I've
3 reviewed in the press and the documents handed out at
4 the board meetings tell me that the cash flow is sound,
5 the balance sheet is good and that we are not
6 underwater. And the New York Attorney General, if she's
7 successful, is going to put a lot of money in her
8 pocket.
9   Q. (BY MR. PRONSKE) Is -- this morning -- let me
10 put it this way to hopefully avoid another speaking
11 objection.
12     If Mr. Frazer testified this morning that the
13 financial condition of the NRA has never been as good as
14 it is now, would you have any reason to dispute that?
15     MR. CICILIANO: Objection, form,
16 foundation.
17   A. It sure sounds --
18     (Reporter clarification.)
19   A. Sounds like puffing to me.
20   Q. (BY MR. PRONSKE) Would you have any reason to
21 dispute that?
22   A. I do not have access to that information to
23 draw the conclusions you're asking.
24   Q. Okay.
25   A. I just know what it smells like.

Page 75

1   Q. Well, let's talk about that. Do you have --
2 do you believe that the filing of bankruptcy by the NRA
3 was necessary for financial reasons?
4     MR. CICILIANO: Objection, calls for
5 speculation, evades the attorney/client privilege.
6     Don't answer to the extent your knowledge
7 would come from communications with an attorney of the
8 NRA. Go ahead.
9     MR. WATSON: You can answer, Judge, based
10 on your understanding.
11   A. You know, what I've seen in the media by them
12 tells me that there was only one reason they filed the
13 Chapter 11 and wanted to come to Texas, and it's not
14 money.
15   Q. (BY MR. PRONSKE) So I'm sorry, I don't -- I
16 didn't quite hear you. Could you repeat that or --
17   A. Sure. I said based upon what, for example,
18 Wayne LaPierre and other spokespersons have said, it was
19 not a financial problem that caused them to file the
20 bankruptcy in Texas.
21   Q. Okay.
22   A. That's pretty obvious.
23   Q. Why do you believe the NRA filed bankruptcy?
24     MR. CICILIANO: Objection. To the extent
25 that it calls for attorney/client communications, I

Page 76

1 direct you not to answer.
2     MR. WATSON: Judge, you can answer to the
3 extent of your personal knowledge.
4   A. The press reports, the press releases by NRA,
5 the statements of officers and spokespersons clearly say
6 that there was one reason, and that's because they want
7 more sun than they could get in New York. No, I'm
8 kidding. But that they want to get away from the New
9 York AG.
10   Q. (BY MR. PRONSKE) Judge Journey, would you be
11 surprised to learn that John Frazer, the general counsel
12 of the NRA, was not aware that bankruptcy was going to
13 be filed until after the filing?
14     MR. CICILIANO: Objection, foundation,
15 form, calls for speculation.
16   A. That does not surprise me.
17   Q. (BY MR. PRONSKE) Do you believe that he
18 should have been informed as general counsel as to a
19 significant legal proceeding such as the filing of a
20 Chapter 11?
21     MR. CICILIANO: Objection, form, calls
22 for speculation, calls for legal conclusion.
23   Q. (BY MR. PRONSKE) You can answer.
24     MR. WATSON: You can answer, Judge.
25   A. I think it would have been nice to tell the

Page 77

20 (Pages 74 - 77)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1 general counsel what they're planning, just like I think
2 it would have been nice to tell the board.
3     Q. (BY MR. PRONSKE) Would you --
4         MR. CICILIANO: I would move to strike to
5 the extent that that discloses attorney/client
6 communications. Go ahead.
7         THE WITNESS: Thank you.
8     Q. (BY MR. PRONSKE) Would you be surprised to
9 learn that Craig Spray, the treasurer of the NRA, was
10 not aware that bankruptcy was going to be filed until
11 after the filing?
12         MR. CICILIANO: I would object,
13 foundation, speculation.
14     Counsel, I hope you have a basis for asserting
15 that. Go ahead.
16     Q. (BY MR. PRONSKE) You can answer.
17         MR. PRONSKE: And I do have a basis.
18     A. No, I'm not surprised.
19     Q. (BY MR. PRONSKE) And why are you saying that
20 you're not surprised?
21         MR. CICILIANO: Objection to the extent
22 that it calls for you to reveal attorney/client
23 communications, including those that occurred at board
24 meetings or executive board meetings, I would direct you
25 not to answer. Outside of that, you may go ahead.

Page 78

1 meeting is to provide briefing to the board regarding
2 the NRA's reorganization plan and the legal matters
3 overseen by the special litigation committee and to take
4 necessary action related to those -- directly related to
5 those matters, closed quote.
6     Is that a quote that you gave to the WFB, or
7 was it from some other source?
8     A. That was a quote from the email that announced
9 the meeting.
10     Q. Okay. And did you send that email to the WFB?
11     A. I think he already had it.
12     Q. Okay. Do you know what the terms "to take any
13 necessary action related to those matters" means?
14         MR. CICILIANO: Objection, calls for
15 speculation.
16     To the extent that you learned that from an
17 attorney/client communication from the NRA's counsel, I
18 would direct you not to answer.
19         MR. PRONSKE: It doesn't call for
20 speculation. I'm asking him if he knows what that
21 means.
22     A. I think it means like anything else they want
23 to do. I don't know.
24     Q. (BY MR. PRONSKE) Okay. Have you been
25 threatened by anyone about your earlier -- or your

Page 80

1         MR. WATSON: You can answer based on your
2 personal knowledge, Judge, and what you observed.
3         THE WITNESS: Thank you.
4     A. It's clear from my observation of the
5 operation and -- that there are, as I explained before,
6 kind of broaching on it, that there are circles within
7 circles, and the closer circles are more informed than
8 those in the outer reaches. And I'm sure now I'm going
9 to be out there by Pluto somewhere so -- after filing my
10 motion. You know, I may be, I don't know, outside the
11 solar system. We'll see how the 28th goes.
12     Q. (BY MR. PRONSKE) Have you had any
13 conversations since the filing of the bankruptcy with
14 Mr. Cotton, Mr. Lee, Mr. LaPierre or Ms. Meadows?
15     A. No. They're not calling me.
16     Q. Were you aware that there was a board meeting
17 set for March 14th and -- of this year and got called
18 off?
19     A. Yes.
20     Q. Do you know why the meeting got called off?
21     A. They said someone's been exposed to COVID.
22         MR. CICILIANO: Go ahead.
23     Q. (BY MR. PRONSKE) The WFB article says that
24 this to be held board meeting -- or regarding this to be
25 held board meeting that, quote, The sole purpose of the

Page 79

1 filing of your motion to appoint examiner or the
2 contents of the WFB article?
3     A. I don't know if you could quite call them as
4 threats rather than advice, but there have been some
5 statements made by others.
6     Q. Have you been given advice regarding those
7 issues?
8     A. Yes.
9     Q. And who did you get that advice from?
10     A. Law enforcement.
11     Q. And what advice was given to you by law
12 enforcement?
13     A. Keep my head on a swivel. Don't get in an
14 elevator alone.
15     Q. When you testified earlier regarding closer
16 circles, who is in these closer circles?
17     A. You're going to have to ask somebody that
18 makes the circles. I don't know.
19     Q. You don't know who's in the closer circles?
20     A. I have no idea. I would presume it changes
21 periodically also.
22     Q. Are you aware that the Brewer firm was paid
23 $17 million in the 90 days prior to bankruptcy?
24     A. Yes. I saw the filing.
25     Q. Do you know what that's for?

Page 81

21 (Pages 78 - 81)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1  A.  No, I do not.

2  Q.  Do you know whether that amount was paid for

3  services incurred during that period, or are those for

4  services that are older or past due invoices?

5        MR. CICILIANO:  Objection to form.

6  A.  No, I do not.

7  Q.  (BY MR. PRONSKE)  Is the board given

8  information regarding Brewer's fees?

9        MR. CICILIANO:  Objection to the extent

10 it calls for you to divulge attorney/client

11 communications.

12 A.  I mean, I don't know how far he wants me to go

13 back.  I mean, it was the controversy at Indianapolis,

14 and I was there at that meeting 2019.

15 Q.  (BY MR. PRONSKE)  And what was that

16 controversy?

17 A.  I think it's pretty clearly represented in the

18 press, but essentially from what I read and what I saw

19 at that meeting, it became apparent that there was

20 struggle politically between Mr. North and Mr. LaPierre.

21 I mean, I was there in the members meeting.  I attended

22 the board meeting following the members meeting in 2019

23 in Indianapolis.  That's what spurred me to try to get

24 back on the board.

25 Q.  Do you believe as a board member that the

Page 82

1  discussion about the amount of fees is not

2  attorney/client privileged.  So it sounds like you're

3  taking the position that anything that's discussed in an

4  executive session of the board is attorney/client

5  privileged.  Is that right?

6        MR. CICILIANO:  That's certainly not the

7  case.  Your question was broad enough to encompass even

8  what's contained in those fees.  And so if the question

9  was did you discuss and they discussed the actual

10 content of the billing statements, that would be

11 privileged, that content.  The amount of the fees

12 necessarily wouldn't be.  But it's a mixed bag of

13 privilege and nonprivilege, and I am telling him to be

14 careful.

15        MR. PRONSKE:  I specifically said of the

16 amount of the fees, and I specifically did not say was

17 contained in the billing statement.  So let me reask the

18 question and please listen.

19 Q.  (BY MR. PRONSKE)  And the question is:  Has

20 there ever been a discussion in a board meeting when you

21 were present as to the amount of Brewer's fees?  And I

22 am going to ask that first.

23 A.  No.

24 Q.  Has there ever been a discussion by the board

25 of oversight of the Brewer fees and -- of the Brewer

Page 84

1  amount of the Brewer fees in the last couple of years

2  have been reasonable?

3        MR. CICILIANO:  Objection, foundation,

4  calls for speculation.

5        MR. WATSON:  You can answer, Judge, on

6  your personal knowledge.

7        THE WITNESS:  Yeah.

8  A.  Again, without seeing the billings, I'm not

9  sure what he's doing.  It's hard to imagine.  But even

10 on the Internet -- what he has on the web page, his rate

11 is 1,400 bucks an hour.  That's still an awful lot of

12 hours.  So, you know, I don't know.

13 Q.  (BY MR. PRONSKE)  Do you -- has there ever

14 been any discussion by the board that you've been a part

15 of as to either the amount of those fees or the

16 oversight or lack of oversight of those fees?

17        MR. CICILIANO:  I would just object to

18 the extent that it calls for you to disclose anything in

19 one of the executive sessions in which you were

20 discussing with counsel, including meeting with the

21 committee, special litigation committee.  I direct you

22 not to answer.

23        MR. PRONSKE:  Mr. Ciciliano, are you

24 taking the position that everything that happens in an

25 executive session is privileged?  Because certainly a

Page 83

1  fees?

2  A.  I -- okay.

3        MR. CICILIANO:  And I would generally

4  object to the attorney/client privilege to the extent

5  that they are discussing the oversight of the fees.

6        It's a yes or no question.  You can answer yes

7  or no, but that's it.

8        MR. WATSON:  You can answer, Judge.

9        THE WITNESS:  Thank you.

10 A.  No.

11        MR. PRONSKE:  Okay.  I think I am close

12 to being out of time, so I am going to pass the witness;

13 but again, I reserve my rights to recall the witness

14 after discussion of the privilege issues with the Court.

15        MR. WATSON:  That's fine, Gerrit.  And

16 you know, we'll go there.

17        How much time is left on the New York AG side,

18 Julie.

19        THE REPORTER:  They've got 29 minutes.

20        MR. WATSON:  Okay.  Brian, you mentioned

21 that you have a few questions for Judge Journey.

22        MR. MASON:  I do.  Do you want to keep

23 going?

24        MR. WATSON:  Yeah.

25        MR. MASON:  Or Judge, do you need a

Page 85

22 (Pages 82 - 85)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1 break?
2          MR. WATSON: Are you okay, Judge?
3          THE WITNESS: I'm good.
4          MR. WATSON: Why don't you go ahead and
5 finish, Brian.
6          MR. MASON: Okay.
7               EXAMINATION
8 BY MR. MASON:
9    Q.   Judge Journey, good evening. My name is Brian
10 Mason. I represent Ackerman McQueen. And I appreciate
11 you sitting and visiting with us tonight.
12   A.   Tell Revan I said hello.
13   Q.   I will do it.
14        A few questions for you. Going back to the
15 January 7th board meeting, what specifically was voted
16 on with respect to those two executive sessions?
17          MR. CICILIANO: Objection to the extent
18 it calls for attorney/client communications and
19 privilege.
20        To the extent that it's reflected in the
21 general minutes, you can testify to.
22          MR. WATSON: Yeah, Judge. I mean, you
23 can testify to what you remember, so long as it's not
24 privileged or confidential.
25   A.   I have not had a chance to read those minutes.

Page 86

1 They just arrived yesterday for me from the January 7th
2 meeting, but the only two questions were those we've
3 been talking about all afternoon, and that's Wayne
4 LaPierre's employment contract and the empowerment of
5 the special litigation committee.
6    Q.   (BY MR. MASON) When voting on something as a
7 board member, is it important to know what you're voting
8 on?
9    A.   Of course.
10          MR. CICILIANO: Objection, vague.
11   Q.   (BY MR. MASON) Do you rely on the people
12 presenting you with information when you're voting to
13 provide complete and accurate information in order to
14 exercise your vote as a board member?
15   A.   I believe that what Reagan said was true, that
16 I trust but verify. I do my best to try to verify
17 things or questions that have to come up before me, just
18 like I try to do it here where I'm sitting right now.
19   Q.   In the executive session board meetings on
20 January 7, do you believe that there was information
21 that was intentionally withheld from the board?
22          MR. CICILIANO: I am going to object and
23 direct you not to answer to the extent -- or not to
24 answer as it would reveal attorney/client
25 communications.

Page 87

1          MR. MASON: I was asking for his personal
2 opinion.
3          MR. CICILIANO: Even as to personal
4 opinion, you're asking him to reveal the content of the
5 communications because of what he feels was lacking.
6          MR. WATSON: Judge, I am going to
7 instruct you not to answer.
8          THE WITNESS: Okay. I don't why he can't
9 just read the motion.
10   Q.   (BY MR. MASON) I want to be clear. During
11 the first executive session motion -- I mean, I'm
12 sorry -- the first executive session regarding
13 Mr. LaPierre's employment agreement, it was Wit Davis,
14 John Frazer and then somebody from the Brewer firm. Is
15 that your recollection?
16   A.   I remember Mr. Brewer being present
17 personally.
18   Q.   Okay. Were copies of Mr. LaPierre's
19 employment agreement passed out to board members during
20 that executive session?
21   A.   No.
22          MR. CICILIANO: Objection, asked and
23 asked.
24   A.   I answered that. No, it wasn't.
25   Q.   (BY MR. MASON) Without going into what was

Page 88

1 said specifically, were there any questions relating to
2 Mr. LaPierre's employment agreement that were asked?
3    A.   Yes.
4    Q.   Who asked those questions?
5          MR. CICILIANO: I would direct you not to
6 answer pursuant to the attorney/client privilege.
7          MR. MASON: That's not a proper
8 instruction.
9    A.   I think if you review the minutes, it's quite
10 clear that there became a question during that
11 conversation regarding the question of the law that
12 would control the contract.
13   Q.   (BY MR. MASON) So was there just one question
14 that was asked relating to Mr. LaPierre's employment
15 agreement?
16          MR. CICILIANO: Objection, calls for
17 attorney/client communication.
18        Now I am directing you not to answer.
19          MR. MASON: I am not asking about the
20 subject of the question.
21          MR. CICILIANO: You are asking about the
22 subject. You're saying is that the only question that
23 was asked. It's absolutely asking about the subject.
24 I'm directing him not to answer.
25          THE WITNESS: Thank you.

Page 89

23 (Pages 86 - 89)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1    MR. WATSON: Judge, don't answer.
2    THE WITNESS: Okay.
3    Q. (BY MR. MASON) Mr. -- I mean, Judge Journey,
4 about how long -- well, let me back up.
5    You said that there was --
6    MR. ACOSTA: I'm sorry. I'm sorry.
7 Someone is -- we're getting feedback from someone.
8    MR. ACOSTA: 202-437-5091, you're not
9 muted.
10    THE WITNESS: Washington, D.C.
11    Q. (BY MR. MASON) Earlier in the deposition, if
12 I understood your testimony, you made a comment that the
13 NRA reorganizes all the time and has various committees.
14 Did I recall that correctly?
15    A. Yes.
16    Q. Can you describe that for us a little bit
17 more?
18    A. Well, from time to time, questions come up,
19 new shooting disciplines are being popular. One of the
20 many things that NRA does, that don't seem to make the
21 news, is we run the national matches. There are from
22 time to time controversy in those competitions. It
23 requires rule changes. Sometimes you have to create a
24 select committee or a special committee to just look at
25 that one little question and kind of get the information

Page 90

1 from all the competitors and try to figure out what the
2 right answer is. Sometimes there are tasks or special
3 projects that a committee is created to oversee or work
4 out the task for the staff to go implement. You know,
5 it's a large organization that has a myriad of tasks to
6 complete, and it certainly required something more
7 flexible than a fixed commissioner.
8    Q. You testified earlier, if I understand your
9 testimony, that you believe that Mr. LaPierre had a duty
10 to advise the board of the bankruptcy, and then I
11 believe you said and so many other things. Assuming I
12 understood your testimony correctly, could you tell us
13 about what those other things are?
14    MR. CICILIANO: I will just object to the
15 extent that it calls for attorney/client communications.
16    MR. WATSON: You can answer, Judge. You
17 can answer.
18    THE WITNESS: All right.
19    A. Look, when I was on the board 25 years ago, I
20 believe it operated properly. Our board meetings
21 25 years ago were four days long. We would have two
22 days of committee action and two days of board action
23 based upon a committee request. It ran just like the
24 legislature. And that's where I initially learned
25 legislative procedure, and I used it every day I was in

Page 91

1 the state senate.
2    When I went to the board meeting in October, I
3 was aghast because the board meeting ran like a consent
4 agenda. So they would say --
5    MR. CICILIANO: And Judge, I would just
6 warn you not to disclose what was said in the executive
7 sessions, but go ahead beyond that.
8    MR. WATSON: And Judge -- well, hold on.
9 Judge, you can answer as to what you observed that
10 wasn't in executive session. So you can continue.
11    THE WITNESS: Sure.
12    A. You know, and when they would bring an action
13 item up, whether it was a modification of the bylaws --
14 I am not talking about in the executive session, but
15 everything on the agenda that day in Tucson was a
16 consent agenda. They would say, here is your action
17 item, unanimous acclamation, are there any objections?
18 And I had not had the opportunity to be in the board
19 meetings, mostly because they do a lot in executive
20 sessions when I wasn't on the board; and when I got
21 inside, I was astounded. So they don't have committee
22 meetings. They haven't had committee meetings for two
23 board meetings. So how can they inform the finance
24 committee about the finances when it doesn't meet? How
25 could they inform legislative policy about what they're

Page 92

1 doing if it doesn't meet? You know, we've had two board
2 meetings and no committees. I finally got my committee
3 assignments a few weeks ago, and that was after the
4 January 7th meeting. So there are no committee meetings
5 planned for this special emergency meeting they're going
6 to have in, what, ten days, you know. But, of course,
7 this way at least I get to go down to Dallas and only
8 make one trip for a week while we're there on our trial.
9    Q. (BY MR. MASON) Aside from the bankruptcy, do
10 you have concerns about the NRA's disclosure to the
11 board the last two years?
12    MR. CICILIANO: I would just object to
13 the extent it calls for you to disclose what's occurred
14 in the executive committee meetings that would be
15 subject to privilege and direct you not to answer that.
16    MR. WATSON: You can answer, Judge, to
17 the extent of your personal knowledge.
18    THE WITNESS: Thank you.
19    MR. WATSON: So long as it's not in
20 executive session.
21    A. Yeah, I went back and looked in my files from
22 25 years ago, and I saw the board packets they would
23 send me then and they would be about 4 inches. And they
24 would send it to me about three weeks ahead of the
25 meeting so I had time to read everything. Now when I go

Page 93

24 (Pages 90 - 93)

1 to the board meeting, it's sitting on the desk. And you
2 can't get into the room until just before the meeting,
3 so you've got no time to read it. I mean, who knows
4 what they're giving me, you know, but I don't have time
5 to review it to figure out what the questions are, let
6 alone what the answers should be.
7      Q.  (BY MR. MASON)  Are you aware of other board
8 members that share your same concerns?
9      A.  Yes.
10     Q.  Is it a significant number of board members
11 that share these same concerns?
12         MR. WATSON:  Objection, speculation.
13 Objection, that's speculative.
14         THE WITNESS:  I appreciate that.
15     A.  One of the first persons I called was a former
16 general counsel that I knew that had been general
17 counsel of NRA from 1977 to, I don't know, 2014 or so.
18 And I gave him a call, and he taught me a new word,
19 supine. The board is supine.
20     Q.  (BY MR. MASON)  You have mentioned a few times
21 during the deposition the upcoming March 28 board
22 meeting. Is it your understanding that the NRA will ask
23 the board to ratify the bankruptcy on March 28?
24         MR. WATSON:  Objection, speculation.
25         MR. CICILIANO:  And I would further

Page 94

1 object to the extent you acquired that knowledge through
2 attorneys or counsel for the NRA.
3      A.  I'm not sure what they're going to ask us.
4 Really, I'm not.
5      Q.  (BY MR. MASON)  Let me ask you this then. Do
6 you believe that it's good corporate governance for the
7 NRA to try to have the NRA board ratify the bankruptcy
8 filing after it was already filed?
9          MR. WATSON:  I would object to that
10 because it calls for a legal conclusion and is
11 speculative.
12         MR. CICILIANO:  Join.
13     A.  I got no idea what they're going to do. All I
14 know is what they said.
15     Q.  (BY MR. MASON)  You mentioned earlier that
16 your personal view -- or your personal review of the
17 statutes and the case law, you came to the conclusion
18 that the board was required to authorize the NRA's
19 bankruptcy filing. Do you believe that a bankruptcy can
20 be filed in good faith if it was not authorized?
21         MR. CICILIANO:  Objection, calls for a
22 legal conclusion. The witness isn't an expert.
23         MR. WATSON:  Objection also because it's
24 speculative.
25     But go ahead, Judge.

Page 95

1      A.  I think Judge Hale is going to answer that
2 question, not me. We'll see.
3      Q.  (BY MR. MASON)  Would --
4      A.  I --
5      Q.  I'm sorry, go ahead, Judge.
6      A.  I -- you know, I have my own personal opinion,
7 but I think another judge is probably going to give a
8 much sounder one than I.
9      Q.  Can you please share your personal opinion
10 with us?
11         MR. CICILIANO:  I would just object to
12 its relevance and speculation, foundation.
13     Go ahead if you have one.
14         MR. WATSON:  You can answer, Judge, to
15 the extent of your opinion.
16     A.  I think -- I think that the officers and
17 counsel have a duty to disclose to the board things like
18 filing a bankruptcy. I think it's the board's decision.
19     Q.  (BY MR. MASON)  And they did not uphold their
20 duty in this particular instance, did they?
21         MR. CICILIANO:  I would just object
22 pursuant to the attorney/client privilege and direct you
23 not to respond.
24     A.  Oh, my God, how many times do I have to answer
25 that?

Page 96

1         MR. WATSON:  Objection, that's been asked
2 and answered. I think he's answered that, Brian.
3      Q.  (BY MR. MASON)  With respect to the NRA's
4 bankruptcy filing, do you feel like you were deceived?
5         MR. WATSON:  Same objection. I think
6 he's answered that as well.
7         MR. CICILIANO:  And I would just object
8 to the extent he relies on attorney/client privilege.
9      A.  I think just as I told the Free Beacon editor
10 reporter, that I believe it was an omission that was
11 intentional and that they breached that duty to inform
12 the board. I mean, you know, what's 1.03 in the Texas
13 code? Communication by attorneys.
14     Q.  (BY MR. MASON)  Have you spoken with other
15 board members since January 15 that share your same
16 concerns?
17         MR. CICILIANO:  I would just object to
18 the extent that it calls for you to disclose
19 attorney/client communications.
20     I would direct you not to answer to that
21 extent.
22         MR. WATSON:  You can answer, Judge, to
23 the extent of the substance of those conversations that
24 aren't reflected by any attorney/client communication.
25     A.  I reached out to several that I believed I

Page 97

25 (Pages 94 - 97)

1 could have a candid conversation with.
2    Q.  (BY MR. MASON)  Do you have concerns about the
3 Brewer firm's representation of the NRA?
4    A.  Yes.
5    Q.  What are those concerns?
6        MR. CICILIANO:  I would just object to
7 the extent that they call you to call upon
8 attorney/client communications or things you learned
9 through attorney/client privilege.
10        MR. WATSON:  Judge, you can learn -- you
11 can answer the question to the extent of your personal
12 knowledge and that you've become aware of since this
13 case has been filed.
14        MR. CICILIANO:  That doesn't involve
15 attorney/client communications.
16        THE WITNESS:  Thank you.
17        MR. WATSON:  Well, things that are on the
18 record that have been filed in the case are --
19        MR. CICILIANO:  Agreed, Jermaine.
20        MR. WATSON:  You can answer to that
21 extent, Judge.
22    A.  I've read a lot of the firm's work, reading
23 all of these other cases and their filings in them, and
24 I didn't think they were very well done.  I thought it
25 was more sophistry than substance, what I've read in the
Page 98

1 dozens of pleadings that I've read by Brewer and his
2 co-counsel.
3    Q.  (BY MR. MASON)  Are you aware of other board
4 members sharing those same concerns?
5    A.  I don't think as sophisticated, but yes.
6    Q.  Do you believe that Mr. LaPierre is currently
7 fit to lead the NRA?
8    A.  What?
9    Q.  Do you believe that Mr. LaPierre is currently
10 fit to lead the NRA?
11        MR. CICILIANO:  Objection to form.
12        MR. WATSON:  You can answer, Judge, to
13 the extent your opinion or your personal knowledge.
14    A.  You know, I've known Wayne for a long, long
15 time, and he's in such a hole, I don't see how he gets
16 out.
17        MR. MASON:  Thank you, Judge Journey.  I
18 appreciate the time.
19        MR. WATSON:  Did you pass the witness,
20 Brian?
21        MR. MASON:  Yeah, I'll pass the witness.
22        MR. WATSON:  Dylan, do you want to take a
23 break so I can check on my client, and then we can
24 finish up?
25        MR. CICILIANO:  Absolutely.  And just for
Page 99

1 everyone here, I am going to try to make a quick push
2 and only have this be the last break.
3        MR. WATSON:  Okay.  Sounds good.  Five
4 minutes?
5        THE WITNESS:  Okay.
6        MR. CICILIANO:  Let's make it 10 so I can
7 use the restroom.
8        MR. WATSON:  Okay, 10.
9        THE VIDEOGRAPHER:  The time is 6:13.  We
10 are off the record.
11        (Break from 6:13 p.m. to 6:27 p.m.)
12        THE VIDEOGRAPHER:  The time is 6:27 p.m.
13 We're back on the record.
14        EXAMINATION
15 BY MR. CICILIANO:
16    Q.  Judge, as I introduced myself earlier, I'm
17 Dylan Ciciliano.  I represent the debtors in this case.
18 I don't think I've had the pleasure to speak to you
19 before, and I do say it's been an interesting honor to
20 be able to tell a judge to stop talking at times.
21 Usually it's the other way around, so --
22    A.  That's the truth.
23    Q.  So where we start out, I believe towards the
24 end of the questioning you mentioned, in response to
25 Ackerman McQueen's counsel, that you were concerned with
Page 100

1 some of the things that Brewer and his co-counsel had
2 filed.  Is that co-counsel in reference to Garman Turner
3 & Gordon, my firm?
4    A.  No.  No.  No.  I mean, I'm talking about the
5 filings I read in the New York AG's case.  Some of the
6 Ack-Mac litigation in Virginia and Dallas.  The filings
7 in -- oh, what was it?  The insurance case in New York.
8 I was trying to follow that as closely as I could.
9    Q.  And you were reviewing those filings just to
10 get a sense of what was going on as a board member?
11    A.  Yes.
12    Q.  And when was that done?
13    A.  I started -- actually, I started monitoring --
14 trying to monitor those things about three years ago
15 and, you know, did my best to try to follow them.
16    Q.  And that's because they dealt with your
17 beloved organization, the NRA.  Is that right?
18    A.  What?
19    Q.  And that's because -- you were reviewing them
20 for the past three years because you care about the NRA;
21 you wanted to know what was going on?
22    A.  Yes.
23    Q.  Okay.  And I believe in this action -- let
24 me -- let me go in a little reverse order before I ask
25 you some specific questions, but go back through what
Page 101

26 (Pages 98 - 101)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1 counsel asked you.
2      Earlier -- I don't know if you recall -- you
3 were asked about several paragraphs in your motion to
4 appoint the examiner in which you recited that you had
5 some concerns with the governance, as well as things
6 that have happened at the NRA. Do you recall that?
7    A. Yes.
8    Q. And I objected to foundation, and I think you
9 said, well, I have learned a lot of this stuff from
10 reading the New York AG's complaint. Do you recall
11 that?
12    A. Yes.
13    Q. And you also are aware that the New York AG
14 claims that Ackerman McQueen has also taken actions that
15 were untoward. Isn't that right?
16    A. Yes.
17    Q. And is it because the New York AG says it that
18 you believe it to be true?
19    A. No.
20    Q. And in fact, you believe the New York AG has
21 an ulterior motive. Isn't that right?
22    A. I do believe she has a motive, yes.
23    Q. And what --
24    A. She said so when she was campaigning for
25 Attorney General.
Page 102

1    Q. Right. And when she was campaigning, she said
2 the NRA is akin to a terrorist organization. Isn't that
3 correct?
4    A. Among other things, yes.
5    Q. And you don't believe any of that to be true?
6    A. No.
7    Q. Okay. And you believe in the mission of the
8 NRA; isn't that right?
9    A. Yes.
10    Q. And that's why you've opposed the dismissal of
11 the bankruptcy. Right?
12    A. That's why what?
13    Q. You've opposed the dismissal of the
14 bankruptcy?
15    A. Yes.
16    Q. And you've opposed the imposition of a
17 trustee. Correct?
18    A. At this point, yes.
19    Q. And you certainly don't support the New York
20 AG's efforts to dissolve the NRA. Right?
21    A. That's correct.
22    Q. And you, in fact, believe that the dissolution
23 of the NRA would pose a financial issue for the NRA.
24 Isn't that right?
25      MR. PRONSKE: Object to the form. You're
Page 103

1 leading the witness with almost every question.
2      MR. MASON: Yeah. Are you treating the
3 witness as adverse, Dylan?
4      MR. CICILIANO: It's crossing him, and
5 it's at his deposition.
6      MR. MASON: Okay. So he's an adverse
7 witness, okay.
8      MR. CICILIANO: I didn't say he was an
9 adverse witness.
10      MR. MASON: You're treating him like one.
11      MR. CICILIANO: You can object to form,
12 if you want, Brian.
13      THE WITNESS: I love this. Keep going,
14 guys. Come on, I'm really enjoying this.
15      MR. PRONSKE: Judge, I think we need you
16 to rule on some of these evidence objections.
17      THE WITNESS: I would be happy to, but I
18 don't think that's my prerogative at this time. I might
19 be a little biased, too, so --
20    Q. (BY MR. CICILIANO) Do you believe the
21 dissolution is a financial issue?
22    A. I think dissolution would be a tragedy.
23    Q. Right. And I believe in the testimony you
24 said that you believe the New York Attorney General
25 wanted to put the money in her pocket?
Page 104

1    A. Well, it's pretty obvious from the New York
2 corporate code that if the dissolution is granted by the
3 New York courts, that she gets to keep the change and
4 then she can give it to any similar organization she
5 wants. And I mean, you know, Handgun Control does have
6 "gun" in the title.
7    Q. I would -- I would dare to say that I've said
8 about the exact same statement. So to the point,
9 though, is you don't want it to occur. Is that correct?
10    A. I'm sorry. What?
11    Q. You don't want that to occur. Is that right?
12    A. No, I do not.
13    Q. Now earlier in response to Mr. Mason, you said
14 tell Revan I said hello. Do you recall that?
15    A. Yes.
16    Q. Who is Revan.
17    A. Revan is Angus's son. Angus McQueen, Ackerman
18 McQueen.
19      MR. MASON: Just for the record, it's
20 "Revan."
21      THE WITNESS: Thank you so much. I
22 appreciate that. I do. "Revan," okay.
23    Q. (BY MR. CICILIANO) And do you know Revan?
24    A. No, I have not have the pleasure to meet him.
25    Q. Okay. So why did you say tell him hello?
Page 105

27 (Pages 102 - 105)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1    A.  Because I liked his father a lot.
2    Q.  And so you knew his father?
3    A.  Yes.
4    Q.  And did you have dealings with his father?
5    A.  I had conversations with him, but I'm never
6  the one that was in the deal, no.
7    Q.  When was the last time you had a conversation
8  with any of the McQueens?
9    A.  Oh, 25 years ago, although I did see Tony
10  Macerich at the Tulsa Gun Show with Wayne.  Golly, that
11  was ten years ago, 12, something like that.
12    Q.  So out of the last ten years, you haven't seen
13  anyone from -- either Angus McQueen or Revan McQueen?
14    A.  Except perhaps at the NRA's annual meetings
15  that I would attend.  That might be the only place.  I
16  just don't remember.
17    Q.  And since the litigation with the bankruptcy,
18  have you seen or -- the litigation with Ackerman McQueen
19  or this bankruptcy, have you seen or spoken with Angus
20  or Revan?
21    A.  No.  Angus has passed, and no, I have not
22  been able to -- I have not spoken with any of them.
23    Q.  Have you attempted to get into contact with
24  them?
25    A.  No.

Page 106

1    Q.  Do you doubt the allegations that the New York
2  Attorney General made about Ackerman McQueen in its
3  complaint?
4    A.  Well, as I said before, that it was apparent
5  to me from reading the petition on August 5th filed by
6  the New York Attorney General that that petition was
7  based upon discovery that had already been completed,
8  documents produced, testimony provided at depositions or
9  interviews by the attorney general staff.  I mean, they
10  interviewed a hundred past board members.
11    Q.  All right.  And -- but you don't have personal
12  knowledge of any of what occurred there.  Is that
13  correct?
14    A.  That's correct.
15    Q.  And I believe you mentioned the October 2020
16  board meeting, and you said it was something more like a
17  consent agenda.  Do you recall that?
18    A.  Yes.
19    Q.  And you said the board asked if anyone had any
20  objections.  Do you recall?
21    A.  Yes.
22    Q.  Now you could have objected.  Right?
23    A.  Certainly.
24    Q.  Did you object?
25    A.  No.

Page 107

1    Q.  Now you started a GoFundMe related to the NRA.
2  Isn't that correct?
3    A.  Yes.
4    Q.  And what is that GoFundMe called?
5    A.  Restore NRA.
6    Q.  Is anyone else involved in the formation of
7  that GoFundMe?
8    A.  Well, I had professionals help me, yes.  I've
9  been kind of busy.
10    Q.  When you say "professionals," IT
11  professionals?
12    A.  Political ones --
13    Q.  And who are those --
14    A.  -- who I've dealt with for decades in a
15  hundred campaigns I've worked on.
16    Q.  And who are those professionals?
17    A.  Singularis Group.
18    Q.  Anyone specifically at Singularis Group?
19    A.  Everybody that works there, I guess.  Mr. Van
20  Meteren.  You know, I know them all.  I've known them
21  all for a long time.  They're NRA members, and they
22  wanted to help.
23    Q.  Outside of the Singularis Group, was anyone
24  else involved in the formation of Restore The NRA?
25    A.  No.

Page 108

1    Q.  And what's the purpose of the GoFundMe?
2    A.  To keep me from having to give Jermaine my
3  cell tower.
4    Q.  Is your retirement plan based on the cell
5  phone tower?
6    A.  No, the cell tower is my play money.  You
7  know, the cell tower is my play money.  I have already
8  invested in like three retirements, so --
9    Q.  So if I understand you, the Restore The NRA
10  GoFundMe is being used to pay legal counsel in this
11  action?
12    A.  Yes.
13    Q.  Is anyone else, other than you personally or
14  the GoFundMe, contributing to the payment of legal
15  counsel?
16    A.  Yes.
17    Q.  And who is that?
18    A.  You know, there's a lot of people.  I mean, I
19  don't know.  I don't have that spreadsheet in front of
20  me.  It's probably over a hundred contributors.
21         MR. WATSON:  Object to the extent that
22  you're going to speculate, Judge.
23         THE WITNESS:  Yeah.
24         MR. WATSON:  If you don't know, you don't
25  know.

Page 109

28 (Pages 106 - 109)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1  A.  Yeah, I don't know.  Yeah, I don't have it in
2  front of me.
3  Q.  (BY MR. CICILIANO)  Do they only contribute to
4  you through the GoFundMe, or do they contribute to you
5  through other means?
6  A.  No, they would like mail me checks made
7  payable to the law firm.
8  Q.  And how did you reach out to those people to
9  solicit funds?
10  A.  By every means I could find.
11  MR. WATSON:  You know what?  I am going
12  to object to this scope of questioning because it's
13  outside of Gerrit's direct.
14  THE WITNESS:  Yeah.
15  MR. WATSON:  I don't really -- this isn't
16  one of the topics that we agreed to.
17  MR. CICILIANO:  Certainly, it does go to
18  bias.  It also goes to any of his motives here.
19  MR. WATSON:  Well, I mean you guys didn't
20  notice the deposition either, right?
21  MR. CICILIANO:  It's not a 30(b)(6)
22  deposition.  It's a percipient deposition, which
23  means --
24  MR. WATSON:  That's true, but it's
25  outside the scope.  If it's purely cross --

Page 110

1  A.  Let me think.  I would really need to look at
2  the list, you know.  I really don't see how that's
3  relevant to anything here.
4  MR. WATSON:  It's not, Judge.
5  A.  I don't know what your motive is for asking.
6  MR. WATSON:  Judge, if you don't know
7  something, you don't need to speculate.  I mean, he can
8  ask a question, but if you don't know, you don't know --
9  THE WITNESS:  Yeah.
10  MR. WATSON:  -- because it's not in front
11  of you.
12  Go ahead.
13  Q.  (BY MR. CICILIANO)  Has Colonel North donated
14  money to you?
15  A.  What?
16  Q.  Has Colonel North donated money?
17  A.  No.  No.
18  Q.  Have the Knoxs provided you any money?
19  A.  No.
20  Q.  Has Rocky Marshall provided you any funds?
21  A.  I believe so.
22  Q.  And is Rocky Marshall's representation being
23  paid through the Restore The NRA as well?
24  A.  I think he's paid for some himself.  You'll
25  have to ask him.

Page 112

1  MR. CICILIANO:  It's not purely cross.
2  MR. WATSON:  So it is a purely cross.
3  MR. CICILIANO:  It's not purely cross.
4  MR. WATSON:  Okay.
5  MR. CICILIANO:  And it also gets into,
6  like I said, the motives and the basis for the motion.
7  Q.  (BY MR. CICILIANO)  Is anyone from Ackerman
8  McQueen providing you money?
9  A.  No.
10  Q.  Is anyone from the New York Attorney General
11  providing you money?
12  A.  No.
13  Q.  The New York government?
14  A.  No.
15  Q.  Are you receiving money --
16  A.  I'm sure Cuomo is going to call me, yeah.
17  Q.  I'm sure he's not making many calls.
18  But --
19  A.  Yeah.
20  Q.  -- are past board members contributing money?
21  A.  Yes.
22  Q.  Who are they?
23  A.  Sitting board members and past ones, yes.
24  Q.  Let's start with the past board members.  What
25  past board members?

Page 111

1  Q.  Okay.  In this action you are being deposed,
2  the movants attempted to take your deposition all the
3  way back in February.  Isn't that correct?
4  A.  I remember having a conversation with my
5  counsel about that topic.
6  Q.  And outside of -- and we have the emails.  I
7  am just trying to give you a date range.  Outside of --
8  not with your counsel, I apologize.
9  Outside of communications to your counsel,
10  have you had any direct communications with counsel for
11  the New York Attorney General or Ackerman McQueen?
12  A.  No.
13  Q.  And in your motion to appoint an examiner, you
14  state that the -- you or your counsel states that the
15  movant is a creditor holding both a liquidated claim and
16  a contingent liquidated claim.  What's your
17  understanding of your liquidated claim?
18  MR. WATSON:  Objection, calls for legal
19  conclusion.  He's not a bankruptcy expert.
20  THE WITNESS:  That's for sure.
21  A.  Yeah, I only started learning about this on
22  January 16th.
23  MR. WATSON:  And furthermore, it goes to
24  attorney/client privileges and things that have been
25  disclosed and discussed with him privately by his

Page 113

29 (Pages 110 - 113)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1 counsel, so I am instructing him not to answer that
2 question.
3     THE WITNESS:  Thank you.
4     MR. CICILIANO:  And I am trying to
5 establish standing for his motion.
6     Q.  (BY MR. CICILIANO)  So what is your
7 understanding of what your claim is?
8     MR. WATSON:  Same objection.
9     MR. CICILIANO:  And you're directing him
10 not to disclose what his claim is?
11     MR. WATSON:  I think he has disclosed
12 what his claim is.  We filed it in 2019.
13     Q.  (BY MR. CICILIANO)  And what is your
14 understanding of what that was?
15     MR. WATSON:  Judge, you can answer to the
16 extent of your knowledge of what in general terms your
17 claims are.
18     THE WITNESS:  Thank you.
19     A.  I am due reimbursement for travel to the board
20 meetings, and they are listed in -- I think it was the
21 third or the fourth filing in the bankruptcy.  I'm in
22 there.
23     Q.  (BY MR. CICILIANO)  Okay.  And do you have any
24 other claims against the NRA?
25     A.  Not that I'm aware of.

Page 114

1 Q.  And speaking of board meetings, you said the
2 second time around you took -- I believe you got on the
3 board in 2020.  Is that correct?
4     A.  Yes.
5     Q.  And as a board member that second time around,
6 you've only been to the October and the January meeting?
7     A.  Yes.
8     Q.  And when did you decide to run for the NRA
9 board the second time?
10     A.  At Indianapolis.
11     MR. WATSON:  Objection, form.
12     THE WITNESS:  Okay.
13     MR. WATSON:  You can answer, Judge.
14     A.  Well, I thought about it quite a while, and
15 then I went to Indianapolis and watched a meeting there
16 and went to -- I didn't get to go to the Friday meeting
17 because I was at the legal seminar, but I went to the
18 Saturday meeting that's the members meeting, and I
19 watched all that unfold.  And then I went to the board
20 meeting on the following Monday and got bits and pieces
21 of that, watched what I could, and that was when I said
22 I need to go help.
23     Q.  (BY MR. CICILIANO)  Did someone ask or
24 nominate you for the position?
25     MR. WATSON:  Objection.

Page 115

1     A.  I think --
2     MR. WATSON:  Objection, speculation.
3     A.  I think my wife did.  Yeah, someone had to
4 fill out the form.  I think my wife sent it in for me.
5     Q.  (BY MR. CICILIANO)  But no one came to you and
6 said, Judge Journey, we would really like you to be on
7 the board?
8     MR. WATSON:  Same objection, speculation.
9 Go ahead.
10     A.  All right.  No, there were -- there were
11 people, and I had several conversations at Indianapolis
12 with --
13     Q.  (BY MR. CICILIANO)  And who were --
14     A.  -- some current board members.
15     Q.  And who are those current board members?
16     A.  I remember having a conversation with Marion
17 Hammer and Sandy Froman and Herb Lanford and Dan --
18 there were several that I talked to that I can't
19 identify because I don't know them that well and I
20 didn't remember their names, but I knew they had the
21 little pin on and so I knew who to talk to.
22     Q.  All right.  And in running for the NRA board,
23 did you place or take out any ads?
24     MR. WATSON:  Objection to form.
25     You can answer.

Page 116

1     A.  I didn't have any ads.
2     Q.  (BY MR. CICILIANO)  Did you do any other type
3 of campaigning?
4     MR. WATSON:  Objection to form.
5     A.  Yes.
6     MR. WATSON:  You can answer.
7     A.  Yes.  I had flyers.  I went to the National
8 Gun Rights Policy Conference and spoke with lots of
9 people there.  And then I wrote some pieces that were
10 published on the Internet on gun forums, you know, on
11 gun rights forums about what I wanted to do and why.
12     Q.  (BY MR. CICILIANO)  And did you fund all that
13 yourself?
14     MR. WATSON:  Objection to form.
15     You can answer.
16     A.  I do most of my own writing, yes.
17     Q.  (BY MR. CICILIANO)  Did you fund it --
18     A.  Although I do edit my own stuff, so I have
19 somebody else proofread it for me.
20     Q.  I have the same problems.  But did you fund,
21 did you pay for the flyers and the like yourself?
22     MR. WATSON:  Objection to form.
23     You can answer.
24     A.  Yeah, I've still got the digital file
25 somewhere.  Yeah, I handed them out at gun shows.  I

Page 117

30 (Pages 114 - 117)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1 went to gun shows all over the Midwest. I was going to
2 go to one in Vegas, but they didn't want me handing them
3 out there.
4      Q. (BY MR. CICILIANO) Did you speak or have you
5 spoken with anyone affiliated with the New York Attorney
6 General?
7           MR. WATSON: Objection, form. Objection
8 to form, and it calls for speculation.
9           THE WITNESS: Yeah.
10          MR. WATSON: And I think he's already
11 answered the question.
12     So I'm thinking you don't need to answer that
13 question, Judge.
14          MR. CICILIANO: It's a little bit
15 different.
16     Q. (BY MR. CICILIANO) Since the filing of the
17 New York Attorney General action, have you spoken with
18 anyone affiliated with the New York Attorney General's
19 office?
20          MR. WATSON: Same objection. He's
21 answered the question.
22     A. And the answer's no.
23     Q. (BY MR. CICILIANO) When was the last time you
24 spoke with Jeff Knox?
25     A. About three hours ago.

Page 118

1 speculation.
2     A. That one I don't. I think he was curious, I
3 guess.
4     Q. (BY MR. CICILIANO) He was curious about how
5 to notice a special meeting?
6           MR. WATSON: Objection to form.
7     A. That's a big assumption. No. He was asking
8 about the bylaws regarding calling the meeting, and then
9 he wasn't aware that -- he thought I had already had the
10 deposition, and I explained to him what happened at the
11 previous setting and that we were going to go shortly
12 and I had to let him go because I had to come meet you
13 all.
14     Q. (BY MR. CICILIANO) So you had previously
15 spoken with Mr. Knox about your deposition. Is that
16 correct?
17     A. I think --
18          MR. WATSON: Objection to form. It
19 mischaracterizes his testimony. I think --
20     A. I think --
21          MR. WATSON: Hold on, Judge. Hold on
22 before you say anything else.
23     That mischaracterizes his testimony. That's
24 not what he said.
25     Q. (BY MR. CICILIANO) Have you previously spoken

Page 120

1     Q. And what did you speak with Mr. Knox about?
2     A. How he got the bylaws wrong, saying that it
3 was a 30-day window to call an emergency board meeting
4 when the bylaws had been changed and it was only seven.
5     Q. So you were consulting with Mr. Knox regarding
6 the nature -- when you say "the bylaws," the NRA's
7 bylaws?
8     A. I think it was the other way around. I think
9 he was asking me.
10    Q. About the NRA's bylaws?
11    A. Yes.
12    Q. Did you talk about anything else with him at
13 that time?
14          MR. WATSON: Objection to the form,
15 speculation.
16    A. Just how much fun I was going to have this
17 afternoon.
18    Q. (BY MR. CICILIANO) And what precipitated the
19 conversation?
20    A. He called me.
21          MR. WATSON: Objection to form.
22    A. Yeah, he called me.
23    Q. (BY MR. CICILIANO) And do you know why he
24 called you?
25          MR. WATSON: Objection to form,

Page 119

1 with Mr. Knox about your deposition?
2     A. I believe we did communicate, and I told him
3 that it was set and I was curious on your
4 interrogatories how you want me to tell you about my
5 talking to reporters. I mean, I can talk about The New
6 York Times, The Wall Street Journal or others that I've
7 been in conversations with, too.
8     Q. So when was the first --
9     A. And I know with Knox it's kind of personal
10 with everybody back in Fairfax.
11    Q. So when was the first time you talked with
12 Mr. Knox about your deposition?
13    A. I don't know.
14    Q. Shortly -- how many times have you talked with
15 Mr. Knox about your deposition?
16          MR. WATSON: Objection, asked and
17 answered.
18    A. I don't know. I've been talking to a lot of
19 people. You know, it's hell when you're popular.
20    Q. (BY MR. CICILIANO) It's hell when you're
21 what?
22    A. It's hell when you're popular.
23    Q. When did you speak to The New York Times?
24    A. They're waiting on a call.
25    Q. So have you spoken to them yet?

Page 121

31 (Pages 118 - 121)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1 A. Yes. We've been in communication.
2 Q. Have you provided them any documents?
3 A. No. I haven't provided anybody documents.
4 Q. What did you tell The New York Times?
5 A. Actually, they were asking me questions. A
6 lot of them I won't answer. But essentially along the
7 same lines you all have been talking about, and I told
8 them I would prefer to wait until after this. So, you
9 know -- because I knew what was going to happen with the
10 Free Beacon's interview.
11 Q. And when you say there was a lot of questions
12 you wouldn't answer from The New York Times, what were
13 those questions?
14 A. Very similar to the ones I wouldn't answer for
15 you all.
16 Q. Regarding what occurred during the special --
17 A. Yeah, they want to know what happened in the
18 executive session.
19 Q. And when was the last time you spoke with The
20 Wall Street Journal?
21 A. 48 hours ago.
22 Q. And what did you tell them?
23 A. That I wanted to wait until after this.
24 Q. "This" being the deposition?
25 A. Yes.

Page 122

1 Q. Okay. After this deposition, you intend to
2 speak to both The New York Times and The Wall Street
3 Journal?
4 A. Among others.
5 Q. What are the others?
6 A. I've got to look at my phone. Let's see. Oh,
7 ABC, somebody in Europe. I don't know who that is. And
8 another guy in Australia, a friend of mine.
9 Q. And the intent there is to give an interview
10 to all those news outlets. Is that correct?
11 A. We'll see. I may. I may not.
12 MR. WATSON: Objection. That's
13 speculation.
14 A. That is, yeah.
15 Q. (BY MR. CICILIANO) And what's your motivation
16 for talking to The New York Times?
17 MR. WATSON: Objection, speculation,
18 because it assumes facts not in evidence.
19 A. I would think that it would be obvious that
20 there would be a number of tasks that could be
21 accomplished. One, it would be to help with the
22 fundraising to keep this issue in front of the public's
23 eye so that members know that there's somebody out there
24 that's trying to represent them and so that members know
25 that there's somebody out there trying to get to the

Page 123

1 bottom of the controversies that have swirled around NRA
2 for years. You know, I can't go to a gun club meeting.
3 I can't go to a gun show. I can't go to our Kroger
4 store and not have somebody ask me about this, because
5 they all know that in Kansas I'm the guy. You know, I'm
6 the guy that wrote "Right to Carry." I'm the guy that
7 wrote "Preemption." I'm the guy that wrote,
8 "Legalization of Title II," "Firearms and Devices." In
9 Kansas there's only one person that's been at the
10 forefront of this since the 1980s, and that's me. So
11 everybody knows me. Everybody asks.
12 Q. (BY MR. CICILIANO) And you're willing to tell
13 anyone who asks. Right?
14 A. What?
15 Q. And you are willing to tell anyone that asks.
16 Isn't that right?
17 MR. WATSON: Objection, calls for
18 speculation.
19 MR. MASON: Misstates his testimony.
20 MR. WATSON: It misstates facts in
21 evidence.
22 THE WITNESS: Yeah, I don't like that
23 question. That's not true, and I don't like the
24 supposition that comes with it.
25 MR. WATSON: And you don't have to answer

Page 124

1 it, Judge.
2 THE WITNESS: Thank you.
3 MR. CICILIANO: So you're directing him
4 not to answer?
5 MR. WATSON: Well, is there a question or
6 is it you testifying?
7 MR. CICILIANO: Yeah, it's an absolute
8 question.
9 MR. WATSON: Okay. Would you restate it?
10 MR. CICILIANO: You'll talk to anyone
11 Q. (BY MR. CICILIANO) You'll talk to anyone
12 about the NRA that asks. Isn't that right?
13 A. No, that's not.
14 MR. WATSON: Okay. There you go. You
15 got your answer.
16 Q. (BY MR. CICILIANO) So who have you refused to
17 talk to?
18 MR. WATSON: Objection, speculation.
19 A. The ones I believe that would not be able to
20 add to the conversation or would use information to the
21 detriment of the association.
22 Q. (BY MR. CICILIANO) And I believe in your
23 article -- or I believe in your article that you posted
24 when you were running for the board, you had commented
25 that The New York Times -- certainly you question the

Page 125

32 (Pages 122 - 125)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1 veracity of what The New York Times publishes. Isn't
2 that true?
3 A. Yes.
4 Q. But yet you would speak to them even though
5 they may not have the best interest of the NRA at heart.
6 Right?
7 MR. WATSON: Objection, calls for legal
8 conclusion, calls for speculation, and also assumes
9 facts not in evidence.
10 You can answer the question, Judge, but --
11 A. I may not -- I may not believe The New York
12 Times, but I don't mind using them.
13 Q. (BY MR. CICILIANO) And that's using them
14 truly to get the message out that the NRA has a good
15 purpose at its core. Isn't that right?
16 A. I think my message is quite clear, because
17 you've read the article that I wrote on ammo. So, you
18 know, outside of that, I'm sure you've read the other
19 articles I've written, too, about political action and
20 how to keep the election cycle from melting down as it
21 did.
22 Q. And so what -- I mean, just succinctly, what
23 is your message?
24 A. My message is that I want to restore trust
25 between the leadership and the membership of NRA.
Page 126

1 Q. And that only occurs through the continued
2 existence of the NRA. Isn't that correct?
3 A. I certainly want the NRA to continue to exist,
4 yes.
5 Q. Now I believe in -- you don't -- or pardon me.
6 You spoke at length, I believe, with my
7 colleagues on the other side about whether or not there
8 was authority to file the bankruptcy. Do you recall
9 that?
10 A. Yes.
11 Q. And despite your position that you think that
12 there may not have been authority, you don't oppose the
13 bankruptcy. Correct?
14 A. I don't know about that. You know, I don't
15 oppose the move to Texas, is what we said in the
16 petition. I don't know that the bankruptcy was
17 necessary to accomplish that. And I think the
18 motivation, as I see it for the bankruptcy, told me a
19 lot about the quality of the lawsuit in New York.
20 Q. And in fact, your pleadings, though, do say
21 these bankruptcy cases may represent the only path
22 forward to preserve the NRA for the benefit of its
23 creditors, members and other interested parties. Isn't
24 that right?
25 A. I think that's a recognition of the legal
Page 127

1 reality that could occur, yes.
2 Q. And likewise, you said dismissing these
3 bankruptcies could very likely result in the termination
4 of the NRA as a going concern. Isn't that right?
5 MR. WATSON: Objection, calls for legal
6 conclusion.
7 A. What paragraph?
8 Q. (BY MR. CICILIANO) I was -- it was in your
9 opposition to the New York Attorney General's dismissal
10 of the -- or request to dismiss the bankruptcy?
11 MR. WATSON: I believe that if we're
12 going to talk about documents that you're reading from,
13 I think they should be put into evidence so he can know
14 what you're referencing.
15 MR. CICILIANO: Sure, that would be fine.
16 THE WITNESS: That would be really
17 helpful, because I mean, you know, I've read hundreds of
18 documents, you know. Think about what I do every day.
19 MR. CICILIANO: I appreciate that. And
20 Counsel, I am trying not to string this along so we
21 can -- so I will ask one more question, and I don't need
22 to put the document up.
23 Q. (BY MR. CICILIANO) But do you believe
24 dismissing these bankruptcy cases could likely --
25 MR. WATSON: Okay. Before you go
Page 128

1 further, then I would object and I would say that the
2 pleadings speak for themselves, but go ahead.
3 MR. CICILIANO: Okay.
4 Q. (BY MR. CICILIANO) Do you believe, Judge,
5 that dismissing these bankruptcy cases could very likely
6 result in the termination of the NRA as a going concern?
7 MR. WATSON: Objection, calls for legal
8 conclusion.
9 But to the extent you're not making a legal
10 judgment, Judge, you can answer based on your
11 understanding.
12 A. Yeah, I don't know what the judge in the
13 bankruptcy case is going to do, you know. I mean, this
14 thing could go so many different ways. And I know that
15 the way I would like to see it go would be to restore
16 corporate governance, put the safeguards -- turn the
17 safety switches back on, restore trust and relationship
18 between the leadership and the membership and keep
19 general operations running, because I think everybody
20 else, except for the debtors' counsel and us, want to
21 kill the cow rather than milk it.
22 Q. (BY MR. CICILIANO) You're saying that
23 debtors' counsel wants to kill the cow or --
24 A. No. I'm saying you're the only one with me
25 that doesn't want to kill the cow.
Page 129

33 (Pages 126 - 129)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1 Q. Well, I appreciate you saying that. And I
2 do -- so you do believe that through the bankruptcy it's
3 possible to restore the corporate governance and restore
4 the trust in those other factors you talked about?
5 A. That's -- that's my goal.
6 Q. And is there any reason that you -- well, do
7 you doubt the independence of the unsecured creditors
8 committee?
9 MR. WATSON: Objection. Objection to
10 form, and it calls for speculation and possible motives
11 of a party that's not even present. I think they have
12 representatives, but they're not even active in this
13 deposition.
14 But subject to those objections, Judge, you
15 can give your opinion about what you think -- your
16 feelings on the committee.
17 A. Well, the creditor's committee. Isn't that
18 special? That, you know, we end up with what the New
19 York Attorney General could call a co-conspirator end up
20 running the investigation and act as a trustee on the
21 creditor's committee. I don't know how anybody gets
22 around that concept.
23 Q. (BY MR. CICILIANO) And you're talking about
24 Ackerman McQueen?
25 A. Yes.

Page 130

1 Q. You're aware that the creditor's committee,
2 though, has opposed the request that they seek. Right?
3 A. I thought Ackerman McQueen filed a motion to
4 dismiss the case and appoint a trustee.
5 Q. Yes, but the creditor's committee has opposed
6 that relief. Are you --
7 MR. WATSON: I am going to object to the
8 instruction.
9 A. I don't know about that.
10 MR. WATSON: Well, hold on, Judge.
11 THE WITNESS: Okay.
12 MR. WATSON: To the extent you know
13 something, you can testify to it; and to the extent you
14 don't, you shouldn't. Okay?
15 THE WITNESS: Thank you.
16 MR. WATSON: Do you want to reask your
17 question, Dylan?
18 MR. CICILIANO: Yeah, sure.
19 Q. (BY MR. CICILIANO) Are you aware that the
20 unsecured creditors committee has objected to the relief
21 sought by Ackerman McQueen to dismiss the action and
22 appoint a trustee?
23 A. I have not had an opportunity to review that
24 filing.
25 Q. And honestly, sir, what I am trying to figure

Page 131

1 out here is are you aware that the unsecured creditors
2 committee has the power to investigate claims?
3 A. Yes.
4 Q. Okay. And they have the ability to examine
5 the debtors' pre- and post-petition management?
6 A. Yes.
7 Q. And are you aware that the unsecured creditors
8 committee has the ability to monitor the -- or
9 investigate the management practices being employed by
10 the operation of the NRA?
11 MR. WATSON: Objection. Objection, calls
12 for legal conclusions. The judge is not a bankruptcy
13 lawyer. He's not -- he just said that he hasn't read
14 the most recent filing of the committee, so I don't
15 think it's fair to have him speculate about what the
16 committee's powers are. And he's not aware of it.
17 MR. CICILIANO: I appreciate that. And
18 the learned judge has also testified to what he believes
19 requires corporate authority. So I am just asking
20 whether or not he was aware that the unsecured creditors
21 committee has the ability to investigate the management
22 practices of the NRA.
23 MR. WATSON: But do you know -- to the
24 extent you know that, Judge, you can answer to the
25 extent you know; but if you don't know, then you don't

Page 132

1 know.
2 A. My -- my very limited understanding that I
3 have gained of Chapter 11 law since January 15th tells
4 me that the creditors committee acts kind of like the
5 trustee until a trustee or an examiner is appointed.
6 You know, I could be wrong on that. I probably need to
7 ask Jermaine.
8 Q. (BY MR. CICILIANO) Okay. And I certainly
9 don't want you to ask Jermaine here. I'm just
10 wondering -- I'm just wondering is there a reason why
11 the creditors committee can't do the same things that
12 you're proposing an examiner would do?
13 MR. WATSON: Again, calls for legal
14 conclusion and speculation about things that, you know,
15 he doesn't have knowledge of. He's not an expert in
16 bankruptcy.
17 And again, Judge, to the extent you understand
18 what a committee does and what it can and cannot do, you
19 can answer; but to the extent you don't, I am going to
20 instruct you not to answer.
21 A. I don't know what they're doing. I haven't
22 seen anything that they've done that would be along
23 those lines of an investigation, but, you know, you guys
24 are all inside. I have listened to a couple of 341
25 meetings and I think the hearing on Monday, and that was

Page 133

34 (Pages 130 - 133)

1 about it. I really enjoyed that first motion docket.
2 That was fun to watch. When you had like a hundred
3 lawyers on the screen, that was the craziest thing I've
4 ever seen.
5     Q.  (BY MR. CICILIANO) We may be able to agree to
6 that.
7         What I am trying to get to here is that you
8 filed a motion to appoint an examiner, and I am trying
9 to understand what you think the examiner can do that
10 the unsecured creditors committee won't do.
11         MR. WATSON: I am going to object to that
12 question because I think the pleadings that Judge
13 Journey has authorized, both in our motion and in the
14 response to the other pending motions, speak for
15 themselves and are the best evidence of what he
16 understands an examiner's position to be.
17         But to the extent you know, Judge -- to the
18 extent you can answer his question that you know, you
19 know --
20         THE WITNESS: Yes --
21         MR. WATSON: -- definitively, you can
22 answer.
23     A.  The reason I asked for an examiner was because
24 I felt it was necessary, given the past history, that a
25 neutral and objective investigator and factfinder needed

Page 134

1 to go in because I had essentially staff, counsel or
2 others I believe misrepresent things to me, and so the
3 trust I had evaporated on January 15th.
4     Q.  (BY MR. CICILIANO) I appreciate that. And
5 going back to, I think, what you said earlier, you don't
6 have any reason to doubt or question my firm. Is that
7 right?
8     A.  I don't have any reason to question you, no.
9     Q.  Okay. And you believe that the appointment of
10 a trustee would be overly destructive to the NRA's
11 operations. Is that correct?
12         MR. WATSON: I am going to object to the
13 extent you're reading from pleadings filed in the case
14 because they speak for themselves.
15         And to the extent --
16         MR. CICILIANO: I am reading from my
17 notes.
18         MR. WATSON: Okay. But to the extent you
19 are, those pleadings speak for themselves.
20         But Judge, to the extent you know, you can
21 answer.
22     A.  I thought the examiner path was the best path
23 to take because it was the way to find out whether the
24 accusations that have been surrounding NRA for so long
25 are true or not true. Because, you know, every day --

Page 135

1 every day I end up with he said/she said in family law.
2 And you know, I knew I couldn't do the investigation. I
3 don't have time for it. And once they went into
4 bankruptcy court, I wanted to look at my options and I
5 thought the examiner position was the best to find out
6 what's going on. Now, you know, depending on what the
7 examiner finds, I may change my position.
8     Q.  (BY MR. CICILIANO) But right now you're just
9 trying to get to the bottom of things. That's accurate?
10     A.  That's exactly -- that's a nice way to put it,
11 yeah.
12     Q.  Now I marked some of the same paragraphs that
13 opposing counsel did to ask you about, and I just want
14 to follow up and just confirm.
15         When you would say things, I believe in your
16 pleadings, upon information and belief the NRA violated
17 its fiduciary duties under New York law, that was based
18 on what you read from the AG's complaint. Is that
19 right?
20         MR. WATSON: Objection to form. I think
21 it calls for legal conclusions.
22         But go ahead, Judge.
23         THE WITNESS: Okay. I'm sorry. I'm
24 sorry, Jermaine.
25         MR. WATSON: And -- well, and I have

Page 136

1 another objection, too.
2         To the extent it mischaracterizes his
3 testimony, because I don't believe he testified to that.
4 I believe he said it was his opinion, and he gave the
5 basis for his opinion.
6         But subject to those objections, you can
7 answer, Judge.
8         THE WITNESS: Thank you.
9     A.  The New York Attorney General's petition was
10 not the only source of information, that it includes
11 thousands of articles that have been in magazines or
12 newspapers over the past five to six years that I have
13 compiled as I followed the association.
14     Q.  (BY MR. CICILIANO) And I believe you
15 testified that you think the corporate governance needs
16 to be restored. Is that correct?
17     A.  Yes.
18     Q.  And what's the basis for that belief?
19     A.  The fact that -- there's so many things. It
20 appeared to me in reviewing the articles, my personal
21 observations at functions, such as the NRA board
22 meetings, at the annual meetings, that the review of the
23 newspaper articles, the petitions filed by the New York
24 Attorney General and don't forget the Washington, D.C.
25 one, too, all gave me great concern regarding the

Page 137

35 (Pages 134 - 137)

1 corporate governance and essentially the safety switches
2 all being bypassed, whether it's the audit committee or
3 other subentities inside the NRA.
4 Q. I believe you testified to the effect that you
5 don't know how Wayne LaPierre can get out of this. Is
6 that right?
7 MR. WATSON: Objection.
8 A. I don't --
9 MR. WATSON: Objection. Objection. Hold
10 on. That mischaracterizes his testimony.
11 THE WITNESS: Yeah.
12 MR. WATSON: That wasn't the complete
13 nature of his testimony.
14 But you can answer. You can answer, Judge.
15 A. I --
16 Q. (BY MR. CICILIANO) You don't see how he gets
17 out, is that what you said? Sorry.
18 MR. WATSON: Same objection.
19 Go ahead, Judge.
20 A. You know, I've got to tell you that when I was
21 at the January board meeting, when I saw Wayne, I had
22 great concern for him and his health. It was apparent
23 to me that he is subject to a significant amount of
24 stress because of all of these things going around.
25 And, you know, I want to say that I empathized with him,

Page 138

1 and I can't imagine what he's going through right now.
2 You know, you have to understand that I've
3 known all these people for decades. You know, it's not
4 like I walk in off the street and meet a stranger. You
5 know, I knew Wayne before he was EVP, when he was
6 running in Iowa, and I went and interviewed for a job
7 with him.
8 Q. (BY MR. CICILIANO) So I may have
9 misunderstood you. When you said you don't see how he
10 gets out and then talked about concerns about his health
11 and the like, are you saying you don't know how he could
12 personally weather this or how he could -- how this
13 could resolve with him still being in charge of the NRA?
14 A. All of the above.
15 Q. Okay. And the EVP is appointed. Isn't that
16 right?
17 A. No, the EVP is elected by the board.
18 Q. Okay. And how often is he elected?
19 A. Annually.
20 Q. And the members elect -- the members elect
21 one-third of the directors every three years. Is that
22 right?
23 A. Essentially, yes, but there are fluctuations
24 because there have been so many resignations from the
25 board.

Page 139

1 Q. And so every three years, you have a new
2 batch of directors. Is that right? Well, sorry, not a
3 new batch. Let me take a step back.
4 At least every three years, each director is
5 then up for reelection again. Is that right?
6 MR. WATSON: Objection. Objection, it
7 calls for speculation.
8 And you can answer to the extent that you
9 know, Judge, but --
10 THE WITNESS: Yeah, thank you.
11 A. Board members are generally elected for a
12 three-year period, but if they're elected to fill an
13 unexpired term of a member that's resigned of the board,
14 then they could be elected. For example, there were --
15 I think in the last election, there were 25 three-year
16 terms, two or three two-year terms, and one or two
17 one-year terms that all were on the same ballot because
18 they were filling the slots for people that had left the
19 board.
20 Q. (BY MR. CICILIANO) Okay. Put another way,
21 though, at least once every three years directors are
22 accountable to the members who can either elect them or
23 not elect them. Correct?
24 A. That's true.
25 Q. And every year the directors are able to elect

Page 140

1 the EVP. Is that correct?
2 A. That's true.
3 Q. And in fact, you yourself approved the
4 contract of Mr. LaPierre. Is that right?
5 A. Yes. He was elected EVP on October 24th.
6 Q. And I believe you said you started reading
7 about the lawsuits with the NRA three years ago. Right?
8 A. Yes.
9 Q. And you were certainly aware of the New York
10 Attorney General's allegations well before January.
11 Correct?
12 A. Yes. I read that opinion on the 5th, on
13 August 5th. I actually threw up about 40 pages in.
14 MR. CICILIANO: And counsel, if I could
15 have probably five minutes just to confer with my
16 colleagues, I may be done.
17 MR. WATSON: Sure. How much more time do
18 you anticipate?
19 MR. CICILIANO: I don't know that I'll
20 need any more time is what I'm saying. I just want to
21 check.
22 MR. WATSON: Okay. Sure. We can go off
23 the record.
24 THE VIDEOGRAPHER: The time is 7:16. We
25 are off the record.

Page 141

36 (Pages 138 - 141)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1 (Break from 7:16 p.m. to 7:23 p.m.)
2 THE VIDEOGRAPHER: The time is 7:23.
3 We're back on the record.
4 Q. (BY MR. CICILIANO) Judge Journey, previously
5 we testified -- or we talked about some of the
6 allegations in the New York AG's complaint. You're
7 familiar with the allegations they make. Is that
8 correct?
9 A. Yes.
10 Q. Do you have personal percipient knowledge of
11 the allegations in the complaint?
12 A. No.
13 Q. You're familiar with the allegations that the
14 Washington, D.C. Attorney General has made. Is that
15 correct?
16 A. Yes.
17 Q. Do you have personal percipient knowledge of
18 those allegations?
19 A. No.
20 Q. You talked about governance failures at the
21 NRA. Do you have personal knowledge of governance
22 failures.
23 A. Only what I saw.
24 Q. Okay. And aside from what may have occurred
25 in special sessions or otherwise in the presence of

Page 142

1 Q. You said perhaps in some instances. Do you
2 have evidence that they were inaccurate?
3 A. I have evidence that they're sure as hell hard
4 to read, that they don't impart a reasonable view or
5 description of the financial status. Often they're
6 brought out of context and without the juxtaposition
7 next to previous years for comparison purposes. I
8 certainly would like to have a more easily
9 understandable picture presented to the board and to me
10 about the financial circumstances surrounding any period
11 of time that they oversee the NRA's operations.
12 Q. So it would be fair to say you're looking for
13 robust accounting?
14 MR. WATSON: Objection, mischaracterizes
15 testimony.
16 A. Well, among other things.
17 Q. (BY MR. CICILIANO) And other things,
18 comparisons to previous years. That's one of them?
19 A. Well, if one is going to determine where
20 you're at, you need to know where you've been. It's
21 like following a roadmap. If you see trends occurring
22 over a five-year period, it may give you an indication
23 that something needs to happen or something needs to be
24 corrected. But when you're looking at a financial
25 statement for the last quarter without the context, it's

Page 144

1 counsel providing advice, what did you see as far as
2 governance failures?
3 A. Well, I explained earlier how shocked I was at
4 the way the board operated at the October 24th board
5 meeting following the annual meeting in Tucson, that it
6 ran like a consent agenda. I know what that is. I know
7 what its purpose is under Robert's Rules of Order, and
8 it quite clearly was abused at that place and time.
9 Q. So aside from that instance at that meeting in
10 October, have you seen any other -- or do you have
11 personal knowledge of any other governance failures?
12 A. I think it was apparent at the January 7th
13 meeting that the governance failure was at the hand that
14 is at the heart of my motion.
15 Q. All right. So aside from what's in your
16 motion, was there anything else?
17 A. Not that comes to mind at this moment.
18 Q. You mentioned, I believe, accounting failures.
19 Are you -- do you have any personal knowledge of
20 accounting failures occurring at the NRA?
21 A. I don't know if I would call it accounting
22 failure or not, but I have to say that the financial
23 statements that I've had the opportunity to review are
24 less than informative and perhaps in some instances have
25 been far less than accurate.

Page 143

1 much more difficult to come to any reasonable conclusion
2 other than what they tell you.
3 Q. As a member of the board, have you looked at
4 the bylaws to see what you could propose to make those
5 changes?
6 MR. WATSON: Objection to form,
7 speculation -- speculative.
8 A. I don't know that the bylaws would provide the
9 answer to the question that needs to be corrected. It's
10 not the bylaws themselves. It's the application of
11 those bylaws by staff and officers that has come up
12 short. I don't know that the bylaws aren't fine. It's
13 just they don't seem to follow them until they need to.
14 Q. (BY MR. CICILIANO) And as a board member,
15 what have you done to promote management and staff
16 following the bylaws?
17 A. I have expressed concerns over a much longer
18 period of time than my short service in this term on the
19 board. I mean, you know, of the last, what, since
20 October 24th, what, I've been in a room with the other
21 board members for about four and a half hours. You
22 know, what can you get done then? I haven't had
23 committee meetings. We would have a social function.
24 And you know, there are certain things that you can
25 bring up there, but you certainly don't want to jump on

Page 145

37 (Pages 142 - 145)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1 a soapbox in that context.
2 Q. Certainly, sir, you've had a number of
3 communications, I think you talked about, with your
4 board members. Since the filing of the bankruptcy, have
5 you brought up any of these issues to them and come up
6 with a way to fine tune the organization?
7       MR. WATSON: Objection, speculation.
8 A. It's not unusual to try to address that topic
9 in that way, but I came to the conclusion on January
10 15th that it had gone much farther than it -- than it
11 can be pulled back and corrected.
12 Q. (BY MR. CICILIANO) But you believe that the
13 bankruptcy process could help it be pulled back and
14 corrected. Is that right?
15 A. Yes, and --
16       MR. WATSON: Objection. I mean, he's
17 answered that question.
18       THE WITNESS: Yeah.
19 Q. (BY MR. CICILIANO) That answer was a yes?
20 A. So the bankruptcy filing is --
21       MR. WATSON: Same objection.
22 A. The bankruptcy filing is actually the symptom
23 of a disease.
24 Q. (BY MR. CICILIANO) Now do you have any
25 personal knowledge of any failures of the current audit

Page 146

1 committee?
2 A. Not personal knowledge, other than what I've
3 read in the minutes and in the petitions.
4 Q. When you say the petitions, the petitions of
5 the movants here in this case for trustee and a
6 dismissal?
7 A. No, the petition -- that's not a petition;
8 that's a motion. No, the petitions filed by the New
9 York Attorney General in that New York case and the
10 petition filed by the Washington, D.C. Attorney General
11 in that case against The NRA Foundation.
12 Q. You made me laugh when you schooled me on the
13 difference between a petition and a motion. I
14 appreciate that.
15 A. I thought you saw that humor there, too.
16 Q. I did.
17       You mentioned that you have TV tomorrow. Are
18 you going on TV to talk about this case?
19 A. No. I told them I can't talk about this case
20 on TV. But, no, we're going to talk about my friend,
21 who is senate majority leader, got a DUI. And we had a
22 new trial ordered in a rape. My two friends are running
23 for governor against each other, Governor Colyer and the
24 Attorney General. And then -- oh, they passed a bill on
25 transgender women playing in female sports in high

Page 147

1 school. And then -- oh. Oh. We're going to have the
2 Eddie Eagle program statewide. That's a good one. And
3 then -- you know, actually in -- what was it, '92, '93
4 I got Eddie Eagle adopted by the largest school district
5 ever, you know.
6 Q. There you go. Well, to the extent my name
7 comes up, speak good words of me. And I appreciate you
8 being here.
9       MR. CICILIANO: I don't have any further
10 questions.
11       MR. WATSON: Anyone else?
12       MR. PRONSKE: I have got a few more.
13       THE WITNESS: Oh, I knew someone would
14 have redirect. Okay.
15       MR. HENDRIX: Real quick, before you go,
16 Gerrit, this is Nick Hendrix for the Committee. And I
17 think we'll go ahead and just reserve any questions we
18 have for the hearing.
19       MR. PRONSKE: Okay.
20       MR. WATSON: Well, how much time is left,
21 Julie?
22       THE REPORTER: Let's see. Now we're at
23 2:49. 2:49.
24       MR. WATSON: Okay.
25       FURTHER EXAMINATION

Page 148

1 BY MR. PRONSKE:
2 Q. Judge, you testified that your trust in the
3 NRA evaporated on January 15th. Can you tell the Court
4 what happened on January 15th and the reason that your
5 trust evaporated?
6 A. You know that answer. Come on. You know,
7 okay, so, yeah, that's when I found out about the
8 bankruptcy.
9 Q. Okay. And what is it about finding out about
10 the bankruptcy that evaporated your trust?
11       MR. CICILIANO: And I would just object
12 and warn the witness not to reveal anything that
13 occurred during the executive sessions of the board
14 meeting that could be privileged.
15       MR. WATSON: He's answered this question,
16 Gerrit. I mean, he's answered your question, so I am
17 going to object, asked and answered.
18       MR. PRONSKE: In the time it took to make
19 those objections, I think he could have answered two or
20 three times.
21 Q. (BY MR. PRONSKE) Go ahead and answer, Judge.
22 A. What was it again? You guys talk -- I listen
23 to you guys talk so much, I forget --
24 Q. What was it about finding out about the
25 bankruptcy on January 15th that evaporated your trust?

Page 149

38 (Pages 146 - 149)

1 A. I think you pointed that out when we talked
2 about the Free Beacon article, that I came to the
3 conclusion that I had not been dealt with in good faith
4 or in a forthright manner that I expect of counsel or
5 officers who I am supposed to oversee.
6 Q. Okay. And you also testified in questioning
7 from Mr. Ciciliano that when he asked you what the
8 governance failures were, you said there was the
9 governance failure on January 15th, which he didn't
10 follow up on, but I am going to and ask you, what is it
11 that -- and understanding that January 15th is the day
12 of bankruptcy. How is that a governance failure?
13 A. Well, I think the governance failure, I became
14 aware of it on January 15th, but it obviously occurred
15 during the board meeting on January 7th.
16 Q. Okay. And what is that governance failure?
17 A. The governance failure is essentially what I
18 said in the Free Beacon article, that I felt that I had
19 been misled by the omission of the bankruptcy filing
20 because it's obvious that somebody had been working on
21 that for months.
22 Q. And when you say someone had been working on
23 that for months, is the corollary to that and it had not
24 been discussed with the board?
25 A. I --

Page 150

1 MR. CICILIANO: Hold on. Hold on. I
2 would object to the attorney/client privilege and direct
3 you not to answer what was discussed or not discussed at
4 the board meeting.
5 MR. WATSON: I am going to object to the
6 form and also on the basis of asked and answered.
7 Would you mind rephrasing your question,
8 Gerrit?
9 MR. PRONSKE: Yeah.
10 Q. (BY MR. PRONSKE) Well, I am basically
11 following up on a question that Mr. Ciciliano asked,
12 which is what were the governance failures, and which
13 obviously opens the door to the answer which was that
14 there was a governance failure on January 15th. And I
15 am trying to understand -- understanding that that
16 January 15th is the day of bankruptcy, what about that
17 bankruptcy filing constituted a governance failure?
18 MR. CICILIANO: And I will object
19 pursuant to the attorney/client privilege. It certainly
20 did not open the door or waive the attorney/client
21 privilege.
22 I would direct you not to respond to the
23 extent it would require you to waive or to disclose what
24 was discussed between attorneys at that executive
25 session.

Page 151

1 MR. WATSON: And it's asked and answered.
2 And, you know, I want you to get your questions in,
3 everyone, but we only agreed to two hours, irregardless
4 of what you guys agreed to. You've had your pass,
5 Gerrit. We let Brian get in, which is fine. And Dylan
6 got his questions in. So I'm okay with some limited
7 follow-up, Gerrit, but my client has been on the bench
8 all day.
9 MR. PRONSKE: I am below my time. And,
10 quite frankly, both of you, the objections you're making
11 are lasting way longer than legitimate answers to
12 legitimate questions.
13 Q. (BY MR. PRONSKE) I would like to know what
14 was the governance failure part of this filing of
15 bankruptcy that you have a problem with. And I would
16 like to get an answer rather than a bunch of objections
17 that are taking time. You can go ahead and answer.
18 MR. CICILIANO: And I would once again --
19 MR. WATSON: If you -- you know, I'll
20 shut it down. I mean, I've given you -- I've given you
21 time to get your pass. And if that's -- if you want to
22 take it up with Judge Hale, we can do that, but we're
23 not going to sit here and have you ask the same
24 questions over and over again.
25 MR. PRONSKE: The deposition was noticed

Page 152

1 for four hours, and it's been significantly less than
2 four hours. If you want to shut --
3 MR. WATSON: That's fine, but I agreed to
4 two, and we've gone over two.
5 MR. PRONSKE: Jermaine, I promise you,
6 this is probably over in about ten minutes.
7 MR. WATSON: All right. But I agreed to
8 two, so let's be clear.
9 MR. PRONSKE: I understand.
10 MR. WATSON: I've got the emails, Gerrit.
11 I don't want to go there. I don't want to fight with
12 you, but I will.
13 MR. ACOSTA: Please let him ask his
14 questions.
15 MR. PRONSKE: We'll talk to the judge
16 about it tomorrow morning. I am completely fine with
17 that.
18 MR. WATSON: Me too. I have no problem
19 with that.
20 MR. ACOSTA: Let's just ask -- can you
21 just give us like 15 more minutes, please?
22 MR. PRONSKE: I set the deposition for
23 four hours. I told the judge --
24 MR. WATSON: That's fine. That's fine.
25 You also told the judge I didn't agree to it. So --

Page 153

39 (Pages 150 - 153)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1    MR. PRONSKE: Can I finish, please? I
2 told the judge yesterday I was going to go for four
3 hours and that you hadn't filed an objection, and so
4 here we are. And if you would like to shut it down
5 based on those facts, I'm fine going in front of the
6 judge tomorrow morning. What do you want to do?
7    MR. WATSON: Well, what I want to do is
8 let you get your opportunity to ask all the questions
9 you want, but I don't want you to go and reask the same
10 stuff he's already answered.
11    MR. PRONSKE: I am going to ask the
12 question again, and I would like the record to be clear.
13    Q. (BY MR. PRONSKE) For the very first time,
14 Judge Journey, you said that the filing of the
15 bankruptcy on January 15th was a governance failure. I
16 would like to ask you and get an answer because that
17 question has not been answered. What is it about the
18 January 15th bankruptcy filing that was a governance
19 failure?
20    A. Let me be clear. The January 15th filing was
21 not the governance failure. It was an indication of it,
22 that the governance failure I believe occurred happened
23 at the January 7th board meeting. And the fact that the
24 board was not informed --
25    MR. CICILIANO: And I am going to stop

Page 154

1 you there, Judge, and caution you not to get into the
2 attorney/client privilege, not to discuss what happened
3 in the executive session.
4    MR. WATSON: Well, Judge, you can testify
5 as to what your understanding was without disclosing
6 privilege. You can answer Mr. Pronske's question, to
7 the extent you understood -- what your understanding
8 was --
9    THE WITNESS: Thank you.
10    MR. WATSON: -- so we can get past this.
11    THE WITNESS: Thank you.
12    A. That the governance failure that occurred --
13    MR. CICILIANO: It comes to privilege,
14 though. If his understanding is informed by counsel, I
15 don't think he can.
16    MR. WATSON: But he's not saying that it
17 did.
18    MR. ACOSTA: And Dylan, you can't hide
19 the fact of what he voted on.
20    MR. WATSON: Right. And he has -- he can
21 form his own opinion, Dylan, and it doesn't have to come
22 from counsel.
23    MR. CICILIANO: Right. And so long as
24 it's not formed from counsel or wasn't something counsel
25 told him or what he claims counsel didn't tell him --

Page 155

1    MR. WATSON: Right, and that's what I
2 instructed my client to say.
3    MR. CICILIANO: I understand.
4    MR. WATSON: You can answer Gerrit's
5 question. But let's move along, guys. It's late.
6    A. Oh, you're waiting on me?
7    Q. (BY MR. PRONSKE) Yes.
8    A. I thought you guys weren't done yet. Okay.
9    MR. WATSON: No. No, we're done. We're
10 trying to finish up.
11    THE WITNESS: Okay.
12    A. So look at the Free Beacon article. The
13 governance failure was the failure of officers or
14 counsel or those the board is dependent on from
15 revealing the material fact the bankruptcy was in
16 process of being filed at that board meeting.
17    MR. CICILIANO: And again, I will move to
18 strike based on attorney/client privilege. But go
19 ahead.
20    Q. (BY MR. PRONSKE) Judge Journey, were there
21 any presentations given at the January 7th executive
22 session by nonlawyers?
23    A. No. I believe Mr. Cotton was the one
24 addressing the board regarding those topics.
25    Q. Was anyone addressing those topics -- and when

Page 156

1 you say "those topics," what exactly are you --
2    A. The topics of the executive sessions.
3 Mr. Cotton was chairing the meeting.
4    Q. Was there anybody giving a presentation at
5 that executive session other than Mr. Cotton?
6    MR. CICILIANO: Objection to form.
7    A. I'm not certain. I am not certain on that.
8    Q. (BY MR. PRONSKE) And was Mr. Cotton -- I
9 understand Mr. Cotton is an attorney, but was he in his
10 capacity as attorney in that meeting? And if so, who
11 was he representing?
12    A. No, he was not acting as counsel. He was
13 acting as first vice president and chairing the meeting
14 because the president wasn't there, as I explained
15 before.
16    Q. Okay. And what did he say during that
17 presentation?
18    A. That is what happened in executive session
19 and --
20    MR. CICILIANO: Yeah, I would object
21 pursuant to attorney/client privilege and instruct you
22 not to answer.
23    MR. WATSON: Okay. Yeah, I am going to
24 instruct you not to answer.
25    MR. PRONSKE: It's not a conversation

Page 157

40 (Pages 154 - 157)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1 between an attorney who is acting in the capacity as an
2 attorney and clients. Are you saying it's just because
3 of the presence of attorneys in that room?
4         MR. CICILIANO: No, Gerrit. I'm saying
5 because we have a declaration, as you well know, board
6 counsel who actually explains that they were all
7 discussing attorney/client privilege. So you may want
8 to beat around it and try to snip out portions. It's
9 not going to happen. I am directing him not to answer,
10 as is his counsel.
11        MR. PRONSKE: Who is the attorney that
12 you say was involved in that attorney/client discussion,
13 Mr. Ciciliano?
14        MR. CICILIANO: I believe the declaration
15 says William Davis, as well as counsel from Brewer.
16        MR. PRONSKE: And so just because an
17 attorney was present in the room, all discussions in
18 that executive session were privileged?
19        MR. CICILIANO: No. But if you actually
20 look at the declaration, what they say is that every
21 discussion they had in there was regarding legal advice.
22 So in that instance, yes.
23        MR. PRONSKE: So you're saying that
24 everything that happened in the executive session
25 regarding Wayne LaPierre's employment contract on

Page 158

1 January 7th was privileged. Is that right?
2         MR. CICILIANO: For this one, for what
3 I'm seeing, absolutely.
4         MR. PRONSKE: Okay.
5         Q. (BY MR. PRONSKE) And Judge Journey, are you
6 refusing to answer the question based on Mr. Ciciliano's
7 advice?
8         MR. WATSON: Well, it's my advice. I am
9 instructing him not to answer.
10        Q. (BY MR. PRONSKE) Okay. Are you refusing to
11 answer the question based on advice of counsel?
12        A. I am going to defer to counsel, yes.
13        Q. When you said -- when you testified that
14 bankruptcy is not the disease but it's a symptom of the
15 disease, what is the disease?
16        A. I think the disease and its symptoms are
17 described in great detail in the New York Attorney
18 General and the Washington, D.C. Attorney General's
19 petitions. There are other things that I've read in
20 other cases that gave me pause also and concern.
21        Q. When you testified that there have been,
22 quote, so many resignations from the board, why do you
23 believe there have been so many resignations from the
24 board?
25        A. Well, it's part of the process to make the

Page 159

1 board supine, that --
2         Q. And by supine, you mean subservient?
3         A. I mean supine. It's a little more than that
4 single synonym.
5         Over the years, I have watched the NRA and its
6 operations with the board of directors and officers, and
7 I mean, you know, I know many of them. There's been a
8 pattern that I believe is easily established, where if a
9 board member questions a position, they lose their
10 committee assignments and then they're effectively
11 ostracized, and they basically say, well, I'm not
12 getting paid for this and leave. And so I think we will
13 have several soon. We'll see. Anyway, I expect we're
14 going to have resignations, from what I'm hearing, on
15 the 28th. So we'll see.
16        Q. And will those resignations be, at least to
17 some degree, because the board was not told about the
18 bankruptcy?
19        A. You know, you're going to have ask --
20        MR. CICILIANO: I am going to object.
21 Calls for speculation. Also is a direct attempt to
22 invade the attorney/client privilege.
23        MR. WATSON: And it's been asked and
24 answered, but go ahead.
25        A. You're going to have to ask them. We'll see

Page 160

1 who resigns and who stays and who wants to stay and fix
2 it.
3         Q. (BY MR. PRONSKE) Have any of the board
4 members that are resigning, have you spoken with any of
5 them and have they told you why they're resigning?
6         A. Several.
7         Q. And what is the reason that you're being given
8 by those persons for resigning?
9         MR. CICILIANO: And I would just object
10 to the extent that the reasons they're giving you are
11 attorney/client privileged.
12        A. You want to know the real reason? Because
13 they don't know how to count noses.
14        Q. (BY MR. PRONSKE) What does that mean?
15        A. That means they don't win. That means they
16 get on their little donkeys and tilted the windmill and
17 lose and then they leave.
18        Q. Have any of those persons told you that the
19 reason that they are resigning is because of the failure
20 to inform the board members of the bankruptcy?
21        MR. CICILIANO: I am going to object --
22        MR. WATSON: Same objection.
23        MR. CICILIANO: -- to attorney/client
24 privilege and direct you not to answer.
25        MR. PRONSKE: That's not privileged.

Page 161

41 (Pages 158 - 161)

1 That's a --
2 Q. (BY MR. PRONSKE) Let me ask you this, Judge
3 Journey.
4 A. I think if you talk to Mr. -- what's his name,
5 the one that resigned after the meeting?
6 Q. Relating to the question I just asked you,
7 Judge Journey, were any of those conversations with
8 those board members as to their resignations, were any
9 of those conversations with lawyers present?
10 A. No.
11 Q. Okay. So did any of these persons tell you
12 they're resigning because of the failure of the NRA to
13 tell its board that it was going to file bankruptcy?
14 MR. CICILIANO: Objection. I am going to
15 object and instruct you not to answer on the basis of
16 attorney/client privilege.
17 MR. PRONSKE: That's not privileged.
18 MR. WATSON: I think he can answer that
19 one, Dylan.
20 MR. CICILIANO: Here is the problem with
21 the privilege. You're presupposing a conversation that
22 happened during the executive session. You're saying
23 this is the conversation that happened and, therefore --
24 MR. WATSON: I think he can answer it,
25 Dylan, because I don't think Gerrit's question is
Page 162

1 limited to that. He's talking about conversations that
2 may have been had outside of that.
3 MR. PRONSKE: Your objections are really
4 problematic, Dylan, and they're going to get in front of
5 the judge. And you -- you making an objection to a
6 privilege based on a conversation between two people
7 with a lawyer not present as to the reason that a board
8 member is leaving is not privileged and you know it.
9 And just because there was some seed of
10 privilege that you can go to many days or weeks before
11 that conversation doesn't mean that when one person
12 tells another person without a lawyer present why he's
13 quitting is somehow privileged. That's just ridiculous.
14 MR. WATSON: Judge, you can answer the
15 question to the extent that you know.
16 A. One board member has resigned since January
17 15th.
18 Q. (BY MR. PRONSKE) And who is that?
19 A. Duane Sutnik (sic).
20 Q. And did he --
21 A. He runs -- what is it? He's CEO of Magpul.
22 Q. And did you speak with Mr. Sutnik (sic) after
23 his resignation?
24 A. I spoke with him for a brief period one time.
25 Q. And did he tell you why he resigned?
Page 163

1 A. He said because his lawyers told him to get
2 out and because of the bankruptcy. I think that was
3 the -- I would characterize his perception that was the
4 last straw.
5 Q. So when you say because of the bankruptcy, are
6 you talking about because the NRA filed bankruptcy or
7 because of how they filed bankruptcy without informing
8 the board, as you've stated in the article?
9 MR. CICILIANO: Gerrit --
10 MR. WATSON: Objection. That's a
11 compound question. Could you break that down, Gerrit?
12 THE WITNESS: Yeah, he's wanting me to
13 speculate, and I would suggest you guys take Duane's
14 deposition and ask him why he quit.
15 Q. (BY MR. PRONSKE) I am not asking you to --
16 A. You know, I had like two minutes on the phone
17 with him.
18 Q. And I am not asking --
19 A. And he didn't want to help me, so that's when
20 I stopped talking to him.
21 Q. Okay. Judge Journey, listen to me for a
22 minute. Okay?
23 A. I'm trying.
24 Q. I am not asking you to speculate. I'm asking
25 you did you tell you -- which would not be speculation.
Page 164

1 Did he tell you why he was resigning?
2 A. I think the last -- the straw that broke the
3 camel's back was filing the bankruptcy without informing
4 the board. Does that answer your question?
5 Q. It does. Thank you.
6 MR. CICILIANO: And Gerrit, let's be real
7 clear about something. If two individuals who are on
8 the board are discussing attorney/client privileged
9 communications, that still falls within the privilege.
10 Whether or not you want to believe it or not, that is
11 clearly within the privilege.
12 MR. PRONSKE: I'll pass the witness.
13 MR. WATSON: Anybody else got any
14 questions?
15 MR. MASON: I have just got a few
16 follow-ups. Real quickly, I promise.
17 MR. WATSON: Okay. Go ahead, Brian.
18 THE WITNESS: My wife is going to want to
19 hear that. Yeah. She's hungry.
20 MR. WATSON: Yeah.
21 FURTHER EXAMINATION
22 BY MR. MASON:
23 Q. Judge Journey, with respect to Mr. Cotton's
24 presentation, was it a PowerPoint presentation that he
25 did?
Page 165

42 (Pages 162 - 165)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1   A.  Who?
2   Q.  I believe you mentioned --
3   A.  Oh, Mr. Cotton.  No, there was no PowerPoint
4  in either board meeting.
5   Q.  Okay.  There was some conversation earlier
6  about the -- that the creditors committee and members of
7  the creditors committee.  Do you know how members of the
8  creditors committee are selected in a Chapter 11
9  bankruptcy?
10   A.  Correct me if I'm wrong, but the trustee does
11  that.
12   Q.  Okay.  And is that your understanding of what
13  happened in this particular case?
14   A.  I did watch the motion where somebody else
15  wanted on the creditors committee, yes.
16   Q.  And I guess just to be --
17   A.  That would be about all I know.
18   Q.  And I guess just to be clear when you say "the
19  trustee," are you referring to the US Trustee?
20   A.  Yes.
21   Q.  Can you describe Mr. LaPierre's -- let me ask
22  it this way.
23      Is Mr. LaPierre, does he have a close
24  relationship with a lot of members of the board?
25      MR. WATSON:  Calls for speculation.

Page 166

1  always --
2      MR. WATSON:  Well, hold on, Judge.  Hold
3  on, Judge.  I don't want you to speculate on what you
4  may remember and what you may not remember.
5      THE WITNESS:  Yeah, I would hate to get
6  it wrong, because I'm sure she would point that out to
7  me, too.
8      MR. MASON:  I think that's all I've got.
9  Thank you, Judge.
10      THE WITNESS:  Thank you.
11      MS. EISENBERG:  Mr. Watson --
12      MR. WATSON:  Yeah.
13      MS. EISENBERG:  -- your client referred
14  to a Mr. Sutnik.  I suspect he may have misspoken
15  inadvertently.  There is an individual by the name of
16  the Duane Liptak.  Would you like to ask your client if
17  that's the last name he intended to use?
18      THE WITNESS:  She is absolutely right.
19  Yes.  Thank you.
20      MR. WATSON:  And could you state your
21  name for the record, Counsel?
22      THE WITNESS:  It was only one time, you
23  know.
24      MR. CICILIANO:  That's Svetlana.  She's
25  already made an appearance.

Page 168

1  Yeah, I object to that.
2   A.  Yeah, I don't know.  I don't know.  I have no
3  idea.  You know, I'm sure there's a handful, I'm
4  guessing, but I can't even tell you who they are.
5   Q.  (BY MR. MASON)  Have you spoken with Marion
6  Hammer since January 15th?
7   A.  No, but she emailed me a wonderful thing.
8   Q.  And was it just you and her on that particular
9  email?
10   A.  I didn't respond.
11   Q.  What did Ms. Hammer tell you in that email?
12   A.  I'd have to like search my Google.  Oh, my
13  God, that's so far ago.  Basically that she knew I
14  shouldn't have got on the board, and she was right all
15  along.
16   Q.  I'm sorry.  Can you say that one more time?
17   A.  That I should not have been elected to the
18  board, and she was right all along.
19   Q.  Anything else that she said in that email?  Do
20  you have it in front of you?  Do you have access to it
21  on your computer right there?
22      MR. WATSON:  I will object to that.  I am
23  going to object to that.  It's not in evidence, Brian.
24  And he's testified from his memory what was said, so --
25   A.  Something about -- something about how I

Page 167

1      MR. WATSON:  Okay.  But -- yeah, yeah.
2  But she's talking.  She didn't identify herself, Dylan.
3      MR. CICILIANO:  No, I appreciate that it.
4      MR. WATSON:  Yeah.
5      MS. EISENBERG:  It's nice to meet you.
6  I'm Svetlana Eisenberg.  We are Proposed Special
7  Counsel for Debtors.
8      MR. WATSON:  Oh, I understand.  I just
9  wanted to, you know, make sure that on the written
10  record that your question --
11      MS. EISENBERG:  I appreciate it.
12      MR. WATSON:  Yeah.
13      MS. EISENBERG:  Thank you.
14      MR. WATSON:  Did he give you the answer
15  you were seeking?
16      MS. EISENBERG:  Yes, I believe --
17      THE WITNESS:  She gave me the answer.
18      MS. EISENBERG:  -- the Judge confirmed,
19  yeah.
20      MR. WATSON:  Okay.  Great.
21      Do you guys have any questions, Gerrit?  I
22  want everyone to be happy.
23      THE WITNESS:  Yeah.
24      MR. WATSON:  I don't want to cut you off.
25      THE WITNESS:  Yeah.

Page 169

43 (Pages 166 - 169)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1    MR. PRONSKE:  I will be happy to press
2  "leave" here.
3        MR. WATSON:  I know, but it's my job to
4  rough you up a little bit, Gerrit.
5        But seriously, do you have any more questions,
6  Gerrit?
7        MR. PRONSKE:  Thank you.
8        MR. WATSON:  You do or you don't?
9        MR. PRONSKE:  I do not.  Thank you.
10        MR. WATSON:  Okay.  Okay.  Great.
11  Anybody else?  You Dylan?
12        MR. CICILIANO:  No.
13        MR. WATSON:  Okay.  Can we go off the
14  record then, Julie?
15        THE VIDEOGRAPHER:  This is Zack, the
16  videographer.  We have taken all transcript and video
17  orders off the record.  The time is 7:57.  We are off
18  the record.
19        (Proceedings ended at 7:57 p.m.)
20
21
22
23
24
25
                                              Page 170

1        I, PHILLIP JOURNEY, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5        _____
6              PHILLIP JOURNEY
7
8  THE STATE OF _____)
9  COUNTY OF _____)
10        Before me, _____, on
11  this day personally appeared PHILLIP JOURNEY, known to
12  me (or proved to me under oath or through
13  _____) (description of identity
14  card or other document) to be the person whose name is
15  subscribed to the foregoing instrument and acknowledged
16  to me that they executed the same for the purposes and
17  consideration therein expressed.
18        Given under my hand and seal of office this
19  _____ day of _____, _____.
20
21
22        _____
23        NOTARY PUBLIC IN AND FOR
24        THE STATE OF _____
25
                                              Page 172

1        CHANGES AND SIGNATURE
2  WITNESS NAME:  PHILLIP JOURNEY
3  DATE OF DEPOSITION:  MARCH 18, 2021
4  PAGE  LINE    CHANGE      REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____
                                              Page 171

1  STATE OF TEXAS  )
2  COUNTY OF DALLAS )
3        I, Julie C. Brandt, Certified Shorthand
4  Reporter in and for the State of Texas, certify that the
5  foregoing deposition of HONORABLE PHILLIP JOURNEY was
6  reported stenographically by me remotely via Zoom, said
7  witness having been placed under oath by me, and the
8  deposition is a true record of the testimony given by
9  the witness;
10        That the amount of time used by attorneys at
11  the deposition is as follows:
12        Mr. Pronske     - 1 hour, 49 minutes
13        Mr. Ciciliano   - 59 minutes
14        Mr. Mason       - 23 minutes
15        I further certify that I am neither counsel
16  for, nor related to any party in the cause and am not
17  financially interested in its outcome.
18        In witness whereof, I have subscribed my name
19  this 19th day of March, 2021.
20
21        _Julie C. Brandt_
           Julie C. Brandt, CSR, RMR, CRR
22        TX CSR No. 4018, Exp. 10/31/21
23        Veritext Legal Solutions
           Firm Registration No. 571
24        300 Throckmorton Street, Suite 1600
           Fort Worth, Texas 76102
25        817-336-3042
                                              Page 173

                                    44 (Pages 170 - 173)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

```
 1  jermaine.watson@bondsellis.com
 2              March 19, 2021
 3  RE: In Re: National Rifle Association Of America And Sea Girt
 4  DEPOSITION OF: Honorable Phillip Journey (# 4504406)
 5      The above-referenced witness transcript is
 6  available for read and sign.
 7      Within the applicable timeframe, the witness
 8  should read the testimony to verify its accuracy. If
 9  there are any changes, the witness should note those
10  on the attached Errata Sheet.
11      The witness should sign and notarize the
12  attached Errata pages and return to Veritext at
13  errata-tx@veritext.com.
14      According to applicable rules or agreements, if
15  the witness fails to do so within the time allotted,
16  a certified copy of the transcript may be used as if
17  signed.
18          Yours,
19          Veritext Legal Solutions
20
21
22
23
24
25
                                            Page 174
```

45 (Page 174)

# EXHIBIT E

SUBSCRIBE TO OUR MORNING BEACON NEWSLETTER

STORE

---

GUNS

## NRA Board to Hold Emergency Hearing Amid Bankruptcy Turmoil

Board member says lawyers mislead the board, LaPierre mislead the court



Getty Images

Stephen Gutowski - MARCH 9, 2021 5:00 AM

The National Rifle Association will hold a special meeting on the group's bankruptcy in Dallas on Sunday amid private grumblings from board members who claim the group's lawyers intentionally left them in the dark, according to a notice obtained by the *Washington Free Beacon*.

NRA leaders will brief the board about its bankruptcy strategy, which was sold to board members as a way to avoid dissolution at the hands of the New York attorney general, according to an official notice sent to board members on March 2. NRA president Carolyn Meadows sent the short-notice invitation to the group's 76 board members, as she and the nation's top gun-rights group attempt to present a unified front to a federal bankruptcy court.

"The sole purpose of the meeting is to provide a briefing to the Board regarding the NRA's reorganization plan and the legal matters overseen by the Special Litigation Committee, and to take any necessary action directly related to those matters," the letter said.

The meeting comes after board member Phillip Journey accused NRA lawyers of misleading the board about the creation of the Special Litigation Committee and the bankruptcy in a court filing. Journey, a Kansas family court judge, told the *Free Beacon* the board was not made aware of the bankruptcy plan when it voted to

AMc DEPOSITION
EXHIBIT
128

3/13/202... NRA Board to Hold Emergency Hearing Amid Bankruptcy Turmoil - Washington Free Beacon

empower the committee in a Jan. 7, 2021 meeting. He said he found out about it when his daughter texted him a news story.

"You could have seen the top of my car blow off with my head," Journey said. "Because I knew what that meant. It meant that those three lawyers committed a lie of omission of material facts to the board of directors.... Nobody said bankruptcy."

William A. Brewer III, counsel to the NRA, said Journey is mistaken.

"Judge Journey purportedly supports the mission of the NRA and claims not to oppose the Association seeking to reincorporate in Texas," he said in a statement. "Unfortunately, he seems to mistakenly believe the NRA reorganization plan did not follow board and internal protocol. This plan was undertaken in full compliance with NRA policy. The plan has been widely endorsed by NRA board members, NRA members, elected officials, and other key stakeholders."

Journey said he had voted to support the committee, but had no idea the group's leadership and legal advisers had planned to go into bankruptcy. He disputed NRA filings that claimed board members were properly informed. Those filings were signed by embattled executive vice president Wayne LaPierre, who was not present at the meeting when the committee was discussed, according to Journey. The Kansas jurist believes the law has been violated and he has a duty to report it to the court.

"It certainly was a fraud perpetrated on the court," Journey said. "I told them all when I got on the board, 'Look, I'm a judge. I'm a mandatory reporter. Whatever we do, we got to be on the up and up.'"

Journey was named to the board for the second time in 2020. He said he only wants what is best for the NRA membership, but added those goals can only be realized if board members are properly informed of the organization's dealings. He has also asked the bankruptcy court to appoint an independent examiner to go through the group's finances.

"Once they did that in the January 7 board meeting, everything else is pretty much set in stone. You know, I mean, my decisions are made for me," Journey said. "It kills me. It really does. I'm losing friends I've had for decades because I've got to do the right thing. I never wanted anything like this to happen."

The board meeting will be held at the Omni Dallas Hotel on March 14 beginning at 10 a.m.

---

## Related Articles



**Democrats' Gun Bill Would Force AG's Office To Team Up With Gun-Control Ally**



**EXHIBIT F**

**Page 1**

AMc DEPOSITION
EXHIBIT
131

----------------------------------

TRANSCRIPTION OF AUDIO FILE

341 MEETINGS OF CREDITORS (CONTINUED)

SEA GIRT, LLC

BANKRUPTCY CASE NO. 21-30080

AND

NATIONAL RIFLE ASSOCIATION OF AMERICA

BANKRUPTCY CASE NO. 21-30085

MARCH 12, 2021

----------------------------------

**Page 2**

1 THE U.S. TRUSTEE: Welcome, everyone. This
2 is the second continuation of the Sea Girt and NRA
3 Bankruptcy Case 341 Meeting, Case Nos. 21-30085 and
4 21-30080, though, I have reversed those numbers. This
5 is the continued opportunity for Creditors and their
6 representatives to ask questions about why the
7 bankruptcy had to be filed. There will be members of
8 the press on the phone, but the parties entitled to ask
9 questions are those who are Creditors or other parties
10 and interests, as defined under the Bankruptcy Code.
11 If you have a question at the end or during
12 the course of the 341 Meeting, please identify yourself
13 and state your -- state how you are involved in the
14 bankruptcy case as a Creditor. The witnesses have been
15 previously sworn. The witnesses that are here today are
16 Mr. Frazer, Mr. David Warren, and Sonya Rowling. If you
17 could each state your name and your role with the Debtor
18 for the record, so that the court reporter recognizes
19 your voice when the 341 is transcribed.
20 MR. FRAZER: Yeah. Good afternoon, this is
21 John Frazer. I'm the Secretary and General Counsel of
22 the National Rifle Association, and I appreciate
23 everyone's accommodation of my travel schedule today.
24 Thank you.
25 MS. ROWLING: My name is Sonya Rowling. I

**Page 3**

1 am the Acting Chief Financial Officer of the National
2 Rifle Association.
3 MR. WARREN: This is David Warren. I am
4 the Chief Financial Officer of For-Profit Entities for
5 the National Rifle Association.
6 THE U.S. TRUSTEE: I would remind you all
7 that you have been previously sworn and you remain sworn
8 for purposes of the Creditors' Meeting. In addition, I
9 would remind you that we have a deal that the testimony
10 of one is the testimony of all, unless you clarify or
11 modify the statement of another person and -- and -- and
12 note that it needs to be corrected or changed. Do we
13 have a deal on that? Everyone say "yes" (phonetic).
14 MR. FRAZER: Yes.
15 THE U.S. TRUSTEE: All right.
16 MS. ROWLING: Yes.
17 THE U.S. TRUSTEE: I understand -- one more
18 "yes" I'm missing.
19 MR. WARREN: Yes.
20 THE U.S. TRUSTEE: Are there any changes to
21 the Schedules or Statements of Financial Affairs that
22 need to be noted for the record at this time?
23 MR. BUNCHER: This is Doug; not to my
24 knowledge.
25 THE U.S. TRUSTEE: Are there any

**Page 4**

1 clarifications or corrections of prior testimony that
2 need to be made at this time?
3 MR. BUNCHER: I'll let the witnesses speak
4 to that, but I'm not aware of any.
5 MR. FRAZER: Not to my knowledge. This is
6 John.
7 MS. ROWLING: Not to my knowledge.
8 THE U.S. TRUSTEE: Okay. So my name is
9 Lisa Lambert. I'm an Assistant U.S. Trustee with the
10 U.S. Trustee's Office. I previously explained my role
11 in the role of the 341 Meeting. I have a few follow-up
12 questions. I'm going to ask my questions of Mr. Frazer
13 first and then open up the floor to additional questions
14 to him, and I'm going to reserve the rest of my
15 questions for Mr. Warren and Ms. Rowling.
16 So, Mr. Frazer, my question for you is: In
17 connection with this force -- Special Board Meeting,
18 will -- will you agree to provide the minutes and
19 resolutions from the Special Board Meeting to the Office
20 of the United States Trustee?
21 MR. FRAZER: Yes.
22 THE U.S. TRUSTEE: I pass the witness.
23 MR. KATHMAN: This is Jason Kathman. I'm
24 an attorney with the Law Firm of Spencer Fane, LLP. We
25 represent the New York Attorney General and the State of

Page 5

1  New York in this matter.  Good afternoon.
2        MR. FRAZER:  Good afternoon.
3        MR. KATHMAN:  Mr. Frazer, I believe you
4  announced that you are the General Counsel of the
5  Debtor -- the National Rifle Association -- is that
6  correct?
7        MR. FRAZER:  That's correct.
8        MR. KATHMAN:  And you have been the General
9  Counsel since approximately 2015; is that correct?
10       MR. FRAZER:  Since 2015, yes.
11       MR. KATHMAN:  Okay.  When was the first
12  time that you saw a draft of the Wayne LaPierre
13  employment agreement that was approved at the
14  January 7th, 2021 board meeting?
15       MR. FRAZER:  I -- I saw it after it was
16  executed.
17       MR. KATHMAN:  So as the General Counsel of
18  the National Rifle Association, you did not review or
19  see a copy of Wayne LaPierre's employment agreement
20  until after it was executed and approved at the
21  January 7th board meeting; is that correct?
22       MR. FRAZER:  Yes.
23       MR. KATHMAN:  And, Mr. Frazer, you -- you
24  were not at the meeting -- or not in the meeting of the
25  Officers' Compensation Committee on January 6th, 2021,

Page 6

1  when that contract or those provisions were discussed;
2  is that correct?
3        MR. FRAZER:  No, I was not present.
4        MR. KATHMAN:  Now, it's my understanding
5  that the Officers' Compensation Committee -- which
6  I'll -- I'll refer to the OCC -- as "OCC."  It's my
7  understanding that the OCC usually meets and discusses
8  Mr. LaPierre's compensation in the fall; is that
9  correct?
10       MR. FRAZER:  Yes.
11       MR. KATHMAN:  Okay.  Did the Officers'
12  Compensation Committee meet in the fall to discuss
13  Mr. LaPierre's compensation?
14       MR. FRAZER:  Yes.  The comp -- the -- the
15  Committee met in the fall to discuss comp -- to discuss
16  compensation.  The -- the contract was an additional
17  item of business that was -- you know, that was,
18  obviously, addressed at the January meeting.
19       MR. KATHMAN:  Do you know whether this
20  employment agreement was discussed at the fall Officers'
21  Compensation Committee?
22       MR. FRAZER:  I wasn't present at that
23  meeting -- I -- so I do not know.
24       MR. KATHMAN:  Has the Board in the past
25  ever included -- approved an employment agreement with

Page 7

1  Mr. LaPierre?
2        MR. FRAZER:  The Board as a whole, not to
3  my knowledge.
4        MR. KATHMAN:  At the time that the LaPierre
5  employment agreement was approved -- that is at the
6  January 7th board meeting -- isn't it correct that it
7  did not include a choice-of-law provision?
8        MR. FRAZER:  Well, it was approved so --
9  that if -- if you look at the resolution that came out
10  of that meeting, it was approved with the -- with the
11  proviso that a choice-of-law clause be added before
12  execution.
13       MR. KATHMAN:  So my que -- so that,
14  necessarily, implies that that was approved -- subject
15  to the inclusion of a choice-of-law provision, that
16  implies that the choice-of-law provision was not in the
17  contract when it was approved, correct?
18       MR. FRAZER:  That's correct.
19       MR. KATHMAN:  Okay.  And, ultimately, there
20  was a Texas choice-of-law provision that was included
21  into that agreement, correct?
22       MR. FRAZER:  Yes.
23       MR. KATHMAN:  Okay.  Mr. Frazer, as the
24  General Counsel for the National Rifle Association, can
25  you tell me of any other contracts the National Rifle

Page 8

1  Association has that has a Texas choice-of-law
2  provision?
3        MR. FRAZER:  There are others.  I couldn't
4  give you an exhaustive list without -- you know, without
5  looking at every contract we have.  You know, choice of
6  law is something that's routinely negotiated between
7  parties.
8        MR. KATHMAN:  Can you tell me of another
9  employment contract that the National Rifle Association
10  has that has a choice-of-law provision?
11       MR. FRAZER:  I don't have all of them in
12  front of me, but I -- they normally do have some kind of
13  choice-of-law provision.
14       MR. KATHMAN:  Right.  But my specific
15  question was:  Can you tell me of an employment
16  agreement that has a Texas choice-of-law provision?
17       MR. FRAZER:  Not to my knowledge.
18       MR. KATHMAN:  Okay.  Mr. Frazer, do you
19  recall -- at the January 7th, 2021 board meeting, do you
20  recall the Board going into an Executive Session?
21       MR. FRAZER:  Twice.  Yes, it -- we -- yeah,
22  we went into Executive Session twice.
23       MR. KATHMAN:  You anticipated my next
24  question, which was going to be:  How many times?  And
25  can we -- and I want to focus on the first time that it

Page 9

1 went into Executive Session. Can you tell me what the
2 reason for going into Executive Session was the first
3 time?
4         MR. FRAZER: The reason for going into
5 Executive Session was to have a -- you know, so -- so
6 all matters involving officer compensation are normally
7 conducted in Executive Session to facilitate a thorough
8 and -- and candid discussion and, also, to allow the
9 Board to -- to receive legal advice.
10         MR. KATHMAN: Okay. So my question,
11 though -- and -- and -- and I appreciate that
12 explanation. My question was: What was the reason that
13 the Board went into Executive Session the first time?
14         MR. FRAZER: I think it was for the reasons
15 that I just stated.
16         MR. KATHMAN: To discuss -- was it to
17 discuss the Officers' Compensation Committee report?
18         MR. FRAZER: Well, yes --
19         MR. KATHMAN: Okay.
20         MR. FRAZER: -- the first Executive
21 Session --
22         MR. KATHMAN: And --
23         MR. FRAZER: -- was on the Officers'
24 Compensation Committee report.
25         MR. KATHMAN: Thank you. And I'm just

Page 10

1 focusing on the first Executive Session right now. Was
2 Mr. LaPierre's employment agreement discussed during
3 that Executive Session?
4         MR. FRAZER: Yes.
5         MR. KATHMAN: Were there lawyers present
6 during that Executive Session?
7         MR. FRAZER: Yes.
8         MR. KATHMAN: Okay. Can you tell me who --
9 which lawyers -- or who were the lawyers that were
10 present during that Executive Session?
11         MR. FRAZER: I was present, Board Counsel,
12 Mr. Davis, was present and I think Ms. Rogers from the
13 Brewer Firm was present. I don't think Bill Brewer was
14 there yet, but I could be mistaken on -- on -- on the
15 latter two.
16         MR. KATHMAN: Is there a reason why
17 Ms. Rogers is not listed as an attendant at the
18 January 7th board meeting?
19         MR. FRAZER: The attendance roster in
20 the -- in the board minutes -- you know, we give a
21 detailed roster for the Board, Executive Counsel and
22 Officers, and -- and we do note, traditionally, that
23 Board Counsel was present. We do not normally list
24 the -- the names -- and we, actually, really, never list
25 the names of all of the other -- other staff consultants

Page 11

1 and guests who may be there.
2         MR. KATHMAN: Fair enough. You -- I think
3 you mentioned yourself, Mr. Davis was Counsel to the
4 Board, and then you mentioned Ms. Rogers. Who did
5 Ms. Rogers represent?
6         MR. FRAZER: Ms. Rogers is Counsel for the
7 NRA.
8         MR. KATHMAN: For the company, correct?
9         MR. FRAZER: Right.
10         MR. KATHMAN: Did any of the lawyers speak
11 during the Executive Session? And I'm not asking you
12 what their -- the content of their conversation or what
13 they said, just the mere question of: Did any lawyers
14 speak during that Executive Session?
15         MR. FRAZER: Yes.
16         MR. KATHMAN: Okay. Thank you. And now I
17 want to focus on the second Executive Session. What was
18 the reasoning why the Board went into Executive Session
19 the second time?
20         MR. FRAZER: The Board went into sec --
21 into Executive Session the second time to consider a
22 resolution that had been proposed regarding the -- the
23 formalization of the delegation of authority to the
24 Special Litigation Committee.
25         MR. KATHMAN: Okay. Were there lawyers

Page 12

1 present during this Executive Session?
2         MR. FRAZER: Yes.
3         MR. KATHMAN: Okay. Who were the lawyers
4 that were present during this Executive Session?
5         MR. FRAZER: Excuse me. Well, I -- I was
6 not. I left -- I left at the beginning of the Executive
7 Session. Mr. Davis was present, Ms. Rogers was present,
8 and I believe Mr. Brewer was in attendance at that
9 point.
10         MR. KATHMAN: Do you know what -- well, do
11 you know -- well, same question. In that Executive
12 Session, did Mr. -- who did Mr. Brewer represent?
13         MR. FRAZER: Mr. Brewer is Counsel for --
14 for the Association.
15         MR. KATHMAN: For the company, correct?
16         MR. FRAZER: Yes.
17         MR. KATHMAN: Okay. And do you know
18 whether lawyers spoke during this second Executive
19 see -- Session?
20         MR. FRAZER: I -- I -- I do know that at
21 least Ms. Rogers spoke.
22         MR. KATHMAN: Okay. Thank you. Were the
23 words "bankruptcy" or "Chapter 11" ever said during any
24 part of the January 7th board meeting, including in the
25 Executive Session?

Page 13

1     MR. BUNCHER: All right. Objection, calls
2 for attorney-client communication. Instruct the
3 witnesses not to re -- to respond. The question --
4     THE U.S. TRUSTEE: (Inaudible) --
5     MR. BUNCHER: -- necessarily -- the -- the
6 question necessarily would lead to disclosure of
7 privileged communications.
8     MR. KATHMAN: Okay. And, Mr. Buncher, just
9 to clarify the record, are you instructing the witnesses
10 not to answer?
11     MR. BUNCHER: I just did. Yes.
12     MR. KATHMAN: All right. And are the
13 witnesses taking the attorney's advice and not answering
14 the question?
15     MR. FRAZER: I am.
16     MR. KATHMAN: All right. Mr. Frazer --
17     THE U.S. TRUSTEE: Wait. Let's go back --
18     MR. KATHMAN: -- you're not going to
19 take (phonetic) --
20     THE U.S. TRUSTEE: Let's -- let's go back.
21 Can we reach an agreement that this can be discussed to
22 the extent it was in the general board meeting and not
23 in the Executive Session?
24     MR. BUNCHER: Well --
25     MR. KATHMAN: Yeah. My question was,

Page 14

1 actually, more specific. It just said, Were the words
2 "bankruptcy" or "Chapter 11" ever said during the
3 January 7th board meeting, including the Executive
4 Session. So I can break that up, if you would like,
5 Lisa.
6     THE U.S. TRUSTEE: Yes --
7     MR. BUNCHER: I think --
8     THE U.S. TRUSTEE: -- I think you should.
9     MR. BUNCHER: I think you are going to
10 get -- need to get more specific so that it's clear on
11 the record.
12     MR. KATHMAN: Okay. I -- I'll -- I'll --
13 I'll ask more specific.
14     Were the words "bankruptcy" or "Chapter 11"
15 ever said during the January 7 -- during the January 7th
16 board meeting outside of the Executive Session?
17     MR. BUNCHER: Okay. Object to the
18 question, to the extent answering it would reveal
19 communications by counsel or with counsel.
20     But if there -- if you can answer the
21 question as to whether any discussion of those topics
22 occurred, other than with counsel at the meeting, you
23 can answer that part of the question.
24     MR. FRAZER: Well, counsel -- well, several
25 counsel were present throughout the meeting. But I

Page 15

1 think I can say that I don't re -- and -- and -- and,
2 you know, I haven't gone back and looked for this in the
3 transcripts, but I -- I do not recall those words being
4 used in any of the -- in any of the open sessions of the
5 meetings.
6     MR. KATHMAN: And, Mr. Frazer, I want to
7 ask you about that. You said "transcripts." Are there
8 actual transcripts of the meeting that occurred?
9     MR. FRAZER: For the open sessions, yes.
10     MR. KATHMAN: Okay. I'd request a copy
11 of those transcripts. I suspect there may be a few
12 other people that may want those. Now, let me ask a
13 second question: Were the words "bankruptcy" or
14 "Chapter 11" -- were the words "bankruptcy" or
15 "Chapter 11" ever said during -- in the Executive
16 Session of the January 7th board meeting?
17     MR. BUNCHER: All right. And -- and I'm
18 going to object that that, necessarily, calls for
19 disclosure of attorney-client communications. Because,
20 as you have already established on the record, Counsel
21 for the Board and the company was in both Executive
22 Sessions, at which resolutions regarding Mr. LaPierre's
23 employment contract and the authority of the SLC were
24 discussed.
25     So, Mr. Frazer, I instruct you not to

Page 16

1 answer the question if it would reveal attorney-client
2 communication.
3     MR. KATHMAN: And, Mr. Frazer, are you
4 taking your attorney's -- or the -- the company's
5 attorney's advice not to answer the question?
6     MR. FRAZER: Well, let me ask you, can you
7 restate the question?
8     MR. KATHMAN: Sure. The question is: Were
9 the words "bankruptcy" or "Chapter 11" ever said during
10 any part -- or during any Executive Session of the
11 January 7th board meeting?
12     MR. BUNCHER: And the same objection and
13 instruction, Mr. Frazer.
14     MR. FRAZER: So the -- so your -- since
15 we're not in the same room, your -- your instruction
16 is -- is -- is -- can you -- can you repeat it? I'm
17 sorry, Doug -- I'm sorry, Mr. Buncher.
18     MR. BUNCHER: To the extent an answer
19 to that question would reveal the substance of
20 attorney-client communications occurring during the
21 Executive Sessions, I would instruct you not to answer.
22     MR. FRAZER: Okay. To -- to my
23 recollection, I -- I did not hear those phrases during
24 the Executive Session that I atte -- that I -- for which
25 I was present.

Page 17

1    MR. KATHMAN: Mr. Warren, were you present
2 at the January 7th board meeting?
3    THE U.S. TRUSTEE: Can we reserve questions
4 for Mr. Warren since we have --
5    MR. KATHMAN: Oh, okay.
6    THE U.S. TRUSTEE: -- somebody that --
7    MR. KATHMAN: Yeah, that's -- that's --
8    THE U.S. TRUSTEE: -- (inaudible) --
9    MR. KATHMAN: That's -- that's very fair.
10 Thank you, Lisa. That -- I -- I -- I appreciate that.
11 I will pass the witness.
12    THE U.S. TRUSTEE: Okay. Mr. Acosta, on
13 behalf of the Ackerman Firm?
14    MR. ACOSTA: Hello, Mr. Warren,
15 Ms. Rowlings (sic), and Mr. Warren -- Mr. Frazer, as
16 well.
17    First thing, can -- we also get the --
18 the Trustee's request for board minutes of the
19 January 7th meeting, and Mr. Kathman, for the New York
20 AG's request for the transcript of the January 7th
21 meeting; if that's okay?
22    MR. BUNCHER: I'm sorry?
23    MR. ACOSTA: Hearing no response, I -- I --
24 I think that means a consent, so --
25    MR. BUNCHER: What? I'm sorry, I -- this

Page 18

1 is Mr. Buncher. What are you asking?
2    MR. ACOSTA: We're asking for the same --
3    THE U.S. TRUSTEE: He asked if he could
4 have --
5    MR. ACOSTA: -- requests for -- I -- I
6 asked if I can have the same documents that were
7 requested by the U.S. Trustee and the New York AG at --
8 at this meeting.
9    MR. BUNCHER: And you are?
10    MR. ACOSTA: I'm Joseph Acosta for Ackerman
11 McQueen.
12    MR. BUNCHER: Yes, I -- yes, I mean,
13 I've -- I think I've supplied everybody on the last call
14 with all the documents.
15    MR. ACOSTA: Okay. Yeah, and I appreciate
16 that, Mr. Buncher. I just wanted to clarify.
17    Following up on Mr. Kathman's questions,
18 my -- my -- my question is a little more specific. Did
19 the full Board vote for a bankruptcy or a Chapter 11 at
20 the January 7th meeting?
21    MR. FRAZER: Well, I think you have the
22 minutes, which reflect that the Board voted -- voted to
23 approve Wayne LaPierre's employment contract, which
24 includes the provision regarding reorganization. And
25 the Board, also, approved the resolution regarding the

Page 19

1 Special Litigation Committee.
2    MR. ACOSTA: But there was no line item
3 that said "bankruptcy" or "Chapter 11"?
4    MR. FRAZER: Those -- we -- well, those
5 words aren't used any during those resolutions
6 (phonetic).
7    MR. ACOSTA: Okay. And is there a
8 resolution by the Special Litigation Committee that
9 approved Chapter 11 bankruptcy, specifically, or --
10 yeah, specifically?
11    MR. BUNCHER: Are you talking about
12 resolutions other than the ones attached to the
13 bankruptcy petitions? Because those are signed by
14 LaPierre and the SLC.
15    MR. ACOSTA: Well, I'm not sure when those
16 were issued, but I'm talking about resolutions at the
17 January 7th board meeting.
18    MR. BUNCHER: Resolutions on that date?
19    MR. ACOSTA: Yes, specifically authorizing
20 Chapter 11 or bankruptcy.
21    MR. BUNCHER: Well, objection to the extent
22 the question implies that -- that the resolutions
23 attached to the petition are not resolutions stemming
24 from the January 7th board meeting.
25    But subject to that, go ahead and answer,

Page 20

1 Mr. Frazer.
2    MR. FRAZER: If I'm -- I -- I -- and --
3 and -- and I apologize, Mr. Acosta, if I've lost the
4 thread here. But the -- the -- I'm sorry, can you
5 restate the question, just so I don't lose the thread?
6    MR. ACOSTA: My question is: After the
7 January 7th board meeting, was there a specific
8 resolution passed by the Special Litigation Committee,
9 in Executive Session, authorizing a Chapter 11
10 bankruptcy or any bankruptcy?
11    MR. BUNCHER: Object to the form of the
12 question to the extent it implies that the resolutions
13 attached to the petitions are not resolutions stemming
14 from the January 7th board meeting.
15    Subject to that, Mr. Frazer, answer the
16 question.
17    MR. FRAZER: The -- the resolutions that
18 I'm aware of are the ones attached to the petition.
19    MR. ACOSTA: Okay. Fair enough.
20 Mr. Frazer, were you aware of the Chapter 11 filing --
21 that the Chapter 11 filing was authorized on
22 January 7th -- as of January 7th?
23    MR. FRAZER: As of January 7th, I was not
24 aware that a -- that a chapter -- that a -- that a
25 decision had been made on this.

Page 21

1      MR. ACOSTA: Okay. Great. Let's switch
2 gears a little bit. Do you know that in -- in the
3 Statement of Financial Affairs it -- it requires the --
4 maybe this is a question for Mr. Warren. Well, did --
5      THE U.S. TRUSTEE: Yeah. I've said no
6 questions --
7      MR. ACOSTA: -- you assist Mr. Warren --
8 did you assist Mr. Warren in preparing the Statement of
9 Financial Affairs, Mr. Frazer?
10      MR. FRAZER: Yes.
11      MR. ACOSTA: And, specifically, did you
12 assist Mr. Warren in preparing the list of lawsuits that
13 the NRA is involved in?
14      MR. FRAZER: Yes.
15      MR. ACOSTA: And -- and -- and, you know, I
16 could be wrong on this, but I -- I am now seeing about
17 12 lawsuits that we have on our Schedule and, I -- I
18 guess, I kind of wanted to ask you about those
19 (phonetic). There are two lawsuits against Ackerman
20 McQueen that aren't listed in the Statement of Financial
21 Affairs, Question No. 7.
22      MR. FRAZER: Can you bear with me --
23      MR. ACOSTA: Do you know whether or not
24 the --
25      MR. FRAZER: -- a moment? I -- I -- I'm

Page 22

1 sorry, Mr. Acosta, but can you bear with me a moment
2 while I -- while I pull up -- pull up the -- the
3 Statement?
4      THE U.S. TRUSTEE: Okay. So we are
5 looking -- for the record, we are looking at the Amended
6 Statement of Financial Affairs, which is Docket No. 288?
7      MR. FRAZER: Yes. That's what I have
8 and -- and it -- it would save time if -- if you would
9 direct me to a page number, perhaps.
10      MR. ACOSTA: I believe it's in the
11 Schedules attached to Question No. 7.
12      THE U.S. TRUSTEE: Can you refer to the ECF
13 page up at the top on the right-hand corner? It should
14 be something of 55 for the documents filed on March 4th,
15 2021.
16      MR. ACOSTA: Sure.
17      MR. BUNCHER: I'm sorry. Are you referring
18 to the list of causes of action from the Schedule A or
19 are you talking about lawsuits from the Statement of
20 Financial Affairs?
21      MR. ACOSTA: Lawsuits from the Statement of
22 Financial Affairs, and it appears at Docket No. 288,
23 Page No. 45.
24      MR. FRAZER: Okay. Thank you very much
25 for --

Page 23

1      MR. ACOSTA: Sure.
2      MR. FRAZER: -- helping me -- helping me
3 find that. Okay. I'm -- I am there.
4      MR. ACOSTA: Okay. So there are two
5 Virginia suits against Ackerman McQueen that aren't
6 listed. Is there a reason why they're not listed?
7      MR. FRAZER: You know, I'm not sure I can
8 point to a reason, except that may -- you know, to
9 the -- that we may have been think -- thinking of active
10 lawsuits, and the Virginia lawsuits were all stayed,
11 pending the -- the resolution of the Texas case.
12      MR. ACOSTA: Okay. And there are two
13 lawsuits against Lockton. Is there a reason why those
14 aren't -- pending in the Eastern District of Virginia,
15 is there a reason why those aren't listed?
16      MR. FRAZER: Well, those have been settled.
17 Those were settled two years ago.
18      MR. ACOSTA: Okay. There's a lawsuit
19 against the Central District of California. Is -- is --
20 has that one been settled already?
21      MR. FRAZER: Can you point me to which
22 specific case -- case you are referring to?
23      MR. ACOSTA: It's -- it was filed in April
24 of 2019 against the cen -- the Central District of
25 California.

Page 24

1      MR. FRAZER: Against the --
2      THE U.S. TRUSTEE: I think he's asking --
3      MR. FRAZER: -- Central District --
4      THE U.S. TRUSTEE: -- for the parties in
5 the --
6      MR. FRAZER: Yeah.
7      THE U.S. TRUSTEE: -- Central District --
8      MR. ACOSTA: I think it's just the National
9 Rifle --
10      THE U.S. TRUSTEE: -- of California
11 litigation.
12      MR. ACOSTA: -- Association versus the City
13 of Los Angeles.
14      MR. FRAZER: Yeah. That case -- that case
15 has also been resolved. It's no longer pending.
16      MR. ACOSTA: Okay. There is a -- a
17 separate lawsuit filed in August of 2019 against the
18 Attorney General James in the New York Supreme Court.
19 Is there a reason why that one's not listed?
20      MR. FRAZER: I'm looking, because I thought
21 that it was.
22      MR. ACOSTA: Okay. So I --
23      MR. FRAZER: We don't have a --
24      MR. ACOSTA: -- guess, you know --
25      MR. FRAZER: We don't have a --

Page 25

1    MR. ACOSTA: -- we don't --

2    MR. FRAZER: I'm afraid I don't have --

3    MR. ACOSTA: -- have --

4    MR. FRAZER: -- an answer -- an answer on

5 that one.

6    MR. ACOSTA: But you tried to list all the

7 lawsuits that were -- that were pending in response to

8 Statement of Financial Affairs, No. 7; is that right?

9    MR. FRAZER: Correct, within the -- you

10 know, within what -- the parameters of the question.

11    MR. ACOSTA: Okay.

12    MR. FRAZER: Yeah.

13    MR. ACOSTA: Now, Mr. Brewer -- Brewer's

14 Firm was hired around April of 2018; is that correct?

15    MR. FRAZER: It -- it's close. I think it

16 was March.

17    MR. ACOSTA: Okay. And I think what I

18 understand is he -- he was hired to address a New York

19 AG investigation or enforcement action?

20    MR. FRAZER: He was hired, initially, to

21 address issues involving some of our -- some of our

22 Affinity partners. But then, you know, the ex -- the

23 engagement expanded over time to encompass additional

24 issues.

25    MR. ACOSTA: And, then, I guess after his

Page 26

1 hiring, he has been involved in about 18 lawsuits that

2 the NRA is involved in -- or he represents the NRA in 18

3 lawsuits, approximately?

4    MR. FRAZER: That sounds high, but I --

5 I -- I -- you know, I would have to -- I would have to

6 go count them.

7    MR. ACOSTA: Well, let's see, count them

8 with me. He represents the NRA in the Dell'Aquila class

9 action?

10    MR. FRAZER: Yes.

11    MR. ACOSTA: Is that right? He represents

12 the NRA in the New York AG enforcement action?

13    MR. FRAZER: Yes.

14    MR. ACOSTA: He represents the NRA in the

15 D.C. AG enforcement action?

16    MR. FRAZER: Yes. Although, that's been --

17    MR. ACOSTA: And then there's thir --

18    MR. FRAZER: -- dismissed.

19    MR. ACOSTA: Okay. And then there are 13

20 lawsuits where the NRA is actually a plaintiff; is --

21 and then Mr. Brewer represents the NRA in those

22 plaintiff lawsuits? And I can get more specific if you

23 want.

24    MR. FRAZER: I mean, he represents the NRA

25 in -- in a -- in a number of lawsuits in which we're the

Page 27

1 plaintiff -- you know, where we are, you know,

2 pursuing -- you know, pursuing claims of the

3 Association.

4    MR. ACOSTA: Okay. So four of those

5 lawsuits are against Ackerman McQueen?

6    MR. FRAZER: Apologies for the pause. I'm

7 trying to remember the history of the Virginia

8 litigation.

9    MR. ACOSTA: Well, while you do that --

10    MR. FRAZER: I mean, there's only --

11 there's only one currently active.

12    MR. ACOSTA: Okay. But he represented it

13 in all four of them; is that correct?

14    MR. FRAZER: He's been the NRA Counsel --

15    MR. ACOSTA: He represented the NRA in all

16 four of them?

17    MR. FRAZER: -- in -- in all of the

18 litigation against Ackerman, yes.

19    MR. ACOSTA: He's represented the NRA in

20 the two lawsuits against Governor -- Governor Cuomo?

21    MR. FRAZER: Well, there's the one --

22 there's the -- there's the one involving -- there's a

23 Second Amendment lawsuit involving the shutdown of gun

24 stores under a COVID order and -- and, second, against

25 the -- and -- and against the -- against Governor Cuomo

Page 28

1 and the Department of Financial Services, with respect

2 to, you know, targeting of NRA -- of -- you know, by

3 the -- by -- by the DFS. I can't recall off the top of

4 my head if Cuomo was a defendant in any -- in any

5 others, but certainly two.

6    MR. ACOSTA: Okay. And two -- two lawsuits

7 against former NRA President, Oliver North?

8    MR. FRAZER: Well, one -- there's --

9 there's -- there's one that's stayed and then there

10 was -- there's an earlier one regarding an -- regarding

11 an indemnity demand, if those are --

12    MR. ACOSTA: Has --

13    MR. FRAZER: -- the two -- if those are the

14 ones you are thinking of.

15    MR. ACOSTA: Has the NRA ever put pen to

16 paper on how much all of these lawsuits have cost them

17 since Mr. Brewer has been retained?

18    MR. FRAZER: I mean, we certainly ha -- we

19 certainly have records of the -- of the total fees.

20    MR. ACOSTA: And -- and do those total fees

21 look over six figure -- I mean, over a hundred million

22 dollars?

23    MR. FRAZER: I don't think so, but I don't

24 have any -- the exact number.

25    MR. ACOSTA: Okay. And did the NRA file

Page 29

1 bankruptcy because it can no longer afford to prosecute
2 those lawsuits by Mr. Brewer or defend --
3       MR. FRAZER: That is --
4       MR. ACOSTA: -- those lawsuits by -- by
5 Mr. Brewer?
6       MR. FRAZER: No.
7       MR. ACOSTA: So the NRA can afford to
8 prosecute and defend those lawsuits?
9       MR. FRAZER: Yes.
10       MR. ACOSTA: Okay. Now, back to the costs.
11 Have you shared the costs of -- of these lawsuits with
12 the NRA Members or the NRA Board?
13       MR. FRAZER: Well, the NRA Board
14 approves the -- approves the -- the Association's
15 budget, which includes a line item for -- for -- for
16 legal -- you know, for -- for the Office of General
17 Counsel, which includes the legal fees and, you know, so
18 they're certainly aware of our -- of our legal spending.
19       MR. ACOSTA: Okay. I -- I believe in the
20 last -- in your papers as well, one of the reasons why
21 you filed bankruptcy was to reorganize in Texas; is that
22 right?
23       MR. FRAZER: Yes.
24       MR. ACOSTA: Then the other one is to
25 centralize disputes in all of these lawsuits?

Page 30

1       MR. FRAZER: Yes.
2       MR. ACOSTA: Do you need to centralize
3 disputes in every single lawsuit that you listed in
4 Schedule -- Statement of Financial Affairs, No. 7?
5       MR. FRAZER: Well -- well, no, you can't,
6 because some of them are, for example, Second Amendment
7 litigation all over the country that wouldn't be
8 relevant to -- to, you know, corporate -- corporate
9 mat -- matters, such as this bankruptcy filing.
10       MR. ACOSTA: Would it be fair to say that
11 you need to centralize the disputes where Mr. Brewer's
12 Firm is representing the NRA?
13       MR. FRAZER: Well, Mr. Brewer's Firm is
14 representing the NRA in the type of suits that -- in the
15 type of suits that we would like to be able to
16 streamline and centralize.
17       MR. ACOSTA: Okay. Okay. Out of those 18
18 lawsuits, do you need to centralize all -- that
19 Mr. Brewer's Firm is involved in, do you need to
20 centralize all of them?
21       MR. FRAZER: Well, no, because even -- even
22 some of those aren't -- aren't the type that would be
23 subject to -- that would be subject to this, such as the
24 New York State gun store case.
25       MR. ACOSTA: Okay. I have two more

Page 31

1 questions and I've gone over my time, I see.
2       THE U.S. TRUSTEE: Yes, you have.
3       MR. ACOSTA: So there's -- is these
4 lawsuits, Mr. Brewer (sic), there's what I consider
5 contingent liabilities -- or they are claims against the
6 NRA that, if proven true, would cause a liability to the
7 NRA; is that correct?
8       MR. FRAZER: Well, the -- the -- the Brewer
9 Firm is defending us in some cases in which we're the
10 defendants -- you know, the -- the -- the initial
11 defendant, and then somewhere we are a counterclaim
12 defendant. So it's -- so, yes, he's defending us in
13 cases where there are potential liabilities to the NRA.
14       MR. ACOSTA: So these potential liabilities
15 or contingent claims, have you ever calculated how much
16 they would be? Has the NRA ever calculated how much
17 they would be?
18       MR. FRAZER: You know, I think there has
19 been a calculation, but I don't know what it is. The
20 top number --
21       MR. ACOSTA: Would that be over a hundred
22 million?
23       MR. FRAZER: Well, I mean, if you are
24 talking about -- about -- if you include, for example,
25 the New York Attorney -- Attorney General action --

Page 32

1 which seeks dissolution of the Association and the
2 disposal of all of its assets -- well, then, yes.
3       MR. ACOSTA: Well, Mr. Dell'Aquila's
4 suit -- the class action -- requests over 50 million
5 alone, right?
6       MR. BUNCHER: Objection. Mr. Dell'Aquila's
7 lawsuit is not a class action and, in fact, he hasn't
8 even filed a motion for a class certification. I think
9 his damages are, like, $40,000.
10       MR. ACOSTA: Okay. Well, Mr. Dell'Aquila's
11 suit, is -- is it your testimony that they are only
12 asking for $40,000?
13       MR. FRAZER: I don't -- I don't recall the
14 demand, but it's somewhere in there. It -- it's, you
15 know, in the mid-five figures.
16       MR. ACOSTA: Okay. And -- and Ackerman
17 McQueen is asking for over $40 million?
18       MR. FRAZER: I believe that's correct.
19       MR. ACOSTA: Okay. I -- I -- that's all.
20 I reserve my questions for later. Thank you,
21 Ms. Lambert.
22       THE U.S. TRUSTEE: And I think the D.C.
23 Attorney General's Office has said that they can reserve
24 questions for Mr. Warren, so --
25       MR. KATHMAN: Hey, Lisa, this is -- this is

Page 33

1 Jason. I -- can -- can I just ask one follow-up
2 question, based on what Mr. Acosta just asked? And then
3 I -- I have four questions I didn't see at the bottom of
4 my outline that relate to Mr. -- Mr. Frazer. I -- I --
5 I promise, it is only five questions.
6       THE U.S. TRUSTEE: Oh, okay. Well, the
7 trick is that Mr. Frazer's going to be unavailable for
8 the broader audience as well, so --
9       Operator, although we had planned to open
10 up at the end of the meeting -- because this witness is
11 only available now -- is it possible to open it up and
12 close it?
13       THE OPERATOR: Sure. That's not a problem
14 at all. Would you like me to give the instructions now?
15       THE U.S. TRUSTEE: Yes, I would, please.
16       THE OPERATOR: Thank you.
17       We will now begin the question-and-answer
18 session. If you would like to ask a question, please
19 press star 1. Please unmute your phone and record your
20 name cl -- slowly and clearly when prompted. Your name
21 is required to introduce your question. To cancel your
22 request, press star 2.
23       THE U.S. TRUSTEE: So the questions at this
24 point should be for Mr. Warren only. I -- not for
25 Mr. Warren only -- for Mr. Frazer only, the in-house

Page 34

1 Counsel. If you can wait and ask your questions of
2 other witnesses, there will be another opportunity at
3 the end of the 341 Meeting.
4       THE OPERATOR: Once again, to ask a
5 question, please press star 1; record your name clearly
6 when prompted. To cancel your request, please press
7 star 2.
8       THE U.S. TRUSTEE: Operator, does this mean
9 we have no questions for Mr. Frazer coming through?
10      THE OPERATOR: That is correct.
11      THE U.S. TRUSTEE: Great. Okay. So let's
12 close the line for questioning and let's reopen
13 Mr. Kathman's follow-up questions.
14      MR. KATHMAN: Thank you.
15      Mr. -- Mr. Frazer, I want to follow up on a
16 question that Mr. Acosta -- well, kind of, a line of
17 questioning Mr. Acosta was asking. Mr. Frazer, when did
18 you learn that the National Rifle Association would be
19 filing bankruptcy?
20      MR. FRAZER: I think I testified about this
21 on the -- on one of the previous calls. I --
22      THE U.S. TRUSTEE: You --
23      MR. FRAZER: I knew that --
24      THE U.S. TRUSTEE: You did.
25      MR. FRAZER: Right, and -- and -- and I

Page 35

1 knew that -- I guess I was aware at some time in the
2 fall that -- that it was a potential option and -- but I
3 also -- but I didn't know that the decision had been
4 made until the date of the -- the -- the date the
5 petition was filed.
6       MR. KATHMAN: Thank you for that answer.
7 Okay. Mr. Frazer, you -- you testified -- I think -- I
8 think it was you, but it may have been somebody else.
9 You testified that Mr. Spray was on, quote, unquote,
10 administrative leave. Do you recall that testimony last
11 week?
12      MR. FRAZER: Yes.
13      MR. KATHMAN: Okay. And your counsel
14 produced an email this week that you sent on January the
15 29th of this year; whereby, you communicate to the Board
16 and Executive Committee that Mr. LaPierre had spoken to
17 Mr. Spray on January 28th, and that Mr. Spray expressed
18 a -- expressed a desire to relieve -- be relieved of his
19 responsibilities in the Association due to health
20 concerns. Do you recall that email you sent on
21 January 29th?
22      MR. FRAZER: Yes.
23      MR. KATHMAN: Okay. So my question for
24 you, as the in-house Counsel for the National Rifle
25 Association, is: Is Mr. Spray still employed by the

Page 36

1 National Rifle Association, presently?
2       MR. FRAZER: Yes, he -- yes, he is.
3       MR. KATHMAN: He has not been terminated?
4       MR. FRAZER: That's correct.
5       MR. KATHMAN: I don't have any further
6 questions. We can pass the witness.
7       THE U.S. TRUSTEE: Does anyone else have
8 any questions for Mr. Frazer?
9       Hearing none, Mr. Frazer, you may be
10 excused from the 341 Meeting and --
11      MR. FRAZER: Thanks.
12      THE U.S. TRUSTEE: -- you are finally
13 excused.
14      MR. FRAZER: Thank you very much. I
15 appreciate it.
16      THE U.S. TRUSTEE: All right. At this
17 time, I have some questions for Mr. Warner -- or
18 Mr. Warren and Ms. Rowling. Let me start with
19 Ms. Rowling.
20      Ms. Rowling, are you anticipating that your
21 final approval as Treasurer and Chief Financial Officer
22 would be approved at the Special Board Meeting?
23      MS. ROWLING: No, that is not going to
24 happen.
25      THE U.S. TRUSTEE: All right. Let's talk

Page 37

1  about the Statement of Financial Affairs' answers to
2  Question 4, which are payments to insiders.  And I'm
3  going to refer you to Statement of Financial Affairs
4  amended -- Amended Docket No. 288, and the original one
5  was Docket No. 162.  And you should be on 288 looking at
6  Pages 39 to 55 -- of 55 to 43 of 55; on the first one,
7  Docket 162, at 38 of 54 to 42 of 54.
8          The Statement of Financial Affairs'
9  question asks you to, List all insider payments during
10 the year before bankruptcy that benefited any insider.
11 And it defines "payments" or "transfers," including
12 expense reimbursements made within one year before the
13 filing of the case.  And it defines "insiders" as
14 including officers, directors, and anyone in control of
15 a corporate debtor and their relatives, general partners
16 and their relatives, affiliates of the debtors, and
17 insiders of affiliates -- in Question 4 -- which you
18 would find to be printed on Page 9 -- Page 8 of 54 on
19 the Amended Schedules -- or State -- Amended Statement
20 of Financial Affairs.
21         If you look through the list that I
22 referred you to at Pages 39 to 43, have you listed all
23 payments to directors, including reimbursement payments?
24         MR. WARREN:  This is -- this is --
25         MR. BUNCHER:  That may be a --

Page 38

1          MR. WARREN:  -- Mr. Warren.
2          MR. BUNCHER:  -- question for Mr. Warren.
3          THE U.S. TRUSTEE:  Yes.
4          MR. WARREN:  Yeah.  This is Mr. Warren.
5  Yes, those are disclosed in that Schedule.
6          THE U.S. TRUSTEE:  Have you listed all
7  payments to officers?
8          MR. WARREN:  I believe it was -- the
9  officers -- the answer is, No, in that -- in that
10 Schedule to that question.  I believe --
11         THE U.S. TRUSTEE:  Have you listed all --
12         MR. WARREN:  -- those were disclosed, as
13 were --
14         THE U.S. TRUSTEE:  Have you listed the
15 payments to all relatives of officers?
16         MR. WARREN:  To our --
17         MR. BUNCHER:  And --
18         MR. WARREN:  -- knowledge, yes.
19         THE U.S. TRUSTEE:  Okay.
20         MR. BUNCHER:  Also, for the record, the
21 question asks about payments on debts owed to an
22 insider, not all payments to insiders.  So I just want
23 to clarify that.
24         THE U.S. TRUSTEE:  Is it your position that
25 the payment of salary is not a debt?

Page 39

1          MR. BUNCHER:  I don't know how they treated
2  that, but Mr. Warren --
3          THE U.S. TRUSTEE:  You listed the
4  payment -- the -- you listed unpaid salary payments in
5  the Schedules, right?
6          MR. WARREN:  That's correct.
7          THE U.S. TRUSTEE:  And there -- and we had
8  an order allowing payment of debt to your employees on
9  the day that the bankruptcy was filed, right -- shortly
10 thereafter, right?
11         MR. WARREN:  That's correct.
12         THE U.S. TRUSTEE:  Okay.  So I'm going to
13 ask you to go back and amend this -- this Statement of
14 Financial Affairs' answer.  And the fact that the
15 question's answered other places is not necessarily
16 relevant, because this is used to evaluate the timing of
17 payments as well.  So mi -- I -- I'm looking for the
18 answer to the Statement of Financial Affairs' question
19 that's asked here.  Do we have a deal on that?
20         MR. BUNCHER:  What specifically are you
21 wanting to be listed that's not listed?  I guess I'm not
22 understanding.
23         THE U.S. TRUSTEE:  I'm wanting payments to
24 directors or officers, including payments of expenses,
25 as the question asks.

Page 40

1          MR. BUNCHER:  And -- and just for the
2  record, Mr. Warren, are those not listed either here or
3  in Question -- what is it -- 30?
4          MR. WARREN:  Yes, that's correct.  They are
5  listed in here --
6          MR. BUNCHER:  Okay.  So I'm -- I'm not
7  clear on --
8          MR. WARREN:  -- and compensation of the --
9          MR. BUNCHER:  -- what's not here that we
10 are supposed to amend, then.
11         THE U.S. TRUSTEE:  So the expenses are
12 included in your response to Question 30?
13         MR. WARREN:  What is disclosed there is
14 compensation.  All other expenses have been disclosed,
15 if they were -- if they occurred.
16         MR. BUNCHER:  So just for the record,
17 Mr. Warren -- this is Mr. Buncher -- all payments of
18 salaries or expense reimbursements have been listed in
19 one of the Schedules to the SOFA; is that correct?
20         MR. WARREN:  That is correct.
21         MR. BUNCHER:  Okay.
22         THE U.S. TRUSTEE:  And you've listed the
23 dates of the payments?
24         MR. WARREN:  That is correct.
25         THE U.S. TRUSTEE:  Turn with me to Page 54

Page 41

1 of 54.

2        MR. WARREN: Okay.

3        THE U.S. TRUSTEE: So it says there at the

4 bottom -- for the last three entries -- executive full

5 period compensation, right?

6        MR. WARREN: Correct.

7        THE U.S. TRUSTEE: It doesn't say anything

8 about reimbursement of expenses, does it?

9        MR. WARREN: That's correct.

10        THE U.S. TRUSTEE: Your question in

11 Statement of Financial Affairs -- Question 4 -- asks

12 about expenses, as though that's a separate line item,

13 right?

14        MR. WARREN: Correct. So a definition

15 of the -- of reimbursement of the expenses would mean

16 that the reimbursement is reimbursed to the individual,

17 correct?

18        THE U.S. TRUSTEE: That is correct. He was

19 an insider -- an individual who was --

20        MR. WARREN: Correct.

21        THE U.S. TRUSTEE: -- an insider? Okay.

22        MR. WARREN: Correct.

23        THE U.S. TRUSTEE: And --

24        MR. WARREN: So --

25        THE U.S. TRUSTEE: And, then, let's go back

Page 42

1 to Statement of Financial Affairs, Question 4.

2        MR. WARREN: Uh-huh (affirmative). Okay.

3        THE U.S. TRUSTEE: Do you see that the

4 Statement of Financial Affairs, Question 4, has the date

5 that the payments were made as one of the line items?

6 It's after -- the first it -- item requested is

7 insider's name and address, and the relationship to the

8 Debtor. The second item is the dates on which the

9 payments were made.

10        MR. WARREN: Correct.

11        THE U.S. TRUSTEE: Do you see that?

12        MR. WARREN: Correct.

13        THE U.S. TRUSTEE: So we want the dates

14 that the payments were made. So this is why I've asked

15 for the amendment.

16        MR. BUNCHER: The dates --

17        MR. WARREN: Yeah. So --

18        MR. BUNCHER: -- are on the Schedule for

19 No. 4. I still don't -- I'm sorry, Ms. Lambert, I'm not

20 sure what we are talking about --

21        THE U.S. TRUSTEE: The problem is --

22        MR. BUNCHER: -- and --

23        THE U.S. TRUSTEE: -- that Question 30 does

24 not provide the dates of the payments. So I need the

25 amendment to include the payments to the insiders,

Page 43

1 including salary payments and the dates when the

2 payments occurred, please.

3        MR. WARREN: Okay.

4        MR. BUNCHER: You want dates for the

5 transactions in Question 30; is that what you're asking

6 for? There's dates --

7        THE U.S. TRUSTEE: I -- yes.

8        MR. BUNCHER: -- on that Schedule, too.

9 I -- I'm sorry.

10        THE U.S. TRUSTEE: They are aggrega -- they

11 are aggregated dates.

12        MR. WARREN: Yeah.

13        THE U.S. TRUSTEE: They are not broken down

14 by the date that the payments occurred.

15        MR. WARREN: Okay.

16        MR. BUNCHER: I --

17        MR. WARREN: So -- so I -- as I understand

18 the request, since -- the three individuals listed on

19 Question 30, you would like those broken down by payment

20 date, as opposed to aggregate?

21        THE U.S. TRUSTEE: That is correct.

22        MR. WARREN: Uh-huh (affirmative). Yes.

23        THE U.S. TRUSTEE: And I'm using those as

24 examples, but any director, officer or relative of a

25 director or officer who received reimbursement of

Page 44

1 expenses or other payments -- such as salary, which I

2 understand is paid in arrears -- to be listed. Okay?

3        MR. WARREN: Okay.

4        THE U.S. TRUSTEE: All right. And so on

5 the Global Notes that you've included on these Amended

6 Statements of Financial Affairs, there's now a provision

7 that says, The Global Notes control over the responses

8 to the questions in the Schedules and the Statements of

9 Financial Affairs. And I mentioned th -- this at the

10 first meeting and I'm going to remind you both again.

11 It is the U.S. Trustee's position that you cannot modify

12 the questions that are asked in the official forms.

13        So if there are any amendments, it is the

14 U.S. Trustee's understanding that -- that the questions

15 control over anything in the notes. And I -- I'm not in

16 a position to know what those might be or what

17 differences there might be, but I can't take it to the

18 court until I know that there is a difference. And so

19 if there are any differences in your answers because of

20 this -- this disclaimer in the Global Notes, can you

21 tell me what those are now?

22        MR. BUNCHER: I -- I think you covered this

23 last time and we said there weren't any.

24        But, David --

25        THE U.S. TRUSTEE: I -- well, the prob -- I

Page 45

1  covered it before the amendments --
2       MR. BUNCHER:  Oh, okay.
3       THE U.S. TRUSTEE:  -- and I'm asking about
4  the amendments.
5       MR. BUNCHER:  All right.
6       David, go ahead.
7       MR. WARREN:  There -- there are none.
8       THE U.S. TRUSTEE:  Okay.  How will the --
9  how will the museum store be handled when -- if the
10  corporate headquarters is moved to Texas?
11       MR. BUNCHER:  Okay.  This is --
12  Ms. Lambert, this is a confusion -- I -- the
13  terminology -- "the museum store" -- is not the right
14  terminology.  I think you are referring to the NRA
15  store.
16       THE U.S. TRUSTEE:  It's listed as "the
17  museum store" in the Schedules.
18       MR. BUNCHER:  Okay.  Well, that may be a --
19  a semantics error on somebody's part.
20       But, go ahead, Mr. Warren.
21       MR. WARREN:  Well, I -- I believe the
22  disclosure of "the museum store" is in reference -- if
23  I'm -- if I'm correct, is in reference to the inventory
24  valuation of that reference.  Is that accurate?
25       THE U.S. TRUSTEE:  Yes, that -- that's

Page 46

1  where I saw --
2       MR. WARREN:  Yeah.
3       THE U.S. TRUSTEE:  -- the listing.  But my
4  question --
5       MR. WARREN:  Yeah.
6       THE U.S. TRUSTEE:  -- is, you know --
7       MR. WARREN:  Sure.
8       THE U.S. TRUSTEE:  -- is what happens to
9  the museum store if the headquarter building is sold and
10  the NRA moves Dallas.
11       MR. WARREN:  It -- I -- I don't know if I
12  can properly answer it.  I -- because I -- it -- it
13  depends on what happens to the museum itself.  If the
14  museum is relocated, then the store aspect of the museum
15  would -- would be in consideration to follow.
16       THE U.S. TRUSTEE:  Okay.  And, then, how
17  would the ILA's act -- and I don't want to get into what
18  the ILA does or anything, but how would its action --
19  I'm just talking about the mechanics of it.  How would
20  their actions change if the headquarters moved from
21  Tex -- from Virginia to Texas?
22       MR. WARREN:  Th -- this is Mr. Warren
23  and -- and the feedback would be, is that it would -- it
24  would stay as it exists.  I mean, it would remain as it
25  exists today.

Page 47

1       THE U.S. TRUSTEE:  So the ILA NRA employees
2  would stay in D.C. or Virginia?
3       MR. BUNCHER:  I -- I don't think that's
4  been -- I think we are getting way ahead of ourselves.
5  I don't --
6       Mr. Warren, you can testify to what you
7  know, but I don't know that that's --
8       MR. WARREN:  Yeah.
9       MR. BUNCHER:  -- been decided.
10       MR. WARREN:  Yeah.  That -- the location of
11  employees is -- has not been -- there's been no
12  direction on location, geographically.  But, certainly,
13  the presence and the mission of -- of I -- of -- of ILA
14  would remain as it is.
15       THE U.S. TRUSTEE:  I pass the witness.
16       MR. KATHMAN:  Okay.  This is Jason --
17       MS. MIRANDA:  Good afternoon.  This is --
18       MR. KATHMAN:  Go ahead.
19       MS. MIRANDA:  -- Leonor Miranda with the
20  D.C. Attorney General's Office.  And I have a -- I
21  represent the District today and I have a few questions,
22  which are probably directed either to David Warren or to
23  Sonya Rowling, and they're -- primarily, have to do with
24  the grants returned -- the grants identified as
25  "returned as unused" from the NRA to the Foundation.

Page 48

1  During the last Creditors' Meeting, we discussed these
2  unused grant funds.
3       And this week we were provided with an
4  Excel sheet that identified about 108 grant
5  transactions, which included a column for grant year.
6  And I just want to clarify, does this column identify
7  the grant year in which the NRA received the particular
8  grant funding?
9       MS. ROWLING:  That is correct.  This is
10  Sonya.
11       MS. MIRANDA:  Okay.  And so all -- all the
12  grants identified are from either 2018 or 2019.  The --
13  the amounts returned -- were those amounts returned
14  in -- sort of within the -- you know, the one year
15  before the NRA filed for bankruptcy?
16       MS. ROWLING:  Yes, because they were listed
17  on the schedule of payments made 90 days prior.
18       MS. MIRANDA:  Sure.  And were these returns
19  made pursuant to a -- any grant terms that specified
20  that, you know, if the grant hadn't been -- the full
21  grant money hadn't been used by X time that they had to
22  be returned to the Foundation?
23       MS. ROWLING:  It is our policy to return
24  within two years, basically.  But we changed the policy
25  in 2020 to only get the funds after we've made the

Page 49

1  expenditure. So that's why you won't see any 2020
2  returns -- only ones from before -- because they were
3  handled in a slightly different way. We would actually
4  get the funds upfront and then try to -- and then spend
5  it and spend -- when spending was less than what the
6  total grant was, we would then return the unspent funds.
7  This --
8       MS. MIRANDA: Okay.
9       MS. ROWLING: -- Schedule represents what
10  was returned in normal course, following normal
11  procedures.
12       MS. MIRANDA: Okay. So you said the -- the
13  policy changed in 2020, so that now the NRA makes that
14  expenditure, and then it's reimbursed for that rather
15  than --
16       MS. ROWLING: Correct.
17       MS. MIRANDA: -- a full grant funding
18  (phonetic)?
19       MS. ROWLING: Yes. We go through a process
20  of applying for the grant, but not actually receiving
21  the funds. So the grant in and of itself gets approved,
22  then we would go out and the -- the expense would be
23  incurred. We would submit the expenditures and get
24  reimbursed for what actually happens, to avoid having to
25  return funds.

Page 50

1       MS. MIRANDA: And when in 2020 did this
2  policy change occur?
3       MS. ROWLING: I don't know the exact date.
4       MS. MIRANDA: Are there any board minutes
5  where there was, you know, a vote to --
6       MS. ROWLING: It's not a --
7       MS. MIRANDA: -- make a change to
8  (inaudible) --
9       MS. ROWLING: -- board policy -- there's no
10  board policy regarding that. It's an internal -- so if
11  I use "policy," and it's -- you know, and you are
12  expecting a board policy, that's not -- those are
13  internal procedures.
14       MS. MIRANDA: Oh, okay. And would there --
15  would there be any communications, possibly, that would
16  sort of narrow down or provide a timeframe for when this
17  policy change occurred?
18       MS. ROWLING: I would have to check. I was
19  not involved in that process.
20       MS. MIRANDA: Okay. We're going to put --
21  I'll put in a request for this and I'll send it in
22  writing after the meeting.
23       MR. BUNCHER: That sounds like a litigation
24  discovery request to me. I don't know what that has to
25  do with the bankruptcy.

Page 51

1       MS. MIRANDA: Sure. So as far as the
2  timing, I'm inquiring as to when this policy change
3  occurred with having money go back. And I just -- you
4  know, we're inquiring because that, obviously, has a
5  direct impact on the amount of money -- or the money
6  that's available to the bankruptcy estate.
7       MR. BUNCHER: You -- you're free to send
8  your request and we'll respond as we see appropriate.
9       MS. MIRANDA: Okay. And then -- so prior
10  to this change in policy -- the 2020 change in policy --
11  was the NRA returning -- for how -- how long was the NRA
12  returning these funds to the Foundation?
13       MS. ROWLING: I would have to check the
14  records. I -- I mean, it was just a -- these were the
15  processes that was undertaken. We would return grant
16  funds that were not spent. I'm not sure I understand
17  why that's an issue.
18       MS. MIRANDA: I had another question and,
19  mainly, it's clarification. In the -- I think the
20  request, though, went out either earlier last week
21  asking for just additional details relating to these
22  Foundation grant transactions that were listed in -- in
23  the Schedule. The response that was received stated
24  that there was, you know, nothing beyond what was --
25  what has already been provided, specifically, and

Page 52

1  identified back -- backup for each check request for
2  payments to the Foundation had been already produced.
3       And I just wanted -- I was unclear as to
4  what -- you know, what this backup is? So what exactly
5  does it mean that the backups for the check requests has
6  already been -- what is the backup for the check
7  requests?
8       MS. ROWLING: This Excel schedule is the
9  backup for the check requests. It represents what we
10  had in temporarily restricted for these purposes, and so
11  the backup is -- is the -- this Excel that says we
12  didn't spend this portion of it, and we would submit the
13  returned money back to the Foundation.
14       MS. MIRANDA: Okay. And this -- this
15  Excel, was that created because these grants, you know,
16  had to be identified via the -- the bankruptcy filing or
17  was -- are these similar Excels kept for previous years
18  in which the NRA was returning unused grant funds?
19       MS. ROWLING: We keep records, that look
20  very similar to this sheet, that track all grant money
21  sent to us from the Foundation for as long as we have
22  gotten grants from the Foundation. So they were not
23  generated specifically for this meeting.
24       MS. MIRANDA: Okay. I may have a few
25  points for clarification, but I will -- that's -- that

Page 53

1 can be handled via email -- the other requests.  Thank
2 you.
3          THE U.S. TRUSTEE:  Other questions for
4 Mr. Warren or Ms. Rowling?
5          MR. KATHMAN:  Yes, this is Jason Kathman
6 for the New York Attorney General.
7          Mr. Warren, the Amended Schedules reflect
8 an employment contract for Taylor Schropp.  I think
9 that's how you say it.  Who is Taylor Schropp?
10          MR. WARREN:  Yeah.  It's Tyler Schropp and
11 he heads the -- the NRA advancement function --
12          MR. KATHMAN:  And what does that mean --
13          MR. WARREN:  -- for the NRA.
14          MR. KATHMAN:  -- "the NRA advancement"?
15 Can you explain that?
16          MR. WARREN:  The -- yeah, sorry.  The
17 fundraising function for the NRA in -- in conjunction
18 with the Foundation as well.
19          MR. KATHMAN:  And do you know how much his
20 compensation is?
21          MR. WARREN:  I -- I don't know
22 specifically, no.
23          MR. KATHMAN:  Okay.  Do you know if it's
24 greater than $200,000 a year?
25          MR. WARREN:  I -- I -- I don't know.  I

Page 54

1 would be speculating to answer your question that way.
2          MR. KATHMAN:  Ms. Rowling, do you know how
3 much Mr. Schropp's compensation is?
4          MS. ROWLING:  I know that Mr. Schropp was
5 listed on the 990 and so his compensation would be
6 there.
7          MR. KATHMAN:  Okay.  What about Rick
8 Tedrick?  Who is Rick Tedrick, Mr. Warren?
9          MR. WARREN:  Yeah.  We -- I think we've --
10 we've provided this previously, but he -- he is the CFO
11 of the Foundation and a managing -- Finance Managing
12 Director of the NRA.
13          MR. KATHMAN:  Okay.  And, Ms. Rowling, do
14 you know whether his compensation is listed in the 990
15 as well?
16          MS. ROWLING:  Yes, it is.
17          MR. KATHMAN:  Okay.  Ms. Rowling, I think
18 Ms. Lambert asked whether you were going to be
19 submitted -- or -- or put up for a vote to be appointed
20 the Treasurer at this weekend -- this weekend's meeting
21 and you said, No.  Do you know why you are not being put
22 up as the Treasurer this weekend -- at this weekend's
23 meeting?
24          MS. ROWLING:  My understanding is that this
25 meeting was called by the President, and under very

Page 55

1 specific reasons, and you cannot -- for a special
2 meeting -- discuss anything other than what is listed by
3 the President, and that wasn't listed.
4          MR. KATHMAN:  So my question is:  Do you
5 know why that was not listed?
6          MS. ROWLING:  No, I do not.
7          MR. KATHMAN:  And the testimony early --
8 earlier was that Mr. Spray is no longer the Treasurer;
9 is that correct?
10          MS. ROWLING:  I bel -- I believe John
11 Frazer has discussed this before.  There are board
12 reasons why he has to remain, because he's a --
13 because -- because he is the Treasurer, not because --
14 I -- you -- you would have to discuss all that with
15 John Frazer and you -- that --
16          MR. KATHMAN:  Okay.
17          MS. ROWLING:  -- and that was --
18          MR. KATHMAN:  Yeah.
19          MS. ROWLING:  -- discussed already in
20 previous meetings --
21          MR. BUNCHER:  Right.
22          MS. ROWLING:  -- that -- that that --
23          MR. BUNCHER:  Refer to the --
24          MS. ROWLING:  -- that that --
25          MR. BUNCHER:  -- prior testimony in the

Page 56

1 transcript.  This has already been covered.
2          MR. KATHMAN:  Sorry.  That's a -- it
3 wasn't -- it wasn't a -- it wasn't a very good question.
4 So I'll -- I'll -- I'll -- I'll take the blame on that
5 one.
6          Ms. Rowling, do you know why -- in the
7 absence of the Treasurer being on administrative leave,
8 do you know why there is not a line item on this
9 weekend's meeting to approve a new Treasurer?
10          MR. BUNCHER:  Calls for speculation, unless
11 she's the one that decided it.
12          MR. KATHMAN:  But the question was --
13          MR. BUNCHER:  Do you know why, Ms. Rowling?
14          MR. KATHMAN:  -- does she -- does --
15 does -- and it doesn't call for speculation, because I
16 asked does she knows why.  She can say, yes, she knows
17 why or, no, she doesn't.
18          MS. ROWLING:  No, I do not.
19          MR. KATHMAN:  Okay.  Do you know -- do you
20 have an understanding of whether you will eventually be
21 put to a vote to be the Treasurer?
22          MS. ROWLING:  That is my understanding.
23          MR. KATHMAN:  Is -- when was the last time
24 you spoke with Mr. Spray?
25          MS. ROWLING:  Before he -- before he had

Page 57

1 left. I couldn't tell you the exact date.

2       MR. KATHMAN: Do you know whether Mr. Spray

3 is still doing work for the NRA?

4       MS. ROWLING: I do not know.

5       MR. KATHMAN: How about you, Mr. Warren, do

6 you know if Mr. Spray is currently doing work for the

7 NRA?

8       MR. WARREN: I -- I do not know,

9 specifically.

10       MR. KATHMAN: All right. I'll pass the

11 witness.

12       MR. ACOSTA: Well, this is Joe Acosta. I

13 would like to ask Ms. Rowling a couple of questions, if

14 that's okay. I'm for Ackerman McQueen.

15       Ms. Rowling, you have worked in the Office

16 of the Treasurer for several years now; is that -- is

17 that correct?

18       MS. ROWLING: I have worked in the finance

19 division of the Office of the Treasurer, yes, since --

20 for 21 years.

21       MR. ACOSTA: Okay. What is -- what have

22 been your roles in the last, say, three years?

23       MS. ROWLING: I have been the Director of

24 Accounting Operations and Financial Reporting for the

25 last 15 years.

Page 58

1       MR. ACOSTA: And -- and what does that

2 entail, Ms. Rowling?

3       MS. ROWLING: That entails handling of all

4 accounting operations; including, accounts payable,

5 accounts receivable, cash received, general ledger,

6 monthly financial reporting to the Finance Committee to

7 the Board, as well as handling everything with respect

8 to the audit of our financial statements.

9       MR. ACOSTA: Who's in charge of reporting

10 to the New York Attorney General's Office?

11       MS. ROWLING: I don't understand the

12 question.

13       MR. ACOSTA: Under New York law, does there

14 have to be some type of reporting that occurs to the

15 New York Attorney General financially?

16       MR. BUNCHER: Object to the extent that you

17 are asking her for a legal conclusion. She can answer

18 what her understanding is.

19       MS. ROWLING: I believe our General

20 Counsel's Office handles submitting certain financial

21 information to New York. I couldn't specify other than

22 that.

23       MR. ACOSTA: Okay. That's all I have.

24 Thank you, Ms. -- very much, Ms. Rowling.

25       THE U.S. TRUSTEE: Any other questions for

Page 59

1 Mr. Warren or Ms. Rowling on -- as representatives of

2 the NRA?

3       Hearing none, I'm going to open up the

4 questions from the floor.

5       And mi -- Madam Operator, can you do that

6 for us, please?

7       THE OPERATOR: Thank you. We will now

8 begin the question-and-answer session. If you would

9 like to ask a question, please press star 1. Please

10 unmute your phone and record your name slowly and

11 clearly when prompted. Your name is required to

12 introduce your question. To cancel your request, please

13 press star 2.

14       Once again, to ask a question, please press

15 star 1; re -- record your name clearly when prompted.

16 To cancel your request, please press star 2.

17       THE U.S. TRUSTEE: Thank you.

18       THE OPERATOR: At this time --

19       THE U.S. TRUSTEE: (Inaudible) --

20       THE OPERATOR: -- we have no questions.

21       THE U.S. TRUSTEE: Great. All right. This

22 concludes the 341 Meeting for Sea Girt and NRA. Thank

23 you all for your time and your cooperation.

24       MR. BUNCHER: Thank you. Have a --

25       MR. WARREN: Thank you.

Page 60

1       MR. BUNCHER: -- good weekend.

2       MR. ACOSTA: You, too.

3       THE U.S. TRUSTEE: You --

4       THE OPERATOR: That concludes today's

5 conference. You may now disconnect.

6       (End of proceedings)

7       (End of audio file)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LEXITAS

Page 61

1          I, Gwendolynn R. Murphy, Certified Shorthand

2   Reporter in and for the State of Texas, do hereby

3   certify that the foregoing 60 pages comprise a true,

4   complete and correct transcription of the aforementioned

5   audio file to the best of my ability.

6          Given under my hand and seal of office on this

7   15th day of March, 2021.

8

9

10

11

12            

              Gwendolynn R. Murphy

13            Texas CSR No. 6040

              Expiration Date:  10/31/2022

14

              Lexitas-Dallas, Reg No. 459

15            325 N. St. Paul

              Suite 1900

16            Dallas, Texas 75201

              (214) 373-4977

17

18

19

20

21

22

23

24

25

## $

**$200,000** 53:24

**$40** 32:17

**$40,000** 32:9,12

## 1

**1** 33:19 34:5 59:9,15

**108** 48:4

**11** 12:23 14:2,14 15:14,15
16:9 18:19 19:3,9,20
20:9,20,21

**12** 21:17

**13** 26:19

**15** 57:25

**162** 37:5,7

**18** 26:1,2 30:17

## 2

**2** 33:22 34:7 59:13,16

**2015** 5:9,10

**2018** 25:14 48:12

**2019** 23:24 24:17 48:12

**2020** 48:25 49:1,13 50:1
51:10

**2021** 5:14,25 8:19 22:15

**21** 57:20

**21-30080** 2:4

**21-30085** 2:3

**288** 22:6,22 37:4,5

**28th** 35:17

**29th** 35:15,21

## 3

**30** 40:3,12 42:23 43:5,19

**341** 2:3,12,19 4:11 34:3
36:10 59:22

**38** 37:7

**39** 37:6,22

## 4

**4** 37:2,17 41:11 42:1,4,19

**42** 37:7

**43** 37:6,22

**45** 22:23

**4th** 22:14

## 5

**50** 32:4

**54** 37:7,18 40:25 41:1

**55** 22:14 37:6

## 6

**6th** 5:25

## 7

**7** 14:15 21:21 22:11 25:8
30:4

**7th** 5:14,21 7:6 8:19 10:18
12:24 14:3,15 15:16
16:11 17:2,19,20 18:20
19:17,24 20:7,14,22,23

## 8

**8** 37:18

## 9

**9** 37:18

**90** 48:17

**990** 54:5,14

## A

**absence** 56:7

**accommodation** 2:23

**accounting** 57:24 58:4

**accounts** 58:4,5

**accurate** 45:24

**Ackerman** 17:13 18:10
21:19 23:5 27:5,18 32:16
57:14

**Acosta** 17:12,14,23 18:2,
5,10,15 19:2,7,15,19
20:3,6,19 21:1,7,11,15,23
22:1,10,16,21 23:1,4,12,
18,23 24:8,12,16,22,24
25:1,3,6,11,13,17,25
26:7,11,14,17,19 27:4,9,
12,15,19 28:6,12,15,20,
25 29:4,7,10,19,24 30:2,
10,17,25 31:3,14,21 32:3,
10,16,19 33:2 34:16,17
57:12,21 58:1,9,13,23
60:2

**act** 46:17

**Acting** 3:1

**action** 22:18 25:19 26:9,
12,15 31:25 32:4,7 46:18

**actions** 46:20

**active** 23:9 27:11

**actual** 15:8

**added** 7:11

**addition** 3:8

**additional** 4:13 6:16 25:23

51:21

**address** 25:18,21 42:7

**addressed** 6:18

**administrative** 35:10 56:7

**advancement** 53:11,14

**advice** 9:9 13:13 16:5

**Affairs** 3:21 21:3,9,21
22:6,20,22 25:8 30:4
37:3,20 41:11 42:1,4
44:6,9

**Affairs'** 37:1,8 39:14,18

**affiliates** 37:16,17

**Affinity** 25:22

**affirmative** 42:2 43:22

**afford** 29:1,7

**afraid** 25:2

**afternoon** 2:20 5:1,2
47:17

**AG** 18:7 25:19 26:12,15

**AG's** 17:20

**aggrega** 43:10

**aggregate** 43:20

**aggregated** 43:11

**agree** 4:18

**agreement** 5:13,19 6:20,
25 7:5,21 8:16 10:2 13:21

**ahead** 19:25 45:6,20 47:4,
18

**allowing** 39:8

**amend** 39:13 40:10

**amended** 22:5 37:4,19
44:5 53:7

**amendment** 27:23 30:6
42:15,25

**amendments** 44:13 45:1,
4

**amount** 51:5

**amounts** 48:13

**Angeles** 24:13

**announced** 5:4

**answering** 13:13 14:18

**answers** 37:1 44:19

**anticipated** 8:23

**anticipating** 36:20

**Apologies** 27:6

**apologize** 20:3

**appears** 22:22

**applying** 49:20

**appointed** 54:19

**approval** 36:21

**approve** 18:23 56:9

**approved** 5:13,20 6:25
7:5,8,10,14,17 18:25 19:9
36:22 49:21

**approves** 29:14

**approximately** 5:9 26:3

**April** 23:23 25:14

**arrears** 44:2

**asks** 37:9 38:21 39:25
41:11

**aspect** 46:14

**assets** 32:2

**assist** 21:7,8,12

**Assistant** 4:9

**Association** 2:22 3:2,5
5:5,18 7:24 8:1,9 12:14
24:12 27:3 32:1 34:18
35:19,25 36:1

**Association's** 29:14

**attached** 19:12,23 20:13,
18 22:11

**atte** 16:24

**attendance** 10:19 12:8

**attendant** 10:17

**attorney** 4:24,25 24:18
31:25 32:23 47:20 53:6
58:10,15

**attorney's** 13:13 16:4,5

**attorney-client** 13:2 15:19
16:1,20

**audience** 33:8

**audio** 60:7

**audit** 58:8

**August** 24:17

**authority** 11:23 15:23

**authorized** 20:21

**authorizing** 19:19 20:9

**avoid** 49:24

**aware** 4:4 20:18,20,24
29:18 35:1

**B**

**back** 13:17,20 15:2 29:10
39:13 41:25 51:3 52:1,13

**backup** 52:1,4,6,9,11

**backups** 52:5

**bankruptcy** 2:3,7,10,14
12:23 14:2,14 15:13,14
16:9 18:19 19:3,9,13,20
20:10 29:1,21 30:9 34:19
37:10 39:9 48:15 50:25
51:6 52:16

**based** 33:2

**basically** 48:24

**bear** 21:22 22:1

**begin** 33:17 59:8

**beginning** 12:6

behalf 17:13

bel 55:10

benefited 37:10

Bill 10:13

bit 21:2

blame 56:4

board 4:17,19 5:14,21
6:24 7:2,6 8:19,20 9:9,13
10:11,18,20,21,23 11:4,
18,20 12:24 13:22 14:3,
16 15:16,21 16:11 17:2,
18 18:19,22,25 19:17,24
20:7,14 29:12,13 35:15
36:22 50:4,9,10,12 55:11
58:7

bottom 33:3 41:4

break 14:4

Brewer 10:13 12:8,12,13
25:13 26:21 28:17 29:2,5
31:4,8

Brewer's 25:13 30:11,13,
19

broader 33:8

broken 43:13,19

budget 29:15

building 46:9

Buncher 3:23 4:3 13:1,5,
8,11,24 14:7,9,17 15:17
16:12,17,18 17:22,25
18:1,9,12,16 19:11,18,21
20:11 22:17 32:6 37:25
38:2,17,20 39:1,20 40:1,
6,9,16,17,21 42:16,18,22
43:4,8,16 44:22 45:2,5,
11,18 47:3,9 50:23 51:7
55:21,23,25 56:10,13
58:16 59:24 60:1

business 6:17

C

calculated 31:15,16

calculation 31:19

California 23:19,25 24:10

call 18:13 56:15

called 54:25

calls 13:1 15:18 34:21
56:10

cancel 33:21 34:6 59:12,
16

candid 9:8

case 2:3,14 23:11,22
24:14 30:24 37:13

cases 31:9,13

cash 58:5

cen 23:24

Central 23:19,24 24:3,7

centralize 29:25 30:2,11,
16,18,20

certification 32:8

CFO 54:10

change 46:20 50:2,7,17
51:2,10

changed 3:12 48:24 49:13

chapter 12:23 14:2,14
15:14,15 16:9 18:19 19:3,
9,20 20:9,20,21,24

charge 58:9

check 50:18 51:13 52:1,5,
6,9

Chief 3:1,4 36:21

choice 8:5

choice-of-law 7:7,11,15,
16,20 8:1,10,13,16

City 24:12

cl 33:20

claims 27:2 31:5,15

clarification 51:19 52:25

clarifications 4:1

clarify 3:10 13:9 18:16
38:23 48:6

class 26:8 32:4,7,8

clause 7:11

clear 14:10 40:7

close 25:15 33:12 34:12

Code 2:10

column 48:5,6

Committee 5:25 6:5,12,
15,21 9:17,24 11:24 19:1,
8 20:8 35:16 58:6

communicate 35:15

communication 13:2 16:2

communications 13:7
14:19 15:19 16:20 50:15

comp 6:14,15

company 11:8 12:15
15:21

company's 16:4

compensation 5:25 6:5,8,
12,13,16,21 9:6,17,24
40:8,14 41:5 53:20 54:3,
5,14

concerns 35:20

concludes 59:22 60:4

conclusion 58:17

conducted 9:7

conference 60:5

confusion 45:12

conjunction 53:17

connection 4:17

consent 17:24



consideration 46:15

consultants 10:25

content 11:12

contingent 31:5,15

continuation 2:2

continued 2:5

contract 6:1,16 7:17 8:5,9
15:23 18:23 53:8

contracts 7:25

control 37:14 44:7,15

conversation 11:12

cooperation 59:23

copy 5:19 15:10

corner 22:13

corporate 30:8 37:15
45:10

correct 5:6,7,9,21 6:2,9
7:6,17,18,21 11:8 12:15
25:9,14 27:13 31:7 32:18
34:10 36:4 39:6,11 40:4,
19,20,24 41:6,9,14,17,18,
20,22 42:10,12 43:21
45:23 48:9 49:16 55:9
57:17

corrected 3:12

corrections 4:1

cost 28:16

costs 29:10,11

counsel 2:21 5:4,9,17
7:24 10:11,21,23 11:3,6
12:13 14:19,22,24,25
15:20 27:14 29:17 34:1
35:13,24

Counsel's 58:20

count 26:6,7

counterclaim 31:11

country 30:7

couple 57:13

court 2:18 24:18 44:18

covered 44:22 45:1 56:1

COVID 27:24

created 52:15

Creditor 2:14

Creditors 2:5,9

Creditors' 3:8 48:1

Cuomo 27:20,25 28:4

D

D.C. 26:15 32:22 47:2,20

Dallas 46:10

damages 32:9

date 19:18 35:4 42:4
43:14,20 50:3 57:1

dates 40:23 42:8,13,16,24
43:1,4,6,11

David 2:16 3:3 44:24 45:6
47:22

Davis 10:12 11:3 12:7

day 39:9

days 48:17

deal 3:9,13 39:19

debt 38:25 39:8

debtor 2:17 5:5 37:15
42:8

debtors 37:16

debts 38:21

decided 47:9 56:11

decision 20:25 35:3

defend 29:2,8

defendant 28:4 31:11,12

defendants 31:10

defending 31:9,12

defined 2:10

defines 37:11,13

definition 41:14

delegation 11:23

Dell'aquila 26:8

Dell'aquila's 32:3,6,10

demand 28:11 32:14

Department 28:1

depends 46:13

desire 35:18

detailed 10:21

details 51:21

DFS 28:3

difference 44:18

differences 44:17,19

direct 22:9 51:5

directed 47:22

direction 47:12

director 43:24,25 54:12
57:23

directors 37:14,23 39:24

disclaimer 44:20

disclosed 38:5,12 40:13,
14

disclosure 13:6 15:19
45:22

disconnect 60:5

discovery 50:24

discuss 6:12,15 9:16,17
55:2,14

discussed 6:1,20 10:2
13:21 15:24 48:1 55:11,
19

discusses 6:7

**discussion** 9:8 14:21

**dismissed** 26:18

**disposal** 32:2

**disputes** 29:25 30:3,11

**dissolution** 32:1

**District** 23:14,19,24 24:3, 7 47:21

**division** 57:19

**Docket** 22:6,22 37:4,5,7

**documents** 18:6,14 22:14

**dollars** 28:22

**Doug** 3:23 16:17

**draft** 5:12

**due** 35:19

### E

**earlier** 28:10 51:20 55:8

**early** 55:7

**Eastern** 23:14

**ECF** 22:12

**email** 35:14,20 53:1

**employed** 35:25

**employees** 39:8 47:1,11

**employment** 5:13,19 6:20,25 7:5 8:9,15 10:2 15:23 18:23 53:8

**encompass** 25:23

**end** 2:11 33:10 34:3 60:6, 7

**enforcement** 25:19 26:12, 15

**engagement** 25:23

**entail** 58:2

**entails** 58:3

**Entities** 3:4

**entitled** 2:8

**entries** 41:4

**error** 45:19

**established** 15:20

**estate** 51:6

**evaluate** 39:16

**eventually** 56:20

**everyone's** 2:23

**exact** 28:24 50:3 57:1

**examples** 43:24

**Excel** 48:4 52:8,11,15

**Excels** 52:17

**Excuse** 12:5

**excused** 36:10,13

**executed** 5:16,20

**execution** 7:12

**executive** 8:20,22 9:1,2,5, 7,13,20 10:1,3,6,10,21 11:11,14,17,18,21 12:1,4, 6,11,18,25 13:23 14:3,16 15:15,21 16:10,21,24 20:9 35:16 41:4

**exhaustive** 8:4

**exists** 46:24,25

**expanded** 25:23

**expecting** 50:12

**expenditure** 49:1,14

**expenditures** 49:23

**expense** 37:12 40:18 49:22

**expenses** 39:24 40:11,14 41:8,12,15 44:1

**explain** 53:15

**explained** 4:10

**explanation** 9:12

**expressed** 35:17,18

**extent** 13:22 14:18 16:18 19:21 20:12 58:16

### F

**facilitate** 9:7

**fact** 32:7 39:14

**fair** 11:2 17:9 20:19 30:10

**fall** 6:8,12,15,20 35:2

**Fane** 4:24

**feedback** 46:23

**fees** 28:19,20 29:17

**figure** 28:21

**figures** 32:15

**file** 28:25 60:7

**filed** 2:7 22:14 23:23 24:17 29:21 32:8 35:5 39:9 48:15

**filing** 20:20,21 30:9 34:19 37:13 52:16

**final** 36:21

**finally** 36:12

**finance** 54:11 57:18 58:6

**financial** 3:1,4,21 21:3,9, 20 22:6,20,22 25:8 28:1 30:4 36:21 37:1,3,8,20 39:14,18 41:11 42:1,4 44:6,9 57:24 58:6,8,20

**financially** 58:15

**find** 23:3 37:18

**Firm** 4:24 10:13 17:13 25:14 30:12,13,19 31:9

**floor** 4:13 59:4

**focus** 8:25 11:17

**focusing** 10:1

**follow** 34:15 46:15

LEXITAS

follow-up 4:11 33:1 34:13

For-profit 3:4

force 4:17

form 20:11

formalization 11:23

forms 44:12

Foundation 47:25 48:22 51:12,22 52:2,13,21,22 53:18 54:11

Frazer 2:16,20,21 3:14 4:5,12,16,21 5:2,3,7,10, 15,22,23 6:3,10,14,22 7:2,8,18,22,23 8:3,11,17, 18,21 9:4,14,18,20,23 10:4,7,11,19 11:6,9,15,20 12:2,5,13,16,20 13:15,16 14:24 15:6,9,25 16:3,6, 13,14,22 17:15 18:21 19:4 20:1,2,15,17,20,23 21:9,10,14,22,25 22:7,24 23:2,7,16,21 24:1,3,6,14, 20,23,25 25:2,4,9,12,15, 20 26:4,10,13,16,18,24 27:6,10,14,17,21 28:8,13, 18,23 29:3,6,9,13,23 30:1,5,13,21 31:8,18,23 32:13,18 33:4,25 34:9,15, 17,20,23,25 35:7,12,22 36:2,4,8,9,11,14 55:11,15

Frazer's 33:7

free 51:7

front 8:12

full 18:19 41:4 48:20 49:17

function 53:11,17

funding 48:8 49:17

fundraising 53:17

funds 48:2,25 49:4,6,21, 25 51:12,16 52:18

**G**

gears 21:2

general 2:21 4:25 5:4,8,17 7:24 13:22 24:18 29:16 31:25 37:15 53:6 58:5,15, 19

General's 32:23 47:20 58:10

generated 52:23

geographically 47:12

Girt 2:2 59:22

give 8:4 10:20 33:14

Global 44:5,7,20

good 2:20 5:1,2 47:17 56:3 60:1

Governor 27:20,25

grant 48:2,4,5,7,8,19,20, 21 49:6,17,20,21 51:15, 22 52:18,20

grants 47:24 48:12 52:15, 22

Great 21:1 34:11 59:21

greater 53:24

guess 21:18 24:24 25:25 35:1 39:21

guests 11:1

gun 27:23 30:24

**H**

ha 28:18

handled 45:9 49:3 53:1

handles 58:20

handling 58:3,7

happen 36:24

head 28:4

headquarter 46:9

headquarters 45:10 46:20

heads 53:11

health 35:19

hear 16:23

Hearing 17:23 36:9 59:3

helping 23:2

Hey 32:25

high 26:4

hired 25:14,18,20

hiring 26:1

history 27:7

hundred 28:21 31:21

**I**

identified 47:24 48:4,12 52:1,16

identify 2:12 48:6

ILA 46:18 47:1,13

ILA's 46:17

impact 51:5

implies 7:14,16 19:22 20:12

in-house 33:25 35:24

inaudible 13:4 17:8 50:8 59:19

include 7:7 31:24 42:25

included 6:25 7:20 40:12 44:5 48:5

includes 18:24 29:15,17

including 12:24 14:3 37:11,14,23 39:24 43:1 58:4

inclusion 7:15

incurred 49:23

indemnity 28:11

individual 41:16,19

individuals 43:18

information 58:21

initial 31:10

initially 25:20

inquiring 51:2,4

insider 37:9,10 38:22
41:19,21

insider's 42:7

insiders 37:2,13,17 38:22
42:25

instruct 13:2 15:25 16:21

instructing 13:9

instruction 16:13,15

instructions 33:14

interests 2:10

internal 50:10,13

introduce 33:21 59:12

inventory 45:23

investigation 25:19

involved 2:13 21:13 26:1,
2 30:19 50:19

involving 9:6 25:21 27:22,
23

issue 51:17

issued 19:16

issues 25:21,24

item 6:17 19:2 29:15
41:12 42:6,8 56:8

items 42:5

J

James 24:18

January 5:14,21,25 6:18

7:6 8:19 10:18 12:24
14:3,15 15:16 16:11 17:2,
19,20 18:20 19:17,24
20:7,14,22,23 35:14,17,
21

Jason 4:23 33:1 47:16
53:5

Joe 57:12

John 2:21 4:6 55:10,15

Joseph 18:10

K

Kathman 4:23 5:3,8,11,
17,23 6:4,11,19,24 7:4,
13,19,23 8:8,14,18,23
9:10,16,19,22,25 10:5,8,
16 11:2,8,10,16,25 12:3,
10,15,17,22 13:8,12,16,
18,25 14:12 15:6,10 16:3,
8 17:1,5,7,9,19 32:25
34:14 35:6,13,23 36:3,5
47:16,18 53:5,12,14,19,
23 54:2,7,13,17 55:4,7,
16,18 56:2,12,14,19,23
57:2,5,10

Kathman's 18:17 34:13

kind 8:12 21:18 34:16

knew 34:23 35:1

knowledge 3:24 4:5,7 7:3
8:17 38:18

L

Lambert 4:9 32:21 42:19
45:12 54:18

Lapierre 5:12 7:1,4 19:14
35:16

Lapierre's 5:19 6:8,13
10:2 15:22 18:23

law 4:24 8:6 58:13

lawsuit 23:18 24:17 27:23
30:3 32:7

lawsuits 21:12,17,19
22:19,21 23:10,13 25:7
26:1,3,20,22,25 27:5,20
28:6,16 29:2,4,8,11,25
30:18 31:4

lawyers 10:5,9 11:10,13,
25 12:3,18

lead 13:6

learn 34:18

leave 35:10 56:7

ledger 58:5

left 12:6 57:1

legal 9:9 29:16,17,18
58:17

Leonor 47:19

liabilities 31:5,13,14

liability 31:6

Lisa 4:9 14:5 17:10 32:25

list 8:4 10:23,24 21:12
22:18 25:6 37:9,21

listed 10:17 21:20 23:6,15
24:19 30:3 37:22 38:6,11,
14 39:3,4,21 40:2,5,18,22
43:18 44:2 45:16 48:16
51:22 54:5,14 55:2,3,5

listing 46:3

litigation 11:24 19:1,8
20:8 24:11 27:8,18 30:7
50:23

LLP 4:24

location 47:10,12

Lockton 23:13

long 51:11 52:21

longer 24:15 29:1 55:8

looked 15:2

**Los** 24:13

**lose** 20:5

**lost** 20:3

---

**M**

**Madam** 59:5

**made** 4:2 20:25 35:4 37:12 42:5,9,14 48:17,19, 25

**make** 50:7

**makes** 49:13

**managing** 54:11

**March** 22:14 25:16

**mat** 30:9

**matter** 5:1

**matters** 9:6 30:9

**Mcqueen** 18:11 21:20 23:5 27:5 32:17 57:14

**means** 17:24

**mechanics** 46:19

**meet** 6:12

**meeting** 2:3,12 3:8 4:11, 17,19 5:14,21,24 6:18,23 7:6,10 8:19 10:18 12:24 13:22 14:3,16,22,25 15:8, 16 16:11 17:2,19,21 18:8, 20 19:17,24 20:7,14 33:10 34:3 36:10,22 44:10 48:1 50:22 52:23 54:20,23,25 55:2 56:9 59:22

**meetings** 15:5 55:20

**meets** 6:7

**members** 2:7 29:12

**mentioned** 11:3,4 44:9

**mere** 11:13

**met** 6:15

**mi** 39:17 59:5

**mid-five** 32:15

**million** 28:21 31:22 32:4, 17

**minutes** 4:18 10:20 17:18 18:22 50:4

**Miranda** 47:17,19 48:11, 18 49:8,12,17 50:1,4,7, 14,20 51:1,9,18 52:14,24

**missing** 3:18

**mission** 47:13

**mistaken** 10:14

**modify** 3:11 44:11

**moment** 21:25 22:1

**money** 48:21 51:3,5 52:13,20

**monthly** 58:6

**motion** 32:8

**moved** 45:10 46:20

**moves** 46:10

**museum** 45:9,13,17,22 46:9,13,14

---

**N**

**names** 10:24,25

**narrow** 50:16

**National** 2:22 3:1,5 5:5,18 7:24,25 8:9 24:8 34:18 35:24 36:1

**necessarily** 7:14 13:5,6 15:18 39:15

**negotiated** 8:6

**normal** 49:10

**North** 28:7

**Nos** 2:3

**note** 3:12 10:22

**noted** 3:22

**notes** 44:5,7,15,20

**NRA** 2:2 11:7 21:13 26:2, 8,12,14,20,21,24 27:14, 15,19 28:2,7,15,25 29:7, 12,13 30:12,14 31:6,7,13, 16 45:14 46:10 47:1,25 48:7,15 49:13 51:11 52:18 53:11,13,14,17 54:12 57:3,7 59:2,22

**number** 22:9 26:25 28:24 31:20

**numbers** 2:4

---

**O**

**object** 14:17 15:18 20:11 58:16

**objection** 13:1 16:12 19:21 32:6

**OCC** 6:6,7

**occur** 50:2

**occurred** 14:22 15:8 40:15 43:2,14 50:17 51:3

**occurring** 16:20

**occurs** 58:14

**Office** 4:10,19 29:16 32:23 47:20 57:15,19 58:10,20

**officer** 3:1,4 9:6 36:21 43:24,25

**officers** 10:22 37:14 38:7, 9,15 39:24

**Officers'** 5:25 6:5,11,20 9:17,23

**official** 44:12

**Oliver** 28:7

**one's** 24:19

**open** 4:13 15:4,9 33:9,11



59:3

**operations** 57:24 58:4

**Operator** 33:9,13,16 34:4, 8,10 59:5,7,18,20 60:4

**opportunity** 2:5 34:2

**opposed** 43:20

**option** 35:2

**order** 27:24 39:8

**original** 37:4

**outline** 33:4

**owed** 38:21

## P

**Pages** 37:6,22

**paid** 44:2

**paper** 28:16

**papers** 29:20

**parameters** 25:10

**part** 12:24 14:23 16:10 45:19

**parties** 2:8,9 8:7 24:4

**partners** 25:22 37:15

**pass** 4:22 17:11 36:6 47:15 57:10

**passed** 20:8

**past** 6:24

**pause** 27:6

**payable** 58:4

**payment** 38:25 39:4,8 43:19

**payments** 37:2,9,11,23 38:7,15,21,22 39:4,17,23, 24 40:17,23 42:5,9,14,24, 25 43:1,2,14 44:1 48:17 52:2

**pen** 28:15

**pending** 23:11,14 24:15 25:7

**people** 15:12

**period** 41:5

**person** 3:11

**petition** 19:23 20:18 35:5

**petitions** 19:13 20:13

**phone** 2:8 33:19 59:10

**phonetic** 3:13 13:19 19:6 21:19 49:18

**phrases** 16:23

**places** 39:15

**plaintiff** 26:20,22 27:1

**planned** 33:9

**point** 12:9 23:8,21 33:24

**points** 52:25

**policy** 48:23,24 49:13 50:2,9,10,11,12,17 51:2, 10

**portion** 52:12

**position** 38:24 44:11,16

**possibly** 50:15

**potential** 31:13,14 35:2

**preparing** 21:8,12

**presence** 47:13

**present** 6:3,22 10:5,10,11, 12,13,23 12:1,4,7 14:25 16:25 17:1

**presently** 36:1

**President** 28:7 54:25 55:3

**press** 2:8 33:19,22 34:5,6 59:9,13,14,16

**previous** 34:21 52:17 55:20

**previously** 2:15 3:7 4:10 54:10

**primarily** 47:23

**printed** 37:18

**prior** 4:1 48:17 51:9 55:25

**privileged** 13:7

**prob** 44:25

**problem** 33:13 42:21

**procedures** 49:11 50:13

**proceedings** 60:6

**process** 49:19 50:19

**processes** 51:15

**produced** 35:14 52:2

**promise** 33:5

**prompted** 33:20 34:6 59:11,15

**properly** 46:12

**proposed** 11:22

**prosecute** 29:1,8

**proven** 31:6

**provide** 4:18 42:24 50:16

**provided** 48:3 51:25 54:10

**provision** 7:7,15,16,20 8:2,10,13,16 18:24 44:6

**provisions** 6:1

**proviso** 7:11

**pull** 22:2

**purposes** 3:8 52:10

**pursuant** 48:19

**pursuing** 27:2

**put** 28:15 50:20,21 54:19, 21 56:21

## Q

**question** 2:11 4:16 8:15, 24 9:10,12 11:13 12:11



13:3,6,14,25 14:18,21,23
15:13 16:1,5,7,8,19 18:18
19:22 20:5,6,12,16 21:4,
21 22:11 25:10 33:2,18,
21 34:5,16 35:23 37:2,9,
17 38:2,10,21 39:18,25
40:3,12 41:10,11 42:1,4,
23 43:5,19 46:4 51:18
54:1 55:4 56:3,12 58:12
59:9,12,14

**question's** 39:15

**question-and-answer**
33:17 59:8

**questioning** 34:12,17

**questions** 2:6,9 4:12,13,
15 17:3 18:17 21:6 31:1
32:20,24 33:3,5,23 34:1,
9,13 36:6,8,17 44:8,12,14
47:21 53:3 57:13 58:25
59:4,20

**quote** 35:9

---

### R

**reach** 13:21

**reason** 9:2,4,12 10:16
23:6,8,13,15 24:19

**reasoning** 11:18

**reasons** 9:14 29:20 55:1,
12

**recall** 8:19,20 15:3 28:3
32:13 35:10,20

**receivable** 58:5

**receive** 9:9

**received** 43:25 48:7 51:23
58:5

**receiving** 49:20

**recognizes** 2:18

**recollection** 16:23

**record** 2:18 3:22 13:9

**reporting** 57:24 58:6,9,14

**represent** 4:25 11:5 12:12
47:21

**representatives** 2:6 59:1

**represented** 27:12,15,19

**representing** 30:12,14

**represents** 26:2,8,11,14,
21,24 49:9 52:9

**request** 15:10 17:18,20
33:22 34:6 43:18 50:21,
24 51:8,20 52:1 59:12,16

**requested** 18:7 42:6

**requests** 18:5 32:4 52:5,7,
9 53:1

**required** 33:21 59:11

**requires** 21:3

**reserve** 4:14 17:3 32:20,
23

**resolution** 7:9 11:22
18:25 19:8 20:8 23:11

**resolutions** 4:19 15:22
19:5,12,16,18,22,23
20:12,13,17

**resolved** 24:15

**respect** 28:1 58:7

**respond** 13:3 51:8

**response** 17:23 25:7
40:12 51:23

**responses** 44:7

**responsibilities** 35:19

**rest** 4:14

**restate** 16:7 20:5

**restricted** 52:10

**retained** 28:17

**return** 48:23 49:6,25
51:15

14:11 15:20 22:5 33:19
34:5 38:20 40:2,16 59:10,
15

**records** 28:19 51:14
52:19

**refer** 6:6 22:12 37:3 55:23

**reference** 45:22,23,24

**referred** 37:22

**referring** 22:17 23:22
45:14

**reflect** 18:22 53:7

**reimbursed** 41:16 49:14,
24

**reimbursement** 37:23
41:8,15,16 43:25

**reimbursements** 37:12
40:18

**relate** 33:4

**relating** 51:21

**relationship** 42:7

**relative** 43:24

**relatives** 37:15,16 38:15

**relevant** 30:8 39:16

**relieve** 35:18

**relieved** 35:18

**relocated** 46:14

**remain** 3:7 46:24 47:14
55:12

**remember** 27:7

**remind** 3:6,9 44:10

**reopen** 34:12

**reorganization** 18:24

**reorganize** 29:21

**repeat** 16:16

**report** 9:17,24

**reporter** 2:18



returned 47:24,25 48:13, 22 49:10 52:13

returning 51:11,12 52:18

returns 48:18 49:2

reveal 14:18 16:1,19

reversed 2:4

review 5:18

Rick 54:7,8

Rifle 2:22 3:2,5 5:5,18 7:24,25 8:9 24:9 34:18 35:24 36:1

right-hand 22:13

Rogers 10:12,17 11:4,5,6 12:7,21

role 2:17 4:10,11

roles 57:22

room 16:15

roster 10:19,21

routinely 8:6

Rowling 2:16,25 3:16 4:7, 15 36:18,19,20,23 47:23 48:9,16,23 49:9,16,19 50:3,6,9,18 51:13 52:8,19 53:4 54:2,4,13,16,17,24 55:6,10,17,19,22,24 56:6, 13,18,22,25 57:4,13,15, 18,23 58:2,3,11,19,24 59:1

Rowlings 17:15

**S**

salaries 40:18

salary 38:25 39:4 43:1 44:1

save 22:8

schedule 2:23 21:17 22:18 30:4 38:5,10 42:18 43:8 48:17 49:9 51:23

52:8

Schedules 3:21 22:11 37:19 39:5 40:19 44:8 45:17 53:7

Schropp 53:8,9,10 54:4

Schropp's 54:3

Sea 2:2 59:22

sec 11:20

Secretary 2:21

seeks 32:1

semantics 45:19

send 50:21 51:7

separate 24:17 41:12

Services 28:1

session 8:20,22 9:1,2,5,7, 13,21 10:1,3,6,10 11:11, 14,17,18,21 12:1,4,7,12, 19,25 13:23 14:4,16 15:16 16:10,24 20:9 33:18 59:8

sessions 15:4,9,22 16:21

settled 23:16,17,20

shared 29:11

sheet 48:4 52:20

shortly 39:9

shutdown 27:23

sic 17:15 31:4

signed 19:13

similar 52:17,20

single 30:3

SLC 15:23 19:14

slightly 49:3

slowly 33:20 59:10

SOFA 40:19

sold 46:9

somebody's 45:19

Sonya 2:16,25 47:23 48:10

sort 48:14 50:16

sounds 26:4 50:23

speak 4:3 11:10,14

special 4:17,19 11:24 19:1,8 20:8 36:22 55:1

specific 8:14 14:1,10,13 18:18 20:7 23:22 26:22 55:1

specifically 19:9,10,19 21:11 39:20 51:25 52:23 53:22 57:9

speculating 54:1

speculation 56:10,15

Spencer 4:24

spend 49:4,5 52:12

spending 29:18 49:5

spent 51:16

spoke 12:18,21 56:24

spoken 35:16

Spray 35:9,17,25 55:8 56:24 57:2,6

staff 10:25

star 33:19,22 34:5,7 59:9, 13,15,16

start 36:18

state 2:13,17 4:25 30:24 37:19

stated 9:15 51:23

statement 3:11 21:3,8,20 22:3,6,19,21 25:8 30:4 37:1,3,8,19 39:13,18 41:11 42:1,4

statements 3:21 44:6,8 58:8



States 4:20

stay 46:24 47:2

stayed 23:10 28:9

stemming 19:23 20:13

store 30:24 45:9,13,15,17,
22 46:9,14

stores 27:24

streamline 30:16

subject 7:14 19:25 20:15
30:23

submit 49:23 52:12

submitted 54:19

submitting 58:20

substance 16:19

suit 32:4,11

suits 23:5 30:14,15

supplied 18:13

supposed 40:10

Supreme 24:18

suspect 15:11

switch 21:1

sworn 2:15 3:7

**T**

taking 13:13 16:4

talk 36:25

talking 19:11,16 22:19
31:24 42:20 46:19

targeting 28:2

Taylor 53:8,9

Tedrick 54:8

temporarily 52:10

terminated 36:3

terminology 45:13,14

terms 48:19

testified 34:20 35:7,9

testify 47:6

testimony 3:9,10 4:1
32:11 35:10 55:7,25

Tex 46:21

Texas 7:20 8:1,16 23:11
29:21 45:10 46:21

thing 17:17

thinking 23:9 28:14

thir 26:17

thought 24:20

thread 20:4,5

time 3:22 4:2 5:12 7:4
8:25 9:3,13 11:19,21 22:8
25:23 31:1 35:1 36:17
44:23 48:21 56:23 59:18,
23

timeframe 50:16

times 8:24

timing 39:16 51:2

today 2:15,23 46:25 47:21

today's 60:4

top 22:13 28:3 31:20

topics 14:21

total 28:19,20 49:6

track 52:20

traditionally 10:22

transactions 43:5 48:5
51:22

transcribed 2:19

transcript 17:20 56:1

transcripts 15:3,7,8,11

transfers 37:11

travel 2:23

Treasurer 36:21 54:20,22
55:8,13 56:7,9,21 57:16,
19

treated 39:1

trick 33:7

true 31:6

Trustee 2:1 3:6,15,17,20,
25 4:8,9,20,22 13:4,17,20
14:6,8 17:3,6,8,12 18:3,7
21:5 22:4,12 24:2,4,7,10
31:2 32:22 33:6,15,23
34:8,11,22,24 36:7,12,16,
25 38:3,6,11,14,19,24
39:3,7,12,23 40:11,22,25
41:3,7,10,18,21,23,25
42:3,11,13,21,23 43:7,10,
13,21,23 44:4,25 45:3,8,
16,25 46:3,6,8,16 47:1,15
53:3 58:25 59:17,19,21
60:3

Trustee's 4:10 17:18
44:11,14

Turn 40:25

Tyler 53:10

type 30:14,15,22 58:14

**U**

U.S. 2:1 3:6,15,17,20,25
4:8,9,10,22 13:4,17,20
14:6,8 17:3,6,8,12 18:3,7
21:5 22:4,12 24:2,4,7,10
31:2 32:22 33:6,15,23
34:8,11,22,24 36:7,12,16,
25 38:3,6,11,14,19,24
39:3,7,12,23 40:11,22,25
41:3,7,10,18,21,23,25
42:3,11,13,21,23 43:7,10,
13,21,23 44:4,11,14,25
45:3,8,16,25 46:3,6,8,16
47:1,15 53:3 58:25 59:17,
19,21 60:3

Uh-huh 42:2 43:22

**ultimately** 7:19

**unavailable** 33:7

**unclear** 52:3

**understand** 3:17 25:18
43:17 44:2 51:16 58:11

**understanding** 6:4,7
39:22 44:14 54:24 56:20,
22 58:18

**undertaken** 51:15

**United** 4:20

**unmute** 33:19 59:10

**unpaid** 39:4

**unquote** 35:9

**unspent** 49:6

**unused** 47:25 48:2 52:18

**upfront** 49:4

---

**V**

**valuation** 45:24

**versus** 24:12

**Virginia** 23:5,10,14 27:7
46:21 47:2

**voice** 2:19

**vote** 18:19 50:5 54:19
56:21

**voted** 18:22

---

**W**

**wait** 13:17 34:1

**wanted** 18:16 21:18 52:3

**wanting** 39:21,23

**Warner** 36:17

**Warren** 2:16 3:3,19 4:15
17:1,4,14,15 21:4,7,8,12
32:24 33:24,25 36:18
37:24 38:1,2,4,8,12,16,18

39:2,6,11 40:2,4,8,13,17,
20,24 41:2,6,9,14,20,22,
24 42:2,10,12,17 43:3,12,
15,17,22 44:3 45:7,20,21
46:2,5,7,11,22 47:6,8,10,
22 53:4,7,10,13,16,21,25
54:8,9 57:5,8 59:1,25

**Wayne** 5:12,19 18:23

**week** 35:11,14 48:3 51:20

**weekend** 54:20,22 60:1

**weekend's** 54:20,22 56:9

**witnesses** 2:14,15 4:3
13:3,9,13 34:2

**words** 12:23 14:1,14 15:3,
13,14 16:9 19:5

**work** 57:3,6

**worked** 57:15,18

**writing** 50:22

**wrong** 21:16

---

**Y**

**year** 35:15 37:10,12 48:5,
7,14 53:24

**years** 23:17 48:24 52:17
57:16,20,22,25

**York** 4:25 5:1 17:19 18:7
24:18 25:18 26:12 30:24
31:25 53:6 58:10,13,15,
21



# EXHIBIT G

1 UNITED STATES BANKRUPTCY COURT

2 NORTHERN DISTRICT OF TEXAS

3 DALLAS DIVISION

4 IN RE: )
)  Case No.

5 NATIONAL RIFLE ASSOCIATION ) 21-30085-hdh-11
OF AMERICA AND SEA GIRT, LLC)

6 ) Chapter 11
Debtors. )

7

8

9

10 **************************************************

11 VIDEOTAPED ORAL DEPOSITION OF

12 NATIONAL RIFLE ASSOCIATION OF AMERICA

13 BY AND THROUGH ITS CORPORATE REPRESENTATIVE

14 JOHN FRAZER

15 MARCH 15, 2021

16 VOLUME 1

17 CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

18 (Reported Remotely)

19 **************************************************

20

21

22

23

24

25

Page 1

1
2      On the 15th day of March, 2021, at 8:11 a.m.,
3  the videotaped oral deposition of the above-named
4  witness was taken at the instance of The State of New
5  York and Ackerman McQueen, Inc., via Zoom video
6  conference, before Michelle L. Munroe, Certified
7  Shorthand Reporter in and for the State of Texas, the
8  Witness located at the Brewer Law Firm, 1717 Main
9  Street, Suite 6000, Dallas, Texas, pursuant to
10  Notice, the Thirty-Sixth Emergency Order Regarding
11  the COVID-19 State of Disaster, and the agreement
12  hereinafter set forth.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 2

1   A P P E A R A N C E S
2  FOR NATIONAL RIFLE ASSOCIATION OF AMERICA:
    Mr. Dylan T. Ciciliano (via Zoom)
3   Mr. Gregory E. Garman (via Zoom)
    Ms. Talitha Gray (via Zoom)
4   Ms. Teresa Pilatowicz (via Zoom)
    GARMAN TURNER GORDON LLP
5   7251 Amigo Street, Suite 210
    Las Vegas, Nevada 89119
6   702.777.3000 telephone
    dciciliano@gtg.legal
7
    FOR JOHN FRAZER:
8
9   Mr. William B. Fleming (via Zoom)
    GAGE SPENCER & FLEMING LLP
10   410 Park Avenue, Floor 9
    New York, New York 10022-9492
11   212.768.4900 telephone
    wfleming@gagespencer.com
12
13
    FOR THE PEOPLE OF THE STATE OF NEW YORK:
14   Mr. James Sheehan (via Zoom)
    Mr. Stephen Thompson (via Zoom)
15   Ms. Emily Stern (via Zoom)
    Ms. Monica Connell (via Zoom)
16   Ms. Yael Fuchs (via Zoom)
    Ms. Sharon Sash (via Zoom)
17   OFFICE OF THE ATTORNEY GENERAL OF THE
        STATE OF NEW YORK
18   28 Liberty Street
    18th Floor
19   New York, New York 10005
    212.416.8401 telephone
20   james.sheehan@ag.ny.gov
21
    Mr. Jonathan Conley (via Zoom)
22  NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
    The Capitol
23   Albany, New York 12224
    212.416.8108 telephone
24   jonathan.conley@ag.ny.gov
25

Page 3

1  FOR THE PEOPLE OF THE STATE OF NEW YORK:
    Mr. Eric Van Horn (via Zoom)
2   Mr. Jason Kathman (via Zoom)
    Mr. Gerrit Pronski (via Zoom)
3   SPENCER FANE LLP
    2200 Ross Avenue, Suite 4800 West
4   Dallas, Texas 75201
    214.750.3610 telephone
5   ericvanhorn@spencerfane.com
6
7  FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:
    Ms. Laura Smith (via Zoom)
8   Mr. Scott Drake (via Zoom)
    Mr. Tim Carney (via Zoom)
9   NORTON ROSE FULBRIGHT US LLP
    2200 Ross Avenue, Suite 3600
10   Dallas, Texas 75201
    214.855.8341 telephone
11   laura.smith@nortonrosefulbright.com
    scott.drake@nortonrosefulbright.com
12   tim.carney@nortonrosefulbright.com
13
14  FOR JUDGE PHILLIP JOURNEY:
    Mr. Jermaine Watson (via Zoom)
15   Mr. Paul Farmer (via Zoom)
    BONDS ELLIS EPPICH SCHAFER JONES LLP
16   420 Throckmorton Street, Suite 1000
    Fort Worth, Texas 76102
17   817.529.2724 telephone
    jermaine.watson@bondsellis.com
18
19
    FOR ACKERMAN MCQUEEN, INC.:
20   Mr. Brian E. Mason (via Zoom)
    Mr. Joseph Acosta (via Zoom)
21   Ms. Kelsey Taylor (via Zoom)
    Mr. Mike Gruber (via Zoom)
22   DORSEY & WHITNEY LLP
    300 Crescent Court, Suite 400
23   Dallas, Texas 75201
    214.981.9929 telephone
24   mason.brian@dorsey.com
25

Page 4

1  FOR THE OFFICE OF THE U.S. TRUSTEE:
    Ms. Juliet M. Sarkessian (via Zoom)
2   UNITED STATES TRUSTEE PROGRAM
    844 King Street
3   Room 2207
    Wilmington, Delaware 19801
4   302.573.6491 telephone
    juliet.m.sarkessian@usdoj.gov
5
6   Mr. Marc F. Salitore (via telephone)
    UNITED STATES TRUSTEE PROGRAM
7   1100 Commerce Street
    Room 976
8   Dallas, Texas 75242
    marc.f.salitore@usdoj.gov
9
10
    ALSO PRESENT:
11   Dave Webster, AlixPartners (via telephone)
    Thomas Prince, AlixPartners (via telephone)
12   David Crenshaw, Video Technician
13
14  [Reporter's note:  Physically present at the
    deposition were Mr. Frazer, Mr. Ciciliano and David
15  Crenshaw, the videographer.  Everyone else attended
    remotely via Zoom and/or telephone.]
16
17
18
19
20
21
22
23
24
25

Page 5

2 (Pages 2 - 5)

```
1          I N D E X
   WITNESS                      PAGE
2
   JOHN FRAZER
3
      Examination by Mr. Sheehan................ 7
4
      Examination by Mr. Thompson............... 193
5
      Further examination by Mr. Sheehan........ 224
6
      Examination by Mr. Mason.................. 256
7
8  DEPOSITION EXHIBITS              IDENTIFIED
9  Exhibit 1    Notice of deposition for
                corporate representative........ 7
10
   Exhibit 2    Agreement between Allegiance
11              Creative Group and NRA.......... 216
12 Exhibit 3    Fourth Amendment................ 220
13
14 PREVIOUSLY MARKED EXHIBITS:
15 Exhibit 53   Notice of deposition of
                corporate representative........ 256
16
   Exhibit 109  January 7, 2021 NRA Meeting of
17              the Board of Directors.......... 293
18
19
20
21
22
23
24
25
                                       Page 6
```

```
1          P R O C E E D I N G S
2       THE VIDEOGRAPHER (VIA ZOOM):  I'm on    08:11:01
3  the record.  The time is 8:11.          08:11:02
4            JOHN FRAZER,                   08:11:02
5  having been first duly sworn, testified as follows:  08:11:02
6        EXAMINATION                        08:11:02
7  BY MR. SHEEHAN (VIA ZOOM):              08:11:19
8     Q.  Good morning, Mr. Frazer, my name is James  08:11:19
9  Sheehan.  I am an Assistant Attorney General in the  08:11:20
10 State of New York.                       08:11:22
11       It is my understanding that you are here  08:11:24
12 pursuant to a Rule 30(b)(6) deposition notice and  08:11:26
13 that you have agreed to act as a corporate  08:11:29
14 representative.                          08:11:31
15       Is my understanding of those correct?  08:11:31
16    A.  Yes.                             08:11:34
17    Q.  I would ask you to examine Exhibit 1 and  08:11:36
18 tell me which of the questions in Exhibit 1 that you  08:11:40
19 are prepared to testify about.           08:11:43
20       (Exhibit 1 marked.)               08:11:50
21       MR. CICILIANO (VIA ZOOM):  Counsel,   08:11:50
22 we -- we provided you notice it was 5, 7, 10, 11, and  08:11:50
23 15.                                      08:11:54
24    Q.  Okay.  Is that consistent, Mr. Frazer,  08:11:54
25 with your understanding?                 08:11:56
                                        Page 7
```

```
1     A.  Let me get there.                08:11:58
2        MR. CICILIANO (VIA ZOOM):  And for  08:12:04
3  anyone else on the call, could I ask you that you  08:12:06
4  mute your line so that sound interference doesn't  08:12:08
5  switch over the camera because we keep losing  08:12:10
6  Mr. Sheehan as he's talking.             08:12:13
7     A.  Yes, that's correct.             08:12:22
8     Q.  All right.  So let's talk first.  You are  08:12:25
9  presently the general counsel and corporate  08:12:26
10 secretary of the National Rifle Association; is that  08:12:29
11 correct?                                 08:12:31
12    A.  Yes.                            08:12:31
13    Q.  All right.  And have you been -- have you  08:12:34
14 testified previously as a 30(b)(6) representative of  08:12:37
15 the NRA?                                 08:12:39
16    A.  I have not.                      08:12:41
17    Q.  Have you participated in a 30(b)(6)  08:12:42
18 deposition as counsel or present during such an  08:12:44
19 examination?                            08:12:48
20    A.  No, I have not.                  08:12:49
21    Q.  So this will be a new experience, but let  08:12:50
22 me just walk through.                    08:12:54
23       Can you tell me, to prepare for your  08:12:58
24 answers to 5, 7, 10, 11, 15 in Exhibit 1, how did  08:13:00
25 you prepare?                             08:13:04
                                        Page 8
```

```
1     A.  I met with counsel over the weekend.  I --  08:13:05
2  and we reviewed various documents that I understand  08:13:10
3  have been produced to you.               08:13:14
4     Q.  And what documents did you review?  08:13:16
5     A.  I mean, everything that has been produced  08:13:18
6  to you.  It was quite a few.  I can't list them from  08:13:25
7  memory.                                  08:13:29
8     Q.  Okay.  And who -- well, who are the  08:13:31
9  counsel who prepared you?                08:13:34
10    A.  I met with Mr. Ciciliano, Mr. Garman,  08:13:35
11 Ms. Rogers, Mr. Brewer, my attorney Fleming.  08:13:41
12    Q.  And were they all -- was there anybody  08:13:51
13 else?                                    08:13:53
14    A.  I believe that's it for counsel.  08:13:53
15    Q.  Were there any humans in the room as well  08:13:58
16 that -- to assist in preparation?         08:14:01
17    A.  Humans in the room.  We -- we had a  08:14:04
18 couple -- we talked to a couple of NRA employees on  08:14:07
19 the phone.                               08:14:11
20    Q.  Okay.  Who were they?             08:14:12
21    A.  We talked to Sonya Rowling, we talked to  08:14:13
22 Tyler Schropp, and we talked to Wayne LaPierre.  08:14:16
23    Q.  Mr. Warren?  Did you talk to Mr. Warren?  08:14:25
24    A.  Not for the 30(b)(6).             08:14:28
25    Q.  Are those all the people you talked to in  08:14:34
                                        Page 9
```

3 (Pages 6 - 9)

1 preparation for this 30(b)(6)?                08:14:37
2    A.  I believe so.                          08:14:38
3    Q.  So you have examined Exhibit 1, and that  08:14:48
4 is, in fact, an accurate copy of the notice of  08:14:50
5 deposition which you used to prepare for this  08:14:53
6 deposition; is that correct?                  08:14:56
7    A.  Yes.                                    08:14:57
8         MR. CICILIANO (VIA ZOOM):  Counsel, if  08:14:58
9 I can interrupt, whoever has the phone number  08:15:00
10 (845) 331-0153, can you please mute your phone.  08:15:01
11        UNIDENTIFIED SPEAKER (VIA ZOOM):     08:15:08
12 Yeah, please tell me how to do that.          08:15:08
13        (Off-the-record conversation.)        08:15:25
14        MR. CICILIANO (VIA ZOOM):  Go ahead,  08:15:35
15 Counsel.                                      08:15:36
16    Q.  All right.  Mr. Frazer, on topic 5 which  08:15:37
17 is the identification, investigation, determination,  08:15:40
18 calculation, and recovery of amounts due from any  08:15:43
19 officer, director, or key person to the NRA in 2019,  08:15:46
20 2020, or 2021, including the identity, title, and  08:15:50
21 role of each of the persons involved in these  08:15:54
22 activities.                                   08:15:56
23        To whom did you obtain -- from whom did  08:15:57
24 you obtain information to prepare for topic 5?  08:16:01
25    A.  That was all with counsel.            08:16:04

Page 10

1    Q.  So you did not discuss topic 5 with any of  08:16:08
2 the -- the humans, the non-lawyers, that is, Sonya  08:16:12
3 Rowling or Tyler Schropp or Wayne LaPierre; is that  08:16:17
4 correct?                                      08:16:20
5    A.  No, we didn't.                         08:16:20
6         MR. CICILIANO (VIA ZOOM):  Hey,       08:16:22
7 Counsel, just interpose an objection.  You're asking  08:16:25
8 what he did to specifically prepare this weekend, not  08:16:28
9 basis of his knowledge.  Those are two different  08:16:30
10 questions.                                    08:16:32
11        MR. SHEEHAN (VIA ZOOM):  Fair enough.  08:16:34
12    Q.  Apart from the -- what you did to prepare  08:16:34
13 this weekend, is there -- is there other information  08:16:37
14 or knowledge that you have acquired over the course  08:16:42
15 of your work as the counsel for -- go back.   08:16:44
16        Apart from the preparation this weekend,  08:16:49
17 are there other documents or conversations you have  08:16:51
18 had to prepare yourself for answering topic 5?  08:16:55
19    A.  No, I don't think so.                  08:17:03
20    Q.  So let me ask first, I'm going to use the  08:17:05
21 acronym -- you know what, let's skip that.    08:17:14
22        Did the NRA consider in answering topic 5  08:17:16
23 whether to treat William Brewer as the key person  08:17:21
24 for the NRA?                                  08:17:25
25        MR. CICILIANO (VIA ZOOM):  I'm just    08:17:28

Page 11

1 going to object to the extent it calls for work  08:17:29
2 product or attorney client privilege.          08:17:30
3         Go ahead.                             08:17:32
4    A.  We did not discuss Mr. Brewer as a key  08:17:34
5 person of the NRA.                            08:17:37
6    Q.  Did -- in preparing for topic 5, did you  08:17:38
7 consider Sarah Rogers as a key person for the NRA?  08:17:42
8    A.  No.                                    08:17:46
9    Q.  All right.  Schedule L Part V of the -- of  08:17:50
10 the 2019 NRA 990, there are specific dollar amounts  08:17:55
11 identified as due from specific employees and also  08:18:04
12 more general -- let me go back.               08:18:07
13        Schedule L, Part V, how did the NRA     08:18:11
14 identify the dollar amounts due from each     08:18:14
15 disqualified person?                          08:18:17
16    A.  It was a calculation made by -- made by  08:18:18
17 counsel.                                      08:18:24
18    Q.  When you say it was a calculation made by  08:18:30
19 counsel, what factors did they consider?       08:18:33
20    A.  They reviewed -- I should say counsel in  08:18:36
21 conjunction with -- with forensic accountants in  08:18:40
22 certain cases and -- and experts, they considered --  08:18:43
23 I'm sorry, can you repeat the question.        08:18:48
24    Q.  You said that the calculations were made  08:18:52
25 by counsel.                                   08:18:55

Page 12

1        How did they make the calculation?     08:18:55
2    A.  Well, the calculations -- it was different  08:18:57
3 for each individual.  And it was -- but it was based  08:18:59
4 on examination of relevant documents, discussion  08:19:04
5 with individuals involved in some cases, but  08:19:07
6 primarily review of documents.                08:19:11
7    Q.  How does -- now, how does the NRA know that  08:19:13
8 you mentioned, by the way, a forensic accountant.  08:19:16
9        Who are they?                          08:19:19
10   A.  A different in different cases, but the --  08:19:19
11 the primary one that was used in a -- with respect  08:19:23
12 to a couple of these instances was Forensic Risk  08:19:26
13 Alliance.                                     08:19:32
14   Q.  Any others?  Any other forensic          08:19:32
15 accountants?                                  08:19:39
16   A.  You know, I think with respect to one  08:19:40
17 individual, a different -- a different organization  08:19:42
18 was used, but I'm sorry, I don't recall the name.  08:19:47
19   Q.  How do you know, sitting here today       08:19:52
20 representing NRA, that the identification was  08:19:54
21 accurate and complete of the amounts due from any  08:19:56
22 officer, director, or key person?            08:19:59
23   A.  From -- well, again, it depends on the --  08:20:02
24 depends on the specific people.  But in some cases  08:20:05
25 we -- in some cases I was able to review some of the  08:20:10

Page 13

4 (Pages 10 - 13)

1  specific -- specific amounts, specific items. I'm        08:20:13
2  familiar with them from that. And in other cases,        08:20:17
3  we're relying on the -- on the clear diligence of        08:20:20
4  NRA counsel and contractors.                08:20:27
5      Q. Okay. So you representing the NRA today        08:20:28
6  are telling me, as I understand it, that in        08:20:32
7  determining the amount -- I'm sorry, identifying the        08:20:35
8  amount due from each of these disqualified persons,        08:20:38
9  you're relying upon information obtained from        08:20:43
10  counsel; is that correct?                08:20:44
11      MR. CICILIANO (VIA ZOOM): I would        08:20:46
12  just object to the extent that it misstates testimony  08:20:47
13  as well as the term "disqualified persons."        08:20:51
14      Q. You can go ahead and answer.        08:20:53
15      A. I'm sorry, can you repeat the question?        08:20:56
16      Q. In -- in identifying amounts due from any        08:20:57
17  disqualified person, is it NRA's testimony today        08:21:04
18  that you're relying upon the calculations performed  08:21:07
19  by counsel?                    08:21:10
20      A. In -- in part, but it -- but it -- we also  08:21:12
21  did our own analysis in some cases as well.        08:21:15
22      Q. Okay. When you did your own analysis in  08:21:19
23  some cases as well, who did that analysis?        08:21:21
24      A. I participated in that with respect to one  08:21:24
25  individual, and we also drew on information from our  08:21:28

Page 14

1  treasurer's office.                    08:21:31
2      Q. And -- so let's -- let's go back.        08:21:33
3      You -- you did the calculation with one        08:21:37
4  individual. Who was that?                08:21:38
5      A. I worked on some of the items with respect  08:21:40
6  to -- to -- Josh Powell.                08:21:44
7      Q. With respect to the amounts --        08:21:48
8  identification of amounts relating to Mr. Wayne        08:21:55
9  LaPierre, who did that?                08:22:01
10      A. That was -- that was done by -- at least  08:22:03
11  by Mr. LaPierre himself and by the -- in conjunction  08:22:09
12  with tax counsel, his personal attorney, and the    08:22:15
13  Brewer firm.                    08:22:20
14      Q. Apart from Mr. Wayne LaPierre doing it    08:22:22
15  himself -- well, let me back up.            08:22:26
16      With respect to Mr. LaPierre, are you        08:22:31
17  confident -- you, the NRA, confident today that you  08:22:34
18  have identified all payments which would be due from  08:22:35
19  him to the NRA between 2014 and 2019?        08:22:41
20      A. I believe so.                08:22:48
21      Q. And you base that, in part, upon the        08:22:51
22  information you received from tax -- tax counsel?    08:22:55
23      A. Yes.                    08:23:00
24      Q. Who were the tax counsel?            08:23:01
25      A. It was the firm of Lan Smith Sosolik.        08:23:04

Page 15

1      Q. Okay. Slow down. Land? Land?        08:23:08
2      A. Lan, L-a-n.                08:23:10
3      Q. Smith?                    08:23:13
4      A. Smith, Sosolik, S-o-s-o-l-i-k.        08:23:14
5      Q. And whose tax counsel are they?        08:23:20
6      A. The NRA's.                08:23:23
7      Q. Does the NRA have other tax counsel?    08:23:24
8      A. Not currently.                08:23:28
9      Q. And have they previously had other tax    08:23:31
10  counsel?                    08:23:34
11      A. Yes.                    08:23:35
12      Q. Who?                    08:23:36
13      MR. CICILIANO (VIA ZOOM): Objection    08:23:38
14  just as to time and scope of the question.        08:23:40
15      But to the extent you know, go ahead.    08:23:44
16      A. In the past, we have used Morgan Lewis; we  08:23:46
17  have used Pillsbury for certain issues; Steve    08:23:51
18  Shulman, late -- the late Steve Shulman for a number  08:24:00
19  of years did some tax work.            08:24:04
20      Q. All right. Let's go back to Mr. Wayne    08:24:06
21  LaPierre's amounts due.                08:24:09
22      Did you consider in calculating amounts    08:24:13
23  due any communications from the Ackerman McQueen    08:24:16
24  firm?                    08:24:20
25      And by the way, Mr. Frazer, each time I    08:24:21

Page 16

1  say "you" here, I'm talking about you, the NRA, not  08:24:23
2  you, the general counsel.                08:24:26
3      A. Understood.                08:24:28
4      And I'm sure that communications from    08:24:29
5  Ackerman about various matters were considered.    08:24:34
6      Q. So how did -- how did the NRA determine  08:24:37
7  that there were only $299,000 due from Wayne    08:24:41
8  LaPierre to the NRA for the period 2014 to 2019?    08:24:45
9      MR. CICILIANO (VIA ZOOM): And I'll    08:24:50
10  just impose an objection to the extent that it relies  08:24:53
11  on the advice of counsel -- or his advice of counsel,  08:24:54
12  his communications with counsel as privileged.    08:24:55
13      But go ahead.                08:24:57
14      A. Well, on the -- on the 990, you are    08:24:59
15  you're supposed to report excess benefit        08:25:04
16  transactions that you -- that you know of. And the  08:25:09
17  ones -- and the ones that we felt reasonably assured  08:25:13
18  of are -- were involved some of the private travel  08:25:18
19  that Mr. LaPierre used.                08:25:23
20      Q. When you say you were sure of, were there  08:25:25
21  other ones that you were unsure of, other -- other  08:25:27
22  amounts due that you were unsure of?        08:25:32
23      A. I think there were -- I think there are  08:25:34
24  other allegations that at -- that at this time we    08:25:37
25  don't think necessarily reach the -- the level of an  08:25:41

Page 17

5 (Pages 14 - 17)

1 excess -- excess benefit transaction. 08:25:46
2    Q. What was -- when you were determining the 08:25:49
3 level of an excess benefit transaction, what 08:25:50
4 standard or test did you apply? 08:25:53
5        MR. CICILIANO (VIA ZOOM): Objection 08:25:57
6 to form. Oh, pardon, objection to form. 08:25:57
7    A. Well, it would have been the legal 08:26:01
8 standard set forth by the IRS. 08:26:02
9    Q. All right. That is in the instructions to 08:26:05
10 the 990? 08:26:10
11    A. Instructions, statutes -- instructions, 08:26:12
12 relevant regulations. 08:26:15
13    Q. What regulations did you look to? 08:26:16
14    A. Yeah -- 08:26:19
15    Q. The witness is looking over to someone in 08:26:25
16 the corner of the -- outside the camera. 08:26:27
17        Who are you looking to? 08:26:29
18        MR. CICILIANO (VIA ZOOM): I'm 08:26:30
19 actually right here, Counsel. 08:26:31
20        THE WITNESS (VIA ZOOM): 08:26:32
21 Mr. Ciciliano. 08:26:32
22        MR. CICILIANO (VIA ZOOM): And I would 08:26:34
23 just object to the extent that it calls for 08:26:35
24 attorney-client privilege. 08:26:38
25        Go ahead. 08:26:39
                                                   Page 18

1 on the 990 was all private travel. 08:27:50
2    Q. Were there any other expenses for 08:27:53
3 Mr. LaPierre which were considered but not placed in 08:27:55
4 the category of excessive payments to disqualified 08:27:58
5 persons? 08:28:03
6    A. I don't believe so based on the -- some of 08:28:03
7 the other items that have been alleged by this 08:28:05
8 office. 08:28:08
9    Q. Okay. What other -- what other items? 08:28:08
10    A. Be -- it would include, I think, some of 08:28:11
11 the wardrobe expenses and -- and other -- other 08:28:14
12 travel or hospitality issues. 08:28:20
13    Q. What did you decide with respect to the 08:28:22
14 wardrobe expenses in terms of whether it was a 08:28:25
15 payment -- excess payment to disqualified person? 08:28:27
16        THE WITNESS (VIA ZOOM): Is that 08:28:35
17 calling for work product? 08:28:35
18    Q. Let me just say, Mr. Frazer, if you're 08:28:37
19 asking questions of your counsel, they should be on 08:28:39
20 the record, and I can't hear what you just said. 08:28:41
21        MR. CICILIANO (VIA ZOOM): He is 08:28:43
22 questioning, and I'll represent for the record he 08:28:44
23 questioned whether or not it calls for work product. 08:28:46
24        And I will object to the extent that 08:28:48
25 it does require you to reveal attorney-client 08:28:50
                                                   Page 20

1    A. And I can't -- I can't personally speak to 08:26:40
2 what -- to what tax counsel looked at in that 08:26:44
3 review. 08:26:49
4    Q. So you relied entirely on tax counsel in 08:26:49
5 order to determine whether it met the level to -- to 08:26:52
6 be an excess -- I'm sorry -- an excess benefit 08:26:56
7 transaction under the internal revenue code? 08:27:03
8        MR. CICILIANO (VIA ZOOM): I just 08:27:05
9 object to the extent it misstates previous testimony. 08:27:05
10    Q. Go ahead. 08:27:09
11    A. That's my -- that's my understanding. 08:27:10
12    Q. But the -- the level was determined solely 08:27:11
13 by what tax counsel told you? 08:27:13
14    A. I believe so. 08:27:16
15    Q. Okay. And that means there was no 08:27:19
16 independent evaluation of these expenditures by the 08:27:22
17 NRA apart from what tax counsel told them? 08:27:26
18    A. Well, it was in conjunction with tax 08:27:29
19 counsel. 08:27:31
20    Q. What were the expenditures that you -- 08:27:33
21 that the NRA decided met the standard under the -- 08:27:35
22 the excess payments to disqualified persons, what 08:27:39
23 specific types of expenditures apart from private 08:27:44
24 travel? 08:27:47
25    A. I believe the -- I think what was reported 08:27:48
                                                   Page 19

1 privilege, but I believe the question attempted to 08:28:53
2 avoid attorney-client privilege. 08:28:55
3        And so, Mr. Sheehan, if you wanted to 08:28:57
4 rephrase that so he felt comfortable. That's what he 08:29:00
5 was asking about. 08:29:03
6    Q. How did the NRA determine that the 08:29:04
7 wardrobe expenses, that is, the $200,000 in suits, 08:29:16
8 were not an excess benefit to a disqualified person? 08:29:11
9    A. I'm still not -- I'm still not sure I can 08:29:20
10 answer that without -- without discussing work 08:29:23
11 product. 08:29:25
12    Q. But the NRA made a decision, is that -- 08:29:26
13 isn't that correct, that the $200,000 in suits did 08:29:28
14 not meet the standard for excess benefit to 08:29:32
15 disqualified person? 08:29:35
16    A. I think that's -- 08:29:35
17    Q. Let me -- let me go -- let me try again. 08:29:38
18        Did the NRA determine whether there was 08:29:41
19 any amount due back to the NRA for the $200,000 in 08:29:44
20 suits that were paid for for Wayne LaPierre? 08:29:48
21    A. Not at this time. 08:29:52
22    Q. I'm sorry, not at this time? So you -- 08:29:52
23 you may -- 08:29:53
24    A. Not at this time. 08:29:53
25    Q. So the NRA's made no determination on that 08:29:54
                                                   Page 21

6 (Pages 18 - 21)

1 suit issue; is that correct?                    08:29:56
2     A. Again, I'm not sure -- I'm not sure how --  08:29:59
3 how I can -- how I can answer this without       08:30:03
4 addressing work product.                         08:30:05
5     Q. Well, I'm just asking did -- yes or no,   08:30:06
6 did the NRA determine whether the suits were an  08:30:08
7 excess benefit to an insider disqualified person?  08:30:13
8     A. I said -- I said that at this point, we -- 08:30:17
9 we do not believe that they required reporting as an  08:30:20
10 excess benefit.                                  08:30:23
11    Q. All right. And you base that again solely  08:30:25
12 upon what? The advice of counsel?               08:30:29
13    A. On --                                      08:30:32
14        MR. CICILIANO (VIA ZOOM): I would       08:30:34
15 just -- I would object to the extent that it calls  08:30:35
16 for attorney-client privilege.                   08:30:37
17    Q. Mr. Frazer, apart from whatever counsel   08:30:40
18 told you, is there any other basis for the NRA to  08:30:42
19 conclude that the $200,000 in suits was not a -- not  08:30:45
20 due back from Mr. LaPierre to the NRA?          08:30:51
21    A. Again, I mean -- if I could confer with  08:31:01
22 Mr. Ciciliano off camera, maybe we could -- maybe I  08:31:07
23 could answer that better.                        08:31:10
24        MR. CICILIANO (VIA ZOOM): And,          08:31:11
25 Mr. Sheehan, I would say if I could confer with the  08:31:13
                                                  Page 22

1 witness, I don't think he misunderstands the extent  08:31:16
2 to which he can testify to because I think you're  08:31:19
3 asking a question that's not seeking necessarily  08:31:21
4 privileged information.                           08:31:24
5        So if we could have a five-minute        08:31:25
6 break, I'll come back and establish for the record  08:31:26
7 the privileged nature.                           08:31:28
8        MR. SHEEHAN (VIA ZOOM): Okay. Let's      08:31:29
9 do that.                                         08:31:30
10       So, videographer, if you'd just take     08:31:31
11 us off the record at this point.                 08:31:33
12       THE VIDEOGRAPHER (VIA ZOOM): Yes.        08:31:34
13 We're going off the record at 8:31. We're off the  08:31:35
14 record.                                          08:31:39
15       (Recess 8:31 a.m. to 8:36 a.m.)         08:31:39
16       THE VIDEOGRAPHER (VIA ZOOM): We're       08:35:58
17 back on the record at 8:36.                      08:36:08
18       MR. SHEEHAN (VIA ZOOM): All right.       08:36:13
19 Could you -- we -- can you address the discussion we  08:36:13
20 just had? I don't know how you want to do this,  08:36:16
21 whether through the witness or through counsel.  08:36:18
22       MR. CICILIANO (VIA ZOOM): Counsel        08:36:19
23 make a record of the discussion. The witness had  08:36:20
24 some concern that generally the NRA made a decision  08:36:23
25 that was informed by counsel and was concerned just  08:36:28
                                                  Page 23

1 the level that he could discuss it. I think he was  08:36:30
2 being careful, as I appreciate all witnesses. I  08:36:33
3 talked to him. I believe he's going to tell you --  08:36:35
4 if you ask the question, he's going to tell you  08:36:37
5 exactly what he told me because I don't believe that  08:36:40
6 to be confidential or privileged. And at that point,  08:36:42
7 I think the record will be complete on that. So  08:36:47
8 hopefully we can move forward with it. It was just a  08:36:49
9 misunderstanding I believe.                      08:36:49
10    A. And -- and, Mr. Sheehan, I apologize for  08:36:50
11 the delay and inconvenience. I'm sure you        08:36:52
12 appreciate this, Counsel, I sometimes have to sort  08:36:55
13 out my sources of knowledge and -- or in this case,  08:36:59
14 the NRA's sources of knowledge.                  08:37:02
15       So the answer to the question as to the  08:37:04
16 consideration of the suits is that the NRA's     08:37:08
17 judgment was that they were a business -- business  08:37:11
18 expenditure that was made at the suggestion of   08:37:16
19 Ackerman McQueen for Mr. LaPierre's appearance in  08:37:19
20 video production.                                08:37:25
21    Q. And does the -- in the video production,  08:37:26
22 which video production was that?                 08:37:29
23    A. It was for the Crime Strike program and   08:37:31
24 some -- some other productions he did -- he did  08:37:37
25 across the board.                                08:37:40
                                                  Page 24

1    Q. All right. Are you -- did the NRA        08:37:42
2 consider whether the makeup expenses for Susan   08:37:45
3 LaPierre were amounts due from Mr. LaPierre?    08:37:49
4        MR. CICILIANO (VIA ZOOM): I would       08:38:00
5 just object to the scope.                        08:38:01
6        But go ahead.                            08:38:02
7    A. I don't know -- I don't know -- I don't   08:38:03
8 know that those were considered specifically. I  08:38:07
9 don't know if those were considered specifically.  08:38:09
10    Q. In making the judgment about which of the  08:38:11
11 travel expenses should -- that Wayne LaPierre or his  08:38:13
12 relatives incurred should be determined to be   08:38:16
13 amounts due from Mr. LaPierre, what test or standard  08:38:19
14 did the NRA apply?                               08:38:23
15    A. The issues that applied were -- were --  08:38:25
16 you know, was the destination some type of       08:38:29
17 NRA-related activity, was it -- and was it otherwise  08:38:34
18 consistent with travel policies as applied to    08:38:41
19 Mr. LaPierre as an employee and to his -- and to his  08:38:45
20 family members who are employees or volunteers.  08:38:48
21    Q. And what travel policy was reviewed in   08:38:50
22 order to make that determination with respect to the  08:38:57
23 flights?                                         08:38:59
24    A. Well, you have the -- you have the NRA, a  08:39:00
25 travel policy which calls for employees to -- to  08:39:04
                                                  Page 25

7 (Pages 22 - 25)

| | |
|---|---|
| 1 travel by the most economical means available unless 08:39:08 | 1 A. Could be -- you know, you have to have the 08:41:33 |
| 2 there's some specific authorization. That's the -- 08:39:13 | 2 whole -- you have to have the whole universe of 08:41:37 |
| 3 that's the primary policy. 08:39:16 | 3 travel in order to determine what parts are -- you 08:41:39 |
| 4 Q. And did the NRA determine that 08:39:18 | 4 know, fall on one side of the line or the other. 08:41:42 |
| 5 Mr. LaPierre had not obtained the necessary 08:39:22 | 5 Q. All right. And so apart from the 08:41:45 |
| 6 authorization for those trips? 08:39:24 | 6 spreadsheet, right, the -- prepared by the -- who 08:41:48 |
| 7 A. Well, the issue -- there are a couple of 08:39:25 | 7 made the determination within the NRA, right, that 08:41:52 |
| 8 issues. One is that we determined that Mr. -- 08:39:28 | 8 these -- that the amounts for certain trips should 08:41:54 |
| 9 that some of the trips that -- and I think it was 08:39:33 | 9 be recovered? 08:41:58 |
| 10 primarily the trips for family members didn't have 08:39:37 | 10 A. I know that there were significant 08:41:59 |
| 11 business purposes. 08:39:41 | 11 discussions between Mr. LaPierre and counsel. 08:42:01 |
| 12 Q. So apart from the trips for family 08:39:43 | 12 Q. So Mr. LaPierre made the decision? 08:42:04 |
| 13 members, were there any other trips in which 08:39:46 | 13 A. I don't know what other -- I don't know 08:42:08 |
| 14 Mr. LaPierre was flying by -- by charter jet that 08:39:50 | 14 what other staff were involved, but I know he had -- 08:42:10 |
| 15 the NRA determined were not appropriate 08:39:55 | 15 I know he had very active discussions with counsel. 08:42:13 |
| 16 expenditures? 08:39:57 | 16 Q. So let me see if I understand this. 08:42:16 |
| 17 A. I don't know the answer. 08:40:00 | 17 Mr. LaPierre made the determination about what of 08:42:18 |
| 18 Q. Is there a document that shows the 08:40:03 | 18 his expenditures were improper or should be 08:42:21 |
| 19 evaluation of each of the trips to determine whether 08:40:09 | 19 recovered by the NRA? 08:42:24 |
| 20 they should be identified as amounts due from 08:40:13 | 20 A. I mean, I know he provided his -- his 08:42:28 |
| 21 Mr. LaPierre? 08:40:17 | 21 information and recollection as to the business 08:42:31 |
| 22 MR. CICILIANO (VIA ZOOM): And just 08:40:19 | 22 purposes of the trip and ended up reimbursing 08:42:33 |
| 23 objection to the extent it calls for work product of 08:40:20 | 23 300-some thousand dollars. 08:42:39 |
| 24 counsel. 08:40:22 | 24 Q. So who made the decision that these trips 08:42:40 |
| 25 But go ahead. 08:40:23 | 25 were improper at the NRA? 08:42:42 |
| Page 26 | Page 28 |
| 1 A. Subject to that exception, my 08:40:23 | 1 A. Well, at a minimum, Mr. LaPierre. 08:42:45 |
| 2 understanding is that a spreadsheet was -- was 08:40:26 | 2 Q. Anybody else besides Mr. LaPierre? 08:42:49 |
| 3 created, you know, listing trips and allowing them 08:40:28 | 3 A. You know, I wasn't personally involved in 08:42:52 |
| 4 to be classified or coded. 08:40:32 | 4 those discussions, so I am afraid I couldn't -- 08:42:54 |
| 5 Q. And who -- who put together that 08:40:34 | 5 couldn't tell you anyone else. 08:42:56 |
| 6 spreadsheet? 08:40:36 | 6 Q. But remember, you're testifying for the 08:42:58 |
| 7 A. I believe that one of the staff of the 08:40:37 | 7 NRA. 08:43:00 |
| 8 Brewer firm aided in preparing that spreadsheet 08:40:42 | 8 Is there anybody else at the NRA who 08:43:00 |
| 9 based on documents that had previously been 08:40:47 | 9 made -- who participated in making that decision 08:43:02 |
| 10 collected. 08:40:49 | 10 that -- whether Mr. LaPierre's expenditures were 08:43:05 |
| 11 Q. Did anyone at the NRA make an independent 08:40:50 | 11 improper? 08:43:08 |
| 12 determination that the spreadsheet was accurate and 08:40:53 | 12 A. I understand that -- that qualification, 08:43:08 |
| 13 correct? 08:40:55 | 13 but I'm not -- I'm not aware -- I'm not aware of 08:43:11 |
| 14 MR. CICILIANO (VIA ZOOM): Objection 08:40:57 | 14 anyone else. 08:43:16 |
| 15 to form. 08:40:57 | 15 Q. Apart from the trips, there were other 08:43:18 |
| 16 Independent from whom? 08:40:59 | 16 expenditures which Ackerman McQueen identified in 08:43:21 |
| 17 Q. Independent from Mr. Brewer -- I'm asking 08:41:00 | 17 2019 that they were passed through the Ackerman 08:43:25 |
| 18 you, did the NRA decide based solely on the Brewer 08:41:04 | 18 contract. 08:43:29 |
| 19 spreadsheet that these expenditures were improper or 08:41:06 | 19 Are you familiar with those? 08:43:30 |
| 20 proper? 08:41:10 | 20 MR. CICILIANO (VIA ZOOM): Objection 08:43:34 |
| 21 A. Well, I believe the spreadsheet listed 08:41:11 | 21 just to form, foundation. 08:43:35 |
| 22 all of his private travel and -- and was used -- and 08:41:13 | 22 A. I'm familiar with Ackerman's allegations, 08:43:36 |
| 23 was used to -- to -- as raw material from which 08:41:17 | 23 yes. 08:43:39 |
| 24 trips required reimbursement could be selected. 08:41:27 | 24 Q. What, if any, effort did the NRA make to 08:43:39 |
| 25 Q. Could be selected? 08:41:32 | 25 determine whether the expenditures which Ackerman 08:43:41 |
| Page 27 | Page 29 |

8 (Pages 26 - 29)

1 McQueen identified as pass-through expenditures were 08:43:45
2 required to be recovered from Mr. LaPierre? 08:43:50
3 MR. CICILIANO (VIA ZOOM): I will just 08:43:53
4 object on the grounds that you're referring to 08:43:54
5 apparently a document that's not before the witness. 08:43:56
6 MR. SHEEHAN (VIA ZOOM): Right. But 08:44:00
7 he's -- the witness is the NRA. 08:44:00
8 Q. With respect to -- 08:44:02
9 MR. CICILIANO (VIA ZOOM): Go ahead. 08:44:04
10 Q. Mr. Frazer, with respect to any allegation 08:44:04
11 by the Ackerman McQueen firm that Mr. LaPierre had 08:44:07
12 incurred expenses which were paid without proper 08:44:16
13 documentation by Ackerman McQueen, how did the NRA 08:44:20
14 evaluate to determine whether those expenses should 08:44:24
15 be recovered from Mr. LaPierre? 08:44:27
16 A. I'm sorry, I just don't know. 08:44:32
17 MR. THOMPSON (VIA ZOOM): My 08:44:32
18 apologies, this is Stephen Thompson. I just received 08:44:35
19 a notification that the Zoom is being recorded. 08:44:37
20 Was that done by Veritext or is that 08:44:40
21 somebody else who started the recording? 08:44:42
22 THE VIDEOGRAPHER (VIA ZOOM): This is 08:44:46
23 David, the videographer, and I don't know -- I don't 08:44:47
24 know how to get into the Internet at this firm I'm 08:44:50
25 at, so it's not me. I was trying and going to 08:44:52

Page 30

1 attempt to do that. It may be Rebecca. 08:44:54
2 VERITEXT CONCIERGE (VIA ZOOM): Yes. 08:45:02
3 THE VIDEOGRAPHER (VIA ZOOM): Okay. 08:45:02
4 Thank you, Rebecca. I don't -- I don't have access 08:45:03
5 to the Internet here, so once I get that -- we don't 08:45:04
6 have to do that right now. As long as you're 08:45:06
7 recording, we'll do that on a break. I don't want to 08:45:07
8 hold up the deposition. 08:45:11
9 VERITEXT CONCIERGE (VIA ZOOM): 08:45:11
10 Correct, it was myself. Thank you. 08:45:15
11 THE VIDEOGRAPHER (VIA ZOOM): Thank 08:45:15
12 you, Rebecca. 08:45:16
13 Q. So, Mr. Frazer, just to go back, with 08:45:16
14 respect to the Ackerman McQueen allegations that 08:45:18
15 expenses were passed through the NRA contract and 08:45:22
16 paid for Mr. LaPierre without proper documentation, 08:45:28
17 it's your testimony today that you don't know how 08:45:32
18 the decision was made not to include those in the 08:45:35
19 expenses to be reported on Schedule L in 2019, 990? 08:45:38
20 MR. CICILIANO (VIA ZOOM): I would 08:45:44
21 object to the extent that it requires attorney-client 08:45:45
22 privilege communications. 08:45:47
23 Go ahead. 08:45:48
24 A. And I'm -- I apologize, I'm just -- I'm 08:45:49
25 afraid that I just -- I just don't know the answer 08:45:50

Page 31

1 to that discussion. 08:45:52
2 MR. SHEEHAN (VIA ZOOM): Okay. So, 08:45:55
3 Counsel, at this time, the topic 5 required 08:45:56
4 identification of amounts due, including 08:45:59
5 investigation, determination, calculation, and 08:46:02
6 recovery. Your 30(b)(6) witness is unable to testify 08:46:04
7 about that issue, so we would ask for a second 08:46:07
8 witness who can actually provide information on this 08:46:10
9 question. 08:46:12
10 MR. CICILIANO (VIA ZOOM): And I -- 08:46:13
11 and I would just generally say that the -- the 08:46:13
12 category's overbroad as well as vague as to what 08:46:17
13 identification, investigation, determination, 08:46:20
14 calculation, and recovery of amounts due is, I 08:46:23
15 disagree. 08:46:26
16 To the extent that you are looking 08:46:28
17 for -- hold on. To the extent that you're looking 08:46:29
18 for that, I will confer with -- after this and see 08:46:32
19 whether or not we can have perhaps Ms. Rowling fill 08:46:35
20 in some of those answers to the extent necessary. 08:46:40
21 Q. So -- 08:46:40
22 A. And if I could also add -- this is Mr. 08:46:44
23 Frazer. And thank you for someone -- whoever 08:46:49
24 cleared the notification on the screen so I can see 08:46:49
25 Mr. Sheehan. 08:46:54

Page 32

1 The question also -- because the question 08:46:56
2 calls for determination of amounts due, you know, 08:46:58
3 we're obviously focused on the amounts that actually 08:47:04
4 were recovered or sought to be recovered. 08:47:08
5 Q. I don't quite understand that answer, 08:47:09
6 Mr. Frazer. I'm not just looking for amounts that 08:47:11
7 were recovered. I'm asking you how they identify 08:47:14
8 the amounts recovered, including what amounts they 08:47:17
9 didn't -- they didn't identify. 08:47:19
10 Let me go back. That's not a question. 08:47:22
11 The -- the issue from -- that I'm asking 08:47:25
12 about is how broad of scope did the NRA undertake to 08:47:29
13 determine what should be reported on Schedule L with 08:47:34
14 respect to payments due from Mr. LaPierre? 08:47:38
15 A. Well, it was -- well, it was broad, but -- 08:47:44
16 but, you know, obviously focused on the travel 08:47:48
17 expenses very heavily. 08:47:50
18 Q. Why did -- okay. So apart from travel 08:47:53
19 expenses, what other expenses of Mr. LaPierre did 08:47:56
20 the NRA consider in determining what amounts were 08:47:59
21 due from him for the period 2014 to 2019? 08:48:02
22 A. I believe that everything that was -- that 08:48:05
23 has been alleged in your complaint was considered, 08:48:07
24 but -- but, I'm sorry, I just don't have information 08:48:10
25 on some of the aspects. 08:48:14

Page 33

9 (Pages 30 - 33)

| | |
|---|---|
| 1 Q. And so that includes the Ackerman -- the 08:48:16 | 1 privilege. 08:50:32 |
| 2 Ackerman claim for pass-throughs was considered? 08:48:18 | 2 Go ahead. 08:50:32 |
| 3 A. I believe it was. 08:48:23 | 3 A. You know, a lot of these are -- are issues 08:50:33 |
| 4 Q. And the expenses for Susan LaPierre for 08:48:25 | 4 that I'm -- that are being reviewed by -- by counsel 08:50:43 |
| 5 makeup and other -- other items were considered? 08:48:33 | 5 and that I have not analyzed. 08:50:47 |
| 6 A. I don't know about that one. 08:48:35 | 6 Q. So the NRA has no idea what has been done 08:50:52 |
| 7 Q. And personal expenditures related to his 08:48:37 | 7 since November 15, 2020, with respect to 08:50:55 |
| 8 house were considered? 08:48:40 | 8 identifying, investigating, or determining amounts 08:50:58 |
| 9 A. Referring to security expenses, for 08:48:43 | 9 due from Mr. LaPierre? 08:51:01 |
| 10 example? 08:48:45 | 10 MR. CICILIANO (VIA ZOOM): Objection 08:51:05 |
| 11 Q. Or mosquito control. 08:48:45 | 11 to the extent it calls for attorney-client privilege. 08:51:06 |
| 12 A. I -- I couldn't answer that specifically. 08:48:50 | 12 Go ahead. 08:51:08 |
| 13 Q. And of all the expenses Mr. LaPierre 08:48:54 | 13 Q. Mr. Frazer? 08:51:13 |
| 14 incurred between 2014 and 2019, the investigation 08:48:58 | 14 A. Yeah, I -- I understand. 08:51:14 |
| 15 determined there were no expenses which should be 08:49:03 | 15 The -- the -- I'm sorry, I just don't have 08:51:20 |
| 16 reported on Schedule L or were due from Mr. LaPierre 08:49:07 | 16 an answer. 08:51:28 |
| 17 to the NRA except for travel expenses; is that 08:49:11 | 17 Q. Okay. 08:51:28 |
| 18 correct? 08:49:13 | 18 MR. SHEEHAN (VIA ZOOM): Same -- same 08:51:29 |
| 19 A. Well, we obviously have a lot of -- a lot 08:49:13 | 19 issue, Counsel, that we asked this witness to testify 08:51:29 |
| 20 of review still going on as litigation progresses. 08:49:15 | 20 about these issues and he's not prepared to answer 08:51:32 |
| 21 But at this -- at this point as of the date of the 08:49:19 | 21 them. 08:51:35 |
| 22 990, we believe that the amounts that clearly were 08:49:22 | 22 Q. Does the NRA believe, apart from 08:51:37 |
| 23 due were some of the travel expenses. 08:49:25 | 23 Mr. LaPierre, that it has all the information 08:51:40 |
| 24 Q. So what -- what are you still 08:49:29 | 24 necessary to determine whether it made excess 08:51:44 |
| 25 investigating? What is the NRA still investigating 08:49:31 | 25 payments to disqualified persons for 2014 and 2019? 08:51:46 |
| Page 34 | Page 36 |

| | |
|---|---|
| 1 to determine what amounts are due? 08:49:33 | 1 A. 2014 to 2019? 08:51:51 |
| 2 MR. CICILIANO (VIA ZOOM): I would 08:49:36 | 2 Q. Correct. 08:51:53 |
| 3 just object to the extent it calls for 08:49:37 | 3 A. Based on the -- based on the information 08:51:53 |
| 4 attorney-client privilege. Also, it seeks collateral 08:49:40 | 4 that we have, we believe that the -- that the claims 08:51:55 |
| 5 questions about what's being sought from Ackerman 08:49:43 | 5 with respect to other individuals were complete. 08:51:59 |
| 6 McQueen, and that's separate litigation. 08:49:43 | 6 Q. So everybody except LaPierre? 08:52:03 |
| 7 Go ahead. 08:49:46 | 7 A. Well, except for LaPierre and a couple of 08:52:08 |
| 8 A. And I believe that everything that's at 08:49:46 | 8 matters that we noted as being under -- under 08:52:11 |
| 9 issue in either your office's litigation or the -- 08:49:48 | 9 continuing review and that we are -- and that we 08:52:14 |
| 10 or the Ackerman litigation or other litigation is -- 08:49:51 | 10 weren't able to estimate amounts for it at the time 08:52:21 |
| 11 is under consideration. 08:49:56 | 11 of filing. 08:52:23 |
| 12 Q. So when you say it's under consideration, 08:49:57 | 12 Q. Okay. So under continuing review on 08:52:23 |
| 13 what is the NRA doing to determine whether those 08:49:59 | 13 Schedule L -- what does "continuing review" mean? 08:52:27 |
| 14 expenses were proper? 08:50:01 | 14 Does that mean that the NRA is looking 08:52:31 |
| 15 A. Well, the question in -- with any expense 08:50:04 | 15 into these issues? 08:52:32 |
| 16 by any employee or individual would be whether it 08:50:06 | 16 A. That's correct. 08:52:33 |
| 17 served a legitimate NRA purpose. 08:50:09 | 17 Q. I'm going come back to that, but let's -- 08:52:35 |
| 18 Q. Right. 08:50:12 | 18 has the NRA investigated any -- I'm sorry, 08:52:38 |
| 19 So in -- you filed -- "you" meaning the 08:50:13 | 19 undertaken any identification, investigation, 08:52:41 |
| 20 NRA filed its 990 on November 15, 2020. It's now 08:50:16 | 20 determination, calculation with respect to payments 08:52:44 |
| 21 March 15, 2021. 08:50:22 | 21 or reimbursements to Mr. LaPierre in 2020? 08:52:46 |
| 22 What progress have you made to identify 08:50:23 | 22 A. In 2020? 08:52:49 |
| 23 amounts due from Mr. LaPierre since then? 08:50:25 | 23 Q. Correct. For -- for 2020 expenditures. 08:52:51 |
| 24 MR. CICILIANO (VIA ZOOM): And just 08:50:29 | 24 A. 2020 expenditures. I'm not -- I'm not 08:52:55 |
| 25 objection to the extent it calls for attorney-client 08:50:29 | 25 aware of any, but, of course, Mr. LaPierre's travel 08:52:58 |
| Page 35 | Page 37 |

10 (Pages 34 - 37)

1 has been severely constrained just like everyone 08:53:01
2 else's. 08:53:05
3   Q.  Okay.  So my question is:  Have you 08:53:05
4 undertaken any investigation with respect to his 08:53:07
5 2020 expenses to determine whether they are 08:53:10
6 reportable on Schedule L as excess benefit 08:53:15
7 transactions? 08:53:21
8   A.  Well, we haven't begun work on the -- on 08:53:22
9 the 2020 Schedule L yet. 08:53:24
10   Q.  So is it correct the NRA has done nothing 08:53:28
11 to determine whether there are excess benefit 08:53:32
12 transactions of Mr. LaPierre during 2020? 08:53:37
13   A.  Mr. LaPierre's expenses for 2020, to the 08:53:40
14 extent that there have been some, will be submitted 08:53:43
15 and reviewed in the ordinary course of business. 08:53:47
16 Obviously if anything seemed irregular, that would 08:53:50
17 be a subject of investigation. 08:53:53
18   Q.  Did any of them seem irregular in 2020? 08:53:54
19   A.  Not to -- not to my knowledge. 08:53:58
20   Q.  Your knowledge meaning the NRA's 08:54:00
21 knowledge? 08:54:02
22   A.  Right. 08:54:02
23   Q.  How about 2021, any -- any excess benefit 08:54:04
24 transactions that were investigated or identified 08:54:09
25 for 2021? 08:54:12

1   A.  Well, you're -- you're referring to items 08:54:13
2 that would be reported on a tax -- on a tax return 08:54:19
3 that won't be due for a year and a half.  But -- 08:54:20
4 but, again not to our knowledge. 08:54:23
5   Q.  Mr. -- the Schedule L recites that 08:54:26
6 Mr. LaPierre paid back money with respect to the 08:54:32
7 amounts that he -- that he had identified. 08:54:36
8     Schedule L recites that Mr. LaPierre paid 08:54:40
9 back approximately $299,000 to the NRA.  The exact 08:54:43
10 number is $299,778.78. 08:54:50
11     How did he pay it back? 08:54:56
12   A.  He wrote a check. 08:54:58
13   Q.  When was that? 08:55:01
14   A.  It was in November. 08:55:03
15   Q.  Of 2020? 08:55:05
16   A.  Of 2020. 08:55:07
17   Q.  When did the NRA identify the overpayments 08:55:10
18 by -- to Mr. LaPierre? 08:55:12
19   A.  It was -- it was through the time frame 08:55:13
20 that the 990 was being prepared in the -- in the 08:55:18
21 fall. 08:55:23
22   Q.  So prior to the fall of 2020, the NRA had 08:55:23
23 no idea that Mr. LaPierre owed money to the NRA? 08:55:26
24     MR. CICILIANO (VIA ZOOM):  Objection 08:55:35
25 to scope. 08:55:36

1   A.  You know, it was an -- it was an ongoing 08:55:41
2 analysis.  The analysis was concluded around the 08:55:43
3 time of the 990 filing, and Mr. LaPierre wrote a 08:55:46
4 check.  The amount was actually for more than -- 08:55:49
5 than what you're -- what you're citing. 08:55:52
6   Q.  How much was it for? 08:55:54
7   A.  It was over 300,000.  I'm not sure if -- 08:55:56
8 I'm not sure if the figure on the 990 included 08:56:00
9 interest. 08:56:03
10   Q.  How about the excise tax?  Did -- who paid 08:56:03
11 the excise tax on those amounts of 74,944? 08:56:10
12   A.  I -- you know, I'm not a hundred percent 08:56:14
13 sure. 08:56:30
14     MR. SHEEHAN (VIA ZOOM):  Okay.  Again, 08:56:31
15 Counsel, that -- 08:56:32
16   Q.  Did the NRA require Mr. LaPierre to pay 08:56:34
17 the excise tax? 08:56:39
18   A.  I'm not sure. 08:56:41
19   Q.  Do you know whether Mr. LaPierre did pay 08:56:45
20 the excise tax? 08:56:47
21   A.  I know -- I know he filed a Form 4720 as 08:56:49
22 the NRA did. 08:56:53
23   Q.  Did he pay the tax? 08:56:54
24   A.  I would assume so if it was due with the 08:56:55
25 form, but I -- but I don't have personal knowledge. 08:57:02

1   Q.  Again, NRA has no knowledge of whether 08:57:04
2 Mr. LaPierre paid the excise tax. 08:57:07
3   A.  Understand. 08:57:07
4   Q.  I'm sorry to keep doing this to you, but 08:57:09
5 that's -- it's hard to separate yourself from the 08:57:10
6 NRA -- 08:57:13
7   A.  I -- I am aware. 08:57:13
8   Q.  Okay.  So to the best of your knowledge, 08:57:14
9 the NRA -- the NRA has no idea whether Mr. LaPierre 08:57:18
10 paid the excise tax due from him personally or not? 08:57:20
11   A.  I'm sure that the NRA knows; however, I'm 08:57:24
12 sorry, I don't. 08:57:28
13   Q.  Did the NRA pay the tax for Mr. LaPierre? 08:57:30
14   A.  I don't believe so. 08:57:34
15   Q.  Did the NRA ask Mr. LaPierre to pay any 08:57:37
16 other amounts due with respect to these -- the 08:57:39
17 amounts identified on Schedule L; that is, penalties 08:57:44
18 relating to the incorrect W-2s or penalties relating 08:57:48
19 to incorrect 941s? 08:57:53
20     MR. CICILIANO (VIA ZOOM):  Objection; 08:57:55
21 assumes facts. 08:57:57
22     Go ahead. 08:57:57
23   A.  I'm not -- I'm not aware of any such 08:57:58
24 demands. 08:58:01
25   Q.  Did Mr. LaPierre, in connection with 08:58:01

1 these -- these excess benefit transactions, submit 08:58:06
2 anything in writing to the NRA under oath asserting 08:58:13
3 the -- that it was owed the money it was due? 08:58:15
4 A. I don't believe so. 08:58:21
5 Q. So it was entirely verbal? 08:58:23
6 A. Huh? 08:58:23
7 Q. Let me go back. 08:58:26
8 How did Mr. LaPierre find out -- who 08:58:27
9 demanded the repayment to the NRA of the excess 08:58:31
10 benefit transaction amounts due? 08:58:37
11 MR. CICILIANO (VIA ZOOM): Objection; 08:58:40
12 form. 08:58:42
13 Go ahead. 08:58:43
14 A. I believe that the calculation was 08:58:44
15 provided by outside counsel and, you know, at which 08:58:46
16 point he delivered his check. 08:58:52
17 Q. Did the NRA cash the check? 08:58:53
18 A. I assume so. 08:58:56
19 Q. You don't know whether they cashed the 08:58:58
20 check? 08:59:00
21 A. It was delivered -- it was delivered to 08:59:00
22 the treasurer, so presumably it was cashed. 08:59:02
23 Q. Has the NRA received any other checks in 08:59:05
24 connection with excess benefit transactions reported 08:59:11
25 on the 2019, 990? 08:59:14

Page 42

1 A. With respect to excess benefit 08:59:16
2 transactions on a -- well -- well, prior to the 08:59:18
3 filing of the 2019, 990, Joshua Powell sent a check 08:59:23
4 to the NRA in a -- in a purported attempt to repay 08:59:28
5 some funds that had been demanded. But at that 08:59:37
6 time, it wasn't in connection with an excess benefit 08:59:38
7 transaction. It was transactions that we later did 08:59:41
8 report as excess benefit transactions. 08:59:45
9 Q. With respect to the -- all the other 08:59:47
10 people besides Mr. LaPierre, has the NRA undertaken 08:59:54
11 any identification, investigation, determination, 08:59:58
12 calculation, and recovery of amounts due for 2020 or 09:00:01
13 2021? 09:00:03
14 A. For 2020 or twenty -- 09:00:05
15 Q. Correct. 09:00:08
16 A. We're not aware of any amounts due for 09:00:09
17 2020 or 2021. 09:00:11
18 Q. Apart from putting together the 990 tax 09:00:14
19 return, are there any ongoing reviews undertake -- 09:00:16
20 skip that question. 09:00:21
21 With respect to the -- I believe you said 09:00:22
22 investigation was ongoing in the fall of -- let me 09:00:40
23 go back. 09:00:43
24 In the complaint which was filed by the 09:00:44
25 Attorney General's office in August of 2020, there 09:00:47

Page 43

1 were certain expenditures identified as improper 09:00:50
2 payments to Mr. LaPierre and other officers. 09:00:53
3 What, if anything, has the NRA done 09:00:57
4 with -- in preparing its 990 to determine whether 09:01:02
5 those claims are correct? 09:01:05
6 MR. CICILIANO (VIA ZOOM): I would 09:01:08
7 just first assert an objection to the extent that it 09:01:09
8 seeks discovery in a collateral matter and that it 09:01:11
9 calls for attorney-client privilege. 09:01:16
10 But go ahead. 09:01:16
11 A. Well, we were -- at one time or another 09:01:18
12 and on an ongoing basis, the NRA has reviewed and 09:01:21
13 continues to review everything that's in the 09:01:25
14 complaint. 09:01:26
15 Q. Apart from what is in the IRS 990 -- 09:01:31
16 let's -- let's take a look at some of the other 09:01:40
17 people involved. 09:01:42
18 Mr. Phillips and other officers of the NRA 09:01:43
19 at various points had access to American Express 09:01:48
20 credit cards, correct? 09:01:51
21 A. Yes. 09:01:52
22 Q. And the expenditures on those American 09:01:55
23 Express credit cards, not the ones for Ackerman but 09:01:58
24 the ones for the NRA were -- the bills were sent to 09:02:00
25 the treasurer's office; is that correct? 09:02:04

Page 44

1 A. Yes. 09:02:05
2 Q. Can you tell me what, if any, 09:02:05
3 investigation -- identification, investigation, 09:02:08
4 calculation, and recovery of amounts due were done 09:02:13
5 on those American Express credit cards which were 09:02:16
6 the -- in the name of the NRA to determine whether 09:02:20
7 they were amounts due from the individuals who had 09:02:24
8 the cards? 09:02:27
9 A. Yes. There was certain -- there was an 09:02:29
10 investigation undertaken with respect to 09:02:35
11 Mr. Powell's American Express charges through the 09:02:39
12 course of his entire tenure with the NRA, and that 09:02:43
13 resulted in the demand for repayment that we 09:02:46
14 mentioned, which he attempted to -- to repay. 09:02:49
15 Although, I should -- I didn't -- I didn't 09:02:53
16 get to mention in my previous answer that the NRA 09:02:57
17 has rejected Mr. Powell's payment as insufficient. 09:03:01
18 Q. Anybody else -- any other American Express 09:03:06
19 card which was in the name of the NRA or -- name of 09:03:09
20 the NRA -- rephrase that. 09:03:13
21 With respect to the Express -- American 09:03:16
22 Express cards which are NRA cards overseen by the 09:03:18
23 treasurer's office, apart from Mr. Powell were there 09:03:21
24 any other recoveries -- were there any other 09:03:23
25 identification, investigation, calculation, or 09:03:27

Page 45

12 (Pages 42 - 45)

1 recovery of amounts due from other holders or users 09:03:29
2 of the American Express card? 09:03:33
3   A. Yes. 09:03:35
4   Q. What other recoveries were there? 09:03:37
5   A. There were -- there was a sum recovered 09:03:40
6 from a Ms. Hallow, Millie Hallow, for American 09:03:43
7 Express charges that included primarily a lot of 09:03:48
8 travel and entertainment-related expenses that we 09:03:54
9 felt were not tied to a business purpose. 09:03:59
10   Q. And who did the identification and 09:04:01
11 calculation of the amounts due from Ms. Hallow? 09:04:06
12   A. Outside counsel. 09:04:10
13   Q. And did the NRA determine with outside 09:04:12
14 counsel -- 09:04:16
15   A. In -- in -- 09:04:16
16   Q. I'm sorry, go ahead. 09:04:16
17   A. In -- in conjunction with our treasurer's 09:04:18
18 office. 09:04:22
19   Q. Okay. So was there -- was there a human 09:04:22
20 who did it? Who was the human who did the 09:04:26
21 conjunction? 09:04:29
22       MR. CICILIANO (VIA ZOOM): With the 09:04:32
23 treasurer's office? 09:04:33
24       MR. SHEEHAN (VIA ZOOM): Correct. 09:04:34
25   A. Yeah, I'm not sure -- I'm not sure what 09:04:35
Page 46

1 individual worked with counsel on that. 09:04:37
2   Q. Was there a written demand made upon 09:04:40
3 Ms. Hallow to repay the amounts due? 09:04:43
4   A. I'm afraid I don't know. 09:04:45
5   Q. Did Ms. Hallow dispute the amounts due? 09:04:49
6   A. Not to my knowledge. 09:04:52
7   Q. How did Ms. Hallow pay back the money due? 09:04:54
8   A. I believe it was a check, but I don't know 09:05:01
9 for certain. 09:05:04
10   Q. When did Ms. Hallow pay back the money 09:05:07
11 due? 09:05:10
12   A. I believe sometime in the fall. 09:05:10
13   Q. Of what year? 09:05:18
14   A. 2020. 09:05:20
15   Q. When were the expenditures made for the 09:05:22
16 wedding? 09:05:24
17   A. Well, those were not -- those were not 09:05:28
18 American Express charges, I don't think, but that 09:05:31
19 would have been 2012. 09:05:35
20   Q. That she paid back the wedding expenses? 09:05:37
21   A. No, I'm sorry. My understanding is the 09:05:41
22 wedding -- the wedding occurred in 2012. 09:05:43
23   Q. When did she pay back the wedding 09:05:45
24 expenses? 09:05:48
25   A. As part of the other reimbursement in 2020 09:05:48
Page 47

1 with interest. 09:05:52
2   Q. So did the NRA not know for 8 years that 09:05:52
3 Ms. Hallow had been putting personal charges on the 09:05:55
4 American Express card? 09:05:59
5       MR. CICILIANO (VIA ZOOM): Objection; 09:06:04
6 misstates testimony. 09:06:05
7   Q. You can go ahead and answer. Mr. Frazer. 09:06:08
8   A. Well, right, because -- right. My 09:06:10
9 understanding is that the wedding-related expenses 09:06:13
10 were not on the American Express card, so it was a 09:06:16
11 separate -- it was a little bit of a separate -- 09:06:18
12 separate bucket but it was repaid all in the same 09:06:20
13 transaction. 09:06:22
14   Q. How -- how were the wedding expenses paid 09:06:23
15 for by the NRA? 09:06:26
16   A. Through a -- through a vendor invoice. 09:06:29
17   Q. To what vendor? 09:06:33
18   A. I believe it was Paul Erickson. 09:06:35
19   Q. All right. And -- and who authorized the 09:06:39
20 payment of that invoice? 09:06:41
21   A. There -- there may have been some on the 09:06:43
22 American Express. I'm sorry, I just don't remember. 09:06:45
23   Q. And who authorized the payment of that 09:06:50
24 invoice to Paul Erickson? 09:06:53
25   A. You know, we have that, but sitting here, 09:06:58
Page 48

1 I don't recall. 09:07:00
2   Q. Why did it take the NRA from 2012 to 2020 09:07:01
3 to identify, investigate, calculate, and recover the 09:07:08
4 amounts from Millie Hallow for the wedding expenses? 09:07:12
5   A. I don't know when the -- I don't know when 09:07:17
6 it first became known. 09:07:25
7   Q. The NRA has no idea -- 09:07:25
8       (Simultaneous speaking.) 09:07:25
9   Q. The NRA has no idea when it became -- 09:07:30
10   A. Well, it was -- I don't think it was -- I 09:07:33
11 don't think it was -- I don't think it was known -- 09:07:37
12 I don't know if it was known in 2012, in other 09:07:41
13 words, but it was certainly known at a later date. 09:07:43
14   Q. When was it known? 09:07:46
15   A. At least by 2019. 09:07:47
16   Q. So if it was known in 2019, why was no 09:07:55
17 recovery made until 2020? 09:07:58
18   A. I think it was just a matter of completing 09:08:00
19 a comprehensive review. 09:08:05
20   Q. So who did the comprehensive review of 09:08:07
21 Millie Hallow's expenses? 09:08:10
22   A. I know there was I know the Brewer firm 09:08:12
23 was involved. 09:08:15
24   Q. Who at the NRA? 09:08:16
25   A. You know, it would have been whoever 09:08:20
Page 49

13 (Pages 46 - 49)

1 provided documents, but I don't know -- I don't know 09:08:23
2 for sure. 09:08:25
3    Q.  Who made the decision to recover the money 09:08:25
4 from Millie Hallow? 09:08:28
5    A.  The NRA. 09:08:29
6    Q.  What human? 09:08:32
7    A.  Oh, well, I mean, we had a lot of 09:08:33
8 discussions with counsel.  I know that I was 09:08:44
9 involved in some of that, and I believe Mr. LaPierre 09:08:47
10 was. 09:08:54
11    Q.  And so who made the decision? 09:08:57
12    A.  It was a collaborative decision. 09:09:05
13    Q.  And the participants in the collaborative 09:09:11
14 decision were Mr. LaPierre and you? 09:09:13
15    A.  I didn't have a discussion directly with 09:09:16
16 Mr. LaPierre, but I know that -- I know those are 09:09:19
17 some of the people who were involved. 09:09:23
18    Q.  So who were the other collaborators 09:09:24
19 besides Mr. LaPierre? 09:09:28
20    A.  Sitting here, I can't identify any 09:09:30
21 particular names. 09:09:33
22    Q.  Did Ms. Hallow object to or dispute any of 09:09:35
23 the charges which were presented to her as 09:09:39
24 calculations of amounts due? 09:09:43
25    A.  I don't know.  I think that would have 09:09:46

Page 50

1 been discussions with -- through discussions with 09:09:51
2 Ms. Hallow's counsel who I'm -- sitting here, I 09:09:53
3 don't know. 09:09:57
4    Q.  With respect to Ms. Hallow, prior to -- at 09:09:58
5 one -- at some point, she was cut off from the 09:10:04
6 American Express card herself, wasn't that correct? 09:10:07
7    A.  I'm trying -- I'm trying to remember. 09:10:13
8       Yeah, there was -- there was an earlier 09:10:20
9 issue in the early 2000s in -- in which I -- which I 09:10:22
10 believe her American Express card was taken at one 09:10:30
11 point. 09:10:34
12    Q.  Was it ever restored to her by the NRA? 09:10:35
13    A.  You know, I don't know if she carried a 09:10:43
14 card or if she had access, you know, to accounts on 09:10:46
15 which the card was a payment method. 09:10:52
16    Q.  So with respect to Ms. Hallow, her card 09:10:55
17 was removed by the NRA in the early 2000s because of 09:11:01
18 another incident involving improper expenditures, 09:11:05
19 that's correct, right? 09:11:08
20    A.  Well, it involved expenditures that were 09:11:09
21 questioned, but she was ultimately -- ultimately 09:11:11
22 cleared in that matter but didn't keep the card. 09:11:15
23    Q.  Is Ms. Hallow still employed by the NRA? 09:11:21
24    A.  Yes, she is. 09:11:23
25    Q.  Does she have any authority to spend money 09:11:24

Page 51

1 for the NRA? 09:11:27
2    A.  No, she doesn't. 09:11:28
3    Q.  Okay. 09:11:29
4       MR. CICILIANO (VIA ZOOM):  Hey, 09:11:35
5 Counsel, I was caught up in all the fun.  But just 09:11:36
6 generally with respect to Ms. Hallow, we would object 09:11:37
7 that that's outside the scope of number 5, but go 09:11:40
8 ahead. 09:11:43
9    Q.  Let's go on to the other people identified 09:11:44
10 in your -- in Schedule L.  Mr. Phillips, what, if 09:11:51
11 any, investigation -- identification, investigation, 09:11:59
12 determination, calculation, recovery of amounts due 09:12:03
13 from Mr. Phillips have occurred in 2019, 2020, and 09:12:05
14 2021? 09:12:12
15    A.  I'm sorry for the pause, I'm trying to -- 09:12:15
16 I'm trying to recall.  I'm sorry, I don't have the 09:12:21
17 specific 990 language with respect to Mr. Phillips 09:12:26
18 in my head, but -- 09:12:32
19    Q.  Let me -- let me read it to you:  From 09:12:37
20 1993 through September 13, 2018, Mr. Phillips served 09:12:39
21 as treasurer and chief financial officer of the NRA. 09:12:45
22 As such, he was a disqualified person.  The New York 09:12:45
23 Attorney General -- New York State Office of the 09:12:51
24 Attorney General has alleged that compensated paid 09:12:51
25 to Mr. Phillips during and after his tenure was 09:12:53

Page 52

1 unreasonable. 09:12:56
2       So that's -- that's all that's there. 09:12:57
3       Mr. Phillips had access to the -- as 09:12:59
4 treasurer, had access to the American Express card 09:13:02
5 for the NRA; isn't that correct? 09:13:04
6    A.  Yes. 09:13:05
7    Q.  And not only did he have access to the 09:13:07
8 card, he was responsible for reviewing the charges 09:13:09
9 on that card; isn't that correct? 09:13:12
10    A.  Yes. 09:13:13
11    Q.  And there's nobody else besides 09:13:14
12 Mr. Phillips who reviewed those charges when he was 09:13:16
13 the treasurer; isn't that correct? 09:13:18
14    A.  I don't -- I don't think that's correct. 09:13:20
15 I think some of Mr. Phillips' staff would have 09:13:24
16 reviewed charges on the cards. 09:13:26
17    Q.  Who would that be? 09:13:28
18    A.  I believe Mr. Tedrick, Rick Tedrick. 09:13:30
19    Q.  Okay.  As part of the internal control 09:13:37
20 system such as it is at the NRA, was Mr. Tedrick 09:13:38
21 specifically assigned to review all of Mr. Phillips' 09:13:43
22 charges on the American Express card? 09:13:46
23       MR. CICILIANO (VIA ZOOM):  I would 09:13:48
24 just object. 09:13:48
25       When you say "such as it is," are you 09:13:49

Page 53

14 (Pages 50 - 53)

1 talking today or then? 09:13:52
2 Q. Sir, take out "such as it is." 09:13:53
3 Under the internal control system which 09:13:55
4 was in effect when Mr. Phillips worked at the NRA, 09:13:58
5 was Mr. Tedrick specifically tasked with reviewing 09:14:00
6 all the charges Mr. Phillips incurred on the 09:14:05
7 American Express card with the NRA? 09:14:07
8 MR. CICILIANO (VIA ZOOM): And I would 09:14:09
9 just object generally to scope. 09:14:10
10 But go ahead. 09:14:12
11 A. I'm -- I'm sorry, I don't know. 09:14:13
12 Q. Okay. Did the NRA ever conduct any review 09:14:16
13 of Mr. Phillips' charges on the NRA American Express 09:14:18
14 card to determine whether they were disqualified 09:14:21
15 excess benefit transactions or represented monies 09:14:25
16 due the NRA? 09:14:29
17 A. I'm not aware of any investigation, but 09:14:30
18 I'm not aware of any cause for investigation. 09:14:33
19 Q. Did anyone review -- do you know if 09:14:38
20 Mr. Tedrick ever disapproved any American Express 09:14:43
21 credit card transaction by Mr. Phillips? 09:14:46
22 MR. CICILIANO (VIA ZOOM): Objection; 09:14:49
23 scope. 09:14:50
24 A. I don't know. 09:14:51
25 Q. So just to close out the book on 09:14:59

Page 54

1 Mr. Phillips, with respect to the American Express 09:15:02
2 card charges which he incurred during the time that 09:15:06
3 he was treasurer and chief financial officer for the 09:15:08
4 NRA and/or -- during the time Mr. Phillips was the 09:15:11
5 treasurer and/or chief financial officer of the NRA, 09:15:15
6 there was never any investigation of any American 09:15:18
7 Express card charges he incurred; is that correct? 09:15:21
8 MR. CICILIANO (VIA ZOOM): Objection; 09:15:24
9 scope as well. 09:15:27
10 Go ahead. 09:15:27
11 A. Sitting here today, I can't -- I'm not 09:15:28
12 aware of any. 09:15:30
13 Q. All right. And with respect to 09:15:31
14 Mr. Phillips, there was never a calculation and 09:15:34
15 recovery of any amounts due from him in 2019 or 2020 09:15:36
16 or 2021? 09:15:41
17 MR. CICILIANO (VIA ZOOM): Objection; 09:15:44
18 assumes facts. 09:15:46
19 Go ahead. 09:15:48
20 A. There hasn't been any recovery. 09:15:48
21 Q. And no -- no determination, correct, of 09:15:49
22 whether Mr. Phillips owes money to the NRA? 09:15:51
23 A. I think that's under review. 09:15:55
24 Q. And what does the review consist of at 09:15:58
25 this point? 09:16:01

Page 55

1 MR. CICILIANO (VIA ZOOM): Objection; 09:16:02
2 to the extent it calls for attorney-client privilege, 09:16:03
3 work product. 09:16:05
4 Go ahead. 09:16:05
5 A. Well, Mr. -- the amounts paid to 09:16:06
6 Mr. Phillips in that time frame after retirement 09:16:08
7 consisted of fees for his -- under his consulting 09:16:10
8 contract that the NRA paid for a time, and the 09:16:15
9 question would be whether the NRA derived any 09:16:18
10 services from that contract -- derived adequate 09:16:21
11 services for that contract. 09:16:25
12 Q. And what investigation has the NRA 09:16:26
13 undertaken with respect to that issue, that issue 09:16:29
14 being the -- whether it derived any services in 09:16:32
15 return for that consulting contract? 09:16:34
16 MR. CICILIANO (VIA ZOOM): I would 09:16:36
17 just object pursuant to the attorney-client privilege 09:16:37
18 and the work product doctrine. 09:16:39
19 Go ahead. 09:16:41
20 A. I'm sorry, I don't know what investigation 09:16:42
21 may have occurred. 09:16:44
22 Q. And do you know whether any determination 09:16:47
23 has been made by the NRA with respect to the 09:16:49
24 consulting contract entered into with Mr. Phillips 09:16:51
25 at the end of 2018? 09:16:55

Page 56

1 A. The determination has been made not to -- 09:16:56
2 not to make any further payments on the contract. 09:16:58
3 Q. And who made that determination? 09:17:01
4 A. I think Mr. -- I think it was Mr. Spray, 09:17:05
5 Craig Spray. 09:17:15
6 Q. Craig Spray the -- the -- is Mr. Spray the 09:17:16
7 chief financial officer at this point? 09:17:21
8 A. No, he's not. 09:17:23
9 Q. Is he the treasurer at this point? 09:17:24
10 A. He is the treasurer until the board elects 09:17:26
11 a successor. 09:17:30
12 Q. Is he still employed -- I'm sorry. 09:17:30
13 When did Mr. Spray make the determination 09:17:33
14 not to pay Mr. Phillips on that consulting contract? 09:17:34
15 A. I think it was -- I mean, it would have 09:17:41
16 been sometime in 2019. 09:17:44
17 Q. Did Mr. Spray decide not to recover -- 09:17:47
18 not -- not to determine, calculate, or recover 09:17:50
19 monies due from Mr. Phillips on the consulting 09:17:54
20 contract? 09:17:56
21 A. I don't know. I don't know Mr. Spray's 09:17:56
22 determination. 09:18:02
23 Q. Did the NRA make any determination not to 09:18:04
24 determine, calculate, or recover any monies due on 09:18:07
25 the consulting contract? 09:18:10

Page 57

15 (Pages 54 - 57)

1 A. I don't -- I don't think we have decided 09:18:12
2 not to, no. 09:18:14
3 Q. So essentially the NRA hasn't decided yet 09:18:19
4 on that issue? 09:18:22
5 A. I think that would be fair. 09:18:23
6 Q. What services did Mr. Phillips render in 09:18:25
7 order to get paid under the consulting -- 2018 09:18:34
8 consulting contract? 09:18:36
9 MR. CICILIANO (VIA ZOOM): I would 09:18:38
10 just object this is outside the scope of any of the 09:18:38
11 requests. 09:18:42
12 But go ahead. 09:18:42
13 A. I think -- I think the NRA has concerns 09:18:43
14 about what -- about what services he provided. 09:18:46
15 Q. And what are those concerns? 09:18:51
16 MR. CICILIANO (VIA ZOOM): Objection 09:18:53
17 to the extent it calls for attorney-client privilege, 09:18:54
18 work product doctrine. 09:18:56
19 A. The concern would be whether he provided 09:19:01
20 any services commensurate with the level of 09:19:03
21 compensation. 09:19:08
22 Q. And what has the NRA determined with 09:19:09
23 respect to that question; that is, whether he 09:19:11
24 provided any services? 09:19:13
25 A. I don't know that we have made a final 09:19:16
Page 58

1 determination. 09:19:18
2 Q. And how long has the NRA been reviewing 09:19:18
3 that question to determine whether he provided any 09:19:23
4 services? 09:19:25
5 MR. CICILIANO (VIA ZOOM): Objection 09:19:30
6 to scope. 09:19:30
7 Go ahead. 09:19:31
8 A. I'm sorry, I don't have the time frame for 09:19:31
9 you. 09:19:34
10 Q. Was it in 2020? 09:19:34
11 A. Well, I mean, we stopped paying him in 09:19:37
12 2019. So... 09:19:43
13 Q. So at that point, the NRA had determined 09:19:47
14 that he was not providing services commensurate with 09:19:51
15 the contract? 09:19:53
16 A. I believe so. 09:19:54
17 Q. All right. Let's talk about Mr. Powell 09:19:58
18 for a moment. 09:20:00
19 NRA made demand for repayment of 09:20:02
20 $57,522.12 from Mr. Powell, correct? 09:20:04
21 A. Yes. 09:20:08
22 Q. And how was that amount calculated? 09:20:09
23 A. That was calculated through a very 09:20:13
24 detailed analysis of his American Express charges 09:20:16
25 and other expense reports throughout his tenure with 09:20:18
Page 59

1 the NRA. 09:20:20
2 Q. And his American Express charges meaning 09:20:20
3 the ones on the NRA card? 09:20:24
4 A. Yes. 09:20:26
5 Q. Did the NRA consider expenses which were 09:20:27
6 passed through Ackerman McQueen in determining the 09:20:30
7 amount of excess benefit transactions Mr. Powell 09:20:34
8 engaged in? 09:20:36
9 A. No, but that's because we don't have 09:20:37
10 access to the full scope of Ackerman McQueen's 09:20:45
11 records. 09:20:49
12 Q. So -- 09:20:50
13 A. Actually, let me correct that, I think -- 09:20:51
14 I think we did have some Ackerman McQueen items in 09:20:53
15 there. 09:20:56
16 Q. How do I -- how can you -- so who did the 09:20:58
17 calculation of the amount due? 09:21:02
18 A. I did along with the forensic consultants. 09:21:06
19 Q. Okay. And is there a spreadsheet for the 09:21:12
20 amounts due from Mr. Powell? 09:21:13
21 A. There was a spreadsheet that was generated 09:21:15
22 by -- that was created by the forensic accountants 09:21:19
23 in anticipation of litigation. 09:21:23
24 Q. And -- but it was based upon that 09:21:28
25 spreadsheet that you made the demand on Mr. -- 09:21:30
Page 60

1 Mr. Powell, correct? 09:21:32
2 A. Yes. 09:21:33
3 Q. And did Mr. Powell contest any 09:21:36
4 expenditures that were listed on the spreadsheet? 09:21:38
5 A. He did. 09:21:40
6 Q. All right. And did you-all come to a 09:21:41
7 determination of which expenses were proper and 09:21:44
8 which ones were improper? 09:21:47
9 A. Well, the NRA and Mr. Powell came to 09:21:49
10 different determinations of which expenses were 09:21:52
11 proper and improper, which is why he -- he short 09:21:55
12 paid the demand. 09:21:59
13 Q. Were there any expenses which were 09:22:02
14 considered to be included in the excess benefit 09:22:04
15 transactions but not included? 09:22:06
16 MR. CICILIANO (VIA ZOOM): Objection; 09:22:10
17 vague, form. 09:22:13
18 A. Yes, there were. 09:22:16
19 Q. And what were those expenses? 09:22:17
20 A. I think it include -- well, there were -- 09:22:22
21 there were a few. There were his -- there were 09:22:25
22 his -- his cellular phone charges where we demanded 09:22:33
23 information about -- you know, more detailed 09:22:37
24 information about his cellular billing. I don't 09:22:40
25 think we demanded repayment of those, but we also 09:22:43
Page 61

16 (Pages 58 - 61)

1 couldn't get enough information to determine that 09:22:46
2 they were necessarily improper. 09:22:49
3       And I think we -- I think there was some 09:22:50
4 unclarity about the terms of his -- some of his 09:22:53
5 housing and relocation expenses and whether they 09:22:59
6 properly should have been covered or not. 09:23:02
7       So I think we left -- I think we left some 09:23:04
8 things out where we were uncertain about -- 09:23:06
9 uncertain about the justice of the demand. 09:23:09
10      Q. The justice -- you had concerns about the 09:23:13
11 justice of the demand. 09:23:16
12      What does -- and what does that mean? 09:23:18
13      A. Just whether the -- whether the evidence 09:23:19
14 was strong enough that the expenditures were 09:23:20
15 improper. 09:23:23
16      Q. Okay. So who participated in that 09:23:23
17 negotiation with Mr. Powell about the justice of the 09:23:26
18 particular claims? 09:23:31
19      A. Well -- well, just to be clear, there were 09:23:33
20 a couple of -- there were -- there were multiple 09:23:35
21 discussions with Mr. Powell's -- who was represented 09:23:38
22 by counsel through -- throughout. There were 09:23:43
23 multiple discussions with counsel. But the 09:23:45
24 discussions were by me and Ms. Rogers. 09:23:46
25      Q. Did the NRA list on its bankruptcy 09:23:52

1 schedules the amounts due to Mr. Powell as a debt -- 09:23:56
2 I'm sorry, as an account receivable or an -- or an 09:24:03
3 asset? 09:24:06
4       MR. CICILIANO (VIA ZOOM): Objection 09:24:07
5 to scope. 09:24:08
6       A. You know, I'm afraid I just don't recall 09:24:08
7 without looking at the schedules. 09:24:10
8       Q. Has the NRA made any effort to collect the 09:24:14
9 debt from Mr. Powell since -- since the spring of 09:24:16
10 2020? 09:24:18
11      A. After he -- so -- so Mr. Powell tendered a 09:24:31
12 check for an insufficient amount along with a cover 09:24:33
13 letter for counsel -- from counsel indicating that 09:24:38
14 if we cashed the check, we would essentially be -- 09:24:41
15 agree that this would be a satisfaction and release 09:24:44
16 of claims. We told them that that was unacceptable 09:24:46
17 and please remit the -- I think we said to please 09:24:50
18 remit the full amount due. 09:24:55
19      Q. Since then what effort have you made to 09:24:55
20 recover the amount due, "you" meaning the NRA? 09:24:57
21      MR. CICILIANO (VIA ZOOM): Objection 09:25:04
22 to the extent it calls for attorney-client privilege. 09:25:05
23      Go ahead. 09:25:07
24      A. I don't -- I don't think we have had 09:25:07
25 further communication. We might have sent a 09:25:09

1 follow-up, but I don't recall with certainty. 09:25:10
2      Q. With respect to Christopher Cox, all 09:25:13
3 right -- let me go back to Mr. Powell for a second. 09:25:18
4      Did Mr. Powell pay the excise tax? 09:25:21
5      A. I don't know. 09:25:24
6      Q. Did you ask that he pay the excise tax? 09:25:25
7      A. No, that would be between him and his tax 09:25:29
8 advisors. 09:25:32
9      Q. Did you advise him -- did you ever advise 09:25:33
10 him or his counsel of the -- the Schedule L 09:25:39
11 disclosure excess benefit transaction? 09:25:43
12      A. Not directly to my recollection. 09:25:45
13      Q. Indirectly? 09:25:52
14      A. I think he became aware of it through -- 09:25:56
15 through -- I assume he became aware of it through 09:25:58
16 news reporting. 09:26:01
17      Q. Did -- are you aware of manager liability 09:26:03
18 for excise taxes in addition to the recipient of the 09:26:09
19 excess benefit transaction? 09:26:14
20      A. Yes. 09:26:16
21      Q. Did you consider whether to require 09:26:18
22 Mr. LaPierre to pay the manager excise tax for the 09:26:21
23 improper payments listed on Schedule L? 09:26:25
24      A. I believe that was considered. 09:26:31
25      Q. And what did the NRA determine? 09:26:33

1      A. I believe we determined that it wasn't 09:26:36
2 necessary. 09:26:38
3      Q. Based on what? 09:26:39
4      MR. CICILIANO (VIA ZOOM): Objection 09:26:42
5 to the extent it calls for attorney-client privilege. 09:26:43
6      A. I -- I think it would -- I think it would 09:26:44
7 call for attorney-client privilege to discuss that. 09:26:46
8      Q. You're the witness, not the lawyer, so 09:26:49
9 what -- what, if any -- what did the NRA rely upon 09:26:52
10 in making the determination not to require 09:26:56
11 Mr. LaPierre to report manager liability? 09:27:00
12      A. I think it would have to have been advice 09:27:09
13 of counsel. 09:27:12
14      Q. Okay. On to Mr. Cox. Mr. Cox was the 09:27:13
15 executive director of the Institute for Legislative 09:27:18
16 Action until 2019. And the -- you state in the -- 09:27:21
17 rather, the NRA states in the Schedule L, The NRA 09:27:28
18 has become aware that Mr. Cox improperly used 09:27:33
19 association funds -- 09:27:33
20      MR. SHEEHAN (VIA ZOOM): Am I going to 09:27:33
21 fast, Ms. Munroe? 09:27:43
22      THE REPORTER (VIA ZOOM): You're okay. 09:27:43
23      MR. SHEEHAN (VIA ZOOM): Not yet?
24 Okay.
25      THE REPORTER (VIA ZOOM): You're okay.

17 (Pages 62 - 65)

```
 1 review of the American Express card accounts?    09:48:19
 2   A.  I don't know that there was a specific    09:48:24
 3 linkage, but it was part of the overall -- overall   09:48:27
 4 revitalized focus on -- on compliance and controls.   09:48:32
 5   Q.  Did -- did Mr. LaPierre use the American   09:48:35
 6 Express card, the -- the ones that were controlled   09:48:38
 7 by the -- the CFO or the treasurer?        09:48:41
 8   A.  No, he doesn't.            09:48:45
 9   Q.  Did Mr. Cox use the American Express    09:48:47
10 cards?                    09:48:50
11   A.  No, he didn't.            09:48:50
12   Q.  Mr. Phillips clearly used the American    09:48:52
13 Express cards, right?              09:48:57
14   A.  I believe so.            09:48:57
15   Q.  So what review -- in that general review,  09:48:58
16 what review is conducted of Mr. Phillips'      09:49:01
17 expenditures on those American Express cards?    09:49:03
18   A.  I don't know if there was a review of    09:49:07
19 Mr. Phillips' expenditures.  I think we talked about   09:49:10
20 this earlier.                09:49:12
21   Q.  Why not?              09:49:14
22   A.  Huh?                09:49:15
23   Q.  Why not?  Why was there no review of    09:49:16
24 Mr. Phillips' expenditures?          09:49:20
25   A.  Let -- let -- okay.  Let me -- let me    09:49:21
```
Page 74

```
 1 clarify.  I don't -- I don't know if there was a    09:49:26
 2 review, but I know that -- I know that we haven't    09:49:28
 3 found any -- I'm sorry.  I don't -- I don't know if   09:49:33
 4 there was a specific review of Mr. Phillips or not.   09:49:39
 5   Q.  But you just told me that there was a    09:49:42
 6 general review of the American Express charges.    09:49:44
 7     Wouldn't that -- shouldn't that have    09:49:46
 8 included Mr. Phillips?            09:49:48
 9   A.  And -- and it -- and it may have, but as I   09:49:53
10 said, I don't know for sure.          09:49:55
11   Q.  And you said -- as I understand your    09:49:56
12 testimony, there were only two American Express    09:49:58
13 credit cards, correct?            09:50:01
14   A.  That's right.            09:50:02
15   Q.  And Mr. Phillips specifically allowed    09:50:03
16 Millie Hallow to make charges on the American    09:50:07
17 Express card that he controlled; isn't that correct?  09:50:11
18   A.  She was able to do it; I don't know what   09:50:14
19 communication the two of them had.        09:50:16
20   Q.  And in theory, he was reviewing the    09:50:18
21 charges that she incurred on the American Express   09:50:22
22 card, correct?                09:50:24
23     MR. SHEEHAN (VIA ZOOM):  Objection    09:50:27
24 foundation.                09:50:27
25     Go ahead.              09:50:27
```
Page 75

```
 1   A.  In theory, yes.            09:50:28
 2   Q.  Did -- in reviewing the Amex in general   09:50:33
 3 that you described earlier, did the NRA consider   09:50:36
 4 whether appropriate controls had been imposed upon  09:50:39
 5 the use of those two credit cards?        09:50:42
 6     MR. SHEEHAN (VIA ZOOM):  Objection;    09:50:45
 7 time.                    09:50:45
 8   Q.  You can go ahead and answer.        09:50:48
 9   A.  Yes, the NRA -- the NRA did, and we felt   09:50:51
10 that the controls needed to be strengthened and we   09:50:55
11 did strengthen them.              09:50:58
12   Q.  But your CFO and treasurer was the person  09:50:59
13 responsible for reviewing the expenditures on those  09:51:03
14 cards, correct?              09:51:06
15   A.  Well -- well, when the -- when the changes  09:51:08
16 in the American -- at the time the changes in the   09:51:13
17 process were made, Mr. Phillips wasn't the treasurer  09:51:16
18 or CFO.                    09:51:18
19   Q.  In addition to -- so if you -- if you look  09:51:20
20 at the disqualified persons list, all right,      09:51:24
21 Mr. DeBergalis, did he have access to the American   09:51:27
22 Express card?                09:51:30
23   A.  I don't believe so.          09:51:30
24   Q.  Did any board member have access to the   09:51:32
25 NRA American Express card?          09:51:35
```
Page 76

```
 1   A.  At one time a few board members, I think   09:51:38
 2 past presidents, had access to American Express    09:51:43
 3 cards, but that ended some time ago.        09:51:47
 4   Q.  Do you know who the most recent one who   09:51:48
 5 had such a card?              09:51:51
 6   A.  I believe the most recent would have been  09:51:52
 7 Jim Porter.  And I think that was at the time that   09:51:55
 8 Mr. Porter was serving as the volunteer executive   09:51:59
 9 director of the NRA Foundation and traveling    09:52:02
10 substantially.                09:52:05
11   Q.  I guess I should ask that question too.    09:52:06
12     In addition to the charges that were    09:52:08
13 identified as overpayments for the NRA, did you    09:52:10
14 determine that any officer, director, or key person   09:52:14
15 of the NRA who also had a Foundation role had    09:52:17
16 charged the American Express card in that Foundation  09:52:22
17 role?                    09:52:26
18   A.  I'm sorry, I'm not sure I follow the    09:52:28
19 question.                  09:52:30
20   Q.  Well, you -- as I understand it from    09:52:32
21 your -- what you just said, Mr. Porter, because he   09:52:33
22 was with the NRA Foundation as the volunteer    09:52:37
23 executive director, had access to the American    09:52:40
24 Express card; is that correct?          09:52:42
25   A.  Right.  Right.            09:52:43
```
Page 77

20 (Pages 74 - 77)

```
 1     Q.  And who oversaw the -- the expenditures on   09:52:44
 2  the card for Mr. Porter when he was the volunteer    09:52:48
 3  executive director of the Foundation?               09:52:51
 4     A.  That would come through the treasurer's      09:52:54
 5  office because I know Mr. Spray was reviewing those   09:52:56
 6  at one time.                                         09:53:00
 7     Q.  At the time that Mr. -- the demand was       09:53:00
 8  made upon Mr. Powell to repay the money, had the NRA  09:53:03
 9  made a decision to terminate him?                    09:53:10
10     A.  No, he was -- no, he -- no.  He -- he took   09:53:15
11  leave time while the investigation was conducted.    09:53:19
12     Q.  Was that at his direction or at the NRA's    09:53:23
13  direction?                                           09:53:26
14     A.  We believed that it was advisable for him    09:53:27
15  not to -- not to be actively working, not to have    09:53:31
16  access to NRA systems at the time.                   09:53:35
17     Q.  So because -- because of his access to the   09:53:39
18  NRA systems and the concerns about his charges, you  09:53:42
19  cut him off -- "you" mean the NRA cut him off from   09:53:45
20  access to the -- everything at the NRA?              09:53:47
21         MR. CICILIANO (VIA ZOOM):  Objection;        09:53:51
22  form.                                                09:53:51
23         Go ahead.                                     09:53:53
24     A.  Yes.                                          09:53:53
25     Q.  All right.  How about Millie Hallow, did     09:53:55
```
Page 78

```
 1  you cut her off?                                     09:53:59
 2     A.  No.                                           09:54:00
 3     Q.  How about Wayne LaPierre, did you cut him    09:54:00
 4  off?                                                 09:54:04
 5     A.  Mr. LaPierre is not really an active user    09:54:04
 6  of NRA information systems, but no.                  09:54:07
 7     Q.  Mr. Cox, did you cut him off?                09:54:11
 8     A.  The investigation of Mr. Cox occurred        09:54:14
 9  after -- after he resigned.                          09:54:17
10     Q.  All right.  Mr. DeBergalis, did you cut      09:54:21
11  him off?                                             09:54:27
12     A.  Huh?  No.                                     09:54:27
13         MR. CICILIANO (VIA ZOOM):  Counsel,          09:54:40
14  can you adjust the camera?  Do you guys have the     09:54:40
15  camera or are you having trouble?                    09:54:45
16         THE WITNESS (VIA ZOOM):  Yeah, the           09:54:45
17  camera, I'm only seeing you from the nose down -- or  09:54:46
18  nose up.                                             09:54:50
19         MR. SHEEHAN (VIA ZOOM):  Okay.  Okay.        09:54:51
20  I just moved around because the sun is coming in but  09:54:52
21  here we go.                                          09:54:54
22     Q.  How about David Lehman, did you allow him    09:54:56
23  access to the computer systems or -- after he was --  09:55:00
24  during the investigation of his expenditures?        09:55:05
25     A.  Mr. Lehman resigned before the -- before     09:55:08
```
Page 79

```
 1  the investigation occurred.                          09:55:11
 2     Q.  So why was Mr. -- why were -- why were       09:55:14
 3  Mr. Cox's expenditures investigated?                 09:55:17
 4     A.  Because as part of the NRA's overall --      09:55:21
 5  overall compliance review, we started taking a --    09:55:24
 6  taking a deep look at the Institute for Legislative   09:55:26
 7  Action.  For various historical reasons, the -- the  09:55:32
 8  Institute had long had its own separate financial    09:55:35
 9  systems, didn't have a lot of visibility from the    09:55:39
10  sixth floor treasurer's office, and, you know,       09:55:42
11  that's something that we're -- that we're remedying  09:55:46
12  now, working more collaboratively and integrating    09:55:48
13  better.                                              09:55:51
14         But -- but essentially because of -- of      09:55:52
15  that communication coordination issue, the parent --  09:55:56
16  the parent organization didn't have as much insight  09:56:02
17  into its -- into this particular division.  Once we  09:56:06
18  started looking at it, things started to come to     09:56:08
19  light.                                               09:56:11
20     Q.  Isn't it true that Mr. LaPierre's expenses   09:56:12
21  were processed through the Institute for Legislative  09:56:16
22  Action?                                              09:56:22
23     A.  For -- for some time that was the case.      09:56:22
24     Q.  And when did that stop?                      09:56:25
25         MR. CICILIANO (VIA ZOOM):  I just            09:56:29
```
Page 80

```
 1  object to scope.                                     09:56:31
 2     A.  I'm not certain of -- I'm not certain of     09:56:33
 3  the -- of the date.                                  09:56:35
 4     Q.  Did you undertake -- "you" the NRA           09:56:36
 5  undertake the same investigation of charges          09:56:39
 6  processed through the ILA for Wayne LaPierre that     09:56:42
 7  you did for Mr. Cox?                                 09:56:46
 8     A.  Yes, we have.                                 09:56:49
 9     Q.  And when was that?                           09:56:51
10     A.  You know, probably -- probably beginning     09:56:55
11  probably 2019.                                       09:57:03
12     Q.  Does the NRA know when it started --         09:57:06
13     A.  '18 or '19.  I'm sorry?                      09:57:08
14     Q.  I thought you told me earlier that the --    09:57:10
15  the investigation of Mr. Cox's expenses and the ILA  09:57:13
16  did not occur until after he left, which was in May  09:57:18
17  or June of 2019; isn't that right?                   09:57:20
18     A.  Right.                                        09:57:22
19     Q.  So after that, an investigation or review    09:57:22
20  was conducted of Mr. LaPierre's expenses that were   09:57:26
21  processed through the ILA; is that correct?          09:57:29
22     A.  That's right.  And I appreciate the -- I     09:57:31
23  appreciate your help on that.  But, yes, so it would  09:57:33
24  have been 2019 on.                                   09:57:36
25     Q.  And is it accurate to say there was not a    09:57:37
```
Page 81

21 (Pages 78 - 81)

1 MR. CICILIANO (VIA ZOOM): Objection; 10:07:39
2 calls for a legal conclusion -- 10:07:40
3 Q. You can answer. 10:07:42
4 MR. CICILIANO (VIA ZOOM): -- outside 10:07:43
5 the scope. 10:07:44
6 A. Yes. 10:07:45
7 Q. Tickets to sporting/entertainment events. 10:07:49
8 Didn't Mr. LaPierre have the NRA pay for 10:07:51
9 tickets to sporting/entertainment events? 10:07:54
10 A. Yes. 10:07:57
11 Q. Did you review his tickets to sporting and 10:07:57
12 entertainment events to see if they were authorized? 10:08:01
13 A. I believe that has been done. 10:08:06
14 Q. Who did it? 10:08:11
15 A. I believe outside counsel. 10:08:12
16 Q. And did you participate in the review of 10:08:17
17 the outside expenses of Mr. LaPierre for 10:08:20
18 sporting/entertainment events? 10:08:24
19 A. No. 10:08:25
20 MR. CICILIANO (VIA ZOOM): "You" being 10:08:26
21 Mr. Frazer personally? 10:08:27
22 MR. SHEEHAN (VIA ZOOM): Let's start 10:08:28
23 with that, yes. 10:08:29
24 A. No. 10:08:29
25 Q. Did anyone else at the NRA besides 10:08:29

Page 90

1 Mr. LaPierre and outside counsel do a review of his 10:08:32
2 tickets to sporting and entertainment events? 10:08:36
3 A. I'm sorry, I don't know. 10:08:39
4 Q. You don't know if anybody besides 10:08:41
5 Mr. LaPierre -- I'm sorry. 10:08:43
6 So to the best of your knowledge, no one 10:08:45
7 else did any review of the sporting/entertainment 10:08:47
8 events except Mr. LaPierre and outside counsel; is 10:08:52
9 that correct? 10:08:55
10 MR. CICILIANO (VIA ZOOM): Objection; 10:08:55
11 misstates testimony. 10:08:55
12 Go ahead. 10:08:56
13 A. I'm sorry, can you restate? 10:08:58
14 Q. Sure. 10:08:59
15 So to the best of your knowledge as the 10:09:00
16 representative of the NRA, no one besides 10:09:03
17 Mr. LaPierre and the outside counsel reviewed the 10:09:06
18 use of tickets by Mr. LaPierre for 10:09:13
19 sporting/entertainment events and the reimbursement 10:09:16
20 of those tickets by the NRA? 10:09:19
21 MR. CICILIANO (VIA ZOOM): Objection 10:09:25
22 to the extent it misstates testimony. 10:09:26
23 Go ahead. 10:09:28
24 A. I don't know that anyone did. 10:09:30
25 Q. So you know -- just to rephrase it: You 10:09:31

Page 91

1 know of no one who did such a review apart from 10:09:37
2 Mr. LaPierre and counsel, correct? 10:09:40
3 A. I -- I can't identify anyone, no. 10:09:41
4 Q. The investigation -- identification, 10:09:45
5 investigation, determination, calculation, and 10:09:48
6 recovery of amounts due from these officers or 10:10:02
7 directors, what, if any, conversation did the NRA 10:09:53
8 employees have with the board concerning these -- 10:09:58
9 these claims? 10:10:00
10 A. Of all -- you mean with respect to all of 10:10:06
11 the individuals that we're talking about? 10:10:07
12 Q. Yeah. Let's -- let's start with 10:10:09
13 Mr. LaPierre. 10:10:11
14 A. I know that -- so communications between 10:10:13
15 the NRA and the board. 10:10:20
16 Q. Right. About improper expenses by 10:10:22
17 Mr. LaPierre which were on -- excess benefit 10:10:27
18 transactions. 10:10:29
19 MR. CICILIANO (VIA ZOOM): I'll just 10:10:34
20 object generally to scope. 10:10:35
21 But go ahead. 10:10:37
22 A. You know, we have -- we have 76 board 10:10:38
23 members. And so -- so it's challenging to -- to 10:10:40
24 know with certainty what -- who may have 10:10:46
25 communicated with any of them about what. 10:10:48

Page 92

1 Q. Do you have any knowledge of communication 10:10:50
2 to the audit committee about the improper charges by 10:10:53
3 Mr. LaPierre that gave rise to excess benefit 10:10:59
4 transactions? 10:11:02
5 A. Yes, the audit committee has been briefed 10:11:02
6 on these matters. 10:11:05
7 Q. When was that? 10:11:06
8 A. It will be the last couple of meetings, 10:11:07
9 but I'm sorry, I don't remember the dates. 10:11:13
10 Q. Meaning -- meaning what? November -- from 10:11:14
11 November to the present -- November 2020 to the 10:11:18
12 present? 10:11:20
13 A. I'm sorry, I just don't have the committee 10:11:22
14 dates off the top -- off the top of my head. 10:11:25
15 Q. And will the agenda and the minutes of 10:11:26
16 those committees show that discussion? 10:11:31
17 MR. CICILIANO (VIA ZOOM): I just 10:11:40
18 object to foundation. 10:11:41
19 Go ahead. 10:11:41
20 A. I don't believe so. 10:11:43
21 Q. And why is that? 10:11:46
22 A. Because it would occur in the context of a 10:11:48
23 privileged legal briefing. 10:11:51
24 Q. Does the -- does the NRA keep minutes of 10:11:53
25 its executive sessions or attorney briefings? 10:11:57

Page 93

Veritext Legal Solutions
800-336-4000

1   A.  No.        10:12:01
2   Q.  So regardless of whether it was an   10:12:02
3 attorney briefing, there will be no record in the   10:12:05
4 organization even under privilege showing a   10:12:07
5 conversation with counsel and what the details of   10:12:10
6 the conversation were?   10:12:13
7        MR. CICILIANO (VIA ZOOM): I would   10:12:15
8 just object to the extent of the use of the term   10:12:16
9 "record."   10:12:21
10       But go ahead.   10:12:21
11   A.  If there was a record -- if -- well,   10:12:23
12 there -- right. You're right. The NRA -- the   10:12:23
13 NRA -- there wouldn't be records in minutes or -- in   10:12:27
14 minutes or -- or committee reports because of the   10:12:30
15 privileged nature of the discussion.   10:12:32
16   Q.  Right.   10:12:34
17   A.  Right.   10:12:35
18   Q.  Would there be any other kind of summary   10:12:38
19 or report that would be maintained under privilege?   10:12:40
20   A.  Only whatever was -- was created or   10:12:45
21 provided by counsel.   10:12:48
22   Q.  And if the board made a determination or a   10:12:53
23 committee made a determination based upon counsel's   10:12:55
24 advice or discussion, would there be any record of   10:12:58
25 that determination?   10:13:01

Page 94

1   A.  If the committee made a -- if the   10:13:02
2 committee made a -- you know, adopted a resolution   10:13:05
3 dealing with a matter, that would be reflected in   10:13:09
4 the minutes or report.   10:13:11
5   Q.  Going to the board member travel, it says   10:13:20
6 that NRA is currently reviewing in -- whether   10:13:22
7 various board members may have used first class or   10:13:24
8 business travel without authorization.   10:13:28
9       Has the NRA concluded that review?   10:13:28
10   A.  No.   10:13:32
11   Q.  Has the NRA made any claim against any   10:13:32
12 board member for using unauthorized travel?   10:13:36
13   A.  No.   10:13:38
14   Q.  Has the -- which board members has the NRA   10:13:38
15 investigated with respect to unauthorized travel?   10:13:42
16       MR. CICILIANO (VIA ZOOM): Just object   10:13:45
17 to the extent that it calls for disclosure of   10:13:45
18 attorney-client privilege or work product.   10:13:48
19       Go ahead.   10:13:49
20       And assumes facts.   10:13:55
21   A.  I'm sorry, I don't -- I'm sorry, I don't   10:13:56
22 have -- I don't have -- have names for you. We have   10:13:58
23 got a report from our travel agent about all   10:14:00
24 upgrades collectively but -- which would include --   10:14:04
25 we have some questions about the -- about the scope   10:14:10

Page 95

1 of that data.   10:14:15
2   Q.  Which travel agent are we talking about   10:14:18
3 here?   10:14:20
4   A.  This would be Direct Travel.   10:14:20
5   Q.  Do any board members have their travel   10:14:24
6 authorized through Gayle Stanford?   10:14:28
7   A.  No. No -- no, that's right. No. No.   10:14:31
8   Q.  In the course of your review of Wayne   10:14:36
9 LaPierre's charges for travel and other matters, did   10:14:38
10 the investigation include interviews of Gayle   10:14:43
11 Stanford?   10:14:46
12   A.  I believe so.   10:14:48
13   Q.  Who did those interviews?   10:14:54
14   A.  I believe the Brewer firm may have spoken   10:14:56
15 with her or with her counsel.   10:14:59
16   Q.  And just -- just to wrap up on this,   10:15:01
17 between November 15, 2020, and the present, the NRA   10:15:09
18 has not completed its review of any of the   10:15:13
19 transactions which are under review at the time the   10:15:15
20 990 was filed; is that correct?   10:15:18
21   A.  That's correct.   10:15:20
22   Q.  Okay. The -- and there have been -- the   10:15:21
23 NRA has not identified any additional excess benefit   10:15:27
24 transactions since November 15, 2020; is that   10:15:30
25 correct?   10:15:33

Page 96

1   A.  No, we have not.   10:15:33
2   Q.  The -- what bylaws or regulations or   10:15:37
3 policies govern -- govern identification,   10:15:41
4 investigation, determination, calculation, recovery   10:15:45
5 of amounts due from disqualified persons?   10:15:47
6       MR. CICILIANO (VIA ZOOM): Objection   10:15:54
7 as to time.   10:15:55
8       Go ahead.   10:15:56
9   A.  If -- if -- if your question is limited to   10:15:57
10 internal NRA materials, NRA policies and so on?   10:16:00
11   Q.  Correct.   10:16:03
12   A.  So -- so we're not talking about IRS   10:16:04
13 regulations and so on?   10:16:06
14   Q.  We'll get there, but let's start with just   10:16:07
15 the NRA policies.   10:16:10
16   A.  Sure. So internally you have a -- you   10:16:11
17 have provisions in the bylaws governing, you know,   10:16:15
18 authorizing payment of expenses. And -- but also   10:16:18
19 you have provisions in the bylaws that prohibit   10:16:22
20 payment of any salary or private benefit without --   10:16:26
21 without approval by the board or an authorized   10:16:28
22 committee.   10:16:32
23   Q.  Right.   10:16:34
24   A.  You have -- you have a provision in the   10:16:34
25 bylaws that has been around since the late 1970s   10:16:35

Page 97

25 (Pages 94 - 97)

1 that -- that requires that any board member doing 10:16:38
2 business with the Association self-report and that 10:16:42
3 those be reported at the members meeting at -- to 10:16:46
4 the secretary and at the board meetings. 10:16:49
5     And then you also have the travel and 10:16:51
6 entertainment policy which -- well, there are a 10:16:55
7 couple of assorted travel policies adopted by the 10:16:59
8 board with respect to board members. There's also a 10:17:04
9 travel and entertainment policy that applies to -- 10:17:08
10 to employees. 10:17:10
11     Q. Does -- could I -- does the travel -- 10:17:12
12 travel and entertainment policy for employees apply 10:17:15
13 to officers or managers of the NRA? 10:17:18
14     A. It certainly applies to salaried 10:17:23
15 officers -- officers of the NRA and all -- you know, 10:17:25
16 all -- all salaried individuals at the NRA. 10:17:30
17     Q. Going back to the investigation that we 10:17:34
18 talked about here, what, if any, role did the 10:17:36
19 financial services division play in the 10:17:39
20 investigations of excess benefit transactions with 10:17:41
21 the people listed on Schedule L? 10:17:46
22     A. Yeah, they were -- they were integral to 10:17:48
23 those -- to those investigations. Financial 10:17:52
24 services division, of course, is the repository of 10:17:54
25 data about all -- about all payments by the NRA. 10:17:57

1     Q. And do you know if they -- prior to Chris 10:19:19
2 Cox leaving, did they ever ask? 10:19:22
3     MR. CICILIANO (VIA ZOOM): Objection; 10:19:26
4 scope. 10:19:26
5     Go ahead. 10:19:28
6     A. I don't know. 10:19:28
7     Q. What people at the financial services 10:19:30
8 division were involved in the investigation 10:19:33
9 identification, investigation, and determination of 10:19:36
10 amounts due from disqualified persons during 2018, 10:19:40
11 2019, and 2020? 10:19:45
12     A. Sure. Mr. Spray, Ms. Rowling, Mike 10:19:46
13 Erstling, those are the -- those are the ones that 10:19:57
14 I'm personally aware of -- Mr. -- Mr. Tedrick as 10:20:10
15 well. Sorry. 10:20:15
16     And just to be clear, I'm speaking a 10:20:18
17 little bit more expansively about the treasurer's 10:20:20
18 office of which the financial services division is a 10:20:23
19 component. 10:20:26
20     Q. Got it. 10:20:27
21     Prior to 2019, what system existed at the 10:20:34
22 NRA to identify receivables from officers, 10:20:36
23 directors, and key employees? 10:20:39
24     A. To identify... 10:20:42
25     Q. Receivables from officers, directors, and 10:20:44

1 And beyond that, it varies a little bit depending on 10:18:01
2 which individual you're talking about. But... 10:18:04
3     Q. Does financial services division have -- 10:18:08
4 did financial services division, before Mr. Cox 10:18:11
5 left, have records of the Institute for Legislative 10:18:14
6 Affairs expenditures? 10:18:19
7     A. As I testified earlier, unfortunately that 10:18:22
8 was not well integrated. 10:18:25
9     MR. CICILIANO (VIA ZOOM): And before 10:18:27
10 your next question, whoever MGruber's iPad is -- I 10:18:28
11 don't know who that is -- but could you mute, please? 10:18:33
12 Same with 330 number again. 10:18:34
13     Q. I'm sorry. You were asking about the 10:18:41
14 financial -- you -- if the financial services 10:18:44
15 division wanted to review the records of the 10:18:48
16 Institute for Legal -- Institute for Legislative 10:18:50
17 Affairs records, did they have the ability to do 10:18:55
18 that? 10:18:57
19     A. At what -- at what point in time are you 10:18:57
20 referring to? 10:19:01
21     Q. Before Chris Cox left. 10:19:02
22     A. Unfortunately -- I mean, they could 10:19:06
23 certainly -- they could certainly have asked, but 10:19:13
24 they wouldn't have had access without assistance 10:19:14
25 from ILA. 10:19:17

1 key employees. 10:20:47
2     A. Key -- oh, key employees. I couldn't 10:20:48
3 quite hear you. I'm sorry. 10:20:52
4     Q. Sorry. 10:20:52
5     A. Well, it would have been primarily the -- 10:20:56
6 it would have been the NRA expense reporting system. 10:20:59
7     Q. And -- but the American Express card 10:21:03
8 charges, for example, don't show up in the expense 10:21:06
9 reporting system; isn't that correct? 10:21:08
10     A. Sure -- well, sure, I'm sorry. The -- 10:21:10
11 there's the expense reporting system under which you 10:21:11
12 submit an expense report and seek reimbursement and 10:21:13
13 then there's also the -- the American Express -- 10:21:17
14 American Express card or the Wells Fargo cards which 10:21:21
15 were -- which were formerly issued in a -- more 10:21:25
16 broadly than Amex. Once the Amex cards were 10:21:29
17 curtailed, the number of people who traveled on 10:21:33
18 business got Wells Fargo cards. 10:21:35
19     Q. Let's -- so the issued -- prior to 2019, 10:21:37
20 you would agree with me that the system for 10:21:43
21 identifying receivables from disqualified persons 10:21:47
22 did not include any expenditure which was put 10:21:51
23 through the American Express card? 10:21:54
24     MR. CICILIANO (VIA ZOOM): Objection 10:21:57
25 to the extent it misstates testimony. 10:22:00

26 (Pages 98 - 101)

1     A. And I don't know that that's -- I don't    10:22:02
2 know that that's correct. People have had -- people    10:22:03
3 have had to substantiate their American Express    10:22:08
4 charges.                    10:22:11
5     Q. Sorry, you say people have had to    10:22:13
6 substantiate their American Express charges.    10:22:15
7       And what system would show me that that    10:22:17
8 was done and how it was done?            10:22:22
9       MR. CICILIANO (VIA ZOOM): I would    10:22:25
10 just object to the term "system" as being vague.    10:22:25
11     Q. Doesn't sound like a system to me either,    10:22:28
12 but Mr. --                  10:22:31
13       MR. CICILIANO (VIA ZOOM): Are you    10:22:32
14 asking for, like, a computer program? I guess is my    10:22:33
15 problem is it a system as in like a policy or a    10:22:35
16 system as in --               10:22:38
17     Q. Mr. Frazer, what system of records    10:22:38
18 within -- with respect to American Express credit --    10:22:44
19 credit card charges will show what receivables are    10:22:46
20 due from disqualified persons?         10:22:53
21     A. Well, it has been -- you know, along with    10:22:58
22 a lot of other things, it has been tightened up.    10:22:59
23 The current process is that if charges are made on    10:23:02
24 a -- are made on a card, the -- whoever is    10:23:06
25 responsible for approving that particular employee's    10:23:10

Page 102

1 expenditures, you know, reviews the output of the    10:23:12
2 system and, you know, it's line item -- line item    10:23:20
3 expenditures.               10:23:22
4     Q. What's the system -- there's an electronic    10:23:24
5 system for expense assessment?        10:23:27
6     A. What I'm aware of is typically an exchange    10:23:31
7 of emails. I mean, you will have a spreadsheet    10:23:34
8 showing, you know, Employee A incurred the following    10:23:37
9 charges; gas, lunch, whatever. And that's sent to    10:23:41
10 the person responsible for reviewing expenses for    10:23:45
11 that individual. And, you know, we have an -- and    10:23:48
12 the reviewer then can approve, deny, or ask    10:23:51
13 questions.                10:23:55
14     Q. Is there -- is there an electronic system    10:23:56
15 within the NRA that captures the -- those email    10:24:00
16 exchanges, the invoices, whether somebody has    10:24:06
17 returned the -- you know, sent the email back, is    10:24:08
18 there an electronic system for that even now?    10:24:10
19     A. Well, it's all part of our -- of our --    10:24:13
20 it's all done through the -- through the email    10:24:17
21 network.                10:24:19
22     Q. Yeah, but that's -- so that -- there's no    10:24:21
23 central place at the NRA that captures those emails    10:24:24
24 and makes sure that for every expenditure, there's    10:24:27
25 an email approval?           10:24:29

Page 103

1       MR. CICILIANO (VIA ZOOM): Objection;    10:24:30
2 misstates testimony, scope.         10:24:33
3     A. I don't -- I don't know that there's not.    10:24:34
4 I'm sorry, it's a little bit outside my personal    10:24:36
5 knowledge. And I understand I'm testifying as the    10:24:39
6 NRA.                   10:24:45
7     Q. Is there an outside vendor that you use to    10:24:45
8 manage your travel -- travel and entertainment    10:24:49
9 expenditures at the NRA --         10:24:51
10       MR. CICILIANO (VIA ZOOM): Objection;    10:24:53
11 outside the scope.            10:24:54
12     Q. -- besides the software system?     10:24:55
13     A. I'm not aware of any specialized software    10:24:57
14 on this issue.             10:25:01
15     Q. Okay.              10:25:03
16     A. Let me -- let me -- let me make one -- let    10:25:04
17 me -- clarification on that. The -- the current    10:25:11
18 management of the Institute for Legislative Action    10:25:16
19 adopted a software package because they have a lot    10:25:20
20 of employees who travel a lot, more than the -- than    10:25:23
21 the parent organization, I think. They adopted a    10:25:27
22 system of which the name is just completely escaping    10:25:33
23 me, I'm afraid, in which -- in which receipts are    10:25:36
24 submitted electronically.        10:25:40
25     Q. Why is that system not used generally at    10:25:42

Page 104

1 the NRA?                 10:25:49
2       MR. CICILIANO (VIA ZOOM): Objection;    10:25:50
3 outside the scope.            10:25:51
4     A. Historically -- historically ILA has --    10:25:52
5 you know, has had -- had an independent financial    10:25:54
6 structure, they make their own decisions. And, you    10:25:55
7 know, the new fiscal officer who came in there in    10:25:58
8 2019 decided to -- to experiment with this over    10:26:01
9 the -- over the then existing system in which people    10:26:07
10 had to tape -- tape receipts to pieces of paper,    10:26:10
11 that kind of thing.          10:26:16
12     Q. And so at the present time, does the NRA,    10:26:17
13 outside of ILA, still use the taping pieces of paper    10:26:21
14 system to account for receipts?      10:26:25
15     A. Yes. It's -- it's paper-based with    10:26:27
16 respect to items on people's personal cards. But --    10:26:29
17 but as I said in exchange of emails, with respect --    10:26:33
18 actually, let me -- let me correct that further.    10:26:39
19       So American Express was always an exchange    10:26:43
20 of emails, but for the Wells Fargo cards, there was    10:26:45
21 actually a -- an electronic portal through which    10:26:50
22 they would be reviewed.         10:26:57
23     Q. And --              10:26:58
24       MR. CICILIANO (VIA ZOOM): Again, I    10:26:59
25 would object to that being outside the scope.    10:27:00

Page 105

27 (Pages 102 - 105)

```
 1           Counsel, if you want to tell me what  10:27:02
 2  question that pertains to, I would appreciate it.  10:27:03
 3           MR. SHEEHAN (VIA ZOOM):  Implies to  10:27:06
 4  identification of -- of -- of overpayments to any  10:27:07
 5  officer, director, or key person.  I'm trying to  10:27:10
 6  figure out if there's a system designed to detect  10:27:13
 7  that.                                  10:27:15
 8      Q.   Whose job is it to chase down employees of  10:27:18
 9  the NRA who have not submitted their receipts?  10:27:22
10           MR. CICILIANO (VIA ZOOM):  Well, I'm  10:27:27
11  going to respectfully disagree.  Now you're asking  10:27:27
12  about employees, not officers, directors, or key  10:27:30
13  persons.                               10:27:30
14           MR. SHEEHAN (VIA ZOOM):  Fair enough.  10:27:32
15  Okay.  Let's go to that.               10:27:32
16      Q.   Mr. Frazer --                  10:27:34
17           MR. CICILIANO (VIA ZOOM):  But  10:27:34
18  moreover, I still have a scope objection.  I think  10:27:35
19  it's outside the scope.  I will tell you I'm not  10:27:36
20  going to prevent him from testifying to -- to the  10:27:39
21  basis of his knowledge.  I'm just telling you it's  10:27:42
22  outside the scope.                     10:27:45
23      Q.   Okay.  So whose responsibility was it  10:27:46
24  within the NRA to pursue disqualified persons,  10:27:48
25  officers, directors, or key persons, to obtain the  10:27:53
                                         Page 106
```

```
 1  receipts for travel, entertainment expenses and the  10:27:56
 2  purpose of those expenses?             10:28:00
 3           MR. CICILIANO (VIA ZOOM):  Objection  10:28:03
 4  as to time.                            10:28:03
 5      A.   Well, generally speaking, the first burden  10:28:06
 6  is on the individual who wants to get reimbursed  10:28:11
 7  because you're not going to get reimbursed unless  10:28:15
 8  you submit them.  If someone is -- you know, maybe  10:28:17
 9  not -- maybe not as worried about -- about getting  10:28:21
10  reimbursed, it would be -- it would be the -- I  10:28:24
11  think it would be the financial staff's task to --  10:28:29
12  to follow up.                          10:28:31
13      Q.   Any particular person?          10:28:33
14      A.   It's a fairly large staff, but I think it  10:28:42
15  would have been Ms. Rowling in her, you know, prior  10:28:48
16  capacity as financial services director and her --  10:28:50
17  and her team.                          10:28:52
18      Q.   Has the NRA forgiven or waived any portion  10:28:55
19  of the amounts due from any -- any disqualified  10:28:58
20  person?                                10:29:02
21      A.   Not to my knowledge.           10:29:04
22      Q.   How does the NRA address liability for  10:29:08
23  FICA, income taxes, excise taxes, arising out of  10:29:08
24  receivables from the officers, directors, or key  10:29:14
25  employees?                             10:29:16
                                         Page 107
```

```
 1      A.   I'm sorry.                     10:29:20
 2      Q.   So if you make a payment to a disqualified  10:29:23
 3  person, you have liability under the Internal  10:29:26
 4  Revenue Code for the fact that the W-2 was false and  10:29:31
 5  that the 941 was false and you may have interest or  10:29:34
 6  other charges.                         10:29:37
 7           What -- how does the NRA address those  10:29:40
 8  liabilities?                           10:29:42
 9           MR. CICILIANO (VIA ZOOM):  I would  10:29:44
10  just object to the extent it calls for a legal  10:29:44
11  conclusion and misstates what the law is.  10:29:47
12      A.   Well, it would be different -- it would be  10:29:50
13  different for employees versus nonemployees because,  10:29:52
14  of course, you can have disqualified persons in  10:29:57
15  either category.                       10:30:00
16      A -- you know, for an employee, payments  10:30:04
17  to the employee would be -- would be reported  10:30:09
18  through the payroll system or to human resources and  10:30:13
19  reported on W-2.  And -- and for nonemployees, it  10:30:17
20  would be -- you know, either it's a reimbursable  10:30:23
21  expense and it gets reimbursed, or if it's a payment  10:30:25
22  to the individual, it would be subject to issuance  10:30:29
23  of a 1099 as appropriate.              10:30:31
24      Q.   Let's go -- let's go back to people who  10:30:33
25  are employees of the NRA.              10:30:36
                                         Page 108
```

```
 1           Would you agree with me that the original  10:30:38
 2  W-2 which did not reflect these payments was  10:30:42
 3  incorrect?                             10:30:46
 4           MR. CICILIANO (VIA ZOOM):  I would  10:30:46
 5  just object, outside the scope.  I think this is the  10:30:48
 6  same issue you had before.             10:30:49
 7      A.   I'm sorry, whose W-2 are you referring to?  10:30:52
 8      Q.   Wayne LaPierre's, for example, during --  10:30:55
 9  for the five years he was getting improper payments.  10:30:57
10      A.   So you're asking me whether his W-2 was  10:31:07
11  incorrect?                             10:31:09
12      Q.   Correct.                       10:31:10
13           THE WITNESS (VIA ZOOM):  And I'm  10:31:15
14  sorry, Dylan, do we have an objection pending on that  10:31:16
15  one?                                   10:31:19
16           MR. CICILIANO (VIA ZOOM):  You can go  10:31:19
17  ahead to the extent you know.  I think it calls for a  10:31:20
18  legal conclusion, but go ahead.        10:31:24
19      Q.   Let me -- let me -- Mr. Frazer, what I'm  10:31:28
20  asking is --                           10:31:29
21      A.   I'm sorry, I'm a little puzzled of how to  10:31:30
22  answer that one.                       10:31:33
23      Q.   Okay.  Is there any system for correct --  10:31:33
24  once you have identified an overpayment or an excess  10:31:34
25  benefit transaction with a officer, director, key  10:31:34
                                         Page 109
```

28 (Pages 106 - 109)

1 employee, are there -- you know what, let it go. 10:31:42
2 Let's move on. 10:31:46
3 Did -- looking at the financial statements 10:31:48
4 for the -- for the NRA for 2019, the independent 10:31:52
5 audit review, note 6 states that there are 10:31:58
6 receivables other than contributions and advertising 10:32:02
7 of -- well, let me ask you this. 10:32:05
8 Do the financial statements which were 10:32:07
9 submitted -- do the financial statements which the 10:32:10
10 auditors signed off on with their opinion on 10:32:14
11 November 15th, 2020, with respect to 2019, do they 10:32:17
12 reflect the accounts receivable identified in 10:32:21
13 Schedule L? 10:32:24
14 MR. CICILIANO (VIA ZOOM): I would 10:32:28
15 just object to scope. 10:32:28
16 What topic is this? 10:32:29
17 MR. SHEEHAN (VIA ZOOM): The same 10:32:30
18 topic, right, identification, calculation, and 10:32:31
19 recovery of amounts due. 10:32:35
20 MR. CICILIANO (VIA ZOOM): You're 10:32:36
21 asking him about financial statements outside of 10:32:37
22 that? 10:32:39
23 MR. SHEEHAN (VIA ZOOM): No, no. 10:32:40
24 Statements -- 10:32:40
25 Q. Mr. Frazer, do the statements reflect the 10:32:41
Page 110

1 obligations, the receivables that are set forth in 10:32:43
2 Schedule L? 10:32:46
3 MR. CICILIANO (VIA ZOOM): I would 10:32:47
4 just object. I think it's outside the scope. 10:32:48
5 To the extent you know. 10:32:50
6 Q. Mr. Frazer -- 10:32:53
7 A. I'm sorry, what was the date -- what was 10:32:54
8 the date of the statements? 10:32:55
9 Q. The statements are for fiscal year 2019 10:32:57
10 submitted -- NRA -- actually, I don't know the date 10:33:01
11 of the statements. 10:33:05
12 The 2019 statements, do they reflect the 10:33:05
13 receivables due that are listed on Schedule L? 10:33:12
14 A. Well, that's why I asked about the date of 10:33:15
15 the statements because I think the date of the 10:33:17
16 statements is critical. The -- and I don't have 10:33:19
17 them -- I don't know if we have them here. 10:33:22
18 MR. CICILIANO (VIA ZOOM): Do you have 10:33:25
19 the statements you can show him? 10:33:25
20 MR. SHEEHAN (VIA ZOOM): No, I'm -- 10:33:27
21 I'm asking him as representative of the NRA whether 10:33:27
22 the financial statements for 2019, certified 10:33:31
23 financial statements, reflect the accounts receivable 10:33:35
24 that are in Schedule L. 10:33:39
25 MR. CICILIANO (VIA ZOOM): Yeah, and I 10:33:40
Page 111

1 would just object that he's telling you he doesn't 10:33:41
2 remember. And I think even being a 30(b)(6) -- 10:33:43
3 30(b)(6) doesn't require that you memorize 10:33:46
4 everything. 10:33:49
5 A. Let me try to answer it. 10:33:49
6 Q. Sure. Okay. 10:33:51
7 A. I'm sorry. I'm sorry. I'm sorry. Do you 10:33:52
8 have a -- do you have a question? I don't want to 10:33:54
9 interrupt you. 10:33:54
10 Q. No. Go ahead. 10:33:55
11 A. If the -- if -- if what -- if my 10:33:57
12 recollection is correct -- and I'm not involved in 10:34:01
13 preparing the -- personally involved in preparing 10:34:04
14 the financial statements, so just to be clear. 10:34:07
15 If my recollection is correct, the 10:34:09
16 financial statements are prepared much earlier in 10:34:10
17 the year. And so they couldn't reflect matters that 10:34:12
18 were only concluded, you know, shortly before the 10:34:15
19 time of the filing of the 990. 10:34:19
20 Q. And -- and with respect to the debtors' 10:34:21
21 schedules which were filed with the bankruptcy 10:34:24
22 court, do those schedules reflect the obligations 10:34:27
23 that are set forth on Schedule L? 10:34:31
24 MR. CICILIANO (VIA ZOOM): I would 10:34:33
25 just object to the extent that he has not been 10:34:33
Page 112

1 designated for that topic. I think Ms. Rowling under 10:34:36
2 2 for the Ackerman McQueen has been. 10:34:39
3 MR. SHEEHAN (VIA ZOOM): Yeah, but 10:34:43
4 this is -- goes to -- 10:34:43
5 Q. I'll ask, Mr. Frazer, can you answer the 10:34:45
6 question? 10:34:47
7 MR. CICILIANO (VIA ZOOM): And so it's 10:34:48
8 outside the scope of number 5, but to the extent you 10:34:48
9 have personal knowledge, go ahead. 10:34:52
10 A. I don't think I have knowledge on that. 10:34:53
11 Q. Let me -- that's -- that's -- 10:34:54
12 identification. All right. Does the -- do the 10:34:58
13 bankruptcy schedules include identification of the 10:35:02
14 amounts due as set forth in Schedule L? 10:35:05
15 MR. CICILIANO (VIA ZOOM): I would 10:35:09
16 just object that you're now asking about -- the term 10:35:10
17 "identification" doesn't apply just to identify 10:35:13
18 everything. It's identification of recovery of 10:35:15
19 amounts due. It's a modifier of "amounts due." 10:35:18
20 So... 10:35:22
21 Q. So, Mr. Frazer, do the bankruptcy 10:35:22
22 schedules identify the amounts due which are set 10:35:25
23 forth in Schedule L to the 2019, 990? 10:35:29
24 MR. CICILIANO (VIA ZOOM): And I would 10:35:33
25 just object it's outside the scope. 10:35:34
Page 113

29 (Pages 110 - 113)

1 recall if any of those productions actually occurred  10:54:45
2 in 2019 or if they were all in a prior year.  10:54:48
3    Q. So is it fair to say that you conducted  10:54:53
4 some investigation of the payments to Colonel North  10:54:58
5 but you made no determination, "you" the NRA,  10:55:02
6 calculation, recovery of amounts due from Colonel  10:55:04
7 North?  10:55:09
8    MR. CICILIANO (VIA ZOOM): Objection  10:55:09
9 to the extent that it calls for attorney-client  10:55:12
10 privilege or work product that's currently ongoing.  10:55:13
11    Q. Mr. Frazer?  10:55:19
12    A. Well -- right. I'm following the chain  10:55:20
13 here. In -- we are attempting to recover from --  10:55:24
14 from Ackerman McQueen. And if Ackerman McQueen paid  10:55:30
15 its employee -- paid its employee excessively and we  10:55:33
16 were -- and we were to recover that, then that might  10:55:37
17 amount to a recoupment of those same funds.  10:55:43
18    Q. But you report on your 990 that Mr. North  10:55:45
19 received payment from the association of the amount  10:55:48
20 that I just stated, $986,000.  10:55:51
21    A. But those were pay -- I'm sorry.  10:55:58
22    Q. No, go ahead. Go ahead.  10:56:01
23    A. But those -- but those were amounts paid  10:56:04
24 to him by Ackerman McQueen in which the NRA paid on  10:56:06
25 Ackerman's billing.  10:56:10
             Page 118

1    Q. Okay. With respect to the American  10:56:12
2 Express credit card, isn't it true that in 2019,  10:56:18
3 Mr. DeBergalis had access to the Amex card as well?  10:56:20
4    A. In what time frame?  10:56:24
5    Q. 2019.  10:56:25
6    A. 2019. I don't know for certain.  10:56:27
7    Q. Did Mr. DeBergalis have access to the  10:56:33
8 American Express credit card for 2018?  10:56:36
9    MR. CICILIANO (VIA ZOOM): Object to  10:56:38
10 scope.  10:56:40
11    A. Again, I don't know for certain.  10:56:41
12    Q. What, if any, investigation was conducted  10:56:46
13 into Mr. DeBergalis's expenditures on the Amex card?  10:56:48
14    A. Well, you're -- you're assuming that he  10:56:53
15 made expenditures on the American Express card, and  10:56:55
16 I'm afraid I don't know that.  10:56:58
17    Q. Okay. How about Mr. Cors, did Mr. Cors  10:57:00
18 have access to the American Express credit card?  10:57:05
19    A. Mr. Cors may have had access at some time  10:57:08
20 as president of the NRA or past president traveling  10:57:14
21 on NRA business.  10:57:18
22    Q. Did -- was there any investigation or  10:57:18
23 identification of expenditures by Mr. Cors on the  10:57:21
24 American Express credit card?  10:57:26
25    A. Not to my knowledge.  10:57:27
             Page 119

1    Q. Was there any investigation of  10:57:28
2 Ms. Froman's expenditures on the American Express  10:57:31
3 credit card?  10:57:33
4    A. Not to my knowledge.  10:57:34
5    Q. Did she have access to the American  10:57:35
6 Express credit card?  10:57:37
7    A. As a past president, she may have, but I  10:57:38
8 don't know for certain.  10:57:42
9    Q. Going to topic 7.  10:57:50
10    So let's -- let's start off with -- were  10:57:58
11 you present when Mr. LaPierre told the Court -- told  10:58:01
12 the 341 proceeding that the NRA was a hundred  10:58:07
13 percent compliant with New York State law?  10:58:10
14    A. Yes.  10:58:12
15    Q. Do you agree with that?  10:58:14
16    A. We believe that the NRA is -- you know, I  10:58:26
17 don't know that -- I don't know that anyone can  10:58:29
18 testify that they're perfect. I know I'm personally  10:58:30
19 not perfect. But I know that we have made enormous  10:58:33
20 strides and -- and endeavor to substantially comply  10:58:37
21 in every way.  10:58:40
22    Q. So do you agree with Mr. LaPierre's  10:58:42
23 characterization of a hundred percent compliance?  10:58:44
24    A. I would be reluctant to say a hundred  10:58:46
25 percent about anything.  10:58:49
             Page 120

1    Q. So do you disagree with Mr. LaPierre's  10:58:51
2 description of a hundred percent compliance?  10:58:54
3    MR. CICILIANO (VIA ZOOM): Objection;  10:58:56
4 scope, asked and answered.  10:58:59
5    Q. Mr. Frazer?  10:59:04
6    A. I mean, I think I would have to disagree  10:59:07
7 just because of it's an imperfect world and nobody's  10:59:09
8 perfect.  10:59:13
9    Q. Okay. Thank you.  10:59:13
10    What training do the general counsel or  10:59:15
11 his staff receive about New York State laws  10:59:17
12 governing charities and charitable assets since  10:59:27
13 you've been --  10:59:23
14    A. Well, it's -- I'm sorry?  10:59:23
15    Q. -- since you have been general counsel?  10:59:24
16    A. Sure. The -- I can point to a couple of  10:59:26
17 things. So, first of all, the attorneys in the  10:59:30
18 Office of General Counsel are all admitted in the  10:59:33
19 state of Virginia. Virginia requires, you know, 12  10:59:36
20 hours annually of continuing legal education. I --  10:59:40
21 I leave it to the -- to the individual attorneys to  10:59:44
22 determine what subject -- subject matters they  10:59:47
23 study. But certainly some of them have received  10:59:51
24 training in nonprofit law, tax law, and so on.  10:59:54
25 And -- and they also all attended the internal  11:00:01
             Page 121

                              31 (Pages 118 - 121)

1 compliance training session that -- that I conducted 11:00:06
2 in 2018 and 2019. 11:00:10
3 Q. You said -- when you say "I conducted," 11:00:13
4 you conducted that training? 11:00:15
5 A. Yes. 11:00:16
6 Q. What training have you yourself received 11:00:21
7 on New York State laws governing charities and 11:00:22
8 charitable assets? 11:00:26
9 A. When I came back on board with the NRA in 11:00:27
10 2015, I attended a couple of -- several continuing 11:00:30
11 legal education seminars covering nonprofit 11:00:36
12 governance, tax law, including -- I believe there 11:00:53
13 was one specifically on New York law. I read 11:00:45
14 various practice guides and manuals about the 11:00:48
15 subject to educate myself. 11:00:51
16    And -- and, of course, I, you know, talked 11:00:54
17 to co-counsel regularly, reviewed past -- past legal 11:00:55
18 opinions that were in the files on various subjects, 11:01:00
19 and generally tried to familiarize myself with the 11:01:04
20 subject, and of course -- of course further research 11:01:08
21 or refresh my information when -- when a specific 11:01:10
22 issue comes up. 11:01:15
23 Q. Have you ever required your staff to 11:01:16
24 attend specific training on New York charities law? 11:01:18
25 A. Other than the -- other than the internal 11:01:22
Page 122

1 training that we did, no. 11:01:28
2 Q. And internal training, you're referring to 11:01:34
3 the internal compliance program? 11:01:36
4 A. Correct. 11:01:38
5 Q. What consultants or attorneys has the NRA 11:01:42
6 engaged to advise it about compliance issues during 11:01:58
7 the relevant time period, that is, 2018, '19, '20, 11:01:49
8 and '21? 11:01:54
9 A. Consultants and attorneys on compliance 11:01:54
10 issues. So in twenty -- you know, for a -- we 11:01:57
11 retained Morgan Lewis on compliance issues. We used 11:02:01
12 K&L Gates, now Peter Flocos who is retired from K&L 11:02:12
13 Gates currently on retainer. And -- and, you know, 11:02:20
14 the Brewer firm is certainly advised on these 11:02:27
15 issues. And there have been various subcontracted 11:02:30
16 experts that I can't -- I can't name them all off 11:02:36
17 the top of my head. 11:02:41
18 Q. Okay. 11:02:41
19 A. And for charitable registration matters, 11:02:42
20 we worked with the Copilevitz firm out of Kansas 11:02:46
21 City for -- you know, on a nationwide basis. 11:02:49
22 Q. Okay. You yourself are not licensed in 11:02:51
23 New York State; is that correct? 11:02:54
24 A. No, I'm not. 11:02:54
25 Q. Is there anybody on your staff that's 11:02:55
Page 123

1 licensed in New York State? 11:02:57
2 A. No. 11:02:58
3 Q. Have any -- you or any of your staff 11:03:01
4 acquired the in-house registration required by the 11:03:03
5 New York State Bar process? 11:03:07
6 A. Not to my knowledge. 11:03:11
7 Q. Okay. Are you familiar -- you personally 11:03:13
8 familiar with the 2020 DOJ compliance guidance for 11:03:22
9 corporations? 11:03:26
10 A. I believe I have -- I'm not sure. 11:03:28
11 Q. You're not sure? 11:03:37
12 A. No, I'm not, I guess. 11:03:40
13 Q. Are you the chief compliance officer for 11:03:43
14 the NRA? 11:03:48
15 A. The NRA doesn't have such a title 11:03:49
16 formally. 11:03:51
17 Q. Okay. Are you in charge of the compliance 11:03:52
18 function for the NRA? 11:03:54
19 A. There's not a single individual compliance 11:03:55
20 at the NRA; it's a team effort. That's essentially 11:03:58
21 what we try to teach people. 11:04:01
22 Q. So who is on the team? 11:04:03
23 A. Everyone. But the principal executives 11:04:06
24 involved -- involved in these matters would include 11:04:09
25 the senior -- the Office of General Counsel and the 11:04:13
Page 124

1 senior financial staff. 11:04:16
2 Q. Whose responsibility at the end of the day 11:04:18
3 is it -- where does the buck stop to make sure there 11:04:21
4 is an effective compliance program at the NRA? 11:04:23
5 A. Well, all of the -- all of the officers 11:04:26
6 and staff report to Mr. LaPierre and ultimately to 11:04:28
7 the board of directors. And, of course, the 11:04:33
8 treasurer and secretary are also elected directly by 11:04:34
9 the board, so there's an independent check there. 11:04:37
10 Q. So who is responsible to make sure there's 11:04:39
11 an effective compliance program? 11:04:41
12 A. Again, team effort. 11:04:43
13 Q. Ultimately responsible. Ultimately 11:04:45
14 responsible. 11:04:46
15 A. So -- well -- so, ultimately, you know, 11:04:48
16 you pass it all the way up, it's the board. 11:04:51
17 Q. Of -- of the salaried employees of the 11:04:53
18 organization, who has the primary responsibility for 11:04:57
19 ensuring there's an effective compliance program? 11:04:59
20 A. You know, again, the buck stops at the 11:05:03
21 top, so it would be Mr. LaPierre. But, of course, 11:05:04
22 all of us assessed. 11:05:07
23 Q. Has Mr. LaPierre -- are you familiar with 11:05:09
24 the COSO Enterprise Risk Management Framework? 11:05:15
25 A. The -- the what again? I'm sorry, I 11:05:21
Page 125

32 (Pages 122 - 125)

1 couldn't hear you.                                11:05:21
2     Q.  COSO Enterprise Risk Management Framework.  11:05:21
3 C-O-S-O.                                          11:05:25
4     A.  No, I'm not.                              11:05:26
5     Q.  Do you know if the NRA uses the COSO       11:05:27
6 Enterprise Risk Management Framework?              11:05:34
7     A.  No, I don't.                              11:05:36
8     Q.  Is there any employee within the NRA who   11:05:40
9 has specific job duties involving preparation,     11:05:47
10 review of compliance plans or actions?            11:05:49
11    A.  Specific job duties.                       11:05:53
12    Q.  For preparing compliance plans and taking  11:05:58
13 compliance actions.                               11:06:02
14    A.  You know, I can't rule out that someone    11:06:03
15 has -- has -- you know, has compliance functions in  11:06:05
16 a job description, but I'm not aware of anyone who   11:06:08
17 has that as a primary job description.            11:06:12
18    Q.  So who -- who are the people who you would  11:06:15
19 put in that category that don't have it as their   11:06:16
20 primary job description?                          11:06:19
21    A.  The -- all of the staff that work on tax   11:06:20
22 issues, which would include Mr. Tedrick at times,   11:06:25
23 Ms. Rowling, Arif Rahman who works in financial     11:06:33
24 services.  I believe the -- another gentleman's name  11:06:42
25 is Keith Phillips.                                11:06:48

                                                Page 126

1     You also have a couple of members of the      11:06:54
2 Office of General Counsel staff who are -- who are   11:06:57
3 especially involved in compliance due to their roles  11:07:03
4 with affiliated (c)(3)s.  Stefan Tahmassebi.       11:07:06
5        THE WITNESS (VIA ZOOM):  That's -- for      11:07:06
6 the court reporter, that's T-a-h-m-a-s-s-e-b-i.    11:07:13
7     A.  And Skipp Galythly.  Skipp with two Ps,    11:07:18
8 last name G-a-l-y-t-h-l-y.  And also within the    11:07:23
9 Institute for Legislative Action, the fiscal staff  11:07:35
10 led by Robert Owens.                              11:07:37
11    Q.  Is the compliance oversight function aware  11:07:40
12 of any pending or completed federal, state, or local  11:07:45
13 agency investigations of the NRA?                 11:07:49
14    A.  Well, there's yours.  There's the --       11:07:51
15 there's the DC Attorney General's.                11:07:54
16    Q.  Right.                                     11:07:57
17    A.  Well, for -- let me ask you, for           11:08:01
18 "completed," what's the time frame that you're     11:08:05
19 speaking of?                                      11:08:07
20    Q.  2018 to the present.                       11:08:08
21    A.  Okay.  Thanks.                             11:08:11
22        The New York Department of Financial        11:08:14
23 Services investigation, which was settled.  There's  11:08:15
24 the Washington Office of the Insurance Commissioner  11:08:19
25 investigation, which was ended with a cease and    11:08:24

                                                Page 127

1 desist order that we didn't contest because we had   11:08:46
2 already ceased doing the -- doing the -- the actions  11:08:33
3 that they wanted us to desist from.               11:08:37
4        There was a similar matter with the        11:08:40
5 California insurance regulators.  As for --        11:08:42
6     Q.  How is the California one completed or is   11:08:49
7 it completed?                                      11:08:52
8     A.  We entered an agreed stipulation, similar  11:08:52
9 to Washington, that we weren't -- we weren't doing  11:08:55
10 the matters that were complained of anymore, so we  11:09:00
11 agreed not to do that.                            11:09:03
12        And for pending issues, we have quite a    11:09:05
13 few federal election commission matters.  I don't   11:09:07
14 recall the number.  It's, you know, more than half a  11:09:11
15 dozen, but I don't know how many, which are under   11:09:16
16 investigation but not yet concluded due to, you    11:09:21
17 know, severe backlog at the FEC.                  11:09:25
18    Q.  Any other investigations?                  11:09:28
19    A.  Those are the ones that I can think of.  I  11:09:31
20 can't necessarily rule out that there might be some  11:09:44
21 minor issue that I have forgotten.                11:09:46
22    Q.  Any tax investigations by federal, state,  11:09:49
23 or local agencies?                                11:09:52
24    A.  Well, there's a media report about the --   11:09:54
25 about an IRS investigation, but we have heard      11:09:57

                                                Page 128

1 nothing from the IRS.                             11:10:01
2     Q.  How about --                               11:10:02
3     A.  We -- huh?                                 11:10:03
4     Q.  I'm sorry.                                 11:10:04
5     A.  I'm sorry?                                 11:10:06
6     Q.  Go ahead.                                  11:10:07
7     A.  I am not aware of any state tax            11:10:10
8 investigations, no.                               11:10:15
9     Q.  And any local investigations?             11:10:19
10    A.  We have a minor -- and I don't know if     11:10:24
11 this would even count as an investigation, but we   11:10:30
12 have a minor thing going on with the Virginia      11:10:33
13 Department of Environmental Quality regarding waste  11:10:36
14 removal from our shooting range, basically the     11:10:40
15 calculation of the tonnage of material being       11:10:44
16 removed.  But, you know, we have responded and     11:10:48
17 haven't heard back as far as I know.              11:10:51
18    Q.  How does the -- so that -- and so that --   11:10:52
19 those are all the investigations of which the NRA is  11:10:55
20 aware at the present time?                        11:10:58
21    A.  That I can recall sitting here, yes.       11:11:00
22        And -- and, I'm sorry, there -- there were  11:11:09
23 some congressional investigations related to       11:11:10
24 Russia-related matters that have either been       11:11:17
25 concluded or kind of dormant.  Sorry about that.   11:11:19

                                                Page 129

33 (Pages 126 - 129)

1 Q. And any state legislative investigations? 11:11:22
2 A. Not that I'm aware of. 11:11:26
3 Q. How do board -- the board or board 11:11:33
4 committees oversee the compliance program? 11:11:34
5 A. Reporting function on these issues is 11:11:39
6 primarily through the audit committee, internal 11:11:40
7 staff and the -- we meet regularly with the audit 11:11:44
8 committee when it meets. And you know, brief them 11:11:48
9 on -- brief them on issues. We talk about anything 11:11:51
10 that may require an action item, such as 11:11:54
11 consideration of potential conflict of interest or 11:11:57
12 related party transaction. We go over any 11:11:58
13 whistleblower complaints that have been received. 11:12:01
14 Those -- that's a major channel of it. 11:12:07
15 And there are also -- there's also some 11:12:10
16 financial reporting -- financial reporting that goes 11:12:14
17 on, obviously, to the finance committee. And, of 11:12:16
18 course, so we give a -- a comprehensive privileged 11:12:20
19 summary of all NRA legal matters to our legal 11:12:23
20 affairs committee. 11:12:26
21 Q. So at the end of the day, which committee 11:12:27
22 has the responsibility for making sure there's an 11:12:30
23 effective compliance program at the NRA? 11:12:33
24 A. Again, it's a team effort, but I would 11:12:36
25 point to the audit committee as the primary 11:12:39

Page 130

1 stakeholder there. 11:12:41
2 Q. Okay. And whose responsibility is it 11:12:42
3 within the salaried employees at the NRA to make 11:12:45
4 reports to the audit committee about compliance 11:12:47
5 activities? 11:12:49
6 A. It -- you know, at the top level, it would 11:12:51
7 primarily be me and the treasurer and CFO. 11:12:56
8 Q. And what -- what does the audit committee 11:12:59
9 require of you in terms of reporting on a periodic 11:13:09
10 basis about the status of the compliance plan or 11:13:14
11 program? 11:13:16
12 A. There's -- there's not a fixed timetable 11:13:17
13 for reporting. It's more of a -- you know, you 11:13:24
14 meet -- you meet, you report on anything significant 11:13:28
15 that you're working on, you update on status of 11:13:31
16 items from -- pending from previous meetings, and 11:13:34
17 then -- and you address any specific action items 11:13:36
18 that have come to light. 11:13:39
19 Q. So if I look at the audit committee 11:13:40
20 minutes, would I find each of those things written 11:13:43
21 up in the audit committee minutes? 11:13:46
22 A. You -- it would depend on what was 11:13:48
23 discussed and the level of significance of it. You 11:13:50
24 would -- but let me -- let me offer this caveat on 11:13:56
25 minutes in general. You know, we have -- as a 11:14:00

Page 131

1 parliamentary authority, we follow Robert's Rules of 11:14:03
2 Order. Robert's prescribes that the body's minutes 11:14:08
3 are a record of what was done, not what was said. 11:14:11
4 Your minutes aren't supposed to be a transcript. 11:14:13
5 You report, you know, general topics of discussion 11:14:15
6 and major action items, especially any items 11:14:19
7 requiring board action. 11:14:24
8 Q. Is there -- has the audit committee of the 11:14:25
9 NRA board of directors taken any specific 11:14:29
10 responsibility for overseeing the development of a 11:14:32
11 compliance program; that is, do they direct 11:14:35
12 management to do it? 11:14:38
13 Do they -- do they suggest a -- how they 11:14:39
14 wanted it to be done? 11:14:42
15 A. There has been discussion with the 11:14:45
16 committee about -- about all of that and, you know, 11:14:47
17 I think the committee itself takes on some 11:14:52
18 responsibility for this in its committee charter. 11:14:55
19 But the -- and then -- and then we 11:14:57
20 discuss, you know, any issues surrounding that at 11:15:01
21 the committee meetings. And certainly there -- 11:15:05
22 there have been discussions about various steps that 11:15:09
23 could be taken, pros and cons and so forth. 11:15:12
24 Q. So the -- to go back to the payments of 11:15:15
25 disqualified persons which we talked about in the 11:15:21

Page 132

1 last part of this deposition, were there any 11:15:23
2 discussions of payments to disqualified persons in 11:15:27
3 the context of the compliance program? 11:15:29
4 A. Yeah, I would say -- I would say we always 11:15:33
5 talk about that because one of the key aspects of 11:15:39
6 compliance program is to properly police your 11:15:43
7 related party transactions. 11:15:46
8 Q. Right. 11:15:48
9 A. That's -- that's another term. Legal 11:15:48
10 standards may be different, but there's another term 11:15:52
11 for disqualified persons. That's just broader than 11:15:54
12 disqualified persons. 11:15:59
13 Q. But if I look at Schedule L on the 11:16:00
14 payments of disqualified persons that are listed 11:16:03
15 there for the 2019 IRS 990, were those payments or 11:16:05
16 the investigation of those payments discussed with 11:16:09
17 the audit committee? 11:16:11
18 A. Some of them were and some of -- some 11:16:12
19 of them -- in the past, and then some have come to 11:16:18
20 light in the preparation of the 990. The committee 11:16:21
21 hasn't met since then. 11:16:32
22 Q. When was the last audit committee meeting? 11:16:25
23 A. I'm sorry, I don't recall the date. 11:16:27
24 Q. Before -- before November of 2019? 11:16:30
25 A. I believe it was. I don't know but -- I'm 11:16:33

Page 133

34 (Pages 130 - 133)

1 sorry, I was thinking -- 11:16:36
2 Q. I'm sorry, November -- 11:16:38
3 A. November 2020. Sorry. 11:16:39
4 Q. That's what I meant. 11:16:39
5 So before -- has there been one since 11:16:41
6 November 15, 2020? 11:16:46
7 A. I don't think so. The time lag of the 11:16:46
8 990s throws me off too. 11:16:49
9 Q. Prior to July -- prior to July of 2019, 11:16:52
10 did the NRA have a compliance program? 11:16:57
11 A. Prior to July 2019, absolutely. 11:17:01
12 Q. Let me go back. 11:17:06
13 Prior to July of 2018, did the NRA have a 11:17:08
14 compliance program? 11:17:10
15 A. You know we did, but I don't think it was 11:17:12
16 nearly as robust as it's become since. 11:17:15
17 Q. Where would I find the documents that 11:17:17
18 would show the compliance plan that existed prior to 11:17:20
19 2018 -- July 2018? 11:17:24
20 A. Well, there's not a single document 11:17:25
21 that -- that says, you know, "compliance plan" on 11:17:27
22 the cover, but again, I point to the general network 11:17:31
23 of policies that govern our compliance, you know, 11:17:33
24 all of the board policies and executive level 11:17:36
25 policies on expense reimbursement, so on, you know, 11:17:39
Page 134

1 you have the audit committee charter, the conflict 11:17:44
2 of interest and related party transaction policy 11:17:47
3 that we adopted in 2016, that's an important 11:17:50
4 keystone of it. 11:17:54
5 Q. By the way, why did it take so long for 11:17:54
6 the NRA to adopt a conflict of interest and 11:17:57
7 related -- related party transactions policy after 11:18:00
8 the amendment to the New York State statute 11:18:03
9 effective July 1, 2014? 11:18:06
10 MR. CICILIANO (VIA ZOOM): Objection; 11:18:08
11 argumentative, scope. 11:18:09
12 Go ahead. 11:18:09
13 A. You know, unfortunately, I -- 11:18:11
14 unfortunately, I think that prior to -- prior to my 11:18:15
15 coming on board, it just hadn't gotten the attention 11:18:19
16 it may have deserved. And once I -- once I came on 11:18:22
17 board, I took steps to remedy that. 11:18:26
18 Q. But it took two years to get a conflict of 11:18:28
19 interest policy, is that accurate, after the passage 11:18:32
20 of the -- of the conflict of interest requirement by 11:18:36
21 New York State legislature? 11:18:39
22 A. Well, we had a prior statement of 11:18:41
23 corporate ethics, but -- but upon -- you know, upon 11:18:43
24 review after I came on board, it didn't appear 11:18:46
25 adequate, and so we took steps to fix that. 11:18:49
Page 135

1 Q. And it didn't comply with the New York 11:18:54
2 State law? 11:18:56
3 MR. CICILIANO (VIA ZOOM): Objection; 11:18:57
4 calls for a legal conclusion. 11:18:59
5 And to the extent that it calls for 11:19:00
6 attorney-client privilege or work product -- 11:19:04
7 MR. SHEEHAN (VIA ZOOM): Come on. 11:19:06
8 MR. CICILIANO (VIA ZOOM): -- I direct 11:19:08
9 you not to answer, but go ahead. 11:19:09
10 THE WITNESS (VIA ZOOM): Sorry, is not 11:19:11
11 answer or go ahead? 11:19:12
12 MR. CICILIANO (VIA ZOOM): I direct 11:19:13
13 you not to answer to the extent it requires 11:19:13
14 attorney-client privilege or work product. To the 11:19:17
15 extent that it doesn't and you can otherwise answer, 11:19:18
16 I'd tell you you can answer. 11:19:21
17 A. I don't know that I can answer that 11:19:22
18 without getting into, you know, work product, mental 11:19:23
19 impressions and so forth. 11:19:26
20 Q. Does the NRA believe that at -- prior to 11:19:27
21 the passage of the conflict of interest policy in 11:19:29
22 2016 by the NRA that it was in compliance with the 11:19:35
23 New York law requiring a conflict of interest 11:19:37
24 policy? 11:19:41
25 A. We believed that the enactment of the law 11:19:43
Page 136

1 did require some additional steps, and so that's why 11:19:47
2 we went and adopted a new policy. 11:19:49
3 Q. Why did it take two years to do that? 11:19:53
4 A. Well, I wasn't -- I wasn't at the NRA at 11:19:56
5 the time of -- at the time of the -- at least as of 11:19:59
6 the effective date of the -- of the statute. I 11:20:03
7 can't speak to my predecessor's knowledge. 11:20:05
8 Q. Okay. You started in spring of 2015? 11:20:10
9 A. That's correct. 11:20:13
10 Q. Okay. At the present time, does the NRA 11:20:15
11 have any officer in play with any certification of 11:20:18
12 corporate compliance? 11:20:21
13 MR. CICILIANO (VIA ZOOM): Objection; 11:20:26
14 vague. 11:20:27
15 A. You know, I can't -- it's outside of what 11:20:29
16 I repaired for, but it's not -- but I can't -- I 11:20:34
17 can't rule -- I can't rule it out, but I'm not aware 11:20:36
18 of anyone personally. 11:20:39
19 Q. Does the NRA have any board member who has 11:20:39
20 a certification in corporate compliance? 11:20:43
21 MR. CICILIANO (VIA ZOOM): Same 11:20:45
22 objection. 11:20:46
23 A. I'm not aware of that. 11:20:47
24 Q. Okay. At the present time, does the NRA 11:20:53
25 have a conflict of interest policy that is regularly 11:20:54
Page 137

35 (Pages 134 - 137)

1 and consistently monitored and compliance enforced? 11:20:57
2 A. Yes. 11:21:01
3 Q. How is this regular and consistent 11:21:01
4 monitoring enforcement achieved? 11:21:06
5 A. We -- we issue a questionnaire at least 11:21:07
6 annually to officers, directors, key employees, 11:21:12
7 highly compensated employees, sometimes to any 11:21:18
8 additional employee that concern has been raised 11:21:20
9 about asking them to certify their -- to, you know, 11:21:23
10 certify answers to various -- various questions that 11:21:28
11 would address that. It's actually a form that I 11:21:31
12 personally helped -- helped develop and have 11:21:35
13 reviewed and edited periodically since. 11:21:38
14 The -- because -- we actually consolidated 11:21:42
15 it because in -- you know, prior to 2015, 2016, the 11:21:46
16 secretary's office collected disclosures from the 11:21:55
17 board pursuant to those 1970s bylaw provisions 11:21:57
18 Association -- business with the Association that I 11:22:03
19 mentioned. And then the treasurer's office gathered 11:22:03
20 information that they needed for tax compliance. 11:22:06
21 But as -- as we reviewed things more 11:22:10
22 comprehensively in that -- in that 2015, 2016 time 11:22:13
23 frame, you know, I wasn't personally satisfied that 11:22:19
24 we had -- that we were getting all we needed to make 11:22:22
25 the representations that we needed to make, for 11:22:26

Page 138

1 example, on state charitable filings across the 11:22:29
2 country. 11:22:33
3 So I worked with the treasurer's office to 11:22:33
4 develop a form that would capture everything that 11:22:36
5 everyone needs. We just keep adding stuff to it. 11:22:38
6 We send it out to the -- we hand it out to the board 11:22:42
7 usually at the January board meeting, follow up 11:22:46
8 periodically by email with those who didn't attend 11:22:48
9 or who didn't turn it in to us at the meeting, you 11:22:52
10 know, with an -- with an effort to maximize our 11:22:57
11 return of those. 11:23:01
12 Q. What happens? How do you enforce the 11:23:01
13 policy with respect to people who don't return the 11:23:06
14 forms? 11:23:08
15 A. We -- we follow up with them until they do 11:23:10
16 as best we can. 11:23:14
17 Q. And are there people who have not complied 11:23:16
18 with the conflict of interest policy in 2020? 11:23:20
19 A. A small handful, but I -- I don't -- I 11:23:24
20 don't recall an exact number. 11:23:30
21 Q. Who? 11:23:32
22 A. I don't recall the names. 11:23:33
23 Q. That's a matter of record with the 11:23:38
24 organization, right? 11:23:40
25 A. That's right, we would have -- we would 11:23:41

Page 139

1 have records on it. The only one that I -- the only 11:23:42
2 one that I remember specifically is -- is Karl 11:23:45
3 Malone, board member. 11:23:48
4 Q. And what -- what were the consequences to 11:23:50
5 Karl of not providing the conflict of interest form? 11:23:54
6 A. None that I'm aware of. 11:24:06
7 Q. Do you think a policy can be consistently 11:24:09
8 enforced if there are no consequences for failing to 11:24:12
9 provide the required document? 11:24:14
10 MR. CICILIANO (VIA ZOOM): Objection; 11:24:18
11 calls for speculation, assumes facts. 11:24:19
12 Q. Mr. Frazer? 11:24:23
13 A. You know, you're giving me some ideas, 11:24:24
14 but -- 11:24:26
15 Q. That's good. 11:24:27
16 A. Thanks for the help. 11:24:28
17 But, no, I think, obviously -- obviously 11:24:33
18 it would be better to -- to -- you know, to address 11:24:34
19 that. Look, I think people -- I think board 11:24:37
20 members, by and large, recognize that it's an 11:24:52
21 important obligation of the Association to -- to 11:24:45
22 provide this information. And for most people I 11:24:48
23 think it's -- you know, it's simply an oversight, 11:24:51
24 they lose the form or it gets lost, you know, 11:24:54
25 misplaced in the shuffle. 11:24:55

Page 140

1 Q. So let's go back. In 2018, what was your 11:24:57
2 compliance rate for your -- your board members and 11:25:00
3 officers -- your board -- what was your 11:25:03
4 compliance -- try again. 11:25:06
5 Were there significant numbers of board 11:25:07
6 members or employees or -- or disqualified persons 11:25:09
7 who were not returning the conflict of interest 11:25:14
8 form? 11:25:19
9 MR. CICILIANO (VIA ZOOM): I would 11:25:19
10 just object to -- to scope on this. I think it 11:25:20
11 starts getting a little bit broad. But... 11:25:21
12 A. So I think 2018 was -- and I apologize if 11:25:24
13 I'm getting years mixed up, but -- you know, because 11:25:28
14 we are going back and forth talking about calendar 11:25:30
15 years, tax years, and filing dates and so on. 11:25:32
16 But I think for return of forms covering 11:25:36
17 tax year 2018, 2019, I think we had -- I think we 11:25:41
18 did really well. I want to say we had maybe three 11:25:46
19 or four that didn't return forms. 11:25:51
20 Q. Okay. 11:25:54
21 A. I could be a little off, but it was -- it 11:25:54
22 was -- it was pretty effective. 11:25:56
23 Q. And did you have any kind of electronic 11:25:59
24 system for tracking the return of the conflict of 11:26:02
25 interest forms? 11:26:04

Page 141

36 (Pages 138 - 141)

1  A. Yes, we do. We maintain a spreadsheet  11:26:06
2  showing who -- who returned them, and their general  11:26:07
3  answers by, you know -- you know, yes or no to any  11:26:11
4  question. We don't transcribe any narratives that  11:26:15
5  they write.  11:26:18
6  Q. Who prepares that spreadsheet?  11:26:19
7  A. One of my staff members in the secretary's  11:26:22
8  office.  11:26:25
9  Q. Who is that?  11:26:25
10  A. Stephen McCormick.  11:26:26
11  Q. And who sends out the email saying we  11:26:30
12  don't have your form yet?  11:26:35
13  A. Either Stephen or I, just depending on  11:26:38
14  workloads.  11:26:43
15  Q. What do you do to make sure that the  11:26:45
16  conflict of interest disclosures are accurate?  11:26:48
17  A. So we cross-check them against NRA records  11:26:52
18  and against personal knowledge of various  11:26:55
19  individuals. So it's one advantage of having been  11:26:59
20  around the NRA since the mid '90s is that if  11:27:03
21  someone -- you know, what sometimes happens is  11:27:09
22  someone will forget a transaction and -- or forget  11:27:10
23  some relationship and -- and, you know, it's  11:27:15
24  something that I'm aware of or have heard about, and  11:27:20
25  I follow up with the person and say, well, what  11:27:23

Page 142

1  about this, and they'll either set my memory  11:27:25
2  straight or I'll jog their memory, in which case I  11:27:27
3  ask them to file an amended form.  11:27:30
4  We also cross-check against records from  11:27:32
5  the financial services division. We get periodic  11:27:37
6  reports of payments -- not -- not periodic in the  11:27:39
7  sense that it's a monthly thing, but on demand  11:27:43
8  they'll give us -- you know, when we're working on  11:27:46
9  disclosures, they will give us a list of -- or a  11:27:49
10  spreadsheet of payments -- payments to related  11:27:53
11  parties. And we'll cross-check it and see if what's  11:27:56
12  actually happened according to the NRA's accountants  11:28:00
13  matches up with what's disclosed, and if the board  11:28:03
14  member was deficient in disclosing it, we'll  11:28:06
15  approach them.  11:28:09
16  If a board member -- you know, sometimes  11:28:09
17  there will be a mismatch of amounts. Board members  11:28:12
18  who may have a consulting contract, for example, you  11:28:16
19  know, if their December payment is made in January,  11:28:20
20  they'll report the full-year amount and it isn't  11:28:23
21  quite right. But, you know, we -- we try to square  11:28:26
22  all of that away and understand what the total  11:28:27
23  picture is.  11:28:30
24  Q. Have you ever taken action against a  11:28:32
25  employee or board member who filed a false conflict  11:28:35

Page 143

1  of interest form?  11:28:37
2  MR. CICILIANO (VIA ZOOM): Objection  11:28:40
3  to term "false."  11:28:41
4  Q. Mr. Frazer?  11:28:47
5  A. Well, action against a board member is  11:28:48
6  challenging because the only process for removal of  11:28:54
7  a board member is through the NRA -- is through an  11:28:57
8  NRA ethics proceeding --  11:29:01
9  Q. Right.  11:29:03
10  A. -- or -- or recall by the membership.  11:29:03
11  So there's the -- so there's not -- I  11:29:05
12  don't have any independent disciplinary authority  11:29:09
13  over -- over board members.  11:29:14
14  But I think also the question is what's  11:29:17
15  appropriate. If it's a -- if it's an inadvertent  11:29:20
16  failure to disclose something, that's -- you know,  11:29:24
17  that's something that I ask people to -- to  11:29:26
18  self-correct.  11:29:29
19  If I think someone is intentionally  11:29:29
20  concealing it, that would be another story. That  11:29:32
21  might rise to the level of ethics complaint or, you  11:29:34
22  know, a payment demand or something depending on the  11:29:37
23  situation. But...  11:29:39
24  Q. Do you advise the board of people who fail  11:29:43
25  to complete their forms or have completed their  11:29:46

Page 144

1  forms inaccurately?  11:29:49
2  A. No.  11:29:50
3  MR. CICILIANO (VIA ZOOM): That was  11:29:59
4  just -- a late objection. Was that "you" as the NRA  11:30:00
5  or "you" as Mr. Frazer?  11:30:02
6  Q. You the NRA.  11:30:03
7  A. Same answer.  11:30:06
8  Q. Okay. Are you familiar with -- by the  11:30:07
9  way, what was Josh Powell's role in the compliance  11:30:16
10  program?  11:30:19
11  A. So Josh was -- Josh was involved in the  11:30:21
12  initial development of the presentation that was  11:30:28
13  given to staff. And he -- and when that -- when  11:30:31
14  that -- when the first of those presentations was  11:30:36
15  given, he participated in the presentation  11:30:38
16  basically, you know, introducing it. You know, in  11:30:40
17  his position at the time as chief of staff, he  11:30:44
18  stressed the importance of this, you know, for  11:30:48
19  the -- for the health and future of the  11:30:52
20  organization. And then, you know, that was the --  11:30:54
21  that was the main issues that I recall.  11:31:00
22  Q. And at the time that he made that  11:31:04
23  presentation or participated in that presentation,  11:31:05
24  he was also mischarging the NRA according to your  11:31:07
25  Schedule L for travel expenses; isn't that true?  11:31:11

Page 145

37 (Pages 142 - 145)

| | |
|---|---|
| 1 A. Yes. 11:31:16 | 1 to the -- again to the statute. 11:33:22 |
| 2 Q. Do you think that Mr. Powell was an 11:31:18 | 2 Go ahead. 11:33:24 |
| 3 appropriate representative to advocate for 11:31:20 | 3 A. I -- I think that under the -- that under 11:33:24 |
| 4 compliance with employees and with (audio 11:31:22 | 4 the policy as -- as it's currently stated, I think 11:33:27 |
| 5 distortion) -- 11:31:27 | 5 that the primary responsibility would be with the 11:33:31 |
| 6 MR. CICILIANO (VIA ZOOM): Objection; 11:31:27 | 6 audit committee. 11:33:34 |
| 7 foundation. 11:31:28 | 7 Q. It requires an officer, employee, or 11:33:35 |
| 8 Q. -- looking back? 11:31:29 | 8 director. So who is the employee, officer, or 11:33:38 |
| 9 A. As we know -- based on what we know now, 11:31:30 | 9 director who has that responsibility? 11:33:41 |
| 10 he would not have been the right choice. 11:31:33 | 10 A. Well, the chairman of the audit committee 11:33:42 |
| 11 Q. Okay. Who was the employee, officer, or 11:31:41 | 11 is Charles Cotton. 11:33:44 |
| 12 director designated to administer the whistleblower 11:31:41 | 12 Q. So is it your belief that he has under the 11:33:46 |
| 13 policy at any time since July 1, 2014? 11:31:46 | 13 statute a responsibility to administer the 11:33:48 |
| 14 A. Since 2014. So -- 11:31:49 | 14 whistleblower policy and report to the audit 11:33:52 |
| 15 MR. CICILIANO (VIA ZOOM): I would 11:31:51 | 15 committee? 11:33:55 |
| 16 just objects it's outside the scope. 11:31:52 | 16 MR. CICILIANO (VIA ZOOM): Objection; 11:33:55 |
| 17 And if you have a specific to the 11:31:55 | 17 calls for a legal conclusion, outside the scope. 11:33:56 |
| 18 2014, I'm willing to listen to your answer, but you 11:31:57 | 18 A. And I'm -- and I'm sorry, I also didn't 11:34:00 |
| 19 can go ahead. 11:31:59 | 19 follow your question. 11:34:02 |
| 20 THE WITNESS (VIA ZOOM): Sure. 11:32:01 | 20 Are you saying that -- does the audit 11:34:02 |
| 21 A. So the policy has been amended in -- that 11:32:02 | 21 committee chairman have the responsibility to report 11:34:04 |
| 22 was amended in January 2020. But the -- I think 11:32:06 | 22 to the audit committee? 11:34:06 |
| 23 there was a change in the reporting makeup but it 11:32:12 | 23 Q. Here's what the statute requires. It has 11:34:07 |
| 24 was -- it was pretty minimal. 11:32:14 | 24 to have an officer, director, or employee of the 11:34:10 |
| 25 Essentially at all of the relevant time 11:32:15 | 25 corporation to administer the whistleblower policy. 11:34:12 |
| Page 146 | Page 148 |

| | |
|---|---|
| 1 frames, whistleblowers could report issues of 11:32:22 | 1 So I asked you who that is. 11:34:16 |
| 2 concern to the audit committee. 11:32:24 | 2 So I think what you answered is it's -- 11:34:18 |
| 3 Q. Let me -- let me take you -- here is the 11:32:27 | 3 it's Mr. Cotton; is that correct? 11:34:19 |
| 4 question I'm asking. 11:32:30 | 4 A. I mean, the chairman of the audit 11:34:23 |
| 5 A. Sure. 11:32:30 | 5 committee would have the primary responsibility for 11:34:24 |
| 6 Q. The statute requires that it be an 11:32:31 | 6 matters involving the whistleblower policy because 11:34:27 |
| 7 employee, officer, or director to administer the 11:32:34 | 7 ultimately that's where they're reported. But 11:34:30 |
| 8 whistleblower policy. 11:32:36 | 8 for -- as far as administering goes at staff level, 11:34:33 |
| 9 A. Uh-huh. 11:32:36 | 9 it would be the other reporting locations that I 11:34:36 |
| 10 Q. Do you agree with me on that? 11:32:37 | 10 described. 11:34:38 |
| 11 MR. CICILIANO (VIA ZOOM): I would 11:32:39 | 11 Q. So there's no one officer, employee, or 11:34:38 |
| 12 just object to the extent that you're misstating the 11:32:40 | 12 director; it's multiple people. Is that correct? 11:34:41 |
| 13 statute or what statute you're talking about. 11:32:44 | 13 A. That's what's designated -- those are -- 11:34:45 |
| 14 A. Well, I don't -- I don't have the 11:32:45 | 14 those are the people who are designated as points of 11:34:48 |
| 15 statute -- I don't have the statute in front of me, 11:32:46 | 15 contact in an effort to give people options. 11:34:50 |
| 16 but what I'm saying is that the -- is that to give 11:32:47 | 16 Q. But the person who has to administer the 11:34:54 |
| 17 employees a choice of whom to -- of whom to report 11:32:53 | 17 policy and report to the audit committee, what 11:34:57 |
| 18 matters to, we specified at various times the audit 11:32:58 | 18 individual is that? Who is it? 11:34:59 |
| 19 committee, Office of General Counsel, and human 11:33:04 | 19 A. It's whoever -- it's whoever received a 11:35:02 |
| 20 resources division. 11:33:07 | 20 report, and that's why normally we have -- obviously 11:35:05 |
| 21 Q. Okay. The -- the statute requires an 11:33:10 | 21 we normally have the audit committee secretary 11:35:11 |
| 22 employee, officer, or director of the corporation be 11:33:13 | 22 present at audit committee meetings, I would attend 11:35:13 |
| 23 designated to administer the whistleblower policy. 11:33:16 | 23 as general counsel, and the -- and the HR director 11:35:15 |
| 24 So who is that? 11:33:19 | 24 would attend or be asked in advance whether -- 11:35:19 |
| 25 MR. CICILIANO (VIA ZOOM): Objection 11:33:21 | 25 whether there have been any matters reported. 11:35:22 |
| Page 147 | Page 149 |

38 (Pages 146 - 149)

1 Q. So does the -- who reports to the audit 11:35:25
2 committee about violations or suspected violations 11:35:29
3 of laws or corporate policies? 11:35:32
4 A. Whichever -- whichever of these 11:35:35
5 responsible parties was aware of them or conducted 11:35:37
6 any investigation. 11:35:43
7 Q. Go back a second. OGC? Who at OGC? 11:35:43
8 A. Normally it would be me. 11:35:48
9 Q. At finance, who at finance? 11:35:51
10 A. It would be the -- well, the -- the staff 11:35:55
11 contact with finance and the audit committee is the 11:36:01
12 secretary of the audit committee, so currently David 11:36:04
13 Warren and previously Rick Tedrick. 11:36:07
14 Q. So would you say that David Warren has the 11:36:09
15 responsibility to administer the whistleblower 11:36:13
16 policy and report to the audit committee on its 11:36:15
17 implementation? 11:36:16
18 A. He's -- he's certainly one of the 11:36:17
19 individuals, yes. 11:36:19
20 Q. Does he know that? 11:36:20
21 A. Yes. 11:36:22
22 Q. And how about HR? 11:36:24
23 A. They are very well aware. 11:36:27
24 Q. Who at H -- who -- I'm sorry. 11:36:28
25       Who at HR has the responsibility to 11:36:30

Page 150

1 administer the policy and report to the audit 11:36:33
2 committee? 11:36:35
3 A. I'm sorry, the HR -- the HR director, 11:36:35
4 Linda Crouch, is the one who is involved. 11:36:39
5 Q. To your knowledge, were the concerns 11:36:49
6 raised by Colonel North with respect to the auditing 11:36:55
7 of the Brewer contracts presented to the audit 11:36:57
8 committee as a whistleblower concern? 11:37:03
9 A. We didn't regard Colonel North as a 11:37:06
10 whistleblower. Colonel North was -- you know, 11:37:09
11 Colonel North was a board member presenting -- 11:37:13
12 presenting concerns. 11:37:17
13 Q. And why would he not be a whistleblower if 11:37:22
14 he presented concerns with compliance with law, 11:37:26
15 policy, or -- or bylaws? 11:37:29
16 A. Well, at the time, the whistleblower 11:37:31
17 policy -- you know, and this -- I think this is one 11:37:40
18 of the issues that we -- that we worked to 11:37:44
19 strengthen in the 2020 policy. But at the time, the 11:37:46
20 whistleblower policy was, I think, primarily seen as 11:37:52
21 an employee matter. 11:37:56
22 Q. By whom? 11:37:57
23 A. Of course, employees -- employees are -- I 11:37:58
24 think generally employees are usually the ones who 11:38:02
25 are going to become aware of things first. 11:38:03

Page 151

1 Q. But so here -- here's what the statute 11:38:07
2 says, Such policies provide that no director, 11:38:08
3 officer, employee, or volunteer of a corporation who 11:38:11
4 in good faith reports any action or suspected action 11:38:14
5 taken within the organization, illegal, fraudulent, 11:38:17
6 or in violation of adopted policy, shall suffer 11:38:20
7 intimidation, harassment, discrimination, or other 11:38:24
8 retaliation, or in the case of employees, adverse 11:38:25
9 employment consequence. 11:38:28
10       Would you agree with me that the 11:38:29
11 whistleblower policy must apply not only to 11:38:31
12 employees but to directors, officers, and 11:38:34
13 volunteers? 11:38:36
14       MR. CICILIANO (VIA ZOOM): I would 11:38:38
15 just object. First of all, I don't know what statute 11:38:38
16 you're referring to, so if you want to provide that 11:38:39
17 for the record, that would be great; and that, 11:38:42
18 second, just that it misstates testimony. 11:38:43
19 A. So -- so a couple of things about -- about 11:38:46
20 that -- about that statute. One is that -- well, I 11:38:48
21 think -- I think mainly -- I think the main point 11:38:54
22 about that statute is the phrase "good faith." As 11:38:56
23 we evaluated Colonel -- at the time Colonel North 11:39:00
24 was presenting these issues, Colonel North was also 11:39:03
25 simultaneously refusing to disclose his employment 11:39:07

Page 152

1 contract with Ackerman McQueen, and so there's a -- 11:39:12
2 there was a significant question about -- about his 11:39:15
3 good faith in the matter. 11:39:19
4 Q. Okay. Apart from -- but the -- the issue 11:39:24
5 here is when Colonel North complained about the 11:39:25
6 Brewer contract, along with two other directors -- 11:39:30
7 let me go back a second. 11:39:37
8       Is it your testimony today as NRA that 11:39:39
9 there was no retaliation against Colonel North for 11:39:48
10 reporting his concerns about the Brewer contract? 11:39:51
11       MR. CICILIANO (VIA ZOOM): Just 11:39:57
12 objection to scope here. I don't think this falls 11:39:58
13 within any of the categories. 11:40:01
14 Q. You can answer, Mr. Frazer. 11:40:03
15 A. I'm trying to recall what Colonel North 11:40:06
16 alleges to have been retaliation. But Colonel 11:40:11
17 North -- you know, Colonel North wasn't -- wasn't 11:40:15
18 renominated to the board, but that was -- not to the 11:40:17
19 board but to the -- to the presidency. However, you 11:40:22
20 know, everyone has to be nominated independently -- 11:40:30
21 independently for office. And second of all, at the 11:40:32
22 time he wasn't renominated substantial -- as I said, 11:40:34
23 substantial issues about his -- about his good faith 11:40:37
24 had arisen based on his attempt to -- to extort 11:40:40
25 Wayne LaPierre. 11:40:47

Page 153

39 (Pages 150 - 153)

1 Q. After Mr. -- Colonel North raised the 11:40:49
2 concerns about the Brewer contract, isn't it true 11:40:54
3 that Mr. LaPierre called the directors of the NRA to 11:40:57
4 advocate that he should not be re-elected as the 11:41:03
5 president of the NRA? 11:41:06
6 MR. CICILIANO (VIA ZOOM): Objection; 11:41:09
7 outside the scope. Which one does this go to, 11:41:09
8 Counsel? 11:41:12
9 MR. SHEEHAN (VIA ZOOM): Compliance 11:41:13
10 program, compliance of the statute. 11:41:15
11 MR. CICILIANO (VIA ZOOM): It goes to 11:41:16
12 the compliance program in what way? That anything 11:41:18
13 that happens in the NRA is technically subject to the 11:41:19
14 compliance program and can be -- 11:41:21
15 MR. SHEEHAN (VIA ZOOM): I'm not going 11:41:22
16 to argue with you. All right? 11:41:24
17 Q. Mr. Frazer, can you answer the question, 11:41:25
18 please? 11:41:27
19 MR. CICILIANO (VIA ZOOM): Well, I 11:41:27
20 mean, I'm objecting it's outside the scope, so if 11:41:28
21 you're asking for the NRA, he is not providing the 11:41:31
22 NRA stance on that. 11:41:34
23 MR. MASON (VIA ZOOM): Dylan, I 11:41:34
24 would -- Dylan, I would also note that it goes to 11:41:35
25 topic number 6 of Ackerman's notice which the New 11:41:39
Page 154

1 York AG cross-noticed and we did with theirs. 11:41:42
2 Q. Mr. Frazer? 11:41:47
3 A. Can I review -- 11:41:51
4 MR. CICILIANO (VIA ZOOM): Yeah. 11:41:51
5 A. -- the topic here? 11:41:52
6 MR. CICILIANO (VIA ZOOM): Yeah. The 11:41:53
7 topic is the existence, review, documentation, 11:41:53
8 evaluation of all whistleblower complaints since 11:41:55
9 January 1, 2018. 11:41:59
10 So you're asking -- it's not what they 11:42:00
11 did to existence, the review, documentation, or the 11:42:02
12 evaluation. That goes beyond that. 11:42:04
13 A. And I'm sorry -- 11:42:10
14 MR. SHEEHAN (VIA ZOOM): The 11:42:11
15 plaintiffs actions by the NRA. That's -- anyway, so 11:42:11
16 are you going to direct him not to answer? 11:42:15
17 MR. CICILIANO (VIA ZOOM): Can you 11:42:17
18 restate the question? 11:42:18
19 Q. Did Mr. LaPierre, after Colonel North 11:42:19
20 raised concerns about the Brewer contract, contact 11:42:25
21 members of the board of directors to urge them to 11:42:27
22 vote against Mr. North for re-election as president? 11:42:30
23 MR. CICILIANO (VIA ZOOM): So I will 11:42:35
24 direct the witness it's outside the scope. 11:42:36
25 To the extent you have personal 11:42:39
Page 155

1 knowledge, they're going to ask you about it in three 11:42:40
2 days anyways. 11:42:43
3 A. Yeah, I don't have personal knowledge of 11:42:44
4 what calls Mr. LaPierre made. 11:42:45
5 Q. In your experience as the general counsel 11:42:49
6 of the NRA, has Mr. LaPierre ever retaliated against 11:42:52
7 a director, officer, employee for raising concerns 11:42:56
8 about compliance by the NRA with any adopted policy 11:43:01
9 of the corporation or illegal fraudulent conduct? 11:43:04
10 A. And, I'm sorry, I couldn't quite hear that 11:43:09
11 at the end so -- because -- 11:43:11
12 Q. Let me -- let me try it again. 11:43:12
13 A. -- where you were with respect to the 11:43:13
14 microphone. 11:43:15
15 Q. During the time that you have been general 11:43:15
16 counsel of the NRA, have you ever observed 11:43:17
17 Mr. LaPierre retaliating against an employee who 11:43:22
18 reported -- I'm sorry. Let me start again. 11:43:27
19 During the time you have been the general 11:43:30
20 counsel of the NRA, have you ever observed or 11:43:31
21 been -- received reports of any director, officer, 11:43:33
22 employee, or volunteer of the corporation be 11:43:37
23 retaliated against for reporting action or suspected 11:43:40
24 action which was illegal, fraudulent, or in 11:43:44
25 violation of any adopted policy of the NRA? 11:43:46
Page 156

1 A. Other than the allegations by Colonel 11:43:48
2 North, no. 11:43:52
3 Q. Yes. 11:43:52
4 Okay. During the time period of 2018 to 11:43:53
5 the present, does the NRA have any confidential 11:44:04
6 reporting system for whistleblowers? 11:44:08
7 A. Yes. The -- the policy says that reports 11:44:12
8 can be made anonymously as to how that's done and it 11:44:17
9 has happened. It's very old school. And, you know, 11:44:22
10 we may receive a -- you know, an anonymous piece of 11:44:27
11 paper under our doors or something like that. 11:44:47
12 Q. What record does the NRA maintain of those 11:44:34
13 both -- of the confidential reports? 11:44:39
14 A. You know, thinking about -- thinking about 11:44:50
15 the last few years, I know we have had a couple -- 11:44:52
16 you know, as an attorney and a pack rat by nature, I 11:44:57
17 don't -- I don't destroy things. So they would be 11:45:01
18 filed probably under some kind of audit committee 11:45:05
19 file to discuss and/or with any email exchanges 11:45:08
20 about the matter that I might have as -- as we 11:45:13
21 investigate it with HR or whoever -- whoever 11:45:15
22 originated the matter. 11:45:18
23 Q. Can you tell me sitting in the role of NRA 11:45:19
24 today how many confidential submissions have been 11:45:23
25 received from whistleblowers at the NRA during 2018 11:45:28
Page 157

40 (Pages 154 - 157)

1 or 2019? 11:45:31
2 A. So confidential submissions in 2018 to 11:45:32
3 2019. So I am -- I'm not certain of the time frame, 11:45:39
4 but I can recall -- I think I can only recall one 11:45:48
5 that falls in that time frame. 11:45:54
6 Q. And who was that from? 11:45:56
7 A. Huh? 11:45:58
8 Q. What was it about? 11:45:58
9 A. It was anonymous. 11:46:00
10 Q. What was it about? 11:46:01
11 A. It was -- it was an allegation that -- 11:46:08
12 that an employee essentially wasn't working hard 11:46:07
13 enough. The person supposedly was out of the office 11:46:11
14 all the time and -- and so on, and we reviewed it 11:46:14
15 with the person's supervisor who was, you know, 11:46:20
16 working very closely with the individual and found 11:46:23
17 it to be unfounded. 11:46:26
18 Q. Okay. So if I were to ask you -- so 11:46:30
19 confidential does not just include anonymous. 11:46:32
20 Are there other confidential whistleblower 11:46:35
21 submissions, meaning that they're maintained in your 11:46:37
22 system, during 2018 and 2019? 11:46:39
23 A. Again -- again with some uncertainty about 11:46:45
24 the time frames, but yes. 11:46:47
25 Q. And can you tell me the -- how many? 11:46:52

Page 158

1 A. Well, would this -- would this -- does 11:46:57
2 your question include the matters that were raised 11:47:05
3 directly with the audit committee and its meetings 11:47:07
4 in -- meeting in 2018. 11:47:09
5 Q. Yes. 11:47:11
6 A. Okay. So there were all of those, however 11:47:12
7 you want to count those, and I can recall one other 11:47:16
8 that I think was in that time frame. 11:47:23
9 Q. Just one -- just one other confidential 11:47:26
10 submission? 11:47:28
11 A. That's right. 11:47:30
12 Q. Do the -- did Ms. Crouch and -- I'm sorry, 11:47:30
13 who was the -- I see you and I see -- who was the 11:47:37
14 finance person to get these complaints? Mr. Warren? 11:47:41
15 A. David Warren currently and Rick Tedrick 11:47:43
16 before him. 11:47:46
17 Q. How many complaint -- how many 11:47:48
18 whistleblower -- how would you know if Mr. Warren or 11:47:49
19 Ms. Crouch received whistleblower complaints? 11:47:52
20 A. Two ways; either they would -- either they 11:47:54
21 would come to the Office of General Counsel seeking 11:47:59
22 assistance in investigating an issue or some legal 11:48:01
23 analysis about the -- about the issue or they would 11:48:04
24 bring it directly to the audit committee in which 11:48:10
25 case we would hear about it at the audit committee. 11:48:12

Page 159

1 Q. Okay. So there's no central system for 11:48:15
2 reporting all these -- all these. 11:48:21
3 There's no central system for capturing 11:48:22
4 both the status of complaints and the resolution of 11:48:25
5 them; is that correct? 11:48:28
6 MR. CICILIANO (VIA ZOOM): Objection 11:48:31
7 to the extent it misstates testimony. 11:48:33
8 A. And I guess I'm not sure what -- what you 11:48:34
9 would say -- what you would characterize as a 11:48:36
10 system. You know, matters are received, matters are 11:48:39
11 reviewed, matters are appropriately reported. 11:48:43
12 Q. The statute also requires that the policy 11:48:46
13 be distributed to all officers, directors, 11:48:52
14 employees, and volunteers who provide services to 11:48:54
15 the corporation. 11:48:57
16 And do you know, has that been 11:48:57
17 accomplished? In other words -- 11:49:04
18 A. Certainly been -- 11:49:04
19 Q. I'm sorry. Go ahead, Mr. Frazer. 11:49:06
20 A. Yeah, it has certainly been accomplished 11:49:07
21 with respect to the -- with respect to the board. 11:49:10
22 Most of them were there when it was adopted. And 11:49:11
23 for those who weren't there, it's in the minutes 11:49:14
24 that are distributed to them, so the board has it 11:49:16
25 for sure. 11:49:18

Page 160

1 With respect to employees, pretty much 11:49:19
2 immediately after it was adopted, we incorporated it 11:49:22
3 into the employee handbook, which is available 11:49:25
4 online, and we also emailed it directly to employees 11:49:28
5 as a significant policy change. 11:49:31
6 With respect to volunteers, that's a 11:49:35
7 challenge. We have -- you know, that's one level or 11:49:37
8 another tens of thousands of volunteers, so I'm not 11:49:41
9 sure quite how that would be done. 11:49:46
10 Q. Do you know if it was done? 11:49:48
11 A. Huh? Not to my knowledge. 11:49:50
12 Q. Do you know if it was done? 11:49:52
13 A. Not to my knowledge. 11:49:53
14 Q. Do you know if the compliance 11:50:00
15 presentation -- the two compliance presentations, 11:50:01
16 the one from July of '18 and the one from February 11:50:03
17 of '19, include any discussion of the whistleblower 11:50:07
18 policy? 11:50:09
19 A. Yes. 11:50:10
20 Q. And what's -- what's the answer, do they? 11:50:12
21 A. Yes, they did. We discussed it. 11:50:14
22 Q. Okay. 11:50:18
23 MR. SHEEHAN (VIA ZOOM): Stephen, can 11:50:22
24 you pull up the 2019 policy as Exhibit 2. 11:50:27
25 A. So I think our screen has gone to sleep 11:50:37

Page 161

41 (Pages 158 - 161)

1 here.                                              11:50:39
2    Q.   Okay.  Maybe we should come back to this.   11:50:41
3    A.   We're waking it up.                         11:50:45
4    Q.   Well, you know what, let's -- let's move    11:50:47
5 on to something else.                               11:50:49
6         Does the NRA have a policy with respect to  11:50:55
7 honoring the restrictions on restricted assets?     11:50:58
8    A.   Yes.                                         11:51:02
9    Q.   And how does the NRA assure compliance      11:51:03
10 with the restrictions on restricted assets?        11:51:07
11   A.   The financial services team tracks those    11:51:10
12 and -- tracks those and makes sure that those funds 11:51:15
13 are appropriately -- again, not being an accountant, 11:51:22
14 I lack -- I don't -- I don't have detailed knowledge 11:51:27
15 of this, but I know that they're tracked and        11:51:28
16 controlled by the finance team.                     11:51:31
17   Q.   So in terms of the compliance with the      11:51:33
18 terms of these restricted gifts required by New York 11:51:35
19 law, can you tell me what person has that           11:51:38
20 responsibility what individual?                     11:51:43
21   A.   It would be Ms. Rowling and her staff.      11:51:44
22   Q.   Okay.  And that -- you don't -- you         11:51:48
23 don't -- you, John Frazer, don't get involved in    11:51:50
24 those discussions, I take it?                       11:51:54
25   A.   Only if there's a specific question about   11:51:55
                                                    Page 162

1 the -- about the terms of a particular endowment.   11:51:58
2    Q.   During the period 2018 or 2019, did any     11:52:03
3 director or vendor claim they were retaliated        11:52:10
4 against for raising concerns about a violation of    11:52:14
5 any law, rule, regulation, bylaw, or policy of the   11:52:16
6 NRA?                                                 11:52:20
7    A.   There's Colonel North.                       11:52:22
8    Q.   Right.                                        11:52:23
9    A.   And there were, I believe, three board      11:52:24
10 members who raised that concern.                    11:52:33
11   Q.   And how did they raise that concern?  The   11:52:36
12 three board members, how did they raise that        11:52:38
13 concern?                                            11:52:42
14   A.   In a -- in a joint resignation letter.      11:52:44
15   Q.   What was the concern that they raised?      11:52:49
16   A.   You know, without referring to the letter,  11:52:52
17 I don't remember exactly which issue or issues      11:52:58
18 they -- they wrote down there.                      11:53:04
19   Q.   Okay.  Speaking as the NRA, though, your    11:53:06
20 recollection is they raised a -- they raised a      11:53:09
21 question of retaliation; is that correct?           11:53:12
22   A.   Yes.                                         11:53:14
23   Q.   And what investigation did you undertake    11:53:16
24 or did the NRA undertake to determine whether those 11:53:18
25 allegations of retaliation were accurate?           11:53:21
                                                    Page 163

1    A.   I'm not aware of an investigation on that    11:53:26
2 subject.                                             11:53:33
3    Q.   Why was there no investigation?             11:53:36
4    A.   I don't know.                                11:53:39
5    Q.   Are you also aware of allegations in the    11:53:42
6 press about Mr. LaPierre bringing in people at the   11:53:44
7 NRA's expense to attend the annual convention and -- 11:53:49
8 for the time being.                                  11:54:00
9         Did the NRA consider whether Christopher    11:54:01
10 Cox was a whistleblower?                            11:54:06
11   A.   I don't think I have ever heard any         11:54:06
12 suggestion of that.                                 11:54:08
13   Q.   The -- the 2019, 990 recites that there     11:54:14
14 were significant diversion of NRA assets.           11:54:17
15        And as part of the -- can you tell me how   11:54:22
16 those diversions were discovered?                   11:54:25
17        MR. CICILIANO (VIA ZOOM):  Objection;       11:54:28
18 scope.                                              11:54:29
19   Q.   Or the compliance program is to identify    11:54:30
20 diversions and to form them up.                     11:54:33
21        MR. CICILIANO (VIA ZOOM):  And you          11:54:36
22 have -- you have another question that's on         11:54:37
23 specifically the Form 990 that Ms. Rowling has been 11:54:37
24 designated.                                         11:54:41
25        MR. SHEEHAN (VIA ZOOM):  I'm sorry, I       11:54:41
                                                    Page 164

1 want to ask --                                       11:54:41
2    Q.   This guy is in charge of the compliance     11:54:42
3 program.  I want to know what you do with the issue  11:54:43
4 of significant diversions.                           11:54:49
5        MR. CICILIANO (VIA ZOOM):  Counsel,          11:54:54
6 I'm not stopping you, I just placing my objection.   11:54:54
7        So go ahead.                                  11:54:58
8    A.   So -- I'm sorry, can you repeat the         11:55:00
9 question.                                            11:55:00
10   Q.   What does the compliance -- what is the     11:55:01
11 compliance, how are the diversions discussed in     11:55:04
12 2019, 990 discovered by the NRA?                    11:55:07
13   A.   So can -- I don't have the 990 in front of  11:55:11
14 me.  Can you tell me which -- remind me of what --  11:55:14
15 what the specific statement is there?               11:55:19
16   Q.   Sure.  One second.                           11:55:20
17        What it states is that Part IV -- Part VI,  11:55:36
18 line 5 -- this is on Schedule O, National Rifle     11:55:37
19 Association became aware during 2019 of a           11:55:42
20 significant diversion of its assets during 2019 and 11:55:43
21 for prior calendar years.  And then it says, See    11:55:46
22 Schedule L.  In addition, a staff employee (who was 11:55:48
23 not a disqualified person) diverted $41,820 from the 11:55:51
24 NRA but has fully repaid the organization.          11:55:56
25        So my question for you is:  How are these   11:55:58
                                                    Page 165

42 (Pages 162 - 165)

1 transactions discovered -- and that's with respect 11:56:05
2 to both the -- I think we have covered that 11:56:07
3 already -- by the individuals who engaged in these 11:56:13
4 transactions still employed by the NRA. 11:56:20
5     Well, if we go through, each of the page 11:56:22
6 on Schedule L, Wayne LaPierre is still employed by 11:56:23
7 the NRA, correct? 11:56:27
8  A.  Yes. 11:56:28
9  Q.  And apart from having to repay the money 11:56:28
10 years later, there has been no discipline imposed 11:56:32
11 upon him as a result of those charges correct? 11:56:35
12  A.  No. 11:56:37
13  Q.  And Millie Hallow, who is -- has a series 11:56:38
14 of diversions, still works for the NRA; is that 11:56:43
15 correct? 11:56:47
16  A.  Yes. 11:56:47
17  Q.  And she's had no discipline imposed upon 11:56:48
18 her as a result of those diversions; is that 11:56:51
19 correct? 11:56:53
20     MR. CICILIANO (VIA ZOOM):  Objection 11:56:53
21 to the extent it misstates testimony. 11:56:55
22     Go ahead. 11:56:56
23  A.  Not to -- not to my knowledge.  Maybe I 11:56:56
24 should limit that.  Not to my personal knowledge 11:57:03
25 because I don't know -- I don't know what 11:57:04

Page 166

1 conversations Mr. LaPierre may have had with her, 11:57:08
2 for example. 11:57:11
3  Q.  But there has been no discipline, formal 11:57:11
4 discipline -- let me go back. 11:57:14
5     Within the NRA, if there's formal 11:57:16
6 discipline of an employee, what is the role of 11:57:19
7 general counsel in reviewing or approving that? 11:57:21
8  A.  You know, it depends on whether any legal 11:57:24
9 advice is required in -- is required in relation to 11:57:27
10 the discipline.  Individual managers have 11:57:28
11 considerable leeway to discipline -- to discipline 11:57:32
12 employees.  They usually work with human resources 11:57:33
13 on that.  If it's a simple matter that doesn't raise 11:57:37
14 any legal issues or require legal advice, they'll 11:57:40
15 just handle it direct. 11:57:44
16  Q.  That was the manager will handle it 11:57:44
17 directly or the HR people will handle it direct? 11:57:46
18  A.  Manager in conjunction with HR. 11:57:48
19  Q.  So sitting here today as the NRA, you have 11:57:51
20 no knowledge of any discipline imposed upon Millie 11:57:54
21 Hallow as a result of these diversions? 11:57:59
22     MR. CICILIANO (VIA ZOOM):  And object 11:58:01
23 again to scope. 11:58:03
24     Go ahead. 11:58:03
25  A.  No. 11:58:04

Page 167

1  Q.  With respect to Mr. DeBergalis, do you 11:58:10
2 know if any discipline was imposed upon 11:58:15
3 Mr. DeBergalis for the charges that -- that are 11:58:17
4 listed on Schedule L? 11:58:20
5  A.  Well, no, but that would be highly 11:58:21
6 premature because it's an issue that's still under 11:58:24
7 investigation. 11:58:26
8  Q.  What reporting has the NRA made to its 11:58:34
9 employees, vendors, or board members concerning 11:58:36
10 the -- any discipline imposed upon NRA employees? 11:58:40
11     MR. CICILIANO (VIA ZOOM):  Objection; 11:58:45
12 vague, scope. 11:58:46
13  A.  Reporting to the board and who else did 11:58:49
14 you say? 11:58:51
15  Q.  Employees -- employees, vendors, or board 11:58:52
16 members.  Let me go back. 11:58:55
17     As part of the compliance program, one of 11:58:56
18 the standards -- by the way, do you know what the 11:58:58
19 seven standards are for compliance programs? 11:59:01
20  A.  Not off the top of my head. 11:59:04
21  Q.  One of them is communication of 11:59:07
22 discipline and enforcement of the policy. 11:59:09
23     Do you know if there's any public 11:59:13
24 communication of any discipline of any employee of 11:59:24
25 the NRA for violating any policies or the compliance 11:59:16

Page 168

1 requirements? 11:59:21
2  A.  Well, the board is certainly aware of Josh 11:59:26
3 Powell's termination, as the staff is.  You know, we 11:59:30
4 don't report -- and then -- and then the board has 11:59:40
5 certainly been briefed on legal matters involving 11:59:45
6 vendors.  Of course, that's, you know, a privileged 11:59:49
7 discussion. 11:59:52
8  Q.  Go back.  With respect to Josh Powell, 11:59:52
9 what communication was made of the reason he was 11:59:55
10 terminated to anybody? 11:59:57
11  A.  I don't -- I don't recall -- I don't 11:59:58
12 recall what was done with respect to Powell.  And I 12:00:08
13 may have misstated.  I'm not -- I'm not sure about 12:00:11
14 that one. 12:00:13
15  Q.  You're not sure that it was ever 12:00:16
16 communicated why Mr. Powell was terminated; is that 12:00:17
17 accurate? 12:00:24
18  A.  Well, I don't think the reasons for his 12:00:25
19 termination were communicated publicly.  Of course, 12:00:29
20 there are legal issues with doing that. 12:00:33
21  Q.  What are the legal issues with doing that? 12:00:35
22     MR. CICILIANO (VIA ZOOM):  Objection; 12:00:38
23 outside the scope, calls for a legal conclusion, 12:00:39
24 invades the attorney-client privilege. 12:00:41
25  Q.  You just told me that you couldn't 12:00:45

Page 169

43 (Pages 166 - 169)

1 communicate it to employees because of the legal 12:00:47
2 concerns. 12:00:50
3     What were those legal concerns? 12:00:53
4     MR. CICILIANO (VIA ZOOM): Objection; 12:00:55
5 misstates testimony. 12:00:57
6     Go ahead. 12:00:57
7     A. Just as -- as a general matter, you know, 12:00:58
8 the concern would be whether -- whether anything 12:01:02
9 could give rise to a defamation action. 12:01:04
10    Q. Did the NRA communicate to its employees 12:01:13
11 the fact that Mr. -- Mr. LaPierre had been found to 12:01:16
12 have violated the famous disqualified person 12:01:21
13 standard? 12:01:27
14    A. No. 12:01:30
15    Q. Why not? 12:01:31
16        MR. CICILIANO (VIA ZOOM): Objection 12:01:34
17 to the extent it calls for attorney-client privilege. 12:01:35
18    A. It's -- it's -- 12:01:39
19        MR. CICILIANO (VIA ZOOM): And outside 12:01:44
20 the scope. 12:01:46
21    A. You know, I can't tell you a reason why on 12:01:48
22 that. Communicating about employee matters is just 12:01:52
23 not -- is just not our normal practice, specific -- 12:01:55
24 specific criticisms of specific individuals. 12:02:02
25    Q. So here you have a -- here you have a 12:02:07

1 policy, the buck stops here and Mr. LaPierre is 12:02:09
2 responsible for implementing as the -- as the 12:02:14
3 executive VP, and you have a policy which he himself 12:02:16
4 violated. 12:02:19
5     In a compliance program, do you think it's 12:02:21
6 appropriate when the most senior person violates 12:02:26
7 your policy is not to tell employees that you have 12:02:28
8 taken action as a result? 12:02:30
9         MR. CICILIANO (VIA ZOOM): I would 12:02:32
10 just object; calls for speculation and 12:02:33
11 characterization of what occurred, incomplete 12:02:34
12 hypothetical. 12:02:38
13    Q. Mr. Frazer? 12:02:40
14        MR. CICILIANO (VIA ZOOM): But to the 12:02:41
15 extent the NRA has a position, go ahead. 12:02:42
16    A. I don't know that we have a position on 12:02:44
17 it. 12:02:45
18    Q. With respect to the diversions identified 12:02:48
19 on Schedule L, did the NRA report any of those 12:02:51
20 transactions to law enforcement? 12:02:54
21        MR. CICILIANO (VIA ZOOM): I would 12:02:56
22 just, once again, object pursuant to the scope 12:02:57
23 objection we previously made. I think this is 12:03:01
24 outside the scope here. 12:03:05
25    Q. Mr. Frazer -- 12:03:06

1         MR. CICILIANO (VIA ZOOM): If there's 12:03:07
2 any investigative privilege. 12:03:07
3     Go ahead. 12:03:09
4     A. Not to my knowledge. 12:03:09
5     Q. Did it report any of the diversions to its 12:03:12
6 insurers? 12:03:18
7     A. To who? 12:03:18
8     Q. To its insurance companies. 12:03:18
9     A. The insurers are aware of a lot of these 12:03:20
10 matters to -- to -- you know, to the extent that 12:03:25
11 they involve claims against the NRA and issues come 12:03:26
12 up as counterclaims. 12:03:29
13    Q. That's fair. 12:03:30
14    But I guess what I'm looking for here is 12:03:31
15 you had employees who received improper payments. 12:03:36
16 And did you make any claim on a fidelity bond or on 12:03:41
17 a D&O policy with respect to those losses? 12:03:45
18    A. No. In the matters where we sought 12:03:49
19 recovery, we sought recovery directly from the 12:03:52
20 employer -- employee. 12:03:55
21    Q. Did you advise D&O carriers with respect 12:03:56
22 to the claims before you got the recovery? 12:03:59
23        MR. CICILIANO (VIA ZOOM): I would 12:04:02
24 just object as to outside the scope. 12:04:02
25    Q. Mr. Frazer? 12:04:07

1     A. The D&O carriers are aware of the Cox 12:04:12
2 matter where, of course, we haven't gotten a 12:04:16
3 recovery yet. And that's the only one I can think 12:04:20
4 of. 12:04:23
5     Q. How about with respect to Mr. LaPierre, 12:04:23
6 did you advise the D&O carriers of the claim against 12:04:25
7 Mr. LaPierre? 12:04:28
8     A. No. 12:04:29
9     Q. Did you advise the -- did you advise any 12:04:31
10 insurer of the claims against Millie Hallow? 12:04:35
11        MR. CICILIANO (VIA ZOOM): Just object 12:04:38
12 based on it's outside the scope. 12:04:40
13    A. Yeah -- no. 12:04:43
14    Q. Did you advise the D&O carriers of any 12:04:46
15 claim against Mr. DeBergalis? 12:04:48
16    A. No. 12:04:51
17        MR. CICILIANO (VIA ZOOM): Same 12:04:51
18 objection. 12:04:52
19    Q. In various years, the NRA has settled 12:04:55
20 claims involving allegations of sexual harassment or 12:04:57
21 sex discrimination of former employees. 12:05:00
22    Was the Office of Counsel aware of each of 12:05:02
23 these settlements? 12:05:04
24    A. Yes. 12:05:06
25    Q. And did the Office of Counsel have to 12:05:08

```
 1  approve each of these settlements?          12:05:10
 2          MR. CICILIANO (VIA ZOOM): I would   12:05:13
 3  just object to outside the scope and the timing on  12:05:14
 4  your question.                              12:05:16
 5      A.  I would -- I would also -- I would also  12:05:18
 6  disagree with the characterization of sexual   12:05:25
 7  harassment, but --                          12:05:28
 8          (Cell phone chatter.)               12:05:34
 9          MR. CICILIANO (VIA ZOOM): Hey,      12:05:34
10  Greg -- sorry, Greg, you're talking right now. We   12:05:35
11  can hear you.                               12:05:37
12      Q.  Can we -- Mr. Frazer --             12:05:37
13      A.  Can we wait until Mr. Garman mutes?  12:05:37
14          MR. CICILIANO (VIA ZOOM): Yeah, let  12:05:51
15  me -- let me try to get Greg Garman's attention.   12:05:54
16          Greg, you're talking and we can hear  12:05:57
17  you.                                        12:05:59
18          Is he muted now?                    12:06:05
19          Sorry, Mr. Sheehan, go ahead.       12:06:11
20      Q.  With respect to allegations of sexual   12:06:13
21  harassment or sexual discrimination alleged by   12:06:15
22  employees or former employees of the NRA, did the  12:06:19
23  N -- did the general counsel's office have to   12:06:23
24  approve each such settlements?              12:06:24
25          MR. CICILIANO (VIA ZOOM): Objection;  12:06:27
                                          Page 174
```

```
 1  I -- objection to the extent that it mischaracterizes  12:06:30
 2  and assumes facts not in evidence.          12:06:32
 3      Q.  Mr. Frazer --                       12:06:34
 4      A.  Yes, we would be -- yes, we would be   12:06:34
 5  involved in any settlement on those issues.   12:06:35
 6      Q.  And did the -- did the NRA report to its  12:06:38
 7  board each of the settlements of the sexual   12:06:42
 8  harassment or sexual discrimination claim?   12:06:45
 9          MR. CICILIANO (VIA ZOOM): Objection;  12:06:47
10  outside the scope.                          12:06:47
11          Time frame, Counsel?               12:06:48
12          MR. SHEEHAN (VIA ZOOM): 2018, 2019,  12:06:54
13  2020, and 2021.                             12:06:56
14      Q.  Mr. Frazer?                         12:07:00
15      A.  So in -- in twenty -- again, excuse me  12:07:01
16  sorting out the time frames. But in -- in 2020, we  12:07:13
17  settled a discrimination matter which -- and   12:07:18
18  reported that to the -- reported to the legal   12:07:26
19  affairs committee in our -- in the committee report.  12:07:29
20      Q.  In other words, reported the allegations  12:07:34
21  on the settlement?                          12:07:36
22      A.  Okay. We reported that -- I'm trying to  12:07:38
23  picture the description, but we reported that --   12:07:41
24  that an allegation had been made and that it had   12:07:43
25  been settled.                               12:07:48
                                          Page 175
```

```
 1      Q.  Okay. How do you flag -- as part of your  12:07:48
 2  compliance program, how do you flag related party  12:07:55
 3  contracts?                                  12:07:58
 4      A.  Couple of ways. One is self-reporting on  12:08:00
 5  the -- on the questionnaire. Another is -- yeah,  12:08:03
 6  one is self-reporting by the related parties   12:08:11
 7  themselves.                                 12:08:14
 8          Another is by, you know, awareness of a  12:08:15
 9  relationship on the part of the financial services  12:08:20
10  team if they're asked to make a payment.    12:08:22
11          And then the third is that it's part of  12:08:25
12  our ongoing compliance improvements, you know, both  12:08:35
13  the -- I mean really just feeding into both of the  12:08:41
14  items I mentioned before, both the related parties  12:08:44
15  and the employees who are asked to enter into   12:08:48
16  contracts are trained to be aware of these   12:08:51
17  transactions.                               12:08:54
18      Q.  So when your compliance director or   12:08:55
19  compliance person, Josh Powell, arranged for the   12:09:00
20  hiring of his spouse by McKenna, what -- how did --  12:09:02
21  how did you, meaning -- I'm going to say you the   12:09:08
22  general counsel, first learn of the hiring by   12:09:12
23  McKenna of Mr. Powell's spouse?             12:09:14
24      A.  Mr. Powell disclosed it sometime after it  12:09:17
25  occurred.                                   12:09:20
                                          Page 176
```

```
 1      Q.  How much after?                     12:09:21
 2      A.  I'm not a hundred percent certain, but I  12:09:25
 3  believe it was a number of months.          12:09:28
 4          MR. CICILIANO (VIA ZOOM): Hey,      12:09:29
 5  Counsel, just to the extent you find a good stopping  12:09:30
 6  point, our lunch is here.                   12:09:32
 7          MR. SHEEHAN (VIA ZOOM): Okay. Yeah,  12:09:34
 8  that's -- lunch being here is a good time to take a  12:09:36
 9  break. Let's go ahead.                      12:09:38
10          And what's our -- want to do 30 or   12:09:39
11  40 minutes? What's your plan?               12:09:42
12          MR. CICILIANO (VIA ZOOM): Do you have  12:09:44
13  a preference outside of that?               12:09:45
14          THE WITNESS (VIA ZOOM): Whatever --  12:09:48
15  whatever, you know, works to get through the   12:09:48
16  proceedings.                                12:09:49
17          MR. CICILIANO (VIA ZOOM): He would   12:09:50
18  rather get through faster, so he may skip lunch   12:09:52
19  giving his druthers, but let's do 30.       12:09:53
20          MR. SHEEHAN (VIA ZOOM): Thirty.     12:09:58
21  Okay. It will be 1:40 on Eastern time, 12:40 on your  12:09:58
22  time.                                       12:10:05
23          Thank you very much, Mr. Frazer, and  12:10:05
24  I'll see you again.                         12:10:05
25          THE VIDEOGRAPHER (VIA ZOOM): We're   12:10:05
                                          Page 177
```

45 (Pages 174 - 177)

1 going off the record at 12:10. We're off the record. 12:10:10
2        (Recess 12:10 p.m. to 12:46 p.m.)    12:10:22
3        THE VIDEOGRAPHER (VIA ZOOM): We are    12:46:09
4 back on the record at 12:46.    12:46:19
5    Q.  All right.  Mr. Frazer, before the break,    12:46:25
6 we were talking about the calculation of the amounts    12:46:27
7 due from Mr. Wayne LaPierre back to the NRA as    12:46:32
8 payments and disqualified -- excess payments to    12:46:38
9 disqualified persons.    12:46:42
10        Is it accurate that the only people who    12:46:43
11 reviewed and determined the amounts to be repaid    12:46:45
12 were Mr. Brewer and Mr. LaPierre?    12:46:49
13    A.  No, it's not Mr. Brewer and Mr. LaPierre.    12:46:54
14 I mentioned before the break our tax counsel, Don    12:46:57
15 Lan at Lan Smith Sosolik.  I hope I'm pronouncing    12:47:02
16 that right.    12:47:08
17        And -- and actually, as I think about it,    12:47:08
18 I know Mr. LaPierre's tax advisor was involved at    12:47:11
19 some point.  And I don't know -- I don't know that    12:47:15
20 there weren't others.  There may have been others.    12:47:18
21 Those are the ones I know about.    12:47:20
22    Q.  The NRA doesn't know or you don't know?    12:47:20
23    A.  I don't know personally.    12:47:24
24    Q.  Okay.  Would you agree with me that in    12:47:27
25 a -- in a discussion about how much money    12:47:30
                                              Page 178

1 Mr. LaPierre got improperly and how much he has to    12:47:33
2 pay back to the NRA, that Mr. LaPierre's personal    12:47:38
3 interests are in conflict with the interest of the    12:47:43
4 NRA?    12:47:46
5        MR. CICILIANO (VIA ZOOM):  Objection    12:47:46
6 to the extent it calls for a legal conclusion.    12:47:48
7 You can answer to the extent the NRA    12:47:50
8 has a position.    12:47:52
9    A.  I don't have that we have a position on    12:47:52
10 it.  You know, I don't want to say what his position    12:47:54
11 on it is.  Obviously he wants to look out for the    12:47:57
12 best interest of the NRA at all times as well.    12:48:01
13    Q.  Would you agree that when the interests of    12:48:03
14 the NRA come into conflict with a financial interest    12:48:05
15 of someone positioned to influence decision making,    12:48:08
16 it requires thorough disclosure and board oversight?    12:48:10
17        MR. CICILIANO (VIA ZOOM):  Objection;    12:48:14
18 incomplete hypothetical, calls for speculation, and    12:48:14
19 it's outside the scope.    12:48:18
20    Q.  Mr. Frazer?    12:48:20
21    A.  Yes, I mean, I think there was thorough    12:48:22
22 disclosure.  You know, there was disclosure on the    12:48:24
23 990.    12:48:28
24    Q.  But -- no, but thorough disclosure by the    12:48:29
25 people participating in the transaction at the time    12:48:33
                                              Page 179

1 it happened, did that happen?    12:48:35
2        MR. CICILIANO (VIA ZOOM):  Objection;    12:48:37
3 vague.    12:48:38
4    A.  The transaction, you meaning -- do you    12:48:39
5 mean the original flights?    12:48:41
6    Q.  No, the agreement to -- to pay and to    12:48:43
7 accept the $300,000 amount as the appropriate    12:48:46
8 repayment of the excess payments to disqualified    12:48:49
9 persons.    12:48:52
10    A.  I have to say that the -- that the full    12:48:54
11 range of communications with -- of -- you know, with    12:48:57
12 everyone involved about this was outside my    12:49:00
13 preparation for this.  But -- so I can't sit here    12:49:03
14 and say that the people I listed were the only ones    12:49:08
15 involved.    12:49:10
16        And I'm sure that in the ordinary course    12:49:12
17 of -- of events as we observed them at the NRA,    12:49:16
18 Mr. LaPierre would talk to the board leadership    12:49:18
19 about this type of matter as well.    12:49:22
20    Q.  As -- testifying as the NRA    12:49:24
21 representative, do you know if he had a conversation    12:49:26
22 with the board leadership about the obligation to    12:49:28
23 repay the $300,000 to the NRA --    12:49:31
24    A.  I do not know that.    12:49:31
25    Q.  -- prior to entering into the agreement,    12:49:36
                                              Page 180

1 prior to making the payment?    12:49:37
2    A.  I -- I don't know.  Again, no, under --    12:49:41
3 under my preparation.    12:49:43
4    Q.  Okay.  And the calculation of the amount    12:49:45
5 due, was that done by the Brewer firm?    12:49:47
6        MR. CICILIANO (VIA ZOOM):  Objection    12:49:52
7 to the extent it calls for attorney-client privilege.    12:49:54
8    A.  No, it didn't.  No, it wasn't.    12:49:57
9    Q.  Who did it?    12:49:59
10    A.  It was done based on -- I believe it was    12:50:02
11 done by Lan Smith Sosolik primarily.    12:50:06
12    Q.  I'm sorry, remind me of the -- who are    12:50:11
13 they?    12:50:14
14    A.  They're the tax -- they're outside tax    12:50:14
15 counsel.    12:50:16
16    Q.  And they did the investigation?    12:50:21
17    A.  They reviewed -- they reviewed the    12:50:25
18 information about the flights and, you know,    12:50:28
19 analyzed the -- the business purposes and -- and    12:50:34
20 performed the calculations.  You know, there was an    12:50:39
21 interest calculation and so on too.    12:50:41
22    Q.  Did -- did Lan Sosolik consider the    12:50:45
23 other -- did they consider anything except the    12:50:48
24 flights --    12:50:51
25        MR. CICILIANO (VIA ZOOM):  I would    12:50:51
                                              Page 181

                                              46 (Pages 178 - 181)

1 just --                                    12:50:51
2    Q.  -- in determining what was due to be    12:50:52
3 repaid?                                   12:50:54
4        MR. CICILIANO (VIA ZOOM):  I would    12:50:55
5 just object to the extent it calls for       12:50:56
6 attorney-client privilege, work product.      12:50:58
7    A.  And I'm sorry, I have to say that's     12:51:00
8 outside the scope of what I prepared for.     12:51:01
9    Q.  Did Mr. LaPierre disqualify himself from  12:51:05
10 being involved in those discussions about how much  12:51:09
11 was to be repaid?                         12:51:11
12   A.  Well, he had to be involved to a degree  12:51:13
13 because -- because there was -- you know, his -- his  12:51:15
14 recollection and understanding of the purposes of  12:51:19
15 flights and so on was an important part of that.  12:51:21
16   Q.  But the negotiation -- he handled the    12:51:29
17 negotiation on behalf of the NRA, correct, with  12:51:34
18 himself?                                 12:51:37
19   A.  I don't know.  Again, within my        12:51:38
20 preparation for this deposition, I don't know who  12:51:40
21 else from the NRA may have participated.      12:51:42
22   Q.  Would it be compliant with your compliance  12:51:48
23 program for a person who has the direct financial  12:51:50
24 interest in the outcome of this decision to    12:51:54
25 participate in the decision?                12:51:57

Page 182

1    A.  I think the question would be whether he's  12:52:00
2 participating in the decision versus whether he was,  12:52:01
3 you know, providing information for the analysis.  12:52:06
4    Q.  And was he participating in the decision  12:52:09
5 about how much he should repay?             12:52:13
6    A.  Again, I don't have an answer on that.    12:52:15
7    Q.  Meaning you don't know the answer?       12:52:20
8    A.  It's not --                         12:52:21
9    Q.  Does the NRA -- does the NRA know the     12:52:25
10 answer to that question?                    12:52:28
11   A.  I would -- I would -- I believe the NRA    12:52:29
12 would know the answer to that, it's just not    12:52:30
13 something I prepared for personally.          12:52:33
14   Q.  And with respect to Mr. Brewer, what was    12:52:35
15 his role in determining the amount that was going to  12:52:38
16 be repaid by Mr. LaPierre?                  12:52:40
17        MR. CICILIANO (VIA ZOOM):  Objection  12:52:43
18 to the extent it calls for attorney-client     12:52:45
19 communications or work product.             12:52:48
20   A.  Yeah, I know he participated in some -- in  12:52:48
21 some discussions, but I can't speak to his role more  12:52:50
22 broadly than that.                        12:52:54
23   Q.  Okay.  Are there -- sorry.  One second.    12:53:06
24       In your compliance program, you say that  12:53:44
25 since 2018, whistleblower concerns are investigated  12:53:47

Page 183

1 by counsel and addressed to the audit committee.    12:53:50
2 The -- the phrase "investigated by counsel," does  12:53:54
3 that mean the general counsel or outside counsel?  12:53:57
4    A.  It would depend on what's appropriate for  12:54:00
5 the case, for the matter.  In my experience in  12:54:03
6 that -- in that time frame, with the exception of  12:54:08
7 the matters from the July 2018 audit committee    12:54:10
8 meeting, which obviously involved heavy involvement  12:54:14
9 by outside counsel, the other matters that I'm    12:54:17
10 familiar with were handled in-house.           12:54:21
11   Q.  Okay.  How did you make sure in addressing  12:54:23
12 compliance matters raised by employees or directors  12:54:27
13 of the NRA that your outside counsel complied with  12:54:31
14 the prohibition on retaliation that is --       12:54:35
15        MR. CICILIANO (VIA ZOOM):  And I    12:54:35
16 would --                                 12:54:35
17   Q.  -- contained in the New York statute?     12:54:40
18        MR. CICILIANO (VIA ZOOM):  And I would  12:54:42
19 just caution not to reveal attorney-client     12:54:43
20 communications.                          12:54:45
21   A.  Yeah, I -- I have no information that any  12:54:49
22 retaliation occurred.  And obvious -- obvious --  12:54:50
23 obviously counsel who were engaged to investigate a  12:54:55
24 whistleblower complaint presumably are, you know,  12:54:58
25 presumably informed on the NRA whistleblower policy  12:55:01

Page 184

1 and requirements of applicable law.           12:55:04
2    Q.  Presumably meaning that you're assuming  12:55:07
3 that they know that, correct?               12:55:11
4    A.  I think that would be something that would  12:55:12
5 fall in the level of minimum competence to handle a  12:55:15
6 matter.                                  12:55:19
7    Q.  How do you know that they followed the     12:55:21
8 whistleblower policy and the whistleblower statute  12:55:23
9 with respect to the investigation of the -- of the  12:55:26
10 2018 whistleblower complaints?              12:55:30
11   A.  The -- you know, well, the -- you're      12:55:41
12 asking about a dog that doesn't bark.  If the --  12:55:42
13   Q.  It worked for Sherlock Holmes.          12:55:46
14   A.  Right.  Right.  You need the hat.         12:55:48
15       The -- you know, look, if there was -- you  12:55:52
16 know, to the extent there were any allegations to  12:55:56
17 the contrary, we would -- we would look at those.  12:55:57
18 But if -- but barring that, I -- you know, if I    12:56:00
19 don't -- if I don't hear -- if I don't hear of a  12:56:04
20 concern, I would have to assume there's no concern.  12:56:07
21   Q.  Did anyone ever express a concern to you    12:56:09
22 about Bill Brewer being -- Bill Brewer or his firm  12:56:11
23 retaliating or threatening witnesses?          12:56:14
24   A.  Yeah, Ms. Couple mines, Emily couple mines  12:56:18
25 made some allegations along those lines.        12:56:23

Page 185

47 (Pages 182 - 185)

```
 1    Q.  And what did she say?              12:56:25
 2    A.  She sent -- you know, about seven months   12:56:27
 3 after she left NRA employment, she sent a letter to   12:56:29
 4 us, which I believe has been produced, which, you   12:56:32
 5 know, appeared out of the blue making such claims.   12:56:37
 6    Q.  And what did you do to investigate those   12:56:41
 7 claims?                                 12:56:44
 8    A.  Well, you know, it's an after-the-fact   12:56:46
 9 claim by an -- by an ex-employee, and so you look at   12:56:49
10 it.  And the question -- you know, not going line by   12:56:52
11 line from memory here, but the allegation -- but you   12:56:56
12 look at the allegations and you consider whether an   12:56:59
13 investigation is necessary.             12:57:02
14        If the allegations are, you know,      12:57:03
15 nonspecific or if they're matters that you're   12:57:06
16 already familiar with and understand the basis for   12:57:08
17 these -- for these suggestions, then, you know,   12:57:12
18 maybe no investigation of a particular item would be   12:57:15
19 necessary.                             12:57:18
20    Q.  Did you confront Mr. Brewer about the   12:57:19
21 allegations from Ms. Couple mines?       12:57:22
22    A.  I believe we spoke about it at some point,   12:57:25
23 but after the letter came in, I wouldn't say   12:57:27
24 confront.                             12:57:32
25    Q.  Okay.  When you say you spoke about it,   12:57:33
```
Page 186

```
 1 what was the discussion?                 12:57:35
 2        MR. CICILIANO (VIA ZOOM):  Objection   12:57:37
 3 to the extent it calls for attorney-client   12:57:37
 4 communication and direct you not to answer.   12:57:39
 5    A.  Yeah, I don't think I can answer that   12:57:42
 6 without talking about attorney-client communication.   12:57:42
 7    Q.  Mr. Frazer, you received an allegation   12:57:44
 8 about Mr. Brewer's conduct --            12:57:46
 9    A.  Uh-huh.                          12:57:46
10    Q.  -- in the furtherance of the NRA business.   12:57:48
11    A.  Uh-huh.                          12:57:48
12    Q.  What did the NRA do about that allegation   12:57:51
13 of misconduct by Mr. Brewer?            12:57:54
14        MR. CICILIANO (VIA ZOOM):  I would   12:57:57
15 just -- objection.  The assumption there was that you   12:57:58
16 said misconduct -- or misconduct by Mr. Brewer as   12:58:00
17 opposed to alleged misconduct.          12:58:04
18        MR. SHEEHAN (VIA ZOOM):  Okay.       12:58:04
19        MR. CICILIANO (VIA ZOOM):  Yeah.      12:58:04
20    Q.  Mr. Frazer, alleged misconduct.     12:58:06
21    A.  I -- I think what I concluded was that   12:58:07
22 based on information that was already well known,   12:58:12
23 that there was no misconduct.           12:58:14
24    Q.  What was the information you had that was   12:58:17
25 already well known?                     12:58:18
```
Page 187

```
 1    A.  It -- it was -- you know, it was the   12:58:21
 2 whole -- well, it was particularized to individual   12:58:27
 3 issues.  You know, she had five, six, seven   12:58:30
 4 paragraphs; I can't remember.  And my answer to that   12:58:33
 5 question would be different for each item, but we --   12:58:38
 6 generally -- you know, generally she was raising   12:58:42
 7 issues.  You know, and I respect Emily.  I worked   12:58:45
 8 with her for a number of years and learned a lot   12:58:49
 9 from her, but -- but I felt that the issues in the   12:58:51
10 letter were stale.                     12:58:53
11    Q.  So did you ever ask Mr. Brewer whether he   12:58:55
12 maintained burn books on employees who complained or   12:58:59
13 expressed concerns about misconduct at the NRA?   12:59:02
14        MR. CICILIANO (VIA ZOOM):  I would   12:59:05
15 just object based on attorney-client privilege and --   12:59:06
16 and work product.                     12:59:13
17    Q.  Yeah.  Yeah.  Yeah.              12:59:10
18        Mr. Frazer?                       12:59:11
19    A.  Yeah, without -- without revealing any   12:59:11
20 privileged communications, I think that that   12:59:16
21 suggestion in the letter was based on a   12:59:20
22 misunderstanding of research that the firm conducted   12:59:23
23 on potential witnesses and individuals that it was   12:59:26
24 interviewing.                         12:59:30
25    Q.  What was the misunderstanding?      12:59:30
```
Page 188

```
 1    A.  Huh?  Well, the misunderstanding is that   12:59:34
 2 researching -- you know, is the idea that   12:59:36
 3 researching a person's background is intended to --   12:59:39
 4 you know, to produce damaging information that can   12:59:43
 5 be used against them as opposed to simply   12:59:45
 6 understanding that the -- you know, the background   12:59:48
 7 of the individual you're talking to and knowing   12:59:50
 8 where they're coming from.               12:59:52
 9    Q.  And in order to determine the intent of   12:59:54
10 the -- gathering that information, don't you need to   12:59:57
11 know what the -- the thoughts or -- or intention of   13:00:01
12 the doer are?                         13:00:06
13        MR. CICILIANO (VIA ZOOM):  Just       13:00:07
14 objection; calls for speculation, outside the scope.   13:00:09
15    A.  And, you know, and I think that from   13:00:13
16 working with the firm for, at that point, more than   13:00:16
17 a year, reviewing their billing monthly and so on, I   13:00:20
18 think I had an understanding of the -- of the   13:00:24
19 intention of all of their research.     13:00:26
20    Q.  Did you ask Mr. Brewer about the burn   13:00:29
21 books?                                13:00:32
22    A.  Huh?                            13:00:33
23        MR. CICILIANO (VIA ZOOM):  Objection   13:00:33
24 to the extent it calls for attorney-client privilege   13:00:35
25 and work product.                     13:00:38
```
Page 189

48 (Pages 186 - 189)

```
 1    A.  I don't remember.              13:00:39
 2    Q.  Did you ask him?  Okay.        13:00:39
 3        Did you reach out to Ms. Couple mines and  13:00:41
 4  ask her for more detail about the allegations in the  13:00:44
 5  letter?                             13:00:48
 6    A.  No.  I had tried to reach to -- to contact  13:00:49
 7  Ms. Couple mines about some -- about a previous  13:00:53
 8  issue and had been unsuccessful.  She changed her  13:00:55
 9  phone number and didn't respond to online messages.  13:01:00
10    Q.  So did you send a letter to her to ask her  13:01:03
11  for more detail about these allegations?  13:01:06
12    A.  Well, just to be clear, but my efforts to  13:01:12
13  contact her were prior to receiving that letter as I  13:01:15
14  recall.                             13:01:18
15    Q.  Understood.                   13:01:18
16        So now you have a letter saying  13:01:19
17  Mr. Brewer's engaged in misconduct, and she's asking  13:01:20
18  you to -- to become aware of it and to address it.  13:01:25
19        Did you -- did you make any effort to  13:01:28
20  contact her after you got the letter?  13:01:29
21    A.  No.                          13:01:32
22    Q.  Okay.  To your knowledge, are the security  13:01:34
23  contracts entered into by the NRA since beginning of  13:01:45
24  2018 consistent with the compliance policy?  13:01:49
25    A.  Can you clarify which policy you're  13:01:54
```
Page 190

```
 1  referring to?                       13:01:56
 2    Q.  Okay.  So the -- the policy I'm referring  13:01:57
 3  to is that articulated in the July -- July 2018  13:01:59
 4  PowerPoint submitted to employees.  13:02:04
 5    A.  You mean, taken as a whole?  13:02:08
 6    Q.  Yeah.                         13:02:11
 7    A.  Okay.                         13:02:11
 8    Q.  Right.                        13:02:12
 9    A.  Right.  Security contracts entered into --  13:02:12
10  and -- and what was your time frame?  13:02:18
11    Q.  Beginning in -- the beginning of 2018 to  13:02:20
12  the present.                        13:02:23
13    A.  To the extent that -- to the extent --  13:02:29
14  again, I have to -- I know I'm the 30(b)(6) witness,  13:02:35
15  but to a degree here, I have to, you know, limit  13:02:38
16  myself to what I'm personally aware of.  13:02:46
17        For the contracts that entered into after  13:02:48
18  that time that I'm familiar with, I think they are  13:02:51
19  compliant.                          13:02:54
20    Q.  Did the NRA ever engage an independent  13:02:58
21  security consultant with respect to Mr. LaPierre's  13:03:05
22  safety?                             13:03:08
23        MR. CICILIANO (VIA ZOOM):  I would  13:03:11
24  just object as overbroad and outside the scope.  13:03:11
25    A.  Yes -- yes, we did.            13:03:15
```
Page 191

```
 1    Q.  Who was it?                   13:03:17
 2    A.  I'm sorry, I don't have the name.  13:03:20
 3    Q.  When was it?                  13:03:21
 4    A.  There was -- and it may have been more  13:03:24
 5  than one and at least one of those was in 2019.  13:03:27
 6    Q.  And what was the nature of their analysis?  13:03:32
 7        MR. CICILIANO (VIA ZOOM):  Counsel,  13:03:37
 8  you dropped off.  Your sound went to nothing.  13:03:37
 9        MR. SHEEHAN (VIA ZOOM):  I'm sorry.  13:03:41
10    Q.  What was the nature -- what were they --  13:03:41
11  what were they contracted for to analyze?  13:03:43
12    A.  On a -- on a general level, I understand  13:03:46
13  that they were -- that they -- that it was a threat  13:03:49
14  assessment essentially, you know, what is -- a  13:03:52
15  threat assessment.  However, I haven't reviewed the  13:03:56
16  studies -- study or studies.        13:03:58
17    Q.  Would you agree with me that the excess  13:04:02
18  benefit transactions listed on Schedule L of the IRS  13:04:11
19  990 have the potential to jeopardize the NRA's tax  13:04:14
20  exemption?                          13:04:19
21        MR. CICILIANO (VIA ZOOM):  I would  13:04:20
22  just object; calls for a legal conclusion,  13:04:20
23  speculation, and outside the scope.  13:04:23
24    A.  You know, look, the -- well, the IRS has  13:04:26
25  a -- you know, has various levels of sanctions that  13:04:34
```
Page 192

```
 1  can be applied.  And, you know, because as counsel  13:04:37
 2  knows, you are calling for a legal conclusion.  I  13:04:40
 3  don't think that sitting here I can say that any  13:04:43
 4  specific allegation that's -- you know, once it's  13:04:45
 5  disclosed and dealt with would jeopardize the NRA's  13:04:49
 6  tax status, so I don't think I can answer that as  13:04:53
 7  stated.                             13:04:55
 8    Q.  In designing the compliance program for  13:04:55
 9  the NRA, was one of the considerations protection of  13:04:57
10  the NRA's tax exemption?             13:05:00
11    A.  Yes.                          13:05:04
12        MR. SHEEHAN (VIA ZOOM):  With that,  13:05:06
13  I'm going to turn over to my colleague Stephen  13:05:07
14  Thompson to cover one of our topics with Mr. Frazer.  13:05:10
15        THE WITNESS (VIA ZOOM):  Okay.  Thank  13:05:10
16  you.                                13:05:21
17        MR. CICILIANO (VIA ZOOM):  I mean,  13:05:21
18  I -- and, Jim, I will note a general objection to  13:05:23
19  passing off the witness to someone else at your own  13:05:24
20  firm.  I'm not going to make you do it.  I'm just  13:05:24
21  noting the objection.               13:05:24
22        MR. SHEEHAN (VIA ZOOM):  Stephen?  13:05:24
23        EXAMINATION                    13:05:24
24  BY MR. THOMPSON (VIA ZOOM):          13:05:36
25    Q.  All right.  Mr. Frazer, can you hear me?  13:05:36
```
Page 193

49 (Pages 190 - 193)

1  A. I can.                              13:05:37
2  Q. My name is Stephen Thompson. I'm also an  13:05:38
3 Assistant Attorney General in the New York State  13:05:40
4 Office of the Attorney General.           13:05:40
5      So I am going to be covering topic 11 from  13:05:43
6 the 30(b)(6) notice. So this is the topic that  13:05:47
7 relates to payments to David Stanton, known as  13:05:51
8 David McKenzie, or any entities owned or operated in  13:05:56
9 whole or in part by him.                  13:05:59
10     So, first, can you tell me what you did to  13:06:00
11 prepare to answer questions related to this topic?  13:06:07
12  A. Yeah, we reviewed -- we reviewed some of  13:06:09
13 the contracts with some of those entities, we -- and  13:06:15
14 other documents about -- related to those entities,  13:06:19
15 which I understand have all been produced to you.  13:06:22
16 We spoke to Wayne LaPierre.              13:06:25
17     We spoke to -- we spoke to -- I can't  13:06:30
18 remember if we discussed this with Sonya Rowling or  13:06:32
19 Tyler Schropp, but, you know, we spoke to other NRA  13:06:34
20 staff.                                13:06:37
21  Q. Okay. Does the NRA currently have a  13:06:38
22 contractual relationship with either Mr. Stanton in  13:06:42
23 his personal capacity or any entities owned or  13:06:47
24 operated in whole or in part by him?      13:06:50
25  A. Yes. We have relationships with three  13:06:53

Page 194

1 entities; Membership Marketing Partners,  13:06:58
2 Allegiance -- Allegiance Creative Group, and Concord  13:07:03
3 Social and Political.                   13:07:09
4  Q. Any other entities currently?         13:07:10
5  A. Not that I'm aware of.               13:07:13
6  Q. And do any NRA affiliates have any current  13:07:15
7 relationships with any of those entities or any  13:07:20
8 other entities Mr. Stanton owns or controls?  13:07:23
9     MR. CICILIANO (VIA ZOOM): Just  13:07:27
10 objection to the use of the term "affiliates" and  13:07:28
11 outside the scope.                      13:07:31
12  A. Right. So to my knowledge, the -- I  13:07:32
13 believe the NRA Special Contribution Fund which  13:07:42
14 manages our Whittington Center facility in New  13:07:49
15 Mexico has a relationship with one or more of the  13:07:49
16 entities, but I'm not sure how many.    13:07:51
17  Q. Does the NRA currently have or has it ever  13:07:55
18 had a contractual relationship with Member Marketing  13:07:57
19 Partners as opposed to Membership Marketing  13:08:03
20 Partners?                              13:08:08
21  A. You know, I don't -- I don't know. That  13:08:08
22 was a -- I don't know.                  13:08:11
23  Q. Okay. All three of the entities you  13:08:15
24 mentioned -- Allegiance Creative Group, Concord  13:08:22
25 Social and Public Relations, and Membership  13:08:26

Page 195

1 Marketing Partners -- the CEO of those organizations  13:08:28
2 is a man by the name of Gurney Sloan; is that  13:08:30
3 correct?                               13:08:34
4  A. Yes.                                13:08:34
5  Q. And all three of those entities are  13:08:34
6 headquartered in office space rented out of the NRA  13:08:37
7 headquarters in Virginia; is that correct?  13:08:42
8  A. Yes.                                13:08:44
9  Q. Do you know whether or not any of those  13:08:46
10 entities have any other office space?      13:08:47
11  A. I don't know for certain. You know, I  13:08:52
12 don't -- I think some of their employees may have  13:08:59
13 worked remotely even before last year, but I think  13:09:03
14 that their primary -- I mean, their primary office  13:09:08
15 space is certainly, you know, as a tenant in NRA  13:09:11
16 headquarters.                          13:09:14
17  Q. Okay. The NRA has had a contractual  13:09:15
18 relationship with those three entities going back to  13:09:19
19 approximately 2011; is that correct?      13:09:22
20  A. I know at least 2011, yes.            13:09:25
21  Q. And prior to that point, did those -- any  13:09:28
22 of those entities have a different name or a  13:09:31
23 different d/b/a?                        13:09:34
24     MR. CICILIANO (VIA ZOOM): I'll just  13:09:37
25 object outside the scope and -- and time stale, not  13:09:38

Page 196

1 relevant to this proceeding.              13:09:41
2  A. Yeah, not -- no, I don't think so.  13:09:44
3  Q. So, for example, in the statement of  13:09:48
4 payments made in the last 90 days that the NRA filed  13:09:53
5 in connection with the bankruptcy, it mentions  13:09:56
6 payments to entities called Membership Advisors  13:09:58
7 Fundraising and Membership Advisors Public  13:10:03
8 Relations.                             13:10:07
9     Do you recognize the names of those  13:10:07
10 entities?                              13:10:10
11     MR. CICILIANO (VIA ZOOM): I just  13:10:11
12 object; it's outside the scope of this witness.  13:10:13
13     But go ahead.                       13:10:15
14  A. No, I don't.                        13:10:15
15  Q. The NRA in its schedule G, the executory  13:10:15
16 contracts that are filed in connection with the  13:10:21
17 bankruptcy did not list contractual relationships  13:10:23
18 with Allegiance Creative Group or Concord Social and  13:10:26
19 Public Relations under those names, did it?  13:10:33
20     MR. CICILIANO (VIA ZOOM): I will just  13:10:35
21 object. It's outside the scope of this witness's  13:10:36
22 knowledge.                             13:10:39
23  A. Yeah, and -- and I couldn't tell you  13:10:39
24 without looking at the schedules.         13:10:41
25  Q. Okay. Who at the NRA originally  13:10:42

Page 197

50 (Pages 194 - 197)

1  negotiated the contracts that were entered into          13:10:56
2  between the NRA and those three entities back in          13:11:00
3  2011 or whenever they were first entered into?            13:11:05
4          MR. CICILIANO (VIA ZOOM): I would           13:11:08
5  just object; outside the scope.                           13:11:09
6      A.  Yeah, however -- however, I think the              13:11:11
7  answer is Woody Phillips, Wilson Phillips, the             13:11:14
8  former treasurer.                                         13:11:19
9      Q.  Anyone else at the NRA?                           13:11:20
10     A.  Wayne LaPierre had some involvement but           13:11:24
11 I'm not sure how -- in how much detail.                   13:11:27
12     Q.  Can you expand on that at all how much            13:11:29
13 involvement Mr. LaPierre had?                             13:11:31
14         MR. CICILIANO (VIA ZOOM): I would           13:11:34
15 just object again; outside the scope.                     13:11:35
16     A.  Well, I know the -- the relationship came         13:11:36
17 about because a prior marketing firm that had worked      13:11:41
18 for us called PM Consulting was, you know,                13:11:44
19 dissolving, you know, the -- the principal of that        13:11:49
20 firm was retiring.  And the -- there was some             13:11:54
21 discussion about, you know, who could replace them        13:11:59
22 and so on.  And I know that Mr. Phillips and              13:12:02
23 Mr. LaPierre had discussions about -- about a --          13:12:05
24 about a potential successor.                              13:12:06
25     Q.  PM Consulting, did I get that name right?         13:12:14
                                                         Page 198

1      A.  Yes.                                              13:12:14
2      Q.  Is that correct?                                 13:12:18
3      A.  Yes.                                              13:12:18
4      Q.  Was that owned by Brad O'Leary?                  13:12:19
5      A.  I believe -- I believe he was the owner.          13:12:23
6  He was certainly the name associated with the firm.      13:12:25
7      Q.  Do you know whether or not Mr. Phillips or       13:12:28
8  Mr. LaPierre were involved in any negotiations           13:12:31
9  between David Stanton and Mr. O'Leary over               13:12:34
10 Mr. Stanton's purchase of the entities from              13:12:40
11 Mr. O'Leary?                                             13:12:42
12         MR. CICILIANO (VIA ZOOM): I would           13:12:44
13 just object; it's way outside the scope of this.          13:12:45
14         MR. THOMPSON (VIA ZOOM): So, Counsel,      13:12:48
15 the scope of this is the existence, accuracy,             13:12:49
16 completeness, preparation, and review of each of the     13:12:51
17 contracts in question.  And we're talking about the      13:12:54
18 preparation and existence of the contracts and what      13:12:57
19 was done with respect to them.  So I think it is          13:13:01
20 within the scope, but we can save that for another        13:13:03
21 time.                                                    13:13:05
22         MR. CICILIANO (VIA ZOOM): Well,            13:13:05
23 you're actually talking about -- as I understood the     13:13:06
24 question, you're asking about whether or not the         13:13:07
25 witness knows whether or not Mr. Wayne Pierre -- or      13:13:08
                                                         Page 199

1  LaPierre or Mr. Woody Phillips had any communications   13:13:12
2  regarding the purchase that David Stanton had entered   13:13:16
3  into with a third party was what I understood the        13:13:20
4  question to be but may have just because it was long     13:13:22
5  and compound.                                           13:13:25
6      Q.  Mr. Frazer, do you know the answer?             13:13:28
7      A.  My understanding is that Mr. Phillips had        13:13:30
8  some negotiations with Mr. McKenzie.                    13:13:35
9      Q.  With respect to Membership Marketing           13:13:40
10 Partners, do you know who at the NRA negotiated the      13:13:50
11 most recent amendment to the -- the contract between    13:13:53
12 the NRA and Membership Marketing Partners?               13:13:56
13     A.  Can you refresh my recollection on the          13:14:00
14 date of that amendment?                                 13:14:04
15     Q.  Yes.  It was in 2017 is my understanding.       13:14:05
16     A.  So -- I'm reluctant --                          13:14:12
17     Q.  I'll represent to you that it was in            13:14:15
18 January of 2017.                                        13:14:18
19     A.  Right.  I'm reluctant to speculate, but          13:14:19
20 I -- but I believe it -- and -- but I think it would     13:14:24
21 have been Woody Phillips primarily although --          13:14:27
22 although the -- our membership director may have         13:14:30
23 been involved.  But again, I'm reluctant to              13:14:33
24 speculate.                                              13:14:37
25     Q.  Who was the membership director at that         13:14:37
                                                         Page 200

1  time?                                                   13:14:41
2      A.  Todd Grable, G-r-a-b-l-e.  And his proper        13:14:41
3  title is executive director of membership and           13:14:51
4  marketing -- membership and affinity programs, I        13:14:55
5  believe.                                                13:14:57
6      Q.  And Mr. Grable still has that position          13:14:57
7  today; is that correct?                                 13:15:01
8      A.  Yes, he does.                                   13:15:01
9      Q.  What about with respect to the most recent      13:15:03
10 amendment to the agreement between the NRA and          13:15:08
11 Allegiance Creative Group?                               13:15:11
12     A.  Again, can you refresh my memory about the      13:15:13
13 date of that?                                           13:15:18
14     Q.  Yes.  One moment.                               13:15:20
15         So I'll represent to you that this was          13:15:29
16 entered into in December of 2018.                        13:15:30
17     A.  2018?                                           13:15:33
18     Q.  Yes.                                            13:15:35
19     A.  Yeah.  So that was after Mr. -- that was         13:15:37
20 after Mr. Phillips' retirement.  So I believe            13:15:42
21 that -- I think it would have been Wayne LaPierre,      13:15:53
22 possibly Craig Spray, and possibly Skipp Galythly,      13:16:02
23 an Assistant General Counsel in my office.               13:16:06
24     Q.  Okay.  In 2018, the NRA requested an audit     13:16:16
25 of Membership Marketing Partners and Allegiance         13:16:26
                                                         Page 201

51 (Pages 198 - 201)

1 Creative Group; is that correct?        13:16:29
2    A.  I don't know if the NRA requested an -- an 13:16:30
3 audit.  We -- there was some analysis done of their, 13:16:35
4 you know, contractual rates versus actual billing. 13:16:42
5 And there was some discussion with them through 13:16:45
6 counsel about the -- you know, about the basis for 13:16:49
7 some of their billing.        13:16:54
8    Q.  Okay.  Can you expand on that?  What were 13:16:55
9 the conversations that the NRA had with counsel for 13:16:58
10 Membership Marketing Partners about the -- any 13:17:03
11 discrepancies between what the contract called for 13:17:05
12 and the invoicing?        13:17:08
13    A.  Uh-huh.  Yeah, the -- the fundamental 13:17:12
14 question was what -- what the basis was for billing 13:17:15
15 us -- increasing their billing to us beyond the 13:17:21
16 amount specified in the escalator clause of the 13:17:25
17 contract.        13:17:28
18        And so trying to get some -- some 13:17:29
19 information on that, we contacted them and had a 13:17:33
20 discussion in which the -- which their counsel 13:17:36
21 represented to us that -- that a key factor was that 13:17:41
22 at some point, MMP had taken on the responsibilities 13:17:48
23 of another contractor that had formerly done 13:17:54
24 business with the NRA and that the -- the increased 13:17:58
25 amount reflected that.  And I regret I don't recall 13:18:04
Page 202

1 the name of that other firm.        13:18:07
2    Q.  You don't recall the name of the other 13:18:10
3 firm that MMP --        13:18:11
4    A.  That MM --        13:18:11
5    Q.  -- took on the services of for the NRA? 13:18:13
6    A.  Correct.  Correct.        13:18:16
7    Q.  Who would have that information at the 13:18:17
8 NRA?        13:18:19
9    A.  I don't -- I don't know.  You know, likely 13:18:20
10 the treasurer's office and/or membership division. 13:18:33
11    Q.  Was a contract review sheet prepared with 13:18:38
12 respect to the most recent amendment in 2018 to the 13:18:51
13 Allegiance Creative Group contract?        13:18:56
14        MR. CICILIANO (VIA ZOOM):  I would 13:19:00
15 just object to the extent you're relying on documents 13:19:01
16 that aren't in front of the witness.        13:19:05
17    A.  Right.  And I -- and I don't -- I don't 13:19:06
18 recall the answer without seeing documents. 13:19:09
19    Q.  Well, I'm -- I'm asking whether it exists. 13:19:10
20        Does a -- does a contract review sheet 13:19:13
21 exist for the most recent amendment in 2018 to the 13:19:17
22 Allegiance Creative Group contract?        13:19:22
23    A.  I'm afraid I don't know.        13:19:26
24    Q.  So the NRA has a policy with respect to 13:19:33
25 contracts valued at more than $100,000 in a given 13:19:36
Page 203

1 year; is that correct?        13:19:42
2    A.  Yes.        13:19:45
3    Q.  What are the requirements of that policy? 13:19:46
4    A.  Yeah, the policy is that a business case 13:19:50
5 analysis has to be prepared describing the -- the 13:19:52
6 purposes of the contract and the contract terms.  It 13:19:55
7 has to state what other potential vendors bid on the 13:20:00
8 service or if there was -- if no bid -- if -- if it 13:20:07
9 falls -- if it falls within one of the exceptions to 13:20:11
10 our competitive bidding requirement, that has to be 13:20:15
11 justified.        13:20:17
12        And then you have to have signoff from 13:20:18
13 the -- from legal counsel, from the treasurer, and 13:20:20
14 from the executive vice president before entering 13:20:27
15 into the contract.        13:20:31
16        And then in addition, you have to have 13:20:32
17 signatures or other communications acknowledging 13:20:35
18 the -- from -- from the president and at least one 13:20:41
19 of our two vice presidents acknowledging the 13:20:43
20 contract.        13:20:47
21    Q.  Do you know whether or not the Allegiance 13:20:49
22 Creative Group contract is worth more than 13:20:52
23 $100,000 --        13:20:54
24    A.  It is.        13:20:54
25    Q.  -- per year?        13:20:55
Page 204

1    A.  It is.        13:20:56
2    Q.  Did you -- did the general counsel's 13:20:58
3 office review the amendment to the Allegiance 13:21:00
4 Creative Group contract in 2018?        13:21:04
5    A.  I believe we did.        13:21:07
6    Q.  Was a business case analysis prepared for 13:21:11
7 the Allegiance Creative Group amendment in 2018? 13:21:14
8    A.  Sitting here today without any documents, 13:21:18
9 I can't recall.        13:21:23
10    Q.  Did the treasurer's office review the 13:21:24
11 Allegiance Creative Group contract amendment in 13:21:27
12 2018?        13:21:31
13    A.  Again, sitting here, I can't recall. 13:21:31
14    Q.  Do you know whether or not the contract 13:21:38
15 was provided to the president or either vice 13:21:40
16 president for their review in -- at the time that it 13:21:45
17 was entered into in 2018 or thereabouts? 13:21:49
18    A.  I'm sorry, I can't recall.        13:21:54
19    Q.  Does the NRA have any procedures in place 13:21:57
20 for identifying contracts that may not have complied 13:22:01
21 with the hundred thousand dollar policy 13:22:07
22 requirements?        13:22:09
23    A.  Yes.  When we become aware of one, the 13:22:10
24 guidance that we have given is that the -- is that 13:22:13
25 the absence of the -- of the analysis and approval 13:22:17
Page 205

52 (Pages 202 - 205)

1 sheet should be noted for the file and -- and, you 13:22:22
2 know, retained -- retained with that contract, you 13:22:27
3 know, once that deficiency is noted. 13:22:31
4 MR. THOMPSON (VIA ZOOM): Okay. So, 13:22:34
5 Counsel, just for the record, I am going to make an 13:22:35
6 objection that Mr. Frazer does not appear to be 13:22:38
7 prepared to address this topic to the extent that is 13:22:42
8 called for in the notice, but we can address that at 13:22:48
9 another time. 13:22:51
10 MR. CICILIANO (VIA ZOOM): Well, so 13:22:52
11 it's not naked -- so it's not naked on the record, he 13:22:53
12 is telling you that he doesn't recall off his memory 13:22:55
13 but if you could show him the record. So if you do 13:22:58
14 have the record in your possession and your just 13:23:01
15 withholding it from him, I have an objection to the 13:23:03
16 gamesmanship there. It's like asking someone to 13:23:04
17 remember everything in a document and then 13:23:07
18 withholding it from them and saying, aha, you didn't 13:23:08
19 memorize it even though you're supposed to talk to 13:23:10
20 the document. 13:23:10
21 So if you have something, I suggest 13:23:12
22 you show it. Otherwise, we can meet and confer on 13:23:14
23 that issue. 13:23:17
24 MR. THOMPSON (VIA ZOOM): Sure. And I 13:23:18
25 can represent to you that we do not have a business 13:23:18

Page 206

1 case analysis or contract review sheet as would be 13:23:20
2 required under the $100,000 policy for the NRA, which 13:23:23
3 is why I'm asking whether one exists and has not been 13:23:27
4 produced to us. 13:23:31
5 Q. So is it your understanding, Mr. Frazer, 13:23:33
6 that following the discussions with counsel for 13:23:38
7 Membership Marketing Partners in 2018, did the NRA 13:23:42
8 agree to pay an increased monthly fee to Membership 13:23:46
9 Marketing Partners? 13:23:56
10 A. Well, the question -- the question that we 13:23:56
11 were addressing with counsel was that we were 13:23:58
12 already paying an increased monthly fee. And -- and 13:24:00
13 so the conversation was to satisfy us as to whether 13:24:05
14 there -- as to whether there was a basis for that -- 13:24:10
15 for that fee. 13:24:14
16 And based on the discussion, we've -- I 13:24:15
17 believe we've continued paying MMP at the same -- at 13:24:19
18 the same -- at the same rate, not at any additional 13:24:22
19 increase. 13:24:24
20 Q. So was the NRA satisfied by what counsel 13:24:27
21 for Membership Marketing Partners had to say about 13:24:31
22 the basis for the increase in the fee? 13:24:34
23 A. Yes. 13:24:36
24 Q. Are there any communications reflecting 13:24:39
25 that back and forth with Membership Marketing 13:24:41

Page 207

1 Partners? 13:24:45
2 A. It was -- I'm familiar -- all I'm familiar 13:24:45
3 with personally is a phone call. I don't know 13:24:49
4 whether there might be any, you know, notes of 13:24:52
5 counsel. And, of course, there will be privilege 13:24:58
6 issue with -- issues with those. 13:24:59
7 Q. I'm sorry, can you -- so -- I'm sorry, did 13:25:01
8 you say that there may be a privilege issue with the 13:25:06
9 communications with Membership Marketing Partners? 13:25:09
10 A. If -- no. If outside -- if outside 13:25:12
11 counsel for the NRA kept -- kept notes of the 13:25:15
12 conversation, you know, those -- those may be work 13:25:19
13 product, but I don't know for certain if there are 13:25:24
14 any such documents. 13:25:26
15 Q. Is there any written record of the NRA's 13:25:27
16 agreement to retroactively reprove or continue to 13:25:33
17 pay the increased fee that was the subject of this 13:25:39
18 2018 discussion? 13:25:44
19 A. I don't recall. 13:25:47
20 Q. What services does Membership Marketing 13:25:50
21 Partners currently provide to the NRA? 13:26:02
22 A. They provide strategy and copyrighting and 13:26:04
23 so on with respect to -- with respect to direct mail 13:26:10
24 marketing of membership, NRA membership and 13:26:13
25 donations. A little bit of difference between -- 13:26:18

Page 208

1 between MMP, Allegiance, and Concord; but maybe if 13:26:20
2 we take them as an aggregate, the -- the three 13:26:23
3 entities combined, you know, do the -- do the NRA's 13:26:26
4 direct mail program both for recruitment, renewal of 13:26:30
5 membership, and fundraising from existing members. 13:26:35
6 And that's across -- you know, that includes, for 13:26:37
7 example -- that includes separate campaign -- that 13:26:41
8 includes, you know, campaigns across the -- across 13:26:44
9 the organization. And they -- they also do online 13:26:46
10 strategy with respect to the same -- the same tasks. 13:26:53
11 Q. So that was -- that was all three 13:27:01
12 together; is that correct? 13:27:00
13 A. Right. Right. 13:27:00
14 Q. That that's generally what their -- 13:27:02
15 A. Right. 13:27:02
16 Q. -- their function is? 13:27:04
17 A. Right. 13:27:04
18 Q. Okay. So if we could take them one at a 13:27:05
19 time, can you tell me what Membership Marketing 13:27:07
20 Partners in particular, what services they provide 13:27:11
21 to the NRA? 13:27:13
22 A. Yeah, that -- that would be primarily on 13:27:14
23 the -- on the direct mail strategies. 13:27:15
24 Q. Okay. 13:27:21
25 A. And especially -- especially with respect 13:27:22

Page 209

53 (Pages 206 - 209)

1 to -- to membership recruitment and renewals. 13:27:23
2 Q. What about Allegiance? 13:27:28
3 A. Allegiance -- allegiance would be 13:27:31
4 primarily with respect to, you know, fundraising 13:27:34
5 above and beyond membership renewals. 13:27:37
6 Q. I see. So Allegiance is in charge of 13:27:46
7 fundraising efforts with respect to nonmembers; is 13:27:50
8 that correct? 13:27:52
9       MR. CICILIANO (VIA ZOOM): Objection; 13:27:53
10 misstates testimony. 13:27:54
11 A. Or with respect -- and, yeah -- and 13:27:54
12 with -- my understanding is that Allegiance is 13:28:00
13 involved in fundraising that doesn't relate to 13:28:03
14 membership dues. So in other words, a person joins 13:28:06
15 and pays the dues, then they're also going to do -- 13:28:10
16 you know, they're also going to get solicited for 13:28:14
17 contributions above and beyond. 13:28:17
18 Q. Okay. And then what about Concord? 13:28:20
19 A. Concord would be primary focused, as 13:28:24
20 the -- as the name of the company would suggest, 13:28:28
21 on -- on social media issues. 13:28:29
22       That's my best understanding of the 13:28:34
23 breakdown. 13:28:36
24       MR. CICILIANO (VIA ZOOM): Is that 13:28:38
25 what Concord means, focused on grapes? 13:28:38

Page 210

1       THE WITNESS (VIA ZOOM): Concord 13:28:46
2 Social and Political, right. 13:28:44
3 Q. Is -- do you know what Communications 13:28:49
4 Corporation of America is? 13:28:54
5 A. Yes. 13:28:54
6 Q. Are they a sub-vendor through Membership 13:28:54
7 Marketing Partners for the NRA? 13:28:59
8 A. They work closely with -- with MMP, but 13:29:02
9 they are paid directly by the NRA. So CCA is a mail 13:29:07
10 house essentially that -- you know, I think they do 13:29:14
11 the printing and mailing of direct mail. They're 13:29:17
12 one of several vendors we use for this for, you 13:29:20
13 know, that kind of task. 13:29:23
14 Q. Do you know whether or not MMP has a 13:29:24
15 contract with CCA for work done on behalf of the 13:29:27
16 NRA? 13:29:31
17       That's -- sorry, that's a lot of acronyms. 13:29:32
18 A. No. No. And I totally understood what 13:29:34
19 you were saying. 13:29:36
20       I -- I don't know. I know that we pay CCA 13:29:38
21 directly. 13:29:41
22 Q. Does the NRA have a direct contractual 13:29:43
23 relationship with CCA? 13:29:47
24 A. I don't know if it's a contractual 13:29:50
25 relationship or if it's done on a -- on a purchase 13:29:52

Page 211

1 order basis off the top of my head. 13:29:54
2 Q. Okay. 13:29:54
3 A. But it is -- I know there are direct 13:29:56
4 payments because I see the invoices. 13:29:59
5 Q. Who within the NRA supervises the 13:30:02
6 relationship with MMP? 13:30:07
7 A. The day-to-day work with MMP is kind of 13:30:11
8 twofold. At -- at -- at one level, it's the -- the 13:30:14
9 top leadership in the membership division. That's 13:30:21
10 Todd Grable and his deputy, Derek Robinson. 13:30:26
11       And at a more -- what I would call a more 13:30:31
12 strategic level, they work with Wayne LaPierre in 13:30:36
13 terms of general messaging and strategies for -- 13:30:43
14 for, you know, the big NRA-wide appeals. 13:30:47
15       I should also say that -- that the -- that 13:30:51
16 MMP does work for ILA specific to fundraising for 13:30:54
17 ILA's special projects and for the NRA Political 13:30:59
18 Victory Fund, our federal -- our federal and state 13:31:04
19 PAC. 13:31:04
20       And -- and for those purposes, they would 13:31:08
21 work with the -- with the leadership at the 13:31:14
22 Institute for Legislative Action, Jason Ouimet, 13:31:17
23 O-u-i-m-e-t, and fiscal officer Bob Owens, and I 13:31:23
24 don't know who else in ILA works with them. 13:31:29
25 Q. Does that govern the -- is MMP's 13:31:32

Page 212

1 relationship with ILA governed by a separate 13:31:34
2 agreement or does that fall under the umbrella of 13:31:38
3 the agreement that the NRA has with MMP? 13:31:40
4 A. I believe it's under the umbrella of 13:31:46
5 the -- of the main agreement. 13:31:49
6 Q. Okay. What about the supervision of the 13:31:53
7 relationship with Allegiance, who at the NRA is 13:31:57
8 responsible for that? 13:32:00
9 A. It would-- 13:32:02
10       MR. CICILIANO (VIA ZOOM): I would 13:32:02
11 just object to being outside the scope. 13:32:03
12       Go ahead. 13:32:05
13 A. It would be the same as for MMP. 13:32:05
14 Q. And same for Concord as well? 13:32:08
15 A. Yes. 13:32:10
16 Q. Has the NRA ever considered bringing the 13:32:17
17 services provided by these three entities -- MMP, 13:32:21
18 Concord, and Allegiance -- in-house? 13:32:24
19 A. Yes, I know it has been discussed. 13:32:27
20 Q. In what context has it been discussed? 13:32:30
21       MR. CICILIANO (VIA ZOOM): I would 13:32:35
22 just object and ask which category does this pertain 13:32:35
23 to. 13:32:38
24       MR. THOMPSON (VIA ZOOM): Sure. I 13:32:39
25 believe that this pertains to the existence and 13:32:40

Page 213

54 (Pages 210 - 213)

1 review of these contracts to the extent that the 13:32:44
2 review from a cost-saving perspective would imply 13:32:48
3 whether or not it's better for these services to be 13:32:52
4 conducted in-house. 13:32:54
5 MR. CICILIANO (VIA ZOOM): I think 13:32:56
6 that's a pretty broad interpretation. 13:32:57
7 But I'll let you answer if you know. 13:32:59
8 A. It has been discussed. 13:33:02
9 Q. Who has it been discussed by within the 13:33:03
10 NRA? 13:33:05
11 A. To my -- the only -- you know, you're -- 13:33:06
12 you're challenging my knowledge as a 30(b)(6) 13:33:15
13 deponent, but I'm aware of discussions that I had 13:33:49
14 with -- with one of our former outside attorneys and 13:33:29
15 possibly with Woody Phillips and/or Josh Powell. 13:33:41
16 Q. Do you remember approximately when these 13:33:44
17 conversations occurred? 13:33:47
18 A. Well, it would be a pretty broad time 13:33:56
19 frame, but it would have been in, you know, 2016 to 13:34:03
20 as late as 2018, but that's very -- I know that's a 13:34:06
21 big -- covers a lot of ground. 13:34:11
22 Q. Okay. So I am going to go ahead and mark 13:34:18
23 two exhibits. These are the original Allegiance 13:34:23
24 Creative Group contract that was provided to us in 13:34:29
25 connection with the 341 as well as the fourth 13:34:30
Page 214

1 amendment, which I -- I will ask whether or not it 13:34:33
2 is the most recent. But -- 13:34:36
3 A. If you could bear with us, we're trying -- 13:34:41
4 we're trying to wake up the -- 13:34:43
5 MR. CICILIANO (VIA ZOOM): The 13:34:43
6 monitor. 13:34:43
7 A. -- the monitor. 13:34:46
8 MR. CICILIANO (VIA ZOOM): Computer 13:34:51
9 may have gone to sleep by this point. 13:34:51
10 THE WITNESS (VIA ZOOM): It's not 13:34:54
11 responding as promptly as it did this morning. 13:34:58
12 MR. CICILIANO (VIA ZOOM): Evidently 13:34:59
13 after lunch, it went to sleep. We're at about the 13:35:00
14 hour time if you want to take a break for a second, 13:35:06
15 for like 10 minutes for just a standard break, and 13:35:08
16 I'll try to get it on in the interim. 13:35:09
17 MR. THOMPSON (VIA ZOOM): Sure. That 13:35:12
18 makes sense to me actually. 13:35:13
19 MR. CICILIANO (VIA ZOOM): Okay. 13:35:13
20 Great. 13:35:19
21 MR. MASON (VIA ZOOM): Can we get a 13:35:19
22 time how long -- on record time too, please, from the 13:35:20
23 videographer? 13:35:22
24 THE VIDEOGRAPHER (VIA ZOOM): I'll add 13:35:22
25 it up while we're off the record and tell you guys. 13:35:23
Page 215

1 MR. MASON (VIA ZOOM): Great. Thank 13:35:26
2 you. 13:35:27
3 THE VIDEOGRAPHER (VIA ZOOM): We're 13:35:27
4 going off the record at 1:35. We're off the record. 13:35:28
5 (Recess 1:35 p.m. to 1:43 p.m.) 13:35:50
6 THE VIDEOGRAPHER (VIA ZOOM): We're 13:43:57
7 back on the record at 1:43. 13:44:12
8 Q. All right. Thank you very much. 13:44:18
9 So during the break, Mr. Frazer, I have 13:44:21
10 marked two exhibits. Exhibit Number 2 is the -- 13:44:23
11 what I understand to be the original December 2011 13:44:29
12 agreement between the NRA and Allegiance Creative 13:44:32
13 Group that was provided to us in connection with the 13:44:36
14 341 hearings. And Exhibit 3 is the fourth amendment 13:44:39
15 to that contract that was signed in or about 13:44:47
16 December 2018 or January 2019. 13:44:54
17 So we'll start with Exhibit 2. 13:44:59
18 (Exhibit 2 marked.) 13:45:01
19 MR. CICILIANO (VIA ZOOM): It's up on 13:45:05
20 the screen. 13:45:06
21 Q. So if I could direct your attention to the 13:45:07
22 Services and Duties section. And in particular, at 13:45:09
23 the bottom of the second page, subparagraph P as in 13:45:15
24 Paul, do you see where it says, Provide periodic 13:45:21
25 statistical data on the results of all projects; 13:45:24
Page 216

1 provided, however, ACG's obligation to provide such 13:45:28
2 data on the results of projects is dependent upon 13:45:31
3 the NRA supplying relevant information to ACG as ACG 13:45:34
4 may reasonably request. 13:45:39
5 A. Yes, I see it. 13:45:39
6 Q. Do you see that? 13:45:42
7 A. I do. 13:45:42
8 Q. Do you know whether or not any such 13:45:44
9 statistical data was requested by or provided to the 13:45:47
10 NRA under the provision of the agreement? 13:45:51
11 MR. CICILIANO (VIA ZOOM): I would 13:45:55
12 just object it's outside the scope. 13:45:56
13 To the extent you know. 13:45:59
14 A. I'm sorry, I'm afraid I don't know. 13:46:00
15 Q. Okay. And then going down to the top of 13:46:07
16 the next page, subparagraph Q, Submit budget sheets 13:46:09
17 for projects and campaigns for approval by the NRA. 13:46:18
18 Do you see that? 13:46:19
19 A. I do. 13:46:20
20 Q. Do you know whether any such budget sheets 13:46:21
21 for projects and campaigns were submitted to the NRA 13:46:24
22 by Allegiance for approval? 13:46:28
23 MR. CICILIANO (VIA ZOOM): I would 13:46:31
24 just object as to scope. 13:46:33
25 A. I don't know but it isn't clear to me 13:46:35
Page 217

55 (Pages 214 - 217)

1 whether -- whether that is for any kind of special 13:46:39
2 projects or campaigns, you know, under this contract 13:46:41
3 or if it would be special projects above and beyond 13:46:47
4 the standard fee. 13:46:50
5 Q. Okay. 13:46:53
6 A. I -- I don't -- 13:46:53
7 Q. And then the next paragraph -- I'm sorry? 13:46:54
8 A. And by -- by the way, if I can interject, 13:46:57
9 I noticed on the first page that it states that it 13:47:00
10 does include contracts with Institute for 13:47:03
11 Legislative Action -- or does include work for the 13:47:06
12 Institute of Legislative Action. 13:47:09
13 Q. Thank you. That's good to know. 13:47:12
14 So going down to the next subparagraph 13:47:13
15 there, paragraph R, Create a system for NRA 13:47:15
16 management approval for signoff of all fundraising 13:47:18
17 campaigns and projects. 13:47:26
18 Do you know whether any such system was 13:47:22
19 implemented? 13:47:26
20 MR. CICILIANO (VIA ZOOM): Again, I 13:47:28
21 object; it's outside the scope of the witness. 13:47:29
22 A. Yeah, and -- and I'm sorry I can't speak 13:47:32
23 to Allegiance specifically, but there certainly is 13:47:34
24 an approval process for campaigns and projects, you 13:47:38
25 know, collectively with these -- with these 13:47:44
Page 218

1 entities. You know, there's a -- there's a -- 13:47:45
2 basically a routing -- I don't -- I don't know how 13:47:47
3 it's done now but certainly in -- in -- you know, 13:47:50
4 earlier in the -- in the period of the contract, 13:47:58
5 there was, you know, a routing sheet of sorts that 13:48:00
6 would, you know, go around for signoff of direct 13:48:05
7 mail copy, for example. 13:48:10
8 Q. Can you talk a little bit more about that 13:48:13
9 process? What does that -- what does that entail? 13:48:17
10 A. Yeah -- 13:48:20
11 MR. CICILIANO (VIA ZOOM): And I would 13:48:20
12 just object; again, outside the scope. 13:48:21
13 But go ahead. 13:48:23
14 A. So -- and again, this is a little bit of 13:48:24
15 personal knowledge from my prior position at the -- 13:48:28
16 at the NRA but that there was a -- there was a 13:48:30
17 process by which the -- by which MMP -- and, 13:48:34
18 frankly, before it, PM Consulting, would 13:48:40
19 circulate -- would circulate their draft letter copy 13:48:44
20 to key individuals for review. Everyone would 13:48:47
21 review it within the purview of their -- of their 13:48:51
22 responsibilities. 13:48:53
23 So, for example, the -- the research staff 13:48:56
24 at the Institute for Legislative Action would 13:49:01
25 review -- would review materials to make sure that 13:49:06
Page 219

1 they were factually accurate and accurately 13:49:09
2 reflected the NRA's legislative positions. The more 13:49:13
3 senior leadership, whether it's the executive 13:49:17
4 director or -- of the Institute or the executive 13:49:19
5 vice president of the NRA would review things to 13:49:21
6 make sure -- you know, would -- would look at it 13:49:23
7 with an eye towards general strategy, messaging, 13:49:25
8 public impact. 13:49:30
9 And -- and obviously the -- you know, the 13:49:32
10 membership or fundraising teams would look at things 13:49:36
11 in terms of whether they were likely to be 13:49:39
12 financially successful. 13:49:42
13 Q. Okay. So if we could then go to the next 13:49:43
14 exhibit, Exhibit 3. 13:49:47
15 (Exhibit 3 marked.) 13:49:50
16 MR. CICILIANO (VIA ZOOM): I'm going 13:49:50
17 to try to use the next file on the bottom, so when it 13:49:51
18 all crashes on me, I apologize. 13:49:56
19 MR. THOMPSON (VIA ZOOM): It worked 13:49:57
20 for me, so -- 13:49:58
21 MR. CICILIANO (VIA ZOOM): It worked 13:49:59
22 too. 13:50:00
23 Q. So am I correct that this fourth amendment 13:50:00
24 to the Allegiance Creative Group contract is the 13:50:07
25 current version of the NRA's contract with 13:50:13
Page 220

1 Allegiance Creative Group? 13:50:18
2 A. This was -- this was executed -- can we 13:50:19
3 look at the execution page? 13:50:23
4 Q. Looks like the second-to-last page is the 13:50:26
5 execution page. 13:50:28
6 A. Yes, I believe that's the current 13:50:32
7 iteration. 13:50:34
8 Q. Okay. So if I could draw your attention 13:50:34
9 back to the first page, paragraph 1, The subsections 13:50:42
10 of Section 1, Services and Duties, are deleted in 13:50:47
11 their entirety and replaced with what follows. 13:50:51
12 So I will represent to you that the 13:50:54
13 provision in the Allegiance Creative Group, the 13:51:05
14 original contract that we were just looking at 13:51:08
15 regarding the provision of statistical data at the 13:51:10
16 request of the NRA is not included in this amended 13:51:15
17 Services and Duties section. 13:51:18
18 And I wanted to ask why -- why the NRA 13:51:21
19 forewent that option to receive statistics from 13:51:29
20 Allegiance Creative Group about the effectiveness of 13:51:33
21 its campaigns. 13:51:35
22 A. Uh-huh. Uh-huh. 13:51:38
23 MR. CICILIANO (VIA ZOOM): I would 13:51:38
24 just object, first, to outside the scope. 13:51:38
25 And to the extent you know, go ahead. 13:51:40
Page 221

56 (Pages 218 - 221)

1     A.   So -- so I'm going to have to -- to state   13:51:42
2  this advisedly given that my office reviewed this as   13:51:45
3  legal counsel and reviewed or -- reviewed or   13:51:52
4  assisted in its drafting as legal counsel.   13:51:57
5        But my recollection generally speaking is   13:52:00
6  that the services and duties were amended to better   13:52:03
7  align with, you know, the realities of how the   13:52:09
8  parties actually did business day-to-day and with   13:52:13
9  the tasks that we actually wanted Allegiance to --   13:52:16
10  to perform.   13:52:20
11     Q.   Going back to our earlier conversations   13:52:23
12  about the discussions between the NRA and Membership   13:52:26
13  Marketing Partners about the increase in the   13:52:33
14  management fee --   13:52:34
15     A.   Uh-huh.   13:52:34
16     Q.   -- were there any discussions about the   13:52:35
17  increases in the management fee with respect to   13:52:39
18  either Allegiance Creative Group or Concord?   13:52:43
19        MR. CICILIANO (VIA ZOOM):   Objection:   13:52:47
20  vague.   13:52:48
21        Go ahead.   13:52:48
22     A.   I think it all rolls into the -- rolls in   13:52:49
23  to the same general topic area.  You know, the   13:52:51
24  entities as a whole having taken on additional --   13:52:56
25  additional duties resulting from the -- the -- the   13:52:58
                                                    Page 222

1  dissolution of this -- of the -- the prior vendor   13:53:03
2  relationship.   13:53:07
3     Q.   So these three entities -- these three   13:53:12
4  separate legal entities collectively took on pieces   13:53:30
5  of the work or -- they all collectively took on the   13:53:36
6  entirety but split it up between them, the work that   13:53:43
7  was being done by this other currently unknown   13:53:46
8  entity; is that correct?   13:53:50
9     A.   I believe that's my recollection of the   13:53:51
10  discussion.   13:53:56
11     Q.   Okay.  And I'm sorry, can you remind me,   13:53:56
12  who was involved in the discussions between MMP and   13:53:59
13  their counsel and the NRA?   13:54:04
14        Who were the --   13:54:07
15        MR. CICILIANO (VIA ZOOM):   Objection:   13:54:08
16  asked and answered.   13:54:08
17        Go ahead.   13:54:09
18     A.   It -- it was me.  In the -- in the one   13:54:09
19  conversation that I specifically remember because I   13:54:14
20  was on it, it was me, Sarah Rogers from the Brewer   13:54:16
21  firm, and one attorney for MMP whose name I'm afraid   13:54:21
22  escapes me.   13:54:28
23     Q.   Was Mr. Phillips involved in any of those   13:54:32
24  discussions?   13:54:34
25     A.   He wasn't -- he wasn't on that call, but I   13:54:35
                                                    Page 223

1  can't say he wasn't -- I can't say as to other   13:54:41
2  discussions.   13:54:43
3     Q.   What about Mr. LaPierre, was he involved   13:54:44
4  in any of these discussions?   13:54:47
5     A.   Again, not -- not on that call, but I   13:54:48
6  don't know about other discussions.   13:54:51
7        MR. THOMPSON (VIA ZOOM):   Jim, that   13:55:03
8  is -- I think that's it for topic 15, so I can turn   13:55:04
9  it back over to you.   13:55:07
10        MR. SHEEHAN (VIA ZOOM):   All right.   13:55:10
11  Thank you.  And we have about, what, 30 minutes left   13:55:11
12  out of the five hours for the AG's office.   13:55:13
13        FURTHER EXAMINATION   13:55:18
14  BY MR. SHEEHAN (VIA ZOOM):   13:55:19
15     Q.   Mr. Frazer, in the compliance world, in   13:55:19
16  compliance the category topic 7, when did you as the   13:55:21
17  person in charge of conflict of interest, you   13:55:26
18  personally, first learn that Wayne LaPierre had   13:55:28
19  received a gift of a week on a 112-foot yacht from   13:55:30
20  Mr. Stanton?   13:55:41
21     A.   You're asking me personally?  I don't   13:55:46
22  recall.   13:55:49
23     Q.   Did you ever learn about the --   13:55:50
24  Mr. Stanton making available to Mr. LaPierre the use   13:55:55
25  of a 112-foot yacht?   13:55:57
                                                    Page 224

1     A.   I'm sorry.  The audio on your end is a   13:56:02
2  little rocky.   13:56:05
3     Q.   Let me get a little bit closer.  I'm   13:56:06
4  trying to keep my face on screen and my voice at the   13:56:08
5  same time.   13:56:11
6     A.   I know there are challenges.   13:56:11
7     Q.   When did you first learn -- let me go   13:56:14
8  back.   13:56:17
9        When did you first learn that Wayne   13:56:18
10  LaPierre received from Mr. Stanton/McKenzie use of a   13:56:20
11  112-foot yacht in the Bahamas?   13:56:26
12     A.   I don't recall specifically.  I don't   13:56:29
13  recall specifically.   13:56:35
14     Q.   Was it before 2020?   13:56:35
15     A.   I think it was in 2020 or not much before.   13:56:42
16     Q.   How did you learn of it?   13:56:46
17     A.   So this is -- is this me personally or the   13:56:49
18  NRA's?   13:56:58
19     Q.   Let's start -- let's say the NRA.   13:56:59
20        Apart from Wayne knowing that he's getting   13:57:02
21  the gift, how did the NRA learn of the gift of   13:57:06
22  112-foot yacht for a week in the Bahamas to   13:57:09
23  Mr. LaPierre from Mr. Stanton?   13:57:12
24        THE WITNESS (VIA ZOOM) (VIA ZOOM):   13:57:12
25  And, Mr. Sheehan, I apologize.  Can I speak with   13:57:18
                                                    Page 225

57 (Pages 222 - 225)

1 counsel a minute?                        13:57:20
2          MR. SHEEHAN (VIA ZOOM): Sure. Let's 13:57:21
3 go off the record.                       13:57:26
4          THE VIDEOGRAPHER (VIA ZOOM): We're 13:57:27
5 going off the record.                    13:57:28
6          (Recess 1:57 p.m. to 2:00 p.m.)  13:58:28
7          THE VIDEOGRAPHER (VIA ZOOM): We're 14:00:15
8 back on the record at 2:00 o'clock.      14:00:23
9    Q.  Mr. Frazer, I was asking you before the 14:00:25
10 break how the NRA learned of Mr. LaPierre's receipt 14:00:27
11 of a 112-foot yacht for a week from      14:00:33
12 Mr. Stanton/McKenzie?                    14:00:39
13         MR. CICILIANO (VIA ZOOM): Counsel, 14:00:39
14 just to complete the record because we did take a 14:00:41
15 break.  I know there is an issue in some 14:00:43
16 jurisdictions about certain -- we did go outside, had 14:00:45
17 a conversation.  He informed me how he learned. 14:00:46
18         I would caution the witness regarding 14:00:49
19 not to share the advice of legal counsel but to go 14:00:51
20 ahead and -- not my legal advice but what you are 14:00:54
21 about to testify to.  You can go ahead and testify. 14:00:58
22 Go ahead.                                14:01:00
23    A.  So -- so, again, my recollection is that I 14:01:02
24 learned this -- I learned this personally from 14:01:06
25 Mr. Brewer.                              14:01:12

                                            Page 226

1    Q.  And do you know when that was       14:01:15
2 approximately?  Let me say, was it in 2020? 14:01:17
3    A.  I can't say with a hundred percent 14:01:26
4 certainty, but I think it was 2020.      14:01:29
5    Q.  Did you -- when you learned of the fact 14:01:33
6 that Wayne had gotten a 112-foot yacht, a full crew, 14:01:35
7 two jet skis, his whole family on the boat, full 14:01:41
8 food and supplies and fuel for a week, what did you 14:01:46
9 do?  What did the NRA do?                 14:01:48
10   A.  So just to clarify my previous answer. 14:01:51
11 What I became aware of was that Mr. LaPierre had 14:01:54
12 made some trips to the Bahamas.  Those additional -- 14:02:00
13 I did not become aware of those additional details, 14:02:04
14 I think, until -- I think until some media report 14:02:08
15 came out.  I can't recall the media outlet. 14:02:14
16   Q.  Did you read the complaint filed by the 14:02:17
17 Attorney General of New York?            14:02:20
18   A.  Yes.                               14:02:22
19   Q.  Which detailed the use of the 112-foot 14:02:24
20 yacht by Mr. LaPierre, correct?          14:02:29
21   A.  Yes.                               14:02:30
22   Q.  So at that point, August of 2020, you were 14:02:31
23 aware at least of the allegation that Mr. LaPierre 14:02:34
24 had gotten a 112-foot yacht for a week as a -- as a 14:02:38
25 gift from a supplier.                    14:02:44

                                            Page 227

1    Q.  What did you do about it?          14:02:46
2          MR. CICILIANO (VIA ZOOM): I would 14:02:47
3 just object to the characterization of the question. 14:02:48
4 You can go ahead answer but I would warn you to the 14:02:50
5 extent it involves attorney-client communications, 14:02:53
6 those are protected.                     14:02:57
7          THE WITNESS (VIA ZOOM):          14:02:58
8 Sure.                                    14:02:58
9    A.  Well, first of all, it was unclear to me 14:02:59
10 whether it would be a gift.  Second of all, at that 14:03:03
11 point because I was also named as a defendant in the 14:03:08
12 same litigation, I was immediately taking steps to 14:03:12
13 segregate myself from matters in that litigation. 14:03:18
14   Q.  So I'm asking you now as the NRA.    14:03:23
15         What did the NRA do when that allegation 14:03:27
16 appeared in the Attorney General's complaint? 14:03:30
17         MR. CICILIANO (VIA ZOOM): And I would 14:03:34
18 just object to the extent it calls for work product 14:03:34
19 and attorney-client privilege.           14:03:36
20   A.  And, I mean, the NRA began responding to 14:03:37
21 it appropriately in connection with -- in connection 14:03:42
22 with a litigation, but I can't testify to that 14:03:46
23 because of my status.                    14:03:50
24   Q.  You can't testify as to what the -- I'm 14:03:52
25 confused, Mr. Frazer.                    14:03:56

                                            Page 228

1 I'm asking you what the NRA did after it  14:03:57
2 discovered that its executive VP was alleged to have 14:04:01
3 received a gift, favor or gratuity from a supplier 14:04:05
4 at least no later than August of 2020.  What did the 14:04:10
5 NRA do to investigate those allegations? 14:04:12
6    A.  Well, it's outside the scope of my 14:04:17
7 preparation because I -- because I'm not involved in 14:04:21
8 matters involving the NRA's response to your 14:04:23
9 office's litigation.                     14:04:27
10   Q.  No, so let's go back.  You were asked as 14:04:28
11 part of this to describe a compliance program. 14:04:31
12 Earlier you discussed your role in that compliance 14:04:34
13 program as involving review of conflicts of 14:04:36
14 interest, right?  You were the person.   14:04:39
15         What did the reviewer of conflicts of 14:04:42
16 interest do upon receiving this allegation with 14:04:45
17 respect to Mr. LaPierre, not with respect to 14:04:48
18 litigation, but with respect to Mr. LaPierre as an 14:04:50
19 employee of the NRA?                     14:04:53
20   A.  I didn't take any steps personally because 14:04:55
21 the matter was being handled by litigation counsel. 14:05:01
22   Q.  The matter meaning the -- what the 14:05:05
23 compliance program does with respect to Mr. LaPierre 14:05:07
24 was being handled by litigation counsel? 14:05:10
25   A.  Issues -- issues surrounding these 14:05:12

                                            Page 229

58 (Pages 226 - 229)

1 allegations were being handled by litigation 14:05:16
2 counsel. 14:05:19
3 Q. Let me go back. Your form -- 14:05:19
4 Could I ask you to adjust your screen? 14:05:21
5 I'm basically seeing you from the forehead up at 14:05:24
6 this point. 14:05:26
7 Q. Last time it was lower than that. But, 14:05:27
8 okay, let's -- 14:05:29
9 A. Thanks. It's much better. 14:05:30
10 Q. So your conflict of interest form for 2016 14:05:32
11 has a question to Mr. LaPierre: Have you or any 14:05:37
12 relative received or you or any relative expect to 14:05:41
13 receive any gift, gratuity, personal favor, 14:05:44
14 entertainment for either retail price or fair market 14:05:48
15 value in excess of $300 from any person or entity 14:05:50
16 that has or is seeking a business relationship with 14:05:53
17 or received funds from NRA or any NRA entity. 14:05:56
18 Mr. LaPierre checked "no." 14:06:00
19 Assuming that he received the use of a 14:06:02
20 112-foot yacht for his family, including his wife, 14:06:06
21 his niece, and other family members, from David 14:06:11
22 McKenzie/Stanton, in your opinion, was the answer 14:06:15
23 "no" to that number 4 correct? 14:06:17
24 MR. CICILIANO (VIA ZOOM): I would 14:06:21
25 just object; calls for speculation. 14:06:22

Page 230

1 Go ahead. 14:06:28
2 A. You know, at a minimum it's a topic that I 14:06:29
3 think would have warranted some discussion about the 14:06:34
4 definition of gifts or -- and so on and the business 14:06:35
5 relationships, family relationships involved. 14:06:39
6 Q. Is there any doubt in your mind that the 14:06:42
7 use of a 112-foot yacht for a week is worth more 14:06:44
8 than $300? 14:06:47
9 A. No. 14:06:49
10 Q. Is there any doubt -- 14:06:51
11 MR. CICILIANO (VIA ZOOM): I object; 14:06:52
12 depends on the condition of the yacht. 14:06:53
13 MR. SHEEHAN (VIA ZOOM): Fair enough. 14:06:59
14 Okay. 14:06:59
15 Q. Shouldn't Wayne have discussed with the 14:07:03
16 board and with you the acceptance of the use of a 14:07:05
17 112-foot yacht for a week from a supplier, owner 14:07:10
18 of a supplier? 14:07:12
19 MR. CICILIANO (VIA ZOOM): I would 14:07:14
20 just object; it calls for speculation, outside the 14:07:14
21 scope. 14:07:16
22 And you're talking "you" him 14:07:16
23 personally? 14:07:17
24 Q. You as the -- I'm sorry, no. You the NRA. 14:07:18
25 MR. CICILIANO (VIA ZOOM): Then I 14:07:26

Page 231

1 object; asked and answered. 14:07:27
2 A. Right. I think I answered that when I 14:07:27
3 said that it would have warranted some discussion as 14:07:30
4 to, you know, any -- people come to me regularly 14:07:32
5 with questions about whether something requires 14:07:35
6 disclosure. We look at the terms of the documents 14:07:38
7 and try to answer it. 14:07:41
8 Q. And so Wayne did not do that? 14:07:41
9 A. No. 14:07:45
10 Q. Should Wayne have participated -- assuming 14:07:50
11 that Wayne did receive a gift in excess of $300 from 14:07:53
12 David Stanton/McKenzie, should he have participated 14:07:57
13 under the conflict of interest rules of the NRA in 14:08:02
14 any negotiations or contract discussions or contract 14:08:06
15 reviews with the McKenzie/Stanton entity? 14:08:08
16 MR. CICILIANO (VIA ZOOM): I just 14:08:13
17 object; calls for a legal conclusion, calls for 14:08:14
18 speculation. 14:08:17
19 A. And with respect to drawing any legal 14:08:17
20 conclusion, I think -- I think we would have to 14:08:20
21 analyze the -- analyze the wording of the policy. 14:08:23
22 However, I would say that, you know, it's -- that 14:08:26
23 it's certainly an item that should have been 14:08:32
24 discussed and discussed whether -- you know, whether 14:08:34
25 there's an appropriate avenue for review by the 14:08:36

Page 232

1 audit committee, for example. 14:08:41
2 Q. Okay. But you're testifying as the NRA, 14:08:42
3 your compliance and conflict of interest policies. 14:08:46
4 Once he received the use of this yacht for 14:08:50
5 a week would, would the conflict of interest 14:08:52
6 policies preclude him from participating in 14:08:55
7 negotiating or overseeing the contract with the 14:08:58
8 McKenzie entity? 14:09:01
9 MR. CICILIANO (VIA ZOOM): Objection; 14:09:01
10 calls for speculation, incomplete hypothetical. 14:09:03
11 Go ahead. 14:09:05
12 A. And, I'm sorry, but I'm afraid I can't 14:09:05
13 answer that without reference to the language of the 14:09:08
14 policy itself. 14:09:11
15 Q. Where would you -- what document would you 14:09:15
16 look to to find that? 14:09:18
17 A. That would be the 2016 conflict of 14:09:19
18 interest and related party transactions policy. 14:09:21
19 Q. So as of today without having this the 14:09:30
20 specific document in front of you, as the 14:09:33
21 representative of the NRA, you cannot say whether 14:09:34
22 LaPierre's continued involvement in contracts with 14:09:41
23 Stanton/McKenzie's companies would violate the 14:09:43
24 policy once he has accepted the gift, correct? 14:09:46
25 A. Again, being a cautious attorney, I would 14:09:49

Page 233

59 (Pages 230 - 233)

```
 1 rather --                          14:09:54
 2    Q. I'm asking about the NRA, not the cautious 14:09:54
 3 attorney.                          14:09:57
 4       The NRA cannot say whether the conflict of 14:09:58
 5 interest policy would preclude him?   14:10:02
 6    A. The NRA -- I think the NRA would want to  14:10:05
 7 look at the policy, too.            14:10:08
 8       MR. CICILIANO (VIA ZOOM): So he can  14:10:13
 9 give you the interpretation of the policy but he's 14:10:14
10 asking for it.                      14:10:17
11       MR. SHEEHAN (VIA ZOOM): I don't have 14:10:17
12 it. I'm asking him as the representative of the  14:10:18
13 entity whether it would be a violation and he's   14:10:21
14 unable to answer that.              14:10:24
15    Q. You're unable to answer that question,   14:10:25
16 Mr. Frazer, as the representative of the NRA without 14:10:27
17 the --                              14:10:29
18    A. I'm unable -- I'm unable to answer it    14:10:30
19 without speculating unless I review the document. 14:10:33
20    Q. With respect to the Philips consulting   14:10:47
21 contract, the Weaver consulting contract, the -- let 14:10:50
22 me go back a second.                14:10:56
23       Mr. Marcellin, do you know who         14:11:01
24 Mr. Marcellin is?                   14:11:03
25    A. I do.                        14:11:04
```
Page 234

```
 1    Q. According to the 2018 990, Mr. Marcellin  14:11:05
 2 had a contract with the Lockton Affinity Company for 14:11:08
 3 over $550,000 at a time when he was managing the  14:11:15
 4 relationship with the Lockton Affinity Company; is 14:11:19
 5 that correct?                       14:11:22
 6    A. I believe the contract -- I believe the  14:11:26
 7 contract took effect after he retired from the NRA. 14:11:29
 8 It was no longer managing the relationship.       14:11:33
 9    Q. Do you know when he negotiated the       14:11:36
10 contract with Lockton Affinity?     14:11:38
11    A. I think the negotiation occurred before  14:11:42
12 his retirement.                     14:11:45
13    Q. And were you as the conflict of         14:11:46
14 interest -- you would have been as the conflict of  14:11:51
15 interest person advised of those negotiations?   14:11:54
16    A. No.                          14:11:56
17    Q. Do you know why those negotiations were  14:11:56
18 not reported on the 2017 990?       14:11:58
19    A. The NRA wasn't -- the NRA wasn't aware of 14:12:01
20 his contract with Lockton until 2017.  14:12:05
21    Q. Until 2018. Until 2018, right?         14:12:10
22    A. No, 2017.                     14:12:14
23    Q. How did the NRA learn of Marcellin's    14:12:16
24 contract?                           14:12:20
25    A. It came out during the investigation of  14:12:21
```
Page 235

```
 1 the -- by the New York Department of Financial  14:12:26
 2 Services relating to the NRA's insurance Affinity 14:12:30
 3 programs.                           14:12:36
 4    Q. In your opinion, as the custodian of the 14:12:37
 5 conflict of interest policy at the NRA, this is --  14:12:39
 6 in the NRA's opinion, would negotiating a contract 14:12:43
 7 with a vendor for a continued payment after       14:12:46
 8 retirement be a violation of the conflict of      14:12:49
 9 interest policy?                    14:12:52
10       MR. CICILIANO (VIA ZOOM): Objection;   14:12:54
11 calls for speculation, incomplete hypothetical.  14:12:56
12       Go ahead.                      14:12:57
13    A. Again, without -- without referring to the 14:12:57
14 policy, what I would say is that it would be       14:13:00
15 something that should certainly have been disclosed 14:13:02
16 at the time and reviewed.           14:13:04
17    Q. Did Mr. Marcellin have to fill out a     14:13:06
18 conflict of interest disclosure form?  14:13:13
19    A. No, not at the time.          14:13:15
20    Q. How would you -- for people who did not  14:13:20
21 have to fill out a conflict of interest form, how  14:13:22
22 would you find out whether they would have a       14:13:24
23 conflict of interest; "you" meaning the NRA?      14:13:26
24    A. Well, under the -- under the statement of 14:13:29
25 corporate ethics -- I'm sorry. I was trying to   14:13:37
```
Page 236

```
 1 remember the title of the document -- which is    14:13:39
 2 published to all employees in the NRA employee   14:13:42
 3 handbook, employees are supposed to avoid conflicts 14:13:46
 4 of interest in all respects and, you know, take   14:13:52
 5 appropriate steps to avoid or remedy them. I can't 14:13:56
 6 remember the specific terms.        14:14:01
 7    Q. What did Mr. Marcellin do for Lockton    14:14:04
 8 Affinity for his money?             14:14:09
 9    A. I don't know. I don't know his activities 14:14:12
10 for a third entity.                 14:14:15
11    Q. The NRA reported income -- that income on 14:14:19
12 the 2018 return. You know what, let's save that for 14:14:23
13 later this week.                    14:14:30
14       When you learn of the Marcellin contract 14:14:32
15 what, if any, action did NRA take with respect to  14:14:37
16 Mr. Marcellin?                      14:14:40
17    A. Well, Mr. Marcellin had already retired. 14:14:41
18    Q. Right.                       14:14:44
19    A. So the NRA -- you know, the NRA stopped  14:14:45
20 paying Mr. Marcellin's -- the consulting contract  14:14:52
21 that the NRA had with him and eventually          14:14:56
22 negotiated -- and eventually negotiated a settlement 14:15:02
23 of the dispute over that.           14:15:06
24    Q. And who negotiated that deal?          14:15:08
25    A. Outside counsel.              14:15:12
```
Page 237

60 (Pages 234 - 237)

| | |
|---|---|
| 1 Q. Mr. Brewer again? 14:15:14 | 1 MR. CICILIANO (VIA ZOOM): And I would 14:17:32 |
| 2 A. Ms. Rogers, I believe. 14:15:16 | 2 just object to the extent it calls for 14:17:33 |
| 3 Q. Ms. Rogers of the Brewer firm? 14:15:18 | 3 attorney-client communications. 14:17:36 |
| 4 A. Correct. 14:15:20 | 4 A. Mr. Marcellin threatened to sue us for 14:17:36 |
| 5 Q. And was the board advised of the 14:15:21 | 5 breach of contract. 14:17:39 |
| 6 negotiations and the settlements? 14:15:24 | 6 Q. Did you have discussions with 14:17:44 |
| 7 MR. CICILIANO (VIA ZOOM): I just 14:15:30 | 7 Mr. Marcellin personally? 14:17:45 |
| 8 object generally to the extent that it calls for 14:15:31 | 8 MR. CICILIANO (VIA ZOOM): Objection; 14:17:49 |
| 9 revealing attorney-client privilege, but you can go 14:15:33 | 9 time. Ever or regarding this? 14:17:50 |
| 10 ahead. 14:15:36 | 10 Q. Regarding this. 14:17:52 |
| 11 A. I don't recall. 14:15:36 | 11 A. Regarding the settlement or the threatened 14:17:54 |
| 12 Q. Was the board ever advised by anyone of 14:15:38 | 12 lawsuit? 14:17:56 |
| 13 the negotiations and settlement with Mr. Marcellin? 14:15:41 | 13 Q. Let's start with threatened lawsuit. Did 14:17:58 |
| 14 A. I don't recall. 14:15:45 | 14 he talk to you personally about it? 14:18:00 |
| 15 Q. What was the -- what were the terms of the 14:15:47 | 15 A. No. 14:18:02 |
| 16 Marcellin settlement? 14:15:49 | 16 Q. Who did he talk to? 14:18:02 |
| 17 A. He released his claims against the NRA and 14:15:51 | 17 A. I think we heard from his counsel. 14:18:04 |
| 18 the NRA paid a discounted amount of the amounts that 14:15:53 | 18 Q. And who did the counsel talk to? 14:18:06 |
| 19 otherwise would have been due. 14:16:00 | 19 A. I'm trying to remember if I got any 14:18:12 |
| 20 Q. How much was it? 14:16:02 | 20 communication, but ultimately I know he talked to 14:18:22 |
| 21 A. I don't -- 14:16:06 | 21 Ms. Rogers. Counsel talked to Ms. Rogers, that is. 14:18:25 |
| 22 MR. CICILIANO (VIA ZOOM): And I would 14:16:07 | 22 Q. With respect to the Weaver consulting 14:18:30 |
| 23 just object. If you know that it's subject to some 14:16:08 | 23 contract -- let me go back, skip that for a second. 14:18:40 |
| 24 sort of confidentiality order, don't reveal it. 14:16:12 | 24 The -- is it true that contract management 14:18:45 |
| 25 MR. SHEEHAN (VIA ZOOM): This 14:16:13 | 25 has now been centralized at the NRA? 14:18:52 |
| Page 238 | Page 240 |

| | |
|---|---|
| 1 confidentiality business, this is a federal court 14:16:14 | 1 A. We don't have a single contract manager. 14:18:56 |
| 2 bankruptcy proceeding. You know, your contractual 14:16:16 | 2 I know that's something that we're looking at. But 14:19:04 |
| 3 obligations are different from what the law requires 14:16:20 | 3 we -- we are taking much greater steps to enforce 14:19:07 |
| 4 the witness to testify to so -- 14:16:23 | 4 our long-standing requirement that contracts -- that 14:19:12 |
| 5 MR. CICILIANO (VIA ZOOM): He hasn't 14:16:26 | 5 copies of all contracts be provided to the financial 14:19:15 |
| 6 identified whether or not that's an actual thing. 14:16:29 | 6 services division so they can check and -- check for 14:19:18 |
| 7 I'm just warning him in case there is something I 14:16:31 | 7 the status of any contract before payments are made. 14:19:22 |
| 8 need to know about so I can advise him accordingly. 14:16:34 | 8 Q. So is it accurate to say that contract 14:19:25 |
| 9 I'm not trying to interfere with that should it be 14:16:37 | 9 management has now been centralized? 14:19:28 |
| 10 proper for him to tell you. I'm not stopping it. I 14:16:39 | 10 MR. CICILIANO (VIA ZOOM): Objection; 14:19:30 |
| 11 just need to know so that I can make sure it's fine. 14:16:41 | 11 vague as to centralized but. 14:19:31 |
| 12 I'm sure you understand. 14:16:44 | 12 A. It's -- 14:19:33 |
| 13 Q. Mr. Frazer, how much money -- what was the 14:16:45 | 13 Q. All language. 14:19:36 |
| 14 settlement amount that was paid to Mr. Marcellin 14:16:48 | 14 A. The responsibility has -- the 14:19:37 |
| 15 pursuant to this settlement you talked about before? 14:16:51 | 15 responsibility has always been with financial 14:19:38 |
| 16 A. You know, I don't have the numbers at my 14:16:54 | 16 services. 14:19:41 |
| 17 fingertips, but there -- it was in two payments that 14:16:56 | 17 Q. The responsibility for what, managing the 14:19:44 |
| 18 were reported in the NRA's schedules or statements 14:17:00 | 18 contracts? 14:19:45 |
| 19 in this case. 14:17:03 | 19 A. Right, for overseeing and documenting 14:19:47 |
| 20 Q. When were the payments made? 14:17:05 | 20 contracts. 14:19:50 |
| 21 A. I believe -- I believe early 2020. 14:17:08 | 21 Q. What about the EVP consulting budget, has 14:19:50 |
| 22 Q. Okay. What was the precipitating event 14:17:19 | 22 that always been centralized? 14:19:54 |
| 23 for deciding to negotiate with Mr. Marcellin 14:17:22 | 23 A. I mean, it's like -- it's like other 14:19:58 |
| 24 concerning the -- his contract and the payments from 14:17:25 | 24 budget -- it's like other budget areas within the 14:20:00 |
| 25 Lockton Affinity? 14:17:30 | 25 NRA. We have a financial services division includes 14:20:05 |
| Page 239 | Page 241 |

61 (Pages 238 - 241)

1 the budget manager but the budget manager helps work 14:20:06
2 out the budget for all divisions. But then every 14:20:12
3 division is responsible for supervising its own 14:20:15
4 contracts. 14:20:18
5 Q. So contract management has not been 14:20:18
6 centralized? 14:20:21
7 MR. CICILIANO (VIA ZOOM): I would 14:20:24
8 object to the term "centralized." It's vague. 14:20:24
9 A. Maybe I'm just not clear what you mean by 14:20:28
10 contract management. 14:20:32
11 Q. I'm using a phrase that was used by the 14:20:36
12 NRA. So let me ask you this: At one point in 2020, 14:20:39
13 we were told by witnesses that there are certain 14:20:47
14 contracts that the contract management staff was not 14:20:50
15 even allowed to see. 14:20:53
16 Is that consistent with your understanding 14:20:55
17 as the NRA witness here? 14:20:57
18 MR. CICILIANO (VIA ZOOM): Objection; 14:20:59
19 incomplete statement as to foundation for your claim 14:21:00
20 that this is what other employees said as well as 14:21:05
21 vague as to time. 14:21:07
22 Q. I'll ask you: Is it true, Mr. Frazer, 14:21:08
23 that there were certain contracts that the contract 14:21:10
24 management staff was not allowed to see at the NRA? 14:21:14
25 MR. CICILIANO (VIA ZOOM): Objection; 14:21:18
Page 242

1 vague as to time. 14:21:19
2 A. Right. And that was true at one -- that 14:21:21
3 was true at one time. However, now contracts are 14:21:23
4 centralized within the financial services division. 14:21:26
5 Q. When did that -- when did that situation 14:21:29
6 change? 14:21:32
7 A. I'm not sure exactly but, you know, after 14:21:35
8 the review of all of these issues in 2018. 14:21:41
9 Q. Was it -- was it 2020? 14:21:44
10 A. I do -- I don't know for sure and I don't 14:21:48
11 know if it all happened at a single date. 14:21:55
12 Q. But you're confident that as of today all 14:21:57
13 contracts are provided to the financial services 14:22:02
14 division? 14:22:04
15 A. That's my understanding. 14:22:04
16 Q. No. Yours, the NRA's understanding? 14:22:06
17 A. Yes. 14:22:09
18 Q. What about contracts involving security 14:22:11
19 issues for the NRA? 14:22:14
20 A. I believe they're treated like any other 14:22:20
21 contract. 14:22:22
22 Q. In -- since the beginning of 2018, has 14:22:26
23 there ever been a situation where a contract over 14:22:30
24 $100,000 is not supported either by a request for 14:22:33
25 proposals and/or a signed document? 14:22:37
Page 243

1 A. As to requests for proposals, the answer 14:22:44
2 is yes, because some -- some contracts are exempt 14:22:47
3 from our competitive bidding requirements. 14:22:52
4 Q. I thought competitive bidding are two 14:22:55
5 different processes. 14:22:58
6 A. I'm sorry, I couldn't hear you. 14:22:59
7 Q. I thought the competitive bidding is one 14:23:01
8 process; the RFP is a second process. So I asked 14:23:05
9 you is with respect to contracts which are not 14:23:07
10 subject to competitive bidding, I didn't ask this 14:23:10
11 but now I'm asking it. 14:23:12
12 With contracts who were not subject to 14:23:13
13 competitive bidding over $100,000, were they always 14:23:16
14 subject to an RFP process since the beginning of 14:23:19
15 2018? 14:23:22
16 A. So you're talking about RFPs for sole 14:23:24
17 source contracts? 14:23:29
18 Q. Anything that was not a competitive bid 14:23:30
19 contract. 14:23:33
20 A. There have been -- there have been 14:23:35
21 noncompetitively bid contracts executed without 14:23:40
22 RFPs. 14:23:45
23 Q. Executed without your -- I couldn't hear 14:23:45
24 it. 14:23:48
25 A. Without -- without RFPs. 14:23:48
Page 244

1 Q. What contracts are they? 14:23:51
2 A. Law firms. I can't -- I don't -- I don't 14:23:54
3 have -- it would be a range of contracts and I can't 14:24:11
4 point to specific instances. 14:24:14
5 But just to be -- just to be clear, I'm 14:24:16
6 not sure -- I'm not sure you and the NRA have quite 14:24:21
7 the same understanding of RFPs. I mean, you know, 14:24:25
8 we're not -- contracts aren't coming in out of the 14:24:31
9 blue. They don't fall on us out of the sky. 14:24:34
10 If a -- you know, we would put out a 14:24:37
11 formal RFP or bid request if we're seeking -- if 14:24:41
12 we're seeking services from multiple vendors. If 14:24:44
13 there's a single vendor that we believe is well 14:24:48
14 advised to use and falls outside the competitive bid 14:24:53
15 requirement, then maybe -- maybe approaching that 14:24:56
16 vendor amounts to an RFP. But again, there may be 14:25:02
17 just a different understanding. 14:25:08
18 Q. Approaching a single vendor in your view 14:25:09
19 could satisfy the RFP process set forth in your 14:25:13
20 procurement policy? 14:25:17
21 A. If there's no -- if the contract falls 14:25:18
22 outside of the competitive bid requirement, yes. 14:25:20
23 Q. Okay. Has the NRA entered into oral 14:25:23
24 contracts or oral amendments of contracts for a 14:25:32
25 value exceeding $100,000 since January 1, 2018? 14:25:38
Page 245

62 (Pages 242 - 245)

Veritext Legal Solutions
800-336-4000

1  A. Oral contracts -- or what was the second?  14:25:43
2  Q. Oral extensions or modifications of  14:25:50
3 existing contracts.  14:25:53
4  A. I don't know.  14:25:57
5  Q. Okay. Who would you ask to find out?  14:26:01
6  A. Ms. Rowling, Mr. LaPierre.  14:26:12
7  Q. Anybody else?  14:26:15
8  A. Not that I can think of.  14:26:22
9  Q. Mr. Spray?  14:26:24
10  A. I was thinking current employees but  14:26:26
11 Mr. Spray certainly.  14:26:29
12  Q. Is Mr. Spray a current employee?  14:26:32
13  A. I'm sorry. We're in transitional stage  14:26:34
14 obviously, but yes, Mr. Spray.  14:26:37
15  Q. What records would you consult to find out  14:26:39
16 whether all modifications or either oral contracts  14:26:42
17 over $100,000 or oral modifications over $100,000?  14:26:48
18  MR. CICILIANO (VIA ZOOM): Written  14:26:52
19 records or spoken records?  14:26:53
20  Q. Any -- any documentation of an oral  14:26:54
21 contract, where would I go to find those?  14:26:59
22  A. You know, you might have -- you might have  14:27:02
23 an email or other written communication in which  14:27:04
24 someone says this was agreed to or something like  14:27:09
25 that, but I couldn't point you to specific  14:27:12

Page 246

1 instances.  14:27:15
2  Q. To your knowledge, were any oral contracts  14:27:18
3 entered into for over $100,000 since January 1,  14:27:22
4 2018?  14:27:27
5  A. I think I answered that I didn't know.  14:27:27
6  Q. Okay. How does your system, your existing  14:27:32
7 contract system, capture incurred but not reported  14:27:40
8 contract expenditures?  14:27:45
9  A. I'm sorry. Say again. Can you say again?  14:27:47
10  Q. Sure. How does -- how does the NRA system  14:27:50
11 capture incurred but not yet reported contract  14:27:53
12 expenditures?  14:27:56
13  A. Incurred but not yet reported.  14:27:57
14  Q. Right. So I have done the work. I  14:28:02
15 haven't sent you an invoice yet. How does the  14:28:03
16 system capture or identify those -- those  14:28:06
17 obligations?  14:28:10
18  A. We would ask -- we would ask -- when  14:28:12
19 something like that occurs, we would ask for the  14:28:16
20 vendor to provide an amount or estimate so that it  14:28:19
21 could be properly accrued.  14:28:24
22  Q. Something like -- okay. I'll go back.  14:28:29
23  And did -- is there a system for capturing  14:28:32
24 those incurred but not reported expenditures?  14:28:35
25  MR. CICILIANO (VIA ZOOM): I would  14:28:41

Page 247

1 just object. This is outside the scope.  14:28:41
2  MR. SHEEHAN (VIA ZOOM): This is part  14:28:44
3 of Article 10, Section 10.  14:28:44
4  MR. CICILIANO (VIA ZOOM): What part  14:28:48
5 of Section 10 speaks to accounting practices?  14:28:49
6  MR. SHEEHAN (VIA ZOOM): Each  14:28:53
7 evaluation or analysis by any person at any time in  14:28:54
8 the performance of any NRA contract or vendor.  14:28:57
9  MR. CICILIANO (VIA ZOOM): It's  14:29:02
10 overbroad and ambiguous.  14:29:22
11  Q. Mr. Frazer, can you tell me with respect  14:29:04
12 to expenses which are incurred but not reported what  14:29:09
13 evaluation or analysis does the NRA do of those  14:29:12
14 costs?  14:29:15
15  A. Well, I mean, you're speaking -- I'm not  14:29:21
16 sure how -- I mean, look, that would fall more under  14:29:31
17 the accounting staff. However, because it's  14:29:37
18 primarily an issue of making sure the expense is  14:29:39
19 properly accrued to the right time period.  14:29:42
20  However, you know, you would see what --  14:29:44
21 you know, what the anticipated amount is and  14:29:51
22 presumably a responsible manager has an idea of  14:29:55
23 whether the amount is reasonable. And then -- and  14:29:59
24 then ultimately, of course, it's not going to be  14:30:02
25 paid until it's invoiced and then the invoice will  14:30:05

Page 248

1 be reviewed as any other invoice.  14:30:10
2  Q. To go back to Mr. LaPierre and his  14:30:11
3 expenses -- or his expenses incurred by the NRA  14:30:16
4 which were reimbursed to him, were paid for him,  14:30:19
5 where would I go to find the documents which support  14:30:23
6 the dollar value which was decided upon by the -- by  14:30:26
7 whoever negotiated the deal with him for the  14:30:32
8 repayment?  14:30:35
9  A. You're referring to the reimbursement of  14:30:36
10 the private air travel?  14:30:39
11  Q. Correct.  14:30:41
12  A. Any of that documentation, as far as I  14:30:43
13 know, would be with outside counsel.  14:30:48
14  Q. What about Mr. Sloane?  14:30:51
15  A. Mr. Sloane wasn't involved in that as far  14:30:56
16 as I know, unless I'm mistaken.  14:31:00
17  Q. So there's a spreadsheet. Are there  14:31:02
18 documents supporting the spreadsheet?  14:31:05
19  A. Just to be clear, Sloane was the -- is the  14:31:08
20 expert in the Cox matter.  14:31:13
21  Q. Sorry. Okay. I have got -- I apologize.  14:31:15
22  Go back to Wayne LaPierre and the  14:31:18
23 negotiations about how much he would have to repay.  14:31:21
24 The source documents for the amount that was arrived  14:31:25
25 upon, where would they be?  14:31:29

Page 249

63 (Pages 246 - 249)

```
 1    A.  Just to --                14:31:32
 2          MR. CICILIANO (VIA ZOOM):  I would    14:31:35
 3  object to scope, to the extent you know.  And I would  14:31:36
 4  caution you not to reveal attorney-client privileged   14:31:39
 5  information or work product.          14:31:41
 6    A.  So my understanding is that the -- is that  14:31:44
 7  that analysis was conducted based on flight invoices   14:31:51
 8  provided by the travel agent II and IS or GS2, you    14:31:55
 9  know, collected by the Brewer firm, compiled into a    14:32:08
10  spreadsheet by the Brewer firm and then subjected to   14:32:11
11  analysis by tax counsel.            14:32:14
12    Q.  In preparation for today's testimony, did   14:32:16
13  you examine both the spreadsheet and the underlying    14:32:18
14  document?                  14:32:21
15    A.  No.                  14:32:22
16    Q.  And in determining the amount that was due   14:32:27
17  from Mr. LaPierre and investigating it, did the NRA   14:32:30
18  consider anything other than the air expenses you've   14:32:35
19  just described?                14:32:39
20          MR. CICILIANO (VIA ZOOM):  Objection    14:32:41
21  to the extent its asked and answered, calls for    14:32:41
22  attorney-client privilege.          14:32:47
23    A.  And I'm afraid I don't know.        14:32:48
24    Q.  Okay.  How does the NRA know that there    14:32:52
25  aren't additional expenses which Mr. LaPierre     14:32:57
                                   Page 250
```

```
 1  issues.                    14:34:33
 2    Q.  Okay.  And did you look at the documents   14:34:34
 3  they examined in order to determine there were no    14:34:38
 4  additional costs due?             14:34:40
 5    A.  I did not.                14:34:41
 6    Q.  And I'm trying to remember the second part  14:34:42
 7  of the question.                14:34:48
 8    A.  But there was a second part.        14:34:50
 9    Q.  The determination -- the determination     14:34:54
10  that there were no other expenses by -- that     14:35:00
11  Mr. LaPierre should be called upon the to repay was   14:35:04
12  undertaken by the Brewer firm; is that correct?     14:35:08
13    A.  Yes, although I'm afraid I don't know if   14:35:15
14  that was discussed with tax counsel.       14:35:18
15    Q.  And the tax counsel -- there was Wayne    14:35:21
16  LaPierre's tax counsel and there was tax counsel for  14:35:23
17  the NRA.  Was there anybody else there?      14:35:27
18    A.  That's all I know of.  And just to be    14:35:32
19  clear -- never mind.  I was right.  Okay.  Nothing   14:35:36
20  to add.                    14:35:41
21    Q.  Okay.  At this point it is pretty clear to  14:35:42
22  me that -- Mr. Frazer, that you are not prepared to   14:35:45
23  answer questions regarding the identification,     14:35:48
24  investigation, determination and calculation of    14:35:52
25  amounts that could possibly be due for Mr. LaPierre  14:35:57
                                   Page 252
```

```
 1  incurred that were billed to the NRA and should not   14:33:02
 2  have been during the time period 2014 to present?    14:33:07
 3          MR. CICILIANO (VIA ZOOM):  I would    14:33:12
 4  just caution to the extent that it's -- not to share  14:33:14
 5  attorney-client communications, but go ahead.     14:33:16
 6    A.  I think that -- I think that because of    14:33:18
 7  the depth of the review of everything that we have   14:33:20
 8  undergone since 2018, we have engaged in voluminous   14:33:24
 9  collection, screening and production to you of    14:33:30
10  documents, I think that certainly should provide a   14:33:32
11  factual basis for what we looked at.       14:33:40
12    Q.  Right.  This is a different question.     14:33:42
13  Somebody -- did anybody investigate the expenses,    14:33:45
14  other than the airfare expenses, and did anybody     14:33:50
15  determine whether there were additional amounts due   14:33:53
16  apart from the airfare expenses for Mr. LaPierre?    14:33:56
17    A.  I know -- so two-part question.  The first  14:34:00
18  part is yes, matters other than airfare have     14:34:04
19  certainly been reviewed and investigated.  And --    14:34:07
20  and as to the second part whether any decision has   14:34:13
21  been made that any others need to be reimbursed, I'm  14:34:17
22  not aware of any at this time.          14:34:21
23    Q.  Okay.  So that review and investigation of  14:34:22
24  expenses other than the airfare, who did that?     14:34:25
25    A.  I know the Brewer firm has looked at those  14:34:28
                                   Page 251
```

```
 1  apart from the airfare or to describe to us the    14:35:59
 2  thought process and decision-making process by the   14:36:05
 3  NRA with respect to limiting the recoveries to those  14:36:08
 4  amounts.  Am I being unfair?          14:36:12
 5          MR. CICILIANO (VIA ZOOM):  I would    14:36:14
 6  just object to your characterization.  We're happy to  14:36:15
 7  meet and confer on that if we need to.  And should we  14:36:19
 8  make the decision or determination that he is, we    14:36:21
 9  can -- we have three other 30(b)(6) depositions    14:36:24
10  coming forward as well as Mr. Frazer's personal     14:36:26
11  deposition.  I'm sure we can reach some sort of    14:36:29
12  agreement on that.               14:36:32
13          MR. SHEEHAN (VIA ZOOM):  Okay.  I     14:36:33
14  think at this point let's take a 2-minute break,    14:36:34
15  Stephen, and then we'll pass the witness -- let's    14:36:38
16  take a 2-minute break and then we'll come back.    14:36:41
17          MR. CICILIANO (VIA ZOOM):  Can we make  14:36:46
18  it 5 just so we can use the rest room and avoid the   14:36:47
19  next one?                   14:36:50
20          MR. SHEEHAN (VIA ZOOM):  Sure.  Sounds  14:36:51
21  good.                     14:36:53
22          THE VIDEOGRAPHER (VIA ZOOM):  We're    14:36:53
23  going off the record at 2:36.  We're off the record.  14:36:54
24          (Recess 2:36 p.m. to 2:43 p.m.)     14:36:59
25          THE VIDEOGRAPHER (VIA ZOOM):  We're    14:43:38
                                   Page 253
```

64 (Pages 250 - 253)

1 back on the record at 2:43.                    14:43:56
2    Q.  So Mr. Frazer what, if any, role did the   14:44:00
3 counsel's office of the NRA have in negotiating or  14:44:05
4 executing the settlement agreement with         14:44:09
5 Mr. Marcellin that you described in your earlier  14:44:12
6 testimony?                                     14:44:19
7    A.  We didn't negotiate it.  However, once I   14:44:22
8 believe I reviewed -- I believe I reviewed drafts at  14:44:30
9 some point after it had been negotiated, and I may  14:44:35
10 have signed the settlement agreement.          14:44:41
11   Q.  Have there been any negotiations         14:44:47
12 concerning the termination of the Philips consulting  14:44:51
13 contract?                                      14:44:53
14   A.  I don't -- I don't know the answer to     14:44:55
15 that.                                          14:44:56
16   Q.  Have there been any negotiations         14:44:57
17 concerning the termination of the Weaver consulting  14:44:59
18 contract?                                      14:45:02
19   A.  That contract is expired.               14:45:03
20   Q.  Prior to its expiration, were there any  14:45:06
21 negotiations about terminating early?          14:45:11
22   A.  Not to my knowledge.                    14:45:13
23   Q.  With respect to the HWS consulting      14:45:14
24 contract, were you involved in negotiating the  14:45:17
25 termination of that contract?                  14:45:21

Page 254

1        MR. CICILIANO (VIA ZOOM):  You cut out  14:45:21
2 there, Counsel.  We didn't hear the name of the  14:45:30
3 vendor.                                        14:45:31
4    A.  I don't recall the term of the contract  14:45:31
5 but I know that the principal of the company   14:45:34
6 Mr. Sheets -- I can't remember -- I can't recall if  14:45:39
7 it was a decision by him not to renew it or if it  14:45:44
8 was a termination by him.                      14:45:47
9    Q.  Was there any review of the reimbursement  14:45:50
10 request that Mr. Sheets put in to the NRA between  14:45:56
11 2018 and the present?                          14:46:00
12   A.  Yes, there was a review of Mr. Sheets'  14:46:02
13 expenses.                                      14:46:04
14   Q.  Did the NRA identify any expenses which  14:46:06
15 would have been considered excess payments    14:46:10
16 disqualified persons that went to HWS or Mr. Sheets?  14:46:14
17   A.  I don't know that Mr. Sheets would have  14:46:22
18 been considered a disqualified person.  What I know  14:46:27
19 is that there were certain expenses that required  14:46:29
20 further explanation.                           14:46:34
21   Q.  Was there a review of expenses he had   14:46:36
22 already been paid for at the same time or about the  14:46:39
23 same time?                                     14:46:41
24   A.  The review that I'm aware of had to do  14:46:42
25 with expenses that he submitted but not yet paid  14:46:46

Page 255

1 for.                                           14:46:49
2    Q.  So at the NRA, were there -- once those  14:46:49
3 expenses were received but not paid, was there a  14:46:53
4 review of prior expenses incurred by Mr. Sheets or  14:46:56
5 HWS and billed to the NRA to determine whether they  14:47:00
6 were valid?                                    14:47:04
7    A.  Not to my recollection.                 14:47:05
8        MR. SHEEHAN (VIA ZOOM):  Okay.  And    14:47:07
9 with that I'll pass the witness to our colleagues.  14:47:08
10       EXAMINATION                            14:47:18
11 BY MR. MASON (VIA ZOOM):                       14:47:19
12   Q.  Good afternoon, Mr. Frazer.  How are you.  14:47:19
13   A.  I'm fine.  Thanks.  Good to see you again.  14:47:20
14   Q.  You as well.                           14:47:23
15       Let's do this.  I think Exhibit 53 has  14:47:25
16 been dropped into the exhibit folder.  If you could  14:47:30
17 take a look at that for me.  It's the Ackerman  14:47:33
18 corporate rep notice.                          14:47:37
19       (Exhibit 53 previously marked.)        14:47:48
20   A.  I'm not seeing it in there.             14:47:50
21   Q.  It may not be in there yet.  Dylan, maybe  14:47:52
22 you can help me out with this.                 14:47:56
23       But I just want to confirm, Mr. Frazer,  14:47:57
24 with respect to the Ackerman notice you are the  14:47:59
25 NRA's designated corporate representative for topics  14:48:01

Page 256

1 2, 3, 6, 7, 11 and 13; is that correct?        14:48:05
2        MR. CICILIANO (VIA ZOOM):  That's      14:48:12
3 correct.  I believe he may have even been 9 as well.  14:48:13
4        MR. MASON (VIA ZOOM):  I believe he    14:48:17
5 was 9.  We withdraw that particular topic.     14:48:19
6        MR. CICILIANO (VIA ZOOM):  Okay.       14:48:22
7    Q.  With respect to topic number 3,         14:48:22
8 Mr. Frazer, the NRA's financial condition, the  14:48:26
9 accuracy and completeness of all forms and schedules  14:48:29
10 filed in the NRA bankruptcy and the reasons, both  14:48:32
11 financial and nonfinancial, for seeking protection  14:48:37
12 under Chapter 11 of the bankruptcy code.       14:48:39
13       Are you the person most knowledgeable at  14:48:42
14 the NRA with respect to the reasons that the NRA  14:48:45
15 filed for Chapter 11 bankruptcy?               14:48:50
16       MR. CICILIANO (VIA ZOOM):  Counsel,     14:48:53
17 I'm going to pose two objections here.  One is  14:48:54
18 Ms. Rowling has also been designated.  She'll attend  14:48:56
19 to the financial or the financial side.  Counsel here  14:48:59
20 will refer more to the nonfinancial side.      14:49:01
21       Also there is no person most           14:49:05
22 knowledgeable designation anymore.  It's a 30(b)(6)  14:49:07
23 representative.                                14:49:08
24       But go ahead.                          14:49:09
25   A.  I mean, it's hard to -- I'm not quite sure  14:49:11

Page 257

65 (Pages 254 - 257)

1 how -- what yardstick I use to compare who is more 14:49:14
2 knowledgeable about -- excuse me. 14:49:20
3 I'm not sure what yardstick measures who 14:49:24
4 is most knowledgeable, but it's going to vary by 14:49:26
5 topic, from topic to topic. 14:49:32
6 Q. Did you know -- Mr. Frazer, I understand 14:49:33
7 you did not know that the NRA was filing for 14:49:35
8 bankruptcy as of January 15, correct? 14:49:38
9 A. On January 15th, I became aware that it 14:49:42
10 was actually being done. As I testified on the 341 14:49:45
11 meetings, I had been aware that the -- that the 14:49:56
12 possibility was being considered. 14:49:56
13 Q. When did you first become aware that the 14:49:59
14 possibility was being considered? 14:50:02
15 A. Sometime in the fall. 14:50:05
16 Q. And who made you aware of that 14:50:08
17 possibility? 14:50:10
18 A. Discussions with outside counsel. 14:50:11
19 Q. And who was that outside counsel? 14:50:13
20 A. Ms. Rogers. 14:50:17
21 Q. Were you made aware that there was 14:50:19
22 considerations for bankruptcy filing in Texas or 14:50:24
23 were you just made aware that we were -- the NRA was 14:50:29
24 potentially considering bankruptcy? 14:50:32
25 MR. CICILIANO (VIA ZOOM): And I would 14:50:36

Page 258

1 just object to extent that it calls for 14:50:36
2 attorney-client communications and work product. 14:50:39
3 A. I knew that we were actually looking at a 14:50:41
4 few different states. 14:50:46
5 Q. What were the other states that were being 14:50:49
6 considered? 14:50:50
7 MR. CICILIANO (VIA ZOOM): I would, 14:50:54
8 again, object and actually direct you not to answer 14:50:55
9 that one. 14:50:58
10 THE WITNESS (VIA ZOOM): 14:50:59
11 Yeah. 14:50:59
12 Q. From the time that you had that initial 14:50:59
13 conversation with Ms. Rogers in the fall of 2020, 14:51:04
14 did you have any idea that there was preparations 14:51:08
15 that were ongoing for bankruptcy until January 15th? 14:51:14
16 MR. CICILIANO (VIA ZOOM): Objection; 14:51:22
17 calls for speculation, facts not in evidence, and 14:51:25
18 then also to the extent that it would require the 14:51:27
19 disclosure of information learned from an attorney 14:51:29
20 representing the NRA, I direct you not to answer. 14:51:34
21 Q. Are you going to follow your counsel's 14:51:36
22 instructions? 14:51:38
23 THE WITNESS (VIA ZOOM) (VIA ZOOM): So 14:51:41
24 I can answer to the extent it doesn't disclose 14:51:42
25 information learned from an attorney? 14:51:45

Page 259

1 MR. CICILIANO (VIA ZOOM): Right, or 14:51:47
2 planning of an attorney. 14:51:48
3 A. Then I think I can't answer that one. 14:51:53
4 Q. We'll come back to that. 14:51:56
5 Mr. Frazer, what are all the reasons the 14:52:02
6 NRA filed for bankruptcy? 14:52:05
7 A. The NRA filed for bankruptcy to -- as a 14:52:08
8 way to address a whole constellation of issues but 14:52:13
9 including the need to -- including the need to 14:52:16
10 streamline our litigation, address -- consolidate 14:52:20
11 everything, a lot of claims against the NRA, and 14:52:24
12 also to effect a reorganization in the state that 14:52:33
13 has frankly a ton of advantages for us. 14:52:39
14 Q. I want to understand every single reason 14:52:44
15 that the NRA filed. So I have got here streamline 14:52:46
16 litigation, consolidate claims, and reorganize in 14:52:49
17 Texas. 14:52:56
18 Do I have that right? 14:52:56
19 A. I think that's fair. 14:53:00
20 MR. CICILIANO (VIA ZOOM): I would 14:53:02
21 just object based on the financial and my 14:53:02
22 representation that Ms. Rowling would be providing 14:53:06
23 additional information should it apply. 14:53:09
24 Q. Are there any other reasons as you sit 14:53:11
25 here today as to why the NRA filed for Chapter 11 14:53:15

Page 260

1 bankruptcy? 14:53:18
2 A. I think I have addressed them. 14:53:20
3 Q. Okay. So those three: Streamline 14:53:22
4 litigation, consolidate claims, and reorganize, 14:53:26
5 right? 14:53:28
6 A. Yes. 14:53:28
7 Q. Okay. So in terms of streamlining 14:53:29
8 litigation, can you explain what that means? 14:53:32
9 MR. CICILIANO (VIA ZOOM): I would 14:53:38
10 generally object to the extent that it would call for 14:53:38
11 the attorney-client privilege or work product. But 14:53:41
12 to the extent outside of that, your understanding. 14:53:42
13 A. Well, streamline and consolidate kind of 14:53:45
14 go together. The bankruptcy court provides an 14:53:47
15 expedited avenue to address claims against the NRA 14:53:50
16 in a single forum and faster than traditional 14:53:56
17 litigation in the district courts or state courts. 14:54:01
18 And I think that answers your question. 14:54:05
19 Q. Any other -- any other reasons with 14:54:11
20 respect to the litigation claims? 14:54:14
21 A. I think I addressed that. I think I 14:54:21
22 answered that. 14:54:23
23 Q. Was the cost of litigation a reason that 14:54:25
24 the NRA filed for bankruptcy? 14:54:30
25 A. Yes. If you can take -- if you can take a 14:54:34

Page 261

66 (Pages 258 - 261)

1 series of claims against the NRA that are being 14:54:42
2 fought in multiple courts all over the country and 14:54:47
3 resolve them in a -- in a single faster proceeding 14:54:51
4 in the bankruptcy court, that should be both faster 14:54:57
5 and more cost efficient in the long run. 14:55:03
6 Q. So the legal fees that the NRA was 14:55:15
7 incurring with respect to these litigation claims 14:55:17
8 was a reason that the NRA filed for bankruptcy? 14:55:21
9 MR. CICILIANO (VIA ZOOM): Objection 14:55:25
10 to the extent it misstates his testimony. 14:55:27
11 A. Look, litigation is expensive and 14:55:29
12 obviously we're incurring costs in this litigation. 14:55:33
13 But, you know, if you end the litigation faster and 14:55:36
14 presumably save fees, then fees are certainly a 14:55:42
15 factor. 14:55:45
16 Q. What is your plan to end -- what 14:55:47
17 litigation are you speaking of specifically that the 14:55:49
18 NRA is seeking to consolidate as part of this 14:55:52
19 Chapter 11? 14:55:55
20 MR. CICILIANO (VIA ZOOM): I would 14:55:56
21 just object to the extent it calls for 14:55:57
22 attorney-client privilege and invades work product 14:56:00
23 and the plans of counsel as this case moving forward. 14:56:02
24 A. You have got -- you have got a host of 14:56:05
25 matters that are against the NRA that are stayed, 14:56:07

Page 262

1 and I think we would consider it to apply all of 14:56:11
2 those. 14:56:20
3 Q. Can you please provide me with a list of 14:56:20
4 all of the lawsuits that factored into the decision 14:56:22
5 for the NRA to consolidate litigation because of 14:56:27
6 legal costs? 14:56:31
7 A. If you take the -- I can't list them all 14:56:32
8 off the top of my head. But if you look -- I can't 14:56:36
9 remember if it's the schedule or the statement of 14:56:38
10 financial affairs where you list current pending 14:56:40
11 litigation involving the Association, you take that, 14:56:42
12 subtract out the ones that are second amendment 14:56:54
13 advocacy and I think you have got the universe 14:56:49
14 there. 14:56:53
15 Q. How does this bankruptcy assist the NRA in 14:57:06
16 reincorporating in Texas? 14:57:09
17 A. Well, ultimately the proposed 14:57:11
18 reorganization -- the plan proposed to the Court 14:57:16
19 would include provisions to reincorporate the NRA 14:57:21
20 with court approval. 14:57:26
21 Q. Has the NRA's litigation over the last 14:57:27
22 couple of years created a financial burden for the 14:57:30
23 NRA? 14:57:34
24 MR. CICILIANO (VIA ZOOM): I would 14:57:35
25 just object to the form of the question. 14:57:35

Page 263

1 A. Litigation -- I mean, litigation is always 14:57:44
2 a financial burden. If you spend one dollar on 14:57:46
3 litigation, it's a dollar that could be spent on 14:57:49
4 something else. 14:57:51
5 Q. So the answer to my question is yes, the 14:57:52
6 NRA's litigation over the last couple of years has 14:57:54
7 created a financial burden for the NRA? 14:57:57
8 MR. CICILIANO (VIA ZOOM): I just 14:58:00
9 object to the form of the burden. 14:58:02
10 A. Right. Litigation -- litigation is 14:58:03
11 inherently burdensome. 14:58:05
12 Q. So the answer to my question is yes? 14:58:07
13 A. I answered your question. 14:58:12
14 Q. No, you haven't. 14:58:14
15 Has the NRA's litigation over the last 14:58:15
16 couple of years created a financial burden for the 14:58:17
17 NRA? 14:58:20
18 A. Yes. 14:58:21
19 Q. And it's your testimony that all of the 14:58:24
20 litigation listed in the schedules has created a 14:58:28
21 financial burden? 14:58:32
22 MR. CICILIANO (VIA ZOOM): I just -- I 14:58:35
23 just object to the extent this has already been asked 14:58:37
24 and answered and the form. 14:58:41
25 Go ahead. 14:58:41

Page 264

1 A. Yeah. I mean, collectively -- 14:58:41
2 collectively it's a lot of cases. 14:58:44
3 Q. Did the NRA file for bankruptcy for 14:58:46
4 purposes of cost minimization? 14:58:57
5 MR. CICILIANO (VIA ZOOM): Objection 14:59:04
6 to form. 14:59:05
7 A. I think that falls -- I think that would 14:59:09
8 fall more in the financial aspect of the topic. 14:59:14
9 But, I mean, the cost reduction -- cost reduction 14:59:19
10 over the long run is absolutely a factor. 14:59:28
11 Q. The NRA has claimed that it is as 14:59:33
12 financially healthy as ever, right? 14:59:38
13 A. Right. 14:59:41
14 Q. So why was it unable to continue paying 14:59:42
15 the litigation costs associated with these lawsuits? 14:59:46
16 MR. CICILIANO (VIA ZOOM): I would 14:59:50
17 just object. First of all, it misstates the 14:59:50
18 testimony. Second, it's outside the scope. 14:59:52
19 Q. You can answer the question. 14:59:54
20 A. The NRA is in good financial condition. I 15:00:00
21 think the question would be, you know, could we be 15:00:05
22 in better financial condition, you know, once we -- 15:00:08
23 once we resolve these issues. I think the answer is 15:00:11
24 clearly yes. 15:00:15
25 Q. Was the NRA in financial distress as of 15:00:17

Page 265

67 (Pages 262 - 265)

| | |
|---|---|
| 1 January 15th, 2021? 15:00:19 | 1 me -- September 2020 and formalized by the board in 15:03:27 |
| 2 MR. CICILIANO (VIA ZOOM): I would 15:00:23 | 2 January '21. And other matters that the Brewer firm 15:03:31 |
| 3 just object to the form of the question as well as 15:00:23 | 3 is handling are overseen by me. 15:03:35 |
| 4 the fact that Ms. Rowling will be testifying as to 15:00:26 | 4 Q. All other legal matters? 15:03:44 |
| 5 the financial reasons under topic number 2. 15:00:29 | 5 A. Legal matters handled by the Brewer firm, 15:03:44 |
| 6 Q. You can answer the question. 15:00:32 | 6 yes. 15:03:47 |
| 7 A. No. We were in good financial condition 15:00:35 | 7 Q. Sure. So prior to -- prior to January 1st 15:03:47 |
| 8 as of the petition date. 15:00:37 | 8 of this year, all legal matters with respect to the 15:03:50 |
| 9 Q. What role did the New York Attorney 15:00:44 | 9 Brewer firm are overseen by you, right? 15:03:55 |
| 10 General's enforcement action play in the NRA's 15:00:46 | 10 A. No, not prior to January 1st. Prior to 15:03:58 |
| 11 bankruptcy filing? 15:00:51 | 11 September when the special litigation committee was 15:04:01 |
| 12 MR. CICILIANO (VIA ZOOM): I would 15:00:52 | 12 formed. 15:04:05 |
| 13 just object to the extent that it calls for 15:00:53 | 13 Q. Okay. So since that time, what has -- 15:04:05 |
| 14 attorney-client communications and/or work product. 15:00:55 | 14 what has been your involvement with the Brewer firm 15:04:09 |
| 15 A. So this is a little -- I have to say that 15:01:03 | 15 with respect to litigation or legal issues not 15:04:14 |
| 16 this is also somewhat outside the scope of my 15:01:06 | 16 related to the New York enforcement action? 15:04:19 |
| 17 preparation because of my role as a defendant in 15:01:09 | 17 MR. CICILIANO (VIA ZOOM): I'll just 15:04:23 |
| 18 that case. I'm not -- I'm not -- the New York AG 15:01:13 | 18 object on attorney-client privilege. Don't review 15:04:23 |
| 19 matter isn't -- isn't discussed with me routinely. 15:01:19 | 19 the nature of the communications with counsel. 15:04:25 |
| 20 Q. Well, but you're designated to testify 15:01:24 | 20 General topic matters you can give a 5,000-foot view. 15:04:27 |
| 21 about the reasons that the NRA filed for bankruptcy. 15:01:27 | 21 A. So -- so it would be just what you would 15:04:32 |
| 22 So was one of the reasons that the NRA 15:01:32 | 22 expect with any outside counsel, general counsel 15:04:36 |
| 23 filed for bankruptcy the New York enforcement 15:01:35 | 23 relationship. They brief me on what's going on in 15:04:40 |
| 24 action? 15:01:39 | 24 cases. They ask for my decisions or inputs where 15:04:43 |
| 25 MR. CICILIANO (VIA ZOOM): I also 15:01:39 | 25 necessary. I review the billing. And before and 15:04:48 |
| Page 266 | Page 268 |

| | |
|---|---|
| 1 identified that Ms. Rowling was identified on that 15:01:41 | 1 after September I review the billing for things that 15:04:57 |
| 2 plus he has already provided that all litigation was. 15:01:45 | 2 I'm not conflicted on. After September, those go to 15:05:00 |
| 3 A. So to extent it falls under the other 15:01:49 | 3 the special litigation committee. 15:05:04 |
| 4 umbrella that I talked about, then yes. But beyond 15:01:53 | 4 Q. And just to be clear, the things that 15:05:05 |
| 5 that I'm afraid I'll have to defer based on what I 15:01:58 | 5 you're conflicted on is -- are related to the New 15:05:07 |
| 6 said. 15:02:02 | 6 York enforcement action, right? 15:05:12 |
| 7 Q. But for the New York enforcement action, 15:02:03 | 7 A. New York and District of Columbia, because 15:05:13 |
| 8 would the NRA have filed for Chapter 11 bankruptcy? 15:02:06 | 8 the District of Columbia investigation was 15:05:16 |
| 9 MR. CICILIANO (VIA ZOOM): I just 15:02:09 | 9 coordinated with New York. 15:05:18 |
| 10 object; calls for speculation, outside the scope. 15:02:10 | 10 Q. Were you conflicted on issues relating to 15:05:21 |
| 11 A. And, you know, that's a hypothetical that 15:02:17 | 11 bankruptcy? 15:05:25 |
| 12 I just simply have not ever discussed. 15:02:19 | 12 A. No. 15:05:29 |
| 13 Q. Who at the NRA is in charge of -- let me 15:02:38 | 13 Q. Did -- let me ask it this way. Let's back 15:05:33 |
| 14 ask this question: Prior to January 1st, who at the 15:02:42 | 14 up a little bit. 15:05:38 |
| 15 NRA is in charge of oversight with respect to the 15:02:47 | 15 So you said that in the fall of 2020 you 15:05:39 |
| 16 Brewer law firm? 15:02:52 | 16 learned that the NRA was considering filing for 15:05:42 |
| 17 MR. CICILIANO (VIA ZOOM): January 1st 15:02:54 | 17 bankruptcy, right? 15:05:47 |
| 18 of what year? 15:02:55 | 18 A. I learned that the -- I learned that the 15:05:50 |
| 19 MR. MASON (VIA ZOOM): This year. 15:02:57 | 19 option was a possibility, yes. 15:05:52 |
| 20 A. Well, it's divided since the filing of the 15:02:59 | 20 Q. Okay. The NRA authorized the Brewer firm 15:05:56 |
| 21 New York AG case. The matters that involve the New 15:03:03 | 21 in the fall of 2020 to conduct various legal work 15:06:02 |
| 22 York and District of Columbia litigation and related 15:03:10 | 22 with respect to a potential bankruptcy; is that 15:06:06 |
| 23 matters that I would be conflicted on are overseen 15:03:14 | 23 fair? 15:06:09 |
| 24 by the special litigation committee originally 15:03:19 | 24 MR. CICILIANO (VIA ZOOM): I'll just 15:06:10 |
| 25 formed by President Meadows in September -- excuse 15:03:22 | 25 object to the extent it calls for attorney-client 15:06:12 |
| Page 267 | Page 269 |

68 (Pages 266 - 269)

1 privilege and work product. You can respond. 15:06:16
2 A. Yes. 15:06:19
3 Q. Did you authorize the Brewer firm to 15:06:22
4 conduct that bankruptcy-related work (audio 15:06:24
5 distortion)? 15:06:29
6 A. I'm sorry. The sound broke up terribly 15:06:29
7 there. 15:06:32
8 Q. Did you authorize the Brewer firm to 15:06:32
9 conduct that bankruptcy-related work in the fall of 15:06:35
10 2020? 15:06:38
11 A. No. 15:06:40
12 Q. Who did? 15:06:44
13 A. I mean, I didn't -- I didn't initiate or 15:06:45
14 approve it. 15:06:48
15 Q. Who on behalf of the NRA did initiate and 15:06:52
16 approve it? 15:06:56
17 MR. CICILIANO (VIA ZOOM): I just 15:06:59
18 object to the scope. 15:07:01
19 Where does this fit in. 15:07:07
20 MR. MASON (VIA ZOOM): It fits into 15:07:12
21 the Brewer firm topic. It fits into the reasons for 15:07:13
22 bankruptcy. It's going to fit into the employment 15:07:16
23 agreement that we're going to talk about. It's going 15:07:16
24 fit in compliance issues. 15:07:18
25 MR. CICILIANO (VIA ZOOM): I mean, as 15:07:23
Page 270

1 far as the authorization of the work done, I'm going 15:07:23
2 to direct you not to responds pursuant to the 15:07:25
3 attorney-client privilege. 15:07:29
4 MR. MASON (VIA ZOOM): Based on what? 15:07:30
5 Q. I'm asking the question: Who at the 15:07:31
6 National Rifle Association authorized the Brewer 15:07:33
7 firm to begin preparing bankruptcy work in the fall 15:07:35
8 of 2020? 15:07:39
9 MR. CICILIANO (VIA ZOOM): The problem 15:07:42
10 you have there is the assertion of what was 15:07:43
11 actually -- you're trying to get to the nature of the 15:07:45
12 actual advice -- 15:07:48
13 MR. MASON (VIA ZOOM): I'm not asking 15:07:49
14 about anything specific. I'm asking who authorized 15:07:50
15 it. 15:07:53
16 MR. CICILIANO (VIA ZOOM): Okay. You 15:07:53
17 are making an assumption about facts not in evidence 15:07:54
18 as to about what was authorized. I'm telling him not 15:07:56
19 to testify and he won't be testifying to things that 15:07:59
20 regard the attorney-client privilege and direction 15:08:02
21 given to counsel or vice versa. 15:08:04
22 Q. Mr. Frazer, do you know who at the NRA 15:08:07
23 authorized the Brewer firm to begin 15:08:10
24 bankruptcy-related work? 15:08:15
25 MR. CICILIANO (VIA ZOOM): I direct 15:08:16
Page 271

1 you not to respond. 15:08:17
2 MR. MASON (VIA ZOOM): I'm asking him 15:08:18
3 who. That is not protected by the attorney-client 15:08:19
4 privilege. 15:08:22
5 MR. CICILIANO (VIA ZOOM): You're 15:08:23
6 asking about -- you're asking about fundamentally. 15:08:24
7 It would be like asking who directed to file these 15:08:28
8 motions or who directed you to take these steps which 15:08:32
9 does invade the privacy of the attorney-client -- 15:08:34
10 MR. MASON (VIA ZOOM): No, I'm not. 15:08:35
11 Q. I'm asking, Mr. Frazer, as you sit here 15:08:35
12 today, do you know who at the National Rifle 15:08:38
13 Association authorized the Brewer firm to begin 15:08:42
14 bankruptcy-related work in the fall of 2020? 15:08:44
15 MR. CICILIANO (VIA ZOOM): And he's 15:08:47
16 being advised -- advice of counsel not to reveal 15:08:48
17 communications with the Brewer firm or the nature of 15:08:51
18 the communications because it necessarily presupposes 15:08:55
19 that a conversation happened. So if he admits or 15:08:57
20 denies that a conversation happened along those 15:08:59
21 lines, I'm telling him not to answer. You can take it 15:09:00
22 with the Court. We can met and confer about it after 15:09:03
23 this deposition. He's not going to answer those 15:09:03
24 questions. 15:09:06
25 Q. Mr. Frazer, as the general counsel of the 15:09:06
Page 272

1 NRA and an officer of the Court, are you going to 15:09:09
2 refuse to answer that question? 15:09:12
3 MR. CICILIANO (VIA ZOOM): First of 15:09:14
4 all, it's not his privilege to waive. It's the 15:09:16
5 debtor's privilege to waive. I'm directing you not 15:09:19
6 to answer. 15:09:21
7 MR. MASON (VIA ZOOM): I'm not asking 15:09:21
8 you. I'm asking the witness a question. 15:09:21
9 Q. Are you going to follow your counsel's 15:09:21
10 advice? 15:09:24
11 A. Yes, I am. 15:09:24
12 Q. Why did the NRA not disclose to its 15:09:29
13 general counsel that it authorized bankruptcy work 15:09:32
14 to begin in the fall of 2020? 15:09:35
15 MR. CICILIANO (VIA ZOOM): And I'll 15:09:38
16 direct you not to reveal legal advice as well as 15:09:38
17 communications that go to you in a legal aspect -- in 15:09:42
18 a legal context. I direct you not to answer. 15:09:45
19 Q. Are you going to follow your counsel's 15:09:47
20 advice? 15:09:49
21 A. Yes. 15:09:49
22 Q. And that is based upon what, 15:09:50
23 attorney-client communications? 15:09:53
24 MR. CICILIANO (VIA ZOOM): Yes. 15:09:57
25 A. Yes. 15:09:57
Page 273

69 (Pages 270 - 273)

1 Q. And who are the attorneys that were 15:09:59
2 involved in those attorney-client communications? 15:10:02
3 MR. CICILIANO (VIA ZOOM): I'm going 15:10:05
4 to object on the grounds that you're assuming there 15:10:07
5 are certain communications. The problem that you're 15:10:09
6 approaching this is you're assuming that that 15:10:11
7 communication happened and then asking him to 15:10:12
8 identify who was there which would invade the 15:10:14
9 province of the attorney-client privilege. I'm 15:10:17
10 directing him not to answer. 15:10:18
11 Q. Did Wayne LaPierre authorize the Brewer 15:10:28
12 firm to begin -- let me ask you this: Does the NRA 15:10:30
13 and the Brewer firm have an engagement letter 15:10:36
14 relating to its bankruptcy work? 15:10:39
15 MR. CICILIANO (VIA ZOOM): I believe, 15:10:43
16 Counsel, that any engagement letters would have had 15:10:44
17 to have been filed with the Court or application -- 15:10:48
18 MR. MASON (VIA ZOOM): You can stop 15:10:50
19 coaching the witness. It's a simple yes or no 15:10:51
20 question and it goes to topic number 3. 15:10:53
21 Q. Mr. Frazer, is there an engagement letter 15:10:55
22 between the National Rifle Association and the 15:10:58
23 Brewer firm with respect to the bankruptcy? 15:10:59
24 MR. CICILIANO (VIA ZOOM): I'm not 15:11:02
25 coaching the witness. I'm asserting the objection. 15:11:03
Page 274

1 To the extent there's discussions and you're going 15:11:05
2 attempt to -- 15:11:05
3 MR. MASON (VIA ZOOM): I'm not asking 15:11:08
4 about -- I'm asking whether there's an engagement 15:11:09
5 letter. 15:11:11
6 MR. CICILIANO (VIA ZOOM): Counsel, 15:11:12
7 did you hear the admonishment from the court reporter 15:11:12
8 at the beginning that we can't talk over each other? 15:11:16
9 MR. MASON (VIA ZOOM): If you'd stop 15:11:16
10 objecting, then this is not going to be an issue. 15:11:17
11 It's simple yes or no question. 15:11:20
12 MR. CICILIANO (VIA ZOOM): Are you 15:11:21
13 saying that I don't have the right to object here 15:11:23
14 because I absolutely have a right to object to 15:11:24
15 protect the client's privilege issues. So what I'm 15:11:26
16 saying -- 15:11:28
17 MR. MASON (VIA ZOOM): You're 15:11:29
18 asserting improper objections and coaching the 15:11:30
19 witness. 15:11:32
20 Q. Mr. Frazer, as a representative of the 15:11:33
21 NRA, does the NRA have an engagement letter with the 15:11:35
22 Brewer law firm relating to its bankruptcy work? 15:11:39
23 MR. CICILIANO (VIA ZOOM): Again, I 15:11:42
24 would object on the attorney-client privilege with 15:11:45
25 regards to not necessarily the existence of an 15:11:47
Page 275

1 engaged letter but the nature of -- I guess, are you 15:11:50
2 asking him if they specifically have an engagement 15:11:54
3 letter that says file bankruptcy. 15:11:57
4 MR. MASON (VIA ZOOM): I'm asking for 15:11:59
5 this witness -- 15:11:59
6 Q. Mr. Frazer, are you going to follow your 15:12:01
7 counsel's advice and answer -- and refuse to answer 15:12:04
8 my question? 15:12:06
9 A. I'm sorry. I may have lost track here. 15:12:07
10 But do we have an instruction not to answer? 15:12:11
11 MR. CICILIANO (VIA ZOOM): I'm looking 15:12:11
12 here. I don't see -- first of all, I don't see a 15:12:16
13 topic that says frankly any engagement agreement. It 15:12:17
14 says, Matters concerning the Brewer firm. That's 15:12:23
15 large -- 15:12:24
16 MR. MASON (VIA ZOOM): And look at B, 15:12:25
17 the services the Brewer firm has provided to NRA 15:12:26
18 since January of 2018, including all legal matters 15:12:28
19 and public relation services. 15:12:31
20 MR. CICILIANO (VIA ZOOM): Right. 15:12:33
21 That is true. That's also constrained by the 15:12:34
22 attorney-client privilege. It does not ask for a 15:12:36
23 date or when or if an engagement agreement was 15:12:40
24 identified or executed. 15:12:43
25 Counsel, I do believe that if there is 15:12:45
Page 276

1 an engagement letter or agreement in the filings, the 15:12:47
2 application with the Brewer firm, that's a matter of 15:12:51
3 public record. 15:12:52
4 MR. MASON (VIA ZOOM): Well, then the 15:12:53
5 witness should be able to answer that question. 15:12:54
6 Q. Mr. Frazer, I'll ask you again. Does the 15:12:55
7 NRA have a separate engagement agreement with the 15:12:58
8 Brewer firm relating to its bankruptcy work? 15:13:02
9 MR. CICILIANO (VIA ZOOM): And I would 15:13:05
10 just object to the scope. And if you know what's 15:13:06
11 attached or whatever in the bankruptcy filings, you 15:13:09
12 can reveal it. 15:13:12
13 A. I'm sorry, we're back and forth. I don't 15:13:15
14 remember what's attached to the filings. So I 15:13:18
15 apologize, I just -- I don't remember what was 15:13:23
16 attached there, but I don't think there's a separate 15:13:26
17 engagement letter. 15:13:29
18 Q. Who at the National Rifle Association was 15:13:35
19 directing the legal work that the Brewer firm was 15:13:40
20 conducting in the fall of 2020? 15:13:46
21 MR. CICILIANO (VIA ZOOM): Objection 15:13:51
22 to vague. 15:13:51
23 But go ahead. 15:13:52
24 A. Which -- which legal work are you 15:13:53
25 referring to? Generally speaking -- 15:13:54
Page 277

70 (Pages 274 - 277)

1 Q. Any -- 15:13:56
2 A. Generally speaking I was. Well, as I said 15:13:56
3 earlier, I was except with respect to the matters 15:14:00
4 under the special litigation committee. 15:14:06
5 Q. And with respect to the matters relating 15:14:06
6 to the bankruptcy work, right? 15:14:09
7 A. Huh? 15:14:14
8 Q. I said and with respect to the bankruptcy 15:14:14
9 work that the Brewer firm had been doing as well, 15:14:17
10 right? 15:14:21
11 MR. CICILIANO (VIA ZOOM): What was 15:14:23
12 the time frame here? 15:14:24
13 THE WITNESS (VIA ZOOM) (VIA ZOOM): 15:14:27
14 Last fall. 15:14:27
15 MR. CICILIANO (VIA ZOOM): And we have 15:14:29
16 already -- I think we have already asserted the 15:14:29
17 attorney-client privilege as to the nature of any, I 15:14:31
18 guess, exact work that occurred before then. With 15:14:35
19 respect to that it's not public. 15:14:37
20 Q. And, again I'm not asking about any exact 15:14:41
21 work. 15:14:43
22 So Mr. Frazer, are you going to refuse to 15:14:43
23 answer my question? 15:14:45
24 A. So your question is who was directing -- 15:14:49
25 I'm sorry. Can you repeat your question? 15:14:52

Page 278

1 Q. Who at the National Rifle Association was 15:14:55
2 directing the Brewer firm to do bankruptcy-related 15:14:59
3 work in the fall of 2020? 15:15:03
4 MR. CICILIANO (VIA ZOOM): I would, 15:15:05
5 again, assert the attorney-client privilege and 15:15:06
6 direct you not to answer. 15:15:08
7 THE WITNESS (VIA ZOOM): 15:15:09
8 Okay. 15:15:09
9 Q. Are you going to follow your counsel's 15:15:09
10 instructions? 15:15:12
11 A. Yes. 15:15:12
12 Q. Just to be clear, you are not going to 15:15:13
13 disclose the identity of the individual or 15:15:17
14 individuals? You're refusing to answer -- 15:15:20
15 A. So -- 15:15:20
16 Q. You're refusing to answer that question, 15:15:25
17 Mr. Frazer? 15:15:27
18 MR. CICILIANO (VIA ZOOM): That's not 15:15:28
19 exactly -- that's not exactly -- as we have already 15:15:31
20 discussed, do you want to take a break? 15:15:32
21 THE WITNESS (VIA ZOOM): 15:15:35
22 Recess for a minute. 15:15:35
23 MR. CICILIANO (VIA ZOOM): Let's go 15:15:36
24 ahead and take a break for a minute. 15:15:37
25 THE VIDEOGRAPHER (VIA ZOOM): 15:15:39

Page 279

1 Everybody agree? Going off the record. 15:15:40
2 (Recess 3:15 p.m. to 3:24 p.m.) 15:15:47
3 THE VIDEOGRAPHER (VIA ZOOM): Back on 15:24:22
4 the record at 3:24. 15:24:23
5 Q. Mr. Frazer, did you have a chance to 15:24:26
6 consult with your counsel during the break? 15:24:27
7 A. I did. 15:24:30
8 MR. CICILIANO (VIA ZOOM): To make a 15:24:34
9 record, Mr. Mason, during the break we consulted on 15:24:36
10 the nature of the questions as well as 15:24:41
11 attorney-client communications that he has had. It 15:24:42
12 this time we will continue to assert the 15:24:43
13 attorney-client privilege. 15:24:45
14 However, with respect to requests to 15:24:46
15 identify persons, the witness can generally identify 15:24:47
16 the persons to which the Brewer firm took direction 15:24:50
17 from disambiguous -- or disambiguated from any 15:24:55
18 specific engagement assignment or task. 15:24:59
19 Q. Okay. Let's see -- let's go back. 15:25:04
20 Mr. Frazer, you testified previously that 15:25:10
21 the Brewer firm was authorized to conduct 15:25:14
22 bankruptcy-related work in the fall of 2020. Am I 15:25:18
23 correct about that? 15:25:23
24 MR. CICILIANO (VIA ZOOM): I would 15:25:25
25 object to misstates testimony. I would direct you 15:25:25

Page 280

1 not to answer as to what the Brewer firm was doing 15:25:33
2 pursuant to the direction of clients. 15:25:36
3 Q. They have disclosed $900,000 worth of 15:25:42
4 bankruptcy-related work on their schedules in fall 15:25:44
5 of 2020. So unless you're going to tell me -- so 15:25:47
6 let me ask you this, Mr. Frazer: Did the Brewer law 15:25:52
7 firm conduct legal work with respect to this 15:25:58
8 bankruptcy in the fall and later part of 2020? 15:26:01
9 MR. CICILIANO (VIA ZOOM): And, 15:26:07
10 Mr. Mason, if you telling me that's reflected in 15:26:08
11 their schedules, then, I mean, that's reflected on 15:26:11
12 their schedules. I'm going to caution the witness -- 15:26:13
13 MR. MASON (VIA ZOOM): You can quit 15:26:15
14 coaching the witness. It's a yes or no question. 15:26:17
15 MR. CICILIANO (VIA ZOOM): It's not a 15:26:19
16 yes or no question. What you're telling me is a fact 15:26:20
17 that I may not necessarily be aware of. So if you're 15:26:22
18 telling me it's on the schedules -- and I think as we 15:26:24
19 have disclosed in this, there's a lot going on. We 15:26:27
20 have fairly compartmentalized idea. I haven't 15:26:30
21 prepared the schedule. In fact, I haven't looked at 15:26:32
22 the schedules. So if it's on there and you're 15:26:34
23 telling me the time period -- 15:26:35
24 MR. MASON (VIA ZOOM): That's fine. 15:26:38
25 I'm not going to sit and argue with you about what 15:26:38

Page 281

71 (Pages 278 - 281)

1 you should or should not know. We're all under a   15:26:40
2 tightened time schedule here.                    15:26:41
3        So I'm just going to make a record   15:26:43
4 again and I'm going to object to your speaking   15:26:45
5 objects to virtually every single one of my   15:26:47
6 questions. And we will be going and asking for   15:26:49
7 additional time based upon -- based upon this. So   15:26:52
8 let me ask -- let me ask some more questions.   15:26:56
9    Q. Mr. Frazer, did the Brewer law firm   15:26:59
10 conduct bankruptcy-related work in the fall of 2020?   15:27:04
11        MR. CICILIANO (VIA ZOOM): And, again,   15:27:08
12 I'll object here pursuant to the attorney-client   15:27:09
13 privilege and direct you to the statements and   15:27:12
14 schedules which you claim show that they did and   15:27:14
15 direct you not to answer regarding the work that the   15:27:17
16 Brewer firm conducted.                    15:27:20
17    Q. Are you going to follow your counsel's   15:27:22
18 instructions?                          15:27:24
19    A. Yes.                           15:27:25
20    Q. Just to be clear, you are not going to   15:27:27
21 answer my question yes or no as to whether the   15:27:29
22 Brewer law firm did any legal work in the fall of   15:27:32
23 2020 with respect to this bankruptcy?   15:27:36
24        MR. CICILIANO (VIA ZOOM): Brian,   15:27:42
25 again --                             15:27:44

Page 282

1    Q. You're refusing to answer my question,   15:27:44
2 Mr. Frazer?                          15:27:47
3        MR. CICILIANO (VIA ZOOM): And I'm   15:27:47
4 going to assert an objection here. An objection has   15:27:48
5 been asserted. I need to see the schedules. And   15:27:53
6 consistent with those schedules he can testify   15:27:54
7 because that's in the public record.   15:27:57
8        But beyond and until I can see them,   15:27:58
9 I'm directing him not to answer. So if you want to   15:28:00
10 provide them, you want to send them over, I'll take a   15:28:02
11 look at them. We can have that discussion. I'll let   15:28:05
12 you ask questions.                      15:28:07
13        In fact, if this is going to go to a   15:28:08
14 second day, which we've been told it would, perhaps   15:28:09
15 we can confer on that and I would let him testify   15:28:10
16 consistently to that. But as I sit here today on the   15:28:13
17 spot, I'm directing him not to answer.   15:28:14
18    Q. Are you going to follow your counsel's   15:28:16
19 instructions?                         15:28:19
20    A. Yes.                          15:28:19
21    Q. Mr. Frazer, were you personally aware that   15:28:20
22 the Brewer law firm was doing any bankruptcy-related   15:28:22
23 work for the NRA in the fall of 2020?   15:28:25
24        MR. CICILIANO (VIA ZOOM): Same   15:28:29
25 objection. Direct you not to answer.   15:28:30

Page 283

1    Q. Are you going to follow your counsel's   15:28:32
2 instructions as to whether you personally knew?   15:28:34
3        THE WITNESS (VIA ZOOM) (VIA ZOOM):   15:28:44
4 Can we talk about this again? Can we confer briefly?   15:28:44
5        MR. CICILIANO (VIA ZOOM): Yes, we can   15:28:48
6 confer.                             15:28:49
7        THE WITNESS (VIA ZOOM): I   15:28:50
8 apologize, gentlemen.                    15:28:50
9        THE VIDEOGRAPHER (VIA ZOOM): We're   15:28:53
10 going off the record at 3:28. We're off the record.   15:28:53
11        (Recess 3:28 p.m. to 3:34 p.m.)   15:29:01
12        THE VIDEOGRAPHER (VIA ZOOM): We're   15:34:53
13 back on the record at 3:35.   15:34:59
14    Q. Mr. Frazer, did you have personal   15:35:04
15 knowledge that the Brewer firm was conducting legal   15:35:07
16 work with respect to this bankruptcy in the fall of   15:35:11
17 2020?                              15:35:17
18    A. Yes.                          15:35:18
19    Q. When did you first learn that?   15:35:22
20    A. At some point in the fall of 2020.   15:35:26
21    Q. Was that -- sorry. Go ahead.   15:35:30
22    A. I'm sorry. I can't pinpoint a month for   15:35:33
23 you.                               15:35:37
24    Q. Was that at the --                15:35:37
25        MR. CICILIANO (VIA ZOOM): Counsel,   15:35:38

Page 284

1 just to make the record clear, I'm withdrawing the   15:35:39
2 objection to the extent it applies to the time period   15:35:41
3 in which he knows it was occurring, the general   15:35:44
4 amount of those legal bills and the fact some sort of   15:35:47
5 analysis was going on. I maintain the objection to   15:35:49
6 the specific results of the analysis or the   15:35:52
7 individual direction that the law firm was given.   15:35:54
8        MR. MASON (VIA ZOOM): Okay. So   15:36:01
9 basically you're withdrawing all of your objections   15:36:01
10 to questions that I didn't ask.   15:36:05
11        MR. CICILIANO (VIA ZOOM): I don't   15:36:08
12 think that's -- I don't think that's accurate. But   15:36:09
13 I'm telling you that's where the objection stands.   15:36:11
14 So I let him answer the question. Continue and we'll   15:36:14
15 handle it there.                       15:36:16
16    Q. So let's take a step back then.   15:36:17
17        Mr. Frazer, when was the Brewer firm first   15:36:19
18 authorized to begin bankruptcy-related work?   15:36:24
19    A. I don't have a date for that.   15:36:32
20    Q. Did you authorize it?   15:36:36
21        MR. CICILIANO (VIA ZOOM): And I would   15:36:41
22 just object to the extent it calls for   15:36:42
23 attorney-client communication. But you can tell him   15:36:45
24 who communicated with the Brewer firm generally   15:36:47
25 regarding the subject matter.   15:36:50

Page 285

72 (Pages 282 - 285)

1   A. So -- so in addition to me, the people who   15:36:55
2 were communicating with the Brewer firm regularly,   15:36:59
3 you know, regarding -- regarding its scope and   15:37:05
4 activities would include Wayne LaPierre and the   15:37:08
5 members of the special litigation committee.   15:37:11
6   Q. Anyone else?   15:37:15
7   A. Board counsel Mr. Davis, Wit Davis.   15:37:19
8   Q. Did you personally authorize the Brewer   15:37:27
9 firm to conduct bankruptcy-related work in 2020?   15:37:36
10   A. No.   15:37:38
11   Q. Who at the NRA authorized the Brewer firm   15:37:44
12 to begin bankruptcy-related work in 2020?   15:37:48
13     MR. CICILIANO (VIA ZOOM): I just   15:37:53
14 object to the term bankruptcy-related work and direct   15:37:54
15 you not to disclose the content of any communications   15:37:58
16 with counsel.   15:38:04
17   A. I don't know specifically who communicated   15:38:05
18 that. I would describe -- described the other   15:38:07
19 individuals who would generally communicate with the   15:38:09
20 firm and give direction to the firm.   15:38:12
21   Q. Did Mr. LaPierre know that the Brewer firm   15:38:16
22 was conducting bankruptcy-related work in 2020?   15:38:21
23     MR. CICILIANO (VIA ZOOM): Objection;   15:38:28
24 calls for speculation, calls for attorney-client   15:38:30
25 communications. Direct you not to answer.   15:38:32
                        Page 286

1   Q. Are you going to follow your counsel's   15:38:35
2 instruction?   15:38:38
3   A. Yes.   15:38:38
4   Q. Did Wayne LaPierre authorize the Brewer   15:38:49
5 law firm to begin bankruptcy-related work in the   15:38:55
6 fall of 2020?   15:39:00
7     MR. CICILIANO (VIA ZOOM): Same   15:39:02
8 objection as well as scope.   15:39:03
9     THE WITNESS (VIA ZOOM) (VIA ZOOM): Do   15:39:06
10 I answer?   15:39:07
11     MR. CICILIANO (VIA ZOOM): Direct you   15:39:08
12 not to answer.   15:39:09
13   Q. I didn't hear that. Are you refusing to   15:39:11
14 answer that question, too, Mr. Frazer?   15:39:14
15     MR. CICILIANO (VIA ZOOM): Yes.   15:39:17
16   A. Yes.   15:39:18
17   Q. Did Ms. Meadows authorize the Brewer law   15:39:21
18 firm to begin bankruptcy-related work in 2020?   15:39:27
19     MR. CICILIANO (VIA ZOOM): That's the   15:39:34
20 same objection.   15:39:34
21   Q. Are you going to follow your counsel's   15:39:35
22 instruction?   15:39:37
23   A. Yes.   15:39:38
24   Q. What about with respect to Mr. Cotton and   15:39:40
25 Mr. Lee, did either one of them authorize the Brewer   15:39:43
                        Page 287

1 law firm to begin doing any legal work relating to   15:39:50
2 bankruptcy in 2020?   15:39:54
3     MR. CICILIANO (VIA ZOOM): It's the   15:39:57
4 same objection. Instruct you not to answer.   15:39:58
5   Q. Are you going to follow your counsel's   15:40:02
6 instruction?   15:40:05
7   A. Yes.   15:40:05
8   Q. I just want to be sure that the record is   15:40:05
9 absolutely clear here because all of this goes to   15:40:09
10 the fundamental issues that we are here about in the   15:40:11
11 filing of this bankruptcy.   15:40:15
12   So, Mr. Frazer, do you have personal   15:40:17
13 knowledge of the individual or individuals that   15:40:20
14 authorized the Brewer law firm to begin doing any   15:40:26
15 bankruptcy-related work in 2020?   15:40:31
16     MR. CICILIANO (VIA ZOOM): I would   15:40:34
17 object on scope. He's here testifying as a 30(b)(6)   15:40:35
18 witness, not based on his individual knowledge and   15:40:38
19 otherwise would direct him not to respond with --   15:40:39
20 consistent with prior instruction.   15:40:43
21   Q. Are you going refuse to answer my   15:40:46
22 question?   15:40:48
23   A. Yes.   15:40:50
24   Q. As to whether or not you have personal   15:40:53
25 knowledge, you're going to refuse to answer my   15:40:55
                        Page 288

1 question?   15:40:57
2     MR. CICILIANO (VIA ZOOM): It's   15:40:57
3 outside the scope.   15:40:58
4   Q. Mr. Frazer, we're going to ask you the   15:41:02
5 same question on Thursday. We'll play this tape for   15:41:05
6 Judge Hail tomorrow if we have to, so I'll ask you   15:41:09
7 again.   15:41:12
8   Do you have personal knowledge of who   15:41:13
9 authorized the Brewer firm to begin   15:41:17
10 bankruptcy-related work in 2020?   15:41:20
11     MR. CICILIANO (VIA ZOOM): He's here   15:41:23
12 to testify on behalf of the NRA and I direct you not   15:41:24
13 to answer based on attorney-client communication with   15:41:28
14 respect to the rest.   15:41:29
15   Q. Mr. Frazer, as general counsel and an   15:41:30
16 officer of the Court, are you going to refuse to   15:41:32
17 answer that question?   15:41:34
18     MR. CICILIANO (VIA ZOOM): Counsel, I   15:41:37
19 warned you about, I guess, insinuating that you're   15:41:39
20 going to take professional action against the witness   15:41:41
21 who is being directed by the client not to respond.   15:41:43
22     MR. MASON (VIA ZOOM): You can stop   15:41:47
23 the speaking objections.   15:41:49
24   Q. Mr. Frazer, are you going to follow your   15:41:49
25 counsel's instruction and refuse to answer my   15:41:51
                        Page 289

73 (Pages 286 - 289)

1 question? 15:41:54
2 THE WITNESS (VIA ZOOM) (VIA ZOOM): 15:41:57
3 May I confer with counsel again? I'm sorry for the 15:41:58
4 interruptions. I just want to -- I just want to make 15:42:00
5 sure that I'm acting appropriately. 15:42:03
6 MR. MASON (VIA ZOOM): Okay. 15:42:06
7 THE VIDEOGRAPHER (VIA ZOOM): 15:42:09
8 Everybody agree? Going off the record at 3:42. 15:42:10
9 We're off the record. 15:42:14
10 (Recess 3:42 p.m. to 3:48 p.m.) 15:42:17
11 THE VIDEOGRAPHER (VIA ZOOM): We're 15:48:19
12 back on the record at 3:48. 15:48:19
13 Q. I'm just going to go ahead and note that 15:48:22
14 we're going to move on, that we have basically 15:48:25
15 wasted the last hour arguing about privileged stuff. 15:48:27
16 I think that that the privilege objections are 15:48:29
17 completely unfounded. I don't think that the 15:48:34
18 witness has been prepared on topic number 3, and 15:48:36
19 we'll be taking this up with the court. 15:48:39
20 So with that said -- 15:48:42
21 MR. CICILIANO (VIA ZOOM): I just want 15:48:43
22 to tell you you can ask him if he has percipient 15:48:44
23 knowledge. 15:48:48
24 MR. MASON (VIA ZOOM): Are we going to 15:48:49
25 get our time back that we just wasted for the last 15:48:50

Page 290

1 hour? Can we reach an agreement right now that we're 15:48:54
2 going to get our time back? 15:48:57
3 MR. CICILIANO (VIA ZOOM): So first of 15:48:59
4 all, we had several breaks in there so that time 15:48:59
5 doesn't count for time on the record so you don't 15:49:01
6 have to get that one back. As far as the others, 15:49:02
7 we'd have to take it on a case-by-case. 15:49:02
8 I think quite a few of your questions 15:49:05
9 went outside the bounds. And as I told you before, 15:49:07
10 you know, I changed -- that changed. I withdrew the 15:49:10
11 objection to the extent it applied to certain things 15:49:14
12 and so we can certainly we talk about it. You know, 15:49:16
13 we can quantify some of that time. I'm not 15:49:19
14 foreclosing it. 15:49:23
15 THE WITNESS (VIA ZOOM) (VIA ZOOM): A 15:49:26
16 settlement, as it were. 15:49:26
17 MR. CICILIANO (VIA ZOOM): I don't 15:49:29
18 know if it was a settlement. 15:49:30
19 MR. MASON (VIA ZOOM): Are we on the 15:49:35
20 record? 15:49:36
21 THE VIDEOGRAPHER (VIA ZOOM): Yes, we 15:49:36
22 are on the record. 15:49:36
23 Q. Mr. Frazer, do you have personal knowledge 15:49:36
24 as to who authorized the Brewer law firm to conduct 15:49:37
25 bankruptcy-related law work in 2020? 15:49:40

Page 291

1 A. No, I don't. 15:49:44
2 Q. Have you historically been involved in 15:49:47
3 reviewing employment agreements for officers? 15:49:50
4 A. Yes, some. 15:49:55
5 Q. Are there -- are there any agreements with 15:50:03
6 the exception of maybe an agreement for yourself 15:50:05
7 that you have not been involved with? 15:50:07
8 A. Obviously limited to my tenure with the 15:50:13
9 NRA, I was not involved in the most -- in the 2018 15:50:16
10 amendment for Wayne LaPierre's employment contract. 15:50:28
11 Q. When was the first -- when was the first 15:50:38
12 time that you learned that Mr. LaPierre was going to 15:50:39
13 potentially have a new employment agreement? 15:50:45
14 A. Just to be clear, which -- which -- 15:50:48
15 which -- 15:50:52
16 Q. Sure. 15:50:52
17 A. -- employment agreement are you referring 15:50:53
18 to? 15:50:55
19 Q. Bad question. Let me -- let me rephrase 15:50:55
20 it. 15:50:57
21 When was the first time that you knew that 15:50:58
22 an employment agreement was going to be presented to 15:51:02
23 the board for Mr. LaPierre on January 7, 2021? 15:51:06
24 A. So I couldn't point to a specific date or 15:51:10
25 even month, but I know that it was -- you know, it 15:51:16

Page 292

1 was probably a month or two before the board meeting 15:51:22
2 I knew that that might be considered. 15:51:24
3 Q. And how did you obtain that information? 15:51:27
4 A. Discussion with counsel. 15:51:30
5 Q. Which counsel? 15:51:34
6 A. I don't remember. Actually, it could have 15:51:36
7 been -- I don't remember. 15:51:41
8 Q. All right. Let's take a look at 15:51:45
9 Exhibit 109. 15:51:49
10 MR. CICILIANO (VIA ZOOM): I'm not 15:52:04
11 seeing it in the folder. 15:52:05
12 MR. MASON (VIA ZOOM): It may get -- 15:52:08
13 it may get dropped in there. I can share it. 15:52:09
14 MR. CICILIANO (VIA ZOOM): I'm 15:52:13
15 refreshing. Maybe it will take a second. 15:52:15
16 (Exhibit 109 previously marked.) 15:52:15
17 Q. So, Mr. Frazer, if I understand correctly, 15:52:19
18 on January 6th, there was an officer's compensation 15:52:22
19 committee meeting? 15:52:26
20 A. Yes. 15:52:28
21 Q. What was the purpose of that meeting? 15:52:29
22 A. The purpose of that meeting was to discuss 15:52:34
23 a new employment agreement with Mr. LaPierre to 15:52:41
24 supersede the previous one dated back to 2013 and 15:52:46
25 had been amended a couple times. 15:52:52

Page 293

74 (Pages 290 - 293)

1  Q. And I'll represent to you that the report  15:52:56
2  from that meeting states that an employment  15:53:00
3  agreement negotiated by counsel for the NRA and it  15:53:03
4  was counsel for Mr. LaPierre.  15:53:08
5  Do you agree with that?  15:53:11
6  A. That's my recollection of the document.  15:53:14
7  Is that the -- is that the exhibit that we're trying  15:53:18
8  to pull up here?  15:53:21
9  Q. I believe so, yeah.  15:53:22
10  A. It seems to still be having some  15:53:26
11  difficulties.  15:53:29
12  Q. Let's try this. Can you see -- can you  15:53:30
13  see that okay?  15:53:36
14  A. Yes.  15:53:36
15  MR. CICILIANO (VIA ZOOM): What number  15:53:40
16  was that, Brian?  15:53:41
17  MR. MASON (VIA ZOOM): 109.  15:53:42
18  Q. It says right down here, The committee was  15:53:45
19  presented with and considered an employment  15:53:47
20  agreement negotiated by counsel for the NRA and  15:53:49
21  counsel for Mr. LaPierre.  15:53:51
22  Do you see that?  15:53:53
23  MR. CICILIANO (VIA ZOOM): What page  15:53:56
24  is that?  15:53:56
25  MR. MASON (VIA ZOOM): Eleven. It's  15:53:57

Page 294

1  on the screen.  15:53:59
2  THE WITNESS (VIA ZOOM) (VIA ZOOM):  15:54:03
3  We're scrolling down this version because it's easier  15:54:03
4  to see.  15:54:06
5  A. Yes, I see it.  15:54:21
6  Q. Who was counsel for the NRA that  15:54:22
7  negotiated this agreement?  15:54:24
8  A. I don't -- I don't know with certainty,  15:54:34
9  but I believe it was the Brewer firm.  15:54:36
10  Q. Who was counsel for Mr. LaPierre that  15:54:39
11  negotiated this employment agreement?  15:54:40
12  A. That would have been Kent Correll,  15:54:43
13  C-o-r-r-e-l-l.  15:54:47
14  Q. And he is a former law partner of  15:54:50
15  Mr. Brewer, correct?  15:54:56
16  A. I don't recall if he was a partner. I  15:54:57
17  know they worked together in the past.  15:54:59
18  Q. Was he hired to represent Mr. LaPierre at  15:55:02
19  the recommendation of Mr. Brewer?  15:55:05
20  MR. CICILIANO (VIA ZOOM): I would  15:55:10
21  just object. It's outside the scope, potentially  15:55:11
22  calls for attorney-client communications.  15:55:14
23  A. Well, the recommendation would have been  15:55:22
24  made to Mr. LaPierre. So if any -- if there was  15:55:23
25  a -- any recommendation would have been made to  15:55:27

Page 295

1  Mr. LaPierre, so I don't think I have knowledge on  15:55:29
2  that.  15:55:32
3  Q. Who prepared the first draft of  15:55:35
4  Mr. LaPierre's employment agreement?  15:55:37
5  A. I don't know.  15:55:42
6  Q. Who was responsible for making revisions  15:55:45
7  to Mr. LaPierre's employment agreement?  15:55:48
8  MR. CICILIANO (VIA ZOOM): Objection;  15:55:54
9  vague.  15:55:56
10  A. Again, I don't know, with the caveat that  15:55:56
11  there was one provision added at -- added at the  15:56:05
12  request of the board. You see that mentioned in the  15:56:08
13  interlineation.  15:56:12
14  Q. Right. And that was at the January 7th  15:56:15
15  board meeting, correct?  15:56:17
16  A. Correct.  15:56:19
17  Q. So prior to this particular committee  15:56:20
18  meeting January 6th, who were all of the people that  15:56:24
19  reviewed the draft of Mr. LaPierre's employment  15:56:29
20  agreement?  15:56:31
21  A. I mean, other than presumably -- I'm  15:56:32
22  sorry, I don't have -- I don't have names of all of  15:56:42
23  the individuals. But obviously Mr. Correll is  15:56:44
24  LaPierre's counsel, LaPierre's only counsel that I'm  15:56:49
25  aware of.  15:56:53

Page 296

1  Q. So based on -- so the only people that you  15:56:54
2  are aware of that were reviewing and involved in the  15:56:57
3  negotiations with respect to this employment  15:57:01
4  agreement would have been the Brewer law firm and  15:57:04
5  Mr. Correll?  15:57:06
6  MR. CICILIANO (VIA ZOOM): Objection  15:57:09
7  to the extent it misstates testimony.  15:57:11
8  A. I'm not sure that's what I -- I'm not sure  15:57:12
9  that's what I said but -- and Mr. Davis as board  15:57:14
10  counsel may have been involved, but I don't know  15:57:19
11  that.  15:57:21
12  Q. Anyone else that was involved in the  15:57:23
13  preparation of Mr. LaPierre's employment agreement  15:57:25
14  prior to January 6th?  15:57:29
15  A. Not that I'm aware of.  15:57:34
16  Q. Do you know whether Mr. --  15:57:40
17  A. I mean, just -- just the committee members  15:57:42
18  presumably who approved it would have been involved  15:57:45
19  at some level.  15:57:50
20  Q. Do you know whether -- do you know whether  15:57:50
21  those committee members had knowledge and reviewed  15:57:53
22  the contract prior to January 6th?  15:57:56
23  A. Prior to January 6th, I don't know.  15:58:01
24  Q. Why was a choice of law provision not  15:58:06
25  included in the draft employment agreement that was  15:58:09

Page 297

75 (Pages 294 - 297)

1 presented to the board on January 6th?　　　15:58:14
2 　　　　MR. CICILIANO (VIA ZOOM): Just object 15:58:19
3 to the extent it calls for attorney-client privilege 15:58:20
4 or work product.　　　　15:58:22
5 　　A. I don't know.　　　15:58:23
6 　　Q. Who would know the answer to that　　15:58:26
7 question?　　　　15:58:27
8 　　A. Presumably counsel for one or both of the　15:58:30
9 parties.　　　　15:58:33
10 　　Q. So the Brewer firm or Mr. Correll, they　15:58:35
11 would be the best people to ask about that?　　15:58:38
12 　　A. Or Mr. Davis.　　　15:58:40
13 　　Q. In your experience as general counsel, is　15:58:54
14 it fairly to common to include a choice of law　15:58:56
15 provision in an employment contract?　　15:58:59
16 　　A. Yes.　　　　15:59:02
17 　　Q. Do you know whether there was any　　15:59:11
18 discussion relating to bankruptcy during this　15:59:12
19 January 6th, 2021, officer's compensation committee 15:59:18
20 meeting?　　　　15:59:22
21 　　　　MR. CICILIANO (VIA ZOOM): Objection 15:59:24
22 to the extent it would require you to disclose　15:59:25
23 attorney-client communications.　　15:59:27
24 　　A. I'm sorry, Brian. I'm thinking about　15:59:42
25 whether it falls under that. Are you -- are you --　15:59:45
Page 298

1 　　Q. Correct.　　　　16:06:06
2 　　A. On January 6. I don't have knowledge. I 16:06:17
3 didn't attend the meeting.　　16:06:15
4 　　Q. Did you take any steps -- well, let me　16:06:18
5 back up.　　　　16:06:20
6 　　The purpose of this meeting was to discuss 16:06:20
7 Mr. LaPierre's employment agreement, right?　16:06:23
8 　　A. Right.　　　　16:06:26
9 　　Q. And you're the --　　16:06:27
10 　　A. The committee meeting. The committee met 16:06:28
11 on the 6th and I did not attend that meeting.　16:06:31
12 　　Q. And you are designated as the corporate 16:06:35
13 representative relating to Mr. LaPierre's employment 16:06:39
14 agreement, right?　　　16:06:43
15 　　A. Yes.　　　　16:06:47
16 　　Q. What steps did you take to prepare　16:06:48
17 yourself to be able to testify on that topic here 16:06:51
18 today?　　　　16:06:56
19 　　A. I mean, I was already familiar with -- I 16:06:59
20 was familiar with the agreement and I reviewed the 16:07:05
21 prior agreements, the January 7th agreement,　16:07:11
22 January 7th, 2021, meeting supercedes.　16:07:17
23 　　Q. Did you speak with anyone that was present 16:07:20
24 at this January 6th meeting to determine what was 16:07:25
25 discussed or what happened in preparation for your 16:07:28
Page 300

1 are you talking about -- about whether there was　15:59:54
2 discussion of the choice of law clause during the　15:59:57
3 officer compensation committee meeting?　16:00:02
4 　　Q. I'm asking -- I'm asking whether there was 16:00:04
5 any discussion about bankruptcy during the officer's 16:00:06
6 compensation committee meeting on January 6th?　16:00:09
7 　　A. I'm sorry. I would like to confer with　16:00:12
8 counsel again.　　　16:00:16
9 　　　　MR. MASON (VIA ZOOM): Okay.　16:00:19
10 　　　　THE VIDEOGRAPHER (VIA ZOOM): We're　16:00:21
11 going off the record at 4:00 p.m. We're off the　16:00:22
12 record.　　　　16:00:26
13 　　(Recess 4:00 p.m. to 4:05 p.m.)　16:00:26
14 　　　　THE VIDEOGRAPHER (VIA ZOOM): We're　16:05:21
15 back on the record at 4:05.　　15:05:31
16 　　Q. Mr. Frazer, I believe the pending question 16:05:37
17 was, do you know whether there was any discussion 16:05:39
18 about bankruptcy during the January 6th, 2021,　16:05:42
19 officer's compensation committee meeting?　16:05:46
20 　　　　MR. CICILIANO (VIA ZOOM): And I would 16:05:52
21 just object to the extent things presented in the　16:05:53
22 executive session that are maintained are privileged. 16:05:55
23 　　A. Just to -- I'm sorry. So you're asking　16:05:59
24 about the -- at the -- at the meeting of the officer 16:06:03
25 compensation committee?　　16:06:05
Page 299

1 deposition today?　　　16:07:31
2 　　A. I did not.　　　16:07:32
3 　　Q. Now, you have previously testified that on 16:07:47
4 the -- at the board meeting on January 7th, there　16:07:55
5 was two executive sessions; is that correct?　16:07:58
6 　　A. Yes.　　　　16:08:02
7 　　Q. And you were present for the first　16:08:03
8 executive session?　　　16:08:06
9 　　A. Yes.　　　　16:08:08
10 　　Q. Were there any third-party guests present 16:08:13
11 during that executive session?　　16:08:17
12 　　A. No. The only people there were, you know, 16:08:21
13 board members, operational staff for the meeting and 16:08:35
14 the officers, officers and counsel.　16:08:42
15 　　Q. Does the NRA keep a record of -- a written 16:08:45
16 record of whether -- of when third-party guests are 16:08:53
17 present during executive session?　　16:08:57
18 　　A. No.　　　　16:09:00
19 　　Q. Has it always been like that?　16:09:05
20 　　A. I'm not aware of any changes.　16:09:08
21 　　Q. You testified there was three　16:09:17
22 attorneys in the room during that first executive 16:09:19
23 session, yourself, Ms. Rogers and Wit Davis; is that 16:09:21
24 correct?　　　　16:09:21
25 　　A. Remind me. I think that was my testimony 16:09:34
Page 301

76 (Pages 298 - 301)

1 on the 341?                                    16:09:37
2    Q.   Correct.                               16:09:38
3    A.   Those are the people who would be there as   16:09:40
4 counsel to the NRA or its board.  We have board   16:09:43
5 members who are -- who happen to be lawyers, but the   16:09:46
6 only people who are there as counsel were those.   16:09:48
7    Q.   Okay.  Without getting into any specifics   16:09:50
8 as to what was said, did yourself, Ms. Rogers or   16:09:54
9 Mr. Davis answer any questions with respect to   16:10:00
10 Mr. LaPierre's employment agreement?           16:10:04
11   A.   Yes.                                   16:10:08
12   Q.   Which one -- which attorneys did?      16:10:16
13   A.   I don't recall if Ms. Rogers answered any   16:10:19
14 questions.  I know that Mr. Davis did and I did.   16:10:22
15   Q.   Were there any discussions during that   16:10:26
16 executive session relating to Mr. LaPierre's   16:10:40
17 employment agreement and specifically the language   16:10:47
18 discussing reorganization?                     16:10:55
19        MR. CICILIANO (VIA ZOOM):  I just      16:11:00
20 object on attorney-client privilege and direct you   16:11:00
21 not to answer.                                 16:11:02
22   Q.   Are you going to follow your counsel's   16:11:03
23 instruction?                                   16:11:06
24   A.   Yes, I'm going to follow advice.       16:11:06
25   Q.   Mr. Frazer, at the time that           16:11:37

Page 302

1 Mr. LaPierre's employment agreement was approved at   16:11:40
2 the January 7th board meeting, did you personally   16:11:43
3 know that the language in that agreement was going   16:11:49
4 to be used as a basis for filing bankruptcy?    16:11:52
5        MR. CICILIANO (VIA ZOOM):  Object to    16:11:56
6 the extent it calls for attorney-client privilege or   16:11:57
7 work product.  Direct you not to answer.        16:12:02
8    Q.   I'm asking you personally.             16:12:04
9        MR. CICILIANO (VIA ZOOM):  Same         16:12:08
10 answer -- or same objection.                   16:12:11
11       THE WITNESS (VIA ZOOM) (VIA ZOOM):  So  16:12:15
12 I'm sorry, let me ask -- let me ask you to restate.   16:12:15
13 Is it -- is it -- is it an instruction not to answer   16:12:18
14 at all or not to answer to the extent that it would   16:12:21
15 reveal --                                      16:12:24
16       MR. CICILIANO (VIA ZOOM):  Not to       16:12:26
17 answer to the extent that it would reveal       16:12:27
18 communications with the client NRA or from outside   16:12:30
19 counsel as well as work product related to the issue.   16:12:35
20   A.   Okay.  Okay.  Can you -- can restate?  16:12:38
21   Q.   Sure.  Let me see if I can ask it again.   16:12:43
22       As of January 7th when Mr. LaPierre's   16:12:46
23 employment agreement was approved by the board, did   16:12:50
24 you personally understand as of that date that the   16:12:56
25 reorganized and restructure language in his   16:13:02

Page 303

1 employment agreement would be used as an alleged   16:13:05
2 basis to file Chapter 11 bankruptcy?           16:13:09
3    A.   No, I didn't.                          16:13:13
4    Q.   From the time that you had that initial   16:13:24
5 conversation with Ms. Rogers back in the fall and   16:13:26
6 learned about the possibility of bankruptcy until   16:13:29
7 January 15th, did you have any personal knowledge   16:13:38
8 that there was bankruptcy-related activity going on?   16:13:41
9        MR. CICILIANO (VIA ZOOM):  I just       16:13:48
10 object to the form and I think characterization of   16:13:49
11 the words.  But the question was he aware, I'm not   16:13:52
12 going to object to.                            16:13:56
13   A.   Yes.                                   16:13:57
14   Q.   What -- what time period did you become   16:14:03
15 aware of that?                                 16:14:05
16   A.   I'm pausing because I'm trying to      16:14:06
17 remember.  I believe it was sometime after     16:14:19
18 January 7th.                                   16:14:28
19   Q.   Mr. Frazer, you have been the general   16:14:42
20 counsel of the National Rifle Association for how   16:14:48
21 many years?                                    16:14:47
22   A.   Six years.                             16:14:49
23   Q.   Do you personally believe that you should   16:14:54
24 have been advised as to what was going on with the   16:14:57
25 bankruptcy before January 15th?                16:15:00

Page 304

1        MR. CICILIANO (VIA ZOOM):  I just       16:15:07
2 object.  He's not here in his personal capacity.   16:15:10
3 He's a 30(b)(6) witness.  Moreover, I think the   16:15:13
4 question is argumentative and not relevant and also   16:15:15
5 assumes facts, so...                           16:15:26
6        THE WITNESS (VIA ZOOM) (VIA ZOOM):  So  16:15:30
7 am I answering?                                16:15:31
8        MR. CICILIANO (VIA ZOOM):  You can      16:15:32
9 answer.                                        16:15:32
10   A.   Okay.  I would say that -- I would say   16:15:36
11 that normally that that's something you would expect   16:15:39
12 but there are also reasons to -- you know, to do   16:15:42
13 otherwise that I can't discuss on the basis of   16:15:49
14 privilege.                                     16:15:52
15   Q.   And who is that privilege with?  I'm    16:15:53
16 sorry, that's a bad question.                  16:15:57
17       So let me ask it this way:  Do you know  16:15:59
18 why that information was withheld from you?      16:16:06
19       MR. CICILIANO (VIA ZOOM):  Objection;   16:16:12
20 assumes facts.  And to the extent that it calls for   16:16:13
21 attorney-client privilege, I instruct you not to   16:16:16
22 respond.                                       16:16:22
23   Q.   Are you going to follow your counsel's   16:16:25
24 instruction?                                   16:16:27
25       THE WITNESS (VIA ZOOM) (VIA ZOOM):  So  16:16:28

Page 305

77 (Pages 302 - 305)

1 is it a direction not to respond at all? 16:16:28
2 MR. CICILIANO (VIA ZOOM): Yes. 16:16:30
3 A. Yes, I'm going to follow counsel's advice. 16:16:31
4 Q. So you're not -- okay. That's fine. 16:16:34
5 We'll take it up with Judge Hale. 16:16:36
6 MR. MASON (VIA ZOOM): Let's do this: 16:16:48
7 Let's go ahead and take a 5-minute break. Can we 16:16:48
8 figure out where we're at on time, please, too? 16:16:50
9 THE VIDEOGRAPHER (VIA ZOOM): Yes, if 16:16:53
10 we can go off the record, I'll tell you the time. 16:16:55
11 We're going off the record at 4:17. We're off the 16:16:58
12 record. 16:17:03
13 (Recess 4:17 p.m. to 4:27 p.m.) 16:17:04
14 THE VIDEOGRAPHER (VIA ZOOM): We're 16:26:50
15 back on the record at 4:27. 16:26:57
16 Q. Mr. Frazer, when did you personally become 16:27:06
17 aware of -- that the Neligan law firm had been 16:27:08
18 hired? 16:27:12
19 A. I believe on the -- on January 15th. 16:27:16
20 Q. Did the Neligan law firm have an 16:27:25
21 engagement with the Brewer law firm or the NRA? Let 16:27:28
22 me -- let me back up. That was -- that was a bad 16:27:36
23 question. 16:27:38
24 So I'll represent to you that according to 16:27:38
25 the bankruptcy schedules that have been filed, the 16:27:41
Page 306

1 Neligan law firm conducted bankruptcy-related work 16:27:44
2 in 2020. 16:27:48
3 Are you aware of that? 16:27:49
4 A. Yes. 16:27:50
5 Q. Who authorized the Neligan firm from the 16:27:54
6 NRA to conduct that work? 16:27:56
7 MR. CICILIANO (VIA ZOOM): And I just 16:27:59
8 object on the attorney-client privilege. 16:28:00
9 Q. You can answer the question. 16:28:05
10 MR. CICILIANO (VIA ZOOM): I direct 16:28:08
11 you not to answer. 16:28:09
12 Q. Are you going to follow your counsel's 16:28:10
13 advice? 16:28:12
14 A. Yes. 16:28:12
15 Q. Did the Neligan firm in 2020 have an 16:28:15
16 engagement agreement with the NRA or the Brewer 16:28:19
17 firm? 16:28:27
18 MR. CICILIANO (VIA ZOOM): Just 16:28:27
19 objection to foundation, but... 16:28:28
20 A. And I'm sorry, I don't recall. 16:28:30
21 Q. As the representative on topic number 3, 16:28:43
22 can you please describe all the work that the Brewer 16:28:46
23 firm -- or generally describe the work -- the 16:28:49
24 bankruptcy work that the Brewer firm has been 16:28:51
25 involved with before January 15th, 2021? 16:28:54
Page 307

1 MR. CICILIANO (VIA ZOOM): And I would 16:29:00
2 just object to the extent it calls for 16:29:02
3 attorney-client privilege and work product. 16:29:04
4 A. I don't know how -- 16:29:04
5 MR. CICILIANO (VIA ZOOM): I direct 16:29:09
6 you not to answer. 16:29:09
7 A. I was going to say I don't... 16:29:10
8 Q. Are you going to follow your counsel's 16:29:13
9 instruction? 16:29:17
10 A. I'm going to follow that advice. 16:29:17
11 Q. As of January 15th -- well, let me ask 16:29:21
12 this: As of January 15th -- 14th, who at the NRA 16:29:30
13 knew that the NRA was going to be filing for 16:29:35
14 bankruptcy? 16:29:38
15 MR. CICILIANO (VIA ZOOM): Objection; 16:29:39
16 calls for attorney-client privilege. 16:29:42
17 To the extent that it does, don't 16:29:42
18 respond. 16:29:45
19 A. So I don't know. 16:29:47
20 Q. You don't know? 16:29:49
21 A. As of January 14th, I don't know. 16:29:50
22 Q. Do you know of anyone that did not know as 16:30:01
23 of January 14th? 16:30:07
24 MR. CICILIANO (VIA ZOOM): Objection; 16:30:10
25 calls for speculation. 16:30:13
Page 308

1 And to the extent it relies on 16:30:14
2 attorney-client privilege, I direct you not to 16:30:16
3 answer. 16:30:19
4 A. So -- so should I -- I mean, should I 16:30:23
5 answer as to people that I know did not know? 16:30:27
6 MR. CICILIANO (VIA ZOOM): I mean, 16:30:35
7 unless it comes from -- was it imparted to you by 16:30:35
8 counsel? I don't know how you would answer that. I 16:30:40
9 mean, it's vague but... 16:30:41
10 A. I'm sorry, Brian. That's a -- that's a 16:30:48
11 little bit of a tough one to sort out. 16:30:51
12 Q. It's a fact. It's a fact. It's not 16:30:54
13 privilege. You can answer the question. 16:30:57
14 MR. CICILIANO (VIA ZOOM): I don't 16:31:05
15 necessarily agree with -- that there can't be a 16:31:06
16 privileged aspect to that. You're asking him who at 16:31:09
17 NRA didn't know presupposes that he has everybody's 16:31:12
18 knowledge which is the real problem with the 16:31:15
19 question. 16:31:17
20 MR. MASON (VIA ZOOM): I'm asking who 16:31:17
21 he knew -- who he now knows that was not aware that 16:31:18
22 the NRA was going to be filing for bankruptcy as of 16:31:22
23 January 14th or 15th. 16:31:25
24 MR. CICILIANO (VIA ZOOM): Across the 16:31:29
25 entire NRA? 16:31:31
Page 309

78 (Pages 306 - 309)

1 MR. MASON (VIA ZOOM): Whoever he 16:31:32
2 knows. 16:31:32
3 Q. You can answer the question. 16:31:37
4 A. Yeah, I know that Craig Spray learned 16:31:38
5 about it shortly after I did. 16:31:42
6 Q. Is that it? 16:31:46
7 A. You know, as to specific individuals that 16:31:49
8 I'm aware of. 16:31:55
9 Q. Did the -- did the Brewer law firm help 16:32:07
10 prepare the NRA's bankruptcy schedules prior to 16:32:10
11 January 15th of 2021? 16:32:14
12 MR. CICILIANO (VIA ZOOM): General 16:32:21
13 objection to the extent it calls for attorney-client 16:32:22
14 communications. 16:32:24
15 A. I actually don't know. 16:32:32
16 Q. Assuming that -- assuming that they did, 16:32:37
17 do you know who at the NRA provided them with 16:32:39
18 information to help in the preparation of those 16:32:44
19 schedules? 16:32:46
20 MR. CICILIANO (VIA ZOOM): I would 16:32:47
21 just object on the grounds it's an incomplete 16:32:48
22 hypothetical and you're asking for him to guess as to 16:32:50
23 who would have -- 16:32:53
24 MR. MASON (VIA ZOOM): You can stop 16:32:54
25 coaching the witness, Dylan. I'm going to be asking 16:32:56
Page 310

1 for a lot more time but you can stop coaching the 16:32:59
2 witness. 16:33:01
3 A. All of the -- all of the work on preparing 16:33:02
4 the schedules that I'm familiar with occurred after 16:33:04
5 the filing. 16:33:08
6 Q. You personally or you as the NRA? 16:33:11
7 A. I personally. 16:33:22
8 Q. The NRA is aware that -- in Ackerman's 16:33:27
9 motion and the New York Attorney General's motion 16:33:32
10 that we're here about right now, that there's 16:33:37
11 allegations relating to the Brewer firm, correct? 16:33:40
12 A. Yes. 16:33:44
13 Q. Is the Brewer firm actively involved -- 16:33:46
14 currently actively involved with issues relating to 16:33:51
15 the motion to dismiss and motion appoint a trustee? 16:33:57
16 MR. CICILIANO (VIA ZOOM): I would 16:34:03
17 just object to the extent it calls for 16:34:03
18 attorney-client privilege and work product and direct 16:34:06
19 you not to answer. 16:34:07
20 Q. Are you going to refuse to answer that 16:34:11
21 question? 16:34:13
22 A. I'm going to take counsel's advice. 16:34:13
23 Q. Was the NRA's board of directors told that 16:34:27
24 the NRA was going to be filing for bankruptcy prior 16:34:46
25 to January 15th, 2021? 16:34:48
Page 311

1 MR. CICILIANO (VIA ZOOM): I just 16:34:54
2 object to the attorney-client privilege and 16:34:55
3 communications that were conveyed by counsel to the 16:34:56
4 board and direct you not to answer. 16:34:59
5 Q. Are you going to follow your counsel's 16:35:02
6 instruction? 16:35:04
7 A. Yes, I'm going to follow counsel's advice. 16:35:04
8 Q. Was Mr. LaPierre's January 2021 employment 16:35:13
9 agreement intended to amend the NRA's bylaws? 16:35:18
10 A. No. 16:35:26
11 Q. When did the -- let me ask this: Who is 16:35:57
12 Marshall Smith? 16:36:04
13 A. Marshall Smith is an individual who was 16:36:06
14 initially retained to serve as chief restructuring 16:36:12
15 officer for the NRA in connection with this filing. 16:36:15
16 Q. When was he first retained? 16:36:22
17 A. I'm sorry. I don't recall. 16:36:25
18 Q. Who authorized his retention? 16:36:32
19 A. I'm sorry. I don't know that. 16:36:36
20 Q. Was he -- was he appointed as an officer 16:36:42
21 of the NRA? 16:36:49
22 A. No. 16:36:50
23 Q. Did he have any sort of contractual 16:36:53
24 agreement with the NRA? 16:37:02
25 MR. CICILIANO (VIA ZOOM): I just 16:37:04
Page 312

1 object to scope on here. 16:37:05
2 Which one does this go to, Counsel? 16:37:06
3 MR. MASON (VIA ZOOM): The Brewer firm 16:37:18
4 compliance. 16:37:14
5 MR. CICILIANO (VIA ZOOM): So are you 16:37:18
6 taking the position if the Brewer firm is involved 16:37:19
7 the witness had to have knowledge -- 16:37:22
8 Q. Let me ask you this -- let me ask you 16:37:24
9 this, Mr. Frazer. Do you know how Mr. Smith was 16:37:26
10 selected as potential CRO? 16:37:29
11 MR. CICILIANO (VIA ZOOM): Objection; 16:37:33
12 to the extent it calls for attorney-client 16:37:34
13 communications or work product. Direct you not to 16:37:38
14 answer. 16:37:41
15 THE WITNESS (VIA ZOOM) (VIA ZOOM): 16:37:41
16 Not to answer at all? 16:37:42
17 MR. CICILIANO (VIA ZOOM): If it 16:37:43
18 requires you to use attorney-client communication or 16:37:44
19 work product. 16:37:46
20 A. I think the announcement that went out to 16:37:49
21 the board stated Mr. Smith's qualifications. 16:37:53
22 MR. MASON (VIA ZOOM): I'll object as 16:37:18
23 nonresponsive. 16:38:02
24 Q. Let me ask it this way: Who was involved 16:38:06
25 in the decision to hire Mr. Smith? 16:38:08
Page 313

79 (Pages 310 - 313)

```
 1    A.  I don't know.                    16:38:14
 2    Q.  Are you aware that Mr. Smith had a prior  16:38:18
 3  relationship with Mr. Brewer?          16:38:21
 4    A.  I believe so.                    16:38:26
 5    Q.  You're also aware that Wit Davis, the  16:38:28
 6  general counsel to the NRA board, had a prior  16:38:31
 7  relationship with Mr. Brewer too, right?  16:38:35
 8        MR. CICILIANO (VIA ZOOM):  Let me just  16:38:37
 9  object.  This gets way outside the scope.  It doesn't  16:38:38
10  going to compliance and/or the Brewer firm.  It's  16:38:41
11  collateral to the issue.               16:38:45
12    A.  Mr. Davis, just to clarify, is not general  16:38:47
13  counsel to the board.  He is counsel to the board.  16:38:50
14  But he -- I'm aware -- and, yes, I'm aware he has a  16:38:52
15  prior relationship.                    16:38:57
16    Q.  Is Mr. Brewer part of the leadership team  16:38:59
17  at the NRA?                            16:39:04
18    A.  He's an important adviser to the NRA but  16:39:06
19  he's not -- he's not an officer or director or  16:39:09
20  employee obviously.                    16:39:13
21    Q.  You're familiar with the NRA website,  16:39:14
22  right?  You have seen it?               16:39:19
23    A.  Yes.                           16:39:19
24    Q.  Have you seen the section titled  16:39:20
25  Leadership Quotes?                     16:39:23
                                          Page 314
```

```
 1    A.  Yes.                           16:39:24
 2    Q.  Have you seen Mr. Brewer's quote as a  16:39:25
 3  leader of the NRA?                     16:39:30
 4    A.  I don't recall, but it has been some time  16:39:32
 5  that he -- some time since I have looked at that.  16:39:34
 6        MR. CICILIANO (VIA ZOOM):  That's  16:39:42
 7  actually outside the scope as well.     16:39:43
 8    Q.  Mr. Frazer, why was Sea Girt formed?  16:39:59
 9    A.  Sea Girt was formed as an entity to assist  16:40:04
10  in the potential restructuring and relocation of the  16:40:11
11  NRA.                                   16:40:15
12    Q.  And I understand that Mr. LaPierre  16:40:18
13  authorized the formation of Sea Girt; is that  16:40:21
14  correct?                               16:40:30
15    A.  I believe so.                   16:40:30
16    Q.  Did you have any personal knowledge that  16:40:32
17  Sea Girt was being incorporated in 2020?  16:40:34
18    A.  Yes, formed.  Not incorporated but formed,  16:40:37
19  yes.                                   16:40:46
20    Q.  Sure.  So you were advised in the fall of  16:40:46
21  2020 that an entity was going to be formed -- or Sea  16:40:50
22  Girt was going to be formed in Texas?   16:40:54
23        MR. CICILIANO (VIA ZOOM):  I would  16:40:57
24  just object to the extent it calls for  16:40:57
25  attorney-client communications.  Direct you not to  16:41:00
                                          Page 315
```

```
 1  answer if it does.                     16:41:03
 2        THE WITNESS (VIA ZOOM) (VIA ZOOM):  16:41:15
 3  Hang on a second.  May I confer with counsel?  16:41:15
 4        MR. MASON (VIA ZOOM):  Sure.      16:41:19
 5        THE WITNESS (VIA ZOOM) (VIA ZOOM):  16:41:19
 6  Thanks.                                16:41:20
 7        THE VIDEOGRAPHER (VIA ZOOM):  We're  16:41:20
 8  going off the record at 4:41.  We're off the record.  16:41:22
 9        (Recess 4:41 p.m. to 4:46 p.m.)  16:41:30
10        THE VIDEOGRAPHER (VIA ZOOM):  We're  16:45:57
11  back on the record at 4:46.            16:46:02
12        MR. MASON (VIA ZOOM):  Can we have the  16:46:05
13  question read back, please?            16:46:26
14        (Record read.)                  16:46:26
15    A.  I was asked to assist in the formation of  16:46:27
16  an entity, yes.                        16:46:30
17    Q.  Were you aware at that time that that  16:46:33
18  entity would then be used as a basis to file  16:46:35
19  bankruptcy in Texas?                   16:46:39
20        MR. CICILIANO (VIA ZOOM):  I object to  16:46:47
21  the extent that it calls for you to reveal  16:46:47
22  attorney-client communications.  Otherwise, you can  16:46:50
23  go ahead.                              16:46:52
24    A.  On that basis, I don't think I can answer  16:46:53
25  that one.                              16:46:55
                                          Page 316
```

```
 1    Q.  At the time that Sea Girt was formed, do  16:46:58
 2  you have an understanding of whether a Texas entity  16:47:01
 3  had to be formed by the NRA in order for the NRA to  16:47:03
 4  file bankruptcy in Texas?              16:47:07
 5        MR. CICILIANO (VIA ZOOM):  I would  16:47:11
 6  just object to the extent that it calls for you to  16:47:12
 7  reveal the attorney-client communications or work  16:47:14
 8  product.                               16:47:18
 9    A.  So same -- same answer.  I can't answer  16:47:18
10  that without discussing attorney-client  16:47:20
11  communications.                        16:47:22
12    Q.  And those attorney-client communications  16:47:23
13  are with the Brewer firm?              16:47:26
14    A.  Yes.                           16:47:31
15    Q.  As you sit here today, can you tell me any  16:47:32
16  other reason why Sea Girt was formed other than for  16:47:35
17  the purpose of securing venue for the NRA to file  16:47:38
18  for bankruptcy and trying to reincorporate in Texas?  16:47:41
19        MR. CICILIANO (VIA ZOOM):  I would  16:47:46
20  just object and say it misstates his prior testimony.  16:47:47
21        Go ahead.                       16:47:52
22    A.  Let me think about it.  You know, I think  16:47:53
23  it's not uncommon for corporations to form  16:48:01
24  subsidiaries to carry out missions and assistance of  16:48:07
25  the corporation.                       16:48:11
                                          Page 317
```

80 (Pages 314 - 317)

1    Q.  Is it uncommon for a nonprofit          16:48:14
2  organization to form for-profit entities?    16:48:17
3         MR. CICILIANO (VIA ZOOM):  I would    16:48:24
4  object and say it's outside the scope and calls for  16:48:24
5  speculation but...                           16:48:27
6    A.  No.  The answer is not at all.  The NRA  16:48:28
7  itself has actually formed for-profit entities in  16:48:31
8  the past.                                     16:48:33
9    Q.  And if I understand the prior testimony  16:48:35
10 from the 341 meeting, the only for-profit entity  16:48:36
11 that is currently in place is Sea Girt right now; is  16:48:41
12 that correct?                                 16:48:47
13   A.  No, that's not correct.               16:48:47
14   Q.  What are the other ones?              16:48:49
15   A.  So we have NRA Holdings Inc., which is a  16:48:51
16 Virginia for-profit corporation.  We have Wingate  16:48:56
17 Church Insurance Services, which is a Delaware  16:49:04
18 for-profit corporation that's never had a board  16:49:07
19 appointed.  And we have Lexington & Concord Holdings  16:49:14
20 which is a Delaware nonprofit LLC.            16:49:18
21   Q.  Why didn't the NRA put any of those   16:49:22
22 subsidiaries into bankruptcy?                 16:49:24
23        MR. CICILIANO (VIA ZOOM):  Objection;  16:49:28
24 calls for attorney-client privilege and work product.  16:49:30
25 I direct you not to answer unless otherwise it's  16:49:31

Page 318

1  outside of that.                             16:49:35
2    Q.  Are you going to follow your counsel's  16:49:38
3  advice?                                       16:49:41
4    A.  Let me think about the question again a  16:49:42
5  moment.  You know, I want to try to answer questions  16:49:45
6  where I can.  I think the answer is I don't know.  16:49:47
7    Q.  In or around -- or let's just say in 2020,  16:50:03
8  did the NRA form any other for-profit entities in  16:50:06
9  other states to explore a possible reorganization?  16:50:10
10   A.  No.                                    16:50:15
11   Q.  Whose idea was it to form Sea Girt?    16:50:21
12        MR. CICILIANO (VIA ZOOM):  Objection;  16:50:26
13 to the extent that it calls for personal       16:50:28
14 attorney-client privilege or work product.     16:50:29
15   A.  And I can't -- I don't know a specific  16:50:31
16 individual.                                   16:50:34
17   Q.  Does Sea Girt have any current operations?  16:50:49
18   A.  Sea Girt has -- Sea Girt has assets.  Sea  16:50:55
19 Girt has activities related to these proceedings.  16:51:05
20   Q.  What are those activities?            16:51:10
21   A.  You know, retaining -- retaining counsel  16:51:15
22 and responding to questions and so on.        16:51:20
23   Q.  Any other activities?                 16:51:25
24   A.  Not that I'm aware of.                16:51:28
25   Q.  Would you agree with me that Sea Girt is  16:51:37

Page 319

1  just a shell company?                        16:51:39
2         MR. CICILIANO (VIA ZOOM):  Objection  16:51:43
3  to characterization, vague.                  16:51:43
4    A.  Right.  I don't -- I don't know what you  16:51:50
5  would call -- how you would define the term shell  16:51:54
6  company.                                      16:51:58
7    Q.  How would you define it?              16:51:58
8    A.  A shell company might be a company that's  16:52:01
9  formed to carry out some purpose at a later date or  16:52:10
10 is a potential future holding company.        16:52:16
11   Q.  Based on your based on your definition of  16:52:21
12 a shell company, the NRA's definition, would you say  16:52:23
13 Sea Girt is a shell company?                  16:52:29
14        MR. CICILIANO (VIA ZOOM):  I would    16:52:33
15 object.  There's not a category that makes him  16:52:34
16 testify to what the NRA defines as a shell     16:52:37
17 corporation.  If you want to ask him in his personal  16:52:39
18 capacity, then that's fine.                   16:52:41
19   A.  I mean, I just -- I'm having a hard time  16:52:47
20 with your -- I'm having a hard time with the   16:52:51
21 definition here.                              16:52:57
22   Q.  Fair enough.  Let's -- let's move on.  16:52:58
23        Mr. LaPierre previously testified that he  16:53:03
24 authorized a 15 -- $50,000 transfer into Sea Girt's  16:53:05
25 bank account; is that correct?               16:53:11

Page 320

1    A.  Yes, I believe so.                    16:53:15
2    Q.  And that money was transferred from the  16:53:17
3  Brewer IOLTA account; is that correct?        16:53:21
4    A.  From a trust account, yes.  I don't know  16:53:25
5  the exact structure of their trust account.   16:53:28
6    Q.  Fair -- fair enough.  Why was that -- why  16:53:30
7  were those funds not directly transferred from the  16:53:33
8  NRA?                                          16:53:38
9         MR. CICILIANO (VIA ZOOM):  Objection  16:53:40
10 to the extent it calls for attorney-client privilege  16:53:42
11 or work product.                              16:53:44
12   A.  And I can't answer that on that basis.  16:53:45
13   Q.  And just to be clear, the attorney-client  16:53:48
14 communications that you're referring -- that you're  16:53:51
15 refusing to answer on are communications with the  16:53:54
16 Brewer firm?                                  16:53:58
17   A.  Yes.                                  16:53:59
18   Q.  Isn't it true, Mr. Frazer, that the reason  16:54:09
19 that that money was paid from the Brewer trust  16:54:13
20 account and not directly from the NRA, that the NRA  16:54:17
21 did not want its accounting department to know what  16:54:24
22 it was doing?                                 16:54:27
23        MR. CICILIANO (VIA ZOOM):  And I would  16:54:29
24 just object on the same basis and direct you not to  16:54:30
25 answer to the extent it requires disclosure of  16:54:33

Page 321

81 (Pages 318 - 321)

1 attorney-client communications or work product. 16:54:37
2 A. And on that basis, I'm not going to 16:54:40
3 answer. 16:54:44
4 Q. And again, that's based on attorney-client 16:54:44
5 communications with the Brewer law firm, right? 16:54:48
6 A. Yes. 16:54:52
7 Q. How long has the NRA been chartered in New 16:54:56
8 York? 16:55:05
9 A. Since 1871. 16:55:05
10 Q. And now it is seeking to leave New York 16:55:08
11 and reincorporate in Texas, right? 16:55:13
12 A. Yes. 16:55:16
13 Q. Do you believe that that decision is a 16:55:18
14 major decision for the NRA? 16:55:26
15 A. Yes. 16:55:30
16 MR. CICILIANO (VIA ZOOM): Objection 16:55:31
17 to scope. 16:55:32
18 Q. Do you believe that that decision is a 16:55:34
19 significant decision for the NRA to make? 16:55:38
20 MR. CICILIANO (VIA ZOOM): Objection 16:55:43
21 to scope. And are you asking him personally? 16:55:44
22 MR. MASON (VIA ZOOM): I'm asking him 16:55:46
23 as the NRA. 16:55:47
24 A. Yes, very important decision. 16:55:53
25 Q. I believe you have previously testified 16:56:15
Page 322

1 that the Brewer law firm was retained in March 16:56:17
2 of 2018; is that right? 16:56:25
3 A. Yes. 16:56:26
4 Q. Since March of 2018 to present, 16:56:28
5 approximately how much money had the Brewer law firm 16:56:33
6 received as a result of the work it has done for the 16:56:37
7 National Rifle Association? 16:56:44
8 A. Exclusive of subcontractor billing and 16:56:48
9 amounts that were, you know, repaid, indemnified by 16:56:56
10 other parties back to the NRA, it's under 16:57:01
11 $50 million. 16:57:06
12 Q. So I want to make sure I've got that 16:57:09
13 right. Subcontractors -- what was it -- what is the 16:57:12
14 under 50? It's excluding what? 16:57:14
15 A. It's -- so -- so calculating funds that 16:57:16
16 are actually paid to -- paid to the Brewer firm not 16:57:21
17 counting any subcontractors that are retained 16:57:26
18 through the firm and expensed by the firm and not 16:57:29
19 counting fees that were reimbursed to the -- that 16:57:33
20 were paid to the firm and then recouped as -- you 16:57:37
21 know, from an indemnitor, it's under -- it's a 16:57:40
22 little under $50 million. 16:57:45
23 Q. So the funds that maybe the NRA was 16:57:48
24 indemnified for, is that what you're saying? 16:57:53
25 A. Right. 16:57:57
Page 323

1 Q. There's additional funds that they have 16:57:57
2 been paid on top of the 50 million that maybe the 16:57:59
3 NRA was indemnified for? 16:58:02
4 A. Right. 16:58:04
5 Q. And what -- what amount are those funds? 16:58:04
6 A. I'm sorry. I don't -- I don't recall the 16:58:10
7 number. 16:58:11
8 Q. Do you have an approximate amount? 16:58:15
9 A. Less than 10 million. 16:58:18
10 Q. So would that be from, like, insurance 16:58:20
11 companies potentially? 16:58:23
12 A. Yes. 16:58:27
13 Q. So there's the 50 million plus 16:58:29
14 approximately 10 relating to the indemnity 16:58:32
15 agreement? 16:58:36
16 A. It's well under 10, and I apologize that I 16:58:36
17 don't have the exact answer. 16:58:39
18 Q. How much has the NRA paid to the Brewer 16:58:44
19 firm with respect to the subcontractors? 16:58:47
20 A. I don't know the answer. 16:58:52
21 Q. Were you reviewing the Brewer firm's 16:59:12
22 invoices in the fall of 2020? 16:59:16
23 A. Yes. 16:59:22
24 Q. Were you reviewing all of the Brewer 16:59:24
25 firm's invoices for all work that they had been 16:59:27
Page 324

1 doing in 2020? 16:59:30
2 A. No. 16:59:31
3 Q. What invoices were you not reviewing? 16:59:35
4 MR. CICILIANO (VIA ZOOM): Objection. 16:59:39
5 "You" here is Mr. Frazer personally or the NRA? 16:59:40
6 MR. MASON (VIA ZOOM): Well, yeah. 16:59:47
7 Let's go with Mr. Frazer personally. 16:59:48
8 A. Right. And thank you, Dylan. 16:59:52
9 This purports the NRA is reviewing all of 16:59:56
10 the invoices. I personally review all of the 16:59:57
11 invoice other than the matters that are under the 17:00:00
12 oversight of the special litigation committee. 17:00:04
13 Q. What about the invoices relating to the 17:00:09
14 bankruptcy work? 17:00:11
15 A. Yes, I have reviewed those. 17:00:18
16 Q. Did you review them in 2020? 17:00:22
17 A. Yes. 17:00:25
18 Q. So you did personally know that the Brewer 17:00:28
19 firm was doing bankruptcy-related work in 2020? 17:00:31
20 MR. CICILIANO (VIA ZOOM): Objection; 17:00:35
21 to the extent it misstates prior testimony. 17:00:36
22 A. Yes. 17:00:40
23 Q. But you didn't authorize them to do that 17:00:42
24 work? 17:00:49
25 A. No, just as sometimes they'll do work 17:00:50
Page 325

1 that's requested by other -- you know, other NRA 17:00:53
2 officers or senior staff. 17:00:58
3  Q. Well, we're going in circles, Mr. Frazer. 17:01:01
4 Now you're starting to answer -- so answer questions 17:01:03
5 that you didn't answer earlier. 17:01:05
6  So let me ask you again: What -- what 17:01:08
7 bankruptcy-related work did the Brewer firm do in 17:01:14
8 2020? 17:01:17
9  MR. CICILIANO (VIA ZOOM): Objection; 17:01:18
10 calls for attorney-client privilege. I'll direct you 17:01:20
11 not to answer. 17:01:24
12  Q. Are you going to follow your counsel's 17:01:24
13 instruction? 17:01:26
14  A. Yes, I'm going to take counsel's advice or 17:01:26
15 this. 17:01:29
16  Q. Have you reviewed the schedules that the 17:01:48
17 NRA filed? 17:01:53
18  A. Yes. 17:01:55
19  Q. Are you aware that those schedules 17:01:57
20 indicate payments of over $17 million to the Brewer 17:02:04
21 firm within the 90 days prior to filing for 17:02:08
22 bankruptcy? 17:02:12
23  MR. CICILIANO (VIA ZOOM): And I would 17:02:13
24 just object on the scope of the financials, but go 17:02:14
25 ahead -- or on the scope of the schedules. 17:02:17
Page 326

1  But go ahead. 17:02:20
2  A. I can't say I know the -- I can't say I 17:02:22
3 know the number personally sitting here. 17:02:23
4  Q. Okay. Well, I'll represent to you that 17:02:34
5 the schedules indicate that the Brewer firm was paid 17:02:29
6 over $17 million within the last 90 days. 17:02:33
7  So my question for you is: What was 17:02:37
8 that -- break that 17 million down -- $17 million 17:02:43
9 down for me. What was that for? What cases? 17:02:46
10  MR. CICILIANO (VIA ZOOM): I will 17:02:52
11 generally object to the extent you're asking for 17:02:53
12 specific advice. But if you want to put it in some 17:02:55
13 buckets, go ahead. I think we're producing that to 17:02:58
14 you in discovery. 17:03:01
15  A. So the cases that were billed in the last 17:03:07
16 90 days are much the same as -- as in the previous 17:03:10
17 several months. You have litigation against your 17:03:16
18 client obviously, litigation involving Under Wild 17:03:21
19 Skies, litigation against the (inaudible) Virginia 17:03:28
20 attorney, litigation involving State of New York, 17:03:33
21 both the New York Attorney General matter, the 17:03:38
22 NRA's lawsuit against -- NRA's lawsuit against the 17:03:50
23 Attorney General countersuit, and also a general 17:03:51
24 governance advice category. 17:03:55
25  Q. Does the Brewer firm oversee -- are they 17:03:58
Page 327

1 involved with all NRA litigation? 17:04:01
2  A. No. 17:04:03
3  Q. Well, does the Brewer firm -- are they 17:04:05
4 involved with internal compliance at the NRA? 17:04:08
5  A. I mean, the firm has provided compliance 17:04:15
6 advice. 17:04:18
7  Q. And the firm -- has the firm provided 17:04:20
8 regulatory advice as well? 17:04:23
9  A. Yes. 17:04:26
10  Q. Has the Brewer firm provided public 17:04:28
11 relations work and advice as well? 17:04:31
12  A. The firm provides some public relation 17:04:35
13 services in connection with their legal assignments. 17:04:38
14  Q. Does the NRA consider the Brewer firm 17:04:43
15 experts on New York nonprofit law? 17:04:46
16  MR. CICILIANO (VIA ZOOM): Objection; 17:04:50
17 calls for speculation. 17:04:54
18  A. They are -- they are very competent New 17:04:55
19 York attorneys who have provided guidance on that 17:04:58
20 subject. 17:05:01
21  MR. MASON (VIA ZOOM): Objection; 17:05:03
22 nonresponsive. 17:05:04
23  Q. Does the NRA consider the Brewer firm 17:05:04
24 experts on New York nonprofit law? 17:05:07
25  MR. CICILIANO (VIA ZOOM): Objection; 17:05:10
Page 328

1 vague and same other objection. 17:05:11
2  A. I consider them highly qualified on 17:05:14
3 everything that they undertake. 17:05:18
4  Q. Who was the NRA's largest vendor in 2019? 17:05:19
5  MR. CICILIANO (VIA ZOOM): Objection; 17:05:26
6 scope. What topic is this? 17:05:30
7  Q. Well, let me ask it this way: Was the 17:05:32
8 Brewer firm the NRA's largest vendor in 2019? 17:05:34
9  A. I apologize. I just don't -- I don't 17:05:38
10 recall the order of names on that -- on that list. 17:05:43
11  Q. Was the Brewer firm the NRA's largest 17:05:49
12 vendor in 2020? 17:05:54
13  A. I don't know that I have seen an analysis 17:05:55
14 of that yet. 17:06:00
15  Q. In May of 2018, the NRA filed a lawsuit 17:06:05
16 against Lockton, right? 17:06:09
17  A. No. No. That was considerably later in 17:06:12
18 the year, I think. 17:06:18
19  Q. Well, all right. Let's back up. 17:06:22
20  So when did -- when did the NRA file its 17:06:25
21 lawsuit against Lockton? 17:06:29
22  A. I'm sorry, unless I'm misremembering. 17:06:31
23  Q. I'll represent to you, Mr. Frazer, that it 17:06:33
24 was in May of 2018. 17:06:37
25  A. All right. And assuming that's correct, 17:06:40
Page 329

83 (Pages 326 - 329)

1 I'll take your word for it. I don't -- I think I   17:06:46
2 was thinking about a particular proceeding.   17:06:49
3     Q. The Lockton litigation -- there was a   17:06:56
4 settlement with Lockton in or around November 2018.   17:06:58
5     Does that sound right?   17:07:02
6   A. Yes.   17:07:04
7     Q. How much money did the NRA receive as part   17:07:06
8 of that settlement?   17:07:10
9     MR. CICILIANO (VIA ZOOM): I just   17:07:12
10 object pursuant to a confidentiality provision in the   17:07:13
11 settlement agreement and direct you not to answer.   17:07:16
12     Q. Are you going to follow your counsel's   17:07:21
13 advice?   17:07:23
14   A. Yes.   17:07:24
15     Q. How much money did the Brewer firm -- or   17:07:25
16 let me ask you this: Did the Brewer firm receive   17:07:27
17 any money pursuant to that settlement agreement with   17:07:30
18 Lockton?   17:07:34
19     MR. CICILIANO (VIA ZOOM): And same   17:07:36
20 objection. Direct you -- or objection and direct you   17:07:38
21 not to answer.   17:07:39
22     Q. Are you going to follow your counsel's   17:07:41
23 advice?   17:07:43
24   A. Yes.   17:07:44
25     MR. CICILIANO (VIA ZOOM): And,   17:07:46

                                  Page 330

1 counsel, as we told you, we reached out to Lockton   17:07:46
2 pursuant to that agreement to see if we could get   17:07:49
3 their waiver. We have to approach it according to   17:07:51
4 that agreement. Otherwise I don't have a problem   17:07:55
5 with him otherwise answering that.   17:07:57
6     Q. Mr. Frazer, is there a provision in the   17:08:00
7 Lockton settlement agreement that allows the Brewer   17:08:02
8 firm to continue to represent the NRA and   17:08:15
9 Lockton-related issues going forward?   17:08:20
10     MR. CICILIANO (VIA ZOOM): Objection;   17:08:23
11 to the extent -- objection; direct you not to answer   17:08:23
12 pursuant to a confidentiality clause in that   17:08:26
13 agreement.   17:08:29
14     Q. Are you going to follow your counsel's   17:08:29
15 advice?   17:08:32
16   A. Yes.   17:08:33
17     Q. In the Lockton settlement agreement, did   17:08:36
18 Lockton agree that the Brewer firm could represent   17:08:38
19 the NRA in the future with respect to any   17:08:43
20 Lockton-related insurance matters?   17:08:46
21     MR. CICILIANO (VIA ZOOM): Pursuant to   17:08:49
22 the confidentiality terms in that agreement, I'll   17:08:51
23 direct you not to answer.   17:08:53
24   A. Yes. I'm sorry. Yes, I'm taking his   17:08:54
25 advice. I'm anticipating your next question. I   17:08:58

                                  Page 331

1 apologize.   17:09:00
2     Q. Since -- since the November 2018 Lockton   17:09:02
3 settlement agreement, has the Brewer firm received   17:09:08
4 any money that is any way related to that Lockton   17:09:11
5 settlement agreement?   17:09:16
6     MR. CICILIANO (VIA ZOOM): To the   17:09:17
7 extent that any money received would have been a   17:09:18
8 product of the settlement agreement, I would direct   17:09:21
9 you not to answer.   17:09:24
10   A. Then I won't -- then I won't answer. I'll   17:09:26
11 take counsel's advice.   17:09:28
12     MR. MASON (VIA ZOOM): Let's do this.   17:09:47
13 Let's take a 10-minute break and see where we're at   17:09:48
14 on time.   17:09:50
15     MR. CICILIANO (VIA ZOOM): And, Brian,   17:09:52
16 just before we go off the record -- we can go off the   17:09:53
17 record first.   17:09:55
18     THE VIDEOGRAPHER (VIA ZOOM): We're   17:09:55
19 going off the record at 5:10. We're off the record.   17:09:56
20     (Recess 5:10 p.m. to 5:21 p.m.)   17:10:04
21     THE VIDEOGRAPHER (VIA ZOOM): We're   17:21:06
22 back on the record at 5:21.   17:21:13
23     MR. MASON (VIA ZOOM): At this time   17:21:17
24 counsel has had discussions about continuing the   17:21:20
25 deposition and I know Mr. Frazer is set on Thursday   17:21:24

                                  Page 332

1 as well. We are not passing the witness, but at this   17:21:33
2 time, we'll agree to shut it down for today.   17:21:37
3     However, I want to make clear on the   17:21:40
4 record that it's our position that Mr. Frazer was not   17:21:43
5 prepared on numerous topics here today, including   17:21:47
6 topic number 2 -- at least topic number 2, 3, and 13   17:21:51
7 on Ackerman's notice of deposition as well as topic   17:22:01
8 15 on the New York Attorney General's notice relating   17:22:08
9 to Mr. LaPierre's employment agreement.   17:22:13
10     I'll also note that we intend to   17:22:16
11 confer with counsel and ask for additional time based   17:22:19
12 on the significant amount of inappropriate speaking   17:22:28
13 objections. We also intend to raise with the Court   17:22:31
14 the numerous issues with respect to privilege that we   17:22:34
15 contend were improperly asserted.   17:22:37
16     And so with that said, I don't know if   17:22:40
17 Mr. Sheehan or anyone else would like to chime in.   17:22:42
18     MR. SHEEHAN (VIA ZOOM): Yes, please,   17:22:49
19 if I may. So we have the same concerns with respect   17:22:50
20 to Mr. Frazer's preparation on topic 5 and topic 7,   17:22:51
21 the Attorney General's inquiry. And the -- I did   17:22:55
22 want to make sure -- we will be asking for more time   17:23:01
23 but I want to make sure that I have a chance to   17:23:03
24 confer with my colleagues first. I think it makes   17:23:05
25 sense to do Thursday.   17:23:08

                                  Page 333

84 (Pages 330 - 333)

```
 1      Mr. Frazer, where will you be on --     17:23:10
 2 will you be in Dallas on Thursday or will you be    17:23:13
 3 somewhere else.                        17:23:16
 4      THE WITNESS (VIA ZOOM) (VIA ZOOM):      17:23:16
 5 I'll be back in Virginia.              17:23:16
 6      MR. SHEEHAN (VIA ZOOM): Just in terms   17:23:18
 7 of arranging the video conference, Eric, are you on? 17:23:19
 8 Eric Van Horn?                         17:23:19
 9      MR. VAN HORN (VIA ZOOM): Yes, I'm       17:23:28
10 here.                                  17:23:29
11      MR. SHEEHAN (VIA ZOOM): So what do we  17:23:30
12 need to do in order to make sure that we have the  17:23:31
13 setup arranged in Virginia on Thursday?          17:23:33
14      MR. VAN HORN (VIA ZOOM): Mr. Frazer,    17:23:37
15 is it at NRA headquarters that you're planning to be? 17:23:37
16      THE WITNESS (VIA ZOOM) (VIA ZOOM):      17:23:41
17 Yes.                                   17:23:41
18      MR. VAN HORN (VIA ZOOM): Okay. We'll   17:23:45
19 coordinate -- we'll coordinate it with Veritext.   17:23:46
20      MR. SHEEHAN (VIA ZOOM): Okay. As       17:23:49
21 long as we're here, do we need to arrange the two  17:23:50
22 Friday depositions in terms of location? Do we know 17:23:54
23 where Mr. Philips -- are we square on Mr. Philips? 17:23:59
24      MR. VAN HORN (VIA ZOOM): I think        17:23:59
25 Mr. Philips will be here in Dallas. But Ms. Rowling, 17:24:06
                                         Page 334
```

```
 1 Mr. Frazer, or Mr. Ciciliano, do you know where    17:24:06
 2 Ms. Rowling will be -- will be at NRA headquarters as 17:24:11
 3 well?                                  17:24:13
 4      MR. CICILIANO (VIA ZOOM): Let me       17:24:13
 5 confer with you on that one. I think that may be the 17:24:14
 6 case, but before I confer -- or tell you it is, let's 17:24:17
 7 make sure.                             17:24:23
 8      I think someone just let us know we're  17:24:24
 9 still on the record. I think we intended to be on   17:24:25
10 the record.                            17:24:28
11      MR. GARMAN (VIA ZOOM): This is Greg    17:24:30
12 Garman. Ms. Rowling will be at NRA headquarters     17:24:32
13 also. I'll be honest though, as we sit here right   17:24:35
14 now, I don't know where Philips is. It's just not in 17:24:37
15 my knowledge base so we should confer about that.   17:24:40
16      MR. CICILIANO (VIA ZOOM): Okay.        17:24:44
17      MR. VAN HORN (VIA ZOOM): We'll work    17:24:48
18 with Veritext to have the videographer at the NRA   17:24:49
19 headquarters approximately an hour before the       17:24:53
20 depositions start on Thursday and Friday.          17:24:55
21      MR. CICILIANO (VIA ZOOM): Just so      17:25:02
22 there's no avoidance of doubt on the record we, of  17:25:03
23 course, disagree with your assertion on the topics as 17:25:05
24 well as the witness being prepared as well as the   17:25:09
25 objections.                            17:25:09
                                         Page 335
```

```
 1      As I offered I think several times       17:25:10
 2 during the deposition, should you guys have specific 17:25:12
 3 questions or want something, you know, let's try to  17:25:14
 4 confer especially before Thursday. If Mr. Frazer    17:25:17
 5 can, you know, educate himself on certain things     17:25:20
 6 you're looking for and it's not overly burdensome or 17:25:24
 7 cumbersome, we may be able to reach an agreement on  17:25:29
 8 that. Just let me know. Happy to work with you     17:25:31
 9 guys. May not always reach an agreement but happy to 17:25:32
10 talk and see if we can.                17:25:36
11      MR. SHEEHAN (VIA ZOOM): And,           17:25:37
12 Ms. Munroe, what's your -- I know you've had -- this 17:25:38
13 has been a very long day for you. What's your ETA in 17:25:40
14 terms of the transcript?               17:25:40
15      THE REPORTER: I'm going to shoot for
16 tomorrow sometime.
17      MR. SHEEHAN (VIA ZOOM): Wow. Okay.
18      THE REPORTER: I'm going to try.
19 We're over 300.
20      MR. SHEEHAN (VIA ZOOM): Thank you.     17:25:58
21      MR. DRAKE (VIA ZOOM): Okay. This is     17:25:58
22 Scott Drake on behalf of the Committee. I would just 17:25:59
23 like to make a brief statement on the record.       17:26:01
24      As mentioned off the record that the    17:26:04
25 committee did cross-notice these. I just want to    17:26:05
                                         Page 336
```

```
 1 make clear that we're reserving our rights.        17:26:08
 2 Mr. Garman and I are going to talk and hopefully we  17:26:10
 3 can reach an agreement about where we fit in the    17:26:15
 4 prior agreement reached between the noticing parties 17:26:18
 5 and the debtors. And so we'll be in touch with     17:26:21
 6 debtor's counsel but reserve our rights to question  17:26:25
 7 the witness in his corporate capacity on Thursday as 17:26:29
 8 well as the individual capacity that we have        17:26:33
 9 cross-noticed as well.                 17:26:37
10      MR. SHEEHAN (VIA ZOOM): Is there       17:26:38
11 anybody here from the Trustee's Office currently,   17:26:39
12 U.S. Trustee? I guess not. Okay. Thank you.        17:26:42
13      MR. CICILIANO (VIA ZOOM): I            17:26:54
14 appreciate the courtesy.               17:26:54
15      THE VIDEOGRAPHER (VIA ZOOM): Are we    17:26:58
16 done?                                  17:26:59
17      MR. SHEEHAN (VIA ZOOM): We are done.   17:27:01
18      THE VIDEOGRAPHER (VIA ZOOM):           17:27:02
19 Everybody stand by. We're going off the record at   17:27:02
20 5:27.                                  17:27:07
21      (Off the video record.)               17:27:07
22      MS. SARKESSIAN (VIA ZOOM): Before we   17:27:10
23 go off the record, I'm sorry, I was muted and I was  17:27:12
24 having trouble unmuting. Yes, Juliet Sarkessian is  17:27:14
25 here for the Office of the U.S. Trustee. Sorry.    17:27:17
                                         Page 337
```

85 (Pages 334 - 337)

```
1        Mr. Sheehan, is there something you    17:27:20
2  would like to ask me?                        17:27:22
3        MR. SHEEHAN (VIA ZOOM): I just wanted  17:27:24
4  to make sure if you had any questions -- if you had  17:27:25
5  questions that you had an opportunity to ask them or  17:27:26
6  to ask for time to ask them so...             17:27:28
7        MS. SARKESSIAN (VIA ZOOM): Yes.        17:27:32
8  Thank you. There are a few questions, just some  17:27:33
9  follow-up questions that we would like to ask when  17:27:35
10 everybody else is done. We're happy to wait in line  17:27:39
11 for that.                                     17:27:42
12       MR. CICILIANO (VIA ZOOM): I would      17:27:43
13 like to tell you that the videographer said that this  17:27:43
14 wasn't video recorded. I think the court reporter is  17:27:46
15 still taking it down. I don't have an issue with  17:27:49
16 that. I don't know if counsel does if we want to go  17:27:51
17 back on the video recording. It seems unnecessary.  17:27:53
18       MR. SHEEHAN (VIA ZOOM): I think it's   17:27:57
19 unnecessary for this.                         17:27:58
20       MR. DRAKE (VIA ZOOM): I'm fine         17:28:01
21 without it being on video.                    17:28:01
22       (Deposition adjourned at 5:28 p.m.)
23
24
25
                                              Page 338
```

```
1
2
3
4        _____
         (Signature of the Witness)
5
6
7
8  THE STATE OF _____
9  COUNTY OF _____
10
11     Subscribed and sworn to before me by the said
12 witness, JOHN FRAZER, on this the _____ day of
13 _____, 2021.
14
15
         _____
16       Notary Public in and for the
         State of _____
17       County of _____
18 My commission expires: _____
19
20
21
22
23
24
25
                                              Page 340
```

```
1        DEPOSITION CHANGES
2  WITNESS: JOHN FRAZER
3  PAGE NO. LINE NO.    CHANGE   REASON FOR CHANGE
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 Job No. TX4501078
                                              Page 339
```

```
1  STATE OF TEXAS   )
2  COUNTY OF DALLAS )
3      I, Michelle L. Munroe, Certified Shorthand
4  Reporter in and for the State of Texas, certify that
5  the foregoing deposition of JOHN FRAZER was reported
6  stenographically by me at the time and place
7  indicated, said witness having been placed under oath
8  by me, and that the deposition is a true record of
9  the testimony given by the witness;
10     That the amount of time used by each party at
11 the deposition is as follows:
         Mr. Sheehan -    4 hours, 39 minutes
12       Mr. Thompson -   42 minutes
         Mr. Mason   -   1 hour, 49 minutes
13
14     I further certify that I am neither counsel for
15 nor related to any party in this cause and am not
16 financially interested in its outcome.
17     Given under my hand on this the _____ day
18 of _____, 2021.
19
20
21       <%signature%>
         Michelle L. Munroe, CSR No. 6011
22       Commission expires 12-31-22
         Firm Registration #571
23       VERITEXT LEGAL SOLUTIONS
         300 Throckmorton Street, Suite 1600
24       Fort Worth, Texas 76102
         817.336.3042 telephone
25
                                              Page 341
```

86 (Pages 338 - 341)

1  dciciliano@gtg.legal

2           March 16, 2021

3  In Re: National Rifle Association Of America And Sea Girt

4  DEPOSITION OF: John Frazer (# 4501078)

5     The above-referenced witness transcript is

6  available for read and sign.

7     Within the applicable timeframe, the witness

8  should read the testimony to verify its accuracy. If

9  there are any changes, the witness should note those

10 on the attached Errata Sheet.

11    The witness should sign and notarize the

12 attached Errata pages and return to Veritext at

13 errata-tx@veritext.com.

14    According to applicable rules or agreements, if

15 the witness fails to do so within the time allotted,

16 a certified copy of the transcript may be used as if

17 signed.

18           Yours,

19           Veritext Legal Solutions

20

21

22

23

24

25

Page 342

**EXHIBIT H**

1                    UNITED STATES DISTRICT COURT
2                    NORTHERN DISTRICT OF TEXAS
3                         DALLAS DIVISION
4
5       IN RE:                    )
                                  )
6                                 )
        NATIONAL RIFLE            ) Case No.
7       ASSOCIATION OF AMERICA    ) 21-30085-hdh-11
        AND SEA GIRT, LLC,        )
8                                 )
           Debtors.              )
9
10
11      *********************************************************
12         REMOTE ORAL AND VIDEOTAPED DEPOSITION OF
13                       SONYA ROWLING
14             IN HER INDIVIDUAL CAPACITY AND
15             AS CORPORATE REPRESENTATIVE OF
16        THE NATIONAL RIFLE ASSOCIATION OF AMERICA
17                     MARCH 19, 2021
18     CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER
19      *********************************************************
20
21
22
23
24
25

                                              Page 1

**Page 2**

1      REMOTE ORAL AND VIDEOTAPED DEPOSITION OF SONYA

2 ROWLING, produced as a witness at the instance of the

3 New York State Office of the Attorney General, and

4 duly sworn, was taken remotely in the above-styled

5 and numbered cause on the 19th day of March, 2021, from

6 9:12 a.m. to 7:07 p.m., via Zoom, before Julie C.

7 Brandt, RMR, CRR, and CSR in and for the State of Texas,

8 reported by machine shorthand, with the witness located

9 in Fairfax, Virginia, pursuant to the Federal Rules of

10 Civil Procedure and the provisions stated on the record

11 or attached hereto.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 3**

1      APPEARANCES

2

3 FOR THE NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL:

4    Eric Van Horn (Remote appearance)
   Jason Kathman (Remote appearance)

5    Gerrit Pronske (Remote appearance)
   SPENCER FANE LLP

6    2200 Ross Avenue, Suite 4800 West
   Dallas, Texas 75201

7    214.750.3610
   ericvanhorn@spencerfane.com

8

9 FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:

10    Scott Drake (Remote appearance)
   Emma Persson (Remote appearance)

11    NORTON ROSE FULBRIGHT US LLP
   2200 Ross Avenue, Suite 3600

12    Dallas, Texas 75201
   214.855.8341

13    scott.drake@nortonrosefulbright.com

14

   FOR ACKERMAN MCQUEEN, INC.:

15

16    H. Joseph Acosta (Remote appearance)
   Kelsey M. Taylor (Remote appearance)

17    DORSEY & WHITNEY LLP
   300 Crescent Court, Suite 400
   Dallas, Texas 75201

18    214.981.9970
   acosta.joseph@dorsey.com

19

20 FOR THE NATIONAL RIFLE ASSOCIATION OF AMERICA:

21    Talitha Gray Kozlowski
   Teresa M. Pilatowicz

22    Dylan Ciciliano (Remote appearance)
   GARMAN TURNER GORDON LLP

23    7521 Amigo Street, Suite 210
   Las Vegas, Nevada 89119

24    702.777.3000
   tgray@gtg.legal

25

**Page 4**

1 FOR THE PEOPLE OF THE STATE OF NEW YORK:

2    James Sheehan (Remote appearance)
   Stephen Thompson (Remote appearance)

3    Yael Fuchs (Remote appearance)
   Sharon Sash (Remote appearance)

4    OFFICE OF THE ATTORNEY GENERAL OF THE
     STATE OF NEW YORK

5    28 Liberty Street, 18th Floor
   New York, New York 10005

6    212.416.8401
   james.sheehan@ag.ny.gov

7    stephen.thompson@ag.ny.gov

8

   FOR THE OFFICE OF THE U.S. TRUSTEE:

9

10    Elizabeth A. Young (Remote appearance)
   Marc F. Salitore (Remote appearance)

   Emily Stern (Remote appearance)

11    UNITED STATES TRUSTEE PROGRAM
   1100 Commerce Street, Room 976

12    Dallas, Texas 75242
   214.767.8967

13    elizabeth.a.young@usdoj.gov
   marc.f.salitore@usdoj.gov

14

15 FOR THE PROPOSED SPECIAL COUNSEL FOR DEBTORS:

16    Sarah Rogers (Remote appearance)
   BREWERS ATTORNEYS & COUNSELORS

17    750 Lexington Avenue, 14th Floor
   New York, New York 10022

18    212.224.8817

19

   FOR INFOCISION:

20

21    Curtis L. Tuggle (Remote appearance)
   THOMPSON HINE

22    3900 Key Center, 127 Public Square
   Cleveland, Ohio 44114-1291

23    216.566.5904
   Curtis.Tuggle@ThompsonHine.com

24

25

**Page 5**

1 FOR JOHN FRAZER:

2    William B. Fleming (Remote appearance)
   GAGE SPENCER & FLEMING LLP

3    410 Park Avenue, Floor 9
   New York, New York 10022-9492

4    212.768.4900
   wfleming@gagespencer.com

5

6 FOR THE PEOPLE OF WASHINGTON, D.C.:

7    Leonor Miranda (Remote appearance)
   OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON, D.C.

8    441 4th Street, NW
   10th Floor South

9    Washington, D.C. 20001
   202.727.3400

10    leonor.miranda@dc.gov

11

   ALSO PRESENT:

12

13    Jack Butler (Remote appearance)

14    Jeremy Economos (Remote appearance)

15    Jim Purtel (Remote appearance)

16    Bill Winkler (Remote appearance)

17    Loring Hill (Remote appearance)

18    David MacGreevey (Remote appearance)

19    David Dell'Aquila (Remote appearance)

20

   VIDEOGRAPHER:

21

   Dan Reidy - Veritext Legal Solutions

22

23

24

25

Veritext Legal Solutions
800-336-4000

INDEX
PAGE

Appearances...................................... 3
Proceedings...................................... 8

SONYA ROWLING

Examination by Mr. Sheehan................ 9
Examination by Mr. Thompson............ 101
Examination by Mr. Acosta................ 208
Examination by Mr. Drake................. 265
Signature and Changes...................... 293
Reporter's Certificate....................... 295

DEPOSITION EXHIBITS          IDENTIFIED
Exhibit 1    Notice of Deposition................ 9
Exhibit 2    Form 4720 for 2018............. 12
Exhibit 3    Form 990 for 2019............. 64
Exhibit 4    List of Top Concerns for the
             Audit Committee
             NYAG-00036198 - 36199......... 126
Exhibit 5    Personal Statement by Sonya
             Rowling, Director, Accounting
             Operations and Financial
             Reporting NRA Audit Committee
             Meeting July 30, 2018
             NYAG-00081159................ 135
Exhibit 6    Dec. 1, 2011 Agreement between
             MMP and NRA................... 157
Exhibit 7    Second Amendment Jan. 30, 2017
             between MMP and NRA............ 157
Exhibit 8    Statement of Financial Affairs
             Answer to Question No. 3
             Payments Made to Creditors
             Within 90 Days Before Filing.... 168
Exhibit 9    Excel file, NRA-BK-00003360.xlsx  188

Page 6

Exhibit 10   Excel file, NRA-BK-00003361.xlsx  188
Exhibit 11   Carolyn Meadows expenses
             NRA-BK-00003427................ 197

Exhibit 12   National Rifle Association of
             America and Affiliates
             Management Letter Dec. 31, 2019
             NRA-BK-00001864 - 1874.......... 201

Exhibit AMc 84   7/13/2018 email/attachment
             NRA-AMc_00063924 - 63926..... 219
Exhibit AMc 59   Notes of Emily Cummins
             July 15, 2019............... 222

Exhibit AMc 24   Global Notes, Methodology,
             Statement of Limitations, and
             Disclaimers Regarding the
             Debtors' Schedules of Assets
             and Liabilities and
             Statements of Financial
             Affairs - 55 pages.......... 226

Exhibit AMc 127  Form 990 for 2019............ 236

Exhibit AMc 22   Global Notes, Methodology,
             Statement of Limitations, and
             Disclaimers Regarding the
             Debtors' Schedules of Assets
             and Liabilities and
             Statements of Financial
             Affairs - 236 pages.......... 242

Exhibit AMc 14   CHAR500 2018................. 246

Exhibit AMc 6    Jan. 13, 2021 letter from
             Wayne LaPierre to Brewer,
             Attorneys & Counselors and
             Jan. 13, 2021 email string... 262

Exhibit UCC 1    Jan. 15, 2021 letter to Valued
             Vendors from NRA................ 268

Page 7

PROCEEDINGS

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:12 a.m. on Friday, March 19, 2021.

Please note that microphones are sensitive and may pick up whispering, private conversations and cellular interference. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit 1 of the video recorded deposition of Sonya Rowling, taken for counsel of the Movant in regards to the National Rifle Association of America and Sea Girt, LLC. This case is filed in the United States Bankruptcy Court for the Northern District of Texas, the Dallas Division, Case No. 1-30085-hdh-11.

This deposition is being held at the headquarters of the National Rifle Association, located at 11250 Waples Mill Road, Fairfax, Virginia 22030.

My name is Dan Reidy from the firm Veritext Legal Solutions, and I am the videographer. The court reporter is Julie Brandt from the firm Veritext Legal Solutions.

Will the court reporter please swear in the witness.

Page 8

SONYA ROWLING,

having been first duly sworn and having confirmed that she is Sonya Rowling, testified remotely as follows:

EXAMINATION

BY MR. SHEEHAN:

Q. Good morning, Ms. Rowling. My name is Jim Sheehan. I'm an assistant attorney general for the State of New York, and you and I have met each other before. Correct?

A. Yes.

MR. SHEEHAN: I am going to ask the court reporter at this point to pull up the 30(b)(6) notice as an exhibit.

And Ms. Brandt, are we managing the exhibits as they come, or is that -- does the court reporter do that?

MR. THOMPSON: Jim, this is Stephen. I have marked the exhibit, and it has been introduced in the Marked Exhibit folder on the Exhibit Share site.

MR. SHEEHAN: Excellent. Okay.

(Exhibit 1 marked.)

Q. (BY MR. SHEEHAN) So Ms. Rowling, it's my understanding that you have consented to testify on behalf of the National Rifle Association with respect to topics 2, 3, 4 and 6. Is that correct?

Page 9

3 (Pages 6 - 9)

1    A.  That's correct.
2    Q.  All right.  Can you tell me just briefly what
3  you did to prepare yourself for testifying on these
4  issues?
5    A.  I spoke with various individuals at the NRA
6  regarding certain of these issues.  I -- I reviewed my
7  own recollection, as well as those of others associated
8  with these issues.
9    Q.  Who did you speak with regarding the issues
10  that are in 2, 3, 4 and 6?
11       MS. KOZLOWSKI:  Just for clarity of the
12  record, don't reveal any communications of counsel.
13       THE WITNESS:  Okay.
14    A.  I spoke with Rick Tedrick.
15    Q.  (BY MR. SHEEHAN)  Who else?
16    A.  I spoke with Linda Crouch.
17    Q.  Who else?
18    A.  Counsel.
19    Q.  Okay.  Which counsel?
20    A.  I'm sorry?
21    Q.  Which counsel?
22    A.  The Brewer firm.
23    Q.  Which lawyers of the Brewer firm?
24    A.  Sarah Rogers and Svetlana --
25    Q.  Eisenberg?
Page 10

1    A.  Thank you.
2    Q.  Who else?
3    A.  On these specifics, that is the extent.
4    Q.  Any other lawyers besides the Brewer firm?
5    A.  No.
6       THE WITNESS:  Did I say you?
7    A.  The Garman firm as well.  Sorry.
8    Q.  So who at the Garman firm?
9    A.  Teresa --
10       THE WITNESS:  Sorry, I don't know your
11  last name.
12       MS. PILATOWICZ:  "Pilatowicz."
13    A.  Talitha.
14    Q.  (BY MR. SHEEHAN)  Anyone else?
15    A.  Greg Garman.
16    Q.  Anyone else?
17    A.  Dylan -- I don't know his last name either,
18  I'm sorry.
19    Q.  Okay.  Anyone else?
20    A.  No.
21    Q.  All right.
22       MS. KOZLOWSKI:  Mr. Sheehan, we're losing
23  your face again, if you can adjust the camera, that
24  would be great.
25       MR. SHEEHAN:  The problem is I can't see
Page 11

1  my face.  So you tell me.  Am I doing okay now?
2       MS. KOZLOWSKI:  That's fine.  Thank you.
3       MR. SHEEHAN:  Okay.  I'm not sure what
4  that is.
5    Q.  (BY MR. SHEEHAN)  So what I would like to do,
6  Ms. Rowling, at this point is to ask Mr. Thompson to
7  pull up the IRS Form 4720 which you produced to us last
8  week.
9       MR. SHEEHAN:  Stephen, can you do that?
10       MR. THOMPSON:  Yes, just one moment.
11  Okay.  Counsel, it should be in the Exhibit Share site
12  now.
13       MR. SHEEHAN:  I'm embarrassed even that I
14  signed on for -- let me see what I got here.  One
15  second.
16       (Exhibit 2 marked.)
17    Q.  (BY MR. SHEEHAN)  If you take a look at this
18  exhibit, which includes the 2018 document, the 2019
19  document and then the 2019 amended document, do you
20  recognize these documents?
21    A.  Yes.
22    Q.  All right.  And can you tell what these
23  documents are?
24    A.  These are the excess benefit and compensation
25  tax returns relating to the NRA.
Page 12

1    Q.  That is for excise tax returns?
2    A.  That's correct.
3    Q.  And are you familiar with the contents of
4  these 4720 three documents?
5    A.  Yes.
6    Q.  Did the NRA consider whether the Brewer law
7  firm or Mr. Brewer met the standard under Section 4958
8  as a disqualified person?
9       MS. KOZLOWSKI:  Objection to the extent
10  it calls for a legal conclusion.
11       Additionally, to the extent it seeks
12  attorney/client privileged information, I would instruct
13  you not to answer.
14       THE WITNESS:  Okay.
15    Q.  (BY MR. SHEEHAN)  So you can answer.
16    A.  There were discussions had with legal counsel
17  regarding those issues.
18    Q.  And what did the NRA conclude with respect to
19  whether --
20       MS. KOZLOWSKI:  Objection.
21    Q.  (BY MR. SHEEHAN)  I'm sorry, one second.
22       What did the NRA conclude with respect to
23  whether Mr. Brewer or the Brewer law firm should be
24  listed as a disqualified person?
25       MS. KOZLOWSKI:  Objection to the extent
Page 13

4 (Pages 10 - 13)

1 it calls for a legal conclusion. As well as to the
2 extent that it seeks information derived from
3 conversations with counsel, I would instruct you not to
4 answer.
5 Q. (BY MR. SHEEHAN) You can answer.
6 A. I cannot answer.
7 Q. All right. So you don't know whether the
8 NRA -- you do not know whether the NRA reached a
9 conclusion whether Mr. Brewer met the standard as a
10 disqualified person?
11 MS. KOZLOWSKI: Objection, misstates
12 testimony. Additionally, the witness has been
13 instructed not to answer to the extent that you're
14 seeking attorney/client privileged communication.
15 Q. (BY MR. SHEEHAN) Isn't it true that
16 Mr. Brewer was in a position to substantially influence
17 the affairs of the NRA?
18 MS. KOZLOWSKI: Objection to the extent
19 it calls for a legal conclusion. Additionally, to the
20 extent that --
21 MR. SHEEHAN: Are we going to have
22 speaking objections throughout this?
23 Q. (BY MR. SHEEHAN) Let's go back, Ms. Rowling.
24 Is Mr. Brewer in a position to substantially influence
25 the affairs of the NRA in your opinion as the NRA?
Page 14

1 A. Mr. Brewer is a legal counsel. His opinion
2 and counsel is sought for various matters.
3 Q. If you look at the amended return, the
4 attachment, you will see the statement -- you will see
5 the statement that -- I'm sorry. Can you pull up the
6 document? Do you have access to the document here?
7 MS. KOZLOWSKI: We do have a copy of the
8 document. Can you advise what page you're referring to?
9 MR. SHEEHAN: Sure.
10 Q. (BY MR. SHEEHAN) 2019 amended return, and I
11 am looking at page 1 of the attachment.
12 MR. THOMPSON: And Counsel, that's
13 page 31 of the PDF, if that is helpful.
14 Q. (BY MR. SHEEHAN) Ms. Rowling, do you have the
15 document?
16 A. I do.
17 Q. All right. You'll see in the second paragraph
18 it says, Mr. LaPierre was recently informed that some
19 travel expenses incurred by the NRA from 2015 through
20 2019 resulted in his receipt of excess benefits. Do you
21 see that sentence?
22 A. Yes.
23 Q. How was Mr. LaPierre informed that some travel
24 expenses result in the receipt of excess benefits?
25 MS. KOZLOWSKI: I am going to again
Page 15

1 object as to attorney/client privilege.
2 If these are communications and your
3 understanding is based on conversations with counsel, I
4 would instruct you not to answer.
5 Q. (BY MR. SHEEHAN) So how was Mr. LaPierre
6 informed that some travel expenses resulted in excess
7 benefits?
8 A. Those were the result of legal counsel's
9 discussion.
10 Q. Did he examine any documents in connection
11 with the travel expenses to determine whether they were,
12 in fact, excess benefits?
13 A. With the advice of some legal counsel, those
14 invoices relating to those travel expenses were
15 examined.
16 Q. Who selected the invoices to look at?
17 A. Those were requested -- all Mr. LaPierre's
18 travel expenses were requested as part of litigation
19 efforts.
20 Q. All his expenses, not just travel expenses?
21 A. The expenses -- yes.
22 Q. All right. And so who conducted a review of
23 the travel expenses and other LaPierre expenses to
24 determine on the 4720 amended return whether they should
25 be reported?
Page 16

1 MS. KOZLOWSKI: Objection as to form,
2 foundation.
3 As well as, again, instruct you not to reveal
4 any attorney/client communications.
5 A. They were reviewed with counsel.
6 Q. (BY MR. SHEEHAN) Was there -- let me -- okay.
7 Prior to this meeting with -- whatever
8 meetings there were with counsel and Mr. LaPierre
9 concerning the travel expenses, what process at the NRA
10 was used to identify excess benefits to disqualified
11 persons in -- for 2019?
12 MS. KOZLOWSKI: Objection, form.
13 Again, I instruct you not to disclose any
14 attorney/client communication.
15 A. It is an ongoing process within the accounts
16 payable department to recognize excess benefit
17 transactions.
18 Q. (BY MR. SHEEHAN) And whose job was that
19 within the accounts payable department?
20 A. Portia Padilla with advice and discussions
21 with myself and then counsel, if necessary.
22 Q. All right. For 2019, are you confident that
23 all the excess benefit payments to disqualified persons
24 were identified? "You" meaning NRA. "You" meaning the
25 NRA.
Page 17

5 (Pages 14 - 17)

1     MS. KOZLOWSKI: Objection as to form.
2         To the extent that -- I instruct you not to
3 speculate as well as not to reveal any attorney/client
4 communications.
5     A. To the best of our knowledge of what we had
6 visibility of at the time, yes.
7     Q. (BY MR. SHEEHAN) You say what you had
8 visibility of at the time. Were there items that you
9 did not have visibility of as of 2019 with respect to
10 payments to disqualified persons?
11     MS. KOZLOWSKI: Objection, same form
12 again.
13         And I instruct you not to reveal any
14 attorney/client communications. To the extent that you
15 can answer without disclosing such information, you can
16 answer.
17     A. There is ongoing insights or look into various
18 matters that were actually disclosed in the 4720 that
19 are still being looked at.
20     Q. (BY MR. SHEEHAN) Okay. So let's go back to
21 2019. Did the NRA -- during the calendar year 2019,
22 what system did the NRA have in place to make sure that
23 all payments to disqualified persons were identified and
24 reported?
25     A. I believe I answered that question.

Page 18

1     Q. Well, try -- I didn't -- let's try again.
2     A. The accounts payable department reviews
3 invoices and backups to determine if those transactions
4 exist, and then counsel is brought in in questionable
5 areas.
6     Q. All right. And was that the same process that
7 was used in 2020 for 2019 expenditures?
8     A. 2020 is still under review, but yes. As the
9 process takes place, yes.
10     Q. With respect to 2018 expenditures, was it the
11 same process as you just describe for 2019?
12     A. Yes.
13     Q. All right. With respect to the I'll call them
14 payments to disqualified persons, did the process
15 consider economic benefits provided through the Ackerman
16 McQueen firm or Ackerman entities? Let me reask that
17 question.
18         In 2019, during calendar year 2019, did the
19 process that you just described with respect to
20 Ms. Padilla include evaluation of expenses which were
21 paid through Ackerman or Ackerman entities?
22     MS. KOZLOWSKI: Objection to form,
23 foundation.
24         And again, to the extent that it seeks
25 information derived from counsel, I would instruct you

Page 19

1 not to disclose those communications.
2     A. The Ackerman review was more from a legal
3 perspective at that time.
4     Q. (BY MR. SHEEHAN) So let me go back a step.
5 Forget the attorneys. I don't want to talk about the
6 attorneys.
7         You described the process which Ms. Padilla
8 undertook during 2019 to identify excess payments to
9 disqualified persons. Did that process that Ms. Padilla
10 used include review of payments that were made to the
11 Ackerman McQueen or its related entities?
12     MS. KOZLOWSKI: Objection, form,
13 foundation.
14     A. The Ackerman McQueen did not provide
15 sufficient backup, which was why counsel was brought in.
16     Q. (BY MR. SHEEHAN) All right. So is it
17 accurate to say that you did not include during calendar
18 year 2019, "you" the NRA, any payment from Ackerman, any
19 payment by Ackerman of expenses which were incurred by
20 disqualified persons at the NRA?
21     MS. KOZLOWSKI: Objection, form,
22 foundation, misstates testimony.
23         THE WITNESS: I don't know what to say.
24     A. Again -- again, the review of those invoices
25 ended up being through counsel because of litigation.

Page 20

1     Q. (BY MR. SHEEHAN) Okay. But let's go back to
2 2019. When expenses were incurred -- this is for
3 calendar year 2019 -- did Ms. Padilla have the records
4 from Ackerman in making the judgment about whether those
5 expenses should be treated as payments to disqualified
6 persons?
7     MS. KOZLOWSKI: Objection, form,
8 foundation.
9         You can answer to the extent you know.
10     A. She did not have the proper backup at that
11 time.
12     Q. (BY MR. SHEEHAN) Okay. Thank you.
13         Did the process, that process in 2019,
14 consider gifts that were purchased by Wayne LaPierre for
15 others in excess of $25?
16     MS. KOZLOWSKI: Objection, form,
17 foundation.
18     A. We had no expenses paid to Mr. LaPierre
19 through the accounts payable processes in 2019.
20     Q. (BY MR. SHEEHAN) So if he was purchasing
21 gifts during 2019 for other employees of the NRA or
22 outside persons, you would have no visibility into those
23 purchases. Is that correct? "You" the --
24     MS. KOZLOWSKI: Objection.
25     Q. (BY MR. SHEEHAN) Is that correct?

Page 21

6 (Pages 18 - 21)

1     MS. KOZLOWSKI: Objection, form,
2 foundation.
3     And you cut out for a moment, so we didn't
4 actually hear the totality of your question.
5     Q. (BY MR. SHEEHAN) Did Ms. Padilla or the
6 process in financial services have insight into or
7 access to the gifts purchased by Mr. LaPierre for other
8 NRA employees in determining excess benefits to
9 disqualified persons during calendar year 2019?
10     MS. KOZLOWSKI: Objection as to form and
11 foundation.
12     A. I will repeat, no expenses were paid to
13 Mr. LaPierre during that timeframe.
14     Q. (BY MR. SHEEHAN) That's true, but how about
15 on his behalf?
16     MS. KOZLOWSKI: Objection as to form and
17 foundation.
18     Q. (BY MR. SHEEHAN) Ms. Rowling?
19     A. If expense reports came through our normal
20 process of accounts payable, they would have been
21 evaluated.
22     Q. And how would I find out now or how would you
23 find out whether those expenses were reported through
24 your accounts payable process?
25     MS. KOZLOWSKI: I am going to object as

Page 22

1 to form and foundation and assumes facts not in
2 evidence.
3     Q. (BY MR. SHEEHAN) Ms. Rowling?
4     A. We would have to evaluate other expense
5 reports, which is done in the normal course anyway.
6     Q. When you say it's done in the normal course,
7 who does that?
8     A. I spoke to Portia Padilla.
9     Q. All right. Did the process in 2019 consider
10 hair and makeup services to Susan LaPierre as possible
11 excess payments to disqualified persons?
12     MS. KOZLOWSKI: Objection as to form,
13 foundation, assumes facts not in evidence.
14     And to the extent that it seeks information
15 that you learned from counsel, I would instruct you not
16 to disclose those communications.
17     It also calls for a legal conclusion.
18     MR. SHEEHAN: That objection is
19 ridiculous.
20     Q. (BY MR. SHEEHAN) The question is did the
21 process that you described, Ms. Rowling, for 2019
22 consider hair and makeup services to Susan LaPierre?
23     MS. KOZLOWSKI: Same objections.
24     A. Yeah, the process was -- was assisted with
25 counsel at that point.

Page 23

1     Q. (BY MR. SHEEHAN) In 2019?
2     A. It did not during 2019, but during the process
3 of -- of trying to determine what goes into the form.
4     Q. Okay. So let's go back. Let's talk about
5 calendar year 2019. Did the process include
6 consideration of hair and makeup services for Susan
7 LaPierre?
8     MS. KOZLOWSKI: Objection as to form and
9 foundation.
10     And again, I instruct you not to disclose any
11 attorney/client communications.
12     Q. (BY MR. SHEEHAN) Ms. Rowling?
13     A. I am not aware of those payments.
14     Q. All right. When you say you, "you" meaning
15 the NRA.
16     A. Sorry. I don't know.
17     Q. Okay.
18     A. I can't answer that.
19     Q. Okay. That's -- you're allowed to give that
20 answer, by the way.
21     Let's go back to the issue of -- so let's talk
22 about during 2019 are you familiar with the American
23 Express cards which were used by employees at the NRA?
24     A. Yes.
25     Q. And could you tell me whether the expenditures

Page 24

1 which were incurred on the American Express credit cards
2 were considered as part of the process you've described
3 for identifying potential excess benefit payments to
4 disqualified persons during calendar year 2019?
5     A. American Express payments were -- they were
6 reviewed in a normal course process. To the extent they
7 were considered excess benefits, would not have been
8 through that accounts payable process.
9     Q. Okay. So how would they be considered as
10 excess benefits if not through the normal accounts
11 payable process in 2019?
12     MS. KOZLOWSKI: Objection.
13     To the extent it calls for attorney/client
14 communications, I instruct you not to disclose those.
15     A. The process surrounding American Express
16 payments or credit card payments were -- were through
17 another line of approvals, so they would have been
18 evaluated separately.
19     Q. (BY MR. SHEEHAN) So who would the person be
20 during 2019 who would evaluate whether the American
21 Express credit card charges were excess benefits to
22 disqualified persons?
23     MS. KOZLOWSKI: Objection to the extent
24 it calls for a legal conclusion, as well as form and
25 foundation.

Page 25

7 (Pages 22 - 25)

1  A. I don't know.

2  Q. (BY MR. SHEEHAN) You, the NRA, don't know?

3  A. It would have gone through the treasurer's

4  office. So Rick Tedrick, Craig Spray at that time.

5  Q. And during 2019, did Mr. Tedrick or Mr. Spray

6  conduct a review and report back for purposes of the

7  2019 -- let me go back.

8      During 2019, did Mr. Tedrick or Mr. Spray have

9  within their responsibility the reporting of excess

10  benefit payments to disqualified persons to some other

11  portion of the NRA?

12      MS. KOZLOWSKI: Objection as to form.

13  A. No.

14  Q. (BY MR. SHEEHAN) With respect to 2018 and the

15  American Express credit cards, at that point whose

16  responsibility was it to review the American Express

17  credit card charges by disqualified persons within the

18  NRA?

19  A. It would have been the same and Woody

20  Phillips.

21  Q. All right. And did Mr. Phillips or

22  Mr. Tedrick or Mr. Spray have the specific

23  responsibility within the NRA of identifying American

24  Express credit card charges that involved potential

25  payments to disqualified persons?

Page 26

1      MS. KOZLOWSKI: Objection as to form,

2  foundation.

3      And again, to the extent it requires

4  attorney/client communication, I instruct you not to

5  disclose those.

6  A. No.

7  Q. (BY MR. SHEEHAN) Okay. How is it that

8  Mr. Spray in May of 2020 reported that there were no

9  payments to disqualified persons in 2019?

10      MS. KOZLOWSKI: Objection as to form,

11  foundation, assumes facts not in evidence, and it may

12  require speculation.

13  A. I would have to speculate on his answer to

14  that.

15  Q. (BY MR. SHEEHAN) Okay.

16  A. I don't have --

17  Q. What knowledge did the NRA have of American

18  Express credit card charges that were potentially excess

19  benefit payments to disqualified persons as of the time

20  that the original 2019 return was filed?

21  A. Can you repeat that question, please?

22  Q. What knowledge --

23      MR. SHEEHAN: Sorry, could the court

24  reporter read it back, please?

25      (Requested testimony read.)

Page 27

1  Q. (BY MR. SHEEHAN) And that's the 2019 4720

2  return.

3      MS. KOZLOWSKI: Objection as to form, as

4  well as objection to the extent it calls for a legal

5  conclusion.

6      Do you understand the question?

7  A. I don't really understand the question,

8  actually.

9  Q. (BY MR. SHEEHAN) What knowledge did the NRA

10  have of payments to disqualified persons when the

11  May 2019 return was filed?

12      MS. KOZLOWSKI: Objection to form,

13  foundation. Object to the extent it that calls for a

14  legal conclusion and to the extent that it seeks

15  attorney/client communication.

16  A. The form was signed at that time, as it even

17  says on the form, to the best of their knowledge.

18  Q. (BY MR. SHEEHAN) And their knowledge meaning

19  Mr. Spray's knowledge only?

20  A. It represents the organization.

21  Q. So that was to the best of the organization's

22  knowledge in May 2019, there was no 2020 --

23      To the best of the NRA's knowledge in May of

24  2020, there were no excess payments to disqualified

25  persons in 2019. Is that correct?

Page 28

1      MS. KOZLOWSKI: Objection as to form,

2  foundation, misstates testimony and to the extent it

3  calls for a legal conclusion.

4  Q. (BY MR. SHEEHAN) Ms. Rowling?

5  A. The question again, please?

6  Q. When -- I am going to rephrase it.

7      When the May 2020 4720 tax return, which is

8  Exhibit 2, part of Exhibit 2, was filed with the

9  Internal Revenue Service, the NRA had no knowledge of

10  any payments to disqualified persons -- excess payments

11  to disqualified persons during 2019. Is that correct?

12      MS. KOZLOWSKI: Same objection.

13  A. That -- if there was knowledge, it was not

14  known to the individual who signed it. I don't know who

15  else would have known, but at that point in time that

16  was the -- what was signed and agreed to.

17  Q. (BY MR. SHEEHAN) Hadn't Mr. Spray by May of

18  2020 identified significant failures to oversee the

19  American Express credit card charges by his predecessor

20  Mr. Phillips and by Mr. Tedrick?

21      MS. KOZLOWSKI: Objection as to form,

22  foundation. It's also argumentative.

23  Q. (BY MR. SHEEHAN) You can answer.

24  A. Mr. Spray identified areas of weakness, and we

25  were -- and was working toward rectifying those.

Page 29

8 (Pages 26 - 29)

1  Q. What were the weaknesses he identified?
2  A. Certification of -- and signatures by
3  individuals to their -- to the validity of the
4  individual charges or in some cases missing -- missing
5  receipts.
6  Q. How about statement of the purpose of the
7  expenditures? Was there weakness there with respect to
8  the 2019 American Express charges?
9  A. In some instances. Not all.
10  Q. Okay. And what did Mr. Spray -- or what did
11  the NRA do about those weaknesses with respect to
12  specific charges during 2019?
13  A. We sought -- sought further clarification and
14  implemented processes going forward to remove those
15  weaknesses.
16  Q. Did the NRA go back to older charges on the
17  NRA cards before 2019 to evaluate whether the same
18  weaknesses had existed in prior years?
19  A. For certain individuals there was a review.
20  Q. Which individuals?
21  A. Josh Powell specifically.
22  Q. Who else?
23  A. I am not aware of who else.
24  Q. Did anyone go back -- I'm sorry. Did the NRA
25  go back prior to --

Page 30

1  that came through on the corporate card, you say they
2  were looked at in the ordinary course. Who looked at
3  them?
4  A. That would have been Rick Tedrick.
5  Q. And did Mr. Tedrick ever identify any
6  weaknesses in Mr. Phillips' submission of charges on the
7  American Express Card?
8  MS. KOZLOWSKI: Objection as to form and
9  objection to the extent it calls for a legal conclusion.
10  A. I do not know.
11  Q. (BY MR. SHEEHAN) Okay. Let's go back to the
12  amended return that we were examining before. Can you
13  tell me when Mr. LaPierre was informed that some of his
14  travel expenses resulted in his receipt of excess
15  benefits?
16  MS. KOZLOWSKI: Objection as to form and
17  foundation.
18  And to the extent it calls for attorney/client
19  communications, I instruct you not to disclose them.
20  A. I am unaware of the exact date and time that
21  Mr. LaPierre was informed.
22  Q. (BY MR. SHEEHAN) Was it before 2020?
23  MS. KOZLOWSKI: Same objections.
24  A. I don't know.
25  Q. (BY MR. SHEEHAN) Okay. Doesn't the NRA know?

Page 32

1  During 2019, did the NRA go back and take a
2  look at the expenses incurred by Mr. Phillips for
3  weaknesses that you've talked about in your previous
4  answer?
5  MS. KOZLOWSKI: Objection to form and
6  foundation.
7  A. Mr. Phillips at that point was no longer with
8  the organization, and we were focusing on those
9  individuals that were currently with the organization.
10  Q. (BY MR. SHEEHAN) So it is fair to say
11  that you did not look at Mr. Phillips' charges. Is that
12  right?
13  MS. KOZLOWSKI: Objection, misstates
14  testimony.
15  A. Mr. Phillips, there -- again, he wasn't the
16  focus because he was no longer with the organization.
17  Q. (BY MR. SHEEHAN) So that means you did not
18  look at Mr. Phillips' charges. Is that correct?
19  MS. KOZLOWSKI: Objection, misstates
20  testimony.
21  A. Mr. Phillips' charges were -- were looked at
22  in normal course, as well as -- so I -- in a lot of
23  Mr. Phillips' expenses actually came through on an
24  expense report, not on a corporate card.
25  Q. (BY MR. SHEEHAN) All right. But for the ones

Page 31

1  A. I'm sure the NRA does know, and I realize I'm
2  speaking for the NRA, but that is not knowledge that I
3  currently have.
4  MR. SHEEHAN: So Counsel, we would like
5  to have a witness who can testify about that issue,
6  which is specifically part of our examination questions.
7  MS. KOZLOWSKI: I would disagree. You
8  have a very broad scope here. I certainly disagree that
9  that specific nuanced question falls within the scope
10  for something that the witness should be prepared to
11  answer.
12  Q. (BY MR. SHEEHAN) The 4720s that were filed,
13  were they -- were copies of these documents provided to
14  the board of directors of the NRA, that is, of
15  Exhibit 2?
16  A. No, they were not.
17  Q. Why not?
18  A. It's not procedure to do so.
19  Q. Say that again. I couldn't quite hear that.
20  A. It is not procedure to do so.
21  Q. So the disclosure that was filed in November
22  of 2020 that says that the employee -- senior employees
23  and officers, directors -- let me go back a second.
24  The disclosure from November 15, 2020 that
25  describes excess benefits payments to disqualified

Page 33

9 (Pages 30 - 33)

1  persons in violation of the IRS code were not disclosed
2  to the board?
3          MS. KOZLOWSKI: Objection. It is
4  argumentative, misstates -- assumes facts not in
5  evidence, misstates testimony, misstates the document.
6     Q.  (BY MR. SHEEHAN) Ms. Rowling?
7     A.  The board was not given this document.
8     Q.  Okay. Was there any committee of the board
9  that was given the document that is Exhibit 2, the 4720
10 filed on November 2020 for 2019?
11    A.  The committee -- no, not -- no committee was
12 given this document.
13    Q.  Why did the NRA not disclose these important
14 issues to the NRA board or any committee thereof?
15         MS. KOZLOWSKI: Objection, misstates
16 testimony.
17         MR. SHEEHAN: How does it misstate
18 testimony? Can you tell me on the record, please?
19         MS. KOZLOWSKI: You said how were
20 these -- why were these issues not disclosed to the
21 board. That is distinct from why was this document not
22 handed to the board. Those are different questions, and
23 the response was different. And it does -- and you
24 incorporate in there that no issue was disclosed to the
25 board, and that is inaccurate and misstates the

Page 34

1  testimony.
2          MR. SHEEHAN: Okay. Fair enough.
3     Q.  (BY MR. SHEEHAN) Ms. Rowling, how was the
4  board advised of the excess benefit payments to
5  disqualified persons by the NRA for 2019?
6          MS. KOZLOWSKI: I am going to object.
7     To the extent the communications were from
8  counsel, I would instruct you not to disclose those.
9     A.  I don't know.
10    Q.  (BY MR. SHEEHAN) Okay. As of today, as of
11 March 19, 2021, has the 4720 form, the amended 4720 form
12 ever been disclosed to any member of the board of
13 directors of the NRA who is not also an officer?
14    A.  I can't -- I don't know if it has been
15 disclosed to any member of the board.
16    Q.  Now in preparing that amended 4720, can you
17 tell me all the people who were involved in preparing
18 the amended report?
19    A.  Arif Rahman.
20    Q.  Who is that?
21    A.  He is the manager of tax and accounting
22 analysis.
23    Q.  Who else?
24    A.  John Frazer.
25    Q.  Okay. Who else?

Page 35

1     A.  And the Brewer firm.
2     Q.  Who else?
3     A.  Don -- Don Lan --
4     Q.  Who is he?
5     A.  -- who is the tax attorney for tax -- I guess
6  he's a tax attorney for Smith Lan Sosolik
7  Baxter-Thompson & Johnston.
8     Q.  Okay. And whose tax lawyer is he?
9     A.  He is not -- well, for the NRA. He was
10 brought in to help with the legal and disclosure
11 requirements surrounding tax returns.
12    Q.  Was Mr. LaPierre's personal tax attorney
13 involved in reviewing the -- that form, the 4720 for the
14 amended return?
15         MS. KOZLOWSKI: Objection to form and
16 scope.
17    A.  I don't know.
18    Q.  (BY MR. SHEEHAN) Who negotiated the amount to
19 be repaid by Mr. LaPierre to the NRA?
20         MS. KOZLOWSKI: Objection as to form,
21 scope.
22    As well as to the extent that it calls for
23 attorney/client communications, I would instruct you not
24 to disclose those.
25    A.  I don't know that negotiation was involved;

Page 36

1  however, those were legal counsel's discussions.
2     Q.  (BY MR. SHEEHAN) So was there anybody in a --
3  let me rephrase that.
4     With respect to Mr. LaPierre, was there a
5  demand made upon him to repay the money that he had
6  received that was considered an excess benefits
7  transaction?
8          MS. KOZLOWSKI: Again, to the extent it
9  seeks attorney/client communications, I ask you not to
10 disclose those.
11    A.  A payment was made back to the NRA.
12    Q.  (BY MR. SHEEHAN) Who made the demand that he
13 pay it back?
14    A.  I don't know.
15    Q.  Okay. Was there any negotiation involved to
16 determine the amount to be repaid to the NRA between --
17         MS. KOZLOWSKI: Objection, asked and
18 answered.
19    Q.  (BY MR. SHEEHAN) -- between Mr. LaPierre and
20 anyone else at the NRA?
21         MS. KOZLOWSKI: Objection, asked and
22 answered.
23    Q.  (BY MR. SHEEHAN) Ms. Rowling?
24    A.  I already indicated that I am unaware if there
25 was a negotiation.

Page 37

10 (Pages 34 - 37)

1 Q. Is the NRA confident that the amended return
2 with respect to Mr. LaPierre is complete, that is, it
3 includes all the payments which could be considered
4 excess benefits payments to disqualified persons for
5 2019?
6         MS. KOZLOWSKI: Objection, form,
7 foundation, calls for legal conclusion.
8         And again, to the extent that it seeks
9 attorney/client communications, I ask you not to
10 disclose those.
11    A. The NRA is confident in that, you know, what
12 we have -- what has been reviewed is accurate.
13    Q. (BY MR. SHEEHAN) What about what has not been
14 reviewed?
15         MS. KOZLOWSKI: Same objection.
16    A. What we -- there is no evidence at this time
17 that there is anything that hasn't been reviewed.
18    Q. (BY MR. SHEEHAN) Okay. And how do you know
19 that?
20    A. That would involve legal counsel.
21    Q. Okay. With respect to the Exhibit 2 which is
22 in front of you, starting at that amended return
23 documents, it says there's other transactions in 2019 in
24 prior calendar years that are still under review by the
25 NRA.

Page 38

1    A. I guess I don't -- considering that they're
2 all listed here, I'm not sure what your question is.
3    Q. (BY MR. SHEEHAN) It says -- so what it says
4 is there are other transactions in 2019 in prior
5 calendar years that are still under review by the NRA.
6         So what are the transactions from 2019 and
7 prior calendar years that are still under review by the
8 NRA?
9    A. The ones listed here.
10    Q. Any others besides the stuff that is in
11 these -- in these litigations?
12         MS. KOZLOWSKI: Objection to the extent
13 it it's seeking attorney/client communications and
14 investigations being undertaken by legal counsel.
15    Q. (BY MR. SHEEHAN) Ms. Rowling?
16         MS. KOZLOWSKI: If you have knowledge
17 outside of that, you can answer. If not, I would
18 instruct you not to answer.
19    A. These -- to the best of my knowledge, these
20 are what is currently under investigation. There --
21 through counsel there could be --
22         MS. KOZLOWSKI: Again, I would instruct
23 you --
24         THE WITNESS: Okay. Yeah.
25         MS. KOZLOWSKI: -- not to disclose any

Page 40

1         And could you tell me what those -- what those
2 other transactions are that -- I'm sorry.
3         There are other transactions in 2019 and prior
4 calendar years that are still under review by the NRA.
5 Can you tell me what other transactions are under
6 review, please?
7         MS. KOZLOWSKI: Counsel, can you advise
8 where you're reading from within the document so that we
9 can see it?
10         MR. SHEEHAN: I apologize. Okay. So
11 it's paragraph 3. It's like the third sentence from the
12 top.
13         MS. KOZLOWSKI: On page 1?
14         MR. SHEEHAN: Correct.
15    A. What page of the --
16         MR. SHEEHAN: I'm sorry. Stephen, it's
17 page 31?
18         MR. THOMPSON: Yeah, it's page 31, third
19 paragraph down, last sentence.
20    A. Okay. So I'm sorry, repeat the question.
21    Q. (BY MR. SHEEHAN) What are the other
22 transactions in 2019 and prior calendar years that are
23 still under review by the NRA?
24         MS. KOZLOWSKI: Objection to the extent
25 that it seeks attorney/client communications.

Page 39

1 attorney/client communications.
2    A. I am having difficulty answering on behalf of
3 NRA versus personal knowledge, so I apologize for that.
4    Q. (BY MR. SHEEHAN) No, that's understandable.
5         So tell me -- what I'm looking for here is
6 forget whatever the Brewer firm is doing with this
7 stuff. What effort is the NRA as an organization making
8 to make sure that the transactions in 2019 and prior
9 calendar years, the review is completed and action is
10 taken? Does that make sense?
11    A. It does. It's hard to separate when you say
12 forget what the Brewer firm is doing because there is a
13 role that they play in this process.
14    Q. So let me try this. If you look at the
15 current transactions for 2020, right, the current
16 transactions, the NRA is currently evaluating those,
17 correct, in its ordinary course of business to determine
18 whether they are excess benefits paid to disqualified
19 persons. Correct?
20    A. Correct.
21    Q. And is Portia Padilla still in charge of that
22 process?
23    A. Portia is part of that process.
24    Q. Who else is part of that process?
25    A. Anyone in AP, in accounts payable department.

Page 41

11 (Pages 38 - 41)

1 Anyone in -- across the organization is part of that
2 process.
3    Q.   But the process of evaluating transactions for
4 2020 to determine whether they are excess benefit
5 transactions, is that primarily Ms. Padilla's
6 responsibility?
7         MS. KOZLOWSKI:  Objection as to form and
8 to the extent it calls for a legal conclusion.
9    A.   No, it would not primarily be her
10 responsibility as the transactions are also reviewed at
11 legal counsel level.
12    Q.   (BY MR. SHEEHAN) And who does that review?
13         MS. KOZLOWSKI:  Objection to the extent
14 it's seeking attorney/client communications.
15         I instruct you not to answer.
16    Q.   (BY MR. SHEEHAN) Now if you look at the
17 bottom of page 1 and the top of page 2, it walks through
18 the calculation of payments due -- let me go back to
19 Mr. LaPierre for a second.
20         Did Mr. LaPierre pay the excise tax due on the
21 amounts disclosed in amended return 2019 in this
22 Exhibit 2?
23         MS. KOZLOWSKI:  Objection, form,
24 foundation and to the extent it calls for speculation as
25 to what Mr. LaPierre did.

Page 42

1 record, this question exceeds -- far exceeds the scope
2 of the topics for which -- for this 30(b)(6) that was
3 noticed.
4    Q.   (BY MR. SHEEHAN)  Did the NRA calculate the
5 excise tax due from Mr. LaPierre for the 2019 excess
6 benefits to disqualified persons?
7         MS. KOZLOWSKI:  Objection, scope,
8 foundation.  Again, this far exceeds the topics for
9 which this deposition has been -- has been noticed.  It
10 is also seeking information with respect to
11 Mr. LaPierre's personal actions with respect to his
12 taxes and is not appropriate.
13    Q.   (BY MR. SHEEHAN) Does the NRA undertake any
14 effort to determine whether its senior executives as
15 disqualified persons honor their tax obligations to the
16 United States?
17         MS. KOZLOWSKI:  Objection as to form,
18 foundation.  Again, this far exceeds the scope of the
19 topics for which this deposition has been noticed.
20    Q.   (BY MR. SHEEHAN) Okay.  Let's go then to
21 Mr. Powell.
22         Sorry, has the NRA identified excess benefits
23 to disqualified persons from Mr. LaPierre during 2020,
24 that were incurred during calendar year 2020?
25    A.   That is currently being evaluated.

Page 44

1    A.   Yeah, I can't speak to what Mr. LaPierre has
2 done.
3    Q.   (BY MR. SHEEHAN) Okay.  So the document in
4 front of you that the NRA represents that Mr. LaPierre
5 repaid the NRA the entire aggregate amount plus
6 interest.  It says nothing about whether he paid the
7 excise tax.  Does the NRA know whether he paid the
8 excise tax?
9         MS. KOZLOWSKI:  Objection to form,
10 foundation and to the extent it calls for speculation.
11    A.   Again, I cannot speak to what Mr. LaPierre has
12 done for his personal taxes.
13    Q.   (BY MR. SHEEHAN) Okay.  Did -- does the NRA
14 know if he paid the excise tax?
15         MS. KOZLOWSKI:  Same objection.
16    A.   Same response.
17    Q.   (BY MR. SHEEHAN)  That the NRA does not know
18 whether he paid the excise tax?
19         MS. KOZLOWSKI:  Objection, misstates
20 testimony.
21    Q.   (BY MR. SHEEHAN) Ms. Rowling?
22    A.   I do not know.  I know I'm speaking for the
23 NRA, but I do not know the answer to that question.
24    Q.   Okay.  That's fair.
25         MS. KOZLOWSKI:  For clarity of the

Page 43

1    Q.   And are there -- is anyone involved in that
2 except for the lawyers?
3    A.   Yes.
4    Q.   Who?
5    A.   I have been involved.
6    Q.   And what has been your involvement?
7    A.   Providing information surrounding
8 transactions.
9    Q.   What transactions?
10    A.   Are you asking from a personal perspective or
11 NRA perspective?
12    Q.   NRA perspective.
13    A.   Repeat the question, please.
14    Q.   You said -- well, what transactions that were
15 engaged in in 2020 is the NRA currently reviewing to
16 determine whether they involve excess benefits to
17 disqualified persons for Mr. LaPierre?
18         MS. KOZLOWSKI:  Objection to form,
19 foundation, to the extent it calls for a legal
20 conclusion and to the extent that it invades the
21 attorney/client privilege.
22         To the extent you have knowledge outside
23 discussions with counsel, you can answer.
24    A.   Flight details.
25    Q.   (BY MR. SHEEHAN)  What kind of flight details?

Page 45

12 (Pages 42 - 45)

1      MS. KOZLOWSKI:  Same objection.
2   A.  Travel.  I mean, what other flights are there?
3 I'm not sure where that's coming from.
4   Q.  (BY MR. SHEEHAN)  Where -- flights to where?
5 Flights from where?
6      MS. KOZLOWSKI:  Same objections.
7   A.  Business travel.
8   Q.  (BY MR. SHEEHAN)  What about expenses apart
9 from flights for Mr. LaPierre?
10      MS. KOZLOWSKI:  Same objection.
11   A.  I testified earlier that no expenses had been
12 paid for Mr. LaPierre relating to 2019 or 2020.
13   Q.  (BY MR. SHEEHAN)  I'm sorry, no expenses have
14 been paid for Mr. LaPierre by the NRA for 2019 or 2020?
15 Did I hear that right?
16   A.  That is correct.
17   Q.  So when he incurred expenses for -- when he
18 incurred expenses in order to travel or do other things
19 for the NRA, who paid for them?
20      MS. KOZLOWSKI:  Objection, form,
21 foundation, calls for speculation.
22   A.  Mr. LaPierre has expense reports that he has
23 not submitted that are -- that he has maintained but has
24 not submitted.
25   Q.  (BY MR. SHEEHAN)  How do you know that?

Page 46

1   A.  Because he incurred those expenses.
2   Q.  How do you know that?
3   A.  I have seen a few in order to accrue expenses
4 into the proper period.
5   Q.  And so just so I understand, no expense which
6 Mr. LaPierre incurred for travel was charged to the --
7 was ever paid by the NRA in either 2019 or 2020.  Is
8 that correct?
9   A.  No, that's not correct.
10   Q.  Okay.  So what expenses were paid for
11 Mr. LaPierre for travel during 2019 and 2020 by the NRA?
12   A.  Flights.
13   Q.  Flights.  And no other expenses beyond that.
14 Is that correct?
15   A.  I -- that would -- that would have -- none of
16 his personal expense reports have been submitted.
17   Q.  Okay.  And has he received any advances, any
18 travel advances from the NRA for those expenses?
19   A.  No, he has not.
20   Q.  Okay.  With respect to Mr. Powell the --
21 actually, let's go to Mr. Cox.
22      How was -- how did the NRA determine the
23 amounts set forth on page 32 of Exhibit 2 for Mr. Cox?
24      MS. KOZLOWSKI:  Objection, form,
25 foundation.

Page 47

1      Additionally, to the extent that your
2 knowledge is informed by conversations with counsel, I
3 instruct you not to disclose those communications.
4   A.  The review of those expenses came through a
5 litigation process, which I cannot speak to.
6   Q.  (BY MR. SHEEHAN)  Okay.  On page 32, it says
7 it's in excess of 1 million.  Is that accurate?
8      MS. KOZLOWSKI:  Objection, form,
9 foundation.
10   A.  That is what the page says.
11   Q.  (BY MR. SHEEHAN)  Is it true?
12   A.  Again, that is legal.
13   Q.  Well, it says the NRA determined to be
14 provided to Mr. Cox.  Right?
15      MS. KOZLOWSKI:  Can you restate the
16 question, Counsel?
17      MR. SHEEHAN:  Sure.
18   Q.  (BY MR. SHEEHAN)  It says that to date the
19 aggregate excess benefit from 2015 to June 26, 2019
20 determined to be provided to Mr. Cox is in excess of
21 $1 million.  Who at the NRA made that determination?
22      MS. KOZLOWSKI:  Objection, asked and
23 answered.
24      Additionally, to the extent that it calls for
25 communications with legal counsel, I would instruct you

Page 48

1 not to disclose those.
2   A.  Again, those are litigation matters at this
3 point.
4   Q.  (BY MR. SHEEHAN)  Who made the determination
5 that he owed that much money at the NRA?
6      MS. KOZLOWSKI:  Same objection.
7   A.  And same response.
8   Q.  (BY MR. SHEEHAN)  What, that -- the person who
9 made the determination -- there's no employee of the NRA
10 who made the determination that Mr. Cox owed in excess
11 of $1 million?
12      MS. KOZLOWSKI:  Objection, misstates
13 testimony.
14   Q.  (BY MR. SHEEHAN)  Am I correct?
15   A.  There are internal and external counsel
16 involved in these proceedings.
17   Q.  Understood.  But did anyone who is an employee
18 of the NRA, not a lawyer, make a determination that
19 Mr. Cox owed in excess of $1 million?
20   A.  Internal counsel is an employee of the NRA.
21   Q.  Did he make that determination?
22      MS. KOZLOWSKI:  Objection.  No, that is
23 unequivocally asking for attorney/client communication.
24      I instruct the witness not to answer.
25      MR. SHEEHAN:  We disagree on that.

Page 49

13 (Pages 46 - 49)

1 Q. (BY MR. SHEEHAN) So what does it say about
2 the effectiveness of the process that you had that
3 between 2015 and 2019 the NRA failed to capture in
4 its -- any of its returns until November of 2020 the
5 excess payments to Mr. Cox?
6 MS. KOZLOWSKI: Objection, argumentative,
7 foundation, exceeds the scope.
8 Q. (BY MR. SHEEHAN) Let me ask you this. Did
9 anyone -- anyone involved in reviewing or preparing
10 4720s identify these excess payments to Mr. Cox between
11 2015 and 2019?
12 MS. KOZLOWSKI: Objection to the extent
13 it calls for speculation.
14 A. Yeah, I do not know.
15 Q. (BY MR. SHEEHAN) You don't know if anybody
16 ever looked at the expenses incurred by Mr. Cox in
17 preparing IRS Form 4720 for 2015, 2016, 2017, 2018,
18 2019?
19 MS. KOZLOWSKI: Counsel, this far exceeds
20 the scope of the topics. The deposition topics refer to
21 the 4720s for 2019, 2020 and 2021. That's an improper
22 question.
23 Q. (BY MR. SHEEHAN) Would you agree with me that
24 to the extent -- well, let's move on from that.
25 We talked about --

Page 50

---

1 4720 filed in 2019?
2 A. Was the form filed in 2019?
3 Q. Yes.
4 A. Yes.
5 Q. Okay. Do you know whether that form for 2018,
6 which is part of Exhibit 2, filed in 2019 captured or
7 reflected the American Express credit card charges for
8 disqualified persons that were issued by Ackerman
9 McQueen?
10 MS. KOZLOWSKI: Objection to form and
11 foundation.
12 A. No, it did not.
13 Q. (BY MR. SHEEHAN) What, if any, effort has
14 been made since the filing of the 2018 4720 to capture
15 those Ackerman McQueen American Express charges for
16 disqualified persons at the NRA?
17 A. That involves ongoing litigation, so it's part
18 of that process.
19 Q. Okay. With respect to -- is there any
20 determination that has been made subsequent -- all I see
21 now is a phone. Okay.
22 With respect -- has there been any
23 determination of payments to disqualified persons
24 subsequent to the filing of the 2019 amended return in
25 2020?

Page 52

---

1 MR. SHEEHAN: Do you need a break at this
2 point? Would you like a break at this point?
3 MS. KOZLOWSKI: Sure, that would be great
4 here.
5 MR. SHEEHAN: Okay. Why don't we take
6 ten minutes.
7 THE VIDEOGRAPHER: We're going off the
8 record. The time on the video is 10:09 a.m.
9 (Break from 10:09 a.m. to 10:33 a.m.)
10 THE VIDEOGRAPHER: This begins media unit
11 number 2. The time on the video is 10:33 a.m. We are
12 on the record.
13 Q. (BY MR. SHEEHAN) Ms. Rowling, when the 2018
14 4720 document was prepared, were the individuals
15 involved in the preparation of that document aware of
16 American Express credit cards which were issued for
17 Ackerman McQueen but given to disqualified persons at
18 the NRA?
19 MS. KOZLOWSKI: Objection. This exceeds
20 the scope of the topics for which this deposition was
21 sought. The topic includes the Form 4720 for 2019,
22 2020, and 2021.
23 MR. SHEEHAN: And that were drafted,
24 reviewed, or filed in 2019.
25 Q. (BY MR. SHEEHAN) Ms. Rowling, was the 2018

Page 51

---

1 MS. KOZLOWSKI: Object to form.
2 A. I don't know.
3 Q. (BY MR. SHEEHAN) Okay. All right. Let's
4 move on to the topic 6, which is the accountable plan.
5 MR. SHEEHAN: Court Reporter, I guess
6 when the witness doesn't speak, it just goes back to the
7 phone, is what it looks like.
8 MR. THOMPSON: This is Stephen. If you
9 right click on Ms. Rowling's video, there should be a
10 pin option which will make it so that she is there even
11 if somebody else speaks.
12 MR. SHEEHAN: Okay. Not -- not letting
13 me do that. Okay.
14 Q. (BY MR. SHEEHAN) Ms. Rowling, can you tell me
15 what the NRA believed -- well, does the NRA maintain an
16 accountable plan for payment of expenses of employees --
17 (audio unclear.)
18 (Reporter clarification.)
19 MR. SHEEHAN: Okay. Let me try again.
20 Q. (BY MR. SHEEHAN) Ms. Rowling, between 2016
21 and the present has the NRA maintained and accountable
22 plan for payment of the employee expenses?
23 A. The NRA maintains an accountable plan.
24 Q. And who is responsible for maintaining that
25 plan?

Page 53

---

14 (Pages 50 - 53)

1     MS. KOZLOWSKI: Objection to form.
2    A. It is part of the policy manual of the NRA.
3    Q. (BY MR. SHEEHAN) Right. But who is the human
4 who is in charge of maintaining the accountable plan?
5    A. That would fall under the treasurer's office.
6    Q. And so is there a person who has that
7 responsibility?
8    A. Ultimately, the treasurer.
9    Q. Is there anyone below the treasurer meaning --
10 who has that responsibility for maintaining the
11 accountable plan?
12    A. Specifically one person?
13    Q. Yeah.
14    A. No. A policy and procedures manual is for
15 everyone to follow, so not one person.
16    Q. Who makes sure that people follow it, the
17 accountable plan?
18    A. As expense reports are submitted to accounts
19 payable, they're reviewed.
20    Q. And who is --
21    A. They're also part of the entire process of
22 review by each individual who submits an expense report.
23 They are held accountable for that by their -- for
24 whoever approves their expense report.
25    Q. Is that process that you just described

Page 54

1 applicable also to directors and officers of the NRA?
2    A. Yes.
3    Q. And has that been the case since between 2016
4 and the present?
5    MS. KOZLOWSKI: Objection to form.
6    A. The process -- sorry, I'm losing my voice --
7 has always been in place, you know, and the plan has
8 been in place.
9    Q. (BY MR. SHEEHAN) Has it been enforced since
10 2016?
11    MS. KOZLOWSKI: Objection to form.
12    A. There were areas in which there was lacking
13 enforcement of that plan by the treasurer himself who is
14 no longer with the organization.
15    Q. (BY MR. SHEEHAN) All right. And what were
16 those failures by the former treasurer?
17    MS. KOZLOWSKI: Objection, misstates
18 testimony, form.
19    A. I didn't say there were failures. There were
20 areas in which proper review might not have taken place
21 and -- or enforcement.
22    Q. (BY MR. SHEEHAN) All right. What areas were
23 those that were -- proper review may not have taken
24 place or enforcement?
25    A. That would be -- those are very specific

Page 55

1 incidences that I can't recall off the top of my head.
2    Q. Okay. Can the NRA recall?
3    A. No.
4    Q. Okay. With respect to pass-through expenses
5 to the Ackerman McQueen, were those pass-through
6 expenses captured in the accountable plan enforcement or
7 direction?
8    MS. KOZLOWSKI: Objection as to form.
9    A. I don't -- I do not know. I know I have to
10 speak for the NRA, but in this regard I cannot -- I do
11 not know.
12    Q. (BY MR. SHEEHAN) One of the requirements of
13 an accountable -- what is your understanding of the
14 requirements of an accountable plan?
15    A. They are -- an accountable plan is following
16 IRS guidelines with respect to employee expense
17 reimbursement for business purpose.
18    Q. Okay. And what specific things do they
19 require?
20    A. I don't know off the top of my head.
21    Q. Would you agree that the -- under an
22 accountable plan if you have a business expense, you
23 have to have a written justification for the business
24 expense?
25    MS. KOZLOWSKI: Objection as to form, and

Page 56

1 objection to the extent it calls for a legal conclusion.
2    A. Business purpose is required as part of our
3 policy.
4    Q. (BY MR. SHEEHAN) Okay. And does that -- and
5 how is that -- how is the business purpose documented
6 under your policy for your accountable plan?
7    A. I don't understand your question.
8    Q. In other words, how -- when a person submits
9 their expenses, how do they document the business
10 purpose under the terms of the NRA accountable plan?
11 How are they expected to or required to?
12    MS. KOZLOWSKI: Objection as to form.
13    A. There is an area on an expense report which
14 they are to fill that out.
15    Q. (BY MR. SHEEHAN) All right. And if they
16 don't fill out an expense report or they use an American
17 Express card, for example, what is the obligation to
18 document the business purpose of the expenditure under
19 the accountable plan?
20    A. There is -- an Excel spreadsheet is created
21 from a download directly from an American Express
22 statement, and the individuals are required to fill out
23 next to each line item a business purpose.
24    Q. And how recent is that requirement?
25    A. That has been in place.

Page 57

15 (Pages 54 - 57)

1  Q. For how long?
2  A. As far as I know, it's always been in place.
3  Q. Did Mr. Phillips follow that policy?
4       MS. KOZLOWSKI: Objection as to form and
5  to the extent it calls for the advice of counsel.
6  A. I would have to look at each individual
7  expense report of Mr. Phillips and/or credit card
8  statement to verify that.
9       (Audio interference.)
10      MR. SHEEHAN: Jason, we can hear you.
11      MR. KATHMAN: Sorry.
12  Q. (BY MR. SHEEHAN) With respect to Mr. Powell,
13  did he comply with the requirements for documentation of
14  the business purpose of expenses he incurred?
15      MS. KOZLOWSKI: Objection to form.
16      And to the extent that it calls for
17  attorney/client communications, I instruct you not to
18  disclose them.
19  A. Mr. Powell -- the Excel spreadsheets were
20  completed. To the extent that the business purpose was
21  full and complete is part of ongoing litigation.
22  Q. (BY MR. SHEEHAN) With respect to Mr. Cox, did
23  he complete the spreadsheet with the business purpose
24  for each transaction?
25      MS. KOZLOWSKI: Same objection.

Page 58

1  A. I do not know, and -- yeah, I don't know.
2  Q. (BY MR. SHEEHAN) Okay. With respect to
3  Mr. LaPierre, did he complete the spreadsheet with the
4  business purpose of each transaction?
5       MS. KOZLOWSKI: What period of time,
6  Counsel?
7  Q. (BY MR. SHEEHAN) At any time between 2016 and
8  the present.
9  A. Again, I recognize I speak for the NRA, but I
10  do not know given those expense reports were never
11  processed through the division for which I was
12  personally in.
13  Q. You were personally in. I'm sorry. So
14  speaking on behalf of the NRA --
15  A. I understand that, but I don't know.
16  Q. Okay. Fair enough.
17      If there was an improper expenditure under the
18  accountable plan, how does the NRA recover that
19  expenditure?
20      MS. KOZLOWSKI: Objection.
21      To the extent it calls for communications with
22  counsel, I would instruct you not to disclose them.
23  A. Well, that's -- that's a vague hypothetical
24  question with respect to -- the assumption there is kind
25  of all over the place with respect to that, so I can't

Page 59

1  really answer that question.
2  Q. (BY MR. SHEEHAN) Are there -- under the
3  accountable plan between 2016 and the present, under the
4  expense reimbursement policy of the NRA, have there ever
5  been situations, other than those listed in the 4720, in
6  which an employee received payment for what was later to
7  be determined a personal expense?
8  A. Through the expense report process, those
9  would generally be not ever reimbursed. Through the
10  credit card process, yes, employees have had to pay
11  back.
12  Q. And whose job is it to chase them down and
13  make sure they pay it back under the accountable plan?
14      MS. KOZLOWSKI: Objection to form.
15  A. Not one particular person. It would be
16  identified and then pursued by their -- I guess their
17  superior, depending on who it is.
18  Q. (BY MR. SHEEHAN) So with respect to
19  Mr. Powell, it would be pursued by Mr. LaPierre at the
20  time he was -- that Mr. Powell worked for the NRA?
21  A. That would have been pursued by Craig Spray as
22  treasurer.
23  Q. Okay. With respect to Mr. DeBergalis, if he
24  received improper reimbursement, who would pursue it
25  with him?

Page 60

1  A. You're speculating on, you know, if that
2  actually occurred.
3  Q. Your 4720, Exhibit 2, says Mr. DeBergalis may
4  have received business class travel without
5  authorization, right. If that amount is determined to
6  be due, whose job would it be to pursue the recovery of
7  that money?
8       MS. KOZLOWSKI: Objection to form and
9  seeks -- and it calls for the advice of counsel.
10      I would instruct you not to disclose those
11  communications.
12  A. That would either be through counsel's office,
13  internal, or the treasurer --
14  Q. (BY MR. SHEEHAN) Okay.
15  A. -- or probably both.
16  Q. With respect to indirect payments for expenses
17  of the NRA employees -- let me go back.
18      For the indirect payment of expenses for NRA
19  employees, for example, dinner at Landini's that was
20  reimbursed to Ackerman McQueen or its affiliates, how
21  would the process -- the accountable plan process
22  address those charges in terms of obtaining
23  documentation for business purpose?
24      MS. KOZLOWSKI: Objection as to form.
25  A. The NRA no longer would allow the way it was

Page 61

16 (Pages 58 - 61)

1 billed in the past, which was hidden in other invoices;
2 and due to the NRA instituting proper backup behind an
3 invoice, that would not occur.
4    Q.   (BY MR. SHEEHAN) All right. How many
5 years -- between 2016 and 2019, how often did it occur?
6 How often did it occur that Landini's bills were sent
7 through and paid on behalf of disqualified persons
8 through the Ackerman account?
9         MS. KOZLOWSKI: Objection to form.
10 Additionally, objection to the extent that it's seeking
11 work product due to the ongoing investigation.
12    A.   That is subject to ongoing litigation.
13    Q.   (BY MR. SHEEHAN) Okay. Is it fair to say
14 that the accountable plan in place between 2016 and 2019
15 had no system for capturing expenses paid indirectly
16 through the Ackerman account at the NRA?
17         MS. KOZLOWSKI: Objection as to form.
18    A.   The systems in place at that time would have
19 difficulty in seeing that sort of transaction.
20    Q.   (BY MR. SHEEHAN) Would have difficulty. Was
21 there any -- was there any regular reporting of those
22 transactions to the system in place at the time?
23         MS. KOZLOWSKI: Objection, vague.
24    A.   Given the lack of support behind certain
25 invoices, those would not have been identified.

Page 62

1    Q.   Prior to May -- prior to April of 2019, did
2 the NRA ever make any request to the Ackerman McQueen
3 people as a part of its accountable plan to identify
4 payments for travel or other expenses for disqualified
5 persons?
6         MS. KOZLOWSKI: Objection to the extent
7 it's seeking attorney/client communications --
8         MR. SHEEHAN: I am asking about --
9    Q.   (BY MR. SHEEHAN) Did you make -- what efforts
10 did the NRA make between 2016 and 2019 pursuant to its
11 accountable plan to identify expenses that were passed
12 through the Ackerman account?
13    A.   The -- those individuals responsible for that
14 were not informed that that was taking place by the CFO.
15 So it was the treasurer and CFO who neglected his duties
16 to identify that those transactions existed.
17    Q.   And have all those transactions been addressed
18 since then to make sure there are no -- let that go.
19         Let's move on to the IRS 990, which is topic
20 2.
21         (Reporter clarification.)
22    Q.   (BY MR. SHEEHAN) Let's start off with the
23 2019 IRS 990.
24         MR. SHEEHAN: Stephen, could you pull
25 that up on the screen?

Page 63

1         MR. THOMPSON: Yes. It will just take a
2 minute for it to load.
3         THE REPORTER: While we're waiting, could
4 the 202 number who just joined please identify?
5         MR. THOMPSON: Jim, you said 2019?
6         MR. SHEEHAN: Correct.
7         MS. KOZLOWSKI: Ms. Brandt, before we
8 move into the 990, we do need to track down the 202
9 number.
10         MR. SHEEHAN: Could we go off the record
11 for that so we're not burning time?
12         THE VIDEOGRAPHER: We're going off the
13 record. The time is 10:53 a.m.
14         (Break from 10:53 a.m. to 10:54 a.m.)
15         THE VIDEOGRAPHER: We're back on the
16 record. The time on the video is 10:54 a.m.
17         (Exhibit 3 marked.)
18    Q.   (BY MR. SHEEHAN) Ms. Rowling, is it the NRA's
19 belief that the 2019 IRS 990 and supporting schedules
20 that were submitted in November of 2020 and identified
21 as Exhibit 3, is it the NRA's view that that IRS 990 is
22 accurate, correct and complete?
23    A.   To the extent of the knowledge at the time
24 that it was filed, which is what it says in the
25 signature line, yes.

Page 64

1    Q.   And whose responsibility was it to prepare the
2 2019 990?
3    A.   There are multiple parts of this form, but the
4 preparer was Arifur Rahman.
5    Q.   And you told me Arif's title before, but I've
6 forgotten it. What was his title?
7    A.   Manager of tax and accounting analysis.
8    Q.   And when Mr. Rahman prepared Exhibit 3, did he
9 have workpapers to support that preparation?
10    A.   Yes.
11    Q.   How did he go about obtaining the information
12 necessary to prepare the 2019 990?
13    A.   The main source of the 990 from the dollar
14 figure amount is the audited financial statement.
15    Q.   With respect --
16    A.   Other --
17    Q.   I'm sorry. Go ahead.
18    A.   Other -- other information is obtained through
19 the secretary's office and legal -- internal legal
20 counsel.
21    Q.   Any other sources?
22    A.   Internal policies, manuals.
23    Q.   Okay. Now with respect to -- if you take a
24 look at the first page, line F, of the 2019 990, it
25 represents that the principal officer of the NRA is

Page 65

17 (Pages 62 - 65)

1 Wayne LaPierre. Is that correct, that he is the
2 principal officer?
3    A. Yes.
4    Q. Does that represent any change from 2018 or
5 2017?
6    A. I would have to look at those two other
7 documents.
8    Q. They both represent that Mr. Spray is the
9 principal officer. Was Mr. Spray the principal officer
10 during 2018 -- I'm sorry -- during 2018 and 2017?
11    A. I believe both could be interchanged in those
12 forms.
13    Q. As principal officer?
14    A. Correct.
15    Q. Why is the document signed by Mr. LaPierre in
16 2019?
17        MS. KOZLOWSKI: Objection to form.
18    And to the extent that it involves
19 conversations with legal counsel, I would instruct you
20 not to disclose those.
21    A. Yeah, those were legal decisions that were
22 made with respect to that signature.
23    Q. (BY MR. SHEEHAN) Okay. What review did
24 Mr. LaPierre undertake prior to signing off on the -- on
25 Exhibit 3?

1    A. Mr. LaPierre reviewed this form with John
2 Frazer.
3    Q. When you say reviewed it, how did he assure
4 himself that the information contained in the form was
5 correct before he signed?
6    A. I do not know.
7    Q. Okay.
8    A. Those were conversations with John Frazer.
9    Q. All right. If you turn to part IV, question
10 25a and b, and that's -- on the 990 form, it's on page
11 4.
12        MS. KOZLOWSKI: Can you give a page of
13 the PDF, please?
14        MR. SHEEHAN: Stephen, can you give a
15 page of the PDF?
16        MR. THOMPSON: Yes. It is also PDF page
17 4.
18        MS. KOZLOWSKI: Thank you.
19    Mr. Sheehan, can we have you adjust your
20 camera? It's difficult to -- it's easier to hear you
21 when we can also see your lips. Thank you.
22        MR. SHEEHAN: Okay. It's because it
23 doesn't show on my screen for some reason. I will do my
24 best here.
25    Q. (BY MR. SHEEHAN) Let's go with --

1        MS. KOZLOWSKI: Thank you.
2    Q. (BY MR. SHEEHAN) -- 25a and b, do you know
3 what the -- how did the organization determine they
4 engaged in an excess benefit transaction with a
5 disqualified person?
6    A. I'm sorry. Can you repeat that question?
7    Q. Sure.
8    How did the NRA determine that the correct
9 answer to question 25a was yes?
10        MS. KOZLOWSKI: Objection.
11    To the extent it calls for communications with
12 legal counsel, I would instruct you not to disclose
13 those communications.
14    A. The disclosure was part of review due to
15 ongoing litigation and discussions with counsel to
16 determine whether there were excess benefit
17 transactions.
18    Q. (BY MR. SHEEHAN) And would you give me the
19 same answer as to question 25b?
20    A. That is correct.
21    Q. All right. With respect to -- let's move on
22 to part -- by the way, have you ever seen before the
23 2019 return the NRA checking the box yes as to 25a or
24 25b in part IV?
25    A. I don't recall, and I'd have to look at the

1 document.
2    Q. All right. Let's move on to part VI. Part
3 VI, line 5, which is --
4        MS. KOZLOWSKI: Can you provide the page
5 again, please?
6        MR. THOMPSON: Yes. Two pages down, PDF
7 page 6.
8        MS. KOZLOWSKI: Thank you. That's
9 helpful.
10    Q. (BY MR. SHEEHAN) Look at question 5. Did the
11 organization become aware during the year of a
12 significant diversion of the organization's assets? And
13 the box is check yes.
14    What was the basis for the preparation, review
15 of that answer?
16        MS. KOZLOWSKI: Objection.
17    To the extent that it calls for communications
18 with counsel, I would instruct you not to disclose
19 those.
20    A. That was checked yes due to the discovery of
21 the incidences that are under review or, I guess, in
22 litigation regarding Josh Powell.
23    Q. (BY MR. SHEEHAN) Apart from the Josh Powell
24 payment, were there any other payments which were
25 perceived as a significant diversion supporting that

1 question 5?
2 (Audio interference.)
3 MR. THOMPSON: You are unmuted.
4 MS. KOZLOWSKI: Counsel, can you repeat
5 the question after that?
6 MR. SHEEHAN: And I have forgotten my
7 question.
8 Court reporter, can you just read back the
9 question?
10 (Requested testimony read.)
11 MS. KOZLOWSKI: The same objection with
12 respect to attorney/client communication.
13 A. There is -- as disclosed in the notes, there
14 are ongoing litigations with respect to any other
15 diversion of assets that would have --
16 Q. (BY MR. SHEEHAN) Wasn't the -- I'm sorry.
17 Wasn't the payment for Wayne LaPierre's
18 expenses one of the diversions referenced for question 5
19 of part IV -- part VI.
20 MS. KOZLOWSKI: Objection.
21 To the extent it calls for attorney/client
22 communications, please don't disclose those.
23 A. Mr. LaPierre repaid any assets that were
24 deemed to have not been supported by a business purpose.
25 And you know -- and I am not -- I don't know, given the

Page 70

1 legal advice surrounding it, if it's caused that
2 particular yes in that --
3 Q. (BY MR. SHEEHAN) How about with respect to
4 Millie Hallow, the payments -- the moneys that Millie
5 Hallow owed for her son's wedding, was that part of the
6 answer to question 5, part VI?
7 MS. KOZLOWSKI: Objection.
8 Again, to the extent that the answer to
9 question 5 was derived from advice of counsel, I would
10 instruct you not to disclose those communications.
11 A. Ms. Powell also repaid those assets, and
12 again, that goes to legal advice on the -- answering
13 those yes for that question.
14 Q. (BY MR. SHEEHAN) With respect to part VI,
15 line 11a, you'll see the question asked, Has the
16 organization provided a complete copy of this Form 990
17 to all members of its governing body before filing the
18 form? And the answer is no. Is that answer correct?
19 A. Yes.
20 Q. Why did the NRA not provide a copy of this
21 form to all members of its governing body before filing
22 for Exhibit 3?
23 MS. KOZLOWSKI: To the extent that was
24 actually taken on the advice of counsel, I would
25 instruct you not to disclose those communications.

Page 71

1 A. A draft form was provided at the board
2 meeting, but due to what was deemed material changes to
3 the form, we chose to mark that no because they had not
4 seen the final version.
5 Q. (BY MR. SHEEHAN) Were the material changes of
6 the form related to the disclosure of the improper
7 payments of the excess benefits to disqualified persons?
8 MS. KOZLOWSKI: Objection to form.
9 A. There were multiple changes to the document.
10 That was one of them.
11 Q. (BY MR. SHEEHAN) Okay. So when did the board
12 see the earlier draft of the 990, the earlier draft
13 Exhibit 3?
14 A. That would have been at the October -- sorry
15 with the dates in COVID. I believe we had an October
16 board meeting that that draft would have been made
17 available.
18 Q. But that draft, as I understand it, did not
19 include the payments of disqualified persons and did not
20 include the yes answer to question 5 on part VI?
21 A. I would have to go back and look at that
22 draft.
23 Q. All right. How do I -- where would that draft
24 be today?
25 A. I don't know.

Page 72

1 Q. Does the NRA give hard copies or electronic
2 copies of the draft 990s to board members? Let me
3 rephrase that.
4 Did the NRA give hard copies or electronic
5 copies of the draft 990 to the board members in 20 --
6 A. Which year?
7 Q. The form for 2019 and reviewed in 2020.
8 A. The finance committee was provided an
9 electronic copy due to COVID.
10 Q. And that -- was that of the draft --
11 A. Through a --
12 Q. I apologize, Ms. Rowling. Go ahead and finish
13 your answer.
14 A. Through a secure email system.
15 Q. So was that the draft or the final that the
16 finance committee received?
17 A. I'm sorry. Let me -- it's the audit committee
18 that receives the 990, so it was not the finance
19 committee. I apologize.
20 Q. And did the audit committee receive the draft
21 990 that we talked about for October?
22 A. They -- they received one at their audit
23 committee meeting. I do not recall the exact date of
24 that meeting.
25 Q. Did the audit committee receive a copy of the

Page 73

19 (Pages 70 - 73)

1 final 990 prior to filing?
2   A.  I do not know.
3   Q.  All right.  Has the 990, the final 990,
4 Exhibit 3, been distributed to members of the board
5 since the filing in November of 2020?
6   A.  I do not know.
7   Q.  Does the NRA know?
8   A.  Again, I do not know.
9   Q.  Okay.
10   A.  I mean --
11   Q.  Fair enough.  That's fair.
12       MR. SHEEHAN:  It is a question I would
13 like the answer to, Counsel.
14   Q.  (BY MR. SHEEHAN)  Let's walk through it.  If
15 you look at part VI, lines --
16       (Reporter clarification.)
17   Q.  (BY MR. SHEEHAN)  Take a look at Exhibit 3,
18 part VI, lines 12a to c.  If you look at the answer to
19 question c, it says did the organization regularly and
20 consistently monitor and enforce compliance with the
21 conflict of interest policy?  And the answer is checked
22 yes.  Is that -- does the NRA believe that answer is
23 true?
24       MS. KOZLOWSKI:  Objection to the extent
25 that -- that it invades the attorney/client privilege

Page 74

1 and communications with respect to the position on the
2 form.
3   A.  The NRA checked yes in that -- in that box.
4   Q.  (BY MR. SHEEHAN)  It says yes in that box.  As
5 of today, does the NRA believe that answer to be
6 correct?
7   A.  Yes.
8   Q.  Has the NRA enforced its conflict of interest
9 policy with respect to board member Karl Malone?
10       MS. KOZLOWSKI:  Objection to the extent
11 it calls for a legal conclusion or communications with
12 counsel.
13   A.  Yeah, I do not know.
14   Q.  (BY MR. SHEEHAN)  Okay.  If you look at part
15 7 -- I'm sorry.  No, that's a different one.  Part X --
16 part X, part X, lines 5, 6 and 22, and part X is on page
17 11.  Do you see that?
18   A.  Part X?  I'm sorry.
19   Q.  Part X.  Let's look first at line 5.  And you
20 see that line 5 says loans and other receivables from
21 any current or former officer, director, trustee, key
22 employee, et cetera.  And the entry there is zero.  Is
23 that answer correct?
24       MS. KOZLOWSKI:  Objection to the extent
25 it calls for a legal conclusion.

Page 75

1   A.  The form was filled out this way and reviewed
2 by all parties, legal included.  To the best of our
3 knowledge at the time, that was -- that is the answer.
4   Q.  (BY MR. SHEEHAN)  Even though on schedule L
5 you mention amounts that are due and not yet repaid.
6 Correct?
7       MS. KOZLOWSKI:  Objection, argumentative
8 and to form.
9   Q.  (BY MR. SHEEHAN)  Okay.  Let me try this.
10 Ms. Rowling, you're an accountant.  Right?
11   A.  Yes.
12   Q.  (BY MR. SHEEHAN)  Does Mr. Powell owe the NRA
13 money as of the time --
14   A.  Those -- those are legal matters of which
15 recording of receivable for something at a legal
16 proceeding is not going to take place.
17   Q.  Is that your accounting -- is that the
18 accountant in you saying this, that the recognition of a
19 receivable, even though reported somewhere else in the
20 form, should not be entered in answer to question 5?
21   A.  They were not on our audited financial
22 statements, which means they are not on this 990.
23   Q.  Okay.  But your audited financial statements,
24 when were they completed for 2019?
25   A.  They were finalized in March.

Page 76

1   Q.  Were the accountants -- the accountants who
2 did the independent audit of your books and records told
3 about the amounts due from disqualified persons at the
4 time they completed their audit and submitted their
5 audit?
6   A.  The information regarding Josh Powell was
7 known at the time.
8   Q.  And not -- was it reflected in the audited
9 financial report that was provided by the accounting
10 firm?
11   A.  No, it was not.
12   Q.  Why not?
13   A.  It's not a material receivable to have
14 reported and, given it's litigated, there was no
15 guarantee the money would be returned.
16   Q.  Okay.  So do you have to have a guaranteed
17 return in order to enter on line 5 loans or other
18 receivables due?
19       MS. KOZLOWSKI:  Objection, form,
20 misstates testimony.
21   Q.  (BY MR. SHEEHAN)  Ms. Rowling?
22   A.  There's accounting with respect to reporting
23 of receivables, and you would not want to report a
24 receivable that would be an unknown at that time.  That
25 would be inflating your balance sheet.

Page 77

20 (Pages 74 - 77)

1  Q.  Okay.  And with respect to line 22 -- no, not
2  line 22, okay.
3      All right.  Schedule D, part V.
4      MR. SHEEHAN:  I will need your help on
5  this, Stephen, because the hard copy does not reflect
6  the number on it.
7      MR. THOMPSON:  You said schedule D, as in
8  David, Jim?
9      MR. SHEEHAN:  D as in David, right.  Is
10  there a page number, Stephen?
11     MR. THOMPSON:  Just one minute.
12     MR. DRAKE:  It's going to be 59.
13     MR. THOMPSON:  Yes.  Beat me to the
14  punch.
15     Q.  (BY MR. SHEEHAN)  If you look at part V of
16  schedule D which lists out endowment funds, do you know
17  what the source of the endowment funds figure is for the
18  NRA?  Do you see where we are?
19     MS. KOZLOWSKI:  No, we don't.
20     A.  No.
21     MR. THOMPSON:  This is PDF page 60.
22     A.  Yes.
23     Q.  (BY MR. SHEEHAN)  Who was responsible for
24  making sure that the number shown in current year under
25  part V, line 1g is correct?

Page 78

1  Q.  Is there a person within his group who is
2  responsible for tracking restricted gifts and
3  endowments?
4  A.  Melissa Coder within that group.
5  Q.  How do you spell Coder?
6  A.  C-O-D-E-R.
7  Q.  Let's go to schedule J.
8      MR. SHEEHAN:  And Stephen, can you pull
9  up schedule J, page 1.
10     MR. THOMPSON:  So that is PDF page 77.
11     MR. SHEEHAN:  All right.
12  Q.  (BY MR. SHEEHAN)  So Ms. Rowling, if you look
13  at page 1 of Exhibit 3, you'll see that the box is
14  checked for first-class or charter travel, travel for
15  companions and health or social club dues, among other
16  things.  And 1b recites, if any of the boxes on 1, 1a
17  are checked, did the organization follow written policy
18  regarding payments or reimbursements or provision of all
19  the expenses described above?  If no, complete box 3 to
20  explain.  The box is checked no.  Was that answer
21  correct at the time this document was submitted to the
22  IRS?
23  A.  Yes.
24  Q.  Does that remain -- does the NRA still provide
25  first-class or charter travel, travel for companions and

Page 80

1  A.  Arifur Rahman.
2  Q.  And does the -- do you know if these endowment
3  funds include only NRA endowment funds or also include
4  endowment funds for the benefit of the Institute for
5  Legislative Affairs (sic)?
6  A.  The Institute for Legislative Action is part
7  of the NRA.  They're not a separate entity.  So they do
8  include ILA's endowment.
9  Q.  Okay.  And so whose job is it within the NRA
10  to make sure that endowment funds or restricted funds
11  are properly spent?
12  A.  Depending on which group is doing it.  So ILA
13  has their accounting department, and Bob Owens is
14  responsible for that.
15  Q.  And how about for the rest of the NRA?
16  A.  The NRA, it's multiple people depending on
17  where those -- but Arifur Rahman is -- would follow
18  through with the receiving of the support behind those.
19  Q.  Okay.  With respect to the restrictions
20  themselves, who maintains the record of the existing
21  restrictions within the NRA?
22  A.  Arifur Rahman has some, as well as the Office
23  of Advancement from where the donation was made through.
24  Q.  So that would be Tyler Schropp?
25  A.  His group.

Page 79

1  health or social club dues to disqualified persons?
2      MS. KOZLOWSKI:  Objection to form and to
3  the extent it calls for a legal conclusion.
4  A.  The two questions are different.
5  Q.  (BY MR. SHEEHAN)  Okay.
6  A.  Does it provide and do its policies --
7  Q.  So let's go with the -- does the NRA still
8  provide to any employees first-class or charter travel,
9  travel for companions or health or social club dues as
10  of today?
11     MS. KOZLOWSKI:  Objection as to form.
12  A.  There -- yes, the NRA has provided some of
13  those on a case by case basis depending on a particular
14  situation.
15  Q.  (BY MR. SHEEHAN)  How do they do it?  How does
16  the NRA do it?
17  A.  I don't -- how do we do what?
18  Q.  How do you do -- you say based upon a
19  particular situation.  So how does the NRA determine
20  whether a particular situation warrants first-class or
21  charter travel, travel for companions or health or
22  social club dues?
23  A.  Each case is evaluated individually.
24  Discussions are with internal counsel as well.
25  Q.  Who does the evaluation?

Page 81

21 (Pages 78 - 81)

1    A.   Counsel would do evaluation, internal counsel.
2    Q.   Okay.  It says in b, did the organization
3 follow written policy regarding payment or
4 reimbursements?  And the box is checked no.  Is that
5 correct as of when this was filed?
6         MS. KOZLOWSKI:  Objection, asked and
7 answered.
8    A.   I already answered that question.
9    Q.   (BY MR. SHEEHAN) Okay.  Is it true today that
10 it does not follow written policy regarding payment of
11 reimbursement of the expenses described in 1a?
12         MS. KOZLOWSKI:  Objection, form.
13    A.   The evaluation still needs to be done on
14 whether all of those boxes would be checked.  The NRA is
15 in the process or actually was in the process of
16 updating a travel policy to reflect all of these areas
17 to make them within the policy.  However, given COVID,
18 they have not been presented to the board for approval.
19    Q.   (BY MR. SHEEHAN) Where are those -- where are
20 those draft policies now?  Who has custody or ownership
21 of them?
22    A.   Those are with multiple people.  Craig Spray
23 was the originator of the request.
24    Q.   Request for new travel policy?
25    A.   Correct.

Page 82

1    A.   Can you repeat the question?
2    Q.   (BY MR. SHEEHAN) Sure.
3         Why don't we pick an example.  So Josh Powell
4 is listed here with his base compensation, other
5 reportable compensation and a variety of other things
6 going across.  In the 990, you recite that he received
7 $40,000 in payments which were excess compensation.  Is
8 that amount reflected in the schedule J, part II, for
9 Mr. Powell?
10         MS. KOZLOWSKI:  Objection to form.  You
11 don't have the other document in front of you to clarify
12 or to confirm.
13    A.   I mean, I could say what I think, but I
14 don't --
15         MS. KOZLOWSKI:  Don't.
16    A.   I don't want to speak to that, so I don't know
17 for sure.
18    Q.   (BY MR. SHEEHAN) Okay.  Who would know at the
19 NRA whether that amount was included?
20    A.   Arifur would have the details surrounding the
21 input into the schedule.
22    Q.   Okay.  With respect to Mr. DeBergalis, does
23 that amount which is set forth on schedule J, part II,
24 reflect the additional amounts he may have received or
25 got reimbursed?

Page 84

1    Q.   Okay.  Did Craig Spray or members of his staff
2 draft the initial travel policy?
3    A.   The initial?  I'm sorry, which policy are you
4 referring to?
5    Q.   So there apparently is a draft out there.
6 Somebody had to do the first cut on the draft.  Who did
7 the initial draft that you described?
8    A.   Rick Tedrick.
9    Q.   Okay.  Let's go to part II of schedule J.
10         MR. SHEEHAN:  Which, Stephen, is what
11 page?
12         MR. THOMPSON:  Just the next page, PDF
13 page 78.
14         MR. SHEEHAN:  Okay.
15    Q.   (BY MR. SHEEHAN) Ms. Rowling, does part II of
16 schedule J on Exhibit 3 accurately reflect the payments
17 to each of the people listed on schedule J, part II?
18         MS. KOZLOWSKI:  Objection as to form.
19    A.   To my knowledge, yes.
20    Q.   (BY MR. SHEEHAN) Okay.  How did the NRA treat
21 the excess payments and disqualified persons on
22 reporting part II, schedule J, the compensation these
23 people received?
24         MS. KOZLOWSKI:  Objection as to form.
25         Do you understand the question?

Page 83

1    A.   There were no specific amounts reflected at
2 that time, so they could not have been put into those
3 numbers.
4    Q.   Okay.  With respect to Mr. LaPierre, do the
5 amounts shown for him reflect the amounts he received in
6 improper reimbursement for -- for expenses?
7         MS. KOZLOWSKI:  Objection, form.
8    A.   Same answer as your -- the request on Josh
9 Powell.
10    Q.   (BY MR. SHEEHAN) Okay.  Thank you.
11         All right.  Then we go to part II with
12 Mr. Phillips.  You know what?  I am going to pass on
13 that.
14         If you look at schedule L, part I --
15         MR. THOMPSON:  And that's starts on PDF
16 page 82.
17    Q.   (BY MR. SHEEHAN) It reflects five specific
18 officers and directors who received -- were parties to
19 excess benefit transactions.  Do you believe as of the
20 time that the 990 was filed through the NRA that that
21 schedule was correct?
22    A.   At the time that this was filed, to the best
23 of our knowledge, yes.
24    Q.   Are there any additional persons who you now
25 discovered received excess benefit transactions in 2019

Page 85

22 (Pages 82 - 85)

1 and before --
2 MS. KOZLOWSKI: Objection, scope.
3 Q. (BY MR. SHEEHAN) -- in the NRA?
4 MS. KOZLOWSKI: Objection, scope. The
5 topics request information with respect to the 2017,
6 2018 and 2019 990s.
7 Q. (BY MR. SHEEHAN) And so this goes to the
8 question of accuracy, Ms. Rowling. Do you now believe
9 that this statement in part I of schedule L is accurate
10 and complete.
11 MS. KOZLOWSKI: I am also going to
12 instruct you not to answer to the extent that you would
13 be disclosing information learned in conjunction with
14 your counsel either in-house or external.
15 A. I don't know.
16 Q. Okay. So let's go to schedule O.
17 MR. SHEEHAN: And Stephen, what's the
18 number on that?
19 Q. (BY MR. SHEEHAN) I'm sorry. Before you get
20 there, let's go back to part V on schedule L, which has
21 the discussion of the excess benefit transactions. Was
22 this part of the IRS 990 shared with the finance
23 committee before it was filed with the IRS?
24 A. I had corrected that. It would have been the
25 audit committee.

1 Q. I apologize, right.
2 Was this portion that is part V of the IRS
3 990, which is Exhibit 3, shown to the audit committee
4 before it was filed with the IRS?
5 A. I do not know.
6 Q. Okay. Who would know?
7 A. Probably John Frazer. I wasn't part of those
8 at the time. I was not in this role or was not part of
9 the discussion.
10 Q. Would Craig Spray know?
11 MS. KOZLOWSKI: Objection, calls for
12 speculation.
13 Q. (BY MR. SHEEHAN) Do you know if Craig Spray
14 knows whether this part of the preparation was shared
15 with the finance committee?
16 MS. KOZLOWSKI: Same objection.
17 A. The audit committee --
18 Q. (BY MR. SHEEHAN) I apologize. Okay.
19 A. I do not know. I can't speculate as to what
20 he knows.
21 Q. All right. Then we go to part -- to schedule
22 O.
23 MR. THOMPSON: PDF page 91, Counsel.
24 Q. (BY MR. SHEEHAN) You will see on schedule O
25 under the section that is -- it says part VI, line 5.

1 Can you see that at the bottom of the first page of
2 schedule O?
3 A. Yes.
4 Q. And the reference to the staff employee in
5 that section, is that Millie Hallow?
6 A. I believe so, yes.
7 Q. And is it true that she has fully repaid the
8 organization, including interest?
9 A. I don't know.
10 Q. With respect to both -- with respect to
11 Ms. Hallow, what form did her repayment take?
12 A. A wire transfer.
13 Q. And do you know when that happened?
14 A. I do not.
15 Q. Okay. Now let's look at the second page of
16 schedule O, and you will see on the second box -- and
17 that's the question about review of the Form 990 by the
18 governing body. It states drafts of Form 990 are
19 reviewed by the external accounting firm. Is that
20 correct per the 2019 990?
21 A. That is correct.
22 Q. When did they -- when did the external -- is
23 that Aronson?
24 A. That is Aronson.
25 Q. When did the Aronson firm review the draft of

1 the Form 990 for 2019?
2 A. It was an ongoing process with Aronson, so
3 it's not just one particular draft they looked at.
4 Q. Who was the partner at Aronson who did the
5 review?
6 A. I cannot remember her name.
7 Q. Did she --
8 A. Sorry.
9 Q. That's all right.
10 Did she have any comments about the 990s when
11 she reviewed them?
12 A. Yes.
13 Q. That is the two 990s.
14 Did she put those comments in writing?
15 A. There were probably some in writing and some
16 in -- over the phone.
17 Q. Who did she communicate the comments in
18 writing to?
19 A. Those would have gone to Arifur Rahman.
20 Q. And her oral comments, where would they have
21 gone to?
22 A. Same.
23 Q. Did Arifur Rahman make any notes of her oral
24 comments?
25 A. I don't know.

23 (Pages 86 - 89)

1 Q. Did -- did anyone share the partner at
2 Aronson's comments about the 990 with the board or
3 with -- with you individually?
4 MS. KOZLOWSKI: Objection, form and
5 scope.
6 A. I don't know.
7 Q. (BY MR. SHEEHAN) Did the 990 change as a
8 result of the comments from the Aronson firm? The
9 drafts, I mean.
10 A. I think your misunderstanding is of directing
11 this line of questioning in a way that it doesn't apply.
12 There is not one draft. Aronson has a -- has a system,
13 electronic system of what information is input. As
14 input is done, they can review along the way. So it's
15 not at the end of, you know, we submit something
16 process. So comments are made throughout the entire
17 process relating to our interpretation of where
18 accounting data should go versus -- so changes are made
19 all the time.
20 Q. In the draft 990s -- in the draft 990s --
21 A. Again, there is not one draft of the 990. It
22 is a fluid document.
23 Q. So what was the last time that this partner
24 from Aronson reviewed a draft of the IRS 990 for --
25 MS. KOZLOWSKI: Objection, form.

Page 90

1 A. They were reviewing up until the point it was
2 filed.
3 Q. (BY MR. SHEEHAN) Okay. Did you ask -- was
4 Aronson -- was there a discussion with Aronson of
5 signing off as the professional preparer for the 990?
6 MS. KOZLOWSKI: Objection as to form.
7 A. There was a discussion regarding that.
8 Q. (BY MR. SHEEHAN) And what was the -- what
9 position did Aronson take on that subject?
10 A. That involved legal discussions due to the
11 litigation that was listed within the 990.
12 Q. Did Aronson refuse to sign off on the 990 as a
13 professional preparer?
14 A. I can't speak for Aronson.
15 Q. Well, did they say to the NRA, we decline to
16 sign off on the 990?
17 MS. KOZLOWSKI: Objection as to form, and
18 the witness has already testified that those
19 communications were in conjunction with counsel.
20 Q. (BY MR. SHEEHAN) So there's a communication
21 by Aronson, not privileged, an outside organization.
22 Did they say to the NRA or any representative of the NRA
23 that we decline to sign the 990 as currently drafted?
24 MS. KOZLOWSKI: Same objections.
25 A. They did not sign the 990s. So I don't know

Page 91

1 where the question --
2 Q. (BY MR. SHEEHAN) Did they -- why didn't they
3 sign the 990?
4 MS. KOZLOWSKI: Same objection. The
5 witness has already testified that those communications
6 were in conjunction with counsel.
7 And to the extent that your knowledge is based
8 on counsel's communications and advice, I would instruct
9 you not to answer.
10 Q. (BY MR. SHEEHAN) Let's go back. Did the NRA
11 hear from the accounting firm saying we decline and
12 refuse to sign the 990 as currently drafted?
13 MS. KOZLOWSKI: Same objection.
14 A. Aronson's decisions were based on legal
15 matters as to signing those returns.
16 Q. (BY MR. SHEEHAN) How do you know that?
17 A. Discussions with counsel.
18 Q. Okay. So let's go on. Then it says,
19 presented the NRA board of directors audit committee and
20 made available to board members attending the board of
21 directors meeting. Is that accurate with respect to
22 2019 990 as finally filed?
23 A. Draft is what it says, yes.
24 Q. Okay. Then it says the NRA's elected officers
25 and audit committee leadership review a final draft

Page 92

1 before filing.
2 So the NRA's elected officers are the three,
3 right, the general counsel, the CFO/treasurer and
4 Mr. LaPierre. Is that correct?
5 A. That is correct.
6 Q. And the audit committee leadership, what does
7 that mean?
8 A. That would be the chair of the committee.
9 Q. Just the chair of the committee?
10 A. That would be the leader of the audit
11 committee.
12 Q. Okay. And who was that at the time that this
13 990 was filed?
14 A. Charles Cotton.
15 Q. Okay. Do you know whether -- did Mr. Cotton
16 have any -- when -- I'm sorry. When did Mr. Cotton
17 actually get to see the final draft?
18 A. I do not know that.
19 Q. Okay. When did Mr. Spray get to see the final
20 draft?
21 A. Mr. Spray was part of the ongoing process, and
22 he reviewed multiple revisions of this 990 as
23 adjustments were made.
24 Q. Okay.
25 MR. THOMPSON: Jim, can I recommend that

Page 93

24 (Pages 90 - 93)

1  we take a short break?

2        MR. SHEEHAN:  Sure, absolutely.

3        THE VIDEOGRAPHER:  We are going off the

4  record.  The time on the video is 11:39 a.m.

5        (Break from 11:39 a.m. to 11:49 a.m.)

6        THE VIDEOGRAPHER:  We're back on the

7  record.  The time on the video is 11:49 a.m.

8     Q.  (BY MR. SHEEHAN)  All right.  Ms. Rowling, can

9  you take a look at the part of schedule O that says Form

10  990, part VII, section A, line 5, compensation to

11  unrelated organizations?  Do you see that section?

12       MS. KOZLOWSKI:  Provide me a page number,

13  please, of the PDF.

14       MR. SHEEHAN:  Stephen, could you give the

15  PDF number?

16       MR. THOMPSON:  Yes.  This is PDF page 92,

17  and I believe it is the second box from the bottom.

18     Q.  (BY MR. SHEEHAN)  Do you see that?

19       All right.  So if you look at that box, it

20  recites that Colonel North reported compensation of

21  $986,015 from unrelated organization Ackerman McQueen

22  for professional services.  Do you know where that

23  number came from?

24       MS. KOZLOWSKI:  Objection as to form.

25     A.  It was provided through counsel, as far as I

1  know.

2        MS. KOZLOWSKI:  I instruct you not to

3  disclose attorney/client communications.

4     Q.  (BY MR. SHEEHAN)  Apart from whatever counsel

5  did, did the NRA receive from Colonel North a dollar

6  figure for the compensation he received from Ackerman

7  McQueen?

8        MS. KOZLOWSKI:  Objection, form.

9     A.  Yeah, I don't know.

10     Q.  (BY MR. SHEEHAN)  Okay.  It says that upon

11  information and belief, the NRA estimates that the

12  self-reported amount was only a fraction of the actual

13  amount paid by the NRA to Ackerman McQueen for Colonel

14  North's services and that the total paid exceeds the

15  value received.

16       What was the information and belief for the

17  statement that the self-reported amount is only a

18  fraction of the actual amount paid by the NRA?

19       MS. KOZLOWSKI:  Objection.

20       I would caution you to the extent that it is

21  based on analysis of legal counsel, I would instruct you

22  not to disclose those communications.

23     A.  Yeah, those are part of ongoing legal

24  litigation at this point, and those were calculated as

25  part of that ongoing litigation.

1     Q.  (BY MR. SHEEHAN)  Well, if I look for the

2  workpapers that support the information and belief that

3  the self-reported is only a fraction of the amount due,

4  where would I look for those workpapers?

5     A.  Again, those are part of legal documents.

6     Q.  What does that mean?

7     A.  Those would be with legal counsel.

8     Q.  But are they created by legal counsel?

9     A.  I do not know.

10     Q.  How did the NRA decide that this statement was

11  accurate that's contained on the part VI, question a,

12  line 5?

13       MS. KOZLOWSKI:  Objection, asked and

14  answered.  The witness has testified that this was based

15  on advice of counsel.

16     Q.  (BY MR. SHEEHAN)  Apart from the advice of

17  counsel, did the NRA undertake any other effort to

18  determine how much was actually due -- I'm sorry -- how

19  much was actually charged the NRA for Colonel North's

20  services?

21       MS. KOZLOWSKI:  Objection, form.

22     A.  I do not know what other action would have

23  been taken outside of legal counsel given the ongoing

24  litigation.

25     Q.  (BY MR. SHEEHAN)  With respect to IRS Form

1  941, you're familiar with IRS Form 941?

2     A.  Yes.

3     Q.  Who within the NRA has the responsibility of

4  completing IRS 941s during 2020?

5     A.  In 2020?

6     Q.  Yes.

7     A.  Those are forms that are outsourced to the

8  payroll processing company.

9     Q.  What payroll processing company do you use?

10     A.  UKG.  It used to be Ultimate.

11     Q.  That was their former name, or it used to be

12  Ultimate was a different contractor?

13     A.  No, that's the same contract but different

14  name when they merged.

15     Q.  Okay.  How long -- how long have they been

16  doing payroll for you?

17     A.  Three -- three or four years at this point.

18     Q.  And who has the responsibility of

19  communicating to go UKG the information necessary to

20  prepare the 941?

21       MS. KOZLOWSKI:  Objection, form.

22     A.  The human resources department.

23     Q.  (BY MR. SHEEHAN)  And so who would that --

24  what person would that be?

25     A.  Payroll specialist.

1   Q. What's her name or his name?
2   A. Lindsay McGee.
3   Q. And how long has she been at the NRA?
4   A. I do not know.
5   Q. More than a year?
6   A. Yes.
7   Q. When -- when UKG prepares the 941s, is there
8 any review conducted of the NRA to make sure they're
9 accurate?
10   A. Lindsay McGee does an audit of those forms.
11   Q. Okay.
12     MR. SHEEHAN: All right. With that, that
13 concludes this portion of the 30(b)(6) examination of
14 Ms. Rowling, and I will pass the witness.
15     Thank you very much, Ms. Rowling.
16     MR. ACOSTA: So I guess Ackerman McQueen
17 is up, Mr. Sheehan?
18     MR. SHEEHAN: Yes. Well, we're done, so,
19 yes, you're up.
20     MR. ACOSTA: Okay. Are we ready?
21     MS. KOZLOWSKI: To be clear, you are
22 asking questions in Ms. Rowling's 30(b)(6) capacity.
23 Correct?
24     MR. ACOSTA: Most of it's going to be in
25 her individual capacity.

Page 98

1     MS. KOZLOWSKI: It is appropriate. You
2 have noticed up the 30(b)(6). She is sitting for the
3 30(b)(6). We have started with the 30(b)(6). It is
4 appropriate to continue that. We don't get to move into
5 individual, back to 30(b)(6), back to individual. It's
6 not appropriate.
7     MR. SHEEHAN: So you're refusing to let
8 her respond to the questions as an individual witness?
9     MS. KOZLOWSKI: I am not. I am -- if we
10 are concluding the 30(b)(6), she is prepared to testify
11 in her individual capacity.
12     MR. ACOSTA: Ms. Rogers, we appreciate
13 your objection, and I am going to let Mr. Sheehan
14 proceed unless you want to close down the deposition.
15     MS. ROGERS: This is Ms. Rogers. I
16 didn't make any objections, but I think you might be
17 referring to other counsel.
18     MR. ACOSTA: So who is defending this
19 deposition? I'm sorry.
20     MS. KOZLOWSKI: Talitha Gray Kozlowski.
21     MR. ACOSTA: Okay. Well, we noted your
22 objection.
23     Mr. Sheehan, could you please proceed?
24     MR. SHEEHAN: And, Stephen, I will turn
25 it over to you at this point for the individual exam.

Page 100

1     MR. THOMPSON: Yeah, so just to clarify,
2 Mr. Acosta, we are prepared to still continue on with
3 questions in her individual capacity; and if you would
4 like us to do that portion of our deposition first as
5 well, we're happy to do that.
6     MR. ACOSTA: Yes. Yes, sir, please.
7     MR. THOMPSON: Okay.
8     MR. SHEEHAN: Thank you, Stephen.
9     MS. KOZLOWSKI: I apologize. I didn't
10 follow that. Are we concluding the 30(b)(6) in its
11 entirety and moving on to the individual? Is that
12 correct?
13     MR. SHEEHAN: No. As I understand it, we
14 are concluding the Attorney General's portion of the
15 30(b)(6). Mr. Acosta, representing Ackerman, has
16 postponed his portion of the 30(b)(6) until after the
17 conclusion or some other agreed upon term of the
18 individual examination of Ms. Rowling.
19     MS. KOZLOWSKI: We don't agree to that.
20 The 30(b)(6) is moving -- is currently proceeding, and
21 questions with respect to the 30(b)(6) need to continue,
22 and then we can transition into the individual capacity.
23     MR. SHEEHAN: And what's your basis for
24 that? Where in the Rules does it say that's how it
25 works?

Page 99

1     MR. THOMPSON: Sure. And of course,
2 Counsel, please let me know when the food arrives and we
3 can take a break.
4       EXAMINATION
5 BY MR. THOMPSON:
6   Q. So Ms. Rowling, my name is Stephen Thompson.
7 I am also an assistant attorney general in the New York
8 State Office of the Attorney General, and I am going to
9 be asking questions of you in your individual capacities
10 now. So, of course, you know, please don't speculate,
11 and then let me know if you don't know the answer to any
12 of my questions. Is that okay?
13   A. Yes.
14   Q. And in this horrible Zoom world that we all
15 now live in, I will try to be extra careful not to speak
16 over you, if you could also just let me make sure I
17 finish my question before answering. Is that all right?
18   A. Yes.
19   Q. Okay. Can you tell me what you did to prepare
20 for this deposition in your individual capacity?
21   A. I -- I spoke with counsel from the Garman firm
22 as well as the Brewer firm.
23   Q. Did you speak with any of your colleagues in
24 the NRA?
25   A. With respect to my individual capacity?

Page 101

26 (Pages 98 - 101)

1    Q.   Yes, that's right.
2    A.   No.
3    Q.   Okay.  So you are currently the chief
4 financial officer of the NRA.  Is that correct?
5    A.   Acting chief financial officer.
6    Q.   Acting chief financial officer.
7         Who -- so the chief financial officer is not
8 an elected position at the NRA.  Is that correct?
9    A.   That is correct.
10   Q.   The treasurer is the elected officer elected
11 by the board.  Is that correct?
12   A.   That is correct.
13   Q.   Who appoints the CFO?
14   A.   It's not an appointment.
15   Q.   Sorry.  Who -- who hires, who selects the CFO?
16   A.   That was Wayne LaPierre.
17   Q.   And was it Mr. LaPierre who selected you for
18 the interim CFO position?
19   A.   Mr. LaPierre asked me, didn't select me.
20   Q.   Okay.  And when did Mr. LaPierre ask you?
21   A.   It was late February -- or I'm sorry, late
22 January.  Sorry.
23   Q.   And prior to being CFO, you were the director
24 of accounting operations and financial reporting.  Is
25 that right?

Page 102

1    A.   That is correct.
2    Q.   And you held that position since the mid
3 2000s.  Is that correct?
4    A.   No, that is -- oh, mid 2000s?  Yes, 2006.
5    Q.   Okay.  Great.
6         And in your prior position as director of
7 accounting operations and financial reporting, did you
8 report to Mr. Tedrick?  Was he your direct report or the
9 person you reported directly to?
10   A.   That's correct.
11   Q.   And then Mr. Tedrick, in turn, reported
12 directly to the treasurer and CFO.  Is that correct?
13   A.   That is correct.
14   Q.   And was that the reporting structure for the
15 entire time that you held that position?
16   A.   Yes.
17   Q.   In your current role as -- I'm sorry.  It was
18 interim CFO.  Is that correct?
19   A.   Acting interim.
20   Q.   Acting, okay.  In your current role as acting
21 CFO, does Mr. Tedrick now report to you?
22   A.   Yes.
23   Q.   Who are your other direct reports in your
24 current role?
25   A.   Bob Owens, Mike Erstling, Lisa George, Jim

Page 103

1 Purtell.
2    Q.   Mr. Owens is the CFO of ILA.  Is that correct?
3    A.   The fiscal officer of ILA.
4    Q.   Fiscal officer.
5         Mr. Erstling is the director of budgeting.  Is
6 that correct?
7    A.   That's correct, and financial analysis.
8    Q.   And financial analysis.
9         And Ms. George is director of purchasing.  Is
10 that correct?
11   A.   That is correct.
12   Q.   And who was the last person that you
13 mentioned?
14   A.   Jim Purtell.  He's the director of information
15 services.
16   Q.   In your previous role as a director, let's say
17 since -- between 2018 and when you were -- when you
18 became the acting CFO, who were your direct reports in
19 your previous role?
20   A.   Arifur Rahman, Portia Padilla, Angela St. Ann
21 and Evan Knight.
22   Q.   Do you know when Mr. Rahman joined the NRA?
23   A.   He joined in 2019.
24   Q.   Okay.
25   A.   So in 2018, that position was held by Svetlana

Page 104

1 Olchevski.
2    Q.   What is Mr. Tedrick's current position?  Am I
3 correct that -- is he the managing director of financial
4 services?  Is that correct?
5    A.   He's the managing director of finance.
6    Q.   Of finance.  Thank you.
7         In your current role as acting CFO, do you
8 report directly to Mr. LaPierre?
9    A.   That's correct.
10   Q.   Do you currently have any direct reporting --
11 let me rephrase that question.
12        In your current role as acting CFO, do you
13 have a direct reporting line to anyone on the board of
14 directors?
15   A.   Through the communications with the audit and
16 finance committee, yes.
17   Q.   Okay.  Would you please just describe in broad
18 terms for me your current duties as acting CFO?
19   A.   Well, currently my focus has been on these
20 proceedings with respect to the bankruptcy.  I am also
21 managing cash flow, budgeting processes, accounting
22 reporting.
23   Q.   Okay.  When was the last time that you spoke
24 to Mr. Spray?
25   A.   Prior to his departure.

Page 105

27 (Pages 102 - 105)

1  Q.  And his departure was towards the end of
2  January of this year.  Is that correct?
3  A.  That's correct.
4  Q.  Can you -- what was the context of your last
5  conversation with Mr. Spray?  Was it a phone call?  Was
6  it in person -- or I'm sorry.  I assume it wasn't in
7  person.  Was it a phone call?
8  A.  We were part of a joint call that he was on.
9  Q.  Okay.  Who else was on that call, if you
10  remember?
11  A.  I believe it was the -- I don't recall.  I
12  don't recall which.
13  Q.  Was that call -- did that call take place
14  after the NRA filed its petition for bankruptcy in this
15  case?
16  A.  Yes.
17  Q.  Do you recall whether legal counsel was on
18  that call?
19  A.  I believe the call was with the Neligan firm,
20  actually.
21  Q.  Okay.  Have you had -- when was the last time
22  you had a one on one conversation with Mr. Spray, if you
23  remember?
24  A.  Maybe a week prior to that.  It was after the
25  15th filing, but before that call.

Page 106

1  specific day.  Is that right?
2  A.  That was the impression that I was left
3  with --
4  Q.  Okay.
5  A.  -- from that conversation.
6  Q.  And you said that was a conversation with
7  other financial services staff, is that correct, or
8  other treasury staff?
9  A.  Treasury staff.  It was not the financial
10  services staff.
11  Q.  Do you recall who else was on that phone call,
12  or are there typically people that would be on that
13  phone call?
14  A.  It would have been his direct reports.
15  Q.  So that would have been Mr. Tedrick,
16  Mr. Owens, Mr. Erstling, Ms. George, Mr. Purtell, and
17  then yourself.  Is that correct?
18  A.  If there were others, I don't recall, but
19  those people were on that call.
20  Q.  Okay.  Have you communicated with Mr. Spray at
21  all about any transition related matters from him
22  transitioning the CFO role or the treasurer role to you?
23  A.  No.
24  Q.  Have you reached out to Mr. Spray about any
25  matters related to the transition?

Page 108

1  Q.  Okay.  And do you remember anything about the
2  substance of that call which you spoke about with
3  Mr. Spray?
4  A.  No.  We were discussing requirements that were
5  needed with respect to the reporting for bankruptcy.
6  Q.  Did Mr. Spray ever speak with you about or
7  communicate to you his feelings about the NRA filing for
8  bankruptcy?
9  A.  Not in specific terms.
10  Q.  In general terms or in any other terms?
11  A.  He -- I mean, we spoke about the fact that we
12  filed and the requirements that were being put upon us
13  with respect to that filing.
14  Q.  Did Mr. Spray ever express any surprise to you
15  about the filing of the bankruptcy?
16  A.  He indicated he -- while he knew the
17  bankruptcy was going to happen, he did not know it was
18  happening that day.
19  Q.  Do you remember when he told you that or when
20  that conversation took place?
21  A.  I believe that was on a conference call with
22  staff after the filing.
23  Q.  So you recall Mr. Spray saying that he was
24  aware generally that a bankruptcy was in the pipeline,
25  so to speak, but not that it would be filed on that

Page 107

1  A.  No.
2  Q.  Is there a reason that you have not done so?
3  A.  Been kind of busy.
4  Q.  In your current role as acting CFO, are you
5  performing the duties that would be expected of the
6  treasurer until a new treasurer is appointed?
7  A.  No.  I can't.  I'm not elected as treasurer.
8  Q.  Right.  So then I guess my question is, is
9  there anyone who is performing the duties expected of
10  the treasurer until such time that a new treasurer can
11  be appointed by the board?
12  MS. KOZLOWSKI:  Objection, form.
13  And I would caution you in speculating.  To
14  the extent you know, you can answer.
15  A.  Yeah, I mean, to the extent as acting CFO, I'm
16  performing duties.  To the extent of the full duties of
17  the treasurer, I can't speak to that at this point.
18  Q.  (BY MR. THOMPSON)  To the best of your
19  knowledge, are there any duties you are -- strike that.
20  Okay.  So turning back to your direct reports.
21  One of your direct reports is Mr. Owens, the fiscal
22  officer of ILA.  Is that correct?
23  A.  That's correct.
24  MR. THOMPSON:  And just for the court
25  reporter, ILA is an acronym, I-L-A.

Page 109

28 (Pages 106 - 109)

1  Q. (BY MR. THOMPSON) That reporting is a recent
2  change in the organization structure for the NRA. Is
3  that correct? And by recent, I mean the past two years.
4  A. That is correct.
5  Q. Prior to that change, what was the
6  relationship between the ILA fiscal officer and the
7  officer of the treasurer?
8  MS. KOZLOWSKI: Objection, form.
9  A. I can't speak to what communications were held
10 between the treasurer at that time and the ILA fiscal
11 officer.
12 Q. (BY MR. THOMPSON) Do you know before the
13 change to where Mr. Owens or the fiscal officer would
14 report directly to the treasurer, who did the ILA fiscal
15 officer report to, if anyone?
16 A. He reported directly to the executive director
17 of ILA.
18 Q. Okay. That is currently Mr. Ouimet. Is that
19 correct?
20 A. That's correct.
21 MR. THOMPSON: And again for the court
22 reporter, that is O-U-I-M-E-T, Ouimet.
23 Q. (BY MR. THOMPSON) Ms. Rowling, you yourself
24 learned about the filing for bankruptcy after it
25 occurred. Is that correct?

Page 110

1  A. I learned of the filing of the bankruptcy on
2  the 15th of January.
3  Q. Did you learn after it had actually been filed
4  or just before it was filed?
5  A. I'm -- the email that was sent to all
6  employees said we had just filed --
7  Q. Right.
8  A. -- so it would have been after.
9  Q. So you learned in an NRA-wide email. Is that
10 correct?
11 A. That is correct.
12 Q. Where did that email come from, if you
13 remember?
14 A. I believe it came from the human resources
15 area, I think. I don't know. I don't recall. I don't
16 want to say for sure.
17 Q. Okay. Fair enough.
18 Can you tell me what your reaction to that
19 email was when you received it?
20 A. I found it interesting.
21 Q. Were you surprised?
22 A. It wasn't something I had heard of before, so
23 in that regard, sure.
24 Q. Did you speak with any of your colleagues,
25 excluding any internal legal counsel, about the filing

Page 111

1  for the bankruptcy right after you found out about it?
2  A. For those that might have been physically in
3  the office. Yeah, I probably spoke with Mike Erstling
4  and Lisa George.
5  Q. That's actually a sort of -- leads me to
6  another question. Are you currently working physically
7  in the office, or are you still remote?
8  A. Me personally?
9  Q. Yes, you personally.
10 A. I have been mostly in the office the entire
11 time.
12 Q. Okay. Is the same thing true for
13 Mr. Erstling?
14 A. That's correct.
15 Q. And Ms. George?
16 A. That's correct.
17 Q. And so you were -- you were physically in the
18 office when the email was circulated informing staff
19 about the bankruptcy. Is that right?
20 A. Yes.
21 Q. Okay.
22 MR. THOMPSON: Sharon, are you -- if you
23 are on the line, could we go ahead and mark tab 1 as an
24 exhibit?
25 Q. (BY MR. THOMPSON) And while that is

Page 112

1  happening, I will just ask. So Ms. Rowling, going back
2  a few years now, in 2018 you, along with some other
3  members of financial services and other departments as
4  part of the office of the treasurer, prepared a memo for
5  the audit committee listing some concerns that you
6  collectively had about compliance and financial issues
7  in the NRA. Is that correct?
8  A. Yes.
9  Q. And in fact, you would go on to be a
10 whistleblower to the audit committee, is that correct,
11 in 2018?
12 A. Yes.
13 Q. Can you tell me about -- and I've asked my
14 colleague to mark the list of top concerns, so we'll get
15 to that in a minute. But can you tell me in broad
16 strokes about what led you personally to participate in
17 the preparation of that list?
18 A. Events leading up to the actual meeting caused
19 us some concern individually. Those events consisted of
20 a rollout of a program that was very costly to the
21 organization. We were in financial strains due to it.
22 There was a hiring of an individual who -- at an
23 executive level that was -- was, for lack of better
24 words, trying to take over every aspect of the
25 organization.

Page 113

29 (Pages 110 - 113)

1    There were -- we were asked as an accounting
2 department to do some things outside of our practices
3 that we were not comfortable with at all.  And as
4 individuals, we kind of started talking to each other
5 about compliance issues, which -- which kind of
6 clarified a broader issue on an individual basis.  There
7 were pieces of a puzzle, but as -- as a group, that
8 puzzle became more clear.
9    And then with Craig Spray coming in at that
10 time as well, we expressed some of those concerns to him
11 in our course of discussions and bringing him up to
12 speed so that he could do his job as effectively as
13 treasurer and CFO.
14    Q.  Great.  So I am definitely going to break that
15 down.  That was very helpful.  Thank you.
16         MR. THOMPSON:  But before I do so, I
17 believe Mr. Acosta had a question.  We have somebody on
18 the phone for 917-355-7693.
19    If the person on that line could identify
20 themselves, and if you are muted, we cannot hear you.
21         MR. ACOSTA:  We don't really need to be
22 taking up a lot of deposition time.  The 917 number
23 really needs to identify themselves immediately or else
24 we're going to ask for them to be removed from the
25 deposition.

Page 114

1    A.  Take over in various areas that were not under
2 his responsibility.
3    Q.  And was that person Josh Powell?
4    A.  Go ahead.  Yes.
5    Q.  Okay.  You mentioned having been asked to do
6 things that were outside of the typical practices for
7 the NRA.  Am I stating that correctly?
8    A.  That's correct.
9    Q.  Who asked you or the other members of the
10 staff that were part of these discussions to do those
11 things outside of policy?
12    A.  That was Woody Phillips.
13    Q.  Anyone else?
14    A.  Not specifically.  I mean, no.
15    Q.  And then you said that Mr. Spray came in and
16 you and the other members of the staff that were a part
17 of these discussions used that as an opportunity to
18 express some of these concerns to him.  Is that correct?
19    A.  Yes.
20    Q.  Is it fair to say that Mr. Spray coming in was
21 something of a catalyst for you and the other members of
22 the staff to start voicing some of these concerns?
23    A.  No, the catalyst was prior to him coming in.
24 He provided a platform.
25    Q.  Okay.  So Mr. Spray provided a platform for

Page 116

1    MS. FUCHS:  This is Yael Fuchs.  I'm on
2 from 917-572-9763.  Is that the number in question?
3         MR. THOMPSON:  No.  You're showing up as
4 a real person with a name.
5         MR. MacGREEVEY:  This is David MacGreevey
6 from Alix Partners.  I have a 917 number as well.
7         MR. THOMPSON:  Yes.  Thank you.  I think
8 that's it.
9         MR. MacGREEVEY:  Okay.  Thank you.
10         The reporter:  Could you spell your last
11 name, please, David?
12         MR. MacGREEVEY:  Yeah, of course.  It's
13 M-A-C capital G-R-E-E-V-E-Y.
14         THE REPORTER:  Thank you.
15    Q.  (BY MR. THOMPSON)  All right.  So turning back
16 to what we were just discussing about, Ms. Rowling.  So
17 you mentioned a program that was proving to be somewhat
18 costly to the NRA, is that correct, as one of the issues
19 that you were discussing?
20    A.  That's true.
21    Q.  Was that program, was that Carry Guard?
22    A.  Yes, that was.
23    Q.  And you mentioned a person who I believe you
24 said in your opinion was effectively trying to take over
25 the NRA.  Is that correct?  Is that accurate?

Page 115

1 the airing of some of these concerns.  Is that correct?
2    A.  He did, and then along with the internal
3 investigations by the Brewer firm.
4    Q.  Were any -- without giving me any details or
5 specifics, were any counsel, other than internal counsel
6 and the Brewer firm, involved in any investigations
7 related to the concerns that you raised to the audit
8 committee in 2018?
9    A.  I don't know.  I couldn't answer that.
10    Q.  You -- did you -- you personally did not have
11 any involvement with any counsel other than internal
12 counsel and the Brewer firm.  Is that fair to say?
13    A.  Personally?  As far as I can recall, that was
14 all that my discussions were with.
15    Q.  Okay.  What, if any, role did Mr. Tedrick play
16 in the preparation of the top concerns memo or any of
17 your discussions about the issues therein?
18    A.  He -- we provided the list to him, basically.
19 I mean, he was supposed to consolidate it.  We chose to
20 consolidate it ourselves between the group and provided
21 that to him.
22    Q.  Why did you decide to consolidate it
23 yourselves instead of allowing Mr. Tedrick to do so?
24    A.  Mr. Tedrick had a personal problem at the time
25 that I don't feel is appropriate discussion for this.

Page 117

30 (Pages 114 - 117)

1  Q. Okay. Without providing me any details, do
2 you believe that this personal issue that was affecting
3 Mr. Tedrick continues to affect him?
4      MS. KOZLOWSKI: Objection as to form.
5  A. Yeah, I couldn't --
6      MS. KOZLOWSKI: To the extent it's not in
7 your personal knowledge.
8  A. Well, the assumption is an -- there's -- I
9 can't say without revealing what his personal issue is.
10  Q. (BY MR. THOMPSON) Okay.
11  A. And these types of things are ongoing.
12  Q. So let me try and ask or get at this from a
13 different angle.
14      In your current role as acting CFO, you manage
15 Mr. Tedrick. Is that correct?
16  A. Yes.
17  Q. How confident are you in Mr. Tedrick as an
18 employee currently?
19  A. Mr. Tedrick performs the job duties that he's
20 been provided.
21  Q. Okay. And are you satisfied with his job
22 performance?
23  A. Currently, yes.
24  Q. Currently, yes.
25      Let's say before you took on your current

Page 118

1 have the in-depth knowledge of the division of which I
2 was responsible for, so he -- even though requests were
3 maybe given to him, he could not do them without
4 basically getting support for having us do all the
5 work --
6  Q. I understand.
7      And was that true -- so just to make sure that
8 we've got the timeframe correct here, was that true in
9 2019, to the best of your recollection?
10  A. In 2019?
11  Q. Yes.
12  A. Sure. Yes, to the best of my recollection.
13  Q. Okay. You mentioned that Mr. Tedrick was not
14 in the office. Is that since COVID-19 development, or
15 was that the case beforehand as well?
16  A. I couldn't speak to prior to COVID because we
17 were never on the same floor in the building. I know
18 there were occasions when he wasn't here, but during
19 COVID -- sorry, I am losing my voice.
20  Q. No, of course.
21  A. During COVID he could not -- for medical
22 reasons needed to isolate.
23  Q. I understand.
24      Am I remembering correctly, is financial
25 services located on the second floor of headquarters,

Page 120

1 position, so in your previous life, during 2019 do you
2 recall ever being -- let me strike that and see if I can
3 rephrase it.
4      Previously you reported to Mr. Tedrick in your
5 prior position, if I'm remembering correctly. Is that
6 right?
7  A. Yes.
8  Q. Was that -- so I understand that that was the
9 formal reporting structure. Was that the actual
10 reporting that you would do in your prior position?
11 Would you, in fact, report directly to Mr. Tedrick or,
12 for example, instead did you report more so directly to
13 Mr. Spray when he was the CFO and treasurer?
14      MS. KOZLOWSKI: Objection, form.
15  A. I had communications with both, but my -- but
16 my reporting structure was through Rick.
17  Q. (BY MR. THOMPSON) Okay. And let's say in
18 2019, what was your opinion of Mr. Tedrick as a
19 supervisor?
20      MS. KOZLOWSKI: Objection, form.
21  A. Mr. -- he -- in certain ways it was difficult
22 to be his employee.
23  Q. (BY MR. THOMPSON) Can you expand on that any?
24  A. He's not in the office right now. So direct
25 lines of communication were difficult. He didn't always

Page 119

1 NRA headquarters?
2  A. That's correct.
3  Q. And was Mr. Tedrick with the executive staff
4 on the sixth floor? Is that right?
5  A. Yes.
6  Q. Do any other members -- other than the
7 treasurer and CFO and Mr. Tedrick, do any other members
8 of the treasurer staff sit on the sixth floor?
9      MS. KOZLOWSKI: Objection as to
10 timeframe.
11      MR. THOMPSON: That's fair. Let me
12 think.
13  Q. (BY MR. THOMPSON) Immediately prior to the
14 COVID shutdown.
15  A. Yeah, and that reminds me of an individual
16 that I did not list as a reporting person. David Warren
17 was also on the sixth floor. My apologies for excluding
18 him.
19  Q. No, that is completely fair. And Mr. Warren,
20 his official title is the CFO of the for-profit
21 entities. Is that correct?
22  A. That is correct.
23  Q. Can you tell me what Mr. -- so strike that.
24      Prior to the filing of the bankruptcy, so
25 let's say in 2020, do you know what Mr. Warren's job

Page 121

31 (Pages 118 - 121)

1 responsibilities were?
2    A. I know the areas that he worked on. It was
3 not my place to know exactly what his responsibilities
4 were.
5    Q. Understood, but can you tell me what those
6 general categories were?
7    A. He was an overall kind of financial analyst
8 for Craig --
9    Q. I apologize. I don't mean to cut you off, but
10 there's some feedback that we're getting.
11       MR. THOMPSON: If I could ask everyone
12 just to mute themselves.
13       Okay. I think we're good.
14    Q. (BY MR. THOMPSON) I'm sorry. I did not mean
15 to interrupt.
16    A. He performed a lot of financial analysis work
17 for Mr. Spray directly.
18    Q. Do you -- if you are able to, can you tell me
19 any more specificity as to what sorts of financial
20 analysis Mr. Warren was engaged in?
21    A. I can't speak to exactly what he was working
22 on for Mr. Spray.
23    Q. Did Mr. Warren ever provide you with any
24 financial analysis in your prior position?
25    A. Excel spreadsheets on legal expenses. Yeah, I

Page 122

1 can't recall off the top of my head what he might have
2 helped with.
3    Q. So just sticking with the spreadsheets on
4 legal expenses, what was the analysis that Mr. Warren
5 was doing if you remember?
6    A. It was just a comparison to where we were with
7 budget.
8    Q. Do you recall what you needed those
9 spreadsheets for?
10    A. No.
11    Q. Going back to talking about Mr. Tedrick, do
12 you know whether or not Mr. Tedrick's job
13 responsibilities have changed at all, let's say, in the
14 past two years, so since the beginning of 2019?
15    A. It wouldn't have been my place to know what
16 his exact job responsibilities were at those times other
17 than being the managing director of finance.
18    Q. So -- let's see. So always in only from what
19 you know and in your personal capacity, did -- were
20 there any changes in what you yourself reported to
21 Mr. Tedrick from 2019 until your new position as acting
22 CFO?
23       MS. KOZLOWSKI: Objection, form, and it's
24 vague.
25    A. I don't recall any specific changes, but you

Page 123

1 know, I don't -- I can't -- I don't know. I don't
2 recall any.
3    Q. (BY MR. THOMPSON) So in your current role as
4 acting CFO, do you know what Mr. Tedrick's job
5 responsibilities are currently?
6    A. I have not specifically looked at his -- at
7 his, I guess, position description, but I know we have
8 staff meetings to know exactly what people are working
9 on.
10    Q. Can you tell me what Mr. Tedrick -- without
11 getting into any legal advice or any assistance that
12 Mr. Tedrick may be providing to counsel, can you tell me
13 what Mr. Tedrick is currently working on, what his
14 current duties are?
15    A. Insurance renewals that are due coming up
16 soon, audit work, reviewing monthly financial reporting.
17 And he has dual roles, so he has responsibilities
18 associated with the Foundation?
19    Q. He is the -- is he the treasurer of the
20 Foundation or is he the CFO of the Foundation?
21    A. He's the CFO of the Foundation.
22    Q. Do you know whether or not Mr. Tedrick's --
23 Mr. Tedrick has been the subject of a vote of no
24 confidence in his role as CFO of the Foundation?
25    A. I am not familiar with that.

Page 124

1    Q. Have you -- in your current role as acting
2 CFO, have you reviewed any of Mr. Tedrick's work, any
3 reports that he has prepared?
4       MS. KOZLOWSKI: Objection, vague.
5    A. He's not prepared any specific reports. He
6 reviews reports prepared by others. We are going
7 through an insurance renewal process that requires a lot
8 of reporting back to the insurance renewals. We had an
9 update the other day from the insurance, so I know those
10 are being done.
11    Q. (BY MR. THOMPSON) Okay. So let me try and --
12 I promise that I am not intending to be vague. If I am
13 being vague, please feel free to let me know.
14       Earlier you spoke about -- we were talking
15 about Mr. Tedrick's job performance, and I believe you
16 said -- and please correct me if this is wrong -- that
17 in your current role you have been satisfied with
18 Mr. Tedrick's job performance so far. Is that correct?
19    A. As far as I can tell at this point, yes.
20    Q. Okay. And so my question, what I'm trying to
21 get at, I guess, is what is the basis for that or sort
22 of what is -- what are you basing your evaluation of
23 Mr. Tedrick's job performance on?
24       MS. KOZLOWSKI: Object as to form.
25    A. He's answering questions when I've asked him.

Page 125

1 He is responsive to the emails that exchange. He has
2 coordinated requests that have been asked of him. He's
3 performing the duties that have been asked of him.
4 That's how I was making that determination.
5    Q.  (BY MR. THOMPSON)  Okay.  Thank you.
6       MS. KOZLOWSKI:  Counsel, we did have
7 lunch arrive.  So when you get to a breaking point, if
8 we could take a lunch break, that would be nice.
9       MR. THOMPSON:  Yeah, I think this is
10 actually a great spot.  So we can go ahead and take a
11 break.  And is -- would coming back at 1:30 be
12 acceptable?
13       MS. KOZLOWSKI:  Yeah, I think that's
14 fine.
15       THE VIDEOGRAPHER:  We are going off the
16 record.  The time on the video is 12:42 p.m.
17       (Break from 12:42 p.m. to 1:31 p.m.)
18       THE VIDEOGRAPHER:  We are back on the
19 record.  The time on the video is 1:31 p.m.
20    Q.  (BY MR. THOMPSON)  Welcome back, Ms. Rowling,
21 in what I'm sure is a very exciting day.
22       If you could please open, there should be a
23 new exhibit in the Marked Exhibit folder, Exhibit No. 4.
24       (Exhibit 4 marked.)
25    Q.  (BY MR. THOMPSON)  And after you have a chance
Page 126

1 to take a look at it, I will ask if you recognize the
2 document.
3    A.  I do recognize the document.
4    Q.  Can you tell me what it is?
5    A.  The list of top concerns for the audit
6 committee.
7    Q.  Is this the list of top concerns that we were
8 discussing earlier that was prepared in anticipation of
9 presenting it to the audit committee in 2018?
10   A.  Yes.
11   Q.  Going through this memo -- well, let me step
12 back for a second.
13      So there were multiple people involved in
14 preparing this memo.  Is that correct?
15   A.  That is correct.
16   Q.  And am I correct that the other people who
17 were involved in preparing the memo were Mr. Erstling,
18 Ms. George, Ms. Emily Cummins and Portia Padilla.  Is
19 that correct?
20   A.  Portia had input but not into this exact
21 document.
22   Q.  Okay.
23   A.  So I wouldn't say she had direct input --
24 direct -- she wasn't directly involved, let's put it
25 that way.
Page 127

1    Q.  Is it fair to say that she was a contributor,
2 but not a preparer?
3    A.  Correct.
4    Q.  Okay.  And was I correct with respect to the
5 other individuals involved, Mr. George -- I'm sorry --
6 Ms. George, Mr. Erstling and Ms. Cummins?
7    A.  That's correct.
8    Q.  Were there -- was there anyone else involved?
9    A.  Rick Tedrick received it, but he did not add
10 input into what was on here.
11   Q.  Okay.  So looking at Exhibit No. 4, this list
12 of top concerns, were there particular items on this
13 list that were your additions to the list?
14   A.  Yes.
15   Q.  Can you identify those for me?
16   A.  Woody Phillips payments made to significant
17 other.  Josh Powell's wife recently hired at a top
18 vendor.  The forced payments to WBB Investments for
19 $70,000 without a W-9.  I was involved in discussions
20 surrounding Lance Olson's invoice for purchases.  I was
21 not the only contributor of that.  Yeah, those were my
22 specifics.
23   Q.  Okay.  Thank you.
24      Going back up to paragraph 1 and looking down
25 at sub d, as in David, board member compensation
Page 128

1 arrangements not being disclosed, impairing independence
2 and arranged behind the scenes with vendors such as
3 Ackerman McQueen, Associated TV and Warpspeed.  Do you
4 recall was the person who added this item to the top
5 concerns memo?
6    A.  I believe that was Emily Cummins, to the best
7 of my recollection.
8    Q.  Do you recall if there were -- let me
9 rephrase.
10      Do you recall which board member's
11 compensation was intended to be included in this item?
12      MS. KOZLOWSKI:  Objection, form.
13   A.  I believe -- I believe it related to -- to
14 Oliver North.
15   Q.  (BY MR. THOMPSON)  Was that with respect to
16 Ackerman McQueen specifically, if you recall?
17   A.  Oliver North would have been with respect to
18 Ackerman McQueen.
19   Q.  Do you recall which, if any, board member was
20 associated with Associated TV?
21   A.  I don't recall, huh-uh.
22   Q.  What about with respect to Warpspeed?
23   A.  I don't recall.
24   Q.  So a version of this memo was ultimately
25 presented to the audit committee in July of 2018.  Is
Page 129

33 (Pages 126 - 129)

1 that correct?
2    A. That's correct.
3    Q. Do you recall -- so I am going to be asking
4 you as much as you can remember about this audit
5 committee meeting that happened coming up on three years
6 ago.
7      Do you recall whether or not a hard copy of
8 this memo or another version of this memo was provided
9 to the members of the audit committee at that meeting?
10    A. My recollection was they were provided a
11 version, and then we brought this version that we're
12 looking at to the meeting.
13    Q. There was a version that was edited by Rick
14 Tedrick to exclude certain of these items that was sent
15 to the audit committee. Is that correct?
16      MS. KOZLOWSKI: Objection as to form.
17    A. The version that was sent to the audit
18 committee had been edited by Rick Tedrick.
19    Q. (BY MR. THOMPSON) Do you recall whether
20 anyone other than Rick Tedrick edited the memo that went
21 to the audit committee?
22    A. I don't recall.
23    Q. Can you walk me through, to the best of your
24 recollection, let's start with who was present at the
25 audit committee meeting in July 2018?

Page 130

1    A. Initially Charles Cotton, Carolyn Meadows,
2 David Coy. It was Emily Cummins, myself, Rick Tedrick,
3 John Frazer, Mike Erstling. And I know there were other
4 audit committee members. I believe Herb Lanford. And I
5 think there's one other, but I cannot remember the name.
6 And then Steve Hart was there initially as well.
7    Q. Was there anyone present from the Brewer law
8 firm?
9    A. No.
10    Q. So you said initially. Did the persons
11 present change during the course of the meeting?
12    A. Yes. When we first got there, we requested
13 that Steve Hart leave the room; and then Charles Cotton
14 and Carolyn Meadows, due to the lateness of the meeting,
15 had to leave for flights.
16    Q. Was there a -- did the audit committee members
17 meet with anyone prior to -- that's vague. Let me
18 rephrase.
19      Was there a pre-meeting to your meeting, I
20 guess, with the audit committee that you were not
21 present for?
22      MS. KOZLOWSKI: Objection, calls for
23 speculation.
24    A. The meeting did not start with us, so there --
25 there were other matters being addressed prior to what

Page 131

1 we were called in for.
2    Q. (BY MR. THOMPSON) Did you -- based on your
3 personal knowledge, do you know what those matters were
4 that were being addressed?
5    A. No, I don't.
6    Q. Do you know was the -- was any representative
7 of the Brewer law firm in that meeting?
8    A. I would be speculating on the attendance of
9 that meeting.
10    Q. Do you have any personal knowledge of the
11 attendance of that meeting?
12    A. I do not. I wasn't there.
13    Q. Okay. So you mentioned that you requested
14 that Steve Hart leave the room, is that correct, when
15 the meeting started?
16    A. That's correct.
17    Q. Steve Hart at the time was counsel to the NRA
18 on board related matters. Is that correct?
19    A. That is my understanding. I don't have
20 personal knowledge into all of his exact role, but he
21 was counsel to the board. That's part of what he was
22 doing.
23    Q. Okay. Why -- so when you say that you
24 requested that Steve Hart to leave the room, was that
25 you personally or was that you as a group, both?

Page 132

1    A. As a -- as a group.
2    Q. And why did you as a group request that
3 Mr. Hart leave the room?
4    A. There were comments made by Steve Hart that
5 alluded to wanting to blame the CPAs for whatever these
6 issues were instead of -- so we did not want him to be a
7 part of these discussions with that thought in his head.
8    Q. Okay. Do you remember who these comments were
9 made to?
10    A. I was informed by Emily Cummins of the
11 comments. Other than that, I don't know who they were
12 addressed to.
13      MR. THOMPSON: Sharon, could you go ahead
14 and mark tab 3?
15    Q. (BY MR. THOMPSON) And while that is
16 happening, I believe you said that Ms. Meadows and
17 Mr. Coy left the meeting early in order to catch a
18 flight. Is that correct?
19    A. No, Mr. Cotton.
20    Q. I'm sorry. Mr. Cotton and Ms. Meadows. Is
21 that correct?
22    A. Yes.
23    Q. Do you recall -- well, first, do you remember
24 approximately how long the entire meeting lasted?
25    A. I don't recall. It was more than an hour.

Page 133

34 (Pages 130 - 133)

1 Q. More than an hour. Okay.
2 Do you recall approximately how long into the
3 meeting Mr. Cotton and Ms. Meadows left?
4 A. Very early on, probably within the first five,
5 ten minutes.
6 Q. So the remaining members of the audit
7 committee -- and that was Mr. Coy and Mr. Lanford and
8 one other person, whose name you can't recall -- did
9 they stay the entire time?
10 A. Yes.
11 Q. Okay. Can you tell me, generally speaking --
12 so, well, let me -- let me rephrase.
13 Did you feel during the meeting as if the
14 audit committee was taking the concerns that you and
15 your colleagues were presenting seriously?
16 A. Yes.
17 Q. Do you recall what, if any, written materials
18 were present for the audit committee members to review
19 during that meeting?
20 A. I had a -- personally, I had a spreadsheet
21 that detailed the billing of McKenna, which was a vendor
22 at the time. Mike Erstling had some items as well, but
23 I really can't speak to exactly what those were that
24 were -- that were handed out.
25 Q. Sorry. I am just checking to see whether we

Page 134

1 have -- yes, the new exhibit should be available. It
2 should be Exhibit 5.
3 (Exhibit 5 marked.)
4 Q. (BY MR. THOMPSON) I ask that you open that
5 and take a moment to look at it and let me know whether
6 you recognize it.
7 MS. KOZLOWSKI: Sorry, Counsel. It's
8 taking a moment to refresh here.
9 A. It's up.
10 Q. (BY MR. THOMPSON) Do you recognize this
11 document?
12 A. I do.
13 Q. Can you tell me what it is?
14 A. It is a personal statement that I wrote, did
15 not present to the committee.
16 Q. You wrote, but you did not present this to the
17 committee?
18 A. That is correct.
19 Q. Is there a particular reason that you did not
20 present it to the committee?
21 A. It was -- no, I just chose not to at the time.
22 To fully read that statement, I did not.
23 Q. Okay. So if I could take you down to the
24 third paragraph where it says, I fully believe this
25 meeting is being manipulated in a way as to try to

Page 135

1 explain away our issues or try to claim the items on the
2 list are fixed before we can present them as
3 whistleblowing. Do you see that?
4 A. I do.
5 Q. Can you tell me at the time what you meant by
6 that sentence?
7 A. There was concern that -- that -- we were
8 afraid the list would be viewed as single items that
9 were an issue versus a more bigger picture issue with
10 respect to certain individuals, and we did not want this
11 to be let's fix these items. These were issues as an
12 individual issue, so that was where that came from.
13 Q. Were there particular persons that you had in
14 mind when you wrote this sentence as the -- as persons
15 who were manipulating the meeting?
16 A. Not being fully aware of all of the legal
17 ongoings of what was being discussed, we were concerned
18 at the time that with individual issues being cleaned
19 up, that it was by at the advice of counsel that these
20 items were kind of being seen as individual items
21 instead of a bigger picture. So these are -- it was
22 more in terms of what legal counsel was doing, internal
23 and external.
24 Q. Which counsel in particular?
25 A. That would have included John Frazer and the

Page 136

1 Brewer firm.
2 Q. Do you recall whether or not you relayed the
3 sentiment in this sentence, in whole or in part, to the
4 audit committee at the meeting in July 2018?
5 A. I do not believe that I did. I don't recall
6 specifically, but I don't believe that I voiced that
7 during the meeting.
8 Q. Okay. Did either you or, to the best of your
9 knowledge, any of your colleagues ever relay that
10 concern or sentiment to anyone in the NRA?
11 A. I don't -- I don't know that. I --
12 Q. For you personally, do you remember doing so?
13 A. I don't recall doing so.
14 Q. I will ask you sort of generally about this
15 statement just to the best of your recollection. Do you
16 recall relaying any part of this statement in sum or
17 substance to the audit committee at that meeting in
18 July 2018?
19 A. At that meeting? I don't recall, but I don't
20 think so. I just -- I don't recall. I know I didn't
21 present the statement, so, you know, if there was any
22 specific thing discussed, I just -- I don't recall doing
23 so.
24 Q. Do you recall whether you or any of your
25 colleagues at that meeting asked to be considered

Page 137

35 (Pages 134 - 137)

1 whistleblowers under the then existing whistleblower
2 policy for the NRA?
3     A. I don't recall. I don't believe we did.
4     Q. To the best of your recollection, was there
5 any reason that you didn't do so?
6     A. No.
7     Q. With respect to the last paragraph in your
8 personal statement, I also want to officially file a
9 complaint that the NRA violated our whistleblowing
10 protection by placing Josh Powell in a direct chain of
11 command over those who spoke out against him and others
12 when Craig Spray was hospitalized and on medical leave.
13     Do you see that?
14     A. I do.
15     Q. Did you ever make a complaint of this nature
16 to anyone at the NRA?
17     A. I did not personally. There were complaints
18 made by others of the group to HR at the time.
19     Q. Do you remember who --
20     A. And I believe -- and I believe John Frazer as
21 well was made aware that that was an issue for us.
22     Q. Do you recall who made those complaints?
23     A. I believe Mike Erstling did. I -- I can't say
24 if anyone else specifically did.
25     Q. And am I correct that -- so when Mr. Spray was

Page 138

1 hospitalized or when he was out on medical leave from
2 the organization, that Mr. Powell was appointed as
3 acting CFO? Is that correct?
4     MS. KOZLOWSKI: Objection as to form.
5     A. Yeah, I can't recall the exact title, but we
6 were to report through him.
7     Q. (BY MR. THOMPSON) Okay. Do you know whether
8 or not any action was taken by anyone at the NRA in
9 response to the complaint that Mr. Erstling made?
10     A. I do not know.
11     Q. Do you recall having any conversations with
12 Mr. Erstling about the outcome of or any follow-up to
13 the complaint that he made regarding Mr. Powell?
14     A. No. Mr. Spray came back fairly quickly on
15 limited capacity, so we just did not report to Josh.
16     Q. Okay.
17     A. We chose not to.
18     Q. Do you remember who -- who was it that
19 communicated to you that while Mr. Spray was out, you
20 were to report to Mr. Powell?
21     A. I -- I believe it was an email from Wayne
22 LaPierre's office.
23     Q. So it was a -- it was an email that came from
24 the office of the executive vice president. Is that
25 right?

Page 139

1     A. Correct.
2     Q. Or did it come from Mr. -- let me -- sorry,
3 let me rephrase.
4     So it's my understanding that Mr. LaPierre
5 does not personally send out very many, if any, emails.
6 Is that correct?
7     A. That is correct.
8     Q. Okay.
9     A. But to kind of rephrase that, that it was his
10 office.
11     Q. Okay. Is it -- is it fair to say that this is
12 an email that came from Mr. LaPierre's email address at
13 the NRA?
14     MS. KOZLOWSKI: Objection as to form and
15 calls for speculation.
16     A. Yeah, I don't -- I don't recall exactly where
17 that email came from. You know -- yeah, I just don't
18 recall exactly where that came from, what email address.
19     Q. (BY MR. THOMPSON) Okay. Other than
20 communications with counsel, internal or external, do
21 you recall having any communications with anyone in the
22 NRA between this July 2018 audit committee meeting and
23 the September meeting of the board that year about the
24 issues that were addressed in the top concerns memo?
25     A. With anybody?

Page 140

1     Q. Anybody outside of the group that presented
2 the memo.
3     A. There were big conversations because the rumor
4 mills got started around the building, but specifics
5 were tried to be avoided with respect to what was
6 discussed.
7     Q. Were you personally -- I am going to be --
8 let's see how best to phrase this question.
9     Were you personally involved in any efforts to
10 remediate or correct or identify any of the issues that
11 you raised -- that your group raised in the top concerns
12 memo immediately following the July meeting with the
13 audit committee?
14     MS. KOZLOWSKI: Objection, form.
15     A. I'm not sure I understand exactly what you're
16 asking.
17     Q. (BY MR. THOMPSON) I'm asking whether you were
18 involved in any corrective measures that were taken in
19 response to the top concerns memo immediately after
20 presenting it to the audit committee in 2018?
21     A. We were asked for a vendor list so that
22 letters could be sent for procedures that were going to
23 be enforced with respect to vendor invoicing. We were
24 told with the support of Craig Spray to enforce the
25 policies and that he would support us in those efforts

Page 141

36 (Pages 138 - 141)

1 if anyone tried to circumvent, I guess, our controls.
2   Q.   Do you recall who asked you, other than
3 counsel, for the vendor list?
4   A.   That came through Craig Spray.
5   Q.   Okay.  Do you remember approximately how long
6 after the July 2018 meeting Craig came back in his -- I
7 understand he started -- he came back -- what's the
8 word -- partially to begin due to his health.  Is that
9 correct?
10   A.   That is correct.
11   Q.   And do you remember approximately how long
12 after the July 2018 audit committee meeting that was?
13   A.   I don't recall when that was.
14   Q.   Okay.  So if I could take you back to the top
15 concerns memo, which has been marked as Exhibit 4, and
16 let me know when you have that back.
17       MS. KOZLOWSKI:  It's back.
18   Q.   (BY MR. THOMPSON) So Ms. Rowling, are you
19 aware that the NRA has been paying a law firm for the
20 purpose of representing Marion Hammer in connection with
21 litigation that she is a plaintiff in regarding some
22 cyber harassment that she endured?
23   A.   Yes, I'm aware.
24   Q.   Can you tell me when you became aware of that?
25   A.   I don't recall.

Page 142

1   A.   That's correct.
2   Q.   Were you the person who brought potentially --
3 potentially wrongful charges to the attention of Craig
4 Spray?
5       MS. KOZLOWSKI:  Objection, form.
6   A.   Craig brought some issues up to me and asked
7 me to -- to do the research.
8   Q.   (BY MR. THOMPSON) Do you recall what the
9 issues were that he brought to you?
10   A.   He had access to the details -- the actual
11 statements for American Express and American Express
12 provides a lot of detail on their statements, and I
13 believe he noticed on those within that detail the
14 actual person on -- a plane ticket was bought for, and
15 he had concerns with what he was seeing with respect to
16 that.
17   Q.   Was that with respect to -- did you say plane
18 tickets in particular, or was it expenses more broadly?
19   A.   His initial concern was with what he was
20 seeing with respect to the purchase of flights --
21   Q.   Okay.
22   A.   -- on those --
23   Q.   And that was -- was that on -- did you say
24 that that was on the Amex card that had been given to
25 Mr. Powell?

Page 144

1   Q.   Was it --
2   A.   I believe I saw a contract when it came
3 through my office.
4   Q.   I'm sorry.  Say that one more time.
5   A.   I believe I saw the contract for those
6 services when they came through my office, but I
7 couldn't tell you the timeframe.
8   Q.   Were you aware of it prior to the filing of
9 the bankruptcy?
10   A.   Yes.
11   Q.   Do you know whether or not that arrangement
12 has been disclosed to the board of directors?
13   A.   I believe it was in the audit committee
14 minutes relating to her indemnification for that.
15   Q.   Okay.  I think we can -- we can try and find
16 those minutes, but it was my understanding -- no, we'll
17 come back to that.
18       If I could take you down in the top concerns
19 memo to paragraph 2c where it says Josh Powell
20 purchasing computer assets via company credit card.  Do
21 you recall who added that item to the top concerns memo?
22   A.   Mike Erstling.
23   Q.   Okay.  Am I correct that you were involved
24 into an investigation into Mr. Powell's expenses
25 starting in -- in or around October of 2019?

Page 143

1   A.   That's correct.
2   Q.   Okay.  And am I correct that -- currently,
3 does the NRA have two lines of credit with respect to
4 Amex cards, one under the treasurer and one under
5 Mr. Tedrick?
6       MS. KOZLOWSKI:  Objection, form.
7   A.   Currently, the NRA has no credit cards.
8   Q.   (BY MR. THOMPSON) Okay.  Is that true for
9 Visa as well?
10   A.   That's correct.
11   Q.   Right, because -- I forgot what proceeding we
12 were in for a minute.
13       Prior to the filing of the bankruptcy, did
14 the -- immediately prior to the filing of the
15 bankruptcy, did the NRA still have -- did the NRA have
16 the two lines of Amex credit cards, one under Mr. Spray
17 and one under Mr. Tedrick?
18       MS. KOZLOWSKI:  Objection to form.
19   A.   Yes, there were two lines of credit cards.
20   Q.   (BY MR. THOMPSON) Can you tell me immediately
21 prior to the filing of the bankruptcy who had been
22 provided -- who at the NRA had Amex cards?
23   A.   I couldn't provide you a complete list off the
24 top of my head because the programs were not underneath
25 me as -- you know, to be able to monitor.

Page 145

37 (Pages 142 - 145)

1   Q.   Who were they underneath?
2   A.   Craig and Rick monitored those --
3   Q.   Okay.
4   A.   -- specific activities.
5   Q.   To the extent that you know, can you provide
6   me with the names of anyone that you know to have had
7   Amex cards immediately prior to the filing of the
8   bankruptcy?
9   A.   Craig, Rick, Carolyn Meadows and Charles
10  Cotton, Joe -- Joe DeBergalis.  Yeah, I don't want to
11  speculate on -- yeah, I just don't want to --
12  Q.   No, I understand.  Just to the extent that you
13  know.
14       So other than this review of Mr. Powell's Amex
15  expenses that occurred in 2019, have you had any
16  responsibility for reviewing Amex expenses full stop?
17  A.   I'm sorry.  Prior to that review, is that
18  what -- I'm sorry.  I missed the beginning of that.
19  Q.   Let's say since that review, actually.  So,
20  you know, other than the review in 2019 of Mr. Powell's
21  expenses on the Amex and since then, have you had any
22  role in reviewing Amex expenses at the NRA?
23  A.   Upon becoming acting CFO and given COVID, I
24  was asked to look at some Amex that had occurred during
25  the year last year, but that was because Craig was not

Page 146

1   physically in the office, and that only happened after I
2   became acting.  Prior to that, no, I had no visibility
3   into those.
4   Q.   Okay.  Can you tell me what the Amex -- excuse
5   me -- what the Amex expenses that you've looked at
6   recently or what -- when you referred to the Amex
7   expenses that you reviewed since becoming acting CFO,
8   what those were?
9   A.   I looked at Rick Tedrick's card, which has
10  actually not really any of his personal -- he didn't
11  really use that for personal business.  It's more as a
12  corporate card when we have business expenses that must
13  be charged that way, such as there being -- Facebook
14  requires you to if you're utilizing any of their
15  services.  Things like that that are required to
16  utilized a credit card, that's what's generally on
17  those, as well as corporate rentals, car charge goes on
18  there.  So those types of things.
19  Q.   Okay.  Can you tell me why you were asked to
20  review Mr. Tedrick's Amex expenses?
21       MS. KOZLOWSKI:  Objection, asked and
22  answered.
23  A.   Yeah, I already said because Craig was not
24  physically in the office due to the COVID situation.
25  Q.   (BY MR. THOMPSON)  Were you reviewing them

Page 147

1   for a -- strike that.
2        So turning back to the -- going back to your
3   review of Mr. Powell's expenses in 2019, did you also
4   determine that Mr. Powell had inappropriately purchased
5   computer assets for himself?
6   A.   That was added to this by Mike Erstling, the
7   other -- the top concern, but that charge was listed in
8   that part of that review.  It was there.
9   Q.   Okay.  So I think the question that I have is
10  why did it take until October of 2019 for this review of
11  Mr. Powell's expenses to take place when one of the
12  issues that you and your colleagues raised in the top
13  concerns memo related to Mr. Powell's expenses?
14       MS. KOZLOWSKI:  Objection to the extent
15  it calls for speculation or advice of counsel.
16  A.   Yeah, so this was one item on a credit card
17  that was noticed because it was considered a fixed
18  asset.  That was why it was noticed.  Other than that,
19  we had no visibility into his credit card to know that
20  there was anything else to consider as an issue.
21  Q.   (BY MR. THOMPSON)  Understood.  And I don't
22  mean to imply that you did have visibility into his Amex
23  expenses.  I am just trying to understand from your own
24  personal knowledge if you know why no investigation into
25  Mr. Powell's expenses was done until you were asked by

Page 148

1   Mr. Spray to look into some of his expenses in 2019.
2   A.   I don't know.
3   Q.   Okay.  Do you have any personal knowledge of
4   any investigation that was done into -- well, let me
5   step back.
6        Is it fair to say that several of the items on
7   the top concerns memo related to Mr. Powell?
8   A.   Yes.
9   Q.   Do you know personally whether any
10  investigation into the Powell related items on this memo
11  were conducted between the July 2018 audit committee
12  meeting and when you began reviewing his Amex expenses
13  in 2019?
14       MS. KOZLOWSKI:  I would object to the
15  extent that that is seeking communications you've had
16  with counsel with respect to any investigation.
17  A.   I would have to make assumptions to -- to
18  answer that, and --
19  Q.   (BY MR. THOMPSON)  That's fine.  No reason to
20  speculate.  Thank you.
21       So going down on the top concerns memo to
22  paragraph 4, and we'll start with little a.  So first,
23  this relates to vague and deceptive billing by preferred
24  vendors/contractors.  And starting with little a,
25  Associated TV, billing of 1.8 million for rental of a

Page 149

38 (Pages 146 - 149)

1 house that belongs to Stanton/McKenzie, an owner of
2 Associated TV.
3     First, do you remember who added that item to
4 the top concerns memo?
5     A. Mike Erstling.
6     Q. Am I correct that in late 2018 or early 2019,
7 Mr. Spray undertook a review of the invoices submitted
8 by Associated Television, to the best of your knowledge?
9         MS. KOZLOWSKI: Objection to the extent
10 it calls for speculation.
11     A. Well, conversations I had regarding that were
12 with counsel.
13     Q. (BY MR. THOMPSON) Which counsel?
14     A. The Garman firm, as well as the Brewer firm.
15     Q. At the time that the review -- well, okay, let
16 me start over.
17     Are you personally aware of a review into
18 Associated Television?
19     A. I was not.
20     Q. Okay. So at the time that the review was
21 going on, you were not involved. Is that fair?
22     A. That's correct.
23     Q. Okay. As you sit here today, do you have any
24 personal knowledge of what goods or services Associated
25 Television provided to the NRA?

Page 150

1     A. I believe they provided a TV series called
2 Crime Strike.
3     Q. And again, only from your personal knowledge,
4 do you know when the last airing of -- excuse me -- let
5 me restart.
6     To the best of your personal knowledge, do you
7 know when the last airing of a Crime Strike episode was?
8     A. No, I do not.
9     Q. And then skipping down a few bullets in the
10 memo to sub d, as in David, MMP bills violate the
11 contract stipulations. Do you know who added that item
12 to the memo?
13     A. Mike Erstling.
14     Q. And do you have any personal knowledge of what
15 this is referring to, this item?
16     A. My knowledge was of an increase in the bills
17 outside of what escalation clauses were within the
18 contract.
19     Q. And do you have any personal knowledge as to
20 a -- let me restart.
21     Do you know whether or not the NRA spoke with
22 MMP about this issue?
23     A. Yes.
24     Q. What is the basis of your knowledge? I'm
25 sorry --

Page 151

1     A. I received --
2     Q. I'm sorry. I was just going to say it was a
3 very lawyerly question, so I apologize; but if you
4 understood, please go ahead and answer.
5     A. I received a memo prepared by MMP explaining
6 their reasons behind each individual increase with
7 respect to the bills.
8     Q. When did you receive that memo?
9     A. I don't recall.
10     Q. Do you recall if it was in 2019?
11     A. I really don't. I don't --
12     Q. Okay.
13     A. -- recall exactly when I got it.
14     Q. Do you know if you still have that memo in
15 your possession?
16     A. I don't know. I really don't.
17     Q. And so did you personally receive that memo?
18     A. Yes.
19     Q. Did anyone -- was that memo provided to anyone
20 else in financial services or the office of the
21 treasurer?
22     A. I couldn't speak to that. I don't know.
23     Q. Do you recall whether or not you provided the
24 memo to Mr. Spray?
25     A. I did not provide the memo to anybody.

Page 152

1     Q. Okay. Do you recall what the justification in
2 the memo was for the increase in their billing?
3         MS. KOZLOWSKI: Objection, form.
4     A. It was a long memo. And it wasn't provided to
5 me from MMP, by the way. It was -- as I recall, they
6 discussed certain added responsibilities that they were
7 given and the costs associated with those, the specific
8 hires they had to make in order to fulfill those
9 requests. It was pretty specific as to each individual
10 increase. You know, I couldn't talk to exactly what was
11 said. It was a long time ago.
12     Q. (BY MR. THOMPSON) Who was the memo provided
13 to you by?
14     A. I don't recall if -- it was Rick or Craig,
15 either one. I just don't recall which one it was.
16     Q. So was the memo -- was the memo prepared
17 internally at the NRA?
18     A. No, I don't believe it was. It was prepared
19 by MMP.
20     Q. Okay. All right. So yeah, let me just -- I'm
21 just trying to figure out where the memo came from and
22 who it went to. So you believe that MMP prepared the
23 memo. Is that correct?
24     A. That is my understanding, that it was prepared
25 by MMP.

Page 153

39 (Pages 150 - 153)

1 Q. Okay. And so the memo was not provided by MMP
2 to you directly. Is that correct?
3 A. That is correct.
4 Q. And do you recall who MMP provided the memo to
5 at the NRA?
6 A. No. I was not involved in any of that part of
7 their process.
8 Q. Okay. But to the best of your recollection,
9 you were provided with the memo by either Rick Tedrick
10 or Mr. Spray. Is that correct?
11 A. That would have been the normal course of who
12 would have provided me that type of information.
13 Q. MMP is still a vendor for the NRA. Is that
14 correct?
15 A. Yes.
16 Q. Can you walk me through currently what the
17 normal practice is when an invoice comes in for services
18 at the NRA?
19 A. The invoice, depending on where it comes in
20 to -- if it comes in directly to accounts payable, it is
21 routed to the division responsible for the services that
22 were provided. They review, code to a proper general
23 ledger account according to their budget, and route it
24 back after it's approved back to our accounts payable
25 department. Accounts payable will verify whether

Page 154

1 there's a contract associated with that, whether there
2 is a -- or is it a purchase order, if either of those
3 are needed. And then depending on the dollar amount,
4 routes for further approval.
5 Q. Do you happen -- as you sit here today, do you
6 know what the, sort of, levels of approval are for
7 different levels of amounts?
8 A. Anything over 50,000 on one invoice must be
9 approved by two officers.
10 Q. And officers, is that elected officers or
11 officers according to the bylaws?
12 A. I believe it's as officers, but we utilize
13 internal -- the internal elected officers.
14 Q. Would that be --
15 A. Employees versus board of directors.
16     (Reporter clarification.)
17 A. Employees versus our board of directors.
18 There have been recent changes to that relating to
19 certain legal matters that must go through board
20 approval.
21 Q. (BY MR. THOMPSON) So other than those recent
22 changes, am I correct that the general practice would be
23 to get approval on invoices over $50,000 from one of the
24 treasurer, the general counsel or the executive vice
25 president?

Page 155

1 A. It would not be general counsel. It would be
2 the secretary.
3 Q. I'm sorry. Thank you. The secretary.
4     But otherwise is that correct, the secretary,
5 the executive vice president or the treasurer?
6 A. That's correct.
7 Q. What about, are the managing director of
8 general operations or the -- I'm sorry. That's not the
9 correct title.
10     Executive director of general operations, is
11 he another officer who can sign off on invoices $50,000
12 or more?
13 A. No, he is not.
14 Q. And then digging down a little bit more into
15 the invoice approval process, I believe you said that
16 financial services division or the accounts payable will
17 determine whether or not there is a contract in place
18 for an invoice. Is that correct?
19 A. They will -- they will look to see if we have
20 one on file, if it is required. It depends on the
21 invoice if a contract is required. If we have a water
22 bill, it's not a contract.
23 Q. Right, understood.
24     So let's take -- well, for those invoices
25 where there is a contract or a contract is required,

Page 156

1 does accounts payable also determine whether or not the
2 invoice meets whatever payment terms are in the
3 contract?
4 A. Accounts payable cannot be held responsible
5 for determining if the actual services behind an invoice
6 were rendered. We can compare to a contract. We can --
7 but the signature of approval on those invoices signal
8 to the accounts payable department that those services
9 were rendered and were appropriate.
10 Q. Understood.
11     So not with respect to whether or not services
12 were rendered, but -- so, for example, if a contract is
13 for a monthly fee of some kind, does accounts payable
14 check the monthly fee as stated in the contract against
15 the invoice that was received?
16 A. With their best effort, that's what they do.
17 Q. Okay. So if we take the MMP, Membership
18 Marketing Partners, as an example --
19     MR. THOMPSON: And actually, Sharon, if
20 we could go ahead and mark -- let me find the tab
21 number. If we could go ahead and mark tab 6 and 7,
22 please.
23     (Exhibit 6 marked.)
24     (Exhibit 7 marked.)
25 Q. (BY MR. THOMPSON) While Sharon is taking care

Page 157

40 (Pages 154 - 157)

1 of that, can you tell me in general terms about what
2 efforts the NRA has taken to centralize contracts in the
3 NRA?
4          MS. KOZLOWSKI: Can you be more specific
5 as to what time period?
6     Q. (BY MR. THOMPSON) Let's say in the two years
7 prior to the filing of this petition.
8     A. There has been compliance training with
9 managers and above to remind them of the rules
10 surrounding contracts, as well as other areas, but
11 specifically the contracts. The -- a concerted effort
12 between legal and financial services has been done to
13 try to help ensure completeness and -- of the files.
14 And, yeah, so those things have taken place. We are --
15 we are actively seeking out contracts if we receive an
16 invoice that should have had one that we might not have
17 in our possession.
18    Q. Okay. So taking a few parts of that answer,
19 you mentioned that there was some compliance training
20 for managers. Is that right?
21    A. That's correct.
22    Q. And is that compliance training the training
23 that occurred in 2018 and in early 2019?
24    A. I know training occurred, and I don't know the
25 exact date, but that sounds reasonable.

Page 158

1     Q. Do you know whether or not -- so do you recall
2 attending a compliance training given by Mr. Frazer
3 either in 2018 or 2019?
4     A. I have attended two of those trainings.
5     Q. Okay.
6     A. I believe there was a third one, but I could
7 not attend.
8     Q. It's my understanding -- and let me ask you if
9 this is correct -- that there were three trainings
10 total: one in July of 2018, one in October of 2018 and
11 one in February of 2019. Does that sound correct?
12    A. It sounds reasonable.
13    Q. Okay. Are there any other compliance
14 trainings that you are aware of that have occurred since
15 that training in February of 2019?
16    A. No. The one for 2020 for obvious reasons did
17 not occur, and it says it is currently being discussed
18 with --
19    Q. Currently being discussed --
20    A. Yeah, with John Frazer to hold another one.
21    Q. Okay. Is there -- is there a person in the
22 treasurer's office who has the primary responsibility to
23 be the keeper of the contracts?
24          MS. KOZLOWSKI: Objection as to form.
25    A. The -- the financial services division has

Page 159

1 always maintained that we keep contracts for which we
2 are aware of. I know legal also keeps contracts. They
3 are supposed to have -- have the original and -- well,
4 let me back that up.
5         The originals are provided at some times to
6 financial services or to general counsel's office and --
7 where copies are maintained. And there's an ongoing
8 effort to make sure that any contract that comes through
9 to financial services, that general counsel has and vice
10 versa.
11    Q. (BY MR. THOMPSON) And then is there a
12 particular person in financial services or the broader
13 office of the treasurer whose job it is to -- well, let
14 me step back.
15        Is there a file of contracts that is
16 maintained by the office of the treasurer?
17    A. Yes, there is a file of contracts.
18    Q. Does that file also include, where available,
19 business case analyses for contracts?
20    A. Where available, yes.
21    Q. And is there a particular person in financial
22 services who is responsible for maintaining that file?
23    A. During COVID, it was actually me because we
24 were -- had staff that were furloughed. And prior to
25 that, it was with a financial representative within

Page 160

1 financial services.
2     Q. Do you remember who that person was prior to
3 the furloughs?
4     A. Evan Knight did it. But, again, I don't want
5 to put on a lower level staff that it was their
6 responsibility to know about contracts that he wasn't
7 given a copy of, so I don't want to say that.
8     Q. No, I understand.
9         So my question is only whether or not there
10 was a -- if there was a point person in financial
11 services to whom other departments of the NRA were
12 supposed to provide copies of contracts or copies of
13 business case analyses where available?
14    A. That was me.
15    Q. Okay. So --
16          MR. THOMPSON: Well, actually, we've been
17 going for about an hour. So counsel, this would be a
18 good time to take a break if you would like to take a
19 break.
20          THE VIDEOGRAPHER: We're going off the
21 record. The time on the video is 2:35 p.m.
22          (Break from 2:35 p.m. to 2:48 p.m.)
23          THE VIDEOGRAPHER: We are back on the
24 record. The time on the video is 2:48 p.m.
25    Q. (BY MR. THOMPSON) Okay. So Ms. Rowling,

Page 161

41 (Pages 158 - 161)

1 there should be two new exhibits in the Exhibit Share
2 folder, the first one marked Exhibit 6 and the next one
3 marked Exhibit 7. If you could open Exhibit 6, please,
4 and let me know when you're there.
5     A. Okay.
6     Q. Do you recognize the document that has been
7 marked as Exhibit 6?
8     A. I have seen that document, I believe, before.
9     Q. Do you know whether or not this is a contract
10 that financial services has in its collection of
11 contracts?
12     A. I believe we do.
13     Q. And then if you click on the next file button
14 at the bottom, it should take you to Exhibit 7.
15         MS. KOZLOWSKI: Okay. We have Exhibit 7
16 open.
17     Q. (BY MR. THOMPSON) Do you recognize this
18 document?
19     A. Yes.
20     Q. So is it fair to say -- well, first, both
21 Exhibit 6 and Exhibit 7 are the NRA's agreements with
22 Membership Marketing Partners. Is that correct?
23     A. That is my understanding.
24     Q. And do you also -- does financial services
25 also have a copy of Exhibit 7 in its collection of

Page 162

1 contracts?
2     A. I believe we do.
3     Q. And to the best of your knowledge, are there
4 any other contracts or amendments between the NRA and
5 Membership Marketing Partners excluding other related
6 entities like Allegiance Creative Group and Concord?
7     A. Oh, financial services isn't in possession of
8 any others --
9     Q. Okay.
10     A. -- I don't --
11     Q. Do you know whether or not a business case
12 analysis was prepared with respect to this second
13 amendment to the Membership Marketing Partners
14 agreement?
15     A. I don't know.
16     Q. To the best of your knowledge, does financial
17 services have a copy of any such agreement or, I'm
18 sorry, of any such business case analysis?
19         MS. KOZLOWSKI: Objection. The testimony
20 was that she didn't know of its existence.
21     Q. (BY MR. THOMPSON) To the best of your
22 knowledge, does financial services have a copy of any
23 contract review sheet that was prepared in connection
24 with this second amendment to the Membership Marketing
25 Partners contract?

Page 163

1     A. I do not know.
2     Q. Okay. So using the previous file button to go
3 back to the -- what has been marked as Exhibit 6, let me
4 know when you're there.
5         MS. KOZLOWSKI: We're there.
6     Q. (BY MR. THOMPSON) Is this the agreement that
7 somebody in the accounts payable department at the NRA
8 would use to determine whether or not an MMP invoice is
9 compliant with the MMP contract?
10         MS. KOZLOWSKI: Objection as to form.
11     A. Yeah, the -- the process to -- to review with
12 respect to the contract was not in place originally.
13 That was something that Craig Spray had, you know, tried
14 to implement. MMP is a -- is one in which Craig himself
15 was working with. So I'm not sure that --
16         MS. KOZLOWSKI: Don't speculate.
17     A. Yeah, I don't know.
18     Q. (BY MR. THOMPSON) So we were talking a little
19 bit earlier about -- and I understand that -- am I
20 correct, it's a recently implemented -- and by recently,
21 I mean the last two years -- process where invoices
22 involving a contract are checked against the contract
23 before a payment is made. Is that correct?
24     A. That's been -- yes, that's a more recent
25 process.

Page 164

1     Q. Okay. Instituted by Craig Spray. Is that
2 correct?
3     A. That's correct.
4     Q. Okay. Are invoices for Membership
5 Marketing -- let me rephrase.
6         Do invoices for Membership Marketing --
7 Membership Marketing Partners go through that process?
8     A. I don't know for sure. MMP is one in which
9 Craig Spray, you know, was looking at. So I don't know
10 if accounts payable is directly tying those two to a
11 contract.
12     Q. Okay. Invoices are coming -- invoices for MMP
13 are coming through accounts payable, though. Is that
14 correct?
15     A. Yes.
16     Q. Okay. How do the staff in accounts payable
17 know whether or not to tie any particular invoice to a
18 contract?
19         MS. KOZLOWSKI: Objection to form to the
20 extent it calls for speculation.
21     A. I don't know their exact thought process in
22 that. I don't know.
23     Q. (BY MR. THOMPSON) So in your previous role as
24 a director at the NRA, were you -- did you supervise
25 accounts payable?

Page 165

42 (Pages 162 - 165)

1  A.  I did.
2  Q.  Okay.  In that role, did you take any steps to
3 implement this new invoice checking process that
4 Mr. Spray implemented?
5  A.  I spoke with the accounts payable manager
6 about -- about looking for, yes, contracts associated
7 with invoices.
8  Q.  Who is the accounts payable manager -- or let
9 me rephrase that.
10      Who was the accounts payable manager at the
11 time that this process was first implemented?
12  A.  Portia Padilla.
13  Q.  Is she still the accounts payable manager?
14  A.  Yes.
15  Q.  Okay.  Do you have any personal knowledge of
16 what, if anything, Ms. Padilla did to implement that new
17 procedure?
18  A.  She -- I know she would ask me at times, you
19 know, does this fall under a contract review?  So I know
20 she was looking into it.  Or if she had my permission to
21 reach out to a particular department asking for a
22 contract, if we did not have one.
23  Q.  Okay.  And did Ms. Padilla ever approach you
24 about how to handle invoices from Membership Marketing
25 Partners?

Page 166

1  A.  Not that I'm aware of.
2  Q.  Do you know --
3  A.  Not that I recall.
4  Q.  Okay.  Do you have any personal knowledge of
5 whether or not she reached out to Mr. Spray about how to
6 handle invoices from Membership Marketing Partners?
7  A.  I do not know.
8  Q.  Okay.  Do you know in -- prior to filing of
9 the bankruptcy, let's say in the last six months prior
10 to the filing of the bankruptcy, how much Membership
11 Marketing Partners was invoicing the NRA for on a
12 monthly basis?
13  A.  Not off the top of my head, I don't.
14  Q.  If I told you that it was approximately
15 $960,000 per month, would that sound correct?
16      MS. KOZLOWSKI:  Objection, form, calls
17 for speculation.
18  A.  Yeah, I don't -- I don't know off the top of
19 my head what -- what their invoices are for.
20  Q.  (BY MR. THOMPSON)  Sorry.  Bear with me one
21 minute.
22      MR. THOMPSON:  Sharon, I have uploaded a
23 new document to the private folder called NRA SOFA
24 90-day payments.  Would you please mark that as the next
25 exhibit?

Page 167

1  Q.  (BY MR. THOMPSON)  While Sharon is handling
2 that, are you familiar with Allegiance Creative Group?
3  A.  Yes.
4  Q.  And are you familiar with Concord Social and
5 Public Relations?
6  A.  Yes.
7  Q.  I hope I have that right.
8      Do you know whether or not the NRA has ever
9 done business with any of those entities under different
10 names?
11      MS. KOZLOWSKI:  Objection, form --
12  A.  They have --
13      MS. KOZLOWSKI:  -- foundation.
14  A.  They have doing -- DBAs.  I'm not -- I
15 couldn't name them off the top of my head, but they do
16 have DBAs.
17  Q.  (BY MR. THOMPSON)  Okay.  Let me just see if
18 this exhibit is available yet.
19      (Exhibit 8 marked.)
20  Q.  (BY MR. THOMPSON)  Yes.  So there should be a
21 new exhibit in the folder after you refresh, Exhibit 8.
22 Let me know when you have that.
23  A.  I have that.
24  Q.  Okay.  So I will represent to you that this is
25 an extract from one of the documents that the debtor

Page 168

1 filed in connection with this case, and you can see the
2 docket number at the top of the exhibit.  But if I could
3 direct you -- once I find it myself.  If I could direct
4 you to page 10 of this PDF.  And I apologize that you
5 may have to rotate your head a bit.  Please let me know
6 when you are there.
7  A.  Oh, that's small.  Okay.
8  Q.  So towards the top right-hand side of this
9 page in the -- what would be the left most column if
10 this was properly rotated -- oh, you can rotate it
11 actually.  If you hover over the bottom, there is a
12 rotate symbol, which at least --
13  A.  Yeah.  We've done that.
14  Q.  Okay.  So towards the top, there is Membership
15 Advisors Fundraising.  Do you see that?
16  A.  We must be on the wrong page.  I'm sorry.
17  Q.  Oh, I'm sorry.  This is page 11 of the PDF,
18 not page 10.
19  A.  Yes.
20  Q.  Who is membership -- or what is Membership
21 Advisors Fundraising?
22  A.  An entity that performs fundraising activity
23 for the NRA.
24  Q.  Do you know whether or not that is a DBA of
25 either Allegiance Creative Group or Concord?

Page 169

43 (Pages 166 - 169)

1    A.  It is -- I believe it is one of those.
2    Q.  Okay.  And is the same thing true for
3  Membership Advisers Public Relations?
4    A.  That's correct.
5    Q.  Okay.  And then going down to Membership
6  Marketing Partners, do you see that?
7    A.  Yes.
8    Q.  And then if you go all the way across the
9  page, you will see that there are three payments
10  corresponding to October, November and December of last
11  year, each for $961,850.  Do you see that?
12    A.  That's correct, I do.
13    Q.  Okay.  So does this refresh your recollection
14  as to whether or not -- or as to the amount of
15  Membership Marketing Partners' monthly invoices, period?
16       MS. KOZLOWSKI:  I guess I would object as
17  to scope.  This reflects the payments for three months.
18  It certainly doesn't reflect the payments in perpetuity.
19    A.  Yeah, this reflects the three months that
20  we -- of payments to them.
21    Q.  (BY MR. THOMPSON)  Sure.  So in that case, I
22  am comfortable representing to you that, as of at least
23  mid 2018, the monthly invoices for Membership Marketing
24  Partners have been $961,850.
25       So if I could take you back to Exhibit 6,

Page 170

1  which is the original Membership Marketing Partners
2  agreement.  Please let me know when you are there.
3    A.  Uh-huh.
4    Q.  And then if you could please go all the way to
5  the very last page, schedule A.
6    A.  I'm there.
7    Q.  Do you see where it says effective December 1,
8  2011, the management fee payable to MMP under this
9  agreement shall be $400,000 per month?  Do you see that?
10    A.  Yes.
11    Q.  Are you aware of any agreement between the NRA
12  and Membership Marketing Partners to increase the
13  monthly management fee that is referenced in this
14  schedule A to Exhibit 6?
15       MS. KOZLOWSKI:  Objection to form and to
16  the extent it calls for speculation.
17    A.  Yeah, I don't know.
18    Q.  (BY MR. THOMPSON)  Okay.  The memorandum that
19  you mentioned that was prepared by Membership Marketing
20  Partners, did that include, to the best of your
21  recollection, any reference to the NRA's agreement to
22  pay the increased fees that were described in that
23  memorandum?
24       MS. KOZLOWSKI:  Objection to form.
25    A.  My understanding was they were verbal

Page 171

1  agreements with the treasurer at the time when they
2  originally started their increases.
3    Q.  (BY MR. THOMPSON)  What is the basis for that
4  understanding?
5    A.  Whenever --
6       MS. KOZLOWSKI:  I would caution you,
7  again, with conversations with counsel.
8       THE WITNESS:  I know.  I am trying to
9  recall the conversations.
10    A.  Yeah, I can't answer as to the exact -- who
11  the conversations were with, with the potential of
12  revealing privileged conversations.
13    Q.  (BY MR. THOMPSON)  Okay.  So outside of your
14  conversations with counsel, you cannot recall what else
15  would -- okay.  All right.  I understand.
16       And with respect to the person who would have
17  authorized these verbal agreements, is it your
18  understanding that that was Mr. Phillips?
19       MS. KOZLOWSKI:  Again, I will object to
20  the extent it seeks information that you have learned
21  from your counsel.
22       To the extent that you know outside of
23  conversations with counsel, you can answer.
24    A.  And, again, I don't recall if -- I would
25  rather not say, given I can't recall if any of those

Page 172

1  conversations were had outside of counsel.
2    Q.  (BY MR. THOMPSON)  Okay.  Other than these
3  verbal agreements, are you aware of -- let me step back.
4       Since Mr. Phillips left the NRA and since
5  Mr. Spray became the treasurer of the NRA -- those are
6  not two exactly lined-up dates.
7       Since Mr. Spray became the treasurer of the
8  NRA, are you aware of any agreement by the NRA to pay an
9  increased monthly fee to Membership Marketing Partners?
10       MS. KOZLOWSKI:  Object to the extent it
11  calls for speculation.
12    A.  Yeah, I don't know.
13    Q.  (BY MR. THOMPSON)  Are you aware of any other
14  contracts that do not go through the new invoice
15  matching to contract process that we were discussing
16  earlier, other than this Membership Marketing Partners
17  agreement?
18       MS. KOZLOWSKI:  Object to form and that
19  it misstates testimony.
20    Q.  (BY MR. THOMPSON)  Okay.  Let's -- let's try
21  and lock this down.
22       This contract does not go through the invoice
23  matching to contract process that we were discussing
24  earlier.  Is that correct?
25       MS. KOZLOWSKI:  Objection to form.

Page 173

44 (Pages 170 - 173)

1    A. This contract, yeah, comes down fully approved
2 for -- the invoices come fully approved to the AP
3 department. And other than that, that's to the extent
4 of how -- of what they are doing with respect to this
5 contract.
6    Q. (BY MR. THOMPSON) Okay. Are you aware of any
7 other invoices that are -- that come to accounts payable
8 fully approved in the same way as these Membership
9 Marketing Partners invoices?
10    A. Well, all invoices come approved.
11    Q. Let me back up and just make sure that I
12 understand. My understanding of your answer a moment
13 ago was that the invoices for Membership Marketing
14 Partners come to accounts payable fully approved and
15 that then no further investigation into the propriety of
16 those payments is performed by accounts payable. Is
17 that accurate?
18    MS. KOZLOWSKI: Objection to form,
19 misstates testimony, calls for speculation.
20    A. Yeah, I can't speak to what else Portia might
21 be doing with respect to those invoices.
22    Q. (BY MR. THOMPSON) As the acting CFO of -- I'm
23 sorry?
24    A. I do not know specifically what Portia does
25 with respect to those invoices.

Page 174

1    say that the contracts are -- and should be reviewed at
2 particular points in time and potentially renegotiated.
3    Q. Do you know whether or not the NRA
4 evaluates -- evaluates MMP's performance?
5    MS. KOZLOWSKI: Objection, form, vague.
6    A. As -- as acting CFO, I know that I receive
7 monthly performance parameters internally, as well as --
8 well, the internal ones that are weekly, based on actual
9 cash received relating to membership, which would be
10 their activities, as well as a monthly report from MMP
11 that breaks down all of their activity for the month and
12 the revenue that has been generated from all of their
13 activity.
14    Q. (BY MR. THOMPSON) You receive that report
15 currently as acting CFO?
16    A. Yes.
17    Q. And I believe you said that report provides
18 revenue generated by MMP as a result of their work for
19 the NRA. Is that correct?
20    A. That's correct.
21    Q. Do you recall, with respect to the most recent
22 such report that you received, how much revenue MMP
23 generated for the NRA? Just a ballpark figure.
24    A. It's -- I am trying to think of -- there's at
25 least probably 20 million in January, another 12 to 15

Page 176

1    Q. But you would agree with me that, other than
2 the say-so of those approving the invoices submitted by
3 Membership Marketing Partners to accounts payable,
4 accounts payable does not have access to information
5 that would allow them to test the accuracy of the
6 invoices submitted by Membership Marketing Partners
7 against any existing agreements the NRA has with
8 Membership Marketing Partners?
9    MS. KOZLOWSKI: Objection, form, calls
10 for speculation, misstates testimony.
11    A. Yeah, I can't speak to if there are any other
12 contracts. I mean, you're implying I know that what all
13 contracts exist with respect to MMP and what other
14 discussions have been had of which I know nothing about.
15    Q. (BY MR. THOMPSON) How comfortable are you
16 that you have all contracts that exist between the NRA
17 and MMP?
18    A. I don't know. I'm not sure. There have been
19 conversations that I have had with counsel regarding MMP
20 and their contracts.
21    Q. Without providing me -- without going into the
22 substance of your conversations with counsel, do you
23 have any concerns about the contract that the NRA has
24 with MMP?
25    A. I would not say they were concerned. I would

Page 175

1    in February, approximately.
2    Q. Can you tell me approximately -- well, let me
3 ask this. I believe you also said that you receive
4 performance metrics for the membership division. Is
5 that correct?
6    A. No. That -- well, it's generated from
7 membership reports out of the membership system, but it
8 is created by David Warren.
9    Q. Okay. And do the reports generated by
10 Mr. Warren provide any breakdown as to membership
11 related revenue generated by MMP versus membership
12 revenue generated by nonMMP sources?
13    A. We have that reporting available, because any
14 type of revenue that's generated through membership is
15 entered with a code that identifies the exact source.
16 So we know if it's related to a particular mailer that
17 was from MMP. We know if it was related to someone
18 joining online or through a telephone call.
19    Q. Okay. And going back to you did not call them
20 concerns, but you said that you thought that -- correct
21 me if this is wrong -- that the Membership Marketing
22 Partners contract should be looked at and potentially
23 renegotiated. Is that correct?
24    MS. KOZLOWSKI: I believe that misstates
25 testimony.

Page 177

45 (Pages 174 - 177)

1    A.   In normal course, contracts should always be
2 reviewed.  It is probably time that this one be
3 reviewed.
4    Q.   (BY MR. THOMPSON)  Okay.
5    A.   And whether it's reviewed and renegotiated
6 with MMP or it's decided that the value we receive from
7 them is adequate with respect to the fees, that's to be
8 determined.  And --
9    Q.   Have you -- sorry, I did not mean to cut you
10 off.
11        Have you -- other than counsel, have you
12 communicated that sentiment to anyone in the NRA?
13    A.   These were discussions we had, including Mike
14 Erstling and I had, with Craig Spray early on and when
15 he started.
16    Q.   To the best of your knowledge, have there been
17 any such reviews or potential renegotiations with MMP
18 since that time?
19        MS. KOZLOWSKI:  Objection to the extent
20 it calls for speculation.
21    A.   The -- what I have been told was told to me by
22 counsel with respect to the MMP process.
23    Q.   (BY MR. THOMPSON)  Okay.  Are there any other
24 contracts or relationships that the NRA has that you had
25 a similar discussion with Craig Spray about reviewing or

1 renegotiating or anything of that nature?
2        MS. KOZLOWSKI:  Objection to form and
3 vague as to time.
4    Q.   (BY MR. THOMPSON)  Since Craig Spray --
5 between the time that Craig Spray became the treasurer
6 and when he left the NRA, or when he was put on
7 administrative leave or took administrative leave.
8    A.   McKenna was looked at.  Looking Glass.
9 Ackerman McQueen.  Associated Television.
10        I'm sure there are others, but, you know, it's
11 hard to recall off the top of my head.  Oh, Josh
12 Powell's dad's contract with respect to photography
13 services.
14    Q.   So thinking back to the top concerns memo --
15 and we can open it and take a look at it again, but
16 there was the item about Associated Television and the
17 $1.8 million payment and the reference to Mr. McKenzie
18 and Stanton.  Are you aware that Membership Marketing
19 Partners, Allegiance Creative Group and Concord are also
20 owned in whole or in part by Mr. McKenzie?
21        MS. KOZLOWSKI:  Objection to form,
22 foundation.
23    A.   I have been made aware of that by counsel.
24    Q.   (BY MR. THOMPSON)  But other than through
25 counsel, you had no knowledge of that ownership?

1    A.   I don't recall if I had any knowledge of that
2 prior to a counsel discussion.
3    Q.   Going back to your time as a director before
4 your current position and let's say since Mr. Spray
5 became the treasurer, what has been done to identify
6 contractual relationships that the NRA has that do not
7 comply with the NRA's $100,000 contract policy?
8        MS. KOZLOWSKI:  Objection, form,
9 foundation.
10    A.   Those were discussions that were held with
11 respect to the compliance seminars.  As contracts are
12 brought up to counsel for review, they are advising of
13 those rules as well.  I mean, that's the extent of my
14 knowledge as to what has been done.
15    Q.   (BY MR. THOMPSON)  Let's say in your last year
16 as a director, so for 2020, did Ms. Padilla or anyone
17 else in accounts payable reach out to you with concerns
18 about whether or not any contracts complied with the
19 NRA's $100,000 contract policy?
20        MS. KOZLOWSKI:  Objection, form.
21    A.   I don't recall.
22    Q.   (BY MR. THOMPSON)  Do you recall any such
23 conversations for 2019?
24        MS. KOZLOWSKI:  Objection, form.
25    A.   I'm sorry, a notice popped up on the screen so

1 it distracted me from your question.
2    Q.   (BY MR. THOMPSON)  No, of course.
3        For -- in 2019, do you recall Ms. Padilla or
4 anyone else in accounts payable approaching you with
5 concerns about any contracts that did not appear to
6 comply with the NRA's $100,000 contract policy?
7        MS. KOZLOWSKI:  Objection, form,
8 foundation.
9    A.   The $100,000 contract policy, is that -- I
10 don't recall.  I don't recall.
11    Q.   (BY MR. THOMPSON)  Okay.  And just to make
12 sure, do you know what I mean when I say the $100,000
13 contract policy?
14    A.   Yes.
15    Q.   Okay.  Did you -- let me step back.
16        Are you aware of, other than your
17 conversations with counsel, any investigation into
18 expenses incurred by Millie Hallow?
19        MS. KOZLOWSKI:  Objection to the extent
20 it calls for communications with counsel.
21    A.   Yeah, I can't -- those were -- any of my
22 knowledge is through counsel.
23    Q.   (BY MR. THOMPSON)  Were you personally
24 involved in any such an investigation?
25    A.   No.

1 Q. Do you know who was involved in any such
2 investigation?
3 A. No.
4 MR. THOMPSON: Sharon, could we go ahead
5 and mark tabs 11 and 12, please?
6 Q. (BY MR. THOMPSON) While that is happening,
7 Ms. Rowling, during your 30(b)(6) testimony earlier this
8 morning, I believe you said that Mr. LaPierre has not
9 been reimbursed for any expenses for 2019 or 2020. Is
10 that correct?
11 A. That's -- to the best of my knowledge, that is
12 correct as to that he has not --
13 Q. Okay.
14 A. -- submitted expenses for those time periods.
15 Q. Oh, so it's -- just so I understand, it's not
16 only that he hasn't been reimbursed, but he has also not
17 submitted his expenses for that time period?
18 A. That is correct.
19 Q. Okay. So to the best of your knowledge --
20 well, let me step back.
21 Is there a procedure in place for reviewing
22 and approving expenses that Mr. LaPierre submits to the
23 NRA for reimbursement?
24 A. For what time period?
25 Q. Good question. Let's say before Mr. Spray

Page 182

1 became treasurer, to start with.
2 A. I would have no knowledge of what that was.
3 His expenses were processed through ILA, which is a --
4 would have been a separate department, financial
5 department from where I was.
6 Q. And historically, before the, sort of,
7 reorganization of the ILA to fall under the office of
8 the treasurer, am I correct that Mr. LaPierre's expenses
9 were reviewed and submitted by Andra Fischer?
10 MS. KOZLOWSKI: Objection to the extent
11 it calls for speculation.
12 A. Yeah, I don't know what the process was with
13 respect to his expenses.
14 Q. (BY MR. THOMPSON) Okay. Is there -- is there
15 a new process for reviewing Mr. LaPierre's expenses
16 other than that historical process through ILA?
17 A. My understanding right now is that process was
18 being -- was being reviewed. As far as who would be the
19 approver, John Frazer and I have been discussing that.
20 And that's the extent of what I could say with --
21 MS. KOZLOWSKI: I would caution you not
22 to disclose any communications with counsel.
23 Q. (BY MR. THOMPSON) Okay. So I -- I do want to
24 probe this a little bit because it's hard for me to --
25 this seems more like a finance process point rather than

Page 183

1 a legal point, so I want to see if I can work around
2 privilege issues that may exist.
3 When was -- to the best of your knowledge,
4 when was the last time that Mr. LaPierre submitted
5 expenses for review and potential reimbursement to the
6 NRA?
7 A. To the best of my knowledge, 2017. Maybe some
8 in 2018, but I am not 100 percent sure.
9 Q. Okay. So did you ever have any conversations
10 with Mr. Spray about the process for reviewing
11 Mr. LaPierre's expenses?
12 A. Yes, I did.
13 Q. Can you -- when was that conversation or
14 conversations?
15 A. Bob Owens was -- was here. So I am trying to
16 figure out timeframe. We were having a discussion as to
17 what the process was through his office, but he hadn't
18 seen any at that point, because of -- the individual who
19 worked through these issues with -- or expense reports
20 with Wayne had a medical emergency and no longer worked
21 at the organization. Bob indicated he had not seen any
22 expense reports at that point, and -- and we were trying
23 -- he was trying to come up with a plan of -- at that
24 point of how they should be processed and who should
25 process them, which division.

Page 184

1 Q. Okay. Did that result -- did those
2 conversations or that conversation result in a new
3 process for reviewing Mr. LaPierre's expenses?
4 A. It resulted in a -- because I believe they
5 happened sometime in 2019, this conversation. And I say
6 that because Bob Owens was going to still process the
7 2019 expense reports as they came in, which they never
8 did, because it was already in their budget. For 2020,
9 those expense reports were going to come through the
10 financial services division for payment.
11 Q. Okay. But that has not occurred yet.
12 Correct?
13 A. That is correct.
14 Q. Okay. Oh, I just remembered. I knew I had
15 one more question.
16 I believe also earlier today you said that --
17 and please correct me if this is wrong -- that you had
18 at least looked at some of Mr. LaPierre's expenses for
19 purposes of a potential accrual. Is that correct?
20 MS. KOZLOWSKI: Objection, misstates
21 testimony.
22 A. Yes, I had looked at, not reviewed, his
23 expenses so that we could accurately reflect expenses
24 into the proper period.
25 Q. (BY MR. THOMPSON) Okay.

Page 185

47 (Pages 182 - 185)

1   A.  It would have been for 2020.
2   Q.  And is that the -- I don't know that I have
3  the exact language in front of me -- the $180,000
4  LaPierre expense reserve that is listed in the statement
5  of financial assets that the NRA submitted?
6   A.  Not exactly.  A portion of that is going to be
7  what ILA had accrued for previous years.  That had not
8  been submitted either, and those were based on
9  estimates.  The portion that relates to the 2020 accrual
10  was somewhere around $12,000 --
11   Q.  Okay.
12   A.  -- for the entire year.
13   Q.  So the 12,000 was for 2020, and then the
14  remainder was an estimate of expenses incurred by
15  Mr. LaPierre through the ILA budget.  Is that correct?
16   A.  Yes.  They were estimates that were approved,
17  and I don't know for how many years that would
18  represent.
19   Q.  Okay.  For the $12,000 that are in connection
20  with 2020, how did you -- how did you reach that number?
21   MS. KOZLOWSKI:  Objection.  The testimony
22  is it was approximately 12,000.  I don't think that was
23  a specific amount.
24   MR. THOMPSON:  Sure.
25   MS. KOZLOWSKI:  So just for clarity of

Page 186

1  the record.
2   Q.  (BY MR. THOMPSON)  Approximately 12,000.
3   A.  I was provided the expense reports for the
4  purpose of accrual only.  They had not been approved by
5  anyone at that point.
6   Q.  Who provided them to you?
7   A.  They were all in a box that was, I believe,
8  sent to me from -- because they ended up in Texas.  So
9  they were shipped to me from Texas.
10   Q.  When, approximately, did you conduct this --
11  let me -- I don't want to put words in your mouth.
12       When did you look at these documents?
13   A.  In January of 2021.
14   Q.  Before or after the filing of the bankruptcy?
15   A.  Before.
16   Q.  Do you recall who asked you to do this
17  accrual?
18   A.  I asked myself to do it.
19   Q.  Okay.
20   A.  We knew that we were supposed to record
21  Mr. LaPierre's expenses in our -- in the NRA side apart
22  from ILA, and I asked the questions of the individual
23  who was putting those together where they were so that I
24  could get an estimate to approve.
25   Q.  Who was that individual?

Page 187

1   A.  Lisa Supernaugh.
2   Q.  I know it's changed a bit over the years.  Can
3  you tell me what Ms. Supernaugh's current role at the
4  NRA is?
5   A.  She is the deputy to Joe DeBergalis, as he's
6  the executive director of general operations.  So she's
7  a deputy under him.
8   Q.  Okay.
9       MR. THOMPSON:  Counsel, I think this is a
10  good time to take another break if you would like to
11  take a five-minute break.
12       MS. KOZLOWSKI:  Okay.
13       THE VIDEOGRAPHER:  We're going off the
14  record.  The time on the video is 3:38.
15       (Break from 3:38 p.m. to 3:50 p.m.)
16       THE VIDEOGRAPHER:  We're back on the
17  record.  The time on the video is 3:50 p.m.
18   Q.  (BY MR. THOMPSON)  So Ms. Rowling, there
19  should be two new documents in the shared folder,
20  Exhibits 9 and 10.
21       (Exhibit 9 marked.)
22       (Exhibit 10 marked.)
23   Q.  (BY MR. THOMPSON)  If you could please open up
24  Exhibit 9, and it should be a spreadsheet that may take
25  a second to load once you click on it.

Page 188

1       MS. KOZLOWSKI:  Oh, it's up.  Sorry.
2       MR. THOMPSON:  Great.
3   Q.  (BY MR. THOMPSON)  And for the record, this is
4  an Excel spreadsheet that was produced to us as
5  NRA-BK-3360.  Ms. Rowling, do you recognize this
6  document?
7   A.  Yes.
8   Q.  Can you tell me what it is?
9   A.  It was a request for testing from Aronson
10  relating to expenses by Millie Hallow.
11   Q.  When was this requested?
12   A.  As part of audit procedures for 2020's audit.
13   Q.  Was that the audit in 2020 of 2019, or is it
14  the audit this year of last year?
15   A.  It was part of prelim work, so it was
16  requested in 2020 for the audit of 2020.
17   Q.  Okay.  Do you remember when approximately in
18  2020 it was requested?
19   A.  Either November or December, sometime around
20  that timeframe.
21   Q.  Is the -- is Aronson the NRA's external
22  auditor currently?
23   A.  Yes.
24   Q.  Have they completed their audit for 2020?
25   A.  No.

Page 189

1 Q. Has Aronson sent a management letter to the
2 NRA for the 2020 audit?
3 A. No.
4 Q. As you sit here today, do you have any
5 expectation that a management letter is forthcoming from
6 Aronson for the 2020 audit?
7 A. I would expect. It's standard practice for
8 auditors to issue a management letter.
9 Q. Have you had any communications with Aronson
10 about any deficiencies that they have identified in
11 connection with the 2020 audit?
12        MS. KOZLOWSKI: Objection, form.
13 A. They have not issued any -- we have not had
14 discussions about what would be in a management letter
15 at this point.
16 Q. (BY MR. THOMPSON) Okay. So turning back to
17 Exhibit 9, who was involved in -- I tell you what. Let
18 me step back.
19        Is this the document that was -- is this a
20 document that was given to the NRA by Aronson?
21 A. Yes.
22 Q. And so Aronson requested additional
23 information with respect to these particular ACH
24 transactions. Is that correct?
25 A. That's correct.

Page 190

1 processes.
2 Q. Okay. And were there other -- so the top of
3 this document refers to it as a specialized procedures
4 testing or refers to it as specialized procedures
5 testing. Did you personally or are you personally aware
6 of any communications between the NRA and Aronson about
7 why they were requesting this particular testing?
8        MS. KOZLOWSKI: Objection as to form and
9 foundation.
10 A. It was -- they added special testing in
11 response to the New York AG's report.
12 Q. (BY MR. THOMPSON) And then if you click the
13 next file button to go to the next exhibit, it should be
14 Exhibit 10, another spreadsheet. And for the record,
15 this is an Excel spreadsheet that was produced to us as
16 NRA-BK-3361. Ms. Rowling, do you recognize this
17 document?
18 A. Yeah.
19 Q. And at the top of this document, it reads
20 specialized procedures-travel -- and I assume that is
21 business entertainment selection. Is that correct?
22        MS. KOZLOWSKI: Objection to the extent
23 it calls for speculation.
24 A. That was the assumption as to what that
25 represents.

Page 192

1 Q. Who at the NRA was responsible for providing
2 Aronson with this requested information?
3 A. So that would have fallen within the accounts
4 payable department, so that would have been Portia
5 Padilla.
6 Q. And do you know, in fact, whether additional
7 information was provided for these expenses to Aronson?
8 A. I believe they were.
9 Q. Do you know whether or not a copy of those
10 documents is still maintained by the NRA?
11 A. I don't know. I'd have to look. We have
12 copies of -- if those are expense reports, we would have
13 the expense physical reports.
14 Q. And I'm sorry, so you -- I believe you said
15 that this was requested -- that this was requested prior
16 to Aronson commencing the 2020 audit. Is that correct?
17 And I'm not intending to mischaracterizing your
18 testimony; I'm trying to remember what you said.
19 A. Normal audit procedure is you can come in
20 early and do preliminary audit field work, which we do
21 and we have them do because of our normal tight
22 timeframe at the end of the year to audit the entire
23 year. So they came in, as all of our prior year
24 auditors have done, in the fall/winter timeframe of the
25 current year they're auditing to start their audit

Page 191

1 Q. (BY MR. THOMPSON) Okay. You didn't assume
2 that they were asking for your "bus ent" selection. Is
3 that correct?
4 A. That is correct.
5 Q. Okay. And are these travel and entertainment
6 expenses associated with any particular person at the
7 NRA, to the best of your knowledge?
8 A. Oh, sorry. Hold on. Sorry, I hit the wrong
9 button.
10 Q. No, of course.
11 A. Yeah, they are not associated with any
12 particular individual.
13 Q. Do you know which individuals they are
14 associated with?
15 A. No, I don't.
16        MR. THOMPSON: Sharon, would you please
17 go ahead and put in tabs 13 and 16?
18 Q. (BY MR. THOMPSON) And while that is
19 happening, Ms. Rowling, it's my understanding that
20 Mr. Spray sought to introduce a policy that the expense
21 reports of senior personnel in the NRA should not be
22 reviewed and approved by more junior personnel. Does
23 that sound familiar to you, I guess to start with?
24        MS. KOZLOWSKI: Objection as to form and
25 foundation.

Page 193

49 (Pages 190 - 193)

1   A.  Yes, that's familiar.
2   Q.  (BY MR. THOMPSON)  Okay.  Did you ever have
3 any conversations with Mr. Spray about implementing such
4 a policy?
5   A.  Well, let's clarify a policy versus procedure.
6   Q.  Yes, fair enough.  So let's say --
7   A.  A procedure --
8   Q.  Let's start with a policy, I guess, whether or
9 not implementing such policy.
10   A.  No, not a policy.
11   Q.  What about procedure?
12   A.  Yes, I'm familiar with his stance on that.
13   Q.  Okay.  What was his -- to the best of your
14 knowledge, what was his stance on whether senior
15 personnel's expenses should be reviewed by personnel
16 that are junior to that person?
17       MS. KOZLOWSKI:  Objection as to form and
18 foundation.
19   A.  Our discussions were that he -- he felt that
20 the expense reports by a senior person should not be
21 approved by a junior person.
22   Q.  (BY MR. THOMPSON) To the best of your
23 knowledge, did Mr. Spray take any steps to implement
24 procedures such that junior personnel would not be
25 responsible for reviewing and approving the expenses of
Page 194

1 more senior personnel?
2       MS. KOZLOWSKI:  Objection as to form.
3   A.  In my capacity as the acting CFO, I have seen
4 evidence that expense reports of Joe DeBergalis, for
5 example, or another executive director have gone up
6 through the chain versus anyone beneath them.  So that
7 is -- if that's evidence, I guess it could be considered
8 evidence.
9   Q.  (BY MR. THOMPSON)  Okay.  When you say "up
10 through the chain," can you tell me what that means?
11   A.  So I have been approving those invoices as the
12 CFO.
13   Q.  Okay.
14   A.  Or those expense reports.
15   Q.  Do you know who is responsible currently
16 for -- well, let me step back.
17       Is Ms. Meadows submitting any expense
18 reimbursement requests to the NRA currently, regardless
19 of whether or not they're being paid?
20       MS. KOZLOWSKI:  Objection, form.  It
21 essentially calls for speculation.
22   A.  Yeah, I don't -- I don't know.  I don't know.
23 I haven't seen any --
24   Q.  (BY MR. THOMPSON)  Okay.
25   A.  -- so I don't know if she has or has not.
Page 195

1   Q.  Have you seen any expense reimbursement
2 requests in your role as acting CFO from any of the
3 board officers, the president or either vice president?
4   A.  No, I have not.
5   Q.  Do you have personal knowledge of what, if
6 any, procedures were in place prior to the filing of the
7 bankruptcy for reviewing and approving any expenses
8 submitted by the board officers, the president and
9 either vice president?
10       MS. KOZLOWSKI:  Objection as to form and
11 foundation.
12   A.  Yeah, I don't know those processes, and I
13 haven't seen them in my current capacity, so.
14   Q.  (BY MR. THOMPSON)  Let me check to see
15 whether if we have the new exhibits up.
16       MR. ACOSTA:  Yeah, I apologize,
17 Mr. Thompson, I probably --
18       MR. THOMPSON:  No, it's fine.  I was
19 about to --
20       MR. ACOSTA:  I uploaded all my exhibits
21 because I'm not very technologically advanced, so I
22 figured that was the only way I could get them up.
23       MR. THOMPSON:  I did almost ask, but then
24 stopped myself.
25   Q.  (BY MR. THOMPSON)  So yes, there are now a
Page 196

1 number of new documents, but if you scroll all the way
2 to the bottom, you will see the Exhibit 11, the --
3       (Exhibit 11 marked.)
4   Q.  (BY MR. THOMPSON)  And let me know when you
5 have that document up.
6   A.  Okay.
7   Q.  Do you recognize this document?
8   A.  Yeah.  That's the American Express document.
9 So if it was unclear as to expense reimbursement versus
10 American Express, since these are NRA cards, it's a
11 different process.  So I apologize for the confusion.
12   Q.  Okay.  So there is a -- there is a different
13 process in place for submission of expense reimbursement
14 requests versus approval of Amex expenditures.  Is that
15 correct?
16   A.  Correct, just because of how the expense has
17 already been incurred.
18   Q.  Right.
19   A.  So it's going to be a different process.
20   Q.  Of course.
21       So do you know whether or not this document
22 was provided to Aronson in connection with the special
23 procedures that we were discussing a few minutes ago?
24   A.  I don't know for sure if it was or wasn't.
25 I'd have to --
Page 197

50 (Pages 194 - 197)

1 Q. Okay.
2 A. -- check what our AP person presented to them.
3 Q. Do you have -- so it's actually -- it's
4 difficult to read the date under Ms. Meadows' signature,
5 or what I presume to be Ms. Meadows' signature. If I
6 had to guess, I would say February of 2020. Does that
7 look correct to you?
8 A. It's 2020, for sure.
9 Q. Okay. So to the best of your knowledge, in
10 2020 was the process for reviewing Amex expenditures
11 still -- no, let me rephrase.
12 In 2020, was the process for reviewing Amex
13 expenditures that were on Mr. Tedrick's line of Amex
14 cards Mr. Tedrick's responsibility?
15 A. I am not 100 percent sure of whose exact
16 responsibility that was.
17 Q. Okay. Either in your current capacity as
18 acting CFO or in your prior life as a director in
19 financial services, have you had any involvement in
20 reviewing Amex expenditures on either line of Amex
21 credit cards for the year 2020?
22 A. Yes.
23 Q. Can you tell me what -- what that role has
24 been or was?
25 A. I believe I testified to that earlier today,

Page 198

1 that Craig Spray was not in the office during a lot of
2 2020 and Rick provided me with, kind of, a backlog of
3 expenses for these Amex to review and because of Craig's
4 absence.
5 Q. Do you recall whether you determined that any
6 of the Amex expenses were -- well, let me start over.
7 In connection with that review that you did
8 earlier this year, was one of your responsibilities to
9 make a determination as to whether or not a charge was
10 incurred for an appropriate NRA related purpose?
11 A. That it was as part of the review process, is
12 to look at business purpose.
13 Q. Okay. And in connection with the review that
14 you did, did you determine that -- do you recall whether
15 you determined whether any expenses were not incurred
16 for an appropriate NRA business purpose?
17 A. I don't recall if I -- if I did or didn't.
18 Q. When you were doing the review, did you feel
19 as if you had sufficient backup to make a determination
20 as to whether or not an expense was incurred for an
21 appropriate business purpose?
22 A. There were -- there were occasions where I
23 asked for a receipt that might have been missing. I
24 don't recall on whose exact expense report or Amex
25 statement that was. And then I held on to those.

Page 199

1 Q. And did you, in fact, receive the support or
2 the underlying support that you requested?
3 A. I believe -- I don't know if I -- if I have
4 received them all or not as of yet. What was in my
5 office was pulled for this purpose, and so I have not
6 gotten those back yet as part of the request from the
7 New York's AG's office for these trials coming up. So I
8 haven't received them back to see if there's -- support
9 was added that I was missing.
10 Q. Okay. Understood.
11 So is it fair to say that, well, the review of
12 the Amex expenses that you undertook earlier this year
13 has not been completed yet?
14 A. That's correct.
15 Q. Okay.
16 MR. ACOSTA: Mr. Thompson, could we get a
17 time check, if that's okay?
18 MR. THOMPSON: Yes, of course.
19 THE VIDEOGRAPHER: 5:14.
20 MR. ACOSTA: Do you have a stopping point
21 here soon or --
22 MR. THOMPSON: Yes. May I have 15 more
23 minutes, Mr. Acosta?
24 MR. ACOSTA: This one time, sure.
25 MR. THOMPSON: Okay. Thank you.

Page 200

1 MR. ACOSTA: Yes, sir.
2 MR. DRAKE: Sorry, Stephen, I just --
3 Scott Drake on behalf of the committee. I just want to
4 remind everybody that the creditors committee will have
5 questions, too. And I don't know if the US Trustee is
6 on, but I just wanted to make sure everybody remembered
7 that.
8 MR. THOMPSON: No, of course. Thank you.
9 Q. (BY MR. THOMPSON) So Ms. Rowling, you're
10 turning to the next file which should be Exhibit 12.
11 Let me know when you have that.
12 (Exhibit 12 marked.)
13 A. It's up.
14 Q. (BY MR. THOMPSON) Do you recognize this
15 document?
16 A. Yes.
17 Q. And can you tell me what it is?
18 A. The management letter from Aronson.
19 Q. And this is in connection with their audit of
20 2019. Is that correct?
21 A. That is correct.
22 Q. Okay. And this was given or sent to the NRA
23 in or around March 11, 2020. Is that right?
24 A. Yes.
25 Q. And just to be clear, the NRA has not received

Page 201

51 (Pages 198 - 201)

1 any similar management letter from Aronson in connection
2 with its current audit. Is that correct?
3    A.  That's correct.
4    Q.  Okay.  If I could take you down to PDF page 6,
5 the heading "Expense Reporting."
6    A.  Yes.
7    Q.  So under observation, it reads Aronson noted
8 instances of noncompliance with the credit card and
9 expense reporting policies during our audit.
10        Down under recommendation, it reads at the
11 very end of -- the last sentence of the first paragraph,
12 we also suggest the organization implement a formal
13 sampling process over credit card expenditures.
14        And then in the management response the last
15 sentence reads, management concurs with the
16 recommendation of a more formal sampling process over
17 credit card expenses.
18        Can you tell me whether or not there has been
19 such a formal sampling process over credit card
20 expenses?
21    A.  Yes, there have.
22    Q.  Okay.  Who conducted that sampling?
23    A.  I did.
24    Q.  And when did you conduct it?
25    A.  Every month.

Page 202

1    Q.  Every month since when?
2    A.  From January of 2020 through December of 2020.
3 Or through probably November.
4    Q.  Did you begin that sampling process in January
5 of 2020?
6    A.  No, I began that process as an audit
7 recommendation and as limited that recommendation --
8    Q.  Okay.
9    A.  -- retroactively.
10    Q.  I understood.
11        So you have conducted a sampling of the
12 entirety of 2020, and you began that sampling process in
13 or around March of 2020.  Is that correct?
14    A.  December might not have been audited itself,
15 but majority of 2020 was audited.
16    Q.  Okay.  And what -- do you have any work
17 product that's come out of that audit, an Excel, a
18 summary or a memo?
19    A.  Because of COVID and the way that the audits
20 were completed, there was no -- they were -- there were
21 printouts and -- of -- and these audits were done of the
22 Wells Fargo card.  I did not have visibility into any
23 Amex at that time.  So the Wells Fargo cards that are
24 issued to various individuals were -- the statements
25 were printed.  A selection was performed every month.

Page 203

1 The statements were printed as -- as well as the
2 receipts.
3    Q.  Do you know whether or not this item on the
4 management letter, this expense reporting item, did
5 this -- was Aronson referring to the well Fargo cards or
6 were they also referring to the Amex cards in connection
7 with their noted instances of noncompliance with credit
8 card and expense reporting policies?
9        MS. KOZLOWSKI:  Objection to the extent
10 it calls for speculation.
11    A.  I would have to speculate on exactly what they
12 were trying to adjust with respect to their credit
13 cards.  They knew of both, so --
14    Q.  (BY MR. THOMPSON)  They knew of both?
15    A.  Yes.
16    Q.  Okay.  And they're not -- in this management
17 letter, they do not specify the Wells Fargo cards or the
18 Amex cards.  Is that correct?
19        MS. KOZLOWSKI:  Objection, the document
20 speaks for itself.
21        MR. THOMPSON:  I agree with that.
22    Q.  (BY MR. THOMPSON)  And were you asked by
23 anyone to perform that sampling of the Wells Fargo
24 cards?
25    A.  I don't recall if anyone specifically asked me

Page 204

1 to do that, other than it being in the management letter
2 and we agreed to do it.
3    Q.  Do you know whether or not there was a
4 sampling of the Amex cards?
5    A.  I do not know.
6    Q.  What was the result of your audit of the Wells
7 Fargo cards?  I'm sorry, the results of your sampling of
8 the Wells Fargo cards?
9    A.  The sampling, you know, there were times when
10 adequate invoices were not submitted.  There was an
11 incidence of an accidental personal charge that was then
12 reimbursed, but that was a follow-up to make sure that
13 that actual reimbursement did take place and it had.
14 Incidents of the approval -- the electronic approval
15 process having not been followed, so a manual process
16 had to be followed.
17        With COVID and a shutdown of things fairly
18 quickly, there were -- there were instances where that
19 formal approval process through the system did not take
20 place, so a supplemental approval process took place
21 outside of the system.
22    Q.  I see.  Did you communicate the results of
23 your sampling to Aronson?
24    A.  I have not yet.  It hasn't been part of their
25 audit process as of yet.

Page 205

52 (Pages 202 - 205)

1  Q. Is it a normal part of the audit process for
2 an auditor to revisit issues in a previous management
3 letter for discussion with the client, in your
4 experience?
5  A. Yes.
6  Q. When does that usually occur in the audit life
7 cycle?
8  A. Some point during their audit testing.
9  Q. Has -- has Aronson completed their testing for
10 the 2020 audit yet?
11  A. No.
12  Q. Do you have an expected end -- or is there an
13 expectation as to when that process will be completed?
14  A. The last communication I had with respect to a
15 final audited financial statement would be the end of
16 May.
17  Q. Okay.
18   MR. THOMPSON: All right. So with that,
19 Mr. Acosta, I thank you for your patience. I will pass
20 the witness.
21   MS. KOZLOWSKI: Can we take a few minute
22 break since we're transitioning counsel here?
23   MR. ACOSTA: Sure.
24   MS. KOZLOWSKI: Thank you.
25   THE VIDEOGRAPHER: We're going off the
Page 206

1 record. The time on the video is 4:22 p.m.
2   (Break from 4:22 p.m. to 4:36 p.m.)
3   THE VIDEOGRAPHER: We are back on the
4 record. The time on the video is 4:36 p.m.
5   MS. KOZLOWSKI: Mr. Acosta, before you
6 begin, are you asking questions in individual capacity
7 or as the designated 30(b)(6) or --
8   MR. ACOSTA: Yes, thank you for asking
9 that question.
10   Ms. Rowling, if you could just answer in your
11 individual capacity unless I specifically ask you to
12 answer in your corporate capacity. Most of my questions
13 are probably going to be directed to your individual
14 capacity. Do we have that understanding?
15   MS. KOZLOWSKI: So we won't agree to
16 that. You need to ask questions either as the 30(b)(6)
17 and then you can move into the individual, but bouncing
18 between the two is not acceptable.
19   MR. ACOSTA: Okay. I am starting with
20 individual capacity then, but if there's a point in time
21 in my deposition where I cross over to corporate, I will
22 take up your objection.
23   So can we proceed now? Okay. So --
24   MS. KOZLOWSKI: You can proceed, but we
25 won't be answering questions as to 30(b)(6) during the
Page 207

1 individual deposition, just to be clear.
2   MR. ACOSTA: Okay.
3   EXAMINATION
4 BY MR. ACOSTA:
5  Q. Ms. Rowling, it's a pleasure to meet you. I
6 thank you for sitting in this deposition.
7   You had mentioned before during Mr. Thompson's
8 examination that you worked, I believe, in the financial
9 services division. Is that correct?
10  A. What time period are you referring to?
11  Q. Currently.
12  A. I'm currently acting CFO, which puts me in the
13 treasurer's office.
14  Q. Okay. Is that different than the financial
15 services division?
16  A. Yes.
17  Q. Okay. And what does the financial services
18 division do?
19  A. Process the accounting.
20  Q. Okay. And what --
21  A. Accounts payable people.
22  Q. And what does the treasurer's office do?
23  A. The treasurer's office, among the review of
24 financial statements, also has purchasing and
25 information services underneath the treasurer's
Page 208

1 position.
2  Q. Okay.
3  A. As well as the other entities --
4  Q. Okay.
5  A. -- of the NRA.
6  Q. So financial services division does not fall
7 under the treasurer's office?
8  A. I started with the financial services area,
9 so, yes, it falls under the treasurer's office.
10  Q. Would the treasurer's office supervise the
11 financial services division?
12   MS. KOZLOWSKI: Objection as to form.
13  A. That is the reporting structure, is that the
14 reporting goes up through the treasurer's office.
15  Q. (BY MR. ACOSTA) Okay. Does the ILA have a
16 separate financial services division?
17   MS. KOZLOWSKI: Objection as to time and
18 form.
19  Q. (BY MR. ACOSTA) You can assume everything is
20 current unless I say differently, if that's okay.
21  A. Yes, ILA has its own accounting department.
22  Q. Okay. And does that fall underneath the
23 treasurer's office?
24  A. Currently, yes.
25  Q. Okay. Can we pull up Exhibit No. 12 from the
Page 209

53 (Pages 206 - 209)

1  New York Attorney General's exhibit?
2      A.  It's up.
3      Q.  Do you have it in front of you, Ms. Rowling?
4      A.  Yes.
5      Q.  And if you wouldn't mind turning to number 3,
6  which is -- appears on page 6 of the PDF.
7      A.  Okay.
8      Q.  Actually, it appears on page 8.  There are a
9  couple of sections overlaps, but it says Aronson noted
10 the organization's stand-alone financial statements
11 prepared using information from two separate accounting
12 departments, financial services division and the
13 Institute For Legislative Action.  Has that been
14 rectified?
15         MS. KOZLOWSKI:  Objection to form.
16     A.  Not a -- it's not something that needed to be
17 rectified.  They're recognizing that that happened.
18     Q.  (BY MR. ACOSTA)  And the last sentence says
19 financial information from ILA is not currently reviewed
20 by FST for parallel application of accounting policies.
21 Is that correct?  Is that still the case?
22     A.  That is still the case because you're talking
23 about two parallel organizations in which that should
24 not -- that review of that work should not occur at that
25 level.

Page 210

1      Q.  Okay.  And correct me if I was wrong, I think
2  before you said Mr. LaPierre hasn't submitted any
3  expenses to the NRA in 2020?
4      A.  As far as I'm aware, the expense reports that
5  he has he has not submitted them to NRA.
6      Q.  But he has submitted them to ILA, to the best
7  of your knowledge?
8          MS. KOZLOWSKI:  Objection.
9      A.  No.  No, he hasn't.
10     Q.  (BY MR. ACOSTA)  So he hasn't submitted any
11 reimbursable expenses to any NRA affiliated
12 organization?
13     A.  As far as I know, no.
14     Q.  In 2020?
15     A.  That is correct.
16     Q.  Okay.  Now who is -- I guess this should be
17 obvious.  The treasury department, who is the overall
18 head of the treasury department?
19     A.  The treasurer.
20     Q.  Okay.  And who is that person right now?
21     A.  The current treasurer as appointed by the
22 board is Craig Spray, who is on, as we said earlier,
23 administrative leave, so the CFO currently, which would
24 be me.
25     Q.  So you're currently in charge of the treasury

Page 211

1  department?
2          MS. KOZLOWSKI:  Objection, form,
3  misstates testimony.
4      A.  Yeah, I mean, technically Craig Spray as
5  treasurer is.  In his absence, I am filling that role.
6      Q.  (BY MR. ACOSTA)  But practically speaking,
7  Craig Spray hasn't -- hasn't worked at the NRA for a
8  while.  Is that correct?
9          MS. KOZLOWSKI:  Objection, form,
10 foundation.
11     A.  What is your definition of "for a while"?
12     Q.  (BY MR. ACOSTA)  When was the last time you
13 saw -- when was the last time Craig Spray worked on any
14 NRA business, to your knowledge?
15     A.  I am not -- I don't know when his -- I don't
16 know if anyone else is calling him.  I know I have not
17 spoken with him since even before his departure.
18     Q.  Okay.  And when was his departure again,
19 Ms. Rowling?
20     A.  The end of January.
21     Q.  January 2021 or January 2020?
22     A.  2021.
23     Q.  Okay.  And was he acting as the treasurer
24 functionally speaking as of three months ago or maybe
25 even as of December 2020?

Page 212

1          MS. KOZLOWSKI:  Objection as to form,
2  foundation, vague.
3      A.  Yeah, that's -- that's a vague question.  I
4  had been --
5      Q.  (BY MR. ACOSTA)  Who --
6      A.  -- in communication with Craig Spray up until
7  the point, you know, before his departure.
8      Q.  Were you reporting to him as of six months
9  ago?
10     A.  My reporting structure at that time reported
11 through Rick Tedrick.  We testified to that earlier.
12     Q.  Okay.  When were you notified that Craig Spray
13 was not -- was either on leave or was not going to be
14 able to serve as the treasurer?
15         MS. KOZLOWSKI:  Objection, misstates
16 testimony, form, foundation.
17     A.  I had a discussion with Wayne LaPierre
18 regarding Craig's departure at the end of January.
19     Q.  (BY MR. ACOSTA)  Okay.  And is it your
20 testimony that Mr. Spray, to your knowledge, was
21 actively serving as the treasurer of the treasury
22 department as late as December of 2020?
23         MS. KOZLOWSKI:  Objection, form,
24 foundation.
25     A.  I mean, I have no other knowledge to suggest

Page 213

54 (Pages 210 - 213)

1 otherwise, but, you know, I don't -- I didn't always
2 speak directly to Craig. My line of communication was
3 through Rick.
4 Q. (BY MR. ACOSTA) Okay. Now do you have an
5 employment contract, Ms. Rowling?
6 A. I do not.
7 Q. Is it standard policy for the NRA to issue
8 employment contracts to its employees?
9 A. That would be a question for our human
10 resources department.
11 Q. Okay. So they don't share employment
12 contracts with either the financial services division or
13 the treasury department?
14 MS. KOZLOWSKI: Objection, misstates
15 testimony, form, foundation, argumentative.
16 Q. (BY MR. ACOSTA) Do they share employment
17 contracts with the treasury department?
18 A. I do not know if they share. I have not
19 received any in my capacity in the treasurer's
20 department, nor did I receive any in my capacity in
21 financial services. We do not handle payroll which
22 would mean we should not see those contracts.
23 Q. Okay. And I think -- I could be wrong, but I
24 think you mentioned that as part of the treasury
25 department, you manage cash flow. Is that correct?

Page 214

1 A. That is correct.
2 Q. You handle budgeting processes. Is that
3 correct?
4 A. That's correct.
5 Q. And you handle account -- accounts reporting.
6 Is that correct? Accounting reports?
7 A. What?
8 Q. Accounting reports. You handle accounting
9 reports?
10 A. Financial reporting, yes.
11 Q. Okay. Is there any other function of the
12 treasury department that you're aware of besides those?
13 A. I believe we had testimony earlier with
14 respect to all of the areas that fall under treasury.
15 Q. Okay. Besides the three that I just
16 mentioned, is there any other that you can recall real
17 quickly?
18 A. Purchasing, information services and other --
19 and accounting for the other various entities and ILA.
20 Q. Okay. Now back to Exhibit No. 12 of the New
21 York AG, the NRA gets audited yearly. Is that a fair
22 assessment?
23 MS. KOZLOWSKI: Objection, form,
24 foundation.
25 Q. (BY MR. ACOSTA) Does the NRA --

Page 215

1 (Audio interruption.)
2 (Reporter clarification.)
3 A. The NRA's financial statements are audited
4 annually.
5 Q. (BY MR. ACOSTA) Okay. And is that -- do you
6 know what the reason for the audit is?
7 A. It's required in the bylaws.
8 Q. Okay. And to your -- I think at the 341
9 meeting, you testified that you have been with the NRA
10 for 20 years?
11 A. 21.
12 Q. 21 years. Have they been audited since you've
13 been there?
14 A. Yes.
15 MS. KOZLOWSKI: Object --
16 Q. (BY MR. ACOSTA) And are those audits made
17 public?
18 MS. KOZLOWSKI: Objection, form,
19 foundation.
20 A. The audited financial statements of the NRA
21 and affiliates combined is made public.
22 Q. (BY MR. ACOSTA) Is that on your web page or
23 the NRA's web page?
24 A. It is not. You have to request them, and they
25 are always available at the NRA annual meeting of

Page 216

1 members.
2 Q. Okay. Would you say -- and correct me if I'm
3 wrong. Would you say that the treasury department, as
4 part of managing cash flow, that it's responsible for
5 monitoring expenses of the NRA?
6 MS. KOZLOWSKI: Objection, form,
7 foundation.
8 A. It --
9 Q. (BY MR. ACOSTA) You can answer, Ms. Rowling.
10 A. It monitors cash come coming in and going
11 out --
12 Q. Okay.
13 A. -- related to its budget.
14 Q. Does it control cash going out?
15 MS. KOZLOWSKI: Objection as to form and
16 vague as to the word "control."
17 Q. (BY MR. ACOSTA) Does it have purse strings?
18 A. I'm sorry, what?
19 Q. Does it have purse strings?
20 MS. KOZLOWSKI: Objection as to form,
21 vague.
22 You can answer if you know what that means.
23 If you don't know what that means --
24 THE WITNESS: I mean, I know what he's
25 trying to allude to.

Page 217

55 (Pages 214 - 217)

1      MS. KOZLOWSKI: Yeah, but --
2   A.  The -- the payments made out from the NRA are
3   made according to contract terms and purchase order
4   terms and are, I guess, scheduled within the accounts
5   payable department with the help of the individual who
6   monitors cash on a daily basis.
7   Q.  (BY MR. ACOSTA)  And that individual is who?
8   A.  Mike Erstling.
9   Q.  Okay.  And is he in the treasury department,
10  or is he in the financial division services department?
11  A.  He is specifically in the financial services
12  division.
13  Q.  Okay.  And I think just a couple of seconds
14  ago you said you switched from financial services
15  division to the treasury department.  Is that right?
16      MS. KOZLOWSKI: Objection, misstates
17  testimony.
18  A.  The CFO's position is budgeted through the
19  treasurer's department.  The overall organizational
20  structure has the financial services division reporting
21  to the treasurer.
22  Q.  (BY MR. ACOSTA)  Okay.  And Mike Erstling you
23  said is in the financial services division.  Is that
24  correct?
25  A.  That is correct.

Page 218

1   Q.  Okay.  When you were in the financial services
2   division, did you have any concerns about how the NRA
3   operated?
4       MS. KOZLOWSKI: Objection, form,
5   foundation, vague.
6       THE WITNESS: Timeframe.
7       MS. KOZLOWSKI: Timeframe.
8       THE WITNESS: Sorry.
9   Q.  (BY MR. ACOSTA)  Let's say back in 2020, or
10  let's say back in 2018.  Did you have any concerns about
11  how the financial services division operated?
12  A.  The financial services division?  No, I was
13  comfortable with our processes.  I was uncomfortable
14  with processes that were being circumvented by other
15  people outside of the division.
16  Q.  Okay.  Well, then let me -- I think it was New
17  York AG Exhibit No. 4.  Can you pull that one back up,
18  please?  Actually, instead of that one, can you pull up
19  AMc Exhibit No. 6?
20  A.  It's up.
21  Q.  No.  And, in fact, I'm not even -- I'm at
22  the wrong exhibit, I'm sorry.  I told you I was
23  technologically deficient.  It's Exhibit No. 84, AMc
24  Exhibit No. 84.
25      (AMc Exhibit 84 marked.)

Page 219

1   Q.  (BY MR. ACOSTA)  Can you tell me when you have
2   it up, please?
3   A.  It is up.
4   Q.  Do you recognize this document?
5   A.  Yes.
6   Q.  And correct me if I'm wrong, it's an email
7   from you to Rick Tedrick?
8   A.  Yes.
9   Q.  And it copies Ms. Padilla, Mr. George (sic),
10  Ms. Cummins and Mr. Erstling.  Right?
11  A.  Ms. George, but yes.
12  Q.  Okay.  And it attaches the -- what the New
13  York AG considered the list of top concerns for the
14  audit committee?
15      MS. KOZLOWSKI: Objection as to form.
16  A.  I mean, there is a PDF attached.
17  Q.  (BY MR. ACOSTA)  Okay.  And the title of the
18  PDF is what?
19  A.  SKM_C45818071313190.pdf.
20  Q.  Okay.  Well, let's turn to the second page.
21  What's the first line of the second page say?
22  A.  List of top concerns for the audit committee.
23  Q.  Okay.  And I think you talked with the New
24  York AG about you having specific concerns on this page?
25  A.  That's correct.

Page 220

1   Q.  And I think you mentioned under 1d that the
2   concern with respect to Ackerman was that Ackerman
3   employed Oliver North.  Is that correct?
4       MS. KOZLOWSKI: Objection, misstates
5   testimony.
6   A.  No, I did not have -- no, I did not say that.
7   Q.  (BY MR. ACOSTA)  Okay.  Under number 4, vague
8   and deceptive billing by preferred vendors and
9   contractors, there are four contractors listed there.
10  Is that right?
11  A.  Yes.
12  Q.  And I don't see Ackerman's name under number
13  4.  Is there a reason for that?
14  A.  Ackerman was listed at a different location.
15  Q.  Okay.  And that was 1d where you had talked
16  about.  Right?
17  A.  Yes, they were listed in 1d.
18  Q.  Okay.  Now you're not the only one that's ever
19  expressed concerns about how the NRA performs its
20  accounting function.  Am I accurate on that?
21      MS. KOZLOWSKI: Objection, misstates.
22  Objection to form, foundation, misstates testimony.
23  Q.  (BY MR. ACOSTA)  Have there been other people
24  that have expressed concerns about the NRA's accounting
25  practices?

Page 221

56 (Pages 218 - 221)

1        MS. KOZLOWSKI: Objection. Same
2 objection.
3        A. I mean, are you referring to anyone other than
4 what has already been acknowledged on this -- who
5 brought up these -- these concerns?
6        Q. (BY MR. ACOSTA) Well, I'm not sure exactly
7 who brought up these concerns, but I know that you sent
8 the email and that there are several people copied. But
9 I am going to have you look at Exhibit No. -- AMc
10 Exhibit No. 59.
11        (AMc Exhibit 59 marked.)
12        Q. (BY MR. ACOSTA) Can you please pull that one
13 up?
14        MR. ACOSTA: And Ms. Brandt, in case I
15 wasn't clear, please mark AMc Exhibit No. 84, and please
16 mark AMc Exhibit No. 59.
17        Q. (BY MR. ACOSTA) Are you there, Ms. Rowling?
18        A. Yeah.
19        Q. Do you recognize this document?
20        A. I was shown a copy of this document by
21 counsel. I had not seen it prior.
22        Q. Okay. So at the bottom of the document, it
23 says July 15, 2019. Is that right?
24        A. Yes.
25        Q. And you're saying you didn't see it on or

Page 222

1 about July 15, 2019?
2        A. No.
3        Q. Okay. So the first time you saw it was when
4 counsel showed it to you. When was that, if you don't
5 mind?
6        A. Yesterday.
7        Q. Yesterday. Okay.
8        Well, notwithstanding the new discovery, did
9 Ms. Cummins ever express these concerns that are on this
10 document to you?
11        A. Ms. Cummins wasn't even an employee at this
12 time, and these concerns relate to the top ten list of
13 concerns that were originally brought up.
14        Q. Okay. So you're saying that Ms. Cummins did
15 express these concerns to you before or didn't?
16        MS. KOZLOWSKI: Objection. Objection,
17 misstates testimony.
18        A. There -- no, she has not expressly discussed
19 some of these concerns with me. Her -- yeah, no.
20        Q. (BY MR. ACOSTA) Okay. Let's -- let's go
21 through the specific concerns, because you may not be
22 that familiar with the document. Let's start at the
23 bottom. The second to last paragraph says I witnessed
24 Bill Brewer himself created 2018 cash flow crunch by
25 interfering with accounts payable to prioritize paying

Page 223

1 himself immediately. Are you saying that Ms. Cummins
2 has never expressed that concern to you before?
3        A. I don't know how she witnessed it. She wasn't
4 part of the accounts payable process.
5        Q. And I appreciate that, but if you could answer
6 my question. My question was has she ever expressed
7 that concern to you before?
8        A. I don't recall whether she had expressed that
9 concern before.
10        Q. And I guess it's not a concern that you share?
11        A. We paid the Brewer firm in terms of their
12 contract, so you know --
13        Q. Ma'am --
14        A. I don't --
15        Q. My question is it's not a concern that you
16 share? That's my question. Not what you paid Brewer,
17 it's whether you share that concern or not.
18        A. That he caused a cash flow crunch?
19        Q. Yeah, in 2018.
20        A. I don't believe that that was the cause of the
21 cash flow crunch, no.
22        Q. Okay. So it's not your concern? I mean, it's
23 not something that -- a concern that you share with
24 Ms. Cummins?
25        MS. KOZLOWSKI: Objection, misstates

Page 224

1 testimony, it's argumentative. She answered the
2 question. You're simply arguing with the witness at
3 this point.
4        Q. (BY MR. ACOSTA) How about 2019? Is it a
5 concern for you that Mr. Brewer has caused a cash crunch
6 in 2019?
7        MS. KOZLOWSKI: Objection as to form, as
8 to foundation. There's certainly not even an allegation
9 that the Brewer firm caused a cash crunch in 2019.
10        MR. ACOSTA: I am not going to argue with
11 you, Counsel. The allegation is on this Exhibit 59 and
12 as anyone can read, so I'm asking whether she shares
13 this concern for 2019.
14        MS. KOZLOWSKI: Again, objection as to
15 form, misstates the document.
16        You can answer as to whether you have the
17 concern as to the hypothetical that is raised by
18 counsel.
19        A. I would have to go back and look to see what
20 type of cash flow crunch we were having in 2019 to be
21 able to objectively answer that question.
22        Q. (BY MR. ACOSTA) Okay. So do you have a
23 concern for 2020 that Mr. Brewer's billing has caused a
24 cash flow crunch for the NRA?
25        MS. KOZLOWSKI: Again, objection as to

Page 225

57 (Pages 222 - 225)

1 form. Objection as to foundation. Objection as to an
2 improper hypothetical.
3 Q. (BY MR. ACOSTA) You can answer the question,
4 Ms. Rowling.
5 A. There was no -- not a cash flow crunch in
6 2020.
7 Q. Well, let me ask you. How much has
8 Mr. Brewer's firm been paid since they were retained by
9 the NRA?
10 MS. KOZLOWSKI: Objection to the extent
11 it calls for speculation as you're testifying in your
12 individual capacity.
13 A. I don't have the exact number.
14 Q. (BY MR. ACOSTA) Is it more than 50 million?
15 Less than 50 million?
16 MS. KOZLOWSKI: Same objection.
17 A. I do not know off the top of my head.
18 Q. (BY MR. ACOSTA) Okay. Can you give me a
19 range? I'm not asking you for an exact number.
20 A. No, I cannot give you a range.
21 Q. Okay. I am going to have you pull up Exhibit
22 Number 24, AMc Exhibit No. 24, please.
23 (AMc Exhibit 24 marked.)
24 Q. (BY MR. ACOSTA) Do you recognize this
25 document?

Page 226

1 A. Yes.
2 Q. It's the schedules that the NRA prepared in
3 connection with the bankruptcy?
4 A. Yes.
5 Q. Did you -- Mr. Warren prepared this document.
6 Did you help Mr. Warren?
7 A. I reviewed what Mr. Warren had put together.
8 Q. For what purpose?
9 A. In my capacity as CFO.
10 Q. Did you want to check the accuracy of the
11 things that he was stating in this document?
12 MS. KOZLOWSKI: Objection, form,
13 foundation, argumentative.
14 A. To the best of our ability, we would like for
15 these statements to have been accurate. So yes, the
16 more eyes that look at the data, the better.
17 Q. (BY MR. ACOSTA) Okay. Is there any reason
18 why he signed this document as opposed to you?
19 A. Because he pulled the information together.
20 Q. Okay. If you don't mind scrolling down to
21 page 20 of this PDF, and let me know when you're there.
22 You can tell the page numbers at the top right-hand
23 corner. There's a stamp that says something of 55 or --
24 A. I'm there.
25 Q. Okay. On page 20 is a schedule of answers to

Page 227

1 question number 3 of the statement of financial affairs
2 or an attachment. Is that right?
3 A. It's an answer to question number 3.
4 Q. Right. And the payments made to creditors
5 within 90 days before filing?
6 A. Yes, that's what the document says.
7 Q. Okay. So if you go to the next page, there's
8 some reports that start. Do you know who prepared these
9 reports?
10 A. David Warren pulled these reports together. I
11 might have helped pulled this one together prior to me
12 being -- I might have started that process, and then
13 David finished it by verifying and then compiling data
14 including ILA.
15 Q. Okay. And do you recall how much was paid on
16 these reports within 90 days?
17 A. No. I would have to look at the --
18 Q. Does the number 74 million sound accurate
19 maybe?
20 A. I would have to go to the very last page of
21 that document and look.
22 Q. Well, let me ask you this. This looks like an
23 accounting report that an accounting department
24 generally prepares when the debtor files bankruptcy. Is
25 this something that the financial division services

Page 228

1 would prepare or something that the treasury department
2 would prepare?
3 MS. KOZLOWSKI: Objection, form.
4 A. We asked David Warren to be the point person
5 for pulling this information together. So he in his
6 capacity had full access and had already had full access
7 to the accounting system to be able to do this.
8 Q. (BY MR. ACOSTA) Okay. Do you know whether
9 all of these vendors have a contract with the NRA?
10 A. Not all vendors require a contract.
11 Q. Okay. So the question is you don't know or
12 you do know?
13 A. Not all vendors require a contract. So this
14 list would include vendors that do not require a
15 contract. They could have a purchase order. They could
16 not have either. It depends on the exact vendor and
17 each one in its capacity of what they do.
18 Q. And I believe when Mr. Stephen was asking you
19 questions, you said you had an internal process for
20 paying invoices. Did you follow that process when you
21 paid all the invoices attached, you know, in response to
22 question number 3 to the statement of financial affairs?
23 MS. KOZLOWSKI: Objection, form,
24 foundation, argumentative.
25 A. We would literally have to go through every

Page 229

58 (Pages 226 - 229)

1 single one of these invoices for me to objectively
2 answer that question.
3    Q.  (BY MR. ACOSTA)  Okay.  So you don't -- there
4 wasn't a check -- there wasn't a review before you made
5 these payments to these vendors by either the treasury
6 department or the financial services division?
7         MS. KOZLOWSKI:  Objection.  Objection,
8 misstates testimony, argumentative, form, foundation.
9    A.  An invoice is not paid without proper approval
10 at any time.
11    Q.  (BY MR. ACOSTA)  Okay.
12    A.  So --
13    Q.  Go ahead.  Sorry, I cut you off.  Go ahead.
14         I guess I'm trying to figure out what proper
15 approval is.
16    A.  It depends on the invoice.
17    Q.  Okay.  Well, let's look at a couple of these.
18 On page number 22, there's a -- I know this is turned
19 upside down, but you can still read it.  There's a
20 couple of notation line items for Brewer attorneys.
21    A.  Okay.
22    Q.  Do you see that?  What kind of approval
23 process -- proper approval process did the NRA go to
24 before paying those invoices?
25         MS. KOZLOWSKI:  Objection to form.

Page 230

1    Q.  (BY MR. ACOSTA)  Okay.  So are there certain
2 invoices that the treasury department can approve, legal
3 invoices?
4    A.  No.
5    Q.  So there are -- different departments
6 sometimes are involved, I guess is what you're saying?
7    A.  No.  There are certain invoices that have been
8 delegated to approval because of what they are -- what
9 they are for.
10    Q.  Okay.  Can you please turn to page 39 of the
11 same document?  Are you there?
12    A.  Yes.
13    Q.  And these are answers to question number 4 for
14 the statement of financial affairs.  If you turn to the
15 next page, we see some more accounting type reports.  Is
16 that an accurate statement?
17    A.  Yes.
18    Q.  Okay.  Did you prepare these reports?
19    A.  I had participation in the preparation of some
20 of these reports, yes.
21    Q.  Okay.  And then go ahead and scroll down to
22 question -- page number 48, please.  It's the answer to
23 question number 11.  And if you scroll to the next page,
24 it has another report.  Did you assist in preparing this
25 report?

Page 232

1 Additionally, the witness has already testified that
2 legal is -- handles distinct and that she doesn't have
3 personal knowledge as to that.
4         MR. ACOSTA:  You know, I'm going to have
5 to object to the speaking objections.  If you're going
6 to object to form, it's one thing, but coaching the
7 witness through your speaking objections is quite
8 different.  So if you wouldn't mind just limiting your
9 objections to the proper form.
10    Q.  (BY MR. ACOSTA)  You can answer all these
11 questions by saying that you don't -- the treasury
12 department or financial division services doesn't review
13 any legal invoices.  Is that accurate?
14         MS. KOZLOWSKI:  Objection, misstates
15 testimony.
16    A.  We do not review those invoices with respect
17 to the validity.  We ensure that proper approvals are on
18 those invoices, and with respect to these, it would
19 depend on which invoice had whose approval on them.
20    Q.  (BY MR. ACOSTA)  And is it on an attorney by
21 attorney basis on the approval, or does everything go
22 through the legal department at the NRA?
23         MS. KOZLOWSKI:  Objection to form.
24    A.  Well, no, not everything goes through the
25 legal department.

Page 231

1    A.  No, I did not.
2    Q.  All right.  And go ahead and scroll down to
3 page number 30 -- I'm sorry, page number 53 out of 55,
4 and it's answer to question number 30.  And if you turn
5 to the next page, it has some more reports.  I would
6 represent to you that question number 30 is payments to
7 insiders within one year of the bankruptcy filing.  And
8 in this report -- did you help prepare this report that
9 starts on page 54?
10    A.  I don't recall if I did -- participated at all
11 in this one or if it was purely David Warren, and so I
12 don't know for sure.
13    Q.  Well, if you scroll down to page number 55 of
14 55, at the very bottom there are three individuals:
15 Wayne LaPierre, Craig Spray and John Frazer.  Do you see
16 that?
17    A.  Yes.
18    Q.  Do you think that they belong in this report?
19         MS. KOZLOWSKI:  Objection to the extent
20 it calls for a legal conclusion.
21    A.  The report asks for specifically employees, so
22 they are on this report.
23    Q.  (BY MR. ACOSTA)  Well, let's scroll back up.
24 We're talking about insider -- payments to insiders.
25 Would you consider Mr. LaPierre, Mr. Spray and

Page 233

59 (Pages 230 - 233)

1 Mr. Frazer an insider?
2         MS. KOZLOWSKI:  Objection to the extent
3 it calls for a legal conclusion.
4     A.  The -- yeah, the advice that we received on
5 who should be on this included those three individuals.
6     Q.  (BY MR. ACOSTA)  Is there any reason that -- I
7 will represent to you that the NRA today filed an
8 amended answers to number 30 and deletes Mr. LaPierre,
9 Mr. Spray and Mr. Frazer.  Were you aware of that?
10    A.  I am not aware that that was the case.  Yeah,
11 I'm not aware.
12    Q.  Okay.  While we're still on this report, who
13 is Mr. David Keene?
14    A.  Mr. Keene is a board member.
15    Q.  And who is Mr. James Porter?
16    A.  He is a board member.
17    Q.  Okay.  Now back at the very top of this report
18 on page -- page number 7 of 55.  Can you let me know
19 when you're there, please?
20    A.  7?
21    Q.  Yes, page 7 of 55.
22    A.  Okay.  I am there.
23    Q.  Okay.  It says in part I, in 2020 the NRA's
24 gross revenue was 290 million, roughly?
25    A.  That is what the statement says.

Page 234

1 vague.
2     A.  I would have to go look at what the current
3 unapproved budget numbers were.
4     Q.  (BY MR. ACOSTA)  Okay.  Were you expecting a
5 shortfall for 2021?
6         MS. KOZLOWSKI:  Objection as to form.
7     A.  I do not believe in what I have looked at
8 for -- with respect to 2021 that there was a shortfall
9 projected.
10    Q.  (BY MR. ACOSTA)  Okay.  Thank you.
11        Now I am going to have you turn to AMc Exhibit
12 No. 127.
13        (AMc Exhibit 127 marked.)
14    Q.  (BY MR. ACOSTA)  Tell me when you have that
15 pulled up, please.  Do you recognize this document?
16    A.  Yes.
17    Q.  Can you tell me what it is?
18    A.  The 2019 Form 990.
19    Q.  Okay.  Did you help prepare this document?
20    A.  I reviewed portions of this document.
21    Q.  Okay.  So what portions did you review?
22    A.  More of the financial information that is
23 reported on this document.
24    Q.  Okay.  Well, let's go ahead and scroll down to
25 page 7, part VII of this document, if you don't mind.

Page 236

1     Q.  And it says for 2019 the NRA's revenues was
2 roughly 306.7 million?
3     A.  That is what the statement says.
4     Q.  Okay.  Do you have any reason to believe that
5 it's inaccurate?
6     A.  No, I don't.
7     Q.  Now the NRA, like most nonprofits, does
8 budgeting for the following year.  Is that accurate?
9     A.  At a particular point in time, yes, budgeting
10 is done for the next year.
11    Q.  Did the NRA do budgeting in the fall of 2020
12 for 2021?
13    A.  Yes.
14    Q.  And is the budgeting significantly different
15 than those numbers right there that you see on page 7 of
16 the statement of financial affairs?
17        MS. KOZLOWSKI:  Objection, form.
18    A.  Our budget has not even been approved, so I
19 don't recall what the numbers were exactly.
20    Q.  (BY MR. ACOSTA)  Okay.  Is it approximately
21 $300 million?
22    A.  I don't know.
23    Q.  Okay.  When do you think you're going to find
24 out?
25        MS. KOZLOWSKI:  Objection as to form,

Page 235

1     A.  Part VII or page 7?
2     Q.  It says page 7 at the top, also part VII.
3     A.  Okay.
4     Q.  Are you there?
5     A.  Yes.
6     Q.  This is payments to officers and directors
7 within the last -- within 2019.  Right?
8     A.  That is correct.
9     Q.  And did you help prepare this portion?
10    A.  I did not.  I reviewed it.
11    Q.  Okay.  Do you see there's a list of officers
12 and directors of the NRA going up to 25 on the next
13 page?
14    A.  Yes.
15    Q.  And then it says see statement.  Probably
16 there are more attached.  And the number that --
17    A.  Yes.
18    Q.  The number that was paid to officers and
19 directors was 11.9 million.  Do you see that?
20    A.  Officers, directors, key employees, yes.
21    Q.  Is this number different in 2020 than 2019,
22 much different, or do you still pay officers and
23 directors?
24        MS. KOZLOWSKI:  Objection to the extent
25 it calls for speculation.

Page 237

60 (Pages 234 - 237)

1   A.  I mean, we have not prepared this form yet to
2   know exactly what those numbers are.
3   Q.  (BY MR. ACOSTA)  Okay.  Would you agree with
4   me that this compensation should appear in response to
5   question number 30 of the statement of financial
6   affairs, payments to officers in the last year?
7       MS. KOZLOWSKI:  Objection to the extent
8   it calls for a legal conclusion.
9   A.  Yeah, I would -- the filling out of that form
10  was --
11      MS. KOZLOWSKI:  Objection to the extent
12  that you're going to testify to attorney/client
13  communications.  I would direct you not to do so.
14      THE WITNESS:  Okay.
15  Q.  (BY MR. ACOSTA)  Well, an accountant prepares
16  this form, doesn't it?
17  A.  The 990?  Yes.
18  Q.  Yes.  Okay.  So what legal conclusion can you
19  draw from the fact that you normally are supposed to
20  prepare this form?
21      MS. KOZLOWSKI:  Objection.  That wasn't
22  the question asked.
23  Q.  (BY MR. ACOSTA)  All these folks that listed
24  on page 7 and 8 of this 990 are insiders, are they not?
25      MS. KOZLOWSKI:  Objection to the extent

Page 238

1   it calls for a legal conclusion.  The witness is not an
2   attorney.
3   Q.  (BY MR. ACOSTA)  Yeah, you can answer because
4   you said you normally prepare this one --
5   A.  I don't know.
6   Q.  You don't know?  Okay.
7       And if you scroll down --
8   A.  I did not say I normally prepare this
9   return --
10  Q.  Okay.  If you scroll down --
11  A.  -- to clarify.
12  Q.  Okay.  But an accountant would normally
13  prepare this return, would it not?
14  A.  An accountant, yes.
15  Q.  If you scroll down to the bottom of page 8, it
16  has certain vendors of the NRA.  Do you see that under
17  independent contractors, section B?
18  A.  Yes.
19  Q.  And I believe Mr. Stephens was asking --
20  Mr. Thompson was asking you about how much you pay
21  Membership Marketing Partners.  Now Membership Marketing
22  Partners is listed there, is it not?
23  A.  Yes.
24  Q.  And that figure is about 11.5 million.  Is
25  that right?

Page 239

1   A.  Yes.
2   Q.  Are you -- is that figure going to vary
3   significantly in 2020?
4       MS. KOZLOWSKI:  Objection to the extent
5   it calls for speculation.
6   A.  And what year did you say?  Did I -- in 2021
7   do I expect that to change or 2020?
8   Q.  (BY MR. ACOSTA)  For 2020, which has already
9   occurred, is that number going to be significantly
10  different than that number that you see right there on
11  page 8?
12  A.  I don't know.  The information hasn't been
13  gathered in this form.
14  Q.  Okay.  While we're still on this document, if
15  you don't mind scrolling all the way down to page 50,
16  and let me know when you're there.
17  A.  Okay.
18  Q.  It should say at the very top schedule 1, part
19  I, line 1 through 4, excess benefit transaction Wayne
20  LaPierre.  Is that accurate?
21  A.  Yes.
22  Q.  And have you seen this before?
23  A.  Yes.
24  Q.  And go ahead, can you explain what your
25  understanding is of the statements that are contained in

Page 240

1   this first box?
2       MS. KOZLOWSKI:  Objection to form.
3       And again you're testifying in your individual
4   capacity, so your understanding in that regard.
5   A.  Yeah.  So this portion was not prepared by the
6   accountants.
7   Q.  (BY MR. ACOSTA)  Okay.
8   A.  So --
9   Q.  Is it an inaccurate characterization to say
10  that Mr. LaPierre paid approximately $300,000 back with
11  interest to the NRA for travel expenses in 2019?
12      MS. KOZLOWSKI:  Objection as to form.
13  A.  Can you repeat that in a different way because
14  the double negative in there was --
15  Q.  (BY MR. ACOSTA)  Is it inaccurate to say that
16  Mr. LaPierre paid back the NRA approximately $300,000 in
17  2019 for travel related expenses?
18      MS. KOZLOWSKI:  Objection as to form.
19  A.  Mr. LaPierre paid back approximately $300,000
20  to the NRA.  For what it was for, I cannot, other than
21  what this says, cannot testify to that.
22  Q.  (BY MR. ACOSTA)  Well, let me ask something
23  else then separately.
24      Are you aware if Mr. LaPierre paid back the
25  NRA any amount of money for clothing expenses?

Page 241

61 (Pages 238 - 241)

1    MS. KOZLOWSKI:  Objection to form.
2    A.  I do not know.
3    Q.  (BY MR. ACOSTA)  Or are you aware that
4  Mr. LaPierre paid back the NRA for any other type of
5  expenses that he would have incurred?
6    MS. KOZLOWSKI:  Objection as to form.
7    A.  Yeah, I don't know.
8    Q.  (BY MR. ACOSTA)  Okay.  I would like you to
9  pull up AMc Exhibit No. 22, please.
10    (AMc Exhibit 22 marked.)
11    MS. KOZLOWSKI:  I'm sorry, Counsel, did
12  you say 22?
13    MR. ACOSTA:  Yeah, I'm sorry.
14    MS. KOZLOWSKI:  Okay.  Thank you.  We
15  have it up.
16    Q.  (BY MR. ACOSTA)  On Exhibit No. 22, we see the
17  same type of global notes that we saw on the statement
18  of financial affairs.  If you don't mind turning to page
19  number 2, it says -- right before the subtitle "global
20  notes," it says David Warren has signed these schedules
21  and statements.  Right?
22    A.  Yes.
23    Q.  Then you go to the next page -- well, let me
24  ask you.  These pages, these global notes of methodology
25  and statement of limitations, did you review them at all

1  prior to them being filed with the Court?
2    A.  Did I review the statements?
3    Q.  Yes.
4    A.  These statements?
5    Q.  Yes.
6    A.  I -- I looked at them, yes.
7    Q.  Okay.  Did you correct anything that was
8  inaccurate?
9    A.  I don't recall.  Yeah, I don't recall whether
10  there was corrections made.
11    Q.  Okay.  If you go to page number 3 at the very
12  bottom, the number 6 says insiders.  Are you with me?
13    A.  Yes.
14    Q.  To the best of your knowledge, did you prepare
15  the statements according to that definition of insider?
16    MS. KOZLOWSKI:  Objection.  The witness
17  testified she did not prepare these statements.  Also,
18  object to the extent it's calling for a legal conclusion
19  with respect to insiders.
20    And further to the extent that you had
21  communications with counsel with respect to what
22  constitutes an insider, I would advise you not to
23  disclose those communications.
24    Q.  (BY MR. ACOSTA)  So did you try to comply with
25  that definition, to the best of your knowledge?

1    MS. KOZLOWSKI:  Same objections.
2    A.  Yeah, I did not prepare these statements, so.
3    Q.  (BY MR. ACOSTA)  Okay.  If you scroll down to
4  page number 5, number 1 under -- at the very bottom,
5  number 1 under specific notes for certain items on
6  schedules, it says that the NRA has 26.7 million
7  approximately in restricted cash.  Do you see that?
8  It's the last line.
9    A.  Yes.
10    Q.  Okay.  I'm sorry, it's cash and cash
11  equivalents.  And then in the next page on page 6, it
12  says about accounts receivable, certain accounts won't
13  get paid.  Do you see that?
14    A.  I'm sorry.  It says what?
15    Q.  It has a notation for accounts receivable?
16    A.  Yes, there is a notation regarding accounts
17  receivable.
18    Q.  And then number 3, there's a notation about
19  investments of the NRA that are restricted?
20    A.  Yes.
21    Q.  13 million.  Is that accurate?
22    A.  Yes.
23    Q.  Is there a way -- I know this could be
24  complicated, but is there a way to determine what those
25  restrictions are?

1    MS. KOZLOWSKI:  Objection as to form,
2  foundation, to the extent it calls for a legal
3  conclusion.
4    A.  Yes, we know what these restrictions relate
5  to.
6    Q.  (BY MR. ACOSTA)  Okay.  And how many -- can
7  you explain what they generally relate to?
8    A.  They relate to endowments.
9    Q.  So do they have to be used for a specific
10  purpose?
11    A.  Endowments cannot be spent -- the principal
12  cannot be spent at all, and the interest up to a certain
13  percentage can be spent for a particular purpose.
14    Q.  Okay.  Can any of that $13 million be spent on
15  legal fees?
16    A.  I would have to look at exactly what those
17  restrictions relate to.
18    Q.  Okay.  So any portion of it -- any portion of
19  it be used for legal fees?
20    MS. KOZLOWSKI:  Objection, asked and
21  answered.
22    Q.  (BY MR. ACOSTA)  Your answer -- just to get it
23  clear on the record, your answer is I don't know?
24    MS. KOZLOWSKI:  Objection, misstates
25  testimony.

```
 1     A.  My answer is I would have to look at each
 2 individual endowment record to show -- to figure that
 3 out.  Part of that activity is sitting with ILA.  So
 4 that is not under my purview at the time when these
 5 numbers were determined.
 6     Q.  (BY MR. ACOSTA)  Okay.  And that applies to
 7 both the 26 million for cash and cash equivalents and
 8 the 13 million?
 9         MS. KOZLOWSKI:  Objection, form.
10     A.  Some of the restrictions in cash relate to a
11 temporarily restricted position which would not be
12 related to endowment.
13     Q.  (BY MR. ACOSTA)  Okay.  If you wouldn't mind
14 pulling up AMc Exhibit No. 14, please.
15         (AMc Exhibit 14 marked.)
16     Q.  (BY MR. ACOSTA)  Let me know when you're
17 there.
18     A.  We are there.
19     Q.  Okay.  Can you scroll down to -- go ahead and
20 identify that document, if you don't mind.
21     A.  It is the CHAR500.
22     Q.  I am trying to find the actual page.  If you
23 scroll down to page number 102 of 108.  Let me know when
24 you're there.
25     A.  Okay.
```
Page 246

```
 1     Q.  If you see at the top, it says National Rifle
 2 Association of America, Notes to Financial Statements,
 3 and it talks about restrictions on endowment assets.
 4 Are these the types of restrictions you're talking about
 5 with respect to the schedules?
 6     A.  They are, but this includes more than what --
 7 well, yeah, these are the restrictions at the time.
 8     Q.  Okay.  And the very first one is endowment net
 9 assets.  Do you see that?
10     A.  Yes.
11     Q.  Can any of that money -- could any of that
12 money have been used to pay legal expenses?
13         MS. KOZLOWSKI:  Objection, this has been
14 asked and answered.
15         MR. ACOSTA:  No, I believe I asked her
16 about this year, about the schedules.  I am asking her
17 now about 2018.
18     A.  Again, I would have to go back and look at
19 every single endowment to make that call.
20     Q.  (BY MR. ACOSTA)  Scroll up to page 21, if you
21 don't mind, of the same document while we're here.
22         MR. DRAKE:  I'm sorry, Joe.  What page
23 did you say?
24         MR. ACOSTA:  21.
25         MR. DRAKE:  Thanks.
```
Page 247

```
 1     Q.  (BY MR. ACOSTA)  Are you there, Ms. Rowling?
 2     A.  Yes.
 3     Q.  The title says part VII, section A, officers,
 4 directors, trustees, key employees, and highest
 5 compensated employees.  Am I accurate on that?
 6     A.  Yes.
 7     Q.  It actually starts on the prior page, page --
 8 or a couple of prior pages up.  It starts on page --
 9 page number 18.  But for our purposes -- well, did you
10 prepare this document?  Did you assist in preparing this
11 document?
12     A.  No.
13     Q.  You did?
14     A.  No, I did not.
15     Q.  Okay.  If you look at the bottom of page
16 number 21, it has a total of amount compensated to
17 directors and officers in 2018.  Am I accurate in saying
18 that total is 12.8 million, roughly?
19     A.  Yes.
20     Q.  And you don't know whether this information
21 needs to be included in the statement of financial
22 affairs.  Is that still your testimony?
23         MS. KOZLOWSKI:  Objection, misstates
24 testimony.
25     Q.  (BY MR. ACOSTA)  You can go ahead answer.
```
Page 248

```
 1     Is it your belief that this information should
 2 not be included in the statement of financial affairs?
 3     A.  This relates to 2018.
 4     Q.  No, with respect to 2020.
 5     A.  Again, we've already gone over that.
 6     Q.  And that was when I was looking at 2019's 990.
 7 Now I'm looking at 2018's 990.  And I'm asking you
 8 whether you think that when the statement of financial
 9 affairs asks you for compensation for insiders within
10 one year of filing bankruptcy, whether this information
11 should not be included?
12         MS. KOZLOWSKI:  Objection, asked and
13 answered.  The witness testified that this is from 2018.
14     Q.  (BY MR. ACOSTA)  Were directors and officers
15 paid in 2020, Ms. Rowling?
16     A.  Yes.
17     Q.  Now we can probably flip back to AMc Exhibit
18 No. 14, if you don't mind.  And this --
19         MS. KOZLOWSKI:  We were in Exhibit 14?
20         MR. ACOSTA:  I'm sorry?
21         MS. KOZLOWSKI:  We were in Exhibit 14.
22         MR. ACOSTA:  Okay.  It's AMc No. 22.
23 Sorry.
24     Q.  (BY MR. ACOSTA)  And if you go to page number
25 5 of --
```
Page 249

63 (Pages 246 - 249)

1      MS. KOZLOWSKI: We don't have the exhibit
2  open yet. Please give us a moment, Counsel.
3      Okay. We have it up. Thank you.
4      MR. ACOSTA: Sure.
5  Q. (BY MR. ACOSTA) If you turn to page --
6  actually, turn to page 8 or page 10. There's
7  36.5 million in cash and cash equivalents that the NRA
8  currently has?
9  A. Yes.
10  Q. Does that include cash and cash equivalents
11  that ILA has?
12  A. Yes.
13  Q. Does that include cash and cash equivalents
14  that all the NRA entities have?
15  A. No.
16  Q. So there are some NRA entities that have more
17  cash than the 36.5 million -- I mean, that have cash
18  above that amount?
19      MS. KOZLOWSKI: Objection, form,
20  foundation.
21  A. The NRA entities are not part of this
22  schedule. They are not part of the filing. They
23  weren't part of the bankruptcy.
24  Q. (BY MR. ACOSTA) Okay.
25  A. They should not be included --

Page 250

1  A. No. It's a slightly different type of
2  restriction, in that we have a receivable on the books
3  relating to endowments that are held by the Foundation.
4  They're donations to the Foundation that are made by a
5  donor for the benefit of a program within the NRA.
6  Those are Foundation assets. However, accounting rules
7  require us to show that as a receivable on our side, and
8  so those are restricted within those amounts.
9  Q. So it's a Foundation asset, but you have to
10  show it on your books and -- on your balance sheet. Is
11  that what you're saying? The NRA --
12  A. As a receivable.
13  Q. Okay. Can the NRA use any of that money?
14  A. The NRA -- the only portion that can be used
15  is when it is provided to us after we show proper backup
16  and support for a valid expense relating to a very
17  specific endowment fund.
18  Q. And let me ask you a related question. Who
19  handles the accounting for the NRA Foundation?
20  A. Currently, that is Sunee Stacks.
21  Q. Okay. And does she work for the NRA or the
22  NRA Foundation?
23  A. The NRA Foundation does not have employees.
24  Q. Okay. So does the NRA, either financial of
25  division services or treasury department, handle the

Page 252

1  Q. Is there ever a transfer of cash between
2  different NRA type entities?
3      MS. KOZLOWSKI: Objection to form,
4  foundation, vague as to time.
5  A. Yeah, can you please be more specific on that?
6  Q. (BY MR. ACOSTA) In 2020, did any of the NRA
7  entities exchange cash?
8      MS. KOZLOWSKI: Objection as to form,
9  vague. Vague as to what exchange cash means.
10  Q. (BY MR. ACOSTA) You can answer.
11  A. When appropriate, with appropriate
12  documentation there are transfers to the -- and from the
13  other entities.
14  Q. Okay. And if you can turn to page number 12
15  of 236, under part III those are the accounts
16  receivable. See that?
17  A. Yes.
18  Q. 55.4 million approximately due within 90 days?
19  A. Yes.
20  Q. Okay. I think at the 341 meeting someone said
21  that was restricted. Is that accurate?
22  A. Not all of it. There is a portion in there
23  that is restricted.
24  Q. It's restricted the same way that the cash and
25  cash equivalents is restricted?

Page 251

1  accounting function for the NRA Foundation?
2  A. There is a group of individuals that are
3  within the treasurer department that work specifically
4  and only on the Foundation.
5  Q. Okay. If you turn to page number 13 of the
6  same document, at the bottom it's the sum total of all
7  investments of the NRA, and it says 64 million, 54 -- 64
8  million, roughly. Is that right?
9  A. Hold on, I lost it.
10      MS. KOZLOWSKI: I'm sorry, Counsel. What
11  exhibit was that? We totally closed it out.
12      MR. ACOSTA: It's still Exhibit 22, page
13  13.
14      MS. KOZLOWSKI: Okay. Thank you. Sorry
15  about that. The iMac is not the ideal computer for
16  this.
17  A. Okay. Repeat your question, please.
18  Q. (BY MR. ACOSTA) If you just turn to page
19  number 13, I will represent to you that's the sum total
20  of all the investments that the NRA currently has, 64
21  million.
22  A. Yes.
23  Q. Can any of these investments be liquidated
24  relatively quickly?
25  A. No. They are held as collateral for the line

Page 253

64 (Pages 250 - 253)

1  of credit.
2      Q.  Okay.
3      A.  Or they are also endowment related as well.
4      Q.  I appreciate that clarification, but my
5  question is, can they be liquidated?  I'm not saying
6  whether you're going to do it; I'm asking you whether
7  they can be.
8      A.  They cannot without the approval through
9  the -- with respect to the banking agreements.
10      Q.  Okay.
11      A.  We cannot just liquidate them without their
12  permission.
13      Q.  Okay.  And then 64 million -- I think that's
14  in the global notes you said 13 million of that was
15  restricted?
16          MS. KOZLOWSKI:  Objection, misstates
17  testimony.
18      A.  They're -- 13 of that is restricted for
19  endowment purposes.  It's also collateral for other
20  reasons.
21      Q.  (BY MR. ACOSTA)  Okay.  So let's go down to
22  page 69, if you don't mind.  Are you there?
23      A.  Yes.
24      Q.  Part I on page 69 is payments to priority
25  unsecured creditors.  You have the internal revenue at

Page 254

1  please.
2          MR. ACOSTA:  I think this is -- after a
3  couple more questions, that would be a good time to take
4  a break.  I understand.
5      Q.  (BY MR. ACOSTA)  If you scroll down to page --
6  it's page number 176.  I represent to you, you list PBGC
7  as having a contingent claim for 48.4 million.  Can you
8  tell me what that's about?
9          MS. KOZLOWSKI:  Objection.  Counsel, the
10  last line of questioning has -- you've used the word
11  "you," and I think you've meant to use the word "NRA."
12  I think I just want to clarify the record that all of
13  these questions are with respect to the NRA and not
14  Ms. Rowling.
15          MR. ACOSTA:  Sure.
16      Q.  (BY MR. ACOSTA)  Do you know what the Pension
17  Benefit Guaranty claim for 48.4 million is about?
18      A.  There is a liability that is required based on
19  accounting rules that we must record with respect to the
20  pension plan.
21      Q.  Okay.  Is that in the event that you default
22  on the pension obligations or --
23      A.  No.  It's pension accounting rules that
24  require a disclosure relating to present value if
25  everything -- if we had to make payments all upfront,

Page 256

1  3.4 million.  What's that debt for?
2      A.  It's disputed.
3      Q.  I understand, but do you know what it's for?
4      A.  No, we do not.
5      Q.  Okay.  And then if you scroll to the next
6  page, at number 3.6 you have Ackerman McQueen's claim,
7  and you put unknown, disputed, contingent, unliquidated.
8  Do you see that?
9      A.  Yes.
10      Q.  Now are you familiar with -- I'd represent to
11  you that on a list of top 20 creditors, you listed
12  Ackerman McQueen as having a liquidated $1.2 million
13  amount, still disputed, contingent and unliquidated.  Do
14  you know where that amount came from?
15      A.  That came from the invoices that are in
16  dispute that we received within financial services.
17      Q.  I guess the invoices that remain
18  unpaid?
19      A.  The invoices that are in dispute that have
20  remained not paid.
21      Q.  Okay.  And then if you scroll down a little
22  further --
23          MS. KOZLOWSKI:  Counsel, we've going for
24  well over an hour.  When you get to a stopping point in
25  the next few minutes, we would like to take a break,

Page 255

1  yes, what would those liabilities represent.
2      Q.  Okay.  Has -- to your knowledge, has the NRA
3  ever defaulted on its pension obligations?
4      A.  No, it has not.
5      Q.  To your knowledge, has the NRA ever been
6  liable to the Pension Benefit Guaranty Corporation at
7  the end of the year?
8          MS. KOZLOWSKI:  Objection to the extent
9  it calls for a legal conclusion.
10      A.  I don't know.  I don't know.
11      Q.  (BY MR. ACOSTA)  Well, as of December 21,
12  2020, was the NRA liable to the Pension Benefit Guaranty
13  Corporation?
14          MS. KOZLOWSKI:  Objection, vague to the
15  extent of liable and to the extent it calls for a legal
16  conclusion.
17      Q.  (BY MR. ACOSTA)  You can answer.
18      A.  The NRA is current on all payments required to
19  be made to the PBGC.
20      Q.  Okay.  And there's no concern that that's --
21  they are going to default on their pension obligations?
22          MS. KOZLOWSKI:  Objection, calls for
23  speculation, form.
24      Q.  (BY MR. ACOSTA)  You can go ahead and answer.
25      A.  Well, that would be speculating.

Page 257

65 (Pages 254 - 257)

Veritext Legal Solutions
800-336-4000

1  Q.  Okay.
2      MR. ACOSTA:  I think we're at a good
3  stopping point, Counsel.  Do you want to go five or ten
4  minutes, or -- and I would also like to -- let's do how
5  much?
6      MS. KOZLOWSKI:  Oh, ten minutes.  But
7  could we also get a time check as well?
8      THE VIDEOGRAPHER:  Yes.
9      We're going off the record.  The time on the
10 video is 5:56 p.m.
11     (Break from 5:56 p.m. to 6:10 p.m.)
12     THE VIDEOGRAPHER:  We're back on the
13 record.  The time on the video is 6:10 p.m.
14     Q.  (BY MR. ACOSTA)  Okay.  Ms. Rowling, do you
15 know what the definition of insolvency is?
16     MS. KOZLOWSKI:  Objection to the extent
17 it calls for a legal conclusion.
18     A.  Yeah, that's -- that's a legal term.
19     Q.  (BY MR. ACOSTA)  Okay.  Do you know whether
20 the NRA's assets exceed their liabilities?
21     A.  The assets -- liquidated assets, yes, would
22 exceed the liabilities.
23     Q.  Okay.  And is the NRA having any problems
24 paying its debts as they come due?
25     A.  No.

Page 258

1      Q.  Would it surprise you that on schedule F, the
2  1,117 creditors that the NRA lists, over 1,000 of them
3  are owed under $10,000?
4      MS. KOZLOWSKI:  Objection to form.
5      A.  I mean, it's no surprise that there are, yeah,
6  creditors with less than $1,000 on this list.
7      Q.  (BY MR. ACOSTA)  Right.  And so I mean, the
8  NRA generally doesn't have any problems paying those
9  creditors, does it?
10     MS. KOZLOWSKI:  Objection to form,
11 argumentative.
12     A.  Timeframe?
13     MS. KOZLOWSKI:  Can you be specific as to
14 timeframe as well?
15     Q.  (BY MR. ACOSTA)  In 2020, did the NRA have
16 problems paying its creditors, difficulties?
17     A.  No.
18     Q.  Okay.  In the last 20 years that you've been
19 with the NRA, has it ever had difficulties paying its
20 debts?
21     MS. KOZLOWSKI:  Objection to the extent
22 it's asking you to speculate, but you can certainly
23 answer as to what you have in your personal knowledge.
24     A.  There have been occasions when -- when there
25 were cash difficulties which required pushing back the

Page 259

1  scheduling of payments.
2      Q.  (BY MR. ACOSTA)  Okay.  And do you recall when
3  the last of those occasions was?
4      A.  I don't recall.
5      Q.  Okay.  You testified earlier that the Brewer
6  firm was, I think you said, paid according to the terms
7  of their contract, their contract with the NRA?
8      MS. KOZLOWSKI:  Objection to the form and
9  to the extent it misstates testimony.
10     A.  The bills are paid, and I believe the
11 contract -- well, I don't -- I mean, I don't know what
12 the contract says exactly, so I can't -- I don't know.
13     Q.  (BY MR. ACOSTA)  So that was my next question.
14 You haven't seen the contract?
15     A.  No, that is not the case.
16     Q.  And I represent to you that the statement of
17 financial affairs, you listed Brewer received
18 17.5 million within the last 90 days.  And I represent
19 to you that the 1099 for 2019 shows that the Brewer firm
20 received $26 million.  And I would represent to you that
21 the 2018 990 says the Brewer firm received approximately
22 $14 million.  Now you do the math.  That's over
23 $50 million in the last three years, last two years.  Is
24 that accurate, or am I a little off on my numbers?
25     MS. KOZLOWSKI:  Objection as to --

Page 260

1  objection as to form, to the extent it calls for
2  speculation, to the extent -- to the extent that you're
3  asking the witness whether if you add those numbers up
4  it exceeds 50.  I suppose she can testify as to what
5  that mathematical equation would be.
6      MR. ACOSTA:  Could you let her testify,
7  please?
8      Q.  (BY MR. ACOSTA)  You can testify, Ms. Rowley.
9      A.  In order to give you an exact number, I would
10 have to look into the accounting records for that
11 information.
12     Q.  Well, let's assume it's over $50 million.  Do
13 you think that's excessive for a vendor?
14     MS. KOZLOWSKI:  Objection.  Objection as
15 to form, argumentative, and to the extent that
16 Ms. Rowling is testifying in her individual capacity.
17     Q.  (BY MR. ACOSTA)  You can answer the question,
18 Ms. Rowling.
19     A.  The Brewer firm is handling many different
20 areas of concern in litigation for the NRA, so -- and
21 their contract terms are not within my purview to -- to
22 comment on as to, you know, what they do.
23     Q.  Let's talk about something that could be in
24 your purview then.  Do you know of the formation of Sea
25 Girt?

Page 261

66 (Pages 258 - 261)

1    A.  I do not.
2    Q.  You don't know an entity called Sea Girt?
3    A.  I do know an entity called Sea Girt.
4    Q.  Okay.  Did you know that it was formed last
5  year?
6    A.  I have learned that information.  I did not
7  know that it was formed at the time.
8    Q.  Okay.  Did anyone -- did you know that the NRA
9  capitalized Sea Girt with $50,000?
10       MS. KOZLOWSKI:  Objection to form.
11  Objection to the extent it calls for speculation.
12   A.  I have been provided information that -- with
13  respect to a bank account that was created for Sea Girt.
14   Q.  (BY MR. ACOSTA)  Has anyone asked for the
15  treasury or the financial services division permission
16  to create that account?
17   A.  I don't know.
18   Q.  I would like you to pull up AMc Exhibit No. 6,
19  please.
20       (AMc Exhibit 6 marked.)
21   Q.  (BY MR. ACOSTA)  Are you there, Ms. Rowling?
22   A.  Yes.
23   Q.  Have you seen this before?
24   A.  Not to my recollection.
25   Q.  Do you see at the top it says the date is

Page 262

1  January 13, 2021?
2    A.  Yes.
3    Q.  And then who is this addressed to?
4    A.  Brewer, Attorneys & Counselors.
5    Q.  And who signed the letter?
6    A.  Wayne LaPierre, Charles Cotton, Carolyn
7  Meadows.
8    Q.  Is it fair to say that this letter is
9  directing the Brewer firm to pay $50,000 to set up an
10  account for Sea Girt?
11       MS. KOZLOWSKI:  Objection to form,
12  foundation.  The witness has testified she has not seen
13  this document before.
14   Q.  (BY MR. ACOSTA)  Well, just read the first
15  sentence.
16   A.  The first sentence says transfer $50,000 from
17  the Brewer trust to a bank account established in the
18  name of Sea Girt.
19   Q.  So they didn't even take the money out of the
20  NRA's account to create Sea Girt, did they?
21       MS. KOZLOWSKI:  Objection, form,
22  foundation.  The witness has testified she did not see
23  this document before.  She does not have knowledge.
24   Q.  (BY MR. ACOSTA)  To your knowledge, did they
25  use the NRA's money to create Sea Girt?

Page 263

1        MS. KOZLOWSKI:  Objection.  Same
2  objections.
3    A.  The Brewer Trust was NRA money.
4    Q.  (BY MR. ACOSTA)  Okay.  So how do you account
5  for a transaction like this on your books and records,
6  on the NRA's books and records?
7    A.  The NRA received documentation with respect to
8  these -- the transfers out of that account.
9    Q.  Okay.  And you're saying they're reflected in
10  the internal books and records of the NRA?
11   A.  Yes.
12   Q.  There was another entity that was formed, WBB
13  Investment, LLC.  Do you recall that entity?
14   A.  I am familiar with the name.
15   Q.  Okay.  Do you recall anyone asking permission
16  from the treasury or financial division services
17  permission to capitalize that entity?
18       MS. KOZLOWSKI:  Objection, form,
19  foundation.
20   A.  This was part of our top list of concerns.
21   Q.  (BY MR. ACOSTA)  Okay.  Fair enough.
22       MR. ACOSTA:  I'm going to just reserve
23  the right to request additional time, because half the
24  testimony in this case was given by the attorney for the
25  NRA, and I just don't want anyone to think I'm going to

Page 264

1  waive that right.  So with that, I will pass the witness
2  at this time, and I will pass it to the UCC.
3        MS. KOZLOWSKI:  Before we conclude --
4  before the witness is passed, can we confirm the total
5  30(b)(6) time on the record that's been utilized today?
6        THE VIDEOGRAPHER:  Two hours and
7  11 minutes.
8        MS. KOZLOWSKI:  Thank you.
9        MR. DRAKE:  Are we ready?
10       EXAMINATION
11  BY MR. DRAKE:
12   Q.  Hi, Ms. Rowling.  Just for the record, my name
13  is Scott Drake.  I represent the Official Committee of
14  Unsecured Creditors.
15       I just want to make sure.  Who -- who's
16  present with you physically in the room?
17   A.  Talitha and Teresa from Garman and the
18  videographer.
19       MR. DRAKE:  And Counsel, I caught at the
20  beginning -- I think most of my questions are
21  individual, but I know Ms. Rowling was designated on 2,
22  3, 4 and 6 from the AG's notice.  Is she designated on
23  any topics from the Ackerman notice?
24       MS. KOZLOWSKI:  She was designated on
25  topic 2.

Page 265

67 (Pages 262 - 265)

1    THE WITNESS: Part of topic 2.
2    MS. KOZLOWSKI: I'm sorry, part of topic
3 2. And topic 4, 10 and 12.
4    MR. DRAKE: Okay.
5    Q. (BY MR. DRAKE) So Ms. Rowling, I just wanted
6 to get an understanding. From your testimony earlier
7 today, I believe you found out about the bankruptcy I
8 think the day of the filing, either right before or
9 right after it was filed. Is that right?
10    A. That is correct.
11    Q. So since the date of the filing, have you been
12 personally involved in any aspect of the bankruptcy on
13 behalf of the NRA?
14    A. Yes, with respect to reviewings of the
15 schedules that have been required to be submitted, part
16 of the 341 meeting and other discussions with counsel.
17    Q. And when you say "counsel," is that internal
18 NRA counsel or outside counsel?
19    A. Both.
20    Q. And what outside counsel? I don't want to
21 know the substance of the communications, but what
22 outside counsel do you deal with specifically with
23 respect to the bankruptcy?
24    A. Neligan and Garman.
25    Q. Are you aware of whether or not there is a

Page 266

1 committee within the NRA that's in charge of making
2 decisions for the NRA about the bankruptcy?
3    A. I don't know what you're referring to.
4    Q. I just -- I know Mr. Frazer had testified that
5 some things within the NRA are done by committee. I
6 didn't know if there was a formal or informal group of
7 individuals that were, more or less, in charge of making
8 decisions on behalf of the NRA in the bankruptcy.
9    A. I am not aware of anything.
10    Q. Are you familiar with the term or have heard
11 the term "plan of reorganization"?
12    A. Yes.
13    Q. Are you personally involved at all in
14 development of a plan of reorganization for the NRA?
15    A. That plan is just getting started, and I will
16 be brought in as needed for those discussions.
17    Q. Do you know who else at the NRA is involved in
18 the plan process?
19    A. I don't know exactly at this point in time.
20    Q. Are you -- have you had any personal
21 involvement in analyzing whether the NRA plans to pay
22 its creditors in full through the bankruptcy process?
23    A. I am aware of the intent, that that is our
24 hope to pay the unsecured creditors in full.
25    Q. Ms. Rowling, if you'll look at the exhibit

Page 267

1 folder, at the very bottom there should be -- and I
2 accidentally loaded it twice, so I renamed on duplicate
3 ignore. But above that, you should see UCC Exhibit 1.
4 Are you able to locate that file?
5    MS. KOZLOWSKI: We probably need to
6 refresh. Give us a moment here.
7    MR. DRAKE: Okay.
8    MS. KOZLOWSKI: We do have it.
9    A. It's up.
10    Q. (BY MR. DRAKE) Great. So Ms. Rowling, I am
11 showing you what's been marked as UCC Exhibit 1.
12    (UCC Exhibit 1 marked.)
13    Q. (BY MR. DRAKE) Do you recognize -- have you
14 seen this before?
15    A. Yes.
16    Q. And what do you recognize this as?
17    A. A letter that is on an NRA website, as well as
18 one that was mailed to certain vendors.
19    Q. Were you involved in the drafting of this
20 letter?
21    A. No, I was not.
22    Q. Do you have personal knowledge as to who did
23 draft it?
24    A. No, I don't.
25    Q. But I understand you have been -- you've

Page 268

1 reviewed it or seen it at some time then after it was
2 posted to the website?
3    A. That's correct.
4    Q. Were you involved at all in mailing it to the
5 vendors?
6    A. To the extent that the accounts payable
7 department provided a -- a list out of the payables of
8 the vendors, that's the extent.
9    Q. Okay.
10    MR. DRAKE: So, Counsel, if you don't
11 mind, I think I have like two questions on topic 12,
12 which would be the only 30(b)(6) topics for her. If you
13 don't mind if I just do that now, and then the rest of
14 the depo will be in her personal, but it relates to this
15 letter. Topic 12 from the Ackerman notice.
16    MS. KOZLOWSKI: Okay.
17    MR. DRAKE: Will that work?
18    MS. KOZLOWSKI: Yes, that's fine.
19    Q. (BY MR. DRAKE) And so, Ms. Rowling, I don't
20 have it on my screen to show you, but I don't know if --
21 the notice, I'll represent to you the documents set
22 forth in the Ackerman McQueen notice was communications
23 with vendors regarding the reasons for the NRA
24 bankruptcy, delinquent payments and plans for future
25 repayment of outstanding amounts. That's one of the

Page 269

68 (Pages 266 - 269)

1 topics you're designated to testify today on behalf of
2 the NRA?
3    A. Yes.
4    Q. Is UCC Exhibit 1, is this an example of such
5 communications with vendors regarding the reasons for
6 the bankruptcy and plans for future payment of
7 outstanding amounts?
8    A. Yes.
9    Q. And Ms. Rowling, if you'll see the bottom of
10 the page 1, second to last paragraph, which is bold, do
11 you see where it says, As part of the restructuring, the
12 NRA will propose a plan providing payment in full of all
13 valid creditor claims. All post-petition claims will be
14 paid in the regular course of business. Do you see
15 that?
16    A. Yes.
17    Q. Was that an accurate statement of the NRA's
18 intent as of January 15, 2021?
19    A. That was the intent, yes.
20    Q. And is it still the intent, as we sit here
21 today on March 19th, that as part of the restructuring,
22 the NRA intends to propose a plan providing payment in
23 full of all valid creditor claims?
24    A. Of all valid creditor claims, yes.
25    Q. And is it also true, sitting here today, that

Page 270

1 this note. Are you aware of anything in this document
2 or elsewhere that suggests that the NRA does not intend
3 to pay any valid receivables -- sorry, this is the
4 receivable. I'm sorry.
5    A. Yeah.
6    Q. That's why I was confused by his question. I
7 thought it said -- and maybe he misspoke -- said it
8 wouldn't pay certain receivables. So I think what he
9 meant to say is it wouldn't collect receivables, and
10 that was my confusion.
11    But it's been a long day for all of us, so I
12 just want to make sure. You're not aware of anything
13 with respect to payables, accounts payables, that the
14 NRA doesn't intend to pay any valid accounts payables?
15    A. That's correct.
16    Q. All right. And so then -- I think that's all
17 I had on the 30(b)(6) topics.
18    Ms. Rowling, I did want to ask you because
19 your colleague Mr. Frazer suggested that you were the
20 right person to ask. With respect to revenue for the
21 NRA, are you aware of approximately how much -- how much
22 of the NRA's revenue comes from donations and
23 fundraising efforts?
24    A. Not off the top of my head. You know,
25 membership dues is our largest portion, and then

Page 272

1 all post-petition claims will be paid in the regular
2 course of business?
3    A. It would be valid post-petition claims, but
4 yes.
5    Q. Oh, right. I understand. It wouldn't -- the
6 claims would have to be valid and whatnot. I understand
7 that. But assuming the claims are valid, it's the NRA's
8 intent to pay those in the regular course for
9 post-petition claims?
10    A. Yes.
11    Q. Okay. And then I just want to clear up
12 something Mr. Acosta asked you which relates to AMc
13 Exhibit 22. And let me know when you have that up.
14    A. Okay. That's up.
15    Q. If you'll go down to page 6 of the PDF, page 6
16 of 236. Do you see that?
17    A. Yes.
18    Q. Do you see item 2, which is accounts
19 receivable?
20    A. Yes.
21    Q. I may have misheard Acosta -- misheard
22 Mr. Acosta, but -- and the record will show what he
23 asked, but I thought I heard him ask if you saw in
24 section 2 the accounts receivable note that said some
25 receivables would not be paid, and I don't see that in

Page 271

1 contributions would be the second.
2    Q. Okay. And so when you say "contributions," I
3 assume that's donations and other fundraising efforts?
4    A. Yes. It's donations and a segment of a class
5 of membership that provides no additional benefit to the
6 member, so that portion is also considered a
7 contribution.
8    Q. And again, this is just in your individual
9 capacity, to the extent you know. Do you know
10 approximately what percentage of revenue that the
11 membership dues and contributions make up for the NRA?
12    A. Probably -- well, I would be guessing. It's
13 the majority, over 50 percent.
14    Q. Certainly over 50 percent. And, again,
15 because it's not a memory test or anything, is there a
16 document -- and, you know, maybe I should know this
17 already, but is there a document that would reflect the
18 amount of revenue that is attributable to membership
19 dues and contributions?
20    A. Our audited financial statements would show
21 that, as well as the 990.
22    Q. And I can certainly look at those, but do you
23 know just on a year-to-year basis, while the amount of
24 revenue generated probably fluctuates year to year, does
25 the percentage that is attributable to membership dues

Page 273

69 (Pages 270 - 273)

1 and contributions remain fairly constant or does it
2 likewise fluctuate?
3    A. It's going to fluctuate. That's mainly due
4 to -- if it's an election year, for example, those
5 numbers will fluctuate.
6    Q. What are the other sources of revenue besides
7 contributions and membership dues in broad categories?
8    A. Advertising programs, affinity programs and
9 then some other miscellaneous areas, but those are --
10 and public -- well, publications is the advertising, so.
11    Q. In your opinion, Ms. Rowling, as the interim
12 CFO, would a significant decline in membership dues or
13 contributions have a negative impact on the financial
14 condition of the NRA?
15    A. It would be severe.
16    Q. Why do you think that?
17    A. Because it's the majority of our -- of our
18 revenue.
19    Q. Are you aware of whether donations or
20 contributions have been impacted by the NRA's filing of
21 bankruptcy?
22    A. I am not -- I don't know for 100 percent on
23 that. Donations in the early part of the year are --
24 it's not necessarily the big time of year for donations.
25    Q. Do you know, based on your long tenure there,

Page 274

1 whether donations tend to increase or decrease when
2 there's a President who is viewed as either supportive
3 of gun rights or anti-gun rights?
4    A. It can fluctuate based on who sits in the
5 White House, yes.
6    Q. And in your experience, what -- which way does
7 that go? Is it such that when there's an occupant in
8 the White House who is viewed pro gun, that donations
9 increase, or is it when there's someone in the White
10 House that's viewed as against gun rights, donations
11 tend to increase?
12    A. Donations tend to increase when there is an
13 anti-Second Amendment President in the White House.
14    Q. If you could pull up -- I believe this is
15 Exhibit 3 from the Attorney General. I believe it's the
16 2019 990.
17    A. Okay.
18    Q. And specifically page 77. Let me know when
19 you have that.
20    A. Just a minute. Okay.
21    Q. I have to confess, I don't remember if it was
22 Mr. Thompson or Mr. Sheehan, but one of them was asking
23 you about the response to question 1b, about whether or
24 not the organization followed a written policy regarding
25 payment or reimbursement, and I just wanted to follow up

Page 275

1 on that to make sure I heard you right.
2    So was I -- did I hear you correctly that
3 there is not yet a final such written policy related to
4 first-class travel?
5    A. First-class travel? No, first-class travel
6 was actually in the original travel policy. So it's
7 certain of those -- those boxes checked in 1a that were
8 not addressed in -- it doesn't mean all of them were not
9 addressed; some of them were not addressed in the
10 current travel policy.
11    Q. Okay. I just want to clarify. So there was a
12 written travel policy that did cover some of those
13 topics, including first-class travel. Is that right?
14    A. Yes.
15    Q. But the existing written travel policy did not
16 cover all of the categories that you see in section 1a.
17 Is that right?
18    A. That's correct.
19    Q. And then I believe you say that Mr. Spray
20 requested a new travel policy at some point?
21    A. Yes.
22    Q. And did I understand that Mr. Hendrick (sic)
23 has done a first draft?
24    A. "Tedrick."
25    Q. Oh, I'm sorry, Mr. Tedrick.

Page 276

1    And have you -- have you reviewed the draft?
2    A. I have looked at the draft.
3    Q. And is that something that the NRA intends to
4 finalize at some point in the near future?
5    A. Yes.
6    Q. Ms. Rowling, I would now like to go to
7 Ackerman Exhibit 84.
8    A. It's up.
9    Q. And just for the record, this is the email
10 that Mr. Acosta showed you and marked as Ackerman
11 Exhibit 84. The attachment to it is the list of top
12 concerns for the audit committee that I believe was the
13 New York AG's Exhibit 4. This list of top concerns for
14 the audit committee, that was the same list that the AG
15 showed you. Is that right?
16    A. Yeah, I believe that's the same list.
17    Q. I mean, yeah, I believe -- I haven't done a
18 complete analysis of it, but it appears to me to be the
19 same. I guess what I would ask you is can you recall
20 whether you ever drafted more than one document that --
21 other than drafts, did you ever finalize more than one
22 document that listed concerns for the audit committee?
23    A. I don't recall doing other drafts or other
24 versions personally.
25    Q. And so, Ms. Rowling, I would like to ask

Page 277

70 (Pages 274 - 277)

1  you -- and my screen has frozen, so I apologize. I
2  can't get back up to the top, so I am going to have to
3  ask it blind.
4      So I believe you emailed this to Mr. Tedrick
5  back in July of 2018. Correct?
6  A. That's correct.
7  Q. And as you reflected in your email, it was a
8  joint effort by you and Mr. Erstling, Ms. Padilla and
9  Ms. George. Correct?
10  A. As well as Emily Cummins.
11  Q. Right. She had provided a copy of her list,
12  and you incorporated her concerns is what you say.
13  Right?
14  A. That's correct.
15  Q. So what I may have just missed or maybe nobody
16  asked you, but whose idea was it to create this list?
17  A. We were requested to create this list.
18  Q. And who requested that you create this?
19  A. Craig Spray.
20  Q. Okay. And do you know why Mr. Spray requested
21  this list?
22  A. It was to present to the audit committee.
23  Q. Is this something that you had done in any
24  other year?
25  A. No.

Page 278

1  Q. And so, Ms. Rowling, I would like us to look
2  at the list of concerns that were enumerated on this
3  document.
4      So starting at page 2 of Exhibit 84, the first
5  one relates to financial conflict of interest at the
6  senior management and board of directors level. Do you
7  see that? And then there's -- that's number 1.
8  A. Did you -- I'm sorry. Okay. Number 1 on the
9  list?
10  Q. Yes.
11  A. Okay.
12  Q. Do you see that number 1 on this list is
13  financial conflict of interest at the senior management
14  and board of directors level?
15  A. Yes.
16  Q. So is it accurate to say, Ms. Rowling, that in
17  July of 2018, you shared the concern that there were
18  financial conflicts of interest at the senior management
19  and board of directors level?
20  A. We did.
21  Q. And Mr. Phillips and the payments made to his
22  girlfriend was one of those concerns?
23  A. I believe it states significant other, but
24  yes.
25  Q. Okay. That's fair.

Page 279

1      And he's -- he no longer has an active role
2  with the NRA. Is that right?
3  A. That is correct.
4  Q. So is it fair to say that with respect to
5  Mr. Phillips going forward from the petition date in
6  January of this year and throughout the bankruptcy, that
7  you no longer have concerns with respect to
8  Mr. Phillips' going forward role with the NRA?
9  A. That is correct.
10  Q. Would that also be true with respect to
11  Mr. Powell?
12  A. That's correct.
13  Q. And do you believe that the NRA has addressed
14  the concerns with respect to Mr. Schropp?
15  A. I don't know.
16  Q. Do you have -- with respect to d, letter d, it
17  was board member compensation arrangements not being
18  disclosed, impairing independence and arranged behind
19  the scenes. So was that a concern you had in July of
20  2018?
21  A. That was, I believe, Emily's concern. And I
22  do know there have been various changes to compensate to
23  board member agreements since this took place, but those
24  were not my specific concerns at this time.
25  Q. Is that -- is that a concern you have sitting

Page 280

1  here today in 2021 as the NRA operates as a debtor in
2  possession?
3  A. No, it is not.
4  Q. Are you aware of whether, in response to this
5  letter, the NRA did anything to address the concerns you
6  had with respect to financial conflict of interest at
7  the senior management and board of directors level?
8  A. Yes. As I said, certain vendors were -- we no
9  longer do business with. There are procedures within --
10  that are being followed within the audit committee to
11  review the board member agreements, and those have been
12  modified as well.
13  Q. Sitting here today as the NRA operates in
14  bankruptcy, do you have any concerns about financial
15  conflict of interest at the senior management and board
16  of directors level?
17  A. I am not aware of any. So, no, I do not have
18  any.
19  Q. And Ms. Rowling, then moving on to number 2,
20  senior management override of internal controls. Was
21  that -- were any of these enumerated items under number
22  2 a concern you personally had in 2018, to the extent
23  you recall?
24  A. Yes. I was involved in the forced payment to
25  WBB Investments.

Page 281

71 (Pages 278 - 281)

1    Q.   And are you aware of whether any -- anything
2  was done within the NRA after July of 2018 to help
3  prevent forced payments such as this one listed in part
4  2a?
5    A.   The change has been made with leadership in
6  the -- the tone at the top and then being -- so
7  basically the requirements surrounding accounts payable
8  are now being enforced from the upper levels and
9  supported by the senior management versus fought
10  against.
11    Q.   Are you aware, Ms. Rowling, of whether there
12  are any, for lack of a better word, restrictions on how
13  the NRA can make payments to outside parties now that
14  it's in bankruptcy?
15    A.   I'm not sure I understand what type of
16  restrictions or what you're referring to, I guess.
17    Q.   Yeah, it was probably not the best question.
18      But I was just trying to figure out if you
19  personally are aware with respect to payments of vendors
20  and things like that if anything has changed with how
21  that's handled as a result of the fact that the NRA
22  filed for bankruptcy?
23    A.   I mean, with respect to -- invoices are very
24  closely monitored for pre- and post-petition.  And any
25  questions regarding payments are asked of bankruptcy

1  counsel to make sure our interpretation of those rules
2  are correct.  We follow the motions and try to
3  understand and get clarification when those motions are
4  finalized to make sure that payments are made in the
5  proper aspect.
6    Q.   And who within the NRA is responsible for
7  monitoring those type of things that you just listed?
8    A.   The accounts payable manager Portia, she would
9  be -- have the visibility and -- on establishing the
10  payment cycle.  So she coordinates and asks me
11  questions, along with the bankruptcy counsel.
12    Q.   And do you know which bankruptcy counsel she
13  consults with respect to making payments to outside
14  vendors?
15    A.   John Gaither.
16    Q.   Ms. Rowling, do you still in 2021 have
17  concerns about senior management override of internal
18  controls at the NRA?
19    A.   No, I do not.
20    Q.   What do you recall led to you and your
21  colleagues including number 3 in this list of concerns
22  for the audit committee, which specifically was
23  management has subordinated its judgment to vendors?  Do
24  you have any recollection of that topic?
25    A.   Yes.

1    Q.   What do you recall?
2    A.   That related to Ackerman McQueen.
3    Q.   Anyone else?
4    A.   Possibly McKenna was in that realm, but mostly
5  Ackerman.  But McKenna started falling into that with --
6  because of Josh Powell's reliance on them.
7    Q.   Do you -- do you have any concerns in 2021
8  about management subordinating its judgment to vendors?
9    A.   No, I do not.
10    Q.   And I don't remember if I asked you this.  Was
11  number 3 something you personally were concerned about,
12  or was that one of your colleagues?
13    A.   That was Emily Cummins.
14    Q.   Number 4, Ms. Rowling, is vague and deceptive
15  billing by preferred vendors/contractors, some of whom
16  have no current contract or no contract.  And then
17  there's four examples, a through d.  Do you see that?
18    A.   Uh-huh, yes.
19    Q.   Was that a concern you had in 2018?
20    A.   Those were -- some of those vendors, yes, were
21  my concern.
22    Q.   Do you have any such concerns today about
23  vendors or contractors providing vague and deceptive
24  billing to the NRA?
25    A.   No, I do not.

1    Q.   Are you aware of whether any vendors are
2  operating without a contract?
3    A.   I don't know for sure.  I don't know of any
4  specifically, but I can't speak globally to that.
5    Q.   Who -- who is in charge of the contract
6  management?  I know we've had some questions about
7  whether it's centralized or not, but is there an
8  individual that is in charge of maintaining vendor
9  contracts?
10    A.   Not currently.  As a central location, no, not
11  currently.
12    Q.   Was there someone who had that responsibility?
13    A.   No.
14    Q.   So is there anyone that monitors whether
15  vendors are under a current contract that your --
16    A.   No, we try to -- we try to monitor through the
17  accounts payable process as best we can.
18    Q.   And how does that work?  When you get an
19  invoice, before you pay it is there a database, or how
20  would the payables monitor it?
21    A.   Yeah, we have an Excel spreadsheet at this
22  point that -- that lists all the contracts we have in
23  financial services.  So they can go to that first to see
24  if it's there, and then if it's there -- we're also in
25  the process of trying to actually digitize the contracts

Veritext Legal Solutions
800-336-4000

1 themselves so they can look at a PDF. If not, they can
2 go pull the actual file.
3     Q. And then, Ms. Rowling, on number 5 it's Carry
4 Guard issues. That's a program that's no longer in
5 place. Right?
6     A. That's correct.
7     Q. Okay. Number 6, this is reimbursement of
8 expenses relating to apartments and living expenses
9 beyond HR policy manual stipulations and on a permanent
10 basis, with no contract to support the reimbursement
11 request. Was this a concern you personally had in July
12 of 2008?
13     A. That was probably a joint one, but yes, I was
14 concerned of that area.
15     Q. And were you aware of all four of the
16 individuals listed, a through d, under number 6?
17     A. Yes.
18     Q. Has the NRA done anything, to your knowledge,
19 since July of 2008 to address the concerns you and your
20 colleagues articulated in number 6?
21     A. One thing that Craig did was issue
22 notice to every individual that participated in these --
23 these types of expenses, gave them a timeframe of cut
24 off, and -- and none of those exist at this point.
25     Q. And to follow up on your answer there, are you

1 aware of since July of 2008 any reimbursement expenses
2 relating to apartments and living expenses that were
3 beyond HR policy that were reimbursed?
4     A. I believe, because of the way Craig gave
5 notice, there was a timeframe that -- that still existed
6 with respect to those. I know Doug Hamlin maintained an
7 apartment, but after the fact we learned that that was
8 actually part of his contract, so -- but he longer does
9 either as of -- I believe it was sometime in 2020.
10     Q. And other than Mr. Hamlin, are you aware of
11 any such reimbursement of expenses relating to
12 apartments and living expenses beyond HR policy in 2020?
13     A. No, I'm not aware of any.
14     Q. Do -- do you have any present concern here in
15 2021 about reimbursement of expenses relating to
16 apartments and living expenses that are beyond HR
17 policy?
18     A. No, I do not.
19     Q. Number 7, Ms. Rowling, was purchase of
20 firearms that remained on the books starting in 2005
21 where we have no indication of where the firearms are
22 located, and then in parenthetical, it suggests it's
23 over a million dollars in assets. Do you recall
24 anything about topic number 7 from July of 2008?
25     A. Yes.

1     Q. And was this a concern you personally had, or
2 was this something that your colleagues had raised?
3     A. I believe that was a colleague, but I am aware
4 of the situation.
5     Q. And so -- I mean, obviously, I can read what
6 it says, but what was -- what was the issue? It was
7 that the NRA had purchased firearms that they still
8 showed on the books, but no one knew where the guns
9 actually were?
10     A. That's correct. They were shown as an asset.
11 Since that time, a full accounting of where those
12 firearms are has been done.
13     Q. And again, I just personally don't know. Does
14 the NRA purchase firearms for events and fundraisers or
15 do they have them for like display? Or what is the
16 reason the NRA purchases firearms?
17     A. Some of these were purchased for events. Some
18 were purchased with a -- maybe with Wayne LaPierre's
19 signature on the side or something like that to be able
20 to potentially give to a donor. I mean, there are
21 various reasons for having some of these firearms.
22     Q. Did the NRA -- I think you mentioned -- I
23 don't know if you said audit or investigation, but there
24 was some type of exercise, I understand, in order to
25 locate the firearms. Did I understand that correctly?

1     A. Yes, that's correct.
2     Q. Was that something done internally by NRA
3 personnel, or did an outside organization do that?
4     A. Conversations were had amongst internal
5 personnel that we could finally track down where the --
6 where these firearms were located.
7     Q. And are you aware, Ms. Rowling, of whether
8 that's still an issue, that there are firearms shown on
9 the books but the NRA is not aware of the location for
10 those firearms?
11     A. Not that I'm aware of that there are.
12     Q. Is that an accounting department -- who would
13 be responsible for that? I mean, I know the actual
14 carrying it as an asset is an accounting exercise, but
15 who is actually responsible for tracking the location of
16 the firearms?
17     A. I know that John Frazer helped in this
18 capacity. I'm not sure who else would be, kind of, in
19 charge of that. I know our -- there is an individual
20 that tracks firearms and where they're located with
21 respect to the museum and storage areas. So all of
22 those people were involved in this process.
23     Q. And then the last one, Ms. Rowling, number 8,
24 lack of controls over vehicle leases. Do you recall
25 whether that's a concern you personally had back in

1 2018?

2 A. That was put forth by Lisa George.

3 Q. And what do you recall about Ms. George's

4 concern with respect to vehicle leases?

5 A. That -- that there were instances where

6 individuals were provided vehicles that in the history

7 had not -- would not have qualified to have received a

8 vehicle as part of their job duties.

9 Q. Are you aware of whether the NRA has done

10 anything since July of 2018 to address Ms. George's

11 concern about lack of control over vehicle leases?

12 A. I believe -- well, Ms. George has mentioned to

13 me that Craig was working on an official vehicle policy.

14 I do not believe that has been presented or finalized.

15 Q. And that was going to be my question, is

16 whether you knew whether or not it had been finalized.

17 So just to make sure I understood, as far as you're

18 aware, you don't believe it's been finalized?

19 A. That's correct, I'm not aware.

20 Q. Do you have a sense of kind of how big an

21 issue the vehicle lease problem was?

22 A. It was what was removed from our original

23 list, so some people did not believe it was as big an

24 issue. To us it more stemmed from the individuals that

25 were allowing it to happen, in particular, Josh Powell.

Page 290

---

1 Q. Do you recall, Ms. Rowling, whether these

2 topics were ranked in any type order? Like, do you

3 recall if number 1 was literally the top concern or if

4 they were just in a random order? Do you have any

5 recollection?

6 A. I don't recall whether these were kind of put

7 in a particular order.

8 MR. DRAKE: Ms. Rowling, that's all the

9 questions I have, but I appreciate your time. I know

10 it's been a long time, but I thank you for waiting

11 around and letting me ask a few questions.

12 With that, I'll pass the witness.

13 MR. ACOSTA: I don't have any other

14 questions of the witness, but I guess I need to

15 coordinate some with Veritext.

16 I didn't use all my exhibits, so I don't -- I

17 already made the deposition long enough. I don't want

18 to add to it, so are you going to take care of that,

19 Ms. Brandt?

20 THE REPORTER: Yes, I will only attach

21 the ones that were referred to.

22 MR. ACOSTA: I don't mind everyone having

23 them; it's just I don't want to pay for it.

24 MR. DRAKE: Do we have any more questions

25 for the record? If not, we can probably go off the

Page 291

---

1 record. And then there are probably some logistical

2 questions about exhibits and things like that, but I

3 didn't know if we were off the record or if anybody had

4 questions.

5 MR. ACOSTA: Well, I think we're over

6 time, and being respectful of Ms. Rowling's time, she

7 probably wants to get home. So we can go off the

8 record. She can be dismissed.

9 MS. KOZLOWSKI: Before we go -- before we

10 go off, I do want to confirm that the Office of US

11 Trustee didn't have any further questions or any

12 questions. I'm hopeful not. It's been a long day.

13 MS. YOUNG: Right. This is Liz Young

14 with the US Trustee's Office. I can confirm we do not

15 have any questions for the purposes of today's

16 deposition. Thank you.

17 MS. KOZLOWSKI: Thank you. Thank you

18 very much.

19 All right. With that, I think we can go off

20 the record. Thank you.

21 THE VIDEOGRAPHER: This concludes today's

22 deposition. The time on the video is 7:07 p.m. We are

23 off the record.

24 (Proceedings ended at 7:07 p.m.)

25

Page 292

---

1 CHANGES AND SIGNATURE

2 WITNESS NAME: SONYA ROWLING

3 DATE OF DEPOSITION: MARCH 19, 2021

4 PAGE LINE CHANGE REASON

5 _____

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

Page 293

---

74 (Pages 290 - 293)

1  I, SONYA ROWLING, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5  _____
6      SONYA ROWLING
7
8  THE STATE OF _____)
9  COUNTY OF _____)
10      Before me, _____, on
11  this day personally appeared SONYA ROWLING, known to me
12  (or proved to me under oath or through
13  _____) (description of identity
14  card or other document) to be the person whose name is
15  subscribed to the foregoing instrument and acknowledged
16  to me that they executed the same for the purposes and
17  consideration therein expressed.
18      Given under my hand and seal of office this
19  _____ day of _____, _____.
20
21
22  _____
23      NOTARY PUBLIC IN AND FOR
24      THE STATE OF _____
25
                                    Page 294

1  tgray@gtg.legal
2          March 20, 2021
3  RE: In Re: National Rifle Association Of America And Sea Girt
   LLC
4  DEPOSITION OF: Sonya Rowling (# 4504860)
5      The above-referenced witness transcript is
6  available for read and sign.
7      Within the applicable timeframe, the witness
8  should read the testimony to verify its accuracy. If
9  there are any changes, the witness should note those
10  on the attached Errata Sheet.
11      The witness should sign and notarize the
12  attached Errata pages and return to Veritext at
13  errata-tx@veritext.com.
14      According to applicable rules or agreements, if
15  the witness fails to do so within the time allotted,
16  a certified copy of the transcript may be used as if
17  signed.
18          Yours,
19          Veritext Legal Solutions
20
21
22
23
24
25
                                    Page 296

1  STATE OF TEXAS   )
2  COUNTY OF DALLAS )
3      I, Julie C. Brandt, Certified Shorthand
4  Reporter in and for the State of Texas, certify that the
5  foregoing deposition of SONYA ROWLING was reported
6  stenographically by me remotely via Zoom, said witness
7  having been placed under oath by me, and the deposition
8  is a true record of the testimony given by the witness;
9      That the amount of time used by attorneys at
10  the deposition is as follows:
11      Mr. Sheehan    - 2 hour, 11 minutes
12      Mr. Thompson    - 3 hours, 6 minutes
13      Mr. Acosta     - 1 hour, 30 minutes
14      Mr. Drake      - 48 minutes
15      I further certify that I am neither counsel
16  for, nor related to any party in the cause and am not
17  financially interested in its outcome.
18      In witness whereof, I have subscribed my name
19  this 20th day of March, 2021.
20
21  *Julie C. Brandt*
    Julie C. Brandt, CSR, RMR, CRR
22  TX CSR No. 4018, Exp. 10/31/21
23  Veritext Legal Solutions
    Firm Registration No. 571
24  300 Throckmorton Street, Suite 1600
    Fort Worth, Texas 76102
25  817-336-3042
                                    Page 295

75 (Pages 294 - 296)