## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 21-30085-hdh-11** |
| **NATIONAL RIFLE ASSOCIATION OF** | § | |
| **AMERICA and SEA GIRT LLC,** | § | **CHAPTER 11** |
| | § | |
| Debtors.[1] | § | Jointly Administered |

### DECLARATION OF MONICA CONNELL IN SUPPORT OF THE STATE OF NEW YORK'S MOTION TO PRECLUDE DEBTORS FROM INTRODUCING CERTAIN EVIDENCE AND ELICITING CERTAIN TESTIMONY THEY HAVE SHIELDED FROM DISCOVERY BASED UPON INAPPROPRIATE PRIVILEGE ASSERTIONS

I, Monica Connell, pursuant to 28 U.S.C. § 1746, state:

1. I am a licensed attorney in good standing of the bar of the Supreme Court, Appellate Division, Second Judicial Department of the State of New York. I am authorized pursuant to Bankruptcy Rule 9010 to appear in this Court under L.B.R. 2090-1(f) to represent the People of the State of New York, by Letitia James, Attorney General of the State of New York, who is a party in interest in this proceeding. I am an Assistant Attorney General in the New York State Office of the Attorney General (the "**NYAG**"), a party in interest in the above-referenced bankruptcy case. I have participated in the investigation and related legal proceedings involving the National Rifle Association of America, Inc. ("**NRA**"), including this bankruptcy proceeding.

2. I submit this declaration in support of the NYAG *Motion to Preclude Debtors From Introducing Certain Evidence and Eliciting Certain Testimony They Have Shielded from Discovery Based Upon Inappropriate Privilege Assertions* (the "**Motion**"). The Motion seeks appropriate remedies regarding the improper and overbroad assertion of attorney-client privilege

---

[1] The last four digits of the Debtors' taxpayer identification numbers are: 6130 (NRA) and 5681 (Sea Girt). The Debtors' mailing address is 11250 Waples Mill Road, Fairfax, Virginia 22030.

**DECLARATION OF MONICA CONNELL IN SUPPORT OF THE STATE OF NEW YORK'S MOTION TO COMPEL DISCOVERY DUE TO INAPPROPRIATE PRIVILEGE DESIGNATIONS – PAGE 1**

made by NRA and its wholly-owned shell company Sea Girt LLC ("**Sea Girt**") (collectively, the "**Debtors**").

1.      In preparation for the hearing beginning next Monday, March 23, 2021, the NYAG has vigorously and expeditiously pursued discovery of nonprivileged materials relevant to its *Motion to Dismiss, or, in the Alternative, To Appoint Chapter 11 Trustee* ("**Motion to Dismiss**").

2.      As a part of those discovery efforts, NYAG had obtained the proposed employment agreement for NRA Executive Vice President Wayne LaPierre that was presented to the NRA Board at a January 7, 2021 Board Meeting.  A true and correct copy of the proposed employment agreement is attached as **Exhibit A** to this declaration.

3.      NYAG has also obtained the amended version of the employment agreement that was executed by LaPierre after the Board Meeting on January 7, 2021.  A true and correct copy of the executed employment agreement is attached as **Exhibit B** to this declaration.

4.      On February 15, 2021, Debtors filed in this case an NRA Statement of Financial Affairs (SOFA) for Non-Individuals Filing for Bankruptcy, Form 207, Part 6 No 11, Certain Payments or Transfers - Payments related to bankruptcy ("**NRA Statement**").  A true and correct copy of the NRA Statement is attached as **Exhibit C** to this declaration.

5.      On March 12, 2021, a 341 meeting of creditors occurred regarding this bankruptcy proceeding.  A true and correct copy of excerpts of the transcript of the 341 meeting that took place that day is attached as **Exhibit D** to this declaration.

6.      On March 9, 2021, the news outlet Washington Free Beacon ("**WFB**") published an article regarding the January 7, 2021 NRA Board Meeting that extensively quoted party-in-interest Judge Philip Journey ("**Judge Journey**"), who is an NRA Board Member who attended

**DECLARATION OF MONICA CONNELL IN SUPPORT OF THE STATE OF NEW YORK'S MOTION TO COMPEL DISCOVERY DUE TO INAPPROPRIATE PRIVILEGE DESIGNATIONS – PAGE 2**

DA 2114713.3

the January 7, 2021 meeting. A true and correct copy of the WFB article is attached as **Exhibit E** to this declaration.

7.      As a part of discovery in this proceeding, and on March 18, 2021, Judge Journey was deposed. A true and correct copy of excerpts of the transcript of that deposition is attached as **Exhibit F** to this declaration.

8.      On March 12, 2021, William W. Davis, counsel to the NRA Board, filed a Declaration with this Court in Support of Debtors' *Emergency Motion for Protective Order* regarding Judge Journey's deposition. A true and correct copy of the Declaration is attached as **Exhibit G** to this declaration.

9.      Also as a part of discovery in this proceeding and on March 18, 2021, NRA General Counsel John Frazer was deposed. A true and correct copy of excerpts of the transcript of that deposition is attached as **Exhibit H** to this declaration.

10.     On February 22, 2021, a 341 meeting of creditors occurred regarding this bankruptcy proceeding. A true and correct copy of excerpts of the transcript of the 341 meeting that took place that day is attached as **Exhibit I** to this declaration; however, the transcript reflects that the meeting of creditors occurred on January 22, 2021 based upon announcement of the January 22, 2021 date at the beginning of the meeting.

11.     NYAG has also obtained the current version of the NRA's Bylaws, dated October 2020. A true and correct copy of the Bylaws is attached as **Exhibit J** to this declaration.

12.     Also as a part of discovery in this proceeding and on March 18, 2021, NRA General Counsel John Frazer was deposed. A true and correct copy of excerpts of the transcript of that deposition is attached as **Exhibit K** to this declaration.

13. I declare, under penalty of perjury, that the foregoing is true and correct.

**DECLARATION OF MONICA CONNELL IN SUPPORT OF THE STATE OF NEW YORK'S MOTION TO COMPEL DISCOVERY DUE TO INAPPROPRIATE PRIVILEGE DESIGNATIONS – PAGE 3**

DA 2114713.3

Executed on this day March 26, 2021.

*/s/ Monica Connell*
Monica Connell, Esq.

*Copy 1*

# EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT is made by and between the National Rifle Association of America (the "NRA" or the "Association") and Wayne R. LaPierre ("Employee").

1.  <u>Employment</u>. The Association hereby employs Employee, and Employee hereby accepts employment with the Association, upon the terms and conditions hereinafter set forth. Terms used herein that are also used in the Bylaws of the Association shall have the same meaning ascribed to them in the Bylaws of the Association.

2.  Duties and Compensation.

    (a)     Employee shall serve as the Executive Vice President of the Association and shall direct all the affairs of the Association in accordance with the programs and policies established by the Board of Directors. Among his authorities, Employee shall be empowered to exercise corporate authority in furtherance of the mission and interests of the NRA, including without limitation to reorganize or restructure the affairs of the Association for purposes of cost-minimization, regulatory compliance or otherwise. Employee shall devote his full time to performing the customary duties of such position and such other commensurate duties as may be assigned from time to time by the Board of Directors. Employee agrees to abide by the reasonable rules, regulations, instructions, personnel practices, employment manuals, and policies of the Association, as they may exist or be modified from time to time by the Association.

    (b)     Employee shall be compensated by the Association for all services to be rendered pursuant to this Agreement, as follows:

        (1)     The Association shall pay Employee a base salary at the rate of $1,300,000 per year (the "Base Salary").

        (2)     The Association shall review the Base Salary at least annually. The Association may recommend changes to the Base Salary which the Officers Compensation Committee of the Board of Directors of the Association (the "OCC") reasonably determines to be in the best interest of the Association, taking into account Employee's performance, input obtained from independent compensation consultants, and other relevant factors. Employee's consent to any salary modification recommended by the OCC shall not be unreasonably withheld.

        (3)     Employee shall be eligible for an annual performance bonus determined at the sole discretion of the OCC (provided, however, that any performance bonus recommended by the OCC must be approved by the full Board of Directors of the Association).

    (c)     The Association shall provide the Employee with the following benefits:

        (1)     Paid vacation time as customarily provided to the Association's other comparable employees;

        (2)     Paid holidays as customarily provided to the Association's other comparable employees;

        (3)     Life insurance as customarily provided to the Association's other comparable employees;

    (d)     Medical and/or dental coverage as may be provided by the Association in

1

**EXHIBIT A**

its sole discretion.

      (e)    Reimbursement for all reasonable expenses incurred by Employee during the term of this Agreement for advancing the Association's business, provided that such expenses comply with, and are documented and submitted pursuant to, applicable NRA policies and guidelines.

      (f)    Employee's eligibility for any benefit provided herein shall be subject to Employee's compliance with the reasonable requests of, and to Employee's meeting the underwriting criteria used by, any insurance company providing any of the benefits specified herein to the Association's employees. Employee agrees to submit to any medical examination and to provide and complete any documentation (including medical records) required by any such insurance company. All benefits provided for hereunder are taxable to Employee to the extent required by applicable tax laws.

      3.    <u>Term of Employment</u>. Employee was elected to his present employment on October 24, 2020, and shall serve until the expiration of his elected term in accordance with the NRA Bylaws. This Employment Agreement, once executed, shall become effective immediately upon authorization by the NRA Board of Directors, and shall terminate effective immediately if the NRA declines to re-elect Employee to the position of Executive Vice President at the next annual election pursuant to NRA Bylaws Art. V, Sec. 1, and may additionally be terminated by the Association:

      (a)    Upon 10 days written notice for Cause (as defined below); or

      (b)    Effective immediately upon Employee's death or disability.

For purposes of this Paragraph 3, "Cause" shall mean: (i) material failure to perform the duties of Employee's position; (ii) fraud, misappropriation, embezzlement or acts of similar dishonesty; (iii) conviction of a felony involving moral turpitude; (iv) illegal use of drugs or excessive use of alcohol in the workplace; (v) intentional and willful misconduct that may subject the NRA to criminal or civil liability; (vi) breach of Employee's duty of loyalty by diversion or usurpation of corporate opportunities properly belonging to the NRA; or (vii) any material breach of this Agreement.

      4.    <u>Confidentiality and Noncompetition</u>. In consideration of the employment of Employee by the Association, Employee agrees as follows:

      (a)    Employee shall not, during the period of his employment with the Association or at any time thereafter, regardless of the reason for the cessation of his employment: (1) use any Confidential Information (as hereinafter defined) for his own benefit or for the benefit of any person or entity other than the Association; (2) disclose to any other person or entity any Confidential Information; or (3) remove from the Association's premises or make copies of any Confidential Information, in any form; except, in each case, as may be required within the scope of Employee's duties during the course of his employment by the Association.

      (b)    Upon termination of employment, or at any such time as the Association may request, Employee will deliver to the Association all copies in his possession of any Confidential Information, in any form. Employee shall not at any time assert any rights in or with respect to any Confidential Information.

      (c)    "Confidential Information" means (i) any and all specifications, drawings, designs, techniques, processes, know-how, research, customer lists, customer needs, prices, costs

**EXHIBIT A**

and marketing, sales and financial information, and (ii) any similar or other trade secret or confidential information of the Association or any member, vendor, supplier, distributor, or customer of the Association, regardless of how acquired or developed by the Association or any such member, vendor, supplier, distributor, or customer, concerning any of their respective businesses, policies, research, processes, inventions, products, business operations or business methods. Confidential Information does not include information, knowledge, or data which Employee can prove was in his possession prior to the commencement of employment with the Association or information, knowledge, or data which was or is in the public domain by reason other than the wrongful acts of Employee.

(d)     In the event that Employee is required by applicable law, regulation or legal process to disclose any Confidential Information, Employee shall promptly notify the Association in writing so that the Association may seek a protective order or other appropriate remedy; moreover, Employee shall cooperate reasonably with the Association to facilitate the Association's efforts to prevent or limit disclosure and assert any applicable privileges. Nothing herein shall be deemed to prevent Employee from honoring a subpoena (or governmental order) that seeks discovery of Confidential Information if (a) a motion for a protective order, motion to quash and/or other motion filed to prevent the production or disclosure of the Confidential Information has been denied or is not made; provided, however, that the Employee may disclose only that particular Confidential Information which Employee's legal counsel advises is legally required and that Employee exercises commercially reasonable efforts to preserve the confidentiality of all other Confidential Information; or (b) the Association consents to the disclosure in writing.

(e)     During the period of employment with the Association and for two (2) years thereafter, Employee shall not, for himself or on behalf of any other person or entity, in any way compete with the business then done or intended to be done by the Association, including calling upon any current, former or potential member, vendor or customer of the Association for the purpose of soliciting or providing to any such individual or entity any products or services which are the same as or similar to those provided or intended to be provided by the Association.

5.     Option to License Name and Likeness; Post-Employment Services. For a period of two (2) years commencing upon termination of Employee's employment pursuant to this Agreement (the "Post-Employment Period"), the Association may, at its sole option:

(a) Utilize Employee's name, likeness, and signature for fundraising, public relations, and membership purposes; provided, however, that (i) the Association shall exercise such option in good faith and shall not deploy Employee's name, likeness, or signature in any manner which the Association reasonably foresees may harm Employee's reputation, and (ii) the Association shall pay Employee a reasonable royalty in exchange for such use, not to exceed $500,000 per calendar year.

(b) Engage Employee for in-person public appearances, for which Employee will be compensated at a rate of $750 per hour.

6.     Intellectual Property. Employee agrees that any intellectual property developed during the term of this Agreement, including, without limitation, trademarks, copyrights, and patents ("Intellectual Property"), and any products, processes, know-how, inventions or devices, or any improvements to any of the foregoing whether patentable or not ("Inventions"), discovered or developed during the course of his employment with the Association which are (i) related to the Association's business; (ii) in the course of development by the Association; or (iii) made with the

**EXHIBIT A**

use of the Association's time, materials or facilities, shall belong to the Association. Employee hereby assigns and transfers to the Association all right, title, and interest to any and all such Intellectual Property and Inventions.

7.    Injunctive Relief. In the event of a breach or threatened breach of any of the terms of this Agreement, the Association shall be entitled to an injunction restraining Employee from committing any breach of this Agreement without showing or proving any actual damages and without diminishing any other right or remedy which the Association may have at law or in equity to enforce the provisions of this Agreement. Employee waives any right Employee may have to require the Association to post a bond or other security with respect to obtaining or continuing any injunction or temporary restraining order, releases the Association and its officers and directors from, and waives any claim for, damages against them which Employee may have with respect to the Association's obtaining any injunction or restraining order pursuant to this Agreement, and waives any claim that the Association has an adequate remedy at law.

8.    General Terms.

(a)    Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties hereto, their personal representatives, and permitted successors, and assigns.

(b)    Assignment. This Agreement may not be assigned, in whole or in part, by any party hereto without the prior written consent of all other parties.

(c)    Entire Agreement. This Agreement contains the entire understanding between the parties hereto and supersedes any prior understanding, memoranda, or other written or oral agreements between them respecting the within subject matter. There are no representations, agreements, arrangements, or understandings, oral or written, between the parties relating to the subject matter of this Agreement which are not fully expressed herein.

(d)    Modifications; Waiver. No modification or waiver of this Agreement or any part hereof shall be effective unless in writing and signed by the party or parties sought to be charged therewith. No waiver of any breach or condition of this Agreement shall be deemed to be a waiver of any other or subsequent breach or condition, whether of like or different nature.

(e)    No Third-Party Beneficiary. None of the provisions of this Agreement shall be for the benefit of, or enforceable by, any person or entity not a party hereto.

(f)    Partial Invalidity. If any provision of this Agreement shall be held invalid or unenforceable by competent authority, such provision shall be construed so as to be limited or reduced to be enforceable to the maximum extent compatible with the law as it shall then appear. The total invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

(g)    Notices. Any notice or other communication required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given if it is delivered, either personally, by facsimile transmission, or by registered, certified or express mail, return receipt requested, postage prepaid, to the address for such party specified below or to such other address as the party may from time to time advise the other party, and shall be deemed given and received as actual personal delivery, on the first business day after the date of delivery shown on any such facsimile transmission or upon the date of actual receipt shown on any return receipt if registered, certified or express mail is used, as the case may be.

**EXHIBIT A**

Notice to the National Rifle Association of America shall be sent to:

> John Frazer, Esq.
> General Counsel
> National Rifle Association of America
> 11250 Waples Mill Road
> Fairfax, VA 22030

with a copy to:

> William A. Brewer, III, Esq.
> Brewer Attorneys & Counselors
> 750 Lexington Avenue, 14th Floor
> New York, NY 10022

Notice to Wayne R. LaPierre shall be sent to:

> Wayne R. LaPierre
> Executive Vice President
> National Rifle Association of America
> 11250 Waples Mill Road
> Fairfax, VA 22030

with a copy to:

> P. Kent Correll, Esq.
> Correll Law Group
> 250 Park Avenue, 7th Floor
> New York, NY 10177.

     (h)    <u>Arbitration</u>. In the event that any disagreement or dispute should arise between the parties hereto with respect to this Agreement or Employee's tenure at the NRA, then such disagreement or dispute shall be submitted to arbitration in accordance with the rules then pertaining to the American Arbitration Association with respect to commercial disputes. Judgment upon any resulting award may, after its rendering, be entered in any court of competent jurisdiction by any party.

     (i)    <u>Effect of Termination</u>. Unless otherwise specifically agreed in writing, the terms of Paragraphs 4, 5, 6, 7 and 8shall survive any termination, cancellation, repudiation, or rescission of this Agreement, and under such circumstances the parties may continue to enforce such terms as if this Agreement were otherwise in full force and effect.

     (j)    <u>Headings</u>. The headings contained in this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

     (k)    <u>Fair Meaning</u>. This Agreement shall be construed according to its fair meaning, the language used shall be deemed the language chosen by the parties hereto to express their mutual intent, and no presumption or rule of strict construction will be applied against any

**EXHIBIT A**

party hereto.

(l)     Gender. Whenever the context may require, any pronoun used herein shall include the corresponding masculine, feminine, or neuter forms and the singular of nouns, pronouns, and verbs shall include the plural and vice versa.

(m)     Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed an original, and all of said counterparts together shall constitute but one and the same instrument.

(n)     Further Assurances. The parties hereto shall execute and deliver any and all additional writings, instruments, and other documents and shall take all such further actions as shall be reasonably required in order to effect the terms and conditions of this Agreement.

**EXHIBIT A**

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement as of January __, 2020.

ASSOCIATION:


By:_____
Name:
Title:




EMPLOYEE:

*Wayne R. LaPierre*

**EXHIBIT A**

# EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT is made by and between the National Rifle Association of America (the "NRA" or the "Association") and Wayne R. LaPierre ("Employee").

1. <u>Employment</u>. The Association hereby employs Employee, and Employee hereby accepts employment with the Association, upon the terms and conditions hereinafter set forth. Terms used herein that are also used in the Bylaws of the Association shall have the same meaning ascribed to them in the Bylaws of the Association.

2. <u>Duties and Compensation</u>.

(a) Employee shall serve as the Executive Vice President of the Association and shall direct all the affairs of the Association in accordance with the programs and policies established by the Board of Directors. Among his authorities, Employee shall be empowered to exercise corporate authority in furtherance of the mission and interests of the NRA, including without limitation to reorganize or restructure the affairs of the Association for purposes of cost-minimization, regulatory compliance or otherwise. Employee shall devote his full time to performing the customary duties of such position and such other commensurate duties as may be assigned from time to time by the Board of Directors. Employee agrees to abide by the reasonable rules, regulations, instructions, personnel practices, employment manuals, and policies of the Association, as they may exist or be modified from time to time by the Association.

(b) Employee shall be compensated by the Association for all services to be rendered pursuant to this Agreement, as follows:

(1) The Association shall pay Employee a base salary at the rate of $1,300,000 per year (the "Base Salary").

(2) The Association shall review the Base Salary at least annually. The Association may recommend changes to the Base Salary which the Officers Compensation Committee of the Board of Directors of the Association (the "OCC") reasonably determines to be in the best interest of the Association, taking into account Employee's performance, input obtained from independent compensation consultants, and other relevant factors. Employee's consent to any salary modification recommended by the OCC shall not be unreasonably withheld.

(3) Employee shall be eligible for an annual performance bonus determined at the sole discretion of the OCC (provided, however, that any performance bonus recommended by the OCC must be approved by the full Board of Directors of the Association).

(c) The Association shall provide the Employee with the following benefits:

(1) Paid vacation time as customarily provided to the Association's other comparable employees;

(2) Paid holidays as customarily provided to the Association's other comparable employees;

(3) Life insurance as customarily provided to the Association's other comparable employees;

(d) Medical and/or dental coverage as may be provided by the Association in

1

**EXHIBIT B**

its sole discretion.

(e)    Reimbursement for all reasonable expenses incurred by Employee during the term of this Agreement for advancing the Association's business, provided that such expenses comply with, and are documented and submitted pursuant to, applicable NRA policies and guidelines.

(f)    Employee's eligibility for any benefit provided herein shall be subject to Employee's compliance with the reasonable requests of, and to Employee's meeting the underwriting criteria used by, any insurance company providing any of the benefits specified herein to the Association's employees. Employee agrees to submit to any medical examination and to provide and complete any documentation (including medical records) required by any such insurance company. All benefits provided for hereunder are taxable to Employee to the extent required by applicable tax laws.

3.    <u>Term of Employment</u>. Employee was elected to his present employment on October 24, 2020, and shall serve until the expiration of his elected term in accordance with the NRA Bylaws. This Employment Agreement, once executed, shall become effective immediately upon authorization by the NRA Board of Directors, and shall terminate effective immediately if the NRA declines to re-elect Employee to the position of Executive Vice President at the next annual election pursuant to NRA Bylaws Art. V, Sec. 1, and may additionally be terminated by the Association:

(a)    Upon 10 days written notice for Cause (as defined below); or

(b)    Effective immediately upon Employee's death or disability.

For purposes of this Paragraph 3, "Cause" shall mean: (i) material failure to perform the duties of Employee's position; (ii) fraud, misappropriation, embezzlement or acts of similar dishonesty; (iii) conviction of a felony involving moral turpitude; (iv) illegal use of drugs or excessive use of alcohol in the workplace; (v) intentional and willful misconduct that may subject the NRA to criminal or civil liability; (vi) breach of Employee's duty of loyalty by diversion or usurpation of corporate opportunities properly belonging to the NRA; or (vii) any material breach of this Agreement.

4.    <u>Confidentiality and Noncompetition</u>. In consideration of the employment of Employee by the Association, Employee agrees as follows:

(a)    Employee shall not, during the period of his employment with the Association or at any time thereafter, regardless of the reason for the cessation of his employment: (1) use any Confidential Information (as hereinafter defined) for his own benefit or for the benefit of any person or entity other than the Association; (2) disclose to any other person or entity any Confidential Information; or (3) remove from the Association's premises or make copies of any Confidential Information, in any form; except, in each case, as may be required within the scope of Employee's duties during the course of his employment by the Association.

(b)    Upon termination of employment, or at any such time as the Association may request, Employee will deliver to the Association all copies in his possession of any Confidential Information, in any form. Employee shall not at any time assert any rights in or with respect to any Confidential Information.

(c)    "Confidential Information" means (i) any and all specifications, drawings, designs, techniques, processes, know-how, research, customer lists, customer needs, prices, costs

2

**EXHIBIT B**

and marketing, sales and financial information, and (ii) any similar or other trade secret or confidential information of the Association or any member, vendor, supplier, distributor, or customer of the Association, regardless of how acquired or developed by the Association or any such member, vendor, supplier, distributor, or customer, concerning any of their respective businesses, policies, research, processes, inventions, products, business operations or business methods. Confidential Information does not include information, knowledge, or data which Employee can prove was in his possession prior to the commencement of employment with the Association or information, knowledge, or data which was or is in the public domain by reason other than the wrongful acts of Employee.

(d) In the event that Employee is required by applicable law, regulation or legal process to disclose any Confidential Information, Employee shall promptly notify the Association in writing so that the Association may seek a protective order or other appropriate remedy; moreover, Employee shall cooperate reasonably with the Association to facilitate the Association's efforts to prevent or limit disclosure and assert any applicable privileges. Nothing herein shall be deemed to prevent Employee from honoring a subpoena (or governmental order) that seeks discovery of Confidential Information if (a) a motion for a protective order, motion to quash and/or other motion filed to prevent the production or disclosure of the Confidential Information has been denied or is not made; provided, however, that the Employee may disclose only that particular Confidential Information which Employee's legal counsel advises is legally required and that Employee exercises commercially reasonable efforts to preserve the confidentiality of all other Confidential Information; or (b) the Association consents to the disclosure in writing.

(e) During the period of employment with the Association and for two (2) years thereafter, Employee shall not, for himself or on behalf of any other person or entity, in any way compete with the business then done or intended to be done by the Association, including calling upon any current, former or potential member, vendor or customer of the Association for the purpose of soliciting or providing to any such individual or entity any products or services which are the same as or similar to those provided or intended to be provided by the Association.

5. <u>Option to License Name and Likeness; Post-Employment Services</u>. For a period of two (2) years commencing upon termination of Employee's employment pursuant to this Agreement (the "Post-Employment Period"), the Association may, at its sole option:

(a) Utilize Employee's name, likeness, and signature for fundraising, public relations, and membership purposes; provided, however, that (i) the Association shall exercise such option in good faith and shall not deploy Employee's name, likeness, or signature in any manner which the Association reasonably foresees may harm Employee's reputation, and (ii) the Association shall pay Employee a reasonable royalty in exchange for such use, not to exceed $500,000 per calendar year.

(b) Engage Employee for in-person public appearances, for which Employee will be compensated at a rate of $750 per hour.

6. <u>Intellectual Property</u>. Employee agrees that any intellectual property developed during the term of this Agreement, including, without limitation, trademarks, copyrights, and patents ("Intellectual Property"), and any products, processes, know-how, inventions or devices, or any improvements to any of the foregoing whether patentable or not ("Inventions"), discovered or developed during the course of his employment with the Association which are (i) related to the Association's business; (ii) in the course of development by the Association; or (iii) made with the

**EXHIBIT B**

use of the Association's time, materials or facilities, shall belong to the Association. Employee hereby assigns and transfers to the Association all right, title, and interest to any and all such Intellectual Property and Inventions.

      7.    <u>Injunctive Relief</u>. In the event of a breach or threatened breach of any of the terms of this Agreement, the Association shall be entitled to an injunction restraining Employee from committing any breach of this Agreement without showing or proving any actual damages and without diminishing any other right or remedy which the Association may have at law or in equity to enforce the provisions of this Agreement. Employee waives any right Employee may have to require the Association to post a bond or other security with respect to obtaining or continuing any injunction or temporary restraining order, releases the Association and its officers and directors from, and waives any claim for, damages against them which Employee may have with respect to the Association's obtaining any injunction or restraining order pursuant to this Agreement, and waives any claim that the Association has an adequate remedy at law.

      8.    <u>General Terms</u>.

      (a)    <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto, their personal representatives, and permitted successors, and assigns.

      (b)    <u>Assignment</u>. This Agreement may not be assigned, in whole or in part, by any party hereto without the prior written consent of all other parties.

      (c)    <u>Entire Agreement</u>. This Agreement contains the entire understanding between the parties hereto and supersedes any prior understanding, memoranda, or other written or oral agreements between them respecting the within subject matter. There are no representations, agreements, arrangements, or understandings, oral or written, between the parties relating to the subject matter of this Agreement which are not fully expressed herein.

      (d)    <u>Modifications; Waiver</u>. No modification or waiver of this Agreement or any part hereof shall be effective unless in writing and signed by the party or parties sought to be charged therewith. No waiver of any breach or condition of this Agreement shall be deemed to be a waiver of any other or subsequent breach or condition, whether of like or different nature.

      (e)    <u>No Third-Party Beneficiary</u>. None of the provisions of this Agreement shall be for the benefit of, or enforceable by, any person or entity not a party hereto.

      (f)    <u>Partial Invalidity</u>. If any provision of this Agreement shall be held invalid or unenforceable by competent authority, such provision shall be construed so as to be limited or reduced to be enforceable to the maximum extent compatible with the law as it shall then appear. The total invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

      (g)    <u>Notices</u>. Any notice or other communication required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given if it is delivered, either personally, by facsimile transmission, or by registered, certified or express mail, return receipt requested, postage prepaid, to the address for such party specified below or to such other address as the party may from time to time advise the other party, and shall be deemed given and received as actual personal delivery, on the first business day after the date of delivery shown on any such facsimile transmission or upon the date of actual receipt shown on any return receipt if registered, certified or express mail is used, as the case may be.

**EXHIBIT B**

Notice to the National Rifle Association of America shall be sent to:

> John Frazer, Esq.
> General Counsel
> National Rifle Association of America
> 11250 Waples Mill Road
> Fairfax, VA 22030

with a copy to:

> William A. Brewer, III, Esq.
> Brewer Attorneys & Counselors
> 750 Lexington Avenue, 14th Floor
> New York, NY 10022

Notice to Wayne R. LaPierre shall be sent to:

> Wayne R. LaPierre
> Executive Vice President
> National Rifle Association of America
> 11250 Waples Mill Road
> Fairfax, VA 22030

with a copy to:

> P. Kent Correll, Esq.
> Correll Law Group
> 250 Park Avenue, 7th Floor
> New York, NY 10177.

(h)     Arbitration. In the event that any disagreement or dispute should arise between the parties hereto with respect to this Agreement or Employee's tenure at the NRA, then such disagreement or dispute shall be submitted to arbitration in accordance with the rules then pertaining to the American Arbitration Association with respect to commercial disputes. Judgment upon any resulting award may, after its rendering, be entered in any court of competent jurisdiction by any party. **The place of arbitration, and the forum and venue for enforcement of any award, shall be Dallas, Texas.**

**(i)     Governing Law. This Agreement, and all claims or causes of action (whether in contract, tort or statute) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any alleged representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), or which otherwise arise out of or relate to Employee's employment by the NRA, shall be governed by, and enforced in accordance with, the internal laws of the State of Texas, without giving effect to conflict-of-laws principles thereof. This document shall be**

5

**EXHIBIT B**

construed as a contract negotiated and executed in the State of Texas.

      (j)    <u>Effect of Termination</u>. Unless otherwise specifically agreed in writing, the terms of Paragraphs 4, 5, 6, 7 and 8 shall survive any termination, cancellation, repudiation, or rescission of this Agreement, and under such circumstances the parties may continue to enforce such terms as if this Agreement were otherwise in full force and effect.

      (k)    <u>Headings</u>. The headings contained in this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

      (l)    <u>Fair Meaning</u>. This Agreement shall be construed according to its fair meaning, the language used shall be deemed the language chosen by the parties hereto to express their mutual intent, and no presumption or rule of strict construction will be applied against any party hereto.

      (m)    <u>Gender</u>. Whenever the context may require, any pronoun used herein shall include the corresponding masculine, feminine, or neuter forms and the singular of nouns, pronouns, and verbs shall include the plural and vice versa.

      (n)    <u>Counterparts</u>. This Agreement may be executed in several counterparts, each of which shall be deemed an original, and all of said counterparts together shall constitute but one and the same instrument.

      (o)    <u>Further Assurances</u>. The parties hereto shall execute and deliver any and all additional writings, instruments, and other documents and shall take all such further actions as shall be reasonably required in order to effect the terms and conditions of this Agreement.

**EXHIBIT B**

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement as of January __, 2020.

ASSOCIATION:

By: _____

Name: CHARLES L COTTON

Title: First Vice-President

EMPLOYEE:

_____

Wayne R. LaPierre

**EXHIBIT B**

National Rifle Association of America
Statement of Financial Affairs (SOFA) for Non-Individuals Filing for Bankruptcy
Form 207
Part 6 No. 11
Certain Payments or Transfers - Payments related to bankruptcy

This schedule only includes payments of money or other transfers of property made by the debtor or person acting on behalf of the debtor within 1 year before the filing related to the debt consolidation or restructuring, seeking bankruptcy relief or filing a bankruptcy case. We have not included amounts unrelated to debt consolidation or restructuring, seeking bankruptcy relief, or filing a bankruptcy case herein.

| Who was paid or who received the transfer? | If not money, describe any property transferred | Date of Payment | Amount | Address | Email or website address | Who Paid, if not debtor? |
|---|---|---|---|---|---|---|
| Brewer, Attorneys & Counselors | Not applicable | 10/22/2020 | $160,020.00 | 1717 Main Street, Suite 5900 Dallas, TX 75201 | mim@brewerattorneys.com | |
| Brewer, Attorneys & Counselors | Not applicable | 11/19/2020 | $35,587.50 | 1717 Main Street, Suite 5900 Dallas, TX 75201 | mim@brewerattorneys.com | |
| Brewer, Attorneys & Counselors [1] | Not applicable | 12/3/2020 | $500,000.00 | 1717 Main Street, Suite 5900 Dallas, TX 75201 | mim@brewerattorneys.com | |
| Nelligan LLP [2] | Not applicable | 12/3/2020 | $350,000.00 | 325 North St. Paul Street, # 3600 Dallas, TX 75201 | pnelligan@nelliganlaw.com | |
| Brewer, Attorneys & Counselors [4] | Not applicable | 12/17/2020 | $86,859.38 | 1717 Main Street, Suite 5900 Dallas, TX 75201 | mim@brewerattorneys.com | |
| Brewer, Attorneys & Counselors [3][4] | Not applicable | 1/6/2021 | $5,000,000.00 | 1717 Main Street, Suite 5900 Dallas, TX 75201 | mim@brewerattorneys.com | |
| Nelligan LLP [2] | Not applicable | 1/8/2021 | $98,600.00 | 325 North St. Paul Street, # 3600 Dallas, TX 75201 | pnelligan@nelliganlaw.com | |
| Nelligan LLP [2] | Not applicable | 1/14/2021 | $1,000,000.00 | 325 North St. Paul Street, # 3600 Dallas, TX 75201 | pnelligan@nelliganlaw.com | |
| Marshall Smith [5] | Not applicable | 1/14/2021 | $60,000.00 | 18640 Olinda Trail N Marine on Saint Croix, MN 55047 | marschall.smith@gmail.com | |
| Brewer, Attorneys & Counselors [6] | Not applicable | 1/14/2021 | $209,741.88 | 1717 Main Street, Suite 5900 Dallas, TX 75201 | mim@brewerattorneys.com | |
| Brewer, Attorneys or Counselors | Not applicable | 1/14/2021 | $302,373.75 | 1717 Main Street, Suite 5900 Dallas, TX 75201 | mim@brewerattorneys.com | |

[1] On 12/3/2020, the NRA transferred $500,000 to Brewer, Attorneys & Counselors for payment of restructuring related expenses.

[2] This payment was made out of funds transferred to Brewer, Attorneys & Counselors by the NRA for payment of third party expenses.

[3] On 1/6/2021, the NRA transferred $5,000,000 to Brewer, Attorneys & Counselors, to be held in trust, for payment of NRA expenses, both restructuring and non-restructuring, including a retainer to Brewer, Attorneys & Counselors.

[4] Post-petition, no portion of the retainer paid to Brewer, Attorneys & Counselors has been or will be withdrawn unless such withdrawal complies with all applicable laws, rules, and court orders.

[5] Mr. Smith refunded the $60,000 on 2/5/2021. The refunded amount was placed in Brewer, Attorneys & Counselors' trust account for the debtors benefit.

[6] This payment was made to Brewer, Attorneys & Counselors by the NRA for pre-bankruptcy services provided by Brewer Attorneys & Counselors.

* All payments were made from debtors funds. Certain payments were made to Brewer, Attorneys & Counselors with the intent that those funds be transferred to third parties. This schedule shows amounts paid by debtors for services provided by Brewer, Attorneys & Counselors prior to the bankruptcy filings that were related to debt consolidation or restructuring, seeking bankruptcy relief, or filing a bankruptcy case. Those amounts totaled $794,582.50. Debtors also paid $2,551,009.57 to Brewer, Attorneys & Counselors for a retainer for services to be provided after the bankruptcy filings. This schedule does not include amounts paid to Brewer, Attorneys & Counselors during the 1 year prior to the bankruptcy filings for services provided by Brewer, Attorneys & counselors unrelated to debt consolidation or restructuring, seeking bankruptcy relief, or filing a bankruptcy case.

EXHIBIT C

1

2

3

4

5

6

7      ------------------------------------

8           TRANSCRIPTION OF AUDIO FILE

9     341 MEETINGS OF CREDITORS (CONTINUED)

10             SEA GIRT, LLC

11        BANKRUPTCY CASE NO. 21-30080

12                  AND

13   NATIONAL RIFLE ASSOCIATION OF AMERICA

14        BANKRUPTCY CASE NO. 21-30085

15             MARCH 12, 2021

16      ------------------------------------

17

18

19

20

21

22

23

24

25

1          MR. BUNCHER:  All right.  Objection, calls

2  for attorney-client communication.  Instruct the

3  witnesses not to re -- to respond.  The question --

4          THE U.S. TRUSTEE:  (Inaudible) --

5          MR. BUNCHER:  -- necessarily -- the -- the

6  question necessarily would lead to disclosure of

7  privileged communications.

8          MR. KATHMAN:  Okay.  And, Mr. Buncher, just

9  to clarify the record, are you instructing the witnesses

10 not to answer?

11         MR. BUNCHER:  I just did.  Yes.

12         MR. KATHMAN:  All right.  And are the

13 witnesses taking the attorney's advice and not answering

14 the question?

15         MR. FRAZER:  I am.

16         MR. KATHMAN:  All right.  Mr. Frazer --

17         THE U.S. TRUSTEE:  Wait.  Let's go back --

18         MR. KATHMAN:  -- you're not going to

19 take (phonetic) --

20         THE U.S. TRUSTEE:  Let's -- let's go back.

21 Can we reach an agreement that this can be discussed to

22 the extent it was in the general board meeting and not

23 in the Executive Session?

24         MR. BUNCHER:  Well --

25         MR. KATHMAN:  Yeah.  My question was,

1  actually, more specific.  It just said, Were the words

2  "bankruptcy" or "Chapter 11" ever said during the

3  January 7th board meeting, including the Executive

4  Session.  So I can break that up, if you would like,

5  Lisa.

6              THE U.S. TRUSTEE:  Yes --

7              MR. BUNCHER:  I think --

8              THE U.S. TRUSTEE:  -- I think you should.

9              MR. BUNCHER:  I think you are going to

10 get -- need to get more specific so that it's clear on

11 the record.

12             MR. KATHMAN:  Okay.  I -- I'll -- I'll --

13 I'll ask more specific.

14             Were the words "bankruptcy" or "Chapter 11"

15 ever said during the January 7 -- during the January 7th

16 board meeting outside of the Executive Session?

17             MR. BUNCHER:  Okay.  Object to the

18 question, to the extent answering it would reveal

19 communications by counsel or with counsel.

20             But if there -- if you can answer the

21 question as to whether any discussion of those topics

22 occurred, other than with counsel at the meeting, you

23 can answer that part of the question.

24             MR. FRAZER:  Well, counsel -- well, several

25 counsel were present throughout the meeting.  But I

1  think I can say that I don't re -- and -- and -- and,

2  you know, I haven't gone back and looked for this in the

3  transcripts, but I -- I do not recall those words being

4  used in any of the -- in any of the open sessions of the

5  meetings.

6             MR. KATHMAN:  And, Mr. Frazer, I want to

7  ask you about that.  You said "transcripts."  Are there

8  actual transcripts of the meeting that occurred?

9             MR. FRAZER:  For the open sessions, yes.

10            MR. KATHMAN:  Okay.  I'd request a copy

11 of those transcripts.  I suspect there may be a few

12 other people that may want those.  Now, let me ask a

13 second question:  Were the words "bankruptcy" or

14 "Chapter 11" -- were the words "bankruptcy" or

15 "Chapter 11" ever said during -- in the Executive

16 Session of the January 7th board meeting?

17            MR. BUNCHER:  All right.  And -- and I'm

18 going to object that that, necessarily, calls for

19 disclosure of attorney-client communications.  Because,

20 as you have already established on the record, Counsel

21 for the Board and the company was in both Executive

22 Sessions, at which resolutions regarding Mr. LaPierre's

23 employment contract and the authority of the SLC were

24 discussed.

25            So, Mr. Frazer, I instruct you not to

1   answer the question if it would reveal attorney-client

2   communication.

3               MR. KATHMAN:  And, Mr. Frazer, are you

4   taking your attorney's -- or the -- the company's

5   attorney's advice not to answer the question?

6               MR. FRAZER:  Well, let me ask you, can you

7   restate the question?

8               MR. KATHMAN:  Sure.  The question is:  Were

9   the words "bankruptcy" or "Chapter 11" ever said during

10  any part -- or during any Executive Session of the

11  January 7th board meeting?

12              MR. BUNCHER:  And the same objection and

13  instruction, Mr. Frazer.

14              MR. FRAZER:  So the -- so your -- since

15  we're not in the same room, your -- your instruction

16  is -- is -- is -- can you -- can you repeat it?  I'm

17  sorry, Doug -- I'm sorry, Mr. Buncher.

18              MR. BUNCHER:  To the extent an answer

19  to that question would reveal the substance of

20  attorney-client communications occurring during the

21  Executive Sessions, I would instruct you not to answer.

22              MR. FRAZER:  Okay.  To -- to my

23  recollection, I -- I did not hear those phrases during

24  the Executive Session that I atte -- that I -- for which

25  I was present.

NRA Board to Hold Emergency Hearing Amid Bankruptcy Turmoil | Washington Free Beacon

SUBSCRIBE TO OUR MORNING BEACON NEWSLETTER

STORE

GUNS

## NRA Board to Hold Emergency Hearing Amid Bankruptcy Turmoil

Board member says lawyers mislead the board, LaPierre mislead the court



Getty Images

Stephen Gutowski - MARCH 9, 2021 5:00 AM

The National Rifle Association will hold a special meeting on the group's bankruptcy in Dallas on Sunday amid private grumblings from board members who claim the group's lawyers intentionally left them in the dark, according to a notice obtained by the *Washington Free Beacon.*

NRA leaders will brief the board about its bankruptcy strategy, which was sold to board members as a way to avoid dissolution at the hands of the New York attorney general, according to an official notice sent to board members on March 2. NRA president Carolyn Meadows sent the short-notice invitation to the group's 76 board members, as she and the nation's top gun-rights group attempt to present a unified front to a federal bankruptcy court.

"The sole purpose of the meeting is to provide a briefing to the Board regarding the NRA's reorganization plan and the legal matters overseen by the Special Litigation Committee, and to take any necessary action directly related to those matters," the letter said.

The meeting comes after board member Phillip Journey accused NRA lawyers of misleading the board about the creation of the Special Litigation Committee and the bankruptcy in a court filing. Journey, a Kansas family court judge, told the *Free Beacon* the board was not made aware of the bankruptcy plan when it voted to empower the committee in a Jan. 7, 2021 meeting. He said he found out about it when his daughter texted him a news story.

"You could have seen the top of my car blow off with my head," Journey said. "Because I knew what that meant. It meant that those three lawyers committed a lie of omission of material facts to the board of directors.... Nobody said bankruptcy."

William A. Brewer III, counsel to the NRA, said Journey is mistaken.

"Judge Journey purportedly supports the mission of the NRA and claims not to oppose the Association seeking to reincorporate in Texas," he said in a statement. "Unfortunately, he seems to mistakenly believe the NRA reorganization plan did not follow board and internal protocol. This plan was undertaken in full compliance with NRA policy. The plan has been widely endorsed by NRA board members, NRA members, elected officials, and other key stakeholders."

Journey said he had voted to support the committee, but had no idea the group's leadership and legal advisers had planned to go into

**EXHIBIT E**

bankruptcy. He disputed NRA filings that claimed board members were properly informed. Those filings were signed by embattled executive vice president Wayne LaPierre, who was not present at the meeting when the committee was discussed, according to Journey. The Kansas jurist believes the law has been violated and he has a duty to report it to the court.

"It certainly was a fraud perpetrated on the court," Journey said. "I told them all when I got on the board, 'Look, I'm a judge. I'm a mandatory reporter. Whatever we do, we got to be on the up and up.'"

Journey was named to the board for the second time in 2020. He said he only wants what is best for the NRA membership, but added those goals can only be realized if board members are properly informed of the organization's dealings. He has also asked the bankruptcy court to appoint an independent examiner to go through the group's finances.

"Once they did that in the January 7 board meeting, everything else is pretty much set in stone. You know, I mean, my decisions are made for me," Journey said. "It kills me. It really does. I'm losing friends I've had for decades because I've got to do the right thing. I never wanted anything like this to happen."

The board meeting will be held at the Omni Dallas Hotel on March 14 beginning at 10 a.m.

---

### Related Articles



**Democrats' Gun Bill Would Force AG's Office To Team Up With Gun-Control Ally**



**Biden Attorney General Nominee Pleads Ignorance on Gun Control Limits**



**Washington Appeals Court Unanimously Strikes Down Local Gun-Control Law**



**New Bill Would Protect Veterans from Gun Confiscation**

**EXHIBIT E**



**EXHIBIT E**

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

```
1                    UNITED STATES DISTRICT COURT

2                    NORTHERN DISTRICT OF TEXAS

3                         DALLAS DIVISION

4

5

     IN RE:                      )

6                                )

                                 )

7    NATIONAL RIFLE              ) Case No.

     ASSOCIATION OF AMERICA      ) 21-30085-hdh-11

8    AND SEA GIRT, LLC,          )

                                 )

9       Debtors.                 )

10

11   ****************************************************

12        REMOTE ORAL AND VIDEOTAPED DEPOSITION OF

13              HONORABLE PHILLIP JOURNEY

14                  MARCH 18, 2021

15   CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

16   ****************************************************

17

18

19

20

21

22

23

24

25

                                            Page 1
```

**EXHIBIT F**

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1    employment contract to be approved?

2         A.    They were not given a copy, no.  There were

3    two copies at two tables, and you had to sit there and

4    read it and turn it back in.

5         Q.    And did you go over and open that contract and

6    review it?

7         A.    Yes, I read it.

8         Q.    Was there a presentation made by someone with

9    respect to that contract?

10        A.    Mr. Cotton was the -- is the first vice

11   president of the NRA, and as President Meadows was not

12   at the board meeting, he ran the meeting.  So there was

13   another lawyer in the room, too, by the way.  You know,

14   you'll have to ask him what he said.

15        Q.    Okay.  And was Mr. LaPierre present in that

16   session?

17        A.    No.  No.

18        Q.    This morning --

19        A.    Mr. LaPierre came for about three minutes and

20   left and did not return to the board meeting.

21        Q.    Okay.  So he attended the full board meeting

22   or this executive session?

23        A.    He was not in either of the executive

24   sessions.

25        Q.    Okay.  So Mr. Frazer testified this morning he

                                             Page 22

**EXHIBIT F**

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1  board member, would you consider the filing of a

2  bankruptcy petition of the NRA to be the performance of

3  a corporate activity of the NRA of such major

4  significance as to warrant action by the full board?

5                    MR. CICILIANO:  I would --

6                    MR. WATSON:  Same objection.  Hold on,

7  Dylan.  Same objection, calls for a legal conclusion.

8  Go ahead.

9                    MR. CICILIANO:  I would similarly object.

10  Furthermore, I would object to the extent that that's

11  informed by the legal advice of counsel of the NRA.

12         But in your personal opinion, I guess go

13  ahead.

14     A.   If I had thought otherwise, I don't think I

15  would have filed the motion, do you, Gerrit?

16     Q.   (BY MR. PRONSKE)  Well, I'm asking you.  So

17  your answer is that you believe that the filing would be

18  a corporate activity of major significance?

19     A.   Yes.

20     Q.   Okay.  Would you consider the filing of a

21  bankruptcy petition of the NRA to qualify as a petition

22  for a judicial dissolution?

23                    MR. WATSON:  Objection, calls for a legal

24  conclusion.

25                    MR. CICILIANO:  Join.

Page 35

**EXHIBIT F**

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1                MR. PRONSKE: Can I finish, please? I

2   told the judge yesterday I was going to go for four

3   hours and that you hadn't filed an objection, and so

4   here we are. And if you would like to shut it down

5   based on those facts, I'm fine going in front of the

6   judge tomorrow morning. What do you want to do?

7                MR. WATSON: Well, what I want to do is

8   let you get your opportunity to ask all the questions

9   you want, but I don't want you to go and reask the same

10   stuff he's already answered.

11               MR. PRONSKE: I am going to ask the

12   question again, and I would like the record to be clear.

13      Q. (BY MR. PRONSKE) For the very first time,

14   Judge Journey, you said that the filing of the

15   bankruptcy on January 15th was a governance failure. I

16   would like to ask you and get an answer because that

17   question has not been answered. What is it about the

18   January 15th bankruptcy filing that was a governance

19   failure?

20      A. Let me be clear. The January 15th filing was

21   not the governance failure. It was an indication of it,

22   that the governance failure I believe occurred happened

23   at the January 7th board meeting. And the fact that the

24   board was not informed --

25               MR. CICILIANO: And I am going to stop

**EXHIBIT F**

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

```
 1    you there, Judge, and caution you not to get into the
 2    attorney/client privilege, not to discuss what happened
 3    in the executive session.
 4              MR. WATSON:  Well, Judge, you can testify
 5    as to what your understanding was without disclosing
 6    privilege.  You can answer Mr. Pronske's question, to
 7    the extent you understood -- what your understanding
 8    was --
 9              THE WITNESS:  Thank you.
10              MR. WATSON:  -- so we can get past this.
11              THE WITNESS:  Thank you.
12       A.   That the governance failure that occurred --
13              MR. CICILIANO:  It comes to privilege,
14    though.  If his understanding is informed by counsel, I
15    don't think he can.
16              MR. WATSON:  But he's not saying that it
17    did.
18              MR. ACOSTA:  And Dylan, you can't hide
19    the fact of what he voted on.
20              MR. WATSON:  Right.  And he has -- he can
21    form his own opinion, Dylan, and it doesn't have to come
22    from counsel.
23              MR. CICILIANO:  Right.  And so long as
24    it's not formed from counsel or wasn't something counsel
25    told him or what he claims counsel didn't tell him --
```

Page 155

**EXHIBIT F**

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1          MR. WATSON:  Right, and that's what I

2     instructed my client to say.

3          MR. CICILIANO:  I understand.

4          MR. WATSON:  You can answer Gerrit's

5     question.  But let's move along, guys.  It's late.

6     A.   Oh, you're waiting on me?

7     Q.   (BY MR. PRONSKE)  Yes.

8     A.   I thought you guys weren't done yet.  Okay.

9          MR. WATSON:  No.  No, we're done.  We're

10    trying to finish up.

11          THE WITNESS:  Okay.

12    A.   So look at the Free Beacon article.  The

13    governance failure was the failure of officers or

14    counsel or those the board is dependent on from

15    revealing the material fact the bankruptcy was in

16    process of being filed at that board meeting.

17          MR. CICILIANO:  And again, I will move to

18    strike based on attorney/client privilege.  But go

19    ahead.

20    Q.   (BY MR. PRONSKE)  Judge Journey, were there

21    any presentations given at the January 7th executive

22    session by nonlawyers?

23    A.   No.  I believe Mr. Cotton was the one

24    addressing the board regarding those topics.

25    Q.   Was anyone addressing those topics -- and when

                                        Page 156

**EXHIBIT F**

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1  you say "those topics," what exactly are you --

2      A.   The topics of the executive sessions.

3  Mr. Cotton was chairing the meeting.

4      Q.   Was there anybody giving a presentation at

5  that executive session other than Mr. Cotton?

6            MR. CICILIANO:  Objection to form.

7      A.   I'm not certain.  I am not certain on that.

8      Q.   (BY MR. PRONSKE)  And was Mr. Cotton -- I

9  understand Mr. Cotton is an attorney, but was he in his

10  capacity as attorney in that meeting?  And if so, who

11  was he representing?

12      A.   No, he was not acting as counsel.  He was

13  acting as first vice president and chairing the meeting

14  because the president wasn't there, as I explained

15  before.

16      Q.   Okay.  And what did he say during that

17  presentation?

18      A.   That is what happened in executive session

19  and --

20            MR. CICILIANO:  Yeah, I would object

21  pursuant to attorney/client privilege and instruct you

22  not to answer.

23            MR. WATSON:  Okay.  Yeah, I am going to

24  instruct you not to answer.

25            MR. PRONSKE:  It's not a conversation

**EXHIBIT F**

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1  between an attorney who is acting in the capacity as an

2  attorney and clients.  Are you saying it's just because

3  of the presence of attorneys in that room?

4         MR. CICILIANO:  No, Gerrit.  I'm saying

5  because we have a declaration, as you well know, board

6  counsel who actually explains that they were all

7  discussing attorney/client privilege.  So you may want

8  to beat around it and try to snip out portions.  It's

9  not going to happen.  I am directing him not to answer,

10  as is his counsel.

11         MR. PRONSKE:  Who is the attorney that

12  you say was involved in that attorney/client discussion,

13  Mr. Ciciliano?

14         MR. CICILIANO:  I believe the declaration

15  says William Davis, as well as counsel from Brewer.

16         MR. PRONSKE:  And so just because an

17  attorney was present in the room, all discussions in

18  that executive session were privileged?

19         MR. CICILIANO:  No.  But if you actually

20  look at the declaration, what they say is that every

21  discussion they had in there was regarding legal advice.

22  So in that instance, yes.

23         MR. PRONSKE:  So you're saying that

24  everything that happened in the executive session

25  regarding Wayne LaPierre's employment contract on

Page 158

**EXHIBIT F**

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

```
 1    January 7th was privileged.  Is that right?
 2                 MR. CICILIANO:  For this one, for what
 3    I'm seeing, absolutely.
 4                 MR. PRONSKE:  Okay.
 5         Q.   (BY MR. PRONSKE)  And Judge Journey, are you
 6    refusing to answer the question based on Mr. Ciciliano's
 7    advice?
 8                 MR. WATSON:  Well, it's my advice.  I am
 9    instructing him not to answer.
10         Q.   (BY MR. PRONSKE)  Okay.  Are you refusing to
11    answer the question based on advice of counsel?
12         A.   I am going to defer to counsel, yes.
13         Q.   When you said -- when you testified that
14    bankruptcy is not the disease but it's a symptom of the
15    disease, what is the disease?
16         A.   I think the disease and its symptoms are
17    described in great detail in the New York Attorney
18    General and the Washington, D.C. Attorney General's
19    petitions.  There are other things that I've read in
20    other cases that gave me pause also and concern.
21         Q.   When you testified that there have been,
22    quote, so many resignations from the board, why do you
23    believe there have been so many resignations from the
24    board?
25         A.   Well, it's part of the process to make the
```

Page 159

**EXHIBIT F**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | **CHAPTER 11** |
| | § | |
| | § | |
| **NATIONAL RIFLE ASSOCIATION OF** | § | **CASE NO. 21-30085-hdh11** |
| **AMERICA and SEA GIRT LLC** | § | |
| | § | |
| **DEBTORS[1]** | § | **JOINTLY ADMINISTERED** |

**DECLARATION OF WILLIAM W. DAVIS IN SUPPORT OF DEBTORS'
EMERGENCY MOTION FOR PROTECTIVE ORDER
RE: NYAG'S NOTICE OF INTENTION TO TAKE THE
<u>DEPOSITION OF THE HONORABLE PHILLIP JOURNEY [DOCKET NO. 341]</u>**

I, William W. Davis, pursuant to 28 U.S.C. § 1746, state:

1.      I am a an attorney duly licensed in and am a member in good standing of the bar for the State of Wisconsin, maintaining offices in Middleton, Wisconsin.  There are no disciplinary proceedings against me in any jurisdiction.

2.      I submit this declaration in support of Debtors's emergency motion for  protective order with respect to the *Notice of Intent to Take Oral Deposition of the Honorable Phillip Journey* (the "<u>Notice</u>") served by the People of the State of New York, by Letitia James, Attorney General of the State of New York (the "<u>NYAG</u>") via e-mail at 12:54 p.m. on March 10, 2021, scheduling the deposition (the "<u>Journey Deposition</u>") of the Honorable Phillip Journey ("<u>Judge Journey</u>") on March 11, 2021 at 3:00 p.m.  Except as otherwise stated, I have personal knowledge of each of the facts stated in this Declaration, which are true and correct.  If called as a witness, I could and would testify as to the matters set forth herein.

---

[1] The last four digits of the Debtors' taxpayer identification numbers are: 6130 (NRA) and 5681 (Sea Girt). The Debtors' mailing address is 11250 Waples Mill Road, Fairfax, Virginia 22030.

**EXHIBIT G**

3.      Since April 2019, I have been retained as independent counsel to the Board of Directors of the National Rifle Association. In my capacity as Board counsel, I attend Board meetings and frequently participate in confidential executive sessions of the Board.

4.      Although proceedings in executive session are not *per se* privileged, they are strictly confidential, and breaches of that confidentiality are subject to punishment under the disciplinary provisions of the NRA bylaws. Moreover, when the Board does receive briefings on ongoing litigation, conduct strategic deliberations wherein legal advice is sought, or otherwise engage in privileged discussions at Board meetings, these activities are typically conducted in executive session.

5.      On January 7, 2021, the NRA Board of Directors met at the Omni Hotel in Dallas, Texas. From 10:00 a.m. to 10:52 a.m., the Board was in executive session to discuss the report of the Officers Compensation Committee, which included a recommendation that the Board adopt and approve a revised employment contract for NRA Executive Vice President Wayne LaPierre.

6.      I was present for the duration of that executive session. During the executive session, copies of the proposed contract were made available to the Board, which many directors chose to review. In connection with this process, Board members who chose to review copies of the contract executed a written assurance that they would treat the document confidentially. NRA First Vice President Charles Cotton, who chaired the meeting, reminded the Board that because they were discussing proposed contract terms the discussion was confidential and privileged.

7.      Thereafter, discussion ensued regarding the terms of the contract, wherein Board members sought legal advice regarding particular provisions of the contract and the potential addition of a forum-selection clause.

DECLARATION OF WILLIAM J. DAVIS IN SUPPORT OF DEBTORS' EMERGENCY MOTION FOR A PROTECTIVE ORDER

**EXHIBIT G**

8.     At 11:05 a.m., the Board again entered executive session to discuss a proposed resolution formalizing the appointment of a Special Litigation Committee.  During this executive session, I provided legal advice regarding topics including director independence.  A discussion occurred regarding ongoing litigation and the definitions of certain terms, in which I and outside counsel to the NRA (Brewer, Attorneys & Counselors) participated.  This discussion was also conducted in confidence, between NRA directors and counsel, for the purpose of obtaining legal advice.

9.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and that all statements I make in this declaration are based on my personal knowledge unless otherwise noted herein.

Executed on March 12, 2021          By: */s/ William Davis*
                                          William W. Davis

### CERTIFICATE OF SERVICE

The undersigned certifies that on the 12th day of March 2021 a true and copy of the foregoing was served electronically via this Court's CM/ECF notification system.

 _/s/ Douglas J. Buncher_
Douglas J. Buncher

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1                UNITED STATES BANKRUPTCY COURT

 2                  NORTHERN DISTRICT OF TEXAS

 3                      DALLAS DIVISION

 4    IN RE:                        )

                                    )   Case No.

 5    NATIONAL RIFLE ASSOCIATION   )   21-30085-hdh-11

      OF AMERICA AND SEA GIRT, LLC)

 6                                  )   Chapter 11

          Debtors.                  )

 7

 8

 9

10    ************************************************

11             VIDEOTAPED ORAL DEPOSITION OF

12          JOHN FRAZER IN HIS PERSONAL CAPACITY

13                   MARCH 18, 2021

14       CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

15                  (Reported Remotely)

16    ************************************************

17

18

19

20

21

22

23

24

25

                                           Page 1
```

**EXHIBIT H**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1              MR. GARMAN (VIA ZOOM):  Objection to

 2      form.

 3              Go ahead.

 4      A.   It's correct that he alleges that.

 5      Q.   I'm sorry.  Is his contention correct?

 6      A.   Not in my opinion.

 7      Q.   Are you aware of any violations of the

 8      bylaws in connection with board meetings that have

 9      occurred in the last year?

10              MR. GARMAN (VIA ZOOM):  So let me --

11      let me insert -- I don't think this question calls

12      for the invasion of the attorney-client privilege.  I

13      just -- you're general counsel.  I want you to start

14      being careful with the answers.  But if you -- to the

15      extent that you can answer that question, please go

16      ahead.

17      A.   No, I'm not aware of any violations of the

18      bylaws.

19      Q.   Mr. Rocky Marshall became a member of the

20      board in January 2021; isn't that correct?

21      A.   That's correct.

22      Q.   And what were the circumstances that led

23      to his becoming a board member?

24      A.   A sitting board member resigned.  And

25      under our bylaws, when a vacancy occurs on the
```

Page 36

EXHIBIT H

1    board, the -- the vacancy is filled by the -- the

2    next runner-up who wasn't re-elect -- who wasn't

3    elected, excuse me, elected in the -- in the most

4    recent board election.

5         Q.   And who was the sitting member of the

6    board that left the board?

7         A.   That was Duane Liptak.

8              THE WITNESS (VIA ZOOM):  That's

9    L-i-p-t-a-k for the reporter.

10        Q.   And did Mr. Liptak resign shortly after

11   the filing of the bankruptcy petition?

12        A.   Yes, he did.

13        Q.   And do you have an understanding why

14   Mr. Liptak resigned?

15        A.   I do.

16        Q.   And what is your understanding?

17        A.   He stated that -- in a resignation letter

18   that he felt he wasn't able to provide proper

19   oversight.

20        Q.   And do you have an understanding of what

21   he meant by not being able to provide proper

22   oversight?

23              MR. GARMAN (VIA ZOOM):  Objection to

24   form.

25        A.   Not having the letter in front of me, I

Page 37

**EXHIBIT H**

1          A.   Yes.  This is Mr. -- this is the letter

2     Mr. Liptak sent me in January.

3          Q.   Okay.  And so he states in the letter,

4     However, in the current organizational environment,

5     I am no longer able to effectively perform the

6     duties of a director with what I feel is the

7     appropriate level of oversight required.

8               And that is what you were referring to

9     when you said that he had concerns about oversight

10    issues; is that right?

11         A.   Yes.

12         Q.   And did you have any conversations with

13    Mr. Liptak in or around the time that he resigned?

14         A.   I had -- I had a couple of email exchanges

15    with him.

16         Q.   And in those communication -- what were

17    the sum and substance of those communications?

18         A.   He -- prior to his resignation letter, he

19    sent a letter regarding the bankruptcy filing in

20    which he asked why -- asked essentially why it

21    hadn't been discussed with the board at the

22    January 7th meeting.

23               MS. STERN (VIA ZOOM):  Counsel, has

24    that letter been produced?

25               MR. GARMAN (VIA ZOOM):  I don't know.

Page 40

**EXHIBIT H**

1          MR. GARMAN (VIA ZOOM):  Objection to

2    form.

3               Go ahead.

4     A.    I'm sorry.  Yes.

5     Q.    And so if you identify legal risks to the

6    NRA in its, you know, sort of corporate status,

7    would you bring those to the legal affairs

8    committee?

9               MR. GARMAN (VIA ZOOM):  Objection to

10   form.

11    A.    I would -- I would -- I would bring them

12   to the -- you know, it would depend on the specific

13   detail but obvious -- or on the specific issue.  And

14   it might also depend on how close we are to a -- to

15   an upcoming meeting or something like that.

16          Sometimes -- so sometimes I'll report to

17   the legal affairs committee primarily, sometimes

18   I'll report directly to the corporate officers, you

19   know, whoever -- whatever seems to be the

20   appropriate channel to get done what needs to be

21   done.

22    Q.    Prior to the NRA filing for bankruptcy in

23   mid January, did you communicate to the board any --

24   anything with respect to potential of a bankruptcy

25   filing?

                                        Page 65

**EXHIBIT H**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

 1               MR. GARMAN (VIA ZOOM):  Objection.

 2               I need to instruct you not to answer

 3    to the extent your answer would -- would compromise

 4    attorney-client communications.

 5       A.    I'm going to decline to answer that.

 6       Q.    And just for the record, I'll just ask the

 7    same question -- let me just put it differently.

 8               In -- I think you have testified that you

 9    learned in the fall of 2020 that the Brewer firm was

10    doing some work concerning subject matter of a

11    potential bankruptcy.

12               Do I have that right?

13       A.    Yes.

14       Q.    And when you learned that, did you bring

15    that to the attention of the legal affairs

16    committee --

17               MR. GARMAN (VIA ZOOM):  So --

18       Q.    -- yes or no?

19               MR. GARMAN (VIA ZOOM):  So objection

20    to form.

21               I'll -- I'll instruct you not to

22    answer to the extent it invades the attorney-client

23    privilege.  Answer if you can otherwise do so.

24       A.    May I confer with counsel?  It'll be

25    brief.

                                          Page 66

EXHIBIT H

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1  Mr. Fleming did call on an unrelated -- just called

2  unrelated.  They didn't confer on it.  Just make sure

3  the record is -- is clear.  But --

4                    THE WITNESS (VIA ZOOM):  Right.

5                    MR. GARMAN (VIA ZOOM):  But, yeah, so

6  go ahead.

7                    THE WITNESS (VIA ZOOM):  Okay.

8  Thanks, Greg.

9       A.   So my understanding of the question was

10  whether after I became aware that Chapter 11

11  reorganization was being considered as a

12  possibility, whether I discussed that with the legal

13  affairs committee.

14           Is that a fair restatement?

15       Q.   I'll take the answer to that question.

16       A.   Okay.  The answer is no.

17       Q.   And did you discuss -- did you share that

18  information with anyone else on the board?

19       A.   Not that I recall.

20       Q.   Okay.  So you mentioned that -- the

21  difficulty of communicating with a 76-member board.

22           Is it fair to say that's a challenge?

23       A.   Sometimes.  Sometimes it's more of an

24  individual challenge.

25       Q.   And the NRA's managed by its 76-member

                                        Page 68

**EXHIBIT H**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1      A.   I can't -- I can't -- I don't have any

2    other names, I'm afraid.

3      Q.   Okay.  Mr. LaPierre testified at the 341

4    that at some point in time, the NRA hired law firm

5    of Morgan Lewis to do a compliance review of the

6    organization; is that accurate?

7                MR. GARMAN (VIA ZOOM):  Objection to

8    form.

9                Go ahead.

10     A.   Yes.

11     Q.   And when did that occur?

12     A.   In 2017.

13     Q.   What was your involvement?

14     A.   I interviewed Morgan Lewis and another

15   firm and -- trying to be helpful and not --

16   ultimately we decided to retain Morgan Lewis.

17     Q.   Who was the other firm?

18     A.   Caplin & Drysdale.

19                THE WITNESS (VIA ZOOM):  For the

20   reporter, that's C-a-p-l-i-n and Drysdale is

21   D-r-y-s-d-a-l-e.

22     Q.   And who specifically was involved from

23   Morgan Lewis?

24     A.   Alex Reid, Alexander Reid, R-e-i-d.

25     Q.   Is he a partner?

                                        Page 158

**EXHIBIT H**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1       A.   Yes.

2       Q.   Were there any other partners involved?

3       A.   I don't recall -- I don't recall meeting

4  with any other partners for that initial project.

5       Q.   And what was the scope of that initial

6  project, the substantive scope?

7               MR. GARMAN (VIA ZOOM):  Counsel, help

8  me out here because you're asking a general counsel

9  about his engagement and his conversations with his

10  lawyer.  I sure feel like this is the wrong witness

11  when the -- when the predicate was someone else's

12  testimony.

13               MS. STERN (VIA ZOOM):  Mr. LaPierre --

14  okay.  Mr. LaPierre has said that the NRA has done

15  all manner of compliance reviews and pointed to the

16  work that Morgan Lewis did, and so I would like to

17  understand what they did.  If the NRA is relying on

18  that work as demonstration of its compliance and its

19  commitment to being compliant organization, I'm

20  asking this witness --

21               MR. GARMAN (VIA ZOOM):  Well --

22               MS. STERN (VIA ZOOM):  -- to

23  explain --

24               MR. GARMAN (VIA ZOOM):  We'll go a

25  little further, but --

EXHIBIT H

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1      MS. STERN (VIA ZOOM):  -- what that

2  engagement was.

3      MR. GARMAN (VIA ZOOM):  We'll go a

4  little further but you're asking one of

5  Mr. LaPierre's lawyers to talk about conversations

6  with other of Mr. LaPierre's lawyers, and -- and the

7  privilege is getting fairly compounded here.  But we

8  will -- we'll go ahead and --

9      THE WITNESS (VIA ZOOM):  Maybe we can

10 confer --

11     MR. GARMAN (VIA ZOOM):  Yeah.

12     THE WITNESS (VIA ZOOM):  -- on -- on

13 this one.

14     MR. GARMAN (VIA ZOOM):  Yeah.

15     MS. STERN (VIA ZOOM):  Okay.  Before

16 we -- before we go out in the hallway, I think my

17 question was -- and -- and I can try to restate the

18 question if it was too broad, but was the scope of

19 the -- of the work that was done.

20     THE WITNESS (VIA ZOOM):  Okay.

21 Understood, but -- understood, but I would like to

22 confer.

23     MS. STERN (VIA ZOOM):  Okay.

24     MR. GARMAN (VIA ZOOM):  As we have all

25 day, we're trying to be constructive in -- in the

Page 160

**EXHIBIT H**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1   process.

2                       MS. STERN (VIA ZOOM):  I appreciate

3   that.  I just know that there's a lot of lawyers on

4   this call that are wanting this to get moving

5   forward.  So...

6                       MR. GARMAN (VIA ZOOM):  Understood.

7   You have some here, too.

8                       THE VIDEOGRAPHER (VIA ZOOM):  Going

9   off the record.  The time is 15:22 p.m.

10                      (Recess 3:22 p.m. to 3:28 p.m.)

11                      THE VIDEOGRAPHER (VIA ZOOM):  Going

12  back on the record.  The time is 15:28 p.m.

13      Q.   Mr. Frazer, you had the opportunity to

14  confer with your counsel, and who was that?

15      A.   It was Mr. Garman and Ms. Eisenberg.

16      Q.   Okay.

17                      MS. STERN (VIA ZOOM):  And can we have

18  the last question read back, please.

19                      THE REPORTER (VIA ZOOM):  One moment.

20                      (Record read.)

21                      MR. GARMAN (VIA ZOOM):  I'm going to

22  object here.  I'll give you a speaking objection

23  because it might be helpful, but if you don't mind so

24  I can just make an objection.

25                      But the scope of the services

                                        Page 161

**EXHIBIT H**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1   certainly, as Mr. LaPierre testified, included
 2   compliance.  However, the scope of those services
 3   are -- and compliance is just irrevocably intertwined
 4   with your action in New York, and I'm not going to
 5   permit this lawyer of the Association to talk about
 6   his communications with other lawyers of the
 7   Association as they relate to -- to that pending
 8   action.
 9              And so -- so Mr. Frazer will confirm
10   that compliance was within the scope of their
11   services but we won't be answering questions deeper
12   than that.
13              MS. STERN (VIA ZOOM):  Okay.  I'm
14   going to ask a couple questions, see what -- see
15   where we go with that.
16       Q.   Mr. Frazer, what is your understanding was
17   the reason for the NRA's retention of Morgan Lewis
18   to do the compliance work that Mr. LaPierre
19   referenced at the 341?
20              MR. GARMAN (VIA ZOOM):  I'm going to
21   object.  I don't -- I don't think you can answer that
22   without invading the attorney-client privilege.  I'll
23   leave it to you to decide if you can.  But I don't
24   think you can -- I don't think you could -- I don't
25   think you have independent facts other than your role
```

Page 162

**EXHIBIT H**

1          My objection is do not use a speaking

2   objection to inform him of what he may now think is a

3   problem with the question.  Thank you.

4               MR. GARMAN (VIA ZOOM):  So -- so, one,

5   I take great offense to you accusing me of bad faith.

6   And two, at many points in today's conversation I

7   have said I will make purely speaking objections, but

8   I have been attempting to be helpful and candidly

9   permit things that arguably fall within the

10  attorney-client privilege to be reformed.  And so I

11  will simply say, I instruct the witness not to answer

12  because that invades the attorney-client privilege.

13  We'll tighten it up from here.

14              MR. GRUBER (VIA ZOOM):  Thank you.

15              MS. STERN (VIA ZOOM):  Sorry, I need

16  one second.

17      Q.   Mr. Frazer, do you agree with

18  Mr. LaPierre's characterization that Morgan Lewis

19  was retained to do a compliance review?

20      A.   Yes, I do.

21      Q.   And what did that compliance review

22  entail?

23              MR. GARMAN (VIA ZOOM):  Objection;

24  that's work product and subject to the

25  attorney-client privilege.

                                          Page 164

**EXHIBIT H**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1          I instruct you not to answer.

2     Q.   Did they -- did the compliance review

3   entail interviewing any individuals at the NRA, yes

4   or no?

5              MR. GARMAN (VIA ZOOM):  Go ahead.

6     A.   Yes.

7     Q.   Will you identify what individuals were

8   interviewed at the NRA --

9              MR. GARMAN (VIA ZOOM):  No, we won't.

10    Q.   -- without describing the substance of the

11  interview?

12             MR. GARMAN (VIA ZOOM):  No, we won't.

13    Q.   Did the compliance review that Morgan

14  Lewis firm did entail the review of any of the NRA's

15  policies or procedures?

16             MR. GARMAN (VIA ZOOM):  Objection.

17  Mr. Frazer sits here today as a lawyer involved in

18  the internal legal --

19             MS. STERN (VIA ZOOM):  We just -- we

20  just had a --

21             MR. GARMAN (VIA ZOOM):  Okay.

22             MS. STERN (VIA ZOOM):  -- conversation

23  about not doing speaking objections.

24             MR. GARMAN (VIA ZOOM):  I'm going to

25  instruct him not to answer then.

                                    Page 165

**EXHIBIT H**

1              MS. STERN (VIA ZOOM):  So if you are

2    going to instruct him not to answer on the grounds of

3    privilege, that's fine, but I'm entitled to make a

4    record.

5              MR. GARMAN (VIA ZOOM):  Work product.

6    That's fine.  It's work product.

7              Don't answer.

8       Q.   Did Morgan Lewis's compliance review

9    result in any kind of report?

10             MR. GARMAN (VIA ZOOM):  Objection.

11             You can't answer that question; it's

12   privileged.

13      Q.   Were any recommendations by the -- this is

14   a yes or no question -- any recommendations by the

15   Morgan Lewis firm conveyed to senior management at

16   the NRA?

17             MR. GARMAN (VIA ZOOM):  Objection.

18   That's privileged.  He won't answer.

19      Q.   Was the board of directors aware of the

20   engagement of Morgan Lewis to do compliance work,

21   yes or no?

22      A.   The -- we did a business case analysis and

23   sign-off sheet, so the senior board officers were

24   certainly aware.

25      Q.   And just yes or no, did the business case

                                    Page 166

**EXHIBIT H**

1  analysis indicate that they were being engaged to do

2  a compliance review?

3       A.   It has been quite some time since I

4  reviewed it.  I can't tell you exactly what it said.

5       Q.   Did the NRA take any action with respect

6  to its compliance policies, procedures, or practices

7  in reliance on the Morgan Lewis engagement?

8                 MR. GARMAN (VIA ZOOM):  Object to

9  form.

10      A.   Yes.

11      Q.   And what were those actions?

12                MR. GARMAN (VIA ZOOM):  Objection.

13  The content is privileged.  He won't answer that.

14      Q.   Other than Morgan Lewis, I think you have

15  identified a K&L Gates and Peter Flocos and the

16  Brewer firm as having provided advice to the NRA

17  concerning compliance and charities laws matters; is

18  that correct?

19                MR. GARMAN (VIA ZOOM):  Objection to

20  the form of the question.

21      A.   That's correct.

22      Q.   Are there any other firms -- law firms or

23  other professional consultants that you have -- that

24  the NRA has engaged during your tenure as a general

25  counsel?

                                        Page 167

**EXHIBIT H**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1      Are you aware of any specific instances

2   where a board member reported a transaction that

3   caused the audit committee to look back at prior

4   transactions?

5           MR. GARMAN (VIA ZOOM):  Objection to

6   form.

7       A.   Without -- without looking at the

8   committee report, I can't point you to a -- to a

9   specific instance.

10      Q.   And when you said that you -- that the NRA

11  began looking at these transactions as part of its

12  compliance review, was this the review that we were

13  talking about that Morgan Lewis did?

14      A.   It was --

15           MR. GARMAN (VIA ZOOM):  Wait.  Wait.

16  Wait.

17           I'm sorry, Counsel, would you -- would

18  you restate that.

19           MS. STERN (VIA ZOOM):  Can the court

20  reporter read the question.

21           (Record read.)

22           MR. GARMAN (VIA ZOOM):  I instruct you

23  not to answer the question with regard to the work

24  done by Morgan Lewis.

25      A.   So it was part of the compliance review of

Page 202

**EXHIBIT H**

1

2

3

4

5

6

7      ------------------------------------

8      TRANSCRIPTION OF AUDIO FILES 1-2

9         341 MEETINGS OF CREDITORS

10              SEA GIRT, LLC

11      BANKRUPTCY CASE NO. 21-30080

12                  AND

13   NATIONAL RIFLE ASSOCIATION OF AMERICA

14      BANKRUPTCY CASE NO. 21-30085

15            JANUARY 22, 2021

16     ------------------------------------

17

18

19

20

21

22

23

24

25

1          THE U.S. TRUSTEE:  -- not answering -- I --

2          MR. BUNCHER:  -- if you cut him off --

3          THE U.S. TRUSTEE:  I hear what you are

4  say --

5          MR. BUNCHER:  -- then we object to that.

6          THE U.S. TRUSTEE:  The witness is not

7  answering my question.  He's answering a question that

8  he wants to answer.  My question is:  What changes have

9  been made since 2018 to the audit procedures?

10          MR. LaPIERRE:  Okay.  Okay.  Okay.  What we

11  did is we immediately hired Morgan Lewis to -- to do

12  a -- one of the top nonprofit law firms in the

13  country -- to do a complete review of the governance of

14  the NRA, to make sure we were in complete and total

15  compliance with New York State non-for-profit law.

16  And -- and -- and we began a review of the entire

17  association, all of its employees, all of its vendors,

18  of -- of -- of everyone.  Because if there was anything

19  out of compliance, we wanted to self-correct.

20          And that procedure began in 2017, continued

21  through 2018, 2019, and it -- it's still -- it -- it is

22  still ongoing.  It -- as a result of what New York --

23  you are talking about finances.  As a result of -- of

24  the attack from New York State, where they weaponized

25  the Department of Financial Services against any bank or

1  invoice the National Rifle Association, who, if anyone,

2  reviews their monthly fee statements?

3           MR. LaPIERRE:  Those monthly statements

4  from lawyers are -- under the NRA procedures, are

5  reviewed by the general counsel's office.  The general

6  counsel's office, if they have questions, they ask them,

7  and then they are reviewed by the Treasurer's office,

8  also, before -- before they are paid.  And that -- that

9  is in compliance with the NRA bylaws and we -- we,

10  actually, double-checked that with outside counsel --

11  Morgan Lewis -- to make sure we were doing it

12  appropriately.

13           THE U.S. TRUSTEE:  Okay.  The Special

14  Litigation council -- or Committee has no role in

15  overseeing the law firms' fees; is that right?

16           MR. FRAZER:  Ms. -- Ms. -- Ms. Lambert,

17  it's my understanding that the SLC reviews -- does

18  review some -- firm billing related to, you know, fees

19  for the matters that that committee is overseeing.

20           THE U.S. TRUSTEE:  Which --

21           MR. BUNCHER:  And the -- but --

22           THE U.S. TRUSTEE:  -- professionals'

23  firms -- firm fees does the Special Litigation coun --

24  Committee oversee?

25           MR. LaPIERRE:  I -- I believe -- and I'm --

1                  MR. LaPIERRE:  Pardon me?

2                  MR. VAN HORN:  I'm sorry.  Who would know?

3                  MR. LaPIERRE:  The things that we have

4    been -- you know, as I've said, we have gone through

5    this complete safety check, self-correction starting --

6    beginning in 2017 with Morgan Lewis and with every

7    division, every vendor, everything to try to make sure

8    that we were in 100 percent compliance with New York

9    State non-for-profit law.  And I -- I -- I -- I -- I

10   believe the NRA is operating in complete compliance now

11   in regard to all of those areas and we strive for

12   compliance.

13                  I was -- I always thought we had robust

14   controls.  If we had a fail -- if we did have any

15   failures, that's why we did the complete safety check to

16   be in 100 percent compliance with New York State law,

17   which I believe we are -- we are now in compliance.

18   Although, it's still ongoing in terms of our -- our

19   self -- our -- our -- our safety checks.

20                  MR. VAN HORN:  Okay.  Thank you,

21   Mr. LaPierre.  With respect to credit cards or the

22   American Express card, are there American Express cards

23   provided to any officers or directors of the NRA,

24   Mr. LaPierre?

25                  MR. LaPIERRE:  You would have to ask the --

1  the Brewer Firm billed for legal work and -- and --

2  that -- that -- that the Brewer Legal Firm did --

3              MR. DELL'AQUILA:  And did --

4              MR. LaPIERRE:  -- that went -- went in the

5  appropriate place when it went to the trea -- or to --

6  to the general counsel's office.  They would vet them.

7  They would ask questions.  They went to the Treasurer's

8  office and -- and -- and -- and they would ask questions

9  and pay them.  And the scope of the Brewer Firm work was

10  all signed off on and okayed separately by Morgan Lewis,

11  who took a look at what they were doing --

12             MR. DELL'AQUILA:  Okay.

13             MR. LaPIERRE:  -- as an independent look.

14             MR. DELL'AQUILA:  Okay.  And on the tax

15  return -- on 2015 -- the Form 990, there was a hundred

16  thousand dollars was given to George Mason University

17  law firm (sic) for a Second Amendment study.  And then,

18  also, on the tax return on year 2012, there was a George

19  Mason -- a hundred thousand dollars -- done for the

20  Second Amendment study.  Do you -- can you -- do you

21  know anything about that?  Why it would be $200,000 for

22  a Second Amendment fund twice?

23             MR. LaPIERRE:  Yes.  Yes, I do.  I think

24  I -- and I will also let John Frazer -- who knows even

25  more about it than I do.  I believe that the George

# The NATIONAL RIFLE
## ASSOCIATION
## OF AMERICA



# BYLAWS

AS AMENDED
OCTOBER 24, 2020

A NEW YORK STATE MEMBERSHIP
CORPORATION CHARTERED IN 1871

**EXHIBIT J**

# The National Rifle Association of America

The National Rifle Association, chartered in 1871, is not only the oldest sportsmen's organization in America, but also is an educational, recreational and public service organization dedicated to the right of the individual citizen to own and use firearms for recreation and defense.

The NRA is a nonprofit corporation supported by membership dues and contributions from public spirited members and clubs. It is not affiliated with any arms or ammunition manufacturer nor with any business which deals in guns or ammunition. It receives no appropriations from Congress.

The NRA cooperates with all branches of the United States Armed Forces, federal agencies, state and local governments interested in teaching small arms marksmanship and firearm safety to the maximum number of Americans.

During World War II, NRA members taught over one million seven hundred thousand Americans the correct use of small arms in preinduction training courses.

Past presidents of the Association include: U.S. President Ulysses S. Grant and General Philip H. Sheridan. Among the many notables who have been members of the National Rifle Association are eight Presidents of the United States, two Vice Presidents of the United States, two Chief Justices of the U.S. Supreme Court and numerous U.S. Congressmen, as well as legislators and officials of the several state governments.

(This supersedes the printed copy of the Bylaws as amended September 14, 2019).

NOTE: AMENDMENTS IN BOLD FACE ITALICS SHALL NOT BE REPEALED OR AMENDED BY THE BOARD OF DIRECTORS.

Copyright 2020, National Rifle Association of America

**EXHIBIT J**

## TABLE OF CONTENTS

**ARTICLE I,** NAME . . . . . . . . . . . . . . . . . . . . . . . . . . 1
**ARTICLE II,** PURPOSES AND OBJECTIVES. . . . . . . 1
**ARTICLE III,** MEMBERSHIP. . . . . . . . . . . . . . . . . . . 2
   Section 1. Eligibility . . . . . . . . . . . . . . . . . . . . . . . . 2
   Section 2. Dues and Contributions . . . . . . . . . . . . . 2
   Section 3. Individual Members . . . . . . . . . . . . . . . . . 2
   Section 4. Affiliated or Participating
     Organizations. . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   Section 5. Admission to Membership . . . . . . . . . . . . 5
   Section 6. Rights and Privileges of Members . . . . . . 6
   Section 7. Members Holding Office . . . . . . . . . . . . . 7
   Section 8. Meetings of Members (Quorum) . . . . . . . 7
   Section 9. Duties of Members. . . . . . . . . . . . . . . . . . 8
   Section 10. Voluntary Termination of Membership . . 9
   Section 11. Involuntary Termination
     of Membership and Disciplinary
     Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   Section 12. Committee on Hearings . . . . . . . . . . . . . 12
**ARTICLE IV,** BOARD OF DIRECTORS . . . . . . . . . 12
   Section 1. Composition. . . . . . . . . . . . . . . . . . . . . . . 12
   Section 2. Powers and Duties . . . . . . . . . . . . . . . . . 13
   Section 3. Meetings (Quorum) . . . . . . . . . . . . . . . . 14
   Section 4. Indemnification and Advancement
     of Expenses of Directors of the Association . . . . 16
**ARTICLE V,** OFFICERS . . . . . . . . . . . . . . . . . . . . . . 16
   Section 1. Number and Election . . . . . . . . . . . . . . . 16
   Section 2. Duties of Officers . . . . . . . . . . . . . . . . . . 17
   Section 3. Suspension and Removal . . . . . . . . . . . . 20
   Section 4. Vacancies . . . . . . . . . . . . . . . . . . . . . . . . 22
   Section 5. Compensation. . . . . . . . . . . . . . . . . . . . . 22
   Section 6. Bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
**ARTICLE VI,** EXECUTIVE COMMITTEE . . . . . . . 23
   Section 1. Composition . . . . . . . . . . . . . . . . . . . . . . 23
   Section 2. Powers and Duties . . . . . . . . . . . . . . . . . 23
   Section 3. Vacancies in the Executive
     Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
   Section 4. Meetings of the Executive
     Committee (Quorum). . . . . . . . . . . . . . . . . . . . 24
**ARTICLE VII,** EXECUTIVE COUNCIL . . . . . . . . . 25
   Section 1. Composition . . . . . . . . . . . . . . . . . . . . . . 25
   Section 2. Rights and Privileges . . . . . . . . . . . . . . . 25
   Section 3. Removal . . . . . . . . . . . . . . . . . . . . . . . . . 26
**ARTICLE VIII,** NOMINATION AND
ELECTION PROCEDURES (For Election of Director
   by the Mail Ballot) . . . . . . . . . . . . . . . . . . . . . . . . 26
   Section 1. Nominating Committee . . . . . . . . . . . . . 26
   Section 2. Nomination and Election
     of Directors . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
   Section 3. Nomination of Directors by
     Petition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
   Section 4. Election of One Director at
     Annual Meeting of Members . . . . . . . . . . . . . 34

i    **EXHIBIT J**

ARTICLE IX, REMOVAL OF ASSOCIATION
OFFICIALS BY RECALL . . . . . . . . . . . . . . . . . . . . . . 34
    Section 1. Petition for Removal by Recall . . . . . . . . 34
    Section 2. Procedure . . . . . . . . . . . . . . . . . . . . . . . . . 35
    Section 3. Filling of Vacancies Created by
        Removal of Office-Holder
        by Membership . . . . . . . . . . . . . . . . . . . . . . . 39

**ARTICLE X,** NATIONAL RIFLE
ASSOCIATION INSTITUTE FOR
LEGISLATIVE ACTION . . . . . . . . . . . . . . . . . . . . . . 39
    Section 1. Name and Function . . . . . . . . . . . . . . 39
    Section 2. Officers. . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    Section 3. Planning . . . . . . . . . . . . . . . . . . . . . . . . . 39
    Section 4. Reports . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Section 5. Directives . . . . . . . . . . . . . . . . . . . . . . . . 40
    Section 6. Prohibition of Political
        Contributions . . . . . . . . . . . . . . . . . . . . . . . . 40

**ARTICLE XI,** STANDING AND SPECIAL
COMMITTEES OF THE ASSOCIATION. . . . . . . . . . 41
    Section 1. Standing Committees . . . . . . . . . . . . . . . 41
    Section 2. Special Committees . . . . . . . . . . . . . . . . 42
    Section 3. Committee Members Appointed
        by President . . . . . . . . . . . . . . . . . . . . . . . . . 42
    Section 4. Responsibilities of Committees . . . . . . . 42
    Section 5. Limitations on Powers of
        Committees . . . . . . . . . . . . . . . . . . . . . . . . . . 43
    Section 6. Committee Organization;
        Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
    Section 7. Conference Telephone Meetings . . . . . . 43

**ARTICLE XII,** PROHIBITION OF PROXY
VOTING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

**ARTICLE XIII,** CORPORATE SEAL . . . . . . . . . . . . 43

**ARTICLE XIV,** ORDER OF BUSINESS. . . . . . . . . . 44
    Section 1. Order of Business. . . . . . . . . . . . . . . . . . 44
    Section 2. Parliamentary Authority and
        Parliamentarian . . . . . . . . . . . . . . . . . . . . . . 45
    Section 3. Taking of Votes at Annual
        Meeting of Members . . . . . . . . . . . . . . . . . . . 45

**ARTICLE XV,** AMENDMENTS . . . . . . . . . . . . . . . . 46
    Section 1. Amendments by the Board of
        Directors. . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
    Section 2. Germane Amendments . . . . . . . . . . . . . 46
    Section 3. Amendments by Mail by the
        Membership . . . . . . . . . . . . . . . . . . . . . . . . . 46
    Section 4. Authority to Amend or Repeal . . . . . . . . 48

**ARTICLE XVI,** AMENDMENTS TO THE
CERTIFICATE OF INCORPORATION . . . . . . . . . . . 49
    Section 1. Recommendation by the Board of
        Directors. . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
    Section 2. Adoption by Members . . . . . . . . . . . . . . 49
    Section 3. Publication of Notice . . . . . . . . . . . . . . . 50

**ARTICLE XVII,** DIRECTED VOTING
PROCEDURE OF MEMBERS . . . . . . . . . . . . . . . . . 50

ii

**EXHIBIT J**

# *Bylaws*

## ARTICLE I

*Name*

*The name of this organization is the National Rifle Association of America.*

## ARTICLE II

**Purposes And Objectives**

*The purposes and objectives of the National Rifle Association of America are:*

*1. To protect and defend the Constitution of the United States, especially with reference to the God-given inalienable right of the individual American citizen guaranteed by such Constitution to acquire, possess, collect, exhibit, transport, carry, transfer ownership of, and enjoy the right to use, keep and bear arms, in order that the people may exercise their individual rights of self-preservation and defense of family, person, and property, and to serve in the militia of all law-abiding men and women for the defense of the Republic and the individual liberty of the citizens of our communities, our states and our great nation;*

*2. To promote public safety, law and order, and the national defense;*

*3. To train members of law enforcement agencies, the armed forces, the National Guard, the militia, and people of good repute in marksmanship and in the safe handling and efficient use of small arms;*

*4. To foster, promote and support the shooting sports, including the advancement of amateur and junior competitions in marksmanship at the local, state, regional, national, international, and Olympic levels;*

*5. To promote hunter safety, and to promote and defend hunting as a shooting sport, for subsistence, and as a viable and necessary method of fostering the propagation, growth and conservation, and wise use of our renewable wildlife resources.*

*The Association may take all actions necessary and proper in the furtherance of these purposes and objectives.*

1    **EXHIBIT J**

## ARTICLE III

### Membership

#### Section 1. Eligibility.

(a) Any citizen of the United States who is and while he remains of good repute, who subscribes to the objectives and purposes of the Association, or any organization as hereinafter described, shall be eligible to be a member of the Association, provided that citizens of foreign nations and organizations composed in whole or in major part of citizens of foreign nations may be admitted to membership as provided in Sections 3 and 4 of this Article.

(b) No individual who is a member of, and no organization composed in whole or in part of individuals who are members of, any organization or group having as its purpose or one of its purposes the overthrow by force and violence of the Government of the United States or any of its political subdivisions shall be eligible for membership.

#### Section 2. Dues and Contributions.

The dues or minimum contributions of each class of membership shall be fixed by the Board of Directors. Except for those persons who are lifetime members elected prior to July 1, 1979, all members of all classes with addresses not within the domestic United States may be required to pay the additional postage costs necessary for Association mailings to their stated addresses. The imposition of such requirement and the amount of such costs shall be determined administratively from time to time.

#### Section 3. Individual Members.

(a) **Individual Members.** Individual members shall be Benefactor, Patron, Endowment, Life, Annual, and such other members as are designated in this section.

(b) **Honorary Life Member.** A person may be nominated for Honorary Life membership by the Executive Council and be elected to such

2

**EXHIBIT J**

membership by the Board of Directors in recognition of outstanding service to the Association on a national scale in any one or more of the primary fields of endeavor of the National Rifle Association of America. Not more than three individuals shall be elected as Honorary Life Members in any one calendar year. Honorary Life Members shall enjoy all the rights and privileges of Life Members.

(c) **Lifetime Members.** Benefactor, Patron, Endowment, and Life Members are members for life.

(d) **Associate Member.** A person who elects to pay reduced dues may become an Associate member on an annual basis upon payment of such dues as may be determined by the Board of Directors.

(e) **Junior Member.** A person 20 years of age or under, who pays such dues as may be determined by the Board of Directors, may become a junior member. Such status shall continue through the end of the calendar year in which his or her 20th birthday occurs.

(f) **Non-Citizen Member.** A citizen of a nation other than the United States, whether resident within or without the United States, who is interested in the pursuit of the purposes and objectives of the Association may become a member of the Association in any of the classes listed in this Section, subject to the limitation of Section 6(e) of this Article, upon the fulfillment of any condition for membership within said class. Non-citizen memberships shall be subject to termination or suspension by vote of the Board of Directors, or the Executive Committee, if the Board is not in session, whenever, by proclamation of the President of the United States, or by action of the Congress, the nation of which any such member is a citizen is in a state of war or active military hostilities with the United States, and good cause exists for such termination or suspension.

(g) **Membership Categories.** The Board of Directors may establish Membership Categories for individual members of various Membership Classes. Membership shall be in accordance

**3**   **EXHIBIT J**

with administrative requirements and procedures approved by the Executive Vice President. The Board may provide for reduced or augmented dues for members belonging to such categories.

(h) **Upgrading Class of Membership.** An individual member of one class may become a member of a different class, if qualified therefor, by contributing the minimum dues or contribution specified by the Board of Directors for the class of membership desired, less the contribution specified for his current membership.

### Section 4. Affiliated or Participating Organizations.

#### (a) Affiliated Organizations.

The following affiliated organizations are organization members:

(1) **State Association.** An organization in a single state or territory that promotes and supports the purposes and objectives, policies and programs of the National Rifle Association. Membership shall be composed primarily of individuals, clubs and other organizations of that state or territory. Affiliation as the official State Association shall be by approval of the Board of Directors of the National Rifle Association, and not more than one organization may be so affiliated to represent any state or territory.

(2) **Approved Organization.** An organization other than a local club, composed primarily of individuals and/or clubs from a single state or territory, formed to promote one or more of the purposes and objectives of the National Rifle Association in the state or territory for which it is organized. Affiliation shall be in accordance with administrative requirements and procedures approved by the Executive Vice President.

An organization whose purposes and/or programs conflict with those of an existing affiliate in a state or territory shall not be affiliated.

(3) **Club.** A local organization composed of not less than five citizens of the United States, whose purposes are consistent with those of the National Rifle Association. Affiliation shall be

4

**EXHIBIT J**

in accordance with administrative requirements and procedures approved by the Executive Vice President.

### (b) Non-Citizen Organizations.

An organization of five or more members, wherever located, composed in whole or in major part of citizens of countries other than the United States, the purposes of which are consistent with those of the National Rifle Association. Enrollment shall be in accordance with administrative requirements and procedures approved by the Executive Vice President. Such organization membership shall be subject to termination or suspension in the same manner as provided in Section 3(f) of this article.

### (c) Participation By Other Organizations.

A nonprofit organization, including a national, regional, or state membership organization, educational institution, summer camp, or law enforcement organization, the purposes of which are not inconsistent with those of the National Rifle Association, may affiliate with the NRA or participate in programs of the NRA, in accordance with administrative requirements and procedures approved by the Executive Vice President.

A commercial organization or enterprise, including a private security agency, the purposes of which are not inconsistent with those of the National Rifle Association, may participate in specific programs of the NRA, in accordance with administrative requirements and procedures approved by the Executive Vice President.

### Section 5. Admission to Membership.

(a) An appropriate card, certificate or insignia shall be issued to each member as evidence of membership.

(b) Any applicant for any class of membership or affiliation may be refused admission or affiliation by the Board of Directors for any reason deemed by it to be sufficient.

**5**   **EXHIBIT J**

### Section 6. Rights and Privileges of Members.

(a) All members who comply with the regulations and meet the conditions specified for any particular match shall have the privilege of competing in such match whether conducted by the Association or its affiliated organizations and of qualifying for such awards as may be established by the Association.

(b) All members shall have the privilege of requesting and receiving from the Association such advice and assistance as may be currently available concerning small arms, ammunition and accessories, range construction, and organization and management of clubs and competitions. A reasonable charge may be made by the Association for such assistance.

(c) Except as provided in this subsection, all individual members of the Association shall be entitled to a subscription to the official journal as a privilege of membership. The Board of Directors may determine reduced dues or contributions for Associate, Junior or undesignated Family members of the Association, on the condition that such members electing to pay reduced dues or contributions shall not be entitled to a subscription to the official journal. Except as provided in Article IV, Section 1(a)(2), no Associate member, Junior member, or undesignated Family member shall be entitled to vote.

(d) All members shall have the privilege to attend and be heard at all official meetings of members, and shall have the right to attend all meetings of the Board of Directors, Executive Committee, and standing and special committees of the Association, except during executive sessions thereof.

(e)(1) Fully paid lifetime members and annual members with five or more consecutive years of membership, as shown in the Association's membership records, who have attained the age of 18 years on or before the fiftieth (50th) day prior to the date of the annual meeting of members and who are citizens of the United States of America shall be entitled to vote. Each such member shall be entitled to cast a vote for not more than one person for each vacancy on the Board of Directors to be filled by the membership at any election of

6

**EXHIBIT J**

Directors, which vote shall be cast as provided in these Bylaws. In order for such a member to cast a vote at any meeting of members, a properly completed, fully paid application for lifetime membership must have been received by the Secretary on or before the fiftieth (50th) day prior to the date of the meeting, or an annual member must have five years of consecutive membership, as shown in the Association's membership records, and such consecutive membership must be in effect on the fiftieth (50th) day prior to the meeting.

(2) Individual members who are not lifetime members or annual members with five (5) or more consecutive years of membership and who are otherwise qualified to vote pursuant to Section 6(e)(1) above, shall have the right to vote for the seventy sixth (76th) Director on the occasion of the Annual Meeting of Members.

**(f)** *Any member shall have the right to circulate and submit petitions for nominating Directors, to be signed by members entitled to vote, as provided In Article VIII, Section 3.*

(g) Members of the Association entitled to vote, and any affiliated organization as defined in Section 4(a) of this Article, shall have the right to petition for removal of any officer, Director, or member of the Executive Council by the procedure provided in Article IX.

(h) Members of the Association entitled to vote shall have the right to demand a special meeting of the members by the procedure provided in Section 8(b) of this Article.

### Section 7. Members Holding Office.

The holding of any office or membership on any committee shall be contingent upon membership in good standing in this Association.

### Section 8. Meetings of Members.

(a) **Annual Meeting of Members.** The Association shall hold an Annual Meeting of Members to receive the report of the election of Directors and to transact such other business as may properly come before the meeting, at such

7 **EXHIBIT J**

time and place as shall be determined by the Board of Directors, but in no case later than November 30th of each calendar year, unless a later date is made necessary or appropriate due to any act of God, state of emergency, governmental action, war, act of terrorism, civil unrest, protest, pandemic or other widespread health emergency, widespread transportation disruption, or other circumstance beyond the control of the Association that makes it impossible or impracticable to hold an earlier meeting ("Exigent Circumstances"). Notice of the time and place of such meeting shall be given in such manner as allowed by the corporate laws of the state under which the Association is incorporated.

(b) **Special Meetings of Members.** A special meeting of members of the Association may be called at any time by the President, by the Board of Directors, or by the Executive Committee, or upon demand, in writing, signed by not less than 5% of the members entitled to vote, and stating the specific purpose of the proposed meeting. Notice of the time, place and object of such meeting shall be given in such manner as allowed by the corporate laws of the state under which the Association is incorporated. The place of such meeting shall be fixed by the President.

(c) **Quorum.** At any annual or special meeting 100 members entitled to vote shall constitute a quorum.

(d) **Presentation of Awards.** No award shall be presented during any meeting of members without the prior approval of the Board of Directors.

#### Section 9. Duties of Members.

(a) It is the duty of each member to assist in every feasible manner in promoting the objectives of the Association as set forth in Article II of these Bylaws and to act at all times and in every matter in a manner befitting a sportsman and a good citizen.

(b) It is the duty of the officers of organization members to conduct the affairs of their organization in an efficient manner, in accordance with their organization bylaws, and such programs and regulations as may, from time to time, be adopted by

**EXHIBIT J**

this Association. Officers of organization members shall maintain proper records and shall promptly render such reports concerning membership, finances, facilities and activities as may be requested from time to time by the Association. In addition, officers of affiliated organization members shall conduct the affairs of the organization in a fiscally responsible manner, including the development of an annual budget and the completion of an annual audit.

(c) It is the duty of organization members to maintain their shooting ranges in a state of adequate repair, to operate their ranges in a safe manner under properly qualified supervision and to conduct a continuing program of small arms instruction and competition in compliance with the regulations and program of the Association as currently in effect.

### Section 10. Voluntary Termination of Membership.

(a) Any individual member may terminate his or her membership at any time by a resignation in writing sent by first class United States mail to the Secretary of the Association, but such member will not be entitled to any refund of dues or contributions already paid.

(b) Any organization member may terminate its membership at any time by a vote of a majority of the members of such organization at any regular meeting or special meeting called for the purpose, by a resignation in writing accompanied by a copy of the minutes of said meeting sent by first class United States mail by the Secretary of the organization to the Secretary of the Association, but such organization member should not be entitled to any refund of dues already paid.

### Section 11. Involuntary Termination of Membership and Disciplinary Proceedings.

(a) **Default.** Any member in default in payment of dues shall be terminated from membership and from all privileges of membership.

**9**     **EXHIBIT J**

(b) **Discipline, Suspension and Expulsion.**
Any individual or organization member may
be disciplined, suspended, or expelled for good
cause, including but not limited to, any conduct
as a member that is contrary to or in violation of
the Bylaws of the Association; for having obtained
membership in the Association by any false or
misleading statement; or, without limitation,
conduct disruptive of the orderly operation of the
Association in pursuit of its goals; violating one's
obligation of loyalty to the Association and its
objectives; or willfully making false statements
or misrepresentations about the Association or
its representatives. No member so suspended or
expelled will be entitled to any refund of dues or
contributions already paid.

(c) **Notice and Service by Mail.** Where notice
is required under this Section, notification shall
be by personal service or by a simultaneous first
class mailing and certified mailing to the address
of record with the Secretary. Notification by mail
shall be deemed to have been served five days after
mailing.

(d) **Procedure for Discipline, Suspension, or
Expulsion.**

(1) Any member of the Association in good
standing may file a complaint with the Secretary
of the Association against any individual or
organization member. Complaints regarding a
member's performance or activity at a competition
or competitions shall be filed with the Protest
Committee and shall be subject to this procedure
only if forwarded to the Secretary for such
processing by the Protest Committee.

(2) The complaint must be in writing,
notarized, and signed by the complainant. It
must distinctly describe the cause for which the
member's discipline, suspension, or expulsion is
sought. No complaint shall be filed or considered
with respect to the same facts or transactions as
an earlier filed complaint. Except for a complaint
based upon a conviction for an offense which
prohibits the person from possessing or receiving
firearms under federal law, or on facts which could
not have been discovered earlier with due diligence,
the complaint shall be based solely on facts, events,

**10**                                    **EXHIBIT J**

and transactions that shall have occurred not more than three years prior to the filing of the complaint. All exhibits referred to in the complaint shall accompany the complaint.

(3) The Secretary shall transmit the complaint to the Ethics Committee for consideration at its next meeting.

(4) The Ethics Committee shall determine whether the charges if proved would warrant suspension, expulsion, or other discipline, or should be dismissed.

(5) If the Ethics Committee determines not to dismiss the charges, it shall propose a resolution providing for suspension, expulsion, or other discipline as the appropriate remedy in the event the charges are proved or a hearing is not requested.

(6) The Secretary shall promptly notify the accused member of the proposed suspension, expulsion, or other discipline by mailing him a copy of the resolution. The Secretary shall enclose a copy of the complaint, the exhibits if any, and the Bylaws of the Association. The Secretary shall inform the accused member of the right to a hearing as hereinafter provided and further inform the member that unless the member requests a hearing in writing received by the Secretary within forty-five days after the date of such notice, the proposed resolution will be submitted to the Board of Directors for adoption.

(7) If a hearing is timely requested, the Secretary shall immediately notify the Chairman of the Committee on Hearings. A Hearing Board composed of three hearing officers shall be elected by and from the membership of the Committee on Hearings, none of whom shall have any personal interest in the proceeding. No more than two such hearing officers may be members of the Board of Directors or the Executive Council. The hearing officers shall choose a chairman from among their membership. The Hearing Board shall hold a hearing upon at least sixty days notice to the complainant and the accused.

(8) At the hearing, the complainant, the Association and the accused member may be represented by counsel. The Chairman of the

**11**   **EXHIBIT J**

Hearing Board shall preside at the hearing and may rule on all procedural matters. Testimony shall be taken under oath.

(9) At the conclusion of the hearing, the Hearing Board shall determine its recommendation to the Board of Directors.

(10) Upon receiving the recommendation of the Hearing Board, or the proposed resolution of the Ethics Committee in the event a hearing was not timely requested, the Board of Directors, in Executive Session, shall consider the submission at its next meeting and may dismiss the charges or, by a three-quarters vote, order the expulsion, suspension or other discipline of the accused member.

(e) **Confidentiality.** All proceedings under this Section shall be confidential.

(f) If the accused person allows his or her membership to lapse by failing to pay dues or by resigning pending final disposition of the complaint, then such person shall not be eligible to rejoin the Association without permission of the Board of Directors.

### Section 12. Committee on Hearings.

The Committee on Hearings shall be appointed by the President and composed of nine members entitled to vote, no more than six of whom shall be members of the Board of Directors or Executive Council.

# ARTICLE IV

## Board of Directors

### Section 1. Composition.

(a) The Board of Directors shall consist of seventy-six (76) Directors as follows:

(1) Seventy-five (75) Directors, elected for three (3) year terms as provided in Article VIII from lifetime members of the Association who are entitled to vote and have been lifetime members for a minimum of 5 years at the time

**12**                          **EXHIBIT J**

of nomination. This tenure requirement shall not affect any director serving as of April 29, 2019. The Executive Committee may, by a vote of the majority of the members present at a meeting called by the President, either by telephone or in person, waive this tenure requirement and allow a lifetime member who has been such for fewer than 5 years to be put on the ballot for election to the Board of Directors. A request for such a waiver must be submitted to the Secretary and received not more than 45 days after the adjournment of the most recent Annual Meeting of Members. Each such Director (except such Directors elected to fill unexpired terms) shall hold office from the adjournment of the Annual Meeting of Members at which his or her election is announced until the adjournment of the third Annual Meeting of Members next following such election or until his or her successor is elected and qualified. The terms of office of such Directors shall continue to be so arranged that one-third (1/3) of such terms shall expire at each Annual Meeting of Members or until their successors are elected and qualified.

(2) One (1) Director, elected as provided in Article VIII, Section 4, shall hold office from the adjournment of the Annual Meeting of Members at which he was elected until the adjournment of the next Annual Meeting of Members, or until a successor is elected and qualified.

(b) Conviction of a felony shall be a disqualification for nomination to or service on the Board of Directors unless the Board for good cause determines to the contrary.

### Section 2. Powers and Duties.

The Board of Directors shall formulate the policies and govern and have general oversight of the affairs and property of the Association, in accordance with applicable law and these Bylaws. The Board shall elect from among its own members a President and one (1) or more Vice Presidents. It shall also elect the Executive Vice President, Secretary and Treasurer of the Association, members of the Executive Committee, and may elect members to the Executive Council. *All*

**EXHIBIT J**

*vacancies in the Board occurring between regular elections for any reason shall be filled by persons who ran and lost on the most recent mail ballot in rank order of number of votes received; and each such person shall serve until the adjournment of the next Annual Meeting of Members.*

*Any Director, officer, or employee of the Association who is also a member of the governing body of any business, corporate, or other entity (whether as trustee, director, sole-owner, officer, partner, or the like) which receives from the Association any payment(s) for goods or services which total in excess of $2,000 either within a year or pursuant to any contract or contracts originating within a year shall immediately file a written statement of all such business as to the nature and amount thereof, to the best of his or her knowledge, with the Secretary who shall transmit such statement to the Board of Directors at its next meeting and who shall include all such statements in the Secretary's report at the next Annual Meeting of Members.*

Section 3. Meetings.

(a) *Regular Meetings. There shall be three regular meetings of the Board of Directors in each year. A first regular meeting of the Board of Directors shall be held within one week after the Annual Meeting of Members and after the election and installation of newly elected members of the Board of Directors as announced at the Annual Meeting of Members. At this meeting of the Board of Directors, the officers for ensuing terms shall be elected and such other business transacted as may properly come before the meeting. The second regular meeting of the Board of Directors shall be held approximately 120 days after the Annual Meeting of Members. The third regular meeting of the Board of Directors shall be held approximately 240 days after the Annual Meeting of Members. The exact*

**EXHIBIT J**

***time and place of each meeting may be determined by the Board of Directors at the previous meeting, reasonable notice being given.***

(b) **Special Meetings.** A special meeting of the Board of Directors may be held at any time on the call of The President, or by action of the Executive Committee, or upon demand in writing stating the object of the proposed meeting and signed by not less than a majority of the Board. Notice of the time, place and object of such special meetings shall be transmitted to each Director at least seven days before the date of holding such a meeting in person, or 72 hours before any special meeting held by means of a conference telephone or similar communications technology pursuant to subsection (f) of this section.

(c) **Quorum.** At any regular or special meeting of the Board of Directors 25 members shall constitute a quorum.

(d) Upon a request of 20% of the membership of the Board of Directors present, a roll call vote shall be taken on any specified question. ***Every such roll call vote, together with the specified question, shall be published by the Secretary In the official journal within 90 days.***

(e) Upon request of 20% of the membership of the Board of Directors present, the names of the persons voting in the affirmative, in the negative and the abstaining, shall be recorded in the minutes of the meeting but not published in the Official Journal.

(f) Members of the Board of Directors and Executive Council may participate in a meeting of such Board by means of a conference telephone or similar communications equipment or by electronic video screen communication ("Electronic Means"), and participation by Electronic Means shall constitute presence in person at the meeting so long as all persons participating in the meeting can hear one another at the same time and each participant can participate in all matters before the Board, including, without limitation, the ability to propose, object to, and vote upon a specific action to be

**15**    **EXHIBIT J**

taken by the Board, but only if (1) all Board and Executive Council members intending to participate in the meeting do so by Electronic Means, and (2) Exigent Circumstances for conducting the meeting exclusively by Electronic Means are determined to exist. Such determination shall be made when the time and place of the meeting is established. No participation by Electronic Means by any Board or Executive Council member in any meeting of the Board shall be permitted except as expressly provided in this paragraph (f).

### Section 4. Indemnification and Advancement of Expenses of Directors of the Association.

The indemnification and advancement of expenses of Directors granted pursuant to, or provided by, the corporate laws of the state under which the Association is incorporated shall not be exclusive of any other rights to which a Director seeking indemnification or advancement of expenses may be entitled, and each Director shall be entitled to such indemnification and expenses immediately to the fullest extent requested in writing to the Secretary or Executive Vice President by such Director unless and only unless prohibited by corporate laws of the state under which the Association is incorporated.

## ARTICLE V

### Officers

### Section 1. Number and Election.

(a) The officers of the Association shall be a President, one or more Vice Presidents, an Executive Vice President, a Secretary, a Treasurer, an Executive Director of the National Rifle Association General Operations, and an Executive Director of the National Rifle Association Institute for Legislative Action. The President and Vice Presidents shall be elected annually by and from the Board of Directors. The Executive Vice President, Secretary and Treasurer shall be elected annually by the Board of Directors, and they shall

**EXHIBIT J**

serve until their successors have been elected and qualified. ***The Executive Vice President shall be elected by the Board of Directors. In the event that the Office of the Executive Vice President becomes vacant, the succeeding Executive Vice President shall be elected by the Board of Directors at its next meeting.*** The President may not succeed himself or herself more than once, after being elected to serve a full term, except that Charlton Heston may succeed himself as President a second time for the term commencing in the year 2000 and ending in the year 2001, and a third time for the term commencing in the year 2001 and ending in the year 2002, and a fourth time for the term commencing in the year 2002 and ending in the year 2003. When two (2) or more candidates are nominated for office, voting for officers shall be by written ballot.

**(b)** ***The Board may not abolish said offices nor create any other offices.***

**Section 2. Duties of Officers.**

(a) **President.**

(1) The President shall preside at all meetings of the Association, of the Board of Directors and of the Executive Committee.

(2) With the exceptions of the Nominating Committee, the Committee on Hearings and the Committee on Elections, the President shall be an ex officio member, with vote, of all committees.

(3) Except as otherwise provided in these Bylaws, the President shall appoint all standing and special committees of the Association.

(4) The President shall perform all such other duties as usually pertain to the office.

(b) **Vice Presidents.** The Vice President shall perform the duties of the President in the absence or at the request of the President. In case a vacancy shall occur in the office of the President, the first Vice President shall become President and shall serve for the balance of the term. In case more than one Vice President is elected by the Board of Directors, each Vice President shall be designated

**EXHIBIT J**

in succession by number, and in case of a vacancy shall succeed to the next higher office. With the exceptions of the Nominating Committee, the Committee on Hearings and Committee on Elections, the Vice Presidents shall be ex officio members, with vote, of all committees. The Vice Presidents shall perform such duties as may be delegated by the President or assigned by either the President or the Board of Directors.

(c) **Executive Vice President.** The Executive Vice President shall direct all the affairs of the Association in accordance with the programs and policies established by the Board of Directors. Among his authorities, the Executive Vice President shall be empowered to (1) appoint, suspend with or without pay, or remove the Executive Director of the National Rifle Association General Operations or the Executive Director of the National Rifle Association Institute for Legislative Action; (2) suspend with pay the Secretary or the Treasurer until the next meeting of the Executive Committee or the Board of Directors, whichever occurs first; and (3) employ, suspend with or without pay, or dismiss any employee.

(d) **Secretary.** The Secretary, under the direction of the Executive Vice President, shall have the following duties: (1) have charge of the archives of the Association; (2) attend to the proper publication of official notices and reports, attest documents, and perform such other duties as usually pertain to the office; (3) have such other duties as may be assigned from time to time by the Board of Directors, the Executive Committee, and/or the Executive Vice President; and, (4) shall be Secretary of the Board of Directors, the Executive Committee, the Nominating Committee and the Committee on Elections.

(e) **Treasurer.** The Treasurer shall operate in accordance with the financial policies set forth by the Board of Directors or the Executive Committee, and shall have charge of the books of account and financial operations of the Association. The Treasurer shall regularly report his or her recommendations regarding the financial affairs of the Association to the Finance Committee,

**18**

**EXHIBIT J**

Executive Vice President, the Board of Directors, and the Executive Committee. The Treasurer shall assist a firm of certified public accountants selected by the Board of Directors to make an annual audit of the Association's books of account and prepare a statement of financial conditions as of the close of each fiscal year as may be established by the Board of Directors, and shall furnish a copy of such statement, together with the certificate of audit, to each member of the Board of Directors. The funds of the Association shall be placed in such bank or banks as may be designated by the Board of Directors. The Treasurer shall have such other duties as may be assigned to him or her from time to time by the Board of Directors, the Executive Committee, and/or the Executive Vice President.

(f) **Executive Director of the National Rifle Association General Operations.** The Executive Director of the National Rifle Association General Operations shall have such powers and duties as delegated to him from time to time by the Executive Vice President. In case of a vacancy in the office of the Executive Vice President, the Executive Director of the National Rifle Association General Operations shall automatically become the Executive Vice President and serve as such until the next *meeting of the Board of Directors.*

(g) **Executive Director of the National Rifle Association Institute for Legislative Action.** *The Executive Director of the National Rifle Association Institute for Legislative Action shall, under the direction of the Executive Vice President, conduct the legislative, legal, informational, fund raising activities, operational, administrative and financial* affairs of the Institute in accordance with the programs and policies established by the Board of Directors. The Executive Director of the Institute shall appoint a Fiscal Officer who shall have charge of the books of account of the Institute, and said Fiscal Officer shall assist the firm of Certified Public Accountants selected to make an annual audit of the books of account of the Institute, and in the preparation of a statement of financial condition of the Institute to be included as a part of the audit and incorporated in the statement of condition of the

**EXHIBIT J**

National Rifle Association of America referred to in subsection 2(e) of this Article. The funds donated to the Association for the use of the Institute or allocated and transferred by direction of the Board of Directors from the Association's other funds, or which are otherwise received by the Institute, shall be placed in such bank or banks, as may be designated by the Board of Directors in accounts designated as "The National Rifle Association-Institute Account," and may be withdrawn only on checks signed by the Fiscal Officer of the Institute and such other signatures as the Board of Directors may prescribe; provided, however, that the Board of Directors may authorize the establishment of special accounts for specific operations or for the payment of routine bills not requiring the Fiscal Officer's signature. Once each fiscal year the Treasurer of the Association shall conduct an internal audit of the books of the Institute and of its general financial condition. The Executive Director, Fiscal Officer and the staff of the Institute shall assist the Treasurer in such internal audit.

(h) The Executive Vice President, the Secretary, the Treasurer, the Executive Director of the National Rifle Association General Operations and the Executive Director of the National Rifle Association Institute for Legislative Action shall be ex officio members, with voice but without vote, of the Board of Directors, the Executive Committee and all committees, special and standing, of the Association, except the Nominating Committee, Committee on Hearings, Officers Compensation Committee and Committee on Elections, and shall be authorized but not required to attend the meetings; provided, however, that the aforesaid officers shall not attend or participate in executive sessions except by invitation of the respective committee or Board.

### Section 3. Suspension and Removal.

(a) **Elected Non-salaried Officers.** Any elected non-salaried officer of the Association may be suspended with or without cause by the Executive Committee by a three-fourths (3/4) affirmative vote of the members of the Executive Committee present at any regular or special meeting, such suspension

**20**

**EXHIBIT J**

to be effective until the next meeting, either regular or special, of the Board of Directors. Any such officer may be removed with or without cause by the Board of Directors, by a three-fourths (3/4) affirmative vote of the members of the Board of Directors present at any regular or special meeting of the Board of Directors. No vote on suspension or removal may be taken unless at least fifteen (15) days notice in writing shall have been given to the officer of the proposed suspension or removal and of any charges preferred (if the proposed suspension or removal is for cause) and of the time and place of the meeting of the Executive Committee or of the Board of Directors, at which such charges will be considered. Notice of the time, place and object of such meeting, with a full copy of any charges preferred shall be mailed to each member of the Executive Committee or of the Board of Directors at least fifteen (15) days in advance of the meeting. At such meeting the officer whose suspension or removal is proposed shall be accorded a full hearing and may be represented by counsel.

(b) **Elected Salaried Officers.** Any Officer elected by the Board of Directors who is a salaried employee may be suspended with or without cause and with or without pay at any time by the Executive Committee by a three-fourths (3/4) affirmative vote of the members of the Executive Committee present at any regular or special meeting. Such suspension shall be effective until the next meeting, either regular or special, of the Board of Directors. Any such Officer may be removed with or without cause at any time by the Board of Directors, by a three-fourths (3/4) affirmative vote of the members of the Board of Directors present at any regular or special meeting of the Board of Directors. No vote on removal may be taken unless at least fifteen (15) days notice in writing shall have been given to the officer of the proposed removal and of any charges preferred (if the proposed removal is for cause) and of the time and place of the meeting of the Board of Directors at which such charges shall be considered. Notice of the time, place and object of such meeting with a full copy of any charges preferred shall be mailed to each member of the Board of Directors at least fifteen (15) days in advance of the meeting.

**21** **EXHIBIT J**

At such meeting, the officer whose removal is proposed shall be accorded a full hearing and may be represented by counsel.

### Section 4. Vacancies.

Except as otherwise provided in Section 2(c) and (f) hereof, in the event of the death, resignation, suspension, removal or permanent disability of any officer, the vacancy thereby caused may be filled by the Executive Committee until the next meeting of the Board of Directors. Except as otherwise provided in Section 2(b) and (c), hereof, the Board of Directors shall elect a replacement to serve out the balance of the term of any such officer.

### Section 5. Compensation.

(a) No Director or member of the Executive Council shall receive any salary or other private benefit unless specifically authorized by resolution of the Board of Directors or an authorized committee thereof, but all such persons shall be entitled to reimbursement for expenses incurred on behalf of the Association, to such extent as may be authorized or approved by the Board of Directors.

(b) There shall be an Officers Compensation Committee, which shall consist of the President, who shall serve as the Chairman, the First Vice President and the Second Vice President. In case there shall be no Second Vice President, the President shall appoint a Director to serve in his place.

(c) At the fall meeting of the Directors, the Officers Compensation Committee shall recommend to the Board, and the Board shall, at the same meeting, establish by resolution the authorized compensation for the next budget year for all elected salaried officers, who shall be the Executive Vice President, the Secretary, and the Treasurer. Nothing contained herein shall preclude other meetings of the Officers Compensation Committee as may be called by the President, which may include consideration of the salaries of newly elected salaried officers or of prospective candidates to fill vacancies among the elected salaried officers pursuant to the provisions of Article V, Section 4 of these Bylaws.

All deliberations by the Board of Directors

22

**EXHIBIT J**

concerning such compensation shall be held in an executive session, at which none of the officers whose compensation is to be or is being established may attend, except for the limited time and limited purpose of answering questions asked by any member of the Board of Directors at the meeting.

(d) The compensation of the Executive Director of the National Rifle Association General Operations and the Executive Director of the National Rifle Association Institute for Legislative Action shall be established by the Executive Vice President.

### Section 6. Bonds.

All officers and employees handling moneys of the Association shall be bonded in such amount as may be determined by the Board of Directors. The expense of furnishing such bonds shall be paid by the Association.

# ARTICLE VI

## Executive Committee

### Section 1. Composition.

(a) There shall be an Executive Committee consisting of the President, any Vice Presidents and 20 members elected from the Board of Directors, as herein provided.

(b) The 20 members of the Executive Committee nominated by the Nominating Committee or from the floor at any meeting of the Board of Directors, and elected annually by and from said Board, shall serve until their successors are elected and qualified.

### Section 2. Powers and Duties.

The Executive Committee shall exercise all the powers of the Board of Directors when said Board is not in session, other than the power to:

(a) Repeal or amend the Bylaws, or adopt new Bylaws;

(b) Fill vacancies on the Board of Directors or the Executive Committee;

**EXHIBIT J**

(c) Fix the compensation of Directors or Officers;

(d) Remove a Director, with or without cause;

(e) Amend or repeal any resolution of the Board, which by its terms shall not be amendable or repealable;

(f) Adopt and disseminate a fundamental change of view, or basic policy, or basic organizational structure of the Association;

(g) Approve the submission of matters to the members, or submit to the members any action requiring member approval under the applicable statute;

(h) Purchase, sell, mortgage, or lease real property of the Association, or adopt a corporate resolution recommending the sale, lease, exchange or other disposition of all or substantially all the assets of the Association, or authorize major new construction;

(i) Present a petition for judicial dissolution, or to adopt plans of merger, consolidation, or nonjudicial dissolution;

(j) Authorize indemnification of Officers, Directors, members of the Executive Council, or employees; or

(k) Formulate such other corporate policy decisions or perform corporate activities of the Association of such major significance as to warrant action by the full Board of Directors.

### Section 3. Vacancies in the Executive Committee.

A vacancy in the Executive Committee may be filled by a majority vote of the entire Board of Directors.

### Section 4. Meetings of the Executive Committee.

**(a) *Meetings of the Executive Committee will be held on the call of the President, reasonable notice being given.***

(b) A special meeting shall be called by the President within twenty-one (21) days of receipt by the Secretary of a demand in writing stating the

**24**                    **EXHIBIT J**

specific object of the proposed meeting and signed by no less than a majority of the committee.

(c) Notice of the time and place of any Executive Committee meeting, and the stated specific object of any special meeting, shall be sent to each member of the committee, the Board of Directors, and the Executive Council. Other than for a conference telephone meeting pursuant to Article XI, Section 7, such notice shall be sent at least five (5) business days in advance of the meeting. For a conference telephone meeting, such notice shall be sent at least 48 hours in advance of the meeting, except that notice sent less than 48 hours in advance shall be deemed sufficient upon confirmation of delivery to all members of the committee. Members of the Board of Directors who are not members of the committee shall be entitled to attend such meetings at their own expense.

(d) Twelve members of the Executive Committee shall constitute a quorum.

## ARTICLE VII

### Executive Council

#### Section 1. Composition.

(a) There shall be an Executive Council which shall be advisory to the Executive Committee and the Board of Directors. Any member of this Association whose advice and counsel, in the opinion of the Board of Directors, will be valuable to the continuing welfare of the Association may be elected thereto for life by said Board of Directors.

(b) Any member of the Association may be nominated by any member of the Board of Directors or Executive Council and be elected to the Executive Council for life subject to removal as provided in Section 3 by said Board of Directors.

#### Section 2. Rights and Privileges.

(a) The members of the Executive Council shall have the right to sit with the Executive Committee and Board of Directors at all regular and special

**EXHIBIT J**

meetings, including any executive sessions thereof. The Executive Council members shall have all rights and privileges of members of the Executive Committee or full Board of Directors, including the right to sponsor Bylaw amendments, to introduce or second motions, debate, serve as a full voting member on, or as chairman or vice chairman of standing or special committees; but Council members who are not members of the Board of Directors shall have no right to vote at meetings of the Executive Committee or the Board of Directors.

(b) The Executive Council shall perform such acts and duties as may be specifically delegated to it by these Bylaws, or by the President, the Executive Committee or the Board of Directors.

(c) Any member may serve simultaneously on the Board of Directors and the Executive Council.

### Section 3. Removal.

Any member of the Executive Council may be removed for cause by the Board of Directors at any regular or special meeting of the Board of Directors pursuant to procedures outlined in Article V, Section 3(a).

For the purposes of this Article "cause" is set forth in Article III, Section 11(b) of these Bylaws.

## ARTICLE VIII

### Nomination and Election Procedures (For Election of Director by the Mail Ballot)

### Section 1. Nominating Committee.

(a) *At each regular meeting of the Board of Directors next following the Annual Meeting of Members, the Board shall elect, by secret ballot, a Nominating Committee which shall be responsible for nomination of Directors, members of the Executive Committee, and officers who are to be elected at the next annual meeting of members or at a subsequent meeting of the Board of Directors.* Any vacancy in the Nominating Committee occurring between

**EXHIBIT J**

regular annual elections may be filled by majority vote of the Board of Directors. ***The Nominating Committee shall also serve as an appeals board of first resort by members seeking to contest a ruling by the Secretary of the Association as to the validity of a petition for nomination of a candidate to elected office in the Association.***

***(b) The Nominating Committee shall be composed of nine members entitled to vote, no more than six of whom shall be members of the Board of Directors or Executive Council. Nominations for election to the Nominating Committee shall be made from the floor. Following the close of nominations for membership on the Nominating Committee, each Director present at the meeting shall receive one ballot listing the nominees, on which he is entitled to cast not more than one vote for each of nine nominees, of whom not more than six may be members of the Board of Directors or the Executive Council. All nominees for the Nominating Committee shall be voted on together, with the nine receiving the greatest number of votes being elected; provided, however, that no more than six nominees who are members of the Board of Directors or Executive Council shall be elected. In case of a tie for the last vacancy, a run-off vote shall be conducted between the nominees tied. A Director whose term expires at the end of the ensuing year shall not be eligible for election to the Nominating Committee. Notwithstanding any other provision of these Bylaws, no person elected to the Nominating Committee shall be eligible for election as a Director during the tenure of the Nominating Committee to which he was elected; nor shall any officer be a member or ex officio member of the Nominating Committee.***

(c) No person shall be eligible for election to the Nominating Committee more often than once every three years.

**EXHIBIT J**

### Section 2. Nomination and Election of Directors.

(a) Directors shall be elected from among the lifetime members of the Association. Annual nominations to fill vacancies on the Board of Directors shall be made by the Nominating Committee and by the members through the petition process described in this Article. Annual elections shall be by mail ballot vote of members entitled to vote. The Committee on Elections shall be responsible for the tabulation of the votes, and shall report the results of the election at the Annual Meeting of Members. The provisions of this Article do not apply to the filling of interim vacancies on the Board of Directors, as provided in Article IV, Section 2.

(b) Not later than 240 days prior to each Annual Meeting of Members, the Secretary shall provide notice in the official journal of the Association of the date and place of such Annual Meeting, of the date and place of the meeting of the Nominating Committee at which nominations for Director will be made, and of the procedure for nomination and election of Directors. The notice shall be accompanied by a blank form requesting the recommendation of suitable nominees to be considered by the Nominating Committee. An individual or organization member may make one or more recommendations. The Secretary shall again give notification of the Annual Meeting of Members by publication in the official journal of the Association not less than 30 days prior to the time of such Annual Meeting of Members.

(c) Recommendations for nomination by the Nominating Committee must be received by the Secretary not less than twenty days prior to the published date of the meeting of the Nominating Committee to select nominees for the office of Director. The Secretary shall promptly confirm the eligibility of persons recommended and transmit the recommendations to the Nominating Committee.

(d) Not less than one hundred eighty (180) days prior to the Annual Meeting of Members the Nominating Committee shall meet to select from among the members entitled to hold the office of Director a list of nominees. Not less than sixty (60)

**EXHIBIT J**

days prior to the Annual Meeting of Members, the names of the nominees selected by the Nominating Committee and by the petition process described in Section 3 shall be published in the official journal of the Association, together with a short biographical sketch of each. Biographical sketches shall be limited to biographical facts and shall be submitted to the Secretary of the Association by each candidate and shall be sworn to or affirmed by the candidate as being truthful in every respect. Any willful material misrepresentation contained therein shall invalidate the candidacy provided that (1) such misrepresentation shall first be brought to the attention of the candidate by the Secretary, and (2) the candidate persists in the inclusion of such misrepresentation in the biography by submitting a further sworn statement or affirmation reaffirming the truthfulness thereof. The decision of the Secretary of the Association in matters concerning biographies shall be final.

(e)(1) At least forty-five (45) days prior to the date of the Annual Meeting of Members, the Secretary shall mail a printed ballot to each member entitled to vote as provided in Article III, Section 6(e)(1), directed to his last address on record with the Secretary; provided, however, that to receive said ballot all qualifications described in Article III, Section 6(e)(1) must have been met on or before the fiftieth (50th) day prior to the Annual Meeting of Members, and a properly completed, fully paid application for lifetime membership must have been received, or an annual member must have five or more years of consecutive membership, as shown in the Association's membership records, on the fiftieth (50th) day prior to the date of the Annual Meeting at which the election of directors is announced.

(2) The ballot shall list thereon the names, cities and states of principal residence of all nominees proposed by the Nominating Committee, as well as the names, cities and states of principal residence of those nominated by the petition process pursuant to the provisions of Section 3 hereof. The order of the names on the ballot shall be rotated as determined by the Committee on Elections. The

**EXHIBIT J**

ballot shall provide five blank spaces for write-in candidates. A return envelope with means for authentication, including a place for signature and address of the member, shall be enclosed with each ballot. The final date on or before which the ballot must be received by the Association in order for it to be counted shall be shown clearly on the face of the ballot.

(f) A member eligible and desiring to vote shall clearly mark his ballot for his choice of Directors. He may make his selection from the list of candidates printed on said ballot, and/or he may write the name, together with the city and state of principal residency of each other member whom he wishes to be on the Board and believes to be eligible to hold the office of Director. In any event, if his ballot is to be valid, he must not vote for a number of candidates greater than the total number of Directors to be elected by the mail ballot. Having marked his ballot and signed the authentication, the member must place and seal the ballot in the return envelope. Any ballot received by the Association later than the 20th day preceding the date of the Annual Meeting of Members shall be invalid and shall not be opened or counted.

(g) Prior to the Annual Meeting of Members the President each year shall appoint a Committee on Elections, no member of which shall himself be a nominee proposed by the Nominating Committee or by the petition process described in Section 3 hereof, to conduct the election of Directors. It shall be the duty of that Committee to determine whether every member elected to the office of Director is eligible to hold the office. The Executive Vice President shall, at the request of the President or the Chairman of the Committee on Elections, make available such employees of the Association as may be necessary to assist the Committee in the examination and validation of the ballots as set forth in subsection (h) of this section.

(h) Upon the receipt of a ballot by the Association on or before the prescribed latest date, the Committee on Elections shall verify the name of the voter against the rolls of members entitled to vote, and verify the eligibility to hold the office

**EXHIBIT J**

of Director of any write-in names on the ballot. A ballot shall be invalid if not cast on the official printed ballot form provided by the Secretary; or if not received by the Association on or before the prescribed latest date specified on the ballot; or if not authenticated by a member entitled to vote; or if more than one ballot is received from the same voter; or if the ballot is not clearly marked; or if the ballot contains more than one vote for a single candidate; or if the ballot contains votes for more than the number who are to be elected Directors. No ballot shall be invalidated for failure to contain a vote for one person for each of the vacancies to be filled at said election.

(i) A ballot judged invalid shall have the reason noted thereon and be initialed by the person who examined it. All ballots, whether judged valid or invalid, and all returned envelopes, including authentication, shall be preserved by the Association for 120 days. Up to that time, any member entitled to vote may make application to the Executive Committee or the Board of Directors, whichever shall meet first, for a canvass or recount upon such terms and conditions as that body may prescribe, and for redress thereafter, if appropriate. If no such application is made before the time herein specified, all protests and grievances concerning the election shall be deemed to have been waived, and the ballots and return envelopes including authentications may then be destroyed.

(j) The Committee on Elections shall serve as election tellers and the chairman of the committee shall announce the results of the election when called upon to do so by the presiding officer at the Annual Meeting of Members. The chairman of the Committee on Elections shall include in his report the total number of ballots received, the total number of all ballots judged valid and judged invalid, and the total number of votes received by each person. The chairman shall declare elected to regular three (3) year terms those persons who, in numbers equal to the number of such vacancies, receive the largest number of the votes cast; and shall declare elected to specified incomplete terms, if any, beginning with the longest remaining incomplete term or terms, those persons who receive the next largest number

**31**    **EXHIBIT J**

of votes cast. In the event of a tie vote between two or more persons for the last vacancy to be filled in any term at issue, the tie shall be decided by lot by a means to be determined by the Committee on Elections.

(k) The results of the election by mail ballot as announced at the annual meeting shall be published in the Official Journal within 90 days after such announcement.

**Section 3. Nomination of Directors by Petition.**

(a) *In addition to such persons as are selected by the Nominating Committee as provided in Section 2 of this Article, an individual qualified to hold office may be nominated for Director by petition of the members.*

(b) *Any member ("sponsor") may circulate a petition calling for the nomination of a qualified member for the office of Director. A petition shall be valid only if received by the Secretary not more than 45 days after the announced date of the meeting of the Nominating Committee to select nominees for the office of Director. A petition may consist of multiple pages, but all pages must be submitted by the proposed nominee. The Secretary shall prescribe the format of the petition and furnish forms upon request. No petition for nomination of a person for the office of Director shall contain the name of more than one proposed nominee, nor shall a petition be submitted to the Secretary which contains the name of more than one proposed nominee per sheet. No petition for nomination of a person for the office of Director shall be valid without the proposed nominee's written permission filed with the Secretary on or before the last day for submission of petitions. The petition may contain a brief resume approved by the proposed nominee. The name of a sponsor(s) shall be indicated on each sheet of the petition. The petition must*

**EXHIBIT J**

**bear the original handwritten signatures, names, membership identification numbers, addresses and date of signing of a number of members eligible to vote that is not less than 0.5% of the number of valid ballots cast in the most recent mail ballot election of directors, which number shall be provided by the Secretary to any member upon request. Each petition shall indicate the proposed nominee's principal city and state of residence, and not more than five petition nominees shall be from any one state during any one year. In the event there are petitions for more than five proposed nominees from one state, the five proposed nominees who have the greatest number of signatures on the petition shall be nominated; provided, however, that in case of ties, the Nominating Committee shall select by lot among those having the same number of petition signatures. In no event shall the date of signing be prior to the adjournment of the most recent annual meeting of members.**

**(c) The Secretary shall immediately determine the validity of all petitions received and the eligibility of all signatories to vote.**

**(d) In the event the petition shall have been found invalid, the Secretary shall immediately notify the proposed nominee and the sponsor(s) stating the reasons for such ruling. The proposed nominee or a sponsor may appeal this ruling to the Nominating Committee in writing within fourteen days of such notice. If the petition is ruled valid by the Nominating Committee, the proposed nominee shall be certified as a nominee. If the petition is denied by the Nominating Committee, the proposed nominee or a sponsor may appeal to the Board of Directors who shall act on the appeal at the next Board meeting. If said Board rules the petition valid, the proposed nominee shall be declared a nominee for the next annual election of Directors.**

**EXHIBIT J**

*(e) On the official ballot for the election of Directors, no persons nominated by petition nor by the Nominating Committee shall be so designated. Nothing contained in this section shall prohibit publication of the Report of the Nominating Committee in any copy of the Association's official journals; nor prohibit any candidate from designating the method or methods of nomination in his or her biographical sketch; nor prohibit paid advertisements from containing such information.*

*(f) All applicable rules of Section 2 of this Article shall apply equally to all nominees, whether selected by petition or Nominating Committee.*

### Section 4. Election of One Director at Annual Meeting of Members.

One Director shall be elected for a one-year term on the occasion of each Annual Meeting of Members by a plurality of the votes cast by those individual members present in person (and not by proxy) who are entitled to vote pursuant to Article III, Section 6(e). Such Director shall be chosen only from those persons who were nominated as candidates for election for Director in the mail ballot (Article VIII) immediately preceding said Annual Meeting of Members, but who failed to be elected thereby.

# ARTICLE IX

## Removal of Association Officials by Recall

### Section 1. Petition for Removal by Recall.

*Notwithstanding any other provision of these Bylaws, any voting member of the Association ("sponsor") may in a single petition call for the removal of one officer, or Director, for good cause, in the manner hereinafter provided. For the purposes of this Article, "good cause" is set forth in Article III, Section 11(b) of these Bylaws.*

34                    **EXHIBIT J**

**Section 2. Procedure.**

(a) *Not less than 270 days prior to any Annual Meeting of Members of the Association, any member entitled to vote (the "sponsor") may submit to the Secretary of the Association a petition in writing which calls for or proposes such removal.*

(b) *In order to be valid:*

*(1) Such petition for removal shall be in writing, notarized, and signed in handwriting by the sponsor, and must be received by the Secretary no later than the deadline specified in subsection (a) of this section. It shall distinctly describe the cause for which the person's removal from office is sought, and except for a petition based upon a conviction for an offense which prohibits the person from possessing or receiving firearms under federal law, or in cases of newly discovered evidence which could not have been discovered earlier with due diligence, shall be based solely on facts, events, and transactions that shall have occurred not more than three years prior to the filing of the petition. No petition shall be filed or considered with respect to the same facts or transactions as an earlier filed petition for the removal of the same person, or if it contains willful false statements or misrepresentations, or if it is completely without merit under law (including these Bylaws), or if it is filed to harass or maliciously injure another, to disrupt the orderly operation of the Association in pursuit of its goals, or for any other improper purpose.*

*(2) The petition shall contain the names, addresses, membership identification numbers, original handwritten signatures and dates of signing of a number of members eligible to vote that is not less than 5% of the number of valid ballots cast in the most recent mail ballot election of directors, which number shall be provided by the Secretary to any member upon*

35    **EXHIBIT J**

*request. A petition may consist of multiple pages, but all pages must be submitted by the sponsor.*

*(3) At least three states of the United States of America shall be represented on the petition by the signatures of no fewer than 100 residents of each such state, as reflected by each signor's last address of record furnished to the Secretary.*

*(4) Such petition shall contain no signature for which the date of signing is prior to the adjournment of the most recent Annual Meeting of Members.*

*(5) Such petition shall clearly state that it may be withdrawn by the sponsor without notice to, or approval by, the signatories.*

*(c)(1) The Secretary shall rule a petition invalid if it fails to comply with any provision of section (1) of this article or of subsections (a) or (b) of this section.*

*(2) In the event a petition is ruled invalid by the Secretary, he shall immediately notify the sponsor of the petition and the person whose removal is sought, stating the reasons for such ruling. The sponsor may appeal this ruling to the Committee on Hearings, by a written notice that must be received by the Secretary within 21 days of the Secretary's ruling. The Committee on Hearings shall meet within 10 days to hear such an appeal. The party not prevailing in the appeal to the Committee on Hearings may appeal within 10 days of the ruling by the Committee on Hearings, to the Executive Committee, which shall hold a conference telephone meeting within 10 days to act on the appeal, and the decision of that body shall be final.*

*(d) In the event that the petition is ruled valid by the Secretary, the person whose removal is sought, and the sponsor of the petition, shall be notified immediately. The person whose removal is sought shall have the right, upon written request*

36

**EXHIBIT J**

received by the Secretary within 10 days of the Secretary's ruling, to inspect the petition, and to appeal the Secretary's ruling, in writing, to the Committee on Hearings within 21 days of such ruling. The Committee on Hearings shall meet within 10 days to hear such an appeal. The party not prevailing in the appeal to the Committee on Hearings may appeal within 10 days of the ruling by the Committee on Hearings, to the Executive Committee, which shall hold a conference telephone meeting within 10 days to act on the appeal, and the decision of that body shall be final.

(e) If, after all appeals, the petition is ruled valid:

(1) a Hearing Board shall be elected as prescribed in Article III, Section 11(d).

(2) the Hearing Board shall schedule and conduct a hearing as soon as possible at a time and place determined by the Secretary. The hearing shall be conducted in accordance with Article III, Section 11(d)(8). The Hearing Board shall make a complete record of all testimony and exhibits presented, and within 21 days of the date of the hearing shall prepare a written opinion, or a majority opinion and minority view, and a recommendation concerning a disposition of the petition. All proceedings under this subsection shall be confidential.

(f) At the time the Secretary mails out printed ballots to each member of record entitled to vote for the election of Directors, as provided in Article VIII, Section 2(e), he shall also enclose the printed recall ballot containing the name and office for each such person whose removal was the subject of a valid petition, together with a copy of the recommendation of the Hearing Board, including the minority view if the recommendation is not unanimous. Statements not exceeding five hundred words may also be enclosed in the mailing by the sponsor of the petition for recall and

37 **EXHIBIT J**

*by each person whose removal was the subject of a valid petition. The recall ballot shall state as follows:*

*"Shall (name of office-holder) be removed from membership on the Board of Directors?" (or other specific office in the Association).*

*(g) In the recall voting procedure, the applicable provisions of Article VIII, Section 2, paragraphs (f), (g), (h), (i), (j), and (k) of these Bylaws shall apply to the use and authentication of prescribed official ballot forms, their validation, the counting of votes, and the announcement of results.*

*(h) If a majority of votes cast on the recall ballot by members of record entitled to vote shall call for the removal of an officer or Director, the removal shall be effective immediately upon certification of the results of a mail ballot recall procedure by the Committee on Elections.*

*(i) In any event, the Secretary shall immediately notify the person whose removal was petitioned and voted upon as to the results of a mail recall ballot, shall simultaneously inform the officers and Directors of the Association of such results and whether a resulting vacancy exists, and shall cause the results of such recall vote to be published in an official publication of the Association as soon as possible.*

*(j) At any stage of the proceedings under this Article, the sponsor of a petition may, with the written consent of the person against whom the recall petition was directed, withdraw the petition or otherwise terminate the proceedings provided for under this Article by so requesting in writing. At the written request of the person against whom the petition was directed, an announcement of the withdrawal or termination shall be published forthwith in the official journal of the Association.*

**38**

**EXHIBIT J**

**Section 3. Filling of Vacancies Created by Removal of Office-Holder by Membership.**

*In the event an officer or Director is removed by recall vote of the membership, the vacancy shall be filled pursuant to the provisions of Article V, Section 4 for officers and Article IV, Section 2 for Directors; provided, however, that no person removed from office by the membership shall be returned to that office by the Board of Directors acting under this provision.*

# ARTICLE X

**National Rifle Association Institute for Legislative Action**

**Section 1. Name and Function.**

*The National Rifle Association Institute for Legislative Action shall have sole responsibility to administer the legislative, legal, informational and fund raising activities of the Association relating to the defense or furtherance of the right to keep and bear arms, in accordance with the objectives and policies established by the Board of Directors.*

**Section 2. Officers.**

The Executive Director and Fiscal Officer shall have the duties set forth in Article V, Section 2(g). The Executive Director shall be in general charge of the Institute, shall be responsible for hiring, firing and establishing salary schedules for the remaining staff of the Institute, in accordance with the approved budget and other directives of the Board of Directors.

**Section 3. Planning.**

At least annually the Executive Director shall prepare and submit to the Board of Directors for approval a detailed plan of action in the following areas:

**EXHIBIT J**

(a) Federal legislative activity.

(b) Legislative action organization development and operation in the political subdivisions of the United States.

(c) Legal action.

(d) Legislative information gathering and dissemination.

(e) Such other legislative activity as may be advisable.

(f) Fund raising for the above activities.

## Section 4. Reports.

In addition to the planning recommendation under Section 3, the Executive Director shall report to the Board of Directors and the Executive Committee at each meeting thereof as to the activities of the Institute. The report shall indicate specifically all necessary compliance by the Association and its Institute with the applicable Federal, state and local laws regulating legislative activity.

## Section 5. Directives.

The Board of Directors shall by resolution from time to time set the legislative, legal action, political education, and informational objectives and policies of the Association relating to the defense or furtherance of the right to keep and bear arms, and shall give specific directions to the Institute in these and such other matters as the Board shall deem advisable.

## Section 6. Prohibition of Political Contributions.

Neither the Association, its Institute for Legislative Action, nor any officer, Director, employee, or agent acting on behalf of the Association or its Institute for Legislative Action, shall make any contribution to a political campaign, candidate, or political committee. These prohibitions shall not apply to contributions by the Association or its Institute for Legislative Action to any federal independent-expenditure-only committee formed pursuant to a resolution of the Board of Directors, or to any state political

**40**

**EXHIBIT J**

committee formed by the Institute for Legislative Action for the exclusive purpose of supporting or opposing a state ballot question, initiative, measure, or referendum.

# ARTICLE XI

## Standing and Special Committees of the Association.

### Section 1. Standing Committees.

(a) The standing committees of the Association are as follows:

| | |
|---|---|
| Action Shooting | Legal Affairs |
| Air Gun | Legislative Policy |
| Audit | Membership |
| Black Powder | Military and Veterans' |
| Bylaws & Resolutions | Affairs |
| Clubs & Associations | * Nominating |
| Collegiate Programs | **Officers Compensation |
| Competition Rules & | Outreach |
| Programs | Pistol |
| Disabled Shooting Sports | Protest |
| Education & Training | Public Affairs |
| Elections | Publications Policies |
| Ethics | Range Development |
| Finance | Shotgun |
| Grassroots Development | Silhouette |
| Gun Collectors | Smallbore Rifle |
| Hearings | Sport Shooting |
| High Power Rifle | Women's Policies |
| Hunting & Wildlife | Youth Programs |
| Conservation | |
| Law Enforcement | |
| Assistance | |

*Members elected by the Board of Directors, pursuant to Article VIII, Section 1.

**Members designated pursuant to Article V, Section 5.

(b) At least once each year, each standing committee shall submit a written report through the Secretary of the Association to the Board of

**41**   **EXHIBIT J**

Directors at a regular meeting of the Board, and at such other time as may be requested by the President. It may also make written reports and recommendations to the Board or to the Executive Committee at any regular or special meeting.

### Section 2. Special Committees.

The President or the Board of Directors may establish such special committees of the Association as may be deemed necessary from time to time to fulfill the objectives of the Association. Each special committee will report at such time and place as may be specified by the President or the Board of Directors.

### Section 3. Committee Members Appointed by President.

Except as otherwise provided in Article V, Section 5, for the designation of members of the Officers Compensation Committee, in Article VI, Section 1(b), for the election of members of the Executive Committee, and in Article VIII, Section 1, for the election of members of the Nominating Committee, members of the Board of Directors or of the Executive Council or other members of the Association in good standing may be appointed by the President to membership on such standing and special committees of the Association as may be established, and shall serve at the pleasure of the President or until the adjournment of the next Annual Meeting of Members, or until their successors have been duly appointed, whichever last occurs.

### Section 4. Responsibilities of Committees.

The President or the Board of Directors shall assign responsibilities to the committees relating to the administration, conduct, regulation, or oversight of particular activities or special areas or endeavors of the Association, except that no corporate authority may be delegated to any committee unless all members of such committee are members of the Board of Directors of the Association, and unless such committee has been delegated such authority by a resolution adopted by a majority of the entire Board of Directors.

**EXHIBIT J**

### Section 5. Limitations on Powers of Committees.

No special or standing committee of the Board or of the Association shall exercise any powers prohibited to the Executive Committee.

### Section 6. Committee Organization; Meetings.

Committee chairmen are authorized to appoint subcommittees and ad hoc committees from among the members of their respective full committee, as the chairman deems necessary. Official meetings of the committees or subcommittees thereof shall be authorized by the President or, in the absence of the President, by a Vice President or the Executive Vice President. Each respective Chairman shall inform the Secretary, who will issue the official notice for such meeting.

### Section 7. Conference Telephone Meetings.

Members of any committee of the Association may participate in a meeting of such committee conducted by means of a conference telephone or similar communications equipment allowing all persons participating in the meeting to hear one another at the same time. Participation by such means shall constitute presence in person at a meeting.

## ARTICLE XII

### Prohibition of Proxy Voting

*At all meetings of the Board of Directors, Executive Committee, other committees of the Association, and meetings of members, each person entitled to vote shall have a right to cast one vote on each question presented, which vote shall be cast in person and not by proxy.*

## ARTICLE XIII

### Corporate Seal

The Association shall have a corporate seal bearing the words "National Rifle Association

43 **EXHIBIT J**

of America Corporate Seal." The Seal which is impressed on the title page of these Bylaws is the corporate seal of this Association.

# ARTICLE XIV

## Order of Business

### Section 1. Order of Business.

(a) The following shall be the regular order of business at all meetings of the members:

1. Opening Prayer, Pledge of Allegiance, and National Anthem.
2. Roll call.
3. Adoption of agenda (only if it is proposed to supplement or supersede this order of business).
4. Approve minutes of previous meeting.
5. Reports of officers.
6. Report of Committee on Elections.
7. New Business: Resolutions.

(b) The following shall be the regular order of business at all meetings of the Board of Directors:

1. Opening Prayer and Pledge of Allegiance.
2. Roll call.
3. Adoption of agenda (only if it is proposed to supplement or supersede this order of business).
4. Approve minutes of previous meeting.
5. Introductions, presentations and recognitions.
6. Reports of officers.
7. Reports of standing committees.
8. Reports of funds and special committees.
9. Unfinished business (only if items have come over from the previous meeting because the board adjourned without completing its order of business, regardless of the length of time between meetings).
10. New Business: Resolutions.
11. Good of the Order.
12. Closing prayer.

44

**EXHIBIT J**

(c) At any meeting an agenda may be adopted. If it supplements but does not conflict with the order of business provided in these bylaws, its adoption requires a majority vote; if it conflicts with that order of business, its adoption requires a two-thirds vote.

### Section 2. Parliamentary Authority and Parliamentarian.

(a) Parliamentary Authority. *Roberts Rules of Order Newly Revised* shall govern the deliberations of all meeting of the members, Board of Directors, Executive Committee, and all other standing committees, special committees, and subcommittees unless specific exceptions are made herein.

(b) Parliamentarian. The President may appoint an official Parliamentarian of the Association, who shall serve at the pleasure of the President.

### Section 3. Taking of Votes at Annual Meeting of Members.

**(a) *The casting of votes at the Annual Meeting of Members shall be by showing of voting credentials, and shall be by paper ballots on a showing of voting credentials of one hundred members entitled to vote requesting such paper balloting or upon request of the chair.***

**(b) *Paper ballots at the Annual Meeting of Members shall be collected and immediately placed in custody of a certified public accountant who shall immediately count them and without unnecessary delay shall certify the result of the count to the Chair at the meeting, and the paper ballots shall thereafter be preserved by the accountant for 180 days, and thereafter the accountant shall deliver the ballots to the Secretary for preservation until the adjournment of the next Annual Meeting of Members and until such further times, if any, as decided by vote of the members or, to the extent not inconsistent therewith, by the President.***

**EXHIBIT J**

# ARTICLE XV

## Amendments

### Section 1. Amendments by the Board of Directors.

*These Bylaws may be amended at any regular meeting of the Board of Directors by a majority vote, provided that the amendment has been submitted in writing at the previous regular meeting of said Board, or has been sent in writing by mail to every member of the Board listed in the most recent Official Directory not less than thirty days prior to the scheduled Board meeting. To qualify under this Section, the proposed amendment must be recommended by the Bylaws & Resolutions Committee as printed in the Bylaws & Resolutions Committee report to the Board of Directors, or signed by at least two members of the Board of Directors or alternatively by two hundred fifty members of the Association entitled to vote.*

### Section 2. Germane Amendments.

*Notice of specific amendments proposed shall not preclude amendments being made from the floor which are germane to the specifically proposed amendments.*

### Section 3. Amendments by Mail by the Membership.

*(a) These Bylaws may be amended by mail in conjunction with the casting of ballots for the election of Directors by a majority vote of those members qualified to vote and voting by mail on the proposed Bylaws amendment. Proposals for changes to be made by mail may be recommended by the Board of Directors or by petition of members.*

*(b) Proposals for changes in the Bylaws to be made by mail may be submitted by*

EXHIBIT J

petition of members and must be received by the Secretary of the Association no later than September 1st of the year prior to the mailing of the ballot in which the proposals to be voted upon will be included. Such petitions must bear the signatures, names, membership identification numbers and addresses of a number of members eligible to vote that is not less than 5% of the number of valid ballots cast in the most recent mail ballot election of directors, which number shall be provided by the Secretary to any member upon request. The petition may be accompanied by one supporting statement of not more than 500 words. Signatures on an amendment proposed by voting members must be handwritten, original signatures, and all signatures must be sent by the same person (the "sponsor"). The petition shall clearly state that it may be withdrawn by the sponsor without notice to, or approval by, the signatories. The Board of Directors may prepare a statement of not more than 500 words in response to a proposal for change submitted by petition, and such statement must be received by the Secretary no later than October 1st.

(c) Proposals for changes in the Bylaws to be made by mail may be recommended by the Board of Directors at any meeting of the Board, provided that the proposed amendment has been recommended by the Bylaws & Resolutions Committee as printed in the Bylaws & Resolutions Committee report to the Board of Directors at the previous regular meeting of said Board, or signed by at least two members of the Board of Directors and either submitted in writing at the previous regular meeting of said Board, or sent in writing by mail to every member of the Board listed in the most recent "Official Directory" not less than forty-five days prior to the scheduled Board meeting. Such proposals may be accompanied by two statements, each not more than 500 words, one statement

47 **EXHIBIT J**

*representing the majority view and the other representing the minority view of the Board, and must be received by the Secretary no later than October 1st of the year prior to the mailing of the ballot in which the proposals to be voted upon will be included.*

*(d) A rebuttal statement of not more than 250 words may be prepared by the persons who prepared the corresponding main statement and must be received by the Secretary no later than October 30th.*

*(e) The proposed changes together with the statements in support and opposition shall be published in the issue of the "Official Journal" of the Association containing the ballot to elect Directors. Ballots for voting on changes in the Bylaws to be made pursuant to this section shall be mailed in accordance with the procedures established under Article VIII, Section 2(e), regarding ballots for election of Directors. The results of balloting conducted pursuant to this section shall be tabulated in accordance with the procedures established under Article VIII Section 2 (h), (i) and (j), to the extent applicable, shall be announced at the Annual Meeting of Members and shall be published in the "Official Journal" within 90 days after such announcement.*

Section 4. Authority to Amend or Repeal.

*Any Bylaw adopted by the Board may be amended or repealed either by the Board, or by the members by mail pursuant to Section 2 of this Article. Any Bylaw adopted by the members may be amended or repealed by the Board, unless it is adopted in bold face italics, in which case it may be amended or repealed only by the members, by mail, and not by the Board.*

**EXHIBIT J**

# ARTICLE XVI

## Amendments to the Certificate of Incorporation

### Section 1. Recommendation by the Board of Directors.

(a) Amendments to the Certificate of Incorporation shall be recommended at any regular or special meeting of the Board of Directors by a majority affirmative vote of all Directors currently constituting the Board of Directors, provided that either (i) the amendment has been submitted in writing at the previous meeting of the Board of Directors, or (ii) has been sent in writing by mail to every member of the Board of Directors as listed in the most recent Official Directory not less than forty-five (45) days prior to the scheduled Board of Directors meeting. To qualify for recommendation under this section, the proposal must be signed by not less than ten (10) members of the Board of Directors or Executive Council.

(b) No vote on amendments to the Certificate of Incorporation may be taken unless and until such proposals have been reviewed by outside legal counsel and the Board of Directors has been informed by such outside legal counsel of its opinion as to the legality, propriety, and efficacy of such proposal and its conformity with existing Bylaws and the Not-For-Profit Corporation Law of the state in which the Association is incorporated.

### Section 2. Adoption by Members.

(a) Amendments to the Certificate of Incorporation proposed and recommended pursuant to Section 1 above, shall be presented to the members for adoption in conjunction with the casting of ballots for the election of Directors, and shall be approved by a majority affirmative vote of those members qualified to vote and voting by the directed voting procedure described herein at Article XVII. The proposed amendment must be received in writing by the Secretary by the first (1st) day of September of the year immediately preceding the mailing of the ballot in which the

**EXHIBIT J**

proposals to be voted on by directed vote will be included. Notice of any such recommended amendments timely received by the Secretary and the exact text of the recommended amendments to the Certificate of Incorporation to be voted upon by the membership by directed voting procedure shall be printed in the NRA Official Journal not less than forty-five (45) days, nor more than ninety (90) days before the mailing of the ballot in which the recommended proposals to be voted on by directed vote will be included.

### Section 3. Publication of Notice.

Proposals and recommendations for changes to the Certificate of Incorporation may be accompanied by two statements, each not more than 500 words, one statement representing the majority view of the Board of Directors, and the other representing the minority view of the Board of Directors, and must be received by the Association Secretary no later than October 1st (first) of the year preceding the mailing of the ballots in which the proposals to be voted on by directed vote will be included. The President shall designate persons from the Board of Directors to prepare such statements on behalf of the Board of Directors.

# ARTICLE XVII

### Directed Voting Procedures of Members

(a) The mail ballot voting procedure described in Article XV, Section 3 of these Bylaws is hereby defined as the Association's "Directed Voting Procedure." Votes of the membership by Directed Voting Procedure shall be termed "directed votes" and shall have the same force and effect as if such vote had been delivered by a member in person at a meeting. A directed vote shall not constitute a vote by proxy and shall not violate Article XII of these Bylaws.

(b) The Directed Voting Procedure shall be used by the membership to elect directors, amend the Bylaws, remove Association officials by recall, and amend the Certificate of Incorporation.

**EXHIBIT J**

(c) Where any provisions of these Bylaws provides for a petition by the members, only original, handwritten signatures on such a petition shall be valid.

**EXHIBIT J**

**52**

**EXHIBIT J**

53 **EXHIBIT J**

54

**EXHIBIT J**

**EXHIBIT J**

11250 Waples Mill Road
Fairfax, Virginia 22030-9400

CL1300051 **EXHIBIT J**

1              UNITED STATES BANKRUPTCY COURT

2                NORTHERN DISTRICT OF TEXAS

3                    DALLAS DIVISION

4    IN RE:                    )

                               )   Case No.

5    NATIONAL RIFLE ASSOCIATION  )   21-30085-hdh-11

     OF AMERICA AND SEA GIRT, LLC)

6                               )   Chapter 11

        Debtors.               )

7

8

9

10   *************************************************

11          VIDEOTAPED ORAL DEPOSITION OF

12       NATIONAL RIFLE ASSOCIATION OF AMERICA

13      BY AND THROUGH ITS CORPORATE REPRESENTATIVE

14                  JOHN FRAZER

15                MARCH 15, 2021

16                  VOLUME 1

17   CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

18              (Reported Remotely)

19   *************************************************

20

21

22

23

24

25

                                       Page 1

**EXHIBIT K**

```
 1    on the 341?                                          16:09:37

 2         Q.   Correct.                                   16:09:38

 3         A.   Those are the people who would be there as 16:09:40

 4    counsel to the NRA or its board.  We have board      16:09:43

 5    members who are -- who happen to be lawyers, but the 16:09:46

 6    only people who are there as counsel were those.     16:09:48

 7         Q.   Okay.  Without getting into any specifics  16:09:50

 8    as to what was said, did yourself, Ms. Rogers or     16:09:54

 9    Mr. Davis answer any questions with respect to       16:10:00

10    Mr. LaPierre's employment agreement?                 16:10:04

11         A.   Yes.                                       16:10:08

12         Q.   Which one -- which attorneys did?          16:10:16

13         A.   I don't recall if Ms. Rogers answered any  16:10:19

14    questions.  I know that Mr. Davis did and I did.     16:10:22

15         Q.   Were there any discussions during that     16:10:26

16    executive session relating to Mr. LaPierre's         16:10:40

17    employment agreement and specifically the language   16:10:47

18    discussing reorganization?                           16:10:55

19              MR. CICILIANO (VIA ZOOM):  I just          16:11:00

20    object on attorney-client privilege and direct you   16:11:00

21    not to answer.                                        16:11:02

22         Q.   Are you going to follow your counsel's     16:11:03

23    instruction?                                          16:11:06

24         A.   Yes, I'm going to follow advice.           16:11:06

25         Q.   Mr. Frazer, at the time that               16:11:37
```

Page 302

**EXHIBIT K**

1    STATE OF TEXAS    )

2    COUNTY OF DALLAS )

3         I, Michelle L. Munroe, Certified Shorthand

4    Reporter in and for the State of Texas, certify that

5    the foregoing deposition of JOHN FRAZER was reported

6    stenographically by me at the time and place

7    indicated, said witness having been placed under oath

8    by me, and that the deposition is a true record of

9    the testimony given by the witness;

10        That the amount of time used by each party at

11   the deposition is as follows:

          Mr. Sheehan   -   4 hours, 39 minutes

12        Mr. Thompson -   42 minutes

          Mr. Mason     -   1 hour, 49 minutes

13

14        I further certify that I am neither counsel for

15   nor related to any party in this cause and am not

16   financially interested in its outcome.

17        Given under my hand on this the _____ day

18   of _____, 2021.

19

20

21                    <%signature%>

                      Michelle L. Munroe, CSR No. 6011

22                    Commission expires 12-31-22

                      Firm Registration #571

23                    VERITEXT LEGAL SOLUTIONS

                      300 Throckmorton Street, Suite 1600

24                    Fort Worth, Texas  76102

                      817.336.3042  telephone

25

                                        Page 341

**EXHIBIT K**

1  dciciliano@gtg.legal

2                    March 16, 2021

3  In Re: National Rifle Association Of America And Sea Girt

4  DEPOSITION OF: John Frazer (# 4501078)

5      The above-referenced witness transcript is

6  available for read and sign.

7      Within the applicable timeframe, the witness

8  should read the testimony to verify its accuracy. If

9  there are any changes, the witness should note those

10  on the attached Errata Sheet.

11      The witness should sign and notarize the

12  attached Errata pages and return to Veritext at

13  errata-tx@veritext.com.

14      According to applicable rules or agreements, if

15  the witness fails to do so within the time allotted,

16  a certified copy of the transcript may be used as if

17  signed.

18                    Yours,

19                    Veritext Legal Solutions

20

21

22

23

24

25

Veritext Legal Solutions
800-336-4000

**EXHIBIT K**