Leslie Rutledge
 *Arkansas Attorney General*

Nicholas J. Bronni
 Appearing under L.B.R. 2090-1(f)
 *Solicitor General*

Vincent M. Wagner
 Texas Bar No. 24093314
 Appearing under L.B.R. 2090-1(f)
 *Deputy Solicitor General*

Dylan L. Jacobs
 Appearing under L.B.R. 2090-1(f)
 *Assistant Solicitor General*

OFFICE OF THE ARKANSAS
 ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
vincent.wagner@arkansasag.gov

*Counsel for Amici Curiae*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| *In re:* | § § § § | Chapter 11 |
| NATIONAL RIFLE ASSOCIATION OF AMERICA; and SEA GIRT LLC, | § § § | Case No. 21-30085-HDH-11 |
| *Debtors.*[1] | § § § § § | Jointly Administered |

**BRIEF OF THE STATES OF ARKANSAS, ALABAMA, ALASKA, GEORGIA, IDAHO, KENTUCKY, LOUISIANA, MISSISSIPPI, MISSOURI, MONTANA, OHIO, OKLAHOMA, SOUTH CAROLINA, SOUTH DAKOTA, UTAH, AND WEST VIRGINIA AS *AMICI CURIAE* IN SUPPORT OF DEBTORS; AND IN OPPOSITION TO THE STATE OF NEW YORK'S MOTION TO DISMISS, OR IN THE ALTERNATIVE TO APPOINT A CHAPTER 11 TRUSTEE**

---

[1] The last four digits of the Debtors' taxpayer identification numbers are: 6130 (NRA) and 5681 (Sea Girt). The Debtors' mailing address is 11250 Waples Mill Road, Fairfax, Virginia 22030.

TABLE OF CONTENTS

Table of Contents ............................................................................................................. i

Table of Authorities ....................................................................................................... ii

Introduction .................................................................................................................... 1

Argument ........................................................................................................................ 2

    I.    The Second Amendment guarantees an individual right to keep and bear arms. ..................................................................................................... 2

    II.   State regulation of nonprofit and charitable organizations is essential to protecting the public. ................................................................................. 3

    III.  The NRA and its members are entitled to First Amendment protection from discriminatory enforcement actions like the New York AG's dissolution suit. ........................................................................................... 6

        A.   The NRA's political speech is protected by the First Amendment. ........................... 7

        B.   The NRA has made a compelling case that New York is violating the constitutional rights of the organization and its members. ......................................... 8

        C.   The NRA's federal-court action seeks to protect the associational rights of its members. ...................................................................................... 10

Conclusion .................................................................................................................... 12

Certificate of Service ................................................................................................... 13

## TABLE OF AUTHORITIES

**Cases**

*Citizens United v. Fed. Election Comm'n*,
 558 U.S. 310 (2010) ...................................................................................................8

*District of Columbia v. Heller*,
 554 U.S. 570 (2008) ...................................................................................................3

*District of Columbia v. NRA Found.*,
 No. 2020-CA-003454 (D.C. Sup. Ct. Aug. 6, 2020) ...............................................10

*Dorsett v. Cty. of Nassau*,
 732 F.3d 157 (2d Cir. 2013) .......................................................................................9

*FTC v. Superior Ct. Trial Lawyers Ass'n*,
 493 U.S. 411 (1990) ...................................................................................................8

*Hill v. Colorado*,
 530 U.S. 703 (2000) ...................................................................................................8

*McDonald v. City of Chicago*,
 561 U.S. 742 (2010) ...................................................................................................3

*Meyer v. Grant*,
 486 U.S. 414 (1988) ...................................................................................................7

*Nat'l Rifle Ass'n of Am. v James*,
 No. 1:20-CV-00889-MAD-TWD (N.D.N.Y. Aug. 6, 2020) .....................................7

*New York Times Co. v. Sullivan*,
 376 U.S. 254 (1964) ...................................................................................................8

*People v. Zymurgy, Inc.*,
 233 A.2d 178 (N.Y. App. Div. 1996) ................................................................4, 10

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
 487 U.S. 781 (1988) ...................................................................................................4

*Roth v. United States*,
 354 U.S. 476 (1957) ...................................................................................................8

*United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*,
 389 U.S. 217 (1967) ...................................................................................................7

**Statutes**

Ark. Code Ann. 4-28-101 ...................................................................................................4

Ark. Code Ann. 4-28-222 ...................................................................................................5

Ark. Code Ann. 4-28-416 ...................................................................................................4

**Other Authorities**

Bob Carlson, et al., Protection and Regulation of Nonprofits and Charitable Assets, STATE ATTORNEYS GENERAL POWERS AND RESPONSIBILITIES (Nat'l Ass'n of Attorneys Gen. 2013) ..................................................................................................5

David Cole, *The NRA Has a Right to Exist*, WALL ST. J. (Aug. 26, 2020) .....................................6

*Montana Attorney General's Investigative Report of Greg Mortenson and Central Asia Institute* (Apr. 2012) ..............................................................................................................................5

The Nonprofit Sector in Brief 2019, Urban Institute (June 2020) ....................................................5

The States of Arkansas, Alabama, Alaska, Georgia, Idaho, Kentucky, Louisiana, Mississippi, Missouri, Montana, Ohio, Oklahoma, South Carolina, South Dakota, Utah, and West Virginia submit this brief as *amici curiae* in support of Debtors, and in opposition to *The State of New York's Motion to Dismiss, or, In the Alternative, to Appoint Chapter 11 Trustee* [ECF No. 155].[2]

## INTRODUCTION

The National Rifle Association of America is the country's foremost Second Amendment advocacy organization and one of the strongest voices against government overreach. New York Attorney General Letitia James disagrees with the NRA's efforts to defend the individual constitutional right to keep and bear arms, and since becoming New York's attorney general, she has made it her mission to destroy the NRA and silence its members. That's why she filed a politically motivated state-court action to dissolve the NRA, and that's why she asks this Court to dismiss the NRA's bankruptcy case. The *Amici* States oppose New York's efforts to silence one of the country's most powerful voices in defense of the constitutional right to keep and bear arms. Indeed, a significant portion of NRA members reside in the *Amici* States, and the *Amici* States have a significant interest in ensuring their voices aren't silenced by the New York AG.

New York seeks to punish the NRA's membership because of the alleged corporate malfeasance of a handful of executives. New York doesn't allege that the NRA itself or its membership have done anything illegal. To the contrary, New York purports to be acting in the interesting of the NRA's members. But it's difficult to fathom how New York believes dissolution of

---

[2] Insofar as other motions seek the same relief as New York's, *Amici* States also oppose those motions. *See Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, and Brief in Support* [ECF No. 131]; *The District of Columbia's Motion in Support of the State of New York's Motion to Appoint Chapter 11 Trustee* [ECF No. 214].

the country's oldest civil rights organization and silencing those members' most powerful defender could possibly be in the best interest of the NRA's members. Dissolving the NRA would leave its members with less of a voice and more vulnerable to New York's efforts to undermine civil liberties.

But that's precisely the point. Whatever New York's purported justification for dissolving the NRA, New York's real goal is to undermine the Second Amendment and silence those who oppose its effort. Indeed, the New York AG campaigned for office on a platform of taking down the NRA by any means possible. To accomplish that goal, New York has weaponized its not-for-profit governance laws and now seeks to use them in unprecedented and heretofore unthinkable ways. And unsurprisingly, as any civil liberties organization would, in response to such a hostile climate, the NRA has decided to change its state of residence as part of a broader chapter 11 reorganization.

There is nothing improper about the NRA's desire to escape New York's unconstitutional treatment as part of its reorganization. And New York's efforts to oppose that reorganization are little more than the next step in its campaign to take down the NRA at all costs and silence its members. New York's motion should be denied, and the NRA should be allowed to move forward with reorganization.

## ARGUMENT

### I. The Second Amendment guarantees an individual right to keep and bear arms.

Though New York's discriminatory purpose in bringing the dissolution suit against the NRA violates the First Amendment, the ongoing battle between the NRA and New York, both inside and outside the courtroom, is really about the Second Amendment's protection of an individual's right to keep and bear arms.

That Amendment provides that, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In *District of Columbia v. Heller*, the Supreme Court confirmed that the Second Amendment confers "an individual right to keep and bear arms." 554 U.S. 570, 595 (2008). And the Court went on in *McDonald v. City of Chicago* to hold that the right to keep and bear arms is both "fundamental" and "deeply rooted in this Nation's history and tradition." 561 U.S. 742, 768 (2010). That right, moreover, is "fully applicable to the States" through the Fourteenth Amendment. *Id.* at 750.

New York seeks dissolution of the NRA because it doesn't like the Second Amendment and wants to silence an organization—and its members—dedicated to the defense of the Constitution. And the NY AG and her office have a long history of seeking to undermine the individual right to keep and bear arms.[3] It is no wonder that the NRA seeks to relocate to a State that respects that fundamental right, nor that New York would, as part of its campaign to undermine that right, oppose that relocation. But despite New York's efforts to undermine the civil liberties of millions of law-abiding Americans, the fact remains that the Second Amendment enshrines an individual right to keep and bear arms.

## II. State regulation of nonprofit and charitable organizations is essential to protecting the public.

*Amici* States recognize the important governmental interests in regulating the governance and operations of nonprofit and charitable entities. Many have established statutory frameworks

---

[3] *See, e.g.*, Br. of States of New York et al., as *Amici Curiae* in Supp. of Respondents, *N.Y. State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525 (2020) (No. 18-280), 2019 WL 3814392.

covering those entities[4] and provide their respective Attorney General with enforcement authority as New York has done.[5] Protecting the public from deceptive and fraudulent practices by nonprofit and charitable organizations is a key purpose underlying these laws.

Attorneys General and other executive officials play a central role in policing bad behavior via enforcement actions against nonprofit and charitable entities.[6] These suits can achieve restitution for victims of fraud and waste, deter unlawful practices by such entities, and in exceptional cases, shut down sham entities predicated on unlawful activities. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 800 (1988) (recognizing state interest in "vigorously enforc[ing] its antifraud laws" to prohibit organizations "from obtaining money on false pretenses or by making false statements"). Notably, the New York AG in the past sued to dissolve a nonprofit corporation that was operating to solicit funds for NAMBLA, a pro-pedophilia outfit and child-pornography cartel. *See People v. Zymurgy, Inc.*, 649 N.Y.S.2d 662 (N.Y. App. Div. 1996). And States use enforcement actions to dissolve sham charities, though such a remedy is drastic and sought only in the most egregious cases.[7]

"Ultimately, attorneys general hold the power and the commensurate responsibility to determine the course of action best suited to the protection of the public's interest in charity." Bob

---

[4] *See, e.g.*, Ark. Code Ann. 4-28-101 *et seq.*

[5] *See, e.g.*, Ark. Code Ann. 4-28-416(a)(2) (providing enforcement authority to Attorney General).

[6] *See, e.g.*, *Rutledge Announces Settlement with Fraudulent Hospice Care Charity*, News Release, Office of the Arkansas Attorney General (Aug. 1, 2019) (detailing settlement with organization accused of operating a sham charity soliciting donations ostensibly for end of life care services), https://www.arkansasag.gov/media-center/news-releases/rutledge-announces-settlement-with-fraudulent-hospice-care-charity/; *Rutledge Reaches Settlement with Children of Veterans Foundation*, News Release, Office of the Arkansas Attorney General (Sept. 9, 2016) (detailing settlement with organization accused of soliciting donations for children of American veterans while instead using donations for the financial gain of the organization's directors), https://arkansasag.gov/media-center/news-releases/settlement-with-children-of-veterans-foundation/.

[7] *See, e.g.*, *Rutledge Settles Claims Against Two Bogus Cancer Charities*, Office of the Arkansas Attorney General (Apr. 1, 2016) (multi-state and FTC settlement resulting in dissolution of two fake cancer charities), https://arkansasag.gov/media-center/news-releases/claims-against-two-bogus-cancer-charities/.

Carlson, et al., *Protection and Regulation of Nonprofits and Charitable Assets*, STATE ATTORNEYS GENERAL POWERS AND RESPONSIBILITIES 205 (Nat'l Ass'n of Attorneys Gen. 2013). As the charitable and nonprofit sectors continue to grow,[8] States and their attorneys general must continue to use limited resources to protect the public and in so doing must be afforded considerable discretion. That discretion is particularly important when attorneys general must become involved in investigations regarding high-profile organizations.[9] Because an attorney general's enforcement powers may sweep broadly, it is important that they be exercised responsibly.

That is particularly true with extraordinary remedies such as involuntary dissolution. Many States' involuntary-dissolution statutes are written broadly, allowing a court to dissolve a nonprofit corporation if it "constitutes a public nuisance" or "violates the laws of [the] state or the rules of any state regulatory board or commission having jurisdiction of any activity of the corporation."[10] But given that the purpose of enforcement actions involving charities and nonprofits is to bring the organization into compliance if possible, discretion must be exercised to reserve dissolution for the worst, irredeemable offenders.

When an organization's primary mission is political advocacy, involuntary dissolution risks the appearance of constitutionally problematic, viewpoint-based targeting. Perhaps no situ-

---

[8] *See* The Nonprofit Sector in Brief 2019, Urban Institute (June 2020) ("From 2006 to 2016, the number of nonprofit organizations registered with the IRS rose from 1.48 million to 1.54 million, an increase of 4.5 percent."), https://nccs.urban.org/publication/nonprofit-sector-brief-2019.

[9] *See, e.g.*, Jennifer Chambers, *Ford Foundation's Work Doesn't End with 'Grand Bargain'*, DETROIT NEWS (Jan. 19, 2015) (describing investigation of Ford Foundation by Michigan AG), https://www.detroitnews.com/story/news/local/wayne-county/2015/01/19/ford-foundations-work-end-grand-bargain/21981269/; *Montana Attorney General's Investigative Report of Greg Mortenson and Central Asia Institute* (Apr. 2012) (report of investigation by Montana AG into prominent charity), https://dojmt.gov/wp-content/uploads/2012_0405_FINAL-REPORT-FOR-DISTRIBUTION.pdf; John Schmeltzer, *Kauffman Foundation Cleared of Wrongdoing*, CHI. TRIB. (Mar. 8, 2004) (Missouri AG investigation regarding Kansas City charitable organization), https://www.chicagotribune.com/news/ct-xpm-2004-03-08-0403080210-story.html.

[10] Ark. Code Ann. 4-28-222(5), (6).

ation is riper for potential abuse than when an attorney general investigates and initiates enforcement action against an organization that is a political rival. The stakes are even higher when the extraordinary remedy of involuntary dissolution is sought. Involuntary dissolution ends, once and for all, the public's ability to participate in the dissolved organization's political advocacy. Commitment to scrupulousness is of the upmost importance, lest an Attorney General appear to be engaging in impropriety.[11] As the ACLU's National Legal Director recently explained, there's no doubt that the New York AG's dissolution action crosses that important line.[12]

### III. The NRA and its members are entitled to First Amendment protection from discriminatory enforcement actions like the New York AG's dissolution suit.

The NRA is the country's oldest and one of its most important civil rights organizations. It has consistently fought for Americans' Second Amendment rights via political advocacy, litigation, and legislative efforts.[13] Its five million members include citizens of the *Amici* States, and the organization has played a central role in ensuring those citizens continue to enjoy their individual constitutional right to bear arms.[14] But the New York AG calls the NRA a "criminal

---

[11] *Compare* Max Brantley, *Clinton Foes Target Clinton Foundation, but Rutledge Office Says There's No Investigation*, ARK. TIMES (Jan. 11, 2016) (Arkansas AG declining to pursue investigation of Clinton Foundation), https://arktimes.com/arkansas-blog/2016/01/11/clinton-foes-target-clinton-foundation-but-rutledge-office-says-theres-no-investigation, *with* Colby Hamilton, *Schneiderman: 'Unfair' To Single Out Clinton Foundation for Foreign Donations*, POLITICO (Oct. 19, 2016) (New York AG struggling to explain the State's differential treatment of Clinton Foundation and Trump Foundation), https://www.politico.com/states/new-york/albany/story/2016/10/trump-foundation-investigation-offers-no-parallels-to-clinton-for-schneiderman-106520.

[12] *See* David Cole, *The NRA Has a Right to Exist*, WALL ST. J. (Aug. 26, 2020) (describing the state dissolution suit as "unconstitutional government overreach"), https://www.wsj.com/articles/the-nra-has-a-right-to-exist-11598457143.

[13] *See, e.g.*, Br. of *Amicus Curiae* NRA, Inc. in Support of Pets., *Rogers v. Grewal*, 140 S. Ct. 1865 (2020) (No. 18-824); Br. of *Amicus Curiae* NRA, Inc. in Support of Pets., *N.Y. State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525 (2020) (No. 18-280), 2019 WL 2173975.

[14] *See, e.g.*, *Alert! Attention: First Time Gun Buyers - NRA Launches Online Gun Safety Courses*, NRA Institute for Legislative Action (Apr. 8, 2020), https://www.nraila.org/articles/20200408/alert-attention-first-time-gun-buyers-nra-launches-online-gun-safety-courses.

enterprise"[15] and a "terrorist organization."[16] These are not the words of a state official scrupulously enforcing nonprofit governance law. Rather, these words underscore what New York's state dissolution case really is: a politically motivated assault on free speech and an effort to destroy both a fundamental constitutional right and a political opponent dedicated to defending that right. Thankfully, the First Amendment protects the right to advocate for the Second.

Because New York has weaponized its state courts in pursuit of the capstone of the New York AG's campaign against the NRA—its corporate destruction—the NRA has sought relief in federal district court in New York State. *See generally* Am. Compl., *Nat'l Rifle Ass'n of Am. v. James*, No. 1:20-CV-00889-MAD-TWD (N.D.N.Y. Aug. 6, 2020), ECF No. 13 (hereinafter, "*NRA v. James* Complaint"). That lawsuit forcefully demonstrates that New York's attempts to dissolve the organization are discriminatory and in violation of the First Amendment. Against that backdrop, and the strong likelihood that the NRA will continue to be subject to political discrimination by New York government officials, its decision to relocate to Texas through this reorganization proceeding makes perfect sense.

### A. *The NRA's political speech is protected by the First Amendment.*

The NRA's Second Amendment advocacy is at the heart of First Amendment protection. *See Meyer v. Grant*, 486 U.S. 414, 422 (1988) (describing "interactive communication concerning political change . . . as core political speech") (internal quotation marks omitted). After all, the right "to petition for a redress of grievances [is] among the most precious of . . . liberties safeguarded by the Bill of Rights." *United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*,

---

[15] *Attorney General Candidate*, *Public Advocate Letitia James*, OUR TIME PRESS (Sept. 6, 2018), https://www.ourtimepress.com/attorney-general-candidate-public-advocate-letitiajames/.

[16] Teddy Grant, *Letitia 'Tish' James on Becoming New York's Next Attorney General*, EBONY (Oct. 31, 2018), https://www.ebony.com/news/letitia-tish-james-on-becoming-new-yorksnext-attorney-general/.

389 U.S. 217, 222 (1967); *see FTC v. Superior Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 426 (1990) (noting the First Amendment right "to lobby . . . officials to enact favorable legislation"). That is because the First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) (quoting *Roth v. United* States, 354 U.S. 476, 484 (1957)).

When government officials, like the New York AG in this case, target organizations for their members' political viewpoints, they subvert the very freedoms they are sworn to protect. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 349 (2010) ("If the First Amendment has any force, it prohibits [governments] from fining or jailing citizens, or associations of citizens, for simply engaging in political speech."). That is especially true here, as New York's invasive firearm laws make it a frequent target for lawsuits brought by organizations such as the NRA and their members. *See Hill v. Colorado*, 530 U.S. 703, 787 (2000) (Kennedy, J., dissenting) ("Laws punishing speech which protests the lawfulness or morality of the government's own policy are the essence of the tyrannical power the First Amendment guards against."). If ever there were a time that an organization required First Amendment protection from a government entity seeking to destroy it, this is it.

> **B.** ***The NRA has made a compelling case that New York is violating the constitutional rights of the organization and its members.***

The facts and circumstances surrounding New York's decision to attempt to dissolve the NRA illustrate that New York's lawsuit is retaliation for political speech and violates the First Amendment. "To plead a First Amendment retaliation claim" in the Second Circuit, where the NRA has sued the New York AG, "a plaintiff must show: (1) [it] has a right protected by the

First Amendment; (2) the defendant's actions were motivated or substantially caused by [its] exercise of that right; and (3) the defendant's actions caused [it] some injury." *Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013). As explained above, the NRA's political advocacy is core First Amendment activity, so the first prong is satisfied. The New York AG's campaign statements demonstrate the truth of the NRA's allegations, that its protected activity led to New York's dissolution action. *See NRA v. James* Complaint, *supra*, ¶ 56 ("James's actions as NYAG . . . were . . . undertaken directly in response to and substantially motivated by NRA's political speech regarding the right to keep and bear arms. James has acted with the intent to obstruct, chill, deter, and retaliate against the NRA's core political speech . . . ."); *id.* ¶ 57 ("James chose to exercise her discretion to harm the NRA based on the content of the NRA's speech regarding the Second Amendment.").

The NRA's allegations in its federal-court lawsuit are no mere window dressing. The statements made by the New York AG are nothing short of startling. The New York AG's promise to "take down the NRA" if elected, coupled with her description of the NRA's advocacy as "poisonous" and "deadly propaganda,"[17] makes it clear that the NRA's message is the impetus for the New York AG's dissolution request. And her statement that she would be investigating not simply whether the NRA complied with New York nonprofit law but the NRA's very "legitimacy as a not-for-profit corporation" underscores that her goal was always to punish the NRA for its speech—not to pursue a legitimate investigation. *NRA v. James* Complaint, *supra*, ¶ 16.

The NRA has also adequately pleaded harm attributable to New York's discriminatory action. It alleges that New York's discriminatory "investigation has cost the NRA "millions of

---

[17] *See* Jon Campbell, *New York AG Letitia James Called the NRA a 'Terrorist Organization.' Will It Hurt Her Case?*, USA TODAY (Aug. 19, 2020), https://www.usatoday.com/story/news/politics/2020/08/19/nra-lawsuit-ny-ag-letitia-james-pastcomments/ 5606437002/.

dollars in unnecessary expenses." *Id.* ¶ 52. Moreover, it alleges that the investigation has caused the NRA reputational harm. *Id.* ¶¶ 60, 72, 80, 88. And it's easy to see why that would be true, given that the remedy of dissolution is historically reserved for sham organizations or those that are steeped in criminal activity. *See, e.g.*, *Zymurgy, Inc.*, 649 N.Y.S.2d at 663 (allowing dissolution of corporation in part because it published a magazine "that contains numerous pornographic photographs of what appear to be minor boys"). New York has harmed the NRA by lumping it together with such organizations. This harm is cognizable, and it demonstrates why the New York AG has clearly injured the NRA's First Amendment rights with her politically motivated investigation.

Finally, it is telling that a companion lawsuit against the NRA and the NRA Foundation brought by the District of Columbia on the same day as New York's action does not seek dissolution. *District of Columbia v. NRA Found.*, No. 2020-CA-003454 (D.C. Sup. Ct. Aug. 6, 2020). Indeed, the District of Columbia's failure to seek so draconian a remedy underscores what's all too obvious: There's no plausible case for dissolution, and New York's dissolution request is really about silencing anyone who disagrees with its AG's view of the Second Amendment.

    **C.**    *The NRA's federal-court action seeks to protect the associational rights of its members.*

New York's campaign against the NRA infringes not only on the free-speech rights of the organization but also the associational rights of its members. The NRA's members—including citizens of the *Amici* States—certainly have a First Amendment right to associate with the organization and each other. New York has specifically sought dissolution of the organization itself and, if it obtains dissolution, the entity through which the NRA's members associate would cease to exist, stifling these individuals' Second Amendment advocacy. *See NRA v. James* Complaint ¶ 31; *see id.* ¶ 80 ("James's intentional actions are designed to punish the NRA and its members

for associating to engage in Second Amendment advocacy and to chill NRA members' future exercise of such freedom of association . . . .").

The NRA is the foremost organization defending the constitutional right of individuals to keep and bear arms; indeed, it's the oldest civil rights organization in America. It cannot simply be replaced if it is dissolved. And consequently, New York cannot possibly dispute that dissolving the organization will undermine the ability of NRA members to organize and advocate for the Second Amendment. Allowing the NRA to proceed with this reorganization case will benefit not just the Association itself but also its members, whose individual constitutional rights are threatened by New York's actions.

*       *       *

There is no ill motive behind the NRA's decision to leave New York for greener pastures. Given the history of politically motivated targeting of the NRA by New York government officials—its AG being the most notable among them—it isn't surprising that New York is unwilling to roll over and allow the NRA to continue its advocacy elsewhere. But there is nothing improper about the NRA pursuing reorganization to ensure that it emerges intact from its ongoing battle with its powerful politically motivated opponents. Seeking to thwart responsible government oversight is one thing; getting out from under the thumb of government officials abusing their office is another.

## CONCLUSION

For these reasons, the motions to dismiss should be denied.

Respectfully submitted,

Steve Marshall
  *Alabama Attorney General*

Treg R. Taylor
  *Alaska Attorney General*

Christopher M. Carr
  *Georgia Attorney General*

Lawrence G. Wasden
  *Idaho Attorney General*

Daniel Cameron
  *Kentucky Attorney General*

Jeff Landry
  *Louisiana Attorney General*

Lynn Fitch
  *Mississippi Attorney General*

Eric S. Schmitt
  *Missouri Attorney General*

Austin Knudsen
  *Montana Attorney General*

Dave Yost
  *Ohio Attorney General*

Mike Hunter
  *Oklahoma Attorney General*

Alan Wilson
  *South Carolina Attorney General*

Jason R. Ravnsborg
  *South Dakota Attorney General*

Sean D. Reyes
  *Utah Attorney General*

Patrick Morrisey
  *West Virginia Attorney General*

Leslie Rutledge
  *Arkansas Attorney General*

Nicholas J. Bronni
  Appearing under L.B.R. 2090-1(f)
  *Solicitor General*

Vincent M. Wagner
  Texas Bar No. 24093314
  Appearing under L.B.R. 2090-1(f)
  *Deputy Solicitor General*

Dylan L. Jacobs
  Appearing under L.B.R. 2090-1(f)
  *Assistant Solicitor General*

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
vincent.wagner@arkansasag.gov

**CERTIFICATE OF SERVICE**

I certify that on March 31, 2021, I filed this document with the Court's CM/ECF system, which will serve all parties entitled to notice, including the Debtors and United States Trustee.

/s/ *Vincent M. Wagner*
Vincent M. Wagner