Gerrit M. Pronske
State Bar No. 16351640
Eric M. Van Horn
State Bar No. 24051465
Jason P. Kathman
State Bar No. 24070036
**SPENCER FANE LLP**
2200 Ross Avenue, Suite 4800 West
Dallas, TX 75201
(214) 750-3610 – Telephone
(214) 750-3612 – Telecopier
-and-
5700 Granite Parkway, Suite 650
Plano, TX 75024
(972) 324-0300 – Telephone
(972) 324-0301 – Telecopier
Email: gpronske@spencerfane.com
Email: ericvanhorn@spencerfane.com
Email: jkathman@spencerfane.com

**COUNSEL FOR THE PEOPLE OF
THE STATE OF NEW YORK, BY
LETITIA JAMES, ATTORNEY GENERAL
OF THE STATE OF NEW YORK**

James Sheehan
*Pro Hac Vice*
Emily Stern
*Pro Hac Vice*
Monica Connell
*Pro Hac Vice*
Stephen Thompson
*Pro Hac Vice*
**OFFICE OF THE ATTORNEY GENERAL
OF THE STATE NEW OF NEW YORK**
28 Liberty Street
New York, NY 10005
(212) 416-8401 – Telephone
Email: James.Sheehan@ag.ny.gov
Email: Emily.Stern@ag.ny.gov
Email: Monica.Connell@ag.ny.gov
Email: Stephen.Thompson@ag.ny.gov

**COUNSEL FOR THE PEOPLE OF
THE STATE OF NEW YORK, BY
LETITIA JAMES, ATTORNEY GENERAL
OF THE STATE OF NEW YORK**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 21-30085-hdh-11** |
| **NATIONAL RIFLE ASSOCIATION** | § | |
| **OF AMERICA and SEA GIRT LLC,** | § | **CHAPTER 11** |
| | § | |
| Debtors[1]. | § | **Jointly Administered** |

**THE STATE OF NEW YORK'S
OMNIBUS REPLY TO DEBTORS' OPPOSITION AND THE COMMITTEE'S
RESPONSE TO MOTION TO DISMISS OR APPOINT A TRUSTEE**

---

[1] The last four digits of the Debtors' taxpayer identification numbers are: 6130 (NRA) and 5681 (Sea Girt). The Debtors' mailing address is 11250 Waples Mill Road, Fairfax, Virginia 22030.

---

**TO THE HONORABLE HARLIN D. HALE,**
**CHIEF UNITED STATES BANKRUPTCY JUDGE:**

The People of the State of New York, by Letitia James, Attorney General of the State of New York ("**NYAG**"), a party in interest in the above-referenced bankruptcy case, hereby respectfully submits this *Omnibus Reply to Responses to the Motion to Dismiss, or, in the Alternative, Appoint a Trustee*[2] (the "**Reply**") to (i) the *Debtors' Omnibus Opposition to (1) Ackerman McQueen, Inc.s' Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative Motion for the Appointment of a Chapter 11 Trustee, (2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11 Trustee, and (3) the District of Columbia's Motion Appoint Chapter 11 Trustee* [Docket No. 307] (the "**Debtors' Opposition**"); and (ii) *The Official Committee of Unsecured Creditors Response to (I) Ackerman McQueen, Inc.s' Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative Motion for the Appointment of a Chapter 11 Trustee, (II) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11 Trustee, and (III) the District of Columbia's Motion Appoint Chapter 11 Trustee* [Docket No. 368] (the "**UCC Response**").

## PRELIMINARY STATEMENT

1. The Debtors seek regulatory – not financial – relief from this Court, and have pursued it through deception of their own Board of Directors (the "**Board**"), executives, and members. Fearing leaks and distrusting its own executive leadership, their staffs, and its own Board of Directors, the National Rifle Association of America ("**NRA**", collectively with Sea Girt, LLC, the "**Debtors**") invoked the constitutional privilege of bankruptcy, reserved for "honest but

---

[2] *The State of New York's Motion to Dismiss, or, in the Alternative, to Appoint a Trustee* [Docket Nos. 155-156] (the "**Motion**").

---

unfortunate"[3] debtors, using a deceptive scheme to hide the filing from its General Counsel, John Frazer ("**GC**" or "**Frazer**"), Treasurer & Chief Financial Officer, Craig Spray ("**CFO**" or "**Spray**"), their staffs, and the NRA's own Board.

2.     At the January 7, 2021, meeting of the Board, the NRA's Officers' Compensation Committee and management asked the Board to approve a new employment contract for Wayne LaPierre (the "**Employment Agreement**"), which for the first time included within his duties, the authority to "reorganize or restructure the affairs of the Association…" Without any explanation that such term meant – or could mean – bankruptcy; without any disclosure to the Board that the NRA had been paying more than $1 million for bankruptcy advice; and without any disclosure that the NRA had formed a Texas-domiciled entity in November 2020 to anchor bankruptcy venue in Texas, the Board voted to approve the Employment Agreement.  Mr. LaPierre has testified and will testify he relied upon the Employment Agreement to delegate him the authority to file bankruptcy for the Debtors, and would not have filed the petition without that delegation.

3.     In an attempt to rectify an apparent effort to sidestep Board review, the Debtors called an emergency, in-person meeting of the Board in Dallas on March 28, 2021, which barely over half the directors attended (remote participation could have been, but was not, used). The vaguely worded agenda informed the Board that "[t]he sole purpose of the meeting is to provide a briefing to the Board regarding the NRA's reorganization plan and the legal matters overseen by the Special Litigation Committee, and to take any necessary action directly related to those matters."[4]

---

[3] *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934) (bankruptcy "gives to the honest but unfortunate debtor . . . a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.").
[4] Official Notice Special Meeting of the Board of Directors dated March 2, 2021.

4.      After the Debtors spent $1.3 million in legal fees to prepare for filing bankruptcy, and after the Debtors have likely incurred millions in legal fees for thousands of hours of legal work, over the course of less than four (4) hours, the Board was presented with a pre-printed set of Resolutions to review and approve.

5.      The manner in which the NRA sought approval and effectuated the filing of its bankruptcy case is just the latest example of the distrust, fraud and gross mismanagement that had plagued the NRA for years. The coverup is itself evidence that supports the Motions. Tainted with conflicts of interest, the NRA's bankruptcy filing publicly displays the NRA's clear motive for filing ("Dump New York"), chronic gross mismanagement and governance failures. As Judge Phillip Journey testified: "The bankruptcy filing is actually the symptom of a disease."[5]

6.      The desperation to avoid the NYAG Enforcement Action is palpable. The NRA claims, by its own testimony, to be in its best financial position in years, with allegedly record membership exceeding five (5) million members, and its creditors have been assured they will be paid in full. There was only one reason to file bankruptcy and then seek an emergency ratification of it – to obtain regulatory, not financial, relief through a litigation tactic.

7.      The Debtors' cases should be dismissed for being filed in bad faith. If not, the Court should appoint a trustee to impartially, and prudently, operate the Debtors to avoid the clear conflicts of interests and gross mismanagement that currently plague them.

## OMNIBUS REPLY

8.      The NRA is a charitable not-for-profit corporation chartered in the State of New York in November of 1871. The NRA is legally domiciled in New York. It is registered with the NYAG Charities Bureau ("**Charities Bureau**") to conduct business and solicit donations and is

---

[5] Deposition of the Honorable Phillip Journey, March 19, 2021 at 146:22-23.

subject to the NYAG's oversight. NYAG is the regulator responsible for overseeing the activities of New York not-for-profit corporations and the conduct of their officers and directors, in accordance with New York's Not-for-Profit Corporation Law ("**N-PCL**"), Estates Powers & Trusts Law ("**EPTL**"), Prudent Management of Institutional Funds Act ("**NYPMIFA**") and the Executive Law ("**Exec. Law**"). NYAG has a wide range of supervisory and oversight powers over charitable corporations, and over the trustees of property held for charitable purposes. *Citizens United v. Schneiderman*, 882 F.3d 374 (2d Cir. 2018).

9.       On August 6, 2020, the NYAG commenced the action styled *People of the State of New York, by Letitia James, Attorney General of the State of New York v. The National Rifle Association of America, Inc., et. al.¸* Index No. 451625/2020 (the "**NYAG Enforcement Action**"). The 163-page Verified Complaint ("**NYAG Enforcement Complaint**") filed in the Supreme Court of the State of New York (the "**NY State Court**") presents detailed factual allegations of pervasive illegal conduct at the NRA.[6] Furthermore, and importantly, the NYAG Enforcement not only seeks declarations and remedies against the NRA, but also names certain individual defendants, including Wayne LaPierre and John Frazer as defendants, and seeks monetary damages against both of them.

## I.       THE DEBTORS' CASES SHOULD BE DISMISSED.

10.       "Cause" exists to dismiss the Debtors' cases because they cannot show that they were filed in good faith. *See In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d Cir. 2004)("the burden is on the bankruptcy petitioner to establish [good faith]."); *see also In re 15375 Memorial Corp. v. BEPCO, L.P.¸*589 F.3d 605, 618 (3d Cir. 2009); *In re In re SGL Carbon Corp.,*

---

[6] *See generally* NYAG Enforcement Complaint, attached as Exhibit 1 to the Appendix in Support of the New York Attorney General's Motion to Dismiss, or in the Alternative, to Appoint Chapter 11 Trustee ("**Appendix**")[Docket No. 156-1].

200 F.3d 154, 160 (3d Cir. 1999). To determine whether a bankruptcy case was filed in good faith, a court must make a "fact intensive inquiry" and "examine" the totality of the facts and circumstances to determine whether they support a finding of good faith. *Id.* at 162; *see also In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 379 (8th Cir. 2000)(*citing In re Little Creek Dev. Co.*¸ 779 F.2d 1068, 1072 (5th Cir. 1986)). One Circuit Court has identified two particular factors to assist in the determination of whether a debtor filed its case in good faith—(i) whether the petition serves a valid bankruptcy purpose, and (ii) whether the petition was filed to obtain a tactical litigation advantage. *See In re SGL Carbon Corp.*, 200 F.3d at 165. As shown and explained herein, the Debtors' cases do not serve a valid bankruptcy purpose, and were filed to obtain a tactical litigation advantage.

### A. The Debtors' Bankruptcy Seeks Regulatory – Not Financial – Relief.

11. Although a debtor need not be insolvent before filing for bankruptcy protection, "[s]aying that there is no insolvency requirement…does not mean that all solvent firms should have unfettered access to Chapter 11." *See Integrated Telecom Express, Inc.*, 384 F.3d at 122. As the Third Circuit has explained, and reaffirmed:

> Courts, therefore, have consistently dismissed Chapter 11 petitions filed by financially healthy companies with no need to reorganize under the protection of Chapter 11. Those courts have recognized that if a petitioner has no need to rehabilitate or reorganize, its petition cannot serve the rehabilitative purpose for which Chapter 11 was designed.

12. *Id.* (*quoting SGL Carbon Corp.*, 200 F.3d at 166)). At their core, the Debtors seek regulatory relief – not financial relief – from this Court and the Bankruptcy Code. Escaping regulatory oversight is not a valid rehabilitative purpose.[7] Mr. LaPierre has proudly testified multiple times during these cases, and publicly declared, that the NRA did not file bankruptcy

---

[7] NYAG notes that the Bankruptcy Code itself provides an express exception to the automatic stay for regulatory agencies to exercise their police and regulatory powers. *See e.g.* 11 U.S.C. § 362(b)(4).

because of financial problems: "we decided it was in the . . . best interest of the organization to – to file for reorganization under the Chapter 11, not because we – the NRA was in financial difficulty, but because it would allow us . . . to consolidate and streamline a lot of these litigation costs . . . without giving up our claims."[8] The message was specifically directed to the NRA's creditors: "we wanted to make clear that the NRA was – was on solid financial footing and that our vendors would be paid."[9]

13.     According to Mr. LaPierre, the NRA picked bankruptcy court in Dallas because "given what we considered an unfair playing field in New York State, from a legal standpoint, it . . . would be in the best interest of the NRA to move to a state . . . where we would get – have a fair legal playing field."[10]

14.     The NRA states that there is no doubt that it can pay its creditors. The NRA admits that it has only $25 million of undisputed trade vendors.[11] But the actual amount is likely much less, about $18 million, based upon the NRA's own bankruptcy schedules.[12] Those creditors can be paid now. The NRA's February 2021 monthly operating report disclosed $34,482,029 of cash available and it earned a profit of $8,658,871.[13]

15.     Based upon discovery and its testimony, the NRA claims to be financially strong, despite the increasing amount of high legal fees related to litigation, the majority of which was initiated by the NRA and perpetuated through scorched earth litigation tactics.[14] Evidence elicited

---

[8] 341 Meeting of Creditors on February 22, 2021 at 167:25-168: 7.
[9] Deposition of Wayne LaPierre, March 23, 2021 at 425: 21-25.
[10] 341 Meeting of Creditors on February 5, 2021 at 73: 13-18.
[11] *Debtors' Information Brief in Connection with Voluntary Chapter 11 Petition* at ¶ 15 [Docket No. 31].
[12] NRA's Amended Schedules of Assets and Liabilities [Docket No. 286]. The NRA schedules a total of approximately $66 million in unsecured claims, of which $48 million is on account of a contingent claim for the Pension Benefit Guaranty Corporation that is not yet owed and for which the Debtors admit can be paid in the ordinary course.
[13] Amended February Monthly Operating Report for the NRA at p. 2, 4 [Docket No. 399].
[14] *See e.g.,* Declaration of Michael J. Collins, Schedule 1 [Docket No. 84-2] (reflecting that the Debtors commenced 10 of the 16 cases for which the Debtors seek to employ Brewer Attorneys & Counselors (the "**Brewer Law Firm**")).

---

in these cases also indicates counsel's presence in ordinary course of business activities by the NRA, cloaking such activities in privilege but at great cost. In 2019, the NRA paid $38 million in legal fees, of which $25 million went to the Brewer Law Firm.[15] Again, in 2020, the NRA paid another $32 million ($17.5 million of which was paid within the 90 days prior bankruptcy)[16] to the Brewer firm, and yet Mr. Spray testified that the payments did not pose a financial threat. Moreover, there has been no evidence that the Mr. LaPierre or the Board considered any study, assessment, or estimate of the relative costs of litigation with or without bankruptcy. Further still, the multidistrict litigation panel already rejected the NRA's claim that consolidation was called for.

16. Without a financial need for bankruptcy, the Debtors' bad faith motives to circumvent the regulatory process in New York become even more clear. The Debtors claim they are not seeking a litigation advantage in bankruptcy because they have not sought to delay or stay the NYAG Enforcement Action – but argue that the automatic stay does apply, and appear to reserve the right to move for a stay at some future time.[17] The Debtors' intent and ultimate goal are clear: test the resources of the NYAG by bringing its claims of bias in multiple courts in an effort to obstruct or delay the NYAG Enforcement Action and utilize the automatic stay at the opportune time to circumvent and usurp the authority of the NY State Court with that of this Court in Texas by seeking confirmation of a bankruptcy plan that would moot or terminate the NYAG Enforcement Action.[18] The Debtors cite *In re HHH Choices Health Plan, LLC* to support this tactic. That debtor, however, "did not have the resources to continue to operate its facilities . . . "[19]

---

[15] 2019 IRS 990 available at Docket No. 266-1, p. 8 of 65.
[16] NRA's Amended Statement of Financial Affairs at p. 22 of 55 [Docket No. 288].
[17] Debtors' Opposition at ¶¶50-60 (arguing that the automatic stay applies to the NYAG Enforcement Action).
[18] *Id*. at 62-63.
[19] *In re HHH Choices Health Plan, LLC*, 554 B.R. 697, 698 (Bankr. S.D.N.Y. 2016)

nor was it the subject of a pending regulatory enforcement action. This is the very definition of seeking a litigation advantage.

17.     Debtors set up a straw man argument that bankruptcy is necessary to protect the NRA's assets. Debtors assert that the NYAG "seeks to distribute the assets of these estates to other non-profits over the objection of the NRA's membership" and seeks destruction of the NRA "as an end in and of itself."  Setting aside these hyperbolic and untrue statements, in fact, as alleged in the NYAG Enforcement Action, the NYAG seeks to stop Wayne LaPierre and other current and former officers from misusing, wasting and defrauding the NRA, asks for repayment of monies fraudulently taken from the NRA, seeks to disgorge prohibited transactions, and seeks to ensure compliance with the laws applicable to not for profit entities to protect the assets of such entities. The NYAG asserts 18 causes of action in the NYAG Enforcement Action.  Dissolution as one form of possible relief.  But New York law does not allow the NYAG to summarily dissolve a charity, but rather place a burden upon the NYAG to prove to a court that dissolution is called for under the law in a given circumstance. With respect to N-PCL § 1101, the Attorney General must show a regulated entity's misconduct "has produced, or tends to produce, injury to the public. The transgression must not be merely formal or incidental, but material and serious, and such as to harm or menace the public welfare." *People v. Oliver Schools*, *Inc.*, 206 A.D.2d 143, 145 (4th Dep't 1994) (interpreting BCL § 1101, from which N-PCL § 1101 is derived) (quoting *People v. North River Sugar Refining Co.*, 121 N.Y. 582, 609 (1890)). And it is the court that ultimately decides whether dissolution of the NRA is in the best interest of the public. N-PCL § 1109(b)(1). With respect to Dissolution under N-PCL § 1102, the Attorney General stands in the shoes of the NRA's members and, as relevant here, must prove that the "directors or members in control of [the NRA] have looted or wasted the corporate assets, have perpetuated the corporation solely for their

personal benefit, or have otherwise acted in an illegal, oppressive or fraudulent manner." N-PCL § 1102(a)(2)(D); 112(a)(7). And it is the court that must ultimately decide whether dissolution of the NRA is in the best interest of its members. *See* N-PCL § 1109(b)(2).

18. The bad faith is even more clear because creditors would be paid in full in the NYAG Enforcement Action. Under New York law, even if dissolution is successful, creditors will be paid. The N-PCL provides a careful, judicial process for notifying creditors and providing them with not less than six (6) months to present claims for payment and the distribution of assets.[20] In fact, N-PCL 1007 provides a statutory scheme similar to the Bankruptcy Code that provides for the payment of creditors with liens, ahead of other creditors, and provides a preference for "Laborer's wages."[21]

19. Furthermore, the process of distributing the assets of a charitable not-for-profit corporation in the event of a judicial (involuntary) dissolution is a judicial process governed by Article 11 of the N-PCL, and certain relevant provisions of Article 10 of the N-PCL. Section 1109 of the N-PCL, provides sole discretion to the Court hearing the dissolution case both to determine whether the corporation should be dissolved, and "may, in its discretion, provide . . . for the distribution of the property of the corporation to those entitled thereto according to their respective rights." According to N-PCL 1002-a(c) "after paying or adequately providing for the payment of its liabilities," the remaining assets of the corporation which are "legally required to be used for a particular purpose" shall be distributed to "one or more domestic or foreign corporations or other organizations engaged in activities substantially similar to those of the dissolved corporation." Thus, the statutory framework of N-PCL Articles 10 and 11 provides built-in protection for creditors and a method for ensuring that any remaining assets of the

---

[20] N-PCL 1115, which incorporates by reference N-PCL 1006-1008.
[21] N-PCL 1007(d).

dissolved corporation may only be distributed to organizations engaged in substantially similar activities to those of the dissolved corporation.

20. The Debtors filed bankruptcy to "Dump New York" to address a regulatory enforcement – not financial – problem. The Debtors did not file, and do not need bankruptcy, to ensure that their creditors are paid in full. They filed for one reason only – to obtain a litigation advantage.

**B.** **Debtors' Bad Faith is Further Evidenced by the Lack of Authority to File and Alleged Post-Bankruptcy Ratification of the Filing.**

**i.** **Bad Faith Evidenced by Lack of Authority to File**

21. The NYAG has learned through discovery that not only was the bankruptcy filing of the NRA not approved by its Board, but the plan to file was intentionally kept from the Board, the then-Treasurer/CFO who was an *ex officio* board member, the Secretary/General Counsel, who was also an *ex officio* board member, and the current acting CFO. NRA attempted to secure authority for the bankruptcy filing to Mr. LaPierre from the Board without the Board knowing that NRA intended to file for bankruptcy. NRA attempted this feat by seeking Board approval, at the January 7, 2021 Board Meeting, of the Employment Agreement between the NRA and Mr. LaPierre. An inner circle of NRA officers and outside attorneys, rather than asking for Board approval to file for Bankruptcy through a Board resolution –as required by the Bylaws - sought to do so replace informed by and through Paragraph 2(a) of the Proposed Employment Agreement, which outlines a list of "duties" of Mr. LaPierre. The second sentence of Paragraph 2(a) of the Proposed Employment Agreement (entitled "Duties and Compensation") that the NRA contends provided the Board notice, knowledge and authority for Mr. LaPierre to file the bankruptcy states as follows:

> Among his authorities, Employee shall be empowered to exercise corporate authority in furtherance of the mission and interests of the NRA, including without limitation to reorganize or restructure the affairs of the Association for purposes of cost-minimization, regulatory compliance or otherwise [and] the customary duties of such position and such other commensurate duties as may be assigned from time to time by the Board of Directors.

(the "**Alleged Delegation Clause**") *Id.* [22]

22.     Because the portion of the Executive Session of the Board Meeting regarding consideration of the Employment Agreement dealt with Mr. LaPierre, he was excluded from the Executive Session of the Board Meeting. Minutes of the Board Meeting show that there was no discussion about the above-quoted sentence of the Alleged Delegation Clause in paragraph 2(a) of the Proposed Employment Agreement or any discussion whatsoever about the NRA's plan to file for bankruptcy. NRA now apparently takes the position that it successfully extracted authority from the Board for this bankruptcy filing through the Board's approval of the ambiguous Alleged Delegation Clause, or that Mr. LaPierre had that authority all along as the EVP pursuant to the Bylaws.

23.     Various executives and NRA witnesses were asked questions at three separate sessions of the meeting of creditors pursuant to 11 U.S.C. § 341 about whether there was any discussion whatsoever at the Board Meeting (or any other meeting) regarding the NRA's plans to file for bankruptcy. These questions were based, at least in part, on Debtors' disclosure in this proceeding that, between October 2020 and the Board meeting, NRA invested more than $6 million in preparation for NRA' bankruptcy filing.

---

[22] The Employment Agreement that Mr. LaPierre ultimately signed added provisions selecting Texas for the choice of governing law and forum for dispute resolution. This is despite NRA being legally domiciled in New York. Due to the NRA's assertion of privilege, no inquiry was permitted into the discussions with the Board concerning the addition of these provisions and choice of Texas.

24.     To summarize, the NRA appears set to argue that it informed its 76-member Board of its intention to put the NRA into bankruptcy by inserting an ambiguous sentence into an employment contract that ostensibly delegated Board authority to a single NRA officer, an offcer who is currently facing regulatory claims in New York State for his misconduct in regard to eh organization.  NRA worked to hide the intended use of the critical provision in the Employment Contract that it now relies on for the assignment of nontransferable powers from the Board to Mr. LaPierre.

25.     The NYAG has reason to believe that NRA misled the Board during the Executive Session.  At the third session of the 341 meeting, on March 12, 2021 at approximately 1:21 p.m., John Frazer, General Counsel for the NRA, was asked whether "the words 'bankruptcy' or 'Chapter 11'" were ever spoken at the Executive Session of the Board Meeting, or any other part of the Board Meeting, or any other board meeting.[23]  Mr. Frazer was present at the Executive Session where Mr. LaPierre's Employment Contract was discussed, did attend a separate Executive Session as well as the open portion of the Board Meeting on January 7th.[24]  Mr. Frazer did not recall those words ever being used in the portions of the Board Meeting he attended.  *Id.* 15:3-5, 16:22-25.  The failure of the Board to approve the filing of the NRA bankruptcy, and the attempt to hide and obfuscate the bankruptcy filing from the Board, are highly relevant facts to the Motion.

26.     With that background, and after various attempts by the NRA to continue to hide the fact that the Board was never informed of the plan to file for bankruptcy, a news story broke that provides a basis for questioning board witnesses, including Judge Journey, a current NRA Board member and sitting Judge in the State Court in Kansas, about the alleged Board

---

[23] Transcript of 341 Hr'g held March 12 2021, 13:25-16:25.
[24] Mr. Frazer was not present at a separate Executive Session concerning the Special Litigation Committee.

---

authorization of the bankruptcy. At 5:00 a.m. on March 9, 2021, the *Washington Free Beacon* published an article that stated, in relevant part:

> The meeting [an upcoming NRA Board Meeting scheduled for Sunday, March 14, 2021] comes after board member Phillip Journey accused NRA lawyers of misleading the board about the creation of the Special Litigation Committee and the bankruptcy in a court filing. Journey, a Kansas family court judge, told the Free Beacon the board was not made aware of the bankruptcy plan when it voted to empower the committee in a Jan. 7, 2021 meeting. He said he found out about [the bankruptcy filing] when his daughter texted him a news story.
>
> "You could have seen the top of my car blow off with my head," Journey said. "Because I knew what that meant**.** It meant that those three lawyers committed a lie of omission of material facts to the board of directors…. Nobody said bankruptcy."[25]

27.     The subsequent March 18, 2021 deposition of Judge Journey ("**Journey Dep.**") has revealed the extent to which NRA officers and attorneys worked to prevent Board members from becoming aware of the purpose of the Delegation Clause in the Proposed Employment Agreement. According to Judge Journey, Board members were not even provided individual copies of the Proposed Employment Agreement. Judge Journey explained that only a few copies of the Proposed Employment Agreement were placed at two tables and that individual Board members could take turns reading the two copies before both copies were "turn[ed] . . . back in."[26]

28.     When NYAG Counsel asked Judge Journey why he thought the filing of the bankruptcy was a governance failure, Judge Journey indicated that "[t]he January 15th filing was not the governance failure. It was an indication of it, that the governance failure I believe occurred happened at the January 7th board meeting. And the fact that the [B]oard was not informed . . . ."

---

[25] "NRA Board to Hold Emergency Hearing Amid Bankruptcy Turmoil", Washington Free Beacon dated March 9, 2021, a trust and correct copy of which can be found at https://freebeacon.com/guns/nra-board-to-hold-emergency-hearing-amid-bankruptcy-turmoil/.
[26] Deposition of Hon. Phillip Journey dated March 18, 2021, at 22:2-4.

*Id.* 154:13-24.  At that point, Debtors' counsel cut Judge Journey off and stated that Judge Journey could not "discuss what happened" in the January 7th executive session.  *Id.* 154:25-155:3.

29.    Judge Journey further testified: "So look at the Free Beacon article. The governance failure was the failure of officers or counsel or those the board is dependent on from revealing the material fact the bankruptcy was in process of being filed at that board meeting." *Id.* 156:12-16.

30.    As set forth the NYAG's motion regarding privilege (Dkt __), the NRA has shielded facts regarding the executive session and the Employment Agreement by overbroad assertions of privilege.

31.    Mr. Frazer, NRA's General Counsel, testified at his deposition that one Board member, Mr. Duane Liptak ("**Liptak**"), resigned from the Board shortly after the filing of the bankruptcy as he felt "he wasn't able to provide proper oversight."[27] (the "**Frazer Dep.**").  Prior to resigning, Mr. Liptak sent an email to Mr. Frazer "regarding the bankruptcy filing in which he asked why – asked essentially why it hadn't been discussed with the board at the January 7th meeting." *Id.* 40:18-22.

32.    Mr. Frazer was asked directly whether or not "Prior to the NRA filing for bankruptcy in mid-January, did you communicate to the board any – anything with respect to potential of a bankruptcy filing?" *Id.* 65:22-25.  Mr. Frazer confirmed that after he became aware that Chapter 11 reorganization was being considered, he did not discuss the potential bankruptcy with the legal affairs committee of the Board nor did he inform anyone on the Board. *Id.* 68:9-19.  Mr. Frazer himself only became aware of the decision to file the petition at the time of filing on January 15, 2021.

---

[27] Deposition of John Frazer dated March 18, 2021 at 36:22-37:19.

33.     Besides keeping the Board and senior executive officers in the dark on the actual filing itself, the Debtors failed to obtain the proper authority from the Board to actually accomplish its goal of legally and physically moving to Texas. The Bylaws specifically require the Board to approve actions by the NRA to physically relocate to Texas, like all actions to "[p]urchase, sell, mortgage, or lease real property of the Association . . . ."[28] Additionally, the Bylaws require other Board action which would likewise be necessary to make such a significant legal and physical relocation including resolutions to "[a]dopt and disseminate a fundamental change of view, or basic policy, or basic organizational structure of the Association . . ." and "[f]ormulate such other corporate policy decisions or perform corporate activities of the Association of such major significance as to warrant action by the full Board of Directors."[29]

ii.     **Bad Faith Evidenced by Post-Filing Cover-Up & Alleged Ratification.**

34.     The Debtors' lack of authority became increasingly clear starting with the first meeting of creditors on February 22, 2021 and continuing throughout discovery. The Debtors recognized the severity of this problem and called a special, emergency, in-person meeting of the Board for March 14, 2021 to be held in Dallas. The notice to the Board stated that "[t]he sole purpose of the meeting is to provide a briefing to the Board regarding the NRA's reorganization plan and the legal matters overseen by the Special Litigation Committee, and to take any necessary action directly related to those matters."[30]

35.     After cancelling the first date of the meeting, NRA rescheduled the meeting – in person – in Dallas for March 28, 2021, the eve of the hearing on the pending motions.  (The hearings were later adjourned to begin on April 5, 2021.) The Bylaws had just been amended in

---

[28] Bylaws at Art. IV, Sec. 2(h).
[29] Id. at Sec. 2(f) and (k).
[30] Official Notice Special Meeting of the Board of Directors Date March 2, 2021.

October 2020 to allow for Board meetings to be held electronically.[31] This new provision only allowed remote Board meetings to occur if all members attended electronically, and did not allow for some to attend in-person and some to attend electronically. Thus, not only did requiring an in-person meeting cost the Debtors financially[32], and possibly subject NRA staff and Board members to the risk of exposure to COVID, it also deprived other Board members of an opportunity to easily participate on short notice electronically.

36.     On March 28, 2021, just over half (48) of the 76 member Board met in person in Dallas. The meeting was led by Mr. Charles Cotton, the First Vice President and member of the Special Litigation Committee. Mr. LaPierre attended the entire meeting. Attorneys for the Debtors, including members of the Brewer Law Firm, were present for the entire meeting.

37.     After a discussion purportedly with lawyers, a motion was made by David Keene, the Debtors' former president and recipient of one of the many lucrative "consulting contracts" Mr. LaPierre gave his allies, to ratify the filing of the bankruptcy case by the Debtors. Ratification of the bankruptcy petition was not the agenda, yet the Board members were provided printed copies of a detailed proposed resolution to ratify approval of the bankruptcy filing.  That ratification included a provision protecting the employment current NRA counsel

38.     The resolution passed with forty-three (43) votes in favor, three (3) abstentions and one (1) vote against.[33]

39.     Thus, the Board, facing the significant potential legal ramifications of improperly filed bankruptcy cases by Mr. LaPierre, voted to ratify the bankruptcy filings through a process that continued to undermine the Board's ability to make a considered decision.  The vote was taken

---

[31] Bylaws at Arti. IV, Sec. 3(f).
[32] Board members who attended the meeting, which took place at the Omni Hotel & Convention Center, are reimbursed for airfare and other travel costs.
[33] One board member, Mr. Allen West, left the Board meeting for unknown reasons and did not vote.

at an emergency Board meeting, conducted in person, paid for by the Debtors, with little notice of

the action to be taken. Mr. LaPierre and the Brewer Law Firm, who, together, orchestrated the

initial bankruptcy filing and facilitated the deception attended the entire meeting. The Brewer

Firm is also the subject of a pending objection to its employment as special counsel to the Debtors.

Even if the Board's ratification of the bankruptcy filing could cure the defective initial filing, the

facts and circumstances of how the Debtors planned and executed the ratification evince bad faith

and further demonstrate the Board's inability to obtain impartial, candid legal advice and in a way

(electronically) that promotes maximum participation by directors.

## II.   A TRUSTEE SHOULD BE APPOINTED IF THE CASES ARE NOT DISMISSED.

### A.   Mr. LaPierre's Express Conflict of Interest Constitutes Cause to Appoint a Trustee.

40.     Courts will leave a debtor in possession only where current management "can be

depended upon to carry out the fiduciary responsibilities of a trustee." *See Commodity Futures

Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985). Where management is incapable of

performing these duties, a Chapter 11 trustee must be appointed. *See In re Marvel Entm't Group,

Inc.*, 140 F.3d 463, 473 (3d Cir. 1998). Prepetition conduct that raises serious questions regarding

management's ability to run the company without bias toward a particular stakeholder, like Mr.

LaPierre's decision to put the NRA into bankruptcy without obtaining Board approval, is sufficient

alone to warrant the appointment of a trustee. *See* 11 U.S.C. § 1104(a)(1); *see also Sharon Steel*,

817 F.2d 1217, 1225-29 (3d Cir. 1989)(cause existed to appoint a Chapter 11 trustee based in part

on prepetition actions); *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y.

1989). Further, courts in this district and this Circuit have specifically held that where management

has a conflict of interest, cause exists to appoint a chapter 11 trustee. *See In re Patman Drilling

Int'l Inc.*, Case No. 07-34622-SGJ, 2008 WL 724086 *6 (Bankr. N.D. Tex. Mar. 14, 2008)(*citing*

*In re Cajun Elec. Power Co-op, Inc.*, 69 F.3d 746, 749 (5th Cir. 1995), *withdrawn in part on reh'g*, 74 F.3d 599 (5th Cir. 1996)).

41.    Mr. LaPierre made the decision to place the Debtors into bankruptcy while laboring under a substantial conflict of interest, and he continues to be burdened by those conflicts during these bankruptcy cases. As an individually named defendant in the NYAG Enforcement Action, Mr. LaPierre had, and has, a conflict of interest on matters and decisions relating to that lawsuit.

42.    To address this conflict, on September 10, 2020, one month after the NYAG Enforcement Action began, Ms. Carolyn Meadows, the NRA's President, formed the Special Litigation Committee (the "**SLC**") consisting of Mr. Cotton (First Vice President), Willes Lee (Second Vice President), and herself with the following powers:

> [The SLC] shall exercise corporate authority on behalf of the NRA with respect to the prosecution and defense of (i) the litigation captioned *People of the State of New York v. The National Rifle Association et. al.,* Index No. 451625/2020 (Sup. Ct. N.Y.); (ii) the litigation captioned *The National Rifle Association v. Letitia James*, Case No. 1:20-cv-889 (N.D.N.Y. 2020); (iii) the litigation captioned *District of Columbia v. NRA Foundation, Inc.* et al., [sic] (2020 CA 003545 B); and (iv) any additional legal proceedings arising from or relating to the same facts, circumstances, or allegations as the foregoing, wherein the potential for an actual or apparent conflict of interest favors recusal by one or more of the NRA executives who would customarily oversee such proceedings.[34]

43.    At the time of its formation in September 2020, the SLC had no powers to exercise the NRA's "corporate authority" because it had not yet been approved by the Board pursuant to the Bylaws.[35] The Board's approval was not sought until January 7, 2021, the same time as Mr. LaPierre's Employment Agreement was proposed for approval, just before the bankruptcy filing.[36]

---

[34] NRA Bankruptcy Petition [Docket No. 1] at p. 5.
[35] Bylaws, Art. XI, Sec. 4 ("no corporate authority may be delegated to any committee unless . . . such committee has been delegated such authority by a resolution adopted by a majority of the entire Board of Directors.").
[36] The Board held a meeting in October 2020 and was not presented with the resolution to approve the SLC at that

44.     Mr. Cotton, the NRA's First Vice President, and member of the SLC, testified that the bankruptcy filing was within the scope of the SLC[37]—thus acknowledging a conflict for Mr. LaPierre.  Mr. LaPierre testified that Mr. Frazer, the NRA's general counsel, did not take part in discussions about matters with the SLC because he (Mr. Frazer) is named individually as well. When asked whether Mr. LaPierre asked Mr. Frazer for "his ideas and input on whether you should file for bankruptcy", Mr. LaPierre answered:

> I did not, because Mr. Frazer had largely taken himself out of dealing with the special litigation committee because he is involved in litigation with the New York State Attorney General. And those discussion were heavily involved with the special litigation committee, so Mr. Frazer had kind of removed himself from those conversations.[38]

45.     Thus, Mr. LaPierre clearly connected the potential bankruptcy filing and conversations with the SLC to matters involving the NYAG Enforcement Action, and testified that would have been the reason why Mr. Frazer was not involved in bankruptcy discussions with the SLC.

46.     Mr. LaPierre, obviously, did not remove himself from such discussions with the SLC about bankruptcy. Instead, he negotiated and signed an employment contract that he would later purport gave him the authority to file, authorized the transfer of $5 Million to the Brewer firm (of which $1 Million would be transferred to the Neligan firm in connection with the bankruptcy filing), and then single-handedly signed the petition to put the NRA into bankruptcy.

47.     Mr. LaPierre made the significant and major decision to place the NRA into bankruptcy without being free of conflict. The bankruptcy case clearly, in his mind, provides a potential benefit of resolving the NYAG Enforcement Action for the NRA – and himself. And

---

time.
[37] Deposition of Charles Cotton March 27, 2021, 59:25-60:6
[38] Deposition of Wayne LaPierre, March 22, 2021, 213:12-18.

while he consulted with the SLC on his decision, the SLC did not do any independent analysis related to the filing of the bankruptcy and was not the ultimate decision maker, nor was filing bankruptcy within the scope of its powers to exercise the NRA's corporate authority.

48.     A trustee must be appointed for the Debtors to be operated by an independent person, with fiduciary duties to their estates who is free of any actual or potential conflicts.

**B.     The Evidence of Fraud, Dishonesty, Incompetence and Gross Mismanagement of the Affairs of the NRA Merit Appointment of a Trustee.**

49.     NYAG, in its motion to appoint a trustee, outlines a significant number of violations of New York non-profit law. The NRA bases its defense (consisting of just six (6) paragraphs) against the appointment of a trustee on the argument that the NYAG's allegations are outdated and disputed, and that the NRA has self-corrected.[39] The facts prove otherwise. At trial, the NYAG will show how failure to manage and follow statutory requirements and internal controls policies that have plagued it in the past, still exists today.

50.     There is no dispute that in the face of the NYAG investigation and Enforcement Action, the NRA attempted to implement some policies that are intended to address governance issues.  The evidence is just as clear that these policies are routinely violated by board members and employees, and that Mr. LaPierre appears to be exempt from the policies altogether.   As one glaring example, the NRA has a policy by which all contracts over $100,000 must be accompanied by a business case analysis, must be approved by two of the salaried officers (Executive Vice President, Treasurer and Secretary), and acknowledged by two of the three Board officers (President, First Vice President, and Second Vice President). As recently as November 2020, the

---

[39] Debtors' Opposition at ¶¶95-100.

engagement agreement for the Neligan firm (which contemplated a $350,000 retainer) received neither a business cases analysis, nor the signatures of two of the three salaried officers.[40]

51.     Equally revealing is the testimony of Mr. Spray, the former CFO who has testified that he did not have access to important documents and information for the NRA's 2019 IRS Form 990, the primary information return provided to the IRS and state regulators, or the amended Form 4720 for reporting excess benefit transactions. By way of an example, Mr. Spray testified that he gathered information about expenses pertaining to at least one former officer to assist tax counsel as part of the identification of excess benefit transactions but that in connection with Mr. LaPierre's expenses "I did not have access to those documents."   When asked if he knew what expenses they reviewed he was instructed not to answer.  Mr. Spray, testified as follows:

> Q:   Is it your testimony that you don't know how the number reported in schedule I of the 2019 amended 4720 for Wayne LaPierre was arrived at?
> A:       I requested that information, and I was advised that because of privilege I wasn't going to get it.

52.     Combined with the Debtors' lengthy, and likely growing, list of ways that they have not complied with the disclosure requirements of the Bankruptcy Code, and their pattern and practice of obfuscating material information, before and after bankruptcy, the Debtors fall far short of availing themselves of corrected behavior to prevent the appointment of a trustee.

53.     In short, despite being placed on notice of pervasive and persistent misconduct that could subject the NRA to legal liability, the NRA, and more particularly its current management team, continue to engage in such conduct.

**C.     Cause Exists to Appoint a Trustee Based Upon New Evidence.**

54.     Section 1104(a)(1) does not limit what constitutes "cause" for the appointment of a trustee, but it provides examples of "fraud, dishonesty incompetence, or gross mismanagement .

---

[40] The employment agreement for the Neligan firm was signed by Wayne LaPierre

. . or similar cause." Importantly, for purposes of appointment under Section 1104(a)(1), so long as "cause" exists, the Court is not required to consider the "interests of creditors" or "other interests of the estate" which form an independent basis for the appointment of a trustee under Section 1104(a)(2). Here, either prong will be satisfied with evidence cited in the NYAG Enforcement Action and new evidence obtained during these bankruptcy cases.

### i.     Failure to Inform Executive Leadership & the Board of Bankruptcy.

55.     First, "cause" exists by virtue of the undisputed evidence that Mr. LaPierre and a select few of advisors, including the Brewer Law Firm, concealed the plan to file bankruptcy from the NRA's own GC and CFO. Neither of them knew, or were informed, of the plan to file. Given the significance of a bankruptcy filing for an entity, and the immense legal and financial issues it presents – from the disclosure of assets, debts and financial affairs, to reporting obligations to the Office of the United States Trustee ("**UST**"), to developing, negotiating and proposing a plan – an entity is not well served, much less best prepared, for bankruptcy when key executives like the GC and CFO are not informed or materially involved in the preparations to file.

56.     Second, "cause" exists by the failure to clearly and unequivocally obtain approval from the Board to file for bankruptcy.  The NRA blames its Board members for not understanding that "reorganize or restructure the affairs of the Association" in Mr. LaPierre's Employment Agreement meant bankruptcy and not asking questions about whether that phrase met bankruptcy. Why would they? The NRA was then, and is now, in financially sound condition. The Board likely, and justifiably, relied upon the NRA's executives and officers to inform them of an event of such major significance as a bankruptcy filing, as Judge Journey did: "The governance failure was the

failure of officers or counsel or those the board is dependent on from revealing the material fact the bankruptcy was in process of being filed at that board meeting."[41]

57.    Third, the NRA's explanation for why they kept the bankruptcy filing secret establishes "cause." Repeatedly, Mr. LaPierre and Mr. Cotton, testified that they were concerned of the bankruptcy plan being leaked from within their own executive leadership teams and the Board. They apparently felt that their own distrust of the Board justified circumvention of the Board.  When asked why he did not tell the CFO about the bankruptcy filing, Mr. LaPierre answered "[b]ecause we were very concerned about leaks…."[42] Mr. Cotton, similarly testified that that Mr. Frazer "did not have to know. It was critical that this information not get out."[43] As for the Board, Mr. LaPierre testified that "[t]there was tremendous concern among the special litigation committee, in particular, about leaks and the fact that -- and as we talked about, there was an ongoing process of leaks, unfortunately, in real-time from the -- from the board."[44]

58.    The very fact that an entity's chief executive cannot trust those to whom he reports, or his executive teams, who bear responsibility for critical functions, evidences "cause." Mr. LaPierre was involved in the hiring and retention of every single senior executive at the NRA during his 30 years as the Chief Executive Officer.  If those he hired cannot be trusted to keep such information confidential, or their opinions and advice on such a fundamental decision have no value, this reflects on Mr. LaPierre's role as the CEO. It is gross mismanagement, incompetence, and perhaps even dishonest, for Mr. LaPierre and certain advisors to engage in a pattern and practice of depriving key NRA decision makers and advisors, such as the Board Secretary and General Counsel, of material information and plans for a significant corporate event like

---

[41] Deposition of the Honorable Phillip Journey, March 18, 2021 at 156:12-16.
[42] Deposition of Wayne LaPierre, March 22, 2021 at 223:11.
[43] Deposition of Charles Cotton, March 27, 2021 at 185:8-9.
[44] Deposition of Wayne LaPierre, March 23, 2021 at 344:1-5.

bankruptcy. Simply put, this is no way to manage and make critical decisions for an organization with millions of members and $325 million of annual revenues.

### ii.     Continued Failures to Fully Inform the Board.

59.     "Cause" also exists based upon how the NRA continues to fail to fully inform the Board and prepare it for making significant decision. As discussed above, the NRA, through Ms. Meadows, called an emergency special board meeting to be held in person in Dallas, even though the meeting could have been held electronically to allow easier participation by directors. The notice of the meeting did not specifically disclose that the Board would be asked to ratify the bankruptcy filing. Yet, the testimony of Mr. Cotton makes clear that the NRA, again, carefully orchestrated and planned the ratification vote. This time, after just a few hours of discussions, a motion was made to ratify the bankruptcy filing and printed copies of prepared resolutions were presented to the Board. A vote was cast to require the vote on the resolutions by roll call so each director's vote would be recorded and published by the NRA to its members – a rare event that could have instilled fear of retaliation among directors who vote against or abstain from ratifying the bankruptcy filing. Moreover, the people responsible for concealing the first filing from the Board (Mr. LaPierre, Mr. Cotton and the Brewer Law Firm) were all present in the room and were never excluded or recused from discussion about ratification even though their acts and omissions may have cost the NRA millions in legal fees for the litigation created by the bankruptcy filing.

60.     The NRA unnecessarily spent financial resources (probably tens of thousands or more) on the special board meeting by requiring in person attendance. This also likely reduced the number of directors who could participate. Further, because of the cryptically worded notice, the NRA did not fully inform the Board of what was planned that day – a carefully coordinated vote to ratify the bankruptcy filing.

C.    **Mr. LaPierre's Entrenchment in the NRA Does Not Prohibit the Court From Appointing a Trustee.**

61.    The Debtors and the UCC argue that the appointment of a trustee would harm NRA, on account of the importance of Mr. LaPierre to the NRA and would not be in the interest of creditors.[45] The Debtors and UCC appear to improperly assume that the UST and the process it utilizes to select trustees, would result in the appointment of a trustee who could not manage the affairs of the NRA as well, or better, than Mr. LaPierre. But Section 1104(a)(1) does not require the Court to engage in such speculation so long as "cause" exists. And even under Section 1104(a)(2), the Court should not be precluded from appointing a trustee based upon speculation, especially when the NRA's -undisputed creditors can easily be paid in full by a trustee.

62.    This is not the first time courts have had to determine whether to appoint a trustee to replace a long term executive who is allegedly critical to a debtor's operations and non-profit mission. In *Woodlawn Community Development Corp.,* the court appointed a trustee even though the debtor, a non-profit, had replaced the CEO accused of wrongdoing, who had led the company for fifty years. On appeal, the district summarized:

> Finally, Woodlawn argues that appointing a trustee was the "death knell" of an "old and venerable community organization" that benefited underserved communities. But Finney rang that bell. Woodlawn's management allowed him to operate with virtually limitless discretion, and Woodlawn is now paying the price. The fault lies with management, not the judge.[46]

63.    Likewise here, the appointment of a trustee is needed because Mr. LaPierre has operated the NRA with nearly unchecked power. The facts and circumstances presented to the Court upon which the Court should find "cause" to appoint a trustee, just like the facts

---

[45] Debtors' Opposition at ¶81-88; UCC Response at ¶55-58.
[46] *In re Woodlawn Community Dev. Corp.*, 613. B.R. 671, 690 (N.D. Ill. 2020).

underpinning the NYAG Enforcement Action, are of the NRA's own making. The NRA, not this Court or the NYAG, is responsible for the existential crisis it claims to be facing.

### D. A Chief Restructuring Officer With Expanded Powers is Inappropriate.

64. Moreover, the appointment of a Chief Restructuring Officer is not appropriate or possible. The Debtors' Bylaws do not allow for the creation of a position of a chief restructuring officer ("**CRO**").[47] Furthermore, a CRO would likely be reporting to the same management and Board that has not properly governed or managed the NRA.[48] The NYAG agrees with the United States Trustee (the "**UST**") that a trustee, if appointed, should have full powers, and that the Bankruptcy Code does not permit a CRO to usurp the powers of a chapter 11 trustee.[49]

### CONCLUSION

67. The Debtors do not need this Court or the Bankruptcy Code for financial relief, they want regulatory relief and use bankruptcy as a litigation tactic, and that is an improper, bad faith reason for filing bankruptcy. The Court should dismiss these cases, or appoint a trustee. Doing otherwise would encourage, and even embolden, others in the future like the NRA, to invoke the tremendous privileges reserved for the "honest but unfortunate" debtors to evade state regulatory enforcement actions when they are financially capable of defending them.

68. For the reasons demonstrated above, NYAG respectfully requests that the Court (1) dismiss the Debtors' bankruptcy cases with prejudice; or, alternatively (2) appoint a chapter 11 trustee. NYAG also requests that the Court grant such other and further relief as it deems just, proper and appropriate.

---

[47] Bylaws, Art. V, Sec. 1(b): The Board may not abolish said offices nor create any other offices."
[48] Likewise, the appointment of an examiner would not suffice given these facts and circumstances. Additional investigations of the type an examiner would conduct are not necessary given the evidence obtained prior to and during these bankruptcy cases, and would only allow the NRA to continue under management that should be replaced if the Debtors want to continue obtaining the privilege and protections of the Bankruptcy Code and this Court.
[49] UST's Statement Regarding Motions Seeking Appointment of Examiner, Trustee, or Case Dismissal at ¶¶3-8; 16-19 [Docket No. 405] (the "**UST Statement**").

---

Dated: April 2, 2021                          Respectfully submitted,

                                             */s/ Jason P. Kathman*
                                             Gerrit M. Pronske
                                             State Bar No. 16351640
                                             Eric M. Van Horn
State Bar No. 24051465
Jason P. Kathman
State Bar No. 24070036
**SPENCER FANE LLP**
2200 Ross Avenue, Suite 4800 West
Dallas, Texas 75201
(214) 750-3610 – Telephone
(214) 750-3612 – Telecopier
-and-
5700 Granite Parkway, Suite 650
Plano, Texas 75024
(972) 324-0300 – Telephone
(972) 324-0301 – Telecopier
Email:  gpronske@spencerfane.com
Email:  ericvanhorn@spencerfane.com
Email:  jkathman@spencerfane.com

– And –

*/s/ Monica Connell*
Monica Connell
*Pro Hac Vice*
James Sheehan
*Pro Hac Vice*
Emily Stern
*Pro Hac Vice*
Stephen Thompson
*Pro Hac Vice*
**OFFICE OF THE ATTORNEY GENERAL OF
THE STATE OF NEW YORK**
28 Liberty Street
New York, NY  10005
(212) 416-8401
Email: James.Sheehan@ag.ny.gov
Email: Emily.Stern@ag.ny.gov
Email: Monica.Connell@ag.ny.gov
Email: Stephen.Thompson@ag.ny.gov

**COUNSEL FOR THE PEOPLE OF THE
STATE OF NEW YORK, BY LETITIA
JAMES, ATTORNEY GENERAL OF THE
STATE OF NEW YORK**

## CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2021, a true and correct copy of the foregoing was served (without exhibits) upon all parties entitled to notice, including the Debtors and United States Trustee, via the Court's electronic transmission facilities. Any party may request the exhibits from the counsel listed above. Any additional method of service will be reflected with a supplemental certificate of service.

*/s/ Eric M. Van Horn*

Eric M. Van Horn