**G. Michael Gruber**
State Bar. No. 08555400
gruber.mike@dorsey.com
**H. Joseph Acosta**
State Bar No. 24006731
acosta.joseph@dorsey.com
**Brian E. Mason**
State Bar No. 24079906
mason.brian@dorsey.com
**DORSEY & WHITNEY LLP**
300 Crescent Court, Suite 400
Dallas, TX 75201
Tel.: (214) 981-9900
Fax: (214) 981-9901
*Attorneys for Ackerman McQueen, Inc.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | **CHAPTER 11** |
| | § | |
| **NATIONAL RIFLE ASSOCIATION** | § | **Case No. 21-30085-hdh-11** |
| **OF AMERICA and SEA GIRT LLC,** | § | |
| | § | |
| **DEBTORS.** | § | **JOINTLY ADMINISTERED** |

## ACKERMAN MCQUEEN, INC.'S OMNIBUS REPLY TO RESPONSES OF THE DEBTORS, OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND PHILLIP JOURNEY TO ACKERMAN MCQUEEN, INC.'S  MOTION TO DISMISS THE CHAPTER 11 BANKRUPTCY PETITION, OR, IN THE ALTERNATIVE, MOTION FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

COMES NOW Ackerman McQueen, Inc. ("*AMc*" or "*Creditor*"), and hereby files this

*Omnibus  Reply* to (I) Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss

the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a

Chapter 11 Trustee, (2) the State of New York's Motion to Dismiss or, in the Alternative, to

appoint Chapter 11 Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11

Trustee (the "***Debtor's  Response***") [ECF 307]; (II) The Official Committee of Unsecured

Creditors' Omnibus Response to (i) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter

11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, (ii) the State of New York's Motion to Dismiss or, in the Alternative, to appoint Chapter 11 Trustee (the "*UCC Response*") [ECF 368]; and (III) the Limited Objection to the Motions to Dismiss or the Appointment of Trustee (the "*Journey Response*") [ECF 306]. In support hereof, AMc would respectfully show the Court as follows:

## I.    PRELIMINARY STATEMENT

1.      The National Rifle Association of America ("*NRA*") is using this bankruptcy case as a sword rather than an equitable shield. The NRA desperately wants the Court to believe it "has a legitimate need to restructure its debts, repay its creditors, and reorganize under chapter 11,"[1] when, in fact, the NRA needs no such relief form this Court. The NRA proclaims it is financially strong, has absolutely no problem paying its debts as they come due, is current on its only secured lender (Atlantic union Bank) and all pension obligations. In fact, the NRA only has approximately $14 million in matured unsecured trade debts and over 90% of such creditors are owed well under $10,000.00.[2] This is not surprising, given that the NRA has raised approximately $300 million in revenues for the past two years and, as of the bankruptcy filing, was sitting on approximately $150 million in liquidity, including $36 million in cash and $55 million in collectable accounts receivable.

2.      What then is this bankruptcy all about? The NRA claims it wants to establish "a centralized, neutral forum in which [the NRA] can streamline, resolve, and address the outstanding claims against it."[3] Besides the regulatory action by the New York Attorney General ("*NYAG Enforcement Action*"), the only other litigation the NRA seeks to centralize is that which it is

---

[1] ECF 307 (Debtors' Resp.) at 1.
[2] As demonstrated below, the $48.4 million PBGC debt is unmatured and only listed as a liability for accounting purposes. The NRA has never had difficulties funding its pension obligations.
[3] ECF 307 (Debtors' Resp.) at 1.

largely responsible for commencing and escalating.  This advanced litigation consists of lawsuits against former vendors, former officers, former counsel, and former donors, all of which it created after the 2018 NYAG investigation began to scapegoat others for accusations of its own lack of internal controls and proper governance.  There should be little doubt this litigation is well-beyond the nascent stage, as the NRA has paid one law firm, at least, $55 million[4] within the last several years to prosecute the NRA's claims and defenses in such suits.  Having failed to convince the NYAG that the NRA is committed to reform, the NRA now asks this Court, for supposedly "efficiency purposes," to (a) halt all the litigation that it instigated and (b) transfer such complicated suits to this forum, even the litigation with the NYAG.  The reality is that the NRA is using the automatic stay and the threat of impairing rights of creditors to exert leverage against the NYAG and other litigants.

## II.  CORRECTED AND UNCONTESTED FACTS

### A.  Special Litigation Committee

3.      On September 10, 2020, the President of the NRA, Carolyn Meadows, formed a special litigation committee ("**SLC**") to advise the board on how to handle the NYAG Enforcement Action, DCAG Enforcement Action against the NRA Foundation, and related litigation "arising from the same facts, circumstances, or allegations."  It was not until January 7, 2021 that the NRA Board adopted a resolution approving the SLC's management of that litigation.[5]  The resolution

---

[4] While no officer of the NRA appears to know how much money the NRA has spent on this law firm, (a) the NRA's Statement of Financial Affairs reveals the law firm (Brewer) was paid $17,483,271.70 within 90 days of the Petition Date, *see* ECF 288 at 49; (b) the NRA's 2018 990 tax form reveals this law firm was paid $13,832,060, *see* Ex. 1, Part VII, at 8; and (c) the NRA's 2019 990 tax form reveals that this law firm was paid $24,789,326, *see* Ex. 2, Part VII, at 8.  *See also*, Ex. 33, Tony Makris Dep. (Mar. 24, 2021) 290:14-22 ("And when I say that, all you've got to do is look at what we talked about earlier, you know, the 38 years of -- of the NRA's ascendancy. And the three years of their precipitous decline and ask yourself, who benefited from this. It's the old -- it's the old Watergate question. Follow the money. Who benefited from this? The NRA's not better off. Ackerman McQueen is not better off. NRA members aren't better off. So who benefited?").

[5] *See* Ex. 3, NRA Board Mins. (Jan. 7, 2021) at 6.

stated the SLC members Carolyn Meadows, Charles Cotton, and Willes Lee were "determined to be independent and disinterested."[6]

### B. Authorization to File Bankruptcy

4.    LaPierre proclaimed that "the size of the [NRA] board is the strength of the organization, because the strength of the organization is ultimately based on membership and the board representing that membership."[7] Yet at a January 7, 2021 Board meeting, LaPierre and the SLC sought to strip the NRA Board of its governance function.

5.    At this meeting, the Board was asked to approve the Officer's Compensation Committee's recommendation on an employment agreement for LaPierre (the "*Employment Agreement*"). In a secret executive session run by the Brewer Firm and SLC member Charles Cotton (First Vice President), the NRA Board purportedly approved the Employment Agreement, "subject to the addition of a choice of law and venue provision to be negotiated between the parties."[8] Pertinently, the Employment Agreement provides:

> Among his authorities, Employee shall be empowered to exercise corporate authority in furtherance of the mission and interests of the NRA, including without limitation to reorganize or restructure the affairs of the Association for purposes of cost-minimization, regulatory compliance or otherwise.[9]

6.    "Bankruptcy" was not disclosed, or apparently even discussed, at the January 7 Board meeting.[10] Neither did anybody explain that "reorganize or restructure" in the Employment Agreement was supposed to mean giving authority to LaPierre to file bankruptcy.[11]

### C. Suspicious Bankruptcy Filing

---

[6] *Id.*
[7] Ex. 6, LaPierre Dep., Vol. 2 (Mar. 23, 2021) 440:9-12.
[8] *See* Ex. 3, NRA Board Mins. (Jan. 7, 2021) at 5.
[9] *See* Ex. 7, Employment Agreement ¶ 2(a).
[10] *See* Ex. 8, Journey Dep. (Mar. 18, 2021) 23:22-23, 24:14.
[11] *See id.* at 28:17-29:4, 29:11-12; Ex. 34, Cotton Dep., Vol. 2 (Mar. 28, 2021) 271:10-18. *Compare with* Ex. 9, Frazer Dep., Vol. 2 (Mar. 18, 2021) 292:1-7 (admitting companies regularly "reorganize or restructure" without bankruptcy).

7. Debtors filed the Bankruptcy Case on the Petition Date. The NRA, which is incorporated in New York and headquartered in Virginia, obtained venue in this Court through the filing of its subsidiary, Sea Girt, a Texas limited liability company the NRA formed less than three months before the Petition Date.

8. Sea Girt has no operations, no employees, no officers or directors, and no offices.[12] Indeed, Sea Girt was funded two days before the Petition Date with $50,000.00[13] provided by the Brewer Firm, which funding has now returned to the NRA, leaving Sea Girt with no assets.[14]

9. According to Debtors, LaPierre decided to file bankruptcy "in consultation with the Special Litigation Committee."[15] LaPierre testified he was unaware of any other document giving him authority to file bankruptcy and that he would not have filed without the Employment Agreement language.[16] At the § 341 meeting of creditors, LaPierre also confirmed the real reason for filing bankruptcy:

> Well, what motivated our filing wasn't to avoid a -- a -- a -- a -- a -- a -- a -- a fight with General James. It was -- it -- we're still pursuing our two First Amendment lawsuits up there and, I mean, like -- I mean, like everyone else, *the NRA wants a level playing field* and -- and we – you know, we -- we thought it was in the best interest of our members to -- to go to the federal court and file a Chapter 11 bankruptcy and ask for a – the court's permission to reincorporate in the state of Texas.[17]

10. It was for that reason that LaPierre decided not to inform the Board of the fundamentally significant event of bankruptcy—at any point—before filing the Bankruptcy

---

[12] *See* Sea Girt Bankr., ECF 1, No. 21-30080-11 (Jan. 15, 2021); Ex. 11, § 341 Creditor Mtg. (Jan. 22, 2021) 170:17-171:7.

[13] *See* Ex. 23.

[14] ECF 397, Sea Girt Monthly Operating Report.

[15] *See* Ex. 10, Resolution Authorizing Chapter 11 Reorganization and Related Retention of Counsel (the "***Bankruptcy Resolution***").

[16] *See* Ex. 6, LaPierre Dep., Vol. 2 (Mar. 23, 2021) 340:3-15.

[17] Ex. 11, § 341 Creditor Mtg. (Mar. 5, 2021) 75:18-25, 76:1-2 (emphasis added). *See also* Ex. 12, LaPierre Dep., Vol. 1 (Mar. 22, 2021) 95:9-96:16; Ex. 6, LaPierre Dep., Vol. 2 (Mar. 23, 2021) 452:14-453:11.

Case,[18] even though the NRA had already spent several million dollars in "bankruptcy related" services in the three months leading up to the January 7 Board meeting.[19]

> Q. Mr. LaPierre, after you and the special litigation committee made the final decision to file Chapter 11 bankruptcy,[20] why did you not go back to the NRA board before actually pulling the trigger and filing?
>
> A. Well, there was tremendous concern among the special litigation committee, in particular, about leaks and the fact that – and as we talked about, there was an ongoing process of leaks, unfortunately, in real-time from the – from the board. And the special litigation committee, in particular – but I shared the same concern, but they were very concerned that a leak on this with the clear intent of General James to dissolve the National Rifle Association in what we believed, as I said numerous times, was an improper use of government authority, that she would – if leaked, she would immediately attempt to put the NRA into receivership, which would, in effect, destroy the organization.[21]

11. When NRA General Counsel John Frazer circulated to the Board a letter LaPierre wrote them informing *after* filing that the Bankruptcy Case was in place, a Board member responded, indicating no discussion had taken place during the January 7, 2021 Board meeting.

12. That Board member resigned four days later, becoming number 21 of various employees and Board members who left, whose employment was terminated, or who were ousted from the Board beginning with Col. North in April 2019 for being "disloyal" to LaPierre by challenging his management.[22]

### D. Financial Strength

13. Contrary to the excuse that "the Debtors seek to address the magnitude of claims in

---

[18] *See* Ex. 8, Journey Dep. (Mar. 18, 2021) 23:22-23, 24:14.

[19] ECF 288 (NRA Am. Stmt. of Fin. Affairs) at 49 (reflecting payments for bankruptcy related work beginning as early as October 2020). *See also* Ex. 11, § 341 Creditor Mtg. (Mar. 5, 2021) 37:5-12 (Frazer testimony).

[20] According to the NRA's post-petition evidence, LaPierre and the SLC made the decision on January 14, 2021, seven days after the Board meeting and one day before filing. *See* Ex. 13, Bankruptcy Ratification Resolution (Mar. 28, 2021). Oddly, neither LaPierre could not remember during deposition testimony when he made the decision. *See* Ex. 12, LaPierre Dep., Vol. 1 (Mar. 22, 2021) 212:17-213:4.

[21] Ex. 6, LaPierre Dep., Vol. 2 (Mar. 23, 2021) 343:21-344:13.

[22] *See* Ex. 15, Will Van Sant & Daniel Nass, *The NRA Exodus: Who Left the Organization During a Year of Upheaval*, THE TRACE (Mar. 2, 2020, with updates) [https://www.thetrace.org/2020/03/nra-departures-timeline-wayne-lapierre/].

which the NRA is a party as costs related to litigation are mounting and starting to adversely affect [the NRA's] operations," the NRA's Secretary and General Counsel, John Frazer, admitted inability to fund the litigation being handled by the Brewer Firm was not a reason for filing bankruptcy. As LaPierre boldly proclaimed in his deposition, the more than $40 million to the Brewer Firm in 2019-2020 alone is "the best money we ever spent."[23]

14.     On the Petition Date, LaPierre wrote a letter to the NRA members (also appearing on the NRA website) that closely parroted his internal letter to the Board, stating in no uncertain terms:

> The NRA is not "bankrupt" or "going out of business." The NRA is not insolvent. **We are as financially strong as we have been in years.**
>
> **…**
>
> We are leaving the state of an attorney general who, just a few months ago, vowed to put us out of business through an abuse of legal and regulatory power. [24]

15.     After the bankruptcy filing, LaPierre sent the same internal message to the NRA board about the NRA's financial strength and for the first time he communicated that there was an in-court bankruptcy filing involved "[t]o facilitate the reorganization" and "dumping New York."[25] According to LaPierre, "**Our filing today allows us to wisely seek protection from New York officials who illegally weaponized the powers they wield against the NRA and its members**."[26]

16.     Board members of the NRA made similar public statements contemporaneously with LaPierre's letters to NRA members and the Board and with the NRA press releases. According to Second Vice-President Willes Lee (the third highest ranking board member) and one of the three members of the SLC, "the NRA is in a better position financially than we've been in

---

[23] Ex. 12, LaPierre Dep., Vol. 1 (Mar. 22, 2021) 212:3-16.
[24] Ex. 17, LaPierre Letter to NRA Members and Supporters, NRAFORWARD.ORG (Jan. 15, 2021).
[25] *See* Ex. 18.
[26] *Id.*

a long time."[27]   First Vice-President Charles Cotton (another one of the three members of the SLC) "made clear that the bankruptcy filing was motivated by litigation and regulatory scrutiny in what he called 'corrupt New York'—not financial concerns."[28]

17.     The above public statements are supported by the disclosures provided in these cases.  The Statement of Financial Affairs demonstrates that the NRA generated revenues of $306.7 million in 2019 and $290.6 million in 2020.[29]  LaPierre boasted in his deposition that the NRA was "so successful" in 2020 that it reduced its debts by $40 million and was $33 million in the black.[30]

18.     The Bankruptcy Schedules disclose $249,379,985.80 in assets, including current and liquid assets of approximately $36.6 million in cash, $55.4 million in collectable accounts receivable, and $64 million in securities investments.[31]  While the NRA lists $111,154,784.25 million in debts, including $62.4 million in unsecured debt, $48,420,214.00 of such debt admittedly constitutes a contingent liability to the PBGC that is not currently owed and is only booked for accounting purposes.[32]  Thus, the NRA essentially has $62.7 million in debts, only approximately $14 million of which is unsecured and owed to 1117 creditors (over 90% of which are owed well-less than $5,000).

## III.     ARGUMENTS AND AUTHORITY

### A.  Motion to Dismiss

19.     The standards for good faith are largely uncontested.  As agreed by the Debtors, under the seminal case of *Little Creek* (Fifth Circuit), "bad faith is based on a 'conglomeration of

---

[27] Ex. 19, NRA list of news statements, NRAForward.org (Jan. 15, 2021).
[28] Ex. 20, Paul J. Weber and Michael R. Sisak, *NRA declares bankruptcy, plans to incorporate in Texas*, AP News (Jan. 15, 2021).
[29] *See* ECF 288 (NRA Am. Stmt. of Fin. Affairs) Part 1, at 1.
[30] Ex 6, LaPierre Dep., Vol. 2 (Mar. 23, 2021) 440:21-24.
[31] ECF 286 (NRA Amended Bankruptcy Schedules).
[32] *Id.*; *see also* Ex. 21, Rowling Dep. (Mar. 19, 2021) 256:16-25, 257:1-4, 257:18-19.

factors…'"[33] The Court must assess whether the "overriding motive [of the debtor] is to delay creditors without benefitting them in any way or to achieve reprehensible purposes" and must protect the "integrity of the bankruptcy courts." [34] This Court and the Fifth Circuit have specifically found dismissal necessary when the overriding motive (objectively) is to obtain a litigation advantage.[35]

20.    The UCC incorrectly contends the Court must look at both objective and subjective factors for bad faith[36] but cites no Fifth Circuit case endorsing that approach. Good faith is an objective standard in the Fifth Circuit.[37]

21.    The movant must show cause for dismissal of a Chapter 11 bankruptcy case by preponderance of the evidence,[38] which means "to prove something is more likely so than not so."[39] The burden then "shifts to the debtor to establish the exceptions in § 1112(b)(2)."[40]

### 1. **Movants Have Met Their Burden and Shown Cause for Dismissal.**

22.    Debtors argue that AMc and the NYAG (collectively, the "**Movants**") cannot meet their burden because "Movants rest on disputed and unproven allegations made by the NYAG in her complaint . . ."[41] But, the NYAG Enforcement Action was verified, detailed, and followed an 15-month investigation. More importantly, the majority of Courts, including the Fifth, Eighth and Third Circuits, have found bad faith when the purpose of the filing is to escape or avoid a forum

---

[33] ECF 307 (Debtors' Resp.) ¶ 4 (quoting *In re Little Creek Dev. Co.*, 779 F.2d 1068, 107 (5th Cir. 1986)).

[34] *Little Creek*, 779 F.2d at 1073.

[35] *See Investors Grp., LLC v. Pottorff*, 518 B.R. 380, 384 (N.D. Tex. 2014); *see also In re Antelope Techs., Inc.*, 431 Fed. Appx. 272, 275 (5th Cir. 2011) (finding that "the purpose of the petition was not primarily to reorganize or respond to financial crisis but instead to gain unfair advantage in the shareholder derivative action.").

[36] ECF 368 (UCC Resp.) ¶ 26.

[37] *See In re Elmwood Dev. Co.*, 964 F.2d 508, 512 (5th Cir. 1992) ("Because the good faith standard is an objective one, the court was not constrained to give dispositive weight to the testimony of the subjective state of Elmwood's manager.").

[38] *In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994).

[39] Fifth Circuit Pattern Jury Instruction 3.2 (2020).

[40] *In re Delta AG Grp., LLC*, 596 B.R. 186, 194 (Bankr. W.D. La. 2019) (citing *In re Briggs-Cockerham, L.L.C.*, No. 10-34222-BJH-11, 2010 Bank. LEXIS 4132, at *3 (Bankr. N.D. Tex. Nov. 23, 2010)).

[41] ECF 307 (Debtors' Resp.) ¶ 11.

or seek a litigation advantage through bankruptcy.[42]

23.    Solvency is also another factor that courts commonly use to determine whether a filing is made in good faith and with legitimate goals, as demonstrated in the *SGL Carbon* case.[43]

24.    Here, David Warren (CFO for NRA for Profit Entities) admitted that the NRA is not facing any liquidity crisis, is able to pay its debts as they come due, and is not—and has not been—in default of its only secured lending facility (approx. $44.5 million) by Atlantic Union Bank.[44] Sonya Rowling similarly confirmed that the NRA's liquidated assets exceed liabilities and the NRA does not have problems paying its debts as they come due.[45]

25.    As with *SGL Carbon*,[46] the NRA's public statements about being financially healthy[47] clearly demonstrate that they had no need to file bankruptcy.

26.    The Debtors argue that pending litigation in *SGL Carbon* "did not pose a sufficient present threat to justify bankruptcy relief" whereas, here, the NRA is attempting to "preserve the estate in the face of an existential crisis," *i.e.*, "the NYAG's lawsuit seeks to put the NRA 'out of business.'"[48] How can there be an imminent crisis when, in the NRA's own words, the NYAG lawsuit is "in its infancy"[49] and "in fact, no judgments have been rendered"?[50] As this Court has found, the *potential* for an adverse ruling in a lawsuit somewhere down the line is not a proper

---

[42] *See* ECF 131 (AMc Dismissal Mot.) ¶¶ 36-40.
[43] *Official Committee of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 166 (3d Cir. 1999).
[44] *See* Ex. 11, § 341 Creditor Mtg. (Mar. 5, 2021) 79:10-25, 80:1-8.
[45] Ex. 21, Rowling Dep. (Mar. 19, 2021) 258:14-25.
[46] *SGL Carbon*, 200 F.3d at 166 (internal quotations omitted).
[47] *See, e.g.*, NRA Press Release, NRAFORWARD.ORG (Jan. 15, 2021) [https://www.nraforward.org/press-release]; Ex. 18, LaPierre letter to the Board (Jan. 15, 2021) ("[The NRA's] day-to-day operations, training programs, and Second Amendment advocacy will continue as usual.").
[48] *See* ECF 307 (Debtors' Resp.) ¶¶ 33-34.
[49] *See id.* at ¶ 47.
[50] *See id.* at ¶ 38.

basis for bankruptcy relief.[51]

27.     Relying on the *Gremillion* case, the UCC contends that even if Movants demonstrate an unfair litigation advantage, they have not shown the NRA's reorganization "would be objectively futile."[52] The *Gremillion* court, however, relies on a two-part bad faith test that has not been adopted by the Fifth Circuit and not used by any federal bankruptcy court in Texas.[53] Moreover, *Gremillion* involved distressed debtors that could not timely pay their debts, but could potentially pay them over time in a bankruptcy.[54]

28.     In contrast, in the NRA's case, no one has demonstrated a necessity to file bankruptcy immediately, or at all.  In fact, the NRA is a financially healthy company that generates approximately $300 million per year and admittedly has plenty of liquidity to pay its secured and unsecured creditors (in addition to interest for its secured creditors[55]) *and* more than $6 million (in advance) to three law firms for bankruptcy services.[56]

29.     The Debtors also cite to *In re Greenwood Supply Co.*, which is similarly inapposite because it applies a two-prong test not recognized in the Fifth Circuit, which test overlooks litigation tactics when there is distress, in favor of "realistic prospect for reorganization."[57]

---

[51] *See Pottorff*, 518 B.R. at 384 (finding that appellant was pressured by an upcoming trial date in impending state court litigation and admitted it filed bankruptcy gain leverage in obtaining a favorable settlement that would have been substantially less expensive than a potentially adverse ruling).

[52] ECF 368 (UCC Resp.) ¶ 29 (*citing Gremillion v. HealthEdge Inv. Fund, L.P. (In re Gremillion)*, 547 B.R.196, 197-98 (Bankr. E.D. La. 2016)).

[53] 531 B.R. 363, 408 (Bankr. S.D.N.Y. 2015) (quoting *In re General Growth Properties, Inc.*, 409 B.R. 43, 56 (Bankr. S.D.N.Y. 2009)).

[54] *See Gremillion*, 547 B.R. at 199 ("Debtor does not appear to have the necessary liquidity to pay off the Judgment and his other debts immediately. However, Debtor does enjoy substantial income which might be sufficient to pay off debt over time."); *MBM Entm't*, 531 B.R. at 408-409 ("In these cases, the evidence shows that incomes from the Gates Property and the Clinton Property were not sufficient to pay ongoing expenses, and that all three properties faced mortgage foreclosures . . .The Chapter 11 filings serve the legitimate purpose of holding foreclosure suits at bay until Davis's claims could be resolved and sales of the properties could be arranged.")

[55] Charles Cotton Live Interview with Grant Stinchfield, NEWSMAX.COM (Jan. 18, 2021) (starting at 3:18, Cotton explaining the NRA plans to fully repay creditors with interest) [https://www.newsmax.com/newsmax-tv/nra-charlescotton-newyork-letitajames/2021/01/18/id/1006145/].

[56] *See* ECF 288 (NRA Am. Stmt. of Fin. Affairs) at 49.

[57] *Id.* at 794.

30.     Debtors cite two other cases that are neither binding nor persuasive. In *Southern Healthcare Systems, Inc.*, "the debtor…filed for bankruptcy ***shortly after*** a Georgia state court had ***enjoined*** it from operating its facilities…"[58] because (a) there was an imminent threat to the debtor's business (*i.e.*, the appointment of a receiver), which (b) immediately jeopardized the stake of over 500 creditors.[59] Here, in contrast, there has been no ruling against the NRA; no receiver has been appointed; the NRA has not been enjoined from operating; and the NRA has not shown that litigation costs have hampered its operations in any way.[60] But, as demonstrated by *SGL Carbon*, being afraid of a potential adverse ruling in the distant future is an insufficient basis to warrant the great equitable relief afforded by bankruptcy.

31.     Lastly, Debtors argue that, after 40+ years with LaPierre at the helm, it suddenly changed course in 2017, starting with the departure of two problematic executives.[61] But, when a ship is lost at sea, it's generally not the crewmen who get blamed for pointing the compass in the wrong direction. The fact that many NRA crewman have abandoned ship in recent years[62] does not change the direction the compass is pointing.

## 2. Totality of Circumstances Demonstrate Bad Faith

32.     Despite agreeing that a court must consider the "totality of the circumstances,"[63] the Debtors still challenge individual circumstances in a vacuum rather than considering the

---

[58] *See* ECF 307 (Debtors' Resp.) ¶ 35 (emphasis added). *See generally In re Southern Healthcare Sys.*, No. 02-11621, 2003 Bankr. LEXIS 2133 (Bankr. M.D. La. Jan. 6, 2003). Additionally, the *Southern Healthcare* case should be rejected because it primarily relies on earlier authority that applied the good faith standard in single asset real estate cases, but, as demonstrated above, more recent cases expand the good faith doctrine in the Fifth Circuit.

[59] *See Southern Healthcare*, 2003 Bankr. LEXIS 2133 at *8. The NRA highlights the same type of injunction requiring the debtor to cease business operations in yet another case it cites. *See also* 307 (Debtors' Resp.) ¶ 37 n.53 (citing *In re Stone Resources, Inc.*, 448 B.R. 361, 367 (Bankr. E.D. Pa. 2011), *rev'd in part*, 448 B.R. 823 (E.D. Pa. 2011)).

[60] *Cf., supra*, nn. 27-32; Ex. 12, LaPierre Dep., Vol. 1 (Mar. 22, 2021) 212:3-16.

[61] ECF 307 (Debtors' Resp.) ¶ 98.

[62] *See* Ex.15, *The NRA Exodus*, THE TRACE [https://www.thetrace.org/2020/03/nra-departures-timeline-wayne-lapierre/].

[63] *See* ECF 307 (Debtors' Resp.) ¶ 17; *see also,* e.g. *Little Creek*, 779 F.2d at 1072.

---

cumulative effect.

### a. *Debtors are clearly solvent and have no need for Chapter 11.*

33.     Debtors posit that an entity need not be insolvent when filing bankruptcy.[64] None

of their cases are from the Fifth Circuit and all of them are distinguishable. In most of the auority

cited in the Debtors Response, the debtors faced significant financial distress.[65] For example, in

*Integrated Telecom*, the Third Circuit (reaffirming *SGL Carbon*)[66] dismissed the case because the

debtor was not in financial distress at the time it filed.[67] As the Third Circuit noted, "[s]aying that

there is no insolvency requirement, however, does not mean that all solvent firms should have

unfettered access to Chapter 11."[68]

34.     In *SGL Carbon*, the Third Circuit distinguished cases where courts found no

insolvency requirement because those debtors still experienced serious financial difficulties at the

time of filing.[69] For example, in *Johns-Manville* (Debtors cited),[70] the solvent debtor faced

significant financial distress from mounting claims and judgments, which would have caused it to

book a $1.9 billion reserve forcing partial liquidation[71]—*i.e.*, *imminent* financial distress.[72] Here,

---

[64] *See* ECF 307 (Debtors' Resp.) ¶ 19; *Marshall v. Marshall (In re Marshall)*, 721 F.3d 1046, 1062 (9th Cir. 2013); *Fields Station LLC v. Capitol Food Corp. (In re Capitol Food Corp.)*, 490 F.3d 21, 25 (1st Cir. 2007); *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 121 (3d Cir. 2004); *In re James Wilson Assocs.*, 965 F.2d 160, 170 (7th Cir. 1992).

[65] *See, e.g.*, *Marshall*, 721 F.3d at 1049 (noting the debtors' liquid assets likely could not satisfy a judgment or the costs of a supersedeas bond and that the lower court properly considered the viability of the proposed plan); *Capitol Food*, 490 F.3d at 25 (considering an abrupt stoppage in the debtor's principal source of cash flow); *James Wilson Assocs.*, 965 F.2d at 170 (finding that the debtor defaulted on mortgage payments, had no income to pay other creditors besides rental income passed to a receiver, and no unencumbered assets to pay those other creditors).

[66] *See Integrated Telecom*, 384 F.3d at 121. In *SGL Carbon*, the Third Circuit excused a solvency requirement but still required that a debtor be suffering from financial distress. *See* 200 F.3d at 163, 166.

[67] *Integrated Telecom*, 384 F.3d at 129 (finding that because the debtor "was not in financial distress, its Chapter 11 petition was not filed in good faith as it could not—and did not—preserve any value for Integrated's creditors").

[68] *Id.* at 122.

[69] *See SGL Carbon*, 200 F.3d at 164 (citing an array of cases and noting the adverse effect of litigation on those debtors' respective financial well-beings at the time of filing).

[70] *See In re Johns-Manville Corp.*, 36 B.R. 727, 730 (Bankr. S.D.N.Y. 1984).

[71] *SGL Carbon*, 200 F.3d at 164.

[72] *See id.* at 169 (discussing *Johns-Manville*, 36 B.R. at 746, and finding that the *Johns-Manville* debtor had a "compelling" and "pressing" need to reorganize due to the fact that it faced tens of thousands of suits pending as of the filing date, while SGL Carbon was dealing with a known and finite number of suits). Debtors also rely on *In re*

there is no imminent threat, as the NYAG suit is in its infancy and the NRA repeatedly boasts of its financial strength.[73] Indeed, LaPierre admitted at his deposition that the NRA was able to pay down $40 million in debt and remain $30 million in the black in 2020, despite COVID. The point of *SGL Carbon* is that solvency is not the only factor, but one of several factors that demonstrate bad faith.[74]

35. While the Debtors claim litigation is "mounting and starting to adversely affect its operations,"[75] the NRA has not shown *any* financial difficulties, let alone "serious" ones; neither has the NRA shown *any* managerial difficulties, beyond mismanagement. As *SGL Carbon* noted, where litigation poses such a real threat, the "debtors [also] experience[] serious financial and/or managerial difficulties *at the time of filing*."[76]

36. The UCC, in turn, argues the "internal governance and management problems…should not and cannot be the linchpin for cratering the entire NRA organization."[77] As if the NRA is cratering. The UCC also contends the Bankruptcy Case "offer[s] the NRA an opportunity to implement corporate governance changes," which begs the question why such changes cannot be implemented outside of bankruptcy.[78] Indeed, if the NRA already (allegedly) self-corrected as LaPierre contends,[79] what additional governance changes need to be implemented outside of a chapter 11 trustee.

---

*Dow Corning*, 456 F.3d 668 (6th Cir. 2006), but that case does not discuss dismissal; it discusses the absolute priority rule and the proper rate of interest to pay in a solvent debtor case. In any event that case is substantially similar to the *Johns-Manville*, in that the debtor faced numerous claims that imminently jeopardized the going concern of the debtor. *See* 456 F.3d at 671; ECF 307 (Debtors' Resp.) ¶ 21.

[73] *See, e.g.*, NRA Press Release, NRAFORWARD.ORG (Jan. 15, 2021) [https://www.nraforward.org/press-release]; Ex. 18, LaPierre letter to the Board (Jan. 15, 2021); Charles Cotton Live Interview with Grant Stinchfield, NEWSMAX.COM (Jan. 18, 2021).

[74] *See SGL Carbon*, 200 F.3d at 164; *see generally Pottorff*, 518 B.R. 380.

[75] ECF 307 (Debtors' Resp.) ¶22.

[76] *See* ECF 307 (Debtors' Resp.) ¶ 34 (quoting *SGL Carbon*, 200 F.3d at 164) (emphasis added).

[77] ECF 368 (UCC Resp.) ¶ 31.

[78] *Id.*

[79] *See* Ex. 24, § 341 Creditor Mtg. (Jan. 22, 2021) at 51:9-52:5 (LaPierre testifying that the NRA is "100 percent in compliance" with New York State not-for-profit law); ECF 307 (Debtors' Resp.) ¶ 98.

37.     Given (a) the NRA's liquidity and amount of assets at its disposal in comparison to its debts, (b) the admission that the NRA can pay its debts as they come due, and (c) the admission that the NRA is not in default to its secured lender, Atlantic Union Bank, or the PBGC, this could very well be a case where solvency alone could demonstrate bad faith.[80]  Regardless, the NRA's other reprehensible conduct warrants dismissal, as demonstrated below.[81]  In essence, Debtors ask this Court to set unsupportable and unsound precedent that would embolden defendants/counter-defendants to simply file bankruptcy to avoid their own litigation.

38.     As for Sea Girt, there is absolutely zero indication that it was under any financial distress on the Petition Date.  It is challenging to conceive of any financial distress to an entity formed on November 24, 2020[82] and does not have assets[83] (besides money deposited from the Brewer Firm[84]) or employees.[85]  The reality is that the NRA set up Sea Girt for the sole purpose of filing bankruptcy.

### b. *Debtors filed to obtain a litigation advantage.*

39.     Moreover, when coupled with Debtors' lack of any present or imminent financial distress, Debtors' *stated* litigation purposes further justify a bad faith dismissal.[86]  The NRA's own statements and actions reveal the only thing "beleaguering" the NRA is <u>very specific</u> pieces of litigation.  To illustrate without providing an exhaustive playbook of the NRA's maneuvers: the

---

[80] In *SGL Carbon*, the Court held that "[c]ourts . . . have consistently dismissed Chapter 11 petitions filed by financially healthy companies with no need to reorganize under the protection of Chapter 11."  200 F.3d at 166.

[81] *See, e.g., In re Kickapoo Kennels, LLC*, No. 12-39321-H3-11, 2013 Bankr. LEXIS 2499, *4-5 (Bankr. S.D. Tex. June 19, 2013) ("Debtor is operating profitably. Debtor was operating profitably prepetition. There was no financial need from Debtor's operational perspective, for the filing of a Chapter 11 case. Instead, this case appears to have been filed in order to gain an unfair advantage in a two-party dispute. . .").

[82] *See* ECF 307 (Debtors' Resp.) ¶ 38.

[83] *See* Sea Girt Bankr., ECF 22 (Schedules A, B, D-H) at 10-11.

[84] *See* Sea Girt Bankr., ECF 22 at Schedule A/B: Assets; Ex. 23 (LaPierre authorizing the Brewer Firm to transfer $50,000 to Sea Girt from the Brewer trust account).

[85] *See* Sea Girt Bankr., ECF 22 at Schedule E/F: Creditors Who Have Unsecured Claims.

[86] *See Pottorff*, 518 B.R. at 385; *Kickapoo Kennels*, 2013 Bankr. LEXIS at *4-5.

NRA hired the Brewer Firm in 2018 to ward off an investigation by the NYAG.[87] Once NYAG James was elected and an investigation was imminent, *then* the NRA started talking about "self-correction."[88] Next came the NYAG Enforcement Action in August 2020. Coincidentally, and according to the NRA, it had been contemplating this bankruptcy since "late last year,"[89] *i.e.*, even closer proximity to the NYAG Enforcement Action than the January 2021 filing. The NRA then formed a "Special Litigation Committee"[90] in September 2020 with the *specific task* of addressing the NYAG Enforcement Action, the DCAG Enforcement Action, and related litigation.[91] The NRA formed Sea Girt in November 2020.[92] The last step was for LaPierre, allegedly in consultation with the SLC, to file bankruptcy without Board approval or knowledge (*i.e.*, so the plan would not be thwarted).[93] In short, the NRA has gone to great lengths to avoid the NYAG since 2018; this is just the latest maneuver.

40.    Debtors' litigation tactics are not just limited to the NYAG.[94] Debtors also seek to

---

[87] Ex. 25, Cotton Dep. (Feb. 7, 2020) 171:6-10 (Q: "So once the New York Attorney General's investigation was threatened or began, which I think you said was right before Bill Brewer was involved?"    A: "Yes, because that was the impetus to hire Bill."). As part of the NYAG investigation, Brewer used that as a scare tactic with AMc, claiming that the FBI was going to raid their offices, that they were going to be brought up on RICO charges, and that he was the only person that was going to keep LaPierre out of jail. *See*, *i.e.*, Ex. 32, AMc Corp. Rep. Dep. (Mar. 26, 2021) 41:7-43:5, 141:9-143:4.

[88] *See*, *e.g.*, Ex. 25, Cotton Dep. (Feb. 7, 2020) 303:10-18.

[89] The Brewer Firm and the Neligan Firm had been investigating and/or pursuing bankruptcy on behalf of the NRA since late 2020. *See* ECF 288 (NRA Am. Stmt. of Fin. Affairs) at 49; Ex. 11, § 341 Creditor Mtg. (Mar. 5, 2021) 37:5-12 (Frazer testimony). In fact, the NRA had tossed around several ideas of how to get out of New York without regulatory oversight or need for broad member or Board approval. *See* Will Van Sant, *To Escape a Legal Reckoning, the NRA Went Shopping for a Friendlier State*, THE TRACE (Mar. 27, 2201) [https://www.thetrace.org/2021/03/nra-new-york-texas-bankruptcy-brewer-lapierre-letitia-james/], hyperlinking to a July 2020 presentation regarding those options. *See* [https://www.documentcloud.org/documents/20523018-nra-domicile-slides-002].

[90] Also worth noting, one of the three members on the Special Litigation Committee, NRA President Carolyn Meadows, is the same person who originally sought an independent review of the Brewer Firm fees along with now-ousted President Lt. Col. Oliver North, but later retracted her request, and now *coincidentally* has been granted the presidency. *See e.g.*, Ex. 4 (Mar. 22, 2019 letter from Col. North, Richard Childress, and Meadows).

[91] Ex. 13, Bankruptcy Ratification Resolution (Mar. 28, 2021).

[92] *See* Ex. 27, Sea Girt Certificate of Formation.

[93] Ex. 6, LaPierre Dep., Vol. 2 (Mar. 23, 2021) 343:21-344:21 (citing concerns about receivership as reason for not seeking approval for bankruptcy from Board of Directors); Ex. 13, Bankruptcy Ratification Resolution (Mar. 28, 2021).

[94] *See*, *e.g.*, Ex. 20, Paul J. Weber and Michael R. Sisak, *NRA declares bankruptcy, plans to incorporate in Texas*, AP NEWS (Jan. 15, 2021) (SLC member and First Vice President Charles Cotton telling AP News, "We've...[frankly] got to get all the litigation in a place where we've got an even shake.").

streamline the lawsuit against AMc and the class action lawsuit by Dell'Alquila.[95]  These are the same lawsuits the NRA attempted to consolidate through the Judicial Panel on Multidistrict Litigation, as even Debtors' counsel voluntarily offered before this Court.[96]  Consolidating the litigation is a strategic advantage unrelated to any financial strain.

41.     In addition to admittedly forum shopping for a "level playing field,"[97] Debtors are manipulating bankruptcy to compel the NYAG to negotiate a settlement, considering the NRA had no interest in doing so—and did not do so—prior to these filings.  Debtors' response that the NYAG Enforcement Action is still proceeding is disingenuous at best,[98] considering the NRA has publicly stated that it intends to emerge from bankruptcy within six months, irrespective of the NYAG Enforcement Action.  Moreover, in papers filed in the NYAG regulatory action in New York, as well as in the Debtors Response, the Debtors take the position that they can change their minds about whether the automatic stay applies to the NYAG action. [99]

42.     With respect to the other litigant claimants, ***whose constitutionals rights appear to be ignored by the parties in this case***, the NRA has used the automatic stay to cause a screeching halt to litigation that was going to be quickly resolved this year in other forums by courts already very familiar with the disputes.  For example, the Cox Arbitration was to begin one business day

---

[95] *See* ECF 307 (Debtors' Resp.) ¶¶ 33-35.

[96] *See* Ex. 28, First Day Mot. Hr'g (Jan. 20, 2021) 12:14-23 (Debtors' bankruptcy counsel explaining the NRA previously requested "an MDL, a multidistrict litigation, in which all of the litigation, or all of its certainly related to the Attorney General and to the investigation and to some of the litigation against former vendors and others, **would be brought in a centralized forum and resolved that way**.  And unfortunately, the parties, to an entity, refused. **And absent being able to streamline discovery and have all of this litigation, or much of it, handled in a centralized forum**, the NRA was indeed facing the adage, death by a thousand cuts.") (emphasis added).

[97] Ex. 12, LaPierre Dep., Vol. 1 (Mar. 22, 2021) 95:9-96:16; Ex. 6, LaPierre Dep., Vol. 2 (Mar. 23, 2021) 452:14-453:11; Ex. 20, Paul J. Weber and Michael R. Sisak, *NRA declares bankruptcy, plans to incorporate in Texas*, AP NEWS (Jan. 15, 2021) (SLC member and First Vice President Charles Cotton telling AP News, "We've...[frankly] got to get all the litigation in a place where we've got an even shake.").

[98] ECF 307 (Debtors' Resp.) ¶ 26.

[99] ECF 307 (Debtors' Resp.) ¶ 50 ("[T]the Debtors do not concede that the NYAG's efforts to dissolve and distribute all of the NRA's assets is simply a regulatory action not subject to the automatic stay."); *State of New York v. NRA*, No. 451625/2020 (Sup. Ct. N.Y.).

after the Petition Date, and AMc's September 2021 federal trial is now jeopardized.

43.     With the same hammer—or bulldozer—Debtors are also compelling other creditors to re-evaluate their litigation positions due to looming deadlines, including the deadline to remove to bankruptcy court and the deadline to file proofs of claim on May 24, 2021. With no chapter 11 plan in sight, contingent creditors are left to guess how a solvent debtor is going to obtain a discharge. As acknowledged at the March 25, 2021 status hearing, even the UCC, which is charged with protecting all unsecured creditors' rights, has been left in the dark. By necessity then, other than trade creditors, which have been promised 100% recovery *with interest*, and secured creditors, which hold rights to collateral worth over $130 million (almost three times the secured debt amount), the largest creditor body in this case is compelled to consider whether it has to compromise its due process and jury trial rights in other forums or risk having its debts discharged.

44.     More importantly, Debtors are likely to attempt to inequitably cramdown all contingent creditors, as the *SGL Carbon* debtors did.[100] Not only have contingent creditors been kept in the dark, but the UCC similarly expresses concerns about Debtors' opaque plans.[101] ***This potentially means that the NRA can keep its $250 million in assets over the objection of contingent unsecured claims and without paying unsecured claims in full.*** This cramdown, or leverage used to force creditors to settle, is precisely the type of litigation tactics the Third, Fifth and Eight Circuits and lower courts have proscribed.[102]

45.     The UCC improvidently argues that "Debtors filed the Bankruptcy Case to implement a strategy *to survive **in the event of*** a potential adverse ruling in the NYAG Action"

---

[100] Debtors rely on limited case law that the absolute priority rule does not apply to nonprofits on the premise that there are no shareholders of a nonprofit corporation. *See, e.g., In re Save Our Springs (S.O.S.) Alliance, Inc.*, 388 B.R. 202 (Bankr. W.D. Tex 2008), *aff'd*, 632 F.3d 168 (5th Cir. 2011).

[101] ECF 368 (UCC Resp.) ¶ 6 ("The Committee is eager to better understand the Debtors' plan for emerging from bankruptcy . . .").

[102] *See, e.g., SGL Carbon*, 200 F.3d at 167; *Elmwood*, 964 F.2d at 512-13; *Cedar Shore*, 235 F.3d at 380.

rather than as litigation advantage.[103]   Therein lies the issue: Debtors filed bankruptcy on a contingency from a case in its infancy, which, according to *SGL Carbon*, supports a finding of bad faith.[104]   Neither Debtors nor the UCC have shown Debtors *need* this Court to assist with litigation.

### i.    *Antelope Techs. Demonstrates Debtors' Bankruptcy Is a Litigation Tactic*

46.    Debtors' attempts to split hairs on AMc's case law is similarly unavailing.  Without challenging the Fifth Circuit's holding that litigation tactics signify sufficient bad faith to warrant a dismissal, Debtors first attempt to distinguish *In re Antelope Techs., Inc.*,[105] but no distinction is meaningful.  In both *Antelope* and the NRA's case, there was pending litigation with no trial date at the time of the bankruptcy filing.[106]

47.    Debtors also distinguish *Antelope* on the basis that a plan was filed in that case, whereas none has been filed here.[107]  But the significance of the plan in *Antelope* was that it was used to exert leverage over litigants.  Leverage is already being asserted in the NRA's case, with claims deadlines looming and abusive plan terms potentially being contemplated.

48.    Debtors lastly point to the interim CEO's alleged admission in *Antelope* that the shareholder derivative suit prompted the filing and claim here "there has been no admission that these Chapter 11 Cases were filed to avoid the NYAG State Action."[108]  But, there is in fact no distinction between the admissions made in *Antelope* and this case.  In both cases, the parties have

---

[103]  ECF 368 (UCC Resp.) ¶ 24 ("to survive" emphasis in original; emphasis added for remainder).

[104]  *SGL Carbon*, 200 F.3d at 163 ("Whether or not SGL Carbon faces a potentially crippling antitrust judgment, it is incorrect to conclude it had to file when it did… SGL Carbon has offered no evidence it could not effectively use those [bankruptcy] protections as the prospect of such a judgment became imminent.  The District Court's finding that the petition had to be filed at that particular time to avoid financial ruin and therefore was made in good faith is clearly contradicted by the evidence.").

[105]  *See generally* 431 Fed. Appx. 272 (5th Cir. 2011)

[106]  *See Antelope Techs., Inc. v. Lowe (In re Antelope Techs., Inc.)*, No. 07-31159-H3-11, 2010 U.S. Dist. LEXIS 73456 at *8 (S.D. Tex. 2010), *aff'd*, *Antelope Techs.*, 431 Fed. Appx. 272 (5th Cir. 2011).

[107]  *See* ECF 307 (Debtors' Resp.) ¶ 29.

[108]  ECF 307 (Debtors' Resp.) ¶ 28-29.

stated that there was a pending lawsuit that threatened their survival.[109]

### ii. *Debtors Cannot Distance from the Striking Similarities of SGL Carbon*

49.     Debtors also attempt to distinguish the Circuit-level case that has the most similarities to this Bankruptcy Case, *SGL Carbon*.[110]  There, (a) the debtor was solvent, (b) the debtor faced numerous lawsuits filed (with the prospect of substantial damages) against it, (c) the debtor issued press releases postpetition that it was "financially healthy" and "expect[ed] to continue [its] normal business operations," (d) the debtor claimed it filed to protect itself against excessive demands by plaintiffs in civil antitrust litigation," (e) the debtor claimed that the lawsuits were "starting to have a material impact on [SGL Carbon's ongoing operations . . ." and (f) the lower court found that the litigation "could very well force it out of business."[111]  Those facts are substantially similar to here.  Indeed, the facts here are worse, because the NRA has experienced no adverse judgment yet.

50.     In *SGL Carbon*, the Third Circuit held that there was no good faith in the bankruptcy filing, because (a) there was no evidence that the extensive litigation posed a "serious threat" to the company's operational well-being, (b) there was no evidence that the possible antitrust judgment might force SGL Carbon out of business, (c) "[w]hether or not SGL Carbon face[d] a potentially crippling antitrust judgment, it [was] incorrect to conclude that it had to file when it did," and (d) SGL Carbon offered no evidence it could not effectively use the bankruptcy "protections as the prospect of such a judgment became imminent."[112]  According to the Third Circuit, "the mere possibility of a future need to file, without more, does not establish that a petition

---

[109] *See Antelope Techs.*, 2010 U.S. Dist. LEXIS 73456 at *8; *See* Ex. 6, LaPierre Dep., Vol. 2 (Mar. 23, 2021) 459:5-462:10.
[110] *See generally* 200 F.3d 154 (3d Cir. 1999).
[111] *Id.* at 157-59.
[112] *Id.* at 162-63.

was filed in 'good faith'"[113]

51.     The Debtors admit that the NYAG Enforcement Action is in a "nascent" stage, and they glaringly fail to show how that lawsuit would actually result in dissolution any time soon.[114] Moreover, Debtors cannot show that they cannot obtain the same results outside of bankruptcy, or that the same dissolution result would not occur inside of bankruptcy with this Court applying New York law.  In short, contrary to their pleas, the Debtors' have not shown any imminent threat to their viability.

52.     Tellingly, the Debtors argue the *SGL Carbon* case is dissimilar because "the debtor's officers 'expressly and repeatedly acknowledged' that the bankruptcy 'was filed solely to gain tactical litigation advantages.'"[115]  The Debtors then attempt to clarify "these Chapter 11 Cases were not filed for the purpose of pressing any claimant to accept a settlement offer or solely to gain a tactical litigation advantage."[116]  What better way is there for the NRA to pressure its opponents than to (1) tie their hands on the opponents' own cases through the automatic stay (2) while the NRA vigorously pursues its own claims in those other lawsuits, (3) thus proceeding on two or more litigation fronts (all the while the NRA has an unending source of funds from its alter ego, the NRA Foundation[117])?  Regardless, the primary inquiry for the Court is whether the debtor is seeking a litigation; that is it.[118]

53.     As with *Antelope*, the NRA distinguishes *SGL Carbon* on the basis of a plan being

---

[113] *Id.* at 164.

[114] *See* ECF 307 (Debtors' Resp.) ¶ 34.

[115] *See* ECF 307 (Debtors' Resp.) ¶ 39.  *Cf.* Ex. 12, LaPierre Dep., Vol. 1 (Mar. 22, 2021) 95:9-96:16; Ex. 6, LaPierre Dep., Vol. 2 (Mar. 23, 2021) 452:14-453:11; Ex. 20, Paul J. Weber and Michael R. Sisak, *NRA declares bankruptcy, plans to incorporate in Texas*, AP NEWS (Jan. 15, 2021) (SLC member and First Vice President Charles Cotton telling AP News, "We've...[frankly] got to get all the litigation in a place where we've got an even shake.").

[116] *See* ECF 307 (Debtors' Resp.) ¶ 39.

[117] Texas Action, ECF 210, AMc's 2d Am. Third-Party Complaint against Wayne LaPierre and the NRA Foundation, Inc. (Mar. 12, 2021).

[118] *See Pottorff*, 518 B.R. at 384.

filed, but fails to acknowledge, as demonstrated by the recent settlement discussions with the NYAG (which delayed these proceedings), that the NRA is similarly using this bankruptcy to transfer venue of a dispute and pressure the NYAG into settlement. It is using that same pressure, including claims deadlines and uncertainty of future plan terms, to exert leverage with the contingent claimants, like AMc and Cox. Unlike the *SGL Carbon* case, however, where the debtor was transparent with its intentions, the NRA seeks to avoid judicial scrutiny and cloak any settlement discussions with the confidentiality protections afforded by Federal Rule of Evidence 408. While the *SGL Carbon* approach was ultimately deemed unacceptable, it was certainly more preferable than the one employed in these cases.

54. Critically, Debtors point to language in *SGL Carbon* about debtor's officers "'expressly and repeatedly acknowledge[ing]' that the bankruptcy 'was filed solely to gain tactical litigation advantages.'"[119] But, the NRA ignore its own public statements about "dumping New York" and seeking "a level playing field."

### iii. *The Debtors' other distinctions fail.*

55. Debtors also try to distinguish *Pottorff*[120] on the basis that it was filed two weeks before trial, but they fail to explain why filing *one business day* before the Cox Arbitration did not provide them with the same tactical advantage to the NRA.[121] Debtors also ignore several other cases cited in the AMc Dismissal Motion, including *Cedar Shore*, where the Eight Circuit dismissed a case based on similar circumstances as *SGL Carbon*, based on solvency and litigation tactics.[122] In a footnote, Debtors also purport to survey select Fifth Circuit cases applying the bad

---

[119] *See* ECF 307 (Debtors' Resp.) ¶ 39.
[120] *See Pottorff*, 518 B.R. at 384.
[121] ECF 307 (Debtors' Resp.) ¶ 30.
[122] *Cedar Shore Resort, Inc. v. Mueller (In re Cedar Shore Resort, Inc.)*, 235 F.3d 375, 380 (8th Cir. 2000) ("The circumstances in *SGL Carbon* are similar to the case before us. The debtor there was a financially healthy company which filed bankruptcy in order to escape potentially crippling effects of a pending civil antitrust judgment against it.").

faith doctrine,[123] but conveniently forget the evolution of the doctrine in the more recent cases, like *Antelope*, *Pottorff*, *Kickapoo Kennels*,[124] and *Briggs-Cockerham*.[125]

56. Debtors and the UCC also ignore *Alexandra Trust*, where Judge Houser fully analyzed the bad faith doctrine in dismissing a case where the debtors employed the same tactics being used here. In that case, the debtor claimed that the reason for filing was:

> (1) the Debtor must consolidate pending litigation into a single forum in order to effectively manage it; (2) the Mississippi State Court is not competent to hear the Mississippi Action; (3) most of the parties to the Mississippi Action are either located in Texas or their books and records are in Texas; and (4) the Debtor would receive a quicker resolution in this Court than in the Mississippi State Court.[126]

But Judge Houser found their pretextual reason to be "specious," if not entirely "false."

### c. *The use of a sham entity to game venue is another sign of bad faith.*

57. The creation of a shell entity, solely for the purpose of filing bankruptcy and transferring litigation to another forum, is highly problematic and a further sign of bad faith. AMc has not conceded venue is proper, as Debtors contend. There is absolutely no published authority in the Fifth Circuit upholding venue other than where a debtor has a presence, and most published opinions generally hold the same.[127] On the Petition Date, Sea Girt admittedly had no offices, operations, employees, or any other presence in Texas, other than possibly a bank account that the NRA's law firm (Brewer) funded two days before the Petition Date.[128] To say such token bank account constitutes a presence is "wholly" proper is inaccurate.

---

[123] *See* ECF 307 (Debtors' Resp.) at 16, n.32.

[124] *See Kickapoo Kennels, LLC*, 2013 Bankr. LEXIS 2499, at *4.

[125] *See Briggs-Cockerham*, 2010 Bankr. LEXIS 4132, at *17 (Bankr. N.D. Tex. Nov. 23, 2010) (Houser, J.) (holding bad faith determination "depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities").

[126] *In re Alexandra Trust*, 526 B.R. 668, 674 (Bankr. N.D. Tex. 2015).

[127] *In re FRG, Inc.*, 107 B.R. 461, 470 (Bankr. S.D.N.Y. 1989) (emph. added) (citing *In re Commonwealth Oil Ref. Co., Inc.*, 596 F.2d 1239, 1247 (5th Cir. 1979), *cert. denied*, 444 U.S. 1045, 100 S. Ct. 732, (1980) ("*CORCO*"); *In re Bell Tower Assocs., Ltd.*, 86 B.R. 795, 800 (Bankr. S.D.N.Y. 1988)).

[128] AMc is still not certain where this bank account is located, but is aware that the law firm that created it has a principal office in Dallas, Texas.

58.     The Debtors and UCC hang their hat on *In re Patriot Coal Corp.*,[129] but that case

is inapplicable because it analyzed and applied the transfer of venue statute, 28 U.S.C. § 1412, not

a section 1112 dismissal for bad faith.  Indeed, the *Patriot Coal* court noted that "[n]o party has

alleged, and there is no evidence in the record, that Debtors acted in bad faith in filing their chapter

11 cases in New York."[130]  Additionally, the court noted that "[n]o allegations were made or

evidence adduced that the Debtors improperly sought to avoid another district or to hinder another

party in interest."[131]  The debtors in *Patriot Coal* were also honest with the court upfront,

stipulating that the sole purpose of forming the shell corporation was to attain jurisdiction and

venue.[132]  The court thus rewarded the debtors by finding that "the Debtors achieved literal and

technical compliance with the venue statute" and offered *dicta* regarding lack of bad faith, in light

of its prior findings.[133]

59.     But, the NRA's case if very different than *Patriot Coal*.  First, the Debtors have

never stipulated that they formed Sea Girt for the sole purpose of obtaining venue.  Rather, the

NRA merely claims Sea Girt is part of the re-incorporation process[134] and recites facts about its

existence.[135]  Second, unlike *Patriot Coal*, where there were no allegations that the debtors were

trying to avoid another forum or hinder a party, Debtors here admittedly filed in Texas to "dump

New York" and make it more difficult for the NYAG to prosecute its claims.

60.     While Debtors cite several cases where courts have held that great weight is

afforded to a debtor's choice of venue, none of the cited cases addressed a bad faith filing or one

---

[129] 482 B.R. 718 (Bankr. S.D.N.Y. 2012).
[130] *Id.* at 742.
[131] *Id.*
[132] *Id.* at 728.
[133] *Id.* at 741-42.
[134] Ex. 6, LaPierre Dep., Vol. 2 (Mar. 23, 2021) 452:15-25 ("And the organization looked for a vehicle to facilitate a possible transition.  Sea Girt was formed.").
[135] ECF 31 (Debtors' Informational Brief) ¶¶ 6-8.

where a debtor used a shell corporation to circumvent the bankruptcy venue statute.[136]

61. Finally, Debtors attempt to distinguish *In re Zed, Inc.* on facts that are irrelevant.[137] Ultimately, using unequivocal language, the *Zed* court found that "the formation of the debtor was a sham and a fraud upon [the secured creditor] and the U.S. Bankruptcy Court," [138] which finding would be sufficient to lift the automatic stay or dismiss under *Little Creek*.[139]

### d. *The NRA is attempting to circumvent New York law in bad faith.*

62. It is axiomatic that a debtor must comply with state law under 28 U.S.C. § 959. Courts have gone as far as to say it constitutes grounds for dismissal.[140] But, here, the Debtors merely state they "are cognizant of New York law and their obligations" and will comply with them "in a proposed plan."[141] Such vague statements give cause to be concerned whether these bankruptcy cases are proceeding in good faith.

63. Furthermore, contrary to the Debtors' baseless arguments, the Movants have never argued that a non-profit New York entity cannot file bankruptcy in good faith.[142] Rather, AMc is arguing that the NRA cannot circumvent New York law to reach its desired outcome. The NRA takes issue with AMc's position that the NRA is defrauding the Court, and yet, the NRA even argues that it can, in fact, merge with a Texas entity *without NYAG approval* and presumably without resolving the merits of NYAG's claims.[143]

---

[136] *In re Dunmore Homes, Inc.*, 380 B.R. 663, 670-71 (Bankr. S.D.N.Y. (2008); *In re Manville Forest Prod. Corp.*, 896 F.2d 1384, 1391 (2nd Cir. 2002) (". . [t]he district in which the underlying bankruptcy case is pending is presumed to be the appropriate district for hearing and determination of a proceeding in bankruptcy. *In re Lionel Corp.*, 24 B.R. 141, 143 (Bankr. S.D.N.Y. 1982).
[137] ECF 307 (Debtors' Resp.) ¶ 79.
[138] *In re Zed Inc.*, 20 B.R. 462, 463 (Bankr. N.D. Cal. 1982).
[139] Debtors make a more meaningful distinction with *In re Hall, Bayoutree Assc., Ltd.*, 939 F2d 802 (9th Cir. 1991), as the case did involve a dismissal based on a technically improper venue filing.
[140] *See In re Charles Land Reclamation Tr.*, 30 B.R. 918, 924 (Bankr. D. Mass 1983).
[141] ECF 307 (Debtors' Resp.) ¶ 40.
[142] *Id.* at ¶¶ 42-45.
[143] *See id.* at ¶¶ 61-62 ("[T]he Bankruptcy Code empowers this Court to apply the Non-Profit Laws to effectuate a merger or dissolution.").

64.     The Debtors have even acknowledged violations of certain portions of New York nonprofit law by admittedly trying to rectify their violations after the fact.[144] Woody Phillips, the former NRA Treasurer, apparently was so concerned with the violations that he pleaded the Fifth Amendment when questioned by the NYAG about the NRA activities he participated in.  As LaPierre even acknowledged in his deposition, the NRA has spent the last three years attempting to correct past infractions.[145]  Indeed, pursuant to the amended 990 tax form the NRA filed in 2020, LaPierre returned approximately $300,000 in donor funds to the NRA as illicit excess benefits he received, as part of the so-called rectification process.[146]

65.     The Debtors rely on the *In re Silberkraus* case where "the debtor sought to have the bankruptcy court, not the state court, decide the matters that were at issue in that state court litigation."[147]  They argue that they are not "request[ing] that this Court decide the [Enforcement Action]."[148]  But that is precisely what they are doing by claiming they can reorganize before the NYAG's claims are decided.  They cannot, as a matter of law, and they even admit that this Court must apply applicable New York law in making any transfer of property under sections 363(d)(1) and 541(f) of the Code.

66.     Indeed, bad faith was found in a case similar to the Debtors.  In *In re First Financial Enterprises, Inc.*,[149] the debtor was attempting to avoid a regulatory scheme by filing chapter 11. Pre-petition, the debtor was the indirect owner of two insolvent insurance companies, which had been placed in receivership and conservatorship pursuant to state insurance laws.[150]   The debtor,

---

[144] *See id.* at ¶ 98 (admitting that it has shoddy contract management practices, present executives improperly siphoned funds for impermissible personal benefits, and it engaged in whistleblower retaliation).
[145] Ex. 12, LaPierre Dep., Vol 1 (Mar. 22, 2021) 65:7-23.
[146] Ex. 2; Ex. 12, LaPierre Dep., Vol. 1 (Mar. 22, 2021) 114:21-119:25.
[147] *See* ECF 307 (Debtors' Resp.) ¶ 32 (citing *In re Silberkaus*, 253 B.R.890, 897-98, 905 (Bankr. C.D. Cal. 2000).
[148] *See* ECF 307 (Debtors' Resp.) ¶ 32.
[149] *See generally* 99 B.R. 751 (Bankr. W.D. Tex. 1989).
[150] *Id.* at 752.

receiver, and conservator were in state litigation regarding control of the two insurance companies. The debtor broadly described its intent to merge the two insurance companies' assets and liabilities into the bankruptcy estate through a plan, which the conservator and receiver contested.[151] In response to a motion to dismiss, the debtor claimed that it was entitled to file and was acting in good faith "'since it [was] an attempt to consolidate the disputes and conflicts among the parties in one judicial forum rather than through various lawsuits, a receivership, and a conservatorship.'"[152] Dismissing the case for bad faith, the court stated that "the obvious purpose in this case is to use the Chapter 11 filing as a litigation strategy and leverage in order to defeat the Texas regulatory scheme for the receivership and conservatorship of insolvent life insurance companies." [153]

67.     Worse here, the NRA's avowed purpose for this bankruptcy petition is to avoid regulation of a not-for-profit entity by state authorities, an obvious example of a reprehensible purpose showing bad faith as announced in *Little Creek*. ***Fundamentally, however, the NRA cannot explain why the NYAG would be entitled to dissolution in New York, but not in front of this Court.*** While the NRA requests the Court "not judge a plan that has not been filed," it also asks the Court, all parties, and the public to prejudge the claims in NYAG Enforcement Action, which has not been adjudicated.  In short, the NRA's attempt to make an end run around New York's exercise of its regulatory authority is an affront to congressionally mandated compliance with state law and is further indicia of the NRA's bad faith, as held by the *Charles Land Reclamation* and *First Financial Enterprises* cases.

68.     With the amendment of sections 363(d)(1) and 1129(a)(16) in 2005, Congress made

---

[151] *See id.* at 753.
[152] *Id.* at 754.
[153] *Id.* at 756.

plain that it did not want a not-for-profit entity to escape the supervision of state regulators.[154] But this is precisely what the NRA is attempting to do here, and the NRA has been upfront about that goal. The NRA is not like the debtors in *HHH Choices Health Plan*,[155] which had a valid reorganizational purpose—to sell its operations because the debtor did not have the resources to continue operating.[156] The court in *HHH Choices Health Plan* then applied the relevant standard under New York law to determine if the sale should be approved. The NRA, however, has no valid reorganizational purpose in filing this case—it merely wants to avoid regulation and investigation by its state of incorporation. Such avowed goal does not meet the requirement that merger be in the public interest under New York law.[157] Hence, until the NYAG regulatory action is resolved in the NRA's favor—which is doubtful—any attempt to reorganize is futile.

69.     Finally, *HHC Choices Health Plan* does not stand for the proposition that this Court can circumvent New York law and fashion relief, regardless of the merits of the NYAG's claims.[158] Rather, the opinion merely points out that Section 1221(e) of BAPCPA appears to have been enacted, but not to have been codified.[159] This section, which modifies sections 363(d)(1), 541(f) and 1129(a)(16), provides that:

> Nothing in this section shall be construed *to require* the court in which a case under chapter 11 of title 11, United States Code, is pending to remand or refer any proceeding, issue, or controversy to any other court or to *require* the approval of any other court for the transfer of property.[160]

But, tothing in this provision ***requires*** the Court to fashion relief if it were to choose to rely on some state authority under the appropriate circumstances. It may be that the Court should rely on

---

[154] *See* 3 *Collier on Bankruptcy* P 363.04 (16th 2020).
[155] *In re HHH Choices Health Plan, LLC*, 554 B.R. 697 (Bankr. S.D.N.Y. 2016).
[156] 554 B.R. at 699.
[157] NY CLS N-PCL § 907-a(e).
[158] *See* ECF 307 (Debtors' Resp.) ¶ 62; ECF 368 (UCC Resp.) ¶ 40.
[159] *See id.*
[160] *Id.* (*citing* Pub. L. No. 109-8, § 1221(e) (2005)).

New York state authority, given that there is no imminent threat to Debtors' viability, Debtors can afford to pay their debts, there was admittedly nothing magical about the January 15, 2021 filing date,[161] and the NYAG Enforcement Action is in its nascent stage.

### e. *The NRA's Other Arguments Do Not Overcome Bad Faith.*

70. Debtors argue that the totality of circumstances show good faith because of "the legitimate goals of the NRA to address all the pending litigation against it, reorganize its internal structural and financial affairs, and emerge as a continued going concern for the benefit of its creditors and members."[162] The UCC similarly argues that "[g]iven the NYAG's overt desire to dissolve and disband the NRA, the Chapter 11 Cases are essential and may present the only path to ensure that the NRA continues as a going concern."[163] These contentions are meritless for several reasons.

71. *First*, the NRA does not need the Bankruptcy Court to address all pending litigation, as demonstrated by the plethora of lawyers it hires and pays. Moreover, as admitted by the NRA's Secretary and General Counsel, John Frazer, the NRA can readily afford to defend and prosecute this litigation.

72. *Second*, the NRA has not shown it needs to "restructure its internal and financial affairs," other than desiring to re-incorporate in Texas. LaPierre admits that "the NRA for years has been talking on and off about the need to reincorporate in somewhere that offered a friendlier environment than New York state to the organization."[164] In fact, LaPierre recalls that the NRA has had discussions about moving with numerous leaders from Arkansas, West Virginia, Texas,

---

[161] *See* Ex. 11, § 341 Creditor Mtg. (Mar. 5, 2021) 63:4-14.
[162] ECF 307 (Debtor's Resp.) ¶ 18.
[163] ECF 368 (UCC Resp.) ¶ 30.
[164] Ex. 6, LaPierre Dep., Vol. 2 (Mar. 23, 2021) 337:23-25, 338:1.

Arizona, and Tennessee.[165] After years of admittedly restructuring and reorganizing outside of bankruptcy, the real reason for re-incorporating in another state is to avoid the NYAG. According to LaPierre:

> We had tried -- and I will be quick. But through 2017, after the Schneiderman call, in 2018, in 2019, not to leave New York, but to actually look at everything, self-correct and -- and ensure that we were in complete compliance with New York state law, but it just got to the point where, based on what happened, if you cared about the NRA we felt we had no other alternative but to take this course.[166]

Even in their Response, Debtors clearly display their objectives: "the NRA is not seeking to evade regulatory oversight; rather it seeks, and is entitled, to be treated fairly by regulators providing that oversight."[167] Thus, any necessity for bankruptcy is in reality part of a litigation strategy LaPierre and the Brewer Firm formed to allegedly "level the playing field" with the NYAG.

73.     *Third*, with respect to "emerging as a going concern" and the alleged "overt desire to disband and dissolve the NRA," the NRA is currently a going concern and has not been ordered by any state authority or state court to dissolve or disband. There is absolutely no illustration—outside of the NRA's press releases—that such recourse is imminent or that the NYAG has "weaponized." The sole facts are that the NYAG underwent an 15-month investigation, which resulted in a 166-page sworn complaint against the NRA, and a similar enforcement action by the DCAG has been initiated. As even the Court has acknowledged, it is difficult to assess the merits of such allegations without any evidence.

## f.     *The unauthorized bankruptcy is bad faith and gross mismanagement.*

74.     During discovery on Movants' dismissal motions, an additional ground of dismissal was revealed; the Debtors filed this illicit bankruptcy without proper corporate authority. As

---

[165] *Id.* at 459:5-25, 460:1-24.
[166] *Id.* at 458: 3-10.
[167] ECF 307 (Debtors' Resp.) ¶ 25.

reflected in the January 7th Board minutes, the Board never authorized a bankruptcy filing.[168]  Not only did the NRA's General Counsel not know about the bankruptcy filing until the Petition Date, the bankruptcies were decried by several loyal NRA board members, including Phillip Journey and Duane Liptak, Jr., who actually resigned four days later.[169]  Judge Journey said the bankruptcy "was a fraud perpetrated on the court," because the Board was unaware of the filing.  He later testified that the Board never voted for such a drastic measure as bankruptcy and the NRA's management and advisors breached their duties to the Board in not disclosing their plans.[170]

75.     The NRA's Bylaws and applicable New York law further demonstrate that only the NRA Board can make a decision to file bankruptcy.[171]  The NRA Executive Vice President "shall direct the affairs of the [NRA] *in accordance with the programs and policies established by the [NRA] Board of Directors*."[172]  An Executive Committee can exercise Board authority in between Board sessions, but cannot, among other things, change the basic organizational structure of the NRA, petition for judicial dissolution, adopt plans of merger or consolidation, or formulate "other corporate policy decisions . . . of such major significance as to warrant action by the Full Board of Directors."[173]  While the NRA President can elect special committees, such committees are prohibited from exercising any authority that the Executive Committee cannot exercise.[174]

76.     The NRA Bylaws comport with New York nonprofit laws, providing that a nonprofit corporation shall be managed by its board of directors.[175]  Significantly, New York laws impose fiduciary duties on directors, officers, and keys person to "discharge the duties of their

---

[168] *See* Ex. 3, NRA Bd. Mins. (Jan. 7, 2021) at 5.
[169] *See* Ex. 26, Liptak Resignation Letter (Jan. 19, 2021).
[170] *See* Ex. 8, Journey Dep. (Mar. 18, 2021) 65:1-13, 97:9-13, 96:16-18.
[171] Ex. 31, NRA Bylaws § IV.2 at 13 ("[NRA] Board of directors shall formulate the policies and govern and have general oversight of the affairs and property of the Association, in accordance with applicable law and these Bylaws.").
[172] *Id.* at § V.2(c) at 18 (emphasis added).
[173] *Id.* at § VI.2(f), (i) & (k).
[174] *Id.* at §§ XIII.3, XIII.5.
[175] NY CLS N-PCL § 701(a).

respective positions in good faith and with the care an ordinarily prudent person in a like position would exercise under similar circumstances."[176] While New York nonprofit law provides that a board and management can rely on information provided by other officers, employees, outside advisors, and special committees, such reliance must be exercised with a special degree of care and in good faith, which will only be deemed properly exercised if the directors, officers, and key persons do not have any special knowledge that would make such reliance unwarranted.[177]

77.     Thus, the Executive Vice President and SLC had no authority to file bankruptcy under the NRA Bylaws, which precludes any post-petition authorization by the NRA Board. Only the NRA Board had the authority to decide to file bankruptcy, and they could only act in good faith and duty of care if they were provided proper information by those officers and outside advisors. Mr. Liptak and Judge Journey demonstrate the NRA Board was not provided information about a bankruptcy filing and never adopted such a measure before the Petition Date.

78.     A bankruptcy court has no jurisdiction to adjudicate a bankruptcy where there is no proper corporate authority for a filing, and therefore should dismiss a case.[178] This factor is an independent ground to dismiss a case, constitutes "cause" under section 1112(b)(4),[179] and further

---

[176] *Id.* at § 717(a)

[177] *Id.* at § 717(b)

[178] *See Franchise Servs. of N. Am. v. United States Trs. (In re Franchise Servs. of N. Am.),* 891 F.3d 198, 214 (5th Cir. 2018) (quoting *Price v. Gurney*, 324 U.S. 100, 106 (1945)) (Absent a properly authorized petition, the bankruptcy court has no "power . . . to shift the management of a corporation from one group to another, to settle intracorporate disputes, and to adjust intracorporate claims.); *In re Delta Starr Broad., LLC*, 422 Fed. Appx. 362, 368 (5th Cir. 2011) ("Any suit lacking subject matter jurisdiction must be dismissed regardless of how long a case has been pending."); *Hager v. Gibson*, 108 F.3d 35 (4th Cir. 1997) (citing *Price*, 324 U.S. at 106); *In re Reliable Air, Inc.*, 2007 Bankr. LEXIS 3060, *7-8 (Bankr. N.D. Ga. Mar. 9, 2007) (quoting *Price*, 324 U.S. at 106) ("A bankruptcy court does not have jurisdiction over a bankruptcy proceeding filed on behalf of a corporation unless it was "filed by those who have authority so to act.")); *In re Franchise Servs. Of N. Am.*, 2018 Bankr. LEXIS 105, *14-15 (Bankr. S.D. Miss. Jan. 17, 2018) ("the Supreme Court held that a bankruptcy petition filed on behalf of a corporation may only be filed by those who have authority to act for the corporation under state law. If the corporate authority to file bankruptcy is lacking, the bankruptcy court does not acquire jurisdiction, and the case must be dismissed").

[179] *In re Marino*, No. 09-33649-11, 2010 Bankr. LEXIS 401, *7 (Bankr. S.D. Tex. Feb. 9, 2010) (citing *Price*, 324 U.S. at 106) ("*Cause for dismissal also includes alleged lack of proper corporate authority to act by a corporate agent*. The authority to file a bankruptcy petition on behalf of a corporation must derive from state corporate governance law and the corporate by-laws.") (emphasis added).

indicates bad faith.[180]

**B. <u>Motion to Appoint a Trustee</u>**

79.     AMc fundamentally believes that these cases should be dismissed under section 1112, because the NRA has plenty of wherewithal to address the legal issues that they have caused. It is true that if the NRA does not take a close look at its management, governance and internal controls and procedures, it may be insolvent one day.  But, that day is nowhere close.  So the NRA is using this Court to exert leverage on the NYAG, and in the meantime is asking this Court to impose a harsh remedy on numerous contingent creditors, in the form of the automatic stay and claims resolution process, thereby substantially altering their jury trial and due process rights.  If the Court should be inclined to impose such a remedy, then the Court should take a hard look at the management that created these non-financial problems and appoint a chapter 11 trustee to turn the NRA ship around.  For the reasons set forth in the AMc Dismissal Motion and the arguments made below, if the Court does not dismiss these cases, it should, at a minimum, appoint a chapter 11 trustee.

80.     The most glaring omission from Debtors' Response regarding the request to appoint a trustee—because it has no reasonable response—is to AMc's argument that:

> Neither the NRA, nor LaPierre at its helm, can realistically carry out the fiduciary duties of a debtor-in-possession toward creditors when *both* the NRA *and* LaPierre face liability for those misdeeds.  Also important is that those same misdeeds affect the bankruptcy estate that the debtor-in-possession is required to maintain for the benefit of creditors.  Indeed, it is likely that litigants against the NRA, like AMc, are the largest stakeholders in this Bankruptcy Case.  Considering the highly contested nature of the pending lawsuits involving the NRA, plus the allegations of mismanagement, dishonesty, and breaches of numerous obligations, it is unfathomable that under current management, the NRA can now serve as a *fiduciary* to those litigant-creditors.[181]

---

[180] *Chitex Communication v. Kramer*, 168 B.R. 587 (S.D. Tex. 1994) (the "initiation of proceedings when he knew or should have known that the divorce decree stripped him of all legal authority regarding Chitex exhibited bad faith").
[181] *See* ECF 131 (AMc Dismissal Mot.) ¶ 83.

Taking into account the unsettled issues of breaches of fiduciary duty of NRA management to its own constituency, it is unreasonable to believe the NRA could serve as a fiduciary outside its walls concerning those same management actions underlying the breaches.

81. Instead, the NRA cherry picks when political pressures are worthy of relief from this Court. On the one hand, the NRA unequivocally states through its officers, Board members, and lawyers that the NYAG Enforcement Action is "political warfare."[182] Texas is a "friendly" forum,[183] whereby the NRA impliedly suggests this Court should find differently from how a New York court would. The NRA says "it seeks, and is entitled, to be treated fairly by regulators providing [regulatory] oversight,"[184] but does not explain how such "fairness" can only come through bankruptcy or a Texas court. Then the NRA strikes at this Court's ability to be fair and impartial by objecting to a trustee based on a hypothetical claim that whom this Court would appoint might be anti-Second Amendment and, effectively, an extension of NYAG James.[185]

82. The NRA makes unsupported allegations that appointing a trustee would "have a devastating impact" on the NRA's "ability to collect dues and raise donations."[186] Recent history would disprove such contention. In the *Life Partners* case in Fort Worth, a trustee was appointed and amazing results occurred. A trustee also has the ability to hire necessary help, as well as counsel. A trustee can also formulate, implement and execute bylaws that an organization will actually adhere to, in a non-autocratic way. And, then, let's not forget the other players in this case that can work with a trustee.

---

[182] By way of example only, *see* ECF 31 (Debtors' Informational Br.) ¶¶ 1, 16; NRA Press Release, NRAFORWARD.ORG (Jan. 15, 2021) [https://www.nraforward.org/press-release]; Ex. 18, LaPierre letter to the Board (Jan. 15, 2021); Ex. 17, LaPierre letter to NRA members and supporters.
[183] *See* ECF 307 (Debtors' Resp.) ¶ 40(d) n.20. *See also* Bob Barr Live Interview with NewsMax, YOUTUBE.COM (Jan. 18, 2021) (beginning at 4:55) [https://www.youtube.com/watch?v=TQ7jD3WDinU].
[184] *See* ECF 307 (Debtors' Resp.) ¶ 25.
[185] *See id.* at ¶ 85.
[186] *See id.* at ¶ 83.

83. Once again, the issue is that the NRA and its management have abdicated their duties in favor of one person, which is in control of everything and can execute whatever order h wants, with the assistance of aggressive counsel. There is no basis for granting current NRA management repeated opportunities to "correct past mistakes"[187] when those mistakes are *continuing*, the same management would be required to uphold fiduciary duties towards adversaries in litigation, and "the pre-petition misconduct has a deleterious post-petition impact on creditors,"[188] which includes its litigant-adversaries.

84. The NRA also argues that its creditors and members "should not be required to suffer uncertainty" that a trustee "may harbor political and social animus towards the NRA and its mission…"[189] Conversely, neither should the creditors and five million members suffer *with certainty* from this continued mismanagement, fraud, and dishonesty. The NRA purports that appointing a trustee would cause "[u]ncertainty in leadership," but there is already uncertainty in *current* leadership.[190] The fact that the NRA can stand before this Court and represent that "the actions complained of were perpetrated by actors that are no longer involved in the operations of the NRA" further solidifies the NRA's doggedness in carrying out a plan to shield its management

---

[187] *Cf.* ECF 307 (Debtors' Resp.) ¶ 90.

[188] *See id.* at ¶ 97. Such analysis necessitates inquiry into the pre-petition misconduct outlined in the Texas Action and the Enforcement Action.

[189] *See* ECF 307 (Debtors' Resp.) ¶ 86.

[190] By way of example only, *see, e.g.*, Ex.15, *The NRA Exodus*, THE TRACE [https://www.thetrace.org/2020/03/nra-departures-timeline-wayne-lapierre/]; Lt. Col. Allen West, *Statement Regarding the NRA* (May 14, 2019) (calling for LaPierre to resign) [https://theoldschoolpatriot.com/statement-regarding-nra/]; Beth Reinhard, WASHINGTON POST (Aug. 1, 2019) *Three NRA board members resign in latest sign of upheaval at gun rights group* [https://www.washingtonpost.com/politics/three-nra-board-members-resign-in-latest-sign-of-upheaval-at-gun-rights-group/2019/08/01/aad49bc0-b49d-11e9-8f6c-7828e68cb15f_story.html]; Zack Budryk, *NRA board member Allen West urges CEO LaPierre to step down*, THE HILL (May 14, 2019) (former Board member Timothy Knight predicting, correctly, he would "'likely lose' [his] committee assignments and not be renominated' for speaking out" about the financial mismanagement under LaPierre's rule) [https://thehill.com/regulation/lobbying/443686-nra-board-member-allen-west-urges-ceo-lapierre-to-step-down]. *See generally*, Gangster Capitalism podcast (discussing "covert campaign to keep Executive Vice President Wayne LaPierre and his loyalists in power" and describing a thwarted attempt by Board members to vote LaPierre out of office) [https://shows.cadence13.com/podcast/gangster-capitalism].

ACKERMAN MCQUEEN, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS, OR, IN THE ALTERNATIVE, MOTION FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE, AND BRIEF IN SUPPORT

PAGE 35

to the detriment of others, including AMc.[191]

## IV.    CONCLUSION

For the foregoing reasons, AMc requests that the Court grant the AMc Dismissal Motion

and dismiss these cases, and , if the Court decides to keep them, appoint a chapter 11 trustee.

Date: April 2, 2021                        Respectfully submitted,

                        **DORSEY & WHITNEY LLP**

                        */s/ G. Michael Gruber*
                        **G. MICHAEL GRUBER**
                        State Bar No. 08555400
                        gruber.mike@dorsey.com
                        **H. JOSEPH ACOSTA**
                        State Bar No. 24006731
                        acosta.joseph@dorsey.com
                        **BRIAN E. MASON**
                        Texas Bar No. 24079906
                        mason.brian@dorsey.com
                        **CHRISTINA M. CARROLL**
                        Texas Bar No. 24092868
                        carroll.christina@dorsey.com
                        300 Crescent Court, Suite 400
                        Dallas, Texas 75201
                        Phone: (214) 981.9900
                        Facsimile: (214) 981.9901

                        **ATTORNEYS FOR ACKERMAN MCQUEEN, INC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document has been served upon all parties receiving notice by and through the Court's CM/ECF system on April 2, 2021

                        */s/ H. Joseph Acosta*
                        H. JOSEPH ACOSTA

---

[191] *See also* Bob Barr Live Interview with NewsMax, YOUTUBE.COM (Jan. 18, 2021) (beginning at 5:30, "There is no anticipated changes in our leadership.") [https://www.youtube.com/watch?v=TQ7jD3WDinU].