fishing opportunities by the U.S. Fish and Wildlife Service (FWS) in history, bringing the Trump Administration's total expansion to more than 4 million acres nationwide.

**Recreational Shooting on Federal Lands**

Since the beginning of the Trump Administration and at the NRA's urging, the Bureau of Land Management has been looking at opportunities to expand and enhance access to safe recreational shooting areas on federal lands. While 97% of BLM and Forest Service lands are open to shooting, the NRA has long been pushing for more developed sites, ranges and micro-ranges on these lands. The first project was announced in January of 2020 and is currently being built. The project includes five new shooting areas in the Phoenix-metro area.

**Lower 48 Gray Wolf Delisting**

In October, the U.S. Fish & Wildlife Service announced its final rule delisting the gray wolf in the lower 48 states. The rule will allow states, rather than the federal government, to manage wolf populations. This is a huge win for state management of wildlife. Several environmental and animal rights groups have already threatened lawsuits and the future of the delisting will likely depend on which federal judges are assigned the case.

**Hunters' Leadership Forum**

Recently, Director Skipwith wrote an op-ed published on the Hunters' Leadership Forum website thanking shooters for their contribution to conservation through excise taxes paid on firearms and ammunition. The editorial can be found here:
https://www.nrahlf.org/articles/2020/8/24/thank-you-recreational-shooters/.

**GRASSROOTS PROGRAMS & CAMPAIGN FIELD OPERATIONS –
Lexy Higgins, Managing Director**

**Grassroots Field Activities**

This year, the Grassroots Programs and Campaign Field Operations Division was faced with an unprecedented number of in person event cancellations due to government restrictions on capacity and the banning of in person gatherings in most areas. We adapted by moving a majority of our outreach online, and have stayed connected with our volunteers via phone calls, text messages, emails, and virtual meetings.

This year, we hosted a variety of online meetings, workshops, and trainings to ensure our volunteers were educated and involved in our efforts nationwide. We hosted 132 virtual workshops that were primarily focused on training new volunteers, and in areas where we were able to, we transitioned from hosting virtual workshops to in person (28 total). We also hosted 26 virtual meetings that allowed for more of a roundtable discussion with existing volunteers. We hosted 30 issues based trainings for both our FrontLines Activist Leaders and our Campaign Field Representatives to ensure they were up to date on NRA's position on key legislative issues.

Despite the challenges that our team faced this year brought on by making sure to allow for social distancing, following local/state guidelines, and taking extra steps to ensure the safety of our staff, we were still able to attend over 100 in person events.

## NRA-ILA Campaign Field Representatives (CFRs)

ILA Grassroots deployed sixteen (16) Campaign Field Representatives for the 2020 Elections in the following states: Arizona, Colorado, North Carolina, Pennsylvania, Iowa, Michigan, Montana and Wisconsin. While we had one group of CFRs that was brought on board in February, the rest of our team has been on boarded and trained virtually. During the first half of the year, our voter contact outreach was limited to phone calls, emails, virtual meetings, and sending text messages. In June, we saw a number of states start to loosen their restrictions, and shifted our focus to in person outreach via going door to door, hosting small in person events, and partnering with our Second Amendment Activist Centers to host NRA Days. Below is what our team was able to accomplish during the 2020 General Election:

- Calls – 730,561
- Texts – 16,426,364
- Doors Knocked – 795,238
- NRA Days  – 52
- Virtual Volunteer Trainings - 109
- Gun Shows – 11

ILA Grassroots has also deployed four (4) Campaign Field Representatives for the U.S. Senate Runoff election in Georgia. Below is what our team was able to accomplish as of mid-December 2020:
- Texts – approximately 1.3 million
- Doors Knocked – approximately 400,000
- NRA Days – 6
- NRA Member Town Halls – 5

We will continue to contact voters in Georgia all the way through the election on Tuesday January 5th.

## NRA-ILA FrontLines Activist Leader (FAL) Program

The FrontLines Activist Leader program continues to undergo improvements as we look to find creative ways to maximize our grassroots outreach. We have held semi-regular virtual meetings throughout the year, as well as started to send a weekly update to increase communication from HQ and ensure that our FALs are up to date on what is going on within the Grassroots Programs and Campaign Field Operations Division nationwide.

We currently have 107 FALs.

**Second Amendment Activist Centers**

In an effort to maintain more consistent communication with our Second Amendment Activist Centers, we launched a new website this year: https://www.nrasecondamendmentactivistcenter.com. Through this website, our Second Amendment Activist Centers have access to a portal that allows them to update their information, request more materials for distribution, and access flyers designed to help promote NRA events at their businesses. We have also utilized the "News" section of this website to highlight events that our Second Amendment Activist Centers have hosted.

We currently have 373 Second Amendment Activist Centers.

**Collegiate Outreach Programs**

Our collegiate engagement has been limited this year because of the inability of students to be on campus due to the Coronavirus. We have kept in contact with our existing Collegiate Coalitions and campus coordinators by hosting a number of virtual events with/for them and are working on setting up a number of virtual meetings.

We have been and will continue to work with NRA Public Affairs to bring our NRA-ILA Grassroots Collegiate programs under one NRA umbrella – Students for 2A. This involves rebranding our existing Collegiate Coalitions, as well as relocating all of our program request forms to be hosted on the Students for 2A website.

While we were able to host 7 NRA Universities in early spring, we have largely been unable to host NRA University (NRA U) programs this year due to the hectic nature of college campuses closing and then reopening and closing again. We are exploring virtual NRA University options for next year, but anticipate a shift in content while presentations have to remain virtual.

**Written & Electronic Correspondence, Information Fulfillment, and Phones**

This reporting period, the Division received approximately 26,050 email messages to which some 8,325 were responded to by Grassroots staff. Roughly 2,425 were forwarded to other NRA Divisions for response or for more information. An additional 15,300 were informational in nature, and thus, required no response. These totals exclude thousands of spam messages and other similar items that are deleted.

The Grassroots Division received approximately 23,600 incoming phone calls and reviewed some 2,050 voicemail comment messages.

Staff has processed and internally distributed hundreds of pieces of mail, have responded to 145 letters, and have mailed dozens of informational items out to members and dozens of packages out to our staff in the field.

**Miscellaneous**

The Division continues to work to ensure that our list of volunteers only contains individuals who are truly willing to be actively engaged in our political and legislative efforts – currently around 1.65 million nationwide.

The Division is continuously updating its email list, which currently totals roughly 2.3 million.

The Division transmitted 50 issues of the Grassroots Alert this reporting period. The Alert is transmitted every Monday to all with email addresses, with thousands more accessing it on ILA's website.

## RESEARCH & INFORMATION – Josh Savani, Director

### Assessing Firearm Research

While an individualized analysis of available firearm research is beyond the scope of this report, it is a good opportunity to address some of the recurring shortcomings of research reviewed by the Division.

All firearm research suffers from one problem: we do not know how many firearms are in the United States or how they are distributed. NRA has long supported various federal laws and appropriations riders as well as laws at the state level to prohibit the collection and centralization of firearm records. While these laws are intended to prevent the creation of firearm registries, they also prevent researchers from conducting accurate studies with the number or distribution of firearms as a variable.

These studies often use self-report to determine firearm ownership levels, but this suffers from other problems. Below is a graph showing Gallup's polling on a firearm ownership question over time.



Do you have a gun in your home?

The highlighted portion of the graph shows, after 1994 far fewer Americans reported having a gun in their home. This timing just happens to coincide with multiple pieces of federal legislation that targeted gun owners. While it is possible that many millions of Americans stopped being gun owners over a period of a few years, it is much more likely that targeting gun owners as a "problem" by federal officials made gun owners much less likely to share gun ownership information with a stranger on the phone.

Another problem common in firearm research (and other areas of research) is misspecification. We will often review studies that attempt to show that more permissive firearm policies increase various types of violent crime. While these studies may attempt to show a particular policy drives certain crime rates, they often fail to correctly account for the various laws of different jurisdictions.

For example, many studies that assess the efficacy of self-defense laws will often look only to the states that have codified a particular policy in statute. However, many states may have very similar self-defense rules through judicial decisions. By misspecifying these states, a study on self-defense laws would be worthless at examining the efficacy of those laws.

We also regularly see attempts to study events that are simply too rare to draw scientifically valid conclusions. This is most common in studies that purport to measure the effect of various laws on mass public shootings. Despite claims by some that hundreds of mass shootings occur each year, research has consistently shown far fewer of these events actually occur. A comprehensive dataset put together by Professor James Allen Fox of these events found that they occur between 20-30 times per year. Even Professor Fox, who is a strong supporter of gun control, admits that there is no evidence that any proposed policy measure will impact the frequency or severity of mass attacks because they are already so rare.

**Research Based Policy**

A large part of the Division's work is focused on informing the policy work done by ILA. By using arguments and messaging that resonate with the largest number of Americans, ILA can best represent the interests of our members.

We know from repeated research that the vast majority of Americans agree that law-abiding people have the right to defend themselves and their families with the firearm of their choosing. This is why that no matter the policy, our messaging continues to focus on self-defense.

Nowhere is this clearer than on our work to expand right-to-carry ("RTC") laws. There is some evidence that NRA's work to expand RTC laws in the 90s and early 2000s helped drive public support for self-defense with a firearm. That support has now made it possible to further expand RTC.

Since we are about to close out the decade, an examination of the expansion of permitless carry in the last ten years shows how well our focus on RTC has worked.

Here is a map showing the state of permitless carry in 2010 and the same map in 2020.



Only two states provided for permitless concealed carry at the beginning of the decade, but 16 do today.

And, it's not just permitless carry that substantially improved in the last decade. When most RTC laws were first passed, they provided for an ad hoc system of reciprocal agreements between states for interstate permit validity. Another push by ILA in the last ten years is to get every state to recognize valid permits from all other states.

The benefits of this system are two-fold. It provides for the greatest number of permitees who can carry in each state, and it proves that interstate carry is very feasible. This second benefit helps counter arguments to federal concealed carry reciprocity legislation.

While some states were initially hesitant to recognize permits from states that did not recognize their permit, many states have now overcome this concern and recognize permits from all states as can be seen from this map.



While ILA's work defending and expanding the rights of law-abiding gun owners is far from over. Gun rights at the end of this decade are more expansive than they were at the beginning due in large parts to the efforts of this Association.

## 2020 Firearm Research

As 2020 comes to a close, two clear trends are obvious from research conducted this year, gun ownership is up (especially amongst new gun owners), and support for gun control is down.

Through November, (the most recent month for which data is available), the FBI's NICS Section had conducted 35,758,249 checks. For some perspective, in 2019, the former busiest year for NICS checks, FBI ran 28,369,750 checks in all 12 months. Assuming December 2020 remains on track with the rest of the year, FBI will likely run ten million more checks in 2020 than it did in 2019 (a 35% increase).

NICS checks are not a perfect measure of gun sales, but they are used regularly as a predictor of current sales until more reliable, but slower to be released, data becomes available.

Subject to the caveats discussed above regarding self-report data sources, there is reason to believe that the huge surge in firearm buying is being driven by new gun owners. According to the National Shooting Sports Foundation, more than seven million new gun owners purchased a firearm in 2020.

This survey data seems to be supported by the types of firearms being sold in 2020. Prior surges in firearm sales have been driven by calls to ban particular types of firearms, most often semiautomatic rifles. In response, huge numbers of rifles have been sold during past surges, but the increase in handgun sales have generally been more modest.

In contrast, sales in 2020 have been mostly handguns, which are likely driven by new gun owners interested in self-defense. The FBI NICS office has run 10,931,060 handgun-related checks and 6,361,838 checks related to long gun sales. This tops the annual handgun check record by 35% (over the 8,085,498 handgun-related checks run in 2016) and this still doesn't include December. However, the long gun checks are likely to only approximately match or narrowly surpass 2013 (the prior record year for long gun-related checks). Not counting December, this year is 766,961 checks away from beating the long gun record set in 2013 (with 7,128,798 such checks).

As noted, with this huge surge in gun ownership, available data shows support for gun control amongst the American people has substantially diminished in 2020.

The longtime pollster Gallup regularly asks Americans what they believe to be "the most important problem" facing the nation. "Guns/gun control" reached a highpoint in March 2018 with 13% of respondents indicating it was the most important issue. In 2020, this number fell to less than 0.5% in each month it was asked from May through November.

This doesn't mean that gun control advocates will be going away, at least not until their billionaire financiers decide to give up on curtailing Americans' fundamental rights, but it does mean that more Americans than ever before will likely be supportive of the goals and objectives of the National Rifle Association in 2021 and beyond.

**OFFICE OF LITIGATION COUNSEL – Michael Jean, Director**

The Office of Litigation Counsel continues to fight for our members' rights through litigation. The following is a list of all the cases brought or supported by the Office of Litigation Counsel that had activity in 2020.

## I. FEDERAL CASES

### SCOTUS

**New York State Rifle & Pistol Association, Inc. v. City of New York, No.18-286**

*Issue*: A New York City premises permit is required to keep a firearm in one's home. The permit prohibits traveling with a firearm outside of the five boroughs, including to second homes and ranges, without permission from the NYPD (which has never been granted). This was challenged in the Southern District of New York under the Second Amendment and the right to travel.

*Status*: We lost in the Southern District of New York, and the Second Circuit affirmed in February 2018. Certiorari was granted on January 22, 2019. But after that, the city repealed the restriction, and the state preempted the city from enacting a similar ordinance in the future. Permit holders are now able to transport their firearm anywhere that they may lawfully possess it. Despite our best efforts to preserve the case and get a ruling on the merits, on April 27, a divided Court held that the case was moot. Although we were unable to get a ruling on the merits, we received a strong dissenting opinion from Justice Alito, criticizing the watered-down scrutiny that lower courts have applied to Second Amendment challenges, which we have already cited in other briefs.

*Future Actions*: The case was remanded back to the Southern District of New York to determine if a claim for damages can be brought.

**Denial of Cert in other cases**

We petitioned the Supreme Court for certiorari in four other cases:

- *Rogers v. Grewal* (18-824) – New Jersey's good-reason requirement
- *Gould v. Lipson* (18-1272) – Massachusetts' good-reason requirement
- *Worman v. Healey* (19-404) – Massachusetts' "assault weapon" ban
- *Malpasso v. Pallozzi* (19-423) – Maryland's good-reason requirement

The Court declined to take all of them, and several other Second Amendment cases, on June 15th. There will be no further activity in these cases.

**NYSRPA v. Corlett, No. 19-156 (2d Cir.) (No SCOTUS Case No. yet)**

*Issue*: New York Law requires an applicant for a carry permit to show "proper cause," i.e., "facts demonstrating a need for self-protection distinguishable from the general public." This requirement was challenged in the Northern District of New York under the Second Amendment.

*Status*: The Second Circuit had already upheld this requirement in *Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012). The trial court and the Second Circuit therefore summarily affirmed our case on August 26th.

Petition for certiorari was filed on December 17, 2020.

**D.C. CIRCUIT**

**CBD v. Bernhardt & FoA v. Bernhardt, Nos. 19-5147 & 19-5152 (D.C. Cir.)**

*Issue*: In 2017, the D.C. Circuit sided with NRA and SCI in our challenges to the Fish and Wildlife Service's unlawfully promulgated rule that banned elephant trophy importations from Zimbabwe. In order to comply with that ruling, the Fish and Wildlife Service withdrew all its prior rules that were unlawfully promulgated in the same manner, and announced that it would make future findings and importation decisions through case-by-case adjudications. Two groups of plaintiffs challenged the withdrawal of the findings and the case-by-case approach in the D.C. District Court. NRA and Safari Club intervened as defendants.

*Status*: The trial court ruled in our favor and dismissed all the claims for lack of standing and failure to state a claim. The plaintiffs appealed to the D.C. Circuit. On June 16, 2020, the D.C. Circuit affirmed the dismissal. The court cited our brief favorably in doing so. As a result, the Fish and Wildlife Service can continue to allow elephant trophies to be imported to the country.

*Future Actions*: None.

**SECOND CIRCUIT**

**NRA v. Cuomo, No. 1:20-cv-00385 (N.D. NY)**

*Issue*: In response to the COVID-19 outbreak, Governor Cuomo issued an executive order closing down all non-essential business, which included gun shops. This lawsuit was filed in the Northern District of New York. It challenges the gun-shop closure under the Second Amendment and the Fifth and Fourteenth Amendments due process clauses.

*Status*: The court denied our motion to amend the complaint and granted NY's motion for judgment on the pleadings August 14th.

*Future Actions*: None.

## THIRD CIRCUIT

### ANJRPC v. Grewal, No. 19-3142 (3d. Cir.)

*Issue*: New Jersey outlawed the possession of magazines with a capacity of greater than ten rounds. This prohibition was challenged in the District of New Jersey under the Second Amendment.

*Status*: The trial court denied our motion to preliminarily enjoin the enforcement of the statute. The Third Circuit affirmed the denial. *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910 F.3d 106 (3d Cir. 2018). The trial court then ruled against us on summary judgment. It held that it was bound by the panel's preliminary injunction holding that we were unlikely to succeed on the merits. On September 1st, the Third Circuit affirmed, holding that it was bound under the law-of-the-case doctrine. We petitioned the court for en banc review. The petition was denied on November 25th.

*Future Actions*: We are currently considering whether to appeal this case to the Supreme Court.

### Doe v. Wolf, No. 19-1927 (3d Cir.)

*Issue*: Pennsylvania law prohibits anyone who has been temporarily committed for a mental health observation from possessing a firearm. There is no hearing or any due process whatsoever before the temporary observation commitment takes place. This statute was challenged in the Eastern District of Pennsylvania under the due process clause of the Fourteenth Amendment, for depriving individuals of their fundamental rights without due process of law.

*Status:* The trial judge ruled against us and the case was appealed to the Third Circuit. The week after we appealed the case, the ATF certified the state's restoration process, which now effectively provided the plaintiffs (and all others committed under the statute) with some post-deprivation due process. The Third Circuit held that the post-deprivation proceedings were enough to satisfy the due process clause's requirements and affirmed. We do not see any more potential out of this case.

*Future Actions*: None.

### Mazahreh v. Grewal, 1:20-cv-17598 (D.N.J.)

*Issue:* New Jersey law requires that an applicant for a concealed-carry permit must prove that they have a "justifiable need" to carry. This requirement was challenged in the District of New Jersey under the Second Amendment. This case is the almost identical to the *Rogers* case.

*Status*: The Complaint was filed on December 1st. We expect to get a summary dismissal because the Third Circuit has already upheld this requirement in *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013).

*Future Actions*: Continue to prosecute the case.

## FOURTH CIRCUIT

### Maryland Shall Issue v. Hogan, No. 19-1496 (4th Cir.)

*Issue*: Maryland law forbids the sale, rental, transfer, purchase, or receipt of a handgun by any person without a valid Handgun Qualification License, which will only be issued after the applicant, among others, pays several fees and takes a four-hour safety course, by a state-certified instructor. This requirement was challenged in the District of Maryland under the Second and Fourteenth Amendments.

*Status*: The state filed a motion to dismiss, which was denied on all but one count: the court found that we didn't have standing to challenge the requirement that applicants take a firearm-safety course from a certified instructor. The Fourth Circuit reversed on August 3, 2020. We are now back in the district court where summary judgment motions are scheduled to be briefed through March 2021.

*Future Actions*: Prosecute the case in the district court.

## NINTH CIRCUIT

### Duncan v. Becerra, No. 19-55376 (9th Cir.)

*Issue*: California outlawed the possession of magazines with a capacity of greater than ten rounds. This prohibition was challenged in the Southern District of California under the Second Amendment, Takings Clause, and Due Process Clause.

*Status*: The court granted our motion for a preliminary injunction on June 29, 2017, and the Ninth Circuit affirmed on July 17, 2018. Back in the district court, we successfully obtained a summary judgment on the Second Amendment and Takings Clause in March 2019. The state appealed to the Ninth Circuit. The court applied strict scrutiny and affirmed on August 14th. California promptly sought en banc review. We opposed.

*Future Actions*: Nothing until we get a ruling from the court.

### Crow Tribe v. U.S. (Six Grizzly Bear Cases), No. 18-36038 (9th Cir.)

*Issue*: In 2017, the U.S. Fish and Wildlife Service delisted grizzly bears in the Greater Yellowstone Ecosystem under the Endangered Species Act. This turned their management over to the states, who were scheduled to hold the first grizzly hunt in the lower 48 states in decades. Six different groups challenged the delisting under the Endangered Species Act and the Administrative Procedure Act in the District of Montana. The NRA intervened in the case with Safari Club International.

*Status*: The trial court held that the Fish and Wildlife Service did not consider all the factors that it needed to and that the bears were not adequately protected when the Service delisted them. The DOJ only partially appealed the case, indicating that it would accept a remand on the other issues. The Ninth Circuit gave the DOJ exactly what it asked for: reversing on the issues that the

DOJ appealed and affirming the issues that the DOJ did not oppose. The bears are back on the list of threatened species, and there will be no hunts until they come off again.

*Future Actions*: None.

### Rhode v. Becerra, No. 20-55437 (9th Cir.)

*Issue*: California law requires ammunition sales, deliveries, and transfers to be conducted by a state-licensed ammunition vendor in a face-to-face transaction. A California resident who seeks to buy firearm ammunition must pay for and pass an electronic background check each time he or she wishes to make a purchase. This restriction was challenged in the Southern District of California under the Second Amendment.

*Status*: Judge Benitez granted us a preliminary injunction in April 2020, prohibiting the state from enforcing this restriction. The state promptly appealed and the Ninth Circuit stayed the injunction pending the appeal. The case was argued on November 9th. The court asked for supplemental briefing on November 16th.

*Future Actions*: Continue to prosecute the appeal.

### Mitchell v. Atkins, No 20-35827 (9th Cir.)

*Issue*: The people of Washington enacted I-1693, which prohibits the sale of handguns and semi-automatic rifles to individuals under 21. This was challenged under the Second Amendment and Commerce Clause in the Western District of Washington.

*Status*: We survived a motion to dismiss in May 2019, but we lost on summary judgment on August 31st. We appealed the case to the Ninth Circuit and filed our opening brief on November 25th.

*Future Actions*: Continue to prosecute the appeal.

### B&L v. 22nd Agricultural District, 3:19-cv-00134 (S.D. Cal.)

*Issue*: The 22nd Agricultural District oversees the Del Mar fairgrounds, which is owned by the state of California. The District voted to no longer host gun shows at the fairgrounds. Suit was brought in the Southern District of California, challenging this decision under the First and Fourteenth Amendments.

*Status*: This case was settled on April 30th.

*Future Actions*: None.

**Brandy v. Villanueva, No. 2:20-cv-02874 (C.D. Cal.)**

*Issue*: In response to the COVID-19 pandemic, California and Los Angeles County issued an order closing down all non-essential businesses, which included gun shops. NRA (along with SAF and FPC) filed this lawsuit challenging the closure under the Second Amendment and Due Process Clause.

*Status*: Our motion for a preliminary injunction was denied by the court. The defendant filed a motion for judgment on the pleadings. Our motion for a preliminary injunction was denied. The defendant filed a motion for judgment on the pleadings, which the court granted on October 20th.

*Future Actions*: We are in the process of appealing.

**Altman v. Santa Clara, No. 5:20-cv-02180 (N.D. Cal.)**

*Issue*: In response to the COVID-19 pandemic, several counties in northern California issued orders closing down all non-essential businesses, which included gun shops. NRA (along with SAF and FPC) filed this lawsuit challenging the closure under the Second Amendment and Due Process Clause.

*Status*: Our motion for a preliminary injunction was denied. Three of the counties repealed their orders, but Alameda County kept theirs in place. Defendants then filed a motion to dismiss. On November 30th, the court ruled that our Second Amendment claim against Alameda County could proceed. It dismissed the claims against the other counties.

*Future Actions*: Continue to prosecute the case.

**TENTH CIRCUIT**

**Aragon v. Grisham, No. 1:20-cv-00325 (D.N.M.)**

*Issue*: In response to the COVID-19 pandemic, Governor Grisham issued an executive order closing down all non-essential businesses, which included gun shops and ranges. NRA (along with NMSSA, SAF, FPC, and Mountain States) filed this lawsuit challenging the closure under the Second Amendment.

*Status*: In response to our lawsuit, we negotiated an agreement whereby the Governor agreed to allow gun shops to open up by appointment only for two weeks, and then allowed them to operate like all other essential businesses thereafter. In response, suits were voluntarily withdrawn.

*Future Actions*: None.

## ELEVENTH CIRCUIT

### NRA v. Swearengin, No. 4:18-cv-00137 (N.D. Fl.)

*Issue*: Florida law prohibits the purchase of firearms by persons under the age of 21. This prohibition was challenged under the Second Amendment and the Equal-Protection Clause in the Northern District of Florida.

*Status*: We survived a motion to dismiss on May 1st. The court allowed all of the claims to proceed against the Commissioner of the Department of Law Enforcement, while dismissing the claims against Attorney General Moody for not having any enforcement authority. The court also gave some indication that it would apply strict scrutiny in later proceedings. Discovery recently closed, and cross motions for summary judgment are fully briefed.

*Future Actions*: Continue to prosecute this case in the district court.

## II. STATE CASES

### Colorado

### Chambers v. City of Boulder, No. 2018CV30581(Boulder District Court)

*Issue:* The city of Boulder passed several ordnances restricting (1) assault weapons and high capacity magazines, and (2) possession of firearms by minors. These ordnances were challenged under the state's preemption law.

*Status:* The court dismissed the possession-by-minors claims for lack of standing. We filed a motion for summary judgment on November 13th.

*Future Actions:* None.

### Florida

### Ballot Initiative: Prohibits Possession of Defined Assault Weapons, No. SC19-1266 (Fla. Supreme Court)

*Issue*: Several groups sponsored a ballot initiative that would amend the Florida right to keep and bear arms by prohibiting "assault weapons," which were defined to include any semi-automatic rifle capable of accepting more than 10 rounds. The Initiative also indicated that this was lawful under the Second Amendment. NRA, NSSF, and the Attorney General asked the Florida Supreme Court to review the Initiative to determine whether it is misleading.

*Status*: The Court agreed with us on June 4th. The Initiative will not be on the ballot this fall.

*Future Actions*: None.

### Illinois

### Guns Save Life Inc. v. Ali, No. 1-18-1846 (Ill First District Appellate Court)

*Issue*: This case challenges Cook County's imposition of a supplemental tax on the purchase of firearms and ammunition in the county under the right to keep and bear arms.

*Status*: The trial court denied our motion for summary judgment and granted Cook County's cross motion. The court essentially ruled that the taxes create a burden that is too minor to invalidate them. We appealed to the First District Appellate Court in Chicago, which affirmed. The Illinois Supreme Court granted our petition to appeal the case on September 30th.

*Future Actions:* Prosecute the appeal.

### Guns Save Life Inc. v. Village of Deerfield, No. 2-19-0879 (Ill Second District Appellate Court)

*Issue*: When Illinois enacted its preemption statute, it gave localities a certain time frame wherein they could enact gun-control laws. The Village of Deerfield enacted an "assault weapon" ordinance after that time expired. This ordinance was challenged under the state's preemption statute.

*Status*: We received a preliminary and permanent injunction in the trial court and village appealed to the Second District Appellate Court. On December 4th, the court ruled that the preemption statute allows localities to amend pre-existing ordinances outside of the preempt timeframe. The court upheld Deerfield's new ordinance because it already had an "assault weapons" storage ordinance before the time frame.

*Future Actions:* We are considering appealing the case further.

### Oregon

### Ballot Initiative 40, No. SC S067201 (OR Supreme Court)

*Issue:* This is a challenge to Ballot Initiative 40, which required firearms be safely stored, reported lost or stolen, and that all minors be supervised while using a firearm.

*Status:* The Court found (1) the title and the yes and no statements to be misleading and (2) the caption to be insufficient. The Initiative was therefore not be on the ballot.

*Future Actions:* None.

### Pennsylvania

### Anderson v. City of Pittsburgh, No. 1753 CD 2019 (PA Commonwealth Court)

*Issue*: The city of Pittsburgh passed a large capacity magazine ordinance. We challenged this under the state's preemption statute in state court.

*Status*: We won at the trial level and the city appealed. The case was argued on October 14th. We are awaiting a decision from the court.

*Future Actions:* Nothing until we get a ruling.

### Vermont

### Vermont Federation of Sportsmen v. Birmingham, No. 2020-155 (VT Supreme Court)

*Issue*: Vermont law bans the possession of magazines with a capacity to hold more than 15 rounds. This case challenges that restriction under the state right to keep and bear arms.

*Status*: After being delayed for over a year in the trial court, we were able to get a new judge who certified the question to the State Supreme Court. The case was argued in November, 2020.

*Future Actions*: Nothing until we get a ruling from the Court.

### Washington

### Alim v. Seattle, No. 793501 (Wash. App. 1st. Division)

*Issue*: The city of Seattle Washington enacted a firearms storage ordinance. This case challenges that ordinance under the state's preemption statute.

*Status*: The trial court dismissed our case for lack of standing, and we appealed. The court reversed on October 19th. We are now going back to the trial court, where we hope to resolve the case on summary judgment motions.

*Future Actions*: Continue to prosecute the case in the trial court.

### III.    AMICUS BRIEFS

We filed amicus briefs in the following cases:

- *Young v. Hawaii*, No. 12-17808 (9th Cir. En Banc) – challenging Hawaii's restrictive process for issuing carry permits: no permit has been issued in the county in 20 years. There has been no ruling in the case yet.

- *McCarthy v. Baker*, No. 1:20-cv-10701 (D. Mass.) – challenging MA's closure of FFLs as non-essential businesses under the state's emergency COVID Order. The court preliminarily enjoined the state from shutting FFLs down.
- *Federal Law Enforcement Officers Association v. Grewal*, No. 3:20-cv-05762 (D.N.J.) – challenging NJ's requirement that retired law enforcement officers who are exempt from state and local carry restrictions under the Law Enforcement Officers Safety Act still need a state-issued permit. The NRA's brief was filed in opposition to the state's motion to dismiss. The state withdrew its motion after the NRA and DoJ filed opposition briefs.

## FINANCE AND ADMINISTRATION – Robert G. Owens C.P.A., Fiscal Officer

### Fundraising

The NRA Institute for Legislative Action (ILA) and the Political Victory Fund (PVF) raised $29.1 million and $11.3 million dollars respectively through November 30, 2020 from direct mail, digital on-line solicitations and Advancement outreach.

### Legislative and Political Mailings

Almost 400,000 pieces of legislative, political and informational mailings were produced and mailed by ILA and the Political Victory Fund. Over 200 new state house and state senate district mailings went to NRA members, hunters, concealed weapons holders and state legislatures via information packets, endorsement letters and postcards.

### Printing

117,000 color postcards printed for CFR's to mail as contact follow-up. Over 1.2 million of 50 different versions of palm cards and door-hangers printed to be given out by CFR's when knocking on doors during GOTV efforts.

### Financial and Fiduciary Performance

ILA, PVF, FAF and NRAVF leadership pivoted quickly in anticipation of the COVID challenges and were able to set priorities, pause spending and alter strategy to remain on track for what is needed in this election year to remain effective and relevant in the political and legislative arenas.

ILA Fiscal staff successfully absorbed the permanent loss of two staff positions without any drop off in productivity or quality of product and successfully launched the NRA Victory Fund Inc. super PAC with a new accounting and database management platform.

## NATIONAL RIFLE ASSOCIATION OF AMERICA
## REPORT OF THE LEGAL AFFAIRS COMMITTEE

**Dallas, Texas**                                                        **January 7, 2021**

**To: NRA Board of Directors**

The Legal Affairs Committee met on January 5, 2021, via teleconference.

Committee members present were: Sandra S. Froman, Chairman; Scott L. Bach, Vice Chairman; Carol Frampton; Antonio Hernández-Almodóvar; Curtis S. Jenkins; Wayne Anthony Ross; Lane Ruhland; John C. Sigler; and Michael Blaz, Committee Secretary. Committee member Charles L. Cotton was excused from attendance.

Others in attendance were: John C. Frazer, NRA Secretary and General Counsel; Wade Callender, General Counsel, NRA-ILA; Michael Jean, Director, Office of Litigation Counsel, NRA-ILA; Joshua Savani, Director, Research and Information, NRA-ILA; Stefan Tahmassebi, NRA Deputy General Counsel; Skipp Galythly, NRA Assistant General Counsel; and Hadan Hatch, Attorney, Office of Litigation Counsel, NRA-ILA.

The minutes of the meeting of October 6, 2020 were approved.

The Chairman commended the performance of the NRA Office of the General Counsel and the Office of Litigation Counsel, NRA-ILA.

The Committee went into executive session at approximately 12:10 P.M.

The Committee emerged from executive session at approximately 1:05 P.M.

The Committee has no recommendations for the Board of Directors at this time.

The Committee adjourned at approximately 1:07 P.M.

Respectfully submitted,

Sandra S. Froman
Chairman

**NATIONAL RIFLE ASSOCIATION OF AMERICA**
**REPORT OF THE EXECUTIVE COMMITTEE**

**Dallas, Texas**                                                    **January 7, 2021**

**TO:  NRA Board of Directors**

The Executive Committee of the National Rifle Association met by teleconference on November 10, 2020.

The meeting was called to order by the committee chairman, NRA President Carolyn D. Meadows. Other committee members present were: Vice President Charles L. Cotton, Vice President Willes K. Lee, Thomas P. Arvas, Scott L. Bach, Bob Barr, Allan D. Cors, Carol Frampton, Joel Friedman, Marion P. Hammer, Susan Howard, Curtis S. Jenkins, David A. Keene, Tom King, James W. Porter II, Jay Printz, Ronald L. Schmeits, and John C. Frazer, committee secretary. The following committee members were unable to attend: David G. Coy, Sandra S. Froman, Todd J. Rathner, Wayne Anthony Ross, and Dwight D. Van Horn.

Other NRA directors in attendance were Clel Baudler, Ted Carter, Todd Ellis, Edie P. Fleeman, Leroy Sisco, Mark A. Vaughan, Blaine Wade, Linda L. Walker, Howard J. Walter, Judi White, and Donald Young.

NRA officers in attendance were Joseph P. DeBergalis, Jr., Executive Director of General Operations, and Jason Ouimet, Executive Director of the NRA Institute for Legislative Action.

Other NRA staff in attendance were Stephanie Daniels, Assistant NRA Secretary, and Millie Hallow, Managing Director, Operations Outreach.

Also in attendance was outside counsel Wit Davis.

The committee reviewed the minutes of the meeting of July 20, 2020, which were approved without objection.

It was moved that the committee go into executive session. Without objection, the committee went into executive session at 2:12 p.m.

The committee rose from executive session at 2:37 p.m., having acted on the following motions:

> "MOVED, to consider all submitted waivers as a slate and approve or deny them as a group."

The motion was adopted unanimously.

> "MOVED, that all of the potential candidates seeking waivers of the five-year membership requirement be granted waivers."

The motion was not adopted, by a roll call vote as follows:

| | |
|---|---|
| Thomas P. Arvas | No |
| Scott L. Bach | Present |
| Bob Barr | No |
| Allan D. Cors | No |
| Charles L. Cotton | Present |
| Carol Frampton | Present |
| Joel Friedman | Present |
| Marion P. Hammer | No |
| Susan Howard | No |
| Curtis S. Jenkins | No |
| David A. Keene | Present |
| Tom King | No |
| Willes K. Lee | Present |
| Carolyn D. Meadows | Present |
| James W. Porter II | No |
| Jay Printz | No |
| Ronald L. Schmeits | No |

There being no further business to come before the committee, the meeting then adjourned.

The Executive Committee of the National Rifle Association met by teleconference on December 8, 2020 at 2:02 p.m.

The meeting was called to order by the committee chairman, NRA President Carolyn D. Meadows. Susan Howard offered an opening prayer. Other committee members present were: Vice President Charles L. Cotton, Vice President Willes K. Lee, Thomas P. Arvas, Scott L. Bach, Bob Barr, J. Kenneth Blackwell, Allan D. Cors, David G. Coy, Joel Friedman, Marion P. Hammer, Susan Howard, Curtis S. Jenkins, David A. Keene, Tom King, James W. Porter II, Jay Printz, Todd J. Rathner, Ronald L. Schmeits, Dwight D. Van Horn, and John C. Frazer, committee secretary. The following committee members were unable to attend: Carol Frampton, Sandra S. Froman, and Wayne Anthony Ross.

Other NRA directors attending were Joe M. Allbaugh, Clel Baudler, Dave Butz, Ted Carter, Patricia A. Clark, Todd Ellis, Edie Fleeman, Johnny Nugent, Don Saba, William H. Satterfield, Steven C. Schreiner, Bart Skelton, Mark E. Vaughan, Linda Walker, and Judi White

NRA officers in attendance were Craig B. Spray, Treasurer; and Joseph P. DeBergalis, Jr., Executive Director of General Operations.

Other NRA staff in attendance were Stephanie Daniels, Assistant NRA Secretary, Millie Hallow, Managing Director, Operations Outreach, and Jeff Poole, Managing Director, Shows & Exhibits.

Also in attendance was outside counsel Wit Davis.

The committee reviewed the minutes of the meeting of November 10, 2020, which were approved without objection.

Without objection, the committee went into executive session at 2:12 p.m.

The committee rose from executive session at approximately 2:30 p.m., having adopted the following resolution:

> WHEREAS, governmental orders resulting from the ongoing COVID-19 pandemic have continued to affect scheduling of large meetings and other events nationwide; and
>
> WHEREAS, the scheduled host hotel in Virginia for the January 2021 board of directors meeting has cancelled all events that month; and
>
> WHEREAS, all major events at the scheduled host site for the NRA's 2021 Annual Meeting of Members have been cancelled for the first half of 2021; now therefore be it
>
> RESOLVED, that the winter 2021 meeting of the NRA Board of Directors shall be held on Thursday, January 7, 2021 at 9:00 a.m., Central Standard Time, in the Dallas Ballroom of the Omni Dallas Hotel in Dallas, Texas; and be it further
>
> RESOLVED, that the 2021 Annual Meeting of Members shall be held on Saturday, September 4, 2021 at 10:00 a.m., Central Standard Time, at the George R. Brown Convention Center in Houston, Texas; and be it further
>
> RESOLVED, that the fall 2021 meeting of the NRA Board of Directors, currently scheduled for Saturday, September 11, 2021 in Tysons Corner, Virginia, shall instead be held on Monday, September 6, 2021 at 9:00 a.m., Central Standard Time, at the Hilton Americas hotel in Houston, Texas; and be it finally
>
> RESOLVED, that the Secretary prepare recommendations for a potential third board meeting in 2021 to replace the meeting currently scheduled to take place in Houston, Texas on May 17, 2021.

Having no other business to conduct, the committee then adjourned.

Respectfully submitted,

Charles L. Cotton
Vice Chairman

# NATIONAL RIFLE ASSOCIATION OF AMERICA

## REPORT OF THE BYLAWS & RESOLUTIONS COMMITTEE

**Dallas, TX**                                                                            **January 7, 2021**

### To: NRA Board of Directors

The Bylaws & Resolutions Committee met via teleconference on January 4, 2021.

Committee members present were Carol Frampton, Chairman; Charles L. Cotton, Vice Chairman; Scott L. Bach; Allan D. Cors; Joel Friedman; and Michael Blaz, Committee Secretary. Committee member Larry E. Craig was not present.

Others in attendance were: Carolyn D. Meadows, NRA President; Willes K. Lee, NRA Second Vice President; Todd J. Rathner, NRA Board Member; John C. Frazer, NRA Secretary and General Counsel; William Davis, Counsel to NRA Board; and Wade Callender, General Counsel, NRA-ILA.

The Committee approved the minutes of the meeting of the Committee on September 20, 2020.

The Committee discussed the issue of possible term limits for NRA Directors including the fact that the Committee previously discussed the issue when it arose at a prior meeting of the Board of Directors.

The Committee went into executive session at approximately 12:25 p.m.

While in executive session it was the consensus of the Committee to issue the following report on the proposed Resolutions that were referred to the Committee:

There were seven proposed Resolutions at the NRA Annual Meeting of Members on October 24, 2020, five of which were referred to the Bylaws and Resolutions Committee. The title of each of these five appears underlined below along with the results of the Committee's consideration.

## RESOLUTION NO. 3

"Term Limit/Bad Director Resolution to be submitted to the National Rifle Association Annual Meeting of the Members, October 24th, 2020" by Jamison Nethery, Member No. 220551156 ("Resolution no. 3")

The Committee has determined that no further action regarding the Resolution is appropriate for the following reasons:

*1.      Term Limits Reduce the Power of the NRA's Members*

The composition of the Board of Directors is sufficiently governed by the election process. Every three years directors come up for election by the voting members. If at any time the membership decides it does not want a director, the members will not vote that director into office. Term limits

would unnecessarily narrow the range of candidates thus diminishing the power of members to choose who will represent them. When voter choices are restricted, it could result in a denial of the voters' will. An impending term limit could also diminish membership power by reducing an outgoing director's responsiveness to member concerns.

2. *Term Limits Reduce Experience, Expertise, Talent, Insights and Institutional Memory Available to NRA.*

NRA's system tasks directors with creating solutions to pressing societal problems relating to our purpose. Often there is no simple answer and there is a likelihood for unintended consequences. Crafting policy is a learned skill; as in other professions, experience matters. Effective directors should not be forced out of their position. NRA should be able to benefit from their skills, talents and experience. Even in instances where staffers, rather than directors, lead the charge in crafting policies, it is often the director-to-director interactions that solidify details, and build coalitions that result in effective action. NRA members and the firearms owning public are best served if experienced directors continue to serve the Association by making important decisions. Term limits would result in an unnecessary loss of directors' experience, expertise and insight, and result in a loss of organizational memory.

Term limits could also reduce the motivation of some directors in their final terms. Directors who know their time is ending will feel less pressure to develop expertise on specific issues knowing that term limits will reduce the Association's ability to benefit from that knowledge.

For these reasons, the Committee believes term limits would not benefit the Association.

**RESOLUTION NO. 4**

"Resolution submitted to the Annual Meeting of the National Rifle Association, 24 October 2020, by Frank C. Tait, Endowment Life Member No. 37307752." ("Resolution no. 4")

The Committee has determined that no further action regarding Resolution no. 4 is appropriate for the following reasons:

1. To the extent Resolution no. 4 seeks the removal of Members of the NRA Board of Directors and/or NRA officers by NRA members by demanding Board action against such NRA Board Members or Officers, Resolution no. 4 fails to comply with the NRA Bylaws. Specifically, the procedure for "the removal of one officer, or Director" is set forth in detail in Bylaws Article IX. Resolution no. 4 fails to comply with the procedure set forth in Article IX.

2. The Committee also noted that Resolution no. 4 points to allegations made against the NRA and certain individuals noted in Resolution no. 4 by the Attorney General for the State of New York (the "NYAG"). The Committee further noted that these allegations are being vigorously contested in litigation now pending before the Supreme Court of New York for the County of New York (the "NYAG Lawsuit"). The NYAG Lawsuit is still in its early stages. The litigation process, and the due process rights of the defendants in the NYAG Lawsuit, demand that the NYAG's allegations be fully litigated before the trier of fact in the NYAG Lawsuit. Accordingly, any action by the Bylaws

and Resolutions Committee, the NRA Executive Committee, or the NRA Board of Directors would be premature and improper.

## RESOLUTION NO. 5

"Resolution submitted to the Annual Meeting of the National Rifle Association, 24 October 2020, by Rob Pincus, Life Member No. 188652907." ("Resolution no. 5")

The Committee has determined that no further action regarding Resolution no. 5 is appropriate because the Committee has determined that the procedures used to determine membership numbers are effective. This is based on the following information:

In a memorandum on December 22, 2020, Derek Robinson, Managing Director, Membership provided, in pertinent part, the following information:

> "The NRA Membership Division tracks member counts using a series of standard reports produced from the membership database at the end of each month by the NRA Information Services Division. Active member counts are tracked using several different criteria, including Membership Type, term and location (State/US Territory/Canadian Province/Foreign). The monthly reports package is used by Membership Division staff to produce an Executive Summary that is distributed to Executive NRA staff and NRA Board Officers each month.

> In addition to the monthly member count reports, Membership Division staff monitor daily and weekly membership/contribution sales reports produced from the membership database to keep track of how many memberships are being sold on a daily and weekly basis. This gives staff an idea of how many members are being added to the system between month end report runs."

## RESOLUTION NO. 6

"Resolution regarding the correction of an illegal bylaw" submitted by Jeff Knox, Endowment Member No. 85326. ("Resolution no. 6")

The Committee has determined that no further action regarding Resolution no. 6 is appropriate for the following reasons:

The Resolution suggests that Article IV, Section 3(e) — which allows a "vote" in which the individual votes cast "shall be recorded in the minutes of the meeting but not published in the Official Journal" — conflicts with Section 3(d) of the same Article, which states that roll call votes "shall be published" in the official journal.

Based on consultation with the NRA Parliamentarian and NRA counsel, the Committee believes there is no conflict. Robert's Rules of Order § 30 allows for various methods of voting (such as a

show of hands, a rising vote or a non-secret paper ballot) that are not strictly roll call votes, but that do allow individual directors' votes to be identified and recorded. It also states that that each organization is entitled to interpret its bylaws based on and with the assistance of professional and authoritative advice. The transcript of the January 1999 Board meeting makes clear that the Board understood the distinction when it adopted Section 3(e). The transcript further indicates the sponsors of the language were trying to authorize a method for Board members to have their individual votes recorded, but without the expense of publishing roll calls in the NRA publications.

The Committee was guided by principles established by the courts when asked to interpret the meaning of a statute. Bylaws to the NRA are like statutes to a legislature. The main principle states we must read the bylaw, or statute, to be consistent so that all parts of it can be respected.

In this regard, the Committee was guided by the following principles of statutory interpretation:

Avoid:

*interpreting a provision in a way that would render other provisions of the [operating governing document] superfluous or unnecessary.

*interpreting a provision [of the operating governing document] in a way inconsistent with the policy of another provision.

* interpreting a provision in a way that is inconsistent with a necessary assumption of another provision.

**RESOLUTION NO. 7**

"Resolution of the NRA Members Regarding Transparency, Competition, and Honesty in Election of Officers" submitted by Jeff Knox, Endowment Member No. 85326 ("Resolution no. 7")

The Committee has determined that no further action regarding Resolution no. 7 is appropriate for the following reasons:

Resolution no. 7 states that the officer election at the April 2019 Board meeting was conducted in executive session, and that the election of the officers by acclamation was later characterized as unanimous. Robert's Rules of Order states that an election by acclamation is unanimous: "If only one person is nominated and the bylaws do not require that a ballot vote be taken, the chair, after ensuring that, in fact, no members present wish to make further nominations, simply declares that the nominee is elected, thus effecting the election by unanimous consent or 'acclamation.'" See RONR § 46 (11th ed.) (in effect at the 2019 meeting); RONR § 46:40 (12th ed.) (identical language).

Resolution no. 7 also expresses concern about the election being conducted in executive session. The decision to conduct any particular business in executive session is a matter of judgment of the cognizant body, in this case the NRA Board of Directors. Nothing in New York law, the NRA Bylaws, or Robert's Rules prohibits conducting elections in executive session.

Resolution no. 7 also calls on the Board "to nominate at least two individuals for every officer position" and to conduct the elections in open session by secret ballot. If the Board is satisfied that

one candidate is the best choice for a position, and there is no requirement that the Board do so, the Committee sees no value in nominating other candidates simply for the sake of creating a contested election. Such wheel-spinning requires time and effort to count ballots, and is unnecessary given that the NRA Bylaws already require that, in the event of a contested election, voting among two or more candidates "shall be by written ballot." Art. V, Sec. 1(a).

The Committee emerged from executive session at approximately 1:10 p.m.

The Committee discussed proposed amendments to the NRA Board Policy for Board Member Attendance, to address pandemic concerns, a copy of which is attached to this report. The Committee expressed that the board policy on attendance should be distributed by the NRA Secretary to Board Members.

The Committee discussed a proposed memorial resolution for Robert Kukla, a copy of which is attached to this report.

**The Committee makes the following recommendations to the Board of Directors:**

1. **"MOVED, That the NRA Board adopt the proposed amendments to the NRA Board Policy for Board Member Attendance as identified in the document attached to this report."**

2. **"MOVED, That the proposed memorial resolution for Robert Kukla, former NRA Board member, be approved."**

The Committee recessed at approximately 1:35 p.m. subject to the call of the Chairman.

Respectfully submitted,

Charles L. Cotton
Vice Chairman

**NRA Board Policy for Board Member Attendance**

(a) Members of the Board of Directors should regularly attend Board meetings. In order to discharge their fiduciary duties under applicable law, Board members shall keep informed of matters within the scope of the Board's oversight role in the governance of the Association. Attendance at Board meetings is one of a number of methods by which Directors may keep informed of matters within the purview of the Board.

(b) An excessive number of unexcused absences from meetings of the Board may be grounds for disciplinary or corrective action in accordance with the Association's Bylaws or as otherwise may be determined. Such action may include, without limitation, publicizing to the Board the attendance record of the Director and the Board asking for the resignation of the Director.

An absence from a Board meeting is deemed "excused" if the President, having been informed of the reason for the absence, in good faith deems the absence excused prior to the closing of the missed Board meeting based on at least one of the following six factors:

(1) the Director has a bereavement, or personal, family, or household illness, including vulnerability to contagions; (2) severe weather, natural disaster, or civil disorder precludes attendance; (3) the Director is engaged in service in the military, as a law enforcement officer or other emergency responder; (4) the Director's attendance is required at a legislative body, legal proceeding, or other professional circumstance beyond the Director's reasonable control; (5) the Director's participation in other activities are of such importance that the Director's absence from Board meetings is justifiable; or (6) reasonable evidence is presented that such Board member has remained engaged and apprised of matters within the scope of the Board's oversight role despite the absence.

(c) In the event an absence is not "excused", the President shall, pursuant to Article VII, Section 2(b) of the Association's Bylaws, delegate the matter to the Executive Council to determine whether the Board member's absence should have been excused or, as the case may be, to make recommendations for disciplinary or corrective action consistent with the Association's Bylaws and applicable law.



# THE NATIONAL RIFLE ASSOCIATION OF AMERICA

# Resolution



**WHEREAS**, Robert J. Kukla, of Park Ridge, Illinois, a former Executive Director of the NRA Institute for Legislative Action and member of the Board of Directors of the National Rifle Association of America, passed away on November 4, 2020, at the age of 87; and

**WHEREAS**, Robert was born on December 1, 1932, in Chicago, Illinois; he graduated from Northwestern University in 1957 with a Juris Doctor degree; he wore many professional hats throughout his life; he worked as casualty adjuster at Allstate Insurance Company, a trial attorney at the firm Fitzgerald, Petrucelli & Simon, and as Director of Marketing Sales and Distribution at Sears, Roebuck and Company; he was a self-employed author, teacher, consultant, television and radio personality; and

**WHEREAS**, Robert was a man with great integrity; he received a certificate of merit from Chicago Mayor Richard J. Daley in 1970, for his demonstration of good citizenship in action for aiding and assisting a victim of assault and robbery; he helped form and was President of the "Logan Square Neighborhood Association," an organization formed to resist crime in the area; he had a deep appreciation for the law and decided to share his passion and knowledge by teaching law courses at Triton College, Oakton College, and Roosevelt University; and

**WHEREAS**, Robert was an NRA Life member at the time of his death; he was Executive Director of NRA-ILA from 1977 to 1978; he served on the NRA Board of Directors from 1966-1976; he served on the Firearms Legislative Committee, Bylaws & Resolutions Committee, Range Facilities Committee, Protest Committee, and State Association Committee; and

**WHEREAS**, Robert was an ardent supporter of firearms and the Second Amendment; he was a skilled marksman and renowned pistol shooter; he served as Vice President and Legislative Committee Chairman of the Illinois State Rifle Association; he served as Vice President of the Tri-County Pistol and Revolver League; he was a member of the Northwest Gun Club, Inc.; he wrote on firearms matters, including a landmark gun rights book, "Gun Control," which is still relevant and referenced today; he was a skilled debater and made over 300 media appearances on behalf of the NRA; now, therefore, be it

**RESOLVED**, That the Board of Directors of the National Rifle Association of America, at its meeting on January 7, 2021, in Dallas, Texas, in recognition of Robert Kukla and his long years of service to the National Rifle Association of America, hereby expresses its profound sense of loss occasioned by his passing, and extends its sincere sympathy to his family; and, be it further

**RESOLVED**, That the text of this resolution be spread upon the minutes of the meeting, and that a copy, suitably engrossed, be forwarded to his beloved children Robert and Jay.

Attest:

_____ On this 25th day of February, 2021
John C. Frazer

## NATIONAL RIFLE ASSOCIATION OF AMERICA
## REPORT OF THE LEGISLATIVE POLICY COMMITTEE

**Dallas, Texas**                                                        **January 7, 2021**

**To: NRA Board of Directors**

The Legislative Policy Committee met on December 29, 2020 via WebEx Video Conference. Committee members present were: Kayne B. Robinson, Chairman; Carolyn D. Meadows, Vice Chairman; Joe M. Allbaugh; Scott L. Bach; Allan D. Cors; Charles L. Cotton; Sandra S. Froman; Marion P. Hammer; Graham Hill; Curtis S. Jenkins; Willes K. Lee; James W. Porter II; Todd J. Rathner; Rob Rotter; Linda L. Walker; and Naomi Farmer, Committee Secretary. Committee members unable to attend were: Bob Barr; Larry E, Craig; David A. Keene; Alan B. Mollohan; John C. Sigler and Donald E. Young. Others in attendance were NRA Secretary John C. Frazer; NRA-ILA Executive Director Jason Ouimet; other NRA Directors; and NRA staff.

**Chairman Robinson** called the meeting to order at 12:00 p.m. on December 29, 2020. The committee unanimously decided to postpone the approval of the January 2020 minutes until the committee can meet in-person.

**Chairman Robinson** thanked everyone for attending the meeting and gave concerns about the two upcoming Georgia Senate Run-off elections, the 2021 political and judicial landscape, along with recognizing ILA's hard work in the 2020 elections and hard work to come in 2021.

**Chairman Robinson recognized NRA President Carolyn D. Meadows.** President Meadows restated Chairman Robinson concerns, adding additional information on the two Georgia Senate Run-off elections and thanked ILA Executive Director Jason Ouimet and his staff for their hard work.

**Chairman Robinson recognized NRA-ILA Executive Director Jason Ouimet.** Mr. Ouimet gave an overview of ILA's 2020 election actions and results, along with the political ramifications of those results for 2021.

**Chairman Robinson recognized NRA First Vice President Charles L. Cotton, NRA Second Vice President Willes K. Lee, and other committee members to discuss concerns and issues.** While the committee discussed many areas of interest, nothing rose to the level of Board action.

**Chairman Robinson, President Meadows, ILA Executive Director Jason Ouimet and ILA Managing Directors fielded questions.**

There being no further business, the committee adjourned at 1:00 p.m.

Respectfully submitted,

Kayne B. Robinson
Chairman

## NATIONAL RIFLE ASSOCIATION OF AMERICA

## REPORT OF THE NOMINATING COMMITTEE

DALLAS, TEXAS                                                    JANUARY 7, 2021

TO:     NRA Board of Directors and Executive Council

The Nominating Committee met via webinar on November 14, 2020, for the purpose of nominating individuals for election to the NRA Board of Directors in 2021. Members present were: Bruce Ash; Bob Barr; J. William Carter; Rick Figueroa; Hilary Goldschlager; Marion P. Hammer; Steven Leyh; Leroy Sisco; Dwight D. Van Horn; and Committee Secretary, John C. Frazer.

The Committee elected Bob Barr as Chairman and J. William Carter as Vice Chairman.

The Nominating Committee is a screening process designed to determine the most qualified candidates to be recommended to NRA voting members for election to the NRA Board of Directors. The Committee made every effort to select the best possible candidates for nomination.

Committee members set aside friendships and personal relationships and placed considerable weight on protection of the Second Amendment; leadership abilities; business expertise; legislative and financial experience; an understanding of the NRA's wide range of safety, training and shooting programs; past performance; and potential capabilities.

The Committee received recommendations for 71 individuals. The Committee reviewed all candidates, including incumbents seeking re-election, and candidates who either submitted themselves for consideration or were recommended by other NRA members.

Service on the NRA Nominating Committee is an honor and a serious responsibility. The Committee has an obligation to select those candidates who are the most dedicated, best qualified, and have the expertise and freedom needed to best serve the needs of the NRA and its members.

Following robust discussion, the Committee nominated the following 30 individuals as being the best qualified to meet the needs of the Association at this time:

1.  Scott L. Bach
    Newfoundland, New Jersey

2.  William A. Bachenberg
    Allentown, Pennsylvania

3.  Ronnie G. Barrett
    Murfreesboro, Tennessee

4.  Donald J. Bradway
    Hayden, Idaho

5.  Dean Cain
    Malibu, California

6.  James Chapman
    Live Oak, California

7.  Anthony P. Colandro
    Woodland Park, New Jersey

8.  David G. Coy
    Adrian, Michigan

9.  John L. Cushman
    Patchogue, New York

10. Edie P. Fleeman
    Durham, North Carolina

11. Joel Friedman
    Henderson, Nevada

12. Maria Heil
    New Freedom, Pennsylvania

13. Antonio Hernández-Almodóvar
    San Juan, Puerto Rico

14. Niger Innis
    North Las Vegas, Nevada

15. David A. Keene
    Ft. Washington, Maryland

16. Carrie Lightfoot
    Scottsdale, Arizona

17. Duane Liptak, Jr.
    Austin, Texas

18. Carolyn D. Meadows
    Marietta, Georgia

19. Bill Miller
    Beckley, West Virginia

20. Owen Buz Mills
    Paulden, Arizona

21. Janet D. Nyce
    Elliottsburg, Pennsylvania

22. Kim Rhode
    Big Bear Lake, California

23. Wayne Anthony Ross
    Anchorage, Alaska

24. Don Saba
    Tucson, Arizona

25. William H. Satterfield
    Birmingham, Alabama

26. John C. Sigler
    Dover, Delaware

27. Craig Swartz
    Adel, Iowa

28. James Tomes
    Wadesville, Indiana

29. James L. Wallace
    Newburyport, Massachusetts

30. Robert J. Wos
    Sarasota, Florida

**PLEASE NOTE:  Voting members may vote for no more than 25 of the 30 candidates listed.**

Respectfully submitted,

Bob Barr
Chairman

## NATIONAL RIFLE ASSOCIATION OF AMERICA
## REPORT OF THE SMALLBORE RIFLE COMMITTEE

**Dallas, Texas**                                          **January 7, 2021**

**TO: NRA Board of Directors**

The NRA Smallbore Rifle Committee met via teleconference on April 16, 2020. Committee members present were Patricia A. Clark, Chairman; Jamie Corkish; Edie P. Fleeman; Ryan Tanoue; Howard J. Walter; Marling P Engle; Keith Sanderson, and Cole McCulloch, Committee Secretary. Committee members unable to attend were Tom King.

At the request of the British NRSA, and due to the cancellation of both countries' National Matches, the Smallbore chair was asked to have the Roberts and Goodwill Randle Team moved to 2022. The committee met and approved the following motion unanimously:

> "MOVED, That the 2021 Pershing Team Match and the Goodwill Randle Team Match be rescheduled to the 2022 National Matches at Camp Atterbury in order to allow for team selection and preparation by visiting teams. The match schedule will return to the every eight year schedule with the next Pershing and Goodwill Randle Team Matches fired in 2029."

The NRA Smallbore Rifle Committee met via teleconference on July 10, 2020. Committee members present were Patricia A. Clark, Chairman; Jamie Corkish; Edie P. Fleeman; Keith Sanderson; Ryan Tanoue; Howard J. Walter; and Cole McCulloch, Committee Secretary. Committee members unable to attend were Tom King, and Marling P. Engle. Also in attendance was Shelly Kramer, Manager, Tournament Operations, Competitive Shooting Division.

**The Committee discussed many areas of interest and while not rising to the level of requiring Board action, the following items were addressed:**

1. The committee and Mr. McCulloch discussed the impacts of the COVID-19 global pandemic on competitive shooting and the NRA Competitive Shooting Division.

2. The committee also discussed the 2021 National Matches and the Smallbore National Championships at Camp Atterbury and the circumstances surrounding preparing for the championship in 2021.

The Committee adopted the following motions that do not require Board action:

> "MOVED, That the Randle match continue following the rules in regard to firing only at the National matches of their respective countries. Countries that are unable to fire at their national matches are invited to participate as Goodwill Randle teams with the scores of up to ten women to count. If ten scores are not available, the country with the lowest amount of firing members will set the team number for all remaining participant countries."

"MOVED, That the Wakefield team be shot on individual home ranges under the supervision of a witness over a one-week period in early September. Firing members will be determined by the team Captain from a list of top 20 shooters by score from each of the 2018 and 2019 years. Those shooters will be polled by the team Captain for willingness to participate until all team slots are filled. The Captain submits via email all timelines, correspondence, and plans to the smallbore committee via email for comment."

**The Committee makes the following recommendations to the Board of Directors:**

**"MOVED. That the Executive Vice President direct staff to submit a list of upcoming sanctioned matches to the committee chair who will invite those tournament sponsors to bid on holding the 2020 Dewar Team match. Selection will depend on the expected number of competitors and likelihood of the match being held. Competitors who fired on the US Dewar Team in recent years will be notified by volunteers and asked to participate."**

**"MOVED, That the Executive Vice President direct staff to submit a list of 2 day outdoor 3-position matches and contacts in the August-September time frame to the committee chair. The chair will reach out to see if they are willing to accommodate an English match following their match for the purpose of firing the Drew Cup, a junior match. Under this plan, a US team might consist of 3 men, and/or 3 women, and/or a full team of 10 shooters given the availability of juniors participating. Appropriate brassards and medals will be awarded to the participants as they become available."**

Respectfully submitted

Edie P. Fleeman
Committee Member

## NATIONAL RIFLE ASSOCIATION OF AMERICA
## REPORT OF THE NRA CIVIL RIGHTS DEFENSE FUND

**DALLAS, TEXAS**                                    **JANUARY 7, 2021**

### TO:  NRA BOARD OF DIRECTORS

The Board of Trustees of the NRA Civil Rights Defense Fund met on January 4, 2021, at 3:00 p.m. Eastern Standard Time, via telephone conference. Trustees present were: James W. Porter II, Chairman; Carol Frampton, Vice-Chairman; Robert K. Corbin; Robert Dowlut; William H. Satterfield; and Robert Sanders. Trustees Robert Cottrol, Charles Cotton, Graham Hill, and Curtis Jenkins were absent and excused. Also present were: Stefan B. Tahmassebi, Secretary, NRA Civil Rights Defense Fund; and Craig B. Spray, Treasurer, NRA Civil Rights Defense Fund. Others in attendance were: Rick Tedrick, NRA Office of the Treasurer; Sunee Stacks, NRA Office of the Treasurer; Wade Callender, NRA-ILA Deputy Executive Director and General Counsel; Michael T. Jean, NRA-ILA Litigation Counsel; Hadan Hatch, NRA-ILA Associate Litigation Counsel and Katie Crowley, Paralegal, Office of General Counsel.

It was established that the official notice of the meeting was e-mailed on December 3, 2020, and mailed on December 7, 2020.

The trustees approved the minutes of the meeting of October 20, 2020.

**Report of the Treasurer.** The Treasurer's written report was presented by: Craig B. Spray, Treasurer, NRA Civil Rights Defense Fund; Rick Tedrick, NRA Office of the Treasurer; and Sunee Stacks, NRA Office of the Treasurer. The Treasurer's written report was reviewed and approved.

**Report of the Chairman.** The Chairman waived his oral report.

**Carter-Knight Freedom Fund Award.** Request was made for the submission of candidates. Trustee Robert J. Dowlut suggested nominating Stephen P. Halbrook and informed the Trustees that the nomination of Mr. Halbrook was supported by ILA. After discussion, the Board of Trustees nominated Stephen P. Halbrook for the Carter-Knight Freedom Fund Award and to award Mr. Halbrook $10,000.00 and a commemorative plaque. The Trustees want the record to reflect that the NRA Civil Rights Defense Fund and ILA worked closely together to nominate this candidate.

**Report of the Secretary.** The Secretary's written report was presented by Stefan B. Tahmassebi, NRA Civil Rights Defense Fund Secretary. The Secretary's written report was reviewed and approved. The Secretary reported on recent actions by the Chairman, the Executive Committee, emergency funding applications, recent updates by applicants, and organizational matters, including:

**Chairman Authorizations**: During this reporting period, the Chairman did not authorize any emergency funding.

**Executive Committee Action**: During this reporting period, the Executive Committee did not authorize any emergency funding.

**Emergency Funding Requests.** During this reporting period, the following pending emergency funding requests were subsumed into regular funding applications which were heard at the meeting of January 4, 2020.

      a.     *Western Pennsylvania Sportsmen's Club, Inc. v. Municipality of Murrysville.*

      b.     *In the Matter of the Application of "John Doe."*

**Organizational Matters:** The Secretary informed of certain organizational matters that needed to be addressed, including the following:

The Secretary informed of expiring terms of Trustees and the status of the Nominating Committee.

The Chairman appointed a Nominating Committee consisting of Carol Frampton as chairman, Graham Hill, and Robert Corbin.

The Secretary informed that the NRA Civil Rights Defense Fund is the sole beneficiary of a land trust established by Mr. Francis Samp, that such land was being held in trust by the Chicago Title Land Trust Company, that a ready, willing and able buyer has made an offer for such land, and that the Chicago Title Land Trust Company required certain resolutions to be passed by the board of trustees, relating as to who has authority to act on behalf of the NRA Civil Rights Defense Fund, and required the execution of certain documents and agreements relating to the acceptance, ratification, and/or transfer of the beneficial interest, the trust agreement and/or the proposed sale.

After discussion, the Trustees resolved that the proposed transaction was fair and reasonable from the standpoint of the NRA Civil Rights Defense Fund, and that the agreements and documents for Chicago Land Title Trust Company be executed on behalf of the NRA Civil Rights Defense Fund, and, the Trustees passed the proffered resolutions.

The Secretary informed of a memorial resolution, proffered by Trustee Dowlut, for Mr. Francis Samp, who had contributed substantial sums to the NRA Civil Rights Defense Fund, both during his lifetime and by bequest after his recent death. After discussion, the Trustees resolved that Trustee Dowlut would draft a letter of appreciation and recognition for the Chairman's signature.

**Actions by Guests:**

Attorney Michael Jean, NRA-ILA Litigation Counsel, gave a report on NRA-ILA cases and various matters pending before the Board of Trustees.

The Trustees then met in executive session to discuss various cases and to make decisions on them and to discuss various other matters relating to the NRA Civil Rights Defense Fund.

**FUNDING REQUESTS:**

The trustees approved funding for the following cases or purposes up to the amount indicated, or denied funding where indicated, or deferred the matter to the next meeting, or took other action as indicated. Where funding was approved, it is understood that the hourly rate paid by the NRA Civil Rights Defense Fund may not exceed $200 per hour.

1.　*Arthur Dean Craig a/k/a Dean Craig v. Arcadia Township.* Because the case had settled, this matter was withdrawn at the request of the applicant's attorney.

2.　*Jerry W Wise, Kathy Lee Wise, David A. Drake and Brozia Lee Drake* v. *Owen County, Indiana, Board of Zoning Appeals; Precision Gun Range, LLC, Baron Creek LLC and Michael Marshall.*
　　*Jerry W Wise, Kathy Lee Wise, David A. Drake and Brozia Lee Drake v. Precision Gun Range, LLC.*
　　*Lane L. Jorgensen, Katheryn A. Jorgensen, as the trustees of the Jorgensen Family Trust v. Precision Gun Range, LLC.* Deferred.

3.　*Goldstein, et al. v. Peacemaker, et al.* West Virginia Litigation. Deferred.

4.　*Robert Arwady and Samuelia Arwady v. Tommy Ho, Jane Doe Ho, and the United States of America.* Granted: $7,000.00 from Texas restricted funds.

5.　*Western Pennsylvania Sportsmen's Club, Inc. v. Municipality of Murrysville.* Deferred.

6.　*Erin Gabbard, Aimee Robson and Dallas Robson, Benjamin Tobey, and Benjamin Adams v. Madison Local Law School District Board of Education and Lisa Tuttle-Huff.* Granted: $1,600.00 from Ohio restricted funds and $28,400.00 from general funds.

7.　*United States v. Gutierrez.* Denied.

8.　*Nyron Harrison, Thelma Williams, Individually and o/b/o Their Minor Child Ka'Mauri Harrison v. Jefferson Parish School Board, Dr. James Gray, Cecily White, Terri Joia, and Patricia Adams.* Granted: $40,000.00.

9.　Clayton Cramer, Mass Murderers: Who? How? Why? Granted: $10,000.00.

10.　David Hardy, Research and Writing Projects. Granted: $10,000.00.

11.　*In the Matter of the Application of "John Doe."* Granted: $250.00 from New Jersey restricted funds and $9,750.00 from general funds.

**NRA Institute for Legislative Action Submissions.** The Chairman recused himself, left the meeting, and was not present for, nor participated in, the discussion of the NRA Institute for Legislative Action funding requests. Vice Chairman Frampton assumed the Chair.

a.  *Mazahreh v. Grewal.* Granted: $10,000.00.

b.  *Rhode v. Becerra.* Granted: $10,000.00.

c.  *ANJRPC v. Grewal.* Granted: $40,000.00.

d.  *Guns Save Lives, et al. v. Kwame Raoul.* Granted: $2,375.00 from Illinois restricted funds and $125.00 from general funds.

Respectfully submitted,

James W. Porter II,
Chairman

# EXHIBIT 4

NATIONAL RIFLE ASSOCIATION OF AMERICA

**OFFICE OF THE PRESIDENT**



March 22, 2019

To:     NRA Audit Committee

From:  Oliver L. North, NRA President
       Richard R. Childress, NRA First Vice President
       Carolyn D. Meadows, NRA Second Vice President

Re:     Brewer Attorneys & Counselors Engagement Review

Since March 2018, Brewer Attorneys & Counselors has billed the NRA for substantial fees and expenses, and has apparently accrued significant additional fees and expenses which have not yet been billed. To ensure that the Audit Committee and its members fulfill their fiduciary obligations, and after consultation with Board Counsel, we have taken specific steps to ensure proper review of the Brewer firm's invoices. This review is consistent with the compliance review conducted by Brewer Attorneys & Counselors over the last year.

Given the magnitude of the legal fees and expenses that the Brewer firm has billed to the NRA over the past 10 months, there are questions concerning the reasonableness of these charges, the documentation to support these charges, and the basis for these expenditures. It is important for the NRA to review these expenditures to ensure that they are appropriate and reasonable.

Therefore, in accordance with our fiduciary duties, we are requesting that the Audit Committee initiate an outside, independent review of Brewer Attorneys & Counselors fees and expenses that the firm has billed the NRA. In accordance with our fiduciary duties, we request that the outside counsel selected to perform the independent review have appropriate expertise to perform such a review, and that the outside counsel be selected in consultation with the President and the First and Second Vice President. The purpose of conducting an outside, independent review of these expenditures is to ensure that such services and fees charged are reasonable and appropriate.

Given the need to fulfill our fiduciary obligations, we are simultaneously notifying Mr. Brewer that the NRA intends to conduct an outside, independent review of Brewer Attorneys & Counselors fees and expenses, and we appreciate his cooperation. We also are informing Mr. Brewer that the NRA needs to enhance the documentation of the scope of his work for the NRA through separate engagement letters for each matter that the Brewer firm is handling for the NRA. This type of documentation is required to comply with existing NRA policies and procedures for contract review and approval of engagements over $100,000. As you know, the Brewer firm currently is billing significant fees and expenses to the NRA for work that is outside the scope of its original engagement letter with the NRA.

(703) 267-1390
(703) 267-3936 fax

North Deposition
Exhibit _14_

12-18-19

AMc DEPOSITION
EXHIBIT
69

NATIONAL RIFLE ASSOCIATION OF AMERICA

**OFFICE OF THE PRESIDENT**



March 22, 2019

To:     NRA Audit Committee

From:   Oliver L. North, NRA President
        Richard R. Childress, NRA First Vice President
        Carolyn D. Meadows, NRA Second Vice President

Re:     Brewer Attorneys & Counselors Engagement Review

Since March 2018, Brewer Attorneys & Counselors has billed the NRA for substantial fees and expenses, and has apparently accrued significant additional fees and expenses which have not yet been billed. To ensure that the Audit Committee and its members fulfill their fiduciary obligations, and after consultation with Board Counsel, we have taken specific steps to ensure proper review of the Brewer firm's invoices. This review is consistent with the compliance review conducted by Brewer Attorneys & Counselors over the last year.

Given the magnitude of the legal fees and expenses that the Brewer firm has billed to the NRA over the past 10 months, there are questions concerning the reasonableness of these charges, the documentation to support these charges, and the basis for these expenditures. It is important for the NRA to review these expenditures to ensure that they are appropriate and reasonable.

Therefore, in accordance with our fiduciary duties, we are requesting that the Audit Committee initiate an outside, independent review of Brewer Attorneys & Counselors fees and expenses that the firm has billed the NRA. In accordance with our fiduciary duties, we request that the outside counsel selected to perform the independent review have appropriate expertise to perform such a review, and that the outside counsel be selected in consultation with the President and the First and Second Vice President. The purpose of conducting an outside, independent review of these expenditures is to ensure that such services and fees charged are reasonable and appropriate.

Given the need to fulfill our fiduciary obligations, we are simultaneously notifying Mr. Brewer that the NRA intends to conduct an outside, independent review of Brewer Attorneys & Counselors fees and expenses, and we appreciate his cooperation. We also are informing Mr. Brewer that the NRA needs to enhance the documentation of the scope of his work for the NRA through separate engagement letters for each matter that the Brewer firm is handling for the NRA. This type of documentation is required to comply with existing NRA policies and procedures for contract review and approval of engagements over $100,000. As you know, the Brewer firm currently is billing significant fees and expenses to the NRA for work that is outside the scope of its original engagement letter with the NRA.

(703) 267-1040
(704) 267-3916 fax

CONFIDENTIAL

OLN00212

# EXHIBIT 6

```
 1                UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF TEXAS

 3                     DALLAS DIVISION

 4

 5     IN RE:                    )
                                 )
 6                               )
       NATIONAL RIFLE            ) Case No.
 7     ASSOCIATION OF AMERICA    ) 21-30085-hdh-11
       AND SEA GIRT, LLC,        )
 8                               )
            Debtors.             )
 9

10

11     *********************************************************

12        REMOTE ORAL AND VIDEOTAPED DEPOSITION OF

13                    WAYNE LAPIERRE

14                       VOLUME 2

15           IN HIS INDIVIDUAL CAPACITY AND

16            AS CORPORATE REPRESENTATIVE OF

17       THE NATIONAL RIFLE ASSOCIATION OF AMERICA

18                   MARCH 23, 2021

19     CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

20     *********************************************************

21

22

23

24

25

                                          Page 245
```

1    REMOTE ORAL AND VIDEOTAPED DEPOSITION OF WAYNE

2  LAPIERRE, produced as a witness at the instance of the

3  New York State Office of the Attorney General, and

4  duly sworn, was taken remotely in the above-styled

5  and numbered cause on the 23rd day of March, 2021, from

6  9:10 a m  to 5:53 p m , via Zoom, before Julie C

7  Brandt, RMR, CRR, and CSR in and for the State of Texas,

8  reported by machine shorthand, with the witness located

9  in Fairfax, Virginia, pursuant to the Federal Rules of

10  Civil Procedure and the provisions stated on the record

11  or attached hereto

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 246

1  FOR THE WITNESS INDIVIDUALLY:
2    P  Kent Correll
     CORRELL LAW GROUP
3    250 Park Avenue, 7th Floor
     New York, New York 10177
4    212 475 3070
     kent@correlllawgroup com
5
6  FOR THE PEOPLE OF THE STATE OF NEW YORK:
7    James Sheehan (Remote appearance)
     Stephen Thompson (Remote appearance)
8    Yael Fuchs (Remote appearance)
     Sharon Sash (Remote appearance)
9    Monica Connell
     OFFICE OF THE ATTORNEY GENERAL OF THE
10     STATE OF NEW YORK
     28 Liberty Street, 18th Floor
11   New York, New York 10005
     212 416 8401
12   james sheehan@ag ny gov
     stephen thompson@ag ny gov
13
     Jonathan Conley (Remote appearance)
14   NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
     The Capitol
15   Albany, New York 12224
     212 416 8108
16   jonathan conley@ag ny gov
17
     FOR THE OFFICE OF THE U S  TRUSTEE:
18
     Lisa L  Lambert (Remote appearance)
19   UNITED STATES TRUSTEE PROGRAM
     1100 Commerce Street, Room 976
20   Dallas, Texas 75242
     214 767 8967
21   lisa l lambert@usdoj gov
22
     FOR JOHN FRAZER:
23
     Ellen Johnson (Remote appearance)
24   GAGE SPENCER & FLEMING LLP
     410 Park Avenue
25   Floor 9

Page 248

1       APPEARANCES
2  FOR THE NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL:
3    Eric Van Horn (Remote appearance)
     Jason Kathman (Remote appearance)
4    Gerrit Pronske (Remote appearance)
     SPENCER FANE LLP
5    2200 Ross Avenue, Suite 4800 West
     Dallas, Texas 75201
6    214 750 3610
     ericvanhorn@spencerfane com
7
8  FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:
9    Scott Drake (Remote appearance)
     Tim Carney (Remote appearance)
10   NORTON ROSE FULBRIGHT US LLP
     2200 Ross Avenue, Suite 3600
11   Dallas, Texas 75201
     214 855 8341
12   scott drake@nortonrosefulbright com
13
     FOR ACKERMAN MCQUEEN, INC :
14
     Brian E  Mason (Remote appearance)
15   G  Michael Gruber (Remote appearance)
     Joe Acosta (Remote appearance)
16   Christina M  Carroll (Remote appearance)
     DORSEY & WHITNEY LLP
17   300 Crescent Court, Suite 400
     Dallas, Texas 75201
18   214 981 9970
     mason brian@dorsey com
19   gruber mike@dorsey com
20
     FOR THE NATIONAL RIFLE ASSOCIATION OF AMERICA:
21
     Gregory E  Garman
22   Dylan Ciciliano (Remote appearance)
     GARMAN TURNER GORDON LLP
23   7521 Amigo Street, Suite 210
     Las Vegas, Nevada 89119
24   702 777 3000
     ggarman@gtg legal
25

Page 247

1    New York, New York 10022-9492
     212 768 4900
2    ejohnson@gagespencer com
3
     FOR THE PEOPLE OF WASHINGTON, D C :
4
     Leonor Miranda
5    OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON, D C
     400 6th Street, NW
6    Washington, D C  20001
     202 727 3400
7    leonor miranda@dc gov
8
     FOR THE HONORABLE PHILLIP JOURNEY:
9
     Jermaine Watson (Remote appearance)
10   BONDS ELLIS EPPICH SCHAFER JONES LLP
     420 Throckmorton Street, Suite 1000
11   Fort Worth, Texas 76102
     817 529 2724
12   jermaine watson@bondsellis com
13
     FOR CHRISTOPHER COX:
14
     Thomas M  Buchanan (Remote appearance)
15   WINSTON & STRAWN LLP
     1901 L  Street NW
16   Washington, D C  20036
     202 282 5787
17   tbuchanan@winston com
18
     ALSO PRESENT:
19
20   Jack Butler (Remote appearance)
21   Jeremy Economos (Remote appearance)
22   Loring Hill (Remote appearance)
23   Dave Hamrick (Remote appearance)
24   David MacGreevey (Remote appearance)
25   David Dell'Aquila (Remote appearance)

Page 249

2 (Pages 246 - 249)

1     Rocky Marshall (Remote appearance)
2     Melanie Montgomery (Remote appearance)
3     Kymberlee Milligan (Remote appearance)
4
5   VIDEOGRAPHER:
6     Dan Reidy - Veritext Legal Solutions
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 250

---

1  AMc Exhibit 148  1-15-2021 email string
      NRA-BK-00039761 - 39763      329
2
   AMc Exhibit 11  Bylaws as amended Oct 20,
3        2020            348
4  AMc Exhibit 109  National Rifle Association of
      America Meeting of the Board
5        of Directors Jan 7, 2021   350
6  AMc Exhibit 59  Statement by Emily Cummins on
        July 15, 2019      383
7
   AMc Exhibit 152  NRA 2017 Budget Planning
8        October 6, 2016
         NRA-AMc_00057337 - 57351    390
9
   AMc Exhibit 70  April 22, 2019 letter to Mark
10       Dycio from Wayne LaPierre
         AMc BR_002459          394
11
   AMc Exhibit 74  Deposition transcript of
12       Oliver North, Dec 18, 2019   402
13 AMc Exhibit 65  May 21, 2018 email from
        Melanie Montgomery to Bill
14      Winkler, Subject: Offer    409
15 AMc Exhibit 90  NRA press release Jan 15,
        2021 NRA Leaves New York to
16      Reincorporate in Texas,
        Announces New Strategic Plan  468
17
   AMc Exhibit 76  NRA Leadership Quotes
18       2/17/2021         469
19 AMc Exhibit 128  NRA Board to Hold Emergency
        Hearing Amid Bankruptcy
20      Turmoil, 3/13/2021      273
21 AMc Exhibit 91  NRA Questions & Answers
        2/17/2021         478
22
   UCC Exhibit 1    Jan  15, 2021 email from John
23      Frazer, subject: Announcement
        from Wayne LaPierre     418
24
   UCC Exhibit 2   Jan  15, 2021 Vendor Letter   423
25

Page 252

---

1                 INDEX
                              PAGE
2
   Appearances                247
3  Proceedings                254
4  WAYNE LAPIERRE - VOLUME 2
5   Examination Continued by Mr Sheehan    254
     Examination by Mr  Mason       310
6   Examination by Mr  Drake        416
     Examination by Mr  Thompson     445
7   Further Examination by Mr  Mason   462
8  Signature and Changes          484
    Reporter's Certificate          486
9
10 DEPOSITION EXHIBITS              IDENTIFIED
11 Exhibit 7    National Rifle Association of
        America Statement of Financial
12      Affairs (SOFA) for Non-
        Individuals Filing for
13      Bankruptcy Form 207      258
14 Exhibit 8    Resolution Formalizing Special
        Litigation Committee, Sept  10,
15       2020          266
16 Exhibit 9    Official Form 201 Voluntary
        Petition for Non-Individuals
17      Filing for Bankruptcy      273
18 Exhibit 10   CharityBuzz information about
        Illusions Yacht       283
19
   Exhibit 11    Notice of Intention to Take Oral
20      Deposition of Corporate
        Representative(s) of the
21      National Rifle Association of
        America            445
22
   Exhibit 12   Jan  7, 2021 minutes of the
23      meeting of the board of
        directors of the National Rifle
24      Association          448
25 Exhibit 13    NRA Questions & Answers     456

Page 251

---

1  UCC Exhibit 3    Omnibus Opposition to (1)
        Ackerman McQueen, Inc.'s
2       Motion to Dismiss the Chapter
        11 Bankruptcy Petition, or,
3       in the alternative, Motion
        for the Appointment of a
4       Chapter 11 Trustee, (2) The
        State of New York's Motion to
5       Dismiss or, in the
        alternative, to Appoint
6       Chapter 11 Trustee, and (3)
        the District of Columbia's
7       Motion to Appoint Chapter 11
        Trustee.................... 433
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 253

3 (Pages 250 - 253)

```
1           P R O C E E D I N G S
2           THE VIDEOGRAPHER:  Good morning.  We are
3 going on the record at 9:10 a.m. on Tuesday, March 23,
4 2021.  This is day 2 of the video recorded deposition of
5 Wayne LaPierre.
6      You may proceed, Counsel.
7           WAYNE LAPIERRE,
8 having been previously duly sworn and having confirmed
9 that he is Wayne LaPierre, testified further as follows:
10          MR. GARMAN:  Jim, you're muted.
11          EXAMINATION CONTINUED
12 BY MR. SHEEHAN:
13     Q.  Good morning, Mr. LaPierre.
14     A.  Good morning.
15     Q.  You'll recall from yesterday that you were --
16 that you swore an oath to tell the truth, the whole
17 truth and nothing but the truth.  Do you recall that?
18     A.  I do.
19     Q.  And do you agree to continue to tell the
20 truth, the whole truth and nothing but the truth?
21     A.  I do.
22     Q.  Excellent.
23          After your testimony yesterday, which was a
24 long day, is there any of your testimony that thinking
25 back you believe is incorrect?
                                              Page 254
```

```
1     A.  The only thing I would add is in terms of who
2 knew about the fact that we were going to file for the
3 bankruptcy.  Andrew Arulanandam in our PR department
4 also was aware of that several days out.
5     Q.  So that's like the 12th or the 13th of January
6 of 2021?
7     A.  It was before that.  I think he was aware of
8 the possibility that we would do it probably a week
9 before or something like that.
10     Q.  So January 7th, January 8th?
11     A.  After the board meeting, yeah, he was aware of
12 it.
13     Q.  Did you tell him yourself that there was a
14 possibility of bankruptcy?
15     A.  I think we discussed it, and I also think he
16 discussed it with Travis with the Brewer firm, the PR
17 person with the Brewer firm.
18     Q.  And apart from that -- that issue with respect
19 to Andrew Arulanandam was there any other part of your
20 testimony that you wanted to correct from yesterday?
21     A.  No, I think that's it.
22     Q.  Now Mr. LaPierre, is it accurate that your
23 first contact with the Neligan firm was in January of
24 2021?
25     A.  That would be correct.
                                              Page 255
```

```
1     Q.  Okay.  And your first payment to the Neligan
2 firm was in January 2021?
3     A.  I believe that would have been out of the
4 trust account.  So whenever that was, that was made out
5 of the trust account.  I don't know the exact date.  It
6 would -- I just don't know the date, the first date it
7 was made out of the trust account.
8     Q.  Okay.  Was anyone authorized to make payments
9 out of the trust account besides you at the NRA?
10          MR. GARMAN:  Objection to form.
11     A.  I think the -- the Brewer firm was offered --
12 authorized to make payments out of that trust account.
13     Q.  (BY MR. SHEEHAN)  Without consulting with you?
14     A.  To people that we had retained, they were --
15 they were, yes.
16     Q.  So you would agree with me that if they were
17 not retained, the Brewer firm could not make payments
18 out of the trust account?
19          MR. GARMAN:  Objection to the form.
20     A.  Well, we retained the Neligan firm, and the
21 money was set aside to make -- to make payments in
22 regards to the reorganization and reorganization
23 matters.
24     Q.  (BY MR. SHEEHAN)  And that was in January of
25 2021?
                                              Page 256
```

```
1          MR. GARMAN:  Objection to form.
2     A.  I don't know the exact date that the trust
3 account was set up, but, I mean, I know that we
4 interviewed the Neligan firm down in Dallas after the --
5 during the board meeting weekend, I did along with the
6 SLC, and we agreed to retain them.  And that's when that
7 took place.
8     Q.  (BY MR. SHEEHAN)  And remind me again.  Did
9 you talk to any other law firm besides the Neligan firm
10 before you decided to retain the Neligan firm for the
11 bankruptcy proceedings?
12          MR. GARMAN:  Objection to form.
13     A.  No, I did not.  They were recommended by the
14 Brewer firm and we interviewed them and we were all very
15 impressed with them and we agreed to retain them.
16     Q.  (BY MR. SHEEHAN)  Who was the "we" who
17 interviewed the Neligan firm?
18     A.  Charles Cotton and Willes Lee, and I believe
19 Carolyn Meadows was there also, although I'm not sure of
20 that.  She may not have been.
21     Q.  Did you make -- okay.  Did you make any notes
22 or a summary of the conversation with the Neligan firm
23 before you hired them?
24     A.  I did not.  I sat in on a meeting with them.
25     Q.  Did anybody else from the special litigation
                                              Page 257
```

4 (Pages 254 - 257)

1 committee do that, make a summary or notes of the
2 meeting?
3     MR. GARMAN: Objection to form.
4     A. I'm honestly not sure. I know that I sat
5 there and listened to them, and they did a presentation,
6 they talked. And that's what I did.
7     Q. (BY MR. SHEEHAN) All right.
8     MR. SHEEHAN: Jonathan, can you mark
9 Exhibit 7? Thank you.
10     (Exhibit 7 marked.)
11     Q. (BY MR. SHEEHAN) So at this point we have
12 Exhibit 7. Could you pull up Exhibit 7, please?
13     MR. GARMAN: Yeah, one second. I don't
14 see it.
15     THE REPORTER: It's in the second day.
16     MR. GARMAN: Oh, I didn't see the date.
17 Sorry about that. Okay.
18     Okay. It's up.
19     Q. (BY MR. SHEEHAN) All right. If you would
20 take -- this will -- do you know that this is part of
21 the statement of financial affairs for the NRA that was
22 filed with the bankruptcy court in Texas?
23     A. I did not. I have not seen this.
24     Q. If you look at line 1, 2, 3, 4, you'll see
25 under who was paid or who received the transfer, it says
Page 258

1 without your approval?
2     MR. GARMAN: Objection to form.
3     A. That is a -- is more of a legal issue. I
4 don't know whether they would or not. I know they -- I
5 know they were going to be working with people to
6 prepare for the reorganization, and I just did not get
7 involved in the specifics of who they were working with
8 to prepare for the reorganization. I knew they were
9 retaining some people to work on the reorganization. I
10 did not know -- I did not meet the Neligan firm until,
11 as I said, down in Dallas in January.
12     Q. (BY MR. SHEEHAN) Did the NRA retain the
13 Neligan firm on or before December 3, 2020 to represent
14 them in anything?
15     MR. GARMAN: Objection to form.
16     Go ahead.
17     A. Not that I'm aware of.
18     Q. (BY MR. SHEEHAN) Okay. Did you have any
19 discussions with the special litigation committee about
20 retaining the Neligan firm before January of 2021?
21     A. The discussions I had with the special
22 litigation committee were in Dallas when we -- we met
23 the Neligan firm and interviewed them. And I think I
24 had heard the name Neligan firm tossed around. I think
25 the SLC had heard the name Neligan firm, but I had not
Page 260

1 Neligan, LLP. Do you see that?
2     A. I do see that.
3     Q. And then if you look across date of payment,
4 it says December 3, 2020. Do you see that?
5     A. I do.
6     Q. Do you know whether Neligan was paid on
7 December 3, 2020, $350,000?
8     A. I don't. I'm not aware of that.
9     Q. You'll see in the footnotes to that Neligan,
10 LLP statement, this payment was made out of funds
11 transferred to Brewer, Attorneys & Counselors by the NRA
12 for payment of third party expenses. Do you see that?
13     A. I do see that.
14     Q. Did you authorize the Brewer firm to pay
15 Neligan in December of 2020?
16     MR. GARMAN: Objection to form.
17     Go ahead.
18     A. I knew that the trust account was going to be
19 used to -- in terms of matters involving the
20 reorganization, but I did not -- and that would be
21 managed by the Brewer firm, that trust account, but I
22 don't -- I don't think I was -- I don't think I was
23 aware of that payment at that point.
24     Q. (BY MR. SHEEHAN) To your knowledge, did the
25 Brewer firm have the authority to retain outside counsel
Page 259

1 met them and we hadn't interviewed them until then.
2     Q. Do you know if there was a retainer agreement
3 between the NRA and the Neligan firm before January of
4 2021?
5     A. I don't.
6     Q. Who has to sign off at the NRA to retain
7 outside counsel?
8     A. The general counsel would. The treasurer
9 would. I don't know whether in this particular
10 instance, where we had a trust set aside for the Brewer
11 firm to retain people, that -- that it would be
12 necessary in terms of reorganization. It required
13 confidentiality. I don't know whether that would --
14 would come under an exception to that.
15     I mean, the trust fund was set up so the
16 Brewer firm could retain certain people in regard to the
17 reorganization. That was the purpose of it.
18     Q. So when you gave $5 million to the Brewer firm
19 for trust account, what were the terms of the payment to
20 the trust account?
21     MR. GARMAN: Objection to form.
22     Go ahead.
23     A. That the Brewer firm I know would keep an
24 accounting of it that would be available for the NRA
25 to -- it would be disclosed to the NRA.
Page 261

5 (Pages 258 - 261)

1  Q. (BY MR. SHEEHAN) Was there complete
2 discretion on the Brewer firm to spend the money in the
3 trust account on whatever they believed was appropriate?
4       MR. GARMAN: Objection to form.
5  A. I think the Brewer firm had -- had discretion
6 in terms of -- in terms of managing this issue, in terms
7 of to retain people in regard to the reorganization
8 and --
9  Q. (BY MR. SHEEHAN) Who --
10  A. -- in a confidential way.
11  Q. Confidential from whom?
12  A. Well, confidential because it -- obviously, we
13 did not want any of this leaked, so this seemed to be a
14 way to -- to facilitate the purpose of the objective of
15 setting aside some dollars so that it would be available
16 for retention of people, if needed, on a reorganization
17 and in a confidential way.
18  Q. So you gave -- you, the NRA, gave complete
19 discretion to the Brewer firm to decide how to spend
20 that $5 million in the trust account. Is that accurate?
21       MR. GARMAN: Objection to form of the
22 question.
23  A. No. They would -- they agreed to keep track
24 and provide -- provide accounting of it in terms of
25 where the money -- where the money ended up being spent.

1  Q. (BY MR. SHEEHAN) So I understand -- I
2 understand that they would report back to you once they
3 had spent it, but before they spent the money that was
4 in the trust account, did they have to get approval from
5 anybody at the NRA?
6  A. I think they had -- they had a significant
7 amount of trust placed in them that they would take the
8 appropriate steps to retain the people that were needed
9 in terms of the reorganization.
10  Q. So is it fair to say, Mr. LaPierre, that you
11 and your special litigation committee delegated to an
12 outside organization the ability to spend $5 million in
13 charitable funds, period -- question mark?
14       MR. GARMAN: Objection to the form of the
15 question.
16  A. We -- we set aside 5 million in a trust to be
17 used in -- NRA did -- in regard to reorganization
18 matters that was managed by the reorganization firm,
19 that's correct.
20  Q. (BY MR. SHEEHAN) When did you find out that
21 the Neligan firm got $350,000 in December 2020?
22  A. You just showed it to me right here,
23 Mr. Sheehan.
24  Q. All right. What else did the Brewer firm
25 spend money on out of that trust account?

1       MR. CORRELL: This is Kent Correll.
2 Objection to the form.
3  A. I'm not aware of -- it would be people needed
4 to line up a team in terms of a reorganization, whether
5 it was the restructuring officer, whether it was --
6 whatever team needed to be put together in terms of
7 resources, they -- that fund was set aside to be used to
8 help retain that team.
9  Q. (BY MR. SHEEHAN) Understood, but did you ever
10 get a report from the Brewer firm describing what
11 expenditures were made out of that escrow account, that
12 trust account until today?
13       MR. GARMAN: Objection to the form.
14       MR. CORRELL: Yeah, and this is Kent
15 Correll. I think you're beginning to go get into an
16 area where you're asking for communications between --
17       MR. SHEEHAN: I'm asking for the bills,
18 but if that's an objection, please put the objection on
19 the record.
20       MR. CORRELL: The objection is that I'm
21 cautioning you that you're asking questions that appear
22 to be designed to --
23       MR. SHEEHAN: This is a speaking
24 objection. Please make your objection for the record.
25       MR. CORRELL: You're now interrupting me.

1       MR. SHEEHAN: Because you're not
2 participating appropriately.
3       MR. CORRELL: I am a counsel. You have
4 to let me speak, sir.
5       My concern is that you are attempting to
6 invade a privilege, and I am trying to ascertain how far
7 you intend to go with this line of questioning. Now if
8 you can please tell me how far you intend to go, I can
9 make an assessment as to whether or not to direct my
10 client not to answer any further questions. Please.
11  Q. (BY MR. SHEEHAN) Mr. LaPierre, when did you
12 give an accounting, if ever, from the Brewer firm
13 concerning the money that was spent from the trust
14 account of $5 million that you authorized for them?
15       MR. CORRELL: I am going to object on the
16 grounds that your question appears to be designed to
17 elicit confidential, attorney/client communications.
18 And I am going to instruct the witness not to answer to
19 the extent that his answer would require him to reveal
20 any strategy -- any legal strategy or any legal advice
21 he was seeking or obtaining from Brewer -- the Brewer
22 firm.
23  Q. (BY MR. SHEEHAN) Mr. LaPierre?
24       MR. CORRELL: If you can answer the
25 question without revealing any communications regarding

1 strategy, then please go ahead.
2   A. Well, I have not -- I have not received an
3 accounting of funds spent out of that -- that trust
4 fund.
5   Q. (BY MR. SHEEHAN) Thank you, Mr. LaPierre.
6      Has anybody else, to your knowledge, at the
7 NRA received an accounting of the funds spent out of the
8 trust fund?
9   A. I don't know whether Mr. Frazer has or
10 Mr. Spray has. I mean, Mr. Frazer is the one that would
11 receive all the Brewer bills, and I don't know whether
12 he has or not, Mr. Sheehan.
13   Q. Thank you, Mr. LaPierre.
14   A. Yes, sir.
15     MR. SHEEHAN: Could we go just off the
16 record -- not off the record.
17   Q. (BY MR. SHEEHAN) Mr. LaPierre, we're pulling
18 up Exhibit 8.
19     (Exhibit 8 marked.)
20   Q. (BY MR. SHEEHAN) Do you have that?
21     MR. GARMAN: It's still refreshing. We
22 have it.
23   Q. (BY MR. SHEEHAN) Mr. LaPierre, could you
24 identify Exhibit 8, please?
25   A. Well, I -- I wasn't in the room, so I am

Page 266

1 speculating on this, but --
2     MR. GARMAN: I don't think there's a
3 question pending.
4     THE WITNESS: Okay.
5   Q. (BY MR. SHEEHAN) Mr. LaPierre, can you
6 identify Exhibit 8?
7   A. It appears to be a resolution of the board of
8 directors making -- making the special litigation
9 committee an official committee of the board of
10 directors.
11   Q. Do you know if the board passed this
12 resolution?
13   A. I -- I was not in that session, Mr. Sheehan,
14 when this was taken up. I believe they did. To the
15 best of my knowledge, at that January meeting the board
16 formally made the special litigation committee an
17 official committee of the board of directors with the
18 powers of the board.
19   Q. Can you tell from looking at this document
20 whether this is the resolution which was passed in
21 January or is it something from earlier in the year in
22 2020?
23   A. I'm not sure because I -- I was not in the
24 room when this was passed, so I'm not sure.
25   Q. How did you, as the executive VP of the NRA,

Page 267

1 determine what the scope of authority of the special
2 litigation committee was before the January board
3 meeting?
4     MR. GARMAN: Object to the form of the
5 question.
6   A. What I was advised by -- by --
7     MR. GARMAN: Whoa. Whoa. Okay. If
8 you're about to say counsel, I am going to object and
9 instruct you not to reveal the contents of your
10 communications with your attorneys.
11   Q. (BY MR. SHEEHAN) Let's go back and try to do
12 that without the counsel issue.
13     You had an understanding, am I correct, that
14 the special litigation committee was to oversee the
15 litigation with the attorney general's office. Is that
16 correct?
17   A. Yes, sir, because John Frazer was named as a
18 defendant, I was named as a defendant; therefore, we
19 could no longer manage the litigation. So the special
20 litigation committee was created to manage the
21 litigation working with the attorneys.
22   Q. Okay. Now it describes in the -- in this
23 document, which you can't identify whether it is, in
24 fact, a resolution of the NRA -- right? You can't --
25 sitting here today, you can't tell me whether this is,

Page 268

1 in fact, a resolution of the NRA board?
2     MR. GARMAN: Objection to form.
3   A. Yes. Yes, sir, that's correct.
4   Q. (BY MR. SHEEHAN) Okay. But it talks about in
5 this document that there's a determination that
6 Mr. Charles Cotton was independent, is that correct,
7 from this document?
8     MR. GARMAN: Objection to form.
9   Q. (BY MR. SHEEHAN) Look at the third paragraph.
10 It says each of whom has been determined to be
11 independent.
12     MR. GARMAN: Objection to form.
13   Q. (BY MR. SHEEHAN) Do you see that line?
14   A. Yes, I do see that. Each of whom has been
15 determined to be independent and disinterested in all
16 relevant aspects of their service -- yes, I see that.
17   Q. (BY MR. SHEEHAN) Did -- to your knowledge,
18 did the NRA ever make a determination that Carolyn
19 Meadows, Charles Cotton and Willes Lee were independent
20 and disinterested in all respects relevant to their
21 service on the special litigation committee?
22     MR. GARMAN: Objection, go ahead.
23   A. I believe they made that determination, and
24 that's why they were designated to be on the special
25 litigation committee, is they were independent.

Page 269

7 (Pages 266 - 269)

1    Q.  (BY MR. SHEEHAN) Who of -- who on the NRA
2  made that determination that they were independent?
3    A.  Well, they were the -- they were the
4  officers -- the three officers of the association.  And
5  when it was -- I think it naturally flowed to them, and
6  I think they had discussions probably with -- with our
7  counsels, and I know that I was -- I was aware of the
8  fact that they were going to be the special litigation
9  committee as officers.
10    Q.  Okay.  With respect to the -- and again, you
11  don't know where this document came from or what it's
12  authority is, but was it your understanding that the
13  special litigation committee was to exercise corporate
14  authority on behalf of the NRA with respect to the
15  attorney general's case against the NRA and the District
16  of Columbia case against the NRA?
17          MR. GARMAN:  Objection to the form of the
18  question.
19    A.  Yes.  I -- I could not supervise that
20  legislation (sic).  John Frazer could no longer
21  supervise that legislation or be involved in any of the
22  management of it.  And it was turned over to the special
23  litigation committee to work with the -- with legal
24  counsel in terms of the management of that litigation.
25  And I have not been on, nor has John Frazer been on, any
                                                    Page 270

1  which was kind of viewed as -- as -- I guess part of the
2  flow of what was happening in New York, but it was also
3  part of a different future to facilitate a merger into a
4  place with a more favorable legal and where NRA could be
5  treated more fairly.  So they decided that -- I mean,
6  that my office needed to be involved with that.
7    Q.  In your view, Mr. LaPierre, did the special
8  litigation committee have responsibility for overseeing
9  the decision to file this bankruptcy proceeding?
10          MR. GARMAN:  Objection to the form of the
11  question.
12    A.  Well, the decision to file was made by -- I
13  made it in consultation with -- with the SLC and in
14  terms of the actual decision, let's go, let's do this.
15    Q.  (BY MR. SHEEHAN) Did you -- in your opinion,
16  though, was the -- was this subject in which the special
17  litigation committee as a special litigation committee
18  had responsibility for making decisions?
19          MR. GARMAN:  Objection to the form of the
20  question, calls for a legal conclusion.
21    A.  I think they had a -- I clearly think they had
22  a role in it, and I clearly think I had a role in it in
23  terms of my -- my role at the NRA.  It was -- it was
24  that significant of a matter.
25          MR. SHEEHAN:  Jon, could you pull up the
                                                    Page 272

1  of the phone calls or discussions since that -- since it
2  was formed.
3    Q.  (BY MR. SHEEHAN) Okay.  And you'll see the
4  next -- on Roman numeral iv, it also includes any
5  additional legal proceedings arising from the same
6  facts, circumstances or allegations as the foregoing,
7  wherein the potential for an actual or apparent conflict
8  of interest favors recusal by one or more NRA
9  executives.
10    So in your opinion, does the bankruptcy
11  raise, does the bankruptcy filing by the NRA, an
12  additional legal proceeding arising from the same facts,
13  circumstances, or allegations as the two attorney
14  general suits?
15          MR. GARMAN:  Objection to form.  That's
16  the ultimate legal question for this case.
17    Q.  (BY MR. SHEEHAN) Mr. LaPierre?
18    A.  I'm looking at it.  I just -- as -- I'm not an
19  attorney.  I just -- as I said before, I mean, John
20  Frazer stepped aside in terms of dealing with -- with
21  the special litigation committee in regards to the
22  Chapter 11.  It was felt because of my position that on
23  that specific issue, the -- the executive vice
24  president's office needed to be -- needed to be involved
25  in that specific matter in terms of the Chapter 11,
                                                    Page 271

1  next exhibit, please?
2    A.  Because the board had delegated me at the
3  board meeting, the -- to my office, the authority to
4  reorganize, which is where the delegation came to -- to
5  have me involved in it in terms of the executive VP's
6  office.
7    As I said, if they had not delegated that
8  authority at that board meeting, I don't think I would
9  have -- I would have proceeded with this.  I don't know
10  whether the SLC on its own would have proceeded or not,
11  but I would not have had not they made that delegation
12  of authority.
13    Q.  (BY MR. SHEEHAN) At this point can we pull up
14  Exhibit 9?
15          (Exhibit 9 marked.)
16          MR. GARMAN:  We have it.
17    Q.  (BY MR. SHEEHAN) All right.  Mr. LaPierre,
18  can you identify Exhibit 9, please?
19    A.  I'm sorry.  We're looking at it, Mr. Sheehan.
20    Q.  Okay.  Can you identify the document, please?
21    A.  Yeah, it is the document for filing
22  bankruptcy.
23    Q.  And it's also a resolution on the board of
24  directors of the NRA?
25          MR. GARMAN:  He hasn't looked at the
                                                    Page 273

8 (Pages 270 - 273)

1 entire document. Give us a second.
2    A. No, I -- yeah, that's the resolution -- yes,
3 sir, that's the resolution that the board passed
4 delegating to the executive vice president office the
5 authority to reorganize the -- the association, and
6 that's the authority under which my office anyway
7 operated in terms of filing the bankruptcy petition
8 along with the SLC.
9    Q. (BY MR. SHEEHAN) All right. So is this
10 document, Exhibit 9, is this a resolution of the board
11 of directors?
12       MR. GARMAN: Take your time and read the
13 document to the extent you need to.
14    A. Yeah, I believe that is the resolution of the
15 board of directors that they passed.
16    Q. (BY MR. SHEEHAN) And if you look down, you'll
17 see that it cites -- when you say this is a resolution
18 they passed, are you just talking about the fourth
19 whereas clause or are you talking about the entire
20 document?
21    A. I'm talking about the whereas clause. As I
22 said, I wasn't in the room when they -- when they passed
23 this or when the discussions occurred. It -- I know
24 that they passed the contract we talked about yesterday,
25 and then they passed the resolution delegating to the
                     Page 274

1 executive VP's office the ability to reorganize the
2 association.
3    Q. So --
4    A. And I believe that --
5    Q. So you believe this entire Exhibit 9 -- and I
6 want to be clear here. You believe that Exhibit 9 in
7 its entirety was approved by the board of directors of
8 the NRA?
9    A. Well, I -- again, I was -- I know that what
10 the board of directors passed was a specific resolution
11 authorizing the EVP the authority to reorganize the
12 association, and I know the board passed a resolution
13 making the special litigation committee an official
14 committee of the board of directors with the power of
15 the board of directors.
16    Q. So when I look at Exhibit 9, whose resolution
17 is it, the entirety of the document?
18    A. The entirety of the document? It --
19       MR. GARMAN: Take some time to look at
20 this.
21       Counsel, he hasn't read the entire document
22 yet, so we're going to take the time to have him read
23 the whole thing.
24       MR. SHEEHAN: Let's go off the record and
25 let him read the document and then come back. Let's
                     Page 275

1 take a five-minute break.
2       THE VIDEOGRAPHER: Off the record, the
3 time on the video is 9:45 a.m.
4       (Break from 9:45 a.m. to 9:51 a.m.)
5       THE VIDEOGRAPHER: We're back on the
6 record. The time on the video is 9:51 a.m.
7    Q. (BY MR. SHEEHAN) All right. Mr. LaPierre,
8 when we broke, you were looking at the resolution
9 authorizing Chapter 11 reorganization and related
10 retention of counsel. And do you have that document in
11 front of you now?
12    A. I do.
13    Q. Do you know who wrote this document?
14    A. I -- I assume it was written either by
15 bankruptcy counsel or by -- by legal counsel from the --
16 from the Brewer firm.
17       MR. GARMAN: I'm going to instruct you
18 not to speculate if you don't know the answer.
19    A. I don't know specifically who wrote it.
20    Q. (BY MR. SHEEHAN) Whose resolution is it?
21       MR. GARMAN: Objection to form.
22    A. It looks -- it -- it looks to be a filing of
23 the bankruptcy proposal, but it contains language from a
24 resolution passed by our board of directors, but then I
25 believe it contains additional language that was
                     Page 276

1 inserted in there also by -- by counsel.
2    Q. (BY MR. SHEEHAN) I am looking at the page 5
3 of 16, which is the exhibit here, and page 6. And then
4 it says -- if you look at the bottom of the page,
5 Mr. LaPierre, that I have it says -- can you see it?
6       MR. GARMAN: Which page, 5 or 6?
7       MR. SHEEHAN: 5.
8    Q. (BY MR. SHEEHAN) And you see at the bottom
9 that it says "Now, therefore, be it"?
10       MR. GARMAN: No, that's not on page 5.
11       MR. SHEEHAN: Jonathan, what do you
12 think?
13    Q. (BY MR. SHEEHAN) Mr. LaPierre, do you see the
14 resolution authorizing Chapter 11 reorganization related
15 retention of counsel, first page?
16    A. The resolution authorizing retention of
17 counsel on the first page? Yes, I do see that.
18    Q. Resolution authorizing Chapter 11
19 reorganization --
20    A. Yes, sir, I see it.
21    Q. Okay. Look at the very bottom of that page.
22 Do you see what the last line is?
23    A. I do. I do see that line.
24    Q. And it says -- it says would advance the best
25 interest -- let me go back a second.
                     Page 277

9 (Pages 274 - 277)

Page 278

1 It says "Now, therefore, be it." Do you see
2 that?
3 A. Yes, I do see it.
4 Q. Okay. And then the next page on the version
5 that I have is blank. Is it blank on your version, too?
6 MR. GARMAN: No, it is not blank.
7 A. No, and it goes on. Resolved that
8 commencement of a Chapter 11 reorganization proceeding
9 in the United States --
10 (Reporter clarification.)
11 A. There's additional three paragraphs that go
12 on.
13 Q. (BY MR. SHEEHAN) Were the three paragraphs in
14 the document before you signed it?
15 MR. GARMAN: Sorry, Counsel, you were
16 muted for half that question.
17 Q. (BY MR. SHEEHAN) Okay. Mr. LaPierre, the
18 document that you signed, did it include those three
19 revolved paragraphs?
20 A. I believe it did.
21 Q. If you look at the next page after the
22 resolution authorizing Chapter 11 reorganization, the
23 one that I have with your signature on it does not have
24 those three resolutions. Is that -- is that accurate?
25 MR. GARMAN: No. The exhibit you put in

Page 279

1 front of him does.
2 MR. SHEEHAN: Okay.
3 MR. GARMAN: And Counsel, I'll point out
4 for the record, it's the file stamped version from the
5 Court's docket.
6 Q. (BY MR. SHEEHAN) All right. When it says
7 resolved, is that resolution -- the three "resolves"
8 that are on that page after your signature page, are
9 they the resolutions of the special litigation committee
10 or you or both?
11 MR. GARMAN: Objection to the form of the
12 question. Counsel, they're before his signature, not
13 after.
14 MR. SHEEHAN: Okay. So my co-counsel
15 tells me that the printer missorted the pages, so thank
16 you for that.
17 Q. (BY MR. SHEEHAN) But if you look at the three
18 "resolves" in this document --
19 A. Yes.
20 Q. Whose resolutions were those?
21 A. I think they were resolutions, the way the
22 wording was, in terms of the filing for the bankruptcy.
23 Those were not resolutions of our board of directors.
24 Q. Okay. So who resolved -- I'm sorry, go ahead.
25 A. I simply believe it's the way the wording was

Page 280

1 put together by the -- by the attorneys that prepared
2 the document for the filing.
3 Q. So there was no -- was there any formal
4 resolution with respect to the commencement of the
5 Chapter 11 reorganization or retaining Neligan or
6 retaining Brewer?
7 MR. GARMAN: Objection to the form of the
8 question.
9 A. I know there was a meeting that we had in
10 Dallas with the Neligan firm in terms of retaining them,
11 and I know that we had numerous discussions with the
12 special litigation committee in terms of doing all of
13 this. I -- I don't know whether there was a formal
14 resolution in terms of -- I mean, I -- this one right
15 here is signed by me; it's not signed by Carolyn
16 Meadows, Charles Cotton.
17 MR. GARMAN: No, no, no, no, sir --
18 MR. SHEEHAN: If I could, Mr. -- (audio
19 unclear.)
20 A. Yeah, they signed it. So that would -- that
21 would substantiate my recollection that the -- all -- we
22 had all of us discuss that all of us agreed to do it,
23 and we did -- we made the decision to do it together.
24 Q. (BY MR. SHEEHAN) As the committee of the
25 board, does the special litigation committee keep

Page 281

1 minutes of its activities?
2 MR. GARMAN: Objection to the form of the
3 question.
4 A. I honestly am not sure of that because I
5 haven't been involved with -- you'd have to -- you'd
6 have to ask them, Mr. Sheehan.
7 Q. (BY MR. SHEEHAN) Is there anyone who staffs
8 the activities of the special litigation committee who
9 is an employee of the NRA?
10 A. Is there anyone staff that is an employee of
11 the special litigation committee with --
12 Q. No, let me try again.
13 Is there anyone who is an employee of the NRA
14 who staffs the work of the special litigation committee?
15 MR. GARMAN: Objection to form.
16 Go ahead.
17 A. Not -- not specifically. I think -- I think
18 Vanessa Shahidi has worked in terms of facilitating some
19 of the matters from the attorneys, at least one of the
20 matters with the attorneys with the special litigation
21 committee. I am not aware of anyone else that staffs
22 the -- I know Andrew Arulanandam in our -- head of our
23 public affairs, works with the special litigation
24 committee in terms of some communication matters.
25 Q. (BY MR. SHEEHAN) In general, the corporate

10 (Pages 278 - 281)

1 secretary is responsible for maintaining the books and
2 records of the corporation with respect to minutes.
3 Correct?
4      A.  That would be correct.
5      Q.  But in this case, he was recused from the
6 special litigation committee activities by the
7 resolution of the board of directors.  Correct?
8           MR. GARMAN:  Objection to the form of the
9 question.
10     A.  Well, by -- by himself, who -- because of the
11 legal situation, took him out of -- he took himself out
12 of issues involving the special litigation committee.
13     Q.  (BY MR. SHEEHAN)  So was there somebody else
14 in the -- in the corporate secretary or corporate
15 counsel's office who had the responsibility of
16 determining what minutes should be kept and where they
17 would be kept?
18          MR. GARMAN:  Objection to the form.
19          Go ahead and answer.
20     A.  I don't know the answer to that.  You would
21 need to ask the special litigation committee if they
22 worked with anyone on minutes.  I simply don't know the
23 answer.
24     Q.  (BY MR. SHEEHAN)  Okay.
25          MR. SHEEHAN:  Could we go to the next

Page 282

1 exhibit, please, Jonathan?
2          (Exhibit 10 marked.)
3      Q.  (BY MR. SHEEHAN)  Okay.  I show you
4 Exhibit 10, Mr. LaPierre.  Have you ever seen Exhibit 10
5 before?
6          MR. GARMAN:  Hold on.  It hadn't shown up
7 until we hit refresh.
8          Okay.  We have Exhibit 10.
9      Q.  (BY MR. SHEEHAN)  Do you recognize -- I'm
10 sorry.
11          MR. GARMAN:  He's reviewing it.
12          Go ahead.
13          MR. SHEEHAN:  Okay.
14     A.  Yes, I recognize that.
15     Q.  (BY MR. SHEEHAN)  Okay.  What is that ship?
16     A.  That is a boat owned by -- I believe it's
17 owned by the McKenzies.
18     Q.  That is the Stanton McKenzies?
19     A.  Yes, that would be correct.
20     Q.  And the description here says it has a full
21 staff and crew at your disposal.  When you used this
22 ship, did you have a full staff and crew at your
23 disposal?
24          MR. GARMAN:  Objection to form.
25          Go ahead.

Page 283

1      A.  There were -- as we've discussed before, there
2 were, I think, two or three or four staff people there,
3 and there was -- and there was a cook.
4      Q.  (BY MR. SHEEHAN)  And was the boat when you
5 received -- the ship when you received use of it, was it
6 fully stocked with fuel and food?
7          MR. CORRELL:  This is Kent Correll.
8 Objection to the form.
9      A.  Yes, I believe it had fuel on it and I believe
10 it had food.
11     Q.  (BY MR. SHEEHAN)  And did it come with four en
12 suite staterooms?
13     A.  It did come with several staterooms.
14     Q.  And did it come with a hydraulic
15 state-of-the-art swim platform?
16     A.  I'm not sure exactly what a state-of-the-art
17 hydraulic swim platform is, but it -- it may have,
18 depending on what that term means.
19     Q.  Okay.  Did it come with a 16-foot jet boat?
20     A.  Occasionally there was a -- was a jet boat
21 there.
22     Q.  Did you have use of the jet boat?
23     A.  Occasionally, yes.
24     Q.  Did it come with two Sea-Doo WaveRunners?
25     A.  Yes, there were two WaveRunners on that boat.

Page 284

1      Q.  Okay.  The -- before accepting the use of this
2 boat for a week at a time, did you advise Mr. Frazer
3 that you intended to do so?
4      A.  I don't think I did.  I did not -- as I said,
5 at this point I was under all kinds of threats.  I did
6 not feel safe anywhere with myself or my family.  I
7 was -- this was offered as a security retreat where we
8 could be safe and feel safe, and I could get Susan and
9 Colleen, who works for WLF, together and do some work
10 and do some other work, and I used it as a security
11 retreat.
12     Q.  Did you offer to the Stanton McKenzies to pay
13 for the use of the ship?
14     A.  No, I did not.  They -- they simply let me use
15 it as a security retreat because they knew the threat
16 that I was under.  And I was basically under
17 presidential threat without presidential security in
18 terms of the number of threats I was getting.  And all
19 of us were struggling with how to deal with that type
20 situation with a private citizen with the amount of
21 threat that we were having.  And this was the one -- one
22 place that I hope could feel safe, where I remember
23 getting there going, Thank God I'm safe, nobody can get
24 me here.  And that's how it happened.  That's why I used
25 it.

Page 285

11 (Pages 282 - 285)

1  Q.  Did the Stanton McKenzies or other companies
2  charge the NRA for use of the yacht?
3  A.  No, they did not.
4  Q.  All right.  Did you consider whether
5  acceptance of the use of this ship Illusions was a
6  potential violation of the conflict of interest policy
7  with the NRA?
8          MR. CORRELL:  This is Kent Correll.
9  Objection to the form.
10  A.  I actually thought that given the security
11  threat that I was under and the fact that NRA was -- was
12  at almost a loss as to how to protect somebody with the
13  amount of threat that I was having, that -- that my work
14  and the threat that came with it, this was -- was a
15  place that I could go and be safe, and it was related to
16  that that I -- that I -- that I did it.
17  Q.  (BY MR. SHEEHAN)  Did you consider whether
18  acceptance of the use of this yacht Illusions by
19  yourself and your family was a potential violation of
20  the conflict of interest policies of the NRA?
21          MR. GARMAN:  Objection to the form of the
22  question.
23          MR. CORRELL:  This is Kent Correll.
24  Objection to the form.
25          MR. GARMAN:  Go ahead.

Page 286

1  totally unique situation that I think hardly anybody
2  else in the US experienced that type of threat, other
3  than maybe the president.  I mean, I had presidential
4  threat without presidential security and was looking for
5  a place to be safe.
6  Q.  (BY MR. SHEEHAN)  When did Mr. Frazer first
7  learn that you had received the use of the yacht
8  Illusions from the McKenzie Stantons?
9          MR. GARMAN:  Objection to the form of the
10  question.
11  A.  I -- I don't know.  I mean, I -- I -- I wasn't
12  trying to hide it, but I wasn't trying to publicize it
13  either because it was a security issue.
14  Q.  (BY MR. SHEEHAN)  With respect to Mr. Frazer,
15  it was a security issue?
16          MR. GARMAN:  Objection to the form of the
17  question.
18  A.  No, the use of it was a security issue.
19  Q.  (BY MR. SHEEHAN)  Okay.  Did you -- did your
20  security director, the NRA security director approve
21  your acceptance of the use of the yacht Illusions for a
22  week?
23          MR. GARMAN:  Objection to the form of the
24  question.
25  A.  At that time the security director I think was

Page 288

1  A.  Because of the threat that I was under and
2  because of the fact that I couldn't feel safe anywhere,
3  was being harassed and screamed at everywhere and death
4  threats, I -- I considered it a condition of the
5  security environment that I was operating in as a result
6  of the job that I had with the NRA, which put me in a
7  totally unique situation that I don't think hardly any
8  other American has experienced, with the possible
9  exception of someone like -- I mean, I can't describe
10  the extent of the threat that I was under at that point.
11  Q.  (BY MR. SHEEHAN)  Did you --
12  A.  And --
13  Q.  I'm sorry.
14  A.  -- there were also some stand-ups for that
15  H2Ostream video website.  But the real -- but the major
16  reason I did this was a security retreat at a time when
17  I could not find a safe place to go at all.
18  Q.  Would you agree with me that the value of a
19  108-foot yacht with a full crew, full of supplies and
20  fuel exceeds $300?
21          MR. GARMAN:  Objection to form.
22      Go ahead.
23  A.  I think -- I think, yes, it probably would,
24  but it was also involved with my job and the threat that
25  I was under and a place to be safe and -- and in a

Page 287

1  just telling me to get out of town, and I -- I -- you
2  know, I found a way.  I was struggling and I found a way
3  to be safe and --
4  Q.  (BY MR. SHEEHAN)  Did you --
5  A.  -- this is something that was part of the
6  self-correction that we have done at the NRA since, you
7  know, 2017, 2018.  It has not happened in 2019, 2020,
8  and it's one of the things that -- that we have
9  self-corrected on where I -- I am not using that -- that
10  boat anymore.
11  Q.  Okay.  What was your last stay on Illusions?
12  A.  I think it was sometime in 2018 after the
13  Parkland shooting in the summer.
14  Q.  When was your first stay on the yacht
15  Illusions?
16  A.  I think it was after the Sandy Hook shooting,
17  the summer after the Sandy Hook shooting.
18  Q.  How many times did you go on the yacht
19  Illusions in The Bahamas?
20  A.  I probably went once -- one time a year where
21  we could go and be safe for the -- from the Sandy Hook
22  shooting up until 2019.  And I did not do it in 2019.
23  As part of the self-correction, that's one of the things
24  that -- that came to my attention in terms of -- I told
25  you we looked at everybody, including me, and that I

Page 289

12 (Pages 286 - 289)

1 have self-corrected on.
2 Q. Did you sail on the yacht Illusions to
3 anyplace other than The Bahamas?
4 MR. GARMAN: Objection to form.
5 A. No, The Bahamas.
6 Q. (BY MR. SHEEHAN) Did you sail on any other --
7 or did you travel on any other yachts owned by the
8 McKenzies, the Stanton McKenzies during the time you've
9 been NRA president and executive VP?
10 A. Yes, only with -- only in relation to work and
11 in relation to celebrities.
12 Q. And so --
13 A. As I -- as I testified before, I would try to
14 recruit celebrities to the NRA. Associated Television
15 was one of our access points into celebrities, young and
16 old. They worked with a lot of the former Disney stars,
17 young people, and also people like -- well, I don't know
18 whether I should say their names. A lot of other
19 celebrities. And those other trips I did with
20 celebrities.
21 Q. What other trips -- how many other trips did
22 you take on boats owned by the Stanton McKenzies besides
23 the yacht Illusions?
24 MR. GARMAN: Objection to form.
25 Go ahead.

Page 290

1 A. Maybe -- maybe three or -- three or four with
2 celebrities.
3 Q. (BY MR. SHEEHAN) Where were those trips
4 located?
5 A. Most of them were in -- in Europe, and I think
6 one of them was to Greece.
7 Q. Did you sign off --
8 A. With --
9 Q. I'm sorry, Mr. LaPierre. I interrupted you.
10 A. With celebrities.
11 Q. And did you sign off on contracts with
12 companies owned by the Stanton McKenzies after you went
13 on your fist trip on the Illusions?
14 MR. GARMAN: Objection to form.
15 A. I wasn't involved in negotiating the
16 contracts. I stayed out of all that. I did sign some
17 of the extensions of the -- the contracts.
18 Q. (BY MR. SHEEHAN) Did you consult with
19 Mr. Frazer, as the head of -- the head of conflicts of
20 interest, to determine whether you could, in fact, sign
21 those contracts or extensions after you had gone on the
22 yacht Illusions?
23 MR. CORRELL: This is Kent Correll.
24 Objection to form.
25 A. I did not because I considered the ones with

Page 291

1 celebrities completely work. And I considered this one
2 was a security issue with my family, with myself, and I
3 did not see that as a -- in all honesty, as a conflict
4 back then. I -- with the safety and the threat issues I
5 was facing with the need to recruit celebrities, I --
6 and the fact that the NRA wasn't charged for it, I just
7 didn't see it an issue.
8 Now with what we've gone through with the
9 2018, 2019, 2020 with the compliance grids and
10 everything else, this is one of the things that -- one
11 of the precautions I took that I -- in terms of my
12 safety that I would not do, given the self-correction
13 that we've done.
14 MR. SHEEHAN: Okay. At this point, let's
15 take a five-minute break.
16 MR. GARMAN: Okay.
17 THE VIDEOGRAPHER: We're going off the
18 record. The time on the video is 10:17 a.m.
19 (Break from 10:17 a.m. to 10:32 a.m.)
20 THE VIDEOGRAPHER: We're back on the
21 record. The time on the video is 10:32 a.m.
22 Q. (BY MR. SHEEHAN) Good morning again,
23 Mr. LaPierre.
24 A. Good morning.
25 Q. Let's go back for a second to Mr. Staples.

Page 292

1 When you went to The Bahamas, did he do any
2 review of the safety or security of the yacht Illusions
3 before you used it for the first time?
4 A. I don't think he did.
5 Q. Did he do any security check on the employees
6 who were on the yacht Illusions before you went on it
7 the first time?
8 A. I don't believe he did.
9 Q. Did he thereafter, in any of your following
10 trips to the yacht Illusions, do any background checks
11 on any of the people who would be on the boat with you?
12 A. I don't -- I don't think he did.
13 Q. When you talked about meeting celebrities at
14 the Super Bowl or Eleuthera or Europe, did Mr. Staples
15 or staff or a contractor do any background checks on any
16 of those celebrities that you met with to make sure that
17 they were not someone who would pose a threat to you?
18 A. No, he didn't, but they were -- I mean, as I
19 said, part of my job -- my job has many facets. I have
20 to raise $300 million to $400 million a year for this
21 association. I am the outfacing brand of the
22 association, doing all the television appearances. I am
23 doing -- putting the networks together to reach all the
24 cultural touchpoints, whether it be the NFL, whether it
25 be NASCAR, whether it be celebrities that influence

Page 293

13 (Pages 290 - 293)

1 American society, to keep NRA in the mainstream.
2     I am also working on raising all the money,
3 working on direct mail and working on all of that, as
4 well as, you know, working with the day-to-day
5 management of the association in terms of -- I mean, I
6 do everything I can to put -- build this association and
7 to do what's in the best interest of this association in
8 terms of making it strong and servicing our 5 million
9 members that -- that we work for.
10     And I mean, with those responsibilities
11 that I've had to undertake, there has come a lot of
12 tremendous burdens that I've had to deal with, and I've
13 dealt with them. And I haven't whined about them, but
14 they've been extraordinary and unique, and I have done
15 the best job I could wrestling with it all.
16     And I think I -- I'm very proud of the work
17 I've done with the NRA. I think our members are.
18 That's why we're still at 5 million members, and that's
19 why we're -- we're strong financially. And it's why the
20 NRA has been able to win consistently from a legislative
21 standpoint for the last couple of decades, is what --
22 it's all a mosaic and I am the glue that kind of tries
23 to hold that -- and piece that whole mosaic together.
24     Q. If I could, Mr. LaPierre, my question was does
25 Mr. Staples do any background check on the celebrities
Page 294

1 question.
2     A. Well, the Brewer firm has been retained to
3 handle litigation matters under the management now of
4 the SLC, so they -- they -- they make litigation matter
5 suggestions.
6     Q. (BY MR. SHEEHAN) I'm sorry. They make
7 litigation matter suggestions. And who has the ultimate
8 decision-making on those suggestions?
9     A. They discuss them with the -- with the SLC.
10     Q. Apart from litigation decisions and financial
11 decisions, are there any areas where the NRA has
12 delegated to the Brewer firm decision-making authority?
13         MR. GARMAN: Objection to form.
14     A. Not that I know of. I mean, they are involved
15 in all litigation matters. They have been involved
16 also -- but the litigation matters with New York state
17 cover a broad scope in terms of what we've had to deal
18 with since the -- I'm not trying to pin you personally,
19 Mr. Sheehan, but in terms of what we've had to deal with
20 from the Department of Financial Services and the
21 governor and the attorney general and -- and her
22 matters, it's a broad scope.
23     It also involved running down any
24 whistleblower complaints that could be an issue in this
25 litigation, to make sure that they were fully protected
Page 296

1 that you meet with?
2     A. No. I mean, I don't -- I don't -- I don't
3 tell him I'm going to meet with this certain celebrity
4 and he needs to do a background check on the celebrity.
5     Q. Okay. With respect to the Brewer firm, has
6 the NRA delegated decision-making authority to the
7 Brewer firm on expenditure of funds by the NRA?
8         MR. GARMAN: Objection to form.
9     A. The -- the NRA has put aside money in a trust
10 to be used by the Brewer firm. I believe that, as I
11 said, that the terms are an accounting will be provided
12 to the -- to the -- I think that accounting is provided
13 to the SLC, and I think it's also to be provided to me
14 as the -- to my office as to -- as to how those -- as to
15 how those funds are spent.
16     Q. (BY MR. SHEEHAN) And did you tell -- has that
17 accounting been provided yet with respect to the
18 $5 million fund?
19     A. I think the accounting has been provided in a
20 couple of instances. They've used money to explore
21 alternatives, reorganization alternatives.
22     Q. Apart from financial decisions, are there any
23 other decisions of the NRA that the NRA has delegated to
24 the Brewer firm to make on behalf of the NRA?
25         MR. GARMAN: Objection to the form of the
Page 295

1 and fully checked out and fully investigated; and if
2 there was anything there, to get to the bottom of it.
3     I mean, the Brewer firm has been retained to
4 work litigation issues, but part of the litigation also
5 involves bringing the NRA into 100 percent
6 self-correction and compliance, every employee,
7 including myself, and every vendor with New York state
8 not-for-profit law and every other not-for-profit law.
9     And we've done, as I said, a massive amount of
10 work for that that's continuing in 2018, 2019 and 2020
11 and 2021, which we are very proud of. And we have
12 learned a lot, and we have adjusted, and we now operate
13 under a completely different compliance grid. There are
14 checks in place to make sure no one can override those
15 compliance controls, and -- and we're very proud of the
16 work that's been done.
17     Q. (BY MR. SHEEHAN) So --
18     A. I don't understand why there is such a lack of
19 recognition of that out of the New York AG's Office in
20 terms of all the good work that's been done here to --
21 to put the organization into complete self-compliance.
22 And this started long before the attorney general's
23 investigation even started.
24     Q. Does the Carry Guard program still exist?
25     A. It does not. It -- we are still providing
Page 297

14 (Pages 294 - 297)

1 personal protection insurance with Lockton. It is not
2 called Carry Guard. As a result of what we believe was
3 an unfair targeting by the Department of Financial
4 Services as part of this plan to weaponize the
5 government of New York state, Maria Vullo, and her
6 Department of Financial Services put out notices to
7 banks and insurance companies and others that it was a
8 risk factor doing business with the NRA and not wise
9 and then, from what we understand, had back channel
10 communication and -- which we believe was clearly a
11 viewpoint discrimination. It was clearly a violation of
12 this organization's constitutional rights, and we have
13 filed First Amendment cases against both the New York
14 Department of Financial Services and the New York
15 Attorney General with the support of the American Civil
16 Liberties Union, who agrees with us that what is going
17 on is not proper under the Constitution of the United
18 States.
19     And so I mean, we're -- as I said, when I
20 started down this path in 2017, I wasn't a lawyer, I'm
21 not a CPA, I'm not an accountant. But when Attorney
22 General Schneiderman told us that, I was determined to
23 do whatever this organization needed to do to take a
24 look at everything, every employee. If we needed to
25 self-correct, self-correct. If -- as you heard me say

Page 298

1 before, if I lost every friend I ever made, that's the
2 path we were going down because it was the right course
3 for the organization.
4     Q.  So let me ask you, Mr. LaPierre. Did you know
5 that Michael Marcellin had a contract with the Lockton
6 Affinity people at the time that he was managing some
7 relationships with Lockton Affinity at the NRA?
8     A.  I did not. I knew nothing about that.
9     Q.  His -- did he get a consulting contract when
10 he left the NRA?
11         MR. GARMAN: Objection to form.
12     Go ahead.
13     A.  I knew nothing about that. I now believe,
14 based on information that's come to light, he did, but I
15 knew nothing about it at all.
16     Q.  (BY MR. SHEEHAN) So you knew nothing about
17 the -- his contract with Lockton Affinity. Correct?
18     A.  I knew nothing about his contract with Lockton
19 Affinity.
20     Q.  Did you know anything about his contract at
21 the end of his employment for consulting services?
22     A.  I did not.
23     Q.  Okay. With respect to the meeting that was
24 scheduled for March 14th, did you travel to Dallas to go
25 to that meeting?

Page 299

1     A.  March 14th?
2         MR. GARMAN: Objection to form.
3     Go ahead.
4     Q.  (BY MR. SHEEHAN) The meeting was not actually
5 held, but it was scheduled for March 14th. Did you
6 travel to Dallas for the March 14th meeting?
7     A.  The one that was canceled, no, I did not.
8     Q.  Okay. Are you traveling to Dallas for the
9 meeting on Sunday, the 28th?
10     A.  I will be.
11     Q.  Okay. And who -- how are you going to get to
12 Dallas?
13     A.  The security is setting up private
14 transportation, and I will take -- take probably a board
15 member and some staff people with me.
16     Q.  Okay. Is there an agenda for the March 28
17 meeting?
18     A.  I have not seen an agenda. I know the notice
19 talked about a -- that went out publicly talked about a
20 legal briefing, and I haven't seen an agenda beyond
21 that.
22     Q.  Is it customary to get agendas in advance of
23 the board meetings at the NRA?
24     A.  For a regular full board meeting, there are
25 agendas in advance that are given out, that's correct.

Page 300

1     Q.  Do you know if there's been a board book
2 distributed with respect to the March 28 meeting?
3     A.  I do not.
4     Q.  Who's responsible for preparing board books or
5 board materials for board meetings at the NRA?
6     A.  The secretary, Mr. Frazer.
7     Q.  Okay. And to the best of your knowledge, he's
8 not prepared a board book for the March 28 meeting?
9         MR. GARMAN: Objection to form.
10     Go ahead.
11     A.  I haven't seen it if he has.
12     Q.  (BY MR. SHEEHAN) Okay. Do you plan to ask
13 the board to ratify the filing of this bankruptcy case?
14         MR. GARMAN: Objection to the form of the
15 question.
16     I instruct you not to answer to the extent
17 that invades the attorney/client privilege and/or
18 strategy.
19     A.  I'm not -- I'm not sure what the strategy is
20 in terms of the board and what they plan to do on that.
21     Q.  (BY MR. SHEEHAN) Have you discussed with
22 anyone else in the -- on the board or the special
23 litigation committee whether the meeting will discuss
24 the issue of ratification of the bankruptcy filing?
25         MR. GARMAN: Objection. I object to the

Page 301

15 (Pages 298 - 301)

1 question.
2      I instruct you not to answer. That invades
3 the attorney/client privilege.
4      THE WITNESS: Okay.
5      Q. (BY MR. SHEEHAN) Okay. I am not asking you
6 about Mr. Brewer. I am asking you about the three
7 members of the special litigation committee.
8      MR. GARMAN: I understand.
9      Q. (BY MR. SHEEHAN) Have you discussed -- have
10 you had discussions with members -- I'm sorry.
11      MR. GARMAN: I'm sorry, Counsel. Go
12 ahead. I was apologizing for interrupting you.
13      MR. SHEEHAN: Okay. Okay.
14      Q. (BY MR. SHEEHAN) Have you discussed with
15 members of the special litigation committee whether the
16 subject of ratification should be discussed at the March
17 28 meeting?
18      MR. GARMAN: I instruct you not to answer
19 to the extent those communications included your legal
20 counsel.
21      MR. CORRELL: This is Kent Correll. I'm
22 also -- I object to the form of the question --
23      (Reporter clarification.)
24      MR. CORRELL: This is Kent Correll. I
25 object to the form of the question, and I instruct the
Page 302

1 witness not to answer the question to the extent that it
2 would require him to divulge conversations he had with
3 members of the SLC about litigation.
4      A. I had -- the conversations with the SLC were
5 all conversations with attorneys that were -- I believe
6 the counsel is advising me not to talk about.
7      I had one conversation with Sandy Froman
8 where -- where we talked about it, and I told her I
9 wasn't sure whether they were or were not going to ask
10 specifically for a ratification of what -- of what -- of
11 the bankruptcy. And we talked about the board in
12 general. And we talked about the fact that they should
13 be able to ask all kinds of questions and they should be
14 able to be fully filled in on everything. And it should
15 be a very open dialogue in terms of everyone and because
16 everything needed to get out in the open.
17      Q. (BY MR. SHEEHAN) Is the March 28 meeting, is
18 that in Dallas?
19      A. Yes, it is.
20      Q. And is it in person?
21      A. It is.
22      Q. Will people be allowed to join electronically?
23      A. I do not believe they will be.
24      Q. Do you know how many directors are confirmed
25 to attend on March 28 meeting?
Page 303

1      A. You know, I don't. I have not asked John
2 that. I know at the last one that we did and ended up
3 being canceled, there were 47 that were planning on
4 attending. I don't know what the number that he has on
5 this one. I have not had a chance to talk with him.
6      Q. Are all the directors flying by coach class to
7 Dallas?
8      MR. GARMAN: Objection to the form of the
9 question.
10      A. As far as I know, they are.
11      Q. (BY MR. SHEEHAN) Have you authorized any
12 board member to fly other than by coach class?
13      A. I have not.
14      Q. And was there a board member flying down with
15 you on your private charter to the meeting on the 28th?
16      A. I intended to. Given the fact the plane was
17 going down there, I intended to offer Willes Lee, who
18 lives in this area, a chance to ride down and one or two
19 staff people that -- given the fact the plane is going
20 there anyway, an opportunity to go down that way.
21      Q. During --
22      A. And --
23      Q. I'm sorry.
24      A. And I also intended -- intend to check with
25 counsel to see whether that's appropriate before I --
Page 304

1 before I do that.
2      Q. During the year of -- between March 15th of
3 2020 and today, how frequently do you go into the office
4 at the NRA?
5      A. I've been here quite a bit.
6      Q. Twice a week, three times a week?
7      A. A couple days a week. Again, a couple days a
8 week.
9      Q. Okay.
10      A. And then I've been working from home a couple
11 days a week --
12      Q. Do you --
13      (Reporter clarification.)
14      A. -- about COVID and -- over the COVID exposure.
15      Q. (BY MR. SHEEHAN) Do you know why the decision
16 was made not to allow attendance electronically at the
17 Dallas meeting on the 28th?
18      MR. GARMAN: Objection to the form of the
19 question.
20      A. I don't, but I believe it was in relation to
21 security concerns of somehow if they -- if they used
22 Zoom or something like that of security -- security
23 issues, although I'm not positive of that.
24      Q. (BY MR. SHEEHAN) Okay.
25      MR. SHEEHAN: At this point I think I'm
Page 305

16 (Pages 302 - 305)

1 finished. I just want to go off the record and talk to
2 my colleagues for a few minutes, but I think that the
3 individual portion of Mr. LaPierre's deposition will be
4 completed at that point.
5 So let's take five minutes and then come back,
6 and then I may have one or two more questions.
7 MR. MASON: Just to clarify, the NY AG's
8 portion of the individual?
9 MR. SHEEHAN: Correct. Correct.
10 THE VIDEOGRAPHER: We're off the record.
11 The time on the video is 10:52 a.m.
12 (Break from 10:52 a.m. to 11:01 a.m.)
13 THE VIDEOGRAPHER: We're back on the
14 record. The time on the video is 11:01 a.m.
15 Q. (BY MR. SHEEHAN) So Mr. LaPierre, I just have
16 one more question and then turn it over to Mr. Mason.
17 If something were to happen to you, is there
18 anyone at the NRA that's in position to succeed you as
19 executive VP and has the training and experience?
20 MR. GARMAN: Objection to the form of the
21 question.
22 A. I think that that is -- that that is one of
23 the -- I have a concern and I know the board of
24 directors has a concern of the fact that -- the fact
25 that I have been for 40 years the voice of our members

Page 306

1 out there on television, in terms of, you know, being
2 their voice and fighting their fight and standing up for
3 their freedoms. My fundraising signature and
4 fundraising ability helps the organization. And I --
5 the fact that I've been out there with the members for
6 40 years that are the ultimate -- what makes this
7 association work, I think I have a unique relationship
8 with the membership in terms of -- and I think -- I
9 think one of the concerns that we're all wrestling with
10 is how that succession will take place when it takes
11 place and how it will affect the monetary situation of
12 the NRA.
13 Q. (BY MR. SHEEHAN) So is there any person in
14 your view who is currently in a position to take over
15 your position if you left?
16 MR. GARMAN: Objection to the form of the
17 question.
18 Go ahead and answer.
19 A. I -- there are a lot -- there are some smart
20 young people around here. I think they are growing, and
21 I have confidence that they have the potential of
22 growing into the job.
23 Q. (BY MR. SHEEHAN) Who are they?
24 A. Well, I don't have a specific successor picked
25 yet. I'm not so sure it -- I'm not so sure it's -- and

Page 307

1 it's not even my decision; it's the board of directors'
2 decision. And I think whatever would happen, the board
3 of directors would be the one that would make the
4 decision after doing a search, and it would be their
5 decision, not mine. So I don't know that I should even
6 speculate, given the fact that that is entirely a
7 decision to be made not by me, who works for the board,
8 but by the board of directors. I mean, that's how I was
9 chosen, and that's how I've been reelected every year by
10 the board, and the board will make that decision. So I
11 would hesitate to even throw out names, given the fact
12 that ultimately it's not my decision.
13 Q. But do you have an opinion about the young
14 people you mentioned before who could step into that
15 role? That is, who they might be?
16 MR. GARMAN: Objection to the form of the
17 question. I think he said no one was ready.
18 A. There's a lot of good people in this
19 organization that I'm sure the board would look at. I
20 mean, I could -- I could throw out names like -- but
21 it's not my decision. I mean, I'm sure they would look
22 at Doug Hamlin. I'm sure they would look at Jason
23 Ouimet. I'm sure they would look at Mr. Schropp. I'm
24 sure they would look at, you know, Mr. DeBergalis. I'm
25 sure they would look at -- but they would also look

Page 308

1 probably at other can dates, and it's ultimately their
2 decision.
3 I just know that -- I think we have a really
4 good staff here right now, and they're doing really good
5 work, and I respect them all. And I wouldn't want to --
6 I wouldn't want to really at this point -- it's not my
7 decision. It's the board's decision. I mean, I -- I
8 don't know how to say it beyond that. It is entirely
9 the board of directors' decision as to who they pick to
10 succeed me should I choose to retire.
11 Q. (BY MR. SHEEHAN) Have you had discussions
12 with the board about a succession plan?
13 MR. GARMAN: Objection to the form of the
14 question.
15 Go ahead.
16 A. I know the board is -- talks about that. I
17 know the officers talk about that. I know they talk
18 also about the fundraising issues that -- that will
19 exist, based on the amount of money that -- I mean, a
20 lot of years -- I mean, because NRA's money comes in
21 based on whether you're out there fighting on TV and
22 whether you're out there fighting the cause and whether
23 you're out there battling.
24 And then, you know, we also have all these
25 great programs, whether they're -- I talked about them,

Page 309

17 (Pages 306 - 309)

1 the 130,000 safety instructors, 14,000 law enforcement
2 instructors, the child safety programs, the great
3 magazines we publish. I mean, all the work the NRA does
4 on a day-to-day basis that's not legislative or
5 political.
6 　　　　And it -- it is a -- and ultimately, the 5
7 million members that elect the board of directors, a
8 third of them each year, control the organization. And
9 it's a very robust process, and I'm sure that the
10 successor -- you know, the board will look at all of
11 those factors when they make the decision.
12 　　　　MR. SHEEHAN: All right. At this point I
13 will turn it over to Mr. Mason on behalf of Ackerman
14 McQueen for questioning.
15 　　　　EXAMINATION
16 BY MR. MASON:
17 　Q. Good morning, Mr. LaPierre. Are you ready --
18 　A. Good morning.
19 　Q. -- to proceed?
20 　A. Yes. Good morning.
21 　Q. My name is Brian Mason. I'm a partner at
22 Dorsey & Whitney in Dallas, and I represent Ackerman
23 McQueen. Do you understand who I am and who I
24 represent?
25 　A. I do.

Page 310

1 management of that litigation in any way and am
2 completely out of the process. It's being managed by
3 the special litigation committee.
4 　Q. So does that include all litigation, including
5 the Ackerman McQueen litigation?
6 　A. The special litigation committee is managing
7 all that litigation, because I think the belief is it's
8 all directly related to the New York state issues.
9 　Q. Is the special litigation committee managing
10 the litigation with Under Wild Skies?
11 　A. The special litigation committee is -- is
12 managing that legislation.
13 　Q. Is the special litigation committee managing
14 the litigation that the NRA has against Mark Dycio?
15 　A. The special litigation committee is managing
16 that litigation also.
17 　Q. So all of the current litigation that the NRA
18 has is being managed by the special litigation
19 committee. Do I understand that correctly?
20 　A. That's -- that's my understanding.
21 　Q. And Mr. Frazer has recused himself from
22 involvement with the special litigation committee
23 because of the New York AG action?
24 　　　　MR. GARMAN: Objection to the form of the
25 question.

Page 312

1 　Q. I want to ask you a few follow-up questions
2 from earlier this morning.
3 　　　　With respect to the money that you were
4 testifying about that was set aside in the Brewer trust
5 account, was that in reference to the $5 million?
6 　　　　MR. GARMAN: Objection to the form of the
7 question.
8 　　　　Go ahead if you understand.
9 　A. Yes, it was $5 million that was put in the
10 Brewer trust account to be used on reorganization
11 matters with -- yes.
12 　　　　MR. CORRELL: This is Kent Correll.
13 Mr. Mason, with Mr. Sheehan we had an agreement that any
14 objection made by the NRA would be joined by
15 Mr. LaPierre individually. Can we have that same
16 agreement?
17 　　　　MR. MASON: Yes, we can.
18 　　　　MR. CORRELL: Thank you.
19 　Q. (BY MR. MASON) You also testified that the
20 Brewer firm was handling the litigation matters under
21 the management of the special litigation committee. Did
22 I understand that correctly?
23 　A. That is correct. Because I was individually
24 named by the New York AG's Office and John Frazer was
25 individually named, I cannot be involved in the

Page 311

1 　A. He has.
2 　Q. (BY MR. MASON) And you have also --
3 　A. I'm not -- I'm saying to the best of my
4 knowledge on this. I mean, I'm not an expert on --
5 you'd have to ask John Frazer whether he's involved in
6 any of this legislation that in some way they may
7 consider different than the New York legislation.
8 　Q. But as you sit right here right now, your
9 understanding is --
10 　　　　MR. CORRELL: Excuse me, Mr. Mason. This
11 is Kent Correll. I just want to note that Mr. LaPierre
12 has twice used the word "legislation" rather than
13 "litigation."
14 　　　　THE WITNESS: Yes. I meant "litigation."
15 　　　　MR. CORRELL: Thank you.
16 　Q. (BY MR. MASON) But as you sit here right now,
17 Mr. LaPierre, it's your understanding that all of the
18 litigation that the Brewer law firm is handling is being
19 managed by the special litigation committee?
20 　　　　MR. GARMAN: Objection to the form of the
21 question.
22 　A. I believe -- I believe it is.
23 　Q. (BY MR. MASON) You also said that the Brewer
24 firm was responsible for running down any whistleblower
25 complaints. Do you recall that?

Page 313

18 (Pages 310 - 313)

1    A.  I did, because they all related to the -- the
2  New York -- the New York AG litigation.
3    Q.  Has the NRA had any whistleblower complaints
4  that the Brewer law firm was not involved with in the
5  last -- in the last two years?
6         MR. GARMAN:  Objection to the form of the
7  question.
8         Go ahead and answer.
9    A.  I think in the last two years, the -- when the
10  whistleblower complaints started to come forward, the
11  Brewer firm was -- was charged with running down those
12  internal whistleblower complaints and then checking them
13  out, making sure the whistleblower was protected, and
14  seeing whether there was truth or not truth and, if
15  there was truth, getting to the bottom of it and dealing
16  with it appropriately.
17    Q.  (BY MR. MASON)  And was that done at your
18  direction?
19    A.  Absolutely.  I wanted -- I mean, going back
20  to 2017 after the call from Attorney General
21  Schneiderman --
22    Q.  Mr. LaPierre, my question was much simpler.
23  It was just was that done at your direction?
24    A.  Yes.  I -- one of the things that we were
25  involved with, this New York litigation, the potential

Page 314

1    Q.  And that includes the entire board, not just a
2  portion of the board.  Correct?
3         MR. GARMAN:  Objection to the form of the
4  question.
5         But go ahead.
6    A.  It includes the -- it includes the whole of
7  the board of directors as a -- as a body.  Not an
8  individual board member, but the -- the -- the board of
9  directors in its entirety and in terms of -- in other
10  words, while I do everything I can to work with
11  individual board members, I actually work for the board
12  as a whole.  The power rests in the board as a whole and
13  their votes and their consensus as a majority of the
14  board of directors.
15    Q.  (BY MR. MASON)  And you've previously
16  testified that the ultimate authority for the governance
17  of the NRA rests with the entire board.  Right?
18         MR. GARMAN:  Objection to the form.
19         Go ahead.
20    A.  It absolutely does.
21    Q.  (BY MR. MASON)  Do you believe it's important
22  to be open and transparent with the board?
23         MR. GARMAN:  Objection to form.
24    A.  I believe I've always believed it's very
25  important to be open and transparent with the board.

Page 316

1  of it.
2         We were already involved with the Department
3  of Financial Services, which was the first part of it.
4         Whistleblower complaints started to come
5  forward that we believed would directly relate to the
6  litigation involving New York, and one of the things
7  that we asked Mr. Brewer to do was to -- the Brewer firm
8  to do was to run down these whistleblower complaints and
9  check them out and get to the bottom of it and protect
10  the whistleblower and do everything appropriate that
11  should be done in that type situation.
12    Q.  Okay.  Yesterday morning you were asked
13  whether you had reviewed any documents prior to your
14  deposition yesterday, and you indicated that you had
15  not.
16         Did you review any documents in preparation
17  for your deposition today, between yesterday evening and
18  this morning?
19    A.  I did not.
20    Q.  As executive vice president, do you report to
21  the NRA board of directors?
22    A.  I work for the NRA board of directors.
23  They -- they can hire me.  They can fire me.  They --  I
24  work completely for the board of directors.  I am
25  their -- their employee.

Page 315

1    Q.  (BY MR. MASON)  Do you believe it's important
2  to be honest with the board?
3         MR. GARMAN:  Objection, form.
4    A.  I've always believed it's important to be
5  honest with the board.
6    Q.  (BY MR. MASON)  Do you trust the NRA board to
7  oversee the NRA?
8    A.  I do trust the NRA board to oversee the NRA.
9  That's why I've always said it's very important that NRA
10  do everything it can to get very distinguished and
11  accomplished people on our board of directors that have
12  experience and intellect and vision and -- and
13  resourcefulness, because ultimately this entire staff in
14  this building works for the board; and if the board in
15  some way is not outstanding, it affects the morale of
16  the entire staff in this building.
17    Q.  Do you trust the NRA board to make decisions
18  that are in the best interest of the NRA?
19    A.  I do trust the NRA board.  I think it's a --
20  it's a -- it's a very responsible board.
21    Q.  And that includes all board members?
22         MR. GARMAN:  Objection to the form.
23    A.  You know, I always give my respect to -- or
24  try to, to all board members, to tell you the truth, and
25  treat them with respect.  That doesn't mean I always

Page 317

19 (Pages 314 - 317)

1  agree with them all, but I always try to respect them
2  all and listen to them and -- and be civil and decent.
3  Q. (BY MR. MASON) Do you trust the board to keep
4  information confidential if you -- if you ask them to do
5  so?
6  MR. GARMAN: Objection to form.
7  Go ahead.
8  A. I don't think it's any secret if you were to
9  talk to our -- most of our board, is the board of
10  directors realizes that in recent years they have had a
11  problem with leaks out of the board meeting, even in
12  executive session, real-time information being passed
13  out -- out of executive session to various individuals
14  or the media, and it is a problem that the board of
15  directors is wrestling with as to how to -- how to
16  function as a board when that type of activity has been
17  going on.
18  Q. (BY MR. MASON) And that's a problem here and
19  now today on March 23rd. Right?
20  A. I think it is an ongoing concern of a good
21  number of our board of directors. I don't think they
22  know who is doing it. I don't think they -- but I just
23  know that they all believe it has been happening.
24  Q. Does it make it difficult to be open and
25  transparent with the NRA board if you're concerned about

Page 318

1  leaks?
2  MR. GARMAN: Objection to form.
3  Go ahead.
4  A. Well, that's one of the concerns the board has
5  had, is the fact that it makes it difficult for them to
6  be open and transparent in executive session if they
7  believe that there's a possibility it will be leaked.
8  Q. (BY MR. MASON) So how can you trust the NRA
9  board to make governance decisions that are in the best
10  interest of the NRA if you're concerned that information
11  shared with them could be leaked?
12  MR. GARMAN: Objection to the form of the
13  question.
14  A. Well, I think the board struggles in the best
15  as they can with that circumstance and try to be as open
16  and transparent as they can, given the fact they are
17  aware that that type of situation has been occurring.
18  It's a problem they wrestle with, but I know they try to
19  be as open and transparent as they can be, recognizing a
20  reality that has existed.
21  Q. (BY MR. MASON) Mr. Powell in his book stated,
22  And as Wayne admitted to me in confidence, they, being
23  the NRA board, exercised almost no genuine oversight on
24  the NRA executive leadership.
25  Did you ever tell Mr. Powell that -- in

Page 319

1  confidence, that the NRA exercised almost no genuine
2  oversight on the NRA executive leadership?
3  MR. GARMAN: Objection to the form of the
4  question.
5  A. No, I did not tell Mr. Powell that.
6  Mr. Powell -- I haven't read his book. From what people
7  have told me about it, he appears to be making up a lot
8  of things that are not accurate.
9  Q. (BY MR. MASON) But he also appears to be
10  making statements that are also true. Right?
11  MR. GARMAN: Objection to the form.
12  A. I don't know.
13  MR. GARMAN: Objection to the form of the
14  question.
15  A. I don't know. I haven't read his book.
16  Q. (BY MR. MASON) Mr. LaPierre, as you sit here
17  today, are you aware whether the NRA board was told on
18  January 7 that the NRA was going to be filing for
19  Chapter 11 bankruptcy?
20  MR. GARMAN: Objection to the form of the
21  question.
22  I instruct you not to answer the contents of
23  executive session. Otherwise, you can answer the
24  question.
25  A. I was not in that session. I -- I do not know

Page 320

1  what the discussion was because I was not in it. All I
2  know is that out of that session, I was -- came out of
3  contract that involved me, and a part of that contract
4  included a delegation of authority to the executive vice
5  president to reorganize the association.
6  Q. (BY MR. MASON) So is it your testimony that,
7  as you sit here right now, you do not know whether the
8  board was advised of the Chapter 11 bankruptcy on
9  January the 7th?
10  MR. GARMAN: Objection to the form of the
11  question.
12  Go ahead.
13  A. I was not in that session. I was not privy to
14  the discussion as to what took place.
15  Q. (BY MR. MASON) I understand you were not
16  present, but my question is more simple than that.
17  As you sit here right now, are you aware
18  whether or not the NRA board was advised about the
19  Chapter 11 bankruptcy on January the 7th?
20  MR. GARMAN: Objection to the form of the
21  question.
22  Go ahead.
23  A. To the best of my knowledge, the board
24  delegated authority to the executive vice president to
25  make decisions on reorganization. And at that point, I

Page 321

20 (Pages 318 - 321)

1 don't -- a decision had not been made on whether or not
2 the NRA was going to move to filing Chapter 11
3 bankruptcy. As I said, without that delegation of
4 authority by the board to the EVP, I certainly wouldn't
5 have moved forward with it.
6           MR. MASON: Objection, nonresponsive.
7    Q. (BY MR. MASON) Have you had conversations
8 with board members since the bankruptcy filing on
9 January the 15th?
10   A. I have had conversations with board members.
11   Q. Have any of those board members indicated to
12 you that they were not advised that the NRA was going to
13 be filing for Chapter 11 bankruptcy on January the 7th?
14   A. I've had board members tell me that they --
15 that they -- they -- yeah, that they did not realize
16 that, they -- they -- and that's one of the reasons that
17 I thought it was a good idea to get them all together
18 and let everyone ask their questions, because I don't
19 think some of them bothered to read the delegation of
20 authority to the executive VP to reorganize the
21 association or ask questions about it.
22         And in executive session, even though I wasn't
23 there, any board member could have asked any question
24 that they wanted to, and I assume the officers would
25 have responded. But a decision had not been made at

Page 322

1 that point to go that route. I guess it's something
2 they could have talked about, but a decision had not
3 been made at that point.
4    Q. Who are the board members that you're
5 referring to that you spoke with and had that
6 conversation with?
7           MR. GARMAN: Objection to the form of the
8 question.
9         Go ahead.
10   A. About -- about the need for more discussion on
11 everything?
12   Q. (BY MR. MASON) Yeah, about the board not
13 being told that, hey, we're about to go file for
14 Chapter 11 bankruptcy?
15          MR. GARMAN: Objection to the form of the
16 question.
17   A. Well --
18          MR. CORRELL: This is Mr. Correll. I
19 would just like to instruct the witness not to reveal
20 the substance of any communications with any members of
21 the special litigation committee that related to
22 litigation strategy.
23   A. Yeah, I'm sorry, could you state the question
24 again?
25   Q. (BY MR. MASON) Sure.

Page 323

1           You said that you've spoken with board members
2 since the bankruptcy filing that have indicated to you
3 that they did not know at the January 7 meeting that
4 what they were doing was authorizing -- purportedly
5 authorizing the NRA to file Chapter 11 bankruptcy. And
6 so my question is who are those board members that you
7 have had those conversations with?
8           MR. GARMAN: Objection to form.
9    A. They didn't -- I wouldn't say they all put it
10 in exactly the terms you just described, but I talked
11 with numerous board members that -- that have expressed
12 the need for -- they would -- and I -- and I believe
13 this, for an open session where everybody can get
14 everything out in the open, everyone can ask their
15 questions.
16         And now that the NRA has made the decision,
17 based on the delegation of authority with the SLCs to
18 file the Chapter 11, they have a discussion about the
19 whole thing. I've talked to board members, from Susan
20 Howard to Sandy Froman to -- to Joel Friedman, to --
21 to -- gosh, I would have to have a list of the board
22 members in front of me to -- but I talked to probably
23 10, 15, 20 of them about -- you know, and everyone
24 agrees that it would be good to get everyone together
25 and have a full, open discussion of everything.

Page 324

1    Q. (BY MR. MASON) Did any of those board members
2 express concerns that they wish that there was that
3 discussion that happened -- let me start over.
4         Did any of those board members express
5 concerns to you that -- about those discussions and how
6 they should have occurred on January the 7th?
7           MR. GARMAN: Objection to form.
8    A. I wouldn't say it was so much in relation to
9 those discussions and how they should have occurred.
10 It was that they expressed a desire to get everything
11 out in the open, ask questions, have a full discussion
12 of everything, everybody get their questions answered,
13 and -- and that would be -- that's a good thing for the
14 board and the association, because some of them clearly
15 did not pay attention or -- or from what -- or follow
16 that part on the reorganization.
17         I had one of them tell me, for example, the
18 only part that he really read was the part that involved
19 my contract and didn't really pay attention to any of
20 the rest of the resolution. So I think there -- I think
21 it would be good for the association to have a board
22 meeting and a full discussion of everything and
23 everybody get everything out in the open.
24   Q. (BY MR. MASON) And a full disclosure with the
25 board, right, because that didn't happen on January

Page 325

21 (Pages 322 - 325)

1 the 7th?
2         MR. GARMAN: Objection to the form of the
3 question.
4    A.    Well, keep in mind, that discussion could have
5 gone anywhere the board took it. I wasn't in there, but
6 in every executive session, every board member has the
7 right to ask any question that they have at all. And
8 the person that was chairing the meeting or the other
9 board members have an opportunity to take the mic and
10 talk about it. And I wasn't in there. I don't -- I
11 mean, if -- if questions weren't asked, they weren't
12 asked, but that's -- that's -- I mean, I wasn't in the
13 room.
14    Q.    (BY MR. MASON) On January 6, 2021, did you
15 know that if your employment agreement was approved by
16 the board on January 7, that you would be having -- that
17 you would believe that you had the authority to file
18 Chapter 11 bankruptcy on behalf of the NRA?
19         MR. GARMAN: Objection to form.
20         Go ahead and answer if you understand.
21         MR. CORRELL: Yeah. And to the extent --
22 this is Mr. Correll. To the extent that you had any
23 conversations with attorneys on that subject, not saying
24 you did, but if you did, please steer clear of those
25 conversations.

Page 326

1    A.    Well, all of my conversations I had prior to
2 that were with -- were with attorneys in regard to my
3 contract and what was in it in terms of -- in terms of
4 the reorganization.
5    Q.    (BY MR. MASON) And who were those attorneys?
6    A.    I had discussions on my contract with Kent
7 Correll, my personal attorney. I had discussions
8 with -- with Bill Brewer.
9    Q.    You testified at the first 341 creditors
10 meeting that you made the decision for -- to file for
11 bankruptcy a couple weeks before January 15. Do you
12 remember that?
13         MR. GARMAN: Objection to form.
14    A.    I think we made the actual final decision a
15 couple of days before. As I said, if we had not had
16 that delegation of authority at the board meeting
17 through the executive VP to reorganize the NRA, I would
18 not have gone ahead, at least I wouldn't have, and filed
19 for that reorganization. So I mean, it -- that's the
20 case.
21         There had been discussions of all kinds of
22 different options that the NRA might take, but no
23 decisions had been made, strategic alternatives to -- to
24 dealing with what we believed was a not fair -- fair
25 playing field in New York state and how -- what do you

Page 327

1 do when you're facing that type situation, where we
2 believed that we were being -- viewpoint discriminated
3 against by the State of New York, and we believed that
4 plan that Attorney General Schneiderman had laid out in
5 2017 was in full operation and in violation of the
6 organization's constitutional rights. And that's why we
7 have two First Amendment cases pending against the
8 Department of Financial Services --
9    Q.    (BY MR. MASON) I understand. I understand.
10 You've answered my question.
11         Who is Duane Liptak?
12         MR. CORRELL: Excuse me. This is Kent
13 Correll. Please don't interrupt the witness and
14 allow -- and please do allow the witness to finish his
15 answer.
16    Q.    (BY MR. MASON) Mr. LaPierre, who is Duane
17 Liptak?
18    A.    Duane Liptak is a member of the board, or was
19 a member of the board.
20    Q.    How long was he a member of the board?
21         Well, let me ask you this. Why is he no
22 longer a member of the board?
23    A.    He sent in a resignation letter saying that --
24 I can't remember exactly what it said. I know he said
25 that he continues to support the organization, he'll do

Page 328

1 anything he can to -- to help it. I honestly don't
2 remember what the rest of the letter said. I read it,
3 but I just don't remember.
4    Q.    Let's take a look at -- if we can get
5 Exhibit -- Ackerman Exhibit 148, please.
6         (AMc Exhibit 148 marked.)
7    Q.    (BY MR. MASON) And if you'll let me know,
8 Mr. LaPierre, when you've got Exhibit 148 up.
9         MR. GARMAN: We are pulling it up right
10 now.
11         Brian, it's Greg. I keep refreshing, but it's
12 not there yet. Is it in the folder deposition of Wayne
13 LaPierre, 3/23 under Marked Exhibits?
14         MR. CORRELL: It should be. Can I get
15 delegated access to share my screen please?
16         MR. GARMAN: Yeah, the screen is pretty
17 far from us. We'll do our best, but it's probably a
18 good 15 feet from us. But you can try. We'll do our
19 best.
20         MR. CORRELL: Let's go off the record
21 real quick. Let me get this figured out. Just for one
22 or two minutes.
23         MR. GARMAN: We won't leave.
24         THE VIDEOGRAPHER: We are going off the
25 record. The time on the video is 11:37 a.m.

Page 329

22 (Pages 326 - 329)

1 (Break from 11:37 a.m. to 11:42 a.m.)
2 THE VIDEOGRAPHER: We're back on the
3 record. The time on the record is 11:47 -- I'm sorry --
4 11:42 a.m.
5 Q. (BY MR. MASON) Mr. LaPierre, I've got up on
6 my screen Ackerman Exhibit 148. Can you see the
7 document on the screen and specifically the email at the
8 top from Mr. Liptak?
9 A. Let me -- it's taking me a minute because it's
10 a long way away. I'm struggling to read it. I see
11 to -- from Duane Liptak to John Frazer. Subject,
12 announcement from Wayne LaPierre. And it says -- I can
13 read it now.
14 (Witness reading to himself.)
15 I read -- just read that.
16 Q. Have you seen this email before?
17 A. I have not seen that email.
18 Q. Have you had any conversations with Mr. Liptak
19 since January the 15th?
20 A. I have not.
21 Q. Do you believe -- do you believe Mr. Liptak
22 would have sent this email to Mr. Frazer if the
23 Chapter 11 bankruptcy had been discussed at the January
24 7th board meeting?
25 MR. GARMAN: Objection to the form of the

Page 330

1 question.
2 A. Well, I'm speculating. I mean, I --
3 MR. GARMAN: No, no, no. We're not going
4 to speculate. I also object to foundation.
5 Q. (BY MR. MASON) Are you going to answer my
6 question, Mr. LaPierre?
7 A. I'd answer your question that I wasn't in the
8 room, but when a resolution was passed, any board member
9 had the opportunity to ask any question that they wanted
10 to ask. And if someone wanted to ask a question in
11 relation to the reorganization and what that entailed,
12 which was delegated to the EVP, they had a full
13 opportunity to do it. I mean, obviously, you know, I
14 wasn't in the room, so I -- I don't -- I don't know the
15 full extent of the discussion or how close they got to
16 it or what they discussed.
17 Q. Prior to the January 7th board meeting, did
18 you have any discussions with anyone about not telling
19 the board of directors at the January 7th meeting that
20 the NRA was considering filing for Chapter 11
21 bankruptcy?
22 MR. GARMAN: Object to the form of the
23 question.
24 And simply to the extent your answer would
25 include counsel, I instruct you not to invade the

Page 331

1 attorney/client privilege, but otherwise you can answer.
2 A. Yeah, the only discussions I had were with
3 counsel and with the SLC.
4 Q. (BY MR. MASON) And that was prior to January
5 7?
6 A. That is correct.
7 Q. And who was the counsel that you're referring
8 to?
9 A. That would be Bill Brewer and the special
10 litigation committee.
11 Q. So did you have conversations with the special
12 litigation committee specifically prior to January 7
13 relating to the NRA filing Chapter 11 bankruptcy?
14 MR. GARMAN: Objection to the form of the
15 question.
16 I again give you the same instruction.
17 A. And I did not have independent -- any
18 discussions were in the presence of counsel.
19 Q. (BY MR. MASON) And I'm not asking you to get
20 into those discussions. I'm asking you -- well, let me
21 ask it this way.
22 Did you ever tell Charles Cotton prior to
23 January 7 that the NRA is seriously considering about to
24 file Chapter 11 bankruptcy in Texas?
25 MR. GARMAN: Objection to the form of the

Page 332

1 question.
2 Same instruction. You can otherwise answer.
3 A. We were -- we were working with Charles Cotton
4 on -- and Charles Cotton was actually having meetings
5 with the governor of Texas and with other people,
6 because Texas was, along with about 20 other states,
7 really were doing everything they can to encourage NRA
8 to leave the toxic environment in New York, which they
9 considered, based on their reading of the news and the
10 information they were receiving from their -- from their
11 contacts that -- and to reorganize in their state. And
12 I had the discussions with Charles Cotton about the work
13 he was doing with the -- with the governor of Texas and
14 with -- in relation to that.
15 Q. (BY MR. MASON) Okay. So prior to January 7,
16 did you specifically tell Mr. Cotton that we are on the
17 verge of making a decision to file Chapter 11 bankruptcy
18 and reincorporate in Texas?
19 MR. GARMAN: Objection to the form of the
20 question.
21 I give you the same instruction.
22 A. I -- I think that Charles was aware that that
23 was one of the options. I don't think -- a decision had
24 not been made. It -- but I had discussions with Charles
25 in terms of reorganizing and -- and moving NRA to a --

Page 333

23 (Pages 330 - 333)

1 somewhere that wanted the organization, would offer a
2 fair regulatory environment where the organization could
3 grow and prosper.
4       A decision had not been made on how that would
5 be done, whether it would be Chapter 11, whether it
6 would be bankruptcy. I think that every -- every option
7 was being explored, but a decision had not been made.
8    Q.  (BY MR. MASON) Who is Phillip Journey?
9    A.  Phillip Journey is a member of the board of
10 directors, a previous member of the board of directors,
11 and he is a former state legislator, I believe. And
12 he's a judge now, to the best of my knowledge.
13    Q.  How long have you known Judge Journey?
14    A.  Gosh, probably 20, 25 years.
15    Q.  Do you consider him a friend?
16    A.  I mean, I -- I'm friendly with everybody. I
17 respect everybody. I mean, do we -- do we pal around
18 together? No, we don't. But I've run into Phil at
19 numerous meetings on -- speaking on the road over the
20 years, and we've always had very friendly conversations
21 and -- yes.
22    Q.  Have you known him to be an honest and
23 truthful person?
24       MR. GARMAN:  Objection to form.
25       Go ahead.
                                              Page 334

1 about someone I'm saying I really don't know very well.
2 I'm not trying to be evasive on the issue; it's just
3 that if you -- if you -- I mean, if you don't know
4 somebody very well, it's hard to make an assessment. I
5 mean, I guess I take everybody at face value, as I
6 believe there's good in everybody that I meet, you know.
7    Q.  (BY MR. MASON) Prior to --
8    A.  I hope there is.
9    Q.  Prior to January 15, did Judge Journey ever
10 say or do anything that made you question his integrity?
11       MR. GARMAN:  Objection to the form of the
12 question.
13    A.  As I've said, the last 15 or 20 years, every
14 time I've met Phil Journey, Judge Journey, he's been
15 nice and we had a nice conversation and nothing happened
16 in those conversations that -- that made me question his
17 integrity.
18       I remember back in the days of the '97 and '98
19 when he was on the board, I thought that -- when there
20 was an issue going on, I thought some of the decisions
21 that he made -- was making in terms of how he voted
22 was -- I thought was the wrong way, but -- and was the
23 wrong decision, but that was a long, long time ago and,
24 you know, people change. And I'm somebody that
25 understands people change, and that's why I responded
                                              Page 336

1    A.  You know, all I can say is I've had -- I've
2 had friendly conversations with him, like all kinds of
3 other people you have friendly conversations with.
4    Q.  (BY MR. MASON) Prior to January 14, did you
5 consider Mr. -- Judge Journey an honest and truthful
6 person?
7       MR. GARMAN:  Objection to the form of the
8 question.
9    A.  You know, again, I don't have -- I don't have
10 a deep relationship with -- I'm not trying to disparage
11 Mr. Journey in any way; it's just I don't have the type
12 of relationship or the amount of experience in terms of
13 working with to -- you know, I mean, Mr. Journey has
14 always appeared to me to be, you know, nice and he was
15 friendly.
16       In fact, prior to his nomination to the board,
17 someone called me on the board and said, What do you
18 think of Phil Journey? And I said, Well, I've run into
19 him several times and he's always been nice and we've
20 had nice conversations. And that was my answer.
21    Q.  (BY MR. MASON) Prior to January 15, did you
22 believe that Judge Journey was a man of integrity?
23       MR. GARMAN:  Objection to the form of the
24 question.
25    A.  Again, you're asking me to make a judgment
                                              Page 335

1 the way I responded when the -- when the person called
2 me about, What do you think about Phil being nominated
3 for the board? I said, I've got a lot of -- I've run
4 into him a lot of times and he was friendly and nice.
5 And I -- basically, I said I've had very nice
6 conversations with him, even though I think back in the
7 '90s some of the positions he took on the board I -- I
8 disagreed with, to the best of my recollection. I
9 didn't think it was in the best interest of the NRA.
10    Q.  (BY MR. MASON) Was the NRA's filing of
11 Chapter 11 bankruptcy a major decision for the NRA?
12       MR. GARMAN:  Objection to the form of the
13 question.
14    A.  Yes, the NRA's decision to file Chapter 11 was
15 a -- was a major decision.
16    Q.  (BY MR. MASON) The NRA has been in New York
17 for 150 years. Right?
18    A.  They have.
19    Q.  This was -- this was a historic decision,
20 wasn't it?
21       MR. GARMAN:  Objection to the form of the
22 question.
23    A.  Well, it was a decision that -- as I said, the
24 NRA for years has been talking on and off about the need
25 to reincorporate in somewhere that offered a friendlier
                                              Page 337

24 (Pages 334 - 337)

1 environment than New York state to the organization.
2 There were also ongoing discussions even about the NRA's
3 principal place of operation here in Virginia, that
4 maybe -- maybe it would be better for our employees to
5 move into a friendlier place.
6      So these discussions have been going on for
7 many, many years, long before the issue of General
8 Schneiderman's telephone call, Governor Cuomo, DFS,
9 General James or General James' statement during her
10 campaign about the NRA being a criminal terrorist
11 organization and --
12      Q.   (BY MR. MASON)  Mr. LaPierre, my question was
13 much more -- was much more simple than that.  Let's move
14 on.
15      Would you agree --
16      MR. CORRELL:  This is Kent Correll.
17 Mr. Mason, again, I would just caution you to allow the
18 witness to finish his answers and not --
19      MR. MASON:  Not if he's just going to
20 filibuster, not if I'm asking him simple questions,
21 so --
22      MR. CORRELL:  Mr. Mason, you have a
23 duty --
24      MR. MASON:  Let's move on.
25      MR. CORRELL:  Excuse me, Mr. Mason.  You

Page 338

1 have a duty as an officer of the court and under the
2 rules of this court to allow a witness to finish an
3 answer.  It's not for you to decide when the witness is
4 done.
5      Q.   (BY MR. MASON)  Mr. LaPierre, would you agree
6 that if a company is going to file for Chapter 11
7 bankruptcy, that that bankruptcy must be authorized?
8      MR. GARMAN:  Objection to the form of the
9 question, calls for a legal conclusion.
10      A.   The -- the board -- as I've said before, the
11 board in the resolution that they passed at the January
12 meeting specifically allocated to the executive VP, and
13 also did it in consultation with the SLC, the authority
14 to reorganize the organization.  If they had not done
15 that, I certainly would not have moved forward.
16      Q.   (BY MR. MASON)  And on January 6, did you know
17 that?  Did you know that the authorization -- the
18 approval of your employment agreement would provide you
19 that authorization?
20      MR. GARMAN:  Objection, asked and
21 answered.
22      Go ahead again.
23      A.   I -- I knew that within that delegation that
24 was being proposed, it would open up the option of doing
25 that, if we chose to do it, but we had not made a

Page 339

1 decision to do it at that point and would not have done
2 it if the board did not delegate that authority.
3      Q.   (BY MR. MASON)  If the board did not delegate
4 that authority, are you aware of any other NRA corporate
5 governance document that provided you with the authority
6 to file Chapter 11 bankruptcy on behalf of the NRA?
7      MR. GARMAN:  Objection to the form of the
8 question, calls for legal conclusion.
9      A.   Yeah, I am not aware, but I'm not a lawyer and
10 I'm not an expert on all of the NRA documents and
11 bylaws.
12      But as I said, I would not -- without that
13 specific delegation of authority from the board in that
14 resolution that delegated me the ability to reorganize,
15 I certainly would not have moved forward.
16      Q.   You testified yesterday that on January 15th,
17 the day that the NRA filed for bankruptcy, you had a
18 telephone call with the SLC.  Is that right?
19      MR. GARMAN:  Objection to the form of the
20 question.
21      Go ahead.
22      A.   Yes, I did.
23      Q.   (BY MR. MASON)  And on that telephone call was
24 yourself and Ms. Meadows and Mr. Cotton and Mr. Lee.  Is
25 that correct?

Page 340

1      A.   That is correct.
2      Q.   Was that the first time that you told the
3 members of the SLC that you had made a final decision
4 with respect to filing Chapter 11 bankruptcy?
5      MR. GARMAN:  Objection to the form of the
6 question.
7      MR. CORRELL:  Also, this is Mr. Correll.
8 I would instruct the witness not to divulge any
9 communications that were made to the SLC for purposes of
10 obtaining legal advice or assistance for the
11 organization.
12      A.   The discussions that I had with the SLC at
13 that point included -- included legal advice from
14 counselors.
15      Q.   (BY MR. MASON)  Were there any attorneys on
16 that -- on that phone call?
17      A.   Yes.
18      Q.   Mr. Cotton?
19      MR. GARMAN:  Objection to form.
20      Q.   (BY MR. MASON)  Or were there other -- were
21 there other attorneys on besides the four of you?
22      MR. CORRELL:  Objection to the form of
23 the question.  This is Mr. Correll.
24      A.   But I also had -- I also had an independent
25 call with --

Page 341

25 (Pages 338 - 341)

1 Q. (BY MR. MASON) Mr. LaPierre, I'm asking about
2 who was on the call. I believe you said -- I asked you
3 if there was attorneys on the call, and you said yes.
4 You said there was four people on the telephone call,
5 yourself, Mr. Cotton, Mr. Lee and Ms. Meadows. Is that
6 correct?
7 MR. GARMAN: Objection to the form of the
8 question.
9 You can answer that.
10 A. Yeah, that's the one I was just going to say.
11 I had conversation with the three officers of the SLC
12 and myself where we made the final decision to file --
13 file for bankruptcy.
14 Q. So prior to that phone call, had you made a
15 final decision on the decision to file for bankruptcy?
16 A. No, that phone call is when we made the final
17 decision to do it.
18 Q. How long did that phone call last?
19 A. I don't remember.
20 Q. Was that the first time that you told the SLC
21 that you had made a final decision to file Chapter 11
22 bankruptcy?
23 MR. GARMAN: Objection to the form of the
24 question.
25 A. No. We had had discussions about it earlier

Page 342

1 in the week and had -- had just not come to a final --
2 final decision on if and when or the time in which we
3 were going to do it.
4 MR. MASON: Let's do this. We've been
5 going about an hour. Why don't we go ahead and take a
6 five-minute break, if that's okay.
7 MR. GARMAN: Sure.
8 Brian, when do you want to take a lunch break,
9 so we can plan?
10 THE VIDEOGRAPHER: Do you want to go off
11 the record?
12 MR. GARMAN: Okay. Yeah, we can go off
13 the record.
14 MR. MASON: It's up to y'all and
15 Mr. LaPierre.
16 THE VIDEOGRAPHER: We're going off the
17 record. The time on the video is 12:04 p.m.
18 (Break from 12:04 p.m. to 12:19 p.m.)
19 THE VIDEOGRAPHER: We're back on the
20 record. The time on the video is 12:19 p.m.
21 Q. (BY MR. MASON) Mr. LaPierre, after you and
22 the special litigation committee made the final decision
23 to file Chapter 11 bankruptcy, why did you not go back
24 to the NRA board before actually pulling the trigger and
25 filing?

Page 343

1 A. Well, there was tremendous concern among the
2 special litigation committee, in particular, about leaks
3 and the fact that -- and as we talked about, there was
4 an ongoing process of leaks, unfortunately, in real-time
5 from the -- from the board. And the special litigation
6 committee, in particular -- but I shared the same
7 concern, but they were very concerned that a leak on
8 this with the clear intent of General James to dissolve
9 the National Rifle Association in what we believed, as I
10 said numerous times, was an improper use of government
11 authority, that she would -- if leaked, she would
12 immediately attempt to put the NRA into receivership,
13 which would, in effect, destroy the organization.
14 And we, the SLC and I, had a -- I mean, my
15 gosh, it's a wonderful organization with 5 million
16 members. It does all kinds of amazing things, as we
17 talked about, safety training, education, political and
18 legislative advocacy. It's one of the oldest civil
19 rights organizations in the country, and it sure doesn't
20 deserve to be dissolved or put into receivership, so --
21 and that's why.
22 Q. Okay. Were there any other reasons, as you
23 sit here right now, that you can think of?
24 A. No.
25 Q. With respect to New York putting the NRA into

Page 344

1 receivership, is that a concern that you came up with on
2 your own?
3 MR. GARMAN: So I object.
4 I instruct you not to divulge the
5 attorney/client privilege, and any information you
6 received from counsel on that point, I instruct you not
7 to respond with.
8 Q. (BY MR. MASON) Are you going to answer my
9 question, Mr. LaPierre?
10 A. No, I'm not. I'm going to take the advice of
11 counsel on that issue.
12 Q. And who was the counsel that you're
13 referencing in refusing to answer that particular
14 question?
15 MR. CORRELL: Objection. This is
16 Mr. Correll. Objection to the extent that the question
17 implies that any particular counsel was -- was giving
18 any advice on that issue.
19 My instruction to the witness is to the extent
20 that you can answer the question without divulging
21 communications with attorneys, you can do so. Otherwise
22 your instruction is not to answer the question.
23 Q. (BY MR. MASON) And I am not asking you for
24 any communications, Mr. LaPierre. I am just asking for
25 the identity of the lawyers that you're refusing to

Page 345

26 (Pages 342 - 345)

1 answer the question based upon the attorney/client
2 privilege.
3       MR. CORRELL: Mr. Mason, you're asking
4 him, in effect, to identify lawyers who advised him on
5 the issue of whether -- of litigation strategy with
6 respect to the pending litigation in New York. I think
7 that's an improper question. Maybe you can try to
8 rephrase your question and we can get to a place where
9 we're more comfortable with your question.
10   Q. (BY MR. MASON) Let me ask it this way.
11       Mr. LaPierre, was the concern that you had
12 with receivership, was that -- was that a concern based
13 upon communications with counsel?
14       MR. GARMAN: So I am going to give you
15 the same instruction. You can answer that question yes
16 or no.
17   A. Yeah.
18   Q. (BY MR. MASON) Who was that counsel?
19   A. Actually, it was -- it was more than one
20 counsel.
21   Q. Okay. Who -- who were the more than one?
22       MR. GARMAN: So I don't understand the
23 relevance of this. I'm going to instruct him not to
24 divulge even who the advice came from. I don't see its
25 relevance.

Page 346

1       MR. MASON: Relevance is not a proper
2 objection, and it is not improper. He's already
3 testified that there was a concern about the NRA going
4 into receivership and that was based upon communications
5 with counsel. It's a perfectly appropriate question to
6 ask who those communications were with without going
7 into anything else.
8       MR. CORRELL: This is Mr. Correll. I
9 respectfully disagree, and I think that if the question
10 is designed to elicit information as to which counsel
11 expressed opinions or gave advice on the issue of
12 whether receivership was -- was something that might be
13 appropriately -- well, receivership might be a concern
14 in New York, I think that it's -- you're asking for who
15 advised him on those issues.
16       MR. GARMAN: I join in that.
17       And I instruct you not to answer.
18   Q. (BY MR. MASON) Mr. LaPierre, are you going to
19 follow your counsel's instruction?
20   A. I am.
21   Q. Did you personally come up with the concern
22 about -- strike that. I'll come back to that.
23       Are you familiar with the NRA's bylaws?
24   A. More or less. I wouldn't say I'm an expert on
25 the NRA bylaws, but I mean, when a question comes up, I

Page 347

1 usually have to pull out the bylaws and -- as do most
2 people, and try to find the section and see what it
3 says.
4   Q. Are you bound by the NRA bylaws?
5       MR. GARMAN: Objection to the form of the
6 question.
7   A. Yes. I work for the board of directors and
8 the bylaws that the organization operates under.
9   Q. (BY MR. MASON) Did your employment agreement,
10 your January 2021 employment agreement, amend or modify
11 the NRA bylaws in any way?
12       MR. GARMAN: Objection to the form of the
13 question.
14   A. Not -- not that I'm aware of.
15   Q. (BY MR. MASON) Let's take a look at -- if we
16 can look at Ackerman Exhibit 11.
17       MR. GARMAN: We have Ackerman Exhibit 148
18 and then we have Exhibits 7 through 10.
19       MR. MASON: Hopefully it's going to drop
20 in any second.
21       MR. GARMAN: We'll keep refreshing.
22       (AMc Exhibit 11 marked.)
23   Q. (BY MR. MASON) Let's come back to that.
24 Let's come back to that if it's not going to be dropped
25 in there.

Page 348

1       On January 6, were you aware that there was an
2 officer's compensation committee meeting?
3   A. That would be the -- I assume that would be
4 the meeting that took place during the -- during the
5 board of directors meeting. Was that the date of the
6 board of directors meeting, the 6th?
7   Q. This is the day before.
8   A. Well, I was -- I was with the officers that
9 day who represent the special compensation committee and
10 who are the members of the special compensation
11 committee. I don't know that they had a meeting. They
12 might have.
13   Q. So as you sit here right now, you were not
14 aware as to whether the officers compensation committee
15 was having a meeting on January 6 with respect to your
16 employment agreement?
17       MR. GARMAN: Objection to form.
18       Go ahead.
19   A. I was -- I was in a meeting with all three of
20 those -- all three of those officers on the 6th, but I
21 wouldn't have been in the part of the meeting where they
22 did the special compensation committee part.
23   Q. (BY MR. MASON) Was the meeting that you were
24 with the SLC on January 6, was that in person? Was
25 everybody there in person?

Page 349

27 (Pages 346 - 349)

1     A.   They were.  I think they were.  I can't
2  remember whether Carolyn -- Carolyn Meadows, I think,
3  was on the phone.
4     Q.   And were you -- where were the rest of you?
5  Were you at the Brewer firm offices on January 6?
6     A.   That's correct.
7     Q.   Okay.  Let's try this again.  Let's see if we
8  can drop Exhibit 109.  It looks like it may be up in
9  the --
10          (AMc Exhibit 109 marked.)
11          MR. GARMAN:  Yeah, yeah that's loaded.
12     Q.   (BY MR. MASON)  And if you will, please scroll
13  down to page 11 of 16, please.
14          Can you see 11 of 16, Mr. LaPierre?  At the
15  top, it says National Rifle Association of America
16  report of the officers compensation committee?
17     A.   I do see that.
18     Q.   Okay.  And then if you go down to the third
19  paragraph, it says the committee was presented with and
20  considered an employment agreement negotiated by counsel
21  for the NRA and counsel for Mr. LaPierre.  Questions and
22  discussion ensued.
23          Do you see that?
24     A.   I do see that.
25     Q.   Had you seen a copy of your -- a draft copy of

*Page 350*

1  your employment agreement as of January the 6th?
2     A.   I think I saw a copy of it on January 6th of
3  what they -- what they had proposed or were proposing.
4     Q.   Prior to January 6th, were you involved at all
5  in the negotiations with respect to your employment
6  agreement?
7          MR. GARMAN:  Objection to form.
8     A.   I had talked about it with my --
9          MR. CORRELL:  Excuse me.  This is
10  Mr. Correll.
11     Q.   (BY MR. MASON)  And I don't want to get into
12  conversations between you and Mr. Correll.
13          MR. CORRELL:  Thank you.
14     Q.   (BY MR. MASON)  So to the extent that you had
15  a conversation, I don't want to get into the substance.
16  My question is just simply -- well, let me ask it this
17  way.
18          Prior to January 6th, were you aware of any
19  negotiations relating to your employment agreement?
20     A.   The communications I -- in terms of this
21  employment agreement took place between myself and --
22  and my attorney, Mr. Correll.
23     Q.   Was Mr. Correll present at the Brewer office
24  on January the 6th?
25     A.   No, I don't believe he was, but he had called

*Page 351*

1  me -- we had talked about this.  He asked me if I was
2  okay --
3     Q.   I don't -- I don't want to get into
4  conversations with -- with your counsel.
5          So let me ask this question.  When did you
6  first execute your employment agreement?
7     A.   I'm sorry.  I don't understand the question.
8     Q.   Sure.
9          Well, let me ask it this way.  Prior to the
10  board meeting on January the 7th, did you -- did you
11  sign your employment agreement?
12     A.   No, I believe I signed it after -- after the
13  board meeting -- after the board meeting approved the
14  employment -- the contract.
15     Q.   Did you have a chance to fully review and
16  approve the employment agreement before it was presented
17  to the board on January the 7th?
18     A.   Yeah, I believe the special compensation
19  committee showed me what they were going to propose on
20  the 6th, and it was what I had agreed to with my
21  attorney.
22     Q.   Are you aware that the -- the employment
23  agreement that was presented to the board on January 7th
24  did not have a choice of law or choice of venue
25  provision in it?

*Page 352*

1     A.   I -- I wasn't aware of that.  I'm not a
2  lawyer.  I wouldn't have been looking for that.
3     Q.   As you sit here today, do you know why your
4  employment agreement that was presented to the board on
5  January 7th did not have a choice of law or choice of
6  venue provision?
7     A.   I do not.  I mean, those are legal questions
8  that I just would not have focused on.
9     Q.   Who would be the people to ask to find the
10  answer to that question?
11     A.   I think the special compensation committee.
12     Q.   Anyone else?
13     A.   Well, whoever the special compensation
14  committee worked with from a legal standpoint, if they
15  worked with someone.
16     Q.   Did you notice when reviewing your employment
17  agreement that was going to be presented to the board
18  that it did not have a choice of law or choice of venue
19  provision?
20          MR. GARMAN:  Objection to form.
21          Go ahead.
22     A.   I did not.  I mean, that would be something
23  that I did not -- not being a lawyer, would not have
24  focused on, did not understand, would not even realize
25  that needed to be in there, if it did.

*Page 353*

28 (Pages 350 - 353)

1  Q. (BY MR. MASON) As you sit here today, do you
2  know that the employment agreement that was presented to
3  the board on January 7th did not have a choice of law or
4  a choice of venue provision?
5  A. I did not know that.
6  Q. You still did not know that as you sit here
7  today?
8  A. No, I -- I did not know that until after the
9  board -- board meeting when I remember -- when I sat
10 down and signed the agreement after the board meeting,
11 after it had been approved, I noticed that it said
12 something about the state of Texas and -- on it. That's
13 the first I noticed it.
14 Q. Are you aware of any negotiations that took
15 place with respect to the choice of law or choice of
16 venue provision in the employment agreement that you
17 ultimately executed?
18 A. I am not. The first I saw it was when I was
19 there with -- I believe sitting there with Charles
20 Cotton and I signed the agreement.
21 Q. Do you know if any other -- any other states
22 or forums besides Texas were considered for the choice
23 of law and venue provision in your employment agreement?
24      MR. GARMAN: Objection to form.
25      Go ahead.

Page 354

1  A. I don't, because I did not even understand
2  that that was necessary to be put in there or that there
3  was a discussion going on around it or that it was going
4  to happen. I just -- not being a lawyer, it's just not
5  something that I would have looked for or understood.
6  Q. (BY MR. MASON) Fair enough.
7      So is it fair to say that you just left that
8  up to the attorneys?
9  A. I -- the fair thing to say is that I noticed
10 that it was there when I signed the contract and had not
11 noticed anything about it until I happened to see it
12 when I was signing the contract.
13 Q. How did you notice it after when you were
14 signing the contract if you didn't notice it when you
15 originally reviewed the employment agreement before the
16 January 7th board meeting?
17      MR. GARMAN: Objection to form.
18      Go ahead.
19 A. Because I don't -- I don't think it was there
20 in the original draft that I -- that I saw.
21 Q. (BY MR. MASON) And so --
22 A. It was the part that I talked about with my
23 attorney in terms of the conditions of employment and
24 the -- you know, and the fact that NRA, not me, had
25 certain -- at their discretion, certain rights to -- to

Page 355

1  my name for fundraising if they decided they wanted to
2  do it, at their discretion, not mine.
3  Q. Do you know all of the people -- or let me ask
4  it this way. Do you know the people that reviewed a
5  draft of your employment agreement before it was
6  presented to the board on January the 7th?
7  A. I don't know. I know the -- I know the -- I
8  know the officers did. I don't know whether any other
9  board members did or not.
10 Q. Why did your employment agreement that was
11 presented to the board on January 7th not include
12 specific language delegating you the power to file
13 Chapter 11 bankruptcy on behalf of the NRA?
14      MR. GARMAN: Objection to the form of the
15 question.
16 A. Why did my employment agreement not include
17 that language?
18 Q. (BY MR. MASON) Yes.
19      MR. GARMAN: Objection to the form of the
20 question.
21 A. Because it was my -- the part I had was my
22 contract with the -- with the -- involving my employment
23 with the NRA.
24 Q. (BY MR. MASON) But if I understand your
25 testimony --

Page 356

1  A. I saw -- I saw it on the 6th, a second part of
2  that contract that talked about the delegation to the
3  EVP about reorganizing the association.
4  Q. When you reviewed that contract on January
5  6th, did you understand that that reorganization
6  language in the employment agreement would have provided
7  you with the authority to file Chapter 11 bankruptcy on
8  behalf of the NRA?
9      MR. GARMAN: Objection to the form of the
10 question.
11      Go ahead and answer.
12 A. I think I understood that it would give the
13 EVP wide latitude in terms of strategic alternatives
14 to -- in terms -- in terms of how it proceeded forward
15 with the NRA and that one of them would have been --
16 would have been pursuing the Chapter 11.
17 Q. (BY MR. MASON) So why was -- why was that not
18 put into the employment agreement? Why -- why was --
19 why was there not bankruptcy language added into the
20 employment agreement?
21      MR. GARMAN: Objection to the form of the
22 question and the characterization.
23 A. I don't know. I don't know. All I know is I
24 read the -- I read the piece of paper all the way
25 through, and I don't know the why.

Page 357

29 (Pages 354 - 357)

1  Q. (BY MR. MASON) Is that something that you
2  relied on your lawyers for?
3      MR. CORRELL: This is Mr. Correll.
4  Objection to the form.
5  A. The part that I was focused on was my part of
6  the contract. I know that the -- the -- you know, the
7  SLC or somebody added the second part to it.
8      MR. MASON: Let's do this. Why don't we
9  go ahead and take a lunch break, if that's works for
10  everybody.
11     MR. GARMAN: Sure.
12     THE VIDEOGRAPHER: We're going off the
13 record. The time on the video is 12:45 p.m.
14     (Break from 12:45 p.m. to 1:36 p.m.)
15     THE VIDEOGRAPHER: We're back on the
16 record. The time on the video is 1:36 p m.
17 Q. (BY MR. MASON) Mr. LaPierre, are you ready to
18 proceed?
19 A. I am.
20 Q. Hopefully you've got Exhibit -- Ackerman
21 Exhibit 11 in front of you. Do you recognize those to
22 be the most recent NRA bylaws?
23 A. I do.
24 Q. Okay. Could you go to page 23 for me, please?
25     Let me know when you're there, please?

Page 358

1  Q. On section a here, it says repeal or amend the
2  bylaws or adopt new bylaws. Do you see that?
3  A. Repeal or amend -- yeah, I do see that.
4  Q. So is it your understanding that the board of
5  directors has the power to -- strike that.
6      Is it your understanding that the board of
7  directors has the sole power to repeal or amend the
8  bylaws or adopt new bylaws?
9      MR. GARMAN: Objection to the form of the
10 question.
11 A. Yeah, I mean, I am not a lawyer, but that's
12 the way -- that's they way that reads.
13 Q. (BY MR. MASON) Okay. If you'll go down to
14 the next page, please, section f. Do you see where it
15 says the board has the power to adopt and disseminate a
16 fundamental change of view or basic policy or basic
17 organizational structure of the association? Do you see
18 that?
19 A. I do.
20 Q. Is it your understanding that the board has
21 the sole authority to adopt and disseminate a
22 fundamental change of view or basic policy or basic
23 organizational structure of the association?
24     MR. GARMAN: Object to the form of the
25 question.

Page 360

1      MR. GARMAN: Hey, Counsel, the way we're
2  set up in here, I have to do the scrolling. It's Greg.
3  So we're almost there. Okay.
4  Q. (BY MR. MASON) Do you see article VI,
5  Mr. LaPierre, executive committee?
6      MR. GARMAN: Oh, you mean 23 -- do you
7  mean 23 of the bylaws or the page of the exhibit?
8      MR. MASON: Page 23 of the bylaws. I
9  guess it looks like page 27 of 60 on the PDF.
10     MR. GARMAN: We're on page 23. Go ahead.
11 Q. (BY MR. MASON) Do you see the section titled
12 article VI, Mr. LaPierre?
13 A. I do.
14 Q. And that's related to the executive committee.
15 Right?
16 A. That's correct.
17 Q. And then do you see at the bottom, section 2,
18 powers and duties?
19 A. I do.
20 Q. And it says the executive committee shall
21 exercise all of the powers of the board of directors
22 when said board is not in session, other than the powers
23 to -- and then there's a list of various things. Do you
24 see that?
25 A. I do.

Page 359

1      You can answer.
2  A. From what I -- from what I understand, that
3  the board also had the power to delegate to the EVP's
4  office the authority to restructure the organization.
5      I've heard -- well, I shouldn't get into
6  privileged conversation with lawyers on this, but --
7      MR. GARMAN: Right. Stop there.
8      THE WITNESS: Yeah.
9  Q. (BY MR. MASON) So is it -- is it your
10 understanding that your January 2021 employment
11 agreement modified or changed the section f that we just
12 read here?
13     MR. GARMAN: Object to the form of the
14 question.
15 A. My understanding is that in my -- that 2020
16 employment agreement, it delegated the board -- the full
17 board delegated to the EVP's office the authority to
18 reorganize the -- association.
19 Q. (BY MR. MASON) Okay. So it's your
20 understanding then that, according to f here, that the
21 executive vice president now has the power to adopt and
22 disseminate a fundamental change of view or basic policy
23 or basic organizational structure of the association?
24     MR. GARMAN: Objection to the form of the
25 question.

Page 361

30 (Pages 358 - 361)

1     A. I understand that the full board has the
2  power -- has the power to delegate to the executive vice
3  president the authority to reorganize the association
4  and the full board operates under the bylaws of the
5  association.
6     Q. (BY MR. MASON) My question is a little bit
7  more simple than that.
8        Did the full board authorize the executive
9  vice president to adopt and disseminate a fundamental
10 change of view or basic policy or basic organizational
11 structure of the association?
12       MR. GARMAN: Objection to the form of the
13 question.
14    A. The board delegated to the executive vice
15 president in a -- in a resolution that they passed at
16 the board meeting in Dallas the authority to reorganize
17 the association.
18    Q. (BY MR. MASON) So is the answer to my
19 question yes?
20       MR. GARMAN: No, objection to the form of
21 the question.
22    A. No, my answer is that the board delegated the
23 authority to the executive vice president at the full
24 board meeting in Dallas to do a reorganization.
25    Q. (BY MR. MASON) Do you see the word

Page 362

1  "reorganization" anywhere in subsection f?
2        MR. GARMAN: Objection to the form of the
3  question.
4     A. No, I don't see the word, but that's what was
5  in the resolution that was passed by our full board of
6  directors at the board meeting.
7     Q. (BY MR. MASON) Let's go down to subsection i.
8  Do you see where it says present a petition for judicial
9  dissolution or to adopt plans of merger, consolidation,
10 or nonjudicial dissolution? Do you see that?
11    A. I do.
12    Q. Would you agree with me that the board has the
13 sole authority to present a petition for judicial
14 dissolution or adopt plans of merger, consolidation or
15 nonjudicial dissolution?
16       MR. GARMAN: Objection to the form of the
17 question.
18    A. I would agree that that language -- that's
19 what that language says. On the other hand, the board
20 of directors at the Dallas meeting delegated the
21 authority to the executive vice president's office to do
22 a re -- to reorganize the association, and that is who I
23 work for, is the board of directors.
24    Q. (BY MR. MASON) Did the board of directors
25 designate you the power to adopt a plan of merger?

Page 363

1        MR. GARMAN: Objection to the form of the
2  question.
3     A. They -- they delegated through the EVP's
4  office the authority to reorganize the -- the
5  association.
6        MR. MASON: Objection, nonresponsive.
7     Q. (BY MR. MASON) Do you know what the word
8  "merger" means?
9        MR. GARMAN: Objection to the form of the
10 question to the extent that it calls for a legal
11 conclusion.
12       MR. CORRELL: Also, I object to your
13 objection. I don't think you can object to your own
14 question. If you're moving to strike, I think that
15 would be the proper response.
16    Q. (BY MR. MASON) Do you know what "merger"
17 means, Mr. LaPierre?
18       MR. GARMAN: Same objection.
19    A. Tell me what it means.
20    Q. (BY MR. MASON) I'm asking you if you know
21 what it means.
22    A. I -- I don't know exactly what it means as
23 it's -- as it's stated there. I mean, what I do know is
24 that board at that board meeting passed a resolution
25 giving the EVP the authority to reorganize the

Page 364

1  association, and it was with that authority that I and
2  the SLC did what we did. And there was an opportunity
3  for full debate at that board meeting. I wasn't in the
4  session, but that's what happened.
5     Q. Did the NRA board designate the executive vice
6  president with the power to petition for judicial
7  dissolution or adopt a plan of merger, consolidation or
8  nonjudicial dissolution in your January 2021 employment
9  agreement?
10       MR. GARMAN: Objection to the form of the
11 question.
12    A. They -- they passed a resolution authorizing
13 the EVP to reorganize the association and -- and beyond
14 that, I would be getting into discussions, all kinds of
15 discussions with lawyers as to what that authority
16 involved.
17    Q. (BY MR. MASON) Let's go town to subsection k.
18 Do you see where it says formulate such other corporate
19 policy decisions or perform corporate activities of the
20 association of such major significance as to warrant
21 action by the full board of directors? Do you see that?
22    A. I do.
23    Q. Do you believe that the filing of Chapter 11
24 bankruptcy is an activity of the association of such
25 major significance?

Page 365

31 (Pages 362 - 365)

1         MR. GARMAN: Objection to the form of the
2 question.
3     A.  I'll give you -- I mean, I'll give you the
4 same answer.  I mean, I understood that with that
5 resolution passed by the full board of directors, they
6 were delegating to the EVP's office, the executive vice
7 president's office, the authority to reorganize the
8 association, and it was under that authority delegated
9 by the full board of directors to the EVP's office that
10 I, in consultation with the SLC, took the action that we
11 took.
12     Q.  (BY MR. MASON)  Was the filing of Chapter 11
13 bankruptcy a major action for the NRA?
14         MR. GARMAN: Objection to the form of the
15 question.
16     A.  I think I've already said it was -- it was a
17 major -- major item.  Significant.
18     Q.  (BY MR. MASON)  Yeah.  Okay.
19         Do you intend to ask the board of directors to
20 ratify the filing of the bankruptcy on March the 28hth?
21         MR. GARMAN: Objection to the form of the
22 question.
23         And I instruct you not to answer to the extent
24 that your answer would constitute our legal strategy and
25 the discussions with counsel.

Page 366

1 filed individual charges against John Frazer and also
2 against me personally, the Brewer firm recused
3 themselves from representing me.  And I -- I found a
4 lawyer to represent me, Kent Correll.  And John Frazer
5 found out that the Brewer firm made it very clear they
6 could no longer represent us individually.
7     Q.  Are you aware you're an individual defendant
8 in the litigation between the NRA and Ackerman McQueen?
9         MR. GARMAN: Objection to form.
10     A.  I am aware of a lawsuit Ackerman McQueen filed
11 against -- against me.
12     Q.  (BY MR. MASON)  And prior to the -- prior to
13 the filing of the New York Attorney General lawsuit, do
14 you know who represented you in your individual
15 capacity?
16     A.  Prior to the filing of the attorney general's
17 lawsuit against the NRA and against John Frazer and
18 myself?
19     Q.  Correct.
20     A.  The Brewer firm was representing the NRA.
21     Q.  Were they representing you as well
22 individually?
23     A.  Not individually.  They were representing
24 me -- they were representing NRA, who I work for.
25     Q.  But you aren't aware -- you're not aware if

Page 368

1     A.  I will take the advice of counsel on that.
2         MR. CORRELL:  This is Mr. Correll.  I add
3 that instruction.  I join in that instruction.
4     Q.  (BY MR. MASON)  Mr. LaPierre, the employment
5 agreement that you've been referencing that provides you
6 the authorization to reorganize the Chapter 11 -- I'm
7 sorry, let me back up.
8         The employment agreement that you have been
9 referencing here today that discusses the power of you
10 reorganizing the National Rifle Association, is -- is
11 that employment agreement the one that was reviewed and
12 approved by the board of directors on January 7th?
13     A.  That would be correct.
14     Q.  The one that was approved by the board of
15 directors, though, it didn't have the choice of law or
16 choice of venue provision in it, did it?
17     A.  Again, I wasn't -- I wasn't in that board
18 meeting.  I was -- I was not -- because it involved me,
19 I wasn't there.  I testified earlier that I did not see
20 that choice of venue provision until I actually sat down
21 to sign the contract after that board meeting was over.
22     Q.  At one point the Brewer firm represented both
23 the NRA and yourself individually.  Isn't that true?
24     A.  No.  The Brewer firm represented the National
25 Rifle Association, and the minute General James' office

Page 367

1 the Brewer firm was ever representing you in your
2 individual capacity in the district court litigation
3 against Ackerman McQueen?
4         MR. GARMAN: Objection to the form of the
5 question.
6         MR. CORRELL:  Timeframe?  Is there a
7 timeframe on that question?
8     Q.  (BY MR. MASON)  Let me ask it this way.
9         In early 2020, Mr. LaPierre, who was
10 representing you in your individual capacity in the
11 district court litigation against Ackerman McQueen?
12         MR. CORRELL:  Objection to the form.
13 This is Mr. Correll.
14     A.  I think that district court -- that
15 legislation (sic) was against the National Rifle
16 Association at that time, as far as I know.
17     Q.  (BY MR. MASON)  Are you aware that you've been
18 an individual defendant in the district court litigation
19 with Ackerman McQueen since the fall of 2019?
20         MR. CORRELL:  This is Mr. Correll.
21 Objection to form.
22     A.  I -- I believed until that -- that recent
23 lawsuit that -- that Ackerman McQueen legislation (sic)
24 was against the National Rifle Association.
25     Q.  (BY MR. MASON)  Okay.  So prior to the New

Page 369

32 (Pages 366 - 369)

1 York Attorney General's lawsuit that was filed in August
2 of last year, you were not aware that you were an
3 individual defendant in the litigation between Ackerman
4 McQueen and the NRA in Dallas, Texas federal court?
5         MR. CORRELL: This is Mr. Correll.
6 Objection to form.
7    A.   As far as I knew, that legislation (sic) was
8 against the National Rifle Association.
9    Q.   (BY MR. MASON) Okay. So the answer to my
10 question is, no, you did not know that?
11         MR. CORRELL: Objection to form.
12 Mr. Correll.
13    A.   I don't think -- I don't think I did.
14    Q.   (BY MR. MASON) When you -- when the New York
15 AG action was filed and you decided to find a different
16 attorney, how did -- well, let me ask you this.
17 Mr. Correll was the one that ultimately agreed to
18 represent you. Correct?
19    A.   That's correct.
20    Q.   And how were you introduced to Mr. Correll?
21    A.   He was a reference from -- from the Brewer
22 firm.
23    Q.   Who is Wit Davis?
24    A.   Wit Davis is general counsel to the board of
25 directors.

Page 370

1    Q.   How was he -- do you know who recommended
2 Mr. Davis for the counsel position to represent the
3 board?
4         MR. GARMAN: Objection to form.
5         Go ahead.
6    A.   I'm not sure. It -- I'm not sure. It may
7 have been the Brewer firm. It may not have. I know
8 that he was interviewed by -- I don't think I
9 interviewed him. He was interviewed by several members
10 of the board of directors, and they agreed to hire --
11 and they hired him.
12    Q.   (BY MR. MASON) Are you aware that Mr. Davis
13 is a former client of Mr. Brewer's?
14    A.   I had heard that.
15    Q.   Are you aware that Mr. Correll is a former
16 partner of Mr. Brewer's?
17    A.   I did know that, and I knew they had been on
18 the same side and on opposite sides of some cases over
19 the years, is what -- in discussions with my lawyer.
20    Q.   Mr. Marschall Smith, the former proposed CRO,
21 was he recommended by Mr. Brewer as well?
22    A.   I believe he was.
23    Q.   Did you attend a meeting in October of 2018
24 with Craig Spray and various representatives from
25 Ackerman McQueen?

Page 371

1    A.   I did.
2         MR. GARMAN: Objection to the form of the
3 question.
4         Go ahead.
5    A.   Yes, I did.
6    Q.   (BY MR. MASON) During that meeting, was there
7 a discussion -- let me back up.
8         During that meeting, did members of --
9 representatives of Ackerman McQueen express concerns
10 with respect to the Brewer law firm?
11         MR. GARMAN: Objection to form.
12         Go ahead.
13    A.   You know, the purpose of that meeting was to
14 try to find cost reductions for the budget going forward
15 from 2018 into 2019, and it was -- I remember the
16 Ackerman McQueen people were incredibly hostile. I
17 remember Angus McQueen pointing his finger at me and
18 saying, You're dead to me. Don't you understand it?
19 You're dead to me.
20         And all I was trying to do was, given the
21 budget situation of the NRA and given the fact that I
22 felt that NRATV -- we had gotten to the point where we
23 were putting a huge amount into NRATV and we couldn't
24 see the return --
25    Q.   (BY MR. MASON) Mr. LaPierre, I asked you a

Page 372

1 very simple question.
2         MR. CORRELL: Excuse me. Please --
3         MR. MASON: No. I asked him a very
4 simple question.
5         MR. CORRELL: Excuse me. Excuse me. I'm
6 representing this witness, sir. Please hear my
7 objection. My objection is that you are not allowing
8 the witness to answer the question. You are
9 interrupting him because apparently you don't like the
10 answer.
11         MR. MASON: No.
12         MR. CORRELL: It is not for you, sir, to
13 decide -- you are not the judge here. Excuse me, sir.
14 It's not for you to decide whether the judge hears this
15 testimony or not. Okay. Please let him continue.
16         MR. MASON: Okay. So just so I'm clear,
17 your position is whatever question I ask, the witness
18 can just talk for seven hours and I have no right to
19 stop that?
20         MR. CORRELL: I will suggest that you ask
21 your questions in a manner that promotes a succinct
22 exchange, and if you ask a why question or an open-ended
23 question, you are inviting the witness to explain and to
24 give you a full explanation and not just the answer you
25 want.

Page 373

33 (Pages 370 - 373)

1      MR. MASON: And that's exactly what I
2  did. Let's move on.
3      Q.   (BY MR. MASON) Mr. LaPierre, during that
4  October 2018 meeting, did representatives of Ackerman
5  McQueen express concerns to you about the Brewer firm?
6      A.   You know, Ackerman McQueen had been -- ever
7  since we started down this course reduction -- course
8  correction and to look at every employee and every
9  vendor and see all their records, Ackerman McQueen had
10  been incredibly hostile towards -- towards Mr. Brewer.
11  And it had been incredibly hostile toward Mr. Brewer,
12  despite the fact that he was simply defending NRA on
13  litigation involving the Department of Financial
14  Services in New York state and other issues that might
15  arise from the AG and attempting to do the right thing
16  in terms of looking at everyone's records. And we
17  didn't think anyone was doing anything wrong, just to
18  make sure that we were in compliance with New York state
19  not-for-profit law.
20      Q.   Did --
21      A.   And there was an incredible amount of
22  hostility from the very start, early -- well, let me say
23  early on, maybe not from the very start, toward
24  Mr. Brewer.
25      Q.   Mr. LaPierre, in the summer around that 2018
                                                    Page 374

1  time period, were you aware of -- did you ever hear
2  anyone say that the FBI was going to raid Ackerman's
3  offices?
4      MR. GARMAN: Objection to the form of the
5  question.
6      Go ahead.
7      A.   No, I didn't hear anyone say that.
8      Q.   (BY MR. MASON) So you're not aware of
9  Mr. Brewer stating that the FBI was going to raid
10  Ackerman McQueen's offices?
11      A.   I'm not --
12      MR. CORRELL: This is Mr. Correll. I
13  object to the form of the question.
14      A.   I am not aware of that. What I am aware of is
15  from the very first time I asked that we wanted to do a
16  review of the Ackerman McQueen records, I remember Angus
17  McQueen going off on a rant on the AG in New York has no
18  right to see our records, the AG -- we're a Texas
19  company, an Oklahoma company, the AG will never see our
20  records. And -- and I remember they have no right to.
21      And I remember that he went off and then said
22  and you're a complete fool to have sued the governor of
23  New York and the Department of Financial Services,
24  they're probably popping the champagne corks up there
25  because that's exactly what they want you to do.
                                                    Page 375

1      And he just went into a complete rant.
2      Q.   So you never heard Mr. Brewer, Josh Powell or
3  Steve Hart say anything about the FBI raiding Ackerman
4  McQueen's offices?
5      A.   I did not.
6      Q.   Around that same time, did you ever hear from
7  Mr. Brewer or anyone else that Mr. Brewer was going to
8  have Ackerman McQueen brought up on RICO charges?
9      A.   I don't think I did. All we were trying to do
10  was do a review of records so that if something was
11  being done -- and we didn't think anyone was doing
12  anything wrong -- that was out of compliance with New
13  York state not-for-profit law, we wanted to do exactly
14  what Attorney General Schneiderman told us to do, which
15  was to self-correct, and that's why we were trying to do
16  the review. No other reason at all.
17      Q.   So when did -- when did you come to the
18  conclusion that Ackerman wasn't complying with the NRA's
19  request?
20      MR. GARMAN: Objection to form.
21      A.   Well, this went on throughout 2018. I
22  remember during the summer of 2019 numerous
23  conversations with Angus on the phone where he was using
24  all kinds of cuss words at me, you know, about you're
25  not going to see our records and what's wrong with you
                                                    Page 376

1  and, you know, culminating at that meeting in October
2  where he's pointing at me and saying you're dead to me
3  right now and don't you understand?
4      And then it became very apparent to us in 2019
5  that they had no intention of letting us see their
6  records. And in order -- we did what we had to do,
7  which we sued for our right under the contract to -- to
8  see the records.
9      Q.   (BY MR. MASON) Were you aware that the NRA
10  had conducted any audits of Ackerman around that time?
11      MR. GARMAN: Objection to the form.
12      Go ahead.
13      A.   I thought that the NRA was doing constant --
14  the NRA's treasurer's office was doing constant audits
15  of Ackerman every year.
16      Q.   (BY MR. MASON) But were you aware that in the
17  fall of 2018 and the beginning part of 2019, were you
18  aware that there was three different audits that the NRA
19  did of Ackerman McQueen's books and records?
20      MR. GARMAN: Objection to form.
21      Go ahead.
22      A.   I'm aware that there was -- there was
23  something that was done, a little bit done by, I don't
24  know, some company that -- I know NRA was trying
25  numerous ways to look at the records. And to the best
                                                    Page 377

34 (Pages 374 - 377)

1 of my memory, those attempts never got far enough to --
2 to serve the purpose that NRA needed to to fulfill its
3 obligations, to look at all the records to see if
4 something was out of compliance and, therefore, correct
5 it, that those -- I'm aware that a number of different
6 attempts were made, but they never were allowed to get
7 to the point where they would fulfill the mission that
8 the NRA was trying to achieve.
9    Q.  (BY MR. MASON) Were you aware that between
10 August -- or September of 2018 and February 2019, there
11 was three separate audits that the NRA did where they
12 physically went to the Ackerman McQueen's business and
13 inspected their books and records?  Are you aware of
14 that, as you sit right here today?
15    A.  When you say the "NRA," what do you mean by
16 the NRA?
17    Q.  The NRA or the NRA's representatives.
18       Well, let me ask it this way.  Were you aware
19 that the Brewer firm went to Ackerman McQueen's offices
20 and conducted an audit?
21       MR. GARMAN:  Objection to form.
22       Go ahead.
23    A.  I -- from what I understand, that whatever any
24 of those attempts, they never were allowed to see the
25 amount of information they needed to see to fulfill the

Page 378

1 duty to look at the records to make an assessment as to
2 whether there was something that needed to be
3 self-corrected.  And there was tremendous frustration on
4 the part of the NRA and its attorneys that those
5 attempts were never allowed to get far enough to do the
6 diligence that the NRA needed to do to see if there was
7 something that was out of compliance that needed to be
8 corrected.
9    Q.  (BY MR. MASON) How do you know that Ackerman
10 McQueen did not comply with the audits and the documents
11 that were being requested?  How do you know that?
12    A.  That gets into conversations with attorneys.
13 It's conversations with attorneys.
14       MR. CORRELL:  This is Mr. Correll.  I
15 instruct the witness not to answer the question as it
16 would require him to divulge attorney/client
17 communication with attorneys.
18    Q.  (BY MR. MASON) And without going into any of
19 the communications, were those communications with the
20 Brewer law firm?
21    A.  They were.
22    Q.  The -- the final audit -- do you know -- have
23 you heard of Forensic Risk Alliance before?  Does that
24 ring a bell for one of the audits?
25    A.  I've heard that name.

Page 379

1    Q.  Were you aware that the NRA had retained
2 Forensic Risk Alliance in early 2019 to conduct an
3 audit -- a third audit of Ackerman McQueen's books and
4 records?
5       MR. GARMAN:  Objection to form.
6       Go ahead.
7    A.  I believe I was aware of that.
8    Q.  (BY MR. MASON) Do you know how long that
9 audit lasted?
10    A.  I don't.  All I know is from what I
11 understood, that was one of them that never was allowed
12 to get to the point where -- to see all the records
13 where they could do the diligence to say they had seen
14 everything and whether something needed to be corrected
15 or not.
16    Q.  And so what --
17    A.  I think the last thing NRA wanted to do was
18 sue Ackerman McQueen.  We didn't believe they were doing
19 anything wrong.  They had been a long-time partner of
20 the association.  They had done great work for the
21 association.  And I just kept saying, look, we don't
22 think you've done anything wrong, we just need to see
23 the records.
24    Q.  And as you sit here right now, you don't
25 actually have personal knowledge of whether Ackerman

Page 380

1 complied with the records request in all those three
2 audits, do you?
3       MR. GARMAN:  Objection to the form of the
4 question.
5    A.  I wasn't personally on the scene, but I --
6 what I would be responding to would be conversations
7 with attorneys as to what they told me.
8    Q.  (BY MR. MASON) And you're aware of
9 Mr. Brewer's relationship with the McQueen family.
10 Right?
11    A.  I am.
12    Q.  And you're aware that there are -- you're
13 aware that there has been prior hostilities between
14 Mr. Brewer and certain members of the McQueen family.
15 Right?
16       MR. GARMAN:  Objection to form.
17    A.  I don't know the extent of the hostilities.
18 I -- all I know is that Mr. Brewer married the daughter
19 of Angus McQueen, and I -- apparently there was some
20 unhappiness about that.
21    Q.  (BY MR. MASON) Did you ever tell anyone from
22 Ackerman McQueen that Mr. Brewer was the only one that
23 could keep you out of jail?
24    A.  No, I did not.
25    Q.  Did you ever tell anyone from Ackerman McQueen

Page 381

35 (Pages 378 - 381)



1  anything about going to jail?

2  A. No, I did not.

3  Q. Did you ever tell Mr. Powell that Mr. Brewer

4  was the only one that could keep you from going to jail?

5  A. No, I did not.

6  Q. Did you ever tell Steve Hart that Mr. Brewer

7  was the only person that could keep you from going to

8  jail?

9  A. No, I did not.

10  Q. Did you ever tell Colonel North that

11  Mr. Brewer was the only person that could keep you from

12  going to jail?

13  A. No, I did not. You can put all that down with

14  the intern story about -- that I did not have an affair

15  with either.

16  Q. Have you read the sworn testimony from those

17  various individuals that have stated that you did tell

18  them that? Have you read that?

19  MR. GARMAN: Objection to form.

20  A. No, I haven't, but I know the truth doesn't

21  seem to bind a lot of these people these days, the last

22  year or two.

23  Q. (BY MR. MASON) So why should the Court

24  believe you as opposed to them?

25  MR. GARMAN: Objection to form.

Page 382

23  Q. (BY MR. MASON) Mr. LaPierre --

24  MR. CORRELL: Excuse me, sir. Could you

25  let him finish his answer?

1  A. Because it's the truth, as is the fact that I

2  didn't have an affair with the intern that they keep

3  flowing out.

4  Q. (BY MR. MASON) Let's take a look at

5  Exhibit 59, if we could drop that into the shared

6  folder, please.

7  (AMc Exhibit 59 marked.)

8  Q. (BY MR. MASON) If you can let me know when

9  you have this up, Mr. LaPierre.

10  MR. MASON: We have the first page up.

11  Q. (BY MR. MASON) Mr. LaPierre, have you seen

12  Exhibit 59 before?

13  A. I don't think I have.

Page 383

1  MR. MASON: No, I want the original

2  question read back.

3  MR. CORRELL: This is Kent Correll. I

4  object. Allow the witness to finish his answer.

5  MR. MASON: I am not going to let him

6  just filibuster. Can I have the original question read

7  back, please?

8  MR. CORRELL: Why don't we go off the

9  camera for a moment and let's talk about this and maybe

10  we should call the judge and ask for some guidance.

11  MR. MASON: That would be great.

12  MR. CORRELL: Let's do it.

13  MR. MASON: Get him on the phone.

14  THE VIDEOGRAPHER: We're going off the

15  record. The time is 2:17 p.m.

16  (Break from 2:17 p.m. to 2:20 p.m.)

17  THE VIDEOGRAPHER: We're back on the

18  record. The time on the video is 2:20 p.m.

Page 385

36 (Pages 382 - 385)



1 relating to the Brewer law firm, do you believe it is
2 appropriate for the Brewer law firm to be conducting
3 investigation into that complaint?
4     MR. CORRELL: Objection as to form.
5     MR. GARMAN: Object to the form of the
6 question. Sorry.
7   A. I think if the -- if a whistleblower complaint
8 was against the Brewer law firm in particular, that it
9 would be -- you would find a neutral party to
10 investigate that.
11   Q. (BY MR. MASON) Let's switch gears a little
12 bit. So I think we've talked a lot -- you've talked a
13 lot about how during your time at the NRA, you've had
14 various concerns with respect to security and
15 confidentiality. Is that fair?
16   A. Yes, that's true.
17   Q. And were those concerns expressed to Ackerman
18 McQueen throughout your relationship with them?
19     MR. GARMAN: Object to the form.
20     Go ahead and answer.
21   A. That was -- yes, Ackerman McQueen was a
22 trusted partner, and I think one of the reasons NRA --
23 for example, some of NRA's donor information involving
24 Mr. Schropp was under Ackerman McQueen for
25 confidentiality reasons. Now that's one of the things,

Page 386

Page 388

1 when we went through the course correction involving the
2 state of New York and their nonprofit law, that we
3 understood we had to self-correct on, that that would be
4 out of compliance with New York state not-for-profit
5 law. But we trusted the Ackerman McQueen firm for
6 sensitivity to leaks. We didn't want our ad buys
7 leaked. We didn't want our work product leaked. And we
8 trusted them as a partner in terms of security.
9   Q. (BY MR. MASON) It was a really good
10 relationship for decades that y'all had. Right?
11   A. That's correct.
12   Q. And you mentioned -- you mentioned
13 Mr. Schropp. Are you -- are you specifically referring
14 to the credit card that Mr. Schropp had with Ackerman
15 McQueen?
16   A. I just know that some of Mr. Schropp's
17 expenses involving donors was under Ackerman McQueen.
18   Q. And you knew that prior to the relationship --
19 the fallout of the relationship. Right?
20     MR. GARMAN: Objection to form. I might
21 have just missed a word.
22     If you understand it, go ahead.
23   A. Yeah, I think I did know that, that they were
24 there for sensitivity reasons to protect the donor.
25   Q. (BY MR. MASON) Is it --

Page 389



12     MR. GARMAN: Okay. Let's let him ask his
13 next question.
14     MR. MASON: Thank you, Mr. Garman.
15   Q. (BY MR. MASON) Mr. LaPierre, do you think
16 that it's appropriate for the Brewer firm to investigate
17 whistleblower complaints relating to the Brewer firm?
18     MR. GARMAN: Object to the form of the
19 question.
20   A. I don't know that -- I'm not aware that --
21 that there was a whistleblower complaint on the Brewer
22 firm at the time Brewer started running them down.
23   Q. (BY MR. MASON) Sure. Fair enough.
24     Let me ask you this, though. If there were --
25 if there was a whistleblower complaint at the NRA

1    A.  And it was discovered that that was out of
2  compliance with New York state not-for-profit law and it
3  was one of the things you were going to have to correct.
4    Q.  Did you know that the NRA was running
5  pass-through expenses through Ackerman McQueen prior
6  to --
7    A.  No, I didn't.
8        MR. GARMAN:  Hold on.  Hold on.
9    Objection to form.
10    Go ahead.
11    A.  No, I did not.
12    Q.  (BY MR. MASON)  You were not aware of that?
13    A.  No.
14        MR. GARMAN:  Objection to form.
15    A.  No.
16    Q.  (BY MR. MASON)  Let's take a look at
17  Exhibit 152, if we could get that loaded.
18        (AMc Exhibit 152 marked.)
19    Q.  (BY MR. MASON)  Mr. LaPierre, while that's
20  getting pulled up, did you attend budget meetings with
21  Ackerman on an annual basis?
22    A.  You know, most of the budget of Ackerman was
23  put together by -- by the treasurer's office in terms of
24  building the budget.  I remember being in the 2018
25  meeting with Craig Spray with Ackerman about the budget.

Page 390

1  I -- most of my interaction with Ackerman McQueen wasn't
2  from a fiscal standpoint.  It was from a branding, PR,
3  crisis management, speeches, me doing all the
4  television, the strategy on media campaigns, all of that
5  type of activity.  The fiscal relationship with Ackerman
6  McQueen tended to be managed by the treasurer's office.
7    Q.  If you could take a look at Exhibit 152 and go
8  down to the second page.  Let me know when you're there,
9  please.
10        MR. GARMAN:  We have page 2 open.
11    Q.  (BY MR. MASON)  Do you recall, when you were
12  having some of your budgeting meetings with Ackerman,
13  looking at charts such as this one right here?
14        MR. GARMAN:  Objection to form.
15    Go ahead and answer it.
16    He's reviewing the document, Counsel.
17    A.  I remember looking at some and involving
18  particularly NRATV and what the budget would be, and
19  I -- I don't remember all these specific charts.  Like I
20  remember what First Freedom cost.  I remember -- I
21  remember looking at something like this with Craig Spray
22  at the meeting I was in with him.
23    Q.  (BY MR. MASON)  Okay.  If you -- do you see
24  the second -- the second bucket of categories, Mercury
25  Group?  Do you see that?

Page 391

1    A.  Yeah, I do.
2    Q.  And then do you see, the third line down,
3  pass-through expenses?  Do you see that?
4    A.  Yeah, I do see that.
5    Q.  Do you know what -- what those pass-through
6  expenses were for?
7        MR. GARMAN:  Object to form, object to
8  foundation.
9    A.  I don't know what they're for.  I've never
10  even focused on that before.
11    Q.  (BY MR. MASON)  Do you recall ever asking what
12  the pass-through expenses were?
13        MR. GARMAN:  Objection to the form,
14  objection to foundation.
15    A.  I don't.  I didn't -- as I said, I did not
16  spend much time at all building the Ackerman McQueen --
17  if any, building the Ackerman McQueen budget each year.
18  I mean, I was focused more on what I just talked about
19  earlier.  I would see the final -- the final figures,
20  but I don't remember being in a whole number of budget
21  meetings with Ackerman McQueen as their budget was put
22  together.
23    Q.  (BY MR. MASON)  So I just want to be sure that
24  the record is clear.  It's your testimony, Mr. LaPierre,
25  that you do not know what the pass-through expenses were

Page 392

1  between Ackerman and the NRA?
2        MR. GARMAN:  Objection to the form.
3    Go ahead and answer.
4    A.  I don't.
5        MR. MASON:  Let's do this.  We can go off
6  the record and see where we're at with time, and we'll
7  go from there.
8        THE VIDEOGRAPHER:  We are off the record.
9  The time on the video is 2:32 p.m.
10        (Break from 2:32 p.m. to 2:49 p.m.)
11        THE VIDEOGRAPHER:  We are back on the
12  record.  Time on the video is 2:49 p.m.
13    Q.  (BY MR. MASON)  Mr. LaPierre, you previously
14  testified that you didn't know anything about the
15  out-of-pocket expenses or the pass-through expenses, but
16  how did you -- how did you think that Tyler Schropp's
17  expenses were being handled with Ackerman McQueen?
18        MR. GARMAN:  Objection to form.
19    Go ahead and answer.
20    A.  I heard talk somewhere of the fact that to
21  protect donor secrecy.  And I can't even remember when I
22  heard it.  It might have even been when we started the
23  course correction, safety check stuff, that his expenses
24  were to protect donor -- donor security under Ackerman
25  McQueen.  I can't remember the time when I heard it, but

Page 393

38 (Pages 390 - 393)

1 I know I heard it and I knew it was one of the things I
2 heard that needed to be self-corrected under New York
3 state's not-for-profit law in terms of the course
4 correction.
5    Q.  (BY MR. MASON)  So prior to January of 2019,
6 did you know that Tyler Schropp had a credit card that
7 was in the name of Ackerman?
8    A.  I don't think I did know that.
9    Q.  If we could take a look at Exhibit 70, please.
10 It should be, hopefully, in the folder.
11       (AMc Exhibit 70 marked.)
12       MR. GARMAN:  We have it.
13    Q.  (BY MR. MASON)  Mr. LaPierre, do you see
14 Ackerman depo Exhibit No. 70.
15    A.  I am reading it right now.
16       Yes, I do remember that.
17    Q.  So you've seen -- you've seen Exhibit 70
18 before?
19    A.  I've seen this letter before, yes.
20    Q.  Did you draft this letter?
21       MR. CORRELL:  Objection to form.
22       And to the extent that it would require you to
23 reveal any communications with attorneys, I would
24 instruct you not to answer.
25    A.  I will take my lawyer's advice.
                                                    Page 394

1 allowed the full disclosure, we felt we had to go to
2 court and sue for our right to see the records under the
3 contract.
4    Q.  If I represent to you, Mr. LaPierre, that the
5 board meeting in September occurred on or about
6 September 8, 2018, do you have any reason to dispute
7 that?
8    A.  With the board meeting September 8th, I mean,
9 it would be the same thing.
10       As a result of what I just said, Ackerman
11 McQueen was also involved in what we, I, the NRA,
12 clearly considered an extortion attempt against me, that
13 if we didn't -- if we did not -- if I did not resign,
14 they were going to smear me to the point where I
15 couldn't walk down the street, and I better withdraw
16 that lawsuit against them or the smear campaign was
17 going to take place, and step down and let -- and let
18 Ollie North get reelected.
19       And I felt the end result of that extortion
20 attempt, if I went along with it, would be the ultimate
21 demise of the NRA, because the whole course correction
22 would have been thrown off course, the stuff that we
23 needed to do to be in compliance with New York state
24 not-for-profit law.  I felt the Brewer firm would be
25 fired, which would -- which would cripple NRA's effort
                                                    Page 396

1    Q.  (BY MR. MASON)  So you're not going to answer
2 the question yes or no whether you drafted this letter?
3       MR. CORRELL:  Again, same instruction.
4    Q.  (BY MR. MASON)  Are you going to follow your
5 counsel's advice?
6    A.  I think it would be the wise thing to do.
7    Q.  Why did you send this letter to Mr. Dycio?
8    A.  Because -- because Mr. Dycio has represented
9 the NRA and did bill the NRA quite a bit of money over
10 the years for his services, and all of a sudden he -- he
11 starts representing a party that by this time had become
12 adverse to the NRA, and we felt it was not proper.
13    Q.  If you go down in the -- to the first
14 paragraph, about halfway down, do you see where you
15 state, The NRA and I have common legal interests in the
16 litigation against Ackerman McQueen which crystallized
17 before the September board meeting and colored the
18 discussion that day?
19       Do you see that?
20    A.  I do.
21    Q.  What was the litigation against Ackerman
22 McQueen that you were referring to here?
23    A.  The fact that NRA had sued Ackerman McQueen
24 to -- for our right under the contract with them to been
25 their records and that we -- because we had not been
                                                    Page 395

1 to self-correct and be in compliance with New York state
2 law and --
3    Q.  Mr. LaPierre, you've answered my question.
4       MR. CORRELL:  Excuse me, sir.  Excuse me,
5 Mr. Mason.  That was a why question, and Mr. LaPierre
6 had not finished his answer.  Please allow him to
7 finish.
8    A.  Anyway, that's -- that's -- that's pretty much
9 it.  I felt that there was a --
10       The other thing is Mark Dycio had set in, as
11 it says in this letter, as the NRA lawyer.  And we
12 identified him as an NRA lawyer when the executive
13 session started at -- at one of Mr. Brewer's
14 confidential privileged briefings to the board of
15 directors.  And there were only a few people allowed to
16 stay in the room to hear Mr. Brewer's confidential
17 presentation, and one of them was Mr. Mark Dycio, that
18 was clearly identified by the secretary as allowed to
19 stay in the room.
20    Q.  (BY MR. MASON)  And that was in September of
21 2018.  Right?
22    A.  I think that probably would have been right
23 when Mr. Dycio sat in the room, yes.
24    Q.  So the litigation against Ackerman
25 crystallized before the September 2018 board meeting,
                                                    Page 397

39 (Pages 394 - 397)

1 according to you. Right?
2     A. It did -- no, the litigation against Ackerman
3 crystallized before the either April or May 2019 board
4 meeting. It was, I think, sometime in March or early
5 April we brought the litigation.
6     Q. Then why -- why did you say that the
7 litigation against Ackerman crystallized before the
8 September board meeting and colored the discussion that
9 day?
10     A. Where -- I'm sorry, you're losing me. I mean,
11 is it in this letter you're referring to?
12     Q. We just read it. First paragraph, about
13 halfway down. The NRA and I have common legal interests
14 in the litigation against Ackerman McQueen, and then you
15 state, which crystallized before the September board
16 meeting and colored the discussion that day.
17         Do you see that?
18     A. (Witness reading to himself.)
19         Well, we were trying to see their records, and
20 they were not letting us see their records. And, you
21 know, Mr. Dycio at the September board meeting sat in on
22 the privileged, confidential briefing from Mr. Brewer as
23 an NRA attorney.
24     Q. Did --
25     A. And part of that was the effort on the part of

Page 398

1 part of the NRA going back to summer of 2018 to take a
2 full look at the Ackerman McQueen records. And I -- I
3 just knew that was ongoing, all the way through the rest
4 of the year.
5     Q. (BY MR. MASON) And the basis for your
6 knowledge was -- was based upon communications with
7 counsel. Do I understand that correctly?
8     A. That's correct.
9     Q. And that counsel being the Brewer firm.
10 Correct?
11     A. The Brewer firm. And in -- in 2018 even --
12 even other counsels too, other counsels also.
13     Q. Before Mr. Brewer was hired in 2018, over the
14 course of the nearly 40-year relationship between the
15 NRA and Ackerman, do you recall any instance where
16 Ackerman denied the NRA access information or
17 documentation that they had requested?
18         MR. GARMAN: Objection to form.
19         Go ahead and answer.
20     A. I don't know because, as I said, my
21 relationship with Ackerman was primarily -- was actually
22 was -- really involved the brand, the marketing, the
23 advertising, the speeches, being the voice on
24 television, building the brand, the advertising
25 campaign, the PR strategy, the television appearances

Page 400

1 the NRA to look at all the records of all the vendors
2 and if we needed to self-correct on something.
3     Q. Was the NRA anticipating litigation against
4 Ackerman as of that September 2018 board meeting?
5         MR. GARMAN: So I am going to object to
6 the form of the question.
7         And to the extent your answer constitutes
8 attorney/client communications privilege, I am going to
9 instruct you not to answer. So, Mr. LaPierre, if the
10 only basis for your answer is the conversations with
11 your attorneys, I instruct you not to answer, but
12 otherwise you can answer.
13     A. We -- we were going back and forth with the
14 attorneys on -- we had to see -- we had to have a full
15 disclosure of Ackerman McQueen's records, and at some
16 point if they wouldn't do that, NRA would end up having
17 to sue for it to exercise its right under the contract
18 to see the records.
19     Q. (BY MR. MASON) Were you aware that none of
20 the three audits that the NRA conducted of Ackerman had
21 occurred as of the September 2018 board meeting?
22         MR. GARMAN: Objection to the form of the
23 question.
24         Go ahead and answer.
25     A. I know that there was a constant effort on the

Page 399

1 and the preparation for that, speeches. I wasn't the
2 guy that would have been asking to see their records in
3 relation to anything. That would have been our
4 treasurer's office. So I wouldn't be aware of -- or
5 wasn't made aware of any of those types of issues.
6     Q. (BY MR. MASON) Let's switch gears a little
7 bit. You have testified that Colonel North had a
8 conflict of interest when he was attempting to conduct a
9 review of the Brewer firm's bills because he is an
10 employee of Ackerman. Do I understand that correctly?
11         MR. CORRELL: This is Kent Correll.
12 Objection to form.
13     A. I -- I -- I consistently was -- the more
14 Colonel North started to interfere with our attempt to
15 do this safety check and this course correction and
16 getting in compliance with New York state not-for-profit
17 law, it became very clear that Colonel North was -- he
18 was doing an NRATV show on NRATV network for Ackerman
19 McQueen for NRA, and that he was adamant and hostile
20 toward Mr. Brewer, trying to get Mr. Brewer fired
21 constantly, to the point where I kept telling him you
22 need to stay out of this. I mean, you have a conflict
23 of interest. You are -- you work with Ackerman McQueen.
24 They are our largest vendor.
25         And I kept informing him over and over and

Page 401

40 (Pages 398 - 401)

1 over to back off.  You know, you're out of your lane.  I
2 mean, we're trying to do the right thing here for the
3 NRA, and you're trying to derail -- derail all this.
4        And I even gave him letters telling him he had
5 a conflict of interest in terms of all of his attacks
6 on -- on Mr. Brewer.  He was upset that Mr. Brewer was
7 involved in terms of the whole Russia issue, trying to
8 check out all the facts in regard to that for us so we
9 would -- we would be able to 100 percent understood
10 if -- what the story was on all that, if there was any.
11       On that Russian trip, I remember Ollie in the
12 room with --
13    Q.  (BY MR. MASON)  Mr. LaPierre --
14    A.  I'm sorry.  I'm sorry, I'll back off.
15    Q.  Let's take a look at -- let's take a look at
16 Exhibit 74.
17       (AMc Exhibit 74 marked.)
18    Q.  (BY MR. MASON)  Have you read the deposition
19 testimony of Colonel North?
20    A.  No, I have not.
21    Q.  Okay.  Let's take a look at Exhibit 74.  Page
22 156, please.
23       MR. GARMAN:  156 of the condensed?
24       MR. MASON:  Yes.
25       MR. GARMAN:  Okay.  We have it.
Page 402

1 Colonel North, I don't know -- I don't know whether to
2 believe that or not, because -- I don't know that that's
3 actually accurate.
4    Q.  Do you think it's important to actually read
5 what somebody testified to under oath in order to figure
6 out what actually happened?
7       MR. GARMAN:  Objection to the form of the
8 question.
9    A.  I do, but I also know what happened in terms
10 of my involvement with Colonel North.  And I know that
11 starting in -- in late -- in 2018, and really continuing
12 through early 2019, Colonel North was doing everything
13 he possibly could to derail Mr. Brewer.  Get him fired,
14 get a phony audit in terms of Mr. Brewer's bills, which
15 they already -- which they told me they already had the
16 guy picked who was going to do it, so I -- I knew it was
17 a setup.  And everything he could to derail -- derail
18 Mr. Brewer, which, in my opinion, if he had succeeded,
19 would have helped destroy the National Rifle
20 Association.  Because we were doing a heck of a job to
21 try to get in compliance with New York state
22 not-for-profit law, and Colonel North was basically
23 laying down on the railroad track to prevent that
24 principled path of correction -- self-correction from
25 succeeding and doing everything he could to derail it.
Page 404

1    Q.  (BY MR. MASON)  If you'll look, Mr. LaPierre,
2 at line 6, do you see where the question is:  When you
3 were in the process of trying to get information about
4 Mr. Brewer's engagement letters or Mr. Brewer's invoices
5 or his billing records, had you ever talked to anybody
6 at Ackerman McQueen about that?  And he says no.
7       Do you see that?
8    A.  I'm sorry.  Where are you?
9       MR. GARMAN:  Counsel, do you mind if I
10 point out the testimony on the page?
11       MR. MASON:  That's fine.
12    A.  (Witness reading to himself.)
13       MR. GARMAN:  So he asked if you see this
14 testimony.
15    A.  Yeah, I see that testimony.  I don't know it
16 to be true.
17    Q.  (BY MR. MASON)  Okay.  Let's go down to line
18 20 on the same page.  Do you see where it says:  Well,
19 let me ask you this.  Did anybody at Ackerman McQueen
20 ever ask you to start looking into Mr. Brewer's invoices
21 or his engagements or his work for the NRA?
22       And what does Mr. -- what is Colonel North's
23 response?
24    A.  He says no, but I don't know that that --
25 based on what I know with my personal interaction with
Page 403

1    Q.  (BY MR. MASON)  Or he was just trying to
2 comply with his fiduciary duties as the president of the
3 NRA.  Right?
4       MR. GARMAN:  Objection.  That's a bit
5 argumentative.
6    A.  I don't believe that for a minute, that that's
7 what he was trying to do.  He never understood things
8 like the Lockton settlement.  He -- he was constantly
9 trying to get me to do things that -- like we told him
10 he could look at Mr. Brewer's invoices in Mr. Frazer's
11 office, just not the ones involving his employer, but he
12 tried to get me to say that that whole Russia trip along
13 with -- along with Jim Porter and a couple of the rest
14 of them was an NRA trip, when it wasn't, when I had done
15 everything I could to stop it, including to get the
16 president to cancel and all the NRA staff.  I told them
17 they couldn't go and no NRA money could be spent.  I
18 mean, Colonel North was off base on -- on so many issues
19 that -- and I'll give an example.  We were paying for
20 him to do his television show on NRATV --
21    Q.  (BY MR. MASON)  Mr. LaPierre, I appreciate --
22 you have answered my question.
23       Let's -- you've mentioned the extortion.  Have
24 you reviewed the sworn testimony of Millie Hallow
25 relating to the alleged extortion?
Page 405

41 (Pages 402 - 405)

1    A.   No, I haven't.  I was there --
2    Q.   Have you reviewed the -- the sworn deposition
3 testimony of Carolyn Meadows relating to the extortion?
4    A.   No, I haven't.
5    Q.   And Carolyn Meadows is the president of the
6 NRA right now.  Right?
7    A.   That's correct.
8    Q.   And she is somebody that you trust.  Right?
9    A.   I trust Carolyn, you're right.  I think she's
10 a good person.
11    Q.   Have you ever reviewed the testimony of former
12 board member Dan Boren relating to the alleged
13 extortion?
14    A.   I have not, although I know what Dan Boren
15 said about the fact he realized why Ackerman McQueen
16 couldn't let anybody see their records, because they
17 were charging NRA 100 percent for employees that were
18 actually working on other accounts.
19    Q.   Have you read Dan Boren's deposition testimony
20 where he said that that is absolutely not true, what you
21 just said is absolutely not true?
22        MR. GARMAN:  Objection to the form of the
23 question.  Objection, foundation.
24    A.   Well, I haven't read it, but that's -- that's
25 what he said at the time.

Page 406

1    Q.   (BY MR. MASON)  Have you read Colonel North's
2 deposition testimony with respect to the extortion?
3    A.   I have not, but I know what happened.
4    Q.   Don't you think it's important to review the
5 sworn testimony of all the people that were involved
6 with the alleged extortion before coming to a conclusion
7 about it?
8        MR. GARMAN:  Objection to the form of the
9 question.
10    A.   You know, I lived it.  I know what happened.
11 I know what they did.  I mean, I don't -- I don't think
12 I need -- that's why I didn't read Josh Powell's book.
13 I don't need to read a lot of fiction.  I mean, these
14 people just make stuff up.  I know what happened.  I
15 lived it.  I went through it.  I was the one that stood
16 up to it all and took all the heat.
17    Q.   (BY MR. MASON)  Just to be clear, nobody --
18 Dan Boren never called you and made any threats.  Right?
19        MR. GARMAN:  Objection to form.
20        If you understand the question --
21    A.   He did not -- he did not call me.
22    Q.   (BY MR. MASON)  And just to be clear, Colonel
23 North never called you on the phone and made any
24 threats.  Correct?
25        MR. GARMAN:  Objection to form.

Page 407

1    A.   Colonel North talked on the phone to Carolyn
2 Meadows and Millie Hallow, and they wrote down what --
3 what he said.  There were notes of what he said that
4 were relayed to about 35 members of the board of
5 directors right after it happened.
6    Q.   (BY MR. MASON)  And then they testified under
7 oath about exactly what happened, and you haven't gone
8 back to read what they said, have you?
9        MR. GARMAN:  Objection to form, asked and
10 answered.
11    A.   I was in the room when they were going through
12 their notes with the 20 or 30 other board members.
13    Q.   (BY MR. MASON)  You weren't on the phone,
14 though, were you?
15        MR. GARMAN:  Objection to form, asked and
16 answered.
17    A.   I wasn't on the phone.
18    Q.   (BY MR. MASON)  Let's take a look at Exhibit
19 65.  Now you have previously testified that the -- well,
20 let's do this.  Do you have it up?
21        MR. GARMAN:  It's opening now.
22    Q.   (BY MR. MASON)  Mr. LaPierre, you previously
23 testified that the Dallas house was Angus McQueen's idea
24 and that when you found out the NRA was going to pay for
25 it, you killed it.  Isn't that true?

Page 408

1    A.   That's exactly what happened.
2    Q.   Okay.  Let's take a look at Exhibit 65.
3        (AMc Exhibit 65 marked.)
4        MR. GARMAN:  Counsel, is the top of this
5 redacted?  I just want to make sure I --
6        MR. MASON:  It is.
7    Q.   (BY MR. MASON)  If you scroll down to the
8 first page.
9        MR. GARMAN:  We did.
10    Q.   (BY MR. MASON)  Have you -- have you seen this
11 email before, Mr. LaPierre?
12    A.   I know that there was some email traffic
13 that -- let me look at this one.
14        MR. GARMAN:  So he's asking a specific
15 question, though, that I want to know the answer to;
16 have you seen this email?
17    A.   Okay.
18    Q.   (BY MR. MASON)  And it was your understanding
19 that Ackerman was going to buy the Dallas house.  Right?
20 That's what you testified to previously?
21    A.   Here is what the truth is --
22    Q.   Mr. LaPierre --
23        MR. GARMAN:  Answer the question.
24    Q.   (BY MR. MASON)  It's a yes or no question.
25 You previously testified that you understood that

Page 409

42 (Pages 406 - 409)

1 Ackerman McQueen was going to buy the Dallas house.
2 Isn't that true?
3    A.  My initial understanding was that Ackerman
4 McQueen had an investment company, they invest in real
5 estate; that Angus McQueen said, Wayne, nobody can live
6 like you guys are living, it's going to drive you crazy,
7 you can't stay on the road all the time.  Like the NRA
8 told me, to get out of town, they can't protect me in my
9 house.
10       Angus said here is what I propose.  Our
11 investment company will buy a house.  You guys can use
12 it as a safe house.  And he said nobody loses money on
13 real estate in North Dallas, and by the way, we'll get
14 our Realtor to come in here -- or you go out and take a
15 look at some houses and everything.
16       And, you know, my understanding at that point
17 is it was going to be an Ackerman McQueen investment
18 and -- and we could use it as a safe house.
19    Q.  Okay.  So on Exhibit 65, this is an email from
20 Melanie Montgomery to Bill Winkler, and Susan LaPierre
21 your wife is cc'd on it.  Do you see that?
22    A.  I do.
23    Q.  And you know Ms. Montgomery and Mr. Winkler,
24 don't you?
25    A.  I know both of them.

Page 410

1    Q.  Okay.  And so Ms. Montgomery says, Hi Bill,
2 Susan, copied here, and I spoke this morning.  Following
3 are my notes from the conversation to assist you in the
4 offer documents -- in the offer document, excuse me.
5 Susan also plans to talk with Amy, so it's likely Amy
6 will have more information.
7       Do you see that?
8       MR. GARMAN:  Counsel, I am going to
9 object.  I don't think we have foundation for this.
10      But go ahead and answer.
11   A.  Yeah, I know that we --
12      MR. GARMAN:  Do you see this?  He's
13 asking whether you see this.
14   A.  I do see it.
15   Q.  (BY MR. MASON)  Let me ask you this,
16 Mr. LaPierre.  Have you seen Exhibit 65 before?
17   A.  I have.
18   Q.  Okay.  So if you'll come down to at the bottom
19 of page 1, Ms. Montgomery says equipment/furnishings to
20 retain as part of offer.  Do you see that?  And then
21 there's a list of bullet points that flows on to page 2.
22      MR. GARMAN:  So Counsel, a couple of
23 things.  I don't want to make this a speaking objection,
24 but it looks to me like he's seen this simply because it
25 was put in front of him at a deposition, which still

Page 411

1 leaves me with a foundation objection.
2       And then, second, we are out of time.  I will
3 let you finish this -- I will let you finish this up,
4 but those are one comment and one foundation objection.
5    A.  Can I make a comment on this?
6    Q.  (BY MR. MASON)  No.  I'm trying to get through
7 my time, Mr. LaPierre.
8       If you go down to page 2, do you see the
9 bullet points?  Do you see the last bullet point that
10 says golf cart if possible?
11   A.  Yeah, I do see that.
12   Q.  Was it your understanding that Ackerman was
13 going to be buying you a golf cart as well?
14      MR. CORRELL:  Objection to the form.
15 This is Mr. Correll.
16   A.  You know, this whole thing, Angus proposed it.
17 We were so beaten up, from the threats and everything
18 else, that we did go look at a bunch of houses.  We did
19 look at this house.  I understand some email traffic
20 went back and forth between my wife and Melanie
21 Montgomery and the retailer that's a friend of Melanie
22 Montgomery's.  But the bottom line to the whole thing is
23 when I found out they wanted to use NRA money to buy
24 this -- this house, I killed it.  No one else killed it.
25 Not the audit committee, not the co-committees, not the

Page 412

1 board.  I said, no, this is not happening, and I killed
2 it.
3       And then my wife, I believe, informed Melanie
4 Hill that the whole thing was dead.  And that's the end
5 of the story.  I killed it.  I --
6    Q.  (BY MR. MASON)  If you look a little bit
7 further down the page, it says we need to discuss how to
8 acquire a social membership to the club.  Do you see
9 that?
10   A.  I do see that.
11      MR. GARMAN:  Again -- again, I'm going to
12 make a foundation objection.
13   Q.  (BY MR. MASON)  Was it your understanding
14 that -- well, let me ask you this.  Did you have any
15 conversations with Ackerman, either you or your wife
16 that you're aware of, relating to a social membership to
17 the club?
18   A.  I didn't.  My wife may have.  I was out on the
19 road doing NRA business here and there and there.
20      And this whole thing was a fantasy.  Angus
21 proposed it.  We were so beaten up, we did look at
22 houses, but when I found out that -- that he wanted to
23 use NRA money, I said no and I killed it.
24      So I don't know why this is such a big deal.
25 It wasn't my idea.  It was Angus' idea.  It was -- the

Page 413

43 (Pages 410 - 413)

1 whole thing was a fantasy, and when I found out they
2 wanted to use NRA money, I killed it and nothing ever
3 happened, and not a penny of NRA money ever ended up
4 being lost in this --
5          MR. GARMAN: Brian, did he answer your
6 question to this one?
7          MR. MASON: No, but I'll ask a couple
8 more, and then we'll -- we'll wrap it up.
9     Q.  (BY MR. MASON) Mr. LaPierre, the NRA did send
10 Ackerman $70,000 with respect to the house. Right?
11    A.  I understand that at some point Mr. Phillips'
12 office sent earnest money of $70,000 that was returned
13 after I got back from wherever I was and said this whole
14 thing is not happening and killed the deal.
15    Q.  So you did not tell Mr. Phillips to send that
16 money to Ackerman?
17    A.  I did not. I think he probably got talked
18 into that by Ackerman.
19    Q.  At the bottom, it says two vehicles will need
20 to be purchased prior to move in as well. Do you see
21 that?
22    A.  Yeah. I don't know anything about that.
23    Q.  Did you -- did you expect that Ackerman was
24 going to be buying two vehicles as well as the
25 $6 million house?

Page 414

1     A.  I did not -- I did not expect anything. I
2 didn't write this. The whole thing to me is a fantasy
3 that never happened, that I didn't propose and I killed
4 it. And that's the whole story.
5          And they sure have marketed it to the media,
6 because the house ended up in the paper and then they
7 tried to say that I suggested it, which I didn't. And
8 they tried to say that they killed it, not me. And you
9 know, the lies just go on and on and on.
10         MR. GARMAN: So, Brian, I think unless
11 you've got more on this, we're probably done.
12         MR. MASON: Yeah, I'm just making sure I
13 don't have any -- any final couple questions.
14         All right. Mr. LaPierre, I am going to pass
15 the witness at this time. I appreciate the time.
16         THE WITNESS: Thank you. Appreciate it.
17         MR. DRAKE: Greg, do you guys want to
18 take five minutes, or what's your preference?
19         MR. GARMAN: Yeah, Scott. Not to put
20 words in your mouth, are we talking 30, 45 minutes? Is
21 that what you're expecting?
22         MR. DRAKE: That's what I expect. I
23 would be surprised if it was -- I mean, I expect it to
24 be under an hour and, hopefully, closer to 30 minutes
25 than an hour, but --

Page 415

1          MR. GARMAN: Do you want a break? We'll
2 do five. We'll do a short break.
3          MR. DRAKE: Come back on at half past.
4          THE VIDEOGRAPHER: We're going off the
5 record. The time on the video is 3:24 p.m.
6          (Break from 3:24 p.m. to 3:34 p.m.)
7          THE VIDEOGRAPHER: We're back on the
8 record. The time on the video is 3:34 p.m.
9                    EXAMINATION
10 BY MR. DRAKE:
11    Q.  Good afternoon, Mr. LaPierre. My name is
12 Scott Drake. I'm one of the lawyers that represents the
13 Official Committee of Unsecured Creditors.
14    A.  Good afternoon.
15    Q.  Without getting into all the specifics, are
16 you familiar just generally with what the Official
17 Committee of Unsecured Creditors is in a Chapter 11
18 case?
19    A.  More or less I am, yes.
20    Q.  Okay. Well, obviously over the past two days
21 you've been questioned by lawyers for the New York
22 Attorney General and Ackerman McQueen, and obviously
23 you're familiar with both of those groups from other
24 litigation. Right?
25    A.  Yes, I am.

Page 416

1    Q.  Okay. And I'll just represent to you,
2 generally the Official Committee of Unsecured Creditors
3 is a committee of certain creditors of the NRA appointed
4 by the US Trustee who represent all the unsecured
5 creditors of the National Rifle Association in these
6 Chapter 11 cases. So --
7    A.  Okay. I understand.
8    Q.  So Mr. LaPierre, I may try to jump around a
9 little bit because I'm going to try to be as quick as
10 possible. I have some follow-up based on some of the
11 things I've heard over the past two days.
12         So I want to first focus on the filing of the
13 bankruptcy. Both Mr. Sheehan and -- asked you about --
14 Mr. Mason asked you about who all was told about the
15 filing and at what point. My questions are a little bit
16 different.
17         I understand from your testimony that
18 obviously you personally were involved in the decision
19 for the NRA to file. Correct?
20    A.  That's correct.
21    Q.  And the members of the SLC, which are
22 Ms. Meadows, Mr. Cotton, and Mr. Lee, they were involved
23 in the decision as well?
24    A.  Yes, that's correct.
25    Q.  And I believe you consulted with counsel,

Page 417

44 (Pages 414 - 417)

1 which includes people from the Brewer firm and also the
2 Neligan firm. Is that right?
3     A.  That is correct.
4     Q.  Was anyone else from the NRA, besides you and
5 the three members of the SLC, was anyone else at the NRA
6 involved in the decision to file for Chapter 11?
7     A.  Not in the decision. Andrew Arulanandam knew
8 about it because he had to be involved with getting --
9 getting press reaction prepared.
10     Q.  But as far as the people who actually made the
11 decision, it was just you and the three SLC members
12 along with advice of counsel?
13     A.  That's correct, based on the authority
14 delegated to us by the board in their resolution.
15     Q.  I would like to look --
16         MR. DRAKE:  I believe I put, Greg, in the
17 folder, there's three exhibits, kind of halfway in the
18 folder below the AMc exhibits.  You should see UCC-1, 2
19 and 3.  Do you have guys those?
20         MR. GARMAN:  Refreshing.  Hold on.
21 Yeah, we got them.
22         MR. DRAKE:  Pull up number 1, please.
23         (UCC Exhibit 1 marked.)
24     Q.  (BY MR. DRAKE)  Mr. LaPierre, can you see UCC
25 Exhibit 1?

Page 418

1     A.  Yes, I do.
2     Q.  And do you recognize this as an email that
3 Mr. Frazer sent out on January 15 of 2021, with a
4 subject line of announcement from Wayne LaPierre.
5     A.  Yes, I do.
6     Q.  Did -- did you prepare the body of the email
7 that starts with "Dear Board of Directors"?
8         MR. GARMAN:  Scott, give him one second
9 to review it.
10         MR. DRAKE:  Sure.
11     A.  No.  No, I did not prepare it.  It was
12 prepared by Andrew Arulanandam, who was our director of
13 public affairs, working with Travis, who works public
14 affairs with the -- with the Brewer firm.
15     Q.  (BY MR. DRAKE)  And as I understand it from
16 Mr. Frazer, the purpose of this message was to inform
17 the entire board of directors about the fact that the
18 NRA had filed for reorganization under Chapter 11 in
19 Dallas.  Is that correct?
20         MR. GARMAN:  I am going to object to
21 form.
22         But go ahead and answer.
23     A.  Yes, that is correct.
24     Q.  (BY MR. DRAKE)  Did you -- I understand you
25 had other people prepare it.  Did you review it before

Page 419

1 it went out?
2     A.  I did.
3     Q.  And so, Mr. LaPierre, I would just like to ask
4 about a couple of -- couple of things.  If you'll scroll
5 down to the second page, you will see at the bottom
6 there's a subheading underlined that says building our
7 strengths.  Do you see that?
8     A.  Yes.
9     Q.  And here you say, I have added Marschall Smith
10 as our chief restructuring officer.  Do you see that?
11     A.  Yes, I do.
12     Q.  And so were you -- let me strike that.
13         Who all was involved in the decision to at
14 this time add or contemplate adding Mr. Smith as the
15 chief restructuring officer?
16     A.  Well, ultimately I guess I made the decision,
17 but he was recommended by the -- by the Brewer firm.
18     Q.  Did you consult with any other potential
19 candidates besides Mr. Smith?
20     A.  I did not.
21     Q.  Did you personally have an understanding as
22 what a chief restructuring officer does in a bankruptcy?
23     A.  Well, my understanding is he was going to help
24 in terms of looking at the organization, streamlining
25 it, looking for cost efficiencies and any way we could

Page 420

1 improve the -- the structure of the organization.
2     Q.  Did you personally believe, Mr. LaPierre, that
3 it would be beneficial for the NRA to have a chief
4 restructuring officer look at the type of things that
5 you just described?
6     A.  If any of them could be improved as we go
7 through this process, I would be all in favor of it.  So
8 I -- I thought it was a good idea to have someone else
9 take a look at it.
10     Q.  And looking at the bottom line of page 2
11 there, did the -- did the things that you envisioned the
12 CRO might look at include the NRA's compliance efforts?
13     A.  I would hope so.  I mean, we would -- we want
14 everyone to look at that.  I mean, it's -- it is a way
15 of life around this place right now that has been
16 ingrained in every division.  And yes, I would
17 definitely want him to look at that.
18     Q.  And would you have also wanted Mr. Smith to
19 look into the NRA's corporate governance?
20     A.  Yeah.
21     Q.  And why -- why did you believe it was worth
22 having an outside person look at the NRA's corporate
23 governance in the context of a bankruptcy?
24         MR. GARMAN:  Objection to form.
25         Go ahead and answer.

Page 421

45 (Pages 418 - 421)

1 A. Well, I just think -- and I'm kind of winging
2 it here on that, but if in any way our corporate
3 governance could be improved, we would -- we would want
4 him to take a look at it.
5 Q. (BY MR. DRAKE) And Mr. LaPierre, what's --
6 what was your understanding of why Mr. Smith ultimately
7 was not appointed as chief restructuring officer?
8 A. You know, my understanding is it was kind of
9 strange, because he was here the day the bankruptcy was
10 announced and he was sitting in on meetings. And then
11 all of a sudden about 3:30, he acted sick or a crisis
12 had come up, and he said -- he said to me, I apologize,
13 I have some emergency, I have to leave. And he left and
14 went back home. And then the following week, I find out
15 that he wasn't going to -- for whatever reason had come
16 up, he wasn't going to be able to do the job. I assumed
17 it was some medical issue or something like that.
18 Q. Would you personally, Mr. LaPierre, still
19 support having someone serve in such a role to look at
20 the NRA's compliance and corporate governance through
21 the bankruptcy process?
22 MR. GARMAN: Objection to the form of the
23 question.
24 A. I wouldn't have any problem with anyone
25 looking at NRA's structure and corporate governance

Page 422

1 through the restructuring process.
2 Q. (BY MR. DRAKE) And if the right person were
3 found, that would include supporting a chief
4 restructuring officer?
5 MR. GARMAN: Objection to the form of the
6 question.
7 A. Yes. If they could come up with suggestions
8 that would improve this place, I would be all in favor
9 of it.
10 MR. DRAKE: Greg, if you want to pull up
11 number 2.
12 (UCC Exhibit 2 marked.)
13 MR. GARMAN: All right. It's up.
14 Q. (BY MR. DRAKE) Mr. LaPierre, if you want to
15 take a second to look at UCC Exhibit 2, I will represent
16 to you this is something off the NRA Forward website
17 dated January 15, 2021, that is apparently a letter to
18 the NRA's vendors. Have you seen this before?
19 A. Yes, I have. It was put out by -- I'm sorry.
20 Q. No, go ahead. I was going to ask -- I think
21 you were anticipating my question. So who put this out?
22 A. This was put out on our website by Andrew
23 Arulanandam and Billy, who -- one of our staff people
24 that works with him. I think they also worked with
25 Travis in the Brewer team in terms of putting the copy

Page 423

1 together, but it was put out by the two of them.
2 Everything on the website is done by the two of them.
3 Q. And you'll see in it looks like the fourth
4 paragraph, it looks like there's a quote from you.
5 A. Yes, I see it.
6 Q. So do you recall whether you reviewed this
7 letter before it went out to the vendors?
8 A. You know, I review so many letters. I
9 probably took a look at this one. I can't remember
10 specifically whether I saw -- I saw this one.
11 Q. And as I understand from your testimony over
12 the past couple days, you -- you personally interact
13 with many of the NRA's vendors. Is that right?
14 A. Well, the ones I interact most with are the
15 ones involved in raising money and in the branding and
16 the image and the PR crisis management and the -- the
17 advertising and the -- I mean, all the things that --
18 that raise money for the NRA and project NRA's image and
19 keep us in the mainstream of American society, which
20 allows NRA to prosper and thrive.
21 Q. And --
22 A. Those were the vendors.
23 Q. -- do those vendors play an important role in
24 allowing the NRA to prosper and thrive?
25 A. They do. They have.

Page 424

1 Q. And is it important to you, Mr. LaPierre, that
2 through this bankruptcy the NRA can reorganize in a way
3 that you can continue -- the NRA can continue to do
4 business with those vendors going forward?
5 A. Yes, with some of them.
6 Q. And Mr. LaPierre, if you'll look at the bottom
7 of page 1, second to last paragraph, it looks like the
8 first bold paragraph. It says, as part of the
9 restructuring, the NRA will propose a plan providing
10 payment in full of all valid creditors' claims. Do you
11 see that?
12 A. That is correct. We wanted --
13 Q. Go ahead.
14 A. I'm sorry.
15 Q. No, go ahead.
16 A. We wanted to let the vendors know that.
17 Q. And was that something that was personally
18 important to you, for the vendors to understand that
19 they would be paid in full for all valid creditor
20 claims?
21 A. That's correct. We thought that was the
22 proper thing to do, and we wanted to make it clear that
23 NRA was -- was on solid financial footing and that our
24 vendors would be paid.
25 Q. And Mr. LaPierre, that sentence also says that

Page 425

46 (Pages 422 - 425)

1 the NRA will propose a plan. Are you generally familiar
2 with the term "plan of reorganization"?
3 A. I am not generally familiar with that term,
4 no.
5 Q. Okay. Well, do you have any awareness at all
6 that a debtor in a Chapter 11 proceeding files a
7 document that's called a plan of reorganization, which
8 is a legal document under the bankruptcy code which
9 describes the proposed terms by which the debtor will
10 reorganize under Chapter 11 and then emerge from
11 bankruptcy?
12 A. Yes, I know we are -- we are in the process of
13 beginning to put that together.
14 Q. And I understand from Mr. Frazer that
15 Mr. Neligan and his law firm is -- is working on a plan
16 of reorganization for the NRA. Are you personally
17 involved in -- in the development of the plan of
18 reorganization?
19 A. I have not been at this point, but I -- I
20 intend to be.
21 Q. And do you have an understanding as to who
22 else from the NRA, not its outside advisers but actually
23 from the NRA, who is involved in the plan process?
24 MR. GARMAN: Objection to form.
25 Go ahead and answer if you can.

Page 426

1 A. Well, I think it will be some of our -- our
2 key valued people that have been around here and we
3 place a tremendous amount of trust in. Sonya
4 Rowling, is our chief financial officer. Jason Ouimet.
5 People like Joe DeBergalis, who that we -- that help run
6 the association. I think they need to be involved in
7 it, people like that.
8 Q. (BY MR. DRAKE) Mr. -- Mr. LaPierre, you were
9 asked some questions by Mr. Mason about the retention of
10 the Neligan firm, and I believe that you met with them
11 sometime in Dallas in 2021. Is that right?
12 A. That's correct.
13 Q. Who from the NRA actually made the decision to
14 engage the Neligan firm?
15 A. The final decision was made -- I made it along
16 with the special litigation committee, Charles Cotton
17 and Willes Lee and Carolyn Meadows.
18 MR. CORRELL: Greg, if you could pull up
19 Exhibit 9, which I think was from the New York AG. Just
20 Exhibit 9. It's the petition.
21 MR. GARMAN: All right. We have it.
22 MR. DRAKE: If you'll go to page 6 of
23 that, please.
24 MR. GARMAN: Okay.
25 Q. (BY MR. DRAKE) And Mr. LaPierre, if you want,

Page 427

1 just to sort of refamiliarize yourself. I know you've
2 looked at a lot of documents. If you go back up to page
3 5, that's actually the first page. This is the
4 January 7 resolution authorizing Chapter 11
5 reorganization and related retention of counsel. Is
6 that right?
7 MR. GARMAN: This is the resolution we
8 looked at.
9 A. Okay. Yes.
10 Q. (BY MR. DRAKE) Okay. So now the question I
11 have is on the next page, which is page 6 of 16. And
12 you'll see the second paragraph is the resolution that
13 empowers the NRA and Sea Girt to retain the Neligan
14 firm. Correct?
15 A. Yes, that's correct.
16 Q. Okay. And so is this what you're talking
17 about, Mr. LaPierre, that ultimately it was your
18 decision along with the three members of the SLC?
19 A. Yes.
20 Q. All right. And so the next question I have is
21 the next paragraph then says resolved that the NRA and
22 Sea Girt shall retain the firm of Brewer, Associates &
23 Counselors as special counsel to prosecute and defend
24 certain non-bankruptcy matters during the course of such
25 Chapter 11 proceeding, including the pre-petition

Page 428

1 matters presently handled by BAC. Do you see that?
2 A. I do.
3 Q. And so do I understand that as of January 7,
4 you were not intending to engage the Brewer firm for
5 bankruptcy matters; is that correct?
6 MR. GARMAN: Objection. Counsel, you
7 referenced January 7. I think this is a January 15
8 document.
9 MR. CORRELL: Oh, thanks. I apologize.
10 Q. (BY MR. DRAKE) So as of the date of this
11 resolution, is it true that the NRA did not intend to
12 engage the Brewer firm for bankruptcy matters?
13 A. Well, we hired -- we -- we executed an
14 agreement with the Neligan firm and the Garman firm to
15 help us on bankruptcy matters specifically.
16 Q. Right. And I was going to ask about
17 Mr. Garman's firm.
18 At the time of this resolution, it was just
19 the Neligan firm. Correct?
20 A. I believe that's correct.
21 Q. And then later, I believe the NRA realized it
22 needed additional --
23 A. Yes.
24 Q. -- I'll say manpower or attorney power, and so
25 Mr. Garman's firm was also brought on to assist the

Page 429

47 (Pages 426 - 429)

1 Neligan firm on bankruptcy matters. Right?
2    A. That is correct.
3    Q. And so are you aware of any resolutions that
4 the NRA adopted that retained the Brewer firm for
5 bankruptcy matters?
6    A. I am not aware of a resolution that the -- in
7 terms of the Brewer firm on bankruptcy matters, although
8 the Brewer firm is involved in litigation, all
9 litigation matters with us regarding New York state and
10 regarding this whole issue in -- the whole issue in
11 general.
12    Q. Correct. And some of those are referenced in
13 the last line of this resolution where it says,
14 including the pre-petition matters presently handled by
15 BAC?
16    A. Yes. Yes. And the Brewer firm continues to
17 work with us on those issues.
18    Q. So Mr. LaPierre, changing focus, throughout
19 the last two days you've referenced things about
20 complete compliance or -- I don't remember your exact
21 words -- thankfully we have a court reporter -- but sort
22 of a self-examination that the NRA did. Were you --
23 were you personally involved in some of those efforts to
24 do kind of the self-examination and correction efforts
25 that the NRA undertook over the past couple of years?

Page 430

1    A. Yes, I was. I was the one that -- that
2 started it. I was the one that insisted the NRA go down
3 that path. Regardless of who liked it or who didn't
4 like it, we were going to go down that path. And we
5 were going to look at every employee, every vendor,
6 everything NRA was doing. If there was something we
7 were doing that was not in compliance, we were going to
8 self-correct and become fully compliant with -- well,
9 New York not-for-profit law at that point. And I
10 personally took the lead from the time we started down
11 that path, virtually every day, insisting that that's
12 the path we're going down whether you like it or not.
13 And if you don't like it, sorry, but this is where we're
14 going.
15      And that's what we've done. And we never --
16 we never let anyone divert us from going down that path,
17 which is why, as I said, we were so proud that we --
18 where we are today. I mean, we got a totally clean
19 audit with -- from a brand new audit firm that knew all
20 the issues and everything else in 2019, and we have
21 completely turned around the financial picture of the
22 NRA in 2020.
23    Q. And Mr. LaPierre, what gives you confidence
24 that the -- the allegations that were made a few years
25 ago have been addressed so that any -- any missteps can

Page 431

1 be avoided going forward in the future?
2    A. I think we have -- I think we have done a
3 complete self-correction on anything NRA was doing that
4 was out of compliance with nonprofit law. We
5 self-corrected it.
6      I think that if you talk to people in this
7 building, compliance is now a way of life for every
8 employee. There are -- there are procedures in place so
9 controls cannot be overwritten. And I think -- I think
10 if anyone interviews any of our financial people that
11 are here today, they will -- they will support what I'm
12 saying, including the ones that were initially
13 whistleblowers that thought things needed to be
14 corrected or might be out of -- out of -- out of line.
15    Q. Do you -- do you think that the -- the
16 compliance efforts and sort of, I guess, public
17 reputation of the NRA with respect to compliance with
18 nonprofit laws is something that's important to NRA's
19 membership?
20    A. I do. I think that -- I think it's important
21 to the organization. I think it's important to the
22 membership. I think that's the type of organization
23 that they want to be a member of.
24      MR. CORRELL: Greg, could you pull up UCC
25 3?

Page 432

1      MR. GARMAN: Yes.
2      (UCC Exhibit 3 marked.)
3    Q. (BY MR. DRAKE) So Mr. LaPierre, if you look
4 at the first page of this document, you'll see it's a
5 filing in these Chapter 11 cases. I will represent to
6 you that it's something filed by the debtors, which is
7 titled at the top of page 2, omnibus opposition to
8 Ackerman McQueen -- and I'm paraphrasing -- motion to
9 dismiss or in the alternative for a trustee, and also
10 the State of New York's motion to dismiss or in the
11 alternative a trustee, and also the District of
12 Columbia's motion to appoint a Chapter 11 trustee.
13      Mr. LaPierre, I just don't know. Do you -- do
14 you review legal filings like this on behalf of the NRA
15 or do you rely on others at the NRA to do that?
16      MR. GARMAN: Scott, this one might be a
17 little messy. Would you mind if we have 30 seconds to
18 talk about the privilege before you --
19      MR. DRAKE: Yeah. No, that's fine.
20      MR. GARMAN: I am going to put you on
21 mute then, or we can just go off the record.
22      THE VIDEOGRAPHER: We are going off the
23 record. The time on the video is 4:03 p.m.
24      (Break from 4:03 p.m. to 4:05 p.m.)
25      THE VIDEOGRAPHER: We are back on the

Page 433

48 (Pages 430 - 433)

1 record. The time on the video is 4:05 p.m.
2 Q. (BY MR. DRAKE) Mr. LaPierre, we're back on
3 the record after a break for you to consult with
4 counsel.
5 MR. DRAKE: Could you read the question
6 back to him, please, Julie?
7 THE REPORTER: Yes.
8 (Requested testimony read.)
9 A. Yes, I -- I have been in conversation about
10 this document in terms of counsel describing it to me
11 what it contained. It was -- this was prepared by
12 counsel and in discussion also with key NRA employees.
13 That's how it was put together.
14 Q. (BY MR. DRAKE) Okay. And Mr. LaPierre,
15 just -- just so you're clear -- and I think after
16 getting towards the end of day two, you probably have an
17 understanding. Like Mr. Sheehan and Mr. Mason, I am not
18 trying to get into your conversations with the NRA's
19 lawyers or your personal counsel. So I'm sure they'll
20 caution you if they think the question calls for it, but
21 just so you know, I don't want to know about those
22 communications.
23 But do you understand -- again, I know you're
24 not a lawyer, but you understand that certain parties,
25 including Ackerman McQueen and the State of New York and

Page 434

1 Mr. Schneiderman's warning, that's referring to what
2 you've testified to about the past two days?
3 A. That's correct.
4 Q. And I believe -- again, I'll paraphrase, but
5 in your words, led to the NRA deciding to take a look at
6 its own governance. Is that generally what you've been
7 referring to?
8 A. Yes. That's what Attorney General
9 Schneiderman advised us to do. He, as I said -- and
10 I'll keep it short. He said there was a plan that had
11 been cooked up by some of the anti-NRA NGOs and they
12 were -- to improperly use the government of New York
13 state to target the NRA and attack us, and he thought it
14 was an improper use of government. He said but they're
15 going to do it. And he said there's tremendous pressure
16 to do it. And he went on to say that -- although he
17 disagreed with the NRA on the Second Amendment issues
18 altogether, he just thought it was an improper use of
19 government. And he said, but I think it's going to
20 happen, and you would be wise -- New York state law, a
21 lot of it's been changed in recent years. He said
22 there's a lot of people out of compliance, probably no
23 one is in full compliance, but that doesn't matter
24 because they're going to target you guys, so you really
25 ought to take a full look at the entire organization and

Page 436

1 the District of Columbia, have moved either to dismiss
2 the bankruptcy entirely or for the appointment of what's
3 called a Chapter 11 trustee. Do you understand that
4 generally?
5 A. Yes, I do.
6 Q. I would like to ask you about a couple of
7 statements in here. If you'll go to page 13 of 54. Do
8 you see, Mr. LaPierre, in the middle there's a heading,
9 Roman numeral II, jurisdiction?
10 MR. GARMAN: I'm sorry. Scott, are
11 you -- oh, yeah, yeah. We're on it.
12 MR. DRAKE: Okay.
13 Q. (BY MR. DRAKE) So Mr. LaPierre, if you see
14 right above that heading jurisdiction, the paragraph
15 above it starts with a sentence that says the facts are
16 that the NRA, acting in the wake of Mr. Schneiderman's
17 warning -- and then it continues on. Do you see that
18 paragraph?
19 A. Yes. Yes, I do.
20 Q. Okay. And Mr. LaPierre, you've testified I
21 think multiple times over the past two days about
22 Mr. Schneiderman's call to you.
23 A. Actually it was Mr. Tom King on our board of
24 directors.
25 Q. Okay. I apologize. Is that reference here

Page 435

1 make sure you're in complete compliance with New York
2 state not-for-profit law, because there's a safe harbor
3 provision, if you do that and you self-correct, your
4 organization will be in good shape.
5 That made perfect sense to me. And from that
6 moment forward, I decided that's the course we're going
7 to go down, whether people like it or not, and there is
8 nothing that is going to stop us from going down that
9 course.
10 MR. GRUBER: This is Mike Gruber.
11 Objection to form for every -- all the hearsay. Thank
12 you.
13 MR. DRAKE: Just so I'm clear, Mike, are
14 you talking about my question or his answer?
15 MR. GRUBER: I'm talking about his answer
16 was --
17 MR. DRAKE: Okay.
18 MR. GRUBER: -- nothing but three minutes
19 of hearsay. Thank you.
20 MR. DRAKE: Okay. I just -- I didn't
21 know.
22 Q. (BY MR. DRAKE) Mr. LaPierre, do you see the
23 third line of that paragraph? It says took steps to
24 redress or obviate nearly every item the NYAG cites in
25 its dissolution lawsuit. Do you see that?

Page 437

49 (Pages 434 - 437)

1     A. I do.

2     Q. In your personal opinion, do you think the NRA

3 has, in fact, taken steps to redress or obviate nearly

4 every item in the New York AG lawsuit?

5     A. I do. I think we have -- we have

6 self-corrected, and we continue to -- if anyone -- we

7 encourage people to step forward if they see anything

8 else. But, yes, I believe we have taken every step

9 possible to -- to self-correct and to bring NRA into

10 full compliance.

11     Q. Do you have any concerns, sir, that -- that

12 many of the people who were in management positions at

13 the NRA at the time prior to the New York AG lawsuit,

14 that the allegations or concern are still in management

15 positions at the NRA today?

16        MR. GARMAN: Objection to form.

17        Go ahead and answer.

18     Q. (BY MR. DRAKE) Does that give you any

19 concern?

20     A. I think the people that are -- we talked about

21 some of them. I think that the people here that are in

22 management positions are doing a good job and they're --

23 they're doing a very good job, and I think you see that

24 in the performance of the organization over the last

25 year and a half.

Page 438

1 election every year, and they report -- they answer

2 directly to the members, and they have to run for

3 election. I think that gives us a pretty independent

4 board that expresses the will of the membership, which

5 is ultimately what makes this organization successful.

6        So I -- I know it's the subject of debate, but

7 I know there are a lot of people that think, well, the

8 NRA board ought to be 15 or 20 people rather than as

9 large as it is. I kind of believe the size of the board

10 is a strength of the organization, because the strength

11 of the organization is ultimately based on the

12 membership and the board representing that membership.

13     Q. And Mr. LaPierre, I have another question

14 about the membership. If you'll scroll down to page 47,

15 specifically page -- excuse me -- paragraph 83. If

16 you'll read that paragraph 83 and let me know when

17 you've had a chance to read it, please.

18     A. I've read it.

19     Q. Do you agree, Mr. LaPierre, with this second

20 sentence that says the removal of the members' selected

21 leadership and the installation of a third-party trustee

22 appointed by the government will have a devastating

23 impact on the NRA's ability to collect dues and raise

24 donations from its members? Do you agree with that?

25        MR. THOMPSON: This is Stephen Thompson.

Page 440

1     Q. Mr. LaPierre, if you could turn to page 24 of

2 54.

3        MR. GARMAN: Okay. We're on page 24.

4     Q. (BY MR. DRAKE) Do you see paragraph b?

5     A. Yes, I do.

6     Q. So you can either -- I can read it, or if you

7 want to just take a minute to read it, read the few

8 sentences.

9     A. Yeah. Okay. Yeah, I'll read it right now.

10        Yes, I've read paragraph b.

11     Q. Okay. Do you agree, Mr. LaPierre, with the

12 last part of that, that the NRA would benefit from

13 modernization to ensure its continued existence as a

14 going concern for the benefit of the NRA's creditors and

15 members?

16     A. Well, the NRA certainly can benefit from a --

17 from a look at any way we can be more efficient and

18 we can -- all of that. I think -- the one issue I would

19 take -- this is a subject of debate and we'll probably

20 debate it as we get into this reorganization plan -- is

21 when you talk about the charter and the -- and the board

22 in particular.

23       I -- I think one of the strengths of the

24 NRA -- some people think it's a weakness -- is the fact

25 that we have 76 board members. A third of them run for

Page 439

1 Objection to form.

2     A. I actually do agree with that. It -- it's one

3 of my biggest concerns, we talked about a little bit

4 earlier, in terms of succession. As I get toward

5 retirement, the fact that -- the fact that I have been

6 the voice of the NRA literally for 40 years out in front

7 of the membership, my signature raises hundreds of

8 millions of dollars for the organization. It has

9 actually raised billions of dollars for the

10 organization, based on the fact that they've seen me out

11 there fighting and they've -- for what they believe in

12 and for their constitutional rights, and therefore, they

13 are responsive based on -- based on -- based on the

14 relationship that I formed with them, based on that

15 they -- well, I've been with them probably 35, 40 years

16 on the road with them also.

17        So if you were to put a trustee, or someone to

18 put a trustee over this organization, you're going to

19 massively crash the amount of revenue coming into this

20 organization and which will have a devastating impact on

21 it. I mean, one of the reasons -- one of the ways we

22 were so successful last year in reducing our debt by 40

23 million and the NRA -- including accounting and paying

24 off the loans, and NRA ran 33 million in the black, was

25 that even with COVID we came within 7 percent of our

Page 441

50 (Pages 438 - 441)

1 preCOVID budget projection on revenue. And that was
2 phenomenal, given the COVID year and if you look at what
3 happened to other nonprofits.
4 And one of the ways we did that was to trust
5 that the membership placed -- places -- placed in the
6 relationship. And I'm not saying -- heck, everybody is
7 dispensable. I mean, I am not trying to build myself up
8 or anything else, but part of that is the relationship
9 over 40 years that I built with those members and the --
10 and then the ability to turn that into dollars, whether
11 it's email, direct mail or -- or digital communication
12 with them. A trustee would be horrible for the future
13 of the National Rifle Association in terms of
14 fundraising.
15 Q. (BY MR. DRAKE) Mr. LaPierre, with respect to
16 your views on the board and the 76 member board and the
17 fact that, you know, a third of the board sits for
18 election every year, how are the board candidates placed
19 up for nomination?
20 A. They -- there's two ways. There is a
21 nominating committee of the board of directors that
22 nominates so many candidates each year. They usually
23 nominate -- I think 25 are elected. They usually
24 nominate somewhere between -- let's say 26 and 32 or 33
25 qualified candidates after looking at all the petitions

1 that come in and recommendations. And then someone can
2 also run for the board of directors by gathering a
3 certain amount of petition signatures and so they -- and
4 be placed on the election ballot independently of the
5 nominating committee.
6 Q. How many people sit on the nominating
7 committee, if you know?
8 A. It's elected by our board of directors every
9 year, and it's usually -- I think it requires six board
10 members and three nonboard members to be on it, I
11 believe.
12 Q. And each of those members is elected by --
13 actually by the board?
14 A. That's correct. It's elected by the board of
15 directors.
16 MR. DRAKE: Mr. LaPierre, I appreciate
17 your time, and at this time I'll pass the witness.
18 THE WITNESS: Thank you. I appreciate
19 it.
20 MR. GARMAN: Well, hearing no one come
21 forward, does this -- does this conclude the deposition
22 by the notice -- by the parties who noticed today?
23 MR. THOMPSON: Mr. Garman, this is
24 Stephen Thompson just to confirm that we do still have
25 some 30(b)(6) questions for Mr. LaPierre, but the New

1 York Attorney General is done with questioning for
2 Mr. LaPierre in his individual capacity.
3 MR. GARMAN: Brian, just confirming? I
4 think it's a formality. We're out of time, but --
5 MR. MASON: Yeah, that's fine. We have
6 some 30(b)(6) time, so --
7 MR. GARMAN: Yeah. Okay. Do you guys
8 have an estimate of how long you -- I'm not going to
9 hold you to it. I think you've got two hours and
10 one minute, by my calculation, left of 30(b)(6) time.
11 Do you guys have an estimate of how long you're going to
12 go?
13 MR. THOMPSON: Yeah, Greg, this is
14 Stephen. I'm estimating about a half hour for my
15 questions.
16 MR. MASON: And I -- I probably will not
17 be more than that as well.
18 MR. GARMAN: Okay. Let's take a break
19 then. It sounds like we could have up to an hour. And
20 what do we say? Let's take 15 minutes.
21 MR. THOMPSON: Thank you.
22 THE VIDEOGRAPHER: We are going off the
23 record. The time on the video is 4:23 p.m.
24 (Break from 4:23 p.m. to 4:43 p.m.)
25 THE VIDEOGRAPHER: We're back on the

1 record. The time on the video is 4:43 p.m.
2 EXAMINATION
3 BY MR. THOMPSON:
4 Q. All right. Good afternoon, Mr. LaPierre.
5 A. Good afternoon.
6 Q. My name is Stephen Thompson. I am an
7 assistant attorney general in the New York State Office
8 of the Attorney General. So we are switching gears. I
9 will now be asking you some questions in your capacity
10 as a corporate representative for the NRA for the
11 30(b)(6) deposition.
12 A. Okay.
13 Q. So if -- there should be a new exhibit,
14 Exhibit 11, in the shared folder. If you could please
15 let me know when you have that.
16 (Exhibit 11 marked.)
17 MR. GARMAN: I'm pulling it up now. One
18 second, Stephen. All right. It's up.
19 Q. (BY MR. THOMPSON) So Mr. LaPierre, if you
20 would please scroll down to page 7 of 8 in this PDF --
21 oh, I'm sorry. Actually, to -- to the last page.
22 A. Okay.
23 Q. So if you could please take a moment to read
24 topics 12, 13 and 14. And just let me know if I am
25 correct that you are prepared to act as a corporate

1 representative for the NRA with respect to these three
2 topics.
3    A. Yes. Yes, I am.
4    Q. Okay. Great. And can you tell me what you
5 did to prepare for your 30(b)(6) deposition?
6    A. I talked with our counselor here, Greg Garman,
7 and I also talked with -- we talked with Andrew
8 Arulanandam, our public relations director at the
9 National Rifle Association. And my attorney sat in on
10 it, but the preparation was actually done with
11 discussion between Mr. Garman and Mr. Arulanandam and
12 myself.
13    Q. Okay. And other than Mr. Garman and
14 Mr. Arulanandam and I believe you said -- was that Kent
15 Correll, your individual lawyer was there for at least
16 part of it?
17    A. He sat in on it, but didn't -- didn't say
18 anything.
19    Q. Okay. Other than -- other than those folks,
20 did you speak with anyone else in preparation for your
21 30(b)(6)?
22    A. I did not.
23    Q. And did you review any documents in
24 preparation for your 30(b)(6)?
25    A. I did not.

Page 446

1 guess.
2    A. I don't know.
3    Q. (BY MR. THOMPSON) Okay. And I believe that
4 you said that the special litigation committee was
5 involved. Were all three members of the special
6 litigation committee involved?
7    A. Yes, they all were involved. They all were
8 aware of what we were doing.
9    Q. Okay. And then the -- the, sort of,
10 incorporation documents were ultimately filed by the
11 NRA's chief of staff Vanessa Shahidi. Is that correct?
12    A. That's correct.
13    Q. Okay.
14    A. That's correct.
15    Q. So turning now to topic 13, there should be a
16 new exhibit, Exhibit No. 12, in the share folder. If
17 you could please let me know when you have that.
18      (Exhibit 12 marked.)
19      MR. GARMAN: Okay. We have Exhibit 12.
20    Q. (BY MR. THOMPSON) Mr. LaPierre, do you
21 recognize this document?
22    A. It's the minutes of a board of directors
23 meeting.
24    Q. Okay. And let me scroll down and give you a
25 PDF page number here.

Page 448

1      MR. GARMAN: Counsel, just to be clear, I
2 put the notices in front of him, but that's all.
3      MR. THOMPSON: Okay. Thank you.
4    Q. (BY MR. THOMPSON) So I am going to --
5    A. These topics, yeah.
6    Q. All right. So I am --
7    A. I'm sorry. The notice, yes, these topics were
8 put in front of me.
9    Q. Right. Okay. Thank you.
10      So starting first with topic 12, which was
11 related to Sea Girt, can you tell me who at the NRA was
12 involved in the formation of Sea Girt?
13    A. I was involved in it and the special
14 litigation committee, which is Carolyn Meadows, Charles
15 Cotton and Willes Lee. And we worked with counsel on it
16 in terms of -- in terms of setting it up and filing.
17    Q. And can you tell me, without providing me the
18 substance of any of your communications, which counsel
19 were involved?
20    A. The Brewer firm.
21    Q. Was the Neligan firm involved?
22    A. The Brewer firm was involved. I don't -- I
23 know the Brewer firm was involved. The Neligan firm --
24 this goes back to November.
25      MR. GARMAN: If you don't know, don't

Page 447

1    A. Thank you.
2    Q. If you could please scroll down to PDF page 7,
3 which is page 5 of the minutes. And if you see towards
4 the -- halfway down the page, it starts, The chair
5 called for if new business. Mr. Frazer stated that he
6 had received one resolution, as follows.
7      Do you see that?
8    A. Yes, I do.
9    Q. And is the resolution that follows the
10 resolution that formalized the delegation of corporate
11 authority by the NRA board of directors to the special
12 litigation committee?
13    A. That's correct. The board of directors needed
14 to -- in order for the special litigation committee to
15 represent the board as a whole, the board needed to
16 officially bless the creation of the special litigation
17 committee where they would have the authority of the
18 board behind them.
19    Q. At the time of this -- this meeting of the
20 board on January 7th, did the board of directors have
21 any vacancies?
22    A. I'm not sure whether they did or not. I
23 don't -- my answer is I doubt it because what happens is
24 if someone drops off, the next person in line moves up
25 and fills that spot. And there are usually three or

Page 449

1 four or five people in line, where if someone were to
2 have a health problem or something and drop off, the
3 next person would move up.
4 Q. Got it.
5 A. So I don't think there was a vacancy.
6 Q. And that is what happened after Mr. Liptak
7 resigned. Is that correct?
8 A. That is correct.
9 Q. Okay. So turning to the -- what is the page 6
10 of the minutes, page 8 of the PDF, still staying within
11 this resolution -- well, before I get to this, can you
12 tell me what role does the special litigation committee
13 have with respect to this bankruptcy?
14     MR. GARMAN: Objection to the form of the
15 question.
16     Go ahead and answer, if you can.
17 A. I have been consulting them all the way
18 through on this because they also represent the three
19 officers of the National Rifle Association. And so they
20 are -- they have been a co-partner with the EVP's office
21 in -- in this process.
22 Q. (BY MR. THOMPSON) Does the special litigation
23 committee have the authority to direct you with respect
24 to -- direct you as executive vice president with
25 respect to the bankruptcy?

Page 450

1     MR. GARMAN: Objection to the form of the
2 question.
3     Go ahead and answer if you can.
4     MR. CORRELL: Yeah, and if I could just
5 get the same agreement on objections, that I will be
6 joining them without having to say it separately. Is
7 that acceptable to you?
8     MR. THOMPSON: Yes. Thank you,
9 Mr. Correll.
10 A. I am not trying to be evasive. That's a legal
11 question that I am not sure I know the answer to, to
12 tell you the truth. I've done this as a partner with
13 them all the way through it, and I -- that would be a
14 legal opinion that I -- I don't know the answer to in
15 terms of direct.
16 Q. (BY MR. THOMPSON) Okay. Is it fair to say
17 that the special litigation committee has the authority
18 to supervise the bankruptcy?
19     MR. CORRELL: Again, Mr. Correll. I am
20 objecting as to form, calls for legal conclusion.
21 A. Yeah, that -- I'm not a lawyer. I'm not
22 trying to be evasive. I just don't know whether they
23 have the authority to supervise the bankruptcy or not.
24 I just know that everything I've been doing in my spot
25 as EVP I've been doing in complete coordination with the

Page 451

1 special litigation committee, which, as I said, are the
2 three officers of the board.
3 Q. (BY MR. THOMPSON) Okay. Is it the NRA's
4 position that this bankruptcy is an additional legal
5 proceeding arising from the same facts, circumstances or
6 allegations as sub Roman i, ii and iii in the resolution
7 on page 6 of this Exhibit 11 -- or 12? I'm sorry.
8     MR. GARMAN: Objection to the form of the
9 question. I object that I believe it's outside the
10 scope of the 30(b)(6) witness.
11     But answer if you can.
12 A. I'm sorry, could -- it's kind of the end of
13 the day. Could you repeat the question, please?
14 Q. (BY MR. THOMPSON) Sure.
15     Is it the NRA's position that this bankruptcy
16 is -- falls within the scope of sub Roman iv of this
17 resolution?
18     MR. GARMAN: I incorporate the same
19 objection.
20     Answer to the extent you can.
21 A. Well, this flows out of the fact that NRA came
22 to believe that the New York state was not a fair
23 playing field for the organization in terms of it to
24 operate. And the organization looked for a vehicle to
25 facilitate a possible transition. Sea Girt was formed.

Page 452

1 And -- and with the approval of a federal judge after we
2 file Chapter 11, we could hopefully find a home for the
3 NRA with a fairer playing field from a -- well, let's
4 just say a fairer playing field for the organization to
5 grow and prosper in. So it -- I mean, as I said
6 earlier, we have been looking, talking for quite a while
7 about, even before any of this came up about finding
8 another home for the NRA out of New York state or even
9 finding another home for our main facility here where
10 most of our employees are, a more favorable area to
11 operate out of, and it was the outgrowth of all of that.
12 Q. (BY MR. THOMPSON) So just because I want to
13 make sure that I have -- to go back to my question, my
14 question is whether the NRA believes that this
15 bankruptcy falls within the scope of sub Roman iv of
16 this resolution?
17     MR. GARMAN: Hold on. Objection to form.
18 Objection, I believe it falls outside the scope of
19 question 13.
20     Answer to the extent you can under romanette
21 iv.
22     MR. CORRELL: And this is Mr. Correll. I
23 object to the form to the extent that it calls for a
24 legal conclusion.
25 A. It's really a legal question you're asking me

Page 453

53 (Pages 450 - 453)

1 that I -- I'm not sure of what the answer is, to tell
2 you the honest truth. I mean --
3 Q. (BY MR. THOMPSON) So if there were to be a
4 disagreement between you as the executive vice president
5 and the special litigation committee about any decisions
6 that need to be made with respect to the bankruptcy, who
7 would have the ultimate authority to make the decision
8 between you as executive vice president and the special
9 litigation committee?
10 MR. GARMAN: Objection to the form of the
11 question, and objection it falls outside the scope of
12 question 13.
13 Answer if you can.
14 A. Well, I -- I think if we -- if we -- if a
15 disagreement of that type occurred between the EVP and
16 the special litigation committee, I think we would -- we
17 would seek further input from the board of directors, to
18 tell you the truth.
19 Q. (BY MR. THOMPSON) Okay. Is it the NRA's
20 position that prior to -- let me step back for a second.
21 Is it the NRA's position that prior to the
22 resolution adopting your employment agreement that was
23 adopted at the January 7th meeting, did you as the
24 executive vice president have the authority to file a
25 Chapter 11 bankruptcy petition on behalf of the National

Page 454

1 believe.
2 (Exhibit 13 marked.)
3 Q. (BY MR. THOMPSON) Okay. The exhibit should
4 be available if you refresh.
5 A. It's here now.
6 MR. GARMAN: All right. We're looking at
7 page 1, questions and answers.
8 MR. THOMPSON: Yes.
9 Q. (BY MR. THOMPSON) Mr. LaPierre, do you
10 recognize -- I apologize for the formatting of this
11 document, but are you able to tell what it is?
12 A. Yes. This is a question and answer document
13 that was prepared by our public -- public relations
14 staff in consultation with Travis with the Brewer firm.
15 Q. Great. So if you could please go down to the
16 bottom of the second page under the question, By filing
17 for Chapter 11, is the NRA admitting it mismanaged donor
18 funds? Do you see that question?
19 A. I do see that question.
20 Q. Okay. And then right underneath that question
21 do you see where it says: Not at all. We have utilized
22 all donor contributions in furtherance of the NRA's
23 mission. This action is necessitated primarily by one
24 thing, the unhinged and political attack against the NRA
25 by the New York Attorney General.

Page 456

1 Rifle Association?
2 MR. GARMAN: Objection to the form of the
3 question. It calls for a legal conclusion, and it falls
4 outside the scope of the designated questions.
5 Go ahead and answer.
6 A. Yeah, as I -- I -- I would not have proceeded
7 in terms of the executive vice president position to
8 move ahead with filing without that resolution from that
9 board of directors delegating authority to the EVP's
10 office to reorganize. Without that, I would not have
11 proceeded.
12 Q. (BY MR. THOMPSON) Okay. So let's go ahead
13 and turn to topic 14. So I believe during your
14 individual deposition you testified that the contents of
15 the NRA Forward website were prepared by Mr. Arulanandam
16 and his team with some input from Mr. Carter at the
17 Brewer firm. Is that correct?
18 A. That is correct.
19 Q. Okay. Sitting here today, does the NRA have
20 any reason to believe that any statements on the NRA
21 Forward website are inaccurate?
22 A. I don't think we have any reason to believe
23 that. Not that I know of.
24 Q. Okay. So I want to -- give me a moment to
25 actually mark it, but I am going to mark Exhibit 13, I

Page 455

1 Do you see that?
2 A. I do see that.
3 Q. Does the NRA agree with this statement?
4 A. Well, as I said earlier, it -- not to be
5 repetitive, but going back to general -- Attorney
6 General Schneiderman and we believe -- we became
7 convinced that -- I became convinced in my deposition
8 the first time that -- where there seemed to be no
9 interest in the self-correction, tremendous pain the NRA
10 was going through to self-correct and look at everyone
11 and to be in complete compliance with New York state
12 law, which we were proud of.
13 And then when the -- General James filed for
14 dissolution of the NRA, this 5 million member
15 organization that does all these great safety and
16 training and education and programs, as well as
17 political advocacy, that the atmosphere in New York --
18 there didn't seem to be any good faith effort in terms
19 of all the work NRA had done on compliance, to even
20 recognize any of that and as -- or the safe harbor
21 provision that Attorney General Schneiderman had talked
22 about, that we honestly felt that we had -- in terms if
23 you cared about the NRA and its programs and its mission
24 and our members, our -- it gotten to the point where our
25 one alternative was to file Chapter 11 and seek a

Page 457

54 (Pages 454 - 457)

1 federal judge's approval on reincorporating in another
2 state.
3 We had tried -- and I will be quick. But
4 through 2017, after the Schneiderman call, in 2018, in
5 2019, not to leave New York, but to actually look at
6 everything, self-correct and -- and ensure that we were
7 in complete compliance with New York state law, but it
8 just got to the point where, based on what happened, if
9 you cared about the NRA we felt we had no other
10 alternative but to take this course.
11 Q. Okay. And I appreciate the context,
12 Mr. LaPierre, but I just want to go back to my question.
13 A. I'm sorry.
14 Q. So my question is whether the NRA agrees with
15 this statement at the bottom of page 2 of Exhibit 13?
16 A. Yes, we do -- I do -- we do agree with it.
17 Q. Okay. Thank you.
18 MR. THOMPSON: Mr. Garman, if we just
19 take a two-minute break, that may be the end of my
20 30(b)(6) questioning, but I just want to have a moment
21 to confer with my colleagues.
22 MR. GARMAN: Sure. Take whatever time
23 you need. We'll go off the record.
24 MR. THOMPSON: Okay. Thank you.
25 THE VIDEOGRAPHER: We're going off the

1 personally.
2 Q. (BY MR. THOMPSON) Okay. And that was my
3 follow-up question, was without -- without itemizing for
4 me who was involved in each particular conversation, can
5 you tell me generally who at the NRA who isn't a lawyer
6 representing the NRA was involved in those
7 conversations?
8 MR. GARMAN: I object to the extent this
9 calls outside of question 13.
10 Go ahead and answer if you can.
11 A. Charles Cotton talked with the governor of
12 Texas directly. Randy Kozuch on our staff had
13 conversations with -- I know he had conversations with
14 the attorney general of Arizona. I think he also had
15 conversations with the governor of Arkansas. I may have
16 said Arizona. Arkansas. I believe the governor of
17 Arkansas also mentioned it to me personally in -- when I
18 was talking with him. Ah --
19 Q. (BY MR. THOMPSON) I'm sorry. Go ahead.
20 A. No, I'm just trying to recall any -- I'm
21 thinking through the -- the governor of Tennessee
22 expressed an interest in setting up a meeting to talk
23 about it. Those are the ones that specifically come to
24 mind.
25 Q. Who is Mr. Kozuch?

1 record. The time on the video is 5:09 p.m.
2 (Break from 5:09 p.m. to 5:12 p.m.)
3 THE VIDEOGRAPHER: We are back on the
4 record. The time on the video is 5:12 p.m.
5 Q. (BY MR. THOMPSON) So Mr. LaPierre, just one
6 last question me relating to topic 13, the process
7 by which the NRA determined to file for bankruptcy.
8 During your individual deposition, you mentioned that
9 there were some conversations that were occurring with
10 leaders in other states, or I believe you specifically
11 mentioned the governor of Texas about a potential move
12 for the NRA. Were there conversations with any other
13 states about a potential move?
14 MR. GARMAN: So objection to the form of
15 the question. Objection to the extent this falls
16 outside of question 13.
17 Go ahead and answer if you can.
18 A. Yes, there were -- there were conversations
19 with -- I know for a fact Arkansas, West Virginia,
20 definitely Texas. I am trying to think, because we've
21 been contacted by -- those are the three that I am
22 specifically aware of, although I know there were many
23 others that also have expressed interest. I just -- I
24 just don't want to misstate the states by -- but I know,
25 for example, the governor of West Virginia called me

1 A. Randy Kozuch works for NRA in the Office of
2 Advancement, but he is -- he is very close to most of
3 the governors and probably most of the attorney generals
4 in the country.
5 Q. And does he -- he works under Mr. Schropp. Is
6 that correct?
7 A. That is correct.
8 Q. And other than Mr. Cotton, prior to the filing
9 of the bankruptcy on January 15, were any members of the
10 board informed about any of the conversations that we
11 were discussing with Arkansas, West Virginia, Texas or
12 Tennessee?
13 MR. GARMAN: Objection to the extent this
14 question falls outside the scope of the identified
15 questions.
16 Go ahead and answer if you can.
17 A. I don't -- I don't think any of them from our
18 end were informed or -- I know you had a lot of
19 discussion going on among our board about the NRA ought
20 to move to Texas, the NRA ought to move to North -- to
21 South Dakota, the NRA ought to move to, you know
22 Kentucky, Tennessee. I mean, everyone seemed to have an
23 opinion, and that was kind of a free-flowing discussion
24 going on just in general, not specifically related to
25 this, but it was just conversational talk going on among

55 (Pages 458 - 461)

1 our board.
2     MR. THOMPSON: Okay. So thank you very
3 much, Mr. LaPierre. With that, I will pass the witness
4 back to Mr. Mason.
5     THE WITNESS: Thank you.
6     MR. MASON: Mr. LaPierre, are you ready
7 to continue, or would you like to take a break?
8     THE WITNESS: I'm fine.
9     MR. MASON: Okay.
10     THE WITNESS: If you are.
11     MR. MASON: I am good.
12     MR. GARMAN: Brian, let me find your
13 video. One second, please. There we are. You were
14 just a voice from beyond before. We're ready.
15     FURTHER EXAMINATION
16 BY MR. MASON:
17     Q.  Mr. LaPierre, when did the NRA and the Brewer
18 firm begin preparing the NRA Forward website?
19     MR. GARMAN: Objection to the form of the
20 question.
21     A.  I -- I don't know the exact date that the NRA
22 began preparing the -- the website. I said that Andrew
23 Arulanandam was brought in on the process to work with
24 Travis and the Brewer firm, but I can't give you an
25 exact date as to when. I just don't know.

Page 462

1     Q.  (BY MR. MASON) Did the NRA and the Brewer
2 firm begin working on the NRA Forward website before
3 January the 7th?
4     A.  I don't know the answer to that.
5     Q.  Who are all the people at the Brewer firm that
6 were involved and had input on the content on the NRA
7 Forward website?
8     A.  As far as I know, the one that worked with
9 Andrew was Travis.
10     Q.  And what's the basis for that knowledge?
11     A.  Just the fact that that's the one that in
12 talking with me Andrew always told me he would talk
13 with.
14     Q.  Have you made any attempts to determine
15 whether anyone else at the Brewer firm besides
16 Mr. Carter was involved in reviewing the content that
17 was going to be going on the NRA Forward website?
18     A.  I haven't.
19     Q.  You're familiar with Wayne's Letter on the NRA
20 Forward website. Correct?
21     A.  Yes, I am. I think Bill probably looked at
22 some of it, too, Bill Brewer, before -- before it went
23 forward also.
24     Q.  Do you know that? Is that your testimony on
25 behalf of the NRA?

Page 463

1     MR. CORRELL: Don't speculate.
2     A.  I'm speculating, but -- I know Travis Carter
3 did.
4     MR. GARMAN: Hold on. So on this, I want
5 to be clear. I want you to testify to what you know,
6 and I want you to testify to what Andrew told us when we
7 asked him these questions.
8     A.  Yeah, he worked with Travis Carter.
9     Q.  (BY MR. MASON) How much time did you spend
10 preparing for your 30(b)(6) deposition today?
11     A.  We talked -- we chatted maybe 30 -- 30 minutes
12 with Andrew and Mr. Garman and --
13     Q.  Okay. So once your individual deposition was
14 done, you spent about 30 minutes preparing for your
15 corporate representative deposition. Is that true?
16     A.  That's true.
17     Q.  Who prepared the first draft of Wayne's
18 Letter?
19     A.  That was prepared by -- by Andrew Arulanandam
20 and Travis Carter.
21     Q.  Did Mr. Arulanandam or Mr. Carter prepare the
22 first draft?
23     MR. GARMAN: Objection to the form of the
24 question.
25     But go ahead and answer.

Page 464

1     A.  As far as I know, based on my conversation
2 with Andrew, that -- that is is -- is what happened.
3     Q.  (BY MR. MASON) Did Mr. Carter prepare the
4 initial draft of the Wayne's Letter that ultimately is
5 on -- currently on the NRA Forward website?
6     A.  I think they both -- they both worked together
7 on all of that.
8     Q.  Do you know how long it took them to prepare
9 that letter?
10     A.  I don't.
11     Q.  Do you know when they began preparing that
12 letter?
13     A.  I think they started working on it a couple of
14 days before.
15     Q.  When did you first review Wayne's Letter
16 that's on the NRA Forward website?
17     A.  I think I was in here that whole day that we
18 filed and was looking over material all day as we
19 prepared to file.
20     Q.  Did you make any changes to Wayne's Letter
21 before it was posted to the NRA Forward website?
22     A.  I can't -- I don't remember, to tell you the
23 truth. If I did, they were minor.
24     Q.  Did you review the entirety of Wayne's Letter
25 before it was posted to the NRA Forward website?

Page 465

56 (Pages 462 - 465)

1    A.   Yeah.  Yes, I believe I did.
2    Q.   Is it fair to say that a lot of time and
3 effort went into preparing the NRA Forward website?
4         MR. GARMAN:  Objection to the form of the
5 question.
6    A.   I'm sure that Andrew and Billy in working with
7 Travis spent -- spent a lot of time on it, worked very
8 hard for a couple days.
9    Q.   (BY MR. MASON)  Why did the Brewer firm need
10 to be involved in the preparation of the NRA Forward
11 website?
12        MR. GARMAN:  Objection to the form of the
13 question.
14        Go ahead and answer if you can.
15    A.   Well, I think Andrew and Billy actually --
16 actually did the website.  It -- I think that Travis
17 Carter would have been involved in some of the content
18 working with Andrew.
19    Q.   (BY MR. MASON)  Would you agree that it is
20 important that all of the content on the NRA Forward
21 website is -- is accurate?
22        MR. GARMAN:  Objection to the form of the
23 question.
24    A.   I think it's always important to try to be
25 accurate.

Page 466

1    Q.   (BY MR. MASON)  Words matter.  Right?
2    A.   They do.
3         MR. GARMAN:  Objection to the form of the
4 question.
5         Go ahead.
6    A.   Yes, I agree with that.
7    Q.   (BY MR. MASON)  Would you agree that -- well,
8 strike that.
9         And you would agree with me that on the NRA
10 Forward website, it's important to make accurate
11 statements to all of your NRA members.  Correct?
12        MR. GARMAN:  Objection to the form of the
13 question.
14        Go ahead.
15    A.   We always try to make accurate statements to
16 all of our members, yes, I agree.
17    Q.   (BY MR. MASON)  Would you agree that the
18 public statements made on the NRA Forward website are
19 consistent with the NRA's legal positions in the
20 bankruptcy?
21        MR. GARMAN:  Objection to the form of the
22 question.
23        MR. CORRELL:  Yeah, I just want to also
24 object on the grounds that it calls for legal
25 conclusion.

Page 467

1    A.   To the -- to the best of my knowledge, the
2 statements on the NRA website are -- are -- are accurate
3 and parallel the legal facts.
4    Q.   (BY MR. MASON)  Do you believe that the
5 statements on the NRA Forward website accurately reflect
6 why the NRA filed for Chapter 11 bankruptcy?
7         MR. CORRELL:  This is Kent Correll.
8 Objection to the form, also calls for legal conclusion.
9    A.   To the best of my knowledge, they do
10 accurately reflect why the NRA filed for Chapter 11.
11    Q.   (BY MR. MASON)  There was a press release that
12 was also issued or also listed on the NRA Forward
13 website.  Are you familiar with that press release?
14    A.   I have read a number of press releases that we
15 did in relation of that -- to this.  I don't know which
16 one you're specifically referring to.
17    Q.   Let's see.  Let's take a look at exhibit --
18 Ackerman Exhibit 90.
19        (AMc Exhibit 90 marked.)
20    Q.   (BY MR. MASON)  It should be in the folder.
21        MR. CORRELL:  It's there.
22    A.   Yeah, I'm looking at it right now.
23    Q.   (BY MR. MASON)  Are you familiar with this
24 press release, Mr. LaPierre?
25    A.   I am.

Page 468

1    Q.   Who prepared the first draft of this press
2 release?
3    A.   It was prepared by Andrew Arulanandam and
4 Travis Carter.
5    Q.   Did Mr. Arulanandam or did Mr. Carter prepare
6 the initial draft?
7         MR. GARMAN:  Objection to the form of the
8 question.
9    A.   To the best of my knowledge, they worked as a
10 team together on this and they collaborated together on
11 it.
12    Q.   (BY MR. MASON)  When was the first draft
13 prepared?
14    A.   I think they were working on it a couple days
15 before -- before the -- the bankruptcy was filed.  I
16 know they were working like around the clock on the
17 couple days before the bankruptcy was filed on -- on all
18 of this type of material.
19    Q.   Let's take a look at Exhibit 76, please.
20        (AMc Exhibit 76 marked.)
21    Q.   (BY MR. MASON)  It should be in the shared
22 folder.
23        MR. GARMAN:  It's up.
24    Q.   (BY MR. MASON)  Mr. LaPierre, do you see
25 Ackerman Exhibit 76?

Page 469

57 (Pages 466 - 469)

1   A. I do.
2   Q. And it looks like there's -- at the top it
3 says leadership quotes. Do you see that?
4   A. I do see that.
5   Q. And there's a statement from yourself, and
6 then if you keep going through, there's a statement from
7 Ms. Meadows and then there's a statement from Mr. Brewer
8 and then there's a statement from Mr. King. Do you see
9 that?
10   A. I do.
11   Q. Who made the decision as to which leadership
12 quotes were going to be -- well, let me back up.
13       Who made the decision as to which leaders were
14 going to be quoted on this particular page?
15       MR. GARMAN: Objection to form.
16       Go ahead and answer.
17   A. I believe Andrew Arulanandam came up with the
18 list of who he thought should be quoted.
19   Q. (BY MR. MASON) Did Mr. Arulanandam consult
20 with anyone else at the NRA before this was posted on
21 the NRA Forward website?
22   A. I believe he -- I'm pretty sure he mentioned
23 to me in terms of these are people I'm thinking of using
24 quotes from, and he mentioned one from me and then he
25 mentioned these others.

Page 470

1 but he doesn't -- he doesn't do it usually on his own --
2 sometimes he might -- without -- without also seeking
3 input or running it by somebody.
4   Q. And when you say "running it by somebody," are
5 you referring to running it by somebody at the NRA or
6 running it by somebody at the Brewer firm?
7   A. Well, I'm talking about at the NRA, but as I
8 said, he works with -- if it's a legal issue, he works
9 with Travis Carter at the Brewer firm on it if it
10 involves any of these litigation matters or -- or this
11 type of matter.
12   Q. Why was John Frazer not quoted on the
13 leadership quotes page on the NRA Forward website?
14       MR. GARMAN: Objection to form.
15   A. I don't have any idea. These are the names
16 Andrew suggested be there, and I -- you'd have to ask
17 Andrew why they didn't decide to -- I mean, other people
18 aren't quoted either. I mean, I don't think it was
19 anything particularly involving John Frazer or aimed at
20 John Frazer. It was just these are the people Andrew
21 came up with that he thought should be quoted.
22   Q. (BY MR. MASON) Do you agree that Mr. Brewer
23 is one of the leaders within the NRA?
24       MR. GARMAN: Objection to the form of the
25 question.

Page 472

1   A. No. Mr. Brewer is litigation counsel working
2 for the NRA. I would not say he's a leader of the NRA.
3   Q. (BY MR. MASON) Let's take a look at
4 Exhibit 128, please.
5       (AMc Exhibit 128 marked.)
6       MR. GARMAN: Okay. We have it.
7   Q. (BY MR. MASON) Mr. LaPierre, have you seen
8 this before, this article before?
9       MR. GARMAN: Counsel, Mr. LaPierre hasn't
10 read it. I'm either going to ask that he read it or you
11 represent what it is.
12       MR. MASON: Sure.
13   A. I have not seen it.
14   Q. (BY MR. MASON) Sure.
15   A. I have not seen the article before.
16   Q. Let me back up and ask one question.
17       Mr. LaPierre, you testified that I believe on
18 January 15, the day that the NRA was filing for
19 bankruptcy, you reviewed the various materials that were
20 going to be posted on the NRA Forward website. Is
21 that -- is that accurate?
22   A. I reviewed all kinds of material that day.
23 I -- yes, I reviewed a lot of material that day. I
24 don't know whether I reviewed everything that was going
25 to be posted on the website, but I reviewed a lot of --

Page 473

1   Q. Did Mr. Brewer ask if he could be quoted on
2 the leadership quotes page?
3       MR. CORRELL: Objection. This is
4 Mr. Correll.
5       To the extent that it calls for you to reveal
6 any communications with attorneys about litigation, I
7 instruct you not to answer.
8   A. Well, as I said, I -- the one I talked to
9 about this was Andrew. So Andrew would have the
10 knowledge on whether it was his idea or whether he had a
11 conversation with Mr. Brewer.
12   Q. (BY MR. MASON) Does --
13   A. I know I didn't have a conversation with
14 Mr. Brewer about it.
15   Q. Does Mr. Arulanandam have complete control as
16 to the NRA's public relations and the statements that
17 are put out by the NRA?
18   A. He is director of public affairs for the
19 National Rifle Association, and he directs that
20 operation. He -- he runs by -- statements by a number
21 of people. He runs -- depending on what the subject, he
22 runs it by me. He runs them by Jason Ouimet, the ILA
23 director, Institute for Legislative Action. He runs
24 them by Joe DeBergalis, the director of general
25 operations. It depends on the nature of the subject,

Page 471

58 (Pages 470 - 473)

1 a lot of press releases and letters to vendors and
2 letters to the board and other things like that.
3     Q.   Okay.  So going back to Ackerman Exhibit 128,
4 this is a press release that was put out by Stephen
5 Gutowski that is titled "NRA Board to Hold Emergency
6 Hearing Amid Bankruptcy Turmoil."
7         And if you will, Mr. LaPierre, I would like
8 for you to scroll down to the second page, please.
9         MR. GARMAN:  Counsel, this is a press
10 release?
11         MR. MASON:  Well, I'm sorry.  It's not a
12 press release from the NRA.  It's a news article.  Thank
13 you for that correction.
14     Q.  (BY MR. MASON)  And if you will, the first
15 full paragraph.  It states, You could have seen the top
16 of my car blow off with my head, Journey said, because I
17 knew what that meant.  It meant that those three lawyers
18 committed a lie of omission of material facts to the
19 board of directors.  Nobody said bankruptcy.
20        Do you see that?
21     A.  I do see that.
22         MR. GARMAN:  So I am going to object.
23 You haven't laid foundation for this document, but go
24 ahead.
25     Q.  (BY MR. MASON)  And then Mr. Brewer, it

Page 474

1 statement in the press -- well, let me ask you this.  As
2 you sit here today, are you aware of any statements that
3 Mr. Brewer has made in the press relating to the
4 bankruptcy that have been run or approved by you first?
5     A.  No, I don't -- I don't know of any statement
6 that Mr. Brewer has made that -- a press release or
7 anything that was run by me.  I know that in this quote,
8 the plan was widely endorsed by the board members.  I
9 mean, since we have had an overwhelming support from
10 board members and NRA members and elected officials in
11 terms of -- since the filing.  I mean, people have --
12 our members have been cheering, to tell you the truth,
13 and so have elected officials.
14     Q.  So when Mr. Brewer says this plan was
15 undertaken in full compliance with the NRA policy, do
16 you understand that he is stating that the plan to file
17 Chapter 11 bankruptcy?  Is that your understanding?
18         MR. GARMAN:  Objection to the form of the
19 question.
20     A.  Yeah, I think he's accurately stating the
21 truth, that it was -- the authority to file was
22 delegated to the EVP's office, and I worked with the
23 SLC, which is in compliance with NRA policy.
24     Q.  (BY MR. MASON)  Who are all the board members
25 that supported the NRA filing Chapter 11 bankruptcy in

Page 476

1 states, Counsel to the NRA says that Journey is
2 mistaken.  Judge Journey purportedly supports the
3 mission of the NRA and claims not to oppose the
4 association seeking to reincorporate in Texas, he said
5 in a statement.  Unfortunately, he seems to mistakenly
6 believe that the NRA reorganization plan did not follow
7 board and internal protocol.  This plan was undertaken
8 in full compliance with the NRA policy.  The plan has
9 been widely endorsed by NRA board members, NRA members,
10 elected officials and other key stakeholders.
11        Do you see that?
12     A.  Yeah.
13     Q.  So my first question for you is who at the NRA
14 authorized Mr. Brewer to make this statement?
15         MR. GARMAN:  Objection first -- objection
16 to the form of the question and objection, lacks
17 foundation.
18         MR. CORRELL:  I would also -- this is
19 Kent Correll.  I object to the extent that it calls for
20 disclosure of any confidential attorney/client
21 communication.
22     A.  It would be a conversation between Andrew
23 Arulanandam and Mr. Brewer.  I haven't seen this
24 article, and I haven't seen this quote.
25     Q.  (BY MR. MASON)  When Mr. Brewer makes a

Page 475

1 Dallas, Texas, prior to the January 7th board meeting?
2         MR. GARMAN:  Objection to the form of the
3 question, objection to foundation.
4     A.  We discussed it at length.  The resolution
5 that was passed delegated to the EVP's office the
6 authority to reorganize, and I consulted with the
7 special litigation committee, Carolyn Meadows, Willes
8 Lee, Charles Cotton.  We were very concerned about
9 leaks, as I've said on this, because if it had leaked --
10 given from her own statements, we believed General
11 James, had she been informed of it by through a leak,
12 would have tried to put the NRA into receivership, which
13 would have destroyed the NRA.  So --
14         MR. MASON:  Could I have my question read
15 back, please?
16         (Requested testimony read.)
17         MR. GARMAN:  Counsel, I believe he
18 answered your question.
19         MR. CORRELL:  Same objections.
20     Q.  (BY MR. MASON)  Prior to the January 7th board
21 meeting.
22         MR. GARMAN:  Object to the form of the
23 question, asked and answered.
24        You can identify the same individuals again.
25     A.  I consulted with Carolyn Meadows, Willes Lee,

Page 477

59 (Pages 474 - 477)

1 Charles Cotton, and the authority was delegated to the
2 EVP's office to reorganize at that board meeting. And I
3 wasn't in the room, so I don't know all the discussions
4 that took place on that resolution.
5 Q. (BY MR. MASON) Since January 15, have any
6 other board members besides Mr. Liptak resigned from the
7 NRA board?
8 MR. GARMAN: Object to the -- object to
9 it being outside the scope.
10 Go ahead and answer.
11 A. Not that I'm aware of.
12 Q. (BY MR. MASON) We can take a look at
13 Exhibit 91, please.
14 (AMc Exhibit 91 marked.)
15 Q. (BY MR. MASON) And while your counsel is
16 pulling that up, Mr. LaPierre, are you aware of any
17 leaks relating to the executive committee meeting that
18 took place on January 7th?
19 MR. GARMAN: Object to the form of the
20 question, object that it's outside the scope of the
21 examination.
22 Go ahead.
23 A. I am not aware of any leaks that took place at
24 that January 7th meeting, no, I'm not.
25 Q. (BY MR. MASON) Is the reason that there were

1 A. I see that.
2 Q. And the NRA states here, This process begins
3 immediately. The NRA is expected to emerge from these
4 proceedings within the next six months.
5 Do you see that?
6 A. I do see that.
7 Q. Is it your testimony that it was just
8 Mr. Arulanandam and Mr. Travis Carter that were involved
9 in preparing the answer to this question?
10 MR. GARMAN: Objection to the form of the
11 question.
12 A. I believe -- my belief on this question is
13 that you would have to ask Andrew, but I would probably
14 bet that on the specific legal issue of proceed within
15 the next six months, they probably consulted legal
16 counsel.
17 Q. (BY MR. MASON) What's the factual basis for
18 the statement that the NRA is expected to emerge from
19 these proceedings within the next six months?
20 MR. GARMAN: Objection to the form of the
21 question.
22 A. I have no personal knowledge of that. You
23 would need to ask -- it would be a question for the
24 attorneys and the bankruptcy attorneys, and I don't have
25 the -- I don't have the answer.

1 not any leaks because Chapter 11 bankruptcy was not
2 discussed?
3 MR. GARMAN: Objection to the form of the
4 question.
5 MR. CORRELL: Objection to the form and
6 no foundation.
7 A. I don't know the answer to that.
8 Q. (BY MR. MASON) If you could take a look at
9 Exhibit 91. I believe this -- we may have looked at
10 this before. This is the questions and answers section
11 of the NRA Forward website. Do you see that?
12 A. Yes, I do.
13 Q. Was anyone else involved with the preparation
14 of these questions and answers besides Mr. Arulanandam
15 and the Brewer law firm?
16 A. Not that I know of, based on my discussions
17 with -- with Andrew Arulanandam earlier today.
18 Q. When did the NRA begin preparing Exhibit 91?
19 A. As I've said, I think they worked on it a
20 couple of days before the -- the bankruptcy was
21 announced. They were working around the clock on this
22 stuff.
23 Q. If you'll go down to the third page about
24 two-thirds of the way down. Do you see the question
25 when will the restructuring process be completed?

1 Q. (BY MR. MASON) You are the NRA's corporate
2 representative designated on the NRA Forward website.
3 Is that right?
4 MR. GARMAN: Objection. He's our
5 designated representative for question 8.
6 Q. (BY MR. MASON) Is that true, Mr. LaPierre?
7 A. I am the designee for the question -- the
8 Ackerman questions here today on -- that are
9 highlighted.
10 MR. GARMAN: Counsel, for clarity of the
11 record, I have a highlighted copy of the -- of the
12 notice in front of me. That's simply all that's here.
13 Q. (BY MR. MASON) And just to be clear,
14 Mr. LaPierre, you were the corporate representative on
15 the Ackerman topics 5 and 8. Is that correct?
16 MR. GARMAN: The witness is referring to
17 my copy --
18 A. That's correct, 5 and 8.
19 Q. (BY MR. MASON) And with respect to topic 8,
20 did you review any of the contents on the NRA Forward
21 website before testifying as the NRA corporate
22 representative today?
23 A. I did not. I had conversations with Andrew
24 Arulanandam about who -- about the process and who he
25 worked with, and that's the conversations I had along,

**Page 482**

1 with counsel from the Garman firm.
2 MR. MASON: All right. Let's go off the
3 record. I think I'm about done. Let me see if I've got
4 any other questions.
5 MR. GARMAN: Sure.
6 THE VIDEOGRAPHER: We're going off the
7 record. The time on the video is 5:49 p.m.
8 (Break from 5:49 p.m. to 5:51 p.m.)
9 THE VIDEOGRAPHER: We're back on the
10 record. The time on the record is 5:51 p.m.
11 Q. (BY MR. MASON) Mr. LaPierre, the general
12 counsel of the National Rifle Association, John Frazer
13 on Thursday testified that if the filing of the
14 bankruptcy was not authorized then it could not be filed
15 in good faith. My question for you is do you agree with
16 that statement
17 MR. GARMAN: I object to the form of the
18 question. I object to the extent it calls for a legal
19 conclusion.
20 A. I said earlier if the board had not delegated
21 the authority to the EVP's office to reorganize, I would
22 not have proceeded ahead with a reorganization.
23 MR. MASON: All right. I am going to
24 pass the witness at this point, save the -- reserve the
25 rest of our 30(b)(6) time, unless Mr. Thompson has any

**Page 483**

1 other questions.
2 MR. THOMPSON: No. Thank you. I will
3 pass the witness as well.
4 MR. DRAKE: This is Scott Drake. On
5 behalf of the Committee, we have no further questions of
6 Mr. LaPierre.
7 MR. GARMAN: Thank you, Scott.
8 Mr. Videographer, if you would put on the
9 record the amount of time each of the parties used on
10 the 30(b)(6) before we go off, I think we would all
11 appreciate it.
12 THE VIDEOGRAPHER: Yes. Mr. Thompson
13 used 32 minutes and Mr. Mason used 32 minutes.
14 MR. GARMAN: Good.
15 MR. MASON: Consistent. Okay. I've got
16 nothing else.
17 Thank you, Mr. LaPierre.
18 THE WITNESS: Thank you.
19 THE VIDEOGRAPHER: This concludes today's
20 deposition. The time on the video is 5:53 p.m. We are
21 off the record.
22 (Proceedings ended at 5:53 p.m.)
23
24
25

**Page 484**

1 CHANGES AND SIGNATURE
2 WITNESS NAME: WAYNE LAPIERRE
3 DATE OF DEPOSITION: MARCH 23, 2021
4 PAGE LINE CHANGE REASON
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 Job No TX4510606

**Page 485**

1 I, WAYNE LAPIERRE, have read the foregoing
2 deposition and hereby affix my signature that same is
3 true and correct, except as noted above.
4
5 _____
6 WAYNE LAPIERRE
7
8 THE STATE OF _____)
9 COUNTY OF _____)
10 Before me, _____, on
11 this day personally appeared WAYNE LAPIERRE, known to me
12 (or proved to me under oath or through
13 _____) (description of identity
14 card or other document) to be the person whose name is
15 subscribed to the foregoing instrument and acknowledged
16 to me that they executed the same for the purposes and
17 consideration therein expressed.
18 Given under my hand and seal of office this
19 _____ day of _____, _____.
20
21
22 _____
23 NOTARY PUBLIC IN AND FOR
24 THE STATE OF _____
25

61 (Pages 482 - 485)

Veritext Legal Solutions
800-336-4000

```
 1  STATE OF TEXAS  )
 2  COUNTY OF DALLAS )
 3        I, Julie C. Brandt, Certified Shorthand
 4  Reporter in and for the State of Texas, certify that the
 5  foregoing deposition of WAYNE LAPIERRE, VOLUME 2, was
 6  reported stenographically by me remotely via Zoom, said
 7  witness having been placed under oath by me, and the
 8  deposition is a true record of the testimony given by
 9  the witness;
10        That the amount of time used by attorneys at
11  the deposition is as follows:
12        Mr. Sheehan    - 1 hour, 28 minutes
13        Mr. Thompson   - 32 minutes
14        Mr. Drake      - 46 minutes
15        Mr. Mason      - 3 hours, 18 minutes
16        I further certify that I am neither counsel
17  for, nor related to any party in the cause and am not
18  financially interested in its outcome.
19        In witness whereof, I have subscribed my name
20  this 24th day of March, 2021.
21
22        Julie C. Brandt
          Julie C. Brandt, CSR, KMR, CRR
23        TX CSR No. 4018, Exp. 10/31/21
          Veritext Legal Solutions
24        Firm Registration No. 571
          300 Throckmorton Street, Suite 1600
25        Fort Worth, Texas 76102
                                            Page 486
```

```
 1  ggarman@gtg.legal
 2             March 24, 2021
 3  National Rifle Association Of America And Sea Girt LLC
 4  DEPOSITION OF: Wayne LaPierre , Vol. 2 (# 4510606)
 5     The above-referenced witness transcript is
 6  available for read and sign.
 7     Within the applicable timeframe, the witness
 8  should read the testimony to verify its accuracy. If
 9  there are any changes, the witness should note those
10  on the attached Errata Sheet.
11     The witness should sign and notarize the
12  attached Errata pages and return to Veritext at
13  errata-tx@veritext.com.
14     According to applicable rules or agreements, if
15  the witness fails to do so within the time allotted,
16  a certified copy of the transcript may be used as if
17  signed.
18             Yours,
19             Veritext Legal Solutions
20
21
22
23
24
25
                                            Page 487
```

62 (Pages 486 - 487)

# EXHIBIT 7

# EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT is made by and between the National Rifle Association of America (the "NRA" or the "Association") and Wayne R. LaPierre ("Employee").

1.    <u>Employment</u>. The Association hereby employs Employee, and Employee hereby accepts employment with the Association, upon the terms and conditions hereinafter set forth. Terms used herein that are also used in the Bylaws of the Association shall have the same meaning ascribed to them in the Bylaws of the Association.

2.    <u>Duties and Compensation</u>.

(a)    Employee shall serve as the Executive Vice President of the Association and shall direct all the affairs of the Association in accordance with the programs and policies established by the Board of Directors. Among his authorities, Employee shall be empowered to exercise corporate authority in furtherance of the mission and interests of the NRA, including without limitation to reorganize or restructure the affairs of the Association for purposes of cost-minimization, regulatory compliance or otherwise. Employee shall devote his full time to performing the customary duties of such position and such other commensurate duties as may be assigned from time to time by the Board of Directors. Employee agrees to abide by the reasonable rules, regulations, instructions, personnel practices, employment manuals, and policies of the Association, as they may exist or be modified from time to time by the Association.

(b)    Employee shall be compensated by the Association for all services to be rendered pursuant to this Agreement, as follows:

(1)    The Association shall pay Employee a base salary at the rate of $1,300,000 per year (the "Base Salary").

(2)    The Association shall review the Base Salary at least annually. The Association may recommend changes to the Base Salary which the Officers Compensation Committee of the Board of Directors of the Association (the "OCC") reasonably determines to be in the best interest of the Association, taking into account Employee's performance, input obtained from independent compensation consultants, and other relevant factors. Employee's consent to any salary modification recommended by the OCC shall not be unreasonably withheld.

(3)    Employee shall be eligible for an annual performance bonus determined at the sole discretion of the OCC (provided, however, that any performance bonus recommended by the OCC must be approved by the full Board of Directors of the Association).

(c)    The Association shall provide the Employee with the following benefits:

(1)    Paid vacation time as customarily provided to the Association's other comparable employees;

(2)    Paid holidays as customarily provided to the Association's other comparable employees;

(3)    Life insurance as customarily provided to the Association's other comparable employees;

(d)    Medical and/or dental coverage as may be provided by the Association in

1

AMc DEPOSITION
EXHIBIT
12

its sole discretion.

    (e)    Reimbursement for all reasonable expenses incurred by Employee during the term of this Agreement for advancing the Association's business, provided that such expenses comply with, and are documented and submitted pursuant to, applicable NRA policies and guidelines.

    (f)    Employee's eligibility for any benefit provided herein shall be subject to Employee's compliance with the reasonable requests of, and to Employee's meeting the underwriting criteria used by, any insurance company providing any of the benefits specified herein to the Association's employees. Employee agrees to submit to any medical examination and to provide and complete any documentation (including medical records) required by any such insurance company. All benefits provided for hereunder are taxable to Employee to the extent required by applicable tax laws.

    3.    <u>Term of Employment</u>. Employee was elected to his present employment on October 24, 2020, and shall serve until the expiration of his elected term in accordance with the NRA Bylaws. This Employment Agreement, once executed, shall become effective immediately upon authorization by the NRA Board of Directors, and shall terminate effective immediately if the NRA declines to re-elect Employee to the position of Executive Vice President at the next annual election pursuant to NRA Bylaws Art. V, Sec. 1, and may additionally be terminated by the Association:

    (a)    Upon 10 days written notice for Cause (as defined below); or

    (b)    Effective immediately upon Employee's death or disability.

For purposes of this Paragraph 3, "Cause" shall mean: (i) material failure to perform the duties of Employee's position; (ii) fraud, misappropriation, embezzlement or acts of similar dishonesty; (iii) conviction of a felony involving moral turpitude; (iv) illegal use of drugs or excessive use of alcohol in the workplace; (v) intentional and willful misconduct that may subject the NRA to criminal or civil liability; (vi) breach of Employee's duty of loyalty by diversion or usurpation of corporate opportunities properly belonging to the NRA; or (vii) any material breach of this Agreement.

    4.    <u>Confidentiality and Noncompetition</u>. In consideration of the employment of Employee by the Association, Employee agrees as follows:

    (a)    Employee shall not, during the period of his employment with the Association or at any time thereafter, regardless of the reason for the cessation of his employment: (1) use any Confidential Information (as hereinafter defined) for his own benefit or for the benefit of any person or entity other than the Association; (2) disclose to any other person or entity any Confidential Information; or (3) remove from the Association's premises or make copies of any Confidential Information, in any form; except, in each case, as may be required within the scope of Employee's duties during the course of his employment by the Association.

    (b)    Upon termination of employment, or at any such time as the Association may request, Employee will deliver to the Association all copies in his possession of any Confidential Information, in any form. Employee shall not at any time assert any rights in or with respect to any Confidential Information.

    (c)    "Confidential Information" means (i) any and all specifications, drawings, designs, techniques, processes, know-how, research, customer lists, customer needs, prices, costs

2

and marketing, sales and financial information, and (ii) any similar or other trade secret or confidential information of the Association or any member, vendor, supplier, distributor, or customer of the Association, regardless of how acquired or developed by the Association or any such member, vendor, supplier, distributor, or customer, concerning any of their respective businesses, policies, research, processes, inventions, products, business operations or business methods. Confidential Information does not include information, knowledge, or data which Employee can prove was in his possession prior to the commencement of employment with the Association or information, knowledge, or data which was or is in the public domain by reason other than the wrongful acts of Employee.

(d) In the event that Employee is required by applicable law, regulation or legal process to disclose any Confidential Information, Employee shall promptly notify the Association in writing so that the Association may seek a protective order or other appropriate remedy; moreover, Employee shall cooperate reasonably with the Association to facilitate the Association's efforts to prevent or limit disclosure and assert any applicable privileges. Nothing herein shall be deemed to prevent Employee from honoring a subpoena (or governmental order) that seeks discovery of Confidential Information if (a) a motion for a protective order, motion to quash and/or other motion filed to prevent the production or disclosure of the Confidential Information has been denied or is not made; provided, however, that the Employee may disclose only that particular Confidential Information which Employee's legal counsel advises is legally required and that Employee exercises commercially reasonable efforts to preserve the confidentiality of all other Confidential Information; or (b) the Association consents to the disclosure in writing.

(e) During the period of employment with the Association and for two (2) years thereafter, Employee shall not, for himself or on behalf of any other person or entity, in any way compete with the business then done or intended to be done by the Association, including calling upon any current, former or potential member, vendor or customer of the Association for the purpose of soliciting or providing to any such individual or entity any products or services which are the same as or similar to those provided or intended to be provided by the Association.

5. Option to License Name and Likeness; Post-Employment Services. For a period of two (2) years commencing upon termination of Employee's employment pursuant to this Agreement (the "Post-Employment Period"), the Association may, at its sole option:

(a) Utilize Employee's name, likeness, and signature for fundraising, public relations, and membership purposes; provided, however, that (i) the Association shall exercise such option in good faith and shall not deploy Employee's name, likeness, or signature in any manner which the Association reasonably foresees may harm Employee's reputation, and (ii) the Association shall pay Employee a reasonable royalty in exchange for such use, not to exceed $500,000 per calendar year.

(b) Engage Employee for in-person public appearances, for which Employee will be compensated at a rate of $750 per hour.

6. Intellectual Property. Employee agrees that any intellectual property developed during the term of this Agreement, including, without limitation, trademarks, copyrights, and patents ("Intellectual Property"), and any products, processes, know-how, inventions or devices, or any improvements to any of the foregoing whether patentable or not ("Inventions"), discovered or developed during the course of his employment with the Association which are (i) related to the Association's business; (ii) in the course of development by the Association; or (iii) made with the

3

use of the Association's time, materials or facilities, shall belong to the Association. Employee hereby assigns and transfers to the Association all right, title, and interest to any and all such Intellectual Property and Inventions.

7. <u>Injunctive Relief</u>. In the event of a breach or threatened breach of any of the terms of this Agreement, the Association shall be entitled to an injunction restraining Employee from committing any breach of this Agreement without showing or proving any actual damages and without diminishing any other right or remedy which the Association may have at law or in equity to enforce the provisions of this Agreement. Employee waives any right Employee may have to require the Association to post a bond or other security with respect to obtaining or continuing any injunction or temporary restraining order, releases the Association and its officers and directors from, and waives any claim for, damages against them which Employee may have with respect to the Association's obtaining any injunction or restraining order pursuant to this Agreement, and waives any claim that the Association has an adequate remedy at law.

8. <u>General Terms</u>.

(a) <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto, their personal representatives, and permitted successors, and assigns.

(b) <u>Assignment</u>. This Agreement may not be assigned, in whole or in part, by any party hereto without the prior written consent of all other parties.

(c) <u>Entire Agreement</u>. This Agreement contains the entire understanding between the parties hereto and supersedes any prior understanding, memoranda, or other written or oral agreements between them respecting the within subject matter. There are no representations, agreements, arrangements, or understandings, oral or written, between the parties relating to the subject matter of this Agreement which are not fully expressed herein.

(d) <u>Modifications; Waiver</u>. No modification or waiver of this Agreement or any part hereof shall be effective unless in writing and signed by the party or parties sought to be charged therewith. No waiver of any breach or condition of this Agreement shall be deemed to be a waiver of any other or subsequent breach or condition, whether of like or different nature.

(e) <u>No Third-Party Beneficiary</u>. None of the provisions of this Agreement shall be for the benefit of, or enforceable by, any person or entity not a party hereto.

(f) <u>Partial Invalidity</u>. If any provision of this Agreement shall be held invalid or unenforceable by competent authority, such provision shall be construed so as to be limited or reduced to be enforceable to the maximum extent compatible with the law as it shall then appear. The total invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

(g) <u>Notices</u>. Any notice or other communication required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given if it is delivered, either personally, by facsimile transmission, or by registered, certified or express mail, return receipt requested, postage prepaid, to the address for such party specified below or to such other address as the party may from time to time advise the other party, and shall be deemed given and received as actual personal delivery, on the first business day after the date of delivery shown on any such facsimile transmission or upon the date of actual receipt shown on any return receipt if registered, certified or express mail is used, as the case may be.

4

Notice to the National Rifle Association of America shall be sent to:

> John Frazer, Esq.
> General Counsel
> National Rifle Association of America
> 11250 Waples Mill Road
> Fairfax, VA 22030

with a copy to:

> William A. Brewer, III, Esq.
> Brewer Attorneys & Counselors
> 750 Lexington Avenue, 14th Floor
> New York, NY 10022

Notice to Wayne R. LaPierre shall be sent to:

> Wayne R. LaPierre
> Executive Vice President
> National Rifle Association of America
> 11250 Waples Mill Road
> Fairfax, VA 22030

with a copy to:

> P. Kent Correll, Esq.
> Correll Law Group
> 250 Park Avenue, 7th Floor
> New York, NY 10177.

    (h)   Arbitration. In the event that any disagreement or dispute should arise between the parties hereto with respect to this Agreement or Employee's tenure at the NRA, then such disagreement or dispute shall be submitted to arbitration in accordance with the rules then pertaining to the American Arbitration Association with respect to commercial disputes. Judgment upon any resulting award may, after its rendering, be entered in any court of competent jurisdiction by any party. **The place of arbitration, and the forum and venue for enforcement of any award, shall be Dallas, Texas.**

    **(i)**   **Governing Law. This Agreement, and all claims or causes of action (whether in contract, tort or statute) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any alleged representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), or which otherwise arise out of or relate to Employee's employment by the NRA, shall be governed by, and enforced in accordance with, the internal laws of the State of Texas, without giving effect to conflict-of-laws principles thereof. This document shall be**

construed as a contract negotiated and executed in the State of Texas.

(j)     Effect of Termination. Unless otherwise specifically agreed in writing, the terms of Paragraphs 4, 5, 6, 7 and 8 shall survive any termination, cancellation, repudiation, or rescission of this Agreement, and under such circumstances the parties may continue to enforce such terms as if this Agreement were otherwise in full force and effect.

(k)     Headings. The headings contained in this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

(l)     Fair Meaning. This Agreement shall be construed according to its fair meaning, the language used shall be deemed the language chosen by the parties hereto to express their mutual intent, and no presumption or rule of strict construction will be applied against any party hereto.

(m)     Gender. Whenever the context may require, any pronoun used herein shall include the corresponding masculine, feminine, or neuter forms and the singular of nouns, pronouns, and verbs shall include the plural and vice versa.

(n)     Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed an original, and all of said counterparts together shall constitute but one and the same instrument.

(o)     Further Assurances. The parties hereto shall execute and deliver any and all additional writings, instruments, and other documents and shall take all such further actions as shall be reasonably required in order to effect the terms and conditions of this Agreement.

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement as of January __, 2020.

ASSOCIATION:

By: _____

Name: *CHARLES L. COTTON*

Title: *First Vice-President*

EMPLOYEE:

_____

*Wayne R. LaPierre*

# EXHIBIT 8

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF TEXAS

3                   DALLAS DIVISION

4

5

   IN RE:                    )

6                            )

                             )

7  NATIONAL RIFLE            ) Case No.

   ASSOCIATION OF AMERICA    ) 21-30085-hdh-11

8  AND SEA GIRT, LLC,        )

                             )

9      Debtors.              )

10

11  *********************************************************

12      REMOTE ORAL AND VIDEOTAPED DEPOSITION OF

13            HONORABLE PHILLIP JOURNEY

14                 MARCH 18, 2021

15  CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

16  *********************************************************

17

18

19

20

21

22

23

24

25

                                          Page 1

## Page 2

1    REMOTE ORAL AND VIDEOTAPED DEPOSITION OF HONORABLE

2 PHILLIP JOURNEY, produced as a witness at the instance

3 of the New York State Office of the Attorney General,

4 and duly sworn, was taken remotely in the above-styled

5 and numbered cause on the 18th day of March, 2021, from

6 4:10 p.m. to 7:57 p.m., via Zoom, before Julie C.

7 Brandt, RMR, CRR, and CSR in and for the State of Texas,

8 reported by machine shorthand, with the witness located

9 in Wichita, Kansas, pursuant to the Federal Rules of

10 Civil Procedure and the provisions stated on the record

11 or attached hereto.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## Page 3

1    REMOTE APPEARANCES

2

3 FOR THE NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL:

4    Gerrit Pronske
     Eric Van Horn

5    Jason Kathman
     SPENCER FANE LLP

6    2200 Ross Avenue, Suite 4800 West
     Dallas, Texas 75201

7    214.750.3610
     gpronske@spencerfane.com

8

9 FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:

10   Nick Hendrix
     Emma Persson

11   NORTON ROSE FULBRIGHT US LLP
     2200 Ross Avenue, Suite 3600

12   Dallas, Texas 75201
     214.855.8341

13   nick.hendrix@nortonrosefulbright.com

14

     FOR THE HONORABLE PHILLIP JOURNEY:

15
     Jermaine Watson

16   BONDS ELLIS EPPICH SCHAFER JONES LLP
     420 Throckmorton Street, Suite 1000

17   Fort Worth, Texas 76102
     817.529.2724

18   jermaine.watson@bondsellis.com

19
     FOR ACKERMAN MCQUEEN, INC.:

20
     Brian Mason

21   Joseph Acosta
     DORSEY & WHITNEY LLP

22   300 Crescent Court, Suite 400
     Dallas, Texas 75201

23   214.981.9929
     mason.brian@dorsey.com

24

25

## Page 4

1 FOR THE NATIONAL RIFLE ASSOCIATION OF AMERICA:

2    Dylan Ciciliano
     William Noall

3    Talitha Gray Kozlowski
     GARMAN TURNER GORDON LLP

4    7521 Amigo Street, Suite 210
     Las Vegas, Nevada 89119

5    702.777.3000
     dciciliano@gtg.legal

6

7 FOR THE PEOPLE OF THE STATE OF NEW YORK:

8    Lucas McNamara
     Monica Connell

9    Yael Fuchs
     OFFICE OF THE ATTORNEY GENERAL OF THE

10       STATE OF NEW YORK
     28 Liberty Street, 18th Floor

11   New York, New York 10005
     212.416.8401

12   lucas.mcnamara@ag.ny.gov

13   Jonathan Conley
     NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL

14   The Capitol
     Albany, New York 12224

15   212.416.8108
     jonathan.conley@ag.ny.gov

16

17 FOR THE OFFICE OF THE U.S. TRUSTEE:

18   Lisa L. Lambert
     Marc F. Salitore

19   UNITED STATES TRUSTEE PROGRAM
     1100 Commerce Street, Room 976

20   Dallas, Texas 75242
     214.767.8967

21   lisa.l.lambert@usdoj.gov

22

23 FOR THE PROPOSED SPECIAL COUNSEL FOR DEBTORS:

     Svetlana M. Eisenberg

24   BREWER ATTORNEYS & COUNSELORS
     750 Lexington Avenue, 14th Floor

25   New York, New York 10022

## Page 5

1    212.224.8817
     sme@brewerattorneys.com

2

3 ALSO PRESENT:

4    Jennifer Jones

5    Jeremy Economos

6    Dave Hamrick

7    Dave Webster

8    David Dell'Aquila

9

     VIDEOGRAPHER:

10
     Zack Mata - Veritext

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2 (Pages 2 - 5)

INDEX

PAGE

Appearances.................................... 3
Proceedings..................................... 7
Stipulations..................................... 8

HONORABLE PHILLIP JOURNEY
Examination by Mr. Pronske....... 10
Examination by Mr. Mason.............. 86
Examination by Mr. Ciciliano........ 100
Further Examination by Mr. Pronske........ 148
Further Examination by Mr. Mason........ 165
Signature and Changes........................ 171
Reporter's Certificate........................ 173

DEPOSITION EXHIBITS              IDENTIFIED
Exhibit 1     NRA Bylaws as Amended
              September 14, 2019.............. 37

Exhibit 2     Employment Agreement of Wayne
              R. LaPierre.................... 41

Page 6

1   MR. WATSON:  Jermaine Watson.  I
2  represent Judge Journey.  I'll be defending this
3  deposition.  I am a partner at Bonds Ellis Eppich
4  Schafer Jones, LLP.
5          And before we go any further, I wanted to
6  point out to all the parties that we agreed to do this
7  on very short notice.  My client is a sitting judge, and
8  he had a docket today.  And we only made him available
9  with the understanding or the agreement, rather, that he
10  would be subjected to two hours or up to two hours, is
11  what it was explained to me.  We don't have an official
12  agreement with any party to go beyond that.  To the
13  extent necessary, I will check with my client at the end
14  of two hours and see if he wants to continue.  But I am
15  not going to promise parties that we're going to keep
16  him much longer than that unless he consents.  So with
17  that, I will let everyone else make their appearance.
18          MR. CICILIANO:  This is Dylan Ciciliano
19  from Garman Turner Gordon on behalf of the Debtors.
20  Along with me are Talitha Gray Kozlowski and William
21  Noall.  As well to add to that objection, I do believe
22  that we've discussed in this case remote videographers
23  may or may not be admissible.  I would also object.  And
24  this is with speaking to the judge before the
25  deposition.  He doesn't have an additional means to --

Page 8

1          P R O C E E D I N G S
2          THE VIDEOGRAPHER:  Today's date is
3  March 18, 2021.  The time is 4:10, and we are on the
4  record.  This is the beginning of the remote video
5  deposition of the Honorable Phillip Journey.
6          This deposition is being held via Zoom due to
7  the COVID-19 pandemic.
8          My name is Zack Mata from the firm Legal Video
9  of Texas.  And I am the videographer.  The court
10  reporter is Julie from the firm Veritext.  I am not
11  authorized to administer an oath.  I am not related to
12  any party in this action, nor am I financially
13  interested in the outcome.
14          Counsel and all present in the room and
15  everyone attending remotely will now state their
16  appearances and affiliations for the record.  If there
17  are any objections to this proceeding being held via
18  Zoom, please state them at the time of your appearance,
19  beginning with the noticing attorney.
20          MR. PRONSKE:  I am Gerrit Pronske.  And I
21  represent the New York Attorney General, along with Eric
22  Van Horn and Jason Kathman; all three of us with the law
23  firm of Spencer Fane.  And we have on the line with us
24  Monica Connell, who is an attorney at the New York
25  Attorney General's office.

Page 7

1  to transmit his video, but we do have an objection to it
2  being from the courtroom just on appearance sake.  I
3  don't imagine I am going to stop the deposition from
4  going forward, but I do want to preserve that just for
5  the appearance sake.  Thank you.
6          MS. EISENBERG:  Good afternoon.  I'm
7  Svetlana Eisenberg from Brewer Attorneys and Counselors,
8  Proposed Special Counsel for the Debtors.
9          MR. HENDRIX:  Nick Hendrix, Norton Rose
10  Fulbright, here on behalf of the Official Committee of
11  Unsecured Creditors.  And I am joined by several members
12  of the committee as well.
13          MR. ACOSTA:  This is Joe Acosta.  I am
14  here with Brian Mason.  We represent Ackerman McQueen.
15          MR. MCNAMARA:  Good afternoon.  This is
16  Lucas McNamara.  I'm Assistant Attorney General with the
17  New York State Office of Attorney General.
18          THE REPORTER:  Anyone else want to
19  identify?
20          MR. WATSON:  I think one of the trial
21  attorneys from the UST's office is logging in.  Lisa,
22  are you going to enter your appearance?  Lisa?
23          Could you mute her?
24          Lisa, can you hear us?
25          MS. LAMBERT:  Yes, I can hear you.

Page 9

3 (Pages 6 - 9)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1 MR. WATSON: Okay. Are you going to
2 identify yourself for the deposition?
3 MS. LAMBERT: This is Lisa Lambert with
4 the Office of the United States Trustee, representing
5 William Neary, the US Trustee.
6 THE REPORTER: Okay. If that's everyone,
7 I will swear in the judge.
8 (Witness sworn.)
9 MR. PRONSKE: Okay. Are you ready for me to
10 proceed?
11 THE REPORTER: Ready.
12 HONORABLE PHILLIP JOURNEY,
13 having been first duly sworn and having confirmed that
14 he is The Honorable Phillip Journey, testified remotely
15 as follows:
16 EXAMINATION
17 BY MR. PRONSKE:
18 Q. Judge Journey, my name is Gerrit Pronske. I'm
19 with the law firm of Spencer Fane and represent the New
20 York Attorney General.
21 Could you -- and actually, as Mr. Ciciliano
22 was objecting, I was thinking that you have a really
23 beautiful courtroom there. So congratulations for that.
24 A. Thank you. It's one of the newer ones. The
25 reason I chose the courtroom was they just spent $40,000
Page 10

1 on sound equipment so y'all can hear me nice and clear.
2 And I tried doing it in chambers and I couldn't get the
3 camera to work, so I gave up this morning.
4 Q. Well, we can -- we can hear you very well, so
5 thanks for that.
6 Can you please state your name for the record?
7 A. Phillip Journey.
8 Q. And can you tell the Court what, if anything,
9 that you did to prepare for this deposition?
10 A. I reviewed the motion, looked through some of
11 the files on my computers. You know, I mean, it's a
12 pretty narrow scope, so I didn't think there was a whole
13 lot to do. And I've had a really crazy week, so right
14 now I am trying to clear up the one on the 29th, if I
15 can, so we'll see.
16 Q. Okay. And I am not going to give you all the
17 normal depo instructions since you're a jurist, but I
18 will ask that we both be particularly cognizant of not
19 talking over one another, given this video format. Can
20 we have that agreement?
21 A. Sure. You sound just like me every day.
22 Q. And we're both wearing blue shirts, you know,
23 so go figure.
24 A. Yeah.
25 Q. So can you tell the Court approximately what
Page 11

1 year you were elected to the board?
2 A. Okay. The first time I was elected, it was
3 from -- for a period of time from 1995 to '98, so about
4 25 years ago.
5 Q. Okay.
6 A. And then I was elected in the 2020 election,
7 but I wasn't able to be sworn in until after the annual
8 meeting had been postponed twice. So I officially
9 joined the board on October 24th of 2020.
10 Q. Okay. And how long is that term?
11 A. It's a three-year term.
12 Q. Okay. Thank you.
13 Are you appointed to any committees of the NRA
14 board?
15 A. I just got my notice. I know it was
16 grassroots and youth development.
17 Q. Okay. And do you sit on the executive
18 committee as well?
19 A. No.
20 Q. Okay. So I'm going to refer to a board
21 meeting that was held on January 7, 2021 and the
22 executive sessions of that board meeting. I'm just
23 going to refer to that as the board meeting. Can we
24 have that agreement?
25 A. Sure.
Page 12

1 Q. It's my understanding from a deposition taken
2 of John Frazer at this morning's session, he
3 characterized that board meeting as having been
4 separated into three sections that he called the full
5 board meeting; and the executive session one, which
6 dealt with the Wayne LaPierre employment contract
7 approval; and then the executive session two, which was
8 the formation of the special litigation committee.
9 Does that sound accurate?
10 A. That's pretty close. There was a lot of
11 little stuff we did at the beginning and then wrapped
12 up. You know, it only took about an hour and a half.
13 Q. Okay. The -- and you attended that board
14 meeting. Correct?
15 A. Yes.
16 Q. The minutes show -- of that board meeting show
17 that there were 37 members of the 76 board members
18 present. Does that sound correct to your view?
19 A. Well, I didn't count noses, but that's
20 probably about right.
21 Q. And was that both attendance by remotely and
22 physically present?
23 A. The only thing I remember was a video
24 presentation by Carolyn Meadows, but that was not a live
25 link from what I could see.
Page 13

4 (Pages 10 - 13)

1 Q. Were the rest of the board members there
2 physically present there?
3 A. Yes.
4 Q. Okay. Can you tell the Court, looking at page
5 4 of the minutes -- we don't need to go to that, but did
6 you hear a request by Ms. Froman that the record reflect
7 that she was not present?
8 A. Yes.
9 Q. And can you provide any context on that
10 statement that was put into the record?
11 A. I am not sure what you're asking for.
12 Q. Do you know the reason that she requested that
13 the record reflect that she was not present?
14 MR. WATSON: Objection, speculation.
15 You can answer, Judge Journey, if you know.
16 THE WITNESS: Thank you.
17 A. I am uncertain as to why she did that.
18 Q. (BY MR. PRONSKE) Okay. Can you tell the
19 Court in general terms what is the difference between
20 the function of the full board and the executive
21 committee?
22 MR. CICILIANO: Objection, lack of
23 foundation.
24 MR. WATSON: Did we get your objection,
25 Mr. Ciciliano?

Page 14

1 changes made for that version?
2 A. I remember there were two bylaws events that
3 were voted on in the October 24th meeting. I do not
4 recall the topics. I do recall that I voted for both of
5 them.
6 Q. Okay. And now let's go to that board meeting,
7 and I want to ask you when the board broke up to have
8 the executive session relating to the Wayne LaPierre
9 employment contract, were you present in that executive
10 session?
11 A. Yes.
12 Q. And can you tell the Court, was the sole
13 purpose of that executive session to review and approve
14 the employment contract of Wayne LaPierre?
15 MR. WATSON: Objection. There may be a
16 privilege here, but I'll let the NRA assert that
17 privilege.
18 MR. CICILIANO: Yeah, I would likewise
19 object to the extent that it calls for the disclosure of
20 attorney/client communications or work product. I would
21 direct you not to answer on behalf of the NRA, but
22 generally --
23 MR. WATSON: I'm sorry. Are you done,
24 Dylan?
25 MR. CICILIANO: Yes.

Page 16

1 MR. CICILIANO: I would just generally
2 object on foundation. Go ahead.
3 MR. WATSON: Okay. Go ahead.
4 A. It's my recollection that the executive
5 committee's purpose is basically to fill in when the
6 board is not in session to make decisions or provide
7 guidance to staff through resolutions.
8 Q. (BY MR. PRONSKE) Okay. And have you reviewed
9 the bylaws of the National Rifle Association?
10 A. Which version? You know, they change about
11 every week, it seems like, but at least every three or
12 four months.
13 Q. I would be talking about the version that
14 would be effective as of the board meeting.
15 A. I have not gotten a copy of the bylaws as they
16 were amended in the October 24th meeting.
17 Q. Okay. Would the bylaws -- do you know that if
18 the bylaws were significantly changed at that point in
19 time?
20 MR. CICILIANO: Objection, form.
21 MR. WATSON: And you can answer, Judge.
22 A. I'm sorry. Ask the question again.
23 Q. (BY MR. PRONSKE) Yeah. You said you hadn't
24 seen that most recent version of the bylaws, and I'm
25 asking you if you know whether there were significant

Page 15

1 MR. WATSON: I am going to instruct you
2 not to answer that, Judge --
3 THE WITNESS: Thank you.
4 MR. WATSON: -- on that basis.
5 Q. (BY MR. PRONSKE) So Judge Journey, are you
6 refusing to answer that question?
7 A. I'm sorry, what?
8 Q. Are you refusing to answer that question on
9 your attorney's advice?
10 A. I think I should rely on my counsel's advice,
11 yes.
12 Q. Okay. So were -- was -- when that committee
13 broke up -- broke into session, was the full board told
14 that this -- that there was going to be an executive
15 session?
16 A. Generally, an executive session is moved by
17 one of the members of the board and then voted on
18 whether they should go into executive session. So it's
19 not like anybody tells you except by making the motion.
20 Q. Okay. And that motion was made in the full
21 board session. Is that right?
22 A. Yes.
23 Q. And the full board would have had all of the
24 board of directors and other individuals that would
25 have -- there would have been attorneys and then there

Page 17

5 (Pages 14 - 17)

1 would have been other individuals there. Is that
2 correct?
3    A. Yes. There were -- there's the board counsel,
4 Wit. And then, of course, there's the general counsel,
5 the secretary. They were both present, and I believe
6 Mr. Brewer was present also. I know he came in and out
7 of the room a couple times.
8    Q. Would there -- would that -- would the full
9 board session be a session that would be considered
10 privileged?
11    MR. CICILIANO: Objection, calls for a
12 legal conclusion.
13    Q. (BY MR. PRONSKE) Or just the executive
14 session?
15    MR. WATSON: I'm going to object. It
16 does call for a legal conclusion.
17    Q. (BY MR. PRONSKE) You can answer, if you know.
18    MR. WATSON: You can answer. You can go
19 ahead and answer, Judge.
20    A. Okay. What was the question again?
21    Q. (BY MR. PRONSKE) The question is is it just
22 the executive sessions that are considered to be
23 privileged, or is the full board session also considered
24 privileged?
25    A. I --

Page 18

1 object to the extent that it requires the judge to
2 actually opine as to what was discussed in a privileged
3 session in order to answer the question, as it
4 presupposes the privilege, the nature of the
5 communication.
6    Q. (BY MR. PRONSKE) You can answer the question.
7    A. The board goes into executive session when a
8 member of the board makes a motion and it's seconded,
9 and then the board votes on that motion. If the
10 board -- so someone would bring up the topic, and then
11 someone would say let's go into executive session, and
12 then the board votes, and they go into executive session
13 if it passes. I mean, it's not like they say we're
14 going to do this at that time and we'll be here.
15    Q. Was the board aware that there was going to be
16 an executive session where the Wayne LaPierre employment
17 contract was going to be discussed and approved?
18    MR. WATSON: Objection, asked and
19 answered or --
20    Could you restate the question, Gerrit?
21    A. I don't think there was any advance notice
22 like an agenda. You know, you all have copies of the
23 agenda. It doesn't say we're going into executive
24 session here.
25    Q. (BY MR. PRONSKE) Okay. Can you tell the

Page 20

1    MR. WATSON: I'm going to object. Same
2 objection.
3    Before you answer, Judge, let me object.
4    THE WITNESS: Okay.
5    MR. WATSON: Calls for a legal
6 conclusion.
7    But you can answer.
8    A. It's my understanding that the regular board
9 meeting is reflected in the minutes and, therefore, it's
10 not privileged because everybody has access to the
11 minutes.
12    Q. (BY MR. PRONSKE) Okay.
13    A. So I believe the privilege extends to the
14 executive session.
15    Q. Okay. So then I'm going to go back to my
16 original question that was objected to, which is did the
17 full board -- was the full board aware that there was
18 going to be an executive session where the sole issue to
19 be reviewed would be the Wayne LaPierre employment
20 contract?
21    MR. WATSON: Same objection, calls for
22 speculation. He can't testify to what the other board
23 members knew. He can only testify to what he observed
24 or his impression of what happened.
25    MR. CICILIANO: And I would further

Page 19

1 Court which attorneys were present in the executive
2 session to discuss the employment contract?
3    MR. CICILIANO: I would just object on
4 the same point to the nature of the question and
5 presupposing what was discussed.
6    You can answer who was at the executive
7 session, what attorneys.
8    A. I don't remember if Brewer was in the room
9 during that conversation, but I believe Mr. Frazer was.
10 He was there the entire time. And I believe board
11 counsel was present.
12    Q. (BY MR. PRONSKE) Is that William Davis?
13    A. Yes.
14    Q. Okay.
15    A. That's Wit. That's all I know, Wit. Yeah,
16 you're right, William Davis, okay.
17    Q. And was Sara Rogers present?
18    A. I'm not sure.
19    Q. Were there any staff members present in that
20 executive session?
21    MR. CICILIANO: Objection, vague.
22    A. You presume I know everybody. I don't know.
23    Q. (BY MR. PRONSKE) Okay. During that executive
24 session, were the members that were sitting in that
25 session provided with a copy of Mr. LaPierre's

Page 21

6 (Pages 18 - 21)

1 employment contract to be approved?
2    A.   They were not given a copy, no.  There were
3 two copies at two tables, and you had to sit there and
4 read it and turn it back in.
5    Q.   And did you go over and open that contract and
6 review it?
7    A.   Yes, I read it.
8    Q.   Was there a presentation made by someone with
9 respect to that contract?
10   A.   Mr. Cotton was the -- is the first vice
11 president of the NRA, and as President Meadows was not
12 at the board meeting, he ran the meeting.  So there was
13 another lawyer in the room, too, by the way.  You know,
14 you'll have to ask him what he said.
15   Q.   Okay.  And was Mr. LaPierre present in that
16 session?
17   A.   No.  No.
18   Q.   This morning --
19   A.   Mr. LaPierre came for about three minutes and
20 left and did not return to the board meeting.
21   Q.   Okay.  So he attended the full board meeting
22 or this executive session?
23   A.   He was not in either of the executive
24 sessions.
25   Q.   Okay.  So Mr. Frazer testified this morning he

Page 22

1 was in that executive session.  Is he just incorrect on
2 that?
3        MR. WATSON:  Objection, assumes facts not
4 in evidence.  Judge Journey wasn't present this morning
5 at Mr. Frazer's deposition.
6    Q.   (BY MR. PRONSKE)  Let me rephrase that.
7        If Mr. Frazer said at a deposition this
8 morning that Mr. LaPierre was in that session, would he
9 be incorrect?
10   A.   My recollection is that the way the board
11 meeting runs is we all go in and we do the roll call and
12 then the officers give us their reports, like the EVP,
13 Mr. LaPierre.  And he came in, gave his report.  It was
14 very short.  And he left.  And I don't remember seeing
15 him enter the room again --
16   Q.   Okay.
17   A.   -- during the board meeting.
18        So you know, maybe Frazer -- but I'm looking
19 forward and Frazer is looking back.  So he may have
20 entered behind me and I had not seen it.  I don't know.
21 All I know is what I saw in front of me.
22   Q.   Was there a discussion in that session of
23 authority to file for bankruptcy?
24        MR. CICILIANO:  I would just object
25 pursuant to the attorney/client privilege and direct the

Page 23

1 witness not to answer.
2        MR. WATSON:  And I, too, am going to
3 direct you not to answer that, Judge Journey.
4        THE WITNESS:  Okay.
5    A.   Okay.  I can't tell you what they did say, but
6 I think I can tell you what they didn't say.  And nobody
7 during that --
8        MR. CICILIANO:  I would object -- I would
9 object, Judge, and direct you that what was said or was
10 not said is covered by the attorney/client privilege,
11 and I would direct you not to answer.  The NRA is not
12 waiving that privilege.
13       THE WITNESS:  Okay.
14   A.   Nobody said the word "bankruptcy."
15   Q.   (BY MR. PRONSKE)  Okay.  And did anyone say
16 the word -- and let me ask you this question.  As far as
17 not answering the question regarding a discussion about
18 authority to file bankruptcy, are you refusing to answer
19 that question?
20   A.   No.  You know, I think my motion speaks for
21 itself.
22   Q.   Okay.
23   A.   Doesn't it?
24        MR. CICILIANO:  Mr. Pronski, we ought to
25 be clear here that the privilege is not his to assert or

Page 24

1 to waive.  The privilege is for the NRA to assert and
2 waive.  And if you are going to insist on getting -- and
3 with respect to Mr. Journey, he may want to talk about
4 it.
5        But to the extent you're going to insist that
6 he break or attempt to break the privilege that's owned
7 by the NRA, I will have to shut the deposition down to
8 seek a protective order under Rule 3OG or 30D.
9        I don't intend to interfere with the rest of
10 his testimony.  So if that's your intent to do so, I say
11 we draw a box around this and move on to other subject
12 matters.
13       MR. PRONSKE:  Well, I think you're going
14 to have a hard time shutting the deposition down because
15 I'm insisting on something when all I've done,
16 Mr. Ciciliano, is ask questions, and I am going to
17 continue to ask questions, and I am going to ask him --
18 when he doesn't want to answer a question, I am going to
19 ask him if he refuses to answer the question.  If you
20 interpret that as insisting, then by all means file
21 whatever you need to file.
22   Q.   (BY MR. PRONSKE)  Judge Journey, can you tell
23 the Court, you've said that the word "bankruptcy" was
24 not used in that session.  Was the word "Chapter 11"
25 used in that session?

Page 25

7 (Pages 22 - 25)

1      MR. CICILIANO: I am going to object and
2 direct you not to answer pursuant to the attorney/client
3 privilege, and if you insist on answering, the
4 deposition will be terminated right now.
5    Q. (BY MR. PRONSKE) Are you refusing to answer
6 that question, Judge Journey?
7      MR. WATSON: I am going to direct you not
8 to answer, Judge Journey.
9      THE WITNESS: Okay. Okay. All right, I
10 will follow your lead, Mr. Watson.
11    Q. (BY MR. PRONSKE) Was the word
12 "reorganization" used in that executive session?
13      MR. CICILIANO: I will once again object
14 and direct the witness not to answer pursuant to the
15 attorney/client privilege.
16      MR. WATSON: I will direct you not to
17 answer, Judge Journey.
18      THE WITNESS: Thank you.
19    Q. (BY MR. PRONSKE) Are you refusing to answer,
20 Judge Journey?
21    A. I reluctantly am, yeah.
22    Q. Was the word -- were either the word "court"
23 or the word "filing" used in that executive session?
24      MR. CICILIANO: I will once again object
25 pursuant to the attorney/client privilege and direct the

Page 26

1 judge not to answer.
2      MR. WATSON: Judge, don't answer the
3 question. I'm instructing you not to answer.
4      THE WITNESS: Okay.
5    A. I'm sorry, I have to say no, I can't answer.
6    Q. (BY MR. PRONSKE) Judge Journey, as you -- as
7 you know, the LaPierre employment agreement says -- that
8 was approved says that Wayne LaPierre is empowered,
9 quote, to reorganize or restructure the affairs of the
10 association for purposes of cost minimization,
11 regulatory compliance or otherwise, closed quote. Are
12 you aware of that language?
13    A. Yes.
14    Q. Was there any discussion during the executive
15 committee session whatsoever regarding that sentence of
16 the agreement?
17      MR. CICILIANO: I am going to object
18 pursuant to the attorney/client privilege and direct the
19 judge not to answer.
20      MR. WATSON: Yeah, Judge, don't -- I'm
21 going to instruct you not to answer that question.
22      THE WITNESS: All right. That's fine.
23    Q. (BY MR. PRONSKE) Your testimony, I believe,
24 Judge Journey, is that you did read the entire agreement
25 before it was approved?

Page 27

1    A. That's correct.
2    Q. As a board member of the NRA, do you believe
3 that those -- that that sentence approved or authorized
4 the filing of a bankruptcy by the NRA?
5      MR. CICILIANO: I would just object, and
6 to the extent that your belief is based on what has been
7 told to you by the counsel of the NRA, I would direct
8 you not to answer. To the extent you have an individual
9 recollection, you may.
10      MR. WATSON: Judge Journey, you can
11 answer based on your -- based on your knowledge or
12 observations.
13      THE WITNESS: Okay.
14    A. So what was the question again? You guys, I'm
15 having too much fun watching y'all. I'm sorry, I'm
16 distracted, okay.
17    Q. (BY MR. PRONSKE) The question, Judge Journey,
18 is that that sentence that I read from the employment
19 contract, do you believe that those words authorized or
20 approved a bankruptcy filing of the NRA?
21    A. You know, when I read that -- we reorganize
22 the NRA all the time. We create committees, and we do
23 all kinds of things that are not what would have been
24 contemplated as what occurred. So, you know, I did
25 not -- I'm a little mad at myself because I didn't make

Page 28

1 that link.
2    Q. You didn't make that connection. There was
3 certainly no discussion of bankruptcy that would have
4 allowed you to make that connection. Is that right?
5      MR. CICILIANO: I am going to object
6 pursuant to the attorney/client privilege and direct the
7 witness not to answer what occurred in the executive
8 session.
9      MR. WATSON: Yes, Judge, don't -- don't
10 answer the question.
11    A. Yeah, I don't have to answer that one. That's
12 self-apparent.
13    Q. (BY MR. PRONSKE) So to be apparent and to be
14 clear, your testimony is, am I correct, Judge Journey,
15 that you did not make any correction -- any correlation
16 in your mind between that sentence of the employment
17 contract or any other sentence in the employment
18 contract and the filing of a bankruptcy. Is that
19 correct?
20      MR. CICILIANO: I would just to -- I
21 would just object. To the extent that that requires you
22 to divulge what's in your mind with respect to what was
23 informed to you by counsel of the NRA, I would direct
24 you not to answer to that extent.
25      MR. WATSON: Judge, you can answer the

Page 29

8 (Pages 26 - 29)

1 question based upon what you know and your recollection.
2        THE WITNESS:  Thank you.
3     A.  You know, I just want to say "sustained" or
4 "overruled." I don't know.
5        But anyway, you know, there was -- there was
6 no hint in my little feeble mind that anyone was
7 contemplating bankruptcy.
8     Q.  (BY MR. PRONSKE)  All right.  And was the
9 resolution to approve the employment contract ultimately
10 adopted by the executive session?
11    A.  It was adopted, and then it was reflected in
12 the minutes when we came out.
13    Q.  And was that adoption unanimous?
14    A.  I -- I know I voted for it, but I'm not sure.
15 I suppose so.  I don't remember anybody sticking
16 their -- else sticking their head out of the trench.
17    Q.  Right.
18        Do you -- have you had any discussions with
19 board members about the bankruptcy filing after it was
20 filed?
21    A.  Sure.
22    Q.  How many would you say you've spoken with?
23    A.  (Laughter.)  I talk to a lot of people.  I
24 mean, you know, I called the US Trustee for Kansas, who
25 just retired who is a really good friend of mine.  I

Page 30

1 US Trustee as far as the authorization issue?
2     A.  That -- that was one of the questions, was how
3 corporations authorize the filing of a bankruptcy.
4     Q.  What was the substance of that conversation
5 regarding authorization?
6     A.  Oh, my gosh.  That was so long ago.  That was
7 like on January 16, you know.  We had -- we had many
8 conversations over the next three days, because I would
9 seek clarification and he would send me more research.
10 I thought he was going to send me his Colyers and just
11 get it over with, you know.
12    Q.  Did you tell that -- did you tell that US
13 Trustee during any of those conversations that you
14 believed that the filing of the bankruptcy by the NRA
15 was not authorized?
16        MR. WATSON:  Objection, calls for a legal
17 conclusion.
18        You can answer.
19    A.  That was my impression, yes, and that was what
20 I related to Mr. Nazar.
21    Q.  (BY MR. PRONSKE)  And did you tell the United
22 States Trustee during those conversations that the
23 filing of bankruptcy was not discussed in the board
24 meetings?
25        MR. CICILIANO:  I would just object here.

Page 32

1 talked to him.  I talked to lots of people after the
2 filing of the bankruptcy, sure.
3     Q.  So can you -- let's drill down on that
4 conversation with the US Trustee.  Can you tell me about
5 that conversation?
6     A.  He is a really good friend, been my friend for
7 over 30 years, Ed Nazar.  He just retired as the trustee
8 for the district of Kansas.  And I talked to him about
9 the bankruptcy.  And he was so kind.  He sent me
10 mountains of research, and I learned all about
11 Chapter 11 in about four days.
12    Q.  Did you have any discussion with that United
13 States trustee about any concerns that you had that that
14 bankruptcy was not authorized in the board meeting?
15    A.  Yes.
16        MR. WATSON:  Objection.
17        THE WITNESS:  Sorry.
18        MR. WATSON:  Objection.  It calls for
19 speculation, and it calls for a legal conclusion based
20 upon -- to the extent it calls for a legal conclusion, I
21 am instructing him not to answer, but he can answer
22 generally as to what his understanding is of how
23 bankruptcy works.
24    Q.  (BY MR. PRONSKE)  Actually, that's not the
25 question.  The question is what was discussed with the

Page 31

1 First of all, I think you're mischaracterizing.  He
2 wasn't the US Trustee.
3        But second of all, to the extent that you did
4 disclose anything covered by the attorney/client
5 privilege, I would direct you not to disclose it again.
6 That's not a waiver.  You don't have the ability to
7 waive it.
8        THE WITNESS:  Thank you.  One thing I
9 would like to clarify --
10        MR. WATSON:  I instruct you not to answer
11 the question, Judge.
12        THE WITNESS:  I just want to make sure
13 they say the retired trustee, because he's retired and
14 playing with his grandkids in Kansas City, and that's
15 where I found him, you know.  He -- he retired like six
16 months ago or something like that.  He had been a
17 trustee for 30 years.
18    Q.  (BY MR. PRONSKE)  So are you refusing to
19 answer that question under advice of counsel?
20    A.  I think we could go there for that, for this
21 one right now, yeah.
22    Q.  Okay.  Do you believe, Judge Journey, as a
23 board member that only the full board of directors of
24 the NRA can authorize a bankruptcy filing?
25        MR. WATSON:  Objection, calls for legal

Page 33

9 (Pages 30 - 33)

1 conclusion.
2      But you can answer, Judge.
3      MR. CICILIANO: Yeah, I would just object
4 to the extent you've been informed by counsel one way or
5 the other of the NRA; but to the extent you have a
6 personal opinion, go ahead.
7   A.  My personal review of the statutes and the
8 case law tells me that the board has to authorize it.
9   Q.  (BY MR. PRONSKE) Okay. And do you think that
10 the filing of bankruptcy can be delegated to the
11 executive committee?
12      MR. WATSON: Same objection, calls for a
13 legal conclusion.
14      MR. CICILIANO: Same.
15      And to the extent that it's informed by
16 counsel, don't answer that, but in your personal
17 knowledge, go ahead.
18   A.  I think it's possible that the board can
19 delegate some authority under the bylaws. And whether
20 that delegation occurred properly under the bylaws and
21 whether that delegation was done knowingly, of course,
22 is a question of fact somebody we all know is going to
23 end up answering.
24   Q.  (BY MR. PRONSKE) Would you -- Judge, would
25 you consider the filing of a bankruptcy petition -- as a
                                                    Page 34

1 board member, would you consider the filing of a
2 bankruptcy petition of the NRA to be the performance of
3 a corporate activity of the NRA of such major
4 significance as to warrant action by the full board?
5      MR. CICILIANO: I would --
6      MR. WATSON: Same objection. Hold on,
7 Dylan. Same objection, calls for a legal conclusion.
8 Go ahead.
9      MR. CICILIANO: I would similarly object.
10 Furthermore, I would object to the extent that that's
11 informed by the legal advice of counsel of the NRA.
12      But in your personal opinion, I guess go
13 ahead.
14   A.  If I had thought otherwise, I don't think I
15 would have filed the motion, do you, Gerrit?
16   Q.  (BY MR. PRONSKE) Well, I'm asking you. So
17 your answer is that you believe that the filing would be
18 a corporate activity of major significance?
19   A.  Yes.
20   Q.  Okay. Would you consider the filing of a
21 bankruptcy petition of the NRA to qualify as a petition
22 for a judicial dissolution?
23      MR. WATSON: Objection, calls for a legal
24 conclusion.
25      MR. CICILIANO: Join.
                                                    Page 35

1      MR. WATSON: And speculation.
2      (Reporter clarification.)
3      MR. WATSON: Yes, Judge, could you wait
4 until I'm done objecting?
5      THE WITNESS: Okay.
6      MR. WATSON: Okay. Now you can answer.
7   A.  I don't think that the bankruptcy petition was
8 a petition to dissolve the NRA.
9   Q.  (BY MR. PRONSKE) If you know the answer to
10 this. If the bankruptcy of the NRA, if it's potentially
11 unsuccessful, for example, if it's converted to a case
12 under Chapter 7, could the filing of the bankruptcy
13 result in a dissolution?
14      MR. WATSON: Same objection. That calls
15 for legal conclusion. Judge Journey is not a bankruptcy
16 practitioner or an expert in bankruptcy.
17      But you can answer the question to the extent
18 you know --
19   A.  If it gets converted to --
20      MR. WATSON: Hold on, Judge. Hold on.
21      THE WITNESS: Okay.
22      MR. WATSON: To the extent that your
23 opinion is informed by other than counsel, your counsel
24 or the NRA's counsel, you can answer.
25      THE WITNESS: Thank you.
                                                    Page 36

1   A.  If a Chapter 11 is converted to a Chapter 7,
2 it does require dissolution, as I understand the
3 statutes, or if it goes back to New York. That's what
4 the Attorney General of New York wants.
5   Q.  (BY MR. PRONSKE) Let's look at --
6      MR. PRONSKE: If we could go ahead and
7 put up page 17 of the bylaws.
8      MR. VAN HORN: Okay. One second.
9      MR. CICILIANO: And Gerrit, are you
10 moving to introduce the entire set of the bylaws or are
11 you just going to do one page?
12      MR. PRONSKE: We'll go ahead and admit
13 the entire set of the bylaws.
14      MR. VAN HORN: All right. Almost there.
15 Okay. Bylaws should be in the marked exhibit folder.
16      (Exhibit 1 marked.)
17      MR. VAN HORN: And while we're waiting to
18 do the screen share, there's an agreement on the record
19 for the prior deposition about objecting only to form or
20 objection to privilege. While I'm waiting to get this
21 on screen share, can that agreement be reached for
22 purposes of this deposition?
23      MR. WATSON: No, not on our side. Sorry.
24 And I will try to keep my objections short.
25      MR. VAN HORN: Okay. Does everyone see
                                                    Page 37

Veritext Legal Solutions
800-336-4000

1 the bylaws?
2        MR. CICILIANO: Yes.
3        MR. VAN HORN: Okay. And what page,
4 Gerrit?
5        THE WITNESS: Those are not the version
6 that was in effect at the time of the meeting. That's
7 September 2019, I think, or September '19. Go back --
8 yeah, it's the 2019 version. They've been amended at
9 least three times since then. So why are we asking me
10 questions about the wrong set?
11       Q. (BY MR. PRONSKE) Do you have any reason,
12 Judge Journey, to believe -- and I want you to look at
13 paragraph C on page 17 and ask you think that has
14 been -- if the duties of the vice president have been
15 altered from the year prior bylaws?
16       MR. WATSON: I am going to object. He
17 has already indicated that this isn't the most recent
18 version, and to get him to answer would be speculative
19 and it's not the best evidence because it's not the
20 actual version of the bylaws.
21       I'm not trying to be an obstructionist, but --
22 Dylan, do you have a copy of it?
23       MR. CICILIANO: These are the bylaws that
24 were produced by the NRA pursuant to the 341 meeting of
25 creditors after the first meeting on February 22. And I

Page 38

1 understand there was amendments that were also produced
2 with a red line after that meeting, and that was also
3 produced to the parties at the 341 meeting. And that's
4 the only -- those are the documents the NRA provided as
5 being representative of the current version of the
6 bylaws, this set that we're looking at and then the red
7 line of a provision that we're not talking about right
8 now.
9        MR. WATSON: Okay. And I am not trying
10 to take up much more time, guys, but with that
11 representation, Judge, I will let you answer the
12 question.
13       THE WITNESS: Okay.
14       MR. WATSON: But we didn't get a copy of
15 it. So -- and we were at the 341 meeting.
16       Can either Dylan or you, Gerrit, or Eric
17 provide me with a copy of it, please.
18       MR. VAN HORN: I'll email it right now,
19 but it's also in the Exhibit Share folder.
20       MR. WATSON: That's good enough for me.
21       With that representation, Judge, you can
22 answer the question.
23       Could you repeat -- could you read back the
24 question for Judge Journey, Julie?
25       MR. PRONSKE: There isn't a question. I

Page 39

1 am about to ask the question.
2        Q. (BY MR. PRONSKE) Judge Journey, if you could
3 please look at subparagraph C, which is the duties of
4 the executive vice president. Do you see that?
5        A. Yes.
6        Q. Do you see anything in the duties of the vice
7 president that -- that would authorize the executive
8 vice president to approve a bankruptcy filing?
9        A. No.
10       Q. And I want you to look at subparagraph D,
11 which is the -- the duties of the secretary. And --
12 yeah, and let's look at specifically subparagraph 3. Do
13 you see that subparagraph 3?
14       A. Yes.
15       Q. And do you see that that gives the secretary
16 the -- the secretary's duties would include duties as
17 may be assigned by the board of directors?
18       A. Yes.
19       Q. Do you see that same provision in the
20 executive vice president's duties, in other words,
21 allowing the executive vice president to perform tasks
22 that are assigned or delegated by the board of
23 directors?
24       A. To belabor the obvious, no.
25       Q. Do you believe that the board of directors has

Page 40

1 the ability to delegate the corporate authority to file
2 bankruptcy to the executive vice president?
3        MR. CICILIANO: I would just object,
4 calls for a legal conclusion.
5        MR. WATSON: You can answer, Judge.
6        A. No.
7        Q. (BY MR. PRONSKE) Okay.
8        MR. PRONSKE: Eric, you can take that off
9 the sharing. Thank you.
10       So Eric, can you put up the employment
11 contract, the first page of it, please, the one that was
12 approved?
13       MR. VAN HORN: Yes.
14       (Exhibit 2 marked.)
15       THE WITNESS: Wow, I haven't got to see
16 this in a long time.
17       MR. CICILIANO: And Gerrit, just as he's
18 putting it up, we have the agreement for this deposition
19 to go forward that we were entitled to half the time. I
20 know Judge Journey's indicated you maybe only have two
21 hours. I just want to make sure we're still good with
22 that agreement, how to handle it so that we don't just
23 invalidate the entire deposition.
24       MR. PRONSKE: Yeah, well, we have a
25 notice of deposition that's noticed specifically for

Page 41

11 (Pages 38 - 41)

1 four hours, and we have an agreement with you to share
2 that time. We intend to go two hours.
3         MR. CICILIANO: Okay. I mean, if we're
4 denied the opportunity to cross, it's a violation of the
5 agreement we had.
6         MR. WATSON: We weren't a part of that
7 agreement, and that's all I'm trying to get you guys to
8 see. We'll see how he feels after two hours and see if
9 we can continue. We're not trying to deny either side
10 equal time. It's just that he had a docket today. And
11 the agreement that I reached with the New York AG was
12 for two hours.
13         MR. CICILIANO: And I appreciate that,
14 Jermaine. And my only point was we were unaware that
15 when they noticed it for four, there wasn't actually an
16 agreement for four. I assumed that that was cleared
17 with you guys, so that's a little bit of a surprise to
18 hear that.
19         MR. WATSON: Well, Gerrit made it known
20 on the record yesterday at yesterday's hearing, but we
21 don't need to get into that.
22         You can go ahead, Gerrit.
23         MR. PRONSKE: Okay. Thank you.
24     Q. (BY MR. PRONSKE) All right. Do you see,
25 Judge Journey, in paragraph 2A of the contract, the

Page 42

1 second sentence of that clause in paragraph 2A says that
2 among his authorities, employee shall be empowered to
3 exercise corporate authority in furtherance of the
4 mission and interests of the NRA, including without
5 limitation to reorganize or restructure the affairs.
6         Do you see that?
7     A. Yes.
8     Q. So to the extent that this employee is being
9 empowered to exercise corporate authority and to the
10 extent that that corporate authority is to file
11 bankruptcy, do you believe that the board has the
12 authority under the bylaws to delegate that corporate
13 authority to the executive vice president?
14         MR. WATSON: I am going to object because
15 it calls for a legal conclusion.
16         But you can answer, Judge.
17     A. I do not believe so.
18     Q. (BY MR. PRONSKE) Okay. Judge Journey, in
19 your opinion as a board member, would in the event -- I
20 am not asking you to testify as to what happened at the
21 meeting. But in the event that that provision being
22 used -- or let me ask you this way.
23         Would the lack of pointing out this provision
24 or having a discussion about it add to its
25 inappropriateness?

Page 43

1         MR. WATSON: Objection, calls for
2 speculation.
3         But you can answer, Judge.
4         MR. CICILIANO: And I would further
5 object to form.
6     A. Yeah, that one's a little tough to answer.
7     Q. (BY MR. PRONSKE) Okay. What I'm asking you
8 is that if there was no discussion or if that provision
9 was not pointed out in that session as being something
10 that was authorizing bankruptcy, would that, in your
11 opinion, be inappropriate and add to the
12 inappropriateness of that delegation of corporate
13 authority?
14         MR. WATSON: Same objection. I think
15 it's speculative.
16         MR. CICILIANO: Objection, form.
17         MR. PRONSKE: It's only speculating
18 because you won't let him answer.
19         MR. WATSON: No, he can answer. I'm just
20 doing my job, Gerrit. Go ahead.
21         THE WITNESS: Okay. Okay.
22     A. No.
23     Q. (BY MR. PRONSKE) Is the filing of the
24 bankruptcy of the NRA something that could potentially
25 have impacted you as a board member?

Page 44

1         MR. CICILIANO: Objection, calls for
2 legal conclusion and speculation.
3         MR. WATSON: You can answer, Judge.
4     A. I am trying to figure out where you're going
5 with that one. I'm not sure what you mean by affect.
6     Q. (BY MR. PRONSKE) Yeah, let me give you an
7 example. Sometimes when an individual is seeking a loan
8 from a bank, you're going to have to answer a question
9 whether you are involved in a corporation or a board
10 member of a corporation that filed bankruptcy.
11         My question to you is, is the filing of the
12 bankruptcy of the NRA something that you believe could
13 potentially have negatively impacted you?
14         MR. CICILIANO: Object --
15         MR. WATSON: Hold on. Hold on.
16 Objection, speculation.
17         MR. CICILIANO: Form and foundation as
18 well, and characterization that counsel made.
19     A. I'm going to tell you I had not considered
20 that possibility, but I see where you're going.
21     Q. (BY MR. PRONSKE) Well, let me ask you this, and
22 let me make it more simple. As a board member, would
23 you have liked to have known that the entity that you're
24 a board member of was going to file bankruptcy?
25     A. That's obvious, yes.

Page 45

12 (Pages 42 - 45)

1  Q.  The board minutes --
2      MR. PRONSKE:  And Eric, you can take down
3  the bylaws.  Thank you.
4  Q.  (BY MR. PRONSKE)  The board minutes of the NRA
5  say that the full board -- or that the full board
6  approved the employment contract.  So would it be
7  correct to say that that employment contract was
8  approved both by the executive session and by the full
9  board?
10  A.  When -- okay.  So the board goes into
11  executive session.  It votes.  And then when we go out
12  of executive session, they record in the full board
13  meeting, as you describe it, what happened.
14  Q.  Okay.
15  A.  So we don't vote on it twice.
16  Q.  Okay.  What other board members have you
17  spoken to about the -- or let me ask this question.
18      Is the first time that you knew that the NRA
19  was going to file bankruptcy after the bankruptcy was
20  filed?
21  A.  Yes.
22  Q.  And have you spoken to any other board members
23  about the bankruptcy filing of the NRA since its filing?
24  A.  Yes.
25  Q.  And which board members have you spoken to?

Page 46

1  A.  I need a book so I can, like, go through the
2  names with you.
3  Q.  Is it a number of them?
4  A.  A lot, yeah.  As many as I could get ahold of.
5  Q.  And can you give me one example?
6  A.  Todd Rathner was probably the first one I
7  called and then Sandy Froman.
8  Q.  Can you repeat the name?  I'm sorry.
9  A.  Todd Rathner.
10  Q.  Okay.
11  A.  And Sandy Froman.  I am trying to remember.
12  Colonel Brown.  Buzz -- Buzz, Buzz, Buzz -- I think it's
13  Davis.  There's a bunch of them I don't know.  There's a
14  lot of them that I knew from when I was on the board 25
15  years, so I basically went to the older ones that I had
16  known longer first.
17  Q.  And were those discussions by telephone?
18  A.  Yes.
19  Q.  And I'm assuming there were no other persons
20  present other than you and the other person to the
21  telephone call during those conversations.  Is that
22  correct?
23  A.  Not that I'm aware of.
24  Q.  And certainly no lawyers present.  Is that
25  right?

Page 47

1  A.  Not that I'm aware of.  I mean, I don't know
2  who was on the other end of the phone, but, you know --
3  Q.  And your -- your opinion or displeasure, or
4  just factually, was it discussed with any of those board
5  members that bankruptcy was not discussed during the
6  board meeting?
7      MR. CICILIANO:  I would just object to
8  the extent that it calls for attorney/client privilege
9  and instruct you not to answer.
10      MR. WATSON:  Yeah, I am not going to let
11  you answer it.
12      Could you rephrase the question, Gerrit?
13      MR. PRONSKE:  Yeah.
14  Q.  (BY MR. PRONSKE)  And I'm asking you, Judge
15  Journey, not to divulge any attorney/client privilege.
16  I am asking you to -- you were speaking board member to
17  board member with no attorney present, and I am asking
18  you during those conversations was it ever discussed,
19  with no lawyer present again, that there was no
20  discussion of the filing of bankruptcy at the time that
21  this employment contract was approved by the board?
22      MR. CICILIANO:  I would similarly object
23  and state that the NRA asserts that even communications
24  between board members regarding attorney/client
25  privileged communications are still privileged.  They're

Page 48

1  within the privilege group.  I would direct him not to
2  answer.
3      MR. WATSON:  Yeah, Judge, I'm going to
4  direct you not to answer that.
5      THE WITNESS:  Thank you.
6  Q.  (BY MR. PRONSKE)  Are you --
7  A.  I'm afraid I will have to do that, not answer.
8  Q.  Judge Journey, are you familiar with a
9  Washington Free Beacon article dated March the 9th, 2021
10  that was published at 5:00 a.m. on that date?
11  A.  Yes.
12  Q.  Okay.  And for purposes of this discussion, I
13  am going to refer to the Washington Free Beacon as the
14  WFB.  Can we have that understanding?
15  A.  Sure.
16  Q.  Did you speak to -- prior to that article
17  being published, did you speak with a reporter from the
18  WFB?
19  A.  Yes.
20  Q.  When was that discussion in relation to the
21  date of the publication of the article?
22  A.  Immediately preceding.
23  Q.  The same day or the day before?
24  A.  Day before.
25  Q.  Day before.

Page 49

13 (Pages 46 - 49)

1     And the person that you spoke to, was that
2  Stephen Gutowski, the author of the article?
3     A.  That's who he represented himself to be, yes.
4     Q.  Okay.  So that WFB article says, quote, Board
5  member Phillip Journey accused NRA lawyers of misleading
6  the board about the creation of the special litigation
7  committee and the bankruptcy in a court filing, closed
8  quote.
9     Are you quoted correctly by the WFB in that
10  sentence?
11     MR. CICILIANO:  I would just object.
12     But go ahead.
13     I would object to form.  And also, it's in the
14  third person, so it didn't sound quite right without
15  seeing the article.
16     MR. WATSON:  And I would object that the
17  article itself would speak for itself.  I mean, it's
18  been published.
19     A.  I do believe that quote was accurate.
20     Q.  (BY MR. PRONSKE)  And when you said that NRA
21  lawyers misled the board, which NRA lawyers are you
22  referring to?
23     A.  I think that that would be -- assuming -- that
24  assumes that they knew, which information I have
25  received subsequently tells me that Mr. Davis may not

Page 50

1  have known about the bankruptcy filing.  So if we take
2  him out, then I'm looking at Cotton and Brewer who were
3  in the room.
4     Q.  So your testimony is that you believe Cotton
5  and Brewer misled the board about the filing of the
6  bankruptcy.  Is that correct?
7     A.  Presuming that they knew the filing was going
8  to happen.
9     MR. CICILIANO:  I would object to the
10  extent it calls for attorney/client privilege.  You're
11  asking him what people he was referencing in the
12  article, and he can testify to that, but not to the
13  content of what happened at that board meeting.
14     MR. PRONSKE:  Well, if he's testifying to
15  misleading and fraud, there's a fraud exception in
16  attorney/client privilege, Mr. Ciciliano.
17     MR. CICILIANO:  Mr. Pronske, you don't
18  get to blow through the fraud privilege by merely
19  asserting it.  It has to be demonstrated to the Court,
20  which hasn't been done, and that also has different
21  standards, so you haven't proven the fraud privilege.
22  Go ahead.
23     Q.  (BY MR. PRONSKE)  Judge Journey, the article
24  goes on to say, quote, Journey, a Kansas City family
25  court judge, told the Free Beacon that the board was not

Page 51

1  made aware of the bankruptcy plan when it voted to
2  empower the committee in a January 7, 2021 meeting.  He
3  said he found out about it when his daughter texted him
4  a news story, closed quote.
5     Are you correctly quoted by the WFB in that
6  sentence?
7     A.  Well, I know I'm not a Kansas City judge, but
8  other than that, I believe that was accurate.
9     Q.  I'm sorry, I actually misread that.  It says
10  a Kansas family court judge.  Is that --
11     A.  Oh, okay.
12     Q.  Is that correct?
13     A.  Kansas City is a long ways away from where I'm
14  at, yeah.
15     Q.  What part of Kansas are you in?
16     A.  I'm in the largest city in the state, Wichita.
17     Q.  Okay.  Okay.  I have a lot of family in Kansas
18  myself.  They're all farmers.
19     A.  That means they're way out west, yeah.
20     Q.  So when the -- when the article says that you
21  found out about the bankruptcy when your daughter texted
22  you a news story, is that a correct statement?
23     A.  Yes.
24     Q.  And presumably that was after the bankruptcy
25  filing.  Is that right?

Page 52

1     A.  Yes.
2     Q.  But you didn't know about the bankruptcy
3  filing until after the bankruptcy was filed.  Is that
4  correct?
5     A.  I had not checked my email when I left work
6  that day, and I was on my way home.
7     Q.  And did you receive an email about the filing
8  of the bankruptcy?
9     A.  Yes, from Mr. Frazer.
10     Q.  And was that email sent after the bankruptcy
11  was filed?
12     A.  I believe so.  It was about 4 o'clock that
13  afternoon on the 15th.
14     Q.  So even if you had been checking your email
15  that day, you still wouldn't have known about the
16  bankruptcy until after it was filed.  Is that right?
17     A.  That's accurate.
18     Q.  Okay.  The next I am going to call it colorful
19  quote from the WFB article says, quote, You could have
20  seen the top of my car blow off with my head, Journey
21  said, quote, because I knew what that meant.  It meant
22  that those three lawyers committed a lie of omission as
23  to material facts to the board of directors.  Nobody
24  said bankruptcy, closed quote.
25     Is that quote that's attributed to you

Page 53

14 (Pages 50 - 53)

1 accurately attributed?
2     A.  I think so.  I would have modified it, and I
3 would have said at least up to three instead of all
4 three, because I think one may not deserve that.
5     Q.  And that quote then instead of saying three
6 lawyers, up to three lawyers, that would be -- that
7 would include Mr. Cotton and Mr. Brewer.  Is that
8 correct?
9     A.  Yes.
10     Q.  And when you said in that quote nobody said
11 bankruptcy, I'm assuming that means in the board meeting
12 or the executive session of the board meeting.  Is that
13 correct?
14         MR. WATSON:  Objection.  Objection.
15     Mr. Ciciliano, do you have a privilege to
16 assert on behalf of the NRA?
17         MR. CICILIANO:  Yeah, I am objecting to
18 the extent it's calling for the disclosure of what
19 occurred during the board meeting.
20         If you're asking him what he said to the
21 newspaper guy, I guess that's just verifying the quote.
22         MR. PRONSKE:  Actually, here is what I am
23 doing.  And listen to me for a minute, all right?  I am
24 not asking him what happened, and I am not asking him
25 about anything that he said that -- where an attorney

Page 54

1 was present.
2         I'm saying that when he said nobody said
3 bankruptcy, I'm asking him did he mean at that -- when
4 he said that to a reporter with no lawyer present -- and
5 let me pause for just a minute.
6     Q.  (BY MR. PRONSKE)  Judge Journey, was a lawyer
7 present when you spoke to the WFB?
8     A.  No.
9     Q.  Okay.  So --
10     A.  At least not one that was mine.
11         MR. PRONSKE:  The question I'm asking is
12 that when he said nobody said bankruptcy to the reporter
13 with no attorney present, did he mean, when he used
14 those words to the reporter, that nobody said bankruptcy
15 in the board meeting?
16         MR. WATSON:  I believe that question's
17 been asked and answered at least a few times.  I think
18 you've already gotten it in, Gerrit.
19         MR. PRONSKE:  Okay.
20     Q.  (BY MR. PRONSKE)  You can answer, Judge
21 Journey.
22     A.  I think anybody who reads that would come to
23 that same conclusion, I think, yes.
24     Q.  And I'm sorry, I didn't hear the last part --
25     A.  I said anybody would come to that same

Page 55

1 conclusion you're seeking, yes.
2     Q.  Okay.
3         MR. WATSON:  Gerrit, could you let us
4 know when you're at a stopping point?  I need to check
5 in on the judge, because we want to be fair to everyone
6 and give everyone equal time.  But I do want you to
7 finish, so I need to check on him, if that's okay.
8         MR. PRONSKE:  I've got a few more
9 relating to this article --
10         MR. WATSON:  Okay.
11         MR. PRONSKE:  -- and then that's a good
12 point.  Not finishing point, but breaking point.
13         MR. WATSON:  Right, breaking point for
14 like five minutes or so.
15     Q.  (BY MR. PRONSKE)  So Judge Journey,
16 paragraph -- switching over just for a moment to your
17 motion to appoint examiner, paragraph 16 of your motion
18 says, quote, In direct violation of its own bylaws, the
19 NRA did not disclose to the board of directors its
20 intent to seek Chapter 11 relief.  In further violation
21 of those bylaws, no solicitation for -- to the board for
22 votes of approval of the filing was conducted.  In fact,
23 one or more board members only became aware of this case
24 through media outlets, closed quote.
25         Is that an accurate statement that's contained

Page 56

1 in your motion?
2     A.  I signed it, yes.
3     Q.  Okay.  And do you believe, Judge Journey, that
4 the board of directors would have approved of the filing
5 of bankruptcy on January 7 if they had been asked to
6 approve it?
7     A.  We may never know, but we'll see what happens
8 on the 28th.
9         MR. CICILIANO:  I would just object,
10 calls for speculation.
11         MR. WATSON:  Yeah, it does call for
12 speculation.
13     Q.  (BY MR. PRONSKE)  And what -- since -- yeah,
14 what happens on the 28th, Judge Journey?
15     A.  New board meeting.
16     Q.  And have you received any kind of written
17 materials on the board meeting that is going to take
18 place on the 28th?
19     A.  All I've gotten so far is the email of the
20 notice.
21     Q.  And does it contain any information as to an
22 agenda or what will take place at that board meeting?
23     A.  I don't know.  I've been busy all day.  I only
24 had 15 hearings, you know.
25     Q.  Did that notice come today?

Page 57

15 (Pages 54 - 57)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1 A. Yes, a few moments ago.
2 Q. Okay. Do you have it in front of you, if you
3 could review it?
4 A. If I close your screen down, I might be able
5 to. Let me look. Let's see.
6 MR. CICILIANO: I am just going to
7 object. Without the benefit, we're unable to assert
8 privilege over it, depending on what it says.
9 MR. WATSON: Yeah, we're not able to look
10 at it either. I haven't seen it.
11 MR. PRONSKE: Well, let's ask him if a
12 lawyer signed it.
13 THE WITNESS: Mr. Frazer, I mean, you
14 guys just had him in his deposition. You should have
15 asked him. He's the one that sent it, I think. It has
16 gone out, but I have not seen it.
17 MR. CICILIANO: So Mr. Frazer is a
18 lawyer. I am going to direct him prophylactically not
19 to respond.
20 THE WITNESS: Thank you.
21 MR. WATSON: Yes. Judge, don't answer
22 that.
23 THE WITNESS: Okay.
24 Q. (BY MR. PRONSKE) You're refusing to answer
25 that question, Judge Journey?

Page 58

1 A. Thank you. Yeah.
2 Q. Okay.
3 A. All right.
4 Q. The WFB article quotes Bill Brewer as saying,
5 quote, This plan -- meaning the filing of the
6 bankruptcy -- this plan was undertaken in full
7 compliance with NRA policy, closed quote.
8 Do you agree with Bill Brewer that the
9 bankruptcy filing was in full compliance with NRA
10 policy?
11 MR. CICILIANO: And I would just object
12 to the extent it calls for you to rely upon
13 attorney/client privileged communications communicated
14 by the NRA.
15 MR. WATSON: And I would add to that that
16 it's speculative and calls for a legal conclusion as
17 well.
18 But you can answer, Judge.
19 A. I don't agree with Mr. Brewer, no.
20 Q. (BY MR. PRONSKE) The article also says that
21 Brewer said, quote, The plan -- again, the bankruptcy
22 filing -- has been widely endorsed by NRA board members,
23 NRA members, elected officials and other key
24 stakeholders.
25 Is that statement true as to NRA board

Page 59

1 members?
2 MR. WATSON: Objection, calls for
3 speculation.
4 A. All I --
5 Q. (BY MR. PRONSKE) Okay.
6 A. All I know is nobody's told me.
7 Q. Okay. The article further says, quote,
8 Journey said that he had voted to support the committee
9 but no -- but had no idea the group's leadership and
10 legal advisors had planned to go into bankruptcy, closed
11 quote.
12 Are you correctly quoted by the WFB with that
13 sentence?
14 A. I believe so, yes.
15 Q. And is that statement accurate?
16 MR. CICILIANO: I would just object to
17 the extent it calls for you to rely on attorney/client
18 communications and direct you not to answer.
19 MR. WATSON: You can answer, Judge. You
20 can answer.
21 A. If you're saying it was an accurate rendition
22 of the quote, I believe that's so.
23 Q. (BY MR. PRONSKE) No, it's a different
24 question. There was two questions. There was that
25 question, whether it was the accurate rendition of the

Page 60

1 quote, and then the second statement is is that
2 statement an accurate statement?
3 MR. CICILIANO: And same objection. I
4 direct you not to answer to the extent it requires you
5 to rely upon attorney/client communications and work
6 product.
7 MR. WATSON: You can answer to the best
8 of your knowledge or your impression of it, Judge. With
9 that qualification, you can answer.
10 A. I'm sorry. What was it again?
11 Q. (BY MR. PRONSKE) The quote says, Journey said
12 he had voted to support the committee but had no idea
13 the group's leadership and legal advisors had planned to
14 go into bankruptcy, closed quote.
15 And my question is, is that statement
16 accurate?
17 A. Yes.
18 Q. The article goes on to say that -- I'm sorry,
19 I don't need to ask that.
20 All right. The article goes on to quote you
21 again saying, quote, It certainly was a fraud
22 perpetrated on the Court. Journey said, quote, I told
23 them when I got on the board, look, I'm a judge, I'm a
24 mandatory reporter. Whatever we do, we've got to be on
25 the up and up.

Page 61

16 (Pages 58 - 61)

1    The question is, is that -- are you accurately
2 quoted by the WFB in that sentence?
3    A.  Yes.
4    Q.  Okay.
5         MR. PRONSKE:  I can take a break right
6 now if you want to -- this is a good time.
7         MR. WATSON:  Okay.  Good.  Go off the
8 record for five minutes.  Do you need more time than
9 that, Judge?
10        THE WITNESS:  No, I'm good.
11        MR. WATSON:  Okay.  Five minutes.  Off
12 the record.
13        THE VIDEOGRAPHER:  The time is 5:15.  We
14 are off the record.
15        (Break from 5:15 to 5:27 p.m.)
16        THE VIDEOGRAPHER:  The time is 5:27.
17 We're back on the record.
18        MR. PRONSKE:  Okay.  For the record, I
19 wanted to state that I believe that many of the
20 objections that have been made are improper.  They're
21 improper speaking objections.  The privilege objections
22 are beyond the pale as to not allowing witnesses to
23 answer questions like what subject matters of
24 discussions were or basically anything that happened in
25 executive session.  It's way beyond what should be

Page 62

1 objected to, and so we're going to reserve our rights to
2 come back after a discussion of the privilege issues
3 with the Court.
4    So moving forward --
5         MR. CICILIANO:  And I would, likewise,
6 place on the record that it's absurd to ask questions,
7 was this word said, was that word said with counsel.
8 That's absurd as well, but go ahead.
9         MR. PRONSKE:  I note your opinion.
10   Q.  (BY MR. PRONSKE)  Judge Journey, do you
11 believe that Wayne LaPierre and/or other officers of the
12 NRA deliberately failed to disclose material facts to
13 the board or the executive session regarding the
14 impending filing of bankruptcy of the NRA?
15        MR. CICILIANO:  I would just object,
16 number one, calls for speculation, foundation.
17   I also direct you not to answer to the extent
18 that calls for you to disclose what occurred at the
19 executive session as it was covered by the
20 attorney/client privilege.
21        MR. WATSON:  Yeah, I am going to instruct
22 you not to answer to the extent of the executive
23 session, Judge.
24        THE WITNESS:  All right.
25   A.  I will have to say I can't answer that on

Page 63

1 advice of counsel.  Thank you.
2         MR. PRONSKE:  So is the position that you
3 all are taking is that anything that was discussed in
4 executive session is privileged by the attorney/client
5 privilege, every single thing that was said in that
6 session?
7         MR. CICILIANO:  No, Gerrit.  What I would
8 say is the executive sessions by themselves are not
9 inherently privileged.  However, if you do look at the
10 declaration of William Davis that was submitted, along
11 with the motion, is that during the executive sessions
12 at issue, that's all that was discussed, were things
13 that were based on the advice of counsel.  So in this
14 instance, they would be privileged, but not in all
15 instances.
16   Q.  (BY MR. PRONSKE)  Judge Journey, do you
17 believe that Wayne LaPierre and/or other officers of the
18 NRA knew that they needed board approval to file
19 bankruptcy?
20        MR. CICILIANO:  I would just object to
21 the extent it calls for you to disclose attorney/client
22 privilege and also just object to speculation.
23        MR. WATSON:  Yeah, I object to
24 speculation.
25   But go ahead, you can answer, Judge.

Page 64

1    A.  I have no idea --
2    Q.  (BY MR. PRONSKE)  Do you believe --
3    A.  -- what other people thought, you know.
4    Q.  Do you believe that Wayne LaPierre and/or
5 other officers of the NRA had a duty to disclose the
6 facts that they intended to file bankruptcy to the
7 board?
8         MR. CICILIANO:  I would just object,
9 calls for legal conclusion.
10        MR. WATSON:  Yeah, same here.
11   But you can answer, Judge.
12   A.  I do believe they had a duty to advise the
13 board on that and so many other things.
14   Q.  (BY MR. PRONSKE)  As of the date of the board
15 meeting, was the board of directors ignorant of the
16 plans of LaPierre and/or the officers -- other officers
17 to file bankruptcy for the NRA?
18        MR. CICILIANO:  I would just object to
19 the extent it calls for speculation.  Further object to
20 the extent that it calls for you to reveal
21 attorney/client communications, as well as work product,
22 and would direct you not to answer on those grounds.
23        MR. WATSON:  And I would carry on to say
24 that, you know, board members is kind of broad, and it's
25 speculative to ask Judge Journey what the other board

Page 65

1 members thought.
2     Q. (BY MR. PRONSKE) Go ahead, Judge.
3     A. Okay. Okay. Somebody like got in or got out,
4 and the tone from their jumping in and out of the
5 hearing kept me from hearing your question. So if you
6 would please repeat it for me, I'm sure they can simply
7 just continue their objection.
8     Q. Okay. I am going to ask you first the
9 question, were you ignorant of the plans of LaPierre and
10 other officers to file a bankruptcy for the NRA as of
11 the date of the board meeting?
12        MR. CICILIANO: I would just object to
13 the extent it calls for attorney/client communications
14 and direct you not to answer.
15        MR. WATSON: You can answer, Judge.
16     A. I appreciate your description other than
17 ignorant, but I had not been informed of any plans.
18     Q. (BY MR. PRONSKE) To your knowledge, Judge
19 Journey, would the answer to that question be the same
20 as to other board members?
21        MR. CICILIANO: I would just object it
22 calls for speculation, as well as I would direct you not
23 to answer to the extent it requires you to disclose
24 attorney/client communications of what happened in any
25 executive board session with counsel.

Page 66

1        MR. WATSON: And I object because it's
2 speculative.
3     But you can answer, Judge, if you know.
4     A. You know, the board operates with different
5 levels of access, and there are some that have access
6 and some that do not. And I'm one that does not, and I
7 have no idea what those that may have access might know.
8     Q. (BY MR. PRONSKE) So let me ask you this way,
9 Judge. Are you aware of any board member that had
10 knowledge of the plans to file bankruptcy as of the date
11 of the board meeting?
12        MR. CICILIANO: I would just object that
13 it calls for speculation and, furthermore, to the extent
14 it requires you to divulge attorney/client
15 communications or how that other board member learned
16 them.
17        MR. WATSON: You can answer, Judge, if
18 you know.
19     A. I do not know of any board member that was
20 aware of the filing prior to the board meeting or prior
21 to the filing.
22     Q. (BY MR. PRONSKE) Do you believe as a board
23 member, Judge Journey, that you authorized the filing of
24 a bankruptcy proceeding of the NRA on the date of the
25 board meeting?

Page 67

1        MR. CICILIANO: I would just object to
2 the extent that it causes you to reveal attorney/client
3 communications.
4        MR. WATSON: You can answer, Judge.
5     A. The answer is no.
6     Q. (BY MR. PRONSKE) Were you present for the
7 entire executive session?
8     A. Yes.
9        MR. CICILIANO: Objection, vague.
10     Q. (BY MR. PRONSKE) Pardon me?
11        MR. CICILIANO: Vague was the objection.
12     A. Yes, I was there.
13     Q. (BY MR. PRONSKE) Paragraph 18 of your motion
14 to appoint an examiner says, quote, Also in direct
15 violation of the NRA's own bylaws, the board of
16 directors did not approve the formation of Sea Girt,
17 LLC, the new corporation created by the NRA to bootstrap
18 the filing into this district and venue, closed quote.
19     Is that a correct statement of fact?
20        MR. CICILIANO: I will just object to the
21 extent that it causes you to reveal attorney/client
22 communications. The document speaks for itself.
23     And don't testify to what was told to you by
24 counsel for the NRA. NRA is not waiving that privilege.
25     Q. (BY MR. PRONSKE) You can answer.

Page 68

1        MR. CICILIANO: Subject to the objection.
2        THE WITNESS: Thank you.
3     A. I think the paragraph is accurate.
4     Q. (BY MR. PRONSKE) Okay. And what facts do you
5 base that paragraph on?
6     A. My personal observation.
7        MR. CICILIANO: Once again, let me
8 interpose the objection that you're not to disclose
9 communications between the NRA's counsel and the board
10 members, including those that occurred during the
11 executive session. Outside of that, you can answer.
12        MR. WATSON: You can answer, Judge.
13        THE WITNESS: Thank you.
14     A. What was it again?
15     Q. (BY MR. PRONSKE) It said -- do you want me to
16 read the quote again or the question?
17     A. Oh. On paragraph 18?
18     Q. Yeah.
19     A. The question regarding paragraph 18 was?
20     Q. The question is what are the facts that you
21 base paragraph 18, that sentence on?
22     A. Oh. Like I said, my personal observation.
23     Q. Okay. In paragraph 6 of your motion to
24 appoint examiner, you said quote, Upon information and
25 belief, the NRA has engaged in actions that violate its

Page 69

18 (Pages 66 - 69)

1 fiduciary duties under New York law, closed quote.
2          Do you believe that to be a correct statement?
3          MR. CICILIANO: Objection, vague.
4          MR. WATSON: You can answer, Judge.
5    A. I think that's based upon my review of the New
6 York AG's petition in August.
7    Q. (BY MR. PRONSKE) Okay. In paragraph 8 of
8 your motion you stated that, quote, The debtors have
9 improperly paid excessive compensation to current
10 management in base salaries, and perhaps more troubling,
11 via a series of excessive perks that were wholly for the
12 debtors' insiders' personal benefit, closed quote.
13         Is that a -- do you believe that to be a
14 correct statement?
15         MR. CICILIANO: Objection, foundation.
16         MR. WATSON: You can answer, Judge.
17   A. That paragraph is also based upon news reports
18 and the New York Attorney General's petition along with
19 the petition by the District -- District of Columbia's
20 Attorney General.
21   Q. (BY MR. PRONSKE) Also in paragraph 8 you say,
22 quote, The debtors' insiders received hidden
23 compensation for items via direct payment of purely
24 personal costs, closed quote.
25         Do you believe that to be a correct statement?

Page 70

1          MR. CICILIANO: Objection, foundation.
2          MR. WATSON: You can answer, Judge.
3          THE WITNESS: Thank you.
4    A. Yes. That also is based upon my review of
5 news reports, attorney generals' petitions from both New
6 York and Washington, D.C.
7    Q. (BY MR. PRONSKE) Okay. But you do believe
8 that to be a correct statement. Is that right?
9    A. Based upon what was in those petitions, I do
10 believe that is accurate, because it was apparent to me
11 from reviewing the New York Attorney General's petition
12 that that was based upon depositions, documents produced
13 in discovery or interviews by the attorney general
14 staff.
15   Q. Okay. And then in paragraph 11 you say,
16 quote, Upon information and belief, the debtors engaged
17 in the practice of passing expenses through Ackerman to
18 conceal personal expenses by the debtors' insiders. Do
19 you believe that -- closed quote.
20         Do you believe that to be a correct statement?
21         MR. CICILIANO: I would object. I would
22 object, lack of foundation. Go ahead.
23         MR. WATSON: You can answer, Judge. Go
24 ahead.
25         THE WITNESS: Thank you.

Page 71

1    A. Yes, based upon my review of those documents I
2 previously referenced.
3    Q. (BY MR. PRONSKE) Okay. And in paragraph 12
4 you say, The debtors -- quote, The debtors and Ackerman
5 engaged in a pass-through expense arrangement whereby
6 expenses would be paid by the debtor without written
7 approvals, receipts or supporting business purpose
8 documentation under the debtors' policies and not
9 disclosed to internal review by the debtors' internal
10 audit committee, closed quote.
11         Do you believe that to be a correct statement?
12         MR. CICILIANO: Objection, foundation.
13         MR. WATSON: You can answer, Judge.
14         THE WITNESS: Thank you.
15   A. Yes. Once again, it's based upon my review of
16 the documents we have previously referenced.
17   Q. (BY MR. PRONSKE) Okay. Thank you.
18         And in paragraph 17 of your motion to appoint
19 examiner, you state, quote, New York law, the NRA bylaws
20 and Robert's Rules of Order were routinely violated by
21 the NRA's management, closed quote.
22         Is that a correct statement?
23         MR. CICILIANO: Objection, foundation,
24 calls for a legal conclusion.
25         MR. WATSON: You can answer, Judge, to

Page 72

1 the extent of your impression or personal knowledge.
2          THE WITNESS: Thank you.
3    A. Yes, I believe that's accurate based upon my
4 review and personal knowledge.
5    Q. (BY MR. PRONSKE) And what in particular would
6 you have personal knowledge of as to those violations?
7          MR. CICILIANO: Objection to the extent
8 it calls for you to disclose what occurred during board
9 meetings and/or executive board meetings where counsel
10 is present and legal advice was given.
11         MR. WATSON: You can answer, Judge, to
12 the extent of your personal knowledge and the basis of
13 your personal knowledge.
14   A. Well, based upon my personal knowledge, from
15 the review of those articles and the petitions and the
16 legal documents, I believe that that statement in
17 paragraph 17 is accurate. My personal knowledge does
18 not go back very far, but based on my review of the
19 bylaws that I have access to, I do believe they exceeded
20 their authority.
21   Q. (BY MR. PRONSKE) Okay. I want to ask you a
22 few questions about the financial condition of the NRA
23 as a board member. Is the board regularly informed and
24 advised regarding the financial condition of the NRA?
25         MR. CICILIANO: Objection, vague -- or

Page 73

19 (Pages 70 - 73)

1 form. Go ahead.
2     MR. WATSON: You can answer, Judge.
3     THE WITNESS: Thank you.
4   A. I believe they are advised to the extent that
5 the CFO or others under their control produce
6 information or documents to the board.
7   Q. (BY MR. PRONSKE) And Judge Journey, have you
8 seen anything in the past 12 months that shows you that
9 the NRA has any financial problems?
10    MR. CICILIANO: Objection, calls for
11 speculation, form.
12    MR. WATSON: You can answer, Judge.
13    THE WITNESS: Okay.
14  A. You guys, I know you don't know me, but I got
15 my first degree in accounting, all right, before I went
16 to law school. And I said, oh, my God, this is boring,
17 I am not doing this for the rest of my life and went on
18 to law school. So, you know, I can read a financial
19 statement. I can review a balance sheet or a cash flow
20 statement and have some comprehension of what it's
21 trying to impart into us.
22    I have to say that I have always felt that the
23 financial statements provided to the board have been
24 lacking in clarity and especially under Mr. Phillips
25 when I was on the board the first time. I have no

Page 74

1 knowledge that NRA is in dire financial straits or
2 insolvent at this time. All the representations I've
3 reviewed in the press and the documents handed out at
4 the board meetings tell me that the cash flow is sound,
5 the balance sheet is good and that we are not
6 underwater. And the New York Attorney General, if she's
7 successful, is going to put a lot of money in her
8 pocket.
9   Q. (BY MR. PRONSKE) Is -- this morning -- let me
10 put it this way to hopefully avoid another speaking
11 objection.
12    If Mr. Frazer testified this morning that the
13 financial condition of the NRA has never been as good as
14 it is now, would you have any reason to dispute that?
15    MR. CICILIANO: Objection, form,
16 foundation.
17  A. It sure sounds --
18    (Reporter clarification.)
19  A. Sounds like puffing to me.
20  Q. (BY MR. PRONSKE) Would you have any reason to
21 dispute that?
22  A. I do not have access to that information to
23 draw the conclusions you're asking.
24  Q. Okay.
25  A. I just know what it smells like.

Page 75

1   Q. Well, let's talk about that. Do you have --
2 do you believe that the filing of bankruptcy by the NRA
3 was necessary for financial reasons?
4     MR. CICILIANO: Objection, calls for
5 speculation, evades the attorney/client privilege.
6     Don't answer to the extent your knowledge
7 would come from communications with an attorney of the
8 NRA. Go ahead.
9     MR. WATSON: You can answer, Judge, based
10 on your understanding.
11  A. You know, what I've seen in the media by them
12 tells me that there was only one reason they filed the
13 Chapter 11 and wanted to come to Texas, and it's not
14 money.
15  Q. (BY MR. PRONSKE) So I'm sorry, I don't -- I
16 didn't quite hear you. Could you repeat that or --
17  A. Sure. I said based upon what, for example,
18 Wayne LaPierre and other spokespersons have said, it was
19 not a financial problem that caused them to file the
20 bankruptcy in Texas.
21  Q. Okay.
22  A. That's pretty obvious.
23  Q. Why do you believe the NRA filed bankruptcy?
24    MR. CICILIANO: Objection. To the extent
25 that it calls for attorney/client communications, I

Page 76

1 direct you not to answer.
2     MR. WATSON: Judge, you can answer to the
3 extent of your personal knowledge.
4   A. The press reports, the press releases by NRA,
5 the statements of officers and spokespersons clearly say
6 that there was one reason, and that's because they want
7 more sun than they could get in New York. No, I'm
8 kidding. But that they want to get away from the New
9 York AG.
10  Q. (BY MR. PRONSKE) Judge Journey, would you be
11 surprised to learn that John Frazer, the general counsel
12 of the NRA, was not aware that bankruptcy was going to
13 be filed until after the filing?
14    MR. CICILIANO: Objection, foundation,
15 form, calls for speculation.
16  A. That does not surprise me.
17  Q. (BY MR. PRONSKE) Do you believe that he
18 should have been informed as general counsel as to a
19 significant legal proceeding such as the filing of a
20 Chapter 11?
21    MR. CICILIANO: Objection, form, calls
22 for speculation, calls for legal conclusion.
23  Q. (BY MR. PRONSKE) You can answer.
24    MR. WATSON: You can answer, Judge.
25  A. I think it would have been nice to tell the

Page 77

20 (Pages 74 - 77)

1  general counsel what they're planning, just like I think
2  it would have been nice to tell the board.
3      Q.  (BY MR. PRONSKE)  Would you --
4          MR. CICILIANO:  I would move to strike to
5  the extent that that discloses attorney/client
6  communications.  Go ahead.
7          THE WITNESS:  Thank you.
8      Q.  (BY MR. PRONSKE)  Would you be surprised to
9  learn that Craig Spray, the treasurer of the NRA, was
10  not aware that bankruptcy was going to be filed until
11  after the filing?
12         MR. CICILIANO:  I would object,
13  foundation, speculation.
14         Counsel, I hope you have a basis for asserting
15  that.  Go ahead.
16     Q.  (BY MR. PRONSKE)  You can answer.
17         MR. PRONSKE:  And I do have a basis.
18     A.  No, I'm not surprised.
19     Q.  (BY MR. PRONSKE)  And why are you saying that
20  you're not surprised?
21         MR. CICILIANO:  Objection to the extent
22  that it calls for you to reveal attorney/client
23  communications, including those that occurred at board
24  meetings or executive board meetings, I would direct you
25  not to answer.  Outside of that, you may go ahead.

Page 78

1          MR. WATSON:  You can answer based on your
2  personal knowledge, Judge, and what you observed.
3          THE WITNESS:  Thank you.
4      A.  It's clear from my observation of the
5  operation and -- that there are, as I explained before,
6  kind of broaching on it, that there are circles within
7  circles, and the closer circles are more informed than
8  those in the outer reaches.  And I'm sure now I'm going
9  to be out there by Pluto somewhere so -- after filing my
10  motion.  You know, I may be, I don't know, outside the
11  solar system.  We'll see how the 28th goes.
12     Q.  (BY MR. PRONSKE)  Have you had any
13  conversations since the filing of the bankruptcy with
14  Mr. Cotton, Mr. Lee, Mr. LaPierre or Ms. Meadows?
15     A.  No.  They're not calling me.
16     Q.  Were you aware that there was a board meeting
17  set for March 14th and -- of this year and got called
18  off?
19     A.  Yes.
20     Q.  Do you know why the meeting got called off?
21     A.  They said someone's been exposed to COVID.
22         MR. CICILIANO:  Go ahead.
23     Q.  (BY MR. PRONSKE)  The WFB article says that
24  this to be held board meeting -- or regarding this to be
25  held board meeting that, quote, The sole purpose of the

Page 79

1  meeting is to provide briefing to the board regarding
2  the NRA's reorganization plan and the legal matters
3  overseen by the special litigation committee and to take
4  necessary action related to those -- directly related to
5  those matters, closed quote.
6          Is that a quote that you gave to the WFB, or
7  was it from some other source?
8      A.  That was a quote from the email that announced
9  the meeting.
10     Q.  Okay.  And did you send that email to the WFB?
11     A.  I think he already had it.
12     Q.  Okay.  Do you know what the terms "to take any
13  necessary action related to those matters" means?
14         MR. CICILIANO:  Objection, calls for
15  speculation.
16         To the extent that you learned that from an
17  attorney/client communication from the NRA's counsel, I
18  would direct you not to answer.
19         MR. PRONSKE:  It doesn't call for
20  speculation.  I'm asking him if he knows what that
21  means.
22     A.  I think it means like anything else they want
23  to do.  I don't know.
24     Q.  (BY MR. PRONSKE)  Okay.  Have you been
25  threatened by anyone about your earlier -- or your

Page 80

1  filing of your motion to appoint examiner or the
2  contents of the WFB article?
3      A.  I don't know if you could quite call them as
4  threats rather than advice, but there have been some
5  statements made by others.
6      Q.  Have you been given advice regarding those
7  issues?
8      A.  Yes.
9      Q.  And who did you get that advice from?
10     A.  Law enforcement.
11     Q.  And what advice was given to you by law
12  enforcement?
13     A.  Keep my head on a swivel.  Don't get in an
14  elevator alone.
15     Q.  When you testified earlier regarding closer
16  circles, who is in these closer circles?
17     A.  You're going to have to ask somebody that
18  makes the circles.  I don't know.
19     Q.  You don't know who's in the closer circles?
20     A.  I have no idea.  I would presume it changes
21  periodically also.
22     Q.  Are you aware that the Brewer firm was paid
23  $17 million in the 90 days prior to bankruptcy?
24     A.  Yes.  I saw the filing.
25     Q.  Do you know what that's for?

Page 81

21 (Pages 78 - 81)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1  A.  No, I do not.

2  Q.  Do you know whether that amount was paid for

3  services incurred during that period, or are those for

4  services that are older or past due invoices?

5       MR. CICILIANO:  Objection to form.

6  A.  No, I do not.

7  Q.  (BY MR. PRONSKE)  Is the board given

8  information regarding Brewer's fees?

9       MR. CICILIANO:  Objection to the extent

10  it calls for you to divulge attorney/client

11  communications.

12  A.  I mean, I don't know how far he wants me to go

13  back.  I mean, it was the controversy at Indianapolis,

14  and I was there at that meeting 2019.

15  Q.  (BY MR. PRONSKE)  And what was that

16  controversy?

17  A.  I think it's pretty clearly represented in the

18  press, but essentially from what I read and what I saw

19  at that meeting, it became apparent that there was

20  struggle politically between Mr. North and Mr. LaPierre.

21  I mean, I was there in the members meeting.  I attended

22  the board meeting following the members meeting in 2019

23  in Indianapolis.  That's what spurred me to try to get

24  back on the board.

25  Q.  Do you believe as a board member that the

Page 82

1  amount of the Brewer fees in the last couple of years

2  have been reasonable?

3       MR. CICILIANO:  Objection, foundation,

4  calls for speculation.

5       MR. WATSON:  You can answer, Judge, on

6  your personal knowledge.

7       THE WITNESS:  Yeah.

8  A.  Again, without seeing the billings, I'm not

9  sure what he's doing.  It's hard to imagine.  But even

10  on the Internet -- what he has on the web page, his rate

11  is 1,400 bucks an hour.  That's still an awful lot of

12  hours.  So, you know, I don't know.

13  Q.  (BY MR. PRONSKE)  Do you -- has there ever

14  been any discussion by the board that you've been a part

15  of as to either the amount of those fees or the

16  oversight or lack of oversight of those fees?

17       MR. CICILIANO:  I would just object to

18  the extent that it calls for you to disclose anything in

19  one of the executive sessions in which you were

20  discussing with counsel, including meeting with the

21  committee, special litigation committee.  I direct you

22  not to answer.

23       MR. PRONSKE:  Mr. Ciciliano, are you

24  taking the position that everything that happens in an

25  executive session is privileged?  Because certainly a

Page 83

1  discussion about the amount of fees is not

2  attorney/client privileged.  So it sounds like you're

3  taking the position that anything that's discussed in an

4  executive session of the board is attorney/client

5  privileged.  Is that right?

6       MR. CICILIANO:  That's certainly not the

7  case.  Your question was broad enough to encompass even

8  what's contained in those fees.  And so if the question

9  was did you discuss and they discussed the actual

10  content of the billing statements, that would be

11  privileged, that content.  The amount of the fees

12  necessarily wouldn't be.  But it's a mixed bag of

13  privilege and nonprivilege, and I am telling him to be

14  careful.

15       MR. PRONSKE:  I specifically said of the

16  amount of the fees, and I specifically did not say was

17  contained in the billing statement.  So let me reask the

18  question and please listen.

19  Q.  (BY MR. PRONSKE)  And the question is:  Has

20  there ever been a discussion in a board meeting when you

21  were present as to the amount of Brewer's fees?  And I

22  am going to ask that first.

23  A.  No.

24  Q.  Has there ever been a discussion by the board

25  of oversight of the Brewer fees and -- of the Brewer

Page 84

1  fees?

2  A.  I -- okay.

3       MR. CICILIANO:  And I would generally

4  object to the attorney/client privilege to the extent

5  that they are discussing the oversight of the fees.

6       It's a yes or no question.  You can answer yes

7  or no, but that's it.

8       MR. WATSON:  You can answer, Judge.

9       THE WITNESS:  Thank you.

10  A.  No.

11       MR. PRONSKE:  Okay.  I think I am close

12  to being out of time, so I am going to pass the witness;

13  but again, I reserve my rights to recall the witness

14  after discussion of the privilege issues with the Court.

15       MR. WATSON:  That's fine, Gerrit.  And

16  you know, we'll go there.

17       How much time is left on the New York AG side,

18  Julie.

19       THE REPORTER:  They've got 29 minutes.

20       MR. WATSON:  Okay.  Brian, you mentioned

21  that you have a few questions for Judge Journey.

22       MR. MASON:  I do.  Do you want to keep

23  going?

24       MR. WATSON:  Yeah.

25       MR. MASON:  Or Judge, do you need a

Page 85

22 (Pages 82 - 85)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1 break?
2         MR. WATSON: Are you okay, Judge?
3         THE WITNESS: I'm good.
4         MR. WATSON: Why don't you go ahead and
5 finish, Brian.
6         MR. MASON: Okay.
7               EXAMINATION
8 BY MR. MASON:
9     Q.  Judge Journey, good evening.  My name is Brian
10 Mason.  I represent Ackerman McQueen.  And I appreciate
11 you sitting and visiting with us tonight.
12     A.  Tell Revan I said hello.
13     Q.  I will do it.
14         A few questions for you.  Going back to the
15 January 7th board meeting, what specifically was voted
16 on with respect to those two executive sessions?
17         MR. CICILIANO: Objection to the extent
18 it calls for attorney/client communications and
19 privilege.
20         To the extent that it's reflected in the
21 general minutes, you can testify to.
22         MR. WATSON: Yeah, Judge.  I mean, you
23 can testify to what you remember, so long as it's not
24 privileged or confidential.
25     A.  I have not had a chance to read those minutes.

Page 86

1 They just arrived yesterday for me from the January 7th
2 meeting, but the only two questions were those we've
3 been talking about all afternoon, and that's Wayne
4 LaPierre's employment contract and the empowerment of
5 the special litigation committee.
6     Q.  (BY MR. MASON)  When voting on something as a
7 board member, is it important to know what you're voting
8 on?
9     A.  Of course.
10         MR. CICILIANO: Objection, vague.
11     Q.  (BY MR. MASON)  Do you rely on the people
12 presenting you with information when you're voting to
13 provide complete and accurate information in order to
14 exercise your vote as a board member?
15     A.  I believe that what Reagan said was true, that
16 I trust but verify.  I do my best to try to verify
17 things or questions that have to come up before me, just
18 like I try to do it here where I'm sitting right now.
19     Q.  In the executive session board meetings on
20 January 7, do you believe that there was information
21 that was intentionally withheld from the board?
22         MR. CICILIANO: I am going to object and
23 direct you not to answer to the extent -- or not to
24 answer as it would reveal attorney/client
25 communications.

Page 87

1         MR. MASON: I was asking for his personal
2 opinion.
3         MR. CICILIANO: Even as to personal
4 opinion, you're asking him to reveal the content of the
5 communications because of what he feels was lacking.
6         MR. WATSON: Judge, I am going to
7 instruct you not to answer.
8         THE WITNESS: Okay.  I don't why he can't
9 just read the motion.
10     Q.  (BY MR. MASON)  I want to be clear.  During
11 the first executive session motion -- I mean, I'm
12 sorry -- the first executive session regarding
13 Mr. LaPierre's employment agreement, it was Wit Davis,
14 John Frazer and then somebody from the Brewer firm.  Is
15 that your recollection?
16     A.  I remember Mr. Brewer being present
17 personally.
18     Q.  Okay.  Were copies of Mr. LaPierre's
19 employment agreement passed out to board members during
20 that executive session?
21     A.  No.
22         MR. CICILIANO: Objection, asked and
23 asked.
24     A.  I answered that.  No, it wasn't.
25     Q.  (BY MR. MASON)  Without going into what was

Page 88

1 said specifically, were there any questions relating to
2 Mr. LaPierre's employment agreement that were asked?
3     A.  Yes.
4     Q.  Who asked those questions?
5         MR. CICILIANO: I would direct you not to
6 answer pursuant to the attorney/client privilege.
7         MR. MASON: That's not a proper
8 instruction.
9     A.  I think if you review the minutes, it's quite
10 clear that there became a question during that
11 conversation regarding the question of the law that
12 would control the contract.
13     Q.  (BY MR. MASON)  So was there just one question
14 that was asked relating to Mr. LaPierre's employment
15 agreement?
16         MR. CICILIANO: Objection, calls for
17 attorney/client communication.
18         Now I am directing you not to answer.
19         MR. MASON: I am not asking about the
20 subject of the question.
21         MR. CICILIANO: You are asking about the
22 subject.  You're saying is that the only question that
23 was asked.  It's absolutely asking about the subject.
24 I'm directing him not to answer.
25         THE WITNESS: Thank you.

Page 89

23 (Pages 86 - 89)

1 MR. WATSON: Judge, don't answer.
2 THE WITNESS: Okay.
3 Q. (BY MR. MASON) Mr. -- I mean, Judge Journey,
4 about how long -- well, let me back up.
5 You said that there was --
6 MR. ACOSTA: I'm sorry. I'm sorry.
7 Someone is -- we're getting feedback from someone.
8 MR. ACOSTA: 202-437-5091, you're not
9 muted.
10 THE WITNESS: Washington, D.C.
11 Q. (BY MR. MASON) Earlier in the deposition, if
12 I understood your testimony, you made a comment that the
13 NRA reorganizes all the time and has various committees.
14 Did I recall that correctly?
15 A. Yes.
16 Q. Can you describe that for us a little bit
17 more?
18 A. Well, from time to time, questions come up,
19 new shooting disciplines are being popular. One of the
20 many things that NRA does, that don't seem to make the
21 news, is we run the national matches. There are from
22 time to time controversy in those competitions. It
23 requires rule changes. Sometimes you have to create a
24 select committee or a special committee to just look at
25 that one little question and kind of get the information

Page 90

1 from all the competitors and try to figure out what the
2 right answer is. Sometimes there are tasks or special
3 projects that a committee is created to oversee or work
4 out the task for the staff to go implement. You know,
5 it's a large organization that has a myriad of tasks to
6 complete, and it certainly required something more
7 flexible than a fixed commissioner.
8 Q. You testified earlier, if I understand your
9 testimony, that you believe that Mr. LaPierre had a duty
10 to advise the board of the bankruptcy, and then I
11 believe you said and so many other things. Assuming I
12 understood your testimony correctly, could you tell us
13 about what those other things are?
14 MR. CICILIANO: I will just object to the
15 extent that it calls for attorney/client communications.
16 MR. WATSON: You can answer, Judge. You
17 can answer.
18 THE WITNESS: All right.
19 A. Look, when I was on the board 25 years ago, I
20 believe it operated properly. Our board meetings
21 25 years ago were four days long. We would have two
22 days of committee action and two days of board action
23 based upon a committee request. It ran just like the
24 legislature. And that's where I initially learned
25 legislative procedure, and I used it every day I was in

Page 91

1 the state senate.
2 When I went to the board meeting in October, I
3 was aghast because the board meeting ran like a consent
4 agenda. So they would say --
5 MR. CICILIANO: And Judge, I would just
6 warn you not to disclose what was said in the executive
7 sessions, but go ahead beyond that.
8 MR. WATSON: And Judge -- well, hold on.
9 Judge, you can answer as to what you observed that
10 wasn't in executive session. So you can continue.
11 THE WITNESS: Sure.
12 A. You know, and when they would bring an action
13 item up, whether it was a modification of the bylaws --
14 I am not talking about in the executive session, but
15 everything on the agenda that day in Tucson was a
16 consent agenda. They would say, here is your action
17 item, unanimous acclamation, are there any objections?
18 And I had not had the opportunity to be in the board
19 meetings, mostly because they do a lot in executive
20 sessions when I wasn't on the board; and when I got
21 inside, I was astounded. So they don't have committee
22 meetings. They haven't had committee meetings for two
23 board meetings. So how can they inform the finance
24 committee about the finances when it doesn't meet? How
25 could they inform legislative policy about what they're

Page 92

1 doing if it doesn't meet? You know, we've had two board
2 meetings and no committees. I finally got my committee
3 assignments a few weeks ago, and that was after the
4 January 7th meeting. So there are no committee meetings
5 planned for this special emergency meeting they're going
6 to have in, what, ten days, you know. But, of course,
7 this way at least I get to go down to Dallas and only
8 make one trip for a week while we're there on our trial.
9 Q. (BY MR. MASON) Aside from the bankruptcy, do
10 you have concerns about the NRA's disclosure to the
11 board the last two years?
12 MR. CICILIANO: I would just object to
13 the extent it calls for you to disclose what's occurred
14 in the executive committee meetings that would be
15 subject to privilege and direct you not to answer that.
16 MR. WATSON: You can answer, Judge, to
17 the extent of your personal knowledge.
18 THE WITNESS: Thank you.
19 MR. WATSON: So long as it's not in
20 executive session.
21 A. Yeah, I went back and looked in my files from
22 25 years ago, and I saw the board packets they would
23 send me then and they would be about 4 inches. And they
24 would send it to me about three weeks ahead of the
25 meeting so I had time to read everything. Now when I go

Page 93

24 (Pages 90 - 93)

1 to the board meeting, it's sitting on the desk. And you
2 can't get into the room until just before the meeting,
3 so you've got no time to read it. I mean, who knows
4 what they're giving me, you know, but I don't have time
5 to review it to figure out what the questions are, let
6 alone what the answers should be.
7    Q. (BY MR. MASON) Are you aware of other board
8 members that share your same concerns?
9    A. Yes.
10    Q. Is it a significant number of board members
11 that share these same concerns?
12       MR. WATSON: Objection, speculation.
13 Objection, that's speculative.
14       THE WITNESS: I appreciate that.
15    A. One of the first persons I called was a former
16 general counsel that I knew that had been general
17 counsel of NRA from 1977 to, I don't know, 2014 or so.
18 And I gave him a call, and he taught me a new word,
19 supine. The board is supine.
20    Q. (BY MR. MASON) You have mentioned a few times
21 during the deposition the upcoming March 28 board
22 meeting. Is it your understanding that the NRA will ask
23 the board to ratify the bankruptcy on March 28?
24       MR. WATSON: Objection, speculation.
25       MR. CICILIANO: And I would further

Page 94

1 object to the extent you acquired that knowledge through
2 attorneys or counsel for the NRA.
3    A. I'm not sure what they're going to ask us.
4 Really, I'm not.
5    Q. (BY MR. MASON) Let me ask you this then. Do
6 you believe that it's good corporate governance for the
7 NRA to try to have the NRA board ratify the bankruptcy
8 filing after it was already filed?
9       MR. WATSON: I would object to that
10 because it calls for a legal conclusion and is
11 speculative.
12       MR. CICILIANO: Join.
13    A. I got no idea what they're going to do. All I
14 know is what they said.
15    Q. (BY MR. MASON) You mentioned earlier that
16 your personal view -- or your personal review of the
17 statutes and the case law, you came to the conclusion
18 that the board was required to authorize the NRA's
19 bankruptcy filing. Do you believe that a bankruptcy can
20 be filed in good faith if it was not authorized?
21       MR. CICILIANO: Objection, calls for a
22 legal conclusion. The witness isn't an expert.
23       MR. WATSON: Objection also because it's
24 speculative.
25       But go ahead, Judge.

Page 95

1    A. I think Judge Hale is going to answer that
2 question, not me. We'll see.
3    Q. (BY MR. MASON) Would --
4    A. I --
5    Q. I'm sorry, go ahead, Judge.
6    A. I -- you know, I have my own personal opinion,
7 but I think another judge is probably going to give a
8 much sounder one than I.
9    Q. Can you please share your personal opinion
10 with us?
11       MR. CICILIANO: I would just object to
12 its relevance and speculation, foundation.
13       Go ahead if you have one.
14       MR. WATSON: You can answer, Judge, to
15 the extent of your opinion.
16    A. I think -- I think that the officers and
17 counsel have a duty to disclose to the board things like
18 filing a bankruptcy. I think it's the board's decision.
19    Q. (BY MR. MASON) And they did not uphold their
20 duty in this particular instance, did they?
21       MR. CICILIANO: I would just object
22 pursuant to the attorney/client privilege and direct you
23 not to respond.
24    A. Oh, my God, how many times do I have to answer
25 that?

Page 96

1       MR. WATSON: Objection, that's been asked
2 and answered. I think he's answered that, Brian.
3    Q. (BY MR. MASON) With respect to the NRA's
4 bankruptcy filing, do you feel like you were deceived?
5       MR. WATSON: Same objection. I think
6 he's answered that as well.
7       MR. CICILIANO: And I would just object
8 to the extent he relies on attorney/client privilege.
9    A. I think just as I told the Free Beacon editor
10 reporter, that I believe it was an omission that was
11 intentional and that they breached that duty to inform
12 the board. I mean, you know, what's 1.03 in the Texas
13 code? Communication by attorneys.
14    Q. (BY MR. MASON) Have you spoken with other
15 board members since January 15 that share your same
16 concerns?
17       MR. CICILIANO: I would just object to
18 the extent that it calls for you to disclose
19 attorney/client communications.
20       I would direct you not to answer to that
21 extent.
22       MR. WATSON: You can answer, Judge, to
23 the extent of the substance of those conversations that
24 aren't reflected by any attorney/client communication.
25    A. I reached out to several that I believed I

Page 97

25 (Pages 94 - 97)

1 could have a candid conversation with.
2 Q. (BY MR. MASON) Do you have concerns about the
3 Brewer firm's representation of the NRA?
4 A. Yes.
5 Q. What are those concerns?
6 MR. CICILIANO: I would just object to
7 the extent that they call you to call upon
8 attorney/client communications or things you learned
9 through attorney/client privilege.
10 MR. WATSON: Judge, you can learn -- you
11 can answer the question to the extent of your personal
12 knowledge and that you've become aware of since this
13 case has been filed.
14 MR. CICILIANO: That doesn't involve
15 attorney/client communications.
16 THE WITNESS: Thank you.
17 MR. WATSON: Well, things that are on the
18 record that have been filed in the case are --
19 MR. CICILIANO: Agreed, Jermaine.
20 MR. WATSON: You can answer to that
21 extent, Judge.
22 A. I've read a lot of the firm's work, reading
23 all of these other cases and their filings in them, and
24 I didn't think they were very well done. I thought it
25 was more sophistry than substance, what I've read in the
Page 98

1 everyone here, I am going to try to make a quick push
2 and only have this be the last break.
3 MR. WATSON: Okay. Sounds good. Five
4 minutes?
5 THE WITNESS: Okay.
6 MR. CICILIANO: Let's make it 10 so I can
7 use the restroom.
8 MR. WATSON: Okay, 10.
9 THE VIDEOGRAPHER: The time is 6:13. We
10 are off the record.
11 (Break from 6:13 p.m. to 6:27 p.m.)
12 THE VIDEOGRAPHER: The time is 6:27 p.m.
13 We're back on the record.
14 EXAMINATION
15 BY MR. CICILIANO:
16 Q. Judge, as I introduced myself earlier, I'm
17 Dylan Ciciliano. I represent the debtors in this case.
18 I don't think I've had the pleasure to speak to you
19 before, and I do say it's been an interesting honor to
20 be able to tell a judge to stop talking at times.
21 Usually it's the other way around, so --
22 A. That's the truth.
23 Q. So where we start out, I believe towards the
24 end of the questioning you mentioned, in response to
25 Ackerman McQueen's counsel, that you were concerned with
Page 100

1 dozens of pleadings that I've read by Brewer and his
2 co-counsel.
3 Q. (BY MR. MASON) Are you aware of other board
4 members sharing those same concerns?
5 A. I don't think as sophisticated, but yes.
6 Q. Do you believe that Mr. LaPierre is currently
7 fit to lead the NRA?
8 A. What?
9 Q. Do you believe that Mr. LaPierre is currently
10 fit to lead the NRA?
11 MR. CICILIANO: Objection to form.
12 MR. WATSON: You can answer, Judge, to
13 the extent your opinion or your personal knowledge.
14 A. You know, I've known Wayne for a long, long
15 time, and he's in such a hole, I don't see how he gets
16 out.
17 MR. MASON: Thank you, Judge Journey. I
18 appreciate the time.
19 MR. WATSON: Did you pass the witness,
20 Brian?
21 MR. MASON: Yeah, I'll pass the witness.
22 MR. WATSON: Dylan, do you want to take a
23 break so I can check on my client, and then we can
24 finish up?
25 MR. CICILIANO: Absolutely. And just for
Page 99

1 some of the things that Brewer and his co-counsel had
2 filed. Is that co-counsel in reference to Garman Turner
3 & Gordon, my firm?
4 A. No. No. No. I mean, I'm talking about the
5 filings I read in the New York AG's case. Some of the
6 Ack-Mac litigation in Virginia and Dallas. The filings
7 in -- oh, what was it? The insurance case in New York.
8 I was trying to follow that as closely as I could.
9 Q. And you were reviewing those filings just to
10 get a sense of what was going on as a board member?
11 A. Yes.
12 Q. And when was that done?
13 A. I started -- actually, I started monitoring --
14 trying to monitor those things about three years ago
15 and, you know, did my best to try to follow them.
16 Q. And that's because they dealt with your
17 beloved organization, the NRA. Is that right?
18 A. What?
19 Q. And that's because -- you were reviewing them
20 for the past three years because you care about the NRA;
21 you wanted to know what was going on?
22 A. Yes.
23 Q. Okay. And I believe in this action -- let
24 me -- let me go in a little reverse order before I ask
25 you some specific questions, but go back through what
Page 101

26 (Pages 98 - 101)

1 counsel asked you.
2       Earlier -- I don't know if you recall -- you
3 were asked about several paragraphs in your motion to
4 appoint the examiner in which you recited that you had
5 some concerns with the governance, as well as things
6 that have happened at the NRA. Do you recall that?
7    A. Yes.
8    Q. And I objected to foundation, and I think you
9 said, well, I have learned a lot of this stuff from
10 reading the New York AG's complaint. Do you recall
11 that?
12   A. Yes.
13   Q. And you also are aware that the New York AG
14 claims that Ackerman McQueen has also taken actions that
15 were untoward. Isn't that right?
16   A. Yes.
17   Q. And is it because the New York AG says it that
18 you believe it to be true?
19   A. No.
20   Q. And in fact, you believe the New York AG has
21 an ulterior motive. Isn't that right?
22   A. I do believe she has a motive, yes.
23   Q. And what --
24   A. She said so when she was campaigning for
25 Attorney General.

Page 102

1 leading the witness with almost every question.
2       MR. MASON: Yeah. Are you treating the
3 witness as adverse, Dylan?
4       MR. CICILIANO: It's crossing him, and
5 it's at his deposition.
6       MR. MASON: Okay. So he's an adverse
7 witness, okay.
8       MR. CICILIANO: I didn't say he was an
9 adverse witness.
10      MR. MASON: You're treating him like one.
11      MR. CICILIANO: You can object to form,
12 if you want, Brian.
13      THE WITNESS: I love this. Keep going,
14 guys. Come on, I'm really enjoying this.
15      MR. PRONSKE: Judge, I think we need you
16 to rule on some of these evidence objections.
17      THE WITNESS: I would be happy to, but I
18 don't think that's my prerogative at this time. I might
19 be a little biased, too, so --
20   Q. (BY MR. CICILIANO) Do you believe the
21 dissolution is a financial issue?
22   A. I think dissolution would be a tragedy.
23   Q. Right. And I believe in the testimony you
24 said that you believe the New York Attorney General
25 wanted to put the money in her pocket?

Page 104

1    Q. Right. And when she was campaigning, she said
2 the NRA is akin to a terrorist organization. Isn't that
3 correct?
4    A. Among other things, yes.
5    Q. And you don't believe any of that to be true?
6    A. No.
7    Q. Okay. And you believe in the mission of the
8 NRA; isn't that right?
9    A. Yes.
10   Q. And that's why you've opposed the dismissal of
11 the bankruptcy. Right?
12   A. That's why what?
13   Q. You've opposed the dismissal of the
14 bankruptcy?
15   A. Yes.
16   Q. And you've opposed the imposition of a
17 trustee. Correct?
18   A. At this point, yes.
19   Q. And you certainly don't support the New York
20 AG's efforts to dissolve the NRA. Right?
21   A. That's correct.
22   Q. And you, in fact, believe that the dissolution
23 of the NRA would pose a financial issue for the NRA.
24 Isn't that right?
25      MR. PRONSKE: Object to the form. You're

Page 103

1    A. Well, it's pretty obvious from the New York
2 corporate code that if the dissolution is granted by the
3 New York courts, that she gets to keep the change and
4 then she can give it to any similar organization she
5 wants. And I mean, you know, Handgun Control does have
6 "gun" in the title.
7    Q. I would -- I would dare to say that I've said
8 about the exact same statement. So to the point,
9 though, is you don't want it to occur. Is that correct?
10   A. I'm sorry. What?
11   Q. You don't want that to occur. Is that right?
12   A. No, I do not.
13   Q. Now earlier in response to Mr. Mason, you said
14 tell Revan I said hello. Do you recall that?
15   A. Yes.
16   Q. Who is Revan.
17   A. Revan is Angus's son. Angus McQueen, Ackerman
18 McQueen.
19      MR. MASON: Just for the record, it's
20 "Revan."
21      THE WITNESS: Thank you so much. I
22 appreciate that. I do. "Revan," okay.
23   Q. (BY MR. CICILIANO) And do you know Revan?
24   A. No, I have not have the pleasure to meet him.
25   Q. Okay. So why did you say tell him hello?

Page 105

27 (Pages 102 - 105)

1    A.  Because I liked his father a lot.
2    Q.  And so you knew his father?
3    A.  Yes.
4    Q.  And did you have dealings with his father?
5    A.  I had conversations with him, but I'm never
6 the one that was in the deal, no.
7    Q.  When was the last time you had a conversation
8 with any of the McQueens?
9    A.  Oh, 25 years ago, although I did see Tony
10 Macerich at the Tulsa Gun Show with Wayne.  Golly, that
11 was ten years ago, 12, something like that.
12    Q.  So out of the last ten years, you haven't seen
13 anyone from -- either Angus McQueen or Revan McQueen?
14    A.  Except perhaps at the NRA's annual meetings
15 that I would attend.  That might be the only place.  I
16 just don't remember.
17    Q.  And since the litigation with the bankruptcy,
18 have you seen or -- the litigation with Ackerman McQueen
19 or this bankruptcy, have you seen or spoken with Angus
20 or Revan?
21    A.  No.  Angus has passed, and no, I have not
22 been able to -- I have not spoken with any of them.
23    Q.  Have you attempted to get into contact with
24 them?
25    A.  No.

Page 106

1    Q.  Do you doubt the allegations that the New York
2 Attorney General made about Ackerman McQueen in its
3 complaint?
4    A.  Well, as I said before, that it was apparent
5 to me from reading the petition on August 5th filed by
6 the New York Attorney General that that petition was
7 based upon discovery that had already been completed,
8 documents produced, testimony provided at depositions or
9 interviews by the attorney general staff.  I mean, they
10 interviewed a hundred past board members.
11    Q.  All right.  And -- but you don't have personal
12 knowledge of any of what occurred there.  Is that
13 correct?
14    A.  That's correct.
15    Q.  And I believe you mentioned the October 2020
16 board meeting, and you said it was something more like a
17 consent agenda.  Do you recall that?
18    A.  Yes.
19    Q.  And you said the board asked if anyone had any
20 objections.  Do you recall?
21    A.  Yes.
22    Q.  Now you could have objected.  Right?
23    A.  Certainly.
24    Q.  Did you object?
25    A.  No.

Page 107

1    Q.  Now you started a GoFundMe related to the NRA.
2 Isn't that correct?
3    A.  Yes.
4    Q.  And what is that GoFundMe called?
5    A.  Restore NRA.
6    Q.  Is anyone else involved in the formation of
7 that GoFundMe?
8    A.  Well, I had professionals help me, yes.  I've
9 been kind of busy.
10    Q.  When you say "professionals," IT
11 professionals?
12    A.  Political ones --
13    Q.  And who are those --
14    A.  -- who I've dealt with for decades in a
15 hundred campaigns I've worked on.
16    Q.  And who are those professionals?
17    A.  Singularis Group.
18    Q.  Anyone specifically at Singularis Group?
19    A.  Everybody that works there, I guess.  Mr. Van
20 Meteren.  You know, I know them all.  I've known them
21 all for a long time.  They're NRA members, and they
22 wanted to help.
23    Q.  Outside of the Singularis Group, was anyone
24 else involved in the formation of Restore The NRA?
25    A.  No.

Page 108

1    Q.  And what's the purpose of the GoFundMe?
2    A.  To keep me from having to give Jermaine my
3 cell tower.
4    Q.  Is your retirement plan based on the cell
5 phone tower?
6    A.  No, the cell tower is my play money.  You
7 know, the cell tower is my play money.  I have already
8 invested in like three retirements, so --
9    Q.  So if I understand you, the Restore The NRA
10 GoFundMe is being used to pay legal counsel in this
11 action?
12    A.  Yes.
13    Q.  Is anyone else, other than you personally or
14 the GoFundMe, contributing to the payment of legal
15 counsel?
16    A.  Yes.
17    Q.  And who is that?
18    A.  You know, there's a lot of people.  I mean, I
19 don't know.  I don't have that spreadsheet in front of
20 me.  It's probably over a hundred contributors.
21        MR. WATSON:  Object to the extent that
22 you're going to speculate, Judge.
23        THE WITNESS:  Yeah.
24        MR. WATSON:  If you don't know, you don't
25 know.

Page 109

28 (Pages 106 - 109)

1 A. Yeah, I don't know. Yeah, I don't have it in
2 front of me.
3 Q. (BY MR. CICILIANO) Do they only contribute to
4 you through the GoFundMe, or do they contribute to you
5 through other means?
6 A. No, they would like mail me checks made
7 payable to the law firm.
8 Q. And how did you reach out to those people to
9 solicit funds?
10 A. By every means I could find.
11 MR. WATSON: You know what? I am going
12 to object to this scope of questioning because it's
13 outside of Gerrit's direct.
14 THE WITNESS: Yeah.
15 MR. WATSON: I don't really -- this isn't
16 one of the topics that we agreed to.
17 MR. CICILIANO: Certainly, it does go to
18 bias. It also goes to any of his motives here.
19 MR. WATSON: Well, I mean you guys didn't
20 notice the deposition either, right?
21 MR. CICILIANO: It's not a 30(b)(6)
22 deposition. It's a percipient deposition, which
23 means --
24 MR. WATSON: That's true, but it's
25 outside the scope. If it's purely cross --

Page 110

1 A. Let me think. I would really need to look at
2 the list, you know. I really don't see how that's
3 relevant to anything here.
4 MR. WATSON: It's not, Judge.
5 A. I don't know what your motive is for asking.
6 MR. WATSON: Judge, if you don't know
7 something, you don't need to speculate. I mean, he can
8 ask a question, but if you don't know, you don't know --
9 THE WITNESS: Yeah.
10 MR. WATSON: -- because it's not in front
11 of you.
12 Go ahead.
13 Q. (BY MR. CICILIANO) Has Colonel North donated
14 money to you?
15 A. What?
16 Q. Has Colonel North donated money?
17 A. No. No.
18 Q. Have the Knoxs provided you any money?
19 A. No.
20 Q. Has Rocky Marshall provided you any funds?
21 A. I believe so.
22 Q. And is Rocky Marshall's representation being
23 paid through the Restore The NRA as well?
24 A. I think he's paid for some himself. You'll
25 have to ask him.

Page 112

1 MR. CICILIANO: It's not purely cross.
2 MR. WATSON: So it is a purely cross.
3 MR. CICILIANO: It's not purely cross.
4 MR. WATSON: Okay.
5 MR. CICILIANO: And it also gets into,
6 like I said, the motives and the basis for the motion.
7 Q. (BY MR. CICILIANO) Is anyone from Ackerman
8 McQueen providing you money?
9 A. No.
10 Q. Is anyone from the New York Attorney General
11 providing you money?
12 A. No.
13 Q. The New York government?
14 A. No.
15 Q. Are you receiving money --
16 A. I'm sure Cuomo is going to call me, yeah.
17 Q. I'm sure he's not making many calls.
18 But --
19 A. Yeah.
20 Q. -- are past board members contributing money?
21 A. Yes.
22 Q. Who are they?
23 A. Sitting board members and past ones, yes.
24 Q. Let's start with the past board members. What
25 past board members?

Page 111

1 Q. Okay. In this action you are being deposed,
2 the movants attempted to take your deposition all the
3 way back in February. Isn't that correct?
4 A. I remember having a conversation with my
5 counsel about that topic.
6 Q. And outside of -- and we have the emails. I
7 am just trying to give you a date range. Outside of --
8 not with your counsel, I apologize.
9 Outside of communications to your counsel,
10 have you had any direct communications with counsel for
11 the New York Attorney General or Ackerman McQueen?
12 A. No.
13 Q. And in your motion to appoint an examiner, you
14 state that the -- you or your counsel states that the
15 movant is a creditor holding both a liquidated claim and
16 a contingent liquidated claim. What's your
17 understanding of your liquidated claim?
18 MR. WATSON: Objection, calls for legal
19 conclusion. He's not a bankruptcy expert.
20 THE WITNESS: That's for sure.
21 A. Yeah, I only started learning about this on
22 January 16th.
23 MR. WATSON: And furthermore, it goes to
24 attorney/client privileges and things that have been
25 disclosed and discussed with him privately by his

Page 113

29 (Pages 110 - 113)

1 counsel, so I am instructing him not to answer that
2 question.
3         THE WITNESS:  Thank you.
4         MR. CICILIANO:  And I am trying to
5 establish standing for his motion.
6     Q.  (BY MR. CICILIANO)  So what is your
7 understanding of what your claim is?
8         MR. WATSON:  Same objection.
9         MR. CICILIANO:  And you're directing him
10 not to disclose what his claim is?
11        MR. WATSON:  I think he has disclosed
12 what his claim is.  We filed it in 2019.
13    Q.  (BY MR. CICILIANO)  And what is your
14 understanding of what that was?
15        MR. WATSON:  Judge, you can answer to the
16 extent of your knowledge of what in general terms your
17 claims are.
18        THE WITNESS:  Thank you.
19    A.  I am due reimbursement for travel to the board
20 meetings, and they are listed in -- I think it was the
21 third or the fourth filing in the bankruptcy.  I'm in
22 there.
23    Q.  (BY MR. CICILIANO)  Okay.  And do you have any
24 other claims against the NRA?
25    A.  Not that I'm aware of.

Page 114

1     Q.  And speaking of board meetings, you said the
2 second time around you took -- I believe you got on the
3 board in 2020.  Is that correct?
4     A.  Yes.
5     Q.  And as a board member that second time around,
6 you've only been to the October and the January meeting?
7     A.  Yes.
8     Q.  And when did you decide to run for the NRA
9 board the second time?
10    A.  At Indianapolis.
11        MR. WATSON:  Objection, form.
12        THE WITNESS:  Okay.
13        MR. WATSON:  You can answer, Judge.
14    A.  Well, I thought about it quite a while, and
15 then I went to Indianapolis and watched a meeting there
16 and went to -- I didn't get to go to the Friday meeting
17 because I was at the legal seminar, but I went to the
18 Saturday meeting that's the members meeting, and I
19 watched all that unfold.  And then I went to the board
20 meeting on the following Monday and got bits and pieces
21 of that, watched what I could, and that was when I said
22 I need to go help.
23    Q.  (BY MR. CICILIANO)  Did someone ask or
24 nominate you for the position?
25        MR. WATSON:  Objection.

Page 115

1     A.  I think --
2         MR. WATSON:  Objection, speculation.
3     A.  I think my wife did.  Yeah, someone had to
4 fill out the form.  I think my wife sent it in for me.
5     Q.  (BY MR. CICILIANO)  But no one came to you and
6 said, Judge Journey, we would really like you to be on
7 the board?
8         MR. WATSON:  Same objection, speculation.
9 Go ahead.
10    A.  All right.  No, there were -- there were
11 people, and I had several conversations at Indianapolis
12 with --
13    Q.  (BY MR. CICILIANO)  And who were --
14    A.  -- some current board members.
15    Q.  And who are those current board members?
16    A.  I remember having a conversation with Marion
17 Hammer and Sandy Froman and Herb Lanford and Dan --
18 there were several that I talked to that I can't
19 identify because I don't know them that well and I
20 didn't remember their names, but I knew they had the
21 little pin on and so I knew who to talk to.
22    A.  All right.  And in running for the NRA board,
23 did you place or take out any ads?
24        MR. WATSON:  Objection to form.
25        You can answer.

Page 116

1     A.  I didn't have any ads.
2     Q.  (BY MR. CICILIANO)  Did you do any other type
3 of campaigning?
4         MR. WATSON:  Objection to form.
5     A.  Yes.
6         MR. WATSON:  You can answer.
7     A.  Yes.  I had flyers.  I went to the National
8 Gun Rights Policy Conference and spoke with lots of
9 people there.  And then I wrote some pieces that were
10 published on the Internet on gun forums, you know, on
11 gun rights forums about what I wanted to do and why.
12    Q.  (BY MR. CICILIANO)  And did you fund all that
13 yourself?
14        MR. WATSON:  Objection to form.
15        You can answer.
16    A.  I do most of my own writing, yes.
17    Q.  (BY MR. CICILIANO)  Did you fund it --
18    A.  Although I do edit my own stuff, so I have
19 somebody else proofread it for me.
20    Q.  I have the same problems.  But did you fund,
21 did you pay for the flyers and the like yourself?
22        MR. WATSON:  Objection to form.
23        You can answer.
24    A.  Yeah, I've still got the digital file
25 somewhere.  Yeah, I handed them out at gun shows.  I

Page 117

30 (Pages 114 - 117)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1 went to gun shows all over the Midwest. I was going to
2 go to one in Vegas, but they didn't want me handing them
3 out there.
4     Q. (BY MR. CICILIANO) Did you speak or have you
5 spoken with anyone affiliated with the New York Attorney
6 General?
7         MR. WATSON: Objection, form. Objection
8 to form, and it calls for speculation.
9         THE WITNESS: Yeah.
10         MR. WATSON: And I think he's already
11 answered the question.
12     So I'm thinking you don't need to answer that
13 question, Judge.
14         MR. CICILIANO: It's a little bit
15 different.
16     Q. (BY MR. CICILIANO) Since the filing of the
17 New York Attorney General action, have you spoken with
18 anyone affiliated with the New York Attorney General's
19 office?
20         MR. WATSON: Same objection. He's
21 answered the question.
22     A. And the answer's no.
23     Q. (BY MR. CICILIANO) When was the last time you
24 spoke with Jeff Knox?
25     A. About three hours ago.

Page 118

1 speculation.
2     A. That one I don't. I think he was curious, I
3 guess.
4     Q. (BY MR. CICILIANO) He was curious about how
5 to notice a special meeting?
6         MR. WATSON: Objection to form.
7     A. That's a big assumption. No. He was asking
8 about the bylaws regarding calling the meeting, and then
9 he wasn't aware that -- he thought I had already had the
10 deposition, and I explained to him what happened at the
11 previous setting and that we were going to go shortly
12 and I had to let him go because I had to come meet you
13 all.
14     Q. (BY MR. CICILIANO) So you had previously
15 spoken with Mr. Knox about your deposition. Is that
16 correct?
17     A. I think --
18         MR. WATSON: Objection to form. It
19 mischaracterizes his testimony. I think --
20     A. I think --
21         MR. WATSON: Hold on, Judge. Hold on
22 before you say anything else.
23     That mischaracterizes his testimony. That's
24 not what he said.
25     Q. (BY MR. CICILIANO) Have you previously spoken

Page 120

1     Q. And what did you speak with Mr. Knox about?
2     A. How he got the bylaws wrong, saying that it
3 was a 30-day window to call an emergency board meeting
4 when the bylaws had been changed and it was only seven.
5     Q. So you were consulting with Mr. Knox regarding
6 the nature -- when you say "the bylaws," the NRA's
7 bylaws?
8     A. I think it was the other way around. I think
9 he was asking me.
10     Q. About the NRA's bylaws?
11     A. Yes.
12     Q. Did you talk about anything else with him at
13 that time?
14         MR. WATSON: Objection to the form,
15 speculation.
16     A. Just how much fun I was going to have this
17 afternoon.
18     Q. (BY MR. CICILIANO) And what precipitated the
19 conversation?
20     A. He called me.
21         MR. WATSON: Objection to form.
22     A. Yeah, he called me.
23     Q. (BY MR. CICILIANO) And do you know why he
24 called you?
25         MR. WATSON: Objection to form,

Page 119

1 with Mr. Knox about your deposition?
2     A. I believe we did communicate, and I told him
3 that it was set and I was curious on your
4 interrogatories how you want me to tell you about my
5 talking to reporters. I mean, I can talk about The New
6 York Times, The Wall Street Journal or others that I've
7 been in conversations with, too.
8     Q. So when was the first --
9     A. And I know with Knox it's kind of personal
10 with everybody back in Fairfax.
11     Q. So when was the first time you talked with
12 Mr. Knox about your deposition?
13     A. I don't know.
14     Q. Shortly -- how many times have you talked with
15 Mr. Knox about your deposition?
16         MR. WATSON: Objection, asked and
17 answered.
18     A. I don't know. I've been talking to a lot of
19 people. You know, it's hell when you're popular.
20     Q. (BY MR. CICILIANO) It's hell when you're
21 what?
22     A. It's hell when you're popular.
23     Q. When did you speak to The New York Times?
24     A. They're waiting on a call.
25     Q. So have you spoken to them yet?

Page 121

31 (Pages 118 - 121)

1 A. Yes. We've been in communication.
2 Q. Have you provided them any documents?
3 A. No. I haven't provided anybody documents.
4 Q. What did you tell The New York Times?
5 A. Actually, they were asking me questions. A
6 lot of them I won't answer. But essentially along the
7 same lines you all have been talking about, and I told
8 them I would prefer to wait until after this. So, you
9 know -- because I knew what was going to happen with the
10 Free Beacon's interview.
11 Q. And when you say there was a lot of questions
12 you wouldn't answer from The New York Times, what were
13 those questions?
14 A. Very similar to the ones I wouldn't answer for
15 you all.
16 Q. Regarding what occurred during the special --
17 A. Yeah, they want to know what happened in the
18 executive session.
19 Q. And when was the last time you spoke with The
20 Wall Street Journal?
21 A. 48 hours ago.
22 Q. And what did you tell them?
23 A. That I wanted to wait until after this.
24 Q. "This" being the deposition?
25 A. Yes.

Page 122

1 Q. Okay. After this deposition, you intend to
2 speak to both The New York Times and The Wall Street
3 Journal?
4 A. Among others.
5 Q. What are the others?
6 A. I've got to look at my phone. Let's see. Oh,
7 ABC, somebody in Europe. I don't know who that is. And
8 another guy in Australia, a friend of mine.
9 Q. And the intent there is to give an interview
10 to all those news outlets. Is that correct?
11 A. We'll see. I may. I may not.
12     MR. WATSON: Objection. That's
13 speculation.
14 A. That is, yeah.
15 Q. (BY MR. CICILIANO) And what's your motivation
16 for talking to The New York Times?
17     MR. WATSON: Objection, speculation,
18 because it assumes facts not in evidence.
19 A. I would think that it would be obvious that
20 there would be a number of tasks that could be
21 accomplished. One, it would be to help with the
22 fundraising to keep this issue in front of the public's
23 eye so that members know that there's somebody out there
24 that's trying to represent them and so that members know
25 that there's somebody out there trying to get to the

Page 123

1 bottom of the controversies that have swirled around NRA
2 for years. You know, I can't go to a gun club meeting.
3 I can't go to a gun show. I can't go to our Kroger
4 store and not have somebody ask me about this, because
5 they all know that in Kansas I'm the guy. You know, I'm
6 the guy that wrote "Right to Carry." I'm the guy that
7 wrote "Preemption." I'm the guy that wrote,
8 "Legalization of Title II," "Firearms and Devices." In
9 Kansas there's only one person that's been at the
10 forefront of this since the 1980s, and that's me. So
11 everybody knows me. Everybody asks.
12 Q. (BY MR. CICILIANO) And you're willing to tell
13 anyone who asks. Right?
14 A. What?
15 Q. And you are willing to tell anyone that asks.
16 Isn't that right?
17     MR. WATSON: Objection, calls for
18 speculation.
19     MR. MASON: Misstates his testimony.
20     MR. WATSON: It misstates facts in
21 evidence.
22     THE WITNESS: Yeah, I don't like that
23 question. That's not true, and I don't like the
24 supposition that comes with it.
25     MR. WATSON: And you don't have to answer

Page 124

1 it, Judge.
2     THE WITNESS: Thank you.
3     MR. CICILIANO: So you're directing him
4 not to answer?
5     MR. WATSON: Well, is there a question or
6 is it you testifying?
7     MR. CICILIANO: Yeah, it's an absolute
8 question.
9     MR. WATSON: Okay. Would you restate it?
10     MR. CICILIANO: Okay.
11 Q. (BY MR. CICILIANO) You'll talk to anyone
12 about the NRA that asks. Isn't that right?
13 A. No, that's not.
14     MR. WATSON: Okay. There you go. You
15 got your answer.
16 Q. (BY MR. CICILIANO) So who have you refused to
17 talk to?
18     MR. WATSON: Objection, speculation.
19 A. The ones I believe that would not be able to
20 add to the conversation or would use information to the
21 detriment of the association.
22 Q. (BY MR. CICILIANO) And I believe in your
23 article -- or I believe in your article that you posted
24 when you were running for the board, you had commented
25 that The New York Times -- certainly you question the

Page 125

32 (Pages 122 - 125)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1 veracity of what The New York Times publishes. Isn't
2 that true?
3     A.  Yes.
4     Q.  But yet you would speak to them even though
5 they may not have the best interest of the NRA at heart.
6 Right?
7         MR. WATSON:  Objection, calls for legal
8 conclusion, calls for speculation, and also assumes
9 facts not in evidence.
10        You can answer the question, Judge, but --
11    A.  I may not -- I may not believe The New York
12 Times, but I don't mind using them.
13    Q.  (BY MR. CICILIANO)  And that's using them
14 truly to get the message out that the NRA has a good
15 purpose at its core.  Isn't that right?
16    A.  I think my message is quite clear, because
17 you've read the article that I wrote on ammo.  So, you
18 know, outside of that, I'm sure you've read the other
19 articles I've written, too, about political action and
20 how to keep the election cycle from melting down as it
21 did.
22    Q.  And so what -- I mean, just succinctly, what
23 is your message?
24    A.  My message is that I want to restore trust
25 between the leadership and the membership of NRA.
                                            Page 126

1     Q.  And that only occurs through the continued
2 existence of the NRA.  Isn't that correct?
3     A.  I certainly want the NRA to continue to exist,
4 yes.
5     Q.  Now I believe in -- you don't -- or pardon me.
6         You spoke at length, I believe, with my
7 colleagues on the other side about whether or not there
8 was authority to file the bankruptcy.  Do you recall
9 that?
10    A.  Yes.
11    Q.  And despite your position that you think that
12 there may not have been authority, you don't oppose the
13 bankruptcy.  Correct?
14    A.  I don't know about that.  You know, I don't
15 oppose the move to Texas, is what we said in the
16 petition.  I don't know that the bankruptcy was
17 necessary to accomplish that.  And I think the
18 motivation, as I see it for the bankruptcy, told me a
19 lot about the quality of the lawsuit in New York.
20    Q.  And in fact, your pleadings, though, do say
21 these bankruptcy cases may represent the only path
22 forward to preserve the NRA for the benefit of its
23 creditors, members and other interested parties.  Isn't
24 that right?
25    A.  I think that's a recognition of the legal
                                            Page 127

1 reality that could occur, yes.
2     Q.  And likewise, you said dismissing these
3 bankruptcies could very likely result in the termination
4 of the NRA as a going concern.  Isn't that right?
5         MR. WATSON:  Objection, calls for legal
6 conclusion.
7     A.  What paragraph?
8     Q.  (BY MR. CICILIANO)  I was -- it was in your
9 opposition to the New York Attorney General's dismissal
10 of the -- or request to dismiss the bankruptcy?
11        MR. WATSON:  I believe that if we're
12 going to talk about documents that you're reading from,
13 I think they should be put into evidence so he can know
14 what you're referencing.
15        MR. CICILIANO:  Sure, that would be fine.
16        THE WITNESS:  That would be really
17 helpful, because I mean, you know, I've read hundreds of
18 documents, you know.  Think about what I do every day.
19        MR. CICILIANO:  I appreciate that.  And
20 Counsel, I am trying not to string this along so we
21 can -- so I will ask one more question, and I don't need
22 to put the document up.
23    Q.  (BY MR. CICILIANO)  But do you believe
24 dismissing these bankruptcy cases could likely --
25        MR. WATSON:  Okay.  Before you go
                                            Page 128

1 further, then I would object and I would say that the
2 pleadings speak for themselves, but go ahead.
3         MR. CICILIANO:  Okay.
4     Q.  (BY MR. CICILIANO)  Do you believe, Judge,
5 that dismissing these bankruptcy cases could very likely
6 result in the termination of the NRA as a going concern?
7         MR. WATSON:  Objection, calls for legal
8 conclusion.
9         But to the extent you're not making a legal
10 judgment, Judge, you can answer based on your
11 understanding.
12    A.  Yeah, I don't know what the judge in the
13 bankruptcy case is going to do, you know.  I mean, this
14 thing could go so many different ways.  And I know that
15 the way I would like to see it go would be to restore
16 corporate governance, put the safeguards -- turn the
17 safety switches back on, restore trust and relationship
18 between the leadership and the membership and keep
19 general operations running, because I think everybody
20 else, except for the debtors' counsel and us, want to
21 kill the cow rather than milk it.
22    Q.  (BY MR. CICILIANO)  You're saying that
23 debtors' counsel wants to kill the cow or --
24    A.  No.  I'm saying you're the only one with me
25 that doesn't want to kill the cow.
                                            Page 129

33 (Pages 126 - 129)

1  Q.  Well, I appreciate you saying that.  And I
2  do -- so you do believe that through the bankruptcy it's
3  possible to restore the corporate governance and restore
4  the trust in those other factors you talked about?
5      A.  That's -- that's my goal.
6      Q.  And is there any reason that you -- well, do
7  you doubt the independence of the unsecured creditors
8  committee?
9          MR. WATSON:  Objection.  Objection to
10 form, and it calls for speculation and possible motives
11 of a party that's not even present.  I think they have
12 representatives, but they're not even active in this
13 deposition.
14         But subject to those objections, Judge, you
15 can give your opinion about what you think -- your
16 feelings on the committee.
17     A.  Well, the creditor's committee.  Isn't that
18 special?  That, you know, we end up with what the New
19 York Attorney General could call a co-conspirator end up
20 running the investigation and act as a trustee on the
21 creditor's committee.  I don't know how anybody gets
22 around that concept.
23     Q.  (BY MR. CICILIANO)  And you're talking about
24 Ackerman McQueen?
25     A.  Yes.

Page 130

1  Q.  You're aware that the creditor's committee,
2  though, has opposed the request that they seek.  Right?
3      A.  I thought Ackerman McQueen filed a motion to
4  dismiss the case and appoint a trustee.
5      Q.  Yes, but the creditor's committee has opposed
6  that relief.  Are you --
7          MR. WATSON:  I am going to object to the
8  instruction.
9      A.  I don't know about that.
10         MR. WATSON:  Well, hold on, Judge.
11         THE WITNESS:  Okay.
12         MR. WATSON:  To the extent you know
13 something, you can testify to it; and to the extent you
14 don't, you shouldn't.  Okay?
15         THE WITNESS:  Thank you.
16         MR. WATSON:  Do you want to reask your
17 question, Dylan?
18         MR. CICILIANO:  Yeah, sure.
19     Q.  (BY MR. CICILIANO)  Are you aware that the
20 unsecured creditors committee has objected to the relief
21 sought by Ackerman McQueen to dismiss the action and
22 appoint a trustee?
23     A.  I have not had an opportunity to review that
24 filing.
25     Q.  And honestly, sir, what I am trying to figure

Page 131

1  out here is are you aware that the unsecured creditors
2  committee has the power to investigate claims?
3      A.  Yes.
4      Q.  Okay.  And they have the ability to examine
5  the debtors' pre- and post-petition management?
6      A.  Yes.
7      Q.  And are you aware that the unsecured creditors
8  committee has the ability to monitor the -- or
9  investigate the management practices being employed by
10 the operation of the NRA?
11         MR. WATSON:  Objection.  Objection, calls
12 for legal conclusions.  The judge is not a bankruptcy
13 lawyer.  He's not -- he just said that he hasn't read
14 the most recent filing of the committee, so I don't
15 think it's fair to have him speculate about what the
16 committee's powers are.  And he's not aware of it.
17         MR. CICILIANO:  I appreciate that.  And
18 the learned judge has also testified to what he believes
19 requires corporate authority.  So I am just asking
20 whether or not he was aware that the unsecured creditors
21 committee has the ability to investigate the management
22 practices of the NRA.
23         MR. WATSON:  But do you know -- to the
24 extent you know that, Judge, you can answer to the
25 extent you know; but if you don't know, then you don't

Page 132

1  know.
2      A.  My -- my very limited understanding that I
3  have gained of Chapter 11 law since January 15th tells
4  me that the creditors committee acts kind of like the
5  trustee until a trustee or an examiner is appointed.
6  You know, I could be wrong on that.  I probably need to
7  ask Jermaine.
8      Q.  (BY MR. CICILIANO)  Okay.  And I certainly
9  don't want you to ask Jermaine here.  I'm just
10 wondering -- I'm just wondering is there a reason why
11 the creditors committee can't do the same things that
12 you're proposing an examiner would do?
13         MR. WATSON:  Again, calls for legal
14 conclusion and speculation about things that, you know,
15 he doesn't have knowledge of.  He's not an expert in
16 bankruptcy.
17         And again, Judge, to the extent you understand
18 what a committee does and what it can and cannot do, you
19 can answer; but to the extent you don't, I am going to
20 instruct you not to answer.
21     A.  I don't know what they're doing.  I haven't
22 seen anything that they've done that would be along
23 those lines of an investigation, but, you know, you guys
24 are all inside.  I have listened to a couple of 341
25 meetings and I think the hearing on Monday, and that was

Page 133

34 (Pages 130 - 133)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1 about it. I really enjoyed that first motion docket.
2 That was fun to watch. When you had like a hundred
3 lawyers on the screen, that was the craziest thing I've
4 ever seen.
5     Q.  (BY MR. CICILIANO)  We may be able to agree to
6 that.
7         What I am trying to get to here is that you
8 filed a motion to appoint an examiner, and I am trying
9 to understand what you think the examiner can do that
10 the unsecured creditors committee won't do.
11        MR. WATSON:  I am going to object to that
12 question because I think the pleadings that Judge
13 Journey has authorized, both in our motion and in the
14 response to the other pending motions, speak for
15 themselves and are the best evidence of what he
16 understands an examiner's position to be.
17        But to the extent you know, Judge -- to the
18 extent you can answer his question that you know, you
19 know --
20        THE WITNESS:  Yes --
21        MR. WATSON:  -- definitively, you can
22 answer.
23     A.  The reason I asked for an examiner was because
24 I felt it was necessary, given the past history, that a
25 neutral and objective investigator and factfinder needed

Page 134

1 to go in because I had essentially staff, counsel or
2 others I believe misrepresent things to me, and so the
3 trust I had evaporated on January 15th.
4     Q.  (BY MR. CICILIANO)  I appreciate that.  And
5 going back to, I think, what you said earlier, you don't
6 have any reason to doubt or question my firm.  Is that
7 right?
8     A.  I don't have any reason to question you, no.
9     Q.  Okay.  And you believe that the appointment of
10 a trustee would be overly destructive to the NRA's
11 operations.  Is that correct?
12        MR. WATSON:  I am going to object to the
13 extent you're reading from pleadings filed in the case
14 because they speak for themselves.
15        And to the extent --
16        MR. CICILIANO:  I am reading from my
17 notes.
18        MR. WATSON:  Okay.  But to the extent you
19 are, those pleadings speak for themselves.
20        But Judge, to the extent you know, you can
21 answer.
22     A.  I thought the examiner path was the best path
23 to take because it was the way to find out whether the
24 accusations that have been surrounding NRA for so long
25 are true or not true.  Because, you know, every day --

Page 135

1 every day I end up with he said/she said in family law.
2 And you know, I knew I couldn't do the investigation.  I
3 don't have time for it.  And once they went into
4 bankruptcy court, I wanted to look at my options and I
5 thought the examiner position was the best to find out
6 what's going on.  Now, you know, depending on what the
7 examiner finds, I may change my position.
8     Q.  (BY MR. CICILIANO)  But right now you're just
9 trying to get to the bottom of things.  That's accurate?
10     A.  That's exactly -- that's a nice way to put it,
11 yeah.
12     Q.  Now I marked some of the same paragraphs that
13 opposing counsel did to ask you about, and I just want
14 to follow up and just confirm.
15        When you would say things, I believe in your
16 pleadings, upon information and belief the NRA violated
17 its fiduciary duties under New York law, that was based
18 on what you read from the AG's complaint.  Is that
19 right?
20        MR. WATSON:  Objection to form.  I think
21 it calls for legal conclusions.
22        But go ahead, Judge.
23        THE WITNESS:  Okay.  I'm sorry.  I'm
24 sorry, Jermaine.
25        MR. WATSON:  And -- well, and I have

Page 136

1 another objection, too.
2        To the extent it mischaracterizes his
3 testimony, because I don't believe he testified to that.
4 I believe he said it was his opinion, and he gave the
5 basis for his opinion.
6        But subject to those objections, you can
7 answer, Judge.
8        THE WITNESS:  Thank you.
9     A.  The New York Attorney General's petition was
10 not the only source of information, that it includes
11 thousands of articles that have been in magazines or
12 newspapers over the past five to six years that I have
13 compiled as I followed the association.
14     Q.  (BY MR. CICILIANO)  And I believe you
15 testified that you think the corporate governance needs
16 to be restored.  Is that correct?
17     A.  Yes.
18     Q.  And what's the basis for that belief?
19     A.  The fact that -- there's so many things.  It
20 appeared to me in reviewing the articles, my personal
21 observations at functions, such as the NRA board
22 meetings, at the annual meetings, that the review of the
23 newspaper articles, the petitions filed by the New York
24 Attorney General and don't forget the Washington, D.C.
25 one, too, all gave me great concern regarding the

Page 137

35 (Pages 134 - 137)

1 corporate governance and essentially the safety switches
2 all being bypassed, whether it's the audit committee or
3 other subentities inside the NRA.
4    Q.  I believe you testified to the effect that you
5 don't know how Wayne LaPierre can get out of this.  Is
6 that right?
7       MR. WATSON:  Objection.
8    A.  I don't --
9       MR. WATSON:  Objection.  Objection.  Hold
10 on.  That mischaracterizes his testimony.
11      THE WITNESS:  Yeah.
12      MR. WATSON:  That wasn't the complete
13 nature of his testimony.
14      But you can answer.  You can answer, Judge.
15   A.  I --
16   Q.  (BY MR. CICILIANO)  You don't see how he gets
17 out, is that what you said?  Sorry.
18      MR. WATSON:  Same objection.
19      Go ahead, Judge.
20   A.  You know, I've got to tell you that when I was
21 at the January board meeting, when I saw Wayne, I had
22 great concern for him and his health.  It was apparent
23 to me that he is subject to a significant amount of
24 stress because of all of these things going around.
25 And, you know, I want to say that I empathized with him,

Page 138

1    Q.  And so every three years, you have a new
2 batch of directors.  Is that right?  Well, sorry, not a
3 new batch.  Let me take a step back.
4       At least every three years, each director is
5 then up for reelection again.  Is that right?
6       MR. WATSON:  Objection.  Objection, it
7 calls for speculation.
8       And you can answer to the extent that you
9 know, Judge, but --
10      THE WITNESS:  Yeah, thank you.
11   A.  Board members are generally elected for a
12 three-year period, but if they're elected to fill an
13 unexpired term of a member that's resigned of the board,
14 then they could be elected.  For example, there were --
15 I think in the last election, there were 25 three-year
16 terms, two or three two-year terms, and one or two
17 one-year terms that all were on the same ballot because
18 they were filling the slots for people that had left the
19 board.
20   Q.  (BY MR. CICILIANO)  Okay.  Put another way,
21 though, at least once every three years directors are
22 accountable to the members who can either elect them or
23 not elect them.  Correct?
24   A.  That's true.
25   Q.  And every year the directors are able to elect

Page 140

1 and I can't imagine what he's going through right now.
2       You know, you have to understand that I've
3 known all these people for decades.  You know, it's not
4 like I walk in off the street and meet a stranger.  You
5 know, I knew Wayne before he was EVP, when he was
6 running in Iowa, and I went and interviewed for a job
7 with him.
8    Q.  (BY MR. CICILIANO)  So I may have
9 misunderstood you.  When you said you don't see how he
10 gets out and then talked about concerns about his health
11 and the like, are you saying you don't know how he could
12 personally weather this or how he could -- how this
13 could resolve with him still being in charge of the NRA?
14   A.  All of the above.
15   Q.  Okay.  And the EVP is appointed.  Isn't that
16 right?
17   A.  No, the EVP is elected by the board.
18   Q.  Okay.  And how often is he elected?
19   A.  Annually.
20   Q.  And the members elect -- the members elect
21 one-third of the directors every three years.  Is that
22 right?
23   A.  Essentially, yes, but there are fluctuations
24 because there have been so many resignations from the
25 board.

Page 139

1 the EVP.  Is that correct?
2    A.  That's true.
3    Q.  And in fact, you yourself approved the
4 contract of Mr. LaPierre.  Is that right?
5    A.  Yes.  He was elected EVP on October 24th.
6    Q.  And I believe you said you started reading
7 about the lawsuits with the NRA three years ago.  Right?
8    A.  Yes.
9    Q.  And you were certainly aware of the New York
10 Attorney General's allegations well before January.
11 Correct?
12   A.  Yes.  I read that opinion on the 5th, on
13 August 5th.  I actually threw up about 40 pages in.
14      MR. CICILIANO:  And counsel, if I could
15 have probably five minutes just to confer with my
16 colleagues, I may be done.
17      MR. WATSON:  Sure.  How much more time do
18 you anticipate?
19      MR. CICILIANO:  I don't know that I'll
20 need any more time is what I'm saying.  I just want to
21 check.
22      MR. WATSON:  Okay.  Sure.  We can go off
23 the record.
24      THE VIDEOGRAPHER:  The time is 7:16.  We
25 are off the record.

Page 141

36 (Pages 138 - 141)

1    (Break from 7:16 p.m. to 7:23 p.m.)
2    THE VIDEOGRAPHER: The time is 7:23.
3 We're back on the record.
4    Q. (BY MR. CICILIANO) Judge Journey, previously
5 we testified -- or we talked about some of the
6 allegations in the New York AG's complaint. You're
7 familiar with the allegations they make. Is that
8 correct?
9    A. Yes.
10    Q. Do you have personal percipient knowledge of
11 the allegations in the complaint?
12    A. No.
13    Q. You're familiar with the allegations that the
14 Washington, D.C. Attorney General has made. Is that
15 correct?
16    A. Yes.
17    Q. Do you have personal percipient knowledge of
18 those allegations?
19    A. No.
20    Q. You talked about governance failures at the
21 NRA. Do you have personal knowledge of governance
22 failures.
23    A. Only what I saw.
24    Q. Okay. And aside from what may have occurred
25 in special sessions or otherwise in the presence of

Page 142

1    Q. You said perhaps in some instances. Do you
2 have evidence that they were inaccurate?
3    A. I have evidence that they're sure as hell hard
4 to read, that they don't impart a reasonable view or
5 description of the financial status. Often they're
6 brought out of context and without the juxtaposition
7 next to previous years for comparison purposes. I
8 certainly would like to have a more easily
9 understandable picture presented to the board and to me
10 about the financial circumstances surrounding any period
11 of time that they oversee the NRA's operations.
12    Q. So it would be fair to say you're looking for
13 robust accounting?
14    MR. WATSON: Objection, mischaracterizes
15 testimony.
16    A. Well, among other things.
17    Q. (BY MR. CICILIANO) And other things,
18 comparisons to previous years. That's one of them?
19    A. Well, if one is going to determine where
20 you're at, you need to know where you've been. It's
21 like following a roadmap. If you see trends occurring
22 over a five-year period, it may give you an indication
23 that something needs to happen or something needs to be
24 corrected. But when you're looking at a financial
25 statement for the last quarter without the context, it's

Page 144

1 counsel providing advice, what did you see as far as
2 governance failures?
3    A. Well, I explained earlier how shocked I was at
4 the way the board operated at the October 24th board
5 meeting following the annual meeting in Tucson, that it
6 ran like a consent agenda. I know what that is. I know
7 what its purpose is under Robert's Rules of Order, and
8 it quite clearly was abused at that place and time.
9    Q. So aside from that instance at that meeting in
10 October, have you seen any other -- or do you have
11 personal knowledge of any other governance failures?
12    A. I think it was apparent at the January 7th
13 meeting that the governance failure was at the hand that
14 is at the heart of my motion.
15    Q. All right. So aside from what's in your
16 motion, was there anything else?
17    A. Not that comes to mind at this moment.
18    Q. You mentioned, I believe, accounting failures.
19 Are you -- do you have any personal knowledge of
20 accounting failures occurring at the NRA?
21    A. I don't know if I would call it accounting
22 failure or not, but I have to say that the financial
23 statements that I've had the opportunity to review are
24 less than informative and perhaps in some instances have
25 been far less than accurate.

Page 143

1 much more difficult to come to any reasonable conclusion
2 other than what they tell you.
3    Q. As a member of the board, have you looked at
4 the bylaws to see what you could propose to make those
5 changes?
6    MR. WATSON: Objection to form,
7 speculation -- speculative.
8    A. I don't know that the bylaws would provide the
9 answer to the question that needs to be corrected. It's
10 not the bylaws themselves. It's the application of
11 those bylaws by staff and officers that has come up
12 short. I don't know that the bylaws aren't fine. It's
13 just they don't seem to follow them until they need to.
14    Q. (BY MR. CICILIANO) And as a board member,
15 what have you done to promote management and staff
16 following the bylaws?
17    A. I have expressed concerns over a much longer
18 period of time than my short service in this term on the
19 board. I mean, you know, of the last, what, since
20 October 24th, what, I've been in a room with the other
21 board members for about four and a half hours. You
22 know, what can you get done then? I haven't had
23 committee meetings. We would have a social function.
24 And you know, there are certain things that you can
25 bring up there, but you certainly don't want to jump on

Page 145

37 (Pages 142 - 145)