CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1 a soapbox in that context.
2 Q. Certainly, sir, you've had a number of
3 communications, I think you talked about, with your
4 board members. Since the filing of the bankruptcy, have
5 you brought up any of these issues to them and come up
6 with a way to fine tune the organization?
7       MR. WATSON: Objection, speculation.
8 A. It's not unusual to try to address that topic
9 in that way, but I came to the conclusion on January
10 15th that it had gone much farther than it -- than it
11 can be pulled back and corrected.
12 Q. (BY MR. CICILIANO) But you believe that the
13 bankruptcy process could help it be pulled back and
14 corrected. Is that right?
15 A. Yes, and --
16       MR. WATSON: Objection. I mean, he's
17 answered that question.
18       THE WITNESS: Yeah.
19 Q. (BY MR. CICILIANO) That answer was a yes?
20 A. So the bankruptcy filing is --
21       MR. WATSON: Same objection.
22 A. The bankruptcy filing is actually the symptom
23 of a disease.
24 Q. (BY MR. CICILIANO) Now do you have any
25 personal knowledge of any failures of the current audit

Page 146

1 committee?
2 A. Not personal knowledge, other than what I've
3 read in the minutes and in the petitions.
4 Q. When you say the petitions, the petitions of
5 the movants here in this case for trustee and a
6 dismissal?
7 A. No, the petition -- that's not a petition;
8 that's a motion. No, the petitions filed by the New
9 York Attorney General in that New York case and the
10 petition filed by the Washington, D.C. Attorney General
11 in that case against The NRA Foundation.
12 Q. You made me laugh when you schooled me on the
13 difference between a petition and a motion. I
14 appreciate that.
15 A. I thought you saw that humor there, too.
16 Q. I did.
17       You mentioned that you have TV tomorrow. Are
18 you going on TV to talk about this case?
19 A. No. I told them I can't talk about this case
20 on TV. But, no, we're going to talk about my friend,
21 who is senate majority leader, got a DUI. And we had a
22 new trial ordered in a rape. My two friends are running
23 for governor against each other, Governor Colyer and the
24 Attorney General. And then -- oh, they passed a bill on
25 transgender women playing in female sports in high

Page 147

1 school. And then -- oh. Oh. We're going to have the
2 Eddie Eagle program statewide. That's a good one. And
3 then -- you know, actually in -- what was it, '92, '93
4 I got Eddie Eagle adopted by the largest school district
5 ever, you know.
6 Q. There you go. Well, to the extent my name
7 comes up, speak good words of me. And I appreciate you
8 being here.
9       MR. CICILIANO: I don't have any further
10 questions.
11       MR. WATSON: Anyone else?
12       MR. PRONSKE: I have got a few more.
13       THE WITNESS: Oh, I knew someone would
14 have redirect. Okay.
15       MR. HENDRIX: Real quick, before you go,
16 Gerrit, this is Nick Hendrix for the Committee. And I
17 think we'll go ahead and just reserve any questions we
18 have for the hearing.
19       MR. PRONSKE: Okay.
20       MR. WATSON: Well, how much time is left,
21 Julie?
22       THE REPORTER: Let's see. Now we're at
23 2:49. 2:49.
24       MR. WATSON: Okay.
25       FURTHER EXAMINATION

Page 148

1 BY MR. PRONSKE:
2 Q. Judge, you testified that your trust in the
3 NRA evaporated on January 15th. Can you tell the Court
4 what happened on January 15th and the reason that your
5 trust evaporated?
6 A. You know that answer. Come on. You know,
7 okay, so, yeah, that's when I found out about the
8 bankruptcy.
9 Q. Okay. And what is it about finding out about
10 the bankruptcy that evaporated your trust?
11       MR. CICILIANO: And I would just object
12 and warn the witness not to reveal anything that
13 occurred during the executive sessions of the board
14 meeting that could be privileged.
15       MR. WATSON: He's answered this question,
16 Gerrit. I mean, he's answered your question, so I am
17 going to object, asked and answered.
18       MR. PRONSKE: In the time it took to make
19 those objections, I think he could have answered two or
20 three times.
21 Q. (BY MR. PRONSKE) Go ahead and answer, Judge.
22 A. What was it again? You guys talk -- I listen
23 to you guys talk so much, I forget --
24 Q. What was it about finding out about the
25 bankruptcy on January 15th that evaporated your trust?

Page 149

38 (Pages 146 - 149)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1    A.  I think you pointed that out when we talked
2 about the Free Beacon article, that I came to the
3 conclusion that I had not been dealt with in good faith
4 or in a forthright manner that I expect of counsel or
5 officers who I am supposed to oversee.
6    Q.  Okay.  And you also testified in questioning
7 from Mr. Ciciliano that when he asked you what the
8 governance failures were, you said there was the
9 governance failure on January 15th, which he didn't
10 follow up on, but I am going to and ask you, what is it
11 that -- and understanding that January 15th is the day
12 of bankruptcy.  How is that a governance failure?
13    A.  Well, I think the governance failure, I became
14 aware of it on January 15th, but it obviously occurred
15 during the board meeting on January 7th.
16    Q.  Okay.  And what is that governance failure?
17    A.  The governance failure is essentially what I
18 said in the Free Beacon article, that I felt that I had
19 been misled by the omission of the bankruptcy filing
20 because it's obvious that somebody had been working on
21 that for months.
22    Q.  And when you say someone had been working on
23 that for months, is the corollary to that and it had not
24 been discussed with the board?
25    A.  I --

Page 150

1    MR. CICILIANO:  Hold on.  Hold on.  I
2 would object to the attorney/client privilege and direct
3 you not to answer what was discussed or not discussed at
4 the board meeting.
5    MR. WATSON:  I am going to object to the
6 form and also on the basis of asked and answered.
7    Would you mind rephrasing your question,
8 Gerrit?
9    MR. PRONSKE:  Yeah.
10    Q.  (BY MR. PRONSKE)  Well, I am basically
11 following up on a question that Mr. Ciciliano asked,
12 which is what were the governance failures, and which
13 obviously opens the door to the answer which was that
14 there was a governance failure on January 15th.  And I
15 am trying to understand -- understanding that that
16 January 15th is the day of bankruptcy, what about that
17 bankruptcy filing constituted a governance failure?
18    MR. CICILIANO:  And I will object
19 pursuant to the attorney/client privilege.  It certainly
20 did not open the door or waive the attorney/client
21 privilege.
22    I would direct you not to respond to the
23 extent it would require you to waive or to disclose what
24 was discussed between attorneys at that executive
25 session.

Page 151

1    MR. WATSON:  And it's asked and answered.
2 And, you know, I want you to get your questions in,
3 everyone, but we only agreed to two hours, irregardless
4 of what you guys agreed to.  You've had your pass,
5 Gerrit.  We let Brian get in, which is fine.  And Dylan
6 got his questions in.  So I'm okay with some limited
7 follow-up, Gerrit, but my client has been on the bench
8 all day.
9    MR. PRONSKE:  I am below my time.  And,
10 quite frankly, both of you, the objections you're making
11 are lasting way longer than legitimate answers to
12 legitimate questions.
13    Q.  (BY MR. PRONSKE)  I would like to know what
14 was the governance failure part of this filing of
15 bankruptcy that you have a problem with.  And I would
16 like to get an answer rather than a bunch of objections
17 that are taking time.  You can go ahead and answer.
18    MR. CICILIANO:  And I would once again --
19    MR. WATSON:  If you -- you know, I'll
20 shut it down.  I mean, I've given you -- I've given you
21 time to get your pass.  And if that's -- if you want to
22 take it up with Judge Hale, we can do that, but we're
23 not going to sit here and have you ask the same
24 questions over and over again.
25    MR. PRONSKE:  The deposition was noticed

Page 152

1 for four hours, and it's been significantly less than
2 four hours.  If you want to shut --
3    MR. WATSON:  That's fine, but I agreed to
4 two, and we've gone over two.
5    MR. PRONSKE:  Jermaine, I promise you,
6 this is probably over in about ten minutes.
7    MR. WATSON:  All right.  But I agreed to
8 two, so let's be clear.
9    MR. PRONSKE:  I understand.
10    MR. WATSON:  I've got the emails, Gerrit.
11 I don't want to go there.  I don't want to fight with
12 you, but I will.
13    MR. ACOSTA:  Please let him ask his
14 questions.
15    MR. PRONSKE:  We'll talk to the judge
16 about it tomorrow morning.  I am completely fine with
17 that.
18    MR. WATSON:  Me too.  I have no problem
19 with that.
20    MR. ACOSTA:  Let's just ask -- can you
21 just give me like 15 more minutes, please?
22    MR. PRONSKE:  I set the deposition for
23 four hours.  I told the judge --
24    MR. WATSON:  That's fine.  That's fine.
25 You also told the judge I didn't agree to it.  So --

Page 153

39 (Pages 150 - 153)

1     MR. PRONSKE: Can I finish, please? I
2 told the judge yesterday I was going to go for four
3 hours and that you hadn't filed an objection, and so
4 here we are. And if you would like to shut it down
5 based on those facts, I'm fine going in front of the
6 judge tomorrow morning. What do you want to do?
7     MR. WATSON: Well, what I want to do is
8 let you get your opportunity to ask all the questions
9 you want, but I don't want you to go and reask the same
10 stuff he's already answered.
11     MR. PRONSKE: I am going to ask the
12 question again, and I would like the record to be clear.
13     Q. (BY MR. PRONSKE) For the very first time,
14 Judge Journey, you said that the filing of the
15 bankruptcy on January 15th was a governance failure. I
16 would like to ask you and get an answer because that
17 question has not been answered. What is it about the
18 January 15th bankruptcy filing that was a governance
19 failure?
20     A. Let me be clear. The January 15th filing was
21 not the governance failure. It was an indication of it,
22 that the governance failure I believe occurred happened
23 at the January 7th board meeting. And the fact that the
24 board was not informed --
25     MR. CICILIANO: And I am going to stop

Page 154

1     MR. WATSON: Right, and that's what I
2 instructed my client to say.
3     MR. CICILIANO: I understand.
4     MR. WATSON: You can answer Gerrit's
5 question. But let's move along, guys. It's late.
6     A. Oh, you're waiting on me?
7     Q. (BY MR. PRONSKE) Yes.
8     A. I thought you guys weren't done yet. Okay.
9     MR. WATSON: No. No, we're done. We're
10 trying to finish up.
11     THE WITNESS: Okay.
12     A. So look at the Free Beacon article. The
13 governance failure was the failure of officers or
14 counsel or those the board is dependent on from
15 revealing the material fact the bankruptcy was in
16 process of being filed at that board meeting.
17     MR. CICILIANO: And again, I will move to
18 strike based on attorney/client privilege. But go
19 ahead.
20     Q. (BY MR. PRONSKE) Judge Journey, were there
21 any presentations given at the January 7th executive
22 session by nonlawyers?
23     A. No. I believe Mr. Cotton was the one
24 addressing the board regarding those topics.
25     Q. Was anyone addressing those topics -- and when

Page 156

1 you there, Judge, and caution you not to get into the
2 attorney/client privilege, not to discuss what happened
3 in the executive session.
4     MR. WATSON: Well, Judge, you can testify
5 as to what your understanding was without disclosing
6 privilege. You can answer Mr. Pronske's question, to
7 the extent you understood -- what your understanding
8 was --
9     THE WITNESS: Thank you.
10     MR. WATSON: -- so we can get past this.
11     THE WITNESS: Thank you.
12     A. That the governance failure that occurred --
13     MR. CICILIANO: It comes to privilege,
14 though. If his understanding is informed by counsel, I
15 don't think he can.
16     MR. WATSON: But he's not saying that it
17 did.
18     MR. ACOSTA: And Dylan, you can't hide
19 the fact of what he voted on.
20     MR. WATSON: Right. And he has -- he can
21 form his own opinion, Dylan, and it doesn't have to come
22 from counsel.
23     MR. CICILIANO: Right. And so long as
24 it's not formed from counsel or wasn't something counsel
25 told him or what he claims counsel didn't tell him --

Page 155

1 you say "those topics," what exactly are you --
2     A. The topics of the executive sessions.
3 Mr. Cotton was chairing the meeting.
4     Q. Was there anybody giving a presentation at
5 that executive session other than Mr. Cotton?
6     MR. CICILIANO: Objection to form.
7     A. I'm not certain. I am not certain on that.
8     Q. (BY MR. PRONSKE) And was Mr. Cotton -- I
9 understand Mr. Cotton is an attorney, but was he in his
10 capacity as attorney in that meeting? And if so, who
11 was he representing?
12     A. No, he was not acting as counsel. He was
13 acting as first vice president and chairing the meeting
14 because the president wasn't there, as I explained
15 before.
16     Q. Okay. And what did he say during that
17 presentation?
18     A. That is what happened in executive session
19 and --
20     MR. CICILIANO: Yeah, I would object
21 pursuant to attorney/client privilege and instruct you
22 not to answer.
23     MR. WATSON: Okay. Yeah, I am going to
24 instruct you not to answer.
25     MR. PRONSKE: It's not a conversation

Page 157

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1 between an attorney who is acting in the capacity as an
2 attorney and clients. Are you saying it's just because
3 of the presence of attorneys in that room?
4 　　　MR. CICILIANO: No, Gerrit. I'm saying
5 because we have a declaration, as you well know, board
6 counsel who actually explains that they were all
7 discussing attorney/client privilege. So you may want
8 to beat around it and try to snip out portions. It's
9 not going to happen. I am directing him not to answer,
10 as is his counsel.
11 　　　MR. PRONSKE: Who is the attorney that
12 you say was involved in that attorney/client discussion,
13 Mr. Ciciliano?
14 　　　MR. CICILIANO: I believe the declaration
15 says William Davis, as well as counsel from Brewer.
16 　　　MR. PRONSKE: And so just because an
17 attorney was present in the room, all discussions in
18 that executive session were privileged?
19 　　　MR. CICILIANO: No. But if you actually
20 look at the declaration, what they say is that every
21 discussion they had in there was regarding legal advice.
22 So in that instance, yes.
23 　　　MR. PRONSKE: So you're saying that
24 everything that happened in the executive session
25 regarding Wayne LaPierre's employment contract on

Page 158

1 January 7th was privileged. Is that right?
2 　　　MR. CICILIANO: For this one, for what
3 I'm seeing, absolutely.
4 　　　MR. PRONSKE: Okay.
5 　　Q. (BY MR. PRONSKE) And Judge Journey, are you
6 refusing to answer the question based on Mr. Ciciliano's
7 advice?
8 　　　MR. WATSON: Well, it's my advice. I am
9 instructing him not to answer.
10 　　Q. (BY MR. PRONSKE) Okay. Are you refusing to
11 answer the question based on advice of counsel?
12 　　A. I am going to defer to counsel, yes.
13 　　Q. When you said -- when you testified that
14 bankruptcy is not the disease but it's a symptom of the
15 disease, what is the disease?
16 　　A. I think the disease and its symptoms are
17 described in great detail in the New York Attorney
18 General and the Washington, D.C. Attorney General's
19 petitions. There are other things that I've read in
20 other cases that gave me pause also and concern.
21 　　Q. When you testified that there have been,
22 quote, so many resignations from the board, why do you
23 believe there have been so many resignations from the
24 board?
25 　　A. Well, it's part of the process to make the

Page 159

1 board supine, that --
2 　　Q. And by supine, you mean subservient?
3 　　A. I mean supine. It's a little more than that
4 single synonym.
5 　　　Over the years, I have watched the NRA and its
6 operations with the board of directors and officers, and
7 I mean, you know, I know many of them. There's been a
8 pattern that I believe is easily established, where if a
9 board member questions a position, they lose their
10 committee assignments and then they're effectively
11 ostracized, and they basically say, well, I'm not
12 getting paid for this and leave. And so I think we will
13 have several soon. We'll see. Anyway, I expect we're
14 going to have resignations, from what I'm hearing, on
15 the 28th. So we'll see.
16 　　Q. And will those resignations be, at least to
17 some degree, because the board was not told about the
18 bankruptcy?
19 　　A. You know, you're going to have ask --
20 　　　MR. CICILIANO: I am going to object.
21 Calls for speculation. Also is a direct attempt to
22 invade the attorney/client privilege.
23 　　　MR. WATSON: And it's been asked and
24 answered, but go ahead.
25 　　A. You're going to have to ask them. We'll see

Page 160

1 who resigns and who stays and who wants to stay and fix
2 it.
3 　　Q. (BY MR. PRONSKE) Have any of the board
4 members that are resigning, have you spoken with any of
5 them and have they told you why they're resigning?
6 　　A. Several.
7 　　Q. And what is the reason that you're being given
8 by those persons for resigning?
9 　　　MR. CICILIANO: And I would just object
10 to the extent that the reasons they're giving you are
11 attorney/client privileged.
12 　　A. You want to know the real reason? Because
13 they don't know how to count noses.
14 　　Q. (BY MR. PRONSKE) What does that mean?
15 　　A. That means they don't win. That means they
16 get on their little donkeys and tilted the windmill and
17 lose and then they leave.
18 　　Q. Have any of those persons told you that the
19 reason that they are resigning is because of the failure
20 to inform the board members of the bankruptcy?
21 　　　MR. CICILIANO: I am going to object --
22 　　　MR. WATSON: Same objection.
23 　　　MR. CICILIANO: -- to attorney/client
24 privilege and direct you not to answer.
25 　　　MR. PRONSKE: That's not privileged.

Page 161

41 (Pages 158 - 161)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1 That's a --
2 Q. (BY MR. PRONSKE) Let me ask you this, Judge
3 Journey.
4 A. I think if you talk to Mr. -- what's his name,
5 the one that resigned after the meeting?
6 Q. Relating to the question I just asked you,
7 Judge Journey, were any of those conversations with
8 those board members as to their resignations, were any
9 of those conversations with lawyers present?
10 A. No.
11 Q. Okay. So did any of these persons tell you
12 they're resigning because of the failure of the NRA to
13 tell its board that it was going to file bankruptcy?
14 MR. CICILIANO: Objection. I am going to
15 object and instruct you not to answer on the basis of
16 attorney/client privilege.
17 MR. PRONSKE: That's not privileged.
18 MR. WATSON: I think he can answer that
19 one, Dylan.
20 MR. CICILIANO: Here is the problem with
21 the privilege. You're presupposing a conversation that
22 happened during the executive session. You're saying
23 this is the conversation that happened and, therefore --
24 MR. WATSON: I think he can answer it,
25 Dylan, because I don't think Gerrit's question is

Page 162

1 limited to that. He's talking about conversations that
2 may have been had outside of that.
3 MR. PRONSKE: Your objections are really
4 problematic, Dylan, and they're going to get in front of
5 the judge. And you -- you making an objection to a
6 privilege based on a conversation between two people
7 with a lawyer not present as to the reason that a board
8 member is leaving is not privileged and you know it.
9 And just because there was some seed of
10 privilege that you can go to many days or weeks before
11 that conversation doesn't mean that when one person
12 tells another person without a lawyer present why he's
13 quitting is somehow privileged. That's just ridiculous.
14 MR. WATSON: Judge, you can answer the
15 question to the extent that you know.
16 A. One board member has resigned since January
17 15th.
18 Q. (BY MR. PRONSKE) And who is that?
19 A. Duane Sutnik (sic).
20 Q. And did he --
21 A. He runs -- what is it? He's CEO of Magpul.
22 Q. And did you speak with Mr. Sutnik (sic) after
23 his resignation?
24 A. I spoke with him for a brief period one time.
25 Q. And did he tell you why he resigned?

Page 163

1 A. He said because his lawyers told him to get
2 out and because of the bankruptcy. I think that was
3 the -- I would characterize his perception that was the
4 last straw.
5 Q. So when you say because of the bankruptcy, are
6 you talking about because the NRA filed bankruptcy or
7 because of how they filed bankruptcy without informing
8 the board, as you've stated in the article?
9 MR. CICILIANO: Gerrit --
10 MR. WATSON: Objection. That's a
11 compound question. Could you break that down, Gerrit?
12 THE WITNESS: Yeah, he's wanting me to
13 speculate, and I would suggest you guys take Duane's
14 deposition and ask him why he quit.
15 Q. (BY MR. PRONSKE) I am not asking you to --
16 A. You know, I had like two minutes on the phone
17 with him.
18 Q. And I am not asking --
19 A. And he didn't want to help me, so that's when
20 I stopped talking to him.
21 Q. Okay. Judge Journey, listen to me for a
22 minute. Okay?
23 A. I'm trying.
24 Q. I am not asking you to speculate. I'm asking
25 you did he tell you -- which would not be speculation.

Page 164

1 Did he tell you why he was resigning?
2 A. I think the last -- the straw that broke the
3 camel's back was filing the bankruptcy without informing
4 the board. Does that answer your question?
5 Q. It does. Thank you.
6 MR. CICILIANO: And Gerrit, let's be real
7 clear about something. If two individuals who are on
8 the board are discussing attorney/client privileged
9 communications, that still falls within the privilege.
10 Whether or not you want to believe it or not, that is
11 clearly within the privilege.
12 MR. PRONSKE: I'll pass the witness.
13 MR. WATSON: Anybody else got any
14 questions?
15 MR. MASON: I have just got a few
16 follow-ups. Real quickly, I promise.
17 MR. WATSON: Okay. Go ahead, Brian.
18 THE WITNESS: My wife is going to want to
19 hear that. Yeah. She's hungry.
20 MR. WATSON: Yeah.
21 FURTHER EXAMINATION
22 BY MR. MASON:
23 Q. Judge Journey, with respect to Mr. Cotton's
24 presentation, was it a PowerPoint presentation that he
25 did?

Page 165

42 (Pages 162 - 165)

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1    A.  Who?
2    Q.  I believe you mentioned --
3    A.  Oh, Mr. Cotton.  No, there was no PowerPoint
4 in either board meeting.
5    Q.  Okay.  There was some conversation earlier
6 about the -- that the creditors committee and members of
7 the creditors committee.  Do you know how members of the
8 creditors committee are selected in a Chapter 11
9 bankruptcy?
10    A.  Correct me if I'm wrong, but the trustee does
11 that.
12    Q.  Okay.  And is that your understanding of what
13 happened in this particular case?
14    A.  I did watch the motion where somebody else
15 wanted on the creditors committee, yes.
16    Q.  And I guess just to be --
17    A.  That would be about all I know.
18    Q.  And I guess just to be clear when you say "the
19 trustee," are you referring to the US Trustee?
20    A.  Yes.
21    Q.  Can you describe Mr. LaPierre's -- let me ask
22 it this way.
23        Is Mr. LaPierre, does he have a close
24 relationship with a lot of members of the board?
25        MR. WATSON:  Calls for speculation.

1 always --
2        MR. WATSON:  Well, hold on, Judge.  Hold
3 on, Judge.  I don't want you to speculate on what you
4 may remember and what you may not remember.
5        THE WITNESS:  Yeah, I would hate to get
6 it wrong, because I'm sure she would point that out to
7 me, too.
8        MR. MASON:  I think that's all I've got.
9 Thank you, Judge.
10        THE WITNESS:  Thank you.
11        MS. EISENBERG:  Mr. Watson --
12        MR. WATSON:  Yeah.
13        MS. EISENBERG:  -- your client referred
14 to a Mr. Sutnik.  I suspect he may have misspoken
15 inadvertently.  There is an individual by the name of
16 the Duane Liptak.  Would you like to ask your client if
17 that's the last name he intended to use?
18        THE WITNESS:  She is absolutely right.
19 Yes.  Thank you.
20        MR. WATSON:  And could you state your
21 name for the record, Counsel?
22        THE WITNESS:  It was only one time, you
23 know.
24        MR. CICILIANO:  That's Svetlana.  She's
25 already made an appearance.

1 Yeah, I object to that.
2    A.  Yeah, I don't know.  I don't know.  I have no
3 idea.  You know, I'm sure there's a handful, I'm
4 guessing, but I can't even tell you who they are.
5    Q.  (BY MR. MASON)  Have you spoken with Marion
6 Hammer since January 15th?
7    A.  No, but she emailed me a wonderful thing.
8    Q.  And was it just you and her on that particular
9 email?
10    A.  I didn't respond.
11    Q.  What did Ms. Hammer tell you in that email?
12    A.  I'd have to like search my Google.  Oh, my
13 God, that's so far ago.  Basically that she knew I
14 shouldn't have got on the board, and she was right all
15 along.
16    Q.  I'm sorry.  Can you say that one more time?
17    A.  That I should not have been elected to the
18 board, and she was right all along.
19    Q.  Anything else that she said in that email?  Do
20 you have it in front of you?  Do you have access to it
21 on your computer right there?
22        MR. WATSON:  I will object to that.  I am
23 going to object to that.  It's not in evidence, Brian.
24 And he's testified from his memory what was said, so --
25    A.  Something about -- something about how I

1        MR. WATSON:  Okay.  But -- yeah, yeah.
2 But she's talking.  She didn't identify herself, Dylan.
3        MR. CICILIANO:  No, I appreciate that it.
4        MR. WATSON:  Yeah.
5        MS. EISENBERG:  It's nice to meet you.
6 I'm Svetlana Eisenberg.  We are Proposed Special
7 Counsel for Debtors.
8        MR. WATSON:  Oh, I understand.  I just
9 wanted to, you know, make sure that on the written
10 record that your question --
11        MS. EISENBERG:  I appreciate it.
12        MR. WATSON:  Yeah.
13        MS. EISENBERG:  Thank you.
14        MR. WATSON:  Did he give you the answer
15 you were seeking?
16        MS. EISENBERG:  Yes, I believe --
17        THE WITNESS:  She gave me the answer.
18        MS. EISENBERG:  -- the Judge confirmed,
19 yeah.
20        MR. WATSON:  Okay.  Great.
21        Do you guys have any questions, Gerrit?  I
22 want everyone to be happy.
23        THE WITNESS:  Yeah.
24        MR. WATSON:  I don't want to cut you off.
25        THE WITNESS:  Yeah.

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1 MR. PRONSKE: I will be happy to press
2 "leave" here.
3 MR. WATSON: I know, but it's my job to
4 rough you up a little bit, Gerrit.
5 But seriously, do you have any more questions,
6 Gerrit?
7 MR. PRONSKE: Thank you.
8 MR. WATSON: You do or you don't?
9 MR. PRONSKE: I do not. Thank you.
10 MR. WATSON: Okay. Okay. Great.
11 Anybody else? You Dylan?
12 MR. CICILIANO: No.
13 MR. WATSON: Okay. Can we go off the
14 record then, Julie?
15 THE VIDEOGRAPHER: This is Zack, the
16 videographer. We have taken all transcript and video
17 orders off the record. The time is 7:57. We are off
18 the record.
19 (Proceedings ended at 7:57 p.m.)
20
21
22
23
24
25

Page 170

1 I, PHILLIP JOURNEY, have read the foregoing
2 deposition and hereby affix my signature that same is
3 true and correct, except as noted above.
4
5 _____
6 PHILLIP JOURNEY
7
8 THE STATE OF _____)
9 COUNTY OF _____)
10 Before me, _____, on
11 this day personally appeared PHILLIP JOURNEY, known to
12 me (or proved to me under oath or through
13 _____) (description of identity
14 card or other document) to be the person whose name is
15 subscribed to the foregoing instrument and acknowledged
16 to me that they executed the same for the purposes and
17 consideration therein expressed.
18 Given under my hand and seal of office this
19 _____ day of _____, _____.
20
21
22 _____
23 NOTARY PUBLIC IN AND FOR
24 THE STATE OF _____
25

Page 172

1 CHANGES AND SIGNATURE
2 WITNESS NAME: PHILLIP JOURNEY
3 DATE OF DEPOSITION: MARCH 18, 2021
4 PAGE LINE CHANGE REASON
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 171

1 STATE OF TEXAS )
2 COUNTY OF DALLAS )
3 I, Julie C. Brandt, Certified Shorthand
4 Reporter in and for the State of Texas, certify that the
5 foregoing deposition of HONORABLE PHILLIP JOURNEY was
6 reported stenographically by me remotely via Zoom, said
7 witness having been placed under oath by me, and the
8 deposition is a true record of the testimony given by
9 the witness;
10 That the amount of time used by attorneys at
11 the deposition is as follows:
12 Mr. Pronske - 1 hour, 49 minutes
13 Mr. Ciciliano - 59 minutes
14 Mr. Mason - 23 minutes
15 I further certify that I am neither counsel
16 for, nor related to any party in the cause and am not
17 financially interested in its outcome.
18 In witness whereof, I have subscribed my name
19 this 19th day of March, 2021.
20
21 *Julie C. Brandt*
Julie C. Brandt, CSR, RMR, CRR
22 TX CSR No. 4018, Exp. 10/31/21
23 Veritext Legal Solutions
Firm Registration No. 571
24 300 Throckmorton Street, Suite 1600
Fort Worth, Texas 76102
25 817-336-3042

Page 173

44 (Pages 170 - 173)

Veritext Legal Solutions
800-336-4000

CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER

1  jermaine.watson@bondsellis.com
2           March 19, 2021
3  RE: In Re: National Rifle Association Of America And Sea Girt
4  DEPOSITION OF: Honorable Phillip Journey (# 4504406)
5      The above-referenced witness transcript is
6  available for read and sign.
7      Within the applicable timeframe, the witness
8  should read the testimony to verify its accuracy. If
9  there are any changes, the witness should note those
10 on the attached Errata Sheet.
11     The witness should sign and notarize the
12 attached Errata pages and return to Veritext at
13 errata-tx@veritext.com.
14     According to applicable rules or agreements, if
15 the witness fails to do so within the time allotted,
16 a certified copy of the transcript may be used as if
17 signed.
18         Yours,
19         Veritext Legal Solutions
20
21
22
23
24
25
                              Page 174

Veritext Legal Solutions
800-336-4000

# EXHIBIT 9

1              UNITED STATES BANKRUPTCY COURT

2             NORTHERN DISTRICT OF TEXAS

3                DALLAS DIVISION

4  IN RE:                  )

                       )  Case No.

5  NATIONAL RIFLE ASSOCIATION  )  21-30085-hdh-11

    OF AMERICA AND SEA GIRT, LLC)

6                    )  Chapter 11

      Debtors.          )

7

8

9

10    **************************************************

11            VIDEOTAPED ORAL DEPOSITION OF

12       JOHN FRAZER IN HIS PERSONAL CAPACITY

13              MARCH 18, 2021

14     CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

15           (Reported Remotely)

16    **************************************************

17

18

19

20

21

22

23

24

25

                                    Page 1

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

---

**Page 2**

```
 1
 2        On the 18th day of March, 2021, at 9:28 a.m.
 3   Eastern Time, the videotaped oral deposition of the
 4   above-named witness was taken at the instance of The
 5   State of New York, via Zoom video conference, before
 6   Michelle L. Munroe, Certified Shorthand Reporter in
 7   and for the State of Texas, the Witness located at
 8   National Rifle Association, 11250 Waples Mill Road,
 9   Fairfax, Virginia, pursuant to Notice, the
10   Thirty-Sixth Emergency Order Regarding the COVID-19
11   State of Disaster, and the agreement hereinafter set
12   forth.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
 1         A P P E A R A N C E S (continued)
 2   FOR THE OFFICE OF THE NEW YORK STATE ATTORNEY
        GENERAL:
 3      Mr. Eric Van Horn (via Zoom)
        Mr. Jason Kathman (via Zoom)
 4      Mr. Gerrit Pronske (via Zoom)
        SPENCER FANE LLP
 5      2200 Ross Avenue, Suite 4800 West
        Dallas, Texas  75201
 6      214.750.3610 telephone
        ericvanhorn@spencerfane.com
 7
 8   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:
 9      Mr. Scott Drake (via Zoom)
        Mr. Tim Carney (via Zoom)
10      NORTON ROSE FULBRIGHT US LLP
        2200 Ross Avenue, Suite 3600
11      Dallas, Texas  75201
        214.855.8341 telephone
12      scott.drake@nortonrosefulbright.com
        tim.carney@nortonrosefulbright.com
13
14
15   FOR JUDGE PHILLIP JOURNEY AND ROCKY MARSHALL:
        Mr. Jermaine Watson (via Zoom)
16      BONDS ELLIS EPPICH SCHAFER JONES LLP
        420 Throckmorton Street, Suite 1000
        Fort Worth, Texas  76102
17      817.529.2724 telephone
        jermaine.watson@bondsellis.com
18
19
20   FOR ACKERMAN MCQUEEN, INC.:
        Mr. Mike Gruber (via Zoom)
        Mr. Joseph Acosta (via Zoom)
21      Ms. Kelsey Taylor (via Zoom)
        Ms. Kymberlee Milligan (via Zoom)
22      DORSEY & WHITNEY LLP
        300 Crescent Court
23      Suite 400
        Dallas, Texas  75201
24      214.981.9929 telephone
        gruber.mike@dorsey.com
25
```

---

**Page 3**

```
 1            A P P E A R A N C E S
 2   FOR THE DEBTORS:
        Mr. Gregory E. Garman
 3      Mr. Dylan T. Ciciliano (via Zoom)
        GARMAN TURNER GORDON LLP
 4      7251 Amigo Street, Suite 210
        Las Vegas, Nevada  89119
 5      702.777.3000 telephone
        ggarman@gtg.legal
 6
 7
        PROPOSED SPECIAL COUNSEL TO THE DEBTORS:
 8      Ms. Svetlana Eisenberg (via Zoom)
        BREWER ATTORNEYS & COUNSELORS
 9      1717 Main Street
        Suite 5900
10      Dallas, Texas  75201
        sme@brewerattorneys.com
11
12
        FOR JOHN FRAZER:
13      Mr. William B. Fleming (via Zoom)
        Ms. Ellen Johnson (via Zoom)
14      GAGE SPENCER & FLEMING LLP
        410 Park Avenue, Floor 9
15      New York, New York  10022-9492
        212.768.4900 telephone
16      wfleming@gagespencer.com
17
18   FOR THE OFFICE OF THE NEW YORK STATE ATTORNEY
        GENERAL:
19      Ms. Emily Stern (via Zoom)
        Mr. Stephen Thompson (via Zoom)
20      Ms. Yael Fuchs (via Zoom)
        Ms. Sharon Sash (via Zoom)
21      OFFICE OF THE ATTORNEY GENERAL
        28 Liberty Street, 18th Floor
22      New York, New York  10005
        212.416.8401 telephone
23      emily.stern@ag.ny.gov
24
25
```

---

**Page 5**

```
 1         A P P E A R A N C E S (continued)
 2   FOR THE OFFICE OF THE U.S. TRUSTEE:
        Ms. Juliet M. Sarkessian (via Zoom)
 3      UNITED STATES TRUSTEE
        844 King Street
 4      Room 2207
        Wilmington, Delaware  19801
 5      302.573.6491 telephone
        juliet.m.sarkessian@usdoj.gov
 6
 7      Mr. Marc F. Salitore (via telephone)
        UNITED STATES TRUSTEE
 8      1100 Commerce Street
        Room 976
 9      Dallas, Texas  75242
        marc.f.salitore@usdoj.gov
10
11
        ALSO PRESENT:
12      Ellen Hebert, Video Technician
13
14   [Reporter's note:  Physically present at the
        deposition location were Mr. Frazer, Mr. Garman,
15      and Ms. Eisenberg and Ms. Ellen Herbert, the
        videographer.  Everyone else attended remotely via
16      Zoom and/or telephone.]
17
18
19
20
21
22
23
24
25
```

---

2 (Pages 2 - 5)

                    I N D E X

WITNESS                                    PAGE

JOHN FRAZER

    Examination by Ms. Stern................. 11

    Examination by Mr. Gruber................ 232

    Examination by Ms. Sarkessian............ 300

    Examination by Mr. Drake................. 307

NYAG DEPOSITION EXHIBITS:            IDENTIFIED
Exhibit 1     January 19, 2021 Liptak
              resignation letter............. 39

Exhibit 2     January 15, 2021 Announcement
              from Wayne LaPierre............. 101
Exhibit 3     NRA Upper Management Seminar,
              Compliance and Governance
              Refresher presentation......... 176
Exhibit 4     Policy manual excerpt, Conflict
              of Interest and Related Party
              Transaction Policy............. 191
Exhibit 5     September 8, 2018 board meeting
              minutes excerpt................ 203

Exhibit 6     January 5, 2019 board meeting
              minutes excerpt................ 209
Exhibit 7     April 29, 2019 board meeting
              minutes excerpt................ 209


ACKERMAN MCQUEEN EXHIBITS:          IDENTIFIED
Exhibit 1.    Voluntary Petition for Non-
              Individuals Filing for
              Bankruptcy..................... 281

                                            Page 6

ACKERMAN MCQUEEN EXHIBITS:          IDENTIFIED
(continued)

Exhibit 8     Resolution Formalizing Special
              Litigation Committee........... 286
Exhibit 11    Bylaws......................... 278
Exhibit 12    Wayne R. LaPierre Employment
              Agreement...................... 291

Exhibit 13    January 20, 2021 transcript
              of Motion for Joint
              Administration................. 268

Exhibit 24    Global Notes, Methodology,
              Statement of Limitations, and
              Disclaimers Regarding The
              Debtors' Schedules of Assets
              and Liabilities and Statements
              of Financial Affairs........... 266
Exhibit 76    NRA Leadership Quotes.......... 265
Exhibit 102   Transcript of 341 Meetings of
              Creditors Sea Girt, LLC,
              March 5, 2021.................. 292
Exhibit 107   January 15, 2021 email re:
              Announcement from Wayne
              LaPierre....................... 257
Exhibit 130   Transcript of John Frazer as
              Corporate Representative
              March 15, 2021................. 274
Exhibit 131   Transcription of 341 Meetings
              of Creditors Sea Girt, LLC,
              March 12, 2021................. 294

UCC EXHIBITS:                       IDENTIFIED
Exhibit 1..   Debtors' Omnibus Response...... 318

                                            Page 7

                 P R O C E E D I N G S

             THE VIDEOGRAPHER (VIA ZOOM): Good
morning. We are going on the record at 9:28 a.m.
Today is March 18, 2021. Please note that the
microphones are sensitive and may pick up whispering,
private conversations, and cellular interference.
Please turn off all cell phones or place them away
from the microphones, as they can interfere with the
deposition audio. Audio and video recording will
continue until -- until both parties agree to go off
the record.
             This is media unit 1 of the video
deposition of John Frazer in his personal capacity
taken by counsel for the debtors in Re: National
Rifle Association of America and Sea Girt, LLC, filed
in the United States Bankruptcy Court for the
Northern District of Texas, Dallas Division, Case
Number 21-30085-hdh-11.
             This deposition is being held at
National Rifle Association, located at 11250 Waples
Mill Road, Fairfax, Virginia.
             My name is Ellen Hebert from Veritext.
I am the videographer. The court reporter is
Michelle Munroe from Veritext.
             Will counsel please state their

                                            Page 8

appearances for the record beginning with the
noticing attorney.
             MS. STERN (VIA ZOOM): Yes. My name
is Emily Stern. I'm an Assistant Attorney General
with the New York State Attorney General's Office and
in the Charities Bureau.
             MR. THOMPSON (VIA ZOOM): Good
morning. My name is Stephen Thompson. I'm also an
Assistant Attorney General in the New York State
Office of the Attorney General.
             MR. GRUBER (VIA ZOOM): My name is
Mike Gruber with the Dorsey law firm, and I represent
Ackerman McQueen.
             MR. DRAKE (VIA ZOOM): Good morning.
This is Scott Drake from Norton Rose Fulbright on
behalf of the Official Committee of Unsecured
Creditors.
             MR. WATSON (VIA ZOOM): Good morning.
This is Jermaine Watson of Bonds Ellis Eppich Schafer
& Jones, LLP. I'm appearing on behalf of Judge
Phillip Journey and Rocky Marshall.
             MR. GARMAN (VIA ZOOM): All right.
Hearing no more appearances, this is Greg Garman with
the law firm Garman Turner Gordon, counsel to the
debtors. With me today is Mr. Frazer.

                                            Page 9

3 (Pages 6 - 9)

1 And, Will, do you want to make your
2 appearance and then we'll have Svetlana make hers?
3 MR. FLEMING (VIA ZOOM): Yeah, William
4 Fleming, Gage Spencer & Fleming, LLP, in New York
5 City for Mr. Frazer.
6 MS. EISENBERG (VIA ZOOM): Good
7 morning -- good morning, this is Svetlana Eisenberg,
8 Brewer Attorneys & Counselors, proposed special
9 counsel for the debtors.
10 MS. SARKESSIAN (VIA ZOOM): Juliet
11 Sarkessian is on the line. I'm a trial attorney with
12 the Office of the U.S. Trustee.
13 JOHN FRAZER,
14 having been first duly sworn, testified as follows:
15 EXAMINATION
16 BY MS. STERN (VIA ZOOM):
17 Q. Good morning, Mr. Frazer. As I introduced
18 myself a moment ago in my appearances, I'm Emily
19 Stern, and I'm the co-chief of the enforcement
20 section of the Charities Bureau.
21 You're appearing here today pursuant to a
22 notice of deposition; isn't that correct?
23 A. Yes.
24 Q. And you're aware that your testimony here
25 today is under oath, correct?

Page 10

1 immediately prior to becoming general counsel that
2 you were in private practice?
3 A. Yes.
4 Q. Okay. And since you testified earlier
5 this week, I know that you're familiar with the
6 process of a deposition, correct?
7 A. Yes.
8 Q. And you've -- you've testified at other
9 depositions; is that right?
10 A. I have given one -- one other deposition.
11 Q. And that was in a lawsuit involving
12 Ackerman McQueen, correct?
13 A. Yes.
14 Q. Okay. So we don't -- I don't think we
15 need to go through the ground rules. And today
16 they're particularly unusual because we're doing
17 this virtually and we have spent quite a lot of time
18 getting set up.
19 So do you have -- are there any health
20 conditions affecting you today that would affect
21 your ability to testify accurately and truthfully?
22 A. No.
23 Q. And are you taking any medications that
24 would affect your ability to testify accurately and
25 truthfully today?

Page 12

1 A. Yes.
2 Q. And that it's no different than if you
3 were -- than if you were testifying in open court,
4 correct?
5 A. Yes.
6 Q. You're an experienced attorney.
7 How many years have you been practicing,
8 Mr. Frazer?
9 A. I was admitted to the bar in 2008.
10 Q. And how many years have you been
11 practicing as a lawyer since you were admitted?
12 A. Well, I was -- I was involved in -- in
13 legal matters involving the NRA Institute for
14 Legislative Action from the time I was admitted.
15 You know, I worked there throughout law school and I
16 was involved in legislative drafting and -- and
17 supporting NRA Second Amendment litigation during
18 that time. And been in -- then I was in private
19 practice and then I returned to the NRA. So I've
20 been continuously involved in legal affairs since
21 2008.
22 Q. And you have been a general counsel of the
23 NRA since 2015; isn't that correct?
24 A. That's correct.
25 Q. And -- and was it the two years

Page 11

1 A. No.
2 Q. Are you aware of any other conditions that
3 would affect your ability to testify accurately and
4 truthfully today?
5 A. No.
6 Q. Okay. And there are, I think, three
7 different attorneys that have identified themselves
8 as appearing for you today.
9 Can -- can you explain to me your
10 relationship to each of those attorneys starting
11 with Mr. Garman?
12 A. Sure. Excuse me. Mr. Garman is counsel
13 for the NRA and Sea Girt as debtor, Ms. Eisenberg is
14 proposed special counsel to the NRA, and Mr. Fleming
15 is my personal attorney.
16 Q. Okay. And over the course of this morning
17 and this afternoon as we -- I ask you questions, if
18 you don't understand a question, please let me know
19 and ask me to clarify.
20 Do we understand each other?
21 A. Sure.
22 Q. Okay. And if -- if you don't ask me for
23 such clarification, I'm going to assume you
24 understand my questions. Okay?
25 A. Okay.

Page 13

4 (Pages 10 - 13)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 14

1    Q.   Very good.
2         What did you do to prepare for today's
3    deposition?
4    A.   I met -- I met with counsel.
5    Q.   Which counsel?
6    A.   I met with Mr. Garman and two of his
7    colleagues, Ms. Kozlowski, and -- I'm -- I'm sorry,
8    I'm afraid --
9         MR. GARMAN (VIA ZOOM):
10   Ms. Pilatowicz.
11   A.   I didn't recall her last name.  Yeah.
12        I also spoke briefly on a couple of
13   occasions with Ms. Eisenberg and I spoke with
14   Mr. Brewer and Mr. Fleming.
15   Q.   And when you said that you -- you spoke
16   with Ms. Eisenberg, was she present either, you
17   know, virtually or physically in the room when you
18   were preparing with Mr. Garman and his colleagues?
19   A.   No, it was a separate -- I think it was
20   actually only one conversation.  It was a quick
21   phone -- a quick phone call.
22   Q.   Okay.  And then the same question with
23   respect to -- did you say it was Bill Brewer that
24   you spoke to?
25   A.   Yes.  We spoke with Mr. Brewer by phone.

Page 15

1    Q.   And Mr. Fleming --
2    A.   Mr. Fleming --
3    Q.   -- did he participate in the -- in the
4    preparation virtually?
5    A.   By -- part of it virtually and part of it
6    by phone.
7    Q.   Okay.  And in the course of your
8    preparation, did you review any documents?
9    A.   I don't think so.
10   Q.   Okay.  Any other materials that were used
11   to refresh your recollection?
12   A.   Actually, I did look at a -- at a set of
13   contracts -- of contracts related to Allegiance
14   Consulting which I had been asked about the other
15   day in the 30(b)(6) deposition.
16   Q.   Okay.
17   A.   Or Allegiance Creative Group, just to be
18   clear.
19   Q.   Okay.  And those were just contracts?
20   A.   Yes.
21   Q.   Okay.  No communications?
22        MR. FLEMING (VIA ZOOM):  Object to
23   form.
24   A.   Okay.  So actually I still looked at the
25   contracts, and I also looked at a draft contract

Page 16

1    review sheet for Allegiance and at a -- at an email
2    regarding a -- a subject that I had been asked about
3    at the other day's deposition.  These were all
4    regarding Allegiance.
5    Q.   And who was that email -- who were the
6    parties on that email?
7    A.   It was an email from Craig Spray to me and
8    to Ms. Rogers for the -- from the -- with the Brewer
9    firm.
10   Q.   And that email helped refresh your
11   recollection around the events that you were not
12   able to answer questions about on Monday; isn't that
13   correct?
14        MR. GARMAN (VIA ZOOM):  Object to
15   form.
16        Go ahead.
17   A.   Slightly.
18   Q.   Slightly.  Okay.
19        MS. STERN (VIA ZOOM):  Can we take
20   just a quick second off the record.
21        MR. GARMAN (VIA ZOOM):  Sure.
22        THE VIDEOGRAPHER (VIA ZOOM):  Going
23   off the record.  The time is 9:38 a.m.
24        (Recess 9:38 to 9:41 a.m.)
25        THE VIDEOGRAPHER (VIA ZOOM):  Going

Page 17

1    back on the record.  The time is 9:41 a.m.
2         THE WITNESS (VIA ZOOM):  Okay.  And --
3    and if I can start with something I remembered during
4    that interlude, I also yesterday reviewed some emails
5    regarding Mr. Phillips, Woody Phillips, our former
6    treasurer.
7         MS. STERN (VIA ZOOM):  So just to
8    state on the record, we're going to ask for
9    production of those materials that he reviewed in
10   preparation that he indicated were -- assisted in his
11   recollection of events.
12        MR. GARMAN (VIA ZOOM):  Yeah, and,
13   Emily, just on that point, these were not documents
14   that we asked Mr. Frazer to review, so I hear your
15   request.  I'm just going to have to look at them to
16   ensure they're -- they're not privileged.  Just
17   letting you know they weren't at our direction, so I
18   have to look at them.
19        MS. STERN (VIA ZOOM):  Okay.  Well,
20   our request still stands.
21   Q.   Mr. Frazer, you are also the secretary of
22   the NRA; isn't that right?
23   A.   Yes.
24   Q.   And you have held that role since 2015
25   also?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1  A.  That's correct.
2  Q.  Did you become the secretary simultaneous
3 with becoming the general counsel?
4  A.  No.  I -- I initially returned to the NRA
5 as general counsel, and then a few months later, I
6 was elected as secretary.
7  Q.  Okay.  And can you describe your role and
8 responsibilities as a secretary?
9  A.  Sure.  The secretary, under the bylaws, is
10 responsible for maintaining the -- the Association's
11 archives and for dealing with meeting notices and
12 such and also serves as the secretary of the board,
13 the executive committee, the nominating committee,
14 and the committee on elections.  So essentially it's
15 an administrative role with respect to -- with
16 respect to board-related activities.
17  Q.  And do you have any substantive role with
18 respect to board-related activities?
19       MR. GARMAN (VIA ZOOM):  Objection as
20 to form.
21       Go ahead if you understand.
22  A.  You know, for the most part the strictly
23 secretarial duties are administerial, but as
24 corporate officer, I'm -- you know, I'm involved in
25 decisions.  I'm -- I'm involved in discussions

Page 18

1 work with the executive vice president.
2  Q.  So about how frequently are you in
3 communication with Mr. LaPierre, the executive vice
4 president, concerning duties as a secretary?
5  A.  Probably -- well, it depends how close we
6 are to a board meeting, but probably once or twice a
7 week on -- on secretary's office matters.
8  Q.  Okay.  And then how -- who do you
9 primarily interface with on the board with respect
10 to matters regarding secretarial affairs?
11  A.  Be the president, Ms. Meadows; first vice
12 president, Mr. Cotton; sometimes the second vice
13 president, Mr. Lee, and then -- I'm sorry.
14       Did you ask about the board generally
15 about secretary's office issues?
16  Q.  Yes.
17  A.  That would be -- those would be the big --
18 the big three.  But, of course, I'm the committee
19 secretary to several committees, so I would work
20 with the -- the chairman of those committees and --
21 and -- and -- but I'm also accessible and available
22 to any board member, and they routinely call me with
23 questions about -- you know, about NRA issues.
24  Q.  Who is the current chair of the legal
25 affairs committee?

Page 20

1 about, you know, potential courses of conduct of the
2 Association and so on in general terms.
3  Q.  Okay.  And to whom do you report in your
4 role as secretary?
5  A.  So under the bylaws, the secretary
6 reports -- the secretary works under the direction
7 of the executive vice president but, of course, is
8 elected by the board and -- and, you know, in an
9 involuntary removal situation can only be removed by
10 the board.
11  Q.  And is that the practice --
12       MR. GARMAN (VIA ZOOM):  Objection as
13 to form.
14  Q.  -- that you report -- I'm sorry.  Let me
15 restate the question.
16       Is it the practice that you report to the
17 executive vice president?
18  A.  It depends on the -- it depends on the
19 issue at hand.  A lot of the time in the secretarial
20 role as a -- as a practical matter, I'm working with
21 the -- with the board officers, the president and
22 the vice presidents, regarding things like planning
23 for upcoming meetings or -- you know, or -- or
24 conducting meetings when they're going on.  And then
25 with respect to -- to some day-to-day activities, I

Page 19

1  A.  Sandra Froman.
2  Q.  Okay.  So I would -- how -- you said you
3 primarily have contacts in terms at the officer
4 level with Ms. Meadows and Mr. Cotton; is that
5 right?
6  A.  Yes.
7  Q.  And -- and how often would you say that
8 you're in contact with them about board-related
9 matters?
10  A.  Again, that often depends how close we are
11 to a board meeting but, you know, maybe two or three
12 times a week each.  Sometimes it's on a -- excuse
13 me -- sometimes it's on a conference call with both
14 of them.
15  Q.  And the form of -- what's the form of your
16 communications with them typically?
17  A.  You mean the communication method?
18  Q.  Yes.
19  A.  Telephone, email, or text, depending on --
20 on what we're trying to communicate about.
21  Q.  What is the typical method of
22 communication with Mr. LaPierre?
23  A.  Telephone or sometimes in person, at least
24 pre-COVID.
25  Q.  And Mr. LaPierre does not use email; is

Page 21

1 that correct?
2    A.  Mr. LaPierre has an email account, but my
3 understanding is that he's -- he's not usually the
4 one -- he's not the one personally using it.
5    Q.  So if you needed to get a message to
6 Mr. LaPierre, whether as a general counsel or as the
7 secretary, what would be the means that you would
8 use?
9    A.  It would depend on the urgency.  If it's
10 something where, for example, I'm forwarding a
11 document that -- that may need his signature, I
12 might email it.  Although normally I would -- in
13 that case, I would email it to one of his -- his
14 staff.
15       Sometimes I will copy him on emails for
16 the record knowing that they're going to his staff.
17 If I really need to talk to him, I'll either -- I'll
18 either contact one of his immediate staff to arrange
19 a meeting or I'll just call him on the phone.  But
20 telephone is -- telephone, especially lately, is by
21 far the most common way I communicate with him.
22    Q.  And when -- is it your understanding that
23 if you are emailing him something for the record --
24    A.  Uh-huh.
25    Q.  -- that his staff would bring it to his
                                                    Page 22

1 attention?
2    A.  That's right.
3    Q.  And who are those staff that you're -- can
4 you identify them?
5    A.  The -- the usual staff that I would
6 contact him would be -- today would be either Andra
7 Fischer, who is his executive assistant, or Vanessa
8 Shahidi, who is the NRA chief of staff.  In the
9 past, I would -- I would sometimes communicate more
10 with Millie Hallow.
11    Q.  And when -- what -- what do you mean by
12 "the past"?  Like, how long ago?
13    A.  Before last year really.  You know, in
14 the -- in the COVID situation, you know, Ms. Hallow
15 is, you know, is an older -- is an older lady and
16 she's not -- she's not in the office routinely,
17 whereas I know Ms. Shahidi and Ms. Fischer are.  And
18 I know -- and Ms. Hallow is also recently widowed,
19 so, you know, trying not to -- to burden her.
20    Q.  Okay.  So -- so you would say that was
21 primarily in the post-COVID period?
22    A.  Right.  It's kind of -- it's kind of
23 shifted in that time period.
24    Q.  Okay.  And you would rely -- prior to
25 that, you would have relied on Ms. Hallow to bring
                                                    Page 23

1 the information that you were conveying to her to
2 Mr. LaPierre's attention if that's what your request
3 was?
4          MR. GARMAN (VIA ZOOM):  Objection to
5 form.
6          Go ahead and answer.
7    A.  Yeah, it might -- it might depend on
8 the -- on the nature of the information or, frankly,
9 just practicalities, you know, who -- where is he,
10 who's -- who's with him as far as I know, that kind
11 of thing.
12    Q.  During the -- during this past year of
13 COVID, what has your physical work arrangement been?
14    A.  Well, like a lot of people, it's -- it's
15 gone through some evolutions.  For about the
16 first -- you know, we shut down the office in mid
17 March of last year and -- and instructed staff, you
18 know, not to attend unless they were direct -- you
19 know, not to -- not to come to the office unless
20 they were directed to do so and authorized to do so
21 as a job necessity.  So essentially it was mandatory
22 work from home for everyone -- everyone possible.
23          And in my case, I don't believe I came to
24 office at all for all -- for the remainder of March,
25 April, maybe mid May, so I was working out of -- out
                                                    Page 24

1 of a home office during that time frame.  You know,
2 like a lot of people, necessity pushed us to
3 increasingly come to the office.
4          And I have some bandwidth issues at home,
5 so if I need to do -- do an important video
6 proceeding of some kind, I'll come to the office for
7 that based on some unfortunate experiences early on.
8 And then -- and then -- I think we have all been
9 there.
10    Q.  Yes.
11    A.  And then more recently, I have been coming
12 to the office more, I think, as -- as people start
13 to feel a little bit safer.  And it has just been
14 practically necessary to deal with paper documents
15 and so forth.
16    Q.  And has Mr. LaPierre been working at -- in
17 the office in Virginia during this past year?
18    A.  I think like most -- I think his pattern,
19 from what I have observed, seemed to follow pretty
20 much my -- my own.  He has been in the office
21 increasingly as, you know, business necessities made
22 it important for him to be around and to meet
23 personally with people.
24    Q.  And -- and what about Mr. Spray?
25    A.  Mr. -- Mr. Spray, due to his health, you
                                                    Page 25

7 (Pages 22 - 25)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1 know, he had some very heightened health concerns,
2 worked remotely from Michigan almost exclusively
3 even -- even before -- even before COVID hit. I
4 think he just happened to be there when the -- when
5 the shutdown started to happen, so he just stayed
6 there.
7    Q.  So he's worked remote the entire time?
8    A.  He was here for --
9        MR. GARMAN (VIA ZOOM):  Objection to
10 form.
11       Go ahead.
12       THE WITNESS (VIA ZOOM):  I'm sorry.
13   A.  He was here a day or two in -- and a few
14 days in the summer, maybe in August, and a few days
15 in November, and that's -- those are the only times
16 I have seen him.
17   Q.  Okay.  Now, you said as the secretary,
18 you're responsible for maintaining the archives.
19       And does -- and are you also responsible
20 for ensuring that the minutes of -- and other
21 documents relating to board meetings are complete
22 and accurate?
23   A.  Yes on both.  With respect to the
24 archives, I'm thinking of sort of the NRA's
25 historical repository of, you know, documents and

Page 26

1 memorabilia, some of them quite old.  And then
2 the -- and then also -- and then with respect to
3 the -- to the -- to the minutes, yes, the
4 secretary's office is responsible for maintaining
5 the minutes of -- of board meetings and -- and
6 the --
7    Q.  Who prepared --
8    A.  -- and the annual meeting members, I
9 should add.
10   Q.  Excuse me for cutting you off.
11       Who prepares the corporate resolutions?
12   A.  It depends on the subject matter.
13 Resolutions may be drafted by staff or counsel,
14 depending on -- on what the situation is or, you
15 know, the committee something is coming from,
16 something like that.  Or on some occasions, they may
17 be presented by individual board members or by -- or
18 by individual rank and file members for resolutions
19 presented at the NRA members meetings.
20       And then for things like banking
21 resolutions, you know, authorizing the NRA to open
22 an account at an institution, a lot of the time
23 those are basically boilerplate resolutions drafted
24 by the -- by the bank or other financial
25 institution.

Page 27

1    Q.  Do you have any role in preparing
2 resolutions for the audit committee?
3    A.  Yes, I have.
4    Q.  And what is that role?
5    A.  I would -- I would sometimes draft them,
6 sometimes edit them if they were drafted by others.
7    Q.  Okay.  When was the most recent board
8 meeting of the NRA?
9    A.  January 7th of this year.
10   Q.  And was there a notice of a special board
11 meeting that was to occur during mid March?
12   A.  Yes.
13   Q.  And did that meeting occur?
14   A.  No, it did not.
15   Q.  And why didn't it occur?
16   A.  It didn't occur because of concerns about
17 potential COVID exposures among some of the
18 individuals who were key presenters at the meeting.
19   Q.  And what was the intended purpose of that
20 special meeting?
21   A.  Yeah, the purpose was to provide the board
22 with a briefing about ongoing legal matters.
23   Q.  Did those ongoing legal matters -- without
24 getting -- I don't want to get into privilege --
25 concern the bankruptcy proceeding?

Page 28

1    A.  Yes.
2    Q.  And since the -- the special meeting was
3 canceled, was there an alternate method used to
4 communicate that information to the board members?
5        MR. GARMAN (VIA ZOOM):  Objection to
6 form.
7        Go ahead.
8    A.  Not yet, but we're working on schedule --
9 on rescheduling the meeting and -- and as -- as we
10 announced to the -- to the board when it was -- when
11 the cancellation occurred.
12   Q.  And when was it canceled?
13   A.  It was canceled on last Friday.  I believe
14 that was the 12th.
15   Q.  And how was notice given to the board that
16 it was going to be canceled?
17   A.  Notice was given to the board through
18 an -- through an email.
19   Q.  And has a new date been set?  Sorry.  Has
20 a -- let me restate my question.
21       Has a new date been set for that special
22 meeting?
23   A.  A new date has been planned but hasn't yet
24 been noticed.
25   Q.  And what is the planned date?

Page 29

8 (Pages 26 - 29)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    A.   March 28th.
2    Q.   Okay. Do you know Judge Phillip Journey,
3 member of the board?
4    A.   Yes, I do.
5    Q.   And are you aware that he has claimed that
6 the NRA management violated its bylaws in connection
7 with filing a petition for bankruptcy protection?
8       MR. GARMAN (VIA ZOOM): Objection as
9 to form.
10       Go ahead.
11    A.   Yes, I'm aware of his allegations.
12    Q.   You were present at the January 7th board
13 meeting, correct?
14    A.   Correct, except for a portion of the
15 meeting that was held in executive session, which I
16 did not attend.
17    Q.   And Judge Journey, as I understand it,
18 contends that the NRA did not disclose to the board
19 its intention to file -- to seek Chapter 11
20 protection.
21      Is his contention correct?
22       MR. GARMAN (VIA ZOOM): Objection;
23 form. Objection to the extent it calls for a legal
24 conclusion.
25       Go ahead.

Page 30

1    A.   Okay. So, I'm sorry, can you restate the
2 question?
3    Q.   Sure. And I'm -- just to be clear, I'm
4 asking you as a matter of fact.
5      Judge Journey contends that the NRA did
6 not disclose to the board the intention to seek
7 Chapter 11 protection.
8      And my question to you is: Is Judge
9 Journey's contention correct?
10       THE WITNESS (VIA ZOOM): May I confer
11 with counsel about a potential privilege issue?
12       MS. STERN (VIA ZOOM): Of course.
13       THE VIDEOGRAPHER (VIA ZOOM): Do you
14 want to go off the record?
15       MR. GARMAN (VIA ZOOM): Yes.
16       THE VIDEOGRAPHER (VIA ZOOM): Going
17 off the record. The time is 10:01 a.m.
18      (Recess 10:01 a.m. to 10:06 a.m.)
19       THE VIDEOGRAPHER (VIA ZOOM): Going
20 back on the record. The time is 10:06 a.m.
21    Q.   Okay. Are you prepared to answer the
22 question, Mr. Frazer?
23    A.   Yes, I am. And, again, thanks for your
24 patience while we -- while we conferred.
25      So there are three parts. I would break

Page 31

1 this -- the board meeting down into -- into three
2 components and answer separately with respect to
3 each of those.
4      First of all, there -- there were, as we
5 noted, I think two executive sessions. The first
6 one was called in order to discuss Mr. LaPierre's
7 employment contract, and we believe that was a
8 privileged discussion. So to the extent that --
9 that that's privileged, I can't answer as to
10 discussions during that session.
11      The second executive session was regarding
12 the resolution formalizing the -- the existence and
13 powers of the special litigation committee. I did
14 not -- I wasn't present for that executive session,
15 so I can't answer on that one.
16      With respect to the open session of the
17 board meeting, the remainder of the meeting, there
18 was no discussion of Chapter 11 filing.
19    Q.   And the first executive session that you
20 referenced where Mr. LaPierre's employment contract
21 was discussed, who was present at that session?
22    A.   The -- the board members who were
23 present -- 37, 38, something -- board members,
24 something like that; Mr. LaPierre; myself; a couple
25 of the staff members from the secretary's office for

Page 32

1 administrative needs; Mr. Davis, the counsel to the
2 board of directors; and I believe Ms. -- Mr. Carter
3 from the Brewer firm was there, and I believe
4 Ms. Rogers was there for the first executive
5 session.
6    Q.   Was Mr. Kent Correll there?
7    A.   No.
8    Q.   And was Mr. Correll present at any other
9 portions of the board meetings that day?
10    A.   No.
11    Q.   Okay. And Mr. Carter, is that -- that's
12 Travis Carter?
13    A.   That's right.
14    Q.   And he's a nonlawyer, correct?
15    A.   I believe so.
16    Q.   Sorry, you broke up a little bit there.
17    A.   Oh, I'm sorry. I believe -- I believe
18 he's a nonlawyer.
19    Q.   Okay. And just off the record, I am
20 concerned about my connectivity today, so if you
21 have a problem, do let me know because we all --
22    A.   We're hearing you fine.
23    Q.   -- live in fear of the frozen screen.
24      You hear -- okay. Great.
25      I want to ask you a quick question just

Page 33

9 (Pages 30 - 33)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1 going back to the special meeting. You said there
2 were certain key presenters --
3 A. Uh-huh.
4 Q. -- that were not able to attend at the
5 scheduled time.
6 Who -- who are the key presenters?
7 THE WITNESS (VIA ZOOM): Can I...
8 MR. GARMAN (VIA ZOOM): Yeah.
9 A. My understanding is that Mr. Brewer and
10 Mr. Garman had concerns about having -- about having
11 been exposed to COVID in the, you know, previous few
12 days.
13 MR. GARMAN (VIA ZOOM): And, Emily, I
14 don't -- if you -- if you find me supplementing to be
15 problematic, I won't, but Mr. Neligan also falls in
16 the category of -- of potential exposure.
17 MS. STERN (VIA ZOOM): Oh, just -- I
18 just -- I'm sorry, I should have clarified. I'm
19 just -- I'm trying not to ask about health issues.
20 MR. GARMAN (VIA ZOOM): Oh.
21 MS. STERN (VIA ZOOM): I'm not
22 interested in your health status.
23 MR. GARMAN (VIA ZOOM): Okay.
24 MS. STERN (VIA ZOOM): I want to just
25 know who were the intended presenters at the special

Page 34

1 meeting.
2 MR. GARMAN (VIA ZOOM): Oh, okay.
3 Then -- then late objection. I'll object to the form
4 of your last question, but we'll do it again.
5 A. Okay. Okay. So the -- so I was not told
6 in advance who the presenters would be, so I don't
7 know that I -- I don't know that I knew that until
8 just now.
9 MR. GARMAN (VIA ZOOM): Okay. So only
10 answer what you know.
11 Q. Okay. So you didn't know who was going to
12 be presenting at the special meeting?
13 A. Not until I found out who wasn't able to
14 present, which was after I --
15 Q. Okay.
16 A. -- after I had arrived in Dallas.
17 Q. Is the plan to have the special meeting in
18 person?
19 A. Yes.
20 Q. Okay. In Dallas?
21 A. Yes.
22 Q. Okay. Mr. -- sorry -- Judge Journey has
23 alleged that NRA bylaws and Robert's Rules of Orders
24 were routinely violated by NRA's management.
25 Is that correct?

Page 35

1 MR. GARMAN (VIA ZOOM): Objection to
2 form.
3 Go ahead.
4 A. It's correct that he alleges that.
5 Q. I'm sorry. Is his contention correct?
6 A. Not in my opinion.
7 Q. Are you aware of any violations of the
8 bylaws in connection with board meetings that have
9 occurred in the last year?
10 MR. GARMAN (VIA ZOOM): So let me --
11 let me insert -- I don't think this question calls
12 for the invasion of the attorney-client privilege. I
13 just -- you're general counsel. I want you to start
14 being careful with the answers. But if you -- to the
15 extent that you can answer that question, please go
16 ahead.
17 A. No, I'm not aware of any violations of the
18 bylaws.
19 Q. Mr. Rocky Marshall became a member of the
20 board in January 2021; isn't that correct?
21 A. That's correct.
22 Q. And what were the circumstances that led
23 to his becoming a board member?
24 A. A sitting board member resigned. And
25 under our bylaws, when a vacancy occurs on the

Page 36

1 board, the -- the vacancy is filled by the -- the
2 next runner-up who wasn't re-elect -- who wasn't
3 elected, excuse me, elected in the -- in the most
4 recent board election.
5 Q. And who was the sitting member of the
6 board that left the board?
7 A. That was Duane Liptak.
8 THE WITNESS (VIA ZOOM): That's
9 L-i-p-t-a-k for the reporter.
10 Q. And did Mr. Liptak resign shortly after
11 the filing of the bankruptcy petition?
12 A. Yes, he did.
13 Q. And do you have an understanding why
14 Mr. Liptak resigned?
15 A. I do.
16 Q. And what is your understanding?
17 A. He stated that -- in a resignation letter
18 that he felt he wasn't able to provide proper
19 oversight.
20 Q. And do you have an understanding of what
21 he meant by not being able to provide proper
22 oversight?
23 MR. GARMAN (VIA ZOOM): Objection to
24 form.
25 A. Not having the letter in front of me, I

Page 37

10 (Pages 34 - 37)

Veritext Legal Solutions
800-336-4000

1 don't recall if he stated any context -- any context
2 for it.
3      Q.  Okay.
4           MS. STERN (VIA ZOOM):  Stephen can
5 we --
6           MR. THOMPSON (VIA ZOOM):  Yes, it has
7 been marked.
8           MS. STERN (VIA ZOOM):  -- provide the
9 letter?
10          Okay.  So in the magic of Veritext,
11 the letter is in the --
12          MR. GARMAN (VIA ZOOM):  So, Emily,
13 just for the record, avoidance of doubt and for
14 clarity of the record, you okay with me showing this
15 exhibit from the Egnyte site to the witness, correct?
16          MS. STERN (VIA ZOOM):  I am.
17          MR. GARMAN (VIA ZOOM):  Okay.
18          MS. STERN (VIA ZOOM):  And you should
19 be looking at a letter dated January 19, 2021.  Is
20 that right?  Is that what we're looking at?
21          THE WITNESS (VIA ZOOM):  Yes.
22          THE VIDEOGRAPHER (VIA ZOOM):  Instead
23 of having the witness shift --
24          MS. STERN (VIA ZOOM):  Stephen, do you
25 want to pop it up?

Page 38

1           THE VIDEOGRAPHER (VIA ZOOM):  -- it
2 would be better to move the laptop.
3           MS. STERN (VIA ZOOM):  Maybe that will
4 keep it.
5           MR. GARMAN (VIA ZOOM):  What's that?
6           THE VIDEOGRAPHER (VIA ZOOM):  Instead
7 of having the witness --
8           MS. STERN (VIA ZOOM):  The screen
9 share.
10          THE VIDEOGRAPHER (VIA ZOOM):  -- it
11 would be better to move the laptop.
12          MR. GARMAN (VIA ZOOM):  It's connected
13 to things.
14          THE VIDEOGRAPHER (VIA ZOOM):
15 Apologies, Counsel.
16          (Off-the-record conversation.)
17          (Exhibit 1 marked.)
18          MS. STERN (VIA ZOOM):  Are you guys
19 struggling -- I'm sorry, we're off the record?
20          MR. GARMAN (VIA ZOOM):  No, no, we
21 have it.  We're ready.
22          MS. STERN (VIA ZOOM):  Oh, you're
23 ready.  Okay.
24      Q.  Mr. Frazer, can you identify the document
25 that we have put into the screen share?

Page 39

1      A.  Yes.  This is Mr. -- this is the letter
2 Mr. Liptak sent me in January.
3      Q.  Okay.  And so he states in the letter,
4 However, in the current organizational environment,
5 I am no longer able to effectively perform the
6 duties of a director with what I feel is the
7 appropriate level of oversight required.
8          And that is what you were referring to
9 when you said that he had concerns about oversight
10 issues; is that right?
11     A.  Yes.
12     Q.  And did you have any conversations with
13 Mr. Liptak in or around the time that he resigned?
14     A.  I had -- I had a couple of email exchanges
15 with him.
16     Q.  And in those communication -- what were
17 the sum and substance of those communications?
18     A.  He -- prior to his resignation letter, he
19 sent a letter regarding the bankruptcy filing in
20 which he asked why -- asked essentially why it
21 hadn't been discussed with the board at the
22 January 7th meeting.
23          MS. STERN (VIA ZOOM):  Counsel, has
24 that letter been produced?
25          MR. GARMAN (VIA ZOOM):  I don't know.

Page 40

1           MS. STERN (VIA ZOOM):  Okay.  We ask
2 for it.  It's production.
3      Q.  To whom was that letter directed that you
4 just referred?
5      A.  It was -- it was sent to me.  I don't
6 recall if it was copied to anyone else.
7      Q.  Did you share the letter with anyone else?
8      A.  Yes.
9      Q.  With whom?
10          MR. GARMAN (VIA ZOOM):  Object.
11          To the extent you can answer without
12 invading the attorney-client privilege, go ahead.
13          THE WITNESS (VIA ZOOM):  Can we confer
14 for 2 seconds.
15          MR. GARMAN (VIA ZOOM):  Ms. Stern?
16          MS. STERN (VIA ZOOM):  Yes.
17          MR. GARMAN (VIA ZOOM):  Okay.  Let's
18 go off the record.
19          THE VIDEOGRAPHER (VIA ZOOM):  Going
20 off the record.  The time is 10:19 a.m.
21          (Recess 10:19 a.m. to 10:22 a.m.)
22          THE VIDEOGRAPHER (VIA ZOOM):  Going
23 back on the record.  The time is 10:22 a.m.
24      Q.  And, Mr. Frazer, you asked for a break to
25 consult with counsel on a question of privilege.

Page 41

11 (Pages 38 - 41)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    Which counsel did you consult with?
2    A.  I consulted with Mr. Garman and
3 Ms. Eisenberg.
4    Q.  Okay.  Okay.  And can you answer the
5 question?
6    A.  And so your -- I'm going to restate your
7 question.  Please tell me if I'm stating it wrong.
8        Your question was whether I had shared
9 Mr. Liptak's communication with anyone?
10   Q.  Correct.
11   A.  Okay.  So I think that -- this actually
12 just occurred to me since we conferred.  Mr. Garman
13 won't be surprised, but I think I shared it -- I
14 know I shared it with board counsel, Wit -- Wit
15 Davis, and -- actually, he's the only person I know
16 I shared it with.
17   Q.  Did you discuss the substance of it with
18 anyone?
19   A.  I believe --
20   Q.  Without disclosing -- without disclosing a
21 privileged conversation.
22   A.  Sure.  I believe I -- I believe I
23 discussed it with Mr. Davis by phone.
24   Q.  Did you bring it to the attention of any
25 of the officers of the board?

Page 42

1    A.  I -- I don't recall if or how I did that
2 or whether I -- I don't -- I don't recall if or how
3 I did that.
4    Q.  At any time have you had any conversations
5 with any of the members of the board concerning
6 Mr. Liptak's communication about the bankruptcy
7 filing?
8    A.  Yes.  I had -- I can't remember if it was
9 a phone call, but I know that I had some emails with
10 the NRA president, Ms. Meadows, regarding
11 Mr. Liptak's resignation.
12       And the question there was whether -- we
13 were in the process of appointing committees.  You
14 know, we have 37-odd committees that oversee
15 different aspects of NRA activities.  And my -- you
16 know, the president appoints the committees.
17       So my question to her was -- was
18 whether -- you know, whether this would affect her
19 committee assignment decisions with respect to
20 Mr. Liptak at all, and the answer was no.
21   Q.  And you mentioned that you had a few
22 communications with Mr. Liptak around the time of
23 his resignation.
24       What other communications did you have
25 with him?

Page 43

1        MR. GARMAN (VIA ZOOM):  Objection to
2 form.
3        Go ahead.
4    A.  So -- so in addition to the communications
5 I mentioned, as I noted, Ms. Meadows indicated that
6 she still wished to appoint him to -- to committees
7 if he was willing to serve.  And so I had some
8 communications with him in which I asked him if he
9 was still willing to serve, and he indicated that he
10 was, and so he remains on those committees.
11   Q.  And -- and just to clarify, he remains on
12 those committees as a non-board member?
13   A.  That's correct.
14   Q.  And did you have any conversations with
15 Mr. Liptak about his concerns regarding the
16 bankruptcy matter in any respect?
17   A.  I don't think I did.
18   Q.  Okay.  Mr. Frazer, you're currently a
19 member of the Virginia Bar?
20   A.  Yes.
21   Q.  And any other bars?
22   A.  District of Columbia.
23   Q.  Are you in good standing?
24   A.  Yes.
25   Q.  And are you up to date in all of your

Page 44

1 continuing legal education requirements?
2    A.  Yes.
3    Q.  And are you up to date in all of your
4 ethical requirements?
5    A.  As part of the CLE, yes.
6    Q.  Okay.  Have you ever been the subject of
7 an ethics complaint?
8    A.  No.
9    Q.  And have you ever been the subject of any
10 type of disciplinary action?
11   A.  No.
12   Q.  Have you ever been the subject of a
13 malpractice claim?
14   A.  No.
15   Q.  Okay.  Prior to becoming general counsel
16 of the NRA, I think that you testified earlier this
17 week that you had done some training classes --
18 courses in law governing not-for-profits and
19 charities.
20       Do I have that right?
21       MR. GARMAN (VIA ZOOM):  Objection to
22 form.
23       Go ahead.
24   A.  Yes.
25   Q.  Okay.  Can you tell me what they were?

Page 45

12 (Pages 42 - 45)

1   A.  I took -- attended the Georgetown --
2 Georgetown Law Center conference on representing --
3 it's a long title.  It's nonprofits and tax-exempt
4 organizations.  It's a major two- or three-day event
5 each spring.  Unfortunately it's often the same
6 weekend as our annual meeting, so I have a problem
7 there.
8       And I attended -- I attended another
9 seminar.  I don't recall the name or the sponsor.
10 And there may have been -- there may have been a
11 third one, but those are the two that I distinctly
12 remember going to.
13   Q.  And what year was this?
14   A.  I think that the Georgetown seminar was in
15 2015 because I think I've had a schedule conflict
16 every year since.
17       And then the -- and then the -- I think
18 the other -- that was very early in my tenure.  I
19 think the other one that I'm thinking of was later,
20 within a -- probably within a year or two, so 2016
21 or 2017.
22   Q.  Did you have any experiencing -- sorry.
23       Did you have any experience as a lawyer
24 handling matters of corporate governance before you
25 became the general counsel?

Page 46

1   A.  I had dealt with some issues about
2 governance of for-profit entities when I was in
3 private practice.
4   Q.  What kinds of issues?
5   A.  One of them -- one of them involved a --
6 trying to figure out -- basic --
7       MR. GARMAN (VIA ZOOM):  I'm going to
8 just lodge a quick objection and we can go on.
9       Obviously to the extent that this
10 question -- you can answer in generalities, but
11 obviously don't invade other clients' privilege
12 issues --
13       THE WITNESS (VIA ZOOM):  Of course.
14       MR. GARMAN (VIA ZOOM):  -- but go
15 ahead and --
16       THE WITNESS (VIA ZOOM):  Of course.
17       MR. GARMAN (VIA ZOOM):  -- go ahead
18 and answer from a high level.
19       THE WITNESS (VIA ZOOM):  Sure.  Sure.
20   Q.  I have no interest in, yeah, privileged
21 information about your current client or your former
22 clients --
23   A.  Okay.  Sure.
24   Q.  -- just in terms of the subject matter,
25 scope of the representation --

Page 47

1   A.  Sure.
2   Q.  -- if you could explain.
3   A.  Yeah.  Sure.
4       One of them -- one of them involved the
5 potential future transfer of an interest in a
6 for-profit, you know, closely held company.  Another
7 involved the transfer of -- of -- actually a couple
8 of them involved asset transfers to and from LLCs.
9 And a third was a -- related to a compliance opinion
10 in respect to issuance of secured debt.
11   Q.  Prior to your current roles at the NRA,
12 had you ever served as a director or officer of the
13 corporate board?
14   A.  No.
15   Q.  And just to be clear on the record, that
16 also includes a not-for-profit board?
17   A.  That's right, no.
18   Q.  Okay.  Did you have any experience in
19 your -- as a lawyer in addressing matters concerning
20 fiduciary duties of officers, directors, or others
21 to a not-for-profit corporation?
22       MR. GARMAN (VIA ZOOM):  Objection to
23 form.
24       Go ahead.
25   A.  As a lawyer, no; but in a prior position

Page 48

1 at the NRA, I was regularly around board meetings
2 when those issues were being dealt with.
3   Q.  Did that entail you providing advice on
4 the legal obligations of the officers and the
5 directors and -- sorry.  Let me restate my question.
6       In -- in your role -- your prior role,
7 which was in ILA, correct?
8   A.  Correct.
9   Q.  And was -- you said you were around board
10 meetings.
11       Was your role in those board meetings as a
12 lawyer to advise the officers and directors?
13   A.  I wasn't a lawyer yet, so no.
14   Q.  Okay.  Did you have -- prior to your
15 current role -- roles at the NRA, any experience
16 dealing with New York laws governing not-for-profits
17 and charities?
18   A.  I had some exposure to that from being
19 around board meetings during my prior role.  I
20 was -- I was serving one of the officers of the NRA
21 during some previous internal conflicts in the
22 organization.
23   Q.  And who was that officer and when was
24 that?
25   A.  That was Tanya Metaksa, M-e-t-a-k-s-a.

Page 49

13 (Pages 46 - 49)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1 She was the executive director of ILA from 1994 to
2 '98. As you know, that was a controversial period,
3 and I regularly attended board meetings to assist
4 her.
5    Q. And what kind of assistance did you
6 provide?
7    A. Really just helping her with anything that
8 she needed, you know, if I -- you know, it was a --
9 I was a junior staffer. If I needed to -- if she
10 needed something, I would -- you know, I would help
11 her get it. Or if I -- or if she needed me to, you
12 know -- I don't know, sometimes I would help edit --
13 edit a document, produce a document, something like
14 that.
15    Q. So fair to say that you were exposed to
16 the governance issues that were raised at that time
17 but you were not involved in substantively handling
18 them; is that correct?
19    A. That's fair.
20    Q. Okay. And prior to your current roles at
21 the NRA, what experience did you have with
22 regulatory reporting requirements of nonprofits and
23 charities?
24    A. That was outside my -- outside my
25 bailiwick in my previous positions.

Page 50

1 some antitrust issues.
2    Q. Okay. Again, prior to your roles at the
3 NRA, did you have any experience handling corporate
4 transactions for not-for-profits or charities?
5    A. Yeah, I did some -- I did some
6 transactional work for for-profit entities but not
7 nonprofits.
8    Q. Okay. And same question so I don't have
9 to repeat it each time, but I'm happy to if you
10 would like me to, which is: Prior to your roles --
11 your current roles at the NRA, did you have any
12 experience in handling matters concerning the
13 oversight of charitable assets?
14    A. No.
15    Q. Did you have any familiarity with the New
16 York law governing prudent management of
17 institutional assets?
18    A. No.
19    Q. Okay. And you said you had compliance
20 experience in the -- with firearms law.
21       Did you have any other corporate
22 compliance experience?
23    A. Yes.
24    Q. And what was that?
25    A. It had to do with a regulatory

Page 52

1    Q. Okay. And was tax law governing
2 nonprofits and charities also outside of your
3 bailiwick in your previous positions?
4    A. It was outside my job responsibilities. I
5 had some exposure occasionally in that earlier part
6 of my NRA career.
7    Q. What was the exposure?
8    A. Just awareness of issues that were being
9 discussed, you know, involving the tax status of the
10 NRA or the foundation, you know, other entities.
11    Q. And in your private practice, did you
12 represent any clients involving matters concerning
13 regulatory reporting requirements of charities or
14 not-for-profits?
15    A. I did a lot of compliance work but not for
16 charities or nonprofits.
17    Q. What was the compliance work that you
18 did --
19    A. Firearms.
20    Q. -- in -- firearms.
21    A. I'm sorry, fire -- yeah, firearms, law
22 compliance, federal and state. And I --
23    Q. And --
24    A. And I did have -- I had a trade
25 association client where I had to become aware of

Page 51

1 investigation that the NRA was -- was being
2 subjected to in which the NRA was being asked to
3 make a document production, and I was asked to
4 assist with that.
5    Q. And that was when you were at -- in ILA?
6    A. That's correct.
7    Q. Was that before or after you were a member
8 of the bar?
9    A. It was after I was a member of the bar.
10    Q. And so did you -- was your role in
11 responding to that regulatory investigation that of
12 a lawyer?
13    A. Yes.
14    Q. And was there anyone else -- any other
15 lawyers involved in that investigation without going
16 into the substance of it?
17    A. Sure. I was -- I was working under the
18 direction of the Office of General Counsel.
19    Q. Okay. So other -- other than that
20 regulatory investigation, what other regulatory
21 investigatory matters were you involved in before
22 you became the general counsel of the NRA?
23    A. I dealt with some private clients on
24 regulatory investigation matters.
25    Q. What agencies?

Page 53

14 (Pages 50 - 53)

1    A.   Bureau of Alcohol, Tobacco, and Firearms.
2    Q.   Any others?
3    A.   Not that I can recall.
4    Q.   Did you handle any regulatory litigation
5  matters?
6    A.   Well, one of the regulatory matters turned
7  into a criminal defense matter, so to that extent,
8  yes.
9    Q.   And did you represent the client?
10   A.   I did.
11   Q.   Did you defend them?  Sorry.
12   A.   Yes.
13   Q.   Okay.
14   A.   Yes.
15   Q.   And did you have any prior experience
16  before you became the general counsel of the NRA
17  conducting internal investigations?
18   A.   I'm trying to figure out whether something
19  would qualify, but I think no.
20   Q.   Okay.  And what was your prior experience
21  with law governing whistleblowers?
22   A.   I hadn't dealt with whistleblower issues
23  previously.
24   Q.   And law governing conflicts of interest in
25  business transactions?

Page 54

1  contracts -- contract reviews, employment matters,
2  regulatory compliance, both for the NRA (c)(4) and
3  the (c)(3), charitable filings, lobbyist
4  registration, charitable gaming, sweepstakes
5  compliance, occasional tort issues.  I mentioned HR
6  matters; that would include OSHA and similar things,
7  environmental matters affecting NRA -- the NRA range
8  at headquarters and other shooting ranges.
9    Q.   And the six attorneys that you oversee, do
10  they have specialized areas?
11   A.   Somewhat.  They're all kind of
12  generalists, but over -- over time, each of them has
13  built up some expertise in specific fields.  And,
14  you know, we try to -- we try to keep everyone
15  informed and educated, but we also try to be
16  efficient, and that means going to the person
17  who's -- who's learned the most about a particular
18  topic.
19   Q.   So do you have anybody in the Office of
20  General Counsel -- this question includes
21  yourself -- who is responsible for ensuring that the
22  NRA is in compliance with its reporting
23  responsibilities as a charity and a not-for-profit?
24   A.   Yes.
25   Q.   Who is that?

Page 56

1    A.   I was obviously familiar with the -- with
2  the bar rules about, you know, lawyers' conflicts of
3  interest.  But I hadn't had to deal with any -- any
4  business conflicts of interest except to the extent
5  that I was aware of the NRA's internal reporting
6  requirements for officers, directors, and employees
7  to report business with the Association.
8    Q.   Okay.  And -- and just to be also clear
9  for the record, just -- that includes any financial
10  transactions, conflicts of interest in any financial
11  transactions.
12       That -- did that -- your prior answer
13  cover the scope of your experience with that?
14   A.   I think so.  You know, the provision I'm
15  referring to is the NRA bylaws provision that we
16  have had since the late 1970s regarding
17  self-reporting of business with the Association.
18   Q.   Okay.  Can you describe just the scope of
19  your role and your responsibility as the general
20  counsel?
21   A.   Sure.  It's -- you know, it's pretty much
22  what you would expect of a -- we have six -- six
23  attorneys, four support staff in the office; I
24  supervise them.  And we do the whole gamut of, you
25  know, routine in-house corporate matters,

Page 55

1    A.   Well, I'm involved in that because I'm
2  often the one certifying the forms.  Before I came
3  on board, a lot of the expertise in that field had
4  been built up by Skipp Galythly.
5       THE WITNESS (VIA ZOOM):  For the
6  reporter -- I think I spelled it the other day --
7  G-l -- G-a -- G-a-l-y-t-h-l-y.
8    A.   And Morgan Shields was an employee -- was
9  an attorney in the office who also worked in that
10  field.  And --
11       (Interruption.)
12       MS. STERN (VIA ZOOM):  Can we go off
13  the record?
14       MR. GARMAN (VIA ZOOM):  Yeah.
15       THE VIDEOGRAPHER (VIA ZOOM):  Going
16  off the record.  The time is 10:45 a.m.
17       (Recess 10:45 a.m. to 10:46 a.m.)
18       THE VIDEOGRAPHER (VIA ZOOM):  Going
19  back on the record.  The time is 10:46 a.m.
20   A.   So before the dramatic interruption, could
21  you restate the question just so I make sure I'm not
22  missing -- missing anyone I need to mention.
23   Q.   I think that -- we don't have to go all
24  the way back to the question.  I think we were
25  talking about who in the Office of General Counsel

Page 57

1 is responsible for ensuring the reporting
2 requirements that apply to charities and
3 not-for-profits are met.
4   A.  Sure.
5   Q.  And I think you were discussing a number
6 of people.  I don't know if you finished.
7   A.  Sure.  I think for the -- I think the --
8 the other individual that I should mention is
9 Matthew Bower, B-o-w-e-r.  Although he does
10 compliance reporting mainly with respect to lobbying
11 and political matters that, you know, don't --
12 aren't necessarily exclusive to nonprofits.
13   Q.  Do you as a general counsel have oversight
14 of the legal affairs of -- of ILA?
15   A.  No, I don't.
16   Q.  Is there separate counsel that oversees
17 the legal issues for ILA?
18   A.  Yes.  Although let me -- let me subdivide
19 that a little -- a little more -- a little more
20 accurately.  The OGC deals with most corporate
21 matters for ILA such as lobbying -- lobbying reports
22 and dealing with campaign finance investigations.
23 However, ILA has its own general counsel and its own
24 litigation counsel, and -- and they're primarily
25 responsible for Second Amendment and, you know,
Page 58

1 that are handling -- let me restate the question.
2     Currently of the more substantial
3 litigation matters that you have, who are the
4 lawyers handling them?
5   A.  So there is -- you know, there are all of
6 the counsel in the bankruptcy proceeding and related
7 matters that you're familiar with and obviously
8 in -- in the -- in your office's investigation.  So
9 we have the -- the Brewer firm, Garman Turner
10 Gordon, and the Neligan firm.  We have Briglia
11 Hundley as local counsel in some of our Virginia and
12 DC-based litigation.  I'm trying to think if we
13 have -- those are -- those are the really major
14 cases.
15     I'm trying to recall -- excuse me -- if we
16 have any -- anything active using outside counsel
17 right now.  Nothing is coming to mind, but that
18 doesn't mean -- there are a couple of -- couple of
19 other things.
20     There's a -- there's a lawsuit -- there's
21 a lawsuit involving the Tree of Life Synagogue
22 murders in which we were initially named as a
23 defendant, and then they kind of haven't taken us
24 out.  We have local counsel monitoring that,
25 although, of course, it's stayed due to the
Page 60

1 firearms law-related advocacy.
2   Q.  And the ILA litigation counsel that you
3 refer to is in-house?
4   A.  Yes.
5   Q.  And do you have litigation counsel
6 in-house on the NRA general side?
7   A.  For some -- some matters we handle
8 in-house, but they're usually relatively minor;
9 issues -- you know, minor employment issues or, you
10 know, advertisers in our publications who don't pay
11 their bills, that kind of thing, so may deal with
12 collection litigation.
13   Q.  And so how do you handle non-minor
14 litigation matters?
15     MR. GARMAN (VIA ZOOM):  Objection to
16 form.
17     Go ahead.
18   A.  Well, we -- we look at -- we look at the
19 issue and we determine whether it's something that
20 someone in-house can handle.  If we can handle it
21 in-house, that's great.  It will save us -- it will
22 save money.  And if it's not, we, you know, look to
23 see if we have a firm that we're familiar with to --
24 to handle the -- handle that type of issue.
25   Q.  And currently how many firms do you have
Page 59

1 bankruptcy.
2     I can't -- I can't exclude that there may
3 be something minor percolating that I'm not thinking
4 of off the top of my head, but those are the --
5 those are the -- the big ones that come to mind.
6   Q.  So is it fair to say that the Brewer firm
7 is handling all of the major nonbankruptcy
8 litigation involving the NRA right now?
9   A.  They're not -- they're not exclusively
10 handling it, but they're involved in the -- in the
11 most major nonbankruptcy matters, yes.
12   Q.  Okay.  And Briglia Hundley, are they
13 involved in the DC AG's matter?
14   A.  For the NRA, yes.  They're local counsel
15 for the NRA.
16   Q.  Are they local counsel with the Brewer
17 firm?
18   A.  Yes.
19   Q.  Okay.  So is the general counsel's office
20 responsible for ensuring that restricted assets --
21 the NRA's restricted assets are handled in
22 accordance with their legal -- with legal
23 obligations?
24   A.  The -- the responsibility for properly
25 accounting for restricted assets is primarily with
Page 61

16 (Pages 58 - 61)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 62

1 the financial services staff, but -- but the OGC
2 advises on specific matters if there's a question.
3 Q. And who's responsible for that in the OGC?
4 A. It would depend on the -- it would depend
5 on the issue. A lot of the time those matters don't
6 involve -- I would say actually most of the time
7 those matters don't involve the NRA itself, but they
8 involve the -- the (c)(3)s.
9 But for -- for some NRA matters that I
10 recall, recently it has been my deputy general
11 counsel, Stefan Tahmassebi.
12 I think I spelled this the other day, but
13 just in case, T-a-h-m-a-s-s-e-b-i.
14 Stefan is also the secretary of the NRA
15 Civil Rights Defense Fund, and so he's aware of
16 restricted accounts in -- in that entity and, you
17 know, helps make sure that those are not overspent
18 or inappropriately spent.
19 And then Skipp Galythly, whom I mentioned
20 earlier, is the secretary for the NRA Foundation and
21 helps review proposed grants for that entity.
22 Q. What is your role with respect to the
23 (c)(3) entities?
24 A. So the -- the OGC provides -- provides
25 services to all of the NRA's (c)(3)s, you know, more

Page 63

1 or less depending on the size of the entity and the
2 complex of the issues. But, you know, we provide
3 legal to support to all the NRA's affiliates and
4 subsidiaries.
5 Q. Do you see it as your responsibility as
6 the general counsel to alert the NRA to any legal
7 risks that you identify?
8 A. Yes.
9 Q. And do you see -- is your responsibility
10 to manage those legal risks as well?
11 A. It's not my sole responsibility. It's the
12 responsibility of everyone involved, but that's part
13 of -- it's certainly part mine.
14 Q. And -- wait. Did you say it was your
15 responsibility to advise the NRA on your view as to
16 how best to manage those legal risks?
17 MR. GARMAN (VIA ZOOM): Objection to
18 form.
19 Go ahead if you understand.
20 A. Yes.
21 Q. Do you see it as your responsibility to
22 advise the NRA just generally on legal issues that
23 may arise?
24 A. Absolutely.
25 Q. Is also part of your responsibility to

Page 64

1 convey to the -- to communicate to the board the
2 status of legal issues that the NRA is facing?
3 A. Yes.
4 Q. And to -- is it also your responsibility
5 to communicate to the board legal risks that you
6 have identified?
7 A. Yes.
8 Q. And how do you communicate those issues to
9 the board?
10 A. So with the size of our board, having 76
11 members when it's at full strength, it functions a
12 lot like a legislature with a lot of the substantive
13 work being done in committee and then
14 recommendations being made through committees.
15 So normally what I would do is identify
16 the appropriate committee to take action on an issue
17 and bring it to the attention of that committee
18 through the committee chairman and/or committee
19 secretary, depending on -- on who it is. And then
20 the committee can hear the issue out and do what
21 needs to be done.
22 Q. And you have a sort of standing reporting
23 relationship with the legal affairs committee; isn't
24 that right?
25 A. Yes.

Page 65

1 MR. GARMAN (VIA ZOOM): Objection to
2 form.
3 Go ahead.
4 A. I'm sorry. Yes.
5 Q. And so if you identify legal risks to the
6 NRA in its, you know, sort of corporate status,
7 would you bring those to the legal affairs
8 committee?
9 MR. GARMAN (VIA ZOOM): Objection to
10 form.
11 A. I would -- I would -- I would bring them
12 to the -- you know, it would depend on the specific
13 detail but obvious -- or on the specific issue. And
14 it might also depend on how close we are to a -- to
15 an upcoming meeting or something like that.
16 Sometimes -- so sometimes I'll report to
17 the legal affairs committee primarily, sometimes
18 I'll report directly to the corporate officers, you
19 know, whoever -- whatever seems to be the
20 appropriate channel to get done what needs to be
21 done.
22 Q. Prior to the NRA filing for bankruptcy in
23 mid January, did you communicate to the board any --
24 anything with respect to potential of a bankruptcy
25 filing?

17 (Pages 62 - 65)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1          MR. GARMAN (VIA ZOOM):  Objection.
2          I need to instruct you not to answer
3   to the extent your answer would -- would compromise
4   attorney-client communications.
5          A.  I'm going to decline to answer that.
6          Q.  And just for the record, I'll just ask the
7   same question -- let me just put it differently.
8          In -- I think you have testified that you
9   learned in the fall of 2020 that the Brewer firm was
10  doing some work concerning subject matter of a
11  potential bankruptcy.
12         Do I have that right?
13         A.  Yes.
14         Q.  And when you learned that, did you bring
15  that to the attention of the legal affairs
16  committee --
17         MR. GARMAN (VIA ZOOM):  So --
18         Q.  -- yes or no?
19         MR. GARMAN (VIA ZOOM):  So objection
20  to form.
21         I'll -- I'll instruct you not to
22  answer to the extent it invades the attorney-client
23  privilege.  Answer if you can otherwise do so.
24         A.  May I confer with counsel?  It'll be
25  brief.

Page 66

1          MS. STERN (VIA ZOOM):  Yes.
2          THE WITNESS (VIA ZOOM):  Thank you.  I
3   appreciate it.
4          THE VIDEOGRAPHER (VIA ZOOM):  Going
5   off the record.  The time is 10:59 a.m.
6          (Recess 10:59 a.m. to 11:07 a.m.)
7          THE VIDEOGRAPHER (VIA ZOOM):  Going
8   back on the record.  The time is 11:07 a.m.
9          MR. GARMAN (VIA ZOOM):  So -- so this
10  is Greg.  Let me start.  I think we're going to
11  answer that question, but I want to make sure we get
12  it right what the question was.
13         Emily, you can either repeat it back
14  or I'll have John summarize it the way he understood
15  it, whichever you prefer.
16         Q.  We can go with the latter.
17         Just to clarify for the record:  And your
18  consultation with counsel on this question of
19  privilege, you were consulting with which counsel?
20         A.  I consulted with Mr. Garman and -- and
21  Ms. Eisenberg.
22         Q.  Okay.  So let's give it a go.  You can
23  explain to me --
24         MR. GARMAN (VIA ZOOM):  So just for
25  avoidance of clarity of the record, though,

Page 67

1   Mr. Fleming did call on an unrelated -- just called
2   unrelated.  They didn't confer on it.  Just make sure
3   the record is -- is clear.  But --
4          THE WITNESS (VIA ZOOM):  Right.
5          MR. GARMAN (VIA ZOOM):  But, yeah, so
6   go ahead.
7          THE WITNESS (VIA ZOOM):  Okay.
8   Thanks, Greg.
9          A.  So my understanding of the question was
10  whether after I became aware that Chapter 11
11  reorganization was being considered as a
12  possibility, whether I discussed that with the legal
13  affairs committee.
14         Is that a fair restatement?
15         Q.  I'll take the answer to that question.
16         A.  Okay.  The answer is no.
17         Q.  And did you discuss -- did you share that
18  information with anyone else on the board?
19         A.  Not that I recall.
20         Q.  Okay.  So you mentioned that -- the
21  difficulty of communicating with a 76-member board.
22         Is it fair to say that's a challenge?
23         A.  Sometimes.  Sometimes it's more of an
24  individual challenge.
25         Q.  And the NRA's managed by its 76-member

Page 68

1   board; isn't that right?
2          MR. GARMAN (VIA ZOOM):  Objection to
3   form.
4          Go ahead.
5          A.  Yes.
6          Q.  Can you describe the leadership --
7   leadership structure of the NRA?
8          A.  Sure.  Well, the way I always explain this
9   is that at the -- at the top, of course, you have
10  the members.  We're a membership organization and
11  all management occurs for the benefit of the -- of
12  the members' interest.  The members elect the board.
13  And then the board -- the board provides general
14  policy guidance and general -- general oversight.
15  And the day-to-day management is conducted by the --
16  by the in-house officers led by the executive vice
17  president.
18         Q.  And there are other -- seven other
19  officers, correct?
20         A.  There are three -- apologize.  I always
21  have to count.  Yeah, there are -- there are three
22  non-salaried officers; the board officers as we call
23  them, the president and two vice presidents.
24  Executive vice president, secretary, and treasurer
25  are the three elected salaried officers.  And then

Page 69

18 (Pages 66 - 69)

1 we have two officers that are salaried but appointed
2 by the EVP, and those are the executive directors of
3 general operations and of the Institute for
4 Legislative Action.
5     Q. And as of January 14th, can you just tell
6 me who was in the -- each of those roles, the eight
7 that you just described, which is the president, the
8 two VPs, the executive vice president, treasurer,
9 secretary, and the executive director of general
10 operations and of ILA?
11         MR. GARMAN (VIA ZOOM): I'm sorry to
12 interject. What was the date?
13         THE WITNESS (VIA ZOOM): As of
14 January 14th.
15         MR. GARMAN (VIA ZOOM): Okay.
16         MS. STERN (VIA ZOOM): The day before
17 the bankruptcy.
18         MR. GARMAN (VIA ZOOM): Thank you.
19     A. So the president was Carolyn Meadows. The
20 first vice president was Charles Cotton. The second
21 vice president was Willes Lee. The executive vice
22 president was Wayne LaPierre. I was the secretary.
23 Craig Spray was the treasurer. The executive
24 director of general operations was Joe DeBergalis.
25 And the executive director of the Institute for

Page 70

1 Legislative Action was Jason Ouimet. That's
2 O-u-i-m-e-t.
3     Q. And today the roster is the same other
4 than Mr. Spray has departed; isn't that right?
5     A. Mr. Spray is -- is still treasurer until a
6 replacement is appointed -- or elected I should say.
7     Q. And is he treasurer in name or is he
8 actually fulfilling the duties of treasurer?
9     A. He's on administrative leave.
10     Q. And on administrative leave, is he
11 providing any services to the NRA?
12     A. He's -- he's provided assistance in -- in
13 transitional issues, like -- you know, I know, for
14 example, he's -- he's helped sign over accounts and
15 things like that.
16     Q. And other than transitioning authority, is
17 he involved in any other aspects of the operations
18 of the NRA since he took administrative leave?
19     A. Only speaking to my personal knowledge,
20 I'm not aware of any.
21     Q. Okay. Are you familiar with the terms of
22 his compensation?
23     A. His -- you mean --
24         MR. GARMAN (VIA ZOOM): Objection to
25 form.

Page 71

1     Go ahead.
2     A. You mean his -- his -- the -- the amounts
3 of his compensation?
4     Q. Are you -- are you familiar with the terms
5 of his current compensation arrangement --
6     A. Uh-huh.
7     Q. -- with the NRA?
8     First, is he getting paid?
9     A. Yes.
10     Q. And do you know in -- what the -- sort of
11 the -- the basis for that payment is?
12     A. It's the salary that was set by the board
13 of directors at its -- at its October meeting.
14 Although, I believe he is still subject to a -- to a
15 salary reduction. You know, we all took salary --
16 salary cuts to deal with the financial impact of
17 COVID.
18     Q. And when you say the salary set at the
19 October meeting, October 2020 meeting?
20     A. That's correct.
21     Q. So the only reduction in his salary
22 currently is because of the COVID reduction --
23     A. That's my --
24     Q. -- right?
25     A. That's my understanding.

Page 72

1     Q. Do you know how long he will continue to
2 receive salary?
3     A. Until he's no longer treasurer.
4     Q. And then once he is no longer treasurer --
5 well, actually, let me ask you a different question.
6     Will he be treasurer until a new treasurer
7 is appointed? Is that the plan?
8     A. Yes.
9     Q. And is there currently an anticipated date
10 when that will occur?
11     A. I don't know.
12     Q. And once a new treasurer is put in place,
13 does Mr. Spray have any entitlement to
14 post-employment compensation?
15     A. Mr. Spray has a contract that provides for
16 post-employment compensation, yes.
17     Q. And do you know what that contract allows?
18     A. So generally -- in general terms, it
19 allows for compensation of three months' salary in
20 the event of a voluntary resignation and 18 months
21 in the event of a termination by the NRA that's not
22 for cause and no compensation beyond accrued
23 vacation time if it's a termination for cause.
24     Q. And under which category will Mr. Spray be
25 entitled to compensation?

Page 73

19 (Pages 70 - 73)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1 A. I don't know at this time.
2 Q. Is that a matter that's under discussion?
3 A. I don't know. Actually, I should --
4 Q. So --
5 A. Actually --
6 MR. GARMAN (VIA ZOOM): Hold on.
7 Let's be careful here. If you're involved in this
8 because you're giving legal advice, it'll be
9 privileged. But if you're just simply -- if you're
10 just simply reporting what you understand other
11 people to -- to be conversations, you can answer to
12 that.
13 THE WITNESS (VIA ZOOM): Okay.
14 A. So if you'd restate the question, I can
15 answer accurately or maybe get it read back.
16 MS. STERN (VIA ZOOM): Can the court
17 reporter read the question back, please.
18 (Record read.)
19 A. Yes, it's under discussion.
20 Q. And who is handling those discussions?
21 MR. GARMAN (VIA ZOOM): Again, if --
22 if you just are aware of the fact of those
23 discussions, you can answer that question.
24 A. Yeah, I know it's under discussion between
25 NRA staff and the Brewer firm.

Page 74

1 Q. Have you had any conversations with
2 Mr. Spray concerning post-employment compensation
3 matters?
4 A. Yes.
5 Q. And what's the sum and substance of those
6 conversations?
7 MR. GARMAN (VIA ZOOM): Okay. So I
8 may need to take a break. I don't -- I don't know
9 this. I need to figure out whether this is --
10 whether this is in his capacity as -- as counsel.
11 THE WITNESS (VIA ZOOM): Okay.
12 MS. STERN (VIA ZOOM): Okay. I just
13 want to raise the point that their interests are not
14 necessarily aligned in this conversation -- in the
15 conversation, a negotiation over --
16 MR. GARMAN (VIA ZOOM): Well, I
17 think -- I think you added a fact there. I need to
18 figure out whether this is -- this was part of a, for
19 instance, advice that was obtained -- just throwing
20 out a hypothetical, advice that was sought
21 preretirement. I just don't know what the answer is.
22 So, Emily, I'm happy to go on with the
23 questioning. I have been -- I have been attempting
24 to -- to make sure that we can answer as many
25 questions as possible, so I'm going to have to be

Page 75

1 extra cautious if I don't understand the substance of
2 this -- these communications.
3 MS. STERN (VIA ZOOM): I -- I have no
4 objection to that, and I appreciate your being
5 careful and also the -- allowing us to, you know,
6 proceed. So if you need to take a moment to talk to
7 your client, I'm happy to do that.
8 MR. GARMAN (VIA ZOOM): Yeah, so let's
9 go off the record.
10 MS. STERN (VIA ZOOM): I'm going to
11 step away myself for a second.
12 THE VIDEOGRAPHER (VIA ZOOM): Going
13 off the record. The time is 11:20 a.m.
14 (Recess 11:20 a.m. to 11:28 a.m.)
15 THE VIDEOGRAPHER (VIA ZOOM): Going
16 back on the record. The time is 11:28 a.m.
17 MR. GARMAN (VIA ZOOM): Ms. Stern,
18 this might be unorthodox, but we'll see which you
19 prefer. We can -- we can go down the path of some of
20 the questions you have asked or we might be able to
21 give you a little broader set of information if you
22 were to allow Mr. Frazer to give a slight narrative
23 to the topic that I think you're asking about. But
24 obviously it's your deposition and we'll proceed as
25 you see fit.

Page 76

1 MS. STERN (VIA ZOOM): And just to be
2 clear, a narrative on the topic of communications
3 with Mr. Spray about terms of his --
4 MR. GARMAN (VIA ZOOM): Yes.
5 MS. STERN (VIA ZOOM):
6 -- compensation?
7 MR. GARMAN (VIA ZOOM): Yes. Yes.
8 MS. STERN (VIA ZOOM): Current?
9 MR. GARMAN (VIA ZOOM): Yes.
10 MS. STERN (VIA ZOOM): Okay. I'll --
11 MR. GARMAN (VIA ZOOM): Happy to
12 proceed as you see fit.
13 MS. STERN (VIA ZOOM): Okay. I
14 appreciate the offer, and in light of Mr. Frazer's
15 role as general counsel and navigating privilege,
16 let's start with the narrative, and then I will see
17 what further follow-up questions that I have.
18 MR. GARMAN (VIA ZOOM): Sure.
19 A. Okay. Sure. Thanks I appreciate your
20 patience with this. I know it's -- I know it's
21 challenging.
22 So the -- so Mr. Spray, since he has been
23 on leave, has communicated with us regarding --
24 regarding the status of -- of post-employment
25 arrangements. So he resigned. He has requested

Page 77

20 (Pages 74 - 77)

1 more than the three months' payment that would be
2 aligned with a voluntary resignation. The issue is
3 still under consideration with counsel.
4    Q. And is -- are you handling that?
5    A. I'm -- I'm one of those handling that,
6 yes.
7    Q. And I think you said the Brewer firm is
8 also involved in those discussions?
9    A. Yes.
10    Q. Are there any other counsel involved in
11 those discussions?
12    A. No, just -- just myself and the Brewer
13 firm.
14    Q. And does Mr. Spray have counsel?
15    A. Not to my knowledge.
16    Q. And other than communications concerning
17 the terms of his post-employment compensation, have
18 you had other communications with Mr. Spray since he
19 resigned?
20    A. Yes. So -- and I forgot to mention one
21 item, which is that he's also inquired about the
22 treatment of his -- of his accrued vacation payout
23 in the context of the -- of the bankruptcy and how
24 the limits of that will affect him and how that can
25 be addressed.

Page 78

1    I have had -- I have had actually a number
2 of other communications with him. So for -- so --
3 you know, immediately after his resignation, I was
4 asked to monitor his inbox in the interim until a
5 new CFO could be appointed. And I forwarded him
6 some personal -- you know, messages of -- you know,
7 farewell messages, messages of gratitude from --
8 from employees. I also have communicated with him
9 about retrieving personal items from his office
10 and -- trying to think what else. You know, some --
11 some friendly -- a few business items about signing
12 over accounts as I've mentioned.
13    And then the -- and then some personal
14 communications. He sent me some pictures of his new
15 house and, you know, the wildlife in the area where
16 he lives. It's quite beautiful.
17    Q. Have you had any communication --
18 discussions with him, communications in any form
19 concerning the bankruptcy filing?
20    A. Prior -- not since his resignation, no.
21    Q. And before his resignation?
22    A. Yes.
23    Q. And can you tell me the sum and substance
24 of those communications?
25    A. There were numerous communications related

Page 79

1 to -- it was about a two-week period early in the
2 filing, and there were -- so there were numerous
3 communications related to, you know, all of the
4 issues that arise in that situation; you know, the
5 compilation of the schedules and statement of
6 financial affairs; bank account issues, I think, in
7 that time period; dealings with vendors, you know,
8 concerned about their prepetition invoices or
9 adequate assurance. You know, Craig and I were on
10 some conference calls about those -- those types of
11 things.
12    Q. And so was Mr. Spray involved initially in
13 preparing the schedules or preparing the information
14 for the schedules either way?
15    A. He was initially involved, you know,
16 working through his -- his team.
17    Q. And his team -- one of the members of his
18 team is David Warren, right?
19    A. Right.
20    Q. And that the 341s, I think David Warren
21 said he prepared or was principally responsible for
22 preparing the schedules.
23    Do I have that right?
24    MR. GARMAN (VIA ZOOM): Objection to
25 form.

Page 80

1    Go ahead and answer.
2    A. I don't recall Mr. Warren's testimony
3 precisely.
4    Q. Okay. Who took responsibility for the
5 preparation of the schedules?
6    A. In -- in the work that I saw, primarily
7 Mr. -- Mr. Warren and Ms. Rowling, and of course I'm
8 sure they got assistance from others but those are
9 the -- those are the people that I interacted with.
10    Q. Mr. Spray was not aware of the NRA's
11 intention to file bankruptcy until the day it was
12 filed --
13    MR. GARMAN (VIA ZOOM): Objection to
14 form.
15    Q. -- is that right?
16    MR. GARMAN (VIA ZOOM): Objection.
17    Go ahead.
18    A. I don't know.
19    Q. Did you have any conversations with
20 Mr. Spray prior to the date that the bankruptcy
21 petition was filed concerning that subject?
22    MR. GARMAN (VIA ZOOM): Object --
23 object to form.
24    But go ahead and answer if you can.
25    A. I don't think I can answer without

Page 81

21 (Pages 78 - 81)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1 treading on privileged ground.
2    Q.   I'm just asking for a yes or no, not --
3         MR. GARMAN (VIA ZOOM): I'm sorry,
4 Emily, could you repeat the question.
5    A.   Yeah, maybe I misunderstood.
6         MS. STERN (VIA ZOOM): Can you read it
7 back?
8         Could you please read it back?
9         THE REPORTER (VIA ZOOM): Yes.
10        (Record read.)
11        MR. GARMAN (VIA ZOOM): I think you
12 can answer yes or no.
13   A.   I apologize for the pause. I'm trying to
14 remember -- remember a conversation. I don't --
15 but I think the -- I think the answer is, no, I
16 don't think it was a conversation about bankruptcy.
17   Q.   Did you communicate to Mr. Spray your
18 awareness in the fall of 2020 that the Brewer firm
19 was doing bankruptcy-related work?
20        MR. GARMAN (VIA ZOOM): Objection to
21 the extent it was in the context of privileged
22 communication. And if it is, I would instruct you
23 not to answer, but you're other -- you can otherwise
24 answer.
25   A.   I don't recall if I discussed that topic

Page 82

1 with him.
2    Q.   Did you discuss that topic -- I think --
3 okay.
4         In the role of general counsel, who do you
5 report to?
6    A.   I report to Wayne LaPierre.
7    Q.   And can you describe the nature of your
8 reporting relationship to him?
9    A.   Sure. Well, we talked earlier about
10 methods of -- of communication. I actually want to
11 mention one that I think I forgot, which is text
12 messages. He's never sent me a text message, but
13 there was one time when he was scrambling to get a
14 on a conference call and asked me to text him the
15 dial-in information. I just wanted to make sure
16 that's complete.
17        The -- but generally we have a weekly
18 staff call among the in-house executive team and
19 report on major areas of activity, major items of
20 general interest to the -- to the group. And so
21 that's the -- that's the most regularized
22 communication. Other than that, I -- I reach out
23 him, as I described earlier, as needed.
24   Q.   And who leads the weekly staff call?
25   A.   Wayne does.

Page 83

1    Q.   And are there agendas for those calls?
2    A.   Really just a list of the people who will
3 be participating, and -- and Wayne may or may not
4 take us in that order.
5    Q.   And -- and who -- is the list of who is
6 participating standard?
7    A.   You know, I don't really read beyond
8 the -- the dial-in information and whether we're
9 having the call on schedule or not. But it's
10 basically just a list of the -- of the senior staff
11 who are participating, so it will say, like, you
12 know, John, report from legal; Todd, membership;
13 that kind of thing.
14   Q.   And -- and who are the usual attendees?
15   A.   So it would usually -- currently be
16 myself, Ms. Rowling as acting CFO, Joe DeBergalis as
17 executive director of general operations, Jason
18 Ouimet as executive director of ILA, Todd Grable
19 from membership, Tyler Schropp from the office of
20 advancement, Jim Staples for security, Linda Crouch
21 from human resources, and Dave Kellner from the NRA
22 Whittington Center in New Mexico. And I feel like
23 I'm forgetting someone but not coming to me offhand.
24   Q.   And do you prepare any other types of
25 reports for Mr. LaPierre?

Page 84

1    A.   Not routinely, no. Actually -- actually,
2 let me correct that. There's a -- there's a --
3 there's a report of the executive vice president to
4 the board, which -- to the full board which includes
5 a short section on -- on the OGC. But it's really a
6 high-level summary of the type of activities that we
7 conduct and doesn't list specific matters. The
8 specific matters are reported to the legal affairs
9 committee.
10   Q.   And so specific legal matters are not
11 routinely reported to Mr. LaPierre?
12        MR. GARMAN (VIA ZOOM): Objection;
13 form of the question.
14   A.   Matters that require some action or
15 attention by him are reported. Others I deal
16 with -- directly with affected -- affected, you
17 know, businesspeople affected, you know --
18 whoever -- whoever is the -- the appropriate, you
19 know, person to deal with the issue.
20   Q.   And then you said, I think, that you reach
21 out to Mr. LaPierre on an as-needed basis and that
22 it's typically orally?
23   A.   Yes.
24   Q.   And -- and how often does Mr. LaPierre
25 reach out to you?

Page 85

22 (Pages 82 - 85)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1  A. We'll probably -- outside of the staff
2  meetings, we'll probably talk one to three times a
3  week depending on what's going on. Sometimes it can
4  be a lot more than that; sometimes we might -- might
5  not talk for a week. And that's -- that's total
6  across both of my capacities.
7  Q. Okay. And before COVID how often would
8  you actually meet in person with Mr. LaPierre?
9  A. Probably less often than we -- than we
10 talk now. But, you know, I would -- I would
11 probably meet with him in person every couple of
12 weeks again, as needed.
13 Q. And when you, pre-COVID, were meeting with
14 him maybe every couple of weeks, what was the extent
15 of the other forms of communication?
16       MR. GARMAN (VIA ZOOM): Objection to
17 form.
18       Go ahead.
19 A. If he was out of the office and -- and
20 needed something, he would call me. You know, I
21 recognize that he's a -- he's a busy person, and so
22 I try to save things up to the extent I can. So if
23 it's not a screaming emergency, I'll wait until he's
24 in the office and sit down with him or wait until he
25 calls me about something else and has time.

Page 86

1  Q. You testified earlier this week at your
2  30(b)(6) deposition that -- you described some
3  matters as being handled in a collaborative fashion.
4       Who were the typical collaborators?
5       MR. GARMAN (VIA ZOOM): Objection to
6  form.
7  A. I don't recall which -- which matters I
8  was referring to in that -- with that phrase.
9  Q. You talked about in the context of
10 compliance.
11 A. Uh-huh. Okay.
12 Q. Is that one area where there's
13 collaboration?
14 A. I think I -- you know, I personally try to
15 be collaborative on -- on everything. I recognize
16 there are only so many hours in the day. I can't do
17 everything myself. I'm going to need support either
18 from my internal team or from outside counsel or
19 from divisions that have factual knowledge or
20 involvement in an issue or from -- or from the
21 board. Again, it depends on the specific issue.
22 Q. And we also talked about the handling of
23 excess benefit payments to -- to certain individuals
24 as something that was handled collaboratively; is
25 that correct?

Page 87

1  A. Yes.
2  Q. Are there other examples of types of
3  matters that are also similarly handled
4  collaboratively?
5  A. Really everything. I -- I can't think
6  of -- offhand, I can't think of any issue that is
7  handled by a -- you know, by me entirely without any
8  communication or help from anyone else, nor for the
9  OGC. We're dealing with -- you know, we're
10 representing a client, so we're always dealing
11 with -- we're always dealing with, you know, some
12 responsible person within the organization.
13 Q. So do you expect as the general counsel
14 that when executives in the NRA become aware of a
15 legal issue, that they would notify you?
16 A. That --
17       MR. GARMAN (VIA ZOOM): Objection to
18 form.
19       Go ahead.
20 A. That would be my hope, and I -- and I
21 believe that's what normally happens.
22 Q. And would you agree with me that it's
23 important to you to fulfill your job
24 responsibilities to be aware of legal issues when
25 they get presented -- when they're presented to the

Page 88

1 NRA?
2       MR. GARMAN (VIA ZOOM): Objection to
3 form.
4       Go ahead.
5  A. Yes.
6  Q. And in order for you to effectively manage
7 those issues, you need to have notice of them; is
8 that right?
9  A. Yes.
10 Q. Does Mr. LaPierre do that?
11       MR. GARMAN (VIA ZOOM): Objection to
12 form.
13       Go ahead.
14 A. It depends on the issue. There are some
15 issues that he -- that he may discuss directly with
16 outside counsel and -- or there may be others that
17 he brings to me. Again, it depends on the nature of
18 the issue.
19 Q. And how -- can you explain the
20 distinction, the circumstances when he brings it to
21 you versus when he brings it to outside counsel?
22       MR. GARMAN (VIA ZOOM): Objection to
23 form.
24 A. Well, I don't know everything that -- I
25 don't know everything -- I don't know how he becomes

Page 89

23 (Pages 86 - 89)

1 aware of everything or how he decides what to --
2 what to bring to whom. I think the things that he
3 brings to me are issues that -- that he believes
4 that I need to be aware of and am the appropriate
5 person to -- to talk to.
6        And sometimes when he talks to outside
7 counsel, you know, he may ask them to communicate
8 with me as well so that we can collaborate.
9    Q. Does that make it difficult for you to do
10 your job if the person who is running the day-to-day
11 affairs of the NRA is not alerting you to legal
12 issues?
13        MR. GARMAN (VIA ZOOM): Objection to
14 form.
15    A. I think I disagree with the -- with the
16 premise. I think I am being alerted directly or
17 indirectly to our significant issues.
18    Q. What are some instances where -- that you
19 can recount where Mr. LaPierre took a legal issue to
20 outside counsel rather than bring it to you in the
21 first instance?
22        MR. GARMAN (VIA ZOOM): Objection to
23 form.
24        We have to be careful on this one, but
25 to the extent that -- to the extent that you're not

Page 90

1 disclosing attorney-client privilege that may come
2 through someone other than Mr. LaPierre, you can
3 answer.
4    A. So it's -- you know, as I said to
5 Mr. Sheehan at one point, it's tough to recall the
6 dogs that don't bark. But -- and I'm having trouble
7 thinking of -- of examples, but -- you know, and all
8 of the examples that I can think of are -- are
9 issues where outside counsel then contacted me,
10 so -- so I ended up being involved.
11        So -- but I -- I recall maybe some
12 discussions of some contracts or -- and maybe of
13 some HR matters, you know, all of which I soon
14 became aware of through, you know, counsel; one
15 counsel or another calling me and saying, well, I
16 spoke with Wayne, Wayne wants us to work on X, and
17 then we would work on X.
18    Q. And -- and are there instances that you
19 can recall where Mr. LaPierre made determinations on
20 legal issues with outside counsel in the first
21 instance rather than discussing with you?
22    A. Not that I can recall specifically. You
23 mean determinations like a final decision on some
24 issue?
25    Q. A decision to take a legal action, for

Page 91

1 instance.
2    A. Can I -- can I confer with counsel on
3 this?
4    Q. Yes.
5    A. Thanks.
6        THE VIDEOGRAPHER (VIA ZOOM): Going
7 off the record. The time is 11:50 a.m.
8        (Recess 11:50 a.m. to 12:01 p.m.)
9        THE VIDEOGRAPHER (VIA ZOOM): Going
10 back on the record. The time is 12:01 p.m.
11    Q. Okay. So again, my question is: During
12 the break when you were conferring on privilege,
13 with whom were you conferring, which counsel?
14    A. I conferred with Mr. Garman and
15 Ms. Eisenberg.
16    Q. Okay. And do you want the court reporter
17 to read back the question?
18    A. Sure.
19    Q. I think she needs to go back to the prior
20 Q and A to provide context.
21        MS. STERN (VIA ZOOM): Michelle, would
22 you do that for us, please.
23        THE REPORTER (VIA ZOOM): Yes.
24        (Record read.)
25    A. Okay. So -- so the answer is yes, I am

Page 92

1 aware of such instances.
2    Q. Okay. Can you tell me all of the
3 instances that you're aware of?
4    A. Actually -- actually, correct myself.
5 There's one that I can think of specifically.
6 It's -- which was the -- the lawsuit -- the first
7 Virginia lawsuit against Ackerman McQueen, that
8 initial decision.
9    Q. And what occurred there?
10    A. The decision was made to file, and I was
11 informed I think shortly after the -- after the
12 complaint was filed.
13    Q. And this was a lawsuit that was brought in
14 about April 2019; is that correct?
15    A. Yes.
16    Q. And you were, in fact, surprised that they
17 had filed the lawsuit?
18        MR. GARMAN (VIA ZOOM): Objection to
19 form.
20        Go ahead.
21    Q. Is that right?
22    A. No, I can't say I was surprised.
23    Q. But you weren't aware that it was going to
24 be filed?
25    A. I wasn't aware that it was going to be --

Page 93

1 I wasn't aware that it was going to be filed, but
2 given Ackerman's conduct, I wasn't surprised that it
3 had been filed.
4 Q. But I -- so let me just clarify my
5 question -- my --
6 MR. GRUBER (VIA ZOOM): And I object
7 as nonresponsive on that last question -- or answer.
8 Thank you.
9 Q. Let me make sure that my question was
10 clear.
11 You were surprised that the NRA filed when
12 it filed; is that right?
13 MR. GARMAN (VIA ZOOM): Objection to
14 form.
15 Go ahead.
16 A. Yes.
17 Q. And in that context of the Ackerman
18 lawsuit, you had not even read the pleading before
19 it was filed; isn't that right?
20 MR. GARMAN (VIA ZOOM): Objection --
21 hold on.
22 I don't know whether you will be able
23 to answer that without invading attorney-client
24 privilege.
25 A. Sitting here today, I just -- I actually
Page 94

1 can't recall the answer.
2 Q. Okay. Hold on one second.
3 Well, did Mr. LaPierre consult with you on
4 the decision to file for Chapter 11 bankruptcy
5 before the petition was filed?
6 MR. GARMAN (VIA ZOOM): Object.
7 Q. Yes or no is the -- I'm only asking yes or
8 no.
9 MR. GARMAN (VIA ZOOM): Yeah, no,
10 we're not going to go there. I object. That -- that
11 invades the attorney-client privilege.
12 Q. Are you going to take your lawyer's
13 direction not to answer that question?
14 A. Yes, I'm going to take counsel's advice.
15 Q. You were not aware of the filing of the
16 bankruptcy petition until the very day that it was
17 filed; isn't that correct?
18 A. Yes.
19 Q. Did you ever inform anyone on the board
20 that you did not learn of it until the date of its
21 filing?
22 MR. GARMAN (VIA ZOOM): Objection to
23 the extent you could only answer that by invading the
24 attorney-client privilege, but go ahead if you can.
25 A. No.
Page 95

1 Q. Of the other eight members -- we talked
2 before, sorry, about the officers and the leadership
3 structure of the NRA, the salaried --
4 A. Uh-huh.
5 Q. -- officers.
6 A. Yes.
7 Q. Among that group, can you tell me who was
8 aware that -- of the plan to file for bankruptcy
9 before the actual filing?
10 MR. GARMAN (VIA ZOOM): Object to the
11 form of the question.
12 Answer if you know.
13 A. I don't know who was aware before the
14 filing.
15 I'm sorry, you're --
16 Q. Was --
17 A. I'm sorry, you're encompassing both the --
18 the in-house and outside officers, all -- all eight
19 including myself?
20 Q. Yeah. Let me just -- so that the record
21 isn't so muddy, you as the secretary, were you
22 aware?
23 MR. GARMAN (VIA ZOOM): Object to the
24 form of the question.
25 A. So was I --
Page 96

1 Q. Were you aware of the filing before it
2 was, in fact, filed?
3 A. Yes.
4 Q. When -- when did you become aware?
5 MR. GARMAN (VIA ZOOM): Hold on.
6 So -- so let's just talk about this,
7 Emily, because I'm not trying to be difficult, but
8 you have pinned down to the day, and I can't let him
9 testify as to the specifics of it without invading
10 the attorney-client privilege. So I'm not sure
11 what -- what question you're asking him, but to
12 answer, you're going to have to work around that.
13 Q. Prior to January 15th you were not aware
14 that a petition for bankruptcy was going to be filed
15 on January 15th; is that right?
16 A. Yes.
17 Q. Okay. And the -- Mr. Spray, do you know
18 if he was aware of the plan to file bankruptcy
19 before January 15th?
20 MR. GARMAN (VIA ZOOM): Object to the
21 form of the question.
22 Go ahead and answer if you can.
23 A. I don't think he was aware before
24 January 15th.
25 Q. Do you know if the executive director of
Page 97

25 (Pages 94 - 97)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1 general operations, Mr. DeBergalis, was aware?
2 A. I don't know.
3 Q. Do you know if the -- Mr. Ouimet, the
4 executive director of -- of ILA, was aware?
5 MR. GARMAN (VIA ZOOM): Emily, we lost
6 you for a second on a lag on the Zoom.
7 MS. STERN (VIA ZOOM): Oh, I'm sorry.
8 MR. GARMAN (VIA ZOOM): Could I ask
9 you -- could I ask you to repeat the call -- or the
10 question.
11 MS. STERN (VIA ZOOM): Sure.
12 Q. My question was: Do you know if
13 Mr. Ouimet, the executive director of ILA, was aware
14 of the plan to file bankruptcy before January 15th?
15 A. No, I don't know.
16 Q. Do you know if Carolyn Meadows was aware
17 of the plan to file for bankruptcy before
18 January 15th?
19 A. I believe she was.
20 MR. GARMAN (VIA ZOOM): So --
21 Q. Do you know when she became aware?
22 MR. GARMAN (VIA ZOOM): So I'm going
23 to caution you not to speculate.
24 THE WITNESS (VIA ZOOM): Uh-huh.
25 MR. GARMAN (VIA ZOOM): You are

Page 98

1 obligated to -- to answer what you have personal
2 knowledge of --
3 THE WITNESS (VIA ZOOM): Uh-huh.
4 MR. GARMAN (VIA ZOOM): -- but -- but
5 I'm going to instruct you not to speculate --
6 THE WITNESS (VIA ZOOM): Okay.
7 MR. GARMAN (VIA ZOOM): -- if you are.
8 THE WITNESS (VIA ZOOM): Okay.
9 MR. GARMAN (VIA ZOOM): So go ahead
10 and answer the next question.
11 THE WITNESS (VIA ZOOM): Okay.
12 Q. I think there's a pending question.
13 MR. GARMAN (VIA ZOOM): I think I
14 spoke over you. Could you repeat it?
15 MS. STERN (VIA ZOOM): Oh. Michelle,
16 did you get the question?
17 (Record read.)
18 A. No.
19 Q. Do you know if Mr. Cotton was aware of the
20 plan to file for bankruptcy before January 15th?
21 A. I believe he was.
22 Q. Do you know when he became aware?
23 A. No.
24 Q. Do you know whether Mr. Lee was aware of
25 the plan to file for bankruptcy before January 15th?

Page 99

1 A. I believe he was.
2 Q. And do you know when he became aware?
3 A. No, I don't.
4 MS. STERN (VIA ZOOM): So let's see,
5 this is -- off the record for a second.
6 THE VIDEOGRAPHER (VIA ZOOM): Going
7 off the record. The time is 12:11 p.m.
8 (Recess 12:11 p.m. to 1:46 p.m.)
9 THE VIDEOGRAPHER (VIA ZOOM): Going
10 back on the record. The time is 13:46 p.m.
11 MS. STERN (VIA ZOOM): Okay. Stephen,
12 can you pull up the document that we marked as tab 4.
13 MR. THOMPSON (VIA ZOOM): It's being
14 introduced now. It should be available in just a
15 minute.
16 MS. STERN (VIA ZOOM): Can you put it
17 on the share also, screen share, Stephen?
18 MR. THOMPSON (VIA ZOOM): Yes.
19 MS. STERN (VIA ZOOM): Thanks.
20 THE WITNESS (VIA ZOOM): See which one
21 I can see better.
22 MR. GARMAN (VIA ZOOM): Yeah. It's
23 not there yet.
24 MR. THOMPSON (VIA ZOOM): I apologize.
25 It seems to have frozen in the act of distributing

Page 100

1 it. Let me try one more time.
2 MR. GARMAN (VIA ZOOM): I don't see it
3 yet in the --
4 MR. THOMPSON (VIA ZOOM): Okay. No,
5 it should be -- it was just introduced, and I will
6 pull it up on the screen share.
7 MR. GARMAN (VIA ZOOM): There we go.
8 So the screen that we're using for the Zoom is now --
9 is now fairly far, so I'm going to have -- I'm going
10 to have Mr. Frazer look at my monitor. I'll
11 represent to everyone that the only thing on my
12 monitor is this exhibit.
13 MS. STERN (VIA ZOOM): Okay. Thank
14 you.
15 (Exhibit 2 marked.)
16 THE WITNESS (VIA ZOOM): I can
17 actually see on the big monitor better.
18 MR. GARMAN (VIA ZOOM): Oh, you can
19 see it? Yeah. Now we got it.
20 MS. STERN (VIA ZOOM): Oh, great.
21 Q. Okay. So, Mr. Frazer, I put before you a
22 document we have marked as Exhibit 2, and I ask you
23 if you can identify this document, please.
24 A. Yes. This is an email message that I sent
25 to the -- to the NRA board and executive councils --

Page 101

26 (Pages 98 - 101)

1 excuse me, executive council announcing the filing
2 of the Chapter 11 petition.
3    Q.   Okay.  I'm just going to note for the
4 record that the top of the document is a result of
5 it being -- the form which it was provided to my
6 office.  So I believe the top of the document is --
7 has the name of an AAG, but -- so that wasn't on the
8 original document, Stephen Thompson's name, correct?
9    A.   Understood.  Understood.
10         MR. GARMAN (VIA ZOOM):  Understood.
11    Q.   Okay.  Okay.  So my question:  Is this the
12 first notice that the board was given of the
13 bankruptcy filing?
14         MR. GARMAN (VIA ZOOM):  And just to
15 interject here, to the extent that you want to review
16 more of it, let us know.
17    A.   Just scroll down quickly.
18    Q.   Yeah.
19         MR. GARMAN (VIA ZOOM):  We have -- we
20 have control of this one.
21         THE WITNESS (VIA ZOOM):  Oh.
22         MR. GARMAN (VIA ZOOM):  I'll give you
23 the mouse.
24    A.   (Reviewed document.)  Yes, this is the
25 first I'm aware of.

Page 102

1    Q.   And before this email was sent out, did
2 you -- were you asked to review it?
3    A.   I was -- I was asked to send it.  And let
4 me -- let me actually just -- just make -- clarify
5 one point.  This is the first notification that was
6 sent to the entire board as a function of the
7 secretary's office.
8    Q.   Okay.  And what prior notification was
9 provided to portions of the board?
10    A.   I don't -- I don't know what notification
11 may have been made to individual members or smaller
12 subsets, but this -- this is the message that went
13 out to the entire board.
14    Q.   Okay.  And so does that mean that you did
15 not personally provide notice to portions of the
16 board prior to this January 15th email?
17         MR. GARMAN (VIA ZOOM):  Objection to
18 form.
19         Go ahead.
20    A.   No, I don't.
21    Q.   And what's the basis for your belief that
22 there was notice provided to some portions of the
23 board prior to January 15th?
24         MR. GARMAN (VIA ZOOM):  Objection to
25 form.

Page 103

1    A.   Well, some of -- some -- what I'm -- what
2 I'm saying is that I don't know that such
3 notification didn't happen, but I -- what I do know
4 is that the way that it would -- notification to the
5 entire board on any matter would happen would be
6 through my office, and that's how I know that this
7 would be the first.
8    Q.   Do you have reason to believe that
9 notification was made to some members of the board
10 before this email?
11    A.   Well, I think the members of the special
12 litigation committee, the president and vice
13 presidents who are officers, were obviously aware.
14    Q.   And why do you say "obviously aware"?
15    A.   Because the -- the SLC has been involved
16 in these discussions as I -- as I understand it.
17    Q.   And you testified that you believe that
18 Mr. Cotton and Mr. Lee were aware of the intention
19 to file for bankruptcy before January 15th.
20         What's the basis for that belief?
21         MR. GARMAN (VIA ZOOM):  Objection to
22 form; asked and answered.
23         Go ahead.
24    A.   It's based on their -- on their service on
25 the special litigation committee.

Page 104

1    Q.   Are you assuming that from the fact that
2 they're on the special litigation committee?
3    A.   Not entirely.
4    Q.   Then what are you -- what is your belief
5 based on?
6         MR. GARMAN (VIA ZOOM):  I'm going to
7 object to the extent the only answer you could give
8 is subject to the attorney-client privilege, but you
9 can answer outside of that.
10    A.   I don't think I can answer without --
11 without getting into attorney-client privileged
12 material.
13    Q.   Do you know if the members of the special
14 litigation committee knew of the plan to file for
15 bankruptcy before the time they signed the
16 resolution that was attached to the bankruptcy
17 petition?
18         MR. GARMAN (VIA ZOOM):  So I'm going
19 to -- I'll start short-handing these if it's okay
20 with everybody.  I'll just admonish the witness that
21 this might invade the attorney-client privilege and
22 not to -- to invade that in his answer if we all can
23 agree that if I simply say I admonish the witness
24 to -- to be -- on the attorney-client privilege,
25 that's the objection I'm lodging.

Page 105

27 (Pages 102 - 105)

1          Trying to short --
2          MS. STERN (VIA ZOOM):  That's fine
3  with me.
4          MR. GARMAN (VIA ZOOM):  Trying to
5  speed it up a little bit.
6          THE WITNESS (VIA ZOOM):  Okay.
7          MR. GARMAN (VIA ZOOM):  So...
8     A.  So can we -- can I have the question
9  again?
10          MS. STERN (VIA ZOOM):  Can the
11  reporter please read the question?
12          MR. GRUBER (VIA ZOOM):  Can I -- this
13  is Mike Gruber real quick.  I don't mind going along
14  with that, but I want to -- I want it understood that
15  I don't believe any of this is subject to
16  attorney-client.  So with that statement, I don't
17  want to be waiving it by agreeing to what y'all are
18  proposing.  But --
19          MR. GARMAN (VIA ZOOM):  Understood and
20  agreed.
21          MR. GRUBER (VIA ZOOM):  -- otherwise
22  he --
23          MR. GARMAN (VIA ZOOM):  Yeah.
24          MR. GRUBER (VIA ZOOM):  I think that
25  helps things move along.  Thank you.

Page 106

1          (Record read.)
2     A.  Yes.
3     Q.  The special meeting that was intended to
4  occur -- I think it was March 14th but mid March, is
5  there a -- was there an agenda prepared for that
6  meeting?
7     A.  There was a -- there was a draft agenda
8  prepared for the meeting.
9     Q.  And what was the substance of the draft
10  agenda?
11     A.  The substance of the draft agenda would --
12  and this is -- this is from my memory, but it would
13  include the usual opening items, such as a call to
14  order, opening prayer, Pledge of Allegiance, reports
15  of the officers, and a legal briefing.
16     Q.  And has there been an agenda prepared for
17  the rescheduled meeting?
18     A.  Not yet.
19     Q.  And has there been a -- I think we -- you
20  said -- other than the email that -- I think you
21  said there was an email that provided notice of the
22  cancellation of the mid-March meeting.
23          Are there any other documents or
24  communications to the board concerning the upcoming
25  meeting?

Page 107

1     A.  There -- to my recollection, there were
2  two emails.  There was -- there was one that went
3  out the Friday evening -- the initial communication
4  about the cancellation which went out Friday --
5  Friday the 12th.
6          And then subsequently -- I don't recall
7  the date, but there was a subsequent email
8  apologizing to the board for the inconvenience and
9  informing them that we intended to hold a
10  rescheduled meeting in Dallas within the coming
11  weeks.
12     Q.  And does -- do you know if the purpose --
13  one of the purposes of that meeting is to ratify
14  approval of filing of the bankruptcy petition?
15          MR. GARMAN (VIA ZOOM):  Objection to
16  the extent that calls for attorney-client privilege.
17     A.  I can't answer based -- I can't -- I'm
18  sorry.  So I can answer, which meeting are you
19  referring to, the original or the rescheduled?
20     Q.  Let's start with the rescheduled.
21     A.  Okay.  No.
22     Q.  What about the original meeting?
23     A.  I can't answer on the grounds of
24  privilege.
25     Q.  Mr. Frazer, are you familiar with the

Page 108

1  contract procurement policy -- the NRA's policy that
2  requires certain levels of approval for contracts
3  over $100,000?
4     A.  Yes.
5     Q.  And whose approvals are required for
6  contracts over $100,000?
7     A.  The policy requires a legal sign-off and
8  then it requires approval of the treasurer and
9  executive vice president.
10     Q.  And -- and does it also require, in
11  certain circumstances, a business case analysis?
12     A.  Yes, it does.
13     Q.  And what are those circumstances?
14     A.  I can't recall if there are any -- you
15  know, sitting here without the document, I can't
16  recall if there are any exceptions to the business
17  case analysis requirement.  I do -- coming back to
18  the question, I don't recall if there are any -- if
19  there were any exceptions to that requirement.
20  But -- so normally a business case --
21     Q.  Does the business case analysis -- I'm
22  sorry to interrupt.  Finish your answer.
23     A.  Normally there would be a business case
24  analysis.
25     Q.  And does that -- do you expect for a

Page 109

28 (Pages 106 - 109)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1 contract retaining counsel to -- where it's going to
2 exceed -- expected to exceed $100,000 that it will
3 include a business case analysis?
4    A. Yes.
5    Q. Okay. Prior to engaging the --
6 Mr. Neligan's firm, how many bankruptcy firms did
7 the debtor speak to?
8    A. My recollection -- well, let me -- let me
9 confer with -- may I confer with counsel on this?
10   Q. I just -- before you do that, I would just
11 remind you that you have put in a declaration in
12 support of the engagement of various lawyers in this
13 proceeding and have discussed certain facts, so
14 just -- if we can -- it -- maybe that will sort of
15 help you recall where the line was drawn?
16   A. No, I'm --
17   Q. I don't want to be giving you advice.
18 You're entirely free to check with your attorney.
19 It's just --
20   A. Right.
21   Q. I'm just trying to sort of move us along.
22   A. I -- I understand. I'm aware. And it
23 should be very brief.
24         THE VIDEOGRAPHER (VIA ZOOM): Going
25 off the record. The time is 14:01 p.m.

Page 110

1         (Recess 2:01 p.m. to 2:05 p.m.)
2         THE VIDEOGRAPHER (VIA ZOOM): Going
3 back on the record. The time is 14:05 p.m.
4    Q. And, Mr. Frazer, you had the opportunity
5 to consult with your counsel. That was Mr. Garman
6 and Ms. Eisenberger --
7    A. That's correct.
8    Q. -- is that right?
9    A. That's correct.
10        MS. STERN (VIA ZOOM): And can we have
11 the last question be read, please.
12        (Record read.)
13   A. I don't recall the exact number.
14   Q. Were you involved in those conversations?
15   A. No, I wasn't.
16   Q. Who was?
17   A. I was -- I was told by Mr. Brewer that he
18 had interviewed -- he had interviewed the firms.
19   Q. And do you know what firms Mr. Brewer
20 interviewed?
21   A. He -- he told me, but I don't recall the
22 names.
23   Q. Do you know when these interviews were
24 conducted?
25   A. I do not know.

Page 111

1    Q. And when did you speak with Mr. Brewer
2 about his interview of various bankruptcy firms for
3 this matter?
4    A. It was shortly before executing my
5 declaration in support of the Neligan firm's
6 application.
7    Q. When was the first time that you met
8 Mr. Neligan or anyone at his firm?
9    A. I first spoke with them -- I don't recall
10 the exact date but shortly after the filing.
11   Q. After the filing.
12        And what was the context? In person?
13 Phone?
14   A. It was a phone call.
15   Q. And do you know what the basis was for the
16 selection of the Neligan firm for this matter?
17        MR. GARMAN (VIA ZOOM): I object.
18 Mr. Frazer submitted his declaration. We're prepared
19 to talk about the facts in his declaration, but the
20 substance of -- of that answer would require invasion
21 of the attorney-client privilege.
22        And I'm going to instruct you not to
23 answer.
24   Q. Mr. Frazer, did you select the Neligan
25 firm?

Page 112

1    A. No, I did not.
2    Q. Can you identify any other situation that
3 you as the general counsel have had where you have
4 not been involved in the selection of the counsel to
5 represent the NRA?
6    A. Yes, I can think of a couple of examples.
7    Q. Tell me what they were.
8    A. Well, one of them was the -- okay.
9 Leaving aside any firms that were working for us
10 before I was general counsel and that we have kept
11 on, I am aware of a couple.
12        One was the firm that represented us in
13 a -- in an intellectual property dispute in which we
14 were indemnified and -- and defended by Ackerman
15 McQueen, and they chose -- they chose the counsel --
16 or their insurer, I don't know.
17        And also the -- you know, various local
18 counsel that have -- that have -- various local
19 counsel that have assisted with litigation have been
20 recommended by the -- the firms -- you know, the
21 primary firms handling the litigation.
22        Ultimately the decision is -- is ours, but
23 I'm willing to take recommendations.
24   Q. Did you delegate the decision-making
25 authority on the retention of counsel in the

Page 113

29 (Pages 110 - 113)

Page 114

1 bankruptcy matter to anyone else at the NRA?
2          MR. GARMAN (VIA ZOOM): Objection to
3 foundation. It assumes facts not in evidence.
4 Objection to form, sorry.
5     A. I -- I did not.
6     Q. And in your declaration, you state,
7 Debtors determined that Neligan was the firm best
8 suited for this case based upon its experience,
9 qualifications, rates, success in confirming
10 reorganization plans for debtors in other cases, and
11 its location in Dallas, Texas, where the NRA
12 determined to file these cases.
13         Do you have personal knowledge of those
14 facts?
15     A. I was advised of those by counsel, and I
16 was provided information about comparative rates
17 from -- from employment applications of other firms.
18     Q. And who prepared those -- those materials
19 that you reviewed?
20     A. I believe it was the Brewer firm, but I
21 don't recall specifically who.
22     Q. And in the declaration, it -- it also
23 notes that the Neligan firm was chosen because of
24 its location in Dallas, Texas, and -- where NRA
25 determined to file these cases.

Page 115

1          Was that determination made prior to the
2 formation of Sea Girt?
3          MR. GARMAN (VIA ZOOM): Go ahead.
4     A. Actually, I don't think I can answer
5 without invading privilege.
6     Q. So are you giving yourself the --
7          MR. GARMAN (VIA ZOOM): So --
8     Q. Are you --
9          MR. GARMAN (VIA ZOOM): So I'll --
10 I'll try and --
11     Q. Are you giving yourself the direction not
12 to answer the question?
13          MR. GARMAN (VIA ZOOM): I'll try and
14 clean this up. Obviously -- obviously the deponent
15 is a -- is a lawyer for this client and has a duty to
16 make that independent analysis. But to the extent
17 this -- this invades the attorney-client privilege, I
18 instruct you not to answer.
19     A. And I'll --
20     Q. Okay.
21     A. I'll follow our advice.
22     Q. Okay.
23          MS. STERN (VIA ZOOM): And I just --
24 just to be clear on the record, we're going to just
25 keep moving on, but that should not be -- any of the

Page 116

1 directions to Mr. Frazer not to testify as to matters
2 of privilege are -- there's no waiver by the Attorney
3 General to contest those. I just want that to be
4 clear.
5          MR. GARMAN (VIA ZOOM): I understand.
6          MS. STERN (VIA ZOOM): Okay.
7          MR. GRUBER (VIA ZOOM): Can I have the
8 same understanding? This is Mike Gruber on behalf of
9 Ackerman.
10          MR. GARMAN (VIA ZOOM): Of course.
11          MR. GRUBER (VIA ZOOM): Thank you.
12     Q. Okay. When was the Neligan firm engaged
13 by the NRA?
14     A. I'm sorry, I don't recall the date of --
15 the date on the letter.
16     Q. And who signed the letter of engagement?
17     A. I'm sorry, I don't recall.
18     Q. Have you seen the engagement letter?
19     A. Yes.
20     Q. And have you provided that in this -- in
21 the bankruptcy? Have you produced it?
22          MR. GARMAN (VIA ZOOM): To who?
23          MS. STERN (VIA ZOOM): To the U.S.
24 trustee.
25          MR. GARMAN (VIA ZOOM): I'll represent

Page 117

1 I don't know the answer to that. I assume the answer
2 is yes, but I -- I can't say for sure.
3     A. And I'm sorry, I just don't recall either.
4          MS. STERN (VIA ZOOM): Okay. Well, we
5 would ask that it be produced to the Attorney
6 General's office.
7     Q. So who authorized the retention of the
8 Neligan firm on behalf of the NRA?
9     A. I don't personally know.
10     Q. And Mr. Neligan's firm was given a
11 $350,000 retainer as stated in your declaration.
12         Do you recall making that statement?
13     A. I do.
14     Q. And do you know when that was paid?
15     A. I -- I don't recall.
16     Q. Do you know who authorized that payment?
17     A. I do not, no.
18     Q. Do you know if there was a business case
19 analysis done before the Neligan firm was engaged?
20     A. I don't remember.
21     Q. So you have never seen a business case
22 analysis for retention of the Neligan firm; is that
23 right?
24          MR. GARMAN (VIA ZOOM): Objection to
25 form.

30 (Pages 114 - 117)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    A.   That's not what I said.  I don't -- I
2  don't remember if I've seen one.
3    Q.   Okay.  Have you -- have you ever seen a
4  business case analysis in connection with the
5  retention of the Neligan firm?
6    A.   I don't --
7        MR. GARMAN (VIA ZOOM):  Objection to
8  form.  He's asked -- answered a couple times.
9    A.   I do not remember.
10   Q.   Who would know if there's a business case
11  analysis?
12   A.   You know, it would -- it would be in the
13  Association's records, but I'm not sure exactly
14  where.
15   Q.   When the NRA engages a law firm to do --
16  to work -- to do work for the NRA and there -- it's
17  a circumstance where it requires a business case
18  analysis under the procurement policy, who typically
19  handles that process?
20   A.   It would typically be me or possibly one
21  of my assistant general counsels, depending on who
22  is going to be, you know, working with the firm.
23   Q.   And are you aware of any other -- any
24  circumstances where the retention of counsel and
25  adherence to that policy did not go through the

Page 118

1  Office of General Counsel?
2        MR. GARMAN (VIA ZOOM):  Objection to
3  form.
4    A.   Where retention of a law firm didn't go
5  through general counsel, yes.
6    Q.   What circumstance is that?
7    A.   It was a firm that was retained to do some
8  pension plan-related work, and it was retained
9  either by the treasurer's office or human resources;
10  I can't recall which.
11   Q.   And when was that?
12   A.   Sometime prior -- several years ago.  I
13  don't know the exact date.
14   Q.   So sitting here today, do you know if
15  there's anyone at the NRA who reviewed a business
16  case analysis for -- relating to the retention of
17  the Neligan firm?
18   A.   I'm sorry, I just don't recall.
19   Q.   And do you recall in your declaration that
20  you indicated that an additional $1 million retainer
21  was paid to the Neligan firm prior to the petition
22  date?
23   A.   Yes.
24   Q.   And when was that $1 million payment made
25  in whole or in part?

Page 119

1    A.   I don't know.
2    Q.   And who authorized that payment?
3    A.   I don't recall.
4    Q.   Do you know if Craig Spray was aware of
5  the million dollars being paid to the Neligan firm?
6    A.   I -- I'm sorry, I don't know.
7    Q.   Do you know if Sonya Rowling was aware of
8  a million dollars being paid to the Neligan firm?
9    A.   I don't know.
10   Q.   What was your role in the selection of the
11  Garman firm?
12   A.   The Garman firm was recommended to -- was
13  recommended as additional counsel.  I received a
14  proposed engagement letter and -- you know and went
15  through the usual retention processes.
16   Q.   And who is it recommended -- who
17  recommended the Garman firm?
18   A.   The -- the Brewer firm did.
19   Q.   And did you consider any other firms when
20  contemplating bringing in additional bankruptcy
21  counsel?
22   A.   Yes.
23   Q.   What other firms?
24   A.   I don't recall the names of the firms.
25   Q.   Were you involved in that process?

Page 120

1    A.   No.
2    Q.   Who handled that process?
3    A.   So my -- it was a -- it was a -- I believe
4  it was a recommendation from the Brewer firm.
5    Q.   All of the firms that were considered were
6  all recommended by the Brewer firm?
7    A.   Well, firms were -- were considered by the
8  Brewer firm but not all of them were ultimately
9  recommended.
10   Q.   And what efforts did you make to determine
11  whether the Garman firm was acceptable to represent
12  the NRA in this matter?
13   A.   So a couple of things.  Again, I reviewed
14  the same -- the same set of prior approved
15  employment applications for bankruptcy firms in the
16  Northern District of Texas.  And additionally the
17  Garman firm had previously represented the NRA
18  successfully as local counsel in a First Amendment
19  case.
20   Q.   And who was the primary counsel in that
21  case?
22   A.   The Brewer firm.
23   Q.   And the materials that -- I think you said
24  you reviewed some materials about the various firms
25  that were under consideration.

Page 121

31 (Pages 118 - 121)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    Who prepared those materials?
2    A.   Again, I think it was the Brewer firm.
3    Q.   Was a business case analysis done with
4 respect to the retention of the Garman firm?
5    A.   Yes.
6    Q.   And who performed that analysis?
7    A.   I prepared it.
8    Q.   Is it in writing?
9    A.   Yes.
10   Q.   And what was the sum and substance of the
11 analysis?
12       MR. GARMAN (VIA ZOOM):  Is this legal
13 advice you're giving in this document?
14       THE WITNESS (VIA ZOOM):  I think -- I
15 think it is.  I think I'm recommending counsel.
16       MR. GARMAN (VIA ZOOM):  So I'm going
17 to instruct you not to answer this.
18       Counsel, I will go back and look at
19 the document to see if it -- if it is the privileged
20 information I believe it to be, but based upon this,
21 I'm going to instruct him not to answer the question.
22   Q.   Okay.  Do you have oversight of the legal
23 fees that are being incurred in the bankruptcy
24 process?
25   A.   Yes.

Page 122

1    Q.   Do you have -- bear primary responsibility
2 for that oversight?
3    A.   I think the invoices are going to come to
4 me when they come.
5    Q.   And did you have conversations with the
6 firms that have been retained as bankruptcy counsel
7 with respect to the budgets that are referenced in
8 the declarations that you have put in?
9    A.   Yes.
10   Q.   And was anyone else involved in those
11 discussions?
12   A.   I'm trying to remember.  The firms -- the
13 firms sent me budgets and I reviewed the budgets.  I
14 don't recall if I had any questions.
15   Q.   Was the Brewer firm involved in that
16 process too?
17   A.   I don't recall.  Obviously they were
18 involved in -- in sending me the budget for the
19 matters for which they were applying, but I don't
20 recall if they were involved in any discussion with
21 or about the other firms.
22   Q.   And was anyone from the Office of General
23 Counsel besides you involved in that process?
24   A.   No.
25   Q.   Was Mr. LaPierre involved in that process?

Page 123

1    A.   Not with me, no.
2    Q.   Was he involved in that process with
3 anyone else?
4        MR. GARMAN (VIA ZOOM):  Objection.
5        Just don't speculate; answer only in
6 your personal knowledge.
7        THE WITNESS (VIA ZOOM):  Right.
8    A.   Well, so -- again I'm -- source of
9 knowledge thing.
10       THE WITNESS (VIA ZOOM):  Can we talk
11 for just a moment?
12       MR. GARMAN (VIA ZOOM):  Sure.
13       THE VIDEOGRAPHER (VIA ZOOM):  Going
14 off the record.  The time is 14:26 p.m.
15       (Recess 2:26 p.m. to 2:27 p.m.)
16       THE VIDEOGRAPHER (VIA ZOOM):  Going
17 back on the record.  The time is 14:27 p.m.
18   Q.   Mr. Frazer, you have asked to consult with
19 and you consulted with Mr. Garman and Ms. Eisenberg
20 again; is that right?
21   A.   Just -- just Mr. Garman this time.
22 Thanks.
23   Q.   Okay.  Thank you.
24       MS. STERN (VIA ZOOM):  So can we have
25 the last question read back, please.

Page 124

1        (Record read.)
2    A.   So my understanding is that -- and I
3 appreciate your -- I appreciate your patience.  I
4 just wanted to -- to verify whether what I had
5 learned had been from a privileged conversation.
6        My understanding is that Mr. LaPierre had
7 reviewed the budgets for the firms.
8    Q.   Did the -- we talked before about the
9 requirements of sign-off on contracts over $100,000.
10       Was the Neligan firm, was their sign-off
11 by the president and the others that are required
12 under the policy?
13   A.   I -- I just don't recall because that
14 would go with the business case analysis.  It's all
15 the same process.
16   Q.   And the NRA has said that it has now
17 centralized its contracts and is managing them in a
18 more centralized fashion.
19       Where is that centralized location?
20       MR. GARMAN (VIA ZOOM):  Objection to
21 form.
22   A.   So all contracts ultimately go to the
23 financial services division.
24   Q.   So the financial services division would
25 have copies of the contracts that we have been

Page 125

32 (Pages 122 - 125)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1 talking about with the Neligan and the Garman firm;
2 is that right?
3    A. Should, yes.
4    Q. And they would -- should also have any
5 business case analysis that was done; is that right?
6    A. That's correct.
7    Q. And documentation of the required
8 approvals would also be with that; is that right?
9    A. That's right.
10    Q. Okay. So we just ask for production of
11 any documents maintained in those or any other files
12 that the NRA has relating to the retention of the
13 Garman and the Neligan firms?
14        MR. GARMAN (VIA ZOOM): So -- so,
15 Counsel, could you put your request in an email when
16 we're done?
17        MS. STERN (VIA ZOOM): Of course.
18        MR. GARMAN (VIA ZOOM): Thank you.
19    Q. Mr. Frazer, when you decide to engage
20 outside counsel for a matter, how would you describe
21 your style of overseeing --
22        MR. GARMAN (VIA ZOOM): Objection to
23 form.
24    Q. -- those outside counsel?
25        MR. GARMAN (VIA ZOOM): Objection to
Page 126

1 form.
2        Go ahead if you understand.
3    A. I'm not sure I understand the question,
4 though.
5    Q. Do you -- let's just take -- for instance,
6 you talked before about other than fairly -- I think
7 you used the word "minor" litigation matters, you
8 typically would seek outside counsel for a
9 litigation matter.
10        In that circumstance, what is your
11 expectation in terms of reporting to the NRA by the
12 outside counsel?
13    A. I expect that firms will uphold their
14 requirements under the state, you know, relevant
15 state bar ethics rules to inform us of
16 significant -- significant developments in the
17 matter, to provide thorough transparent billing, to
18 answer any questions about their billing, and, you
19 know, generally to be responsive.
20    Q. Do you require them to provide copies of
21 pleadings before they're filed to get authorization
22 to file them?
23    A. Not in all cases, but, you know, certainly
24 for -- certainly for significant pleadings. You
25 know, I'm not worried about requests for an
Page 127

1 extension of time or something like that.
2    Q. And in -- what about court proceedings in
3 matters, do you expect them to give you notice of
4 the court proceedings?
5    A. Yes, and they routinely will do that other
6 than, you know, status -- routine status conferences
7 and things like that where nothing really rises to
8 the level of requiring oversight.
9    Q. And we talked earlier about your
10 responsibility to manage legal risks for the NRA.
11        Does that involve, also, monitoring the
12 developments in significant litigation matters?
13    A. Yes.
14    Q. And how do you do that?
15    A. I -- I get reports from counsel. If I
16 haven't heard from counsel about something and, you
17 know, I start thinking, hey, what's going on with
18 that case, I may check in. I also have a periodic
19 check on this via the drafting of the -- of the
20 legal matters report, which is a report that we give
21 to our legal affairs committee.
22        And, you know, if I -- when I'm -- when
23 I'm -- the way we compile that is that each attorney
24 individually writes up the matters that he or she is
25 dealing with, and then I write up the matters that
Page 128

1 I'm personally supervising.
2        And in the course of drafting that, I'll
3 often approach firms to double-check the status, you
4 know, see if there have been any significant
5 developments in the last couple months that I may
6 not have become aware of, usually there are not.
7 And I try to bring it up to the minute before it
8 goes out to that committee.
9    Q. In what circumstance would you yourself
10 attend a court proceeding?
11    A. I would attend a court proceeding -- well
12 back when it was possible -- feasible to physically
13 attend any court proceeding, I would sometimes do
14 that if it was something significant that was going
15 on locally. And -- but it would also depend on the
16 importance of the -- of the matter. If it's a minor
17 motion, I might not worry about it. But if it was
18 something that's, you know, a key -- that's likely
19 to lead to a key development in the case, I would --
20 I might go if possible if it's a matter that I'm
21 directly handling.
22    Q. And would you also, either yourself or
23 another attorney in the Office of General Counsel,
24 attend depositions or other testimony if -- I think
25 you said, it could be a key development in the
Page 129

33 (Pages 126 - 129)

1 matter?
2　A.　Normally we would -- you know, we would be
3 mindful of overcrowding a room even pre-COVID and --
4 and, you know, get -- we try to hire competent
5 counsel and get a report back afterwards, you know,
6 see what was going on of significance or what -- and
7 what facts may have been learned.
8　Q.　So what is -- in order to stay abreast of
9 the -- of the developments in the matter, what kind
10 of report would you expect?
11　A.　Well, they'll send me the transcript when
12 it becomes available usually.
13　Q.　And do you review the transcripts?
14　A.　I do.
15　Q.　And what about circumstances where --
16 where there are no transcripts provided, what do you
17 do to make sure that you're keeping abreast of the
18 developments?
19　A.　So normally counsel will -- will report
20 back, you know, usually by an email, sometimes a
21 phone call, you know, Dear John, the Court heard our
22 plea in bar today. The, you know, plea in bar
23 was -- you know, was sustained, that kind of thing.
24　Q.　The New York Attorney General's
25 investigation against -- involving the NRA was a

Page 130

1　What's your method generally of overseeing
2 the legal billings?
3　A.　I'll get the -- I'll get the bills when
4 they come in, review them. If it is -- if it's a
5 matter -- sometimes I'm reviewing bills for
6 co-counsel or local counsel.
7　So, for example, if it's a -- if it's a
8 firm that has been working as local counsel with
9 another firm, I may go to the -- to the supervising
10 firm and ask if the charges appear reasonable.
11　For matters where I'm directly familiar
12 with the firm's work, I'll -- I'll review it myself
13 and, you know, flag any questions or, you know,
14 either send emails asking about specific items or
15 have a phone call to -- to go through any questions.
16　And once -- once any and all issues are
17 resolved, sometimes an amended bill has to be
18 issued. But a bill that -- that's suitable for
19 approval and payment would then be forwarded to our
20 financial services division.
21　Q.　Do you require that firms give you budgets
22 so that you can plan ahead?
23　A.　Yes. Both at the outset of -- of a
24 matter, I ask for some -- for a cost estimate. And
25 sometimes depending on the size of the matter, I may

Page 132

1 substantial matter for the NRA, wasn't it?
2　A.　Yes.
3　Q.　Did -- did you or any representative of
4 the Office of General Counsel attend Mr. LaPierre's
5 examination in that investigation?
6　A.　No, we didn't.
7　Q.　Did you attend Mr. Spray's examination in
8 that investigation?
9　A.　No, we didn't.
10　Q.　Did you attend the examinations of any of
11 the other NRA employees that were conducted in that
12 investigation?
13　A.　No, we didn't.
14　Q.　I think you have in your declarations that
15 we were speaking about before in connection with the
16 retention of counsel in this matter, you indicated
17 that one of your responsibilities to oversee the
18 billings, review invoices, stay on top of the costs.
19 Is that fair?
20　　　　MR. GARMAN (VIA ZOOM): Objection to
21 form.
22　　　　But go ahead and answer.
23　A.　Yes.
24　Q.　Okay. Do you -- what's your method, just
25 generally, not limited to the bankruptcy.

Page 131

1 not just want an overall cost estimate but a
2 breakdown by month.
3　Also, as part of the NRA's annual budget
4 process, I'll ask firms what their anticipated
5 budgets for the coming -- coming year are.
6　Q.　And what happens if the firm exceeds the
7 cost estimate?
8　　　　MR. GARMAN (VIA ZOOM): Objection to
9 form.
10　　　　Go ahead.
11　A.　Well, I would like at it and -- and try to
12 understand if there's a reason. In legal matters,
13 there are always unexpected developments and
14 sometimes it's readily apparent why the -- why the
15 billing went higher.
16　Q.　And do you have -- do you require the
17 firms to give you notice if their expectation is
18 that they're -- that legal fees are going to be
19 substantially higher than estimated because of
20 developments or whatever other reason?
21　A.　We have done that in some cases, yes.
22　Q.　You have -- personally have had oversight
23 of the Brewer firm's legal billings since they were
24 first engaged in March 2018. Until recently, you
25 had total oversight of that; is that right?

Page 133

34 (Pages 130 - 133)

1    A.  That's correct.
2    Q.  And did you require that the Brewer firm
3  provide any budgets for the matters it's handling?
4    A.  I have -- I have from time to time sought
5  estimates or, you know, some kind of monthly
6  projection so that I can work on developing the
7  NRA's the NRA's budget, yes.
8    Q.  And were those -- were those just a matter
9  of a report by the Brewer firm what they expected or
10  was it a budget?  Just -- maybe you could just flush
11  that out a little bit just so I understand.
12    A.  Sure.
13        MR. GARMAN (VIA ZOOM):  Objection to
14  form.
15    Q.  Go ahead.
16    A.  Sure.  So -- so the answer is twofold.  As
17  part of the NRA's annual budget process, I need to
18  have an idea of what my spending is going to be, you
19  know, per month over the coming calendar year, which
20  is our fiscal year, and so I'll ask for -- for that
21  breakdown.
22        And then in some cases, we have -- we
23  actually have fee caps with the Brewer firm, and
24  they simply won't bill professional fees beyond
25  that -- beyond that amount.

Page 134

1    A.  With the exception of fees for the matters
2  under the oversight of the special litigation
3  committee, yes.
4    Q.  And were you aware of all the matters that
5  they were billing the NRA for --
6    A.  Yes, I would --
7    Q.  -- at that time?
8    A.  Yes.
9    Q.  And were those fees consistent with the
10  budgets or estimates that the Brewer firm had
11  provided to the NRA for that period of time?
12    A.  I'm sorry, I don't recall for that period
13  of time.
14    Q.  At any time, has the Brewer firm exceeded
15  cost estimates or budgets?
16    A.  Sitting here today, I just can't recall
17  any particular time frame.
18    Q.  Does anyone else at the NRA have oversight
19  of the Brewer firm's billings?
20    A.  After the -- after the -- after the bills
21  leave my hands and are sent to the financial
22  services division, they are subject to review by the
23  CFO.
24    Q.  And what kind of review do you understand
25  that the CFO is doing?

Page 136

1    Q.  How many matters do you have with the
2  Brewer firm where there are fee caps?
3        MR. GARMAN (VIA ZOOM):  Counsel, we'll
4  go a little further, but we're getting pretty close
5  to invading strategy and attorney-client privilege
6  here.
7        MS. STERN (VIA ZOOM):  I don't --
8  okay.  I'm not asking for any substantive
9  information; I'm just asking for the oversight of the
10  finances.
11    A.  To my recollection, I believe there are
12  two with fee caps and one that's entirely pro bono
13  with no professional fees charged.
14    Q.  And the pro bono case is one that you
15  discussed in your declaration, correct?
16    A.  Yes, I believe so.
17    Q.  And you're aware that in the schedules
18  that were filed in the bankruptcy, they report that
19  the Brewer firm was paid approximately $17 million
20  just prior to the bankruptcy.
21        Were you overseeing the legal fees at that
22  time?
23        MR. GARMAN (VIA ZOOM):  Objection to
24  form.
25        Go ahead.

Page 135

1    A.  Well, it depends.  Since the bankruptcy
2  situation, I haven't -- I haven't had a set of
3  invoices go through Ms. Rowling.  But, you know, I
4  know Mr. Spray would sometimes ask me questions or I
5  understood that he sometimes -- I understood from
6  him that he would sometimes ask Mr. Brewer
7  questions.
8    Q.  And what is your understanding was the
9  nature of the information that he would be asking
10  about?
11    A.  I don't -- I don't know that I was ever --
12  I don't know that we ever discussed the substance of
13  those discussions.
14    Q.  Okay.  And at some point, you -- I think
15  you referenced it, that you narrowed the scope of
16  the legal fees -- I'm sorry, the legal billings by
17  Brewer because of the possibility of a conflict; is
18  that right?
19    A.  You're referring to -- to my comment about
20  matters under the SLC?
21    Q.  That's right.
22    A.  That's right.
23    Q.  So why were those matters -- why was that
24  responsibility delegated to the special litigation
25  committee?

Page 137

35 (Pages 134 - 137)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    A.   Because after your office named me as an
2  individual defendant in the proceeding against the
3  NRA, it was clear to me that under the applicable
4  bar rules, I had a personal conflict, the
5  conflict -- which would be imputed to my office, so
6  no one in the OGC could review or participate in the
7  defense of that case.
8        So -- and fundamentally, that's why the
9  SLC was created, and so the SLC is overseeing the
10 litigation and, therefore, the SLC is responsible
11 for reviewing those bills.
12   Q.   Do you know what level of experience the
13 members of the SLC have in overseeing litigation
14 matters?
15        MR. GARMAN (VIA ZOOM):  Objection to
16 form.
17   A.   Well, Mr. Cotton on the SLC is a very
18 experienced trial lawyer and litigator in Texas.  So
19 he's -- he has probably 40 years of experience in --
20 in litigation matters and understanding the --
21 understanding billing.  And prior to that, he was a
22 CPA.
23        And the SLC is also advised by board
24 counsel Wit Davis who is a former general counsel of
25 a couple of significant corporations.

Page 138

1    Q.   Does Carolyn Meadows have any prior
2  experience overseeing litigation matters?
3        MR. GARMAN (VIA ZOOM):  Objection to
4  form.
5        Go ahead.
6    A.   I don't know.
7    Q.   And what about Mr. Lee?
8        MR. GARMAN (VIA ZOOM):  Objection to
9  form.
10   A.   I don't know.
11   Q.   Do you have any role in reviewing public
12 statements that the NRA makes concerning legal
13 matters?
14   A.   I do.
15   Q.   What is your role?
16   A.   Depends on the -- it depends on the
17 matter.  Sometimes -- it depends on the matter and
18 it depends on who is making the statement.  I may be
19 approached -- you know, if there's a significant
20 decision, I may be approached by Andrew -- Andrew
21 Arulanandam, that's our public affairs director --
22        Spell it for the court reporter,
23 A-r-u-l-a-n-a-n-d-a-m.
24        -- and ask -- and ask for input.  I may --
25 excuse me.  I may receive something directly from

Page 139

1  the Brewer firm and -- and offer input there and
2  that's about it.
3    Q.   Is one of your responsibilities when you
4  are asked to review things, to make sure that they
5  are accurate?
6        MR. GARMAN (VIA ZOOM):  Objection to
7  form.
8        Go ahead.
9    A.   Even if I wasn't asked to review if
10 something was accurate, I would probably volunteer
11 that, yes.
12   Q.   But it would be important that the
13 statements that the NRA is publicly making are
14 truthful and accurate as -- certainly as to legal
15 matters that you're overseeing, correct?
16   A.   That's very important, yes.
17   Q.   And in connection with -- because of
18 their -- what you reported as sort of your recusal
19 from oversight aspects of the New York AG matter, do
20 you have any role in the review of the press
21 statements there?
22   A.   None.
23   Q.   But I believe that you testified that you
24 are not excluded from the oversight of the
25 bankruptcy matter; is that right?

Page 140

1    A.   That's right.
2    Q.   And did you review the statements that --
3  that have been made to the press concerning the
4  bankruptcy matter?
5        MR. GARMAN (VIA ZOOM):  Objection to
6  form.
7    A.   I don't think I have reviewed every
8  statement that has been made.
9        And -- and just to be clear, my comment
10 earlier about -- about reviewing things, I'm
11 talking about the process when I'm asked to review.
12 I can't speak to the process when I'm not asked to
13 review something.
14   Q.   Do you have an expectation that the
15 communication staff would give you the opportunity
16 to review something before it's issued to the press
17 if it concerns a major legal matter involving the
18 NRA?
19   A.   Not necessarily.  If they're work -- if
20 they're already working with -- with counsel, for
21 example, and, you know, we retain trusted people and
22 rely on them to make accurate statements.
23   Q.   So you would delegate that authority over
24 the public statements to the Brewer firm?
25        MR. GARMAN (VIA ZOOM):  Objection to

Page 141

36 (Pages 138 - 141)

1 form.
2     A.   No, that's not what I said.  If you're
3 retaining a trusted firm, they would always work
4 with -- with inside staff as far as I know.
5     Q.   And my question is:  Is the Brewer firm a
6 firm that you trust that you would not feel the need
7 to review the -- review statements and that you
8 would delegate that authority to them?
9          MR. GARMAN (VIA ZOOM):  Objection to
10 form.
11    A.   I -- I have not delegated authority.
12 However, I think that -- I have found their
13 statements about the matters within the scope of
14 their engagement to be accurate.
15    Q.   And is that true with respect to the
16 bankruptcy matter?
17    A.   Yes.
18    Q.   Before the bankruptcy petition was filed,
19 were you aware of any issues the NRA was having with
20 meeting its financial obligations?
21         MR. GARMAN (VIA ZOOM):  Objection to
22 form.
23         Could you -- Counsel, time frame might
24 help on this one.
25    Q.   Within the year before the NRA filed for

Page 142

1     A.   Referring to -- I think you're referring
2 to my 30(b)(6) testimony.  The -- we're referring to
3 all of the litigation that -- that can come under
4 the purview of the bankruptcy court.
5     Q.   And what are those matters?
6     A.   So --
7          MR. GARMAN (VIA ZOOM):  Objection to
8 the extent this calls for a legal conclusion.
9          THE WITNESS (VIA ZOOM):  Right.
10 Right.
11    A.   Yeah, so those matters include -- you
12 know, principally includes everything that has been
13 stayed as a result of the filing.
14    Q.   And so that doesn't include the lawsuit by
15 the New York Attorney General's office, correct?
16         MR. GARMAN (VIA ZOOM):  Objection --
17 objection; that calls for a legal conclusion.
18    A.   And I think that -- I also can't say that
19 I have looked at that very deeply because of my role
20 as a -- as a defendant.  I'm not involved in
21 discussions of that matter.
22    Q.   Well, I'm asking you sitting here today
23 which specific lawsuits that are pending are part of
24 what the NRA is seeking to streamline?
25         MR. GARMAN (VIA ZOOM):  Objection.  To

Page 144

1 bankruptcy.
2     A.   So within the year before we filed for
3 bankruptcy, you're talking about 2020.  And there
4 was a time in the immediate beginning of the COVID
5 crisis when -- when there was concern about -- about
6 the impact of COVID on the NRA.  You know, like
7 every other organization in the country, we weren't
8 able to have in-person fundraising events, and there
9 were a lot of operational issues involving personnel
10 and so on.  So there was a concern in that period of
11 time, yes.
12    Q.   And were those concerns reasons why the
13 NRA has filed for bankruptcy?
14         MR. GARMAN (VIA ZOOM):  Objection to
15 form.
16    A.   No.
17    Q.   And the NRA stated that it's in -- it's in
18 strong financial state currently; is that correct?
19    A.   Yes.
20    Q.   You testified earlier in this matter that
21 one of the reasons that the NRA was filing for
22 bankruptcy was to streamline its litigation.
23         What litigation are you referring to?
24         MR. GARMAN (VIA ZOOM):  Objection to
25 form.

Page 143

1 the extent you're asking this witness the scope of
2 the automatic stay, that's calling for a legal --
3          MS. STERN (VIA ZOOM):  I'm not asking
4 him the scope of the automatic stay.  I'm asking him
5 as the general counsel of the NRA who has indicated
6 that the purpose -- one of the purposes of the
7 bankruptcy filing is to streamline litigation to
8 identify what existing litigation --
9          MR. GARMAN (VIA ZOOM):  So I'm not
10 going to --
11         MS. STERN (VIA ZOOM):  -- it's hoping
12 to streamline.
13         MR. GARMAN (VIA ZOOM):  I'm not going
14 to prevent him from answering.  I'm not going to
15 prevent him from answering, but the -- objection,
16 that calls for a legal conclusion, it calls for his
17 work product as -- as the scope of general counsel.
18 But -- and he testified that he can't be involved in
19 certain bankruptcy decisions.
20         But go ahead and answer again.
21    A.   So off the top of my head sitting here
22 without any of our schedules of litigation claims,
23 et cetera, we have the Ackerman litigation, the
24 Under Wild Skies litigation, the Dell'Aquila
25 litigation.  I'm sure there are others but they're

Page 145

37 (Pages 142 - 145)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1 not coming immediately to mind.
2   Q. So that's three -- is that three matters?
3   A. That's -- that's three for starters that
4 are coming to -- coming to mind immediately.
5   Q. And of all of the, you know -- the area of
6 legal affairs is -- is your domain at the NRA; isn't
7 that right?
8       MR. FLEMING (VIA ZOOM): Object to
9 form.
10   A. Other than the -- so other than -- other
11 than Second Amendment advocacy, yes.
12   Q. So your -- was your input sought in this
13 idea of using the bankruptcy process to streamline
14 litigation?
15       MR. GARMAN (VIA ZOOM): Objection to
16 form.
17      And I'm not -- I don't think you can
18 answer that without invading the attorney-client
19 privilege.
20   A. Trying to think about whether I can answer
21 it.
22       MR. GARMAN (VIA ZOOM): I instruct you
23 not to answer your discussions with counsel over our
24 strategy in bankruptcy.
25   A. So I don't think I can answer it, no.

Page 146

1   Q. Can you explain how the bankruptcy would
2 serve to streamline the -- the New York Attorney
3 General's litigation and the effect of that
4 litigation on the NRA?
5       MR. GARMAN (VIA ZOOM): So I object.
6 That calls for a legal conclusion of our general
7 counsel and invades conversations we have had.
8   A. And, therefore, I'll decline to answer.
9   Q. Are you aware of the current status of the
10 proceedings in the New York AG's enforcement action?
11   A. Yes, I am.
12   Q. And what is your understanding is the
13 current status?
14   A. The -- all of the defendants have -- have
15 filed answers, and we're in the early stages of
16 discovery.
17   Q. And I think that you said -- are you
18 familiar with who is authorizing decisions with
19 respect to that litigation on behalf of the NRA?
20       MR. GARMAN (VIA ZOOM): Objection to
21 foundation.
22      Go ahead.
23   A. The decisions are being authorized by the
24 special litigation committee.
25   Q. And you as an individual defendant in that

Page 147

1 matter are aware of the -- let me ask it a different
2 way.
3      Are you aware in -- as an individual
4 defendant in the matter of the schedule in that
5 matter?
6       MR. GARMAN (VIA ZOOM): Objection to
7 form.
8      I don't know that I understood it, but
9 if you did, go ahead.
10       MR. FLEMING (VIA ZOOM): Emily, are
11 you talking about the discovery schedule? What
12 schedule are you --
13       MS. STERN (VIA ZOOM): That's right,
14 discovery schedule.
15       MR. FLEMING (VIA ZOOM): Okay.
16   A. Sitting here right now, no, I can't -- I
17 couldn't tell you where we are on deadlines, for
18 example.
19   Q. Are you aware of the scope of the
20 discovery that has been ordered in the New York
21 action?
22       MR. FLEMING (VIA ZOOM): You know, I'm
23 going to lodge an objection to this because I don't
24 really understand how it pertains to the issues that
25 we're here for.

Page 148

1       MS. STERN (VIA ZOOM): That's not an
2 appropriate objection, Mr. Fleming.
3       MR. FLEMING (VIA ZOOM): Go ahead.
4       MS. STERN (VIA ZOOM): Object to form.
5   A. I'm sorry, can you repeat the question?
6   Q. My question is that you're aware of the
7 scope of discovery that has been discussed in the
8 New York State action in particular before the Court
9 on March 9th?
10       MR. FLEMING (VIA ZOOM): Form
11 objection.
12   A. I'm sorry, I'm afraid I'm not.
13   Q. Has the NRA done any kind of analysis of
14 the potential legal costs of the bankruptcy process?
15 Actually, let me restate that.
16      Has the NRA done any kind of analysis of
17 the costs they expect to incur in the bankruptcy
18 process?
19       MR. GARMAN (VIA ZOOM): So I'm going
20 to object to the extent this invades our discussions
21 over the plan process. But if you have knowledge
22 independent of that, you can answer.
23   A. So my knowledge would only be of the -- at
24 this point would only be of the law firm budgets
25 that we previously discussed.

Page 149

38 (Pages 146 - 149)

1    Q.   And are there other individuals at the NRA
2  who are involved in analysis of the bankruptcy costs
3  in other respects?
4    A.   I assume so.
5    Q.   Do you know?
6         MR. GARMAN (VIA ZOOM):  Don't
7  speculate.  Just let her know if you know yes or no.
8    A.   Okay.  I don't know.
9    Q.   Do you know if the NRA has done any kind
10 of analysis of the costs of moving its headquarters?
11   A.   Do I know -- I know that we have -- I know
12 that we're starting to embark on that.
13   Q.   And who is responsible for that?
14   A.   We're working -- we are -- I don't know if
15 I can say this.
16        MR. GARMAN (VIA ZOOM):  So to the
17 extent that --
18        THE WITNESS (VIA ZOOM):  Actually, I
19 think I answered my own question.
20        MR. GARMAN (VIA ZOOM):  Yeah, I don't
21 think you can either.
22        Well, Counsel, we can either table
23 this one and come back to it or you can allow us to
24 confer, whichever you prefer.
25        MS. STERN (VIA ZOOM):  Let's put a pin

Page 150

1  in it and keep moving.
2    Q.   Mr. LaPierre testified at the 341 meeting
3  that various states have reached out to the NRA to
4  invite the organization to move to their respective
5  states.
6         Do you know what states he's talking
7  about?
8    A.   I know that the Oklahoma legislature is
9  actively trying to recruit us.  I think they had a
10 resolution passed in one of the houses of that
11 legislature recently.  And I believe -- I don't know
12 others for sure.
13   Q.   Have you had any conversations with
14 Mr. LaPierre on that subject?
15        MR. GARMAN (VIA ZOOM):  Objection.
16        Don't invade the attorney-client
17 privilege, but you probably can answer yes or no.
18   A.   No, I haven't.
19   Q.   So other than Oklahoma, you can't identify
20 any other state; is that right?
21   A.   Not without invading attorney-client
22 privilege.
23   Q.   And Mr. LaPierre also testified that Texas
24 has offered the NRA incentives to move to the state
25 of Texas.

Page 151

1         Do you know what those incentives are?
2         MR. GARMAN (VIA ZOOM):  Objection to
3  form.
4         Go ahead.
5    A.   So my understanding is -- is fairly
6  general here, and it's that Texas has a generous
7  incentive program for, you know, organizations
8  relocating there.
9    Q.   What does -- what does the incentive
10 program entail?
11   A.   Yeah, I don't recall the -- I don't recall
12 the name of the -- of the fund, Texas Enterprise
13 Fund or something like that, which offers, you know,
14 loans that can, under some circumstances, be
15 converted into outright grants.
16   Q.   And has any other state, to your
17 knowledge, offered any incentives to the NRA?
18   A.   I don't know.
19   Q.   Are you aware of any discussions with the
20 Texas Attorney General's office about the process of
21 incorporating in Texas?
22   A.   I don't know.
23   Q.   You don't know if you're aware of any?
24   A.   I'm sorry.  I misunderstood.  I'm not
25 aware of any discussions with the Attorney General's

Page 152

1  office.
2    Q.   When the NRA initially -- I think we were
3  looking at -- if you want to, we can bring it up --
4  the email -- January 15th email that you identified
5  as notice to the board of the filing of the
6  bankruptcy.
7         Do you recall that it made reference to
8  bringing in Marschall Smith as a chief restructuring
9  officer?
10   A.   Yes, I do remember that.
11   Q.   Mr. Smith did not take that position.  Can
12 you explain why?
13   A.   My understanding is that Mr. Smith had
14 some family health concerns that prohibited from --
15 unexpectedly prohibited him from taking on the
16 engagement.
17   Q.   Were you involved in the discussion of
18 adding a chief restructuring officer to the NRA?
19        MR. GARMAN (VIA ZOOM):  So I object
20 and instruct you not to answer to the extent your
21 participation was as counsel in providing advice.
22   A.   I wasn't involved in any discussion of
23 that.
24   Q.   And when did you learn that Mr. Smith was
25 not going to take on that role?

Page 153

1    A.  I don't recall exactly.  It was shortly
2  after the filing.
3    Q.  And does the NRA intend to propose someone
4  else to serve as a chief restructuring officer?
5        MR. GARMAN (VIA ZOOM):  I object that
6  you cannot answer that without invading our strategy
7  and attorney-client privilege.  It's also work
8  product.
9    A.  I agree with that so I'll decline to
10  answer.
11    Q.  Did the NRA inform the board that
12  Mr. Smith was not taking on the role of chief
13  restructuring officer?
14    A.  No, not to my knowledge, you know, or at
15  least not to the entire board.
16    Q.  Were certain members of the board notified
17  of that development?
18    A.  I would only -- the reason I say it that
19  way is that I'm only aware of stuff that goes out to
20  the entire board.  If someone had discussions with
21  individual board members, I wouldn't necessarily
22  know about it.
23    Q.  You testified previously -- I believe it
24  was at the 341, but it could have been at the
25  30(b)(6) -- that Sea Girt, LLC, the Texas entity, is

Page 154

1  a for-profit that -- is it your understanding that
2  it can be converted into a not-for-profit?
3        MR. GARMAN (VIA ZOOM):  Objection to
4  form.  Objection to the extent it calls for a legal
5  conclusion.
6        Go ahead.
7    A.  That's my -- that is my understanding.
8    Q.  And what would it be converted into, what
9  corporate form?
10        MR. GARMAN (VIA ZOOM):  I'm sorry,
11  Counsel, I don't understand, for what -- what do you
12  mean what would it be converted into.
13    Q.  Well, it's an -- it's an LLC right now; is
14  that right?
15    A.  That's correct.
16    Q.  And it would be -- what -- what is the
17  intention, to convert it into what?
18        MR. GARMAN (VIA ZOOM):  Objection.
19        To the extent you can only answer that
20  by way of our communications over the plan process, I
21  instruct you not to.
22    A.  And I'll respectfully decline on the basis
23  of privilege.
24    Q.  Has the NRA taken any steps to convert the
25  entity into a not-for-profit entity?

Page 155

1    A.  Not to my knowledge.
2    Q.  And who would be responsible for that?
3    A.  Presumably whatever responsible officers
4  of the NRA would be needed to execute, you know, any
5  documents as well as with the advice of counsel.
6    Q.  So that would be -- would that go through
7  the Office of General Counsel?
8        MR. GARMAN (VIA ZOOM):  Objection to
9  the extent it calls for speculation.
10        But go ahead if it's -- if you can
11  answer.
12    A.  Possibly.
13    Q.  Who authorized the NRA's retention of a
14  real estate broker to begin looking for space for
15  new headquarters?
16        MR. GARMAN (VIA ZOOM):  Counsel, I
17  object to the form of the question.  I'm not trying
18  to be tricky here.  The Court ultimately approved it,
19  so you can probably reform that question to one I
20  would let him answer.
21    Q.  Okay.  Who at the NRA was involved in the
22  decision to seek permission from the Court to retain
23  a real estate broker for the purpose of looking for
24  a new headquarters for the NRA?
25    A.  Speaking only as to the individuals that I

Page 156

1  have direct knowledge of, I was involved,
2  Ms. Rowling was involved.  I'm afraid I can't recall
3  who signed the engagement letter with the broker,
4  but Ms. Rowling and I know were -- discussed it.
5    Q.  Was there any consultation with anyone on
6  the board?
7    A.  Not by me.
8    Q.  Was there consultation by anyone else?
9    A.  I don't know.
10    Q.  Would the move -- physical move of the NRA
11  operations require board approval?
12        MR. GARMAN (VIA ZOOM):  Objection to
13  the extent it calls for a legal conclusion.
14        Go ahead.
15    A.  Well, under New York law, purchase of --
16  purchase or leasing of real estate requires board
17  approval, so I think the answer would be yes.
18    Q.  So is there anyone in -- at the board
19  level that's involved in discussions concerning
20  moving the operations of the NRA?
21    A.  Yes.
22    Q.  Who is that?
23    A.  I know Mr. Cotton has been involved in
24  some discussions of that.
25    Q.  Anyone else?

Page 157

40 (Pages 154 - 157)

1    A.  I can't -- I can't -- I don't have any
2  other names, I'm afraid.
3    Q.  Okay.  Mr. LaPierre testified at the 341
4  that at some point in time, the NRA hired law firm
5  of Morgan Lewis to do a compliance review of the
6  organization; is that accurate?
7          MR. GARMAN (VIA ZOOM):  Objection to
8  form.
9          Go ahead.
10    A.  Yes.
11    Q.  And when did that occur?
12    A.  In 2017.
13    Q.  What was your involvement?
14    A.  I interviewed Morgan Lewis and another
15  firm and -- trying to be helpful and not --
16  ultimately we decided to retain Morgan Lewis.
17    Q.  Who was the other firm?
18    A.  Caplin & Drysdale.
19          THE WITNESS (VIA ZOOM):  For the
20  reporter, that's C-a-p-l-i-n and Drysdale is
21  D-r-y-s-d-a-l-e.
22    Q.  And who specifically was involved from
23  Morgan Lewis?
24    A.  Alex Reid, Alexander Reid, R-e-i-d.
25    Q.  Is he a partner?

Page 158

1    A.  Yes.
2    Q.  Were there any other partners involved?
3    A.  I don't recall -- I don't recall meeting
4  with any other partners for that initial project.
5    Q.  And what was the scope of that initial
6  project, the substantive scope?
7          MR. GARMAN (VIA ZOOM):  Counsel, help
8  me out here because you're asking a general counsel
9  about his engagement and his conversations with his
10  lawyer.  I sure feel like this is the wrong witness
11  when the -- when the predicate was someone else's
12  testimony.
13          MS. STERN (VIA ZOOM):  Mr. LaPierre --
14  okay.  Mr. LaPierre has said that the NRA has done
15  all manner of compliance reviews and pointed to the
16  work that Morgan Lewis did, and so I would like to
17  understand what they did.  If the NRA is relying on
18  that work as demonstration of its compliance and its
19  commitment to being compliant organization, I'm
20  asking this witness --
21          MR. GARMAN (VIA ZOOM):  Well --
22          MS. STERN (VIA ZOOM):  -- to
23  explain --
24          MR. GARMAN (VIA ZOOM):  We'll go a
25  little further, but --

Page 159

1          MS. STERN (VIA ZOOM):  -- what that
2  engagement was.
3          MR. GARMAN (VIA ZOOM):  We'll go a
4  little further but you're asking one of
5  Mr. LaPierre's lawyers to talk about conversations
6  with other of Mr. LaPierre's lawyers, and -- and the
7  privilege is getting fairly compounded here.  But we
8  will -- we'll go ahead and --
9          THE WITNESS (VIA ZOOM):  Maybe we can
10  confer --
11          MR. GARMAN (VIA ZOOM):  Yeah.
12          THE WITNESS (VIA ZOOM):  -- on -- on
13  this one.
14          MR. GARMAN (VIA ZOOM):  Yeah.
15          MS. STERN (VIA ZOOM):  Okay.  Before
16  we -- before we go out in the hallway, I think my
17  question was -- and -- and I can try to restate the
18  question if it was too broad, but was the scope of
19  the -- of the work that was done.
20          THE WITNESS (VIA ZOOM):  Okay.
21  Understood, but -- understood, but I would like to
22  confer.
23          MS. STERN (VIA ZOOM):  Okay.
24          MR. GARMAN (VIA ZOOM):  As we have all
25  day, we're trying to be constructive in -- in the

Page 160

1  process.
2          MS. STERN (VIA ZOOM):  I appreciate
3  that.  I just know that there's a lot of lawyers on
4  this call that are wanting this to get moving
5  forward.  So...
6          MR. GARMAN (VIA ZOOM):  Understood.
7  You have some here, too.
8          THE VIDEOGRAPHER (VIA ZOOM):  Going
9  off the record.  The time is 15:22 p.m.
10          (Recess 3:22 p.m. to 3:28 p.m.)
11          THE VIDEOGRAPHER (VIA ZOOM):  Going
12  back on the record.  The time is 15:28 p.m.
13    Q.  Mr. Frazer, you had the opportunity to
14  confer with your counsel, and who was that?
15    A.  It was Mr. Garman and Ms. Eisenberg.
16    Q.  Okay.
17          MS. STERN (VIA ZOOM):  And can we have
18  the last question read back, please.
19          THE REPORTER (VIA ZOOM):  One moment.
20          (Record read.)
21          MR. GARMAN (VIA ZOOM):  I'm going to
22  object here.  I'll give you a speaking objection
23  because it might be helpful, but if you don't mind so
24  I can just make an objection.
25          But the scope of the services

Page 161

41 (Pages 158 - 161)

1 certainly, as Mr. LaPierre testified, included
2 compliance. However, the scope of those services
3 are -- and compliance is just irrevocably intertwined
4 with your action in New York, and I'm not going to
5 permit this lawyer of the Association to talk about
6 his communications with other lawyers of the
7 Association as they relate to -- to that pending
8 action.
9          And so -- so Mr. Frazer will confirm
10 that compliance was within the scope of their
11 services but we won't be answering questions deeper
12 than that.
13          MS. STERN (VIA ZOOM): Okay. I'm
14 going to ask a couple questions, see what -- see
15 where we go with that.
16    Q.  Mr. Frazer, what is your understanding was
17 the reason for the NRA's retention of Morgan Lewis
18 to do the compliance work that Mr. LaPierre
19 referenced at the 341?
20          MR. GARMAN (VIA ZOOM): I'm going to
21 object. I don't -- I don't think you can answer that
22 without invading the attorney-client privilege. I'll
23 leave it to you to decide if you can. But I don't
24 think you can -- I don't think you could -- I don't
25 think you have independent facts other than your role

Page 162

1 as counsel to the NRA and as counsel to Mr. LaPierre
2 to answer that.
3          MR. GRUBER (VIA ZOOM): Okay. I'm
4 going to object to the speaking objections you're
5 making and informing the witness.
6          MR. GARMAN (VIA ZOOM): I'll just --
7 I'll just -- I'll just instruct him not to answer.
8          MS. STERN (VIA ZOOM): Join those
9 objections.
10          MR. GARMAN (VIA ZOOM): I have been
11 trying to be helpful today.
12          MR. GRUBER (VIA ZOOM): If you would
13 just instruct him not to answer in bad faith or what,
14 just...
15          MR. GARMAN (VIA ZOOM): Are you
16 serious? You just accused me of bad faith?
17          MR. GRUBER (VIA ZOOM): I said is that
18 what you're suggesting. And -- and, yeah, I'm asking
19 is that what you're suggesting if the --
20          MR. GARMAN (VIA ZOOM): Counsel, what
21 are you saying to me?
22          MR. GRUBER (VIA ZOOM): The objections
23 are way overbroad, but I do object -- and, look,
24 it's -- I just made an objection. I was ready for
25 you to move on.

Page 163

1          My objection is do not use a speaking
2 objection to inform him of what he may now think is a
3 problem with the question. Thank you.
4          MR. GARMAN (VIA ZOOM): So -- so, one,
5 I take great offense to you accusing me of bad faith.
6 And two, at many points in today's conversation I
7 have said I will make purely speaking objections, but
8 I have been attempting to be helpful and candidly
9 permit things that arguably fall within the
10 attorney-client privilege to be reformed. And so I
11 will simply say, I instruct the witness not to answer
12 because that invades the attorney-client privilege.
13 We'll tighten it up from here.
14          MR. GRUBER (VIA ZOOM): Thank you.
15          MS. STERN (VIA ZOOM): Sorry, I need
16 one second.
17    Q.  Mr. Frazer, do you agree with
18 Mr. LaPierre's characterization that Morgan Lewis
19 was retained to do a compliance review?
20    A.  Yes, I do.
21    Q.  And what did that compliance review
22 entail?
23          MR. GARMAN (VIA ZOOM): Objection;
24 that's work product and subject to the
25 attorney-client privilege.

Page 164

1          I instruct you not to answer.
2    Q.  Did they -- did the compliance review
3 entail interviewing any individuals at the NRA, yes
4 or no?
5          MR. GARMAN (VIA ZOOM): Go ahead.
6    A.  Yes.
7    Q.  Will you identify what individuals were
8 interviewed at the NRA --
9          MR. GARMAN (VIA ZOOM): No, we won't.
10    Q.  -- without describing the substance of the
11 interview?
12          MR. GARMAN (VIA ZOOM): No, we won't.
13    Q.  Did the compliance review that Morgan
14 Lewis firm did entail the review of any of the NRA's
15 policies or procedures?
16          MR. GARMAN (VIA ZOOM): Objection.
17 Mr. Frazer sits here today as a lawyer involved in
18 the internal legal --
19          MS. STERN (VIA ZOOM): We just -- we
20 just had a --
21          MR. GARMAN (VIA ZOOM): Okay.
22          MS. STERN (VIA ZOOM): -- conversation
23 about not doing speaking objections.
24          MR. GARMAN (VIA ZOOM): I'm going to
25 instruct him not to answer then.

Page 165

42 (Pages 162 - 165)

1    MS. STERN (VIA ZOOM): So if you are
2  going to instruct him not to answer on the grounds of
3  privilege, that's fine, but I'm entitled to make a
4  record.
5    MR. GARMAN (VIA ZOOM): Work product.
6  That's fine. It's work product.
7    Don't answer.
8  Q. Did Morgan Lewis's compliance review
9  result in any kind of report?
10    MR. GARMAN (VIA ZOOM): Objection.
11  You can't answer that question; it's
12  privileged.
13  Q. Were any recommendations by the -- this is
14  a yes or no question -- any recommendations by the
15  Morgan Lewis firm conveyed to senior management at
16  the NRA?
17    MR. GARMAN (VIA ZOOM): Objection.
18  That's privileged. He won't answer.
19  Q. Was the board of directors aware of the
20  engagement of Morgan Lewis to do compliance work,
21  yes or no?
22  A. The -- we did a business case analysis and
23  sign-off sheet, so the senior board officers were
24  certainly aware.
25  Q. And just yes or no, did the business case

Page 166

1  analysis indicate that they were being engaged to do
2  a compliance review?
3  A. It has been quite some time since I
4  reviewed it. I can't tell you exactly what it said.
5  Q. Did the NRA take any action with respect
6  to its compliance policies, procedures, or practices
7  in reliance on the Morgan Lewis engagement?
8    MR. GARMAN (VIA ZOOM): Object to
9  form.
10  A. Yes.
11  Q. And what were those actions?
12    MR. GARMAN (VIA ZOOM): Objection.
13  The content is privileged. He won't answer that.
14  Q. Other than Morgan Lewis, I think you have
15  identified a K&L Gates and Peter Flocos and the
16  Brewer firm as having provided advice to the NRA
17  concerning compliance and charities laws matters; is
18  that correct?
19    MR. GARMAN (VIA ZOOM): Objection to
20  the form of the question.
21  A. That's correct.
22  Q. Are there any other firms -- law firms or
23  other professional consultants that you have -- that
24  the NRA has engaged during your tenure as a general
25  counsel?

Page 167

1  A. Other law firms in general or on this type
2  of matter?
3  Q. I'm sorry. No. To address matters
4  concerning compliance with laws governing charities
5  and not-for-profits?
6  A. Wit Davis is NRA board counsel and former
7  NRA general counsel, Bob Dowlut, was on contract for
8  a few years including for such matters.
9  Q. And have you engaged any counsel or
10  consultants to advise the NRA on issues relating to
11  the sufficiency of its internal controls?
12  A. Yes.
13  Q. Can you identify who?
14    MR. GARMAN (VIA ZOOM): I think you
15  can identify who.
16  A. Okay. So to my recollection, Kenrich
17  Group and Charles River Associates.
18  Q. Did you say Kenrich Group?
19  A. Yes. K-e-n-r-i-c-h. I think they also
20  did business or do business as HKA Group or
21  something similar. I can't -- one of them is the
22  old name; the other is the new name. I can't
23  remember which is which.
24  Q. During what time period were they -- was
25  the Kenrich Group under whatever name they were

Page 168

1  using engaged?
2    MR. GARMAN (VIA ZOOM): To -- I'm
3  going to give a speaking objection.
4    To the extent these are -- these are
5  engagements related to ongoing litigation, I'm
6  instructing you not to answer.
7  A. So I hate to do this. I have a minor
8  question, and I think I need to confer.
9  Q. Can I ask -- okay. Let me just try to ask
10  a question or two.
11    Was either the Kenrich Group or the
12  Charles River Group engaged by the NRA in
13  circumstances that were not related to litigation or
14  potential litigation?
15  A. No.
16  Q. So to clarify -- to -- to clear up my bad
17  question, so both Kenrich Group and the Charles
18  River group were engaged in connection with
19  litigation or potential litigation; is that right?
20    MR. GARMAN (VIA ZOOM): Objection to
21  form.
22  A. Yes.
23  Q. Okay. So I still have my question about
24  the time frame as to when each was engaged, and I
25  think -- can you answer that question?

Page 169

43 (Pages 166 - 169)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    A.  So I think I can answer that now.  Charles
2  River would have been in 2020.  And I'm afraid I
3  don't recall the time frame for Kenrich/HKA.
4    Q.  Was it prior to 2017?
5    A.  No.
6    Q.  Was it prior to receipt of the document
7  preservation notice from the New York Attorney
8  General's office?
9    A.  I don't know.
10    Q.  Did you engage them?
11    A.  Yes.
12    Q.  Did you prepare a business case analysis
13  for their engagement?
14    A.  I believe so, yes.
15    Q.  And obtain the necessary contract
16  approvals?
17    A.  Yes.
18    Q.  So any documents that related to the
19  retention of the Kenrich Group would be maintained
20  in the financial services group; is that right?
21    A.  I mean, financial services and/or my
22  office.  Everything goes to them, but of course, I
23  keep copies.
24    Q.  Okay.  And the same with respect to the
25  Charles River group, there would be a business case

*Page 170*

1    Q.  And how -- how were these seminars
2  conducted?  Can you just describe location, how long
3  they were, who attended?
4        MR. GARMAN (VIA ZOOM):  Objection to
5  form of the question.
6        Go ahead.
7    A.  Sure.  We held them in an auditorium in
8  the -- in the basement of NRA headquarters and
9  presented a PowerPoint presentation for
10  approximately -- approximately an hour and a quarter
11  each time.  I think the first time was a little bit
12  longer because we had more questions.  The
13  subsequent presentations were refresher
14  presentations, so some people who had questions
15  the first time had -- you know, their questions had
16  been -- they received answers and they didn't have
17  anything new to ask.
18        And I don't recall off the top of my head
19  how many people may have attended, but it was -- it
20  was a pretty full room of, you know, 50 or so, 40,
21  50 or so people.
22    Q.  And do you take attendance at these
23  programs?
24    A.  We did.  We had -- we had sign-in sheets
25  to record who attended.

*Page 172*

1  analysis and a contract approval?
2    A.  Yes.
3    Q.  You personally have provided compliance
4  training for -- at the NRA, haven't you?
5    A.  Yes.
6    Q.  And when did you first do that?
7    A.  July -- well, ongoing as -- as people
8  would ask questions.  I regard that as a -- as a
9  form of assistance.  But then on a systematic basis
10  since July 2018.
11    Q.  And what is the -- the system of
12  compliance training that currently exists at the
13  NRA?
14    A.  Yeah.  It has been a series of -- it has
15  been a series of seminars for individuals with
16  management or contracting authority and sometimes
17  for their support staff who would be the ones
18  processing or routing documents or contracts.  And
19  the -- we conducted the first of them in July 2018;
20  second one, I believe October 2018; third one, I
21  think February 2019.
22        We have been hoping to have another, but
23  COVID makes it -- COVID and other ongoing matters,
24  obviously, make it challenging to gather people and
25  have the time to do this.

*Page 171*

1    Q.  And is -- are -- is there a category of
2  employees that are required to attend these
3  trainings?
4    A.  Yeah.  I think we -- I think we sent it --
5  I think we initially started with inviting division
6  directors, financial staff, the entire -- the entire
7  OGC staff.  You know, essentially the people who
8  would be making business decisions to engage in
9  contracts or who might be in a position to, you
10  know, have an above-average chance of running into
11  potential conflict of interest issues.
12        And then we -- and then actually there
13  turned out to be quite a bit of interest -- interest
14  in it.  And so after the invitation went out,
15  managers started asking, hey, can I bring my support
16  staff; you know, my administrative assistant is the
17  one who handles these documents, and it would be
18  helpful for -- for him to know and that kind of
19  thing.  So we expanded the scope somewhat and then
20  conducted the training.
21    Q.  Do you provide any training in compliance
22  to the senior executives?
23    A.  Well, this was the senior executives.  It
24  included the in-house officers, you know, executive
25  directors, managing directors and so forth.

*Page 173*

44 (Pages 170 - 173)

1  Q.  Did Mr. LaPierre attend the seminar?
2  A.  Not to my recollection.
3  Q.  So of the three seminars you have done,
4  Mr. LaPierre hasn't attended any of them --
5       MR. GARMAN (VIA ZOOM):  Objection;
6  form of the question.
7  Q.  -- is that right?
8  A.  No, I -- I don't recall him attending.
9  Q.  And was Millie Hallow an attendee at any
10 of these compliance seminars?
11 A.  Yes, she was.
12 Q.  Which one did she attend?
13 A.  Well, at least the first one as I recall.
14 But there may -- but, you know, I don't recall if
15 she attended the others.  There was repeat
16 attendance because they were stated as refreshers.
17 Q.  Was your expectation -- you said this was
18 a system -- was to have a regular compliance
19 training program and/or refresher.  So your -- is
20 repeat attendance a pass on attending again?
21      Let me say it a different way.
22      Is it just a one -- you only expect them
23 to attend it once or is it every year or every 18
24 months?  What is the system?
25      MR. GARMAN (VIA ZOOM):  Object to the

Page 174

1  form of the question.
2  A.  Everyone who -- it was the same invitation
3  list each time.  The intent was to provide refresher
4  training for those who may have been unable to
5  attend the first time.  You know, I recall it was,
6  you know -- so if a person is unable to attend in
7  one instance, then they can attend -- then hopefully
8  they will be able to attend at another.  And for
9  those who are able to attend multiple times, the
10 idea was that it would provide a useful -- a useful
11 reminder.
12 Q.  And who prepared the presentation?
13 A.  The Brewer firm prepared a draft which,
14 you know, we reviewed and made some edits to in a
15 meeting.
16 Q.  Is that the initial presentation was
17 prepared by the Brewer firm?
18 A.  That's right, it's the initial
19 presentation, and I don't think they made any
20 subsequent edits, but we did on our end based on
21 questions -- you know, questions at each seminar.
22 We try to improve the presentation for future
23 seminars.
24 Q.  Okay.
25      MS. STERN (VIA ZOOM):  Stephen, can we

Page 175

1  put in the document that we marked as tab 7.
2       MR. THOMPSON (VIA ZOOM):  Just one
3  moment.
4       Okay.  It should be visible now,
5  Counsel.
6       MR. GARMAN (VIA ZOOM):  We refreshed.
7  Hold on.  Tab 7?
8       MR. THOMPSON (VIA ZOOM):  Yes, that's
9  right.
10 Q.  Can you see that, Mr. Frazer?
11      MR. GARMAN (VIA ZOOM):  The witness
12 has --
13      MS. STERN (VIA ZOOM):  Okay.
14      MR. GARMAN (VIA ZOOM):  Yeah, the
15 witness has it on my laptop and he's scrolling
16 through it.
17 Q.  Okay.  And I believe that we're showing
18 you a document that has been marked as Exhibit 3.  I
19 don't see it myself right now, but it's -- does it
20 have Exhibit 3?
21      MR. GARMAN (VIA ZOOM):  That's right.
22      MS. STERN (VIA ZOOM):  Okay.
23      (Exhibit 3 marked.)
24 Q.  Can you -- is this -- is this a copy of
25 the slides that you just described?

Page 176

1       MR. GARMAN (VIA ZOOM):  Take -- take
2  whatever time you need to review it.
3  Q.  I'll just represent that this was produced
4  to the Attorney General's office by the NRA.  You
5  can see Bates stamp numbers at the bottom of it -- I
6  think you can see them.
7  A.  Okay.  I think your question is whether
8  this is the presentation that we gave, and the
9  answer is -- is that -- is that your question?
10 Q.  That is my question.
11 A.  Yes, it is.
12 Q.  Okay.  And then I see on the lower
13 right-hand corner -- I think on the front page it
14 has the date February 27, 2019.
15      So this is the last version of the
16 presentation that you provided; is that right?
17 A.  That's right.
18 Q.  Okay.  And if you just flip to the end of
19 the presentation, there's some notes.
20      MR. GARMAN (VIA ZOOM):  Counsel, what
21 page?  Is there a page number you're referring to?
22 Q.  I think they are -- sorry, hold on a
23 second.  Page -- oh, they don't have numbers on
24 them.  After the deck on number -- slide number 47.
25      MR. GARMAN (VIA ZOOM):  We see it.

Page 177

45 (Pages 174 - 177)

1 Q. Okay. Who prepared these notes?
2 A. So I do not recall who prepared all of the
3 notes, but I recall preparing some of the notes.
4 Q. Okay. And the -- let's see. I'm looking
5 at what's on our shared screen. But I think I'm --
6 the Bates numbered pages NYAG-26435 that's the Bates
7 number at the very bottom of the page. That's it.
8 A. Yes.
9 Q. Does that -- it refers to "Slide 1, Josh
10 opens."
11 Is that Joshua Powell?
12 A. That's correct.
13 Q. Okay. So you presented this -- and then
14 it says after the bottom of that paragraph, Then
15 over to John.
16 And that's referring to you; is that
17 right?
18 A. Yes.
19 Q. So were you both the presenters for all
20 three seminars that you mentioned?
21 A. No. Josh Powell essentially introduced
22 the first seminar, and then after that, I was the
23 sole presenter for the remaining two seminars.
24 Q. Okay. Did -- did you require that any of
25 the directors review the compliance and governance

Page 178

1 operations across the entire NRA.
2 Q. What kind of -- are there any documents
3 that relate to those presentations?
4 A. Yes. We have some handouts. We have some
5 materials that staff refer to. We have PowerPoint
6 decks created by -- created by, you know, by
7 managers presenting about their division's
8 activities.
9 Q. And who is responsible for maintaining
10 those documents?
11 A. The secretary's office maintains the
12 documents for -- there's actually a notebook that's
13 handed out and we create that and maintain it. And
14 the PowerPoint presentations or other handouts are
15 created or maintained by the individual staff who
16 are -- who are presenting.
17 Q. Does the notebook that's given to the
18 board members, does that include materials that you
19 referred to that provide some training on some of
20 these compliance topics?
21 A. You know, I'm not picturing the same type
22 of materials just because the audience is different.
23 Obviously the focus on a -- on a -- in a staff
24 compliance program is on the type of issues that
25 they're going to run into as they go about hiring

Page 180

1 program?
2 A. I'm sorry, I'm not sure I understand the
3 question.
4 Q. Did the NRA require that directors review
5 this presentation?
6 A. Do you mean directors as in board members
7 or directors as in in-house division directors,
8 staff members?
9 Q. I'm sorry, board members.
10 A. No, we did not.
11 Q. And did you provide any kind of comparable
12 compliance training to members of the board?
13 MR. GARMAN (VIA ZOOM): Objection to
14 form.
15 A. We provide some -- we provide a -- we
16 cover some of the same general topics with the board
17 in our new board member orientations which are
18 held -- typically our new -- new board members are
19 elected in -- in the spring. And typically, you
20 know, shortly after that in the summer, we'll have
21 an orientation session for -- for board members in
22 which they'll receive briefings from -- both from
23 legal counsel and from NRA operational staff
24 addressing and trying to familiarize them with --
25 with both their duties as board members and with

Page 179

1 vendors, for example, as well as about what
2 applicable whistleblower procedures and protection
3 and so forth.
4 The -- the presentation to -- you know,
5 board members aren't signing contracts, so the
6 emphasis is different. The emphasis there is more
7 on their -- on their oversight duties and as well as
8 the information that they need to help the whole
9 board and committee process run smoothly.
10 Q. Do you provide any kind of -- or sorry,
11 does the NRA provide any kind of training to board
12 members on conflicts of interest and related-party
13 transactions?
14 A. Yes. So now because of COVID, we didn't
15 do -- because of COVID and the rescheduling of our
16 annual meeting, we haven't done a board member
17 orientation session since the summer of 2019. So --
18 so we're relying on -- you know, my memory is a
19 little -- a little old here.
20 But, you know, I think we do talk about
21 the duty of -- duty of loyalty, including the duty
22 to avoid conflicts of interest, to put the
23 Association's interests above their own, and then we
24 also -- we also have -- on an ongoing basis, you
25 know, provide them frequently with -- with

Page 181

46 (Pages 178 - 181)

1 additional copies of the conflict of interest policy
2 for their review in the -- in the -- as part of the
3 financial disclosure process.
4          We'll either distribute at a board meeting
5 or send by email a copy of the financial disclosure
6 questionnaire. And each and every time we send the
7 questionnaire out, it's accompanied by a copy of the
8 policy because one of the -- one of the questions on
9 the form asks them to certify that they have read
10 and understood and will abide by the conflict of
11 interest policy. So, you know, we give them the
12 policy so they have the opportunity to review it.
13          And at the board -- at the board
14 meetings -- at each board meeting when I give my
15 report as secretary, I am -- I remind them of the --
16 of the need to return these forms if they haven't
17 done so and as well as to update their forms if they
18 have -- if there have been any changes.
19     Q. Have there been -- have the conflict of
20 interest policies and questionnaires been
21 distributed -- were they distributed in 2020?
22     A. Yes.
23     Q. And have the board members -- what -- what
24 is the response rate on the questionnaires?
25     A. So -- so we distributed them in 2020, and
                                                    Page 182

1 the response rate was somewhere over 90 percent.
2 And we have distributed them in 2021, and it is more
3 than 80 percent, but, you know, the year's earlier
4 -- early -- excuse me -- the year's early, it has
5 been a busy year, so I have some follow-ups to
6 pursue.
7     Q. When do they get distributed in the year,
8 what time frame?
9     A. We distribute them typically in January
10 and then -- at the board meeting, and then start
11 following up by email shortly thereafter with people
12 who didn't return them. A lot of the time that's
13 because people either missed -- people either missed
14 the meeting or they took hard copy home and, you
15 know, gets lost in the shuffle.
16     Q. And last year when you say you had
17 90 percent response rate, do you recall like at what
18 point in the year you achieved 90 percent?
19     A. That's -- that's as of the end of the
20 year. I don't -- I don't know when -- I don't know
21 when in the year we hit that level.
22     Q. Do you provide a due date when you -- when
23 you send them the questionnaire?
24     A. I don't recall. You know, I'm writing a
25 new -- I'm usually writing a new -- when I'm sending
                                                    Page 183

1 it by email, I'm usually writing a new message each
2 year, and it may vary, but I don't know.
3     Q. Has the NRA -- did the NRA consider
4 whether -- the option to do a compliance
5 presentation in 2020 virtually, like we have spent
6 our entire day together?
7     A. I think -- I think we considered it, but
8 the difficulty is that in addition to the -- to the
9 level of the virtual -- addition to the challenges
10 of virtual presentations, some of which we have
11 experienced here today, we also have the issue that
12 because of staff furloughs, you know, people's
13 workload -- a lot of people are doing double and
14 triple duty.
15          And, you know, while compliance is
16 important, I also, you know, don't want to be a
17 burden on my colleagues.
18     Q. Is there any kind of compliance training
19 for outside vendors?
20     A. There have been compliance reminders on
21 certain issues. So as we went into this process
22 in -- in 2018, the treasurer's office sent letters
23 to major vendors demanding that they provide more
24 detailed invoicing and especially more detailed
25 documentation and backup of out-of-pocket expenses
                                                    Page 184

1 that are being passed through to the NRA.
2     Q. And is there compliance training for
3 consultants?
4     A. I would put consultants in the same
5 category as vendors. We use the terms kind of
6 interchangeably.
7     Q. So these are materials that are provided
8 but not an actual presentation that they -- is given
9 to them or that they're required to do; is that
10 right?
11     A. Yes.
12     Q. Okay. And -- and when you have done the
13 seminars, is there any kind of mechanism for testing
14 comprehension?
15     A. Well, the -- you have seen the slide deck.
16 And there's a -- there are a series of hypothetical
17 questions at the end to test people's knowledge.
18 And, you know, I found that those were pretty
19 effective to spark participation. In fact, I think
20 most of the changes that I made from version to
21 version were based on trying to clarify and improve
22 those hypotheticals so that they would be easier to
23 present, easier to understand and engage with.
24     Q. Okay. Let me -- do we still have the --
25 the exhibit? Is it still available to you?
                                                    Page 185

47 (Pages 182 - 185)

1   A.  I still have it, yes.
2   Q.  Okay.  I just had a couple of questions.
3       Okay.  If you can turn to slide 7.
4   A.  Slide 7 in the deck itself?
5   Q.  Yeah.
6       Are you there?
7   A.  Yes, I see it.
8   Q.  Okay.  There's a bullet there that reads,
9   Whistleblower concerns investigated by counsel and
10  addressed by audit committee.
11      And the heading is, Recap since 2018,
12  Recent strides and ongoing initiatives.
13      Do you know what that's referencing?
14  A.  Which --
15      MR. GARMAN (VIA ZOOM):  Objection to
16  form.
17  Q.  The -- direct you to the third bullet.
18  A.  Right.
19  Q.  What does that refer to?
20  A.  Well, that would refer to any and all
21  whistleblower committees that had gone through that
22  process which would primarily being the addressing
23  issues that were brought forth in early to mid 2018.
24  Q.  And those were investigated by what
25  counsel?

Page 186

1   are whistleblower investigations, and so we have to
2   be careful of revealing the identity of the
3   individuals raising concerns.  So we don't -- we
4   don't put out a building-wide email addressing some
5   specific circumstance.  But we -- but we
6   certainly -- you know, the type of situations that
7   came up have been incorporated into subsequent
8   training.  And they -- and certainly have informed
9   our advice to employees, you know, raising -- you
10  know, ask us any questions about any of these types
11  of things.
12      Q.  So my question, Mr. Frazer, is:  Did
13  you -- did the NRA disclose to employees of the
14  organization the nature of issues that were raised
15  and the findings from the investigation?
16      MR. GARMAN (VIA ZOOM):  Objection to
17  the form of the question.
18      A.  Not -- not organization-wide, but we
19  certainly communicated with the individuals who
20  raised specific concerns to talk about our findings.
21  Because frankly we worked with them to -- to figure
22  out what was going on and to find out if they were
23  satisfied that -- that issues had been resolved.
24      Q.  Okay.  Can we turn to slide 14 -- actually
25  slide 15.

Page 188

1   A.  Combination of the inside and outside
2   counsel.  I worked on them and so did the Brewer
3   firm.
4   Q.  And were there any findings reached in
5   that investigation?
6   A.  Yes.
7   Q.  Were they reported to the board?
8   A.  They were reported to the -- they were
9   certainly reported to the audit committee.
10  Q.  Were they reported to anyone beyond -- any
11  other board members beyond the audit committee?
12  A.  Well, bear in mind that the -- because of
13  the importance of the audit committee, it draws an
14  increasingly large audience.  So although its
15  meetings are held in executive session, when it
16  meets in conjunction with the board meeting
17  typically three times a year, we have had quite a
18  few board members attend and -- and become aware of
19  the committee's activities.
20  Q.  If they chose to attend the audit
21  committee meeting; is that right?
22  A.  That's right.
23  Q.  Were findings from that investigation
24  presented to or otherwise reported to NRA employees?
25  A.  So, you know, of course -- of course these

Page 187

1   A.  I think I have it, yes.
2   Q.  Okay.  So there's a few slides here that
3   are entitled -- the very top -- Compliance Refresher
4   Conflicts of Interest and Related-Party
5   Transactions.  There's a few slides in a row.
6       Could you just take a look at them and
7   tell me do these still reflect the policies that are
8   currently in effect?
9       MR. GARMAN (VIA ZOOM):  Counsel, can
10  you identify which slide you're referring to?
11  Q.  Okay.  I just -- I did just try to do
12  that.  Looking at 15, 16, 17, 18, 19, and 20 I
13  believe are all part of that section.
14  A.  Okay.
15  Q.  And my question is:  Do those reflect the
16  policies that are currently in effect, governing
17  conflicts of interest and related-party
18  transactions?
19      MR. GARMAN (VIA ZOOM):  Objection to
20  form.
21      Go ahead.
22      A.  (Reviewed document.)  With the exception
23  that the -- you know, off the cuff here, with the
24  exception that the financial disclosure
25  questionnaire is now the 2021 disclosure form, I

Page 189

48 (Pages 186 - 189)

Page 190

1 think those reflect -- you know, it's summarizing
2 the 2016 conflict of interest policy, so -- which
3 hasn't been changed, so it does reflect that policy.
4     Q. Okay. And on Monday at your 30(b)(6)
5 deposition, we were asked -- you were asked about
6 whether Mr. LaPierre's use of a yacht that was owned
7 by David McKenzie or Stanton, goes by both names,
8 whether that created -- whether that was a conflict
9 of interest.
10     And I think that your question -- that you
11 raised some hesitation as to whether or not since
12 you didn't have the policy in front of you.
13     So looking at the slides, can you answer
14 that question now?
15     MR. GARMAN (VIA ZOOM): Object to the
16 form of the question.
17     A. So understanding that -- that these slides
18 are a summary of the policy and not the policy
19 itself, so you see, for example, on pages 16 through
20 19, I think, there's a footnote that says for the
21 exact language, see the policy itself and refers to
22 page numbers -- section numbers of the policy.
23     Please give me a moment to -- to review.
24     Q. I'll be happy to give you the policy if
25 that would make it easier.

Page 191

1     MS. STERN (VIA ZOOM): Stephen, why
2 don't you just put the policy in the exhibits and
3 we'll mark it as the next exhibit.
4     A. (Reviewed document.)
5     MS. STERN (VIA ZOOM): Stephen, have
6 you had a chance to put the policy in?
7     MR. THOMPSON (VIA ZOOM): It is
8 loading now.
9     MS. STERN (VIA ZOOM): Oh, okay.
10     MR. THOMPSON (VIA ZOOM): Should be
11 available now, Counsel. I apologize, I introduced it
12 without the -- the stamp, so I will ask Veritext at
13 the end of this to mark it as Exhibit 4.
14     And also for the record, I will just
15 note that this is an excerpt of a rather large
16 document but that this excerpt comes from The
17 National Rifle Association of America Policy Manual.
18     (Exhibit 4 marked.)
19     Q. So, Mr. Frazer, do you have access to that
20 exhibit?
21     A. Not yet. We're getting it.
22     Q. Okay.
23     A. You might need to do a word search.
24     Q. Are you -- I know I can help you out in
25 terms of the -- we don't have the -- as my colleague

Page 192

1 just said, this is a -- this is an excerpt. And let
2 me direct you --
3     A. Well, is it the -- is it the -- is it at
4 the -- there we go.
5     Q. I think you're going to find it at Bates
6 stamped page -- again the very bottom Bates stamp --
7 NYAG-00019211.
8     A. Okay.
9     Q. Are you at that page yet?
10     A. Yes, we are.
11     Q. Okay. And so first -- first let me ask
12 you if what's before you, which as we have
13 represented is an excerpt of a document produced to
14 the Attorney General's office that's entitled The
15 National Rifle Association of America Policy Manual,
16 whether you recognize this document to contain
17 excerpts of that policy manual?
18     A. I mean, it certainly -- it certainly
19 contains excerpts -- oh, right, it is excerpts, only
20 72 pages.
21     Q. Yeah. I think if you actually look at the
22 table of contents, there's over 280 pages to the
23 full policy manual.
24     A. Sounds right.
25     Q. So...

Page 193

1     A. Yes, this appears to be the conflict of
2 interest policy.
3     Q. Okay. And then will you turn to Bates
4 stamp NYAG-00019211.
5     And my question is whether or not this is
6 the conflict of interest and related-party
7 transaction policy that's currently in effect at the
8 NRA, and it continues for a few pages there.
9     A. Yes, it is.
10     Q. Okay. So now back to my question about
11 Mr. LaPierre's use of the yacht.
12     Is that a violation of the NRA's conflict
13 of interest policy if he didn't provided advance
14 notice --
15     MR. GARMAN (VIA ZOOM): Object to the
16 form of the question.
17     Q. -- for the use of that yacht?
18     MR. GARMAN (VIA ZOOM): Object to the
19 form of the question.
20     Counsel, will you do me a favor, will
21 you represent that the excerpts you have produced are
22 all of the provisions that would relate to the
23 question you're asking?
24     MS. STERN (VIA ZOOM): It is my
25 understanding -- well, let me just -- Mr. Frazer is

49 (Pages 190 - 193)

1 going to know this better than I am, but it is my
2 understanding that the way that this policy manual is
3 organized is in the historical form where new
4 policies continue to be added and then at the back
5 there are some appendices.
6      And so there is a -- the back of the
7 document which you have are statements of corporate
8 ethics, purchasing policy, among others, an officer
9 and board of directors disclosure of financial
10 interest form.
11      So this portion of the policy is
12 entitled the Conflict of Interest and Related-Party
13 Transaction Policy. I think the witness can explain
14 whether or not this is the current policy.
15   A. I think I already testified that it is the
16 current policy.
17   Q. Okay. So is Mr. LaPierre a covered person
18 under the definition of "covered persons" in the
19 conflict of interest policy?
20   A. Yes.
21   Q. And would his acceptance of a gift from a
22 vendor to the NRA create appearance of influence
23 that would create a potential conflict?
24      MR. GARMAN (VIA ZOOM): Objection to
25 the form of the question.

Page 194

1   A. I would -- I would say it would be a
2 potential conflict, and I would note the language
3 before the numbered list in Section III where it
4 says, Not possible to describe or anticipate all the
5 circumstances that might involve a conflict of
6 interest, a conflict of interest may arise -- and
7 its emphasis in the original -- may arise when a
8 covered person directly or indirectly does various
9 things.
10      So we weren't trying to spell out that
11 things are automatically conflicts of interest but
12 to flag issues that should be considered.
13   Q. Okay. So I direct you back to the -- the
14 compliance slide presentation that we were just
15 looking at, which I believe is Exhibit 3, slide 17.
16   A. Okay.
17   Q. And in your slide presentation, which you
18 yourself presented on a number of occasions, in the
19 middle bullet, it indicates that the provision
20 concerning whether it's subject to actual or
21 apparent undue influence.
22      The e.g.'s include, Has solicited or
23 accepted any gifts, entertainment, or favor where
24 such gift might create the appearance of influence
25 (excludes gifts under $250).

Page 195

1   Q. Do you see below that it specifically
2 includes free use of boats?
3   A. Yes, I do.
4   Q. And so in your presentation to the group
5 of NRA employees that you thought were very
6 important that they have training on compliance with
7 the conflicts of interest and related-party
8 transactions policies, you specifically highlighted
9 this type of transaction.
10      MR. GARMAN (VIA ZOOM): Object to
11 form.
12   Q. In the context of Mr. LaPierre's use of
13 Mr. McKenzie's yacht, is there a reason why it
14 wouldn't be a conflict of interest?
15      MR. GARMAN (VIA ZOOM): Object to the
16 form of the question.
17   A. Well, the -- if you look at the document
18 as a whole, you will note on the previous slide,
19 page 16, states that as a general rule, disclosure
20 should be made if a covered person directly or
21 indirectly does various things. And one of those is
22 to -- includes free use or -- free use of boats,
23 planes, vacation houses, et cetera, as part of a
24 social activity.
25      So, you know, there -- so -- so we're

Page 196

1 talking about a general type of activity and
2 suggesting that certainly under some circumstances
3 it would warrant reporting. And, you know, I think
4 that's what we highlighted, literally highlighted.
5   Q. Is the NRA undertaking any type of
6 investigation as to whether Mr. LaPierre violated
7 the conflict of interest policy in connection with
8 his use of Mr. McKenzie's yacht?
9      MR. GARMAN (VIA ZOOM): One second. I
10 object to the extent the answer requires you to
11 breach the attorney-client privilege.
12   A. I don't know of any investigation.
13   Q. If there were -- if an investigation was
14 to be conducted, who would be responsible for
15 conducting that investigation?
16   A. It would -- well, I mean, you're speaking
17 hypothetically -- are you speaking hypothetically
18 about an investigation of this specific activity or
19 transaction?
20   Q. No, I'm speaking of under the policy --
21 sorry.
22      I'm speaking about under the policy, your
23 conflict of interest policy, who is responsible for
24 conducting an investigation into possible violation
25 of the policy.

Page 197

50 (Pages 194 - 197)

1      MR. GARMAN (VIA ZOOM): Object to --
2 object to the form of the question.
3      Go ahead.
4  A. Into -- into any possible violation. So
5 the -- the enforcement -- just to make sure I
6 understand, you referred to any possible violation.
7    The enforcement of the policy is -- falls
8 under the jurisdiction of the audit committee, and
9 so what would normally happen would be for whoever
10 the -- whoever an issue came to light with, whether
11 it's human resources, Office of General Counsel, or
12 the audit committee secretary, to confer and
13 collaborate on -- on what might be the best way
14 to -- you know, what might be the best way to
15 investigate something or who might be the best
16 person to investigate it. You'd have to consider
17 potential conflicts of interest of the potential
18 investigators, for example.
19    But generally speaking, the Office of
20 General Counsel would normally have a role in that
21 and so would the audit committee.
22  Q. And what do you mean when you say that the
23 investigators might have conflicts of interest?
24  A. Well, if it was -- speaking
25 hypothetically, if it was an allegation about a

Page 198

1 conflict of interest on the part of the general
2 counsel, then the Office of General Counsel isn't
3 going to be involved in it.
4  Q. Okay. I understand. Okay.
5    So whether or not the boat -- the use of
6 the boat was, in fact, a conflict of interest,
7 should Mr. LaPierre have reported it to the audit
8 committee?
9      MR. GARMAN (VIA ZOOM): Objection to
10 the form of the question.
11  A. You know, if it occurred in the time frame
12 when this -- when this policy, you know, became --
13 came into effect, then I think -- I think it would
14 have been appropriate to have disclosure to the
15 committee.
16  Q. Are you aware of whether or not
17 Mr. LaPierre reported use of Mr. McKenzie's yacht to
18 the audit committee?
19  A. I'm not aware that he did.
20  Q. You're not aware that he did report it, is
21 that right, just to be clear?
22  A. That's right. That's right.
23  Q. Okay. In 2018 and in 2019, are you aware
24 of the audit committee reviewing various
25 transactions involving directors, family members of

Page 199

1 directors and officers to determine whether they had
2 been reviewed and approved in accordance with NRA's
3 internal conflicts of interest and related-party
4 transaction policies?
5  A. I am.
6      THE WITNESS (VIA ZOOM): And -- and if
7 I may, could I ask that we take a short break.
8      MS. STERN (VIA ZOOM): Oh, sure.
9      THE WITNESS (VIA ZOOM): Seems like --
10 seems like we're moving into a new topic and this
11 might be a good opportunity.
12      MS. STERN (VIA ZOOM): If the witness
13 would like a break, we should take a break.
14      THE WITNESS (VIA ZOOM): Thank you.
15      THE VIDEOGRAPHER (VIA ZOOM): Going
16 off the record. The time the 16:31 p.m.
17    (Recess 4:31 p.m. to 4:41 p.m.)
18      THE VIDEOGRAPHER (VIA ZOOM): Going
19 back on the record. The time is 16:41 p.m.
20  Q. Okay. So, Mr. Frazer, we were talking
21 about conflict of interest and related-party
22 transactions that were reviewed by the audit
23 committee in 2018 and 2019.
24    Would you agree with me that the audit
25 committee determined that there had been a number of

Page 200

1 instances in which transactions that posed potential
2 conflicts of interest that should have been
3 disclosed and approved in advance were not, in fact,
4 disclosed to the audit committee during that time
5 period?
6      MR. GARMAN (VIA ZOOM): Objection as
7 to form.
8  A. Yes.
9  Q. And just to be clear, they determined
10 during that time period that the transactions had
11 not been disclosed, the transactions occurred over a
12 variety of time periods?
13  A. That's right.
14  Q. Okay. And what -- what caused the audit
15 committee to -- to review those transactions in the
16 first instance?
17  A. Well, as part of the -- as part of the
18 review that we were doing of -- of compliance, we
19 became aware of additional transactions or -- or
20 board members may have reported things for the first
21 time or other people may have reported things for
22 the first time that they may not previously have
23 been aware of posed any issue.
24  Q. You said board members may have reported
25 them for the first time.

Page 201

1    Are you aware of any specific instances
2  where a board member reported a transaction that
3  caused the audit committee to look back at prior
4  transactions?
5           MR. GARMAN (VIA ZOOM):  Objection to
6  form.
7    A.   Without -- without looking at the
8  committee report, I can't point you to a -- to a
9  specific instance.
10   Q.   And when you said that you -- that the NRA
11 began looking at these transactions as part of its
12 compliance review, was this the review that we were
13 talking about that Morgan Lewis did?
14   A.   It was --
15          MR. GARMAN (VIA ZOOM):  Wait.  Wait.
16 Wait.
17          I'm sorry, Counsel, would you -- would
18 you restate that.
19          MS. STERN (VIA ZOOM):  Can the court
20 reporter read the question.
21          (Record read.)
22          MR. GARMAN (VIA ZOOM):  I instruct you
23 not to answer the question with regard to the work
24 done by Morgan Lewis.
25   A.   So it was part of the compliance review of

Page 202

1  which Morgan Lewis was a -- was a part but that
2  encompassed individuals and firms other than Morgan
3  Lewis by the time frame that you're talking about.
4           MS. STERN (VIA ZOOM):  I'm sorry.  Can
5  you just read that last part back?
6           (Record read.)
7    Q.   And who were those individuals and firms?
8    A.   Well, a whole host of internal NRA staff,
9  including myself, as well as the Brewer firm.
10   Q.   Okay.
11          MS. STERN (VIA ZOOM):  Stephen, can we
12 put into the exhibits tabs 15, 11, and 5.
13          MR. THOMPSON (VIA ZOOM):  Yes.
14          MS. STERN (VIA ZOOM):  Just let me
15 know when they're there because I don't have the same
16 setup.
17          MR. THOMPSON (VIA ZOOM):  The first
18 one is available now.
19          MR. GARMAN (VIA ZOOM):  We have
20 Exhibit 5.
21          (Exhibit 5 marked.)
22   Q.   Exhibit 5?
23          And can you take a look at that document,
24 Mr. Frazer, and let me know if you can identify it?
25          MR. THOMPSON (VIA ZOOM):  And,

Page 203

1  Counsel, just for the record, this is an excerpt of
2  the board meeting minutes, specifically an excerpt of
3  the minutes of the audit committee.
4           THE WITNESS (VIA ZOOM):  Thank you.
5    A.   (Reviewed document.)  Okay.
6    Q.   Do you recognize that document?
7    A.   I do.
8    Q.   Okay.  And that -- is that a report of the
9  audit committee dated September -- looks like 8 to
10 9, 2018?
11   A.   Starting on page 6, that's what it is.
12 You have some front matter from the overall board
13 meeting before that.
14   Q.   Okay.  That's right.
15          And so I think at the -- Bates page starts
16 at NYAG-0027013 and continues to NYAG-0027019.
17          So that section of the document is the
18 report of the audit committee for the period
19 September 8 to 9, 2018?
20   A.   Yes.
21   Q.   Actually, let me restate that because
22 that, I don't think, is right.
23          That is the report dated September 8 to 9,
24 2018; is that right?
25   A.   Right.  I appreciate the -- I appreciate

Page 204

1  the catch.  Thank you, Counsel.
2    Q.   Okay.  And -- and the -- this is a
3  standard form which the audit committee was
4  preparing its reports around that time; is that
5  right?
6    A.   Yeah.  It's a standard -- it's a standard
7  form that all of the committees use, and that's why
8  we have the dates of the meeting itself.  It's
9  always stated as two days just in case the meeting
10 goes into a second day.  So -- and the board meeting
11 was going to be held September 8 and potentially
12 September 9, but this actually reflects all
13 activities of the audit committee since the previous
14 board meeting.  So you have reports regarding -- you
15 know, you have items regarding both the July and
16 September meetings.
17   Q.   And just looking at the -- the report that
18 relates to July 30th, 2018, which is at the top of
19 Bates page NYAG-0027013, we were previously
20 discussing some issues raised by whistleblowers.
21          Issues were raised by -- those issues
22 raised by the whistleblowers were presented at that
23 July 30th, 2018, meeting, weren't they?
24   A.   Yes.
25   Q.   Do you know why there's no indication in

Page 205

52 (Pages 202 - 205)

1 the notes of that meeting that those issues were
2 raised?
3          MR. GARMAN (VIA ZOOM): Objection to
4 form.
5          Go ahead.
6     A.  I don't know why that's not stated.
7     Q.  Who prepares the minutes of -- at that
8 time, who was preparing the minutes of the audit
9 committee meetings?
10     A.  So let me make what seems like a minor
11 distinction but may be helpful. There -- what we --
12 part of the secretary's office duties is to train
13 committee secretaries. And we make a distinction in
14 that training between minutes and committee reports.
15 And the minutes are a record of what was done in a
16 particular meeting. The committee report is what
17 goes to the board and can encompass multiple
18 meetings. I just wanted to lay that -- to lay that
19 out.
20          The committee secretary at the time of
21 the -- of -- of the July 30th meeting was Rick
22 Tedrick. And typically Ms. Rowling would take notes
23 and -- and assist in preparation of the -- of the
24 documents. And the documents would then go to the
25 secretary's office staff for some final formatting

Page 206

1 just to make sure all the reports look the same and,
2 you know, check for typos and so forth.
3          The -- but Mr. -- you know, as the minutes
4 indicate, Mr. Tedrick was the committee secretary
5 and -- at the time of the July meeting.
6     Q.  So he would have been responsible for any
7 minutes?
8     A.  He would have, but I don't recall if he --
9 if he actually prepared those minutes or this report
10 at that time.
11     Q.  Okay. So just -- just looking through
12 the -- the report, I am not going to ask you in
13 detail about these transactions, but does this
14 report reflect some of the transactions that the
15 audit committee reviewed and purports to have
16 ratified?
17     A.  The second part of the -- so -- so what
18 this indicates is that there were no such actions at
19 the July meeting but that there were some -- some
20 actions of that type at the -- at the September
21 meeting.
22     Q.  Right.
23          And so there's references to transactions
24 involving Oliver North; and Marion Hammer; Julie
25 Golob; Woody Phillips, two -- two matters, a sailing

Page 207

1 trip and transaction with HomeTelos; transaction
2 involving Josh Powell involving McKenna and another
3 one with Jim Powell Photography.
4          And those are -- are those all
5 transactions that the audit committee reviewed and,
6 to your understanding, purported to ratify?
7          MR. GARMAN (VIA ZOOM): Objection to
8 form.
9     A.  One moment to review the resolutions.
10 (Reviewed document.) Okay.
11          MS. STERN (VIA ZOOM): Can the
12 reporter read the question.
13          (Record read.)
14     A.  Yes.
15     Q.  Do you know who prepared the resolutions?
16     A.  It was a -- you know, there are several,
17 and I don't think they were all prepared by the same
18 individual necessarily, but collectively I would say
19 they represent a combined effort between me and the
20 Brewer firm.
21     Q.  Okay. And do you recall what the -- what
22 kind of materials were provided to the members of
23 the audit committee to consider these transactions?
24     A.  So the document that I recall was -- the
25 document that I recall was -- the document that I

Page 208

1 specifically recall seeing or having -- or having
2 discussed was a -- a brief document that purported
3 to be a summary of Colonel North's contract with
4 Ackerman McQueen. And I don't recall -- I don't
5 recall other documents reviewed by the committee.
6 So...
7          MS. STERN (VIA ZOOM): Okay. And can
8 we look at the next -- Stephen, can we look at the
9 next -- I think it should be tab 11, which would be
10 Exhibit 6, I believe.
11          (Exhibit 6 marked.)
12          MR. THOMPSON (VIA ZOOM): Yes, it
13 should already be available.
14     Q.  Okay. And at the same time, if you could
15 also take a look at tab 5, which should be
16 Exhibit 7.
17          (Exhibit 7 marked.)
18          MR. GARMAN (VIA ZOOM): Regrettably,
19 the system only lets you open one document at a time.
20          MS. STERN (VIA ZOOM): Oh, okay.
21     Q.  All right. So let's identify Exhibit 6,
22 and I'll represent to you that this is also an
23 excerpt of minutes of an NRA board meeting that were
24 produced to the Attorney General's Office and
25 reflect the date January 5, 2019.

Page 209

53 (Pages 206 - 209)

1    My question to you is: Do you recognize
2 the excerpt of the minutes which includes the report
3 of the audit committee that's -- as it's so entitled
4 beginning on page NYAG-0022774 and continuing to
5 page NYAG-0022778?
6    A.  I do.
7    Q.  Okay.  And is this a report of the audit
8 committee dated January 5th to 6th, 2019?
9    A.  That's for the board meeting of January 5
10 to 6, 2019.  But this reflects a committee meeting
11 that occurred on December 5th, 2018.  And I think --
12 and, actually, then another meeting that occurred on
13 January 4, 2019.
14    Q.  And then it was delivered to the -- report
15 was delivered to the board of directors on
16 January 5th or 6th, 2019; is that right?
17    A.  Right.  It would have been the 5th.  We
18 always list a two-day span just in case it goes
19 over.
20    Q.  Okay.  And my question to you is -- is
21 just -- are these additional transactions that the
22 audit committee also considered in connection with
23 its compliance review of transactions involving
24 potential conflicts of interest?
25    A.  Yes.

Page 210

1    Q.  Okay.  And what do you recall was the
2 process by which the audit committee reviewed these
3 transactions?
4        MR. GARMAN (VIA ZOOM):  Objection to
5 the form.
6        Go ahead.
7    A.  So the committee went -- went into
8 executive session with committee members and
9 counsel, among others, discussed the -- you know,
10 discussed the various transactions that are
11 described here and adopted the resolutions that you
12 see.
13    Q.  And what kind of material was provided to
14 the audit committee members to allow them to
15 evaluate the transactions?
16    A.  I don't recall any physical materials
17 being handed out.
18    Q.  Was there a presentation done to the audit
19 committee?
20    A.  I mean, there was a presentation -- there
21 was a -- there was a discussion in which we went
22 through these items one by one.
23    Q.  And how were the items presented to the
24 audit committee for its consideration?
25    A.  The -- I don't remember -- I don't

Page 211

1 remember -- I don't remember this one specifically.
2 But the typical practice was that since these
3 transactions were reported to me, I would often have
4 been the one to -- you know, to gather background
5 information from relevant staff or from the -- or
6 from the officer, director, or other person who
7 reported the item.  And -- and then I would -- you
8 know, we would discuss a potential -- a potential
9 resolution and consider -- and consider it.
10    Q.  Are you familiar with what the standards
11 are for -- under New York law for related-party
12 transactions involving charitable corporations?
13        MR. GARMAN (VIA ZOOM):  Objection to
14 form.
15    A.  Yes.
16    Q.  And what are they?
17    A.  You have to have a determination --
18        MR. GARMAN (VIA ZOOM):  Objection to
19 form.
20        Go ahead.
21        THE WITNESS (VIA ZOOM):  Okay.  Sorry.
22    A.  You have to have a determination by --
23 essentially by a disinterested body that the
24 transactions are fair and reasonable and in the best
25 interest of the organization.

Page 212

1    Q.  Are there any procedural requirements that
2 you're familiar with?
3    A.  You're supposed to -- and this is -- you
4 know, obviously this is from memory of a more
5 detailed statute.
6        But you're supposed to discuss the market
7 valuation, any alternative feasible transactions or
8 words to that effect, and to document the
9 committee's findings.
10    Q.  And what is your understanding of the
11 consideration of alternative -- I think you said
12 alternative feasible transactions.
13        What does that require?
14        MR. GARMAN (VIA ZOOM):  Objection to
15 form.
16    A.  I don't recall specific statutory
17 requirements.  Of course it requires at the outset
18 that there actually be some feasible alternative
19 transactions.  But the -- but I'm afraid I don't
20 recall any other of the statutory provisions.
21    Q.  What -- what does the -- what -- in the
22 two audit committee reports that we have looked at,
23 the September report 2018, the January 2019 report,
24 what do you recall the NRA doing to consider what
25 you call alternative feasible transactions?

Page 213

54 (Pages 210 - 213)

1          MR. GARMAN (VIA ZOOM):  Objection to
2 form.
3     A.  Well, I recall that in at least some
4 cases, there was a discussion of -- of the
5 uniqueness of the -- of the individual's
6 qualifications.  I'm speaking generally here, not on
7 any particular transaction.  There was some
8 discussion of the -- you know, did the person have
9 such unique credentials that there wasn't really a
10 feasible alternative.
11    Q.  And what -- sorry.  I don't mean to
12 interrupt you.  Go ahead.
13    A.  No, you can go ahead.
14    Q.  Okay.  And -- and what did the committee
15 consider to determine whether the terms of the
16 transaction were fair and reasonable and in the best
17 interest of the NRA?
18          MR. GARMAN (VIA ZOOM):  Objection to
19 form.
20    A.  So in those instances, staff would conduct
21 some analysis that was presented orally to the
22 committee about, you know, researching, you know,
23 and at least -- for at least some of these
24 researching market prices.  You know, are we getting
25 a good deal here, you know, compared to comparable

Page 214

1 of what was produced.
2     Q.  Okay.  Can we take a look at the
3 exhibit -- I think it should be tab 5 labeled
4 Exhibit 7.
5          My question -- my first question to you is
6 just if you could take a look at it and let me know
7 if you can identify it.
8          (Exhibit 7 marked.)
9          MR. GARMAN (VIA ZOOM):  Counsel,
10 what's the "Frazer 86" exhibit designation?
11          MR. THOMPSON (VIA ZOOM):  I can make
12 representation on this, Emily.
13          MS. STERN (VIA ZOOM):  Yes, go ahead.
14          MR. THOMPSON (VIA ZOOM):  This is an
15 exhibit that was used in Mr. Frazer's previous
16 deposition from the Ackerman litigation that was
17 produced to us by the NRA.
18          MR. GARMAN (VIA ZOOM):  Thank you.
19    A.  Okay.  I'm ready.
20    Q.  Okay.  Do you -- can you -- do you
21 recognize this document as a report of the audit
22 committee of the NRA?
23          The report is dated April 29, 2019, and it
24 reflects activities by the audit committee beginning
25 in February 2019.

Page 216

1 goods, to the extent that that could be gauged.
2     Q.  And you, I think, said oral.  So are there
3 any documents reflecting the efforts to make a
4 determination as to whether the terms of these
5 transactions were fair and reasonable and in the
6 best interest of the NRA?
7     A.  In at least some instances there would be
8 documents which I -- I, as counsel, directed to be
9 compiled to inform my -- inform my analysis and
10 presentation of these.
11    Q.  And do you have such documents in your
12 possession?
13    A.  I do.
14    Q.  And who compiled them for you?
15    A.  Depending on -- depending -- it would
16 depend on the transaction, who I thought would be in
17 a position to conduct an analysis with respect to
18 each of the related parties.
19    Q.  And do you -- did you produce those
20 documents to the New York Attorney General's office
21 in its investigation?
22    A.  I don't know.
23    Q.  Who would know the answer to that
24 question?
25    A.  I believe the Brewer firm would be aware

Page 215

1     A.  Yes.
2     Q.  Okay.  And just -- this is a fairly
3 lengthy report.  This includes transactions that
4 were also considered -- does this report include
5 transactions that were also considered as part of
6 the compliance review concerning transactions
7 involving potential conflicts of interest or
8 related-party transactions?
9          MR. GARMAN (VIA ZOOM):  Objection to
10 form.
11    A.  Yes.
12    Q.  Okay.  And just focusing on those
13 transactions, what do you recall was presented --
14 what information was presented to the audit
15 committee to allow them to evaluate those
16 transactions to determine whether they were fair and
17 reasonable and in the best interest of the NRA?
18    A.  (Reviewed document.)  With respect to the
19 related-party transactions here, I don't recall any
20 written materials being presented.  There -- there
21 may have been, in fact, you know, certainly were
22 written materials presented on some other issues but
23 not on the related-party transactions.
24    Q.  Okay.  And the -- who -- who presented
25 information to the audit committee on the

Page 217

55 (Pages 214 - 217)

1 transactions that raised the question of conflicts
2 of interest and related-party transactions?
3  A. Sure. And -- and please bear with me.
4 It's a little slower because they aren't separated
5 in those categories.
6  Q. Yeah, I understand.
7  A. I know that I did, and I don't recall who
8 else may have -- who else may have presented --
9  Q. What --
10  A. -- if anyone.
11  Q. Which transactions did you present
12 information concerning?
13  A. You know, I don't specifically remember,
14 but again, just with respect to the related parties,
15 I remember speak -- presenting or speaking about all
16 or -- all or most of them.
17  Q. And what information do you use to inform
18 your presentation that these transactions were fair
19 and reasonable and in the best interest of the NRA?
20  A. As with the previous report, I would have
21 spoken with --
22  MR. GARMAN (VIA ZOOM): Hold on. If
23 this is work product on advice you're giving, I
24 instruct you not to answer. If this is simple -- if
25 these are simple facts that you gathered, you can

Page 218

1 or the board meeting itself.
2  Q. Mr. Frazer, are you going to answer the
3 question?
4  A. So I'm going to answer in general terms,
5 as I think I did on the previous report or reports,
6 that, you know, what I would do in general was to
7 talk to the responsible individuals overseeing the
8 performance of any particular contract or consultant
9 or program and discuss with them what -- what
10 factors went into it, what was -- what value was
11 derived, what was, you know, whether there were any
12 other options, what the -- what the market would --
13 what the market would support, you know for other
14 vendors and so forth, just like the previous
15 meetings.
16  Q. Do you remember in particular doing that
17 with respect to any of the transactions that are
18 reflected in Exhibit 7?
19  A. Yes.
20  Q. And do you have documents that would
21 reflect that -- that inquiry?
22  A. Yes. Yes, for at least some of them, at
23 least one of them.
24  Q. Did you consider or anyone else consider
25 alternative transactions?

Page 220

1 testify.
2  A. Okay.
3  MS. STERN (VIA ZOOM): Are you --
4  A. So --
5  MS. STERN (VIA ZOOM): Wait. I just
6 want to be clear.
7  Are you -- after we have received
8 these documents in an investigation after we have
9 been testifying -- your client has been testifying
10 about them are now suggesting that he shouldn't
11 answer the questions as to what the basis of which
12 the audit committee made a determination --
13  MR. GARMAN (VIA ZOOM): No.
14  MS. STERN (VIA ZOOM): -- whether
15 these were compliant?
16  MR. GARMAN (VIA ZOOM): No. You asked
17 a specific question about what he did in your last
18 question to gather information. And he is the
19 lawyer, and so the work product that he gathered
20 may -- it may be work product. I'm not sure if the
21 answer to that is yes, but I'm drawing a distinction
22 because the specific question was what he in his
23 capacity as general counsel undertook to provide
24 certain advice. That's the distinction I'm drawing.
25 I'm not commenting on the materials provided to you

Page 219

1  A. Yes, in at least one or more instances.
2  Q. And what instances are you referring to?
3  A. One where I recall -- so let me back up a
4 moment here. One -- actually could I -- could I --
5 you know, I want to -- I want to answer, but I want
6 to confer with counsel to -- to make sure I don't
7 inadvertently waive something here.
8  MS. STERN (VIA ZOOM): Go ahead.
9  THE VIDEOGRAPHER (VIA ZOOM): Going
10 off the record. The time is 17:19 p.m.
11  (Recess 5:19 p.m. to 5:23 p.m.)
12  THE VIDEOGRAPHER (VIA ZOOM): Going
13 back on the record. The time is 17:23 p.m.
14  MR. GARMAN (VIA ZOOM): So, Counsel,
15 we'll ask the question to be repeated back to us, but
16 we believe that Mr. Frazer can answer objective
17 factual answers to the question you asked up to --
18 and he's going to testify up to where it would become
19 legal advice, but I think it was a factual question.
20  MS. STERN (VIA ZOOM): I believe so.
21 Okay. Thank you.
22  MR. GARMAN (VIA ZOOM): Again, I'm not
23 trying to speak; I'm trying to be helpful.
24  MS. STERN (VIA ZOOM): Okay.
25 Michelle, can you read it back. Just what you read

Page 221

56 (Pages 218 - 221)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1 back to me would be helpful.
2      (Record read.)
3      MR. GARMAN (VIA ZOOM): Yes, so answer
4 the question to the extent it's factual inquiries
5 and -- and factual recitations.
6      A. Okay. So the one that I'm thinking of in
7 particular here is the -- it's resolution Roman
8 numeral X relating to Peacemaker National Training
9 Center. Peacemaker is a shooting range in West
10 Virginia where we have had -- held various major
11 matches.
12      And I recall a conversation sometime prior
13 to this date -- let me back up a moment. We
14 actually -- we were actually being abundantly
15 cautious here because as the resolution states, we
16 don't actually even think that the individual who
17 employed Peacemaker was qualified as a key employee
18 under any relevant definition. So we're just --
19 we're being very careful and -- and looking at it
20 anyway.
21      And I recall a -- I recall having a
22 discussion with some of the relevant staff on the
23 operational side about whether we had -- you know,
24 whether there was any -- any other range where this
25 type of match could be held. And the answer was

Page 222

1      Q. And where does the audit committee
2 secretary maintain records of the audit committee
3 meetings?
4      MR. GARMAN (VIA ZOOM): Objection to
5 form.
6      A. I don't know.
7      Q. And who would know the answer to that?
8      A. Whoever was the audit committee secretary
9 at the time.
10      Q. Okay. Is the NRA currently paying any
11 legal fees for Marion Hammer in connection with any
12 lawsuits or investigations concerning her?
13      MR. GARMAN (VIA ZOOM): Counsel, could
14 you draw a distinction -- I don't know that the
15 answer changes, but could you draw a distinction
16 between pre- and post-petition for my benefit?
17      Q. Okay. I believe that -- that you,
18 Mr. Frazer, testified, and I believe it was at the
19 341, but it could have been at the 30(b)(6) about
20 payments to a law firm concerning -- that is
21 representing Marion Hammer in connection with a
22 lawsuit pending against her.
23      I believe the firm is Bajo Cuva; is that
24 right?
25      A. Right, but it's not a lawsuit against her.

Page 224

1 that this was a -- you know, this is an unusually
2 good facility given its proximity to major airport,
3 motels, and the fact that it had, you know, a bunch
4 of different types of ranges all in a fairly compact
5 area for shooting different kinds of firearms.
6      Q. And are there any other transactions that
7 were reflected in Exhibit 7 that you recall doing a
8 consideration of alternatives?
9      A. No, although I would -- you know, as a
10 general point on that subject, I note we were
11 looking at a lot of kind of highly unique goods.
12 There's only one Ted Nugent, for example.
13      Q. And the documentation reflecting the
14 committee's consideration, does the audit committee
15 maintain documentation other than what's reflected
16 in these three reports that we have looked at
17 Exhibit 5, 6, and 7, which reflect the review of
18 these transactions?
19      A. I don't know.
20      Q. And who would know the answer to that
21 question?
22      A. The audit committee secretaries.
23      Q. Okay. Whoever was the secretary at the
24 time of that particular meeting; is that right?
25      A. Right. Right. Yeah.

Page 223

1 It's -- it's litigation by her, and -- and the
2 primary case there has -- has ended.
3      Q. And -- okay. So the -- the lawsuit that
4 she commenced, did the board approve payment of her
5 legal fees in that matter?
6      A. No.
7      Q. Who did?
8      A. I don't recall all of the discussions but
9 I was certainly involved in that.
10      Q. Who else was involved in those
11 discussions?
12      A. We had discussions with colleagues in
13 the -- in the Office of General Counsel.
14      Q. And do you know how much the NRA paid to
15 cover the legal fees for Ms. Hammer in that action?
16      A. No, I don't.
17      Q. Who would know the answer to that?
18      A. The financial staff would be -- you know,
19 would know payments that are made.
20      Q. Who was responsible for overseeing those
21 legal fees?
22      A. Those invoices came to me.
23      Q. And did you -- did you monitor those
24 proceedings?
25      A. I did.

Page 225

57 (Pages 222 - 225)

1    Q.   And -- and why was the NRA paying those
2  legal fees?
3    A.   Our -- I'm going to -- I'm going to be
4  careful here because of privilege issues.
5    Q.   Was the NRA a party in that lawsuit?
6    A.   The NRA was not a party in the suit, no.
7    Q.   Okay.  So I guess -- can you answer my
8  prior question?
9         MR. GARMAN (VIA ZOOM):  What was the
10 question again?
11        MS. STERN (VIA ZOOM):  Michelle, can
12 you -- it's the prior question.
13        (Record read.)
14        MR. GARMAN (VIA ZOOM):  I think she's
15 asking whether it was contractual -- I think -- can
16 we -- can we confer?
17        THE WITNESS (VIA ZOOM):  Sure.
18        THE VIDEOGRAPHER (VIA ZOOM):  Going
19 off the record.  The time is 17:31 p.m.
20        (Recess 5:31 p.m. to 5:35 p.m.)
21        THE VIDEOGRAPHER (VIA ZOOM):  Going
22 back on the record.  The time is 17:35 p.m.
23        MR. GARMAN (VIA ZOOM):  So I -- you
24 can answer the question of the factual objective
25 basis for the answer to the question but instruct you

Page 226

1  to stop at the point that it invades work product or
2  the attorney-client privilege.
3        THE WITNESS (VIA ZOOM):  Okay.
4        MR. GARMAN (VIA ZOOM):  So go ahead.
5    A.   Okay.  Can we -- so can you -- just for
6  efficiency, I'll restate it.  I think your question
7  was why the NRA chose to pay these legal fees for
8  representation for Ms. Hammer as a plaintiff in this
9  case?
10   Q.   Yes.
11   A.   The -- the reason that we chose to do that
12 was that she had faced -- she, like other people
13 associated with the NRA, had faced, you know,
14 extreme harassment, threats, and so on.  In her
15 case, it was cyber harassment, threatening messages
16 sent to her by email.
17        And we believed it was in the best
18 interest of the NRA as a whole to take action to
19 deter such conduct that might affect others --
20 others in the future.
21   Q.   What is the process for indemnifying
22 directors under the bylaws?
23   A.   So the process under the bylaws is to --
24 is for the individual seeking indemnification to
25 submit a request for approval.  I don't have the

Page 227

1  provision in front of me.
2    Q.   And does that request require board
3  approval?
4    A.   I believe for indemnification -- I believe
5  that process requires the board approval.
6    Q.   And you yourself -- did you yourself seek
7  indemnification in connection with the New York
8  Attorney General action?
9    A.   Yes.
10   Q.   And what was the process that you
11 followed?
12   A.   It was a -- I'm trying to remember.
13        THE WITNESS (VIA ZOOM):  Actually, may
14 I -- may I confer with Mr. Fleming?
15        MR. FLEMING (VIA ZOOM):  Yes.
16        MS. STERN (VIA ZOOM):  Wait.  You're
17 concerned that this is a privileged question?  I'm
18 asking you just what requests that you made of the
19 NRA for indemnification, and I'm perplexed where the
20 privilege is.
21        MR. FLEMING (VIA ZOOM):  He hasn't
22 indicated privilege, but he has indicated some
23 concern that he would like to talk about with his
24 counsel.
25        MS. STERN (VIA ZOOM):  Okay.  But

Page 228

1  there's -- we're, you know, long into this day, and
2  I'm trying -- there are other counsel that have
3  questions of this witness, and it is inappropriate to
4  confer with counsel unless it's a matter of a
5  question of privilege.
6        MR. FLEMING (VIA ZOOM):  I mean,
7  Emily, I appreciate that it's taking a long time but
8  it is the general counsel.  The day was predictably
9  fraught with possibilities for, you know, implicating
10 privilege.  So I think everyone has approached this
11 in a constructive way.
12        MS. STERN (VIA ZOOM):  They have, and
13 I would like to go off the record because I don't
14 want this time discussing this to go against mine or
15 anyone else's time.
16        MR. FLEMING (VIA ZOOM):  Sure.
17        THE VIDEOGRAPHER (VIA ZOOM):  Going
18 off the record.  The time is 17:39 p.m.
19        (Recess 5:39 p.m. to 5:43 p.m.)
20        THE VIDEOGRAPHER (VIA ZOOM):  Going
21 back on the record.  The time is 17:43 p.m.
22   Q.   Mr. Frazer, have you had the opportunity
23 to consult with your counsel?
24   A.   Yes, I did.
25   Q.   Okay.  And that was Mr. Fleming?

Page 229

58 (Pages 226 - 229)

1    A.  That's correct.
2         MS. STERN (VIA ZOOM):  Okay.  And,
3  Michelle, could you please read back the last
4  question.
5         (Record read.)
6    A.  My counsel -- my counsel that I retained
7  shortly after the New York AG litigation was
8  instituted contacted the NRA and, you know, sought
9  indemnification for me.
10   Q.  And is it your understanding that the
11 board approved that indemnification?
12   A.  No.
13        MS. STERN (VIA ZOOM):  Okay.  I have
14 no further questions.  Thank you very much,
15 Mr. Frazer, for your patience today, and I pass the
16 witness.
17        THE WITNESS (VIA ZOOM):  Thank you.
18        MR. GARMAN (VIA ZOOM):  Thank you.
19        MS. STERN (VIA ZOOM):  I believe
20 Mr. Gruber was going to question you next.
21        MR. GRUBER (VIA ZOOM):  Are you -- I
22 apologize.  Are you ready?  Are y'all prepared to
23 stay around for another hour and a half or whatever
24 it is?
25        MR. GARMAN (VIA ZOOM):  Yes.
Page 230

1  be appointed.
2    Q.  Okay.  Thank you.
3         And as far as the dismissal, do you
4  understand that the test is whether the petition was
5  filed in good faith?
6         MR. GARMAN (VIA ZOOM):  Objection
7  to the extent it calls for a legal -- sorry,
8  objection; form.
9    A.  I understand that that's a -- that that's
10 a factor that can be considered, yes.
11   Q.  But as far as dismissal, isn't that
12 essentially the overriding factor?  I know there are
13 a number of sub factors.  But isn't the overriding
14 factor that the filing has to have been made in good
15 faith?
16        MR. GARMAN (VIA ZOOM):  Objection;
17 form.
18   A.  I think that's right.
19   Q.  So -- so would it be fair to say to start
20 out that the NRA had a requirement to file the
21 Chapter 11 proceeding in good faith?
22        MR. GARMAN (VIA ZOOM):  Objection to
23 form.
24   A.  Yes.
25   Q.  So I want to run a hypothetical by you.
Page 232

1         THE WITNESS (VIA ZOOM):  I'm good.
2              EXAMINATION
3  BY MR. GRUBER (VIA ZOOM):
4    Q.  Okay.  Mr. Frazer, my name is Mike Gruber.
5  I think we both heard each other's names probably in
6  the past.
7         I would like to, first of all, see if we
8  can come to some common understanding.  I don't
9  think we're going to agree on what the outcome
10 should be of this process, but could we at least
11 determine whether we're -- we're open to playing on
12 the same field.
13        So do you understand the issues that are
14 going to be presented at the hearing?  I think
15 there's two -- two motions.
16        Are you familiar with the issues that
17 are -- that are going to be heard in the next couple
18 weeks?
19   A.  Yes, I am.
20   Q.  Okay.  And what do you -- what do you
21 think the -- I'll say two issues.
22        What do you think the two main issues are?
23   A.  The two main issues are whether the NRA's
24 petition for reorganization should be dismissed or,
25 alternatively, whether a trustee or examiner should
Page 231

1  What if somebody in the mail room had -- out of
2  revenge, making mail room wages and possibly feeling
3  like they weren't being treated fairly, had taken a
4  form petition and filed it on behalf of the NRA,
5  would that be a good faith pleading?
6         MR. GARMAN (VIA ZOOM):  Objection to
7  form.
8    A.  No, it wouldn't.
9    Q.  And if you did the same thing, if you
10 decided that you're smarter than everybody else at
11 the NRA and you don't like the way things are going,
12 you completed the form, filled it out correctly,
13 signed it as an attorney, and filed it, would that
14 be in good faith?
15        MR. GARMAN (VIA ZOOM):  Objection to
16 form.
17   A.  As an attorney -- I'm sorry.  I'm puzzled.
18 I'm pausing and I'm smiling because as an attorney,
19 I know everything I file has to be in good faith,
20 right.
21   Q.  I'm glad you mentioned that.
22        But if it was just your idea and possibly
23 with ill motives that you -- you weren't happy with
24 anybody else's decisions and you were going to
25 strike out on your own while still a member of the
Page 233

59 (Pages 230 - 233)

1 NRA as far as, you know, working for them, maybe not
2 for long if you did it this way, but would you agree
3 that that would not be a good faith pleading if you
4 just did it because you wanted to do it and you
5 signed it on behalf of the NRA without anybody else
6 okaying that?
7        Would that be a bad faith pleading?
8        MR. GARMAN (VIA ZOOM): Objection to
9 form.
10    A. Yeah, I think that would be bad faith.
11    Q. Would you agree that -- and I think it
12 kind of showed up a hypothetical. I didn't mean to
13 be facetious.
14       But would you agree that one of the issues
15 in determining whether a petition, any petition, but
16 let's -- specifically a Chapter 11 petition in
17 bankruptcy, part of the -- the basis of the good
18 faith is that it was authorized by the organization
19 in question.
20       Would you say that's true?
21       MR. GARMAN (VIA ZOOM): Objection to
22 the form of the question.
23    A. Yes.
24    Q. Is -- to your understanding as general
25 counsel of the NRA and secretary to the board of

Page 234

1 constitute the special litigation committee.
2    Q. I believe you said -- and I don't recall
3 which this is. So the only thing about that that I
4 would like to ask you -- I appreciate the answer.
5       I believe you said the employment
6 agreement was approved by the board. And again, I'm
7 not asking a legal question about, you know, what --
8 what constitutes a board approval.
9       But I am asking, was the employment
10 agreement adopted by the full board of directors or
11 a -- the executive committee or a subgroup of the
12 board of directors?
13    A. It was adopted by the full board.
14    Q. Okay. And from what I understood earlier,
15 I think there was this discussion there were three
16 different things that came together, and those three
17 things created the authority to file the petition in
18 bankruptcy; is that correct?
19       I'm recalling what you said, so you can
20 correct me if I'm wrong.
21       MR. GARMAN (VIA ZOOM): I'm going to
22 object to the form of the question.
23       But if you understood it, you can
24 answer.
25    A. So I think you're asking about my comment

Page 236

1 directors and individually, to your understanding,
2 was the -- was the petition for Chapter 11 filed in
3 good faith?
4       MR. GARMAN (VIA ZOOM): Objection to
5 form of the question.
6    A. Yes, it was.
7    Q. All right. And was it authorized by the
8 proper authority that was required to do so at the
9 NRA?
10    A. Yes, we believe it was.
11    Q. And -- and what -- could you tell me what
12 authority it was that -- that authorized the filing
13 of the petition?
14    A. So it was under the authority of Wayne
15 LaPierre as the executive president who as EVP has
16 the authority to manage the organization and then he
17 also has an employment contract adopted by the board
18 which specifically authorizes him to restructure and
19 reorganize the organization. And he also works
20 under the guidance of the board officers who
21 constitute the special litigation committee.
22    Q. I'm sorry, I missed the last part.
23    A. I'm sorry. And -- and Mr. LaPierre also
24 operates under the supervision of the board
25 officers, president and two vice presidents, who

Page 235

1 or my answer that the authority -- that Wayne
2 LaPierre had the authority to file you know for
3 several reasons and essentially that he had the
4 authority to file -- he had the authority to file
5 because, you know, not only does he manage the --
6 manage the affairs of the Association under the
7 bylaws, but he also had an employment contract
8 approved by a majority of the board members present
9 and voting which authorizes him to restructure and
10 reorganize.
11       And then and then he also did so under the
12 aegis of the special litigation committee which
13 adopted a resolution approving -- approving the
14 filing.
15    Q. And -- and what I want to ask is each one
16 of those situations you're talking about, in the
17 employment agreement, does it specifically say that
18 he is authorized, generally or at a specific time,
19 to file a Chapter 11 petition in bankruptcy?
20       MR. GARMAN (VIA ZOOM): Objection to
21 the form.
22    A. It does not.
23    Q. And did the special committee resolution
24 specifically say that Mr. LaPierre or anyone else at
25 the NRA could at a certain time or -- or generally

Page 237

60 (Pages 234 - 237)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1 when -- when they chose to file a Chapter 11
2 petition in bankruptcy?
3         MR. GARMAN (VIA ZOOM): Objection to
4 form.
5     A. Well, which resolution are you referring
6 to?
7     Q. Okay. So let's talk about that. I
8 thought there was a special -- what is it, the
9 special litigation committee? Is that --
10    A. Right.
11    Q. Is that the group?
12        Okay. So the special litigation -- and
13 we'll look at some documents specifically, but
14 special litigation committee, I thought, authorized
15 something having to do with existing litigation and
16 potential conflicts coming up.
17        Is that one of the things they did?
18        MR. GARMAN (VIA ZOOM): Objection to
19 form.
20    A. So I -- again, I'm not a hundred percent
21 sure which -- which -- exactly which resolution
22 you're referring to. If you're referring to the
23 resolution by the board that formalized the creation
24 of the -- of the committee, then that resolution did
25 specifically refer to the need to address conflicts.

Page 238

1     A. That's correct.
2     Q. And it is not a -- the executive committee
3 of the board resolution, is it?
4     A. No, it's not.
5     Q. So having gone through all that, we -- we
6 now know that the full board of directors -- and I'm
7 not saying they're required to.
8         But we are -- have concluded, I believe,
9 that the full board of directors did not do a
10 specific resolution that stated that the NRA,
11 through its officers, could at a specific time or
12 generally over time -- over a period of time at some
13 point in time file a Chapter 11 bankruptcy petition;
14 is that correct?
15    A. Yes, that's correct.
16    Q. And a -- the executive committee of the
17 board of directors of the NRA did not pass a
18 resolution specifically stating that the officers
19 immediately or at some point in time could file a
20 Chapter 11 petition in bankruptcy; is that correct?
21    A. Yes, that's correct.
22    Q. Okay. Is one of the ways that a
23 Chapter 11 petition, you know, could be authorized
24 is to have the full -- for the NRA to -- well, for
25 the NRA.

Page 240

1     Q. Okay. And then did that resolution --
2 because we have -- we have talked about two things
3 that didn't specifically address a filing of a
4 Chapter 11 bankruptcy petition, right?
5         Now, did the resolution you're talking
6 about now -- and I appreciate you describing it the
7 way you have -- did it specifically state that
8 Mr. LaPierre or anyone else at the NRA could file a
9 Chapter 11 bankruptcy petition?
10    A. So the board adopted resolution -- again,
11 making sure we're talking about the same resolution,
12 the board adopted resolution creating the
13 committee -- or -- or formalizing the committee
14 which --
15    Q. Yeah.
16    A. -- did not specifically refer to authority
17 to file Chapter 11.
18    Q. Okay. And then you're saying there's
19 another one -- and I think I know what you're
20 talking about.
21        And you're saying there is another
22 resolution -- which I just wanted to get the title,
23 Resolution Authorizing Chapter 11 Reorganization and
24 Related Retention of Counsel.
25        This is not a board resolution, is it?

Page 239

1         Would one way to accomplish what you would
2 consider an effective authorization to do a
3 resolution of a full board and -- and grant the
4 officers of the company the ability to go file a
5 Chapter 11 petition?
6         Is that one way of doing it?
7         MR. GARMAN (VIA ZOOM): Object to the
8 form of the question.
9     A. So just to make sure I understand --
10    Q. Please.
11    A. -- your question, I'll restate it and
12 please tell me if I misstated it.
13    Q. Okay.
14    A. You're saying would it be effective for a
15 resolution of the full -- would it be effective if a
16 resolution of the full board were adopted that
17 specifically authorized the filing?
18    Q. Yes, would -- would that be a way of going
19 about the same thing that was accomplished
20 eventually?
21        MR. GARMAN (VIA ZOOM): And I'll
22 object to the form of my client's question.
23    Q. All right. Now we're okay with each
24 other.
25        THE WITNESS (VIA ZOOM): You're

Page 241

61 (Pages 238 - 241)

1 objecting to your client's memory.
2    A.   The -- yes, a resolution by the full board
3 authorizing the filing would be effective.
4    Q.   Okay.  And would -- and this is -- I don't
5 really know the answer to this.
6         So would it be effective if instead of the
7 way it was done or having the full board do it,
8 would it be effective if the executive committee of
9 the board of directors had authorized something of
10 this magnitude to be done by the officers of the
11 company?  To your understanding, would that be
12 effective?
13         MR. GARMAN (VIA ZOOM):  Object to the
14 form of the question.
15    A.   You know, I haven't analyzed that, so I
16 have to say I don't know.
17    Q.   Okay.  Thank you.
18         Would it be a more -- a clear possibly no
19 if -- if my hypothetical is:  Could the executive
20 committee of the board of directors of the NRA,
21 without consulting the full board, pass a resolution
22 allowing the officers of the company to file a
23 Chapter 11 petition?
24         MR. GARMAN (VIA ZOOM):  Object to the
25 form of the question.
                                                    Page 242

1 I'm going to instruct you not to answer if it's
2 subject to privilege.
3    A.   Yeah, I'm not -- I'm not -- I'm going to
4 respectfully decline to answer on the basis that
5 invades attorney-client privilege.
6    Q.   I am shocked.  No.
7         And I appreciate y'all are working with us
8 here.  I just swallowed my water wrong.
9         So the issue that I would like to present
10 to you is that the NRA, would you agree, has sought
11 relief from the bankruptcy -- from the bankruptcy
12 court.
13         Would you agree that that's a fair
14 statement?
15    A.   Yes.
16    Q.   And would you agree that as part of
17 staying in bankruptcy -- and let's take the burden
18 out of it, but the Court is going to have to find
19 that there was a good faith filing; isn't that
20 correct?
21         MR. GARMAN (VIA ZOOM):  Object.  Well,
22 it calls for a legal conclusion that -- respectfully,
23 I do disagree with that.  It's a negative.  It can't
24 be filed in bad faith but the law is pretty -- isn't
25 that it requires good faith.
                                                    Page 244

1    A.   Again, I have to say I don't know.
2    Q.   Okay.  And don't tell me -- this is --
3 this is an easy instruction.  Don't tell me whether
4 this happened or not, but was there a reason that
5 you can think of not to have the full board vote on
6 a resolution to authorize a bankruptcy petition?
7         MR. GARMAN (VIA ZOOM):  Object to the
8 form of the question.
9         Counsel, you're asking if there's a
10 hypothetical reason?
11         MR. GRUBER (VIA ZOOM):  I'm just
12 asking -- I'm asking -- no.  If -- and I don't want
13 to know, if there was, what it is.  But I am
14 asking -- and I think I'm entitled to ask -- is there
15 a reason that the full board did not pass a
16 resolution to -- to go into bankruptcy.
17         MR. GARMAN (VIA ZOOM):  So I'm just
18 going to reiterate my objection.
19         THE WITNESS (VIA ZOOM):  And what was
20 your objection?
21         MR. GARMAN (VIA ZOOM):  Just to the
22 form.
23    A.   So the answer is yes.
24    Q.   Okay.  All right.  What's the reason?
25         MR. GARMAN (VIA ZOOM):  Well, if --
                                                    Page 243

1         So can we restate the question?
2    Q.   Let me ask this.  I can do that.
3         Is it true that the NRA will have to
4 demonstrate that it had authority to file the
5 petition in bankruptcy to avoid a finding of bad
6 faith?
7         MR. GARMAN (VIA ZOOM):  Object to the
8 form of the question.
9    A.   I don't know.
10    Q.   You have given me two and you have given
11 me two and I think it's four.
12         Earlier you said that it would not be a
13 good faith pleading if it was not authorized.
14         Do you recall that?
15    A.   I do.
16    Q.   Okay.  And that being the case, if there
17 is no authority, again, would you agree that it
18 would be a bad faith pleading?
19         MR. GARMAN (VIA ZOOM):  Object to the
20 extent it calls for a legal conclusion.
21    A.   So the same answer as my -- as my previous
22 answer on that, which is I think you do need
23 authority.
24    Q.   And if there is no authority for -- we
25 went through the hypotheticals, but I do need to
                                                    Page 245

62 (Pages 242 - 245)

1 close the gap -- or close the loop.
2         It would be -- it would be a bad faith
3 pleading if you did lack authority; isn't that true?
4         MR. GARMAN (VIA ZOOM): Objection to
5 the form of the question.
6    A.  You know, I -- I think so.
7    Q.  Okay. Here is -- is there any other place
8 to get the information as to whether the authority
9 was actually granted to file this petition in
10 bankruptcy, the ultimate authority to do so, without
11 finding out what the board as a whole did in their
12 session, what the executive session of the board did
13 without finding out what the special litigation
14 committee did or asking any of the participants in
15 those groups?
16         MR. GARMAN (VIA ZOOM): Counsel, I'll
17 withhold commenting absent our -- I might be of some
18 assistance on this point, but I don't want to speak
19 out of turn.
20    A.  I'm sorry but I'm --
21         MR. GARMAN (VIA ZOOM): Sorry, I don't
22 know if you said anything, sir.
23         MR. GRUBER (VIA ZOOM): I was waiting
24 for an answer unless you want me to do something else
25 with the question, Mr. Frazer.
                                        Page 246

1    A.  I'm not sure I understood the question.
2    Q.  Let me -- let me ask it a different way
3 because this is what I'm getting at.
4         How is it possible given the things that
5 y'all have pointed to -- in our opinion, you have
6 pointed at a bunch of bricks and said that's a
7 house, but you won't explain how the house gets
8 built, the bricks being these various components.
9         When we try to put them together, they
10 don't seem to add up to authority that we would
11 think would have to drive, at some point, from the
12 full board of directors. And it would have to be
13 knowing a grant and it would have to be a grant that
14 does have the full board's approval.
15         So what I'm saying is we are going to a
16 hearing. And if y'all won't answer questions about
17 explain how these things fit together and y'all have
18 refused several times. If you won't tell us how the
19 bricks you've pointed to -- and several times today
20 you pointed to these several things together. And I
21 appreciate it. I appreciate you giving us these
22 bricks.
23         Now, can you explain how the things that
24 you have pointed to that you believe show the
25 approval, the ability to file this petition, how do
                                        Page 247

1 they fit together to do that when -- when they don't
2 trace back to an action by the full board of
3 directors to allow a bankruptcy petition to be
4 filed?
5         MR. GARMAN (VIA ZOOM): I object to
6 the form of the question, and it's going to be
7 speaking. We're not going to walk through our legal
8 theory with you. Those are our pleadings. You can
9 ask facts. You have asked the questions. He has
10 answered them. That's all we have to give you.
11    Q.  Okay. The other -- and you said, you
12 know, the appointment of trustee.
13         Are you familiar with the -- are you
14 familiar with the standard for appointing a trustee?
15    A.  In general terms, yes.
16    Q.  Would you agree that if the Court finds
17 there has been fraud, dishonesty, incompetence, or
18 gross mismanagement before or after the commencement
19 of the bankruptcy case by the debtor, that that
20 would be grounds for appointing a trustee?
21         Do you understand that standard?
22         MR. GARMAN (VIA ZOOM): Object to the
23 form of the question.
24    A.  I recall -- I recall some of that -- some
25 of that phrasing. I'm not sure if that's a quote or
                                        Page 248

1 a paraphrase from the statute or a decision, no.
2    Q.  It's a quote from the decision, but I'm
3 really testing whether you -- first of all, would
4 you generally accept that that's basically the
5 standard, something along those lines?
6         MR. GARMAN (VIA ZOOM): Object to the
7 form of the question.
8    A.  I'm taking your representation that that's
9 a -- that's a statement of the standard. I'm not
10 sure I'm in a position to disagree.
11    Q.  So we have got to go into court in 10 days
12 or something like that, and we have got to address
13 the issue, and I think it's very clear that the --
14 an issue. We have got lots of other things. I
15 don't know if my time has allowed me to get to a lot
16 of them. I may be talking to you at the hearing
17 about a lot of them.
18         But it's pretty clear that we're going to
19 be walking in the hearing and one of the things that
20 we're going to be arguing over and each of us trying
21 to meet whatever burden we have as to the authority.
22 And I will say that as a legal doctrine, I think
23 there's an offensive use doctrine we would like
24 y'all to consider that you -- you shouldn't be
25 allowed to go in and claim authority without
                                        Page 249

63 (Pages 246 - 249)

1 allowing us through the general counsel, possibly
2 some other witness, but the general counsel is a
3 pretty big one, testing the legal basis for the
4 authority. It just simply is a question of facts
5 that produces certain legal -- legal consequence.
6      And, again, that's -- that's -- that leads
7 me to ask, again, based on that doctrine -- and I
8 think we have gone through and you can check later
9 on that I think we have gone through the elements
10 and shown that they exist.
11      But I would like to ask you one more time:
12 Will you explain how the various pieces you pointed
13 to -- because I have read and a lot of lawyers that
14 I think are pretty smart have read it. We can't
15 come up with what you claim is the authority.
16      So I will ask you, will you explain to us
17 how all these various things as opposed to a
18 resolution of the board of directors, which would be
19 very simple, and potentially a resolution of the
20 executive committee, if -- if it had been authorized
21 by the board of directors to take this up.
22      So will you explain how the authority from
23 the board of directors or an executive committee
24 appointed by -- has been passed down to the parties
25 that filed this petition?

Page 250

1      Can you please walk us through and explain
2 it?
3      MR. GARMAN (VIA ZOOM): Respectfully,
4 you have asked and answered, but he can give you his
5 four reasons again.
6      MR. GRUBER (VIA ZOOM): When he's
7 saying here are four blocks, you figure out how to
8 put them together, it's really, if you look at it, a
9 lot more than that.
10      But the problem is, we have gone
11 through and we have determined that there's no --
12 there's -- the board -- or even the executive
13 committees, there's no mention -- and prior testimony
14 you have given also -- there's no mention in those
15 proceedings of the ability to go and file a petition
16 in bankruptcy.
17      Would you agree with that?
18      MR. GARMAN (VIA ZOOM): Of course not.
19 Of course not. You're asking him the ultimate legal
20 question. I'm not going to let him do that.
21      Counsel, if you -- it's our job to
22 fight about the application of the facts to the law.
23 You don't get to ask our general counsel to -- you
24 don't get to ask him that. You can ask him factual
25 questions.

Page 251

1      MR. GRUBER (VIA ZOOM): I am asking
2 him factually.
3      MR. GARMAN (VIA ZOOM): You're polling
4 the law and you're going to tell me I'm wrong --
5      (Simultaneous speaking.)
6      MR. GRUBER (VIA ZOOM): Quit arguing
7 with me. I'll ask him another question.
8      MR. GARMAN (VIA ZOOM): Okay.
9      MR. GRUBER (VIA ZOOM): You did a
10 pretty fair job there. So...
11      Q. Tell me what set of facts that you are
12 aware of that lead you to the conclusion that there
13 has been authorization for the petition in
14 bankruptcy.
15      MR. GARMAN (VIA ZOOM): Object to
16 form.
17      Go ahead.
18      A. The executive vice president's authority
19 to manage the organization under the bylaws; the
20 executive vice president's employment contract
21 approved by the board, which includes the power to
22 restructure, reorganize; and the authorization of
23 the filing by the special litigation committee which
24 was itself created by the board.
25      Q. Okay. All right. Let me ask you this

Page 252

1 question: Would you agree that if there was a
2 question about authority, and at least I think the
3 pleadings and other's testimony have raised some
4 question about it.
5      Would you agree that an attempt to ratify
6 what was attempted or actually done before, would
7 that be some evidence of lack of authority, an
8 attempt to ratify after the fact?
9      MR. GARMAN (VIA ZOOM): Object to the
10 form of the question.
11      A. No, I wouldn't agree with that.
12      Q. Well, isn't the idea of ratification,
13 whatever acts were taken, you ratify them by usually
14 a higher authority to make sure that -- that there
15 was authority for the act in question?
16      MR. GARMAN (VIA ZOOM): Objection.
17      Counsel, you're becoming
18 argumentative.
19      Object to the form of the question.
20      Q. Can you answer that?
21      A. Sorry. I still don't agree with that in
22 all circumstances.
23      Q. Okay. Well, let me ask you this: Was --
24 was the special meeting that was called of the board
25 of directors that was canceled, wasn't either the

Page 253

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1 main item or the only item on that agenda
2 ratification of the filing of the bankruptcy
3 petition?
4 A. That was not on -- well, first of all, no
5 agenda was ever published, and there was no mention
6 of ratification in the meeting notice that was sent
7 out.
8 Q. Okay. So your testimony is there was
9 no -- the meeting that was called and canceled,
10 there was no thought that that meeting would be used
11 to ratify the filing of the Chapter 11 petition?
12 MR. GARMAN (VIA ZOOM): Object to the
13 question. You misstated his testimony.
14 MR. GRUBER (VIA ZOOM): I'm asking a
15 question.
16 MR. GARMAN (VIA ZOOM): I understand.
17 And you misstated his testimony in asking the
18 question.
19 A. So -- I'm sorry. Can I have the
20 question -- it was a long question. Can I have it
21 read back?
22 Q. Okay. What I -- what I -- it was a new
23 question.
24 Is it -- is it your understanding that the
25 meeting that was -- the board meeting that was

Page 254

1 Go ahead and answer.
2 A. Okay. And I'm -- and I -- I think I need
3 to respectfully decline on the basis that it invades
4 attorney-client privilege.
5 Q. Okay. Thank you.
6 There's a document that we put in -- or
7 the New York Attorney General put in. I don't --
8 and I think it was the -- it's our new -- if you
9 look in the -- your documents that we put in, it's
10 our Exhibit 107. Y'all discussed it a little bit
11 earlier today.
12 MR. GARMAN (VIA ZOOM): Counsel, if
13 you want to describe it, maybe we'll find it. None
14 of them are list -- we don't see them listed as 107,
15 but I'm sure I can track it down if I know what it
16 is.
17 MR. GRUBER (VIA ZOOM): So if you go
18 to ours, it would be Exhibit 107. In the Attorney
19 General's, I can describe it as the email on
20 January 15th that Mr. Frazer sent attaching a message
21 from Vice President Wayne LaPierre.
22 MR. GARMAN (VIA ZOOM): Yeah, so I
23 believe it's Exhibit NYAG 2 for today -- or for
24 reference.
25 MR. GRUBER (VIA ZOOM): Okay. And

Page 256

1 called and then canceled was not in any way called
2 to consider ratifying the Chapter 11 filing?
3 MR. GARMAN (VIA ZOOM): Object to the
4 form of the question.
5 A. So the -- think this through.
6 No, the meeting was not called to ratify
7 the -- to ratify the filing.
8 Q. My question was that you're saying that it
9 was not in any way a consideration of calling that
10 meeting. It was not -- and I'll just put it that.
11 It was not in any way a consideration in
12 calling that meeting to ratify the Chapter 11
13 filing?
14 MR. GARMAN (VIA ZOOM): Object to the
15 form of the question, and I -- and I advise you not
16 to speculate.
17 A. Then I -- the answer is that -- I'm sorry,
18 can we restate the last -- restate the last
19 question. Read it back or restate it.
20 Q. It was not a part as a consideration for
21 holding the special board meeting that was
22 eventually canceled a week or so ago to ratify the
23 Chapter 11 filing, no consideration at all?
24 MR. GARMAN (VIA ZOOM): Object to the
25 form of the question.

Page 255

1 that's fine, we'll look at that one -- that copy, but
2 have y'all seen our documents show up or not?
3 MR. GARMAN (VIA ZOOM): I'll be honest
4 with you, there's so much happening, I haven't been
5 through them, so I can only -- I can only answer for
6 myself that I haven't. But...
7 MR. GRUBER (VIA ZOOM): Okay.
8 (Exhibit 107 marked.)
9 Q. So if we look at the -- do you have the
10 January 15, 2021, email and then the attachment?
11 A. I don't think there's an attachment, but
12 it sort of continues in the email. So I think the
13 answer is yes, sir, that Mr. Frazer -- the
14 January 15th email that contains a note from
15 Mr. LaPierre. It's part of the body of the email,
16 but -- so just -- we're on the same page.
17 Q. All right. And did you send that email?
18 A. I did.
19 Q. Okay. Do you -- do you know what the
20 purpose of sending the email out was?
21 A. It was to inform the board of an important
22 development in the Association's legal matters.
23 Q. And is that because they didn't -- they
24 wouldn't know about it otherwise, the board would
25 not?

Page 257

Veritext Legal Solutions
800-336-4000

1    A.  Well, you know, I would assume that many
2  or most of them would read it in the -- in the
3  media, but I think as an organization, we have an
4  obligation to inform our board members promptly.
5    Q.  Okay.  And as you said, if the board of
6  directors saw that there had been a Chapter 11
7  filing, if they saw it in the media or then received
8  this, they would know about it.
9        But as you noted, they wouldn't know about
10 it unless they did one of those two things, right?
11   A.  Right.
12   Q.  So the full board of directors -- let me
13 reverse the question.
14       The company went into Chapter 11
15 bankruptcy without the full board of directors
16 having any knowledge that of that action taking
17 place until after the fact?
18       MR. GARMAN (VIA ZOOM):  Objection to
19 the form.
20   Q.  That's correct though, right?
21   A.  Yes.
22   Q.  And if we read the -- do you see where it
23 says, Dear Board of Directors?
24       Do you see that part under the email, I
25 suppose?

Page 258

1    A.  I do.
2    Q.  And it says, I am pleased announce some
3  exciting news about the NRA.
4        Isn't that right?
5    A.  Yes.
6    Q.  And would you agree that that language is
7  consistent with the board of directors not having
8  news of the bankruptcy filing prior to the message?
9        MR. GARMAN (VIA ZOOM):  Objection to
10 the form.
11   A.  Yes.
12   Q.  Okay.  You wouldn't sit there and -- I'm
13 sorry, are you married, Mr. Frazer?
14   A.  I am.
15   Q.  Okay.  You wouldn't -- you wouldn't get
16 engaged and then the next day, you know, send a note
17 to your wife saying, hey, exciting news, we got
18 engaged yesterday, right?
19       I mean, that doesn't make any sense; is
20 that correct?
21       MR. GARMAN (VIA ZOOM):  I'll object.
22       But go ahead.
23   A.  It's hard to visualize this.
24   Q.  That's the best I could do on short
25 notice.

Page 259

1        But the idea is you don't announce to
2  somebody and say exciting news what you would have
3  done in conjunction with them the day before; isn't
4  that right?
5        MR. GARMAN (VIA ZOOM):  Objection to
6  the form.
7    A.  Well, not necessarily.
8    Q.  Okay.  Tell me in what situation --
9  because I can't quite figure that one out.
10       In what situation would that not be the
11 case?
12       MR. GARMAN (VIA ZOOM):  Objection to
13 the form.
14   A.  Well, we announce -- we announce news
15 about the NRA to the board regularly.  And, you
16 know, it's always going -- we might even use similar
17 phrasing.  It's always going to be things that we,
18 you know, think they need to know because they might
19 not otherwise know it.
20   Q.  In this case, you're pretty sure that the
21 full word didn't know it until they got this, aren't
22 you?
23       MR. GARMAN (VIA ZOOM):  Objection to
24 the form.
25   A.  Yes.

Page 260

1    Q.  I got to tell you, I just want to make
2  sure that -- who is the executive council?
3        I just want to make sure that that's not
4  another way of saying executive committee of the
5  board.
6        Is that a separate group than the
7  executive committee of the board?
8    A.  Yes, it is.  It's a -- and it's the
9  subject of confusion sometimes, so I'm happy to --
10 happy to straighten it out.  But the executive
11 council is basically sort of an elder statesman body
12 of mostly former board members, former officers,
13 past presidents and so on who are elected for life
14 as -- in an advisory capacity.  They can attend
15 board meetings but they can't vote.
16   Q.  Okay.  Can I point you -- in about the
17 middle of the message part, there's a statement
18 about "streamline legal and financial affairs."
19       Do you see that, that that's one of the
20 reasons for the Chapter 11?
21   A.  Is it on the second page?
22   Q.  It's between "board of directors" and
23 "strongest financial condition in years."  If you go
24 between those two, right about in the middle.
25   A.  Can you point me to a heading that it's

Page 261

66 (Pages 258 - 261)

1 under?
2    Q.  What we show is --
3    A.  Is it on page 2?
4    Q.  Well, in ours -- we're turning to a fuller
5 copy because in ours it's just kind of the email and
6 then a short -- a fairly short message.
7    A.  So you have these headings, like, The
8 Battle in New York, Building Our Strengths, and so
9 on.  Is it under one of -- maybe that would help me
10 locate it.  That's the -- that's -- LaPierre.  He
11 looked at something else possibly.
12       MR. DRAKE (VIA ZOOM):  This is Scott
13 Drake.  I think it's the last line of the third
14 paragraph of the email, board of directors.  That may
15 be --
16    Q.  My apologies.  They printed something on
17 front and back and I asked them not to do that.
18       But, yes, I think he's directed you to it.
19       So from the "Dear Board of Directors," you
20 go down one -- last sentence in the second paragraph
21 is where that -- that language appears.
22    A.  Okay.  I found it.
23    Q.  Okay.  And that is legitimate reason for
24 going into bankruptcy.  That would be a good faith
25 reason, would it not?

Page 262

1       MR. GARMAN (VIA ZOOM):  Object to the
2 form of the question.
3       Go ahead.
4    A.  Yes.
5    Q.  But let me ask you this:  If the -- what
6 does "dumping New York" mean?
7       You -- you were the one that mailed this
8 out.  Do you have an understanding of what "dumping
9 New York" means?
10       MR. GARMAN (VIA ZOOM):  Object to the
11 form of the question.
12    A.  It means -- it means as it says in the
13 fourth paragraph here, that -- that our hope is that
14 a -- you know, that the reorganization will
15 ultimately include reincorporation in -- in Texas as
16 a friendlier regulatory, political environment,
17 friendlier on the Second Amendment issues, and in a
18 place that, of course, has major -- many major
19 donors, lots of members, good convention facilities,
20 and so forth.
21    Q.  Let me ask you, if -- and I know how y'all
22 view the New York situation.  But if the -- if the
23 main reason for going into Chapter 11 bankruptcy was
24 to escape regulatory oversight and litigation with
25 the New York Attorney General, would that be a bad

Page 263

1 faith attempt -- a bad faith bankruptcy filing if
2 that were all?
3       My hypothetical, if that were all, is
4 that -- is that a bad faith filing?
5       MR. GARMAN (VIA ZOOM):  Object to the
6 form of the question.
7    A.  And I don't know.  It's not an issue I
8 have analyzed.
9    Q.  Okay.  Instead of going through -- there
10 are about five or six of these things -- but would
11 you agree that there was -- there were press
12 releases and other things along the same lines
13 with -- with basically the same messaging that went
14 out around the 15th of January?
15    A.  Yes.
16       MR. GRUBER (VIA ZOOM):  Can y'all see
17 if y'all can find the Exhibit 76?
18       Do they have to refresh?
19       I think they'll have to refresh
20 something.  I have no idea what that means.  Personal
21 grooming or anything, but you probably have to push a
22 button or something.
23       MR. GARMAN (VIA ZOOM):  Oh, yeah,
24 they're all here now.
25    Q.  All right.  It's a miracle.

Page 264

1       MR. GARMAN (VIA ZOOM):  You'd like us
2 to open Exhibit 76?
3       (Exhibit 76 marked.)
4    Q.  Yeah, would y'all open Exhibit 76.
5    A.  Okay.  We have it.
6    Q.  So those are leadership quotes.  You have
7 got four leaders that are listed.  Mr. LaPierre is
8 one of them and Mr. Brewer's one of them and
9 Ms. Meadows and then I can't recall.  There was
10 somebody else.
11       So this is on the website of the NRA; is
12 that correct?
13    A.  Yes.
14    Q.  And -- and the four leaders -- your --
15 your Mount Rushmore for the NRA includes Mr. Brewer
16 as one of the four top leaders, would you say, of
17 the NRA?
18       MR. GARMAN (VIA ZOOM):  Objection to
19 form.
20       Go ahead.
21    A.  I don't think I agree with that
22 characterization.  It's talking about people who
23 are -- I think it's talking about people who are
24 leading this -- leading this particular effort.  And
25 Mr. Brewer, as -- you know, as key counsel is one of

Page 265

67 (Pages 262 - 265)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1 those.
2 Q. So let me see. And he's actually giving a
3 quote here about illegally weaponized their powers
4 and all as far as New York officials.
5 Do you see that as part of one of the
6 quotes?
7 A. Yes, I do.
8 Q. So I -- I -- we did offer the amended
9 schedule, which you may be familiar with. We added
10 up from 10/22/2020 to 1/14/2021, not including
11 monies that was passed on to other lawyers, but we
12 show $6,294,000-some-odd for bankruptcy work to
13 Mr. Brewer.
14 Does that sound about right to you?
15 A. I mean, I don't know without reviewing
16 underlying documents.
17 Q. So like I said, it's in the amended
18 schedules. Our exhibit in there 24. I don't know
19 if I want to waste a lot of time with it if you'll
20 agree that Mr. Brewer was a substantial worker or
21 his -- his firm was a substantial part of the
22 bankruptcy work that has been done up to this time.
23 Would you just agree with that?
24 (Exhibit 24 marked.)
25 MR. GARMAN (VIA ZOOM): Counsel, can I
Page 266

1 ask you what time reference you're talking about when
2 you're talking about --
3 (Simultaneous speaking.)
4 MR. GRUBER (VIA ZOOM): I'm sorry, go
5 ahead.
6 MR. GARMAN (VIA ZOOM): I just meant
7 do you mean up to the time it was filed or do you
8 mean post-petition? The answer could be different.
9 MR. GRUBER (VIA ZOOM): Okay. And I
10 was just going off of -- off of the -- what's in
11 y'all's schedules from 10/22/2020 to 1/14/2021, we
12 show $6,294,000-and-some-odd.
13 But to answer your question, the time
14 frame I'm asking about would be from October to --
15 2020 to January of 2021.
16 A. So I'm sorry, I have lost the question
17 here.
18 MR. GARMAN (VIA ZOOM): So we'll
19 acknowledge the size -- we'll acknowledge the size of
20 the numbers contained in the schedules and the
21 millions of dollars -- millions of dollars is a big
22 number. We'll agree to that.
23 MR. GRUBER (VIA ZOOM): We can only
24 aspire.
25 Q. So here is the question I have got. Is
Page 267

1 based on whatever the numbers are in the schedules
2 would you agree that the -- Mr. Brewer and the
3 Brewer firm were a substantial part of the
4 bankruptcy work that has been done to date?
5 A. Yes.
6 Q. Okay. Could you look at Exhibit 13. That
7 should be a transcript with some comments from
8 Ms. Rogers.
9 MR. GARMAN (VIA ZOOM): Okay. We have
10 got Exhibit 13. It's a 50-page transcript.
11 (Exhibit 13 marked.)
12 Q. If you could go to page 19, and it's
13 lines -- you know, line 1. If you could go to line
14 1 on page 19, I would appreciate it.
15 A. Okay. I'm there.
16 Q. And I think if you read that -- one of the
17 lawyers is citing that NRA dumping New York in press
18 statements. And Ms. Rogers is repeating that and
19 says -- she says, We want to be clear that those
20 statements as casual, though they were, don't amount
21 to an express intent to allude or obstruct the
22 particular litigation.
23 Would you agree that essentially one of
24 the lawyers that is responsible for doing the legal
25 work on the bankruptcy is also crafting the PR
Page 268

1 message for the NRA?
2 Would you agree that that's true?
3 MR. GARMAN (VIA ZOOM): Objection to
4 the form.
5 A. Which -- which lawyer are you referring to
6 here?
7 Q. Well, the Brewer law firm, let's say,
8 categories, very -- very big player in your
9 bankruptcy legal work but also messaging for the --
10 for the NRA.
11 Is the PR -- is the PR group for the NRA?
12 MR. GARMAN (VIA ZOOM): Objection to
13 the form.
14 A. I disagree that they're the PR group for
15 the NRA. They provide communications in connection
16 with legal matters that they're handling.
17 Q. Well, okay, so on this -- and I should
18 have been more specific.
19 On this specific project, would you agree
20 that they're both the PR -- PR group that's shaping
21 the message that way and they're also doing a
22 substantial amount of the bankruptcy work?
23 MR. GARMAN (VIA ZOOM): Objection to
24 the form of the question.
25 A. No, I would disagree.
Page 269

68 (Pages 266 - 269)

1    Q.  Okay.
2         MR. GRUBER (VIA ZOOM):  Could I ask
3  the court reporter before I start something new how
4  much time we have left or what is the time left?
5         THE VIDEOGRAPHER (VIA ZOOM):  It's --
6  we're at 6 hours and 21 minutes.
7         MR. GRUBER (VIA ZOOM):  Okay.
8         THE WITNESS (VIA ZOOM):  If we're
9  going to start a new topic, I would like to ask for a
10  short break.
11         MR. GRUBER (VIA ZOOM):  Absolutely.
12  Off the clock, I hope.
13         THE VIDEOGRAPHER (VIA ZOOM):  Going
14  off the record.  The time is 18:39 p.m.
15         (Recess 6:39 p.m. to 6:48 p.m.)
16         THE VIDEOGRAPHER (VIA ZOOM):  Going
17  back on the record.  The time is 18:48 p.m.
18    Q.  On 61, if you would go to page 21 at line
19  10.
20         MR. GARMAN (VIA ZOOM):  That page 21
21  of the deposition itself, you know, four pages per
22  page?
23         MR. GRUBER (VIA ZOOM):  I'm sorry.
24  That's a good point.  Page 21 of the deposition
25  itself.

Page 270

1         MR. GARMAN (VIA ZOOM):  Okay.
2    Q.  Exhibit line 10 would be a good place to
3  start.  Would you mind reading from line 10 on page
4  21 to page 22, line 5, and then I would like to ask
5  you some questions about it.
6    A.  (Reviewed document.)  I'm sorry.  I was
7  reading across, not down.
8    Q.  That's a problem.
9    A.  I read the full page depos usually.  So
10  starting on line 10, Question:  What are your
11  responsibilities as secretary of the organization?
12         Answer:  My responsibilities as secretary
13  include coordinating board activities, communicating
14  with the board, facilitating communication with the
15  board, other officers and senior staff, maintaining
16  the minutes and records of committee meetings, you
17  know, supervise.  You know, I either administer or
18  supervise the administration of board meetings and,
19  you know, other processes related to the board.  I'm
20  the secretary of the executive committee, secretary
21  of the nominating committee and secretary of the
22  committee on elections.  Those are all provided in
23  the NRA bylaws.
24         Question:  So you're in attendance at
25  board meetings then?

Page 271

1         Answer:  Yes.
2    Q.  Okay.  This has been year since this
3  statement was made in a deposition.  Are you still
4  corporate secretary of the NRA?
5    A.  Yes.
6    Q.  Okay.  And would you say generally -- I
7  know there may be a specific instance.  But would
8  you say generally that all the things you're talking
9  about, your board activities, are still generally
10  the same?
11    A.  Yes.
12    Q.  Okay.  So did you attend all the board
13  meetings -- did you attend the board meeting, the
14  last board meeting, I believe, right before or
15  sometime before the petition in bankruptcy was
16  filed?
17    A.  Yes, I did.
18    Q.  Okay.
19    A.  Referring to January 7th meeting?
20    Q.  Yes.  At that meeting, was there any
21  discussion of filing bankruptcy that you recall?
22    A.  So -- so I think my -- I think my answer
23  here is -- I think we answered this earlier and I
24  think there were three parts to it.  One is in the
25  open sessions there was no discussion of filing

Page 272

1  bankruptcy.  In the first executive session, that
2  was a privileged discussion which I can't discuss
3  here.  And then the second executive session, I
4  wasn't -- I didn't attend.
5    Q.  So I just thought -- did we not cover that
6  when we were talking about the message from Wayne
7  LaPierre and we covered the fact that the board --
8  nobody on the board -- or the board, we said, did
9  not know about the Chapter 11 petition.
10         So you're saying it still may have been
11  discussed in the executive session of the board
12  meeting?
13         MR. GARMAN (VIA ZOOM):  Objection to
14  the form of your question.
15    A.  I mean, anything could have been discussed
16  in the executive session that I didn't attend.
17    Q.  Okay.  And I apologize.  I did not pick up
18  that you didn't attend that.
19         You attended the full board meeting but
20  not the executive session; is that correct?
21    A.  Not the -- not the second executive
22  session.  I did attend the first executive session
23  which was a privileged discussion.
24    Q.  Okay.  That being the case, can you tell
25  me in the first executive session, was there any

Page 273

69 (Pages 270 - 273)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1 discussion of the petition being filed?
2 MR. GARMAN (VIA ZOOM): I'm going to
3 object on privilege grounds.
4 A. Right. I can't -- the first executive
5 session which involved the discussion of the
6 employment contract for Wayne LaPierre was a
7 privileged discussion and, therefore, I have to
8 respectfully decline to recount that.
9 Q. Okay. Could you go to Exhibit 130, and I
10 believe it's your testimony from Monday. And when
11 you get there to Exhibit 130, if you could go to
12 page 322.
13 MR. GARMAN (VIA ZOOM): 322 of the
14 transcript, I assume?
15 MR. GRUBER (VIA ZOOM): Yes. Thank
16 you.
17 (Exhibit 130 marked.)
18 Q. I would be concentrating on lines 10 to 24
19 but y'all do what you need to do to feel
20 comfortable.
21 A. (Reviewed document.) I can see it. I
22 have to lean in a little bit.
23 Q. I don't want to hear about it. I'm going
24 to be 65 tomorrow. I'm not buying.
25 THE WITNESS (VIA ZOOM): Happy

Page 274

1 birthday.
2 MR. GARMAN (VIA ZOOM): Happy
3 birthday.
4 MR. DRAKE (VIA ZOOM): Mike, while
5 they review that, do you mind giving the exhibit and
6 page number one more time, please?
7 MR. GRUBER (VIA ZOOM): Yes, I
8 apologize. Okay. So it's Exhibit 130 and it's at
9 page 322, lines 10 to 24.
10 MR. DRAKE (VIA ZOOM): Thank you.
11 A. So 322, lines 10 to 24.
12 Q. Please.
13 A. Okay.
14 Q. Yes, go ahead. Did you have a question?
15 A. So no, just tell me if I'm in the wrong
16 place. So starting on line 10, Question: And now
17 it is seeking to leave New York and reincorporate in
18 Texas, right?
19 Answer: Yes.
20 Question: Do you believe that decision is
21 a major decision for the NRA?
22 Yes.
23 Mr. Ciciliano (via Zoom): Objection to
24 scope.
25 Question: Do you believe that decision is

Page 275

1 a significant decision for the NRA to make?
2 Mr. Ciciliano: Object to scope.
3 And are you asking him personally?
4 Mr. Mason (via Zoom): I'm asking him as
5 the NRA.
6 Answer: Yes, very important decision.
7 Q. Okay. And would you agree -- go ahead.
8 I'm sorry. Do you have a question or an issue?
9 A. No. I just wanted to see if you wanted me
10 to read anymore.
11 Q. No, I appreciate it. Thank you.
12 Would you agree that going into bankruptcy
13 is one of biggest decisions that a corporation,
14 profit or nonprofit, could make?
15 A. Yes.
16 Q. Do you -- and we'll look at the bylaws
17 here in a second. But do you recall that corporate
18 acts of the Association of such major significance
19 as to warrant action by the full board of directors
20 is mentioned? And we can go look at it in a second.
21 Do you recall that general idea that major
22 decisions shouldn't even be executive committee;
23 they should be the full board?
24 MR. GARMAN (VIA ZOOM): Objection to
25 form of the question.

Page 276

1 A. Yes, I do recall a provision to that
2 effect.
3 Q. So can you please look at Exhibit 11? And
4 I'm trying to get you to the bylaws. So it's
5 Exhibit 11, pages 23 to 24.
6 MR. GARMAN (VIA ZOOM): We don't have
7 AMc Exhibit 11. We have 8 and 12. I'll refresh.
8 Hold on. No, it still jumps from 8 to 12.
9 MR. GRUBER (VIA ZOOM): This isn't
10 probably as effective but if I can, under Section 2,
11 powers and duties it says, The executive committee
12 shall exercise all the powers of the board of
13 directors when said board is not in session other
14 than the power to -- and then we're citing section
15 (k) because we think it formulates such other
16 corporate policy decisions or perform corporate
17 activities of the Association of such major
18 significance as to warrant action by the full board
19 of directors.
20 Does that sound right? I mean, you
21 can check it but -- and if you refresh now,
22 apparently it is there so we'll see. That's what I'm
23 being told.
24 MR. GARMAN (VIA ZOOM): It's there
25 now.

Page 277

70 (Pages 274 - 277)

1          (Exhibit 11 marked.)
2     Q.   Okay.  So if you want to go look at
3 Section 2, powers and duties and especially section
4 (k) which we think is fairly specific.
5     A.   I do want to note this is not -- this is
6 not the current edition of the NRA bylaws.
7     Q.   Has that particular section changed?
8     A.   We're going to the executive committee
9 section, Article VII?
10     Q.   Yes.
11     A.   I don't -- let me look at it just to
12 refresh my memory.
13          MR. GARMAN (VIA ZOOM):  Counsel, do
14 you have a page reference?
15          MR. GRUBER (VIA ZOOM):  I think it's
16 on page 23.
17     A.   Here we go.  I found it.  Yes.  So
18 although this is not the current edition of the
19 bylaws, I don't believe that the section was amended
20 the last time amendments were made back in
21 October 2020.
22     Q.   So let me point out if you can, first
23 section, subsection (f).  So it's saying that, you
24 know, the executive committee can do certain things
25 but the exceptions are if you look at section (f),

Page 278

1 would you read that?
2     A.   Adopt and disseminate a fundamental change
3 of view or basic policy or basic organizational
4 structure of the Association.
5     Q.   So is making a fundamental change to basic
6 organizational structure, isn't that pretty much the
7 same thing as a major reorganization?
8          MR. GARMAN (VIA ZOOM):  Objection to
9 the form of the question.
10     A.   I'm not sure it is.  You know, I would
11 have to have analyzed -- analyzed this and I have
12 not.
13     Q.   Okay.  So it also says something that
14 shouldn't be done by the executive committee but by
15 the full board.  If you go to (j), Present a
16 petition for judicial dissolution or to adopt plans
17 of merger, consolidation or nonjudicial dissolution.
18          Do you see that?
19     A.   I think that's (i).
20     Q.   I'm sorry.
21     A.   Yeah, I do see that.
22     Q.   And did y'all intend as part of the move
23 from New York domicile or legal presence to Texas
24 wasn't a merger and consolidation going to be
25 involved?

Page 279

1          MR. GARMAN (VIA ZOOM):  Objection to
2 the form of the question.
3     A.   I don't know that that's necessary.
4     Q.   Well, wasn't that what y'all have stated
5 was anticipated?
6          MR. GARMAN (VIA ZOOM):  Objection to
7 the form of the question.
8     A.   I don't recall what statement you're
9 referring to.
10     Q.   Okay.  And then (k) is formulate such
11 other corporate policy decisions or perform
12 corporate activities of the Association of such
13 major significance as to warrant action by the full
14 board of directors.
15          Do you see that?
16     A.   I do.
17     Q.   And I think we have got you under oath
18 talking about both major and significant actions; is
19 that correct?
20          MR. GARMAN (VIA ZOOM):  Object to the
21 form of the question.
22     A.   I don't recall my exact words on those
23 subjects.
24     Q.   Okay.  But whatever they are, they are,
25 and we have looked at them a minute ago; is that

Page 280

1 correct?
2     A.   I think you asked me some questions to
3 that effect.
4     Q.   Can we go to one other resolution, the
5 resolution authorizing Chapter 11 reorganization and
6 related retention of counsel.
7          MR. GARMAN (VIA ZOOM):  Can someone
8 tell us where that is?
9          MR. GRUBER (VIA ZOOM):  And I
10 apologize.  It's Exhibit 1, page 5.
11          MR. GARMAN (VIA ZOOM):  So Exhibit 1
12 is the petition?  Yeah, we see it.
13          MR. GRUBER (VIA ZOOM):  Okay.  I find
14 it.  Is it not attached to the petition?
15          MR. GARMAN (VIA ZOOM):  Yes, sir, it
16 is.
17          (Exhibit 1 marked.)
18     Q.   So page 5 of that group of documents I
19 think should be because I think -- yeah, mine are
20 font and back.
21          Do you recognize this document, resolution
22 authorizing Chapter 11 reorganization and related
23 retention of counsel?
24     A.   I do.
25     Q.   And this document does talk about -- it's

Page 281

71 (Pages 278 - 281)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1 a resolution and it does say that it resolves that
2 there is a Chapter 11 reorganization approved; is
3 that correct?
4        MR. GARMAN (VIA ZOOM): Object to the
5 form of the question, but answer if you can.
6    A. So the -- you know, referring to the
7 last -- the last whereas clause on the first page of
8 this resolution --
9    Q. Right.
10   A. -- says, whereas, in consultation with the
11 special litigation committee, Wayne LaPierre
12 determined that a Chapter 11 reorganization of the
13 NRA, et cetera, et cetera, would have been in the
14 best interest of the NRA. And then, you know...
15   Q. The resolves is covered also?
16   A. Yeah, the first resolved on the next page
17 resolves the commencement of a Chapter 11
18 reorganization proceeding is hereby authorized and
19 directed, yes.
20   Q. Okay. Thank you. And this is signed by
21 Wayne LaPierre; is that correct?
22   A. Yes, it is.
23   Q. And then you have copies signed by -- I
24 have separate copies -- signed by Carolyn Meadows,
25 Charles Cotton and Willes Lee or Willes Lee?

Page 282

1    A. Willes, yes.
2    Q. Do you see that?
3    A. I do.
4    Q. Okay. And Mr. LaPierre, is he -- is he
5 the chairman of the board?
6    A. No, he's not.
7    Q. Okay. Who is the chairman of the board?
8    A. Ms. Meadows, the president of the NRA,
9 serves as the board chairman.
10   Q. Okay. So he's signing it and acknowledged
11 and agreed by the special litigation committee and
12 those are the individuals I mentioned, correct?
13   A. Yes.
14   Q. Okay. And again, this is -- you again,
15 had pointed to the employment agreement and the
16 resolution, you know, on that and some -- you
17 pointed to several things.
18       But, again, would you agree of the things
19 you pointed to as kind of the things that show
20 authorization, the only one that mentions Chapter 11
21 dissolution being filed is not from a board
22 committee but from a special litigation committee;
23 is that correct?
24       MR. GARMAN (VIA ZOOM): Objection to
25 the form of the question.

Page 283

1        Go ahead.
2    A. I disagree with that. The special
3 litigation committee under the resolution that
4 appoints it is expressly described as a committee of
5 the board.
6    Q. Okay. I see. And I apologize.
7       It's not the executive committee of the
8 board, is it?
9    A. No, it's not the executive committee.
10   Q. Okay. My apologies on that.
11       So again, there's either the executive
12 committee or the full board. There's no resolution
13 similar to this one that specifically authorizes --
14 or let me say specifically mentions Chapter 11
15 bankruptcy filing; is that correct?
16       MR. GARMAN (VIA ZOOM): Objection to
17 the form.
18   A. Yes.
19   Q. Okay. There is a paragraph, the whereas
20 on January 7, 2021 -- I think you were looking at
21 that -- that talks about reorganize or restructure
22 the affairs of the Association.
23       Do you see that?
24   A. You're talking about the first paragraph
25 of the resolution.

Page 284

1    Q. Yes, the first whereas.
2    A. Yes.
3    Q. And the last part of that whereas is to
4 reorganize and restructure the affairs of the
5 Association.
6       Do you see that?
7    A. Yes.
8    Q. And you do recall we were looking at other
9 organizational language in the bylaws themselves.
10 And you're not prepared to say that those are
11 equivalent; is that correct?
12       MR. GARMAN (VIA ZOOM): Object to the
13 form.
14   A. I'm not sure I understand -- understand
15 how you're using the term "equivalent" here.
16   Q. Well, I guess as being essentially the
17 same thing, they're both talking about
18 reorganization.
19       You didn't -- you didn't go with me a
20 minute ago, but now that you have seen what is in
21 the -- in the actual agreement or the resolution
22 from the special litigation committee where it talks
23 about reorganize or restructure the affairs of the
24 Association, and I'm asking is that -- isn't that
25 essentially the same thing as adopt and disseminate

Page 285

72 (Pages 282 - 285)

Page 286

1 a fundamental change of view or basic policy or
2 basic organizational structure of the Association?
3        MR. GARMAN (VIA ZOOM): Objection to
4 form.
5    A. And not -- I think -- I don't necessarily
6 agree with that. Different words, different -- and,
7 therefore, it may have different meaning.
8    Q. So changing an organization is not the
9 same as reorganizing?
10        MR. GARMAN (VIA ZOOM): Objection to
11 form.
12    A. Well, no, and I don't think it says
13 change -- I thought it said change an organization
14 policy. But, you know, reading the whole -- I
15 think -- I also think you have to read the whole
16 phrase in context and they're just not the same.
17    Q. Okay. Let's see, so if you could now go
18 to one of the other I think pieces that we have
19 talked about that lead to authority.
20        If we could look at Exhibit 8. Or is that
21 the one you have?
22        MR. GARMAN (VIA ZOOM): No. We have
23 got 8.
24        (Exhibit 8 marked.)
25    Q. Okay. If we could go to the -- it's the

Page 287

1 special litigation committee resolution.
2    A. Yes, I have it.
3    Q. And this is on September 10, 2020; is that
4 correct?
5    A. No. This is a resolution from the
6 January 7th board meeting.
7    Q. I apologize. Whereas -- whereas on
8 September 10, 2020, that's where I'm looking. Can
9 y'all get to that?
10    A. Yes.
11    Q. Okay. It appoints specific individuals it
12 looks like to the special litigation committee. Is
13 that one of the things that's resolved, the first
14 thing?
15    A. Yes, that's in the first resolved clause.
16    Q. So and then what's resolved after that is
17 resolved that the special litigation committee shall
18 exercise corporate authority on behalf of the NRA
19 with respect to the prosecution and defense of --
20 and the lawsuits that it mentions are the New York
21 and DC Attorney General lawsuits; isn't that right?
22    A. It refers to the New York and DC Attorney
23 General lawsuits but also the NRA's lawsuit against
24 Attorney General James.
25    Q. Okay. I agree. I just meant that was one

Page 288

1 of the lawsuits.
2        And then it says, And any additional legal
3 proceeding arising from the same facts,
4 circumstances or allegations as the foregoing,
5 wherein the potential for an actual or apparent
6 conflict of interest favors recusal by one or more
7 NRA executives who would customarily oversee such
8 proceedings.
9        So did I read that correctly?
10    A. You did.
11    Q. Could you tell me what is being referred
12 to in that (iv) portion?
13        MR. GARMAN (VIA ZOOM): Objection to
14 form.
15        Go ahead.
16    A. Any additional legal proceedings.
17    Q. Right.
18    A. I think -- I think -- I mean, I think it's
19 just what it says, anything arising from the same
20 facts, circumstances or allegations. And, you know,
21 it appears to be a catchall to address future
22 developments.
23    Q. I may be wrong, but I thought earlier -- I
24 may have gotten my question and answer earlier.
25 Unless I'm not putting two and two to get two things

Page 289

1 together.
2        But it seems to me that there was a
3 discussion that this might refer to you, that, you
4 know, you might be or Mr. LaPierre -- you and
5 Mr. LaPierre because of the fact that y'all were
6 involved in the lawsuits; is that right? Or did I
7 completely misunderstand something?
8    A. Yeah, that was the -- that was the
9 original purpose of creating the SLC.
10    Q. So y'all -- I believe you pointed to this
11 resolution, though, as showing authority in some way
12 or a part of the puzzle to show authority.
13        But would you agree that there's no
14 mention specifically of bankruptcy filing; is that
15 correct?
16        MR. GARMAN (VIA ZOOM): Objection to
17 form.
18    A. Yes.
19    Q. And there's no mention of reorganizing the
20 NRA; is that correct?
21    A. Yes.
22    Q. And are you willing to shed some light on
23 how this document fits into the picture of authority
24 to file bankruptcy petition?
25        MR. GARMAN (VIA ZOOM): Objection to

1  form. I don't understand the question.
2  Q.  Well --
3  A.  So -- so --
4  Q.  Go ahead.
5  A.  So -- so this resolution creates this
6  committee with the intention of helping oversee
7  certain critical Association litigation. And -- and
8  this body is a body that, you know, among its other
9  activities, consulted with Mr. LaPierre and
10 ultimately agreed with the decision to file
11 Chapter 11.
12 Q.  So you're saying that whatever group --
13 and I can't remember if it was full board or
14 executive committee. But if the board passed this
15 resolution, are you saying that they should have
16 understood somehow through this document it would
17 put them on notice that a bankruptcy petition was
18 going to be filed?
19       MR. GARMAN (VIA ZOOM):  Object to the
20 form.
21 A.  Not necessarily.
22 Q.  Okay. And then if we could -- I have to
23 check my time in a minute.
24       But Exhibit 12, could you see if you can
25 find that. And I would be looking at page 1,

Page 290

1  Section 2. It should be Mr. LaPierre's employment
2  agreement resolution.
3       (Exhibit 12 marked.)
4  A.  Just to be clear, it's not a resolution;
5  it's the employment agreement itself. But yes, I
6  have it.
7  Q.  The employment agreement was approved by
8  what body?
9  A.  By the full board.
10 Q.  Okay. I'll ask the same question with
11 regard to this document, this employment agreement.
12      Do you believe this document puts the
13 board of directors on notice that a bankruptcy
14 petition will be filed relatively soon?
15       MR. GARMAN (VIA ZOOM):  Objection to
16 form.
17 A.  It doesn't say that. You know, it
18 gives -- it gives Mr. LaPierre the authority to
19 reorganize or restructure the affairs of
20 organization for various -- of the organization for
21 various purposes, but it doesn't expressly refer to
22 Chapter 11.
23 Q.  And isn't it true that -- I opened up law
24 360 this morning, they were talking about a
25 reorganization but it wasn't a bankruptcy.

Page 291

1       Let me ask this: Isn't it true that
2  companies reorganize or restructure their affairs
3  all the time without going through a bankruptcy
4  proceeding?
5       MR. GARMAN (VIA ZOOM):  Objection to
6  form. Go ahead.
7  A.  Sure.
8  Q.  Okay. Could we turn to Exhibit 102 at
9  page 36.
10      (Exhibit 102 marked.)
11 A.  So this is a --
12      MR. GARMAN (VIA ZOOM):  Counsel,
13 what -- can you tell us what this is?
14      MR. GRUBER (VIA ZOOM):  It should be
15 some testimony from -- if you go page 36 at line 8, I
16 believe it's some testimony from Mr. Frazer.
17      MR. GARMAN (VIA ZOOM):  This -- so
18 someone -- so you had someone describe the 341?
19      MR. GRUBER (VIA ZOOM):  I think -- I
20 think -- I don't think we did it, but I think there's
21 a transcript of the 341 available.
22 Q.  And I just wanted to ask you -- I was
23 going to think this would save a little time.
24      So you according to this did not review
25 the contract prior to debate on the employment

Page 292

1  agreement; is that correct?
2  A.  That's correct.
3  Q.  And it was asked, Were the board members
4  provided a copy and your answer was, Yes, they were;
5  is that correct?
6  A.  Yes.
7  Q.  Okay. But you did not review it prior to
8  the motion; is that right?
9  A.  That's right.
10 Q.  In reviewing your responsibilities that
11 have been discussed in this deposition and all,
12 wouldn't that normally be something that you would
13 do especially involving the board of directors?
14      MR. GARMAN (VIA ZOOM):  Objection to
15 the form.
16 A.  Not necessarily.
17 Q.  Okay. And who negotiated the agreement
18 for Mr. LaPierre?
19 A.  Mr. LaPierre's counsel, Mr. Correll, as I
20 understand it.
21 Q.  And who on the behalf of the NRA?
22 A.  I don't know exactly.
23 Q.  Was it Mr. Brewer?
24 A.  He was certainly involved, but I don't
25 know if -- I don't know if I could -- I don't know

Page 293

74 (Pages 290 - 293)

1 for sure if he was the one who negotiated it.
2 Q. Do you know if Mr. Correll was a former
3 law partner of Mr. Brewer's?
4 A. I don't -- I don't know. I don't know if
5 he was a partner, no.
6 Q. And I believe earlier today -- if you go
7 to Exhibit 131 -- hold on just a second. Yeah,
8 Exhibit 131 at page 15.
9 (Exhibit 131 marked.)
10 MR. GARMAN (VIA ZOOM): This is the
11 third session. It says continuation.
12 A. You said page 15, Counsel?
13 Q. Yes. Exhibit 131, page 15. If you could
14 go to line 13. I believe earlier today -- and if I
15 misheard, you can tell me -- you didn't believe you
16 could testify about what happened in either of the
17 executive sessions.
18 But here I believe you are stating that
19 the words "bankruptcy" or "Chapter 11" were not used
20 in the executive session on January 7th; is that
21 correct?
22 MR. GARMAN (VIA ZOOM): Counsel, I
23 don't see where that -- where Mr. Frazer is talking
24 there.
25 Q. And I apologize. Go to page 16, at line

Page 294

1 A. I'm sorry. Is there a question or do you
2 want me to read?
3 Q. I just wanted you to acknowledge the
4 testimony.
5 MR. GARMAN (VIA ZOOM): I don't --
6 what testimony are you getting him to acknowledge? I
7 think he says it's attorney-client privilege.
8 Q. Well, on page 14, line 14 and 15 and then
9 on to the first page of line 15 -- of page 15.
10 MR. GARMAN (VIA ZOOM): But that's not
11 Mr. Frazer talking. At the bottom -- lines 14 and 15
12 are not Mr. Frazer. 14 and 15 are the question and
13 then you're instructed not to answer.
14 Q. Okay. Could you go to page 16 at line 22.
15 Would you read those lines.
16 A. So I said --
17 MR. GARMAN (VIA ZOOM): So I don't
18 object to you just re-reading this transcript. So go
19 ahead and re-read this.
20 A. So starting on line 22 I say, Okay -- to
21 my recollection, I did not hear those phrases during
22 the executive session that I -- that -- I'm sorry, I
23 garbled a little on the phone -- that for which I
24 was present.
25 Q. Okay. I don't know how much time is left.

Page 296

1 22 to 25.
2 MR. GARMAN (VIA ZOOM): I will just
3 note that Mr. Buncher instructs Mr. Frazer not to
4 answer in there so -- beginning on line 25.
5 Q. Yeah. If you go to -- I'm sorry. Page 16
6 at line 22. I believe you state, To my
7 recollection, I did not hear those phrases during
8 the executive session that I attended for which I
9 was present.
10 Do you see that?
11 A. I do.
12 Q. And I believe you have already stated
13 today that because there's other -- but in the --
14 outside the board executive session, you didn't hear
15 any discussion of Chapter 11 or bankruptcy either,
16 did you?
17 MR. GARMAN (VIA ZOOM): Objection to
18 form.
19 A. So you're saying --
20 Q. I'm sorry. If you would -- I'm sorry --
21 A. Can you maybe read back -- I'm sorry, I'm
22 not following. Okay. I'm on page 14, right?
23 Q. Line 14 on 14.
24 A. Right.
25 Q. Okay.

Page 295

1 I don't know whether -- I should have asked whether
2 we're talking about just our time. You know, we had
3 an agreement with, I think, splitting time with the
4 New York's Attorney General. I don't really want to
5 pass the witness because of -- I think there's some
6 time left, there's some questions about time on him
7 as a 30(b)(6).
8 But for right now I'm through. I don't
9 believe I'm going to be asking any more personal
10 questions. But I don't know what the situation is
11 with the 30(b)(6) time so...
12 MR. GARMAN (VIA ZOOM): So -- so I
13 think you're actually under 1 minute on his personal
14 deposition. Is that right? So I think we're done
15 there.
16 MR. GRUBER (VIA ZOOM): Counsel, I'm
17 giving you back time.
18 MR. GARMAN (VIA ZOOM): We can regroup
19 on the 30(b)(6). I understand what you said but
20 we'll figure that out off the record.
21 MS. STERN (VIA ZOOM): Just for the
22 record, the Attorney General's Office also joins with
23 Ackerman on -- that it is our understanding we would
24 have 30(b)(6) time at the end of the conclusion of
25 the Mr. Frazer.

Page 297

75 (Pages 294 - 297)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1           MR. GARMAN (VIA ZOOM): I'm sorry.
2 I'm sorry. That is true. I didn't understand that's
3 what counsel was saying. That is true.
4           MS. STERN (VIA ZOOM): And then
5 there's also an issue about how much time is left as
6 well. I don't know if Mr. Gruber was referring to
7 that. I just want to make sure that that is clear
8 that we're still reserving.
9           MR. GARMAN (VIA ZOOM): I think our
10 colleagues -- I think our collective colleagues
11 resolved that while we have been in here this
12 afternoon but we can take that up later.
13           MS. STERN (VIA ZOOM): So can -- one,
14 there's other counsel here I think that have
15 questions. And I would just before we, you know,
16 adjourn, I want to make sure that we can each touch
17 base with our respective colleagues.
18           MR. GARMAN (VIA ZOOM): Sure.
19           MS. SARKESSIAN (VIA ZOOM): This is
20 Juliet Sarkessian here on behalf of U.S. Trustee. I
21 have exactly three questions. They're all to clarify
22 former testimony either today or Monday of
23 Mr. Frazer. That's all I have. I don't know if we
24 want to try to squeeze that in now or there's another
25 day. But I would like to ask those questions. I

Page 298

1 think it will be extremely fast.
2           MR. GARMAN (VIA ZOOM): Please --
3 please proceed.
4           THE WITNESS (VIA ZOOM): So is this
5 30(b)(6)?
6           MR. GARMAN (VIA ZOOM): So does
7 anyone -- you know, I don't think you're moving -- I
8 don't think you're a party to this. Having said that
9 I'm not going to stop you from asking questions
10 unless someone else has an objection.
11           I have no -- I have no objection to
12 you asking both about his testimony today and your,
13 it sounds like, short testimony about the 30(b)(6).
14 So it's a little procedurally awkward, but I have no
15 objection. We can get it on the transcript.
16           MS. SARKESSIAN (VIA ZOOM): I
17 appreciate it.
18           EXAMINATION
19 BY MS. SARKESSIAN (VIA ZOOM):
20     Q. Can you hear me okay?
21     A. Yes, ma'am. Yes.
22     Q. For the record, it's Juliette Sarkessian
23 on behalf of the U.S. Trustee. I do believe that
24 the court reporter has the spelling for my name. If
25 not, let me know.

Page 299

1 So let's go to the transcript which I
2 guess it's now Exhibit 130. I would first ask
3 you -- tell me when you're there.
4           MR. GARMAN (VIA ZOOM): So I think
5 it's broken up over a couple Exhibits.
6           MS. SARKESSIAN (VIA ZOOM): Really?
7           MR. GARMAN (VIA ZOOM): 130 is --
8 yeah. So I think 130 is volume 1. No. Exhibit --
9 so what we have as -- we have exhibit is AMc
10 Exhibit 130, which is identified as the videotaped
11 oral deposition of National Rifle Association by and
12 through its corporate representative John Frazer.
13 I'm sorry. I thought you were referring to the 341.
14 I got it.
15           MS. SARKESSIAN (VIA ZOOM): No. From
16 this Monday, March the 15th. That's 130, correct?
17           MR. GARMAN (VIA ZOOM): Yes, ma'am.
18 I'm sorry.
19     Q. So the first page I would like you to go
20 to is deposition page 67, but on the PDF it's page
21 18 if that helps.
22           MR. GARMAN (VIA ZOOM): Yeah. So
23 page --
24           MR. SARKESSIAN (VIA ZOOM): Page 67 of
25 the PDF is page 18.

Page 300

1           MR. GARMAN (VIA ZOOM): Okay. We're
2 there.
3     Q. Okay. If you could go down to line 22 of
4 page 67 and I'm -- if this is okay, I'm just going
5 to read it into the record and then I'm going to ask
6 you a clarifying question. Okay.
7           So at line 22 it starts, Question: Okay.
8 Who at the NRA made the determination that Mr. Cox
9 owed in excess of a million dollars back to the NRA?
10           Answer: Well, it was done in conjunction
11 with -- and now we're carrying over to the top of
12 page 68 -- it was done in conjunction with
13 general -- excuse me. It was done in conjunction
14 with counsel supervised by me, so I guess -- I guess
15 it's me. And that goes up to line 2 on page 68.
16           My question to you is: Mr. Frazer, there
17 where you say "in conjunction with counsel," who in
18 particular did you mean?
19           MR. GARMAN (VIA ZOOM): So just to be
20 clear, put your 30(b)(6) witness hat back on. That's
21 what we're doing right now.
22     A. Okay. So the counsel in the Cox matter
23 was the Brewer firm.
24     Q. And was it somebody in particular at the
25 Brewer firm that was involved with that with respect

Page 301

1 to what your testimony is or did you just mean the
2 Brewer firm generally?
3    A.   Just the firm generally.
4    Q.   Then we're going to move on to page 90 of
5 the transcript, which is page 24 of the PDF.
6    A.   Okay.
7    Q.   You got there before I did.  Sorry.  I
8 must be doing this the slow way.  Page 90, lines 8
9 through 15.  Okay.  So again, I'm going to read this
10 in the record and then ask you a clarifying
11 question.
12       Starting at line 8 on page 90, this is
13 part of the question:  Didn't Mr. LaPierre have the
14 NRA pay for tickets to sporting/entertainment
15 events?
16       Answer:  Yes.
17       Question:  Did you review his tickets to
18 sporting and entertainment events to see if they
19 were authorized?
20       Answer:  I believe that has been done.
21       Question:  Who did it?
22       Answer:  I believe outside counsel.
23       Do you see that testimony?
24    A.   Yes.
25    Q.   And again, my question to you is:  When

Page 302

1    Q.   And then I have down you spoke with
2 Mr. Brewer and Mr. Fleming -- Mr. Brewer by
3 telephone.  And I just wanted to clarify:  You did
4 speak to Mr. Brewer by telephone in connection with
5 preparing for this deposition today?
6    A.   Yes, I did.
7    Q.   Approximately how long was that call?
8    A.   It was about -- it was about two hours.
9 Well, actually no.  He was -- I'm trying to remember
10 now.  I think he was actually on for part of the
11 morning and I don't recall how much of that.  So in
12 excess of two hours, but I don't know exactly.
13    Q.   Were there other people on the telephone?
14    A.   When I was on the phone with Mr. Brewer I
15 was also on the phone with Mr. Fleming.
16    Q.   And during that call, was Mr. Garman also
17 there physically with you as well?
18    A.   Not for that part of the day.
19    Q.   Okay.  So during -- when you were speaking
20 to Mr. Brewer and Mr. Fleming on the phone, those
21 were the only people you were speaking with; there
22 was no other lawyer that was either with you present
23 or on the telephone, correct?
24    A.   That's correct.
25    Q.   Okay.  Just one more question.  That

Page 304

1 you referred to outside counsel in that testimony,
2 who did you mean?
3    A.   I would have been referring to the Brewer
4 firm.
5    Q.   And again, was there anybody in particular
6 at the Brewer firm that you know was doing this work
7 or did you mean the Brewer firm just generally?
8    A.   Just generally.
9    Q.   And now I'm going to -- my third -- my
10 last question is -- relates to testimony earlier
11 today so it's not with respect to this transcript.
12 I don't, of course, have a transcript for today so
13 you're going to have to bear with me with my notes.
14       This was rather early in the day when
15 Ms. Stern was doing the questioning and she was
16 asking about your preparation for the depositions.
17 And this is -- and again, if I say something wrong,
18 please correct me.
19       But what I have you saying is that to
20 prepare for this deposition that you met with
21 Mr. Garman and two colleagues, Ms. Pilatowicz -- I
22 may be pronouncing that wrong.  You also spoke
23 briefly to Ms. Eisenberg who I believe is she's with
24 the Brewer firm, correct?
25    A.   Yes.

Page 303

1 was -- was that testimony just related to you
2 testifying today; in other words, that was prep just
3 for today, not for Monday?
4       MR. GARMAN (VIA ZOOM):  Different
5 group.  Right.  Sorry.  Go ahead.
6    A.   So the prep -- the prep that I was talking
7 about for -- when I testified this morning about my
8 preparation, I was referring only to the preparation
9 that took place yesterday for today's deposition.
10    Q.   When you -- I think you may have answered
11 this Monday, and I apologize.
12       When you prepared for Monday's deposition,
13 which attorneys were you prepping with?
14    A.   I was with at various times Mr. Brewer --
15 Mr. Brewer, Mr. Garman, Mr. Fleming, Mr. Ciciliano,
16 and Ms. Rogers.  I hope I'm not forgetting anyone.
17    Q.   Approximately how long was Mr. Brewer
18 involved in your prep for that, for Monday's
19 hearing -- excuse me -- Monday's deposition?
20    A.   Well, we prepared on Saturday and Sunday
21 and it was -- you know, it was a fairly large group
22 and people were kind of coming and going so I
23 couldn't give you a number of hours.
24       MS. SARKESSIAN (VIA ZOOM):  Okay.
25 That's all.  Thank you very much.  I appreciate you

Page 305

77 (Pages 302 - 305)

1 letting me have the time.
2          THE WITNESS (VIA ZOOM): My pleasure.
3          MR. GARMAN (VIA ZOOM): Last but not
4 least, Scott.
5          MR. DRAKE (VIA ZOOM): I appreciate --
6 I appreciate that last add-on there. I'm going --
7 without binding myself, I think I'm probably less
8 than 30 minutes. Does anyone need a break? I'm
9 ready to roll, but -- I don't even know how long we
10 have been going. Does anyone know?
11          MR. GARMAN (VIA ZOOM): Can you make
12 it?
13          THE WITNESS (VIA ZOOM): I'm okay.
14          MR. GARMAN (VIA ZOOM): Ellen, do you
15 need a break?
16          THE VIDEOGRAPHER (VIA ZOOM): I'm all
17 right.
18          MR. GARMAN (VIA ZOOM): We'll roll
19 with you, or we'll try to.
20          MR. DRAKE (VIA ZOOM): Okay. Let's do
21 it.
22          EXAMINATION
23 BY MR. DRAKE (VIA ZOOM):
24     Q.   Just for the record, Mr. Frazer, Scott
25 Drake from Norton Rose Fulbright on behalf of the

Page 306

1 official committee of unsecured creditors. I have a
2 few questions just to kind of clarify some of the
3 things you said earlier today to make sure I
4 understood them.
5          So, again, I'm paraphrasing. The
6 transcript will have your exact words. But I
7 believe you mentioned that given the size of the
8 board, the board functions somewhat like a
9 legislature.
10          Do you remember that testimony?
11     A.   Yes.
12     Q.   And I think then you indicated that also
13 the board functions by various committees; is that
14 right?
15     A.   Yes.
16     Q.   Who do you understand -- and when I say
17 "who," it could be an individual or a group of
18 individuals.
19          But who is in charge of decisions with
20 respect to the bankruptcy now that it has been
21 filed?
22     A.   So ultimately, it's -- you know, it's the
23 leadership reporting up, executive vice president
24 LaPierre, president Meadows and the two vice
25 presidents.

Page 307

1     Q.   Anyone else?
2     A.   Obviously, I'm playing a role here and --
3 but those -- I think those would be the key
4 individuals.
5     Q.   Is there -- similar to the special
6 litigation committee, has there been any formal
7 committee formed by the NRA to make decisions with
8 respect to the bankruptcy?
9     A.   No.
10     Q.   Does the special litigation committee play
11 a role in the bankruptcy or are they limited to
12 those litigation matters enumerated in the document
13 that we looked at earlier?
14     A.   Given -- given -- so to be clear, because
15 of the nature of the committee, I have never
16 attended any of its meetings. But my understanding
17 is that they're regularly briefed and bankruptcy
18 issues are discussed with them.
19     Q.   When you were talking earlier about the
20 NRA's retention of Mr. Neligan and his firm, do you
21 know who at the NRA ultimately picked Mr. Neligan's
22 firm for debtors' counsel?
23     A.   My understanding is that it was
24 Mr. LaPierre.
25     Q.   And what about Mr. Garman's firm, would

Page 308

1 that also be Mr. LaPierre that made that decision?
2     A.   You know, I'm sorry, I just don't recall
3 that discussion.
4     Q.   And all these questions are if you know.
5          Do you -- and, again, we have got a lot of
6 depositions scheduled with various people, so I'm
7 just trying to get an understanding of who may know
8 what.
9          Do you, Mr. Frazer, have an understanding
10 as to who at the NRA might have made the decision to
11 hire Mr. Garman's firm?
12     A.   I mean, I was involved and I can't recall
13 if there was a discussion with Mr. LaPierre.
14     Q.   So -- again, just so I'm clear on your
15 testimony, you said you were involved.
16          Did you -- did you make the decision on
17 behalf of the NRA to engage Mr. Garman's firm?
18     A.   Again, I can't recall about a discussion
19 with Mr. LaPierre.
20     Q.   I know it's late so I'm probably just not
21 asking a very good question.
22          So setting aside whether you can recall
23 conversations with Mr. LaPierre, I'm just trying to
24 figure out who actually at the NRA made the
25 decision.

Page 309

78 (Pages 306 - 309)

1 Was that you who made the decision or
2 would it have been somebody else or a group of
3 individuals?
4        MR. GARMAN (VIA ZOOM): Object to the
5 form.
6        Go ahead.
7    A.  I think it would have been -- I think it
8 was kind of a group but sometimes there will be
9 separate conversations that occur.
10    Q.  Do you recall any of the individuals that
11 were in that group?
12    A.  You know, I don't, other than myself.
13    Q.  Mr. Frazer, again, just kind of a point of
14 clarification.  When you talk about the special
15 litigation committee -- and if we need to look at
16 it, hopefully somebody can point it to me.  But I
17 know it specifically mentioned, I believe, one or
18 two of the New York AG actions and the DC AG action.
19 And then I think it kind of had a little bit of a
20 catchall that mentioned another litigation -- and,
21 again, I'm paraphrasing -- other litigation that
22 arises out of the same facts or something like that.
23    Do you recall that generally?
24    A.  Yes.
25    Q.  So is the special litigation committee
Page 310

1 what the questions were.
2    But my question to you on that topic is:
3 Who at the NRA -- and again, "who" could be an
4 individual or a collection of people.
5    Who at the that is involved in the plan
6 process?
7    A.  Well, currently working with counsel, it
8 would be myself, Ms. Rowling, Mr. LaPierre.  It
9 depends on how far -- how far down into the details
10 you would get.
11    Q.  But would it -- as far as ultimate
12 responsibility, would you say it's mainly you,
13 Ms. Rowling and Mr. LaPierre with the assistance of
14 counsel?
15    A.  At an operational level but then, of
16 course, the board will presumably be briefed at the
17 upcoming rescheduled special meeting and, of course,
18 the board officers, you know, who also constitute
19 the special litigation committee but they're -- even
20 if the committee didn't exist, they were and are the
21 board officers, would be -- have been actively
22 engaged and will continue to be.
23    Q.  Mr. Frazer, when you said "and also with
24 the assistance of counsel," what counsel or
25 collection of counsel are you referring to?
Page 312

1 also overseeing the litigation with Ackerman
2 McQueen?
3    A.  No.
4    Q.  And who at the NRA is overseeing that
5 litigation?
6    A.  I am.
7    Q.  Anyone else?
8    A.  Not on -- not at the staff level, no.
9    Q.  Are you the person at the NRA responsible
10 for strategic decisions with respect to that
11 litigation?
12    A.  It has been quite a while since we had
13 any.  But, you know, it's sort of in discovery,
14 right.  But, you know, I think I would make any --
15 it's major litigation.  It's not something that I
16 would decide entirely on my own ever.
17    Q.  And what about the litigation with
18 Mr. Dell'Aquila?
19    A.  Similar situation.
20    Q.  So that's not -- that's not being run by
21 the special litigation committee?
22    A.  Right.  Right.
23    Q.  So, Mr. Frazer, there were also some
24 questions about the plan of reorganization and that
25 process.  To be honest, I can't remember exactly
Page 311

1    A.  On the -- on the plan?
2    Q.  Yes, on the plan specifically.
3    A.  Sure.  The Neligan firm is taking the lead
4 on the plan.
5    Q.  And then if you need to look at -- I think
6 it was Exhibit 2 from the New York Attorney General.
7 I think it's also an exhibit from Ackerman.  This is
8 the email January 15th that was the announcement
9 from Mr. LaPierre.
10    Do you see that?
11    (Exhibit 2 marked.)
12    A.  Yes.
13    Q.  And if you'll scroll down, Mr. Frazer,
14 to -- it's the section about the CRO.  I'm trying to
15 find it.
16    A.  It's under the -- I think I found it.
17 It's under the heading Building Our Strengths.
18    Q.  Yes, that's right.  So again, I may have
19 written it down wrong or misheard you.
20    But I believe your testimony was that you
21 personally were not involved in that decision about
22 adding a CRO; is that correct?
23    A.  Yes, that's correct.
24    Q.  Are you aware, Mr. Frazer, who might have
25 been involved in that decision on behalf of the NRA?
Page 313

79 (Pages 310 - 313)

1    MR. GARMAN (VIA ZOOM): Objection to
2 form.
3    Go ahead.
4    A. Yeah. I know that Mr. Brewer would have
5 been involved and that's all I know for certain.
6    Q. And so, again, when you sent this email,
7 did you draft this -- it came from Mr. LaPierre.
8 But did you draft this email or did somebody else
9 draft it?
10    A. I did not draft it.
11    Q. Did you have an understanding where it --
12 where it says, I have added Marshall Smith as our
13 chief restructuring officer, the "I" there refers to
14 Mr. LaPierre; is that --
15    A. That's right. That's right. Fair point.
16    Q. And so did you understand that it was -- I
17 mean, again, I just don't know what your -- what was
18 your understanding? Was it Mr. LaPierre's decision
19 as he indicates there or was it a decision made by
20 more than just Mr. LaPierre?
21    A. I'm sure Mr. -- you know, from having
22 worked with Mr. LaPierre for some time, I know that
23 he collaborates with his colleagues and gets advice
24 of counsel but -- so I'm sure it wasn't a solo
25 decision.

Page 314

1 correct?
2    A. Yes.
3    Q. And then when you say the vice president
4 who are you referring to? Because I believe you
5 said there's a first vice president, which is
6 Cotton, and then the second VP, which is Lee, and
7 then you have the executive vice president, which is
8 Mr. LaPierre. So would --
9    A. Correct.
10    Q. Would it involve all of those individuals?
11    A. Well, yeah, I kind of -- yes. I mean, I
12 mentioned Mr. LaPierre separately and then the --
13 you know, I think of the president and vice
14 presidents as a group.
15    Q. Okay. Probably just my connection. So
16 when you said vice president, you were saying
17 plural?
18    A. Right.
19    Q. Okay. I'm sorry. I just didn't hear
20 that. So -- and then when you said Mr. LaPierre and
21 counsel, which counsel are you referring to?
22    A. I know that Mr. Brewer advises
23 Mr. LaPierre. Mr. Davis advises the board officers.
24    Q. Would it also involve Mr. Neligan's firm
25 or Mr. Garman's firm?

Page 316

1    Q. But am I understanding you that you
2 sitting here today don't have personal knowledge as
3 to who else might have been involved in that
4 decision?
5    A. That's right.
6    Q. And again, I forget exactly. What was
7 your testimony as to why Mr. Smith ended up not
8 serving as the CRO?
9    A. My understanding is that he or a family
10 member had some unexpected health issues.
11    Q. And to the extent the NRA would engage
12 someone besides Mr. Smith as a CRO, who would make
13 that decision?
14    A. I think similarly it would be Mr. LaPierre
15 with advice of counsel.
16    Q. Anyone else from the NRA besides
17 Mr. LaPierre?
18    A. And the -- and the board leadership.
19    Q. And when you say "board leadership," who
20 do you mean?
21    A. I mean the senior -- you know, the
22 senior -- the senior elected -- the elected outside
23 officers, the president and vice presidents.
24    Q. Just again, so I make sure I understood
25 your testimony. The president is Ms. Meadows,

Page 315

1    A. Of course.
2    Q. Mr. Frazer, so I guess you understand,
3 obviously -- I think Mr. Gruber mentioned this --
4 one of the topics for the deposition is that certain
5 parties have filed a motion to appoint a Chapter 11
6 trustee.
7    Do you understand that?
8    A. Yes.
9    Q. Have you reviewed the debtors' omnibus
10 response to those motions?
11    A. Yes, I did.
12    MR. DRAKE (VIA ZOOM): I'm going to --
13 I have a couple questions. I'm going to see if I
14 can -- I think, Greg, I tried to upload it.
15    MR. GARMAN (VIA ZOOM): Okay.
16    MR. DRAKE (VIA ZOOM): I don't
17 necessarily know that it needs to be an exhibit, but
18 it should be there momentarily.
19    MR. GARMAN (VIA ZOOM): Got it. I
20 think it's currently uploading.
21    MR. DRAKE (VIA ZOOM): Okay. Is it
22 working?
23    MR. GARMAN (VIA ZOOM): It still
24 indicates it's -- I think it's still uploading but --
25 it's there but we can't open it yet.

Page 317

80 (Pages 314 - 317)

1     (Exhibit 1 marked.)
2   Q.  All right.  Let me see, can you see it now
3 on the zoom screen?
4   A.  Yes.
5   Q.  So I have a couple questions about the
6 response and, I guess, for all of them one question
7 will be, you know, are you the person to talk to or
8 is there someone better.  And if there's someone
9 better, if you could identify that person and I'm
10 sure they will be happy that you did.
11     MR. GARMAN (VIA ZOOM):  Well, I
12 drafted it but I don't think you want to talk to me.
13   Q.  So if you'll go to page -- up at the top
14 where it has page blank of 54, page 13 of 54.
15   A.  Okay.  I can see it on your screen.
16   Q.  Yeah.  Yeah.  I forgot.  Sorry.
17     I just had a question here.  This
18 paragraph talks about the allegations from
19 Mr. Schneiderman and the NRA acting in the wake of
20 it.  And you'll see on line 2 it said it conducted a
21 deep examination of its internal controls and took
22 steps to redress or obviate nearly every item.
23     Do you see that?
24   A.  Yes.
25   Q.  Are you familiar, Mr. Frazer, with what

Page 318

1     But then also even with respect to the
2 vendors that we still were using and that we valued
3 at the time, we took a deeper look at their
4 invoicing practices and, you know, we demanded
5 greater transparency.
6     We sent a letter out to hundreds of
7 vendors informing them of our -- of our need for
8 clear and compliant expense backup before the NRA
9 would reimburse anything.  And virtually all of them
10 got onboard with that.
11     A notable exception being Ackerman
12 McQueen, which, you know, continued to refuse and
13 continues to this day to refuse to provide
14 visibility into its -- into some of its operations
15 for us.
16     And then -- and then on personnel issues
17 we looked at where some of the concerns were coming
18 from and they were coming from specific individuals
19 who are no longer with the Association.
20     So I think we have -- I think taken
21 together those and other steps add up to, you know,
22 really strong track record over the last few years
23 of, you know, going out and remedying these problems
24 even though sometimes it's painful along the way.
25   Q.  And, Mr. Frazer, you talked over today and

Page 320

1 steps the NRA took to redress or obviate the
2 concerns and allegations made by the New York AG?
3   A.  Well, there are quite a few items in that
4 complaint.  But I am generally familiar with the
5 NRA's remedial efforts, you know, more in some areas
6 than others.
7   Q.  Sure.  And again, I know it has been a
8 long day and you may not remember every one of them.
9     But just sitting here now, can you kind of
10 describe the remedial efforts that you are aware of
11 that the NRA took --
12   A.  Sure.
13   Q.  -- to address the allegation?
14   A.  Sure.  I mean, a couple of them are
15 mentioned right here about examining internal
16 controls and vendor relationships.  So, you know,
17 what we found substantially is that we had good
18 internal controls and just needed to be stricter in
19 ensuring that they're communicated and enforced.  So
20 that was -- that was a key step.
21     Scrutiny of vendor relationships was very
22 important.  We looked, first of all, at which
23 vendors we actually needed.  And, you know, just as
24 for the financial health of the organization, we
25 terminated contracts with some under performers.

Page 319

1 also on Monday about some of the audits that the NRA
2 did with respect to these allegations.
3     Do you recall those questions generally?
4   A.  You mean reviewing -- reviewing issues
5 that had been raised by whistleblowers, for example?
6   Q.  Yes.
7   A.  Yeah.  I wasn't sure what you meant by the
8 term audit, but yes, we -- we -- we went into those
9 in-depth and tried to resolve every item in a
10 satisfactory way.
11   Q.  Some of -- some of the allegations that
12 you talked about related to various expenses and
13 reimbursements that were in some cases determined to
14 be improper, correct?
15   A.  Yes.
16   Q.  And so what -- what protections, if any,
17 does the NRA have in place today in order to avoid
18 repeating those kind of events?
19   A.  Sure.  So among other things, we greatly
20 tightened up the use of corporate credit cards,
21 basically removed American Express cards from a lot
22 of employees.  For those employees who had American
23 Express cards and still needed access to credit for
24 travel and entertainment, we issued a visa card
25 which provided a much simpler interface for review

Page 321

81 (Pages 318 - 321)

1 and verification of expenses.
2     We -- you know, we -- I'm trying to think
3 of other examples.  We -- so we're talking about --
4 well, another area was housing reimbursement,
5 housing allowances, and we have essentially phased
6 those out or almost out.
7     And we are, you know, just really a
8 different culture in terms of who's authorized to
9 approve things and who -- and what the cross-checks
10 are.  So, you know, officer expenses are reviewed at
11 a higher level than they previously were.  There's
12 no officer expenses passed through vendors.
13 Everything is done internally.  Just a whole host of
14 steps.
15     Q.  I'm going to go to a few pages down.  Bear
16 with me here.  Okay.  So, Mr. Frazer, I direct your
17 attention to paragraph 83.  And again, if this
18 question is better suited for somebody else, let me
19 know who that is.
20     But do you see this second sentence that
21 says, The removal of the member-selected leadership
22 and the installation of a third-party trustee
23 appointed by the government will have a devastating
24 impact on the NRA's ability to collect dues and
25 raise donations from its members, which dues and

Page 322

1 donations are necessary for debtors' existence and
2 reorganization.
3     Do you see that?
4     A.  I do.
5     Q.  And so do you -- do you agree with that
6 statement, Mr. Frazer?
7     A.  Yes, I do.
8     Q.  And what specifically or why specifically
9 does the NRA believe that removal of its selected
10 leadership would have a, in NRA's words, devastating
11 impact on the NRA?
12     A.  Sure.  You know, we're proud to be a
13 membership organization.  We're a grassroots
14 organization, about 5 million members.  And the
15 members have a direct role in the governance of the
16 Association.
17     About half of the NRA's members are
18 eligible to vote, either by being life members or
19 having been -- having being annual members for five
20 or more years consecutively.  And those members get
21 to vote.  They vote for the board.
22     The board elects the president, vice
23 presidents, you know, executive vice president and
24 other elected officers.  If -- if -- you know, and
25 key among those is Mr. LaPierre who is not only the

Page 323

1 CEO but the top fundraiser.  His face and his
2 signature bring in contributions and memberships.
3     So if what's -- so if a trustee were
4 appointed and Mr. LaPierre were removed, for
5 example, who would sign the fundraising mail.  Then
6 another step down the road, who -- you know, would
7 the members want to donate at all to an organization
8 that's under the control of, you know, a trustee
9 appointed by what's regrettably now a hostile
10 presidential administration.
11     Q.  Well, you mentioned fundraising as part of
12 your answer, Mr. Frazer.
13     Approximately how much, if you know, does
14 NRA rely on fundraising dollars as opposed to other
15 sources of money?
16     A.  It's the single most -- membership dues
17 and rank in file contributions are the -- together
18 are the single largest revenue source of the NRA.
19     Q.  So --
20     A.  Ms. Rowling could give you a more precise
21 breakdown.
22     Q.  Okay.  I appreciate that.  I appreciate
23 that.
24     So I want to also turn back to something
25 from earlier testimony that may have been on Monday,

Page 324

1 I think with respect to the IRS Form 990.  That's
2 annual information for, again, loosely describing
3 it, for -- annual information for organizations
4 claiming some kind of federal tax exception.  Is
5 that loosely what it is?
6     A.  Yes.
7     Q.  And I guess you have to file that yearly;
8 is that right?
9     A.  Yes.
10     Q.  And so I guess -- and some of the
11 testimony from Monday was that there was
12 investigations that the NRA did into excess benefit
13 transactions.
14     Did I remember that correctly?
15     A.  Yes.
16     Q.  And so for years 2019 and prior, have
17 those investigations been completed or are they
18 still ongoing?
19     A.  Some of them are still ongoing.
20     Q.  And so if there are additional findings
21 made for those prior years, would the NRA amend its
22 990 to reflect those findings, if required?
23     A.  Normally -- normally what you would do is
24 report them on the subsequent year's 990s.  The
25 Schedule O is used to make sort of a catchall

Page 325

82 (Pages 322 - 325)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1 receptacle for disclosures that don't -- you know,
2 don't automatically fit somewhere else.
3 Q. Is there -- is there any current
4 investigation into excess benefit transactions for
5 the year 2020 for the to be filed 990?
6 A. Only -- I can't answer definitively. But
7 only to the extent that any issues from 2019 that we
8 noted as under investigation, you know, might have
9 included similar issues in 2020.
10 So, for example, we mentioned some issues
11 about first class travel upgrades. And for those
12 we'll look comprehensively at all of the
13 individuals' travel, you know, regardless of year.
14 Q. And, Mr. Frazer, again, just make sure I
15 remember the testimony. Are the investigations done
16 by your outside counsel or is that done internally
17 by NRA personnel?
18 A. Either or both, depending on the specific
19 subject.
20 Q. And is the outside counsel Morgan Lewis or
21 the Brewer firm?
22 A. We have used the Brewer firm and we have
23 used other firms for various types of
24 investigations.
25 Q. Do you have an opinion as to whether the

Page 326

1 I don't know the details so I need to take a moment
2 and get up to speed.
3 And then are you prepared for
4 Mr. Frazer to continue testifying this evening on
5 30(b)(6) topics?
6 MR. GARMAN (VIA ZOOM): Why don't
7 you -- why don't you talk to your colleagues and
8 we'll regroup in here and answer that question.
9 MS. STERN (VIA ZOOM): Okay. Well, it
10 would help us in terms of knowing whether Mr. Frazer
11 is prepared to continue this evening.
12 MR. GARMAN (VIA ZOOM): I need to
13 stand him up and get him some coffee and ask him
14 whether he's capable of doing that.
15 THE WITNESS (VIA ZOOM): Physically
16 I'm doing fine. I'm getting a little hungry but
17 other than that, I mean, I think I'm okay. I just
18 don't know what their -- what their -- the deal is.
19 And can we take a break while we figure out what the
20 deal is?
21 MS. STERN (VIA ZOOM): Yeah, for sure.
22 And the same for the court reporter and the
23 videographer, just -- we'll -- I want to observe that
24 you're also working away all this time too. So we
25 will try to get back to you in, let's say, 10

Page 328

1 measures and procedures that the NRA put in place in
2 response to some of the things we talked about
3 earlier have been effective as to preventing the
4 type of violations that were described in the New
5 York Attorney General's lawsuit?
6 A. Yes. We believe them -- we believe they
7 have been effective.
8 Q. And who -- who at the NRA is involved in
9 those investigations? Would that be you as general
10 counsel or is that somebody in finance or is it a
11 collection of people?
12 A. Normally it would be led by the Office of
13 General Counsel, either me personally or some of the
14 staff, depending on the issue. And to the extent
15 that they involve -- that it involves financial
16 matters, we would surely enlist the finance staff.
17 MR. DRAKE (VIA ZOOM): All right.
18 Mr. Frazer, I think that's all I have and it's pretty
19 close to my time estimate. So I will pass the
20 witness.
21 THE WITNESS (VIA ZOOM): Thank you.
22 MS. STERN (VIA ZOOM): So I'm not sure
23 if anyone else is in line to do -- examine Mr. Frazer
24 in his individual capacity. My understanding is that
25 there is an understanding that has been reached, but

Page 327

1 minutes.
2 MR. GARMAN (VIA ZOOM): Okay.
3 THE VIDEOGRAPHER (VIA ZOOM): Going
4 off the record. The time is 20:12 p.m.
5 (Recess 8:12 p.m. to 8:39 p.m.)
6 THE VIDEOGRAPHER (VIA ZOOM): Going
7 back on the record. The time is 20:39 p.m.
8 MS. STERN (VIA ZOOM): Okay. We
9 have -- the parties have conferred and have agreed
10 that the deposition of John Frazer in his individual
11 capacity has concluded today and that the -- his
12 deposition as a 30(b)(6) witness will be continued.
13 The parties are going to discuss
14 tomorrow after a court hearing the date for that
15 deposition, and it will be at least an hour -- I'm
16 sorry, no more than an hour.
17 Is there anything else anyone wants to
18 add?
19 MR. GARMAN (VIA ZOOM): No. On behalf
20 of the NRA, we agree.
21 MR. GRUBER (VIA ZOOM): On behalf of
22 Ackerman McQueen, we agree.
23 Thank you for your patience and time
24 today, Mr. Frazer, and Counsel. It was a long day.
25 MS. STERN (VIA ZOOM): Thank you very

Page 329

83 (Pages 326 - 329)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Page 330**

1 much everyone. And thank the reporters. And we
2 ordered an expedited -- the Attorney General would
3 like an expedited transcript as per our arrangement.
4     THE VIDEOGRAPHER (VIA ZOOM): We are
5 off the record at 20:40 p.m. This concludes today's
6 testimony of John Frazer in his individual capacity.
7 The total number of media used is 17 and will be
8 retained by Veritext.
9     (Deposition concluded at 8:40 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 332**

1
2
3
4     _____
    (Signature of the Witness)
5
6
7
8 THE STATE OF _____
9 COUNTY OF _____
10
11   Subscribed and sworn to before me by the said
12 witness, JOHN FRAZER, on this the _____ day of
13 _____, 2021.
14
15
    _____
16     Notary Public in and for the
    State of _____
17     County of _____
18 My commission expires: _____
19
20
21
22
23
24
25

**Page 331**

1     DEPOSITION CHANGES
2 WITNESS: JOHN FRAZER
3 PAGE NO. LINE NO.   CHANGE   REASON FOR CHANGE
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

**Page 333**

1 STATE OF TEXAS   )
2 COUNTY OF DALLAS )
3
4
5
6
7
8   I, Michelle L. Munroe, Certified Shorthand
9 Reporter in and for the State of Texas, certify that
10 the foregoing deposition of JOHN FRAZER was reported
11 stenographically by me at the time and place
12 indicated, said witness having been placed under oath
13 by me, and that the deposition is a true record of
14 the testimony given by the witness;
15   That the amount of time used by each party at
16 the deposition is as follows:
    Ms. Stern   -  5 hours, 27 minutes
17     Mr. Gruber   -  1 hour, 33 minutes
18     Ms. Sarkessian  -  9 minutes
19     Mr. Drake   -  32 minutes
20
21
22   I further certify that I am neither counsel for
23 nor related to any party in this cause and am not
24 financially interested in its outcome.
25

84 (Pages 330 - 333)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
1
2       Given under my hand on this the 22nd day
3  of March, 2021.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
        Michelle L Munroe
20      Michelle L. Munroe, CSR No. 6011
        Commission expires 12-31-22
21      Firm Registration #571
        VERITEXT LEGAL SOLUTIONS
22      300 Throckmorton Street, Suite 1600
        Fort Worth, Texas  76102
23      817.336.3042  telephone
24
25
                                    Page 334
```

```
1  ggarman@gtg.legal
2          March 22, 2021
3  RE: In Re: National Rifle Association Of America And Sea Girt
4  DEPOSITION OF: John Frazier (# 4504850)
5     The above-referenced witness transcript is
6  available for read and sign.
7     Within the applicable timeframe, the witness
8  should read the testimony to verify its accuracy. If
9  there are any changes, the witness should note those
10  on the attached Errata Sheet.
11    The witness should sign and notarize the
12  attached Errata pages and return to Veritext at
13  errata-tx@veritext.com.
14    According to applicable rules or agreements, if
15  the witness fails to do so within the time allotted,
16  a certified copy of the transcript may be used as if
17  signed.
18          Yours,
19          Veritext Legal Solutions
20
21
22
23
24
25
                                    Page 335
```

85 (Pages 334 - 335)

# EXHIBIT 10

## RESOLUTION AUTHORIZING CHAPTER 11 REORGANIZATION
## AND RELATED RETENTION OF COUNSEL

WHEREAS, on January 7, 2021, at a meeting of the Board of Directors of the National Rifle Association of America ("NRA"), the NRA Board of Directors voted to approve that certain Employment Agreement between the NRA and Wayne LaPierre, its Executive Vice President, clarifying, for avoidance of doubt, that Wayne LaPierre is delegated the power to "exercise corporate authority in furtherance of the mission and interests of the NRA, including ... to reorganize or restructure the affairs of the Association;" and

WHEREAS, the NRA is the single member and manager of Sea Girt, a Texas limited liability company; and

WHEREAS, on September 10, 2020, NRA President Carolyn Meadows announced the appointment of a Special Litigation Committee of the NRA to oversee the prosecution and defense of certain litigation; and

WHEREAS, on January 7, 2021, the Board of the NRA enacted a resolution formalizing the existence of the Special Litigation Committee as a committee of the Board of the NRA pursuant to N.Y. N-PCL § 712(a), and such resolution contained the following provisions:

> RESOLVED that a Special Litigation Committee of the NRA Board of Directors is hereby appointed, and that the members of such Committee shall be Carolyn Meadows, Charles Cotton, and Willes Lee, each of whom has been determined to be independent and disinterested in all respects relevant to their service on the Special Litigation Committee, and be it further

> RESOLVED that the Special Litigation Committee shall exercise corporate authority on behalf of the NRA with respect to the prosecution and defense of (i) the litigation captioned *People of the State of New York v. The National Rifle Association et al.*, Index No. 451625/2020 (Sup. Ct. N.Y.); (ii) the litigation captioned *The National Rifle Association v. Letitia James*, Case No. 1:20-cv-889 (N.D.N.Y. 2020); (iii) the litigation captioned *District of Columbia v. NRA Foundation, Inc.* et al., (2020 CA 003545 B); and (iv) any additional legal proceedings arising from or relating to the same facts, circumstances, or allegations as the foregoing, wherein the potential for an actual or apparent conflict of interest favors recusal by one or more NRA executives who would customarily oversee such proceedings; and

WHEREAS, in consultation with the Special Litigation Committee, Wayne LaPierre determined that a Chapter 11 reorganization of the NRA along with its wholly owned single member-managed Texas subsidiary, Sea Girt, would advance the best interests of the NRA, its members, and its mission, as well as the interests of Sea Girt; now, therefore, be it

RESOLVED that the commencement of a Chapter 11 reorganization proceeding in the United States District Court for the Northern District of Texas on behalf of the NRA and its wholly owned, single member-managed limited liability company, Sea Girt, is hereby authorized and directed; and be it further

RESOLVED that the NRA and Sea Girt shall retain, as debtor's counsel in connection with such reorganization proceeding, the firm of Neligan LLP; and be it further

RESOLVED that the NRA and Sea Girt shall retain the firm of Brewer, Attorneys & Counselors ("BAC") as special counsel to prosecute and defend certain non-bankruptcy matters during the course of such Chapter 11 proceeding, including the prepetition matters presently handled by BAC.

[Remainder of page intentionally left blank]

Executed this 15th day of January, 2021.

By: _Wayne LaPierre_
Wayne LaPierre
Executive Vice President

**ACKNOWLEDGED AND AGREED BY**
**SPECIAL LITIGATION COMMITTEE:**

By: _____
    Carolyn Meadows
    Committee Chair

By: _____
    Charles Cotton

By: _____
    Willes Lee

Executed this 15th day of January, 2021.


By: _____
    Wayne LaPierre
    Executive Vice President

**ACKNOWLEDGED AND AGREED BY**
**SPECIAL LITIGATION COMMITTEE:**


By: _____
    Carolyn Meadows
    Committee Chair


By: _____
    Charles Cotton


By: _____
    Willes Lee

Executed this 15th day of January, 2021.

By: _____
    Wayne LaPierre
    Executive Vice President

**ACKNOWLEDGED AND AGREED BY
SPECIAL LITIGATION COMMITTEE:**

By: _____
    Carolyn Meadows
    Committee Chair

By: _____
    Charles Cotton

By: _____
    Willes Lee

Executed this 15th day of January, 2021.

By: _____
    Wayne LaPierre
    Executive Vice President

**ACKNOWLEDGED AND AGREED BY**
**SPECIAL LITIGATION COMMITTEE:**

By: _____
    Carolyn Meadows
    Committee Chair

By: _____
    Charles Cotton

By: _____
    Willes Lee

# EXHIBIT 11

**Page 1**

```
1
2
3
4
5
6
7    ------------------------------------
8        TRANSCRIPTION OF AUDIO FILE
9    341 MEETINGS OF CREDITORS (CONTINUED)
10            SEA GIRT, LLC
11       BANKRUPTCY CASE NO. 21-30080
12                 AND
13   NATIONAL RIFLE ASSOCIATION OF AMERICA
14       BANKRUPTCY CASE NO. 21-30085
15             MARCH 5, 2021
16   ------------------------------------
17
18
19
20
21
22
23
24
25
```

**Page 2**

1     THE OPERATOR: At this time, all
2 participants are in a listen-only mode until the
3 question-and-answer session of today's conference. At
4 that time, you may press star 1 on your phone to ask a
5 question. I will now turn the conference over to Lisa
6 Lambert.
7     Thank you. You may begin.
8     THE U.S. TRUSTEE: Thank you.
9     Hello. Welcome, everyone. My name is
10 Lisa Lambert. It is March 5th, 2021, at 1:10 p.m.,
11 Central Time. At this time, I call the Chapter 11
12 341 Meeting (continued) for Sea Girt, LLC, Bankruptcy
13 Case No. 21-30080, and the National Rifle Association of
14 America, Bankruptcy Case No. 21-30085. My name is Lisa
15 Lambert. I am an Assistant U.S. Trustee in the Dallas
16 office of the U.S. Trustee.
17     At the prior meeting, I explained the
18 nature of the 341 Meeting, but I want to remind everyone
19 that to participate in this 341 Meeting, you must be a
20 Creditor or, otherwise, entitled to ask questions as a
21 party and interest in the bankruptcy case under
22 Section 343 of the Bankruptcy Code. Questioners must
23 state their names and indicate who they represent or the
24 nature of their interest in the case. Questions should
25 be limited to this bankruptcy proceeding and [...]

**Page 3**

1 finances of the Debtor.
2     The U.S. Trustee will commence the
3 questioning, as the last time, and we will reserve
4 follow-up questioning after the other examinations. So
5 we're anticipating that the press may be on the line,
6 but they will not be asking questions. In accordance
7 with the 341 Notice, the Unsecured Creditors' Committee,
8 the New York Attorney General, the D.C. Attorney
9 General, and the Ackerman Firm asked for time to ask
10 multiple questions.
11     Other parties who are on the line in
12 listen-only mode will be allowed to ask brief
13 questions -- one or two -- at -- at the end of the
14 session when the line is opened up. Although this
15 meeting is being conducted telephonically, the same
16 rules of conduct apply to the professionals as though we
17 were in person; so the same rules about coaching a
18 witness and availability of materials. We understand
19 that if the witnesses refer to documents or another
20 per -- person for information, they should inform the
21 examiner -- the -- or the questioner.
22     During breaks, witnesses should not discuss
23 their testimony. The witnesses were sworn at the last
24 session. I'm going to remind them that they were
25 previously sworn and they are still under oath. I

**Page 4**

1 understand these witnesses are -- and I'm going to ask
2 you to say your name and your role with the Debtor, so
3 that it's easier for any transcriber to transcribe the
4 recording.
5     So, first, Mr. LaPierre?
6     MR. LaPIERRE: Yes. This is Wayne
7 LaPierre, and it's the Executive Vice President of the
8 National Rifle Association.
9     THE U.S. TRUSTEE: Sonya Rowling?
10     MS. ROWLING: Yes. Sonya Rowling, Acting
11 CFO of the National Rifle Association.
12     THE U.S. TRUSTEE: Robert Owens?
13     MR. OWENS: Robert Owens, Fiscal Officer
14 for the Institute for Legislative Action under the
15 National Rifle Association.
16     THE U.S. TRUSTEE: David Warren?
17     MR. WARREN: Yes. David Warren, CFO,
18 For-Profit Entity.
19     THE U.S. TRUSTEE: Finally, John Frazer?
20     MR. FRAZER: Good afternoon. I'm John
21 Frazer. I'm the Secretary and General Counsel of the
22 NRA.
23     THE U.S. TRUSTEE: Thank you.
24     As I mentioned, you have all been [...] sworn. We had an agreement at the last

AMc DEPOSITION
EXHIBIT
102

Page 5

1 341 Meeting that the testimony of one of you would be
2 corrected or clarified, if necessary, by another; and
3 that the testimony of one is, essentially, the same as
4 the testimony of the others. I understand that we still
5 have a deal on that. If I don't hear any objections, we
6 will proceed with that understanding.
7       Hearing no objections, we will proceed. So
8 the U.S. Trustee is going to start with questions about
9 Sea Girt, LLC and then I'm going to pass the examination
10 to the Unsecured Creditors' Committee. In the Sea Girt,
11 LLC case, the United States Trustee was provided with
12 the Special Litigation Counsel (sic) authorization. So
13 that was done by Ms. Edwards (sic) for the -- for the
14 benefit of the National Rifle Association, and she was
15 the one who selected three members. Is that right?
16       MR. FRAZER: Ms. Lambert, this is
17 John Frazer. I'm not sure I understand. You said
18 "Ms. -- Ms. Edwards"?
19       THE U.S. TRUSTEE: President Carolyn
20 Meadows.
21       MR. FRAZER: Oh, okay. Thank you.
22       THE U.S. TRUSTEE: Was Ms. Meadows the
23 person who established the Special Litigation Committee?
24       MR. FRAZER: This is John Frazer. Yes, she
25 was.

Page 6

1       THE U.S. TRUSTEE: Why was the Special
2 Litigation Committee necessary, in addition to the
3 general litigation committee?
4       MR. FRAZER: Excuse me. This is John,
5 again. Yes. The -- there -- the reason for
6 establishing the Special Litigation Committee was to
7 provide for -- you know, as indicated in her
8 announcement of its establishment, was to provide for
9 management of litigation matters on which, you know,
10 those who would normally engage in such management may
11 be conflicted.
12       THE U.S. TRUSTEE: Who on the litigation
13 committee would have been conflicted?
14       MR. FRAZER: I -- I'm -- I -- I'm sorry,
15 you are referring to -- to -- are you referring to
16 other -- other NRA committees --
17       THE U.S. TRUSTEE: Yes. I'm referring --
18       MR. FRAZER: -- or to -- or to --
19       THE U.S. TRUSTEE: -- to the NR --
20       MR. FRAZER: -- or to -- or to -- or to
21 staff? The --
22       THE U.S. TRUSTEE: No. I'm ref -- I'm
23 refer -- referring to the NRA litigation committee.
24 There's a separate one there that, according to the
25 minutes, exists, right?

Page 7

1       MR. FRAZER: We have a -- we have a Legal
2 Affairs Committee, yes.
3       THE U.S. TRUSTEE: Okay. And does the
4 Legal Affairs Committee consist of any of the officers.
5       MR. FRAZER: Well, all -- under the NRA
6 bylaws, all of the officers of ex officio members of
7 the -- of the committees. However, I -- I think the
8 role is a little bit different here. The Special
9 Litigation Committee has the authority to engage in
10 actual management of the litigation, as opposed to the
11 more general reporting and oversight that the -- that
12 the Legal Affairs Committee, historically, has done.
13       THE U.S. TRUSTEE: Is it the Debtor's view
14 that the authorization in the Special Litigation
15 Committee authorize the filing of the bankruptcy case?
16       MR. FRAZER: Our view is that -- is that it
17 is, essentially, a belt-and-suspenders approach. That
18 Mr. LaPierre had the authority to authorize the filing
19 and that he did so with the full, you know, knowledge,
20 understanding, and -- and agreement of the SLC.
21       MR. LaPIERRE: And, Ms. --
22       THE U.S. TRUSTEE: Does it --
23       MR. LaPIERRE: -- Lambert, I -- ye -- yes.
24 This -- this is -- this is Wayne LaPierre. Yes. It --
25 I mean, it's -- what the Board of Directors did -- and I

Page 8

1 wasn't in the room at the time, but -- because it was a
2 contract involving me that they were talking about. But
3 in a contract that the Board approved, when I was out of
4 the room, for my employment through the September board
5 meeting. And then they added an option for a year or
6 two to use my name, if they wanted to at their -- at
7 their discretion, not mine.
8       There was a second part of that resolution
9 that the Board passed, delegating to the Executive Vice
10 President the authority to reorganize, and -- and -- and
11 that would be to -- to reorganize into the Chapter 11
12 file -- ask the court -- court judge's permission, under
13 that Chapter 11 filing -- to -- to -- to -- for the
14 bankruptcy and for the reorganization in -- in Texas.
15 But that was in part of the contract that was approved
16 by the full Board of Directors.
17       THE U.S. TRUSTEE: I guess I'm asking a
18 little different question, which was: Was the Special
19 Litigation Committee general authorization to litigate
20 and authorize actions arising out of the other pending
21 litigations, such as the New York Attorney General's
22 action, viewed as authorization necessary for the
23 bankruptcy filing?
24       MR. BUNCHER: This is Doug. I don't
25 understand the question and it sounds like it's asking

Page 9

1 for a legal opinion about whether --

2          THE U.S. TRUSTEE: No. I'm just asking for

3 any understanding of the witnesses about the role of the

4 Special Litigation Committee and why it was involved in

5 the bankruptcy filings.

6          MR. BUNCHER: John, I thought you answered

7 that, but you can answer it again.

8          MR. LaPIERRE: This -- this -- this is

9 Wayne. I -- I -- I think the Special Litigation wa --

10 Committee was formed. And in order for it to have its

11 full weight, it had to be approved by the -- by the full

12 Board of Directors -- by a majority of the Board of

13 Directors present at the meeting -- which was done in

14 Dallas -- which gives the Special Litigation Committee,

15 made up of the three Officers -- Carolyn Meadows, Willes

16 Lee and Charles Cotton -- the authority to oversee the

17 NRA legislation because of -- I -- or Wayne LaPierre and

18 John Frazer would be conflicted in term -- if we

19 oversed (sic) it.

20          So it was approved by a majority of the

21 Board present to the Special Litigation Committee to

22 oversee the NRA litigation, which it -- which John and I

23 are not a part of any of those meetings.

24          MR. FRAZER: And --

25          MR. LaPIERRE: I think, separately, the --

Page 10

1 in that contract, the Board authorized the Executive

2 Vice President to -- to reorganize and I did it in

3 consultation with the three Officers who represent the

4 Special Litigation Committee.

5          THE U.S. TRUSTEE: All right. So let's go

6 back.

7          MR. FRAZER: And -- and -- and --

8          THE U.S. TRUSTEE: The language I'm look --

9          MR. FRAZER: -- and, Ms. Lambert --

10 Ms. La --

11          THE U.S. TRUSTEE: The language I'm --

12          MR. FRAZER: Ms. Lambert, this is --

13          THE U.S. TRUSTEE: -- looking at is, Any

14 additional legal proceedings arising from the same

15 facts, circumstances or allegations as the foregoing,

16 which was the State of New York versus the NRA, the NRA

17 versus Letitia James or the District of Columbia

18 litigation. Any additional legal proce -- proceedings

19 arising from the same facts; wherein, the potential for

20 a natural or apparent conflict of interest favors

21 recusal by one or more NRA executives, who would

22 customarily oversee such proceedings.

23          Was that the language that the Board viewed

24 as rela -- authorizing the bankruptcy filing?

25          MR. BUNCHER: Wait a second. The Board --

Page 11

1 there's nobody from the Board on the call. Who are you

2 directing the question to?

3          THE U.S. TRUSTEE: Well, I'm asking what

4 the understanding of this resolution was.

5          MR. BUNCHER: John, I think maybe you can

6 speak to that.

7          MR. FRAZER: Yeah, I -- I will.

8          And, Ms. Lambert, I want to apologize. I

9 started to answer when -- the -- the previous question

10 that was directed to me and realized -- after -- after

11 Mr. LaPierre started talking, I realized that I had it

12 muted. So my -- my apologies for the error. The -- no,

13 I -- I think that -- I think that the understanding is

14 that all -- is that these provisions work together.

15          That to the extent that -- you know,

16 that -- that the employment contract, approved by the

17 Board, gives Mr. LaPierre the authority to -- to make

18 these decisions. But that, also, the mandate to the

19 Special Litigation Committee -- to the extent that --

20 you know, that we are dealing with any related issues,

21 puts them in a position to -- to -- to, you know,

22 oversee and support that.

23          THE U.S. TRUSTEE: All right. I want to

24 circle back then. The litigation over -- the Legal

25 Affairs Committee oversees the litigation of the NRA as

Page 12

1 well; is that right?

2          MR. BUNCHER: Right.

3          MR. FRAZER: Yeah. The Legal Affairs

4 Committee is one of -- you know, one of a few dozen

5 committees of -- of the association, which are -- you

6 know, appointed by the President. They may include --

7 in fact, the Legal Affairs Committee does include

8 non-Board Members and, therefore, can't have corporate

9 authority delegated to it. And so those association

10 committees, typically, have more of a general oversight

11 role. You know, typically, we will -- we'll meet with

12 them.

13          We'll -- we'll report to them on legal --

14 legal matters affecting the association, both on the

15 corporate side and on the Second Amendment advocacy

16 side. The committee -- you know, it will -- the --

17 the -- there will usually be a little bit of

18 brainstorming about legal strategy and so on and then

19 the committee will give a report to the full Board, and

20 not usually with a lot of action items, because that

21 committee typically doesn't -- doesn't get involved in

22 day-to-day management.

23          THE U.S. TRUSTEE: So the Special Liti --

24 Litigation Committee resolution is undated. But it's

25 the testimony that it was approved at the January 2021

Page 13

1 Dallas board meeting; is that right?

2      MR. FRAZER: Are you referring to this --

3 to the resolution creating and -- and delegating

4 authority to the Special Litigation Committee?

5      THE U.S. TRUSTEE: Yes, from the Board.

6      MR. FRAZER: Yes. Yes, that was adopted at

7 the January 7th, 2021 meeting.

8      THE U.S. TRUSTEE: At the bottom, there is

9 some interlineations about who moved and --

10      MR. FRAZER: Right.

11      THE U.S. TRUSTEE: -- and who approved.

12 Whose notes would those be?

13      MR. FRAZER: I think you have two lines of

14 notes there. One is my handwriting indicating who --

15 in -- indicating that it was moved by Mr. Rathner and --

16 and seconded by Mr. Coy. I -- I separate those with a

17 slash, typically, just to keep them straight. And then

18 I left the room and I think -- you know, because I

19 didn't -- I didn't see who wrote the handwritten notes

20 at -- at the bottom, but I -- I think it was probably

21 Charles Cotton, who was presiding during the Executive

22 Session.

23      THE U.S. TRUSTEE: Okay. And there was no

24 separate, specific authorization at -- to establish Sea

25 Girt at the October meeting, right -- board meeting?

Page 14

1      MR. FRAZER: No.

2      THE U.S. TRUSTEE: And there was no

3 specific authorization to approve Sea Girt at the

4 January 2021 board meeting, right?

5      MR. FRAZER: No.

6      THE U.S. TRUSTEE: I want to talk about the

7 Sea Girt bank status. So the records reflect that

8 $50,000 came in from the Texas Equal Access to Justice

9 account and -- and would that have been -- who --

10 whose -- whose account would that have been?

11      MR. WARREN: The -- excuse me, the -- this

12 is David Warren. If -- if I understand your question

13 correctly, the -- are you asking whose account did the

14 $50,000 originate from?

15      THE U.S. TRUSTEE: Yes, on January 14th.

16      MR. WARREN: That -- that transfer would

17 have been originated -- excuse me, originated from the

18 trust balance that was held with brew -- the Brewer Firm

19 in the name of the NRA.

20      THE U.S. TRUSTEE: And the NRA has provided

21 an authorization of 50,000 of its funds to go into this

22 account, right -- into the Sea Girt account, right?

23      MR. WARREN: That's correct.

24      THE U.S. TRUSTEE: And the Brewer Firm also

25 transferred funds that were used to pay the retainers of

Page 15

1 Mr. Neligan, right?

2      MR. WARREN: That's correct.

3      THE U.S. TRUSTEE: And it's contemplated

4 that the retainer of Mr. Garman will be paid out of

5 delegate -- out of Brewer funds, right?

6      MR. FRAZER: This is John Frazer. I

7 believe that's -- that -- I believe that's correct, but

8 I would have to verify.

9      THE U.S. TRUSTEE: What other expenses of

10 the National Rifle Association would come out of the

11 Brewer funds?

12      MR. WARREN: The -- only funds that

13 were -- that were to come out of the -- that fund were

14 to fund the Sea Girt account, as well as associated

15 expenses -- primarily, legal expenses -- to this point.

16      THE U.S. TRUSTEE: You say "primarily legal

17 expenses." What other kinds of expenses that were not

18 legal would have been paid out of that account?

19      MR. WARREN: At the time of the petition,

20 there was a payment to the -- to the -- the Chief

21 Restructuring contract was funded out of that account,

22 and that -- that was the only other, outside of a legal

23 nature.

24      THE U.S. TRUSTEE: If the NRA authorized

25 the transfer of $50,000, why would that transfer not

Page 16

1 have occurred out of the NRA's accounts?

2      MR. BUNCHER: Don't speculate. If somebody

3 knows the answer, answer, but --

4      MR. WARREN: This is -- this -- this is

5 David Warren. I -- I'm not aware, specifically, why

6 that was funded out of that account.

7      THE U.S. TRUSTEE: And the final transfer

8 of funds reflects that the National Rifle Association

9 transferred funds out of Sea Girt. Did those funds go

10 into a Debtor in Possession account for Sea Girt or did

11 they go into the National Rifle Association's Debtor in

12 Possession account?

13      MR. WARREN: In -- in clar -- in -- in

14 clarification, are you referring to the -- the -- the --

15 the transfer out of the Sea Girt bank account --

16      THE U.S. TRUSTEE: In Feb -- yes, I am --

17      MR. WARREN: -- for the business --

18      THE U.S. TRUSTEE: -- in February of 2021.

19      MR. WARREN: Yes. That -- that transfer

20 was made to the NRA -- to an NRA bank account due to

21 the -- the direction that the Sea Girt bank institution

22 was not an approved institution.

23      THE U.S. TRUSTEE: So a separate Debtor in

24 Possession account was not established for Sea Girt; is

25 that right?

Page 17

1    MR. WARREN: It -- it's in process. So it
2 is in process. It just hasn't been final -- finalized.
3    THE U.S. TRUSTEE: Where is it --
4    MR. BUNCHER: Ms. Lambert --
5    THE U.S. TRUSTEE: Where is it --
6    MR. BUNCHER: Ms. Lambert, if I could
7 clarify one thing. On the Garman retainer, according to
8 their application, only part of their retainer is coming
9 from the Brewer Trust Fund. The rest of it is coming
10 from the NRA itself --
11    THE U.S. TRUSTEE: Thank you.
12    MR. BUNCHER: -- for the record.
13    THE U.S. TRUSTEE: Going back, where will
14 the Sea Girt Debtor in Possession account be opened?
15    MR. ROWLING: This is Sonya Rowling.
16 The -- the bank account is with Prosperity and we are in
17 the process of just getting the paperwork to them.
18 There was a delay because of the weather and then I --
19 the paperwork has all been provided at this point.
20    THE U.S. TRUSTEE: Okay. I said I would go
21 half an hour. So I'm going to pass the witness,
22 reserving my questions. The witness is passed to the
23 Unsecured Creditors' Committee.
24    MR. HENDRIX: Thank you, Ms. Lambert. Nick
25 Hendrix, Norton Rose Fulbright, proposed committee for

Page 18

1 the official -- or proposed counsel for the Official
2 Committee of Unsecured Creditors. I want to start
3 asking a few questions about the NRA's insurance. Does
4 the NRA maintain directors and officers insurance?
5    MR. WARREN: This is David Warren. The
6 answer is, Yes.
7    MR. HENDRIX: Who is that policy with and
8 when, if you know, is the expiration date?
9    MR. BUNCHER: This is Mr. Buncher. We --
10 that's one of the things we amended in the Schedules, if
11 you will look at the attachment to Question 73 of
12 Schedule A. The policies are listed along with the
13 carrier's name and policy coverage dates.
14    MR. HENDRIX: Okay. In that case, I
15 haven't -- I haven't looked at the amended ones, but can
16 we go ahead and request copies of all of those policies?
17    MR. BUNCHER: I think Kristian asked --
18 Mr. Gluck asked for those -- one of those yesterday, but
19 I think we can take that up offline.
20    MR. HENDRIX: That's fine.
21    We'll pivot to some of the items on the
22 Schedule of Financial Affairs and start with the 90-day
23 payments.
24    MR. WARREN: Okay.
25    MR. HENDRIX: The first one I have a

Page 19

1 question on is: There's a $1.5 million payment to
2 Winston & Strawn, who I understand is counsel for
3 Mr. Cox in some of the litigation. Why is the NRA
4 making those payments?
5    MR. FRAZER: This -- this is -- this is
6 John -- this is John Frazer. The payment was ordered by
7 the arbitrator in the dispute.
8    MR. HENDRIX: Is there, like, an indemnity
9 agreement or is it just part of the arbitration?
10    MR. FRAZER: I don't know how much I can
11 answer without violating the confidentiality of that
12 proceeding.
13    MR. HENDRIX: Okay. I know we talked about
14 this next one a little bit at the last 341 Meeting.
15 There's a $2.5 million payment to the New York
16 Department of Financial Services. What is the genesis
17 for that payment?
18    MR. FRAZER: This is John -- this is John
19 Frazer, again. That was a settlement of the -- of --
20 you know, resulting from an investigation of some of
21 our -- the conduct of our Affinity Insurance programs.
22    MR. HENDRIX: And I assume there's a
23 settlement agreement reflecting those that -- I think
24 you mentioned -- had a confidentiality provision in it?
25    MR. FRAZER: That's correct.

Page 20

1    MR. HENDRIX: Okay. There's also a
2 $10 million payment to Chain Bridge Bank. What is the
3 purpose of that payment?
4    MR. WARREN: This is David Warren. The --
5 the -- the interest of that payment was more -- was a --
6 a bank -- banking diversification distribution,
7 primarily.
8    MR. HENDRIX: On the SOFA, there's a number
9 of -- what appear, to me at least, to be -- individuals
10 who are listed as vendors and suppliers with various
11 payments. Can the NRA provide some additional detail on
12 who these individuals are and, you know, what services
13 they provide to the NRA?
14    MR. BUNCHER: Could you clarify what
15 specific Schedule you are referring to?
16    MR. HENDRIX: It was under the 90-day
17 payments and I -- I apologize, I don't have it right in
18 front of me. But I've got some names: It's David
19 Keene, James Porter, Bart Skelton. They're just kind of
20 intermixed with others who are, you know, plainly,
21 entity vendors and we're just trying to see how some of
22 these individuals wound up under the vendor and supplier
23 list.
24    MR. BUNCHER: David, can you respond to
25 that?

Page 21

1          MR. WARREN: It -- it -- it appears that
2    you are referring to the requests for insider qualified
3    payments. Is that accurate?
4          MR. HENDRIX: I think so.
5          MR. WARREN: Okay. Yeah, I think --
6          MR. HENDRIX: Yes.
7          MR. WARREN: -- we -- we -- well, I think
8    we noted -- I believe we noted in the submission the
9    reason for those payments. But if -- if you don't -- if
10   they aren't disclosed in your viewpoint, we can
11   certainly -- certainly share them.
12         MR. HENDRIX: Okay. Well, we -- we can
13   just talk about that offline, I think. Looking at some
14   of these payments to insiders, there's a payment to --
15   or a number of payments to Marion Hammer and then a
16   separate payment to Unified Sportsmen of Florida.
17   Marion Hammer is the Executive Director of the Unified
18   Sportsmen of Florida; is that your understanding?
19         MR. OWENS: This is Bob Owens. Yes, that's
20   correct.
21         MR. HENDRIX: And it looks like if you
22   combine those two, she received -- or she and the
23   Unified Sportsmen of Florida received about $430,000
24   over the last 12 months?
25         MR. OWENS: I can speak to the fact that

Page 22

1    the Institute for Legislative Action pays the Unified
2    Sportsmen a grant of 18,000 a month and we pay a
3    quarterly retainer to Ms. Hammer of 12,500 a month.
4          MR. HENDRIX: In looking at my notes, it
5    looks like there might be two separate agreements with
6    Marion Hammer, individually; is that correct? Or is it
7    just --
8          MR. LaPIERRE: That's --
9          MR. HENDRIX: -- one agreement?
10         MR. LaPIERRE: That's -- that's -- you are
11   correct. That's -- this is Wayne LaPierre. Yes,
12   there's the second consulting agreement that she has
13   with the NRA to do consulting services around the
14   country on -- on -- on the -- on the Second Amendment
15   issues to various --
16         MR. HENDRIX: And I --
17         MR. LaPIERRE: -- to various other states.
18         MR. HENDRIX: Okay. I think you have,
19   then, answered what my next question was going to be,
20   which is: Why are there two? Is it the case that one
21   of them is for her activities in Florida and one of them
22   is for her activities elsewhere?
23         MR. OWENS: That's --
24         MR. LaPIERRE: Correct.
25         MR. OWENS: She's one of --

Page 23

1          MR. LaPIERRE: Correct.
2          MR. WARREN: Yes.
3          MR. HENDRIX: And I guess we have seen one
4    of her agreements that was originally dated January 1,
5    2018 through December 31st, 2019. And I think it was
6    originally at $168,000 year; does that sound right?
7    It -- I guess I'll ask my actual question about it,
8    which is: That was then amended, shortly thereafter, on
9    a -- in April of 2018 to become a ten-year agreement
10   running through December 31st, 2028, and increased to
11   $220,000 per year. And so my question is: Why was that
12   extended, so shortly after, to be a ten-year agreement?
13         MR. LaPIERRE: It was negotiated based on
14   Ms. Hammer's value and -- and her -- and her experience
15   as, probably, one of the most prominent Second Amendment
16   figures in the United States and based on -- based on
17   her qualifications and background and the -- the level
18   of services that she could provide.
19         MR. HENDRIX: And, I guess, is there a --
20   a -- a specific reason why it was extended so quickly to
21   ten years; why there weren't, you know, continuing
22   one-year agreements contemplated?
23         MR. LaPIERRE: Just that we've tremendously
24   valued her services, as did people around the country,
25   and -- and we thought it was in the NRA's interest to --

Page 24

1    to tie her up to the point where she was -- we were --
2    people were able -- and the NRA was able -- to receive
3    her services for years to come.
4          MR. HENDRIX: And in the context of this
5    bankruptcy of the NRA, have you given any consideration
6    to rejecting that executory contract?
7          MR. LaPIERRE: I don't believe so at -- I
8    don't believe so.
9          MR. HENDRIX: I know we've seen
10   Mr. LaPierre's contract and compensation, and there's
11   some information on the Schedules relating to payments
12   made to various officers at the NRA. Are there other
13   employment contracts for the other officers of the NRA?
14         MR. WARREN: This is David Warren. Yes,
15   there are.
16         MR. HENDRIX: Okay. We'll just go ahead
17   and make a request for those as well.
18         And then, finally, does the --
19         MR. BUNCHER: Excuse me. Excuse me --
20         MR. HENDRIX: -- NR --
21         MR. BUNCHER: -- this is --
22         MR. HENDRIX: Go ahead.
23         MR. BUNCHER: -- Mr. Buncher. Could you
24   put your requests in writing, please, and just send
25   them, instead of making them on the record? Or you can

Page 25

1 make them on the record -- that's fine -- if you feel
2 the need to do that. But if you want to make an
3 information request, just send me an email.
4          MR. HENDRIX: Okay. And I -- I think the
5 reason we are doing it this way is we've kind of been
6 stonewalled. And I understand there's a lot going on;
7 I'm just trying to do my job.
8          And -- and the the -- only other questions
9 I have relate to document requests, so we can -- we can
10 take those off -- offline. And, with that, I will go
11 ahead and pass the witness on to the next Creditor.
12          MR. ACOSTA: Was that Ackerman or was that
13 the New York AG, Lisa?
14          MR. VAN HORN: Ms. Lambert, we can't hear
15 you, if you are letting us know who you would like to go
16 next after the Committee.
17          THE U.S. TRUSTEE: Yes. I -- I'm sorry. I
18 called the New York Attorney General's Office,
19 Mr. Van Horn.
20          MR. VAN HORN: Okay. Thank you.
21          This is Eric Van Horn of Spencer Fane,
22 Counsel to the State of New York, Office of the Attorney
23 General. And, first, I will do the same thing I did
24 last time; to go around the room and make sure ident --
25 voices are identified and to confirm who is in the room

Page 26

1 with you, if anyone, and then please identify them.
2          So, Mr. LaPierre, where are you testifying
3 from, is there anyone in the room with you and, if so,
4 who?
5          MR. LaPIERRE: I -- I am in my office and
6 Vanessa Shahidi is here and Andrew Arulanandam are here.
7          MR. VAN HORN: Okay. Thank you.
8          Mr. Frazer, same question.
9          MR. FRAZER: Yes. I'm -- I'm in my office
10 at NRA headquarters. I'm by myself.
11          MR. VAN HORN: Okay. Mr. Owens?
12          MR. OWENS: This is Robert Owens. I am in
13 my home office and I am by myself.
14          MR. VAN HORN: Okay. Ms. Rowling?
15          MS. ROWLING: Yes. I'm in my office at
16 headquarters and I'm by myself.
17          MR. VAN HORN: Okay. And, I believe,
18 Mr. Warren?
19          MR. WARREN: Yes. I -- I'm in my home
20 office and I'm by myself.
21          MR. VAN HORN: Okay. And does anyone -- or
22 can you please verify if you do -- have any visual
23 communication with any of your -- any of the NRA's
24 lawyers that we're not able to see right now or any
25 other legal counsel?

Page 27

1          MR. LaPIERRE: We do -- I do -- I -- we
2 do -- this is Wayne. I do not.
3          MR. FRAZER: And this John Frazer --
4          MR. OWENS: Mr. Owens, I do not.
5          MR. FRAZER: -- I don't.
6          MR. VAN HORN: Okay. First -- and, I
7 guess, Mr. Buncher, this will be somewhat to -- to you,
8 but I do have a question for the witnesses -- or at
9 least any witness who can answer.
10          We -- with respect to excise tax returns, I
11 know we've -- we have asked for those -- Mr. Sheehan
12 from the New York Attorney General's Office asked, and I
13 believe Mr. Pronsky has asked Mr. Neligan. I don't
14 believe we have received those yet and so we'll be
15 making a -- a fol -- an additional request for those,
16 Mr. Buncher.
17          But for Mr. Frazer or Mr. LaPierre, is
18 there any reason why those have not yet been provided
19 after these multiple requests?
20          MR. FRAZER: This is John Frazer. I'm not
21 aware of -- I'm not aware of those requests, I don't
22 think.
23          MR. LaPIERRE: Yeah. This is Wayne, I --
24 I -- my answer is the same as John's. I -- I'm not
25 aware that they were -- they -- they were requested

Page 28

1 either.
2          MR. BUNCHER: And -- okay. What
3 specifically are you asking for?
4          MR. VAN HORN: They are considered -- or
5 the excise tax return, so the -- and we can certainly
6 send another request. You may not have been on those
7 emails between Mr. Pronsky and Mr. Neligan, Mr. Buncher,
8 so we will submit those again. But from what I am
9 hearing from the witnesses, no witness has a -- a
10 reason, at least, that they know of yet as to -- or
11 knowledge that those were -- requests were made and why
12 they -- they haven't been yet provided.
13          MR. BUNCHER: And -- and -- and let me just
14 ask you: Are you asking for these for discovery
15 purposes in connection with the pending motions or for
16 some other reason?
17          MR. VAN HORN: No. No. This would relate
18 to the -- to the Statement -- the Schedules and
19 Statement of Financial Affairs that relate to excess
20 benefit transactions and trying to, you know, understand
21 whether the Schedules and Statements of Financial
22 Affairs are accurate. So they relate to -- to what we
23 are here about today as well.
24          MR. BUNCHER: Okay. It sounds like it's
25 crossing over into both, is what you are ask is

Page 29

1 (phonetic).  That's what it sounds like to me, but in

2 any event --

3           MR. VAN HORN:  And, I guess, also, you

4 know, it may be something that Ms. Lambert and the

5 U.S. Trustee's Office is interested in.

6           So I don't know if -- Ms. Lambert, if

7 you -- if you have any other interest in that, but we

8 could certainly make sure you are included on that

9 additional request that we'll make --

10          MR. BUNCHER:  And -- and --

11          MR. VAN HORN:  -- after today's meeting.

12          MR. BUNCHER:  -- did you clarify what tax

13 years you're speaking about?

14          MR. VAN HORN:  I believe the last, you

15 know, three full tax years.

16          MR. BUNCHER:  Right, and -- because I don't

17 know that 2020, for example, has even been finalized.

18 So are -- what years are you asking for?

19          MR. VAN HORN:  So ev -- three -- any -- the

20 three full years that have been completed -- the last

21 three full years that have been completed.

22          MR. BUNCHER:  Okay.

23          MR. LaPIERRE:  Okay.

24          MR. VAN HORN:  Okay.  With respect to

25 Sea Girt -- I guess I will start with Mr. LaPierre.

Page 30

1           Mr. LaPierre, is Sea Girt a -- a for-profit

2 or not-for-profit entity?

3           MR. BUNCHER:  I'm sorry, but didn't we

4 cover this in the last meeting?

5           MR. VAN HORN:  I don't -- I don't know if

6 we cov -- covered this exact question, but there's -- it

7 just seems like there's some inconsistency with some of

8 the documents where it's not clear whether it's for

9 profit or not for profit.  And so I wanted to get the

10 witness' understanding of whether it's for profit or not

11 for profit.

12          MR. BUNCHER:  I think Ms. Lambert covered

13 this in the first meeting, but go ahead.

14          MR. VAN HORN:  Yeah.  Mr. LaPierre?

15          MR. LaPIERRE:  So let me refer -- let me

16 refer to -- it to -- to John Frazer, the legal counsel,

17 and if -- if I could have -- defer that question to him.

18          MR. FRAZER:  Yeah.  This -- this is -- this

19 is John Frazer.  My understanding is that, in Texas,

20 you -- you form a -- you form all the LLCs for profits

21 and then take additional steps to convert them to a

22 nonprofit.

23          MR. VAN HORN:  Have the steps -- so have

24 the steps been made yet to convert it to a not for

25 profit?

Page 31

1           MR. FRAZER:  Not to my knowledge.

2           MR. VAN HORN:  So as we sit here today,

3 Sea Girt is a for-profit entity --

4           MR. FRAZER:  To the best --

5           MR. VAN HORN:  -- is that --

6           MR. FRAZER:  -- of my knowledge.

7           MR. VAN HORN:  Okay.  And that's

8 Mr. Frazer?

9           MR. FRAZER:  Yes.

10          MR. VAN HORN:  With respect to board

11 meetings and executive sessions -- I guess, maybe, I

12 will start with Mr. Frazer on this one -- did you -- are

13 you part of any executive sessions that are conducted by

14 the Board at meetings?

15          MR. FRAZER:  Thanks.  This is -- this is

16 John Frazer.  It depends on the subject matter.  You

17 know, the procedure when you go into Executive Session

18 is to -- is that the Board determines who should remain

19 in the -- in the room, and who that should be depends on

20 the subject matter of -- of the -- to be -- to be

21 discussed in the session.  So, for example, you know,

22 when officer compensation is discussed, the -- those --

23 the people whose compensation is being considered

24 can't -- are -- are not allowed to be in the room, and

25 so we leave.

Page 32

1           But, you know, so it depe -- so I'm present

2 or not present -- or just like anyone else, I'm present

3 or not present depending on the subject.

4           MR. VAN HORN:  Okay.  And are minutes kept

5 or notes from those executive sessions, to your

6 knowledge?

7           MR. FRAZER:  Speaking only for myself, I

8 keep some notes to keep straight.  For example, if is

9 motion is offered, who -- who -- who -- who moved it,

10 who seconded it, what the vote was.

11          MR. VAN HORN:  Is there anyone else on

12 the -- other witnesses know whether or not minutes are

13 kept for the Executive Session that the Board enters

14 into?

15          MR. LaPIERRE:  This -- this is Wayne.  I --

16 I would defer to John Frazer.  He's the Secretary of the

17 NRA and -- and -- and he has the most knowledge on that.

18          MR. VAN HORN:  Okay.  And, Mr. Frazer, your

19 testimony is you're -- you -- or, I guess, I'm -- just

20 to be clear, do you know or not know whether official

21 minutes from executive sessions are kept?

22          MR. FRAZER:  We do not keep formal minutes

23 of these -- of the proceedings in Executive Session.

24          MR. VAN HORN:  Thanks.  So in the min --

25 in -- in the minutes of the January 7th, 2021 board

Page 33

1  meeting, there's a reference to the Executive Session
2  entered into for -- to discuss Mr. LaPierre's contract.
3  Are you familiar with that?
4         MR. FRAZER:  Yes, I am.
5         MR. VAN HORN:  And there -- the minutes
6  reflect that the Board -- the Executive Session was
7  conducted and -- and then concluded with the approval of
8  Mr. LaPierre's contract; is that your understanding?
9         MR. FRAZER:  That's correct.
10        MR. VAN HORN:  And that it was subject
11 to -- subject to, I guess, further documentation of a
12 choice-of-law or choice-of-venue provision in this
13 contract.  Are you familiar with that?
14        MR. FRAZER:  Yes.
15        MR. VAN HORN:  So for tho -- for that to be
16 reported in the minutes, how is that -- information go
17 from the Executive Session and then get reported into
18 the minutes?
19        MR. FRAZER:  Yeah.  During the -- during
20 the Executive Session, there is -- is either a motion or
21 just a request that, without objection, the act -- that
22 the actions taken in -- in Executive Session be reported
23 upon conclusion of the Executive Session.
24        MR. VAN HORN:  And so for that
25 particular -- or for the Executive Session -- for that

Page 34

1  to be reported -- who would be taking notes or how would
2  those notes be taken in order to properly reflect the
3  motion being made, seconded, and then a vote?
4         MR. FRAZER:  The -- I'm not sure I
5  understand the question.
6         MR. VAN HORN:  How -- if there are no
7  formal Executive Session minutes kept, how do -- how do
8  the actions of the -- of the Board in Executive Session
9  get properly documented into the minutes of the board
10 meeting, if there are no official minutes of the
11 Executive Session kept?
12        MR. FRAZER:  Well, the -- when -- after
13 rising from Executive Session, the -- the -- the --
14 the -- you know, the Chair will announce that during the
15 exec -- you know, announce what happened during the
16 Executive Session.
17        MR. VAN HORN:  And so the Chair may have
18 some -- some notes or some other re -- other -- I guess
19 other written notes to show what -- what happened in
20 order to make that report?
21        MR. FRAZER:  Possibly.  I -- possibly, but
22 it's usually -- you know, it's usually a matter of -- of
23 minutes or -- minutes as in time, not as in records,
24 between the conclusion of the Executive Session and
25 the -- and the matter being announced.  But it's very

Page 35

1  fresh in everyone's minds.
2         MR. VAN HORN:  Well, with respect to this
3  particular Executive Session, discussing Mr. LaPierre's
4  contract, who was the Chair who would have taken those
5  notes and made that report to -- for the minutes?
6         MR. FRAZER:  Mr. -- Mr. Cotton, the First
7  Vice President, was in the Chair.
8         MR. VAN HORN:  Okay.  And he's a signatory,
9  on behalf of the NRA to the contract that was approved,
10 to your knowledge?
11        MR. FRAZER:  Yes.
12        MR. VAN HORN:  Were you present in that
13 Executive Session?
14        MR. FRAZER:  I was.
15        MR. VAN HORN:  You were?  Okay.
16        And, then, any other witnesses --
17 Mr. Warren, Ms. Rowling, Mr. Owens -- were either (sic)
18 of you present in that Executive Session?
19        MR. OWENS:  No.
20        MS. ROWLING:  No.
21        MR. WARREN:  And this is Mr. Warren, no.
22        MR. VAN HORN:  Okay.  And, Mr. Owens, were
23 you present?
24        MR. OWENS:  No.
25        MR. VAN HORN:  Okay.  Mr. Frazer, so as --

Page 36

1  with -- with respect to Mr. LaPierre's contract, there
2  was -- the min -- the minutes reflect that it did not
3  have a choice of law -- or subject to further, I guess,
4  modifications to -- or inclusion of a choice-of-law/
5  choice-of-venue provision.  Are you -- you are familiar
6  with that -- that notation in the minutes?
7         MR. FRAZER:  Yes.
8         MR. VAN HORN:  So was the contract that was
9  provided to the Board -- it -- it just didn't have those
10 links filled in or those provisions filled in at that
11 time?
12        MR. FRAZER:  I did not review the contract
13 prior to the debate.
14        MR. VAN HORN:  Were the Board Members
15 provided a copy of -- of the contract?
16        MR. FRAZER:  Yes, they were.
17        MR. VAN HORN:  And did that contract
18 have -- have or not have the -- the choice-of-law/
19 choice-of-venue provisions for Texas law included in it?
20        MR. FRAZER:  I -- as I said, I didn't
21 review the contract prior to the -- you know, prior to
22 the mo -- to the motion.
23        MR. BUNCHER:  Can I ask a clarify -- this
24 is Mr. Buncher, just to clarify the record.
25        Do you know, Mr. Frazer, if there are notes

LEXITAS

Page 37

1 from the Executive Session of the January 7th board
2 meeting or not?
3        MR. FRAZER:  I have some -- I have some
4 notes from the Executive Session, yes.
5        MR. VAN HORN:  Okay.  Mr. Frazer, at
6 what -- you know, what date -- if you've got a -- can
7 give a -- an approximate -- or just an exact date --
8 were you -- did you become aware of the -- the plan to
9 file bankruptcy for the NRA and Sea Girt?
10       MR. FRAZER:  I -- I became aware sometime
11 last fall that -- that such a plan might be -- might be
12 considered.
13       MR. VAN HORN:  Okay.  And in the Executive
14 Session that you attended, was the Board told that the
15 contract that they were considering was -- also
16 authorized the filing of bankruptcy?
17       MR. FRAZER:  Well, I --
18       MR. BUNCHER:  And we may be getting into
19 privileged matters at this point.  I'm going to object
20 to the extent the question calls for attorney-client
21 communication.
22       MR. VAN HORN:  While you were attending the
23 Executive Session, Mr. Frazer, did you hear the word
24 "bankruptcy" used by any of the Board Members?
25       MR. BUNCHER:  Same objection.  If counsel

Page 38

1 was present, you're basically asking him to reveal
2 attorney-client communications.
3        MR. VAN HORN:  Mr. Frazer, when in the
4 Fall of 2020 did you become aware of the plan to file
5 bankruptcy?
6        MR. FRAZER:  Well, to be clear, I -- I
7 can't say it was an awareness of a plan to file
8 bankruptcy.  But I became aware of the concept -- you
9 know, I don't remember the specific -- the specific
10 month, but it was sometime in the fall, you know, No --
11 Novem -- maybe, November, maybe -- maybe, a little
12 earlier.
13       MR. VAN HORN:  Okay.  And, you know, again,
14 this will be probably additional requests, Mr. Buncher.
15 But, yeah, we'll be requesting any notes Mr. Frazer has
16 from the Executive Session that he referenced making.
17       MR. BUNCHER:  All right.  And -- and just
18 to clarify the record, my understanding is our firm
19 produced a number of documents to the Committee
20 yesterday to Mr. Gluck.  So I don't know if, like, maybe
21 the left hand doesn't know what the right hand is doing
22 or -- you know, and I don't have clarity on exactly what
23 was provided at this point.  But, in any event, send me
24 the request once you figure out what you've already got.
25       MR. VAN HORN:  Okay.  Yeah.  Well, I don't

Page 39

1 think --
2        MR. GLUCK:  Hey, Doug --
3        MR. VAN HORN:  -- we have it.
4        MR. GLUCK:  -- the -- I -- I think the
5 person who's asking the questions isn't for the
6 Committee, so --
7        MR. BUNCHER:  Okay.  I'm sorry.  That's --
8 that's.  All right.  Okay.  Very good.  Who is asking --
9        MR. VAN HORN:  Yeah.
10       MR. BUNCHER:  Who is speaking right now?
11 I'm sorry.
12       MR. VAN HORN:  This -- this is Eric Van
13 Horn, and then, I believe, just prior was Mr. -- I
14 believe that was Mr. Gluck?
15       MR. GLUCK:  That's right, Eric.  Thanks.
16       MR. BUNCHER:  Yeah.  Yes.  Okay.  All
17 right.  My -- my fault.  All right.  Very good.  Thank
18 you.
19       MR. VAN HORN:  So, yeah, and -- and,
20 certainly, if there were documents produced to the
21 Committee that -- you know, that cover this, you know,
22 we will certainly request those.
23       With respect to -- Mr. Frazer -- the
24 Executive Session, do you recall who provided any sort
25 of presentation or overview of Mr. LaPierre's contract

Page 40

1 and what it -- what it entailed and what the Board was
2 being asked to approve?  Was it Mr. Cotton or somebody
3 else on the Board?
4        MR. FRAZER:  You know, the -- the -- this
5 is John Frazer.  I -- I apologize.  I don't recall
6 who -- I -- I mean, a number of Board Members asked
7 questions.  I know the Chair participated in the
8 discussion, but I'm hard-pressed to identify specifics.
9        MR. VAN HORN:  Okay.  And that Chair -- I'm
10 sorry -- was that Mr. Cotton?
11       MR. FRAZER:  Yes.  Mr. Cotton was in the
12 Chair throughout the -- throughout the meeting.
13       MR. VAN HORN:  Okay.  And do you recall any
14 Board Members who asked questions about the contract?
15       MR. FRAZER:  I recall that there were
16 several questions.  I couldn't tell you ev -- tell you
17 everyone that asked a question.
18       MR. VAN HORN:  Okay.  And do you re -- can
19 you -- what -- what questions do you remember being
20 asked about the contract?
21       MR. BUNCHER:  I'm sorry.  To clarify, are
22 we speaking about the Executive Session or the regular
23 board meeting at this point?
24       MR. VAN HORN:  The -- the session dealing
25 with Mr. LaPierre's employment contract.

LEXITAS

Case 21-30085-hdh11 Doc 468-3 Filed 04/03/21 Entered 04/03/21 02:48:03 Page 113 of
151
NRA of America Bankruptcy Case No. 21-30080      Pagess 41..44

Page 41

1      MR. FRAZER: Well, so -- so I think there
2 were some questions that might touch on -- on legal
3 advice. So --
4      MR. VAN HORN: Okay. How about non --
5      MR. FRAZER: -- I think that there --
6      MR. VAN HORN: How about nonlegal advice
7 questions; do you recall any?
8      MR. FRAZER: You know, the only question
9 that I spec -- that I -- that I specifically recall, I
10 think, was one that would have touched on legal advice.
11      MR. VAN HORN: Okay. And I believe I have
12 seen the list of Board Members who attended the meeting
13 on January 7th, 2021. But just to confirm, at least one
14 of the Board Members was Duane Liptak; do you recall
15 that being accurate?
16      MR. FRAZER: Correct.
17      MR. VAN HORN: And he's the Board Member
18 who resigned after the bankruptcy case was filed?
19      MR. FRAZER: That's correct.
20      MR. VAN HORN: And then another Board
21 Member was Phillip Journey; is that -- was he -- do you
22 recall him being present at the Executive Session?
23      MR. FRAZER: Yes.
24      MR. VAN HORN: And he is still a Board
25 Member, to your knowledge?

Page 42

1      MR. FRAZER: He is.
2      MR. VAN HORN: Okay. And do you know
3 why the employment contract did not have the Texas
4 choice-of-law provision in it at the time that it was
5 being considered?
6      MR. FRAZER: I don't know.
7      MR. VAN HORN: Okay. Was the Board
8 informed that the contract authorized Wayne to file
9 bankruptcy for the NRA?
10      MR. BUNCHER: Objection to the extent that
11 calls for attorney-client communications.
12      If you can answer without revealing
13 attorney-client communications, you can answer the
14 question.
15      MR. FRAZER: I don't recall any discussion
16 of that.
17      MR. VAN HORN: Okay. So no recollection of
18 any -- any other Board Members asking about whether it
19 authorized Mr. LaPierre to file bankruptcy for the NRA?
20      MR. FRAZER: No, not that I recall.
21      MR. VAN HORN: Okay. Mr. LaPierre's
22 contract provides for a salary of $1.3 million; you are
23 familiar with that term, Mr. Frazer?
24      MR. FRAZER: Yes.
25      MR. VAN HORN: Okay. And maybe this will

Page 43

1 be a question for -- yeah, a -- a question for
2 Mr. LaPierre.
3      Mr. LaPierre, how often are the -- your
4 base salary payments made under the contract? Are they,
5 you know, monthly, twice a month? What -- what -- when
6 do you get paid your base salary?
7      MR. LaPIERRE: The pay -- the pay -- as
8 with every other employee, the pay periods are usually
9 two pay periods a month. I think there are two weeks --
10 there are two other times -- there are two times when
11 it's three payments a month, but that's -- it's the same
12 as any other employee.
13      MR. VAN HORN: Okay. So that would be --
14      MR. LaPIERRE: And right now --
15      MR. VAN HORN: -- (inaudible) --
16      MR. LaPIERRE: -- I'm at -- as -- as -- as
17 many other employees, I -- I think I'm at 80 percent
18 of -- of that salary. Some of us took -- a lot of us
19 took reductions with COVID and I'm at 80 percent of
20 that.
21      MR. VAN HORN: Okay. Question for
22 Mr. Warren and then, maybe, Mr. Frazer. You -- you may
23 know this que -- the answer to this question.
24      The Schedules reflect a -- a contract -- a
25 newly added contract to the Schedules for a gentleman

Page 44

1 named Rick Tedrick. Mr. Warren, do you know who
2 Mr. Tedrick is?
3      MR. WARREN: Yes, I do.
4      MR. VAN HORN: Okay. Who is he and what's
5 his position?
6      MR. WARREN: He is the -- I think his
7 formal title is -- is Managing Director and CFO of
8 the -- of the Foundation -- the NRA Foundation and the
9 Managing Director of -- of the NRA, as well.
10      MR. VAN HORN: Okay. And is he continuing
11 to work for the NRA?
12      MR. WARREN: Yes, he is.
13      MR. VAN HORN: Okay. And is he -- I
14 believe I've seen him on the witness and exhibit list
15 somewhere. Is he available for testimony during this
16 case?
17      MR. BUNCHER: What -- what's the question?
18 I'm sorry. It's Mr. Buncher.
19      MR. VAN HORN: If Mr. Tedrick is -- is --
20 is -- is available for -- during this case of the -- for
21 testimony. I think I have seen him on a witness and
22 exhibit list, Mr. Buncher, but I'm just trying to get
23 some clarification about who he is and what he does
24 and -- and whether, you know, he's expected to be
25 testifying.

Page 45

1    MR. BUNCHER: Well, my understanding is
2 he's the guy that oversees the insurance, but the
3 witnesses would need to clarify --
4    MR. VAN HORN: Okay.
5    MR. BUNCHER: -- because his role is
6 more --
7    MR. VAN HORN: Mr. Frazer, do you know?
8    MR. FRAZER: Yeah. Rick -- Rick is the
9 Managing Director of Finance. He's a long-term em --
10 employee on the finance -- in the -- in the Treasurer's
11 office. His responsibilities include the -- you know,
12 various matters about insurance and investments, among
13 other things.
14    MR. VAN HORN: Okay. And is there any
15 reason you can think that he's -- or so -- so he's,
16 generally, working every day for the NRA right now?
17    MR. FRAZER: Yes.
18    MR. VAN HORN: Okay. And, then, is that
19 the same situation for Mr. Spray? Is he still working?
20    MR. FRAZER: I --
21    MR. BUNCHER: Now, this was covered in the
22 first meeting ad nauseam, Lisa -- or, Ms. Lambert. Are
23 we going to have to ask -- answer all the same questions
24 over again?
25    MR. VAN HORN: No. This is a little bit

Page 46

1 different, because it -- it was un -- a little bit
2 unclear, Mr. -- I believe Mr. Spray is still working.
3 An employment contract was scheduled -- or now scheduled
4 for him, and so I just want to understand what's his
5 current activity or employ -- you know, and -- and
6 employment with the NRA.
7    MR. BUNCHER: All right. Fair enough.
8    MR. LaPIERRE: This is Wayne. Mr. --
9 Mr. Spray is -- is -- is no longer working as Chief
10 Financial Officer of the NRA or Treasurer. He does have
11 a -- he had an agreement with the NRA, which the NRA is
12 honoring, and I -- I would refer to Mr. Frazer, the
13 general counsel's office, in terms of the -- the -- that
14 agreement. It -- it -- I'm not sure whether it's
15 confidential or not.
16    MR. FRAZER: This is Mr. --
17    MR. VAN HORN: Mr. Frazer?
18    MR. FRAZER: This is John Frazer. I
19 think -- I think I can answer that. You know, he -- you
20 know, Mr. Spray has an agreement that provides for --
21 for, you know, basically, a contingency contract for
22 severance under various circumstances.
23    MR. VAN HORN: Okay. So -- so as of today,
24 he's still being -- but he's -- he is being paid?
25    MR. FRAZER: Yes.

Page 47

1    MR. VAN HORN: So he may or may not be
2 working?
3    MR. FRAZER: He's -- he -- he's on
4 administrative leave.
5    MR. VAN HORN: Okay. And, Mr. Frazer,
6 maybe you'll -- you'll know the answer to this question.
7 Back -- just a quick follow-up on the employment
8 contract with Mr. LaPierre. Do you know how long after
9 the Board approved -- or approved the employment
10 contract was the choice-of-law provision inserted into
11 it, and then the agreement executed by Mr. LaPierre and
12 Mr. Cotton?
13    MR. FRAZER: I don't know.
14    MR. VAN HORN: Mr. LaPierre, do you know?
15    MR. LaPIERRE: Yes. Yes. I believe --
16 well, I can actually give you the date. It's -- it was
17 executed on -- well, I thought I could give you the
18 date. It's -- I know the board meeting was on -- it was
19 the afternoon of the board meeting. I believe it was
20 executed after the board meeting. Whatever date the
21 board meeting was, it was later that afternoon when the
22 agreement was executed and it -- because it was -- it
23 added a -- a governing law contract negotiated and
24 executed -- executed in the state of Texas, and it would
25 have been done -- been -- that would have been signed

Page 48

1 the afternoon after the board meeting concluded.
2    MR. VAN HORN: Okay. Is there a reason,
3 Mr. LaPierre -- I'm looking at the contract -- it
4 doesn't have that date filled in. Is there a reason
5 that date wasn't filled in?
6    MR. LaPIERRE: Yeah, that's what -- that's
7 what I was just looking at. I thought I was going to
8 reference the date, too, and it -- I saw that it had
9 January 2020 on it. Yeah, it -- that's why I couldn't
10 give you a date. But I'm sure that -- I know for a fact
11 that this was executed the afternoon after the board
12 meeting concluded.
13    MR. VAN HORN: Okay. So after the Board --
14 during the Executive Session, the report in the minutes
15 says it -- the employment contract was approved, subject
16 to further negotiations about a choice-of-law and
17 choice-of-venue provision, being that it's called the
18 Texas provision. This ha -- so, Mr. LaPierre, that took
19 place after the Board went into Executive Session, then
20 you and, I guess, Mr. Cotton -- who signed the
21 agreement -- agreed to Texas choice of law and then
22 executed the agreement. Is that series of events
23 correct?
24    MR. LaPIERRE: That is correct. We went
25 ba -- back to the -- the -- the law -- the law firm and

Page 49

1 had a meeting, and that's when I signed the agreement.

2      MR. VAN HORN: Okay. And the law firm was

3 what law firm?

4      MR. LaPIERRE: The Brewer Law Firm.

5      MR. VAN HORN: Okay. Mr. Warren, I've got

6 a few questions for you. Can you hear me okay?

7      MR. WARREN: Yes, I can.

8      MR. VAN HORN: Okay. When did you first

9 become aware of the bankruptcy filing?

10      MR. WARREN: I was made aware on -- on

11 January 15th, 2021.

12      MR. VAN HORN: Okay. And that's the same

13 day that the -- that the bankruptcy was filed --

14      MR. WARREN: That's accurate.

15      MR. VAN HORN: -- correct? Okay. When did

16 you first become aware that you would be asked to sign

17 the Schedules -- bankruptcy Schedules and Statements of

18 Financial Affairs?

19      MR. WARREN: That was determined after I

20 had managed the organizing of the Schedules being

21 completed.

22      MR. VAN HORN: Okay. When -- when did you

23 first begin the process of compiling the Schedules and

24 Statement of Financial Affairs?

25      MR. WARREN: I don't have -- I don't know

Page 50

1 the spe -- the specific date, but it would have been

2 late January.

3      MR. VAN HORN: Okay. So definitely after

4 the bankruptcy was filed, because you didn't even know

5 the bankruptcy was filed until --

6      MR. WARREN: That's correct.

7      MR. VAN HORN: -- the day it was filed,

8 right?

9      MR. WARREN: That's correct.

10      MR. VAN HORN: Okay. And how was the

11 information compiled for the Schedules and Statement of

12 Financial Affairs? Did you -- well, who did you work

13 with and instruct or, otherwise, delegate responsibility

14 to?

15      MR. WARREN: Once I got an organization

16 around all the requests, I either identified that I

17 would be able to gather that information

18 independently -- and when I wasn't, I incorporated the

19 specific individual that -- that was appropriate to do

20 so -- or staff member.

21      MR. VAN HORN: Okay. And can you -- can --

22 which -- do you know which members or key members did

23 you work with? It sounds like Ms. Rowling was, maybe,

24 one of them; is that correct?

25      MR. WARREN: That's accurate.

Page 51

1      MR. VAN HORN: Okay.

2      MR. WARREN: Yes.

3      MR. VAN HORN: Anyone -- anyone else?

4      MR. WARREN: Other members internal to the

5 organization, specific to the financial services

6 department, I would have engaged Mike Earstling for

7 assistance. I also involved John Frazer.

8      MR. VAN HORN: Okay. How about -- was

9 Mr. Spray involved at all?

10      MR. WARREN: No.

11      MR. VAN HORN: Okay. And your title is CFO

12 of the For-Profit Entities, correct?

13      MR. WARREN: That's correct.

14      MR. VAN HORN: And so what -- what is your,

15 sort of, knowledge or -- or ability to -- to execute

16 Schedules and Statement of Financial Affairs for a

17 non -- for any of the nonprofit entities or,

18 specifically, the NRA as a nonprofit?

19      MR. BUNCHER: This was covered, precisely,

20 in the first meeting by Ms. Lambert -- this exact topic.

21      THE U.S. TRUSTEE: It was. This is

22 Ms. Lambert.

23      MR. VAN HORN: Okay.

24      THE U.S. TRUSTEE: Is there anything new

25 that you are asking in follow-up?

Page 52

1      MR. VAN HORN: I -- no, I will refer back

2 to the transcript for -- for that question.

3      THE U.S. TRUSTEE: We're going to continue

4 the meeting if there's something novel to ask receptive

5 to that, but this was covered.

6      MR. VAN HORN: Yeah. Well, my apologies.

7 I thought I -- I may -- I must have missed it.

8      Mr. Warren, there was -- can you provide an

9 overview of the amendments to the Schedules that were

10 made and what -- any of the highlights or things that

11 you -- you know that should be on there that weren't on

12 there in the first or the second set of Schedules that

13 were filed?

14      MR. WARREN: Just to -- just to clarify,

15 are you asking for all of the -- a summary of all of the

16 amendments or anything in particular?

17      MR. VAN HORN: I mean, can you just, you

18 know, give us -- and then the Schedules were just

19 filed -- or amended Schedules were just filed yesterday

20 and I don't think we've all had an ability to really go

21 through and figure out exactly what was amended. So can

22 you provide any summary of what was amended in the -- in

23 the Schedules? And then we can talk about the Statement

24 of Financial Affairs, you know, separately.

25      MR. WARREN: Yes, I can -- I can go through

Page 53

1 that. In specific to the -- the Schedules -- speaking,
2 specifically, to the Sea Girt Schedules, specifically --
3 there was an amendment to the Unsecured Creditor list,
4 Schedule F, and it was just an amendment of the amount
5 to one of the parties -- one of the Creditors listed.
6 There wasn't an --
7            MR. VAN HORN:  Okay.
8            MR. WARREN:  There wasn't an addition to --
9 an addition of a Creditor, just the bal -- or the amount
10 of the claim.
11           MR. VAN HORN:  Okay.  And so that's on the
12 Sea Girt Schedules.  So on the NRA Schedules --
13           MR. WARREN:  Uh-huh (affirmative).
14           MR. VAN HORN:  -- what -- what changes --
15 what amendments were in -- in that one?
16           MR. WARREN:  Sure.  Yeah.  I will go
17 through that.  On the -- on the NRA Schedule, one of the
18 adjustments was the addition of disclosure of insurance
19 policies, and that's -- that's on Schedule A/B, Part 11,
20 No. 73, specifically, where we disclosed the active
21 insurance policies.  Another amendment was on
22 Schedule A, Part 2, No. 8, and that's where we disclosed
23 a prepaid position.  So we added and amended an
24 additional prepaid position to that schedule.
25           MR. VAN HORN:  Okay.  Can we talk about --

Page 54

1 I guess, identify that one real quick.  It was a
2 prepayment of -- do you remember about how much?
3            MR. WARREN:  Yes.  It was a -- an addi --
4 an -- it -- the addition of that was $805,500.
5            MR. VAN HORN:  Okay.  I think I -- and
6 that's to Free Beacon, LLC?
7            MR. WARREN:  That's correct.
8            MR. VAN HORN:  Okay.  I think I found it
9 now.  And why wasn't that in the prior Schedules?
10           MR. WARREN:  That wasn't dis -- that was
11 identified after the original submission as a -- as a
12 need to disclose.  So it was an identi -- identification
13 post the original submission.
14           MR. VAN HORN:  The -- kind of sim --
15 similar -- so was -- was it the Wells Fargo account,
16 about $3.8 million, that was identified for amending in
17 the First Amended Schedules, that's along tho -- it's an
18 asset right along those lines.
19           MR. WARREN:  Yeah.  That was a bank account
20 that had not been -- had -- just had mistakenly not
21 been -- been keyed onto the original Schedule, and that
22 was -- that was a bank account that was omitted in -- in
23 error.
24           MR. VAN HORN:  Okay.  Any other -- any
25 other amendments to the Schedules that you can summarize

Page 55

1 for us?
2            MR. WARREN:  Yeah.  I mean, we -- we did
3 bring an update to Schedule F, Unsecured Creditors.
4 Just -- it's a perpetual list, as we continue to -- to
5 adan -- advance forward.  So we -- we amended that to
6 the most current position was the update there.  We also
7 amended Schedule G where all leases that we have, as a
8 recipient, meaning, we the -- we -- we being the NRA as
9 a landlord, we did not -- we did not include in the
10 original submission.  So all of our leases that we hold
11 with the external third parties was added.
12           We also added any confidentiality or NDA
13 agreements.  Those weren't in our original scope, so
14 we -- we added those to Schedule G in this -- in this
15 update.
16           MR. VAN HORN:  Okay.
17           THE U.S. TRUSTEE:  Mr. Van Horn, if we are
18 going to come back next week to examine on these
19 amendments in part, can we defer these questions?
20           MR. VAN HORN:  Yes, Ms. Lambert.  If I can
21 just ask, maybe, two more quick questions.
22           Ms. Rowling, can you hear me okay?
23           MS. ROWLING:  Yes, I can.
24           MR. VAN HORN:  Okay.  When did you first
25 become aware of the bankruptcy filing?

Page 56

1            MS. ROWLING:  January 15th, 2021.
2            MR. VAN HORN:  Okay.  And, then, when did
3 you first become aware of the -- the need to help
4 compile the Schedules and Statements of Financial
5 Affairs?
6            MS. ROWLING:  Probably the same timeframe
7 as Mr. Warren, maybe a week or two after.
8            MR. VAN HORN:  Okay.  And do you have
9 any -- can you just provide, again, any just quick
10 summary of the -- he -- as far as amendments to the
11 Schedules that he hasn't already identified?
12           MS. ROWLING:  David is the preparer of
13 those, so I would refer to what he has said.
14           MR. VAN HORN:  Okay.  All right.
15 Ms. Lambert, thanks very much for the additional time.
16           Mr. Buncher, we will send the additional
17 document requests after the meeting, and thank you for
18 your time.
19           Reserving rights for questions for next
20 meeting.
21           THE U.S. TRUSTEE:  So next we Ackerman,
22 Mr. Acosta?
23           MR. ACOSTA:  Yes.  Hello, folks.  My name
24 is -- Mr. LaPierre, Ms. Rowling, Mr. Owens, Mr. Warren,
25 Mr. Frazer, my name is Joe Acosta.  I represent Ackerman

Page 57

1 McQueen. I hope you guys are doing well today.

2      MR. LaPIERRE: Thanks.

3      MR. ACOSTA: Let me start off by --

4      MR. LaPIERRE: You, too.

5      MR. ACOSTA: -- ask -- let me start off by

6 asking who -- who currently is governing the NRA?

7      MR. LaPIERRE: Well, I'm the -- this is

8 Wayne. I'm the Executive Vice President of the NRA and

9 we all work for the Board of Directors.

10      MR. ACOSTA: So it's the full Board or a

11 portion of the Board that's governing the NRA?

12      MR. LaPIERRE: It's the full Board -- the

13 full Board is the one that has the -- has the power to

14 govern the NRA.

15      MR. ACOSTA: And do they know that they are

16 governing the NRA during bankruptcy?

17      MR. BUNCHER: I object, calls for the

18 witnesses to speculate about what somebody else knows or

19 doesn't know (phonetic). I -- do you want to rephrase

20 that?

21      MR. ACOSTA: Sure. Was there any notice

22 provided to the full Board that they were in bankruptcy

23 and they were still governing the bankruptcy?

24      MR. LaPIERRE: We -- we -- after they

25 delegated authority at the Dallas board meeting to the

Page 58

1 Executive Vice President to reorganize the NRA, after

2 the full Board passed that in that contract, when we

3 moved to our Chapter 11 bankruptcy, we immediately sent

4 out a -- a notice to the -- to the full Board.

5      MR. ACOSTA: And did that notice indicate

6 that they were still governing the NRA or did it

7 indicate that you were governing the NRA, Mr. LaPierre?

8      MR. LaPIERRE: I will refer to -- to John

9 Frazer as to just exactly the contents of the notice.

10      MR. FRAZER: This -- this -- this is John

11 Frazer. Yeah. We sent the notice out announcing the --

12 that the reorganization plan had been filed, you know,

13 discussing the new website that had been created to

14 provide news about it, describing the -- the intention

15 of the reorganization to emerge as a Texas nonprofit. I

16 don't -- I don't think there was any notice about --

17 that the Board was still governing, because I don't

18 think there was any -- there was any question that the

19 Board is still governing.

20      MR. ACOSTA: So they understand that they

21 are still on the hook for any decisions made by the NRA?

22      MR. BUNCHER: That's --

23      MR. TERRELL: Objection. Calls for a legal

24 conclusion.

25      MR. BUNCHER: And it calls for --

Page 59

1      MR. ACOSTA: Do they understand that --

2      MR. BUNCHER: It calls for --

3      MR. ACOSTA: -- they're still under --

4      MR. BUNCHER: -- calls for them --

5      MR. ACOSTA: -- a fiduciary duty

6 (phonetic)?

7      MR. BUNCHER: -- to speculate on what

8 somebody else understands or does not understand. So do

9 you want to rephrase that?

10      MR. ACOSTA: Do they understand that it's

11 business as normal?

12      MR. BUNCHER: Same objection. They can't

13 testify what somebody else understands or not.

14      MR. ACOSTA: Okay. You didn't provide them

15 notice that it was business as normal, did you?

16      MR. TERRELL: Object -- objection to the

17 form.

18      MR. ACOSTA: Okay. You can answer the

19 question.

20      MR. BUNCHER: I think the witness already

21 testified what the notice said and now you're just

22 badgering the witness, so --

23      MR. ACOSTA: That's not true. I don't -- I

24 don't know if they -- there was any notice provided that

25 the Board was still in charge of the NRA.

Page 60

1      MR. BUNCHER: Is the notice on the website,

2 Mr. Frazer?

3      MR. FRAZER: The -- the -- no, the message

4 that went to the Board isn't -- isn't posted online.

5      MR. ACOSTA: Well, would you mind sharing

6 that with us? Maybe that -- I can move --

7      THE U.S. TRUSTEE: Gentlemen --

8      MR. ACOSTA: -- this along.

9      THE U.S. TRUSTEE: -- let's just get a copy

10 of what was sent to the Board, as Mr. Acosta has just

11 said, and let's ask about what questions have been

12 received from the Board about managing during the

13 bankruptcy, if any, to counsel.

14      MR. BUNCHER: Yeah. Well, that sounds like

15 attorney-client communication to me.

16      THE U.S. TRUSTEE: Well, I think that if

17 there are general questions about the operation of the

18 Debtor by the Board, that those are not particularly

19 legal questions, but could be. I agree.

20      MR. BUNCHER: Okay.

21      MR. ACOSTA: Well, let me ask this

22 question: Has the Board made any decisions since the

23 bankruptcy?

24      MR. FRAZER: This --

25      MR. LaPIERRE: The ---

Page 61

1         MR. FRAZER:  This is John Frazer --

2         MR. LaPIERRE:  The Board has not had -- had

3   a -- had a meeting -- a formal meeting since -- since

4   the bankruptcy.  Although, many of us have -- have had

5   numerous communications individually with Board Members.

6         MR. ACOSTA:  So is it fair to say that the

7   day-to-day governance of the NRA is conducted by you,

8   Mr. LaPierre?

9         MR. LaPIERRE:  Well, as -- as always --

10        MR. TERRELL:  Objection --

11        MR. LaPIERRE:  -- under the -- under the --

12  I work for the Board.

13        MR. ACOSTA:  Okay.  When was the last time

14  you apprised the full Board of what was going on in the

15  bankruptcy?

16        MR. LaPIERRE:  We -- we sent -- we sent a

17  notice and we have -- we -- we -- we have had individual

18  conversations with Board Members about -- about the fact

19  that we -- we have actually -- going -- are going to

20  have a Board of Directors meeting coming up.

21        MR. ACOSTA:  And when is that date, sir?

22        MR. LaPIERRE:  The notice has gone out.

23  It's the -- the -- I believe it's the 14th of January --

24  the 14th of March --

25        MR. ACOSTA:  Okay.

Page 62

1         MR. LaPIERRE:  -- maybe, the 15th of March.

2   It's a Sunday.  I know that.

3         MR. FRAZER:  This -- this is -- this is --

4   this is John Frazer.  There's a -- a special meeting has

5   been called for March 14th.  I would also add that we've

6   sent periodic emails to the Board about the -- you know,

7   about news coverage, interviews, and -- and that kind of

8   thing that -- you know, that have cov -- that have --

9   you know, that have been aired regarding the

10  reorganization plan.

11        MR. ACOSTA:  Okay.  Would you mind sharing

12  all -- everything shared with the Board that's not

13  privileged since January 15th, 2021?

14        MR. BUNCHER:  We'll take that under

15  advisement.  I'm hard-pressed to see how a communication

16  from counsel to the Board is anything but privileged.

17        MR. ACOSTA:  I said everything

18  non-privileged.

19        MR. BUNCHER:  I -- I'm saying, I'm -- I'm

20  hard-pressed to see what would not be privileged, but

21  we'll --

22        MR. ACOSTA:  Well, if it was sent by

23  Mr. LaPierre, would you agree that it's not privileged?

24        MR. BUNCHER:  I'm not on this call to

25  debate with you.  I've -- I've noted my objection for

Page 63

1   the record.  We'll take it under --

2         MR. ACOSTA:  Okay.

3         MR. BUNCHER:  -- advisement.

4         MR. ACOSTA:  Fair enough.  What was so

5   magical about filing on January 15th?  And just a

6   reminder, everyone, please --

7         MR. LaPIERRE:  --

8         MR. ACOSTA:  -- announce your name when

9   you, you know, respond, if you don't mind.

10        MR. LaPIERRE:  This is Wayne.  I -- I don't

11  know what was magical about that.

12        MR. ACOSTA:  Okay.  January 7th is when the

13  Board resolution to empower the Special Litigation

14  Committee occurred; is that correct?

15        MR. LaPIERRE:  At -- at the board meeting,

16  that -- that is correct.

17        MR. ACOSTA:  Okay.  Now, maybe I can back

18  into this.  When did -- when did the NRA hire bankruptcy

19  counsel?

20        MR. LaPIERRE:  I'll refer that to the --

21  the attorneys.

22        MR. ACOSTA:  It's -- it's a fact.  It's --

23  I'm not asking what you talked to bankruptcy counsel

24  about.

25        MR. LaPIERRE:  I'm not trying to be

Page 64

1   evasive.  I -- I just don't know the date, which is why

2   I'm referring it to the attorneys.  I -- I assume they

3   would know the date.

4         MR. ACOSTA:  Mr. Frazer, do you know?

5         MR. FRAZER:  I -- I'm sorry, I don't have

6   the date of -- the date of engagement in front of me.

7         MR. ACOSTA:  Would it have been more than

8   six months ago?

9         MR. FRAZER:  Not -- not that I know of.

10        MR. ACOSTA:  Okay.  So would it have been

11  before Sea Girt was formed?

12        MR. FRAZER:  I'm sorry, I don't have an

13  answer for that.

14        MR. ACOSTA:  Would it have been in the Fall

15  of 2020?

16        MR. FRAZER:  I don't -- I don't know any --

17  I don't know the date when --

18        MR. ACOSTA:  How about this, would it have

19  been --

20        MR. FRAZER:  I'm sorry.

21        MR. ACOSTA:  -- in the first -- first six

22  months of 2020?

23        MR. FRAZER:  Not that I know of.

24        MR. ACOSTA:  Would it have been the second

25  six months of 2020?

Page 65

1          MR. BUNCHER:  Mr. Acosta, this is
2  Mr. Buncher.  Could you clarify what counsel you are
3  referring to in your question as, quote, bankruptcy
4  counsel?
5          MR. ACOSTA:  Sure.  I -- I would be happy
6  to.  Mr. Neligan's firm, when -- when were they hired?
7          MR. FRAZER:  I'm -- I'm sorry, I don't have
8  that answer at my fingertips.
9          MR. ACOSTA:  So --
10         MR. LaPIERRE:  Yeah.  This is --
11         MR. ACOSTA:  -- do you think it might be --
12         MR. LaPIERRE:  This is Wayne.  I -- I
13  don't -- I don't either have that answer at my --
14         MR. ACOSTA:  Okay.  Well, you disclosed in
15  the Statement of Financial Affairs that Mr. Neligan's
16  firm was paid $450,000 prior to filing bankruptcy.  Do
17  you recall that?
18         MR. LaPIERRE:  I'll refer that to our --
19  our -- our -- our chief financial people.
20         MR. ACOSTA:  Mr. Warren, do you recall
21  that?
22         MR. WARREN:  I am aware that -- that there
23  were -- there were payments made prior to January 15,
24  2021.
25         MR. ACOSTA:  Okay.  Are you aware that

Page 66

1  payments were made to Mr. Neligan's firm, as well as
2  Mr. Brewer's firm?
3          MR. WARREN:  I'm aware that -- that
4  payments were made to both firms.
5          MR. ACOSTA:  And they were both in
6  connection with the bankruptcy?
7          MR. WARREN:  I am -- I am aware, due to
8  the -- to the scope of engagement with Neligan, yes
9  (phonetic).  The Brewer Firm, I'm not -- I'm not -- I'm
10  not for certain that it had -- it's related to
11  bankruptcy matters, since we engage them in other
12  matters.
13         MR. ACOSTA:  Well, you know the Statement
14  of Financial Affairs specifically asks you to disclose
15  how much payments were made to any law -- professional
16  law firm in connection with the bankruptcy filing.  Do
17  you recall that?
18         MR. WARREN:  Yes, I do.
19         MR. ACOSTA:  Okay.  Do you re -- do you
20  recall putting four hun -- approximately, $450,000 for
21  the Neligan Firm?
22         MR. WARREN:  Yes.
23         MR. ACOSTA:  Do you recall putting over
24  $6 million for the Brewer Firm?
25         MR. WARREN:  I believe there's a definition

Page 67

1  issue with that, in terms of being associated directly
2  from a bankruptcy matter --
3          MR. ACOSTA:  Okay.
4          MR. WARREN:  -- (inaudible) --
5          MR. ACOSTA:  But my -- my -- my -- my
6  question is -- is very simple.  In response to the
7  question in the Statement of Financial Affairs -- how
8  much did you pay your professional -- you put an amount
9  for the Brewer Firm; did you not?
10         MR. BUNCHER:  What question --
11         MR. LaPIERRE:  This is Wayne.  I -- I -- I
12  know we set aside -- we put aside -- I -- I -- I -- I
13  think it was -- well, I -- I'm -- I'm not sure my
14  memory's correct.  I think we set aside 5 million
15  or -- to -- to -- to -- to be set aside to be used in various
16  matters re -- re -- relating to the reorganization.
17         MR. WARREN:  I was going to answer --
18         MR. ACOSTA:  Okay.
19         MR. WARREN:  -- your question (phonetic).
20         MR. ACOSTA:  And I appreciate that,
21  Mr. LaPierre, but since Mr. Warren filled out the
22  Schedules, I'm asking his understanding of why he put
23  down several digits that amounted to about $6 million
24  for the Brewer Firm, in response to the question, How
25  much did you pay your professional in connection with

Page 68

1  preparing for the bankruptcy?
2          UNKNOWN MALE SPEAKER:  (Inaudible) for
3  that.
4          MR. WARREN:  Again -- and -- and this is --
5  this is Mr. Warren and -- and my -- my feedback to that
6  is, I am -- I am aware of the Neligan component.  I
7  believe the definition utilized for the Brewer Firm
8  specifically related to bankruptcy may be re -- may be
9  misinterpreted in terms of the question.
10         UNKNOWN MALE SPEAKER:  That's --
11         MR. ACOSTA:  Okay.  Well, let me -- let me
12  ask you this:  In -- in response to the question about
13  preferences, you said the Brewer Firm received
14  17.5 million, approximately, during the 90 days prior to
15  filing bankruptcy.  Do you recall that?
16         MR. WARREN:  Correct.
17         MR. ACOSTA:  Okay.  And -- and that's a
18  different amount than the amount that you put down with
19  respect to the Statement of Financial Affairs question,
20  relating to the professionals that advised the company
21  in connection with the bankruptcy.
22         MR. BUNCHER:  Mr. Acosta, this is
23  Mr. Buncher.  That's because the payments you are
24  referring to in one question are payments related only
25  to bankruptcy-related work.

Page 69

1        MR. ACOSTA:  I think --

2        THE U.S. TRUSTEE:  Let's --

3        MR. ACOSTA:  -- that's right, Mr. Buncher.

4  Thank you.

5        THE U.S. TRUSTEE:  Let's go back.  So we've

6  got, in the -- in the overall statements, a provision

7  that the Brewer Firm and the NRA contend that

8  bankruptcy-related work is not all the litigation work.

9  And the U.S. Trustee has challenged that in his

10  objection to the employment of the Brewer Firm, and I

11  guess we're going to have to have a court determine

12  that, either for discovery or for hearing purposes.

13  But, you know, that -- that's what they have stated in

14  their general notes.

15        MR. ACOSTA:  Okay.  So then let me ask you

16  this -- this is more factually based:  Is the amount

17  that you answered to one question "bankruptcy-related

18  work" in addition to the amount that you answered for

19  just general payments made within 90 days or is it the

20  same -- is it part of the payments made within 90 days?

21        MR. WARREN:  The --- the -- I'm sorry,

22  this is Mr. Warren and I'm -- when you -- just for

23  clarification.  You had mentioned payments within 90

24  days versus -- and I forget your definition, I

25  apologize.  I just want to make sure I have the right

Page 70

1  definition to your question.

2        MR. ACOSTA:  Yes.  The Statement of

3  Financial Affairs Question No. 3 asks you to list

4  payments made to Cre -- to Creditors within 90 days of

5  filing bankruptcy.

6        MR. WARREN:  Correct.  Uh-huh

7  (affirmative).

8        MR. ACOSTA:  In that --

9        MR. WARREN:  Correct.

10        MR. ACOSTA:  In that Schedule, you listed

11  17 -- approximately, 17.5 million for the Brewer Firm.

12  The Statement of Financial Affairs Question No. 7 says,

13  How much did you pay professionals or advisors in

14  connection with preparing for the bankruptcy filing?  In

15  that question, I would represent to you that you put

16  down in excess of $6 million for the Brewer Firm alone,

17  and 450,000 for the Neligan Firm.  So my question is:

18  Is the $6 million that you put down for the Brewer Firm

19  in addition to the 17.5 million or is it part of the

20  17.5 million made within 90 days?

21        MR. WARREN:  Part of that 90 days would be

22  inclusive in -- in that second question that you are

23  referring to.

24        MR. ACOSTA:  Okay.  Okay.  So then this

25  question is for Mr. Frazer and -- and Mr. Neligan.  Who

Page 71

1  are your bankruptcy counsel right now?  Mr. Frazer

2  and --

3        MR. FRAZER:  Well --

4        MR. ACOSTA:  -- Mr. -- not Mr. Neligan.

5  Sorry.  Mr. Frazer and Mr. LaPierre.

6        MR. FRAZER:  The Neligan Firm has been

7  approved.

8        MR. BUNCHER:  And the --

9        MR. ACOSTA:  Is that your only bankruptcy

10  counsel?

11        MR. BUNCHER:  -- the Garman Firm.

12        MR. ACOSTA:  Oh, and -- and --

13        MR. BUNCHER:  Were you not at

14  (inaudible) --

15        MR. ACOSTA:  -- the Garman firm.

16        MR. BUNCHER:  -- yesterday?

17        MR. ACOSTA:  I -- I'm not on trial here,

18  Mr. Buncher --

19        MR. BUNCHER:  Well --

20        MR. ACOSTA:  -- but thank you.

21        MR. BUNCHER:  -- why do we need to ask

22  questions everybody knows the answer to?

23        MR. ACOSTA:  You know, that's just the type

24  of guy I am.

25        MR. BUNCHER:  It's a matter of record.  You

Page 72

1  know who the counsel are.

2        MR. ACOSTA:  Let me see here.  The New York

3  Attorney General enforcement action, what factor did

4  that play in the -- in the filing of this bankruptcy?

5        MR. LaPIERRE:  You know -- this -- this is

6  Wayne.  We had been -- we had been looking for some time

7  at -- at -- at other homes for the NRA and a place -- a

8  place to reorganize.  Going back far -- long before

9  Governor Cuomo and long before General James, we had

10  been thinking about it.  We also thought that -- been

11  thinking about the fact that our employees might be

12  better off somewhere else, rather than in this -- the

13  north -- northern Virginia area.

14        So it -- it -- as -- as the sequence of

15  events moved along, with Attorney General Schneiderman

16  calling us in 2017 and telling us that there was a plan

17  by the Democratic National Committee, some NGOs, an

18  anti-Second Amendment to weaponize the government of

19  New York State against the NRA, the Department of

20  Financial Service, the Attorney General, during our

21  campaign -- General James -- said that because the NRA

22  supported the Second Amendment, she considered it a

23  criminal terrorist organization and was going to open an

24  investigation.

25        THE U.S. TRUSTEE:  Mr. LaPierre --

Page 73

1  Mr. LaPierre --
2        MR. LaPIERRE:  As -- as --
3        THE U.S. TRUSTEE:  -- I -- I don't want
4  this to be a discussion of anything about -- about money
5  (phonetic).
6        MR. LaPIERRE:  Okay.  Well, it -- it --
7  it's just -- from -- from a money standpoint, it got
8  into a -- it became -- we had all kinds of states
9  offering financial incentives for us to -- to -- to --
10  to move.  At -- at some point, it became very clear that
11  Texas was offering many financial incentives for us to
12  move and -- and we -- we had decided that, well, if you
13  took a look at it from a money standpoint, given what we
14  considered an unfair playing field in New York State,
15  from a legal standpoint, it -- you know, it would be in
16  the best interest of the NRA to move to a state that --
17  that -- where we would get -- have a fair legal playing
18  field, which would be better for our members and --
19  and -- and more supportive of -- supportive of the
20  Second Amendment freedom the NRA stands for.
21        MR. ACOSTA:  And -- and is the NRA aware
22  that there are restrictions to moving out of the state
23  of New York for nonprofits?
24        MR. BUNCHER:  Objection --
25        MR. LaPIERRE:  Exactly.

Page 74

1        MR. BUNCHER:  -- that calls for a --
2        MR. LaPIERRE:  In fact --
3        MR. BUNCHER:  -- a legal conclusion.
4        MR. ACOSTA:  I didn't ask --
5        MR. BUNCHER:  And this is just --
6        MR. ACOSTA:  -- for the specific legal.
7        MR. BUNCHER:  Ms. Lambert, this is just --
8  this is replowing a lot of the same stuff that --
9        THE U.S. TRUSTEE:  No.  It's --
10        MR. BUNCHER:  -- was covered in the first
11  meeting.
12        THE U.S. TRUSTEE:  It's not really
13  replowing, but let's focus on why it went into
14  bankruptcy and what one plans to do to get out of
15  bankruptcy.
16        MR. ACOSTA:  Well --
17        MR. BUNCHER:  It's --
18        MR. ACOSTA:  We would like to find out --
19        MR. BUNCHER:  But it's --
20        MR. ACOSTA:  -- why they're in bankruptcy,
21  if there are restrictions to them moving to the state of
22  Texas.  And so is --
23        MR. BUNCHER:  Covered in the last meeting.
24        MR. ACOSTA:  -- the NRA aware of
25  restrictions -- I'm sorry?

Page 75

1        MR. BUNCHER:  Covered in the last meeting.
2        MR. ACOSTA:  Okay.  Well, it's a simple
3  answer.  Is the NRA aware of restrictions from moving
4  out of the state of New York?
5        MR. BUNCHER:  Objection --
6        MR. TERRELL:  Well, this is counsel for --
7        MR. BUNCHER:  -- calls for a legal
8  conclusion.
9        MR. TERRELL:  -- counsel for Wayne
10  LaPierre.  To the extent that your question implies
11  the -- for a -- a premise which constitutes a legal
12  conclusion, I think it's unfair to ask Mr. LaPierre to
13  opine on a legal issue.
14        MR. ACOSTA:  Okay.  Well, take legal out of
15  it.  Any restrictions that you are aware of for moving
16  out of the state of New York -- that the NRA is aware
17  of, from a -- just a pure business person standpoint?
18        MR. LaPIERRE:  Well, what motivated our
19  filing wasn't to avoid a -- a -- a -- a -- a -- a --
20  a -- a -- a fight with General James.  It was -- it --
21  we're still pursuing our two First Amendment lawsuits up
22  there and, I mean, like -- I mean, like everyone else,
23  the NRA wants a level playing field and -- and we -- you
24  know, we -- we thought it was in the best interest of
25  our members to -- to go to the federal court and file a

Page 76

1  Chapter 11 bankruptcy and ask for a -- the court's
2  permission to reincorporate in the state of Texas.
3        And, then, we are actively considering
4  moving a -- a -- a -- a good part of our facility to --
5  to a state of Texas -- to -- to the state of Texas.
6        MR. ACOSTA:  And -- and by the fact that
7  you are saying that you did not try to avoid two
8  lawsuits and are still pursuing them kind of suggests to
9  me that you know there are restrictions from moving out
10  of the state of Texas, Mr. LaPierre -- I mean --
11        MR. BUNCHER:  And --
12        MR. ACOSTA:  -- out of the state of New
13  York.
14        MR. BUNCHER:  And -- and --
15        MR. LaPIERRE:  You -- you're --
16        MR. BUNCHER:  -- hold on --
17        MR. LaPIERRE:  -- really into legal --
18        MR. BUNCHER:  -- (inaudible) --
19        MR. LaPIERRE:  -- ground that I will defer
20  to the general counsel on, that has a better --
21        THE U.S. TRUSTEE:  Let's --
22        MR. LaPIERRE:  -- knowledge of --
23        THE U.S. TRUSTEE:  Let's just --
24        MR. LaPIERRE:  -- than that I do.
25        THE U.S. TRUSTEE:  Let's just not badger



Page 77

1  the witness.
2          MR. BUNCHER:  Yeah.  Ms. --
3          THE U.S. TRUSTEE:  Just --
4          MR. BUNCHER:  -- Lambert --
5          THE U.S. TRUSTEE:  -- ask a question.
6          MR. ACOSTA:  Okay.  All right.  I can move
7  on.  This is --
8          MR. BUNCHER:  Ms. Lambert --
9          MR. ACOSTA:  This is --
10         MR. BUNCHER:  -- we're going to object.
11         MR. ACOSTA:  This is way too difficult.
12         MR. BUNCHER:  This is like --
13         THE U.S. TRUSTEE:  We're --
14         MR. BUNCHER:  -- cross --
15         THE U.S. TRUSTEE:  We're done.
16         MR. BUNCHER:  This is -- this is --
17         THE U.S. TRUSTEE:  We're done.  We're done.
18  Okay.  He's moving on.
19         MR. ACOSTA:  All right.  All right.  So
20  moving on to financial situations, I think the NRA
21  disclosed it had $249.4 million in assets?  Is that
22  about right, Mr. Warren?
23         MR. WARREN:  Yes.
24         MR. ACOSTA:  Then about, approximately,
25  111 mill -- 111.2 million in as -- in liabilities?

Page 78

1          MR. WARREN:  That's correct.
2          MR. ACOSTA:  Okay.  And out of the
3  assets -- let's talk about that for a second -- there's,
4  approximately, 185 million in personal property?
5          MR. WARREN:  Yes.
6          MR. ACOSTA:  And out of that there's,
7  approximately, $150 million in liquidity?
8          MR. WARREN:  There are restrictions around
9  those assets, so liquidity is -- by definition of the
10  Schedule, yes, but there are restrictions on -- on those
11  assets.
12         MR. ACOSTA:  Well, let's go down each one,
13  if you don't mind.  There's 36.6 million in cash on
14  deposits at various bank accounts.
15         MR. WARREN:  Correct.
16         MR. ACOSTA:  How much of that is
17  restricted?
18         MR. WARREN:  Approximately, 25.6 million.
19         MR. ACOSTA:  Okay.  There's 5.6 million in
20  prepaids on deposits.  How much of that is restricted?
21         MR. WARREN:  I believe thos -- none of
22  those are restricted.
23         MR. ACOSTA:  Okay.  There's, approximately,
24  55.4 million in collectible AR.  How much of that is
25  restricted?

Page 79

1          MR. WARREN:  Approximately, 35.3 million.
2          MR. ACOSTA:  Okay.
3          MR. BUNCHER:  That -- and I would refer you
4  to the -- to the notes where tho -- that's disclosed,
5  Mr. Acosta.
6          MR. ACOSTA:  Yeah, and I appreciate that.
7  And there was $64 million in mutual funds;
8  how much of that is restricted?
9          MR. WARREN:  Approximately, 41 million.
10         MR. ACOSTA:  41 million.  Okay.  So, I
11  mean, it -- was -- was the NRA facing a liquidity crisis
12  at the time it filed bankruptcy?
13         MR. WARREN:  No.
14         MR. ACOSTA:  Was it able to pay its debts
15  normally, like any other profit organization?
16         MR. WARREN:  As of -- as of January 15,
17  2021, yes.
18         MR. ACOSTA:  And normally -- what I mean by
19  "normally" is, was it able to pay on time, you know,
20  when things are due?
21         MR. WARREN:  Under a normal course, yes.
22         MR. ACOSTA:  Okay.  And I believe you
23  disclosed that there was about 44.5 million in -- in
24  three loans made by Atlantic Union Bank?
25         MR. WARREN:  That's correct.

Page 80

1          MR. ACOSTA:  Was -- there -- there was no
2  defaults under any of those loans -- has there been any
3  default under any of those loans?
4          MR. WARREN:  No, there has not.
5          MR. ACOSTA:  Okay.  Within the last two
6  years?
7          MR. WARREN:  No, there has -- there were
8  not.
9          MR. ACOSTA:  Okay.
10         I'm almost done, Ms. Lambert.  I promise.
11         THE U.S. TRUSTEE:  You knew I was coming to
12  ask you.
13         MR. ACOSTA:  Yeah.  I have three more
14  questions, but I figured I -- I might as well ask them.
15         Back to Sea Girt.  Without getting into any
16  attorney-client privilege, what was the corporate or
17  business justification for forming Sea Girt?
18         MR. LaPIERRE:  It was to -- it was --
19  was -- it was to facilitate and to do the -- put an
20  entity in a place that -- or how could I say it -- to do
21  the -- to do the preliminary work to facilitate a move
22  to Texas, if it's --
23         MR. ACOSTA:  Okay.
24         MR. LaPIERRE:  -- approved by the -- by the
25  court and the judge.

Page 81

1        MR. ACOSTA:  Okay.  So what was the
2 business justification for putting it in bankruptcy?
3        MR. LaPIERRE:  I -- I'm not a lawyer.
4 I'll -- I'll -- from what I understand legally, that was
5 the -- the Chapter 11 reorganization was the -- was the
6 proper way to -- I'll -- but I will defer to the lawyers
7 to answer that.
8        MR. ACOSTA:  So does that mean that you are
9 not aware of any business justification for why it wa --
10 was in bankruptcy?
11        MR. BUNCHER:  Objection, answered,
12 badgering, cross-examination for purposes of litigations
13 and motions to dismiss.  Not appropriate for a
14 341 Meeting, Ms. Lambert.
15        THE U.S. TRUSTEE:  Okay.  Mr. Buncher, the
16 problem is that the 341 covers the same things that is
17 appropriate questions for a 341 are:  Why you are in
18 bankruptcy and what you are planning to do to get out of
19 the bankruptcy --
20        MR. BUNCHER:  Which has --
21        THE U.S. TRUSTEE:  -- and how --
22        MR. BUNCHER:  -- been answered in the first
23 meeting and -- and now it's just become a badgering of
24 our witnesses.
25        THE U.S. TRUSTEE:  Well, I've --

Page 82

1        MR. BUNCHER:  My adversary --
2        THE U.S. TRUSTEE:  He has two more
3 questions, Mr. Buncher.
4        MR. BUNCHER:  Okay.  Well, it's getting out
5 of control, in my opinion.
6        MR. LaPIERRE:  When -- when the plans came
7 together to -- to -- it -- it -- it became obvious
8 that -- you know, that -- that Texas was a good option
9 and then we needed an entity, Sea Girt was formed to
10 facilitate that transition.  The other thing and --
11 and -- and -- and in the Chapter 11 reorganization
12 bankruptcy was -- I'm not a lawyer, again, but from what
13 I have -- have been -- understand from the lawyers, is
14 that the proper way to do that was the Chapter 11
15 filing.
16        The bankruptcy was also a way to streamline
17 and organize and reduce all of these litigation costs
18 that -- that the NRA was being burdened with --
19        MR. ACOSTA:  Okay.  Well --
20        MR. LaPIERRE:  -- and -- and still not --
21        MR. ACOSTA:  Now, let me ask --
22        MR. LaPIERRE:  -- give up any -- and still
23 not give up any of our -- our claims.
24        MR. ACOSTA:  Let me ask Mr. Frazer the same
25 question.  What was the justification of putting

Page 83

1 Sea Girt in bankruptcy?
2        MR. BUNCHER:  Objection, calls for a legal
3 conclusion and, also, calls for attorney-client
4 communication.  To the extent you can answer, without
5 revealing either of those, Mr. Frazer, you can answer.
6        But we have covered that in the first
7 meeting, Ms. Lambert.
8        MR. ACOSTA:  You can go ahead and answer,
9 Mr. Frazer.
10        MR. FRAZER:  And -- and I -- I don't think
11 I can -- I don't think I have anything to add that
12 wouldn't -- you know, that we haven't previously
13 addressed that wouldn't touch on privileged matters.
14        MR. ACOSTA:  Okay.  Then let me just ask
15 the same question.  Was there any corporate or business
16 justification for the NRA filing bankruptcy?
17        MR. BUNCHER:  Objection to the extent it
18 calls for a legal conclusion or legal strategy, attorney
19 work product.  Beyond that, you can answer the question.
20        MR. ACOSTA:  I'm asking for corporate or
21 business --
22        MR. FRAZER:  I don't think --
23        MR. ACOSTA:  -- justification for the NRA
24 to file bankruptcy.
25        MR. FRAZER:  I don't think I have any --

Page 84

1 beyond -- outside of privileged communications, I don't
2 think I have anything to add to what Mr. LaPierre
3 stated.
4        MR. ACOSTA:  Okay.  To -- so streamline
5 litigation and -- and -- and facilitate the move to
6 Texas; is that right?
7        MR. LaPIERRE:  Yes.
8        MR. FRAZER:  Yes.
9        MR. ACOSTA:  I'm wondering --
10        THE U.S. TRUSTEE:  You're -- you're out of
11 questions, Mr. Acosta.
12        MR. ACOSTA:  Fair enough.  Fair enough.
13        Thank you very much, gentlemen, for your
14 time.
15        MR. LaPIERRE:  Thank you.
16        MR. BUNCHER:  And for the record, I would
17 just ask Ms. Lambert --
18        THE U.S. TRUSTEE:  Operator, would you
19 please open the line to questions from the floor?
20        MS. MIRANDA:  Ms. Lambert, this is Leonor
21 with the D.C. Attorney General's Office.
22        THE U.S. TRUSTEE:  Okay.
23        MS. MIRANDA:  We had a few additional
24 questions.
25        THE U.S. TRUSTEE:  I'm opening up the floor

Page 85

1 to questions from the audience at this point. I'll
2 return to your questions after I do that.
3        MS. MIRANDA: Okay. Thank you.
4        THE OPERATOR: Thank you.
5        We will now begin the question-and-answer
6 session. If you would like to ask a question, please
7 press star 1, unmute your phone, and record your name
8 clearly. Your name is required to introduce your
9 question. If you need to withdraw your question, press
10 star 2. Again, to ask a question, please press star 1.
11        It will take a few moments for the
12 questions to come through. Please stand by. Our first
13 question is from Daniel Callahan.
14        Go ahead, your line's open.
15        THE U.S. TRUSTEE: Mr. Callahan, I need you
16 to state your name, what the nature of your relationship
17 to the NRA is, please -- if you are a Creditor.
18        MR. CALLAHAN: Hi, good -- good af -- good
19 afternoon. I am with the Law Offices of Michael Reznick
20 and we are representing a number of Creditors and
21 parties of interest in the NRA, and my question is to
22 Mr. LaPierre.
23        Good morning -- good afternoon,
24 Mr. LaPierre.
25        MR. LaPIERRE: Good afternoon.

Page 86

1        MR. CALLAHAN: Thank you very much for your
2 leadership throughout these decades. Our question
3 relates to the ongoing operations and the operations of
4 the various committees and advocacies that your
5 organization has been creating in this time of unique
6 circumstances of the bankruptcy. How are you assuring
7 the ongoing support to the donor base and to the people
8 who need your assistance in their -- protection of their
9 various constitutional interests?
10        MR. LaPIERRE: Thank you for the question.
11 We are continuing with the day-to-day operations of the
12 NRA and the -- the mission of the NRA. The Institute
13 for Legislative Action is continuing with its
14 legislative and political activities, not only on
15 Capitol Hill, but throughout the -- throughout the
16 United States and cities, towns, state legislatures. As
17 always, the -- our publications division is publishing
18 its magazines.
19        As -- as -- as always, the -- our general
20 operations people are -- are still -- that do the
21 competitions, the matches, the safety and the training
22 of law enforcement and all of that, some of that has
23 been restricted by COVID restrictions in various times,
24 but we are starting to get back to normal. For example,
25 our Friends' dinners, I think, have gone -- are -- we --

Page 87

1 we are now going back up to 575 or 600 that -- that we
2 are -- we are free to run.
3        We're having a meeting next week in regard
4 to the national shooting matches at -- at Camp Atterbury
5 as to whether, with COVID, we can -- we can do those or
6 not. Most of the general operation -- operations, to
7 tell you the truth, it's -- it's -- it's been more of a
8 COVID issue, to tell you the truth, that we have been
9 dealing with. But the day-to-day activities of the
10 organization and its mission goes on.
11        MR. CALLAHAN: Is -- is there a form,
12 Mr. LaPierre, in which supporters of the NRA -- like
13 ourselves and creditors -- can pitch in to -- to support
14 you and --
15        THE U.S. TRUSTEE: Are you a Creditor?
16        MR. CALLAHAN: -- and what you are trying
17 to do?
18        THE U.S. TRUSTEE: Sir --
19        MR. CALLAHAN: We are, ma'am.
20        THE U.S. TRUSTEE: -- are your clients
21 Creditors? How are they Creditors?
22        MR. CALLAHAN: They are vendors.
23        THE U.S. TRUSTEE: Okay. Have you filed a
24 statement of multi-party representation?
25        MR. CALLAHAN: No, we have not.

Page 88

1        THE U.S. TRUSTEE: I would be grateful if
2 you would do that.
3        MR. CALLAHAN: We shall.
4        Go ahead, Mr. LaPierre.
5        MR. LaPIERRE: Well, the -- the forms
6 are -- are -- are -- are available, as always, to -- to
7 help the NRA. If it's legislative and political, ILA --
8 donating to ILA. If it's -- if it's the NRA, donating
9 to the NRA or buying ads in the magazines or helping
10 with the -- with the NRA Office of Advancement. And --
11 and then there's the -- independently, there's the
12 NRA Foundation, which help -- helps, you know, among
13 other things, fund the 501(c)(3) needs of -- of programs
14 of the organization, like -- like the safety, training,
15 education, child safety programs, competitions, matches,
16 things like that.
17        MR. CALLAHAN: And, Mr. LaPierre, have you
18 created an outreach to explain to the donors and the
19 creditors what the plan is with the NRA and how you are
20 going to restructure it as part of your plan of
21 reorganization in the future and how your base can get
22 involved in supporting that?
23        THE U.S. TRUSTEE: So excuse --
24        MR. LaPIERRE: We are --
25        THE U.S. TRUSTEE: Excuse me for a second.

Page 89

1 The disclosure statement must be approved by the
2 bankruptcy court and there are risks to putting any
3 statements about what the bankruptcy is going to do
4 without having a disclosure statement approved by the
5 court.
6      MR. CALLAHAN: I understand.
7      Go ahead, Mr. LaPierre, if you could please
8 ed -- edify us.
9      MR. LaPIERRE: Well, we are working -- we
10 are working with our -- our Board of Directors in terms
11 of -- in terms of -- of -- of -- of things like that,
12 the, restructuring, and -- and we are still in the
13 process of -- of putting that together.
14      MR. CALLAHAN: What about outreach towards
15 the grassroots, like, the vendors, creditors, donors on
16 a -- on an ongoing basis in the various states you are
17 involved in?
18      MR. LaPIERRE: We have -- we have
19 contacted, as -- as far as I'm aware, our creditors --
20 and if there's someone from fiscal, if -- if -- and --
21 and -- and let them know that we intend to -- to -- to
22 make good on their -- on their -- on their -- on their
23 claims.
24      So Son -- Ms. Rowl -- Ms. Rowling? Sonya?
25      MS. ROWLING: We reached out to a -- a

Page 90

1 certain number of these vendors. They -- I wouldn't say
2 all, but there were a large list and it was just a -- a
3 letter stating our in -- our intent. But, obviously,
4 that intent is directed by the courts.
5      MR. CALLAHAN: Is there -- can we expect --
6      MR. LaPIERRE: And we continue to keep our
7 members informed on what's going on through the
8 magazines and -- articles in the magazines.
9      THE U.S. TRUSTEE: Sir --
10      MR. CALLAHAN: Well --
11      THE U.S. TRUSTEE: -- I had --
12      MR. CALLAHAN: -- is --
13      THE U.S. TRUSTEE: -- asked in the Notice
14 of the 341 Meeting that you had more than two or three
15 questions, that you would get on the list to ask
16 questions that were lengthier. How many more questions
17 do you have today?
18      MR. CALLAHAN: Just two.
19      THE U.S. TRUSTEE: Okay. That's fine.
20      MR. CALLAHAN: Mr. LaPierre, can we expect
21 and hope to receive, in the very, very near future,
22 perhaps, a -- a Zoom or platform call where you and the
23 people that look up to you and what do you, to be
24 edified about this situation? Because the general
25 consensus of others is that there's -- it's quite a

Page 91

1 chaotic affair, and I think you, as the leader of this
2 organization and movement, should consider -- in the
3 very near future -- to create such a platform and -- and
4 outreach to your members. Do you intend to do that even
5 though --
6      MR. LaPIERRE: I -- I -- I appreciate the
7 suggestion. I mean, we -- we -- we're -- we're looking
8 at -- at -- at various things like that. I -- I gave a
9 speech on Sunday where I -- I -- I talked about a -- I
10 talked about what was going on and I talked about why
11 the NRA was doing what it was doing. I did a television
12 show last week talking about it and I have written
13 articles in the -- an article in the magazine about it.
14      And, yeah, we'll continue to look for
15 other -- other platforms to -- believe me, because we
16 know that the only reason -- I mean, the NRA, what makes
17 it work, isn't this concrete building in Washington.
18 It's -- it's members all over the country and what's in
19 their hearts and their passion, and that's why this
20 organization is just -- the whole basis of its success.
21 So we -- and -- and -- and the good news is, our
22 membership has been very supportive of what we have
23 done.
24      Our membership has been rising for the last
25 several months -- probably, about the last eight months,

Page 92

1 and -- and we -- as we continue to move forward.
2      MR. CALLAHAN: If you don't mind,
3 Mr. LaPierre, I would like to suggest that you
4 consider -- given the unique circumstances --
5      THE U.S. TRUSTEE: Sir --
6      MR. CALLAHAN: -- involved --
7      THE U.S. TRUSTEE: Sir, are you asking
8 questions? This is --
9      MR. CALLAHAN: I am.
10      THE U.S. TRUSTEE: -- not a -- this is not
11 a suggestion time. This is an asking-questions time.
12      MR. CALLAHAN: It -- the question is,
13 Mr. LaPierre: Is there a direct advocacy footnote or
14 place within your bankruptcy petition where advocacy for
15 the Second Amendment guns right can be -- can be viewed
16 and for -- for us, as creditors and the public in
17 general, to make sure that you're -- you are continued
18 to be enabled to do your primary work, which is protect
19 and support the Second Amendment?
20      MR. LaPIERRE: That -- that's kind of a
21 legal question that I would have to refer to -- as to
22 whether that needed to be within a -- a filing. All I
23 can tell you is, the Institute for Legislative Action,
24 nothing has changed. They continue on fighting for the
25 Second Amendment to the Constitution of the United

Page 93

1 States every day and carrying out that core mission of
2 the NRA that is in the bylaws.
3        MR. CALLAHAN:  Thank you, Mr. LaPierre,
4 I don't --
5        MR. LaPIERRE:  Thank you.
6        MR. CALLAHAN:  -- have anymore questions.
7 God bless.
8        MR. LaPIERRE:  You, too.
9        THE OPERATOR:  Our next question is from
10 David.  Go ahead, your line's open.
11        MR. DELL'AQUILA:  Yes.  This is David
12 Dell'Aquila, plaintiff in the class action suit against
13 the NRA.  I have several questions, depending on, you
14 know, the response.  You know -- you know, we may need
15 clarification, but the shorter you keep your
16 questions -- I mean, your answers, I can get through
17 mine.
18        And I want to thank everybody here for
19 participating -- Ms. Lambert, and -- and everyone
20 else -- I'm not going through -- through all the
21 names -- and I just want to -- you know, I'm not sure --
22 I -- there's some question from the NRA in front of
23 Judge Hale was, like --
24        THE U.S. TRUSTEE:  Mr. Dell'Aquila --
25        MR. DELL'AQUILA:  -- nothing's been done in

Page 94

1 18 --
2        THE U.S. TRUSTEE:  Mr. Dell'Aquila, just
3 please ask some questions.
4        MR. DELL'AQUILA:  Okay.  So quick
5 clarification on -- on a participant asking some
6 questions.  Does the NRA have -- I'm not asking who it
7 is, but do they have directors and officers insurance
8 indemnity?  Actually, this would be a -- a yes or no.  I
9 guess, Wayne -- I will ask Wayne, first -- I mean -- I
10 mean -- sorry.
11        THE U.S. TRUSTEE:  I (inaudible) --
12        MR. LaPIERRE:  Well, let -- let -- let me
13 just refer that to our -- to our general counsel --
14 our -- our le -- legal, John Frazer.
15        MR. FRAZER:  Mr. -- Mr. Dell'Aquila, this
16 is -- good to hear from you, again.  We -- we -- yes, we
17 have directors and officers insurance.  It's described
18 in the -- in the Schedules or Statements.
19        MR. DELL'AQUILA:  Okay.  Thank you.  And
20 then another question.  I heard Mr. LaPierre mention
21 about, they -- they thought about moving out of New York
22 before Governor Cu -- Cuomo and -- and the Attorney
23 General -- one -- is it true about 20 years ago that
24 came up about moving out of New York and that was
25 defeated or -- or it -- it was voted down?

Page 95

1        MR. LaPIERRE:  Well, it -- I wasn't with
2 the NRA at the time and if -- if there's a -- a --
3 but -- but, as I understand that, the real issue at that
4 time was that the -- the -- the -- the people that were
5 leading the NRA wanted to turn it more into a
6 conservation organization and they intended to move it
7 out of Washington, D.C.
8        And con -- people like Congressman John
9 Dingell, along with numerous other leaders of the NRA at
10 that point, got together and wanted the NRA to be a
11 Second Amendment advocacy organization, in addition to
12 doing all the general operation programs, and -- and --
13 and they ended up winning that fight.  And at that
14 point, they decided to keep the NRA in Washington and
15 not let it move to somewhere else and become more of a
16 conservation organization.
17        MR. DELL'AQUILA:  Okay.  So, my
18 understanding, is that Mr. LaPierre that -- that -- that
19 was speaking?
20        MR. LaPIERRE:  That's correct.
21        MR. DELL'AQUILA:  And you -- did I mis -- I
22 heard you said you weren't with the NRA at that time --
23        MR. LaPIERRE:  I was not with the --
24        MR. DELL'AQUILA:  -- in -- in the '90s?
25        MR. LaPIERRE:  -- NRA at that time.

Page 96

1        MR. DELL'AQUILA:  So that did not come up
2 in --
3        MR. LaPIERRE:  No.  No.  No.
4        MR. DELL'AQUILA:  -- the 19 --
5        MR. LaPIERRE:  You are talking -- you are
6 talking -- I mean, what you are talking about occurred,
7 I believe, in the late '60s or -- or mid-'70s.
8        MR. DELL'AQUILA:  No.  No.  No.  No.  No,
9 what I'm talking about is --
10        MS. MIRANDA:  Ms. Lambert --
11        MR. DELL'AQUILA:  -- my understanding --
12        MS. MIRANDA:  -- this is -- this is Leonor
13 with the District of Columbia.  We have several
14 questions that we would like to ask and would like to be
15 given some time.
16        MR. DELL'AQUILA:  Okay.  Well, my questions
17 aren't relevant when it goes to your -- the -- it -- I
18 mean, it -- it's going to be continued.  Well,
19 obviously, my questions are after yours.  I'll -- you
20 can go -- you go next and then I'll bring my questions
21 up.
22        THE U.S. TRUSTEE:  Mr. Dell'Aquila --
23        MR. DELL'AQUILA:  I -- I --
24        THE U.S. TRUSTEE:  -- can you finish your
25 question?

Page 97

1      MR. DELL'AQUILA: Sure. I've got -- loo --
2 loo -- looking at -- yeah, I'm looking at your nine --
3 your -- your 990s and trying to understand why, in 2013,
4 2014, 2015, 2016, and 2017, the charity for Youth for
5 Tomorrow wa -- was not reported on the -- your 990s.
6      THE U.S. TRUSTEE: You know,
7 Mr. Dell'Aquila, those -- I understand that's a question
8 that you have, but it relates to your litigation, so
9 it's not -- or not really a question for here today. It
10 is a question for your --
11     MR. DELL'AQUILA: It --
12     THE U.S. TRUSTEE: -- litigation, but not
13 for here today.
14     MR. DELL'AQUILA: Okay. It's -- okay. I'm
15 just trying to get through -- it was reported in 2011 --
16     THE U.S. TRUSTEE: Okay. So we had talked
17 about --
18     MR. DELL'AQUILA: Okay.
19     THE U.S. TRUSTEE: We had talked about --
20     MR. DELL'AQUILA: Okay.
21     THE U.S. TRUSTEE: -- maybe, three
22 questions and I think that you've asked your three now.
23 But we're going to be back --
24     MR. DELL'AQUILA: Okay.
25     THE U.S. TRUSTEE: -- in a week, so can you

Page 98

1 hold on?
2     MR. DELL'AQUILA: Yes. Thank you,
3 Ms. Lambert.
4     THE U.S. TRUSTEE: All right. Other
5 questions from the floor, please?
6     THE OPERATOR: So no further questions on
7 the phone lines now.
8     THE U.S. TRUSTEE: D.C. AG's Office?
9     MS. MIRANDA: Thank you, Ms. Lambert. This
10 is my first time attending a bankruptcy hearing. This
11 is Leonor Miranda with the D.C. Attorney General's
12 Office and I represent the District of Columbia. I have
13 several questions and they, primarily, relate to two --
14 two things. So, hopefully, it won't take too long.
15     During the February 22nd meeting, we asked
16 the NRA questions relating to a $32 million asset that
17 was listed on its most recent 990 filing and that was
18 listed on Schedule D, Part 9, and it was categorized as
19 "due from the Foundation." Can the NRA confirm that
20 that asset is reflected in its Schedule -- its Schedule
**21 A of the -- oh, sorry, in -- yes, Schedule A, Part 3,**
**22 Question 11, under "accounts receivable." There is a**
**23 $64,072,298.70 -- 70 cents face amount -- amount listed.**
**24     Is that $32 million fully included in that**
**25 $64 million listing?**

Page 99

1     MR. WARREN: Yes. This is Mr. Warren.
2 Yes, it is.
3     MS. MIRANDA: And next to that, there is
4 about $8.6 million that's identified as a subset of the
5 64 million that's listed as "doubtful" or uncollectible
6 accounts." Is any of the $32 million assets listed on
7 the 990, are any of those assets included in the
8 8.6 million amount?
9     MR. WARREN: No, they do not assign
10 themselves to that receivable.
11     MS. MIRANDA: And Question 12, in that
12 same -- in Part 3 on your accounts receivable, the total
13 amount of accounts receivable is about $56 million. Is
14 the full $32 million asset "due from the Foundation"
15 listed, is it included fully in that $56 million figure?
16     MR. WARREN: Yes, it is.
17     MS. MIRANDA: And from -- the $32 million
18 asset that was listed on the 990, that -- that consists
19 of assets that are exclus -- are purely restricted
20 funds, right?
21     MR. WARREN: That's correct. It would be
22 classified as restricted.
23     MS. MIRANDA: And what type of restrictions
24 apply to those funds?
25     MR. WARREN: That is -- that is a

Page 100

1 receivable for endowment funds with the Foundation. So
2 those -- those funds are, specifically, restricted based
3 on the endowment placement.
4     MS. MIRANDA: Okay. And when the --
5 when -- when the NRA receives these funds, are all
6 these -- funds coming in from the accounts receivable,
7 are they all placed in, like, one specific account
8 together?
9     MR. WARREN: Are you asking specific to
10 ordinary receivables or specific to the endowment?
11     MS. MIRANDA: I'm looking at the
12 $64-million figure and I'm trying to figure out if, you
13 know, there is, like, an account that just adds up to
14 $64 million or if you're adding up several different --
15     MR. WARREN: Yeah.
16     MS. MIRANDA: -- accounts in the NRA to
17 come up to that number?
18     MR. WARREN: No. There's several --
19 several accounts that are utilized to come up with
20 that -- that consolidated position.
21     MS. MIRANDA: And is there a separate
22 endowment account?
23     MR. WARREN: Yes.
24     MR. BUNCHER: I think -- I don't know if
25 you were -- this is Mr. Buncher. I don't know if you

Page 101

1 were present at the initial meeting, but this was
2 discussed, and Ms. Rowling testified that the NRA only
3 receives money from the endowment after it has spent
4 money on a qualified 501(c)(3) activity, and then they
5 request and receive reimbursement of those costs. So I
6 don't know if you were present or not for that.
7      MS. MIRANDA: I was not, but thank you for
8 that clarification.
9      And I have one last question regarding this
10 topic. So over half -- I'm taking into consideration
11 the $32 million asset that's restricted funds or -- or
12 endowment funds, and that makes up over half of that
13 $56 million; that's listed as the NRA's accounts
14 receivable?
15      MR. WARREN: Correct.
16      MS. MIRANDA: Great. And the only other
17 question that I have relates to the -- and -- and, you
18 know, I think it's about 106 transfers relating to
19 return of grant funding from the NRA -- to the NRA
20 Foundation, and I just wanted to follow up. I didn't
21 know if my colleague at the first meeting requested
22 (inaudible), and if you -- if the NRA could provide
23 documents identifying what specific grants those are;
24 whether it's the nature of the grants, grants'
25 identification numbers on the specific accounts that

Page 102

1 correspond to those transactions. And we can follow up
2 that, you know, with an email request.
3      MR. BUNCHER: Well, this is Mr. Buncher.
4 Those transactions were discussed in the first meeting
5 as well.
6      MS. MIRANDA: I'm sorry. Can you repeat
7 that?
8      MR. BUNCHER: I said those transactions you
9 are referring to, with the Foundation, were discussed in
10 the first meeting.
11      MS. MIRANDA: Oh, okay. And so in the
12 first meeting, the NRA identified exactly what each
13 grant -- out of the hun -- the ones -- the 106 grants
14 that were listed, and has described the nature of those
15 grants and the --
16      MR. BUNCHER: No. No.
17      MS. MIRANDA: I'm sorry.
18      MR. BUNCHER: I think there was general
19 testimony about what those represented and I can't
20 recall if it was Ms. Rowling or Mr. Warren who -- who
21 described that.
22      MS. MIRANDA: Okay. I'm going to --
23      MR. BUNCHER: But it --
24      MS. MIRANDA: -- ask at this time --
25      MR. BUNCHER: It wasn't -- but just so I'm

Page 103

1 clear, it wasn't specific each and every single one.
2 But they did describe it, generally, of -- of what those
3 represent.
4      MS. MIRANDA: Okay. Well, can the NRA
5 provide documents that specify the additional
6 information relating to the nature of the grants, grant
7 numbers or the specific ac -- accounts for those
8 transactions for the NRA Foundation?
9      MR. BUNCHER: Are -- you might need to ask
10 one of the witnesses if there are any documents about
11 that. I -- I don't know.
12      MS. MIRANDA: Okay. Ms. Rowling?
13      MS. ROWLING: Yes.
14      MS. MIRANDA: Are there any documents
15 relating to the 106 transactions listed on Pages 39
16 through 41 of the Statement of Financial Affairs,
17 listing transfers from the NRA to the NRA Foundation,
18 identified as -- it -- I think it's on returned funds or
19 state -- okay. Give me one second. I don't want to
20 mis -- "unused grant funds"?
21      MS. ROWLING: Yes. We can -- we can
22 provide the grant number associated with those.
23      MS. MIRANDA: And are all those grants
24 held, you know, in one -- in -- all together in one
25 particular NRA account or are they held in separate

Page 104

1 accounts?
2      MS. ROWLING: I'm not sure I understand
3 exactly what you're asking --
4      MS. MIRANDA: Sure. So --
5      MR. ROWLING: -- but I can still --
6      MS. MIRANDA: So the transactions that are
7 listed in -- are -- are those funds coming out of one
8 particular account within the NRA -- when they are being
9 transferred to the NRA Foundation -- or are they coming
10 from different -- are they originating from different
11 NRA accounts?
12      MS. ROWLING: NRA bank accounts? I -- I --
13      MS. MIRANDA: Sure.
14      MR. ROWLING: Still I would --
15      MS. MIRANDA: I mean, I'm just asking
16 for --
17      MR. ROWLING: -- want some clarification;
18 exactly what accounts --
19      MS. MIRANDA: Sure. NRA bank --
20      MR. ROWLING: -- are you talking about?
21      MS. MIRANDA: -- accounts or if they cla --
22 you know, they are held -- yeah, sure -- in NRA bank
23 accounts.
24      MR. BUNCHER: Okay. Let me -- let me try
25 to clarify this -- this is Mr. Buncher -- because --

Page 105

1  just to try to speed this up.
2        Ms. Rowling, those are transactions that
3  were called "unused grant funds"; is that correct?
4        MS. ROWLING:  That's correct.
5        MR. BUNCHER:  And those are instances where
6  grant money was not spent and is returned back to the
7  Foundation; is that right?
8        MS. ROWLING:  That's correct.
9        MR. BUNCHER:  Okay.  So I just want -- I
10 just wanted to clarify that's what we are talking about
11 here.
12        MS. MIRANDA:  Yes.  That is exactly what we
13 are talking about are --
14        THE U.S. TRUSTEE:  Let's -- let me ask
15 you --
16        MS. MIRANDA:  -- (inaudible) --
17        THE U.S. TRUSTEE:  Wait.  Wait.  Let's hold
18 up just a second.
19        When you provide the list of the items
20 incorporated to the D.C. AG's Office will, in it,
21 reflect the bank accounts out of which the funds came?
22        MS. ROWLING:  Well, we only have one bank
23 account from which we cut checks from, so it would have
24 been one bank account.
25        THE U.S. TRUSTEE:  Okay.  So --

Page 106

1        MS. ROWLING:  However, we track the
2  restriction on those funds in a restricted net asset
3  account.  So it's an accounting thing, but it comes out
4  of a bank account.  But it's restricted from an
5  accounting ex -- perspective.
6        MS. MIRANDA:  And in that restricted net
7  asset account, is it further restricted depending on,
8  you know, the particular grant that the funds are
9  supposed to go to?
10        MS. ROWLING:  Yes, it is.
11        MS. MIRANDA:  And so we would just place a
12 request for that information, particularly, for those
13 106 transactions that are listed -- listed --
14        MR. BUNCHER:  Okay.
15        MS. MIRANDA:  -- on Question 4.
16        MR. BUNCHER:  We have noted your request.
17        MS. MIRANDA:  Thank you.  That sums up my
18 questions.
19        THE U.S. TRUSTEE:  All right.
20        MS. MIRANDA:  And I, respectfully, reserve
21 our time if we have any additional questions in the
22 future.  Thank you.
23        THE U.S. TRUSTEE:  So your time is
24 reserved.
25        So we will come back next Friday at 1:00.

Page 107

1  I'm anticipating that the questions will continue to
2  narrow, based on the Schedules and Statements of Fin --
3  Financial Affair amendments, and the discovery that was
4  produced that was not -- was not subject to questioning
5  today.  I will try to get the same call-in numbers, but
6  I don't know that that will be possible.  Look on the
7  court's docket to ensure that we were able to get the
8  same numbers.
9        Thank you -- thank everyone for their
10 participation today.
11        MR. BUNCHER:  Thanks.
12        MR. WARREN:  Thank you.
13        MR. LaPIERRE:  Thanks.
14        MR. ROWLING:  Thank you.
15        MR. OWENS:  Thank you.
16        THE U.S. TRUSTEE:  Operator, we are going
17 to disconnect --
18        MR. FRAZER:  Thank you.
19        THE U.S. TRUSTEE:  -- now.  Thank you.
20        THE OPERATOR:  That concludes today's
21 conference.  Thank you for participating.  You may
22 disconnect at this time.
23        (End of proceedings)
24        (End of audio file)
25

Page 108

1        I, Gwendolynn R. Murphy, Certified Shorthand
2  Reporter in and for the State of Texas, do hereby
3  certify that the foregoing 107 pages comprise a true,
4  complete and correct transcription of the aforementioned
5  audio file to the best of my ability.
6        Given under my hand and seal of office on this
7  11th day of March, 2021.
8
9
10
11
12
                                    _____
                                    Gwendolynn R. Murphy
13                                  Texas CSR No. 6040
                                    Expiration Date:  10/31/2022
14
                                    Lexitas-Dallas, Reg No. 459
15                                  325 N. St. Paul
                                    Suite 1900
16                                  Dallas, Texas 75201
                                    (214) 373-4977
17
18
19
20
21
22
23
24
25

# EXHIBIT 12

```
 1              UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF TEXAS
 3                   DALLAS DIVISION
 4
 5    IN RE:                    )
                                )
 6                              )
      NATIONAL RIFLE            ) Case No.
 7    ASSOCIATION OF AMERICA    ) 21-30085-hdh-11
      AND SEA GIRT, LLC,        )
 8                              )
          Debtors.             )
 9
10
11   ********************************************************
12        REMOTE ORAL AND VIDEOTAPED DEPOSITION OF
13                   WAYNE LAPIERRE
14                      VOLUME 1
15            IN HIS INDIVIDUAL CAPACITY AND
16            AS CORPORATE REPRESENTATIVE OF
17       THE NATIONAL RIFLE ASSOCIATION OF AMERICA
18                   MARCH 22, 2021
19     CONFIDENTIAL PURSUANT TO PROPOSED PROTECTIVE ORDER
20   ********************************************************
21
22
23
24
25
                                          Page 1
```

1    REMOTE ORAL AND VIDEOTAPED DEPOSITION OF WAYNE

2 LAPIERRE, produced as a witness at the instance of the

3 New York State Office of the Attorney General, and

4 duly sworn, was taken remotely in the above-styled

5 and numbered cause on the 22nd day of March, 2021, from

6 9:24 a m  to 6:04 p m , via Zoom, before Julie C

7 Brandt, RMR, CRR, and CSR in and for the State of Texas,

8 reported by machine shorthand, with the witness located

9 in Fairfax, Virginia, pursuant to the Federal Rules of

10 Civil Procedure and the provisions stated on the record

11 or attached hereto

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 2

---

1 FOR THE WITNESS INDIVIDUALLY:
2    P  Kent Correll
     CORRELL LAW GROUP
3    250 Park Avenue, 7th Floor
     New York, New York 10177
4    212 475 3070
     kent@correlllawgroup.com
5
6 FOR THE PEOPLE OF THE STATE OF NEW YORK:
7    James Sheehan (Remote appearance)
     Stephen Thompson (Remote appearance)
8    Yael Fuchs (Remote appearance)
     Sharon Sash (Remote appearance)
9    Lucas McNamara
     Emily Stern
10   Monica Connell
     OFFICE OF THE ATTORNEY GENERAL OF THE
11      STATE OF NEW YORK
     28 Liberty Street, 18th Floor
12   New York, New York 10005
     212 416 8401
13   james sheehan@ag ny gov
     stephen thompson@ag ny gov
14
     Jonathan Conley (Remote appearance)
15   NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
     The Capitol
16   Albany, New York 12224
     212 416 8108
17   jonathan conley@ag ny gov
18
     FOR THE OFFICE OF THE U S  TRUSTEE:
19
     Lisa L  Lambert (Remote appearance)
20   Marc F  Salitore (Remote appearance)
     UNITED STATES TRUSTEE PROGRAM
21   1100 Commerce Street, Room 976
     Dallas, Texas 75242
22   214 767 8967
     elizabeth a young@usdoj gov
23   marc f salitore@usdoj gov
24   Juliet M  Sarkessian (Remote appearance)
     UNITED STATES TRUSTEE PROGRAM
25   844 King Street

Page 4

---

1             APPEARANCES
2 FOR THE NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL:
3    Eric Van Horn (Remote appearance)
     Jason Kathman (Remote appearance)
4    Gerrit Pronske (Remote appearance)
     SPENCER FANE LLP
5    2200 Ross Avenue, Suite 4800 West
     Dallas, Texas 75201
6    214 750 3610
     ericvanhorn@spencerfane com
7
8 FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:
9    Scott Drake (Remote appearance)
     Tim Carney (Remote appearance)
10   NORTON ROSE FULBRIGHT US LLP
     2200 Ross Avenue, Suite 3600
11   Dallas, Texas 75201
     214 855 8341
12   scott drake@nortonrosefulbright com
13
     FOR ACKERMAN MCQUEEN, INC :
14
     G  Michael Gruber (Remote appearance)
15   Kelsey M  Taylor (Remote appearance)
     Brian E  Mason (Remote appearance)
16   Christina M  Carroll (Remote appearance)
     DORSEY & WHITNEY LLP
17   300 Crescent Court, Suite 400
     Dallas, Texas 75201
18   214 981 9970
     gruber mike@dorsey com
19
20 FOR THE NATIONAL RIFLE ASSOCIATION OF AMERICA:
21   Gregory E  Garman
     Talitha Gray Kozlowski
22   Teresa M  Pilatowicz
     GARMAN TURNER GORDON LLP
23   7521 Amigo Street, Suite 210
     Las Vegas, Nevada 89119
24   702 777 3000
     ggarman@gtg legal
25

Page 3

---

1    Room 2207
     Wilmington, Delaware 19801
2    302 573 6491
     juliet m sarkessian@usdoj gov
3
4 FOR INFOCISION:
5    Curtis L  Tuggle (Remote appearance)
     THOMPSON HINE
6    3900 Key Center
     127 Public Square
7    Cleveland, Ohio 44114-1291
     216 566 5904
8    Curtis Tuggle@ThompsonHine com
9
     FOR JOHN FRAZER:
10
     Ellen Johnson (Remote appearance)
11   GAGE SPENCER & FLEMING LLP
     410 Park Avenue
12   Floor 9
     New York, New York 10022-9492
13   212 768 4900
     ejohnson@gagespencer com
14
15 FOR THE PEOPLE OF WASHINGTON, D C :
16   Jennifer Jones (Remote appearance)
     OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON, D C
17   400 6th Street, NW
     Washington, D C  20001
18   202 727 3400
     jen jones@dc gov
19
20 FOR THE HONORABLE PHILLIP JOURNEY:
21   Jermaine Watson (Remote appearance)
     BONDS ELLIS EPPICH SCHAFER JONES LLP
22   420 Throckmorton Street
     Suite 1000
23   Fort Worth, Texas 76102
     817 529 2724
24   jermaine watson@bondsellis com
25

Page 5

2 (Pages 2 - 5)

1 FOR CHRISTOPHER COX:
2    Thomas M. Buchanan (Remote appearance)
   Matthew M. Saxon (Remote appearance)
3    WINSTON & STRAWN LLP
   1901 L. Street NW
4    Washington, D.C. 20036
   202.282.5787
5    tbuchanan@winston.com
6
  ALSO PRESENT:
7
8    Jack Butler (Remote appearance)
9    Jeremy Economos (Remote appearance)
10    Loring Hill (Remote appearance)
11    Anthony Makris (Remote appearance)
12    Dave Hamrick (Remote appearance)
13    David MacGreevey (Remote appearance)
14    David Dell'Aquila (Remote appearance)
15
  VIDEOGRAPHER:
16
    Dan Reidy - Veritext Legal Solutions
17
18
19
20
21
22
23
24
25

Page 6

1        INDEX
             PAGE
2
  Appearances.......................................   3
3 Proceedings......................................   8
4 WAYNE LAPIERRE - VOLUME 1
5   Examination by Mr. Sheehan................   9
6 Signature and Changes.......................... 242
  Reporter's Certificate...................... 244
7
8 DEPOSITION EXHIBITS          IDENTIFIED
9 Exhibit 1   Form 990 for 2019................   46
10 Exhibit 2   Form 4720 for 2018.............. 143
11 Exhibit 3   Excel file, NRA-BK-00039547.xlsx 152
12 Exhibit 4   April 22, 2019 letter to Wayen
        LaPierre from William Winkler
13       with attachments
        NYAG-00120792 - 120796.......... 188
14
  Exhibit 5   May 6, 2019 letter to Craig
15         Spray from William Winkler with
16         attachments
        NYAG-00120797 - 120799.......... 188
17 Exhibit 6   Entertainment Report and bill
        from Mosquito Authority
18         NRA-NYAG-00040681 - 40683....... 193
19
20
21
22
23
24
25

Page 7

       P R O C E E D I N G S
2     THE VIDEOGRAPHER: Good morning. We are
3 going on the record at 9:24 a.m. on Monday, March 22,
4 2021.
5     Please note that audio and video recording
6 will continue to take place until all parties agree to
7 go off the record.
8     This is media unit 1 of the video recorded
9 deposition of Wayne LaPierre, taken by counsel for the
10 Movant In the Matter -- or In Regards to the National
11 Rifle Association of America and Sea Girt, LLC.
12     This case is filed in the United States
13 Bankruptcy Court for the Northern District --
14     MR. SHEEHAN: All right. Could I ask the
15 court reporter to swear the witness?
16     MR. GARMAN: He's not quite done.
17     MR. SHEEHAN: I'm sorry.
18     MR. GARMAN: The court reporter is not
19 quite done.
20     MR. SHEEHAN: I'm sorry. Okay.
21     MR. GARMAN: It's the Northern District
22 of Texas.
23     THE VIDEOGRAPHER: -- Northern District
24 of Texas, Caption Case No. 21-30085-hdh-11.
25     This deposition is being held at the National

Page 8

1 Rifle Association, located at 11250 Waples Mill Road,
2 Fairfax, Virginia 22030.
3     I am Dan Reidy from Veritext Legal Solutions,
4 and I am the videographer. The court reporter is Julie
5 Brandt from the firm Veritext Legal Solutions.
6     MR. GARMAN: Ms. Court reporter, I
7 believe we're ready to swear in the witness.
8        WAYNE LAPIERRE,
9 having been first duly sworn and having confirmed that
10 he is Wayne LaPierre, testified remotely as follows:
11        EXAMINATION
12 BY MR. SHEEHAN:
13   Q. Good morning, Mr. LaPierre. We're here to
14 take --
15   A. Good morning.
16   Q. I'm sorry?
17   A. I said "good morning."
18   Q. Oh, good.
19     We here today to take your deposition in a
20 contested bankruptcy proceeding brought by the National
21 Rifle Association. I'm Jim Sheehan. You may recall me
22 from our encounter about nine months ago. I'm an
23 assistant attorney general with the New York State
24 Attorney General's Office, and I represent the Attorney
25 General's Office in this proceeding.

Page 9

3 (Pages 6 - 9)

1    I know that you have had your deposition taken
2  before.  Have you had your deposition taken since the
3  last time we met in June of 2020?
4    A.  I took a deposition with the Under Wild Skies
5  Dycio law firm.
6    Q.  And who took that deposition?
7    A.  I think it was Mr. Biggs who is an attorney
8  with Dycio firm.
9    Q.  Okay.  When was that?
10   A.  I think about two months ago.
11   Q.  Okay.  And in addition to that deposition two
12 months ago, have you had your deposition taken between
13 June of 2020 and the present?
14   A.  I don't believe so.
15   Q.  Okay.
16       MR. GARMAN:  Counsel, it's Greg Garman.
17 Just to identify again, he did sit under oath at the 341
18 meeting at your office.
19       MR. SHEEHAN:  Correct.
20       MR. GARMAN:  I want to be clear about
21 that.
22   Q.  (BY MR. SHEEHAN)  Okay.  Are you represented
23 today by counsel?
24   A.  I am.  Mr. Kent Correll from the Correll Law
25 Group.

Page 10

1  I would ask you to hold until I'm done and I will do my
2  best to do the same.  And if you don't understand a
3  question that I ask, I'll ask you to ask me to rephrase
4  it or repeat it.  Do you understand that instruction?
5    A.  (Witness nods head.)
6    Q.  You're nodding your head yes.
7    A.  I do understand.
8    Q.  Okay.
9    A.  Yes, I do.
10   Q.  If you need a break at any time, please let us
11 know.  I may want to finish a certain question, but
12 after that you're allowed to take a break as you ask for
13 it.
14   A.  Okay.
15   Q.  Okay.  You're Wayne Robert LaPierre.  Is that
16 correct?
17   A.  That's correct.
18   Q.  And what other names have you ever used?
19   A.  Well, I use Wayne LaPierre.

Page 12

1    Q.  Okay.  There is also counsel for the debtor.
2  Is that correct?
3    A.  Yes, sir.  It's Greg Garman from Garman Turner
4  Gordon.  In the room with me today are Teresa Pilatowicz
5  and Talitha Gray Kozlowski who are my colleagues.
6    Q.  And as you know in a deposition, I'll be
7  asking some questions.  The court reporter will take
8  down your testimony and make a complete transcript.
9  Because she's trying to take everything down, and
10 especially since you're wearing a mask, it will help if
11 you try to answer each question out loud with a verbal
12 response.  Do you understand that instruction?
13   A.  I will do that.
14   Q.  When you were at CPAC, did you wear a mask
15 this year?
16   A.  I went straight from the car -- I had a mask
17 on.  I took the mask off when I went up on stage.  I put
18 the mask on the minute I came off stage.
19   Q.  So how long were you on stage with the mask
20 off?
21   A.  Maybe 16 minutes, 15 minutes.
22   Q.  All right.  In addition, we're going to have
23 to speak one at a time, and this is especially true
24 since this is a remote deposition.  So you may think you
25 know the answers to my questions before you finish, but

Page 11





1 you prefer, Mr. Sheehan, I can do it every time.
2     MR. SHEEHAN: Of course I prefer that you
3 join all the objections the NRA makes. And let the NRA
4 make the objections. How's that?
5     MR. CORRELL: Well, I might make
6 additional objections that the NRA is not making, so I
7 reserve that right.
8     Do we have a deal on that, sir?
9     MR. SHEEHAN: We have a deal on you'll
10 join, and it's unclear to me what your standing is to
11 object. You know what? Let's -- let's go off the
12 record for a second.
13     THE VIDEOGRAPHER: We're going off the
14 record. The time on the video is 9:35 a.m.
15     (Discussion off the record.)
16     THE VIDEOGRAPHER: We are now on the
17 record. The time is 9:35 a.m.
18     MR. SHEEHAN: Okay. So we will -- it's
19 my understanding from the discussion previously that
20 Mr. LaPierre's counsel will join in all the objections
21 that are asserted by the NRA. He may have additional
22 objections on his own, which I request be done as an
23 objection and not as a speaking objection, but we are in
24 agreement on that process.
25     MR. CORRELL: Thank you, Mr. Sheehan.
Page 16

10   Q. When you fly, right, do you ever fly
11 commercial?
12   A. No. NRA security has a policy against me
13 flying commercial because of threats, numerous threats
14 that they have documented over and over and over again.
15   Q. And where --
16   A. I take the advice of the NRA security people.
17   Q. Where would I find that documentation of the
18 threats?
19     MR. GARMAN: Object to the form.
20 Go ahead and answer.
21     MR. CORRELL: Join.
22     (Reporter clarification.)
23     MR. CORRELL: Sure. This is Kent Correll
24 for Mr. LaPierre. I'm proposing that we agree that I
25 join all objections that the NRA counsel makes or, if

1     MR. SHEEHAN: Okay.
Page 17

5 (Pages 14 - 17)

**Page 18**

1    Q. (BY MR. SHEEHAN) Under the accounting system
2 at the NRA, do you have to write down the purpose of the
3 trip and the place that you visited with respect to
4 hotel bills?
5    A. I do.
6    Q. Do you do that --
7    A. And --

[REDACTED]

16    Q. All right. And are security expenses put
17 through Portia Padilla?
18    A. The security expenses are put through the
19 treasurer's office.
20    Q. And is that still true today?
21    A. That is true today.
22    Q. Do you remember -- (audio unclear.)
23    MR. GARMAN: I'm sorry. I'm sorry. This
24 is Greg Garman. Your microphone might be on the table,
25 because when you go through documents, it creates an

**Page 19**

1 awful racket.
2    MR. SHEEHAN: Got it. Thank you.
3 Appreciate that.
4    Q. (BY MR. SHEEHAN) Are you familiar with a
5 gentleman named Powell, Joshua Powell?
6    A. Yes, I am.
7    Q. And he was your hunting buddy and then he was
8 your chief of staff?
9    MR. GARMAN: Objection as to form.
10    A. I wouldn't call him my hunting buddy. I went
11 hunting with him, I think, once on a taping of Under
12 Wild Skies. He was chief of staff.
13    Q. (BY MR. SHEEHAN) Did you read his book?
14    A. I did not read his book.
15    Q. Why not?
16    A. Because I know the truth, and I did not think
17 that what was in that book was true, and I thought why
18 bother reading it.
19    Q. How would you know it wasn't true if you
20 didn't read it?
21    A. Because I believe that by that time he was
22 creating a bunch of nonsense, and I -- it wasn't worth
23 my time to read. I knew the truth. I knew the facts.
24 I knew what we had done in this place. I knew the good
25 we had done in this place. I knew what we built.

**Page 20**

1 knew how we built it. And I also knew everything we had
2 been doing since 2017 to self-correct this organization
3 and bring it in -- ensure it was in complete compliance
4 with New York state not-for-profit law, and there wasn't
5 anything that I was aware of that we had done that could
6 have been a problem.
7    Q. There was nothing -- there was nothing you
8 were aware of that could be a problem. Is that what you
9 just said?
10    MR. GARMAN: Objection as to form.
11    A. I -- everything we intended to do was to --
12 was to self-correct this place, take a 360-degree look
13 at it as Attorney General Schneiderman recommended to us
14 when he called me in 20 -- he called Tom King on our
15 board in 2017, and -- and the Attorney General of New
16 York, Eric Schneiderman, said that a plan had been
17 adopted by some of the anti people that didn't like the
18 NRA, the Bloomberg people, to improperly use the
19 government of New York state to target the NRA.
20 Although he didn't agree with some of the issues, he did
21 not think it was a proper use of government, and he
22 thought that New York state law -- a lot of changes had
23 been made in terms of nonprofit laws. He actually said
24 he probably thought no one was in real compliance, but
25 that doesn't matter, they intend to use the government

**Page 21**

1 to target you guys, and I recommend you take a complete
2 look at everything. If something is being done
3 improper, self-correct it. New York state has a safe
4 harbor provision. Make a good effort to look at every
5 employee, everything, every vendor and self-correct.
6 And that's the proper thing to do, given the pressure
7 being put on the government of New York state to --
8 to -- to target the NRA improperly.
9    Q. (BY MR. SHEEHAN) And was that a conversation
10 you had with Mr. Schneiderman?
11    A. No, Tom King on our board of directors had it
12 with Mr. Schneiderman. Steve Shulman, our former
13 general counsel to the board, had -- was a friend of
14 Attorney General Schneiderman. He had formed a
15 relationship between Tom King and -- who was in New York
16 and the Attorney General. As I said, they didn't agree
17 on the issue, but they became friends, and the Attorney
18 General Schneiderman was very offended by what he
19 thought was an improper use of government authority to
20 essentially weaponize the government of New York state
21 against this great nonprofit organization, the NRA,
22 that's been in existence since 150 years and does
23 firearm training, safety education, 14,000 law
24 enforcement instructors, 130,000 instructors on safety
25 and training --

6 (Pages 18 - 21)

1     Q.   Mr. LaPierre, I am going to break my own rule
2 here. I asked you whether you talked to
3 Mr. Schneiderman. Did you talk to Mr. Schneiderman?
4     A.   No, I did not. Tom King relayed the
5 conversation to me.
6     Q.   Okay. And did he relay it in writing or
7 orally?
8     A.   He called me on the phone and relayed to me.
9     Q.   Did you record in any way what he told you?
10 Did you write it down?
11     A.   I did not. I listened very carefully to what
12 he said.
13     Q.   So -- and how many years ago was this?
14     A.   It was in 2017. I think in the summer of
15 2017.
16     Q.   So almost four years ago you remember that
17 level of detail of the conversation?
18     A.   I sure do.
19        MR. GARMAN: Objection as to form.
20     Q.   (BY MR. SHEEHAN) Did Mr. King send you any
21 follow-up memo summarizing the conversation, alleged
22 conversation with Mr. Schneiderman?
23     A.   He did not. He talked to me on the phone
24 and -- on the phone.
25     Q.   Did he convey to the board the message with

Page 22

1 the board saying this is the information we've received
2 from Tom King in this conversation with Schneiderman?
3     A.   I talked about it with board members.
4     Q.   What board members?
5     A.   I can't remember. It was a long time ago, but
6 it was a -- it was a major issue.
7     Q.   My question was what board members?
8     A.   Yeah, and my answer is I don't remember.
9     Q.   Okay.
10     A.   I believe -- I believe --
11     Q.   You believe?
12     A.   That's my answer, I don't remember.
13     Q.   Okay. With respect to Mr. Powell, is it true
14 that, as stated in his book at page 224, that President
15 Trump told you on April 2019 that you're spinning
16 yourself to death?
17        MR. GARMAN: Objection as to form.
18     A.   President Trump was -- mentioned that we're
19 having a lot of legal costs and there are a lot of cheap
20 lawyers around.
21     Q.   (BY MR. SHEEHAN) That's what President Trump
22 said to you?
23     A.   Pretty much.
24     Q.   With respect to Mr. Powell, did you know that
25 Bill Brewer discussed a job at his law firm with Josh

Page 24

1 Mr. Schneiderman that he allegedly had?
2        MR. GARMAN: Objection as to form.
3     A.   I don't know whether Tom King conveyed it at
4 some point because we began to act on it. I'm sure we
5 informed the board of the conversation because what I
6 did is I -- I called one of our attorneys, our outside
7 attorneys, and he --
8        MR. GARMAN: Objection, just to caution
9 the witness not to divulge the substance of any
10 communications between Mr. LaPierre or -- either
11 individually or on behalf of the NRA and any attorney
12 that he was speaking to for the purpose of --
13     Q.   (BY MR. SHEEHAN) Let's do this here because,
14 again, you're not answering my question, Mr. LaPierre.
15     What I asked you was did Tom King communicate
16 to the board his conversation with Mr. Schneiderman?
17        MR. GARMAN: Objection as to form.
18     Answer his question.
19     A.   I believe I recall he did at some point.
20     Q.   (BY MR. SHEEHAN) Was the conversation in the
21 minutes of the board meetings or any committee of the
22 board?
23     A.   I don't -- I can't remember whether it was in
24 executive session or in the minutes.
25     Q.   Did you send anything in writing to members of

Page 23

1 Powell?
2        MR. GARMAN: Objection as to form.
3     A.   I did not know that.
4     Q.   (BY MR. SHEEHAN) All right. In page 220 of
5 his book, Mr. Powell quotes you saying about John
6 Frazer, I wouldn't use him for my parking tickets.
7     Did you say that?
8        MR. GARMAN: Objection as to form.
9     A.   I think I made a joke at one point about John
10 a long time ago because John tended to argue or be --
11 follow up with -- and I think I said it as a -- as a
12 joke at one point.
13     Q.   (BY MR. SHEEHAN) Did you --
14     A.   I don't -- I believe John is a very competent
15 attorney, and I have been incredibly impressed with the
16 work that he's done ever since we put him into the
17 general counsel's office.
18     Q.   Was Mr. Frazer the general counsel of the NRA
19 at the time you said you wouldn't use him for your
20 parking tickets?
21     A.   I can't -- I can't remember that. I don't
22 know.
23     Q.   Was -- did you say this to Mr. Frazer's face?
24        MR. GARMAN: Objection as to form.
25     A.   No, I didn't. No, I didn't.

Page 25

7 (Pages 22 - 25)

1    Q.  (BY MR. SHEEHAN) Who did you say it to?
2    A.  I respect John. He's a very good attorney,
3 and I think he is -- he is doing an exceptional job in
4 that role.
5    Q.  Who did you say this to?
6         MR. GARMAN:  Objection as to form.
7    Q.  (BY MR. SHEEHAN)  "This" being I wouldn't use
8 him for my parking tickets.
9         MR. GARMAN:  Objection as to form.
10   A.  I -- I may have said it as a joke at some
11 point to Josh possibly.
12   Q.  (BY MR. SHEEHAN)  Okay.  Have you ever flown
13 on Bill Brewer's private jet?
14   A.  I have not.
15   Q.  All right.  Do you know if Bill Brewer bills
16 the use of his private jet to the NRA?
17        MR. GARMAN:  Objection to form.
18   A.  I -- I don't know the answer to that.  I would
19 be speculating.
20   Q.  (BY MR. SHEEHAN)  Who would be responsible for
21 knowing whether Mr. Brewer is billing his private jet
22 travel to the NRA at the NRA?
23   A.  The treasurer's office.
24   Q.  A person?
25   A.  And also John Frazer would know that because

Page 26

1 John Frazer -- what happens to any of the Brewer legal
2 bills is they come in, they are vetted by -- as the
3 appropriate NRA process, they are vetted by the general
4 counsel's office --
5    Q.  Mr. LaPierre, my question was who knows?
6         MR. GARMAN:  Sir, he's telling you who
7 knows through the process.
8         MR. CORRELL:  Mr. Sheehan, I have to
9 insist that you allow the witness to finish his answer.
10        MR. SHEEHAN:  He is filibustering and not
11 answering the question.
12   A.  The answer to the question is that John Frazer
13 vets all the Brewer bills.  He sees them all.  He asks
14 any questions about them.  And then they go to the
15 treasurer's office, and they -- they vet them also, and
16 then they pay them.
17   Q.  (BY MR. SHEEHAN)  Okay.
18   A.  And that is the NRA process under the auspices
19 that's in place.
20   Q.  At page 259 of Mr. Powell's book, he says with
21 respect to the expense report issues in the fall of 2009
22 for Josh Paul, quote, This is all Craig, he's just out
23 to get you, unquote.
24        Is that an accurate summary of what you said
25 to Josh Powell about the expense issues in the fall of

Page 27

1 2019?
2    A.  I don't --
3         MR. GARMAN:  Hold up.
4         Objection, Counsel.  He's indicated he hasn't
5 read the book.
6         MR. SHEEHAN:  I know.
7    Q.  (BY MR. SHEEHAN)  But I'm asking you did you
8 say that to Josh Powell?
9         MR. GARMAN:  Objection as to form.
10   A.  I do not think I said that to Josh Powell.
11   Q.  (BY MR. SHEEHAN)  At page 45 Josh Powell says
12 about you, he would meet with people, "yes" them to
13 death and then he would disappear, what he called the
14 rope-a-dope.
15        Have you ever used the phrase "rope-a-dope" in
16 your work at the NRA?
17        MR. GARMAN:  Objection as to form.
18   A.  Yes, I have used the phrase "rope-a-dope."  I
19 think a lot of people use the word "rope-a-dope" in
20 terms of based on Muhammad Ali's fight with George
21 Foreman.
22        I don't -- what was your question again?  I'm
23 sorry, Mr. Sheehan.
24   Q.  (BY MR. SHEEHAN)  It was a simple yes/no
25 question.  Have you used the phrase "rope-a-dope" in

Page 28

1 your work at the NRA?
2    A.  I may have used the phrase "rope-a-dope" in
3 terms of something we were dealing with at the NRA.
4    Q.  Have you ever used the phrase "gasoline on the
5 fire" about your fundraising efforts at the NRA to Josh
6 Powell?
7         MR. GARMAN:  Objection as to the form of
8 the question.
9    A.  I don't believe I've used that to Josh Powell,
10 I've ever said that to Josh Powell.
11   Q.  (BY MR. SHEEHAN)  Have you used the phrase
12 "gasoline on the fire" to refer to fundraising efforts
13 at the NRA?
14        MR. GARMAN:  Objection as to form.
15   A.  I did not use that phrase in relation to
16 fundraising efforts at the NRA.
17   Q.  (BY MR. SHEEHAN)  Did you use that phrase with
18 respect to any other work at the NRA?
19   A.  I remember one time, probably in the -- in the
20 1980s maybe, going back that far, where I was talking
21 with Angus McQueen about the fact that we needed to --
22 to, I think, build more pressure on -- to get people to
23 sign a discharge petition that we were working on.
24 Either that or the highlight the crime issue, the fact
25 of the criminal was the real problem, and I used that

Page 29

8 (Pages 26 - 29)

1 phrase that we need to be stronger. It was totally
2 taken out of context by Ackerman McQueen in one of the
3 documents that I've read and -- in terms of when it was
4 used, how it was used, and all their reference to it is
5 completely out of context and untrue.
6     Q. Okay. What, if anything, did you do to
7 prepare for this deposition today?
8     A. I met with my attorney Kent Correll for three
9 hours on Saturday. Yesterday, I met with my attorney
10 Kent Correll and also Mr. Garman. We got on the phone
11 for a little while with Bill Brewer. And then it went
12 back into a meeting with Kent Correll and with
13 Mr. Garman.
14     Q. Did you review any documents in preparation
15 for today's testimony?
16     A. I did not.
17        MR. GARMAN: Counsel, before we move on,
18 this is his individual deposition, correct?
19        MR. SHEEHAN: I'm sorry. This is the
20 individual deposition, yes.
21        MR. GARMAN: I just wanted to make sure
22 we -- the prep might be different for the two, so I want
23 to make sure our record is clear.
24     Q. (BY MR. SHEEHAN) Okay. So Mr. LaPierre, just
25 to follow up on that issue that was just raised in the

Page 30

1 discussion, the preparation that you did both Saturday
2 and Sunday, was that for your 30(b)(6) deposition or for
3 this deposition, that meaning the individual deposition?
4        MR. GARMAN: Counsel, let me insert
5 myself just to be clear. I don't want to make a mess of
6 this.
7        MR. SHEEHAN: Okay.
8        MR. GARMAN: We have done the 30(b)(6),
9 but there is additional information that the witness
10 needs to be educated, and so we plan to do that
11 before -- we plan to continue that before we commence
12 the 30(b)(6), and so his testimony is the totality of
13 the preparation we've done. We covered a portion of the
14 30(b)(6), but we will likely be talking to other folks
15 at the NRA to complete his 30(b)(6) preparation.
16        MR. SHEEHAN: Okay. All right.
17     Q. (BY MR. SHEEHAN) Did you discuss your
18 testimony today with anyone else besides your -- besides
19 the two attorneys that you've mentioned and Mr. Brewer
20 prior to the deposition?
21     A. I did not.
22     Q. All right. Mr. Powell quotes your spouse
23 saying your management style was, quote, no management
24 style at all, unquote.
25        Have you heard her say that?

Page 31

1        MR. GARMAN: Objection to the form of the
2 question.
3     A. I have not heard her ever say that.
4        In fact, I'm very proud of my management
5 style. I -- it's very open. I let everyone have a say.
6 I -- I make sure that everyone's heard. I search for
7 the best ideas for the NRA, what would be in the best
8 interest of the NRA after giving everyone a chance to
9 speak their mind. I value teamwork and I value input,
10 and if you give everyone that chance, I think you end up
11 with the -- making the best decision in the interest of
12 the organization.
13     Q. (BY MR. SHEEHAN) And do you also impose high
14 ethical standards on the people who work for you at the
15 NRA?
16        MR. GARMAN: Objection to the form of the
17 question.
18        Go ahead and answer.
19     A. Yes. Yes, I do. Everything I do, I try to do
20 in the best interest of the NRA and always have. I've
21 worked my tail off for this organization to build it
22 into a 5 million member organization, and I'm very proud
23 of what we've done. I've very proud of the work of the
24 NRA, as one of the oldest civil rights organizations,
25 and everything it does, from legislative advocacy to all

Page 32

1 its programs.
2     Q. (BY MR. SHEEHAN) Mr. LaPierre, are you an
3 actor?
4     A. I am not --
5        MR. GARMAN: Objection to the form of the
6 question.
7     A. I am not an actor for -- I was probably the
8 first person to do television for the NRA. For the
9 better part of 35, 40 years, I have been the principal
10 brand spokesperson for the NRA, carrying the voice of
11 our NRA members throughout the country on television,
12 hundreds of television appearances, video appearances,
13 radio, grassroots appearances around the country,
14 speaking engagements, and -- and I've also done some
15 television shows for the NRA, debates for the NRA, in my
16 role as -- in my role as representing our members, who
17 are the key to making everything in this organization
18 work.
19     Q. (BY MR. SHEEHAN) Mr. LaPierre, I asked you a
20 very simple question. Are you an actor? Yes or no?
21     A. I am not an actor.
22     Q. Okay. Thank you.
23        Let us go at this point to Exhibit 1.
24        MR. SHEEHAN: Jonathan, could you get us
25 Exhibit 1?

Page 33

9 (Pages 30 - 33)

1    MR. GARMAN: Counsel, I actually am
2 slightly embarrassed to regret that I haven't logged
3 into the Veritext system yet. I can do it now, or we
4 can go off the record for --
5    MR. SHEEHAN: Let's go off the record,
6 and we'll come back when you're ready.
7    MR. GARMAN: Sorry about that.
8    MR. SHEEHAN: No problem.
9    THE VIDEOGRAPHER: We're going off the
10 record. The time on the video is 9:59 a.m.
11    (Break from 9:59 a.m. to 10:07 a m.)
12    THE VIDEOGRAPHER: We're back on the
13 record. The time on the video is 10:07 a m.
14    Q. (BY MR. SHEEHAN) Mr. LaPierre, the -- do you
15 know whether Tom King recorded the conversation with
16 Attorney General Schneiderman?
17    A. I do not.
18    Q. All right. On page 51 of Josh Powell's book
19 he says, Behind Wayne LaPierre's office was a smaller
20 room filled with 6-foot high stacks of yellow legal
21 pads.
22    This is when he first started at the NRA.
23 When he first started at the NRA, was that true, that
24 you had a 6-foot high stack of yellow legal pads?
25    MR. GARMAN: Objection as to the form of

Page 34

1    A. I did not make as many notes because -- notes
2 because -- unless they were privileged communications
3 with attorneys, by and large.
4    Q. Okay. So if -- you turned over all the yellow
5 legal pads in connection with this proceeding that you
6 had in your possession. Is that correct?
7    MR. GARMAN: Objection to the form of the
8 question.
9    A. That's correct.
10    Q. (BY MR. SHEEHAN) And so the -- well, okay.
11 Is it true that you didn't keep a filing draw
12 of draft memos when you first met with Wayne -- with
13 Josh Powell when he started the job?
14    MR. GARMAN: Objection to the form of the
15 question. I didn't understand that one. Can you do it
16 again?
17    Q. (BY MR. SHEEHAN) Did you -- in 2016 when Josh
18 Powell became your chief of staff, did you ever draft
19 memos yourself?
20    A. I don't think I did draft -- draft memos.
21    Q. Did you keep a file drawer or a file for
22 conversations with specific individuals showing what
23 your conversations had been?
24    MR. GARMAN: Objection to the form of the
25 question.

Page 36

1 the question.
2    A. There was a bunch of old NRA trash back in
3 there that we cleaned out years ago. It was in the NRA
4 trash where nobody knew where to put the old boxes. We
5 threw them out years ago.
6    Q. (BY MR. SHEEHAN) Is it true that you use
7 yellow pads to record your notes of conversations today?
8    A. I -- I do sometimes.
9    Q. All right. And did your counsel review those
10 yellow pads in -- "your counsel" meaning either personal
11 or NRA -- in preparing responses to document requests by
12 the attorney general's office in this proceeding?
13    MR. GARMAN: Objection to the form of the
14 question.
15    Go ahead and answer.
16    A. All of my legal pads were turned over to
17 the -- to the NRA's legal counsel, and I believe they
18 were given to the State of New York.
19    Q. (BY MR. SHEEHAN) That is in connection with
20 this bankruptcy proceeding?
21    A. I don't really have legal pads in relation to
22 the bankruptcy proceeding.
23    Q. Was there a point at which you stopped making
24 notes on yellow legal pads after the subpoena from the
25 attorney general's office in 2019?

Page 35

1    Q. (BY MR. SHEEHAN) As of 2016 when he first
2 started.
3    A. I didn't keep a file drawer of people with
4 specific conversations.
5    Q. Did you use a computer in 2016?
6    A. I did not.
7    Q. Do you use a computer now?
8    A. I do not.
9    Q. Did you use a computer at any time between
10 2016 and the present?
11    A. I have not.
12    MR. GARMAN: Objection to the form of the
13 question.
14    Go ahead.
15    Q. (BY MR. SHEEHAN) Do you ever use text in your
16 position at the NRA?
17    A. I do not.
18    Q. Do you tweet in your position at the NRA?
19    A. No, I don't.
20    Q. Do you ever send emails in your position of
21 the executive vice president of the NRA?
22    A. I -- I don't.
23    Q. Did you --
24    A. Occasionally --
25    Q. I'm sorry.

Page 37

10 (Pages 34 - 37)

1 A. Occasionally it's possible from time to time
2 that -- and I'm not sure of this -- that Andrew
3 Arulanandam, our public relations director, may have
4 sent out an email on something, but I didn't do it.
5 Q. To your knowledge, were emails sent out under
6 your name by Mr. Arulanandam?
7 A. It is -- it is possible, but I'm not sure.
8 Q. Is Mr. Arulanandam authorized to send out
9 emails with your name on them without your review?
10 A. No. If he sent something out, he would have
11 showed it to me.
12 Q. Okay. When people text you at the NRA -- let
13 me go back.
14 Do people text you at the NRA in the course of
15 your work?
16 MR. GARMAN: Objection to the form.
17 A. Sometimes people send texts, yes.
18 Q. (BY MR. SHEEHAN) And how do you read those
19 texts, if you do?
20 A. Most of the time, I don't read them, to tell
21 you the truth. I mean, I just -- I just -- I just
22 don't -- that's just not my method of communication.
23 Q. So most of the time -- let me see if I
24 understand. Most of the time when you get a text sent
25 to you, you don't read it. Is that correct?

Page 38

1 three months?
2 A. No. They were just -- people were like, I
3 want to get you this number, and they said I'll text it
4 to you. And I realized it popped up on my phone, so I
5 started reading it.
6 Q. Okay. What kind of phone --
7 A. I know it sounds like I'm from the Stone Age,
8 but maybe I'm a Stone Age guy when it comes to this type
9 of technology.
10 Q. But it also makes it possible, doesn't it,
11 Mr. LaPierre, for no one to know that they have a
12 written response from you to anything?
13 MR. GARMAN: Objection to form.
14 A. Well, that -- that never was the intent on any
15 of that.
16 Q. (BY MR. SHEEHAN) What electronic devices do
17 you get your texts on?
18 A. The only one would be my phone.
19 Q. And what's the phone number for that phone?
20 A. I don't --
21 MR. GARMAN: Counsel, are we putting this
22 in a confidential portion of the transcript?
23 MR. SHEEHAN: I hadn't planned to. Is
24 that -- is that your request?
25 MR. GARMAN: It is.

Page 40

1 A. That's correct.
2 Q. How do you decide which text to read?
3 A. I -- I don't. Within the last two or three or
4 four months, if a text pops up, I might happen to read
5 it, but that was only a recent thing I started to do.
6 Q. What was the reason that you --
7 A. I don't answer -- and I don't answer back.
8 Q. Why don't you answer back?
9 MR. GARMAN: Objection to the form.
10 A. I just have never got used to doing that. I'm
11 old. I just don't do it.
12 Q. (BY MR. SHEEHAN) You were born in 1949.
13 Correct?
14 A. Correct.
15 Q. You said in the last two to three months, if I
16 understand correctly, that you started to read texts.
17 And where do you read them?
18 A. If -- if somebody had sent me a text on my
19 phone in the last, you know, month or two, like two or
20 three months, like a telephone number for a call, I -- I
21 would read that.
22 Q. And --
23 A. I started to do that.
24 Q. Did something change about your electronic
25 devices that are available to you in the last two to

Page 39

1 Q. (BY MR. SHEEHAN) Okay. So Mr. LaPierre --
2 MR. SHEEHAN: And Ms. Brandt, I assume
3 that's doable, correct, it won't show up on the
4 transcript if we make that part confidential?
5 THE REPORTER: Yes, I can put it under a
6 separate cover.
7 MR. SHEEHAN: Okay. Thank you.
8 Q. (BY MR. SHEEHAN) Mr. LaPierre, what is the
9 phone number for that cell phone?
10 A. You know, believe it or not, I don't know it.
11 I can get it to you. I don't know it off the top of my
12 head.
13 Q. Okay. What kind of phone is it?
14 A. It's an iPhone.
15 Q. All right. Do you have an iPad?
16 A. I do not.
17 Q. The phone calls that you make out, are they on
18 a landline at the NRA or do you use your iPhone as well?
19 MR. GARMAN: Objection to form.
20 Go ahead.
21 A. I use both. I use a landline at the NRA and I
22 use my iPhone.
23 Q. (BY MR. SHEEHAN) Do you use any other phones
24 besides your iPhone and the landline to make calls out
25 in the course of your work at the NRA?

Page 41

11 (Pages 38 - 41)

**Page 42**

1    A.   There is one other phone at the house that --
2 that I use from time to time.
3    Q.   All right.  I take it from your answer that
4 you mean infrequently you use that phone at the house?
5    A.   Yes, infrequently I use that phone.
6    Q.   Okay.  Mr. Powell says at page 51 of his book,
7 There was a joke around the office that the only way to
8 make eye contact with Wayne was to lie down on the floor
9 while talking to him.
10        Have you ever heard that before?
11        MR. GARMAN:  Objection to the form of the
12 question.
13    A.   That is just ridiculous.  I mean, I talk with
14 everyone at the NRA.  I'm as open as you can be.  I want
15 everyone's ideas.  I'm the most accessible guy to our
16 members and to -- to people.  I work as a team with
17 people, and that's just ridiculous.
18    Q.   (BY MR. SHEEHAN)  Okay.  The security bills
19 that we talked about before -- I'm sorry, the security
20 threats that we talked about before, where would I go
21 within the NRA to find the record of those security
22 threats?
23        MR. GARMAN:  Counsel, let me just
24 interject here, not to stop the answer, but I want to
25 catch myself.  I think I may have messed up before.

**Page 43**

1        To the extent that we're talking about his
2 individual security protocols again, I would like to go
3 back and make those confidential to protect his
4 identity.  So if we're going to head down that again,
5 I'd like to agree to that.
6        MR. SHEEHAN:  Let me go off the record
7 for a second, because I'm not sufficiently comfortable
8 with what agreement we've reached on that issue and I
9 need some advice.  So let's go off the record again.
10        THE VIDEOGRAPHER:  We're off the record.
11 The time on the video is 10:19 a.m.
12        (Break from 10:19 a.m. to 10:20 a.m.)
13        THE VIDEOGRAPHER:  We're back on the
14 record.  The time on the video is 10:20 a.m.
15    Q.   (BY MR. SHEEHAN)  All right.  Mr. LaPierre, do
16 you have Exhibit 1 in front of you?
17        MR. GARMAN:  Yes, he does.  Counsel, as
18 we discussed before, I'll represent the setup of the
19 room is one in which the screen is quite far away from
20 us.  So Mr. LaPierre is looking at a second screen
21 connected to my laptop, and the only thing that's
22 available for him to see is your Exhibit 1.
23        MR. SHEEHAN:  Ms. Brandt, could you read
24 back the previous question about the security threat
25 record?  I don't think we got an answer.

**Page 44**

1        (Requested testimony read.)
2        MR. GARMAN:  Objection as to form.
3        Go ahead and answer.
4    A.   The NRA director of security.
5    Q.   (BY MR. SHEEHAN)  And who was that?
6    A.   It is currently Mr. Jim Staples.
7    Q.   And does he maintain a written record of the
8 threats?
9        MR. GARMAN:  Objection to the form.
10        Go ahead.
11    A.   You'd have to talk to Mr. Staples as to how he
12 does all of that.
13    Q.   (BY MR. SHEEHAN)  Does Mr. Staples prepare for
14 you any report of the threats that have been received
15 about you?
16    A.   He doesn't prepare a report to me.  He calls
17 me from time to time and tells me if there's some -- if
18 the threat level is extremely high and he thinks I need
19 to leave town because he can't protect me at our house
20 or if there are particular death threats they are
21 particularly worried about.
22    Q.   And what, if any, record do you make of these
23 calls with Mr. Staples concerning security threats?
24    A.   I don't make a record of them.  I just listen
25 to what he says on the phone.

**Page 45**



**Page 46**

7  Q.  That was 2018.  Correct?

8  A.  Correct.

9  Q.  Let's turn now to Exhibit 1.

10  (Exhibit 1 marked.)

11  Q.  (BY MR. SHEEHAN)  And are you familiar,

12 Mr. LaPierre, with what has been marked as Exhibit 1?

13  A.  Is that the 990?

14  Q.  That's 990 and supporting schedules for 2019.

15 Are you familiar with that document?

16  A.  I am familiar with it.

17  Q.  Okay.  And you'll see on the first page, it

18 says name and address of principal officer, Wayne R.

19 LaPierre.  Is that statement on the 990 correct as of

20 2019?

21  A.  Yes, it is.

22  Q.  Were you also the principal officer of the NRA

23 in 2017 and 2018?

24  A.  I was.

25  Q.  Okay.  Do you know why the 2017 and 2018 990s

**Page 47**

1 do not identify you as the principal officer?

2  A.  I don't.

3  Q.  Okay.  All right.  If you look at the first

4 page of the 990, you'll see at the bottom signature of

5 officer Wayne R. LaPierre Executive Vice President.

6  A.  Correct.

7  Q.  And -- and, in fact, you did sign this return

8 electronically.  Correct?

9  MR. GARMAN:  Objection to form.

10  Go ahead.

11  A.  I signed the 990.  I -- I don't know whether I

12 signed it electronically or not.  I know I signed the

13 990.

14  Q.  (BY MR. SHEEHAN)  So the document in front of

15 you, which is taken from the New York State Attorney

16 General's records of filings, is that an exact copy of

17 what you signed?

18  A.  If that's the 990, I signed the 990.

19  Q.  And do you recall whether you signed it on the

20 signature block on part II or whether you signed a

21 separate document?

22  A.  I don't recall that, Mr. Sheehan.  I just know

23 I signed the 990.

24  Q.  Okay.  If you look at that on part I, the

25 summary, you will see it says number of voting members

**Page 48**

1 of the governing body and it has the number 73.  That's

2 in question 3.  Is that answer correct?

3  A.  Number of voting members of the governing

4 body.  That would be, I assume, our board of directors.

5 Am I correct?

6  Q.  I'm asking you because you signed it and

7 certified it was true.

8  At the time that this was filed on November 18

9 of 2020, were there 73 members of the governing body?

10  MR. GARMAN:  I'm going to object as to

11 form.

12  But I am going to instruct you not to

13 speculate.  Testify as to your personal knowledge.

14  A.  Yeah, I -- when I scanned through this and

15 read the parts that I particularly thought I needed to

16 focus on, I didn't really focus on that line.  This was

17 prepared by our treasurer's people, our tax

18 professionals, our outside tax professionals, and I

19 relied on them.

20  Q.  (BY MR. SHEEHAN)  So sitting here today, you

21 don't know whether, in fact, there were 73 members of

22 the board of directors -- 73 voting members of the

23 governing body as of 11/18/2020.  Correct?

24  MR. GARMAN:  Objection to the form of the

25 question.

**Page 49**

1  A.  I -- I don't.  I don't know what they were

2 referring to on that -- on that line.

3  Q.  (BY MR. SHEEHAN)  Okay.  And when you signed

4 this document in November of 2020, you did not make any

5 effort to determine whether that number of voting

6 members was correct?

7  MR. GARMAN:  Objection to the form of the

8 question.

9  A.  I just relied on the professional competence

10 of our tax preparers, our treasurer's office, our

11 outside tax professionals, and I relied on them for

12 that.

13  Q.  (BY MR. SHEEHAN)  All right.  With respect to

14 the professionals that you relied upon, who were they?

15  A.  It would be our treasurer's office.  It would

16 be our general counsel office.  It would be our outside

17 tax counsels to the -- to the NRA.

18  Q.  So let's walk through that.

19  Treasurer's office, whose job was it within

20 the treasurer's office to make sure that the 990 was

21 accurate?

22  A.  That would be the treasurer Mr. Craig Spray

23 and his staff in the treasurer's office.

24  Q.  Okay.  With respect to the general counsel,

25 whose job was it to make sure that the 990 was correct?

13 (Pages 46 - 49)

1     A. That would be Mr. John Frazer and his staff.
2     Q. With respect to outside advisers, whose job
3 was it to make sure the 990 was correct?
4     A. They had a number -- I think a number of
5 outside tax experts that worked with them on this. I
6 think one was -- one was -- I'm not positive of this. I
7 think one was Don Lan.
8     Q. Anybody else?
9     A. Not that I know of.
10     Q. What was the role of the Aronson firm in
11 preparing the 2019 990 for the NRA?
12     A. I don't know. The Aronson was -- a new audit
13 firm that the NRA hired after RSM, and they did the 2019
14 audit, which was a very clean audit, and they also
15 checked all -- double checked all of our control systems
16 and everything else, and we were very proud of the fact
17 that we had a clean audit for 2019.
18     Q. Mr. LaPierre, what was the role of the Aronson
19 firm in preparing the 2019 990 for the NRA?
20     A. I don't know the answer to that.
21     Q. Did the Aronson firm have any role in
22 preparing the 990 for the NRA for 2019?
23     A. You would have to ask our treasurer's office
24 and tax expert who worked on this.
25     Q. Okay. Was there a paid preparer for the 2019

Page 50

1 990 for the NRA?
2     A. You'd have to ask the treasurer's office or
3 our general counsel or the -- you'd have to ask our
4 treasurer's office.
5     Q. The signature block says that I have examined
6 the return including -- take a look at the signature
7 block language on Exhibit 1, part II. Do you see that?
8     A. Yes.
9     Q. It says, I examined the return, including the
10 accompanying schedules and statements. Correct?
11        MR. GARMAN: Objection to form.
12     A. Where are you -- where are you reading?
13     Q. (BY MR. SHEEHAN) It says -- if you look at
14 part II, signature block on Exhibit 1, it says, Under
15 penalties of perjury, I declare that I've examined this
16 return --
17     A. I see that.
18     Q. Okay.
19     A. Right.
20     Q. And to the best of my knowledge and belief, it
21 is true and correct and complete.
22        So what --
23     A. That is correct.
24     Q. Of what did your examination of the Exhibit 1
25 consist?

Page 51

1        MR. GARMAN: Objection as to form.
2     A. I -- I looked through it. I scanned through
3 it. I read other parts in more detail than others, but
4 I -- I looked through the whole thing as I -- before I
5 signed it.
6     Q. (BY MR. SHEEHAN) And --
7     A. But --
8     Q. -- is it true that at the time you signed this
9 990, it was, to the best of your knowledge and belief,
10 true, correct and complete?
11     A. That's correct.
12     Q. And as of March 22, 2021, is it still your
13 belief that the 990 that was filed with the attorney
14 general's office in New York is true, correct and
15 complete?
16     A. I don't have any reason not to believe that.
17     Q. Does that mean you do believe it?
18        MR. GARMAN: Object to form.
19     A. Yeah, I believe it's true, accurate and
20 complete.
21     Q. (BY MR. SHEEHAN) Okay. Did the NRA ask the
22 Aronson firm to sign off as paid preparer for the 990?
23     A. I don't know the answer to that.
24     Q. All right. Prior to signing the 990 in
25 November 2020, did you talk to the Aronson firm about

Page 52

1 the completion of the IRS 990 for 2019 for the NRA?
2     A. I did not.
3     Q. All right. Did you review any memos from the
4 Aronson firm concerning the 2019 2020 -- I'm sorry.
5        Did you review any memos or other documents
6 from the Aronson firm concerning the preparation of the
7 2019 990?
8     A. I did not.
9     Q. In prior years, Craig Spray is the person who
10 signed off on the 990 that is 2018 and 2017. Can you
11 tell me why Craig Spray did not sign the 2019?
12        MR. GARMAN: Objection as to form.
13     A. I don't. I did not talk to Craig Spray about
14 why he didn't sign the 990. I didn't have a
15 conversation with him about it.
16     Q. (BY MR. SHEEHAN) Did you personally decide to
17 sign the 990 for 2019 yourself?
18     A. I told everybody I would be happy to sign it
19 because I was proud of it because it reflected all
20 the -- a lot of the self-correction work that the NRA
21 had started into from 2017 forward when we -- after the
22 Schneiderman call where we hired Morgan Lewis to help us
23 with governance, and then we -- we had started down this
24 path of looking at everything, self-correcting and
25 self-improving, improving our compliance controls,

Page 53

14 (Pages 50 - 53)

1 making sure they were robust. And it reflected a lot of
2 the work that we had done, so I was proud to sign it.
3 Q. Let me -- you say that you hired Morgan Lewis
4 to help you with governance. When was that?
5 A. It was after the Schneiderman call. We
6 retained Morgan Lewis, one of the top nonprofit firms,
7 to -- because everything General Schneiderman said to
8 Tom King made sense to me. We didn't know whether --
9 whether or not what he said was going to happen, which
10 was the other side was going to improperly use the
11 government or state to target the NRA. We weren't sure
12 that it happened, but --
13     (Reporter clarification.)
14     MR. GARMAN: Yeah, so Mr. Sheehan, I
15 think we're having the same microphone issue on your
16 side. It is actually hard to hear you at points with
17 the paper.
18     MR. SHEEHAN: I'm not sure what, frankly,
19 to do about that, because I do need my documents, but
20 let's -- I will make an effort to avoid rustling papers
21 during the answer.
22 Q. (BY MR. SHEEHAN) Mr. LaPierre --
23 A. When General Schneiderman said -- said that, I
24 mean, we didn't know whether it was going to happen or
25 not happen. When he said that they were making a huge
Page 54

1 effort to improperly use the government of the New York
2 state to target the NRA, he disagreed with that. He
3 thought it was an improper use of government.
4     But he thought we ought to do this major
5 safety check, compliance review to make sure that we
6 were in complete compliance with New York state
7 not-for-profit law. So we hired -- the first thing we
8 did, we hired Morgan Lewis, one of the top nonprofit
9 firms, to help with governance issues and to start the
10 NRA down that road, which we have continued down that
11 road in 2017, 2018, 2019, 2020 and continue today down
12 that road to improve.
13 Q. So who at Morgan Lewis undertook the review?
14     MR. GARMAN: You can tell him who at
15 Morgan Lewis, but I instruct you not to discuss the
16 content of the communication.
17 A. You would need to talk to our general
18 counsel's office to see who they communicated with
19 primarily on that.
20 Q. (BY MR. SHEEHAN) So is it fair to say you
21 never communicated with Morgan Lewis on that?
22     MR. GARMAN: Objection to form.
23 A. I -- I had some conversations with the Morgan
24 Lewis people, but most of it was done by counsel --
25 counsel.
Page 55

1 Q. (BY MR. SHEEHAN) What Morgan Lewis people did
2 you have conversations about these issues?
3 A. I can't -- I can't -- I can't remember.
4 Q. Not a single Morgan Lewis lawyer that you can
5 remember?
6     MR. GARMAN: Objection as to form.
7 A. I can't remember. That goes back primarily
8 to 2017, although we had some additional opinions as
9 we were going through this whole NRA issues over the
10 last several years on whether what we were doing was
11 proper --
12     MR. GARMAN: Hold on. Hold on. Hold on.
13 I think you're talking about your communications with
14 Morgan Lewis.
15     THE WITNESS: Right.
16     MR. GARMAN: I'm not sure, but if you
17 are --
18     THE WITNESS: I am.
19     MR. GARMAN: -- I would instruct you not
20 to go any further.
21 Q. (BY MR. SHEEHAN) Mr. LaPierre, did you rely
22 upon Morgan Lewis' advice in making the changes to
23 conform to New York state nonprofit law?
24 A. We relied on Morgan Lewis. We also later on,
25 as we -- as we -- we retained the Brewer firm as the -- as
Page 56

1 what General Schneiderman told us was going to happen
2 started to play out --
3 Q. Mr. LaPierre, I asked you did you rely upon
4 Morgan Lewis's advice. That was the question. What's
5 your answer?
6 A. Yes, we did.
7 Q. Okay. And did you rely upon their advice in
8 performing your duties as the executive vice president
9 of the NRA?
10     MR. GARMAN: Objection as to form.
11 A. The work that went on with Morgan Lewis was
12 primarily work that went on with our -- with our general
13 counsel's office. I did not -- was not involved
14 in-depth with the -- with the work that was going on
15 with Morgan Lewis.
16 Q. (BY MR. SHEEHAN) What governance changes did
17 the NRA make between the alleged Schneiderman call in
18 the summer of 2017 and the retention of the Brewer firm
19 in 2018?
20     MR. GARMAN: Objection as to form.
21 A. You would have to ask our general counsel
22 that. The Brewer -- the Morgan Lewis firm, I think,
23 were concentrating on a more general basis, in terms of
24 governance and the IRS, to make sure NRA was in
25 compliance. And that would be a treasurer's office
Page 57

15 (Pages 54 - 57)

1 issue, a general counsel's office issue as opposed to a
2 lot of the more specific litigation type issues that the
3 Brewer firm got involved with, which -- which involved
4 the department of financial services. It also involved
5 the attorney general's office in New York after the
6 attorney general said during her campaign that she --
7 Q. (BY MR. SHEEHAN) Mr. LaPierre, that is
8 totally nonresponsive to my question.
9 MR. SHEEHAN: The court reporter,
10 Ms. Brandt, could you read back the question again?
11 (Requested testimony read.)
12 MR. GARMAN: Objection as to form.
13 A. And my answer is I'm not sure because I wasn't
14 the principal one working with Morgan Lewis in terms of
15 their work at that time.
16 Q. (BY MR. SHEEHAN) And the -- do you know what
17 the inquiry that was conducted by Morgan Lewis was
18 between the alleged Schneiderman call and when the
19 Brewer firm was hired?
20 MR. GARMAN: Objection.
21 MR. SHEEHAN: I am asking whether he
22 knows it.
23 MR. GARMAN: I understand. You can
24 answer yes or no to that.
25 A. I'm sorry. Could you read me the question

Page 58

1 again?
2 Q. (BY MR. SHEEHAN) The question is do you know
3 what inquiry the Morgan Lewis firm conducted between the
4 alleged Schneiderman call and when the Brewer firm was
5 hired concerning governance or the tax status of the
6 NRA?
7 MR. GARMAN: I instruct you not to invade
8 the attorney/client privilege, but you can answer.
9 A. No, I don't know specifically. I was so busy
10 at that time with the -- with my other responsibilities.
11 You had the Las Vegas shooting. You had the Somerville
12 shooting. You had -- and I was -- I wasn't the one
13 specifically working with Morgan Lewis on what they were
14 working on.
15 Q. (BY MR. SHEEHAN) In your view, was the
16 alleged Schneiderman call a basis to believe the very
17 existence of the NRA was at stake?
18 A. It was in my belief that Attorney General
19 Schneiderman relayed very clearly that the whole effort
20 to weaponize the government of New York state from the
21 AG's office, starting with the AG's office, but also
22 going to the department of financial services, involved
23 an attempt to destroy the National Rifle Association by
24 using the incorporation of New York state and its
25 nonprofit status, and he thought that was improper use

Page 59

1 of government and -- and he talked about the tremendous
2 pressure being put on to go down that route.
3 And I thought, yeah, it was a very real threat
4 to the NRA, which is why I thought it made sense to
5 begin to -- to do what the attorney general recommended,
6 which made sense whether the investigation was going to
7 happen or not.
8 Look, I'm not a CPA. I'm not a lawyer. I'm
9 not a tax person or anything like that. But I just
10 thought it made good sense in general to take a look at
11 everything the NRA was doing, every employee, every
12 vendor, everything, and see if we were in compliance.
13 Because if the investigation happened, that would be a
14 good thing, and we would be prepared to proudly show
15 everything we had done. And if it didn't happen, it was
16 still a good thing to do.
17 Q. Did Morgan Lewis ever interview you?
18 A. I don't think they interviewed me, no.
19 Q. Did you get any written reports from Morgan
20 Lewis? "You" meaning you, Wayne LaPierre, personally.
21 MR. GARMAN: Answer the question yes or
22 no.
23 A. No.
24 Q. (BY MR. SHEEHAN) Did -- did the Aronson firm
25 refuse to sign the Exhibit 1?

Page 60

1 A. I don't know.
2 Q. The numbers that are in part I of the 990,
3 where do they come from, that is the -- sorry, in the
4 revenue and expenses and assets sections, where do those
5 numbers come from?
6 A. They would have been prepared by our -- our
7 treasurer's office, to the best of my knowledge, by our
8 tax professionals on the inside and the outside and
9 working with our general counsel's office.
10 Q. Do you know whether those numbers are
11 accurate?
12 A. Well, all I can do is rely on the
13 professionals that we hire and trust, and they presented
14 them as accurate to me, and I -- I rely on their
15 professionalism and I trust them.
16 Q. Okay. So you made no independent inquiry to
17 determine if the numbers were correct in part II of --
18 sorry -- part I of the Exhibit 1?
19 MR. GARMAN: Objection as to the form of
20 that question.
21 A. I think I'm entitled to rely on our
22 professionals that that's their job to do and their --
23 and their good work. And I trust them, they're
24 competent people, and I relied on their -- I relied on
25 them.

Page 61

16 (Pages 58 - 61)

1 Q. (BY MR. SHEEHAN) Okay. So let's go to page 4
2 of the 2019 990. And if you would look at questions 25a
3 and b. Do you see that question, Mr. LaPierre?
4 A. Did the organization -- (witness reading to
5 himself.)
6 Q. You're being pretty tough on Ms. Brandt.
7 MR. SHEEHAN: Can you get all that,
8 Ms. Brandt?
9 THE REPORTER: No.
10 Q. (BY MR. SHEEHAN) Okay. Can you go more
11 slowly?
12 A. I was just reading what the question said in
13 those two sections.
14 Q. And you'll see in 25a and b -- and we'll go
15 back to what they say in a minute -- that the box is
16 checked yes to both of those questions. Correct?
17 A. Correct.
18 Q. And you understand that checking the box yes
19 to that means the corporation did engage in an excess
20 benefit transaction with a disqualified person during
21 the year. Is that correct?
22 MR. GARMAN: Objection to form.
23 Go ahead.
24 A. That's correct.
25 Q. (BY MR. SHEEHAN) And with respect to question

Page 62

1 25b, is the organization aware it engaged in an excess
2 benefit transaction with a disqualified person in a
3 prior year and that the transaction has not been
4 reported on any of the organization's prior forms 990 or
5 990-EZ, was that answer true, correct and complete when
6 you signed this 990 in November of 2020?
7 MR. GARMAN: Objection to form.
8 Go ahead.
9 A. You know, I relied on the professional opinion
10 of our lawyers, our tax preparers and our treasurer's
11 office on that, so I -- I -- I relied on their judgment.
12 Q. (BY MR. SHEEHAN) Do you believe today that
13 those two answers are correct, that is 25a and 25b on
14 part IV of Exhibit 1?
15 A. I have no knowledge that they're not correct.
16 I don't know why they wouldn't be correct.
17 Q. Did you ask anyone at the NRA why we are
18 checking yes to those two boxes, that is 25a and 25b of
19 the part IV of the 990?
20 A. I did not. I assumed that they knew what they
21 were -- they were competent in terms of the areas they
22 were dealing with and they prepared it appropriately.
23 Q. At the time that you signed Exhibit 1, did you
24 know that engaging in an excess benefit transaction with
25 a disqualified person put the NRA's tax exemption in

Page 63

1 jeopardy?
2 MR. GARMAN: Objection to the form of
3 that question.
4 A. You know, I'm not a lawyer. I mean, I --
5 you're asking legal issues. I am not an expert on New
6 York not-for-profit law or -- I -- I really don't know
7 the -- didn't know -- don't know the answer to that
8 question.
9 Q. (BY MR. SHEEHAN) So Mr. LaPierre, after
10 Morgan Lewis went through and did the review in the
11 summer of 2017 through 2018, after Mr. Brewer and his
12 firm spent $2 million a month of your money making sure
13 you're 100 percent compliant, why is it that the NRA
14 in -- for 2019 was not compliant with the excess
15 benefits for disqualified persons standard?
16 MR. CORRELL: This is Mr. Correll.
17 Objection to form.
18 MR. GARMAN: Objection to the form of the
19 question. And I'm instructing you not to answer that
20 question to the extent that it only could come from your
21 conversations with counsel.
22 Q. (BY MR. SHEEHAN) All right. Let me phrase it
23 more specifically.
24 Why is it, Mr. LaPierre, that after you told
25 the Court in February of 2021 that the NRA was

Page 64

1 100 percent compliant, that the most recent IRS 990
2 filed by the NRA says you're not?
3 MR. GARMAN: Objection. Objection to the
4 form of the question. That's not what it says.
5 Q. (BY MR. SHEEHAN) You can answer,
6 Mr. LaPierre.
7 A. I believe that the NRA has gone through an
8 unbelievable process that I took the lead on, starting
9 in 2017. As you heard me say before, Mr. Sheehan, if I
10 lose every friend I've ever made, we are going down this
11 principal path of looking at every employee, every
12 vendor, everything. And if there's something that needs
13 to be self-corrected, we're going to do it. And I don't
14 care what the fallout is, and no one is going to drag us
15 from that principle path.
16 And we started in 2017. We started throughout
17 2018. We started compliance seminars in 2018. In 2019,
18 we were very proud of the fact that we had gotten to the
19 point where we were -- the new audit firm, despite of it
20 being aware of all the other issues -- whatever other
21 issues there were, looked at controls, looked at
22 everything, gave us a clean audit. And we continued to
23 improve in 2020.
24 I think it's a positive story for this
25 organization. I think it's a great story. And I don't

Page 65

1 think the organization could have been working harder to
2 go down the principal path of trying to be in complete
3 compliance with New York state or any other state's
4 nonprofit law.
5  Q. Okay. Let me ask you -- let me ask you this.
6 If you look at part V, the question 1c, did the
7 organization comply with backup withholding rules for
8 reportable payments to vendors and reportable gaming --
9 gambling winnings to prizewinners, and the box is
10 checked yes. How did you know that was true?
11  MR. GARMAN: Objection to the form of the
12 question.
13  A. I relied on our professional tax preparers,
14 our tax office and our general counsel's office that all
15 worked on this form, and I relied on their
16 professionalism. I had trust placed in them to do this
17 honestly and accurately.
18  Q. (BY MR. SHEEHAN) Are there workpapers related
19 to the preparation of the 2019 990 at the NRA?
20  A. I don't know the answer to that.
21  Q. Did you review any workpapers before signing
22 this return that was true, correct and complete?
23  A. I did not.
24  Q. Does the NRA have any gaming or gambling
25 winnings for prizewinners?

Page 66

1 question.
2  A. Our treasurer's office, our tax preparers and
3 our general counsel's office would -- I assume would
4 know.
5  Q. (BY MR. SHEEHAN) But you yourself, having
6 signed this document saying it's true, correct and
7 complete, do not know whether that answer is true,
8 correct, and complete?
9  MR. GARMAN: Objection to the form of the
10 question.
11  A. I believe it is because I -- I rely on
12 professionals in this field, in this building, out of
13 this building, professional tax preparers out of this
14 building, lawyers in this building and I rely on all of
15 our treasurer's office people. So as far as I know,
16 based on my reliance on them and the trust I place in
17 them and the belief they are professional, hard working
18 people, that these are -- this is accurate, that they do
19 good work. I couldn't possibly be involved in every bit
20 of detail, given all the rest of my responsibilities
21 where we talked about everything I'm doing.
22  Q. (BY MR. SHEEHAN) Mr. LaPierre, what I am
23 trying to find out is apart from trust and belief, what
24 effort did you make to make sure that the 990,
25 Exhibit 1, was accurate and correct?

Page 68

1  MR. GARMAN: Object to the form of the
2 question.
3  A. You know, I -- you know, that's an issue that
4 you'd have to ask the tax preparers what they were
5 referring to. I mean, I would be speculating on what
6 they're talking about when you get into that. I mean,
7 I'll give you an example I know. We have a sweepstakes
8 where we do a truck raffle, so maybe it's referring to
9 that.
10  MR. GARMAN: Don't speculate.
11  A. But I'm speculating.
12  Q. (BY MR. SHEEHAN) Do you know with respect to
13 the truck raffle whether the backup withholding
14 requirements are -- I'm sorry, do you know with respect
15 to the truck raffle whether the reportable winnings
16 were, in fact, reported?
17  MR. GARMAN: Object to the form of the
18 question.
19  A. It's actually a truck sweepstakes that we do
20 through our magazines and -- and through the mail. I'm
21 not the guy on the specifics on all that.
22  Q. (BY MR. SHEEHAN) So you don't know the answer
23 of what is done with respect to reporting the winnings
24 as recited on part V, 1c?
25  MR. GARMAN: Object to the form of the

Page 67

1  MR. GARMAN: Objection. You have asked
2 him that question. He's answered it now. He can answer
3 again.
4  Q. (BY MR. SHEEHAN) Mr. LaPierre?
5  A. I relied on the professional work of our
6 treasurer's office, our general counsel's office, the
7 outside tax preparers and all the work that they put in
8 to putting this document together.
9  Q. Okay. Let's go to part VI and look at
10 question number 5. Do you see question number 5 on part
11 VI?
12  A. I do.
13  Q. Did the organization become aware during the
14 year of a significant diversion of the organization's
15 assets? And you'll see the answer is checked yes. What
16 did you do to inform yourself about whether that answer
17 was correct?
18  MR. GARMAN: Objection to the form of the
19 question.
20  Go ahead.
21  A. My answer is to say I relied on the
22 professional opinions of our tax preparers, our
23 treasurer's office and our general counsels, that
24 they -- in preparing this document. Do you know, Mr. LaPierre,

Page 69

18 (Pages 66 - 69)

1 what the -- what this means, what it means to have a
2 significant diversion of subassets of the organization?
3    A.  I -- I don't know that I know the legal
4 definition of what that means.
5    Q.  What is the legal definition of what that
6 means?
7    A.  I don't know that I know what the legal
8 definition of what that means is.
9    Q.  What is it?
10       MR. GARMAN:  He just said he doesn't
11 know.
12       MR. SHEEHAN:  No, he said he does know
13 what --
14    Q.  (BY MR. SHEEHAN) I'm sorry.  What is your
15 understanding of what the legal definition of diversion
16 of assets means?
17       MR. GARMAN:  Objection.  Counsel, he said
18 he does not know.
19    A.  I don't know.
20    Q.  (BY MR. SHEEHAN) Okay.
21    A.  I said I don't know the legal definition of
22 what that means.
23    Q.  That is, you don't -- you don't know what a
24 significant diversion of the organization's assets is?
25       MR. GARMAN:  Objection to the form of the

Page 70

1 question, calls for a legal conclusion, asked and
2 answered.
3    Q.  (BY MR. SHEEHAN) Mr. LaPierre?
4    A.  I am just not aware of that legal terminology
5 and what it means.  I -- I trusted our general counsel's
6 office, our treasurer and our professional tax preparers
7 understand it completely when they answered the
8 question.
9    Q.  Do you know, Mr. LaPierre, how frequently the
10 NRA has reported that it had a significant diversion of
11 its organization's assets during the time that you've
12 been the executive vice president of the NRA?
13       MR. GARMAN:  Objection to the form of the
14 question.
15    A.  I do not know that.
16    Q.  (BY MR. SHEEHAN) Isn't it true that in the
17 entire time that you've been at the NRA that answer has
18 never been answered yes before?
19       MR. GARMAN:  Objection to the form of the
20 question.
21    Q.  (BY MR. SHEEHAN) The answer to question 5 on
22 part VI.
23       MR. GARMAN:  Objection to the form of the
24 question.  You're being argumentative now.
25    A.  I don't -- I don't know.  I'm not aware of

Page 71

1 what you just said.  I don't know whether that's true or
2 not true.
3    Q.  (BY MR. SHEEHAN) Are you aware that in the
4 charities world, that the -- answering yes to question 5
5 on part VI means the Charity Navigator, among other
6 watch dogs, will not rate your organization?
7       MR. GARMAN:  Objection lack of
8 foundation, objection to the extent it calls for a legal
9 conclusion, objection to the form.
10    Q.  (BY MR. SHEEHAN) Mr. LaPierre?
11    A.  I am not -- I have heard of Charity Navigator.
12 I am not aware of how -- how this applies to what they
13 do.  And I just -- it's not my area of expertise.
14    Q.  Do you know that less than 1/2 of 1 percent of
15 charities that file electronically, like the NRA, with
16 the IRS report yes to question 5?
17       MR. GARMAN:  Objection, lack of
18 foundation.  Object to the form of the question.
19    A.  Yeah, I wouldn't have any basis to know that.
20       Keep in mind, if -- and I assume -- and our
21 treasurer's office and our outside tax preparers and our
22 preparers can talk about this, but whatever they're
23 doing on any of this is in the context of this whole
24 self -correction in terms of what the NRA is doing to
25 make sure we're in 100 percent compliance and best

Page 72

1 practices with nonprofit law.  So I mean, it -- it --
2 you know.
3    Q.  Mr. LaPierre, did you -- you mentioned two
4 compliance training programs, one in 2018 and one in
5 2019.  Did you attend the full session of either of
6 those compliance training programs?
7       MR. GARMAN:  Objection to the form of the
8 question.  He didn't mention any such training program.
9    Q.  (BY MR. SHEEHAN) Mr. LaPierre, you can
10 answer.
11    A.  Yeah, I -- I do not think I attended it.  I
12 was aware of what they were -- what they were -- of what
13 the content of what they were relaying.
14    Q.  Do you think it's important for the CEO and
15 executive vice president of an organization to show its
16 support for compliance program by at least showing up to
17 the training programs?
18       MR. GARMAN:  Objection to the form of the
19 question.
20    A.  I actually would do that from now on if we do
21 another one, but I had read what they were -- I was very
22 much aware of what they were going down and what it
23 contained and the information they were relaying.
24    Q.  (BY MR. SHEEHAN) And in fact, the
25 representative that you sent to the first session in

Page 73

19 (Pages 70 - 73)

1 2018 was Josh Powell. Correct?
2         MR. GARMAN: Objection, lack of
3 foundation. Object to the form of the question.
4     A. I believe that's correct. Mr. Spray had had a
5 heart attack. Mr. Powell was filling in for him. And
6 you're correct, I believe it was Mr. Powell.
7     Q. (BY MR. SHEEHAN) And so the person that you
8 put in charge of communicating the compliance program to
9 the employees of the NRA was a person that a year later
10 you would fire for improper expense reports to the NRA.
11 Is that correct?
12         MR. GARMAN: Objection to the form of the
13 question.
14     A. As I said, Mr. Powell was filling in for
15 Mr. Spray and, unfortunately, yes, a year later we did
16 end up letting Mr. Powell go as part of -- as part of
17 the fact that we -- compliance is an everyday rule of
18 life around the organization now. There are no
19 exception. If someone is not complying, they face
20 consequences.
21     Q. (BY MR. SHEEHAN) All right. So let us go now
22 to question 11a on the 990. That is part VI. Has the
23 organization provided a complete copy of this Form 990
24 to all members of its governing body before filing the
25 form? And the box is checked no. Is that answer
Page 74

1     Q. (BY MR. SHEEHAN) Do you know with respect to
2 Exhibit 1 when that was given to all members of the
3 board of directors?
4     A. I don't know when it was given to our board of
5 directors.
6     Q. Do you know with respect to the 990, Exhibit
7 1, for 2019 when it was given to all members of the
8 audit committee?
9     A. I don't know when it was given to the audit
10 committee. You'll have to ask our treasurer's office or
11 our general counsel's office.
12     Q. Do you know whether the completed 990, as
13 filed with the New York Attorney General's Office, was
14 ever given to either the audit committee or to the board
15 of directors?
16         MR. GARMAN: Objection as to the form.
17     A. I -- I believe the 990 was given both to our
18 audit committee and our board of directors.
19     Q. (BY MR. SHEEHAN) And what do you base that
20 belief on?
21     A. The fact -- the fact that the NRA was working
22 intensively on compliance, on controls. As I said, it's
23 an ongoing process. The audit committee has been
24 brought into all of this. The board of directors has
25 been brought into all of this, and -- and I believe this
Page 76

1 correct?
2         MR. GARMAN: Objection to the form of the
3 question.
4         Go ahead.
5     A. Again, this was prepared by our general
6 counsel's office, our -- our --
7     Q. (BY MR. SHEEHAN) Mr. LaPierre, the question
8 is is the answer to that question correct on 11a of part
9 VI?
10     A. I assume -- I assume it is correct because it
11 was prepared by these professionals and relying on their
12 professional judgment -- professional work. I believe
13 that answer is correct.
14     Q. Did anyone give the IRS 990 that was filed
15 with the Attorney General's Office of New York to all
16 members of the governing body before it was filed?
17         MR. GARMAN: Objection to the form.
18     A. I don't know the answer to that.
19     Q. (BY MR. SHEEHAN) Is there a practice within
20 the NRA of distributing the 990 that is to be filed with
21 the board before the filing occurs?
22         MR. GARMAN: Objection to the form.
23     A. I'm -- as far as I know, the 990s are
24 distributed through our board of directors to be -- to
25 be looked at. I'm not sure exactly when that occurs.
Page 75

1 form was shown to all of them.
2     Q. And what do you base that belief on?
3         MR. GARMAN: Objection to the form.
4     A. I base it on -- one, I believe our attorneys
5 were working with the audit committee on all of this in
6 making them aware of everything, and I -- I -- the NRA,
7 as a practice, I remember always talked about the 990
8 being available to the board.
9     Q. (BY MR. SHEEHAN) Do you believe it's an
10 important part of an effective compliance program to
11 distribute the 990 to the governing body before it's
12 filed?
13         MR. GARMAN: Objection as to the form of
14 the question.
15     A. You know, I'm not aware -- again, you're
16 getting into an area where I'm not an expert on. I know
17 the 990 was made available to our board. I don't know
18 whether it's made available to them before it's filed or
19 not.
20     Q. (BY MR. SHEEHAN) And you don't know whether
21 it's made available -- you don't know whether it's made
22 available to them after it's filed either. Right?
23         MR. GARMAN: Objection to the form of the
24 question.
25     A. Pardon me. Made available -- I'm sorry?
Page 77

20 (Pages 74 - 77)

1  Q.  (BY MR. SHEEHAN) I'm sorry.  You don't know
2 whether the Form 990 is made available to the members of
3 the board of directors after it was filed, Exhibit 1?
4           MR. GARMAN:  Objection to the form of the
5 question.
6     A.  I testified that I believe the 990 is always
7 made available to our board of directors at one of the
8 board -- at one of the board meetings.
9     Q.  (BY MR. SHEEHAN) How was the 990 made
10 available to the board members at a board meeting for
11 2019?
12     A.  I --
13           MR. GARMAN:  Objection to the form.
14           Go ahead.
15     A.  The way it is usually done, and I have not --
16 2020 has been such a crazy year because of COVID and all
17 that, that the way it's usually done is the general
18 counsel, the secretary makes an announcement that the
19 990s are available in -- in the back of the room for
20 board members to pick up and look at.
21     Q.  (BY MR. SHEEHAN) Are the board members
22 permitted -- I'm sorry, go ahead.
23     A.  To my recollection, that's the way it's
24 usually done.
25     Q.  Okay.  They're allowed to pick it up and look

Page 78

1 at it.  Can they take it home?
2     A.  I don't know the -- I don't know the answer to
3 that.
4     Q.  Okay.  Let's go to question 12a.
5           MR. SHEEHAN:  Let's take a short break.
6           MR. GARMAN:  Did you say a break,
7 Counsel?
8           MR. SHEEHAN:  Actually, I think we can go
9 ahead.  Well, we can go ahead.  Let's do this.
10     Q.  (BY MR. SHEEHAN) Can you tell me,
11 Mr. LaPierre, in the ordinary course, is that 990 made
12 available --
13           MR. GARMAN:  Jim, we went off.  Are we
14 back on?
15           THE VIDEOGRAPHER:  Yes.
16           MR. GARMAN:  Okay.  We're back on.  We
17 went off, but we're back on I guess.
18           MR. SHEEHAN:  Okay.  Thank you.
19     Q.  (BY MR. SHEEHAN) Was the 990 made available
20 to the members of the board of directors before or after
21 it was filed?
22           MR. GARMAN:  Objection to the form of the
23 question.
24     A.  I'm not sure.  I think it was made available
25 to them after it was filed.

Page 79

1     Q.  (BY MR. SHEEHAN) Okay.  Has any member of the
2 board of directors ever asked you any questions about
3 the 990s that have been filed by the NRA?
4     A.  No, not that I -- not that I recall.
5     Q.  Okay.  Let's go to question 12a.  All right.
6 Did the NRA have a written conflict of interest policy?
7 The box is checked yes.  To your knowledge, is that
8 correct?
9     A.  Yes, I believe that's correct.
10     Q.  12b, were officers, directors or trustees and
11 key employees required to disclose annually interests
12 that could give rise to conflicts?  And that box is
13 checked yes.  To your knowledge, is that correct?
14     A.  Yeah.
15     Q.  With respect to question 12C, did the
16 organization regularly and consistently monitor and
17 enforce compliance with the policy?  The box is checked
18 yes.  To your knowledge, was that correct at the time
19 for the year 2019?
20     A.  Yes, it is.  Part of the -- part of the
21 360-degree review of this organization, self-correction
22 and safety checks, look at everything to make sure NRA
23 is in complete compliance and improve anything that
24 needed to be improved.
25           In the past, I know that one of the things NRA

Page 80

1 improved on and worked on was to make sure that -- and
2 with the audit committee also and with the board, that
3 it updated and improved all of its -- all of its
4 policies in this area.
5     Q.  So in your opinion, Mr. LaPierre, does the NRA
6 consistently and regularly enforce -- let me go back.
7           During 2019, did the NRA consistently -- let
8 me start again.
9           During 2019, did the organization regularly
10 and consistently monitor and enforce compliance with a
11 conflict of interest policy?
12           MR. GARMAN:  Objection to the form of the
13 question.
14           You can answer.
15     A.  I believe in 2019 the NRA -- the NRA did.  The
16 NRA as part of its compliance reviews, its safety checks
17 and its complete desire to bring this organization -- to
18 not let anyone drag it off course, that the organization
19 was doing that in 2019.
20     Q.  (BY MR. SHEEHAN) How about 2018?
21           MR. GARMAN:  Objection to the form of the
22 question.
23     A.  I --
24     Q.  (BY MR. SHEEHAN) Go ahead, Mr. LaPierre.
25     A.  I think it was an ongoing process of, as I

Page 81

21 (Pages 78 - 81)