IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re: | ) **Case No. 21-30085-hdh-11** |
| | ) Jointly Administered |
| NATIONAL RIFLE ASSOCIATION | ) |
| OF AMERICA, et al., | ) Dallas, Texas |
| | ) April 7, 2021 |
| Debtors. | ) 1:15 p.m. Docket |
| | ) |
| | ) TRIAL DAY 3 - AFTERNOON DOCKET |
| | ) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE HARLIN DEWAYNE HALE,
UNITED STATES CHIEF BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For Ackerman McQueen,      Brian Edward Mason
Inc.:                      G. Michael Gruber
                           H. Joseph Acosta
                           Christina M. Carroll
                           DORSEY & WHITNEY, LLP
                           300 Crescent Court, Suite 400
                           Dallas, TX  75201
                           (214) 981-9900

For the Official Committee Louis R. Strubeck, Jr.
Of Unsecured Creditors:    Scott P. Drake
                           NORTON ROSE FULBRIGHT US LLP
                           2200 Ross Avenue, Suite 3600
                           Dallas, TX  75201
                           (214) 855-8000

For the Debtors:           Gregory Eugene Garman
                           William McCarty Noall
                           Talitha Gray Kozlowski
                           Dylan Thomas Ciciliano
                           GARMAN TURNER GORDON, LLP
                           7251 Amigo Street, Suite 210
                           Las Vegas, NV  89119
                           (725) 777-3000

For the Debtors:           John Frazer
                           NATIONAL RIFLE ASSOCIATION

APPEARANCES, cont'd.:

| | |
|---|---|
| For the Debtors: | Douglas James Buncher |
| | Patrick J. Neligan |
| | John D. Gaither |
| | NELIGAN, LLP |
| | 325 N. St. Paul, Suite 3600 |
| | Dallas, TX  75201 |
| | (214) 840-5333 |
| For the Indiana Office of the Attorney General: | Heather M. Crockett |
| | OFFICE OF THE INDIANA ATTORNEY GENERAL |
| | 302 W. Washington Street |
| | IGCS-5th Floor |
| | Indianapolis, IN  46204 |
| | (317) 233-6254 |
| For Christopher Cox: | Thomas M. Buchanan |
| | WINSTON & STRAWN, LLP |
| | 1901 L Street, NW |
| | Washington, DC  20036 |
| | (202) 282-5000 |
| For the Office of the New York State Attorney General: | Gerrit M. Pronske |
| | Eric M. Van Horn |
| | Jason Patrick Kathman |
| | SPENCER FANE, LLP |
| | 5700 Granite Parkway, Suite 650 |
| | Plano, TX  75024 |
| | (972) 324-0300 |
| For the Office of the New York State Attorney General: | Monica Connell |
| | Emily Stern |
| | James Sheehan |
| | OFFICE OF THE ATTORNEY GENERAL- NEW YORK |
| | 28 Liberty Street |
| | New York, NY  10005 |
| | (212) 416-8401 |
| For the U.S. Trustee: | Lisa L. Lambert |
| | Asher Bublick |
| | OFFICE OF THE UNITED STATES TRUSTEE |
| | 1100 Commerce Street, Room 976 |
| | Dallas, TX  75242 |
| | (214) 767-8967 |

APPEARANCES, cont'd.:

| | |
|---|---|
| For Phillip Journey,<br>Roscoe B. Marshall,<br>Jr., et al.: | Marcus Jermaine Watson<br>Clay M. Taylor<br>BONDS ELLIS EPPICH SCHAFER JONES,<br>  LLP<br>420 Throckmorton Street,<br>  Suite 1000<br>Fort Worth, TX  76102<br>(817) 529-2861 |
| For Wayne LaPierre: | Philip Kent Correll<br>P. KENT CORRELL, ESQ.<br>250 Park Avenue, Floor 7<br>New York, NY  10177-0799 |
| For the D.C. Attorney<br>General's Office: | Leonor Miranda<br>Nancy L. Alper<br>OFFICE OF THE ATTORNEY<br>GENERAL FOR THE DISTRICT OF<br>COLUMBIA<br>600 6th Street N.W., 10th Floor<br>Washington, D.C.  20001<br>(202) 727-3400 |
| Recorded by: | Shanette D. Green<br>UNITED STATES BANKRUPTCY COURT<br>1100 Commerce Street, Room 1254<br>Dallas, TX  75242<br>(214) 753-2088 |
| Transcribed by: | Kathy Rehling<br>311 Paradise Cove<br>Shady Shores, TX  76208<br>(972) 786-3063 |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

| | |
|---|---|
| 1 | DALLAS, TEXAS - APRIL 7, 2021 - 1:15 P.M. |
| 2 | THE COURT:  We'll go back on the record in the NRA |
| 3 | case. |
| 4 | Let me say, one thing that came up this morning.  At |
| 5 | least from this point forward, if we're going to use |
| 6 | deposition clips, I think the deposition needs to be |
| 7 | unedited.  I'm not casting aspersions on anyone.  I think |
| 8 | maybe it was done for efficiency purposes.  But I think, for |
| 9 | purposes of the record being complete, -- |
| 10 | All right.  Mr. Noall? |
| 11 | MR. PRONSKE:  Your Honor, this is Gerrit Pronske.  I |
| 12 | have one quick announcement, if I might? |
| 13 | THE COURT:  Sure. |
| 14 | MR. PRONSKE:  And that is I told the Court this |
| 15 | morning that we're not going to call Dr. Emily Harris.  There |
| 16 | is a motion pending from the NRA that was filed yesterday to |
| 17 | exclude her testimony.  And, obviously, us not calling her |
| 18 | moots that.  And I think Mr. Garman and I reached an |
| 19 | agreement essentially that that motion is withdrawn. |
| 20 | MR. GARMAN:  Yes, sir.  Based upon her not being |
| 21 | called, we hereby withdraw the motion. |
| 22 | THE COURT:  Thank you.  So you think I just |
| 23 | shouldn't hear the two of you argue anyway; is that right? |
| 24 | MR. PRONSKE:  I think we -- |
| 25 | MR. GARMAN:  I'm sure Mr. Pronske is going to be. |

Frazer - Cross                                    5

1    Not yet.

2              THE COURT:  I appreciate that.  We started working

3    on it, and I appreciate that.  And I'm sorry, I don't know if

4    I said thanks, Mr. Pronske, this morning, when you gave me

5    the items of streamlining.  I appreciate that, too.  All

6    right.

7              MR. PRONSKE:  You're welcome.

8              THE COURT:  Mr. Noall?

9              MR. NOALL:  Yes, Your Honor.

10   JOHN FRAZER, ACKERMAN MCQUEEN'S WITNESS, PREVIOUSLY SWORN

11                        CROSS-EXAMINATION

12   BY MR. NOALL:

13   Q    Mr. Frazer, can you hear me okay?

14   A    Yes, I can.

15   Q    Okay.  Mr. Frazer, at what point did you first become

16   employed by the National Rifle Association in any role?

17   A    In March 1993.

18   Q    And prior to the time -- let me restate the question.

19   How long did you work for the National Rifle Association

20   after you began in 1993 and before you became a lawyer at the

21   National Rifle Association?

22   A    So, to -- so, I became a lawyer while I was -- I attended

23   law school at night while I was working for the NRA.  So, to

24   give the brief timeline, I worked at the NRA for about 11

25   years before beginning law school in 2004.  Continued

1   attending law school until 2008.  Was admitted to the Bar in

2   2008 and worked five more years at the NRA before I started

3   my private practice.  So it was a full 20 years at the NRA

4   before I -- before I initially left.

5   Q    Okay.  And while you were working at the NRA before you

6   initially left, did you attend any board meetings?

7   A    I attended board meetings.  You know, I had several

8   different jobs during that time frame, but I attended board

9   meetings more or less regularly, depending on my job duties

10  at the time.  I certainly attended, I think, all of them from

11  1994 to 1997.  And then I attended them routinely -- pretty

12  routinely from '97 to 2004, when I was -- came back to more

13  of a management role.  And then I think I attended them

14  consistently from about 2004 to the time I left, 2013.  I may

15  have missed a few, but not many.

16  Q    And with respect to the time that you were at the

17  National Rifle Association prior to the time you went to --

18  that you first left, and you mentioned your management role,

19  can you just describe to the judge the nature of those roles

20  -- or role or roles for him, to show your involvement at the

21  -- at National Rifle Association?

22  A    Sure.  From, well, pretty much exactly the first year

23  that I was there, it was an entry-level job, answering the

24  mail and the -- and phones, legislative questions from

25  members.  It was in the Institute for Legislative Action.

1  Then from 1994 to 1997, I was -- I was an executive assistant

2  for the executive director of the Institute for Legislative

3  Action.  In 1990 -- from 1997 to the beginning of 2005, right

4  after I started law school, I was a federal lobbyist.  And

5  then from 2005 to I think 2007, I was deputy director of the

6  research and information division in Iowa.  So that was where

7  I was most of my law school time.  Then I was -- then I was

8  promoted to director of research and information, and I did

9  that until 2013, when I left to start my own firm.

10  Q    And so during the time that you were employed by the NRA

11  but before your first departure, did you draft documents for

12  the National Rifle Association?

13  A    I did.  I worked pretty extensively on legislative

14  drafting, in particular, before and after attending law

15  school.  I performed legal analyses related to legislation

16  and litigation issues as -- the research and information

17  division provides legal and factual support for the NRA's

18  Second Amendment advocacy, so we worked with the legal team

19  closely on that.  And then -- and then occasionally stood in

20  or assisted with corporate legal matters, you know, to the

21  extent that they affected the Institute for Legislative

22  Action.

23  Q    When you returned to the National Rifle Association to be

24  employed after you left for private practice, what was the

25  status of the Office of General Counsel?

Frazer - Cross                                    8

1  A    When I returned -- so, I was in private practice for a

2  couple of years, and then when I came back -- so, 2014, the

3  general counsel, longtime general counsel, had retired, and I

4  came back as his replacement with, at the time, six attorneys

5  in the office whom I supervised, and all long -- most of them

6  very longtime employees by that point already.

7  Q    And so, at that time, including yourself, there would

8  have been seven lawyers or persons working in the Office of

9  General Counsel; is that correct?

10  A    Yes.

11  Q    Okay.  And how many -- how many persons or lawyers are

12  working in the Office of General Counsel, including yourself,

13  today?

14  A    Now it's six.

15  Q    Okay.  And with respect to the persons that are -- the

16  lawyers that are working with you in --

17  A    Actually, correction.  I'm sorry.  It's actually seven,

18  but one of them is on medical disability at the moment.

19  Q    Okay.  With respect to the lawyers besides yourself

20  working in the Office of General Counsel, do any of those

21  lawyers have experience, apart and separate from your

22  experience, in the areas of tax or guidance to a nonprofit

23  entity?

24  A    All of them, to some degree of another.  My deputy

25  general counsel has been with the NRA for more than 30 years.

Frazer - Cross                              9

1   He is also the secretary of the NRA Civil Rights Defense Fund

2   and is familiar with CRDF -- excuse me, familiar with tax

3   issues from helping manage that 501(c)(3) entity.  I also --

4   he also handled in-house quite a bit of litigation involving

5   New York law, involving board members at one time.  We had

6   some controversies on the board.

7       We -- one of my assistant general counsels is also the

8   secretary of the NRA Foundation.  He's familiar with federal

9   tax issues affecting nonprofits.  And also for quite a while

10  he managed the NRA's charitable filing efforts.

11      And then pretty much everyone gets some exposure to these

12  issues just by virtue of working in the office.  I think the

13  shortest-serving person that I have on the team now has been

14  there for I want to say 12 or 13 years at least.

15  Q    And if I understand, you're responsible for supervising

16  all these in-house lawyers, correct?

17  A    That's right.

18  Q    And I suspect that, as a lawyer, do you have to -- if an

19  issue comes up, do you have to research the issue and solve

20  the problem?  Do you still do that?

21  A    I do, I do work on some issues directly, but I also

22  delegate to whoever I think is most suitable, who has the

23  appropriate expertise and the time.  I have to manage

24  everyone's workloads, including my own.

25  Q    And you're a member of the Bar in good standing; isn't

1  that correct?

2  A   Yes, I am.

3  Q   Okay.  And you've heard quite a bit of discussion about

4  the Brewer fees, or -- during your direct testimony from Ms.

5  Stern and also from Ackerman.  Do the size and scope of the

6  Brewer fees that you've been questioned about yesterday and

7  today, are they reflective of the importance of the matters

8  that the Brewer firm is handling for the National Rifle

9  Association?

10 A   Sure.  Sure.  The fees are substantial, but it's

11 substantial because the firm does a lot of work, and we've

12 chosen to employ them for just many of our key issues, which

13 are closely interrelated.

14 Q   Do you have discussions with lawyers at the Brewer firm

15 with respect to strategy concerning the matters that the

16 Brewer firm is handling for the National Rifle Association?

17 A   Yes, I do.

18 Q   Okay.  Do you discuss the status of cases and matters

19 that are being handled by the National Rifle Association by

20 the Brewer firm?

21 A   Absolutely.

22        MR. GRUBER:  Your Honor, I'm going to object to

23 leading.  We've kind of let it go in the preliminary, but

24 basically he's giving him the answers in each question.

25        THE COURT:  Sustained.

Frazer - Cross                    11

1  BY MR. NOALL:

2  Q    So, Mr. Frazer, tell me how you manage the -- handle the

3  case management with the Brewer firm on matters for which

4  you're not conflicted?

5  A    Yes.  I talk to -- I communicate with members of the firm

6  daily, including -- certainly including evenings and

7  weekends, and also -- you know, both in terms of updates on

8  current status.  You know, they may request my input on a

9  decision that's being made.  I may be on conference calls

10  with other NRA executives and them.  And then also the

11  monthly billing cycle provides kind of a check-in on all of

12  the issues as I review the work that the firm has done and

13  ask questions about things that may not have been the top

14  focus day-to-day.

15  Q    Okay.  And are there any firms other than the Brewer firm

16  that the National Rifle Association delegates matters to that

17  you supervise?

18  A    Yes.  I work with -- I work with all of our outside

19  counsel.  Either I or people in my office work with all of

20  our outside counsel that we -- that handle matters for the

21  NRA, outside of the Second Amendment and Firearms Law

22  advocacy that's it's handled by ILA.

23  Q    And I don't know how to ask -- maybe I'll have to ask

24  this question differently, but do you -- can you tell me

25  approximately like the number of firms that may provide work

1    for the National Rifle Association, legal work for the

2    National Rifle Association besides the Brewer firm that your

3    office supervises?

4    A    From small to large, including, for example, insurance --

5    like insurance-appointed counsel in some matters, I'm just

6    trying to think about ordinary course declarations, I want to

7    say, you know, eight to twelve, something like that.

8    Q    Okay.  And are those -- do you manage those firms'

9    handling of National Rifle Association matters the same way

10   you do as the Brewer -- you do with the Brewer firm?

11   A    Yes, although the -- although the scope, size, and

12   frequency may be different.  And for some of them that are

13   handling -- you know, they're on-call for routine corporate

14   matters, we may not have a question for them that often.  If

15   it's a litigation matter that I've delegated to one of my

16   staff, they may have the primary interaction.  But I think

17   the management of all the firms is consistent.

18   Q    Okay.  And how do you determine whether to maintain a

19   matter in-house or to refer it to out-of-house counsel?

20   A    It's a matter of, usually, a couple of factors, expertise

21   and scalability, as well as jurisdiction.  Obviously, if we

22   have something that's out of -- that's going to be a

23   significant litigation matter out of state, that may not be

24   efficient for one of my attorneys who's not admitted in that

25   state to handle if you have to retain outside counsel anyway.

Frazer - Cross                          13

1   If -- and then other things will be -- you know, it'll just

2   depends on whether people in-house have the time and

3   expertise.  And if they don't, we'll usually go to outside

4   counsel, too, that we have some relationship with and look

5   around.

6   Q   And with respect to the matters that the Brewer firm has

7   been handling, how would you characterize those matters as

8   compared to matters handled by your other outside counsel?

9   A   The matters that the Brewer firm has been handling are

10  the matters that have the farthest -- the biggest reach in

11  terms of impact on the NRA, and they're also ones that are

12  typically closely related.  They arise from, you know, maybe

13  -- in speaking of litigation matters, for example, they may

14  involve different party opponents but they'll often come from

15  -- share some common facts or arise from the same

16  investigations.

17  Q   Thank you.  I want to turn to the January 7th board

18  meeting for a minute -- or, excuse me, the March 28th board

19  meeting for a minute -- the board meeting held just a couple

20  weeks ago.  At that meeting, the testimony has been that it's

21  an in-person meeting and that you were present.  Do you

22  recall that?

23  A   Yes.

24  Q   And you recall that Ms. Stern directed you to NYAG

25  Exhibit 10, which were the bylaws of the National Rifle

1   Association?

2            MR. GRUBER:  Objection.  Leading.

3            MR. NOALL:  Okay.

4   BY MR. NOALL:

5   Q   And --

6            THE COURT:  I overrule on that one.  You may answer

7   the question, sir.

8            THE WITNESS:  Yes, I do recall that.

9   BY MR. NOALL:

10  Q   And was the -- was the -- was conducting the meeting in

11  person permitted by the bylaws, in your view, as counsel for

12  the National Rifle Association?

13  A   Yes.  I think that conducting a meeting in person is

14  always allowed.  And electronic meetings were created as an

15  option, and further refined as an option in some recent

16  amendments, for use in situations where an in-person meeting

17  just is impossible or impractical.

18  Q   Does the National Rifle Association have a

19  parliamentarian?

20  A   Yes, we do.  We have -- we use different people depending

21  on availability recently, but our primary parliamentarian has

22  been with us for quite a few years, predating my time as

23  secretary and general counsel.

24  Q   And who is that?

25  A   His name is Thomas Balch (phonetic).  He's one of the

1   editors of *Robert's Rules of Order*.

2   Q    And what is the role of the parliamentarian?

3   A    We typically will consult with him before, during, and

4   after board meetings to make sure that we're in compliance

5   with our parliamentary authority, *Robert's Rules*.  So I'll

6   typically consult with him before a meeting, as we're

7   considering agendas, drafting the meeting notice, if there's

8   anything unusual about that.  Work with him to understand the

9   steps that have to be taken to ensure that decisions are

10  properly made and recorded.  And then during the meeting, he

11  advises the presiding officer, typically the president or one

12  of the vice presidents, on issues as the meeting progresses.

13  And then sometimes we'll consult with him after the meeting

14  about the -- how things should properly be recorded in the

15  minutes, for example.

16  Q    Okay.  And is the parliamentarian of the National Rifle

17  Association or a parliamentarian always present during a

18  board meeting?

19  A    Yes.

20  Q    Okay.  And with respect to the meeting that was held on

21  March 28th, the testimony was there was a roll call vote.  Do

22  you recall that?

23  A    Yes.

24  Q    Okay.  Why was there a roll call vote, Mr. Frazer?

25  A    Under our bylaws, if 20 percent of the board members

1    request a roll call vote, then a vote -- on a matter, then a

2    roll call vote will be taken and recorded in the official

3    journals.  That's our four magazines that are published to

4    our members.

5    Q    Did 20 percent request a roll call vote at the meeting on

6    March 28th?

7    A    Easily, yes.

8    Q    Okay.  You took some questions or had some questions

9    directed to you about Mr. Steve Hart.  Do you believe that

10   Steve Hart's firing had anything to do with retaliation by

11   the NRA?

12   A    I think that there were -- I'm going to speak advisedly,

13   as a -- as a -- to avoid getting into privileged matters.

14   But no, I don't think it had to do with retaliation for any

15   financial concerns that were raised, as was asked in the

16   previous question.

17   Q    And you also were questioned a bit about Josh Powell; do

18   you remember that?

19   A    Yes, I do.

20   Q    Okay.  Does Mr. Josh Powell work for the National Rifle

21   Association today?

22   A    Not anymore, no.

23   Q    Do you understand that Leticia James has described the

24   National Rifle Association as a terrorist organization?

25   A    Yes, I do.

1              MS. STERN:  Objection.

2    BY MR. NOALL:

3    Q   Okay.  And do you believe that she wants to dissolve or

4    otherwise shut down the National Rifle --

5              MS. STERN:  I'm sorry, I'm sorry to interrupt.  I

6    assert an objection to that last question.  I don't know if

7    the Court heard it.

8              THE COURT:  I did hear it.

9              MS. STERN:  I'm sorry, Your Honor.  I think maybe it

10   was transitioning from the mute.  I object to that last

11   question.

12             THE COURT:  What's your objection?

13             MS. STERN:  It's hearsay, Your Honor.

14             THE COURT:  Overruled.  I think it might be a party

15   admission.

16   BY MR. NOALL:

17   Q   You can answer the question, Mr. Frazer.

18             THE COURT:  It's already been answered.  She was

19   referring to the last question.

20             MR. NOALL:  Okay.  So, --

21             THE COURT:  Could you ask the pending question again

22   for the witness?

23   BY MR. NOALL:

24   Q   Do you believe, Mr. Frazer, that Ms. James desires to

25   dissolve or otherwise shut down the National Rifle

Frazer - Cross                          18

1  Association?

2  A    Yes.  It's in the prayer for relief in her complaint.

3  Q    Okay.  Do you believe, as general counsel, that the New

4  York Attorney General's position with respect to the National

5  Rifle Association may result in continuing -- a continuing

6  legal assault on the NRA in the state of New York?

7            MR. GRUBER:  Your Honor, I object to leading.

8            THE COURT:  Sustained.

9            MS. STERN:  And I object on the grounds it's

10  hypothetical, Your Honor.

11            THE COURT:  Sustained on leading.

12            MR. NOALL:  Okay.

13  BY MR. NOALL:

14  Q    So, with respect -- Mr. Frazer, with respect to the

15  position of the New York Attorney General, does that give you

16  any concerns that you need to take into consideration with

17  respect to leading or otherwise providing advice to the

18  National Rifle Association concerning its location in New

19  York?

20  A    So, for me personally, --

21            MS. STERN:  Objection, Your Honor.  The question is

22  vague and unclear.

23            THE COURT:  Would you restate your question?  I

24  think you're also still leading, Mr. Noall.

25            MR. NOALL:  Okay.

1  BY MR. NOALL:

2  Q   Mr. Frazer, does the legal position or Ms. James's

3  positions with regard to the NRA raise any concerns with you

4  concerning the National Rifle Association being located in

5  New York?

6  A   Yes.

7  Q   Okay.  And why?

8  A   Because -- because as long as we're located in New York,

9  we could be subject to similar types of attacks.

10  Q   Mr. Frazer, on cross-examination, the New York Attorney

11  General through Ms. Stern discussed a case between the NRA

12  and Ackerman McQueen that was pending in the Northern

13  District of Texas, I believe.  Do you recall that?

14  A   Yes.

15  Q   And I believe your -- the testimony was that the lawsuit

16  that was pending in the Northern District of Texas was filed

17  without your knowledge.  Is that correct?

18  A   Not quite.  The one that was filed without my knowledge

19  was the initial books and records inspection lawsuit that was

20  filed in the circuit court of Alexandria, Virginia.  But

21  that's been stayed pending resolution of a later-filed case

22  in Texas, which was filed with my full knowledge.

23  Q   Since the filing of the books and records lawsuit, have

24  you been involved in the oversight of the NRA's Ackerman

25  litigation?

1    A    Yes, I have.

2    Q    Do you review the legal bills associated with that

3    litigation?

4    A    Yes, I do.

5    Q    Do you review the draft briefs associated with that

6    litigation?

7    A    I review the most significant draft briefs.  There

8    obviously is a lot of sort of ancillary motion practice that

9    goes on in a complex case like this, but the key briefs, yes.

10   Q    And do you discuss litigation strategy with your out-of-

11   house lawyers regarding the Ackerman litigation?

12   A    Yes, I do.

13   Q    Okay.  Is there just one attorney at the Brewer firm that

14   you discuss the case with, or are there others?

15   A    The -- for the Ackerman litigation, I discuss it

16   primarily with Mr. Brewer, or sometimes Ms. Rogers.

17   Q    Okay.  You testified, I believe, that you weren't

18   surprised that the NRA sued Ackerman.  Why not?

19   A    Because -- you're referring to the initial books and

20   records inspe... books and records lawsuit.  I wasn't

21   surprised at all because I had been personally involved for

22   at least seven months, I think, probably longer than that, in

23   correspondence to Ackerman, demanding that they comply with

24   their contractual obligations to let us inspect their books

25   and records.

1  Q    Thank you.  There was some testimony right at the end of

2  this morning regarding the appointment of a receiver.  Do you

3  recall that?

4  A    Yes.

5  Q    Do you believe that the appointment of a receiver would

6  have an effect upon the NRA's fundraising?

7  A    Yes.

8  Q    Okay.

9        MR. NOALL:  I'll pass the witness, Your Honor.

10       THE COURT:  Thank you.  Mr. Drake, before you -- I

11  think you're the next person to question.  I have my lift

12  stay docket that is also set and we're stepping on it.  So if

13  you all will just pause in the NRA and let me call that

14  docket, and then we'll go back to Mr. Drake asking questions.

15  You can just stay on where you are.

16     (Off the record, 1:43 p.m. until 1:57 p.m.)

17       THE COURT:  All right.  Back on the NRA now.  And I

18  apologize for having to do this short stay docket.

19     Mr. Drake, I believe that you had indicated that you were

20  going to ask Mr. Frazer some questions?

21       MR. DRAKE:  Yes, Your Honor.  I'm prepared to go

22  forward if the Court's ready.

23       THE COURT:  I'm ready.  And I see Mr. Frazer on my

24  front screen, so I think he's ready, too.

25                         CROSS-EXAMINATION

Frazer - Cross                              22

1   BY MR. DRAKE:

2   Q    Mr. Frazer, I assume that you're aware that certain

3   parties are asking this Court to appoint a Chapter 11 trustee

4   in this case?

5   A    Yes, I am.

6   Q    Are you familiar, generally, with the allegations made by

7   the Movants who are seeking the appointment of a Chapter 11

8   trustee?

9   A    Yes, I am.

10  Q    Are many of the factual allegations made in support of

11  those trustee motions similar to allegations made by the New

12  York Attorney General in the New York litigation?

13  A    Similar, if not identical.

14  Q    I believe you testified earlier, has the NRA investigated

15  -- they've done an investigation into the allegations made by

16  the New York Attorney General?

17  A    Yes, sure, both in connection with the defense of the

18  case and also because many of them, in fact, are things that

19  came to light through our own prior investigative efforts as

20  part of the course correction since 2018.  2017-2018.

21  Q    Mr. Frazer, when, then, did the NRA first begin

22  investigating its internal governance and compliance with

23  respect to the allegations that the NRA was not in compliance

24  with New York nonprofit laws?

25  A    Sure.  Well, obviously, we've always wanted to improve

1    and enhance our compliance efforts.  So, going back to my

2    earliest times as general counsel, we started -- started some

3    projects on that front.  But then we really kind of

4    formalized it beginning in 2017 after the phone call from

5    Attorney -- then-Attorney General Schneiderman.

6    Q    That was actually going to be my next question, which

7    was, what prompted the NRA to do that investigation?  Was it

8    anything other than the call from Mr. Schneiderman?

9    A    Well, no, you know, we always want to be a good corporate

10   citizen, good charitable citizen, and so we had done --

11   started doing quite a few things before that.  But then that

12   really prompted us to consider the options for both

13   compliance with New York law and potentially for re-

14   domestication elsewhere as a goal.

15   Q    Did you, Mr. Frazer, have personal involvement with

16   implementing any of the steps the NRA took to address these

17   allegations?

18   A    Yes, I did.

19   Q    Could you please describe what type of efforts the NRA

20   implemented in order to address some of these allegations,

21   beginning in 2017?

22   A    Sure.  Well, beginning in 2017, we continued some of our

23   internal disclosure and -- internal disclosure initiatives

24   that had begun earlier with the creation of a new, more

25   comprehensive, more robust disclosure form and enforcement of

1    that.  So we're now, you know, we've gone from, I think, 80-

2    some percent return rate among board members to well over 90

3    percent, mid to high 90s.  And with addressing any issues

4    that are raised, cross-checking the accuracy of those forms,

5    bringing any potential matters that required Audit Committee

6    review before the Audit Committee, bringing matters to

7    outside counsel where appropriate, investigating --

8    investigating any concerns raised internally by staff, either

9    -- either personally, in some cases, or in conjunction with

10   outside counsel.  And then, of course, all of the financial

11   -- financial control changes that you may have heard about or

12   -- I'm not sure what you've heard about them, but you may

13   have heard about in terms of contract -- contract management,

14   greater transparency within the organization on invoicing and

15   financial records, and generally making sure that our

16   existing internal controls are strengthened where needed or

17   better-enforced where appropriate.

18        As I testified, I think, yesterday, no organization is

19   ever a hundred percent perfect or probably ever going to be a

20   hundred percent perfect, but as -- you know, one of our past

21   presidents used to quote Bear Bryant, If you strive for

22   perfection, you'll, you know, you'll achieve -- you'll

23   achieve greatness.

24   Q   What was done with respect to contract management, Mr.

25   Frazer?

Frazer - Cross                                    25

1   A    Sure.  We try to make -- we've taken a lot of steps to

2   ensure that -- mainly -- a lot of them are just in the forms

3   of -- form of reminding people that when contracts are

4   executed, copies need to be retained, need to be provided to

5   the financial services division so that financial services

6   can make sure that payments are made pursuant to a properly

7   executed, properly approved contract.  And we're looking at

8   some further steps that can be taken to provide additional

9   layers of safeguards on that front.

10  Q    What actions did the NRA take with respect to its vendor

11  relationships?

12  A    So, in 2018 in particular, we looked really closely at

13  the vendors, I would say from top to bottom, top being the

14  highest paid, down to the small vendors, just trying to

15  determine whether the Association was getting good value from

16  those vendors and also trying to make sure that the vendors

17  provided us appropriate documentation for reimbursement that

18  was being made.

19       We sent out letters -- I think we saw some of them

20  yesterday -- to, I want to say, well over a hundred or maybe

21  hundreds of vendors, reminding them of the need to properly

22  document out-of-pocket expenses.  And we've actually carried

23  that forward with incorporating a reimbursement documentation

24  policy into contracts with many, if not all, vendors going

25  forward.

1   Q    What actions did the NRA take with respect to expense

2   reimbursement?

3   A    We've done a -- we've done a number of things.  For one

4   thing, we -- we withdrew a lot of the American Express cards

5   that were in use at one time, so that some of those -- some

6   of those employees who didn't have need to travel a lot, for

7   example, would simply use personal cards and seek

8   reimbursement.  And obviously, the incentive there falls on

9   the employee to make sure that they're providing good

10   documentation.  And then the -- and then for other employees,

11   we started using a Wells Fargo credit card that uses an

12   online review and approval portal.  It provides, as I

13   understand it, more accessibility, transparency, and ability

14   to scrutinize the charges.

15   Q    Earlier today, Ms. Stern and Mr. Gruber asked you about

16   some compliance training programs you led.  Could you just

17   briefly describe what is involved in that training program?

18   A    Sure.  So, we conducted three sessions to date.  And, you

19   know, it's been challenging to try to continue that during

20   COVID, due to layoffs and furloughs that we had to -- to deal

21   with the impact of that, as well as the obvious technological

22   issues.  But we've conducted -- we conducted three of those

23   seminars in 2018, 2019.  And the focus there, I think -- I

24   think what we saw in one of the exhibits was the table of

25   contents for the slide deck, and I think it was about an hour

1    and a quarter presentation in all, hour, hour and a quarter

2    presentation, reminding people of the key laws that govern

3    the NRA's operations, the key internal policies, the sign-off

4    procedures that need to be addressed, the very specific

5    requirements with respect to related-party transactions and

6    conflicts of interest, and very importantly, the protections

7    that apply to whistleblowers.

8        This all predates the update to our whistleblower policy,

9    but we were training on -- training people on -- on the

10   protections that they, as employees, would enjoy as potential

11   whistleblowers back, you know, going back to the summer of

12   2018.

13       And it closes with a number of hypothetical case studies

14   to help people really engage with the material and to

15   understand how what mind be kind -- look like dry or arcane

16   rules would apply in the real world in the context in which

17   an employee may have to deal with an issue.

18   Q    Do you believe the training programs have helped improve

19   the NRA's compliance?

20   A    Yes.  And to support that, I'll just say I get questions

21   pretty routinely about specific -- about specific issues that

22   we covered in those training sessions that no one ever asked

23   or rarely asked prior to that time period.  You know, I

24   recall a conversation I had last week before I came down here

25   to Texas about the, you know, what's required for contract

1   renewal under certain circumstances, for example.

2   Q   Mr. Frazer, I'd like to kind of shift gears and talk a

3   little bit about the questions Mr. Gruber asked you this

4   morning about being in New York and the NRA's strategy to

5   leave New York.

6       What is your personal opinion, Mr. Frazer, as to whether

7   there are leaders in the state of New York that have

8   demonstrated a hostility towards the NRA?

9   A   I think their words are on the record.  I think you have

10  numerous statements from Attorney General James, during and

11  after her campaign, and after the commencement of the New

12  York AG enforcement action, that express her disdain for the

13  NRA.  And, you know, I say this as a native New Yorker

14  myself, but it's -- you know, New York is not what it used to

15  be in the 1870s.

16  Q   Did you have concerns about the NRA being in New York

17  prior to the New York action being filed in the fall of 2020?

18  A   Yes.  And even prior to 2017.  And I'm also aware, from

19  having attended, you know, board meetings more or less

20  regularly back to the mid '90s, that it was even discussed

21  back then.

22  Q   Has the New York litigation been costly to the NRA?

23  A   Yes, although I, you know, I only kind of see the top

24  line of the legal bills.  But -- you know, because of my

25  status as a defendant.  But I'm aware that preparing for it

1  and pursuing it has been costly.

2  Q   What impact, if any, has the New York AG litigation had

3  on the -- just the general operations of the NRA?

4  A    It's --

5           MS. STERN:  Objection, Your Honor.  That question is

6  vague and ambiguous.

7           THE COURT:  Do you want to restate?

8  BY MR. DRAKE:

9  Q   Yeah, Mr. Frazer, has the New York litigation had any

10  impact on the day-to-day operations of the NRA?

11  A   Yes, it has.

12  Q   And what has that impact been?

13  A   It's caused staff and officers to spend a lot of time

14  dealing with that litigation that could have been spent on

15  more core functions of the organization.

16  Q   Has the New York litigation had any impact, in your

17  opinion, on the public perception of the NRA?

18           MS. STERN:  Objection, Your Honor.  Again, vague and

19  ambiguous.

20           THE COURT:  I sustain it.

21  BY MR. DRAKE:

22  Q   Mr. Frazer, are you aware of any other impact the New

23  York litigation has had on the NRA?

24  A    Yes.

25  Q   And what is that?

1  A    Negative publicity, among other things.  People read the

2  media headlines and they sometimes take allegations as fact,

3  unfortunately.

4  Q    Do you have an opinion, Mr. Frazer, as to how the

5  political environment in the state of Texas is for the NRA as

6  compared to New York?

7          MS. STERN:  Objection, Your Honor.  Again, vague and

8  ambiguous.

9          THE COURT:  Overruled on that.  You may answer the

10 question, sir.

11         THE WITNESS:  Thank you, Your Honor.  The political

12 environment in Texas is like night and day to New York.  The

13 political environment in Texas is very friendly.  Texas

14 officials have been very encouraging, including the Texas

15 Attorney General, have been very encouraging in their support

16 of the NRA's potential reincorporation and potential physical

17 relocation to Texas.

18    Texas is obviously -- you know, nearly 10 percent of our

19 members are in Texas.  Texas is home of, I think, two of the

20 five viable sites for NRA annual meetings these days, due to

21 the size of those events.  There are only a limited number of

22 places we can have them.  Just a lot of -- a lot of favorable

23 reaction within Texas.

24         MR. DRAKE:  We'll pass the witness.

25         THE COURT:  Thank you.  I have a couple of questions

1    of Mr. Frazer.  I think it's appropriate for me to do them

2    now, because the lawyers get to cross as to my questions,

3    too.  I'll be very short.

4                    EXAMINATION BY THE COURT

5            THE COURT:  Mr. Frazer, yesterday you were talking

6    briefly about the claim that Mr. Cox has asserted in the

7    arbitration, and you said that the claim was $2 million in

8    contractual damages, I think you said.  Am I right on that?

9            THE WITNESS:  Yes, Your Honor.  That's related to

10   the payments that he believes he would be entitled to.

11           THE COURT:  And does he have other claims besides

12   the $2 million?

13           THE WITNESS:  I think he has some damages -- I think

14   he has some damages claims, Your Honor.  But I'd have to

15   review the pleadings to spell those out.

16           THE COURT:  Okay.  And second, could you look at New

17   York Attorney General Exhibit 285, which is the set of Brewer

18   statements?  Just let me know when you get there.

19           THE WITNESS:  285?  Yes, Your Honor.

20           THE COURT:  Could you go to the last statement in

21   the stack, which is January 14, 2021?

22           THE WITNESS:  Yes, Your Honor.  I have it.

23           THE COURT:  Okay.  So, I was just curious.  If you

24   remember, 354 is the statement that had the wrong year on it

25   that I think you and Mr. Gruber visited about, and that was

 1   January 4.  So we're talking about a second statement that

 2   you got just in the same month.  Is it unusual to get a

 3   statement from the Brewer firm in the middle of the month

 4   like this?

 5         THE WITNESS:  The billing is usually monthly, Your

 6   Honor.

 7         THE COURT:  Uh-huh.  And so when this came in on the

 8   14th, which is the day before the bankruptcy case was filed,

 9   how was it handled?

10         THE WITNESS:  I reviewed it and forwarded it for

11   payment.

12         THE COURT:  And were funds then wire-transferred to

13   Brewer?

14         THE WITNESS:  Your Honor, I'm afraid I don't recall

15   how our -- how we pay.  Some -- we pay some vendors by wire

16   transfer, some by ACH, some by check.

17         THE COURT:  Uh-huh.  And since this was unusual,

18   getting two statements from them, did you talk to them and

19   ask them -- I don't want any privileged things, but did you

20   ask them why you got another statement so quickly?

21         THE WITNESS:  Yes, Your Honor.  I had an -- I had an

22   understanding of why -- why this was done.

23         THE COURT:  Okay.  All right.

24      Ms. Stern, you get to go next.  We'll just go in the same

25   order.  I would think that the pass will be shorter this

1    time, though.

2                MS. STERN:  Yes, Your Honor.  It will be.

3                      REDIRECT EXAMINATION

4    BY MS. STERN:

5    Q    Mr. Frazer, I think you just testified that one of the

6    things that you started to do as part of the post-2017

7    compliance review that you've been describing was cross-

8    checking the accuracy of conflict of interest forms.  Was

9    that -- was my understanding correct?

10   A    Yes.

11   Q    Did you cross-check the accuracy of Wayne LaPierre's

12   conflict of interest forms?

13   A    So, so when I said cross-check, I mean that, to the

14   extent that information is available, we double-check the

15   person's answers on the forms.  If I could illustrate.  We,

16   in addition to getting disclosures from board members, we

17   also get records from the financial services division of

18   payments to board members to make sure that the -- to see if

19   the reporting is consistent or to see if there are any

20   discrepancies.  So that's what I meant by -- in the

21   discussion of cross-check.

22   Q    So if there wasn't a formal contract or record that the

23   financial services division has, you wouldn't have any way

24   through your process to determine whether the disclosure by

25   Mr. LaPierre, for instance, was correct; isn't that right?

1   A    Well, I would -- I described what I was generally

2   referring to.  I would also apply any other personal

3   knowledge that I have or anything else that I thought gave --

4   gave reason for inquiry.

5   Q    And if you did have personal knowledge that there was

6   information that was in conflict with what the disclosure

7   provided, would you undertake an investigation of that?

8   A    I would -- I would certainly make inquiry on that.  And

9   I've done that, for example, with board members who have

10  forgotten things.

11  Q    And would you do the same inquiry with Mr. LaPierre?

12  A    Sure.

13  Q    And what inquiry have you done in that regard with

14  respect to gifts that Mr. LaPierre has admitted to having

15  received from David McKenzie?

16  A    I'm not sure what -- I'm not sure -- I'm not sure what

17  he's admitted, if anything, but I would certainly look at

18  that and see if there's an issue.

19  Q    So we've talked a lot about the New York Attorney General

20  enforcement action.  And are you aware that Mr. LaPierre has

21  submitted a verified answer in that action in which he has

22  admitted to having received certain gifts from Mr. McKenzie?

23  A    I -- I know that he submitted an answer, but I had not --

24  hadn't focused on that particular item.

25  Q    So even though Mr. LaPierre has publicly filed an answer

1   in which he verified having received gifts from Mr. McKenzie,

2   including trips on a luxurious yacht, you haven't actually

3   looked into whether that was a violation of the conflict of

4   interest policy of the NRA.  Is that right?

5   A   I know that all of these issues -- all of these issues

6   are reviewed, have been reviewed, either --

7           MS. STERN:  I move to strike anything after -- from

8   the response, the beginning.

9           THE COURT:  Sustained.

10          MS. STERN:  Thank you.

11          MR. NOALL:  Your Honor, there was -- there was no

12  affirmative response by the witness.

13          THE COURT:  All right.  Do you want to just -- do

14  you want to ask your question again?  Just answer the

15  question this time, Mr. Frazer.

16          THE WITNESS:  Sure, Your Honor.

17  BY MS. STERN:

18  Q   My question, Mr. Frazer, is Mr. LaPierre has publicly

19  filed a verified answer in the New York Attorney General

20  action in which he has admitted to having received gifts from

21  Mr. McKenzie, including trips on a luxurious yacht.  In light

22  of that, have -- is it your testimony that you have taken no

23  steps to investigate whether that's a violation of the

24  conflict of interest policy?  Yes or no?

25  A   I haven't done that personally, no.

1   Q   Okay.  Thank you.  Mr. Frazer, you just gave some

2   testimony about a variety of different measures that you

3   contend that the NRA has taken with respect to reviewing

4   vendor relationships.  Do you recall your testimony?

5   A   Yes, I do.

6   Q   Okay.  Are you personally responsible for looking at

7   those vendor relationships?

8   A   Not all of them.  It depends on -- it depends on the

9   vendor.  It depends on the nature of the issue presented.

10  Q   And you talked about a process in 2018 that the NRA

11  undertook, you described, to review various vendors and their

12  compliance with the NRA's policies.  But you personally were

13  not involved in that process, were you?

14  A   No, yes, I was involved.

15  Q   Were you responsible for that process?  Wasn't that Mr.

16  Phillips' job at the time?

17  A   No.  It was a -- Mr. Phillips sent the particular letters

18  that I think you may be referring to, but it as a team effort

19  across multiple divisions of the NRA.

20  Q   So, Mr. Frazer, was it your responsibility to follow up

21  to ensure that Mr. McKenzie's entities -- Membership

22  Marketing Partners, Allegiance Creative Group, and the

23  Concord entity -- that they complied with the demands in

24  those 2018 letters?

25  A   Compliance with demands from the treasurer's office falls

1    in the first instance with the treasurer's office.

2    Q    So, just so I understand the distinction between what you

3    say was the treasurer's responsibility and what was your

4    responsibility, you -- maybe you could just explain it to me.

5    What was your role versus what you said was Mr. Phillips' or

6    the treasurer's role?

7    A    Sure.  The -- it's the treasurer's office and the

8    financial services division, which is a subdivision of the

9    Treasury, it's their responsibility to, you know, to pay

10   properly-invoiced amounts or to address any questions about

11   those invoices.  And it's the general counsel's role to

12   advise on legal or compliance issues, as requested.

13   Q    So you, sitting here today, cannot tell the Court that

14   you ensured that Membership Marketing Partners, the Concord

15   entity, and Allegiance Creative Group actually complied with

16   these demands that were made in 2018; is that right?

17   A    Well, no, to that -- to the extent that you're referring

18   to a specific vendor, we would assist as needed.  And in that

19   case, we did --

20   Q    No.

21   A    -- ultimately make inquiries.

22   Q    Okay.  Mr. Frazer, my question is with respect to these

23   particular entities that I've identified:  Membership

24   Marketing Partners, the Concord Social entity, and Allegiance

25   Creative.  My question to you, sir, is, sitting here today,

1    can you tell the Court that you ensured that they met and

2    satisfied the demands that were made in the August 2018

3    letters that were sent out by Mr. Phillips?

4    A    So, in the August 2018 letters, we requested, as I

5    recall, among other things, better documentation of pass-

6    through expenses and also explanation of increased billing,

7    and there were some subsequent conversations with counsel and

8    exchange of a written explanation that explained -- that

9    explained those variances.

10   Q    And Mr. Frazer, were you responsible for ensuring that

11   all those conditions and requests were satisfied?

12   A    I was -- I was involved in it, but not primarily

13   responsible.

14   Q    Thank you.  You also gave some testimony about the New

15   York Attorney General litigation fees as -- but just to be

16   clear, because I think I understand this but I just want to

17   make sure I do, which is that you recused yourself from

18   oversight of that matter, correct?

19   A    That's correct.

20   Q    And you were not responsible for looking at the bills on

21   that matter because that's been delegated to the Special

22   Litigation Committee; isn't that right?

23   A    That's correct, but the top line -- the bottom line

24   amount shows on the summary sheet that I receive, so I'm

25   aware of the general level of billing.

1    Q    All right.  Thank you.  Mr. Frazer, isn't it true that

2    the NRA commenced a lawsuit in New York state court, New York

3    State Supreme Court, seeking a declaratory judgment against

4    -- a declaratory judgment in connection with the dispute that

5    the NRA was having with Oliver North over proceeding to

6    remove Mr. North as a member of the NRA?

7            MR. NOALL:  Your Honor?  Your Honor, I object.  This

8    exceeds the scope of the redirect of the witness.

9            THE COURT:  I --

10           MS. STERN:  Your Honor, may I respond?

11           THE COURT:  You may.  Yes.

12           MS. STERN:  They -- on the cross or the redirect of

13   Mr. Frazer, the issue of the purported bias of the New York

14   regulators and New York courts was raised, and I am just

15   addressing that issue, Your Honor.

16           THE COURT:  Overruled.  You may answer the question,

17   sir.

18           MS. STERN:  Thank you.

19           THE WITNESS:  And I'm sorry, Ms. Stern, but can you

20   repeat the question?

21   BY MS. STERN:

22   Q    Yeah.  My question, Mr. Frazer, is, is it not true that

23   the NRA commenced a lawsuit selecting New York State Supreme

24   Court as the forum to litigate a dispute that the NRA was

25   having with Mr. -- with, excuse me, Lieutenant Colonel Oliver

1  North concerning a process to remove Mr. -- sorry, to remove

2  the Lieutenant Colonel Oliver North from the NRA as a member?

3  A    Yes, we did.

4  Q    Okay.  And that is a declaratory judgment action that's

5  pending in New York State Supreme Court in Albany County,

6  isn't it?

7  A    Yes.

8  Q    That lawsuit was -- arose out of a complaint that Mr. Tom

9  King made seeking to remove Lieutenant Colonel Oliver North

10  as a member of the NRA; isn't that right?

11  A    Yes.

12  Q    And in addition to that lawsuit, isn't it also true that

13  the NRA litigated another dispute with Lieutenant Colonel

14  Oliver North in New York State Supreme Court?

15  A    Yes.  Yes, it is.

16  Q    And that second lawsuit concerned a dispute over Colonel

17  North's entitlement to indemnification; isn't that right?

18  A    Yes, it is.

19  Q    And you're aware, aren't you, that that lawsuit with --

20  over the indemnification was before Justice Joel Cohen, the

21  very same judge who is presiding over the New York State

22  Attorney General's enforcement action?

23  A    I actually didn't recall that it was Justice Cohen.

24  Q    Okay.  Well, I will represent to you that it is.  And in

25  that lawsuit concerning the indemnification, the NRA actually

1    prevailed in that action, didn't they?

2    A    Yes, we did.

3    Q    Can I ask you to turn to New York Attorney General

4    Exhibit 288?  Oh, I'm sorry, 28 -- oh, I'm sorry, 288.  And

5    it's, if you turn to Page 4, which I'm paging to.  Do you

6    have it before you?

7    A    I do.

8    Q    Okay.  And Mr. Frazer, did you authorize -- sorry.  I --

9            MS. STERN:  I'm offering New York Attorney General

10   Exhibit 288 into evidence.

11           THE COURT:  Could I just ask you a question about

12   the exhibit while Debtor's counsel is looking at it?  It's

13   also part of 285, isn't it?

14           MS. STERN:  Um, I --

15           THE COURT:  The January 14 --

16           MS. STERN:  Your Honor, I do not believe that the

17   email at the end of the doc --

18           THE COURT:  Okay.

19           MS. STERN:  -- at the end of the document is in the

20   285 version.

21           THE COURT:  I think you're right.  All right.  Let's

22   wait for Debtor's counsel to look at it.

23           MR. NOALL:  The Debtors have no objection, Your

24   Honor.

25           THE COURT:  288 is in.

1       (New York Attorney General's Exhibit 288 is received into

2   evidence.)

3   BY MS. STERN:

4   Q   Mr. Frazer, you personally authorized the payment of this

5   second invoice received from the Brewer firm on January 14,

6   2021; isn't that true?

7   A   With respect to the matters that aren't under the SLC,

8   yes.

9   Q   Okay.  Thank you.

10          MR. NOALL:  Your Honor, I do need to redact the

11  email addresses on this particular email.

12          THE COURT:  I think that -- that'll be fine.

13          MR. NOALL:  Per our prior agreement.

14          THE COURT:  That's fine.

15          MS. STERN:  No objection.

16      Sorry.  Your Honor, could I have just a second?  I'm just

17  going to take a quick look at my notes to make sure that I

18  have nothing else, if that's all right?

19          THE COURT:  You can take just a second.  Yes, thank

20  you.

21          MS. STERN:  All right.

22          THE COURT:  Actually, take as long as you need, Ms.

23  Stern.

24      (Pause.)

25          MS. STERN:  Okay.  Thank you, Your Honor, for your

1    indulgence.

2    BY MS. STERN:

3    Q    Mr. Frazer, can you turn to New York Attorney General

4    Exhibit 56, which was entered into evidence this morning?

5    A    Two hundred --

6    Q    Do you have it?

7    A    256?  The slide deck?

8    Q    No.  I'm sorry.  56.

9    A    I'm sorry.  Fifty-six.  But it is the slide deck, right?

10   Q    That's correct.

11   A    Okay.

12   Q    And if you would just turn your attention to Slide 17 in

13   the presentation.

14   A    Yes.

15   Q    Okay.  And just turning your attention to the middle of

16   that slide, there, you're -- this is your training program

17   for your NRA staff which you said has been effective at

18   making the NRA a more compliant corporate citizen.  Isn't

19   that right?

20   A    Yes.

21   Q    And in this program, you have emphasized to your staff

22   areas that you think require particular -- that are

23   particularly risky or that you would like them to be well

24   aware of.  Isn't that right?

25   A    Yes.

1    Q    In Slide 17, you're addressing areas where there's

2    concern about conflict of interest.  Isn't that right?

3    A    Yes.

4    Q    And situations that could create an actual or apparent

5    undue influence, perception of that.  Is that right?

6    A    Yes.

7    Q    And there in the middle of the page, your slides provide,

8    for example, where there has been a solicitation or

9    acceptance of any gift, entertainment or favor, where such

10   gift might create the appearance of influence, excluding

11   gifts under $250.

12       That's the standard in the conflict of interest

13   disclosure form; isn't that right?

14   A    Yes.

15   Q    That you have --

16   A    I believe -- I believe so.

17   Q    And it goes on to provide some examples, because you're

18   trying to give your staff something tangible so that it's not

19   an abstract concept, they have some idea of how it might

20   apply.  Isn't that right?

21   A    Yes.

22   Q    Okay.  And you go on that that would include any gift,

23   gratuity, favor, or entertainment from an entity that has or

24   is seeking to have a business relationship with or receive

25   funds from the NRA or an affiliate.  Right?

1    A    Yes.

2    Q    So that would include Membership Marketing Partners,

3    Allegiance Creative Group.  Isn't that right?

4    A    Yes.

5    Q    Okay.  And then the next item is again another example of

6    how this might actually occur.  Includes free use of boats,

7    planes, vacation houses, sporting event tickets, or other

8    items as part of a social activity.  Do you see that?

9    A    Yes.

10   Q    That's something that you particularly wanted to call to

11   the attention of the NRA staff; isn't that right?

12   A    It was a -- it was an example -- it was some examples,

13   yes.

14   Q    Okay.  Thank you.  And if we can now turn to New York

15   Attorney General Exhibit 3.  Okay.  And these have also been

16   admitted into evidence.  And if we can turn to Page 14 of

17   this document --

18   A    Excuse me.  Is that Page 14 of the PDF document or a

19   numbered Page --

20   Q    It is Page 14 of the PDF document.  Okay.

21   A    Okay.

22   Q    And -- just a second, please.  My poor tired eyes are

23   trying to see it on this small screen.  Okay.  So you

24   testified earlier that the New York Attorney General actions

25   had an adverse effect on the NRA.  That was your testimony,

1    right?

2    A    Yes.

3    Q    And that it's had an adverse effect on fundraising

4    because I think you said something along the lines that the

5    public can't distinguish between what's alleged and what is

6    true; is that right?

7    A    No, that's not.  I wasn't talking about fundraising.

8    Q    You were talking about the reputation of the NRA?

9    A    Yes.

10   Q    So, at the board meeting on January 7, 2021, where we

11   heard a lot of discussion about the process of authorizing

12   filing the bankruptcy, there was also regular board

13   activities, correct?

14   A    Yes.

15   Q    And in those regular board activities, reports are given

16   to the members, right?

17   A    Yes, although I should note it was pretty limited due to

18   the impact of COVID.  We didn't want to have a lot of

19   committee meetings.

20   Q    Okay.  And what -- and at that board meeting, there was a

21   report here that we're looking at on Page 14.  This is part

22   of the report of the -- of Mr. LaPierre's report to the

23   board, isn't it?  If you just, I think, page back to --

24   A    Yes, it --

25   Q    -- Page 13, you'll see the start of the report.

1  A   Yes.  It is.  It's part of his written report that's

2  provided to the Court.

3  Q   Okay.  So, turning back to Page 14, Mr. LaPierre here

4  focuses on telemarketing and notes that, through November of

5  2020, we generated $10.5 million net revenue.  Do you see

6  that?

7  A   I do.

8  Q   In September, he goes on, we continue to see strong

9  support from our members using our Save NRA scripts.  We were

10  able to morph that support into a New York attack script

11  which has done very well.  Do you see that?

12  A   Yes, I do.

13  Q   Okay.  And that was -- that was the message that Wayne

14  LaPierre gave to the members that -- that a script that

15  focused on the New York attack was very successful in their

16  telemarketing efforts.  That's what he said that day; isn't

17  that right?

18  A   It's --

19  Q   That's what he reported that day?  That's what he

20  reported that day?

21  A   It's in the written report provided for that meeting.

22  Q   Okay.

23        MS. STERN:  Thank you, Your Honor.  I have no

24  further questions.

25        THE COURT:  Thank you.  Mr. Gruber?

1          MR. GRUBER:  Your Honor, just a few.

2                        RECROSS-EXAMINATION

3    BY MR. GRUBER:

4    Q   Mr. Frazer, you remember the Cummings memo?

5          MR. NOALL:  Objection, Your Honor.  That document

6    we've previously spoken about is not in evidence and there's

7    no foundation for it.

8          MR. GRUBER:  I'm asking if he remembers the Cummings

9    memo.  Do you remember it, sir?

10         THE COURT:  Overruled.

11         MR. NOALL:  Your Honor, we -- and we also had an

12   agreement with respect to the disclosure of the particular

13   person's name who is not supposed to be disclosed on the

14   record under the law.

15         MR. GRUBER:  Your Honor, I believe it's already been

16   talked about in depositions.

17   BY MR. GRUBER:

18   Q   But do you recall a memo by a potential whistleblower who

19   claimed that Mr. Brewer got his bills paid immediately?

20   A   Yes, I do.

21   Q   And did you find that to be the case?

22   A   I'm sorry, did I find what to be the case?  I'm not sure

23   I understand.

24   Q   That he got his bills paid immediately.

25   A   His bills are paid promptly, as required by the contract.

1   Q    So like within four hours for a million dollars?  Would

2   that be -- would that be prompt?

3   A    That would be prompt, but it's also not the norm.

4   Q    Okay.  So this would be -- if somebody paid Mr. Brewer's

5   bills within four hours in an amount of about a $1.2 million,

6   you would say that's out of the ordinary course of business?

7   A    I don't know what I'd -- I don't know if I would.  It's

8   --

9   Q    Well, it either is or it isn't, isn't it?

10  A    Yeah.  I mean, it's not -- it's -- it's faster than --

11  than ordinary.

12  Q    Well, would you agree that it's out of the ordinary

13  course of the way NRA processes its bills for its attorneys?

14  A    Yes.

15  Q    Remind me what -- the Judge pointed out a specific

16  invoice that was paid on, I believe, January 14th of 2021.

17  Can you remind me which invoice that was?

18  A    You're referring -- you're referring to a Brewer firm

19  invoice?

20  Q    Yes.

21       THE COURT:  It's the last page of New York Attorney

22  General 285, if that'll help everybody.  Or last invoice,

23  excuse me.

24       MR. GRUBER:  Thank you, Your Honor.  I just didn't

25  have a reference.

1             THE COURT:  No problem.

2    BY MR. GRUBER:

3    Q    So, Mr. -- have you found the invoice the Judge was

4    talking about?

5    A    Last invoice in 285, yes.

6    Q    So when the Judge asked you about that on the January

7    14th, did you mention all the other bills that got paid that

8    day?

9    A    I don't -- I don't think any others were discussed.

10   Q    So, do you remember, at 3:51 in the afternoon, receiving

11   an email from Mike McCormick asking for the January 14, 2021,

12   invoices for governance, Cuomo, Russia, and Ackerman to be

13   paid?

14   A    I don't recall the email.

15   Q    Do you recall you doing an email at 7:09, trying --

16   approving those?

17   A    I don't recall time frames or specific emails.

18   Q    Do you recall Mr. LaPierre checking with Carolyn Meadows

19   and stating that those should be taken out of the trust

20   account --

21   A    No, I don't.

22   Q    -- that Mr. Brewer was holding?

23   A    No, I don't.

24   Q    And do you -- do you remember specifically, then, Mr.

25   LaPierre stating that $1,224,047.76, plus, I believe, the one

1   -- the $44,000 -- $45,000 invoice you're talking about, that

2   that be paid to Mr. Brewer immediately?  Do you recall any of

3   that?

4   A    No.  I don't recall.  I wouldn't have seen Mr. LaPierre's

5   communications.

6   Q    Well, how about your communication about the same figure?

7   I'm sorry.  It's only a million to the Brewer firm, so maybe

8   it didn't ring a bell.

9   A    I just don't recall the specific emails that you're

10  reporting --

11          MR. NOALL:  Objection, Your Honor.  Argumentative.

12          THE COURT:  Sustained.

13  BY MR. GRUBER:

14  Q    Do you recall, on the 14th, before bankruptcy being filed

15  the next day, within four hours giving the approvals and

16  sending out $1.2 million to Mr. Brewer's firm?

17  A    I recall approving the invoices, but I don't recall the

18  time frames.  I can't confirm that.

19          MR. GRUBER:  Could we pull up -- sorry, one second.

20  Is it A -- could you pull up AMC Exhibit 83?

21          THE WITNESS:  Okay.  I have it.

22  BY MR. GRUBER:

23  Q    Do you want to add up what the invoices are for

24  governance, Cuomo, Russia, and Ackerman?

25  A    (Pause.)  Yes.

Frazer - Recross                           52

1    Q    And what do they come out to?

2    A    It's -- I'm doing this in my head, but I think it's about

3    $660,000.

4    Q    Do you know why, then, for requests for those invoices to

5    be paid, it was authorized that Mr. Brewer take out the

6    amount of $1,224,047.76 out of his account plus remit to HKA

7    Global $45,518?

8    A    I'm sorry, can you repeat the first part of that

9    question?

10   Q    Based on requests for invoices to be paid on governance,

11   Cuomo, Russia, and Ackerman, why would $1,224,047.76 be paid

12   out, plus a remittance to HKA Global for $45,518.75?

13   A    Well, I see now.  I think you're referring to Page 3 of

14   this exhibit.  Is that right?

15   Q    Uh, let's -- we'll do the math, but we --

16            MR. GRUBER:  Your Honor, we'd like to introduce

17   Exhibit 83 into evidence.

18            MS STERN:  Your Honor, I just would note for the

19   record that New York Attorney General Exhibit 288 is the same

20   document.

21            MR. GRUBER:  Is that already in, Ms. Stern?

22            MS. STERN:  Yeah, and that was admitted.

23            MR. GRUBER:  All right.  Never mind, Your Honor.  We

24   don't need to put that one in.

25            THE COURT:  Okay.

1   BY MR. GRUBER:

2   Q    Can I ask you, Mr. Foster [sic], were any questions

3   raised about allowing Mr. Brewer to draw down over a million

4   dollars out of his trust account on a request of invoices

5   late in the afternoon, the request being made at almost 4:00

6   o'clock in the afternoon?  Any questions about that being

7   done right before bankruptcy?

8   A    There was a -- I had a discussion about the payment of

9   those invoices, although I don't recall when that discussion

10  occurred.

11  Q    And who did you have that discussion with?

12  A    I believe I had a discussion with Ms. Rogers from the

13  Brewer firm.

14  Q    Well, do you know what happens when you ask a barber if

15  you need a haircut?

16  A    I'm sorry?

17       MR. NOALL:  Objection, Your Honor.  Argumentative.

18       THE COURT:  Sustained.

19  BY MR. GRUBER:

20  Q    You asked Ms. Rogers whether -- whether you should pay

21  $1.2 million to the Brewer firm right before bankruptcy was

22  filed?

23       MR. NOALL:  Your Honor, to the extent that the

24  question involves advice of counsel, I would object.

25  Otherwise, the witness can answer.

1          THE COURT:  If you can --

2          MR. GRUBER:  Well, I believe there's an exception in

3   this case, Your Honor.

4          THE COURT:  If you can answer the question without

5   invading the attorney-client privilege, which would involve

6   legal advice, you may answer the question.

7          THE WITNESS:  I had a discussion with -- I had a

8   discussion, as I said, I bel... I think it was with Ms.

9   Rogers, regarding the -- regarding these payment -- the

10  payment of these invoices.

11  BY MR. GRUBER:

12  Q   And was that in her role as a vendor who wanted $1.2

13  million paid to her or in her role as your attorney?

14  A   I'd say it was in her role as our attorney.

15  Q   And in her role as your attorney, she gave you the good

16  and sound advice that you should go ahead and release the

17  $1.2 million?

18         MR. NOALL:  Objection to the extent it invades the

19  attorney-client privilege.

20         THE COURT:  Same ruling -- same ruling I just gave.

21         MR. NOALL:  And it's argumentative.

22         THE COURT:  Same ruling I just gave. You may answer

23  the question, sir.

24         THE WITNESS:  So, to -- to answer -- I don't think I

25  could answer that question without disclosing legal advice.

Frazer - Recross                              55

1    BY MR. GRUBER:

2    Q    So, let me ask you this.  When you authorized payment to

3    the Brewer law firm, did she tell you that they were going to

4    be filing bankruptcy the next day?

5    A    I don't know if I can answer that without disclosing

6    privileged communications.

7            MR. GRUBER:  Your Honor, I -- we feel like this is a

8    situation we should be able to invade this.  She is wearing

9    two hats at the time and she is not disclosing to the

10   individual who's, you know, finally authorizing payment, that

11   $1.2 million should be paid.  And I think we're entitled to

12   go into it and figure out what was said and what went on.

13           THE COURT:  Mr. Garman?  Excuse me.  Mr. Noall?  I'm

14   sorry.

15           MR. NOALL:  Your Honor, again, to the extent that

16   Ms. Rogers was providing legal advice or legal discussion

17   regarding the timing of the payments and their legal effect,

18   it would be embraced and covered by the attorney-client

19   privilege and inadmissible.

20           THE COURT:  Okay.  I'm going to sustain the

21   privilege objection.

22   BY MR. GRUBER:

23   Q    Okay.  Mr. Frazer, you were talking about public

24   perception of the Attorney General's inquiry, were you not?

25   A    Yes, I did talk about that.

Frazer - Recross                              56

1  Q    And you also said, when the Russian issue came up, that

2  that caused quite a stir also.  Is that correct?

3  A    Yes.

4  Q    So, just briefly describe what happened in the Russia

5  situation.

6  A    Yeah.  There -- we were -- we had to respond to two

7  Federal Election Commission complaints, which have now been

8  -- both been dismissed, essentially, alleging that the NRA

9  had received unlawful campaign contributions from Russian

10 individuals or entities.  And then there were also -- then

11 there were also multiple Congressional investigations related

12 to interactions between various agents or alleged agents of

13 the Russian government and individuals associated with the

14 NRA.

15 Q    And one of those was Ms. Butima [sic], is that -- is that

16 how you say it?

17 A    Ms. Butina, yes.

18 Q    And she ended up pleading guilty to espionage and, what,

19 trying to overthrow the U.S. government or something like

20 that, wasn't it?

21 A    I believe she pleaded guilty to acting as an unregistered

22 foreign agent.

23         MR. NOALL:  Your Honor, we object to this line of

24 questioning.  It's way beyond the scope of the redirect of

25 the witness.

1          MR. GRUBER:  Well, I -- one last question, Your

2     Honor.

3     BY MR. GRUBER:

4     Q    Between the two, the Russia investigation that started

5     with the trip, what, in 2015, and there's still -- still huge

6     legal bills on it as of, you know, today, which one do you

7     think caused most harm to the reputation of the NRA?

8          MR. NOALL:  Same objection, Your Honor.

9          THE COURT:  Overruled, but this will be the end of

10    this inquiry.  Go ahead and answer the question, sir.

11         THE WITNESS:  Between Russia and the Attorney -- and

12    the Attorney General's investigation?

13    BY MR. GRUBER:

14    Q    Right.

15    A    I would say the Attorney General's investigation.

16         MR. GRUBER:  Your Honor, I pass the witness.

17         THE COURT:  Okay.

18         MR. NOALL:  Your Honor, this is Mr. Noall.  Before

19    we go forward, I would just like to re-raise the issue I did

20    at 2:42 this afternoon with respect to the memo that was

21    being discussed about the whistleblower.

22         Last Friday, you will recall that counsel stipulated with

23    the Court at the hearing we had that the particular person

24    whose name was on that memo would be referred to as

25    Whistleblower #3.  That was a stipulation.  Mr. Gruber

1  violated that stipulation.  I'd like the record with respect

2  to the witnesses -- or to that particular witness's name to

3  be stricken and have Whistleblower 3 put in its place where

4  necessary.  Thank you.

5          MR. GRUBER:  Your Honor, I -- and I apologize and I

6  stipulate to that, so --

7          THE COURT:  Your request is granted, Mr. Noall.

8          MR. BUCHANAN:  Your Honor?  This is -- sorry for the

9  interruption, but I represent Christopher Cox.  This is

10 Thomas Buchanan.  And you asked a few questions about Mr.

11 Cox's claims with the NRA and the legal fees.  And if -- I

12 could help clarify that with a few questions of the witness,

13 if that would be permissible.  I can wait until after Mr.

14 Noall, but I just -- or I could put on Mr. Cox.  But I think,

15 since the Court asked those questions, I think Mr. Frazer

16 knows the answers.  I could be very quick.

17         THE COURT: I'm not going to let you do that, with

18 all due respect.  I just had a question about a statement he

19 made about contract damages and I was actually looking

20 through the exhibits on the bills today and it raised a

21 question.  But I actually don't need further clarification on

22 it.  Thank you.  Thank you, though.

23         MR. BUCHANAN:  Okay.  Thank you, Your Honor.

24         THE COURT:  You're welcome.  Let's see.

25         MR. TAYLOR:  Your Honor, Clay Taylor on behalf of

1  Mr. Journey.

2          THE COURT:  Yes.  All right.

3          MR. TAYLOR:  I do have some -- a brief line of

4  questioning for this witness, Your Honor, based upon his most

5  recent testimony.

6          THE COURT:  You're able to go, even though you

7  didn't go the first time.  Go ahead.

8                      RECROSS-EXAMINATION

9  BY MR. TAYLOR:

10 Q    Mr. Frazer, Mr. Cotton was the chair of the Audit

11 Committee back in 2017, correct?

12 A    I believe that's correct.

13 Q    Wayne LaPierre was in the role that he's in today back in

14 2017, correct?

15 A    Yes.

16 Q    Yet you and your bankruptcy counsel have readily admitted

17 that problems existed in 2017, correct?

18 A    Yes.

19 Q    And Mr. LaPierre had to pay taxes for prior years for

20 previously-undisclosed compensation for travel, correct?

21 A    Yes.

22 Q    But the NRA opposes the appointment of an examiner,

23 correct?

24 A    Yes.

25 Q    And the NRA wants to let management, much of whom are the

1    same people who were sitting in the same places in 2017,

2    continue to be the control people for the NRA; is that

3    correct?

4    A    Yes.  We believe that people had fixed the problems.

5    Q    Who is conducting the investigation of the LaPierre-

6    McKenzie interactions and whether taxes should be paid on

7    that?

8    A    Well, that -- to the extent that that's an issue in --

9    well, so to the extent that that may be a tax issue, it would

10   probably -- it would be handled by tax counsel.  But the, you

11   know, any tax return addressing anything recent wouldn't be

12   due for a while.

13   Q    Has the NRA conducted an investigation as to whether that

14   was even a proper interaction, for him to use that luxury

15   yacht?

16   A    To the extent that it's an issue in the New York AG

17   litigation, I believe it'll -- it has been or will be

18   addressed in that forum.

19   Q    Okay.  And who is -- who is conducting that investigation

20   on behalf of the NRA?

21   A    Anything in the New York AG litigation is being handled

22   by the Brewer firm.

23   Q    Okay.  And who is looking into the propriety of the NRA's

24   interactions with the Brewer firm?

25   A    I know that that's -- that's a subject of a pending

1  motion in this court.

2  Q   And that's the application to retain the Brewer firm,

3  correct?

4  A   Right.  But from the NRA's standpoint, there's -- there's

5  no concern to investigate.

6  Q   And the NRA doesn't believe that an examiner should look

7  into that relationship; is that correct?

8  A   That's correct.

9  Q   Okay.

10       MR. TAYLOR:  I have no further questions, Your

11  Honor.

12       THE COURT:  Thank you, Mr. Taylor.  Mr. Noall?

13       MR. NOALL:  I have no further questions, Your Honor.

14       THE COURT:  Thank you, Mr. Noall.  Mr. Drake?

15       MR. DRAKE:  I do not have any further questions

16  either, Your Honor.  Thank you.

17       THE COURT:  Mr. Noall, is Mr. Frazer the designated

18  representative of the NRA under the rule?

19       MR. NOALL:  He is not, Your Honor.

20       THE COURT:  He is not?  All right.  Mr. Frazer,

21  you're going to be excused from the hearing, and you probably

22  -- well, you didn't hear, because -- if you would wait to

23  discuss your testimony with anyone until after I have given a

24  ruling on the motions in front of me, I would appreciate it.

25       MR. FRAZER:  Thank you, Your Honor.  Understood.

1           THE COURT:  Who is our next witness?

2           MS. STERN:  Your Honor, we're just going to trade

3   places here for a moment and Mr. Sheehan will be stepping to

4   the podium.

5           THE COURT:  All right.

6           MS. STERN:  Thank you, Your Honor.

7           THE COURT:  Nice to see you.

8           MR. SHEEHAN:  Good afternoon, Your Honor.

9           THE COURT:  Hi.

10          MR. SHEEHAN:  My name is -- can you see me, Your

11  Honor?

12          THE COURT:  I can.  I remember you from the first

13  day, too.

14          MR. SHEEHAN:  Okay.  Thank you.  Your Honor, my name

15  is Jim Sheehan.  I'm an Assistant Attorney General for the

16  State of New York.  We are calling Mr. Wayne LaPierre this

17  afternoon.

18          THE COURT:  All right.  This witness probably is

19  going to take a little while.  It's 3:00 o'clock.  Can we

20  maybe just take five minutes for everybody to get their act

21  together, and then we'll swear Mr. LaPierre in.  All right?

22          MR. SHEEHAN:  Your Honor, we're going to need about

23  ten minutes in order to make the witness transition, if

24  that's okay.

25          THE COURT:  That'd be fine.  Why don't we flip the

1  recess, then.  We'll do the longer one now and then we'll do

2  again a short break as we get a little bit deeper into the

3  afternoon.  So, it's 3:04.  Let's come back, you know, 3:15

4  or so.  All right.  Thank you.

5          MR. SHEEHAN:  All right.  Thank you.

6      (A recess ensued from 3:04 p.m. until 3:51 p.m.)

7          THE COURT:  We'll go back on the record in National

8  Rifle Association.

9      Mr. LaPierre, --

10          MR. GARMAN:  Uh, --

11          THE COURT:  I'm sorry?

12          MR. GARMAN:  Yes, Your Honor.  Just a previous -- so

13  I'll be defending this, but just for the record, Mr. Correll,

14  who is Mr. LaPierre's personal attorney, I believe is

15  authorized to object to privilege.  He's in the room, too, to

16  my left.  And then, by way of stipulation amongst the

17  parties, a paralegal from my office, Ms. Michelle Corey

18  (phonetic), is in the room with Mr. LaPierre.  She's under

19  strict instructions not to do anything except assist with

20  getting exhibits in front of him.  As we talked about, Mr.

21  LaPierre did have an eye procedure done on Friday, and so the

22  parties did agree to that.  I wanted to make sure the record

23  was clear on that point.

24          THE COURT:  Thank you.  I note for the record that

25  the judge every now and then has to have help with his

 1   exhibits too, Mr. Garman, so I totally understand.

 2        Mr. LaPierre, can you hear me?

 3             MR. LAPIERRE:  Your Honor, I can.

 4             THE COURT:  Would you raise your right hand?

 5        I'm not sure I'm seeing him.  Where --

 6             MR. GARMAN:  Michelle?  Oh, there we go.

 7             THE COURT:  Okay.

 8        (The witness is sworn.)

 9             THE COURT:  All right.  Mr. Sheehan

10             MR. SHEEHAN:  Thank you, Your Honor.

11     WAYNE LAPIERRE, NEW YORK ATTORNEY GENERAL'S WITNESS, SWORN

12                     DIRECT EXAMINATION

13   BY MR. SHEEHAN:

14   Q   Good afternoon, Mr. LaPierre.

15   A   Good afternoon, Mr. Sheehan.

16   Q   You're the executive vice president, aren't you, of the

17   National Rifle Association?

18   A   Yes, I am.

19   Q   All right.  And you've held that position since 1991,

20   correct?

21   A   Yes, I have.

22   Q   And as the executive vice president of the NRA, you're

23   the chief executive officer of the organization, correct?

24   A   That's correct.

25   Q   As we go today, I -- if -- I know you had surgery last

LaPierre - Direct                           65

1   week.  If you need to take a break, I'm sure the judge will

2   -- let us know and we'll ask the judge for a break.

3   Agreeable?

4   A    Thank you.  Thank you.

5   Q    And as we go through your testimony today, I understand

6   you have a paralegal with you to assist you in the operation

7   of the exhibits.  Are you able to see the exhibit machine?

8   A    Yes, I am.  I'll switch glasses, too, when I do it.

9   Q    Okay.  And as far as the -- I also should discuss your --

10  in terms of how you do your business on a day-to-day basis,

11  is it true that you send no emails?

12  A    That's correct.

13  Q    And is it true that you send no texts?

14  A    That's correct.

15  Q    And do you read the texts that you get?

16  A    As we've talked about recently, I've been reading texts

17  that come on my phone.

18  Q    And do you read your emails yourself?

19  A    Ah, do you mean that come on the phone?

20  Q    Or, or on your --

21  A    Yeah.

22  Q    -- desktop?

23  A    I don't -- I don't read any on a computer, no.

24  Q    Do you read the ones on your phone?

25  A    If somebody sends something on my phone and it comes up,

1    I -- I read it.  Recently, yes.

2    Q    Whether -- and recently meaning the last six months?

3    A    The last couple months, I've started reading them.

4    Q    So it's fair to say --

5    A    I'm kind of old-fashioned.

6    Q    Me, too.  So, as a practical matter, we're not going to

7    find emails or texts that you sent before a couple months

8    ago, correct?

9    A    That's correct.  I haven't -- I haven't sent any emails

10   or texts.

11   Q    All right.  Is it true that the reason you filed this

12   bankruptcy was so the NRA could leave New York and

13   reincorporate in Texas?

14   A    We filed this bankruptcy to esca... to look for a fair

15   legal playing field where NRA could prosper and grow in a

16   fair legal environment, as opposed to what we believed had

17   become a toxic, weaponized, politicized government in New

18   York State, as Attorney General Schneiderman called Tom King

19   on our board of directors and said there was a plan to

20   weaponize the government.

21            MR. SHEEHAN:  Your Honor, I object to the reference

22   to a hearsay conversation and ask that it be stricken.

23            THE COURT:  Sustained.

24       Mr. LaPierre, I think it would better for everyone,

25   including you, on shortening your testimony, if you'd listen

LaPierre - Direct                         67

1    carefully to the question and answer it.

2              THE WITNESS:  Yes, sir, Your Honor.

3              MR. SHEEHAN:  Mr. Thompson, could you pull up New

4    York Attorney General Exhibit 153?

5         And at this time, Your Honor, I ask that New York

6    Attorney General Exhibit 153 be admitted.

7              MR. GARMAN:  Your Honor, I apologize, I'm going to

8    be slower than Mr. Noall, but I have no objection.

9              THE COURT:  NYAG 153 is in.

10             MR. SHEEHAN:  All right.  And --

11        (New York Attorney General's Exhibit 153 is received into

12   evidence.)

13   BY MR. SHEEHAN:

14   Q    So, Mr. LaPierre, can you read the Exhibit 153?

15   A    Yes, I can.  NRA Leaves New York to Reincorporate in

16   Texas, Announces New Strategic Plan.

17   Q    And did you authorize this press release to be issued?

18   A    I did.

19   Q    And is it correct that you wanted to use the protection

20   of the bankruptcy court to dump New York, as stated in the

21   press release?

22   A    Yes.  We wanted to file Chapter 11 to ask the federal

23   court's permission to reincorporate in the State of Texas and

24   -- where we felt the organization could prosper.  And -- and

25   was seeking us and offering us incentives.

LaPierre - Direct                              68

1  Q   You made the decision to file for bankruptcy, correct?

2  A   I did, along with conferring with the Special Legislative

3  Committee.

4  Q   But you made the decision, correct?

5  A   Pardon me?

6  Q   You made the decision yourself?

7  A   Yes.  I made the decision, with the concurrence of the

8  SLC, which is -- which are the three officers of the NRA.

9  Q   And their concurrence is not a committee concurrence,

10  correct?

11  A   Well, the SLC was made an official committee of the board

12  of directors of the National Rifle Association at the January

13  7th meeting, so it is an official committee of the board of

14  directors, who I work for.

15  Q   Understood.  But as -- you consulted with the Special

16  Litigation Committee, but they did not vote as a committee to

17  authorize the bankruptcy, correct?

18  A   They were all in favor of it, and they -- they felt it

19  was a move that we needed to make, given the fact that the

20  New York AG was seeking to dissolve the NRA and seeking --

21        MR. SHEEHAN:  Your Honor, I'd like to move to strike

22  the answer as nonresponsive.

23        THE COURT:  Sustained.

24     Mr. LaPierre, please listen to the question and answer it

25  only.

 1              THE WITNESS:  All right.

 2    BY MR. SHEEHAN:

 3    Q    All right.  So let's go back, Mr. LaPierre, a second,

 4    time.  Did the Special Litigation Committee authorize, as a

 5    committee, the filing of the bankruptcy before it occurred?

 6    A    I filed it with their concurrence.

 7              MR. SHEEHAN:  Your Honor, I'd ask the -- that the

 8    testimony be stricken.

 9              THE COURT:  Sustained.

10              MR. GARMAN:  Your Honor, this is Mr. Garman, if I

11    might.  Your Honor, I believe his testimony is entirely

12    consistent with the resolution attached to the petition.

13              THE COURT:  Well, then he'll have to testify that

14    way, Mr. Garman.  He still hasn't answered the question

15    that's asked.

16    BY MR. SHEEHAN:

17    Q    Mr. LaPierre?

18    A    Yes?

19    Q    Did the Special Litigation Committee vote to authorize

20    the bankruptcy?

21    A    Yeah.  I talked to all three of them and they all three

22    said yes, they wanted to file -- authorize the bankruptcy.

23    Q    So you talked to all three -- okay.  Let's move on.

24         In addition to the Special Litigation Committee, did you

25    advise the other members of the board that you were filing

1    for bankruptcy before you did so?

2    A    No, we did not.

3    Q    When you use the term we, Mr. LaPierre, who are you

4    referring to?

5    A    The Special Litigation Committee, the three officers of

6    the National Rifle Association, and myself.

7    Q    In addition to the Special Litigation Committee, you

8    filed for bankruptcy without -- let me start again.  You

9    filed for bankruptcy without informing any of the salaried

10   officers until the day the petition was filed, correct?

11   A    That, that is correct.

12   Q    So let me walk through the officers who were not advised.

13   Craig Spray, your -- the board-elected treasurer and your

14   elected chief financial officer, was not advised before the

15   filing, correct?

16   A    He knew we were pursuing a reorganization.  He did not

17   know specifically we were going the bankruptcy route.

18          MR. SHEEHAN:  Your Honor, I'd move to strike the

19   answer as nonresponsive.

20          THE COURT:  I think he was trying to respond to

21   that, and so I'm going to overrule the objection.

22   BY MR. SHEEHAN:

23   Q    Mr. Joe De Bergalis is your executive director of general

24   operations, correct?

25   A    Yes, sir.

1   Q    And if you were to step down or be unable to serve as

2   EVP, Mr. De Bergalis would, by operation of your bylaws, take

3   charge of the NRA, correct?

4   A    Yes.

5   Q    You didn't inform him that you were filing bankruptcy

6   before you did so, right?

7   A    No, we did not.  I did not.

8   Q    Tyler Schropp is your director of -- executive director

9   of advancement, correct?

10  A    That's correct.

11  Q    And he's responsible for fundraising within the NRA?

12  A    That's correct.

13  Q    You didn't consult with him before you filed for

14  bankruptcy, correct?

15  A    That's correct.

16  Q    Jason Ouimet is your executive director of the Institute

17  for Legislative Affairs, correct?

18  A    Correct.

19  Q    And his responsibility is to handle lobbying and advocacy

20  for the NRA; is that correct?

21  A    That is correct.

22  Q    You didn't inform Mr. Ouimet of the -- this -- you did

23  not inform Mr. Ouimet before you filed for bankruptcy that

24  you're filing; is that correct?

25  A    That is correct.

1    Q    Sonya Rowling, the former director of accounting

2    operations and financial reporting, and your now-acting CFO,

3    did you tell her before you filed for bankruptcy?

4    A    No, we did not.  I did not.

5    Q    Did you solicit her opinion or advice?

6    A    No.

7    Q    David Warren, who signed the NRA's Statements of

8    Financial Affairs, you didn't inform him of the filing for

9    bankruptcy before it occurred, either, right?

10   A    No, we did not.  I did not.

11   Q    In fact, the only salaried employees at the NRA besides

12   you who knew of the bankruptcy filing before it occurred were

13   Mr. Arul --

14   A    Arulanandam.

15   Q    Thank you.  Thank you.  And I'll need your help again if

16   I do that.  Thanks.

17   A    Okay.

18   Q    He was the only person who knew of the filing of the

19   bankruptcy before it occurred?

20   Q    That -- that's correct.

21   A    And he's the NRA's spokesperson, correct?

22   Q    That is correct.  I'm not sure whether his assistant,

23   Billy, knew or not.  He night have.

24   A    Thank you for that correction.

25        And in the months leading up to the January 7, 2021

1    meeting of the board, you didn't discuss filing for

2    bankruptcy with the full board, correct?

3    Q    That's correct.

4              MR. SHEEHAN:  And can we go to Exhibit 50, please?

5              MR. GARMAN:  I'm sorry, Mr. Sheehan.  I assume

6    that's NYAG 50?

7              MR. SHEEHAN:  I'm sorry.  Yes, that's correct.

8    BY MR. SHEEHAN:

9    Q    Can you identify Exhibit -- NYAG Exhibit 50, Mr.

10   LaPierre?

11   A    It is a -- it's an employment agreement between myself

12   and the -- and the NRA.

13   Q    And was this employment agreement the only employment

14   agreement ever presented to the board with respect to your

15   employment by the NRA?

16   A    No.  I have a -- I have a -- a contract was approved at

17   the January 7th meeting of the board of directors that I --

18   that I have right now in effect with the board.

19   Q    Isn't that what this agreement is, that Exhibit 50?  I

20   don't mean to confuse you.  If this -- my understanding was

21   this is the January 7th agreement.

22   A    Yes, that is -- that is correct, Mr. Sheehan.

23   Q    Okay.  Was this the first time that an employment

24   agreement for you had been presented to the board of

25   directors of the NRA since you've worked there?

1   A    I'm not sure of that because I'm not in the compensation

2   committee session that they do.  I had other contracts with

3   the NRA, but I don't know whether they were presented to the

4   compensation -- by the compensation committee to the full

5   board.

6   Q    Okay.  So, to the best of your knowledge, there has been

7   no presentation of a -- before this contract that is Exhibit

8   50, there's been no presentation of a full contract -- of a

9   contract to the full board of the NRA for you?

10  A    I know this one was presented to the full board.  I'm not

11  sure whether any of the other ones that were in effect were

12  presented to the full board because I would have been out of

13  the compensation committee discussion.

14  Q    Right.  But after the compensation committee meets and

15  makes a decision, that decision is a matter of record,

16  correct?

17  A    If the board chooses to make it out of executive session

18  part of the record, they do.

19  Q    And it's a contract with you.  So if you -- if it's a

20  contract with you, wouldn't you have knowledge if the board

21  had signed off on it?

22  A    If they went out of executive session and made it in the

23  public record, yes, I would.

24  Q    So let's try that again.  As far as the public record --

25  that is, the public record of the NRA -- this is --

1  A    Right.

2  Q    -- the only contract, employment contract that you've

3  ever received which was approved by the full board?

4          MR. GARMAN:  Your Honor, I'm going to --

5          THE WITNESS:  As far -- as far as I know, --

6          MR. GARMAN:  Wayne.  Wayne.

7          THE COURT:  Mr. --

8          MR. GARMAN:  Your Honor, I would object.  This is

9  the third time we've asked this question.

10          THE COURT:  One more try in answering it.  Try to

11  answer it, Mr. LaPierre.

12          THE WITNESS:  I know that the other employment

13  contracts I had were signed by the officers of the NRA, the

14  three officers of the NRA.  I don't know whether they were

15  approved by the full board.  I don't -- I believe they may

16  not have been.

17  BY MR. SHEEHAN:

18  Q    Okay.  If you look at New York AG Exhibit 50, it is your

19  understanding it is this contract which authorized you to

20  file for bankruptcy; is that correct?

21  A    That is correct.  It delegated to the executive vice

22  president's office the ability to reorganize the Association.

23  Q    Actually, not the office, correct?  It's the executive

24  vice president?

25  A    Right.  That's correct.

1  Q    You spoke at the meeting on January 7th?  That is, the

2  board meeting?

3  A    That's correct.

4  Q    And for board meetings at the NRA, and this one in

5  particular, there was a general session, correct?

6  A    There was -- there was a short general session.

7  Q    And then there were some -- there were executive sessions

8  as well?

9  A    That's correct.

10 Q    You did not take part in the executive session where your

11 employment contract was discussed, right?

12 A    I did not take part and I was not in the room.

13 Q    But you did speak at the general session of the board

14 meeting, correct?

15 A    I may have had some short -- short comments.

16 Q    And in your short comments -- when you look at the --

17 well, --

18 A    I can't remember, to tell you the truth.

19 Q    Okay.  You didn't mention -- you don't remember today if

20 you actually spoke in the general session of the board

21 meeting?

22 A    I don't -- I don't -- I may have had some short comments

23 at the January 7th meeting.  I know I spoke at the most

24 recent board meeting we had, where they -- where the board

25 ratified the decision to file for bankruptcy.

1  Q   Mr. LaPierre, --

2           MR. SHEEHAN:  I'd move to strike that answer as

3  nonresponsive --

4           THE COURT:  Sustained.

5           MR. SHEEHAN:  -- after "I don't recall."

6  BY MR. SHEEHAN:

7  Q   I'd like you to examine New York AG Exhibit 299.  Can you

8  see that, please?  Can you identify Exhibits --

9           MR. SHEEHAN:  I'm sorry.  I'd ask that Exhibit 299

10 be admitted.

11           MR. GARMAN:  No objection.

12           THE COURT:  NY --

13 BY MR. SHEEHAN:

14 Q   Mr. LaPierre, can you --

15           THE COURT:  Excuse me, Mr. Sheehan.

16           MR. SHEEHAN:  I'm sorry.

17           THE COURT:  NYAG 299 is in.

18      (New York Attorney General's Exhibit 299 is received into

19 evidence.)

20 BY MR. SHEEHAN:

21 Q   Mr. LaPierre, can you identify Exhibit 299?

22 A   It says, Proceedings of the Meeting of the Board of

23 Director NRA, Thursday, January 7, 2021.

24 Q   And is this a transcript, as far as you know, of the

25 meeting on January 7th?  General session?

1    A    That's what it appears to be.

2    Q    Okay.  If you take a look at Pages 20 to 21 for me.

3    A    We're pulling them up right now.

4    Q    Okay.

5    A    (Pause.)  I'm sorry.  We're working to pull it up right

6    now.

7    Q    Understood.  Gives me a chance for a little water.

8    A    Yes, I -- yeah, I can read it.

9    Q    And I want to make -- so, you have Page 20 and 21 pulled

10   up?

11   A    We are.  And we're looking at remarks I obviously made at

12   that meeting.  So I -- I --

13   Q    So, let me -- let me just read a couple of the sentences

14   from that report.

15   A    Okay.

16   Q    If you look at the first full paragraph.  "Beginning in

17   late spring of this year, we outperformed all of our

18   projections for the rest of the year in membership and

19   fundraising."

20   A    Correct.

21   Q    Did you state that?

22   A    I did.

23   Q    And did you believe it when you said it?

24   A    Yeah, I -- I said that we -- we had -- we've had like

25   eight straight months of increasing membership, and eight of

1  the last -- in the last nine months, our membership had

2  increased, and we came within, in a COVID year, we came

3  within seven percent of our revenue.

4  Q    Let me -- okay.  Let me -- I was going to go to the next

5  paragraph.

6  A    Projections.

7  Q    All right.  So, "NRA ended the year by putting the

8  organization in a position of maximum liquidity."  Do you see

9  that?

10  A    I do.

11  Q    Was that true when you said it?

12  A    Yes, I believe it to be true.  I believe we reduced our

13  debt by about -- about $40 million.

14  Q.   Mr. LaPierre, you're jumping ahead to the next -- the

15  next clause.

16  A    I'm sorry.

17  Q    Let's stick with --

18  A    I'm not trying -- I don't mean to.

19  Q    And I don't, either.  So let me try again.  When you said

20  that NRA ended the year by putting the organization in a

21  position of maximum liquidity, you believed that to be

22  correct, right?

23  A    Correct.  Compared to the situation we were in the year

24  before.  Absolutely.

25  Q    Then you say, "We reduced our debt and we improved our

1  financial -- the financial performance of the Association by

2  $40 million."  Did you believe that when you said it?

3  A    I did believe that when I said it.

4  Q    And do you still believe it to be correct?

5  A    I do, because I got it from our -- from our treasurer,

6  who -- who -- that's where I got the figure from.  And I know

7  we paid off our -- yes.

8  Q    Okay.  Thank you.  And as a result of your performance

9  during 2020, you offered some key staff people some retention

10  bonuses, correct?

11  A    We did.

12  Q    And you say some accepted it and some turned it down,

13  correct?

14  A    Yes, that's correct.

15  Q    All right.  And then if you look at the bottom of Line

16  23, the bottom line is, "As we come out of this year

17  financially and membership-wise, NRA is strong membership-

18  wise, strong financially, it's financially solvent, and the

19  membership numbers continue to be incredibly high."  Do you

20  see that?

21  A    I do.

22  Q    And was that correct when you said it?

23  A    Yes.

24  Q    And is it still true?

25  A    Yes, it is.  We are continuing to grow in terms of

LaPierre - Direct                            81

1    membership.  And our first two months -- we don't have the

2    final numbers for March in yet -- were strong financially.

3            MR. SHEEHAN:  Move to New York Attorney General

4    Exhibit 3.  I'm sorry.

5    BY MR. SHEEHAN:

6    Q    This is -- if you look at Exhibit 3, have you seen

7    Exhibit 3 before?

8    A    I'm seeing it right now.

9    Q    And is it the practice of the NRA to issue board books to

10   board members before they come to a meeting?

11   A    I -- I'd have to refer to the secretary.  I'm not sure

12   whether they do or not.  I think they're sent out to the

13   board, but I'm not positive.

14   Q    Do you know whether the two contracts that -- do you know

15   whether your employment contract was distributed to the board

16   of directors before the meeting on January 7th?

17   A    Again, I wasn't in the room.  I -- I know -- I don't -- I

18   know it wasn't distributed before the executive session, and

19   I wasn't in the executive session where I assume it was -- I

20   assume it was discussed and board members would have had a

21   chance to see it.

22   Q    All right.  So, let's -- so, let me just make clear.  To

23   the best of your knowledge, it was neither sent to the board

24   members before the meeting nor distributed in the general

25   session, correct?  That is, the draft contract?

 1  A    To the best of my knowledge, it wasn't distributed prior

 2  to the meeting.  I wasn't in the room when it -- because it

 3  was my contract, when it was presented to the board.

 4  Q    Okay.

 5           MR. SHEEHAN:  So let's go to New York Attorney

 6  General Exhibit 4.  I'm sorry, Exhibit 3.

 7  BY MR. SHEEHAN:

 8  Q    Mr. LaPierre, do you have Exhibit 3?

 9  A    Yes, sir, I do.

10  Q    And if you look at the index, which is the second page of

11  Exhibit 3, do you --

12  A    I'm looking --

13  Q    I'm sorry.

14  A    I'm sorry.  I'm looking at it right now.

15  Q    Okay.  Where on that page is any report related to the

16  contract, discussion of the contract for you?

17           MR. GARMAN:  Your Honor, I have an objection.  I

18  don't think we've laid foundation for this document with Mr.

19  LaPierre.

20           MR. SHEEHAN:  Well, it's been admitted -- this has

21  been admitted previously.

22           THE COURT:  Overruled.

23  BY MR. SHEEHAN:

24  Q    Mr. LaPierre, do you recognize Exhibit 3?

25  A    It is a schedule for the board meeting.

1  Q    And it also includes a series of reports from various

2  officers in the NRA, correct?

3  A    Correct.

4  Q    And it recites that it's the minutes of the meeting of

5  the board of directors.  Did you receive minutes of the

6  meeting of the board of directors for January 7, 2021?

7  A    No, I have not received them.

8  Q    Okay.  Did you review draft minutes before they went out?

9  A    No, I did not.

10         MR. SHEEHAN:  Okay.  Let's go to Exhibit 55.

11  BY MR. SHEEHAN:

12  Q    This is previously-admitted New York Exhibit 55.  Could

13  you examine Exhibit 55, please?

14  A    Yes, I'm looking at it right now.

15  Q    All right.  This was the announcement sent by Mr. Frazer

16  to the full board on your behalf about the filing for

17  bankruptcy; is that correct?

18  A    That's correct.  Mr. Frazer sent something out to the

19  full board once it was filed.

20  Q    All right.  Did you review this Exhibit 55 before it went

21  out?

22  A    I -- I believe I did.

23  Q    And how does that work?  Do you get -- does -- do people

24  walk over a copy of the document to you to read on paper?

25  A    Yes.  What the -- what -- the press releases were

1    prepared by Andrew Arulanandam and Travis Carter, and -- on

2    these, and I -- there were several different ones.  One for

3    the board, one for the public in -- members in general,

4    another one for the media.  Yes.

5    Q    They were all paper and they were walked to you as paper?

6    A    That's correct.

7    Q    And would you mark them up?

8    A    No, I didn't mark them up because I didn't have any

9    changes.

10   Q    Okay.  And you'll see in Exhibit 55, it says, "Dear Board

11   of Directors, I'm pleased to announce some exciting news

12   about the NRA."  Was that the first time that -- the first

13   time that the board had received a message from you, the full

14   board had received a message from you concerning the decision

15   to file for bankruptcy?

16   A    That -- that would be correct.

17   Q    Okay.  So, --

18   A    I also did a telephone call with several board members,

19   and it's possible the telephone call reached them before the

20   -- before this did, actually.

21   Q    When you say several, how many?

22   A    I -- I don't know.  There were probably 15, 20 on it.  We

23   were going to do three different calls with board members.

24   Q    After the filing?

25   A    After the filing.  Correct.

1    Q    Did you -- did you ever discuss with Carolyn Meadows the

2    idea of having a special board meeting just before the

3    filing?

4    A    A special board meeting before the filing?

5    Q    Right.  To advise the board that you were filing?

6    A    No, we had a -- we had a -- we had a board meeting where

7    the Special Litigation Committee and the officers presented

8    this contract --

9    Q    Mr. LaPierre, --

10             MR. GARMAN:  I'm going to have to object and move to

11    strike.

12             THE COURT:  Sustained.

13             THE WITNESS: Okay.

14    BY MR. SHEEHAN:

15    Q    What I'm asking is you've now decided, you decided on or

16    about January 13th to file for bankruptcy, correct?

17    A    The 11th, 12th, 13th, we were moving toward that, making

18    the decision to -- to move that way, yes.

19    Q    So you made the decision by the 13th of January?

20    A    We were discussing it.  We actually made the final

21    decision on the -- on the -- on -- to do it on the 15th, but

22    we were preparing on the 13th and 14th.  Working on releases

23    and --

24    Q    So you're working on releases about a decision you had

25    not yet made; is that correct?

1  A   That's correct.  In the -- in -- if we decided to pull

2  the -- pull the plug and do it.

3  Q   And in addition to you, did the three Special Litigation

4  Committee members review the press releases?

5  A   I don't know whether they did or not.  I know -- I know

6  -- they may very well have.  Andrew Arulanandam may very well

7  have sent them to all of them.

8  Q   But you don't know for sure, correct?

9  A   I don't -- I don't know for sure.

10 Q   Were there a press officer --

11 A   I think -- I think they probably saw them.

12 Q   Was there a press officer at the Brewer firm who worked

13 on the press releases, too?

14 A   Travis Carter with the Brewer firm worked on the press

15 releases.

16         MR. SHEEHAN:  Let's go to Exhibit 151.

17 BY MR. SHEEHAN:

18 Q   And by the way, on Exhibit 55, just to go back, the

19 statements made in that press release that you've reviewed

20 were correct to the best of your knowledge, correct?

21 A   Yes.

22 Q   Okay.  Have you seen Exhibit 151 before today?

23 A   Yes.  That's a letter we did to our members and -- our

24 members.

25         MR. SHEEHAN:  I'd ask at this time, Your Honor, to

1    admit Exhibit -- New York Attorney General Exhibit 151.

2              MR. GARMAN:  No objection, Your Honor.

3              THE COURT:  151 --

4              MR. SHEEHAN:  All right.

5              THE COURT:  151 is in.

6        (New York Attorney General's Exhibit 151 is received into

7    evidence.)

8    BY MR. SHEEHAN:

9    Q    Mr. LaPierre, this is your letter to NRA members and

10   supporters on the NRA Forward website, correct?

11   A    Correct.

12   Q    And the statements in this letter accurately reflect why

13   the NRA filed for bankruptcy, correct?

14   A    Yes.  That's what -- that's what I believe, yeah.

15   Q    Okay.  And then -- all right.  That's what you believed,

16   that they were correct when you sent them out?  Right?

17   A    Yes.  I believe they -- they were correct when we sent

18   them out.

19             MR. SHEEHAN:  Let's go to Exhibit 208.  On Exhibit

20   208 -- I ask admission of Exhibit 208.

21             MR. GARMAN:  No objection.

22             THE COURT:  NYAG 208 is in.

23       (New York Attorney General's Exhibit 208 is received into

24   evidence.)

25   BY MR. SHEEHAN:

1  Q   Did you discuss with -- do you know who drafted this

2  Exhibit 208?

3  A   Yes.  It was drafted by Andrew Arulanandam and working

4  with Travis Carter of the Brewer firm.

5  Q   Did you review it before it went out?

6  A   I did -- I did review it.

7  Q   And did you believe it to be accurate?

8  A   Yes, I did.

9  Q   Let's -- let's turn to another subject, which is Sea

10 Girt.

11     By the way, in terms of the NRA Forward website, have

12 there been any additions on that website since the initial

13 announcement?

14 A   You know, that's managed by Andrew Arulanandam and his --

15 his -- and Billy, who works with him.  And I don't know

16 whether they put in the -- I've been so busy, I don't know

17 whether they've added -- added anything in the last couple

18 days or not.

19 Q   Has the NRA issued a press release about the meeting of

20 March 28th by the board?

21 A   I'm not sure whether we have or not.

22 Q   Has the NRA issued a press release about the motions

23 filed by the Attorney General in this case?

24 A   I'm not sure whether we have or not.

25 Q   Okay.  Let's go now to Sea Girt.  Do you know what Sea

1   Girt is?

2   A    I do.

3   Q    What's Sea Girt?

4   A    Sea Girt was formed in November of 2020 as a possible

5   vehicle for restructuring, and then in -- I believe, when we

6   were moving toward filing for bankruptcy, we officially filed

7   Sea Girt and put, I think, $50,000 in its bank account and --

8   yeah.

9   Q    All right.  So --

10  A    So it's a transition vehicle.

11  Q    All right.  Let's go through -- you said you filed -- you

12  opened up Sea Girt in November of 2020, correct?

13  A    Right.

14  Q    And it's a Texas LLC, correct?

15  A    That's correct.

16  Q    And you signed the operating agreement?

17  A    That's correct.

18       MR. SHEEHAN:  Do we have that Exhibit 347?

19  BY MR. SHEEHAN:

20  Q    Okay.  Take a look at Exhibit 347.

21  A    At that -- at that point, we were also considering, and

22  we didn't follow through, --

23       MR. SHEEHAN:  I'm sorry, Mr. LaPierre.  I'm going to

24  object and move to strike as not responsive to a pending

25  question.

 1              THE COURT:  Sustained.

 2              MR. SHEEHAN:  Your Honor, I'd ask admission of New

 3   York Attorney General Exhibit 347.

 4              MR. GARMAN:  No objection.

 5              MR. SHEEHAN:  All right.

 6              THE COURT:  NYAG --

 7              MR. SHEEHAN:  If you look --

 8              THE COURT:  Hold on just a second, Mr. Sheehan.

 9              MR. SHEEHAN:  I'm sorry, Your Honor.

10              THE COURT:  NYAG 347 is in.

11         (New York Attorney General's Exhibit 347 is received into

12   evidence.)

13   BY MR. SHEEHAN:

14   Q   All right.  And you'll see a signature on the back of --

15   of the Exhibit 347 in two places that looks to be yours.  Is

16   that your signature?

17   A   That's correct.  That's my signature.

18   Q   And did you tell Craig Spray about the formation of Sea

19   Girt?

20   A   I -- I knew Craig knew that we were -- we were setting up

21   a trust account --

22   Q   Mr. LaPierre, could you please just answer the question I

23   asked, which is, did you tell Craig Spray about Sea Girt?

24   A   I -- I honestly don't remember.

25   Q   Okay.  And a few days before the petition date for

1    bankruptcy, you directed that $50,000 be transferred to Sea

2    Girt from a trust account managed by Brewer, Attorneys and

3    Counselors, correct?

4    A    That's correct.

5    Q    And the -- at the time that this organization was formed

6    -- that is, Sea Girt -- it had no employer identification

7    number, correct?

8    A    I'm not -- I'm not an expert on that.  I -- I'm not sure.

9    Q    Did you open a bank account for Sea Girt?

10   A    We -- we opened a bank account, I believe, on the 11th or

11   12th of January, when we put -- Vanessa Shahidi, who works

12   with me in my office, we put -- we put $50,000 in there, in

13   the --

14   Q    In that bank account?

15   A    In that bank account.

16   Q    And did she open the bank account?

17   A    I believe she did.

18   Q    And where is that $50,000 now?

19   A    I believe it's still with Sea Girt, but I'm -- as far as

20   I know.

21   Q    And Sea Girt has no employees, correct?

22   A    Correct.

23   Q    And you didn't tell the board about Sea Girt's creation

24   or existence before you put it into bankruptcy, right?

25   A    That's correct, I believe.

1   Q    And Sea Girt has no financial reason to file for

2   bankruptcy, correct?

3   A    You know, that's -- that's kind of a legal question that

4   I --

5   Q    Fair enough.  Let me try a different question.  As far as

6   you know, Sea Girt's assets exceed its debts, correct?

7   A    Correct.

8   Q    And -- all right.

9          MR. SHEEHAN:  Let's turn to New York Attorney

10  General Exhibit 138.

11  BY MR. SHEEHAN:

12  Q    Could you identify for me, Mr. LaPierre, Exhibit 138?

13  A    Yes.  That is a -- a contract that was proposed by the

14  board to me and -- after the April Dallas board of directors

15  meeting.

16  Q    All right.

17         MR. SHEEHAN:  Now, at this point, Your Honor, I'd

18  like to move the admission of New York Attorney General

19  Exhibit 138.

20         MR. GARMAN:  No objection.

21         THE COURT:  138 is in.

22    (New York Attorney General's Exhibit 138 is received into

23  evidence.)

24  BY MR. SHEEHAN:

25  Q    Mr. LaPierre, you said it was by the board.  Can you tell

1  me -- if I'm looking at this letter, I don't see anything in

2  the document that identifies it as presented by the board.

3  Do you?

4  A   It was presented to me by -- by Steve Hart, who was

5  counsel to the board.  And it ended up being signed by, I

6  think, two or -- either two or three of the officers.  And

7  then I signed it.

8  Q   Do you know if it was proposed by the whole board?

9  A   I don't -- I don't think it was.

10 Q   It says it extends and modifies your contract that we

11 entered into on December 1, 2013, and it also refer -- let me

12 go back a step on that.  All right.  The -- it discusses in

13 this contract a series of payments for you over -- through

14 2030; is that correct?

15 A   That's correct.

16 Q   Okay.  And the people who sign off on it are Mr.

17 Phillips, who was at the time your CFO and treasurer,

18 correct?

19 A   Let me pull up the -- yes.  Yes.

20 Q   And by Mr. Brownell, who at that time was the -- the

21 first -- was the president of the NRA?

22 A   That's correct.  He was the president.

23 Q   And by Carolyn Meadows, who was what, the second vice

24 president at the time?

25 A   I think she was the -- either the first or second vice

1   president, one or the other.

2   Q    And when --

3   A    First vice president, I think.

4   Q    When this contract was signed, was it right after the

5   annual meeting?

6   A    It -- it was.

7   Q    All right.  And was there a press release associated with

8   this contract extension?

9   A    I don't think there was.

10  Q    All right.  You'll see on the second paragraph it says,

11  "These rates are applicable when your term as an officer has

12  ended."  Do you see that?

13       I'm sorry, Mr. LaPierre, you have to --

14  A    I do see that.

15  Q    And when your term as an officer has ended, that means

16  you're no longer the executive VP, correct?

17  A    That's correct.  They -- they wanted to tie up my name

18  and likeness for fundraising purposes, and that's why they --

19  why they proposed it.

20  Q    All right.  And as far as this -- this agreement extends

21  out for 10 years, until 2030.  To your knowledge, the entire

22  board did not approve this contract, correct?

23  A    That's correct.

24  Q    And if someone else were to take over as executive vice

25  president of the NRA, they would still be stuck with $15

1  million in obligations under this contract, correct?

2  A    If it had remained in effect, that would have been

3  correct.

4  Q    Okay.  Was this contract -- that is, New York Exhibit 138

5  -- ever revoked?

6  A    Yes.  I told the officers in -- I became uncomfortable

7  with it, one, I didn't -- whether I wanted my --

8  Q    Mr. LaPierre, --

9           MR. SHEEHAN:  I'd move to strike.

10          THE COURT:  Sustained.

11          THE WITNESS:  But can I --

12  BY MR. SHEEHAN:

13  Q    So let me try again, Mr. LaPierre.

14  A    Okay.

15  Q    Is this contract still in effect?

16  A    No, it's not.

17  Q    Was it revoked in writing?

18  A    Yes, it was.

19  Q    Is that -- and -- all right.  When was that?

20  A    I -- I told the officers in --

21  Q    Mr. --

22  A    -- in May or June of 2019 I'd like to tear it up because

23  I was uncomfortable with it and I --

24  Q    Mr. LaPierre, I apologize, I have to move to strike,

25  because --

1          THE COURT:  Sustained.

2    BY MR. SHEEHAN:

3    Q    Was it revoked?  Let's go back.

4    A    Yes.  It was -- it was -- I thought it had been torn up

5    when you did my deposition in June.  I found out it hadn't

6    when -- when the AG actually filed --

7    Q    Okay.

8    A    -- a dissolution.  And then I officially made sure that

9    it was in writing to --

10   Q    Mr. LaPierre, --

11   A    -- to nullify it.

12   Q    All right.  So there's a writing revoking the agreement,

13   this agreement that is Exhibit 138?  Yes or no question.

14   A    There is -- there is, in writing from me to the officers

15   or the compensation committee, revoking and tearing this up.

16   Q    And when -- when -- can you tell me the date of that

17   writing?

18   A    It would have been, oh, gosh, sometime in August,

19   September, October, or November.  One of those, one of those

20   months, I think.  Because I was surprised it hadn't --

21   Q    Mr. LaPierre, okay, I asked you when and I think you've

22   answered the question.

23   A    Okay.

24   Q    Let's go through.  Move on.  Employment agreements.  Did

25   you get -- did you get a document back from the compensation

 1  committee acknowledging receipt of a revocation of the

 2  contract?

 3  A   I can't -- I honestly can't remember whether I did or did

 4  not.  I just know that I --

 5  Q   All right.

 6  A   I wrote them and -- and then they received it.

 7          MR. SHEEHAN:  Your Honor, move to strike after "I

 8  don't know."

 9          THE COURT:  Sustained.

10  BY MR. SHEEHAN:

11  Q   Mr. LaPierre, let's move on to the bankruptcy counsel

12  Brewer fees.  You authorized --

13          MR. GARMAN:  Your Honor?  Your Honor, I'm sorry.  I

14  have to object.  I'm looking at the real-time transcript and

15  he didn't say the words "I don't know."

16          THE COURT:  All right.  Do you want to restate your

17  question and have Mr. LaPierre --

18          MR. SHEEHAN:  Sure.

19          THE COURT:  -- answer that question?

20      Thank you very much, Mr. Garman.

21          MR. SHEEHAN:  I'm sorry, Your Honor.

22  BY MR. SHEEHAN:

23  Q   Mr. LaPierre, did you ever receive a written revocation

24  -- written notice that this contract had been revoked?

25  A   I -- I don't remember.

1   Q    Thank you.  Moving on to the bankruptcy counsel issue.

2          MR. SHEEHAN:  Let's do Exhibit 193.  No, let's hold

3   off on that for a moment.

4   BY MR. SHEEHAN:

5   Q    You authorized payments of attorney fees to the Brewer

6   firm within 90 days prior to bankruptcy totaling $17.5

7   million, correct?

8   A    That sounds -- sounds correct.

9   Q    In addition to dealing the Brewer firm, the Debtors have

10  retained the Neligan firm as counsel, correct, in the

11  bankruptcy case?

12  A    Correct.

13  Q    And when you testified last week or two weeks ago about

14  the Neligan firm, you said you met them in early January,

15  interviewed them then with the SLC.  Is that correct?

16  A    That's correct.

17  Q    And that was the first time you met with the Neligan

18  firm?

19  A    That was the first time I had -- believe I met with the

20  Neligan firm.  I know -- I know we --

21          MR. SHEEHAN:  Move to strike, Your Honor.

22          THE COURT:  Sustained.  Just answer the question.

23  BY MR. SHEEHAN:

24  Q    Mr. LaPierre, the -- could you look at Exhibit 298,

25  please?  (Pause.)  Can you identify -- Mr. LaPierre, have you

1  had a chance to look at Exhibit 298?

2  A    Yes.  This -- when we first retained the Neligan firm to

3  look at options for restructuring was in November of 2020.

4  Q    And you'll see at the end of this contract that there is

5  a signature, your signature, what appears to be your

6  signature.  Is that your signature on the bottom page?

7  A    Yes, it is.  I -- I know we retained them in November

8  2020 to help us look at options.

9           MR. SHEEHAN:  Move to strike anything after yes.

10           THE COURT:  Sustained.

11 BY MR. SHEEHAN:

12 Q    So, Mr. LaPierre, did you meet with -- I'm sorry.  Let's

13 take a look at Exhibit 298 for a second.  "Dear Mr. LaPierre,

14 Thank you for asking Neligan, LLP to represents the National

15 Rifle Association in connection with investigating,

16 analyzing, evaluating alternative legal strategies available

17 to the NRA under Title 11 of the United States Code and

18 otherwise."

19      Do you see that?

20 A    I do.

21 Q    Did you ask the Neligan firm to look into legal

22 strategies under Title 11 of the United States Code?  In

23 November of 2020?

24 A    Yes.  We did.  We asked them to look at various options

25 and -- and -- and strategies.

LaPierre - Direct                            100

1    Q    And --

2    A    I -- go ahead.  I'm sorry.

3    Q    Thank you.  Was that a meeting in person that you met

4    with the Neligan firm in November of 2020?

5    A    I don't believe it was.

6    Q    Was it by telephone?

7    A    I may -- I may have talked to them on the phone.

8    Q    Was anybody else -- besides you, was there anyone else

9    who asked the Neligan firm to investigate, analyze, and

10   evaluate alternative legal strategies available to the NRA

11   under Title 11 of the United States Code or otherwise?

12   A    The -- the attorneys with the Brewer firm, I believe,

13   were engaged with the Neligan -- were -- had communicated

14   with the Neligan firm.

15   Q    Did you yourself have direct communication with the

16   Neligan firm in November 2020?

17   A    I may have talked with them on the phone.  I -- I didn't

18   -- I do not remember meeting them in person until the Dallas

19   meeting we talked about.

20   Q    A decision of this magnitude -- you usually use yellow

21   pads to make a record, don't you, of your conversations with

22   people?

23   A    I -- I did not use any yellow pads on -- on any of this.

24   Q    So when you went to meet with the Neligan Firm in January

25   of 2021 before the board meeting, the -- no SLC, the Special

1   Litigation Committee, had never met the Neligan firm before,

2   correct?

3   A   They met them at that -- at that same meeting I was at.

4   Q   That is, the January 2021 meeting?

5   A   I believe it was January 7th, 2021.  That's correct.

6   Q   That was the board meeting, right?  So --

7   A   It was the date -- I believe it was the -- it was either

8   the -- I think it was after the board meeting, back -- back

9   here at -- back, after the board meeting, at the Brewer firm.

10  Q   So, in the meeting with Neligan was the Brewer firm, in

11  addition to the three SLC members and yourself, correct?

12  A   Correct.

13  Q   Anyone else?

14  A   Not that I remember.  I don't think Carolyn Meadows was

15  there in person.  She was on -- she was on the phone.

16  Q   Let me go to -- with respect to the New York Attorney

17  General suit against you personally, --

18  A   Yes.

19  Q   -- that suit seeks repayment by you of funds to the NRA;

20  isn't that correct?

21  A   Yes, it does.

22  Q   And you have a personal interest in moving the NRA away

23  from the state regulator which brought the action against

24  you; isn't that correct?

25  A   No.  Moving the NRA away from the state regulator would

1    do absolutely nothing to help me.  It would help the NRA

2    where the New York AG is trying to dissolve its assets and --

3    Q    I --

4    A    -- and dissolve the NRA.  It would help the NRA prosper

5    and grow and have a chance to survive in the future.

6         MR. SHEEHAN:  Your Honor, at this point I'd move to

7    strike as nonresponsive.

8         THE COURT:  Sustained.

9         MR. GARMAN:  Your Honor, I believe much of that

10   answer was directly responsive to the question.

11        THE COURT:  I sustain the objection.

12   BY MR. SHEEHAN:

13   Q    Let's move on to -- and your -- did you hear the opening

14   statements of counsel for the Debtor?

15   A    No, I did not.

16   Q    In his opening statement, as I understand it, he

17   described the NRA's path to compliance in early to mid-2018

18   which began with compliance seminars for hundreds and

19   hundreds of NRA employees.  Do you agree that happened in

20   2018?

21   A    That happened in July of 2018.

22   Q    And did you attend the first compliance seminar?

23   A    I did not attend it, but I looked over all the material.

24   Q    Did you attend the second compliance seminar?

25   A    I did not, but I had seen the material.

1  Q    Did you attend the third compliance seminar?

2  A    I did not, but I -- I know the material that was

3  presented.

4          MR. SHEEHAN:  Can I have Exhibit 56, please?

5  Exhibit 56 is -- I have it.

6  BY MR. SHEEHAN:

7  Q    Now, Mr. -- I'm sorry.  Mr. LaPierre, do you recognize

8  Exhibit 56?

9  A    I do.

10  Q    So let's take a look.  Even though you didn't attend the

11  program, you say you're familiar with the material, correct?

12  A    Correct.

13  Q    So take a look at Page 17.  Do you see Page 17?

14  A    We're pulling it up right now.  (Pause.)  I see it.

15  Q    And you'll see there it talks about transactions

16  implicating covered persons?

17  A    I do.

18  Q    You see that after the heading?

19  A    I do.

20  Q    And you'll see the -- you'll see it says, "is subject to

21  actual or apparent undue influence" in the first line

22  underneath the heading?  You see that?

23  A    I do.

24  Q    And do you see the -- "is subject to actual or apparent

25  undue influence -- *e.g.*, has solicited or accepted any gift,

1  entertainment, or favor, where such gift might create

2  appearance of influence (excludes gifts under $250)."  Do you

3  see that?

4  A    I do see that.

5  Q    All right.  And do you see it includes free use of boats,

6  planes, vacation houses, sporting event tickets, or other

7  items as part of a social activity?

8  A    I do see that.

9  Q    And it's your understanding that, in circumstances where

10 a person, a covered person is subject to actual or apparent

11 undue influence under the policy, there are certain actions

12 that have to be taken, correct?

13 A    Yes.

14 Q    And you'll see the next bullet says, "Appearance of bias

15 is enough to warrant disclosure, even if you're confident no

16 wrongdoing has occurred."  Do you see that?

17 A    I do.

18 Q    And you understand that the appearance of bias is enough

19 to warrant disclosure?  Yes?

20 A    I see that.

21 Q    Okay.  Look at -- now turn to Page 18.  You'll see the

22 blown-up paragraph?

23 A    I see it.

24 Q    "All material facts relating to conflicts of interest,

25 including the nature of your interest and the information

LaPierre - Direct                              105

1    about any proposed transaction or other arrangements, are

2    required to be disclosed in good faith in writing to the NRA

3    Audit Committee."

4         Do you see that sentence?

5    A    I do.

6    Q    And does that remain the policy of the NRA?

7    A    It does.

8    Q    And was that policy in effect going back to 2013?

9    A    Yeah, it -- it probably was.

10   Q    Okay.  And it says, "Material facts relating to conflicts

11   of interest, you should contact Thomas Tedrick, secretary of

12   the NRA Audit Committee."

13   A    Correct.

14   Q    And Mr. Tedrick -- was -- Mr. Tedrick is a managing

15   director of the NRA.  Correct?

16   A    Correct.

17   Q    Did you yourself ever make any disclosure of material

18   facts relating to conflicts of interest to Mr. Tedrick?

19   A    I did not.

20   Q    Do you see the last, the last sentence, "Conflict

21   identification analysis can be difficult, and therefore you

22   are at all times expected to err on the side of caution and

23   disclose all instances where a conflict of interest, the

24   appearance of the conflict exists, even if you do not believe

25   that there's an actual conflict."

1      Do you see that sentence?

2   A   I do see that.

3   Q   Do you agree that's the policy of the NRA?

4   A   I do.

5   Q   Let's go on to Page 19.  (Pause.)  And are you there, Mr.

6   LaPierre?

7   A   Yeah.  Yes.  I'm sorry.  I am.

8   Q   It's my job to make sure you're seeing it, but let me

9   know if --

10  A   No.  Thank you.

11  Q   -- if I'm going ahead of you.

12  A   If any one of the foregoing situations arises -- that is,

13  conflicts of interest with respect to a covered person -- or

14  if you are aware of an actual or apparent conflict of

15  interest, it says you should contact Audit Committee

16  Secretary David Warren.

17      And what is -- is Mr. Warren now the secretary of the

18  Audit Committee?

19  A   I believe -- yes, he is, I believe.

20  Q   Did you ever contact Mr. Warren concerning a actual or

21  apparent conflict of interest?

22  A   I did -- I did not.

23  Q   The second link says, "Take steps to ensure the potential

24  conflict is disclosed in writing to the Audit Committee."  Do

25  you see that?

LaPierre - Direct                                107

1   A    I do.

2   Q    Did you ever submit -- did you ever submit any potential

3   conflict in writing to the Audit Committee?

4   A    I did not, until -- until the -- until the form this

5   year.

6   Q    And when you talk about the form this year, are you

7   talking about the form that is going to be dated January 20,

8   2021?

9   A    The -- the --

10          MR. GARMAN:  Objection.  Objection.  Vague and

11   ambiguous question.  I don't know what the form is.

12          THE COURT:  Sustained.  Could you restate your

13   question?

14          MR. SHEEHAN:  Sure.  Thank you, Your Honor.

15   BY MR. SHEEHAN:

16   Q    The -- each year, you prepare a conflict of interest

17   form, correct?

18   A    Correct.

19   Q    And it's collected by Mr. Frazer, the secretary of the

20   corporation?

21   A    Correct.

22   Q    And if I understand your point correctly, that for the

23   form which was just distributed in January of 2021, that you

24   prepared a document setting forth your potential conflicts of

25   interest.  Is that correct?

1  A   Correct.

2  Q   My colleagues tell me we have not -- was that -- we have

3  not received that document.  Was that document prepared by

4  you, Mr. LaPierre?

5  A   Yes, it was.

6  Q   All right.  When did you turn it in to Mr. Frazer?

7  A   In the last -- last day or two.

8  Q   I'm going to ask you to examine Exhibits 270, 271, 272.

9  That's it.

10         MR. GARMAN:  Counsel?  Regrettably, the witness can

11  only examine one document at a time.

12         MR. SHEEHAN:  I gotcha.

13     Let me ask you -- I'd ask to have these admitted.  These

14  are -- these are compliance training sign-in sheets.  Aren't

15  -- there are -- there are hard binders in the room, too, I

16  think, which might be helpful here with Mr. LaPierre.

17         MR. GARMAN:  Yeah.  We coordinated before the call

18  and we talked about the options of paper over digital, and

19  the agreement we had was digital, but we can  -- we can try

20  and revisit it.  Let me look at these exhibits real quick.

21         THE WITNESS:  I'm looking at them right now.

22  Forgive me.

23         MR. GARMAN:  Forgive me.  I'm  -- I'm not certain

24  whether or not there was a request to admit these documents.

25         MR. SHEEHAN:  I was asking to look at them first.

1  Yes.  I request admission of these documents.

2          MR. GARMAN:  I don't object to the admission, as

3  long as there's a reservation that I'm not certain this is

4  the complete sign-in list.

5          MR. SHEEHAN:  Okay.  Agreed.

6          THE COURT:  Would that --

7          MR. SHEEHAN:  The --

8          THE COURT:  Hold on, Mr. Sheehan, if you would.

9          MR. SHEEHAN:  Sorry.  I'm sorry.

10          THE COURT:  Are we talking about 270, 271, and 272?

11 Are those the exhibit numbers?

12          MR. SHEEHAN:  That's correct, sir.

13          THE COURT:  Okay.  Those exhibits are in, with Mr.

14 Garman's caveat.

15      (New York Attorney General's Exhibits 270, 271 and 272

16 are received into evidence.)

17 BY MR. SHEEHAN:

18 Q    And the Exhibit 56 that we looked at before was a seminar

19 for upper management, wasn't it?

20 A    It -- it was --

21          MR. GARMAN:  Hold on,  Your Honor, I have an

22 objection.  I believe 56 was a -- is a -- was a PowerPoint

23 from 2019, not the management meetings that were -- or, not

24 the compliance meetings that were discussed earlier.

25          THE COURT:  Do you want to look at that and restate

1    your question, Mr. Sheehan?

2    BY MR. SHEEHAN:

3    Q    Sir, the PowerPoint that we looked at, Exhibit 56, which

4    has in its title "Upper Management Seminar Compliance and

5    Governance Refresher, dated February 27, 2019," to your

6    knowledge, was that one of the three sessions that you talked

7    about for compliance?

8    A    Yes.  I believe it was.

9    Q    Okay.  And was there -- did you require that all of upper

10   management attend the compliance sessions?

11   A    We -- we asked all upper management -- as far --

12   management to attend, the division directors to attend the

13   compliance sessions.  That's correct.

14   Q    But you elected not to attend?

15   A    I don't know that I elected not to attend.  I may have

16   been out of town.  I may have been -- I -- I don't -- I just

17   know I -- I didn't -- I didn't attend it.  I read the

18   material.

19   Q    You've known David --

20   A    Looking back on it, I wish I had attended it.

21   Q    I understand that, Mr. LaPierre.  You've known David

22   McKenzie and Laura McKenzie for 20 years, correct?

23   A    I have known them for a long time.

24   Q    All right.  And I'm going to use the name McKenzie,

25   although Mr. Stanton -- Mr. McKenzie also uses the name

1  Stanton, correct?

2  A    I believe that's correct.

3  Q    And you consider Mr. McKenzie to be a friend?

4  A    Well, I consider him a -- in my work, if I'm the

5  quarterback, he's one of the people on the field that can

6  just hit and block and tackle, I mean, helping us win this

7  and further the interests of the NRA.  I --  I mean,--

8  Q    Mr. LaPierre, I'm going to ask --

9          MR. SHEEHAN:  We'll ask the Court to strike anything

10  after yes.

11          THE COURT:  Overruled.  I think he was trying to

12  answer the question.

13          MR. SHEEHAN:  All right.

14  BY MR. SHEEHAN:

15  Q    Mr. McKenzie is the owner of Associated Television,

16  correct?

17  A    That's correct.

18  Q    And that's a -- that's an NRA contractor?

19  A    That's correct.

20  Q    Mr. McKenzie also owns, in whole or in part, Membership

21  Marketing Partners, Allegiance Creative Group, Concord Social

22  & Public Relations, correct?

23  A    I'm not sure, but I believe that's owned by -- by his

24  wife.

25  Q    I'm sorry.  Which one?

1   A    Laura McKenzie.

2   Q    No, what --

3   A    MMP.

4   Q    Which company?

5   A    I think MMP.

6   Q    But he owns Allegiance Creative Group and Concord Social

7   & Public Relations?

8   A    I'm honestly not sure who owns that, which one of them.

9   Q    All right.  And Mr. Frazer testified in his capacity as

10  the NRA's corporate representative, "Mr. McKenzie owns or

11  operates, in whole or in part, MMP, ACG, and Concord."

12       Is that consistent with your understanding?

13  A    My understanding is -- is -- and I -- I'm not positive of

14  this, is that Laura McKenzie owns MMP.

15  Q    Before the pandemic hit -- that is, the COVID-19 pandemic

16  -- you made frequent trips to Los Angeles, correct?

17  A    Yes.

18  Q    And you met with Mr. McKenzie in Los Angeles several

19  times a year?

20  A    Yes.

21  Q    And on those trips, you'd fly by private charter, paid

22  for by the NRA, correct?

23  A    I'm required to fly private --

24  Q    Mr. --

25  A    -- by the NRA security.

1   Q    Mr. LaPierre, please answer the question yes or no.

2   A    Yes.

3   Q    And you'd stay at a hotel in Beverly Hills when you made

4   these trips, correct?

5   A    Yes.

6   Q    And you'd meet with -- you'd meet with Mr. McKenzie and

7   others over lunch and dinner.  Correct?

8   A    Correct.

9   Q    And you provided gifts to Mr. McKenzie and his wife and

10  their daughter from the National Rifle Association, correct?

11  A    Correct.  Along with many other people that were key to

12  making the organization succeed, I provided the NRA gifts.

13  Q    Mr. LaPierre?

14          MR. SHEEHAN:  Your Honor, I move to strike after

15  yes.

16          THE COURT:  Sustained.

17  BY MR. SHEEHAN:

18  Q    And you stayed on David McKenzie's yachts, correct?

19  A    I did.

20  Q    And there's -- there's two that -- there are two that

21  you've told us before you've stayed on.  One is the

22  Illusions, and the other is Grand Illusion.  Is that correct?

23  A    Grand Illusion was -- was recruiting celebrities, with

24  celebrities.

25  Q    Mr. LaPierre?

1          MR. SHEEHAN:  I'm sorry.  Your Honor, I move to

2    strike that answer as nonresponsive.

3          THE COURT:  Sustained.

4    BY MR. SHEEHAN:

5    Q    You stayed on Illusions, correct, Mr. LaPierre?

6    A    I did.

7    Q    You stayed on the Grand Illusion; is that correct?

8    A    I did.

9    Q    You've often visited, over the last eight years, the

10   Bahamas in the summer, correct?

11   A    Correct.

12   Q    And during those trips, you would stay for a week on the

13   yacht Illusions.  Isn't that correct?

14   A    That's correct.

15   Q    And you started staying on the yacht Illusions in the

16   Bahamas for a week at a time in 2013, correct?

17   A    For security, as a security retreat.

18          MR. SHEEHAN:  Your Honor, I move to strike as

19   nonresponsive.

20          THE COURT:  Sustained.

21          THE WITNESS:  Yes, I did.

22   BY MR. SHEEHAN:

23   Q    And family members would join you on these trips,

24   correct?  That is, the trips on the McKenzies' yachts?

25   A    Yes.

1   Q   You went at least once a year until 2019, correct?  On

2   the Illusions yacht?

3   A   Correct.

4          MR. SHEEHAN:  And at this point, I'd like to have

5   New York Attorney General Exhibit 95.

6          MR. GARMAN:  I'm sorry, Mr. Sheehan.  Did you say

7   95?

8          MR. SHEEHAN:  New York AG Exhibit 95, yes.

9          MR. GARMAN:  Thank you.

10  BY MR. SHEEHAN:

11  Q   Mr. LaPierre, I'd ask you, looking at Exhibit 95, -- I

12  guess --

13         MR. SHEEHAN:  At this time, Your Honor, I'd like to

14  have admitted Exhibit 95.

15         MR. GARMAN:  Your Honor, I object.  It's hearsay.

16         THE COURT:  Response on hearsay?

17         MR. SHEEHAN:  Your Honor, I'd like to -- my last --

18  well, I'll lay a foundation with the witness.

19         THE COURT:  All right.  I sustain the objection for

20  now.

21  BY MR. SHEEHAN:

22  Q   Mr. LaPierre, can you identify the ship which is shown in

23  Exhibit 95?

24  A   Yes.  That looks like the boat Illusions.  That's the

25  boat Illusions.

1  Q   Okay.  And that's the boat that you used in the Bahamas

2  for a week at a time over the last six years, correct?

3  A   Correct.

4  Q   And it is, in fact, equipped with four staterooms?

5  A   I believe so.

6  Q   And apart from the crew and the chef, only your family

7  has been on board during your stays, correct?

8  A   Correct, although my wife and --

9            MR. SHEEHAN:  Your Honor?

10            THE WITNESS:  -- work with the Women's Leadership

11  Forum.

12            MR. SHEEHAN:  Your Honor, I'd move to strike

13  everything after "Correct."

14            THE COURT:  Sustained.

15            MR. SHEEHAN:  All right.  At this time, Your Honor,

16  I'd like to move the admission of Exhibit 10, now that the

17  witness has identified it.

18            MR. GARMAN:  Your Honor, it remains hearsay.

19            MR. SHEEHAN:  Your Honor, I'd like to ask the

20  admission of Exhibit 10, only the picture, not the text.

21            THE COURT:  The exhibit is 95, I think.  The picture

22  is admissible.

23            MR. SHEEHAN:  I said 95.  I'm sorry.  Correct.

24            THE COURT:  That's okay.  The picture is admitted.

25  The narrative surrounding the picture is not admitted.

1        (New York Attorney General's Exhibit 95 is received into

2    evidence as specified.)

3    BY MR. SHEEHAN:

4    Q    In addition to your week-long trips -- by the way, on the

5    yacht Illusions, when you travelled on it, did it come

6    equipped with fuel paid for by someone else?

7    A    I -- it had fuel, yes.

8    Q    Did it come equipped with food supplies?

9    A    Yes, it did.

10   Q    And you didn't pay for the food, did you?

11   A    I paid for the food if it was -- if it was anywhere off

12   the boat.

13   Q    If it was on the boat, you did not pay for it, correct?

14   A    I did not.

15   Q    In addition to the yacht Illusions, you also spent time

16   on the singular Grand Illusion, correct?

17   A    Correct.

18   Q    Where did you travel on the Grand Illusion?  What places?

19   A    I believe around Europe.  I believe around Europe with --

20   with celebrities that I was trying to recruit for NRA.

21   Q    Okay.

22        MR. SHEEHAN:  Move to strike anything that's not

23   geographic, Your Honor.

24        THE COURT:  Sustained.

25   BY MR. SHEEHAN:

1  Q    All right.  How many times did you go sailing on the

2  Grand Illusion?

3  A    I think twice.

4  Q    In addition to the two Illusions, the Grand and regular,

5  you also visited the Bahamas in late December through early

6  January, correct?

7  A    Correct.

8  Q    And on these winter trips, you would often stay at the

9  Atlantis Resort on Paradise Island, correct?

10  A    Correct.

11  Q    And you did not pay for the hotel stay at the Atlantis

12  Resort on Paradise Island, correct?

13  A    I did not.  It was a business, trying to -- at a

14  celebrity retreat where I was trying to recruit celebrities

15  for the organization.

16          MR. SHEEHAN:  Your Honor, move to strike anything

17  after "I did not."

18          THE COURT:  Sustained.

19  BY MR. SHEEHAN:

20  Q    Your lodging at the Atlantic Resort and Casino was paid

21  for by David McKenzie during those trips to Paradise Island,

22  correct?

23  A    Along with the other celebrities.  And I wasn't a

24  celebrity.  I was just an invited guest.

25          MR. SHEEHAN:  Your Honor, I move to strike the

1  answer as nonresponsive.

2            THE COURT:  Sustained.

3  BY MR. SHEEHAN:

4  Q   When Oliver North, Lieutenant Colonel Oliver North was

5  raising concerns with you about the Brewer contracts, you

6  told him that he was precluded by his conflict of interest

7  from raising concerns about the Brewer contracts.  Is that

8  correct?

9  A   Colonel North was trying to derail our 360 top-to-bottom

10  --

11            MR. SHEEHAN:  Your Honor, I'm moving to strike that

12  answer as nonresponsive.

13            THE COURT:  Mr. LaPierre, this will go a lot quicker

14  if you'd just listen to the question that's asked and answer

15  it.

16            THE WITNESS:  Okay.  Yes, sir, Your Honor.

17  BY MR. SHEEHAN:

18  Q   Mr. LaPierre, you raised concerns -- conflict of interest

19  concerns with Mr. North when he asked for an independent

20  review of the Brewer law firm, correct?

21  A   I did.

22  Q   And we've seen in the prior materials we looked at that,

23  if you have a conflict of interest concern, you're supposed

24  to refer it to Mr. Tedrick or Mr. Warren and to the Audit

25  Committee, correct?

1    A    I -- the -- on -- on those forms, yes.

2    Q    On those forms?  If you have a conflict of interest

3    concern, would you agree with me, Mr. LaPierre, that it's

4    your responsibility as an officer of the NRA to raise it with

5    the Audit Committee?

6    A    I did raise it with the Audit Committee.  I raised it

7    with Charles Cotton, the chairman of the Audit Committee.

8    Q    Okay.  So you didn't send it to Mr. Tedrick or Mr.

9    Warren; is that correct?

10   A    I did not, but I raised it with the chairman of the Audit

11   Committee.

12          MR. SHEEHAN:  Move to strike the answer as

13   nonresponsive after "I did not," Your Honor.

14          THE COURT:  Overruled.  I think he was trying to

15   answer it.

16          MR. SHEEHAN:  Okay.  Thank you, Your Honor.

17       Okay.  Let's -- the next step, let's take a look at --

18   I'm going to move for the admission of these five exhibits,

19   but let's take just one of them.  So the five exhibits, for

20   Counsel and the Court:  314, 316, 315, 364, and 360.  And

21   I'll represent to my colleagues and to the Court that these

22   are Wayne LaPierre conflict of interest questionnaires.

23          MR. GARMAN:  Counsel, I'm sorry.  I didn't catch all

24   the numbers.  Could you do it again?

25          MR. SHEEHAN:  Sure.  314, '15, and '16, and 364 and

1   360.

2        And Your Honor, at this time I'd like to request also

3   that the conflict of interest form that Mr. LaPierre said he

4   has filled out in the last day or so be provided to us before

5   tomorrow's session.

6              THE COURT:  Any problem with that, Mr. Garman?

7              MR. GARMAN:  I don't think so, Your Honor.

8              THE COURT:  Thank you.

9              MR. SHEEHAN:  All right.  So, why don't we do -- Mr.

10  LaPierre, why don't we pull up --

11             THE COURT:  Hold --

12             MR. SHEEHAN:  -- New York AG Exhibit 316, please.

13             THE COURT:  Hold on just a second.  Mr. Garman is

14  still looking at those exhibits.

15             MR. GARMAN:  If we're on 316, have I been asked to

16  admit this one?

17             THE COURT:  Yeah.  Three --

18             MR. SHEEHAN:  We're asking to admit all five of the

19  COI, conflict of interest forms.

20             MR. GARMAN:  Happy -- we're either going to need to

21  wait a minute so I can do all five --

22             MR. SHEEHAN:  Sure.

23             MR. GARMAN:  -- or we can take them one at a time.

24             MR. SHEEHAN:  Why don't we take a minute, because

25  I'm not going to ask questions about all five.

1          (Pause.)

2              MR. GARMAN:  So, Your Honor, as to 314, I agree to

3     admit.  There are -- I will note there are blank pages, but I

4     believe they're just the back to some of the forms.  So, with

5     the understanding that the blank pages are represented to be

6     just the back, I'm okay with admitting 314.

7          As to three -- as to the remaining documents, no

8     objection to admitting them.  I'll just note there were two

9     documents for the year 2018.

10             THE COURT:  All right.  With that understanding,

11    314, 315, and 316 and '64 and 370 are all admitted.

12             MR. GARMAN:  Oh.  No, sir.  I didn't look at 370.  I

13    looked at 360.  Perhaps that was my mistake.

14             THE COURT:  No.  I may have misspoken.  It is 360.

15    I'm sorry.

16         (New York Attorney General's Exhibits 314, 315, 316, 360,

17    and 364 are received in evidence.)

18             THE COURT:  Mr. Sheehan?

19             MR. SHEEHAN:  I'm sorry.  Your Honor, I didn't

20    realize.

21    BY MR. SHEEHAN:

22    Q    Mr. LaPierre, could you take a look at Exhibit 316?

23    A    Yes.

24    Q    And can you tell me, is that the conflict of interest

25    form that you signed on 2/8/16?

1   A   Yes, it is.

2   Q   All right.  And at the last page -- that is, Page 4 of

3   that exhibit -- you'll see what appears to be your signature.

4   Is that your signature?

5   A   Yes.  It is.

6   Q   All right.  And above your signature, it says, "By my

7   signature below, I affirm that my answers are true and

8   correct to the best of my knowledge."

9       Do you see that?

10  A   I do.

11  Q   And when you signed this document, did you believe that

12  to be accurate?

13  A   I did, because I was living under incredible threat at

14  the time, and I used the boat --

15          MR. SHEEHAN:  Your Honor, I move to strike the after

16  -- I think after "I did."

17          THE COURT:  Okay.  Mr. LaPierre, --

18          MR. GARMAN:  So, Mr. LaPierre, this is -- yeah.  Mr.

19  LaPierre, this is Greg.  Don't worry.  I will be asking you

20  questions at some point --

21          THE COURT:  Yes.

22          MR. GARMAN:  -- to follow up.

23          THE COURT:  Yeah.  And I was just about to say

24  almost the same thing.  So if you'd just listen to Mr.

25  Sheehan's questions and answer that.  Your side is going to

LaPierre - Direct                    124

1  have an opportunity to explore probably the things that

2  you're wanting to tell me.

3           MR. SHEEHAN:  Mr. LaPierre, --

4           THE WITNESS:  Okay.

5           MR. SHEEHAN:  I'm sorry.

6  BY MR. SHEEHAN:

7  Q   If you look at the second bullet on Page 4, it says,

8  "I've received a copy of the NRA's conflict of interest and

9  related-party transaction policy."  And was that -- was that

10  true and correct as of February 8, 2016?

11  A   Yes.

12  Q   All right.  And the third bullet says, "I have read and

13  understand that policy and agree to comply with it."  Was

14  that true and correct as of February 8, 2016?

15  A   Yes.  I'd read the policy.  Yes.

16  Q   And you understood it?

17  A   And --

18  Q   And you understood it?

19  A   I did.

20  Q   And you agreed to follow it?

21  A   I did.  I believed there were special circumstances that

22  that --

23  Q   No.  No, Mr. LaPierre, --

24           MR:. SHEEHAN:  Your Honor, move to strike as

25  nonresponsive after "I did."

1              THE COURT:  Sustained.

2     BY MR. SHEEHAN:

3     Q    Now, this document that is dated 2/8/2016, did you fill

4     it out at the annual meeting?  Or did you fill it out at a

5     meeting of the NRA?

6     A    I -- I might have.

7     Q    Okay.  If you look at the first page of Exhibit 316,

8     you'll see, "Unless the question states otherwise, you only

9     need to answer with respect to calendar year 2015."  Right?

10    You see that?

11    A    Yes.

12    Q    And if we go down to the questions and if you look at

13    Question 4.  Do you see that question?  "Have you or any

14    relative received or do you or any relative expect to receive

15    any gift, gratuity, personal favor, or entertainment with

16    either a retail price or fair market value in excess of $300

17    from any person or entity that has or is seeking to have a

18    business relationship where it will receive funds from NRA or

19    any NRA entity?"

20         Do you see that?

21    A    I do.

22    Q    And you checked the box no, correct?

23    A    I did.  And I believe -- now to do -- is one of the

24    mistakes that I made.

25    Q    Okay.  And it was -- and was -- the transaction with the

1  McKenzies in which you received in 2015 a week on the yacht

2  Illusions in the Bahamas, do you believe that exceeded $300

3  now?

4  A    I do.

5  Q    Did you consider, under the policy that you said that you

6  had read and followed, whether the use of the yacht Illusions

7  in 2015 was in violation of the conflict of interest policy?

8  A    I believe now that it -- it should have been -- it should

9  have been -- should have been disclosed.  It's one of the

10  mistakes I made.

11  Q    Going back to 2016 when you signed this document, though,

12  did you approach Mr. Warren or Mr. Tedrick or your -- the

13  corporate secretary for advice on whether the -- whether to

14  accept the use of the ship, the yacht Illusions, in 2015?

15  A    I did not because if it was a security issue, --

16  Q    Mr. --

17  A    -- that was private.

18         MR. SHEEHAN:  Your Honor, I move to strike

19  everything -- "I did not."

20         THE COURT:  Sustained.

21  BY MR. SHEEHAN:

22  Q    Mr. LaPierre, --

23         MR. GARMAN:  Mr. Sheehan?  Mr. Sheehan?  Pardon my

24  interruption.  I am terribly sorry.  I am not quite sure what

25  exhibit we're looking at right now.

1          MR. SHEEHAN:  Oh, I'm sorry.

2          MR. GARMAN:  Is it 315 or 316?  I think I confused

3    myself.

4          MR. SHEEHAN:  Okay.  It's Exhibit 316.  Did you want

5    me to go through again?

6          MR. GARMAN:  No, no, sir.  I just wanted to make

7    sure I was following along.

8          MR. SHEEHAN:  Okay.

9    BY MR. SHEEHAN:

10   Q   Did you offer, Mr. LaPierre, to pay the McKenzies for the

11   use of the yacht Illusions in 2015?

12   A   I did not.

13   Q   Mr. LaPierre, if we went through the other conflict of

14   interest forms between 2013 and 2020, each of the -- it's

15   true, isn't it, that each of the boxes in Number 4 are

16   checked no?

17   A   That's correct.

18   Q   And you now believe that those answers were incorrect?

19   A   I believe it was a mistake -- one of the mistakes I made

20   now, not listing it.  It --

21         MR. SHEEHAN:  I apologize, but I'm going to have to

22   move to strike after "Yes."

23         THE COURT:  Sustained.

24         MR. GARMAN:  Your Honor, I believe that it was

25   responsive.

LaPierre - Direct                                128

1          THE COURT:  Yes.  I'm going to take that back.  I'm

2     going to let the answer stand.

3          MR. SHEEHAN:  Okay.

4     BY MR. SHEEHAN:

5     Q    And with respect to each of the other years besides the

6     2016 report that is Exhibit 316 for 2015, the answer should

7     have been yes in each of those cases, correct, as to Question

8     4?

9     A    Knowing what I know now, the answer should have been yes.

10    Q    And that is as to the yacht Illusions, correct?

11    A    Correct.

12    Q    When you were examined in -- strike that.  In addition to

13    your work with the McKenzies, in addition to the trips and

14    gifts from the McKenzies, you also received free hunting

15    trips, including all expenses paid for by Under Wild Skies,

16    an NRA vendor; isn't that true?

17    A    Yes.  That was all work.

18    Q    All right.  Including an elephant-hunting trip -- you

19    received an elephant-hunting trip in Africa with your spouse

20    in 2014, correct?

21    A    As part of the work for NRA on -- yes.

22    Q    Thank you, Mr. LaPierre.  And your water buffalo hunt in

23    Botswana?  Was that a free hunting trip as well?

24    A    We were filming the television show *Under Wild Skies* for

25    NRA.

1  Q   Mr. LaPierre, could you -- did you receive a trip to

2  Botswana for your water buffalo hunt paid for by Under Wild

3  Skies in 2014?

4  A   Yes, as part of my work for NRA.

5  Q   And did your spouse accompany you on that water buffalo

6  hunt?

7  A   Yes, she did, as part of projecting her image for the

8  NRA.

9  Q   And Mr. --

10        MR. SHEEHAN:  Your Honor, could I ask that the

11  answer be stricken after "Yes"?

12        THE COURT:  Yes.  Sustained.

13  BY MR. SHEEHAN:

14  Q   So when you went on your hunts -- let's back up.  Under

15  Wild Skies not only paid for your hunting trips, right,

16  including the guides, the hunters, the permits, and internal

17  travel, they paid for all of that, correct?

18  A   As part of the television show that we were filming for

19  NRA.

20        MR. SHEEHAN:  Your Honor, move to strike the answer

21  as nonresponsive.

22        THE COURT:  Sustained.  I mean, --

23        MR. GARMAN:  Your Honor, if I might be heard.

24        THE COURT:  Hold on.  I sustained it, but I meant to

25  overrule.  Overruled.  I think he was trying to respond to

1   it.

2   BY MR. SHEEHAN:

3   Q    So, let me ask you, Mr. LaPierre.  Under Wild Skies did

4   pay for your airfare, your licenses, the professional

5   hunters, and the game equipments on each of the trips you

6   went on for Under Wild Skies, correct?

7   A    As part of my work for the NRA.

8           MR. SHEEHAN:  Your Honor, I move to strike the

9   answer as nonresponsive.

10          THE WITNESS:  Well, but that -- that's why -- that's

11  why we were doing it, was to project NRA's image in the

12  hunting field in front of our members, in front of potential

13  high donors, and to have hunters understand that NRA was

14  their organization so they would bond to it, to bring in

15  members and money into the NRA from that segment, where NRA

16  was doing all the legislative work but not being perceived as

17  a hunting organization.

18          THE COURT:  All right.  Let's go backwards for a

19  second.  Mr. LaPierre, please don't do that again, all right?

20  There wasn't a pending question.  So that part is struck.

21      And second, I will let your answer -- I think you were

22  attempting to answer briefly the question.

23      Would you not make me keep saying that, too?  Would you

24  please listen to the question --

25          THE WITNESS:  Yes, sure, Your Honor.

1          THE COURT:  -- and answer it only?  Because I've

2    done that a few times this afternoon.

3          THE WITNESS:  I'm sorry.  I apologize.

4    BY MR. SHEEHAN:

5    Q    Isn't it true, Mr. LaPierre, that Under Wild Skies paid

6    for you to preserve hunting trophies and the animals you shot

7    on Under Wild Skies' trips, to send them back to your home in

8    Virginia?

9    A    They did.

10   Q    Thank you.

11         MR. SHEEHAN:  One second, please.

12       (Pause.)

13         MR. GARMAN:  Your Honor, I would, certainly at Mr.

14   Sheehan's discretion, but I'd request that we take our short

15   afternoon break at some point coming up.

16         THE COURT:  I was looking at the hour.  I was

17   thinking about doing it at 5:00.  But if this is a good spot,

18   I'll be happy to stop now.

19      Mr. Sheehan, are you at a good spot to stop for just a

20   few minutes?

21         MR. SHEEHAN:  That works, Your Honor.

22         THE COURT:  The witness has been testifying for an

23   hour and a half.

24         MR. SHEEHAN:  Thank you.

25         THE COURT:  The witness is coming off of surgery and

LaPierre - Direct                    132

 1  he's been testifying for an hour and a half, which in and of

 2  itself is not very pleasant, I'm sure.

 3      We'll take a, you know, about a ten-minute recess.  My

 4  intentions are to go slightly past 6:00 o'clock tonight

 5  Central time.

 6              MR. GARMAN:  Thank you, Your Honor.

 7              THE WITNESS:  Thank you, Your Honor.

 8              THE COURT:  Oh, Mr. LaPierre, you haven't heard me

 9  say this before.  There has been an evidentiary rule invoked,

10  and you're not to speak with anyone about your testimony

11  during the break.  Do you understand that?

12              THE WITNESS:  I do, Your Honor.

13              THE COURT:  All right.  We'll be in recess for about

14  ten minutes.

15              MR. GARMAN:  Your Honor?

16              THE COURT:  Yes?

17              MR. GARMAN:  I'm terribly sorry, Your Honor.  This

18  is Greg Garman.  Might I speak with the witness just of the

19  mechanics of the question-and-answering session?

20              THE COURT:  I would be very pleased if you spoke

21  with the witness about that.  Obviously, not about the

22  substance.  And I have every confidence that you know how to

23  draw the line on that, Mr. Garman.

24              MR. GARMAN:  Of course, Your Honor.

25              MR. GRUBER:   And Your Honor, this is Mike Gruber.

1    Could we just confirm who the corporate representative is for

2    the NRA?

3              THE COURT:  Sure.

4              MR. GARMAN:  Your Honor, we haven't designated a

5    corporate representative, and no one has been sitting in with

6    us.

7              THE COURT:  Okay.

8              MR. GRUBER:  Okay.  Thank you.

9         (A recess ensued from 4:53 p.m. until 5:04 p.m.)

10             THE WITNESS:  Yes, Your Honor.

11             MR. GARMAN:  Your Honor?  Your Honor, I'm sorry.

12   This is Greg Garman.  We're still regathering.

13             THE COURT:  That's fine.  It's fine.  We can wait.

14             MR. GARMAN:  Yeah.  Your Honor, I would like to just

15   note for the record the 2021 disclosure was requested of the

16   Debtor.  We don't have it to the Court yet, but we have

17   supplemented with Exhibit 661 to the other parties, and I

18   believe we have already distributed that, but if we haven't

19   it'll be relatively shortly.

20             THE COURT:  Thank you, Mr. Garman.

21             MR. SHEEHAN:  And I will acknowledge, Your Honor,

22   receipt of Exhibit 661.  Thank you.

23        And I will just point out to Your Honor for the record

24   that I'm not Emily Stern, although underneath my picture is

25   her name because it's her computer.

1      Mr. LaPierre, are you ready to go?

2            THE WITNESS:  Yes, I am.

3            THE COURT:  Could we wait just a second?  I don't

4    think Mr. LaPierre's attorney is in the room yet.  It's

5    coming right now.

6            MR. CORRELL:  Mr. Correll is back.

7            THE COURT:  All right.  You now may proceed.

8            MR. SHEEHAN:  Okay.  At this time, Your Honor, I'd

9    ask the -- move the admission of Exhibit 661, which is the

10   2021 conflict of interest form.  And I -- I may have more

11   questions tomorrow, but -- since I just got it.  But, I mean,

12   I just want to ask Mr. LaPierre.

13   BY MR. SHEEHAN:

14   Q   If you look at the bottom of the form,  --

15           MR. GARMAN:  Well, I'm sorry.  Just for the

16   avoidance of doubt on the record, Your Honor, there's no

17   objection.

18           THE COURT:  All right.

19           MR. SHEEHAN:  You'll see, Mr. LaPierre -- I'm sorry,

20   Your Honor.

21           THE COURT:  Could you hold on just one second?  The

22   exhibit is in, but I'm not sure we have a copy of it here

23   yet.  Do we?

24       (New York Attorney General's Exhibit 661 is received into

25   evidence.)

 1          MR. SHEEHAN:  I think we're trying to screen share,

 2   Your Honor.

 3          THE COURT:  Go ahead.

 4          MR. GARMAN:  Your Honor, we will -- we will make

 5   sure that we email a true and correct and identical copy of

 6   661 to your Court here shortly.

 7          THE COURT:  That'd be fine.  Send it to Mr. Manz, if

 8   you have his email.  You probably do.

 9          MR. SHEEHAN:  I think at this -- we --

10   BY MR. SHEEHAN:

11   Q   Mr. LaPierre, do you have Exhibit 661?  Do you see it on

12   the screen there?

13   A   Yes, I do.

14   Q   All right.  And you'll see that it's dated -- what

15   appears to be your signature.  Is that your signature on

16   Exhibit 661?

17   A   It is.

18   Q   And you'll see it's dated 4/7/21?

19   A   Correct.

20   Q   I've sort of lost track of what day it is.  Is that

21   today?

22   A   Yeah, it is.  I filled it out yesterday, but we made a

23   change today, and so I -- I had to add Sea Girt, and so I --

24   it's signed today.

25   Q   So are there actually two forms?

1    A    No.  This is the form.

2    Q    Did you -- did you execute a form yesterday, too?

3    A    No, I did not execute one yesterday.

4    Q    Why don't we do this.  I'm going to -- I want to look

5    this over tonight and then ask you questions about it

6    tomorrow, just because it's fresh off the press.

7         Let's move on to Exhibit --

8              MR. SHEEHAN:  One second, Your Honor.

9         (Pause.)

10             MR. SHEEHAN:  Your Honor, at this time I would move

11   the admission of Exhibit 339 into evidence.

12             THE WITNESS:  I do.

13   BY MR. SHEEHAN:

14   Q    All right.

15   A    No, I --

16             MR. GARMAN:  No.  Your Honor, no objection.

17             THE COURT:  339 is in.

18      (New York Attorney General's Exhibit 339 is received into

19   evidence.)

20   BY MR. SHEEHAN:

21   Q    Now, Mr. LaPierre, you're familiar with a store in

22   Beverly Hills, California, called Zina?

23   A    I am.

24   Q    All right.  And you'll see here on Exhibit 339 -- did you

25   ever receive Exhibit 339 before today?

1   A    Yes, I have seen this.

2   Q    Okay.  And do you know under what circumstances -- the

3   -- the letter represents -- it involves clothing purchases by

4   Ackerman McQueen on your behalf.  And in the letter, Mr.

5   Winkler says they were -- your ward -- "We need to address

6   your wardrobe.  You required us to provide specifically

7   purchases at the Zina store in Beverly Hills, California."

8        Do you see that?

9   A    I do.

10  Q    It says, "Due to the substantial nature of the total, we

11  should address these items immediately."  And it lists out a

12  dollar number of $274,695.03.  Do you see that?

13  A    I do see that.

14  Q    And you'll see attached is a list of purchases by date

15  and amount.  Do you see that?  On the back?

16  A    I do see that.

17  Q    All right.  And did you receive from the Zina store

18  clothing in a value of $275,695.03 paid for by Ackerman

19  McQueen?

20  A    I never saw the receipts.  Ackerman McQueen set it up.

21  It was their idea that I acquire a wardrobe for television

22  and all the appearances that I did.  They set it up.  The

23  receipts went to them.

24       This was the opening salvo of their extortion attempt to

25  try to get me to withdraw --

1          MR. SHEEHAN:  Your Honor, I'm going to ask that

2   after "receipts went to them," that the rest of the answer be

3   stricken.

4          THE COURT:  Sustained.

5   BY MR. SHEEHAN:

6   Q   So, Mr. LaPierre, you'll see that the dates go from

7   4/7/2004 all the way up to 2/12/2017, correct?

8   A   Correct.

9   Q   And does -- let's talk a little about Zina and -- you

10  would show up at the store, correct?

11  A   Correct.

12  Q   The physical store, correct?

13  A   Correct.

14  Q   And they would have laid out for you clothing that you

15  might be interested in, correct?

16  A   Suitable for television appearances.

17  Q   And did you make any suggestions?  Did you have a regular

18  sales rep at Zina?

19  A   There was -- there was someone that I worked with most of

20  the time, yes.

21  Q   Who is that?

22  A   A man, his first name is Noah.  I don't know his last

23  name.

24  Q   Okay.  And so you would go into the store, you would look

25  at the things they had selected, and you would take what you

1    wanted, correct?

2    A    They would make suggestions as to what looked good for

3    television and what ties looked good for television, what

4    suits looked good for television.

5    Q    And you would -- you would -- they would pack them up,

6    you'd take them with you.  Is that correct?

7    A    No, I wouldn't take them with me.  They would -- they

8    would ship them.

9    Q    Okay.  And the most recent visit you went on was on

10   2/12/2017.  Is that correct?

11   A    That sounds correct.

12   Q    Okay.  $21,000?  $21,880?

13   A    That would be for television wardrobe that -- suggested

14   by Ackerman McQueen.

15   Q    Did you have to call up Ackerman McQueen each time you

16   went to Zina to ask for permission to get another suit?

17   A    They were telling me to update my wardrobe and to keep my

18   wardrobe updated, and yes, we talked about it.

19   Q    All right.  Did Ackerman -- anyone from Ackerman McQueen

20   come with you to the store?

21   A    No, I don't believe they did.

22   Q    Did your wife come with you to the store?

23   A    I think she may have been there once.  One time.

24   Q    And these were during -- when you were out visiting the

25   McKenzies in Beverly Hills?

1    A    Or when I was out there doing speeches in the area or

2    meeting with donors or meeting with celebrities.

3    Q    So, the Ackerman firm paid for these, this clothing,

4    correct?

5    A    As wardrobe --

6    Q    Okay.

7    A    -- for work.

8    Q    Right.  Did you ever offer to pay them for the clothing

9    that you got?

10   A    No.  It was work wardrobe that -- I never wore it other

11   than work.

12   Q    Okay.  Mr. LaPierre, if we'd stick to yes or no here.

13   A    Yes.

14   Q    So, okay.  Did you offer to pay Ackerman for the suits?

15   A    No.

16   Q    Did the NRA pay Ackerman for the suits?

17   A    NRA did not pay Ackerman for the suits.  The --

18   Q    So those --

19   A    Ackerman left the impression NRA paid Ackerman.

20          MR. SHEEHAN:  I object and move to strike.

21          THE COURT:  Sustained.

22   BY MR. SHEEHAN:

23   Q    Mr. LaPierre, the NRA did not pay for the suits, correct?

24   A    Correct.

25   Q    And you did not pay for the suits, correct?

1   A    Correct.

2   Q    So the suits were a gift, correct?

3   A    No.

4   Q    Okay.

5   A    They were work -- they were work wardrobe.

6   Q    Okay.  Let's move on to the next set of issues.

7           MR. SHEEHAN:  And if we can pull up 2019 Form 990,

8   which is Exhibit -- Exhibit 8.

9   BY MR. SHEEHAN:

10  Q    Mr. LaPierre, do you have Exhibit 8?

11          MR. GARMAN:  I'm sorry.  I'm sorry, Mr. Sheehan.  I

12  believe this has been admitted, but I just would like to

13  reiterate that I believe we had an objection to the extent

14  that it was unsigned.  But I have no other objection to the

15  use of the document.

16          MR. SHEEHAN:  Okay.  Why don't I -- why don't we

17  address that objection right now.

18      If you look at the back, at the last page of Exhibit 8,

19  you'll see there's an exempt organization declaration and

20  signature for electronic filing.

21  BY MR. SHEEHAN:

22  Q    Mr. LaPierre, do you recognize your signature on that

23  last page of Exhibit 8?

24  A    I do.

25          MR. SHEEHAN:  Does that address, Mr. Garman, your

LaPierre - Direct                    142

1    objection?

2           MR. GARMAN:  I think it does.  I think it does.

3    Just would again like to note that it wasn't otherwise

4    signed.  But I have no objection to you using the document.

5    And I believe it's been admitted.

6           THE COURT:  8 is in.  Of course, I didn't write "In"

7    on the first day of the hearing, so I can't tell you whether

8    I admitted it then, but it's now in evidence.

9           MR. SHEEHAN:  Thank you.

10      (New York Attorney General's Exhibit 8 is received into

11   evidence.)

12   BY MR. SHEEHAN:

13   Q   So, Exhibit 8, Mr. LaPierre, is a true and -- is a copy

14   of what was filed with the Attorney General's Office of the

15   State of New York on November 18, 2020.  And you'll see in

16   the -- there's a signature block, and the signature where it

17   says, Sign Here, Wayne LaPierre.

18      So, you did review and sign for this 990; is that

19   correct?

20   A   I did.

21   Q   And if we look to the signature block, you'll see it says

22   "Under penalties of perjury, I declare I've examined this

23   return, including accompanying schedules and statements, and

24   to the best of my knowledge and belief it is true, correct,

25   and complete."

1        Do you see that?

2    A    I do.

3    Q    Okay.  When you signed this document, was that

4    representation correct?

5    A    Yes.  I believe it was.  It was prepared for by the -- by

6    the tax -- outside tax professionals, by our tax

7    professionals, and --

8            MR. SHEEHAN:  Your Honor, move to strike the answer

9    after "Yes," --

10           THE COURT:  Sustained.

11           MR. SHEEHAN:  -- "I believe it was."

12           THE COURT:  Sustained.

13   BY MR. SHEEHAN:

14   Q    Now, as to this 990 return, isn't it true that Mr. Craig

15   Spray refused to sign this return?

16   A    I don't -- I don't know that to be true or not.

17   Q    Okay.  If you turn to Schedule L, Part 5, Page 50 of the

18   990.

19           MR. SHEEHAN:  And do we need a -- a PDF number for

20   that?

21           MR. GARMAN:  Yes, counsel, if you -- if you have it.

22           MR. SHEEHAN:  Yeah.  So it's Page 82 of the 990, but

23   it looks -- Mr. Thompson, can you tell me what page of the

24   exhibit it is?  Page 49 of the PDF.  And then --

25           MR. GARMAN:  So I think that's Page 86 of the 990,

1    Counsel?

2         MR. SHEEHAN:  Well, 82.  Let's start with 82.  We'll

3    go to 86 in a moment.  It says, Schedule L says, Transactions

4    with Interested Persons.

5         MR. GARMAN:  Okay.  I think that's Page 45 of the

6    PDF.

7         MR. SHEEHAN:  All right.  You'll see, in -- in Part

8    1, it lists out a series of individuals, right?  Mr. Powell,

9    Mr. Cox, Mr. Lehman, Mr. LaPierre, Mr. Phillips.  And then it

10   says, See Statements.  Right?  And the statements is set

11   forth on Part 5.

12   BY MR. SHEEHAN:

13   Q    But at the time you signed this, Mr. LaPierre, did you

14   believe that each of those people received excess benefit

15   transactions from the NRA?

16   A    (pause)  Yeah, I -- I believe it had -- it was -- it was

17   accurately -- accurately filled out.

18   Q    Do you believe it was complete?

19   A    As far as I know.

20   Q    All right.  What effort did you make to determine

21   whether, in fact, Schedule L was correct?

22   A    I relied on the tax -- outside tax professionals that

23   worked with us and worked with our treasurer's office in

24   terms of preparing this and worked with our general counsel's

25   office in preparing it.

LaPierre - Direct                         145

1          MR. SHEEHAN:  Your Honor, at this point, there --

2     there is a significant issue with respect to privilege, and

3     the privilege was asserted repeatedly in the context of the

4     examination of both Mr. LaPierre and other witnesses

5     concerning the preparation of Schedule L.

6        Each time we asked for it, we were told that it was

7     privileged and not available for disclosure.  And so that was

8     one of the subject of our motion last week.  And we would ask

9     that any testimony about information which Mr. LaPierre

10    obtained or was given by attorneys be barred in this

11    proceeding because we did not get a fair chance to examine

12    him.

13          THE COURT:  Mr. Garman?

14          MR. GARMAN:  Your Honor, I'm not quite sure what --

15    what's being -- what's being asked at this point in time.

16    Mr. LaPierre testified that this was partially prepared by

17    tax counsel.  I understand the sword and the shield issue,

18    but I don't quite understand what's being asked at this point

19    in time.

20          THE COURT:  Okay.  I think you have to ask questions

21    and then let me rule on  them.

22          MR. GARMAN:  Yeah.  Your Honor, I have a separate

23    issue.  I'm seeing on my screen that there's a -- a

24    livestream broadcaster, it's called Exploit (phonetic)

25    Broadcaster, that shows up as a virtual camera, and I looked

1   it up on the Internet and it appears to be a livestreaming

2   software application.

3            THE COURT:  Thank you for bringing that to my

4   attention.

5        (Pause, 5:21 p.m.)

6            THE COURT:  Just for the record -- thank you, Mr.

7   Garman -- we're going to terminate that livestream.

8            MR. SHEEHAN:  Your Honor, should I go ahead?

9            THE COURT:  Okay.

10  BY MR. SHEEHAN:

11  Q   So, Mr. LaPierre, if you look at Schedule L, Part 5, you

12  will see a series of text concerning excess benefit

13  transactions entered into by -- by disqualified persons at

14  the NRA.  Do you see that?

15  A   Are you talking about the one starting with Joshua

16  Powell?

17  Q   Is it -- no, there's a -- there is a -- there's a general

18  statement first, yes, and then it says -- goes to Josh

19  Powell.

20  A   Yes, I see that.

21  Q   Can you tell me what the source of this text is with

22  respect to Mr. Josh Powell on Part 5, Page 86, of the 2019

23  IRS 990 at Schedule L?

24           MR. GARMAN:  Your Honor, I have an objection to

25  foundation.  Mr. LaPierre's testimony is that he did not

1   prepare this document and it was prepared by others.

2   BY MR. SHEEHAN:

3   Q    Mr. LaPierre, you signed this document, correct?

4   A    Relying on the advice of outside tax counsel, our general

5   counsel, and our treasurer's office.

6   Q    Is it fair to say -- you signed it.  It was to the best

7   of your knowledge, opinion, and belief.  Correct?

8   A    That their work was accurate and -- and -- that their

9   work was accurate.

10         THE COURT:  Lack of foundation --

11  BY MR. SHEEHAN:

12  Q    So you made no independent effort --

13         THE COURT:  Hold on just --

14         MR. SHEEHAN:  I'm sorry, Your Honor.

15         THE COURT:  Hold on just a second.  Lack of

16  foundation is overruled.

17  BY MR. SHEEHAN:

18  Q    Mr. LaPierre, you made no independent effort to determine

19  if anything on this IRS 990 for 2019 -- that is, Exhibit 8 --

20  was correct.  Is that right?

21  A    I read over the whole form and I -- I thought I was

22  entitled to rely on -- on the work of tax --

23         MR. SHEEHAN:  Your Honor, move to strike.  Move to

24  strike as nonresponsive.

25         THE COURT:  I sustain that.

1          MR. GARMAN:  Your Honor, I believe he's responding.

2          THE COURT:  I sustain the objection.  If you'll just

3    listen carefully to the question and try to answer that, we

4    can get done much quicker.

5    BY MR. SHEEHAN:

6    Q    Mr. LaPierre, would you agree with me that you made no

7    independent effort to determine whether the IRS 990, Exhibit

8    8 in this case, was correct?

9    A    I was aware that there were issues pending with these --

10   with these people.

11   Q    Okay.

12   A    But I made no independent effort to verify --

13   Q    Anything -- anything on this IRS 990 form.  Is that

14   correct?

15   A    Well, I read it all, assuming it -- believe -- to make --

16   to see if I saw anything that I thought was inaccurate.

17   Q    And did you see anything that was inaccurate on the draft

18   that you saw?

19   A    No, I -- nothing came to my attention or I would have

20   spoke up.

21   Q    Okay.  Who did you get the draft 990 from, as you

22   conveyed?

23   A    I believe it was presented to me by -- by our -- I think

24   our general counsel.

25   Q    And did -- sorry.

1    A    Or it could have been put to me by Vanessa Shahidi, who

2    works with me in my office.  But I believe it was general

3    counsel.

4    Q    And did you -- did you ever ask anybody what the source

5    of the information contained on the 990 was?

6    A    Yes.  It was tax professionals on the outside, our

7    treasurer's office, and our general counsel's office.

8    Q    Is that what you were told by Mr. -- by Mr. Frazer?

9    A    I talked with John Frazer about this, and then I knew the

10   outside tax professionals were working on it and I knew out

11   treasurer's office --

12   Q    And how -- how did you know it was accurate?  The form

13   that you were presented, how did you know it was accurate?

14   Did you make any -- I apologize.  Let me go back a step.  Why

15   don't we do this with respect just to Page 86.  You'll see a

16   representation as to Mr. Joshua Powell.  Mr. Powell charged

17   the NRA or had reimbursed by the NRA various personal

18   travels, cellular, and other expenses -- do you see that --

19   which Mr. Powell knew or should have known were not

20   appropriate to submit as business expenses.

21   A    I'm sorry.  We need -- we need to find the -- I'm sorry,

22   Mr. Sheehan.  We need to find the section you're referring

23   to.  Do you have a page number?

24   Q    Page 86, which is PDF Page 49.

25   A    I see exercise benefit transaction, Joshua Powell.

1   Q    So look at the second paragraph.

2   A    Is that what you're referring to, Mr. Sheehan?

3   Q    Yeah, exactly.  Look at the second paragraph.

4   A    (Pause.)  Yes, I read that.  I read through that.

5   Q    All right.  How would you know that this statement about

6   Mr. Powell is accurate?

7   A    Because I was relying on the attorneys and the

8   treasurer's office that I believe I was entitled to rely on

9   in terms of preparing it.

10  Q    Okay.  So you relied upon attorneys; is that correct?

11  A    And our treasurer's office.

12  Q    How do you -- what attorneys did you rely upon in

13  preparing this document?

14  A    Mr. -- Mr. Frazer and outside tax counsel that they

15  worked with.

16  Q    And is it your belief, sitting here today, that these

17  statements of what Mr. Powell owed were done by tax counsel?

18  A    I believe they were done by tax counsel and -- and -- and

19  our attorneys.

20  Q    All right.  So --

21  A    Whether they were within the general counsel's office or

22  whether there were other attorneys that were working on the

23  whole self-correction compliance issues for the NRA.

24  Q    How do you know -- I'm sorry.  How do you know that this

25  estimate of what is owed by Mr. LaPierre is correct?

1          MR. GARMAN:  Objection to the question.  I think he

2     identified the wrong person.

3          THE COURT:  I think you meant Mr. Powell.

4          MR. SHEEHAN:  I'm sorry.  Mr. Powell?  Mr. Powell.

5     That's correct.  I'm sorry.  It's getting late in the day.

6     BY MR. SHEEHAN:

7     Q    How do you know that the calculation, Mr. LaPierre, with

8     respect to Josh Powell is correct?

9     A    Because that is the -- was prepared by the tax counsel

10    and our treasurer's office and our attorneys.  And I relied

11    on them in terms of their preparation of it.

12         MR. SHEEHAN:  Your Honor, I'm going to continue

13    through the other -- the other people listed on the chart.

14    BY MR. SHEEHAN:

15    Q    Let's talk about Mr. Cox.  Where did the numbers with

16    respect to Mr. Cox, the claims against Mr. Cox come from?

17    A    They came from the top-to-bottom review, a 360-review of

18    the -- all NRA employees and outside vendors that we were

19    doing to self-correct if NRA was doing anything out of

20    compliance with New York State not-for-profit law.  And

21    that's where that came, out of that investigation.

22    Q    Okay.  Did you apply the same standards to determining

23    what Mr. Cox's excess benefit transactions were that you

24    applied to all the other people on this list?

25         MR. GARMAN:  Object to the foundation of the

1  question.

2           THE COURT:  Sustained.

3  BY MR. SHEEHAN:

4  Q   Do you know what process was used to determine the amount

5  of excess benefit transaction that the NRA claimed was due

6  from Mr. Cox?

7  A   I don't.  That is an issue the attorneys are working on

8  and are still working on.

9  Q   Okay.  But there are specific numbers here, correct, as

10 to what Mr. Cox -- I'm sorry -- in excess of -- in excess of

11 $1 million that you're saying Mr. Cox got improperly,

12 correct?

13 A   That is an issue that the attorneys are working on.  In

14 fact, I think it's in -- it's in either litigation or

15 mediation right now.

16 Q   But Mr. LaPierre, you made the representation in Schedule

17 L, Part 5, that Mr. Cox owed over a million dollars.  What

18 did you base that on?

19         MR. GARMAN:  Your Honor, I object to the foundation

20 of the question.  The -- there is no representation that is

21 contained in the signature block.

22         THE COURT:  Do you want to just restate your

23 question?

24         MR. SHEEHAN:  Sure.

25 BY MR. SHEEHAN:

LaPierre - Direct                                    153

1  Q   What it says under Mr. Cox is, "To date, the aggregate

2  excess benefit from 2015 to June 26, 2019, determined to be

3  provided to Mr. Cox is in excess of a million dollars."

4      So what I'll ask you about is the determination that it's

5  in excess of a million dollars.  How did you come to that --

6  how did the NRA come to the conclusion that he owed an excess

7  of a million dollars?

8  A   The attorneys that are working on the compliance and

9  self-correction, that have been working on it since 2017 and

10  investigating all NRA employees, including myself, and all

11  vendors, that's -- that's the conclusion the attorneys have

12  come to.

13  Q   So you relied, in putting together Schedule L, Part 5,

14  referring to Mr. Cox, you relied upon the work of the

15  attorneys to make that determination?

16  A   I did.

17  Q   And no one at the NRA made any determination apart from

18  the attorneys about how much Mr. Cox owed; is that correct?

19  A   I'm not aware of -- I'm not aware of anything beyond --

20  beyond the attorneys worked on it.

21  Q   Okay.  Let's go to -- if you look at the second

22  paragraph, when -- when -- the second paragraph of the Cox

23  language.  When the evaluation was done of excess benefit

24  payments to you, Mr. LaPierre, isn't it correct that the only

25  amounts included were for certain air travel, correct?

1    A    That's correct.

2    Q    Now you'll see, with Mr. Cox, they have represented here

3    that he caused the expense to be paid by the NRA or advanced

4    to himself -- I'm sorry, very tough to read this.  He -- he

5    had -- let me start again.

6         "Caused the expense to be paid by the NRA or reimbursed

7    to him for personal family travel, business trips utilizing

8    unapproved charter or first-class travel, tickets to sporting

9    and entertainment events, and meals or hotel expenses which

10   are not approved by the NRA."

11        Do you see that?

12   A    I do.

13   Q    Did the NRA look at your travel and entertainment

14   expenses in the same -- I'm sorry, the sporting and

15   entertainment events -- as they did with Mr. Cox?

16   A    I think the NRA has looked at -- at me as well as every

17   other employee.

18   Q    Well, did you ever get asked, in the course of a review

19   of your excess benefits, about your attendance at sporting

20   and entertainment events?

21   A    No, but I didn't -- I didn't have any excess benefits.

22            MR. SHEEHAN:  Move to strike the answer, Your Honor,

23   after "No."

24            THE COURT:  Sustained.

25   BY MR. SHEEHAN:

LaPierre - Direct                                    155

1  Q   Mr. LaPierre, is it true that the only benefits -- the

2  only activities that were looked at for you were airfares

3  with respect to the excess benefits calculation?

4  A   I don't -- I don't know that to be true.  I think -- I

5  think the law firms that were working compliance and a top-

6  to-bottom 360 review of all employees looked at -- looked at

7  a lot of things in terms of all employees, including me.

8  Q   But when I asked you those questions in your deposition,

9  your attorneys did not permit you to answer.  Can you now

10 answer about what they looked at?

11 A   I don't know everything they looked at.

12 Q   Okay.  Let's take a look at the Schedule L Wayne LaPierre

13 section, which is the top of Page 87, which is PDF -- what's

14 the next page?  PDS 50?  PDF 50?  You'll see in that section

15 -- and again, it's kind of hard for me -- but the NRA has

16 determined the treat the claims as automatic excess benefits.

17 Who at the NRA made a determination to treat the $299,778.78

18 as excess benefits?

19 A   It was -- it was made by the -- by our outside tax

20 counsel that was working this issue, along with our, I

21 believe, the -- our -- our other attorneys that were working

22 this whole compliance issue.

23 Q   Let's take a look --

24 A   Wait a minute.

25 Q   I'm sorry.

LaPierre - Direct                    156

1  A    No, I'm sorry.  Go ahead.

2  Q    Take a look at the excess benefits transactions for Woody

3  Phillips.  I'm sorry, I'm looking -- I'm sorry, you'll see

4  it's Wilson Phillips, not Woody Phillips.  That's 1(f) below

5  you.

6  A    I do.

7  Q    Okay.  Do you know if anyone looked at Mr. Wilson

8  Phillips -- let me go back.  Mr. Wilson Phillips was the CFO

9  and the treasurer, right?

10 A    Yes, that's correct.

11 Q    All right.  Do you know if -- and he left at the end of

12 2018, correct?

13 A    Yes, that's correct.  At the end of 2018.

14 Q    Do you know if anyone looked at Mr. Phillips' expense

15 reports or credit card charges to determine if there were

16 excess benefits paid to him?

17 A    I -- I don't.  I believe our -- I believe our -- I'm

18 sorry, I -- I don't.

19 Q    With respect to the excess benefit transactions with

20 Lieutenant Colonel North, there's a long discussion about

21 Lieutenant Colonel North payments.  Do you know where the

22 text for that came from?  Do you see where I'm pointing to?

23 A    I do.

24 Q    All right.  Do you know where the text that is set forth

25 there concerning excess benefit transactions of Mr. North

1    came from?

2    A   I believe it came, again, from the attorneys that are

3    working the whole compliance/self-correction issue for the

4    NRA, who have been working on it since I started that in

5    2017.

6    Q   Okay. Take a look at Mr. Joseph De Bergalis, which is

7    the next one. And you'll see it says there, "The NRA is

8    currently reviewing whether Mr. De Bergalis may have used

9    business class travel without authorization."

10       Do you see that?

11    A   I do.

12    Q   All right. And with respect to Mr. De Bergalis, it says

13    there is -- do you know who's doing that evaluation?

14    A   I -- it's being done by the attorneys that are working

15    the self-compliance -- the compliance issues for the NRA in

16    terms of self-correcting anything that is not in compliance

17    with New York nonprofit law. And I believe the people in our

18    treasurer's office were also working on this.

19    Q   When you say you believe people in your treasurer's

20    office were working on Mr. De Bergalis --

21    A   I think Craig Spray was working on this.

22    Q   On Mr. De Bergalis?

23    A   Yes, I do.

24    Q   Okay. But he wasn't working on Oliver North?

25    A   I don't know that he was working on Oliver North.

1  Q    Okay.  Why do you believe he was working on the De

2  Bergalis expense?

3  A    I believe he mentioned it to me.

4  Q    Okay.  All right.  So, you said several times that

5  outside counsel worked on several of these areas.  So let's

6  go back to Mr. Cox.  What outside counsel worked on

7  calculating the amounts due for Mr. Cox?

8  A    I don't know exactly.  I think there are -- I know there

9  are attorneys with the Brewer firm that have been working on

10  that whole issue involving Mr. Cox.  They may be working with

11  other counsel, too.

12  Q    And again, the person that determined that he got in

13  excess of $1 million were the Brewer firm?

14          MR. GARMAN:  Objection, Your Honor.

15          THE WITNESS:  Well, --

16          MR. GARMAN:  Misstates his testimony.

17          THE COURT:  Sustained.  Why don't you restate your

18  question.

19          MR. SHEEHAN:  You'll see -- let me go -- I'm sorry,

20  Your Honor.

21          THE COURT:  Restate your question, Mr. Sheehan.

22          MR. SHEEHAN:  Okay.

23  BY MR. SHEEHAN:

24  Q    You'll see under the Christopher Cox section it says that

25  "The aggregate excess benefit from 2015 to June 26, 2019

LaPierre - Direct                                       159

1   determined to be provided to Mr. Cox was in excess of $1

2   million."  And wo what I'm asking you is, did the Brewer firm

3   make that determination?

4   A    I know that this is an issue that the Brewer firm has

5   been working on, and I believe that they probably made that

6   determination.  They may have worked with other outside tax

7   counsel also.

8   Q    So nobody in -- who is an officer of the NRA made that

9   determination; is that correct?

10  A    No, this is part of the -- the -- either litigation or --

11  or -- that's going on with Mr. Cox right now.

12  Q    Well, let's go back a second.  You submitted a form to

13  the IRS and to New York State which represented that the NRA

14  had determined that he owed in excess of $1 million.  So I'm

15  asking you to name the person at the NRA who made that

16  determination.

17       MR. GARMAN:  So, Your Honor, I'd like to renew my

18  foundation objection.  I believe that Counsel has not

19  accurately represented what is attested to this.  And I would

20  note for the record that this was a 30(b)(6) topic for which

21  we designated the CFO, not Mr. LaPierre, and I believe that

22  was misunderstood in our previous discussion.

23       THE COURT:  Response, Mr. Sheehan?

24       MR. SHEEHAN:  Your Honor, the 30(b)(6) is an

25  entirely different issue.  In that, the 30(b)(6) witness said

1    she couldn't say.  What we're focused on is a document that

2    Mr. LaPierre signed which says the -- there's a determination

3    by the organization filing this document that there was in

4    excess of a million dollars paid improperly.

5              THE COURT:  Uh-huh.  I --

6              MR. SHEEHAN:  So what I'm trying to get at is the

7    person who -- at the NRA who made that decision.

8              THE COURT:  Overrule the objection.

9              THE WITNESS:  I believe it was made by the legal

10   counsel at the Brewer firm that's working this issue.  I

11   think they discussed it with John Frazer, our general

12   counsel, also.  And may have discussed it with our

13   treasurer's office.

14   BY MR. SHEEHAN:

15   Q    Do you allow outside law firms to make determinations for

16   the NRA that are in filings with the federal government?

17   A    Well, that's why I said our general counsel's office has

18   looked at this also.

19   Q    How do you know that?

20   A    Because I -- I've discussed this form with, I believe,

21   Mr. Frazer.

22   Q    Isn't it true that all of -- all of these statements

23   which are contained in Schedule L, Part 5 of the Exhibit 8

24   were not -- were not shown to the board before this document

25   was filed?

1    A    I believe that's correct.

2    Q    And isn't it true that all the statements that are

3    contained in Part 5 of the 990 Schedule L were not shown to

4    the Audit Committee before they were filed?

5    A    I don't -- I don't know the answer to that, whether they

6    were shown to the Audit Committee or not.

7    Q    Isn't it true that your outside audit firm which

8    presented the 990s, draft 990s, to the Audit Committee never

9    saw this version of Schedule L of the 990?

10    A    I don't -- I don't know the answer to that, whether they

11    did or didn't.

12    Q    Okay.  Did you discuss the 990 with the Aronson firm?

13    A    I did not.

14    Q    Now, the flights that were the subject of the excess

15    benefit transaction payments to you, were they all the

16    flights that you took that year?

17    A    Yes, they were.

18    Q    I'm sorry.  Were they all the flights -- they're all the

19    flights that -- let rephrase that.  The flights are between

20    2015 and 2019.  Is it your belief that it includes -- that

21    all the flights for those four years were you?

22    A    That is my belief.

23              MR. GARMAN:  Objection.  Vague and ambiguous.

24    BY MR. SHEEHAN:

25    Q    And who did that review of the flights that you --

1          THE COURT:  Hold on.  Hold on just a second.

2          MR. SHEEHAN:  I'm sorry.

3          THE COURT:  Why don't you restate that question so

4   the witness can answer it.

5          MR. SHEEHAN:  Okay.  Let me try to do a better job,

6   Your Honor.

7          THE COURT:  Okay.

8   BY MR. SHEEHAN:

9   Q    The benefits, the excess benefits that were determined

10  for you in Schedule L, Part 5, of $300,000 for flights, did

11  the review of your flights include all the flights that you

12  took during that time period?

13  A    Yes, I believe they did.

14  Q    Did it include flights taken by your niece?

15  A    Yes.

16  Q    By herself?

17  A    Yes.

18  Q    How do you know that?

19  A    Because they were -- they were listed in -- in the

20  spreadsheets.

21  Q    And did you talk to anybody about the spreadsheets and

22  what was accurate and what wasn't?

23  A    Yes.  I --

24          MR. GARMAN:  Objection.  Objection, both to

25  foundation, as to vague and ambiguous as to spreadsheets.

1            MR. SHEEHAN:  All right.  Fair enough.  I'm sorry,

2    Your Honor.  Let me rephrase the question.

3    BY MR. SHEEHAN:

4    Q    You looked at a spreadsheet concerning your excess

5    payments.  Isn't that correct, Mr. LaPierre?

6    A    Yes.

7    Q    And then somebody made a determination of how much you

8    had to pay back?

9    A    Outside tax counsel made that determination.

10   Q    And who was that?

11   A    I believe the -- it was -- Don Lan worked on it with his

12   firm, and there was a Chaney (phonetic) firm that worked on

13   it, and -- and I believe the -- some folks with the Brewer

14   firm worked on it, too.

15   Q    Apart from you, did anyone else review the spreadsheet

16   prepared by outside counsel to determine if you were -- let

17   me start again.  Apart from you and the outside counsel, did

18   anyone at the NRA determine that that was the correct number

19   for you to repay?

20   A    Well, all the lawyers were looking at it, and that's --

21   they determined that was the amount.  I -- I didn't get

22   involved at all in the amount.  All I did was go through the

23   flights and what the purpose was.

24   Q    So the NRA's determination that you owed $300,000 was

25   entirely the outside lawyers' determination; is that correct?

LaPierre - Direct                         164

1          MR. GARMAN:  Objection.  Your Honor, I -- I'm going

2    to withdraw the objection.

3          THE COURT:  You may answer.

4          THE WITNESS:  The professionals that were working on

5    this issue for the NRA, it was their determination.

6    BY MR. SHEEHAN:

7    Q    The outside professionals who were attorneys; is that

8    correct?

9    A    That's correct.

10   Q    And no one on the board, no one in the other officers,

11   had any role in determining the amount of money that you were

12   required to pay back to the NRA.  Is that correct?

13   A    No, other than I -- the outside attorneys, the, you know,

14   the Brewer firm folks, and I believe our general counsel's

15   office.  Those were the attorneys working on that issue.

16   Q    Right, but who at the NRA made the determination that the

17   proper amount for Wayne LaPierre to pay back in excess

18   benefits that he received was $300,000?

19   A    I believe that was by outside tax counsel, working with

20   our -- our general counsel's office, and probably with our,

21   I'm not sure, but with our treasurer's office also.

22   Q    Would you agree with me that when the CEO of a nonprofit

23   organization is found to have received $300,000 in excess

24   benefits, that the board should be advised in order to make

25   -- exercise a governance function?

1    A    Well, I think they were advised when NRA filed a 990 form

2    and -- and it -- that showed it there.  I wasn't aware that

3    these were excess benefits until it became clear in the 360

4    review that they were, and then I immediately offered to pay

5    it.

6    Q    But let's go back, Mr. LaPierre.  The board oversees you,

7    correct?

8    A    Yes.  I work for them.

9    Q    You work for the board?

10   A    Yes.

11   Q    If you had an employee who had gotten $300,000 in

12   payments from an organization you supervised, wouldn't you

13   want to know about it?

14   A    Well, I believe they do know about it as a result of

15   reading this form, --

16   Q    But you --

17   A    -- which is made available to the board.

18   Q    Did you tell the board that you had gotten $300,000 in

19   excess payments?

20   A    I didn't know until it -- it came to my attention during

21   the investigation that NRA was doing on all employees,

22   including me, that I had received excess benefits.  And then

23   when I -- the minute I found out I did, I offered to repay

24   it, --

25   Q    Do you --

LaPierre - Direct                               166

1   A    -- which I did.

2   Q    Would you recognize, Mr. -- I'm sorry, Mr. LaPierre.

3   Don't you believe you had a conflict of interest with the NRA

4   in determining the amount of excess benefits that you

5   received?

6   A    I didn't make that determination --

7         MR. GARMAN:  Hold on.  Hold on.  Objection.

8   Objection; misstates his testimony.

9         THE COURT:  Do you want to restate that question?

10  BY MR. SHEEHAN:

11  Q    Would you agree with me that a person who is being

12  requested to pay back money to the NRA is in a conflict of

13  interest position with the NRA?

14  A    Well, I don't -- I don't know.  I mean, NRA determined

15  that I had received excess benefits, and the attorneys

16  working the issue -- and the minute it was brought to my

17  attention, I offered to pay it.  So I don't know whether that

18  puts me in conflict with the NRA or simply an employee doing

19  the right thing when he finds out that -- becomes aware of

20  something and wants to fix it and immediately offers to fix

21  it, which is what I did.

22      I mean, that was the whole idea of doing this 360 review,

23  was to --

24         MR. SHEEHAN:  Move to strike, Your Honor.

25         THE COURT:  The first part of the answer stays.

1   Just the last part will be struck.

2   BY MR. SHEEHAN:

3   Q    Let's --

4           MR. SHEEHAN:  Your Honor, I will be moving to

5   another topic at this point.  And I'm happy to do that, but

6   it may make sense to call it a day at 5:53.

7           THE COURT:  You're at a -- you think you're at a

8   logical stopping point?  All right.

9           MR. SHEEHAN:  That makes sense to me, Your Honor.

10          THE COURT:  All right.  Mr. LaPierre, overnight,

11  you're instructed not to speak with anyone about your

12  testimony.  Do you understand that?

13          THE WITNESS:  Yes, sir, Your Honor.

14          THE COURT:  Okay.  And Mr. Mason and Mr. Garman, we

15  have your discovery -- not discovery issue, but deposition

16  issue I think that we need to take up tomorrow morning, as I

17  understand it.  I have flexibility, though.  It doesn't

18  necessarily have to go at 9:00.  But what are y'all's

19  thoughts on that?

20          MR. GARMAN:  Your Honor, this is Greg Garman.  I'll

21  be honest.  Since we've been in trial today, I don't know if

22  a response has been filed by Mr. Mason.  If there is, I'm

23  happy to go whatever the Court deems appropriate.

24          THE COURT:  I've gotten a signal that it has been

25  filed.  I certainly haven't seen it because I've been in here

1   with you.

2        Would it make some sense to do it at 1:30 instead of at

3   9:00, so that we would be able to -- at 1:15 instead of 9:00,

4   just so we'd be able to all attend it and --

5            MR. MASON:  That's great, Your Honor.  Whatever Your

6   Honor prefers.

7            THE COURT:  Okay.  I assume we'll be still with this

8   witness for a while.

9            MR. GARMAN:  Your Honor, they're both the same to

10  me, because --

11           THE COURT:  Okay.  All right.  So we won't take that

12  up first thing tomorrow morning.  My intentions would be to

13  take it up probably at 1:15, when we start back in the

14  afternoon session.  And I'm asking you that because I just

15  want to make sure it doesn't become an issue tomorrow

16  morning.

17       All right.  My trusty and relied-upon law clerks wanted

18  me to make this point, not to the lawyers, but we've had an

19  issue this afternoon, at least it was brought to my

20  attention, that someone is trying to record or stream these

21  proceedings.  I think I mentioned to everyone before the

22  trial had started that we've been contacted by a news agency

23  to do the same and we pointed out to them that that's not

24  possible to do, so we made an arrangement to put our

25  proceedings on our court's docket twice a day so that people

1   could have access to the audio.  We release the audio.  You

2   may not record or broadcast the audio or visuals from this

3   trial.  To the extent that you do record or broadcast the

4   audio or visual, the Court reserves its abilities to impose

5   sanctions for doing that.

6        Anything further?

7            MR. SHEEHAN:  No, Your Honor.

8            MR. GARMAN:  Yes, Your Honor.  Greg Garman.  Your

9   Honor, if they're -- if the NRA is expected to produce a

10  witness after Mr. LaPierre tomorrow, I will need to know who

11  it is so that I can make arrangements.

12           THE COURT:  All right.  If you y'all could talk

13  about that --

14           MR. SHEEHAN:  I would --

15           THE COURT:  Yes.  Go ahead.  Go ahead.

16           MR. SHEEHAN:  We will let them know this after --

17  this evening.  We'll just have a conversation with them.  We

18  have to talk among our team.

19           THE COURT:  All right.  From my standpoint, we moved

20  along pretty well today.  I'd like for us to keep moving

21  along, though, to switching the case over to the NRA.  You

22  know, I don't know necessarily that's going to happen

23  tomorrow from the pace that we're on, but everybody continue

24  their good work on streamlining things so that we stay pretty

25  much on schedule.

1      We'll be in recess until 9:00 o'clock tomorrow morning.

2          (Proceedings concluded at 5:57 p.m.)

3                          --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
22    above-entitled matter.

23    **/s/ Kathy Rehling**                    **04/08/2021**

24    _____    _____

Kathy Rehling, CETD-444                        Date
25    Certified Electronic Court Transcriber

```
 1                               INDEX
                   Continued from 10:30 a.m. Morning Docket
 2

 3     PROCEEDINGS                                               4

       WITNESSES
 4
       New York Attorney General's Witnesses
 5
       John Frazer, cont'd.
 6     - Cross-Examination by Mr. Noall                          5
       - Cross-Examination by Mr. Drake                         21
 7     - Examination by the Court                               31
       - Redirect Examination by Ms. Stern                      33
 8     - Recross-Examination by Mr. Gruber                      48
       - Recross-Examination by Mr. Taylor                      59
 9
       Wayne LaPierre
10     - Direct Examination by Mr. Sheehan                      64

11     EXHIBITS

12     New York Attorney General's Exhibits

13     8                                          Received 142
       95  (Portion)                              Received 116
14     138                                         Received 92
       151                                         Received 87
15     153                                         Received 67
       208                                         Received 87
16     270                                        Received 109
       271                                        Received 109
17     272                                        Received 109
       288 (As Redacted)                           Received 41
18     299                                         Received 77
       314                                        Received 122
19     315                                        Received 122
       316                                        Received 122
20     339                                        Received 136
       347                                         Received 90
21     360                                        Received 122
       364                                        Received 122
22     661                                        Received 134

23     RULINGS

24     Motion for Appointment of Examiner filed by Creditor
       Phillip Journey (114)
25
```

INDEX
Page 2

RULINGS, cont'd.

Motion to Dismiss Case filed by Creditor Ackerman McQueen,
Inc. (131)

Motion to Dismiss Case filed by Interested Party Attorney
General of the State of New York (155)

Motion to Appoint Trustee filed by Interested Party
Attorney General of the State of New York (163)

Motion to Appoint Trustee filed by Creditor District of
Columbia Office of the Attorney General for the District
of Columbia (214)

Motion to Dismiss Case - Motion in Support of State of
New York's Motion to Dismiss filed by Creditor District
of Columbia Office of the Attorney General for the District
of Columbia (423)

END OF PROCEEDINGS                                    170

INDEX                                            171-172