**G. Michael Gruber**
State Bar. No. 08555400
gruber.mike@dorsey.com
**H. Joseph Acosta**
State Bar No. 24006731
acosta.joseph@dorsey.com
**Brian E. Mason**
State Bar No. 24079906
mason.brian@dorsey.com
**DORSEY & WHITNEY LLP**
300 Crescent Court, Suite 400
Dallas, TX 75201
Tel.: (214) 981-9900
Fax: (214) 981-9901
*Attorneys for Ackerman McQueen, Inc.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| | § | |
| NATIONAL RIFLE ASSOCIATION | § | Case No. 21-30085-hdh-11 |
| OF AMERICA and SEA GIRT LLC, | § | |
| | § | |
| DEBTORS. | § | JOINTLY ADMINISTERED |

**ACKERMAN MCQUEEN, INC.'S OPPOSITION TO APPLICATION OF THE
DEBTORS FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT
OF ANKURA CONSULTING GROUP, LLC AND APPOINTMENT OF
<u>LOUIS E. ROBICHAUX IV AS THE DEBTORS' CHIEF RESTRUCTURING OFFICER</u>**

COMES NOW Ackerman McQueen, Inc. ("***AMc***" or "***Creditor***"), and hereby files its *Opposition to Application of the Debtors for an Order Authorizing the Retention and Employment of Ankura Consulting Group, LLC and Appointment of Louis E. Robichaux IV as the Debtors' Chief Restructuring Officer* (the "***Opposition***" and "***Application***").

## PRELIMINARY STATEMENT

1. In yet another clear demonstration of its litigation tactics, the National Rifle Association of America ("*NRA*") requests—in the middle of the trial on dismissal and appointment of a trustee—that the Court appoint a Chief Restructuring Officer (*"CRO"*) on an emergency basis, presumably to cure all of its current and past gross mismanagement and bad faith. The NRA unabashedly suggests that the proposed CRO will serve as "an independent fiduciary overseeing these proceedings" (ECF 519, CRO Application ¶ 9), when it knows full and well that neither the Bankruptcy Code nor the CRO's engagement letter as originally drafted provide such authority.

2. In point of fact, the very first provision in the CRO's engagement letter provides that CRO is authorized to make decisions related to its "CRO Responsibilities (as defined in Schedule II hereto, subject to only ***the direction, limitations, and parameters set by the SLC***[1] and consistent with the Company's bylaws and all applicable laws."[2] While there is a token sentence in Schedule II that labels the CRO a "court-appointed representative of the Company," Schedule II as originally drafted leaves little doubt that the "CRO will report directly to the SLC," not the Court.[3]

3. The vague and ambiguous descriptions the CRO and current management's going forward responsibilities alone should cause the Court to deny the Application. While the NRA's current management remains responsible for the daily "Current Fundamental Mission Operations" the proposed CRO is charged with "Management Operations," which are essentially limited to (a) accounting, (b) information technology and (c) "general administration, facilities administration,

---

[1] The SLC is defined as the Special Litigation Committee of the NRA board. (ECF 519-2, CRO Engagement Letter at 1.)
[2] ECF 519-2, CRO Engagement Letter ¶ 1.
[3] *Id.* at Schedule II, "Appointment and Reporting."

ACKERMAN MCQUEEN, INC.'S OPPOSITION TO APPLICATION OF THE DEBTORS FOR AN ORDER     PAGE 1
AUTHORIZING THE RETENTION AND EMPLOYMENT OF ANKURA CONSULTING GROUP, LLC AND APPOINTMENT
OF LOUIS E. ROBICHAUX IV AS THE DEBTORS' CHIEF RESTRUCTURING OFFICER

purchasing, and supervision and management of vendors . . . unrelated to the Core Fundamental Mission Operations."[4] And if there is any "material difference of opinion" as to the CRO's role or decisions, under the current proposal advanced by the NRA, it is the SLC—not the Court—that makes a final determination.[5]

4. The reality is that the CRO gambit is nothing more than attempt to divert attention from the NRA's bad-faith filing or the necessity for an authentic, court-appointed, independent fiduciary. The fact that the NRA is latching on to a suggestion made by the Official Committee of Unsecured Creditors ("*UCC*") early in the case does not make the CRO's proposed retention appropriate or necessary.

## FACTS

5. The SLC was formed in September 2020, to handle the enforcement action (the "**Enforcement Action**") by the New York Attorney General (the "**NYAG**") and litigation that the NRA initiated or caused against former insiders, vendors, and donors (the "**Related Litigation**"). The Enforcement Action is in its nascent stage, while most of the Related Litigation is advanced. Thus far, the SLC has tried to transfer the Enforcement Action to a federal court in New York and a federal court in Texas. It has employed the same tactic with certain of the Related Litigation, multiple times, and failed.

6. On January 15, 2021 (the "*Petition Date*"), the SLC, primarily driven with the goal of transferring the Enforcement Action out of New York, employed its latest strategy of filing bankruptcy under the auspices of seeking "legitimate restructuring goals." In order to do so, the SLC and Executive Vice President Wayne LaPierre secretly attempted to manufacture proper

---

[4] *Id.* at 15.
[5] *Id.*

corporate authority through a board meeting, held a week earlier, when the NRA board had no idea that the SLC was planning to file bankruptcy.

7. On the very day of the filing, Mr. LaPierre informed—for the very first time—the NRA's officers and employees and the general public that, despite the bankruptcy, the NRA was financially strong, would continue to operate as normal and only filed bankruptcy in Texas to "dump New York."

8. Not surprisingly, several parties, including the NYAG and AMc, filed motions to dismiss the bankruptcy or, alternatively, to appoint an independent fiduciary (collectively, the "**Dismissal/Trustee Motions**") to correct the bad-faith litigation tactics and illicit usurpation of power that Mr. LaPierre and SLC have employed or exercised. On March 28, 2021, the SLC and Mr. LaPierre attempted to rectify the latter by having the NRA ratify the decision to file bankruptcy.

9. As of the end of February 2021, the NRA had amassed a war chest, of at least, $62.4 million in cash, which is more than ample to pay all unsecured creditors with matured, noncontingent claims. In fact, the NRA's former Treasurer testified that there was no financial reasons for this bankruptcy and the NRA came off of one of its strongest years (in 2020).

10. Since the Petition Date, the Debtors also have retained (a) two sets of bankruptcy counsel, (b) a special litigation counsel that assisted with the filings, (c) two additional special litigation counsel, (d) a financial advisor, (e) outside accountants, (f) a real estate broker, and (g) a phalanx of ordinary-course professionals (consisting primarily of lawyers or advisors).

11. On March 29, 2021, the hearings on the Dismissal/Trustee Motions were scheduled to commence, but the hearings were continued, without the UCC's consent, and over objections

by several parties, to permit settlement discussions with the NYAG. The hearings on the Dismissal/Trustee Motions commenced on April 5, 2021.

12. On April 7, 2021, almost three months after the Petition Date and after three days of testimony has been received on the Dismissal/Trustee Motions, the NRA attempted to cure the bad-faith filing and avoid the appointment of an independent fiduciary, by filing an emergency application to retain Ankura as its CRO. The sole business justification is contained in Paragraph 9 of the CRO Application, which provides:

> The relief requested in this Application is necessary to the successful administration of these Chapter 11 Cases, and to provide assurance to creditors, parties in interest and the Court that there is an independent fiduciary overseeing these proceedings, the Debtors' reorganization, and the Debtor's financial operations. The Debtors require the services of an experienced CRO to guide existing management through a restructuring of the Debtors' operations and a successful resolution of these Chapter 11 Cases. Ankura is being retained specifically to provide CRO services. Ankura is not being retained as a general financial advisor. Therefore, there will be no duplication of the role of BVA as financial advisor.

(ECF 519, Application ¶ 9.) The Application does not address, with the numerous other professionals that have already been employed in these cases or the approximately 500 employees, why a CRO is necessary or why the NRA should incur the substantial expense of another professional who, as originally proposed by the NRA, could be hired and fired by the SLC. The Application is also devoid of any analysis of the propriety of seeking appointment of a CRO when faced with a motion to appoint a Trustee, particularly where Congress did not authorize an appointment in such circumstances.

## ARGUMENTS AND AUTHORITY

**A. The Hearing on the Application Should be Deferred Until the Motion to Dismiss or Appoint a Trustee is Resolved.**

13. The hearing on the Application should be deferred until after the Motion to Dismiss is resolved because the Court's decision on the Motion to Dismiss may render the Application as

moot. As argued by AMc and the NYAG, the NRA commenced his case in bad faith and the Bankruptcy Code mandates dismissal of the case. AMc will not belabor its arguments the existence of cause for dismissal here. The NRA has not persuasively argued that a different result is appropriate. Hence, the Court should continue the hearing on this Application, if necessary, until after it resolves the Motion.

### B. There is no Business Justification for a CRO

14. The scant boilerplate language included in Paragraph 9 of the CRO Application provides this Court will virtually no justification for why a CRO is necessary in these cases or at this time. The Debtors' counsel has already declared in his opening statement during the hearings on the Dismissal/Trustee Motion that the Debtors are already prepared to file a plan and will be filing one shortly. In point of fact, Mr. LaPierre publicly announced, after spending $450,000 on the Neligan firm prepetition and, at least, $1.2 million or more on the Brewer firm, that they would be out of bankruptcy in six months. It is unclear if the NRA's new strategy is to delay these proceedings under the guise of permitting CRO to participate in development of a plan—that the SLC **must** approve—when in fact the NRA has already prepared its plan.

15. Moreover, there is no justification why the Debtors could not utilize the CRO outside of bankruptcy, if they needed one. The CRO readily admits in his deposition that he has reorganized companies outside of bankruptcy effectively. The evidence presented during the hearings on the Dismissal/Trustee Motions also clearly indicate that there is no doomsday looming soon. Indeed, the NRA was supposedly tipped off four years ago that the NYAG was supposedly "weaponizing," and no imminent threat has transpired as of the Petition Date.

16. Furthermore, if the Debtors authentically wanted the advice of a CRO, they would have obtained it prior to filing bankruptcy. Not only did they fail to do so, they kept their key

officers, including the Treasurer, in the dark about the filing. Mr. Spray (former treasurer) and Ms. Rowling (acting CFO) even testified that keeping financial people in the dark about a bankruptcy filing was a mistake. What's worse, the Debtors continued to sit on their hands for months following commencement of the case and only sought the appointment to stave off the selection of an independent trustee or dismissal of the case.

### C. A Chief Restructuring Officer is Not a Substitute for a Trustee.

17. Alternatively, if the Court is not inclined to dismiss this case, then a Trustee should be appointed. Again, AMc will not belabor its arguments the existence for appointment of a trustee here. As cause exists for appointment of a Trustee, the Court should order the appointment. A CRO is a poor substitute for a Trustee.

18. *First*, the Bankruptcy Code does not authorize the appointment of a CRO when faced with a motion to appoint a Trustee (or to dismiss). If cause exists, Section 1112(b)(1) mandates dismissal of the case, conversion to Chapter 7, or appointment of a trustee or examiner. Congress did not authorize the appointment of a CRO in these circumstances.[6] Rather, upon

---

[6] *See*, *e.g.*, *In re First Conn. Consulting Grp.,* 579 B.R. 673 (Bankr. D. Conn. 2018) ("Seeking to avoid the application of Section 1112(b), [Debtor's principal] asserts that the proposed intervention of his handpicked CRO renders any prior bad faith conduct irrelevant for purposes of the Motion. The Court disagrees."); (*In re Adelphia Communs. Corp.*, 336 B.R. 610, 619-620 (Bankr. S.D.N.Y. 2006) (refusing to appoint a non-statutory fiduciary and recognizing that the Bankruptcy Code did not authorize such appointment); *In re SunCruz Casinos, LLC*, 298 B.R. 821, 832 (Bankr. S.D. Fla. 2003) (holding that if a debtor's management needs to be replaced, the Bankruptcy Code provides for the appointment of a trustee but does not contemplate the appointment of a restructuring officer to perform the duties of a trustee); *In re Kobra Props.*, 406 B.R. 396, 400-401 (Bankr. E.D. Cal. 2009) (noting that a motion to appoint a CRO elicited the court's "skepticism because of the vagueness of the CRO concept in the context of chapter 11 . . . and the inability to articulate whether and how those duties would contrast with the duties of a chapter 11 trustee"); *In re BR Festivals, LLC*, 2014 Bankr. LEXIS 1276, at *3-4 (Bankr. N.D. Cal. Mar. 28, 2014) (refusing to appoint a CRO as a substitute for a chapter 11 trustee); *In re Tamarack Resort, LLC*, No. 09-03911-TLM; 2010 Bankr. LEXIS 3680, at *55-*57 (Bankr. D. Idaho 2010) (holding that the Bankruptcy Code does not tolerate the appointment of a CRO with less than the full duties and accountability of a trustee or debtor in possession); *see also In re Plaza de Diego Shopping Center, Inc.*, 911 F.2d 820, 830 (1st Cir. 1990) (bankruptcy court is without power to appoint a specific chapter 11 trustee of its choosing); 1 *Collier on Bankruptcy* P 6.20 (16th 2021).

finding of cause, Congress vested appointment of a trustee in the U.S. Trustee, not the Court.[7] The timing of the Application—in midst of the trial on dismissal—belies its true purpose: to sidestep the Bankruptcy Code's mandate that an independent fiduciary be appointed by the U.S. Trustee after the finding of cause. Even in cases where a CRO has been used to cure cause for a dismissal under section 1112, such CRO was given full managerial powers (akin to a chapter 11 trustee), unlike the limited authority granted to the proposed CRO here.[8] On information and belief, the UCC made the suggestion of employing a CRO over a month ago, but the NRA sat on its hands until it could not deny that cause existed for the dismissal of this case or appointment of a trustee.

19. *Second*, a CRO is not an acceptable substitute because a CRO is not an independent fiduciary. As a matter of state corporate law, CROs—like other officers or employees—ultimately report to the debtor's board or existing management. In fact, where faced with a motion to appoint a trustee, courts eschew appointment of a CRO in favor of a trustee unless sufficient safeguards (like the appointment of independent directors or mangers) are put in place to ensure the independence of the CRO and oversee his or her work.[9] Here, as discussed below, the NRA's proposal (i) has the CRO reporting to the same tainted SLC that turned a blind eye to the bad-faith filing of this case, (ii) is impermissibly vague about the CRO's duties and authority, and (iii) permits NRA's existing management—including its Executive Vice President—to overrule the

---

[7] 11 U.S.C. § 1104; *see also* In re *Euro-American Lodgind Corp.*, 365 B.R. 421 (Bankr. S.D.N.Y. 2007) ("If someone must be hired to report to the Court, the United States Trustee rather than the Debtor should select the new fiduciary. . . . [T]he trustee will be bonded for faithful performance of his or her duties. [citing 11 USC § 322(a)]).''

[8] *In re Blue Stone Real Estate, Constr. & Dev. Corp.*, 392 B.R. 897, 905 (Bankr. M.D. Fla. 2008).

[9] *See In re 1031 Tax Group LLC*, 374 B.R. 78, 88-89 (Bankr. S.D.N.Y 2007) (discussing steps taken by debtor, including pre-petition steps, to ensure that tainted pre-petition management was not overseeing the CRO); *see also In re Gaslight Club*, 782 F.2d 767, 771 (7th Cir. 1986) (approving of replacement management in lieu of a trustee where former management was completely removed from control of the debtor); *In re Beach*, --- B.R. ---, 2019 Bankr. LEXIS 4113, *5 (Bankr. M.D. Fla. 2019) (CRO appointed as a part of settlement between warring owners, with CRO vested with full management authority); *In re Commun. Options, Inc.*, 299 B.R. 481, 482 (Bankr. S.D. Ohio 2003) (granting creditor's motion to appoint a trustee-like fiduciary and removing existing management).

CRO's decisions, even on those subject supposedly entrusted to the CRO, by vesting final decision making authority with the tainted SLC. In the end, appointing a CRO changes nothing with respect to the NRA's management. The CRO will merely duplicate the work of the NRA's other highly compensated attorneys and advisors while giving the false appearance of a change in leadership.

### D. The NRA's Proposed Scope of Work for the CRO Makes the Appointment of No Benefit to Creditors or the Estate

20. The details in scope of work for the proposed CRO show that the NRA is setting up the CRO to be little more than window dressing. While AMc is ***heartened by the changes identified by the UCC in its response***,[10] the NRA has not yet affirmatively said that it agrees with the proposed changes, and even if all of the proposed changes are accepted, the retention remains objectionable. Out of an abundance of caution, AMc will press its objections to the original terms for the retention of the CRO, which are objectionable for the following reasons:

#### 1. The Engagement Letter Creates an Irreconcilable Conflict of Interest

21. Paragraph 2(b) of the CRO's engagement letter (the "***Engagement Letter***") provides an irreconcilable conflict of interest that incentivizes the CRO to keep these bad-faith cases in bankruptcy, even if they belong outside of bankruptcy. Pursuant to this provision, Ankura is provided with the following success fee:[11]

> (b) Restructuring Fee: Ankura shall be paid a restructuring fee in the amount of $1,000,000 payable immediately upon the effective date of any Chapter 11 plan consented to, or accepted by, the Debtors' Board (the "***Restructuring Fee***" and together with the CRO Services Compensation, the "***Fees***").

Yet, at his deposition, the proposed CRO admitted that, in accordance with his fiduciary duties, he would be required to advise the NRA Board that an out-of-court restructuring might be the best

---

[10] ECF 588.
[11] ECF 519-2 at 9.

course of action, if all of the legal and business purposes lined up. Of course, the proposed CRO, who commenced working on March 18, 2021, is not aware of all of the facts and circumstances of this case to give a definitive opinion on where this alleged "reorganization" belongs. But, he readily admits that he has successfully reorganized companies outside of bankruptcy. *While it cannot contest the integrity of the proposed CRO (Mr. Robichaux)*, AMc would still suggest that this million-dollar kicker creates an irreconcilable conflict that could motivate the proposed CRO to proceed to restructure the NRA inside of bankruptcy, as opposed to outside of bankruptcy. This has a bearing on independence.

22. Moreover, because this provision only requires NRA Board approval—and interestingly not Court, creditor, or member approval—the proposed CRO is unduly incentivized to unconditionally support the decisions of the SLC, which consist of the primary elected officers and leaders of the NRA Board (*i.e.*, Meadows, Cotton, and Willes) throughout these cases. This strategy could include delaying these cases to frustrate creditors, attempting to cram down creditors, attempting to circumvent New York law, and foregoing the option of holding the directors and officers accountable, all within the discretion of the SLC. As acknowledged in the proposed CRO's deposition, this could even include ignoring a potentially bad-faith filing, if the SLC suggests. The carrot that is dangled before the CRO is irreconcilable with his fiduciary duties.

### 2. The Engagement Letter Does Not Address the Mismanagement of the NRA

23. The Engagement Letter with the CRO does nothing to address the fundamental corporate governance problems at the NRA. Under the terms of the Engagement Letter, the CRO will be responsible to the SLC.[12] What's more, while the CRO is responsible for certain

---

[12] ECF 519-2 at 22.

"Management Operations,"[13] his authority is substantially limited. In particular, in the event the NRA's management disagrees with the CRO's decision regarding Management Operations, the NRA's officers can suggest a solution and the SLC makes the final decision.[14] While the amendments proposed by the UCC blunt some of the worst provisions, the fact remains that the CRO remains responsible to the SLC, not an independent committee of board members separated from the allegations of management abuses. The SLC already has a habit of deferring to entrenched NRA management. Hence, the CRO is not an independent fiduciary, like a trustee, but rather beholden to the SLC and existing management.

24.    The CRO's position as dependent on the SLC and existing management is compounded by the denial of direct access to the NRA Board of Directors. Rather, the CRO does not have direct access to the Board only after "consultation with the SLC and counsel to the Board," and any reports or presentation to the Board is only after "request by the SLC or counsel to the Board."[15] A true CRO would have direct access to the Board, including independent board members, so that he or she could advise the Board on the extraordinary obligations imposed upon a debtor in possession by the Bankruptcy Code and keep the Board apprised of decisions taken to advance the bankruptcy case. Here, however, the NRA has not followed this standard approach. Rather, the NRA's proposal is a feint to misdirect the parties into believing an independent fiduciary will be managing the NRA's business operations when, in fact, existing management will continue largely unabated. While the UCC's proposed revisions help address this issue, it remains to be seen if the NRA will accept these changes.

---

[13] *Id.*
[14] *Id.* at 23.
[15] ECF 519-2 at 22.

### 3. The Engagement Letter's Division of Responsibilities is Vague and Will Lead to Mischief

25. The Engagement Letter's bifurcation of duties between existing management and the CRO is vague and confusing, confirming the subservient role the NRA foresees for the CRO. The Engagement Letter contemplates that existing management will retain complete control over "Core Fundament Mission Operations."[16] The list of Core Fundament Mission Operations includes a vague reference to "charitable programs comprising the Company's nonprofit mission."[17] This definition is broad enough to capture everything done by the NRA. More troubling, is the reservation of control over the undefined "mission-related litigation," which again could include every piece of litigation involving the NRA, including its disputes with AMc and the NYAG. Rather than a vague reference to mission-related litigation, the CRO should be charged with resolving all litigation, or the Court, the CRO, and the parties should know specifically which lawsuits existing management is retaining control over, and which ones will the CRO be charged of resolving—a suggestion implemented by the UCC's revisions.

26. Moreover, the denial of control to the CRO over all legal, governance, and compliance issues compounds the chance for abuse.[18] If the CRO were a true fiduciary, he would have control over the NRA's legal team, would be responsible for ensuring good governance, and oversee a robust compliance program—particularly in light of the evidence of past financial abuses by NRA's existing management.

27. Nor does the Engagement Letter confirm that the CRO will have the support necessary to carry out his duties. The Engagement Letter does not afford the CRO any support

---

[16] *Id.*
[17] *Id.*
[18] *Id.* Limiting the definition of "Management Operations" entrusted to the CRO to, *inter alia*, legal, governance, and compliance issues "to the extent such issues arise in connection with Management Operations or Bankruptcy Responsibilities."

from within Ankura absent additional consent from the SLC, and preemptive approval of even one additional timekeeper is not included in the Engagement Letter. While the UCC's revisions make headway on this point, it remains to be seen if the team will be sufficient to support the CRO in reforming the NRA's past management irregularities.

28.     The fact that the NRA seeks to hamstring the CRO out of the gate only further demonstrates that the NRA is not seeking to change its ways and is not serious about resolving the fundamental management problems that caused it to pursue this course in bankruptcy.

### 4. The CRO's Responsibilities With Respect to the Plan are Illusory

29.     The Engagement Letter also offers conflicting terms about the CRO's role in the preparation and negotiation of a plan. Section 18(e)[19] of the Engagement Letter states "Ankura shall not have any obligation or responsibility to provide . . . 'crisis management' or business consultant advice or services hereunder, and shall have no responsibility for designing or implementing operating, organizational, administrative, cash management or liquidity improvements." This conflicts with the CRO's charge in Schedule II to develop, negotiate, and advance a plan of reorganization.[20] If the CRO has no responsibilities to design any of the improvements necessary to formulate a plan of reorganization, then what is it the NRA proposes he do with respect to the Plan, other than provide an aura that an independent fiduciary was consulted. The proposed revisions advanced by the UCC may resolve this conflict by making clear that Schedule II trumps the remaining terms of the Engagement Letter, but it remains to be seen if the NRA will agree to the revisions.

---

[19] ECF 519-2 at 15.
[20] *Id.* at 23.

### 5. The Engagement Letter Arguably Gives the NRA's Attorneys Veto Power

30. Even more troublesome, the CRO Engagement Letter appears to give the NRA's attorneys veto power over instructions they may received from the CRO. Schedule II to the Engagement Letter includes the following provision:[21]

> o <u>External Resources</u>: all retained legal and restructuring professionals for the portion of such firms' work that pertain in any way to the CRO Responsibilities; <u>provided</u>, <u>however</u>, that nothing herein shall alter such professionals' fiduciary duties to the Company clients.

The clause, "provided, however, that nothing herein shall alter such professionals' fiduciary duties to the Company clients," makes clear that the NRA and its management, not the CRO, are the client. Further, the language appears to give counsel the right to disregard instructions they may receive from the CRO in the event they believe it is in the NRA's best interests to do so. This provision is additional evidence that the CRO in this case is not an independent fiduciary, but rather a instrument of existing management. Again, the UCC's proposed revision appears to have resolved this issue, but the Debtor has not yet confirmed that it agrees to the revision.

### 6. Employment and Compensation Under Section 327 and 330

31. AMc joins in the U.S. Trustee's objections to the Application, in particular the U.S. Trustee's objections that the employment be approved under section 363 rather than section 327, with compensation approved under Section 330. This case calls for an independent fiduciary whose connections are scrutinized and whose fees are reviewed by the parties and the Court. Notably, the NRA and the CRO have not complied with the J. Alix Protocol, which normally permits retention under section 363(b) by incorporating the provisions of section 327.[22]

---

[21] *Id.* at 24.
[22] *See* Clifford J. White III et al., *The Future of the USTP's CRO "Protocol"*, XXXVII ABI J. 9 (2018) (discussing the key provisions of the J. Alix Protocol, also referred to as the CRO Protocol); *see also* 3 *Collier on Bankruptcy* P 327.04[2][a][iii][D] (16th 2021) (same and collecting cases).

32. Additionally, Section 18(h) of the Engagement Letter is objectionable, which provides:

> (h) Assignment: This Agreement may not be assigned by any party hereto without the prior written consent of the other parties. Any attempted assignment of this Agreement made without such consent shall be void and of no effect, at the option of the non-assigning parties. Notwithstanding the foregoing, Ankura may assign or novate this Agreement to a transferee of all or part of its business upon written notice. Ankura may also transfer or deal with our rights in any unpaid invoice without notice.

This provision is objectionable because, *inter alia*, of its blanket assignment rights by Ankura; any professional working for the NRA should be approved by the Court under section 327 after notice to all interested parties. Moreover, the CRO Engagement Letter is vague as to what constitutes "[Ankura's] business" as used in this provision. Without full and complete disclosures, this provision of the Engagement Letter should not be approved.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

## CONCLUSION

For the foregoing reasons, AMc requests that the Court deny the CRO Application, or, alternatively, defer it until the Court has ruled on the Dismissal/Trustee Motions.

Date: April 16, 2021

Respectfully submitted,

**DORSEY & WHITNEY LLP**

*/s/ H. JOSEPH ACOSTA*
**G. MICHAEL GRUBER**
State Bar No. 08555400
gruber.mike@dorsey.com
**H. JOSEPH ACOSTA**
State Bar No. 24006731
acosta.joseph@dorsey.com
**BRIAN E. MASON**
Texas Bar No. 24079906
mason.brian@dorsey.com
300 Crescent Court, Suite 400
Dallas, Texas 75201
Phone: (214) 981.9900
Facsimile: (214) 981.9901

**ATTORNEYS FOR ACKERMAN MCQUEEN, INC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document has been served upon all parties named on the attached Master Service List by first-class U.S. Mail and all parties receiving notice by and through the Court's CM/ECF system on April 16, 2021.

*/s/ H. Joseph Acosta*
H. JOSEPH ACOSTA