# EXHIBIT A



April 28, 2021

Charles Cotton, Board Member, Special Litigation Committee
11250 Waples Mill Rd.
Fairfax, Virginia 22030

**Re: Retention of Ankura to Provide Chief Restructuring Officer Services**

Dear Mr. Cotton:

This letter agreement (the "***Agreement***"), entered into and effective as of April 2, 2021 (the "***Effective Date***"), confirms the terms of the agreement among Ankura Consulting Group, LLC ("***Ankura***") and the National Rifle Association of America and Sea Girt, LLC (collectively, the "***Company***") pursuant to which Ankura has been engaged to provide Chief Restructuring Officer ("***CRO***") and related services as described herein on the terms set forth below.

We have been retained by the Company and will report directly to the Special Litigation Committee (the "***SLC***") of the Board of Directors of the Company (the "***Board***").

1. <u>Scope of Engagement</u>: Subject to the terms and conditions of this Agreement, Ankura will provide to the Company the CRO and interim management services (the "***Services***") as set forth in <u>Schedule II</u> hereto.

Notwithstanding anything to the contrary in this Agreement, Ankura and the Company agree that the CRO shall be authorized, in such capacity, to make decisions with respect to discharging the CRO Responsibilities (as defined in <u>Schedule II</u> hereto), in such manner as the CRO deems appropriate, subject to only the direction, limitations, and parameters set by the SLC and consistent with the Company's bylaws and all applicable laws.

In the event there is a disagreement as to any direction, guidance or instruction to be given to Ankura in connection with the foregoing Services, Ankura shall take such direction, guidance or instruction from the SLC.

It is our intention to work closely and cooperatively with the SLC, the Company's senior executive team, and the Company's other outside retained professionals throughout the course of this engagement. The Services and compensation arrangements set forth herein do not encompass other advisory services not set forth in this Section 1. If the Company and Ankura later determine to expand the scope of Services to include other services not otherwise set forth herein, such future agreement will be the subject of a further and separate written agreement of the parties, and may require approval by the Bankruptcy Court, as defined below.

2. <u>Fees and Expenses</u>: For Ankura's Services hereunder, the Company agrees to pay to Ankura the following non-refundable fees and expense reimbursements:

   (a) <u>CRO Services Compensation</u>: Professional fees for the Services set forth above rendered by the Engagement Personnel (the "***CRO Services Compensation***") will be based on the actual hours expended on rendering the Services at our standard hourly rates that are in effect when the Services are rendered, subject to a fee cap (the "***Full-Time Cap***") as described below. Our rates are typically revised annually. Our current hourly rates are as follows:



| Professional | Hourly Rate |
|---|---|
| Senior Managing Director & Managing Director (including the CRO) | $900 - $1,155 |
| Other Professionals | $410 - $870 |
| Paraprofessional | $275 - $330 |

The Full-Time Cap means for any individual Engagement Personnel during any given month, the CRO Services Compensation billed to the Company shall not exceed the standard hourly billing rate in effect when the Services are rendered multiplied by 40 hours per week, as adjusted for actual number of workdays in the applicable month.

(b) Restructuring Fee: Ankura shall be paid a restructuring fee in the amount of $1,000,000 payable immediately upon the effective date of any Chapter 11 plan consented to, or accepted by, the Debtors' Board (the "***Restructuring Fee***" and together with the CRO Services Compensation, the "***Fees***").

(c) Expense Reimbursement: Ankura shall be entitled to reimbursement of reasonable out-of-pocket and direct expenses incurred in connection with the Services to be provided under this Agreement (including for Ankura's reasonable out-of-pocket fees, expenses for outside legal counsel, other third-party advisors, and to the extent reasonably necessary, security services) incurred in connection with this Agreement, including the negotiation and performance of this Agreement and the matters contemplated hereby (collectively, "***Expenses***").

(d) Reasonableness of Fees: The Company acknowledges that it believes that Ankura's general restructuring experience and expertise will inure to the benefit of the parties hereto, that the value to the parties hereto of Ankura's Services derives in substantial part from that experience and expertise and that, accordingly, the structure and amount of the Fees to be paid to Ankura hereunder are reasonable. The Company acknowledges that a substantial professional commitment of time and effort will be required of Ankura and its professionals hereunder, and that such commitment may foreclose other opportunities for Ankura. Given the numerous issues that may arise in engagements such as this, Ankura's commitment to the variable level of time and effort necessary to address such issues, the expertise and capabilities of Ankura that will be required in this engagement, and the market rate for Ankura's services of this nature, whether in-court or out-of-court, the parties agree that the fee arrangement provided for herein is reasonable, fairly compensates Ankura, and provides the requisite certainty to the parties hereto.

(e) Testimony; Subpoena Requests. If Ankura is requested or required to appear as a witness in any action that is brought by, on behalf of, or against you or that otherwise relates to this Agreement or the Services rendered by Ankura hereunder, you agree to (i) compensate Ankura for its associated time charges at our regular rates in effect at the time and (ii) reimburse Ankura for all documented, actual out-of-pocket expenses incurred by Ankura in connection with such appearance or preparing to appear as a witness, including without limitation, the fees and disbursements of legal counsel of Ankura's choosing. In addition, Ankura will be compensated and reimbursed for any time and expense (including without limitation, fees and expenses of legal counsel of Ankura's choosing) that Ankura may incur in considering or responding to discovery requests or other formal information requests for documents or information made in connection with any action or in connection with the Services.



3. [Reserved]

4. Invoices and Payment: The obligations of the Company under this Agreement shall be joint and several obligations. The payment of the Fees and Expenses hereunder are the exclusive obligations of the Company. In the event that the Company does not pay Ankura's invoices in accordance with their terms, Ankura has the discretion to (i) terminate or suspend the engagement and the performance of Services, and (ii) deduct any outstanding amounts owed from monies held on the Company's behalf. Under these circumstances, the Company will also be responsible for any costs, including legal fees, associated with the collection of outstanding and overdue fees and expenses.

5. Term of Agreement:

If either party hereto desires to terminate its relationship with the other or the engagement, it may do so at any time for any reason by giving written notice to the other party. In such event, Ankura will be paid for fees and expenses incurred through the termination date, as well as for reasonable engagement closing costs.

6. Nature of Services; Use of Advice:

(a) The Services, including the deliverables and reports, are provided solely for your use for the purposes set forth herein. You may not disclose or discuss the Services or any deliverable or report or make the benefit of the Services available to anyone else or refer to the contents of a deliverable or report or the findings of our work except (i) as specifically stated herein, (ii) with our prior written consent on terms to be agreed in writing, or (iii) where required by law or regulation. The Services and all deliverables are not for a third party's use, benefit or reliance and Ankura disclaims any contractual or other responsibility or duty of care to any third party based upon the Services or deliverables. Client will indemnify and hold Ankura harmless from any and all claims asserted by a third party as a result of such unauthorized release of the any deliverables or reliance on the Services. Nothing in this Agreement, express or implied, is intended to confer or does confer on any person or entity, other than the parties hereto, the Indemnified Persons (as such term is defined in Schedule I) and each of their respective successors, heirs and assigns, any rights or remedies under or by reason of this Agreement or as a result of the services to be rendered by Ankura hereunder.

(b) At the direction of legal counsel, certain communications and correspondence between Ankura and reports and analyses prepared by Ankura, in connection with this Agreement and the matters contemplated hereby, will be considered in preparation for litigation, and accordingly, will be subject to the attorney-client privilege and work-product privilege between Ankura and the Company.

(c) The Services and any deliverables, including any oral advice or comments, should not be associated with, referred to or quoted in any manner in any financial statements or any offering memorandum, prospectus, registration statement, public filing, loan or other agreements.

7. Intellectual Property:

Ankura owns the intellectual property rights in the deliverables and reports and any materials created under this Agreement. Ankura agrees that upon payment in full for the Services, you will have a non-exclusive, non-transferable license to use the deliverables for your own internal use in accordance with the terms of this Agreement. Notwithstanding the foregoing, (i) any patent, copyright, trademark and other intellectual



property rights of Ankura contained in any deliverable or report shall remain the sole and exclusive property of Ankura, and (ii) all methodologies, processes, techniques, ideas, concepts, trade secrets and know-how and other intellectual property embedded in the deliverable or reports that we may develop or supply in connection with our Services shall remain the sole and exclusive property of Ankura.

8. <u>Court Approval</u>:

    (a) The Company shall use its best efforts to promptly file this agreement with the United States Bankruptcy Court (the "***Bankruptcy Court***") having jurisdiction over the Company's proceeding under Title 11 of the United States Code (the "***Bankruptcy Code***") for the approval pursuant to sections 363 and 328 of the Bankruptcy Code of (A) this Agreement and (B) Ankura's retention by the Company under the terms of this Agreement and subject to the standard of review provided in section 328(a) of the Bankruptcy Code and not subject to any other standard of review under section 330 of the Bankruptcy Code. The Company will use their best efforts to ensure that the Bankruptcy Court approves this Agreement, *nunc pro tunc* to the Effective Date.

    (b) The Company shall provide Ankura with a draft of such notice and any proposed order authorizing Ankura's retention sufficiently in advance of the filing of such notice and proposed order to enable Ankura and its counsel to review and comment thereon. Ankura shall have no obligation to provide any Services under this Agreement unless Ankura's retention under the terms of this Agreement is approved under section 328(a) of the Bankruptcy Code by a final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition for certiorari, and which order is acceptable to Ankura in all respects.

9. <u>Confidentiality</u>:

    (a) <u>Generally</u>. In connection with this engagement, either party (the "***Receiving Party***") may come into the possession, whether orally or in writing, of Confidential Information (as defined below) of the other party (the "***Disclosing Party***"). The Receiving Party hereby agrees that it will not disclose, publish or distribute such Confidential Information to any third party without the Disclosing Party's consent, which consent shall not be unreasonably withheld other than (i) to the Receiving Party's affiliates and its and their employees, officers, directors, auditors, and advisors; (ii) pursuant to court order, subpoena, legal process, or request by a governmental agency having regulatory authority which would require disclosure, provided that Receiving Party shall use its best efforts to promptly give Disclosing Party written prior notice (if legally permissible) of any disclosure under this clause (ii) so that Disclosing Party can seek a protective order; or (iii) to tax advisors regarding the tax treatment or tax structure of any transaction; provided that such advisors are informed of the confidential obligations hereunder.

    (b) <u>Definition of Confidential Information</u>. "***Confidential Information***" means any and all non-public, confidential or proprietary knowledge, data, or information of or concerning the Disclosing Party. For the avoidance of doubt, Confidential Information includes without limitation, research, analyses, names, business plans, valuations, databases and management systems. Confidential Information shall not include information that: (i) was publicly known and made generally available in the public domain prior to the time of disclosure; (ii) is already in the lawful possession of the Receiving Party at the time of disclosure; (iii) is lawfully obtained from a third party lawfully in possession of such information and without a breach of such third party's obligations of confidentiality; or (iv) is independently developed without use of or reference to any Confidential Information.



10. <u>Company Access and Information</u>:

In order to fulfill the Services under this Agreement, it will be necessary for Ankura personnel to have access to the Company's facilities and certain books, records and reports of the Company. In addition, Ankura will need to have discussions with the Company's management and certain other personnel. Ankura will perform the Services in a manner that will permit the business operations of the Company to proceed in an orderly fashion, subject to the requirements of this engagement. We understand that the Company has agreed it will furnish Ankura with such information as Ankura believes appropriate to its assignment (all such information so furnished being the "***Information***"). The Company recognizes and confirms that Ankura (i) will use and rely on the accuracy and completeness of the Information and on Information available from generally recognized public sources without independently verifying the same, (ii) does not assume responsibility for the accuracy, completeness or reasonableness of the Information and such other Information, and (iii) will not make an appraisal of any assets or liabilities (contingent or otherwise) of the Company. The Company shall advise Ankura promptly upon obtaining any actual knowledge of the occurrence of any event or any other change in fact or circumstance upon which Ankura formed part or all of its opinions, advice, or conclusions, or which could reasonably be expected to result in some or all of the Information being incorrect, inaccurate, or misleading. To the best of the Company's knowledge, the Information to be furnished by or on behalf of the Company, when delivered, will be true and correct in all material respects and will not contain any material misstatement of fact or omit to state any material fact necessary to make the statements contained therein not misleading.

Ankura will submit oral reports highlighting our findings and observations based upon the Services we perform pursuant to this Agreement. Our reports will encompass only matters that come to our attention in the course of our work that we perceive to be significant in relation to the objectives of our engagement. The depth of our analyses and extent of our authentication of the information on which our advice to you will be based may be limited in some respects due to the extent and sufficiency of available Information, time constraints dictated by the circumstances of our engagement, and other factors. We do not contemplate examining any such Information in accordance with generally accepted auditing or attestation standards. It is understood that, in general, we are to rely on Information disclosed or supplied to us by employees and representatives of the Company without audit or other detailed verification of their accuracy and validity. Accordingly, we will be unable to and will not provide assurances in our reports concerning the integrity of the Information used in our analyses and on which our findings and advice to you may be based. In addition, we will state that we have no obligation to, and will not update our reports or extend our activities beyond the scope set forth herein unless you request, and we agree to do so.

11. <u>Indemnification; Limitation of Liability</u>: The Company shall provide indemnification, contribution and reimbursement as set forth in <u>Schedule I</u> hereto. The terms and provisions of <u>Schedule I</u> are an integral part hereof, are hereby incorporated by reference, are subject in all respects to the provisions hereof and shall survive any termination or expiration of this Agreement. Further, if an Indemnified Person (as defined in <u>Schedule I</u>) is requested or required to appear as a witness in any Action (as defined in <u>Schedule I</u>) that is brought by or on behalf of or against the Company or that otherwise relates to this Agreement or the Services rendered by Ankura hereunder, the Company shall, jointly and severally, reimburse Ankura and the Indemnified Person for all documented, actual out-of-pocket expenses incurred by them in connection with such Indemnified Person appearing or preparing to appear as such a witness, including without limitation, the fees and disbursements of legal counsel. Neither the Client nor any other party acting on their behalf shall hold Ankura liable for any matter in connection with the engagement or the Agreement, absent gross negligence, willful misconduct or bad faith as finally determined by a judgment of a court of competent jurisdiction. In no event shall Ankura be liable (i) under this Agreement or the engagement for damages in excess of the total amount of Fees collected; (ii) loss or corruption of data from the Client's systems; or (iii) for any claim whatsoever for any loss of profit, goodwill, business opportunity, anticipated savings or benefits, special, consequential, exemplary, incidental, punitive or indirect damages of any kind.



12. Entire Agreement; Amendments:  This Agreement represents the entire agreement between the parties in relation to the Services, supersedes all previous agreements relating to the subject matter hereof (should they exist) and may not be modified or amended except in writing signed by all of the parties hereto.

13. Counterparts:  This Agreement may be executed in counterparts (and by facsimile or other electronic means), each of which shall constitute an original and all of which together will be deemed to be one and the same document.

14. Severability:  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision.

15. Announcements: Ankura shall be entitled to identify the Company and use the Company's name and logo in connection with marketing and pitch materials upon conclusion of the Services. In addition, if requested by Ankura, the Company agrees that in any press release related to the Services or outcome of the Services provided hereunder, the Company will include in such press release a mutually acceptable reference to Ankura's role as CRO to the Company.

16. Governing Law; Jury Trial Waiver; Jurisdiction: THIS AGREEMENT WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY IN SUCH STATE. ANKURA AND THE COMPANY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATED TO OR ARISING OUT OF OR IN CONNECTION WITH THE ENGAGEMENT OF ANKURA PURSUANT TO, OR THE PERFORMANCE BY ANKURA OF THE SERVICES CONTEMPLATED BY, THIS AGREEMENT. REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PRINCIPAL PLACE OF BUSINESS OF THE PARTIES HERETO, EACH PARTY HEREBY IRREVOCABLY CONSENTS AND AGREES THAT ANY CLAIMS OR DISPUTES BETWEEN OR AMONG THE PARTIES HERETO ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL BE BROUGHT AND MAINTAINED EXCLUSIVELY IN THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS PRESIDING OVER THE COMPANY'S BANKRUPTCY CASE, ANY FEDERAL COURT OF COMPETENT JURISDICTION SITTING IN THE NORTHERN DISTRICT OF TEXAS, OR, IF SUCH COURTS DO NOT HAVE JURISDICTION, THEN THE STATE COURTS SITTING IN THE DALLAS COUNTY, TEXAS, WHICH COURTS SHALL HAVE EXCLUSIVE JURISDICTION OVER THE ADJUDICATION OF SUCH MATTERS SUBJECT TO DELAWARE GOVERNING LAW DISCUSSED HEREIN; PROVIDED HOWEVER, THAT IF ANY ENTITY COMPRISING THE COMPANY BECOMES A DEBTOR UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AND IF A COMPANY ENTITY IS A PARTY TO SUCH DISPUTE WITH RESPECT TO THIS AGREEMENT, ANKURA AND THE COMPANY IRREVOCABLY AGREE TO SUBMIT TO THE EXCLUSIVE JURISDICTION AND FORUM OF THE BANKRUPTCY COURT IN WHICH SUCH CHAPTER 11 CASE IS PENDING. BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY HERETO FURTHER IRREVOCABLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND HEREBY WAIVES IN ALL RESPECTS ANY CLAIM OR OBJECTION THAT IT MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON-CONVENIENS. EACH PARTY HERETO AGREES THAT A FINAL NON-APPEALABLE JUDGMENT IN ANY SUCH ACTION BROUGHT IN ANY SUCH COURT SHALL BE CONCLUSIVE AND BINDING UPON IT AND MAY BE ENFORCED IN ANY OTHER COURT(S) HAVING JURISDICTION OVER IT BY SUIT UPON SUCH JUDGMENT. EACH PARTY HERETO



IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN ALL SUCH DISPUTES BY THE MAILING OF COPIES OF SUCH PROCESS TO THE NOTICE ADDRESS FOR EACH SUCH PERSON AS SET FORTH IN THIS AGREEMENT. EACH OF THE PARTIES HERETO HEREBY CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF ANY OTHER PARTY HERETO HAS REPRESENTED EXPRESSLY OR OTHERWISE THAT SUCH PARTY WOULD NOT SEEK TO ENFORCE THE PROVISIONS OF THIS WAIVER. EACH OF THE PARTIES HERETO HEREBY ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY AND IN RELIANCE UPON, AMONG OTHER THINGS, THE PROVISIONS OF THIS SECTION.

17. <u>Notices</u>: Notice given pursuant to any of the provisions of this Agreement shall be in writing and shall be mailed or delivered (including via email so long as the recipient acknowledges receipt) at the address set forth in the signature blocks of each such person below. Notices shall be deemed provided on the date sent.

18. <u>Miscellaneous</u>:

(a) <u>Conflicts</u>:

    i. Ankura is involved in a wide range of other activities from which conflicting interests, or duties, may arise. We have undertaken an inquiry of our records in accordance with our standard business practices based on the parties identified to us and have determined that we may proceed. Due to the diversity of Ankura's experts and advisory services, Ankura cannot be certain all relationships have or will come to light. Should an actual conflict come to the attention of Ankura during the course of this engagement, we will notify you immediately and take appropriate actions, as necessary. The Company represents and warrants that it has informed Ankura of the parties-in-interest to this matter and agrees that it will inform Ankura of additions to, or name changes for, those parties-in-interest. Ankura is not restricted from working on other engagements involving the parties in this matter; however, during the course of this engagement, services of the nature described in this Agreement that are directly adverse to the Company shall not be provided by personnel working on this engagement without prior written consent of the Company.

    ii. The Company acknowledges that Ankura and its affiliates may have provided professional services to, may currently provide professional services to, or may in the future provide such services to other parties-in-interest. The Company agrees that Ankura, its affiliates, subsidiaries, subcontractors and their respective personnel will have no responsibility to the Company in relation to such professional services, nor any responsibility to use or disclose information Ankura possesses by reason of such services, whether or not such information might be considered material to the Company. Information which is held elsewhere within Ankura but is not publicly available will not for any purpose be taken into account in determining Ankura's responsibilities to the Company under this engagement. Ankura will not have any duty to disclose to the Company or any other party or utilize for the benefit of any such party's or any other party any non-public information, or the fact that Ankura is in possession of such information, acquired in the course of providing services to any other person, engaging in any transaction (on its own account or otherwise) or otherwise carrying on its business.

(b) <u>Exculpation</u>: You agree not to bring any claim against a direct or indirect holder of any equity interests or securities of Ankura in such capacity as a holder of equity interests, whether such holder is a limited or general partner, member, stockholder or otherwise, affiliate of Ankura, or director, officer, employee, representative, or agent of Ankura, or of an affiliate of Ankura or of any such direct or indirect holder of any equity interests or securities of Ankura (collectively, the "***Party***



*Affiliates*"). You further agree that no Party Affiliate shall have any liability or obligation of any nature whatsoever in connection with or under this Agreement or the Services contemplated thereby, and you waive and release all claims against such Party Affiliates related to any such liability or obligation.

(c) [reserved]

(d) <u>Independent Contractors</u>:  In connection with the Services, Ankura may utilize employees, agents or independent contractors or its own affiliates (each of which is a separate and independent legal entity) or its own agents or independent contractors.  References in this Agreement to Ankura personnel shall apply equally to employees, agents or independent contractors of Ankura and its affiliates. Ankura shall act as an independent contractor under this Agreement, and not in any other capacity including as a fiduciary, and any obligations arising out of its engagement shall be owed solely to you.  As an independent contractor, Ankura will have complete and exclusive charge of the management and operations of its business, including hiring and paying the wages and other compensation of all its employees and agents, and paying all bills, expenses and other charges incurred or payable with respect to the operations of its business.  Ankura will remain solely responsible for the Services.

(e) <u>Limitations of Engagement</u>:  The Company acknowledges that Ankura is being retained solely to assist the Company as described in this Agreement. The Company agrees that it will be solely responsible implementing any advice or recommendations and for ensuring that any such implementation complies with applicable law. The Company understands that Ankura is not undertaking to provide any legal, regulatory, accounting, insurance, tax or other similar professional advice and the Company confirms that it is relying on its own counsel, accountants and similar advisors for such advice. This engagement shall not constitute an audit or review, or any other type of financial statement reporting engagement. It is expressly agreed that, other than as set forth in this Agreement, Ankura will not evaluate or attest to the Company's internal controls, financial reporting, illegal acts or disclosure deficiencies and Ankura shall be under no obligation to provide formal fairness or solvency opinions with respect to any bankruptcy case or otherwise, or any transaction contemplated thereby or incidental thereto. In rendering its Services pursuant to this Agreement, and notwithstanding anything to the contrary herein, Ankura is not assuming any responsibility for any decision to pursue (or not to pursue) any business strategy or to effect (or not to effect) any transaction. Ankura shall not have any obligation or responsibility to provide legal, regulatory, accounting, tax, audit, "crisis management" or business consultant advice or services hereunder, and shall have no responsibility for designing or implementing operating, organizational, administrative, cash management or liquidity improvements.

(f) <u>Limitations on Actions</u>:  No action, regardless of form, relating to this engagement, the Services provided hereunder or this Agreement, may be brought by either party more than one (1) year after the cause of action has accrued, except that an action for nonpayment may be brought by a third party not later than one (1) year following the due date of the last payment owing to the party bringing such action.

(g) <u>Counsel Representation</u>: The terms of this Agreement have been negotiated by the parties hereto, who have each been represented by counsel. There shall be no presumption that any of the provisions of this Agreement shall be construed adverse to any party as "drafter" in the event of a contention of ambiguity in this Agreement, and the parties waive any statute or rule of law to such effect.



(h) <u>Assignment</u>: This Agreement may not be assigned by any party hereto without the prior written consent of the other parties. Any attempted assignment of this Agreement made without such consent shall be void and of no effect, at the option of the non-assigning parties. Notwithstanding the foregoing, Ankura may assign or novate this Agreement to a transferee of all or part of its business upon written notice. Ankura may also transfer or deal with our rights in any unpaid invoice without notice.

(i) <u>Headings</u>: Headings used herein are for convenience of reference only and shall not affect the interpretation or construction of this Agreement.

(j) <u>Survival</u>: Those provisions that by their nature are intended to survive termination or expiration of this Agreement and any right or obligation of the parties in this Agreement which, by its express terms of nature and context is intended to survive termination or expiration of this Agreement, shall so survive any such termination or expiration. For the avoidance of doubt, upon any termination of this Agreement, Section 2-12 and 14-18 shall survive such termination and shall remain in effect. Notwithstanding the foregoing, the obligations under Section 9 shall survive for two (2) years after termination of this Agreement.

(k) <u>Force Majeure</u>: Ankura shall not be liable for any delays or nonperformance directly or indirectly resulting from circumstances or causes beyond its reasonable control, including but not limited to, fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

(l) <u>Non-Solicitation</u>: The Client will not, during the term of the engagement or for twelve (12) months thereafter, solicit (directly or indirectly) any employee of Ankura or attempt to induce or cooperate with any other firm in an attempt to induce any employee to leave the employ of Ankura. In the event that an employee of Ankura is hired by the Client during the above-mentioned period, the Client agrees to pay to Ankura, no later than ten (10) days after the employees accepts a position with the Client, an amount equal to one hundred percent (100%) of the employee's annualized compensation; <u>provided</u> that the foregoing shall not be violated by general advertising not targeted at Ankura employees.

(m) <u>Insurance</u>: The Company shall use commercially reasonable efforts to cause the CRO and any other Engagement Personnel serving in officer roles to be covered under the Company's existing directors, officers and corporate liability insurance policies (the "***Policy***"). The Company shall cause its insurance broker to send copies of all documentation and other communications regarding the Policy, including without limitation any renewal or cancellation thereof to the attention of the CRO. Upon any cancellation or nonrenewal of the Policy by the insurer, the Company shall use commercially reasonable efforts to extend the claim period to a six-year "discovery period" and shall exercise such rights and pay the premium required thereunder.

(n) <u>Money Laundering</u>. Ankura may, in addition to making searches of appropriate databases, request from you, your affiliates or your advisors, certain information and documentation for the purposes of verifying your identity in order to comply with our obligations under applicable money-laundering regulation, legislation and our internal policies. When you are acting on behalf of a third-party client, we may request from you, copies of any documentation you have obtained in relation to your client. If satisfactory evidence of identity is not provided within a reasonable time, it may be necessary for us to cease work. Where we believe that there are circumstances which may give rise to a money laundering offence under applicable legislation, we may consider it necessary to make a report to the appropriate authorities. We may not be able to discuss such reports with you



and we will not be liable to you for any loss or damage which you may suffer or incur as a result of our making such a report, including, without limitation, as a result of any delay to any stage of a matter or as a result of completion being prohibited by such authorities.

[Signature pages follow.]



If the foregoing correctly sets forth our understanding, please indicate your acceptance thereof in the space provided below, whereupon this Agreement and your acceptance shall constitute a binding agreement between us.

If you have any questions, please call me at (214) 924-1575. We look forward to working with you on this matter.

**ANKURA CONSULTING GROUP, LLC**

By: _____
Louis E. Robichaux IV
Senior Managing Director

15950 Dallas Parkway, Suite 750
Dallas, TX 75248

With a copy to
485 Lexington Avenue, 10th Floor
New York, NY 10017
Attn.: General Counsel

Accepted and agreed:

**COMPANY:**

**<u>NATIONAL RIFLE ASSOCIATION OF AMERICA and
SEA GIRT, LLC</u>**

By: _____
Name: Charles Cotton
Title: Board Member, Special Litigation Committee
Date:

By: _____
Name: Wayne LaPierre
Title: Executive Vice President
Date:

Address:  11250 Waples Mill Rd.
Fairfax, Virginia 22030

With a copy to:



## Schedule I

This Schedule I is a part of and incorporated into the Agreement, dated as of April 4, 2021 between Ankura, and the Company pursuant to which Ankura has been engaged to provide Services as set forth in the Agreement.  Capitalized terms not defined herein shall have the same meaning assigned in the Agreement.

As a material part of the consideration for the agreement of Ankura to furnish its Services under the Agreement, the Company, jointly and severally, agrees that it shall defend, indemnify and hold harmless Ankura and its affiliates and their respective directors, officers, employees, attorneys and other agents appointed by any of the foregoing and each other person, if any, controlling Ankura or any of its affiliates (Ankura and each such person and entity being referred to as an "***Indemnified Person***"), from and against any losses, claims, damages, judgments, assessments, costs and other liabilities (collectively, "***Liabilities***"), and will reimburse each Indemnified Person for all reasonable fees and expenses (including the reasonable fees and expenses of counsel) (collectively, "***Indemnified Expenses***") as they are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation, whether or not in connection with pending or threatened litigation and whether or not any Indemnified Person is a party (collectively, "***Actions***"), in each case, related to or arising out of or in connection with the Services rendered or to be rendered by an Indemnified Person pursuant to the Agreement or any Indemnified Persons' actions or inactions in connection with any such Services; provided that the Company will not be responsible for any Liabilities or Indemnified Expenses of any Indemnified Person that are determined by a judgment of a court of competent jurisdiction, which judgment is no longer subject to appeal or further review, to have resulted primarily from such Indemnified Person's gross negligence, bad faith or willful misconduct in connection with any of the Services.  The Company shall also reimburse such Indemnified Person for all Indemnified Expenses as they are incurred in connection with enforcing such Indemnified Persons' rights under the Agreement (including without limitation its rights under this Schedule I).  Such Indemnified Person shall reasonably cooperate with the defense of any Actions.

The Company shall, if requested by Ankura, assume the defense of any such Action including the employment of counsel reasonably satisfactory to Ankura.  The Company will not, without prior written consent of Ankura (which shall not be unreasonably withheld), settle, compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened Action in respect of which indemnification or contribution may be sought hereunder (whether or not any Indemnified Person is a party thereto) unless such settlement, compromise, consent or termination (i) includes an unconditional release of such Indemnified Person from all Liabilities arising out of such Action and (ii) does not include any admission or assumption of fault or culpability on the part of any Indemnified Person.

In the event that the foregoing indemnity is not available, for any reason, to an Indemnified Person in accordance with the Agreement, the Company shall contribute to the Liabilities and Indemnified Expenses paid or payable by such Indemnified Person in such proportion as is appropriate to reflect (i) the relative benefits to the Company, on the one hand, and to Ankura, on the other hand, of the matters contemplated by the Agreement, or (ii) if the allocation provided by the immediately preceding clause (i) is not permitted by applicable law, not only such relative benefits but also the relative fault of the Company, on the one hand, and Ankura, on the other hand, in connection with the matters as to which such Liabilities or Indemnified Expenses relate, as well as any other relevant equitable considerations.  Notwithstanding the foregoing, in no event shall any Indemnified Persons be required to contribute an aggregate amount in excess of the amount of fees actually received by Ankura from the Company pursuant to the Agreement.

Prior to entering into any agreement or arrangement with respect to, or effecting, any (i) merger, statutory exchange or other business combination or proposed sale, exchange, dividend or other distribution



or liquidation of all or a significant portion of its assets, or (ii) significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Company set forth in this Agreement, the Company will notify Ankura in writing thereof, if not previously so notified, and shall arrange in connection therewith alternative means of providing for the obligations of the Company set forth in this Agreement, including the assumption of such obligations by another party, insurance, surety bonds, the creation of an escrow, or other credit support arrangements, in each case in an amount and upon terms and conditions reasonably satisfactory to Ankura.

These indemnification, contribution and other provisions of this <u>Schedule I</u> shall (i) remain operative and in full force and effect regardless of any termination of the Agreement or completion of the engagement by Ankura; (ii) inure to the benefit of any successors, assigns, heirs or personal representative of any Indemnified Person; and (iii) be in addition to any other rights that any Indemnified Person may have.



**Schedule II**

This <u>Schedule II</u> is a part of and incorporated into the Agreement, dated as of April 3, 2021 between Ankura, and the Company pursuant to which Ankura has been engaged to provide the Services as set forth in the Agreement. Capitalized terms not defined herein shall have the same meaning assigned in the Agreement.

To the extent there is an inconsistency between this Schedule II and the other terms and conditions of the Agreement, this Schedule II shall control.

Ankura Consulting Group, LLC ("***Ankura***") will provide **Louis E. Robichaux IV** to serve as Chief Restructuring Officer ("***CRO***") of the National Rifle Association of America and Sea Girt, LLC (collectively, the "***Company***") pursuant to the terms and conditions of this Agreement, with the appointment, scope of duties and responsibility, and authority (the "***CRO Appointment Scope***") described in this **Schedule II**. Michael Morton of Ankura (together with the CRO, the "***Initial Personnel***") will assist the CRO in carrying out those duties and responsibilities.

Upon the mutual agreement of Ankura and the Special Litigation Committee of the Board (the "***SLC***"), Ankura may also provide such additional Ankura personnel (the "***Additional Personnel***" and collectively with the Initial Personnel, the "***Engagement Personnel***") as are necessary to support the CRO, and to assist the CRO in the execution of his duties set forth more fully herein. The Initial Personnel and Additional Personnel may be designated as management or executive officers by the Company upon agreement with the SLC and Ankura.

## Appointment and Reporting

- The CRO will serve as a court-appointed representative of the Company with the role, scope and authority set forth herein. The CRO shall be considered a representative, and the functional equivalent of an executive, of the Company for purposes of the attorney-client privilege and the attorney work product doctrine. The CRO shall not be authorized to waive attorney-client privilege or work product protections of the Company.

- The Bankruptcy Court shall approve the CRO Appointment Scope and the Ankura engagement letter.

- The CRO will report directly to the SLC. The CRO will have direct access to other Board members, after consultation with the SLC and counsel to the Board, to carry out the CRO Appointment Scope.

- The CRO shall be available to provide reporting and presentations to the Board regarding CRO Responsibilities, upon request by the SLC or counsel to the Board and reasonable advance notice, regarding the Bankruptcy Responsibilities.

- The CRO will work collaboratively with the Company's officers and the members of management team and each will make themselves available to regularly communicate in furtherance of their respective duties.

## Scope of Duties and Responsibility

- For purposes of the CRO Appointment Scope, the Company's day-to-day operations are defined as follows:

  - "***Core Fundamental Mission Operations***" are defined as: (i) all activities of the NRA-ILA (*e.g.*, political and legislative activities) including, without limitation, management of donor-restricted funds that relate exclusively to NRA-ILA activities, (ii) charitable programs comprising the Company's nonprofit mission, (iii) mission-related litigation,



including 1st Amendment litigation, 2nd Amendment litigation as well as actions and investigations brought by federal or state government actors the outcome of which could, in the opinion of the SLC, jeopardize the future existence or financial viability of the Company,[1] (iv) marketing, (v) membership, (vi) donor development and fundraising, and (vii) all internal and external communications that pertain to the foregoing.

- o *"**Management Operations**"* are defined as all operations that are not Core Fundamental Mission Operations. It is intended that the CRO will have broad authority for these operations. Examples of activities in this category include but are not limited to: (i) finance and accounting, (ii) treasury management, (iii) legal, governance and compliance operations to the extent they relate to the CRO Responsibilities (defined below), (iv) all litigation that is not mission-related litigation (subject to the settlement authority and other limitations as set forth herein), (v) information technology, (vi) general administration, facilities administration, purchasing, and supervision and management of vendors who furnish goods or perform services unrelated to the Core Fundamental Mission Operations, and (vii) all internal and external communications that pertain to the foregoing.

- Wayne LaPierre and the other applicable Officers of the Company will lead and be responsible for Core Fundamental Mission Operations.

- The CRO will lead and be responsible for Management Operations. In the event of a material difference of opinion among the CRO, on the one hand, and any Company advisor, employee or officer on the other hand (a "***Material Difference***"), regarding any matter within the scope of the CRO Responsibilities (defined below), the matter may be raised with the SLC, which will make a determination resolving the conflict (an "***SLC Determination***"). If, after good-faith discussions between the CRO and SLC, the CRO believes that the SLC Determination constitutes a post-petition breach of a fiduciary duty, the CRO may, at his discretion, bring the matter to the Bankruptcy Court for hearing.

- The CRO will also lead and be responsible for the Company's efforts to pursue and effectuate its Chapter 11 bankruptcy restructuring (the "***Bankruptcy Responsibilities***" and together with Management Operations, the "***CRO Responsibilities***"), including, without limitation, the following:

  - o Working closely and cooperatively with the Company's bankruptcy advisors, oversee and manage the Company's required bankruptcy reporting, administration, and disclosures.

  - o Working in close coordination with the SLC and Official Committee of Unsecured Creditors (the "***UCC***"), and subject to settlement authority thresholds and guidance from the SLC, lead the Company's efforts to resolve claims and controversies which have material connections to the Chapter 11 restructuring process.

  - o Working in close coordination with the SLC and the UCC, and subject to settlement authority thresholds and guidance from the SLC, exercise oversight and decision-making authority with respect to any litigation claims (other than mission-related litigation), whether filed in state or federal court, or before any administrative or governmental agency, or an arbitration that could potentially result in a claim in the bankruptcy.

  - o Lead the communications and negotiations with the Company's stakeholders, UCC and parties in interest in the Company's bankruptcy restructuring.

  - o Lead and oversee any efforts by the Company to divest any assets during the bankruptcy proceeding, with any asset sales being approved by the SLC or the Board, with input from the UCC.

---

[1] For the avoidance of doubt, the current mission-related litigation is identified on Annex 1 hereto.



- o Assist bankruptcy counsel and provide bankruptcy court testimony, as the primary representative of the Company, in the Chapter 11 proceeding.
- o The Company shall receive and consider any input provided by the CRO in connection with the evaluation of, and decisions regarding the assumption or rejection on, executory contracts and unexpired leases.
- o Develop, negotiate, and advance the Plan of Reorganization which must ultimately be approved by the Board.

**Authority**

- The following individuals and firms shall have direct line reporting to the CRO concerning matters within the scope of the CRO Responsibilities:
  - o <u>Company Resources</u>: Chief Financial Officer; Treasurer; Internal General Counsel; the senior executive of Human Resources; the senior executive of Information Technology; and the senior executive responsible for internal and external communications.
  - o <u>External Resources</u>: all retained legal and restructuring professionals for the portion of such firms' work that pertain to the CRO Responsibilities; <u>provided</u>, <u>however</u>, that nothing herein shall alter such professionals' fiduciary duties to the Company clients.
- The CRO and Mr. LaPierre recognize and acknowledge that certain of the Company's internal and external resources may also support Core Fundamental Mission Operations. To the extent these individuals and firms provide services and support to multiple areas of the Company's operations: (i) such individual or firm, as applicable, will report directly to Mr. LaPierre for the portion of their work and responsibilities that pertain to Core Fundamental Mission Operations, and (ii) the CRO and Mr. LaPierre agree to work cooperatively to ensure that lines of reporting are not confusing or ambiguous, and that that all aspects of the Company's operations are adequately supported.
- The CRO will work closely and cooperatively with the Company's senior executive team and existing retained bankruptcy and non-bankruptcy professionals to render the services described above.
- The CRO shall have access to all Company books, records, data and information as well as all company employees.
- The parties mutually intend that the CRO shall not be liable directly, derivatively, or otherwise for claims or losses arising out of the Core Fundamental Mission Operations or the Management Operations. The Company shall use their best efforts to obtain an order from the Court releasing the CRO from any such potential liability.



**Annex 1**

|  |
| --- |
|  |
|  |
|  |

Annex 1: Current Mission Related Litigation

| DATE FILED | CAUSE # | JURISDICTION | PLAINTIFFS | DEFENDANTS | CASE CAPTION | NATURE OF CASE | STATUS |
|---|---|---|---|---|---|---|---|
| 3/13/2020 | 126014 | Illinois Supreme Court | Guns Save Life, Inc., DPE Services, Inc. d/b/a Maxon Shooter's Supplies and Indoor Range and Marilyn Smolenski | Zahra Ali, solely in her capacity as Director of the Department of Revenue of Cook County, Thomas J. Dart, solely in his capacity as Cook County Sheriff, and the County of Cook, a county in the State of Illinois | Guns Save Lives v. Ali | Challenging Cook County's Firearm and Ammo Violence Tax under the state constitutional right to keep and bear arms. | On appeal |
| 12/3/2019 | 2019-ch-000180 | Sangamon County Court, Illinois | Guns Save Life, Inc. | Kwame Raoul, in His Official Capacity as Attorney General of the State of Illinois; and Brendan Kelly, in His Official Capacity as Acting Director of the Illinois State | Guns Save Lives v. Raoul | Challenging the FOID Act under the Illinois Constitutional right to keep and bear arms. | Pending |
| 9/30/2019 | 451825/2019 (N.Y. Supreme Court) | New York Appellate Division, First Department | People of the State of New York, by Letitia James, Attorney General of the State of New York | Ackerman McQueen, Inc.; and NRA | People of the State of New York v. AMc and The National Rifle Association | Compelling subpoena compliance | On appeal |

Annex 1: Current Mission Related Litigation

| 11/9/2020 | 20-56233 | United States Court of Appeals for the Ninth Circuit | Jonah Martinez, Jason Montes, Weyland-Yutani LLC, DBA Match Grade Gunsmiths, Alan Kushner, The Target Range, Tom Watt, A place to shoot, Second Amendment Foundation, California Gun Rights Foundation, National Rifle Association of America, and Firearms Policy Coalition, Inc. | Alex Villanueva, Sonia Y. Angell, Barbara Ferrer, and County of Los Angeles | Brandy v. Villanueva | The NRA filed suit challenging Los Angeles County's counties listing federal firearms dealers as non-essential business and shutting them down under their COVID-19 Orders under the Second Amendment. | On appeal |
|---|---|---|---|---|---|---|---|
| 5/11/2018 | 1:18-cv-566 | USDC NY-ND | NRA | Andrew Cuomo, both in individually and in his official capacity; Maria T. Vullo, both individually and in her official capacity; and the NY State Department of Financial Services | The National Rifle Association v. Andrew Cuomo | Civil rights action | Pending |
| 8/31/2020 | 20-35827 | United States Court of Appeals for the Ninth Circuit | Daniel Mitchell, Armen Tooloee, Luke Rettmer, Matthew Wald, Nathaniel Casey, National Rifle Association, Robin Ball, Second Amendment Foundation, | Charles Atkins, Craig Meidl, Teresa Berntsen | Daniel Mitchell, et al v. Charles Atkins, et al | The NRA filed suit challenging the ban on semi-auto transfers to 18-20 year-olds under the Second Amendment. | On appeal |

Annex 1: Current Mission Related Litigation

| 11/15/2019 | No. 995966 | Washington Supreme Court | Brett Bass, Swan Seaberg, The Second Amendment Foundation, Inc., and NRA | City of Edmonds, Dave Earling, Mayor of the City of Edmonds, in his official capacity; Edmonds Police Department; and Al Compaan, Chief of Police, in his official capacity | Bass v. Edmonds | The NRA filed suit challenging the city of Edmonds's "safe storage" ordinance under the state preemption statute | On appeal |
|---|---|---|---|---|---|---|---|
| 9/11/2020 | 1753 CD 2019 | Pennsylvania Commonwealth Court | Lawrence Joseph Anderson, Scott Miller, Robert Reinhold Opdyke and Michael A. Whitehouse | City of Pittsburgh, William Peduto, in his official capacity as Mayor of the City of Pittsburgh, and Pittsburgh City Council | Anderson v. City of Pittsburgh | Challenging Pittsburgh's ammunition magazine restriction as preempted under state law. | On appeal |
| 12/12/2018 | 18-2-18114-3 SEA | King County Superior Court WA | Omar Abdul Alim, Michael Thyng, The Second Amendment Foundation, Inc., and NRA | City of Seattle; Jenny Durkan, Mayor of the City of Seattle, in her official capacity; Seattle Police Department, a department of the City of Seattle; and Carmen Best, Chief of Police, in her official capacity, City of Seattle | Alim v. Seattle | The NRA filed suit challenging the city of Seattle's "safe storage" ordinance under the state preemption statute. | Pending |

Annex 1: Current Mission Related Litigation

| 6/2/2020 | 21-15602 | United States Court of Appeals for the Ninth Circuit | Janice Altman, California Association of Federal Firearms Licensees, Inc., California Gun Rights Foundation, Scott Chalmers, City Arms East LLC, City Arms LLC, Cuckoo Collectibles LLC, Dmitri Danilevsky, Greg David, Firearms Policy Coalition, Inc., Ryan Goodrich, Roman Kaplan, National Rifle Association of America, Second Amendment Foundation, Albert Lee Swann and Yan Traytel | Carlos Bolanos, Max Bosel, City of Mountain View, City of Pacifica, City of Pleasant Hill, City of San Jose, Sara H. Cody, County of Contra Costa, County of San Mateo, County of Santa Clara, Chris Farnitano, Edgardo Garcia, Bryan Hill, Sam Liccardo, David Livingston, Scott Morrow, Jeffrey Rosen, Laurie Smith and Daniel Steidle | Janice Altman, et al., v. County of Santa Clara, et al | The NRA filed suit challenging four northern California counties listing federal firearms dealers as non-essential business and shutting them down under their COVID-19 Orders under the Second Amendment | On Appeal |
|---|---|---|---|---|---|---|---|
| 8/6/2020 | 1:20-cv-889 (MAD-TWD) | USDC NY-ND | NRA | Letitia James, both individually and in her official capacity | The National Rifle Association v. Letitia James | Civil rights action | Pending |
| 6/19/2018 | 2020-155 (224-4-18) | Vermont Supreme Court (Wash. County Superior) | Vermont Federation of Sportsmen's Clubs, et al | Matthew Birmingham, et al | Vermont Federation of Sportsmen v. Birmingham | Challenging Vermont's 15-round magazine law under the state constitutional right to keep and bear arms. | On appeal |

Annex 1: Current Mission Related Litigation

| Date Filed | Cause # | Jurisdiction | Plaintiffs | Defendants | Case Caption | Nature of Case | Status |
|---|---|---|---|---|---|---|---|
| 8/6/2020 | 451625/2020 | Supreme Court of the State of New York County of New York | People of the State of New York, by Letitia James, Attorney General of the State of New York | NRA, Wayne LaPierre, Wilson Phillips, John Frazer, and Joshua Powell | People of the State of New York v. The National Rifle Association et al. | Regulatory enforcement | Pending |
| 8/6/2020 | 2020 CA 003454 B | Superior Court for the District of Columbia Civil Division | District of Columbia | NRA; and NRA Foundation, Inc. | District of Columbia v. NRA Foundation and NRA | Regulatory enforcement | Pending |
| 3/9/2018 | 4:18-cv-00137 | United States District Court for the Northern District of Florida | NRA, Radford Fant | Rick Swearingen, Ashley Moody | National Rifle Association of America v. Swearingen, et al | The NRA filed suit challenging Florida's ban on transferring firearms to 19-20 year olds under the Second Amendment. | Pending |
| 12/7/2020 | 126840 | Illinois Supreme Court | Guns Save Life, Inc. and John William Wombacher III | The Village of Deerfield and Harriet Rosenthal, in Her Official Capacity as Mayor of the Village ofDeerfield | Guns Save Life, Inc. v. Village of Deerfield | "Assault Weapon" & 10+ Round Magazine ordinances as preempted by state law. | Pending |
| 1/29/2021 | CL-2021-01569 | Fairfax County Circuit Court | Kimberly LaFave, Glenn Taubman, Robert Holzhauer, and National Rifle Association of America | County of Fairfax, Col Edwin C. Roessler | LaFave v. Fairfax County | The NRA Filed Suit challenging Fairfax County's ban on possessing firearms in parks and other vaguely defined areas | Pending |
| 5/16/2018 | No. 20-843 | Supreme Court of the United States | New York State Rifle & Pistol Association, Robert Nash, Brandon Koch | Kevin Bruen and Richard McNally | NYSRPA v. Bruen | NRA-supported suit challenging New York's restrictive process for issuing carry permits. | On appeal |

Annex 1: Current Mission Related Litigation

| 1/14/2021 | 3:21-cv-00349 | U.S. District Court for the Northern District of California | WILDEARTH GUARDIANS, WESTERN WATERSHEDS PROJECT, CASCADIA WILDLANDS, ENVIRONMENTAL PROTECTION INFORMATION CENTER, KLAMATH FOREST ALLIANCE, KLAMATH-SISKIYOU WILDLANDS CENTER, THE LANDS COUNCIL, and WILDLANDS | DAVID BERNHARDT, the UNITED STATES DEPARTMENT OF THE INTERIOR, the UNITED STATES FISH AND WILDLIFE SERVICE, and AURELIA SKIPWORTH, And Intervenor-Defendant Applicants National Rifle Association of America and Safari Club International | WildEarth Guardians v. Bernhardt | NRA Intervened to defend the U.S. Fish and Wildlife Service's rule delisting the gray wolf from the list of threatened species. | Pending |
|---|---|---|---|---|---|---|---|
| 1/25/2021 | 3:21-cv-00561 | U.S. District Court for the Northern District of California | NATURAL RESOURCES DEFENSE COUNCIL, INC., | UNITED STATES DEPARTMENT OF THE INTERIOR; UNITED STATES FISH AND WILDLIFE SERVICE, Defendants And Intervenor-Defendant Applicants National Rifle Association of America and Safari Club International | NRDC v. Department of the Interior | NRA Intervened to defend the U.S. Fish and Wildlife Service's rule delisting the gray wolf from the list of threatened species. | pending |

Annex 1: Current Mission Related Litigation

| 1/14/2021 | 3:21-cv-00344 | U.S. District Court for the Northern District of California | DEFENDERS OF WILDLIFE, CENTER FOR BIOLOGICAL DIVERSITY, SIERRA CLUB, NATIONAL PARKS CONSERVATION ASSOCIATION, OREGON WILD, and HUMANE SOCIETY OF THE UNITED STATES, | U.S. FISH AND WILDLIFE SERVICE; DAVID BERNHARDT, and U.S. Secretary of the Interior, and Intervenor-Defendant Applicants National Rifle Association of America and Safari Club International | Defenders of Wildlife v. U.S. Fish and Wildlife Service | NRA Intervened to defend the U.S. Fish and Wildlife Service's rule delisting the gray wolf from the list of threatened species. | Pending |
|---|---|---|---|---|---|---|---|
| 12/1/2020 | 1:20-cv-17598 | U.S. District Court for the District of New Jersey | AL-AMEEN I. MAZAHREH, BILLY NUNES DE ALMEIDA, BRIAN SWENSON, NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., and COALITION OF NEW JERSEY FIREARM OWNERS A NEW JERSEY NONPROFIT CORPORATION | GURBIR GREWAL, PATRICK J. CALLAHAN, RICHARD J. MEDER, MARK P. TARANTINO, THOMAS BRYAN, JOSEPH L. REA, ROBERT BRENNAN, and N. PETER CONFORTI, | Mazahreh v. Grewal | NRA filed suit challenging NJ's restrictive process for issuing concealed carry permits. | Pending |

Annex 1: Current Mission Related Litigation

| 5/17/2017 | 19-55376 | U.S. Court of Appeals for the Ninth Circuit | VIRGINIA DUNCAN, RICHARD LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO, CHRISTOPHER WADDELL, and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, | XAVIER BECERRA, in his official capacity as Attorney General of the State of California; and DOES 1-10, | Duncan v. Becerra | NRA-Supported suit challenging California's ban on firearm magazines under the Second Amendment . | On appeal |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 8/17/2016 | 18-55717 | U.S. Court of Appeals for the Ninth Circuit | MICHELLE FLANAGAN, SAMUEL GOLDEN, DOMINIC NARDONE, JACOB PERKIO, and THE CALIFORNIA RIFLE & PISTOL ASSOCIATION, | CALIFORNIA ATTORNEY GENERAL, SHERIFF JAMES McDONNELL, and DOES 1-10, | Flannagan v. Becerra | NRA-supported suit challenging CA's restrictive process for issuing concealed carry permits. | On appeal |
| 5/11/2020 | 3:20-cv-05762 | U.S. District Court for the District of New Jersey | FEDERAL LAW ENFORCEMENT OFFICERS ASSOCIATION, NEW JERSEY FRATERNAL ORDER OF POLICE, RICHARD BOWEN, JOSEPH JAKUBIEC, and CHRISTOPHER MARTINEZ | GURBIR GREWAL and PATRICK J. CALLAHAN | FLEOA v. Grewal | NRA filed an amicus brief in support of several retired federal law enforcement officers asserting their right to carry a firearm under the Law Enforcement Officer's Safety Act | Pending |

Annex 1: Current Mission Related Litigation

| 4/2/2018 | 1D19-2819 | Florida District Court of Appeal 1st Division | STATE OF FLORIDA, GOVERNOR RON DESANTIS, ATTORNEY GENERAL ASHLEY MOODY, and FDLE COMMISSIONER RICHARD L. SWEARINGEN, | CITY OF WESTON, FLORIDA, DAN DALEY, and BROWARD COUNTY | Weston v. Florida | NRA filed an amicus brief in support of the state of Florida in a suit brought by several localities challenging the validity of Florida's firearm preemption statute. | On appeal |
|---|---|---|---|---|---|---|---|
| 9/5/2012 | 3:12-cv-08176 | U.S. District Court for the District of Arizona | CENTER FOR BIOLOGICAL DIVERSITY, SIERRA CLUB, and GRAND CANYON WILDLANDS COUNCIL, | UNITED STATES FOREST SERVICE, and Intervenor Defendants the National Rifle Association of America, Safari Club International, and the National Shooting Sports Foundation | CBD v. USFS | NRA intervened in a lawsuit alleging that hunting with lead ammunition violated the Resource Conservation and Recovery Act | Pending |
| 12/28/2016 | 1:16-cv-03311-ELH | U.S. District Court for the District of Maryland | MARYLAND SHALL ISSUE, INC.ATLANTIC GUNS, INC., ANA SLIVEIRA, DEBORAH KAY MILLER, SUSAN BRANCATO VIZAS, CHRISTINE BUNCH | LAWRENCE HOGAN, and WILLIAM M. PALLOZZI, | MSI v. Hogan | NRA-supported lawsuit challenging Maryland's Handgun Qualification License requirement under the Second Amendment. | pending |
| 6/13/2018 | Cert Petition Filed 4/26/21 | Supreme Court of the United States | ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and ALEXANDER DEMBOWSKI | GURBIR GREWAL, PATRICK J. CALLAHAN, THOMAS WILLIVER, JAMES B. O'CONNOR, | ANJRPC v. Grewal | NRA-Supported lawsuit challenging NJ's restriction on commonly possessed firearms magazines under the Second Amendment | On appeal |

Annex 1: Current Mission Related Litigation

| 6/11/2018 | 20-55437 | U.S. Court of Appeals for the Ninth Circuit | KIM RHODE, GARY BRENNAN, CORY HENRY, EDWARD JOHNSON, SCOTT LINDEMUTH, RICHARD RICKS, DENISE WELVANG, ABLE'S SPORTING, INC., AMDEP HOLDINGS, LLC, d/b/a AMMUNITION DEPOT, R & S FIREARMS, INC., d/b/a SAM's SHOOTERS EMPORIUM, and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED AMDEP HOLDINGS, LLC, d/b/a AMMUNITION DEPOT, R & S FIREARMS, INC., d/b/a SAM's SHOOTERS EMPORIUM, and CALIFORNIA RIFLE & PISTOL ASSOCIATION, | XAVIER BECERRA and DOES 1-10, | Rhode v. Becerra | NRA-supported lawsuit challenging California's restrictive ammunition background check law under the Second Amendment. | On appeal |
|---|---|---|---|---|---|---|---|

| | | | INCORPORATED | | | | |
|---|---|---|---|---|---|---|---|
| 6/12/2012 | 12-17808 | U.S. Court of Appeals for the Ninth Circuit | George K. Young | State of Hawaii, Neil Abercrombie, David M. Louie, County of Hawaii, William Kenoi, Hilo County Police Department, Harry Kubojiri, John Does 1-25, Jane Does 1-25, Corporations 1-5, and Doe Entities 1-5 | Young v. Hawaii | NRA filed amicus brief in support of individual who challenged Hawaii's restrictive carry laws under the Second Amendment | On appeal |
| 7/19/18 | 2018CV30581 | Colorado District Court, Boulder County | Robert Lynn Chambers, James Michael Jones, Colorado State Shooting Association | City of Boulder | Chambers v. City of Boulder | NRA-supported suit challenging the City of Boulder's ban on possession and transfer of certain firearms and ammunition magazines. | On appeal |