## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

```
IN RE:                         )   Case No. 21-30085-hdh11
                               )   (Jointly Administered)
                               )   Chapter 11
                               )
NATIONAL RIFLE ASSOCIATION     )   Courtroom 1
OF AMERICA AND SEA GIRT LLC,   )   1100 Commerce Street
                               )   Dallas, Texas 75242-1496
     Debtors.                  )
                               )   April 29, 2021
                               )   8:01 a.m.
                               )   (MORNING SESSION)
```

TRANSCRIPT OF CONTINUED HEARING RE:  MOTION FOR APPOINTMENT OF
 EXAMINER FILED BY CREDITOR PHILLIP JOURNEY (114);  MOTION TO
DISMISS CASE FILED BY CREDITOR ACKERMAN MCQUEEN, INC. (131);
  MOTION TO DISMISS CASE FILED BY INTERESTED PARTY ATTORNEY
  GENERAL OF THE STATE OF NEW YORK (155); MOTION TO APPOINT
TRUSTEE FILED BY INTERESTED PARTY ATTORNEY GENERAL OF THE STATE
OF NEW YORK (163); MOTION TO APPOINT TRUSTEE FILED BY CREDITOR
 DISTRICT OF COLUMBIA OFFICE OF THE ATTORNEY GENERAL FOR THE
 DISTRICT OF COLUMBIA (214); MOTION TO DISMISS CASE MOTION IN
 SUPPORT OF STATE OF NEW YORK'S MOTION TO DISMISS FILED BY
CREDITOR DISTRICT OF COLUMBIA OFFICE OF THE ATTORNEY GENERAL
            FOR THE DISTRICT OF COLUMBIA (423)
       BEFORE HONORABLE JUDGE HARLIN DeWAYNE HALE
       UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

```
ECRO:                          Shanette D. Green
```

**TRANSCRIPTION SERVICE:**    **TRANSCRIPTS PLUS, INC.**
**435 Riverview Circle**
**New Hope, Pennsylvania 18938**
**Telephone:  215-862-1115**
e-mail CourtTranscripts@aol.com

Proceedings recorded by electronic sound recording, transcript
           produced by transcription service.

2

APPEARANCES VIA WEBEX:

For the Debtors:          Neligan LLP
                          By:  PATRICK J. NELIGAN, JR., ESQ.
                               DOUGLAS J. BUNCHER, ESQ.
                               JOHN D. GAITHER, ESQ.
                          325 N. St. Paul, Suite 3600
                          Dallas, Texas 75201

                          Garman Turner Gordon LLP
                          By:  GREGORY E. GARMAN, ESQ.
                               TALITHA BETH GRAY KOZLOWSKI, ESQ.
                               WILLIAM M. NOALL, ESQ.
                               TERESA M. PILATOWICZ, ESQ.
                               DYLAN THOMAS CICILIANO, ESQ.
                          7251 Amigo Street, Suite 210
                          Las Vegas, Nevada 89119

For the Creditors'        Norton Rose Fulbright US LLP
Committee:                By:  SCOTT DRAKE, ESQ.
                               LAURA SMITH, ESQ.
                               LOUIS R. STRUBECK, JR., ESQ.
                               NICK J. HENRIX, ESQ.
                          2200 Ross Avenue, Suite 3600
                          Dallas, Texas 75201-7932

For Creditor:             Dorsey & Whitney, LLP
Ackerman McQueen, Inc.:   By:  BRIAN MASON, ESQ.
                               JOSEPH ACOSTA, ESQ.
                               MICHAEL GRUBER, ESQ.
                               CHRISTINA CARROLL, ESQ.
                               KELSEY TAYLOR, ESQ.
                          300 Crescent Court
                          Suite 400
                          Dallas, Texas 75201

For Phillip Journey:      Bonds Ellis Eppich Schafer Jones LLP
                          By:  CLAY M. TAYLOR, ESQ.
                               MARCUS JERMAINE WATSON, ESQ
                          420 Throckmorton Street
                          Suite 1000
                          Fort Worth, TX 76102

3

```
APPEARANCES VIA WEBEX:
(Continued)

For the Attorney          Spencer Fane LLP
General of the State      By:  JASON PATRICK KATHMAN, ESQ.
of New York:                   GERRIT M. PRONSKE, ESQ.
                               ERIC M. VAN HORN, ESQ.
                          5700 Granite Parkway
                          Suite 650 Plano, TX 75024

                          Office of the Attorney
                          General-New York
                          By:  JAMES SHEEHAN, ESQ.
                               EMILY STERN, ESQ.
                               STEPHEN THOMPSON, ESQ.
                               MONICA CONNELL, ESQ.
                               YAEL FUCHS, ESQ.
                          28 Liberty Street
                          New York, NY 10005

For the Office of the     Department of Justice
United States Trustee:    Office of The United States Trustee
                          By:  LISA LAMBERT, ESQ.
                          Earle Cabell Federal Building
                          1100 Commerce Street, Room 976
                          Dallas, Texas 75242

                          Office of The United States Trustee
                          By:  MARC SALITORE, ESQ.
                          Bank of America Building
                          110 North College Avenue, Room 300
                          Tyler, Texas 75702

For the District of       Office of Attorney General
Columbia Attorney         for the District of Columbia
General:                  By:  LEONOR MIRANDA, ESQ.
                          400 6th Street N.W., 9th Floor
                          Washington, DC 20001


                               *  *  *
```

<u>INDEX</u>

<u>WITNESSES</u>                                                      <u>PAGE</u>

GREG PLOTTS
 Direct Examination by Ms. Gray Kozlowski              10
 Cross-Examination by Ms. Fuchs                        28
 Cross-Examination by Mr. Acosta                       68
 Redirect Examination by Ms. Gray Kozlowski            85
 Recross-Examination by Ms. Fuchs                      92

WAYNE LAPIERRE
 Direct Examination by Mr. Garman                      95
 Cross-Examination by Mr. Sheehan                      119
 Cross-Examination by Mr. Gruber                       144
 Cross-Examination by Mr. Watson                       148
 Redirect Examination by Mr. Garman                    151

<u>ACKERMAN MCQUEEN EXHIBITS</u>                            <u>ID</u>    <u>EVID</u>

N/A

<u>NYAG's EXHIBITS</u>                                     <u>ID</u>    <u>EVID</u>

8     2019 IRS Form 990                                53     --
10    Aronson engagement letter (10/26/2020)           52     --
12    Management representation letter                 38     39
148   Letter (Aronson to Spray)                        52     --
276   Email (Tedrick to Aronson)                       56     56
327   Compilation of minutes dated 1/11/2020
      NRA report of Audit Committee and
      updated policy                                   44     --
367   Docket Entry 519/Application                     140    --

<u>NRA's EXHIBITS</u>                                      <u>ID</u>    <u>EVID</u>

155   Email (Rowling to Plotts)                        30     30
177   Final Aronson presentation for March, 2020
      Audit Committee meeting                          20     21
189   Aronson proposal to NRA for audit and
      tax services                                     13     14
211   Contract review sheet                            76     78*

*Admitted in evidence to the extent it has not previously been
admitted.

5

1          THE COURT:  Good morning.  This is the Bankruptcy

2   Court in Dallas in the National Rifle Association of America

3   case.

4          I'll call roll first of the folks that are

5   registered, and then we'll take appearances by anyone else.

6          Mr. Pronske, Van Horn, and Kathman?

7          MR. PRONSKE:  We hare here, Your Honor; thank you.

8          THE COURT:  Welcome.

9          And then your cohorts from New York, Mr. Sheehan, Ms.

10  Stern, Ms. Connell, and Mr. Thompson.

11          MR. SHEEHAN:  And Ms. Yael Fuchs, Your Honor.

12          THE COURT:  Welcome.

13          Mr. Mason, and your team.

14          MR. MASON:  Good morning, Your Honor; we are all

15  here.

16          THE COURT:  Welcome.

17          Mr. Neligan, Buncher, and Gaither?

18          MR. BUNCHER:  Your Honor, this is Doug Buncher, and

19  Mr. Neligan is on the telephone line at the moment.

20          THE COURT:  Welcome.

21          MR. BUNCHER:  Good morning.

22          THE COURT:  Mr. Strubeck, Drake, Hendrix, and Ms.

23  Smith?

24          MR. HENDRIX:  Yes, Your Honor.  All on behalf of the

25  Official Committee of Unsecured Creditors; good morning.

6

1          THE COURT:  Good morning to you.

2          Mr. Garman, and your group?

3          MR. GARMAN:  Present, sir.

4          THE COURT:  Welcome.

5          Ms. Miranda from the Attorney General of the District

6   of Columbia.

7          MS. MIRANDA:  Good morning, Your Honor.

8          THE COURT:  Welcome back.

9          I'll take appearances from anyone that didn't

10  register that would like to make an appearance.

11         MR. WATSON:  Good morning, Your Honor.  Jermaine

12  Watson and Clay Taylor on behalf of Judge Journey, at all.  And

13  we're with Bonds Ellis.

14         THE COURT:  Welcome back.

15         MR. SALITORE:  Good morning, Your Honor.  Marc

16  Salitore and Lisa Lambert on behalf of the United States

17  Trustee.

18         THE COURT:  Welcome back to you.

19         MR. SALITORE:  Thank you, sir.

20         THE COURT:  Anyone else wish to make an appearance?

21             (No audible response heard)

22         THE COURT:  Well, we have -- it's -- I remember the

23  last day for the NRA to put on its case in chief, and it has

24  three witnesses.

25         If I could just follow-up, I think Mr. Mason brought

7

1  this up at the end of the last day.  Have you all been talking

2  about time, and that sort of thing, for the closing arguments

3  that are -- I think they're tentatively scheduled to be on

4  Monday.  Mr. Mason, do you want to tell me?

5          MR. MASON:  Your Honor, we did have some preliminary

6  conversations.  I will confess, we have not -- or at least I

7  have not been involved in any subsequent conversations on that

8  fact.

9          What I would suggest is if maybe during the lunch

10 break, if the Court would permit us, I'm happy to try and

11 circle everybody up, and then maybe that's something we could

12 address after lunch.

13         THE COURT:  That certainly works for me.  I'm not

14 pushing it today, but if we could know, I think tomorrow, for

15 sure on what y'all are expecting, and what you're wanting, and

16 then we'll see whether we can make all that work.

17         MR. MASON:  Absolutely.

18         THE COURT:  And second, we have a matter set in this

19 case at 1:30.  I did not see any response filed to it, so I

20 don't know -- Mr. Garman, is the Neligan group going to take

21 that up at 1:30?

22         MR. BUNCHER:  Your Honor, this is Mr. Buncher.  I was

23 planning to handle that, and you are correct that there are no

24 objections filed.  So I don't know if we need to have a

25 hearing, or the Court can just grant the motion on the

1 pleadings.

2        THE COURT:  What I would suggest, unless we hear

3 something contrary after I make this proposal, is that you be

4 here at 1:30, and we'll just go past the noon hour so we can

5 start the afternoon at 1:30, and just make just a very, very

6 short record on this so we'll have a record, and then we can

7 move back into the motions that we're hearing right now.

8        MR. BUNCHER:  Very well; will do, Your Honor.

9        THE COURT:  Okay, all right.

10        Before we start, anything that y'all like call

11 housekeeping that just makes me cringe?

12                    (Laughter)

13        MR. GARMAN:  It's Greg Garman.  I don't think there's

14 much other than we, over the weekend, came to agreement with

15 the Unsecured Creditors' Committee on an expanded scope of the

16 CRO.  I'm sure you'll hear testimony about that today, but I

17 just wanted to make sure that you saw that we filed an amended

18 CRO application sometime late last night.

19        THE COURT:  I saw that it was filed, and I had a

20 chance to scan it, and I appreciate you doing the redline, too,

21 Mr. Garman.  I haven't read it in detail, but --

22        So are you willing to tell the order of your

23 witnesses so we can get our head around what we're looking for

24 today?

25        MR. GARMAN:  Yes, sir.  We previously identified the

 1  order for the other parties:  We're going to be starting today

 2  with Mr. Plotts, who is the auditor with Aronson; and we will

 3  turn to Mr. LaPierre, who I'm expecting to not be an overly

 4  lengthy examination on our part; and then finally, we will have

 5  Mr. Robichaux, our proposed CRO.  The debtor will easily get

 6  that testimony in -- without cross-examination, that will

 7  easily happen within -- in less than a half a day.

 8            THE COURT:  All right.

 9            If everybody could be mindful that we are going to

10  try to finish the NRA's case today, it sounds to me like it's

11  very possible.  So you folks who are doing cross of these three

12  witnesses, remember that that's our goal.

13            And then toward the end of the day, if the movants

14  can let us know whether they intend to call rebuttal witnesses

15  tomorrow, and if so -- excuse me -- if so, time estimates and

16  things like that so we can be thinking in terms of that.

17            One other housekeeping matter:  I've struggled with

18  this rule issue a lot with my law clerks, there's not a lot of

19  law on it, there's not a situation like this that we really

20  have come across, and given that the movants -- or actually the

21  Attorney General for New York asked for the rule to be invoked,

22  I thought the fairest thing, since there is a NRA meeting

23  coming up with -- committee meetings, I think, starting

24  tomorrow is to lift the rule after the debtors' case has

25  concluded, which I think everybody anticipates would be today.

1  So that was my thinking, that's the method behind the madness.

2  I tried to come up with something that I thought would be fair

3  to everybody, so I hope I didn't offend you too much, but

4  that's my thinking on that.

5          Okay, Mr. Garman, you may call your witness.

6          MS. GRAY KOZLOWSKI:  Good morning, Your Honor.

7  Talitha Gray Kozlowski on behalf of the debtors.

8          And we have Mr. Plotts available, Your Honor, to be

9  sworn in.

10         THE COURT:  All right.  Mr. Plotts, would you raise

11 your right hand?

12           GREG PLOTTS, DEBTORS' WITNESS, SWORN

13         THE COURT:  Thank you.  You may proceed.

14         MS. GRAY KOZLOWSKI:  Thank you, Your Honor.

15                      DIRECT EXAMINATION

16 BY MS. GRAY KOZLOWSKI:

17 Q   Good morning, Mr. Plotts.  Can you please introduce

18 yourself to the Court?

19 A   Yes, good morning.  I'm Greg Plotts, I'm a partner with

20 Aronson.  I'm also the lead engagement partner on the NRA's

21 financial statements and tax services.

22 Q   Thank you.  And can you provide the Court with an overview

23 of the services Aronson provides?

24 A   Yeah, Aronson has been in service for over 55 years,

25 providing audit, tax and consulting services to four main

Plotts - Direct/Gray Kozlowski                                11

1  industries:  One is being not-for-profit association, in other

2  words, government contracting; technology services; and

3  construction and real estate.  And I am the partner in the not-

4  for-profit association practice.

5  Q    Thank you.  And can you give an indication of how many

6  clients Aronson has?

7  A    Yeah, Aronson has thousands of clients.  In our not-for-

8  profit practice, we have over 250 not-for-profits that we work

9  with, and produce probably over 170 financial statement audits

10 for not-for-profits.

11 Q    Thank you.  And can you describe your experience and

12 credentials with respect not-for-profits?

13 A    Yes.  I've been in public accounting for 22 years, started

14 out my career in the big four, at PricewaterhouseCoopers, and

15 have been working for not-for-profits for 22 years.

16        I provide assurance, tax and consulting services for

17 not-for-profits.  Consulting services range around enterprise

18 risk management, board governance issues, fraud investigations,

19 internal controls.

20        And I also enjoy speaking at national conferences

21 with association executives.  For example, I've spoken at ASAE

22 at their finance conference, Association Trends, finance

23 conference, (inaudible - weak Internet connection), Society of

24 CPAs, finance conference over board governance matters,

25 financial transactions, and -- and internal controls and fraud

1  investigations.

2  Q    Thank you.  When was Aronson retained by the National

3  Rifle Association?

4  A    We have a signed engagement letter in November of 2019.

5  Q    And what services did Aronson provide to the NRA with

6  respect to 2019?

7  A    We provided financial statement assurance, that's an audit

8  over their financial statements, and tax consulting services.

9  Q    Okay.  And can you describe briefly the process by which

10 Aronson came to be retained?

11 A    Yes, so I received a call from Sonya Rowling in -- I

12 believe it was probably September of 2019, asking -- telling me

13 that they were going out for a request for proposal for audit

14 firms to bid on their audit and tax services for the year 2019,

15 and she wanted to know if I was interested.  And I told them

16 that we would be interested, but we would like a meeting with

17 management to understand the entity before we would put

18 together a proposal.

19      So in October of 2019, we had a meeting -- in-person

20 meeting with Craig Spray, Rick Tedrick, and Sonya Rowling to

21 discuss about current events that were going on at the NRA,

22 internal controls, and any litigation matters or fraud

23 allegation matters at that point.

24      And then we went back internally, and the Board of

25 Directors and the engagement team met to talk about our

Plotts - Direct/Gray Kozlowski                                13

1    questions and answers.  And we decided, based on our risk of

2    the audit, that we could move forward with the proposal.  And

3    we went ahead and put a proposal in with the Audit Committee

4    and management, and went to a proposal meeting in October of

5    2019 to present to the Audit Committee and management.

6    Q    Okay.  And can I have you please turn to Exhibit NRA 189?

7    And once you've located it, could you please describe what this

8    document is?

9    A    Okay, I have located it.  And this is our -- this is our

10   proposal for audit and tax services to the NRA.

11   Q    Okay.  And who prepared this proposal?

12   A    Aronson prepared it, I was very involved in preparing this

13   proposal.

14         MS. FUCHS:  Your Honor; objection.  I don't believe

15   the exhibit is in evidence.

16         MS. GRAY KOZLOWSKI:  Your Honor, I'm laying the

17   foundation to seek to have it admitted.

18         THE COURT:  Overruled.

19   BY MS. GRAY KOZLOWSKI:

20   Q    Mr. Plotts, is the -- is this proposal -- are proposals

21   like this something that's prepared in the ordinary course of

22   Aronson's business?

23   A    It is.

24   Q    And is it regular practice for Aronson to provide

25   proposals to its clients?

Plotts - Direct/Gray Kozlowski                              14

1  A    Yes, it is.  For new clients, yes.

2         MS. GRAY KOZLOWSKI:  Your Honor, I would move to

3  admit Exhibit NRA 189.

4         MS. FUCHS:  Your Honor, I don't believe the

5  foundation has been laid for submission as a business record.

6  We don't know who the custodian of record is.

7         THE COURT:  NRA 189 is --

8         MS. FUCHS:  How this was maintained.

9         THE COURT:  NRA 189 is admitted.

10        (NRA Exhibit 189 admitted into evidence)

11        MS. GRAY KOZLOWSKI:  Thank you, Your Honor.

12 BY MS. GRAY KOZLOWSKI:

13 Q    Mr. Plotts, can you please turn to Page 32, which I

14 believe is the Statement of Independence, if I've got my pages

15 correct?

16 A    Yes, okay.

17 Q    Okay.  Why is this Statement of Independence included

18 within this proposal?

19 A    Well, independence, integrity, and objectivity is the

20 cornerstone for auditors.  So our auditor judgment cannot be

21 swayed or influenced by anyone on the outside, or any one

22 person, so we can give an unbiased and professional opinion

23 over the financial statement audit.

24 Q    Thank you.  And how many audits of not-for-profit entities

25 does Aronson conduct each year?

Plotts - Direct/Gray Kozlowski                          15

1  A    Approximately 170.

2  Q    What -- can you describe the stages of Aronson's audit

3  process?

4  A    Sure.  So the goal of the audit is to express an opinion

5  whether or not the financial statements, in all material

6  respects, are in accordance with the United States generally

7  accepted accounting principles.

8       Now we conduct our audits in accordance to generally

9  accepted auditing standards which requires us to plan and

10 perform the audit around risk of material misstatements.

11      So each -- each client that we have has different

12 risks involved with their organization, so we develop a

13 tailored audit approach for each one of our clients to address

14 those risk of material misstatements.  And we -- we divide it

15 up into four stages:

16      Our audit, we have a planning stage, a preliminary

17 fieldwork stage, a year end fieldwork stage, and then a

18 reporting stage.

19      During our audit, we also use software that helps us

20 with all the data out there in these transactions that helps us

21 sort so we can look at trends analysis, and also we can look at

22 unusual items within our audit.

23 Q    Okay.  And so that -- what are the steps that are taken

24 during the initial planning phase?

25 A    Okay.  So step one is our planning phase.  And this is

Plotts - Direct/Gray Kozlowski                                16

1  where we just gather information from the entity.  We want to

2  know about any unusual transactions that took place, any

3  significant transactions.  We also want to know of any

4  allegations of fraud or if there's been any litigation that has

5  been happening over the past year.

6          So to do that, we meet with management.  We also meet

7  with the audit committee, and we get their views of the risk at

8  the organization, and if they have any concerns that they would

9  specifically like us to review during our audit procedures.  So

10 that's a more fact-gathering and --

11         MR. ACOSTA:  Your Honor, I hate to object, but I'm

12 going to have to object.  This is a narrative.  The witness

13 goes on and on, there's no Q&A involved.

14         THE COURT:  I'll sustain that.

15 BY MS. GRAY KOZLOWSKI:

16 Q   Mr. Plotts, with respect to the next stage, what is --

17 what are the -- briefly the steps that are taken with respect

18 to the next phase, which I believe you said was the fieldwork

19 stage?

20 A   Yeah, fieldwork stage is in two stages, we do preliminary

21 fieldwork and year end fieldwork.  Preliminary is when we do

22 walk throughs of internal controls, key controls, and we test

23 those key controls over major transactions.

24         And then our fieldwork stage is when we do

25 substantive audit procedures, and that is looking at more

1 (inaudible - interruption from telephonic participant)

2 documents and finishing up with our testing of internal

3 controls in order to support our underlying opinion.

4 Q    Thank you.  And then what is the final phase of the audit

5 process?

6 A    The final phase is the reporting phase.  So this is when

7 we report the audit results to management, and the audit

8 committee.

9 Q    Thank you.  And is the process you just described the

10 process that was employed with respect to the NRA's 2019

11 financial statement audit?

12 A    It was.

13 Q    Okay.  And you described a meeting before submitting the

14 proposal with Mr. Spray, Ms. Rowling, and a few other folks.

15 Did that meeting inform or impact the audit procedures that

16 were employed?

17          MR. ACOSTA:  Objection, Your Honor; leading.

18          THE COURT:  Overruled.

19 A    Yes, we --

20 Q    How so?

21 A    Yeah, so when we talk with management, we -- that's how we

22 evaluate risk of material misstatements.  So we get an

23 understanding from management of where any kind of risk would

24 lie within the audit, and then we can tailor our audit

25 procedures around those risks.

Plotts - Direct/Gray Kozlowski                          18

1  Q    Okay.  Did Aronson conduct an audit of the NRA's internal

2  controls?

3  A    No, we did not conduct an audit over the internal

4  controls.

5  Q    But as part of the audit of the NRA's 2019 financial

6  statements, did Aronson examine the NRA's internal controls?

7  A    Yes, in order to plan and perform the audit, we would look

8  at significant internal controls.

9  Q    Okay.  And can you elaborate a little bit on how that

10 actually works from a practical standpoint?

11 A    We look at risk of material misstatement, and we key in on

12 those transactions and account balances.  And then we do walk

13 throughs with management of how things are recorded and

14 approved in the records of the financial statements, and then

15 we would test to make sure they're designed effectively, and

16 then we would test those controls and make sure they are

17 operating effectively.

18 Q    Did Aronson examine, for instance, related party

19 transactions in connection with its audit?

20 A    We did.

21         MR. ACOSTA:  And, Your Honor, leading.

22         THE COURT:  Overruled.

23 A    We did.

24 Q    During the audit process, who did Aronson communicate with

25 at the NRA?

1  A    We communicate directly with the Audit Committee, and had

2  multiple conversations with Charles Cotton and David Coy, the

3  Committee Chair, and David Coy being the Vice Chair of the

4  Audit Committee.  We meet with management and the finance team,

5  which would include Craig Spray, Sonya Rowling, Rick Tedrick,

6  and others throughout the organization, too.

7  Q    Okay.  And how would you describe the working relationship

8  between Aronson and the folks at the NRA that you just

9  identified?

10 A    I thought it was an excellent professional relationship.

11 They were very transparent, they were very timely on the

12 requests that we asked for during the audit.  Everything that

13 we asked for was provided to us.

14 Q    And did you ever have difficulty communicating with

15 anybody at the NRA through the audit process?

16 A    We did not have any problems with communication.

17 Q    Okay.  And you used the word "transparent," can you

18 elaborate on what you meant by that?

19 A    Sure --

20         MS. FUCHS:  Your Honor; vague.

21         THE COURT:  Overruled.

22         You may answer the question, sir.

23 A    Sure, I felt management was transparent.  If I brought up

24 any questions about fraud allegations, they were open to

25 discuss anything that was going on, any litigation matters --

Plotts - Direct/Gray Kozlowski                          20

1         MS. FUCHS:  Your Honor -- Your Honor, I'm sorry to

2  interrupt.  I'm going to object on best evidence rule.  I

3  believe that Mr. Plotts here is testifying as to the audit

4  process, which would be reflected in the work papers, the work

5  papers being the audit trail for the 2019 audit.  And those --

6  that writing is not in evidence.

7         THE COURT:  Overruled.

8         You may complete your answer, sir.

9  A    Sure.  I -- again, I found management transparent on all

10 of our questions that we asked.  And any kind of management --

11 the best practices that we brought forward, they encouraged us

12 -- in fact, they encouraged us to put them all in writing and

13 to share them with the Audit Committee.  So I think that was --

14 showed more transparency on the management side.

15 Q    Thank you.  Can I have you turn to NRA 177, please?  And

16 once you've located the document, can you identify it, please?

17 A    Yes, I've located it, and this is our Audit Committee

18 meeting on March 11, 2020.  This is to talk about the final

19 audit results of our 2019 audit.

20 Q    Okay.  And who prepared this document?

21 A    The Aronson engagement team and I did.

22 Q    Okay.  And who maintains this record -- this presentation?

23 A    Well, we give that to management and the Audit Committee.

24 Q    Okay.  And does Aronson retain a copy of it?

25 A    Yes, we do.

Plotts - Direct/Gray Kozlowski                               21

1  Q    And is it created in the ordinary course of Aronson's

2  audit procedures?

3  A    Yes, it is.

4  Q    And is it regular practice to prepare a presentation to

5  the Audit Committee in connection with an audit?

6  A    Yes, it is.

7        MS. GRAY KOZLOWSKI:  Your Honor, I would move to

8  admit Exhibit NRA 177.

9        MS. FUCHS:  No objection, Your Honor.

10       THE COURT:  NRA 177 is in.

11          (NRA Exhibit 177 admitted into evidence)

12 BY MS. GRAY KOZLOWSKI:

13 Q    And when was the presentation made to the Audit Committee

14 with respect to the financials?

15 A    This was made on March 11th, 2020.

16 Q    Okay.  And was only the Audit Committee present, or were

17 there other people present at the presentation?

18 A    There were others, management was present also.  For

19 example, Craig Spray, Rick Tedrick, Sonya Rowling were present

20 at the meeting also.

21 Q    Okay.  And what was the conclusion of Aronson's audit of

22 the NRA's 2019 financial statements?

23 A    We -- we expressed an unqualified opinion on the financial

24 statements, that they're in accordance with all material

25 respects in accordance with U.S. generally accepted accounting

1  principles, which would mean a clean opinion.

2  Q    Thank you.  Those of us with anthropology backgrounds

3  appreciate the breakdown.

4        Can I have you turn to NYAG 22, please?  And once

5  you've located it, can you please identify the document?

6  A    All right, NYAG 22 is our management letter to the

7  National Rifle Association.

8  Q    Okay.  And what is the purpose of a management letter?

9  A    This is to identify any control deficiencies that we

10  recognize during the audit to bring them forward to the Audit

11  Committee in writing if they are significant enough.

12  Q    Okay.  And is it standard practice for Aronson to issue a

13  management letter when conducting an audit?

14  A    It is.

15  Q    Okay.  And the management letter refers to material

16  weakness and significant deficiency, can you explain the

17  difference?

18  A    Sure.  So stepping back:  For a control deficiency to be

19  in place, if they exist, when design or operation of a control

20  does not prevent or detect incorrect on a timely basis a

21  misstatement.  So now a material weakness is one of those

22  controls, or a combination of those controls, that it is

23  reasonably possible to cause a material misstatement in the

24  financial statements.

25        Now a significant deficiency is less severe than a

Plotts - Direct/Gray Kozlowski                                        23

1 material weakness.  But in the auditor's judgment, it's

2 important to merit the attention of the Audit Committee, so we

3 put those in writing, and talk through during our Audit

4 Committee presentation.

5 Q    Thank you.  Did Aronson identify any material weaknesses

6 in the NRA's internal controls?

7 A    We did not.

8 Q    Okay.  Is it -- is it common for Aronson to identify

9 control deficiencies in connection with its audit of not-for-

10 profits?

11 A    Yes, it is common that we do find control deficiencies in

12 not-for-profit audits.

13 Q    Okay.  And did Aronson identify any significant deficiency

14 in the internal controls?

15 A    We did; we identified three.

16 Q    Okay.  And once those were identified, can you explain the

17 process for sharing those with management and the Audit

18 Committee?

19 A    Sure.  When we go through the audit process, we start to

20 identify control deficiencies, and then we bring them to

21 management to make sure we have all our facts and circumstances

22 correct, and then we share our letter -- our draft letter with

23 management to make sure they agree with all the facts, that we

24 have them all correct.  And then we turn around and put those

25 in final writing, and share them with the Audit Committee.

Plotts - Direct/Gray Kozlowski                    24

1  Q    Okay.  And what was the NRA's management's response to the

2  three identified deficiencies?

3          MS. FUCHS  Objection, Your Honor; hearsay.  Or asking

4  for hearsay.

5          MS. GRAY KOZLOWSKI:  Your Honor, if I may, NYAG 22,

6  which has been admitted into evidence, includes management's

7  response.  I'm certainly happy to rephrase it as to what his

8  understanding is, though, if that's -- if that is preferred.

9          THE COURT:  I'm going to overrule that.

10          You may answer the question, sir.

11 A    For management's response to our significant deficiencies

12 where they agreed with our deficiencies, and they appreciated

13 our control comments and best practices, including the

14 significant deficiencies, and that they were going to respond

15 to try to put controls in place to address these significant

16 deficiencies in the future.

17 Q    Okay.

18          MS. FUCHS:  Your Honor, I'm actually not sure that

19 Exhibit 22 is in evidence, to the extent that it's not, I would

20 like to lodge a hearsay objection.

21          THE COURT:  Okay.  I keep mine in a rolling number.

22 Let's see if we can tell whether it --

23          (The Court engaged in off-the-record colloquy)

24          MS. FUCHS:  And I apologize, Your Honor.

25          THE COURT:  It's okay

1                              (Pause)

2                  MS. FUCHS:  I'm being informed my colleagues that it

3    is; I withdraw the objection.

4                  THE COURT:  Okay; thank you.

5                  I keep mine just as they're admitted, and then the

6    court reporter keeps it a little more organized.  Thank you

7    very much.

8                  You may proceed.

9                  MS. GRAY KOZLOWSKI:  Thank you, Your Honor.

10   BY MS. GRAY KOZLOWSKI:

11   Q    Mr. Plotts, I apologize if I'm retreading, but it got a

12   little disjointed there.  Is it your understanding that the NRA

13   was going to address the deficiencies that were identified?

14   A    Yes, they were going to address them.

15   Q    Okay.  And who were you -- who did you address these

16   deficiencies to?

17   A    To management and the Audit Committee.

18   Q    Okay.  And, again, for clarity, what was the outcome of

19   the audit of the NRA's 2019 financial statements?

20   A    Again, we expressed an unqualified audit opinion that they

21   were in all material respects in accordance with U.S. generally

22   accepted accounting principles.

23   Q    Thank you.  And you indicated that you provided additional

24   assistance with respect to the NRA's taxes.  What were you

25   referring to there?

Plotts - Direct/Gray Kozlowski                                    26

1  A    Yes, so we did review and consulting services for the tax

2  services over their 990.

3  Q    Okay.  And what is a Form 990?

4  A    990 is an IRS form, that's an informational form that is

5  filed by not-for-profits on an annual basis.

6  Q    Okay.  Did Aronson sign the NRA's 2019 990?

7  A    No.

8  Q    Why not?

9  A    We were not engaged to prepare the 990; we were engaged to

10 review and consult the 990.

11 Q    And do you believe it's prudent for not-for-profits to

12 obtain advice with respect to their Form 990s?

13 A    Absolutely.

14 Q    Why?

15 A    990 is a very complex document, it's become more of a

16 informational document over the years and a legal document.  So

17 it's very complex, they have many schedules and many parts to

18 those schedules inside the document.

19 Q    How would you describe the working relationship between

20 Aronson and the NRA with respect to the Form 990?

21 A    I think it was a good, extensive relationship.  It was

22 very informational.  They prepared the 990 and asked us

23 questions on the rulings of the IRS, some more information on

24 how the IRS looks at certain things on the 990, and asked our

25 advice on how to disclose things on the 990 based on their

Plotts - Direct/Gray Kozlowski                                    27

1   facts and circumstances.

2   Q    Okay.  How extensive was the advice provided by Aronson

3   with respect to the 990?

4   A    I believe it was pretty extensive.  There was quite a few

5   questions on the 990 that we helped them with.

6   Q    Okay.  And are you familiar with Schedule L of the Form

7   990?

8   A    I am familiar with it.

9   Q    And what is that document?

10  A    Well, it's titled Transactions With Interested Persons.

11  Q    And what was Aronson's involvement with respect to

12  Schedule L?

13  A    We helped with the disclosure on -- and the writing of,

14  you know, all the commentary.  We gave our advice on that.

15  Q    Okay.  And did Aronson do the actual calculations?

16  A    We did not do any calculations.

17  Q    Okay.  And in your experience, would you expect tax

18  counsel to be involved in the calculation of excess benefit

19  transactions?

20  A    Yes, we do --

21          MS. FUCHS:  Objection; leading.

22          THE COURT:  Overruled.

23  A    Yes, we do.  We have that advice to anyone that needs to

24  fill out a Schedule L to get tax attorney assistance.

25  Q    And why do you provide that advice?

Plotts - Direct/Gray Kozlowski                                    28

1  A    Because Schedule L can be very complex and a lot of

2  calculations that go into it, so I would suggest getting a tax

3  attorney to help you with that.

4  Q    Okay.  And, Mr. Plotts, on the question, is Aronson -- or

5  has Aronson provided -- been independent with respect to the

6  services it's provided to the NRA?

7  A    We have.

8         MS. GRAY KOZLOWSKI:  Your Honor, with that, I would

9  pass the witness.

10        THE COURT:  Thank you.

11        NYAG gets to go next.

12        MS. FUCHS:  Thank you, Your Honor.

13                      CROSS-EXAMINATION

14  BY MS. FUCHS:

15  Q    Mr. Plotts, good morning.

16  A    Good morning.

17  Q    My name is Yael Fuchs, I am an Assistant Attorney General

18  with the New York Attorney General's Office, and I'll be asking

19  you some questions today.

20        You testified as to the process of Aronson becoming

21  engaged to offer services to the NRA.  Had you -- before Ms.

22  Rowling contacted you, were you familiar with her?

23  A    I was.

24  Q    How did you know Ms. Rowling?

25  A    I knew her when I worked at PricewaterhouseCoopers back in

Plotts - Cross/Fuchs                                           29

1  1999 to 2004.  I worked on the NRA audit at that point, so I

2  knew her from there.

3           And then also, there's networking events that not-

4  for-profits go to, and I saw her again there at a networking

5  event.

6  Q    And you testified that -- I'm sorry, I don't have the real

7  time testimony so I'm going to paraphrase, so if I get it

8  wrong, just let me know.  I believe that you testified that

9  there was a committee at Aronson that had to approve the taking

10 on the NRA as a client, is that correct?

11 A    That is correct, yes.

12 Q    And is that a quality control committee?

13 A    Yes, that is.

14 Q    And is it accurate that they took one day between the time

15 that Ms. Rowling called you to suggest that Aronson provide a

16 response to the RFP, it was one day later that they okay'd the

17 NRA?

18 A    No, that is not correct.

19 Q    Was it the next day that they okay'd Aronson to

20 participate in the RFP process?

21 A    No, that's not.

22 Q    If you could pull up NRA 155, please.

23 A    NRA 155?

24 Q    Yes, please.

25                              (Pause)

Plotts - Cross/Fuchs                    30

1          MS. FUCHS:  And I move that NRA 155 be admitted into

2   evidence.

3          MS. GRAY KOZLOWSKI:  No objection, Your Honor.

4          THE COURT:  NRA 155 is in.

5          (NRA Exhibit 155 admitted into evidence)

6   BY MS. FUCHS:

7   Q    So if you scroll down to the bottom of the email, please,

8   Mr. Plotts, I believe it shows that on October 10th, 2019, Ms.

9   Rowling contacted you.

10  A    (No verbal response).

11  Q    Do you see that?

12  A    October 10th, all the way down, okay, yes.  I do see that,

13  October 10th.

14  Q    Yes.  And she asks you if Aronson would be interested in

15  bidding.  And then if you scroll up, you can see that you reply

16  that same day that you would be interested in bidding, do you

17  see that?

18  A    Yes.

19  Q    And so was that a decision that you had authority to make

20  on your own?

21  A    I had counsel.

22  Q    "Counsel" meaning a lawyer?

23  A    No, talking with others in Aronson.

24  Q    Got it.  And then on Friday, if you scroll up, it shows

25  that on Friday, October 11th, you state that you had discussed

1  internally with the Board.  And is that the Board of Aronson?

2  A    Yes, it would be.

3  Q    And QC, is that quality control?

4  A    That is, yes.

5  Q    And the acceptance process had passed the first stage.  So

6  that's actually what I was referring to, is it accurate that

7  the next -- that it took one day for the Board and QC to

8  approve -- to go through this first stage of the acceptance

9  process.

10  A    To have a meeting with NRA management to talk about the

11  RFP process.

12  Q    Got it.

13  A    Yeah, that would --

14  Q    And --

15  A    Yes.

16  Q    And you testified that the meeting with management was

17  with Mr. Spray, Ms. Rowling, and Mr. Tedrick, is that correct?

18  A    To the best of my recollection, I believe all three of

19  them were there at the meeting.

20  Q    Did you meet with Mr. LaPierre at that time?

21  A    We did not.

22  Q    And were you aware that -- you were aware the RSM was the

23  NRA's previous auditors, correct?

24  A    Yes.  Yeah.

25  Q    And were you aware that RSM fired the NRA as a client?

1  A    I do not know that to be true.

2  Q    As part of the transition from RSM, did you ask to review

3  work papers from RSM?

4  A    Yes.

5  Q    And did you receive those work papers?

6  A    We did.

7  Q    And those were the work papers for their audit for 2018?

8  A    They were selected work papers from 2018, what they gave

9  us.

10  Q    Not the full audit file from 2018?

11  A    No.

12  Q    Did you request the full audit file?

13  A    We requested audit work papers for 2018 to help us in

14  order to audit --

15  Q    My question was whether you requested the full audit file.

16  A    We requested the audit file.

17  Q    You didn't specify that you only wanted parts of the audit

18  file, correct?

19  A    That's correct.

20  Q    But they only gave you parts.

21  A    They gave us selective work papers, correct?

22  Q    And did you have a conversation with RSM about the

23  circumstances of them ending their engagement with the NRA?

24  A    Yes.

25  Q    And they didn't tell you that they, in fact, fired the

Plotts - Cross/Fuchs                                    33

1  NRA?

2  A    They did not.

3  Q    Did they tell you anything to be on the lookout for?

4  A    The only -- yes, they did.

5  Q    What did they tell you?

6           MS. GRAY KOZLOWSKI:  Your Honor, objection; hearsay.

7           THE COURT:  Response on hearsay?

8           MS. FUCHS:  I'll rephrase, Your Honor.

9  BY MS. FUCHS:

10 Q    Did you design any specific audit procedures based on what

11 RSM told you?

12 A    Yes.

13 Q    What were those?

14 A    Specific audit procedures around expense reports.

15 Q    Anything else?

16 A    Not based on what RSM told us, yes, that was it.

17 Q    Do you recall any findings from RSM regarding a lack of

18 compliance with the NRA's $100,000 procurement policy?

19 A    Do not recall that.

20 Q    Do you recall reviewing an RSM work paper regarding

21 noncompliance with the NRA's $100,000 procurement policy?

22 A    I do not recall that.

23           MS. FUCHS:  Mr. Thompson, if you could please share

24 on the screen the document in Plotts exhibit file bearing Bates

25 Number RSM-NYAG 37790.

Plotts - Cross/Fuchs                                    34

1        MS. GRAY KOZLOWSKI:  Your Honor, I'm going to object

2   to utilizing this document.  Mr. Plotts testified that he did

3   not receive the entire audit file, nor has there been any

4   foundation established that he's actually seen this document.

5        THE COURT:  I think he can be asked that question;

6   we'll carry that for now.

7        You can continue your examination, Ms. Fuchs.

8        MS. FUCHS:  Thank you, Your Honor.

9   BY MS. FUCHS:

10  Q    Mr. Plotts, do you recall seeing this RSM work paper?

11  A    I do not recall seeing this.

12  Q    Okay.

13       MS. FUCHS:  Mr. Thompson, could you scroll down,

14  please, to the testing section?  Thank you.  And if there is a

15  way to just help us view that entire chart.

16                          (Pause)

17       MS. FUCHS:  Bear with us just a minute, and I'll be

18  very fast on this.

19  Q    So are you familiar with the -- are you familiar with the

20  NRA's $100,000 procurement policy?

21  A    I'm -- yes.

22  Q    What do you understand that policy to require?

23  A    I'd have to get their policy to repeat it.

24  Q    So sitting here today, you don't recall?

25  A    No, I could not quote their $100,000 policy.

Plotts - Cross/Fuchs                                    35

1  Q    Do you recall that it requires a business case analysis?

2  A    I believe that is correct, but I would -- I would need to

3  see the actual policy --

4  Q    Okay.

5  A    -- to be sure of that.

6  Q    So this spreadsheet, does it refresh your recollection as

7  to the fact that there were numerous -- if you look at the

8  column with Roman Numeral 1, that there were numerous -- that

9  RSM found numerous contracts that did not have a business case

10 analysis?

11         MS. GRAY KOZLOWSKI:  Your Honor, the witness has

12 already testified several times that he is not familiar with

13 this document.

14         THE COURT:  I'm going to sustain that.

15         MS. FUCHS:  Okay.

16         Mr. Thompson, you can take that down.

17                        (Pause)

18 BY MS. FUCHS:

19 Q    Has RSM conducted any testing regarding the NRA's

20 compliance with its $100,000 procurement policy?

21 A    I --

22 Q    Maybe I misspoke; I'm sorry.  My question was has Aronson

23 done that testing?

24 A    Oh.  That was not one of our specific procedures.

25 Q    Okay.  So is that a no?

Plotts - Cross/Fuchs                                        36

1  A    No.  No.

2  Q    I'd like to turn to Aronson's audit for 2019.  I believe

3  that you testified that you did not audit internal controls,

4  correct?

5  A    That is correct.

6  Q    But you examined internal controls, and is it correct that

7  based on significant risks, is that correct?

8  A    That's correct, yes.

9  Q    And that's informed by the materiality calculation, is

10 that correct?

11 A    One of the pieces, that's correct.

12 Q    And do you recall what the materiality threshold is for

13 the NRA?

14 A    Materiality is quantitative and qualitative, but

15 quantitatively it's approximately three to four million

16 dollars.

17 Q    So -- and just to clarify for all of us non-accountants,

18 non-auditors what that means, does that mean that if there is a

19 misstatement that is under the materiality threshold, then you

20 don't necessarily test for such a possible misstatement, is

21 that correct?

22 A    We look at any misstatement that we'd find, and we look at

23 it individually.  And then we collect all misstatements on a

24 schedule, and then look at them aggregately to see if they

25 would materially misstate the financial statements, both

Plotts - Cross/Fuchs                                        37

1  quantitatively or qualitative.

2  Q    And that quantitative materiality threshold, you said is

3  three to four million dollars, correct?

4  A    That's correct.

5  Q    So if you identified misstatements under that threshold,

6  it wouldn't necessarily make it into a management letter, is

7  that correct?

8  A    Typically misstatements would make it into the management

9  letter because the reason a misstatement happens is because

10  there's a control deficiency, but not all the time.  So --

11  Q    Sir, I'm just going to ask you to answer my question, and

12  maybe it wasn't a good question.  So I'm -- I'll circle back

13  around to it.

14        So you testified that the audit opinion for 2019 was

15  an unmodified opinion, correct?

16  A    That's correct.

17  Q    And that means that the financial statements are free from

18  material misstatements, correct?

19  A    Correct.

20  Q    And when you provide an unmodified audit opinion, you are

21  not expressing an opinion on the effectiveness of the entity's

22  internal controls, is that correct?

23  A    Correct.

24  Q    And, in fact, that is reflected very explicitly in your

25  engagement letters, correct?

Plotts - Cross/Fuchs                                      38

1  A    Correct.

2  Q    And that is also expressed very clearly in your audit

3  opinions, correct?

4  A    Correct.

5  Q    And so your audit opinion stated that you express no

6  opinion on the effectiveness of the entity's internal control,

7  is that correct?

8  A    Correct.

9  Q    And your management letter also stated that, is that

10 correct?

11 A    That is correct.

12 Q    And, in fact, the management letter stated explicitly that

13 there -- that material weaknesses or significant deficiencies

14 may exist that were not identified, is that correct?

15 A    Yes, correct.

16 Q    Please turn to NYAG Exhibit 12, and you'll see that this

17 is the management representation letter from the NRA to

18 Aronson, correct?

19 A    Yes, I have it in front of me, and it's correct.

20 Q    So at the end of any audit, an audit firm requires a

21 management representation letter, is that correct?

22 A    Correct.

23 Q    And can you describe what is the purpose of a management

24 representation letter?

25 A    It's management's representation that they gave us all the

Plotts - Cross/Fuchs                                    39

1  records, and told us everything that they knew that could

2  effect the financial statements in our audit.  They represent

3  that to the auditors, and they sign the letter.

4  Q    And if you'll look at -- if you scroll down to the

5  signature section --

6  A    Yes.

7  Q    -- Mr. LaPierre didn't sign the management representation

8  letter, correct?

9  A    That's correct.

10          MS. FUCHS:  And, Your Honor, I apologize, I thought

11 that NYAG Exhibit 12 had been admitted, but I'm being told that

12 it's not, so I would move for its admission.

13          MS. GRAY KOZLOWSKI:  No objection, Your Honor.

14          THE COURT:  NYAG 12 is in.

15          (NYAG's Exhibit 12 admitted into evidence)

16          MS. FUCHS:  Thank you.

17 BY MS. FUCHS:

18 Q    Do you have any other -- do you have any other 501(c)(4)

19 clients -- audit clients?

20 A    Yes.

21 Q    Do you have any other 501(c)(4) clients where the CEO

22 doesn't sign the management representation letter?

23 A    I -- I would say yes, but I would have to go back and

24 check the files.

25 Q    Sitting here today, do you know of any?

Plotts - Cross/Fuchs                                    40

1  A    Off the top of my head, we care about the CFO signing the

2  engagement letter --

3  Q    My question to you is whether or not, sitting here today,

4  you know of any 501(c)(4) clients where the CEO didn't sign the

5  management representation letter?

6  A    I could -- I cannot sit here today and recall that.

7  Q    Are you aware that Mr. LaPierre also didn't sign the RSM

8  management representation letters?

9  A    I was not aware.

10 Q    Were you aware that RSM considered Mr. LaPierre not to be

11 involved in the NRA's financial operations?

12        MS. GRAY KOZLOWSKI:  Your Honor, objection; calls for

13 speculation.

14        THE COURT:  The question was just --

15        MS. FUCHS:  I'm just asking if he's aware of that.

16        THE COURT:  The question was whether he was aware;

17 overruled.

18        You may answer the question, sir.

19        THE WITNESS:  Can you repeat the question again?

20 BY MS. FUCHS:

21 Q    Are you aware that RSM did not consider Mr. LaPierre to be

22 involved in the organization's and the NRA's financial

23 operations?

24 A    I did not know that to be true.

25 Q    RSM -- you never -- RSM never communicated to you that

Plotts - Cross/Fuchs                                    41

1  they didn't have Mr. LaPierre sign the management

2  representation letter because they considered him not to be

3  involved in the NRA's financials?

4  A    Not to my recollection.

5  Q    Okay.

6         MS. FUCHS:  Mr. Thompson, could you please share for

7  us -- give me just one second -- the document bearing Bates

8  number RSM NYAG 37793?

9  BY MS. FUCHS:

10 Q    Do you recall ever seeing this document?

11 A    I don't know what this document is, so -- is this an RSM

12 document?

13 Q    This is a document from the RSM 2018 work papers, I'll

14 represent to you.

15 A    I do not recall seeing this.

16 Q    Okay.  You don't think you received this?

17 A    I don't recall.

18 Q    Okay.  And so you don't recall RSM communicating one way

19 or another that Wayne, as it said, is not involved in financial

20 reporting/litigation matters, correct?

21 A    I do not recall.

22 Q    Okay.

23         MS. FUCHS:  You can take that down.

24 Q    Were you aware that RSM never interviewed Mr. LaPierre as

25 part of their audit?

Plotts - Cross/Fuchs                                          42

1  A    I don't know that to be true.

2  Q    You don't know one way or the other?

3  A    I do not, no.

4  Q    Did you ever ask the RSM auditors about that fact?

5  A    Not to my recollection.

6  Q    Okay.  Are you aware that Mr. LaPierre signed the 2019 990

7  on behalf of the NRA?

8  A    I am aware that he signed the 990, yes.

9  Q    And as you testified, that's a complex document, is that

10 correct?

11 A    Correct.

12 Q    And that would require some understanding of the

13 organization's financial operations in order to be able to

14 attest to its truthfulness.

15 A    Correct.

16 Q    Okay.  You testified that you looked into related party

17 transactions in connection with your 2019 audit, correct?

18 A    Correct.

19 Q    And related party transactions, do you -- what are you

20 referring to when you say "related party transactions"?

21 A    Related party transactions could be between entities, like

22 the NRA Foundation and the NRA (c)(4).  It also could mean

23 those at a -- on the Board, transactions with those on the

24 Board or interested parties are related party transactions,

25 too.

Plotts - Cross/Fuchs                     43

1  Q    And there's supposed to be a related party transaction
2  note in the audited financials, is that correct?
3  A    If the material related party transactions happen, there's
4  none, no.
5  Q    And there are no transactions between the NRA and insiders
6  disclosed in the NRA's 2019 audited financials, is that
7  correct?
8  A    Correct.
9  Q    Is that because Aronson didn't consider any of them to be
10 material?
11 A    These are management's financial statements, so no
12 material transactions were recorded that we would -- that we
13 were aware of that needed to be in the financial statements,
14 that's correct.
15 Q    Did you test whether or not that was an accurate
16 representation?
17 A    We did.
18 Q    Did you receive a list of all of the related party
19 transactions for 2019?
20 A    We did.
21 Q    And did you get information about a ratification about a
22 related party transaction?
23 A    We did.
24 Q    Did you get Audit Committee meeting minutes?
25 A    We did.

Plotts - Cross/Fuchs                                    44

1  Q    If you could please turn to NYAG Exhibit 327.  These are

2  minutes, and at the top, it indicated January 11th, 2020.  But,

3  in fact, it's a compilation, so I'll try to direct your

4  attention accordingly.

5        The first --

6  A    I'm sorry, can I -- I'm sorry, what number was it again?

7  NYAG 27, did you say?

8  Q    I'm sorry, it's 327.

9  A    Oh, 327, okay.  Okay, I'm there.

10 Q    Okay.  So the first set of minutes reflected here is from

11 November 20th, 2019, do you see that?

12 A    (No verbal response).

13 Q    Do you see that?  I just want to make sure we're all on

14 the same page.

15 A    Please repeat that again.

16 Q    Sure.  I'm on the first page, and it is -- it says January

17 11th, 2020, and then the minutes reflects -- the text reflects

18 that the Audit Committee met in person on November 20th, 2019,

19 do you see that?

20 A    I do see that.

21 Q    And it doesn't reflect that you are present for that

22 meeting, do you see that?

23 A    I do see that.

24 Q    So your audit engagement letter was signed October, 2019,

25 correct?

                        Plotts - Cross/Fuchs                        45

1   A     Incorrect.  I believe it was November.

2   Q     Okay.

3   A     Yeah.

4   Q     I'll take a look at that.  So if you scroll down, I just

5   want to draw your attention to -- I'm sorry, let me back up.

6   Have you seen these minutes before?

7   A     We have.  Yes, we have seen these minutes.

8   Q     You received them as part of your audit process?

9   A     Yes.

10  Q     And so I direct your attention to the second page where

11  there is a resolution approving and ratifying the transactions

12  between Barrett Firearms and the NRA Foundation, do you see

13  that?

14  A     I do.

15  Q     And it indicates that at various times since 2012 -- so

16  for seven years prior to this -- Barrett Firearms offered the

17  NRA Foundation the opportunity to buy these rifles at prices

18  favorable to the Foundation, do you see that?

19  A     I do.

20  Q     And it indicates that Ronnie Barrett, the founder and CEO

21  of Barrett Firearms, is an NRA director, do you see that?

22  A     I do.

23  Q     So did you review any documents relating to purchases from

24  Barrett Firearms Manufacturing by the NRA or the NRA

25  Foundation?

Plotts - Cross/Fuchs                                              46

1  A     I don't recall.

2  Q     Okay.  And did you -- backing up.  Are you familiar with

3  New York not-for-profit law Section 715?

4  A     We were not engaged to do our testing --

5  Q     My question was -- my question was just whether you're

6  familiar with it?

7  A     I'm not familiar with that one.

8  Q     So are you familiar with the requirements for approval of

9  related party transactions under New York law?

10 A     No.

11 Q     So you weren't able to test any of --

12        MS. FUCHS:  Strike that.

13 Q     If you scroll down the second transaction is the Remington

14 Outdoor Company, do you see that?

15 A     Yes, I do.

16 Q     And here it indicates that that from 2011 to 2018, Mr.

17 Kollitides -- I apologize if I'm mispronouncing that name --

18 served as a Trustee of the NRA Foundation, do you see that?

19 A     Yes.

20 Q     And during part of that time period, he served as Chair

21 and CEO of the Remington Outdoor Company, do you see that?

22 A     I do.

23 Q     And then it describes that there were also transactions

24 between the NRA Foundation and the Remington Outdoor Company,

25 correct?

Plotts - Cross/Fuchs                                    47

1  A    Correct.

2  Q    And sitting here today, do you know if Aronson reviewed

3  any documentation relating to purchases from the Remington

4  Outdoor Company?

5  A    I do not recall.

6  Q    Okay.  You don't know how -- the extent of the purchase,

7  correct?

8  A    From my recollection, I do not.

9  Q    If you scroll down, is it correct that you also didn't

10 review any documentation regarding transactions between Sturm

11 Ruger & Company, and the NRA Foundation?

12 A    That is correct.

13 Q    Okay.  And then the next set of Audit Committee meeting

14 minutes is from January 9th, 2020, do you see that?

15 A    (No verbal response).

16 Q    And I'm sorry, that's reflected on Page 3 of the PDF.

17 A    Page 3 of the --

18                         (Pause)

19 A    I'm sorry, what am I looking for again on Page 3?

20 Q    On Page 3, the paragraph where it indicates that the Audit

21 Committee met in person on January 20th, 2020.

22 A    (No verbal response).

23 Q    I'm sorry, January 9th, 2020.

24 A    Okay, I do see that.

25 Q    Okay.  And by this point, Aronson would have been engaged,

Plotts - Cross/Fuchs                                    48

1  correct?

2  A    Correct.

3  Q    And the minutes indicate that you made a presentation at

4  that Audit Committee meeting, is that correct?

5  A    That is correct.

6  Q    So you were present at the Audit Committee meeting?

7  A    That's correct.

8  Q    Were you present when any related party transactions were

9  discussed?

10  A    Not to my recollection.

11  Q    Okay.  Well, you can put that aside.  Did you examine

12  whether the NRA was compliant with its conflict of interest

13  policy?

14  A    I'm sorry; could you repeat that question?

15  Q    As part of your audit, did Aronson examine whether the NRA

16  was compliant with its conflict of interest policy?

17  A    Yes.

18  Q    As part of its audit, did Aronson identify whether any

19  officers or directors had not submitted the disclosures

20  required under the conflict of interest policy?

21  A    No.

22  Q    So were you aware that Mr. LaPierre did not submit his

23  disclosure under the conflict of interest policy until the day

24  of his testimony in this trial?

25  A    I was not aware.

Plotts - Cross/Fuchs                                           49

1  Q    Are you aware that the NRA has no chief compliance

2  officer?

3  A    I -- I don't know that to be true.

4  Q    You don't know one way or the other?

5  A    It's not a -- I'm not aware of one.

6  Q    Okay.  Are you aware that it has no internal audit

7  function?

8  A    I am aware that they do not have a designated audit --

9  internal audit function.

10 Q    Okay.  If you'll turn, please, to NYAG Exhibit 22, that's

11 the management letter you were looking at.

12 A    Yes, I have it.

13 Q    Thank you.  Now you testified that you identified in this

14 management letter three significant deficiencies, is that

15 correct?

16 A    Correct.

17 Q    And the deficiency expense reporting, was that actually

18 provided to you by Craig Spray?

19 A    Could you repeat that question?

20 Q    Sure, and I'll try to rephrase it.  So Mr. Spray testified

21 that he actually self-reported those issues to Aronson so that

22 it could be included in the management letter, do you agree

23 with that?

24 A    Craig Spray was transparent on an expense report that was

25 not in compliance, yes.

1           MS. FUCHS:  I move to strike as non-responsive.

2           THE COURT:  Sustained.

3   BY MS. FUCHS:

4   Q    So my question was whether it's true that Craig Spray

5   self-reported to you the instances of noncompliant with credit

6   card and expense-reporting policies, specifically so that you

7   could include it in the management letter?

8   A    I don't know that to be completely true.

9   Q    Okay.  So if Mr. Spray testified to that, you think he

10  would not be telling the truth?

11          MS. GRAY KOZLOWSKI:  Your Honor, objection; misstates

12  testimony.

13          THE COURT:  Overruled.

14          You may answer the question, sir.

15  A    I would not believe that to be -- or know that to be true

16  either.

17  Q    Okay.

18  A    It could be difference of opinions.

19  Q    Okay.  So within the three deficiencies flagged in the

20  management letter -- and let me back up.

21          This management letter was issued on March of 2020,

22  correct?

23  A    Correct.

24  Q    At the end of the audit for 2019, is that correct?

25  A    That's correct, yes.

Plotts - Cross/Fuchs                    51

1  Q    So you had already gone through all the testing for 2019.

2  A    Correct.

3  Q    And the management letter doesn't identify the

4  noncompliance with the conflict of interest policy, correct?

5  A    I'm not aware of any noncompliance with conflict of

6  interest.  So --

7  Q    It's --

8  A    There's no representation there on it.

9  Q    And there's no representation there about excess benefits

10 accrued by officers and directors, correct?

11 A    There is nothing in our letter, correct.

12 Q    And no reference to the fact that Mr. LaPierre's --

13 oversight of Mr. LaPierre's expenses is not subject to any

14 written policy, right?  That's not in the management letter?

15 A    The management letter does not state anything to that

16 effect.

17 Q    Is it true that Mr. Spray asked you to conduct additional

18 procedures on ILA -- NRA-ILA?

19 A    Correct, yeah.

20 Q    But the management letter doesn't identify any misuse of

21 funds by Chris Cox, correct?

22 A    Correct.

23 Q    Or David Lehman?

24 A    Correct.

25 Q    Do you know if Aronson ever identified any misuse of funds

Plotts - Cross/Fuchs                                           52

1  by Mr. Cox?

2  A    We did not identify any.

3  Q    Okay.  If you would -- I'm going to shift to the 2019 990,

4  and if you could please pull up Exhibit NYAG 148.

5  A    Okay, I have it up.

6  Q    Thank you.  And if you could, please -- let me direct your

7  attention to Page 3 of the PDF, four other services.  Do you

8  see where it says, "We will assist in preparing the

9  organization's Federal and State information and tax returns

10 for the year ended December 31st, 2019"?

11 A    I do see that.

12 Q    And did Aronson --

13          MS. FUCHS:  Strike that.

14 Q    Are you aware that in past years, RSM signed the 990 as

15 tax preparer?

16 A    I am aware.

17 Q    Now if you would turn, please, to NYAG Exhibit 8.

18 A    Okay, I'm there.

19 Q    Okay.  And actually before we delve into that, if you

20 could just take a quick look at NYAG Exhibit 10?  And this is

21 the 2020 engagement letter, do you see that?

22 A    Yes.

23 Q    And if I can direct your attention to Exhibit -- I'm sorry

24 -- to Page 3 of the PDF again, also remembering all four other

25 services.

Plotts - Cross/Fuchs                                          53

1  A    Okay.

2  Q    And here, you use different verbiage, here you say, "We

3  will assist in the review of the organization's Federal and

4  State tax returns," do you see that?

5  A    I do.

6  Q    So 2019 said you'll assist in the preparation, and 2020

7  said you'll assist in the review, is that correct?

8  A    That's correct, that's what the engagement letters say,

9  yes.

10 Q    And Aronson -- it's correct that Aronson did not sign the

11 2019 990 as preparer, is that correct?

12 A    That is correct.

13 Q    So if you will turn to Page -- I'm sorry -- to Exhibit

14 NYAG Exhibit 8.

15 A    Okay.

16 Q    And if I can, please, direct your attention to Page 40 of

17 the PDF, which is the Schedule J -- are you there?

18 A    It's a large document, I'm trying to get there.

19 Q    Sure.  You can also input 40 into the bar at the top, and

20 it will zoom you over there.

21                          (Pause)

22 Q    I'm sorry?

23 A    I'm sorry, I'm getting there.  There we go.

24 Q    Sure.

25                          (Pause)

Plotts - Cross/Fuchs                                              54

1  Q    Do you what you need to do to be comfortable with the

2  document.  I'll just suggest, again, that if you input the

3  number 40 into the top bar, it will take you right to that

4  page.

5  A    Okay; thank you.  I'm there.

6  Q    Okay.  So I'll direct your attention to Question 1A, which

7  asks about certain perks relating to travel and otherwise, and

8  1B, the NRA checks off "No," the organization did not follow a

9  written policy regarding payment or reimbursement, or provision

10 of all the expenses described above, do you see that?

11 A    I do.

12 Q    And this was finalized in November, 2020, correct?

13 A    That's correct.

14 Q    And, again, going back to your -- to your audit of the

15 2019 financial statements, you didn't note any significant

16 deficiencies relating to the lack of travel policies, correct?

17 A    That's correct.

18 Q    And if you look at Question Number 2, "Did the

19 organization require substantiation prior to reimbursing or

20 allow expenses?"  Again, the NRA checks off "No," do you see

21 that?

22 A    I do.

23 Q    And that lack of substantiation also didn't make it into

24 any representations in your 2019 audit, is that correct?

25 A    Yes.

Plotts - Cross/Fuchs                                          55

1  Q    And you testified that Aronson helped with the verbiage

2  for some of the schedules in the 990, is that correct?

3  A    We helped with the disclosures, correct.

4  Q    The disclosures.  So if you'll turn, please, to Page 43.

5  Just a little bit down the page, there's a disclosure that

6  corresponds to Schedule J, Part 1, Line 1B, do you see that?

7  A    Okay, yes.

8  Q    Right?  And the disclosure is, "The NRA has a written

9  policy for first class travel," do you see that?

10 A    Yes, I do see that.

11 Q    Doesn't really provide any explanation regarding the fact

12 that the NRA checked off "No" that it didn't have certain

13 policies, correct?

14 A    Correct.

15 Q    And, in fact, that's not the disclosure that Aronson

16 recommended, is that correct?

17 A    I don't know that to be true.

18 Q    Also turn, please to NYAG Exhibit 276.

19 A    276?

20 Q    Yes, please.

21                         (Pause)

22          MS. FUCHS:  And I would like to move 276 into

23 evidence.

24          MS. GRAY KOZLOWSKI:  Your Honor, I believe this

25 exhibit contains hearsay.

Plotts - Cross/Fuchs                                    56

```
 1              THE COURT:  Let me get it up on my screen.
 2                            (Pause)
 3              THE COURT:  Overruled.
 4              MS. FUCHS:  And this is -- thank you.  So 276 is
 5   admitted, Your Honor?
 6              THE COURT:  It is in.
 7              (NYAG's Exhibit 276 admitted into evidence)
 8              MS. FUCHS:  Thank you.
 9   BY MS. FUCHS:
10   Q    So if, again, you'll scroll down to the bottom because
11   that's the first email in time, the email exchange between --
12   is between Katherine -- and, I'm sorry, how do you pronounce
13   the last name?
14   A    Cuddapah.
15   Q    -- Cuddapah and Rick Tedrick and Arifur Rahman of the NRA,
16   and you are copied on that, do you see?
17   A    I do see that.
18   Q    And who is Katherine Cuddapah?
19   A    She is a Director of our 990 tax services at Aronson.
20   Q    Was she the lead on 990 preparation for the NRA
21   engagement?
22   A    We did not prepare the 990.
23   Q    Was she --
24   A    She was --
25   Q    Go ahead.
```

Plotts - Cross/Fuchs                                        57

1  A    So she was -- she was the lead on the review of the 990

2  services.

3  Q    Okay.  And we see that she is providing pretty substantive

4  information in that first email regarding thresholds for

5  Schedule L disclosures, do you see that?

6  A    I do.

7  Q    Okay.  And then the next email up is from Mr. Rahman, and

8  he is now stating that there are adjustments that were made to

9  the 990T, including Schedule J, Part 1, Line B, "Answered 'No,'

10 and added a narrative," do you see that?

11 A    I do.

12 Q    Okay.  And then above that, Mr. Tedrick notes that "We do

13 not have a policy on charter travel," do you see that?

14 A    I do.

15 Q    And he's asking Kathy a question, "On the description,

16 should we use the word 'other' or be more specific?" do you see

17 that?

18 A    I do.

19 Q    And then the next email is Ms. Cuddapah's advice, and she

20 says, "I think it should use the word 'charter' in the

21 narrative," do you see that?

22 A    I see that, yes.

23 Q    And then if you scroll up to the next email from Kathy,

24 that starts with, "Right, so you are now checking 'no' on Line

25 1B," do you see that?

Plotts - Cross/Fuchs                                          58

1  A    I do.

2  Q    And she says, "Then in the narrative, you are explaining

3  the charter situation.  I would add in that narrative that you

4  do have written agreements for first class travel, etc., since

5  that's a positive.  The questions 1B only want a narrative

6  about the unwritten ones," do you see that?

7  A    I do.

8  Q    Okay.  And somebody -- sorry -- from the NRA replies, "We

9  actually only have a policy for first class travel.  None of

10 the others in 2019," do you see that?

11 A    I do see that.

12 Q    And she says, "Okay.  Then the narrative needs to talk

13 about all those, too," do you see that?

14 A    I do.

15 Q    And that's because the narrative needs to actually provide

16 some information about why the NRA checked off no, is that

17 correct?

18 A    That's correct.

19 Q    But that's not what the NRA did on Exhibit 8, correct?

20 A    It does not appear that way, that's correct.

21 Q    Okay.  So the NRA didn't follow Ms. Cuddapah's

22 instructions on the narrative for Schedule J, did it?

23 A    According to these emails, it does not look like that.

24 Q    Okay.  You testified about the Schedule L, correct?

25 A    Yes, I did.

Plotts - Cross/Fuchs                                    59

1  Q    I'm sorry, I'm going to try to speed things up, but I will

2  direct your attention -- I believe it is found on Page -- back

3  on Exhibit 8, on -- sorry -- on Page 49 of the PDF begins the

4  narrative, the disclosures on Schedule L, do you see that?

5  A    I'm opening it up.

6  Q    Thank you.

7                              (Pause)

8  A    Okay, I'm at Schedule L.

9  Q    Yes, Page 49 of the PDF, the narrative disclosure, and

10 I'll direct your attention to the row that is second from the

11 bottom on that page that discloses "Excess benefit

12 transactions, Christopher Cox," do you see that?

13 A    I do, yes.

14 Q    Did Aronson play any role in examining alleged excess

15 benefit transactions from Christopher Cox?

16 A    No.

17 Q    Did you play any role in that verbiage?  I'm sorry, in

18 drafting that verbiage that's included in the 990?

19 A    We re -- we reviewed the verbiage.

20 Q    Did you verify its accuracy?

21 A    No.

22 Q    How about for David Lehman, did you verify the accuracy of

23 the disclosures in that row?

24 A    No.

25 Q    How about if you scroll down, for Wayne LaPierre, did you

Plotts - Cross/Fuchs                              60

1  verify the accuracy of the disclosures for Wayne LaPierre?

2  A    No.

3  Q    Did you play any role in examining alleged excess benefit

4  transactions from Wilson Phillips?

5  A    We were not engaged to do so.

6  Q    You never asked to look into Mr. Phillips' expenses?

7  A    Not to my knowledge.

8  Q    Okay.  You're aware that Craig Spray did not sign the NRA

9  990 for 2019, correct?

10 A    I am aware of that.

11 Q    But he did sign the 990 for the other NRA entities for

12 2019, is that correct?

13 A    I believe that to be correct.  I don't have them in front

14 of me, but --

15 Q    Did it raise any concerns with you that the CFO wasn't

16 signing the 990?

17 A    Not really, no.

18 Q    Usually the CFO signs the 990, correct?

19 A    A member of the Board or an officer needs to sign the 990.

20 So sometimes that's the CFO or CEO.

21 Q    It's really -- it's most common that the CFO would sign

22 the 990, is that correct?

23 A    Depends on the organization, but more likely than not,

24 it's the CFO.

25 Q    And you're aware that the NRA's CFO signed the 990 in past

Plotts - Cross/Fuchs                                        61

1  years, correct?

2  A    I -- again, I don't have that in front of me, but I would

3  assume that was the case if you say so.

4  Q    Okay.  Did you interview Mr. LaPierre in connection with

5  the 2019 audit?

6  A    No.

7  Q    How about for the 2020 audit?

8  A    We -- we had had conversations with Mr. LaPierre.

9  Q    Did you conduct interviews -- did you conduct interviews

10 in accordance with generally accepted accounting principles

11 with Mr. LaPierre?

12 A    For what year?

13 Q    For 2020.

14 A    What -- not -- not required.

15 Q    That wasn't my question.

16 A    Did we do the interview in accordance with GAAP?  Yes.

17 Q    So what was the nature of the interview with Mr. LaPierre

18 for 2020?

19 A    In his view of risk at the entity, he knew of any fraud

20 allegation, or through any litigation, and his view of

21 transactions that have taken place over the last time we've

22 talked to each other.

23 Q    And was anybody else in the room when you interviewed Mr.

24 LaPierre?

25 A    I've had multiple -- I've had a couple of calls with Mr.

Plotts - Cross/Fuchs                                        62

1  LaPierre, and one time there was someone else on the call with

2  us.

3  Q    Who was that?

4  A    Bill Brewer.

5  Q    And other times -- on how many occasions have you been

6  able to speak with Mr. LaPierre without Mr. Brewer present?

7  A    One other time.

8  Q    And how long did that conversation last?

9  A    Thirty to 45 minutes.

10 Q    And what did Mr. LaPierre say to you about his -- in

11 response to your questions?

12        MS. GRAY KOZLOWSKI:  Your Honor, I would object as

13 hearsay.

14        THE COURT:  Overruled.

15        You may answer the question, sir.

16 A    Can you be more specific?  There was a 30- to 45-minute

17 conversation.

18 Q    So you testified that you asked him about his assessment

19 of risk at the NRA, correct?

20 A    That is correct.

21 Q    So what did he say in response to that?

22 A    He felt like controls were in the best shape that they had

23 ever been, and that they're in full compliance with New York

24 not-for-profit law, and their internal controls are strong.

25 Q    Do you know if Mr. LaPierre is an expert in New York not-

Plotts - Cross/Fuchs                                               63

1  for-profit law?

2  A    I do not know that.

3  Q    So you were engaged to do the audits for 2020, is that

4  correct?

5  A    We were engaged, yes.  We are engaged, I should say.

6  Q    You are engaged.  And for the 2019 audit, you completed

7  that in March of 2020, is that correct?

8  A    Correct.

9  Q    For 2020, you have not yet completed the audit, correct?

10 A    Correct.

11 Q    Are you currently -- is Aronson currently conducting audit

12 fieldwork for the NRA in connection with the 2020 audit?

13 A    We were delayed January 15th with the bankruptcy, and we

14 just got approved, I believe, last week to start back up on the

15 audit.  So we need to schedule -- not right now, we are not,

16 but scheduling it soon.

17 Q    Okay.

18 A    Start --

19 Q    Okay.  You worked with Craig Spray, correct?

20 A    I did.

21 Q    Would you say that he was a compliance-oriented CFO?

22 A    I would.

23 Q    He was the one -- he was one of the people that asked you

24 to conduct additional procedures, correct?

25 A    He requested additional procedures, correct.

Plotts - Cross/Fuchs                    64

1  Q    Were you informed that Mr. Spray is no longer with the

2  organization?

3  A    Yes.

4  Q    When were you informed that?

5  A    I don't recall; I'm going to give you an estimate of

6  January, 2020.

7  Q    Of 2020?

8  A    Or, I'm sorry, 2021; sorry.

9  Q    Okay.

10 A    Forgot the year -- just --

11 Q    And who told you that?

12 A    My recollection is Rick Tedrick told me that.

13 Q    And what did he tell you?

14 A    That Craig Spray is no longer with our organization.

15 Q    Did he tell you anything about the circumstances of Mr.

16 Spray's departure?

17 A    Not -- not to my recollection that there was anything

18 talked about.

19 Q    Did you ask?

20 A    I did.

21 Q    You did?

22 A    I did ask, yes.

23 Q    Okay.  And did he respond?

24 A    To my recollection, he did not know all the details of

25 what went on, just that he was no longer there.

Plotts - Cross/Fuchs                                              65

1  Q    Since that conversation, have you gotten any additional

2  information about the circumstances of Mr. Spray's departure?

3  A    I've asked multiple people, individuals, about Craig

4  Spray's departure, and I was told it was health reasons, that

5  he wanted to leave the organization.

6  Q    Who told you that?

7  A    Charles Cotton, Audit Committee Chair.  To the best of my

8  recollection, it was a conversation with Wayne LaPierre, too.

9  Q    Mr. LaPierre told you that, that Mr. Spray left for health

10 reasons?

11 A    To the best of my recollection, I believe that that's what

12 he -- yes.

13 Q    Was that in a -- was that over a phone call?

14 A    That was.

15 Q    So did anybody ever tell you that Mr. LaPierre told Mr.

16 Spray that the organization was, quote, "going in a different

17 direction" so that Mr. Spray would no longer be with the NRA?

18 A    Not to my recollection.

19 Q    Have you heard that before I just said that today?

20 A    I don't -- no, I don't believe I have.

21 Q    Okay.  So prior to today, you were never told that Mr.

22 Spray did not choose to leave the NRA in January of 2021.

23         MS. GRAY KOZLOWSKI:  Your Honor, objection; this has

24 been asked and answered several times.

25         THE COURT:  Overruled.

Plotts - Cross/Fuchs                                          66

1              You may answer the question, sir.

2              THE WITNESS:  Could you repeat that question again?

3              MS. FUCHS:  Sure.

4   BY MS. FUCHS:

5   Q    So prior to today, is it correct that you were never told

6   that Mr. Spray did not choose to leave the NRA in January,

7   2021?

8   A    That is correct, I was never told that.  To my

9   recollection, yes, I was never told.

10  Q    Are you aware that the NRA does not have a functioning

11  treasurer?

12  A    I believe that to be true, yes.

13  Q    Do you think that the NRA is better off without Craig

14  Spray?

15  A    I don't -- I don't know that to be true.

16  Q    Okay.  Mr. Plotts, is it correct that you found out about

17  the NRA filing for bankruptcy after the filing occurred?

18  A    That's correct.

19  Q    You were never informed that the NRA was planning on

20  filing for bankruptcy, correct?

21  A    That's correct.

22  Q    And Aronson never identified any imminent liquidity

23  issues, did you?

24  A    We did not.

25  Q    No going concern issues, is that correct?

1  A    We evaluate going concern, and they were taking steps to

2  address any concerns that we had about going concerns.  So

3  that's -- that's part of our audit procedures.

4  Q    Okay.

5           MS. FUCHS:  Okay; thank you.  I pass the witness.

6           THE COURT:  Thank you.

7           Mr. Acosta, you're going to go next, but let me poll

8  just to see how long folks are going to have with this witness

9  as we try to get through the day.  How long do you think you

10 have on cross, Mr. Acosta?

11          MR. ACOSTA:  I think, if the Court doesn't hold me to

12 it, 30 minutes.

13          THE COURT:  Okay.  And Journey?

14          MR. WATSON:  Judge, Jermaine Watson on behalf of

15 Judge Journey.

16          We don't anticipate asking any questions of this

17 witness, but we reserve, depending on further testimony.

18          THE COURT:  Okay.  And then Committee?

19          MR. HENDRIX:  Your Honor, the Committee does not

20 anticipate having any questions for this witness.

21          THE COURT:  All right.

22          Why don't we -- the witness has been testifying for

23 an hour and 45 minutes.  Why don't we take a recess, we'll come

24 back in at 10 o'clock.

25          Mr. Acosta has got a half an hour, and I assume the

Plotts - Cross/Acosta                                        68

1  debtor has got some redirect, but really we have three

2  witnesses to cover today, and everyone promised me that that

3  was very doable the other day, and also this morning when I

4  asked.

5            So we're in recess until 10 o'clock.

6               (Recess 9:44 a.m./Reconvene 10:00 a.m.)

7            THE COURT:  Mr. Plotts, are you ready?

8            THE WITNESS:  I am, Your Honor.

9            THE COURT:  Mr. Acosta, are you ready?

10           MR. ACOSTA:  I am, Your Honor; may I proceed?

11           THE COURT:  You may proceed.

12                        CROSS-EXAMINATION

13 BY MR. ACOSTA:

14 Q    Hello, Mr. Plotts.  My name is Joe Acosta, I represent

15 Ackerman McQueen.  We've never met before, I'd like to visit

16 with you a little bit, if that's okay.

17 A    Sounds good; thank you.

18 Q    So you mentioned that the audit that you performed in

19 2019, that was a financial audit?

20 A    Correct.

21 Q    And what are the other kinds of audits, so the Court can

22 be -- that you're aware of, so the Court can be aware, as well?

23 A    Well, there's a number of different audits that you can be

24 engaged with.  There's internal controls audit, that could be

25 done.  And, you know, you can also audit towards other

1  compliance regulations out there.  There's a whole list of

2  them, but --

3  Q     Okay.  But --

4  A     But typically (indiscernible - multiple speakers).

5  Q     And I'm sorry, I didn't mean to speak over you.  But those

6  were not part of the financial audits that Aronson performed in

7  2019, is that correct?

8  A     Right, we just did (indiscernible - weak connection),

9  financial statement audit.

10  Q     And the internal controls audit, can you go into a little

11  more detail about what that entails?

12  A     Well, again, we weren't engaged to do one, but that would

13  be more of the testing of your internal controls in offering an

14  opinion that the internal controls are appropriate, and you

15  would offer an opinion over the internal controls of the

16  organization.

17  Q     Would you say that's a 360 degree review of the internal

18  controls of the organization?

19  A     I don't know if it's a three-sixty, but it's a deep dive

20  into their internal controls, and their process, so --

21  Q     Fair enough.  And you said you were familiar with the 100K

22  policy that the NRA has, is that right?

23  A     I'm familiar with it.

24  Q     Okay.  It's a procurement policy, have you heard it being

25  referred to that before?

1  A    I have.

2  Q    And are you aware that it requires a signature of certain

3  people whenever the NRA entered into 100K policy?

4  A    I'm aware of that, yes.

5  Q    And who does it require the signature of?

6  A    I'd have to look at the policy to verify that.

7  Q    Okay.  And are you aware whether law firms or accounting

8  firms are excluded from that policy?

9  A    I -- I -- I am not aware of that.

10  Q    And would you -- do you believe law firms or accounting

11  firms or professional services firms should be excluded from

12  that policy?

13  A    It depends on the facts and circumstances, I think, around

14  that.  For example, the accounting firm should be hired

15  directly by the Audit Committee.

16  Q    Right, but do you think that they should be -- the NRA

17  should follow their procurement policy with respect to

18  professional services?

19  A    I think best practice would be to have a procurement

20  policy in place, and follow the policy -- the procurement

21  policy, yes, I -- that would be best practice.

22  Q    Fair enough.  And you said that you assisted the NRA with

23  the 2019 990.

24  A    We did.

25  Q    Okay.  And I just want to make sure, you didn't assist

Plotts - Cross/Acosta                                              71

1  them with calculating Schedule L, right?

2  A    That's correct.

3  Q    Okay.  So do you know who assisted the NRA with

4  calculating Schedule L?

5  A    I actually do not know.  I know they hired a tax attorney

6  that was working with them, but I was not involved with the

7  calculation, so I do not know who actually prepared those.

8  Q    Fair enough.  Now are you aware of whether Mr. LaPierre

9  has been reimbursed for any expenses in 2020?

10 A    That would be part of our audit procedures, but we have

11 not concluded on any audit procedures yet for 2020, so I cannot

12 verify that right now.

13 Q    And if he wasn't, in fact, reimbursed, as he's testified,

14 and a number of witnesses have testified, would you consider

15 that part of best practices, as well?

16 A    I'm sorry, Joe, could you repeat that, again, for me?

17 Q    If I told you that a number of NRA witnesses testified Mr.

18 LaPierre has not been reimbursed for any 2020 expenses, would

19 that be -- would that raise any concerns for the audit?

20 A    I'm sorry, you broke up -- you broke up just a little bit

21 when you were making an important part of your question; could

22 you please repeat that.

23 Q    Fair enough.  If I told you that a number of witnesses

24 testified that Mr. LaPierre has not been reimbursed for any

25 expenses in 2020, would that raise any concerns for Aronson?

Plotts - Cross/Acosta                                          72

1  A    It -- it -- it does not raise any certain concerns.  He

2  was not reimbursed for anything in 2019 that we were aware on

3  his expense reports.

4  Q    Okay.  And -- and do you believe that he incurred expenses

5  that are reimbursable for 2019?

6  A    Well, I would not know that because we did not test any of

7  those because he wasn't reimbursed for any of those expenses.

8  Q    And do you believe that Mr. LaPierre did not incur any

9  expenses for 2020 that are reimbursable?

10  A    I'm sorry; repeat that again.

11  Q    Do you believe that Mr. LaPierre did not incur any

12  reimbursable expenses for 2020?

13         MS. GRAY KOZLOWSKI:  Your Honor, I would object.  The

14  witness has testified that the audit is in process for 2020.

15  We do have concerns about impairing objectivity by inquiring

16  about opinions with respect to the ongoing audit.

17         MR. ACOSTA:  Your Honor, if I could respond.

18         THE COURT:  You can.

19         MR. ACOSTA:  They're auditors, they're supposed to

20  detect some things like this.  I mean, he's -- he's asking --

21  he's saying he's testing samples, and he doesn't know that the

22  head of the NRA has submitted expenses or been reimbursed for

23  expenses; I think he should know.

24         MS. GRAY KOZLOWSKI:  Your Honor, my objection is

25  limited to 2020.

1          Certainly he can inquire about all those with respect

2    to 2019.

3          THE COURT:  Overruled.

4          You may answer the question.

5          THE WITNESS:  Okay.  Could you repeat the question

6    one more time so I know what I'm answering?

7          MR. ACOSTA:  Sure.

8    BY MR. ACOSTA:

9    Q    Would you expect the head of the NRA, Mr. LaPierre, not to

10   have any reimbursable expenses for the entire year of 2020?

11   A    In my opinion, I would expect him to have reimbursable

12   expenses, yeah.  I would --

13   Q    And would it be -- from an accounting perspective, would

14   it be best practices for him not to have been reimbursed at all

15   for any of his reimbursable expenses in 2020?

16   A    As a -- as -- he needs to go through the right policies

17   and procedures, and if they've been through the approval of the

18   expense reports, and he should be reimbursed for those.  But

19   until those go through the right process of internal controls,

20   then he should not be reimbursed for those expenses.

21   Q    And would it be a good internal control to allow someone

22   that incurs a lot of expenses during the entire year not to

23   have been reimbursed until the very end?

24   A    It depends on the facts and circumstances of the

25   situation.  If there's any questions about the reimbursable

Plotts - Cross/Acosta                                    74

1  expenses, then he would not be reimbursed until they have been

2  appropriately approved.

3  Q    Okay, fair enough.  Let me turn your attention to -- are

4  you familiar with a $5 million payment that was made to -- for

5  a trust fund that was created with the Brewer firm for $5

6  million in October of 2020?

7           MS. GRAY KOZLOWSKI:  Your Honor, I'd object.  This

8  relates to 2021, and Aronson has not been engaged currently

9  with respect to 2021.

10           MR. ACOSTA:  Your Honor, they were engaged for 2020,

11  I believe, and this is a question about 2020.

12  A    We haven't performed enough --

13           THE COURT:  Hold on.  Hold on.

14           THE WITNESS:  Oh, I'm sorry.

15           THE COURT:  Hold on just a second, Mr. Plotts.

16           The question is about a trust fund that was set up

17  for 2021, is that right, the January?

18           MR. ACOSTA:  No, Your Honor.  This is for the --

19  well, I can ask him a different way, Your Honor, that's fine.

20           THE COURT:  Okay, I think you ought to rephrase your

21  question.

22           Thank you.

23  BY MR. ACOSTA:

24  Q    If I gave you a hypothetical that said that the NRA gave a

25  law firm $5 million, could we agree that that's a hypothetical?

Plotts - Cross/Acosta                                    75

1  A    Okay, sure.

2  Q    And would it concern you what that $5 million was going to

3  be used for from an auditing perspective?

4  A    Definitely we would look into the $5 million transaction.

5  Q    Okay.  Because -- would it concern you that $5 million is

6  used for more than professional services?

7  A    We would want to get invoices and understand what the

8  expenses were for.

9  Q    Would it concern you if invoices were paid up to over a

10 million dollars, charged against that $5 million, and approved

11 in less than four hours?

12 A    Again, we'd have to look at the facts and circumstances

13 around that, and we would want to see the source documents to

14 support payment and the approval process.

15 Q    But would that raise a red flag initially for you?

16 A    If five million -- it would -- it would raise a red flag

17 that we would look into.  Yeah, it would be part of our risk

18 assessment.

19 Q    Fair enough.  I'll have you turn to NRA Exhibit 211, if

20 you don't mind.  Let me know when you're there, please.  Have

21 you seen this document before, Mr. Spray -- I'm sorry, not Mr.

22 Spray -- but Mr. Plotts?

23 A    NRA 211, I'm just opening it up now.   Contract review,

24 signature, Aronson --

25                          (Pause)

Plotts - Cross/Acosta                                        76

1  Q    It's just a yes or no question, if you've seen it before.

2  A    I don't -- I don't recall seeing this.

3  Q    Okay.  And do you know what it is then?

4  A    Well, it looks like it's a contract that was -- that was

5  signed here for Aronson, LLC.  Let's see.  For something over

6  $100,000.

7  Q    Does it look like a business case analysis that the NRA

8  performed when it was retaining Aronson?

9  A    I'm scrolling down -- oh, so it's just that one sheet that

10 you want me to look at?

11 Q    Well, at this point, we're just on the first page.

12 A    Oh, on this page.  Yeah, I mean, I don't see a business

13 case scenario on this one.

14 Q    Okay.  Are you familiar with business case analysis that

15 the NRA performs?

16 A    We are familiar with them.

17 Q    Okay.  And this doesn't look like the business case

18 analysis to you?

19 A    It does -- it does not.

20 Q    Okay; fair enough.  If you scroll down to -- halfway down

21 the page, in the big black box, it says if a contract payment

22 is 100K or greater in a 12-month period, the signatures of the

23 President and Vice President acknowledging the officer is aware

24 of the contract is required, do you see that?

25 A    I do see that.

Plotts - Cross/Acosta                                      77

1  Q    Okay.  Do you know whether the procurement policy of the
2  NRA also requires the treasurer's signature if it's over 100K?
3  A    I would not recollect that right now.
4  Q    It wasn't part of your sampling?
5  A    It was -- it was part of our sampling, but I just don't
6  recall right now.
7  Q    Okay.  If you were to flip over to Page Number 6 of the
8  business case analysis, and let me know when you're there.
9  A    Page 6 of this document?
10 Q    Yes, sir.
11                        (Pause)
12            MS. GRAY KOZLOWSKI:  Your Honor, I'd object.  Mr.
13 Acosta is pulling up selected pages when the document is in
14 evidence, and the witness has been precluded from examining the
15 document in its totality.  I would ask that he be provided an
16 opportunity to review the document before responding to further
17 questions.
18            THE COURT:  It sounds like a fair request to me.
19            MR. ACOSTA:  Your Honor, I would move to admit -- I
20 would move to admit NRA Exhibit 211.
21            THE COURT:  We think it may be in evidence, is that
22 right?
23            MS. GRAY KOZLOWSKI:  I do believe it's in evidence,
24 Your Honor.
25            THE COURT:  To the extent it is not, it is now in

Plotts - Cross/Acosta                                          78

1  evidence.

2  (NRA's Exhibit 211 admitted to the extent it has not previously

3                         been admitted)

4            MR. ACOSTA:  Thank you, Your Honor.

5            THE COURT:  If you would, Mr. Acosta, just give the

6  witness a minute just to flip through it, if you could.

7            THE WITNESS:  Yeah, and can you -- and you're sharing

8  it on your screen?  Or someone's sharing it?

9            MS. GRAY KOZLOWSKI:  Your Honor, if I may.

10            Mr. Plotts, this is NRA Exhibit 211, if you want to

11  locate it in the exhibits.

12            THE WITNESS:  Okay.  And this is a sheet that's

13  sideways on here that we're looking at on mine.

14  BY MR. ACOSTA:

15  Q    Can you see the screen, Mr. Plotts?

16  A    Yes, I do see the -- I see the screen.

17  Q    Can you read that's on the screen, sir?

18  A    Yes, "Business Case Analysis."  Right, the audit and tax

19  services, okay.

20  Q    And if you scroll down to the middle of the page, it's

21  under analysis, you see the first sentence says that RSM said

22  that they no longer wanted to provide services to the NRA?

23  A    Yeah, I do see that.

24  Q    Okay.  And before, no one had told you that, Mr. Plotts?

25            MS. GRAY KOZLOWSKI:  Objection; misstates testimony.

Plotts - Cross/Acosta                                          79

1          THE COURT:  Overruled.

2          You may answer the question, sir.

3  A    No, it -- they told me that they were no longer going to

4  provide audit services to the NRA.

5  Q    And did you get a chance to speak with the -- RSM about

6  why they didn't want to provide audit services to the NRA?

7  A    I did.

8  Q    You did; okay.  When did you speak with them, sir?

9  A    When we reviewed their work papers, rough -- I'm going to

10 give you the rough estimate here of timeline, probably in

11 November or December, I believe, of 2019.

12 Q    And from an auditing perspective, does it raise any red

13 flags to you that the previous accounting firm no longer wanted

14 to provide auditing services to the NRA?

15 A    Yes.

16 Q    Now I believe you said that you were working on the 2021

17 management letter, right?

18 A    That's incorrect.

19 Q    You're not working on the management letter for 2021?

20 A    We're working on the financial statement audit of 2020.

21 Q    Okay; sorry.  It's going to be dated 2020, but it covers

22 2021, and I'm sorry.

23 A    No, no.  I'm sorry, it's going to be dated 2021, but cover

24 2020.

25 Q    Right.  And let me ask you this way, we went over the

1  business case analysis for Aronson firm, does it concern you

2  from an auditing perspective that this business case analysis

3  is not performed for other professional services?

4         MS. GRAY KOZLOWSKI:  Objection; assumes facts not in

5  evidence.

6         THE COURT:  Would you restate your question, Mr.

7  Acosta.

8  BY MR. ACOSTA:

9  Q    If I told you hypothetically speaking that not all

10 professionals have a business case analysis when their policy -

11 - when they are going to be paid over $100,000 a year over a

12 12-month period, would that concern you from an auditing

13 perspective?

14 A    It depends on the facts and circumstances around that,

15 we'd want to look into that, yes.

16 Q    Do you know how much the NRA has paid in professional

17 services in 2020?

18 A    I would not know that right now.

19 Q    Would it concern you if professional services was provided

20 by a particular firm that was paid over $20 million if there

21 was no business case analysis performed for that group?

22 A    Again, you'd have to look at the facts and circumstances

23 around that.

24 Q    Fair enough point.

25 A    (Indiscernible - multiple speakers) highlight that as one

1  of the -- a risk assessment and look into that as part of our

2  2020 audit.

3  Q    And I believe you said that you worked well with Mr. Spray

4  was the treasurer of the NRA?

5  A    We had a good relationship with Mr. Spray, a good

6  professional relationship, yes.

7  Q    And do you believe he was a good treasurer?

8  A    From my experience working with Mr. Spray, he was a good

9  treasurer.

10  Q    And you said you didn't know why he left, or you said

11  someone told you it was for health reasons?

12  A    Yes, it was relayed to me he had health issues and health

13  reasons as why he left.

14  Q    So my question is if he testified that he didn't have

15  health reasons, that he was fired, would that raise red flags

16  for you from an auditing perspective?

17  A    Yeah, again, as facts and circumstances come to us, we

18  would like to know more about that situation, yes.

19  Q    Fair enough.  And one more quick line of questioning, and

20  then I'm done.  Can you please turn to NRA Exhibit 183, and I

21  think it's NYAG Exhibit 148, either one works.

22  A    All right, so I'm going to go to NRA Exhibit 123?

23  Q    Yeah.  I'm sorry, 183.

24  A    Oh, 183.

25                              (Pause)

Plotts - Cross/Acosta                                      82

1  Q    And this is the engagement letter that Aronson entered

2  into with the NRA for 2019 audit and tax services, is that

3  accurate?

4  A    I'm just pulling it up now.  Oh, you've got it up on the

5  screen.  So this is our 2019 engagement letter.

6  Q    This is for the audit and tax services you provided to the

7  NRA -- Aronson provided?

8  A    Correct.

9  Q    Okay.  And if you look at the second page, under "Audit

10  Procedures,"  Roman III, and you scroll down to the third

11  paragraph underneath that, there's a number of qualifications

12  contained in this letter, isn't there?

13  A    Okay.

14  Q    Are you familiar with those qualifications?

15  A    Yes.

16  Q    Is one of them you don't guarantee accuracy of the

17  financial statements?

18  A    Could -- yes.  We do not guarantee the accuracy of the

19  financial statements, yes.

20  Q    And you don't -- you don't detect material fraud?

21  A    We may not detect immaterial fraud.

22  Q    And you can't eliminate fraud, right?

23  A    That is correct.

24  Q    Okay.  And -- and -- skipping back to the second paragraph

25  underneath that, it says that you -- that you -- on the test

Plotts - Cross/Acosta                                        83

1  basis, you examine the internal controls of the NRA, is that

2  accurate?

3  A    Yeah, an audit includes examining on a test basis some

4  internal controls, yes, around a risk assessment, yes.

5  Q    And that involves looking at the transactions that the NRA

6  has entered into?

7  A    It does.

8  Q    And do you know -- can you tell the Court how many

9  transactions you looked at at the NRA?

10 A    Well, there's many transactions that we looked at.  We

11 look at revenue transactions, we look at expense transactions,

12 we dive into the account balances of the balance sheet, and

13 look at those transactions.

14        So it would be hard for me to tell you how many

15 transactions, other than there is numerous transactions that we

16 look at.

17 Q    "Numerous," is that over 100, Mr. Plotts?

18 A    Yes, that's well over 100.

19 Q    And you'd agree with me that an organization that has a

20 budget of 300 million has numerous transactions.

21 A    Yes.

22 Q    Way more than 1,000 probably.

23 A    Yes.

24 Q    If you flip over to the next page, in the second paragraph

25 to the bottom, it contains a qualification that says, "An audit

Plotts - Cross/Acosta                                           84

1  is not designed to provide assurance of internal controls or

2  identified deficiencies in internal controls," is that

3  accurate?

4  A    The one that's highlighted is not the one that you were

5  saying.

6  Q    Right, I think it's the second sentence in the second

7  paragraph.  But do you believe that to be accurate, Mr. Plotts?

8  A    Yes, could you read -- could you read it again?  I mean,

9  you're reading it right from our engagement letter?  Yes.

10 Q    Sure.  It's the second sentence, it says, "An audit is not

11 designed to provide assurance of internal controls or

12 identified deficiencies in internal controls," is that

13 accurate?

14 A    That's right.

15 Q    You only look at samples of transactions, is that right?

16 A    Correct.

17 Q    And if you detect something, you pass it along to the NRA.

18 A    If we detect something, and it's significant, we pass it

19 along to the Audit Committee, yes.

20 Q    And if the NRA doesn't disclose particular transactions,

21 you have nothing to detect because you're not performing an

22 internal audit -- an audit of internal controls, are you?

23 A    Are you talking about transactions that are not in the

24 financial records?

25 Q    Transactions that are not shared with Aronson.  There's no

Plotts - Cross/Acosta                                    85

1  way for you to detect whether they're in compliance with

2  internal controls.

3  A    If they're not shared with us, then we would not be able

4  to detect that, yes.

5          MR. ACOSTA:  Thank you very much, Mr. Plotts, it was

6  nice (indiscernible).

7          THE WITNESS:   Okay; thank you.

8          THE COURT:  Thank you, Mr. Acosta.

9          Before the debtor gets to redirect, does anyone else

10 have any questions of this witness?

11              (No audible response heard)

12         THE COURT:  Goes back to the debtor.

13         MS. GRAY KOZLOWSKI:  Thank you, Your Honor.  I will

14 try to keep this short to move us along here.

15                  REDIRECT EXAMINATION

16 BY MS. GRAY KOZLOWSKI:

17 Q    Mr. Plotts, Mr. Acosta concluded his questioning by asking

18 you about qualifications that are included in the engagement

19 letter.  Is that standard language included all of Aronson's

20 audit letters -- engagement letters?

21 A    It is.

22 Q    Okay.  Mr. Acosta also asked you about your relationship

23 with -- whether you had a good relationship with Mr. Spray, do

24 you recall that?

25 A    I do.

Plotts - Redirect/Gray Kozlowski                                86

1  Q    Okay.  Did you also have a good relationship with Ms.

2  Rowling?

3  A    Yes, we did.

4  Q    In connection with your -- the audit services provided in

5  2019, do you have an opinion of Ms. Rowling?

6  A    Yes, we evaluate finance staff, including Sonya Rowling,

7  based on their SKE, is what we call it, skills, knowledge, and

8  experience.  And she had very high experience with the NRA,

9  very high knowledge of accounting practices, and she had the

10  skills in order to do her duties quite well.  So we had a very

11  good transparent relationship and working relationship with

12  Sonya Rowling.

13  Q    Okay.  Kind of working backward through the questioning,

14  you were asked about Mr. LaPierre's expenses in 2019.  Do you

15  know whether those have been reimbursed?

16  A    I would not know if they've been reimbursed in 2020 yet.

17  Q    I'm sorry, in 2019.

18  A    In 2019, we were not aware of any reimbursement for

19  expenses of Wayne LaPierre.

20  Q    Okay.  And turning back to the 990, which was NYAG 8, you

21  were asked a number of questions about Schedule L, do you

22  recall that?

23  A    Yes.

24  Q    Okay.  If we look at the explanations that are included

25  for Mr. Cox, do they include transactions that predated 2019?

Plotts - Redirect/Gray Kozlowski                          87

1  A    Yes, they do.

2          MR. ACOSTA:  I think the document speaks for itself.

3  I don't really know why this witness has to testify to that.

4          THE COURT:  Overruled.

5          MS. GRAY KOZLOWSKI:  Your Honor --

6          THE COURT:  The witness --

7          MS. GRAY KOZLOWSKI:  Thank you, Your Honor.

8          THE COURT:  The witness said yes.

9          MS. GRAY KOZLOWSKI:  Thank you, Your Honor.

10 BY MS. GRAY KOZLOWSKI:

11 Q    You were also asked about the disclosures with respect to

12 Mr. Lehman.  Do the disclosures include transactions that

13 predate 2019, as well?

14 A    Yes, they do.

15 Q    And the same -- is the same also true for Mr. LaPierre?

16 A    Yes.

17 Q    Okay.  You were then asked why -- asked about why

18 transactions that -- these transactions aren't disclosed in the

19 financial statements, would you expect transactions that

20 occurred before 2019 to be in the NRA's 2019 financial

21 statement?

22         MS. FUCHS:  Objection, Your Honor; misstates

23 testimony.  The questioning related to the management letter.

24         THE COURT:  Do you want to restate your question?

25         MS. GRAY KOZLOWSKI:  Certainly.

Plotts - Redirect/Gray Kozlowski                    88

1  BY MS. GRAY KOZLOWSKI:

2  Q    Mr. Plotts, would you expect transactions that predated

3  2019 to be included in the management letter?

4  A    It depends on the facts and circumstances if it relates to

5  internal controls of 2019.

6  Q    You were asked about the engagement letter from 2019, and

7  it used the phrase "assist in preparing the 990," do you recall

8  that?

9  A    I do recall that.

10  Q    Okay.  And you were also asked about RSM signing the prior

11  990s, do you recall that?

12  A    I do.

13  Q    Would it have been appropriate for RSM to sign the 990s,

14  in your opinion?

15  A    If they -- if they were paid preparer, then they would

16  sign the 990.

17  Q    Okay.  Is it your understanding that they were the paid

18  preparer?

19  A    It is my understanding that they were the paid preparer of

20  the 990.

21  Q    Okay.  And is Aronson the paid preparer of the NRA's 2019

22  990?

23  A    No, we were not.

24  Q    Okay.  And do you -- why was -- why -- do you know why

25  Aronson wasn't engaged to be the paid preparer?

Plotts - Redirect/Gray Kozlowski                                89

1          MR. ACOSTA:  Objection, Your Honor; speculation.

2          THE COURT:  Overruled.

3          You may answer the question, sir.

4   A    The NRA staff took training on 990s, and filled out their

5   own 990 forms on special software that they had in 2020 when

6   they did the 2019 990, and so they prepared their own 990.

7   Q    Thank you.  You were also asked about Mr. Spray self-

8   reporting the deficiencies identified in the management letter,

9   do you recall that?

10  A    Yeah, I do.

11  Q    Okay.  And you wanted to provide an explanation, but were

12  precluded from doing so.  Can you -- can you help me understand

13  what your understanding of the alleged self-reporting in the

14  management letter?

15  A    Yes, Mr. Spray was very transparent when we first met with

16  him before we took on the engagement in October of 2019, that

17  there was -- could be alleged fraudulent expense reporting at

18  the NRA.  So he did bring it to our attention, and when we did

19  our sample selection of expense reportings, we also found the

20  control deficiency in our casting.  So with his pointing out

21  some of those expense reports, and with our testing, we came up

22  with the significant deficiency in the management letter.

23  Q    Okay.  And is part of Aronson process to inquire about

24  whether management has any concerns like that?

25  A    Yeah, absolutely.

1 Q    Okay.  You were asked about steps taken with respect to

2 related party transactions.  What steps did Aronson take with

3 respect to related party transactions?

4 A    Yes, so we got a listing of related party transactions,

5 and we took those related party transactions and made sure that

6 they are approved for in the minutes of the Audit Committee,

7 and that there was no material transactions that needed to be

8 disclosed in the financial statements, and we also had

9 management represent to that.

10 Q    Okay.  Why don't we turn quickly to -- well, let me --

11 before I move on, do you have an understanding of why RSM

12 decided to not continue providing services to the NRA?

13 A    What I was told was they were moving in a different

14 strategic direction with their auditing --

15         MS. FUCHS:  Hearsay; objection.

16         THE COURT:  Who was the speaker there, Mr. Plotts?

17 Who told you that?

18         THE WITNESS:  That was the audit partner at RSM.

19         THE COURT:  Sustained.

20 BY MS. GRAY KOZLOWSKI:

21 Q    Could I have you move -- turn to Exhibit 155, please?

22 It's NRA 155, you previously look at this document with

23 counsel, do you recall that?

24 A    I'm getting it.

25 Q    I'm sorry.

Plotts - Redirect/Gray Kozlowski                    91

1  A    NRA 155.

2  Q    Yes, sir.

3  A    This is an email, yes, I do recall seeing this.

4  Q    Okay.  And so you have -- it walks through October -- you

5  know, you walked through the timeline of October 10th.  You

6  responding being -- appreciating being contracted.  And then it

7  continues through to a meeting.

8        When did Aronson meet internally to decide whether or

9  not it was interested in providing a proposal to the NRA?

10 A    So at -- after our meeting with the NRA in person, this

11 was the email to set up that meeting with Craig Spray, I think,

12 and Sonya Rowling, and Rick Tedrick.  We came back and

13 evaluated all the facts and circumstances around the risk, and

14 then we decided to move forward with the proposal, doing a

15 formal proposal, and that was done in -- you know, October --

16 after the meeting, at some point between October -- October

17 31st -- October -- so -- before we gave them that proposal.

18 Q    Thank you.

19       MS. GRAY KOZLOWSKI:  I have no further questions,

20 Your Honor.

21       THE COURT:  Thank you, Counsel.

22       For the record, does anyone else have any questions

23 of Mr. Plotts?

24       MS. FUCHS:  Your Honor, just three or four questions

25 on recross.

Plotts - Recross/Fuchs                                    92

1         THE COURT:  Okay.  Just, if you would, wind down this

2   time, though.

3         Thank you.

4         MS. FUCHS:  Yes; thank you.

5                     RECROSS-EXAMINATION

6   BY MS. FUCHS:

7   Q    Mr. Cross [sic], isn't it -- I'm sorry, Mr. Plotts, isn't

8   it true that the only related party transactions you reviewed

9   would be the ones provided to you by the NRA?

10  A    That were provided to us, and that were in the Board

11  minutes.

12  Q    And do you recall how many there were?

13  A    I can't recall right at this -- at this time.

14  Q    Do you recall the aggregate value of the related party

15  transactions?

16  A    The aggregate value was immaterial to disclosing the

17  financial statements that was provided to us.

18  Q    And immaterial on a quantitative or a qualitative basis?

19  A    Well, it would be quantitative, and we felt qualitative,

20  too.

21  Q    Isn't it true that a factor in qualitative materiality is

22  the potential of noncompliance with relevant laws and

23  regulations?

24  A    That -- it could be one of the qualitative.

25  Q    But you didn't feel like the number of related party

Plotts - Recross/Fuchs                                        93

1 transactions was material enough to include in the financial

2 statements.

3 A    That is correct, that we did not see any material

4 transactions with related parties that needed to be disclosed

5 in the financial statements.

6 Q    Okay.

7            MS. FUCHS:  Thank you.  Pass the witness.

8            THE COURT:  Thank you.

9            Anyone else have any questions of this witness?

10            MR. ACOSTA:  Nothing from Ackerman, Your Honor.

11            THE COURT:  Thank you, Mr. Acosta.

12            Mr. Plotts, there's been a Rule of Evidence invoked,

13 and I'd ask that you not speak with anyone about your testimony

14 until I've ruled.

15            Does anyone intend to call this witness back?

16 Because we can release him at least as far as watching the rest

17 of the trial, if he wants to.

18                 (No audible response heard)

19            THE COURT:  Okay.  I'm going to excuse you from part

20 of the rule, if you want to watch anymore of the trial, it's

21 supposed to go today, tomorrow, and then closing arguments on

22 Monday, you're welcome to do that.

23            But until one of the lawyers on the debtors' side

24 tells you that I've released you completely with the rule, if

25 you would not speak with anyone about what's going on right

1  now, that is the rule.

2         Do you understand that?

3         MR. PLOTTS:  I understand, Your Honor.

4         THE COURT:  Okay, thank you.  Thanks for coming down

5  here.

6         MR. PLOTTS:  All right; thank you.  Have a great day.

7         THE COURT:  Mr. Garman, you may call your next

8  witness.

9         MR. GARMAN:  Yes, sir, my next witness will be Mr.

10 LaPierre.  We're in the process of getting him in the room set

11 up, it will probably be less than five minutes.

12        THE COURT:  Okay.

13                        (Pause)

14        MR. GARMAN:  Apparently, Your Honor, I'm slower than

15 the witness.

16                      (Laughter)

17        THE COURT:  No problem.

18        MR. GARMAN:  Your Honor, I believe we're ready to go.

19        THE COURT:  All right.  Mr. LaPierre, can you hear

20 me?

21        MR. LAPIERRE:  I sure can.

22        THE COURT:  All right.  Would you raise your right

23 hand?

24          WAYNE LaPIERRE, DEBTORS' WITNESS, SWORN

25        THE COURT:  All right, Mr. Garman, you may proceed.

LaPierre - Direct/Garman                    95

 1              MR. GARMAN:  Yes, sir.

 2                        DIRECT EXAMINATION

 3  BY MR. GARMAN:

 4  Q    Good morning, Mr. LaPierre.

 5  A    Good morning.

 6  Q    I know doing this, I'm probably going to occasionally call

 7  you Wayne because we've been spending some time together, so

 8  forgive me if I do that.

 9              How are you feeling today?

10  A    I feel good; a lot better than last time.  No medication.

11  Q     Okay.  So, Mr. LaPierre, of the things --

12              MR. GRUBER:  Objection, Your Honor; I'm going to ask

13  that that statement about -- Your Honor, I'm going to ask that

14  the statement about medication be stricken from the record.

15              THE COURT:  And why?

16              MR. GRUBER:  Because it wasn't part of the question,

17  and he made a statement that was non-responsive about -- that

18  in -- injects another issue into the -- his testimony from last

19  time.  It was not responsive to the question, and I think it's

20  an improper statement that he's made.

21              THE COURT:  Overruled.

22              MR. GARMAN:  So --

23              THE COURT:  Overruled.

24  BY MR. GARMAN:

25  Q    Mr. LaPierre, one of the things we didn't cover last time

LaPierre - Direct/Garman                    96

1   you testified was your background.  Could you introduce

2   yourself, and give the Court a brief introduction to your

3   upbringing?

4   A    Sure.  I was born up in Schenectady, New York, I grew up

5   down Roanoke, Virginia, went to high school in Roanoke.  I went

6   off to college at Siena College in New York.  I worked as an

7   intern in the New York State Legislature for two State

8   senators.

9        I went back to Virginia, I worked on a democratic

10  campaign for Congress.

11       I then worked with a country store owner that was

12  running for the House of Delegates in Virginia, I worked on his

13  campaign.

14       I then went off to Boston College to pursue a masters

15  in government politics, and --

16  Q    So, Mr. LaPierre, let's stop there.  Your undergraduate

17  work, what did you study for your undergraduate?

18  A    It was government and education.

19  Q    And did you receive a degree, and if so, from where?

20  A    Yes, from Siena College in Loudonville, New York.

21  Q    Okay.  So I interrupted you, but you were talking about

22  graduate work now, if you could tell us about your graduate

23  studies.

24  A    Yeah, I obtained a masters degree from Boston College in

25  government politics, and went back, and worked in the Virginia

LaPierre - Direct/Garman                          97

1  Legislature with a delegate, and then went back to Boston

2  College to pursue a PhD, and did all the course work, and after

3  I got through with that, I wasn't sure what I was going to do.

4  In fact, Tip O'Neill's office talked about me becoming a

5  capital police officer to write -- while I wrote my

6  dissertation, but I was over at the Democratic National

7  Committee because I was on their list talking with a

8  congressional candidate about possibly working on his campaign.

9  And I knew a bunch of the NRA people -- the NRA building was

10 right across the street.

11 Q    So let me stop you there, sir.  So -- so we talked about

12 your education, some of your work background.  Let's now turn

13 to the NRA and the first time you were employed by the National

14 Rifle Association.

15 A    Well, I -- after I left the Democratic National Committee

16 building, I walked into the NRA building and I knew a lot of

17 the people because we had -- the delegate that I worked for

18 sponsored a mandatory senate bill for the use of a gun in a

19 crime, and NRA supported that.  So I walked in to say hi to the

20 NRA people, and they offered me a job as a lobbyist because

21 they were looking for a democrat lobbyist --

22 Q    And what year was that?  What year was that, sir?

23 A    That was in -- well, in late 1977 when they offered me the

24 job.

25 Q    And did you take that job?

LaPierre - Direct/Garman                               98

1  A    I did.   I thought about it, I didn't know whether I wanted

2  to be a lobbyist or not, but I loved the process, I loved the

3  legislative process, the whole back and forth.   And I thought

4  about it, and I took the job as a State liaison.

5  Q    And what did it mean to be a State liaison at that time?

6  A    I worked for NRA doing ten legislators -- legislatures in

7  the northeast United States.   I worked with the members in

8  those states with hunting clubs, and with firearms clubs, and I

9  tried to put them up front, meeting with the legislatures, not

10  me, because it's always better to have a constituent do it than

11  some guy from Washington.   But occasionally I'd go to meetings

12  in the legislatures --

13  Q    And what --

14  A    -- (indiscernible - multiple speakers) in those states.

15  Q    Okay.   And how long did you have that first job as a

16  liaison for those ten or so states?

17  A    I did it for one year.

18  Q    And then your -- and how did your career advance after

19  that?

20  A    Well, they put me into the position of Director of State

21  and Local, which was managing all 50 states in terms of the

22  State Legislation.   So I started working with NRA members

23  around all 50 states, and with the -- with the legislators and

24  with the other NRA lobbyists.

25  Q    And how long did you do that, sir?

1  A    I did that for one year, and then they moved me over to

2  Director of Governmental Affairs, which was working Capitol

3  Hill for the NRA.

4  Q    And when you say "they" moved you over, who are you

5  referring to?

6  A    The Executive Vice President of the NRA and the Director

7  of the Institute for Legislative Action.

8  Q    Okay.  And so I'm sorry, I may have cut you off.  But you

9  turned to Capitol Hill, what approximate year are we talking

10 about now, sir?

11 A    1986.

12 Q    Okay.  And could you tell us what your duties were?

13 A    No, no, 1980.  1980, I took over the Governmental Affairs

14 position on Capitol Hill.

15 Q    Okay.  And what were your job duties in charge of

16 Governmental Affairs for Capitol Hill?

17 A    Overseeing the NRA's legislative priorities on Capitol

18 Hill, whether they were for or against something, directing the

19 lobbying staff, working with members up on Capitol Hill, and

20 also being involved with all the political races where NRA was

21 supporting or opposing someone.

22 Q    And these jobs that you've talked about so far, are they

23 part of the Institute for Legislative -- ILA?

24 A    Yeah, that's correct, they are.

25 Q    Okay.  So how long did you have that position, sir?

LaPierre - Direct/Garman                    100

1   A    I had that position for six years.

2   Q    And so at the end of that six years, what happened?

3   A    I was promoted to the Executive Director of the NRA

4   Institute for Legislative Action, which is the part of the NRA

5   that controls all the political and legislative affairs of the

6   NRA.

7   Q    Okay.  And so approximately what year did you elevate to

8   that position?

9   A    1986, I believe.

10  Q    Okay.  And --

11  A    Yeah, '86.

12  Q    And how long did you hold -- how long did you hold that

13  job?

14  A    Until '91.

15  Q    Okay.  And so -- so testimony's been out in 1991, you

16  become the Executive Director -- the Executive Vice President

17  of the NRA, right?

18  A    That's correct.

19  Q    Could you tell the Court how you came to have that job?

20  A    Well, it's kind of funny.  I mean, I actually wanted to

21  stay in the Institute for Legislative Action because what I

22  really loved was the legislation and the politics, and the back

23  and forth, and all of that.  I mean, that's kind of what I grew

24  up loving, the process and all that.  But I realized that -- I

25  tried to recruit a bunch of other people.  I tried to recruit

1  the -- either Secretary of the Air Force, the Undersecretary to

2  the Air Force, the same thing with the Navy.  I tried to

3  recruit Congressman John Dingell who helped form the Institute

4  for Legislative Action, the key democrat on Capitol Hill.  And

5  I actually had him for one night say he would do it.

6          But then they all kept saying, Wayne --

7          MR. GRUBER:  Objection; hearsay.

8          THE COURT:  You need to narrow your answer down.  I

9  don't want to run into what we did the last time.  So sustain

10 that.

11 BY MR. GARMAN:

12 Q    So, Mr. LaPierre, how did you come to throw your hat in to

13 be Executive Vice President?

14 A    Well, they all kept saying, Wayne, you've been around here

15 a long time, you've been out with the members, the members --

16 you've been doing all the television for the NRA, the members

17 know you, you need to throw your hat in the ring, and we'll all

18 back you.

19 Q    And, of course, that happened; what year was that?

20 A    1991.

21 Q    And how were you selected?  What's the process by which

22 you became Executive Vice President?

23 A    The Board of Directors elects the Executive Vice

24 President, the 76 Board of Directors members, every year.

25 Q    And what was -- in 1991 when you took that job, can you

LaPierre - Direct/Garman                                    102

1 describe for us what the NRA was, and perhaps how it's

2 different from what it is today?

3 A    Well, its -- its budget was about $87 million, I believe

4 it had 2.5 million members, I mean, it's a lot bigger

5 organization today.  It has a lot more members.  I mean, the

6 membership is just under 4.9 million now.

7        We -- we -- one of the things I tried to do was

8 transition the organization into rather than just gun owners

9 for or sportsman for, into a freedom organization because

10 that's really what the NRA is about is defending the freedom

11 and the Bill of Rights to not only the Second Amendment, but

12 the First Amendment.

13 Q    So, sir, I want to explore that a little bit more.  What -

14 - why did you believe it was important to transition, in your

15 word, the NRA in that direction?

16 A    Because that's really what the NRA is about, and it's also

17 the mainstream of what NRA stands for.  We're -- the NRA is the

18 deepest part of the river.  I mean, Americans overwhelmingly

19 believe they have an individual right to own a firearm under

20 the Constitution.  And in every poll, they overwhelmingly

21 believe they have the right to own a firearm, to protect

22 themselves and their family.

23        So it made good sense, in terms of keeping NRA in the

24 mainstream, and having it grown and prosper, to transition the

25 organization's brand to a freedom brand.

LaPierre - Direct/Garman                                            103

1  Q    So, sir, you've used the word "mainstream" now, how do --

2  how did you move the NRA towards what you've defined as the

3  mainstream?

4  A    Well, I mean, one of the things I've always tried to do

5  from the time I started out was get out there around the

6  country with the members.  I mean, that's the real strength of

7  the NRA, it's not the building in Washington, it's not me, it's

8  one-by-one-by-one, people all over their country -- all over

9  this country that in their hearts believe they have the freedom

10 to own a firearm, and it's their right.

11          And so I was constantly out there on the road with

12 members, talking with them, I was doing speaking engagements

13 wherever I could do.  I became the voice of the NRA on TV.  I

14 think I was the first person to ever do TV for the NRA, and

15 I'd try to say what the members would say if they were on TV.

16 So --

17 Q    Sir, let me -- let's direct this conversation a little

18 bit.  So you recall being on the stand two weeks ago, right?

19 A    I do.

20 Q    And do you recall there was an answer that you wanted to

21 give about cultural touch points as, I believe, it was Mr.

22 Sheehan who asked you that question, do you recall that?

23 A    I do recall that.

24 Q    You had more to say on that subject, now is our

25 opportunity.  Why are those -- all those cultural touch points

1  important at the NRA?

2  A    Well, it's because besides the strength being in the

3  individual members, and people all over the country, and also

4  having the NRA take positions that resonate with the mainstream

5  of American society, I mean, it's important for NRA to be

6  involved with all of these cultural influence points in

7  American society, that they understand what the organization's

8  about, that it's not what the media portrays the organization.

9  That it's good people all over the country, and safety,

10  training, education, in addition to supporting the freedom.

11       So I tried to make contact with the celebrity

12  community, educate the celebrities about what the organization

13  is for, bring them in to supporting the organization with

14  groups like NASCAR, which has an influence on a huge part of

15  American society.

16       The NFL where we did things with the NFL alumni.  We

17  actually ran the clay shoot for the NFL alumni at the Super

18  Bowl for them.

19       With country music, where we started a brand called

20  NRA Country, and got involved with all the country music

21  artists.

22       Because all of these cultural touch points, besides

23  the media, they're huge influencers on American society.  And

24  in terms of NRA to grow and prosper, I felt it was important,

25  all these cultural touch points understand the organization,

LaPierre - Direct/Garman                                    105

1  what it's about, what it stands for, that it's good people.  It

2  stands for freedom, and we'd like them to get involved, and

3  speak out, and be part of it.

4  Q    Sir, how do those -- how does all of that ultimately

5  benefit the NRA?

6  A    Well, it benefits the NRA -- I mean, probably the best

7  example is my gosh, what did Charlton Heston mean to the

8  organization when he was one of the touch points that we

9  reached, and he decided to become an officer, and become

10  President for six years -- I mean eight years.  You really

11  can't put a value on what that was worth.

12         But it's also -- I mean, there's a big value when you

13  see some country music star that talks about the fact that,

14  yeah, he learned to shoot with the NRA, and he's proud of it.

15         We did events at the Academy of Country Music, and --

16  where we did a sporting clay event.  And during the national

17  television show, they would show clips of country music stars

18  out shooting sporting clays, I mean, at the NRA event.  That

19  makes people feel better about the NRA, it makes them feel

20  better about joining, and about -- they -- hey, you know, it's

21  not just me alone, I mean, my gosh, these -- all these other

22  folks are for it, too.

23  Q    And how do you do this?  How do you go about cultivating

24  that roster of celebrities and supporters?

25  A    Well, you've got to be out there, and you've got to be out

LaPierre - Direct/Garman                           106

1  there building relationships.  I mean, we used to do a

2  celebrity shoot in Hollywood, for example, for a number of

3  years.  We -- there's a lot of people in the Hollywood

4  community that love shooting, so we would do a celebrity shoot

5  out there.

6          We'd go out there and just work dinners or -- you

7  know, where we had an opportunity to circulate within the

8  community.  And it's a relationship business, and as you build

9  the relationships, you explain what the organization's about,

10 and you build a relationship, and eventually not all of them,

11 but many of them go, hey, I'm for that.  I mean, we had a lot

12 of celebrities step forward and do Eddie Eagle child safety ads

13 for us, which is one of our best child safety programs.

14 Q    So, sir, what's a typical work -- pre-COVID, what's a

15 typical work week like for Wayne LaPierre?

16 A    Oh, gosh, I mean, it's a mixture of everything.  I mean,

17 it may be preparing for days for a -- television interviews,

18 for national television interviews.  It's working on

19 fundraising, working with donors, working with members around

20 the country, going out and giving speeches, whether it's

21 Friends' Dinners or whether it's a hunting group, or even a

22 group like the Detroit Economic Club, or the Commonwealth Club,

23 or something like that.  It's working with programs and with

24 our program people in terms of -- I mean, we've expanded so

25 many of our programs.  It's just a -- it's just a -- it's a

LaPierre - Direct/Garman                    107

1  mixture of a variety of things to try to push the organization

2  forward, keep bringing in members, keep bringing in the dollars

3  to support all the good work the NRA does.  And being the

4  outface of the organization publicly is --

5  Q    And, Wayne, how much of your -- well, how many hours a

6  week on average do you work as Executive Vice President?

7  A    You know, depending on the week, it could be -- I mean,

8  there were weeks where I was on the road 40 weekends a year, so

9  I mean, you're -- 40, 50, 60 hours sometimes a week I work.

10 Q    And how much of your -- how much of your work is -- as you

11 described, forward facing versus how much work you do in the

12 office?

13 A    It's both, but I spend -- I mean, because I know where our

14 strength is.  Our real strength is with the members out there

15 on the road, and if I can be out there thanking them, and

16 keeping them bonded to the NRA, I'm keeping the NRA strong.  I

17 always say that the day the NRA gets cut off in Washington, DC

18 is a day the NRA starts losing.

19       So I spend a lot of time out there with our members,

20 which is where our real strength is.

21 Q    Sir, you --

22 A    Go ahead.

23 Q    You brought up what you called Friends' Dinners in your

24 testimony a few minutes ago.

25 A    Yes.

LaPierre - Direct/Garman                      108

1  Q    What are those?

2  A    It's one of the programs I started where I became the EVP

3  of the NRA, it -- I wanted to showcase who NRA really was as

4  opposed to what the media tends to portray NRA as.  And I

5  thought, gosh, wouldn't it be great if we did a dinner in every

6  community in the country to raise money for the 501(c)(3)

7  programs of the NRA, the shooting, and the training, and the

8  education, and the hunter safety, and the child safety, and all

9  those type programs.

10         So we started doing a dinner, we do 11 hundred of

11 them before COVID.  We're doing -- we're going to end up doing

12 about 750 this year.

13 Q    And how many of those --

14 A    The --

15 Q    Sir, how many of those do you go to?

16 A    A lot.  I mean, it depends on the year, but I would go to,

17 you know, as many as I could get to.  Sometimes it was 30 a

18 year, sometimes it was maybe more than that, sometimes less

19 than that.  But I would also go out and -- and I would never

20 eat.  What I would do is spend my time walking around to every

21 table in the room, and thanking everybody for being there,

22 saying, thanks for being here, thanks for supporting NRA,

23 you're the reason this organization works, and also listening

24 to them.  I mean, I get so much good input from listening to

25 all these people when I'm out on the road with their

LaPierre - Direct/Garman                    109

1  suggestions in terms of -- a lot of our advertising campaigns

2  over the years have actually come out of listening to what our

3  members, and gun owners, and hunters were saying to me when I

4  was actually out there talking with them on the road.

5  Q    So when -- circling back now to kind of where we were a

6  little while ago talking about mainstream, what happens if the

7  NRA strays from the mainstream?

8  A    Well, I think if NRA strays from the mainstream, it starts

9  losing its clout.  I mean, I've always thought from the time I

10 started with the NRA, the way the NRA gets beat is it pushes --

11 it gets pushed to fringe as an extremist organization, and

12 that's how the NRA loses.  And I have done everything I can to

13 -- I mean, I remember there was one meeting where I stood up

14 publicly in front of the whole meeting and said, look, if

15 anybody -- if you think you're training for revolution in the

16 woods --

17           UNIDENTIFIED ATTORNEY:  Objection, Your Honor.

18 A    -- so you're part of some militia group that thinks you're

19 going to take the law into your own hands, there's the door, we

20 don't want you in the National Rifle Association.  So I've --

21 Q    So --

22 A    I've always tried to have the NRA take legislative

23 stances, too, that made sense, not only for --

24 Q    So, Mr. LaPierre, we'll talk about those in a moment.  But

25 -- I'm sorry, I think I was speaking over someone.  Maybe not.

1          THE COURT:  I would say this, Mr. Garman, that --

2          UNIDENTIFIED ATTORNEY:  Your Honor, if I could, I did

3   object --

4          THE COURT:  We probably need to be more narrow in the

5   answers because we're trying to finish up in the one day here,

6   so --

7          MR. GARMAN:  Your Honor, I'm going to be in and out

8   in less than an hour.

9          THE COURT:  Okay, well --

10          MR. GARMAN:  And we're going to be pretty efficient

11   here.

12          THE COURT:  This was more directed --

13          MR. GARMAN:  So I will tighten it up, thought.

14          THE COURT:  This was more directed to Mr. LaPierre

15   than you, Mr. Garman.

16          THE WITNESS:  I will, Your Honor.

17          THE COURT:  Okay; thank you.

18          THE WITNESS:  I will.

19   BY MR. GARMAN:

20   Q    Mr. LaPierre, how many members does the NRA have right

21   now?

22   A    Just under 4.9 million members.

23   Q    Do -- what efforts do you undertake to grow that number?

24   A    Well, I mean, I do everything I can to encourage people to

25   join.  We do -- we do mail, we do email, we do prospecting that

LaPierre - Direct/Garman                    111

1  I usually sign.  It -- we -- you know, we do TV appearances,

2  which people see it and go, "Hey, I want to join."  Anything we

3  can to get the NRA in front of the American public, we do

4  because when people see us out there, they join.

5  Q    And is that an important part of being Executive Vice

6  President?

7  A    It's an essential part of being the Executive Vice

8  President.

9  Q    Sir, changing chapters now, back to the lobbying component

10 you testified about earlier.  We need to do it briefly, but can

11 you identify notable legislative wins that you've overseen on

12 behalf of your members?

13 A    Well, I think one of the big -- the biggest is the

14 McClure-Volkmer bill where we basically rewrote the entire 68

15 Gun Control Act to -- it was way too broad.  Everything was a

16 felony, you didn't have to have intent.  We wrote it to protect

17 law-abiding citizens, but we also took all the law enforcement

18 amendments to make sure that law enforcement could still do its

19 job.

20         But we also passed bills like preemption where you

21 didn't have a crazy patchwork quilt of gun laws in every state

22 where if you drove from one town to another, you'd be in

23 violation of the law.

24         We passed range protection laws, hunter protection

25 laws, emergency power bills where the Government couldn't come

LaPierre - Direct/Garman                        112

1  into your house in a time of emergency and take your gun and

2  leave you defenseless.

3         We passed right to carry laws in virtually 40 some

4  states where law-abiding people could carry a firearm for

5  personal protection.

6         And then ultimately the Heller and McDonald

7  decisions, which NRA was involved with, where the Supreme Court

8  declared the Second Amendment on an individual right, not the

9  Government's right.

10 Q    Sorry, I was waiting.

11 A    We also worked to arm America's airline pilots, and we

12 also worked on legislation to -- where retired police officers

13 could carry a firearm also.

14 Q    Turning, sir, to hunters, you talked about hunters a

15 minute ago, is that an important community for the National

16 Rifle Association?

17 A    It is.  I mean, there are -- it's less than it used to be

18 in terms of numbers, it's probably 15, 16 million now; it used

19 to be in the twenties.  But, yes, it's an important community

20 for the NRA to reach, yes.

21 Q    And do you -- and does the NRA take steps to grow its

22 relationship with the hunting community?

23 A    Yes, I mean, NRA used to do virtually all the legislative

24 work on the hunting issue on Capitol Hill because all of the --

25 and the State legislatures, because all these other hunting

LaPierre - Direct/Garman                                    113

1  groups were actually 501(c)(3) groups, and they couldn't lobby.

2  But NRA wasn't perceived as a hunting organization, so one of

3  the things I tried to do was get the NRA in front of the

4  hunting community as a hunting organization.  So I would go

5  speak at as many events, like the Mule Deer Association, or the

6  Wild Sheep Foundation.

7           We have programs now like hunter safety courses that

8  we do online where people can get their permit for hunting.

9           We have programs like the youth hunter education

10 challenge, which teaches young people about the outdoors, and

11 about hunter safety and ethics.

12 Q    And, sir, can you -- can you tell me, do you have an

13 understanding of what Shikar is?

14 A    I do.  Shikar is probably the premier hunting organization

15 in the world in terms of professional -- in terms of hunters,

16 men and women.

17 Q    And does the NRA have a relationship with that

18 organization?

19 A    We do.  I, along with my wife, both became members of

20 Shikar as a result of our hunting experience.  And we attend

21 the convention every year, not this year because of this

22 hearing that's going on, but, yes, we are members, and have

23 gone into that organization and formed a relationship with it.

24 Q    And do you remember members for the New York Attorney

25 General asking you questions about a piece of jewelry purchased

LaPierre - Direct/Garman                          114

1  from Neiman Marcus, do you remember that?

2  A    Yeah, I sure do.  It --

3  Q    So, one, can you tell us what that piece of jewelry is,

4  and then I'll ask you the next question?

5  A    Yeah, what that was is -- and Shikar asked the

6  organizations to donate to their auction where they raise over

7  a million dollars a year at their auction.  And my wife

8  happened to be walking through Neiman Marcus Last Call, which

9  is where they mark down stuff 50, 60, 70, 80 percent.  And she

10 saw this necklace that she thought -- because she knows pretty

11 much what women hunters like.  And she purchased it, gave --

12 for the NRA to donate to the Shikar auction, and I put it on my

13 expenses, and it -- she --

14 Q    And, sir --

15 A    (Indiscernible - multiple speakers).

16 Q    So, did you, in fact, donate that to Shikar as an auction

17 item?

18 A    We did.  She bought it for -- I think it was something

19 like seven -- a thousand -- seven hundred and fifty dollars.

20 It was worth forty-five hundred, and Shikar actually auctioned

21 it off at their auction for $7,500.

22 Q    And did you attend that auction -- that meeting?

23 A    I did.  I did.

24 Q    And -- and did the -- did the NRA receive a benefit for

25 being associated with Shikar, and attending that meeting?

LaPierre - Direct/Garman                    115

1  A     Yes, I actually came back from that meeting with a

2  $3 million check for the NRA Foundation from the Shikar

3  Foundation.  And I also provided documentation to the NRA from

4  Shikar on all the backup.

5  Q     And, sir, you're generally familiar with the allegations

6  that have been made against you by the New York Attorney

7  General, right?

8  A     I am.

9  Q     And are you familiar with allegations that you have

10 purchased gifts for the NRA staff?

11 A     I am.

12 Q     And can you tell us -- well, one, is that true?  Have you,

13 in fact, purchased gifts for NRA employees?

14 A     Yes, I have.  I thought it was a smart thing to do.  I

15 mean, I'm kind of the -- in my position, the EVP, or any EVP,

16 you're kind of the glue that's trying to hold the organization

17 together, and keep morale up.  And I thought it was a good idea

18 to give Christmas gifts, or if somebody had a baby, or a

19 wedding, something like that --

20 Q     And could you -- Mr. -- Wayne, could you tell us the

21 scale?  How big were these gifts that you gave to employees,

22 and what types of gifts were they?

23 A     Well, to the staff, I mean, most of them were like ice

24 cream and, you know, 12 -- 12 pints of ice cream or six pints

25 of ice cream.  Occasionally, it would be something different if

LaPierre - Direct/Garman                    116

1  we -- but it was -- it was -- it was things like that to the

2  staff.

3  Q    Okay.  And, sir, the final topic I want to talk about is -

4  - you had more to say on this subject, but do you remember

5  being questioned about the course correction?

6  A    Yes, I do.

7  Q    And in your own words, sir, what was the -- what is the

8  course correction?

9  A    Well, the course correction was Tom King called me up, and

10 relayed a conversation he had about the fact that New York non

11 -- with someone -- and about --

12        MR. SHEEHAN:  Your Honor, could I object on the basis

13 of hearsay?

14        MR. GARMAN:  Your Honor, I'm not -- he's not

15 testifying as to the truthfulness of Tom King's statement.  I

16 think he's simply saying that that was the catalyst for his

17 course correction.

18        THE COURT:  Not the content then.  Why don't you

19 restate your question?

20 BY MR. GARMAN:

21 Q    So let's -- Mr. LaPierre, let's take this piece-by-piece.

22 Just from a high level, what is -- what is the course

23 correction, in your own words?

24 A    The course correction is I decided that it was only a

25 smart management thing to do to take a 360 degree look at every

LaPierre - Direct/Garman                    117

1 NRA employee, including myself, every NRA vendor, to make sure

2 that the organization was in complete compliance with New York

3 State not-for-profit law, was in compliance in terms of our

4 internal procedures, and was in compliance in terms of our

5 controls to the point where there was not a possibility of

6 overrides, and just do an entire safety check of the entire

7 organization.  I just thought that was a smart thing to do for

8 the organization.

9 Q    And, sir, what was the catalyst for starting the course

10 correction?

11 A    Well, the catalyst is when -- it was explained to me that

12 there were a lot of changes in New York not-for-profit law, and

13 someone suggested that there might even be an investigation,

14 that I decided the smart, prudent thing to do, whether or not

15 there was an investigation, but just from a management

16 standpoint, was to let's take a complete look at the

17 organization, every employee, every vendor, and make sure we're

18 in compliance, and that we have best practices, and we actually

19 encouraged, as we went through that the whistle-blowers to step

20 forward.  We checked out every whistle-blower complaint, ran it

21 down just to make sure that the organization was functioning.

22 We had always had clean audits.

23 Q    And -- and then when did -- when did the course correction

24 begin?

25 A    It started in 2017, and continued throughout 2018.  I

LaPierre - Direct/Garman                                    118

1  think in 2019, we did compliance seminars in the summer of

2  2018, we worked with the whistle-blowers during the summer of

3  2018, checking out all of their complaints, and just running

4  down everything.

5  Q    And -- and --

6  A    Because we (indiscernible - multiple speakers).

7  Q    Yeah.

8  A    If there was any mistake, we wanted to correct it.  If

9  someone was taking advantage, we wanted to pursue it.  And we

10  just wanted to get everything right.

11  Q    And where does the NRA stand today in the context of its

12  course correction?

13  A    I think the NRA is in a much better place today.  I think

14  it's stronger.  I think the controls are stronger.  I think the

15  -- the possibilities of any overrides of controls are -- it is

16  not going to happen, the protections are in place.  And I feel

17  very good about where we are, and I know that when a -- a

18  recent 2019 audit, they looked at everything that had come up,

19  in the media and everything else, and we received a completely

20  clean audit.

21          So it's one of the things I'm proudest of, the fact

22  that I've done in my career, to tell you the honest truth is

23  take this organization for the last three years down this

24  principle path of looking at every employee, including myself,

25  every vendor, and making sure the organization is in compliance

LaPierre - Cross/Sheehan                    119

1 with New York State law, but also has all its controls in place

2 internally with its procedures, and that it's right where it

3 ought to be.

4 Q    Mr. LaPierre -- thank you, sir, I appreciate your

5 testimony today.

6         MR. GARMAN:  Your Honor, I'll pass the witness.

7         THE COURT:  Thank you.

8         We'll go in the same order that we've been going on.

9 I just want to say, everyone, certainly gets the right to

10 cross-examine Mr. LaPierre.  I'm going to remind you that we've

11 had six hours with the movants asking him questions already, so

12 if you could be efficient, and not duplicate others, I think we

13 can move through the day.

14         Mr. Sheehan, you get to go first.

15         MR. SHEEHAN:  Thank you, Your Honor.

16                         CROSS-EXAMINATION

17 BY MR. SHEEHAN:

18 Q    Good morning, Mr. LaPierre.

19 A    Good morning.

20 Q    I'm going to ask you a series of questions, and I will try

21 to keep this brief.  Starting off with the course correction

22 that you just described, you were the leader of it, right?

23 A    I was; I was the one that started it, and I was the one

24 that kept us on the principle path, no matter how hard anybody

25 tried to take us off of it.

LaPierre - Cross/Sheehan                    120

1  Q    Okay.  And you understand the National Rifle Association

2  is a New York charity, right?

3  A    I do.

4  Q    And you understand that it's been a charity in New York

5  for 150 years, correct?

6  A    Yes.

7  Q    And you understand that as an officer of this New York

8  charity, you have a fiduciary duty to perform your duties in

9  good faith, and with the care of a prudent person, correct?

10 A    Yes.

11 Q    And you understand that as an officer of a New York

12 charity, you may receive only reasonable compensation for your

13 services for the charity, correct?

14         MR. GARMAN:  Your Honor, I object, only to the extent

15 that calls for a legal conclusion.

16         THE COURT:  I sustain that, but the witness may give

17 his understanding, if he has one.

18         You may answer the question, if you have an

19 understanding, Mr. LaPierre.

20 A    I -- I -- I don't really have an understanding of the law

21 on that.

22 Q    All right.

23 A    I -- I think my compensation has always been reasonable.

24 Q    All right.  And you understand that the -- as an officer

25 of a New York charity, you cannot distribute the assets of the

LaPierre - Cross/Sheehan                        121

1 charity, except for the charitable mission, correct?

2 A    I would -- I would believe that everything I've done is in

3 the best interest of the NRA and --

4 Q    Mr. LaPierre, is it your understanding that you're not

5 allowed to distribute the revenues of the NRA to yourself or

6 other officers and directors except as compensation?

7 A    Yes.

8 Q    Okay.  And do you also understand that under New York

9 charities law, the NRA cannot enter into a transaction which

10 you have a financial interest without the approval of the Board

11 or an authorized committee?

12         MR. GARMAN:  Your Honor, again, I object only to the

13 extent it calls for a legal conclusion.

14         THE COURT:  Same ruling.

15         MR. SHEEHAN:  Now --

16         THE COURT:  You may answer the question, Mr.

17 LaPierre, if you know the answer.  I sustained legal

18 conclusion.

19 A    Yes.  Yes, I believe that's true.

20 Q    Okay; thank you.  In earlier testimony, you said the New

21 York Attorney General commenced her charities investigation at

22 the NRA because of bias, correct?

23         MR. GARMAN:  Your Honor, I do want to object here.

24 I've been very careful under the scope of the direct, that's

25 relating back to the movant's case in chief, and I believe it's

LaPierre - Cross/Sheehan                          122

1   inappropriate under Rule 611.

2            THE COURT:  I sustain that, Mr. Sheehan.

3            MR. SHEEHAN:  Thank you.

4   BY MR. SHEEHAN:

5   Q    You told us in your testimony that the NRA took the

6   whistle-blowers' complaints very seriously, correct?

7   A    Yes, we did.  We -- we backed them completely, and I --

8            MR. SHEEHAN:  Objection, Your Honor; move to strike.

9   It's asking for a yes or no.

10  A    Yes, we did.

11           THE COURT:  Sustained.

12  Q    And isn't it true that, Mr. LaPierre, that you did not see

13  the whistle-blowers' complaints until June 6th -- June 19th of

14  2020?

15           MR. GARMAN:  Your Honor, I'm going to object again.

16  There was no substantive testimony about whistle-blowers or

17  specific whistle-blower complaints in my direct.

18           THE COURT:  I think this may be --

19           MR. SHEEHAN:  Your Honor --

20           THE COURT:  I think this may be being used to impeach

21  him.  Overruled.

22           MR. SHEEHAN:  All right.  Your Honor -- okay.

23           THE COURT:  I overruled the objection.

24  Q    So --

25           MR. SHEEHAN:  Thank you, Your Honor.

LaPierre - Cross/Sheehan                              123

1  Q    Mr. LaPierre, you did not even see the whistle-blowers'

2  top concerns memo until June 19th, 2020, correct?

3  A    What I did is when I heard the whistle-blowers --

4            MR. SHEEHAN:  Your Honor, move to strike.

5            THE COURT:  Just answer the question, Mr. LaPierre.

6  A    No, I think that's about when I saw it.

7  Q    Okay.  And that was nearly two years after that whistle-

8  blowers' concerns memo was presented to the Audit Committee,

9  correct?

10 A    Yes, that's when I saw the entire list.

11           MR. SHEEHAN:  Mr. Conley, can you pull up Exhibit

12 129, please?

13           THE COURT:  Is this NYAG --

14           MR. SHEEHAN:  Is it open already?

15           THE COURT:  NYAG?

16           MR. SHEEHAN:  Yes, Your Honor, 179.

17           MR. GARMAN:  I'm sorry, Your Honor, this is my fault,

18 I need to send somebody up to get the exhibits opened on Mr.

19 LaPierre's computer.

20           THE COURT:  That's not a problem.

21                       (Pause)

22           THE COURT:  Your lawyers are all fast on the hoof,

23 Mr. Garman.

24           MR. GARMAN:  Mr. Noall might not be as fast as Mr.

25 Ciciliano.

LaPierre - Cross/Sheehan                    124

1              (Laughter)

2              MR. NOALL:  Mr. Sheehan, that was -- you said NYAG

3  what number?

4              MR. SHEEHAN:  179.

5              (Pause/Off-the-record Colloquy)

6  BY MR. SHEEHAN:

7  Q   So, Mr. LaPierre, do you have it in front of you now?

8  A   I -- I -- I do, but I -- we're working on it.

9              MR. NOALL:  Where would you like the witness to view

10 the document, Mr. Sheehan?

11             MR. SHEEHAN:  It's the second page on the PDF, which

12 is the list of top concerns for the Audit Committee.

13             (Pause)

14 A   Yes, I'm looking at it right now.

15 Q   All right.  And just to recapitulate, you did not see this

16 document between the time it was submitted to the Audit

17 Committee in 2018 and June 19th, 2020, correct?

18 A   I don't think I saw the draft of this document, that would

19 be correct.  But what I did do --

20             MR. SHEEHAN:  Objection, Your Honor.

21             THE COURT:  Sustained.  Just --

22             MR. SHEEHAN:  Beyond I didn't see the draft.

23             THE COURT:  Just answer the question.

24 A   I'm not sure when I finally saw this document.

25 Q   So on -- let's go on from that document to New York AG

LaPierre - Cross/Sheehan                              125

1  Exhibit 138.

2          MR. SHEEHAN:  May I ask, Mr. Noall, are you going to

3  have to stay with the witness?

4          MR. NOALL:  I can try and find somebody else to do

5  it, if you would like me to.

6          MR. SHEEHAN:  No.

7          MR. NOALL:  I'm just trying to help Mr. LaPierre with

8  the exhibits.

9          MR. SHEEHAN:  Okay.

10          MR. NOALL:  Is there an objection to that?

11          MR. SHEEHAN:  No.

12  A    Yes, I do.

13  Q    Okay.

14          MR. SHEEHAN:  Maybe we can try to screen share on

15  Exhibit 138, Mr. Conley.

16  Q    All right.  I'm showing you, Mr. LaPierre, Exhibit 138,

17  which purports to be a contract between the NRA and yourself,

18  do you see that document?

19  A    I do see that document.

20  Q    And do you see the signature on the bottom of the second

21  page?

22          MR. GARMAN:  Your Honor, I'd like to lodge an

23  objection to being outside the scope, and I'm going to start

24  objecting that the testimony is cumulative.

25          MR. SHEEHAN:  Your Honor --

1          THE COURT:  Mr. Sheehan --

2          MR. SHEEHAN:  I'm sorry; yes.

3          THE COURT:  -- address scope, and also cumulative, if

4   you would.

5          MR. SHEEHAN:  Your Honor, what happened here, he

6   testified that there was a course correction in 2018, and in

7   2017, 2018, and 2019 as a direct result of his intervention,

8   and we would like this document to show, in fact, it was not a

9   course correction, that he continued with the practices that

10  had existed before, especially for himself.

11         THE COURT:  Overruled.

12         THE WITNESS:  May I explain, Mr. Sheehan?

13         THE COURT:  No.

14         MR. GARMAN:  No, hold on, Wayne.

15         THE COURT:  Overruled.  May be used for impeachment,

16  I think.  But I do think we do not need to cover the same

17  ground we covered in the examination of the witness a couple

18  weeks ago.

19         MR. SHEEHAN:  Understood, Your Honor.

20  BY MR. SHEEHAN:

21  Q    When this document was signed, Mr. LaPierre, it was signed

22  on May 5th, 2018, correct?

23  A    Correct.

24  Q    And it was signed by you, Mr. Phillips, Mr. Brownell, and

25  Ms. Meadows, correct?

LaPierre - Cross/Sheehan                    127

1  A    Correct; it was presented to me by the -- by the --

2            MR. SHEEHAN:  Objection; move to strike.

3            THE COURT:  Just answer the question, Mr. LaPierre.

4  A    Yes.

5  Q    All right.  And on the day this document was signed, May

6  5th, 2018, isn't it true that Mr. Brownell had two days left in

7  his term as President at the NRA?

8  A    I'm not sure of that, but that could be true.  It -- his

9  term was coming to an end.

10 Q    His term was coming to an end because it was the annual

11 meeting of the NRA, correct --

12 A    That's correct.

13 Q    -- in Dallas?

14 A    Yes.

15 Q    And the election was going to be held on May 7th, 2018,

16 correct?

17 A    Yes.

18 Q    All right.  And this document, that is Exhibit 138, that

19 you signed, and that Mr. Phillips signed was to go into effect

20 for -- until 2030, is that correct?

21 A    Yes, it was.

22 Q    All right.  And the -- isn't it true that for the years --

23 if you were fired as the head of the NRA, as the Executive

24 Director, this contract would continue until 2030, and you

25 would receive approximately $17 million in compensation post

LaPierre - Cross/Sheehan                    128

1  employment as EVP, correct?

2         MR. GARMAN:  Your Honor, I'd like to object, under

3  the best evidence rule, the document speaks for itself.

4         MR. SHEEHAN:  All right.

5         THE COURT:  That's --

6         MR. SHEEHAN:  Your Honor, maybe I can rephrase.

7         THE COURT:  Yeah, I sustain that.

8         MR. SHEEHAN:  Okay.

9  BY MR. SHEEHAN:

10 Q   So let's take a look at the document at 138, and go to the

11 revised seven-year schedule.  So for 2019, you're going to

12 receive $1,300,000 if you were fired EVP of the NRA, correct?

13        MR. GARMAN:  Your Honor, I'd lodge the same

14 objection.

15        THE COURT:  I'll permit the witness to answer that

16 question.

17 A   Yes, that's what the document says.

18 Q   And that was your understanding of the contract, too,

19 right?

20 A   Yes.

21 Q   And for 2020 to 2025, you're going to get a million and a

22 half dollars a year for six years, correct?

23 A   Yes, that's what the document says.

24 Q   Okay.  And then from 2026 to 2028, you're going to get

25 three more years at $1,500,000.

LaPierre - Cross/Sheehan                    129

 1  A    Yes, that's correct.

 2  Q    Okay.  And $1.3 million in 2029 and 2030, correct?

 3  A    Yes.

 4  Q    All right.  And this contract executed on May 5th, 2018 by

 5  Mr. Brownell and Ms. Meadows, Ms. Meadows is the current

 6  President of the NRA?

 7  A    Yes, that's correct.

 8  Q    And she's the head of the Special Litigation Committee?

 9  A    Yes.

10  Q    All right.  This contract -- this -- was this contract

11  approved by the Board?

12  A    I -- I don't think it was.  It was approved by the Comp

13  Committee.

14  Q    Okay.  So the compensation for you was not approved by the

15  Board, correct?

16  A    As far as I'm aware, I'm not in those sessions, it was

17  approved -- I know it was approved by the Comp Committee.

18  Q    How do you know --

19  A    I --

20  Q    -- it was approved -- I'm sorry.  Let me --

21  A    May I explain?

22  Q    Well, no.  Let's -- let's walk through with respect to

23  this contract.  This is the only employment contract you had

24  between May 5th, 2018, correct, and January -- January 7th,

25  2021, right?

LaPierre - Cross/Sheehan                    130

1  A    Yes, although I thought it had been torn up in 2019.

2         MR. SHEEHAN:  Objection; move to strike, Your Honor.

3         THE COURT:  Sustained.

4         Mr. LaPierre, you're going to get off the stand a lot

5  quicker if you just listen to the question that's asked, and

6  answer it.

7         THE WITNESS:  Yes, sir, Your Honor.

8  BY MR. SHEEHAN:

9  Q    So --

10 A    Yes.

11 Q    Yes, just to confirm, to your knowledge, this contract was

12 never submitted to the Audit Committee for review as a related

13 party transaction, right?

14 A    I'm not aware of whether it was or wasn't.

15 Q    So to the best of your knowledge, it was not submitted to

16 the Audit Committee, correct?

17 A    I'm not aware of whether it was or wasn't.

18 Q    So to the best of your knowledge, it wasn't.

19 A    I don't know whether it was.

20 Q    This contract stayed in effect until January 7th, 2021

21 when it was replaced with your new employment contract,

22 correct?

23 A    That is correct.

24 Q    And that's -- that's the Exhibit 50, which we've looked at

25 before, with a one-year term.

LaPierre - Cross/Sheehan                           131

1  A    Correct, and the Board --

2          MR. SHEEHAN:  Objection, Your Honor; move to strike.

3          THE COURT:  Sustained.

4  Q    And isn't it true, Mr. LaPierre, in addition to your

5  contract on May 5th, 2018, the NRA entered into an independent

6  consulting agreement with Treasurer Woody Phillips, correct?

7          MR. GARMAN:  Your Honor, I believe this is -- this is

8  cumulative, and it's well outside the scope of my examination.

9          THE COURT:  I think it is getting cumulative, Mr.

10 Sheehan, so help me on why we need to do this again.

11         MR. SHEEHAN:  Course -- it's course of conduct, Your

12 Honor.  The same day -- what we're prepared to show is that the

13 same day that Woody Phillips signed off on Mr. LaPierre's

14 contract, and Mr. Brownell, who was leaving in two days, signed

15 off on Mr. LaPierre's contract, and Ms. Meadows, who is the

16 head of the independent litigation committee, signed off on it,

17 this is not -- insider contract, the second insider contract

18 that Mr. LaPierre and the NRA entered into.

19         THE COURT:  But --

20         MR. SHEEHAN:  It's inconsistent with the theory of

21 course correction.

22         THE COURT:  Isn't that already in the record, though?

23         MR. SHEEHAN:  The -- Your Honor, I understand what

24 you're saying, let's keep moving.

25         THE COURT:  Yeah.

1          MR. SHEEHAN:  I just --

2          THE WITNESS:  No, I did not enter into this

3  contract --

4          MR. GARMAN:  Wayne --

5          THE COURT:  Wait, hold on.  Hold on.

6          MR. GARMAN:  Wayne, wait for the Judge.

7          THE COURT:  Mr. LaPierre, I just ask that you would

8  sort of move it along so we can do the things that we said that

9  we were going to accomplish today, Mr. Sheehan.

10          MR. SHEEHAN:  Yes.

11          THE COURT:  And I hear you, too.  You've made a point

12  with me, all right?

13          MR. SHEEHAN:  Thank you, Your Honor.

14  BY MR. SHEEHAN:

15  Q    Mr. Phillips was paid in 2019 under this contract,

16  correct?

17  A    I was not aware of this contract.

18  Q    Okay.  It was entered into on the same day that your

19  contract was entered into, May 5th, 2018.

20          MR. GARMAN:  Your Honor, asked and answered.

21          THE COURT:  Sustained.

22  Q    Wasn't the Woody Phillips contract included in the 2019

23  EVP budget.

24  A    I have no knowledge of that; I don't know.

25  Q    Okay.  When the course correction began in 2017, all

1 right, which you took charge of --

2 A    I did.

3 Q    You've got to let me ask the question, Mr. LaPierre.

4 Isn't it true that after the course correction began, you and

5 your wife looked at several homes in the Dallas, Texas area

6 with a realtor and an Ackerman executive?

7             MR. GARMAN:  Your Honor, we are well outside the

8 scope.  The evidence is that no house was purchased.  This

9 feels cumulative and outside a very narrow scope of my

10 examination.

11            THE COURT:  I'll permit it for brief impeachment.

12 But, again, this is already in the record, Mr. Sheehan, so --

13            MR. SHEEHAN:  Okay.

14            THE COURT:  And we have a judge trial, so -- thank

15 you.

16            MR. SHEEHAN:  Your Honor, all right.

17            THE COURT:  Answer the question, Mr. LaPierre.

18 A    I did not propose anyone buying a house for us.  We looked

19 -- Ackerman McQueen suggested that -- I didn't propose anyone

20 buying a house for us.  We did look at some houses --

21            MR. SHEEHAN:  Your Honor, move to -- move to strike

22 as non-responsive.

23            THE COURT:  Sustained.

24            Mr. LaPierre, please just answer the question that's

25 asked.

1 A    We looked -- we looked -- my wife and I were driven around

2 by a realtor and looked at some houses.

3 Q    In April of 2018?

4 A    That's correct.

5 Q    With respect to the course correction and the 100 percent

6 compliance, did the NRA have a written policy with respect to

7 charter flights ever?

8         MR. GARMAN:  Your Honor, I'm going to object.  It

9 misstates his testimony; he never said 100 percent compliance,

10 I don't believe.

11         MR. SHEEHAN:  Fair enough.  Your Honor, let me

12 rephrase the question.

13         THE COURT:  Okay.

14 BY MR. SHEEHAN:

15 Q    Would you agree with me that as of the end of 2019, the

16 NRA still had no written policy on charter flight travel?

17 A    The -- the NRA security office had a policy on private

18 travel.

19         MR. SHEEHAN:  Your Honor, I move to strike as non-

20 responsive.

21         THE COURT:  Overruled.

22 Q    Mr. LaPierre, did the NRA, by the end of 2019, after your

23 course correction, have a written policy on charter travel for

24 you?

25         MR. GARMAN:  I object; asked and answered.

1            THE COURT:  I think the question is slightly

2   different.

3            You may answer the question, sir.

4   A    I'm not aware of whether the NRA has put that policy in

5   writing or not, the NRA Security Committee has put it in --

6   Q    Okay.

7   A    -- in writing or not.

8   Q    Have you ever seen a written policy that requires you to

9   fly charter?

10  A    I haven't seen -- no, I haven't.

11  Q    Okay.

12           MR. SHEEHAN:  Your Honor, could I just take a few

13  minutes' break to see if I can shorten my questioning?

14           THE COURT:  Certainly.  Why don't we all take about

15  five minutes.  But really, let's limit it to five because we

16  want to try to move things along.

17           Mr. LaPierre, you've heard me say this, I think, when

18  you were testifying last time, during the break, don't speak

19  with anyone about your testimony, you're in the middle of

20  examination, do you understand that?  Okay.

21           THE WITNESS:  I do, Your Honor.

22           THE COURT:  We'll come back in -- we'll come back in

23  in just about five minutes.

24              (Recess 11:32 a.m./Reconvene 11:37 a.m.)

25           THE COURT:  Ready, Mr. Sheehan?

LaPierre - Cross/Sheehan                    136

1          MR. SHEEHAN:  Yes, Your Honor.  And I take to heart

2   your request that we move quickly, and we're going to try to do

3   that.

4          THE COURT:  Okay.

5   BY MR. SHEEHAN:

6   Q    Mr. LaPierre, with respect to Mr. Robert Kyle Weaver,

7   isn't it true that payments to Mr. Weaver continued after the

8   course correction began?

9   A    I'm not sure when the last payment to Mr. Weaver was.

10  Q    Okay.  The 2019 990 recites that he got paid over $200,000

11  in 2019, is that consistent with your understanding?

12  A    Again, I -- I -- I'd have to see the document.  If that's

13  in the 990, I'm sure it's accurate.

14  Q    Okay.  And there's been no disgorgement of the amounts

15  paid to Mr. Weaver under this contract, correct?

16  A    That's -- yes.

17  Q    All right.  And with respect to Mike Marcellin -- is it

18  Michelle Marcellin?

19  A    It's Mike Marcellin.

20  Q    Okay.  He was the former managing director of Affinity

21  Programs at the NRA, correct?

22  A    Correct.

23  Q    And he had a consulting contract with the NRA after he

24  left the Association, correct?

25  A    I wasn't aware of that.

LaPierre - Cross/Sheehan                           137

1  Q    All right.  Isn't it true that in 2020, the NRA paid Mr.

2  Marcellin $748,000 as reflected on the statement of financial

3  affairs?

4  A    I don't know.

5        MR. SHEEHAN:  Could you just pull that up, Mr.

6  Conley?

7                         (Pause)

8  Q    So you see, Michael Marcellin --

9        MR. GARMAN:  What number exhibit?

10        MR. SHEEHAN:  I'm sorry, this is Exhibit 193.

11  A    Yes, I see it.

12  Q    Do you see there are two payments, one in January and one

13  in April, for $374,100 apiece?

14  A    Yes, I see that.

15  Q    And is it your testimony you don't know what that payment

16  was for?

17  A    I knew nothing about the Mike Marcellin contracts or

18  payments --

19  Q    Okay.

20  A    -- or anything about that at all, to tell you the truth.

21  Q    Do you know if those contracts -- these payments were

22  examined to see if they should be disgorged?

23  A    I had no idea.

24  Q    Okay.  Do you know Mr. Robert Marcario?

25  A    I do.

LaPierre - Cross/Sheehan                    138

1  Q    And isn't it true that he was the NRA's Managing Director

2  of Membership until the end of 2015?

3  A    Correct.

4  Q    And he got a post employment contract for 10,000 per month

5  through 2020, correct?

6  A    I know he had a two-year -- I think -- I believe it was a

7  two-year contract.  I was not aware that someone extended his

8  contract beyond that.

9  Q    And if you look at what -- at Exhibit 193, you'll see

10 under Mr. Marcario there's a breach of contract settlement for

11 $200,000, do you see that?

12 A    I do.

13 Q    Did you authorize that payment?

14 A    I knew that our lawyers were talking with Mr. Marcario

15 about reaching a settlement.

16 Q    Okay.  Okay.  Did you authorize that payment?

17 A    I authorized them to -- they thought it was a --

18          MR. SHEEHAN:  Objection; move to strike, Your Honor.

19          MR. GARMAN:  Your Honor, he's trying to answer.

20 A    I took the lawyer's advice.

21 Q    So you authorized the payment.

22 A    I -- I -- I took the lawyer's advice on what they thought

23 we ought to do.

24 Q    So you authorized the payment.

25 A    Yes, I accepted the lawyer's -- our lawyer's legal

LaPierre - Cross/Sheehan                               139

1  judgment.

2  Q    And there was no review of Mr. Marcario's payment to

3  determine whether there should be disgorgement as an excess

4  benefit, correct?

5  A    I don't know; that was all done with the lawyers, and I

6  wasn't even aware of the contract extension.  It was done

7  without my knowledge.

8  Q    Okay.  Let's move on to the issue of the Chief

9  Restructuring Officer.  Now did you read the application of the

10 NRA for a Chief Restructuring Officer?

11 A    I did.

12 Q    Okay, good.

13 A    Or I think I signed it back in April or --

14 Q    It seems like a long time ago, doesn't it?

15 A    Well, it -- yeah, it does.

16 Q    Okay.

17                      (Laughter)

18          MR. SHEEHAN:  Mr. Conley, could you pull up Docket

19 Number 519?

20 Q    This is the --

21          MR. SHEEHAN:  You're -- Mr. Noall, you're still

22 pulling it up for him?

23          MR. NOALL:  Standby.  I'm sorry, was that an exhibit

24 or a docket entry?

25          MR. SHEEHAN:  It was a docket entry 519 marked for

1  identification as Exhibit 677, I believe.  No, 367.

2        MR. NOALL:  Did you say 367?

3        MR. SHEEHAN:  Correct.

4        MR. NOALL:  NYAG 367?

5        MR. SHEEHAN:  One second.

6        MR. NOALL:  Standby.

7        MR. SHEEHAN:  One second, Your Honor.

8                        (Pause)

9        MR. SHEEHAN:  Your Honor, this is one of the NRA's

10 documents, it is not admitted yet, I'd like to move for its

11 admission.

12       MR. GARMAN:  We don't have Exhibit 367, but I have no

13 objection to the Court taking judicial notice of pleadings we

14 filed on the docket.

15       THE COURT:  What's the docket entry because my

16 exhibits don't go that far.

17       MR. SHEEHAN:  It's Docket Number 519, Your Honor.

18                        (Pause)

19       MR. NOALL:  I don't have in the witness exhibit room

20 docket entries on the record, Mr. Sheehan.

21       (Mr. Sheehan engaged in off-the-record colloquy)

22 BY MR. SHEEHAN:

23 Q    Mr. LaPierre, can you see the application?

24 A    Yes.  Yes, I can.

25 Q    All right.  Do you believe the creditors need to be

LaPierre - Cross/Sheehan                    141

 1  provided assurance in this case that the NRA no longer has

 2  internal control problems?

 3  A    I -- I am in favor of a compliance officer --

 4          MR. SHEEHAN:  Objection, Your Honor; move to strike.

 5          THE COURT:  Sustained.

 6  Q    Do you believe the creditors in this case need assurance

 7  that the NRA no longer has internal control problems, Mr.

 8  LaPierre?

 9  A    I don't see any problem with that.

10  Q    I'm sorry.  Do you believe the creditors need to be

11  provided assurance that the NRA no longer has internal control

12  problems?

13  A    I believe NRA no longer has internal control problems, but

14  I have no problem with them getting reassurance of that.

15  Q    Okay.  So the document represents that the creditors need

16  to be provided assurance that the NRA no longer has internal

17  control problems.

18          MR. SHEEHAN:  And, Jonathan, can you pull up that

19  section of the document?

20                              (Pause)

21  Q    Mr. LaPierre, do you believe the parties in interest in

22  this case need an independent fiduciary -- need to be assured

23  there's an independent fiduciary overseeing these proceedings?

24  A    I -- I have talked with Mr. Robichaux, and I am in --

25          MR. SHEEHAN:  Objection; move to strike.

LaPierre - Cross/Sheehan                    142

1          THE COURT:  Overruled.

2   A    I'm in agreement with a Chief Restructuring Officer.

3   Q    Mr. LaPierre, do you believe that the parties in interest

4   need to be assured that there is an independent fiduciary

5   overseeing these proceedings, independent from the NRA?

6   A    I'm not -- I'm not sure I understand your question.

7   Q    The -- it's my understanding of the application that the

8   NRA is seeking an independent fiduciary, is that your

9   understanding in the form of --

10  A    In this -- in Mr. Robichaux.

11  Q    Right.

12  A    Yes, that's correct.

13  Q    And the reason the NRA is doing that is because the NRA

14  believes that the parties in interest need to be assured

15  there's an independent fiduciary overseeing these proceedings.

16          MR. GARMAN:  So, Your Honor --

17  A    Yes.

18          MR. GARMAN:  Your Honor, I do just want to interject

19  an objection for the record.

20          Mr. LaPierre testified that he signed the agreement.

21  I don't think he has testified he saw the application.  I think

22  we were talking past one another, so I actually would object to

23  foundation on the motion without more.

24          MR. SHEEHAN:  Your Honor, let me just -- I think I'm

25  almost finished, but let me just take two second.

LaPierre - Cross/Sheehan                    143

1         THE COURT:  Okay; take a couple seconds, you can.

2                          (Pause)

3         MR. SHEEHAN:  Mr. Conley, can you pull up Paragraph 9

4   of the document?

5   BY MR. SHEEHAN:

6   Q    And, Mr. LaPierre, do you see Paragraph 9 on that

7   document?

8   A    I do.

9   Q    And you see it says that the relief requested in this

10  application is necessary to the successful administration of

11  these Chapter 11 cases, do you believe that's correct?

12  A    Yes, I -- I did not negotiate this --

13  Q    Mr. LaPierre --

14  A    -- but I signed it.  I -- I --

15  Q    Mr. LaPierre --

16  A    Yes.

17  Q    Thank you.  And do you believe it's necessary to provide

18  assurance to creditors, parties in interest and the Court that

19  there is an independent fiduciary overseeing these proceedings,

20  do you believe that?

21  A    Yes.

22  Q    All right.

23        MR. SHEEHAN:  Thank you very much, Mr. LaPierre.

24        THE WITNESS:  Thank you.

25        THE COURT:  Thank you, Mr. Sheehan.

LaPierre - Cross/Gruber                          144

1          Let me just poll the remaining lawyers just for a

2     time estimate -- and approximate time estimate.  Ackerman for

3     cross of Mr. LaPierre?

4          MR. GRUBER:  Your Honor, I think five or ten minutes.

5          THE COURT:  Okay.  We can probably get that done

6     before we break.

7          Journey?

8          MR. WATSON:  Judge, Jermaine Watson.

9          Five minutes.

10         THE COURT:  Okay, maybe we can get that one in, too.

11         Committee?

12         MR. HENDRIX:  Your Honor, Nick Hendrix for the

13    Committee.

14         I don't believe we'll have any questions for Mr.

15    LaPierre today.

16         THE COURT:  Thank you, Mr. Hendrix.

17         Okay.  I want to go to about ten or so, there's no

18    magic to that, since we're going to have to start at 1:30

19    because there's a matter that is set for 1:30 in this case.

20         So, Mr. Gruber, why don't you go first for your five

21    to ten, and we'll see if Mr. Watson can get his done, too.

22         MR. GRUBER:  Thank you, Your Honor.

23                         CROSS-EXAMINATION

24    BY MR. GRUBER:

25    Q    Hello, Mr. LaPierre; how are you today?

LaPierre - Cross/Gruber                    145

1  A    I'm fine; good afternoon.

2  Q    So a lot of your testimony seemed to be about mainstream

3  America and your efforts to bring the NRA, I guess, closer to

4  mainstream America, would you say that's a fair restatement of

5  your testimony?

6  A    Yes, I would say NRA represents mainstream America.

7  Q    And you -- weren't you touting your own efforts as far as

8  that?  As far as making the NRA more acceptable to mainstream

9  America, is that correct?

10  A    I worked on that, along with others.

11  Q    Okay.  So not to ignore the elephant in the room, but

12  let's talk about elephants.  Have you read the newspapers for

13  the last few days about your hunt in Africa back a few years?

14  A    (Inaudible - weak Internet connection) the newspapers, but

15  I understand that there have been newspaper articles.

16  Q    Including Wall Street Journal, New York Times, USA Today,

17  most of them have covered it, haven't they?

18  A    I haven't read them, but I don't doubt it that they might

19  -- that they probably did.

20  Q    And would you agree that the consensus was you represent

21  all the hunters and the non-hunters?

22        MR. GARMAN:  Objection to vague and ambiguous

23  question.

24        THE COURT:  Why don't you restate your --

25  A    I don't -- I don't understand what you're questioning.

LaPierre - Cross/Gruber                    146

1        THE COURT:  Why don't you restate your question?

2 BY MR. GRUBER:

3 Q    So if you've gotten a report on the articles, isn't it

4 true that both hunters and non-hunters were upset by the video

5 that was released about your hunt?

6        MR. GARMAN:  Objection; hearsay, Your Honor.

7        THE COURT:  And also what's the relevance of this?

8        MR. GRUBER:  Your Honor, I think, first of all, it's

9 not just today, but this seems to be kind of putting a cap on

10 the testimony for the last week about how great and

11 indispensable Mr. LaPierre is for the NRA, and I am hearing the

12 same thing today, that he's gone out as far as fundraising and

13 all, was a big part of what he was talking about, he's gone all

14 across country fundraising, and introducing the NRA to

15 mainstream America.

16        And I -- our point is that we think Mr. LaPierre has

17 not done a very good job at all of connecting with mainstream

18 America, and has damaged the NRA brand over the last number of

19 years significantly.

20        THE COURT:  And so --

21        MR. GARMAN:  Your Honor, might I respond?

22        THE COURT:  Sure.

23        MR. GARMAN:  So, Your Honor, yesterday, or the day

24 before, Tony Makris, from Ackerman McQueen, released six-year-

25 old footage of Mr. LaPierre hunting an elephant that was

LaPierre - Cross/Gruber                   147

1  clearly designed to embarrass him the day before he took the

2  stand.

3         The fact that Mr. Makris' own lawyer is now

4  questioning him about it on something wholly unrelated to

5  whether a trustee should be appointed or dismissal of these

6  cases should occur is highly objectionable.

7         THE COURT:  I don't know that it's highly

8  objectionable.  Just for the record, so everyone knows, I have

9  not seen the video, but it's in the headlines.  I'm trying, as

10 I said a couple of times, trying to avoid, as much as I can.

11 There's something in the paper every day about this case.

12        I don't think we need to go there, Mr. Gruber.  So I

13 sustain the objection.

14        MR. GRUBER:  Okay.

15 BY MR. GRUBER:

16 Q   Well, how about -- could I ask this, just -- have you read

17 all the publicity over the last several weeks about the

18 bankruptcy?

19 A   I haven't.

20 Q   Have you gotten reports to you about all the negative --

21 all the publicity about the bankruptcy?

22 A   I have not been following the media.

23 Q   And you haven't been getting reports on it?

24 A   I -- I have not, I have avoided it.

25 Q   Okay.  So you don't have any idea that there's daily

1  negative press coming out about the bankruptcy -- the -- going

2  into bankruptcy by the NRA?

3          MR. GARMAN:  Object, Your Honor, it's an

4  argumentative question.

5          THE COURT:  Overruled.

6          Answer the question, if you can.

7  A    I -- I have not been following the media because I am not

8  supposed to know what people are saying in their testimony, and

9  I have not been following the media.

10          MR. GRUBER:  Your Honor, I don't have any other

11  questions for the witness.

12          THE COURT:  Thank you, Mr. Gruber.

13          Mr. Watson?

14          MR. WATSON:  Thank you, Your Honor; Jermaine Watson

15  on behalf of Judge Journey.

16                         CROSS-EXAMINATION

17  BY MR. WATSON:

18  Q    Good afternoon, Mr. LaPierre.

19  A    Good afternoon.

20  Q    You previously testified that the NRA has 4.9 million

21  members currently, is that correct?

22  A    Just under, yes.

23  Q    Okay.  How many --

24  A    Four eight nine seven or something like that.

25  Q    Thank you.  How many of those life members -- how many of

LaPierre - Cross/Watson                                  149

1  those members are life members?

2  A    I think about 55, 60 percent.

3  Q    Okay.  So would you -- would you estimate that -- that two

4  and a half million life members are members of the NRA?

5  A    I think that's probably correct.

6  Q    Thank you.  Isn't it also true that life members are the

7  primary voters for NRA Board members?

8  A    That's correct, although three -- I believe three and

9  five-year members can also vote, but I think you're correct.

10 Q    But of that body of members, isn't it a majority -- isn't

11 a majority of those members life members?

12 A    Yes, I think that's true.

13 Q    Okay.  Isn't it true that the NRA provides membership

14 services to life members?

15 A    Yes.

16 Q    And what types of services does the NRA provide to life

17 members?

18 A    We provide magazines every month, we provide what they

19 joined NRA for, all the great programs and the legislative

20 representation, and the advocacy.  We also provide Affinity

21 benefits for them, and all of that type of stuff.

22 Q    Does the NRA encumber -- have encumbered funds set aside

23 to take care of these membership services for life members?

24 A    We do.

25 Q    Okay.

LaPierre                                    150

1              MR. WATSON:  Thank you, Judge.  No further questions.

2              THE COURT:  Thank you, Mr. Watson.

3              MR. GRUBER:  Your Honor -- Your Honor, could I

4    address the Court for just a minute?

5              THE COURT:  Sure.

6              MR. GRUBER:  Mr. Garman made a statement that

7    surprised me, and I've just checked, and I think it's

8    completely untrue that Mr. Makris had anything to do with

9    releasing video.

10             I -- we know nothing of that, and we have confirmed

11   with the client that they don't believe that's true, so I --

12             MR. GARMAN:  It was reported in the --

13             MR. GRUBER:  -- (indiscernible - multiple speakers)

14   statement on the record, so --

15             MR. GARMAN:  It was reported in the Washington Post

16   yesterday that it was footage from Mr. Makris from Under Wild

17   Skies from 2014.

18             MR. GRUBER:  No, that's a misrepresentation of -- it

19   -- it occurred on a trip that he was on, but there is nothing

20   reporting that the video was released by Mr. Makris.  If we

21   need to call him in rebuttal, we'll do so.

22             THE COURT:  Well, if it helps, Mr. Garman's statement

23   is not evidence; yours isn't evidence either.  I'm certainly

24   not going to think that anybody's testified the source of the

25   tape -- or video, whatever, but we didn't let the video or

1  discuss it, or it come into the record.  But I appreciate your

2  saying that on the record, Mr. Gruber.

3            MR. GRUBER:  That's very helpful; thank you, Your

4  Honor.  I appreciate that.

5            THE COURT:  All right, okay.

6            Mr. Garman, do you have any other questions of Mr.

7  LaPierre?  If you have a few, we can do him before we break.

8            MR. GARMAN:  I can be done before we break, Your

9  Honor, it's just a few.

10           THE COURT:  Okay, why don't you do that then?

11                    REDIRECT EXAMINATION

12 BY MR. GARMAN:

13 Q    Mr. LaPierre, what's your current compensation?

14 A    It's -- it's -- it's a million three, but it's cut 20

15 percent.  So I have a 20 percent cut in place on my

16 compensation.

17 Q    And why is that 20 percent cut?

18 A    Because I voluntarily did it when -- when -- during --

19 during COVID when we -- we also cut other people by 20 percent;

20 I did the same thing with my pay.

21 Q    Okay.  And did you receive a bonus last year?

22 A    No, I did not.

23 Q    Why not?

24 A    I -- I -- I offered to give it up so that the NRA could do

25 retention bonuses to -- Comp Committee could do the retention

1  bonuses to other key employees.

2  Q    Do you recall Mr. Sheehan asking you about when you saw

3  the whistle-blower report, do you remember that testimony?

4  A    I do.

5  Q    And do you remember testifying that you didn't see the

6  actual document until June of 2020?

7  A    Yes, I -- I -- I do remember that.

8  Q    And is that the first time you had heard of the whistle-

9  blower concerns in June of 2020?

10  A    No, I heard the whistle-blowers were stepping forward in

11  June of 2018, maybe even late May of 2018, and I immediately

12  asked the Brewer firm to run it all down, work with them, check

13  everything else, they could see every document.

14  Q    Okay.

15  A    Let's find out what's true and not true.

16  Q    Okay.  Changing now -- I want to get this done in a couple

17  of minutes here, a couple more questions.  Sir, do you remember

18  having questions about your --

19         MR. SHEEHAN:  Your Honor?  Your Honor, can I go back

20  for a second on that statement?

21         MR. GARMAN:  No.

22         MR. SHEEHAN:  The testimony --

23         MR. GARMAN:  No.

24         MR. SHEEHAN:  -- about what was told to --

25         MR. GARMAN:  No.

LaPierre - Redirect/Garman                    153

1          MR. SHEEHAN:  -- attorneys --

2          THE COURT:  Not right now, we're in the middle of

3   redirect.

4          MR. SHEEHAN:  Okay; I'm sorry.

5   BY MR. GARMAN:

6   Q    Mr. LaPierre, do you remember being questioned about your

7   2018 employment contract?

8   A    I do.

9   Q    Who asked for that contract?

10  A    I didn't ask for it, it was -- it was presented to me by

11  the -- by the Board and the counsel of the Board.

12  Q    Okay.  Last subject:  You were asked a series of questions

13  about the Chief Restructuring Officer application, do you

14  recall that?

15  A    I do.

16  Q    Were you involved in negotiating the contract with Mr.

17  Robichaux and Ankura to be CRO?

18  A    No, I recused myself from any involvement, and I did not,

19  in any way, negotiate it.

20  Q    Who did negotiate that?

21  A    The lawyers and the SLC with Mr. Robichaux and Ankura.

22         MR. GARMAN:  Your Honor, I have no further questions.

23         THE COURT:  Thank you.

24         Does anyone else have any questions of Mr. LaPierre?

25         MR. SHEEHAN:  No, Your Honor, not from the Attorney

154

 1 | General's Office.

 2 |          THE COURT:  All right.

 3 |          MR. GRUBER:  No, Your Honor, not from AMc.

 4 |          THE COURT:  All right, thank you.

 5 |          All right, Mr. LaPierre --

 6 |          MR. GARMAN:  Your Honor, I would ask that Mr.

 7 | LaPierre be released as the Board meeting has already begun on

 8 | this -- there is work of the NRA to do.

 9 |          THE COURT:  All right.  Let me -- let me ask -- I

10 | guess I'll give you my views if we don't have a consensus on

11 | this, but is there a problem with releasing him?  He's not

12 | going to be called back again, and the witness is Robichaux,

13 | and then the next witnesses come from the movants.  So is there

14 | any problem with releasing him from the Rule, so he can go to

15 | the Board meeting?

16 |          MR. GRUBER:  Your Honor, I don't mind him being

17 | released from the Rule, but I'm not going to say we're not

18 | going to make him a witness in rebuttal; we need to talk about

19 | it.

20 |          MR. SHEEHAN:  And the AG has the same position, Your

21 | Honor.

22 |          THE COURT:  Okay.

23 |          MR. GARMAN:  Are you going to call --

24 |          MR. WATSON:  Your Honor, Jermaine Watson on behalf of

25 | Judge Journey.

1          I don't have an issue with it, as long as my clients

2  are released to attend the Board meeting speak freely, as well.

3          THE COURT:  Anybody want to weigh in on that?  We'll

4  take just a couple minute break for me to visit with my law

5  clerks.  Anybody intending to call Journey tomorrow?

6          MR. GRUBER:  Your Honor, I don't believe we are.

7          THE COURT:  Or I guess the other Journey witnesses,

8  too, I probably should have said it broader than that.  There

9  were some other folks that are under the Rule, some other Board

10  members I think.

11          MR. GRUBER:  No, we don't.

12          And Mr. LaPierre can go to the Board meeting as far

13  as we're concerned, as long as he's instructed, you know, still

14  -- at least until -- until a couple of hours after the last

15  witness, that he's still instructed not to violate the Rule.

16          THE COURT:  So, Mr. Garman, is that possible?  My

17  intentions were to release him from the Rule at the end of your

18  case in chief, which I anticipate would be today.

19          MR. GARMAN:  So, Your Honor, if it's a couple hours

20  from now, we can make that work.

21          THE COURT:  Okay.

22          MR. GARMAN:  I was asking for him to be released now,

23  but --

24          THE COURT:  Okay.

25          MR. GARMAN:  -- in the interest of fairness, a couple

156

1  of hours from now when everyone's released, we'll make that

2  work.

3          THE COURT:  Okay.

4          MR. GRUBER:  Your Honor, we just need over the lunch

5  hour.  I can't speak for the New York Attorney General, but

6  they need -- we need over the lunch hour to make the decision,

7  especially based on the limited amount of material we could get

8  into.

9          MR. GARMAN:  I'm going to -- I mean, Mr. LaPierre is

10  not available tomorrow; I'm going to object so I guess we'll

11  cover that and see if it comes up.

12          THE COURT:  Y'all have shown a great deal of

13  professionalism to date, I expect that in the afternoon also.

14          We'll be in recess until 1:30.

15     (Whereupon, the morning session concludes at 12:05 p.m.)

16

17

18

19

20

21

22

23

24

25

157

1

2

3

4                    CERTIFICATE OF TRANSCRIBER

5

6      I, KAREN HARTMANN, a certified Electronic Court

7  Transcriber, certify that the foregoing is a correct transcript

8  from the electronic sound recording of the proceedings in the

9  above-entitled matter.

10

11

12

13

14

15  Karen Hartmann, AAERT CET 475   Date: April 29, 2021

16  TRANSCRIPTS PLUS, INC.

17

18

19

20

21

22

23

24

25