UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

```
IN RE:                    .    Case No. 21-30085-HDH-11
                          .
NATIONAL RIFLE            .
ASSOCIATION OF AMERICA    .    Earle Cabell Federal Building
and SEA GIRT LLC,         .    1100 Commerce Street
                          .    Dallas, TX  75242-1496
                          .
         Debtors.         .
                          .    April 29, 2021
                          .    1:31 p.m.
. . . . . . . . . . . . ..     P.M. Session
```

TRANSCRIPT OF TRIAL
BEFORE HONORABLE HARLIN DeWAYNE HALE
UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

TELEPHONIC APPEARANCES:

```
For the Debtors:          Neligan LLP
                          By:  PATRICK J. NELIGAN, JR., ESQ.
                               JOHN D. GAITHER, ESQ.
                               DOUGLAS J. BUNCHER, ESQ.
                          325 North St. Paul, Suite 3600
                          Dallas, TX 75201

                          Garman Turner Gordon LLP
                          By:  GREGORY E. GARMAN, ESQ.
                               WILLIAM M. NOALL, ESQ.
                               TERESA M. PILATOWICZ, ESQ.
                               DYLAN CICILIANO, ESQ.
                               TALITHA GRAY KOZLOWSKI, ESQ.
                          7251 Amigo Street, Suite 210
                          Las Vegas, NV 89119


Audio Operator:           Shanette Green
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311      Fax No. (609) 587-3599**

TELEPHONIC APPEARANCES (Cont'd):

For Ackerman McQueen,          Dorsey & Whitney LLP
Inc.:                          By:  G. MICHAEL GRUBER, ESQ.
                                    H. JOSEPH ACOSTA, ESQ.
                                    BRIAN E. MASON, ESQ.
                                    CHRISTINA M. CARROLL, ESQ.
                                    KELSEY TAYLOR, ESQ.
                               300 Crescent Court, Suite 400
                               Dallas, TX 75201

Proposed Counsel to the        Norton Rose Fulbright US LLP
Unsecured Creditors            By:  SCOTT P. DRAKE, ESQ.
Committee:                          LAURA SMITH, ESQ.
                                    NICK J. HENDRIX, ESQ.
                                    LOUIS R. STRUBECK, ESQ.
                               2200 Ross Avenue, Suite 3600
                               Dallas, TX 75201

For Phillip Journey,           Bonds Ellis Eppich Schafer Jones LLP
et al.:                        By:  MARCUS JERMAINE WATSON, ESQ.
                                    CLAY M. TAYLOR, ESQ.
                                    ROBBIE CLARKE, ESQ.
                               420 Throckmorton Street, Suite 1000
                               Fort Worth, TX 76102

For Wayne LaPierre:            P. KENT CORRELL, ESQ.
                               250 Park Avenue, 7th Floor
                               New York, NY 10177

For the United States          Office of The United States Trustee
Trustee:                       By:  LISA L. LAMBERT, ESQ.
                               1100 Commerce Street, Room 976
                               Dallas, TX 75202

                               Office of The United States Trustee
                               By:  MARC SALITORE, ESQ.
                               Bank of America Building
                               110 North College Avenue, Room 300
                               Tyler, Texas 75702

For Attorney General of        Spencer Fane LLP
the State of New York:         By:  JASON PATRICK KATHMAN, ESQ.
of New York:                        GERRIT M. PRONSKE, ESQ.
                                    ERIC M. VAN HORN, ESQ.
                               5700 Granite Parkway, Suite 650
                               Plano, TX 75024

TELEPHONIC APPEARANCES (Cont'd):

For Attorney General of          Office of the Attorney General-New
the State of New York:           York
                                 By:  JAMES SHEEHAN, ESQ.
                                      STEPHEN THOMPSON, ESQ.
                                      EMILY STERN, ESQ.
                                      MONICA CONNELL, ESQ.
                                 28 Liberty Street
                                 New York, NY 10005


For the District of             Office of Attorney General
Columbia Attorney               for the District of Columbia
General:                        By:  JENNIFER JONES, ESQ.
                                400 6th Street N.W.
                                9th Floor
                                Washington, DC 20001

                                - - -

**I N D E X**

| **MOTION** (retain experts) | **PAGE** |
|---|---|
| BY MR. BUNCHER | 5 |
| **DECISION** | 7 |

**WITNESS**
LOUIS ROBICHAUX

| | PAGE |
|---|---|
| Direct Examination by Mr. | 12 |
| Cross Examination by Mr. Salitore | 32 |
| Cross Examination by Mr. Pronske | 63 |
| Cross Examination by Mr. Acosta | 80 |
| Cross-Examination by Mr. Taylor | 100 |

| **EXHIBITS** | | **ID** | **EVD**. |
|---|---|---|---|
| NRA 610-1 | Experts' engagement letters | | 7 |
| NRA 610-2 | Experts' resumes | | 7 |
| NRA 610-3 | Schedule of amounts owed | | 7 |
| NRA 610-4 | Charles River engagement letter | | 7 |
| NRA 610-5 | Peter Resnick resume | | 7 |
| NRA 687 | Top 20 list | | 11 |
| NRA 688 | NRA Amendment Schedule A, Question 75 | | 11 |
| NRA 689 | Amendment to engagement letter | 26 | 27 |
| NYAG 368 | NRA March MOR | | 112 |
| NYAG 369 | SEA Girt March MOR | | 112 |
| AMC 1 | to the extent not already admitted | | 117 |
| AMC 13 | to the extent not already admitted | | 117 |
| AMC 14 | to the extent not already admitted | | 117 |
| AMC 18 | to the extent not already admitted | | 117 |
| AMC 19 | to the extent not already admitted | | 117 |
| AMC 66 | to the extent not already admitted | | 117 |
| AMC 67 | to the extent not already admitted | | 117 |
| AMC 124 | to the extent not already admitted | | 117 |

1       THE COURT:  Everybody ready to go back on the record

2  in NRA?

3       MR. BUNCHER:  I'm ready, Your Honor, it's Mr.

4  Buncher.

5       THE COURT:  Okay.  Why don't we have your motion

6  presented first, Mr. Buncher, and then there are some

7  housekeeping issues that we were talking about right before the

8  lunch break that we'll go back to, and I've had a chance to

9  look at your motion.

10      MR. BUNCHER:  Very well, Your Honor.  This is docket

11 number 610, it's the debtor's motion for authority to retain

12 and pay litigation experts.  There's five experts in the

13 Ackerman litigation which the Court is very familiar with

14 pending in Judge Fish's Court.  These experts were retained

15 over a year ago in January of 2020 so the debtor is simply

16 seeking authority to continue the retention of these experts

17 and to pay the experts the amounts in accordance with, it was

18 Exhibit C to the motion, docket number 610-3.

19      There were columns on that exhibit showing the post

20 petition amount that the experts billed but have not yet been

21 paid so we're seeking authority to pay those amounts and then

22 there are monthly estimates going forward, Your Honor.  We have

23 an expert deadline of May 24th in that litigation and so we

24 need these experts to be, to continue their work and to pay

25 them.

1            And then there's one expert in the New York Attorney

2    General case, Charles River.  They're a compliance expert and

3    we want them to continue their work since that case is not

4    stayed.  The motion is supported by the engagement letters

5    which was Exhibit A 610-1 to the docket.  Also, that was the

6    Ackerman engagement letters.  Then the resumes of those experts

7    were 610-2, 610-4 was the engagement letter of Charles River

8    and 610-5 is the resume of Mr. Peter Resnick with Charles

9    River.

10            We listed all these as exhibits on our exhibit list

11   and for the record, I would move to admit to 610-1 through 610-

12   5 in support of this motion.  And there has been no objection

13   to the motion, Your Honor.  I cited authority that indicates

14   that litigation experts on collateral litigation that doesn't

15   have to do with core matters in the bankruptcy case are not

16   professionals under 327.

17            We did seek relief in the motion to, in the event we

18   do want to use these experts for some purpose in the bankruptcy

19   case.  For example, estimating Ackerman's claim or for some

20   compliance purpose, use Charles River in connection with the

21   plan.  We proposed in the motion that we would file a

22   disinterested declaration for whichever expert we want to use

23   for that purpose and then parties would have 10 days to object

24   to the use or retention under 327 if we decide to use them for

25   that purpose.  So with that, I would move for admission of

1  those exhibits, Your Honor and move that the Court grant the

2  motion and enter the order that's submitted with it.

3       THE COURT:  The exhibits are admitted.  For the

4  record, I had a chance to look at this and also had a chance to

5  look this morning before we started the hearing to see whether

6  anyone filed a response and I didn't see a response.  Does

7  anyone wish to be heard on the motion?  Hearing none, the

8  motion is granted.  Mr. Buncher, if you would upload an order

9  consistent with your representations with the motion I'll sign

10 it upon receipt.

11      MR. BUNCHER:  Thank you, Your Honor.

12      THE COURT:  Thank you.  You have a nice day.  You're

13 probably going to hang on but still have a nice day.

14      MR. BUNCHER:  I am.  As nice as it can be with

15 hanging onto this, okay, thank you, Your Honor.

16      THE COURT:  My pleasure.  Why don't we go back on the

17 record and finish the conversation about the rule and Mr.

18 LaPierre and things we were talking about before?  And I don't

19 know if Mr. Mason wants to also talk about closing yet and it's

20 fine with me if you all weren't ready to talk about closing

21 yet.

22      STENOGRAPHER:  Your Honor, this is the stenographer.

23 Was none of that on the record?

24      THE COURT:  Pardon me?

25      STENOGRAPHER:  I was writing that.  I was taking that

1  for the record.  Is that supposed to be off the record, that

2  last exchange with Mr. Buncher?

3          THE COURT:  You can leave that on the record.

4          MR. MASON:  Your Honor, with that, I think we are

5  ready to address closing but with respect to the rule from

6  Ackerman's perspective, we're fine with Mr. LaPierre being

7  released at this point.  I can tell the Court at this point we

8  don't anticipate there being any rebuttal for us right now.

9  However, that's obviously subject to change after Mr.

10 Robichaux's testimony.

11         THE COURT:  Sure.

12         MR. MASON:  But that's Ackerman's position.

13         THE COURT:  And you can reserve your right to tell me

14 afterwards too after the next witness testifies.  What about

15 the Attorney General?

16         MR. PRONSKE:  Your Honor, we would ask that that be

17 delayed until after Mr. Robichaux's testimony is over with.

18         THE COURT:  To release, to release?

19         MR. PRONSKE:  Yes.

20         THE COURT:  I don't have a problem with that.  My

21 intentions would be to release the Journey folks too.  Is there

22 going to be a problem with that, Mr. Pronske?

23         MR. PRONSKE:  No.

24         THE COURT:  All right.  Mr. Mason, any problem with

25 the Journey group?  I didn't sense that before lunch.

1          MR. MASON:  Yeah, no problem from us, Your Honor.

2          THE COURT:  All right.  Do we want to talk about

3 closing or do you want to wait until the end of the day to talk

4 about it?  It doesn't really matter to me.

5          MR. MASON:  It's up to you, Your Honor.  We did have

6 a conversation about it during the lunch hour.  I'm happy to,

7 whatever the Court prefers.

8          THE COURT:  Let me go back --

9          MR. PRONSKE:  I would prefer if we could wait on that

10 because I haven't had a chance to talk to my client about that

11 and we didn't reach any agreements talking earlier today.  We

12 just had some discussion about it.  I think we can be more in a

13 position potentially to agree to things and tell you about that

14 if we do it a little later on today.

15          THE COURT:  That's fine.  Let me go back with one

16 thing with you too, Mr. Pronske.  As it stands now before

17 Robichaux testifies, do you think you all are going to call a

18 rebuttal witness tomorrow?  Because it actually matters from a

19 couple things I want to say to you all before we break up.

20          MR. PRONSKE:  At this point, Your Honor, we don't

21 think so but I want to reserve our rights because we're not

22 going to know until Mr. Robichaux finishes.

23          THE COURT:  That's fine.  Your rights are being

24 reserved.  There's a couple of things I would like to say to

25 you all about the closing, so if we're not going to come back

1  tomorrow, I'm going to have to say them this afternoon so,

2  okay.  Some things I would like covered in closing.  All right.

3  Mr. Garman, you want to weigh in at all on this?  It sounds to

4  me like we're going to be releasing witnesses from the rule

5  after the testimony about the CRO motion.

6      MR. GARMAN:  Yes, sir, that seems fine to me.  I

7  think we'll wait for Mr. Pronske and the New York Attorney

8  General to confer about closing but I think we had a productive

9  conversation and are ready to tell you at least our thoughts

10  subject to them getting some fair time to communicate about.

11      THE COURT:  All right.  I think we'll have enough

12  time to do the CRO testimony as well as take a break and let

13  you all finish talking a little bit among yourselves and then

14  come back out, visit with me too, okay?  All right.  Call your

15  next witness.

16      MR. GARMAN:  Your Honor, I did have one housekeeping

17  matter just real quick which is we previously introduced

18  statements and schedules top 20 creditor list, et cetera with a

19  reservation that they would be supplemented to be, fulsome and

20  complete and to that end, I would on behalf of the debtor like

21  to introduce NRA Exhibits 687 and 688 which are, which I think

22  bring the amended statements and schedules, top 20 list and the

23  like fully inclusive.

24      THE COURT:  Any problem with those?  I think those

25  were, I think there were three exhibits added over the last few

1 days and these are two of them, I take it, right?

2      MR. GARMAN:  Yes, sir, the third is the CRO document

3 that we'll talk about here in the testimony.

4      THE COURT:  Okay.  NRA 687 and 688 are admitted.

5     (NRA 687 and 688 Exhibits are admitted into evidence)

6      MR. GARMAN:  Thank you.

7      MR. PRONSKE:  Your Honor, we also have one we would

8 like to add rather than having to go into a rebuttal case to do

9 it, and it shouldn't be controversial.  We would like to have

10 the March MOR introduced into evidence.

11      MR. GARMAN:  No objection from the debtor, Your

12 Honor.

13      MR. PRONSKE:  Yeah, from Sea Girt --

14      MR. GARMAN:  Yeah, no objection.

15      THE COURT:  Do you have a number on that, Mr.

16 Pronske?

17      MR. PRONSKE:  Do we have a number?  We'll get that

18 for you, Your Honor.

19      THE COURT:  Just give it to me before we close out

20 the day, okay?

21      MR. PRONSKE:  Okay.

22      THE COURT:  All right.  Mr. Garman?

23      MR. GARMAN:  Yes, sir.  So the debtor is calling

24 Louis Robichaux, who's here.  We don't have to break.  We're

25 ahead of the curb.

1        THE COURT:  Mr. Robichaux, can you hear me?

2        MR. ROBICHAUX:  I can.  Can you hear me?

3        THE COURT:  I can.  Would you raise your right hand?

4         DEBTOR'S WITNESS, LOUIS ROBICHAUX, SWORN

5        THE COURT:  Mr. Garman, you may proceed.

6        MR. GARMAN:  Yes, sir.

7                    DIRECT EXAMINATION

8   BY MR. GARMAN:

9   Q    Mr. Robichaux, one of the sillier questions of the day,

10  but would you put your name on the record so the Court and the

11  parties know who you are?

12  A    Louis E. Robichaux, IV.

13  Q    And how are you currently employed, sir?

14  A    I'm employed as a senior managing director of Ankura

15  Consulting Group and the turnaround and restructuring practice

16  based in Dallas, Texas.

17  Q    Okay.  We're going to talk about Ankura in a minute but I

18  would like to talk about your background first.  High level and

19  we're trying to advance things here, but could you give the

20  Court an overview of your educational background?

21  A    Sure.  I have a bachelor's degree in business

22  administration.  I have a master's degree in business

23  administration.  I've earned the chartered financial analyst

24  charter holder designation, CFA designation.  I earned the

25  certified turnaround professional designation, the CIRA,

Robichaux - Direct/Garman                              13

1   certification insolvency and reorganization adviser and I have

2   a certificate in distressed business valuations.

3   Q    And on your professional experience, sir, could you give

4   the Court a brief overview of your professional background?

5   A    Sure.  After graduating from business school, I spent five

6   years in the healthcare industry as working in long time

7   healthcare as a licensed nursing facility administrator in

8   Texas, running nursing homes.  I then worked for about two and

9   a half years at Kaiser Permanente in the DFW area, that's a

10  staff model HMO as a performance improvement and financial

11  analyst.  And then in 1997, I joined Price Waterhouse in one of

12  their groups that part of what they did is turnaround

13  restructuring.

14  Q    And just narrowing it to maybe the last 10 years, could

15  you give an overview of your experience in restructuring and

16  bankruptcy matters?

17  A    Sure.  You know over the course of my carrier, I've worked

18  for a variety of constituents, companies and debtors, secured

19  lenders and lending syndicates, occasionally work for an

20  unsecured creditors committee, even worked for government

21  agencies on a couple of matters.  I would say in the last 10

22  years, it has been almost exclusively working for on the

23  company side of restructuring matters, and a significant

24  portion of those have involved Chapter 11 and involved taking

25  an officer role or interim management role such as chief

Robichaux - Direct/Garman                          14

1  restructuring officer.

2  Q    So during the last 10 years, you know what percentage of

3  your professional work has been related to restructuring and/or

4  bankruptcy?

5  A    Probably about 95 percent.

6  Q    And do you have an estimate as to how many matters of

7  substance you've been involved in as a professional in the

8  restructuring and bankruptcy world?

9  A    Yes, sir, reviewing my CV in preparation for this, I would

10 estimate somewhere between 80 and 100 substantive matters,

11 joining restructuring.

12 Q    And have you previously been appointed as the chief

13 restructuring officer for a debtor under Chapter 11?

14 A    Yes.

15 Q    Approximately how many times?

16 A    Approximately 20 different times, was appointed as a chief

17 restructuring officer or the functional equivalent of that.

18 Q    Do you have experience with nonprofit entities?

19 A    Quite a bit of experience, yes.

20 Q    Can you give an overview of your experience with nonprofit

21 entities?

22 A    So I've worked probably half or more of my bankruptcy

23 restructuring cases both in and out of court, have in one way

24 or another involved nonprofit organizations, mostly working for

25 nonprofits but also in my roles as like a lender adviser, that

Robichaux - Direct/Garman                                        15

1  might have been a lender to a nonprofit, also worked from that

2  side as well.

3  Q    And are there distinctions between restructuring work

4  that's for a nonprofit versus restructuring work for a for

5  profit entity?

6  A    Yeah, there's actually quite a bit.  There's, you know

7  about every restructuring conference you go to in this

8  business, there's usually a CPE session around the differences

9  in restructuring nonprofits.  What comes to mind for me is, you

10 know a nonprofit does not have shareholders or stockholders in

11 the traditional sense.  They're governed differently.  They're

12 regulated by usually the nonprofit or trust division of the

13 Attorney General in the State in which they're incorporated.

14          The governance is usually the Board composition can

15 be wide and varied.  Usually board members are often times

16 they're volunteers, come from a broad variety walks of life and

17 also importantly another distinction is a nonprofit typically

18 has a mission, a stated mission and that mission actually has,

19 forms the underpinning of a third fiduciary duty that the

20 officers and directors take.

21 Q    I was going to ask you about that.  I was going to ask you

22 how the fiduciary duties of a nonprofit differ from a for

23 profit entity.

24 A    Yeah.  So a nonprofit directors and officers assume a

25 third duty, it's duty of obedience to the mission as well as

Robichaux - Direct/Garman                                    16

1  the typical duty of care and loyalty but the duty, which are

2  any for profit directors and officers assume.

3  Q    So I'm not going to get too bogged down in your experience

4  but I would like to explore your experience serving on boards

5  of directors.  Could you tell us what experience you have

6  there?

7  A    Sure.  I've served on both nonprofit boards and for profit

8  boards.

9  Q    Can we start with the nonprofit sir, what's your

10 experience there?

11 A    So my nonprofit experience I have served and currently

12 serve on the board of the Highland Village Parks Foundation in

13 the town where I live.  It's a nonprofit, it's a community

14 nonprofit that owns and operates a community theater as well as

15 support the park's mission of the town where I live.  I also

16 serve on the Austin Peay State University College of Business

17 advisory board as a board member for the last three years.

18 Q    And moving on to for profit entities, do you have

19 experience there?

20 A    Yes, I've served on the board of a physician owned

21 hospital company based in Oklahoma City that I owned and

22 operated three hospitals in that area and I've also served as

23 the independent board member of a physical therapy company

24 privately held for private based in the Baltimore area that was

25 going through an out of court restructuring.

Robichaux - Direct/Garman                    17

1  Q    And then finally, you've had, I'm sorry, you've held

2  public office, right, sir?

3  A    I have.  I was elected to four consecutive two year terms

4  and served as city council member in the City of Highland

5  Village, Texas.

6  Q    And is that experience, do you view that experience to be

7  relevant to serving as a chief restructuring officer?

8  A    You might not think it would, it is but I learned an

9  incredible amount serving on those eight years.  I've learned

10 how to work with a broad variety of people, a broad variety of

11 viewpoints.  I've learned to work with folks that had different

12 levels of educational experience, come from different walks of

13 life in order to work with them and get things done to find

14 common ground and bridge differences of opinion in order to

15 achieve a common goal and I find that to be very useful as a

16 CRO.

17 Q    And then finally, have you ever found to be qualified as

18 an expert in testifying in one or more courts?

19 A    I have.

20 Q    And how about in the Northern District of Texas here?

21 A    I think a few times, yes.

22 Q    So let's talk about Ankura now, sir.  Can you briefly

23 describe what Ankura is and the services it provides?

24 A    Yeah, Ankura is a professional services firm that provides

25 financial regulatory operational type consulting and advisory

Robichaux - Direct/Garman                    18

1  services to a board variety of stakeholders.  I'm sorry, go

2  ahead.

3  Q    And how big of an organization is it?

4  A    Sure.  We are, say at the last count, we are $800 million

5  in revenue.  We are about 1,600 professionals.  I was looking

6  on the website before this hearing, I think we're in about

7  eight different countries now.  So we've grown quite a bit over

8  the last five years.

9  Q    Okay.  And when were you first approached about

10  potentially being the chief restructuring officer for these

11  debtors?

12  A    That was March 18th, I think that was a Thursday.

13  Q    And who contacted you on that day?

14  A    So I was contacted on the same day by both Pat Neligan and

15  Louis Strubeck.

16  Q    And when you were contacted, was this a position you were

17  initially interested in, in serving?

18  A    Well, Ankura had been following the NRA's case and was

19  interested in talking to the NRA about a potential role.  At

20  the moment, we hadn't really considered taking a chief

21  restructuring officer role but I was glad to take the calls.

22  So when I received the calls, I took good notes, asked a lot of

23  questions of both Mr. Neligan and Mr. Strubeck and then

24  initiated a series of calls internally in Ankura to evaluate

25  our ability to take the assignment.

Robichaux - Direct/Garman                    19

1  Q    Did you have any concerns or apprehension about taking on

2  this role?

3  A    Well, I suppose, yes, you know the NRA is a well known

4  advocacy organization that very much believes in its mission

5  but that also means that there are folks out there who opposes

6  their mission.  So Ankura had to have a discussion around

7  whether we wanted to take this assignment and continue with

8  potential fallout from those who might not agree with the NRA's

9  mission.

10      We did that.  We had an internal discussion and pretty

11  quickly resolved that this was a case that we thought deserved

12  representation and I also personally had to think about whether

13  this was a case that I wanted to personally get involved with

14  and with, you know the positives and negatives that would come

15  along with it so I thought about it.  And had a discussion with

16  my wife about what that might entail and ultimately in about 24

17  hours after being contacted concluded that it was a case that

18  we were willing to accept.

19  Q    So how do you proceed from there?  When did you first meet

20  with the folks at the NRA?

21  A    I believe that was the next Wednesday.  I don't have a

22  calendar in front of me but that might be the 24th, I think it

23  was the next Wednesday.  We had a remote interview.

24  Q    And who participated in that interview process?

25  A    So for Ankura, it was just me and for the NRA it was

Robichaux - Direct/Garman                          20

1  special litigation committee members Charles, Louis and Carolyn

2  as well as you participated, Pat Neligan and Wayne LaPierre.

3  Q    Okay.  And after you went to this interview process, how

4  did this engagement proceed from there?

5  A    So after the interview, I spoke with Mr. Neligan a few

6  times and I understand that the special litigation committee

7  was going through the interview process with other candidates.

8  So really not much happened until, I didn't hear much until

9  April the 1st when I was, received a call from Mr. Neligan that

10 Ankura had been selected to provide the CRO services.

11 Q    And at that point, just to advance our cause here, at that

12 point you began to negotiate an engagement agreement, correct?

13 A    That is correct.

14 Q    And can you explain to the Court how that process of

15 negotiated and engagement agreement occurred?

16 A    Sure.  I worked primarily through Pat Neligan.  Pat

17 Neligan, myself with some input and consultation with the

18 unsecured creditors committee specifically around the scope and

19 authority began a process of negotiating the engagement letter.

20 I started with offering a first draft of an engagement letter

21 and there were several terms of the engagement letter which

22 addressed a variety of comments throughout the engagement

23 letter but principally around what I think is now Schedule 2

24 which is the scope of services and authority of the CRO.

25 Q    For the avoidance of doubt though, was it only Schedule 2

Robichaux - Direct/Garman                                         21

1  the services that was negotiated between the parties?

2  A    No.

3  Q    What types of other categories were negotiated?

4  A    So the staff was negotiated, fees, the fees were

5  negotiated.  There were other aspects that were negotiated as

6  well, choice of law was negotiated in particular.  There's a

7  section in the engagement letter that Ankura always requires in

8  a chief restructuring officer engagement that the CRO is

9  covered by the client's directors and officers insurance.  We

10 were informed that that was not available in this case.  So

11 that had to be negotiated.  So there were other elements of the

12 letter that were negotiated as well.

13 Q    And who did you negotiate with on behalf of the National

14 Rifle Association?

15 A    So my primary contact was Pat Neligan.  It's my

16 understanding he was discussing it with a variety of parties

17 inside the NRA including yourself, the special litigation

18 committee and other advisers of the NRA.

19 Q    And when about did those negotiations conclude and

20 agreement was reached?

21 A    It concluded on April the 7th, same day which the original

22 application and declaration were filed.

23 Q    And so I want to talk about that original application and

24 declaration.  Prior to the engagement, did you and/or Ankura do

25 a conflict evaluation?

Robichaux - Direct/Garman                         22

1  A    Yes, we did.

2  Q    And can you describe that process for the Court?

3  A    We have a standard process that Ankura goes through to

4  evaluate any connections to parties and interest in a

5  bankruptcy case.  We submitted the list of parties and

6  interests that was filed with the Norton Rose Fulbright

7  retention application in the case.  We submitted that as the

8  list.  That list was checked.

9       And it returned no conflicts that we were concerned about.

10 I prepared a declaration of the first declaration discussing

11 our engagement and stating that we did not believe we had any

12 conflicts and that's what was filed.

13         THE COURT:  I think you're on mute.

14         MR. GARMAN:  Somehow I got muted, sorry about that.

15 Q    So sir, I know you haven't sought employment under 327,

16 but is this a type of process that Ankura does to run conflicts

17 for a 327 employment?

18 A    It is.

19 Q    Okay.  But did there come a point in time where you

20 supplemented your disclosures?

21 A    Yes, I did.

22 Q    And why was that?

23 A    So during my deposition, I received questions around the

24 employment of one of Ankura's employees named Ryan Strubeck who

25 is the son of Louis Strubeck who is a partner at Norton Rose

Robichaux - Direct/Garman                                    23

1  Fulbright.  It was something that we informed the debtors of

2  during the interview process so it was nothing that there was,

3  you know an attempt to hide.  But because we received questions

4  about it and there seemed to be concern, I reached out to our

5  internal general counsel at Ankura and asked to file a first

6  supplemental declaration.  When we did that we filed I think

7  within a few days of that, we filed a first supplemental

8  declaration which did a couple of things.

9       We filed and made a disclosure of Ryan Strubeck's

10 employment as well as filed disclosures of the specific parties

11 and interest that we ran in our conflicts system as well as we

12 filed a list of unrelated connections that our firm has to

13 parties and interest that are on that list in matters unrelated

14 to this matter.  So all of that was in the first supplemental

15 declaration.

16 Q    Do you believe that the employment of Ryan Strubeck by

17 Ankura in any way impacts the independence you can exercise in

18 this engagement?

19 A    I do not.  Ryan, not at all.  Ryan is a senior associate

20 in the firm's Houston office in a different practice in the

21 firm.  He's in our energy practice and he doesn't work with me

22 and he doesn't work on this matter.

23 Q    Have steps been taken to segregate Mr. Strubeck from this

24 matter?

25 A    Yes, prior to today, Ankura put in place a formal ethical

Robichaux - Direct/Garman                                        24

1  wall procedure which involves from the documentation signed by

2  the engagement members on this engagement and Mr. Strubeck, I'm

3  sorry, Ryan Strubeck, as well as taking IT steps to prevent

4  Ryan Strubeck from accessing the location where we store files

5  related to this engagement.

6  Q    And does Mr. Strubeck and I mean Ryan Strubeck, does his

7  compensation is it in any way impacted by this proceeding and

8  not to be compound, but does he receive the equivalent of

9  origination credit in the way we professionals understand it?

10 A    No, he does not.

11 Q    Okay.  So let's turn to the, I'm sorry, to the services

12 contracted for with Ankura, the fee structure.  Fee structure

13 set forth in the underlying agreement, right, sir?

14 A    Correct.

15 Q    And are those fees as set forth in the agreement

16 consistent with the normal hourly billing rates charged by

17 Ankura?

18 A    Our hourly billing rates are our standard hourly billing

19 rates, yes.

20 Q    Is there anything, strike that.  The agreement

21 contemplates a fee cap.  Is that a standard provision that

22 Ankura provides?

23 A    That is not something that Ankura puts in every engagement

24 letter, no.

25 Q    Can you explain to the Court how the fee cap would work in

Robichaux - Direct/Garman                              25

1  this case?

2  A    So it's an hourly cap.  What it does is essentially limit

3  the week, the amount of weekly hours that either me or Mr.

4  Morton would bill the NRA.  For weeks where we work less than

5  40 hours a week, we would bill the lower amount.  If there are

6  weeks where we work more than 40 hours, we only bill up to 40

7  hours.

8  Q    And in connection with the retention, there is a

9  restructuring fee, right, sir?

10  A    There is.

11  Q    And can you explain the restructuring fee to the Court?

12  A    Yeah, the restructuring fee we looked at as be warranted

13  and required for a few reasons in this case.  One is because in

14  the totality of the circumstances in this case, the amount of

15  effort required in a short period of time here, we think this

16  fee very much aligns the incentive and the activities of Ankura

17  and our engagement team.

18      With the goals, objectives and frankly the fiduciary

19  duties of the NRA.  You know I had a conversation with our

20  leadership team and when all things were considered, the risk

21  here, the particular difficulties involved, the amount of work

22  involved, when we also looked at what other engagements,

23  similar engagements of difficulty had included as either an

24  exit fee, a back end fee or restructuring fee, we felt very

25  comfortable that this was a reasonable request.

Robichaux - Direct/Garman                              26

1  Q    And how much is that fee?

2  A    It's $1 million earned only if a plan, a reorganization

3  that the debtor's Board accepts or, I don't remember the exact

4  language, either accepts or agrees to actually is not just

5  confirmed but reaches an effective date.

6  Q    Okay.  So can you open NRA Exhibit 689?  And I'll

7  represent this is the exhibit that we circulated earlier today

8  and hopefully the Court also has a copy.

9  A    I'm there.

10 Q    Okay.  You beat me, one second.

11          MR. GARMAN:  Your Honor, do you have this exhibit?

12          THE COURT:  I'm not as quick as you folks are, give

13 me just a second, Mr. Garman, I'm sorry.  I have it now, thank

14 you.  I do.

15 Q    Sir, can you identify what Exhibit 689 is?

16 A    This is a filing made yesterday to update the Court and

17 the parties on some proposed amendments to the engagement

18 letter for Ankura that had been negotiated between the debtors

19 and the unsecured creditors committee.

20 Q    So I'll represent to you, sir, this was filed with the

21 Court and it's an unsigned copy but you did in fact sign this

22 yesterday, right?

23 A    Yes, I signed it and I also believe that it has been

24 signed by the two representatives of the debtors.

25          MR. GARMAN:  Okay.  And for the parties I do believe

Robichaux - Direct/Garman                           27

1  we circulated an executed copy of this a couple of hours ago.

2  We're not going to introduce it as an exhibit but to the extent

3  that anyone doesn't have it, let us know.  So Your Honor, I

4  guess we'll move to admit this.  I still think it might make

5  sense to take judicial notice but the practice has been to

6  admit pleadings so I would move to admit NRA Exhibit 689.

7           THE COURT:  Any problem with 689 with anyone?  689 is

8  in.

9           (NRA 689 Exhibit admitted into evidence)

10 Q    Okay.  Mr. Robichaux, just in your own words can you

11 describe for the Court what you understand your scope of

12 responsibility and scope of services are under Exhibit 689?

13 A    Certainly.  So normally our scope of services would be set

14 forth in Section one of the engagement letter.  You see here we

15 actually refer to the attached Schedule 2 so let me roll down

16 to Schedule 2.  This sets out all the terms and then we just

17 scroll there.

18 Q    And you're referring to page 15 of 29 of the docketed

19 header?  I guess that would be PDF page 19 of 51.

20 A    Get there real quick.  Yes, so this would be header page

21 15 of 29, the bottom to be 14 of 17 on the letter.

22 Q    Can you explain to the Court how the scope of duties works

23 under this Schedule 2?

24 A    So in the broadest sense, since I really had a hand in

25 helping pen this, I really think of this in three buckets,

Robichaux - Direct/Garman                                    28

1  okay.   Number one, this carves up the day to day

2  responsibilities of the NRA which is presently in one bucket,

3  carved it up into two buckets, okay.   One bucket is core

4  mission, core fundamental mission operations and the other

5  bucket is management operations, okay.   Currently, all of those

6  things today report to the executive vice president, Mr.

7  LaPierre.

8       The way this carves it up, is core fundamental mission

9  operations.   Going forward would report to Mr. LaPierre or

10 other officers of the company and the management operations

11 would report to me as the CRO.

12 Q    Can you break that down a little?   Can we break that down?

13 What sort of functions are core fundamental mission operations

14 that would continue to report to Mr. LaPierre?

15 A    Sure, you can see that at the bottom of engagement letter

16 page 14.   It's really all of the political and Legislative

17 activities, things that are really tightly related to their

18 ideology and their mission, okay.   You see it listed here.

19 Things that relate to the ILA.   Things that relate to their

20 charitable mission.   Mission related litigation and I'm sure

21 you're going to want to talk about in a little bit.

22      That relates to First Amendment litigation, Second

23 Amendment litigation as well as very important State and

24 Federal Government investigations, okay.   Marketing,

25 membership, donor development, these are things that where the

Robichaux - Direct/Garman                    29

1  NRA has developed a very tight bond with their membership and

2  the concern was bringing a third-party in to manage those core

3  things would be disruptive to the organization.  Those are all

4  core mission related operations.

5  Q    Who would report to you if this application is approved

6  and what sorts of duties do those folks have?

7  A    So who would report to me is listed further on down, okay

8  and page 17 of the PDF or page 16 of the letter, okay.  When

9  you talk about first we'll appoint the following individuals

10 and firms shall have a direct line of reporting to me and it

11 breaks it down into two categories, company resources and

12 external resources.

13        So for all matters that relate to the CRO

14 responsibilities, the CFO reports to me, the treasurer, the

15 internal general counsel, human resources, information

16 technology and any executive that has anything to do with

17 communications for things that have to do with the CRO

18 responsibilities.

19        The same things, that same concept applies for all

20 retained professionals, both legal and restructuring

21 professionals.

22 Q    So what type of litigation if approved falls under your

23 purview as CRO?

24 A    Anything that's not core mission related litigation and

25 those would be First Amendment, Second Amendment, government

1  investigations that go to the existence of the NRA, things

2  along those lines.  Things that fall under me would have to do

3  with money, just seeking money damages, vendor disputes, the

4  Ackerman litigation, the Cox litigation, the Dell'Aquila

5  litigation, things along those lines.

6  Q    And you identified there was a third bucket of

7  responsibility.  What's the third bucket?

8  A    That would be bankruptcy responsibilities.  That's listed

9  on PDF page 16 or engagement letter page 15.  These are the

10 things that the bankruptcy folks in the hearing would most

11 directly associate with what a CRO does in managing a

12 restructuring process.  So you're leading and coordinating the

13 company's bankruptcy advisers.  You're overseeing the

14 bankruptcy process.

15       I would be overseeing the company's current

16 bankruptcy retained financial advisers as it relates to

17 required reporting and disclosures.  I would serve as the lead

18 liaison in coordinating with the parties in interest,

19 interacting with claimants and other stakeholders to try to

20 negotiate resolutions of any disputes and controversies,

21 working with the SLC, the Board and counsel to develop and

22 advance a plan of reorganization and just serving as the

23 company's primary lead company representative as it relates to

24 the Chapter 11 process.

25 Q    And who do you report to?

1  A     A special litigation committee.

2  Q     Do you report to Mr. LaPierre?

3  A     No.

4  Q     Have you met with Mr. LaPierre?

5  A     Yes.

6  Q     And do you believe that the two of you could work together

7  to fulfill your independent obligations to the association?

8  A     I do, although I don't believe there's a lot of, you say

9  working together, I don't believe there's a lot of things that

10 me carrying out my duties and responsibility would be dependent

11 on Mr. LaPierre.  I sort of view the scope of services with the

12 CRO as being somewhat independent of Mr. LaPierre.

13 Q     Poor choice of words on my part.  Do you believe that

14 either of you would be an impediment to the other performing

15 your duties?

16 A     I do not.

17 Q     Notwithstanding the supplemental disclosure of Mr.

18 Strubeck, do you perceive yourself as holding the independence

19 necessary to effectuate the duties of chief restructuring

20 officer?

21 A     I believe every time I am, take an assignment as a chief

22 restructuring officer I function as an independent party that

23 assumes fiduciary duties including in this case.  I believe I

24 am independent and would function independently, yes.

25 Q     And not to embarrass you, sir, but do you believe that you

Robichaux - Cross/Salitore                                    32

1  are well suited for this representation?

2  A    This representation was going to be incredibly challenging

3  and I think I am adequately well suited and I will give it my

4  absolute best.

5         MR. GARMAN:  Your Honor, I'll pass the witness so I

6  have no further questions.

7         THE COURT:  Thank you, Mr. Garman.  We'll start with

8  the New York Attorney General.

9         MR. PRONSKE:  Your Honor, I believe the United States

10 Trustee is going to go first with the cross examination.

11        THE COURT:  That's fine with me.

12                    CROSS EXAMINATION

13 BY MR. SALITORE:

14 Q    Good afternoon, Mr. Robichaux, can you hear me?

15 A    Yes, I can.

16 Q    Thank you.  Mr. Robichaux, my name is Marc Salitore.  I

17 represent the United States Trustee and we met on April 15th at

18 your deposition, do you recall?

19 A    I do.

20 Q    Thank you.  First, I would like to just explore broadly

21 what you and Mr. Garman discussed about the core fundamental

22 mission operations versus management operations.  I understand

23 you have said that Mr. LaPierre will continue to lead and

24 remain solely responsible for what are called core fundamental

25 mission operations, correct?

Robichaux - Cross/Salitore                    33

1  A    No, if you look at the engagement letter I think it says

2  Wayne LaPierre or other applicable officers of the company will

3  lead and be responsible for core fundamental mission

4  operations.  So could be Mr. LaPierre or it could be the other

5  officers, the other officers being let's say the president or

6  either of the vice presidents.

7  Q    And it's contemplated under the engagement agreement that

8  you as CRO would lead and have responsibility for, I guess what

9  I would call non-core or what's referred to as management

10 operations.

11 A    That is correct.

12 Q    And in addition to that, you also are going to be, you

13 also have under the engagement bankruptcy responsibilities.

14 A    That is correct.

15 Q    And those bankruptcy responsibilities essentially are to

16 lead the efforts to confirm a Chapter 11 plan, correct?

17 A    Amongst other things, yes.

18 Q    So together the management operations plus the bankruptcy

19 responsibilities under the agreement that's defined as the CRO

20 responsibilities, correct?

21 A    Yes.

22 Q    And as far as you and Mr. Garman discussed the line of

23 reporting that will take place if your retention is approved

24 and my understanding is that company officers for core

25 fundamental mission operations would continue to report through

Robichaux - Cross/Salitore                                34

1  Mr. LaPierre, correct?

2  A    So I think a number of folks that currently report to Mr.

3  LaPierre would continue to report to Mr. LaPierre.  But as I

4  read this engagement letter and based on my understanding of

5  the bylaws, there may be other officers of the NRA that have

6  duties that could fall into that bucket that don't necessarily

7  report to Mr. LaPierre such as the president, first president

8  or second vice president.

9  Q    And then there's, some of those same officers, like say

10 for example Mr. Frazer or acting CFO, Ms. Rowling, to the

11 extent their activities fall within the management operations,

12 they would also report to you?

13 A    That is correct.

14 Q    And so the way it's contemplated is certain, depending on

15 function, whether it's core management or excuse me, core

16 mission or whether it's management operations, depending on

17 which function that is, that determines where an officer would

18 report.

19 A    For that particular slice of their day and function, that

20 is correct, yes.

21 Q    Now, I would like to explore a little closer the core

22 fundamental mission operations and for this, I would refer you

23 to the engagement letter, NRA 689.

24 A    I'm there.

25 Q    And the description of that begins on page header 15 of 29

Robichaux - Cross/Salitore                              35

1  at the bottom of the page.

2  A    Yup.

3  Q    Now, I would like to go through these a little bit and

4  flush this out.  The NRA ILA activities, these are the

5  activities currently overseen by Mr. Quimet, Jason Quimet?

6  A    That is correct.

7  Q    And Mr. LaPierre and other officers retain responsibility

8  for all of those activities, correct?

9  A    That is correct.

10 Q    Looking at charitable programs, I understand this confirm,

11 that this includes for example C3 entities fall under the NRA

12 umbrella, is that correct?

13 A    Are you referring to the nondebtor C3 activities?

14 Q    Yes, sir.

15 A    Yes, that's my understanding.

16 Q    And those charitable programs, well, let me ask you this.

17 Are you aware of the women's leadership forum?

18 A    I've heard it come up in testimony.  I don't have an

19 understanding or knowledge of the program.

20 Q    If that was a charitable program, that would remain under

21 the control of Mr. LaPierre and other officers, correct?

22 A    If it was a charitable program comprising the company's

23 nonprofit mission, that would fit under Roman Act II there, and

24 that definition yes, it would fall under core fundamental

25 mission operations and it would fall under Mr. LaPierre or

Robichaux - Cross/Salitore                    36

1  another officer of the company.

2  Q    And moving to Roman III, this is the mission related

3  litigation, there's a footnote there and that footnote directs

4  the reader to an annex and that includes all state and

5  regulatory actions and at least I looked at it and it looked

6  like 32 litigation actions described in the annex.  Is it

7  correct Mr. LaPierre or other officers or the special

8  litigation committee retains the oversight and management of

9  those 32 litigation actions?

10 A    It's my understanding that the special, the answer is yes.

11 Yes.

12 Q    And looking at Roman IV, marketing this is intended to

13 capture marketing activities by the NRA, correct?

14 A    Yes.

15 Q    And so under this Mr. LaPierre or other officers would

16 retain control of those relationships, is that correct?

17 A    That is correct.

18 Q    And have you heard of or are you aware of the NRA's

19 relationship with Membership Marketing Partners, MMP?

20 A    I have.

21 Q    That relationship would continue to be overseen and

22 controlled by Mr. LaPierre or other officers, correct?

23 A    The relationship would, yes.

24 Q    Now, what about contract review say for example of MMP's

25 contract?  Is that still under the control of Mr. LaPierre and

Robichaux - Cross/Salitore                    37

1  other officers?

2  A    Contract, I would say no.

3  Q    So you would contend or it's your understanding that as

4  CRO you would have the ability to conduct contract review of

5  Membership Marketing Partners?

6  A    To the extent that there would be, if you drop down below

7  into management operation, a legal or compliance related issue,

8  related to any contract, I believe that would fall under

9  management operations.

10 Q    Okay.  Let's look down and explore that a little bit.

11 Going to top of page 16 of 29 in the header, management

12 operations, I think you're referring to Roman III, legal

13 governance and compliance operations.  Is that what you are

14 referring to?

15 A    Yes, that's correct.

16 Q    But there's also a limitation to the extent they relate to

17 the CRO responsibilities.

18 A    That's correct.

19 Q    And so can you explain to me how the, if you're limited to

20 review the contract only to the extent they relate to the CRO

21 responsibilities, how does contract review become bifurcated

22 then between yourself or Mr. LaPierre at least under this

23 engagement?

24 A    So I think my answer was to the extent there was a

25 compliance issue raised with respect to a contract, I think it

1  falls under legal or compliance as related here, okay.  Because

2  the management operations also include finance and accounting

3  and importantly this includes treasury management which I would

4  contend includes the appropriate control of cash and reporting.

5  To the extent a contract presents a compliance issue, it would

6  fall in this bucket and fall under CRO responsibilities.  So

7  further parsing that to the extent that a marketing contract

8  with a particular firm, to the extent the NRA has to make a

9  determination whether that firm is effective at its marketing

10 activities, whether it's a firm that they want to be associated

11 with, whether that firm presents the right image for the NRA,

12 that is not something that I think would be, fall under legal

13 governance and compliance and would not fall under management

14 operations.  That would fall under core mission.

15 Q    And so how about for invoice payment authorization for MMP

16 invoices, is that core mission or is that a management

17 operation?

18 A    I would say that falls under the control of cash on a post

19 petition basis which is finance, accounting and treasury

20 management.

21 Q    So your understanding would be, at least under this

22 engagement that you are in control of authorizing invoice

23 payments to MMP in this example?

24 A    So I would say all post petition disbursements of cash for

25 any reason falls under management operations that falls under

Robichaux - Cross/Salitore                    39

1  me including MMP.

2  Q    And how about invoice review of MMP invoices, does that

3  fall under core management or excuse me, core mission or core

4  management?

5  A    I would think it would be both.

6  Q    Going back to the core fundamental mission operations and

7  looking at Roman Act V membership, the engagement as it's

8  currently written does not contemplate any form of a CRO report

9  or evaluation of governance processes to be published to the

10  membership, does it?

11  A    That is correct.

12  Q    And looking at Roman Act VI, donor development and

13  fundraising, this remains under the control of Mr. LaPierre or

14  officers, correct?

15  A    Correct.

16  Q    And are you familiar with the office of advancement within

17  the NRA?

18  A    I am.

19  Q    And doesn't Mr. Tyler Schropp --

20  A    I'm sorry, can I clarify my answer?

21  Q    Certainly.

22  A    I'm only, I'm familiar to the extent I've heard testimony.

23  Q    Okay.  And is it your understanding that Mr. Schropp heads

24  that office of advancement?

25  A    Yes, that's my understanding.

Robichaux - Cross/Salitore                    40

1  Q    And the office of advancement is directly responsible for

2  generating large donors, correct?

3  A    That office is the office that is responsible for

4  developing large donors, yes.

5  Q    And that office remains under the control of Mr. LaPierre

6  or other officers, does it not?

7  A    That is correct.

8  Q    And so the office of advancement and its activities and

9  expenditures, those also remain under control of Mr. LaPierre

10 or applicable officers, correct?

11 A    So to the extent that there, I think I said this before,

12 to the extent that the operations of the NRA involve the

13 disbursement of post petition cash, and I should have clarified

14 earlier, and the cash is not NRA ILA cash, and it falls under

15 in my opinion treasury management, it falls under management

16 operations.  So to the extent part of your question involved

17 Mr. LaPierre having sole authority to approve post petition

18 disbursement of cash, I would disagree with that part of the

19 question.

20 Q    Okay.  So your testimony would be that as to expenditures

21 of cash or those fall under your responsibilities as CRO,

22 correct?

23 A    Yes, to the extent that they're appropriate based on the

24 agreements that are in place, at the time that I step in, yes.

25 Q    Now, who approves travel and lodging expenses related to

Robichaux - Cross/Salitore                                41

1  the office of advancement or fundraising efforts?

2  A    I would assume, I would be presuming, but I presume that

3  they're approved based on the policies and procedures of the

4  NRA and if there are probably levels or tiers of approval,

5  ultimately concluding with Mr. LaPierre.

6  Q    So those approvals would remain under the control of Mr.

7  LaPierre or applicable officers?

8  A    I would take the position to the extent they are within

9  policy, yes.

10 Q    Do you perceive that you have the ability to determine

11 whether they are in or outside of policy?

12 A    I do.

13 Q    Now, let's touch on management operations a little bit

14 further.  Now management operations are the, essentially what's

15 left after the core mission functions, correct?

16 A    That's the intent.  You define core mission and then

17 everything else that's left is scooped up into management

18 operations, yes.

19 Q    Now, earlier you testified if I'm not mistaken with

20 respect to MMP that you do believe that you have a role in that

21 relationship.  Can you help me understand the last, in Roman

22 Act VI of management operations, it indicates that you would

23 have supervision and management of vendors who furnish goods or

24 perform services unrelated to the core fundamental mission

25 operations.  Can you help me understand how this squares with

Robichaux - Cross/Salitore                           42

1 your perception that you have the ability to manage the

2 relationship with MMP, for example?

3 A    Sure.  Let's take MMP separate, okay.  So MMP would be a

4 core fundamental mission vendor.  I don't think I testified

5 that I have a role in the relationship.  I'm specifically using

6 the word relationship very precisely.  I don't have a role in

7 the day to day interaction with MMP, meaning determining if MMP

8 is the right vendor to select for that service, evaluating the

9 performance of that vendor, interacting with that vendor's

10 client service personnel or anything along those lines.

11      Those are the things I call "relationship", okay.  So how

12 I square that is, others make a debtor that MMP is the right

13 vendor for that service and finance, accounting and treasury

14 management is presented with evidence of that relationship to

15 pay invoices against.  When invoices from MMP come in play, I

16 would assume that they're first approved by those who had a

17 relationship with MMP and once approved they come down for a

18 double check by the compliance function in finance, accounting

19 and treasury.

20      And if things check out, they're paid.  If things don't

21 check out, there is a check, there's a check and balance at the

22 treasury management payment level which I have the ability to

23 control and raise an issue with if there is a problem with

24 paying a vendor that falls outside of Roman Act VI under

25 management operations.

Robichaux - Cross/Salitore                    43

1  Q     Thank you, Mr. Robichaux.  Let's shift gears to your

2  reporting or how it's contemplated that you would report to the

3  SLC, the special litigation committee and how differences of

4  opinion are to be resolved and I think that's located at header

5  page 16 of 29 and the second open bullet towards the bottom of

6  the page.  I'll start out, your understanding is you as a CRO

7  and Ankura would report directly to the special litigation

8  committee, correct?

9  A     Correct.

10 Q     And by report, that means that you as CRO is subject to

11 special litigation committee direction, correct?

12 A     No.

13 Q     How does, what does that mean, report to the special

14 litigation committee?

15 A     Okay.  So for purposes of our client contact, the special

16 litigation committee is our client reporting relationship.  The

17 connotation in your question was does the CRO take direction

18 from the SLC and that's a very broad question and I would say

19 the answer is no.

20 Q     If, as you understand, well -- let's go to the engagement

21 letter, header page 2 of 29.  And I'm specifically looking at

22 the scope of engagement paragraph one.

23 A     Okay.

24 Q     Towards the end of the second paragraph it says that --

25 A     Hold on one second, I'm not quite there yet.  I'm sorry.

Robichaux - Cross/Salitore                    44

1 Q    I'm sorry.

2 A    This mouse is not scrolling very fast, sorry.  Okay, go

3 ahead.

4 Q    Going to the very end of that second paragraph under one,

5 it does indicate CRO shall be authorized in such capacity to

6 make decisions with respect to discharging the CRO

7 responsibilities in such manner as the CRO deems appropriate

8 subject to only the direction, limitations and parameters set

9 by the SLC.

10 A    Correct.

11 Q    And so if you could explain to the Court how you are not

12 acting under the direction of the SLC?

13 A    Yeah, --

14 Q    Under the engagement.

15 A    -- acting under the direction connotes that they're going

16 to direct me on all of my activities and I would reject that.

17 What this does is this says that the SLC will put parameters,

18 they'll put guard rails, and so on, and within those guard

19 rails, the CRO is an independent party and can execute within

20 my discretion.  There's also -- I'm sorry.  That's the genesis

21 of my answer.

22 Q    Now going back to the Schedule 2, which is the scope, and

23 looking at page 15 of 29, I'm sorry to have you bouncing

24 around.

25 A    That's all right, it's all right.  It's going to take me a

Robichaux - Cross/Salitore                          45

1  second, I'm sorry.  Okay, I'm  there.

2  Q    Under Appointment and Reporting, at the third bullet point

3  it describes your access to Board Members.  But you're only

4  able to access Board Members after consultation with the SLC

5  and counsel to the Board, is that correct?

6  A    Yes, consultation with, correct.

7  Q    And if the SLC declines a request to access a Board

8  Member, what happens in that case?

9  A    So as I read it this isn't with the approval of or the

10 authority of.  This is after a consultation.  This literally

11 only requires that I come to the SLC, tell them that I'm

12 requesting access to a Board Member and also counsel to the

13 Board.  They'll have a discussion around it and then I will be

14 granted access to the Board Member.  This isn't an approval or

15 non-approval provision.

16 Q    Didn't we discuss earlier that the SLC is able to set

17 parameters of what you're able to do and not do?

18 A    Yes, we did.

19 Q    And what would happen if the SLC decided that it would

20 contain by setting a parameter that you would not have access

21 to a Board Member?

22 A    Yeah, see, so that's a really good question.  So I view,

23 if you go up in Schedule 2, the very top, second paragraph, it

24 says to the extent there's an inconsistency between this

25 Schedule 2 and any of the other terms and conditions of this

1  agreement Schedule 2 shall control, okay.

2          So put aside whatever else the agreement says about

3  reporting to the SLC.  In my opinion this Schedule 2 was so

4  heavily negotiated that the Schedule 2 sets out exactly where

5  the SLC has discretion and authority to put bounds on my

6  activities, okay.

7          So the, I do not believe that the SLC would have the

8  authority to come in and just say hey, Mr. Robichaux, you know

9  that bullet point #3 under Appointment and Reporting where it

10 says you just have to have consultation, okay, in our

11 discretion now we're changing that to you have to have our

12 approval.  I believe that would be a breach of the agreement

13 and I believe I would have remedies under that.

14 Q    And we can touch a little later on what happens in the

15 event of a disagreement.  But still under the heading of

16 Appointment and Reporting the forethought indicates that you

17 should be available, available to provide reporting and

18 presentations to the Board, is that correct?

19 A    That's correct.

20 Q    But this engagement as its written does not contemplate

21 any form of evaluation or a report on governance to the Board,

22 does it?

23 A    That is correct.

24 Q    This engagement doesn't contain any mandate or requirement

25 that you evaluate and provide recommendations related to

Robichaux - Cross/Salitore                    47

1 governance to the Board, does it?

2 A    It's certainly something that I will do with respect to

3 the SLC.  It does not have a mandated requirement that that be

4 done for the Board.

5 Q    Now earlier we were talking a little bit about what

6 happens if there's a disagreement.  Let's go to the next page

7 which is 16 of 29 in the header.  And the second solid bullet

8 point I think addresses this issue.  This provides if there's a

9 dispute between yourself or another advisor or officer or

10 employee then that is taken to the Special Litigation Committee

11 for determination, correct?

12 A    That is correct.

13 Q    And if you're not satisfied with how the Special

14 Litigation Committee determines the dispute this provides that

15 you have the discretion but not obligation to bring the issue

16 to the Bankruptcy Court, isn't that correct?

17 A    So it goes into a little bit more detail about not being

18 satisfied.  But the crux of what you're stated is accurate,

19 yes.

20 Q    So there's no obligation contained within the agreement to

21 bring that matter to the Bankruptcy Court?

22 A    Other than my own fiduciary duties as an independent

23 fiduciary of the Association there's no contractual duties, no.

24 Q    Thank you, Mr. Robichaux.  I'm going to shift to looking

25 at the bylaws a little bit.  You had indicated you've reviewed

Robichaux - Cross/Salitore                                    48

1  the bylaws?

2  A    So the bylaws are quite lengthy.  I've reviewed several

3  sections.  I'm not going to purport to be a bylaw expert of the

4  NRA.  But yes, I've reviewed them.

5  Q    And it's your understanding that Ankura and yourself are

6  to be retained as a representative of the company, correct?

7  A    So it's my understanding that Ankura is not being retained

8  as a representative of a company, of the company.  Ankura is

9  being hired as a service provider and part of what they're

10 providing is me as an individual to serve as a representative

11 of the company.

12 Q    And as you sit here today you don't have an opinion about

13 whether or not you're an Officer as it's referred to in the

14 bylaws?

15 A    I do have an opinion about that.

16 Q    And what is that opinion?

17 A    So my opinion is I am not going to be a named Officer as

18 those Officer positions are outlined in the bylaws.

19 Q    And why is that?

20 A    Because the bylaws do not have a Chief Restructuring

21 Officer role contained in them.

22 Q    But it is correct that under the contemplated engagement

23 other Officers report to you when appropriate, such as Acting

24 CFO Rowling or Secretary and General Counsel Frazer, correct?

25 A    So the CFO is not a designated Officer under the bylaws, I

Robichaux - Cross/Salitore                              49

1  don't believe.  And Mr. Frazer would report to me and Mr.

2  LaPierre depending upon his, what the nature of what he's

3  doing, yes.

4  Q    And as you testified earlier under the engagement as it's

5  written you have the authority, you contend, to review and

6  authorize contracts within the scope of your limited

7  responsibilities, correct?

8  A    Yes.

9  Q    And under the engagement you also I think testified you

10 have the authority to authorize payments to vendors so long as

11 it's within your limited responsibilities, correct?

12 A    Yes.

13 Q    And under the engagement agreement it also provides that

14 for purposes of the attorney-client privilege and work product

15 doctrines you're considered the functional equivalent of an

16 executive, correct?

17 A    That is correct.

18 Q    Now I'll go back to the bylaws for just a bit.  Earlier

19 you testified that you believe that you are independent of Mr.

20 LaPierre?

21 A    Yes.

22 Q    Do you believe that Mr. LaPierre has the ability to

23 terminate the engagement?

24 A    I do not.

25 Q    Can you go to the PDF, page 22 of the bylaws?

1         THE COURT:  Counsel, what exhibit are we looking at?

2         MR. SALITORE:  Yes, that would be AMC-10.

3         THE COURT:  Thank you.

4         MR. SALITORE:  I apologize.

5 Q    And specifically, Mr. Robichaux, I'm looking here at

6 Article 5, Section 2, Subsection C that describes the duties of

7 the Vice President.  Have you seen this before or reviewed it?

8 A    I have.

9 Q    And you don't believe or consider yourself to be an

10 employee that can be terminated by the Executive Vice

11 President, correct?

12 A    Are you referring to C(3) here?

13 Q    Anywhere under C actually would work.  You don't consider

14 yourself to be in a position where you can be terminated by Mr.

15 LaPierre I think you said.

16 A    That is correct.

17 Q    But isn't it true that the company can terminate the

18 engagement at any time on the authority of the Special

19 Litigation Committee?

20 A    That's my belief.

21 Q    And there's no provision in this engagement letter that

22 expressly curtains any ability of Mr. LaPierre to terminate the

23 engagement?

24 A    I believe it does.

25 Q    Where, could you point me to that?

Robichaux - Cross/Salitore                                    51

1  A    So it's really embodied in the, who the letter is

2  addressed to.  So when you sort of take it together, who the

3  letter's addressed to, which is Mr. Cotton, who it states we

4  report to, which is the Special Litigation Committee, and Mr.

5  Cotton being the lead signature on the agreement.

6  Q    Earlier you testified that two debtor representatives

7  signed the agreement and I haven't seen that.  But is one of

8  those debtor representatives Mr. LaPierre?

9  A    That is correct.

10 Q    Okay, I want to explore just for a little bit, and I'm

11 getting close to done, but I want to explore just a little bit

12 the creation of the Special Litigation Committee and for this I

13 direct you back to the bylaws, that AMC-10, and let's go to PDF

14 page 46.  And just let me know when you're there.

15 A    Oh, I'm looking at your screen.  If you want, do you want

16 me to go there, or do you want me to look at your screen share?

17 Q    No, no, no, as long as you can see it.

18 A    I can see it.

19 Q    And have you seen that before or are familiar with that?

20 A    I do remember reading that, yes.

21 Q    And the Special Litigation Committee is a special

22 committee that was established by the President Ms. Meadows,

23 correct?

24 A    That's my understanding.

25 Q    Let's go to PDF page 47, the next page.  And Section 5

Robichaux - Cross/Salitore                                    52

1  describes limitations on the powers of committees.  Do you see

2  that, are you familiar with that?

3  A    I do.  I've read that before, yes.

4  Q    And so this provides that no special committee can

5  exercise any powers prohibited by the Executive Committee.  Now

6  let's go to PDF 27.  Now Article 6 describes the Executive

7  Committee and Section 2 describes powers and duties.  And it

8  specifically says the Executive Committee does not have the

9  power to, and it beings at A and runs all the way through K on

10 the next page.  Do you see that?

11 A    I do.

12 Q    And under F the Executive Committee, and therefor a

13 Special Committee, cannot adopt and disseminate a fundamental

14 change of view or basic policy or basic organizational

15 structure of the organization.  Have you reviewed that and are

16 you familiar with that?

17 A    I am.  I have.

18       MR. GARMAN:  I'd like to lodge an objection.  The

19 question is ultimately the legal question of the relief brought

20 before the Court, so I believe this line of questioning is

21 asking this witness to opine on legal conclusions that are the

22 subject of our motion.

23       THE COURT:  The witness may give his understanding if

24 he has one.

25 Q    Mr. Robichaux, can you describe your understanding of what

Robichaux - Cross/Salitore                          53

1  Section 2, Subsection F, okay, that's the Executive Committee

2  and Special Committees, from doing?

3  A     Sure.

4  Q     In your own words.

5  A     Sure, in my own words and with the advance apologies to

6  the NRA Board since I'm certainly not an historian.  This is

7  the way I would read it, and I'll take those three pieces one

8  at a time, okay.  Adopt and disseminate a fundamental change of

9  view, okay.  Well, the NRA is an advocacy organization.  It

10 takes views on First Amendment and Second Amendment issues, it

11 takes view on gun ownership and use.  And so anything that

12 would involve, I'm sorry, let me just say this.  So things

13 related to the basic view or mission, okay, would be prohibited

14 through this exception.

15        The second piece, a basic policy.  So a basic, so

16 something so fundamental and basic that it's a policy, a basic

17 policy, or a basic organization structure of the Association.

18 And the other thing that I in my sort of lay person's reading

19 into this is that the intent of the, any of these three changes

20 would be to make an ongoing, permanent and durable change in

21 either a change of view, a basic policy or an organizational

22 structure change.  Durable and permanent as opposed to

23 temporary.

24 Q     But the words ongoing, durable and permanent don't appear

25 anywhere within Section 2, correct.

Robichaux - Cross/Salitore                                    54

1  A    Yeah, correct, you just asked me for my opinion, right.

2  Q    I understand, thank you.  Now let's switch if we can to

3  New York AG Exhibit 2.

4  A    You want me to go find that?  Happy to.

5  Q    Well, I think we can put that up on the screen.  And this

6  is the resolution formalizing the Special Litigation Committee.

7  A    Okay, got you.

8  Q    And I'm specifically looking at the last paragraph, or the

9  last two paragraphs, the actual resolutions.  Can you take just

10  a few moments and review those, or have you seen this before?

11  A    I have.

12  Q    And could you take just a few moments to refresh yourself

13  on those last two paragraphs?

14  A    Sure, okay, I'm there.

15  Q    That resolution does not expressly confer authority on the

16  SLC to oversee the NRA's non-litigation business activities,

17  does it?

18  A    First of all it's my understanding that this is not the

19  current resolution.  But it's my understanding that the NRA

20  believes that the last paragraph, (iv), is what the SLC

21  believes it is empowered to move forward with the Ankura

22  engagement letter under.

23  Q    And that's the paragraph that says any additional legal

24  proceedings?

25  A    That is correct.

Robichaux - Cross/Salitore                    55

1  Q    But this resolution, it does not expressly confer

2  authority to the SLC to assume control of governance or control

3  protocols, does it?

4          MR. GARMAN:  I object solely to the extent this calls

5  for a legal conclusion.

6          THE COURT:  Sustained on that.  The witness may give

7  his understanding.

8  A    Yeah, so Your Honor, Mr. Garman beat me to the punch.  I

9  was going to say that is a, that is a very excellent technical

10 legal question that you want me to answer and that I think is

11 left up to the Judge.

12 Q    But isn't it true that your belief is that the scope of

13 the CRO is actually significantly broader than what the SLC on

14 a day to day basis actually has delegated to it?

15 A    I don't believe I said that.

16         MR. SALITORE:  Ms. Lambert, could we just very

17 quickly go to the deposition of Mr. Robichaux from April 15?

18 And specifically page 69.  PDF is just fine.  Actually, let me

19 begin if I could on the previous page, 68, and starting at line

20 22:  Let me try and put it this way.  Could the Special

21 Litigation Committee direct you to do something that it itself

22 is not able to do within its authority?

23         And isn't your answer, Mr. Robichaux, so you're off

24 the cuff without having thought about it, qualified answer,

25 without having thought about answering on the fly, without

Robichaux - Cross/Salitore                                    56

1  fully understanding what the Special Litigation Committee's

2  charge is right off the bat, my belief is that the CRO scope

3  and appointment is actually significantly broader than what the

4  Special Litigation Committee on a day to day basis actually has

5  delegated to it.

6       Whereas since the SLC doesn't have day to day

7  authority over finance, accounting, treasury, management and

8  all these other things that specifically part of the duties and

9  authorities that today are delegated to the Executive Vice

10 President.

11      Okay, so right off the bat the scope and authority

12 contains a significant amount of areas of responsibility that

13 the SLC does not currently have I would assume in its charge, I

14 could be wrong, but I assume that's not the case.

15      Do you see that, Mr. Robichaux?

16 A    I do.

17 Q    Can you square for me how it is that whether you have

18 authority broader than what the Special Litigation Committee

19 itself is capable of possessing?

20 A    Yeah, how did --

21      MR. GARMAN:  Hold on, I'd like to object.  Your

22 Honor, the witness has testified and he's accurate.  This is

23 not the resolution that currently forms the Special Litigation

24 Committee.  So I would assume, I object to the use of this

25 exhibit, and it assumes facts not in evidence, the question.

1          THE COURT:  Mr. Salitore, do you want to respond to

2   that?

3          MR. SALITORE:  Your Honor, I'm perfectly willing to

4   accept that there is a subsequent resolution.  What I'm

5   interested is to gain the understanding of the proposed CRO as

6   to whether he must act within the powers of the SLC, whatever

7   those are, or if he believes he has the power to act outside of

8   the limitations of the SLC?

9          THE COURT:  Why don't you ask him a question to that

10  effect and I believe he can answer that question, or it would

11  be allowed at least.

12         MR. SALITORE:  Thank you, Your Honor.

13  BY MR. SALITORE:

14  Q    Mr. Robichaux, can you describe for me whether you believe

15  that as CRO under the retention you have the ability to act

16  with broader authority than what the SLC itself has?

17  A     Not unless the Board itself approves the engagement

18  letter and there was otherwise provisions in the bylaws for it.

19  I believe because it's my understanding that SLC is who we

20  report to, SLC authorized the engagement letter.  The scope of

21  power, I'll say, as opposed to day to day duties, the scope of

22  power of the COO, I don't know how it could logically exceed

23  that of the SLC.

24  Q    Thank you, Mr. Robichaux.  And I'm almost wrapped up here,

25  just at the back end.  Is it your understanding that under the

Robichaux - Cross/Salitore                                        58

1  terms of your engagement if the Special Litigation Committee

2  directs you not to investigate something you do not believe you

3  have the power to investigate, notwithstanding their direction?

4  A    I believe that is the case.  I'm sorry, would you repeat

5  the question please.  There's a bunch of negatives in there.

6  Q    I understand.  Is it your belief that under the terms of

7  the engagement if the Special Litigation Committee directs you

8  not to investigate something you do not believe you have the

9  power to investigate despite that direction?

10 A    So I'm going to ask you to repeat that one more time.  I

11 don't --

12 Q    Sure.  If the Special Litigation Committee directs you not

13 to investigate something, under the terms of your engagement as

14 you understand them can you investigate it anyway?

15 A    If it falls under my delegated authority in either

16 management operations, bankruptcy responsibilities and it is of

17 a material nature that in my opinion would rise to the level of

18 a post-petition breach of fiduciary duties, if it were not

19 raised, investigated and raised to the SLC and discussed, then

20 I do believe I have an ability to gather facts, investigate it

21 and raise it with the SLC, yes.  Notwithstanding direction to

22 the contrary.

23       MR. SALITORE:  And Ms. Lambert, could we go to Mr.

24 Robichaux's deposition on page 53?  Specifically starting at

25 line 3.

1 Q    And in your situation as COO or as, you know, in the

2 situation of the Schedule 2 CRO, if the SLC tells you not to

3 investigate certain things do you believe you have the power to

4 investigate, notwithstanding their direction?

5          And your answer then, Mr. Robichaux, was no.

6 Correct?

7 A    Correct.  Can you square that, too?

8 Q    I think your counsel will have an opportunity to do that

9 on redirect.  I'm trying to get through.  I want to touch on

10 whistleblower complaints.  You testified a little bit about

11 that before.  Any whistleblower complaints related to core

12 fundamental mission operations would be outside of your

13 purview, is that correct?

14 A    Not necessarily.

15 Q    And it's your belief that that would then fall under

16 governance or under governance practice, correct?

17 A    And/or disbursement of cash.

18 Q    The engagement agreement itself doesn't refer to

19 whistleblower complaints and how those are to be routed,

20 whether through the traditional chain of command in a core

21 fundamental mission operation or in management, does it?

22 A    Not expressly, no.  I would assume though that that falls

23 under governance and compliance.  But it does, the word

24 whistleblower I don't think appears in our engagement letter.

25 Q    And to touch on compensation just briefly, I understand

Robichaux - Cross/Salitore                    60

1  the terms of engagement limit each person working on the matter

2  to compensation to 40 hours per person working on that,

3  correct?

4  A    Applied to each person.

5  Q    Adjusted.

6  A    I'm sorry.

7  Q    I'm sorry, I think I interrupted you, Mr. Robichaux.

8  A    Yes, applied at each person's level.

9  Q    And the initial personnel contemplates two Ankura

10 personnel to work under the engagement and any expansion of

11 that may be authorized by the SLC under the engagement,

12 correct?

13 A    Correct.

14 Q    But there's no, other than the authorization of the SLC

15 there's no limitation on the number of Ankura persons who could

16 work on the engagement, correct?

17 A    I suppose other than the number of available Ankura

18 personnel, yes, correct.

19 Q    Now looking at the success fee, that applies only if the

20 confirmed plan is agreeable to the NRA and it becomes

21 effective, correct?

22 A    Correct.

23 Q    And is it true that you believe your fiduciary duties

24 compel you to recommend for acceptance the plan best for the

25 estate, correct?

Robichaux - Cross/Salitore                61

1  A    Best for the estate, including encompassing all of its

2  fiduciary duties, yes.

3  Q    And that applies even if the best plan for the estate is

4  not agreeable to the NRA, correct?

5  A    That's why the job of the CRO is so difficult.  Yes.

6  Q    Now the engagement terms contemplate accrued approval of

7  fees under Section 328, correct?

8  A    Yes.

9  Q    And as such there would not be any review of fees under

10 Section 330, true?

11 A    Correct.

12 Q    Isn't it true that the other professionals retained by the

13 debtors under 327 are subject to be reviewed?

14 A    That's correct.

15 Q    And you're aware that the application to retain Ankura and

16 yourself as the CRO indicates that it intends to retain you as

17 an independent fiduciary, isn't that true?

18 A    Correct.

19 Q    Now I want to explore this independent concept.  The CRO

20 is not independent of the SLC correct?

21 A    It is independent of the SLC.

22 Q    I thought it reported directly to the SLC.

23 A    So the reporting relationship doesn't connote dependence

24 or the lack of independence in my opinion.

25 Q    But the SLC has the ability to terminate the relationship

Robichaux - Cross/Salitore                              62

1   at any time, correct?

2   A    So I also have the ability to exercise the right to go to

3   court, and Ankura also has the ability to exercise a noisy

4   resignation.  So you know, I believe there are significant

5   elements of independence in the engagement letter and in the

6   CRO scope.

7   Q    So you believe that independent here is something far more

8   broad than the fact that Ankura doesn't have any conflicts of

9   interest that would prevent retention, correct?

10         MR. GARMAN:  So I'm sorry, I'm going to object.  I'm

11   not sure what we're referring to by here, counsel.

12         THE COURT:  Do you want to restate your question.

13         MR. SALITORE:  Yes, actually, I'll move on.  Thank

14   you.

15   Q    And as to being a fiduciary it's your understanding that

16   you accept the fiduciary responsibilities under the bankruptcy

17   code as you earlier described as unique for a nonprofit,

18   correct?

19   A    That is correct.

20   Q    Isn't it true that all of the other professionals retained

21   by the NRA also have those same fiduciary duties?

22   A    I don't believe outside retained advisors have Director

23   and Officer fiduciary duties.  That's not my understanding.

24   Q    And is it true that the debtors are not seeking your

25   appointment by the Court, but is it more accurate to say that

Robichaux - Cross/Pronske                                          63

1 the debtors are asking permission under Section 363 to retain

2 and compensate you as an NRA representative on the terms

3 provided in the engagement letter?

4         MR. GARMAN:  Your Honor, I object.  That is a legal

5 conclusion called for by the motion.

6         THE COURT:  Sustained.  You may give your

7 understanding, I think you have enough experience in this area

8 to give your understanding.

9 A    Yeah, so my understanding, not, don't hold me to the legal

10 terms, is this is not a forced court imposition of a position,

11 but this is the debtor seeking authority under 363 and 105A for

12 the retention of a Chief Restructuring Officer, yes.

13        MR. SALITORE:  Thank you, Mr. Robichaux.  I would

14 pass the witness.  Thanks for your time, sir.

15        THE COURT:  Thank you, Mr. Salitore.  Does anyone

16 else have any questions of Mr. Robichaux?  I think we'll just

17 start in the same order that we have been going.  NYAG?

18        MR. PRONSKE:  Yes, Your Honor, we have questions.

19        THE COURT:  Okay.

20                      CROSS EXAMINATION

21 BY MR. PRONSKE:

22 Q    Good afternoon, Mr. Robichaux, I'm Gerrit Pronske, I took

23 your deposition a couple of weeks ago and I represent the New

24 York Attorney General.  Your testimony is that you're not an

25 officer of the NRA, correct?

1  A    I'm not an officer as the defined term is used in the NRA

2  bylaws, correct.

3  Q    And if you were an officer under the bylaws you would not

4  be able to be terminated unless there was Board approval, is

5  that correct?

6  A    That's not necessarily correct.  There are Capital O

7  Officers as contemplated in the bylaws that can be terminated

8  without Board approval.

9  Q    Okay.  Let me ask you this.  Under your arrangement the

10 NRA can terminate with you at any time for any reason, is that

11 right?

12 A    So I think I've testified I think the SLC can terminate

13 the engagement.

14 Q    And I think your testimony, is this correct, is that

15 because the letter was with Mr. Cotton, is that right?

16 A    It's a combination of things.  The reason, are you asking

17 what forms my basis of understanding?

18 Q    Yes.

19 A    Okay.  It's because we've addressed the letter to Mr.

20 Cotton, we've crafted the letter that Mr. Cotton is the company

21 representative for purposes of executing the letter, we've

22 fashioned a letter that the Special Litigation Committee is our

23 reporting body.  I've looked at the resolution that formed the

24 Special Litigation Committee, I've been informed by counsel the

25 SLC believes it has the authority to supervise Ankura under

Robichaux - Cross/Pronske                           65

1  this, and I've also spoken to Mr. LaPierre who told me that he

2  did not think he could terminate the engagement letter.

3  Q    Okay.  But despite the fact that the letter is to Mr.

4  Cotton, the agreement is not with Mr. Cotton, isn't that right?

5  A    It's with the company, correct.

6  Q    Right.  And the company is a defined term that means the

7  National Rifle Association, is that right?

8  A    And its subsidiaries together.

9  Q    Right.  And the termination provision says that either of

10 the parties can terminate at any time for any reason.  But the

11 parties would mean the NRA and you, isn't that correct?

12 A    That is correct.

13 Q    Okay.  And when I took your deposition on April 13 do you

14 recall saying that there's nothing in the engagement letter

15 that would prevent Mr. LaPierre from firing you?

16 A    Correct.

17 Q    But you're changing your testimony today, is that right?

18 A    I have had additional discussions, I've reviewed

19 additional documents --

20        MR. PRONSKE:  I object, non-responsive.  I just asked

21 him if he's changing his testimony.

22        THE COURT:  Sustained.

23 A    I'm updating my testimony.

24 Q    Okay.  Are you changing your testimony?

25 A    So my testimony was accurate at the time.

Robichaux - Cross/Pronske                                    66

1  Q    The question is yes or no, Mr. Robichaux.  Are you

2  changing your testimony today?

3  A    So are you asking me am I changing my prior testimony, are

4  you asking me if my prior testimony was inaccurate as to what I

5  understood at the time?

6  Q    I'm asking you a pretty simple question actually, which is

7  are you changing your testimony today?

8  A    Okay, so I'm really not trying to be argumentative, I'm

9  just trying to understand if you're asking if I have different

10 testimony today than previously.

11 Q    Well, what I'm asking you is this.  In your deposition on

12 page 32, line 13, I asked you is there anything in Schedule 2

13 or the retention letter that limits Mr. LaPierre's powers of

14 authority as an Officer of the NRA to bind the NRA to a

15 termination of your engagement, and your answer was I don't

16 believe there's anything in the engagement letter that would

17 limit that.  Period.

18        And my question is are you changing your testimony

19 today?

20 A    Yes, with explanation.

21 Q    Thank you.  And if you could be terminated by Mr. LaPierre

22 or by anyone on the management of the NRA isn't it true that

23 you would not be able to qualify as an "independent fiduciary"?

24 A    No.

25 Q    So you're saying to me that if Mr. LaPierre doesn't like

Robichaux - Cross/Pronske                                    67

1 what you're doing and decides to terminate you that you still

2 would, you still would consider yourself an independent

3 fiduciary?

4 A    Yes.

5 Q    Okay.  The, you're familiar with the application obviously

6 that proposes your engagement to the Court.  And it has a

7 sentence in paragraph 9 that says "The relief requested in this

8 application is necessary to the successful administration of

9 these Chapter 11 cases and to provide assurance to creditors,

10 parties in interest and to the Court that there is an

11 independent fiduciary overseeing these proceedings."  Are you

12 familiar with that sentence?

13 A    I am.

14 Q    Would you agree that the appointment of a CRO is necessary

15 for the successful administration of the cases?

16 A    So I would agree that the appointment of a CRO would be

17 very helpful and would aid the successful completion of the

18 cases.  I don't that I know enough to go as far as to say

19 necessary.  I know the debtors believe that.  I think it would

20 be very helpful.

21 Q    And you obviously believe that an independent fiduciary is

22 needed in this particular case, correct?

23 A    So based on all of the testimony that I've sat through and

24 heard I think an independent fiduciary will bring comfort to a

25 lot of the parties in interest here, yes.

1  Q    Okay, but that's not what I asked you and that's not what

2  the sentence says.  The sentence actually says that the relief

3  requested is necessary to provide for an independent fiduciary

4  overseeing the proceedings, and my question to you is do you

5  think that it is necessary or that an independent fiduciary is

6  necessary or needed in this particular case?

7  A    I believe the debtors believe that, yes.

8  Q    As of the date that I took your deposition on April 13 you

9  had not yet looked at the schedules, is that right?

10  A    That is correct.

11  Q    Or the SOFAs?

12  A    Correct.

13  Q    And you had not looked at any plan or disclosure

14  statement, is that right?

15  A    That's correct.

16  Q    The, and have you looked at those documents since the

17  deposition was taken?

18  A    No.

19  Q    Let's talk about the restructuring fee for a minute.  The

20  $1 million restructuring fee as Mr. Salitore brought out

21  requires that a plan be confirmed, that the NRA has consented

22  to or accepted by the debtors".  Are you familiar with that?

23  A    Yea, but I think it actually says it has to go effective

24  to, not just be confirmed.

25  Q    Well, I'll read the whole sentence.  "Payable immediately

Robichaux - Cross/Pronske                    69

1  upon the effective date of any Chapter 11 plan consented to or

2  accepted by the debtors".  Correct?

3  A    Correct.

4  Q    And your testimony was that the restructuring fee is in

5  line with your fiduciary duty.  And I want to ask you if that,

6  you said the Schedule 2 was heavily negotiated.  Is there

7  anything about that sentence that you attempted to negotiate?

8  A    Are you talking about the language on the restructuring

9  fee?

10  Q    Yes.

11  A    Yeah, that is language that I proposed.

12  Q    So why did you put a proviso in there that only pays you

13  $1 million if a plan is confirmed that the NRA actually agrees

14  to, consents to accept?

15  A    Because that's in my opinion pretty standard.  And that is

16  logical in aligning the interest of the estate to an important

17  service provider.

18  Q    But aren't there possible outcomes that would be favorable

19  to the estate that the NRA would not agree to?

20  A    Perhaps.

21  Q    Well, let's go through some of them.  For example you

22  would not receive $1 million if a plan is confirmed that's

23  potentially favorable to creditors but not consented to by the

24  debtor, is that right?

25  A    That is correct.

Robichaux - Cross/Pronske                                    70

1 Q     And you would not receive $1 million if you determined

2 that the best avenue for a restructure would be a sale of

3 assets instead of confirmation of a plan that the NRA consented

4 to, is that right?

5 A     Would you ask that again, please.

6 Q     Sure.  If there was a sale instead of a plan confirmation,

7 if there was a sale under Section 363 of the Bankruptcy Code

8 that was potentially favorable to creditors in the best avenue

9 of a restructure but was not consented to by the NRA you would

10 not receive $1 million, right?

11 A    And are you saying and the Court approved a 363 sale plan?

12 Q    No, I didn't say plan, I said a sale of assets under

13 Section 363.

14 A    I'm really not trying to be dense, I'm not following your

15 question.

16 Q    You understand that a sale can happen without a plan?

17 A    I do.

18 Q    Okay.  So if there was a sale and that sale was in the

19 best interest of creditors, in the best interest of the estate

20 and the best avenue for the debtor but was not consented to by

21 the NRA and that sale went forward you would not receive $1

22 million fee, correct?

23 A    So if any action is taken outside of a plan the only way

24 the restructuring fee is triggered is through a plan.  So any

25 363 sale will not trigger the restructuring fee.

Robichaux - Cross/Pronske                                     71

1  Q    Okay.  And if you determined that the best avenue for

2  restructure of the debtor was to dismiss the bankruptcy case

3  you would not receive the $1 million fee also, right?

4  A    So what, what was the eventual outcome of the case?  Is it

5  you're, no, that's not what your hypothetical said.

6  Q    It is what my hypothetical --

7  A    So what I thought was.  So I'm sorry, could you ask your

8  hypothetical again please.

9  Q    Yes.  If you determined that the best avenue for a

10 restructure was dismissal and there was a motion to dismiss the

11 case and granted, that you would not receive your $1 million

12 fee, right?

13 A    That's correct.

14 Q    So there are a number of, or let me put it this way.

15 There's clearly a financial incentive for Ankura and for you to

16 develop a plan that only has terms that the debtor will approve

17 or consent to, and that financial incentive being that you

18 would only receive $1 million if you do what the debtor wants

19 you to do, is that right?

20 A    There is only an opportunity to earn a fee if a plan is

21 confirmed that the Board consents to or acquiesces to, yes.

22 Q    Yeah, but that's not my question.  My question doesn't

23 that provide a financial incentive for Ankura to have the only

24 course in this case be a Chapter 11 plan that the NRA wants?

25 A    That provides, yes, that financial incentive would be

Robichaux - Cross/Pronske                                72

1 there.   The financial incentive to us, to me, would be to bring

2 the parties together and get the parties to agree on a plan

3 including the NRA.   But if that was not possible and a plan was

4 confirmed that the NRA did not agree with, then the financial

5 incentive would cut in the other direction, you are correct.

6 Q    Are you aware that a special meeting of the Board of

7 Directors has been called for Saturday, May 1, to review and

8 potentially approve the plan of reorganization?

9 A    I am.

10 Q    And your testimony sitting here today is that you've never

11 seen a draft plan, is that right?

12 A    A draft of the actual documents of the plan, that is

13 correct.

14 Q    And if you have never seen a plan then would it be safe to

15 say that you have not developed that plan?

16 A    I've provided substantial input to the plan to the

17 bankruptcy counsel.

18 Q    But who developed the concept for the plan, not you,

19 right?

20 A    I developed certain concepts for the plan, yes, I did.

21 Q    Okay.   The plan that you've never seen?

22 A    Well, the concepts that I've developed I've certainly

23 seen.

24 Q    The duty and Schedule 2 that you have is that you will

25 "lead and be responsible" to "develop, negotiate and advance a

Robichaux - Cross/Pronske                          73

1  plan of reorganization", is that correct?

2  A    That is correct.

3  Q    Do you feel that having not reviewed or read a plan or

4  disclosure statement that you've been the leading person to

5  develop the plan?

6  A    I think up to this point I have been afforded significant

7  input on portions of the plan that I'm pretty concerned about,

8  number one.  And I'm also comfortable that the plan can be

9  adjusted and amended in order to gain consensus around what

10 will certainly be objecting parties.  So I'm comfortable that I

11 will continue to have additional expanded input and authority

12 over the plan as we move forward.

13 Q    Isn't it true that to develop a plan you need to analyze a

14 lot of information?

15 A    You need access to information, yes.

16 Q    And would that include financial information of the

17 debtor?

18 A    Yes.

19 Q    And your testimony today is that you've never even looked

20 at the schedules or statements of affairs, is that right?

21 A    That is correct.

22 Q    When you negotiated the Schedule 2, which I think you said

23 was heavily negotiated, did you ask to be able to report

24 directly to the Board?

25 A    No.

Robichaux - Cross/Pronske                          74

1  Q    Is that normal for you to report directly to the Board?

2  A    I would say more than half of the time it's normal for us

3  to report to a subcommittee of the Board.

4  Q    And to not report to the Board?

5  A    Correct.

6  Q    Isn't it, so you were the CRO in a case called Mayflower,

7  is that right?

8  A    Correct.

9  Q    And did your engagement application in that case say that

10 Mr. Robichaux will report to the Board of Directors of the

11 debtor?  Do you recall that?

12 A    I don't recall.

13         MR. PRONSKE:  Mr. Van Horn, can you put up the

14 Mayflower application, page 14, I'm sorry, page 5, paragraph

15 14B.

16 Q    Do you see your scope of services in the Mayflower case?

17 A    I do.

18 Q    And do you see one of the scope of services is that Mr.

19 Robichaux will report to the Board of Directors of the debtor?

20 A    I do.

21 Q    Okay.  And in that case there was no restructuring fee, is

22 that right?

23 A    That's correct.

24 Q    And in fact that same application said "Ankura

25 compensation does not include a back-end success fee,

Robichaux - Cross/Pronske                              75

1  restructuring fee or a transaction fee", is that right?

2  A    That is correct.

3  Q    Were you the Trustee in a case called Senior Living

4  Center?

5  A    I was not a, I was a Trustee?  I've been a Trustee.

6  Q    Were you involved in the Senior Living Center case?

7  A    I was involved in a case called Senior Living Properties,

8  LLC.  But I was not in the Senior Centers case recently, if

9  that's what you're thinking about.  What case are you talking

10 about?

11 Q    A case called SCSQ LLC Senior Living Center --

12 A    Yes.

13 Q    Corpus Christie, application employed Louis Robichaux as

14 CRO.

15 A    Correct, yes.

16 Q    Okay.  Again, did you report directly to the Board in that

17 case?

18 A    I believe I did, yes.

19 Q    And I can show it to you, but do you recall that

20 engagement letter saying that one of your services was to

21 "report to the debtor's Board of Directors"?

22 A    I don't recall that specifically but I suspect that's what

23 it was,  yes.

24 Q    And in that case there was a specific provision saying

25 that you would, I'm sorry.  There was no restructure fee in

Robichaux - Cross/Pronske                                    76

1  that case either, right?

2  A    That is correct.

3  Q    And you were CRO in the 4 West Holdings, Inc., case,

4  correct?

5  A    Correct.

6  Q    And again I can show it to you, but it says under

7  Category of Services that you will "report in such capacity to

8  the debtor's Board of Directors, paragraph 17B, page 6".

9  A    I believe so.

10 Q    Pardon me?

11 A    Yes.  Yes, I recall.

12 Q    And that 4 West Holdings CRO case also said "Ankura

13 compensation does not include a success fee, restructuring fee

14 or transactional fee".  Do you recall that?

15 A    That is correct.

16 Q    You were, you were the CRO in the Foundation Healthcare

17 case, is that right?

18 A    I believe I was the pre-petition CRO in Foundation

19 Healthcare.  I think someone else was post-petition CRO,

20 correct.

21 Q    Right.  Well actually, can I see that?  Yeah, that's

22 correct.  And you reported to the Board in that case as well,

23 right?

24 A    I don't recall.  That might have been, you're reporting to

25 the Executive Committee.  It might have been the Board.  I'm

Robichaux - Cross/Pronske                                    77

1  not sure.

2  Q    And that engagement also said "Ankura's compensation does

3  not include a success fee, restructuring fee or transactional

4  fee", is that right?

5  A    Correct.

6  Q    You were CRO in a case called Ascent Group, LLC, is that

7  right?

8  A    I do not believe I was a CRO there, no.

9  Q    Oh, you were, it was a transactional, or you tell me what

10 it was.

11 A    We were transactional advisor.

12 Q    And in that capacity there was a fixed fee and no

13 restructure, a $50,000 fixed fee and no restructure fee, right?

14 A    Yeah, that engagement was more or less a favor, honestly.

15 It's really not comparable to the other engagements that you've

16 been listing.

17        MR. PRONSKE:  Object, non-responsive, move to strike.

18        THE COURT:  Overruled.

19 Q    And then without going into details of these other ones,

20 but isn't it true that in the St. Francis Hospital case, the

21 Virginia United Methodist case, the Sage Physician case and the

22 CWT liquidation case that as the CRO you or other members of

23 your team were all reporting to the Board?

24 A    Sage Physicians we were not the CRO.  I'm not sure that

25 every one of those that you listed were a CRO engagement.

Robichaux - Cross/Pronske                    78

1  Q    Okay, I'll move on.  Since it appears fairly common that

2  you report to the Board when you are a CRO why did you not

3  require in this case that you would report to the Board like

4  you did in your other cases?

5  A    When you look at the Board composition here and you look

6  at how the Special Litigation Committee was formed for

7  efficiency, to me it makes sense.  And frankly the NRA believe

8  that this was the proper avenue of reporting.

9  Q    Were you involved with --

10  A    I'm sorry, go ahead.

11  Q    You said the Schedule 2 was negotiated.  Was it the NRA's

12  language and the NRA's requirement that you report to the SLC

13  instead of the Board?

14  A    I don't know that there was really much negotiating.  I

15  probably just asked Mr. Mulligan who he expected that Ankura

16  and the CRO would report to.  And he said the Special

17  Litigation Committee.

18  Q    Okay.  And it's true, isn't it, Mr. Robichaux, that if

19  this case were dismissed there would be nothing that would

20  prevent the debtor from being able to hire you as CRO outside

21  of bankruptcy, is that right?

22  A    Correct.

23         MR. PRONSKE:  I'll pass the witness.

24         THE WITNESS:  Thank you, Mr. Prosecutor.

25         THE COURT:  Let me just hold up here and see how much

Robichaux - Cross/Pronske                           79

1  longer we have in cross, or we can figure out whether to stop

2  for a minute.  Ackerman, how long do you think your examination

3  is going to be of the witness?

4          MR. ACOSTA:  No more than 35 minutes, Your Honor.

5          THE COURT:  Okay.

6          MR. ACOSTA:  Probably less.

7          THE COURT:  Okay.  And Journey?

8          MR. TAYLOR:  Your Honor, I think all of the good

9  questions are going to, largely have been taken.  So no more

10 than 5 to 10.

11         THE COURT:  Okay.  Committee?

12         MR. HENDRIX:  Your Honor, pending anything unforeseen

13 coming up, we don't have any questions.

14         THE COURT:  Okay, thank you.  All right, the witness

15 has been testifying for a while now, so why don't we take a 15-

16 minute recess.  During the break, Mr. Robichaux, don't speak

17 with anyone about your testimony because we're breaking during

18 examination, all right.

19         THE WITNESS:  Yes, Your Honor.

20         THE COURT:  We will be recessed until 4:00.

21      (Recess at 3:42:39/Reconvened at 3:59:28 p.m.)

22         THE COURT:  Mr. Acosta.

23         MR. ACOSTA:  Yes, Your Honor.

24         May I proceed?

25         THE COURT:  You may proceed.

Robichaux - Cross/Acosta                    80

CROSS-EXAMINATION

BY MR. ACOSTA:

Q    Hello, Mr. Robichaux.  How are you doing today?

A    Great.  Thank you.

Q    Good.  Good.

     Mr. Robichaux, I just want to pin this down a little bit.
You were involved in negotiation of the CRO's engagement
letter.  Is that correct?

A    Yes.

Q    And the NRA was involved in that negotiation as well, the
NRA's counsel and their executives?

A    Yes.

Q    And the UCC and its counsel was involved in the
negotiations of the engagement letter to the best of your
knowledge.

A    The UCC's counsel had input on the scope and authority
section principally.

Q    Did Mr. Journey ask to comment on your engagement letter?

A    Not that I'm aware.

Q    Did any contingent creditors, to your knowledge, have any
input on your engagement letter?

A    No, not that I'm aware.

Q    Okay.  Now, and I believe in your deposition you had
mentioned that contingent creditors also -- that there were
some fiduciary duties in this case.  Is that accurate?

1  A    All -- in my belief, all claims asserted against the

2  debtors would fall under the company's fiduciary duties for

3  consideration, yes.

4  Q    And you were here when (indiscernible) said that the

5  contingent creditors (indiscernible) is about 100 million

6  estimated in claims against the debtor?

7  A    Yeah, I heard that testimony.  Yes.

8  Q    Did you have any reason to disbelieve that?

9  A    To disbelieve the asserted amount?

10  Q    The estimated amount.

11  A    I'm not aware that the contingent creditors claims have

12  been estimated.

13  Q    Okay.  You did hear Ms. Rowling say that the current

14  estimation is about 100 million, right, of contingent creditor

15  claims?

16  A    I actually was in and out on part of her testimony.  I

17  don't -- honestly, Mr. Acosta, I don't know that I recall that

18  testimony from her.

19  Q    Okay.  Now, when did the parties finalize its agreements,

20  the engagement agreement with the (indiscernible)?

21  A    Initially, it was April 7th.

22  Q    Okay.  But there's been some changes.  I'm talking about

23  after the changes.  When was it finalized?

24  A    That was finalized yesterday afternoon.

25  Q    Okay.  Do you recall if it was before five o'clock or?

Robichaux - Cross/Acosta                                    82

1  A    I think I recall signing the letter along with Mr. Cotton

2  and Mr. LaPierre I think early to mid-afternoon.

3  Q    Okay.  Fair enough.

4       Now, I'd like to talk to you a little bit about this

5  independence function and I know everyone has talked to you

6  about that.  I'd like to (indiscernible) from a different

7  perspective.

8       I believe you said that both parties can walk away from

9  the engagement.  Is that right?

10 A    Yes.

11 Q    And I believe you said that the special litigation

12 committee could also fire you.  Is that right?

13 A    That's correct.

14 Q    Would the board also be able to fire you, Mr. Robichaux?

15 A    I presume that by taking action to withdraw the authority

16 that the board has vested in the SLC and then the board itself

17 terminate the engagement letter.  I suppose that's

18 theoretically possible, yeah.

19 Q    And you'd agree with me that the board can also delegate

20 that authority to Mr. LaPierre.

21 A    So the board -- I suppose the board -- yeah, theoretically

22 possible.  The board could alter its resolution -- its SLC

23 resolution.

24 Q    Okay.

25 A    Yes.

Robichaux - Cross/Acosta                    83

1   Q    Now, let's go back a little bit.  I think you said that

2   you had restructured companies inside and outside of

3   bankruptcy.

4   A    Yes.

5   Q    And you've been successful at it, what did you say, 80,

6   100 times?  Is that what you said?

7   A    I said I was involved in 80 to 100 restructuring

8   engagements.

9   Q    Okay.  And a good portion of those were outside of

10  bankruptcy.

11  A    Some of them were.  You know, I'd say more than

12  half -- probably two-thirds to three-quarter involved

13  Chapter 11 in some way.

14  Q    Okay.  There's nothing in the engagement letter that

15  required the bankruptcy petition --

16  A    That requires bankruptcy?

17  Q    Right.

18  A    No.  There's nothing in the engagement letter that

19  requires the NRA be in Chapter 11, no.

20  Q    So if you come to determine the issue that the NRA should

21  be outside of bankruptcy and restructuring could occur outside

22  of bankruptcy, do you believe that you could -- do you believe

23  that you could still perform services for the NRA outside of

24  bankruptcy, restructuring services?

25  A    Well, I believe the engagement letter would need to be in

Robichaux - Cross/Acosta                          84

1  large part renegotiated because Schedule 2 contemplates a

2  significant portion of the CRO's scope and authority has to do

3  specifically with dealing with the Chapter 11 bankruptcy

4  process.  But other than that, the core dealing with other

5  areas once you renegotiate, the engagement letter could be

6  tweaked to morph to an out-of-court situation, yes.

7  Q    Could you perform the same function absent the bankruptcy

8  provisions, bankruptcy responsibilities, could you perform the

9  same functions outside of bankruptcy in the engagement letter

10 that you can perform inside of bankruptcy?

11 A    So I'm going to be really precise.  Are you asking if I --

12 if the services -- well, would you mind if I ask you to point

13 me to the scope of services and specifically point out what

14 you're referring to?

15 Q    The management services that you're providing to the NRA,

16 could you provide those services outside of bankruptcy?

17 A    Yes, I believe so.

18 Q    Okay.  Now, I think you had mentioned before that Rowling

19 and Frazer would directly report to you with respect to

20 management operations.

21 A    Well, actually, with respect to the CRO responsibilities,

22 which includes more than just management operations, yes.

23 Q    Okay.  And you'd agree with me, you're not authorized to

24 fire Ms. Rowling or Mr. Frazer, are you?

25 A    Not -- no, not in my sole discretion, no.

Robichaux - Cross/Acosta                              85

1  Q    And you'd agree with me that the engagement letter is a

2  contract, right?

3  A    It is.

4  Q    And that contract can't circumvent the by-laws of the NRA,

5  can it?

6  A    I don't know that I have a legal opinion on that.

7  Q    Okay.  Let's go ahead and turn to NRA Exhibit 689, which

8  is the supplemental notice that was filed last night.  And can

9  you let me know when you --

10  A    Yes.  One sec.

11      Okay.  I'm there.

12  Q    Okay.  And I'd like to focus on Exhibit Number B, which is

13  the redline.  We can skip right to Schedule II if that's okay.

14  A    Hold on a sec.  You're going to the redline?

15  Q    Yes, sir.  It's Exhibit B, I believe.

16  A    Okay.  I'm there.

17  Q    Okay.  If you look at the third paragraph, it says that

18  the special litigation committee has to agree to any additional

19  personnel.  Do you see that?

20  A    Are you in Schedule II?

21  Q    I'm in Schedule II, paragraph number 3.

22  A    All right.  Stand by.

23  Q    Very first sentence, Mr. Robichaux.

24  A    Yeah.  Okay.  I'm there.

25  Q    So if they don't agree, you don't get additional

Robichaux - Cross/Acosta                           86

1  personnel, right?

2  A     That is correct.

3  Q     In the last sentence, Mr. Robichaux, it says both the

4  initial personnel, and that includes you and Mr. Morton, and

5  additional personnel may be designated as management or

6  executive officers.  Do you see that?

7  A     I do.

8  Q     So has that designation been made already?

9  A     As of right now, the anticipation is that only the chief

10 restructuring officer is designated as a representative with

11 the functional equivalent as an executive.  Mr. Morton who is

12 also on my team is not, at the moment, being designated as a

13 specifically designated executive officer.

14 Q     Okay.  So we'll get to functional equivalent in a second,

15 but you're saying that they've already made a designation that

16 you are going to be management executive officers, that

17 Mr. Robichaux is already part of management, an executive

18 officer?

19 A     Yeah, I think -- yeah, I think yes.  That is the -- I

20 think that's in the pre -- or the first paragraph of the

21 engagement letter.  Yes.

22 Q     Yeah.  Now, the sentence doesn't say Mr. Morton may be

23 designated does it?

24 A     No.  What it says is, Mr. Morton of Ankura, together with

25 the CRO, are defined as the initial personnel.

1  Q    Correct.  So both you and Mr. Morton may be designated as

2  management or executive officers of the NRA, according to that

3  sentence.

4  A    That is the point of that sentence, correct.

5  Q    Okay.  And any place in Schedule II where you can point me

6  to where that designation has occurred for either you or

7  Mr. Morton?

8  A    So top of the paragraph 3 states that I will serve as the

9  chief restructuring officer pursuant to the terms and

10  conditions of this -- of this agreement.  And then, in the

11  letter itself, there is a provision that talks about -- point

12  you to that --

13  Q    Are you looking at the first bullet point under

14  appointment and reporting, functional equivalent?

15  A    Yes.  Yeah, yeah, yeah.  Yeah, I'm sorry.

16  Q    Okay.  (Indiscernible)

17  A    I'm in the wrong spot.  Yeah.

18  Q    Well, let's stay on that paragraph, now if you don't mind.

19  Quickly (Indiscernible).

20      And it's your contention that calling you a functional

21  equivalent is the same thing as designating you as an executive

22  officer of management of the NRA?

23  A    The CRO shall be considered a representative and the

24  functional equivalent of an executive of the company.  Yes.

25  Q    Let me ask, the next sentence says that the CRO can't

Robichaux - Cross/Acosta                              88

1  waive the attorney/client privilege.

2  A    That is correct.

3  Q    Whereas, an executive of the NRA (indiscernible)?

4  A    I didn't quite catch the last part of your question.

5  Q    Whereas, an executive of the NRA could waive the attorney

6  (indiscernible).

7         MR. GARMAN:  Objection, Your Honor.  That calls for a

8  legal conclusion.

9         THE COURT:  Sustained.

10         THE WITNESS:  I didn't quite hear the Judge.

11         THE COURT:  I'm sorry, I was at the screen, there.  I

12  sustain the objection.

13         THE WITNESS:  Okay.  Thank you.

14  BY MR. ACOSTA:

15  Q    So if in your independent judgment you determined that the

16  attorney/client privilege should be waived, you can't do it,

17  can you pursuant to that provision?

18  A    So I would say, Mr. Acosta, I'm not a lawyer.  I'm having

19  trouble in my mind conceiving of a scenario where the best

20  solution to resolve a situation is to waive the attorney/client

21  privilege.  But let's just say there is one and I couldn't get

22  past it with the special litigation committee, there is a

23  dispute resolution process that if the refusal to waive that

24  attorney/client privilege presented such a problem that it rose

25  to the level of a breach of a duty, then there's a dispute

Robichaux - Cross/Acosta                                      89

1  resolution process that I would have available.

2  Q     That dispute resolution process doesn't give you powers

3  that this Schedule II gives you, does it?

4  A     I don't understand the question.

5  Q     Yeah, that was a bad question.

6       The dispute resolution process is to determine the power

7  that you are being provided under Schedule II.

8  A     I still don't understand the question.

9  Q     Okay.  If the authority that you're being provided in

10 Schedule II is in question, the dispute resolution process is

11 solely for the purpose of determining that authority, the

12 extent of that authority.

13 A     If you'd allow me one second to consult with the document.

14 Q     That's okay, Mr. Robichaux.  That's fine.  If you can

15 answer, I don't expect you to be a lawyer.

16 A     Look, if there is a dispute on the basic interpretation of

17 this document, in particular what my powers and authorities are

18 or are not, there is a section in the engagement letter that

19 deals with governing law and a forum to resolve that.  That's

20 one possible way of resolving it.

21 Q     Let me just ask you this.  Is the language in the last

22 sentence of the first bullet point under appointment and

23 reporting, is that clear language to you, Mr. Robichaux?

24 A     Is it clear language?  Yes.

25 Q     (Indiscernible)

Robichaux - Cross/Acosta                                    90

1  A    I mean, I understand it and I understand the intent

2  because I was involved in the negotiation and helped write it,

3  but it's clear to me.

4  Q    Okay.  Let's pivot a little bit.  I still want to stay on

5  the privilege.  Have you heard enough about the testimony that

6  there's such a thing when the board meets, there's the general

7  session and there's the executive session?

8  A    No.

9  Q    Do you know about how that operates?

10 A    Sir --

11 Q    And have you heard enough -- I'm sorry.  Go ahead.  I'm

12 sorry.

13 A    Yes, yes, yes, I heard that testimony and I think I

14 understand it, yes.

15 Q    And have you heard enough to know that the NRA has 100

16 percent of the time claimed that everything in the executive

17 session is protected by privilege?

18        MR. GARMAN:  Objection.  Misstates the testimony.

19        THE COURT:  Sustained.  Why don't you restate your

20 question?

21 BY MR. ACOSTA:

22 Q    Have you heard enough to know that the NRA generally takes

23 the position that everything that occurs in executive session

24 at a board meeting is privileged and confidential?

25        MR. GARMAN:  Same objection.

1          THE COURT:  Overruled.

2          You may answer the question, sir.

3          THE WITNESS:  So, Mr. Acosta, I think what I got out

4   of the testimony a few days ago was clearly an understanding

5   that the NRA considers what happens in executive session to be

6   confidential.  I don't -- I don't know that I have an

7   understanding that they all the time claim that everything in

8   there is subject to the attorney/client privilege.  I just

9   don't have an understanding.  They may or may not, I just don't

10  know.

11  BY MR. ACOSTA:

12  Q    Okay.  And you understand that board members are prevented

13  from talking about what they discuss in the executive session?

14  A    From the testimony, I have heard that board members are

15  told not to breach confidentiality and talk about what was

16  discussed in executive session, yes.

17  Q    And you understand that it's because of that

18  confidentiality that board members can't discuss whether the

19  board approved this bankruptcy on January 7, 2021?

20  A    I don't know that I -- I don't know that I had that

21  understanding.

22  Q    Okay.  So if you did learn something in the executive

23  session and the NRA took the position that it was privileged by

24  the attorney/client privilege, isn't that first bullet point,

25  doesn't that prevent you from talking about it to the Court?

Robichaux - Cross/Acosta                    92

 1  A    No.

 2  Q    Okay.  Fair enough.

 3       If you don't mind turning to the next page, Mr. Robichaux.

 4  I'm almost done, so a lot less than 45 minutes.

 5       The first bullet under scope of duties and responsibility

 6  falls into that page.  And my first question is, mission-

 7  related litigation --

 8  A    I'm sorry, Mr. Acosta.  I didn't catch exactly where

 9  you're looking at.  If you could point me --

10  Q    Mission-related litigation right at the top.

11  A    Okay.

12  Q    Do you see that?

13  A    Yeah.  Thank you.

14       MR. ACOSTA:  And actually, Ms. Stephanie, could you

15  transfer to Exhibit B instead -- I mean the redline instead of

16  the Exhibit A, please.

17       I think if you just scroll down, it will get to

18  Exhibit B.

19       There we go, Ms. Johnson, thank you.  Just one more

20  page down, please.

21  BY MR. ACOSTA:

22  Q    Okay.  Exhibit B, mission-related litigation, you talked a

23  lot about that with several people already.  I'm not sure

24  whether you mentioned this or not, mission-related litigation

25  includes the New York AG enforcement action that was commenced

Robichaux - Cross/Acosta                               93

1  on August 6, 2020.  Is that right?

2  A    That's correct.

3  Q    And does it also include the D.C. Attorney General's

4  enforcement action?

5  A    It does.

6  Q    Okay.  And if you continue to read that sentence, it says

7  including.  So are you aware of any other mission-related

8  litigation other than what's defined or attached to your

9  engagement letter?

10 A    I believe that is a complete listing of the existing

11 litigation and action that would be encompassed in that

12 definition, correct.

13 Q    And would you agree with me that the NRA could expand the

14 list that's attached to your engagement letter?

15 A    So the list attached to the engagement letter as mission-

16 related litigation could get amended for various reasons, not

17 just through the NRA expanding it.

18 Q    Fair enough.

19      Now if you continue in that clause, Mr. Robichaux, I think

20 it attempts to define what mission-related litigation is and it

21 says, in the opinion of the SLC, jeopardizes the future

22 existence or financial viability of the company.

23      Do you see that?

24 A    I do.

25 Q    Okay.  And jeopardize is the word that I want to focus on.

1  Is there a component of timing with respect to jeopardizing in

2  your understanding?  And what I mean is, I guess, anyone can

3  make a threat, but doesn't it have to be close to being a

4  reality before it would be considered jeopardizing?

5  A    I suppose the threat would have to be sufficient enough

6  for the SLC to consider it even an action.

7  Q    So it would also have to be close to being real, wouldn't

8  it?

9  A    I suppose it would be a threat, a real threat, right.

10 Yes.

11 Q    And I think you agreed with me that the New York action is

12 included in the mission-related litigation.

13 A    Yes.

14 Q    And what's your understanding of the imminent threat of

15 the New York AG action?

16 A    The imminent threat is if the New York Attorney General

17 prevails in the action, it would result in a dissolution of the

18 NRA.

19 Q    And at this point, do you have any understanding of when

20 that could occur?

21 A    Well, the action has already been taken.

22 Q    Right.  But when would the dissolution occur?

23 A    As soon as it's adjudicated.

24 Q    And do you have any sense of how long it would take to be

25 adjudicated?

Robichaux - Cross/Acosta                          95

1  A    I do not.

2  Q    Okay.  Fair enough.

3       If you go down a couple of paragraphs, I'd like to talk to

4  you about -- yeah, right there.  The second bullet point

5  underneath the responsibilities.  This is where you get into

6  the SLC determination and I'd like to talk to you about the

7  last sentence.

8       It says that you can appeal to a higher court, so to

9  speak, in the event that you believe there is a breach of

10  fiduciary duty.  Is that accurate?

11  A    Well, it doesn't say a higher court.  It says the

12  bankruptcy court.  But yes.

13  Q    Yeah, and I guess -- I'm sorry.  I wasn't specific enough.

14       So let me ask you a question.  If any officer of the

15  corporation or any special committee or any employee for that

16  matter usurped the corporate authority of the board of

17  directors, would that constitute a breach of fiduciary duty?

18  A    It might.  Yeah, it might.

19  Q    And if the NRA tried to reincorporate in the state of

20  Texas, contrary to the by-laws, would you think that that would

21  constitute a breach of fiduciary duty?

22          MR. GARMAN:  Objection.  That calls for a legal

23  conclusion.

24          THE COURT:  Sustained.

25  BY MR. ACOSTA:

1  Q     Would you ever recommend that the NRA reincorporate

2  outside of its procedures and by-laws?

3  A     Could you repeat the question, please?

4  Q     Would you ever recommend to the NRA board that they be

5  allowed to reincorporate outside of the procedures set forth in

6  the by-laws?

7  A     Outside of the procedure.  So I think as a general

8  statement, if I formulated a recommendation with respect to any

9  restructuring action, and that action required -- I'm

10 sorry -- and that action required modifications to the existing

11 by-laws in order to properly implement my recommendations as

12 part of a plan of reorganization, my recommendation to the

13 board would be that it follow its procedures in order to modify

14 properly the by-laws to allow for the implementation of that

15 plan.

16 Q     Okay.  Now, continuing on.  Would you say --

17 (indiscernible) makes you kind of a whistleblower, doesn't it,

18 this provision that (indiscernible)?

19 A     You know, I'll confess, Mr. Acosta, I -- those who know me

20 would say I'm a know-it-all and know a lot of things.  I don't

21 know that I know a true definition of a whistleblower.  This

22 does -- this provision puts me in a position of being able to

23 bring things to the SLC's attention and being able to insist

24 that we have a good faith discussion about things of concern.

25 That if we don't get those resolved and that issue is material

1  enough that it rises to a post-petition breach of a fiduciary

2  duty, then there would be consequences.  So I don't know if

3  that really in your definition makes it a whistleblower, but it

4  is a -- it's a very important feature of the scope and

5  authority.

6  Q    Okay.  Let's scroll down to the next bullet where it talks

7  about CRO responsibilities or bankruptcy responsibilities.

8  A    Yes.

9  Q    Do you see that?

10 A    Yes.

11 Q    And the third sub-bullet under there says, "Working in

12 close coordination with the SLC and the UCC, and subject to the

13 settlement authority thresholds and guidance from the SLC."

14      Do you see that?

15 A    I do.

16 Q    So correct me if I'm wrong.  Is your interpretation that

17 the SLC could put a cap on how you can settle outside

18 litigation, settlement amount cap?

19 A    They could set caps on settlement of litigation subject to

20 further discussion of those caps.  Yes, they could.

21 Q    So if they told you you only have authority to settle with

22 the claimants for $100, they could do that, right?

23 A    Yes, with explanation.

24 Q    Okay.  Fair enough.

25      And if you don't agree with the explanation, what exactly

Robichaux - Cross/Acosta                          98

1 can you do?

2 A    I'm sorry?

3 Q    And if you don't agree with their explanation, what

4 exactly can you do?

5 A    No, I'm sorry.  With explanation was code.  That was so I

6 didn't drone on and you object to my answer.

7 Q    Okay.  All right.

8      You were doing Mr. Garman's job?

9 A    Correct.

10 Q    Okay.  All right.

11      And so let's go back up then to management operations and

12 little (iv) in the (indiscernible) talks about how you're going

13 to handle all litigation that's not mission-related.

14      Do you see that?

15 A    Yes, correct.

16 Q    But that is -- in the parenthetical, it says subject to

17 the settlement authority that the SLC gave you.  Do you see

18 that?

19 A    That is correct.

20 Q    Okay.  So just answer this question.  You can't waive the

21 attorney/client privilege regardless, but the SLC can put

22 limits on you and the NRA can fire you, and it is still your

23 testimony that you're an independent fiduciary to this Court?

24 A    Yes.  And I can either scroll up for you or I can say with

25 explanation.

1  Q    Well, I mean, Mr. Garman is just going to ask you, so go

2  ahead and explain.

3  A    Okay.  Oh, explain it?

4       So look, as I mentioned, the material -- the resolution of

5  a material difference is a very important feature to this

6  engagement letter.  It allows after a good faith discussion in

7  one way or -- I have the burden of explaining to the SLC why,

8  let's say, setting settlement authority too low to resolve a

9  litigation is wrong or why failing to investigate an issue is

10 wrong and if that issue is material enough, why it's wrong and

11 it constitutes a breach, and I believe in my professional

12 judgment that it's a breach, this allows me to bring it

13 forward.

14      I also have thought long and hard about it and I've talked

15 to counsel about it, and I believe that these issues can be

16 brought to Judge Hale and adequately described without

17 violating the attorney/client privilege.

18 Q    Okay.  But you would agree with me, Mr. Robichaux, that

19 even if those issues were brought to Judge Hale or even if you

20 believe that there were issues that should be brought to Judge

21 Hale, it would have to be raised to a level of breach of

22 fiduciary duty.  Is that right?

23 A    This feature wasn't designed for ticky, tacky, small,

24 minor, immaterial issues, correct.  It has to be a material

25 issue.  Correct.

Robichaux - Cross/ Taylor                    100

1  Q    Okay.  And you would agree with me also that if this

2  engagement occurred -- well, no.  Scratch that.

3            MR. ACOSTA:  I have no further questions, Your Honor.

4            I'll pass the witness.

5            THE COURT:  Thank you very much, Mr. Acosta.

6            Mr. Taylor.

7                        CROSS-EXAMINATION

8  BY MR. TAYLOR:

9  Q    Good afternoon, Mr. Robichaux.  It's good to see you

10  again.  For the record, my name is Clay Taylor.  I'm

11  representing Phillip Journey, et al., who are various board

12  members.  I believe you probably heard that before, correct?

13  A    That is correct.

14  Q    Okay.  And you previously testified that under this

15  engagement letter you wouldn't report to the board, would you?

16  A    Not without further action of the board, correct.

17  Q    Okay.  And you can't go to the board unless the SLC

18  authorizes you to, correct?

19  A    Not correct.

20  Q    Okay.  Could you explain that, please?

21  A    Yeah.  So if you look -- if you look at the third bullet

22  under "Appointment and Reporting," it says the CRO will report

23  directly to the SLC and will have direct access to other board

24  members after consultation with the SLC and counsel to the

25  board.  Consultation is just that; it's just consultation.

1  Q    Okay.  So the consultation is not that you can just go

2  talk to individual board members.  You can actually go talk to

3  the whole board if you want to?

4  A    I could -- if I wanted to, I could go talk to the entire

5  board; yes.

6  Q    Okay, thank you.  Your general remedy in the event that

7  you have a disagreement with the SLC is to be able to go to

8  this court, correct?

9  A    That's one, yes.

10 Q    Okay.  What's going to happen if there are members of the

11 SLC who are conflicted out of any particular issue?  For

12 instance, if the NRA has any claims against the SLC members,

13 what's going to happen then?

14 A    The -- my under -- so it's my understanding the SLC was

15 set up to avoid the currently known conflicts amongst

16 individuals within the NRA.  So I'm not aware that the

17 currently existing SLC members have even been alleged to have

18 conflicts.  But in your hypothetical, I suppose if there is a

19 -- if there's an alleged conflict with one of the SLC members,

20 the SLC would need to consider appointing alternates in order

21 to have a functioning subcommittee in order to handle those

22 issues.

23 Q    Okay.  And this engagement letter doesn't consider or

24 contemplate those situations; does it?

25 A    I will just say generally our engagement letter would

Robichaux - Cross/Taylor                    102

1  never seek to put governance terms or address the governance

2  terms of the NRA or any other client how they would deal with

3  their own governance.  This just governs the propriety between

4  or the privity between Ankura and the company.

5  Q    Do you have any affirmative duties under this engagement

6  letter to investigate preferences?

7  A    I would say yes.

8  Q    Could you tell me where that is?

9  A    Well, it's in my general scope and authorities over

10 preparing and prosecuting the plan.  Preferences would be

11 claims that would be held by the estate.  Those potentially

12 would have value.  And I would say this falls under the

13 bankruptcy responsibilities that rolls up to the CRO

14 responsibilities.

15 Q    Would your answer be the same for fraudulent transfer

16 actions against officers?

17 A    In a general sense, either investigating them or being

18 aware that they are being investigated, I would say yes.

19 Q    Would your answer be the same for investigation of any

20 directors?

21 A    I don't -- investigating for what?

22 Q    If there's any financial improprieties, for instance, if

23 they received a fraudulent transfer?

24 A    Well, I think any potential assets of the estate would

25 need to get resolved in the bankruptcy plan.  And that would

Robichaux - Cross/Taylor                                   103

1  generally fall under the CRO scope of duties, yes.

2  Q    Okay.  So the answer's yes?

3  A    Yes.

4  Q    Would your answer be the same for investigation of other

5  insiders including affiliates of insiders?

6  A    To the extent those need to be resolved as part of a plan,

7  yes.

8  Q    And would your answer be the same as to investigation of

9  vendors?

10 A    Yes.

11 Q    What if you didn't -- what if he SLC disagrees with you

12 that those investigations need to be conducted?  What are you

13 going to do then?

14 A    So I would note, Mr. Taylor, that there's various other

15 parties that frankly are ongoing in pursuing these

16 investigations, notwithstanding what the SLC thinks.  My

17 general --

18 Q    Well, sir --

19 A    Yeah, I'm sorry.

20 Q    I really appreciate that.  But if you could just answer

21 the question as posed, that would be helpful.

22 A    Okay.  Could you repeat your question?

23 Q    What if the SLC disagrees that any of those investigations

24 need to be conducted?

25 A    And in your hypothetical, are you assuming that no

Robichaux - Cross/Taylor                              104

1 investigations are ongoing?

2 Q    I'm assuming that you -- you said you have the duty or at

3 least the right to investigate preferences, fraudulent

4 transfers amongst the officers, directors, et cetera.  Are you

5 going to conduct that investigation?

6 A    If others are conducting them or they are being conducted

7 appropriately, then I would not feel the need ourself, myself

8 conduct them.  Correct.

9 Q    Okay.  And the UCC is conducting some of those

10 investigations, right?

11 A    It's my understanding the UCC and others, other parties,

12 are -- are all looking at those types of transactions, yes.

13 Q    What other parties are looking at that other than the UCC?

14 A    The New York Attorney General.

15 Q    Do you think the New York Attorney General is seeking to

16 claw back potential or fraudulent transfers for the benefit of

17 the NRA?

18 A    I don't have an opinion on that.

19 Q    Okay.  And the UCC is only going to pursue potential

20 fraudulent transfer claims to the extent it needs to to satisfy

21 unpaid claimants, correct?

22 A    I don't know.  I have not talked to the Unsecured

23 Creditors' Committee specifically about their -- the scope of

24 their investigations.

25 Q    Do you think generally -- you're pretty experienced in

Robichaux - Cross/Taylor                          105

1  bankruptcy cases, correct?

2  A    Correct.

3  Q    And generally speaking, the Unsecured Creditors'

4  Committee, they're a constituency of unpaid creditors, correct?

5  A    Correct.

6  Q    Okay.  And so their constituency does not include equity

7  or members here, does it?

8  A    That would be my presumption, yes.

9  Q    Okay.  So isn't it important that you as a CRO as somebody

10 that has a duty to the whole estate and includes the members or

11 equity also investigate those or at least work in conjunction

12 with the UCC?

13         MR. GARMAN:  Your Honor, I'd like to object here.

14 We're pretty far in the territory of solvency versus insolvency

15 which are elements of a fraudulent transfer.  This calls for a

16 legal conclusion.

17         THE COURT:  Sustained.

18 BY MR. TAYLOR:

19 Q    You could only report any findings of your investigations

20 to the SLC, correct?

21 A    I have the ability to use the dispute resolution process

22 if things need to be reported to the court.  Otherwise, yes.

23 Q    Okay.  You're aware of the New York AG's allegations

24 regarding improprieties of management and various vendors,

25 correct?

Robichaux - Cross/Taylor                    106

1  A    To the extent I've sat through testimony, yes.

2  Q    Okay.  And you've heard testimony that there's been public

3  reporting of those alleged improprieties, correct?

4  A    Correct.

5  Q    And you're aware that various members of the NRA has

6  concerns about that and is concerned about giving their money

7  to the NRA because they don't want it to be used for improper

8  purposes, correct?

9  A    I've heard that testimony, yes.

10 Q    Okay.  And just in your opinion, wouldn't you think that

11 various members of the public who are just considering whether

12 to join the NRA might have the same concerns?

13 A    Potentially, yes.

14 Q    Okay.  Do you think it's important that investigation be

15 conducted and publicly aired to "clear the air?"

16        MR. GARMAN:  Objection, Your Honor.  It's an

17 incomplete hypothetical and calls for speculation.

18        THE COURT:  Overruled.

19        You may answer the question, sir.

20        THE WITNESS:  So that -- that decision requires a

21 holistic analysis.  It would involve materiality.  It would

22 involve whether or not the problems that gave rise to the

23 improprieties have been resolved.  It would involve an analysis

24 on the part of those who know the NRA better than I do on the

25 downside that would occur by that sort of disclosure.

Robichaux - Cross/Taylor                107

1         There are certainly benefits, and I'm not suggesting

2  that an organization should not be transparent.  But that's a

3  holistic analysis.  How you disclose things -- how you disclose

4  that an organization has evaluated and resolved past problems

5  is a very difficult complicated thing.  So I don't -- you ask a

6  very cut-and-dry question.  I don't know that I can just answer

7  it that easily without undergoing all of those discussions

8  myself.  You folks know the NRA better and knowing more facts.

9  BY MR. TAYLOR:

10 Q    So fair enough.  Isn't that exactly what you're going to

11 have to do in this case, though?

12 A    That's why being a CRO was not easy.  Yes.

13 Q    Okay.  And so you haven't started having any of those

14 conversations yet?

15 A    We're not retained yet.

16 Q    Okay.  Can you remove any management for cause?

17 A    Not -- not in -- in my sole authority, no.

18 Q    Do you have power to go to this court if any of your

19 investigations are unduly interfered with?

20 A    So I would just point you right back to the dispute

21 resolution paragraph.  That's -- that's the terms under which I

22 would be able to go to court.

23 Q    Okay.  And in your opinion, is interfering with any of

24 your investigations a breach of fiduciary duty?

25 A    It would depend on the other facts around it.  If the --

Robichaux - Cross/Taylor                                    108

1  if the investigation would have been material enough, it

2  depends on how it was being interfered.  It depends on -- if

3  after having a good-faith discussion, I didn't get a

4  satisfactory answer as to why an investigation should -- was

5  not being done if it should, then -- then perhaps yes.

6  Q    Wouldn't it be a lot easier and clearer to state that if

7  your investigations are interfered with and that interference

8  is not removed after consultation with the SLC that you can go

9  to this Court?  Wouldn't that be a lot clearer way to state

10 your duties?

11 A    So the duties of a CRO, I mean this is very carefully

12 negotiated to be a consensual, cooperative relationship between

13 the CRO and the company and the board.  What you're describing

14 is a forced relationship, and it's just a completely different

15 -- it's a completely different arrangement.  And it's -- I

16 don't think it's apples and apples.

17 Q    Okay.  Fair enough.  I appreciate that answer.  Your

18 ability to go to the Court is important to you.  You've

19 referred to it many times during my questioning and others,

20 correct?

21 A    Correct.

22 Q    And it is -- that was a terrible question because -- it is

23 important to you, correct?

24 A    Oh.  Yes, it's important.

25 Q    Okay.  So would you have taken this engagement without

Robichaux - Cross/Taylor                                109

1 your ability to go to the Court?

2 A    We did, yes.

3 Q    Okay.  And so if it's so important to you, why did you

4 agree in the first two iterations of your engagement letter

5 where you were effectively blocked from being able to go to the

6 Court?

7 A    I believe I could have worked with the special litigation

8 committee to resolve any -- any issues.  The -- the fact that

9 -- you know, I appreciate the fact that the company and the SLC

10 have agreed to this.  I think it makes it more clear that they

11 don't intend to have these kind of disputes and that they're

12 okay with this being -- this dispute resolution process being

13 in here.  And I think that the Unsecured Creditors' Committee

14 kind of saw that that would be a helpful provision, and I'm

15 frankly accepting of it.

16 Q    That was going to be my next question.  So it appears the

17 UCC was the primary driver for getting this included?

18 A    Yes.

19 Q    Thank you very much.  I have no further questions, Mr.

20 Robichaux.

21          MR. TAYLOR:  I pass the witness.

22          THE COURT:  Thank you, Mr. Taylor.

23          Mr. Garman, you get your witness back.

24          MR. GARMAN:  Your Honor, I'm going to exercise a

25 little self-control here and not ask any further questions.

1          THE COURT:  Thank you very much.

2          Mr. Robichaux, you may step down, at least virtually.

3          THE WITNESS:  Thank you, Your Honor.

4          THE COURT:  Any other witnesses, Mr. Garman?

5          MR. GARMAN:  Unless Attorney General James is

6    available, I don't have anyone else.

7          THE COURT:  All right.  Why don't we -- let's ask, I

8    guess, does the New York Attorney General or Ackerman want to

9    tell us about their intentions of calling rebuttal witnesses?

10          MR. PRONSKE:  Your Honor, could I suggest that we

11   maybe take a five-minute break?  I'd like to get with my folks

12   and talk about that and the closing and perhaps have a couple

13   of quick conversations here and get back with --

14          THE COURT:  Yeah.  I think that process may take a

15   little bit longer than five minutes because I'd like for you to

16   talk to Mr. Garman about times needed for closing and things

17   like that.

18          Let me also pose -- I'm not sure this is a good idea

19   to even pose it on the record, but if we didn't have rebuttals,

20   we then would have tomorrow if y'all want to do closing

21   tomorrow.  My understanding is there's a lot of stuff going on

22   with the NRA tomorrow and that may not work.  But we certainly

23   have tomorrow set aside for you and Monday set aside for you.

24   So y'all could talk about that.

25          If you have an agreement on coming back just tomorrow

1  for closing, we have a short 9 o'clock docket that is just

2  going to take a few minutes so factor that in.  I have a couple

3  of things I want to say to you on the record about the closing

4  and about a couple of other things.  So why don't we take --

5  let's give you 15 minutes.  Why don't we take until five after

6  5 and then we'll come back in here, okay.  That lets you circle

7  up with each other, too, okay?

8          MR. PRONSKE:  And, Your Honor, there's a little bit

9  of confusion.  You are intending on starting at 8 o'clock on

10  Monday; is that correct?

11          THE COURT:  Well, that was another thing I was going

12  to talk to you about because depending on how much time y'all

13  need, I know this has been hard on everybody starting at eight

14  so we could just start at -- you have the whole day, so we had

15  set aside the whole day.

16          Judge Larson is hearing my matter.  That's the

17  problem with being a junior judge I think sometimes, but

18  anyway, she's doing it for me.  All right?

19          MR. PRONSKE:  Thank you.

20          MR. ACOSTA:  Your Honor, can I ask one question?

21          THE COURT:  Certainly.

22          MR. ACOSTA:  I just want to make sure that all of my

23  exhibits are -- that we need or that I (indiscernible) the

24  record.  When would be the best time to do that?  Or maybe I

25  can get with Mr. Garman real quick, but --

1       THE COURT:  Well, the best way to do that, our court

2    reporter keeps up with that.  I wouldn't be able to answer your

3    questions about that.  We can tell you the answer.

4       MR. ACOSTA:  I can -- I would move to enter some

5    exhibits in.

6       THE COURT:  I'm sorry.  My misunderstanding of your

7    question, Mr. Acosta.  Yes, I'm sorry.

8       MR. ACOSTA:  And I can do that when we get back, Your

9    Honor, or maybe I can email Mr. Garman and see if he'll just

10   agree to it and --

11      THE COURT:  Okay.

12      MR. ACOSTA:  -- we can be done with it.

13      THE COURT:  All right.  We'll --

14      MR. PRONSKE:  And, Your Honor, I'm sorry, one other

15   thing.  I told you earlier that I was going to get back with

16   you on our exhibit numbers, so if I could just do that real

17   quick.  On the NRA March MOR is NYAG Exhibit 368, and the Sea

18   Girt March MOR is NYAG Exhibit 369.  And I think there's an

19   agreement that those would be admitted into evidence.

20      THE COURT:  NYAG 368, which is the March MOR for the

21   NRA is in.  And NYAG 369 is for Sea Girt.  I think that's the

22   order that they're in, whichever order they're in.  Both the

23   MORs are in.

24      (NYAG Exhibits 368 and 369 admitted into evidence)

25      MR. PRONSKE:  Okay, thank you.

113

1          THE COURT:  My pleasure.  All right.  Let's take

2    about a 15-minute recess for y'all to do some housekeeping

3    things and then we'll come back out and have a little bit of a

4    visit.

5          (Recess at 4:54 p.m./Reconvened at 5:08 p.m.)

6          THE COURT:  Are y'all ready?  And if you're not, you

7    can take a couple of more minutes.

8          MR. PRONSKE:  I believe we are, Your Honor.

9          THE COURT:  Okay.  Mr. Pronske, you want to start?

10          MR. PRONSKE:  Yes.  Your Honor, I think where we are,

11    and I think we're all in agreement on how to do this.  I think

12    the consensus, if not unanimously, we'd like to go on Monday

13    and not tomorrow because I think everybody needs time to get

14    things assimilated if that's okay with you.

15          THE COURT:  Yeah.

16          MR. PRONSKE:  What we had spoken about is basically

17    limiting the closing times in the following manner.  The New

18    York Attorney General would limit to an hour and a half total

19    of which an hour and ten minutes would be initial and then

20    twenty minutes for rebuttal.  Ackerman wants to do I think

21    exactly that same thing, an hour and a half with and hour and

22    ten minutes for the opening part and then twenty minutes for

23    rebuttal.

24          Judge Journey's counsel talked about 30 to 45 minutes

25    this morning.  I don't know if they have an update on that.

1  The Committee had talked about 30 minutes, and the United

2  States Trustee had talked about 30 minutes.  And Mr. Garman had

3  talked about three hours for a limitation.

4         And from our standpoint, we're okay with all of

5  those.

6         THE COURT:  And so do you have a total of what that

7  time is just thinking roughly?

8         MR. PRONSKE:  About seven and a half, seven to seven

9  minutes and 45.

10         THE COURT:  Yeah, okay.  Well, from my perspective --

11         MR. PRONSKE:  Your Honor, I did warn Mr. Garman that

12  I don't even like to watch a great movie for three hours, so --

13  but that didn't seem to have any impact.

14         THE COURT:  All of that sounds fine to me.  I think

15  Ms. Connell asked on the first day, I think as most of you

16  folks know, it's my habit here that the movant gets to go first

17  and last.  So the proposal of having the last word by the three

18  movants, that's fine with me.  So Journey can also split his

19  time up.

20         That works for me.   Like roughly we would go into

21  the afternoon -- if we start at 9, Journey would start right

22  after the noon break and then we'll keep going.  I think all of

23  that works fine.

24         MR. MASON:  Your Honor, the one thing I would add is

25  there was a request that after Mr. Garman is done with his

115

1 hopefully a little bit less than three hours that we be

2 permitted to take a 30-minute recess before the rebuttal. And

3 Mr. Garman had indicated that from his perspective, that was

4 not going to be a problem. I just wanted to make sure that

5 would be okay with the Court, as well.

6        THE COURT: I think that still works fine. I'm

7 trying to do math in my head, which is not good at this time.

8 But, yeah, I think that still would work fine. So let that be

9 our working model.

10        All right. So y'all want to start at 9 then?

11        MR. MASON: We're prepared to start at 8 --

12        THE COURT: Okay.

13        MR. MASON: -- Your Honor. But obviously whatever --

14        THE COURT: Yeah.

15        MR. MASON: -- the Court prefers.

16        THE COURT: Well, just to get it all in, I think 8 is

17 probably better. I know 8's pretty early for everybody, but I

18 think just to not be rushed, that would then put Journey I

19 think maybe in the morning, too. So Mr. Taylor or Mr. Watson,

20 if you're going to be doing that, maybe prepare to do that.

21 Given that NYAG and AMC are going to peel off a little bit, so

22 just be cognizant of that.

23        If it's okay with you all, just to make sure we're

24 not all rushed, then I think we ought to try to start at 8.

25        Okay. Second question is are we going to do anything

116

1  tomorrow or is Ackerman and the two movants, are y'all resting,

2  too?

3          UNIDENTIFIED SPEAKER:  I believe you're muted,

4  Gerrit.

5          MR. PRONSKE:  We are resting, Your Honor.

6          THE COURT:  Okay.

7          MR. ACOSTA:  Your Honor, before Mr. Mason's turn, I

8  just need to get my exhibits and make sure they're in.  I sent

9  a message to the stenographer as well as Mr. Garman.  I'd like

10 to do that before we rest, if that makes sense.

11         THE COURT:  It makes sense.  Are you wanting to do

12 that this afternoon?

13         MR. ACOSTA:  It's only about a half dozen exhibits,

14 Your Honor.  And more so in the publicly filed documents.

15         THE COURT:  Okay.

16         MR. ACOSTA:  So I don't think they should be

17 controversial.  I did email Mr. Garman, but he's understandably

18 busy, so --

19         MR. GARMAN:  So let me just respond real quick.  So I

20 don't believe --

21         MR. ACOSTA:  (Indiscernible).

22         MR. GARMAN:  Yeah, I don't believe your exhibits are

23 in, Joe.  But I believe everything but the 341 meeting

24 transcripts have been -- are exhibits that are already in and

25 we can go through them.  But I do not stipulate to the 341

1  transcripts, AMC 45, 48, and 57 coming in.

2          MR. ACOSTA:  Okay.  Let me -- the rest of them are

3  fine with you, Mr. Garman?

4          MR. GARMAN:  I think they're already in under

5  different numbers.  I think they're in with NRA exhibits.  We

6  can go through them, but I don't have -- maybe we should just

7  take this offline, but I think they're already in so I don't

8  think there's any issue here other than the 341 transcripts.

9          THE COURT:  Mr. Acosta, if you could tell me the

10 number of the non-transcript ones that you want to offer into

11 evidence right now.

12          MR. ACOSTA:  It's AMC Number 1, 13, 14, 18, 19, 66,

13 67, and 124.

14          THE COURT:  All right.  And those --

15          MR. GARMAN:  And so, Your Honor -- yeah.

16          THE COURT:  Go ahead.

17          MR. GARMAN:  Your Honor, all of those with the

18 exception of AMC 67 are petitions, schedules, SOFAs, MORs.  I

19 believe they're all in in NRA Exhibits 530 through 546.  And

20 then I believe that Ackerman Exhibit 67 was admitted on April

21 13th.  So, you know, I think they're in but I don't have any

22 objection to those.

23          THE COURT:  All right.  So just so the record is

24 complete, let's just -- to the extent those exhibits are not in

25 evidence right now, AMC 1, 13, 14, 18, 19, 66, 67, and 124.

1   (AMC Exhibits 1, 13, 14, 18, 19, 66, 67, and 124 admitted into

2                              evidence)

3          THE COURT:  There's not agreement on the 341

4   transcripts.  Mr. Acosta, do you have anything you would like

5   to tell me about them?

6          MR. ACOSTA:  Your Honor, they're part of the

7   financial disclosure that debtor generally makes, and it's

8   understood by the Court.  Debtor wants to be in bankruptcy, and

9   I think it should be transparent.  So I'd move to have the

10  transcripts admitted, 25, 38, and 57 (indiscernible).

11         THE COURT:  I sustain the debtor's objection.

12         MR. ACOSTA:  Thank you, Your Honor.

13         THE COURT:  Thank you.

14         MR. MASON:  And with that, Your Honor, Ackerman will

15  rest.

16         THE COURT:  All right.  Anything else?  I have a

17  couple of things I need to tell you before we just close off

18  today.  So anything else from you all other than we'll see you

19  on Monday?

20         So I wanted to go back.  There was a couple of things

21  that happened right before lunch.  I just want -- to the extent

22  that the record needs to be complete, Mr. Gruber was about to

23  ask Mr. LaPierre some questions about a video, and I held that

24  that was not -- it was not relevant.  It was my holding, and I

25  think that was correct.

1          My understanding from a comment that was made right

2    around the time that that was being offered was that it was six

3    years old, and I just don't think that it's relevant for

4    purposes of the motions to appoint trustee, motions to dismiss,

5    motion to appoint an examiner, and the debtor's motion to

6    appoint a CRO.  So that was that.

7          And then Mr. Sheehan was cross-examining Mr. LaPierre

8    and eventually limited his cross-examination.  There was a

9    comment made about that I think, too, at least a hint before we

10   broke for lunch.

11         My thinking on that was a couple of things.  The

12   debtor's examination of Mr. LaPierre was limited in scope so

13   the cross should have been limited in scope.  But I do think

14   that Mr. Sheehan was attempting to impeach Mr. LaPierre some

15   and I allowed that to happen for a while.  But then to me, it

16   got rather cumulative.  So to the extent that another court

17   looks at this, that's the reasons that I ruled that way before

18   lunch.

19         Then really the one thing or -- well, one thing to

20   close with with you all so you can be thinking on Saturday and

21   Sunday about your closing. As I think I've said a couple of

22   times, we are spending a substantial amount of time on this

23   case.  In fact, all our empty hours in March and April have

24   been spent on the NRA case.

25         We have looked backwards and forwards, all your

1  briefing, your (indiscernible) and that sort of thing, reading

2  extensively the cases that you cite and also doing our own

3  legal research.  We have three law clerks that are working on

4  this, and we had up until they started to take finals three law

5  students that were working on this in addition to my own legal

6  research.

7          I know that there are a lot of issues that you're

8  going to want to talk about on Monday: the lack of good faith;

9  the legitimate purpose of the bankruptcy; if we got to

10  dismissal, whether an examiner or a trustee would be better;

11  the debtor's motion to appoint a CRO.

12          I want to read something to you, and you can just get

13  it off CourtSpeak tonight.  But when you're getting ready on

14  Monday, there's -- and please do not infer more or less than me

15  just telling you something that we've been looking in in some

16  of the briefs.

17          But while one purpose of Chapter 11 is to prevent the

18  unnecessary dissolution of an otherwise viable debtor, is that

19  purpose broad enough to include a situation where the debtor is

20  seeking protection from a potential dissolution that would not

21  be a collateral effect of litigation but rather the intended

22  relief sought, and it would only occur upon a judicial

23  determination that dissolution is in the best interest of the

24  public?

25          So as you're getting ready to tell me your positions,

1  if you would listen to that question and get ready to tell me

2  your thoughts on that.

3         We will see you at 8:00 a.m. on Monday, May 3.  And I

4  think just like a couple of weeks ago when I said have a nice

5  weekend, I understand that that may sound sort of silly to you.

6  But I do hope that you have some pleasant time during the

7  weekend.  Thank you very much.  We'll be in recess.

8         (Proceedings adjourned at 5:21 p.m.)

9                        * * * * *

10                **C E R T I F I C A T I O N**

11        We, TRACY GRIBBEN-CALI, KAREN WATSON and DIPTI PATEL,

12  court approved transcribers, certify that the foregoing is a

13  correct transcript from the official electronic sound recording

14  of the proceedings in the above-entitled matter, and to the

15  best of our ability.

16

17  /s/ Tracy Gribben-Cali

18  TRACY GRIBBEN-CALI

19

20  /s/ Karen K. Watson

21  KAREN K. WATSON

22

23  /s/ Dipti Patel

24  DIPTI PATEL

25  J&J COURT TRANSCRIBERS, INC.        DATE:  April 30, 2021