UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

```
IN RE:                      .    Case No. 21-30085-HDH-11
                            .
NATIONAL RIFLE              .    Earle Cabell Federal Building
ASSOCIATION OF AMERICA      .    1100 Commerce Street
and SEA GIRT, LLC,          .    Dallas, TX  75242
                            .
                            .    May 3, 2021
            Debtors.        .    8:02 a.m.
. . . . . . . . . . . . . ..     A.M. SESSION
```

TRANSCRIPT OF CLOSING SUMMATIONS
BEFORE HONORABLE HARLIN DeWAYNE HALE
UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

TELEPHONIC APPEARANCES:

```
For the Debtors:          Neligan LLP
                          By:  PATRICK J. NELIGAN, JR., ESQ.
                               DOUGLAS J. BUNCHER, ESQ.
                               JOHN D. GAITHER, ESQ.
                          325 North St. Paul, Suite 3600
                          Dallas, TX 75201

                          Garman Turner Gordon LLP
                          By:  WILLIAM M. NOALL, ESQ.
                               GREGORY E. GARMAN, ESQ.
                               TALITHA GRAY KOZLOWSKI, ESQ.
                               TERESA PILATOWICZ, ESQ.
                               DYLAN CICILIANO, ESQ.
                          7251 Amigo Street, Suite 210
                          Las Vegas, NV 89119

For Ackerman McQueen,     Dorsey & Whitney LLP
Inc.:                     By:  G. MICHAEL GRUBER, ESQ.
                               H. JOSEPH ACOSTA, ESQ.
                               BRIAN E. MASON, ESQ.
                               CHRISTINA M. CARROLL, ESQ.
                               KELSEY TAYLOR, ESQ.
                          300 Crescent Court, Suite 400
                          Dallas, TX 75201

ECRO:                     Shanette Green
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail:  dbpatel1180@gmail.com**
**(847) 848-4907**

TELEPHONIC APPEARANCES (Cont'd):

For the Trustee:              Office of The United States Trustee
                              By:  MARC F. SALITORE, ESQ.
                                   LISA LAMBERT, ESQ.
                              110 North College Avenue, Room 300
                              Tyler, TX 75702

Proposed Counsel to the       Norton Rose Fulbright US LLP
Unsecured Creditors           By:  LOUIS R. STRUBECK, JR., ESQ.
Committee:                         LAURA SMITH, ESQ.
                                   SCOTT P. DRAKE, ESQ.
                                   NICK HENDRIX, ESQ.
                              2200 Ross Avenue, Suite 3600
                              Dallas, TX 75201

For People of the State       Spencer Fane LLP
of New York by Letitia        By:  JASON PATRICK KATHMAN, ESQ.
James, Attorney                    GERRITT PRONSKE, ESQ.
General of the State               ERIC VAN HORN, ESQ.
Of New York:                  5700 Granite Parkway, Suite 650
                              Plano, TX 75024

                              Office of the Attorney General of the
                              State of New York
                              By:  JAMES SHEEHAN, ESQ.
                                   EMILY STERN ESQ.
                                   MONICA CONNELL, ESQ.
                                   STEPHEN THOMPSON, ESQ.
                                   JONATHAN CONLEY, ESQ.
                                   YAEL FUCHS, ESQ.
                                   LUCAS McNAMARA, ESQ.
                                   WILLIAM WANG, ESQ.
                                   SHARON SASH, ESQ.
                              28 Liberty Street
                              New York, NY 10005

For Attorney General of       Office of the Attorney General
Washington D.C.:              By:  CATHERINE ANN JACKSON, ESQ.
                              400 6th Street NW
                              Washington, DC 20001

For Journey, et al.:          Bonds Ellis Eppich, Schafer Jones, LLP
                              By:  CLAY TAYLOR, ESQ.
                                   JERMAINE WATSON, ESQ.
                              420 Throckmorton Street, Suite 1000
                              Fort Worth, TX 76102

TELEPHONIC APPEARANCES (Cont'd):

For Wayne LaPierre:        P. Kent Correll Esq.
                          By:  P. KENT CORRELL, ESQ.
                          250 Park Avenue, Floor 7
                          New York, NY 10177

For David Dell'Aquila:    Blackwell, Blackburn, Herring & Singer
                          By:  WALT HERRING, ESQ.
                          7557 Rambler Road, Suite 1450
                          Dallas, TX 75231

                     - - - - -

## I N D E X

**Summations:**                                                    **Page**

By: Mr. Pronske                                                      8

By: Mr. Mason                                                       55

By: Mr. Taylor                                                      96

By: Mr. Lambert                                                    110

By: Mr. Herring                                                    121

1          THE COURT:  Good morning.  This is the Bankruptcy

2  Court in Dallas in the National Rifle Association of America

3  case.  We have some folks that have signed in.  Let me do that

4  quick and then take appearances of anybody else that would like

5  to make an appearance.

6          Mr. Mason and your group?

7          MR. MASON:  Good morning, Your Honor.  We are here

8  and present.

9          THE COURT:  Welcome.

10          Mr. Pronske, Van Horn?

11          MR. PRONSKE:  Your Honor, we are here.  And for the

12  Attorney General's Office Jim Sheehan, Emily Stern, Monica

13  Connell, and Stephen Thompson, Jonathan Conley, Yael Fuchs,

14  Lucas McNamara, Sharon Sash, and William Wang.  And we're all

15  here representing Letitia James, the Attorney General for the

16  State of New York.

17          THE COURT:  I note for the record that you're not

18  doing that by memory, Mr. Pronske.  I see you reading

19  something.

20          Mr. Neligan, Buncher, and Gaither?

21          MR. NELIGAN:  Good morning, Your Honor.  Pat Neligan

22  and Doug Buncher, as well, who's on the line.

23          THE COURT:  Welcome.

24          Ms. Lambert and Mr. Salitore?

25          MS. LAMBERT:  Good morning.  Lisa Lambert and Marc

6

1  Salitore are present.

2          THE COURT:  Welcome.

3          Strubeck, Drake, Hendrix, and Ms. Smith?

4          MR. STRUBECK:  Yes, Your Honor; good morning.  All of

5  us on behalf of the Official Committee of Unsecured Creditors.

6          THE COURT:  Welcome.  Ms. Jackson for the D.C.

7  Attorney General?

8          MS. JACKSON:  Good morning, Your Honor.  Catherine

9  Jackson for the D.C. Attorney General's Office.

10         THE COURT:  Welcome back.

11         Mr. Garman and group?

12         MS. JACKSON:  Thank you.

13         MR. GARMAN:  Yes, sir.  I'm here with my colleagues,

14 Mr. Noall, Ms.

15         Taylor and Watson?

16         MR. TAYLOR:  Good morning, Your Honor.  Jermaine

17 Watson and Clay are here.

18         THE COURT:  Welcome.  Mr. Garman and your group?

19         MR. GARMAN:  Yes, sir.  I'm here with my colleagues,

20 Mr. Noall, Ms. Kozlowski, Mr. Ciciliano.  Mr. Robichaux is in

21 the room with his colleague from Ankura, Mr. Morton.  Mr.

22 Neligan made his appearance already.  We're here together, and

23 Mr. Correll is also present today.

24         THE COURT:  Welcome.

25         Mr. Taylor and Mr. Watson?

Summation - Pronske                              7

 1              MR. TAYLOR:  Good morning, Your Honor.  Clay Taylor

 2   here on behalf of Journey, et al.

 3              THE COURT:  Welcome.

 4              MR. WATSON:  Judge, I'm here, as well.  Thank you.

 5              THE COURT:  Welcome back.

 6              Anyone else wish to make an appearance that I haven't

 7   called?

 8              MR. HERRING:  Yes, Your.  Walt Herring is here on

 9   behalf of David Dell'Aquila.

10              THE COURT:  Welcome.  And just to let everyone know,

11   I think they do know from Friday, Mr. Herring asked for five

12   minutes.  He's joined in one of the motions, and I said that

13   that would be fine.

14              Anyone else like to make an appearance?

15          (No audible response)

16              THE COURT:  All right.  I think we have a breakdown

17   of the times.  Let me also say we have plenty of time by my

18   calculation.  I'm not going to hold anybody to the minute, but

19   if you would try to stay as close to your estimates as

20   possible.  I think that lets us get everything in today that we

21   need to get in.

22              And I show that was the Attorney General going to go

23   first or Ackerman?

24              MR. PRONSKE:  Attorney General, Your Honor.

25              THE COURT:  Okay.  And my memory is that you want to

Summation - Pronske                                    8

1  go about an hour-ten, and then save twenty at the end as I said

2  on the first day.  Is that right?

3            MR. PRONSKE:  That is correct; thank you.

4            THE COURT:  All right.  You may proceed.

5            MR. PRONSKE:  Thank you, Your Honor.  Good morning.

6  Gerrit Pronske for the Attorney General of the State of New

7  York.  We are here this morning to present closing arguments on

8  the New York Attorney General's motion to dismiss this

9  bankruptcy case as a bad-faith filing and, in the alternative,

10 to appoint a Chapter 11 trustee over the NRA.

11           I will begin the presentation with the presentation

12 of the Attorney General's motion to dismiss.  The evidence

13 presented in this case has clearly shown that the NRA and Sea

14 Girt bankruptcy cases were filed in bad faith and should be

15 dismissed under Section 1112 of the Bankruptcy Code for the

16 four following reasons.

17           One, these cases were improperly filed for a pure

18 litigation strategy purpose, in the words of the NRA, to dump

19 New York.

20           Two, the NRA clearly and undisputedly had no

21 financial reasons to file this bankruptcy whatsoever.

22           Three, the bankruptcy filings in Texas were clearly

23 and cavalierly the result of impermissible forum shopping.

24           And, four, these bankruptcy cases were not -- were

25 filed not only without board approval but with management of

1  the NRA intentionally deceiving the board.

2          Number one, Your Honor, this case was filed for a

3  pure litigation strategy purpose, to dump New York, which

4  basically means to escape regulation in the New York

5  proceeding.  Bankruptcy law is clear that a bankruptcy filing

6  as a litigation strategy is a bad-faith filing necessitating

7  the dismissal of the base.  The case law is clear about the

8  existence of the bad-faith remedy.

9          Every circuit in the country has a good-faith filing

10  requirement for the filing of a Chapter 11 bankruptcy.  In the

11  Fifth Circuit, of course, we have the matter of <u>Little Creek</u>

12  <u>Development</u> case in which the Fifth Circuit says that: "every

13  bankruptcy statute since 1898 has incorporated literally or by

14  judicial interpretation a standard of good faith for the

15  commencement, prosecution, and confirmation of bankruptcy

16  proceedings.

17          In the <u>Investors Group, LLC</u>, case, and that's a case

18  where in the Northern District of Texas, District Judge Lindsay

19  affirmed the dismissal of a bankruptcy case that was ruled by

20  Judge Jernigan of the bankruptcy court.  That case has very

21  strong language about what happens when a case is filed to

22  obtain a litigation advantage, like the NRA did in this case.

23          That court said: "when a bankruptcy court finds that

24  a party pursues bankruptcy for the purpose of securing

25  litigation advantage in another forum, such intent is

1  dispositive.  It establishes bad faith and necessitates

2  dismissal."

3          Let's review the testimony relevant to the reasons

4  that the NRA filed bankruptcy.  And, Your Honor, like most all

5  the evidence that goes to the dismissal issues in this case,

6  this testimony and the reason for the filing of the NRA

7  bankruptcy case are not in dispute.

8          Let's look at Wayne LaPierre's testimony regarding

9  the reasons for filing bankruptcy.  Mr. LaPierre said on the

10  screen here, "Okay" -- and this was a question that was being

11  asked by Mr. Gruber, and Mr. LaPierre said, "Okay, you're

12  asking me if you take New York State and all of New York

13  weaponized-government actions out of it, would the NRA have

14  filed Chapter 11?  Is that your question?"  Mr. Gruber says,

15  "Would they need to file Chapter 11, yes, essentially."  And

16  Mr. LaPierre answers, "No."

17          Mr. LaPierre goes on to say that the reason for the

18  filing of the bankruptcy was in his words to abandon the

19  corrupt political and regulatory environment in New York.  And,

20  of course, from this quote, we can see that Mr. LaPierre is

21  saying that if it weren't for the New York Attorney General

22  case, the NRA would never have filed bankruptcy.

23          As far as the second evidence on this, Your Honor,

24  there was a letter to members that was issued by Wayne LaPierre

25  on behalf of the NRA the day of the bankruptcy filing.  And

Summation - Pronske                                    11

1   that's New York Attorney General Exhibit 151.

2           This, among many things in this letter, the letter

3   says: "The plan can be summed up quite simply.  We are dumping"

4   -- in all capital letters -- "New York and we are pursuing

5   plans to reincorporate the NRA in Texas."  The testimony of

6   John Frazer, the NRA's general counsel and corporate secretary,

7   agreed with this and testified that dumping New York was the

8   reason for the filing of the NRA bankruptcy.

9           Debtors' counsel in his opening statement, rather

10  than attempting to deny that the NRA bankruptcy was filed to

11  dump New York, actually embraced that fact.  But he added a

12  twist to attempt to distinguish these cases and save them from

13  being dismissed for bad faith.  The twist raised by debtor's

14  counsel is that the NRA in this case is trying to create

15  essentially an exception or a defense to the well-recognized

16  rule that you can't file bankruptcy for strategic advantage in

17  litigation.

18          They are likening dissolution sought by the New York

19  Attorney General to a foreclosure of the debtors' assets, a

20  more traditional bankruptcy-type proceeding.  They're

21  essentially saying that when dissolution threatens the entire

22  existence of the entity, like a foreclosure of primary assets,

23  that existential threat provides the bankruptcy proceeding with

24  the legitimacy that it needs to survive a bad-faith attack.

25  I'm going to call this the dissolution defense to a bad-faith

1   filing.

2          With that bit of background regarding the reasons for

3   the filing of the NRA bankruptcy and the legal impact of a

4   filing of bankruptcy to secure a litigation advantage and the

5   raising by the NRA of the dissolution defense, the Court raised

6   an interesting and highly significant issue last Thursday that

7   plays into the NRA's argument that being the target of a

8   potential dissolution could somehow immunize the NRA case from

9   being dismissed for bad faith.

10          The Court's issue was stated by Your Honor as

11  follows: "But while one purpose of Chapter 11 is to prevent the

12  unnecessary dissolution of an otherwise viable debtor, is that

13  purpose broad enough to include a situation where the debtor is

14  seeking protection from potential dissolution that would not be

15  a collateral effect of litigation but rather the intended

16  relief sought and it would only occur upon a judicial

17  determination that dissolution is in the best interest of the

18  public."

19          As this Court requested, I would like to now address

20  this Court's question.  And actually, Your Honor, the wording

21  of the Court's question perfectly frames the issue.

22  Paraphrasing, the Court's question seems to me to draw a

23  distinction between, one, a dissolution that is the collateral

24  effect of litigation such as a foreclosure on debtors' assets

25  or a seizure of the debtor's assets following the rendering of

1  a judgment and, two, a dissolution where that dissolution is

2  actually the intended relief sought by a judicial determination

3  that it is in the best interest of the public.

4          The second prong of the Court's question, that being

5  situations where the dissolution is actually the intended

6  relief sought by a judicial determination in the best interest

7  of the public, raises a fascinating question that we actually

8  have been looking at for quite a bit of the time the last

9  several weeks.

10         In order to answer the Court's question, we need to

11 drill down to two further questions or issues.  One, the first

12 issue is whether the New York proceeding under New York law

13 constitutes the exercise of police and regulatory power of the

14 State of New York.

15         To answer that question, let's look at the purpose of

16 the New York Attorney General's Charities Bureau which is that

17 it is responsible for supervising charitable organizations to

18 protect owners and beneficiaries of charities from unscrupulous

19 practices in the solicitation and management of charitable

20 assets.  The Charities Bureau Division supervises the

21 activities of charities such as the NRA, a 150-year-old

22 charity, to ensure that their funds and other property are

23 properly used and to protect the public interest in charitable

24 gifts and bequests contained in wills and trusts.

25         To drill down a little more specifically to the

Summation - Pronske                                    14

1  situation where the subject of a particular proceeding is a

2  request for a dissolution of the charity, the statutory law in

3  New York clearly indicates that the New York proceeding is a

4  proceeding under the police and regulatory powers of the State

5  of New York.

6          Section 1109 of NPCL is the section of the New York

7  not-for-profit statutes that governs over dissolutions.  (b)(1)

8  of Section 1109 says in very clear language that in making the

9  decision of dissolution, "the Court shall take into

10 consideration the following criteria: one, in an action brought

11 by the attorney general, the interest of the public is of

12 paramount importance."

13         Your Honor, I submit that Section 1109(b)(1) is the

14 classic well-recognized language that elevates proceedings to

15 the level of police and regulatory powers of the state.  So the

16 answer to the first question or the first issue is, yes, the

17 New York proceeding under New York law clearly constitutes the

18 exercise of police and regulatory power of the State of New

19 York.

20         The second question or issue to answer this Court's

21 question then looks at the interplay of New York charity law

22 and federal bankruptcy law and asks whether the police and

23 regulatory power of the state is, one, to protect its own

24 pecuniary or money interests or, two, to protect the interests

25 of the public.

Summation - Pronske                              15

1          That question is what type of police and regulatory

2    powers is implicated by New York law's charity dissolution

3    provisions.  Since this bankruptcy case is pending in Texas, we

4    look to the Fifth Circuit and find an extremely clear decision

5    in the Fifth Circuit that provides the answer to what type of

6    political and regulatory -- I'm sorry -- police and regulatory

7    powers we are dealing with.  And that is the Halo Wireless case

8    decided by the Fifth Circuit in 2012.

9          The Fifth Circuit held in the matter of Halo Wireless

10   that bankruptcy cases do not stop or impact the regulatory

11   power of government when that regulatory power is for the

12   purpose of protecting the interests of the public, like in the

13   New York proceeding.  If instead the government is exercising

14   its regulatory power to protect its own pecuniary interests,

15   then bankruptcy might be more like the first example in the

16   question raised by the Court on Thursday where dissolution

17   might be the collateral effect of litigation.

18          I would submit, Your Honor, that the NRA's

19   dissolution defense could potentially have more legitimacy if

20   the government was attacking them to further the government's

21   own pecuniary interest.  However, when government is

22   prosecuting a case to pursue non-pecuniary governmental

23   regulatory power to protect the public, bankruptcy law does not

24   and will not impact the regulatory proceeding.

25          Put into the context of the NRA case, the dissolution

Summation - Pronske                                      16

1  defense to the bad-faith filing is ineffectual because neither

2  the NRA nor this bankruptcy case have power to stop the

3  ultimate dissolution of the NRA as it is clearly under

4  governing statutes the exercise of public-interest police and

5  regulatory powers.

6          Therefore, Your Honor, the whole bankruptcy case

7  becomes a mere continuation of the NRA's dysfunction.  It is a

8  circuit sideshow that eventually ends up without succeeding to

9  stop the New York proceeding including the potential of

10 dissolution.

11         Back to the Court's question, which is basically can

12 the specter of a potential dissolution be a defense to a bad-

13 faith filing when the dissolution is a judicial determination

14 that is, in the words of Halo Wireless, a public-interest

15 police and regulatory action.

16         Quotes from the Fifth Circuit's Halo Wireless case

17 provide a solid way to dispel the NRA's dissolution defense to

18 a bad-faith filing.  Without that defense, Your Honor, this

19 case is nothing more than a pure litigation strategy whose

20 filing was nothing more than an admission of bad faith and must

21 lead to its dismissal.

22         Halo Wireless is an automatic-stay case, but that

23 actually strengthens its application to the dismissal motion.

24 The automatic stay, Your Honor, is a temporary respite.  The

25 exceptions to the stay are situations that are so strongly

Summation - Pronske                                      17

1  outweighing the bankruptcy concerns that the debtor doesn't

2  even get a temporary respite.

3         In the Halo Wireless case, the court said, and I want

4  to just read four quotes from this case that I think are very

5  on point to this situation.  First, the Fifth Circuit said:

6  "This exception discourages debtors from submitting bankruptcy

7  petitions either primarily or solely for the purpose of evading

8  impending governmental efforts to invoke the governmental

9  police powers to enjoin or deter ongoing debtor conduct which

10 would seriously threaten the public safety and welfare."

11        The Fifth Circuit goes on to say: "A fundamental

12 policy behind the police or regulatory power exception is to

13 prevent the bankruptcy court from becoming a haven for

14 wrongdoers."  That's some pretty strong language as it relates

15 to the NRA bankruptcy case, as we'll see as we move further.

16        The third quote says: "The exception to the automatic

17 stay helps to ensure that debtors do not use a declaration of

18 bankruptcy to avoid the consequences of their actions that

19 threaten the public interest."  This quote, Your Honor, could

20 not be more on point to the NRA case.

21        Finally, Fifth Circuit says: "The purpose of the

22 exception is to prevent a debtor from 'frustrating necessary

23 governmental functions by seeking refuge in the bankruptcy

24 court.'"  And isn't it true, Your Honor, that the quote

25 "frustrating necessary governmental functions by seeking refuge

Summation - Pronske                                    18

1  in the bankruptcy court" sounds amazingly similar to the

2  catchphrase "dump New York?"

3           I've taken a long time to answer the Court's

4  question.  It's a powerful question, and the importance of this

5  issue requires a thoughtful response.  I hope this has been

6  somewhat helpful.

7           Now let's review some more of the NRA's act that

8  strongly argue for dismissal of the case.  Interestingly, Your

9  Honor, Wayne LaPierre had to admit that the New York courts are

10 not corrupt and that it is the Court that would potentially

11 dissolve the NRA, not the New York Attorney General, with then

12 two levels of appeal that he admitted were not corrupt.  Mr.

13 Frazer, the general counsel of the NRA, essentially mirrored

14 that testimony.

15          But having said that, Your Honor, it really doesn't

16 matter what Wayne LaPierre or Mr. Frazer think and whether they

17 think the courts in New York hearing these cases are corrupt or

18 not corrupt.  Why?  Because litigants don't get to avoid courts

19 they don't like.  They don't get to forum shop, and they don't

20 get to file bankruptcy as a strategy in litigation in any court

21 even if they think that court is in their own assessment

22 corrupt.

23          This is why we have appeals courts, and this is why

24 the case law says that bankruptcy cases that are the result of

25 forum shopping get dismissed.

Summation - Pronske                                    19

1              Interestingly, Your Honor, Judge Phillip Journey, who

2    is an NRA member since the 1970s and a member of the board of

3    directors of the NRA, does not agree with Mr. LaPierre's

4    characterizations that the New York case is unfounded corrupt

5    proceeding.  Judge Journey testified that he believes that the

6    allegations in the New York case were backed up by civil

7    discovery, that there was significant support for the Attorney

8    General's allegations, and that the NRA's corporate governance

9    was worse than he ever imagined.

10             The second reason for dismissing this bankruptcy

11   case, Your Honor, is that the NRA clearly and undisputedly had

12   no financial reasons for filing bankruptcy.  As you know, Your

13   Honor, federal courts are courts of limited jurisdiction, many

14   of which are set up to deal with a particular type of case and

15   are not for general use to achieve something for which that

16   court was not established.

17             For example, to file a federal tax case, you need to

18   have a tax problem.  To file a federal admiralty case, you have

19   to have a problem about a boat.  And, of course, to file

20   federal bankruptcy, you have to have a problem with debt.  To

21   take this out of the context of the law, to buy a cake, you

22   don't go to Home Deposition testimony.

23             It's a major indicia of bad faith and an abuse of

24   this Court that the NRA has no debt problems.  In a bankruptcy

25   case, that's actually a shocking fact.  Let's look at some of

1    the evidence on the financial strength of the NRA.

2            Again, turning to the letter that Mr. LaPierre sent

3    to the members of the NRA and the supporters the same day as

4    the bankruptcy filing on January 15th, 2021, Mr. LaPierre said

5    that the NRA is not bankrupt or going out of business.  The NRA

6    is not insolvent.  Mr. Frazer, the general counsel, testified

7    that he agreed with those statements and that the NRA had no

8    problem meeting its financial obligations.

9            This letter to the members in bold print says: "The

10   NRA is financially strong as we have been in years."  Mr.

11   Frazer's testimony again agreed that that statement was

12   correct.  Mr. LaPierre's testimony showed that the NRA is in

13   the best financial condition it's ever been in.  And he also

14   testified that financial conditions are not the reason for

15   filing the bankruptcy case.

16           Mr. Craig Spray, the CFO who this bankruptcy case was

17   hidden from until after it was filed, testified that the NRA

18   was in a strong financial position as of the filing date.  He

19   testified that the NRA was current with all its creditors,

20   never had issues making payroll, didn't have any problems

21   funding benefit plans, and was not in financial crisis.  He

22   also testified that there was no financial reason for the NRA

23   or Sea Girt to file bankruptcy.

24           Going back to the case law, dismissal is warranted

25   when debtors don't have real debt problems, which makes sense

Summation - Pronske                                          21

1   with bankruptcy courts and federal courts being courts of

2   limited jurisdiction.  The Investors Group, the Judge Lindsay

3   case that I mentioned earlier, and the SGL Carbon case from the

4   Third Circuit, both stand for that proposition.

5          In the NRA case, there is no question that the

6   unsecured creditors would have been paid in full or will be

7   paid or would be paid in full in the event of a dismissal.

8   Ironically, Your Honor, the only parties that have been

9   financially hurt by the debtors' decision to file bankruptcy

10  are those unsecured creditors.

11         The testimony is that there was plenty of cash on

12  hand as of the bankruptcy filing date to pay unsecured

13  creditors in full in the ordinary course of business.  Instead

14  of paying those creditors in the ordinary course of business,

15  those creditors were not paid intentionally and now will have

16  to wait rather than being paid in the ordinary course if the

17  NRA had not chosen to withhold those payments and file

18  bankruptcy.

19         The secured creditor on the headquarters building

20  will not be impacted by a dismissal.  There is $20 million in

21  equity in the NRA building in Virginia.  I'm not even aware of

22  a single time that the secured lender even appeared at a

23  hearing in this case.  How unusual is that?

24         The assets of the NRA greatly exceed its liabilities,

25  and that is clear from the schedules and statements of affairs

1 filed by the NRA.  The undisputed testimony leads to the

2 inescapable conclusion that the NRA is vastly solvent and that

3 filing bankruptcy with no financial issues or debt problems is

4 an abuse of this court's federal jurisdiction requiring a

5 dismissal of this case.

6       The third reason to dismiss this case, Your Honor, is

7 that Sea Girt's bankruptcy filing was in bad faith for the sole

8 purpose of impermissible forum shopping for the NRA bankruptcy

9 case.  Here we have another independent reason to dismiss the

10 bankruptcy.  Sea Girt, LLC, was formed as a Texas LLC on

11 November 24th, 2020.  Its formation, Your Honor, is pure forum

12 shopping.  It is the foundation piece for the NRA attempting to

13 move to Texas and file bankruptcy.

14       Sea Girt is the poster child of a bankruptcy filed in

15 bad faith.  It has no employees.  It has no operations.  It has

16 no creditors.  It has -- the only asset that it has is $51,000

17 funded from the Brewer firm's trust account into Sea Girt two

18 days before the bankruptcy filing.

19       Then, quite shockingly, Your Honor, after the filing

20 of the bankruptcy, according to the monthly operating reports

21 which are on the screen, the money was transferred out of the

22 Sea Girt account without a court order and paid -- and the

23 money was paid to the NRA, its equity owner.  This transfer,

24 post-petition transfer of $50,000 without a court order, is a

25 serious violation of Section 363(b) of the Bankruptcy Code

Summation - Pronske                          23

1  which requires that transactions out of the ordinary course of

2  business have to be approved by the court, which this

3  transaction was not.

4          The transfers in and then out of Sea Girt positively

5  and conclusively show that the money was not put into the

6  account to pay creditors, to run a business, or for any

7  legitimate purpose.  The money was put into Sea Girt account

8  for the sole purpose of pretending, and that's the right word,

9  pretending that Sea Girt has some possible connection to their

10 forum-shopped estate.

11         The transfer of the money right back out after

12 serving its forum-shopping purpose shows, in addition to

13 violating the Bankruptcy Code, that the whole creation of Sear

14 Girt and the initial deposit of money was nothing more than a

15 ruse and an abuse of this Court and an abuse of the bankruptcy

16 process.

17         The testimony of the NRA officers show their cavalier

18 and brazen attitude as they made no effort to even hide the

19 fact that they were attempting to forum shop.  Mr. LaPierre's

20 words from his testimony were that Sea Girt was formed as a

21 transitional vehicle.  The testimony from John Frazer, again

22 who's the general counsel of the NRA, said he did not know of

23 any purpose for forming Sea Girt other than to file NRA's

24 bankruptcy in Texas.

25         There is no nexus -- there is no other nexus for the

1  NRA to file bankruptcy in Texas other than Sea Girt's bad-faith

2  formation to create venue.   NRA's bankruptcy in Texas is the

3  fruits of the poisoned tree of Sea Girt's bad-faith filing.

4         Your Honor, a bad-faith bankruptcy paradigm is in the

5  beginning of stages.   And I'm going to call this the Boy Scouts

6  paradigm.   In the <u>Boy Scouts</u> bankruptcy case, the Boy Scouts

7  had no nexus to Delaware for the filing of bankruptcy.   In

8  order to forum shop the <u>Boy Scouts</u> case to Delaware, the Boy

9  Scouts set up an entity to bootstrap the real bankruptcy case

10 into Delaware.

11        The NRA in this case, Your Honor, filed that Boy

12 Scouts paradigm precisely 100 percent with every single fact to

13 the letter with 100 percent similarity.   Here's the Boy Scouts

14 paradigm and you will see that it's exactly the same as what

15 the NRA did in this case.

16        In both of these cases, both entities created LLCs

17 where their forum shopping took them.   Both entities put the

18 same amount to the penny into a bank account -- that being

19 $50,000 into a bank account of the LLC in the forum-shopped

20 estate right before the bankruptcy.   Both LLCs carried on no

21 business.   Both LLCs had no employees.   Both LLCs were pure

22 corporate shells.   Both LLCs had no financial problems and no

23 reasons to file a bankruptcy.

24        In the <u>Boy Scouts</u> case, this paradigm was not

25 challenged and, therefore, the Court never addressed it, it

Summation - Pronske                                                    25

 1  never made a ruling on it and, therefore, there was no

 2  precedent set in the Boy Scouts case.

 3          However, Your Honor, this paradigm is being

 4  challenged in this case.  The ruling that this Court makes on

 5  this issue will undoubtedly become major precedent, especially

 6  given the size and importance of this case.  If the Court

 7  condones the Sea Girt forum shopping to allow the NRA to

 8  continue its case in Dallas, Texas, I submit that such a ruling

 9  would completely destroy the bankruptcy venue provision of

10  Section 1408 of Title 28 as it would permit any bankruptcy case

11  to be filed in any district with the simple creation of a decoy

12  duck LLC.

13          A leading bankruptcy professor, that being Adam

14  Levitin, professor of bankruptcy law at Georgetown Law School,

15  wrote an article in Credit Slips dated February 21st, 2020 a

16  little more than a year ago about this Boy Scouts paradigm.

17  Judge, Levitin said: "It's hard to conceive of a more blatant

18  abuse of the venue statute."  Mr. -- Professor Levitin went on

19  and called this paradigm the "gaming of the bankruptcy-venue

20  statute."

21          The Sea Girt venue grab is alone a reason to dismiss

22  the Sea Girt bankruptcy case and the NRA bankruptcy cases both

23  for bad faith.  The Sea Girt bankruptcy case in Texas was the

24  sole foundational lynchpin upon which the entire NRA bankruptcy

25  filing in Texas is based.  That Sea Girt was forum-shopped,

Summation - Pronske                                    26

1  filed, and used as a tool to forum shop the NRA case is blatant

2  manipulation and abuse of the corporate forum, blatant misuse

3  of bankruptcy law and of this Court, and requires that both

4  cases be dismissed.

5       The fourth reason for the dismissal of this case,

6  Your Honor, is that the filing of this bankruptcy was not just

7  without board approval but was performed by intentionally

8  deceiving the board of directors of the NRA.  Your Honor, it's

9  very clear that board approval is needed under the NRA bylaws

10 to file bankruptcy.  The bylaws provide and require that acts

11 of major significance require board approval and cannot be

12 delegated.

13      Let's look at the testimony.  John Frazer, the

14 current general counsel of the NRA, and Judge Journey, a board

15 member, both testified really to the obvious, which is that

16 bankruptcy is an act of major significant.  Mr. Frazer went on

17 to actually say that bankruptcy is one of the biggest decisions

18 that a corporation can make.  Mr. Frazer also testified that he

19 thinks it would be bad faith for a bankruptcy case to be filed

20 without appropriate authority, which is clearly what happened

21 in this case.

22      The NRA did not have authority to file this case.

23 Judge Journey testified that authority was not requested of the

24 board and was not given by the board to file bankruptcy.

25 Instead of submitting the board a simple resolution down the

Summation - Pronske                                              27

1   middle of the fairway to approve a bankruptcy filed by an open,

2   honest, frank discussion regarding bankruptcy, the NRA

3   management chose and attempted to obtain board approval by

4   sneaking language in the employment contract of Wayne LaPierre

5   to fool the board of directors into approving the bankruptcy

6   filing.

7            This language was hidden into the "duties" section of

8   Mr. LaPierre's employment contract which gave Mr. LaPierre the

9   duty "to reorganize or restructure the affairs of the

10  association for purposes of cost minimization, regulatory

11  compliance, or otherwise."  At this January 7 board meeting,

12  management was actually successful in sneaking the board

13  approval by the board without a single board member figuring it

14  out.

15           Again, this is such a horrible fact that it alone

16  cries out for the dismissal of the NRA case for bad faith that

17  rises in this case to the level of actual fraud.  Multiple

18  witnesses testified that bankruptcy was not discussed, not even

19  mentioned during this almost one-hour executive session of the

20  board meeting.

21           Think about how incredible that is, Your Honor.  The

22  strategists knew that board approval was needed for filing

23  bankruptcy.  For some reason, they wanted to get board approval

24  but decided that they needed to get board approval in a way

25  that the board didn't know it was giving approval.  This is as

Summation - Pronske                                           28

shocking as it is completely dishonest.

It is nothing less than fraud and recklessly put the NRA in the horrible position that its entire bankruptcy would be questioned, that we would go through a lengthy trial, that the NRA bankruptcy case would be dismissed in bad faith, and that the press reaching the entire country through major news sources would broadcast out the major misdeeds and dishonesty of the NRA.

According to Judge Journey, and this is an interesting fact, Your Honor, only a handful of copies of that employment contract were made available for the 37 board members to crowd around two tables to read. Management was obviously trying to make sure that the board members had as little opportunity to read and digest the reorganization language in the employment contract as possible. They were successful.

The NRA's general counsel, who was present in the executive session of that January 7 board meeting where the employment contract was the sole topic for nearly an hour and who is obviously a lawyer and who had actually read the employment contract, did not in his words "piece together" that the employment contract contemplated a bankruptcy filing.

Judge Journey, a sitting judge and a board member, also read the employment contract completely and was in that meeting and said it didn't even cross his mind that the

1  employment contract had anything to do with bankruptcy, much

2  less to give board approval to file bankruptcy.

3          I even noted, Your Honor, that during our trial at

4  the time that Mr. Journey was testifying, Your Honor, said:

5  "Let's take a five-minute break to reorganize."  I don't think

6  Your Honor meant let's take a five-minute break for us all to

7  file bankruptcy.  Even the reorganization judge uses the words

8  "reorganize" in a non-bankruptcy sense.

9          Judge Journey testified that the manner in which the

10 approval was obtained is actually a "fraud perpetrated on this

11 court."  I agree with this board members's statement.

12 Authority to file bankruptcy is a very serious matter.  There

13 is no question that the NRA board was tricked into attempting

14 to delegate authority to file bankruptcy, and that's not just

15 fraud on the board.  That's a fraud on this Court.

16         If the board had been given a straight-up resolution

17 to approve bankruptcy and had voted that resolution down, they

18 would have saved this Court a lengthy trial time and countless

19 additional days that this Court, including three law clerks and

20 three interns and Your Honor and your staff, have spent getting

21 prepared for this trial and the hearings in this case with

22 great disruption to Your Honor's docket.

23         This fact alone shows without question that this case

24 was filed in bad faith and deserves no better fate than a

25 dismissal with a bad-faith label attached to it.  Your Honor,

1  the motivation that Mr. LaPierre had to hide this bankruptcy

2  filing from the board of directors is answered by Mr.

3  LaPierre's conflicts of interest for that reason to file the

4  bankruptcy of the NRA.

5          Mr. LaPierre is a personal defendant in the New York

6  case and is being sued for millions of dollars of excess

7  benefits to return that money to the NRA.  This provides

8  motivation for Mr. LaPierre to do anything to dump New York,

9  even to file bankruptcy for the NRA.

10          The NRA points to potential leaks of the board as the

11  reason for keeping the bankruptcy from the board.  And, Your

12  Honor, as to leaks, I'm going to say first leaks do not justify

13  hiding a bankruptcy from a board of directors when bylaws

14  require the board of directors to authorize a bankruptcy

15  filing.

16          Next, Your Honor, the NRA could easily have had a

17  board meeting over a weekend on a Sunday morning, let's say,

18  obtain true bankruptcy authority with honesty and filed

19  bankruptcy on a Sunday afternoon where there would have been no

20  problem with leaks.  The NRA has filed -- has three times

21  during the pendency of this case called board meetings on a

22  weekend on two weeks' notice.

23          So you can't tell me that the NRA doesn't know how to

24  call a Sunday morning board meeting.  And the United States

25  Trustee would tell you that Sunday afternoon bankruptcy filings

1  are not an uncommon occurrence.

2          The fiasco with this board deceit was so bad that it

3  caused at least one board member, Duane Liptak, to resign.

4  That's New York Attorney General Exhibit 201.  Mr. Liptak

5  thought that the board was being deceived.

6          Let's move to the NRA's attempt to ratify the

7  bankruptcy filing at a post-bankruptcy board meeting on March

8  28th, 2021.  This ratification is, of course, an admission of

9  the failure to properly obtain board approval prior to filing.

10 The board had no choice on March 28th to back Mr. LaPierre and

11 to ratify the bankruptcy proceeding.

12         The testimony of a long-term NRA member and board

13 member, Owen "Buz" Mills, was that the board at that March 28

14 meeting was put in a "untenable position when it was asked to

15 ratify bankruptcy."

16         Importantly, the resolution not only authorizes but

17 directs the officers of the NRA to refile bankruptcy if

18 dismissed and does not limit that instruction to immediately

19 refile to a situation only if the bankruptcy is dismissed for

20 lack of authority.

21         In other words, Your Honor, if you dismiss this case

22 for bad faith, they are being -- the management is being

23 directed to immediately refile this case I'm guessing somewhere

24 other than here, which causes me to make the request of this

25 Court that not only that this case be dismissed for bad faith

 1   but that it also be dismissed with prejudice to a further

 2   refiling for a period of 18 months.

 3           I'm going to now move, Your Honor, to the motion to

 4   appoint a trustee.  As the Court knows, the trustee's statute,

 5   Section 1104(a)(1), provides various cause standards for the

 6   appointment of a Chapter 11 trustee.  And those cause standards

 7   that are delineated in the statute are fraud, dishonesty, gross

 8   mismanagement, or incompetence, all which essentially go to the

 9   issue of trust where the inquiry is does the Court have the

10   trust in the current NRA management and board of directors or

11   do they need to be displaced with a court-appointed Chapter 11

12   trustee?

13           In the Marvel Entertainment case, the Third Circuit

14   Court of Appeals held that upon the finding of cause, the

15   appointment of a trustee is mandatory, but that the

16   determination of cause is within the discretion of Your Honor.

17   The Marvel Entertainment court also held that the list of terms

18   in the statute that constitute cause are not exclusive.

19           For example, in the Cajun Electric Power case decided

20   by the Fifth Circuit, the Fifth Circuit added to that statutory

21   list of cause for the appointment of a trustee two additional

22   grounds that constitute cause that are certainly highly, highly

23   relevant in this case, and that being conflicts of interest and

24   acrimony in litigation.

25           I'm going to try to break down the voluminous

1 testimony in this case on the issue of the trustee to three

2 major categories showing the breakdown of these trust issues in

3 the NRA that cry out for the appointment of a trustee, the

4 first issue being conflicts of interest in the management of

5 the NRA; second issue being issues of lack of oversight both at

6 the board level and at the level of key management; and

7 finally, number three, issues of cause under Section 1104 of

8 fraud, dishonesty, gross mismanagement, and incompetence.

9         Let's talk first about the conflict-of-issue problems

10 at the NRA, and we'll start with Mr. LaPierre.  The facts

11 relating to Mr. LaPierre's conflicts of interest and self-

12 dealing that necessitate the appointment of a trustee go to

13 issues of cause that include gross mismanagement and

14 incompetence and even rise to the level of fraud.  The Third

15 Circuit in the <u>Marvel</u> case said that conflicts standing alone

16 can provide sufficient cause for the appointment of a trustee.

17         The filing of this bankruptcy case shows actions

18 taken by Mr. LaPierre as a seriously conflicted officer of the

19 NRA.  These facts I've discussed earlier.  Another good example

20 of Mr. LaPierre's conflicts of interest and the resulting

21 breakdown in NRA policies relates to his dealings with an

22 entity called MMP.

23         The testimony shows that a man named David McKenzie

24 owns various entities which include MMP, Allegiance Creative

25 Group, and Concord Social and Public Relations.  Those entities

1  are getting paid significantly more per month than the

2  contracts support.  Specifically, MMP has been paid over $20

3  million more over the last 36 months than called for in the

4  contracts.  Concord has been paid over $8 million more over 36

5  months than called for in the contracts.

6          At the same time that these massive overpayments in

7  violation of NRA policy are being paid to the McKenzie

8  entities, McKenzie provides Mr. LaPierre with expensive private

9  vacations on two of his yachts, both yachts which happen to be

10 perfectly named for McKenzie and Mr. LaPierre handle business,

11 the Illusions and the Grand Illusions.

12         The Illusions represents eight yacht trips to the

13 Bahamas, and the Grand Illusions represents two yacht trips in

14 Europe.  These week-long private trips on yachts are straight

15 out of the "Lifestyles of the Rich and Famous" and come

16 complete with fuel, food on the yachts, a chef, and complete

17 crews.  In addition to the yacht trips was a lavish vacation to

18 Atlantis and the Bahamas all paid for by Mr. McKenzie.

19         On top of these consequential conflict issues, Mr.

20 LaPierre has consistently denied in his reporting to the NRA

21 that he has received any gifts in excess of $250 in flagrant

22 disregard of conflict rules of the NRA.  Also, Mr. LaPierre has

23 failed to disclose receipt of those sizeable gifts and

24 conflict-of-interest forms as required by the NRA.

25         We've talked about excess benefit issues as they

Summation - Pronske                              35

1   relate to Mr. LaPierre.  And to fit the pattern and the

2   paradigm of the NRA getting caught and then reacting, the NRA

3   was sued in August of 2020 by the New York Attorney General and

4   it was finally at that time that the excess benefits were

5   disclosed for the first time in years in November of 2020.

6          This is one of the many examples of the NRA only

7   attempting compliance as a reaction to being forced into

8   compliance.  As further violation of the NRA policies, these

9   excess benefits were not properly disclosed to the board or to

10  the audit committee.

11         Now let's move to and talk about lack of oversight in

12  this case, which is a serious issue when dealing with a trustee

13  request.  And first we'll talk about lack of board oversight.

14  Your Honor, nonprofit boards are a little different than profit

15  boards.  As the Court knows, the responsibility of a board of

16  directors in a nonprofit is a fundamental legal and public

17  responsibility to provide the oversight and accountability for

18  the organization.

19         The record in this case is replete with examples of

20  lack of board oversight of Mr. LaPierre that constitute cause

21  under the trustee statute and the <u>Cajun Electric</u> and <u>Marvel</u>

22  <u>Entertainment</u> cases.  The inability of the NRA board to provide

23  oversight and/or the conscious indifference of that board to

24  provide oversight go to appointment of a trustee for gross

25  mismanagement.

Summation - Pronske                                    36

1          Your Honor, a case that is very much on point to this

2    case is the <u>Woodlawn Community Development</u> case, which I don't

3    believe is in our brief, but that case is at 6 -- I'm sorry, it

4    is in our brief.  That's at 613 B.R. 671.  In that case,

5    Woodlawn Community Development Corporation was a nonprofit

6    company that had served a vital public interest and had been

7    around for a long time, much like the NRA, and was forced to

8    file bankruptcy.

9          Again, much like the NRA, Woodlawn had a leader who

10   was engaged in acts that led a bankruptcy judge after the

11   filing of a motion to appoint a trustee to conclude that the

12   leader was out of control and that board oversight was failing

13   to contain him.  The bankruptcy judge ordered the appointment

14   of a trustee and the organization appealed touting great

15   accomplishments and merits of the community organization, much

16   like debtors' counsel did with the first half of his opening

17   argument.

18         The appellate court disagreed that the bankruptcy

19   judge erred in appointing a trustee.  In the following quote,

20   Finney is the leader and the organization is called Woodlawn,

21   the court stated: "Finally, Woodlawn argues that appointing a

22   trustee was the death knell of an old and venerable community

23   organization that benefitted underserved communities.  But

24   Finney rang that bell.  Woodlawn's management allowed him to

25   operate with virtually limitless discretion and Woodlawn is now

Summation - Pronske                                    37

1  paying the price.  The fault lies with management; not with the

2  bankruptcy judge."

3          Like in the Woodlawn case, the continuing nature of

4  abuses and lack of oversight was an issue before Judge Nelms in

5  the Northern District of Texas in the Life Partners case

6  dealing with a multi-billion dollar public company that was the

7  largest owner of life insurance policies -- settlements in the

8  world.

9          The appointment of the trustee was requested for past

10 acts dealing with securities law violations of the CEO of the

11 company that had tried to correct itself with the CEO resigning

12 after the bankruptcy filing and shifting the CEO's power over

13 to a compliance-oriented CFO, much like Craig Spray in the NRA

14 case.

15         I represented the debtor in that case and was on the

16 losing end of that trustee battle.  Judge Nelms' ruling in that

17 case dealt with board oversight.  He found that even though the

18 bad actor had resigned, the board nevertheless stayed in place

19 and even though the bad actor was gone, the lack of board

20 oversight had created the problem in the first place and the

21 board remained.

22         As the quote on the screen shows, Judge Nelms said in

23 his ruling, "In short, the evidence is that Ms. Pieper" --

24 that's the CFO -- "Ms. Pieper may be independent but the board

25 is not and, ultimately, it is the board that runs the company.

Summation - Pronske                                            38

1  Consequently, I find that cause exists to appoint a trustee

2  under Section 1104(a)(1), but I also find that a trustee would

3  best serve the best interest of the creditors, shareholders,

4  and other interests of the estate."

5         Let's look at what the record in the NRA case shows

6  as to the examples of continuing problems with board oversight.

7  And those examples include the hiding of information from key

8  officers such as the -- unbelievable is the only word I can

9  think of -- the unbelievable fact that the filing of bankruptcy

10 was kept secret from the general counsel and the CFO of the NRA

11 until after they were filed.

12        And the reason I say the word "unbelievable" is that

13 bankruptcy is a massive legal proceeding, and they kept that

14 legal proceeding from the chief legal officer of the company

15 until after the filing of the case.  And I say "unbelievable"

16 because, obviously, the filing of bankruptcy is a massive

17 financial issue dealing with financial problems for a company

18 and they hid and kept the filing of the bankruptcy from the

19 chief financial officer until after it was filed.

20        Keeping information secret like this necessitates

21 that various rules be violated in the NRA because, for example,

22 if you're going to hide bankruptcy from the general counsel and

23 the CFO, then you also have to hide from the bankruptcy -- you

24 have to hide the bankruptcy lawyer's engagement letter from

25 those individuals which means you have to violate the $100,000

1  contract policy.  And that would have to be violated because

2  showing the bankruptcy lawyer's engagement letter to the

3  general counsel and the CFO who you're trying to hide things

4  from would mean you can't hide from those individuals.

5       So, Your Honor, it's an example of how

6  dysfunctionality breeds governance problems.  This type of

7  example -- these types of examples are replete as a matter of

8  course with the NRA.

9       And the facts bear out in the testimony that the

10 bankruptcy lawyer's engagement letter was hidden from those

11 individuals and that that clearly violated the $100,000

12 contract policy of the NRA which would have required Mr. Frazer

13 and Mr. Spray, the general counsel and the CFO, to sign off on

14 those engagements.

15      Next, the record shows the clear intention to keep

16 the board in the dark in general.  The words of Judge Journey,

17 the long-term board -- the long-term member of the NRA and

18 board member, was that the NRA board is a what he called

19 "supine board" with essentially a consent agenda.  The record

20 shows that the giving of the Brewer firm a $5 million

21 bankruptcy slush fund with no oversight or no controls over its

22 usage.

23      They were keeping all of the bankruptcy work hidden

24 from key officers such as Mr. Frazer and Mr. Spray and board

25 members, the effect of which unquestionably presented the

Summation - Pronske                                          40

1  possibility of oversight and violated a number of the NRA's

2  policies.

3          That slush fund, Your Honor, was just given to Mr.

4  Brewer, and Mr. Brewer was then able to pay lawyers' fees and

5  in fact did pay $1.3 million in bankruptcy legal fees prior to

6  the filing of the bankruptcy case, again, amazingly without the

7  knowledge of the general counsel and without knowledge of the

8  chief financial officer.  And ultimately, this shows a lack of

9  board oversight.

10         And I use the word at the beginning of talking about

11 this that that oversight can be due to inability to provide

12 oversight or a conscious indifference of the board to provide

13 oversight.  I think this is an example where the board was

14 unable to have oversight because they basically -- all the

15 information is kept from them.

16         The record also shows testimony of Carolyn Meadows, a

17 board member and the president of the NRA, admitting that upon

18 finding out that her notes and records could be subpoenaed, she

19 actually destroyed her notes by shredding them and even burning

20 them.  And she remains on the company's special litigation

21 committee overseeing litigation, the person that burned her

22 notes fearing subpoenas.

23         The testimony shows that board oversight is a huge

24 problem.  And I'll quote from some testimony.  First, the

25 testimony again of Judge Journey, a board member and long-time

Summation - Pronske                                          41

 1  historic figure at the NRA, who testified that there are

 2  extensive governance abuses at the NRA and that the New York

 3  proceeding connected a lot of dots for him relating to those

 4  abuses.

 5          Judge Journey also testified that the balance of

 6  power and checks and balances at the NRA are essentially non-

 7  existence and that the NRA is run as a kingdom, not a

 8  corporation, with Wayne LaPierre as the king.

 9          Owen "Buz" Mills, I believe, very credibly testified

10  that the board has abdicated their responsibility and has

11  failed to adequately supervise management.

12          Rocky Marshall, another board member, testified about

13  his concern about the lack of oversight of the board.

14          Another issue that's closely related to oversight

15  issues are a troubling set of facts that revolve around what

16  are known at the NRA as "Wayne says" approvals that violate NRA

17  policy.  "Wayne says" approvals being acts, whether appropriate

18  under the rules, policies, and bylaws of the NRA or not, are

19  automatically approved because Wayne says.

20          The following examples of "Wayne says" mentality,

21  these examples continue even after the NRA was allegedly trying

22  to get into compliance.  And they include first travel --

23  first-class air travel of individuals that are not permitted to

24  fly first class, Brewer's firms being paid in disregard of

25  rules and policies because Wayne says.

Summation - Pronske                      42

1          Another example of "Wayne says" is that there's no

2    board approval of the firing of Craig Spray as required under

3    the bylaws.  Tony Makris' testimony calls this management by

4    crisis.  Judge Journey called this Wayne's kingdom where Wayne

5    LaPierre is the king.

6          Your Honor, in November of 2020, Mr. Spray, the CFO

7    who was trying to bring the NRA into compliance, and this is

8    NYAG Exhibit 278 on the screen, he wrote an email to Mr.

9    Frazer, the general counsel, saying: "You know as well as I do

10   that these are not approvals.  There are no 'Wayne said'

11   approvals at the NRA.  All of you are core to our controls

12   process and, quite frankly, I am disappointed in all of you."

13   He closes with: "I can't emphasize enough what a breakdown this

14   is."   What happens to Mr. Spray?  Of course, he gets fired by

15   Wayne LaPierre.

16          Another telling example is that Wayne LaPierre never

17   attended any of the compliance presentations that the NRA set

18   up to try to get back into compliance.  Mr. LaPierre is not

19   even interested in appearing to be compliant to the duties of a

20   nonprofit organization.  Basically, Mr. LaPierre does what Mr.

21   LaPierre wants to do.

22          This mentality, Your Honor, is something that you

23   actually observed yourself.  This mentality is consistent with

24   his inability to answer simple "yes" or "no" questions, and

25   continuing instructions over and over from this Court and even

1  his own attorney showing that he absolutely cannot follow

2  directions.

3         This is consistent not only with not following

4  bylaws, taking massive excessive benefits and dealing with

5  Craig Spray trying to make meaningful changes in the NRA by

6  firing him.  In Wayne LaPierre's testimony, objections to non-

7  responsiveness were sustained over 60 times.

8         This Court admonished Mr. LaPierre 16 times to just

9  listen to the question and answer the questions, even making

10 sure at one point that Mr. LaPierre could actually hear the

11 Court's instructions.  Mr. LaPierre's own counsel had to

12 admonish his own client, Mr. LaPierre, five times to just

13 listen to the question and answer them.

14        Now let's talk about some lack of oversight issues

15 regarding the Brewer firm that are very important in this case.

16 Your Honor, every dysfunctional company has within it a person

17 who the late great Christopher Wiehl (phonetic) used to call

18 the organizational evil.

19        In the NRA, we can see the impact of Bill Brewer and

20 the Brewer firm on the demise of the functionality of the NRA

21 and the failure to contain those actions.  The issues relating

22 to the Brewer firm are shocking and show complete breakdown in

23 oversight at the NRA.  They go both to the standards of gross

24 mismanagement and to the case-law standard of acrimony in

25 litigation that comes both from the Cajun Electric case in the

Summation - Pronske                                    44

1   Fifth Circuit and the Marvel Entertainment case from the Third

2   Circuit.

3          The first Brewer law firm issue is the absolute

4   exponential expansion of legal fees of the NRA since the hiring

5   of the Brewer firm in March of 2018.  The chart shows what I'm

6   about to tell the Court as far as some numbers here.  The 2016

7   990 shows legal fees and this is before Mr. Brewer's firm's

8   hired -- show total legal fees of the NRA at $6.5 million.  In

9   2017, the 990 shows that the total legal fees are similar at

10  $6.9 million.

11         In 2019, things start changing and that's when Mr.

12  Brewer's firm is hired in March of that year.  In the last nine

13  months after the Brewer firm is hired, the legal fees go up

14  from their normal 6.9-, 6.5-million-dollar number to 13.8

15  million.  And since he was hired only in March, that annualizes

16  to $18.4 million.  That's a 267-percent increase in legal fees

17  when the Brewer firm is hired.

18         Then in 2019, Your Honor, the 990s shows $24.8

19  million in legal fees, which is a 360-percent increase from

20  2017 before the Brewer firm is hired.  In 2020, those legal

21  fees jump up to $34 million to the Brewer firm in fees.  That's

22  a 492-percent increase from 2017 before the Brewer firm was

23  hired.

24         Those three numbers for those three years add up to

25  $72.6 million being paid to the Brewer firm over three years.

Summation - Pronske                                45

1  17.5 million of that 72 million was paid just in the 90 days

2  prior to bankruptcy, which would annualize out to $70 million a

3  year in legal fees.

4          To put the Brewer firm's three years' worth of fees

5  of $72.6 million collected over a three-year period into

6  perspective, Your Honor, that's more than the amount of the

7  value of the NRA 305,000 square-foot corporate headquarters

8  building in Virginia.

9          To put that $72-million number into further

10 perspective, to generate $72.6 million to pay Brewer fees over

11 three years is equivalent at $45 a year membership dues of the

12 NRA to 1.6 NRA member -- 1.6 million NRA members' annual dues,

13 which are going to the Brewer firm rather than going to what

14 debtors' counsel referred to in his opening statement as all

15 the great programs and missions of the NRA.

16         Oliver North, who was president of the NRA in 2019,

17 voiced concerns about the Brewer fees repeatedly.  And what

18 happens to him?  He's pushed out of the NRA, much like Mr.

19 Spray.  Oliver North wrote a letter dated April 18th, 2019, and

20 that's Ackerman's Exhibit Number 38, which says that the Brewer

21 fees "pose an existential threat to the financial stability of

22 the NRA."

23         The Oliver North letter went on to say: "It cries out

24 for outside independent review."  Colonel North also raised

25 issues relating to troubling unethical conduct of Brewer found

Summation - Pronske                                   46

1  by various judges that's discussed in that letter.

2          The second Brewer firm issue that goes to the

3  standard of acrimonious litigation under the case law and lack

4  of oversight and gross mismanagement is that the board failed

5  to control out-of-control litigation that has developed since

6  the Brewer firm took hold of the NRA in 2018.  And, again, all

7  of this is after the NRA claims to be in "self-correction

8  mode."

9          One gross example of this, Your Honor, is the Cox

10  litigation.  The Cox litigation is litigation attempting to

11  block $2 million worth of contractual entitlement to Mr. Cox so

12  it's a $2-million issue that is -- and in that case, Your

13  Honor, the evidence shows that $6 million has been paid to

14  Brewer to chase this $2 million.

15          Additionally, there's an advancement of

16  indemnification provision in Cox's agreement that require

17  prepayment of his attorneys' fees.  So not only has the NRA

18  paid $6 million in legal fees on the Cox litigation, but it's

19  also had to pay $1.8 million to Winston & Strawn which is Cox

20  lawyers because of that provision.

21          So a total of $7.8 million and counting to eliminate

22  a $2-million contractual obligation and a "Hail Mary pass" for

23  additional speculative damages, and the arbitration hasn't even

24  happened yet.  The facts show that legal fees that are

25  multiples of the amount in controversy show a complete lack of

Summation - Pronske                              47

oversight and out-of-control litigation that goes way beyond

mismanagement.

        Your Honor, the New York regulatory case is another

example and suffice it to say that millions of dollars of

Brewer fees are being spent rather than just taking serious

compliance -- taking compliance seriously and making real

changes at the NRA.

        What is clear from these Brewer facts?  One, nobody

is acting as a check to Brewer's power and influence.  And,

two, Brewer's effective takeover of control of the NRA, this

fact and the resulting attorneys'-fees insanity that has been

experienced by the NRA with alarming escalation since the

engagement of Brewer, screams out for the appointment of a

trustee.

        And, finally, Your Honor, issues of cause under

statute for fraud, dishonesty, gross mismanagement, and

incompetence.  The first one I would like to address is the

actual filing of this bankruptcy case.  The fact that this case

was filed at all is a highly problematic issue that goes

strongly in favor of the appointment of a trustee for

incompetence and gross mismanagement.

        The facts of dishonesty surrounding the filing of the

case, which I handled earlier dealing with board approval, go

to fraud and dishonesty.  Those facts earlier discussed apply

to the requirements of the appointment of a trustee every bit

Summation - Pronske                              48

1    as much as they do to show the case was filed in bad faith for

2    purposes of dismissal.

3          But the actual fact of putting this 150-year-old

4    charity into bankruptcy at all goes to the gross mismanagement

5    and competence issues.  First, let's recall the words of

6    debtors' counsel said in the opening statement in this case,

7    that -- I'm sorry, not said in the opening statement, said in

8    open court during this case, that being that the dismissal --

9    that this dismissal-trustee proceeding could end the existence

10   of the NRA.

11         That statement was obviously meant to give this Court

12   pause to rule against the NRA, but the concept that the current

13   proceedings before this Court could end the NRA itself is a

14   major indictment against the NRA for taking the monumental risk

15   in this filing to begin with.  Why?  Because the filing of

16   these motions to dismiss and appoint a trustee were easily

17   foreseeable and should have been completely anticipated.

18         The filing facts, including the financial strength of

19   the NRA, the clear litigation strategy, purpose of the filing

20   of this bankruptcy, the bad-faith forum shopping of this case,

21   using an entity created solely for the purpose of forum

22   shopping, there is no question that a filing for a motion for

23   dismissal of this case or appointment of a trustee was going to

24   be filed and clearly should have been anticipated.

25         And at the risk of losing one of those motions would

Summation - Pronske                          49

be likely, highly likely, the filing of this bankruptcy case

and the endangering of its existence according to debtors'

counsel, as he suggested, could be a result of losing the

motions to dismiss, appoint a trustee.  And therefore, the risk

to the charity, the risk to its programs and mission, the risk

to its members, the risk to its donors is nothing less than

gross mismanagement and incompetence as contemplated under

Section 1104.

        Your Honor, I'm going to briefly go through some

actions that were taken in early May of 2018 after the NRA

claims to be on a course correction.  And those facts show that

in April of 2018, one month after the NRA started its purported

course correction, Wayne LaPierre went to Dallas to shop for a

house that was to be secretly paid for by the NRA.  Weeks later

on May 5th, 2018, the NRA executed a poison-pill contract that

would pay Wayne LaPierre $17 million regardless of whether he

was fired.

        On the same day, May 5th, the NRA's outgoing

president, Pete Brownell, signed a consulting agreement for the

CFO, Woody Phillips, who apparently was not up to the task that

would pay him $30,000 a month after he resigned.

        Importantly, both of those contracts were signed by

Carolyn Meadows.  This is the same Carolyn Meadows that is the

current NRA's president, the same Carolyn Meadows that formed

the special litigation committee that consented to this

1 bankruptcy filing and purportedly acts as a check on Wayne

2 LaPierre's power as she, in her own words, burns her own notes.

3        Two weeks after that, the NRA formed an entity called

4 WBB, LLC, to facilitate the secret purchase of the house, an

5 entity in which Woody Phillips who had just received a

6 lucrative consulting contract authorized $70,000 to be paid to

7 fund that entity.

8        The fact that NRA ultimately did not go through with

9 that purchase does not magically cleanse the fact that WBB

10 entity was set up and funded and a real attempts was pursued to

11 find and purchase a $6-million home for Mr. LaPierre to be paid

12 for by the NRA in secret, all after the NRA claims it's on its

13 way to a course correction.  These facts clearly show fraud and

14 dishonesty under the statute.

15        Your Honor, I'll save for rebuttal some facts I want

16 to talk to the Court about regarding Craig Spray who is the

17 person that was trying to make positive changes of compliance

18 in the NRA, but the long story short is that he attempted this

19 compliance in a serious and sincere manner and ended up being

20 fired by Wayne LaPierre without board approval.

21        The CRO application is going to be discussed by the

22 United States trustee, so the only mention that I want to make

23 of it, Your Honor, is that the CRO application -- and this is

24 completely no disparagement on the CRO who is a well-respected

25 individual in Dallas, but the application and the way that the

Summation - Pronske                                              51

1  CRO was attempted to be employed is a microcosm of the

2  dysfunction in the NRA's management.  The United States Trustee

3  will be discussing this application.

4          But, in sum, Your Honor, after hearing the testimony,

5  my conclusion of the CRO application is that it appears to be

6  merely a transparent attempt to lend the very good name and

7  reputation of the CRO to the NRA and to brand their plan with

8  the CRO's good name in return for a $1-million success fee.

9          So, in closing and conclusion, Your Honor, I'm going

10 to end with what the NRA began this trial with which was

11 debtors' counsel's opening statement.  I was listening intently

12 as to how the NRA would handle their biggest problem in this

13 case which was that it was filed by an entity that is in the

14 best financial condition in its history, has no creditor

15 issues, was filed as pure litigation strategy in a fabricated

16 venue.

17         I can't imagine worse facts.  Instead of trying to

18 argue or disagree with these factual premises, which we were

19 listening for, the NRA instead through debtors' counsel's

20 opening and through its own witnesses' testimony embraced those

21 facts and premises and admitted that the sole reason of the

22 filing of bankruptcy was to gain this strategic litigation

23 through "dumping New York."

24         The twist upon which they hung their hat was that the

25 New York proceeding had been -- had the possibly outcome of

Summation - Pronske                                        52

1  dissolution which debtors' counsel likened to a foreclosure.

2  If it's okay to file bankruptcy to stop a foreclosure, then it

3  must be okay to file a bankruptcy to stop a dissolution.

4        In fact, Your Honor, those two situations are

5  completely different.  Where a company files bankruptcy to stop

6  a foreclosure and has creditors that will be impacted by the

7  foreclosure of a major piece of collateral which that entity

8  needs to conduct business and pay its creditors, the bankruptcy

9  is completely aligned with the purposes of bankruptcy, that

10 being to stave off a secured creditor who the Bankruptcy Code

11 ensures will be adequately protected, preserve the value of the

12 assets, and maximize the payout to unsecured creditors.

13       In the NRA case, the situation is completely

14 different.  In this case, there are no creditors who will not

15 get paid in full.  That is a game-changing difference.  Under

16 New York law in a dissolution proceeding, like in this

17 bankruptcy case, creditors are paid off the top and any excess

18 funds are paid as determined by order of the Court, not at the

19 choice of the New York Attorney General but as determined and

20 ordered by the Court.

21       Under the facts of this case, the assets vastly

22 exceed the debts.  The unsecured creditors would be paid in

23 full in the dissolution, and the secured creditor with $20

24 million plus in equity in his collateral would also be paid in

25 full.  Dissolution would pay all creditors in full, and the New

Summation - Pronske                                    53

1    York court would have taken care of and fully satisfied with

2    the bankruptcy court can and should do on its best day.

3        However, the debtors' counsel did not stop with the

4    payment of his creditors.  Instead, he gave a lengthy

5    presentation on the activities, programs, and members of the

6    NRA, much as debtors' counsel did in the Woodlawn Community

7    case cited earlier.

8        Bringing debtors' counsel opening thoughts back to

9    the potential dismissal of this case and the resulting

10   possibility that the NRA should be dissolved, I submit to you

11   that because the creditors would be paid in full and because

12   the members of the NRA are not shareholders or otherwise equity

13   owners, the right court to hear the debtors' counsel

14   presentation regarding the activities, programs, and members of

15   the NRA is not the court that set up to solve debt problems of

16   which the NRA has none.

17       The right court to make those determinations, the

18   right court to weigh the great activities and programs against

19   wrongful governance, the right court to weigh interests of

20   members against wrongful acts of management is the court that

21   the New York legislature has entrusted that weighing to, which

22   is the state court in which the NRA chose to be incorporated --

23   not the creditor court but instead the public-interest court,

24   not the court that the NRA forum-shopped its way into with a

25   clearly manipulated, fabricated bad-faith venue.

Summation - Pronske                              54

1          Your Honor, this case must be dismissed.  It must be
2  dismissed to allow the right decisions to be made by the right
3  courts, courts that Mr. LaPierre had to admit to you were fair
4  courts that are not corrupt.  Those are the courts that should
5  be hearing about the activities and the programs of the NRA,
6  the welfare of its members, the purpose of its mission and the
7  necessary interplay of New York law is that the police and
8  regulatory power of the State of New York with the purposes of
9  protecting the interests of the public.

10         The Fifth Circuit has told us in cases like <u>Halo</u>
11 <u>Wireless</u> that those police and regulatory powers trump the
12 interests of the bankruptcy law even when there are creditors
13 that won't get paid in full.  In this case, the lack of
14 insolvency takes this case to a new level where this Court is
15 serving no function other than to provide an impermissible
16 block to the New York court system and the New York statutes
17 designed to protect the public interest.

18         It is very clear, Your Honor, that this case was
19 filed in the most -- utmost bad faith, has no legitimate
20 purpose, and must be dismissed.  Thank you.

21         THE COURT:  Thank you, Mr. Pronske.  I show you have
22 just short of 20 minutes left.

23         MR. GARMAN:  Your Honor, this is Greg Garman.  Might
24 I ask a point of clarification?

25         THE COURT:  Sure.

Summation - Mason                           55

1          MR. GARMAN:  Mr. Pronske indicated that he was going

2     to reserve an argument related to Craig Spray for his rebuttal.

3     That would deny me the ability to respond to an argument I

4     understand is going to be advanced.  If there is going to be an

5     argument about Mr. Spray, I do believe it needs to come now,

6     not in rebuttal so that I might properly respond.

7          THE COURT:  Mr. Pronske, you want to respond to that?

8          MR. PRONSKE:  Your Honor, yes, I'll reserve any

9     rebuttal that I have to rebutting whatever he says about Mr.

10    Spray.  In other words, it will be appropriate rebuttal.

11         THE COURT:  And that would count to anybody that gets

12    the last word on the movants' side that you can't spring

13    anything new.

14         All right.  Ackerman -- I think we'll go through

15    Ackerman's first round of closing argument, and then we'll take

16    a short recess before we move into Journey then.

17         So I'm not sure who's going to argue for Ackerman.

18         MR. MASON:  Good morning, Your Honor.  Brian Mason.

19         THE COURT:  And, Mr. Mason, before we start, my

20    understanding is you want about an hour and ten in this first

21    pass; is that right?

22         MR. MASON:  That is correct, Your Honor.

23         THE COURT:  All right.  You may proceed.

24         MR. MASON:  Your Honor, on behalf of Ackerman McQueen

25    and its legal team, we appreciate your patience with us and

1   your attention to this most important case.

2        Like a stone tossed into a tranquil lake, the ruling

3   in this case will have ripples which extend from coast to

4   coast.  And while there's been a great deal of time spent in

5   this courtroom making a record, we believe that the decision to

6   dismiss this bankruptcy is straightforward and overwhelmingly

7   supported by the evidence.  To assist the Court, I'd like to

8   highlight what we believe supports the inevitable conclusion

9   that this bankruptcy must be dismissed with prejudice.

10       Mr. Pronske spent a fair amount of time talking about

11  the standard for dismissal that's applicable here.  And I'm

12  going to do my best to not repeat what he has said, but I do

13  want to highlight some standards that this Court is very much

14  aware of with respect to the dismissal standard at issue here.

15       Your Honor, this bankruptcy was filed in bad faith

16  and should be dismissed for two independently sufficient

17  reasons.  Number one, the NRA did not file this bankruptcy for

18  a valid reorganizational purpose as required under black-letter

19  bankruptcy law.  And number two, this was a fraudulent

20  bankruptcy.  As Judge Journey put it, this was a fraud on this

21  Court.

22       For starters, I'd like to talk a little bit about one

23  of the fundamental issues with most debtors in Chapter 11

24  bankruptcies.  I know Mr. Pronske touched on this, but one of

25  the things that I told the Court in opening that we were going

1  to see during this trial was an overwhelming amount of evidence

2  that the NRA is financially healthy and that its finances had

3  absolutely nothing to do with this bankruptcy filing.

4          And as you can see, this is just a snapshot of the

5  testimony that we saw throughout this trial.  It's exactly what

6  the evidence has shown.  It is an undisputed fact that the

7  NRA's financial situation had nothing to do with the filing of

8  this bankruptcy.  Unlike the vast majority of entities trying

9  to seek shelter in bankruptcy, there is no distress, there's no

10  solvency issues here.

11          This Court heard testimony from virtually every NRA

12  witness in this trial, including Mr. LaPierre, Mr. Frazer, Mr.

13  Spray, Mr. Cotton, Ms. Rowling and others that the NRA is

14  financially healthy as ever and that its finances had nothing

15  to do with this bankruptcy.  The latest operating statements

16  from the NRA bankruptcy disclosures make it clear that there is

17  approximately $72 million of available cash for the NRA.

18          Proudly proclaiming their financial situation just

19  like in SGL Carbon, the NRA boldly told the world in public

20  statements on the very day that they filed this bankruptcy that

21  it was as financially as strong as ever and that it could

22  continue business as usual, despite the bankruptcy, everything

23  that goes along with it.

24          In Cedar Shore Resort, the Eighth Circuit made clear

25  that Chapter 11 bankruptcy was created by Congress as a vehicle

Summation - Mason                                      58

1  for businesses on the verge of a fatal financial plummet, not

2  for a profitable business to evade liability and gain the

3  bankruptcy system like the NRA is trying to do here with this

4  Court.

5          Given that the NRA is solvent and its finances had

6  nothing to do with this bankruptcy, why did it file?  Well, we

7  heard a little bit of evidence throughout this trial that the

8  NRA wanted to try and centralize litigation.  The intent --

9  here Mr. Frazer testified that one of the reasons the NRA filed

10  was to streamline and consolidate litigation.

11          But Mr. LaPierre testified that absent the New York

12  Attorney General enforcement action, its other litigation would

13  not be a reason to file for bankruptcy.  Both Ms. Rowling and

14  Mr. Spray, financial arms of the NRA, testified that the NRA

15  could afford to defend and prosecute litigation, especially the

16  litigation that the NRA has commenced.

17          At the first-day hearings, Mr. Neligan represented to

18  this Court that the NRA had attempted to consolidate litigation

19  through the MDL and that when it failed, the option of

20  bankruptcy was more of a necessity because of the amount of

21  litigation.  Death by a thousand cuts, I believe were Mr.

22  Neligan's words.

23          Importantly, the MDL was not even decided as of the

24  petition date on January 15th.  Mr. Frazer testified that the

25  MDL was asked by the NRA to look at centralization and

Summation - Mason                                              59

1  consolidation of its litigation.  And on February 4th, 2021,

2  the MDL panel found that they were not persuaded that

3  centralization is necessary for the convenience of the parties

4  and witnesses or to further the just and efficient conduct of

5  this litigation.

6           In other words, the MDL panel considered thousands of

7  pages of briefing and evidence, oral argument, and came to the

8  conclusion that the reason Mr. Frazer attempted to articulate

9  as one of the NRA's reasons for filing for bankruptcy was not a

10 valid basis for consolidation or centralization.  This MDL just

11 like this bankruptcy conceived by Mr. LaPierre, the Brewer

12 firm, the special litigation committee, is now another part of

13 the NRA's litigation tactic, to try to obtain an advantage in

14 another forum and exert leverage on the New York Attorney

15 General and other litigants like Ackerman McQueen.

16          So if the NRA didn't file for bankruptcy because of

17 solvency concerns or it's a centralized litigation, what else

18 is there?  In his opening statement, Mr. Garman stated that

19 there was three reasons the NRA filed this bankruptcy: Take

20 dissolution off the table, take receivership off th table, and

21 get out of New York.

22          Mr. Garman further analogized the NRA's situation to

23 a foreclosure.  As Mr. Garman said, it's bankruptcy 101 that

24 you file because you have a foreclosure in place or a judgment

25 is headed your way or a receivership is in the works.  Here

1   there's not even a trial setting.  There is absolutely no

2   evidence of all of a dissolution judgment headed towards the

3   NRA.

4           Mr. Frazer testified that a trial and appeal on the

5   New York AG enforcement action could be years away.  Mr.

6   LaPierre and Judge Journey testified to the same.  Even the

7   proposed CRO, Mr. Robichaux could not tell the Court whether a

8   judgment was close and whether the threat of involuntary

9   dissolution is currently jeopardizing the NRA.

10          This whole idea of comparing the NRA's situation to a

11  foreclosure makes no sense.  In a foreclosure, there is one

12  party that can secretly file its own.  That is not the case

13  here.  The New York Attorney General cannot cause this

14  dissolution on its own.  It requires an independent judicial

15  finding in the Court's sole discretion at the conclusion of the

16  evidence that the equitable remedy of involuntary dissolution

17  is in the best interest of the public.

18          This whole idea of a receiver and the imminency or

19  the thought of a receiver is also a completely made-up idea.

20  First and foremost, the New York Attorney General has not even

21  requested the appointment of a receiver.  Second, there's no

22  evidence of any threat, imminent or otherwise, of a receiver

23  being appointed.  This was confirmed throughout the trial by

24  both Mr. Frazer and Mr. LaPierre and others.

25          In reality, the closest thing the NRA has to a

1  receiver is the appointment of a Chapter 11 trustee if this

2  case does not get dismissed.  And to be absolutely clear, if a

3  Chapter 11 trustee is appointed, then the people that chose to

4  file this bankruptcy -- Mr. LaPierre, the Brewer firm, the

5  special litigation committee -- be can the ones to blame for

6  putting the NRA in this situation.

7          The NRA members can hold them accountable because

8  there was absolutely no legitimate good-faith purpose for

9  filing this bankruptcy and putting the NRA in this position.

10         Both prior to and during this case, Mr. LaPierre and

11  the NRA have slandered and libeled the entire State of New

12  York, its public officials, political officeholders, and

13  overbroadly even its courts.  Mr. LaPierre initially admitted

14  that when the NRA said that all things they said about public

15  officials, he knew that that could be interpreted to mean

16  judges also.  As we will see, he later backed off those

17  comments and made it clear that the NRA is not accusing the New

18  York Judiciary of any wrongdoing or bias.

19         These statements made about New York and its

20  officials are numerous and, frankly, reprehensible.  But

21  importantly, it's all a bunch of political public relations

22  noise.  The NRA cares more about how they're portrayed to the

23  public than fighting for the Second Amendment.

24         Regardless of the outlandish claims the NRA wants to

25  make about New York, it cannot change the simple fact that the

1  New York Attorney General does not have the power or authority

2  to dissolve the NRA.  Mr. Frazer testified that the NRA has due

3  process rights, that there is a judicial process involving a

4  state court judge.

5          Mr. LaPierre also testified that the New York

6  Attorney General cannot unilaterally dissolve the NRA, it takes

7  a court, and that any judgment is subject to an appeal.  Judge

8  Journey testified to the same thing.

9          Even the New York Attorney General makes this same

10 point in her prayer for relief, expressly acknowledging in the

11 complaint that was filed against New York that dissolution

12 would be in the Court's discretion if it's determined to be in

13 the interest of the public.  And I know Mr. Pronske showed the

14 Court this same statute earlier with respect to the idea of

15 dissolution and how there ultimately has to be a determination

16 that it is in the public's best interest.

17         But part of the problem with the NRA's entire

18 argument about a weaponized New York Attorney General is that

19 the New York Attorney General doesn't have a weapon to dissolve

20 the NRA.  All of the Court's questions bear within the seeds of

21 the problems with the NRA's bankruptcy filing.  The grave

22 threat that it waves about to draw the attention of the Court

23 is a phantom.

24         There is no boogeyman or boogey attorney general.

25 There are only state and federal courts with two levels of

Summation - Mason                                          63

1   appeals above each.  These courts are all available to the NRA

2   because of its vast litigation war chest that the Brewer firms

3   had no problem tapping into the last few years.

4          Understanding that the New York Attorney General

5   cannot unilaterally dissolve the NRA, we asked John Frazer, the

6   NRA's general counsel, to confirm that dissolution is in fact

7   nothing like foreclosure.  As you could see here, Mr. Frazer

8   didn't even understand the comparison that Mr. Garman attempted

9   to make in his opening.  Hopefully, Mr. Frazer now understands

10  that a dissolution requires a court process overseen by a judge

11  who is ultimately going to make that determination.

12         Here the judges that we've been talking about who are

13  overseeing this dissolution issue, the ones who should decide

14  whether dissolution is in the best interest of the public, the

15  ones that the NRA is asking this Court to simply ignore, Judge

16  Joel Cohen, there's been a lot of testimony about Judge Cohen

17  in this trial.  The state court judge presiding over the New

18  York enforcement action who, by the way, also presided over the

19  NRA's claim against Colonel North regarding an indemnity issue

20  and who ruled in the NRA's favor.

21         One of the burning questions here is that the NRA

22  claims they've spent the last two and a half years, tens of

23  millions of dollars solving any problems under New York

24  nonprofit law.  Did they not have faith in all the changes that

25  they've made?

1          Mr. LaPierre testified that the NRA is now in

2  compliance.  Every chance they got throughout this trial, they

3  were trying to talk about the wonderful self-correction, the

4  course correction.  Why is the NRA so afraid of having Judge

5  Cohen listen to all of the evidence, listen to the years of

6  self-correction, and then make a final decision of whether the

7  equitable remedy of involuntary dissolution is in the best

8  interest of the public.

9          If this case is dismissed, the NRA's going back to

10 New York to continue to defend themselves in the state court

11 action.  They're swimming in cash.  They've got remedies in

12 federal court and in state court.

13         The NRA has attempted to create the illusion that the

14 complaint filed by the New York Attorney General seeking

15 different requests for relief, one of which is dissolution, has

16 created an immediate, urgent, and catastrophic threat to the

17 NRA.  Nothing could be further from the truth.  There was

18 absolutely no testimony of any immediate, urgent, catastrophic

19 threat.  And three of the key NRA witnesses throughout this

20 trial made clear that the NRA can get a fair shake in New York.

21         Mr. LaPierre acknowledged that the New York courts

22 were not corrupt or that they did not present an uneven playing

23 field.  He testified that the courts and not the New York

24 Attorney General have control over the ultimate outcome, that

25 there's levels of appeal above a trial court, that there's no

1   trial date that's imminent, and any potential final judgment

2   can be appealed.

3           The NRA filed in federal court an action to try and

4   protect their constitutional rights and take dissolution off

5   the table.  Mr. Frazer acknowledged that the courts of New York

6   are not corrupt.  He testified that the courts are going to

7   decide the ultimate outcome of dissolution or receivership,

8   there's no trial setting and, again, that the NRA has exercised

9   their rights and sought relief in the federal courts in New

10  York.  Mr. Frazer also testified that there's different levels

11  of appeal even up to the U.S. Supreme Court.

12          Colonel Lee, the second vice-president of the NRA and

13  member of the special litigation committee, testified that

14  Judge Joel Cohen could be fair and impartial, the NRA cannot

15  unilaterally dissolve the NRA, and that the NRA has due process

16  rights.  Judge Journey -- I'm sorry, Colonel Lee also talked

17  about the various appellate remedies at the NRA's disposal if

18  there's ultimately an unfavorable finding up in the New York

19  Attorney enforcement action.

20          Judge Journey had a number of insights on the fact

21  that dissolution would be accomplished by a court and not be a

22  regulatory agency and that the court in the appellate process

23  would take an extensive amount of time.  He also testified that

24  he knows of no reasons why the courts of New York would be

25  biased or unable to present a level playing field, that they're

Summation - Mason                                              66

1  not actually weaponized against the NRA.

2          I want to talk a little bit more about what's going

3  on in the New York federal court action.  There's been some

4  discussion about it, but I think it's important to emphasize

5  the specific relief that the NRA is requesting in the federal

6  courts up in New York.

7          In addition to having their due process rights and

8  defending themselves in the action before Judge Cohen, the NRA

9  filed a lawsuit in federal court in New York.  And as part of

10 the relief they're seeking, they're asking for an injunction to

11 stop the New York Attorney General enforcement action and take

12 the request of dissolution off the table.  If this case is

13 dismissed, the NRA can continue to exercise those rights.

14         The fact of the matter is this federal New York

15 action is another insurance policy that the NRA has taken out.

16 And they are exercising their rights in two different forums up

17 in New York.  There does not need to be a third.  This Court is

18 not the appropriate court to determine whether dissolution is

19 appropriate.

20         Mr. Frazer testified that -- on that same point that

21 the NRA has sought the protection of the federal district

22 courts in New York and that that is specifically designed to

23 impact the relief sought by the New York Attorney General and

24 the enforcement action.

25         So why are we really here?  New York -- as Mr.

Summation - Mason                                                67

1   Pronske stated, the NRA is double-bound.  This is all about New

2   York.  Mr. Cotton testified on the morning of April 6th that

3   the NRA has been contemplating leaving New York for at least 15

4   years.  Mr. LaPierre even testified that this has been under

5   construction for a while as officials from various states have

6   approached the NRA.

7          Why now?  Mr. Pronske briefly talked about some of

8   his testimony, but I want to highlight it because these next

9   two slides include some of the most important testimony that

10  the Court heard in this trial.  And that is because Mr.

11  LaPierre acknowledged that if you take the New York Attorney

12  General enforcement action off the table, the NRA doesn't file

13  for bankruptcy.  In other words, but for the enforcement

14  action, none of us are here right now.

15         Here, Mr. LaPierre specifically acknowledged that

16  solvency in the other litigation, the Ackerman litigation, the

17  Under Wild Skies litigation, the Chris Cox arbitration, were

18  not issues that require the NRA to file for bankruptcy.  In

19  other words, Mr. Frazer's testimony at the beginning of this

20  trial that one of the purposes was to somehow consolidate or

21  streamline litigation, that's not why we're here.  That's not

22  why the NRA sought the Chapter 11 protection.

23         So why is all that important?  The litigation

24  advantage that the NRA is seeking here is to take dissolution

25  off the table.  By allowing this case to go forward, Your

Summation - Mason                                           68

 1  Honor, you're taking the relief off the table in the State of

 2  New York, moving that relief and taking that determination away

 3  from Judge Cohen to decide the issues based on the entire

 4  merits of that case.  To a large extent, you'd be doing the

 5  same thing to the federal judge overseeing the NRA's

 6  constitutional rights in the federal lawsuit.

 7          In short, I would submit that you're saying the NRA

 8  wins in the First Amendment lawsuit that they filed against

 9  Letitia James by granting them the relief that they're seeking

10  here and taking dissolution off the table.  Plain and simple,

11  bankruptcies cannot be used as litigation tactics, and that is

12  exactly what the NRA has admitted in this case.  Mr. Garman

13  talked about it in his opening.  You heard tons of evidence

14  throughout this trial, and I expect that's exactly what you're

15  going to hear from him again when he gets up here this

16  afternoon.

17          What's really funny is if you think about it, the

18  whole notion that a special litigation committee and not the

19  financial people at the NRA or the CFO decided to file

20  bankruptcy should send a huge red flag that the purpose of this

21  bankruptcy was to obtain a litigation advantage.

22          Mr. Pronske talked about various cases that have been

23  cited in both of our briefs, and I won't go through all of

24  these cases.  But we did highlight some of these for the Court.

25  And if it's okay with Your Honor, we would like to provide the

1  Court with a copy of this PowerPoint at the conclusion and we

2  can highlight some of these cases.

3        But I'm going to flip through some of these because I

4  don't want to be repetitive of Mr. Pronske.  One case that I'm

5  sure that Mr. Pronske did discuss and maybe I missed it, so I

6  apologize if I did, was the In re Alexander Trust case.  And in

7  that case, Judge Houser found that obtaining a more convenient

8  forum in litigation standing alone is not a good faith reason

9  for filing a bankruptcy petition.  So here the NRA creates a

10 sham company, Sea Girt, solely as a transitional vehicle to get

11 this case in Texas, which is not good faith.

12       The bankruptcy court in that case also found it

13 wouldn't be able to decide much of the litigation involving

14 state law rights among non-debtor parties.  And in that case,

15 the court relied on the Supreme Court precedent in Stern v.

16 Marshall.  Judge Houser also found that the litigation tactic

17 in that case that was based on the fact that the bankruptcy

18 filing was timed to events in litigation.  Here the NRA talked

19 about leaving New York for 15 years, but it wasn't until the

20 New York Attorney General filed a lawsuit in April of 2020 that

21 the NRA actually started moving.

22       We heard testimony that starting in September of

23 2020, it formed the special litigation committee.  They hired

24 or they had the Brewer firm beginning bankruptcy-related work.

25 They hired bankruptcy counsel.  And then on January 15th, they

Summation - Mason                                        70

1   filed.  Just like the filing in Alexander Trust was a bad-faith

2   litigation tactic, so too is this bankruptcy.

3          Mr. Garman spent a lot of time talking about the

4   matter of Halo Energy [sic].  I'm not going to repeat that.  I

5   did want to provide the Court with a citation to that case if

6   it doesn't have it.  It's -- for the record, it's 684 F.3d 581.

7          As I mentioned at the outset, there's two reasons why

8   we think this bankruptcy should be dismissed, that it was not a

9   good-faith filing.  The second reason that we believe that this

10  bankruptcy should be dismissed is because it was a fraudulent

11  bankruptcy filing.  It was not authorized by the board of

12  directors.

13         The laughable attempt at authorization of this

14  Chapter 11 petition was the result of an elaborate cynical

15  scheme which began with the NRA's lawyer, Bill Brewer, working

16  with his ex-partner purportedly representing Mr. LaPierre to

17  prepare an employment agreement for the executive vice-

18  president.  You heard testimony that in Mr. LaPierre's

19  approximate 30 years of being at the NRA, his employment

20  agreement has never before been presented to the board.

21         The blatantly obvious purpose of the employment

22  agreement being presented to the board at the closed session on

23  January 7th was to have some language to point out to try and

24  authorize Mr. LaPierre to file for Chapter 11 bankruptcy.  The

25  problem for the NRA, Mr. LaPierre, and their lawyers is that

Summation - Mason                                    71

1  they did it all wrong.

2         Again, Mr. Pronske talked about this briefly, so I

3  will just briefly touch on it.  But according to the NRA's

4  bylaws, the NRA's executive committee is not permitted to

5  authorize the filing of bankruptcy.  The bylaws make clear that

6  there are certain powers that are reserved exclusively for the

7  board.  Two of those provisions that we've heard plenty of

8  evidence are at issue here: present a petition for judicial

9  dissolution, adopt a plan for merger consolidation or non-

10 judicial dissolution, formulate a plan or perform corporate

11 activities of the association of such major significance.

12        Your Honor, they pointed to all of these documents

13 throughout this trial that supposedly show that there was this

14 corporate authority to file this bankruptcy.  But really they

15 just pointed to a bunch of bricks and they're trying to call it

16 a house.  No, these documents are sufficient individually or

17 collectively to overcome the plain language of the bylaws which

18 clearly require full board approval for such a significant

19 decision as the filing for bankruptcy of a nonprofit

20 organization that has been around for 150 years.

21        Mr. Frazer, Mr. LaPierre, and Mr. Cotton and others

22 all testified and acknowledge the obvious.  This was a major

23 decision.  This is an undisputed fact.  So if the executive

24 committee can't approve the bankruptcy filing, what about the

25 special litigation committee?

Summation - Mason                                    72

1          The NRA contends that the special litigation

2     committee approved and authorized the filing of this

3     bankruptcy.  Again, the bylaws make clear because the executive

4     committee cannot file or authorize bankruptcy, neither can a

5     special committee, like the special litigation committee in

6     this particular case.

7          Mr. LaPierre, Mr. LaPierre also did not have the

8     power or authority to authorize the filing of this bankruptcy.

9     The bylaws specifically set out Mr. LaPierre's role and powers

10    and duties with respect to the National Rifle Association.

11    Nowhere in there is there any authority to file or authorize a

12    bankruptcy filing.

13         Numerous witnesses throughout the trial also

14    testified that Mr. LaPierre's employment agreement that we've

15    talked so much about did not amend or change the NRA's bylaws.

16    So how did they do it?  How did they come up with this I don't

17    even want to call it elaborate, but this scheme to defraud the

18    board, to defraud all of us?

19         This is a snapshot of the board minutes from the

20    January 6th executive session of the Officers Compensation

21    Committee that talks about the employment agreement that was

22    drafted by NRA's counsel and Mr. LaPierre's counsel, Kent

23    Correl, Mr. Brewer's former partner.  And here, we know that

24    those two individuals got together, conspired with Mr. LaPierre

25    to hide and slip that language into Mr. LaPierre's employment

1   agreement and make it so ambiguous that it wouldn't catch the

2   board's attention at the January 7 meeting.

3          There's no reason why -- Mr. Pronske said there's no

4   reason why the NRA could not have had a board meeting and

5   talked about this.  There's just not.  This whole idea of

6   (indiscernible) receivership, it's a fallacy.  They could have

7   done it, and instead they chose to be deceptive about it.  They

8   chose to be fraudulent.  They chose to deceive the board.

9          Mr. LaPierre repeatedly stated during his testimony

10  that he would have never filed for bankruptcy if he didn't have

11  the comfort of the reorganized language buried in the middle of

12  the long and convoluted sentence of his employment agreement.

13  Mr. Frazer testified that reorganize and reincorporate can have

14  a variety of reasons, not just bankruptcy.  Many other

15  witnesses said the same thing.

16         Here, Mr. Frazer testified that the language in Mr.

17  LaPierre's employment agreement was not discussed at the

18  January 7 meeting.  Mr. LaPierre's counsel, the Brewer firm,

19  and special litigation committee did not explain that the

20  following language, "reorganize or restructure the affairs of

21  the association for purposes of cost minimization, regulatory

22  compliance, or otherwise" was going to provide Mr. LaPierre

23  with the purported authority to file bankruptcy.

24         Mr. LaPierre and others in on this fraud repeatedly

25  said that the board of directors could have asked any questions

Summation - Mason                                74

1  they wanted.  You guys figure it out.  It's on you if you don't

2  understand what that means.  Come on; that's ridiculous.  It's

3  hard to decide what's more aggravating here that the band of

4  conspirators thought that they were so clever or the fact that

5  they thought we were all so incredibly stupid.

6          Judge Journey was shocked at the filing of this

7  bankruptcy because the attorneys at the January 7 meeting

8  breached their duties to the board.  Judge Journey made clear,

9  and other board members, that there was nothing in the

10  employment agreement, no actions at that board meeting that

11  gave them any inkling that Wayne LaPierre may try and put the

12  NRA into bankruptcy in a couple of weeks.

13          I think it's important here that the NRA produced a

14  number of witnesses throughout this trial, a number of board

15  members.  And other than confirming the complete dysfunction of

16  the NRA board and management, it's notable of the absence of

17  any testimony from any board member that was at that meeting

18  that said, yeah, I knew what that meant.  Of course, it was

19  obvious.  There was none of that, Your Honor.

20          That's because they intentionally deceived the board,

21  and none of those board members would have thought that that

22  language would have provided their purported authorization to

23  file bankruptcy.

24          Mr. Frazer, the NRA's general counsel, he knew that

25  there was bankruptcy-related research going on.  He knew that

Summation - Mason                                    75

the employment agreement for Mr. LaPierre was being discussed

with the board.  But it never occurred to him that the language

in that employment agreement would provide the authority for

Mr. LaPierre to initiate a Chapter 11 proceeding.

Here, Mr. LaPierre claimed under oath it was the

board's fault if they didn't understand the meaning of the

language.  They could have asked questions.  They should have

asked questions.  They should have figured it out.  But Mr.

LaPierre had to admit that his own understanding of that

language in his employment agreement came from talking to

counsel.  He didn't even know it himself until his lawyers

explained to him that it was purportedly going to give him that

authorization.

One of the most damning admissions that Mr. LaPierre

made, and pardon me if I lose count, was that as the general

counsel -- that the NRA's general counsel would be in a better

position to understand the language in the employment agreement

as opposed to any of the board members.  But Mr. Frazer didn't

even know.  So this idea that any board member understood or

should have understood that they were approving a Chapter 11

petition makes no sense.

One of the other remarkable parts about this

fraudulent bankruptcy filing is the people that Mr. LaPierre

and Mr. Brewer and others kept it from.  Mr. LaPierre testified

and made clear that it was a small tight-knit circle, that he

1   had no intention of telling the board that there was going to

2   be a filing based on these paranoid made-up fears that they

3   would leak the information or that it would somehow get out and

4   they wouldn't be able to move forward.

5          The notion that there's no way that the board of

6   directors would go along with this -- with such a reckless,

7   unnecessary, and even -- with the authorization of the board is

8   just more evidence of their unlawful actions here.

9          In addition to not telling the board, we've heard it

10  a ton, Mr. LaPierre did not tell the general counsel, he didn't

11  tell the CFO, two of the most critical officers in any

12  corporation and two people that this Court knows fully well

13  that are normally kept in the loop with normal good-faith

14  bankruptcy filings.  Mr. Spray and Ms. Rowling both admit that

15  they did not find out about the bankruptcy until after the

16  filing and that it was a big mistake in preparation for the

17  filing.

18         I want to talk a little bit about ratification

19  because I think this is important.  Although the attorneys

20  assisting Mr. LaPierre in this conspiracy to defraud the board

21  were well aware of what they intended to do with respect to

22  this employment agreement and this language, they said nothing

23  at the meeting.  But Mr. LaPierre and the special litigation

24  committee and their attorneys, they knew this was an

25  unauthorized filing.  That's why they talked before about

Summation - Mason                                    77

1  getting the board to ratify the filing of this bankruptcy

2  later.

3         The old adage of asking for forgiveness rather than

4  asking for permission, why else would they discuss ratification

5  before filing, as Mr. Cotton testified here, unless they knew

6  they were going to file without proper authority.

7         Mr. LaPierre here testified that he specifically did

8  not -- he specifically discussed not telling the board about

9  the language in the employment agreement.  And he testified

10 also that the only thing he relied on to give him comfort in

11 filing, again, was that language in his employment agreement

12 that the board couldn't have possibly know was going to give

13 him that authorization.

14        Mr. Frazer, general counsel, understood the dismissal

15 issue in this case, that if the bankruptcy was not an

16 authorized bankruptcy filing, it could not be filed in good

17 faith, which is exactly what happened here.  Judge Journey made

18 clear that he believed the filing of this bankruptcy was a

19 fraud on this Court.

20        And nowhere maybe is there a more direct

21 misrepresentation regarding authority to enter the bankruptcy

22 process than the resolution of the special litigation committee

23 that was specifically attached to and made part of the

24 bankruptcy petition itself.  No one has claimed that the

25 special litigation committee had any authority to authorize the

1   bankruptcy filing.

2          And a number of witnesses, even from the NRA, have

3   testified under oath that no such authority existed.  For

4   example, here's Mr. Cotton's testimony making clear that the

5   special litigation committee did not have authority to file

6   bankruptcy on its own.

7          One of the things that Mr. Pronske touched on is with

8   respect to Mr. LaPierre's conflicts with filing this

9   bankruptcy.  Part of the relief sought by the New York Attorney

10  General is that he should be removed as an officer and director

11  from the NRA.  So by attempting to reorganize the NRA in Texas,

12  Mr. LaPierre was taking this relief off the table for himself

13  personally.  If the NRA is permitted to reorganize in Texas,

14  then the New York Attorney General isn't going to have any

15  jurisdiction to remove Mr. LaPierre as an officer of a Texas

16  nonprofit organization.

17         We heard testimony throughout the trial that when the

18  final decision was made to file for bankruptcy, no one, Mr.

19  LaPierre or the special litigation committee, went back to the

20  board to obtain approval.  They determined they'd rather ask

21  for forgiveness than ask for permission.  And they put the

22  board in an untenable position, let's go ratify it.

23         As Mr. Pronske alluded to, Judge Journey, "Buz"

24  Mills, and others testified that the board was put into an

25  untenable position.  But the problem though with all of this,

Summation - Mason                                    79

1  Your Honor, is you can't ratify a fraud, which is exactly what

2  the evidence in this trial has shown.

3        I want to talk briefly about Sea Girt.  I know

4  there's been a lot of discussion about it, no employees or

5  operations other than this bankruptcy filing.  Mr. Frazer's

6  testimony that the basis upon which the NRA obtained venue in

7  Texas was through Sea Girt, making clear that this sham

8  corporation was only formed to carry out the NRA's fraud on

9  this Court trying to secure venue in Texas.

10        And after serving its fraudulent venue purpose, there

11 was a discussion about this briefly earlier, Sea Girt doesn't

12 have any assets left.  The NRA's monthly operating report shows

13 that that $50,000 that was originally there has now been gone

14 back to the Brewer firm.  And in short, it's undisputed that

15 Sea Girt was a sham entity for securing venue.

16        The NRA has admitted to that.  They're unapologetic

17 about it.  But like Mr. Pronske said, you're completely

18 changing and rewriting the history books of bankruptcy law by

19 permitting those actions to take place.

20        I want to spend a few minutes talking about the

21 ripple effect that this bankruptcy is going to create if it's

22 not dismissed.  This Court, as we talked at the beginning, has

23 acknowledged the importance of this case.  And we agree that

24 with that sentiment, we believe it's critical to address the

25 issue of what happens if this case is permitted to move forward

Summation - Mason                                          80

1   and the dangerous precedent we believe that it will set.

2          If this case is not dismissed, Your Honor, it's going

3   throw a monkey wrench into the gears of federalism.  It will

4   put a gasoline on the ideological fires that are already raging

5   out of control in this country.  It will impugn the Attorney

6   General of New York, all of its public officials, and it will

7   impugn the state and federal courts of New York giving truth

8   and support to the internationally-published why that New York

9   politicians, regulators, and judges are corrupt.

10          That is why the decision to dismiss this case is so

11  important.  The purported debtors have intentionally presented

12  the case to you in such a form that you must find that an

13  entire state isn't capable of creating, enforcing, and

14  adjudicating its own laws fairly and justly in a non-corrupt

15  manner.  Should the Court allowed this case to proceed, the

16  standing necessary in order to invoke this Court's jurisdiction

17  won't completely change.

18          The NRA mentioned the issue of a receivership, but

19  there is not even a mention of a receiver anywhere in the New

20  York Attorney General's complaint.  And Mr. LaPierre and

21  others, as we've talked about, have denied any threat of a

22  receiver.

23          The NRA came in comparing the New York Attorney

24  General's conduct as seeking a foreclosure, but as we discussed

25  a unilateral disposition, that's a unilateral disposition of

1  property.  The New York Attorney General has no ability to

2  involuntarily dissolve the NRA, only in a New York state court

3  in its sole discretion at the conclusion of the evidence and

4  only if it believes that it's in the public's best interest.

5          And more importantly, the admissions through the

6  NRA's general counsel, Mr. LaPierre, Mr. Frazer, and others,

7  and the acknowledgment of other board members, including the

8  distinguished Judge Journey, made clear that there's a long

9  road between the filing of this complaint in August of 2020 and

10  a trial up in New York.  We're not even close.  Discovery has

11  just started.

12          There's no imminent harm.  There's no burdensome or

13  oppressive situation due to just the claim.  The NRA has sued

14  the New York Attorney General up in federal court in New York.

15  The NRA has used the New York Attorney General's complaint to

16  clean house at the lowest levels of the NRA, but the threat of

17  a continued regulatory action does not seem to have changed

18  much about the way the NRA does business at the top.

19          So what else would it mean if this bankruptcy is not

20  dismissed?  An unprecedented intervention into the workings of

21  a state government and highly-proprietary area concerning

22  nonprofits, which could be compared to wards of the state.

23          Permitting this case to go forward would mean a major

24  interference in the workings of state and potentially federal

25  courts already involved in the dispute involving dissolution.

Summation - Mason                                              82

1          Permitting this case to go forward is essentially

2    confirmation that the terrible defamation, slander, and libel

3    against the State of New York, which is an NRA and Wayne

4    LaPierre way of doing business, has validity.  Failure to

5    dismiss this case would give truth to the lie that New York

6    officials are corrupt and do not allow for a level playing

7    field.

8          Permitting this case to move forward would make the

9    basis of bankruptcy jurisdiction depend on ideological

10   differences between states and essentially the promotion of

11   hate speech based on the way people think in whatever part of

12   the country they live in.

13         The NRA has framed the question of its right to stay

14   in bankruptcy court in such a way that the failure to dismiss

15   gives truth to another lie, that a party is entitled to escape

16   a jurisdiction based on the way its people think and live for a

17   preferred supposedly more enlightened, more personally

18   compatible justice.  Texas has no legal relationship to the NRA

19   but for the sham corporation that it created to enter this

20   Court.

21         Permitting this case to go forward means that

22   throughout the United States, if any regulator or

23   administrative agency simply seeks the relief of dissolution,

24   seeks the relief of dissolution against a nonprofit or other

25   entity, that entity will be able to immediately point to this

Summation - Mason                                    83

1  NRA bankruptcy case as its "get out of jail free" card where it

2  can simply put up a shell corporation, file for Chapter 11

3  bankruptcy, and move its operations and assets out of town.

4         Permitting this case to move forward means that

5  attorney generals and other administrative agencies tasked with

6  trying to protect and act on behalf of the public in their

7  respective states will be forced to consider whether they can

8  even name or seek the relief of dissolution because they will

9  know that if we do that, if we simply ask for it, even if we

10 think it's absolutely appropriate and warranted, then that

11 entity can simply point to the 2021 NRA bankruptcy proceeding

12 in Dallas, Texas as the opinion that rewrote the history books

13 of bankruptcy law in this country.

14        And, yes, that is how important this case is because,

15 Your Honor, you would be changing the playing field here taking

16 away the rights of the regulators across the United States to

17 do the job they see appropriate, the police and regulatory

18 powers.  One the other similar questions before this Court

19 regarding dismissal is whether a party can use any method, any

20 fraud, any devious scheme to enter the bankruptcy court and

21 expect to stay there.

22        This is not a question of unclean hands in this case.

23 It is hands made actually filthy by the dirty work it took to

24 put together a scheme that brought us to this hearing today.

25 This Court must decide if the toll to enter the bankruptcy

Summation - Mason                                    84

1  courts may be paid with the coin of blatant fraud on the NRA's

2  board, its executives, the other parties to this proceeding,

3  and the Court.

4          You have the opportunity to send that message today

5  that the bankruptcy courts cannot be the subjects of fraud.  In

6  order to do that, this bankruptcy case needs to be dismissed

7  with prejudice.

8          I'd like to talk briefly about a trustee.  As we --

9  as I discussed at opening, the relief that Ackerman McQueen is

10  seeking here is dismissal.  But if the Court does not believe

11  that that is appropriate, we believe that the overwhelming

12  evidence that this Court has heard over the last month supports

13  and justifies, mandates the appointment of a Chapter 11

14  trustee.

15          The Court is familiar with the standard for

16  appointment of a trustee: fraud, dishonesty, incompetent, gross

17  mismanagement.  Let's talk a little bit about fraud and

18  dishonesty.  We've talked a lot about the evidence presented to

19  the Court, how the filing of this bankruptcy was not only a

20  fraud on the NRA's board but a fraud on this Court that amounts

21  to nothing else than a litigation and publicity stunt.

22          Judge Journey testified the filing of this bankruptcy

23  was the symptom of the disease.  We've seen evidence of how the

24  board of directors was intentionally not informed about the

25  bankruptcy filing by management.  We've seen evidence of how

1  none of the NRA's salaried officers were informed.

2         You've seen evidence of how Mr. LaPierre and his

3  attorneys intentionally slipped the language into his

4  employment agreement to try and deceive and trick the board.

5  You've seen evidence of how Sea Girt was formed as a shell

6  company 52 days before the filing of this bankruptcy to simply

7  secure venue.  You've seen evidence of how the $5 million in

8  funds was transferred to the Brewer firm's trust account to

9  keep any record of pre-bankruptcy off the books and unnoticed

10  by the NRA's CFO and account staff.

11         We're not talking about something that happened years

12  ago.  We're not talking about pre-course correction.  We're

13  talking about acts recently taken by the NRA's current

14  leadership and their counsel.  The bankruptcy petition filed in

15  this action is exhibit A for the type of fraudulent conduct

16  that merits the appointment of a trustee in this case.

17         Let's talk a little bit more about the other fraud

18  and dishonesty that we heard throughout this trial.  We saw

19  evidence that the hundreds of thousands of dollars in excess

20  benefits Mr. LaPierre received.  He's apparently agreed to pay

21  back 300,000 of that, but it's abundantly clear that that's

22  only a fraction of the improper benefits he received.

23         For example, there's no evidence that he's agreed to

24  pay back all the benefits he received when he would take off to

25  the Bahamas on his buddy's luxury yacht, especially after a

1   tragic school shooting where the NRA likely needed him the

2   most.

3           Although the NRA has tried to make it sound like all

4   of these expenses were accidental or unintentional, I didn't

5   know, you've seen evidence from Mr. LaPierre's own travel

6   agent, Ms. Stanford, who testified that Mr. LaPierre himself

7   directed Ms. Stanford to exclude certain details about his

8   travel from invoices -- about his travel in the invoices.

9           You've seen evidence of multiple instances of

10  intentional embezzlement by Mr. LaPierre's personal assistant,

11  Millie Hallow, who beyond all rational explanation has been

12  allowed to keep her job with no discipline.

13          You've seen evidence how the NRA's current president,

14  Carolyn Meadows, testified that she burned and shred -- she

15  burned and shred her notes, her NRA notes, upon the advice of

16  the NRA's general counsel, John Frazer, just so they wouldn't

17  be able to be subpoenaed.

18          You've seen evidence that the Brewer firm pushed

19  through an eleventh-hour preferential payment to itself, $1.2

20  million, the day before this bankruptcy petition was filed.

21          Let's talk a little bit about the incompetence and

22  gross mismanagement.  Throughout this trial, many of the NRA's

23  own witnesses, its own witnesses, even its own counsel

24  acknowledged that the NRA had been grossly mismanaged in the

25  past.  Michael Ursling repeatedly testified how the management

Summation - Mason                                            87

1  was in a mess, and this was not just Woody Phillips.  This is

2  not just about Woody Phillips.  This is about Mr. LaPierre.

3          And any notion that this is any wrongdoing, any lack

4  of internal controls in the NRA's finance department is all a

5  result of Mr. Phillips, as, again, it makes no sense.  And you

6  know what, there's only one person that's responsible for the

7  accounting department and Mr. Phillips, and that is Wayne

8  LaPierre.

9          Here's more examples of the incompetence and gross

10 mismanagement that we heard throughout this trial.  Ms. Rowling

11 acknowledging the override of internal controls, the American

12 Express cards, the conflicts of interest, the failure to follow

13 the $100,000 procurement policy.  And relating to that, we

14 heard testimony that apparently according -- to the hiring of

15 law firms, it doesn't apply.  The NRA can just ignore the

16 $100,000 procurement policy.  According to the lawyers and some

17 of the witnesses, no evidence of that.  Vendors being paid

18 without contracts.

19         But then in 2017, the NRA started down this course

20 correction, this self-correction.  Mr. Frazer, Mr. LaPierre,

21 Mr. Cotton testified that the Schneiderman call in mid-2017,

22 that was the gamechanger.  Mr. King suggested that right after

23 the Schneiderman call, they went and hired the Brewer firm

24 because they were a New York law firm.  But remember, Morgan

25 Lewis, according to Mr. LaPierre, was hired to start off the

Summation - Mason                                              88

1   purported self-correction in 2017.

2           The Brewer law firm was hired in March of 2018 to

3   handle the Lockton litigation.  They were not hired for this

4   self-correction.  What happened is the Brewer firm came in and

5   they started taking everything over bit by bit, piece by piece.

6   And that's why that chart that Mr. Pronske showed you earlier

7   continued to go up and up and up.  That's why the litigation

8   exploded -- the four lawsuits against my client, the litigation

9   against Colonel North, and all the other litigation we've heard

10  about.

11          Mr. LaPierre is taking credit for this course

12  correction claim that he was determined to go down the

13  principal path, do the 360-degree top-to-bottom review.  The

14  problem with that is did it work.  Is the NRA's house really in

15  order?  Is this really true?  Can you really clean your house

16  if you just swept everything under the rug?

17          If your definition of cleaning house is just getting

18  rid of everyone who disagrees with you, that doesn't fix the

19  underlying problem.  Ultimately, the focus can't be on just

20  whether past errors have been fixed but whether the effects of

21  those errors are still being felt by the NRA and, most

22  importantly, whether the same management is in place who

23  allowed the errors to occur in the first place.

24          Let's look at some of the evidence that was post-

25  course correction.  The main theme that came out of testimony

Summation - Mason                                    89

1   from witnesses like Judge Journey, Mr. Mills, Esther Schneider,

2   these various board members, Wayne's kingdom, Wayne's sole

3   proprietorship, Wayne's world.  It's all about Mr. LaPierre.

4        Mr. Pronske talked about Mr. LaPierre's inability to

5   answer the questions throughout this trial, I think it was 60

6   times, he said, and the constant admonishment.  If Mr. LaPierre

7   cannot follow the Court's instructions in a trial, a live trial

8   before the general public, how in the world could anyone expect

9   that he's going to listen to anybody else.

10       And like any good dictator, Mr. LaPierre understands

11  that when you can't -- when you control the flow of

12  information, you can control the people and the outcomes in

13  your favor.  Mr. Makris talked about management by chaos.

14  Here's the testimony of Mr. Mills, Judge Journey, Rocky

15  Marshall about the lack of oversight by the board.

16       At the end of the day, Mr. LaPierre, regardless of

17  what he says to this Court, does what he wants.  Another common

18  theme that we heard throughout this trial was the frequency of

19  the board retroactively approving prior actions taken by

20  management about the filing of this bankruptcy.  We heard

21  testimony from "Buz" Mills and Rocky Marshall this was an

22  anomaly compared to other -- the NRA was an anomaly in

23  comparison with other boards that they had served on.

24       These are not ultimately issues that have been

25  cleaned up or self-corrected.  At the end of the day, these are

1    systematic issues that are symptomatic of an ingrained culture

2    at the NRA which won't truly be corrected until new management

3    is in place.

4           And while the NRA management exercises complete

5    control over the board, it only happens due to the director's

6    inability or unwillingness to do something about it.  Mr.

7    Pronske talked about Judge Journey describing the board as

8    being supine, completely passive to the desires and requests of

9    those they are supposed to oversee.  The tail is wagging the

10   dog.

11          Again, here's various examples of evidence that we

12   have heard throughout this trial no real oversight, lacks

13   safety switches of corporate governance, nominated committee

14   picks management, not consulting people before they're fired,

15   not consulting people before they're hired.

16          Let's talk a little bit about Wit Davis.  We talked a

17   lot about the various Brewer firm connections: Mr. Davis; Mr.

18   Correll, a former partner; Mr. Marshall -- Marshall Smith who

19   was going to be the proposed CRO; Mr. Davis; the Neligan firm;

20   Mr. Garman.  The board wasn't consulted about the hiring of Wit

21   Davis.  And Mr. Mills talked about all the problems that the

22   board has with Mr. Davis, counsel to the board, and how they

23   weren't even notified about his prior relationship with Bill

24   Brewer.

25          What's really happened here is there's been this

Summation - Mason                              91

1  attempt to put people in place to cloak the NRA in this wide

2  array of privilege.  And we've heard it a whole lot in the

3  month of expedited discovery.  And we didn't hear it as much in

4  this trial, but it is rampant.  Anything that the NRA wants to

5  do, they cloak it in this privilege.

6          And if you look at all of the individuals surrounding

7  this privilege, they've been carefully placed.  This is not an

8  accident.  The control that is being seen here at the NRA is

9  really at the direction of two people, Mr. LaPierre and Mr.

10 Brewer.

11         Here's some additional examples of the lack of

12 oversight in the testimony that we heard.  The various

13 contracts that NRA board members had with the NRA, Sandy

14 Froman, she receives $50,000 annually for an office space

15 reimbursement.  Marion Hammer, hundreds of thousands of dollars

16 a year paid to her.

17         We heard testimony that the NRA gives business to

18 (indiscernible) ongoing compensation to David Keene.  I believe

19 -- I think it was about two dozen NRA board members that at

20 least -- oh yeah, dozens of board members that currently have

21 agreements and are receiving compensation from this nonprofit,

22 this nonprofit organization.

23         Anther way to keep the board passive is just to

24 simply get rid of the ones who cause too much trouble.  In the

25 last two years, some 21 board members ousted or resigned.  They

Summation - Mason                                    92

1  were either kicked out or left because of retaliation with Mr.

2  LaPierre.  We heard a ton of evidence about anyone that

3  challenges LaPierre, anybody that challenges Mr. Brewer,

4  they're gone.

5          They're labeled extortionists.  They're publicly

6  defamed.  They're shouted down in board meetings.  They're

7  accused of having alternative agendas.  They're accused of

8  being anti-Second Amendment.

9          Craig Spray, the change agent, the change agent who

10 numerous witnesses testified really was the catalyst or the

11 change agent for these internal controls that purportedly

12 changed.  He's fired.  Maybe the one good thing that the NRA

13 had, Mr. LaPierre fired him without consulting anybody.

14         Before I conclude, I do want to address this Court's

15 questions from last Thursday.  And I'm not going to repeat.  I

16 know that the Court is well aware of what it asked the parties

17 to address.  But I'd first like to address the language and the

18 notion of an involuntary dissolution.

19         And, again, whether dissolution is necessary or not

20 is best answered by the New York State and its courts who are

21 charged with protecting the public interest.  I know I've said

22 that a lot, but it is fundamental to why we're here.  There's

23 no reason for this Court to usurp the New York judiciary's role

24 or right to answer that question, but that's exactly, Your

25 Honor, what the NRA is asking you to do here.

Summation - Mason                                          93

1            The phrase that you used, "an otherwise viable

2   debtor, yes, this Court must consider the economic realities of

3   the NRA, which we've seen is undisputedly solvent.  It's in its

4   best financial condition in years.  But we would also present

5   to the Court that viable includes whether the NRA is a viable

6   charity in New York, meaning that whether it's serving its

7   purpose under New York nonprofit law despite repeatedly

8   violating its tax-free status.

9            But, again, this is not for this Court to decide.

10  It's for the independent judiciary in New York after hearing

11  all of the evidence, after hearing the NRA talk about their

12  course correction.  The NRA board members, general counsel,

13  executives, special litigation committee members, and officers

14  all admitted the New York courts are not weaponized.  There's

15  no reason why those courts should not -- should be denied the

16  opportunity of deciding whether a nonprofit within their

17  jurisdiction is viable in terms of whether it is serving the

18  public interest.

19           The NRA spent most of its time making the case that

20  no matter what Mr. LaPierre does, as long as the money rolls

21  in, a big fundraiser, no matter how big of a slice he and his

22  cronies take of that money, he should be allowed to stay.  But

23  this is the very definition of corruption, sacrificing what is

24  right for what is lucrative.  Surely this would not pass the

25  public-interest test.

94

1    Continued corruption would certainly indicate that as

2  a nonprofit entity, betraying the public's trust, NRA may not

3  be viable.  But setting aside the question of when this Court

4  should determine whether a dissolution is unnecessary and

5  whether an entity is viable, there's undoubtedly no urgency in

6  reaching the issue now of an unnecessary dissolution or the

7  viability of the NRA.  There's no urgency in taking the

8  question, in taking the issue of should the NRA be dissolved,

9  is that appropriate  based on all of the evidence.  There is no

10  need to decide that issue now.

11    In answering your question about the bankruptcy,

12  whether the bankruptcy purpose is broad enough to encapsulate

13  the intended relief of dissolution that requires judicial

14  determination to be in the best interest of the public, at the

15  very earliest, we would contend that the Court could intervene

16  if it felt that it must when and if Judge Joel Cohen in his

17  statutory discretion after the conclusion of all the evidence

18  determines that involuntary dissolution of the NRA is in the

19  best interest of the public.

20    There is every reason for this Court to respect

21  federalism, to respect the integrity and good conscience of the

22  judiciary, state and federal courts of the State of New York,

23  and allow the regulatory and judicial process to take its

24  natural course.  If this case is dismissed, the NRA is going to

25  be okay.  They're swimming in cash.  They have remedies in

95

1  different courts.  They're going to be okay.

2        And, Your Honor, we believe that the evidence that

3  you have heard throughout the last month mandates only one

4  course of action in this case, and that is dismissal of this

5  bankruptcy.  And I will reserve the remainder of my time for

6  rebuttal.  Thank you.

7        THE COURT:  Thank you, Mr. Mason.  By my rough

8  calculations, you have slightly more than 20 minutes left.

9        MR. MASON:  Thank you, Your Honor.

10       THE COURT:  Thank you.

11       Before we break, let me just review.  Mr. Watson, Mr.

12  Taylor, I think on Thursday y'all said you'd need between 30

13  and 45 minutes.  Is that still right?

14       MR. TAYLOR:  That's correct, Your Honor.

15       THE COURT:  Okay.  And then, Ms. Lambert, we had sent

16  a message to you I think over the weekend saying it looks like

17  we can get to the U.S. Trustee before lunch.  And y'all are

18  saying about 30 minutes; is that right?

19       MS. LAMBERT:  Yes, Your Honor.

20       THE COURT:  Okay.  I believe we can also hear the

21  five-minute presentation by Mr. Herring also before lunch.  So

22  if y'all could be ready.

23       Why don't we take a 15-minute recess so everybody can

24  get their thoughts together, and we'll come back in at 10:45.

25       (Recess at 10:28 a.m./Reconvened at 10:45 a.m.)

1          THE COURT:  We're back on the record in NRA in a

2     minute.

3          (Pause)

4          THE COURT:  Mr. Taylor, are you ready?

5          MR. TAYLOR:  Yes, Your Honor.  I am.

6          THE COURT:  Mr. Garman, I can see your room.  Are

7     y'all ready?

8          MR. GARMAN:  Yes, sir.

9          THE COURT:  All right.  Mr. Taylor?

10         MR. TAYLOR:  Yes, Your Honor.  Before I get into my

11    direct closing, we would like to attempt to answer Your Honor's

12    question.  And just for purposes of a clear record, the

13    question as we understand it is while one purpose of Chapter 11

14    is to present a necessary dilution of an otherwise viable

15    debtor, is that purpose broad enough to include a situation

16    where the debtor is seeking protection from a potential

17    dissolution that would not be a collateral effect of litigation

18    but rather the intended relief sought that would only occur

19    upon a judicial determination that dissolution is in the best

20    interest of the public.

21         We also have searched the case law for anything

22    definitively on point.  We haven't found anything 100 percent

23    on square with that exact fact pattern, but we do believe that

24    there are some answers available.

25         We start with that insolvency is not a prerequisite

Summation - Taylor                                    97

1  to a finding of good faith under Section 1129(a), and it is not

2  a requirement to be eligible to file for bankruptcy relief.

3          Fields Station, LLC v. Capital Food Corp. is a good

4  example of a case.  That's 490 F.3d 21 (1st Cir. 2007).  And

5  that case stated: "A debtor need not be insolvent before filing

6  a bankruptcy petition, however, provided it is experiencing

7  'some type of financial distress'" -- and they cite to

8  Integrated Telecom that says "The absence of an insolvency

9  requirement encourages companies to file for Chapter 11 before

10 they face a financially hopeless situation."

11         And that's exactly what we have here, Your Honor.

12 The NRA has seen a freight train coming at them, and they have

13 acted expeditiously to avoid that freight train hitting them

14 and blowing them off the tracks.  In fact, the Code itself

15 distinguishes whether the automatic stay such as the

16 enforcement action here can even proceed.

17         If it is a proper exercise of police and regulatory

18 effect, then it must proceed.  Section 362(b)(4) expressly

19 allows certain governmental enforcement actions to continue,

20 notwithstanding a pending bankruptcy.  In other words, the New

21 York AG dissolution suit could technically continue to the

22 extent it is an exercise of police or regulatory power.

23         The Fifth Circuit has ruled that this determination

24 could be summed up as follows, and we actually point to the

25 very same case that the New York AG cited to in its opening in

Summation - Taylor                                    98

1  answering this question.

2         "The pecuniary purpose and public policy test both

3  contemplate that the bankruptcy court after assessing the

4  totality of the circumstances will determine whether the

5  particular regulatory proceeding at issue is designed primarily

6  to protect the public safety and welfare or represents a

7  governmental attempt to recover from property of the debtor

8  estate, whether on its own claim, or on the non-governmental

9  debts of private parties."  That's Halo Wireless that's

10 previously been cited to this Court.

11        In the current case, while the New York AG

12 enforcement action can proceed as far as the reporting

13 requirements and the means by which the NRA reports to the New

14 York regulators while it is still incorporated there, that part

15 can proceed.  But we think that that is a two-pronged type of

16 case.  The damages phase of that action, the dissolution in an

17 attempt to impose pecuniary sanctions on the NRA, take away its

18 assets and redistribute it is something expressly prohibited by

19 the Code, and we think that it should not be allowed to proceed

20 here.

21        And, therefore, we think that this reorganization

22 should be allowed to restructure and reincorporate within Texas

23 to avoid that very outcome.  We'll address that a little bit

24 more in our closing arguments about how we see that playing

25 out, Your Honor.

Summation - Taylor                                         99

1            Moving on to our closing argument, before I start, I

2    know Your Honor and this Court has seen myself and Mr. Watson

3    appearing before Judge Journey and all, but I did want to take

4    this opportunity to thank on the record my colleagues Robby

5    Clark who's provided support throughout this case to us and to

6    Christian Ellis who has helped prepare our closing and helped

7    me with that.

8            May it please the Court, we believe this trial is the

9    most important trial in America right now.  It is so important

10   because the constitutional rights that the citizens of this

11   country and the voices of millions of Americans who support and

12   uphold those rights ride on the outcome of this case.

13           We have been in trial together for a month now.  We

14   truly appreciate Your Honor's attention and demonstrated

15   fairness throughout the entire process.  Anyone watching this

16   trial has seen the judicial process administered evenhandedly

17   and rightly and, for that, we are very grateful.

18           Now we bring a close to this all-important trial

19   which in large part will determine whether or not the voices of

20   millions of America will be silenced -- of Americans will be

21   silenced or whether they will continue to be heard as they have

22   for 150 years.

23           We believe that the most important people in this

24   case, the nearly five million members of the NRA, including

25   over 2.5 million lifetime members, have not been entirely

Summation - Taylor                                    100

1  represented.  My clients have brought their action to represent

2  as best they could the best interests of the members as they

3  saw fit.  We do look forward to the hearing on our motion to

4  form a member committee in the coming days.

5          But at this time, without such a membership committee

6  in place, we implore the Court to recognize that it is our

7  clients and our clients only who do not have a pecuniary or

8  personal interest in this case.  Our clients are paying their

9  legal fees out of their own funds and out of the monies raised

10 by appealing to everyday members of the NRA to save and restore

11 the NRA.

12         Neither Judge Journey nor any of our clients will

13 achieve financial gain or financial loss as a result of what

14 happens here today, which cannot be said of any other party.

15 Judge Phillip Journey; Roscoe "Rocky" Marshall, Jr.; Esther

16 Schneider; Owen "Buz" Mills; and Bart Skelton do stand to win

17 or lose in this case what they hold much more dear than

18 financial gain.  They and members of the NRA could lose the

19 voice protecting their Second Amendment rights and the ongoing

20 life and livelihood of the only organization in America with

21 the history, personnel, resources, and public trust necessary

22 to protect and preserve those Second Amendment rights.

23         For our clients and the millions of other members of

24 the NRA, the ongoing life at the NRA and this important Second

25 Amendment mission is literally equivalent to the ongoing

Summation - Taylor                                                      101

1 preservation of the freedom of the United States of America.

2 We are, therefore, before this bankruptcy court to ensure the

3 preservation of those rights and to preserve the NRA.

4         Now the circumstances of how we got here have been

5 told and retold during this trial.  But in closing, we must say

6 two things.  First, we admit albeit somewhat begrudgingly, but

7 we do admit that this bankruptcy filing was entirely valid

8 under the law and that the entire matter is properly before

9 this Court.

10        Second, we believe that the overall management style

11 and circumstances that led us here are indicative of the steps

12 that we must take in this case going forward to examine and

13 modify how the NRA does its business.

14        The relief sought by the various parties to this

15 matter range along a spectrum, Your Honor.  On the one side of

16 the spectrum, the New York AG's Office moves to dismiss this

17 case and subsequently dissolve the NRA and seize all of its

18 assets.  That is clear.  This is clearly an untenable and

19 imprudent consequence and is no way appropriate here.

20        Dismissal would only be in the interest of a handful

21 of interested parties.  This bankruptcy case is in the best

22 interest of all interested parties.  It was lawfully filed and

23 should be allowed to continue.  Similarly, and as we'll address

24 more fully, the alternative motion for a trustee is in no way

25 an acceptable solution for this situation either.

Summation - Taylor                                    102

1          On the other side of the spectrum is the NRA's

2     request for a "inside baseball-style CRO" whose findings would

3     largely be confidential and without any meaningful powers to

4     identify and address management problems.

5          We are advancing a solution that we believe would be

6     a "Goldilocks" solution.  It is not a "Goldilocks" solution

7     simply because it is the middle ground.  Just like the story,

8     our proposed solution rejects the hot porridge and cold

9     porridge options as being entirely unreasonable and unuseable.

10    Our proposal produces a solution that is proper for this

11    situation, the parties, the members of the NRA, and the overall

12    good of our country's ongoing constitutional discussions.

13         We respectfully pray this Court to appoint an

14    examiner or, if the Court desires, a CRO with the following

15    powers.  Before proceeding, we note that this list of powers

16    differs slightly from our filing, but it will be recited fully

17    in our proposed order to the Court that we will file today or

18    tomorrow.

19         We request that the examiner be required to:

20         One, independently examine the overall management

21    processes of the NRA and, to the extent necessary, suggest

22    modifications to those management processes for the NRA's

23    executive management, if necessary to be implemented via court

24    order in the initial stages of this case and, ultimately, to be

25    implemented as a long-term solution via plan of reorganization.

1          Likewise, we welcome proposed changes and fixes to

2    the ways and means by which the board operates in which changes

3    could be implemented in a plan of reorganization.  These

4    changes would include how management communicates with the

5    board and how management makes decisions.

6          For example, the examiner will provide management

7    guidance to achieve certainty regarding the content and

8    propriety of Form 990 filings and similar issues.  This power

9    would also include the ability to form or disband management

10   committees or other management structures.

11         Two, to independently examine compensation, benefits,

12   and other transfers made to vendors, management, board members,

13   and their respective affiliates.

14         Three, to independently examine and, to the extent

15   necessary, put forth a plan of recovery of any improperly paid

16   amounts.

17         Four, to independently examine and, to the extent

18   necessary, remove management for cause.

19         Five, to independently examine and, to the extent

20   necessary, report to the membership or membership committee

21   should one be formed the circumstances of any board member

22   wrongdoing and put forth removal of the offending board members

23   as per the bylaws of the organization.

24         Six, report the outcomes of all independent

25   examinations directly to the Court, board of directors, the

Summation - Taylor                                    104

1  creditors' committee, and members or member committee.

2      Seven, the ability to come back and ask this Court

3  for expanded powers and duties as necessary.

4      And, eight, to participate in the formulation of a

5  plan of reorganization by coordinating efforts among

6  management, the Unsecured Creditors' Committee, board of

7  directors, the membership committee, and other parties in

8  interest.

9      Now can this task be performed with a chief

10  restructuring officer?  Like the other parties, we have great

11  respect for Mr. Robichaux.  And, yes, we do believe that it can

12  be done with a CRO, and we would support the appointment of a

13  CRO with the above enumerated powers.  We believe that the

14  appointment of an examiner is a better result because of an

15  examiner's inherent independence and direct reporting

16  requirements to this Court.

17      He or she would be a court-appointed fiduciary and

18  would be truly independent and not beholden to management or

19  any board member.  But, ultimately, we are confident that the

20  Court will select the correct vehicle, whether it be examiner

21  or CRO, to accomplish these goals.

22      We further request that the Court with input from the

23  board of directors and membership committee issue final

24  approval of any engagement agreement with any CRO or in an

25  order directing and then confirming the appointment of an

1  examiner.

2          We would ask that the engagement agreement or the

3  order approving the examiner, as appropriate, include the

4  following provisions:

5          One, that no confidentiality provision protect the

6  examiner's disclosure or CRO's disclosure to the Court or other

7  stakeholders of its findings and recommendations.

8          Two, that the examiner may not fail to disclose his

9  or her findings or recommendations in full due to the

10  application of the attorney-client privilege and is entitled to

11  waive the privilege to execute the examiner or CRO's duties.

12          Three, that the examiner or CRO report its findings

13  and recommendations directly to the board, the Unsecured

14  Creditors' Committee, membership committee, and not selectively

15  or exclusively to management or any management committee.  In

16  other words, any reporting must be made in full to the board of

17  directors, membership committee, and this Court.

18          Four, that the special litigation committee not

19  necessarily be the primary point of contact for the examiner or

20  CRO for day-to-day operations or any other function.  That

21  independent person must be free to interact with the debtor as

22  that examiner or CRO sees fit.

23          Five, that the examiner have full autonomy to

24  investigate freely or take any other action allowed by this

25  Court and need not obtain prior advance approval of the special

Summation - Taylor                    106

1    litigation committee or any other stakeholder.

2            The examiner or CRO structure that we envision is

3    best for the NRA and its members is one of autonomy,

4    independence, and transparency.  We do not want the process to

5    be opaque, orchestrated by current management, or cloaked in

6    secrecy.

7            We recognize that the appointment of a trustee would

8    result in autonomy, as well, but such appointment would be, to

9    use the analogy again, a bitter porridge that could lead to

10   significant harm to the NRA and even death.  Appointment of a

11   trustee would be so disruptive and overbearing that the entire

12   organization may well cease to exist.

13           Appointment of a trustee would terminate exclusivity,

14   resulting in a potential torrent of competing reorganization

15   plans proving even more costly, divisive, distracting, and

16   painfully inefficient for all involved.

17           The appointment of a trustee would result in the loss

18   of institutional knowledge, and many of the things that make

19   the NRA a viable and functioning entity would likely disappear.

20   Expenses would skyrocket, and the result would be calamitous

21   for millions of Americans who rely on the NRA's advocacy.

22           Moreover, fundraising, the life blood to fund the

23   NRA's missions would be harmed if not perhaps effectively shut

24   down if a trustee were to be appointed.

25           The appointment of an examiner or CRO with powers and

Summation - Taylor                              107

1  restrictions as enumerated above fits the bill.  This

2  "Goldilocks" solution keeps the lights on, serves the interest

3  of the members, allows fundraising to continue, and fosters the

4  spirit of cooperation among all stakeholders and parties in

5  interest that will allow the NRA to function all while it

6  receives the management examination and possible overhaul that

7  is needed here.

8          Certainly, the NRA has put on ample evidence that

9  while the problems of 2017 and '18 were significant, that they

10 have taken many efforts to remediate those issues.  On the

11 other hand, the New York AG has also put on evidence of some

12 lingering concerns with how the NRA continues to be managed,

13 which we view primarily as curable with the right management,

14 people, and processes in place.

15         What the New York AG has not done is present a case

16 that meets her burden for the appointment of a trustee, which

17 as Your Honor knows is a clear and convincing burden of proof.

18 As the Fifth Circuit Court ruled in 2004 in Shafer v. Army and

19 Air Force Exchange, clear and convincing evidence is: "that

20 weight of proof which produces in the mind of the trier of fact

21 a firm belief on conviction as to the truth of the allegations

22 sought to be established, evidence so clear, direct, and

23 weighty and convincing as to enable the fact-finder to come to

24 a clear conviction without hesitancy of the truth of the

25 precise facts of the case."

Summation - Taylor                                    108

1          Here, the New York AG has simply not met this clear

2   and convincing burden of proof to absolutely establish fraud,

3   dishonesty, incompetence, or gross mismanagement.  Are there

4   indications of incompetent or mismanagement?  Yes, there are

5   indications of those things occurring.  And those occasions

6   give our client the very desire for the appointment of the

7   independent examiner.

8          But the statutory burden that the New York AG bears

9   to have the trustee appointed is clear and convincing evidence.

10  And though this case has been hotly disputed, that burden is

11  simply not been met.

12         The "Goldilocks" plan that Judge Phillip Journey;

13  Roscoe "Rocky" Marshall, Jr.; Esther Schneider; Owen "Buz"

14  Mills; and Bart Skelton put before you today is a plan that

15  best serves the members, best preserves the NRA for the benefit

16  of creditors and its members, and best serves the interests of

17  the future of the NRA.

18         We fully anticipate under our proposal that

19  ultimately any fines required by New York law will be paid to

20  the New York regulatory authorities and, further, that any

21  causes of action that the NRA owns against third parties will

22  be preserved.  And those claims may exist against current

23  management, board members, or vendors.  They need to be

24  preserved for the benefit of the bankruptcy estate and the

25  unsecured creditors and also for the members of the NRA.

Summation - Taylor                                        109

1      Judge Journey and his fellow colleagues have spent

2  their own money, time, and resources for the benefit of the

3  rank and file members of the NRA.  Judge Journey volunteers in

4  a way that embodies the values of the NRA.  He is a 4-H

5  volunteer incorporating NRA training into his service.  He is a

6  benefactor member of the NRA with a lifetime commitment to the

7  organization.

8      He is a former state legislator who has helped write

9  much of the gun legislation in the State of Kansas.  He loves

10  the NRA.  He supports its mission and enjoys the constitutional

11  rights and protections that the NRA has fought long and hard to

12  preserve.

13      Each of our other clients likewise share his passion

14  for the NRA and have likewise given generously of their time,

15  money, and passion to the organization.

16      The NRA exists to train young people and adults in

17  the safe handling and accurate shooting of firearms.  They

18  provide valuable training to Boy Scouts of America, 4-H, and

19  other youth and adult groups across the United States.  The

20  number of lives saved and injuries avoided due to the NRA's 150

21  years of safety training and instruction are incalculable.

22      The NRA also exists to protect our First and Second

23  Amendment freedoms.  There is no other organization in the

24  United States that has been more effective in preserving those

25  freedoms than the NRA.  For the NRA to be dissolved or forcibly

Summation - Lambert                           110

1  taken over and damaged by an appointed trustee would be akin to

2  ripping out the constitutional soul of our country.

3         Judge Journey, "Rocky" Marshall, Esther Schneider,

4  "Buz" Mills, and Bart Skelton are lifetime members.  They along

5  with millions of other Americans paid for these lifetime

6  memberships because they have made a lifetime commitment  the

7  values and freedoms that they hold most dear.  The NRA must be

8  preserved, yet, we know the NRA must be closely examined and

9  their management practices likely must change.

10         Our solution accomplishes those goals and does so in

11  a manner that is lawful, equitable, and just.  We pray that you

12  grant the relief sought by these petitioners.  Thank you, Your

13  Honor.

14         THE COURT:  Thank you, Mr. Taylor.

15         Ms. Lambert or Mr. Salitore for the United States

16  Trustee?

17         MS. LAMBERT:  May it please the Court, my name is

18  Lisa Lambert.  I represent the United States Trustee.

19         THE COURT:  Welcome.

20         MS. LAMBERT:  Your Honor, in the United States

21  Trustee's statement regarding the motion seeking appointment of

22  an examiner, trustee, or case dismissal, we provided our

23  position on the legal standards required for the various forms

24  of relief requested by the parties.  And we specifically

25  reserve the right to take a position on the motions after

1   review of the evidence.

2           And to assist in reviewing the evidence, the United

3   States Trustee's attorneys, among other things, have conducted

4   a Section 341 meeting at which the debtors' representatives

5   testified under oath for seven hours.  We have participated in

6   discovery.  We have attended every deposition, and we have

7   attended every day of trial.

8           It is on this history that the United States Trustee

9   makes this statement.  Considering the undisputed factual

10  record developed here and applying those facts to the

11  applicable law, we submit that the movants have met their

12  burden to justify each of the forms of relief requested:

13  dismissal, a trustee, or an examiner.  The NRA has not met its

14  burden, however, to justify approval of a chief restructuring

15  officer.

16          So let's talk about each of the remedies that have

17  been requested; first, dismissal.  The legal standard, as

18  everyone has stated, under the dismissal statute, Section 1112,

19  is cause.  And the parties have alleged that the cause in this

20  case is bad faith.  As the NRA acknowledges in its brief, the

21  standard is preponderance of the evidence.  And good faith has

22  been the standard incorporated literally or by judicial

23  interpretation since 1898.

24          In <u>Little Creek</u> and other cases, the Fifth Circuit

25  has noted that a bad-faith dismissal may be based on the

Summation - Lambert                        112

totality of circumstances considering all of the facts and

circumstances surrounding the debtor's filing including pre-

petition bad-faith conduct and post-petition bad-faith conduct.

In addition, the Fifth Circuit in <u>Antelope</u>

<u>Technologies</u> and numerous lower court cases also have held that

following to gain a litigation advantage while solvent

constitutes bad faith.  And, for example, in <u>Antelope</u>

<u>Technologies</u>, the Court considered releases, exculpations, or

injunctions protecting third parties in a plan as suggesting an

improper ulterior motive.  <u>Antelope Technologies</u> involved an

attempt to gain control of the litigation and take advantage

while fully solvent.

So let's turn to the undisputed evidence about the

pre-petition facts, post-petition facts in the absence of a

legitimate bankruptcy purpose.  The NRA has stated that it is

seeking refuge from the New York Attorney General's actions and

wishes to change its state of incorporation.  That can be done

outside of bankruptcy.  It is not a legitimate reason for

filing bankruptcy.

The NRA created Sea Girt to manufacture venue.  And

here's what we know about Sea Girt.  It is a non-operating for-

profit LLC.  It has no employees.  There's been no stated

intent of ever operating.  In fact, the pending plan proposes

to dissolve it.  Even the $50,000 put on deposit with Sea Girt

was later withdrawn.

Summation - Lambert                           113

1      They say they're fixing it, that it's a problem with

2  opening the debtor-in-possession account, but two MORs show

3  zero balance in the Sea Girt account.  They've had plenty of

4  time.  It's a shell with no apparent purpose other than to

5  anchor venue in this district.

6      So let's shift from Sea Girt to the NRA.  The filing

7  was conceived and executed without even a minimum amount of

8  transparency.  Putting aside all the questions about the

9  authority to file under the NRA's governing documents, the

10 customary authorities were not informed.  They did not know

11 about the bankruptcy filing, not the board, not the treasurer

12 CFO, not the secretary general counsel, not the executive

13 director of general operations.

14     These are the folks who typically prepare documents

15 for filing.  They navigate strategy.  They contribute to the

16 plan and the disclosure statement.  And using the Brewer trust

17 account to seed the Sea Girt with $50,000 and to pay the

18 bankruptcy counsel facilitated keeping the expenses out of the

19 NRA's purview and keeping the bankruptcy filing from the

20 customary authorities.

21     In responding to the Court's question about whether

22 the prospect of dissolution in New York legitimizes this

23 filing, the case law does not support evading government

24 enforcement as a legitimate function.  The consequences of the

25 NRA's actions are its own.

1          In filing by a solvent entity to avoid litigation in

2    its relatively early stages with created venue, no clear board

3    disclosure, no clear officer disclosure is cause to dismiss.

4    But if the Court does not dismiss, then a Chapter 11 trustee or

5    an examiner is an appropriate remedy.

6          For a trustee, the legal standard is cause.  But if

7    the Court finds cause, then the order to appoint is mandatory

8    under the plain terms of the statute as interpreted by numerous

9    circuit and lower courts.

10         The evidence meets the Fifth Circuit's clear and

11   convincing standards.  Some of the cases cited by the parties

12   today in the briefing apply the preponderance-of-the-evidence

13   standard under Grogan v. Garner, and arguably that is the

14   standard after the 2005 amendments.  But the record provides

15   numerous examples of financial irregularities constituting

16   gross mismanagement under the Code, and the clear and

17   convincing standard is met.

18         Before the audit and the imposition of new cost

19   controls in 2018, the record is unrefuted that Wayne LaPierre's

20   personal expenses were made to look like business expenses.

21   Wayne LaPierre's budget and expense approval was separate from

22   the general budget and approval process.  The $6-million house

23   that was designed to be purchased through a corporation that

24   the NRA and Ackerman McQueen would own stopped, but it started.

25   LaPierre acquired suits for TV, 225,000 in business suits

1  charged to Ackerman McQueen and then charged back.  The charter

2  planes, LaPierre says these are for security.  But the evidence

3  is he picked up family.  The evidence is that extra stops were

4  not to be noted in the booking records.  And the testimony is

5  unrefuted that no NRA policy authorizes charter plane

6  (indiscernible).

7        AMc charges were used for other expenses including a

8  Landini's restaurant account where bills totaled in the

9  thousands.  One employee charged the NRA for $40,000 for her

10 son's wedding.  And the testimony is she has repaid that amount

11 but otherwise has suffered no additional consequences.  Woody

12 Phillips, the former CFO treasurer for decades, when asked

13 about executive vice-president Wayne LaPierre's expenses as

14 well as his own, pled the Fifth Amendment.

15       This evidentiary record clearly and convincingly

16 establishes that executive vice-president Wayne LaPierre has

17 failed to provide the proper oversight.  So then let's turn to

18 the self-correction.

19       Even after the self-described course correction, the

20 irregularities were not fixed.  Those accused of irregularities

21 including, for example, Phillips, were given lucrative

22 consulting packages without any documentation that they did any

23 work.  The chief financial officer was not allowed to see the

24 reimbursement calculations supporting the Schedule L, and some

25 request for certification of reimbursement amounts were not

Summation - Lambert                                116

1  returned.  No documentation came into evidence supporting the

2  calculation of the repayment by the board members or others,

3  including Wayne LaPierre.

4         When the chief financial officer did not sign the

5  990s, communication stopped.  He says he was eventually fired.

6  Some NRA witnesses say he resigned for health reasons.  In any

7  event, he refused to sign critical documents that were

8  essential to show the accuracy of the corrective action, the

9  repayments.  He did not sign, and he was relieved of his

10  duties.

11         And this brings us to the undisputed irregularities

12  that have occurred since the bankruptcy filing.  Almost two

13  weeks into the bankruptcy filing, about the time the schedules

14  and statements of financial affairs would have been due, Chief

15  Financial Officer Spray says Wayne LaPierre terminated him.

16  You have not even heard from the person who signed the

17  schedules and statement of financial declarations.

18         It's not the former Chief Financial Officer Spray.

19  It's not the Interim Chief Financial Officer Rowling, but David

20  Warren who's the chief financial officer for for-profit

21  entities.  Mr. Warren is not even on the NRA organization chart

22  that has been admitted into evidence.

23         Importantly, three years into the self-correction and

24  post-petition, Wayne LaPierre signs the conflict-of-interest

25  form dated April 7th, 2021 the same day he's testifying in this

1  Court.  And he disclosed multiple yacht vacations.  This is

2  relevant because the yacht owners own MMP and related entities

3  that are contractors with the NRA office and the NRA

4  headquarters, building, and we don't know the rental terms.

5        Both the Ursling and Rowling testimony establishes

6  that the MMP invoices more than double the 400,000 contractual

7  amount consistently month after month.  And Spray's testimony

8  is that other contractors were brought in line.  Wayne LaPierre

9  himself signed the agreement with allegiance one of the yacht

10 owners related entities without complying with the NRA's market

11 analysis protocol.

12       So some were shielded from the self-correction

13 because Wayne LaPierre failed to disclose conflicts and because

14 internal procedures were not honored.  This lack of accounting,

15 this lack of accountability, the lavish personal spending, the

16 termination of the chief financial officer who would not sign

17 tax documents, financial irregularities, and misuse of funds

18 amply justify the removal of the debtor-in-possession

19 management in favor of a trustee.

20       However, even if the Court does not agree with our

21 analysis and the facts or law that a trustee is mandated,

22 management can and should on this record still be curtailed.

23       The Court should evaluate the examiner appointment

24 under the legal standard, best interest of the creditors,

25 because there's no evidence that the mandatory five-million

Summation - Lambert                          118

1   trustee threshold has been met.  Given the scope of the

2   problems, the movants' suggestion, the Journey team's

3   suggestion of a $350,000 cap for an independent and thorough

4   financial examination of the NRA, given the NRA's size is not

5   sufficient.

6        Even though the examiner does not displace

7   management, the Court, if the Court opts for an examiner should

8   expand the powers to require that major expenditures and

9   certification of expenditures go through the examiner before

10  being paid.  And the scope might include determining improper

11  expenditures, ensuring that they're paid back, reviewing legal

12  costs, imposing new financial controls, and improving

13  significant expenditures.

14       Importantly, significantly, an examiner would be

15  independent, and the examiner's report would be publicly filed

16  to provide transparency, which brings me to why the CRO is not

17  a proper remedy.

18       Chief restructuring officers should not be used to

19  evade statutory remedies.  And a request to hire a CRO that

20  would report to a government structure that failed to detect

21  and later failed to cure serious financial irregularities

22  should not be approved by the Court.  We made these arguments

23  citing facts and law in the U.S. Trustee's objection to the

24  chief restructuring officer.

25       But the subsequent trial revealed additional facts

Summation - Lambert                                    119

 1  that further demonstrate the improvidence of the chief
 2  restructuring officer.  The CRO terms are unclear, as the
 3  testimony evidenced.  And the CRO's answer to the ambiguities
 4  is impractical.

 5          He suggests that matters be brought to the Court for
 6  resolution.  But the Court's function is to decide important
 7  legal issues, not routine daily internal governance or
 8  financial control of a not-for-profit.  It's unnecessary.  The
 9  Bankruptcy Code provides remedies, the trustee or an examiner.
10  These remedies are more than adequate for the task at hand.

11          The chief restructuring officer's testimony evidences
12  that this same chief restructuring officer typically reports to
13  boards, full boards in bankruptcy cases.  The disclosure
14  procedures are inadequate.  He initially failed to identify
15  material connections related to the hiring process.  The $1-
16  million bonus creates its own conflict of interest for the
17  chief restructuring officer.  It's not similar to his prior
18  engagements.

19          It's not a reasonable exercise of business judgment
20  when according to his own testimony he has not reviewed the
21  schedules and statements of financial affairs, has not done an
22  in-depth financial review, and while he has proposed some plan
23  provisions, he has not read the plan that apparently was
24  already approved by the board yesterday.

25          So, in summary, Judge Hale, there are unusual aspects

Summation - Herring                    120

1  to this case.  There are decades of connections between the NRA

2  and its vendors or former vendors.  Decades that many members

3  of the board of directors have been on the board.  They are

4  long-time employees.  Some of the connections are even

5  familial.

6         And the NRA is a not-for-profit with a mission that

7  includes advocacy.  But, Your Honor, the NRA elected to be

8  here.  And having brought us here, the Bankruptcy Code

9  controls.  The strength of the Bankruptcy Code is that it

10 brings a variety of remedies that anticipate the challenges

11 that arise in a variety of contexts.  Those remedies work.  And

12 under the facts of this case, the Court should impose one of

13 them: dismissal, a trustee, or an examiner with expanded

14 powers.  Thank you.

15        THE COURT:  Thank you, Ms. Lambert.

16        Why don't we hear from Mr. Herring and then we'll

17 take a break and we'll start earlier than I normally start.

18        Mr. Herring, I think you had asked for five minutes.

19        MR. HERRING:  Yes, Your Honor.  It may seven or eight

20 minutes, but certainly under ten.

21        THE COURT:  We'll give you two or three extra there.

22        MR. HERRING:  I appreciate that.

23        Well, Your Honor, may it please the Court, my name is

24 Walt Herring and I'm here on behalf of the creditor, David

25 Dell'Aquila or a creditor of David Dell'Aquila.  Mr.

1  Dell'Aquila is a member of the Unsecured Creditors' Committee,

2  has filed a partial joinder to the UCC motion.  A partial

3  joinder because while Mr. Dell'Aquila opposes the motions to

4  dismiss and adopts the U.S. Trustee and the UCC's position on

5  that point, he does not agree that the appointment of a CRO

6  will halt the systematic abuses of the NRA's current management

7  and the board for the reasons noted below, and the Chapter 11

8  trustee with limited power is what's needed in this case.

9          There's no question that mismanagement, abuse, and

10 outright fraud have been a systematic problem in the NRA for

11 years.  Those issues have become well-known over the past

12 several years and were well-chronicled in the prior closing

13 statements this morning.  Rather than waste time by repeating

14 those issues, we will simply note the facts categorized and

15 highlighted by the other movants at this hearing as

16 confirmation of the undeniable certainty that something is

17 definitely amiss with the NRA's management and board for years

18 before this bankruptcy proceeding was initiated.

19         We do not believe, however, that those systematic

20 abuses have been adequately addressed, unlike some parties in

21 this litigation.  The course corrections of the past few years

22 we believe have been ineffective, and problems will still exist

23 and continue to plague the NRA in the year to come if they are

24 not addressed now.

25         As an example of those continuing systematic problems

Summation - Herring                                    122

1  and abuses, we would note some of the following.  First, the

2  board of directors is too big, 76 members; so big it's just

3  ineffective and, in fact, chaotic.  And that ineffectiveness

4  and chaos has worked to the current management's benefit.  The

5  proposed CRO has recognized this problem when he stated it made

6  sense for him to report to the three-member special litigation

7  committee rather than the board.

8          Some may argue that a board provides a diversity of

9  opinion and that one-third of the board is up for re-election

10 each year ensuring new ideas and new vigor.  Well, that all

11 sounds good in theory, but the reality is something quite

12 different.  The reality is to be a board member, you have to be

13 elected by the nominating committee chosen by the current

14 management places a name on that election ballot.  And who do

15 you think gets appointed to the nominating committee and who

16 gets nominated on the ballot?  Let's just say that diversity of

17 thought, strength of leadership do not appear to be

18 particularly desirable characteristics for the candidates

19 approved by the committee.

20         And the bylaws have changed in the last few years to

21 make it virtually impossible to be a write-in candidate.  As a

22 result, the diversity and vigor of the board is highly

23 questionable.  Instead, the board simply rubber-stamps

24 management's decisions and the one-third turnover does not have

25 the desired effect.  The results have been highlighted in this

Summation - Herring                               123

proceeding, and they speak for themselves.

2          Arguably, the entire board should be charged with

3  dereliction of their fiduciary duties, as Mr. Dell'Aquila has

4  been arguing for years.  Even their own "Buz" Mills testified

5  in this proceeding that he believes the entire board should be

6  replaced, including himself.

7          In addition, the prior business practices and

8  systematic abuses continue.  The fact that the major multi-

9  million-dollar contracts are currently administered under oral

10  arguments.  For example, the MMP contract, Allegiance Creative

11  Group contract, the Concord Social and Public Relations

12  contract, they're all oral at this time and that's just simply

13  unacceptable.  These aren't small vendor contracts with paper

14  clips and pencils.  No legitimately run enterprise would

15  operate this way.

16          Another example, Mr. LaPierre's expenses have not

17  been submitted for review for the last two years and are still

18  being withheld from discovery and scrutiny.  How can anyone say

19  that the abuses have been curbed when the information isn't

20  even there to make an honest assessment?

21          Other examples, there's no companywide policy on

22  charting jets, as the U.S. Trustee just pointed out.  Perhaps,

23  that's not a huge issue in and of itself, but it's emblematic

24  that things really haven't changed that much.  And how about

25  the multiple lucrative severance packages doled out to loyal

Summation - Herring                             124

1  former employees like Michel Marcellin, Robert Marcario, Robert

2  Weaver?  And even Woody Phillips who has repeatedly taken the

3  Fifth Amendment rather than testify?  Or a lucrative consulting

4  contract for Marion Hammer that lasts through 2030, almost

5  another decade?

6        So my favorites, though, are Craig Spray, the CFO who

7  was hired to help reform the system that was fired for no

8  apparent reason after he refused to sign the 2019 IRS Form 990.

9  The president, the first vice-president, and the second vice-

10 president as well as other important members of the management

11 personnel refused to sign that same form because, according to

12 Mr. Cotton, who was the CFO to tell him what to do.

13       Another one, the NRA continues to litigate a

14 severance case with a total liability of two million and has

15 spent to date $6 million in legal fees on a $2-million plane,

16 and the case is ongoing.  They paid the Brewer firm $17.5

17 million in the 90 days before bankruptcy, 2 million of that the

18 day before they filed.  And as has been noted here numerous

19 times, the general counsel and the CFO were not even told of

20 the bankruptcy filing until the filing had occurred.

21       One of those abuses you might excuse as a lapse.

22 Two, you might say, well, that's just bad luck.  Three, I'd

23 start to ask some question.  Seven, eight, nine -- and, again,

24 these are all since the self-corrections have supposedly

25 occurred.  All these since then have taken place.  How can

Summation - Herring                    125

1 anyone seriously argue that the ship is being righted?

2          That doesn't look like righting the ship at all.  It

3 looks as if the ship is still sinking, maybe not as quickly but

4 the holes are huge and the life boats are filling up quickly.

5 Just ask Mr. Spray.

6          Another example of problems, in 2013, the NRA had a

7 membership of five million, and Mr. LaPierre projected then

8 that it would double in the next five years.  A few days ago,

9 after over seven years later, Mr. LaPierre testified that the

10 NRA currently has 4.89 million members.  In other words, under

11 the direction and leadership of Mr. LaPierre, current

12 management, and the board, the membership has basically stayed

13 flat.  It's stagnant at a time when the Second Amendment has

14 never been under greater assault.

15          There are an estimated 100 million gun owners in the

16 United States out of an estimated population of 331 million.

17 Less than five percent are members of the NRA.  What other CEO,

18 what other management group would stay in power with that kind

19 of performance?

20          So the facts just do not support the contention that

21 the abuses are in the past, that thing started to turn for the

22 good several years ago.  The problems continue and will

23 continue if left unchecked.  But those problems are not going

24 to be solved by the proposed CRO.  Why?  Because the CRO

25 proposal doesn't give the CRO the power or authority needed to

1  address the real problems.

2          While we conditionally applaud the decision to have

3  the CRO report to the SLC instead of the board, the definitions

4  of core fundamental mission operations -- i.e., those are the

5  operations outside the CRO's purview -- and the definition of

6  management operations, those operations within the CRO's

7  purview, are significant problems that will only lead to

8  further abuses and mismanagement.

9          By way of example, a core fundamental mission

10 operation, something outside the CRO's purview, includes a

11 charitable program -- includes "charitable programs comprising

12 the company's nonprofit mission."  In prior years, the NRA has

13 given large donations to Youth For Tomorrow.  That's a charity

14 with a very worthwhile goal of providing outpatient and

15 inpatient services for children with acute psychological and

16 behavior disorders.

17         It's a charity that's closely associated with the

18 LaPierres.  While certainly a worthwhile goal and mission, that

19 is not the core mission of the NRA.  Yet, that contribution to

20 that charity would be out of the CRO's domain and purview.

21         And if the CRO objected to that or any other core

22 fundamental mission operation or objected to the SLC's decision

23 on the management operations, something within his purview for

24 that matter, the only recourse this proposal has for the CRO

25 would be an appeal to you, Judge Hale -- I'm sure you would

1  appreciate that -- or to submit a noisy resignation.  That's

2  it.  Not much power there for the CRO.

3         Moreover, and perhaps more of a fundamental problem

4  under the current CRO proposal, the real power lies at the

5  three-member SLC.  Obviously, the appointment of those members

6  and the ability to remove and reappoint members is vital.  We

7  are convinced that the current management and the current board

8  would continue to influence that process through its

9  appointment of SLC members that are friendly to the board and

10  management.

11         Now this is the same SLC whose current member Carolyn

12  Meadows destroyed documents when the subpoena was coming.  And

13  it's the same SLC that has a member now who has said the CFO

14  doesn't make policy for the company.  We question whether the

15  SLC as currently appointed is going to be effective.

16         In essence, the CRO, as proposed, has been or will

17  quickly be emasculated.  That's why we believe that the current

18  management board will never voluntarily relinquish their

19  control to a CRO.  That's proven by the watered-down proposal,

20  and that's what leads Mr. Dell'Aquila to support the alternate

21  proposal of the UCC, the appointment of a Chapter 11 trustee

22  with limited powers.

23         Yes, we understand that's a rare animal.  In fact, we

24  understand the U.S. Trustee has argued it can't be done.  But

25  as pointed out in the UCC's briefing, it can be done in

Summation - Herring                                              128

1  extraordinary circumstances.  And if there ever was an

2  extraordinary circumstance, this is it.  The NRA has an

3  extraordinary history with an extraordinary mission, and it's

4  facing an extraordinary crisis.

5        To address the issue, the UCC has argued that it's

6  too complex and it's too expensive for a trustee to step in and

7  hit the ground running or it's too destructive, as has been

8  argued by the UCC and others.  So fine, leave the current

9  management and board in place for continuity purposes, but let

10 the trustee come in and select who those managers and board

11 members should be and give the trustee the power to let them

12 operate while he closely monitors that performance.  But that

13 trustee must have the power to remove and replace the

14 management board at his or her sole discretion.

15       That alone would prevent the abuses of the past from

16 continuing into the future.  That is what we believe best

17 serves the purpose of the NRA, the mission of the NRA, and best

18 serves the millions of its members of the NRA who truly support

19 the Second Amendment.  You don't have to dissolve it.  The

20 trustee doesn't have to dissolve it.  But you can appoint

21 someone to ensure an experienced crew is steering the ship and

22 that that crew is held accountable to that trustee.

23       In conclusion, Mr. Dell'Aquila is the voice of the

24 rank-and-file member here at this proceeding, the only real

25 voice of those members.  Judge Journey has claimed he and his

1 group represent those members. But Judge Journey has been on

2 the board and is still on the board. With all due respect,

3 where has be been until now?

4 And his examiner proposal steps on and duplicates the

5 role of the UCC. The New York Attorney General represents New

6 York. The D.C. AG represents D.C. Ackerman has its own

7 interest and claims. And the UCC represents a variety of

8 creditors with varied interests, as evidenced by its members

9 taking contrary positions on numerous issues. But only Mr.

10 Dell'Aquila speaks for rank-and-file members. Those members

11 who contribute their hard-earned dollars, 10, 20, 100 dollars

12 at a time but they are, indeed, the life blood of the NRA.

13 Given the continuing systematic management problems,

14 the continuing influence of the very people who cause those

15 problems, and the emasculation of the CRO as proposed by the

16 NRA, a trustee with limited powers is the only real option

17 here. It may be a bold option; it may be an extraordinary

18 option. But the Court should be bold; the Court should be

19 extraordinary. This is the time to do that.

20 Thank you, Your Honor.

21 THE COURT: Thank you, Mr. Herring.

22 Before we break, let me just go through my notes

23 here. Mr. Strubeck, I show that on Thursday, y'all were

24 thinking about a half an hour. Is that still right?

25 MR. STRUBECK: Yes, Your Honor. It is. It may be,

1  as Mr. Herring just suggested at the beginning, a couple of

2  minutes longer, but I think that's about the right amount of

3  time.

4          THE COURT:  Sure.  Yeah, I'm not going to hold

5  anybody to the minutes.  I may hold Mr. Garman to the hours,

6  though, that he's requested.

7          And, Mr. Garman, I show you have three hours then.

8  Is that still about right?

9          MR. GARMAN:  Yes, sir.  I'm going to try and do

10  better than that, sir.

11          THE COURT:  I know you will.  Sometime in the middle

12  of yours, if you could come to a logical just a resting spot

13  for us to take an afternoon break, I think that's going to be

14  appropriate.

15          Then my understanding is we're going to pause for 30

16  minutes and then the AG and Ackerman come back with the last

17  word after that.  Is that still the understanding?

18      (No audible response)

19          THE COURT:  Okay.  All right.  So --

20          MR. GRUBER:  Your Honor, this is Mike Gruber.  I just

21  want to confirm that Mr. Strubeck somehow goes before the last

22  word that you've talked about Ackerman and the New York

23  Attorney General getting.

24          THE COURT:  Mr. Strubeck goes next, Mr. Gruber.

25          MR. GRUBER:  Okay, thank you.

1            THE COURT:  You're welcome.

2            All right.

3            MR. TAYLOR:  Your Honor?  Your Honor, this is Clay

4    Taylor.  We also reserved a brief rebuttal time, and I presume

5    we would keep the same order.

6            THE COURT:  Yeah.  I think that would be fair.  How

7    much do you think you're going to need about?

8            MR. TAYLOR:  We reserved up to 30 to 45 minutes, but

9    we can be done in 10, Your Honor.

10            THE COURT:  That's fine.  I just didn't write that

11   down on Thursday, and that's my bad on that, Mr. Taylor.  But

12   you're a movant, just like the other two are.  Different

13   relief, but you're certainly entitled to come back at the end,

14   too.

15            What I would suggest --

16            MR. PRONSKE:  Your Honor, if I might, I think that

17   the New York Attorney General and Ackerman should have the last

18   word and that Judge Journey is opposed to us, as well.  So I

19   think we would prefer that order.

20            THE COURT:  Okay.

21            MR. TAYLOR:  Your Honor, we were first filed and

22   believe we should go last.

23            THE COURT:  Let's just keep it in the order that we

24   just did the first round.

25            I'm still trying to get out the words here.  I'd like

132

1    to break now.  It's 11:43, so why don't we come back at one.

2    And I think we should have plenty of time to do all the closing

3    that we need to close.

4             All right.  We'll see y'all at 1 o'clock.

5         (Proceedings recessed at 11:43 a.m.)

6                              *  *  *  *  *

133

# **C E R T I F I C A T I O N**

1

2          I, DIPTI PATEL, court approved transcriber, certify

3   that the foregoing is a correct transcript from the official

4   electronic sound recording of the proceedings in the above-

5   entitled matter, and to the best of my ability.

6

7   /s/ Dipti Patel

8   DIPTI PATEL, CET-997

9   LIBERTY TRANSCRIPTS              DATE: May 4, 2021

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25