UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

```
IN RE:                    .    Case No. 21-30085-HDH-11
                          .
NATIONAL RIFLE            .
ASSOCIATION OF AMERICA    .    Earle Cabell Federal Building
and SEA GIRT LLC,         .    1100 Commerce Street
                          .    Dallas, TX  75242-1496
                          .
         Debtors.         .
                          .    May 3, 2021
                          .    1:03 p.m.
. . . . . . . . . . . . ..      P.M. Session
```

TRANSCRIPT OF TRIAL
BEFORE HONORABLE HARLIN DeWAYNE HALE
UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

TELEPHONIC APPEARANCES:

For the Debtors:          Neligan LLP
                          By:  PATRICK J. NELIGAN, JR., ESQ.
                               JOHN D. GAITHER, ESQ.
                               DOUGLAS J. BUNCHER, ESQ.
                          325 North St. Paul, Suite 3600
                          Dallas, TX 75201

                          Garman Turner Gordon LLP
                          By:  GREGORY E. GARMAN, ESQ.
                               WILLIAM M. NOALL, ESQ.
                               TERESA M. PILATOWICZ, ESQ.
                               DYLAN CICILIANO, ESQ.
                               TALITHA GRAY KOZLOWSKI, ESQ.
                          7251 Amigo Street, Suite 210
                          Las Vegas, NV 89119

Audio Operator:           Shanette Green

Proceedings recorded by electronic sound recording, transcript
               produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311     Fax No. (609) 587-3599**

2

TELEPHONIC APPEARANCES (Cont'd):

For Ackerman McQueen,      Dorsey & Whitney LLP
Inc.:                      By:  G. MICHAEL GRUBER, ESQ.
                                H. JOSEPH ACOSTA, ESQ.
                                BRIAN E. MASON, ESQ.
                                CHRISTINA M. CARROLL, ESQ.
                                KELSEY TAYLOR, ESQ.
                           300 Crescent Court, Suite 400
                           Dallas, TX 75201

Proposed Counsel to the    Norton Rose Fulbright US LLP
Unsecured Creditors        By:  SCOTT P. DRAKE, ESQ.
Committee:                      LAURA SMITH, ESQ.
                                NICK J. HENDRIX, ESQ.
                                LOUIS R. STRUBECK, ESQ.
                           2200 Ross Avenue, Suite 3600
                           Dallas, TX 75201

For Phillip Journey,       Bonds Ellis Eppich Schafer Jones LLP
et al.:                    By:  MARCUS JERMAINE WATSON, ESQ.
                                CLAY M. TAYLOR, ESQ.
                                ROBBIE CLARKE, ESQ.
                           420 Throckmorton Street, Suite 1000
                           Fort Worth, TX 76102

For Wayne LaPierre:        P. KENT CORRELL, ESQ.
                           250 Park Avenue, 7th Floor
                           New York, NY 10177

For the United States      Office of The United States Trustee
Trustee:                   By:  LISA L. LAMBERT, ESQ.
                           1100 Commerce Street, Room 976
                           Dallas, TX 75202

                           Office of The United States Trustee
                           By:  MARC SALITORE, ESQ.
                           Bank of America Building
                           110 North College Avenue, Room 300
                           Tyler, Texas 75702

For Attorney General of    Spencer Fane LLP
the State of New York:     By:  JASON PATRICK KATHMAN, ESQ.
of New York:                    GERRIT M. PRONSKE, ESQ.
                                ERIC M. VAN HORN, ESQ.
                           5700 Granite Parkway, Suite 650
                           Plano, TX 75024

TELEPHONIC APPEARANCES (Cont'd):

For Attorney General of      Office of the Attorney General-New
the State of New York:       York
                             By:  JAMES SHEEHAN, ESQ.
                                  EMILY STERN ESQ.
                                  MONICA CONNELL, ESQ.
                                  STEPHEN THOMPSON, ESQ.
                                  JONATHAN CONLEY, ESQ.
                                  YAEL FUCHS, ESQ.
                                  LUCAS McNAMARA, ESQ.
                                  WILLIAM WANG, ESQ.
                                  SHARON SASH, ESQ.
                             28 Liberty Street
                             New York, NY 10005

For the District of          Office of Attorney General
Columbia Attorney            for the District of Columbia
General:                     By:  CATHERINE ANN JACKSON, ESQ.
                             400 6th Street N.W.
                             9th Floor
                             Washington, DC 20001

For David Dell'Aquila:       Blackwell, Blackburn, Herring & Singer
                             By:  WALT HERRING, ESQ.
                             7557 Rambler Road, Suite 1450
                             Dallas, TX 75231

                                  - - -

# I N D E X

| **SUMMATIONS** | **PAGE** |
|---|---|
| By Mr. Strubeck | 5 |
| By Mr. Garman | 32 |
| Rebuttal summation by Mr. Pronske | 108 |
| Rebuttal summation by Mr. Mason | 123 |
| Rebuttal summation by Mr. Taylor | 131 |

Summation - Strubeck                                    5

1          THE COURT:  You may proceed.

2          MR. STRUBECK:  Thank you, Your Honor.

3          And, again, for the record, Louis Strubeck of Norton

4   Rose Fulbright on behalf of the Official Committee of Unsecured

5   Creditors.

6          I wanted to start, Your Honor, by thanking you and

7   your staff.  This trial is one of great magnitude, and imposes

8   huge impositions on a Court and its staff, and we're mindful of

9   that, as I believe all the other lawyers today are, Judge, and

10  so I just wanted to extend the thanks to you and your staff for

11  sticking with us for these many days of trial, and didn't want

12  it to be lost on you that we all appreciate the sacrifices and

13  efforts that you made in connection with this.

14         As I said in my opening statement, Your Honor, the

15  stakes here are extremely high, high stakes poker.  And Your

16  Honor has mentioned the fact that this may be one of the more

17  important motions, if not the most important motion, you've

18  ever had to decide.

19         And when I was preparing for this closing argument, I

20  actually thought about your predecessor on the bench, and I

21  smiled because I think he would have really enjoyed this, and

22  so I hope you are, too, to some extent.

23         I also said in my opening statement, Your Honor, that

24  the Committee sees things here through a different lens than

25  the moving parties.  The lens is not colored by political

1   agendas, or litigation, or fervent longtime members' passions.

2   And I think those dynamics were on display well before the

3   start of trial, and they've continued to play out during the

4   trial, and even in the closing arguments you've heard earlier

5   today.

6           Specifically, Your Honor, in what Mr. Pronske and Mr.

7   Mason had to say, the Committee's positions here are without

8   exception, reflective of and consistent with its statutory

9   duties under the Code.

10          As a result, the closing you're going to hear from

11  me, Your Honor, is going to be a little bit more measured, and

12  there will be considerably much less hyperbole than some of the

13  other closing statements I think you heard earlier in the day.

14          Consistent with the Committee's duties, Your Honor,

15  we oppose the dismissal of these bankruptcy cases and the

16  appointment of a trustee, especially to the extent that the

17  appointment of a trustee would result in the complete

18  displacement of the NRA's management and their ability to

19  propose a restructuring plan, and make mission-specific

20  decisions.

21          These are, as has been reportedly [sic] pointed out

22  to Your Honor, and well-known to the Court, extraordinary

23  remedies that are being sought, and they should be granted only

24  in the most unusual cases.

25          Here, these remedies are just not in the best

Summation - Strubeck                           7

1  interest of creditors and the estates, and I want to emphasize

2  the best interest of creditors and the estates because I'm

3  going to come back and talk about that in just a second when I

4  address the question that everybody has answered that Your

5  Honor posed last Thursday.

6          I think the evidence has demonstrated, Your Honor,

7  that dismissal or displacement of management here would do

8  severe, if not irreparable, harm to the estates, creditors, and

9  other parties in interest.

10          And to steal a line from Mr. Mason earlier, you know,

11  the ripple effect here in terms of what would happen if these

12  cases were dismissed, or if a Chapter 11 trustee were

13  appointed, it's actually more of a tsunami, Judge, in terms of

14  what the effect would be on the NRA going forward.

15          Similarly, Your Honor, the UCC opposes the

16  appointment of an examiner.  The examiner motion essentially

17  raises the same allegations that form the basis of the

18  dismissal and trustee motions.  Section 1103 statutorily

19  empowers the Unsecured Creditors' Committee to investigate the

20  debtors' transactions, governance issues, and affairs, and that

21  investigation has already begun in earnest.

22          An examiner would serve only to add an additional

23  layer of expense and delay to these cases, and duplicate, to a

24  large extent, the efforts of the UCC.

25          The more appropriate solution here, Judge, is the

1  appointment of a CRO.  And I think that's something that Judge

2  Journey's counsel has indicated was acceptable to Judge

3  Journey, the caveat being with the correct scope.

4        I'm going to spend a good bit of time talking about

5  the CRO issues here, to a large degree, Your Honor, because I

6  believe that the Unsecured Creditors' Committee was the

7  champion of those from the get-go.

8        Mr. Pronske suggested in his opening that the NRA's

9  request for approval of the retention of Mr. Robichaux was

10  designed more as a defensive mechanism to bolster its arguments

11  against dismissal or the appointment of a trustee.  But that

12  really isn't the case here, Judge, because since shortly

13  following its appointment, the Committee has strongly

14  encouraged the debtors to retain a chief restructuring officer

15  in these Chapter 11 cases because it is the most practical,

16  efficient, effective, and least disruptive solution to the

17  issues that have been raised by the moving parties.

18        As the Committee previously has opined, the retention

19  of the right chief restructuring officer with the right and

20  proper authority and scope of responsibility would bring

21  stability, transparency, and much needed credibility to the

22  process while instilling confidence and assurance that these

23  Chapter 11 cases are being independently run for the benefit of

24  unsecured creditors without undue influence from any internal

25  agendas.

1          While the initial scope proposed by the debtors

2    regarding the chief restructuring officer was not in the

3    Committee's reasoned viewed sufficiently broad enough, the

4    Committee and the debtors have now agreed upon a revised scope,

5    the terms of which are embodied in a revised engagement

6    agreement that was filed on April the 28th.

7          With this expanded scope, which includes

8    significantly a mechanism for Mr. Robichaux to bring issues to

9    the attention of the Court, the Unsecured Creditors' Committee

10   believes that the appointment of a CRO is the most appropriate

11   and, again, least disruptive remedy here, given the unique

12   nature of the NRA's business, to address the issues that have

13   been raised in the motion to dismiss, appoint a Chapter 11

14   trustee, and the motion to appoint an examiner.

15         I would start, Your Honor, by addressing the

16   dismissal motion, and I have a feeling that the NRA's counsel

17   is going to spend a lot more time in terms of the granular side

18   of all this, and referring to specific testimony and the like.

19         But the outcome here from the Committee's perspective

20   is straightforward, and it comes down to the simple reality

21   that the NRA's continued existence likely depends on these

22   cases being allowed to proceed.

23         In his closing remarks, Mr. Mason said that the NRA

24   would be just fine if these cases were dismissed.  I honestly

25   don't know where that statement comes from because there is no

1  support for the record.

2          At the outset, it's important to emphasize that the

3  UCC's position is not in any way based on the UCC not giving

4  credence to, or not fully appreciating, the seriousness of the

5  allegations of mismanagement and misconduct identified by the

6  New York Attorney General and Ackerman.  I'm not going to begin

7  to trivialize those allegations, Your Honor.

8          To the contrary, the UCC believes that additional

9  management and government changes must be made to the NRA.  And

10  I'm going to make those even clearer, Your Honor, when I start

11  talking at the very end about the CRO application, and the

12  scope of Mr. Robichaux's authority, and the expectations of the

13  Unsecured Creditors' Committee in terms of what we expect to

14  ultimately happen under a plan.

15          In fact, the UCC believes that the ultimate results

16  of these Chapter 11 cases should be twofold:

17          First, there should be a plan that provides for

18  payment in full of creditors, and that's in keeping with the

19  Committee's statutory duties;

20          And, second, there should be a plan, as I said, that

21  proposes major management and government changes to the NRA

22  that includes, among other things, safeguards to protect

23  against future misconduct and additional procedures to further

24  increase transparency and public confidence in how the finances

25  of the NRA are managed.

1          Where the UCC diverges from the New York Attorney

2    General, Ackerman and, to my surprise, the U.S. Trustee, is how

3    to accomplish these objectives.  The UCC believes this can best

4    be accomplished, in fact it can only be accomplished, through

5    these Chapter 11 cases remaining before this Court, and

6    allowing the bankruptcy plan process to play out.

7          Conversely, dismissal of these cases would deprive

8    the NRA of the platform needed to implement the wholesale

9    changes that everyone agrees are needed here.

10          First, and most fundamentally, Your Honor, if the

11   Court dismisses these cases, there is an untenable risk that

12   the NRA may be deprived of the opportunity to restructure and

13   implement any governance changes.  Can there really be any

14   question that the New York Attorney General is seeking

15   dissolution of the NRA through its regulatory action?  I submit

16   not.

17          As addressed in our papers, filing bankruptcy to

18   avoid liquidation or dissolution is the quintessential time-

19   tested reason for a debtor to file for bankruptcy.  Once you

20   accept the dissolution of the NRA is the ultimate end game of

21   the New York Attorney General, then rejecting dismissal becomes

22   an easy call, and everything else is superfluous.

23          For example, the central argument advanced by the New

24   York Attorney General and Ackerman is that these cases were

25   filed in bad faith because they're a litigation ploy, and the

Summation - Strubeck                            12

1  parties make much ado about statements made by the NRA to its

2  constituency about trying to avoid New York and its regulatory

3  and political scrutiny.

4        While the debtors have challenged those allegations,

5  there's been a lot of back and forth about the stated reason

6  for the filing, the Court need not devote much time or

7  attention to this issue because the NRA's subjective intent for

8  filing is not dispositive.

9        In fact, the dispute regarding the NRA's reason for

10 filing is a sideshow that ignores the inescapable conclusion

11 that this bankruptcy may be the only way for the NRA to

12 continue as a going concern with new and improved management

13 and government in place.  So there's clearly a legitimate

14 purpose for the filing.

15       Mr. Pronske referred to the NRA's, quote,

16 "dissolution defense" in his closing statement argument.  I

17 would submit that avoiding dissolution isn't a defense here to

18 dismissal, but a justifiable reason for the filing in the first

19 instance.

20       We cite to multiple cases in our papers, Your Honor,

21 to support the very obvious proposition that allowing the

22 company to continue as a going concern is a basic and sound

23 fundamental objective of Chapter 11.

24       So there's no need to dwell on this issue because

25 it's very clear that these bankruptcy cases serve a legitimate

Summation - Strubeck                                    13

 1 purpose.  And overt threat of dissolution of the NRA also

 2 distinguishes the facts here from those in the SGL Carbon case,

 3 that both movants surprisingly tout as being persuasive and

 4 analogous; it's not.

 5          Simply put, SGL involved a civil class action

 6 antitrust lawsuit seeking monetary damages, not a regularly

 7 lawsuit brought by a state government agency seeking

 8 dissolution.  And a key aspect of the Court's decision in SGL

 9 to dismiss the case was its finding that an adverse judgment

10 against the debtors would not put them out of business.  Here,

11 the very essence of the AG actions is to put the NRA out of

12 business.  So the circumstances here could not be more

13 different.

14          And speaking of dissolution, Your Honor, that's the

15 perfect segue into the Committee's response to the question

16 that you raised at the close of evidence.  And you've heard

17 from the prior attorneys earlier in the day, their take on

18 that, and let me give you the Committee's take, Judge.  Our

19 interpretation of the Court's question was this:  Has cause for

20 dismissal been established under Section 1112 because it is bad

21 faith to file a bankruptcy case to defend against the lawsuit

22 seeking dissolution where a dissolution can only be ordered

23 after a judicial determination that dissolution is in the best

24 interest of the public.  The short and correct answer to this

25 question, we believe, is no.

1          The facts and circumstances of this case support the

2   notion that these Chapter 11 cases were filed for a legitimate

3   purpose, which was to prevent any dissolution that could occur

4   as a result of the New York Attorney General lawsuit, but also

5   to propose a Chapter 11 plan that would allow it to reorganize,

6   address corporate government concerns, and reincorporate in

7   Texas, and pay all creditors in full.

8          We know that the short answer usually is not enough

9   here, so let's take a closer look at the actual New York

10  statute.  Mr. Pronske spoke a little bit about the statute in

11  his closing argument, and I want to elaborate a little bit on

12  some of the points of the statute that I don't think he

13  emphasized.

14         New York public law 1109 provides that dissolution,

15  which is in the court's discretion, does not require that

16  dissolution be in the best interest of the public.  Let me

17  repeat that:  It does not require that dissolution be in the

18  best interest of the public.

19         Instead, the statute merely provides that in making

20  the decision, the interest of the public is of paramount

21  importance, and shall be taken into consideration by the court.

22         Furthermore, it is not clear what interest of the

23  public is to be considered.  Is it the interest of the public

24  in the State of New York?  Or will the Court consider the

25  interest of the broader public of the entire United States,

Summation - Strubeck                                    15

1  which would necessarily include all creditors, including the

2  UCC members, which could include an official member committee

3  formed, and other parties in interest with a vested interest in

4  the survival of the NRA.

5           While I'm sure if we ask Mr. Pronske and the New York

6  Attorney General, they would tell us that the views of

7  constituents from across the country will be considered, that

8  provides little comfort for the Unsecured Creditors' Committee

9  here, and should likewise provide little comfort to the Court.

10          But there is one venue that we know will take into

11 consideration all views, and that is this Court.  In addition

12 to the Unsecured Creditors' Committee and Judge Journey, we've

13 had numerous other State Attorney Generals, including the State

14 of Texas, weigh in and oppose dismissal through the filing of

15 amicus curiae briefs.

16          The bankruptcy process, which is a collective process

17 that permits all parties in interest to participate, is

18 uniquely situated to address the NRA and issues raised by the

19 New York Attorney General and others.

20          That being said, we do not believe the Court even has

21 to reach a decision as to what standard the New York courts are

22 governed by in ruling of dissolution.

23          Indeed, whether the interest of the public must be

24 considered by the New York courts is irrelevant because at the

25 end of the day, Section 1112 of the Bankruptcy Code requires

Summation - Strubeck                                    16

1  this Court to determine whether dismissal of the bankruptcy

2  case or appointment of a trustee or examiner is in the best

3  interest of the estate and its creditors.

4         Here, the evidence at trial was uncontroverted that

5  dismissal of these cases would not be in the best interest of

6  creditors and the estates, and that is the standard.

7         So we would urge this Court to not consider dismissal

8  to be acceptable because at the end of the day, the New York

9  Court cannot dissolve the NRA unless it is in the best interest

10 of the public.

11        The test is whether dismissal is in the best interest

12 of creditors and the estate under the Bankruptcy Code.  And the

13 inescapable conclusion here, based upon the evidence, is that

14 it is not.

15        A fundamental purpose of the Bankruptcy Code is to

16 provide troubled, but viable, companies with a fresh start.

17 What better way to describe the NRA?

18        This notion of providing companies a fresh start

19 covers companies that not only may have financial problems, but

20 also operational problems.  And let's be clear, the New York

21 Attorney General Action is solely about conduct that occurred

22 at the NRA prior to the filing of the lawsuit in 2020.  So any

23 ruling that dissolution is in the best interest of the public

24 would be based solely on whether the prior conduct of officers

25 at the NRA or the prior construct of the NRA warrants

1  dissolution of the organization.  In one regard, it is

2  backward-looking, not forward-looking, and the New York not-

3  for-profit statute confirms this fact.  The scope and purpose

4  of that action is simply not designed to address what, if any,

5  steps or changes may be necessary to allow the NRA a fresh

6  start that would be in the best interest of its stakeholder,

7  including its millions of members all over the United States

8  and beyond.

9       In contrast, this issue is precisely within this

10 Court's scope, and is the key issue that the bankruptcy laws

11 are specifically designed to address.

12      I want to now turn to just a couple of more technical

13 legal arguments related to dismissal, and I'll be brief because

14 I expect Mr. Garman is going to address these in great detail.

15      First, any suggestion that the debtors' current

16 financial position precludes it from filing bankruptcy or is

17 conclusive evidence of bad faith is legally unsupportable.  As

18 the Court knows, the debtor eligibility requirements set out in

19 Section 109 do not include a requirement that the debtor be

20 insolvent.

21      Moreover, the examples of cause under Section 1112 do

22 not include solvency of the debtor.  Even though the list in

23 Section 1112 is not exhaustive, solvency is such a common

24 bankruptcy concept that Congress certainly would have included

25 it in Section 1112 if solvency was a valid basis to dismiss a

1  Chapter 11 case.

2          Next, I want to address an argument raised by

3  Ackerman, but not advanced by the New York Attorney General.

4  Ackerman alleges that dismissal is appropriate because the New

5  York -- because the Court cannot grant relief to the NRA

6  because the NRA, as a New York not-for-profit, is subject to

7  New York State not-for-profit law, which requires that a

8  dissolution or merger be approved by the New York Attorney

9  General or the New York Supreme Court.  That simply cannot be

10 true since it would essentially preclude New York not-for-

11 profit companies from availing themselves to bankruptcy

12 protection.

13         For starters, we do not agree that the Bankruptcy

14 Court requires the application of certain aspects of not-for-

15 profit law, specifically Section 363(d)(1) and 1129(d)(1).

16         I want to turn now, Your Honor, to the issue of the

17 Chapter 11 trustee.  As the Court knows, the Committee opposes

18 the appointment of a Chapter 11 trustee.  And so here, I need

19 to take exception to one of the statements of Mr. Herring who

20 represents Mr. Dell'Aquila.  Prior to retaining counsel, Mr.

21 Dell'Aquila spoke at a prior hearing or hearings before the

22 Court.  Mr. Dell'Aquila is a prospective class action

23 plaintiff, and as Mr. Herring pointed out, he's also a member

24 of the Unsecured Creditors' Committee.

25         Mr. Herring said that Mr. Dell'Aquila, who does not

1  support the Committee's view regarding the retention of a CRO,

2  supported the alternative relief requested by the Unsecured

3  Creditors' Committee regarding a trustee with limited power.

4         I want to point out, Your Honor, that the Committee

5  did not request in the alternative the appointment of a trustee

6  with limited power.  We said only, Your Honor, that to the

7  extent you had decided to appoint a Chapter 11 trustee, that we

8  believed that Chapter 11 trustee should have limited authority

9  here.

10        The UCC, again, takes seriously the allegations of

11 misconduct and mismanagement.  But more importantly, values how

12 important it is that members and creditors of the NRA trust

13 management, and particularly trust that the fiduciaries of the

14 NRA are going to carry out and fulfill these duties

15 appropriately.

16        Again, certain management and government changes need

17 to be made as part of any reorganization or restructuring of

18 the NRA, and the Committee has always said that.

19        However, the complete displacement of current

20 management and their professionals is not the way to achieve

21 this objective.  Rather, the objective is best achieved through

22 a Chapter 11 plan and a coordinated effort between the debtors

23 and its major stakeholders, including the Unsecured Creditors'

24 Committee, to discuss and negotiate government changes that

25 need to be made.

Summation - Strubeck                                    20

1           As indicated by the CRO application, which I'll speak

2    to in a moment, so far the debtors have been receptive to input

3    and suggestions by the UCC, and we expect that will be the case

4    moving forward.

5           Again, I don't want to spend too much time discussing

6    the standard for appointing a Chapter 11 trustee, because we

7    all know that.  But I want to highlight two things:

8           First, appointing a trustee and displacing management

9    is universally viewed as an extraordinary remedy especially

10   early in a case, like here, where a debtor is deprived of the

11   opportunity to move forward with the Chapter 11 plan.  In this

12   regard, the cases are clear that only egregious conduct that is

13   established by clear and convincing evidence warrants the

14   appointment of a trustee.

15          Second, the decision to appoint a trustee under

16   Section 1104 of the Code involves considerable judicial

17   discretion and balancing of relevant interests and cost-benefit

18   analysis.

19          Here, a clear and convincing case has not been made

20   for the appointment of a trustee.  The Unsecured Creditors'

21   Committee has carefully considered the cost and benefits of

22   having a trustee appointed, and concluded the appointment of a

23   trustee is not in the estate and creditors' best interest.

24          Given the NRA's unique nature, a not-for-profit that

25   has an especially specific mission and that, quite frankly, is

Summation - Strubeck                                21

1  a politically polarizing organization, it's neither practical

2  nor realistic for a Chapter 11 trustee to oversee and

3  micromanage the NRA's operations, and to run the entire

4  reorganization process at the NRA.

5          As the testimony has established, there are numerous

6  operational nuances and specialties to consider, such as

7  fundraising, educational programs, interfacing with members and

8  the like, things that a Chapter 11 trustee simply is not

9  equipped to, and frankly was never expected to, handle the sort

10 of practical if not insurmountable impediments here.  But even

11 a trustee could come in and take over, the learning curve would

12 be extremely steep and it would unquestionably take a

13 considerable amount of time and the expenditures of a lot of

14 money for the trustee to get fully up to speed.  This could

15 jeopardize the first objective of these Chapter 11 cases to

16 ensure that the creditors get paid in full, and the primary

17 statutory charge of this Committee.

18         I have always assumed, Judge, that the current

19 management filed these Chapter 11 cases with a specific exit

20 plan in mind.  I've known Mr. Neligan for years, and it would

21 be hard for me to imagine that that would not have been

22 something that would have been a paramount focus for him.

23         Until today, we only knew part of that plan.  It

24 entailed reorganization as a Texas entity, but beyond that, we

25 didn't really have any details.  Now we do, as the NRA has

1  filed a plan, a plan that provides for payment in full of

2  allowed unsecured claims.

3           If the CRO is retained, we expect the CRO will play a

4  major role in negotiating plan changes with the Committee and

5  other parties.

6           If a trustee is appointed, and management is

7  displaced, on the other hand, there is no telling which

8  direction these cases will go.

9           Moreover, the UCC shares the debtors' concern

10 regarding the impact on fundraising.  Donations are a critical

11 component of funding for the NRA, and the undisputed testimony

12 at trial is that any action that would chill relations with the

13 NRA's membership and fundraising efforts would have potentially

14 devastating consequences to the organization.

15          So there are clear and real consequences to

16 displacing management.  There would undoubtably be delay, there

17 are also restructuring execution risks, and these risks and

18 costs far outweigh any benefit.

19          The risk of mismanagement and misconduct during these

20 Chapter 11 cases is extremely low, Your Honor.  Between this

21 Court's oversight, the watchdog role that the Unsecured

22 Creditors' Committee and U.S. Trustee play, as well as the many

23 individual creditors who are watching these cases closely, the

24 debtors are under intense scrutiny.  They have already made

25 numerous disclosures, and provided significant amounts of

1  information during these cases.  And as the Court is fully

2  aware, the debtors have ongoing reporting requirements.

3          Moreover, Ms. Rowling, as the Court will recall, a

4  former whistle-blower, and now the Acting Chief Financial

5  Officer of the NRA, detailed in her testimony the extensive

6  internal measures taken by the NRA to protect against future

7  abuse of spending and other financial waste.  This included

8  stringent enforcement of the human resources policy where she

9  testified there have been no reimbursement or payments for

10 living expenses in 2020, and implementation of an expanded

11 travel reimbursement policy that covers much more than first

12 class travel.

13         Thus, while there have been mismanagement abuses in

14 the past, the evidence has demonstrated the vast majority of

15 those occurred at least three years ago, prior to the New York

16 Attorney General filing her lawsuit in 2020, and that remedial

17 steps have been instituted by the NRA to curb further mishaps.

18         So while ultimately restructuring should include

19 additional management and governance changes, we do not believe

20 there is a material risk of mismanagement/misconduct during the

21 pendency of these cases.

22         Nevertheless, we believe the addition of an

23 independent fiduciary would provide substantial value, and with

24 this in mind, the Unsecured Creditors' Committee proactively

25 has tried to be constructive in suggesting certain compromised

Summation - Strubeck                                    24

1  positions, or at least solutions that would address the

2  concerns raised by the movants without completely undermining

3  the debtors' ability to restructure.  And the best way to

4  achieve that balance, Your Honor, is the retention of a chief

5  restructuring officer.

6          So in this regard, the Creditors' Committee has made

7  two suggestions:

8          First, from the get-go, we have strongly urged the

9  debtors to retain a chief restructuring officer.  The

10 Creditors' Committee believes that the right chief

11 restructuring officer with the right scope and authority would

12 go far to address many of the issues and concerns raised by the

13 movants.

14         The U.S. Trustee responded to the UCC's suggestion

15 and submitted a brief arguing that a CRO cannot usurp the

16 powers of a trustee.

17         However, this is not what the UCC is advocating.  The

18 appointment of a chief restructuring officer is a factor that

19 the Court can consider in determining whether a trustee would

20 benefit the estate.  And here, the Creditors' Committee

21 believes the retention of a CRO would obviate the need for a

22 trustee because effectively, it would address any risk of

23 further mismanagement.

24         And, again, while there are already safeguards in

25 place that make it highly unlikely that there would be

Summation - Strubeck                                      25

1  misconduct during these bankruptcy cases, the appointment of a

2  CRO will serve to further minimize that risk.

3        Second, the Creditors' Committee has advocated if,

4  and only if, the Court were inclined to appoint a trustee, the

5  trustee's powers should be limited.  Specifically a trustee

6  should not displace, but rather should work with current

7  management of the NRA in overseeing operations and seeing the

8  debtors through the Chapter 11 process.

9        The U.S. Trustee has argued that the Court does not

10 have authority to appoint a trustee with limited powers, and

11 essentially the appointment of a trustee is a whole or nothing

12 proposition; we respectfully disagree and refer the Court to

13 the cases cited in our filings.

14       As we cite several cases where a Chapter 11 trustee

15 was appointed and served a limited role, Your Honor, those

16 cases, we think, would be enforceable here, and Your Honor

17 would have the discretion, if you decided to appoint a Chapter

18 11 trustee, to limit his or her authority.

19       I want to turn briefly, Your Honor, to the examiner

20 motion.  Consistent with the Unsecured Creditors' position on

21 the other pending motions before the Court, we do not believe

22 an examiner is warranted nor appointed in these cases.  It's

23 important to note that like the Committee, the movant here, Mr.

24 Journey, opposes the dismissal of the cases and appointment of

25 a trustee.

Summation - Strubeck                                26

1           Where the Committee and Mr. Journey differ is the

2    remedy sought.  And, Your Honor, I believe I heard Mr.

3    Journey's counsel say in his closing arguments that Mr. Journey

4    is receptive to either the appointment of an examiner or a

5    chief restructuring officer, but with respect to the latter, he

6    wants to make sure that the scope is appropriate.  We believe

7    the scope is appropriate now, as it has been expanded.

8           And just very briefly, Your Honor, Mr. Journey

9    contends in support of his request to appoint an examiner, that

10   there's no dispute, the appointment of an examiner is mandatory

11   in these cases under Section 1104.  We agree with Ms. Lambert,

12   that the movant has not satisfied its burden of showing that

13   the debtors' fixed liquidated unsecured debts, other than goods

14   -- for goods, services, taxes owing to an insider exceed $5

15   million as required by the language of the statute.  Indeed

16   because the movant has provided no competent evidence in

17   support of this requirement, and for this reason alone, the

18   motion should be denied.

19           Even if the statutory threshold of Section 1104(c)(2)

20   is satisfied here, which it is not, numerous courts agree that

21   the as is appropriate language of the statute grants a court

22   ample discretion to not appoint an examiner.

23           These courts agree that the appointment of an

24   examiner is precluded where doing so would not be appropriate

25   based upon the facts and circumstances of the case.  And we

Summation - Strubeck                                27

1  submit that is exactly the situation here, Your Honor.

2       If you listen to Mr. Journey's attorney's recitation

3  of the different authority that he would like for an examiner

4  or a chief restructuring officer to have, you'll notice that

5  that scope of authority mirrors the scope of authority that's

6  been provided as expanded for the chief restructuring officer

7  which the NRA seeks to appoint.

8       And in addition, Your Honor, a lot of the other

9  elements of what Mr. Journey's counsel said that he would

10 expect to see an examiner be able to do are things that are

11 both statutorily provided to the Committee under the Bankruptcy

12 Code, and actions the Committee has already undertaken.

13      So, Your Honor, in our judgment, the appointment of

14 an examiner is not justified here, and the appointment of a

15 chief restructuring officer, again, is the much better approach

16 to take in this case.

17      Finally, Your Honor, I want to turn to the chief

18 restructuring officer application and related matter, which the

19 Unsecured Creditors' Committee strongly believes this Court

20 should approve.

21      Since shortly following its appointment, the

22 Creditors' Committee has encouraged the debtors to retain a

23 chief restructuring officer in these cases.  And the debtors

24 clearly heard the Creditors' Committee because they've now

25 filed an application authorizing the retention of Mr. Robichaux

1  as the chief restructuring officer.

2           I know that Mr. Robichaux is well-known to the Court.

3  And as you heard his testimony, the Unsecured Creditors'

4  Committee did have input initially into the scope of his

5  retention.

6           However, as demonstrated by the initial comment we

7  filed, not all of our requested changes were incorporated into

8  the engagement agreement that was originally filed with the

9  Court.

10          Notwithstanding the initial filing, the Unsecured

11 Creditors' Committee and the debtors continued to engage in

12 significant negotiations regarding a revision to the scope and

13 authority for Mr. Robichaux.  The culmination of which are the

14 terms set forth in the revised engagement that was filed with

15 the Court on April the 28th.  I cannot emphasize enough that

16 these were hard-fought negotiations between the debtors and the

17 Unsecured Creditors' Committee.  And, frankly, Your Honor, we

18 didn't get everything that we wanted in connection with those

19 negotiations.

20          However, we think that the revised engagement

21 provides Mr. Robichaux with the proper authority and scope of

22 responsibility to instill confidence and assurance that these

23 Chapter 11 cases are being independently run for the benefit of

24 unsecured creditors and parties in interest, and the current

25 scope and authority is certainly better than the appointment of

1  a full Chapter 11 trustee.

2          Just to point out a few things that were particularly

3  important deal points for the Creditors' Committee in

4  supporting the retention of a CRO here, Your Honor:

5          First is the ability of Mr. Robichaux to bring

6  concerning issues he sees to the attention of the Court.  This

7  was not something included in the original scope of the CRO's

8  engagement.  But as you will see in the revised engagement

9  agreement, as Mr. Robichaux testified to, there is now a

10 dispute resolution process built into the revised engagement

11 agreement that will allow Mr. Robichaux to come to court if he

12 believes there are post petition breached of fiduciary duties.

13         The Unsecured Creditors' Committee also wanted the

14 chief restructuring officer to have input regarding the

15 assumption or rejection of executory contracts and unexpired

16 leases.  That there's been a great deal of testimony during the

17 trial regarding how the debtors handle contracts with several

18 of its current vendors.

19         As a result, you will see that there was a provision

20 added to the revised engagement agreement which provides that

21 the company shall receive and consider any input provided by

22 the CRO in connection with the evaluation of, and decisions

23 regarding, the assumption or rejection on executory contracts

24 and unexpired leases.

25         Additionally, Mr. Robichaux also testified that his

1 role as CRO will include his review of what he said were

2 dollars going out the door.  So the issues that Ms. Lambert

3 alluded to in connection with monies that have been spent, and

4 are being spent, by the debtors with respect to contracts and

5 other providers of services are something that specifically

6 will be part of Mr. Robichaux's charge as the CRO.

7          Finally, Judge, and I mentioned this earlier, it's

8 really important to the Creditors' Committee that the CRO have

9 the ability to propose and recommend governance changes as part

10 of any proposed Chapter 11 plan.

11          As Mr. Robichaux testified, you will see that there's

12 language in the revised engagement agreement that provides him

13 with the ability to propose appropriate government changes,

14 specifically Mr. Robichaux will:

15          First, lead and be responsible for the company's

16 efforts to pursue and effectuate this Chapter 11 bankruptcy

17 restructuring;

18          Second, lead the communications and negotiations with

19 the company's stakeholders and Creditors' Committee and parties

20 in interest in the company's bankruptcy restructuring;

21          And finally, develop, negotiate and advance the plan

22 of reorganization.

23          So in conclusion, Your Honor, the Unsecured

24 Creditors' Committee strongly believes that these cases should

25 not be dismissed as dismissal would not be in the best interest

Summation - Strubeck                              31

1   of creditors and the estates.

2          The debtors' cases should remain in Chapter 11 so

3   that the NRA has the opportunity to reorganize pursuant to a

4   Chapter 11 plan that the debtors have stated will provide for

5   payments of allowed claims of creditors in full.

6          Moreover, it is the unsecured creditors' position

7   that an examiner should not be appointed under either provision

8   of Section 1104.

9          The Creditors' Committee has also opposed the

10  appointment of a Chapter 11 trustee.  Rather, the Creditors'

11  Committee believes the Court should approve the retention of

12  Mr. Robichaux as the chief restructuring officer.  His

13  appointment will adequately address the bulk of the concerns of

14  the moving parties, including concerns about allegedly

15  conflicted management being able to comply with their fiduciary

16  duties, and would also allow the NRA to continue its

17  specialized mission to advocate for gun rights, and protect and

18  defend the Second Amendment to the United States Constitution,

19  a mission largely dependent on the continued donations from,

20  and support of, members.

21         You'll recall, Your Honor, the testimony from Mr.

22  Cotton that the appointment of a trustee would be devastating

23  to the extent of any continued efforts to attract a larger

24  member constituent and to raise funds.

25         Finally, Your Honor, given the very unique nature of

Summation - Garman                                    32

1  the NRA's business, we believe that the appointment of chief

2  restructuring officer is the appropriate, practical, and lease

3  disruptive remedy to address the issues raised in the various

4  motions before the Court.

5          Thank you, Your Honor.

6          THE COURT:  Thank you, Mr. Strubeck.

7          Mr. Garman?

8          MR. GARMAN:  Yes, sir.

9          Your Honor, so at the outset, I have four parts to my

10 presentation, and unlike everyone else, I'm reacting, so I've

11 got about 600 of these Post-Its to get through, and I'm going

12 to get through them as expeditiously as possible.

13         Broken into four parts, if it pleases the Court,

14 maybe about -- after I get through Part 2, we'll take our break

15 in accordance with your instructions.

16         THE COURT:  That sounds good.

17         MR. GARMAN:  Okay.

18         Your Honor, I'm, again, going to use and pick my

19 words very carefully, and that I believe there has been a great

20 deal of hyperbole.  I believe there has been a great deal of

21 leeway that has been used with the record, and I believe there

22 has been a great deal of argument that is not based upon the

23 record before you.

24         But I come before you today to make four large

25 points, the four sections of the presentation I'm going to give

Summation - Garman                                      33

1  you:

2         The first is to talk about the case you were promised

3  by the New York Attorney General, and the case we promised you,

4  and to put in context the evidence you've heard.  And equally

5  as important what you were promised to hear, and what you did

6  not hear.

7         Part 2 is the most important part of my presentation.

8  Because the arguments that have been advanced to you today are

9  suggesting that we are asking you to create fundamentally new

10 rights to restrict states to impact sovereignty of the states

11 in a way that has never been done before, and we're going to

12 take a bit of a tour of the Code because exactly the opposite

13 is the case.

14        We are a debtor who is here to reorganize.  What do

15 debtors do in bankruptcy?  We try and solve problems.  It

16 certainly wouldn't be the first time that upon the petition

17 date, commentators, creditors, or other parties in interest had

18 said no way can this debtor make it through this proceeding.

19        We were attacked for not having sufficient corporate

20 authority.  So what did we do?  We affirmed it.  We ratified

21 it.  We were criticized for that, but we'll cover that.

22        What do debtors do?  They work with their unsecured

23 creditors' committee to try and find common ground for the

24 treatment of creditors, to try and find common ground to solve

25 problems, that's what we've done.  We worked with our

Summation - Garman                                          34

1  Creditors' Committee under the leadership of Mr. Neligan to

2  find a chief restructuring officer to provide the confidence

3  and transparency that the parties in interest told you they

4  lacked in this proceeding.

5          But on top of that, while we have spent literally 12,

6  14, up to 17 hours a day in this and other rooms working on

7  this trial, what did we do?  We went forth and put together a

8  plan.

9          Instead of preparing for closing argument all

10  weekend, Mr. Neligan and I spent that weekend with 76 of our

11  friends who constitute the Board of the National Rifle

12  Association.  They approved a plan; we're going to talk about

13  that plan.  We're going to talk about how it moves us towards

14  the end game, and moves us towards confirmation.

15          But what are we, as a debtor, doing?  We're showing

16  you not only how to get into bankruptcy, which is Part 2 of my

17  presentation, but we get out of bankruptcy as a reorganized

18  entity fulfilling the public policy set forth in the Code.

19          I speak once.  I speak in opposition to the motions

20  because the burdens of these movants are incredibly high.  The

21  presumption is on my side, and so I speak today, as I think I

22  ought to, in response to the arguments you heard, but more

23  importantly in an attempt to consolidate the evidence in a way

24  that respectfully I don't believe has been presented to the

25  Court this morning.

1          In the New York Attorney General and Ackerman's

2   brief, and in oral arguments, they promised you a great deal,

3   Your Honor.  I'm going to use -- forgive me here -- Your Honor,

4   I'm going to go through some of the citations of the Code, some

5   of the evidence, and tell you not only what you did hear, but

6   what you didn't hear.

7          In the State of New York's memorandum in support of

8   not only dismissal, but appointment of a trustee, they promised

9   you -- now this worked five minutes ago.  Your Honor, one --

10  this worked in preps; Your Honor, one second, please.

11          THE COURT:  Take your time.

12                        (Pause)

13          MR. GARMAN:  All right.  All right, there we go.  So,

14  Your Honor, in support --

15          THE COURT:  It's backwards on our screen, Mr. Garman.

16          MR. GARMAN:  Now it's backwards on your screen?

17          THE COURT:  Um-hum.

18          MR. GARMAN:  It showed up normal on mine.  How is it

19  now?

20          THE COURT:  Now it's right; thank you.

21          MR. GARMAN:  Okay.

22          Your Honor, in support of their motion, the U.S.

23  Trustee presented to you that they would provide a case of

24  pervasive illegal conduct that the National Rifle Association -

25  - I'm going to have to get used to doing this backwards.  Wow.

Summation - Garman                                        36

1  -- at the National Rifle Association when taken together

2  reflect a system of widespread misuse of assets by LaPierre and

3  his circle of insiders for their own benefit.

4          Your Honor, they indicated that they would provide

5  you a case in which LaPierre and his lieutenant syphoned off

6  tens of millions of dollars out of the NRA for their own

7  purpose.

8          Sir, respectfully, you heard that in opening, you

9  heard that in closing.  You did not hear a record in which tens

10 of millions of dollars were used for personal benefit.

11         You heard a record of a $1,700 necklace that was

12 donated to a charity that, in turn, returned $4 million.

13         You heard a record in which ice cream was purchased

14 for employees.

15         You heard a record in which Mr. LaPierre did go to a

16 luxury yacht, but he did not pay for that luxury yacht.  It was

17 not used by -- it was not paid for by the National Rifle

18 Association.

19         You have a record that is devoid of the arguments

20 that were advanced to you, the ones that they promised to show

21 you in support of not only a motion to appoint a trustee, but a

22 motion to dismiss.

23         They promised you a case in which tens of millions of

24 dollars would be missing.  They -- I've been involved in many

25 trustee motions, Your Honor, I've never, literally never seen a

1  trustee motion in which there wasn't missing money.  I've never

2  seen a trustee motion in which there wasn't a depletion of

3  assets that at the beginning of the case didn't ride through to

4  the end of the case.  Your Honor, I've been involved in trustee

5  motions in which there were overseas bank accounts.

6         There isn't even an allegation that you heard that

7  Mr. LaPierre did anything other than incur an excess benefit.

8  What is an excess benefit?  It's not illegal, sir.  An excess

9  benefit is one in which the IRS deems to be compensation for

10 the purpose of tax reporting.

11        You heard witnesses tell you that excess benefits

12 are, for all practical purposes, an account entry as it relates

13 to compensation.

14        There is no morality component to an excess benefit.

15 An excess benefit here was repaid.

16        Your Honor, post petition misconduct is the general

17 way in which we find ourselves to a trustee.  I certainly

18 acknowledge that 1104 contemplates that it can be prepetition

19 misconduct on the part of a debtor, but that isn't in practical

20 reality what happens to debtors.

21        Creditors, the U.S. Trustee, courts, they typically

22 look to see is the estate in danger?  Is the estate being

23 reduced by the conduct of this debtor?  And here, there is no

24 record.  And, in fact, it's pointed out as a reason we

25 shouldn't be in bankruptcy that the estate is secure and

1   growing.

2          To the extent that any party has a concern that this

3   estate might not be subject to transparency, might not be

4   subject to the types of restraints and controls that this

5   estate needs, that's why we have Mr. Robichaux here.

6          It's also why we have a CFO who, as of yesterday, Ms.

7   Rowling is now the elected treasurer of the National Rifle

8   Association.  She was that whistle-blower who came forward to

9   say "I have concerns" in the summer of 2018.

10          Of course, Your Honor, a trustee motion can be

11   brought under 1104 based upon prepetition conduct.  But that

12   isn't what -- that isn't what parties generally look to.

13          Other examples of extraordinary occurrences of what

14   you were promised was we have heard about $200,000 in Zegna

15   suits in the New York Times, we've heard about it in this case,

16   we heard about it the brief, and unbelievably, we heard about

17   it in opening statement.

18          Your Honor, Mr. Winkler, a witness for Ackerman

19   McQueen, fair to say a mortal enemy of the National Rifle

20   Association, was the first, but not the only, witness to tell

21   us the National Rifle Association did not, and has never, paid

22   for those suits.

23          This was information that has been known to the

24   parties for months, if not years.  But we repeat it as if it's

25   a fact, and we repeat it in argument today, Your Honor, in a

Summation - Garman                                            39

1  way that I'm troubled.  The Office of the United States

2  Trustee, I respect immensely, they sat through all the

3  testimony was what Ms. Lambert told you.  Yet she used this

4  fact for which there is no basis to suggest that a trustee

5  and/or alternative relief is appropriate.  And, Your Honor,

6  it's simply not the case.

7           Repeating in opening, repeating in pleading,

8  repeating in closing is not evidence.  And the evidentiary

9  record before Your Honor is incredibly limited.

10          Your Honor, there is suggested that you've been told

11 that we committed fraud by the filing of this action.  You've

12 been told that the way we stumbled into bankruptcy is not only

13 a basis to dismiss us, it's a basis for the appointment of a

14 trustee.

15          You have two Board members who say I was misled by

16 what was stated in the contract.  However, Rocky Marshall,

17 testified, and I'll bring this up in a minute, testified that

18 he thought there was plenty of authority that existed under the

19 January 7th authority granted to Mr. LaPierre.  Yet when we

20 come before this Court in an effort to solve what they say are

21 misgivings, you're told the Board didn't know, the Board was

22 misled, fraud was committed upon this Court.  These are the

23 arguments that literally went on for about 26 minutes, by my

24 measure, in the closing arguments this morning.

25          Yet there isn't a single Board member here before you

1  today, not a single Board member who suggests that this case

2  should be dismissed because there is a current lack of

3  authority.

4       The Fifth Circuit has said ratification under the

5  circumstances where appropriate is something that you can do.

6  We do not, for any moment in time, admit or acknowledge that

7  what the Board members believed to be true is that Mr. LaPierre

8  and the Special Litigation Committee, together had the

9  authority to file bankruptcy.  We did not push the members into

10 a untenable situation.  Your Honor, the vote was 44 to one with

11 three abstentions.

12      The movants would suggest to you the fact that they

13 contemplated refiling of the case is the fact for the

14 appointment of a trustee.  But that fact should speak very

15 clearly to the Court, which is the ability and authorization to

16 refile demonstrates that they weren't backed into a corner.

17 And if there was a technical misstep, they said we stand by the

18 decisions of our leadership, we stand by the authority that was

19 previously granted.  And to the extent that you call on us to

20 vote to file bankruptcy to protect the interest of the National

21 Rifle Association, we do so in a number that constitutes well

22 in excess of 95 percent yeas to nays.

23      Your Honor, we're like a family.  There are 76 Board

24 members, around that family table, those members do not always

25 see eye-to-eye.

Summation - Garman                                    41

1           Judge Journey, certain of the leadership that's been

2    elected, they clearly do not agree as to who ought to be

3    running the National Rifle Association on a day-to-day basis.

4    But there is no light, there is no crack between them on the

5    fact that they stand behind this filing as a way to protect the

6    interest of this unique organization.

7           In my opening, Your Honor, I promised you that you

8    would hear evidence of an irreplaceable organization.  Excuse

9    me, Your Honor.  I told you that you would hear evidence of

10   uncontroverted facts that the National Rifle Association is

11   more than what it has been portrayed to be.

12          In 150-year history, it has built institutions, it

13   has built programs.  I won't go into them in the length that I

14   did in my opening, I won't go into them in the length that I

15   did with Colonel Lee.  But this organization stands for a

16   mission:  It is to promote gun safety; it is to promote

17   security; and it is to promote freedom.

18          The uncontroverted evidence is that there is no one

19   who stands in the breach to replace the National Rifle

20   Association.  It has five million members.  It was suggested

21   earlier today that that is a detriment to the organization, and

22   not an advantage to the organization.  Your Honor, there is no

23   other Civil Rights organization of its size or scope.  Five

24   million members represents paying dues of one in 65 Americans.

25          We elicited testimony that we are growing; what does

1  that tell you?  That is evidence of the fact that there is

2  support, there is evidence of the fact that there is trust in

3  the membership for the leaders that they elect.

4        You heard uncontroverted evidence that the lobbying

5  efforts, what is now known to be, and believed to be the

6  mission of the National Rifle Association is but 20 percent of

7  its annual budget.

8        A million, a million people a year are trained in gun

9  safety coast-to-coast, 50 states.  That is not replaceable.

10 That is a national safety program for which, again, no one

11 stands behind us.

12       You heard about conservation efforts, you heard about

13 hunting, you heard about feeding eight million meals a year to

14 those in need.  You heard our efforts in law enforcement.  You

15 heard our efforts with national competitions, with national

16 championships.  I won't go into it but, Your Honor, you heard

17 about the community service that the National Rifle Association

18 Endowment Foundation has, which has distributed more than

19 $425 million to communities with which it partnerships.

20       You heard about scholarships.  You heard about the

21 women's Refuse to Be a Victim program; Eddie Eagle GunSafe, 32

22 million; our museums.

23       I will highlight the quarter million people who

24 gather as a community, as a First Amendment community, the

25 right to associate every year at the Great American Outdoor

Summation - Garman                              43

1  show.

2          The annual meeting, 80,000 people are scheduled to go

3  to Houston for our 150th anniversary.

4          But, Your Honor, you heard a lot in opening, but you

5  didn't hear a lot in testimony of things that suggest that

6  these programs aren't beneficial to the National Rifle

7  Association, and I'm going to highlight one because it was very

8  controversial until we got to this case, and that is the

9  Women's Leadership Program.  Your Honor, in the opening

10 statement, it was stated that you will hear evidence about Mr.

11 LaPierre's private chartered flights, not just for himself, but

12 for his family, and other insiders, and for vacations, and to

13 and for his wife's glam squad.  For instance, to be flown on

14 private jets or to vacation spots.

15         You did not hear that testimony.  You heard, in fact,

16 testimony from Colonel Lee and others, that the Women's

17 Foundation, that squad, raised $100 million of donations and

18 gifts for which there was a $4 million investment.

19         Your Honor, I asked you in my opening statement to

20 hold both of us to the facts which we identified you would hear

21 in this case.  And I stand before you to say that those

22 statements have not been supported.

23         In argument, you just heard an unsupportable record

24 that the Board members of this National Rifle Association do

25 not have control over the organization.  And you heard argument

Summation - Garman                                                    44

without evidence to suggest that the dismissal and appointment

of a trustee is supportable based upon their lack of control

over this organization.

        Well, what's the actual testimony you heard?  You

heard testimony from Board members Tom King, Sandy Froman,

Colonel Lee, Charles Cotton, and then you also heard testimony

from Judge Journey, Buz Mills, Rocky Marshall.  You heard

testimony from an incredibly strong group of people who do not

always agree.

        I'm going to point out again that Mr. Taylor, in his

closing argument, indicated that the bankruptcy was lawfully

filed, and that is the position of the universal group of Board

members.

        Well let's talk about Ms. Froman's testimony.  A

Stanford, Harvard educated lawyer who gave us a bit of a

seminar on what fiduciary duties in the context of nonprofits

constitute.  She gave extensive testimony as to why she trusts

Wayne LaPierre.  She gave testimony as to, when faced with a

difficult question that she needed resolved Mr. LaPierre said

go talk and look at the books, we're open, we're transparent.

That was the actual testimony of Sandy Froman.

        Can there be any doubt that that woman, that Past

President, that woman who was the first partner in the third

largest firm in California at its time possesses the ability to

stand behind her words and exercise fiduciary duties?  There

Summation - Garman                                    45

1  can be no question of that, Your Honor.  There was no

2  impeachment done on that point.  In closing arguments you

3  simply hear that nope, the Board didn't do its job, the Board

4  has never done its job.  We've repeated it so many times that

5  we want it to be true even though it's not.

6         Your Honor, you heard from Charles Cotton, the well-

7  respected Texas lawyer.  He's both a CPA and a lawyer.  He told

8  you, he's the First Vice President, he told you that he chairs

9  the Audit Committee.  He told you everything that the Audit

10 Committee did in the context of not only bringing the Court the

11 whistleblowers, but in the context of creating a culture

12 ensuring that we have the professionals that we need reviewing

13 the contracts.  Mr. Cotton testified at length as to all of the

14 things that that independent man and that independent committee

15 do.

16        Did you hear from an expert?  If I were prosecuting

17 that case I would have brought before you an expert to say the

18 Audit Committee didn't do its job, here are examples of

19 fiduciary duties that were not complied with.  You have no

20 evidentiary record other than speculation and conjecture for

21 facts that are missing for the conclusory statements that

22 fiduciary duties were not complied with.

23        We had a national treasure, Colonel Lee, come before

24 this Court, a war hero, decorated, to tell this Court that he

25 trusts the leadership of Wayne LaPierre.  He is in a better

Summation - Garman                                46

1  position than the speculation of the lawyers in this case.  He

2  came before this Court and told you with specific words that

3  had he lost the confidence, he lost trust in the judgment

4  wherefore with facts upon which evidence actually occurred to

5  oust Mr. LaPierre, he would do so.  But he said exactly the

6  opposite.  He said not only do I trust Mr. LaPierre, here are

7  the benefits for which he provides the Association.

8          We're going talk about the occurrences pre-2018.  It

9  is very, very true that we don't run from happened before 2018.

10 But Your Honor, we are safe, we are secure, we are a well-run

11 organization.  We have responsible new parties in place to

12 ensure that the transparency, the trustworthiness that the

13 Court and the parties require is here while we work in a very

14 finite period of time towards a confirmation plan.

15         Your Honor, you heard from Phil Journey.  Phil

16 Journey, he was in the minority.  Phil Journey doesn't have the

17 same opinion as most of the NRA Board Members.  But can there

18 be any doubt that as an incredibly strong man who understands

19 his fiduciary duties and works as the Boards to achieve what he

20 thinks is right?

21         The most compelling testimony I heard on the Board is

22 that it acts like Congress.  There are 76 of them.  There are

23 not 7, there are not 11.  It is not like most Boards.  You

24 heard testimony that they do not always agree, as you might

25 imagine, in an organization that has political opinions.

1          Your Honor, what has been used today as an argument

2   for the weakness of the Association is in fact its greatest

3   strength.  The disagreement that comes out of that room, that I

4   have now sat through for days on two separate occasions, the

5   strength of that room is its strong-willed disagreement.  It is

6   not the weakness of that room.

7          And to simply bring you conclusory statements in a

8   paternalistic fashion that say this Board can't be managing it,

9   they don't all agree, is not a basis for dismissal or for the

10  appointment of a Trustee.

11         Your Honor, I would be remiss and I wouldn't be doing

12  my clients a disservice but to remind you about not only this

13  current Board, but the long history of this Board and the

14  strength of the people who are there.  This weekend Mr. Neligan

15  and I spoke before that group.  We were grilled by Senators and

16  Congressmen, remarkably successful business folks, cross-

17  examined by a Judge, one we all know.  It is an intimidating

18  room of incredibly intelligent people who take their job

19  seriously and can agree you don't have a shred of evidence to

20  suggest otherwise.

21         I would move now to this organization, Your Honor.

22  If I were to describe in a vacuum this organization, one in

23  which has a $300 million budget, one in which has 1,100

24  creditors, more than 50 pieces of ongoing litigation, $40

25  million of unfunded future litigation, more than $100 million

Summation - Garman                                            48

1  of unliquidated claims which it disputes, $30 million of

2  secured debt, what would that organization sound like to you?

3  That sounds like a debtor.  It sounds like a debtor to me, Your

4  Honor.  We have the look, we have the feel, we are a debtor who

5  has a reason to be here.

6          I'm going to cover this issue about we filed

7  bankruptcy to get out of a piece of litigation in New York, but

8  it's not the case.  Your Honor, an incredible amount was made

9  in the closing arguments that these debtors impermissibly

10 transferred money amongst themselves because we don't care

11 about our fiduciary duties.  Sea Girt's money was transferred

12 for some misdeed.  Your Honor, that isn't the case.  You've

13 heard this.  You've heard this in not only the testimony of Ms.

14 Ryan, you've heard this in the context of our effort to get

15 bank accounts opened.

16         It was the United States Trustee who objected to

17 money being placed in a bank that did not have a sufficient,

18 hadn't been approved by this region's United States Trustee

19 program.  We couldn't get a bank because of the political

20 nature of who we are and the small amount.  We couldn't get a

21 bank that was appropriately on the list at that point in time

22 to open the money, to open an account, a DIP account.

23         So what did we do? we transferred it to the NRA

24 because they had a qualifying bank account that was in a US

25 Trustee-approved DIP account for this region.  That's being

Summation - Garman                                        49

1    used today against us to suggest without any evidence

2    whatsoever that we have breached our fiduciary duties.  I am

3    troubled by how far the evidence is being stretched for

4    illogical and impractical conclusions that aren't supported by

5    an underlying record.

6          I have never, and I think the world of these lawyers,

7    I have never sat through closing arguments in which I heard so

8    few attempts to take actual pieces of evidence and apply them

9    to the record that sits before the Court.

10          I'm going to turn to Chapter 2 now, Your Honor.  Your

11   Honor, this is, this is the most important thing I'm going to

12   tell you today because I'm going to show you under the

13   bankruptcy code why we are a proper debtor, why we are not

14   asking you to expand the rights of debtors.  And in fact, what

15   I'm going to show you through the words of Congress is that the

16   arguments being advanced by the New York Attorney General and

17   Ackerman are contrary to what Congress has given as clear and

18   explicit instructions.  And what's being asked of you is to

19   change the words of Congress for the purpose of limiting

20   debtor's ability quite to the contrary of what has been

21   asserted before Your Honor.

22          So Your Honor, your question.  I will be the most

23   recent lawyer to put your question up on the screen.  I had to

24   change a word, and I had to say effect of, and I had to put a

25   couple of parens in there to make sure I understood what you

1  were attempting to do.  And the answer to this question for the

2  benefit of the NRA as I read it, needs to be yes.  Yes, there

3  is room for us to enter bankruptcy even though there is an

4  alternative and parallel proceeding that is proceeding before

5  the Court somewhere else.

6        Your Honor, Congress has been incredibly thoughtful.

7  Congress has spoken with clarity and Congress has given us

8  instructions as to how we should move forward as a debtor

9  before this Court.  Your Honor, I'm going to walk through what

10 I think are some incredibly important components of the

11 bankruptcy code.

12       Your Honor, we begin with 301.  301 is how we get

13 into bankruptcy.  301 says, it doesn't give us a lot of

14 details, but it says a voluntary case may be commenced by

15 someone who may, in fact, be a debtor.  Well, that's not

16 particularly helpful, all we do know is helpful is what comes

17 in Section 109.

18       109 says debtors may include everyone with the

19 exception of railroads.  It can't include a domestic insurance

20 company, it can't include a bank, homestead associations,

21 credit unions, industrial banks.  In Section (f) it

22 contemplates family farmers may not be included as debtors only

23 to the extent that in Chapter 12 they qualify.

24       But there are some very important language in Section

25 109(c).  And that language in 109(c) specifically contemplates

1  the limited circumstances in which a state, and a state is

2  defined in Section 101 of the bankruptcy code, may limit the

3  ability of a debtor to file for bankruptcy.  In 109(c) it

4  contemplates that state may limit municipalities by an act of a

5  Legislature such that they cannot otherwise be debtors in any

6  case before the Court.

7        109, I'm sorry, 903 codifies this component and it

8  reserves state power for the control of municipalities.  Your

9  Honor, that's reasonably helpful for the process.  I think that

10  black letter law as we know it all stands for the proposition

11  that nonprofits can be debtors.  That issue, and I forgot the

12  name of the case, but that issue was solved decades ago.

13        Nonprofits qualify to be debtors.  So there must be

14  some other reason that is being argued for which we cannot come

15  before this Court.

16        The second piece of useful information that is

17  provided by Congress is Section 106, the waiver of sovereign

18  immunity.  Congress has specifically identified circumstances

19  in which they're going to protect the interest of states and

20  ensure that they're not waiving sovereign immunity by

21  participating in this process.  Importantly Sections 1104 and

22  1112, Trustees and dismissal, those don't constitute a waiver

23  of sovereign immunity.

24        You will not hear me or this argue that by

25  participating in this process the State of New York, the

1   District of Columbia have waived any of their otherwise

2   important sovereign rights by participating in this process.

3   But here's where it becomes vastly more important, Your Honor.

4   The consistency at which Congress speaks when it comes to

5   alternative and parallel proceedings.  When we filed

6   bankruptcy, Your Honor, might now be a good time to take a

7   break?

8            THE COURT:  No, thank you.  Somebody is sending,

9   getting me some water.  Thank you.

10            MR. GARMAN:  So Your Honor, the automatic stay.  The

11  automatic stay under Section (b)(4) is very clear, and it

12  clearly says as well all know that police powers and regulatory

13  powers are not stayed by the bankruptcy case.  We have not,

14  will not come before this Court and tell you that the New York

15  Attorney General proceeding has or is stayed.  Congress told us

16  how to deal with this.  It is a parallel proceeding for the use

17  of a regulatory or a police power.

18            We have not come before this Court and suggested that

19  the stay extends to that proceeding.  It, Your Honor, is

20  ongoing.  So the argument that you have, that you're being

21  asked to establish a dangerous precedent to deny states of

22  police power or regulatory proceedings rings hollow.

23            The idea that we are being asked, that you are being

24  asked to set new precedent to say oh, oh, nonprofits should

25  file bankruptcy to get out of regulatory proceedings is not

Summation - Garman                                         53

1   supported by the acts and conduct of this debtor.

2           You cannot read 362, though, without also reading

3   726.  726 identifies for the Court and the parties how we are

4   to distribute property in the context not only under Chapter 7

5   but in the context of a plan brought before this Court.  And

6   specifically (a)(4) is the provision for which I'd ask the

7   Court to focus.  (a)(4), Congress tells us fourth in the

8   priority scheme is the payment of allowed claims whether

9   secured or unsecured for a fine, a penalty or a forfeiture.  It

10  goes on to say that to the extent such fine, penalty,

11  forfeiture or damages are not compensation for actual pecuniary

12  loss suffered by the holder of such claim.

13          Your Honor, there probably isn't outside of the

14  argument I'm going to make a more important component than

15  showing the synergy of the holistic approach that Congress has

16  brought.  Congress has said move forward without the imposition

17  of the stay to permit a state regulatory or police power to

18  proceed to judgment as it sees fit.  But then under 726 you are

19  obligated to bring that proceeding back to this Court for the

20  treatment either under distribution of property in the state

21  under Chapter 7, or in the context of what we as this debtor

22  are doing, is filing a plan.

23          Yesterday we filed this plan.  This plan does a

24  number of very important things.  Your Honor, this plan moves

25  us to Texas.  This plan, by the way, is not before this Court.

Summation - Garman                                                  54

1   This plan moves us to Texas.  This plan contemplates the

2   payment of unsecured creditors in full.  This plan also does a

3   couple of other important things.  One of them is to improve

4   our governance, if it is completed.

5            But what can't be lost on this Court is that there

6   are claims in Classes 6 and 7.  Class 6 is the New York

7   Attorney General claim.  We are proceeding exactly as Congress

8   told us, which is the New York Attorney General gets a claim

9   and get treatment under a plan for the independent parallel

10  proceeding that is not stayed, that is continuing forward in

11  New York.

12           The New York Attorney General will be forced, they

13  will be forced to acknowledge that we haven't sought to stay

14  their action to dissolve the NRA, they will be forced to

15  acknowledge that they have to argue that our plan is

16  unconfirmable under one of the provisions of 1129.

17           The most important thing I can say at this point,

18  Your Honor, is that that is not before the Court.  The New York

19  Attorney General and Ackerman, and I say this with as much

20  respect as I can muster, the question you posed to us in

21  certain ways conflate the entry into bankruptcy with the exit

22  from bankruptcy.  The entrance go bankruptcy is governed by 109

23  and 301.  The exit of bankruptcy at least in a Chapter 11 is

24  governed by 1129.

25           You cannot prejudge, except to the extent it goes to

1    good faith, you cannot prejudge the 1129 standard for the

2    purpose of determining eligibility under 109.  But that's

3    exactly what the New York Attorney General and Ackerman attempt

4    to do, is to conflate the entrance and the exit.  And I fear to

5    a certain extent that the question posed by the Court has an

6    assumption in it, and I like all those am probably reading too

7    much into Your Honor, you told us to be careful about that, but

8    I am very worried that the assumption built in your question is

9    whether or not the public policy reasons that govern 1129 and

10   the exit and a successful plan which provides for treatment as

11   Congress told us has been conflated with the doorway into

12   bankruptcy.

13           Your Honor, on the issue of 1129 there is an

14   incredibly infrequently used section that I'd like to point the

15   Court's attention to, and that is 1129(d).  I don't remember

16   the last time I cited to 1129(d), but 1129(d) says a bankruptcy

17   court shall not confirm a plan over the objection of a

18   governmental unit to the extent that such plan impacts a tax

19   issue, the avoidance of a tax issue, or Section 5 of the

20   Securities Act of 1933.

21           The critical component of this, Your Honor, is

22   Section 5 of the Securities Act of '33 is a police power.

23   Congress gave us language that said in this instance of a

24   police power bankruptcy courts cannot confirm a plan.  They

25   deliberated, they spoke, they're not silent.  And for the

Summation - Garman                                56

1  Ackerman and New York Attorney General argument to ring true,

2  you must rewrite not only 109, not only 726, not only 362, you

3  have to rewrite 1129(d).

4          There is no answer that they can give you other than

5  to acknowledge that Congress spoke of when a plan cannot be

6  confirmed when it deals with the police power of a governmental

7  unit.

8          So where does that leave us?  If Your Honor agrees

9  with the debtor's position that we are qualified to enter

10 bankruptcy we're held to the fire, the transparency, the

11 process, the time lines that Chapter 11 governs for us.  The

12 New York Attorney General is permitted to proceed on their own

13 time line.  We are obligated and it's our burden to propose a

14 plan consistent with the fourth priority identified in Section

15 726.

16         And do you know what we'd fight about, we'd fight

17 about the provisions of 1129 for which we have a burden.  We'd

18 probably (a)(1), we'd probably fight about (a)(2).  (a)(3) is

19 where the case law stands on this point, which is if they can

20 muster a case to demonstrate that this is a litigation tactic

21 then it's an (a)(3) issue and we can't confirm a plan.

22         The code tells you you actually can't convert a

23 nonprofit to a case under Chapter 7, and so it's my experience

24 that bankruptcy courts when faced with nonprofits deny without

25 prejudice motions to appoint Trustees, deny without prejudice

Summation - Garman                                    57

1  motions to dismiss cases and say I'm going to see if the debtor

2  can confirm a plan under its burden.

3       Once in my life have I thought about an 1129 (a)(5)

4  issue.  I have every reason to believe that if there are

5  concerns of this Court and there remain concerns of the

6  Committee or other parties we'll have a fulsome debate, an

7  evidentiary fight under 1129(a)(5).  And unlike the proceeding

8  before you today that 1129(a)(5) proceeding will be one in

9  which we, Mr. Neligan and I, carry the burden.

10      Judge Markell taught me that the door and access to

11 bankruptcy has been expanding throughout the years.  There are

12 a bunch of cases in the '30s and '40s, U.S. Supreme Court cases

13 in which sought to restrict the access to bankruptcy courts.

14 With the passage and implementation of the Act in '78 that slow

15 process has continued to expand.  We have ipso facto

16 provisions, we have all of the lines of case of recent years in

17 which we say special purpose entities with independent

18 Directors who don't have fiduciary duties aren't going to be

19 counted when determining whether there has been corporate

20 authority.

21      Your Honor, definitely not on point, but I think that

22 your decision from 2004 in the State Park Building Group stands

23 for that momentum of cases in which the doors to bankruptcy

24 continue to get wider and more open instead of more

25 restrictive.  States have attempted to limit the access of

Summation - Garman                                    58

1  bankruptcy to companies in good standing or companies that have

2  not been otherwise dissolved.

3        The cases don't stand for that proposition.  The

4  cases stand for the proposition that there is preemption on

5  this point.  It is the constitution in, I think it's Article 6,

6  Section 8, in which there's to be a uniform bankruptcy code

7  throughout the country, which is our Act.  Preemption flows one

8  direction under the supremacy clause.  Preemption flows that

9  the Federal Government preempts state law.

10        The argument before you today is that if a state

11  takes an action to seek dissolution of a nonprofit, that that

12  somehow preempts Section 109, it somehow preempts the filing

13  under 301.  The tried to disguise it in the context of a motion

14  to dismiss under 1104 but the very heart and soul of the

15  question that the New York Attorney General brings to you is

16  whether or not we qualify for a bankruptcy because of the fact

17  that we have a dissolution case against us.

18        And I stand here incredibly certain, Your Honor, that

19  the advocacy that has been framed before you is that we as a

20  debtor are trying to make this the Boy Scouts paradigm that I

21  wrote down, that we're trying to create a new, a new non-

22  codified set of rights for nonprofit debtors facing

23  dissolution.

24        And I understand the superficial appeal of that.

25  This is a novel case.  I wasn't hired until after the petition

Summation - Garman                                            59

1  date but I believe that the strategy that Mr. Neligan and Mr.

2  Brewer, their teams employed in looking at creative remedies to

3  solve the National Rife Association's problems were out of the

4  box.  They were creative.  It's good lawyering.

5          Just because we have a checklist of how a single

6  asset real estate case works doesn't mean that's the limit of

7  what the tools that Congress has given us.

8          A question of access to Title 11 is not to be

9  confused with an 1129 analysis.  The movants have prejudged our

10 ability to obtain treatment.  They have prejudged the

11 confirmability of our plan under 1129 and candidly brought over

12 their skis because 1129(d) specifically contemplates what

13 they're missing, which is Congress saying we're going to let

14 the states close down the route to confirmation for a limited

15 number of police powers.

16         At its core I stand before you for the proposition

17 that Attorney General James cannot preempt your jurisdiction,

18 she cannot preempt Title 11 simply because she has used the

19 words dissolution in the lawsuit.  There's no doubt that if

20 that case had been commenced seeking a monetary fine or a

21 penalty instead of dissolution we would fit squarely under 726.

22         But the movants contend because the remedy they seek

23 contains the word dissolution the door has been closed, and

24 that is nothing short of state preemption, which is a concept

25 that has never existed on any point.

1        I ask you to have the movants respond to this in

2   their rebuttal because there is no answer other than to frame

3   this as state court preemption under the supremacy clause.

4        So Your Honor, I'd like to bring this back to your

5   question one more time.  Your question also, Mr. Strubeck

6   discussed this, contains an issue that I think has been

7   improperly placed before the Court in a confusing fashion.  The

8   closing phrase of your question, Your Honor, assumes that the

9   judicial (indiscernible) that takes place in New York is a

10  judicial determination in which the legal standard to be

11  applied by a court takes in the best interest of the public.

12       Mr. Strubeck told you that that's not the case.  He

13  in certain respects stole my thunder.  Under 1101 of the New

14  York Actions for Dissolution the corporation has exceeded its

15  authority or has violated any provisional or by its forfeited

16  its charter is the basis by which an action is commenced, and

17  then as Mr. Strubeck identified, it is a discretionary standard

18  for the Judge to, by the way, it's a Jury trial, this is a Jury

19  trial, to determine the life or death of dissolution in New

20  York to the NRA in a test that does not contemplate the best

21  interest of the public but instead simply puts before the Court

22  whether this entity exceeded its statutory or chartered power,

23  and then using the discretion of the Court.

24       Your Honor, one last component that I would like to

25  highlight is that Congress told us also the effect of

Summation - Garman                                           61

1   confirmation.  Congress tells us how a claim, how a treatment,

2   how a plan implicates how we got there.  To say this is

3   probably among the most fulsome, wide spectrum components of

4   how Congress has spoken to an issue, I don't think is an

5   understatement.  Section after section after section, 109, 301,

6   726, 1129, 1441, Congress gives us the roadmap of exactly how

7   you deal with this specific case, this specific fact pattern.

8            Does it use the word dissolution?  Of course it

9   doesn't.  But it's a remedy, it's a plan process, it's

10  confirmable.  We have that fight on another day.  We don't have

11  that fight before Your Honor today.  It would be premature to

12  do so.  But this code, this collective statutory scheme is one

13  in which we can and will deal with police powers.

14           So that leaves us with a fight under 1129 if and when

15  this Court chooses to take up our plan.  It leaves us with what

16  will be I believe one of the most interesting confirmation

17  hearings I've ever participated in.  In addition to 1129(a)(5),

18  which we really rarely ever fight about, we're going to talk

19  about (a)(13) in the context of the PBGC.

20           But Your Honor, this sort of closes out, this does

21  close out my Chapter 2 in my tour of the code sections that

22  specifically permit us and this debtor to solve our problems in

23  the way that we have.

24           It's probably a good time if the Court sees it fit to

25  take our break, and when I return to present Section 3, it will

Summation - Garman                                    62

1  be to demonstrate to you that the law on 1129 and 1104 and the

2  fundamental misunderstanding of what it means to dump New York

3  and how those are implicated under those two sections.

4          THE COURT:  Thank you.  Why don't we just take a 10-

5  minute recess because I know we're going to take a second

6  break, so let's take 10.

7          (Recess at 2:32 p.m./Reconvened at 2:43 p.m.)

8          THE COURT:  Ready, Mr. Garman.

9          MR. GARMAN:  Are you ready for me to start, sir?

10         THE COURT:  I'm ready.

11         MR. GARMAN:  Yes.  So, next I would like to turn to

12 the specific request for relief under 1112 and 1104.

13         Originally I had these separated but after opening

14 argument it became clear through the words of Counsel, that

15 they are using the same facts for the application of statutes.

16 And, so, I'll do them both at the same time.

17         So let's begin with dismissal, Your Honor, under

18 1112.  It's almost, well since 1978 it has been black letter

19 law that insolvency is not a requirement under 109 to file

20 bankruptcy.  So all of those statements, all of those

21 statements in the openings by both movants was to file a

22 bankruptcy you must have a debt problem.  That is not the case.

23 I'm going to tell you the public policy that we seek to base

24 our reorganization on.  It is in part financial, but it is

25 certainly in large part, if not a larger part something else.

1        Let me begin with the financial component.  The

2 Committee has told you about executory contracts for which they

3 have a concern.  That is incredibly important because when the

4 movants say to you, there's enough money to pay the creditors

5 in full they mean if we liquidate the company it's restricted

6 assets, it's building, we cease its operations fire 450 plus

7 people and close down all the programs I talked about might

8 there be enough money to pay the creditors, yeah, only if you

9 don't include the disputed contingent unliquidated creditors.

10 Ackerman McQueen last demand $100 million.  We have secured

11 debt of $40 million.  We have 40 plus pieces of litigation.

12 There is no evidentiary record before Your Honor, other than

13 the conclusions that says here's the math as to how we have the

14 ability to pay our debts.  Those conclusory statements are not

15 and should not be enough.

16        So we'll start where they want us to start, which is

17 1112(b), that's not going to be the only section of the code

18 B1, that we walk through.  And let's talk about (b)(1).  That

19 section, does in fact say shall dismiss to the extent that

20 certain instances are found, and those are codified.  There

21 are, the burden, there's a burden to demonstrate that we have

22 not filed this in good faith, and it doesn't shift, there's all

23 the cases that talk about whether it shifts or not, but I want

24 to talk about B4.

25        Your Honor, dismissal as Congress told us for cause

Summation - Garman                                                      64

1    is described in 1112(b)(4) for which there are 16 codified

2    elements.  I will not stand before Your Honor and suggest that

3    it is an exclusive list, we all know that it is a non exclusive

4    list, but it is an incredibly fulsome list.  The examples and

5    subject matter of which cannot be disregarded by the Court.

6    And how many of those 16 elements for cause, do we satisfy that

7    would be the basis for dismissal.  Exactly zero.  Exactly zero.

8              Substantial or continuing loss, or diminution of the

9    estate.  That's the first one.  I won't go through all 16 of

10   course.  But the movants argue that the fact that we don't have

11   diminution of the estate and the fact that our finances are

12   growing is cause for dismissal.  I highlight that because of

13   the incredible irony of suggesting that the opposite of what

14   the statute stands for should be the basis for dismissal.

15             B2, I want to talk about this one also, because it

16   talks about gross mismanagement, but what's left out of the

17   discussion is of the estate.  This is where the predominate

18   component of what Congress told us to look for is postpetition

19   conduct.  Of course the statute says, particularly in the

20   context of 1104, plea or postpetition conduct, but in the

21   context of dismissal it's gross mismanagement of the estate.

22   We all know that an estate cannot exist on a prepetition basis.

23             Unauthorized use of cash collateral, we do not have

24   that.  I want to be clear on this for the record, Your Honor,

25   they have alleged that we misused estate funds by shifting them

1  from one debtor to the next, but I don't want this Court to

2  conclude that those funds constitute cash collateral which

3  could be the basis of a (4)(d) component.  We didn't fail to

4  comply with orders of the Court, we didn't fail to attend our

5  341, we haven't failed to pay our taxes, we haven't had a

6  confirmation order revoked as contemplated by subsection L. We

7  haven't been unable to to effectuate a plan -- we are actually

8  moving successfully towards all of these components, non

9  exclusive list.

10         So what do they talk about?  They talk about the fact

11  that the way we, I don't know whose word it was, it might have

12  even been mine, stumbled into bankruptcy, without clear lines

13  of communication.  Dismissal bears a burden that is upon them

14  to demonstrate that we did not file in good faith.  The simple

15  fact that we did not tell all of our management team is not the

16  basis of dismissal.  Much of what you heard was the

17  substitution of the movants business judgment or the judgment

18  that we should have.  Particularly Counsel to Ackerman.

19  Counsel to Ackerman argued for a pretty long period of time

20  that New York Courts are fair, we can get a fair shake, we

21  should do this later, our description of weaponization are

22  improper.

23         All of those things are attempting to ask this Court

24  to say replace the reasonable business judgment of the debtor

25  in selecting to file for Chapter 11 with what we believe to be

1  more reasonable elements and components.  Well that's not the

2  case.  The test isn't in the eyes of the Judge, was it a

3  reasonable exercise of business judgment to enter into

4  bankruptcy.  Quite to the contrary they have a heightened

5  burden of demonstrating that we did not file in good faith.

6  We talk about the couple instances of good faith in a

7  minute, because they really do come down to a misunderstanding.

8  I do want to talk about the standard a little bit further.  I

9  wouldn't be doing my job if I didn't remind the Court of the

10  case law that says you should not lightly infer a lack of good

11  faith and you should utilize your powers of dismissal only in

12  egregious cases as the <u>Lackawanna</u> I'm sure I butchered that,

13  case tells us.  The <u>Cedar Shore</u> case tells us that good faith

14  implies an honest intent and genuine desire on the part of a

15  petitioner to use the statutory process to effectuate a plan of

16  reorganization and not merely as a device to serve some

17  sinister or unworthy purpose.

18  I'm going to talk about the factual record of why we

19  filed this bankruptcy and it is vastly broader than simply

20  trying to get out of a piece of litigation which is the New

21  York Attorney General's case.

22  Parallel Paths, that case is proceeding but we filed

23  a plan consistent with the case law, consistent with what we

24  are obligated to demonstrate to you as a debtor that we intend

25  to do to get out of bankruptcy.  And I want to highlight five

Summation - Garman                                                67

1    things, which are contained in out plan.  I actually want to

2    highlight six, really important six, and it came it up in Mr.

3    Mason's argument.  Repair creditors in full.  We are going to

4    provide -- for treatment for the New York Attorney General and

5    the D.C. Attorney General, I think one of them will be a lot

6    simpler than the other and that the D.C. Attorney General has

7    already consented to the jurisdiction of this Court by filing a

8    proof of claim, in fact an amended proof of claim for monetary

9    claim came in while we were in this case today, (indiscernible)

10   to Texas.

11            Why do we want to move to Texas?  The argument was

12   advanced with no evidentiary basis that we have no ties to

13   Texas, that's not the case.  Nearly ten percent of our members

14   live in Texas. It's the State where we are.  It's the State

15   where we can grow, it's the State that we seek to have a First

16   Amendment association.  And I mean Capital A Association in the

17   context of that Constitutional right.  What greater public

18   policy could be served than the protection of first amendment

19   rights, both of free speech that we believe are being infringed

20   upon and the right to associate the way that the First

21   Amendment contemplates it.

22            We spent this weekend talking about that plan.  We

23   also want to improve our governance.  When the Court takes up

24   the issue of our plan, he makes specific tangible proposals to

25   improve our governance.  Please do not take that as a

Summation - Garman                                                68

1  concession or an admission that our governance is not

2  sufficient to withstand these motions but this organization

3  like all organizations can be better.

4          I've got two notes here, I need to talk about.  It

5  was stated boldly stated several times without support that the

6  reason we filed bankruptcy was so that Mr. LaPierre could

7  protect himself from a New York State proceeding.  In addition

8  to lacking any support or authority from an evidentiary record

9  from that perspective, it also is inconsistent with the facts

10 of this case.  This debtor did not seek to stay the New York

11 Attorney General action in any way.  We did not seek a 105

12 injunction to stop Mr. LaPierre from being pursued as an

13 individual.  And most importantly, you will not find in our

14 proposed plan, not only will you not find a channeling

15 injunction, you will not find a release for prepetition conduct

16 by any individual.

17         This is a plan in which the right thing to do is to

18 come before this Court and say, yes of course we are going to

19 ask for a postpetition release of claims that would otherwise

20 constitute administrative claims, but most plans contain

21 prepetition releases and we are not going to ask for that.  We

22 didn't ask for that.  Whatever the claims against Officers,

23 Directors, third parties might be on a prepetition basis they

24 still are.  There is no implication in the New York Attorney

25 General's action against an individual Mr. LaPierre, Mr. Frazer

1  there's no ability -- I'm sorry, there's no attempt on our part

2  to shield any individual or this debtor from the reach of that

3  action.  And those statements that this bankruptcy was filed

4  with a purpose of protecting Mr. LaPierre are not supported by

5  the record before Your Honor or our conduct as a debtor.

6        Your Honor, all you heard is the language about shall

7  under 1112 but there is an alternative again there's an

8  alternative provision to 1112 that the movants completely

9  ignore and that section is 1112(b)(2), in which the shall

10 language flows the other direction.  This language says that

11 the Court may not convert a case under Chapter 7 or dismiss a

12 case if the Court finds it specifically identifies --

13 (indiscernible) too excited in my presentation but it's not

14 shall that you have to (indiscernible) or convert us -- you

15 can't convert us because of the other statutes but it shall

16 can't convert us if you find unusual circumstances.  Everyone

17 who has stood before you today, Your Honor, has said this is

18 either the most important case that's ongoing in the Country --

19 Your Honor, I've lost you a couple of times on the video can

20 you still hear me?

21       THE COURT:  I can hear you, you are coming out a lot

22 better.  You broke up just a little bit, just about one minute

23 ago.  But I can hear you now.

24       MR. GARMAN:  Okay, I think I lost everybody.  So not

25 to be repetitive but 1112(b)(2) says you shall not dismiss us,

Summation - Garman                                    70

1  if you find unusual circumstances or that it would benefit the

2  public if, when you find them.   There's a really interesting

3  and persuasive case that is a Judge Lynn case and it is <u>1701</u>

4  <u>Commerce LLC</u> it's a 2012 case found at 477 BR 652. And in that

5  case, Judge Lynn found bad faith on the part of the debtor in

6  filing a Chapter 11 case.  But I'm going to read directly from

7  the case.  "For the above reasons, the court concludes that

8  Debtor filed its chapter 11 petition in bad faith. While this

9  would in most cases warrant granting one of the Motions, the

10  court recognizes that in the case before it, the Property has

11  significance for other parties whose interests deserve

12  deference from the court. As with any chapter 11 case, the

13  court must consider the legitimate interests of others in

14  deciding whether to grant either of motion." And in the

15  conclusory language, Your Honor, Judge Lynn says; I find bad

16  faith, on the part of the debtor in the filing but I choose not

17  to dismiss the case under 1112(b)(2) because the code says I

18  shall not in instances in which there are unusual circumstances

19  and not dismissing is "in the best interest of creditors and

20  the estate."

21         Your Honor, I don't believe there are grounds to

22  dismiss us but I believe there have been merely admissions by

23  the movants and other parties in this case, that this is the

24  most unusual of circumstances in which the constitutional

25  protections not only of the members but of the public.  And the

Summation - Garman                                           71

1  reason I developed that perhaps to link the evidentiary record

2  about all the important programs that the NRA has and all the

3  people the million plus people who we touch every year, the --

4  some much judicial and witness time on that point is because

5  this is the most appropriate case I have ever encountered and

6  it relates to an 1112(b)(2) analysis for unusual circumstances

7  in which the best interest are taken in a more fulsome and

8  holistic approach.

9       Your Honor, if you find that my argument was

10 persuasive and that there are unusual circumstances -- not only

11 in our programs but in the advocacy that we have under the

12 Second Amendment also the advocacy that we have under the First

13 Amendment in both the components of free speech as well as

14 association -- I stand before you to propose that the code says

15 you shall not dismiss our case.

16      I want to turn to 1104 next Your Honor.  1104 from a

17 legal perspective, we all know what it says, cause including

18 fraud and dishonesty, incompetence, gross mismanagement --

19 fifth circuit, huge burden.  Fifth Circuit tells us

20 extraordinary remedy that's the matter of Cajun Electric Power

21 draconian remedy the Petman Drilling (phonetic) case tell us

22 that, strong presumption in favor of the debtor Adelphia tells

23 that, Patel Association (phonetic) is persuasive on this also.

24      There's also really strong Legislative history and I

25 would encourage the Court not to ignore the Legislative history

1  that talks about the public policy of rehabilitation in general

2  and how existing management, not the appointment of a trustee

3  is the most "most effective" under current management who are

4  familiar with the operations of the business involved.

5          Your Honor, at the meeting that I attended over the

6  weekend, one of the past presidents, he told me a story about

7  how the NRA doesn't have widgets, we don't sell goods or

8  services, we don't sell a product.  What we sell are the hopes

9  and dreams of freedom and that's what the National Rifle

10 Association stands for.  And the simple fact is, is that the

11 public policy for allowing management to pursue its mission, I

12 literally cannot think of an organization other than a civil

13 rights organization like ours, in which that public policy

14 component could even remotely stand up to what Congress

15 identified.

16         This burden is incredibly high, preponderance of the

17 evidence, but it gets higher when you take into account that

18 the, that the Legislative history tells us to look at the

19 underlying public policy.  And I stand here before you, to tell

20 you that I believe this is balancing component.  The higher and

21 more important, the public policy is, this debtor engages in,

22 the higher the burden must be for the appointment of a trustee.

23         I don't want to say, I don't want to be imprecise and

24 I say this without hyperbole, but this is the weakest record, I

25 have ever encountered on the area of the appointment of a

1   trustee.  I stood before you in the opening and told you there

2   would be cringe worthy facts.  Those were delivered.  Candidly,

3   I don't think that the record was particularly fulsome, but

4   does anyone ever want to hear about their CFO taking the Fifth

5   Amendment; of course not.  Does anyone ever want to hear that

6   we didn't comply with our internal policies as well as we

7   could; of course not.  The simply fact is, we had our own

8   course correction.  Why did we have our own course correction

9   because there were circumstances in which it became best

10  business, exercise of fiduciary duty to make that course

11  correction.  But it is old, it is cold, it is stale, it has

12  been cured.  And the burden cannot be met.  And I again,

13  contend, Your Honor, that I know the statute talks about

14  prepetition and post petition conduct, but it is not my

15  experience that prepetition conduct in things like, we didn't

16  fill out our internal forms correctly or we had to repay a tax

17  benefit.  Those aren't the sort of things I've had experience

18  in the appointment of a trustee.  I've had experience when

19  there are foreign bank accounts, I've had experience when

20  there's missing money, appointing a trustee.  I was involved in

21  a case in which actual live gun fire was the basis for the

22  appointment of a trustee, you know which is sort of ironic

23  here, but those are the bases, those are the extreme examples

24  of the things that constitute the appointment of a trustee.

25          The testimony of Col. Lee, I think is of particular

1    importance when it comes to the issue of a trustee.  We

2    listened to testimony at length about the bond that is the

3    basis of the connection between the National Rifle Association

4    and its members.  The fact that money is donated because our

5    members and not just our members those who donate money to the

6    cause, the mission and the programs, they do it because there

7    is trust.  Mr. Robichaux, he testified to an often forgotten

8    point of fiduciary duties which is a fiduciary has to have a

9    fiduciary obligation to the mission.  How hard is it to imagine

10   a scenario in which a US Trustee could assume the obligations

11   of our mission, which in part is to advocate in a way that is

12   often contrary to its own Department of Justice policies

13   relates to the scope of the Second Amendment.

14          That bond cannot be broken, Your Honor. Mr. Strubeck

15   and I coordinated our arguments for efficiency before we both

16   argued and we agreed that he would predominately lead the

17   advocacy as it relates to the examiner motion and the motion

18   for a CRO.  But I do need to stray into the CRO component here

19   for a bit.

20          The reason that the scope of duties was thoughtfully

21   put together the way that it was to be presented to Your Honor

22   is that we had to walk this balance.  The members, they are

23   unlikely to continue to support the mission of the organization

24   to the extent they believe the mission related objectives, the

25   Second Amendment advocacy, the arguments before the U.S.

1  Supreme Court, the message, the membership is in the hands of

2  someone they did not elect.  That's why we broke into

3  components, that's why we broke it into a mission component,

4  and a business operation component.  But the comfort level, the

5  comfort level that this estate, these parties in interest

6  should experience should be the same.  And the reason should be

7  the same as, Mr. Schroop is in charge of the money, all the

8  money, he's in charge of treasury, he's in charge of legal,

9  he's in charge of finance.  Ms. Rowling reports to him.  The

10  simple fact is, this CRO motion is incredibly thoughtful in the

11  way that it's tailored to this particular debtor to achieve the

12  maximum ability to reorganize yet give the constituency, --

13  which Mr. Strubeck is right, he and Mr. Drake, they were the

14  factor that pushed us towards reengaging a CRO moving towards a

15  position of compromise, because that's what debtors do.  It is

16  my job, it is Mr. Neligan's job, what do we do, we solve

17  problems.  Getting this debtor on board with its own secured

18  creditors committee is the next domino towards plan

19  confirmation.  Lots of steps to be had.  But this is what

20  experienced bankruptcy lawyers do, to drive us through the

21  public policy which is confirmation at the end of the day.

22          So where does that turn, Your Honor?  I do need to

23  talk about the course correction.  I do need to talk about the

24  actual evidence that's in the record.  I need to talk about

25  good faith and I think that, I think that I'm going to be done

Summation - Garman                                          76

1  well short of the time that's been allocated to me.  But I do

2  want to talk about the evidentiary record.  And I would begin

3  with in the late days of 2017, Attorney General Schneiderman

4  that's the call.  We heard the words Attorney General

5  Schneiderman called Tom King, I don't know how many times we

6  heard that in this trial, but it is the catalyst that began

7  this process of how we got here today.  And it is the catalyst

8  that I believe will ultimately be successful when we confirm a

9  plan.

10        In those late dates of 2017 sitting Attorney General,

11  a democrat, which is mildly relevant to this discussion as it

12  relates to good faith, it isn't mildly relevant, it is

13  relevant, calls Tom King a board member.  We know this from Tom

14  King's April 21 testimony page 17, line 172.  We hear his

15  testimony that, and I'm paraphrasing here, but we hear his

16  testimony that the wheels of Government have been put in motion

17  for the purpose of silencing the National Rifle Association.

18        This is incredibly important and it's been conflated.

19  The movants would tell you that the only reason that we are

20  here, is because we are trying to flee an existing litigation

21  case.  But that's not what the evidence was before the Court.

22  It's very skillful advocacy but the evidence before the Court -

23  - Yes we used some language that I wish we hadn't used, which

24  is dump New York, it's true, it's honest, it's probably not the

25  language that a lawyer would want to have to advocate in front

Summation - Garman                                      77

1    of Your Honor.  We used the language that we want to dump New

2    York.  Does that say or mean that we want to dump New York for

3    the purpose of getting out a piece of litigation for the

4    purpose of a litigation strategic benefit in that litigation?

5    Of course it doesn't.

6            The evidence before the Court was vastly broader than

7    that.  And we admitted a bunch of -- we admitted a bunch of

8    evidence the Court hasn't actually seen yet, which I think is

9    incredibly relevant on this point.  Hold on.

10           So I want to begin with NRA Exhibit 663 which was

11   admitted and it's Exhibit 663 and it begins on page 47.  This

12   is a memo on New York State Letterhead, dated April 19th, 2018

13   in which Governor Cuomo directs the Department of Financial

14   Services to urge companies to weigh the reputational risk in

15   business ties to the NRA.  Here is what's really important in

16   this, is that, this is First Amendment stuff.  New York may

17   have the strongest gun laws in the Country but we must push

18   forward to insure that gun safety is a top priority for every

19   individual company, organization that does business across the

20   State, Governor Cuomo said.  I am directing the Department of

21   Financial Services to urge, insurers and bankers statewide, to

22   determine whether any relationship they may have with the NRA

23   or similar organizations sends the wrong message to their

24   clients and their communities who often look to them for

25   guidance and support.

Summation - Garman                                78

1          There's a couple of subtle things in here, Your

2   Honor, that are so critically important to our move that I'm

3   going to draw them out because they can't be lost.   Did

4   Governor Cuomo say, don't do business with the NRA because they

5   don't uphold their charitable charter?   Does Governor Cuomo say

6   they haven't complied with the obligations of a non profit in

7   the State of New York; he does not.   He says the political

8   speech, the First Amendment advocacy of the National Rifle

9   Association poses a risk to our State and I am directing the

10  Government, I am directing the Government to do what it can to

11  cause ties to be broken with the National Rifle Association.

12         We commenced a lawsuit over this, because it is the

13  most egregious example I have ever seen of a Government using

14  State power for the purpose of silencing the First Amendment

15  advocacy of its foe.   But this document does not stand for the

16  proposition that the State of New York became hostile, became

17  weaponized in the words of Mr. LaPierre for the purpose of

18  compliance with charitable requirements.   This is the beginning

19  of why not only we started the course correction, this is the

20  beginning of our exodus from New York because public policy

21  permits us to be in a place where we can exercise our

22  Constitutional rights.

23         It is incredibly rare that the First Amendment

24  clashes with the Bankruptcy Code in a fashion in which the

25  policy considerations that underpin the reorganization are

1  premised upon the types of arguments that usually make their

2  way to the United States Supreme Court.

3        The second document, Your Honor, that's important for

4  this component is the actual DFS letter that was sent to

5  financial institutions.  Later, I would ask Your Honor to look

6  at NRA Exhibit 663 at Page 50.  This is where the State of New

7  York actually goes to the financial institutions.  And on

8  Page 2, the closing sentence says "The Department encourages

9  its chartered and licensed financial institutions to continue

10 evaluating and managing their risks, including reputational

11 risks that may arise from dealings with the National Rifle

12 Association."  They point us out by name.  This is an action by

13 the Government specifically targeting the National Rifle

14 Association.  This was sent to financial institutions.

15        Page 53, a couple of pages back, same Exhibit 663,

16 there is a nearly identical memorandum that is sent to

17 insurance companies.  It is sent to all insurers doing

18 business.  Now, Your Honor I'm going to go back to the first

19 exhibit that I had because this is of critical importance for

20 establishing our good faith for the filing of bankruptcy on

21 this record.  If you read the last -- and so to go back, this

22 is Governor Cuomo's press release on New York letterhead.  This

23 is NRA Exhibit 663, Page 47 -- won't fit.

24        What it says is, "The DFS urges all insurance

25 companies and banks doing business in New York to join the

Summation - Garman                                          80

1  companies that have already discontinued their arrangements

2  with the NRA and to take prompt action to manage these risks

3  and promote public health and safety."  Okay.

4           Why is this important?  This is important because

5  Craig Spray testified.  He testified on April 13th, on

6  Page 1624 of the transcript, "that even prior to showing up to

7  the first day, I was dialing into bank meetings.  And it was

8  very obvious to me that the banks were giving every sell" --

9  that should be an S, not a C -- "signal that they could."  He

10  goes on to testify that -- this is uncontroverted testimony.

11  "It is not non-trivial when you put those out to bid and you

12  have to move your accounts and get your loans renegotiated and

13  moved.  It was a non-trivial evolution."

14          At the bottom of the page, and this is the most

15  important testimony I believe Mr. Spray has on the issue of our

16  good faith is that insurance at any price was becoming very

17  difficult, again, specifically around D and O lines.  And you

18  know, effectively, you know, there is more than one way to kill

19  an organization.  This is the existential threat that the

20  National Rifle Association was facing before Attorney General

21  James commenced her action for dissolution.

22          Your Honor, an existential threat because a

23  government actor has taken steps to deny you the ability to

24  have banking relationships and to have D and O insurance is a

25  way, according to the words of Craig Spray that are

Summation - Garman                                    81

1  uncontested, to put this organization out of business.  This is

2  a basis by which we sought to reorganize in the State of Texas.

3  This is a purpose, a public policy purpose.  We have the right

4  to exist.  We have the right to live.  We have the right to

5  exert our First and Second Amendment rights, and this cannot be

6  lost as a basis for us attempting to move to the State of

7  Texas.

8          This for the avoidance of doubt does not constitute a

9  police power.  It does not constitute a regulatory power.

10 Those are actions in which the conduct of the association are

11 found to be inconsistent with the requirements and the

12 regulations of the State of New York.  That's not what this is.

13 This is a situation in which our speech, our public policy

14 speech, was under attack for the purpose of denying us our

15 existence.

16         Is there any public policy that is held more dearly

17 by Americans than the First Amendment?  I contend the answer to

18 that is no, and I contend this is uncontroverted testimony for

19 which the movants did not seek to rebut.  Craig Spray, he is

20 the best example of the dire situation, the risk situation in

21 which this entity exists.

22         John Frazer, at Page 86 of his testimony on Lines 23

23 through 25, provides you testimony that this will never end.

24 This just goes on and on and on.  You then have undisputed

25 testimony from board members, you have it from Colonel Lee who

Summation - Garman                                                82

 1  says that Letitia James called him and the Association a

 2  criminal enterprise and a terrorist.  That's found in his

 3  testimony of April 21, Page 84, Lines 9 through 25.  Mr. Cotton

 4  testifies on Day 2, April 6th, Page 361, Lines 9 through 12,

 5  the same thing.  You have Sandy Froman on the 7th, Page 84,

 6  Lines 8 through 11.  And most tellingly, you have actually

 7  Judge Journey.

 8          Judge Journey testifies that "I do know what she said

 9  campaigning on -- I don't know what she -- she certainly was

10  predisposed because she wants to keep her campaign promise

11  which was to destroy the terrorists like me, in their

12  estimation."  We agree with Judge Journey far more often than

13  we disagree with him.  But at the end of the day, this was the

14  action that was taken in New York that put us on the course

15  correction.

16          So the course correction comes.  I can go over a lot

17  of testimony in this.  I'm going to move through this a little

18  faster.  You heard from Charles Cotton, you heard from John

19  Frazer, you heard from Wayne LaPierre, Sonya Rowling, Craig

20  Spray, Willes Lee, Michael Erstling, Bill Moore.  Everyone of

21  those witnesses testified to the proposition that there was a

22  course correction that began in late 2017 with the phone call.

23  It resulted in the hiring of Morgan Lewis first.  But then it

24  proceeded.  It proceeded in 2018.

25          In the opening arguments, arguments were made that we

1  didn't make changes overnight and even after we commenced our

2  course correction in 2018 that things continued to need

3  improvement.  A course correction doesn't occur overnight.

4        Your Honor, it's indisputable that a course

5  correction occurred in 2018 for the purpose of righting the

6  ship.  The timeline is fairly condensed and it's

7  uncontroverted.  Charles Cotton testified on Day 2, April 6th,

8  that at the end of 2017, Morgan Lewis was hired to give us a

9  non-profit evaluation.  And let's skip some of the exhibits.

10       In March, things begin faster and more earnest.  On

11 March 7th, Charles Cotton testified that the audit committee

12 met to go over the RSM 2018 audit, an audit that came back

13 clean.  Your Honor, it's worth noting this because I think

14 there has been a misapplication of the law on this point.

15       Exhibit 65 is where I refer the Court to.  Exhibit 65

16 is that audit report which was introduced into evidence.  The

17 RSM audit for March of 2018 and it contains a couple of notable

18 provisions that make the course correction all the more

19 important.  It came up clean.  And what does that mean?  It

20 came up clean because they did not identify any significant or

21 unusual transactions, significant accounting policies or

22 controversies for which there was a lack of authoritative

23 guidance of consensus.

24       It comes up clean.  They didn't find any material

25 uncorrected misstatements.  It comes up clean that there were

Summation - Garman                                84

1   no significant issues arising from the subject of the

2   investigation.

3        Your Honor, the reason this is important and what has

4   been missed in the legal arguments you've heard to date is that

5   Section 717, 7-1-7, of New York's Not-for-Profit Corporate

6   Statute, is the business judgment, the fiduciary duties that

7   board members can rely upon.  And I would encourage you to look

8   at Section 717 of the New York Not-for-Profit Corporate

9   Statute, which specifically contemplates that board members may

10  rely upon counsel -- this is romanette ii -- counsel, public

11  accountants, or other persons as to matters which the

12  directors, officers, or key persons believe to be within

13  accordance with a provision of the certificate of incorporation

14  and by-laws.  I'm sorry, misread it, counsel, public

15  accountants, or other persons as to a matter which the

16  directors, officers, or key persons believe to be within such

17  person's professional or expert confidence.

18       So Your Honor, the argument was advanced this morning

19  that these board members breached their duties because they

20  didn't know of conduct of Mr. Phillips and/or others.  That's

21  not what the law says.  What the law says is that these board

22  members relied upon an outside auditor who gave them a report

23  for which they are justified and expected to rely upon because

24  that outside auditor has more subject matter expertise than

25  they do.  That's statute, New York law, cannot be the basis for

1  the appointment of a trustee as it relates to the conduct of

2  the board members for which you heard argument even though it

3  was unsupported by the record this morning.

4         Uncontroverted testimony that March is the big month.

5  That's when the Brewer firm was hired.  The Brewer firm was

6  hired.  We know this because Tom King tells us on April 21st at

7  Page 174 of his testimony that powerful people are coming after

8  the NRA and that they should hire a New York based law firm.

9  That same component is testified to by Charles Cotton on

10 April 6th, Page 399, in which he says the Brewer firm was hired

11 at the recommendation of then board counsel, Steve Hart.

12        You heard testimony that they wanted a New York

13 lawyer who was hard-hitting for the purpose of taking on the

14 State of New York.  A summary, a demonstrative of some sort,

15 was shown to you this morning for the purpose of trying to

16 suggest that dismissal, dismissal for the appointment of a

17 trustee was appropriate because legal fees increased.

18        You heard testimony from most of the board members

19 that $60-plus million is an extraordinary amount of money and

20 one for which they worry.  It rings incredibly hollow though,

21 Your Honor, for the adversaries for which that money was spent

22 come forward for the purpose of saying you should appoint a

23 trustee, strip the debtor of its chosen counsel who's fighting

24 us because the bills are too high.

25        The New York Attorney General, they have told us they

Summation - Garman                                      86

1  have no monetary claim.  The idea that they stand before this

2  Court and suggest that a trustee should be appointed, not

3  because their claim can't be paid but because they don't want

4  to fight the Brewer firm as an adversary, it rings hollow, sir.

5          That same month, Craig Spray is hired.  We've heard

6  his experience.  It's actually undisputed that he was a benefit

7  to the Association.  He came with a background of public

8  company experience.  But what is missing is that on Day 5 of

9  the trial, he testified on Line -- I'm sorry, on Page 1619,

10 Lines 6 through 11, that he was a short timer.  He testified

11 that the duration of his employment was intended by him to be

12 three years.

13         There's a record in which some people said he was

14 fired.  Some people said that he quit because of health

15 reasons.  The reality is is that probably there's a lot of

16 miscommunication going on from a lot of people.  But Craig

17 Spray didn't run from the fact that he made it known to his

18 employer that he did not plan to stay more than three years and

19 there is uncontroverted testimony that Mr. Spray actually

20 vacated his office and had health concerns that were

21 restricting his ability to perform within the office.

22         I'm going to move a little faster, Your Honor.  Craig

23 Spray testified to improving internal controls, reviewing

24 contracts, looking at backup, expense reports, a new credit

25 card policy, and most importantly, encouraging whistleblowers.

1  On April 21st, at Page 255, Michael Erstling tells us that

2  Craig Spray asked questions about invoices and billings and

3  tells the whistleblowers to go share their concerns with the

4  Brewer firm.  And what happens?  That's exactly what happens.

5          Sonya Rowling tells us in her testimony that

6  Mr. Spray -- she gave her concerns to Mr. Spray and the Brewer

7  firm, and it was the Brewer firm's involvement in creating the

8  list of concerns that became the basis for the audit committee

9  taking this up the following month.  Craig Spray tells us that

10 he couldn't have done this without Wayne LaPierre.  This is

11 such important testimony, Your Honor, I'm going to put it on

12 the screen.

13         If you believe what the movants tell you, Craig Spray

14 was fired and held a grudge for what occurred.  But yet, Craig

15 Spray, when he testifies on -- and this by the way on

16 April 13th on Page 1627, beginning at Line 23, he says "We were

17 very successful in implementing change.  And I can't see

18 anything of that magnitude happening if Mr. LaPierre wasn't

19 supporting it.  Not just in front of (indiscernible) but

20 publicly and behind closed doors.  If he was, you know, kind of

21 rolling his eyes at the thought of improved compliance, or

22 whatever, there's no way I would have been able to accomplish

23 what -- what -- what the team accomplished.  And so he was very

24 supportive to me, both in person and in action, in front of me,

25 but more importantly, I felt supported in those areas when

1  he -- when I wasn't in the room."

2          Craig Spray is not the person the movants would have

3  you identify as the one who says Wayne LaPierre was responsible

4  for ensuring that this world of compliance came to be.  They

5  may not like the testimony.  They may not believe the

6  testimony.  But the uncontroverted testimony of Wayne LaPierre

7  is that he said the 360 evaluation, the top-down review, the

8  course correction was his idea and we heard more than once that

9  he was willing to risk every friend he had to ensure that the

10 National Rifle Association was in full compliance with New York

11 State law.

12         That testimony is disregarded.  And the idea that it

13 was advanced in oral argument that a trustee or dismissal is

14 appropriate because Mr. LaPierre was cutoff from testifying is

15 just incomprehensible in the context of an actual legal

16 standard how it could be argued that Mr. LaPierre's demeanor on

17 the stand is a basis with a high burden of demonstrating that a

18 trustee or dismissal should be found at the end of the day.

19         So, what do we know?  The record, again,

20 uncontroverted.  The whistleblowers meet with the Brewer firm.

21 After meeting with the Brewer firm, the whistleblowers compile

22 their top concerns list.  That top concerns list is Ackerman

23 Exhibit 41.  It concerned about conflicts of interest, related

24 party transactions, (indiscernible) vendors, control overrides,

25 budget and contractual limits that are not followed, vague

Summation - Garman                                          89

1  invoices.  These are the concerns of the whistleblowers who are

2  now in control of the National Rifle Association.  You were

3  told a story unsupported by the evidence in which dissenters

4  and which those who don't play by Wayne's rules, those who rock

5  the boat, are purged and pushed from the organization without

6  evidence.

7          What does the evidence tell you?  The evidence tells

8  you that the primary whistleblower, Sonya Rowling, has not only

9  been made the acting chief financial officer, but she has now

10 been elected to the treasurer's seat, one of three elected

11 officials at the National Rifle Association.  It's more than an

12 inconvenient fact for the movants.  It's actual evidence that

13 demonstrates a complete role reversal of what has been

14 portrayed to this Court.  It is not a world in which those who

15 don't play by Wayne's rules and those who rock the boat are

16 pushed out.  It is in fact a world in which the evidence tells

17 us that those people are promoted.

18         Sonya Rowling, Michael Erstling, two of the

19 whistleblowers, they tell you, they testified before Your Honor

20 in the late stages of our case that their concerns are

21 satisfied.  Their concerns are all satisfied.  The National

22 Rifle Association has righted its ship.  It did so beginning in

23 2018 and they have no more concerns about that top list.  What

24 they do tell you is that there were vendors that were problems.

25 They do tell you about 100-plus letters that go out in the

Summation - Garman                                    90

1  Wayne days of 2018.  In my opening statement, this is the point

2  in time that I call the line of demarcation.  In my opening

3  statement, I said of course not everything was going to be

4  fixed by late summer of 2018.  But this is when the self-

5  correction occurred, and this is when the safe harbor efforts

6  began.  Importantly, that is nearly three years ago.

7          Principled path.  How many witnesses testified to the

8  principled path?  What does the self-correction mean?  Sonya

9  Rowling and Charles Cotton gave us the answer to this.  Sonya

10 Rowling testified that it was documentation and approval for

11 contracts.  It was no more vague invoices or documentation.

12 Charles Cotton told us on Day 2, at Page 82, that disclosure of

13 related party transactions, evaluation by the audit committee

14 for disclosure, approval, denial.  He also told us about

15 disgorgement that included corporate waste and badges of fraud.

16         Charles Cotton told us about disgorgement as it

17 relates to Colonel North and lawsuits.  This case, this is not

18 about the dispute between Ackerman McQueen and this debtor.

19 These are two parties that clearly don't like each other.

20 These are two parties that have a 40-year history together.

21 These are two parties who both believe that the other owes them

22 money.  That fight is not the basis of a trustee motion.  Does

23 goes to (indiscernible), but it's not the basis of a trustee

24 motion.  But it does spill over.

25         To suggest that Colonel North was a whistleblower, to

1  suggest that Colonel North was purged from the Association

2  because he wouldn't play ball beguiles the actual testimony

3  which is, Charles Cotton said, his contract with Ackerman

4  McQueen was hidden from the audit committee and hidden from the

5  Association, and when they saw it, and they saw that their

6  president had a fiduciary duty to Ackerman McQueen to the

7  exclusion of the duties the president would owe to the National

8  Rifle Association, they said no.  They said that can't be the

9  circumstances for our president and Oliver North left and has

10 not returned of his own accord.

11         NRA Exhibits 270, 271, 272, 273, and NYAG 60.  These

12 are exhibits of the board and the audit committee and the

13 actions they took and the course correction that demonstrate

14 what was done.  The audit committee met often.  Charles Cotton

15 told us that.  Conflict disclosures, Frazer told us about that

16 on Page 505 of his testimony.

17         Vendor approvals, Sonya Rowling told us about that.

18 Craig Spray told us that in August of '18, we sent 100-plus

19 letters to vendors.  It was Michael Erstling on April 21st at

20 Page 265.  Michael Erstling tells us that the NRA began to

21 terminate contracts with those vendors who wouldn't comply with

22 NRA -- well, the NRA policies.  This is when the relationship

23 with Ackerman McQueen goes south.  It is of, again, modest

24 relevance to the appointment of a trustee.  The claims back and

25 forth will find their way through the claims process or through

1  litigation, but the simple fact is is that they were one of the

2  vendors, at least according to the National Rifle Association,

3  who would not play ball under the National Rifle Association

4  guidelines.

5          NRA Exhibit 270 shows us that in September of '18

6  Brewer presents a strategy to go on the offensive.  Yes, it's

7  going to require money.  Yes, it's going to require a fight.

8  But we've already seen the documents in which the New York

9  Attorney General is -- I'm sorry, the State of New York through

10 its governor, through its Department of Financial Services,

11 Maria Vullo.  We've seen that they are on the attack taking

12 active steps to impair and injure the National Rifle

13 Association.

14         So the National Rifle Association hires an incredibly

15 hard-hitting lawyer.  I think Bill Brewer would be proud of

16 being called a hard-hitting lawyer.  That's who they needed.  I

17 believe, Your Honor -- I believe the evidence demonstrates that

18 the Brewer firm saved the NRA.  I believe that it was an

19 incredibly expensive endeavor for which they worked night and

20 day.  But at the end of the day, Your Honor, there is no

21 evidence other than the evidence of the client, who when

22 exercising their fiduciary duties, said that's an extraordinary

23 amount of money.  But to save an irreplaceable and priceless

24 organization, we had to spend it.

25         Greg Plotts testified.  Greg Plotts was an auditor.

Summation - Garman                                      93

1  He came forward and told you how we knew -- he knew facts and

2  circumstances and allegations of misconduct, they were

3  sensitive to those.  They looked for those problems.  Yet, what

4  did we get?  We got a clean audit.  Nothing gave rise to the

5  level of materiality.

6          Yeah, we were forced to sue Ackerman McQueen, the

7  books and records case.  Again, I don't think it's relevant

8  except for the motive of certain actions and allegations that

9  had been made against National Rifle Association personnel.  It

10 is two weeks, less than two weeks after the commencement of

11 that lawsuit that the letter comes that is not the infamous

12 letter asking for 16-year old backup for suits and Mr. LaPierre

13 had them.  Sixteen years they waited until less than 14 days

14 after the commencement of the lawsuit.

15         AMc Exhibit 163, NRA Exhibit 261, AMc Exhibit 176,

16 these are the documents that evidence the motivations of

17 Ackerman McQueen as it comes in those final weeks of -- I'm

18 sorry, those final months of 2018.  It is NRA Exhibit 272 in

19 which the audit committee rescinds Colonel North's contract

20 with Ackerman McQueen.  The final piece of this component of

21 our course correction, we begin to clean house.

22         It's fair to say that I misspoke in my opening

23 statement when I said the National Rifle Association fired

24 Chris Cox.  I regret being less than precise.  The National

25 Rifle Association put Chris Cox on administrative leave.  They

Summation - Garman                                94

1  then parted ways.  He was their lead lobbyist.

2          Josh Powell, concerns from the whistleblowers,

3  concerns from Ackerman McQueen, Josh Powell.  He parts ways at

4  the decision of the National Rifle Association.  Testimony was

5  that he was Wayne LaPierre's right-hand man.  Self disclosure.

6  Safe harbor.  The NRA finds that even Mr. LaPierre is subject

7  to examination and review, and that brings us to the infamous

8  990.

9          How there couldn't be two ships passing in the night

10 more than on this 990.  The NYAG has suggested that the debtor

11 has not come forward and proven that the 990 is accurate.  Your

12 Honor, that is not our obligation to do.  It is filed under

13 penalty of perjury.  It has been suggested that because

14 Mr. LaPierre signed it, others refused to and were fired for

15 it.  There's no testimony for that.  Mr. Spray indicated that

16 he felt on the outs because he wouldn't sign it, but in no way

17 does that stand for the proposition that it was retaliation for

18 him refusing to sign it.  Mr. LaPierre testified that he was

19 proud of it.

20         You have not heard a shred of evidence to suggest

21 that the 990 is inaccurate.  Conjecture?  Well, there must have

22 been more flights.  Speculation?  Where are the black cars?

23 Where are the meals?  None of that is evidence.  None of that

24 meets an affirmative high burden to either get dismissal or the

25 appointment of a trustee.  Rhetorical questions about why

Summation - Garman                                          95

1  hasn't the NRA done more?  Why was the NRA scared of New York?

2  These are not questions that meet the burden.

3          Self-disclosure, safe harbor, full internal 360

4  review, no evidence that the 990 that was filed is inaccurate.

5  But the simple fact that we investigated Mr. LaPierre demanded,

6  and that's what happened.  The testimony is, "We demanded a

7  refund of certain amounts that were paid on his behalf that he

8  paid is evidence of impropriety."  Your Honor, an excess

9  benefit is a tax compensation issue.  It's a form filed with

10 the Internal Revenue Service.  The Internal Revenue Service has

11 taken no issue with our 990.  They've not suggested it's

12 improper; they've not to assert any form of criminal penalty or

13 illegality as the New York Attorney General would have you

14 believe.

15         Mr. LaPierre, according to his own testimony on, I

16 believe it was Day 3, Page 262, he testifies that he repaid

17 just over $300,000 which was the full amount the National Rifle

18 Association sought back from him for the period 2015 forward,

19 including he had to pay on top of that $70,000 more in taxes.

20         Your Honor, we shut down NRA TV.  That's moderately

21 important.  But then comes Exhibit 663.  663 is the lawsuit in

22 which we sue the State of New York.  This fractured

23 relationship gets even worse.  This fractured relationship

24 becomes one in which we're forced to sue under the First

25 Amendment to protect our interest, to protect our public

1  policy.  This is the origin of the next step of us seeking to

2  leave New York to come to Texas.

3          Who comes to our rescue?  The ACLU, sixteen attorneys

4  general.  We'll talk about the Amicus Briefs filed in this

5  case.  But this is not a case in which the National Rifle

6  Association is alone in the wilderness asserting that its

7  rights are being trampled on.

8          Then comes, Your Honor, August 6, 2020.  This is the

9  day in which the New York Attorney General seeks dissolution.

10 The movants would have you believe that the only reason that we

11 seek to leave New York via this bankruptcy case, the only

12 reason is to gain a litigation advantage in that case.  Now

13 rhetorically, I'll ask, what litigation advantage do we get in

14 a case that we have not sought to stay or stop?  What

15 litigation advantage do we get in a case in which we've

16 proposed treatment under a class or them in our plan?

17         Your Honor, this action goes to the good faith of

18 this moving and it definitely goes to the timing.  Your Honor,

19 I'm going to play a clip of a video, short clip, which is NRA

20 Exhibit 675.  It's been admitted.  This is a video from the

21 Office of the Attorney General in which Attorney General James

22 discusses three things.  She discusses what she alleges is

23 wildly unproven embezzlement from the National Rifle

24 Association that she seeks disillusion of the National Rifle

25 Association and that she may seek to freeze the assets of the

Summation - Garman                                          97

1   National Rifle Association.

2               (NRA Exhibit 675 Video begins at 3:44:20)

3               "MS. JAMES:  Good morning.  I want to thank you all

4   for joining me.  I am joined here this morning by the Chief of

5   the Charities Bureau, Jim Sheehan, the Co-Chief of the

6   Enforcement Section, Emily Stern.

7               "Just a few minutes ago, my office filed a lawsuit

8   against the National Rifle Association to dissolve the

9   organization in its entirety for years of self-dealing and

10  illegal conduct that violate New York's charities law and

11  undermine its own mission.

12              "UNIDENTIFIED SPEAKER:  Next, personal counsel, Eric

13  Larson of (indiscernible).

14              "MR. LARSON:  Yes, hello.  The allegations that

15  you've laid out here suggest that the NRA donors and members

16  here were really essentially victimized allegedly by these

17  actions.  And then, is it not further victimizing them by

18  forcing their, you know, their organization to close, an

19  organization that's pretty popular across the whole country.

20  Is that necessarily fair to these victims here.

21              "MS. JAMES:  The issue is the following:

22              "A number of donors have contributed to the NRA

23  because they believe in their mission.  At this point in time,

24  the NRA right now is financially is in a deficit.  I mean, as a

25  result of four individual defendants who have basically looted

1   its assets.  And so one would think that the donors would like

2   for an organization to have some governance, some standards,

3   some standards of behavior and that they would recognize their

4   fiduciary duty to not-for-profit and/or its mission as opposed

5   to looting assets and using it for their own personal benefit

6   and/or -- and their family.

7          "UNIDENTIFIED SPEAKER:  Thank you very much for

8   your -- in this call, Attorney Generals.

9          "My question is, will you attempt to freeze the

10  assets of the targets in this investigation, or of the NRA or

11  any way try and prevent them doing business (indiscernible)?

12         "MS. JAMES:  That is one of the remedies that we are

13  seeking in our pleadings and so we look forward to again doing

14  investigation to determine if there are any other hidden

15  assets, whether or not they can be frozen.  Again, for the

16  purposes of benefitting those donors we've given to the NRA

17  over the years for its intended mission."

18                 (End of recording at 3:47:02)

19         MR. GARMAN:  So Your Honor, what we have is, I'll

20  call inelegantly, *prima facie* evidence as to reaffirm the

21  National Rifle Association's good faith for trying to protect

22  its assets for the benefit of its members.  Allegations of

23  looting, allegations of freezing our assets, apparently an

24  admission or claim that we are in a deficit, which I believe in

25  the context of that comment to mean insolvent, seeking

1    dissolution of the National Rifle Association.

2            It is not improper to file a bankruptcy based upon

3    those allegations.  It is not improper to file a bankruptcy

4    based upon the fear of a receiver.  Is it a realistic

5    possibility based upon watching that video that members of the

6    National Rifle Association, including Mr. LaPierre, or members

7    of the special litigation committee would be fearful that she

8    would seek the appointment of a receiver to freeze our assets?

9    Of course not.

10           But what you hear from the movants is that it hadn't

11   been done yet.  There was still time.  You don't need to file.

12   You have appellate rights.  All of those are substituting the

13   business judgment of an adversary of the National Rifle

14   Association in determining when and if to seek its protected

15   rights under 301 and 109 -- 3109 of the Bankruptcy Code under

16   Title 11.  Again, a right that -- we rarely say this -- is in

17   fact a right as identified in the Constitution.

18           So I'm going to wrap this up relatively quickly, Your

19   Honor.  I think I can be done in two hours as opposed to three.

20   In August of '20, that case is filed.  Very shortly thereafter,

21   I believe it's the first week of September, the testimony is

22   that the special litigation committee is formed.  Why is it

23   formed?  The testimony of John Frazer.  Well, Mr. Frazer,

24   Mr. LaPierre, the general counsel, and the executive vice

25   president were individually named, the appropriate thing to do

1    is to recuse yourself from that litigation.  They fault us for

2    the fact that Mr. Frazer did the ethically appropriate thing,

3    which is to recuse himself from the process.  They fault us and

4    say that because he wasn't included in the legal strategy of a

5    bankruptcy that in some small part is in response to that

6    lawsuit, that it's somehow the basis for a trustee or the basis

7    for dismissal.

8          How can it be that a lawyer exercising his ethical

9    obligations to ensure that he doesn't find himself in a

10   conflict situation for which he is making a decision or input

11   on behalf of a client can be used as the basis to suggest that

12   we have breached our ethical duties in such a fashion that the

13   appointment of a trustee is appropriate?  That is an illogical

14   conclusion for which it is unsustainable to say that dismissal

15   or a trustee are appropriate under those circumstances.

16         We didn't tell Mr. Frazer the day we filed but the

17   uncontroverted testimony is that he knew about it all the way

18   back in the fall when he learned of the bankruptcy research.

19   That's found in testimony at Pages 286 through 287.  The SLC,

20   Charles Cotton testifies at Page 174, Lines 14, that beginning

21   in the fourth quarter, efforts were underway to look at

22   strategic alternatives, including bankruptcy.

23         A lot has been made, a lot has been identified that

24   on April 7th, there is a suspicion that the board was misled.

25   There is this really interesting fact, Your Honor, which is the

Summation - Garman                    101

1  New York Attorney General -- actually, I don't have a piece of

2  paper here.  It might be a flaw with my system.  The New York

3  Attorney General actually sued us and if you read their

4  complaint, one of the allegations is that the board didn't

5  approve executive contracts.

6       If somebody could find me the citation for this.  The

7  New York Attorney General in its eleventh cause of action,

8  Paragraph 614 through probably 617, one of the bases was

9  asserted we breached our fiduciary duties is because the board

10 didn't take up the issue of executive contracts.  Yet, what do

11 they do?  They turn around and say that because the board took

12 up the issue of Wayne LaPierre's contract at the January 7th

13 meeting, we've now breached our fiduciary duties in the other

14 direction.  It can't be had both ways.

15      This board does not believe, not a member of it

16 believes, that today, we don't have a valid, ratified approved

17 bankruptcy.  The debtor does believe that we have all the

18 authority we needed under Mr. LaPierre's contract.  But they

19 cannot have it both ways and suggest that we've breached our

20 duties by not approving contracts and then turn around and say,

21 well, you should have appointed a trustee because

22 Mr. LaPierre's contract had never previously been before the

23 board and this was clearly part of a conspiracy without

24 evidence to mislead a board whom only one member of which

25 believes it was misled.

1          That complaint is -- does anybody know the exhibit

2     number of this is?

3          I'll move on, Your Honor, and come back to it.

4          In November, we filed a 990 for 2019.  Moving

5     forward, Mr. Neligan is engaged in November, November 23, 2020.

6     That's Exhibit 298.  It's not unusual for a bankruptcy attorney

7     to be hired to provide analysis when no bankruptcy has

8     commenced.  The idea that the hiring of Mr. Neligan is evidence

9     in and of itself of an intent to mislead the board is not

10    sustainable.  The exclusive testimony of Mr. LaPierre, Colonel

11    Lee, Mr. Cotton -- is that twelfth, thirteenth, fourteenth,

12    somewhere in there, they identify that they were going to file

13    for bankruptcy.

14         Your Honor, Mr. Ciciliano has found the complaint I

15    have referring to is NYAG Exhibit 107 and the paragraphs I'm

16    referring to are found on Page 154.

17         The next argument that's made is that well, we

18    somehow did something improper because Mr. Brewer and

19    Mr. Neligan were paid current, outside of a cycle, not in

20    accordance with National Rifle Association policy.

21         Your Honor, I've never been involved in a bankruptcy

22    in which debtor's counsel wasn't paid current on the petition

23    date.  Never once have I been involved in a bankruptcy because,

24    first, we would be conflicted and we would have to either waive

25    our fee or not be able to act as counsel to the debtor.

1          And the second thing is that much was said that this

2    was a preference.  When you have full pay the unsecured

3    creditors wouldn't do any better than a seven than they do in

4    11, and you can't do better than full pay, Your Honor, we all

5    know there is no preference.  On March 28th, NYAG 199,

6    Mr. Neligan and I meet with the board.  We meet extensively.

7    We talk about affirmation, ratification.

8          Rocky Marshall, his testimony was that he doesn't

9    agree with the debtor, but his understanding is that we have

10   plenty of authority after the 7th.  That testimony came out on

11   April 20th, Page 73 and Page 92.

12         Your Honor, kind of final points here I want to

13   cover.  There is no evidence, and there is certainly no clear

14   and convincing evidence of fraud, dishonesty, gross

15   mismanagement, or incompetence post-petition.  They try and

16   shoehorn it in pre-petition.  They've made the argument as to

17   why it's too little.  Why it's a continuation of management.

18   Why we have Rowling.  Why we have Robichaux.  Why we have a new

19   audit committee, we have new board members.  These folks are

20   all the comfort that these estates and these creditors need.

21         We have an active and engaged board of directors.

22   Notwithstanding what the move-ins would tell you.  You heard

23   from a subset of them.  In hindsight, if there's one thing I

24   could do over and one thing I would provide more testimony of,

25   it would be more board members testifying because I will tell

Summation - Garman                                          104

1  you, I'm not one to be nervous presenting in front of a room,

2  but that room, the horsepower that 76 of them from top to

3  bottom, from senator, congressman, to judge, it's an

4  intimidating and impressive group.

5        Sonya Rowling is our CFO.  She's now our treasurer.

6  We have filed a plan.  Her and Michael Erstling have testified

7  that they have no concerns over what the whistleblowers

8  identified.  There is no evidence of clear and convincing, or

9  otherwise, of fraud, dishonesty, gross mismanagement, deceit.

10        The uncontroverted testimony is that Mr. LaPierre is

11  forward facing and that he is a prolific fundraiser, the likes

12  of which are difficult to replace.  The testimony has been with

13  the exception of the Journey group, they've tested, they trust,

14  they would replace, but their leader is Wayne LaPierre, and

15  they will ensure that he does, as he has, the right thing for

16  the National Rifle Association.

17        Your Honor, we are moving towards plan confirmation.

18  We are moving towards a plan that does all of the things that

19  we told you it would do.  It does all of those things without

20  causing any violent separation from what the Code has told us,

21  which is the New York Attorney General case can proceed.  We

22  are proceeding in that case.  It is in fact moving forward.

23  They cannot stand up here and say, well, the judgment, of the

24  bankruptcy may come before the New York AG's case is done

25  because Congress has told us how to resolve those issues and we

1  can take care of them by way of a plan.

2          Your Honor, please do not prejudge our plan.  Please

3  do not allow these movants to identify that the 1129 standards

4  which are not before this Court, should somehow be construed as

5  a basis to close the door under 301 of a case that is properly

6  before this Court.

7          Your Honor, I challenge the movants to respond to how

8  726, 1129(d), 109, I challenge them to identify how this isn't

9  Congress's clear, well-spoken, well-articulated, instructions

10 as to how to proceed to this case.  State preemption of the

11 bankruptcy code by filing a complaint with the words

12 dissolutions is clearly not the legal concept that can

13 withstand judgment.

14         Your Honor, this Association did something very, very

15 hard.  It did something, in my opinion, that is very brave by

16 filing for bankruptcy.  It fulfills their goals and their goals

17 are supported by public policy.  It is a public policy of the

18 Constitution, it is a public policy of the moving to a location

19 that is not hostile to the right to exist.  It is not a

20 litigation strategy.  How could it be a litigation strategy if

21 we get no benefit?  The case continues on.

22         The case can be incorporated into our plan.  The

23 outcome is not predetermined.  The State of New York has all

24 the remedies they need should they choose to participate in

25 this proceeding instead of seeking dissolution.  They could

1 file a plan to liquidate us.  They could file a plan to

2 distribute our assets in accordance with the New York statutes.

3 A will, and can I assume, tackle us under 1129(a)(1), (a)(2),

4 (a)(3), (a)(5), (a)(13), (a)(16).

5           Your Honor, we've done what we're supposed to do as a

6 debtor, which is solve our problems, build bridges to our

7 constituencies.  There are two we cannot build bridges to.

8 There is a fight till the death between a creditor and the

9 National Rifle Association over a relationship that's spans 40

10 years.  And there isn't irrevocable, irreconcilable, dispute,

11 between Attorney General James, governor Cuomo and the National

12 Rifle Association that cannot be overcome.

13           For all of that, and all of what we've done and the

14 plan that we have filed, all in accordance with Title 11 of the

15 United States Code, believe that there was no bases for the

16 appointment of a trustee.  I am confident there is no basis to

17 dismiss us, incorporate the arguments of Mr. Strubeck, as they

18 relate to the appointment of an examiner.  I'm disappointed,

19 but I hear for the first time in closing arguments that the

20 United States trustee has now taken a position for which I'm

21 expected to respond in real time.  But that is what it is.

22           Your Honor, we have natural remedies.  This

23 Department of Justice, we may not see eye-to-eye with the

24 National Rifle Association, but so be it, we have done the

25 right thing.  We have progressed as a debtor is supposed to

Summation - Garman                                                107

1  progress.  I believe in my soul that we've put forward a plan

2  that legally, according to public policy, according to the

3  Bankruptcy Code, will allow us to fulfill our goals of paying

4  our creditors and moving to Texas, dealing with the New York

5  Attorney General the way that Congress told us to do.

6         We are a real debtor.  We've done what real debtors

7  are expected to do and I ask you to deny the totality of the

8  motions with the exception of the motion to appoint

9  Mr. Robichaux as our chief restructuring officer.

10        THE COURT:  Thank you, Mr. Garman.

11        Let me ask Mr. Ponske or Mr. Mason, I think the order

12 was we were going to take a break.  Do you all need 30 minutes?

13                    (No audible response)

14        THE COURT:  Either of you?

15        MR. PRONSKE:   Yes, Your Honor.  We would like to

16 have 30 minutes if that's okay with the Court.

17        THE COURT:  Okay.  We'll be in recess until 4:30.

18 And My understanding is the attorney general and Ackerman will

19 have 20 minutes each and then Judge Journey will have up to 10

20 minutes.

21        We'll be in recess until 4:30.

22         (Recess taken from 4:02 until 4:30 p.m.)

23        THE COURT:  Mr. Pronske, are you ready?

24        MR. PRONSKE:  Yes, Your Honor.  Thank you.

25        THE COURT:  Let's make sure.  I see the debtor's room

Rebuttal - Pronske                           108

1 open.  Everybody ready in NRA?

2           MR. GARMAN:  Yes, sir.

3           MR HERRING:  Your Honor, this is Walt Herring, Your

4 Honor.  I have one minute of rebuttal, if I could work in one

5 minute of rebuttal at some point.

6           THE COURT:  Yes.  I --

7           MR. HERRING:  Thank you.

8           THE COURT:  -- Mr. Herring, I'm going to turn you

9 down on that one, because I worked you in and I let you go a

10 little bit longer than you did on the first pass.  So we have

11 the three going this time.  All right?

12           Mr. Pronske.

13           MR. HERRING:  And I respect your patience, Your

14 Honor.

15           THE COURT:  Thank you.

16           MR. PRONSKE:  Thank you, Your Honor.  May it please

17 the Court.  I want to briefly address the plan that was filed

18 last night, I believe at 7:00 o'clock, and I've enjoyed very

19 much working with Mr. Garman during this whole process.  But I

20 -- and I didn't want to stand up during his argument,

21 obviously, and object, but I don't think it's proper to address

22 that plan for a couple reasons.

23           One, it was only filed last night at 7:00 o'clock.

24 It's not in evidence.  There was no request that it be put into

25 evidence.  The evidence in this case closed on Thursday, and I

Rebuttal - Pronske                                    109

1 don't believe it was proper to discuss that plan, and I'm going

2 to make the assumption that the Court's going to disregard

3 argument about a plan that's not in evidence and wasn't even

4 asked to be admitted into evidence.

5          THE COURT:  And let me just say this much.  I know

6 one of my law clerks sent notice that it had been filed, but I

7 haven't read it.  I haven't had --

8          MR. PRONSKE:  Okay.  Thank you.

9          THE COURT:  I have not even had a chance to read it

10 and see.

11          MR. PRONSKE:  Thank you, Your Honor.  You're in the

12 same boat with us on that.  Your Honor, I'd like to address

13 some points that were raised during the arguments.  First of

14 all, with respect to the New York action I wanted to -- and

15 I've said to the Court, but I want to make sure the Court is

16 clear or that I'm clear with the Court on these issues, which

17 is, first, that the New York Attorney General has no pecuniary

18 interest in that lawsuit against the NRA.

19          It's not suing the NRA for money and it does not have

20 -- if there is any dissolution in excess monies, the New York

21 Attorney General does not make the decision of who that money

22 goes to.  The New York Attorney General does not make the

23 decision about dissolution, and those decisions are made by the

24 Court.

25          And I think that's clear, but I wanted to let the --

Rebuttal - Pronske                           110

1  make sure that I'm clear with the Court on that.  The Court

2  determines the dissolution process and it is in the public

3  interest.  Mr. Garman mentioned the issues about a jury trial,

4  and I did want to let the Court know also that it's the NRA

5  that chose the jury trial, not the New York Attorney General.

6         Your Honor, I'd like to address issues by the

7  unsecured creditors' committee, who we've been calling the UCC,

8  and the debtor's counsel regarding the financial strength

9  issues and the solvency issues in this case, which I think are

10 at the heart of the bad faith issues in this case.

11        The financial stability and strength issue in this

12 case, as I said, is fundamental and I think it's more nuanced

13 than UCC counsel and debtor's counsel are dealing with.

14 Solvency as a stand alone issue in and of itself might not

15 compel the dismissal of the case, and we've never said that.

16        The UCC counsel says insolvency is not -- or

17 insolvency is not necessary under the Bankruptcy Code and we

18 completely agree with that, but it is part of the good

19 faith/bad faith analysis, which is a gating issue for this

20 case.

21        And all of us are clear, and there's absolutely no

22 dispute that you have to be in good faith to file bankruptcy.

23 That good faith requirement is not required in the Bankruptcy

24 Code, but as I said earlier, every circuit in the United States

25 has law at the circuit level that says you have to be in good

Rebuttal - Pronske                                111

1  faith to file bankruptcy, and issues such as solvency and

2  financial strength, as nuanced as they are, are part of that

3  analysis.

4          Counsel for the United States Trustee I think

5  actually stated the law more -- in a more correct, nuanced

6  manner.  Madame U.S. Trustee, Assistant U.S. Trustee argued

7  that solvency when coupled with a litigation strategy purpose

8  requires dismissal of the case.

9          I agree with that statement.  The United States

10 Trustee's position makes complete sense and goes to the limited

11 federal jurisdiction of this Court to solve financial problems,

12 and the bad faith of a case that does not.  In this case, Your

13 Honor, not only is there no insolvency -- in fact, there's vast

14 solvency -- but more importantly, there's a strong financial

15 condition, and that was testified to by Mr. Spray, Mr. Frazer

16 and Mr. LaPierre and in their various writings to the public.

17         That is to say, there's no problem or issue with the

18 NRA's ability to pay its debts, and that's the important issue.

19 An issue of solvency, Your Honor, is not as important.

20 Solvency can turn on a dime.  You can be solvent one day and

21 know you've got a judgment coming against you next week where

22 you're going to be insolvent.

23         And so the Bankruptcy Code is not so inflexible as to

24 require insolvency, but I would submit, Your Honor, as a part

25 of a good faith filing you have to have some problems with your

Rebuttal - Pronske                                    112

1  financial condition, and you have to have debt issues, either

2  now or in the foreseeable future.

3        In this case the evidence is clear from the three

4  individuals I mentioned to you that the NRA is in the strongest

5  financial conditions of its history.  Debtor's counsel raised

6  something today that's actually the first time I've heard a

7  hint of this in the bankruptcy case, and I really do want to

8  address it and we've got actual evidence to address this issue,

9  and that is, debtor's counsel says that there is litigation

10 going on that could create a debt problem so as to qualify as

11 having some financial problems in this case.

12       That statement is absolutely against the evidence,

13 and it is mister -- the debtor's counsel saying that it

14 obviously is not evidence.  There was no evidence in this trial

15 of any potential liabilities that are going to come from that

16 litigation, such as value type evidence or opinion evidence as

17 to what these lawsuits look like at the end of the day.

18       Debtor's counsel even admitted at one point in his

19 closing that the lawsuit regarding Ackerman, which is their

20 largest lawsuit, he thinks that both sides think that they're

21 owed money by each other, and that's probably a pretty fair

22 statement.

23       However, despite what the debtor said about this

24 litigation potentially creating liabilities, let's look at what

25 the actual evidence is.  In these lawsuits there are

Rebuttal - Pronske                      113

1  counterclaims where the NRA claims that not only are these

2  lawsuits not liabilities, but actually, they're assets.

3         The testimonial evidence is that the debtor has no

4  problem -- and this was evidence in the Court -- the debtor has

5  no problem managing, handling and paying for that litigation.

6  Saying that there is some solvency danger in that litigation is

7  literally being raised for the first time today in closing

8  argument.

9         Debtor's counsel referenced two specific examples of

10 that conclusion, and I'm glad he did, because it allows us to

11 talk about the real evidence, at least on those two cases.

12 There's too many of them to go through all of them, but at

13 least debtor's counsel referenced two potential problems with

14 that so that we can address the realities of that from the

15 evidence.

16        The first one is the Ackerman McQueen case, and

17 debtor's counsel in closing said that there's $100 million

18 claimed, and I've got a couple of responses to that.  One is,

19 that $100 million is not in evidence.  It was not testified to

20 and the complaints with the Ackerman Group -- or there's

21 actually two lawsuits, and those complaints are not in

22 evidence.

23        NYAG Exhibit 191, which is in evidence, the schedules

24 and statements of affairs of the debtors, is contrary to

25 debtor's counsels' assertions.  The schedules and statements of

Rebuttal - Pronske                                    114

1   affairs show to the contrary, and that evidence shows, Your

2   Honor, there's two different pages that address this issue.

3          One is showing the claim of Ackerman McQueen against

4   the debtor, and that amount when it says what is the amount

5   says, unknown, and it says that that liability is contingent

6   and it's unliquidated and it's disputed.  Now, let's look at

7   what the -- how the NRA values their counterclaims against

8   Ackerman McQueen, and that's in that same Exhibit 191.

9          And it shows two lawsuits pending with Ackerman

10  McQueen, one in the Bank of America Circuit Court and one in

11  the Northern District of Texas Federal Court.  Under amounts

12  requested by the NRA in the schedules that were filed with the

13  Court it shows that in the Virginia case the NRA claims $40

14  million against Ackerman, and in the -- that's the Virginia

15  case -- and in the Dallas, Texas, case, Federal District Court,

16  the NRA alleges $100 million against Ackerman.

17         So the only evidence before this Court is that the

18  claim of Ackerman against the debtor is unknown, and the claim

19  of the debtor against Ackerman McQueen in litigation is $140

20  million.  He also referenced the potential claim by the secured

21  creditor against the building that's the corporate headquarters

22  in Virginia.

23         And again, Your Honor, the evidence is contrary to

24  the fact -- or to the statement made, which is that that may

25  end up being a liability against the estate.  And the reason

Rebuttal - Pronske                          115

1  I'm sensitive to this is that, Your Honor, I think the evidence

2  is absolutely, 100 percent clear and undisputed that the assets

3  of the NRA vastly exceed the liabilities and I want to make

4  sure we don't have any leaks in the evidence here.

5          Here is what the schedules and the MORs -- M-O-R-s,

6  monthly operating reports, show with respect to the secured

7  creditor.  The schedules and statements of affairs show that

8  the secured creditor is owed $44 million in debt.  The MORs

9  show the asset value, and I understand that's a book value, but

10 it shows that book value at 79 million.

11         And then the testimony clarified that from Ms. Sonya

12 Rowling saying that the real value of that building isn't 79

13 million.  She said it's $60 million plus.  So the bookends

14 there are, Your Honor, at a $60 million valuation, that's 16

15 million in equity and at 79 million, that's 35 million

16 positive.

17         So that's the real evidence on these issues before

18 the Court.  Other than that, there's no evidence before the

19 Court that there's any problems with the litigation, and all we

20 have is the showing that the unsecured creditors will be paid

21 in full, because there's plenty of cash on hand at the present

22 time to pay those claims.

23         Again, Your Honor, the NRA does not have a debt

24 problem or insolvency problem or a financial condition problem.

25 It has a regulatory problem, a regulatory problem that could

Rebuttal - Pronske                              116

1  result, if determined by the Court, not the NYAG, to be in the

2  best interest of the public in a dissolution.

3          That's not a debt problem.  It's not a problem that's

4  solvable by this Court, and yet, it is truly the only one

5  potential problem that this case seeks to attempt to solve.  If

6  I'm wrong about that, then think about it, Your Honor, what

7  single other issue have you heard about in 12 days of this case

8  being tried that this case is trying to solve?

9          They're not trying to solve unsecured creditor

10 problems that they could write a check for tomorrow.  They're

11 not solving problems with their secured creditor, which they

12 could sell the building and put $16 million minimum in their

13 pocket.

14         The only problem they told you that they're trying to

15 solve is the New York, which is not a debt problem, but it's a

16 regulatory problem.  And that problem being a regulatory

17 problem is a problem that this Court has no interest in,

18 because this Court can't solve regulatory problems, and

19 shouldn't solve problems that have no impact whatsoever on

20 creditors.

21         The committee counsel never even suggested that the

22 unsecured creditors have any realistic possibilities of not

23 getting paid in full.  That is a game changer, because there is

24 no constituency in this case that bankruptcy law has a

25 legitimate purpose to impact.

1          The unsecured creditors should not be able to be the

2   tail wagging the dog in this case, when there are no issues

3   that would lead to creditors not being paid.  There's only one

4   thing that can hurt or that could hurt the unsecured creditors

5   in this case, and that's already happened, and that is the

6   filing of this bankruptcy case, which prevented those unsecured

7   creditors from being paid in the ordinary course of business.

8          Having unsecured creditors that -- and I really feel

9   strongly about this next statement, and I think it to me

10  impacts the big picture of where this case should go -- having

11  unsecured creditors that have no possibility of not getting

12  paid is functionally the same as having no creditors at all.

13         This case is not about paying unsecured creditors,

14  and no argument to the contrary that's been raised with

15  evidence is credible.  In short, this case is a square peg in a

16  round hole that no amount of strategy and attorneys' fees can

17  solve, and it's not a problem that this Court should solve.

18         The problem is regulatory and can only be solved by

19  the regulatory court, which is in New York.  For an example

20  here -- for an example here, Your Honor, I'm going to cite to

21  an other case that's instructive on this issue, and that's the

22  Forest Hill Funeral Home and Memorial Park case, and that's at

23  364 B.R. 808.

24         It's a bankruptcy decision from the Eastern District

25  of Oklahoma in 2007.  In this case there was a funeral home

Rebuttal - Pronske                                118

1 that sold prepaid plots.  The money that was paid for the

2 prepaid plots was put into trust, and by an unscrupulous

3 manager of the debtor, was pulled out and invested into an oil

4 and gas deal.

5        The regulators in that case, which was the Tennessee

6 Department of Commerce and Insurance, found out about this

7 investment -- trying to think of a better word for that -- and

8 tried to shut the company down and appoint a receiver.

9 Bankruptcy was filed to stop that receivership.

10        In this case there were three big differences between

11 that case and this case that make that case much more

12 bankruptcy worthy, much more in good faith than the NRA case.

13 Those three facts are as follows.  One, not only was <u>Forest</u>

14 <u>Hill Funeral Home</u> insolvent, but it was in dire financial

15 straits.

16        Two, in that case a receivership was not only filed,

17 but was imminently set for a hearing, and that's what triggered

18 the bankruptcy case, and three, a CRO had already been

19 appointed and management had stepped aside, which solved their

20 governance problems.

21        Your Honor, those three issues make that <u>Forest Hill</u>

22 case a much stronger case in favor of bankruptcy than this

23 case.  Their severe insolvency meant that shutting that company

24 down had real consequences to creditors, unlike a dissolution

25 would in this case.

Rebuttal - Pronske                    119

1            The receivership in that case was imminent compared

2    to this case, where it hasn't been filed or even hinted at, and

3    I don't agree that the statements from Attorney General James

4    that you heard say that there's any receivership imminent.  I

5    took what she said to talk about seizures, and the only

6    seizures that would be appropriate, because the only seizures

7    that are being sued in that case, or the only monetary amounts

8    that are being sued for in that case is against the individual

9    defendants, not against the debtor.

10           But again, the receivership in that case was

11   imminent.  The CRO had already replaced management.  Compare

12   that with our allegation that we still have management problems

13   in the NRA.  Despite that <u>Forest Hill</u> case being I think what

14   is much more of a real bankruptcy case because it had

15   regulation issues, the Court still dismissed that case for a

16   bad filing with the following quote.

17           The Court said, "In this case the TDCI" -- that's the

18   Texas Department of Commerce and Insurance -- "and the

19   Tennessee Attorney General have strong, perhaps compelling,

20   even compelling interests in seeing that the chancery

21   action" -- that's the regulatory proceeding -- "run its course,

22   and that the conduct of the debtor and its pre-petition

23   management is properly brought into the light of day.  The TDCI

24   and the Tennessee courts are in the best position to do so."

25           Case was dismissed as a bad faith filing to let the

Rebuttal - Pronske                    120

1  regulatory action go forward, even where significant creditor

2  issues existed, and we don't have that fact in this case.  Let

3  me go next quickly to the question that you asked, and in

4  answering that question the committee attorney and the debtor's

5  attorney did not address, in my opinion, the meat of the most

6  important part of that question, which is, how are Bankruptcy

7  Court cases different when there is a case pending that deals

8  with the interest of the public.

9         And again, Your Honor, I think the language is clear

10 under section 1109(b)(1) of New York or NPCL, which

11 specifically says that when determining a dissolution case,

12 that is, specifically that is brought by the attorney general,

13 "The interests of the public are paramount."

14         That's an important issue brushed over, both by the

15 debtor and the UDC counsel.  It's a vitally important issue.

16 When there are no creditors that are going to be paid all there

17 is, is a public interest.  That's all there is in this case.

18 Members are not equity owners.

19         Donors are not equity owners.  There is literally

20 nothing to hear in this case, other than they want to move to

21 Texas.  And I promise you, Judge, that's not a valid reason to

22 file a bankruptcy case.  So in closing, Your Honor, I would

23 submit to you that this case, more specifically, the dismissal

24 motion, is at its core a case about the integrity of the

25 bankruptcy process.

Rebuttal - Pronske                               121

1          Not dismissing this case is the same as condoning it.

2   What you would be condoning, of course, becomes, as we've said,

3   set out of a legal precedent.  What legal principles would the

4   NRA bankruptcy case be cited for in the future if this case is

5   not dismissed.

6          I submit to you, Your Honor, it would stand for the

7   proposition that you absolutely do not have to have financial

8   problems to file a Chapter 11.  In fact, you can be in the best

9   condition of your company's history.  This case would stand for

10  the proposition that you can file Chapter 11 when your sole

11  purpose of filing is litigation strategy.

12         This case would stand for the proposition that you

13  can file Chapter 11 to escape the police and regulatory power

14  of state government in a legitimate State Court regulatory

15  proceeding.  This case would stand for the proposition that

16  venue rules for the filing of Chapter 11 under 28 U.S.C.

17  section 1408 have -- literally have zero meaning.

18         You can now file bankruptcy with impunity in any

19  district in the entire United States.  You now no longer are

20  limited by section 1408 to file bankruptcy where your principal

21  assets, principal place of business or domicile are situated.

22         You now have absolute carte blanc to have the real

23  debtor create a shell company with no creditors, employees or

24  operations, open a bank account for your shell company in the

25  district where your forum shopping has taken you, have your

1 lawyer fund the bank account with $50,000, have your shell

2 company file bankruptcy and then file the real case as an

3 affiliate.

4        I've been involved in many trustee motions and many

5 dismissal motions in 30 years of practice, and frankly, and as

6 this Court knows, many times on the wrong side of the argument,

7 honestly, and Your Honor, in the 38 years of practicing

8 bankruptcy law I can almost honestly say, this is the worst

9 abuse I have ever seen.

10       And unfortunately, this abuse, if not stopped by a

11 dismissal, especially with the high profile of this case, will

12 become a court sanctioned and court precedent instruction

13 booklet on how to file a Chapter 11 in the worst possible bad

14 faith with complete impunity and complete success.

15       If this case is not dismissed, Your Honor, you would

16 be telegraphing that, if you don't like what's going on in your

17 State Court lawsuit, come on down to Dallas.  This abuse would

18 be limited not only to New York regulatory proceedings.

19       If you are massive solvent and your legal case in

20 State Court in, for example, Sherman, Texas, is not going well,

21 it's so simple.  File your new shell company in Dallas.  Call

22 yourself an affiliate.  File bankruptcy and then send out a

23 press release that afternoon that says, dump Grayson County.

24       That would be the lasting legacy of this case if it's

25 not dismissed.  Thank you, Your Honor.

Rebuttal - Mason                                                123

1          THE COURT:  Thank you, Mr. Pronske.

2          Mr. Mason.

3          MR. MASON:  Thank you, Your Honor.  Can you hear me

4  okay?

5          THE COURT:  I can.  Thank you.

6          MR. MASON:  Your Honor, I want to also extend my

7  appreciation to the Court.  It's been a long and crazy last

8  couple of months and we appreciate the Court's patience, and

9  know that the Court has moved a lot of things around to make

10 this case a priority, as well as other judges in the Northern

11 District.  So we very much appreciate that.

12         I'd like to address a few things that Mr. Garman

13 said.  But first, I want -- I do want to address a couple

14 things that Mr. Strubeck raised.  Mr. Pronske touched on this,

15 but the notion that dismissing this case is not in the best

16 interest of the creditors, as Mr. Pronske just stated,

17 creditors are better off here, because secured creditors and

18 trade debt creditors would be paid quicker if this case is

19 dismissed.

20         It would also be better for contingent creditors,

21 because they could liquidate their claims faster.  With respect

22 to this whole CRO and Mr. Robichaux, Mr. Garman said that the

23 CRO has been retained for confidence in transparency.  We now

24 have the responsible parties in place.

25         I would just remind the Court -- and I know Mr.

1  Garman wasn't around when this happened -- that the NRA -- Mr.

2  Robichaux was the NRA's second choice.  And what they

3  originally wanted to do was they wanted to hire Marshall Smith,

4  Mr. Brewer's former client when he was working at 3M as the

5  general counsel.

6          Does that really scream confidence and transparency?

7  The reality is the only reason that the CRO is even an issue

8  here is because the NRA agreed to hire Mr. Robichaux to keep

9  the UCC happy.  Mr. Strubeck acknowledged that the CRO was

10 being driven by the UCC, and had there not been these motions

11 to dismiss I would contend that the NRA wouldn't have a CRO

12 right now.

13         If this bankruptcy is dismissed, as well, the NRA

14 could continue to retain Mr. Robichaux.  They could continue to

15 do -- they could continue to restructure.  They could continue

16 to make these corporate governance changes.  I know that Mr.

17 Garman stated that as part of their plan they have specific,

18 tangible proposals to change their governance.

19         They can do all those things with their board, and if

20 the NRA does ultimately stand trial in New York they can put on

21 evidence of that.  But there are things that the NRA is able to

22 accomplish outside of the bankruptcy process.  One of the

23 things that Mr. Garman talked about with respect to Mr.

24 LaPierre was that at the end of the day the evidence has simply

25 shown that Mr. LaPierre, if he did anything wrong, was maybe

1  accept some excess benefits, and he has paid back that money

2  and that issue is over.

3          But recall, Your Honor, that the evidence in this

4  case about Mr. LaPierre going around and telling numerous

5  people, including Mr. Powell, Mr. Hart, Mr. Makris and others

6  that Mr. Brewer was the only person that was going to be able

7  to keep Wayne LaPierre out of jail.

8          Mr. Garman brought up Ackerman McQueen again, and I

9  intentionally did not do that in my original closing argument

10 and I don't want to get into it here, but I just want to make a

11 couple quick points.  One is, this whole notion that the Oliver

12 North contract was somehow concealed from the NRA is just

13 absolutely not true.

14         The evidence is that Mr. LaPierre negotiated the

15 Oliver North contract.  The audit committee of the NRA approved

16 the North contract.  With respect to the Winkler letters, the

17 audits, Your Honor heard the testimony of Mr. Winkler.  We've

18 talked about that.  It's in the record.  I'm not going to beat

19 a dead horse on that.

20         With respect to the plan I agree with Mr. Pronske,

21 the plan is not before the Court.  But essentially what Mr.

22 Garman is asking is that, let's just hit the pause button.

23 Let's just get past -- let us get past this dismissal part.

24         We'll show you the plan, Judge.  We'll right about it

25 later.  We're going to figure it all out, that, you know,

Rebuttal - Mason                                    126

1 whether or not the dissolution, there's a proper purpose for

2 reorganization, let's put that on the back burner.  Let's put

3 it in the future.

4          The problem with that is that the evidence in this

5 trial made absolutely clear that the NRA filed this bankruptcy

6 to take dissolution off the table.  Mr. Garman asked, what is

7 the litigation tactic.  The litigation tactic is taking

8 dissolution off the table.

9          The effect of that is they're asking -- they're

10 mooting that relief in the New York Attorney General

11 enforcement action.  Sure it can continue.  Sure there's

12 individual defendants up there, but that is the litigation

13 tactic.

14          The NRA throughout this case -- and we're starting to

15 hear different things in closing and I'll address those a

16 little bit, new things in terms of why they filed for

17 bankruptcy.  But the reality is, when they filed they made

18 clear why they filed.

19          We took depositions.  We've had trial testimony.

20 This bankruptcy was not filed for a proper purpose.  And if the

21 foundation is rotten you can't build a house on it, and that's

22 what they're asking you to do here, Your Honor.  With respect

23 to the special litigation committee, Mr. Garman says that the

24 special litigation committee was formed because John Frazer,

25 Wayne LaPierre were named individually in the New York Attorney

Rebuttal - Mason                                127

1  General action.

2          And as Mr. Frazer testified, he was conflicted out.

3  Mr. Garman said that Mr. Frazer did the ethical thing by

4  recusing himself from the bankruptcy because of his conflict

5  with the New York Attorney General filing.  But Mr. Garman's

6  argument means that Mr. LaPierre didn't uphold those same

7  ethical standards when he's been all over this bankruptcy,

8  making decisions about the filing of the bankruptcy, who to

9  hire, what lawyers to hire, when to transfer money to these

10  various firms and what to tell or what to not tell the board.

11          Mr. Pronske again touched on section 1109 of the New

12  York nonprofit statute.  I'm not going to read the statute

13  again.  What I will say, though, is Mr. Strubeck brought up the

14  question of an interpretation of that statute, you know, like

15  what is the public interest mean.

16          Does that mean the public of New York?  Does that

17  mean the public of -- in the United States?  And I would

18  submit, Your Honor, that the best person to answer that

19  question and make that determination is Judge Joel Cohen up in

20  New York State Court.

21          There are a bunch of things that I was shocked that

22  we heard or we did not hear about in Mr. Garman's closing.  One

23  of the things that he said is that there was no evidence of

24  dissenters being pushed out.  And with that I would remind the

25  Court about Esther Schneider, who was stripped of -- testified

Rebuttal - Mason                                      128

1  that she was stripped of committee assignments after

2  challenging Mr. LaPierre.

3        Mr. Frazer testified that three board members were

4  removed from committees when questioning Mr. LaPierre's

5  expenses and spending.  Colonel North was pushed out and not

6  re-nominated after questioning Mr. Brewer's retention and his

7  fees.

8        Mr. Hart was fired after forwarding the Winkler

9  letters to the board.  He was fired by Mr. LaPierre without

10 consultation with the board.  Mr. Cox was suspended.  We also

11 didn't hear anything from Mr. Garman about Sea Girt, except to

12 justify the $50,000.

13       There was no answer for the undisputed fact, and the

14 testimony that we heard, was that Sea Girt was a sham entity

15 that was formed solely to manufacture venue.  They're

16 apparently not running from that fact here.  We did not hear

17 any of that.

18       We also didn't hear any dispute at the trial and the

19 New York attorney enforcement action is years away.  We did not

20 hear any argument about how this bankruptcy filing was

21 initially authorized by the board on January 15th.  Instead, we

22 heard more about asking for forgiveness and the ratification.

23       Mr. Garman and Mr. Strubeck said they were shocked by

24 the U.S. Trustee's position.  The evidence that they heard must

25 have been different from what I've heard the last month,

Rebuttal - Mason                                                      129

1  because I -- it's not shocking at all to us, Your Honor.  And

2  right before Mr. Garman finished up he said, Your Honor, we

3  have natural enemies, when talking about the surprise of the

4  U.S. Trustees.

5          This Department of Justice, we may not see eye to eye

6  with the National Rifle Association, so -- but so be it.  So

7  are we going ahead again now, is the Department of Justice now

8  weaponized against the NRA, because they disagree with the

9  position as to where this bankruptcy should be going?

10          I'd like to conclude by going back to the opening,

11  Mr. Garman's opening, and the things that he promised you, the

12  reasons why this bankruptcy was filed.  He analogized it to a

13  foreclosure.  A judgment is heading our way, he promised this

14  Court.  A receiver is in the works.

15          He tried to paint a picture that these are imminent

16  circumstances.  We have to get into the -- we have to seek the

17  protection of the Bankruptcy Courts right now.  Your Honor,

18  there's no evidence of that.  It's a manufactured justification

19  after the fact for why the NRA is here.

20          And now, for the first time in closing we hear that

21  the NRA claims that the existential threat is we couldn't get

22  insurance, there was Governor Cuomo, we couldn't get insurance.

23  So that's why we needed to file for bankruptcy.

24          When we took these depositions, when we listened to

25  the trial testimony of Mr. Frazer and the various people and we

Rebuttal - Mason                                    130

1  talked about, why are we filing, why are we here, why is the

2  NRA filing for bankruptcy, there was no mention about not

3  getting insurance.

4          Mr. Garman didn't mention anything about it in his

5  opening.  This whole argument about Governor Cuomo, the New

6  York Department of Financial Services, there was a lawsuit

7  filed by the NRA relating to that issue in May of 2018 on those

8  issues.  The dissolution argument didn't work out.

9          The receiver argument didn't pan out.  There's no

10 evidence of a receiver.  We heard plenty of evidence that

11 litigation, consolidating and streamlining litigation had

12 nothing to do with why we are here now.  So now, we're going to

13 claim that we had to file this bankruptcy because we were

14 having trouble getting insurance nearly three years ago.

15         They keep changing their story, Your Honor, and

16 enough is enough.  We know that this Court has heard a lot of

17 evidence over the last month.  We trust the Court's judgment.

18 We appreciate the Court's patience.  We believe that this trial

19 has established the need to stop a solvent company from -- this

20 trial is about solvent -- stopping a solvent company from

21 running from accountability and creating a very dangerous

22 precedent.

23         And we believe that this bankruptcy should be

24 dismissed with prejudice.  And again, Your Honor, we thank you

25 and appreciate your time.

Rebuttal - Taylor                    131

1          THE COURT:  Thank you, Mr. Mason.

2          Mr. Taylor, you get to go last.

3          MR. TAYLOR:  Thank you, Your Honor.  May it please

4    the Court.  Judge Journey, et al., close this trial with

5    gratitude for the opportunity to be heard in this forum, and

6    with hope that this Court will adopt the proposed plan for an

7    examiner in this case.

8          Earlier today we discussed that our clients are the

9    only ones without a pecuniary or professional interest in this

10   case.  A review of the record and the arguments of counsel

11   today bears that out.  Now, I believe that I've just heard that

12   the New York AG believes that she has no pecuniary interest,

13   because she is not suing for any money on the New York State's

14   own accord.

15         However, in the clips that we also just heard, the

16   New York Attorney General readily admitted that she was

17   pursuing the claims of those that donated to the NRA.  She also

18   used the words "dissolution" and "seizure of assets."  The

19   proper test as to whether the pecuniary interest is being

20   pursued in the First Circuit, as stated in the Halo case is, as

21   after assessing the totality of the circumstances the

22   Bankruptcy Court will determine whether the regulatory

23   proceeding at issue is designed primarily to protect the public

24   safety and welfare, or represents a governmental attempt to

25   recover from the property of the debtor's estate -- we have

Rebuttal - Taylor                                    132

1  that here, whether on its own claim, allegedly not here -- or

2  on the nongovernmental debts of private parties.

3            That's precisely what Ms. James said that she was

4  doing in her press conference.  The agenda of the New York

5  Attorney General was laid bare almost three years ago when she

6  stated in her political campaign that the NRA had a poisonous

7  agenda, was a criminal enterprise, acted as an organ of deadly

8  propaganda and was a terrorist organization.

9            She then followed through with her threat made in

10 that campaign and filed the enforcement action.  Today, counsel

11 for the NRA in its closing arguments has demonstrated the

12 inconsistent statements and position taken by the AG in order

13 to further her ends.

14           Ackerman McQueen is in a fight with the NRA that has

15 been described as a fight to the death over a 40-year

16 relationship gone bad.  The NRA seeks to do business as normal

17 and not have their affairs exposed.  The NRA wishes to

18 accomplish this feat with the CRO, whose investigatory role is

19 neither fully authorized or defined, and whose opinions and

20 impressions could possibly be kept secret unless he finds that

21 there's a post-petition breach of fiduciary duty, not simply a

22 mere suspicion or a desire to investigate further.

23           Judge Journey, Rocky Marshall, Buz Mills and Bart

24 Skelton are here as board members and as lifetime members of

25 the NRA petitioning this Court to administer this bankruptcy in

1    a just manner, not to advance the personal lifestyle of any

2    person or the political ends of any person; to advance and

3    protect the best interests of the members, the creditors and

4    the legitimate stake holders here.

5            Despite the various disagreements of the parties

6    throughout the course of this trial we see today most clearly

7    the paths are converging to a resolution.  And concerning the

8    relief, or at a minimum, the alternative relief sought by the

9    parties, the paths of the UCC, the trustee, the NRA and Judge

10   Journey are all converging on a single solution, that someone

11   must be responsible for the oversight, reorganization of the

12   NRA in this Court.

13           A proposal for an examiner meets this joint goal

14   fully and legally.  A trustee with limited powers has not been

15   petitioned for.  A CRO would report directly to the NRA and

16   would potentially present difficulties and complications with

17   the disclosure of all findings.

18           But the examiner motion is filed.  It is valid.  It

19   resolves the above-stated problems.  Today we've heard

20   allegations of overspending by lawyers and other vendors.

21   Judge Journey's proposal will cure that problem and opens up

22   the possibility for recovery of funds for those prior problems.

23           We've heard allegations of mismanagement by Wayne

24   LaPierre and others.  Judge Journey's proposal allows for an

25   examiner to inspect the record and effect managerial changes if

Rebuttal - Taylor                               134

1    necessary.  We've heard concerns from creditors about recovery

2    of monies owed.

3          An examiner would be able to work with the unsecured

4    creditors' committee so as not to duplicate those efforts, and

5    instead can work collaboratively with them and the

6    professionals to accomplish those goals in both a cost

7    efficient means and to maximize the recovery.

8          We've heard allegations that there is a cloak of

9    secrecy and possibly even a cloud of fraudulent activity

10   hanging over the organization.  Judge Journey's proposal will

11   allow the examiner to potentially disband the SLC, open up the

12   books and provide accountabilities to members and the general

13   public.

14         We've heard allegations about various persons or

15   vendors improperly taking money from the NRA.  Judge Journey

16   proposal calls for an examiner to investigate and recommend

17   pursuit of such claims.  There is, after all, a four-year look

18   back for such actions.

19         The NRA is a nonprofit corporation.  It has

20   obligations beyond merely financial ones.  It has dedicated

21   itself to a cause and purpose beyond simply maximizing return.

22   So when you think about bankruptcy policy and what should be

23   accomplished here, it is not simply preserving the going

24   concern monetary value or providing for a full payoff for

25   creditors.

Rebuttal - Taylor                    135

1          That's where a lot of the case law is based upon and

2    it doesn't entirely capture what's happening in this

3    bankruptcy.  Here, we are preserving the going concern mission

4    value or charitable purpose value.  Our clients have a

5    fiduciary obligation to protect that as board members, and the

6    potential proceedings in New York appear aimed at totally

7    eliminating that value in the 150-year history of the NRA.

8          Moving to Texas is most certainly a proper of

9    reorganizing in the Bankruptcy Code.  It is a very fundamental

10   use of the Bankruptcy Code.  Denial of access to financial

11   institutions' insurance, an attorney general seeking

12   dissolution, seizure of assets and potentially receivership, of

13   course the NRA wants to reorganize under a different domicile.

14   It's appropriate that they do so.

15         In closing, we will end where we began.  This is the

16   most important case in the country right now, because it

17   directly affects 5 million NRA members and 2.5 million lifetime

18   members.  Will the voices of those millions be silenced or will

19   their voices continue to ring out in support of gun safety and

20   gun rights?

21         We respectfully pray that the Court grant the relief

22   sought by us today and set out in our proposed order being

23   filed tomorrow.  Thank you, Your Honor.

24         THE COURT:  Thank you, Mr. Taylor.  Let me just make

25   a couple remarks at the end and then I'll let you all go.  I

1  asked when the case was filed and then when some of these

2  motions came in if you all would keep the rhetoric as low as

3  possible, and I understand there's strong feelings all the way

4  around about the NRA.

5        And you all have done a very nice job of that.  I had

6  to decide a few skirmishes, but for the most part I think you

7  all worked well together and I appreciate that.  I found the

8  matters that are being concluded today to be awfully hard.

9  This isn't the longest trial I've ever hard and it's not the

10  biggest one I've ever had with dollars, but it certainly has

11  been a hard one on everybody, I think, and I appreciate

12  everybody's efforts.

13        I said the other day that this one is right at the

14  top of my list on importance on things that I will decide over

15  my judicial career.  I'm at the end of my judicial career next

16  year, so when you hear that I'm retiring don't think I'm

17  retiring just because I've been handling the NRA case.

18        I announced that actually before I drew the case.

19  But I want you to know that we're putting this at the top of

20  importance.  My anticipation is that we'll get you a written

21  ruling in approximately a week.  Our goal is to try to get you

22  something in your hands.

23        It may not be Monday, but we're certainly shooting to

24  get it to you at the beginning of next week.  Thank you very

25  much.  We'll be in recess.

137

1         (Whereupon, at 5:15 p.m., the trial in the above-

2  entitled matter adjourned.)

3               **C E R T I F I C A T I O N**

4        We, KAREN HARTMANN, TRACY GRIBBEN-CALI, KAREN WATSON

5  and BETH REID-GRIGSBY, court approved transcribers, certify

6  that the foregoing is a correct transcript from the official

7  electronic sound recording of the proceedings in the

8  above-entitled matter, and to the best of our ability.

9

10  /s/ Karen Hartmann

11  KAREN HARTMANN

12

13  /s/ Tracy Gribben-Cali

14  TRACY GRIBBEN-CALI

15

16  /s/ Karen K. Watson

17  KAREN K. WATSON

18

19  /s/ Beth Reid-Grigsby

20  BETH REID-GRIGSBY

21  J&J COURT TRANSCRIBERS, INC.       DATE:  May 4, 2021

22

23

24

25