COURT ADMITTED EXHIBITS PURSUANT TO DOCKET NO. 757

NYAG EXHIBITS:

1, 2, 3, 4, 5, 7 (REDACTED), 8, 9, 10, 11, 12, 13, 16

**Exhibit
0002**

**From:** Frazer, John
**Sent:** Thursday, September 10, 2020 9:50 PM
**To:** Frazer, John <John.Frazer@nrahq.org>
**Subject:** Special Litigation Committee

Dear Board and Executive Council members:

Please see the message below from President Meadows regarding the appointment of this special
committee.

John Frazer
Secretary and General Counsel
National Rifle Association of America
11250 Waples Mill Rd.
Fairfax, VA 22030
(703) 267-1254
john.frazer@nrahq.org


-----------------------

To: NRA Board of Directors and Executive Council
From: Carolyn Meadows, President
Dear Board and Executive Council Members:
As you know, the NRA is involved in a cluster of new legal proceedings that arise from the
retaliatory, partisan hostilities we face from attorneys general in both New York and the District
of Columbia. Specifically, I refer to: (i) the action commenced against the NRA and four
individual defendants by the NYAG in New York Supreme Court (the "NYAG Lawsuit"); (ii)
the lawsuit against the NRA and the NRA Foundation by the DCAG in D.C. Superior Court; (iii)
the NRA's lawsuit against NYAG James in the U.S. District Court for the Northern District of
New York; and (iv) any future proceedings that arise out of or relate to the same matters (these
proceedings, collectively, the "SLC Litigation"). The NYAG Lawsuit names both our Executive
Vice President, Wayne LaPierre, and our General Counsel, John Frazer, as individual
defendants.
The other officers and I retain full confidence in Wayne and John. However, we have received
advice from both NRA counsel and Board counsel that it would be in the best interest of the
NRA, as well as consistent with corporate-governance best practices, to create a special litigation
committee of the Board of Directors to oversee the SLC Litigation. I am informed that Wayne
and John agree with this course, and wish to recuse themselves from oversight of the SLC
Litigation to avoid the appearance of any conflict. Therefore, in accordance with the authority
vested in the President of the NRA Board of Directors under Bylaws Article XI, Section 2, I am
hereby creating a Special Litigation Committee (the "SLC") for the purpose of overseeing the
NRA's prosecution and defense of the SLC Litigation. The following members of the NRA
Board are appointed as the initial members of the SLC: Carolyn Meadows, Charles Cotton and
Willes Lee. I will chair the SLC.
Additional information about the SLC will be provided at the Executive Session of the next
meeting of the Board of Directors.

**NYAG
EX001**

Sincerely,

Carolyn D. Meadows



**Exhibit**
0003

## Resolution Formalizing Special Litigation Committee

WHEREAS, on September 10, 2020, NRA President Carolyn Meadows announced the appointment of a Special Litigation Committee (the "SLC") to oversee the prosecution and defense of certain litigation; and

WHEREAS, the Board desires that the SLC, in furtherance of its mission and responsibilities, be vested with corporate authority as a committee of the Board pursuant to N.Y. N-PCL § 712(a); now, therefore, be it

RESOLVED that a Special Litigation Committee of the NRA Board of Directors is hereby appointed, and that the members of such committee shall be Carolyn Meadows, Charles Cotton, and Willes Lee, each of whom has been determined to be independent and disinterested in all respects relevant to their service on the SLC, and be it further

RESOLVED that the Special Litigation Committee shall exercise corporate authority on behalf of the NRA with respect to the prosecution and defense of (i) the litigation captioned *People of the State of New York v. The National Rifle Association et al.*, Index No. 451625/2020 (Sup. Ct. N.Y.); (ii) the litigation captioned *The National Rifle Association v. Letitia James*, Case No. 1:20-cv-889 (N.D.N.Y. 2020); (iii) the litigation captioned *District of Columbia v. NRA Foundation, Inc.* et al., (2020 CA 003545 B); and (iv) any additional legal proceedings arising from the same facts, circumstances, or allegations as the foregoing, wherein the potential for an actual or apparent conflict of interest favors recusal by one or more NRA executives who would customarily oversee such proceedings.

MOVED — Rohrer / Cox

Unanimous ⟶ Froman Abstained

**NYAG
EX002**

**Exhibit**
0004

*minutes
of the meeting of the
board of directors
of the*

# NATIONAL RIFLE
# ASSOCIATION

*January 7, 2021*

**NYAG
EX003**

## MINUTES OF THE MEETING OF THE BOARD OF DIRECTORS
### OF THE
### NATIONAL RIFLE ASSOCIATION OF AMERICA
### JANUARY 7, 2021
### OMNI DALLAS HOTEL

**INDEX**                                                              **PAGE NO.**

MINUTES ........................................................................................................... 1

REPORT OF THE FIRST VICE PRESIDENT ............................................................ 7

REPORT OF THE SECOND VICE PRESIDENT ........................................................ 9

REPORT OF THE EXECUTIVE VICE PRESIDENT ................................................ 11

REPORT OF THE SECRETARY .............................................................................. 31

REPORT OF THE TREASURER .............................................................................. 34

REPORT OF THE EXECUTIVE DIRECTOR,
GENERAL OPERATIONS ...................................................................................... 36

REPORT OF THE EXECUTIVE DIRECTOR,
INSTITUTE FOR LEGISLATIVE ACTION ............................................................ 69

REPORT OF THE LEGAL AFFAIRS COMMITTEE .............................................. 136

REPORT OF THE EXECUTIVE COMMITTEE ...................................................... 137

REPORT OF THE BYLAWS & RESOLUTIONS COMMITTEE ............................ 140

RESOLUTION MEMORIALIZING MR. ROBERT J. KUKLA ............................... 146

REPORT OF THE LEGISLATIVE POLICY COMMITTEE ..................................... 147

REPORT OF THE NOMINATING COMMITTEE .................................................. 148

REPORT OF THE SMALLBORE RIFLE COMMITTEE ......................................... 150

REPORT OF THE NRA CIVIL RIGHTS DEFENSE FUND .................................... 152

NATIONAL RIFLE ASSOCIATION OF AMERICA
MINUTES OF THE MEETING OF THE BOARD OF DIRECTORS
JANUARY 7, 2021

The Board of Directors and the Executive Council of the National Rifle Association of America convened at 9:00 a.m. in Dallas Ballrooms D/H of the Omni Dallas Hotel, Dallas, Texas, on Thursday, January 7, 2021. NRA First Vice President Charles L. Cotton presided.

The Chair called the meeting to order and recognized Chief J. William Carter for the opening prayer. Chief Carter led the Body in the Pledge of Allegiance to the Flag.

At the request of the Chair, the Secretary called the roll. The following members of the Board of Directors and Executive Council were present, and the existence of a quorum was established:

BOARD OF DIRECTORS
JOE M. ALLBAUGH
BOB BARR
RONNIE BARRETT
MATT BLUNT
J. WILLIAM CARTER
TED W. CARTER
ANTHONY P. COLANDRO
CHARLES L. COTTON
DAVID G. COY
TODD R. ELLIS
RICHARD S. FIGUEROA
EDIE P. FLEEMAN
JOEL FRIEDMAN
SANDRA S. FROMAN
MARK GEIST
MARIA HEIL
NIGER INNIS
PHILLIP B. JOURNEY
DAVID A. KEENE
HERBERT A. LANFORD, JR.
WILLES K. LEE
DUANE LIPTAK, JR.
BILL MILLER
JOHNNY NUGENT
JAMES W. PORTER II
JAY PRINTZ
TODD J. RATHNER

BARBARA RUMPEL
DON SABA
RONALD L. SCHMEITS
STEVEN C. SCHREINER
BART SKELTON
KRISTY TITUS
MARK E. VAUGHAN
LINDA L. WALKER
JAMES L. WALLACE
JUDI WHITE

EX OFFICIO
JOHN C. FRAZER
WAYNE R. LAPIERRE

EXECUTIVE COUNCIL
KAYNE ROBINSON

\*These minutes are being provided to you as a record of the most recent Board meeting. In accordance with *Roberts Rules of Order, Newly Revised 12th Edition*, these minutes will be considered a DRAFT until the Board of Directors corrects or approves them during the next Board meeting. At that time they will become the OFFICIAL record for the meeting.

Also present for the meeting were outside counsel William Davis; several members of the executive and administrative staff; and guests.

The Secretary provided information about the reasons for absences. The Chair granted excused absences to the following members: Dr. Thomas P. Arvas; Mr. Paul Babaz; Scott L. Bach, Esq.; Mr. William A. Bachenberg; The Honorable Clel Baudler; The Honorable J. Kenneth Blackwell; Lt. Col. Robert K. Brown; Mr. Dave Butz; Ms. Patricia A. Clark; The Honorable Robert K. Corbin; Mr. Allan D. Cors; The Honorable Larry E. Craig; Mrs. Carol Frampton; Ms. Marion P. Hammer; Mr. Graham Hill; Ms. Susan Howard; The Honorable Curtis S. Jenkins; Mr. Tom King; Ms. Carrie Lightfoot; Mr. Robert E. Mansell; Mrs. Carolyn D. Meadows; Mr. Owen Buz Mills; Ms. Il Ling New; Mr. Ted Nugent; Ms. Kim Rhode; Mr. Mark Robinson; Colonel Wayne Anthony Ross; Mr. William H. Satterfield; Captain John C. Sigler; Deputy Dwight D. Van Horn; Chief Blaine Wade; Mr. Howard J. Walter; Lt. Col. Allen B. West; and the Honorable Donald E. Young.

The Chair asked for any amendments to the proposed agenda that had been distributed. Hearing none, the Chair announced that the agenda was adopted as presented.

The Chair called for the approval of the minutes of the October 24, 2020, meeting of the Board of Directors. Hearing no corrections, the President announced that the minutes were approved as presented.

The Chair called NRA Board member James L. Wallace forward to receive the oath of office, which was administered by the NRA Secretary.

The Chair presented the Report of the First Vice President. A copy of the report is attached to and made a part of these minutes.

The Chair called for the Report of the Second Vice President, which was presented by Lt. Col. Willes K. Lee. A copy of the report is attached to and made a part of these minutes.

The Chair called for the Report of the Executive Vice President, which was presented by Mr. Wayne LaPierre. A copy of the report is attached to and made a part of these minutes.

The Chair called for the Report of the Secretary, which was presented by Mr. John C. Frazer. A copy of the report is attached to and made a part of these minutes.

(Secretary's Note: The printed reports of the Treasurer, the Executive Director of General Operations and the Executive Director of the Institute for Legislative Action were distributed. Copies of these reports are attached to and made a part of these minutes.)

The Chair called for the Report of the Legal Affairs Committee, which was presented by the Committee Chairman, Ms. Sandra S. Froman. A copy of the report is attached to and made a part of these minutes.

The Chair presented the Report of the Executive Committee. A copy of the report is attached to and made a part of these minutes.

2

The Chair presented the Report of the Bylaws & Resolutions Committee. A copy of the report is attached to and made a part of these minutes.

Mr. Cotton:

> "MOVED, That the NRA adopt the proposed amendments to the NRA Board Policy for Board Member Attendance as identified in the document attached to this report."

The motion carried.

Mr. Cotton:

> "MOVED, The adoption of the following memorial resolution:
>
> 'WHEREAS, Robert J. Kukla, of Park Ridge, Illinois, a former Executive Director of the NRA Institute for Legislative Action and member of the Board of Directors of the National Rifle Association of America, passed away on November 4, 2020, at the age of 87; and
>
> WHEREAS, Robert was born on December 1, 1932, in Chicago, Illinois; he graduated from Northwestern University in 1957 with a Juris Doctor degree; he wore many professional hats throughout his life; he worked as casualty adjuster at Allstate Insurance Company, a trial attorney at the firm Fitzgerald, Petrucelli & Simon, and as Director of Marketing Sales and Distribution at Sears, Roebuck and Company; he was a self-employed author, teacher, consultant, television and radio personality; and
>
> WHEREAS, Robert was a man with great integrity; he received a certificate of merit from Chicago Mayor Richard J. Daley in 1970, for his demonstration of good citizenship in action for aiding and assisting a victim of assault and robbery; he helped form and was President of the 'Logan Square Neighborhood Association,' an organization formed to resist crime in the area; he had a deep appreciation for the law and decided to share his passion and knowledge by teaching law courses at Triton College, Oakton College, and Roosevelt University; and
>
> WHEREAS, Robert was an NRA Life member at the time of his death; he was Executive Director of NRA-ILA from 1977 to 1978; he served on the NRA Board of Directors from 1966-1976; he served on the Firearms Legislative Committee, Bylaws & Resolutions Committee, Range Facilities

3

Committee, Protest Committee, and State Association Committee; and

WHEREAS, Robert was an ardent supporter of firearms and the Second Amendment; he was a skilled marksman and renowned pistol shooter; he served as Vice President and Legislative Committee Chairman of the Illinois State Rifle Association; he served as Vice President of the Tri-County Pistol and Revolver League; he was a member of the Northwest Gun Club, Inc.; he wrote on firearms matters, including a landmark gun rights book, "Gun Control," which is still relevant and referenced today; he was a skilled debater and made over 300 media appearances on behalf of the NRA; now, therefore, be it

RESOLVED, That the Board of Directors of the National Rifle Association of America, at its meeting on January 7, 2021, in Dallas, Texas, in recognition of Robert Kukla and his long years of service to the National Rifle Association of America, hereby expresses its profound sense of loss occasioned by his passing, and extends its sincere sympathy to his family; and, be it further

RESOLVED, That the text of this resolution be spread upon the minutes of the meeting, and that a copy, suitably engrossed, be forwarded to his beloved children Robert and Jay.'"

The motion passed.

The Chair called for the Report of the Legislative Policy Committee, which was presented by the Committee Chairman, Mr. Kayne Robinson. A copy of the report is attached to and made a part of these minutes.

The Chair called for the Report of the Nominating Committee, which was presented by the Committee Chairman, Congressman Bob Barr. A copy of the report is attached to and made a part of these minutes.

The Chair called for the Report of the Smallbore Rifle Committee, which was presented by Ms. Edie P. Fleeman, a member of the committee. A copy of the report is attached to and made a part of these minutes.

Ms. Fleeman:

"MOVED, That the 2021 Pershing Team Match and the Goodwill Randle Team Match be rescheduled to the 2022 National Matches at Camp Atterbury in order to allow for team selection and preparation by visiting teams. The match schedule will return to the every eight year schedule with the next Pershing and Goodwill Randle Team Matches fired in 2029."

4

The motion passed.

The Chair called for the body to go into executive session to consider the report of the Officers Compensation Committee. Before the executive session, Ms. Sandra Froman asked for the record to reflect that she was not present for, and took no part in the discussion or on the adoption of, the committee's report.

Without objection, the body entered into executive session at 10:00 a.m. The body returned to open session at 10:52 a.m.

The Chair announced that during the executive session, the Board of Directors adopted the following resolution:

> RESOLVED that the Employment Agreement between the NRA and Mr. LaPierre be approved by the NRA Board of Directors, subject to the addition of a choice of law and venue provision to be negotiated between the parties, and
>
> RESOLVED FURTHER, that Mr. Cotton is authorized to execute the Employment Agreement on behalf of the NRA.

The Chair called for the Report of the NRA Civil Rights Defense Fund, which was presented by the Fund Chairman, Mr. James W. Porter II. A copy of the report is attached to and made a part of these minutes.

The Chair called for new business. Mr. Frazer stated that he had received one resolution, as follows:

> "WHEREAS, on September 10th, 2020, NRA President Carolyn Meadows announced the appointment of a Special Litigation Committee (the SLC) to oversee the prosecution and defense of certain litigation; and
>
> WHEREAS, the Board desires that the SLC in furtherance of its mission and responsibilities, be vested with corporate authority as a committee of the Board pursuant to New York Not-For-Profit Corporation Law Section 712(a); now, therefore be it
>
> RESOLVED, that a Special Litigation Committee of the NRA Board of Directors is hereby appointed, and that the members of such committee shall be Carolyn Meadows, Charles Cotton, and Willes Lee, each of whom has been determined to be independent and disinterested in all respects relevant to their service on the SLC; and be it further

5

RESOLVED, That the Special Litigation Committee shall exercise corporate authority on behalf of the NRA with respect to the prosecution and defense of

(i) The litigation captioned People of the State of New York versus the National Rifle Association, et al., Index Number 451625/2020 (Supreme Court of New York);

(ii) The litigation captioned the National Rifle Association versus Letitia James, Case Number 1:20-cv-889 (Northern District of New York, 2020);

(iii) The litigation captioned District of Columbia versus NRA Foundation, Inc., et al.; this is Case Number 2020-CA-003545B; and

(iv) Any additional legal proceedings arising from the same facts, circumstances, or allegations as the foregoing, wherein the potential for an actual or apparent conflict of interest favors recusal by one or more NRA executives who would customarily oversee such proceedings."

Mr. Todd Rathner moved to adopt the resolution. Professor Coy seconded the motion.

The Chair called for the body to go into executive session to discuss the resolution and legal matters.

Without objection, the body entered into executive session at 11:05 a.m. The body returned to open session at 11:39 a.m.

The Chair announced that during executive session, the Board of Directors passed the resolution formalizing the Special Litigation Committee. Mr. Cotton noted that Ms. Froman abstained from the vote.

There were no comments or announcements for the good of the order.

At the Chair's request, Chief J. William Carter presented the closing prayer.

There being no further business to come before the body, the meeting was adjourned at approximately 11:41 a.m., January 7, 2021.

Respectfully submitted,

John C. Frazer
Secretary

6

**REPORT
OF THE
FIRST VICE PRESIDENT
TO THE
BOARD OF DIRECTORS
NATIONAL RIFLE ASSOCIATION OF AMERICA**

**Dallas, Texas**                                                    **January 7, 2021**

Members of the Board, Officers, Staff and Guests:

It is time for the Officer Reports now.

Twice in a row now I will do something completely out of character for me and I will be brief.

A lot of folks are probably wondering why now, why Dallas, why no committee meetings or no in-person committee meetings.

And the short version of that is—actually we could make Jim our poster child—the short version of that is COVID.

The hotel in Tysons Corner shut down everything for the month of January, and it will probably be extended beyond that, so we were going to lose our meeting date and spot. We had to have some—we had to get something done.

As you all will recall, we were scrambling last year trying to get in our Annual Meeting of the Members because it is required by the bylaws. And since Letitia James, the New York AG, is, throwing everything she can at us, we just wanted to make sure we did not give her a bylaw violation to add to the list.

We decided we are not going to let—we are not going to start off 2021 in the hole in terms of meetings. So that is the reason we said we are going to go ahead and have it in January.

We do not know what is going to happen with COVID. I mean if what we are hearing on the news and what we are seeing locally is accurate, we have no idea what it is going to be like.

We are going to schedule meetings and attend those meetings when we can.

Now, as for committee meetings, I am not crazy about telephonic meetings any more than probably a lot of you folks are, but it is a sign of the times right now.

Every time I drive past a restaurant that I used to really like to go to and patronize good folks that have built their businesses for years and I see it closed because of what we are going through now, it breaks my heart to see what is going on.

But that is the reality that we are facing now and will face until this COVID situation is over.

I am not going to get into vaccines or is it going to help or not; we do not know. We just flat do not know.

But that is the reason we are here now, that is the reason we thought we are going to get the January meeting under our belts, so that means by the bylaws we have to have two more before the end of the year, and hopefully our Annual Meeting, our annual convention, and all that that brings will actually be held in September.

As you already know, we had to move it to September because everything in the George R. Brown Convention Center in Houston for that month was canceled, literally everything, so we were able to move it to September 4 I believe it is.

And again, we are hoping we can get that done as well. If not, we will have an Annual Meeting of the Members someplace and we will have our second Board Meeting.

In all likelihood—and a lot of folks are not going to like hearing this—but in all likelihood we are going to have to continue with committee meetings either telephonically or, you know, by WebEx or something like that.

It is certainly less than optimal. I mean let's face it, a lot of the business that we do is outside of the formal committee meetings. It is gathering around tables and having coffee or lunch together and discussing issues, and then we—I guess it is a little bit of an overstatement to say we formalize it in the committee meetings before the Board Meeting, but that is the way it works.

That is the way legislatures work. And we have been correctly described as much more of a legislature than a board of directors because of our size and the varying scope of our responsibilities.

So that is why we are here today, that is why we are so sparsely populated is the COVID problem as well, and that is why our committee meetings are being held telephonically.

If any committee chairs want to have telephonic or WebEx meetings—and we have the ability for WebEx, folks—just let Carolyn know, let the President know, and we will get them done. I mean they will be approved for you; that will not be an issue.

Okay. That is all I have got. Let me put my eyes back on here and make sure I do not get anyone out of order.

# REPORT
## OF THE
## SECOND VICE PRESIDENT
## TO THE
## BOARD OF DIRECTORS
## NATIONAL RIFLE ASSOCIATION OF AMERICA

**Dallas, Texas**                                                          **January 7, 2021**

Members of the Board, Officers, Staff and Guests:

It is a privilege to serve as an officer with Carolyn and Charles and Wayne. I could not beforehand realize the time-consuming complexities of today's NRA, those that we face every day.

We thank you, as Charles just mentioned, for attending the Board Meeting. We had to do this. And, I appreciate you being here.

More importantly, thank you for all the work you have done this past year, certainly since the last Board Meeting, with the elections and our programs and all of the efforts that we have had to conduct to get to this point. I am humbled to serve with each of you.

The NRA, as you will hear in several reports today, enjoyed a very successful 2020. I love being on the team. I love the challenge. I love winning.

It is a joy to be on this team with you. I have been on a couple of teams; in combat with real bullets, at the Pentagon with paper bullets, in sports, in business, in politics with rhetorical bullets, and even in planning for nuclear operations with really, really, really big bullets.

Working with our team is best when it is altruistic. We are all about the Second Amendment and all of our work is for our five million members, massive numbers of supporters, and for freedom.

In a year that we have seen reduced NRA programs and a contentious election, our members and supporters over-performed in training, education, and especially in what they produced during the elections this year.

We, the Board, signed on to preserve, protect, and defend the Constitution and in particular the Second Amendment. To uphold our oath the NRA must be secure and whole.

We have met challenges to freedom and to the NRA. We continue to maintain the best-in-business programs, communications, personnel, legislation, and finances. We should be, we are proud of our successes.

The NRA's strength and importance are highlighted by the fact that so many try to destroy us.

We have sustained attacks by tyrannical governments, NGOs, haters, China virus, fraudulent elections, dishonest media, and leftist terrorists in the streets.

I am glad to fight this fight by your side. Who would not want to be here? Who would not want to be here now to save the NRA and to save freedom?

It is humbling for our association to have great patriots who support us and support our members.

Now, bear with me as I list 16 states whose Attorneys General have publicly voiced their support. Led by Arkansas' Leslie Rutledge, the coalition includes Alaska, Georgia, Idaho, Mississippi, Oklahoma, Kansas, Kentucky, Louisiana, Missouri, Ohio, South Carolina, South Dakota, Texas, Utah, and West Virginia.

Each of these Attorneys General bashed New York's attempt to silence the NRA, while inviting us to come join them in their freedom loving state.

Today we are focused on the immediate and near future. We need to work in unison.

We are the National Rifle Association of America. This year in Houston we celebrate 150 years of promoting freedom. I am spending the year celebrating our next 150 years. This is an exciting journey.

God bless you. God bless the National Rifle Association of America.

Thank you, Mr. Vice President.

# REPORT
## of the
## EXECUTIVE VICE PRESIDENT
### to the
### BOARD OF DIRECTORS
### NATIONAL RIFLE ASSOCIATION OF AMERICA

**Dallas, Texas**                                                    **January 7, 2021**

Mrs. President, Members of the Board, and Executive Council:

The report of the Executive Vice President provides information on the progress of our staff in carrying out the policies and programs of the National Rifle Association and in implementing the resolutions and decisions approved by the NRA Board. This report is given in three parts to include the two staff officers appointed by the NRA Executive Vice President: the Executive Directors of General Operations and the Institute for Legislative Action. The following report provides full year's program/activities report for 2019.

## MEMBERSHIP

While there have been many challenges in 2020, the Membership Division has shown solid returns throughout the year. Our staff has adapted to a virtual environment, and have shown they are capable of maintaining productivity while working from home. While there has been a decline in face-to-face sales with our Annual Meeting and many gun shows being cancelled, we have more than made up for that in increases in direct mail, phones and web marketing. The market will be stagnant and continue to evolve in the post-election period, and should shift significantly after the inauguration.

### Recruiting Programs

The Recruiting Programs Department is comprised of seven national recruiting programs: Certified Instructors, Stocking Gun Dealers, Independent Individuals, Affiliated Clubs, Gun Shows and Special Events, Staff attended shows, and Manufacturers. Through December 15, 2020 these Recruiters have generated 115,569 members and $6,347,156 in revenue.

The program is 1% ahead of 2019, year to date for the year, a huge leap from the shortfall for the first half of the year. If you take Annual Meeting revenues out of the mix the department is actually up roughly 16% on the year. Industry partners have led the charge realizing a 205% increase vs 2019 year to date.

Industry participation will continue to be a large focus moving into next year. Costs are very low with potential rewards being very high. The loss of almost every staff show and major event coupled with lack of adequate staffing will make Industry participation extremely valuable for the first quarter of 2021.

## Membership Operations

Valtim has mailed out 2,056,155 credential packages from January to December, and nearly 700,000 of those have shipped since the first of October. Valtim has also sent out 1,775,325 premiums from January to December this year, 680,000 of the total was since the beginning of October, which has made for a busy few months for fulfillment. After reassessing the total cost of shipping premiums in 2019, a new renegotiated contract with UPS has proven to be very successful. Membership accounts for 86% of all shipping by the association, and the new rates put in place have had significant savings. Since the start of the year, our new rates negotiated by Membership staff have saved the association $1.217 million. We are on track to reduce spending on shipping by $1.247 million by the end of the year.

Valtim has also been able to help us reduce our costs in credentials. We sent out almost 2.1 million credentials in 2020, about 300,000 more than we did in 2019. Even though we sent out more, our total costs were less, at savings of about 33%.

The impact of the COVID-19 virus has impacted our operations since late 2019 with getting premiums in a timely fashion. We have adjusted our order timing to assure members are not without a premium or materials they ordered. There have been some delays that have negatively affected timelines, but we have managed it to a minimum. We currently have all items in stock, and are sending items out within the contractual timelines we have set with Valtim.

Membership Operations also works with MMP to approve marketing mail, emails, and renewal notices to our members. Membership Operations and Information Services continue to work together in approving and testing all membership related web pages.

## Telemarketing

In 2019 we generated just over $10 million in net revenue. Approximately $3.3 million in net came in through inbound member services. We generated 46K new members in Prospecting.

Through November of 2020 we generated $10.5 million in net revenue. In September, we continued to see strong support from our Members using our "Save NRA" scripts. We were able to morph that support into a "NY Attack" script which has done very well. We also tested various new scripts to discuss the elections. Post-election we are seeing some waning in enthusiasm, however we do not anticipate that to last. We continue to use the "Fake News Media" upsell with success.

The third and fourth quarters of 2020 have gone well considering the many obstacles we faced.

## Membership Communications

In Member Services we, in a high-quality manner, provide vital initial contact with NRA Members/prospective members via phone, web chat, and email. Assist the members with membership or NRA-activity questions and perform adjustments to member accounts as necessary. *We proactively inform the member of the benefits of joining, renewing, or upgrading their membership.*

## AFFINITY AND LICENSING PROGRAM

### NRA Credit Card Program

The Credit Card Program transition to Pentagon Federal Credit Union is fully completed.

Despite the numerous challenges in 2020, which have impacted credit card spending, we continue to see good growth with the new program and are pleased with the progress of the program in recent months. PenFed has committed to many promotional campaigns for the program in '21. While 2021 will be a growth year, we are fortunate to have a program in place with a partner who is eager to work with NRA and where we have an opportunity to grow this program back to where it was prior to the termination by FNBO.

### NRA Endorsed Insurance Program

Royalties through November are running slightly behind budget. This is due to the lower than projected one-time annual payout for the Life & Health programs. Regular royalties are performing ahead of budget. Major progress is under way to implement changes to the Property & Casualty programs through Lockton Affinity Outdoor. These changes are designed with every effort to keep the programs in compliance with state regulators.

While we have faced significant legal and regulatory challenges with regard to these programs, we continue to have partners in both Lockton and AGIA who deal head on, work through the challenges, and make required changes to the programs so the insurance products NRA members ask for can continue to be offered. In an environment where NRA seems to be held to an uneven standard this is a particularly challenging task.

### Other Affinity Programs

Our other affinity programs are performing slightly behind budget. The primary discrepancy continues to derive from three areas; Hotel/Travel, Guides & Outfitter (Both negatively impacted due to COVID-19) and the continued tapering of royalties paid by the Lifelock program (terminated).

New programs have all continued to refine their messaging to members and demonstrate program growth.

### NRA Licensing

Licensed product royalties are performing slightly behind budget. We anticipate the December payment to bring us right in line with budget for the year.

## INFORMATION SERVICES DIVISION

### NRA Website Summary

Management responsibilities include website development and maintenance, ecommerce administration, and providing website hosting services. Ecommerce and member services activities needs continue to rise - underscoring the continued importance of remaining current in web technologies.

**Website Traffic:** The total number of visitors to NRA websites is projected to be 62 million by 2020 year-end.

**Ecommerce Activity:** Information Services manages the underlying technologies and security protocols that comprise the NRA's ecommerce presence on the World Wide Web. Providing ecommerce site visitors with a stable, user friendly, and secure web environment continues to be a primary focus. Our ecommerce sites allow visitors to join or renew their membership, make a contribution, pay outstanding invoices and renewal notifications, and purchase NRA products and merchandise.

### NRA Email Summary

Information Services maintains the email system software and provides the IT infrastructure and support for the NRA's email application. As email has proven to be both an effective and efficient communication medium that drives members to our websites, utilization is continually monitored and reassessed. Timely communication of NRA news and information persists as an operative goal.

Through November, a total of 7,934 email campaigns were sent out to 716,249,554 recipients and continues to yield unmatched access - highlighting the ever-increasing use of electronic delivery.

### Remote Support Summary

Each year, Information Services provides support for the NRA's Annual Meeting of Members, the Great American Outdoor Show, Board of Directors meetings, multiple NRA competitive shooting championships, and a variety of additional remote support assignments. Support may include creating and maintaining specialized software applications and/or providing onsite personnel for systems and operational support during the events.

**Board of Directors Meetings:** In support of the January and October BOD Meetings, up to 15 computers and printers were configured to create a remote office for Board Members and NRA staff while at the meetings. The travel phone system was utilized to provide connectivity to the NRA UC environment - allowing secured extension dialing and NRA network access.

The relocation of the Fall BOD meetings required last-minute changes for services and equipment. In less than a week, planned vendors were cancelled and new vendors were

scheduled to accommodate the new location. Information Services staff were onsite during the meetings - to ensure Member lookup functionality and to relocate the NRA Office mid-meeting.

## Production Numbers

Through November of this year, Information Services completed; 31 Change Requests, 1,025 Incidents, and 3,630 Service Requests.

Information Services classifies support tickets by type, and assigns them to one of the following three categories for review and resolution.

- **Change Requests -** tickets to change the way something is designed or to create new.
- **Incidents** - tickets to repair or replace something that is not working as it was designed to.
- **Service Requests -** Change Request tickets that follow an outlined process and have been repeated enough to be considered a "standard" change.

## Computer Operations Review

The Computer Operations department provides and maintains the NRA's IT infrastructure. Comprised of several locations, running multiple computing platforms, and connected via the NRA's enterprise network, this infrastructure serves as the foundation for the efficient and secure operation of NRA business applications and data processing. Providing end-user support and maintaining the operational integrity of the NRA's IT infrastructure are the department's primary goals.

**Disaster Recovery Test:** In October, Information Services performed a semi-annual disaster recovery test. All major components were tested successfully. In-house applications, third party applications, and the financial application were also successfully tested.

**Annual Meeting (Arizona):** Information Services staff traveled to Tucson, Arizona in support of the Annual Meeting of Members in October. Seven desktop computers were set up and connected to NRA HQ for secure data and telephony use, five Member Verification desktops and a server were set up for 76th Director balloting, and a single Membership-on-the-Go (MOTG) station was set up to sell memberships and accept donations.

While onsite, staff provided support for the Members Meeting and the Board of Directors Meetings.

**Whittington Center:** After leaving Tucson, IS staff traveled to the Whittington Center in Raton, New Mexico to update their computing environment. Twenty new desktop computers were configured and installed, six computers were upgraded and reinstalled in new locations, and a new server was built and installed. The server upgrade will be a new resource for the financial and donor tracking applications.

**Field Ops Distribution Center:** Following the Whittington Center site visit, Information Services traveled to Columbia, Missouri to update equipment at the Field Operations Distribution Center. Five desktop computers where configured and installed, a new network switch was installed (replacing an old switch that was no longer compliant), and a new WiFi router was installed to provide better coverage for the warehouse.

## Database Marketing Operations Review

The Database Marketing operation is responsible for managing input and output files for direct mail and telemarketing campaigns related to; membership acquisitions and contributions, ILA/PVF fund raising, and product marketing.

Information Services DB staff maintain the Contact Accumulator Warehouse (CAW), which archives a record for each contact (mail or phone) to any member or prospect ever generated from the Member Warehouse or Prospect System, for use in mailing analysis. The total number of contacts to members recorded is 1,459,178,593, and 96,200,000 million Unique Person/Address records are currently stored in the CAW.

Ten NRA Member Store Catalog files are produced each calendar year. The process used in selecting catalog recipients combines data from 9 different sources, and uses over 40 different selection criteria to build the universe of possible recipients. These processes have been simplified and standardized to drastically decrease manual intervention, improve accuracy and reduce processing time. These improvements empower NRA Member Store staff to more accurately define their target customers and receive faster results.

## Information Security Review

**Payment Card Industry Data Security Standard (PCI DSS):** Maintaining PCI compliance requires a process that is conducted throughout the year. Soon after receiving a Report of Compliance (ROC) last year, the NRA began gathering documentation for recertification of the Payment Card Industry (PCI) Level 1 Certification for 2020. In September, our Qualified Security Assessor (QSA) conducted a virtual audit, and the NRA received our ROC in October - completing this year's PCI certification process.

**Internet Service Provider (ISP) Load Balancing:** Working with an outside vendor, IS staff requested internet circuit changes to provide full internet routes and allow the NRA to load balance the circuits between our two internet providers. Configuration changes were completed in December - giving the NRA full redundancy capabilities with the ability to send and receive traffic on both circuits, using the fastest path to any internet destination.

**POS / Self Assessments:** All internal credit processing departments are now PCI compliant. PCI self-assessments for both the Range and the Museum Store were completed in December.

**Software Development Review**

The Software Development department is responsible for the development and maintenance of business software applications for the NRA. These applications include client/server and web-based solutions, as well as third-party applications. The department's primary objectives include; working with division / department leaders to better understand and improve business processes, creating and supporting quality business solutions, and maintaining the flow and integrity of information.

**New Web Hosting Provider:** In January, Information Services started exploring alternative hosting providers - to improve service quality and reduce costs. After six months and vetting several prospective vendors, a selection was made. General Counsel worked with us, and completed agreements were signed in May. Although a time-consuming process, we look forward to enhanced services and saving the NRA over $600,000 in the next three years. Migration and testing finished, we completed the move and went live in November.

**Website Updates:** As part of the NRA's multi-tiered marketing approach, websites are created to support direct mail, email, social media, text messaging, and TV marketing campaigns. This reporting period includes creating websites that encompass 59 Membership marketing campaigns, 24 ILA marketing campaigns, 19 PVF marketing campaigns, and 4 Whittington Center sweepstakes offerings.

## PUBLICATIONS

NRA Publications' contingency planning prior to the Covid-19 pandemic shutdown paid off handsomely as 2020 unfolded with all its challenges. Remote production of the magazines and digital properties has gone smoothly and effectively, and we will continue in that mode for the foreseeable future.

**Communications**

The historic interview of President Donald J. Trump by Frank Miniter, editor-in-chief of *America's 1st Freedom*, appeared in the November issue of the four Official Journals.

Our staff continues with the production of a commemorative book to mark NRA's 150th Anniversary in 2021. The book will be distributed to members as premiums, as well as to special interest groups. It will be available in the second half of 2021. In addition, each Official Journal will include a commemorative section every month throughout 2021, beginning with the January issue.

NRA Publications' print magazines, digital properties, websites and American Rifleman Television Show are currently reaching 18.5 million customers per month. We had 36 million unique web sessions in 2020, an all-time record (compared to 12 million in 2014).

Distribution includes:

- 3.75 million print subscribers (monthly average)
- 315,246 digital subscribers (monthly average)
- 3 million web sessions (monthly average)
- 5.3 million e-newsletters (monthly average)
- Over 992,000 viewers of American Rifleman TV (monthly average)

Our social media presence includes: Facebook Likes 3.8 million; Twitter Followers 426,662; and YouTube views 893,700 (3-month average).

NRA Hunters' Leadership Forum (www.nrahlf.org): The Forum continues to expose the misinformation about hunting, promote acceptance of hunters and hunting, and highlight the threats to the future of the sport and wildlife conservation. The Forum collaborated with Responsive Management on groundbreaking new research examining Americans' attitudes toward hunting and hunters. Input was also sought from some of the country's leading debate strategists and communications specialists. The result is a convenient, accessible and easy-to-digest book about how to communicate with the American public about hunting. "How to Talk About Hunting" was developed specifically for hunters and wildlife and conservation professionals. It details how to build support for hunting, how to talk to non-hunters about the historical role of hunting and the benefits of hunting, and why hunting remains essential today. Readers will get the tools they need to become more effective advocates for hunting and the North American Model of Wildlife Conservation.

Join the Hunt: This initiative/program continues into 2021. Its mission is to inspire the million readers of the *American Hunter* to recruit and mentor new hunters, retain hunters and reactivate hunters who have left the field. Each month *American Hunter* dedicates a 2-page department called "Join the Hunt" to help its readers become mentors. The initiative also has its own page in the *American Hunter* website (www.americanhunter.org).

Competitive Shooting: *Shooting Sports USA* (www.ssusa.org) continues to provide in-depth coverage and support of competitive shooting. The website's traffic reached 2.2 million viewers at the end of 2020, an all-time high.

NRAWomen.com: Led by Editor-in-Chief Ann Smith, the site's mission is to be the most trusted online resource for women who seek knowledge, confidence and empowerment in the shooting sports. In November, traffic to the site reached an all-time high of 144,000 unique visitors, and we are confident that number will continue to rise. Content is marketed daily through multiple social media channels and through a weekly digital newsletter. Much of the content caters to today's new gun owner, 45 percent of whom are women in the past six months.

Staff continues to assist the Women's Leadership Forum (WLF) and its fundraising efforts.

**Budget**

The challenges imposed by the pandemic did not deter our advertising sales team from doing an outstanding job.

It should be noted that we published 11 issues in 2020 of each Official Journal (combined June/July issue). The projected advertising revenue from the 12th issue would have put us very close to our 2020 revenue goal.

We submitted a conservative budget for 2021. The budget includes 11 issues for each Official Journal (combined June/July issue). We are optimistic that we will see more advertising dollars in 2021 from manufacturers who cut their marketing efforts due to the pandemic. We have already booked 107 of plan for the February issue. We will continue to work hard to reach – if not surpass – our advertising revenue budget in 2021.

**Inter-Division Support**

<u>Art and Photography Departments</u>: Our designers and photographers continue to support other divisions of NRA. From January through December, the Art Department completed 120 hours of collateral projects. Design work in progress includes a challenge coin for NRA-ILA and the Hunters' Leadership Forum book. Photography work in progress includes photoshoots for the NRAStore and the Office of Advancement. Special acknowledgment goes to Photography Director Peter Fountain and Senior Photographer Forrest MacCormack. Working from home is not an option for them due to the nature of their work in the studio and on location, so they continue to go into the building every day. Even after losing one photographer earlier this year due to furlough measures, they have managed to maintain their pre-pandemic production levels – including collateral projects for other divisions -- under stressful circumstances.

NRA Publications has three major objectives for 2021:

- Continue remote publishing for the foreseeable future;

- Continue to strengthen advertising sales and implement cost-cutting measures in such areas as magazine production to avoid serious impact on the budget; and

- Continue to provide NRA members with timely and outstanding editorial content through our award-winning Official Journals and our growing multi-media platform.

## <u>OFFICE OF GENERAL COUNSEL</u>

The NRA is engaged in a variety of legal matters in furtherance of its mission to protect the right to keep and bear arms.  In order to accomplish its goals efficiently, most routine corporate legal matters are handled by the NRA's in-house legal office, the Office of the General Counsel. Services provided by the OGC include research, counseling, representation, and coordination of outside counsel.

## Judicial & Administrative Agency Matters

The OGC provides counsel and representation to NRA and its affiliates in judicial and administrative matters at the Federal, state, and local levels. The OGC provides such services at all stages from pre-trial through appeal, either directly or by supervision of outside counsel.

The OGC provides legal services in business litigation and similar adversarial circumstances. Examples of such circumstances include transactional disputes, intellectual property rights infringements, creditor/debtor issues, trust and estate matters, and subpoenas arising from disputes between other parties.

## Legislative Matters

The OGC provides legal services to NRA on many legislative and lobbying matters.

**Lobbyist Reports:** The OGC provides assistance with lobbyist reports and lobbyist employer reports, registrations and related documents on behalf of NRA-ILA State & Local and its state liaisons. The OGC also provides legal counsel on compliance with lobbying regulations.

**Statutory and Legislative Analysis:** The OGC provides advice on statutes and legislation, especially in areas outside the firearms policy arena, such as campaign finance and charitable regulation. This includes analysis of existing statutes, developing language for draft bills, analysis of language in existing bills, and suggesting amendments to existing laws.

## Contract Matters

The OGC provides legal services to the NRA on transactional matters such as contract drafting and review, with the goal of allowing the NRA to establish and maintain beneficial relationships with outside parties while avoiding misunderstandings and other situations that foster commercial litigation. The subject matters of these agreements typically include: goods and services for NRA activities such as the NRA Annual Meetings & Exhibits, education and training programs, fundraising events and shooting competitions, intellectual property licensing, field operations, security services, publication-related matters such as author services and copyright agreements, and real estate matters such as building maintenance services and leases.

The OGC also provides internal advice and compliance training to ensure that contracting is carried out in compliance with relevant laws and board policies governing operations of the NRA as a non-profit organization.

## NRA Civil Rights Defense Fund

The NRA Civil Rights Defense Fund reviews hundreds of applications for assistance in civil rights cases each year. The OGC provides legal services and administrative support to the Fund. Additionally, the OGC provides services to promote the public's awareness and interest in the Fund. The following are examples of such services:

**Grants:** The OGC provides the CRDF legal services in furtherance of providing grants to support potentially precedent-setting litigation involving the right to keep and bear arms, self-defense, range operations, and other core issues.

**Research:** The OGC provides the CRDF legal services in furtherance of the dissemination of information regarding civil rights.

**Youth Essay Contest:** The OGC provides legal services and administrative support in conjunction with Publications, Media Relations, and Youth Programs on promoting the Youth Essay Contest through press releases, websites, and social media pages. The Essay Contest receives hundreds of entries each year. The students who enter are enrolled in elementary, junior high, or high school. Winners are selected by a committee made up of OGC staff members. Prizes are awarded in each category.

## NRA Affiliates

Entities affiliated with the NRA such as the NRA Freedom Action Foundation and The NRA Foundation, Inc., benefit from services provided by the OGC. These services relate to matters such as corporate registrations, education forums, laws concerning gaming permits, charitable solicitations, trusts, and probate. The following are examples of such matters:

**Charitable Gaming:** The OGC provides legal services as requested on matters such as applications for charitable gaming licenses, registrations, and reports for charitable gaming.

**Charitable Solicitation:** The OGC assists outside counsel in filing charitable solicitation registrations with state agencies for all NRA entities.

**Friends of NRA:** The OGC provides counsel regarding Friends of NRA events and activities.

**Grant Applications:** The OGC provides counsel on grant applications which involve legal issues and assists in resolving incomplete or inadequate grant applications in order to help facilitate qualifying grants. The OGC also provides counsel to The NRA Foundation on grant applications and procedures.

**The NRA Foundation's Annual National Firearms Law Seminar:** Each year the OGC organizes the largest gathering of Second Amendment legal talent in the country. Firearms attorneys and those in the firearms industry gather at the Seminar during the Annual Meetings to network and to hear an entire day's worth of speakers covering many of the hot legal topics across the country.

## Miscellaneous

The OGC provides assistance with many miscellaneous matters such as: inquiries from attorneys, legal review of NRA materials to be published, human resources issues, assistance to shooting ranges, firearms instructor management issues, landowner/landlord liability and management matters, and field representative matters. The following are a few examples:

**Corporate Registrations:** The OGC prepares and files annual corporate reports on behalf of the NRA, The NRA Foundation, and the NRA Freedom Action Foundation.

**Debt Collections and Bankruptcies:** The OGC collects debts owed to the NRA and enrolls debtors in payment plans, advises as to the suitability of commencing legal action, represents the NRA in bankruptcy proceedings of debtors, files paperwork to recover money in bankruptcy cases, and works in conjunction with debt collection agencies and local counsel when necessary.

**Employment Matters:** The OGC provides advice on general employment policies and on situations involving particular employees.

**Insurance:** Upon request, the OGC provides counsel about various NRA corporate insurance matters.

**Intellectual Property:** The OGC provides counsel and representation to the NRA on intellectual property matters, including those concerning right to publicity; right to privacy; trade secrets; and protection, registration, maintenance, use and licensing of NRA trademarks and copyrights.

**Internet Presence:** The OGC provides counsel on legal issues concerning the NRA's presence on the Internet, such as acquisition of domain names, advertising via search engine results, disclaimers, linking and other matters involving communications, and transactions done on the Internet.

**Meetings, Shows & Exhibits:** The OGC provides legal services to facilitate meetings, shows and exhibits such as the NRA's Annual Meetings and Exhibits, or the Great American Outdoor Show. The legal services include negotiation of contracts for facilities and services, and providing counsel on compliance with state and local statutes in the host city.

**Publications Review:** The OGC provides editing and legal review of drafts of various publications created by other divisions of the NRA.

**Regulatory Compliance:** The OGC provides counsel on compliance with statutes and regulations on matters such as disability, discrimination, medical leave, telemarketing, ranges, wages, safety and zoning.

**Range Conferences:** The OGC presents written treatises and speaks at the Field Services Division's NRA Range Conferences. The OGC's participation addresses legal matters of interest to NRA-affiliated ranges, including tax status, choice of entity, limiting liability, release and waivers, insurance, etc.

**Scholar Assistance:** The OGC provides research assistance to people who study and publish works regarding the right to keep and bear arms.

**Trainer Certification:** The OGC assists in the legal aspects of managing the certification of instructors, training counselors, and coaches throughout the country.

**Trusts and Estates:** The OGC provides legal services to the Treasurer's Office and Office of Advancement regarding testamentary gifts, property transfers, and other legal matters concerning administration of trusts and estates. The OGC also provides assistance in resolving disputes concerning trusts and estates.

## <u>OFFICE OF ADVANCEMENT</u>

The NRA Office of Advancement team continues to expand our donor network and secure support for the NRA's outreach efforts and programs.

A total of $25,073,659 in cash and commitments was raised from October 1, 2020 through December 15, 2020. A total of $71,709,515 in cash and commitments was raised from January 1, 2020 to December 15, 2020 through the Office of Advancement, including the Field Operations division.

Since implementation (2005) the NRA Office of Advancement has raised $818,260,465 in new cash and commitments. Total Cash raised since 2005 is $349,039,580.

Since implementation (1993), Field Operations has raised more than $960,000,000 in support of the shooting sports and qualified programs.

**FUNDRAISING FOR 2020 (October 1, 2020- December 15, 2020)**

| | | |
|---|---|---|
| Total Cash from Major Gifts | $ | 7,830,468 |
| Total Cash from *Friends of NRA* | $ | *10,900,000* |
| Pledge Balance | $ | 328,900 |
| Planned Gifts Documented Balance | $ | 6,014,291 |
| In-Kind Gifts | $ | 0 |
| **Total** | **$** | **$25,073,659** |

## ADVANCEMENT NOTES

- **NRA Heritage Society (Planned Giving)**

    - **2,997** active members, including 847 ambassador members
    - From October 1, 2020 – December 15, 2020 total cash from planned gifts and estate expectancies: **$4,618,157**
    - Total cash income from planned gifts since inception (2006): **$135,231,743**

- **NRA Ring of Freedom**

    - **1,354** active members (corporate and individual members)
    - **63** Golden Ring of Freedom members

- **Corporate Partners Program**

    - October 1, 2020 – December 15, 2020 cash and pledges: **$1,417,419** from 16 **corporate partners**
    - October 1, 2020 – December 15, 2020 Round-Up and Add-A-Buck cash: **$41,712** from 5 **participating partners**

**NRA Hunters' Leadership Forum**

    - October 1, 2020 – December 15, 2020 cash and pledges: $29,000 from 3 Hunters' Leadership Forum Members
    - A total of **252** donors have contributed over **$11.25 million** to support and preserve hunting and conservation.

- **NRA Women's Leadership Forum (WLF)**

    - October 1, 2020 – December 15, 2020 cash and pledges: **$4,039,825** from WLF Members
    - **WLF Members have given $11,029,838 in cash and commitments in 2020, including $3,559,053 from planned gifts.**
    - Among the WLF members' contributions, $5,653,215 supported general operating expenses, $1,250,425 supported NRA-ILA, and $103,250 supported PVF.
    - **340** active members, including **24** members who serve on the Women's Leadership Forum Executive Committee
    - The Women's Leadership Council recognizes women who have given $25,000 or more cumulatively and has approximately **110** members.

- *Friends of NRA*

  - October 1, 2020 – December 15, 2020 accrued: **$10.9 million** gross dollars; **$3.9 million** net dollars
  - 2020 End of year projection: **78,000** attendees at **520** *Friends of NRA* events
  - YTD Average money raised per event in 2020: **$26,400**

- **Freedom Action Foundation (FAF)**

  - October 1, 2020 – December 15, 2020 FAF cash: **$63,578**
  - Cash income to benefit FAF totals **$12,128,530** from inception (2008) to date

- **National Rifle Association Foundation (NRAF)**
  - **Planned Giving** – From October 1, 2020 – December 15, 2020, a total of **$1,369,995** in planned giving cash was documented and received for the Foundation. Total planned gifts for the Foundation now stand at $249,677,283. Total cash received from estates to benefit The NRA Foundation since 2006 is $55,201,335.

  - **Strategic Giving** – From October 1, 2020 – December 15, 2020, Advancement Officers raised **$263,425** in cash gifts to benefit The NRA Foundation.

## BUDGET AND FINANCE

The Treasurer and Finance Committee will be issuing a separate report.

## STAFF RESPONSIBILITY AND PROGRESS REPORT

Attached hereto is the Staff Responsibility and Progress Report, submitted three times annually to the Board of Directors by NRA staff. The purpose of this report is to inform the Board of action taken by NRA staff on directives of the Board.

Sincerely,

Wayne LaPierre
Executive Vice President

Attachment

**Staff Responsibility and Progress Report**
**Submitted to the Board of Directors**
**January 7, 2021**
**Dallas, Texas**

<u>**Board of Directors, January 11, 2020**</u>

<u>**ACTIONS:**</u>

1.  "MOVED, That the EVP request the Competitive Shooting Division ask the NRA Information Services Department if it is currently possible to incorporate decimal scoring for records and classification in standing air rifle competitions. If not currently possible, request that programming be developed to accomplish this goal."

    COMPETITIVE SHOOTING

2.  **Resolution Establishing Special Committee to Sell Property**

    WHEREAS, The National Rifle Association of America believes that it is in its own best interest to sell the property at Waples Row, 11244 Waples Mill Road, Fairfax, Virginia 22030, tax map numbers 0464 01 0033A and 0464 01 0033B;

    Now, therefore, be it

    RESOLVED, that the Board of Directors hereby authorizes the sale of the property at Waples Row, 11244 Waples Mill Road, Fairfax, Virginia 22030, tax map numbers 0464 01 0033A and 0464 01 0033B for a sales price to be determined;

<u>**RESPONSES:**</u>

1.  PENDING – Project under review

    [OPEN]

2.  The 11244 Waples Row property has been taken off the market and we are actively marketing available occupancy to lease.

    [OPEN]

**ACTIONS:**                                          **RESPONSES:**

2. (continued)

> RESOLVED, that the Board of
> Directors hereby establishes a
> Special Committee, consisting of the
> President, 1st Vice President, 2nd
> Vice President, Chairman of the
> Finance Committee and Vice
> Chairman of the Finance Committee
> to determine and negotiate a sales
> price with potential buyers;

> RESOLVED, that the Board of
> Directors hereby authorizes the
> President, 1st Vice President, 2nd
> Vice President, Executive Vice
> President, Treasurer, Chairman of
> the Finance Committee and/or Vice
> Chairman of the Finance Committee
> to take any action as they, with the
> advice of counsel, deem necessary or
> advisable effectuate such sale and to
> carry out the purpose or intent of
> these resolutions; and

> RESOLVED, that the Board of
> Directors hereby authorizes the
> President, 1st Vice President, 2nd
> Vice President, Executive Vice
> President, Treasurer, Chairman of
> the Finance Committee and/or Vice
> Chairman of the Finance
> Committee to execute any and all
> desired, required or necessary
> documents on behalf of the Board
> and/or the Corporation to effectuate
> such sale.

> TREASURER

**ACTIONS:**

**RESPONSES:**

3.    "WHEREAS, the State of California has threatened shooting ranges with regulatory violations for replacing residual soil back on the range after reclamation of spent lead ammunition, because pursuant to federal pre-emption, it cannot and will not follow EPA's Best Management Practices guidelines regarding the military munitions rule, which recommends that ranges place residual soils back onto the range where they were reclaimed;

'MOVED, that the Board of Directors directs the EVP to request that NRA-ILA research and investigate the possibility of codifying the military munitions rule under the Resource Conservation and Recovery Act for non-military shooting ranges and report their findings back to the Range Development Committee in a timely fashion.'"

ILA

3.    NRA-ILA is currently reviewing the issue and pursuing appropriate options

[OPEN]

4.    "WHEREAS, numerous States have inappropriately interpreted and adopted HUD standards for lead dust, which were developed for lead paint dust in residential dwellings, and applied this threshold level to commercial facilities, including shooting ranges;

'MOVED, that the Board of Directors directs the EVP to request NRA-ILA to research and investigate the possibility of having the Department of Housing and Urban

4.    NRA-ILA is currently reviewing the issue and pursuing appropriate options

[OPEN]

**ACTIONS:**                                                    **RESPONSES:**

4. (continued)

> Development or the appropriate
> agency or departments to clarify that
> its standard for lead paint dust levels
> in residential dwellings does not and
> shall not be applied to commercial
> facilities such as shooting ranges.'"

ILA

**Board of Directors, January 5, 2019**

**ACTIONS:**

5.   "MOVED, That the Executive Vice         5.   Project is under review and pending.
     President be directed to request NRA
     Competitive Shooting Division in             [OPEN]
     concert with NRA Information
     Services release existing match day
     (scoring) software to match
     directors.:

     COMPETITIVE SHOOTING

6.   "MOVED, The following changes to        6.
     the Precision Pistol Rulebook as
     printed in the committee report:

     f. That first, second, and third place  f.   Evaluating costs and repercussions
        awards be sent with State and             associated with this task.
        Regional sponsor packets for
        Distinguished Revolver matches."          [OPEN]

     COMPETITIVE SHOOTING

**ACTIONS:**  **RESPONSES:**

7.  "MOVED, On behalf of the Shotgun Committee that the Executive Vice President direct staff to conduct a cross reference with NSSA and NSCA to see what percentage of members are common to NSSA, NSCA and NRA."

    MEMBERSHIP

7.  Redirected to Membership

    [OPEN]

8.  "MOVED, On behalf of the Silhouette Committee:

    a. That the Executive Vice President direct staff to investigate sites and partners for a Super Week type National Championship for Silhouette. Such investigation must take into account travel time and allow for side matches. Once the investigation is complete, the results will be shared with the committee by either conference call or face to face meeting.

8.

    a. This has been reviewed. The Competitive Shooting Division will consider this concept for future efforts at a time/s to be determined.

    [OPEN]

9.  "MOVED, The following changes to Smallbore Rifle as printed in the committee report:

    c. To retire the Peters, Remington Western and Kemp trophies and donate them to the NRA Museum."

    COMPETITIVE SHOOTING

9.

    c. PENDING - Working with Museum to Transfer Trophies. [OPEN]

# NATIONAL RIFLE ASSOCIATION OF AMERICA
# REPORT OF THE SECRETARY

**Dallas, Texas**                                                        **January 7, 2021**

TO:    NRA BOARD OF DIRECTORS AND EXECUTIVE COUNCIL

## ELECTION OF DIRECTORS

Preparations for the 2021 election of Directors are proceeding on schedule. Twenty-five nominees will be elected from a total of 30 eligible candidates.

The ballot package will be in the June/July combined issue of the Official Journals. It will contain a ballot to elect Directors, along with candidates' biographical sketches.

The following information may be of assistance in responding to member questions about the elections:

1. Voting members will receive their 2021 ballot packages in the June/July combined *American Rifleman, American Hunter, America's 1st Freedom* and *Shooting Illustrated* magazines. Ballot printing will begin April 5, 2021 and binding will begin May 16, 2021. The ballot issues of the magazine should start to arrive in the hands of the voting members by June 7, 2021 and be completed by June 11, 2021.

2. The last day a person can become a voting member for this election cycle is July 16, 2021. This is established by the NRA Bylaws as 50 days before the Annual Meeting of Members.

3. Voting is by paper ballot only. The deadline for completed ballots to be <u>received</u> by our accounting firm is August 15, 2021. Since this is a Sunday, the last mail pickup will be the morning of Monday, August 16, 2021.

4. The following voting members will receive their ballots by first class mail: 1) those who don't normally receive a magazine; 2) those who live in Hawaii; 3) those who have an APO, FPO or U.S. possessions address; 4) those who receive their Official Journal electronically; and 5) those who become voting members between the date the first addresses were selected at the end of December and the membership deadline, July 16, 2021.

5. There will be two first class mail drops, with the first occurring the week of June 14, 2021 and the second on July 18, 2021.

## MILEAGE REIMBURSEMENT RATE FOR 2021

An updated Expense Report was put in your packets with the 2021 standard mileage reimbursement rate of <u>56 cents per mile.</u>

## INTELLECTUAL PROPERTY

In March of 1995 the Executive Vice President appointed an Intellectual Property Committee to review and make decisions on the use of NRA's trademarks and copyrights. The committee consists of the NRA Secretary (who serves as Chairman), a representative from the Office of General Counsel, a representative from the Membership Division, a representative from the Publications Division and the

Executive Director of General Operations. The Committee met four times in 2020 and considered four items of business. Many requests to use NRA intellectual property are routine matters that do not require action by the committee and are addressed directly by the Secretary. The Secretary also responds to violations of NRA's intellectual property rights, and ensures proper maintenance of NRA's registered trademarks.

<u>FEDERAL FIREARMS LICENSE</u>

The Secretary is the "responsible person" for the NRA's headquarters and Field Operations federal firearms licenses. The headquarters FFL is used in the transfer of firearms to the Museum inventory, firearms received by the Publications Division for test and evaluation and firearms sent to other NRA divisions for training or demonstration purposes. There were 737 transactions on the NRA's headquarters FFL in 2020. (NRA Federal Firearms Licenses are used for Association business only – not for personal transactions.)

<u>ARCHIVES</u>

In accordance with Article V, Section 2(d) of the NRA Bylaws, the Secretary has charge of the archives of the Association. Because of space availability, the NRA did not have an official archives center until 1995. When NRA moved into the new headquarters building in Fairfax, Virginia, the Secretary established an official archives area. Since then a large number of items have been donated to the archives and an offsite storage facility is also being used.

The archives room at NRA Headquarters is located in the basement of the building. The room is climate controlled to help preserve old documents, historical pictures, films and other items. There are over 100,000 items that are listed under 84 major categories.

In 2020 the archives were regularly used in a number of research projects. These projects included researching previous board motions, resolutions, and bylaw amendments.

<u>BYLAW COMPLIANCE</u>

Article IV, Section 2 of the NRA Bylaws, as amended by vote of the members in 2017, requires the NRA Secretary to report business transactions in which NRA Board members, officers, or employees received payments in excess of $2,000 for goods and services provided to the NRA.

No additional business with the Association has been reported since the October 24, 2020 Board Meeting.

<u>FUTURE MEETINGS OF THE BOARD OF DIRECTORS</u>

    2021 Annual Meeting of Members (Houston, Texas) September 4
        (Spring Board Meeting September 6-7)
    2021 Spring Board Meeting (Location TBD) Dates TBD
        (Board Meeting Date TBD)
    2022 Annual Meeting (Louisville, Kentucky) May 19-24
        (Board Meeting May 23-24)
    2023 Annual Meeting (Indianapolis, Indiana) April 13-18
        (Board Meeting April 17-18)
    2024 Annual Meeting (Dallas, Texas) May 16-21
        (Board Meeting May 20-21)

2025 Annual Meeting (Atlanta, Georgia) April 24 – April 29
(Board Meeting April 28-29)

Respectfully submitted,

John C. Frazer
Secretary

## NATIONAL RIFLE ASSOCIATION OF AMERICA
### REPORT OF THE TREASURER

**Dallas, Texas**　　　　　　　　　　　　　　　　　　　　　　　　**January 7, 2021**

**TO:**　　NRA BOARD OF DIRECTORS

---

Operating results for the eleven months ended November 30, 2020 are attached. In a year of tremendous challenges (including COVID 19), tough decisions made in 2018, 2019 and continuing into 2020 enabled the association to significantly improve its financial performance and position. Membership has stayed strong and positive cash flows from operations has driven a pay down of debt of more than $45M (net of cash on hand).

YTD Net Income (before Investment gains) was $36.6M, which is favorable to budget by $26.5M. Revenues were $255.9M, while unfavorable to budget, reflect a decline vs prior year of only 7.5%.

Expenses were $219.2M, which is favorable to budget by $62.3M. Structural adjustments were made across all areas, beginning in late March, which materially reduced spending levels in personnel and benefits, key annual events, programs and general operating activities.

Net Investment gains were $4.7M, which is favorable to budget by $2.9M. NRA's long-term portfolio finished up 9.40% through November 30, 2020. During the same period, the blended benchmark (60% equities, 20% fixed income, and 20% alternative investments) was up 9.97%.

More details on the results of operations and comments on other 2020 activities are included in the Finance Committee report, along with the 2021 budget detail.

The accumulation of the final results for 2020 is in process and will be available in the 2020 NRA Annual Report once our outside auditing firm has completed their work.

Respectfully submitted,

Craig B. Spray
Treasurer



National Rifle Association of America

**STATEMENT OF REVENUE AND EXPENSES**
For Eleven Months Ended November 30, 2020
*(In thousands)*

| | | | A | | B | | C | D |
|---|---|---|---|---|---|---|---|---|
| | | Page Number | Line Number | YTD Actual | % of Annual Budget | YTD Budget | % of Annual Budget | Favorable/ (Unfavorable) Variance | Annual Budget |
| | **Revenue** | | | | | | | | |
| 1 | Membership | A-2 | 72 | $156,103.7 | 79.6% | $175,654.6 | 89.6% | ($19,550.9) | $195,992.0 |
| 2 | Affinity and Other Programs | A-3 | 87 | 6,949.4 | 66.0% | 8,127.3 | 77.2% | (1,177.9) | 10,532.6 |
| 3 | Institute for Legislative Action | A-4 | 94 | 32,298.1 | 107.1% | 29,361.4 | 97.4% | 2,936.7 | 30,155.0 |
| 4 | General Operations | A-5 & A-6 | 157 & 172 | 26,178.2 | 70.2% | 35,009.0 | 93.9% | (8,830.8) | 37,267.4 |
| 5 | Advancement & Field Operations | A-7 | 193 & 203 | 11,685.7 | 88.4% | 11,046.0 | 83.6% | 639.7 | 13,218.0 |
| 6 | Publications | A-9 | 244 | 18,716.3 | 79.4% | 21,103.6 | 89.6% | (2,387.3) | 23,561.0 |
| 7 | Public Relations | A-11 | 293 | 163.8 | 38.1% | 430.0 | 100.0% | (266.2) | 430.0 |
| 8 | NRAF Grants & General Endowments | | | 3,797.0 | 31.9% | 10,861.7 | 91.1% | (7,064.6) | 11,920.0 |
| 9 | **Total Revenue** | | | 255,892.3 | 79.2% | 291,593.6 | 90.3% | (35,701.3) | 323,076.0 |
| | **Expenses** | | | | | | | | |
| | **Membership** | | | | | | | | |
| 10 | Membership - 3rd Party/Variable | A-2 | 56 & 70 | 70,223.8 | 77.8% | 84,984.9 | 94.2% | 14,761.1 | 90,208.2 |
| 11 | Membership - Internal Operations | A-2 | 58-61,63,66,69 | 2,937.8 | 53.9% | 4,804.6 | 88.2% | 1,866.8 | 5,450.1 |
| 12 | Subtotal Membership | | | 73,161.5 | 76.5% | 89,789.5 | 93.9% | 16,628.0 | 95,658.3 |
| 13 | Affinity and Other Programs | A-3 | 88 | 711.9 | 75.2% | 904.8 | 95.6% | 192.9 | 946.4 |
| | Institute for Legislative Action | | | | | | | | |
| 14 | ILA-Costs reimbursed from NRA | A-4 | 99 | 9,492.4 | 61.4% | 13,928.0 | 90.1% | 4,435.7 | 15,451.7 |
| 15 | ILA - Special Programs Costs | A-4 | 112 | 24,201.5 | 71.4% | 30,678.7 | 90.5% | 6,477.2 | 33,915.1 |
| 16 | Subtotal Institute for Legislative Action | | | 33,693.9 | 68.3% | 44,606.7 | 90.4% | 10,912.9 | 49,366.8 |
| 17 | General Operations | A-5 & A-6 | 158 & 173 | 19,176.7 | 53.5% | 32,881.3 | 91.7% | 13,704.7 | 35,873.1 |
| 18 | Advancement & Field Operations(*) | A-7 | 194 & 204 | 6,329.1 | 45.8% | 12,059.6 | 87.3% | 5,730.5 | 13,806.8 |
| 19 | Publications | A-9 | 245 | 24,910.8 | 73.9% | 30,109.8 | 89.3% | 5,198.9 | 33,724.8 |
| 20 | Treasurer | A-10 | 274 | 16,390.2 | 72.6% | 20,139.5 | 89.2% | 3,749.3 | 22,582.0 |
| 21 | Office of President | A-11 | 275 | 187.2 | 54.5% | 315.7 | 91.9% | 128.5 | 343.6 |
| 22 | Executive Vice President | A-11 | 276 | 2,665.1 | 37.1% | 6,339.9 | 88.2% | 3,674.7 | 7,187.4 |
| 23 | Security | A-11 | 277 | 3,911.3 | 49.8% | 7,449.7 | 94.8% | 3,538.5 | 7,855.0 |
| 24 | Human Resources | A-11 | 278 | 614.5 | 76.7% | 713.8 | 89.1% | 99.3 | 801.0 |
| 25 | OGC_Secretary | A-11 | 286 | 35,588.5 | 106.3% | 31,056.0 | 92.7% | (4,532.5) | 33,487.8 |
| 26 | Public Relations | A-11 | 294 | 1,894.0 | 35.4% | 5,118.5 | 95.8% | 3,224.5 | 5,343.0 |
| 27 | **Total Expenses** | | | 219,234.7 | 71.4% | 281,484.9 | 91.7% | 62,250.2 | 306,976.1 |
| 28 | **Operating Income (Loss) b/f Investments** | | | 36,657.6 | 227.7% | 10,108.7 | 62.8% | 26,548.9 | 16,099.9 |
| 29 | Capital Expenditures | | | (681.8) | 22.7% | (2,881.5) | 96.0% | 2,199.7 | (3,000.0) |
| 30 | Principal Activity - Term Loan | | | (354.9) | 91.0% | (354.9) | 91.0% | 0.0 | (389.9) |
| 31 | Principal - Lines of Credit | | | (20,808.9) | 173.5% | (4,285.6) | 35.7% | (16,523.2) | (11,995.0) |
| 32 | Retirement Plan Funding | | | (4,327.8) | 86.6% | (4,668.3) | 93.4% | 340.5 | (5,000.0) |
| 33 | Other Balance Sheet Activity (excl. depreciation/bad debt) | | | 5,827.6 | N/A | 0.0 | N/A | 5,827.6 | 0.0 |
| 34 | **Excess (Deficiency) of Revenue over Expenses** | | | $16,311.7 | -477.8% | ($2,081.7) | 48.6% | $18,393.4 | ($4,285.0) |
| | **Investment Activity** | | | | | | | | |
| 35 | Endowment Activity | | | (516.7) | -25.8% | 1,791.7 | 89.6% | (2,308.3) | 2,000.0 |
| 36 | Dividends, Interest & Net Gains (Losses) from Portfolio | | | 4,680.2 | 204.8% | 1,733.8 | 75.9% | 2,946.4 | 2,285.0 |
| 37 | **Total Investment Activity** | | | 4,163.5 | 97.2% | 3,525.4 | 82.3% | 638.1 | 4,285.0 |
| 38 | **Operating Income (Loss)** | | | $20,475.2 | N/A | 1,443.8 | N/A | 19,031.5 | 0.0 |

**Basis of Accounting:**
These statements are presented using accrual basis method of recording transactions for revenue when earned and expenses when incurred. A key advantage of the accrual basis is that it matches revenues with related expenses, so that the complete impact of a business transaction can be seen within a single reporting period.

*Advancement and Field Operations raise funds for affiliated organizations as well. See pages A-7 and A-8 for complete picture of the operations of these divisions.

# REPORT
## of the
## EXECUTIVE DIRECTOR
## GENERAL OPERATIONS
## to the
## BOARD OF DIRECTORS
## NATIONAL RIFLE ASSOCIATION

Madam President, Members of the Board and Executive Council:

As 2020 ends, the NRA, and its members, continue to endure a pandemic, along with continued unprecedented attacks like never before. General Operations, during these difficult times, continues to offer modified programing to serve our members, where possible, depending on state regulations and executive orders. Through all of this, our programs remain strong thanks to the continued support of our membership and dedicated employees.

The Shows & Exhibits Division worked closely with the NRA Secretary's office to make the Members' Meeting on October 24th, in Tucson, Arizona, a huge success. The S&E division worked diligently on-site selection, ticketing, soliciting bids for audio/visual, production etc. as well COVID compliance requirements, with emphasis placed on maintaining costs. Through contract negotiations, minimizing staff levels, with staff taking on multiple assignments outside of their normal scope of duties, costs were maintained at a minimum. The S&E also worked with the NRA Secretary's office to make the difficult decision to reschedule the 150th NRA Annual Meetings in Houston, Texas. The change was necessary to ensure an unrestricted, full in-person event, with as many members being able to attend as possible. Given the current challenges for the event industry, the S&E division was able to negotiate more favorable terms to continue to minimize cost, but still maximize the experience for NRA Members. The meeting will now be held September 2-5, 2021.

The Education & Training Division continues to reach thousands of individuals to teach and promote safe and responsible firearm use. The E&T division launched an updated Training Counselor Development workshop. The new format received positive reviews from all. In response to the COVID-19 closures and social distancing mandates, the Training Department created a distance learning option for instructors to meet the demand for training while abiding by their local COVID restrictions. Training conducted by the Instructor Cadre along with materials sales has increased approximately 70% over the last year, with a spike of 300% over the summer months. This trend is expected to continue as we move into 2021.

The Community Engagement Division remains on the forefront of assisting affiliated clubs, associations, and Business Alliance partners. Total affiliated organization they assist are 12,861 with 4,893 being Business Alliance partners. Affinity partnerships for these programs, despite the COVID-19 pandemic, have generated revenue totaling nearly $3.4 million for 2020.

The NRA Online Hunter Education program has had 51,418 individuals complete the course. The most recent release has been in the state of Tennessee. Development is being finalized for North Carolina and Massachusetts. The division continues to work diligently with every state agency to ensure the course is available in all 50 states.

The Law Enforcement division continues to process NRA Law Enforcement Instructor Renewals. The division has currently waived the need for Continuing Education Hours to renew your Law Enforcement Firearm Instructor Certification through the end of 2021, as it is very difficult for our certified instructors to obtain the needed training for renewal due to schedules, and COVID-19 restrictions.

The LE division continues to administer Law Enforcement Officer Safety Act (LEOSA) required qualifications to 510 retired officers who reside in Virginia. This is a free service provided as a "thank you" for their service. This is an outstanding program to show we stand behind our men and women in blue, even in retirement.

The following reflects activities and highlights for various divisions within General Operations from October to December 2020.

**Shows & Exhibits Division**

- 2021 AM has been postponed to September 2-5 to avoid COVID restrictions that would negatively impact the 150th Anniversary celebration.

- Contracts have been renegotiated where possible and addendums added to the convention center, HQ hotels and over 30 other hotels in our block.

- 77% of 2021 GAOS exhibitors have committed to the 2022 show by rolling their booth space payments forward.


**Education & Training Division**

- New Training Counselor Workshop Format:  Spearheaded by the Training Counselor Coordinator, the new 5-day workshop includes the Policy and Procedure but puts a strong emphasis on teaching TC Candidates methods to coach their pupils. The Workshop is well received by both candidates and current TCs as auditors.

- Online Training: The online Basics of Pistol Shooting has seen a 100% increase in students, resulting in more than 14,000 users to date. The Online Shotgun Coach Course is completed and is standing by for launch once all of E&T's IS processes are aligned.

- ID Cards: Training Department has been working to provide new ID cards that are available for a small fee for those Instructors that desire a nicer ID card instead of the printed paper ID cards.

- Distance Learning: Training Department has created a modality of training that allows Instructors to conduct Training during Covid-19 social gathering restrictions. A survey of Instructors shows a favorable response to these new offerings.

- Recert Process for long expired Instructors: Due to the number of Instructors wishing to come back to the NRA after letting their certifications lapse for more than two years, a recertification program was created. These Instructors receive all MOU's, Eblasts and the appropriate Training Materials to study from. Instructors scoring above 90% on the recertification exam will have their ratings reinstated.

- Coach Program: The Coach Education Program (CEP) is in the process of alignment with Instructor Program to take advantage of the automation of administration so that efforts will be on Training/Curriculum development in leu of manual registration and material ordering.

**Community Engagement Division**

- In 2020, RTBAV (Refuse to Be A Victim) instructors ordered materials for 4,247 students for 249 basic seminars being held across the country.

- RTBAV Regional Counselors held 55 Instructor Development Workshops. The online instructor course continues to have success certifying 376 new instructors in 2020. The online course is held twice a month with a designated Regional Counselor as the online professor. This brings the total number of RTBAV Instructors to 6,196.

## Community Engagement Division - *continued*

- We have also had law enforcement support in teaching the new Refuse to Be A Victim Collegiate Edition with multiple agencies using the course with local high school students and graduating seniors. Several new campuses had officers become certified instructors with the online course. We have had 34 active duty law enforcement officers and 14 campus personnel register to take the online instructor course.

- The *"NRA Places to Shoot"* has 4,037 ranges entered in the database with permission from the range operators to use on the NRA website. This is a valuable resource for all NRA members looking for ranges in their area.

- Additionally, with funds made available thru the NRA Range Grant Endowment, NRA was able to provide 16 ranges with $71,069 for eligible range improvement projects. The NRA Range Grant program is available exclusively for 100% NRA Clubs, with priority given to Gold Medal Clubs, for projects related to range safety improvements. These funds are essential to assist our clubs with necessary safety improvements to ensure successful operation into the future.

## Law Enforcement Division

- We are processing NRA Law Enforcement Firearm Instructor Renewals. This generates revenue for the Law Enforcement Division in renewal fees, but also, for the Membership Division, as membership must be maintained during the certification period and also for Clubs & Associations, as licensed to be armed private security must be affiliated with the NRA as a requirement of the certification.

- We have waived the need for Continuing Education Hours to renew your Law Enforcement Firearm Instructor Certification through the end of 2021, as it is very difficult for our certified instructors to obtain the needed training for renewal.

- We have administered the Law Enforcement Officer Safety Act (LEOSA) required qualification to 510 retired officers who reside in Virginia. This is a free service we provide as a "Thank you" for your service. Most of the retired officers who attend are already members of the NRA, but those who are not, generally join. Current members tend to make donations. This is an outstanding program to show we stand behind our men and women in blue, even in retirement.

## Competitive Shooting Division

- Difficulties to hold events surrounding the restrictions due to COVID-19, state executive orders, etc. has limited the ability for the division to successfully hold matches.

- The Division continues to sanction matches, posting the scores of the matches as well as responding to customer service inquires.

- The 2021 National Match Calendar for Camp Atterberry has been posted on the website. The continuation to ensure proper development of the NRA National Marksmanship Competition Center remains in progress.

**Administrative Services Division**

- The UPS contract, negotiated earlier in 2020, continues to be successful with an anticipated savings of approximately $1.2mm over the course of 2020.

- Leases were obtained with tow (2) new tenants at the 11244 Waples Mill Road property increasing revenue by approximately $50,000.

- The NRA Range continues to be successful despite the ongoing COVID-19 state restrictions, and the national shortage of ammunition. The Range has reduced its hours of operation temporarily due to some temporary staffing issues.

- Management and Range Officers have been successful in operating the Range within the state restrictions. The Range has received many compliments from patrons of how well the operation is running, and all of the extra measures being taken, in addition to normal safety oversight, during the pandemic to keep our patrons safe while enjoying the Range.

**NRA Museum Division**

- The NRA Firearms Museum remains closed due to state restrictions as well as limited staffing to meet the cleaning needs of the COVID-19 state requirements.  However, the NRA National Sporting Arms Museum at Bass Pro Shops in Springfield, MO averages approximately 2,750 visitors a week.

- Thurston Exhibit Construction – The construction of new cases and facility improvements in the Civil War and Old West areas of the museum are complete and ready for the installation of new displays.

- During this reporting period, the Museum division presented traveling displays at one gun show locally.

- The NRA Museum continues to excel with social media.  The museums YouTube Channel saw 142,635 new visitors in the 4th quarter of 2020 with a cumulative total of 11,625,312 views.  The number of Facebook likes continues to stand at 461,834.

**Shows & Exhibits Division**
**4th Quarter 2020**

Submitted by:
Jeffrey Poole, Managing Director

## Great American Outdoor Show

COVID-related governmental restrictions in Pennsylvania forced the cancellation of the 2021 Great American Outdoor Show originally scheduled for February 6-14, 2021. Given the size and unique composition of the event, relocation or rescheduling was not a viable option as it would not have made fiscal sense. The next Great American Outdoor Show is scheduled for February 5-13, 2022.

Retaining exhibitors after cancelling an annual event is always a concern, particularly large scale events like GAOS with over 1,100 exhibitors. However, our policy provided the option for a full refund or the ability to transfer booth space fees to the 2022 show in the event of a cancellation. Communications regarding this policy were clear and frequent, and exhibitors clearly appreciated the flexibility and transparency as 77% of all exhibitors opted to roll their monies paid to date to the 2022 event. This ratio greatly exceeded expectations and allowed for the retention of over $1.1 million in booth space revenue. In comparison, some other cancelled 1st quarter events, such as SHOT Show, adopted a forced 50/50 policy that mandated a 50% refund and 50% of exhibitor booth space payments to be applied toward 2022 SHOT Show.

Additionally, advertising and sponsorship opportunities will be made available throughout 2021 to those exhibitors who elected to stay in the 2022 show via a series of digital communications to past show attendees. This will also serve to help keep past attendees engaged throughout the year to help build anticipation for the 2022 Great American Outdoor Show.

## Annual Meetings & Exhibits

The 150th NRA Annual Meetings & Exhibits in Houston, TX scheduled for May 13-16, 2021 was recently rescheduled for September 2-5, 2021 and will remain in Houston at the George R. Brown Convention Center. Rescheduling was a difficult decision given that historically the event has taken place in the April/May timeframe every year. However, the change was necessary to ensure an unrestricted, full in-person event, with as many members attending as possible for NRA's 150th Anniversary.

Addendums have been added to the existing agreements with the convention center, two HQ hotels and over thirty additional hotels with rooms blocked for the event. Given the current challenges for the event industry, more favorable terms were negotiated where possible.

Last held in Houston in 2013, the George R. Brown Convention Center and surrounding space has undergone significant improvements both inside and out that bode well for the increased size and scope of the Annual Meeting. In addition to the existing 1,200 room Hilton Americas, a 1,000 room Marriot Marquis has been added to the "campus" since we were there last. Both of these hotels are connected by skywalk to the Convention Center. Also added was

the Avenida Plaza, an outdoor pedestrian-friendly event and leisure space featuring restaurants, and retail space.

To help celebrate NRA's 150th Anniversary, plans this year include additional entertainment options to create a festive atmosphere in Discovery Green Park, which is part of the convention center campus. Located directly in front of the convention center and between the Hilton and Marriott Marquis, Discovery Green is a 12 acre park that will feature live entertainment and interactive events throughout the weekend.

Planning is well underway as we closely monitor changes and anticipated improvements regarding COVID related restrictions to take advantage of all opportunities to produce the event in a traditional format worthy of celebrating NRA's 150th Anniversary.

## Members Meeting

With the cancellation of the Members' Meetings in April as part of the Annual Meetings, the Shows & Exhibits staff assisted the Secretary's Office in the production of the rescheduled Members' Meeting on October 24 in Tucson, Arizona. This included assistance with site selection, ticketing, soliciting bids from audio/visual companies, room layouts, directional signage, graphics, on-site operations, and meeting COVID requirements.

By all accounts the event was conducted safely and successfully, while emphasis was placed on helping to maintain costs through contract negotiations with trusted vendors and minimizing staff levels with the on-site staff taking on several assignments outside of their normal scope of duties typically performed in a traditional Members' Meeting format.

**NRAstore**

Year-to-date, shipped sales trail those of 2019 by only 1.7%. Interestingly, demand is up 7.4%. Backorders currently top $200K. The high level of backorders is a result of limitations placed on purchasing/replenishment, as well as unavoidable seasonal shipping delays due to COVID absences and untimely weather events.

| NRAstore Sales January 1 – December 15 | | | |
|---|---|---|---|
| | **2020** | **2019** | **% Change (from 2019)** |
| Received Orders – Phone [demand] | 14,511 | 12,734 | +14.0% |
| Received Orders – Mail [demand] | 3,669 | 4,275 | -14.0% |
| Received Orders – Web [demand] | 52,642 | 49,035 | +7.4% |
| Total Received Orders [demand] | 70,822 | 66,044 | +7.2% |
| Total Received Revenue [demand] | $6,021,320 | $5,608,125 | +7.4% |
| Average Sale (calculated on received orders [demand]) | $85.02 | $84.91 | +.13% |
| Total Catalog Revenue (actual shipped sales) | $5,487,616 | $5,581,992 | -1.7% |
| Contributions (RoundUp, Add-A-Buck) | $50,215 | $45,170 | +11.2% |
| NRAstore at the Museum | $37,955 | $134,106 | -71.7% |
| Other Revenue (cover sponsorship, order inserts, catalog blow-ins) | $74,107 | $90,957 | -18.5% |
| Events Sales (GAOS) | $45,423 | $463,074 | -90.2% |
| NRAstore YTD TOTAL | 11,858,365 | 12,055,597 | |

**Ongoing Programs**

- NRAstore actively solicits and recruits new NRA members through e-mail promotions and applications inserted in outgoing packages. From January 1 through December 15, 2020, NRAstore efforts have generated 3,866 memberships/renewals for a total of $228,898.
- Year-to-date, NRAstore has generated $50,215 in donations through its "Add-A-Buck" and "Round-Up" programs (an 11.2% increase over the same period in 2019). These programs allow customers to donate in increments of $1.00, $2.00, $3.00, $5.00 or $10.00 at checkout (Add-A-Buck), or they may choose to "Round-Up" their orders to the next whole dollar. NRAstore.com also offers customers the ability to create custom donations of their own choosing.

## EDUCATION AND TRAINING DIVISION
### 4th Quarter 2020

Prepared by:
John Howard, Deputy Director

### Education & Training Overview

The Education & Training Division works diligently to *"Develop and Maintain the National Standard for Safe and Effective Firearms Education and Training as well as Serve and Support our Instructors who deliver it."*

The division continues to reach thousands of individuals throughout the year with the safe and responsible use of firearms. We continue to strive to serve our members, trainers, and the public with the highest level of quality support.

At this time, there are roughly 110,000 NRA Certified Trainers and RSO's with over 118,000 Trainers and Coaches registered on our website, www.nrainstructors.org. There are approximately 2,200 Training Counselors (TC).

Education & Training launched an updated TC Development workshop. The new format received positive reviews, both from TC candidates and current TC's invited to audit the course. Modernization of all lesson plans is ongoing. Currently four disciplines are available online at www.nrainstructors.org. In response to the COVID-19 closures and social distancing mandates, the Training Department created a distance learning option for instructors to meet the demand for training, while abiding by their local social distancing mandates. In addition, the NRA Program Materials Center converted to a new platform during the summer. Education & Training staff has provided an enormous amount of time and energy assisting with the myriad of issues related to the release of the new platform. Training conducted by the Instructor Cadre along with material sales increased approximately 70% over last year, with a spike of 300% over the summer months. This trend is expected to continue as we move into 2021.

In 2021 our Trainers will have the option to purchase hard-copy instructor cards with all their ratings shown on the card. We made the full-switch to electronic certificates in mid-January. This allows us to get better metrics on courses taught and students reached. We increased our credentialing fees January 2020. The increased fees will help as we continue to develop and administer the NRA's Training programs and serve/support those who teach them. It is important to note that not all growth detailed in 2020 is organic, as the Education & Training is capitalizing on current conditions by providing exceptional trainer support and materials. This will set the stage for continued growth in the coming years.

**Training Department**

Basic Firearm Education Program and Fulfillment

NRA Training Department responds to thousands of NRA members and non-members who request information on NRA student courses and instructor training by email and phone. Due to the onset of the COVID-19 Pandemic all available staff are primarily responding to customer service requests, while working on program improvement secondarily as time permits. The all hands on deck approach to customer service during this surge in training nationally is a necessity, but comes at the cost of program development. The Training Department is observing that many Instructors that have not been involved in NRA Programs for years have a renewed desire to reactivate their credentials to start teaching again. In response to this demand, the Training Department has created a recertification process to bring these instructors back into the NRA fold. Currently, the administration of this process is performed manually. Automation of this process on www.nrainstructors.org will occur in 2021.

NRA-Certified Instructor Statistics

NRA Certified Instructors teach basic firearms safety and shooting courses to the public. There are currently *113,318 NRA Certified Instructors and Range Safety Officers. In 2020, 66% (45,000) more NRA courses were administered compared to 2019 (27,000). Additionally, there were 73% (219,926) more students taught in 2020 when compared to 2019 (127,010) *Note- This number can swing quickly month to month due to delayed renewals. The rating of "coach" is not incorporated in this number.

NRAInstructors.org

There are currently 118,996 Trainers registered on the site, to include coaches. This represents a 1% increase since the last report and has not changed more than +/- 5% in the last 4 reports. This suggests that a market equilibrium exists. Given the difficulties that many Trainers have had to endure to conduct instruction this year, stability in the Instructor Cadre is more than acceptable. Monthly analytics show that between 75,000 and 100,000 new users visit www.nrainstructors.org each month.

NRA Trainer Discount Program

The firearms industry recognizes the impact NRA Instructors have on the shooting public. Companies that wish to provide their support to NRA Training Programs are administered by the Office of Advancement, Corporate Partnerships.

NRA Training Materials Sales

The materials sold for conducting NRA training (although not in the Training Department budget) is an important metric for tracking and reporting purposes. In 2020, Training Department materials gross sales, excluding in-house orders, surpassed 2019 by over 69%. 2020 (2.7M) 2019 (1.6M).

## Trainer Support

### NRA Training Counselors

Training Counselors train NRA Certified Instructors on how to teach basic shooting skills. Individuals who wish to become Training Counselors attended a Four-day intensive workshop that includes shooting qualifications and classroom exercises before certification is awarded. In 2020 NRA Training added an additional day to the workshop which quadrupled the amount of shooting and increased classroom exercises. The goal of this change is to make the NRA TCDW a premier Instructor Development Workshop. There are currently 2,183 Training Counselors.

In 2020, the Training Department conducted TC Workshops in Florida, at HQ in Fairfax and the Izaak Walton League in Stafford, VA. The 5-day format has been very successful to date. It was necessary to put TCDWs on temporary hold in response to COVID-19 Pandemic safety precautions. The workshops started back up in October at a facility with an outdoor range. Registration is open for three Workshops in the first quarter of 2021, which are being offered to a waitlist of 130 Individuals. Due to the 12-16 person class size, participation in NRA TCDWs in 2021 is projected to be very good.

Part one of our discipline specific instructor courses, Basic Instructor Training (BIT), administrated by Training Counselors, is in modernization. A new NRA Trainer's Guide is in writing and the accompanying PowerPoint presentation is developing on a parallel track. The Training Department had previously projected releasing the new BIT on or about the first week of January 2021. After surveying the Training Counselor Cadre via Survey Monkey, BIT will include even more instruction, with a new projected launch of July 1, 2021.

### NRA Instructor/Basic Firearm Training Program

### Distance Learning

In response the COVID-19 Pandemic safety precautions and the enormous surge in new firearm ownership, the Training Department created Distance Learning Courses in March. This enabled instructors to continue to offer training in an effort to reach new gun owners. Restrictions nationally have prevented traditional classroom teaching. The Distance Learning offerings differ from their parent courses in two ways. First, the classroom portion is lead over a **two-way** electronic delivery system such as Zoom, Facebook live, WebEx, etc. This is essential so that the student participation in the classroom portion of the course is present. Pre-recorded teaching is strictly forbidden. Secondly, all firearm handling is performed at a range with the student, and in accordance with their State's COVID-19 guidelines. Also, included in the Distance Learning Offerings is The New Shooter Seminar. This is a non- shooting, 45-minute safety seminar. In July, 2020 the Training Department Surveyed all NRA Instructors on the utility of Distance Learning. The most significant finding was that 77% of respondents wanted the Gun Safety Seminar to remain in the Distance Learning format indefinitely.

E-Learning and Blended Training

**14,182** students have enrolled in the online Basics of Pistol Shooting course since January 1, 2020. This is increase of approximately 10,000 users over the same period in 2019.

Nearly 8,000 individuals have registered and participated in our e-learning NRA Range Safety Officer course since its release in August 2013. This year to date, 776 individuals have enrolled in the course.

Lesson Plans

In 2020, E&T has modernized the Lesson Plans of the Top three (3) courses, Basics of Pistol Shooting, Basics of Shotgun Shooting and Basics of Rifle shooting. All Lesson Plans are based on the NRA CCW model. Direct feedback from the field has been stellar as the instructors began looking at the new design and using it in their courses in the days that followed the release. Instructors noted that if all the future curriculum follows the same design, they would look forward to teaching more courses. A survey of the Training Cadre confirmed the individual feedback showing that the clear majority of Trainers preferred the new Lesson plans. Personal Protection in the Home and Range Safety Officer Lesson Plans are currently in production.

Publication Development

The Training Department worked with NRA Publications in the development of a replacement handbook- *NRA Guide: Basics of Pistol Shooting Handbook*. The focus is to set a baseline which will align all of the Training Courses that utilize the Student Handbooks. New book BOPS Handbook sales increased from 150 to almost 500 units per day. The Basics of Rifle Shooting Handbook is to be next in production.

Regional Network

The Training Department held quarterly online web conferences with the Regional Training Counselors. These quarterly calls are meant to augment the daily communication that occurs with the Regional Training Counselors. As noted in the last report, NRA Training Department has developed a communication and training network throughout the United States that mirrors the Friends of the NRA Network. The country is divided into eight regions with one Regional Training Counselor per region. Each state has a number of State Training Counselors that receive information from the Regional Training Counselor. Training is provided (remotely) to the Regional Training Counselors, who disseminate the information to the State Representatives. This program is completely volunteer based. The flow of information to and from Trainers in the field will improve communication between instructors and NRA Headquarters which will result in more consistent administration of NRA courses.

NRA Trainer's Forum

The Office of General Counsel (OGC) has conducted a review of the Training Department's Policy and Procedure for the NRA Trainers Forum. Modifications based OGC's recommendations are incorporated in the ongoing development of the Trainer's Forum. The forum is currently preparing

to move from staging to a roll-out to the State and Regional Training Counselor program for Beta testing. Once familiar with the use and we are comfortable with our ability to moderate it, the Training Department intends to launch it to all NRA Trainers nationwide. The primary goal of the forum is to improve communication amongst NRA Trainers and between those NRA Trainers and the NRA E&T Division. The Trainers only forum will not only improve our ability to communicate, it will diminish the effectiveness of the various *'un-official'* NRA training forums. It is timely and necessary. Our goal is to have completed Beta Testing and announce the Forum at NRA Annual Meeting 2021.

## NRA Coach Education Program (CEP)

The CEP is committed to developing and educating shooting sports coaches who will be effective teachers and role models for athletes in pursuit of sustained competitive excellence in the rifle, pistol, and shotgun disciplines. The nation's major competitive shooting organizations recognize the Coach Education Program as the competitive shooting coach training and credentialing body.

Coach Schools
A temporary hold on Coach Schools was put in place in June, 2020 while a restructuring of the CEP occurred. Restructuring of the CEP to align it with the Instructor Program was already planned in 2019 but became a necessity in 2020 due to the automation already in place for the Instructor Program. Coach materials were moved into the Program Materials Center and a temporary online registration process was created to allow time for a complete buildout of the new IT structure. Coach Schools resumed in October. Currently, Training Department is working with the Information Services Division to test the new permanent structure. Planned rollout of the new CEP is scheduled for Q1, 2021.

National Coach Development Staff (NCDS): NRA Education and Training also trains and manages the National Coach Development Staff (NCDS) which is a select, specially trained volunteer staff of 136 rifle, pistol, and shotgun coaches from all over the United States who provide training at coach schools, clinics, and camps. The Training Department will be holding webinars with NCDS in Q1, 2021 displaying the revamped Coach Education Program. NCDS has been receiving regular updates on the new process throughout 2020.

Online Coach School
The Training Department and AllenComm have successfully developed an Online Shotgun Coach Program.. The course is interactive with videos, animation, and graphics as well as detailed descriptions on how to coach an athlete.

The launch of the Online Shotgun Coach School is currently on hold. The Training Department was in the process of making final edits prior to launching the course when COVID-19 disrupted operations. Once the new CEP process is completely operational, work on this project will resume.

## Youth Training

The Youth Training section of the NRA Training Department oversees five (5) major programs designed to introduce young people to shooting and provides opportunities for them to stay involved in the shooting sports. The five programs are: (1) National Youth Shooting Sports Cooperative Program, (2) NRA's Home Air Gun Program, (3) NRA Outstanding Achievement Youth Award Program, (4) NRA Marksmanship Qualification Program, (5) NRA National Youth Shooting Sports Ambassador Program.

The Training Department has been able to continue support for activities that were in place in 2019 but as of this writing, most of the programs are suspended due to the COVID-19 pandemic. The Marksmanship Qualification Program is still very active and Education & Training will retain most of the 2020 Ambassadors through 2021 since they were not able to perform their duties in 2020. Additionally, Education and Training will continue to support the National Youth Shooting Sports Co-op as funding allows.

## COMMUNITY ENGAGEMENT DIVISION
### 4th Quarter - 2020
Prepared by:
Elizabeth Bush, Managing Director

The NRA Community Engagement Division provides NRA members, youth, and others of all ages, with educational programming and resources. Programs such as Clubs and Associations, Eddie Eagle GunSafe®, Refuse To Be A Victim®, Adaptive Shooting, Women's Wilderness Escape, Youth Hunter Education Challenge, Hunters for the Hungry, Online Hunter Education and the Range Technical Team, showcase the invaluable outreach efforts that NRA General Operations provides to communities across the country. These programs offer and support a wide array of interests in the shooting sports and other educational opportunities with a local, state, and national reach.

## ADAPTIVE SHOOTING DEPARTMENT:

The Adaptive Shooting Program continues to offer training, guidance and resources for NRA members, instructors and the general community.  No new projects have been launched since the last report but e-mails and phone calls continue to come in from Certified Instructors and Training Counselors seeking assistance with training students with disabilities.

Three Temporary Waivers for participation in NRA Competitions were completed for review at the NRA Protest Committee meeting in January 2022.

## CLUBS & ASSOCIATIONS DEPARTMENT:

Through our affiliated clubs, associations, and Business Alliance enrollees, this grassroots network keeps the NRA in the forefront of community action to benefit the American public. Total affiliated organizations are 12,861 with 4,893 being Business Alliance. Affinity partnerships for these programs have generated revenue for NRA totaling nearly $3.4 million for 2020.

The Clubs & Associations department processes affiliation applications, advises NRA members of clubs located in their areas, and provides support to these organizations as requested. Benefits of NRA Club Affiliation include: discounts on Range Technical Team services and conferences; advertising clubs and ranges through *Find NRA Near You*; access to club insurance offered by Lockton Outdoor Affinity, and many other discounts on products and services. Additional benefits are available to Law Enforcement Clubs.  Affiliated clubs are also eligible for NRA Club Awards and Range Grants, opportunities to earn additional income through the NRA Recruiter program, and receive a digital copy of *NRA Club Connection Magazine* on a quarterly basis to stay up-to-date with the latest NRA programs and services available to our affiliates.

### Business Alliance:

The NRA Business Alliance is an affiliate network of businesses that support the NRA.  Enrollees in the Business Alliance program receive benefits and promotions of their services and products through the Business Alliance Online Directory.  Other benefits of NRA Business Alliance

Affiliation include: monthly NRA magazine of their choice; access to business insurance offered by Lockton Outdoor Affinity, credit card processing discounts provided by *Clearent*; and access to FFLBizHub, a trusted platform offered by Orchid Advisors that facilitates entry, licensing and ebound book services. Additional benefits include an affinity partnership for firearms software from the Gearfire including Gearfire website services and AXIS, providing firearm industry retailers with access to the industry's best in class in-store Point of Sale (POS) and online eCommerce platform, Gearfire Marketing and RetailBI for customer sales analytics.

**State Associations:**

State Associations serve a critical role as the state-level delivery system for NRA programs and legislative information. The NRA depends on State Associations to promote firearms and the Second Amendment within their states and motivate NRA-affiliated clubs and grassroots volunteers to activate their programs in their local communities. Benefits to these organizations for taking on this essential role include access to communication via email/mail to NRA members to promote events and membership within their organizations, special grant programs, and access to all other NRA Club benefits. At the time of this report, 49 of the 51 State Associations sent in their required report that includes essential details on their organization participation in NRA programs and legislative matters at the state level.

Coordination with the NRA Clubs & Associations is the primary method of attaining successful results by NRA State Associations. NRA is able to help these organizations with modernization of their websites, social media, member outreach, and coordination with NRA-ILA.

**Brownells/NRA Day Program:**

Brownells/NRA Day events provide adults, youth, families, hunters, sportsmen, competitors - literally everyone - the opportunity to come together under a formal program to learn, experience, share, and grow in appreciation of the shooting sports. The event themes provide exposure to the many different activities available in shooting sports and offer participants the opportunity to learn in a safe, controlled environment. Even with the COVID-19 pandemic in 2020, there were 47 events conducted throughout the year.

**COMMUNITY OUTREACH DEPARTMENT:**

**Eddie Eagle GunSafe® Program Overview (*Statistics accurate as of 12/2020*):**

| Materials | Number of Children Reached |
|---|---|
| Level 1: Pre-K -Kindergarten | 11,109 |
| Level 2: 1st – 2nd grades | 9,837 |
| Level 3: 3rd – 4th grades | 10,727 |
| All Age Activity Books | 1,062 |
| Total Number of Children Reached in 2020 | 32,735 |
| Total Since Inception | 32,371,095 |
| | |
| Eddie Eagle.com Online Treehouse website users in 2020 | 8,142 |
| Eddie Eagle Explore Website visitors in 2020 | 31,252 |

Community Engagement staff have sought grant funding from The NRA Foundation *(Friends of NRA)* in every state. These grants make it possible for law enforcement agencies and educators to purchase the materials they need to spread Eddie Eagle's important safety message. Also during this reporting period, *Friends of NRA* through the NRA Foundation have awarded approved agencies the funds to purchase fourteen Eddie Eagle costumes. These costumes were shipped to Kentucky (X2), Tennessee (X4), Indiana, New Jersey (X2), California, New York, North Carolina, Florida and Ohio with each representing a $2,800 investment to increase the safety of children in these communities.

**Refuse To Be A Victim:**

At year end for 2020, RTBAV (Refuse To Be A Victim) instructors ordered materials for 4,247 students with 249 basic seminars being held across the country. The program has now reached at least 168,000 people since the program started.

RTBAV Regional Counselors held 55 Instructor Development Workshops. The online instructor course continues to have success certifying 376 new instructors in 2020. The online course is held twice a month with a designated Regional Counselor as the online professor. This brings the total number of RTBAV Instructors to 6,196.

We have also had law enforcement support in teaching the new Refuse To Be A Victim Collegiate Edition with multiple agencies using the course with local high school students and graduating seniors. Several new campuses had officers become certified instructors with the online course. We have had 34 active duty law enforcement officers and 14 campus personnel register to take the online instructor course. Collegiate seminars have also been held this year now reaching over 5,000 students since the program began.

## HUNTER SERVICES DEPARTMENT:

**Hunter Education Program:**

NRA Online Hunter Education has fundamentally changed the way hunter education is conducted. This program is available online at www.NRAHE.org. Since inception, a total of 51,418 have completed the course. Connecticut, Florida, New Mexico, Oklahoma, Oregon, Texas, Kentucky and West Virginia have adopted the course, with our most recent release in the state of Tennessee. Additional development is being worked on for North Carolina, and Massachusetts. Hunter Services staff is attempting to work with every state agency to ensure the course is available in all 50 states.

**Women's Wilderness Escape:**

NRA continues to offer the Women's Wilderness Escape (WWE) program that provides women 18 and older with a getaway opportunity to obtain firearm education with exposure to a wide variety of shooting sports activities and an array of outdoor related activities. Due to the COVID-19 pandemic, the offerings for WWE in Seven Springs, PA and at the NRA Whittington Center were cancelled. We were however able to offer the WWE Sig Sauer Academy, NH Event, August

15-16, 2020, which was a success for ladies who were able to attend. We plan to resume this program at the NRA Whittington Center the week of July 18-24, 2021.

## Youth Hunter Education Challenge:

NRA's Youth Hunter Education Challenge (YHEC) is a program focused on outdoor skills and safety training for young hunters. This program is conducted under simulated hunting conditions to provide the best practical environment for reinforcing and testing a young hunter's skills. YHEC is stronger than ever, having adapted throughout the years, reaching over 8,000 youth hunters on an average year. The events are designed to simulate real life hunting situations encountered in the field. The participants will engage in some or all of these activities at the various events; .22 rifle marksmanship, clay shooting with a shotgun, muzzleloader shooting, 3D archery shooting, Wildlife ID, a hunter safety trail exercise, orienteering and an online hunter responsibility exam.

Despite the COVID-19 pandemic, there were 3 State, 5 Local and 1 Regional event that took place in 2020. The Central Regional Youth Hunter Education Challenge was held at the Benton County Quail Facility in Bentonville, Arkansas on July 22-25, 2020 with over 250 Competitors, Coaches, Volunteers and Family members attended this premier hunter-education/competition that allows youth to test their shooting ability and their knowledge of the outdoors. Planning for 2021 events are already underway with 1 local, 4 state, and 1 Regional event already on the books.

Young hunters are able to network at YHEC events with other youth with similar interests. NRA serves an integral role thru this program in educating and supporting the hunting, shooting and outdoor leaders of tomorrow. This popular and growing program has seen over 1.3 million of America's youth complete a course since inception.

## Hunters for the Hungry:

The Hunters for the Hungry initiative has been supported by the NRA for over 25 years. NRA Hunter Services works closely with state organizers to put interested individuals in touch with the programs in their area. The NRA maintains the only national database of processors for hunters to easily find a donation center to drop off their game. Since the program's inception, Hunters for the Hungry has brought hundreds of thousands of pounds of venison to homeless shelters, soup kitchens and food banks across the United States.

Currently, the NRA Hunters for the Hungry Clearinghouse (HFH) has 51 member affiliates. NRA's efforts have fostered public awareness of Hunters for the Hungry through education, fundraising and publicity including coverage in NRA media, press releases, posts to the NRA Community Engagement Facebook page, as well as most recently a webinar offered to all State Fish & Wildlife Agency Directors and NRA Hunt Clubs to provide useful information on how to start a Hunters for the Hungry Program in their area.

## RANGE SERVICES DEPARTMENT:

The Range Technical Team is a nationwide network of volunteers trained in the field of shooting

range development, design, and operations. Services provided by Range Technical Team Advisors (RTTA) include range-planning assistance, range use, procedural evaluations, and range safety and design evaluations. Due to the COVID-19 pandemic, the program is was put on hold and will resume in 2021 with limited availability due to state/local travel restrictions and staffing limitations. 58 new range cases were requested in 2020, 38 were closed with Range Source Book and Online Conference recommendations, 8 have been provided contracts for consideration and an additional 12 are on hold for processing due to lack of RTTAs in their state or availability due to COVID-19 concerns.

NRA Range Services also had to cancel the two scheduled Range Development and Operations Conferences in 2020, which we plan to resume in Fall 2021. The Online Range Development and Operations Conference registered 112 participants in 2020.

The *"NRA Places to Shoot"* has 4,037 ranges entered in the database with permission from the range operators to use on the NRA website. This is a valuable resource for all NRA members looking for ranges in their area.

Additionally, with funds made available thru the NRA Range Grant Endowment, NRA was able to provide 16 ranges with $71,069 for eligible range improvement projects. The NRA Range Grant program is available exclusively for 100% NRA Clubs, with priority given to Gold Medal Clubs, for projects related to range safety improvements. These funds are essential to assist our clubs with necessary safety improvements to ensure successful operation into the future.

## Additional Outreach Efforts:

NRA Community Engagement launched a closed Facebook Group in December 2019 that gives a voice to the average NRA Member, with a primary target audience of NRA Clubs & Associations members. This page is providing an opportunity for both members and NRA to have an open discussion about programs, grants, awards and NRA related news in an easy to use format with up-to-date information. Over this past year, the NRA Community Engagement Facebook Group has grown to include 11,479 members with 1,315 posts, 27,567 comments and 161,487 reactions.

## NRA LAW ENFORCEMENT DIVISION
### 4th Quarter 2020

Prepared by:
Glen Hoyer- Director

## LAW ENFORCEMENT DIVISION OVERVIEW

The Law Enforcement Division provides Law Enforcement Firearm Instructor Training to members of public law enforcement, licensed to be armed private security and members of the U.S. Military. The Division also provides competition programs, as competitions is a direct extension of training, and serves to increase an officers marksmanship abilities, firearm handling techniques and safety. Additionally, the division will provide other services, support and benefits to the law enforcement and military communities, as is needed.

## LAW ENFORCEMENT TRAINING DEPARTMENT

The Law Enforcement Training Department schedules and conducts NRA Law Enforcement Firearm Instructor Development Schools in the disciplines of Handgun/Shotgun, Handgun Only, Tactical Shotgun, Tactical Shooting, Select Fire, Patrol Rifle, and Precision Rifle for law enforcement agencies, security agencies and our military. It coordinates the tuition-free armorer schools and other training seminars offered by various firearm manufacturing companies and other appropriate training organizations at NRA Headquarters, VA. The department also certifies NRA Law Enforcement Firearms Instructors, reviews, approves and registers the firearm training and qualification courses submitted by affiliated law enforcement and security agencies. We authorize firearm instructor award and certificate requests, coordinate, attend and exhibit at various law enforcement related training conferences and exhibit halls and direct the Law Enforcement Division product inventory at SureShip. The following is a statistical report on the LED Training Department for first quarter of 2020:

**1. NRA Law Enforcement Handgun/Shotgun Instructor Development Schools** –No schools have been conducted since the last reporting period. No schools are scheduled for 2021.

**2. NRA Law Enforcement Patrol Rifle Instructor Development Schools** – No schools have been conducted since the last reporting period. No schools are scheduled for 2021.

**3. NRA Law Enforcement Handgun Instructor Development Schools** – No schools have been conducted since the last reporting period. No schools are scheduled for 2021.

**4. Law Enforcement Precision Rifle Instructor Development Schools** – No schools have been conducted since the last reporting period. No schools are scheduled for 2021.

**5. Law Enforcement Select Fire Rifle Instructor Development Schools** – No schools have been conducted since the last reporting period. No schools are scheduled for 2021.

**6. NRA Law Enforcement Tactical Shotgun Instructor Development Schools** – No schools have been conducted since the last reporting period. No schools are scheduled for 2021.

**7. NRA Law Enforcement Tactical Shooting Instructor Development Schools** – No schools have been conducted since the last reporting period. No schools are scheduled for 2021.

**8. Co-sponsored Tuition-Free Training** – The NRA's Law Enforcement Division, in conjunction with numerous firearm manufacturers and training facilities, offers tuition-free training for the law enforcement community. No schools have been conducted since the last reporting period. No schools are scheduled for 2021.

**9. NRA Certified Law Enforcement Firearms Instructors** – There are **10,821** active NRA Certified Law Enforcement Firearm Instructors with many renewals in progress. This is a decline of 484 from the last reporting period.

**10. Affiliated Law Enforcement Agencies** –There are **124** law enforcement agencies affiliated with the NRA at this time. A decline of two.

**11. Affiliated Security Agencies** – There are **306** security agencies affiliated at the NRA. A decline of 48.


## LAW ENFORCEMENT COMPETITIONS DEPARTMENT

The Law Enforcement Competitions Department sanctions all Registered and Approved tournaments for Police Pistol Combat Program, conducts the annual National Police Shooting Championships, maintains a National Classification System, provides awards for the National Records, Governor's 20 Program, National State Team Postal Match, Police Revolver Distinguished, Semi-Automatic Pistol Distinguished, and 1480 and 1490 Honorary Clubs. The department also receives and posts all scores from NRA sanctioned tournaments.

The Law Enforcement Competitors Department also is responsible for the Tactical Police Competition Program. This competition is scenario based and mirrors modern training methods and equipment.

- **NRA Police Pistol Combat Tournaments** (PPC): There currently are no Approved Tournaments or Registered Tournaments approved since the last reporting period.

- **1480 Honorary Club:** No updates.

- **1490 Honorary Club:** No updates.
- **NRA Police Distinguished Revolver Program:** No updates.
- **NRA Police Distinguished Semi-Automatic Pistol Program:** No updates.
- **NRA Police Distinguished Production Pistol Program** - No updates.
- **NRA Tactical Police Competition** (TPC): No updates as all events have been cancelled. None are scheduled for 2021.

## LAW ENFORCEMENT DIVISION ADMINISTRATION

Do to the COVID-19 shutdown all scheduled events and presentations have been cancelled.

We have been able to restart the Law Enforcement Officer Safety Act (LEOSA) qualifications conducted at NRA headquarters, when the range reopened in June. The qualifications have been handled by the Director, Glen Hoyer.

The Law Enforcement Divisions' administrative staff monitors law enforcement incidents throughout the country, and when appropriate, sends "Get Well" or "Condolence" cards to officers and agencies who have had officers injured or killed in the line of duty.

The Law Enforcement Division monitors the news for public law enforcement officers who are killed in the line of duty and we check our membership data-base to see if they are members. If they were members, we contact the agency the officer worked for to verify the information and begin the process of the $35,000 Line of Duty Death Benefit insurance, provided by the NRA. In 2020, there were six "Line of Duty Death Benefits" claims paid totaling $210,000. Since the year 2000 the NRA has paid out, through its insurance company, over 3.4 million dollars in the "Line of Duty Death Benefit" to the families of public law enforcement officers killed in the line of duty.

**SUMMARY**: All events, including our Law Enforcement Firearm Instructor Schools, Tuition-Free training, and Competitions were cancelled, through the end of the year, this also included the National Police Shooting Championships.

Realizing early on that the requirement for 24 hours of Continuing Education training, to renew your Law Enforcement Firearm Instructor Certification, would be impossible for law enforcement officers to obtain during the COVID-19 shutdown and restrictions, Director Hoyer issued a waiver on April 1st, temporarily removing the need for Continuing Education Hours for the remainder of the year. This has been extended through 2021.

Director Hoyer has taken over handling the renewal of our 10,000 plus Law Enforcement Firearm Instructors that are up for renewal this year. This computer data-base has a steep learning curve, as well as, being very time consuming, however, we are processing as many as is possible.

These renewals are not only critical to our certified instructors, but they also provide revenue to the division for the renewal fee, but also to our Membership Division, as membership is required to be certified.  Additionally, revenue is generated to the Clubs and Associations Department as licensed to be armed private security must have an agency affiliation, in addition to an individual membership for the instructor.

Director Hoyer was able to continue to qualify retired officers, who live in Virginia, for LEOSA, at the NRA's Range in Fairfax, once the range was opened again.  Approximately, 510 retired officers who live in Virginia participated in these qualifications. These qualification are conducted free of charge as a way of saying "Thank you" for your service, however, it is noticed that retired officers who are not already members tend to join and those who are make donations to the organization.

# NRA COMPETITIVE SHOOTING DIVISION
## 4th Quarter 2020

Submitted by:
Cole McCulloch, Director

As of the last Executive Vice President Report delivered in the third quarter of 2020, the Competitive Shooting Division has been significantly slowed and disrupted by the COVID-19 global pandemic.

Beginning in mid-march 2020 the division's staff began to move toward a remote work environment and by April significant furloughs or individual employee retirements were in effect. Since late April the division has been reduced to myself and one employee. In recent weeks and days leading up to this report, the CSD has seen the resignation of every staff member with any experience in every significant shooting program. Moreover, we are now down to only four total employees remaining, two of which are furloughed and have only niche levels of experience.

Given the uncertainty of COVID-19, the Competitive Shooting Division was compelled to cancel all NRA sanctioned tournaments until mid-summer 2020. Additionally, the NRA was also compelled to cancel the opening of the NRA National Marksmanship Competition Center and all of its National Championship matches to include Smallbore, High Power, Precision Pistol, and the NRA World Shooting Championship. By mid-summer the Competitive Shooting Division did reopen the sanctioning of NRA tournaments.

At this time, staffing issues, continued uncertainty and restrictions surrounding the COVID-19 global pandemic caused the Competitive Shooting Division has placed a "hold" on all NRA Competitive Shooting Programs operations beyond sanctioning of matches, posting scores and responding to customer service inquiries.

Additionally, we were able to create and post the 2021 National Match Calendar which will be conducted at Camp Atterbury. Further, the Competitive Shooting Division is relying on volunteers to assist with providing subject matter expertise related to each program in order to ensure that our national match programs are produced correctly in preparation for the 2021 shooting season.

Finally, as reported in the fall 2020 EVP Report, it remains a critical need for the NRA Competitive Shooting Division to add new qualified employees to the Division with our new center at Camp Atterbury going live in June of 2021. These new team members for Competitive Shooting Division must soon be re-hired if we are going to meet our commitments at Camp Atterbury and continue to offer Competitive Shooting Programs.

Below is an additional list of our key objectives and efforts which are now underway.

## Key Projects Underway
- Sanction NRA Competitions
- Continue to ensure the proper development of the NRA National Marksmanship Competition Center
- Post and award the 2020 NRA Sectionals
- Collect match fees and produce revenue
- Post and report competition scores across all disciplines
- Respond to customer service inquiries
- Plan for the 2021 competitive shooting season

- Continued a project to centralize, classify, automate and efficiently manage NRA competitive shooting volunteers

## Divisional Overview Summary

**1. Collegiate Program** – The Collegiate and Schools Program has no program manager and no staff. The Collegiate Pistol network of coaches has elected to leave the NRA and follow other groups sanctioning efforts. Collegiate Rifle participants and coaches at various universities are also likely to leave the NRA's sanctioning efforts.

**2. Smallbore Rifle** – The Smallbore Rifle Program also has no program manager and no staff. While the NRA continues to sanction smallbore matches, the NRA CSD has paused all program operations until staff returns.

**3. Air Gun** – The Smallbore Rifle Program also has no program manager and no staff. While the NRA continues to sanction Air Gun matches, the NRA CSD has paused all program operations until staff returns.

**4. Action Pistol** – The Action Pistol Program also has no program manager and no staff. While the NRA continues to sanction Action Pistol matches, the NRA CSD has paused all program operations until staff returns.

**5. Precision & International Pistol** – The Precision Pistol Program also has no program manager and no staff. While the NRA continues to sanction Precision Pistol matches, the NRA CSD has paused all program operations until staff returns.

**6. High Power & F-Class** – The High Power and F-Class Rifle Program/s also has no program manager and no staff. While the NRA continues to sanction High Power and F-Class matches, the NRA CSD has paused all program operations until staff returns.

**7. Silhouette & Black Powder** – The Silhouette and Black Powder Rifle Program/s also has no program manager and no staff. While the NRA continues to sanction these matches, the NRA CSD has paused all program operations until staff returns.

**8. Tournament Resources:** All of the Tournament Resources Dept. has been furloughed or have retired with the exception of Shelly Kramer. Shelly has continued to do an excellent job of processing paperwork to ensure matches continue to be sanctioned and scores are reported properly. Additional staff will be needed to re-start the tournament resources group as we emerge from COVID-19 and as we prepare for the 2021 opening of the NRA National Marksmanship Competition Center in Indiana.

**9. Sectional/Postal's** The postal events/program also has no program manager and no staff. While the NRA continues to sanction some postal type matches, the NRA CSD has paused all program operations until staff returns.

**10. Women On Target:** Women On Target® Instructional Shooting Clinics have continued in small numbers during the COVID-19 Pandemic. However, the WOT manager has been furloughed and additional staff will be needed to re-start this program as we emerge from COVID-19.

## ADMINISTRATIVE SERVICES DIVISION

4th Quarter 2020

Submitted by:

John West, Facility Manager

### Administrative Services Overview

The first quarter of the year was proceeding as expected, with building operations and our various projects running smoothly and on time. The entire NRA contact with UPS was re-negotiated and we anticipate a savings in excess of $1.2mm over the course of 2020.   Then just as the beginning of the 2nd quarter was starting the pandemic hit and everything changed.

The NRA Café closed its doors on April 6. With the building closure for 2 weeks in mid-March and the reduced number of staff able to work in-person due to social distancing requirements and concerns over spreading the virus, management decided to close the Café.

Quite a few Administrative Services Division staff were furloughed and only a small number were left to handle the remaining day to day operations of the building itself such maintenance and upkeep, paying utilities and other operational invoices and to coordinate the various administrative tasks and tenant responsibilities.  Some of our staff have taken on additional responsibilities from other departments within our division to keep us running as seamlessly as possible.

Bill Byrne, Director of Administrative Services, as well as Whit Fentem, Controller, Inventory Management, both retired on September 1.  Their departures leave us with big shoes to fill and they will be sorely missed.  We wish them both a happy and long retirement.

The Administrative Services Division now consists of 5 major departments; Administration, Facilities, Mail Room, the NRA Range and Inventory Management.  Each continuing to contribute to the safe, and efficient operation of our headquarters building as well as our tenant property.

### Facilities: *John West, Manager*

The Facilities Department continues to provide NRA employees and tenants with a high quality, efficient and safe workplace.  The following are some of the activities that Facilities staff was involved with during 1st and 2nd Quarter 2020:

- Provided support services for various functions.

- Replaced vestibules track matting with a concrete surface.

- Storm drain management servicing and county inspection and repair

- Maintain and repair all generators

- Elevator relay replacement

- Negotiated a new landscaping service agreement.

- Supervised fence move for 66 project.

- Replaced underground wires for the parking lot lights.

- Coordinated with Security and Fire Marshal to upgrade evacuation routes in café and museum, to include drawings, permitting and panic bars.

- Continue to coordinate repairs on the roof as needed.

- Continue painting projects in various common areas of the building.

- Reviewed and signed contracts for museum buildout project. Project was put on hold in April due to the pandemic but as of Sept 28 construction resumed and should be completed by late December.

- Negotiated two leases with new tenants at 11244 increasing revenue by $50,000.

- Negotiated existing tenant lease to month to month

- Reinforce all garage ceilings and structural integrity of midlevel

- Continued working with Fairfax County to close any open permits at 11250.

- Supervised dry pipe replacement in museum and south promenade.

- Coordinated a whole building cleaning and sanitizing in late March due to concerns over Covid19 to help keep our building as safe and healthy as possible.

- We reduced the number of sinks and restroom facilities available in each bathroom on every floor to allow for as much social distancing as possible. We also reduced the maximum seating in all or our conference rooms to again allow for proper social distancing.

- Coordinated with the Executive Director's Office, Security and Purchasing to obtain PPE for HQ and the range.   We added hand sanitizing stations on every floor, both the north and south sides near the elevators and several on the range and have masks and gloves available for those staff working in close contact with the public.

**Mail Room:** *Sandra Sookia, Manager*

The Mail Room continues to provide effective and efficient mail delivery and shipping services to all NRA staff members. The Mail Room recently acquired a secure acrylic box for staff to use to safely open US mail. This box reduces the chance for staff to come in direct contact with mail that could be contaminated with harmful substances.

The Mail Room is currently operating with 2 full time staff, down from 6 and as such is only in operation from 9am – 4pm daily. Due to the current pandemic mailroom staff are not delivering or picking up mail. A representative from each department comes to the mailroom to retrieve any mail or packages. Measures are in place to allow for proper distancing between staff when they come to the mail room to pick up or drop off packages and mail. Jose Fernandez retired in July from the Mail Room after 30+ years of service. We wish him a long and healthy retirement.

- The new USPS rates started Sunday, January 26, 2020.

- The rate for First Class Letters, Meter Mail, and First-Class Mail Flats/Large Envelopes did not increase in 2020.

- First Class Package Service increased by 2.2%. The increase is based on the zone. Priority Mail Express also increased by 2.2%

- Priority Mail Commercial Base Pricing increased. The increase varies depending on the type of envelope, ranging from $0.07 to $0.15 per envelope.

- Priority Mail **Flat Rate** increased. The increase varies depending on the type of box, ranging from $0.20 to $0.70.

- Priority Mail **Regional Rate** Boxes increased $0.90 cents.

- Parcel Select Ground had an increase of 2.5%.

- Media Mail increased by 1.9% in 2020.

**NRA Inventory Management:** *Cynthia Whitley, Administrative Assistant*

The General Operations Inventory Management Department concludes another year of successfully managing NRA Program Materials inventory and effectively directing our Program Materials fulfillment center in Landover, Maryland to achieve a very high level of accuracy in the fulfillment of orders resulting in a high level of customer satisfaction. To date we have accomplished the following:

- Discuss with Sureship's management specific problems that arise and ideas that will lead to a more efficient operation on a daily basis.

- The fully automated in-house ordering system enhances staff efficiency in providing materials throughout the country in support of NRA programs.

- Continue to oversee the addition and deletion of items from the NRA Program Materials Center Online Store.

- Process refunds to customers for materials returned to Sureship.

- Established an account with UPS which, after volume shipping discounts, is saving the NRA thousands of dollars annually. We are also utilizing a shipping program that compares UPS rates with USPS and applies the cheaper rate to our shipments which is saving NRA over $2,500 per month in shipping costs.

- All packet construction has halted and packet materials are now placed in boxes and shipped loosely to the customer.

**NRA Range:** *Debbie Crews, Assistant Manager*

- The NRA Range's revenue projections were on pace for this to be our best year since 2015 with $1.3-1.5M year-end revenue. We were consistently totaling more than $300K per quarter in 2020. That revenue level has halted due to the items outlined below resulting in the final quarter being our lowest at only $200K.

- Management and Range Officers have been successful in operating the Range despite the numerous difficulties we have been facing. We continually receive compliments on how well the operation is running with all of the extra measures taken in addition to the normal safety oversight.

- To operate effectively we need 31 Part Time Range Officers, 2 Full Time Range Officers, 2 Managers, and 1 Maintenance Supervisor. We currently have 12 Part Time, 2 Full Time Range Officers, 1 Manager, and 1 Maintenance Supervisor. As such, we were forced to reduce public hours by half starting in December. All rentals, classes and matches and other profitable events have been canceled since May due to a lack of staff to work those events. The dozen Range Officers and 1 Manager have been working diligently to cover all aspects of the operation without failure and to not have the shortage felt by our clientele.

- The Range Covid procedures management devised before reopening have been successful, complete and thorough. The Range Staff have been directed to ask all customers if they live together or are blood relatives and if not, they are not allowed to share a lane together in order to be compliant with the Governors Executive Orders. All firearms instruction has

discontinued at the NRA Range with this protocol in place. Masks must be worn and we are directed to ask anyone without one to leave. This is in addition to hourly sanitizations of all Range equipment, desks, counters, chairs, door handles, etc. With the increased gun sales this year, we are in a high demand to begin hosting training events and matches so we look forward to improving our staffing levels and have the Governors restrictions lifted to be the training source in our community once again.

- The national ammunition shortage has affected sales numbers. Without ammo to sell for customers to use on the Range, we are losing range patrons and ammo sales. Usual monthly ammo sales are $30K and December we are working toward only $9k. Management has contacted all approved vendors from California to Florida, contacted Remington and Winchester directly and exhausted all other outlets with no product to be had. Sales are restricted to one box per person and to only Range Users. We will remove these restrictions once we are able to receive ample quantities.

- Traffic through the use of social media has maintained current levels, exceeding 13,000 "Likes" with 1,700 people reaching us on Facebook in December and Google producing 117K views in December.

- HR 218 LEOSA qualifications are the only group training on the Range, aiding the NRA LE Division in qualifying retired law enforcement to carry nationwide. We hope to resume other events including VIP visits, IPSC, Cowboy Action, USPSA, Acorns, HS Shooting Teams, and IDPA events once we have staffing numbers in place. Rental agreements/services exceeding $14K+ in incremental revenue/profit have ended. No other groups have been authorized to use the Range in its place at this time.

- All COVID cleaning, sanitization and capacity requirements are being followed with extra steps being taken every hour to keep the staff and our customers safe. An acrylic partition was built around the top of the Range desk and during Phase 1 we conduct all wait lists and testing in their vehicles to limit the capacity on the Range. We are still only utilizing half of the lanes on the Range with the distancing requirements in place.

- The Range continues to be uniquely positioned and highly focused on taking excellent care of "first time" visitors, while accommodating a loyal member and non-member base of shooters, aggressively promoting NRA's mission to support firearm related activities and membership.

- RIFLE & PISTOL courses for George Mason University as a paid elective for upperclassmen have been postponed and have not been hosted at the Range since before Covid.

- All Range equipment is being maintained well despite the toll continued bleaching is taking.

### _Highlights of our Division accomplishments_

- The entire NRA contact with UPS was re-negotiated and we anticipate a savings in excess of $1.2mm over the course of 2020.

- Negotiated two leases with new tenants at 11244 increasing revenue by $50,000.

- HR 218 LEOSA qualifications are continuing on the Range, aiding the NRA LE Division in qualifying retired law enforcement to carry nationwide.

# NRA MUSEUMS DIVISION

### 4th Quarter 2020
Prepared by:
Philip Schreier, Senior Curator

## REPORTING PERIOD OVERVIEW

This marks the 86th year of the NRA National Firearms Museum (NFM) and its 23nd year at NRA HQ in Fairfax, VA. The NRA National Sporting Arms Museum (NSAM) at Bass Pro Shops in Springfield, MO has welcomed over 1.5 million visitors since opening six years ago and remains the most visited firearms venue in the country.

## NRA Museums statistics for the period of October 1, 2020 – December 31, 2020

- NRA National Firearms Museum, Fairfax VA remains closed since March 13th.

- NRA National Sporting Arms Museum at Bass Pro Shops in Springfield, MO averages 2,750 visitors a week.

- YouTube video views – our YouTube Channel saw 142,635 new visitors in the 4th quarter of 2020 with a cumulative total of 11,625,312 views.

- Facebook Likes as of December 23, 202 stand at – 461, 834

## MUSEUM OPERATIONS PROGRAM

*This report's statistics cover October 1, 2020 – December 31, 2020 unless otherwise noted.*

- **Thurston exhibit construction** – Construction of new cases and facility improvements in the Civil War and Old West areas of NFM are complete and ready for the installation of the new displays.

## COLLECTION CURATION PROGRAM

- **NRA Collection** – The Museum conserves 10,860 firearms and numerous other artifacts. Of the firearms, approximately 93% are owned by the NRA Foundation or other NRA related entities, and 7% are on loan. Total value of the firearms collection is estimated at approximately $63.5 million, with $26.3 million of that value coming from loaned artifacts.

- **Donations** – During this reporting period 10 firearms were acquired as donations. These new items include a Russian Nagant revolver souvenired by Colonel Roy F. Lynd on the American Expeditionary Force in Siberia, 1919.

- **FFL Records**. The Museum keeps the NRA Headquarters' Federal Firearms License (FFL) records for the Secretary's Office. From the period covering October 1, 2020 – December 23, 2020 the NRA FFL received 63 firearms and logged out 70 were shipped out on our

FFL. Of these, 1 firearm was for the Museum.

## MUSEUM OUTREACH PROGRAM

- **Loans of Firearms to Other Museums** – NRA Museums continue to provide long-term loans of firearms for the Reagan Ranch in California, the Cabela's store in Gainesville, VA, and Johnny Morris' Wonders of Wildlife National Museum & Aquarium in Springfield, MO, and The FBI Experience in Washington, DC. The Museum has loaned seven firearms to the Bureau of Engraving and Printing in Washington, DC.

- **Traveling exhibits** – During this reporting period, the Museum Division presented traveling displays at one gun show in Manassas, VA,

## MUSEUMS MEDIA PROGRAMS

- **NRAmuseums.com** – When the website was redesigned in 2011, it rapidly became the dominant firearms museum site on the internet. Usage peaked in 2014 with triple that of the old website

- **Facebook** – The NRA Museums Facebook page was started in October 2011 and has grown to over 461,834 Likes. Each day, our Facebook page features a popular "Gun of the Day" post that promotes the diverse variety of historic pieces represented in the museum's holdings. Staff also prepares timely special posts about items being shown at traveling displays hosted at collector shows and unique non-firearm items from the collection. Usage has remained steady over several years.

- **YouTube** – The National Firearms Museum YouTube channel is home to 461 videos created by or about the Museum, featuring Museum firearms and staff presenting firearms history and gun collecting information. In almost ten years of operation, the channel has in excess of 11,625,6312 views of these videos and over 21 thousand subscribers.

- **Articles by Museum Staff** –Staff continues to provide Mowbray Publications with the content for "The NRA Page" in their *Man at Arms* magazine.

**Report of the Executive Director of the**
**National Rifle Association – Institute for Legislative Action**
**To the Board of Directors**

Report Prepared December 21, 2020

January 7, 2021

Madam President, Members of the Board and Executive Council,

The following report is an overview of the activities of the Institute for Legislative Action since January 2020.

---

## FEDERAL AFFAIRS – Brian Calabrese, Managing Director

### Introduction

NRA-ILA Federal Affairs continues to (1) oppose gun control legislation; (2) monitor legislative hearings and markups; (3) support pro-gun legislation; (4) defend and seek to advance our legislative position on various appropriations bills; (5) and engage in the 2020 election cycle.

### 2020 Elections:

With abridged congressional calendars and limited legislative activity due to COVID-19 throughout much of 2020, significant time and resources were devoted to primary and general campaigns for the 2020 election cycle. NRA-ILA activated NRA membership to vote for pro-Second Amendment candidates, resulting in significant wins in elections throughout the country.

In the U.S. Senate, 76% of NRA endorsed candidates won their election. Currently, a pro-gun majority has been maintained in the Senate – 50-48. NRA-ILA continues to engage NRA membership to vote in the two Georgia runoff elections held on January 5, 2021.

In the U.S. House, 88% of NRA endorsed candidates won their election – this includes a dozen seats flipping into the pro-gun category. Currently, Democrats have their smallest majority in decades – 222-212 – with one race remaining to be called.

### FY2021 Congressional Appropriations

NRA-ILA remains engaged in the appropriations process. Since the Democrats took control of the House of Representatives in the 2018 elections, much of their focus has been on eliminating pro-gun riders such as the Tiahrt amendment on releasing trace data and the Dickey amendment prohibiting the Centers for Disease Control (CDC) from advocating for gun control. NRA-ILA has worked extensively with Members of the Appropriations Committee during hearings, bill markups and votes in committee and on the floor of the House to keep both the Tiahrt and

Dickey amendments in the text of the House passed legislation. This has been lauded as a huge win in protecting the Second Amendment in a Democrat-controlled House.

**Continuing Resolution:**

Both the House and Senate agreed on a short-term Continuing Resolution that President Trump signed that funds the government through December 18, 2020. This deal will allow more time for House and Senate Appropriators to negotiate spending levels and provisions in the individual bills. As negotiations progress, NRA-ILA will keep you apprised of any developments.

**Provisions removed in House Appropriations Bills:**

Although the more significant Second Amendment riders were protected in the House such as the Tiahrt and Dickey amendments, some Democrat Subcommittee Chairmen aimed to drop any firearm related provisions, even though many of the riders have been included for years and are noncontroversial. These longstanding riders that were removed in the House are listed below and are fully expected to be restored if the FY2021 bills are agreed to before the end of this year.

• **Firearms Parts Export to Canada.** Prohibits ATF from requiring an export license for small firearms parts valued at less than $500 for export to Canada. This provision removed an unnecessary and burdensome requirement on U.S. gun manufacturers that was imposed under the Clinton Administration.

• **Importation of Curios and Relics.** Prevents ATF from arbitrarily denying the importation of qualified curio and relic firearms. This provision ensures that collectible firearms that meet all legal requirements for importation into the United States are not prevented from import by Executive Branch fiat.

• **Shotgun Importation Protections.** Prohibits the DOJ from requiring imported shotguns to meet a "sporting purposes" test that the ATF has used to prohibit the importation of shotguns with one or more features disliked by the agency, such as adjustable stocks, extended magazine tubes, etc.

• **Protecting Lead Ammo and Fishing Tackle from TSCA regulation.** Prevents lead ammunition and fishing tackle from being regulated under the Toxic Substance Control Act. This provision was added in 2014 as a safety policy against any attempt the EPA might make to regulate lead ammunition even though TSCA directly states that it is not in the EPA's jurisdiction.

**Major Provisions that remained included in the House Appropriations Bills:**

• **Protecting Historic Firearms and Spent Brass Casings from Destruction.** Preserves the opportunity for American gun owners to purchase surplus firearms that are no longer of use to the U.S. military. This includes M-1 Carbines, M-1 Garand rifles, M-14 rifles, .22 caliber rifles, .30 caliber rifles and M-1911 pistols. Starting in 1979, different versions of this language have prevented these firearms from being needlessly destroyed. In 2009, Congress amended this

language at the urging of NRA-ILA to prevent the destruction of spent brass casings, a boon for gun owners and reloaders concerned about the rising price of ammunition.

• **Stopping Your Tax Dollars from Funding Gun Control Reports**. Prevents the National Institutes of Health (NIH) and the Centers for Disease Control (CDC) from using taxpayer dollars to promulgate junk science designed to paint legal gun ownership as a public health hazard. Contrary to recent claims by gun control advocates that this rider prevents NIH and CDC from studying "gun violence," the following quote was included in non-binding report language: "[w]hile appropriations language prohibits the CDC and other agencies from using appropriated funding to advocate or promote gun control, the Secretary of Health and Human Services has stated the CDC has the authority to conduct research on the causes of gun violence."

• **No Tax Dollars to Lobby and Promote Gun Control**. Prevents federal funds from being used for lobbying efforts designed to support or defeat the passage of legislation being considered by Congress or any state or local legislative body. Too often, community action groups are utilizing federal money to lobby for increased regulation of firearms including trigger locks, bans on semi-automatic rifles, regulating magazine capacity, etc. This funding subverts the Second Amendment and allows anti-gun Administrations to fund grassroots gun control efforts using taxpayer dollars.

**Congressional and Executive Actions of the 116th Congress**

**Judicial Nominations**

Since President Trump entered office, **233 Article III** judges have been nominated and confirmed. This includes 3 Supreme Court confirmations, with the most recent addition of Amy Coney Barrett on October 26, 2020. The number also includes 54 Appeals Court and 173 District Court confirmations. NRA-ILA has worked closely with the Trump Administration, Senate Majority Leader Mitch McConnell (R-KY), Senate Judiciary Chairman Lindsey Graham (R-SC), and members on the Senate Judiciary Committee to see pro-Second Amendment judges confirmed.

**Pistols with Stabilizing Braces**

Rogue elements within ATF intend to issue guidance documents, through the public notice and comment process, to provide so-called "objective design features" that determine when pistols with stabilizing braces fall into the category of short-barreled rifle, and therefore subject to the National Firearms Act ("NFA").

Problematically, these "objective design features" are not an exhaustive list. They are also nonbinding on future classifications and no single factor is individually determinative as to what causes a firearm to fall under NFA regulation. In reality, this amounts to ATF taking a *subjective* "I'll know it when I see it" approach to classifying firearms.

For many in the firearms industry and community, pistol stabilizing braces have become a popular accessory to many commonly-owned semi-automatic pistols. ATF's subjective guidance

creates an untenable situation, as law-abiding gun owners and the firearm industry are unable to predict ATF's conduct, and thus how to comport their behavior to the law.

NRA-ILA strongly opposes this arbitrary, inequitable, and incorrect guidance by ATF that puts millions of firearms owners in danger of federal prosecution. NRA-ILA will file comment on the guidance, as well as engage our contacts in the Administration and U.S. Congress to rein in this ATF action.

## National Defense Authorization Act (NDAA)

The NDAA is an annual legislative vehicle which authorizes funding for the U.S Armed Services. Typically garnering overwhelming bi-partisan support, this bill has been signed into law every year for decades. As an annual "must-pass" piece of legislation, it attracts many legislative proposals which are not germane to funding our armed forces and the priorities of the Department of Defense.

In July, during the late hours of the U.S. House Armed Services Committee markup of NDAA, Rep. Jackie Speier (D-CA-14) offered an amendment that was adopted to establish a system for the issuance of military protective orders. The orders would, among other things, allow the military judicial system to issue *ex parte* protective orders that prohibit firearm possession for service members during the duration of the order. This would be a clear deprivation of due process protections for military personnel.

Following the passage of the House NDAA bill, NRA-ILA immediately began working with our contacts in the U.S. Senate, including Senate Armed Services Chairman James Inhofe (R-OK), to ensure the Speier provision was not included in the final NDAA bicameral conference report. These efforts proved successful, as the *ex parte* provisions were struck from the final NDAA legislation.

On December 8, 2020, the NDAA legislation passed the House 335-78, and the Senate approved it on December 11, 2020, 83-14. The legislation now awaits President Trump's signature; however, he has threatened to veto the legislation for issues unrelated to the Second Amendment. Should he veto, Congress likely has the required two-thirds vote in each chamber for a veto override. NRA-ILA will keep you apprised of any developments.

## Army Corps of Engineers (ACE) Rule

On April 13, the Trump Administration published a proposed rule to end a ban on the possession of firearms in water resource development projects administered by ACE – this would effectively eliminate one of the largest gun free zones in the country. This commonsense provision would abolish an existing gun-free zone on 12 million acres of public lands and waters nationwide, including 55,390 miles of shoreline, 7,856 miles of trails, 92,588 campsites, and 3,754 boat ramps.

Currently, regulations pertaining to these areas authorize the use and possession of firearms only for specified purposes, including hunting or at designated shooting ranges, or with written

permission from the District Commander who has jurisdiction over the area in question. The otherwise lawful possession of firearms, including for self-defense, is effectively banned.

NRA-ILA filed comments in support of this rule, and its implementation is imminent.

**"Critical Infrastructure"**

On March 28, at the urging of NRA-ILA, DHS's Cybersecurity and Infrastructure Security Agency ("CISA") updated its guidance on the critical infrastructure that the agency determined should remain open during state shutdown orders due to COVID-19. The new guidance identified the following firearms and ammunition industry workers as critical infrastructure: "Workers supporting the operation of firearm or ammunition product manufacturers, retailers, importers, distributors, and shooting ranges."

This directive from the Trump Administration was necessary, as several states relied on CISA's failure to include firearms retailers in prior guidance as a reason to order those businesses to shut down.

**Munitions List Modernization**

On March 9, the Trump Administration's rules by the Departments of State and Commerce to amend Categories I, II and III of the U.S. Munitions List in the International Traffic in Arms Regulations went into effect. These finalized regulations transferred oversight for export of some types of firearms, ammunition, and related items included in these categories from the Department of State to the Department of Commerce. This modernization to the U.S. export regime for firearms and ammunition will ease burdens and reduce red tape on domestic firearm-related businesses, especially gunsmiths and manufacturers. NRA-ILA filed comments in support for this regulatory modernization.

**STATE AND LOCAL AFFAIRS — Chris Kopacki, Managing Director**

**<u>Alabama</u>**
*Pro-Gun Bills*:
HB39 / SB47: Bills to create a standardized statewide process to issue concealed carry permits for terms of 1 year, 5 years, or a permit holder's lifetime. SB 47 passed Senate Judiciary but failed to receive a vote in the House Public Safety Committee due to a COVID related suspension of session.
> *These lifetime permit bills will be a major focus of NRA-ILA's agenda in the 2021 session. The measure is supported by leadership in both chambers.*

**<u>Alaska</u>**
*Anti-Gun Bills:*
HB 62: A bill to establish Gun Violence Protective Orders (GVRO). This would allow law enforcement officers to seek a protective order to prevent an individual from owning, accessing

or purchasing firearms without sufficient due process. HB 62 was introduced and referred to the Judiciary Committee but did not receive a committee vote.

*HB 62 was carried over from the 2019 session. In anticipation of support during the 2020 session, NRA worked throughout the interim to garner opposition to GVROs. Our efforts stalled the bill in committee, which is expected to return next session.*

### Arizona:

*Pro-Gun Bills/Action*:

Executive Order 2020-12: An executive order issued by Governor Ducey designating firearm and ammunition retailers as essential businesses.

*This executive order reaffirmed existing law outlined in ARS 26-303(J), limiting the government's ability to impose additional restrictions on firearms and ammunition. NRA-backed legislation established the statute supporting the Governor's order.*

SB 1664 – A bill creating civil liability penalties for injuries caused by criminal conduct in a gun-free zone. SB 1664 passed the Senate Judiciary 4-3 and failed on the Senate floor 13-16-1

*SB 1664 was sponsored by Arizona Citizens Defense League. NRA supported the measure with written testimony in committee.*

*Anti-Gun Bills*:

HB 2321/SB 1626 – A bill implementing red flag/ERPOs.

HB 2322/HB 2546/SB 1624 – Bills to restrict the private transfer of firearms by requiring "universal background checks."

SB 1625: A bill banning certain semi-automatic rifles and limiting magazine capacity.

*NRA alerted members and utilized an online petition to oppose red flags, universal background checks, and hardware bans. Our member's response resulted in none of these anti-gun measures receiving a hearing during session.*

### Arkansas

*Fiscal year – no policy bills.*

### California:

*Pro-Gun Bills*:

AB 503 – A bill that would exempt religious institutions on school grounds from the prohibition on carrying firearms. AB 503 failed to pass the Assembly Public Safety Committee 1-5-1.

*AB 503 is a response to the removal of authority for CCW holders to carry on school grounds. This was an incremental approach to allow religious institutions that are either attached to a private school or meet on school grounds to allow CCW holders, with written permission from the school, authority to carry. NRA worked closely with the bill sponsor on this legislation.*

*Anti-Gun Bills*:

AB 88/SB 118 – This bill expands the definition of "assault weapon" and expedites the effective date for eligibility checks on precursor firearms parts. AB 88 passed the Senate Budget and Fiscal Review Committee 12-6, and the Senate floor 28-12. The Assembly opted not to vote on the amended bill and instead sent it back to the Senate for further work. The language from AB 88 was amended into SB 118 after the summer recess and quickly passed through both chambers and signed by the Governor. The bill had gone through the Senate and Assembly policy committee as a placeholder type bill. The amendments on the Assembly side were done with a rule suspension, allowing the bill to be voted on the Assembly floor (53-16) and the amendments were concurred in by the Senate (26-12) on the same day. The Governor signed SB 118 and the bill went into effect on September 1.

> *AB 88/SB 118 was an effort by the California Department of Justice to fast track language expanding the definition of "assault weapon" in response to a newly released firearm by Franklin Armory. Franklin Armory's new firearm looks like an "assault weapon" under California's definition, however it does not fit into the defined categories. DOJ prevented the sale of these firearms and was sued. The bill was introduced to mitigate damages from prohibiting sales on a firearm that wasn't covered by the statute. Because of our efforts and other controversial portions of the complex budget trailer bill, the Assembly rejected the bill for further work by the Senate.*

AB 2362 – A bill to allow the California Department of Justice to levy fines of up to $1,000 dollars on firearm dealers for any violations. AB 2362 passed the Assembly Public Safety Committee 6-2, Assembly Appropriations 13-5, the Assembly Floor 55-20-4, the Senate Public Safety Committee 5-2, Senate Appropriations 5-2, Senate Floor 26-11-3 and concurred by the Assembly 53-18-8. AB 2362 was signed by Governor Newsom.

> *AB 2362 was drafted at the request of Brady United Against Gun Violence. Brady has hired personnel in the state of California to look at firearm dealers. This is part of their effort to continue to make it more difficult to operate a firearm retail shop in the state of California.*

AB 2847 – A bill to modify the existing handgun roster requirements by requiring microstamping be located in one place on a firearm cartridge as opposed to the current dual requirement. AB 2847 passed the Assembly Public Safety Committee 6-1-1, Assembly Appropriations Committee 13-4-1, the Assembly Floor 52-20-7, the Senate Public Safety Committee 5-2, Senate Appropriations 5-2, the Senate Floor 25-12-3, and concurred by the Assembly 52-19-8. AB 2847 was signed by Governor Newsom.

> *This bill serves as a way to continue to shrink the handgun roster by requiring the removal of three existing rostered handguns that do not contain microstamping for each new model added. NRA led efforts to oppose this bill by engaging members and communicating with legislators.*

AB 3030 – A bill to further the goal of conserving 30% of California's land, waterways and oceans. AB 3030 passed the Assembly Natural Resources 8-3, Assembly Appropriations 13-5, the Assembly Floor 45-19-15, Senate Natural Resources Committee 6-2-1, and was held on suspense in the Senate Appropriations Committee.

*AB 3030 is part of an international effort to preserve open space, waterways and oceans. With amendments and lack of clear language the bill is highly problematic as recreational use – including hunting and fishing – are not expressly protected. NRA has worked with a broad coalition from the hunting and fishing communities to address the defects of the bill and raise opposition.*

AB 3071 – A bill to ban the use and sale of lead ammunition at shooting ranges in California. This bill has not received a hearing and the effort has been abandoned by the author for the current session.

*AB 3071 was introduced by the Speaker Pro Tempore at the request of a coalition known as the Environmental Working Group. This effort is part of the overall attack on firearm use and aggressive environmental policies.*

SB 914 – A bill that limits when a hunting license can be used by an individual under 21 to purchase a long gun, narrows the exemptions for loaning firearms to minors, and raises the fees on eligibility checks for ammunition purchases and firearm parts. SB 914 passed the Senate Public Safety Committee 5-1-1, Senate Appropriations Committee 5-2, the Senate Floor 29-11, the Assembly Public Safety Committee 6-2, Assembly Appropriations Committee 13-5, the Assembly Floor 53-19-7 and concurred by the Senate 29-10-1. SB 914 was vetoed by Governor Newsom.

*SB 914 is a continuing effort by the sponsor to make purchasing firearms harder for young adults. The language for fee increases is the result of legislative gerrymandering to avoid a tax implication on a DROS increase last session (AB 1669 – 2019). NRA contacted the California Department of Justice (DOJ), showing that they were charging beyond their statutory authority for certain ammunition eligibility checks. In response, the DOJ is attempting to raise the fees for specific checks by amending the statute to read as it did prior to the passage of AB 1669.*

SB 1175 – A bill to ban the importation of any lawfully harvested species deemed "African Iconic." SB 1175 passed Senate Natural Resources 5-1-3, Senate Appropriations 5-1-1, the Senate Floor 29-8-3, the Assembly Water Parks and Wildlife Committee 8-3-3, Assembly Appropriations Committee 13-5, Assembly Floor 49-16-14 and failed with the close of session when the Senate did not take the bill up on concurrence.

*SB 1175 is a second attempt at passing this same legislation (SB 1487 – 2018) that was vetoed by Governor Brown. NRA has been working with other hunting groups at stopping this legislation that violates federal law. We are currently working with partners to prepare a lawsuit if the legislation is ultimately passed.*

### Colorado

*Pro-Gun Bills*:

HB 1040 – This bill would have removed the state ban on carrying with a concealed carry permit in public schools.

> *While this bill died in committee due to the COVID suspension of session, it will be a focus of NRA-ILA's legislative agenda for the 2021 session.*

HB 1099 – This measure sought to repeal the misguided 2013 law that limited the amount of ammunition a firearm magazine can hold.

> *While this bill died in committee due to the COVID suspension of session, it will be a focus of NRA-ILA's legislative agenda for the 2021 session.*

HB 1271 – This bill sought to repeal Colorado's extreme "red flag" gun confiscation law and intensify the standard for an involuntary seventy-two-hour mental health hold.

> *While this bill died in committee due to the COVID suspension of session, it will be a focus of NRA-ILA's legislative agenda for the 2021 session.*

*Anti-Gun Bills*:

HB 1355 – This bill requires the secure storage of firearm with criminal and civil penalties for violations.

> *While this bill died in committee due to the COVID suspension of session, it is expected to return for the 2021 session.*

HB 1356 – This bill required the reporting of lost or stolen firearms with criminal penalties for failure to comply.

> *While this bill died in committee due to the COVID suspension of session, it is expected to return for the 2021 session.*

*Other issues*:  Emergency Powers – On March 25th, Governor Polis issued Order D2020-017 designating "firearms stores" as "Critical Retail," exempting them from being shut down during the state of emergency.

### Connecticut

*Anti-Gun Bills:*

HB 5040 – A bill that adds a thirty-five percent excise tax on the purchase of any ammunition in the state of Connecticut. The bill was referred to the Joint Committee on Finance, Revenue and Bonding for a public hearing on February 27, 2020. Despite a favorable report out of committee, leadership declined to take any further action on the bill and it ultimately died.

> *This was an effort backed by Moms Demand Action who worked with the sponsor to run op-eds in several local papers. NRA rallied our members to defeat this proposal, and were successful by deploying email alerts, holding a member lobby-day on the day of the public hearing, and facilitating testimony by local citizens against the measure.*

## Delaware

*Although several anti-gun measures were contemplated and introduced, the session was suspended due to COVID concerns before any legislation gained significant traction. Many of these measures are expected to return in the 2021 session.*

## Florida

*Over 100 anti-gun bills were prevented from reaching a floor vote. These included: Assault Weapons Bans, Preemption repeal, Castle Doctrine/SYG repeal, Mental Health Evaluation requirement for CCW License holders, Ban on any transfer of firearms, added CCW restrictions, Trigger Lock requirements for storage, Background Checks on Ammunition sales, Large Capacity Magazine Bans, Mandated Storage Requirements for dealers & gun shops, Mandates that ALL firearms transfers go through dealers, and Hunting Bans.*

*Ballot Initiative:*

An assault weapons ban ballot initiative sponsored by BAWN (Ban Assault Weapons NOW - a billionaire funded group) challenged by NRA and the Attorney General of Florida, was kept off the November 2020 ballot. After briefs and oral arguments by attorneys representing NRA, the Florida Supreme Court ruled the ballot language was misleading and ineligible for the Florida ballot. All petition signatures collected were voided.

## Georgia

*Pro-Gun Bills:*

HB 787 – A bill to provide for universal recognition of out-of-state concealed carry permits. The bill failed to be heard before crossover.

*This is the second year this bill has been introduced. It was introduced in the House and passed an initial committee vote, but did not get a floor vote. This bill will be a major focus during the 2021 session.*

*Anti-Gun Bills:*

SB 281 – An omnibus gun control package, including "red flag," universal" background checks, "safe storage" of firearms.

*This is an effort by Moms Demand Action supported legislators to appease the group by offering the 'kitchen sink' of anti-gun bills. Neither chamber had any interest and the Governor promised a veto should it make it to his desk.*

## Hawaii

*Anti-Gun Bills*:

SB 2002/HB 1615 – Bills that criminalize possession of a firearm after consumption of any alcohol, even on your own property, while lacking a self-defense exception. SB 2002 was deferred by the House Committee on Public Safety. HB 1615 was deferred by the joint committee on Public Safety and Judiciary.

*SB 2002 and HB 1615 are bills that have been introduced over several sessions but routinely fail to include self-defense exceptions or address constructive possession issues.*

> *NRA provided both written and oral testimony on the bills and generated member opposition through alerts.*

SB 2519/HB 1902 – Bills that prohibit the possession of magazines capable of holding more than 10 rounds. SB 2519 was passed by the Senate Public Safety Committee 3-1-1, Senate Judiciary 4-1 and the Senate floor 23-2. SB 2519 died in the house without a hearing. HB 1902 passed the House Public Safety Committee 4-2-1, House Judiciary Committee 9-0-3, the House Floor 34-16-1, Senate Public Safety 2-1-2, Senate Judiciary 5-1, Senate floor 20-5, the House disagreed with the amendments and the bill died prior to a conference committee when the legislature adjourned.

> *SB 2519/HB 1902 both sought to extend the restriction on handgun magazines to all magazines. Both bills were amended to include a grandfather clause that included the ability to pass magazines through inheritance. NRA worked with legislators and the Governor's office to stop the bill, including in person testimony, written testimony and member contacts. The Governor's office was receptive to our comments and sensitive to current 9th circuit precedent from Duncan v. Becerra.*

SB 2635/HB 2736 – Bills requiring the licensing of ammunition sellers, identification and permitting of purchasers and possessors of ammunition and regulates ammunition in the same fashion as firearms. SB 2635 passed the Senate Public Safety Committee 5-1-1, Senate Judiciary Committee 5-1, Senate floor 23-2, House Judiciary 13-1-1, House Public Safety 5-2, and died in the Finance committee where it was never scheduled for a hearing. HB 2736 passed the House Judiciary Committee 10-0-3, House Public Safety Committee 6-1-1, House floor 37-13-1, Senate Public Safety Committee deferred the bill.

> *SB 2635 and HB 2736 were companion bills placing additional restrictions on ammunition purchasers, sellers, and possessors. NRA lead efforts to oppose these measures providing written and in-person testimony. SB 2635 was ultimately killed late in the session through friendly legislators who were able to get a finance referral.*

SB 2943/HB 1733 – Bills prohibiting the purchase and possession of certain firearm parts in an effort to ban "ghost guns." SB 2943 was deferred by the Senate Public Safety Committee. HB 1733 was deferred by the joint House Committee on Public Safety and Judiciary and amended into HB 2744.

> *NRA worked with legislators, provided written and in-person testimony during public hearings, and activated our members to oppose these measures. NRA also held the first Hawaii grassroots meeting in years, which helped spark participation by our members. Unfortunately, language dealing with "ghost guns" was inserted/amended into HB 2744.*

SB 3053 – A bill to ban "fifty caliber guns." SB 3054 was deferred by the Senate Committee on Public Safety.

*NRA provided in-person and written testimony as well as member contacts to help defeat this legislation during the first committee hearing.*

SB 3054 – A bill requiring notice to the county of registration when a firearm is permanently removed from the state. SB 3054 passed the Senate Public Safety Committee 3-1-1, Senate Judiciary 4-1, Senate floor 23-2, House Committee on Public Safety 5-2, House Judiciary 11-2-1, House floor 38-13, the Senate concurred in the House amendments. The bill was signed into law by Governor Ige.

*NRA's opposition was focused on the criminal penalties that were originally included for failure to report the removal. Over the course of numerous amendments, a monetary fine that was as high as $250 per firearm but eventually passed as a $100 per firearm penalty.*

HB 2744 – A bill establishing the gun violence and violent crime commissions and criminalizing the purchase, manufacture or obtaining firearm parts for the purpose of building a gun "ghost gun." The "ghost gun" language was attached during the first policy committee hearing. HB 2744 passed the House Judiciary Committee 10-0-3, House Public Safety 5-1-1, House floor 44-6-1, Senate Public Safety 4-0-2, Senate Judiciary 5-1, and Senate floor 23-1. Governor Ige did not sign the bill, but it became law after 15 days of inaction.

*HB 2744 was amended to include language from the "ghost gun" bill earlier deferred by committee. NRA provided written, in-person testimony, and activated member contacts.*

HB 2631 – A bill requiring the Chief of Police to attest to a review of all mental health records prior the issuance of a firearms permit. HB 2631 was deferred by the joint House Committee of Public Safety and Judiciary.

*NRA provided in-person and written testimony in our successful effort to defeat this bill.*

HB 1600 – A bill repealing the ability to temporarily loan a firearm. HB 1600 was deferred by the joint House Committee on Public Safety and Judiciary.

*NRA provided in-person and written testimony, focusing on the many practical problems with prohibiting loans.*

HB 2232 – A bill expanding prohibitions for firearm ownership to include certain emotional and behavior problems unless, the applicant can provide medical documentation they are no longer adversely affected. HB 2232 was deferred by the joint House Committee on Judiciary and Public Safety. Portions of the bill were amended into HB 1902, but were eventually stripped out on the Senate side.

*NRA provided in-person and written testimony, focusing on the vagueness of the bill, the vast nature of the prohibiting disorders and the potential to discourage treatment.*

HB 2710 – A bill that permits law enforcement to perform warrantless searches of people suspected of violating restraining orders. HB 2710 was deferred by the joint House Committee on Public Safety and Judiciary.

> *NRA provided in-person and written testimony focusing on the constitutional issues this bill presented. Additional testimony was provided by the public defender's office that assisted in the bill being deferred.*

SB 2518 – A bill making changes to Hawaii's concealed carry statutes, authorizing the Attorney General to issue statewide permits, changing the point of payment on application as opposed to when the application is granted and increasing the cost tenfold. SB 2518 passed the Senate Public Safety Committee 3-0-2. The bill failed to meet deadlines as no other hearings were scheduled.

> *NRA provided written and in-person testimony. Our opposition focused on Hawaii not issuing a single CCW permit in years and this bill was significantly increasing the cost for the permit.*

**Idaho**
*Pro-Gun Bills:*
SB 1384 – A bill to allow the possession and carry of firearms by school employees on K-12 school premises with an enhanced Concealed Weapons License. SB 1384 was heard in the Senate State Affairs Committee and defeated by a 4-5 vote.

> *Despite several meetings with the Senate State Affairs Committee Chair and committee members, the bill was defeated but is likely to be reintroduced next year.*

HB 516 – A bill to expand permitless carry to allow non-residents to carry within city limits without a permit. HB 516 passed the House with a 56-14 vote and the Senate with a 27-5 vote, and was signed into law by Governor Little.

> *HB 516 enacted the final piece of permitless carry in Idaho. HB 516 expands upon NRA's original permitless bill by removing the requirement of residency in order to conceal carry within city limits without a permit.*

*Anti-Gun Bills:*
HB 383 – A bill to impose firearm restrictions on respondents of a Sexual Assault Protection Order. Referred to the House Judiciary Committee but did not receive a committee vote. In response to the inaction, the sponsor attempted a parliamentary move to pull the bill straight to the floor, but the vote failed 51-17.

> *HB 383 was supported and promoted by Moms Demand Action. Proponents generated pressure on legislators from various angles, including phone calls and media stories. NRA worked in opposition to the bill at the Capitol through several meetings with proponents and committee members. The bill stalled in committee this year, however is likely to be reintroduced next session.*

### Illinois
*Anti-Gun Bills:*

SB 1966 – Called the "FOID Fix," this bill sought to mandate the collection of finger prints for a FOID card, increase the processing time, decrease the duration from ten to five years, double the application fee, prohibit those with a revoked FOID from transferring firearms to another FOID card holder in the same household, take away the right to self-defense from individuals due to the alleged actions of someone else in their household, and require the owner of the seized firearms to petition the court to have them transferred to a third party.

> *SB 1966 was first introduced by an extremely anti-gun member of House Leadership during the 2019 session. NRA and our state affiliate, Illinois State Rifle Association, lobbied aggressively against the bill citing that police funding for FOID processing was routinely used for other priorities; and the impact on lower income and minority families due to increased cost and travel to obtain fingerprints. After five hours of intense debate it narrowly passed the House but was not taken up by the Senate. We were able to secure a large enough coalition of "No" votes to prevent the bill from being heard in the Senate in the 2020 Legislative Session.*

### Indiana
*Pro-Gun Bills/Actions:*

Emergency Orders: On March 23rd, Governor Eric Holcomb issued Executive Order 20-08. This order specifically designated "firearm and ammunition suppliers and retailers for purposes of safety and security" under "Essential Businesses and Operations," exempting them from being shut down during this state of emergency. This was followed on April 2nd with Opinion 2020-4 by Attorney General Curtis Hill which asserted that state and local governments cannot infringe on Second Amendment rights during a state of emergency.

> *To affirm the Governor's order, NRA worked with legislators to request the AG's Opinion on whether local governments could restrict the sale of firearms during a declared state of emergency.*

### Iowa
*Pro-Gun Bills:*

HF 2502 – This measure was a clean-up of Iowa's firearm preemption law. The bill expanded protections to firearm attachments and "other weapons" in addition to adding penalties in the form of damages, attorney's fees, and court costs to the prevailing party for any violation of the preemption statute. The bill passed the House on a party-line vote, 52-44 and in the Senate 32-17, also a party-line vote. Signed by Governor Kim Reynolds, effective July 1, 2020.

> *NRA-ILA worked closely with our state affiliate, the Iowa Firearms Coalition, on the drafting and lobbying of HF 2502. The bill's success was due to our mutual efforts to generate member contacts of legislators throughout the process.*

HF 716 – Current law requires straight-walled cartridges for rifles to take deer. Growing popularity of modern pistols necessitated this change in law to allow for "bottlenecked" pistol cartridges with a minimum muzzle energy of 500 ft/lbs or more. The DNR still has full authority to regulate seasons, tags, and other methods of take. This bill also eliminated the minimum age for deer hunting with a pistol. The bill passed the House 57-40 and the Senate 37-13. Signed by Governor Kim Reynolds, effective July 1, 2020.

SF 459 – This bill allows concealed carry permit holders to store firearms and ammunition in their private vehicle while on employer property provided the firearms and ammunition are out of sight and inside a locked motor vehicle.

> *Failed to pass a Senate committee before the first legislative deadline but will return in 2021.*

SF 2224 – This bill allows the carrying of firearms on school property (driveways, parking lots, other conveyances) by concealed carry permit holders while transporting persons or items to or from the school. Formerly SF 116, SB 1017. Passed Senate Judiciary Committee 10 – 3, with two Republican Senators absent. Failed to be heard on Senate Floor.

> *This bill has been a priority of NRA since the 2018 session. The hurdle of "guns in schools" messaging from anti-gun advocates has been difficult to overcome, especially with a slim 53-47 Republican edge in the House.*

### Kansas

*Pro-Gun Bills/Actions:*

HCR 5025 and HB 2054 – COVID cut short the Kansas session significantly but a fight over the Governor's emergency powers led to a major battle between Governor Kelly and the legislature. HCR 5025 would have hardened protection of 2A-related commerce in the emergency powers statute so that it could not be overturned by executive order. Unfortunately, HCR 5025 was vetoed by the Governor.

> *After the veto, a compromise between the Legislature and the Governor was agreed upon with the Legislature adjourning from Special Session after passing Emergency Powers Legislation, House Bill 2054. House Bill 2054 includes language to prevent the Governor from using emergency powers to seize ammunition or limit the sale of firearms during a declared state of emergency.*

HB 2326 – This bill recognizes all out-of-state concealed carry permits for lawful carry in Kansas. HB 2326 was also amended by Rep. Stephen Owens to allow individuals who are 18 years of age and up to apply for a Kansas concealed carry permit.

> *HB 2326 overwhelmingly passed the House in 2019 by a vote of 83-41 but due to the suspension of the 2020 session, it died in Senate committee. It will be a top priority in 2021.*

## Kentucky

*Anti-Gun Bills:*

HB 76 – Redefine the definition of "domestic abuse." The bill failed to be heard in committee.

HB130 – Semi-auto and "large capacity" magazine ban. This was the second year for AW and high-cap mag ban proposals, along with a buyback program. The sponsors were well aware that they were going nowhere, and filed the bill to appease the greater Louisville area. The bill was not heard in committee.

HB 192 – Semi-auto and "large capacity" magazine ban, along with a registration scheme. This was another attempt for AW and High-cap mag ban proposals, except to include registration and "safe storage," along with the buyback. The bill was not heard in committee.

SB 32 – A bill to create a "safe storage" requirement. The bill failed to be heard in committee.

## Louisiana

*Pro-Gun Bills:*

HB 746 – A bill to allow concealed carry during a mandatory evacuation order issued pursuant to a declared state of emergency or disaster. Passed and signed by Governor Edwards.

HB 781 – A bill that guarantees Second Amendment-related businesses are "essential" under a declared emergency or disaster. Passed and signed by Governor Edwards.

HB 140 – A bill to strengthen statewide preemption by prohibiting localities from imposing restrictions on the possession of firearms from law-abiding residents or visitors. Passed and signed by Governor Edwards.

HB 334 – A bill to authorize the concealed carry of a firearm in a place of worship where the governing body authorizes it. Passed and signed by Governor Edwards.

> *With the legislative session not starting until early to mid-March, they were only in session a few short weeks before deciding to recess until early May. Our package of bills sailed through committee in the House with little opposition and received supermajority support on the House floor. Each measure also passed Senate committees with little to no opposition. As with the House, we also faired very well on the Senate floor. With pressure from several Democratic House members, and law-abiding gun owners across the state, Governor Edwards signed all four measures.*

*Anti-Gun Bills/Issues:*

*Upon adjournment of the regular session on June 1, it was brought to our attention that the Louisiana Department of Wildlife and Fisheries had instituted a lead ban on state game area shooting ranges. With the help of partners like the Congressional Sportsman Foundation and*

*NSSF, we were able to have a joint committee hearing called of the Natural Resources committees in the House and Senate. At the hearing, the ban was overwhelmingly struck down.*

## Maine

*Anti-Gun Bills/Action:*

Executive Order No. 19: An executive order requiring all non-essential businesses to close their physical location that allow "in-person" contact, including gun shops. The order was issued on March 26, 2020 and was reversed on April 1, 2020.

> *This was an effort that was ultimately celebrated by Moms Demand Action. Local police entered Kittery Trading Post and forced them to shut their doors because the Governor deemed the gun shop to be a sporting goods store, and therefore, non-essential. NRA worked in conjunction with NSSF, the Sportsman's Alliance of Maine, and Kittery Trading Post to pressure the Governor to reverse her decision. We sent email alerts and worked with the House and Senate Republicans to send a public letter to the administration calling for a reversal. In addition, NRA provided talking points and prepped lawmakers for media interviews on the issue.*

## Maryland

*Pro-Gun Bills:*

HB0047 – Exempt applicants who are law enforcement in Delaware, Pennsylvania, Virginia, West Virginia and Washington, D.C. from firearms safety training course requirements. Failed in House Judiciary 7-12.

*Anti-Gun Bills:*

HB004 – Requires background checks on private sales and gifts of long guns and rifles. HB004 passed the House Judiciary 15-6. On the House floor, Republicans attempted a number of weakening amendments on the legislation, all of which failed. HB004 passed the House 87-47. In the Senate, HB004 passed Judicial Proceedings Committee 6-5. HB004 passed the Senate 31-14. A week later, the House agreed to the Senate changes 87-43. On May 7, Governor Hogan vetoed the legislation.

> *HB004 was a multi-year effort from Mom's Demand Action and related groups. In 2019, the legislation passed but failed in conference. In 2020, the legislation passed again, and the House accepted the Senate amendments, exempting temporary loans. Because the legislature never reconvened after the March adjournment, they have yet to consider the Governor's vetoes. Following Maryland's legislative rules, the legislature takes up vetoes at the next convened legislation session, in this case, the 2021 session. It is likely the legislature will overturn the Governor's veto when they return in January.*

## Massachusetts
*Anti-Gun Bills:*
H. 2092 – A bill implementing universal background checks on all private transfers of firearms, with a penalty of a $10,000 fine and up to 20 years in prison. The bill was introduced on January 15, 2019 and referred to the committee on Public Safety and Homeland Security. A hearing was scheduled for August 22, 2019. The bill passed favorably out of committee on February 24, 2020. The House Ways and Means Committee declined to move the bill to the floor for a vote.

H. 3843 – A bill banning the common practice of building firearms for personal defense by deeming it a felony, punishable by a minimum sentence of 2 years imprisonment, a fine of not less than $5,000, and firearm forfeiture.

> *Both of these bills were a multi-year effort spearheaded by Everytown, Moms Demand Action, and the Giffords Law Center. The bills received wide media attention and gun control groups had several demonstrations throughout the year to support the effort. NRA rallied our members with alerts, and held a lobby day in conjunction with the Gun Owners Action League during the day of the public hearing. NRA attended the day-long hearing, and hundreds of members turned out to testify against the proposal. NRA continued to maintain pressure to prevent the bill from heading to the full floor for a vote.*

## Michigan
*Pro-Gun Bills:*
HB 4434 – This bill reduces the penalty for carrying on an expired CPL to a $300 civil penalty instead of the current felony charge. Passed House on 5/29/2019 with a vote of 90-19. Referred to Senate Government Operations Committee.
> *Governor Whitmer will likely not sign any pro-gun legislation. Bi-partisan support in the House will help move this bill forward. It will continue to be a priority.*

HB 4770 – A bill to establish permitless carry. Passed House Military, Veterans and Homeland Security Committee and referred to House Judiciary Committee.
> *This bill has been introduced multiple sessions in a row, and most recently passed the House in 2017. There is not sufficient support from House Leadership to take a floor vote as it is understood Governor Whitmer will veto the legislation.*

HB 5479 – The bill would prohibit a local unit of government (a city, village, township, or county) from using any public resource to implement, administer, or operate a program to purchase privately owned firearms, firearm parts, or ammunition from private individuals or organizations (commonly referred to as a "gun buyback program"). A local unit of government could purchase firearms, firearm parts, or ammunition from a licensed firearms dealer for law

enforcement purposes. The bill passed the House on 3/4/20 by a vote of 58-49 with one Democrat joining the Republicans. Currently awaits a hearing in the Senate Government Operations Committee.

> *This bill was drafted in response to a number of counties passing Second Amendment Sanctuary Resolutions across the state.*

*Anti-Gun Bills:*

SB 156 – This bill creates a "firearms restraining order" which prohibits the custody, purchasing, possessing, or receiving of firearms by a person believed to pose a danger of causing injury to himself, herself, or another by use of a weapon. Bill referred to Senate Government Operations Committee.

> *With Republican controlled majorities in the House and Senate, this bill was presumed DOA. In late 2019, however, Senate Majority Leader Mike Shirkey announced during a radio interview that he would hold a committee hearing to further explore the need for this type of legislation. NRA has met with the Majority Leader and other members of the upper chamber to discuss the implications of this type of bill.*

*Anti-Gun Regulations:*

Prohibiting Firearms in the Capitol – In response to anti-lockdown protests at the Michigan State Capitol, the Michigan Capitol Commission met to create a five-member committee to study whether it can prohibit firearms in the capitol building and the capitol square. They are discussing the issue with legislative leaders and Governor Gretchen Whitmer's office. Senate leadership expressed initial interest in pursuing the prohibition, however pushback from members of the Senate has ceased all activity on the subject.

## Minnesota

*Pro-Gun Bills:*

SF 3865 – This bill sought to restore the carry permit's ability to bypass the NICS check for purposes of firearm transactions. In October 2019, ATF determined the Minnesota carry permit would no longer suffice to bypass the NICS background check since it lacked appropriate questions on alien status. ILA worked with Senate staff to compose a bill that would accomplish the purpose of restoring the benefit of the carry permit to speed up firearm transactions. The bill was not taken up.

HF 4605 Amendment A6 – This amendment would have allowed electronic filing of carry permit applications during declarations of emergency. It was sponsored by the Minority Leader (former Speaker of the House). It failed 63-71 in the Democrat controlled House.

*Anti-Gun Bills:*

HF 8 – This bill would have implemented universal background checks in Minnesota on all firearms. In addition, it incorporated some "red flag" type scrutiny by giving law enforcement additional reasons to deny transferee and carry permits. It also removed "shall issue" concealed carry permitting.

> *After favorable votes in committee, the bill was placed on the House calendar in late February where it passed 69-62. On the Senate side, it was referred to Judiciary and Public Safety Finance and Policy where it never received a hearing and died in committee.*

HF 9 – This bill would have implemented "Red Flag" measures allowing emergency seizure of firearms from individuals based upon hearsay and uncorroborated evidence without due process. The bill was referred to House Ways and Means where the Chair referred it to Public Safety and Criminal Justice Reform Finance and Policy Division where it was adopted as amended and returned to the Ways and Means Committee. It was then referred to Judiciary Finance and Civil Law Division where it was adopted as amended and returned to Ways and Means and adopted as amended.

> *After favorable votes in committee, it was placed on the House calendar in late February where it passed 68-62. On the Senate side, it was referred to Judiciary and Public Safety Finance and Policy where it never received a hearing and died in committee.*

### Mississippi

*Pro-Gun Bills:*

HB 1215 – This legislation would have added state agencies to the existing firearms preemption statute and would have also provided citizens a means for challenging unlawful gun restrictions imposed by these entities.

> *COVID-19's disruption of the 2020 legislative session, which ended in early July, stalled efforts to pass the measure. The House passed the bill overwhelmingly and the legislation failed to advance in the Senate. NRA-ILA has met with the Lieutenant Governor and discussed the issue with the appropriate Senate Committee chair to lay the groundwork for passage in the 2021 session. The Legislature did manage to pass a bill in 2020 creating a specialized NRA boat and utility license tag, with a portion of proceeds from the sale going to the NRA Foundation, and legislation clarifying that disabled veterans can use their VA-issued veterans' health services identification cards indicating a service-connected disability as proof that they qualify for exemptions from original and renewal carry permit fees.*

*Emergency Orders:* NRA-ILA worked with the governor's office to ensure that firearms manufacturers and retailers remained designated "essential services" under his statewide executive order to shelter-in-place, issued during the early stages of COVID-19. A little over a month into the pandemic, the Mayor of Jackson issued an executive order ostensibly under civil emergency powers authority which suspended open carry within city limits. NRA-ILA was in contact with the state attorney general, who issued a stern rebuke to the mayor's action by calling it a violation of both the state constitution and the state firearms preemption

law. The order expired after a week and was not subsequently renewed or extended by the mayor.

## Missouri

*Pro-Gun Bills:*

HB 1901/1722 and SB 700 – A bill to allow concealed carry on public transportation. Current law prohibits the carrying of firearms on buses and trains. This bill would remove that prohibition. Passed out of House General Laws Committee, not heard on House floor.

> *Since the passage of permitless carry in 2017, this has been NRA's priority. After the veto override of permitless carry there has been little appetite for gun legislation in the Senate. We expect this to change in the 2021 session.*

HB 1637 – This bill would create the "Second Amendment Preservation Act" which would prohibit state law enforcement from enforcing federal gun control as well as:
"Declares that all federal acts, laws, executive orders, administrative orders, court orders, rules, and regulations, whether past, present, or future, that infringe on the people's right to keep and bear arms as guaranteed by the Second Amendment to the United States Constitution and Article I, Section 23 of the Missouri Constitution must be invalid in this state, including those that impose a tax, levy, fee, or stamp on these items as specified in the bill; require the registration or tracking of these items or their owners; prohibit the possession, ownership, use, or transfer of a firearm; or order the confiscation of these items." HB 1637 was passed out of the House General Laws committee but did not see floor action.

> *NRA did not actively lobby for HB 1637, rather advised sponsors on the possible dangers and roadblocks in the bill as drafted. Outside gun groups such as Missouri Firearms Coalition pushed this bill hard and used it as ammunition to attack Republican lawmakers who did not sign on as co-sponsors.*

HB 1638 – This bill makes changes to the list of locations an individual can carry a concealed firearm within the state. This bill also prohibits the state, political subdivisions, and public institutions of higher learning from imposing any policies or contractual requirements that would have the effect of prohibiting employees or students from the carrying of concealed firearms into locations where concealed carry is not otherwise prohibited by law.

> *For the second session in a row, there was substantial push back from House members and leadership as the bill essentially repealed all gun free zones in the state. Leadership did not want to take this vote during a Presidential Election cycle.*

HB 2186 – This bill allows the concealed carrying of firearms in churches and other places of worship with a concealed carry permit. Current law requires express permission from the presiding official of the religious institution. This bill would expressly permit concealed carry and give the church the option to prohibit.

*This bill came about after the Texas church shooting. It was introduced late in the session and did not get a hearing.*

*Anti-Gun Bills:*
SB 543: This act creates a "firearms restraining order" which prohibits the custody, purchasing, possessing, or receiving of firearms by a person believed to pose a danger of causing injury to himself, herself, or another by use of a weapon.

*Referred to Senate Transportation, Infrastructure and Public Safety Committee and did not receive a hearing. This bill was pushed hard by Moms Demand and other anti-gun groups. Worked with Committee Chair to keep the bill from being heard.*

## Montana
*No Session in 2020.*

## Nebraska
*Anti-Gun Bills:*
LB 816 – LB 816 requires that law-abiding gun owners pay a fee and obtain a certificate to purchase commonly-owned rifles and shotguns. The measure requires a waiting period of at least 48 hours and up to five days, regardless of the outcome of a background check.

*LB 816 had a hearing in late February. Hundreds of NRA Members and Second Amendment supporters packed the Judiciary Committee hearing. The regular room plus two overflow rooms were filled to capacity and it took all day to get through everyone signed up to speak. Thanks to steady opposition, neither of these proposed gun control bills (see LB 58 below) were prioritized before the deadline and did not advance this session.*

LB 58 – A bill to create Extreme Risk Protection Orders (ERPOs) that suspend an individual's Second Amendment rights following an ex parte hearing where the respondent is not present to defend themselves. Upon the issuance of an ERPO, law-enforcement will be allowed to search for and seize any firearms possessed by the respondent. An ERPO issuance is based on third-party allegations, even when there is no evidence of a crime having been committed. Due to an onslaught of opposition, the bill was not prioritized before the deadline.

## Nevada:
*No Session in 2020.*

## New Hampshire
*Anti-Gun Bills:*
HB 687 – A bill establishing an ex parte red flag order, stripping Second Amendment rights without due process. The bill was introduced on January 1, 2019 and referred to the House

Criminal Justice and Public Safety Committee. The bill received a public hearing on March 5, 2019 and carried over to the second year of the legislative session. The bill passed the House on January 9, 2020 and was referred to the Senate Committee on the Judiciary. A public hearing was held on June 24, 2020 and passed the Senate on June 29, 2020. The bill was sent to Gov. Sununu and was vetoed. The veto was sustained on September 16, 2020.

> *HB 687 was the culmination of an extensive campaign by Moms Demand Action to pass an ex-parte red flag order. The proposal received wide media coverage over the course of the 2019-2020 legislation session. NRA rallied our members through multiple alerts and lobby days to ensure strong turnout for the public hearing. In addition, we attended every committee work session throughout the course of the two-year session. NRA worked closely with House and Senate Republicans, as well as the Governor's Office to secure broad opposition and to ensure the Governor could sustain a veto.*

HB 1608 – A bill banning the possession of magazines over 10 rounds for long guns, and 15 rounds for handguns. The bill was introduced on January 8, 2020 and referred to the House Criminal Justice and Public Safety Committee. A public hearing was held on February 12, 2020. The bill passed in the House on March 11, 2020. The bill was tabled in the Senate on June 16, 2020 and never received a committee assignment.

> *HB 1608 was pushed by Moms Demand Action and several related groups. NRA rallied our members for the public hearing that was held in February, provided talking points to lawmakers, and held a lobby day. NRA was successful in getting the bill tabled in the Senate, killing the effort for the legislative session.*

### New Jersey
*Emergency Orders:*

On March 21, Gov. Phil Murphy issued Executive Order 107. The stay-at-home order effectively shut down everything including the Legislature, gun shops and shooting ranges. The NRA state association, ANJRPC, and NRA filed suit.

> *Gov. Murphy quickly reversed himself and re-opened NICS (New Jersey is a point-of-contact state). Gun ranges remained closed, however, so the NRA state association filed suit again in two separate instances to reopen ranges, first outdoor ranges and then indoor ranges. In both cases, the Governor reversed course and reopened the ranges.*

*Anti-Gun Bills*

S.120 – This bill increases penalties for those allowing minors access to firearms resulting in death. NRA-ILA and our state allies pushed a successful amendment to provide an exemption if the minor gained access for legitimate self-defense. NJ already prosecutes these mandatory storage cases, usually under the child endangerment statute. The bill currently sits in committee and has not advanced.

## New Mexico

*Anti-Gun Bills/Actions:*

SB 5 – The Legislature passed red flag gun confiscation legislation during the 30-day fiscal session which ended in late February. Typically, the short sessions in even-numbered years are reserved for debate and consideration of legislation with a direct nexus to the budget.

> *In her quest to reward Bloomberg-backed gun control groups and remain in the discussion as a potential running mate or Cabinet Secretary for Biden (neither of which materialized), the governor endorsed and included red flag bills in the agenda for the 2020 fiscal session. As passed, the legislation requires individuals to surrender firearms to law enforcement based on uncorroborated evidence that they are dangerous. Further, the measure allows for ex parte petitions, providing no initial hearing for these individuals before a judge and no access to mental health services or treatment before they lose their constitutional right to possess a firearm. Individuals subject to these orders will be immediately included in the NICS database as prohibited persons until the order expires. The sponsor of the legislation -- a personal injury attorney -- added a provision that law enforcement officers can be held liable for not complying with the statute. This was a shot across the bow of the New Mexico Sheriffs Association (NMSA), which opposed the measure, and individual sheriffs who stated that they would not enforce the measure. It is also the basis for a potential lawsuit against the Act by NMSA, which is working with Mountain States Legal Foundation.*

*Emergency Order* – In response to the COVID-19 pandemic, the governor ordered the closure of all non-essential businesses, failing to designate gun stores as "essential." She doubled-down on enforcement of her executive action by dispatching the New Mexico State Police to visit several firearm retailers in Albuquerque who remained open for business in defiance of her initial order. With a universal background check law on the books, this essentially prohibited any lawful firearm transfers in the state.

> *In April, NRA-ILA, along with several other pro-Second Amendment organizations, filed litigation in federal court challenging her order and this legal pressure ultimately forced her hand, resulting in gun stores and shooting ranges being allowed to operate on a by-appointment basis far sooner than most other retailers were permitted to even partially open.*

## New York

*Anti-Gun Bills:*

S.7762 and S.7763 – These are "ghost gun" bills, placed on the Senate Codes agenda which passed the Senate, but the Assembly did not pass them.

> *In January and February, legal counsel to Gov. Cuomo reached out to discuss regulation of 80-percent lowers, or what they refer to as "ghost guns." The original intention was for this issue to be addressed in the budget. New York often addresses policy issues in the budget, which is done during the month of March. However, because of Covid-19, virtually all controversial items were removed from the budget to ensure quick passage to have a budget in place for the next fiscal year. As a result, the un-serialized firearms*

*language was removed from the bill. S.7762 is on the Senate calendar. S.7763 passed the Senate and awaits action in the Assembly.*

S.6738 – This measure bans firearms raffles for charities. This bill was introduced on the Assembly side last year, but did not have a Senate companion. NRA invested significant time meeting with lawmakers discussing the implications for our Association. We also partnered with many outdoor groups like Ducks Unlimited, Rocky Mountain Elk Foundation, Pheasants Forever and Quail Forever, among others.

*This bill had a lot of opposition in 2019, however, the Senate version this year removed law enforcement, veterans, and firefighters to reduce opposition. S.6738 remains in committee.*

A.703 – A bill to ban lead ammunition on public hunting lands. The bill passed out of committee and was placed on the Assembly calendar. Working with Assembly leadership, NRA-ILA was able to get the bill held on the calendar where it currently sits.

A.1251 – This measure requires semi-automatic handguns to be equipped with microstamping technology while banning the sale of new handguns not equipped with such technology. This bill had been an annual issue in Albany, and had been blocked in previous years in the Republican-controlled Senate.

A.2437 – A bill to ban .50 caliber firearms. Like microstamping, this bill was a top agenda item as Senate Democrats would make a discharge motion annually while in the Minority to get this bill to the floor. Again, our concern was that this bill would move with an anti-gun Majority now controlling the upper chamber. As of now, it remains in committee.

### North Carolina
*Pro-Gun Bills:*
HB652 – Guns in churches with education facilities attached. HB652 had a substitute dropped and was quickly pushed through the Senate two weeks before adjournment, passing the chamber 28-15. The House rejected the Senate version, and expanded the language to include small firearm code changes. The amended HB652 passed the House 77-38, then the Senate 33-14. On July 2, Governor Roy Cooper vetoed the legislation. The House of Representatives took up an attempt at veto override on July 8, which failed 66-48.

*Anti-Gun Bills:*
HB86 – Gun control omnibus legislation, including extending permit to purchase requirements to long guns, magazine ban, universal background checks, bump stocks, require safe storage, repeal national reciprocity, require reporting of lost and stolen firearms, require anyone who owns a

firearm to purchase liability insurance, repeal preemption laws, restrict handgun ownership. This legislation did not receive a hearing during the two-year legislative session.

## North Dakota
*Pro-Gun Bills:*

HB 1042 – This bill fixed/clarified being able to carry concealed in a vehicle without a permit. It passed House Energy and Natural Resources committee 14-0 and went on to pass the House floor 91-0. It was next heard in Senate Energy and Natural Resources committee and was passed out favorably 6-0 and went on to pass the floor 42-3. It was signed into law by the Governor on April 9, 2020.

HB 1163 – This bill reduced the penalty for carrying in prohibited places from a misdemeanor to an infraction. It was first heard in House Judiciary committee and passed out 12-2 and went on to pass the floor 78-14. On the Senate side it was referred to the Energy and Natural Resources committee and passed 4-2. It then went on to pass the floor 35-10. It was signed by the Governor on April 9, 2020.

HB 1308 – This bill made it clear binary triggers were legal and not part of the definition of a machinegun. It passed both chambers by wide majorities and was signed into law on April 9, 2020.

HB 1381 – This bill prohibited taxpayer funded gun buy-back programs and was brought in response to the largest North Dakota city, Fargo, having discussions of engaging in such a program. It passed both chambers by wide majorities and was signed by the Governor on April 9, 2020.

*Anti-Gun Bills:*

HB 1537 – This was a "Red Flag" proposal brought by Democrat Representative Karla Rose Hanson from Fargo. It received an unfavorable recommendation from the committee and was defeated on the House floor 17-76.

## Ohio
*Pro-Gun Bills:*

SB 317 – Allows those school employees who are authorized to lawfully carry a concealed firearm for self-defense on school property to do so without being required to undergo an extensive police training program.

> *SB 317 was introduced in response to an Everytown lawsuit challenging teacher carry qualification standards. The bill seeks to clarify the intent of the law and allow local school districts to continue to determine what is in the best interest of their faculty and students. NRA worked with members of the committee and Buckeye Firearms Association*

*to craft language and advance the bill. The bill was passed out of committee on 9-2-2020, and is still active during the lame duck session.*

HB 425 – Eliminates Ohio's ambiguously worded requirement that a Concealed Handgun License holder, when interacting with a police officer, "promptly" disclose they are carrying a firearm. The law has been unevenly enforced and has become a trap for law-abiding gun owners in Ohio.

*NRA-provided language on elimination of the civil penalty. HB 425 properly transfers the responsibility to the police officer to ask if a person is carrying. While the law would still require a person to truthfully respond if asked, it would eliminate the harsh first-degree misdemeanor penalty for failure to disclose the information promptly, prior to being asked. This bill has passed the House and had a hearing in the Senate but no Senate votes have been taken yet. This bill remains active during the lame duck session.*

HB 796/SB 383 – Strengthens Ohio's self-defense laws by stating that individuals have no duty to retreat from a place that they are lawfully present before using force in defense of themselves or others. Previously the law only applied to residences and vehicles, however SB 383 expands that to allow for law-abiding gun owners to be able to defend themselves without being required to retreat from any place they are allowed to be.

*This legislation has been fast tracked during the post-election session. NRA has testified in favor of the bill in both the House and Senate committees, as well as sending alerts. It is still active during the lame duck session and awaits floor action in both the Senate and House.*

*Anti-Gun Bills:*

SB 221 – As proposed by Governor DeWine and dubbed "Strong Ohio," is a comprehensive bill that sought to provide for the issuance, in specified circumstances, of a Safety Protection Order to apply regarding a person who is under a drug dependency, chronic alcoholic, or mental health-related firearms disability. The bill also creates a "seller's protection certificate" and a new state-run background check system; it also expands the law regarding the provision of drug and alcohol test results to law enforcement personnel, and provides a new exception to the testimonial privilege for specified medical and dental personnel regarding certain probate court proceedings.

*A letter was sent to the Senate President in December of 2019 stating NRA's opposition and outlining numerous concerns with the bill. The executive branch requested another review of the bill and that NRA work with them to find a "solution." Recommendations were provided on improving record reporting of prohibiting offenses and removal of inaccurate information in a timely manner. All other aspects of the bill were rejected by NRA as unacceptable. As of this report, no hearing is scheduled.*

## Oklahoma

*Anti-Gun Bills*:

SQ 809 – A bill to repeal permitless carry.

> *NRA members and Second Amendment supporters ensured that their voices were heard on permitless carry, with committee members soundly defeating this legislation by a 12-1 vote. Instead of quietly killing the bill on the calendar, leadership worked with NRA to bring this bill to a vote to send a clear message on permitless legislation going forward.*

## Oregon

*Anti-Gun Bills:*

HB 4005 – A bill to require all firearms to be locked with a trigger-locking device or kept in a locked container, unless carried, with each firearm not secured constituting a separate violation. Anyone who has their firearms lost or stolen would be strictly liable for any injury to persons or property if the firearms were not stored in compliance with the law. HB 4005 would also require reporting of loss/stolen firearms or the owner would be held strictly liable. HB 4005 passed out of House Judiciary with a 7-4 vote, and out of the Rules Committee with a 4-3 vote. The bill did not receive a floor vote.

> *HB 4005 has been a two-year battle in the legislature and through ballot initiatives. Similar legislation was introduced in 2019, however Senate Republicans held two "walk-outs" and prevented votes on the legislation. The bill was reintroduced this session. NRA worked closely with Senate and House leadership on session strategy, held several grassroots workshops in key districts, and utilized targeted email alerts, postcards and text messages to engage members in the effort. The Governor and Attorney General were strong proponents of the bill and testified at the committee hearing, with Moms Demand Action in strong attendance. NRA was responsible for organizing the opposition testimony panels for the hearing, and worked with committee members on several amendments, including a "Minority Report" that would be offered on the floor as an alternative. With grassroots support behind them, both Senate and House Republicans held a walk-out that resulted in the defeat of HB 4005. This bill will be reintroduced next year, and has also been unsuccessfully introduced as ballot initiatives for the last two elections.*

## Pennsylvania

*Pro-Gun Bills:*

SB 147 – A bill to expand Sunday hunting opportunities in the Keystone State. Gov. Tom Wolf signed the bill Nov. 2019. The bill took effect Feb. 25, 2020.

> *Passage of SB 147 was the culmination of a many-year battle to get Sunday hunting passed in Pennsylvania. NRA-ILA worked with many organizations to get this bill across the finish line.*

HB 1747 – A bill to address emergency powers. The bill prevents the Governor from suspending or limiting the sale, dispensing or transportation of firearms during a declared emergency. It would have also remove the carry prohibitions that exist, with exemptions. The bill passed both the House and Senate, but was vetoed by Governor Wolf.

*HB 1747 was introduced and pushed during COVID closures and will remain a priority in coming sessions.*

HB 2440 – A bill to designate shooting ranges, sportsman clubs, hunting facilities and businesses relating to the sale or production of firearms and ammunition as life-sustaining. The bill passed both the House and Senate, but was vetoed by Governor Wolf.

*HB 2440 was also introduced and pushed during COVID closures and will remain a priority in coming sessions.*

### Rhode Island
*Pro-Gun Bills:*
S.2418 – This bill creates a review and appeal process for those denied carry permits. It also includes attorney fees and the ability to take it to Supreme Court. The bill remains in committee for further study. It did not advance.

*NRA-ILA has worked on similar legislation in consecutive sessions.*

*Anti-Gun Bills:*
S.2004A/H.7102A – Bills to ban "ghost guns." The only significant gun bill heard on the floor of either chamber was this legislation. NRA worked with the Speaker's legal counsel to secure amendments that protected gun owners on these measures. A couple of our primary concerns were protecting the pre-68 guns and making sure hobbyists could keep their property. Despite some opposition from the Senate, we were able to secure those amendments and blunt the bill. NRA and its state association, the Second Amendment Coalition partnered with the various local gun groups (Rhode Island Firearms Owners League, Rhode Island Rifle and Revolver and the Vermont Federated Sportsmen's Clubs to turn out thousands of members to the Capitol in an impressive display of grassroots opposition on "gun night." COVID closures impacted the legislative schedule. The Senate dealt only with the ghost gun issue.

*The version signed by Gov. Raimondo was the House version with the aforementioned amendments included. Despite massive pressure and funding from Bloomberg funded groups such as the Rhode Island Coalition Against Gun Violence, this was the only bill to pass. Their agenda included semi-auto and magazine bans and restrictions on school carry. They made a significant push for these items prior to session with Gov. Raimondo joining their chorus. Ultimately, none of the bills listed below moved.*

S.2130 – A ban on magazines holding more than 10 rounds.

S.2131 – A ban on popular, commonly owned semi-automatic rifles.

S.2412 – A bill to limit issuance of carry permits to the Attorney General ("may issue").
> *Currently, both local law enforcement and the AG are issuing authorities. The local law enforcement permits are "shall issue." This is an attempt to move 100 percent to "may issue."*

H.7327 – A measure to increase the age from 18 to 21 to buy all firearms and ammunition. *This bill is still in committee.*

H.7715 – This bill prohibits the possession of firearms on school grounds by anyone other than law enforcement.

*Emergency Closures:*

As we were in town preparing for Gun night hearings on the House side, the Governor, at the suggestion of the state health department shut off public access to the state Capitol that afternoon, and it has been closed to the public ever since. As a result, leadership opted to scuttle the hearings only hours before they were to begin. Since the initial closures the Legislature has resumed in-person voting. NRA also worked with the Second Amendment Coalition at the onset to keep gun shops open. Gov. Raimondo ended up issuing Executive Order 20-07 on March 20 which would extend the state's waiting period from 7 days to "up to" 30 days. We also worked to make sure ranges remained open. Neither gun shops nor ranges were ever closed.

## South Carolina
*Pro-Gun Bills:*

S 0293 – Guns in churches with educational facilities attached. This measure passed the Senate unanimously in 2019, but stalled thereafter.
> *With COVID, the legislature suspended session early in March; their operating resolution for resumption in the fall only allows legislation that has passed one chamber to be considered. S 0293 was taken up by the House during the reconvene session in September. Despite broad, bipartisan support, one rogue member of the House (Rep. Jonathon Hill - R), attempted to put a constitutional carry amendment on the legislation. Because of the timing of reconvene and the Senate being adjourned Sine Die, any amendment would have killed the legislation. Leadership was forced to end debate, ending the bill's chances for the 2019-2020 session.*

## South Dakota
*Pro-Gun Bills:*

SB 98 – This bill expanded Capitol Carry from 30 days to a calendar year. It passed both chambers with wide margins and was signed by the Governor on March 30, 2020.

SB 120 – This bill made changes in state statute to comport with federal law allowing a minor to carry a pistol without being in the presence of their parent/guardian. The measure passed both chambers with wide margins and was signed by the Governor on March 30, 2020.

HB 1094 – This measure was considered to be a constitutional carry enhancement bill by repealing the permit requirement while carrying a concealed firearm on a motorcycle, snowmobile & off-road vehicle. The bill passed both chambers with wide margins and was signed by the Governor on March 30, 2020.

HB 1296 – This bill prohibits any form of government from shutting down gun sales, gun ranges, and ammunition sales in addition to prohibiting gun confiscation and other Second Amendment protections during declarations of emergency. The bill was not assigned to a standing committee and was instead presented to the whole House as a Committee of the Whole. The amendment passed 55-11 and the bill went on to pass 62-4. The Senate also met as a Committee of the Whole and they passed the measure on a 26-9 vote. It was signed into law on March 31, 2020.

*Anti-Gun Bills:*
SB 82 – This bill was a watered-down version of the "Red Flag" proposal we have seen across the country. The Lieutenant Governor testified against the bill followed by NRA testimony and we defeated the bill in Senate Judiciary 5-2.

**Tennessee**
*Pro-Gun Bills:*
HB 2817 – A bill to establish permitless carry. In early February, Governor Bill Lee reached out to have us assist in passing constitutional carry. Support for the measure was overwhelming in both legislative chambers and their respective leaders.

> *Unfortunately, the bill was given a fairly significant fiscal note (around $25M), which ultimately derailed our efforts once the COVID crisis hit. The legislature recessed mid-March, only taking care of a few "essential bills" and returned in late-May to complete more essential business before adjourning sine die mid-June.*

**Texas**
*No 2020 Session.*

*Related Business:* The Senate and House Select Committees on Mass Violence Prevention and Community Safety, formed in the aftermath of El Paso and Midland-Odessa shootings, had scheduled public hearings for mid-March and May, respectively, on gun-related interim charges. The Senate committee was to examine ways to keep firearms out of the hands of individuals who would not pass a federal background check, while protecting the Second Amendment and Texans' right to bear arms and whether "stranger-to-stranger" gun sales in Texas should be subject to background checks. The House committee was to examine options

for strengthening enforcement measures for current laws that prevent the transfer of firearms to felons and other persons prohibited by current law from possessing firearms. Both meetings were postponed due to COVID-19 and no further public hearings were held. In August, NRA-ILA was selected as a designated party to submit written testimony on the House Select Committee interim charges and to respond to specific questions from committee members about existing and proposed changes to firearms laws. Thus far, neither Select Committee has issued any recommendations or reports.

*Emergency Orders*: As COVID-19 began spreading across the country, local officials from nearly all of the largest counties and some municipalities in Texas adopted orders closing all "non-essential" businesses, with no exemption for gun stores. NRA-ILA worked with a pro-Second Amendment lawmaker from one of those cities to request an opinion from the state attorney general on whether city and county officials could prohibit the sale of firearms through an emergency order or declaration by excluding firearm manufacturers and retailers as "essential businesses." The Attorney General, within days, issued an opinion stating that the state firearms preemption law prohibits cities and counties from adopting regulations related to the transfer of and commerce in firearms, and that these emergency orders or declarations may not regulate or restrict the sale of firearms. Legislation which NRA-ILA initiated and supported passage of during the 2019 session of the Texas Legislature provided key language that General Paxton relied on for his opinion. Shortly after, the governor issued an executive order overriding these local orders which allowed exceptions for essential activities and services based on the Department of Homeland Security's guidelines on the Essential Critical Infrastructure Workforce, which includes workers supporting the operation of firearm or ammunition product manufacturers, retailers, importers, distributors and shooting ranges.

**Utah:**
*Pro-Gun Bills:*

HB 271 – A bill to strengthen Utah's existing preemption statute, by providing an enforcement mechanism. HB 271 passed the House Law Enforcement and Criminal Justice Committee 7-3-1, the House floor 55-15-5 but failed to be considered in the Senate.

HB 472 – A bill allowing for the carrying of a concealed firearm without a permit. HB 472 failed to receive a hearing.

HJR 15 – Constitutional Right to Hunt and Fish. HJR 15 passed the House Natural Resources Committee 10-0-3, House floor 61-9-5, Senate Natural Resources 7-0-2, failed Senate floor 18-9-2, passed Senate floor on reconsideration 21-7-1 and was concurred by the House 59-11-5. HJR 15 will appear on the November 2020 ballot.

*Anti-Gun Bills:*
HB 109 – A bill criminalizing private transfers of firearms/ "Universal Background Checks." The bill was tabled by the House Law Enforcement and Criminal Justice Committee 8-3.

HB 115 – A bill providing a cause of action for negligent entrustment of a firearm. HB 115 failed to be considered upon a motion in the House Judiciary Committee 3-7-2.

HB 136 – A bill requiring locked storage of firearms. HB 136 failed to be considered upon a motion in the House Judiciary Committee 3-7-2.

HB 229/HB 460/SB 246 – Bills to implement extreme risk protective orders. HB 229, HB 460 and SB 246 failed without a hearing.

## Vermont
*Pro-Gun Bills:*
H.56/H.80 – Bills to allow the use of suppressors while hunting. The bills were first introduced in January 2019 and assigned to the House Committee on Natural Resources, Fish and Wildlife Committee (they carried over to 2020). These bills are a continuation of a multi-year endeavor.

*Anti-Gun Bills:*
S.169 – This legislation imposes a 24-hour waiting period on handgun purchases. It did not advance during the 2020 session. This same bill was vetoed by Gov. Phil Scott on June 10, 2019. The original bill was a 48-hour waiting period on all firearms. We expect that we will see something similar in 2021.
> *We spent the 2019 session fighting this bill which forced them to continue to amend the language to keep it alive. The original bill also contained a mandatory storage provision, but was removed by amendment. When lawmakers returned in January 2020, both chambers placed it on their calendars with the intention of trying to override the Governor's veto.*

H.610 – This bill removes the "default proceed" provision on delayed NICS checks. They are portraying this legislation as "closing the Charleston loophole." The original bill started out with an indefinite wait, until the check comes back as "proceed." The bill also "strengthens" the state's red-flag law. Under the original ERPO bill, only prosecutors could petition. This bill significantly expands the class of petitioners, making it much easier to get an order issued. It did not advance during the 2020 session, and we again expect to see something similar in 2021.
> *Both NRA and our state association, the Vermont Federation of Sportsmen's Clubs, testified in House Judiciary and spent days attending committee hearings on this bill. In late February, H.610 had a large public hearing in the House chambers as NRA and VTFSC rallied gun owners to attend.*

<u>**Virginia**</u>

*Anti-Gun Bills:*

Overview:

> *In the summer of 2019, Governor Ralph Northam announced a legislative agenda of eight pieces of gun control legislation. After Democrats took majorities in both the House of Delegates and State Senate in the November election, Governor Northam introduced the same eight bills for the 2020 legislative session.*
>
> *Ahead of the 2020 legislative session, NRA-ILA conducted an aggressive statewide effort to mobilize members. Between December 1 and the end of the legislative session on March 12, NRA-ILA sent out dozens of alerts to members. Billboard placements in Richmond were purchased for January as legislators returned to Richmond. NRA-ILA also held town-hall meetings in key Senate districts around the state, with hundreds of members turning out to hear from Virginia NRA-ILA representatives. NRA-ILA also organized a media roundtable off-the-record to facilitate better press coverage during the legislative session. Additionally, we organized a Lobby Day at the Capitol on the first day the Senate Judiciary Committee took up gun control bills. As a result, the room was packed with NRA members vocalizing their opposition to these overreaching efforts. More than 1,000 members turned up to directly lobby their legislators and make their voices heard.*
>
> *After a lengthy and drawn out legislative session, Virginia emerged with new laws and regulations governing firearms. All but 1 of the Governor's 8 gun control bills were significantly amended and/or watered down, against the administration's demands. Most importantly, his proposed hardware ban, including semi-automatic rifles and magazines over 12 rounds, failed.*

HB961 – Omnibus legislation to create gun registration, an assault weapons ban with a grandfather clause requiring registration, a magazine ban, a bump stock ban, and a ban on silencers. The legislation was amended before receiving a committee hearing in the House, removing the gun registration provision. HB961 passed the House Public Safety Committee 12-9. On the House floor, the legislation was changed, allowing possession of existing magazines, and the penalty was lowered to a class 1 misdemeanor rather than a felony. The amended HB961 passed the House of Delegates 51-48. HB961 failed in the Senate Judiciary Committee 10-5.

HB2/SB70 – Universal background check legislation. The House version included background checks on transfers, temporary loans, and all private sales. The Senate legislation was amended in committee to limit background checks to private sales only. HB2 passed the House Public Safety Committee 13-9, then the full House 54-46. HB2 was amended in Senate Judiciary to the more limited legislation, and passed Judiciary 9-5, then the full Senate 23-17. In conference, the House agreed to the more limited Senate bill. The House agreed to the conference report 54-44, and the Senate 23-16. HB2 and SB70 were signed by Governor Northam into law on April 10.

HB421/SB35 – Local authority legislation. Governor Northam proposed new authority allowing localities to adopt any gun control legislation they wanted, up to and including blanket bans. HB421 was drafted in that vein, allowing localities to regulate firearms and ammunition as they wanted. HB421 passed the House Public Safety Committee 13-9, then passed the full House 50-48. SB35 was a more limited local authority legislation, restricting localities to government buildings, parks, and permitted events. SB35 passed the Senate Judiciary Committee 9-5, then full Senate 21-19. The House moved to the Senate position, and HB421 was amended to be identical to SB35. HB421 passed the Senate as amended 54-45; SB35 passed the House 53-46. Governor Northam made a small amendment recommendation, an exemption for ROTC programs. The House and Senate agreed to Northam's recommendations, 48-45, and 21-19, and HB421 and SB35 were signed into law on April 22.

HB812/SB69 – Handgun rationing to one handgun purchase a month. HB812 did not include an exemption for conceal carry permit holders, with the administration's backing. SB69 included an exemption for conceal carry permit holders. HB812 passed the House Public Safety Committee 13-9, then the full House of Delegates 53-47. SB69 passed the Senate Judiciary Committee 9-5, then full Senate 21-19. After passing both chambers in differing versions, the Senate position prevailed over the Governor and the House, exempting conceal carry permit holders. The conference report passed the House 52-47, and the Senate 21-19. HB812 and SB69 were signed into law by Governor Northam on April 9.

HB9 – Mandatory reporting of lost and stolen firearms. Companion legislation failed in the Senate 19-21. HB9 passed House Public Safety 15-7, then the full House 55-44. HB9 then passed the Senate Judiciary Committee 8-7. The bill was amended on the floor to increase the timeframe from 24 to 48 hours, and passed 20-20, with the Lieutenant Governor voting yes. The House then agreed to the changes with the same 55-44 vote. HB9 was signed into law by Governor Northam on April 6.

HB1083 – Increasing penalty for 'recklessly' leaving an unsecured, loaded firearm around a minor. The Governor's proposed legislation would have increased the age of minors impacted to 18, and made it a felony. The Senate companion bill was killed in the Senate Judiciary as a result. HB1083 passed the House Public Safety Committee 13-9, then the full House 54-46. The bill was gutted in Senate Judiciary, removing the age change, and changing to penalty from a class 6 felony to a class 1 misdemeanor. HB1083 then passed Senate Judiciary 9-6, and the full Senate 22-18. The House agreed to the Senate changes with a 55-43 vote. HB1083 was signed into law on April 6.

HB674/SB240 – 'Red Flag' legislation, extreme risk protection order. HB674 passed the House Public Safety Committee 13-9, then the full House 52-46. SB240 passed the Senate Judiciary 9-5, then the full Senate 21-19. The bill was amended, increasing elements of due process, including separating the ERPO and search warrant processes, and requiring affidavits to be provided to individuals. HB674 passed the Senate 20-20, with the Lieutenant Governor voting yes, and the House 52-48; SB240 passed the House 53-47, and the Senate 21-17. HB674 and SB240 were signed into law by Governor Northam on April 8.

HB264/SB263 – Training requirements for concealed carry permit. HB264 as drafted would have removed the video and online training components, requiring all CCP training to take place in-person. In sub-committee the patron, Del. Lopez, drafted a new amendment to strip out all references to the NRA from the code. HB264 then passed the House Public Safety Firearms Subcommittee 5-3, then the Public Safety Committee 13-9, then the full House 54-46. SB263 only removed video and online components, making training in-person. SB263 passed the Senate Judiciary Committee 7-6, then the full Senate 21-19. In conference, Senator John Bell insisted that the NRA language remain in the code, citing NRA instructor training as the 'gold standard' of instruction. The House and Governor caved to the Senate position, and final versions limited to requiring in-person training, with an enactment date of January 1, 2021 was agreed to, 52-42 in the House, 23-17 in the Senate. HB264 and SB263 were signed into law on March 23.

### Washington
*Pro-Gun Bills:*
HB 2367 – A bill to clarify that self-defense legal subscriptions are not insurance, and therefore not under the regulation of the Washington Insurance Commissioner. This bill passed out of the House Consumer Protection and Business Committee with an 8-4 vote, but did not receive a floor vote.

SB 6347 – A bill to extend a Conceal Pistol License from 5 to 7 years if an individual voluntarily participates in a firearm safety course. This bill received a public hearing but did not receive a committee vote.

*Anti-Gun Bills:*
HB 1010 – A bill to allow the Washington State Patrol (WSP) to destroy confiscated firearms. Passed out of the House committee with a 9-6 vote but did not receive a floor vote.
> *This bill has been introduced each legislative session for several years now at the request of WSP. NRA has had several meetings with WSP and the bill proponents over the years but have not reached common ground. NRA worked closely with the ranking committee member, who is a law enforcement officer on strategy, including proposing several amendments that were rejected. NRA testified in opposition to the bill and worked with legislators on floor amendments. This bill will be reintroduced next year.*

HB 1315/SB6294 – A bill to require eight hours of firearm instruction and a live range component in order to receive a Concealed Pistol License. HB 1315 & SB 6294 both passed out of their respective chamber committees but neither bill received a floor vote.

HB 1374 – A bill to abolish state preemption. This bill received a public hearing but did not pass out of committee.

> *HB 1374 has been introduced throughout the last several legislative sessions. In anticipation of the bill, NRA worked throughout the interim to generate opposition for the bill by meeting with key Senators. NRA testified in opposition at the committee hearings and utilized email alerts both before and during the session to engage our members. This bill will be reintroduced next session.*

HB 2305 – A bill to impose firearm prohibitions on respondents of a Vulnerable Adult Protective Order. This bill passed out of the House Judiciary Committee with a 9-6 vote and off the House floor with a 55-42. After crossover, the bill passed the Senate Law and Justice Committee with a 4-3 vote, but did not receive a floor vote.

> *Since passing Extreme Risk Protective Orders in Washington in 2016, the anti-gun proponents have introduced legislation each session to expand firearm prohibitions to other protective orders. NRA worked with the ranking committee members on strategy, including providing statistics and information to friendly legislators to use for questions for the proponents during the hearing.*

HB 2240/HB 2947/SB 6077 – Bills to ban magazines capable of holding more than 10 rounds of ammunition. Each bill passed out of their respective committees but did not receive a floor vote.

> *The magazine capacity ban was the top priority of anti-gun legislators and the Alliance for Gun Responsibility this session. Proponents organized several lobby days throughout the session, with direct advocacy to the legislature by the Governor, the First Lady, and the Attorney General. NRA led opposition efforts at the Capitol, arranged all opposition testimony at committee hearings, worked with House members to draft floor amendments to delay a vote, and secured the necessary votes on the Senate side that ultimately killed the bill. Grassroots workshops in key districts, along with post cards, text messages and email alerts all successfully generated activism from our members.*

HB 2519 – A bill to ban online sales of ammunition, and to require background check on ammunition if NICS is available for the checks. This bill received a public hearing but did not receive a committee vote.

> *NRA organized opposition testimony at the committee hearing and alerted members by email. This was first draft attempt of requiring background checks on ammunition, and proponents used the hearing to gain news coverage to start creating public awareness of*

*the issue. This will be reintroduced in some form next year, but will likely change the background check requirement to the state system.*

HB 2622 – A bill to require respondents of a protective order to personally appear at a newly created hearing and testify they are no longer in possession of firearms. Passed the House Judiciary Committee with a 9-6 vote, and the House floor with 56-42 vote. After cross-over, the bill passed the Senate Law & Justice Committee with a 4-3 vote, and passed off the Senate floor with a 29-19 vote. HB 2622 was signed into the law by Governor Inslee on March 25th.

> *NRA testified in opposition to this bill in both committees based on self-incrimination concerns, and worked with the House Judiciary Committee Chair and ranking member to make slight improvements to the language. This bill has since been struck down in court for being in violation of 5th amendment protections.*

HB 2623 – A bill to impose firearm prohibition to the misdemeanor crimes of unlawful aiming or discharge of a felony, and to second degree animal cruelty. This bill passed out of the House Judiciary Committee with a 9-6 vote, and passed the House with a 56-41 vote. After crossover, the bill passed out of the Senate Law & Justice Committee with a 4-3 vote, but did not receive a floor vote.

SB 5434 – A bill to prohibit firearms in child care centers. Passed out of Senate Law & Justice Committee with a 4-3 vote, and passed the Senate with a 27-20 vote. After crossover, SB 5434 passed out of the House Judiciary Committee with a 9-6 vote, and off the House floor with a 56-40 vote. SB 5434 was signed into law by Governor Inslee on March 27.

> *SB 5434 was carried over from the 2019 session, and originally included public parks and libraries. NRA organized the opposition testimony panels for the committee hearings and successfully amended out parks and libraries from the bill on the Senate floor.*

SB 6163 – A bill to impose a firearm prohibition on an individual charged with a DUI while pending trial. This bill passed out of the Senate Law & Justice Committee but did not receive a floor vote.

SB 6288 – A bill to establish an Office of Firearm Violence Prevention within the Governor's office. The Office will conduct research, work with the legislature on policies, find non-state funding, and also implement a state grant system. SB 6288 passed out of the Senate Law & Justice Committee with a 4-3 vote and passed the Senate with a 25-23 vote. After crossover, the bill passed the House Judiciary Committee with a 9-6 vote and off the House floor with a 53-44 vote. The bill was signed into law by Governor Inslee on April 2nd.

SB 6289 – A bill to amend Washington's firearm restoration process to allow judicial discretion in determining whether to restore Second Amendment rights, and extends the time required

before individual can petition for restoration. This bill passed out of the Senate Law & Justice Committee with a 4-3 vote but did not receive a floor vote.

### West Virginia
*Pro-Gun Bills:*
HB 4955 – Concealed Carry Permit fee reduction. This was NRA priority legislation to reduce the total fee for a 5-year permit from $100 to $50. The bill was met with the opposition of sheriff's dept. and court clerks due to financial concerns. The bill passed both chambers unanimously and was signed into law.

SB 96 – Preemption. SB96 originated with the intent of tightening up statewide preemption to include all 'deadly weapons' (knives, etc.) into state code, but NRA added fixes to address ongoing firearm issues. The bill passed both chambers and was signed into law.

*Anti-Gun Bills:*
HB 3069 – Employer Parking lot adjustment for chemical plants. This was the third and final attempt from Judiciary Chair John Shott to appease his big business supporters by excluding "chemical plants" and the "Toyota manufacturing plant" from the employer parking lot law. The bill failed in committee by a strong bi-partisan vote.

### Wisconsin
*Pro-Gun Bills:*
SB 822 – This bill allows the concealed carrying of firearms in churches and other places of worship with a concealed carry permit. The bill was passed out of Senate Committee on Insurance, Financial Services, Government Oversight and Courts on 3/17/20 by a vote of 4-1, but never received a floor vote.

*Anti-Gun Bills:*
AB 431 – This bill generally prohibits a person from selling or transferring any firearm, including the frame or receiver of a firearm, unless the sale or transfer occurs through a federally licensed firearms dealer and involves a background check of the prospective transferee. A "universal" background check bill.

   *This bill was the main push from the Evers' administration. It did not get a hearing in the Assembly however NRA spent time informing legislators of the impacts of this legislation.*

### Wyoming
2020 was a budget session. No significant NRA backed legislation to report.

**EXTERNAL AFFAIRS – James Baranowski, Manager**

**Arms Trade Treaty**

The results of the United States (U.S.) Presidential election pose a serious threat to the work and achievements we have accomplished with the Arms Trade Treaty (ATT) over the past 4 years. It should be expected that the U.S. will re-sign the ATT, once again binding the U.S. to refrain from acts that would defeat the object and purpose of the treaty.

The consequences of re-signing are even more dire given the expansion of the ATT's reach at the Sixth Conference of States Parties to the Arms Trade Treaty (CSP6), which was held by written/silence procedure due to COVID-19 earlier this year (August 17th – 21st, 2020).

As previously reported, at CSP6, the main body of the treaty adopted a resolution brought forward by the Working Group on Transparency and Reporting calling for the formation of a Diversion Information Exchange Forum (DIEF).

Created in secret through a proposal shared only with States Parties, the intended purpose of the DIEF is to allow for State Parties and Signatories to meet in closed sessions in order to share information on arms diversion routes and individual end users. However; despite continuous efforts by both ourselves and our partners in the World Forum on Shooting Activities (WFSA), no further information about the internal functioning or work of the DIEF has been uncovered.

Given the stated purpose of the DIEF and continued secrecy surrounding it, there is a real fear that it will be used to begin work on the establishment of a global firearm user registry. This should not be disregarded, as the ATT has already been used as a tool to attack U.S. policy.

As noted previously, China acceded to the ATT in July, 2020, allowing for them to attend CSP6 as a formal State Party. Using their newly afforded platform, China attacked the U.S., labelling the country a "political virus" and calling for all States Parties to cease any arms trade with countries not a party to the ATT - a clear attempt to disrupt the U.S. arms trade and strangle the military/defensive capabilities of their opponents in the region (i.e., Taiwan).

Accordingly, it is apparent that our adversaries will use the ATT to their advantage, and given the overwhelming support for arms-control by the ATT's States Parties and supporting Non-Governmental Organizations (NGOs), efforts to create a global registry should not be ignored.

In regards to the overall health of the ATT, the willingness of States Parties to meet their obligations continues to decline. Financially, only 47% of States Parties submitted their required financial contributions this year, a decrease of 10% from 2019's abysmal compliance rate of 57%.

The 2020 reporting numbers mirror the same decline in adherence to the ATT's terms. Only 56% of States Parties submitted their required annual reports in 2020, which, like the financial figures, constitute a 10% decline from the previous year.

Despite the continued decline in compliance, the ATT continues to move forward. Fueled by in-kind contributions from Switzerland and the financial relief afforded by the COVID-19 outbreak preventing costly in-person meetings, there is little doubt that the ATT will continue to operate and expand, especially as 2020 marked the expiration on its moratorium on amendments.

For 2021 there will once again be two week-long Working Group and Preparatory meetings, followed by the Seventh Conference of States Parties to the ATT (CSP7). At this time all the meetings are scheduled to occur in Geneva, Switzerland, however, it remains to be determined if they will be in-person, via video-conference, or once again held by silence/written procedure. Formal dates for the WG and Preparatory meetings have not yet been established, but CSP7 is set for August 30th – September 3rd.

## The UN Protocol Against the Illicit Manufacturing Of And Trafficking In Firearms, Their Parts And Components And Ammunitions

The 10th Session of the UN Convention against Transnational Organized Crime (UNTOC), under which the UN Protocol Against the Illicit Manufacturing Of And Trafficking In Firearms, Their Parts And Components And Ammunitions (Firearms Protocol), met October 12th – 16th in Vienna, Austria. Due to the travel restrictions related to COVID-19 only local representatives were able to attend in person while others, such as the NRA, participated via the UN's virtual online platform.

1,100 participants attended the conference from 120 countries. In addition, 16 inter-governmental organizations and 146 civil society representatives were attendance. The main discussions focused on the Firearms Protocol occurred October 14th, resulting in a 6 page resolution entitled "Strengthening international cooperation against the illicit manufacturing of and trafficking in firearms, their parts and components and ammunition".

Several sections of the resolution are concerning, in that they call for synergies between the Firearms Protocol and other related UN initiatives (such as the PoA and ATT), but two in particular are cause for alarm; sections 16 and 17.

Section 16 calls upon all parties to the Protocol to include in their record-keeping systems information about the entire life-cycle of a firearm, parts and components, ammunition, export import and transfer information, and the issuance of licenses for firearms possession and end-user verifications.

Section 17 calls on training private sector actors involved in the import, export and transportation of firearms to assist governments in strengthening border security in order to prevent and combat the theft, loss or diversion of firearms – a mandate which is clearly against the scope of the Firearms Protocol.

Throughout the week there were also a series of side-events focused on small arms and light weapons. The United Nations Office of Drugs and Crime (UNODC) hosted two events; "Celebrating the 15th anniversary of the entry into force of the Firearms Protocol: Time for

universalization and effective implementation" and "Promoting the Community of Practitioners Countering Firearms Trafficking and Related Crimes". Small Arms Survey, along with the UN Institute for Disarmament Research (UNIDIR), hosted an event entitled "Tracking illicit flows and use of ammunition," and finally, the Swedish company Humanium Metal hosted an event focused on the UN's Sustainable Development Goals, entitled "Together for SDG16: Exploring best practice examples to tackle fun violence and organized crime from a youth and survivor's perspective."

The first UNODC event regarding the anniversary of the Firearms Protocol was noteworthy in that it was chaired by Ambassador Jean-Claude Brunet (France). Brunet was the president of the Third Review Conference of the Programme of Action (RevCon3) which went against precedent and incorporated ammunition into the PoA over the objections of the U.S. During his presentation, Brunet noted that the highest priority of the PoA and all other UN initiatives should be to synergize and harmonize so that they are aligned in including ammunition in their terms.

The Small Arms Survey and UNIDIR side event on tracking illicit flows and use of ammunition was also noteworthy. The event focused almost exclusively on the need for the marking and tracing of ammunition, justifying it as being the fuel ("oxygen") of firearms crime. It was also announced during the event that UNIDIR will be launching and Ammunition Profiling Handbook before the end of this year which they envision serving as a guideline to further the discussion about marking and tracing ammunition at all UN firearms initiatives.

While the U.S. is not a party to the Firearms Protocol, like the ATT, principles adopted by it will have an impact on other UN initiatives, most notably the PoA. This is the reason our opponents are continuously arguing for synergies between the initiatives and why we must attend all meetings regardless of the U.S.' status. It is also apparent that the focus has shifted almost exclusively to regulating ammunition on the global scale, and with it now being included in the PoA (as noted more below), why we must ensure that international standards are not established.

**UN Programme of Action to Prevent, Combat and Eradicate the Illicit Trade in Small Arms and Light Weapons and All its Aspects**

The UN Programme of Action to Prevent, Combat and Eradicate the Illicit Trade in Small Arms and Light Weapons and all its Aspects (PoA) will meet for its Seventh Biennial Meeting of States to Consider the National, Regional, and Global Implementation of the PoA (BMS7) from July 26th – 30th, 2021 in New York.

This meeting was previously scheduled for June 15th – 19th of this year but postponed due to complications associated with COVID-19.

As previously reported, BMS7 will be a significant meeting when it does occur, especially in light of the recent developments with lead ammunition in Europe. It will also be the first formal meeting of the PoA since its abandonment of the consensus requirement under the leadership of Ambassador Jean-Claude Brunet at the RevCon3 in 2018, which allowed for the inclusion of ammunition in its terms.

In preparation for the meeting, 14 states have already submitted their views for consideration. Regrettably, most of these views have not been translated and made available in English. Of those that are in English, two of them celebrate the inclusion of ammunition under the PoA; India and Ireland. India also takes their welcoming of ammunition a step further, noting that their Arms (Amendment) Act of 2019 already "lays down provisions for stamping" of ammunition.

This is noteworthy, as the PoA's inclusion of ammunition within its terms has opened the door for the international regulation of ammunition production, sale and possession, exponentially increasing the risk of international marking requirements being established.

Strong arguments exist for the U.S. to formally announce their intention to withdrawal from the PoA and propose elimination of the UN mandate for it. The abandonment of consensus at RevCon3 was a complete betrayal to the PoA process and should the discussions and decisions once again lead to such results we will be prepared to challenge the U.S.' involvement with the initiative in order to protect our members' interest and prevent further intrusion by the UN on our Second Amendment rights.

## Group of Government Experts on Ammunition Stockpile Management

The Group of Government Experts on Ammunition Stockpile Management (GGE), which first established by a UN General Assembly resolution on December 6th, 2006, began work this year to produce a report outlining problems arising from the accumulation of conventional ammunition stockpiles in surplus.

As previously reported, the 25 member GGE, which includes the U.S., met twice this year; first in January and again in April. The GGE was expected to meet again prior to the UN General Assembly First Committee on Disarmament and International Security (First Committee) in October to finalize a report outlining its findings and recommendations to the General Assembly. Due to complications with the COVID-19 outbreak, the GGE was unable to complete their work and no report was tabled at First Committee.

This was significant, as the GGE had been working in areas far beyond its purported scope, and while their meetings are not open to NGOs, it is apparent through issue papers released in October, 2019 and again in May of 2020, that the GGE is exploring the possibility of establishing a framework to regulate ammunition internationally similar to the International Tracing Instrument (ITI).

As the ITI relies on international firearm marking standards, we believe that the ammunition framework envisioned by the GGE would require some form of international ammunition marking requirements, which they claim to be both "technically feasible and cost effective."

The report will become a critical document which will be relied on by those pushing for international ammunition control standards to justify their work and initiatives. Accordingly, during First Committee a resolution was passed calling for Secretary-General to convene the

GGE for up to 10 working days in 2021 in order to allow for the group to complete its work and finish the report. In addition, it was decided that the provisional agenda of the 76th session of the First Committee to be held in 2021 will include under "General and complete disarmament" a sub-item entitled "Problems arising from the accumulation of conventional ammunition stockpiles in surplus" during which the report can be presented.

Despite the 76th First Committee session occurring after the scheduled date of BMS7 in 2021, we believe the report will be completed prior to June so that it can be utilized during BMS7.

**Geneva Peace Week 2020**

Geneva Peace week is an international initiative which brings together academics, international organizations, NGOs and like-minded individuals to "expand the space for building peace and resolving conflict through dialogue and negotiation." Since its inception in 2014 it has not delved into the small arms and light weapons issues and has historically not been an event we have attended or reported on.

This year, during its 7th edition which ran virtually during the week of November 2nd – 6th, two courses were included on its agenda that were of interest. This included an event sponsored by UNIDIR, the U.K. and Switzerland entitled "Building Bridges: Integrating Arms Control and Conflict Prevention", and an event sponsored by the Conservation of Nature (IUCN) and World Wildlife Fund (WWF) entitled "Conservation and peacebuilding: Towards greater collaboration."

We attended these events, and while it remains concerning that the small arms and light weapons are being included on the Peace Week agenda, and especially that UNIDIR has become involved, both focused entirely on overviews of the work being conducted by the presenting associations and did not address any issues related to arms control in depth.

Despite the lack of material information presented this year, the inclusion of these organizations and topics in the agenda signals that small arms and light weapons will be addressed in the context of Peace Week moving forward. Accordingly, we will continue monitoring and participating in pertinent Peace Week events moving forward.

**Ammunition in Europe**

On December 2nd the European Council approved the European Commission's proposal to restrict the use of lead shot over wetlands in Europe by a vote of 18 for, 6 against and 3 abstentions. Due to the manner in which voting is reported it is not possible to know how individual countries voted.

The ban has been published in the Official Journal of the European Union as an amendment to Annex XVII of the REACH Regulation. Member states now 24 months to implement its restrictions, meaning that by the end of 2022 the ban will be implemented throughout the region.

As previously noted, the restriction uses the Ramsar Convention definition of wetlands, which defines them as "areas of marsh, fen, peatland or water, whether natural or artificial, permanent or temporary, with water that is static or flowing, fresh, brackish or salt, including areas of marine water the depth of which at low time does not exceed six meters." Accordingly, any land with standing water, including rain puddles, constitutes a wetland, along with any area within one hundred (100) meters of it. The ban includes a prohibition on possession in Ramsar defined wetlands, meaning that a hunter traversing over a "wetland" to a "dry" area is prohibited from carrying lead ammunition with them.

In addition, a complete ban on the use of lead ammunition in Europe still remains on the horizon. This comes from both a proposal to ban the use of all lead ammunition in terrestrial environments and through the listing of lead metal as a Substance of Very High Concern (SVHC) on the European Chemicals Agency (ECHA) Candidate list.

The terrestrial environment ban witnessed the close of its open comment period on December 16th 2019 and is now with the ECHA who is drafting a restriction dossier expected to be completed in October. After the completion of the dossier there will be a public consultation period expected to close in November of 2021. As previously reported, a final opinion will then be submitted to the European Commission in January 2022, followed by a vote on its adoption in the summer of 2022 and one to two year implementation period.

In short: lead shot will be banned over wetlands no later than December 2022 and an outright ban on all lead ammunition still remains a very real possibility that could occur as early as 2023/2024.

**German Institute for Standardization Specification 91384**

The issues with ammunition in Germany continue to be discussed under the authority of the German Institute for Standardization (DIN), with the last formal meeting of the Consortium taking place virtually on November 17th.

The purpose of this meeting was to incorporate final editorial comments and finalize DIN SPEC 91384. The meeting was contentious but did result in the agreement of wording to be contained in a final document which was shared on December 2nd.

A final up/down vote on DIN SPEC 91384 is scheduled for December 16th; however, in the final document that was shared on the 2nd, numerous changes had been made to the agreed upon language from the November 17th meeting.

This has been a common theme since the DIN began work on the Specification in 2017. While it was initially envisioned as being adopted in 2018 as a means to address the ethical culling of wild game species, it now appears likely that the "no" votes will carry on December 16th and as a result the development process will terminate.

Despite this likely outcome, new ammunition specifications are still expected to be implemented in Germany through a revision of the German Federal Hunting Law. Additionally,

several other nations in Europe have been affording attention to the DIC SPEC process, and even if it fails we expect to see them develop their own national ammunition regulations in the region.

**UN General Assembly First Committee on Disarmament and International Security**

The 75th session of UN General Assembly First Committee on Disarmament and International Security met October 6th – November 10th in New York. Most of the work was performed through virtual webcasting over UN Web TV and limited in-person meetings which excluded NGO's from participation.

Much of the time was spent focused on nuclear issues and political posturing by Russia, along with discussions dedicated to chemical, explosive and autonomous weapons, space and cyber security issues. Accordingly, there was limited discussion on small arms and light weapons, with the focus mainly being on the impact they have on gender based violence.

There was some discussion directed at diversion, with many states noting the importance of BMS7 and role of the ATT. In total, 8 resolutions were tabled for discussion, with the U.S. objecting to the language in only one regarding "strengthening of security and cooperation in the Mediterranean region."

In addition, a resolution was tabled by France and Germany entitled "Fortieth anniversary of the United Nations Institute for Disarmament Research," praising its work and impact on small arms and light weapons initiatives. The resolution received 171 votes in favor, none against, and two abstentions – the U.S. and Israel. The resolution also contained a paragraph calling for UNIDIR's funding to be increased, which led to a separate vote on it which received only 160 votes in favor and one directly against from the U.S.

Also, as previously noted in this report, a resolution was passed affording the GGE 10 more days in 2021 to complete its report on ammunition stockpile management and including on the agenda for the 76th session of the First Committee a sub item entitled "Problems arising from the accumulation of conventional ammunition stockpiles in surplus" during which it is expected that the GGE report will be tabled and discussed.

It was apparent throughout the course of discussions at First Committee this year that there is substantial interest and effort being expended into using next year's BMS7 meeting to advance the reach of the UN on small arms and light weapons issues, and particularly those related to ammunition.

**Canada**

Opposition continues to mount against Canadian Prime Minister Justin Trudeau's May 1st prohibition on over 1,500 previously lawful firearms and their variants. Multiple lawsuits have been filed challenging both the validity of the process used to adopt it, known as an "order-in council," and from individual owners questioning the validity of a prohibition on previously lawful firearms. In addition, a plan for the prohibition's alleged "buy back" program has not

been developed, largely due to the government's inability to secure a single bid from a company willing to design and run the program despite two open solicitations.

The prohibition is also facing backlash from the National Police Federation (NPF), which is the union representing over 20,000 Royal Canadian Mounted Police. In a statement released November 23rd, the NPF highlighted several issues with the prohibition, most notably that firearm crimes in Canada are best lessened by addressing illegal gun trafficking gangs and not by restricting gun ownership on the lawful populace.

In court, the most promising challenge to date has come out of Calgary, Alberta, where on November 30th the Alberta Provincial ruled that individual owners can in fact challenge the prohibition and that the Government's contention that permits are not being "nullified" or "invalidated" is false, finding that they are in fact being "revoked." This is significant, as courts in both New Brunswick and Newfoundland previously ruled in the Government's favor on similar challenges, denying owners the ability to challenge the prohibition under the authority vested in them by Section 74 of the Canadian Firearms Act.

In addition, more information about the language contained in the prohibition, and specifically the Government's understanding of it, continues to emerge. As previously noted, the stated purpose of the prohibition was to ban the sale, transportation, importation and use of "military grade assault weapons," a term undefined by Canadian law.

As attorney's and associations began to dissect the language further, it became clear that the prohibition's language went much further. In addition to capturing Canada's most common firearms such as 10 and 12 gauge shotguns threaded for chokes, the prohibition's reference to "variants" finally received a definition from the Government in mid-December. In their definition, the Government claimed that a series of factors/guidelines will be used to assess if a firearm is a variant of any of those newly prohibited, and therefore itself a prohibited firearm. Along with design similarities, the guidelines also included such factors as "advertising," "depiction by the firearms in the press and firearms industry," "name variants," "purpose of the firearm," "historical significance," "case law," and "formal relationship."

It has also been discovered that the amnesty program which allows for sustenance hunters to continue using their newly prohibited firearms until 2022 contains no exceptions for gunsmithing. Canadian associations are already preparing legal challenges to this, noting that it provides no ability for firearms to be repaired if damaged and that should a one of the amnesty firearms jam in the field a hunter has no ability to travel back from the hunting destination with it as it would result in a violation of Canada's criminal code regarding driving with a loaded firearm.

The Canadian Shooting Sports Association and Canada's National Firearms Association, both members of the WFSA, are both actively fighting against this prohibition, and as a new revelation about it emerges almost every day we will continue to update our members on it.

**World Forum on Shooting Activities**

The COVID-19 outbreak and associated travel restrictions have severely impacted the ability of the WFSA to meet in person; however, the association continues to function through online meetings and workshops.

In addition, efforts are being made to increase the activity and participation of member associations who have been afforded more opportunities to both attend and participate in UN meetings given the elimination of the travel and related expenses historically associated with participation in such events.

In an effort to both seize the opportunity that the new online format for so many international initiatives has afforded and increase the global footprint of the WFSA, we have worked with our counterpart in Italy to develop several proposals that will be presented to the Executive Committee shortly after the filing of this report.

The proposals include the hosting of WFSA training sessions for associations that have not historically attended UN meetings, educational seminars on key issues and speech writing to hopefully result in more associations presenting their opinions at international initiatives, and a retooling of the WFSA's current committee work to hopefully allow for an increase of both the information being exchanged and worldwide image/footprint of the association itself.

Support for these efforts have been expressed by many associations already, especially in light of the success of the online webinar series directed at the countering the lead shot ban in European wetlands.

As previously reported, the WFSA, in partnership AFEMS, FACE, IEACS and SAAMI, hosted four workshops this year in an attempt to both educate and mobilize associations in opposition to the ban. Despite a ban on lead shot over wetlands in Europe ultimately being enacted (as discussed earlier in this report), the workshops showcased the ability of the WFSA to expand its reach and increase its value despite the inability to hold meetings in person.

Formal meeting of the Legislative, Statistics, Environment and Image Committees, along with the Executive Committee, continue to be held via videoconference. The September 23rd - 24th meetings were well attended and productive, and due to the cancellation of both the SHOT and IWA shows next year, meetings will continue to be held in such a format.

**Conclusion**

The NRA has been the most influential national firearms group in the international arena for more than 20 years. Since the start of the 1995 UN small arms and light weapons effort, through the organization of the WFSA in 1996, to being the first firearm group to become an official UN NGO, the NRA's leadership remains unparalleled. While our efforts are often in the shadows, our results, such as convincing the current administration to unsign the ATT, can be seen and heard around the world. Accordingly, it bears repeating that most of what we do internationally is "quiet diplomacy."

**HUNTING POLICY, NATURAL RESOURCES, CONSERVATION & WILDLIFE –**
**Erica Tergeson, Director**

<u>State Issues</u>

Monitored and researched numerous bills introduced and moving through state legislatures that impact hunting, hunters and game management. Drafted testimony and alerts, with the help of state lobbyists and legislative aides. Monitored and researched state fish and game agency proposals and actions in addition to state initiatives and referendums.

*Highlights*

<u>California</u>- For the past two years, bills have been introduced in the California legislature to ban the import of certain iconic African hunting trophies into the State. Last year the bill died because of the cost to the budget; this year the bill died due to key republicans helping to filibuster and run out the clock before the bill could be passed. While likely short-lived, this is still a victory for the NRA.

<u>Colorado: Wolf Reintroduction Ballot Initiative</u>- Last year, animal rights activists collected enough signatures to include an initiative on the Colorado ballot that would reintroduce wolves west of the Continental Divide. Wolves have already been documented in Colorado and would naturally repopulate on their own. This would make wolves the top priority for the Colorado Division of Wildlife and would jeopardize the newly rebounded moose population in addition to threatening elk, mule deer and whitetail deer.

The initiative passed, as expected, but there are several potential lawsuits that could significantly slow implementation. Depending on what happens to the Federal de-listing of the grey wolf from the Endangered Species Act and whether it is upheld in court, the State of Colorado may lack the jurisdiction to re-introduce wolves.

<u>Missouri</u>- In February, the Missouri Senate Committee on Agriculture, Food Production, and Outdoor Resources had a hearing on Senate Joint Resolution 62 to amend the Constitution of Missouri to affirm that it is a right of the public to hunt, fish and harvest wildlife. NRA-ILA is strongly supporting this effort and activated its members in MO. Unfortunately, COVID-19 has adversely impacted the ability of this bill to move forward at this time, but NRA-ILA will continue to push for this in 2021.

<u>North Carolina</u>- Despite the fact that North Carolina voted to end the ban on Sunday Hunting in 2017, the North Carolina Wildlife Resources Commission has yet to open public lands to Sunday Hunting (Sunday hunting is allowed on private lands). NRA has been working with the Commission and other hunting groups to open less controversial public lands to Sunday hunting and has participated in numerous calls, surveys and strategy sessions to accomplish this goal. Some of this hard work has paid off as recently, the State of North Carolina announced a comment period on lands it would like to open for Sunday Hunting. NRA-ILA will continue to push to open all lands to Sunday hunting.

Pennsylvania- On February 25th, the legislation lifting the ban on Sunday Hunting went into effect. For the first time since the Revolutionary War, Pennsylvanian's had the opportunity to hunt on certain Sundays in the 2020 fall hunting season.

Utah- In the November election, the people of Utah voted to add the right to hunt and fish to the State Constitution. NRA-ILA drafted the language for the amendment and helped shepherd the bill through the legislature. There are now a total of 23 states that have enacted right to hunt and fish constitutional amendments.

**NRA Online Hunter Education** - NRA-ILA has been working with General Operations and others to take advantage of the cancellation of in-person hunter education classes and replace them with NRA's free online hunter education courses. To date, the NRA's online hunter education course has accounted for over $150,000 in 'match' dollars for state's Pittman Robertson funds. In other words, thanks to the NRA's free class, states now have $150,000 more to spend on wildlife conservation.

## Federal

### Confirmation of Deputy Secretary of the Department of the Interior, Kate MacGregor

On February 25th, Katharine MacGregor was confirmed by the Senate to be the Deputy Secretary of the Department of the Interior. MacGregor has served in several positions at the Department of the Interior since joining the Trump Administration in January 2017, including Principal Deputy Assistant Secretary for Land and Minerals Management and Deputy Chief of Staff. Previously, MacGregor worked on Capitol Hill for 10 years, serving under two Chairmen of the House Natural Resources Committee. MacGregor is a hunter, outdoorsman and friend of the NRA.

### Trophy Import Permit litigation—NRA win

On June 16th, the U.S. Court of Appeals for the D.C. District Circuit upheld the USFWS' 2018 policy permitting importation of certain threatened and endangered species on a case-by-case basis. The long-running case began in 2014 when the Obama Administration interrupted the legal permitting process in an effort to end importations based on emotion and unsubstantiated claims with no basis in wildlife science. The NRA and SCI challenged the move in court to put an end to the previous administration's arbitrary importation ban. Not only did the ban remove the benefits and incentives of legal, regulated hunting but it hindered wildlife conservation efforts in numerous African nations. This is a huge and long-fought win for NRA, hunters and wildlife conservation.

### Expanded Access to Federal Lands for Hunting

On August 19th the Department of the Interior announced its final rule to open or expand 850-plus hunting and fishing opportunities across more than 2.3 million acres at 147 national wildlife refuges and national fish hatcheries. This rule marks the single largest expansion of hunting and

fishing opportunities by the U.S. Fish and Wildlife Service (FWS) in history, bringing the Trump Administration's total expansion to more than 4 million acres nationwide.

### Recreational Shooting on Federal Lands

Since the beginning of the Trump Administration and at the NRA's urging, the Bureau of Land Management has been looking at opportunities to expand and enhance access to safe recreational shooting areas on federal lands. While 97% of BLM and Forest Service lands are open to shooting, the NRA has long been pushing for more developed sites, ranges and micro-ranges on these lands. The first project was announced in January of 2020 and is currently being built. The project includes five new shooting areas in the Phoenix-metro area.

### Lower 48 Gray Wolf Delisting

In October, the U.S. Fish & Wildlife Service announced its final rule delisting the gray wolf in the lower 48 states. The rule will allow states, rather than the federal government, to manage wolf populations. This is a huge win for state management of wildlife. Several environmental and animal rights groups have already threatened lawsuits and the future of the delisting will likely depend on which federal judges are assigned the case.

### Hunters' Leadership Forum

Recently, Director Skipwith wrote an op-ed published on the Hunters' Leadership Forum website thanking shooters for their contribution to conservation through excise taxes paid on firearms and ammunition. The editorial can be found here: https://www.nrahlf.org/articles/2020/8/24/thank-you-recreational-shooters/.

## GRASSROOTS PROGRAMS & CAMPAIGN FIELD OPERATIONS –
### Lexy Higgins, Managing Director

### Grassroots Field Activities

This year, the Grassroots Programs and Campaign Field Operations Division was faced with an unprecedented number of in person event cancellations due to government restrictions on capacity and the banning of in person gatherings in most areas. We adapted by moving a majority of our outreach online, and have stayed connected with our volunteers via phone calls, text messages, emails, and virtual meetings.

This year, we hosted a variety of online meetings, workshops, and trainings to ensure our volunteers were educated and involved in our efforts nationwide. We hosted 132 virtual workshops that were primarily focused on training new volunteers, and in areas where we were able to, we transitioned from hosting virtual workshops to in person (28 total). We also hosted 26 virtual meetings that allowed for more of a roundtable discussion with existing volunteers. We hosted 30 issues based trainings for both our FrontLines Activist Leaders and our Campaign Field Representatives to ensure they were up to date on NRA's position on key legislative issues.

Despite the challenges that our team faced this year brought on by making sure to allow for social distancing, following local/state guidelines, and taking extra steps to ensure the safety of our staff, we were still able to attend over 100 in person events.

**NRA-ILA Campaign Field Representatives (CFRs)**

ILA Grassroots deployed sixteen (16) Campaign Field Representatives for the 2020 Elections in the following states: Arizona, Colorado, North Carolina, Pennsylvania, Iowa, Michigan, Montana and Wisconsin. While we had one group of CFRs that was brought on board in February, the rest of our team has been on boarded and trained virtually. During the first half of the year, our voter contact outreach was limited to phone calls, emails, virtual meetings, and sending text messages. In June, we saw a number of states start to loosen their restrictions, and shifted our focus to in person outreach via going door to door, hosting small in person events, and partnering with our Second Amendment Activist Centers to host NRA Days. Below is what our team was able to accomplish during the 2020 General Election:

- Calls – 730,561
- Texts – 16,426,364
- Doors Knocked – 795,238
- NRA Days – 52
- Virtual Volunteer Trainings - 109
- Gun Shows – 11

ILA Grassroots has also deployed four (4) Campaign Field Representatives for the U.S. Senate Runoff election in Georgia. Below is what our team was able to accomplish as of mid-December 2020:

- Texts – approximately 1.3 million
- Doors Knocked – approximately 400,000
- NRA Days – 6
- NRA Member Town Halls – 5

We will continue to contact voters in Georgia all the way through the election on Tuesday January 5th.

**NRA-ILA FrontLines Activist Leader (FAL) Program**

The FrontLines Activist Leader program continues to undergo improvements as we look to find creative ways to maximize our grassroots outreach. We have held semi-regular virtual meetings throughout the year, as well as started to send a weekly update to increase communication from HQ and ensure that our FALs are up to date on what is going on within the Grassroots Programs and Campaign Field Operations Division nationwide.

We currently have 107 FALs.

**Second Amendment Activist Centers**

In an effort to maintain more consistent communication with our Second Amendment Activist Centers, we launched a new website this year: https://www.nrasecondamendmentactivistcenter.com. Through this website, our Second Amendment Activist Centers have access to a portal that allows them to update their information, request more materials for distribution, and access flyers designed to help promote NRA events at their businesses. We have also utilized the "News" section of this website to highlight events that our Second Amendment Activist Centers have hosted.

We currently have 373 Second Amendment Activist Centers.

**Collegiate Outreach Programs**

Our collegiate engagement has been limited this year because of the inability of students to be on campus due to the Coronavirus. We have kept in contact with our existing Collegiate Coalitions and campus coordinators by hosting a number of virtual events with/for them and are working on setting up a number of virtual meetings.

We have been and will continue to work with NRA Public Affairs to bring our NRA-ILA Grassroots Collegiate programs under one NRA umbrella – Students for 2A. This involves rebranding our existing Collegiate Coalitions, as well as relocating all of our program request forms to be hosted on the Students for 2A website.

While we were able to host 7 NRA Universities in early spring, we have largely been unable to host NRA University (NRA U) programs this year due to the hectic nature of college campuses closing and then reopening and closing again. We are exploring virtual NRA University options for next year, but anticipate a shift in content while presentations have to remain virtual.

**Written & Electronic Correspondence, Information Fulfillment, and Phones**

This reporting period, the Division received approximately 26,050 email messages to which some 8,325 were responded to by Grassroots staff. Roughly 2,425 were forwarded to other NRA Divisions for response or for more information. An additional 15,300 were informational in nature, and thus, required no response. These totals exclude thousands of spam messages and other similar items that are deleted.

The Grassroots Division received approximately 23,600 incoming phone calls and reviewed some 2,050 voicemail comment messages.

Staff has processed and internally distributed hundreds of pieces of mail, have responded to 145 letters, and have mailed dozens of informational items out to members and dozens of packages out to our staff in the field.

**Miscellaneous**

The Division continues to work to ensure that our list of volunteers only contains individuals who are truly willing to be actively engaged in our political and legislative efforts – currently around 1.65 million nationwide.

The Division is continuously updating its email list, which currently totals roughly 2.3 million.

The Division transmitted 50 issues of the Grassroots Alert this reporting period. The Alert is transmitted every Monday to all with email addresses, with thousands more accessing it on ILA's website.

**RESEARCH & INFORMATION – Josh Savani, Director**

**Assessing Firearm Research**

While an individualized analysis of available firearm research is beyond the scope of this report, it is a good opportunity to address some of the recurring shortcomings of research reviewed by the Division.

All firearm research suffers from one problem: we do not know how many firearms are in the United States or how they are distributed. NRA has long supported various federal laws and appropriations riders as well as laws at the state level to prohibit the collection and centralization of firearm records. While these laws are intended to prevent the creation of firearm registries, they also prevent researchers from conducting accurate studies with the number or distribution of firearms as a variable.

These studies often use self-report to determine firearm ownership levels, but this suffers from other problems. Below is a graph showing Gallup's polling on a firearm ownership question over time.



The highlighted portion of the graph shows, after 1994 far fewer Americans reported having a gun in their home. This timing just happens to coincide with multiple pieces of federal legislation that targeted gun owners. While it is possible that many millions of Americans stopped being gun owners over a period of a few years, it is much more likely that targeting gun owners as a "problem" by federal officials made gun owners much less likely to share gun ownership information with a stranger on the phone.

Another problem common in firearm research (and other areas of research) is misspecification. We will often review studies that attempt to show that more permissive firearm policies increase various types of violent crime. While these studies may attempt to show a particular policy drives certain crime rates, they often fail to correctly account for the various laws of different jurisdictions.

For example, many studies that assess the efficacy of self-defense laws will often look only to the states that have codified a particular policy in statute. However, many states may have very similar self-defense rules through judicial decisions. By misspecifying these states, a study on self-defense laws would be worthless at examining the efficacy of those laws.

We also regularly see attempts to study events that are simply too rare to draw scientifically valid conclusions. This is most common in studies that purport to measure the effect of various laws on mass public shootings. Despite claims by some that hundreds of mass shootings occur each year, research has consistently shown far fewer of these events actually occur. A comprehensive dataset put together by Professor James Allen Fox of these events found that they occur between 20-30 times per year. Even Professor Fox, who is a strong supporter of gun control, admits that there is no evidence that any proposed policy measure will impact the frequency or severity of mass attacks because they are already so rare.

**Research Based Policy**

A large part of the Division's work is focused on informing the policy work done by ILA. By using arguments and messaging that resonate with the largest number of Americans, ILA can best represent the interests of our members.

We know from repeated research that the vast majority of Americans agree that law-abiding people have the right to defend themselves and their families with the firearm of their choosing. This is why that no matter the policy, our messaging continues to focus on self-defense.

Nowhere is this clearer than on our work to expand right-to-carry ("RTC") laws. There is some evidence that NRA's work to expand RTC laws in the 90s and early 2000s helped drive public support for self-defense with a firearm. That support has now made it possible to further expand RTC.

Since we are about to close out the decade, an examination of the expansion of permitless carry in the last ten years shows how well our focus on RTC has worked.

Here is a map showing the state of permitless carry in 2010 and the same map in 2020.



Only two states provided for permitless concealed carry at the beginning of the decade, but 16 do today.

And, it's not just permitless carry that substantially improved in the last decade. When most RTC laws were first passed, they provided for an ad hoc system of reciprocal agreements between states for interstate permit validity. Another push by ILA in the last ten years is to get every state to recognize valid permits from all other states.

The benefits of this system are two-fold. It provides for the greatest number of permitees who can carry in each state, and it proves that interstate carry is very feasible. This second benefit helps counter arguments to federal concealed carry reciprocity legislation.

While some states were initially hesitant to recognize permits from states that did not recognize their permit, many states have now overcome this concern and recognize permits from all states as can be seen from this map.



While ILA's work defending and expanding the rights of law-abiding gun owners is far from over. Gun rights at the end of this decade are more expansive than they were at the beginning due in large parts to the efforts of this Association.

**2020 Firearm Research**

As 2020 comes to a close, two clear trends are obvious from research conducted this year, gun ownership is up (especially amongst new gun owners), and support for gun control is down.

Through November, (the most recent month for which data is available), the FBI's NICS Section had conducted 35,758,249 checks. For some perspective, in 2019, the former busiest year for NICS checks, FBI ran 28,369,750 checks in all 12 months. Assuming December 2020 remains on track with the rest of the year, FBI will likely run ten million more checks in 2020 than it did in 2019 (a 35% increase).

NICS checks are not a perfect measure of gun sales, but they are used regularly as a predictor of current sales until more reliable, but slower to be released, data becomes available.

Subject to the caveats discussed above regarding self-report data sources, there is reason to believe that the huge surge in firearm buying is being driven by new gun owners. According to the National Shooting Sports Foundation, more than seven million new gun owners purchased a firearm in 2020.

This survey data seems to be supported by the types of firearms being sold in 2020. Prior surges in firearm sales have been driven by calls to ban particular types of firearms, most often semiautomatic rifles. In response, huge numbers of rifles have been sold during past surges, but the increase in handgun sales have generally been more modest.

In contrast, sales in 2020 have been mostly handguns, which are likely driven by new gun owners interested in self-defense. The FBI NICS office has run 10,931,060 handgun-related checks and 6,361,838 checks related to long gun sales. This tops the annual handgun check record by 35% (over the 8,085,498 handgun-related checks run in 2016) and this still doesn't include December. However, the long gun checks are likely to only approximately match or narrowly surpass 2013 (the prior record year for long gun-related checks). Not counting December, this year is 766,961 checks away from beating the long gun record set in 2013 (with 7,128,798 such checks).

As noted, with this huge surge in gun ownership, available data shows support for gun control amongst the American people has substantially diminished in 2020.

The longtime pollster Gallup regularly asks Americans what they believe to be "the most important problem" facing the nation. "Guns/gun control" reached a highpoint in March 2018 with 13% of respondents indicating it was the most important issue. In 2020, this number fell to less than 0.5% in each month it was asked from May through November.

This doesn't mean that gun control advocates will be going away, at least not until their billionaire financiers decide to give up on curtailing Americans' fundamental rights, but it does mean that more Americans than ever before will likely be supportive of the goals and objectives of the National Rifle Association in 2021 and beyond.

**OFFICE OF LITIGATION COUNSEL – Michael Jean, Director**

The Office of Litigation Counsel continues to fight for our members' rights through litigation. The following is a list of all the cases brought or supported by the Office of Litigation Counsel that had activity in 2020.

## I.  FEDERAL CASES

**SCOTUS**

**New York State Rifle & Pistol Association, Inc. v. City of New York, No.18-286**

*Issue*: A New York City premises permit is required to keep a firearm in one's home. The permit prohibits traveling with a firearm outside of the five boroughs, including to second homes and ranges, without permission from the NYPD (which has never been granted). This was challenged in the Southern District of New York under the Second Amendment and the right to travel.

*Status*: We lost in the Southern District of New York, and the Second Circuit affirmed in February 2018. Certiorari was granted on January 22, 2019. But after that, the city repealed the restriction, and the state preempted the city from enacting a similar ordinance in the future. Permit holders are now able to transport their firearm anywhere that they may lawfully possess it. Despite our best efforts to preserve the case and get a ruling on the merits, on April 27, a divided Court held that the case was moot. Although we were unable to get a ruling on the merits, we received a strong dissenting opinion from Justice Alito, criticizing the watered-down scrutiny that lower courts have applied to Second Amendment challenges, which we have already cited in other briefs.

*Future Actions*: The case was remanded back to the Southern District of New York to determine if a claim for damages can be brought.

**Denial of Cert in other cases**

We petitioned the Supreme Court for certiorari in four other cases:

- *Rogers v. Grewal* (18-824) – New Jersey's good-reason requirement
- *Gould v. Lipson* (18-1272) – Massachusetts' good-reason requirement
- *Worman v. Healey* (19-404) – Massachusetts' "assault weapon" ban
- *Malpasso v. Pallozzi* (19-423) – Maryland's good-reason requirement

The Court declined to take all of them, and several other Second Amendment cases, on June 15th. There will be no further activity in these cases.

**NYSRPA v. Corlett, No. 19-156 (2d Cir.) (No SCOTUS Case No. yet)**

*Issue*: New York Law requires an applicant for a carry permit to show "proper cause," i.e., "facts demonstrating a need for self-protection distinguishable from the general public." This requirement was challenged in the Northern District of New York under the Second Amendment.

*Status*: The Second Circuit had already upheld this requirement in *Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012). The trial court and the Second Circuit therefore summarily affirmed our case on August 26th.

Petition for certiorari was filed on December 17, 2020.

**D.C. CIRCUIT**

**CBD v. Bernhardt & FoA v. Bernhardt, Nos. 19-5147 & 19-5152 (D.C. Cir.)**

*Issue*: In 2017, the D.C. Circuit sided with NRA and SCI in our challenges to the Fish and Wildlife Service's unlawfully promulgated rule that banned elephant trophy importations from Zimbabwe. In order to comply with that ruling, the Fish and Wildlife Service withdrew all its prior rules that were unlawfully promulgated in the same manner, and announced that it would make future findings and importation decisions through case-by-case adjudications. Two groups of plaintiffs challenged the withdrawal of the findings and the case-by-case approach in the D.C. District Court. NRA and Safari Club intervened as defendants.

*Status*: The trial court ruled in our favor and dismissed all the claims for lack of standing and failure to state a claim. The plaintiffs appealed to the D.C. Circuit. On June 16, 2020, the D.C. Circuit affirmed the dismissal. The court cited our brief favorably in doing so. As a result, the Fish and Wildlife Service can continue to allow elephant trophies to be imported to the country.

*Future Actions*: None.

**SECOND CIRCUIT**

**NRA v. Cuomo, No. 1:20-cv-00385 (N.D. NY)**

*Issue*: In response to the COVID-19 outbreak, Governor Cuomo issued an executive order closing down all non-essential business, which included gun shops. This lawsuit was filed in the Northern District of New York. It challenges the gun-shop closure under the Second Amendment and the Fifth and Fourteenth Amendments due process clauses.

*Status*: The court denied our motion to amend the complaint and granted NY's motion for judgment on the pleadings August 14th.

*Future Actions*: None.

## THIRD CIRCUIT

### ANJRPC v. Grewal, No. 19-3142 (3d. Cir.)

*Issue*: New Jersey outlawed the possession of magazines with a capacity of greater than ten rounds. This prohibition was challenged in the District of New Jersey under the Second Amendment.

*Status*: The trial court denied our motion to preliminarily enjoin the enforcement of the statute. The Third Circuit affirmed the denial. *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910 F.3d 106 (3d Cir. 2018). The trial court then ruled against us on summary judgment. It held that it was bound by the panel's preliminary injunction holding that we were unlikely to succeed on the merits. On September 1st, the Third Circuit affirmed, holding that it was bound under the law-of-the-case doctrine. We petitioned the court for en banc review. The petition was denied on November 25th.

*Future Actions*: We are currently considering whether to appeal this case to the Supreme Court.

### Doe v. Wolf, No. 19-1927 (3d Cir.)

*Issue*: Pennsylvania law prohibits anyone who has been temporarily committed for a mental health observation from possessing a firearm. There is no hearing or any due process whatsoever before the temporary observation commitment takes place. This statute was challenged in the Eastern District of Pennsylvania under the due process clause of the Fourteenth Amendment, for depriving individuals of their fundamental rights without due process of law.

*Status:* The trial judge ruled against us and the case was appealed to the Third Circuit. The week after we appealed the case, the ATF certified the state's restoration process, which now effectively provided the plaintiffs (and all others committed under the statute) with some post-deprivation due process. The Third Circuit held that the post-deprivation proceedings were enough to satisfy the due process clause's requirements and affirmed. We do not see any more potential out of this case.

*Future Actions*: None.

### Mazahreh v. Grewal, 1:20-cv-17598 (D.N.J.)

*Issue:* New Jersey law requires that an applicant for a concealed-carry permit must prove that they have a "justifiable need" to carry. This requirement was challenged in the District of New Jersey under the Second Amendment. This case is the almost identical to the *Rogers* case.

*Status*: The Complaint was filed on December 1st. We expect to get a summary dismissal because the Third Circuit has already upheld this requirement in *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013).

*Future Actions*: Continue to prosecute the case.

## FOURTH CIRCUIT

### Maryland Shall Issue v. Hogan, No. 19-1496 (4th Cir.)

*Issue*: Maryland law forbids the sale, rental, transfer, purchase, or receipt of a handgun by any person without a valid Handgun Qualification License, which will only be issued after the applicant, among others, pays several fees and takes a four-hour safety course, by a state-certified instructor. This requirement was challenged in the District of Maryland under the Second and Fourteenth Amendments.

*Status*: The state filed a motion to dismiss, which was denied on all but one count: the court found that we didn't have standing to challenge the requirement that applicants take a firearm-safety course from a certified instructor. The Fourth Circuit reversed on August 3, 2020. We are now back in the district court where summary judgment motions are scheduled to be briefed through March 2021.

*Future Actions*: Prosecute the case in the district court.

## NINTH CIRCUIT

### Duncan v. Becerra, No. 19-55376 (9th Cir.)

*Issue*: California outlawed the possession of magazines with a capacity of greater than ten rounds. This prohibition was challenged in the Southern District of California under the Second Amendment, Takings Clause, and Due Process Clause.

*Status*: The court granted our motion for a preliminary injunction on June 29, 2017, and the Ninth Circuit affirmed on July 17, 2018. Back in the district court, we successfully obtained a summary judgment on the Second Amendment and Takings Clause in March 2019. The state appealed to the Ninth Circuit. The court applied strict scrutiny and affirmed on August 14th. California promptly sought en banc review. We opposed.

*Future Actions*: Nothing until we get a ruling from the court.

### Crow Tribe v. U.S. (Six Grizzly Bear Cases), No. 18-36038 (9th Cir.)

*Issue*: In 2017, the U.S. Fish and Wildlife Service delisted grizzly bears in the Greater Yellowstone Ecosystem under the Endangered Species Act. This turned their management over to the states, who were scheduled to hold the first grizzly hunt in the lower 48 states in decades. Six different groups challenged the delisting under the Endangered Species Act and the Administrative Procedure Act in the District of Montana. The NRA intervened in the case with Safari Club International.

*Status*: The trial court held that the Fish and Wildlife Service did not consider all the factors that it needed to and that the bears were not adequately protected when the Service delisted them. The DOJ only partially appealed the case, indicating that it would accept a remand on the other issues. The Ninth Circuit gave the DOJ exactly what it asked for: reversing on the issues that the

DOJ appealed and affirming the issues that the DOJ did not oppose. The bears are back on the list of threatened species, and there will be no hunts until they come off again.

*Future Actions*: None.

### Rhode v. Becerra, No. 20-55437 (9th Cir.)

*Issue*: California law requires ammunition sales, deliveries, and transfers to be conducted by a state-licensed ammunition vendor in a face-to-face transaction. A California resident who seeks to buy firearm ammunition must pay for and pass an electronic background check each time he or she wishes to make a purchase. This restriction was challenged in the Southern District of California under the Second Amendment.

*Status*: Judge Benitez granted us a preliminary injunction in April 2020, prohibiting the state from enforcing this restriction. The state promptly appealed and the Ninth Circuit stayed the injunction pending the appeal. The case was argued on November 9th. The court asked for supplemental briefing on November 16th.

*Future Actions*: Continue to prosecute the appeal.

### Mitchell v. Atkins, No 20-35827 (9th Cir.)

*Issue*: The people of Washington enacted I-1693, which prohibits the sale of handguns and semi-automatic rifles to individuals under 21. This was challenged under the Second Amendment and Commerce Clause in the Western District of Washington.

*Status*: We survived a motion to dismiss in May 2019, but we lost on summary judgment on August 31st. We appealed the case to the Ninth Circuit and filed our opening brief on November 25th.

*Future Actions*: Continue to prosecute the appeal.

### B&L v. 22nd Agricultural District, 3:19-cv-00134 (S.D. Cal.)

*Issue*: The 22nd Agricultural District oversees the Del Mar fairgrounds, which is owned by the state of California. The District voted to no longer host gun shows at the fairgrounds. Suit was brought in the Southern District of California, challenging this decision under the First and Fourteenth Amendments.

*Status*: This case was settled on April 30th.

*Future Actions*: None.

**Brandy v. Villanueva, No. 2:20-cv-02874 (C.D. Cal.)**

*Issue*: In response to the COVID-19 pandemic, California and Los Angeles County issued an order closing down all non-essential businesses, which included gun shops. NRA (along with SAF and FPC) filed this lawsuit challenging the closure under the Second Amendment and Due Process Clause.

*Status*: Our motion for a preliminary injunction was denied by the court. The defendant filed a motion for judgment on the pleadings. Our motion for a preliminary injunction was denied. The defendant filed a motion for judgment on the pleadings, which the court granted on October 20th.

*Future Actions*: We are in the process of appealing.

**Altman v. Santa Clara, No. 5:20-cv-02180 (N.D. Cal.)**

*Issue*: In response to the COVID-19 pandemic, several counties in northern California issued orders closing down all non-essential businesses, which included gun shops. NRA (along with SAF and FPC) filed this lawsuit challenging the closure under the Second Amendment and Due Process Clause.

*Status*: Our motion for a preliminary injunction was denied. Three of the counties repealed their orders, but Alameda County kept theirs in place. Defendants then filed a motion to dismiss. On November 30th, the court ruled that our Second Amendment claim against Alameda County could proceed. It dismissed the claims against the other counties.

*Future Actions*: Continue to prosecute the case.

**TENTH CIRCUIT**

**Aragon v. Grisham, No. 1:20-cv-00325 (D.N.M.)**

*Issue*: In response to the COVID-19 pandemic, Governor Grisham issued an executive order closing down all non-essential businesses, which included gun shops and ranges. NRA (along with NMSSA, SAF, FPC, and Mountain States) filed this lawsuit challenging the closure under the Second Amendment.

*Status*: In response to our lawsuit, we negotiated an agreement whereby the Governor agreed to allow gun shops to open up by appointment only for two weeks, and then allowed them to operate like all other essential businesses thereafter. In response, suits were voluntarily withdrawn.

*Future Actions*: None.

## ELEVENTH CIRCUIT

### NRA v. Swearengin, No. 4:18-cv-00137 (N.D. Fl.)

*Issue*: Florida law prohibits the purchase of firearms by persons under the age of 21. This prohibition was challenged under the Second Amendment and the Equal-Protection Clause in the Northern District of Florida.

*Status*: We survived a motion to dismiss on May 1st. The court allowed all of the claims to proceed against the Commissioner of the Department of Law Enforcement, while dismissing the claims against Attorney General Moody for not having any enforcement authority. The court also gave some indication that it would apply strict scrutiny in later proceedings. Discovery recently closed, and cross motions for summary judgment are fully briefed.

*Future Actions*: Continue to prosecute this case in the district court.

## II.    STATE CASES

### Colorado

### Chambers v. City of Boulder, No. 2018CV30581(Boulder District Court)

*Issue:* The city of Boulder passed several ordnances restricting (1) assault weapons and high capacity magazines, and (2) possession of firearms by minors. These ordnances were challenged under the state's preemption law.

*Status:* The court dismissed the possession-by-minors claims for lack of standing. We filed a motion for summary judgment on November 13th.

*Future Actions:* None.

### Florida

### Ballot Initiative: Prohibits Possession of Defined Assault Weapons, No. SC19-1266 (Fla. Supreme Court)

*Issue*: Several groups sponsored a ballot initiative that would amend the Florida right to keep and bear arms by prohibiting "assault weapons," which were defined to include any semi-automatic rifle capable of accepting more than 10 rounds. The Initiative also indicated that this was lawful under the Second Amendment. NRA, NSSF, and the Attorney General asked the Florida Supreme Court to review the Initiative to determine whether it is misleading.

*Status*: The Court agreed with us on June 4th. The Initiative will not be on the ballot this fall.

*Future Actions*: None.

**Illinois**

**Guns Save Life Inc. v. Ali, No. 1-18-1846 (Ill First District Appellate Court)**

*Issue*: This case challenges Cook County's imposition of a supplemental tax on the purchase of firearms and ammunition in the county under the right to keep and bear arms.

*Status*: The trial court denied our motion for summary judgment and granted Cook County's cross motion. The court essentially ruled that the taxes create a burden that is too minor to invalidate them. We appealed to the First District Appellate Court in Chicago, which affirmed. The Illinois Supreme Court granted our petition to appeal the case on September 30th.

*Future Actions:* Prosecute the appeal.

**Guns Save Life Inc. v. Village of Deerfield, No. 2-19-0879 (Ill Second District Appellate Court)**

*Issue*: When Illinois enacted its preemption statute, it gave localities a certain time frame wherein they could enact gun-control laws. The Village of Deerfield enacted an "assault weapon" ordinance after that time expired. This ordinance was challenged under the state's preemption statute.

*Status*: We received a preliminary and permanent injunction in the trial court and village appealed to the Second District Appellate Court. On December 4th, the court ruled that the preemption statute allows localities to amend pre-existing ordinances outside of the preempt timeframe. The court upheld Deerfield's new ordinance because it already had an "assault weapons" storage ordinance before the time frame.

*Future Actions:* We are considering appealing the case further.

**Oregon**

**Ballot Initiative 40, No. SC S067201 (OR Supreme Court)**

*Issue:* This is a challenge to Ballot Initiative 40, which required firearms be safely stored, reported lost or stolen, and that all minors be supervised while using a firearm.

*Status:* The Court found (1) the title and the yes and no statements to be misleading and (2) the caption to be insufficient. The Initiative was therefore not be on the ballot.

*Future Actions:* None.

**Pennsylvania**

**Anderson v. City of Pittsburgh, No. 1753 CD 2019 (PA Commonwealth Court)**

*Issue*: The city of Pittsburgh passed a large capacity magazine ordinance. We challenged this under the state's preemption statute in state court.

*Status*: We won at the trial level and the city appealed. The case was argued on October 14th. We are awaiting a decision from the court.

*Future Actions:* Nothing until we get a ruling.

**Vermont**

**Vermont Federation of Sportsmen v. Birmingham, No. 2020-155 (VT Supreme Court)**

*Issue*: Vermont law bans the possession of magazines with a capacity to hold more than 15 rounds. This case challenges that restriction under the state right to keep and bear arms.

*Status*: After being delayed for over a year in the trial court, we were able to get a new judge who certified the question to the State Supreme Court. The case was argued in November, 2020.

*Future Actions*: Nothing until we get a ruling from the Court.

**Washington**

**Alim v. Seattle, No. 793501 (Wash. App. 1st. Division)**

*Issue*: The city of Seattle Washington enacted a firearms storage ordinance. This case challenges that ordinance under the state's preemption statute.

*Status*: The trial court dismissed our case for lack of standing, and we appealed. The court reversed on October 19th. We are now going back to the trial court, where we hope to resolve the case on summary judgment motions.

*Future Actions*: Continue to prosecute the case in the trial court.

**III.    AMICUS BRIEFS**

We filed amicus briefs in the following cases:

- *Young v. Hawaii*, No. 12-17808 (9th Cir. En Banc) – challenging Hawaii's restrictive process for issuing carry permits: no permit has been issued in the county in 20 years. There has been no ruling in the case yet.

- *McCarthy v. Baker*, No. 1:20-cv-10701 (D. Mass.) – challenging MA's closure of FFLs as non-essential businesses under the state's emergency COVID Order. The court preliminarily enjoined the state from shutting FFLs down.
- *Federal Law Enforcement Officers Association v. Grewal*, No. 3:20-cv-05762 (D.N.J.) – challenging NJ's requirement that retired law enforcement officers who are exempt from state and local carry restrictions under the Law Enforcement Officers Safety Act still need a state-issued permit. The NRA's brief was filed in opposition to the state's motion to dismiss. The state withdrew its motion after the NRA and DoJ filed opposition briefs.

## FINANCE AND ADMINISTRATION – Robert G. Owens C.P.A., Fiscal Officer

### Fundraising

The NRA Institute for Legislative Action (ILA) and the Political Victory Fund (PVF) raised $29.1 million and $11.3 million dollars respectively through November 30, 2020 from direct mail, digital on-line solicitations and Advancement outreach.

### Legislative and Political Mailings

Almost 400,000 pieces of legislative, political and informational mailings were produced and mailed by ILA and the Political Victory Fund. Over 200 new state house and state senate district mailings went to NRA members, hunters, concealed weapons holders and state legislatures via information packets, endorsement letters and postcards.

### Printing

117,000 color postcards printed for CFR's to mail as contact follow-up. Over 1.2 million of 50 different versions of palm cards and door-hangers printed to be given out by CFR's when knocking on doors during GOTV efforts.

### Financial and Fiduciary Performance

ILA, PVF, FAF and NRAVF leadership pivoted quickly in anticipation of the COVID challenges and were able to set priorities, pause spending and alter strategy to remain on track for what is needed in this election year to remain effective and relevant in the political and legislative arenas.

ILA Fiscal staff successfully absorbed the permanent loss of two staff positions without any drop off in productivity or quality of product and successfully launched the NRA Victory Fund Inc. super PAC with a new accounting and database management platform.

**NATIONAL RIFLE ASSOCIATION OF AMERICA**
**REPORT OF THE LEGAL AFFAIRS COMMITTEE**

**Dallas, Texas**                                        **January 7, 2021**

**To: NRA Board of Directors**

The Legal Affairs Committee met on January 5, 2021, via teleconference.

Committee members present were: Sandra S. Froman, Chairman; Scott L. Bach, Vice Chairman; Carol Frampton; Antonio Hernández-Almodóvar; Curtis S. Jenkins; Wayne Anthony Ross; Lane Ruhland; John C. Sigler; and Michael Blaz, Committee Secretary. Committee member Charles L. Cotton was excused from attendance.

Others in attendance were: John C. Frazer, NRA Secretary and General Counsel; Wade Callender, General Counsel, NRA-ILA; Michael Jean, Director, Office of Litigation Counsel, NRA-ILA; Joshua Savani, Director, Research and Information, NRA-ILA; Stefan Tahmassebi, NRA Deputy General Counsel; Skipp Galythly, NRA Assistant General Counsel; and Hadan Hatch, Attorney, Office of Litigation Counsel, NRA-ILA.

The minutes of the meeting of October 6, 2020 were approved.

The Chairman commended the performance of the NRA Office of the General Counsel and the Office of Litigation Counsel, NRA-ILA.

The Committee went into executive session at approximately 12:10 P.M.

The Committee emerged from executive session at approximately 1:05 P.M.

The Committee has no recommendations for the Board of Directors at this time.

The Committee adjourned at approximately 1:07 P.M.

Respectfully submitted,

Sandra S. Froman
Chairman

**NATIONAL RIFLE ASSOCIATION OF AMERICA**
**REPORT OF THE EXECUTIVE COMMITTEE**

**Dallas, Texas**                                                              **January 7, 2021**

**TO:    NRA Board of Directors**

The Executive Committee of the National Rifle Association met by teleconference on November 10, 2020.

The meeting was called to order by the committee chairman, NRA President Carolyn D. Meadows. Other committee members present were: Vice President Charles L. Cotton, Vice President Willes K. Lee, Thomas P. Arvas, Scott L. Bach, Bob Barr, Allan D. Cors, Carol Frampton, Joel Friedman, Marion P. Hammer, Susan Howard, Curtis S. Jenkins, David A. Keene, Tom King, James W. Porter II, Jay Printz, Ronald L. Schmeits, and John C. Frazer, committee secretary. The following committee members were unable to attend: David G. Coy, Sandra S. Froman, Todd J. Rathner, Wayne Anthony Ross, and Dwight D. Van Horn.

Other NRA directors in attendance were Clel Baudler, Ted Carter, Todd Ellis, Edie P. Fleeman, Leroy Sisco, Mark A. Vaughan, Blaine Wade, Linda L. Walker, Howard J. Walter, Judi White, and Donald Young.

NRA officers in attendance were Joseph P. DeBergalis, Jr., Executive Director of General Operations, and Jason Ouimet, Executive Director of the NRA Institute for Legislative Action.

Other NRA staff in attendance were Stephanie Daniels, Assistant NRA Secretary, and Millie Hallow, Managing Director, Operations Outreach.

Also in attendance was outside counsel Wit Davis.

The committee reviewed the minutes of the meeting of July 20, 2020, which were approved without objection.

It was moved that the committee go into executive session. Without objection, the committee went into executive session at 2:12 p.m.

The committee rose from executive session at 2:37 p.m., having acted on the following motions:

> "MOVED, to consider all submitted waivers as a slate and approve
> or deny them as a group."

The motion was adopted unanimously.

> "MOVED, that all of the potential candidates seeking waivers
> of the five-year membership requirement be granted waivers."

The motion was not adopted, by a roll call vote as follows:

| | |
|---|---|
| Thomas P. Arvas | No |
| Scott L. Bach | Present |
| Bob Barr | No |
| Allan D. Cors | No |
| Charles L. Cotton | Present |
| Carol Frampton | Present |
| Joel Friedman | Present |
| Marion P. Hammer | No |
| Susan Howard | No |
| Curtis S. Jenkins | No |
| David A. Keene | Present |
| Tom King | No |
| Willes K. Lee | Present |
| Carolyn D. Meadows | Present |
| James W. Porter II | No |
| Jay Printz | No |
| Ronald L. Schmeits | No |

There being no further business to come before the committee, the meeting then adjourned.

The Executive Committee of the National Rifle Association met by teleconference on December 8, 2020 at 2:02 p.m.

The meeting was called to order by the committee chairman, NRA President Carolyn D. Meadows. Susan Howard offered an opening prayer. Other committee members present were: Vice President Charles L. Cotton, Vice President Willes K. Lee, Thomas P. Arvas, Scott L. Bach, Bob Barr, J. Kenneth Blackwell, Allan D. Cors, David G. Coy, Joel Friedman, Marion P. Hammer, Susan Howard, Curtis S. Jenkins, David A. Keene, Tom King, James W. Porter II, Jay Printz, Todd J. Rathner, Ronald L. Schmeits, Dwight D. Van Horn, and John C. Frazer, committee secretary. The following committee members were unable to attend: Carol Frampton, Sandra S. Froman, and Wayne Anthony Ross.

Other NRA directors attending were Joe M. Allbaugh, Clel Baudler, Dave Butz, Ted Carter, Patricia A. Clark, Todd Ellis, Edie Fleeman, Johnny Nugent, Don Saba, William H. Satterfield, Steven C. Schreiner, Bart Skelton, Mark E. Vaughan, Linda Walker, and Judi White

NRA officers in attendance were Craig B. Spray, Treasurer; and Joseph P. DeBergalis, Jr., Executive Director of General Operations.

Other NRA staff in attendance were Stephanie Daniels, Assistant NRA Secretary, Millie Hallow, Managing Director, Operations Outreach, and Jeff Poole, Managing Director, Shows & Exhibits.

Also in attendance was outside counsel Wit Davis.

The committee reviewed the minutes of the meeting of November 10, 2020, which were approved without objection.

Without objection, the committee went into executive session at 2:12 p.m.

The committee rose from executive session at approximately 2:30 p.m., having adopted the following resolution:

WHEREAS, governmental orders resulting from the ongoing COVID-19 pandemic have continued to affect scheduling of large meetings and other events nationwide; and

WHEREAS, the scheduled host hotel in Virginia for the January 2021 board of directors meeting has cancelled all events that month; and

WHEREAS, all major events at the scheduled host site for the NRA's 2021 Annual Meeting of Members have been cancelled for the first half of 2021; now therefore be it

RESOLVED, that the winter 2021 meeting of the NRA Board of Directors shall be held on Thursday, January 7, 2021 at 9:00 a.m., Central Standard Time, in the Dallas Ballroom of the Omni Dallas Hotel in Dallas, Texas; and be it further

RESOLVED, that the 2021 Annual Meeting of Members shall be held on Saturday, September 4, 2021 at 10:00 a.m., Central Standard Time, at the George R. Brown Convention Center in Houston, Texas; and be it further

RESOLVED, that the fall 2021 meeting of the NRA Board of Directors, currently scheduled for Saturday, September 11, 2021 in Tysons Corner, Virginia, shall instead be held on Monday, September 6, 2021 at 9:00 a.m., Central Standard Time, at the Hilton Americas hotel in Houston, Texas; and be it finally

RESOLVED, that the Secretary prepare recommendations for a potential third board meeting in 2021 to replace the meeting currently scheduled to take place in Houston, Texas on May 17, 2021.

Having no other business to conduct, the committee then adjourned.

Respectfully submitted,

Charles L. Cotton
Vice Chairman

# NATIONAL RIFLE ASSOCIATION OF AMERICA
## REPORT OF THE BYLAWS & RESOLUTIONS COMMITTEE

**Dallas, TX**                                                    **January 7, 2021**

**To: NRA Board of Directors**

The Bylaws & Resolutions Committee met via teleconference on January 4, 2021.

Committee members present were Carol Frampton, Chairman; Charles L. Cotton, Vice Chairman; Scott L. Bach; Allan D. Cors; Joel Friedman; and Michael Blaz, Committee Secretary. Committee member Larry E. Craig was not present.

Others in attendance were: Carolyn D. Meadows, NRA President; Willes K. Lee, NRA Second Vice President; Todd J. Rathner, NRA Board Member; John C. Frazer, NRA Secretary and General Counsel; William Davis, Counsel to NRA Board; and Wade Callender, General Counsel, NRA-ILA.

The Committee approved the minutes of the meeting of the Committee on September 20, 2020.

The Committee discussed the issue of possible term limits for NRA Directors including the fact that the Committee previously discussed the issue when it arose at a prior meeting of the Board of Directors.

The Committee went into executive session at approximately 12:25 p.m.

While in executive session it was the consensus of the Committee to issue the following report on the proposed Resolutions that were referred to the Committee:

There were seven proposed Resolutions at the NRA Annual Meeting of Members on October 24, 2020, five of which were referred to the Bylaws and Resolutions Committee. The title of each of these five appears underlined below along with the results of the Committee's consideration.

## RESOLUTION NO. 3

"Term Limit/Bad Director Resolution to be submitted to the National Rifle Association Annual Meeting of the Members, October 24th, 2020" by Jamison Nethery, Member No. 220551156 ("Resolution no. 3")

The Committee has determined that no further action regarding the Resolution is appropriate for the following reasons:

*1.      Term Limits Reduce the Power of the NRA's Members*

The composition of the Board of Directors is sufficiently governed by the election process. Every three years directors come up for election by the voting members. If at any time the membership decides it does not want a director, the members will not vote that director into office. Term limits

would unnecessarily narrow the range of candidates thus diminishing the power of members to choose who will represent them. When voter choices are restricted, it could result in a denial of the voters' will. An impending term limit could also diminish membership power by reducing an outgoing director's responsiveness to member concerns.

2. *Term Limits Reduce Experience, Expertise, Talent, Insights and Institutional Memory Available to NRA.*

NRA's system tasks directors with creating solutions to pressing societal problems relating to our purpose. Often there is no simple answer and there is a likelihood for unintended consequences. Crafting policy is a learned skill; as in other professions, experience matters. Effective directors should not be forced out of their position. NRA should be able to benefit from their skills, talents and experience. Even in instances where staffers, rather than directors, lead the charge in crafting policies, it is often the director-to-director interactions that solidify details, and build coalitions that result in effective action. NRA members and the firearms owning public are best served if experienced directors continue to serve the Association by making important decisions. Term limits would result in an unnecessary loss of directors' experience, expertise and insight, and result in a loss of organizational memory.

Term limits could also reduce the motivation of some directors in their final terms. Directors who know their time is ending will feel less pressure to develop expertise on specific issues knowing that term limits will reduce the Association's ability to benefit from that knowledge.

For these reasons, the Committee believes term limits would not benefit the Association.

## RESOLUTION NO. 4

"Resolution submitted to the Annual Meeting of the National Rifle Association, 24 October 2020, by Frank C. Tait, Endowment Life Member No. 37307752." ("Resolution no. 4")

The Committee has determined that no further action regarding Resolution no. 4 is appropriate for the following reasons:

1. To the extent Resolution no. 4 seeks the removal of Members of the NRA Board of Directors and/or NRA officers by NRA members by demanding Board action against such NRA Board Members or Officers, Resolution no. 4 fails to comply with the NRA Bylaws. Specifically, the procedure for "the removal of one officer, or Director" is set forth in detail in Bylaws Article IX. Resolution no. 4 fails to comply with the procedure set forth in Article IX.

2. The Committee also noted that Resolution no. 4 points to allegations made against the NRA and certain individuals noted in Resolution no. 4 by the Attorney General for the State of New York (the "NYAG"). The Committee further noted that these allegations are being vigorously contested in litigation now pending before the Supreme Court of New York for the County of New York (the "NYAG Lawsuit"). The NYAG Lawsuit is still in its early stages. The litigation process, and the due process rights of the defendants in the NYAG Lawsuit, demand that the NYAG's allegations be fully litigated before the trier of fact in the NYAG Lawsuit. Accordingly, any action by the Bylaws

and Resolutions Committee, the NRA Executive Committee, or the NRA Board of Directors would be premature and improper.

## RESOLUTION NO. 5

"Resolution submitted to the Annual Meeting of the National Rifle Association, 24 October 2020, by Rob Pincus, Life Member No. 188652907." ("Resolution no. 5")

The Committee has determined that no further action regarding Resolution no. 5 is appropriate because the Committee has determined that the procedures used to determine membership numbers are effective. This is based on the following information:

In a memorandum on December 22, 2020, Derek Robinson, Managing Director, Membership provided, in pertinent part, the following information:

> "The NRA Membership Division tracks member counts using a series of standard reports produced from the membership database at the end of each month by the NRA Information Services Division. Active member counts are tracked using several different criteria, including Membership Type, term and location (State/US Territory/Canadian Province/Foreign). The monthly reports package is used by Membership Division staff to produce an Executive Summary that is distributed to Executive NRA staff and NRA Board Officers each month.

> In addition to the monthly member count reports, Membership Division staff monitor daily and weekly membership/contribution sales reports produced from the membership database to keep track of how many memberships are being sold on a daily and weekly basis. This gives staff an idea of how many members are being added to the system between month end report runs."

## RESOLUTION NO. 6

"Resolution regarding the correction of an illegal bylaw" submitted by Jeff Knox, Endowment Member No. 85326. ("Resolution no. 6")

The Committee has determined that no further action regarding Resolution no. 6 is appropriate for the following reasons:

The Resolution suggests that Article IV, Section 3(e) — which allows a "vote" in which the individual votes cast "shall be recorded in the minutes of the meeting but not published in the Official Journal" — conflicts with Section 3(d) of the same Article, which states that roll call votes "shall be published" in the official journal.

Based on consultation with the NRA Parliamentarian and NRA counsel, the Committee believes there is no conflict. Robert's Rules of Order § 30 allows for various methods of voting (such as a

show of hands, a rising vote or a non-secret paper ballot) that are not strictly roll call votes, but that do allow individual directors' votes to be identified and recorded. It also states that that each organization is entitled to interpret its bylaws based on and with the assistance of professional and authoritative advice. The transcript of the January 1999 Board meeting makes clear that the Board understood the distinction when it adopted Section 3(e). The transcript further indicates the sponsors of the language were trying to authorize a method for Board members to have their individual votes recorded, but without the expense of publishing roll calls in the NRA publications.

The Committee was guided by principles established by the courts when asked to interpret the meaning of a statute. Bylaws to the NRA are like statutes to a legislature. The main principle states we must read the bylaw, or statute, to be consistent so that all parts of it can be respected.

In this regard, the Committee was guided by the following principles of statutory interpretation:

Avoid:

*interpreting a provision in a way that would render other provisions of the [operating governing document] superfluous or unnecessary.

*interpreting a provision [of the operating governing document] in a way inconsistent with the policy of another provision.

* interpreting a provision in a way that is inconsistent with a necessary assumption of another provision.

## RESOLUTION NO. 7

"Resolution of the NRA Members Regarding Transparency, Competition, and Honesty in Election of Officers" submitted by Jeff Knox, Endowment Member No. 85326 ("Resolution no. 7")

The Committee has determined that no further action regarding Resolution no. 7 is appropriate for the following reasons:

Resolution no. 7 states that the officer election at the April 2019 Board meeting was conducted in executive session, and that the election of the officers by acclamation was later characterized as unanimous. Robert's Rules of Order states that an election by acclamation is unanimous: "If only one person is nominated and the bylaws do not require that a ballot vote be taken, the chair, after ensuring that, in fact, no members present wish to make further nominations, simply declares that the nominee is elected, thus effecting the election by unanimous consent or 'acclamation.'" See RONR § 46 (11th ed.) (in effect at the 2019 meeting); RONR § 46:40 (12th ed.) (identical language).

Resolution no. 7 also expresses concern about the election being conducted in executive session. The decision to conduct any particular business in executive session is a matter of judgment of the cognizant body, in this case the NRA Board of Directors. Nothing in New York law, the NRA Bylaws, or Robert's Rules prohibits conducting elections in executive session.

Resolution no. 7 also calls on the Board "to nominate at least two individuals for every officer position" and to conduct the elections in open session by secret ballot. If the Board is satisfied that

one candidate is the best choice for a position, and there is no requirement that the Board do so, the Committee sees no value in nominating other candidates simply for the sake of creating a contested election. Such wheel-spinning requires time and effort to count ballots, and is unnecessary given that the NRA Bylaws already require that, in the event of a contested election, voting among two or more candidates "shall be by written ballot." Art. V, Sec. 1(a).

The Committee emerged from executive session at approximately 1:10 p.m.

The Committee discussed proposed amendments to the NRA Board Policy for Board Member Attendance, to address pandemic concerns, a copy of which is attached to this report. The Committee expressed that the board policy on attendance should be distributed by the NRA Secretary to Board Members.

The Committee discussed a proposed memorial resolution for Robert Kukla, a copy of which is attached to this report.

**The Committee makes the following recommendations to the Board of Directors:**

**1.** **"MOVED, That the NRA Board adopt the proposed amendments to the NRA Board Policy for Board Member Attendance as identified in the document attached to this report."**

**2.** **"MOVED, That the proposed memorial resolution for Robert Kukla, former NRA Board member, be approved."**

The Committee recessed at approximately 1:35 p.m. subject to the call of the Chairman.

Respectfully submitted,

Charles L. Cotton
Vice Chairman

**NRA Board Policy for Board Member Attendance**

(a) Members of the Board of Directors should regularly attend Board meetings. In order to discharge their fiduciary duties under applicable law, Board members shall keep informed of matters within the scope of the Board's oversight role in the governance of the Association. Attendance at Board meetings is one of a number of methods by which Directors may keep informed of matters within the purview of the Board.

(b) An excessive number of unexcused absences from meetings of the Board may be grounds for disciplinary or corrective action in accordance with the Association's Bylaws or as otherwise may be determined. Such action may include, without limitation, publicizing to the Board the attendance record of the Director and the Board asking for the resignation of the Director.

An absence from a Board meeting is deemed "excused" if the President, having been informed of the reason for the absence, in good faith deems the absence excused prior to the closing of the missed Board meeting based on at least one of the following six factors:

(1) the Director has a bereavement, or personal, family, or household illness, including vulnerability to contagions; (2) severe weather, natural disaster, or civil disorder precludes attendance; (3) the Director is engaged in service in the military, as a law enforcement officer or other emergency responder; (4) the Director's attendance is required at a legislative body, legal proceeding, or other professional circumstance beyond the Director's reasonable control; (5) the Director's participation in other activities are of such importance that the Director's absence from Board meetings is justifiable; or (6) reasonable evidence is presented that such Board member has remained engaged and apprised of matters within the scope of the Board's oversight role despite the absence.

(c) In the event an absence is not "excused", the President shall, pursuant to Article VII, Section 2(b) of the Association's Bylaws, delegate the matter to the Executive Council to determine whether the Board member's absence should have been excused or, as the case may be, to make recommendations for disciplinary or corrective action consistent with the Association's Bylaws and applicable law.



# THE NATIONAL RIFLE ASSOCIATION OF AMERICA

# Resolution



**WHEREAS**, Robert J. Kukla, of Park Ridge, Illinois, a former Executive Director of the NRA Institute for Legislative Action and member of the Board of Directors of the National Rifle Association of America, passed away on November 4, 2020, at the age of 87; and

**WHEREAS**, Robert was born on December 1, 1932, in Chicago, Illinois; he graduated from Northwestern University in 1957 with a Juris Doctor degree; he wore many professional hats throughout his life; he worked as casualty adjuster at Allstate Insurance Company, a trial attorney at the firm Fitzgerald, Petrucelli & Simon, and as Director of Marketing Sales and Distribution at Sears, Roebuck and Company; he was a self-employed author, teacher, consultant, television and radio personality; and

**WHEREAS**, Robert was a man with great integrity; he received a certificate of merit from Chicago Mayor Richard J. Daley in 1970, for his demonstration of good citizenship in action for aiding and assisting a victim of assault and robbery; he helped form and was President of the "Logan Square Neighborhood Association," an organization formed to resist crime in the area; he had a deep appreciation for the law and decided to share his passion and knowledge by teaching law courses at Triton College, Oakton College, and Roosevelt University; and

**WHEREAS**, Robert was an NRA Life member at the time of his death; he was Executive Director of NRA-ILA from 1977 to 1978; he served on the NRA Board of Directors from 1966-1976; he served on the Firearms Legislative Committee, Bylaws & Resolutions Committee, Range Facilities Committee, Protest Committee, and State Association Committee; and

**WHEREAS**, Robert was an ardent supporter of firearms and the Second Amendment; he was a skilled marksman and renowned pistol shooter; he served as Vice President and Legislative Committee Chairman of the Illinois State Rifle Association; he served as Vice President of the Tri-County Pistol and Revolver League; he was a member of the Northwest Gun Club, Inc.; he wrote on firearms matters, including a landmark gun rights book, "Gun Control," which is still relevant and referenced today; he was a skilled debater and made over 300 media appearances on behalf of the NRA; now, therefore, be it

**RESOLVED**, That the Board of Directors of the National Rifle Association of America, at its meeting on January 7, 2021, in Dallas, Texas, in recognition of Robert Kukla and his long years of service to the National Rifle Association of America, hereby expresses its profound sense of loss occasioned by his passing, and extends its sincere sympathy to his family; and, be it further

**RESOLVED**, That the text of this resolution be spread upon the minutes of the meeting, and that a copy, suitably engrossed, be forwarded to his beloved children Robert and Jay.

Attest:

_____ On this 25th day of February, 2021

John C. Frazer

## NATIONAL RIFLE ASSOCIATION OF AMERICA
## REPORT OF THE LEGISLATIVE POLICY COMMITTEE

**Dallas, Texas**                                                    **January 7, 2021**

**To: NRA Board of Directors**

The Legislative Policy Committee met on December 29, 2020 via WebEx Video Conference. Committee members present were: Kayne B. Robinson, Chairman; Carolyn D. Meadows, Vice Chairman; Joe M. Allbaugh; Scott L. Bach; Allan D. Cors; Charles L. Cotton; Sandra S. Froman; Marion P. Hammer; Graham Hill; Curtis S. Jenkins; Willes K. Lee; James W. Porter II; Todd J. Rathner; Rob Rotter; Linda L. Walker; and Naomi Farmer, Committee Secretary. Committee members unable to attend were: Bob Barr; Larry E, Craig; David A. Keene; Alan B. Mollohan; John C. Sigler and Donald E. Young. Others in attendance were NRA Secretary John C. Frazer; NRA-ILA Executive Director Jason Ouimet; other NRA Directors; and NRA staff.

**Chairman Robinson** called the meeting to order at 12:00 p.m. on December 29, 2020. The committee unanimously decided to postpone the approval of the January 2020 minutes until the committee can meet in-person.

**Chairman Robinson** thanked everyone for attending the meeting and gave concerns about the two upcoming Georgia Senate Run-off elections, the 2021 political and judicial landscape, along with recognizing ILA's hard work in the 2020 elections and hard work to come in 2021.

**Chairman Robinson recognized NRA President Carolyn D. Meadows.** President Meadows restated Chairman Robinson concerns, adding additional information on the two Georgia Senate Run-off elections and thanked ILA Executive Director Jason Ouimet and his staff for their hard work.

**Chairman Robinson recognized NRA-ILA Executive Director Jason Ouimet.** Mr. Ouimet gave an overview of ILA's 2020 election actions and results, along with the political ramifications of those results for 2021.

**Chairman Robinson recognized NRA First Vice President Charles L. Cotton, NRA Second Vice President Willes K. Lee, and other committee members to discuss concerns and issues.** While the committee discussed many areas of interest, nothing rose to the level of Board action.

**Chairman Robinson, President Meadows, ILA Executive Director Jason Ouimet and ILA Managing Directors fielded questions.**

There being no further business, the committee adjourned at 1:00 p.m.

Respectfully submitted,

Kayne B. Robinson
Chairman

## NATIONAL RIFLE ASSOCIATION OF AMERICA

## REPORT OF THE NOMINATING COMMITTEE

DALLAS, TEXAS                                            JANUARY 7, 2021

TO:     NRA Board of Directors and Executive Council

The Nominating Committee met via webinar on November 14, 2020, for the purpose of nominating individuals for election to the NRA Board of Directors in 2021. Members present were: Bruce Ash; Bob Barr; J. William Carter; Rick Figueroa; Hilary Goldschlager; Marion P. Hammer; Steven Leyh; Leroy Sisco; Dwight D. Van Horn; and Committee Secretary, John C. Frazer.

The Committee elected Bob Barr as Chairman and J. William Carter as Vice Chairman.

The Nominating Committee is a screening process designed to determine the most qualified candidates to be recommended to NRA voting members for election to the NRA Board of Directors. The Committee made every effort to select the best possible candidates for nomination.

Committee members set aside friendships and personal relationships and placed considerable weight on protection of the Second Amendment; leadership abilities; business expertise; legislative and financial experience; an understanding of the NRA's wide range of safety, training and shooting programs; past performance; and potential capabilities.

The Committee received recommendations for 71 individuals. The Committee reviewed all candidates, including incumbents seeking re-election, and candidates who either submitted themselves for consideration or were recommended by other NRA members.

Service on the NRA Nominating Committee is an honor and a serious responsibility. The Committee has an obligation to select those candidates who are the most dedicated, best qualified, and have the expertise and freedom needed to best serve the needs of the NRA and its members.

Following robust discussion, the Committee nominated the following 30 individuals as being the best qualified to meet the needs of the Association at this time:

1.  Scott L. Bach
    Newfoundland, New Jersey

2.  William A. Bachenberg
    Allentown, Pennsylvania

3.  Ronnie G. Barrett
    Murfreesboro, Tennessee

4.  Donald J. Bradway
    Hayden, Idaho

5.  Dean Cain
    Malibu, California

6.  James Chapman
    Live Oak, California

7.  Anthony P. Colandro
    Woodland Park, New Jersey

8.  David G. Coy
    Adrian, Michigan

9.  John L. Cushman
    Patchogue, New York

10. Edie P. Fleeman
    Durham, North Carolina

11. Joel Friedman
    Henderson, Nevada

12. Maria Heil
    New Freedom, Pennsylvania

13. Antonio Hernández-Almodóvar
    San Juan, Puerto Rico

14. Niger Innis
    North Las Vegas, Nevada

15. David A. Keene
    Ft. Washington, Maryland

16. Carrie Lightfoot
    Scottsdale, Arizona

17. Duane Liptak, Jr.
    Austin, Texas

18. Carolyn D. Meadows
    Marietta, Georgia

19. Bill Miller
    Beckley, West Virginia

20. Owen Buz Mills
    Paulden, Arizona

21. Janet D. Nyce
    Elliottsburg, Pennsylvania

22. Kim Rhode
    Big Bear Lake, California

23. Wayne Anthony Ross
    Anchorage, Alaska

24. Don Saba
    Tucson, Arizona

25. William H. Satterfield
    Birmingham, Alabama

26. John C. Sigler
    Dover, Delaware

27. Craig Swartz
    Adel, Iowa

28. James Tomes
    Wadesville, Indiana

29. James L. Wallace
    Newburyport, Massachusetts

30. Robert J. Wos
    Sarasota, Florida

**PLEASE NOTE: Voting members may vote for no more than 25 of the 30 candidates listed.**

Respectfully submitted,

Bob Barr
Chairman

# NATIONAL RIFLE ASSOCIATION OF AMERICA
# REPORT OF THE SMALLBORE RIFLE COMMITTEE

**Dallas, Texas** **January 7, 2021**

## TO: NRA Board of Directors

The NRA Smallbore Rifle Committee met via teleconference on April 16, 2020. Committee members present were Patricia A. Clark, Chairman; Jamie Corkish; Edie P. Fleeman; Ryan Tanoue; Howard J. Walter; Marling P Engle; Keith Sanderson, and Cole McCulloch, Committee Secretary. Committee members unable to attend were Tom King.

At the request of the British NRSA, and due to the cancellation of both countries' National Matches, the Smallbore chair was asked to have the Roberts and Goodwill Randle Team moved to 2022. The committee met and approved the following motion unanimously:

> "MOVED, That the 2021 Pershing Team Match and the Goodwill Randle Team Match be rescheduled to the 2022 National Matches at Camp Atterbury in order to allow for team selection and preparation by visiting teams. The match schedule will return to the every eight year schedule with the next Pershing and Goodwill Randle Team Matches fired in 2029."

The NRA Smallbore Rifle Committee met via teleconference on July 10, 2020. Committee members present were Patricia A. Clark, Chairman; Jamie Corkish; Edie P. Fleeman; Keith Sanderson; Ryan Tanoue; Howard J. Walter; and Cole McCulloch, Committee Secretary. Committee members unable to attend were Tom King, and Marling P. Engle. Also in attendance was Shelly Kramer, Manager, Tournament Operations, Competitive Shooting Division.

**The Committee discussed many areas of interest and while not rising to the level of requiring Board action, the following items were addressed:**

1. The committee and Mr. McCulloch discussed the impacts of the COVID-19 global pandemic on competitive shooting and the NRA Competitive Shooting Division.

2. The committee also discussed the 2021 National Matches and the Smallbore National Championships at Camp Atterbury and the circumstances surrounding preparing for the championship in 2021.

The Committee adopted the following motions that do not require Board action:

> "MOVED, That the Randle match continue following the rules in regard to firing only at the National matches of their respective countries. Countries that are unable to fire at their national matches are invited to participate as Goodwill Randle teams with the scores of up to ten women to count. If ten scores are not available, the country with the lowest amount of firing members will set the team number for all remaining participant countries."

"MOVED, That the Wakefield team be shot on individual home ranges under the supervision of a witness over a one-week period in early September. Firing members will be determined by the team Captain from a list of top 20 shooters by score from each of the 2018 and 2019 years. Those shooters will be polled by the team Captain for willingness to participate until all team slots are filled. The Captain submits via email all timelines, correspondence, and plans to the smallbore committee via email for comment."

**The Committee makes the following recommendations to the Board of Directors:**

**"MOVED. That the Executive Vice President direct staff to submit a list of upcoming sanctioned matches to the committee chair who will invite those tournament sponsors to bid on holding the 2020 Dewar Team match. Selection will depend on the expected number of competitors and likelihood of the match being held. Competitors who fired on the US Dewar Team in recent years will be notified by volunteers and asked to participate."**

**"MOVED, That the Executive Vice President direct staff to submit a list of 2 day outdoor 3-position matches and contacts in the August-September time frame to the committee chair. The chair will reach out to see if they are willing to accommodate an English match following their match for the purpose of firing the Drew Cup, a junior match. Under this plan, a US team might consist of 3 men, and/or 3 women, and/or a full team of 10 shooters given the availability of juniors participating. Appropriate brassards and medals will be awarded to the participants as they become available."**

Respectfully submitted

*Edie P. Fleeman*

Edie P. Fleeman
Committee Member

## NATIONAL RIFLE ASSOCIATION OF AMERICA
## REPORT OF THE NRA CIVIL RIGHTS DEFENSE FUND

**DALLAS, TEXAS**                                        **JANUARY 7, 2021**

### TO:   NRA BOARD OF DIRECTORS

The Board of Trustees of the NRA Civil Rights Defense Fund met on January 4, 2021, at 3:00 p.m. Eastern Standard Time, via telephone conference. Trustees present were: James W. Porter II, Chairman; Carol Frampton, Vice-Chairman; Robert K. Corbin; Robert Dowlut; William H. Satterfield; and Robert Sanders. Trustees Robert Cottrol, Charles Cotton, Graham Hill, and Curtis Jenkins were absent and excused. Also present were: Stefan B. Tahmassebi, Secretary, NRA Civil Rights Defense Fund; and Craig B. Spray, Treasurer, NRA Civil Rights Defense Fund. Others in attendance were: Rick Tedrick, NRA Office of the Treasurer; Sunee Stacks, NRA Office of the Treasurer; Wade Callender, NRA-ILA Deputy Executive Director and General Counsel; Michael T. Jean, NRA-ILA Litigation Counsel; Hadan Hatch, NRA-ILA Associate Litigation Counsel and Katie Crowley, Paralegal, Office of General Counsel.

It was established that the official notice of the meeting was e-mailed on December 3, 2020, and mailed on December 7, 2020.

The trustees approved the minutes of the meeting of October 20, 2020.

**Report of the Treasurer.** The Treasurer's written report was presented by: Craig B. Spray, Treasurer, NRA Civil Rights Defense Fund; Rick Tedrick, NRA Office of the Treasurer; and Sunee Stacks, NRA Office of the Treasurer. The Treasurer's written report was reviewed and approved.

**Report of the Chairman.** The Chairman waived his oral report.

**Carter-Knight Freedom Fund Award.** Request was made for the submission of candidates. Trustee Robert J. Dowlut suggested nominating Stephen P. Halbrook and informed the Trustees that the nomination of Mr. Halbrook was supported by ILA. After discussion, the Board of Trustees nominated Stephen P. Halbrook for the Carter-Knight Freedom Fund Award and to award Mr. Halbrook $10,000.00 and a commemorative plaque. The Trustees want the record to reflect that the NRA Civil Rights Defense Fund and ILA worked closely together to nominate this candidate.

**Report of the Secretary.** The Secretary's written report was presented by Stefan B. Tahmassebi, NRA Civil Rights Defense Fund Secretary. The Secretary's written report was reviewed and approved. The Secretary reported on recent actions by the Chairman, the Executive Committee, emergency funding applications, recent updates by applicants, and organizational matters, including:

   **Chairman Authorizations**: During this reporting period, the Chairman did not authorize any emergency funding.

**Executive Committee Action**: During this reporting period, the Executive Committee did not authorize any emergency funding.

**Emergency Funding Requests.** During this reporting period, the following pending emergency funding requests were subsumed into regular funding applications which were heard at the meeting of January 4, 2020.

a. *Western Pennsylvania Sportsmen's Club, Inc. v. Municipality of Murrysville.*

b. *In the Matter of the Application of "John Doe."*

**Organizational Matters:** The Secretary informed of certain organizational matters that needed to be addressed, including the following:

The Secretary informed of expiring terms of Trustees and the status of the Nominating Committee.

The Chairman appointed a Nominating Committee consisting of Carol Frampton as chairman, Graham Hill, and Robert Corbin.

The Secretary informed that the NRA Civil Rights Defense Fund is the sole beneficiary of a land trust established by Mr. Francis Samp, that such land was being held in trust by the Chicago Title Land Trust Company, that a ready, willing and able buyer has made an offer for such land, and that the Chicago Title Land Trust Company required certain resolutions to be passed by the board of trustees, relating as to who has authority to act on behalf of the NRA Civil Rights Defense Fund, and required the execution of certain documents and agreements relating to the acceptance, ratification, and/or transfer of the beneficial interest, the trust agreement and/or the proposed sale.

After discussion, the Trustees resolved that the proposed transaction was fair and reasonable from the standpoint of the NRA Civil Rights Defense Fund, and that the agreements and documents for Chicago Land Title Trust Company be executed on behalf of the NRA Civil Rights Defense Fund, and, the Trustees passed the proffered resolutions.

The Secretary informed of a memorial resolution, proffered by Trustee Dowlut, for Mr. Francis Samp, who had contributed substantial sums to the NRA Civil Rights Defense Fund, both during his lifetime and by bequest after his recent death. After discussion, the Trustees resolved that Trustee Dowlut would draft a letter of appreciation and recognition for the Chairman's signature.

**Actions by Guests:**

Attorney Michael Jean, NRA-ILA Litigation Counsel, gave a report on NRA-ILA cases and various matters pending before the Board of Trustees.

The Trustees then met in executive session to discuss various cases and to make decisions on them and to discuss various other matters relating to the NRA Civil Rights Defense Fund.

**FUNDING REQUESTS:**

The trustees approved funding for the following cases or purposes up to the amount indicated, or denied funding where indicated, or deferred the matter to the next meeting, or took other action as indicated. Where funding was approved, it is understood that the hourly rate paid by the NRA Civil Rights Defense Fund may not exceed $200 per hour.

1.  *Arthur Dean Craig a/k/a Dean Craig v. Arcadia Township.* Because the case had settled, this matter was withdrawn at the request of the applicant's attorney.

2.  *Jerry W Wise, Kathy Lee Wise, David A. Drake and Brozia Lee Drake* v. *Owen County, Indiana, Board of Zoning Appeals; Precision Gun Range, LLC, Baron Creek LLC and Michael Marshall.*
    *Jerry W Wise, Kathy Lee Wise, David A. Drake and Brozia Lee Drake v. Precision Gun Range, LLC.*
    *Lane L. Jorgensen, Katheryn A. Jorgensen, as the trustees of the Jorgensen Family Trust v. Precision Gun Range, LLC.* Deferred.

3.  *Goldstein, et al. v. Peacemaker, et al.* West Virginia Litigation. Deferred.

4.  *Robert Arwady and Samuelia Arwady v. Tommy Ho, Jane Doe Ho, and the United States of America.* Granted: $7,000.00 from Texas restricted funds.

5.  *Western Pennsylvania Sportsmen's Club, Inc. v. Municipality of Murrysville.* Deferred.

6.  *Erin Gabbard, Aimee Robson and Dallas Robson, Benjamin Tobey, and Benjamin Adams v. Madison Local Law School District Board of Education and Lisa Tuttle-Huff.* Granted: $1,600.00 from Ohio restricted funds and $28,400.00 from general funds.

7.  *United States v. Gutierrez.* Denied.

8.  *Nyron Harrison, Thelma Williams, Individually and o/b/o Their Minor Child Ka'Mauri Harrison v. Jefferson Parish School Board, Dr. James Gray, Cecily White, Terri Joia, and Patricia Adams.* Granted: $40,000.00.

9.  Clayton Cramer, Mass Murderers: Who? How? Why? Granted: $10,000.00.

10. David Hardy, Research and Writing Projects. Granted: $10,000.00.

11. *In the Matter of the Application of "John Doe."* Granted: $250.00 from New Jersey restricted funds and $9,750.00 from general funds.

**NRA Institute for Legislative Action Submissions.** The Chairman recused himself, left the meeting, and was not present for, nor participated in, the discussion of the NRA Institute for Legislative Action funding requests. Vice Chairman Frampton assumed the Chair.

a. *Mazahreh v. Grewal.* Granted: $10,000.00.

b. *Rhode v. Becerra.* Granted: $10,000.00.

c. *ANJRPC v. Grewal.* Granted: $40,000.00.

d. *Guns Save Lives, et al. v. Kwame Raoul.* Granted: $2,375.00 from Illinois restricted funds and $125.00 from general funds.

Respectfully submitted,

James W. Porter II,
Chairman

**Exhibit 0005**

| Fill in this information to identify your case: |
|---|

United States Bankruptcy Court for the:

NORTHERN DISTRICT OF TEXAS

Case number *(if known)* _____     Chapter __11__

☐ Check if this an amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy       02/20

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

| | | |
|---|---|---|
| 1. | **Debtor's name** | **National Rifle Association of America** |
| 2. | **All other names debtor used in the last 8 years** Include any assumed names, trade names and *doing business as* names | |
| 3. | **Debtor's federal Employer Identification Number** (EIN) | **53-0116130** |

| | | | |
|---|---|---|---|
| 4. | **Debtor's address** | **Principal place of business** | **Mailing address, if different from principal place of business** |
| | | **11250 Waples Mill Road** **Fairfax, VA 22030** Number, Street, City, State & ZIP Code | P.O. Box, Number, Street, City, State & ZIP Code |
| | | **Fairfax** County | **Location of principal assets, if different from principal place of business** |
| | | | Number, Street, City, State & ZIP Code |

| | | |
|---|---|---|
| 5. | **Debtor's website** (URL) | **www.nra.org** |

| | | |
|---|---|---|
| 6. | **Type of debtor** | ■ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP)) |
| | | ☐ Partnership (excluding LLP) |
| | | ☐ Other. Specify: _____ |

**NYAG EX004**

Debtor   **National Rifle Association of America**      Case number (*if known*) _____

Name

---

**7. Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

■ None of the above

B. *Check all that apply*

■ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. §80a-3)

☐ Investment advisor (as defined in 15 U.S.C. §80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor.
See http://www.uscourts.gov/four-digit-national-association-naics-codes.

---

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

☐ Chapter 7

☐ Chapter 9

■ Chapter 11. *Check all that apply*:

    ☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,725,625 (amount subject to adjustment on 4/01/22 and every 3 years after that).

    ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

    ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and it chooses to proceed under Subchapter V of Chapter 11.

    ☐ A plan is being filed with this petition.

    ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

    ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

    ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

---

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

■ No.

☐ Yes.

| | District | When | Case number |
|---|---|---|---|
| | _____ | _____ | _____ |
| | _____ | _____ | _____ |

---

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list

☐ No

■ Yes.

| | Debtor | Relationship | |
|---|---|---|---|
| | **Sea Girt LLC** | Relationship | **Affiliate** |
| | District _____ | When _____ | Case number, if known _____ |

---

| Debtor | **National Rifle Association of America** | Case number (*if known*) | |
|---|---|---|---|
| | Name | | |

**11. Why is the case filed in this district?**

*Check all that apply:*

☐ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☑ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☑ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?** _____

Number, Street, City, State & ZIP Code

**Is the property insured?**

☐ No

☐ Yes. Insurance agency _____

Contact name _____

Phone _____

---

### Statistical and administrative information

**13. Debtor's estimation of available funds**

*Check one:*

☑ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available to unsecured creditors.

**14. Estimated number of creditors**

| | | |
|---|---|---|
| ☐ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than100,000 |
| ☑ 200-999 | | |

**15. Estimated Assets**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ☐ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☑ $100,000,001 - $500 million | ☐ More than $50 billion |

**16. Estimated liabilities**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ☐ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☑ $100,000,001 - $500 million | ☐ More than $50 billion |

| Debtor | **National Rifle Association of America** | | Case number (*if known*) | |
|---|---|---|---|---|
| | Name | | | |

| | **Request for Relief, Declaration, and Signatures** |
|---|---|

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    **January 15, 2021**
MM / DD / YYYY

**X** /s/ Wayne LaPierre      **Wayne LaPierre**
Signature of authorized representative of debtor      Printed name

Title    **Executive Vice President**

**18. Signature of attorney**

**X** /s/ Patrick J. Neligan, Jr.      Date **January 15, 2021**
Signature of attorney for debtor      MM / DD / YYYY

**Patrick J. Neligan, Jr. 14866000**
Printed name

**Neligan LLP**
Firm name

**325 N. St. Paul**
**Suite 3600**
**Dallas, TX 75201**
Number, Street, City, State & ZIP Code

Contact phone   **214-840-5300**      Email address   **pneligan@neliganlaw.com**

**14866000 TX**
Bar number and State

## RESOLUTION AUTHORIZING CHAPTER 11 REORGANIZATION
## AND RELATED RETENTION OF COUNSEL

WHEREAS, on January 7, 2021, at a meeting of the Board of Directors of the National Rifle Association of America ("NRA"), the NRA Board of Directors voted to approve that certain Employment Agreement between the NRA and Wayne LaPierre, its Executive Vice President, clarifying, for avoidance of doubt, that Wayne LaPierre is delegated the power to "exercise corporate authority in furtherance of the mission and interests of the NRA, including … to reorganize or restructure the affairs of the Association;" and

WHEREAS, the NRA is the single member and manager of Sea Girt, a Texas limited liability company; and

WHEREAS, on September 10, 2020, NRA President Carolyn Meadows announced the appointment of a Special Litigation Committee of the NRA to oversee the prosecution and defense of certain litigation; and

WHEREAS, on January 7, 2021, the Board of the NRA enacted a resolution formalizing the existence of the Special Litigation Committee as a committee of the Board of the NRA pursuant to N.Y. N-PCL § 712(a), and such resolution contained the following provisions:

> RESOLVED that a Special Litigation Committee of the NRA Board of Directors is hereby appointed, and that the members of such Committee shall be Carolyn Meadows, Charles Cotton, and Willes Lee, each of whom has been determined to be independent and disinterested in all respects relevant to their service on the Special Litigation Committee, and be it further

> RESOLVED that the Special Litigation Committee shall exercise corporate authority on behalf of the NRA with respect to the prosecution and defense of (i) the litigation captioned *People of the State of New York v. The National Rifle Association et al.*, Index No. 451625/2020 (Sup. Ct. N.Y.); (ii) the litigation captioned *The National Rifle Association v. Letitia James*, Case No. 1:20-cv-889 (N.D.N.Y. 2020); (iii) the litigation captioned *District of Columbia v. NRA Foundation, Inc.* et al., (2020 CA 003545 B); and (iv) any additional legal proceedings arising from or relating to the same facts, circumstances, or allegations as the foregoing, wherein the potential for an actual or apparent conflict of interest favors recusal by one or more NRA executives who would customarily oversee such proceedings; and

WHEREAS, in consultation with the Special Litigation Committee, Wayne LaPierre determined that a Chapter 11 reorganization of the NRA along with its wholly owned single member-managed Texas subsidiary, Sea Girt, would advance the best interests of the NRA, its members, and its mission, as well as the interests of Sea Girt; now, therefore, be it

RESOLVED that the commencement of a Chapter 11 reorganization proceeding in the United States District Court for the Northern District of Texas on behalf of the NRA and its wholly owned, single member-managed limited liability company, Sea Girt, is hereby authorized and directed; and be it further

RESOLVED that the NRA and Sea Girt shall retain, as debtor's counsel in connection with such reorganization proceeding, the firm of Neligan LLP; and be it further

RESOLVED that the NRA and Sea Girt shall retain the firm of Brewer, Attorneys & Counselors ("BAC") as special counsel to prosecute and defend certain non-bankruptcy matters during the course of such Chapter 11 proceeding, including the prepetition matters presently handled by BAC.

[Remainder of page intentionally left blank]

Executed this 15th day of January, 2021.

By: _____
Wayne LaPierre
Executive Vice President

**ACKNOWLEDGED AND AGREED BY
SPECIAL LITIGATION COMMITTEE:**

By: _____
Carolyn Meadows
Committee Chair

By: _____
Charles Cotton

By: _____
Willes Lee

Executed this 15th day of January, 2021.

By: _____
    Wayne LaPierre
    Executive Vice President

**ACKNOWLEDGED AND AGREED BY**
**SPECIAL LITIGATION COMMITTEE:**

By: _Carolyn Meadows_
    Carolyn Meadows
    Committee Chair

By: _____
    Charles Cotton

By: _____
    Willes Lee

Executed this 15th day of January, 2021.

By: _____
    Wayne LaPierre
    Executive Vice President

**ACKNOWLEDGED AND AGREED BY**
**SPECIAL LITIGATION COMMITTEE:**

By: _____
    Carolyn Meadows
    Committee Chair

By: _____
    Charles Cotton

By: _____
    Willes Lee

Executed this 15th day of January, 2021.


By: _____
    Wayne LaPierre
    Executive Vice President

**ACKNOWLEDGED AND AGREED BY**
**SPECIAL LITIGATION COMMITTEE:**


By: _____
    Carolyn Meadows
    Committee Chair


By: _____
    Charles Cotton


By: _____
    Willes Lee

| Fill in this information to identify the case: | |
|---|---|
| Debtor name | **National Rifle Association of America** |
| United States Bankruptcy Court for the: | **NORTHERN DISTRICT OF TEXAS** |
| Case number (if known): | |

☐  Check if this is an

amended filing

## Official Form 204

### Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

**12/15**

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **Ackerman McQueen, Inc.** 1601 Northwest Expressway Oklahoma City, OK 73118-1438 | | | **Disputed** | | | **$1,273,800.12** |
| **Membership Marketing Partners LLC** 11250 Waples Mill Road, Suite 310 Fairfax, VA 22030 | | | | | | **$961,850.00** |
| **Gould Paper Corporation** Attn: Warren Connor 99 Park Avenue, 10th Floor New York, NY 10016 | | | | | | **$855,746.40** |
| **Infocision Management Corp.** 325 Springside Drive Akron, OH 44333 | | | | | | **$712,034.83** |
| **Under Wild Skies** 201 N. Union Street, Suite 510 Alexandria, VA 22314 | | | **Disputed** | | | **$550,000.00** |
| **Valtim Incorporated** P. O. Box 114 Forest, VA 24551 | | | | | | **$549,177.67** |
| **Quadgraphics** N63W23075 Hwy 74 Sussex, WI 53089 | | | | | | **$522,236.91** |

Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com  Best Case Bankruptcy

| Debtor | **National Rifle Association of America** | | Case number *(if known)* | |
|---|---|---|---|---|
| | Name | | | |

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| Communications Corp of America Attn: Judy Reid 13195 Freedom Way Boston, VA 22713 | | | | | | $509,746.09 |
| Membership Advisors Public REL 11250 Waples Mill Road, Suite 310 Fairfax, VA 22030 | | | | | | $373,000.00 |
| Salesforce.Com, Inc. One Mark St - The Landmark Suite 300 San Francisco, CA 94105 | | | | | | $332,969.11 |
| Mercury Group 1601 NW Expressway, Suite 1100 Oklahoma City, OK 73118 | | | Disputed | | | $258,613.17 |
| Speedway Motorsports Inc. P.O. Box 600 Concord, NC 28026 | | | | | | $200,000.00 |
| Image Direct Group LLC 200 Monroe Avenue Building 4 Frederick, MD 21701 | | | | | | $143,206.31 |
| Google 1600 Amphitheatre Parkway Mountain View, CA 94043-1351 | | | | | | $132,016.49 |
| TMA Direct, Inc. 12021 Sunset Hills Road, Suite 350 Manassas, VA 20109 | | | | | | $116,989.64 |
| United Parcel Services P.O. Box 7247-0244 Philadelphia, PA 19170 | | | | | | $100,883.93 |
| Membership Advisors Fund Raising 11250 Waples Mill Road, Suite 310 Fairfax, VA 22030 | | | | | | $90,000.00 |

Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com     Best Case Bankruptcy

Debtor **National Rifle Association of America**  Case number *(if known)* _____
Name

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **Stone River Gear, LLC** **P.O. Box 67** **Bethel, CT 06801** | | | | | | $89,284.80 |
| **Krueger Associates, Inc.** **105 Commerce Drive** **Aston, PA 19014** | | | | | | $66,762.00 |
| **CDW Computer Centers, Inc.** **P.O. Box 75723** **Chicago, IL 60675** | | | | | | $59,541.05 |

Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com   Best Case Bankruptcy

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| | § | |
| **NATIONAL RIFLE ASSOCIATION** | § | |
| **OF AMERICA** | § | CASE NO. _____ |
| | § | |
| DEBTOR[1] | § | **Joint Administration Requested** |

## STATEMENT OF CORPORATE OWNERSHIP PURSUANT TO RULES 1007(a)(1) AND 7007.1 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

National Rifle Association of America is a not-for-profit, tax exempt organization with no equity ownership and therefore there are no entities to disclose under Federal Rules of Bankruptcy Procedure 1007(a)(1) and 7007.1(a).

Dated: January 15, 2021

By: _/s/ Wayne LaPierre_____
Name: Wayne LaPierre
Title: Executive Vice President

---

[1] The last four digits of the Debtors' taxpayer identification numbers are: 6130.

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | **CHAPTER 11** |
| | § | |
| **NATIONAL RIFLE ASSOCIATION** | § | |
| **OF AMERICA** | § | **CASE NO. ___** |
| | § | |
| **DEBTOR[1]** | § | **Joint Administration Requested** |

## LIST OF EQUITY SECURITY HOLDERS PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE RULE 1007(a)(3)

National Rifle Association of America is a not-for-profit, tax exempt organization with no equity ownership and therefore there are no entities to disclose under Federal Rule of Bankruptcy Procedure 1007(a)(3).

Dated: January 15, 2021

By: */s/ Wayne LaPierre*
Name: Wayne LaPierre
Title: Executive Vice President

---

[1] The last four digits of the Debtors' taxpayer identification numbers are: 6130.

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor name | **National Rifle Association of America** |
| United States Bankruptcy Court for the: | NORTHERN DISTRICT OF TEXAS |
| Case number (if known) | |

☐ Check if this is an amended filing

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors    12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date.  Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime.  Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.  18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)
☐ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
☐ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)
☐ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)
☐ *Schedule H: Codebtors* (Official Form 206H)
☐ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)
☐ Amended *Schedule*
■ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)
■ Other document that requires a declaration    **Statement of Corporate Ownership**
                                                 **List of Equity Security Holders**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  __January 15, 2021__    X /s/ Wayne LaPierre
                                     Signature of individual signing on behalf of debtor

                                     **Wayne LaPierre**
                                     Printed name

                                     **Executive Vice President**
                                     Position or relationship to debtor

Official Form 202                    **Declaration Under Penalty of Perjury for Non-Individual Debtors**

**Exhibit 0007**

*Copy 1*

# EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT is made by and between the National Rifle Association of America (the "NRA" or the "Association") and Wayne R. LaPierre ("Employee").

1.  <u>Employment</u>. The Association hereby employs Employee, and Employee hereby accepts employment with the Association, upon the terms and conditions hereinafter set forth. Terms used herein that are also used in the Bylaws of the Association shall have the same meaning ascribed to them in the Bylaws of the Association.

2.  Duties and Compensation.

(a)  Employee shall serve as the Executive Vice President of the Association and shall direct all the affairs of the Association in accordance with the programs and policies established by the Board of Directors. Among his authorities, Employee shall be empowered to exercise corporate authority in furtherance of the mission and interests of the NRA, including without limitation to reorganize or restructure the affairs of the Association for purposes of cost-minimization, regulatory compliance or otherwise. Employee shall devote his full time to performing the customary duties of such position and such other commensurate duties as may be assigned from time to time by the Board of Directors. Employee agrees to abide by the reasonable rules, regulations, instructions, personnel practices, employment manuals, and policies of the Association, as they may exist or be modified from time to time by the Association.

(b)  Employee shall be compensated by the Association for all services to be rendered pursuant to this Agreement, as follows:

(1)  The Association shall pay Employee a base salary at the rate of $1,300,000 per year (the "Base Salary").

(2)  The Association shall review the Base Salary at least annually. The Association may recommend changes to the Base Salary which the Officers Compensation Committee of the Board of Directors of the Association (the "OCC") reasonably determines to be in the best interest of the Association, taking into account Employee's performance, input obtained from independent compensation consultants, and other relevant factors. Employee's consent to any salary modification recommended by the OCC shall not be unreasonably withheld.

(3)  Employee shall be eligible for an annual performance bonus determined at the sole discretion of the OCC (provided, however, that any performance bonus recommended by the OCC must be approved by the full Board of Directors of the Association).

(c)  The Association shall provide the Employee with the following benefits:

(1)  Paid vacation time as customarily provided to the Association's other comparable employees;

(2)  Paid holidays as customarily provided to the Association's other comparable employees;

(3)  Life insurance as customarily provided to the Association's other comparable employees;

(d)  Medical and/or dental coverage as may be provided by the Association in

1

NYAG
EX005

**EXHIBIT A**

its sole discretion.

   (e) Reimbursement for all reasonable expenses incurred by Employee during the term of this Agreement for advancing the Association's business, provided that such expenses comply with, and are documented and submitted pursuant to, applicable NRA policies and guidelines.

   (f) Employee's eligibility for any benefit provided herein shall be subject to Employee's compliance with the reasonable requests of, and to Employee's meeting the underwriting criteria used by, any insurance company providing any of the benefits specified herein to the Association's employees. Employee agrees to submit to any medical examination and to provide and complete any documentation (including medical records) required by any such insurance company. All benefits provided for hereunder are taxable to Employee to the extent required by applicable tax laws.

   3. <u>Term of Employment</u>. Employee was elected to his present employment on October 24, 2020, and shall serve until the expiration of his elected term in accordance with the NRA Bylaws. This Employment Agreement, once executed, shall become effective immediately upon authorization by the NRA Board of Directors, and shall terminate effective immediately if the NRA declines to re-elect Employee to the position of Executive Vice President at the next annual election pursuant to NRA Bylaws Art. V, Sec. 1, and may additionally be terminated by the Association:

   (a) Upon 10 days written notice for Cause (as defined below); or

   (b) Effective immediately upon Employee's death or disability.

For purposes of this Paragraph 3, "Cause" shall mean: (i) material failure to perform the duties of Employee's position; (ii) fraud, misappropriation, embezzlement or acts of similar dishonesty; (iii) conviction of a felony involving moral turpitude; (iv) illegal use of drugs or excessive use of alcohol in the workplace; (v) intentional and willful misconduct that may subject the NRA to criminal or civil liability; (vi) breach of Employee's duty of loyalty by diversion or usurpation of corporate opportunities properly belonging to the NRA; or (vii) any material breach of this Agreement.

   4. <u>Confidentiality and Noncompetition</u>. In consideration of the employment of Employee by the Association, Employee agrees as follows:

   (a) Employee shall not, during the period of his employment with the Association or at any time thereafter, regardless of the reason for the cessation of his employment: (1) use any Confidential Information (as hereinafter defined) for his own benefit or for the benefit of any person or entity other than the Association; (2) disclose to any other person or entity any Confidential Information; or (3) remove from the Association's premises or make copies of any Confidential Information, in any form; except, in each case, as may be required within the scope of Employee's duties during the course of his employment by the Association.

   (b) Upon termination of employment, or at any such time as the Association may request, Employee will deliver to the Association all copies in his possession of any Confidential Information, in any form. Employee shall not at any time assert any rights in or with respect to any Confidential Information.

   (c) "Confidential Information" means (i) any and all specifications, drawings, designs, techniques, processes, know-how, research, customer lists, customer needs, prices, costs

2

**EXHIBIT A**

and marketing, sales and financial information, and (ii) any similar or other trade secret or confidential information of the Association or any member, vendor, supplier, distributor, or customer of the Association, regardless of how acquired or developed by the Association or any such member, vendor, supplier, distributor, or customer, concerning any of their respective businesses, policies, research, processes, inventions, products, business operations or business methods. Confidential Information does not include information, knowledge, or data which Employee can prove was in his possession prior to the commencement of employment with the Association or information, knowledge, or data which was or is in the public domain by reason other than the wrongful acts of Employee.

(d)     In the event that Employee is required by applicable law, regulation or legal process to disclose any Confidential Information, Employee shall promptly notify the Association in writing so that the Association may seek a protective order or other appropriate remedy; moreover, Employee shall cooperate reasonably with the Association to facilitate the Association's efforts to prevent or limit disclosure and assert any applicable privileges. Nothing herein shall be deemed to prevent Employee from honoring a subpoena (or governmental order) that seeks discovery of Confidential Information if (a) a motion for a protective order, motion to quash and/or other motion filed to prevent the production or disclosure of the Confidential Information has been denied or is not made; provided, however, that the Employee may disclose only that particular Confidential Information which Employee's legal counsel advises is legally required and that Employee exercises commercially reasonable efforts to preserve the confidentiality of all other Confidential Information; or (b) the Association consents to the disclosure in writing.

(e)     During the period of employment with the Association and for two (2) years thereafter, Employee shall not, for himself or on behalf of any other person or entity, in any way compete with the business then done or intended to be done by the Association, including calling upon any current, former or potential member, vendor or customer of the Association for the purpose of soliciting or providing to any such individual or entity any products or services which are the same as or similar to those provided or intended to be provided by the Association.

5.     Option to License Name and Likeness; Post-Employment Services. For a period of two (2) years commencing upon termination of Employee's employment pursuant to this Agreement (the "Post-Employment Period"), the Association may, at its sole option:

(a) Utilize Employee's name, likeness, and signature for fundraising, public relations, and membership purposes; provided, however, that (i) the Association shall exercise such option in good faith and shall not deploy Employee's name, likeness, or signature in any manner which the Association reasonably foresees may harm Employee's reputation, and (ii) the Association shall pay Employee a reasonable royalty in exchange for such use, not to exceed $500,000 per calendar year.

(b) Engage Employee for in-person public appearances, for which Employee will be compensated at a rate of $750 per hour.

6.     Intellectual Property. Employee agrees that any intellectual property developed during the term of this Agreement, including, without limitation, trademarks, copyrights, and patents ("Intellectual Property"), and any products, processes, know-how, inventions or devices, or any improvements to any of the foregoing whether patentable or not ("Inventions"), discovered or developed during the course of his employment with the Association which are (i) related to the Association's business; (ii) in the course of development by the Association; or (iii) made with the

3

**EXHIBIT A**

use of the Association's time, materials or facilities, shall belong to the Association. Employee hereby assigns and transfers to the Association all right, title, and interest to any and all such Intellectual Property and Inventions.

7.      <u>Injunctive Relief</u>. In the event of a breach or threatened breach of any of the terms of this Agreement, the Association shall be entitled to an injunction restraining Employee from committing any breach of this Agreement without showing or proving any actual damages and without diminishing any other right or remedy which the Association may have at law or in equity to enforce the provisions of this Agreement. Employee waives any right Employee may have to require the Association to post a bond or other security with respect to obtaining or continuing any injunction or temporary restraining order, releases the Association and its officers and directors from, and waives any claim for, damages against them which Employee may have with respect to the Association's obtaining any injunction or restraining order pursuant to this Agreement, and waives any claim that the Association has an adequate remedy at law.

8.      <u>General Terms</u>.

(a)      <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto, their personal representatives, and permitted successors, and assigns.

(b)      <u>Assignment</u>. This Agreement may not be assigned, in whole or in part, by any party hereto without the prior written consent of all other parties.

(c)      <u>Entire Agreement</u>. This Agreement contains the entire understanding between the parties hereto and supersedes any prior understanding, memoranda, or other written or oral agreements between them respecting the within subject matter. There are no representations, agreements, arrangements, or understandings, oral or written, between the parties relating to the subject matter of this Agreement which are not fully expressed herein.

(d)      <u>Modifications; Waiver</u>.  No modification or waiver of this Agreement or any part hereof shall be effective unless in writing and signed by the party or parties sought to be charged therewith. No waiver of any breach or condition of this Agreement shall be deemed to be a waiver of any other or subsequent breach or condition, whether of like or different nature.

(e)      <u>No Third-Party Beneficiary</u>. None of the provisions of this Agreement shall be for the benefit of, or enforceable by, any person or entity not a party hereto.

(f)      <u>Partial Invalidity</u>. If any provision of this Agreement shall be held invalid or unenforceable by competent authority, such provision shall be construed so as to be limited or reduced to be enforceable to the maximum extent compatible with the law as it shall then appear. The total invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

(g)      <u>Notices</u>. Any notice or other communication required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given if it is delivered, either personally, by facsimile transmission, or by registered, certified or express mail, return receipt requested, postage prepaid, to the address for such party specified below or to such other address as the party may from time to time advise the other party, and shall be deemed given and received as actual personal delivery, on the first business day after the date of delivery shown on any such facsimile transmission or upon the date of actual receipt shown on any return receipt if registered, certified or express mail is used, as the case may be.

4

**EXHIBIT A**

Notice to the National Rifle Association of America shall be sent to:

> John Frazer, Esq.
> General Counsel
> National Rifle Association of America
> 11250 Waples Mill Road
> Fairfax, VA 22030

with a copy to:

> William A. Brewer, III, Esq.
> Brewer Attorneys & Counselors
> 750 Lexington Avenue, 14th Floor
> New York, NY 10022

Notice to Wayne R. LaPierre shall be sent to:

> Wayne R. LaPierre
> Executive Vice President
> National Rifle Association of America
> 11250 Waples Mill Road
> Fairfax, VA 22030

with a copy to:

> P. Kent Correll, Esq.
> Correll Law Group
> 250 Park Avenue, 7th Floor
> New York, NY 10177.

(h)     Arbitration. In the event that any disagreement or dispute should arise between the parties hereto with respect to this Agreement or Employee's tenure at the NRA, then such disagreement or dispute shall be submitted to arbitration in accordance with the rules then pertaining to the American Arbitration Association with respect to commercial disputes. Judgment upon any resulting award may, after its rendering, be entered in any court of competent jurisdiction by any party.

(i)     Effect of Termination. Unless otherwise specifically agreed in writing, the terms of Paragraphs 4, 5, 6, 7 and 8 shall survive any termination, cancellation, repudiation, or rescission of this Agreement, and under such circumstances the parties may continue to enforce such terms as if this Agreement were otherwise in full force and effect.

(j)     Headings. The headings contained in this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

(k)     Fair Meaning. This Agreement shall be construed according to its fair meaning, the language used shall be deemed the language chosen by the parties hereto to express their mutual intent, and no presumption or rule of strict construction will be applied against any

5

**EXHIBIT A**

party hereto.

      (l)    <u>Gender</u>. Whenever the context may require, any pronoun used herein shall include the corresponding masculine, feminine, or neuter forms and the singular of nouns, pronouns, and verbs shall include the plural and vice versa.

      (m)    <u>Counterparts</u>. This Agreement may be executed in several counterparts, each of which shall be deemed an original, and all of said counterparts together shall constitute but one and the same instrument.

      (n)    <u>Further Assurances</u>. The parties hereto shall execute and deliver any and all additional writings, instruments, and other documents and shall take all such further actions as shall be reasonably required in order to effect the terms and conditions of this Agreement.

**EXHIBIT A**

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement as of January __, 2020.

ASSOCIATION:


By:_____
Name:
Title:




EMPLOYEE:

*Wayne R. LaPierre*

7

**EXHIBIT A**


### NELIGAN LLP

**Exhibit
0010**

# INVOICE

January 7, 2021

Re:    The National Rifle Association

**Invoice for Pre-Bankruptcy Fees and Expenses**

Total Legal Fees and Expenses:      $448,600.00

Less Retainer on Account:      $350,000.00

**Total Amount Owed      $ 98,600.00**

Below is in the wiring instructions for payment of this invoice:

**Wire Instructions - Operating Acct, Neligan LLP**
**Neligan Foley LLP Operating Account**
**325 N. St. Paul, Suite 3600, Dallas, TX 75201**
**Chase Bank**
**Acct #** ████████
**ABA # 111 000 614**

902890.1

*Approved by e-mail*
*1/7/2021*

NYAG
EX007

CONFIDENTIAL

NRA-BK-00060837

rmack

Michael Collins
Monday, January 11, 2021 3:33 PM
Mike McCormack
Subject: Fw: Nelligan $98,600 Invoice

**From:** William Davis ███████████
**Sent:** Monday, January 11, 2021 3:29 PM
**To:** William Brewer <WAB@brewerattorneys.com>; Michael Collins <MJC@BrewerAttorneys.com>; Sarah Rogers <sbr@BrewerAttorneys.com>
**Subject:** Nelligan $98,600 Invoice

Confirming that the SLC has signed off on this invoice - Charles and Willes with wet signatures last week and Carolyn by e-mail.

**William W. Davis**

███████████████

"Those who would give up essential Liberty,
to purchase a little temporary Safety,
deserve neither Liberty nor Safety." B. Franklin

CAUTION: This email is from outside the organization. DO NOT CLICK a link or open an attachment unless you know the content is safe and are expecting it from the sender. If in doubt, contact the sender separately to verify the content.

1

NRA-BK-00060838

| | |
|---|---|
| **From:** | William Davis |
| **To:** | Svetlana Eisenberg |
| **Subject:** | Fwd: Scan of Documents Davis.PDF |
| **Date:** | Friday, February 19, 2021 7:54:26 AM |

William W. Davis

█████████████████████

Sent from my iPhone

"Those who would give up essential Liberty, to purchase a little temporary Safety, deserve neither Liberty nor Safety." B. Franklin

Begin forwarded message:

> **From:** carolyndmeadows <carolyndmeadows█████████>
> **Date:** January 7, 2021 at 2:36:02 PM CST
> **To:** William Davis ████████████
> **Cc:** Charles Cotton ███████████████, Willes Lee ████████████
> **Subject: Re: Fwd: Scan of Documents Davis.PDF**
>
>  I concur with paying the listed invoice.
>
> Carolyn Meadows
>
> Sent from AT&T Yahoo Mail for iPhone
>
> On Thursday, January 7, 2021, 2:55 PM, William Davis ████████████ wrote:
>
>> Carolyn,
>>
>> This invoice is for the bankruptcy attorney  the Brewer firm has engaged.  The invoice   is for $98,600.00, which is the amount above the $350,000 retainer.
>>
>> Wayne, Charles and Willes have all signed off on the hard copy while they are here in Dallas.
>>
>> Please indicate your concurrence.
>>
>> Thanks!
>>
>> Wit

NRA-BK-00060839

William W. Davis
Mobile: ███████████████
E-mail: ████████████████████████
Sent from my iPhone
"Those who would give up essential Liberty, to purchase a little temporary Safety, deserve neither Liberty nor Safety." B. Franklin

Begin forwarded message:

**From:** Copy Center
██████████████████████████
**Date:** January 7, 2021 at 1:46:31 PM CST
**To:** William Davis ████████████████████
**Subject: Scan of Documents Davis.PDF**

**Copy Center**

Brewer, Attorneys & Counselors

1717 Main Street, Suite 5900

Dallas, Texas 75201

Office: 214.653.4001 | Fax: 214.653.1014

████████████████████████ | www.brewerattorneys.com

This communication (including any attachments) is intended for the sole use of the intended recipient, and may contain material that is confidential, privileged, attorney work product, and/or subject to privacy laws. If you are not the intended recipient, you are hereby kindly notified that any use, disclosure, or copying of this communication or any part thereof is strictly prohibited. If you have received this communication in error, please delete this communication, including any copies or

    NRA-BK-00060840

printouts, and notify us immediately by return email or at the telephone number above. Brewer, Attorneys and Counselors asserts in respect of this communication all applicable confidentiality, privilege, and/or privacy rights to the fullest extent permitted by law. Thank you.

CAUTION: This email is from outside the organization. DO NOT CLICK a link or open an attachment unless you know the content is safe and are expecting it from the sender. If in doubt, contact the sender separately to verify the content.
====================

CONFIDENTIAL

NRA-BK-00060841

| Form **990** | **Return of Organization Exempt From Income Tax** | OMB No. 1545-0047 |
|---|---|---|
| | Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations) | **2019** |
| | ▶ Do not enter social security numbers on this form as it may be made public. | **Open to Public Inspection** |
| Department of the Treasury Internal Revenue Service | ▶ Go to *www.irs.gov/Form990* for instructions and the latest information. | |

**A** For the 2019 calendar year, or tax year beginning _____ , 2019, and ending _____ , 20 ____

| **B** Check if applicable: | **C** Name of organization NATIONAL RIFLE ASSOCIATION OF AMERICA | **D** Employer identification number |
|---|---|---|
| ☐ Address change | Doing business as | 53-0116130 |
| ☐ Name change | Number and street (or P.O. box if mail is not delivered to street address)   Room/suite | **E** Telephone number |
| ☐ Initial return | 11250 WAPLES MILL ROAD | (703) 267-1000 |
| ☐ Final return/terminated | City or town, state or province, country, and ZIP or foreign postal code | **G** Gross receipts $ 302,740,488 |
| ☐ Amended return | FAIRFAX, VA 22030 | |
| ☐ Application pending | **F** Name and address of principal officer: WAYNE R LAPIERRE | **H(a)** Is this a group return for subordinates? ☐ Yes ☑ No |
| | SAME AS C ABOVE | **H(b)** Are all subordinates included? ☐ Yes ☐ No |

**I** Tax-exempt status: ☐ 501(c)(3)  ☑ 501(c) ( 4 ) ◀ (insert no.)  ☐ 4947(a)(1) or  ☐ 527   If "No," attach a list. (see instructions)

**J** Website: ▶ WWW.NRA.ORG    **H(c)** Group exemption number ▶

**K** Form of organization: ☑ Corporation ☐ Trust ☐ Association ☐ Other ▶ | **L** Year of formation: 1871 | **M** State of legal domicile: NY

## Part I   Summary

| | | | |
|---|---|---|---|
| **1** | Briefly describe the organization's mission or most significant activities: FIREARMS SAFETY, EDUCATION, AND TRAINING; AND ADVOCACY ON BEHALF OF SAFE AND RESPONSIBLE GUN OWNERS | | |
| **2** | Check this box ▶ ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets. | | |
| **3** | Number of voting members of the governing body (Part VI, line 1a) | **3** | 73 |
| **4** | Number of independent voting members of the governing body (Part VI, line 1b) | **4** | 63 |
| **5** | Total number of individuals employed in calendar year 2019 (Part V, line 2a) | **5** | 770 |
| **6** | Total number of volunteers (estimate if necessary) | **6** | 150,000 |
| **7a** | Total unrelated business revenue from Part VIII, column (C), line 12 | **7a** | 22,618,742 |
| **b** | Net unrelated business taxable income from Form 990-T, line 39 | **7b** | 0 |

| | | Prior Year | Current Year |
|---|---|---|---|
| **8** | Contributions and grants (Part VIII, line 1h) | 108,599,726 | 109,439,440 |
| **9** | Program service revenue (Part VIII, line 2g) | 193,010,155 | 134,011,736 |
| **10** | Investment income (Part VIII, column (A), lines 3, 4, and 7d) | 2,192,041 | 5,035,760 |
| **11** | Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 48,748,942 | 42,668,528 |
| **12** | Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 352,550,864 | 291,155,464 |
| **13** | Grants and similar amounts paid (Part IX, column (A), lines 1–3) | 75,661 | 103,491 |
| **14** | Benefits paid to or for members (Part IX, column (A), line 4) | 0 | 0 |
| **15** | Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | 63,864,842 | 56,740,325 |
| **16a** | Professional fundraising fees (Part IX, column (A), line 11e) | 7,798,658 | 5,269,873 |
| **b** | Total fundraising expenses (Part IX, column (D), line 25) ▶ 45,441,923 | | |
| **17** | Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) | 283,536,156 | 241,273,626 |
| **18** | Total expenses. Add lines 13–17 (must equal Part IX, column (A), line 25) | 355,275,317 | 303,387,315 |
| **19** | Revenue less expenses. Subtract line 18 from line 12 | (2,724,453) | (12,231,851) |

| | | Beginning of Current Year | End of Year |
|---|---|---|---|
| **20** | Total assets (Part X, line 16) | 197,212,080 | 198,746,752 |
| **21** | Total liabilities (Part X, line 26) | 181,180,554 | 189,092,595 |
| **22** | Net assets or fund balances. Subtract line 21 from line 20 | 16,031,526 | 9,654,157 |

## Part II   Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

| **Sign Here** | ▶ Signature of officer | Date |
|---|---|---|
| | ▶ WAYNE R LAPIERRE, EXECUTIVE VICE PRESIDENT | |
| | Type or print name and title | |

| **Paid Preparer Use Only** | Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|---|
| | Firm's name ▶ | | Firm's EIN ▶ | | |
| | Firm's address ▶ | | Phone no. | | |

May the IRS discuss this return with the preparer shown above? (see instructions) | ☐ Yes ☐ No

**For Paperwork Reduction Act Notice, see the separate instructions.** | Cat. No. 11282Y | Form **990** (2019)


Exhibit NYAG 0005 Spray

Form 990 (2019)                                                                                Page **2**

| **Part III** | **Statement of Program Service Accomplishments** |
|---|---|

Check if Schedule O contains a response or note to any line in this Part III  . . . . . . . . . . . . .  ☑

**1** Briefly describe the organization's mission:

PER NRA BYLAWS, TO PROTECT AND DEFEND THE U.S. CONSTITUTION; TO PROMOTE PUBLIC SAFETY, LAW AND
ORDER, AND NATIONAL DEFENSE; TO TRAIN LAW ENFORCEMENT AGENCIES AND CIVILIANS IN MARKSMANSHIP; TO
PROMOTE SHOOTING SPORTS AND HUNTING.

**2** Did the organization undertake any significant program services during the year which were not listed on the
prior Form 990 or 990-EZ?  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ☐ **Yes** ☑ **No**
If "Yes," describe these new services on Schedule O.

**3** Did the organization cease conducting, or make significant changes in how it conducts, any program
services?  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ☐ **Yes** ☑ **No**
If "Yes," describe these changes on Schedule O.

**4** Describe the organization's program service accomplishments for each of its three largest program services, as measured by
expenses. Section 501(c)(3) and 501(c)(4) organizations are required to report the amount of grants and allocations to others,
the total expenses, and revenue, if any, for each program service reported.

**4a** (Code: _____ ) (Expenses $ ___121,344,093 including grants of $ ___103,491 ) (Revenue $ ___120,556,156 )
NRA MEMBERSHIP SUPPORT INCLUDES PUBLICATIONS, EDUCATION AND TRAINING, FIELD SERVICES, COMPETITIVE
SHOOTING, LAW ENFORCEMENT, HUNTER SERVICES, MEMBER COMMUNICATIONS SERVICES, MEMBER PROGRAMS, MEMBER
SERVICES, AND FULFILLMENT OF MEMBER SERVICES. THE CHIEF VALUE OF NRA MEMBERSHIP IS IN GUN SAFETY AND
TRAINING ALONG WITH REGULAR REINFORCEMENT OF THESE LESSONS AND PRINCIPLES BY KEEPING ENGAGED WITH
THE COMMUNITY OF OUTDOOR LOVERS AND SAFE AND RESPONSIBLE SHOOTING ENTHUSIASTS. NRA MEMBERSHIP
SUPPORT AND FULFILLMENT ARE DEDICATED TO PROVIDING NRA MEMBERS WITH HIGH QUALITY SUPPORT AS WELL AS
CONTENT DELIVERED THROUGH MANY PLATFORMS. SAFE AND RESPONSIBLE GUN OWNERSHIP REMAINS THE CORNERSTONE
OF EVERYTHING THE ASSOCIATION PROVIDES FOR MEMBERS.

**4b** (Code: _____ ) (Expenses $ ___27,138,998 including grants of $ ___0 ) (Revenue $ ___0 )
THE NRA INSTITUTE FOR LEGISLATIVE ACTION ADVOCATES ON BEHALF OF SAFE AND RESPONSIBLE GUN OWNERS. AS
THE FOREMOST PROTECTOR AND DEFENDER OF THE SECOND AMENDMENT, THE NRA PROMOTES FIREARMS SAFETY,
ADVOCATES AGAINST EFFORTS TO ERODE GUN RIGHTS AND FREEDOMS, FIGHTS FOR INITIATIVES AIMED AT REDUCING
VIOLENT CRIME, AND PROMOTES HUNTERS'RIGHTS AND CONSERVATION EFFORTS. NRA MEMBERS RECOGNIZE THIS
VITAL IMPORTANCE OF NRAILA'S TRUE GRASSROOTS WORK TO PRESERVE THE SECOND AMENDMENT FOR FUTURE
GENERATIONS OF SHOOTERS AND OUTDOOR SPORTSMEN AND SPORTSWOMEN. THIS LEGION OF ENGAGED AND MOTIVATED
MEMBERS IS THE REASON FOR THE NRA'S STRENGTH.

**4c** (Code: _____ ) (Expenses $ ___16,001,367 including grants of $ ___0 ) (Revenue $ ___19,828,137 )
NRA SHOWS AND EXHIBITS INCLUDE THE NRA ANNUAL MEETINGS AND MEMBERS EXHIBIT HALL, HELD IN A DIFFERENT
CITY EACH YEAR, AND OTHER SHOWS AROUND THE COUNTRY. THE ANNUAL MEETINGS AND EXHIBITS ARE PRESENTED
AS A CELEBRATION OF AMERICAN FREEDOM FEATURING ACRES OF EXHIBITS, PREMIER EVENTS, EDUCATIONAL
SEMINARS AND WORKSHOPS, AND FUN-FILLED ACTIVITIES FOR THE ENTIRE FAMILY. INDIANAPOLIS, INDIANA WAS
THE 2019 HOST CITY. OTHER NRA HOSTED SHOWS INCLUDED THE GREAT AMERICAN OUTDOOR SHOW HELD IN
HARRISBURG, PENNSYLVANIA.

**4d** Other program services (Describe on Schedule O.)
(Expenses $ ___31,766,483 including grants of $ ___0 ) (Revenue $ ___564,907 )
**4e** Total program service expenses ▶ ___196,250,941

Form **990** (2019)

Form 990 (2019)                                                                                                                Page **3**

## Part IV    Checklist of Required Schedules

|  |  | | Yes | No |
|---|---|---|:---:|:---:|
| 1 | Is the organization described in section 501(c)(3) or 4947(a)(1) (other than a private foundation)? *If "Yes,"* *complete Schedule A* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **1** | | ✓ |
| 2 | Is the organization required to complete *Schedule B, Schedule of Contributors* (see instructions)? . . . | **2** | ✓ | |
| 3 | Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office? *If "Yes," complete Schedule C, Part I* . . . . . . . . . . . . . . | **3** | ✓ | |
| 4 | **Section 501(c)(3) organizations.** Did the organization engage in lobbying activities, or have a section 501(h) election in effect during the tax year? *If "Yes," complete Schedule C, Part II* . . . . . . . . . . | **4** | | |
| 5 | Is the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization that receives membership dues, assessments, or similar amounts as defined in Revenue Procedure 98-19? *If "Yes," complete Schedule C, Part III* | **5** | ✓ | |
| 6 | Did the organization maintain any donor advised funds or any similar funds or accounts for which donors have the right to provide advice on the distribution or investment of amounts in such funds or accounts? *If "Yes," complete Schedule D, Part I* . . . . . . . . . . . . . . . . . . . . . . . . . | **6** | | ✓ |
| 7 | Did the organization receive or hold a conservation easement, including easements to preserve open space, the environment, historic land areas, or historic structures? *If "Yes," complete Schedule D, Part II* . . . | **7** | | ✓ |
| 8 | Did the organization maintain collections of works of art, historical treasures, or other similar assets? *If "Yes," complete Schedule D, Part III* . . . . . . . . . . . . . . . . . . . . . . . . | **8** | ✓ | |
| 9 | Did the organization report an amount in Part X, line 21, for escrow or custodial account liability, serve as a custodian for amounts not listed in Part X; or provide credit counseling, debt management, credit repair, or debt negotiation services? *If "Yes," complete Schedule D, Part IV* . . . . . . . . . . . . . | **9** | | ✓ |
| 10 | Did the organization, directly or through a related organization, hold assets in donor-restricted endowments or in quasi endowments? *If "Yes," complete Schedule D, Part V* . . . . . . . . . . . . . . | **10** | ✓ | |
| 11 | If the organization's answer to any of the following questions is "Yes," then complete Schedule D, Parts VI, VII, VIII, IX, or X as applicable. | | | |
| a | Did the organization report an amount for land, buildings, and equipment in Part X, line 10? *If "Yes," complete Schedule D, Part VI* . . . . . . . . . . . . . . . . . . . . . . . . . | **11a** | ✓ | |
| b | Did the organization report an amount for investments—other securities in Part X, line 12, that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VII* . . . . . . | **11b** | | ✓ |
| c | Did the organization report an amount for investments—program related in Part X, line 13, that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VIII* . . . . . . | **11c** | | ✓ |
| d | Did the organization report an amount for other assets in Part X, line 15, that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part IX* . . . . . . . . . . . . | **11d** | ✓ | |
| e | Did the organization report an amount for other liabilities in Part X, line 25? *If "Yes," complete Schedule D, Part X* | **11e** | ✓ | |
| f | Did the organization's separate or consolidated financial statements for the tax year include a footnote that addresses the organization's liability for uncertain tax positions under FIN 48 (ASC 740)? *If "Yes," complete Schedule D, Part X* | **11f** | ✓ | |
| 12a | Did the organization obtain separate, independent audited financial statements for the tax year? *If "Yes," complete Schedule D, Parts XI and XII* . . . . . . . . . . . . . . . . . . . . . . . . | **12a** | ✓ | |
| b | Was the organization included in consolidated, independent audited financial statements for the tax year? *If "Yes," and if the organization answered "No" to line 12a, then completing Schedule D, Parts XI and XII is optional* | **12b** | | ✓ |
| 13 | Is the organization a school described in section 170(b)(1)(A)(ii)? *If "Yes," complete Schedule E* . . . . | **13** | | ✓ |
| 14a | Did the organization maintain an office, employees, or agents outside of the United States? . . . . | **14a** | | ✓ |
| b | Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, investment, and program service activities outside the United States, or aggregate foreign investments valued at $100,000 or more? *If "Yes," complete Schedule F, Parts I and IV.* . . . | **14b** | ✓ | |
| 15 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or other assistance to or for any foreign organization? *If "Yes," complete Schedule F, Parts II and IV* . . . . . . . . . | **15** | | ✓ |
| 16 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or other assistance to or for foreign individuals? *If "Yes," complete Schedule F, Parts III and IV.* . . . . . . | **16** | | ✓ |
| 17 | Did the organization report a total of more than $15,000 of expenses for professional fundraising services on Part IX, column (A), lines 6 and 11e? *If "Yes," complete Schedule G, Part I* (see instructions) . . . . | **17** | ✓ | |
| 18 | Did the organization report more than $15,000 total of fundraising event gross income and contributions on Part VIII, lines 1c and 8a? *If "Yes," complete Schedule G, Part II* . . . . . . . . . . . . . | **18** | ✓ | |
| 19 | Did the organization report more than $15,000 of gross income from gaming activities on Part VIII, line 9a? *If "Yes," complete Schedule G, Part III* . . . . . . . . . . . . . . . . . . . . . . . | **19** | | ✓ |
| 20a | Did the organization operate one or more hospital facilities? *If "Yes," complete Schedule H* . . . . . | **20a** | | ✓ |
| b | If "Yes" to line 20a, did the organization attach a copy of its audited financial statements to this return? . | **20b** | | |
| 21 | Did the organization report more than $5,000 of grants or other assistance to any domestic organization or domestic government on Part IX, column (A), line 1? *If "Yes," complete Schedule I, Parts I and II* . . . . | **21** | ✓ | |

Form **990** (2019)

Form 990 (2019)      Page **4**

**Part IV**    Checklist of Required Schedules *(continued)*

| | | | Yes | No |
|---|---|---|---|---|
| **22** | Did the organization report more than $5,000 of grants or other assistance to or for domestic individuals on Part IX, column (A), line 2? *If "Yes," complete Schedule I, Parts I and III* . . . . . . . . . . | **22** | ✓ | |
| **23** | Did the organization answer "Yes" to Part VII, Section A, line 3, 4, or 5 about compensation of the organization's current and former officers, directors, trustees, key employees, and highest compensated employees? *If "Yes," complete Schedule J* . . . . . . . . . . . . . . . . . . . . | **23** | ✓ | |
| **24a** | Did the organization have a tax-exempt bond issue with an outstanding principal amount of more than $100,000 as of the last day of the year, that was issued after December 31, 2002? *If "Yes," answer lines 24b through 24d and complete Schedule K. If "No," go to line 25a* . . . . . . . . . . . . . | **24a** | | ✓ |
| **b** | Did the organization invest any proceeds of tax-exempt bonds beyond a temporary period exception? . . | **24b** | | |
| **c** | Did the organization maintain an escrow account other than a refunding escrow at any time during the year to defease any tax-exempt bonds? . . . . . . . . . . . . . . . . . . . . . . | **24c** | | |
| **d** | Did the organization act as an "on behalf of" issuer for bonds outstanding at any time during the year? . | **24d** | | |
| **25a** | **Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations.** Did the organization engage in an excess benefit transaction with a disqualified person during the year? *If "Yes," complete Schedule L, Part I* . . . . . | **25a** | ✓ | |
| **b** | Is the organization aware that it engaged in an excess benefit transaction with a disqualified person in a prior year, and that the transaction has not been reported on any of the organization's prior Forms 990 or 990-EZ? *If "Yes," complete Schedule L, Part I* . . . . . . . . . . . . . . . . . . . . . . | **25b** | | |
| **26** | Did the organization report any amount on Part X, line 5 or 22, for receivables from or payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons? *If "Yes," complete Schedule L, Part II* . . . | **26** | | ✓ |
| **27** | Did the organization provide a grant or other assistance to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor or employee thereof, a grant selection committee member, or to a 35% controlled entity (including an employee thereof) or family member of any of these persons? *If "Yes," complete Schedule L, Part III* . . . . . . . . . . . . . . . . . . | **27** | | ✓ |
| **28** | Was the organization a party to a business transaction with one of the following parties (see Schedule L, Part IV instructions, for applicable filing thresholds, conditions, and exceptions): | | | |
| **a** | A current or former officer, director, trustee, key employee, creator or founder, or substantial contributor? *If "Yes," complete Schedule L, Part IV* . . . . . . . . . . . . . . . . . . . . | **28a** | ✓ | |
| **b** | A family member of any individual described in line 28a? *If "Yes," complete Schedule L, Part IV* . . . | **28b** | | ✓ |
| **c** | A 35% controlled entity of one or more individuals and/or organizations described in lines 28a or 28b? *If "Yes," complete Schedule L, Part IV* . . . . . . . . . . . . . . . . . . . . . . | **28c** | | ✓ |
| **29** | Did the organization receive more than $25,000 in non-cash contributions? *If "Yes," complete Schedule M* | **29** | ✓ | |
| **30** | Did the organization receive contributions of art, historical treasures, or other similar assets, or qualified conservation contributions? *If "Yes," complete Schedule M* . . . . . . . . . . . . . . . | **30** | ✓ | |
| **31** | Did the organization liquidate, terminate, or dissolve and cease operations? *If "Yes," complete Schedule N, Part I* | **31** | | ✓ |
| **32** | Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets? *If "Yes," complete Schedule N, Part II* . . . . . . . . . . . . . . . . . . . . . . . . . | **32** | | ✓ |
| **33** | Did the organization own 100% of an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? *If "Yes," complete Schedule R, Part I* . . . . . . . . . | **33** | | ✓ |
| **34** | Was the organization related to any tax-exempt or taxable entity? *If "Yes," complete Schedule R, Part II, III, or IV, and Part V, line 1* . . . . . . . . . . . . . . . . . . . . . . . . . | **34** | ✓ | |
| **35a** | Did the organization have a controlled entity within the meaning of section 512(b)(13)? . . . . . . | **35a** | ✓ | |
| **b** | If "Yes" to line 35a, did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? *If "Yes," complete Schedule R, Part V, line 2* . | **35b** | ✓ | |
| **36** | **Section 501(c)(3) organizations.** Did the organization make any transfers to an exempt non-charitable related organization? *If "Yes," complete Schedule R, Part V, line 2* . . . . . . . . . . . . . | **36** | | |
| **37** | Did the organization conduct more than 5% of its activities through an entity that is not a related organization and that is treated as a partnership for federal income tax purposes? *If "Yes," complete Schedule R, Part VI* | **37** | | ✓ |
| **38** | Did the organization complete Schedule O and provide explanations in Schedule O for Part VI, lines 11b and 19? **Note:** All Form 990 filers are required to complete Schedule O. . . . . . . . . . . . | **38** | ✓ | |

**Part V**    Statements Regarding Other IRS Filings and Tax Compliance

Check if Schedule O contains a response or note to any line in this Part V . . . . . . . . . . . . . . □

| | | | | | Yes | No |
|---|---|---|---|---|---|---|
| **1a** | Enter the number reported in Box 3 of Form 1096. Enter -0- if not applicable . . . | **1a** | 968 | | | |
| **b** | Enter the number of Forms W-2G included in line 1a. Enter -0- if not applicable . . . . | **1b** | 0 | | | |
| **c** | Did the organization comply with backup withholding rules for reportable payments to vendors and reportable gaming (gambling) winnings to prize winners? . . . . . . . . . . . . . . . | | | **1c** | ✓ | |

**NATIONAL RIFLE ASSOCIATION OF AMERICA**      4      11/18/2020 9:47:17 AM      Form **990** (2019)
53-0116130

Form 990 (2019)                                                                                          Page **5**

**Part V**  **Statements Regarding Other IRS Filings and Tax Compliance** *(continued)*

|  |  |  | Yes | No |
|---|---|---|---|---|
| **2a** | Enter the number of employees reported on Form W-3, Transmittal of Wage and Tax Statements, filed for the calendar year ending with or within the year covered by this return | **2a** 770 | | |
| **b** | If at least one is reported on line 2a, did the organization file all required federal employment tax returns? . | **2b** | ✓ | |
|  | **Note:** If the sum of lines 1a and 2a is greater than 250, you may be required to *e-file* (see instructions) . . | | | |
| **3a** | Did the organization have unrelated business gross income of $1,000 or more during the year? . . . . | **3a** | | ✓ |
| **b** | If "Yes," has it filed a Form 990-T for this year? *If "No" to line 3b, provide an explanation on Schedule O* . | **3b** | ✓ | |
| **4a** | At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)? | **4a** | | ✓ |
| **b** | If "Yes," enter the name of the foreign country ▶ _____ | | | |
|  | See instructions for filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR). | | | |
| **5a** | Was the organization a party to a prohibited tax shelter transaction at any time during the tax year? . . . | **5a** | | ✓ |
| **b** | Did any taxable party notify the organization that it was or is a party to a prohibited tax shelter transaction? | **5b** | | ✓ |
| **c** | If "Yes" to line 5a or 5b, did the organization file Form 8886-T? | **5c** | | |
| **6a** | Does the organization have annual gross receipts that are normally greater than $100,000, and did the organization solicit any contributions that were not tax deductible as charitable contributions? . . . . . | **6a** | ✓ | |
| **b** | If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? . . . . . . . . . . . . . . . . . . . . . | **6b** | ✓ | |
| **7** | **Organizations that may receive deductible contributions under section 170(c).** | | | |
| **a** | Did the organization receive a payment in excess of $75 made partly as a contribution and partly for goods and services provided to the payor? . . . . . . . . . . . . . . . . . . . | **7a** | | |
| **b** | If "Yes," did the organization notify the donor of the value of the goods or services provided? . . . . | **7b** | | |
| **c** | Did the organization sell, exchange, or otherwise dispose of tangible personal property for which it was required to file Form 8282? . . . . . . . . . . . . . . . . . . . . . . | **7c** | | |
| **d** | If "Yes," indicate the number of Forms 8282 filed during the year . . . . . . . . | **7d** | | |
| **e** | Did the organization receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? | **7e** | | |
| **f** | Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? . | **7f** | | |
| **g** | If the organization received a contribution of qualified intellectual property, did the organization file Form 8899 as required? | **7g** | | |
| **h** | If the organization received a contribution of cars, boats, airplanes, or other vehicles, did the organization file a Form 1098-C? | **7h** | | |
| **8** | **Sponsoring organizations maintaining donor advised funds.** Did a donor advised fund maintained by the sponsoring organization have excess business holdings at any time during the year? . . . . . . . | **8** | | |
| **9** | **Sponsoring organizations maintaining donor advised funds.** | | | |
| **a** | Did the sponsoring organization make any taxable distributions under section 4966? . . . . . . . | **9a** | | |
| **b** | Did the sponsoring organization make a distribution to a donor, donor advisor, or related person? . . . | **9b** | | |
| **10** | **Section 501(c)(7) organizations.** Enter: | | | |
| **a** | Initiation fees and capital contributions included on Part VIII, line 12 . . . . . . | **10a** | | |
| **b** | Gross receipts, included on Form 990, Part VIII, line 12, for public use of club facilities . | **10b** | | |
| **11** | **Section 501(c)(12) organizations.** Enter: | | | |
| **a** | Gross income from members or shareholders . . . . . . . . . . . . | **11a** | | |
| **b** | Gross income from other sources (Do not net amounts due or paid to other sources against amounts due or received from them.) . . . . . . . . . . | **11b** | | |
| **12a** | **Section 4947(a)(1) non-exempt charitable trusts.** Is the organization filing Form 990 in lieu of Form 1041? | **12a** | | |
| **b** | If "Yes," enter the amount of tax-exempt interest received or accrued during the year . | **12b** | | |
| **13** | **Section 501(c)(29) qualified nonprofit health insurance issuers.** | | | |
| **a** | Is the organization licensed to issue qualified health plans in more than one state? . . . . . | **13a** | | |
|  | **Note:** See the instructions for additional information the organization must report on Schedule O. | | | |
| **b** | Enter the amount of reserves the organization is required to maintain by the states in which the organization is licensed to issue qualified health plans . . . . . . | **13b** | | |
| **c** | Enter the amount of reserves on hand . . . . . . . . . . . . . | **13c** | | |
| **14a** | Did the organization receive any payments for indoor tanning services during the tax year? . . . . | **14a** | | ✓ |
| **b** | If "Yes," has it filed a Form 720 to report these payments? *If "No," provide an explanation on Schedule O* . | **14b** | | |
| **15** | Is the organization subject to the section 4960 tax on payment(s) of more than $1,000,000 in remuneration or excess parachute payment(s) during the year? . . . . . . . . . . . . . . . . . | **15** | ✓ | |
|  | If "Yes," see instructions and file Form 4720, Schedule N. | | | |
| **16** | Is the organization an educational institution subject to the section 4968 excise tax on net investment income? | **16** | | ✓ |
|  | If "Yes," complete Form 4720, Schedule O. | | | |

Form **990** (2019)

Form 990 (2019)
Page **6**

| **Part VI** | **Governance, Management, and Disclosure** *For each "Yes" response to lines 2 through 7b below, and for a "No" response to line 8a, 8b, or 10b below, describe the circumstances, processes, or changes on Schedule O. See instructions.* |

Check if Schedule O contains a response or note to any line in this Part VI . . . . . . . . . . . ☑

**Section A. Governing Body and Management**

|  |  |  | Yes | No |
|---|---|---|---|---|
| **1a** | Enter the number of voting members of the governing body at the end of the tax year . . | **1a** 73 |  |  |
|  | If there are material differences in voting rights among members of the governing body, or if the governing body delegated broad authority to an executive committee or similar committee, explain on Schedule O. |  |  |  |
| **b** | Enter the number of voting members included on line 1a, above, who are independent . | **1b** 63 |  |  |
| **2** | Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? | **2** | ✓ |  |
| **3** | Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors, trustees, or key employees to a management company or other person? . | **3** |  | ✓ |
| **4** | Did the organization make any significant changes to its governing documents since the prior Form 990 was filed? | **4** | ✓ |  |
| **5** | Did the organization become aware during the year of a significant diversion of the organization's assets? . | **5** | ✓ |  |
| **6** | Did the organization have members or stockholders? . . . . . . . . . . . . . | **6** | ✓ |  |
| **7a** | Did the organization have members, stockholders, or other persons who had the power to elect or appoint one or more members of the governing body? . . . . . . . . . . . . . | **7a** | ✓ |  |
| **b** | Are any governance decisions of the organization reserved to (or subject to approval by) members, stockholders, or persons other than the governing body? . . . . . . . . . . | **7b** |  | ✓ |
| **8** | Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following: |  |  |  |
| **a** | The governing body? . . . . . . . . . . . . . . . . . . . . . | **8a** | ✓ |  |
| **b** | Each committee with authority to act on behalf of the governing body? . . . . . . . | **8b** | ✓ |  |
| **9** | Is there any officer, director, trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? *If "Yes," provide the names and addresses on Schedule O* . . . . | **9** |  | ✓ |

**Section B. Policies** *(This Section B requests information about policies not required by the Internal Revenue Code.)*

|  |  |  | Yes | No |
|---|---|---|---|---|
| **10a** | Did the organization have local chapters, branches, or affiliates? . . . . . . . . . | **10a** |  | ✓ |
| **b** | If "Yes," did the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with the organization's exempt purposes? | **10b** |  |  |
| **11a** | Has the organization provided a complete copy of this Form 990 to all members of its governing body before filing the form? | **11a** |  | ✓ |
| **b** | Describe in Schedule O the process, if any, used by the organization to review this Form 990. |  |  |  |
| **12a** | Did the organization have a written conflict of interest policy? *If "No," go to line 13* . . . . | **12a** | ✓ |  |
| **b** | Were officers, directors, or trustees, and key employees required to disclose annually interests that could give rise to conflicts? | **12b** | ✓ |  |
| **c** | Did the organization regularly and consistently monitor and enforce compliance with the policy? *If "Yes," describe in Schedule O how this was done* . . . . . . . . . . . . . . | **12c** | ✓ |  |
| **13** | Did the organization have a written whistleblower policy? . . . . . . . . . . . . | **13** | ✓ |  |
| **14** | Did the organization have a written document retention and destruction policy? . . . . . | **14** | ✓ |  |
| **15** | Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? |  |  |  |
| **a** | The organization's CEO, Executive Director, or top management official . . . . . . . | **15a** | ✓ |  |
| **b** | Other officers or key employees of the organization . . . . . . . . . . . . . | **15b** | ✓ |  |
|  | If "Yes" to line 15a or 15b, describe the process in Schedule O (see instructions). |  |  |  |
| **16a** | Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? . . . . . . . . . . . . . . . | **16a** |  | ✓ |
| **b** | If "Yes," did the organization follow a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and take steps to safeguard the organization's exempt status with respect to such arrangements? . . . . . . . . . | **16b** |  |  |

**Section C. Disclosure**

| **17** | List the states with which a copy of this Form 990 is required to be filed ▶ AL, AR, AZ, CA, (CONTINUED ON SCHEDULE O) |
|---|---|
| **18** | Section 6104 requires an organization to make its Forms 1023 (1024 or 1024-A, if applicable), 990, and 990-T (Section 501(c) (3)s only) available for public inspection. Indicate how you made these available. Check all that apply. |
|  | ☐ Own website    ☐ Another's website    ☑ Upon request    ☐ Other *(explain on Schedule O)* |
| **19** | Describe on Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year. |
| **20** | State the name, address, and telephone number of the person who possesses the organization's books and records ▶ |
|  | CRAIG B. SPRAY, TREASURER, 11250 WAPLES MILL RD, FAIRFAX, VA 22030, (703) 267-1000 |

Form 990 (2019)             Page **7**

| **Part VII** | **Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors** |
|---|---|

Check if Schedule O contains a response or note to any line in this Part VII . . . . . . . . . . . . . ☑

**Section A.  Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

**1a** Complete this table for all persons required to be listed. Report compensation for the calendar year ending with or within the organization's tax year.

• List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation. Enter -0- in columns (D), (E), and (F) if no compensation was paid.

• List all of the organization's **current** key employees, if any. See instructions for definition of "key employee."

• List the organization's five **current** highest compensated employees (other than an officer, director, trustee, or key employee) who received reportable compensation (Box 5 of Form W-2 and/or Box 7 of Form 1099-MISC) of more than $100,000 from the organization and any related organizations.

• List all of the organization's **former** officers, key employees, and highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations.

• List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations.

See instructions for the order in which to list the persons above.

☐ Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee.

| (A)<br>Name and title | (B)<br>Average hours per week (list any hours for related organizations below dotted line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D)<br>Reportable compensation from the organization (W-2/1099-MISC) | (E)<br>Reportable compensation from related organizations (W-2/1099-MISC) | (F)<br>Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| **(1)** WAYNE R LAPIERRE<br>EXECUTIVE VICE PRESIDENT | 60.0<br>1.0 | | | ✓ | | | | 1,810,571 | 0 | 74,138 |
| **(2)** CHRIS COX<br>EXECUTIVE DIRECTOR ILA 6/26/2019 | 58.0<br>1.0 | | | ✓ | | | | 1,512,582 | 0 | 59,943 |
| **(3)** OLIVER L NORTH<br>BOARD DIRECTOR | 1.0<br>1.0 | ✓ | | | | | | 986,015 | 0 | 0 |
| **(4)** JOSHUA L POWELL<br>CHIEF OF STAFF AND SENIOR STRATEGIST | 50.0<br>1.0 | | | | | ✓ | | 858,930 | 0 | 76,151 |
| **(5)** CRAIG B SPRAY<br>TREASURER | 37.0<br>13.0 | | | ✓ | | | | 805,711 | 0 | 70,027 |
| **(6)** TYLER SCHROPP<br>EXECUTIVE DIRECTOR, ADVANCEMENT | 50.0<br>0.0 | | | | | ✓ | | 801,340 | 0 | 68,673 |
| **(7)** TODD GRABLE<br>EXECUTIVE DIRECTOR, MEMBERSHIP | 50.0<br>0.0 | | | | ✓ | | | 636,832 | 0 | 65,109 |
| **(8)** DOUG HAMLIN<br>EXECUTIVE DIRECTOR, PUBLICATIONS | 50.0<br>0.0 | | | | ✓ | | | 616,832 | 0 | 79,582 |
| **(9)** WILSON H PHILLIPS<br>FORMER TREASURER 9/13/2018 | 1.5<br>0.0 | | | | | | ✓ | 659,386 | 0 | 4,985 |
| **(10)** DAVID LEHMAN<br>DEPUTY EXECUTIVE DIRECTOR 9/13/2019 | 50.0<br>1.0 | | | | | ✓ | | 635,736 | 0 | 23,920 |
| **(11)** JOHN C FRAZER<br>SECRETARY | 50.0<br>0.0 | | | ✓ | | | | 414,585 | 0 | 75,884 |
| **(12)** JOSEPH P DEBERGALIS, JR<br>EXECUTIVE DIRECTOR GO | 50.0<br>0.0 | | | ✓ | | | | 422,340 | 0 | 54,016 |
| **(13)** JASON OUIMET<br>EXECUTIVE DIRECTOR ILA | 40.0<br>1.0 | | | ✓ | | | | 397,104 | 0 | 65,164 |
| **(14)** THOMAS R TEDRICK<br>MANAGING DIRECTOR FINANCE | 30.0<br>20.0 | | | | | ✓ | | 397,314 | 0 | 45,123 |

Form **990** (2019)

Form 990 (2019) Page **8**

| **Part VII** | **Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees** *(continued)* |

| (A)<br>Name and title | (B)<br>Average hours per week (list any hours for related organizations below dotted line) | (C)<br>Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D)<br>Reportable compensation from the organization (W-2/1099-MISC) | (E)<br>Reportable compensation from related organizations (W-2/1099-MISC) | (F)<br>Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| **(15)** JOHN G PERREN | 37.5 | | | | | | | | | |
| SR. ADVISOR TO THE EVP | 0.0 | | | | | ✓ | | 359,906 | 0 | 12,296 |
| **(16)** ROBERT K WEAVER | 0.0 | | | | | | | | | |
| FORMER EXECUTIVE FORMER DIRECTOR GO 10/25/2016 | 0.0 | | | | | | ✓ | 240,000 | 0 | 0 |
| **(17)** MARION P HAMMER | 5.0 | | | | | | | | | |
| BOARD DIRECTOR | 0.0 | ✓ | | | | | | 220,350 | 0 | 0 |
| **(18)** DAVID A KEENE | 1.0 | | | | | | | | | |
| BOARD DIRECTOR | 0.0 | ✓ | | | | | | 57,592 | 0 | 0 |
| **(19)** TED NUGENT | 5.0 | | | | | | | | | |
| BOARD DIRECTOR | 0.0 | ✓ | | | | | | 45,474 | 0 | 0 |
| **(20)** DAVE BUTZ | 5.0 | | | | | | | | | |
| BOARD DIRECTOR | 0.0 | ✓ | | | | | | 21,000 | 0 | 0 |
| **(21)** JULIE GOLOB | 1.0 | | | | | | | | | |
| BOARD DIRECTOR 8/11/2019 | 0.0 | ✓ | | | | | | 16,119 | 0 | 0 |
| **(22)** LANCE OLSON | 5.0 | | | | | | | | | |
| BOARD DIRECTOR | 0.0 | ✓ | | | | | | 15,000 | 0 | 0 |
| **(23)** BART SKELTON | 1.0 | | | | | | | | | |
| BOARD DIRECTOR | 0.0 | ✓ | | | | | | 13,750 | 0 | 0 |
| **(24)** OWEN BUZ MILLS | 1.0 | | | | | | | | | |
| BOARD DIRECTOR | 0.0 | ✓ | | | | | | 6,852 | 0 | 0 |
| **(25)** (SEE STATEMENT) | | | | | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **1b** | **Subtotal** . . . . . . . . . . . . . . ▶ | | | | | 11,951,321 | 0 | 775,011 |
| **c** | **Total from continuation sheets to Part VII, Section A** . . . . ▶ | | | | | 2,465 | 0 | 0 |
| **d** | **Total (add lines 1b and 1c)** . . . . . . . . . . ▶ | | | | | 11,953,786 | 0 | 775,011 |

**2** Total number of individuals (including but not limited to those listed above) who received more than $100,000 of reportable compensation from the organization ▶ 149

| | | Yes | No |
|---|---|---|---|
| **3** | Did the organization list any **former** officer, director, trustee, key employee, or highest compensated employee on line 1a? *If "Yes," complete Schedule J for such individual* . . . . . . . . . . | **3** | ✓ |
| **4** | For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? *If "Yes," complete Schedule J for such individual* . . . . . . . . . . . . . . . . . . . . . . | **4** | ✓ |
| **5** | Did any person listed on line 1a receive or accrue compensation from any unrelated organization or individual for services rendered to the organization? *If "Yes," complete Schedule J for such person* . . . . . . | **5** | ✓ |

**Section B. Independent Contractors**

**1** Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization. Report compensation for the calendar year ending with or within the organization's tax year.

| (A)<br>Name and business address | (B)<br>Description of services | (C)<br>Compensation |
|---|---|---|
| BREWER ATTORNEYS AND COUNSELORS, 1717 MAIN ST, SUITE 5900, DALLAS, TX 75201 | LEGAL SERVICES | 24,789,326 |
| INFOCISION MANAGEMENT CORP, 325 SPRINGSIDE DR, AKRON, OH 44333 | MEMBERSHIP PROCESSING AND CONTROL | 21,723,870 |
| MEMBERSHIP MARKETING PARTNERS LLC, 11250 WAPLES MILL TD, SUITE 310, FAIRFAX, VA 22030 | FUNDRAISING PRINTING AND MAILING | 11,560,154 |
| VALTIM INC, 1095 VENTURE DR, FOREST, VA 24551 | FULFILLMENT CENTER | 8,957,907 |
| ACKERMAN MCQUEEN, 1601 NW EXPRESSWAY, OKLAHOMA CITY, OK 73118 | PUBLIC RELATIONS AND ADVERTISING | 7,317,206 |

**2** Total number of independent contractors (including but not limited to those listed above) who received more than $100,000 of compensation from the organization ▶ 141

Form **990** (2019)

Form 990 (2019)

Page **9**

## Part VIII Statement of Revenue

Check if Schedule O contains a response or note to any line in this Part VIII . . . . . . . . . . . ☑

| | | | | | (A) Total revenue | (B) Related or exempt function revenue | (C) Unrelated business revenue | (D) Revenue excluded from tax under sections 512–514 |
|---|---|---|---|---|---|---|---|---|
| **Contributions, Gifts, Grants and Other Similar Amounts** | **1a** | Federated campaigns | | **1a** | 0 | | | |
| | **b** | Membership dues | | **1b** | 0 | | | |
| | **c** | Fundraising events | | **1c** | 0 | | | |
| | **d** | Related organizations | | **1d** | 13,703,287 | | | |
| | **e** | Government grants (contributions) | | **1e** | 0 | | | |
| | **f** | All other contributions, gifts, grants, and similar amounts not included above | | **1f** | 95,736,153 | | | |
| | **g** | Noncash contributions included in lines 1a–1f | | **1g** $ | 247,980 | | | |
| | **h** | **Total.** Add lines 1a–1f | | ▶ | 109,439,440 | | | |
| **Program Service Revenue** | | | | Business Code | | | | |
| | **2a** | MEMBER DUES | | 813410 | 112,969,564 | 112,969,564 | 0 | 0 |
| | **b** | PROGRAM FEES | | 813410 | 21,042,172 | 21,042,172 | 0 | 0 |
| | **c** | | | | 0 | 0 | 0 | 0 |
| | **d** | | | | 0 | 0 | 0 | 0 |
| | **e** | | | | 0 | 0 | 0 | 0 |
| | **f** | All other program service revenue | | | 0 | 0 | 0 | 0 |
| | **g** | **Total.** Add lines 2a–2f | | ▶ | 134,011,736 | | | |
| **Other Revenue** | **3** | Investment income (including dividends, interest, and other similar amounts) | | ▶ | 3,926,185 | 0 | 0 | 3,926,185 |
| | **4** | Income from investment of tax-exempt bond proceeds | | ▶ | 0 | 0 | 0 | 0 |
| | **5** | Royalties | | ▶ | 13,081,645 | 0 | 0 | 13,081,645 |
| | | | (i) Real | (ii) Personal | | | | |
| | **6a** | Gross rents | **6a** 1,317,211 | 0 | | | | |
| | **b** | Less: rental expenses | **6b** 1,941,872 | 0 | | | | |
| | **c** | Rental income or (loss) | **6c** (624,661) | 0 | | | | |
| | **d** | Net rental income or (loss) | | ▶ | (624,661) | 0 | 0 | (624,661) |
| | **7a** | Gross amount from sales of assets other than inventory | (i) Securities | (ii) Other | | | | |
| | | | **7a** 6,722,597 | | | | | |
| | **b** | Less: cost or other basis and sales expenses | **7b** 5,613,022 | 0 | | | | |
| | **c** | Gain or (loss) | **7c** 1,109,575 | 0 | | | | |
| | **d** | Net gain or (loss) | | ▶ | 1,109,575 | 0 | 0 | 1,109,575 |
| | **8a** | Gross income from fundraising events (not including $ 0 of contributions reported on line 1c). See Part IV, line 18 | | **8a** 758,465 | | | | |
| | **b** | Less: direct expenses | | **8b** 445,004 | | | | |
| | **c** | Net income or (loss) from fundraising events | | ▶ | 313,461 | | | 313,461 |
| | **9a** | Gross income from gaming activities. See Part IV, line 19 | | **9a** 0 | | | | |
| | **b** | Less: direct expenses | | **9b** 0 | | | | |
| | **c** | Net income or (loss) from gaming activities | | ▶ | 0 | 0 | 0 | 0 |
| | **10a** | Gross sales of inventory, less returns and allowances | | **10a** 8,838,051 | | | | |
| | **b** | Less: cost of goods sold | | **10b** 3,585,126 | | | | |
| | **c** | Net income or (loss) from sales of inventory | | ▶ | 5,252,925 | 6,148,472 | (895,547) | 0 |
| **Miscellaneous Revenue** | | | | Business Code | | | | |
| | **11a** | ADVERTISING | | 541800 | 23,232,856 | 0 | 23,232,856 | 0 |
| | **b** | OTHER UNRELATED BUSINESS ACTIVITY | | 900004 | 281,433 | 0 | 281,433 | 0 |
| | **c** | CAFE SALES | | 722320 | 341,877 | 0 | 0 | 341,877 |
| | **d** | All other revenue | | 900009 | 788,992 | 788,992 | 0 | 0 |
| | **e** | **Total.** Add lines 11a–11d | | ▶ | 24,645,158 | | | |
| | **12** | **Total revenue.** See instructions | | ▶ | 291,155,464 | 140,949,200 | 22,618,742 | 18,148,082 |

NATIONAL RIFLE ASSOCIATION OF AMERICA

9

11/18/2020 9:47:17 AM

Form **990** (2019)

53-0116130

Form 990 (2019)

Page **10**

## Part IX Statement of Functional Expenses

*Section 501(c)(3) and 501(c)(4) organizations must complete all columns. All other organizations must complete column (A).*

Check if Schedule O contains a response or note to any line in this Part IX . . . . . . . . . . . . . ☑

| | *Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII.* | (A) Total expenses | (B) Program service expenses | (C) Management and general expenses | (D) Fundraising expenses |
|---|---|---|---|---|---|
| 1 | Grants and other assistance to domestic organizations and domestic governments. See Part IV, line 21 . | 12,000 | 12,000 | | |
| 2 | Grants and other assistance to domestic individuals. See Part IV, line 22 . | 91,491 | 91,491 | | |
| 3 | Grants and other assistance to foreign organizations, foreign governments, and foreign individuals. See Part IV, lines 15 and 16 | 0 | 0 | | |
| 4 | Benefits paid to or for members . . . . | 0 | 0 | | |
| 5 | Compensation of current officers, directors, trustees, and key employees . | 7,543,034 | 3,143,368 | 3,729,868 | 669,798 |
| 6 | Compensation not included above to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) . | 497,914 | 497,914 | 0 | 0 |
| 7 | Other salaries and wages . | 37,992,679 | 24,618,895 | 10,709,461 | 2,664,323 |
| 8 | Pension plan accruals and contributions (include section 401(k) and 403(b) employer contributions) | 3,150,056 | 1,832,778 | 1,065,207 | 252,071 |
| 9 | Other employee benefits . . . . . . | 4,806,782 | 3,084,252 | 1,337,884 | 384,646 |
| 10 | Payroll taxes . . . . . . . . . | 2,749,860 | 1,764,436 | 765,377 | 220,047 |
| 11 | Fees for services (nonemployees): | | | | |
| a | Management . . . . . . . . . | 0 | 0 | 0 | 0 |
| b | Legal . . . . . . . . . . . | 38,584,656 | 10,033,895 | 28,550,761 | |
| c | Accounting . . . . . . . . . | 270,583 | 0 | 270,583 | |
| d | Lobbying . . . . . . . . . . | 665,200 | 665,200 | 0 | |
| e | Professional fundraising services. See Part IV, line 17 | 5,269,873 | | | 5,269,873 |
| f | Investment management fees . . . . | 205,442 | 0 | 205,442 | 0 |
| g | Other. (If line 11g amount exceeds 10% of line 25, column (A) amount, list line 11g expenses on Schedule O.) | 2,281,693 | 2,281,693 | 0 | 0 |
| 12 | Advertising and promotion . . . . | 26,147,357 | 18,894,976 | 0 | 7,252,381 |
| 13 | Office expenses . . . . . . . . | 5,054,084 | 3,221,695 | 1,832,389 | 0 |
| 14 | Information technology . . . . . . | 7,100,417 | 3,692,926 | 3,407,491 | 0 |
| 15 | Royalties . . . . . . . . . . | 0 | 0 | 0 | 0 |
| 16 | Occupancy . . . . . . . . . . | 1,757,002 | 968,459 | 788,543 | 0 |
| 17 | Travel . . . . . . . . . . . | 7,017,420 | 5,285,695 | 1,731,725 | 0 |
| 18 | Payments of travel or entertainment expenses for any federal, state, or local public officials | 0 | 0 | 0 | 0 |
| 19 | Conferences, conventions, and meetings . | 6,758,731 | 5,031,745 | 1,726,986 | 0 |
| 20 | Interest . . . . . . . . . . | 1,689,348 | 904,181 | 785,167 | 0 |
| 21 | Payments to affiliates . . . . . . | 0 | 0 | 0 | 0 |
| 22 | Depreciation, depletion, and amortization . | 3,709,911 | 2,573,868 | 1,136,043 | 0 |
| 23 | Insurance . . . . . . . . . . | 2,282,669 | 2,282,669 | | |
| 24 | Other expenses. Itemize expenses not covered above (List miscellaneous expenses on line 24e. If line 24e amount exceeds 10% of line 25, column (A) amount, list line 24e expenses on Schedule O.) | | | | |
| a | ADD'L MEMBER COMMUNICATIONS | 70,373,725 | 44,217,918 | 0 | 26,155,807 |
| b | ADD'L TRAINING AND COMMUNICATIONS | 24,985,588 | 24,985,588 | 0 | 0 |
| c | ADD'L PRINTING AND PUBLICATIONS | 23,378,939 | 23,378,939 | | |
| d | ADD'L ILA LEGISLATIVE PROGRAM EXP | 5,752,450 | 5,752,450 | | |
| e | All other expenses | 13,258,411 | 7,033,910 | 3,651,524 | 2,572,977 |
| 25 | **Total functional expenses.** Add lines 1 through 24e | 303,387,315 | 196,250,941 | 61,694,451 | 45,441,923 |
| 26 | **Joint costs.** Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation. Check here ▶ ☐ if following SOP 98-2 (ASC 958-720) . . . | 0 | 0 | 0 | 0 |

Form 990 (2019)                                                                     Page **11**

**Part X**   **Balance Sheet**

Check if Schedule O contains a response or note to any line in this Part X   .   .   .   .   .   .   .   .   .   .   ☑

| | | | **(A)** Beginning of year | | **(B)** End of year |
|---|---|---|---:|---|---:|
| **Assets** | **1** | Cash—non-interest-bearing . . . . . . . . . . . . | 0 | **1** | 0 |
| | **2** | Savings and temporary cash investments . . . . . . | 23,937,821 | **2** | 23,935,152 |
| | **3** | Pledges and grants receivable, net . . . . . . . | 841,562 | **3** | 932,766 |
| | **4** | Accounts receivable, net . . . . . . . . . . | 41,458,041 | **4** | 31,138,285 |
| | **5** | Loans and other receivables from any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons . . . | 0 | **5** | 0 |
| | **6** | Loans and other receivables from other disqualified persons (as defined under section 4958(f)(1)), and persons described in section 4958(c)(3)(B) . | 0 | **6** | 0 |
| | **7** | Notes and loans receivable, net . . . . . . . . | 6,639,073 | **7** | 8,479,327 |
| | **8** | Inventories for sale or use . . . . . . . . . | 10,632,177 | **8** | 11,716,358 |
| | **9** | Prepaid expenses and deferred charges . . . . . | 3,179,694 | **9** | 2,887,414 |
| | **10a** | Land, buildings, and equipment: cost or other basis. Complete Part VI of Schedule D . . . **10a** 80,004,902 | | | |
| | **b** | Less: accumulated depreciation . . . **10b** 49,947,784 | 32,709,031 | **10c** | 30,057,118 |
| | **11** | Investments—publicly traded securities . . . . . | 44,066,394 | **11** | 52,490,847 |
| | **12** | Investments—other securities. See Part IV, line 11 . . | 871,077 | **12** | 543,604 |
| | **13** | Investments—program-related. See Part IV, line 11 . . | 0 | **13** | 0 |
| | **14** | Intangible assets . . . . . . . . . . . . | 0 | **14** | 0 |
| | **15** | Other assets. See Part IV, line 11 . . . . . . . | 32,877,210 | **15** | 36,565,881 |
| | **16** | **Total assets.** Add lines 1 through 15 (must equal line 33) | 197,212,080 | **16** | 198,746,752 |
| **Liabilities** | **17** | Accounts payable and accrued expenses . . . . . | 84,837,717 | **17** | 83,446,471 |
| | **18** | Grants payable . . . . . . . . . . . . . | 0 | **18** | 0 |
| | **19** | Deferred revenue . . . . . . . . . . . . | 46,580,520 | **19** | 47,257,288 |
| | **20** | Tax-exempt bond liabilities . . . . . . . . . | 0 | **20** | 0 |
| | **21** | Escrow or custodial account liability. Complete Part IV of Schedule D . | 0 | **21** | 0 |
| | **22** | Loans and other payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons . . . . | 0 | **22** | 0 |
| | **23** | Secured mortgages and notes payable to unrelated third parties . . | 43,138,412 | **23** | 52,320,718 |
| | **24** | Unsecured notes and loans payable to unrelated third parties . . . | 0 | **24** | 0 |
| | **25** | Other liabilities (including federal income tax, payables to related third parties, and other liabilities not included on lines 17–24). Complete Part X of Schedule D . . | 6,623,905 | **25** | 6,068,118 |
| | **26** | **Total liabilities.** Add lines 17 through 25 . . . . . | 181,180,554 | **26** | 189,092,595 |
| **Net Assets or Fund Balances** | | **Organizations that follow FASB ASC 958, check here ▶ ☑ and complete lines 27, 28, 32, and 33.** | | | |
| | **27** | Net assets without donor restrictions . . . . . . | (36,276,779) | **27** | (49,641,823) |
| | **28** | Net assets with donor restrictions . . . . . . . | 52,308,305 | **28** | 59,295,980 |
| | | **Organizations that do not follow FASB ASC 958, check here ▶ ☐ and complete lines 29 through 33.** | | | |
| | **29** | Capital stock or trust principal, or current funds . . . . | | **29** | |
| | **30** | Paid-in or capital surplus, or land, building, or equipment fund . . . . | | **30** | |
| | **31** | Retained earnings, endowment, accumulated income, or other funds . | | **31** | |
| | **32** | Total net assets or fund balances . . . . . . . | 16,031,526 | **32** | 9,654,157 |
| | **33** | Total liabilities and net assets/fund balances . . . . | 197,212,080 | **33** | 198,746,752 |

Form **990** (2019)

Form 990 (2019)          Page **12**

## Part XI   Reconciliation of Net Assets

Check if Schedule O contains a response or note to any line in this Part XI . . . . . . . . . . . . ☑

| | | | |
|---|---|---|---|
| 1 | Total revenue (must equal Part VIII, column (A), line 12) . . . . . . . . | **1** | 291,155,464 |
| 2 | Total expenses (must equal Part IX, column (A), line 25) . . . . . . . . | **2** | 303,387,315 |
| 3 | Revenue less expenses. Subtract line 2 from line 1 . . . . . . . . . | **3** | (12,231,851) |
| 4 | Net assets or fund balances at beginning of year (must equal Part X, line 32, column (A)) . . . | **4** | 16,031,526 |
| 5 | Net unrealized gains (losses) on investments . . . . . . . . . . | **5** | 6,605,046 |
| 6 | Donated services and use of facilities . . . . . . . . . . . | **6** | 0 |
| 7 | Investment expenses . . . . . . . . . . . . . . | **7** | 0 |
| 8 | Prior period adjustments . . . . . . . . . . . . . | **8** | 0 |
| 9 | Other changes in net assets or fund balances (explain on Schedule O) . . . . . . . | **9** | (750,564) |
| 10 | Net assets or fund balances at end of year. Combine lines 3 through 9 (must equal Part X, line 32, column (B)) . . . | **10** | 9,654,157 |

## Part XII   Financial Statements and Reporting

Check if Schedule O contains a response or note to any line in this Part XII . . . . . . . . . . . . ☐

| | | Yes | No |
|---|---|---|---|
| 1 | Accounting method used to prepare the Form 990: ☐ Cash   ☑ Accrual   ☐ Other _____ | | |
| | If the organization changed its method of accounting from a prior year or checked "Other," explain in Schedule O. | | |
| 2a | Were the organization's financial statements compiled or reviewed by an independent accountant? . . | **2a** | | ✓ |
| | If "Yes," check a box below to indicate whether the financial statements for the year were compiled or reviewed on a separate basis, consolidated basis, or both: ☐ Separate basis   ☐ Consolidated basis   ☐ Both consolidated and separate basis | | |
| b | Were the organization's financial statements audited by an independent accountant? . . . . . . | **2b** | ✓ | |
| | If "Yes," check a box below to indicate whether the financial statements for the year were audited on a separate basis, consolidated basis, or both: ☐ Separate basis   ☐ Consolidated basis   ☑ Both consolidated and separate basis | | |
| c | If "Yes" to line 2a or 2b, does the organization have a committee that assumes responsibility for oversight of the audit, review, or compilation of its financial statements and selection of an independent accountant? . | **2c** | ✓ | |
| | If the organization changed either its oversight process or selection process during the tax year, explain on Schedule O. | | |
| 3a | As a result of a federal award, was the organization required to undergo an audit or audits as set forth in the Single Audit Act and OMB Circular A-133? . . . . . . . . . . . . . | **3a** | | ✓ |
| b | If "Yes," did the organization undergo the required audit or audits? If the organization did not undergo the required audit or audits, explain why on Schedule O and describe any steps taken to undergo such audits . | **3b** | | |

Form **990** (2019)

**Part VII** Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees (continued)

| (A) Name and Title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (Check all that apply) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (25) CARRIE LIGHTFOOT | 1.0 | ✓ | | | | | | 1,666 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (26) PETE R BROWNELL | 1.0 | ✓ | | | | | | 527 | 0 | 0 |
| BOARD DIRECTOR 05/29/2019 | 1.0 | | | | | | | | | |
| (27) SCOTT L BACH | 1.0 | ✓ | | | | | | 236 | 0 | 0 |
| BOARD DIRECTOR | 1.0 | | | | | | | | | |
| (28) CHARLES L COTTON | 1.0 | ✓ | | ✓ | | | | 18 | 0 | 0 |
| 1ST VICE PRESIDENT | 1.0 | | | | | | | | | |
| (29) LINDA L WALKER | 1.0 | ✓ | | | | | | 18 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (30) CAROLYN D MEADOWS | 10.0 | ✓ | | ✓ | | | | 0 | 0 | 0 |
| PRESIDENT | 1.0 | | | | | | | | | |
| (31) WILLES K LEE | 1.0 | ✓ | | ✓ | | | | 0 | 0 | 0 |
| 2ND VICE PRESIDENT | 0.0 | | | | | | | | | |
| (32) ALLAN D CORS | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (33) ALLEN B WEST | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (34) ANTHONY P COLANDRO | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (35) BILL MILLER | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (36) BLAINE WADE | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (37) BOB BARR | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (38) CARL T ROWAN, JR | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (39) CAROL FRAMPTON | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 1.0 | | | | | | | | | |
| (40) CLEL BAUDLER | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (41) CRAIG MORGAN | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR 8/19/2019 | 0.0 | | | | | | | | | |
| (42) CURTIS S JENKINS | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 1.0 | | | | | | | | | |
| (43) DAN BOREN | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR 11/1/2019 | 0.0 | | | | | | | | | |
| (44) DAVID G COY | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |

| (A) Name and Title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (Check all that apply) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (45) DEAN CAIN | 1.0 | ✓ | | | | | | | | |
| BOARD DIRECTOR | 0.0 | | | | | | | 0 | 0 | 0 |
| (46) DON SABA | 1.0 | ✓ | | | | | | | | |
| BOARD DIRECTOR | 0.0 | | | | | | | 0 | 0 | 0 |
| (47) DONALD E YOUNG | 1.0 | ✓ | | | | | | | | |
| BOARD DIRECTOR | 0.0 | | | | | | | 0 | 0 | 0 |
| (48) DR. JOHN THODOS | 1.0 | ✓ | | | | | | | | |
| BOARD DIRECTOR 10/4/2019 | 0.0 | | | | | | | 0 | 0 | 0 |
| (49) DUANE LIPTAK, JR | 1.0 | ✓ | | | | | | | | |
| BOARD DIRECTOR | 0.0 | | | | | | | 0 | 0 | 0 |
| (50) DWIGHT D VAN HORN | 1.0 | ✓ | | | | | | | | |
| BOARD DIRECTOR | 1.0 | | | | | | | 0 | 0 | 0 |
| (51) EDIE P FLEEMAN | 1.0 | ✓ | | | | | | | | |
| BOARD DIRECTOR | 0.0 | | | | | | | 0 | 0 | 0 |
| (52) ESTHER SCHNEIDER | 1.0 | ✓ | | | | | | | | |
| BOARD DIRECTOR 8/1/2019 | 0.0 | | | | | | | 0 | 0 | 0 |
| (53) GRAHAM HILL | 1.0 | ✓ | | | | | | | | |
| BOARD DIRECTOR | 0.0 | | | | | | | 0 | 0 | 0 |
| (54) HEIDI E WASHINGTON | 1.0 | ✓ | | | | | | | | |
| BOARD DIRECTOR | 0.0 | | | | | | | 0 | 0 | 0 |
| (55) HERBERT A LANFORD, JR | 1.0 | ✓ | | | | | | | | |
| BOARD DIRECTOR | 0.0 | | | | | | | 0 | 0 | 0 |
| (56) HOWARD J WALTER | 1.0 | ✓ | | | | | | | | |
| BOARD DIRECTOR | 0.0 | | | | | | | 0 | 0 | 0 |
| (57) IL LING NEW | 1.0 | ✓ | | | | | | | | |
| BOARD DIRECTOR | 0.0 | | | | | | | 0 | 0 | 0 |
| (58) J. KENNETH BLACKWELL | 1.0 | ✓ | | | | | | | | |
| BOARD DIRECTOR | 0.0 | | | | | | | 0 | 0 | 0 |
| (59) JAMES W PORTER II | 1.0 | ✓ | | | | | | | | |
| BOARD DIRECTOR | 2.0 | | | | | | | 0 | 0 | 0 |
| (60) JAY PRINTZ | 1.0 | ✓ | | | | | | | | |
| BOARD DIRECTOR | 0.0 | | | | | | | 0 | 0 | 0 |
| (61) JOE M ALLBAUGH | 1.0 | ✓ | | | | | | | | |
| BOARD DIRECTOR | 0.0 | | | | | | | 0 | 0 | 0 |
| (62) JOEL FRIEDMAN | 1.0 | ✓ | | | | | | | | |
| BOARD DIRECTOR | 1.0 | | | | | | | 0 | 0 | 0 |
| (63) JOHN C SIGLER | 1.0 | ✓ | | | | | | | | |
| BOARD DIRECTOR | 0.0 | | | | | | | 0 | 0 | 0 |
| (64) JOHN L CUSHMAN | 1.0 | ✓ | | | | | | | | |
| BOARD DIRECTOR 4/27/2019 | 0.0 | | | | | | | 0 | 0 | 0 |
| (65) JOHNNY NUGENT | 1.0 | ✓ | | | | | | | | |
| BOARD DIRECTOR | 0.0 | | | | | | | 0 | 0 | 0 |

| (A) Name and Title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (Check all that apply) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (66) KARL A MALONE | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (67) KEVIN HOGAN | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (68) KIM RHODE | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (69) KRISTY TITUS | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (70) LARRY E CRAIG | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (71) LEROY SISCO | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (72) MARIA HEIL | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (73) MARK E VAUGHAN | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (74) MARK GEIST | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (75) MARK ROBINSON | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (76) MATT BLUNT | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (77) MELANIE PEPPER | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (78) PATRICIA A CLARK | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (79) PAUL D BABAZ | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (80) RICHARD R CHILDRESS | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR 8/19/2019 | 1.0 | | | | | | | | | |
| (81) RICK S FIGUEROA | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (82) ROBERT A NOSLER | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 2.0 | | | | | | | | | |
| (83) ROBERT E MANSELL | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (84) ROBERT K BROWN | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 1.0 | | | | | | | | | |
| (85) RONALD L SCHMEITS | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 1.0 | | | | | | | | | |
| (86) RONNIE G BARRETT | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |

| (A) Name and Title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (Check all that apply) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (87) SANDRA S FROMAN | 5.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (88) SEAN MALONEY | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR 8/1/2019 | 0.0 | | | | | | | | | |
| (89) STEVEN C SCHREINER | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (90) SUSAN HOWARD | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 1.0 | | | | | | | | | |
| (91) TED W CARTER | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (92) THOMAS P ARVAS | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 1.0 | | | | | | | | | |
| (93) TIMOTHY KNIGHT | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR 8/1/2019 | 0.0 | | | | | | | | | |
| (94) TODD J RATHNER | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (95) TOM KING | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 2.0 | | | | | | | | | |
| (96) WAYNE ANTHONY ROSS | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 0.0 | | | | | | | | | |
| (97) WILLIAM A BACHENBERG | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 1.0 | | | | | | | | | |
| (98) WILLIAM H SATTERFIELD | 1.0 | ✓ | | | | | | 0 | 0 | 0 |
| BOARD DIRECTOR | 2.0 | | | | | | | | | |

| SCHEDULE C | **Political Campaign and Lobbying Activities** | OMB No. 1545-0047 |
|---|---|---|
| **(Form 990 or 990-EZ)** | | **20**19 |

**For Organizations Exempt From Income Tax Under section 501(c) and section 527**

Department of the Treasury
Internal Revenue Service

▶ **Complete if the organization is described below.** ▶ **Attach to Form 990 or Form 990-EZ.**
▶ **Go to** *www.irs.gov/Form990* **for instructions and the latest information.**

**Open to Public Inspection**

**If the organization answered "Yes," on Form 990, Part IV, line 3, or Form 990-EZ, Part V, line 46 (Political Campaign Activities), then**
- Section 501(c)(3) organizations: Complete Parts I-A and B. Do not complete Part I-C.
- Section 501(c) (other than section 501(c)(3)) organizations: Complete Parts I-A and C below. Do not complete Part I-B.
- Section 527 organizations: Complete Part I-A only.

**If the organization answered "Yes," on Form 990, Part IV, line 4, or Form 990-EZ, Part VI, line 47 (Lobbying Activities), then**
- Section 501(c)(3) organizations that have filed Form 5768 (election under section 501(h)): Complete Part II-A. Do not complete Part II-B.
- Section 501(c)(3) organizations that have NOT filed Form 5768 (election under section 501(h)): Complete Part II-B. Do not complete Part II-A.

**If the organization answered "Yes," on Form 990, Part IV, line 5 (Proxy Tax) (see separate instructions) or Form 990-EZ, Part V, line 35c (Proxy Tax) (see separate instructions), then**
- Section 501(c)(4), (5), or (6) organizations: Complete Part III.

| Name of organization | Employer identification number |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130 |

**Part I-A** **Complete if the organization is exempt under section 501(c) or is a section 527 organization.**

1. Provide a description of the organization's direct and indirect political campaign activities in Part IV. (see instructions for definition of "political campaign activities")
2. Political campaign activity expenditures (see instructions) . . . . . . . . . . ▶ $        2,971,894
3. Volunteer hours for political campaign activities (see instructions) . . . . . . . . . .        5,348

**Part I-B** **Complete if the organization is exempt under section 501(c)(3).**

1. Enter the amount of any excise tax incurred by the organization under section 4955 . . . ▶ $
2. Enter the amount of any excise tax incurred by organization managers under section 4955 . . ▶ $
3. If the organization incurred a section 4955 tax, did it file Form 4720 for this year? . . . . . . ☐ Yes ☐ No
4a. Was a correction made? . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No
   b. If "Yes," describe in Part IV.

**Part I-C** **Complete if the organization is exempt under section 501(c), except section 501(c)(3).**

1. Enter the amount directly expended by the filing organization for section 527 exempt function activities . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ $        0
2. Enter the amount of the filing organization's funds contributed to other organizations for section 527 exempt function activities . . . . . . . . . . . . . . . . . . . . ▶ $        0
3. Total exempt function expenditures. Add lines 1 and 2. Enter here and on Form 1120-POL, line 17b . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ $        0
4. Did the filing organization file **Form 1120-POL** for this year? . . . . . . . . . . . . ☑ Yes ☐ No
5. Enter the names, addresses and employer identification number (EIN) of all section 527 political organizations to which the filing organization made payments. For each organization listed, enter the amount paid from the filing organization's funds. Also enter the amount of political contributions received that were promptly and directly delivered to a separate political organization, such as a separate segregated fund or a political action committee (PAC). If additional space is needed, provide information in Part IV.

| (a) Name | (b) Address | (c) EIN | (d) Amount paid from filing organization's funds. If none, enter -0-. | (e) Amount of political contributions received and promptly and directly delivered to a separate political organization. If none, enter -0-. |
|---|---|---|---|---|
| **(1)** (SEE STATEMENT) | | | | |
| **(2)** | | | | |
| **(3)** | | | | |
| **(4)** | | | | |
| **(5)** | | | | |
| **(6)** | | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.     Cat. No. 50084S     **Schedule C (Form 990 or 990-EZ) 2019**

Schedule C (Form 990 or 990-EZ) 2019    Page **2**

| Part II-A | Complete if the organization is exempt under section 501(c)(3) and filed Form 5768 (election under section 501(h)). |
|---|---|

**A** Check ▶ ☐ if the filing organization belongs to an affiliated group (and list in Part IV each affiliated group member's name, address, EIN, expenses, and share of excess lobbying expenditures).

**B** Check ▶ ☐ if the filing organization checked box A and "limited control" provisions apply.

| | Limits on Lobbying Expenditures<br>(The term "expenditures" means amounts paid or incurred.) | (a) Filing organization's totals | (b) Affiliated group totals |
|---|---|---|---|
| **1a** | Total lobbying expenditures to influence public opinion (grassroots lobbying) . . . . | | |
| **b** | Total lobbying expenditures to influence a legislative body (direct lobbying) . . . . . | | |
| **c** | Total lobbying expenditures (add lines 1a and 1b) . . . . . . . . . . . . | | |
| **d** | Other exempt purpose expenditures . . . . . . . . . . . . . . . . | | |
| **e** | Total exempt purpose expenditures (add lines 1c and 1d) . . . . . . . . . . | | |
| **f** | Lobbying nontaxable amount. Enter the amount from the following table in both columns. | | |

| If the amount on line 1e, column (a) or (b) is: | The lobbying nontaxable amount is: |
|---|---|
| Not over $500,000 | 20% of the amount on line 1e. |
| Over $500,000 but not over $1,000,000 | $100,000 plus 15% of the excess over $500,000. |
| Over $1,000,000 but not over $1,500,000 | $175,000 plus 10% of the excess over $1,000,000. |
| Over $1,500,000 but not over $17,000,000 | $225,000 plus 5% of the excess over $1,500,000. |
| Over $17,000,000 | $1,000,000. |

| | | (a) | (b) |
|---|---|---|---|
| **g** | Grassroots nontaxable amount (enter 25% of line 1f) . . . . . . . . . . | | |
| **h** | Subtract line 1g from line 1a. If zero or less, enter -0- . . . . . . . . . | | |
| **i** | Subtract line 1f from line 1c. If zero or less, enter -0- . . . . . . . . . | | |
| **j** | If there is an amount other than zero on either line 1h or line 1i, did the organization file Form 4720 reporting section 4911 tax for this year? . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No | | |

### 4-Year Averaging Period Under Section 501(h)
**(Some organizations that made a section 501(h) election do not have to complete all of the five columns below. See the separate instructions for lines 2a through 2f.)**

| Lobbying Expenditures During 4-Year Averaging Period | | | | | |
|---|---|---|---|---|---|
| Calendar year (or fiscal year beginning in) | (a) 2016 | (b) 2017 | (c) 2018 | (d) 2019 | (e) Total |
| **2a** Lobbying nontaxable amount | | | | | |
| **b** Lobbying ceiling amount (150% of line 2a, column (e)) | | | | | |
| **c** Total lobbying expenditures | | | | | |
| **d** Grassroots nontaxable amount | | | | | |
| **e** Grassroots ceiling amount (150% of line 2d, column (e)) | | | | | |
| **f** Grassroots lobbying expenditures | | | | | |

Schedule C (Form 990 or 990-EZ) 2019

Schedule C (Form 990 or 990-EZ) 2019        Page **3**

**Part II-B**   **Complete if the organization is exempt under section 501(c)(3) and has NOT filed Form 5768 (election under section 501(h)).**

*For each "Yes" response on lines 1a through 1i below, provide in Part IV a detailed description of the lobbying activity.*

| | | (a) | | (b) |
|---|---|---|---|---|
| | | Yes | No | Amount |
| **1** | During the year, did the filing organization attempt to influence foreign, national, state, or local legislation, including any attempt to influence public opinion on a legislative matter or referendum, through the use of: | | | |
| **a** | Volunteers? | | | |
| **b** | Paid staff or management (include compensation in expenses reported on lines 1c through 1i)? | | | |
| **c** | Media advertisements? | | | |
| **d** | Mailings to members, legislators, or the public? | | | |
| **e** | Publications, or published or broadcast statements? | | | |
| **f** | Grants to other organizations for lobbying purposes? | | | |
| **g** | Direct contact with legislators, their staffs, government officials, or a legislative body? | | | |
| **h** | Rallies, demonstrations, seminars, conventions, speeches, lectures, or any similar means? | | | |
| **i** | Other activities? | | | |
| **j** | Total. Add lines 1c through 1i | | | |
| **2a** | Did the activities in line 1 cause the organization to be not described in section 501(c)(3)? | | | |
| **b** | If "Yes," enter the amount of any tax incurred under section 4912 | | | |
| **c** | If "Yes," enter the amount of any tax incurred by organization managers under section 4912 | | | |
| **d** | If the filing organization incurred a section 4912 tax, did it file Form 4720 for this year? | | | |

**Part III-A**   **Complete if the organization is exempt under section 501(c)(4), section 501(c)(5), or section 501(c)(6).**

| | | | Yes | No |
|---|---|---|---|---|
| **1** | Were substantially all (90% or more) dues received nondeductible by members? | **1** | ✓ | |
| **2** | Did the organization make only in-house lobbying expenditures of $2,000 or less? | **2** | | ✓ |
| **3** | Did the organization agree to carry over lobbying and political campaign activity expenditures from the prior year? | **3** | | ✓ |

**Part III-B**   **Complete if the organization is exempt under section 501(c)(4), section 501(c)(5), or section 501(c)(6) and if either (a) BOTH Part III-A, lines 1 and 2, are answered "No" OR (b) Part III-A, line 3, is answered "Yes."**

| | | | |
|---|---|---|---|
| **1** | Dues, assessments and similar amounts from members | **1** | |
| **2** | Section 162(e) nondeductible lobbying and political expenditures (do not include amounts of political expenses for which the section 527(f) tax was paid). | | |
| **a** | Current year | **2a** | |
| **b** | Carryover from last year | **2b** | |
| **c** | Total | **2c** | |
| **3** | Aggregate amount reported in section 6033(e)(1)(A) notices of nondeductible section 162(e) dues | **3** | |
| **4** | If notices were sent and the amount on line 2c exceeds the amount on line 3, what portion of the excess does the organization agree to carryover to the reasonable estimate of nondeductible lobbying and political expenditure next year? | **4** | |
| **5** | Taxable amount of lobbying and political expenditures (see instructions) | **5** | |

**Part IV**   **Supplemental Information**

Provide the descriptions required for Part I-A, line 1; Part I-B, line 4; Part I-C, line 5; Part II-A (affiliated group list); Part II-A, lines 1 and 2 (see instructions); and Part II-B, line 1. Also, complete this part for any additional information.

SEE NEXT PAGE

--------------------------------------------------------------------------------

--------------------------------------------------------------------------------

--------------------------------------------------------------------------------

--------------------------------------------------------------------------------

--------------------------------------------------------------------------------

**NATIONAL RIFLE ASSOCIATION OF AMERICA**      56      11/18/2020 9:47:17 AM
**53-0116130**

| Part IV | **Supplemental Information.** Provide the descriptions required for Part I-A, line 1; Part I-B, line 4; Part I-C, line 5; Part II-A (affiliated group list); Part II-A, lines 1 and 2 (see instructions); and Part II-B, line 1. Also, complete this part for any additional information. |
|---|---|

| Return Reference - Identifier | Explanation |
|---|---|
| SCHEDULE C, PART I-A, LINE 1 - DESCRIPTION OF POLITICAL ACTIVITIES | SUPPORT FOR FUNDRAISING AND ADMINISTRATIVE EXPENSES OF A SEPARATE SEGREGATED FUND IS INDUSTRY STANDARD FOR NONPROFIT ORGANIZATIONS LIKE THE NRA, AS ALLOWED BY LAW. IN 2019, THE NRA PAID $2,971,894 FUNDRAISING AND ADMINISTRATIVE EXPENSES FOR THE SEPARATE SEGREGATED FUND, NRA POLITICAL VICTORY FUND, AS ALLOWED BY LAW. THE NRA ENGAGED IN ACTIVITIES IN SUPPORT OF ITS MISSION, WHICH INCLUDES PROTECTING AND DEFENDING THE CONSTITUTION OF THE UNITED STATES, ESPECIALLY WITH REFERENCE TO THE INALIENABLE RIGHT OF INDIVIDUAL AMERICAN CITIZEN GUARANTEED BY SUCH CONSTITUTION TO ACQUIRE, POSSESS, COLLECT, EXHIBIT, TRANSPORT, CARRY, TRANSFER OWNERSHIP OF, AND ENJOY THE RIGHT TO USE ARMS, IN ORDER THAT THE PEOPLE MAY ALWAYS BE IN A POSITION TO EXERCISE THEIR LEGITIMATE INDIVIDUAL RIGHTS OF SELF PRESERVATION AND DEFENSE OF FAMILY, PERSON, AND PROPERTY. IN PURSUIT OF THESE GOALS OF THE ASSOCIATION, THE NRA SPENT FUNDS DIRECTLY AND INDIRECTLY ON POLITICAL ACTIVITIES, WHICH WERE NOT THE PRIMARY ACTIVITIES OF THE ORGANIZATION. THE NRA IS ORGANIZED PRIMARILY TO PROMOTE SOCIAL WELFARE AND CAN ALSO ENGAGE IN POLITICAL ACTIVITIES ON BEHALF OF OR IN OPPOSITION TO CANDIDATES FOR POLITICAL OFFICE, AS ALLOWED BY LAW. BY ANY MEASURE, THE PERCENTAGE OF FUNDS SPENT BY THE NRA ON POLITICAL ACTIVATES IS MODEST IN COMPARISON TO THE BUDGET DEVOTED TO THE PRIMARY ACTIVITIES OF THE NRA. FOR INSTANCE, ALL EXPENDITURES NOTED ON PART I-A AND I-C OF SCHEDULE C AMOUNTED TO ABOUT 1% OF THE NRA'S TOTAL EXPENSES IN 2019, AS APPLIED TO TOTAL EXPENSES REPORTED ON FORM 990, PART IX, LINE 25. REPORTERS AND OTHER READERS ARE ALSO KINDLY REMINDED THAT THE SEPARATE SEGREGATED FUND IS A SEPARATE ENTITY FOR TAX PURPOSES. |
| SCHEDULE C, PART I-C, LINE 4 - FORM 1120-POL | THIS INFORMATION NOTE REGARDS THE NRA'S TAXES. THE NRA SEPARATELY FILES FORM 1120-POL, WHICH IS NOT SUBJECT TO PUBLIC DISCLOSURE. THE FOLLOWING INFORMATION ABOUT TAXES PAID WITH THE NRA'S FORMS 1120-POL IS SHARED HERE ON A VOLUNTARY BASIS AS A SERVICE TO READERS AND TO DEMONSTRATE IN GOOD FAITH THAT THE ORGANIZATION IS A TAXPAYER IN GOOD STANDING. 527(F) PROXY TAX IS PAID ON THE LESSER OF NET INVESTMENT INCOME OR CERTAIN POLITICAL EXPENDITURES AS DEFINED BY THE FEDERAL TAX CODE, SUCH AS WHEN CERTAIN POLITICAL COMMUNICATIONS EXPRESSLY ADVOCATE THE ELECTION OR DEFEAT OF A CANDIDATE AND ARE MADE BY THE NRA ITSELF RATHER THAN BY THE NRA'S SEPARATE SEGREGATED FUND. THE AMOUNT OF 527 (F) PROXY TAX PAID WITH THE NRA'S 2019 FORM 1120-POL WAS ZERO. HISTORICALLY, 527(F) PROXY TAX WAS REQUIRED TO BE PAID FOR 2018 WAS $164,944; NO 527(F) PROXY TAX WAS REQUIRED TO BE PAID FOR 2017; THE AMOUNT OF 527(F) PROXY TAX PAID WITH THE NRA'S 2016 FORM 1120-POL WAS $20,835; THE AMOUNT PAID WITH THE NRA'S 2015 FORM 1120-POL WAS $21,817. AS ANOTHER POLITE REMINDER TO REPORTERS AND OTHER READERS, FORM 990 INFORMATION IS NOT NECESSARILY EXPECTED TO TIE TO FEDERAL ELECTION COMMISSION (FEC) REPORTING DUE TO DIFFERENT DEFINITIONS AND EXCLUSIONS IN THE DIFFERENT REGULATORY REGIMES. |
| SCHEDULE C, PART I-C, LINE 5 - POLITICAL ACTION COMMITTEE | THE NRA POLITICAL VICTORY FUND, AN INDEPENDENT POLITICAL ACTION COMMITTEE (PAC) OF THE NRA, DIRECTLY RECEIVED CONTRIBUTIONS DURING 2019 OF $10,713,253. |

| PartI-C | Line 5. **Enter the names, addresses and employer identification number (EIN) of all section 527 political organizations to which the filing organization made payments.** (continued) |
|---|---|

| (a)<br>Name | (b)<br>Address | (c)<br>EIN | (d)<br>Amount paid from filing organization's funds. If none, enter -0-. | (e)<br>Amount of political contributions received and promptly and directly delivered to a separate political organization. If none, enter -0-. |
|---|---|---|---|---|
| REPUBLICAN ATTORNEYS GENERAL ASSOCIATION | 1747 PENNSYLVANIA AVE, NW STE 800 WASHINGTON, DC 20006 | 46-4501717 | 90,000 | 0 |
| REPUBLICAN GOVERNORS ASSOCIATION | 1747 PENNSYLVANIA AVE, NW STE 250 WASHINGTON, DC 20006 | 11-3655877 | 145,000 | 0 |
| NRA POLITICAL VICTORY FUND (SEE PARTS I-A AND IV) | 11250 WAPLES MILL RD FAIRFAX, VA 22030 | 52-1083020 | 0 | 3,952 |

**SCHEDULE D**
**(Form 990)**

Department of the Treasury
Internal Revenue Service

# Supplemental Financial Statements

▶ Complete if the organization answered "Yes" on Form 990,
Part IV, line 6, 7, 8, 9, 10, 11a, 11b, 11c, 11d, 11e, 11f, 12a, or 12b.
▶ Attach to Form 990.
▶ Go to *www.irs.gov/Form990* for instructions and the latest information.

OMB No. 1545-0047

**2019**

**Open to Public Inspection**

| Name of the organization | Employer identification number |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130 |

| **Part I** | **Organizations Maintaining Donor Advised Funds or Other Similar Funds or Accounts.** Complete if the organization answered "Yes" on Form 990, Part IV, line 6. |
|---|---|

| | | (a) Donor advised funds | (b) Funds and other accounts |
|---|---|---|---|
| 1 | Total number at end of year . . . . . . | | |
| 2 | Aggregate value of contributions to (during year) . | | |
| 3 | Aggregate value of grants from (during year) . | | |
| 4 | Aggregate value at end of year . . . . | | |

5   Did the organization inform all donors and donor advisors in writing that the assets held in donor advised funds are the organization's property, subject to the organization's exclusive legal control? . . . . . . ☐ Yes ☐ No

6   Did the organization inform all grantees, donors, and donor advisors in writing that grant funds can be used only for charitable purposes and not for the benefit of the donor or donor advisor, or for any other purpose conferring impermissible private benefit? . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No

| **Part II** | **Conservation Easements.** Complete if the organization answered "Yes" on Form 990, Part IV, line 7. |
|---|---|

1   Purpose(s) of conservation easements held by the organization (check all that apply).

☐ Preservation of land for public use (for example, recreation or education)   ☐ Preservation of a historically important land area
☐ Protection of natural habitat   ☐ Preservation of a certified historic structure
☐ Preservation of open space

2   Complete lines 2a through 2d if the organization held a qualified conservation contribution in the form of a conservation easement on the last day of the tax year.

| | | | Held at the End of the Tax Year |
|---|---|---|---|
| a | Total number of conservation easements | 2a | |
| b | Total acreage restricted by conservation easements | 2b | |
| c | Number of conservation easements on a certified historic structure included in (a) . . . . | 2c | |
| d | Number of conservation easements included in (c) acquired after 7/25/06, and not on a historic structure listed in the National Register | 2d | |

3   Number of conservation easements modified, transferred, released, extinguished, or terminated by the organization during the tax year ▶ ------------------------

4   Number of states where property subject to conservation easement is located ▶ ------------------------

5   Does the organization have a written policy regarding the periodic monitoring, inspection, handling of violations, and enforcement of the conservation easements it holds? . . . . . . . . . . . . . ☐ Yes ☐ No

6   Staff and volunteer hours devoted to monitoring, inspecting, handling of violations, and enforcing conservation easements during the year
▶ ------------------------

7   Amount of expenses incurred in monitoring, inspecting, handling of violations, and enforcing conservation easements during the year
▶ $ ------------------------

8   Does each conservation easement reported on line 2(d) above satisfy the requirements of section 170(h)(4)(B)(i) and section 170(h)(4)(B)(ii)? . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No

9   In Part XIII, describe how the organization reports conservation easements in its revenue and expense statement and balance sheet, and include, if applicable, the text of the footnote to the organization's financial statements that describes the organization's accounting for conservation easements.

| **Part III** | **Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets.** Complete if the organization answered "Yes" on Form 990, Part IV, line 8. |
|---|---|

1a   If the organization elected, as permitted under FASB ASC 958, not to report in its revenue statement and balance sheet works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide in Part XIII the text of the footnote to its financial statements that describes these items.

b   If the organization elected, as permitted under FASB ASC 958, to report in its revenue statement and balance sheet works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide the following amounts relating to these items:

(i) Revenue included on Form 990, Part VIII, line 1 . . . . . . . . . . . . . ▶ $ ------------------------
(ii) Assets included in Form 990, Part X . . . . . . . . . . . . . . . . . ▶ $ ------------------------

2   If the organization received or held works of art, historical treasures, or other similar assets for financial gain, provide the following amounts required to be reported under FASB ASC 958 relating to these items:

a   Revenue included on Form 990, Part VIII, line 1 . . . . . . . . . . . . . . ▶ $ ------------------------
b   Assets included in Form 990, Part X . . . . . . . . . . . . . . . . . . ▶ $ ------------------------

For Paperwork Reduction Act Notice, see the Instructions for Form 990.    Cat. No. 52283D    Schedule D (Form 990) 2019
NATIONAL RIFLE ASSOCIATION OF AMERICA
53-0116130      59      11/18/2020 9:47:17 AM

Schedule D (Form 990) 2019 | Page **2**

## Part III — Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets *(continued)*

**3** Using the organization's acquisition, accession, and other records, check any of the following that make significant use of its collection items (check all that apply):

a ☑ Public exhibition       d ☑ Loan or exchange program

b ☑ Scholarly research       e ☐ Other _____

c ☑ Preservation for future generations

**4** Provide a description of the organization's collections and explain how they further the organization's exempt purpose in Part XIII.

**5** During the year, did the organization solicit or receive donations of art, historical treasures, or other similar assets to be sold to raise funds rather than to be maintained as part of the organization's collection? . . ☑ Yes ☐ No

## Part IV — Escrow and Custodial Arrangements.

Complete if the organization answered "Yes" on Form 990, Part IV, line 9, or reported an amount on Form 990, Part X, line 21.

**1a** Is the organization an agent, trustee, custodian or other intermediary for contributions or other assets not included on Form 990, Part X? . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No

**b** If "Yes," explain the arrangement in Part XIII and complete the following table:

| | | Amount |
|---|---|---|
| **c** Beginning balance | **1c** | |
| **d** Additions during the year | **1d** | |
| **e** Distributions during the year | **1e** | |
| **f** Ending balance | **1f** | |

**2a** Did the organization include an amount on Form 990, Part X, line 21, for escrow or custodial account liability? ☐ Yes ☐ No

**b** If "Yes," explain the arrangement in Part XIII. Check here if the explanation has been provided on Part XIII . . . . ☐

## Part V — Endowment Funds.

Complete if the organization answered "Yes" on Form 990, Part IV, line 10.

| | | (a) Current year | (b) Prior year | (c) Two years back | (d) Three years back | (e) Four years back |
|---|---|---|---|---|---|---|
| **1a** | Beginning of year balance . . . | 20,293,364 | 20,566,237 | 19,520,483 | 17,657,500 | 16,738,628 |
| **b** | Contributions . . . . . . . | 1,152,173 | 1,603,940 | 1,371,910 | 1,482,504 | 1,988,178 |
| **c** | Net investment earnings, gains, and losses . . . . . . . . . . | 2,118,475 | (886,512) | 625,818 | 1,204,551 | (266,970) |
| **d** | Grants or scholarships . . . | 0 | 0 | | | |
| **e** | Other expenditures for facilities and programs . . . . . . . . . | 0 | 940,564 | 916,400 | 786,344 | 772,538 |
| **f** | Administrative expenses . . . . | 51,474 | 49,737 | 35,574 | 37,728 | 29,798 |
| **g** | End of year balance . . . . . | 23,512,538 | 20,293,364 | 20,566,237 | 19,520,483 | 17,657,500 |

**2** Provide the estimated percentage of the current year end balance (line 1g, column (a)) held as:

**a** Board designated or quasi-endowment ▶ _____ 0.00 %

**b** Permanent endowment ▶ _____ 100.00 %

**c** Term endowment ▶ _____ 0.00 %

The percentages on lines 2a, 2b, and 2c should equal 100%.

**3a** Are there endowment funds not in the possession of the organization that are held and administered for the organization by:

| | | | Yes | No |
|---|---|---|---|---|
| **(i)** | Unrelated organizations . . . . . . . . . . . . . . . . . . . . . . . . | **3a(i)** | | ✓ |
| **(ii)** | Related organizations . . . . . . . . . . . . . . . . . . . . . . . . | **3a(ii)** | ✓ | |
| **b** | If "Yes" on line 3a(ii), are the related organizations listed as required on Schedule R? . . . . . | **3b** | ✓ | |

**4** Describe in Part XIII the intended uses of the organization's endowment funds.

## Part VI — Land, Buildings, and Equipment.

Complete if the organization answered "Yes" on Form 990, Part IV, line 11a. See Form 990, Part X, line 10.

| Description of property | (a) Cost or other basis (investment) | (b) Cost or other basis (other) | (c) Accumulated depreciation | (d) Book value |
|---|---|---|---|---|
| **1a** Land . . . . . . . . . . | 0 | 5,380,792 | | 5,380,792 |
| **b** Buildings . . . . . . . . | | 55,907,362 | 34,155,156 | 21,752,206 |
| **c** Leasehold improvements . . . | | | | |
| **d** Equipment . . . . . . . | | 18,716,748 | 15,792,628 | 2,924,120 |
| **e** Other . . . . . . . . . | | | | |
| **Total.** Add lines 1a through 1e. *(Column (d) must equal Form 990, Part X, column (B), line 10c.)* . . . . . ▶ | | | | 30,057,118 |

Schedule D (Form 990) 2019

Schedule D (Form 990) 2019 — Page **3**

## Part VII Investments—Other Securities.

Complete if the organization answered "Yes" on Form 990, Part IV, line 11b. See Form 990, Part X, line 12.

| (a) Description of security or category (including name of security) | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| (1) Financial derivatives . . . . . . . . . . | | |
| (2) Closely held equity interests . . . . . . . . | | |
| (3) Other | | |
| (A) | | |
| (B) | | |
| (C) | | |
| (D) | | |
| (E) | | |
| (F) | | |
| (G) | | |
| (H) | | |
| **Total.** (Column (b) must equal Form 990, Part X, col. (B) line 12.) ▶ | | |

## Part VIII Investments—Program Related.

Complete if the organization answered "Yes" on Form 990, Part IV, line 11c. See Form 990, Part X, line 13.

| (a) Description of investment | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| (1) | | |
| (2) | | |
| (3) | | |
| (4) | | |
| (5) | | |
| (6) | | |
| (7) | | |
| (8) | | |
| (9) | | |
| **Total.** (Column (b) must equal Form 990, Part X, col. (B) line 13.) ▶ | | |

## Part IX Other Assets.

Complete if the organization answered "Yes" on Form 990, Part IV, line 11d. See Form 990, Part X, line 15.

| (a) Description | (b) Book value |
|---|---|
| (1) OTHER | 3,970,243 |
| (2) DUE FROM NRA FOUNDATION | 32,252,080 |
| (3) DUE FROM NRA CIVIL RIGHTS DEFFENSE FUND | 1,374 |
| (4) DUE FROM NRA SPECIAL CONTRIBUTION FUND | 342,184 |
| (5) | |
| (6) | |
| (7) | |
| (8) | |
| (9) | |
| **Total.** (Column (b) must equal Form 990, Part X, col. (B) line 15.) . . . . . . . . ▶ | 36,565,881 |

## Part X Other Liabilities.

Complete if the organization answered "Yes" on Form 990, Part IV, line 11e or 11f. See Form 990, Part X, line 25.

| 1. (a) Description of liability | (b) Book value |
|---|---|
| (1) Federal income taxes | |
| (2) NOTE PAYABLE - NRA FOUNDATION | 5,000,000 |
| (3) CAPITAL LEASE ARRANGEMENT | 918,898 |
| (4) ACCRUED SALES AND USE TAXES | 149,220 |
| (5) COUPON LIABILITY | 0 |
| (6) DERIVATIVE INSTRUMENT MARKET VALUATION | 0 |
| (7) | |
| (8) | |
| (9) | |
| **Total.** (Column (b) must equal Form 990, Part X, col. (B) line 25.) . . . . . . . . . . . ▶ | 6,068,118 |

**2.** Liability for uncertain tax positions. In Part XIII, provide the text of the footnote to the organization's financial statements that reports the organization's liability for uncertain tax positions under FASB ASC 740. Check here if the text of the footnote has been provided in Part XIII . ☑

Schedule D (Form 990) 2019 — Page **4**

**Part XI**   **Reconciliation of Revenue per Audited Financial Statements With Revenue per Return.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 12a.

| | | | | | |
|---|---|---|---|---|---:|
| 1 | Total revenue, gains, and other support per audited financial statements . . . . . . . . | | | **1** | 306,852,309 |
| 2 | Amounts included on line 1 but not on Form 990, Part VIII, line 12: | | | | |
| a | Net unrealized gains (losses) on investments . . . . . . . | **2a** | 6,605,046 | | |
| b | Donated services and use of facilities . . . . . . . . . | **2b** | 0 | | |
| c | Recoveries of prior year grants . . . . . . . . . . . | **2c** | 0 | | |
| d | Other (Describe in Part XIII.) . . . . . . . . . . | **2d** | 3,656,292 | | |
| e | Add lines **2a** through **2d** . . . . . . . . . . . . | | | **2e** | 10,261,338 |
| 3 | Subtract line **2e** from line **1** . . . . . . . . . . . | | | **3** | 296,590,971 |
| 4 | Amounts included on Form 990, Part VIII, line 12, but not on line 1: | | | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b . | **4a** | | | |
| b | Other (Describe in Part XIII.) . . . . . . . . . | **4b** | (5,435,507) | | |
| c | Add lines **4a** and **4b** . . . . . . . . . . . . . | | | **4c** | (5,435,507) |
| 5 | Total revenue. Add lines **3** and **4c.** *(This must equal Form 990, Part I, line 12.)* . . . . . . . | | | **5** | 291,155,464 |

**Part XII**   **Reconciliation of Expenses per Audited Financial Statements With Expenses per Return.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 12a.

| | | | | | |
|---|---|---|---|---|---:|
| 1 | Total expenses and losses per audited financial statements . . . . . . . . | | | **1** | 308,822,822 |
| 2 | Amounts included on line 1 but not on Form 990, Part IX, line 25: | | | | |
| a | Donated services and use of facilities . . . . . . . . . | **2a** | 0 | | |
| b | Prior year adjustments . . . . . . . . . . . . | **2b** | 0 | | |
| c | Other losses . . . . . . . . . . . . . . . | **2c** | 0 | | |
| d | Other (Describe in Part XIII.) . . . . . . . . . . | **2d** | 5,526,998 | | |
| e | Add lines **2a** through **2d** . . . . . . . . . . . . | | | **2e** | 5,526,998 |
| 3 | Subtract line **2e** from line **1** . . . . . . . . . . . | | | **3** | 303,295,824 |
| 4 | Amounts included on Form 990, Part IX, line 25, but not on line 1: | | | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b . | **4a** | | | |
| b | Other (Describe in Part XIII.) . . . . . . . . . | **4b** | 91,491 | | |
| c | Add lines **4a** and **4b** . . . . . . . . . . . . . | | | **4c** | 91,491 |
| 5 | Total expenses. Add lines **3** and **4c.** *(This must equal Form 990, Part I, line 18.)* . . . . . . . | | | **5** | 303,387,315 |

**Part XIII**   **Supplemental Information.**

Provide the descriptions required for Part II, lines 3, 5, and 9; Part III, lines 1a and 4; Part IV, lines 1b and 2b; Part V, line 4; Part X, line 2; Part XI, lines 2d and 4b; and Part XII, lines 2d and 4b. Also complete this part to provide any additional information.

SEE STATEMENT

Schedule D (Form 990) 2019

| Part XIII | Provide the descriptions required for Part II, lines 3, 5, and 9; Part III, lines 1a and 4; Part IV, lines 1b and 2b; Part V, line 4; Part X, line 2; Part XI, lines 2d and 4b; and Part XII, lines 2d and 4b. Also complete this part to provide any additional information. |

| Return Reference - Identifier | Explanation | |
|---|---|---|
| SCHEDULE D, PART XI, LINE 2(D) - OTHER REVENUES IN AUDITED FINANCIAL STATEMENTS NOT IN FORM 990 | **(a)** Description | **(b)** Amount |
| | OTHER- AGENCY TRANSACTIONS | 3,534,160 |
| | OTHER-UNREALIZED GAIN (LOSS) ON DERIVATIVE INSTRUMENT | 122,132 |
| SCHEDULE D, PART XI, LINE 4(B) - OTHER REVENUE | **(a)** Description | **(b)** Amount |
| | GRANTS PAID | 91,491 |
| | RENT EXPENSE | - 1,941,872 |
| | COST OF GOOD SOLD-MEMBERSHIP | - 3,585,126 |
| SCHEDULE D, PART XII, LINE 2(D) - OTHER EXPENSES IN AUDITED FINANCIAL STATEMENTS NOT IN FORM 990 | **(a)** Description | **(b)** Amount |
| | RENTAL EXPENSE | 1,941,872 |
| | COST OF GOODS SOLD-MEMBERSHIP | 3,585,126 |
| SCHEDULE D, PART XII, LINE 4(B) - OTHER EXPENSES | **(a)** Description | **(b)** Amount |
| | INTEREST ON ENDOWMENTS - GRANTS | 91,491 |

| Part XIII | **Supplemental Information.** Provide the descriptions required for Part II, lines 3, 5, and 9; Part III, lines 1a and 4; Part IV, lines 1b and 2b; Part V, line 4; Part X, line 2; Part XI, lines 2d and 4b; and Part XII, lines 2d and 4b. Also complete this part to provide any additional information. |

| Return Reference - Identifier | Explanation |
|---|---|
| SCHEDULE D, PART III, LINE 4 - COLLECTIONS OF ART - DESCRIPTION OF COLLECTIONS | THIS RESPONSE DESCRIBES THE MUSEUM COLLECTIONS WHICH ARE HELD BY THE NRA'S RELATED ORGANIZATIONS AND CURATED BY NRA EMPLOYEES. THE NRA MUSEUMS PROMOTE GUN COLLECTING AND PRESERVATION OF HISTORY THOUGH FIREARMS. THE NRA MUSEUMS INCLUDE THE NATIONAL FIREARMS MUSEUM IN FAIRFAX, VIRGINIA; THE FRANK BROWNELL MUSEUM OF THE SOUTHWEST IN RATON, NEW MEXICO; AND THE NRA NATIONAL SPORTING ARMS MUSEUM AT BASS PRO SHOPS IN SPRINGFIELD, MISSOURI. TO MAKE THE NRA MUSEUMS THE FINEST POSSIBLE RESOURCE FOR THE PUBLIC, THE NRA AND ITS AFFILIATED CHARITIES RELY ON GENEROUS SUPPORTERS TO BUILD THE EXHIBITION AND RESEARCH COLLECTIONS THROUGH COLLECTIONS OF HISTORICALLY SIGNIFICANT FIREARMS. PLEASE VISIT NRAMUSEUMS.ORG FOR CURRENT INFORMATION ON THE MUSEUM GALLERIES. |
| SCHEDULE D, PART III, LINE 5 - DONATIONS | THIS RESPONSE EXPLAINS WHY THE NRA MAY SOLICIT OR RECEIVE ASSETS THAT SOME DONORS INTEND TO BE SOLD RATHER THAN MAINTAINED PERMANENTLY. WHEN DONORS INTEND THEIR GIFTS OF FIREARMS TO BE SOLD RATHER THEN HELD FOR EXHIBITION OR RESEARCH IN THE COLLECTIONS OF THE NRA MUSEUM, THE NRA PARTNERS WITH AUCTION HOUSES. DONORS MAY CHOOSE TO HAVE GUNS SOLD FOR VARIOUS REASONS, SUCH AS TO SUPPORT CURRENT PROGRAM SERVICES OR TO FUND A CHARITABLE GIFT ANNUITY OR CHARITABLE TRUST WITH ONE OF THE NRA'S AFFILIATED CHARITIES. THE PHILANTHROPIC INTENT OF EACH DONOR DETERMINES HOW A GIFT IS HANDLED. |
| SCHEDULE D, PART V, LINE 4 - INTENDED USES OF ENDOWMENT FUNDS | THIS RESPONSE DESCRIBES THE INTENDED USES OF THE ORGANIZATION'S ENDOWMENT FUNDS. THE ENDOWMENT FUNDS BENEFIT A DIVERSE RANGE OF PHILANTHROPIC INTERESTS, INCLUDING TRAINING IN MARKSMANSHIP, NATIONAL SHOOTING CHAMPIONSHIPS, WOMEN'S LEADERSHIP, HUNTERS'LEADERSHIP, RECREATIONAL SHOOTING, LAW ENFORCEMENT, NRA MUSEUMS, AND THE NATIONAL ENDOWMENT FOR THE PROTECTION OF THE SECOND AMENDMENT. |
| SCHEDULE D, PART X, LINE 1 - OTHER LIABILITIES-TAXES | THIS INFORMATIONAL NOTE REGARDS THE NRA'S TAXES. THE NRA IS A SUBSTANTIAL TAXPAYER AND REMAINS IN GOOD STANDING WITH THE TAX AUTHORITIES. STATE AND LOCAL TAXES PAID BY THE NRA INCLUDE SALES AND USE TAXES, REAL ESTATE AND PERSONAL PROPERTY TAXES, AMUSEMENT TAXES, AND STATE UNEMPLOYMENT TAXES. THE LIABILITY SHOWN ON SCHEDULE D, PART X FOR ACCRUED SALES AND USE TAXES RELATES TO TIMING AND IS A SMALL FRACTION OF TAXES PAID DURING THE YEAR. ADDITIONAL NOTES REGARDING THE NRA'S TAXES ARE SHARED ON SCHEDULE C REGARDING 527(F) PROXY TAXES AND ON SCHEDULE O REGRADING UNRELATED BUSINESS INCOME TAXES. THE NRA CHOOSES TO SHARE THIS ADDITIONAL INFORMATION ABOUT THE NRA'S TOTAL TAXES TO DEMONSTRATE IN GOOD FAITH THAT THE ORGANIZATION IS A TAXPAYER IN GOOD STANDING. |
| SCHEDULE D, PART X, LINE 2 - FIN 48 (ASC 740) FOOTNOTE | THIS RESPONSE PROVIDES THE TEXT OF THE FOOTNOTE TO THE ORGANIZATION'S FINANCIAL STATEMENTS IN ACCORDANCE WITH FASB ASC 740 THE NRA IS EXEMPT FROM FEDERAL INCOME TAXES UNDER SECTION 501(C)(4) OF THE INTERNAL REVENUE CODE AND FROM STATE INCOME TAXES. THE NRA ACTIVITIES THAT CAUSE IMPOSITION OF THE UNRELATED BUSINESS INCOME TAX PROVISION OF THE CODE RESULT IN NO SIGNIFICANT TAX LIABILITY. THE NRA FOLLOWS THE ACCOUNTING STANDARD ON ACCOUNTING FOR UNCERTAINTY IN INCOME TAXES, WHICH ADDRESSES THE DETERMINATION OF WHETHER TAX BENEFITS CLAIMED OR EXPECTED TO BE CLAIMED ON A TAX RETURN SHOULD BE RECORDED IN THE FINANCIAL STATEMENTS. UNDER THIS GUIDANCE, THE NRA MAY RECOGNIZE THE TAX BENEFIT FROM AN UNCERTAIN TAX POSITION ONLY IF IT IS MORE-LIKELY-THAN-NOT THAT THE TAX POSITION WILL BE SUSTAINED ON EXAMINATION BY TAXING AUTHORITIES, BASED ON THE TECHNICAL MERITS OF THE POSITION. THE TAX BENEFITS RECOGNIZED IN THE FINANCIAL STATEMENTS FROM SUCH A POSITION ARE MEASURED BASED ON THE LARGEST BENEFIT THAT HAS A GREATER THAN 50% LIKELIHOOD OF BEING REALIZED UPON ULTIMATE SETTLEMENT. THE GUIDANCE ON ACCOUNTING FOR UNCERTAINTY IN INCOME TAXES ALSO ADDRESSES DE-RECOGNITION, CLASSIFICATION, INTEREST AND PENALTIES ON INCOME TAXES, AND ACCOUNTING IN INTERIM PERIODS. MANAGEMENT EVALUATED THE NRA'S TAX POSITIONS AND CONCLUDED THAT THE NRA HAD TAKEN NO UNCERTAIN TAX POSITIONS THAT REQUIRE ADJUSTMENT TO THE FINANCIAL STATEMENTS TO COMPLY WITH THE PROVISIONS OF THIS GUIDANCE. TAX YEARS FROM 2016 THROUGH THE CURRENT YEAR REMAIN OPEN FOR EXAMINATION BY TAX AUTHORITIES. |

**SCHEDULE F**
**(Form 990)**

Department of the Treasury
Internal Revenue Service

# Statement of Activities Outside the United States

OMB No. 1545-0047

**2019**

**Open to Public Inspection**

► Complete if the organization answered "Yes" on Form 990, Part IV, line 14b, 15, or 16.
► Attach to Form 990.
► Go to *www.irs.gov/Form990* for instructions and the latest information.

| Name of the organization | Employer identification number |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130 |

**Part I** **General Information on Activities Outside the United States.** Complete if the organization answered "Yes" on Form 990, Part IV, line 14b.

**1** **For grantmakers.** Does the organization maintain records to substantiate the amount of its grants and other assistance, the grantees' eligibility for the grants or assistance, and the selection criteria used to award the grants or assistance? . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☐ **No**

**2** **For grantmakers.** Describe in Part V the organization's procedures for monitoring the use of its grants and other assistance outside the United States.

**3** Activities per Region. (The following Part I, line 3 table can be duplicated if additional space is needed.)

| (a) Region | (b) Number of offices in the region | (c) Number of employees, agents, and independent contractors in the region | (d) Activities conducted in the region (by type) (such as, fundraising, program services, investments, grants to recipients located in the region) | (e) If activity listed in (d) is a program service, describe specific type of service(s) in the region | (f) Total expenditures for and investments in the region |
|---|---|---|---|---|---|
| (1) CENTRAL AMERICA AND THE CARIBBEAN | 0 | 0 | INVESTMENTS | | 3,352,620 |
| (2) EAST ASIA AND THE PACIFIC | 0 | 0 | PROGRAM SERVICES | PUBLICATIONS | 600 |
| (3) EUROPE (INCLUDING ICELAND AND GREENLAND) | 0 | 0 | FUNDRAISING | | 4,800 |
| (4) EUROPE (INCLUDING ICELAND AND GREENLAND) | 0 | 0 | PROGRAM SERVICES | PUBLICATIONS | 15,600 |
| (5) MIDDLE EAST AND NORTH AFRICA | 0 | 0 | FUNDRAISING | | 315 |
| (6) NORTH AMERICA (CANADA & MEXICO ONLY) | 0 | 0 | PROGRAM SERVICES | PUBLICATIONS | 21,500 |
| (7) NORTH AMERICA (CANADA & MEXICO ONLY) | 0 | 0 | FUNDRAISING | NRA OUTDOORS | 2,800 |
| (8) SUB-SAHARAN AFRICA | 0 | 0 | PROGRAM SERVICES | NRA OUTDOORS | 3,700 |
| (9) EAST ASIA AND THE PACIFIC | 0 | 0 | FUNDRAISING | | 14 |
| (10) | | | | | |
| (11) | | | | | |
| (12) | | | | | |
| (13) | | | | | |
| (14) | | | | | |
| (15) | | | | | |
| (16) | | | | | |
| (17) | | | | | |
| **3a** Subtotal . . . . . | 0 | 0 | | | 3,401,949 |
| **b** Total from continuation sheets to Part I . . | 0 | 0 | | | 0 |
| **c** **Totals** (add lines 3a and 3b) | 0 | 0 | | | 3,401,949 |

For Paperwork Reduction Act Notice, see the Instructions for Form 990. Cat. No. 50082W **Schedule F (Form 990) 2019**

Schedule F (Form 990) 2019

Page **2**

## Part II  Grants and Other Assistance to Organizations or Entities Outside the United States. Complete if the organization answered "Yes" on Form 990, Part IV, line 15, for any recipient who received more than $5,000. Part II can be duplicated if additional space is needed.

| **1** (a) Name of organization | (b) IRS code section and EIN (if applicable) | (c) Region | (d) Purpose of grant | (e) Amount of cash grant | (f) Manner of cash disbursement | (g) Amount of noncash assistance | (h) Description of noncash assistance | (i) Method of valuation (book, FMV, appraisal, other) |
|---|---|---|---|---|---|---|---|---|
| **(1)** | | | | | | | | |
| **(2)** | | | | | | | | |
| **(3)** | | | | | | | | |
| **(4)** | | | | | | | | |
| **(5)** | | | | | | | | |
| **(6)** | | | | | | | | |
| **(7)** | | | | | | | | |
| **(8)** | | | | | | | | |
| **(9)** | | | | | | | | |
| **(10)** | | | | | | | | |
| **(11)** | | | | | | | | |
| **(12)** | | | | | | | | |
| **(13)** | | | | | | | | |
| **(14)** | | | | | | | | |
| **(15)** | | | | | | | | |
| **(16)** | | | | | | | | |

**2** Enter total number of recipient organizations listed above that are recognized as charities by the foreign country, recognized as tax-exempt by the IRS, or for which the grantee or counsel has provided a section 501(c)(3) equivalency letter . . . . . . . . . ▲

**3** Enter total number of other organizations or entities . . . . . . . . . . . . . . . . . . . ▲

Schedule F (Form 990) 2019

Schedule F (Form 990) 2019

Page **3**

**Part III** **Grants and Other Assistance to Individuals Outside the United States.** Complete if the organization answered "Yes" on Form 990, Part IV, line 16.
Part III can be duplicated if additional space is needed.

| | **(a)** Type of grant or assistance | **(b)** Region | **(c)** Number of recipients | **(d)** Amount of cash grant | **(e)** Manner of cash disbursement | **(f)** Amount of noncash assistance | **(g)** Description of noncash assistance | **(h)** Method of valuation (book, FMV, appraisal, other) |
|---|---|---|---|---|---|---|---|---|
| (1) | | | | | | | | |
| (2) | | | | | | | | |
| (3) | | | | | | | | |
| (4) | | | | | | | | |
| (5) | | | | | | | | |
| (6) | | | | | | | | |
| (7) | | | | | | | | |
| (8) | | | | | | | | |
| (9) | | | | | | | | |
| (10) | | | | | | | | |
| (11) | | | | | | | | |
| (12) | | | | | | | | |
| (13) | | | | | | | | |
| (14) | | | | | | | | |
| (15) | | | | | | | | |
| (16) | | | | | | | | |
| (17) | | | | | | | | |
| (18) | | | | | | | | |

Schedule F (Form 990) 2019

NATIONAL RIFLE ASSOCIATION OF AMERICA
53-0116130

67

11/18/2020 9:47:17 AM

Page **4**

| Part IV | Foreign Forms |
|---------|---------------|

**1** Was the organization a U.S. transferor of property to a foreign corporation during the tax year? *If "Yes," the organization may be required to file Form 926, Return by a U.S. Transferor of Property to a Foreign Corporation (see Instructions for Form 926)* . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☑ **No**

**2** Did the organization have an interest in a foreign trust during the tax year? *If "Yes," the organization may be required to separately file Form 3520, Annual Return To Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts, and/or Form 3520-A, Annual Information Return of Foreign Trust With a U.S. Owner (see Instructions for Forms 3520 and 3520-A; don't file with Form 990)* . . . . . . . ☐ **Yes** ☑ **No**

**3** Did the organization have an ownership interest in a foreign corporation during the tax year? *If "Yes," the organization may be required to file Form 5471, Information Return of U.S. Persons With Respect to Certain Foreign Corporations (see Instructions for Form 5471)* . . . . . . . . . . . . . . ☐ **Yes** ☑ **No**

**4** Was the organization a direct or indirect shareholder of a passive foreign investment company or a qualified electing fund during the tax year? *If "Yes," the organization may be required to file Form 8621, Information Return by a Shareholder of a Passive Foreign Investment Company or Qualified Electing Fund (see Instructions for Form 8621)* . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☑ **No**

**5** Did the organization have an ownership interest in a foreign partnership during the tax year? *If "Yes," the organization may be required to file Form 8865, Return of U.S. Persons With Respect to Certain Foreign Partnerships (see Instructions for Form 8865)* . . . . . . . . . . . . . . . ☐ **Yes** ☑ **No**

**6** Did the organization have any operations in or related to any boycotting countries during the tax year? *If "Yes," the organization may be required to separately file Form 5713, International Boycott Report (see Instructions for Form 5713; don't file with Form 990)* . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☑ **No**

Schedule F (Form 990) 2019

| Part V | Supplemental Information. Provide the information required by Part I, line 2 (monitoring of funds); Part I, line 3, column (f) (accounting method;amounts of investments vs. expenditures per region); Part II, line 1 (accounting method); Part III (accounting method); andPart III, column (c) (estimated number of recipients), as applicable. Also complete this part to provide any additional information (see instructions). |
|--------|---|

| Return Reference - Identifier | Explanation |
|---|---|
| SCHEDULE F, PART I, LINE 3 - 1. ACTIVITIES PER REGION-OFFSHORE INVESTMENTS | THE NRA'S OFFSHORE INVESTMENTS FOLLOW INDUSTRY STANDARD BEST PRACTICES IN RISK MANAGEMENT FOR NATIONAL NONPROFIT INSTITUTIONAL INVESTORS. ALTERNATIVE INVESTMENTS REDUCE OVERALL PORTFOLIO RISK BY REDUCING VOLATILITY AND IMPROVING DIVERSIFICATION. THE NRA MAINTAINS SEVERAL INVESTMENT ACCOUNTS THAT ARE MULTI-STRATEGY FUNDS OF FUNDS. INCOME FROM PASSIVE INVESTMENTS, WHEN APPROPRIATELY STRUCTURED, IS EXCLUDED FROM UNRELATED BUSINESS INCOME BY LAW. THIS TYPE OF INVESTMENT POSTURE IS COMMONLY ACCEPTED IN THE U.S. EXEMPT ORGANIZATION INDUSTRY. 100% OF THE AMOUNT IS THE TOTAL BOOK VALUE OF INVESTMENTS FOR THAT REGION. |
| SCHEDULE F, PART I, LINE 3 - ACTIVITIES PER REGION | THIS DISCLOSURE REFERS TO FOREIGN FUNDRAISING. 100% OF THE AMOUNT IS THE CASH VALUE OF EXPENDITURES MADE BY THE NRA FOR NECESSARY TRAVEL, ACCOMMODATIONS, AND RELATED EXPENSES. |
| SCHEDULE F, PART I, LINE 3 - ACTIVITIES PER REGION-PROGRAM SERVICES | THIS DISCLOSURE OF PROGRAM SERVICES REFERS TO NRA PUBLICATIONS DIVISION'S FOREIGN TRAVEL EXPENSES RELATING TO GATHERING MATERIALS FOR NRA MAGAZINES. 100% OF THE AMOUNT IS THE CASH VALUE OF EXPENDITURES MADE BY THE NRA FOR NECESSARY TRAVEL, ACCOMMODATIONS, AND RELATED EXPENSES. |
| SCHEDULE F, PART I, LINE 3 - METHOD TO ACCOUNT FOR EXPENDITURES ON ORG'S FINANCIAL STATEMENTS | CENTRAL AMERICA AND THE CARIBBEAN: ACCRUAL<br>EAST ASIA AND THE PACIFIC: ACCRUAL<br>EUROPE (INCLUDING ICELAND AND GREENLAND): ACCRUAL<br>MIDDLE EAST AND NORTH AFRICA: ACCRUAL<br>NORTH AMERICA (CANADA & MEXICO ONLY): ACCRUAL<br>SUB-SAHARAN AFRICA: ACCRUAL |

**SCHEDULE G**
**(Form 990 or 990-EZ)**

Department of the Treasury
Internal Revenue Service

**Supplemental Information Regarding Fundraising or Gaming Activities**

Complete if the organization answered "Yes" on Form 990, Part IV, line 17, 18, or 19, or if the organization entered more than $15,000 on Form 990-EZ, line 6a.
► Attach to Form 990 or Form 990-EZ.
► Go to *www.irs.gov/Form990* for instructions and the latest information.

OMB No. 1545-0047

**2019**

**Open to Public Inspection**

| Name of the organization | Employer identification number |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130 |

**Part I** | **Fundraising Activities.** Complete if the organization answered "Yes" on Form 990, Part IV, line 17. Form 990-EZ filers are not required to complete this part.

1 Indicate whether the organization raised funds through any of the following activities. Check all that apply.

a ☑ Mail solicitations
b ☑ Internet and email solicitations
c ☑ Phone solicitations
d ☐ In-person solicitations
e ☐ Solicitation of non-government grants
f ☐ Solicitation of government grants
g ☐ Special fundraising events

2a Did the organization have a written or oral agreement with any individual (including officers, directors, trustees, or key employees listed in Form 990, Part VII) or entity in connection with professional fundraising services? ☑ Yes ☐ No

b If "Yes," list the 10 highest paid individuals or entities (fundraisers) pursuant to agreements under which the fundraiser is to be compensated at least $5,000 by the organization.

| (i) Name and address of individual or entity (fundraiser) | (ii) Activity | (iii) Did fundraiser have custody or control of contributions? | | (iv) Gross receipts from activity | (v) Amount paid to (or retained by) fundraiser listed in col. (i) | (vi) Amount paid to (or retained by) organization |
|---|---|---|---|---|---|---|
| | | Yes | No | | | |
| 1 ALLEGIANCE DBA MEMBERSHIP ADVISORS, 11250 WAPLES MILL RD, FAIRFAX, VA 22030 | FUNDRAISING CONSULTANT | | ✓ | 47,634,979 | 1,080,000 | 46,554,979 |
| 2 INFOCISION MANAGEMENT CORP, 325 SPRINGSIDE DR, AKRON, OH 44333 | PAID SOLICITOR | | ✓ | 7,044,115 | 3,437,873 | 3,606,242 |
| 3 501C SOLUTIONS, 2530 MERIDIAN PKWY, STE 300, RESEARCH TRIANGLE PARK, NC 27713 | FUNDRAISING CONSULTANT | | ✓ | 0 | 320,000 | (320,000) |
| 4 MCKENNA & ASSOCIATES, 2001 CALRENDON BLVD, STE 201, ARLINGTON, VA 22202 | FUNDRAISING CONSULTANT | | ✓ | 0 | 300,000 | (300,000) |
| 5 KEY & ASSOCIATES, 12177 CHANCERY STATION CIR, RESTON, VA 20191 | FUNDRAISING CONSULTANT | | ✓ | 0 | 72,000 | (72,000) |
| 6 COMMONWEALTH GROUP PARTNERS, 1579 MONROE SR, STE F-341, ATLANTA, GA 30324 | FUNDRAISING CONSULTANT | | ✓ | 0 | 60,000 | (60,000) |
| 7 | | | | | | |
| 8 | | | | | | |
| 9 | | | | | | |
| 10 | | | | | | |
| Total . . . . . . . . . . . . . ► | | | | 54,679,094 | 5,269,873 | 49,409,221 |

3 List all states in which the organization is registered or licensed to solicit contributions or has been notified it is exempt from registration or licensing.

AL, AK, AZ, AR, CA, CO, CT, DC, FL, GA, HI, IL, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, TN, UT, VA, WA, WV, WI

For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.

Cat. No. 50083H

Schedule G (Form 990 or 990-EZ) 2019

**Part II** **Fundraising Events.** Complete if the organization answered "Yes" on Form 990, Part IV, line 18, or reported more than $15,000 of fundraising event contributions and gross income on Form 990-EZ, lines 1 and 6b. List events with gross receipts greater than $5,000.

| | | **(a)** Event #1 NRAILA AUCTION (event type) | **(b)** Event #2 (event type) | **(c)** Other events (total number) | **(d)** Total events (add col. **(a)** through col. **(c)**) |
|---|---|---|---|---|---|
| Revenue | 1 Gross receipts . . . . | 758,465 | 0 | | 758,465 |
| | 2 Less: Contributions . . | 0 | 0 | | 0 |
| | 3 Gross income (line 1 minus line 2) . . . . . . . | 758,465 | 0 | 0 | 758,465 |
| Direct Expenses | 4 Cash prizes . . . . . | 0 | 0 | 0 | 0 |
| | 5 Noncash prizes . . . | 0 | 0 | 0 | 0 |
| | 6 Rent/facility costs . . . | 42,908 | | | 42,908 |
| | 7 Food and beverages . . | 193,500 | | | 193,500 |
| | 8 Entertainment . . . . | 147,899 | | | 147,899 |
| | 9 Other direct expenses . | 60,697 | | | 60,697 |
| | 10 Direct expense summary. Add lines 4 through 9 in column (d) . . . . . . . ▶ | | | | 445,004 |
| | 11 Net income summary. Subtract line 10 from line 3, column (d) . . . . . . . . ▶ | | | | 313,461 |

**Part III** **Gaming.** Complete if the organization answered "Yes" on Form 990, Part IV, line 19, or reported more than $15,000 on Form 990-EZ, line 6a.

| | | **(a)** Bingo | **(b)** Pull tabs/instant bingo/progressive bingo | **(c)** Other gaming | **(d)** Total gaming (add col. **(a)** through col. **(c)**) |
|---|---|---|---|---|---|
| Revenue | 1 Gross revenue . . . . | | | | |
| Direct Expenses | 2 Cash prizes . . . . . | | | | |
| | 3 Noncash prizes . . . | | | | |
| | 4 Rent/facility costs . . . | | | | |
| | 5 Other direct expenses . | | | | |
| | 6 Volunteer labor . . . . | ☐ Yes _____ % ☐ No | ☐ Yes _____ % ☐ No | ☐ Yes _____ % ☐ No | |
| | 7 Direct expense summary. Add lines 2 through 5 in column (d) . . . . . . . ▶ | | | | |
| | 8 Net gaming income summary. Subtract line 7 from line 1, column (d) . . . . . . . ▶ | | | | |

9 Enter the state(s) in which the organization conducts gaming activities: _____
a Is the organization licensed to conduct gaming activities in each of these states? . . . . . . . . . ☐ Yes ☐ No
b If "No," explain: _____
_____

10a Were any of the organization's gaming licenses revoked, suspended, or terminated during the tax year? . ☐ Yes ☐ No
b If "Yes," explain: _____
_____

Schedule G (Form 990 or 990-EZ) 2019         Page **3**

| 11 | Does the organization conduct gaming activities with nonmembers? . . . . . . . . . . . . | ☐ Yes ☐ No |
|----|----|----|
| 12 | Is the organization a grantor, beneficiary or trustee of a trust, or a member of a partnership or other entity formed to administer charitable gaming? . . . . . . . . . . . . . . . . | ☐ Yes ☐ No |

13   Indicate the percentage of gaming activity conducted in:

| a | The organization's facility . . . . . . . . . . . . . . | **13a** | % |
|---|---|---|---|
| b | An outside facility . . . . . . . . . . . . . . . | **13b** | % |

14   Enter the name and address of the person who prepares the organization's gaming/special events books and records:

Name ▶ _____

Address ▶ _____

| 15a | Does the organization have a contract with a third party from whom the organization receives gaming revenue? . . . . . . . . . . . . . . . . . . . . | ☐ Yes ☐ No |
|---|---|---|

b   If "Yes," enter the amount of gaming revenue received by the organization ▶   $ _____ and the amount of gaming revenue retained by the third party ▶   $ _____

c   If "Yes," enter name and address of the third party:

Name ▶ _____

Address ▶ _____

16   Gaming manager information:

Name ▶ _____

Gaming manager compensation ▶   $ _____

Description of services provided ▶ _____

    ☐ Director/officer      ☐ Employee      ☐ Independent contractor

17   Mandatory distributions:

| a | Is the organization required under state law to make charitable distributions from the gaming proceeds to retain the state gaming license? . . . . . . . . . . . . . . | ☐ Yes ☐ No |
|---|---|---|

b   Enter the amount of distributions required under state law to be distributed to other exempt organizations or spent in the organization's own exempt activities during the tax year ▶   $

| **Part IV** | **Supplemental Information.** Provide the explanations required by Part I, line 2b, columns (iii) and (v); and Part III, lines 9, 9b, 10b, 15b, 15c, 16, and 17b, as applicable. Also provide any additional information. See instructions. |
|---|---|

SEE NEXT PAGE

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Schedule G (Form 990 or 990-EZ) 2019

| Part IV | **Supplemental Information.** Provide the explanations required by Part I, line 2b, columns (iii) and (v), and Part III, lines 9, 9b, 10b, 15b, 15c, 16, and 17b, as applicable. Also provide any additional information (see instructions). |
|---|---|

| Return Reference - Identifier | Explanation |
|---|---|
| SCHEDULE G, PART I, LINE 2B(II) - VENDOR INFOCISION MANAGEMENT CORP | THIS SUPPLEMENTAL INFORMATION NOTES THE DISTINCTION BETWEEN 990 CORE FORM PART VII SECTION B LINE 1 (2) AND SCHEDULE G PART I LINE 2B(2) FOR THE FILING ORGANIZATION'S VENDOR INFOCISION MANAGEMENT CORP. THE VENDOR INFOCISION PROVIDED SERVICES TO THE FILING ORGANIZATION FOR BOTH MEMBERSHIPS AND CONTRIBUTIONS SOLICITATIONS, AS SHOWN ON 990 CORE FORM PART VIII SECTION B LINE 1. SCHEDULE G IS SPECIFIC TO THE VENDOR'S WORK AS A PAID SOLICITOR PROVIDING PROFESSIONAL FUNDRAISING SERVICES. THEREFORE, THE SCHEDULE G DISCLOSURE EXCLUDES THE MEMBERSHIP PROCESSING SERVICES. |

**SCHEDULE I**
**(Form 990)**

Department of the Treasury
Internal Revenue Service

# Grants and Other Assistance to Organizations, Governments, and Individuals in the United States

Complete if the organization answered "Yes" on Form 990, Part IV, line 21 or 22.
▶ Attach to Form 990.
▶ Go to *www.irs.gov/Form990* for the latest information.

OMB No. 1545-0047

**2019**

Open to Public Inspection

Name of the organization
NATIONAL RIFLE ASSOCIATION OF AMERICA

Employer identification number
53-0116130

## Part I General Information on Grants and Assistance

1   Does the organization maintain records to substantiate the amount of the grants or assistance, the grantees' eligibility for the grants or assistance, and the selection criteria used to award the grants or assistance?   . . . . . . . . . . . . . . . . . . . . . . ☑ Yes   ☐ No

2   Describe in Part IV the organization's procedures for monitoring the use of grant funds in the United States.

## Part II Grants and Other Assistance to Domestic Organizations and Domestic Governments. Complete if the organization answered "Yes" on Form 990, Part IV, line 21, for any recipient that received more than $5,000. Part II can be duplicated if additional space is needed.

| 1 (a) Name and address of organization or government | (b) EIN | (c) IRC section (if applicable) | (d) Amount of cash grant | (e) Amount of non-cash assistance | (f) Method of valuation (book, FMV, appraisal, other) | (g) Description of noncash assistance | (h) Purpose of grant or assistance |
|---|---|---|---|---|---|---|---|
| (1)  (SEE STATEMENT) | 52-1480785 | 501(C)(3) | 12,000 | | | | (SEE STATEMENT) |
| (2) | | | | | | | |
| (3) | | | | | | | |
| (4) | | | | | | | |
| (5) | | | | | | | |
| (6) | | | | | | | |
| (7) | | | | | | | |
| (8) | | | | | | | |
| (9) | | | | | | | |
| (10) | | | | | | | |
| (11) | | | | | | | |
| (12) | | | | | | | |

2   Enter total number of section 501(c)(3) and government organizations listed in the line 1 table  . . . . . . . . . . . ▲   1

3   Enter total number of other organizations listed in the line 1 table  . . . . . . . . . . . . . . . . . . ▲   0

For Paperwork Reduction Act Notice, see the Instructions for Form 990.   Cat. No. 50055P   **74**   Schedule I (Form 990) (2019)

11/18/2020 9:47:17 AM

Schedule I (Form 990) (2019)

Page **2**

**Part III** **Grants and Other Assistance to Domestic Individuals.** Complete if the organization answered "Yes" on Form 990, Part IV, line 22.
Part III can be duplicated if additional space is needed.

| (a) Type of grant or assistance | (b) Number of recipients | (c) Amount of cash grant | (d) Amount of noncash assistance | (e) Method of valuation (book, FMV, appraisal, other) | (f) Description of noncash assistance |
|---|---|---|---|---|---|
| 1    (SEE STATEMENT) | 22 | 91,491 | 0 | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |

**Part IV** **Supplemental Information.** Provide the information required in Part I, line 2; Part III, column (b); and any other additional information.

(SEE STATEMENT)

Schedule I (Form 990) (2019)

NATIONAL RIFLE ASSOCIATION OF AMERICA
53-0116130

75

11/18/2020 9:47:17 AM

| Part IV | Supplemental Information. Provide the information required in Part I, line 2, Part III, column (b), and any other additional information. |
|---|---|

| Return Reference - Identifier | Explanation |
|---|---|
| SCHEDULE I, PART I, LINE 2 - PROCEDURES FOR MONITORING USE OF GRANT FUNDS. | THE NATIONAL FOUNDATION FOR WOMEN LEGISLATORS PARTNERS WITH THE NATIONAL RIFLE ASSOCIATION FOR THE ANNUAL NFWL/NRA BILL OF RIGHTS ESSAY SCHOLARSHIP CONTEST FOR FEMALE HIGH SCHOOL JUNIORS AND SENIORS. THE NRA ACTIVELY ASSISTS NATIONAL FOUNDATION OF WOMEN LEGISLATORS IN THE SELECTION AND ADMINISTRATION OF NFWL SCHOLARSHIPS FOR COLLEGE. NFWL SCHOLARSHIP APPLICATIONS ARE ASSESSED ON THE ELEMENTS OF HISTORICAL RESEARCH, INSIGHT AND PERSPECTIVE, DEMONSTRATED UNDERSTANDING OF THE AMERICAN CONSTITUTION, INSPIRATIONAL QUALITY, AND MEANINGFUL PERSONAL CONNECTION. SCHOLARSHIP AWARDS ARE PAID DIRECTLY TO THE EDUCATIONAL INSTITUTION. |
| SCHEDULE I, PART II, COLUMN A - NAME AND ADDRESS OF ORGANIZATION OR GOVERNMENT | NATIONAL FOUNDATION FOR WOMEN LEGISLATORS<br><br>910 16TH ST NW, WASHINGTON, DC 20006-2900 |
| SCHEDULE I, PART II , COLUMN H - PURPOSE OF GRANT OR ASSISTANCE | NATIONAL FOUNDATION FOR WOMEN LEGISLATORS:<br><br>UNDERGRADUATE COLLEGE SCHOLARSHIP |
| SCHEDULE I, PART III - LINE 1 | THE NRA JEANNE E. BRAY MEMORIAL SCHOLARSHIP AWARDS PROGRAM IS NAMED IN HONOR AND RECOGNITION OF THE GROUNDBREAKING POLICE OFFICER JEANNE E. BRAY, A SHOOTING CHAMPION AND PAST MEMBER OF THE NRA BOARD OF DIRECTORS. JEANNE E. BRAY WAS THE FIRST FEMALE DETECTIVE ON BURGLARY SQUAD, WHICH HAS EVOLVED INTO TODAY'S MODERN SWAT TEAMS. SHE WAS THE FIRST FEMALE POLICE OFFICER TO EARN THE NRA POLICE MARKSMANSHIP "DISTINGUISHED" BAR, AND SHE WON THE NATIONAL WOMEN'S POLICE PISTOL COMBAT CHAMPIONSHIP FIVE TIMES FROM 1962 TO 1967. THE PROGRAM OFFERS SCHOLARSHIPS OF UP TO $2,500 PER SEMESTER, UP TO $5,000 PER YEAR FOR A MAXIMUM OF FOUR YEARS, TO DEPENDENT CHILDREN OF ANY PUBLIC LAW ENFORCEMENT OFFICER KILLED IN THE LINE OF DUTY WHO WAS AN NRA MEMBER AT THE TIME OF DEATH, AND TO DEPENDENT CHILDREN OF ANY CURRENT OR RETIRED LAW ENFORCEMENT OFFICERS WHO ARE LIVING AND HAVE CURRENT NRA MEMBERSHIP. THE MEMBERSHIP RESTRICTION IS PERMITTED BY LAW BECAUSE THE NRA JEANNE E. BRAY MEMORIAL SCHOLARSHIP AWARDS PROGRAM IS A 501(C)(4) PROGRAM. SCHOLARSHIP AWARDS ARE PAID DIRECTLY TO THE EDUCATIONAL INSTITUTION. |
| SCHEDULE I, PART III, COLUMN A - TYPE OF GRANT | NRA JEANNE E BRAY MEMORIAL SCHOLARSHIP AWARDS |

**SCHEDULE J**
**(Form 990)**

Department of the Treasury
Internal Revenue Service

# Compensation Information

**For certain Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**
▶ **Complete if the organization answered "Yes" on Form 990, Part IV, line 23.**
▶ **Attach to Form 990.**
▶ **Go to www.irs.gov/Form990 for instructions and the latest information.**

OMB No. 1545-0047

**2019**

**Open to Public Inspection**

| Name of the organization | Employer identification number |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130 |

**Part I** | **Questions Regarding Compensation**

| | | Yes | No |
|---|---|---|---|

**1a** Check the appropriate box(es) if the organization provided any of the following to or for a person listed on Form 990, Part VII, Section A, line 1a. Complete Part III to provide any relevant information regarding these items.

☑ First-class or charter travel      ☑ Housing allowance or residence for personal use
☑ Travel for companions      ☐ Payments for business use of personal residence
☑ Tax indemnification and gross-up payments      ☑ Health or social club dues or initiation fees
☐ Discretionary spending account      ☐ Personal services (such as maid, chauffeur, chef)

**b** If any of the boxes on line 1a are checked, did the organization follow a written policy regarding payment or reimbursement or provision of all of the expenses described above? If "No," complete Part III to explain . . . . . . . . . . . . . . . . . . | **1b** | | ✓

**2** Did the organization require substantiation prior to reimbursing or allowing expenses incurred by all directors, trustees, and officers, including the CEO/Executive Director, regarding the items checked on line 1a? . . . . . . . . . . . . . . . . . . . . . . . . | **2** | | ✓

**3** Indicate which, if any, of the following the organization used to establish the compensation of the organization's CEO/Executive Director. Check all that apply. Do not check any boxes for methods used by a related organization to establish compensation of the CEO/Executive Director, but explain in Part III.

☑ Compensation committee      ☑ Written employment contract
☐ Independent compensation consultant      ☑ Compensation survey or study
☐ Form 990 of other organizations      ☑ Approval by the board or compensation committee

**4** During the year, did any person listed on Form 990, Part VII, Section A, line 1a, with respect to the filing organization or a related organization:

**a** Receive a severance payment or change-of-control payment? . . . . . . . . . | **4a** | ✓ |
**b** Participate in, or receive payment from, a supplemental nonqualified retirement plan? . . . | **4b** | ✓ |
**c** Participate in, or receive payment from, an equity-based compensation arrangement? . . . | **4c** | | ✓
If "Yes" to any of lines 4a–c, list the persons and provide the applicable amounts for each item in Part III.

**Only section 501(c)(3), 501(c)(4), and 501(c)(29) organizations must complete lines 5–9.**

**5** For persons listed on Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the revenues of:

**a** The organization? . . . . . . . . . . . . . . . . . . . . . . | **5a** | ✓ |
**b** Any related organization? . . . . . . . . . . . . . . . . . . . . | **5b** | | ✓
If "Yes" on line 5a or 5b, describe in Part III.

**6** For persons listed on Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the net earnings of:

**a** The organization? . . . . . . . . . . . . . . . . . . . . . . | **6a** | | ✓
**b** Any related organization? . . . . . . . . . . . . . . . . . . . . | **6b** | | ✓
If "Yes" on line 6a or 6b, describe in Part III.

**7** For persons listed on Form 990, Part VII, Section A, line 1a, did the organization provide any nonfixed payments not described on lines 5 and 6? If "Yes," describe in Part III . . . . . . . . | **7** | ✓ |

**8** Were any amounts reported on Form 990, Part VII, paid or accrued pursuant to a contract that was subject to the initial contract exception described in Regulations section 53.4958-4(a)(3)? If "Yes," describe in Part III . . . . . . . . . . . . . . . . . . . . . . | **8** | | ✓

**9** If "Yes" on line 8, did the organization also follow the rebuttable presumption procedure described in Regulations section 53.4958-6(c)? . . . . . . . . . . . . . . . | **9** | |

**For Paperwork Reduction Act Notice, see the Instructions for Form 990.**      Cat. No. 50053T      **Schedule J (Form 990) 2019**

Schedule J (Form 990) 2019

Page **2**

## Part II Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees. Use duplicate copies if additional space is needed.

For each individual whose compensation must be reported on Schedule J, report compensation from the organization on row (i) and from related organizations, described in the instructions, on row (ii). Do not list any individuals that aren't listed on Form 990, Part VII.

**Note:** The sum of columns (B)(i)–(iii) for each listed individual must equal the total amount of Form 990, Part VII, Section A, line 1a, applicable column (D) and (E) amounts for that individual.

| (A) Name and Title | | (B) Breakdown of W-2 and/or 1099-MISC compensation | | | (C) Retirement and other deferred compensation | (D) Nontaxable benefits | (E) Total of columns (B)(i)–(D) | (F) Compensation in column (B) reported as deferred on prior Form 990 |
|---|---|---|---|---|---|---|---|---|
| | | (i) Base compensation | (ii) Bonus & incentive compensation | (iii) Other reportable compensation | | | | |
| MARION P HAMMER<br>1 BOARD DIRECTOR | (i)<br>(ii) | 220,350<br>0 | 0 | 0 | 0<br>0 | 0<br>0 | 220,350<br>0 | 0<br>0 |
| OLIVER L NORTH<br>2 BOARD DIRECTOR | (i)<br>(ii) | 986,015<br>0 | 0 | 0<br>0 | 0<br>0 | 0<br>0 | 986,015<br>0 | 0<br>0 |
| CHRIS COX<br>3 EXECUTIVE DIRECTOR ILA 6/26/2019 | (i)<br>(ii) | 744,676<br>0 | 0 | 767,906<br>0 | 16,800<br>0 | 43,143<br>0 | 1,572,525<br>0 | 652,997<br>0 |
| JOSEPH P DEBERGALIS, JR<br>4 EXECUTIVE DIRECTOR GO | (i)<br>(ii) | 346,490<br>0 | 0 | 75,850<br>0 | 16,800<br>0 | 37,216<br>0 | 476,356<br>0 | 0<br>0 |
| JOHN C FRAZER<br>5 SECRETARY | (i)<br>(ii) | 324,989<br>0 | 54,100 | 35,496<br>0 | 16,800<br>0 | 59,084<br>0 | 490,469<br>0 | 0<br>0 |
| WAYNE R LAPIERRE<br>6 EXECUTIVE VICE PRESIDENT | (i)<br>(ii) | 1,268,790<br>0 | 455,000 | 86,781<br>0 | 16,800<br>0 | 57,338<br>0 | 1,884,709<br>0 | 0<br>0 |
| JASON OUIMET<br>7 EXECUTIVE DIRECTOR ILA | (i)<br>(ii) | 393,922<br>0 | 0 | 3,182<br>0 | 16,574<br>0 | 48,590<br>0 | 462,268<br>0 | 0<br>0 |
| CRAIG B SPRAY<br>8 TREASURER | (i)<br>(ii) | 566,437<br>0 | 210,000 | 29,274<br>0 | 16,800<br>0 | 53,227<br>0 | 875,738<br>0 | 0<br>0 |
| TODD GRABLE<br>9 EXECUTIVE DIRECTOR, MEMBERSHIP | (i)<br>(ii) | 437,958<br>0 | 187,744 | 11,130<br>0 | 16,800<br>0 | 48,309<br>0 | 701,941<br>0 | 0<br>0 |
| DOUG HAMLIN<br>10 EXECUTIVE DIRECTOR, PUBLICATIONS | (i)<br>(ii) | 455,666<br>0 | 100,000 | 61,166<br>0 | 16,800<br>0 | 62,782<br>0 | 696,414<br>0 | 0<br>0 |
| DAVID LEHMAN<br>11 DEPUTY EXECUTIVE DIRECTOR 9/13/2019 | (i)<br>(ii) | 384,381<br>0 | 0 | 251,355<br>0 | 16,800<br>0 | 7,120<br>0 | 659,656<br>0 | 235,810<br>0 |
| JOSHUA L POWELL<br>12 CHIEF OF STAFF AND SENIOR STRATEGIST | (i)<br>(ii) | 784,652<br>0 | 0 | 74,278<br>0 | 16,800<br>0 | 59,351<br>0 | 935,081<br>0 | 0<br>0 |
| TYLER SCHROPP<br>13 EXECUTIVE DIRECTOR, ADVANCEMENT | (i)<br>(ii) | 718,429<br>0 | 75,000 | 7,911<br>0 | 16,784<br>0 | 51,889<br>0 | 870,013<br>0 | 0<br>0 |
| THOMAS R TEDRICK<br>14 MANAGING DIRECTOR FINANCE | (i)<br>(ii) | 389,316<br>0 | 0 | 7,998<br>0 | 16,800<br>0 | 28,323<br>0 | 442,437<br>0 | 0<br>0 |
| JOHN G PERREN<br>15 SR. ADVISOR TO THE EVP | (i)<br>(ii) | 350,000<br>0 | 0 | 9,906<br>0 | 8,885<br>0 | 3,411<br>0 | 372,202<br>0 | 0<br>0 |
| (SEE STATEMENT)<br>16 | (i)<br>(ii) | | | | | | | |

**Part II**   Officers, Directors, Trustees, Key Employees and Highest Compensated Employees (continued)

| (a) Name | (b) Breakdown of W-2 and/or 1099-MISC compensation | | | (c) Retirement and other deferred compensation | (d) Nontaxable benefits | (e) Total of columns (b)(i)-(d) | (f) Compensation reported in prior Form 990 or Form 990-EZ |
|---|---|---|---|---|---|---|---|
| | (i) Base Compensation | (ii) Bonus & incentive compensation | (iii) Other reportable compensation | | | | |
| (16) WILSON H PHILLIPS FORMER TREASURER 9/13/2018 (i) | 232,366 | 0 | 427,020 | 4,985 | 0 | 664,371 | 426,309 |
| (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| (17) ROBERT K WEAVER FORMER EXECUTIVE FORMER DIRECTOR GO 10/25/2016 (i) | 0 | 0 | 240,000 | 0 | 0 | 240,000 | 0 |
| (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| Part III | **Supplemental Information.** Provide the information, explanation, or descriptions required for Part I, lines 1a, 1b, 3, 4a, 4b, 4c, 5a, 5b, 6a, 6b, 7, and 8, and for Part II. Also complete this part for any additional information. |
|---|---|

| Return Reference - Identifier | Explanation |
|---|---|
| SCHEDULE J, PART I, LINE 1A - FIRST-CLASS OR CHARTER TRAVEL | CHARTER TRAVEL WAS USED ON OCCASIONS WHEN TRAVEL LOGISTICS OR SECURITY CONCERNS PRECLUDED OTHER AVAILABLE OPTIONS, AND TRAVEL WAS PROPERLY EXCLUDED FROM TAXABLE COMPENSATION. |
| SCHEDULE J, PART I, LINE 1A - HEALTH OR SOCIAL CLUB DUES OR INITIATION FEES | DUES FOR CERTAIN EMPLOYEES MAINTAINING MEMBERSHIPS IN CLUBS FOR BUSINESS PURPOSES, ARE APPROVED THROUGH THE NRA'S STANDARD EXPENSE REIMBURSEMENT PROCESS. |
| SCHEDULE J, PART I, LINE 1A - HOUSING ALLOWANCE OR RESIDENCE FOR PERSONAL USE | HOUSING EXPENSES WERE PROVIDED FOR FOUR INDIVIDUALS AND WERE PROPERLY INCLUDED IN TAXABLE COMPENSATION. DOUG HAMLIN $20,901, JOSHUA POWELL $69,299, JOSEPH DEBERGALIS $52,983, AND CRAIG B SPRAY $3,500. |
| SCHEDULE J, PART I, LINE 1A - TAX INDEMNIFICATION AND GROSS-UP PAYMENTS | ONE INDIVIDUAL (TYLER SCHROPP) RECEIVED A DISCRETIONARY BONUS THAT WAS GROSSED UP. THE BONUS WAS TREATED AS TAXABLE COMPENSATION |
| SCHEDULE J, PART I, LINE 1A - TRAVEL FOR COMPANIONS | COMPANIONS OCCASIONALLY TRAVEL WITH NRA OFFICIALS. TRAVELS WERE PROPERLY EXCLUDED FROM TAXABLE COMPENSATION WHEN TRAVELING ON NRA BUSINESS. SEE SCHEDULE L FOR ADDITIONAL DISCLOSURES. |
| SCHEDULE J, PART I, LINE 1B - WRITTEN POLICY REGARDING PAYMENT OR REIMBURSEMENT OF EXPENSES | THE NRA HAS A WRITTEN POLICY FOR FIRST-CLASS TRAVEL. |
| SCHEDULE J, PART I, LINE 3 - METHODS USED TO ESTABLISH THE COMPENSATION | COMPENSATION OF THE NRA'S TOP MANAGEMENT OFFICIAL IS ESTABLISHED BY METHODS INCLUDING COMPENSATION SURVEYS AND STUDIES, AND COMPARABILITY DATA. COMPENSATION OF THE TOP MANAGEMENT OFFICIAL MUST BE APPROVED BY THE BOARD OF DIRECTORS, BASED ON RECOMMENDATIONS BY THE COMPENSATION COMMITTEE. ALL DECISIONS ARE PROPERLY DOCUMENTED. |
| SCHEDULE J, PART I, LINE 4A - SEVERANCE OR CHANGE-OF-CONTROL PAYMENT | ROBERT K. WEAVER'S EMPLOYMENT AS EXECUTIVE DIRECTOR OF GENERAL OPERATIONS ENDED IN 2016 AND DURING CALENDAR YEAR 2019 MR. WEAVER RECEIVED TAXABLE COMPENSATION OF $240,000 AS YEAR 4 OF A 4 YEAR SEVERANCE AGREEMENT. |
| SCHEDULE J, PART I, LINE 4B - SUPPLEMENTAL NONQUALIFIED RETIREMENT PLAN | THE NRA HAS DEFERRED COMPENSATION RETIREMENT BENEFIT PLANS FOR CERTAIN EMPLOYEES AND NONQUALIFIED SUPPLEMENTAL EXECUTIVE RETIREMENT PLANS FOR CERTAIN EMPLOYEES. FOR NONQUALIFIED PLANS, THE FILING ORGANIZATION DECIDES THE BENEFIT AMOUNT AND TIMEFRAME FOR VESTING OF EACH PARTICIPANT USING DIFFERENT FACTORS PARTICULAR TO EACH RELEVANT INDIVIDUAL AND HIS OR HER SPECIFIC CIRCUMSTANCES. PAYOUTS ARE PROPERLY INCLUDED IN TAXABLE WAGES AND REPORTED IN W-2 INCOME. THE AMOUNT FOR MR. COX INCLUDE $246,031 457(F) DISBURSEMENT, FOR MR. PHILLIPS $19,853 457(F) DISBURSEMENT, AND MR. LEHMAN $51,213 457(F) DISBURSEMENT. |
| SCHEDULE J, PART I, LINE 5A - COMPENSATION CONTINGENT ON REVENUES OF THE ORGANIZATION | ONE INDIVIDUAL LISTED ON FORM 990, PART VII, SECTION A, LINE 1A, TODD GRABLE, RECEIVES INCENTIVE COMPENSATION BASED ON REVENUES RECEIVED FROM CERTAIN MARKETING, RECRUITING, AND LICENSING PROGRAMS. |
| SCHEDULE J, PART I, LINE 7 - NON-FIXED PAYMENTS | THREE INDIVIDUALS LISTED ON FORM 990, PART VII, SECTION A, LINE 1A (MR. LAPIERRE, MR. SPRAY AND MR. FRAZER) RECEIVED DISCRETIONARY BONUSES APPROVED BY THE BOARD OF DIRECTORS. TWO INDIVIDUALS (MR. SCHROPP AND MR. HAMLIN) RECEIVED DISCRETIONARY BONUSES APPROVED BY THEIR SUPERVISOR. |
| SCHEDULE J, PART II, COLUMN (B)(I) - OLIVER L NORTH | OLIVER L. NORTH RECEIVED $986,015 PAID BY AN UNRELATED ORGANIZATION, ACKERMAN MCQUEEN (AS FURTHER DETAILED ON SCHEDULE O). JULIE GOLOB RECEIVED $16,119 PAID BY AN UNRELATED ORGANIZATION, ACKERMAN MCQUEEN (AS FURTHER DETAILED ON SCHEDULE O) |
| SCHEDULE J, PART II, COLUMN (B)(III) - OTHER REPORTABLE COMPENSATION | OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. LAPIERRE INCLUDED $63,036 GROUP LIFE INSURANCE, $19,000 457(B) PLAN, AND $4,745 TAXABLE PERSONAL EXPENSES. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. COX INCLUDED $406,965 457(B) PAYOUT, $246,031 457(F) PAYOUT, $10,234 457(B) PLAN, $3,735 GROUP LIFE INSURANCE, AND $940 TAXABLE PERSONAL EXPENSES. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. PHILLIPS INCLUDED $406,456 457(B) PAYOUT, $19,853 457(F) PAYOUT, AND $711 457(B) PLAN. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. POWELL INCLUDED $70,048 TAXABLE PERSONAL EXPENSES AND $4,230 GROUP LIFE INSURANCE. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. SPRAY INCLUDED $19,000 457(B) PLAN, $7,100 TAXABLE PERSONAL EXPENSE, AND $3,174 GROUP LIFE INSURANCE. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. FRAZER INCLUDED $19,000 457(B) PLAN, $12,652 TAXABLE PERSONAL EXPENSES, AND $3,845 GROUP LIFE INSURANCE. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. DEBERGALIS INCLUDED $53,238 TAXABLE PERSONAL EXPENSES, $19,000 457(B) PLAN, AND $3,612 GROUP LIFE INSURANCE. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. OUIMET INCLUDED $930 GROUP LIFE INSURANCE AND $2,252 TAXABLE PERSONAL EXPENSES. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. SCHROPP INCLUDED $4,545 GROUP LIFE INSURANCE AND $3,366 TAXABLE PERSONAL EXPENSES. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. GRABLE INCLUDED $9,600 TAXABLE PERSONAL EXPENSES AND $1,530 GROUP LIFE INSURANCE. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. HAMLIN INCLUDED $26,901 TAXABLE PERSONAL EXPENSES, $19,000 457(B) PLAN, AND $15,265 GROUP LIFE INSURANCE. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. LEHMAN INCLUDED $51,213 457(F) PAYOUT, $13,889 457(B) PLAN CONTRIBUTION, 457(B) PAYOUT 184,597, AND $1,656 GROUP LIFE INSURANCE. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. TEDRICK INCLUDED $7,998 GROUP LIFE INSURANCE. OTHER REPORTABLE COMPENSATION WITHIN TAXABLE WAGES FOR MR. PERREN INCLUDED $9,906 GROUP LIFE INSURANCE. |

| Return Reference - Identifier | Explanation |
|---|---|
| SCHEDULE J, PART II, COLUMN (C) - RETIREMENT AND OTHER DEFERRED COMPENSATION | EMPLOYER DEPOSITS TOWARD BENEFITS THAT WILL NOT BE PAID UNTIL A FUTURE DATE ARE SHOWN IN COLUMN C. THE AMOUNT FOR MR. LAPIERRE INCLUDED $16,800 401(K). THE AMOUNT FOR MR. COX INCLUDED $16,800 401(K). THE AMOUNT FOR MR. PHILLIPS INCLUDED $4,985 401(K). THE AMOUNT FOR MR. POWELL INCLUDED $16,800 401(K). THE AMOUNT FOR MR. SPRAY INCLUDED $16,800 401(K). THE AMOUNT FOR MR. FRAZER INCLUDED $16,800 401(K). THE AMOUNT FOR MR. DEBERGALIS INCLUDED $16,800 401(K). THE AMOUNT FOR MR. SCHROPP INCLUDED $16,784 401(K). THE AMOUNT FOR MR. GRABLE INCLUDED $16,800 401(K). THE AMOUNT FOR MR. HAMLIN INCLUDED $16,800 401(K). THE AMOUNT FOR MR. LEHMAN INCLUDED $16,800 401(K). THE AMOUNT FOR MR. QUIMET INCLUDED $16,574 401(K). THE AMOUNT FOR MR. TEDRICK INCLUDED $16,800. THE AMOUNT FOR MR. PERREN INCLUDED $8,885 |
| SCHEDULE J, PART II, COLUMN (D) - NONTAXABLE BENEFITS | COLUMN D NONTAXABLE BENEFITS ARE PROVIDED TO EMPLOYEES CONSISTENT WITH ASSOCIATION INDUSTRY STANDARDS AND BEST PRACTICES. STANDARD NONTAXABLE BENEFITS INCLUDE EMPLOYEE BENEFITS SUCH AS THE EMPLOYER PAID PORTIONS OF MEDICAL AND DENTAL PLANS AND LONG-TERM AND SHORT-TERM DISABILITY PLANS. |

**SCHEDULE L**
**(Form 990 or 990-EZ)**

Department of the Treasury
Internal Revenue Service

# Transactions With Interested Persons

► **Complete if the organization answered "Yes" on Form 990, Part IV, line 25a, 25b, 26, 27, 28a, 28b, or 28c, or Form 990-EZ, Part V, line 38a or 40b.**
► **Attach to Form 990 or Form 990-EZ.**
► **Go to www.irs.gov/Form990 for instructions and the latest information.**

OMB No. 1545-0047

**2019**

**Open To Public Inspection**

| Name of the organization | Employer identification number |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130 |

**Part I** **Excess Benefit Transactions** (section 501(c)(3), section 501(c)(4), and section 501(c)(29) organizations only).
Complete if the organization answered "Yes" on Form 990, Part IV, line 25a or 25b, or Form 990-EZ, Part V, line 40b.

| 1 | (a) Name of disqualified person | (b) Relationship between disqualified person and organization | (c) Description of transaction | (d) Corrected? Yes | No |
|---|---|---|---|---|---|
| (1) | JOSHUA POWELL | FORMER OFFICER | SEE PART V | | ✓ |
| (2) | CHRISTOPHER COX | OFFICER | SEE PART V | | ✓ |
| (3) | DAVID LEHMAN | HIGHEST COMPENSATED EMPLOYEE | SEE PART V | | ✓ |
| (4) | WAYNE LAPIERRE | OFFICER | SEE PART V | ✓ | |
| (5) | WILSON PHILLIPS | FORMER OFFICER | SEE PART V | | ✓ |
| (6) | (SEE STATEMENT) | | | | |

**2** Enter the amount of tax incurred by the organization managers or disqualified persons during the year under section 4958 . . . . . . . . . . . . . . . ► $ _____

**3** Enter the amount of tax, if any, on line 2, above, reimbursed by the organization . . . . . . . . ► $ _____

**Part II** **Loans to and/or From Interested Persons.**
Complete if the organization answered "Yes" on Form 990-EZ, Part V, line 38a or Form 990, Part IV, line 26; or if the organization reported an amount on Form 990, Part X, line 5, 6, or 22.

| (a) Name of interested person | (b) Relationship with organization | (c) Purpose of loan | (d) Loan to or from the organization? To | From | (e) Original principal amount | (f) Balance due | (g) In default? Yes | No | (h) Approved by board or committee? Yes | No | (i) Written agreement? Yes | No |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (1) | | | | | | | | | | | | |
| (2) | | | | | | | | | | | | |
| (3) | | | | | | | | | | | | |
| (4) | | | | | | | | | | | | |
| (5) | | | | | | | | | | | | |
| (6) | | | | | | | | | | | | |
| (7) | | | | | | | | | | | | |
| (8) | | | | | | | | | | | | |
| (9) | | | | | | | | | | | | |
| (10) | | | | | | | | | | | | |
| **Total** | | | | ► $ | | | | | | | | |

**Part III** **Grants or Assistance Benefiting Interested Persons.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 27.

| (a) Name of interested person | (b) Relationship between interested person and the organization | (c) Amount of assistance | (d) Type of assistance | (e) Purpose of assistance |
|---|---|---|---|---|
| (1) | | | | |
| (2) | | | | |
| (3) | | | | |
| (4) | | | | |
| (5) | | | | |
| (6) | | | | |
| (7) | | | | |
| (8) | | | | |
| (9) | | | | |
| (10) | | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.  Cat. No. 50056A  **Schedule L (Form 990 or 990-EZ) 2019**

Schedule L (Form 990 or 990-EZ) 2019  Page **2**

| Part IV | Business Transactions Involving Interested Persons. |

Complete if the organization answered "Yes" on Form 990, Part IV, line 28a, 28b, or 28c.

| (a) Name of interested person | (b) Relationship between interested person and the organization | (c) Amount of transaction | (d) Description of transaction | (e) Sharing of organization's revenues? | |
|---|---|---|---|---|---|
| | | | | Yes | No |
| (1) (SEE STATEMENT) | | | | | |
| (2) | | | | | |
| (3) | | | | | |
| (4) | | | | | |
| (5) | | | | | |
| (6) | | | | | |
| (7) | | | | | |
| (8) | | | | | |
| (9) | | | | | |
| (10) | | | | | |

| Part V | Supplemental Information. |

Provide additional information for responses to questions on Schedule L (see instructions).

(SEE STATEMENT)

Schedule L (Form 990 or 990-EZ) 2019

**Part I**    Excess Benefit Transactions (continued)

| (a) Name of disqualified person | (b) Relationship between disqualified person and organization | (c) Description of transaction | (d) Corrected? Yes | No |
|---|---|---|---|---|
| (6) JOHN FRAZER | OFFICER | SEE PART V | | ✓ |
| (7) OLIVER NORTH | DIRECTOR | SEE PART V | | ✓ |
| (8) JOSEPH P DEBERGALIS, JR | OFFICER | SEE PART V | | ✓ |

**Part IV**   **Business Transactions Involving Interested Persons** (continued)

| (a) Name of interested person | (b) Relationship between interested person and the organization | (c) Amount of transaction | (d) Description of transaction | (e) Sharing of organization's revenues? Yes | (e) Sharing of organization's revenues? No |
|---|---|---|---|---|---|
| (1) MARION P HAMMER | BOARD DIRECTOR | $220,000 | MARION P HAMMER PROVIDED CONSULTING SERVICES IN THE FORM OF ADVICE, ANALYSIS, AND OTHER DUTIES REASONABLY ASSIGNED BY THE EXECUTIVE VICE PRESIDENT OF THE NRA AND EXECUTIVE DIRECTOR OF ILA DURING 2019. | | ✓ |

NATIONAL RIFLE ASSOCIATION OF AMERICA
53-0116130

85

11/18/2020 9:47:17 AM

| Part V | Supplemental Information. Provide additional information for responses to questions on Schedule L (see instructions). |
|---|---|

| Return Reference - Identifier | Explanation |
|---|---|
| SCHEDULE L, PART I, LINE 1 - 1A. EXCESS BENEFIT TRANSACTIONS | THE NATIONAL RIFLE ASSOCIATION HAS IDENTIFIED WHAT IT BELIEVES ARE EXCESS BENEFIT TRANSACTIONS IN WHICH IT ENGAGED IN 2019 AND IN PRIOR CALENDAR YEARS OF WHICH IT BECAME AWARE BUT WERE NOT REPORTED ON ITS PRIOR FORMS 990. THESE TRANSACTIONS ARE EXPLAINED BELOW. THERE ARE OTHER TRANSACTIONS IN 2019 AND PRIOR CALENDAR YEARS THAT ARE STILL UNDER REVIEW BY THE NRA AND/OR ARE CURRENTLY SUBJECT TO DISPUTE IN THE FOLLOWING LEGAL PROCEEDINGS:<br><br>1.PEOPLE OF THE STATE OF NEW YORK, BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK V. THE NATIONAL RIFLE ASSOCIATION OF AMERICAN, INC., WAYNE LAPIERRE, WILSON PHILLIPS, JOHN FRAZER AND JOSHUA POWELL, PENDING IN THE SUPREME COURT OF THE STATE OF NEW YORK, [ALBANY COUNTY] INDEX NO. 451625/2020;<br><br>2.THE NATIONAL RIFLE ASSOCIATION OF AMERICA V. OLIVER NORTH, PENDING IN THE SUPREME COURT OF THE STATE OF NEW YORK, [ALBANY COUNTY] INDEX NO. 903843-20;<br><br>3.THE NATIONAL RIFLE ASSOCIATION OF AMERICA AND WAYNE LAPIERRE V. ACKERMAN MCQUEEN, INC., ET. AL., PENDING IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION, CIVIL ACTION NO. 3:19-CV-02074-G; AND<br><br>4.NATIONAL RIFLE ASSOCIATION OF AMERICA V. AMC MCQUEEN, INC. AND MERCURY GROUP, INC., PENDING IN THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA, [VIRGINIA], CASE NOS.: CL19001757, CL19002067 AND CL19002886.<br><br>THE NRA CANNOT AT THE TIME THIS FORM 990 IS FILED DETERMINE WHETHER THESE OTHER TRANSACTIONS ARE EXCESS BENEFIT TRANSACTIONS. |
| SCHEDULE L, PART I, LINE 1 - 1B. EXCESS BENEFIT TRANSACTIONS: JOSHUA POWELL | FROM 2016 THROUGH JANUARY 30, 2020, MR. POWELL SERVED THE NRA IN NUMEROUS CAPACITIES: EXECUTIVE DIRECTOR OF GENERAL OPERATIONS, CHIEF OF STAFF AND SENIOR STRATEGIST. THE NRA BELIEVES MR. POWELL WAS IN A POSITION TO SUBSTANTIALLY INFLUENCE ITS AFFAIRS BY EXERCISING OR SHARING THE RESPONSIBILITY FOR SUPERVISION, MANAGEMENT OR ADMINISTRATION OF ITS OPERATIONS. THEREFORE, THE NRA BELIEVES THAT MR. POWELL WAS A DISQUALIFIED PERSON WITHIN THE INTENDMENT OF SECTION 4958 OF THE INTERNAL REVENUE CODE ("CODE"). SEE TREAS. REG. SECT. 53.4958-3(E)(2).<br><br>MR. POWELL CHARGED TO THE NRA, OR HAD REIMBURSED BY THE NRA, VARIOUS PERSONAL TRAVEL, CELLULAR AND OTHER EXPENSES WHICH MR. POWELL KNEW OR SHOULD HAVE KNOWN WERE NOT APPROPRIATE TO SUBMIT AS BUSINESS EXPENSES. PAYMENT OF THESE EXPENSES WERE NOT INTENDED BY THE NRA TO BE PART OF MR. POWELL'S COMPENSATION AND CONSTITUTE AUTOMATIC EXCESS BENEFITS UNDER TREASURY REGULATIONS SECTION 53.4958-4(C). THE AGGREGATE EXCESS BENEFIT DETERMINED TO BE PROVIDED TO MR. POWELL FROM 2016 THROUGH 2019 WAS $54,904.45. ON MARCH 15, 2020, THE NRA MADE DEMAND FOR REPAYMENT OF $57,522.12 (WHICH INCLUDED INTEREST). ON OR ABOUT JULY 9, 2020, MR. POWELL TENDERED A CHECK TO THE NRA FOR $40,760.20, IN PURPORTED FULL SETTLEMENT. THE NRA HAS REJECTED THE CHECK, SO CORRECTION OF THE EXCESS BENEFIT HAS NOT YET BEEN MADE. THE AMOUNT OF EXCISE TAX DUE UNDER SECTION 4958 BY MR. POWELL IS DETERMINED TO BE $13,726.11. IN ADDITION, THE NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL HAS CHALLENGED, AS UNREASONABLE, COMPENSATION PAID TO MR. POWELL DURING THE PERIOD FROM 2016 THROUGH 2019. |
| SCHEDULE L, PART I, LINE 1 - 2. EXCESS BENEFIT TRANSACTIONS: CHRISTOPHER COX | FROM 2002 THROUGH JUNE 26, 2019, MR. COX SERVED AS THE EXECUTIVE DIRECTOR OF THE INSTITUTE FOR LEGISLATIVE ACTION ("ILA"), WHICH IS THE LEGISLATIVE AND POLITICAL DIVISION OF THE NATIONAL RIFLE ASSOCIATION. MR. COX WAS ALSO AN OFFICER OF THE NRA. BECAUSE (I) ILA'S FINANCES WERE MAINTAINED SEPARATELY FROM THOSE OF THE OTHER NRA DIVISIONS, (II) ILA MAINTAINED ITS OWN FISCAL STAFF, AND (III) MR. COX WAS AN OFFICER OF THE ORGANIZATION, THE NRA BELIEVES MR. COX WAS IN A POSITION TO SUBSTANTIALLY INFLUENCE ITS AFFAIRS AND IS THUS A DISQUALIFIED PERSON WITHIN THE INTENDMENT OF CODE SECTION 4958. TREAS. REG. SECT. 53.4958-3(E)(2)(IV), (V).<br><br>THE NRA HAS BECOME AWARE THAT MR. COX IMPROPERLY USED ASSOCIATION FUNDS TO PAY PERSONAL EXPENSES CHARGED ON HIS PERSONAL CREDIT CARD, AMOUNTING TO UNAUTHORIZED INTEREST-FREE ADVANCES TO HIMSELF. IN ADDITION, MR. COX CAUSED EXPENSES TO BE PAID BY THE NRA, OR REIMBURSED TO HIM, FOR PERSONAL AND FAMILY TRAVEL, BUSINESS TRIPS UTILIZING UNAPPROVED CHARTER OR FIRST CLASS TRAVEL, TICKETS TO SPORTING/ENTERTAINMENT EVENTS, AND MEALS AND HOTEL EXPENSES WHICH WERE NOT APPROVED BY THE NRA. PAYMENT OF THESE EXPENSES WERE NOT INTENDED BY THE NRA TO BE PART OF MR. COX'S COMPENSATION AND THEREFORE CONSTITUTED AN AUTOMATIC EXCESS BENEFIT UNDER TREASURY REGULATIONS SECTION 53.4958-4(C).<br><br>TO DATE, THE AGGREGATE EXCESS BENEFIT FROM 2015 TO JUNE 26, 2019, DETERMINED TO BE PROVIDED TO MR. COX IS IN EXCESS OF $1 MILLION, WHICH THE NRA IS SEEKING TO RECOVER. THIS IS BEING DISPUTED BY MR. COX AND, TO DATE, ANY EXCESS BENEFIT RECEIVED BY MR. COX HAS NOT BEEN CORRECTED. THE NRA BELIEVES THAT THE AMOUNT OF EXCISE TAX DUE UNDER CODE SECTION 4958 BY MR. COX WOULD BE APPROXIMATELY $328,001.50. |
| SCHEDULE L, PART I, LINE 1 - 3. EXCESS BENEFIT TRANSACTION: DAVID LEHMAN | FROM 2002 THROUGH SEPTEMBER 13, 2019, MR. LEHMAN SERVED AS DEPUTY EXECUTIVE DIRECTOR. AS SUCH, THE NRA BELIEVES MR. LEHMAN WAS IN A POSITION TO SUBSTANTIALLY INFLUENCE ITS AFFAIRS AND ILA'S AFFAIRS BY EXERCISING OR SHARING RESPONSIBILITY FOR SUPERVISION, MANAGEMENT OR ADMINISTRATION OF THEIR OPERATIONS. THEREFORE, THE NRA BELIEVES MR. LEHMAN WAS A DISQUALIFIED PERSON WITHIN THE INTENDMENT OF CODE SECTION 4958. TREAS. REG. SECT. 53.4958-3(E)(2).<br><br>UPON INFORMATION AND BELIEF, FROM 2015 TO SEPTEMBER 13, 2019, MR. LEHMAN CAUSED THE NRA TO PAY FOR PERSONAL TRAVEL, CLUB, AND MEAL EXPENSES IN THE AGGREGATE AMOUNT OF AT LEAST $87,595.83. THE NRA HAS NOT YET COMPLETED ITS INVESTIGATION OF THE EXTENT TO WHICH MR. LEHMAN MAY HAVE RECEIVED IMPROPER BENEFITS, BUT IF SUCH EXPENSES ARE SUBSTANTIATED, THEY WERE LIKELY NOT APPROVED NOR INTENDED TO BE COMPENSATION TO MR. LEHMAN BY THE NRA, AND WOULD THUS LIKELY CONSTITUTE AUTOMATIC EXCESS BENEFITS UNDER TREASURY REGULATIONS SECTION 53.4958-4(C). |

| Return Reference - Identifier | Explanation |
|---|---|
| SCHEDULE L, PART I, LINE 1 - 4. EXCESS BENEFIT TRANSACTION: WAYNE LAPIERRE | MR. LAPIERRE IS THE EXECUTIVE VICE PRESIDENT AND CHIEF EXECUTIVE OFFICER OF THE NRA. HE IS AN OFFICER AND IS THUS A DISQUALIFIED PERSON WITHIN THE INTENDMENT OF CODE SECTION 4958. TREAS. REG. SECT. 53.4958-3(C)(2). FROM 2015 THROUGH 2019, THE NRA ESTIMATES THAT IT PAID ON BEHALF OF MR. LAPIERRE, DIRECTLY OR INDIRECTLY, TRAVEL EXPENSES FOR MR. LAPIERRE IN THE AGGREGATE AMOUNT OF $299,778.78. THE NRA HAS DETERMINED TO TREAT THE PAYMENTS AS AUTOMATIC EXCESS BENEFITS UNDER TREASURY REGULATIONS SECTION 53.4958-4(C). MR. LAPIERRE HAS REPAID THIS EXCESS BENEFIT TO NATIONAL RIFLE ASSOCIATION, PLUS INTEREST, AND THEREFORE THE EXCESS BENEFIT HAS BEEN CORRECTED. THE AMOUNT OF EXCISE TAX DUE UNDER CODE SECTION 4958 BY MR. LAPIERRE HAS BEEN ESTIMATED TO BE $74,944.70. IN ADDITION, THE NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL HAS CHALLENGED, AS UNREASONABLE, COMPENSATION PAID TO MR. LAPIERRE DURING HIS TENURE. |
| SCHEDULE L, PART I, LINE 1 - 5. EXCESS BENEFIT TRANSACTION: WILSON PHILLIPS | FROM 1993 THROUGH SEPTEMBER 13, 2018, MR. PHILLIPS SERVED AS TREASURER AND CHIEF FINANCIAL OFFICER OF THE NRA. AS SUCH, MR. PHILLIPS WAS A DISQUALIFIED PERSON WITHIN THE INTENDMENT OF CODE SECTION 4958. TREAS. REG. SECT. 53.4958-3(C)(3). THE NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL HAS ALLEGED THAT COMPENSATION PAID TO MR. PHILLIPS DURING AND AFTER TENURE HIS TENURE WAS UNREASONABLE. |
| SCHEDULE L, PART I, LINE 1 - 6. EXCESS BENEFIT TRANSACTION: JOHN FRAZER | FROM 2015 THROUGH THE PRESENT, MR. FRAZER HAS SERVED AS SECRETARY AND GENERAL COUNSEL OF THE NRA. AS SUCH, MR. FRAZER MAY BE A DISQUALIFIED PERSON WITHIN THE INTENDMENT OF CODE SECTION 4958. TREAS. REG. SECT. 53.4958-3(E)(2). THE NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL HAS ALLEGED THAT COMPENSATION PAID TO MR. FRAZER HAS BEEN UNREASONABLE. |
| SCHEDULE L, PART I, LINE 1 - 7. EXCESS BENEFIT TRANSACTION: OLIVER NORTH | LT. COL. NORTH SERVED AS PRESIDENT OF THE NATIONAL RIFLE ASSOCIATION AT TIMES IN 2018 AND 2019. WITHIN THE FIVE PRIOR YEARS, HE WAS ALSO A VOTING MEMBER OF ITS BOARD OF DIRECTORS. AS SUCH, MR. NORTH WAS A DISQUALIFIED PERSON WITHIN THE INTENDMENT OF CODE SECTION 4958. TREAS. REG. SECT. 53.4958-3(C)(1), (2). UPON INFORMATION AND BELIEF, DURING CERTAIN TIMES IN 2018 AND 2019, MR. NORTH WAS EMPLOYED BY ACKERMAN MCQUEEN, INC. ("AM"), A THIRD-PARTY VENDOR OF THE NATIONAL RIFLE ASSOCIATION, TO HOST A TELEVISION SHOW PRODUCED BY AM. DURING THE SAME PERIOD, AM INVOICED THE NRA FOR A VARIETY OF EXPENSES WHICH ARE NOW THE SUBJECT OF LITIGATION, BUT ARE BELIEVED TO HAVE INCLUDED SALARY, BENEFITS, AND RELATED PERQUISITES FURNISHED BY AM TO NORTH IN CONNECTION WITH NORTH'S EMPLOYMENT BY AM. NRA PAID ALL THESE INVOICES TO AM. SUCH PAYMENTS MAY CONSTITUTE AN INDIRECT BENEFIT FROM NATIONAL RIFLE ASSOCIATION TO MR. NORTH. TREAS. REG. SECT. 53.4958-4(A)(2)(III). AS FURTHER SET FORTH IN THE SAME LITIGATION, THE NRA HAS REASON TO BELIEVE THAT NORTH FAILED TO PERFORM THE SERVICES FOR WHICH HE HAD BEEN CONTRACTED BY AM, AND FOR WHICH HE MAY HAVE BEEN INDIRECTLY COMPENSATED BY THE NRA. IF THAT IS TRUE, THEN ALL OR PART OF NORTH'S COMPENSATION BY AM, PAID INDIRECTLY BY THE NRA, WOULD CONSTITUTE AN EXCESS BENEFIT PROVIDED BY TO THE NRA TO NORTH. THE PENDING LITIGATION IN WHICH THE FOREGOING MATTERS ARE ALLEGED AND CONTESTED CONSISTS PRINCIPALLY OF: PEOPLE V. NAT'L RIFLE ASS'N OF AM., ET AL., INDEX NO. 451625/2020 (SUP. CT. N.Y. CNTY.); NAT'L RIFLE ASS'N OF AM. V. ACKERMAN MCQUEEN, INC. AND MERCURY GROUP, INC., CONS. CASE NOS. CL19002067; CL19001757; CL19002886 (VA. CIR. CT.); AND, NAT'L RIFLE ASS'N OF AM. V. ACKERMAN MCQUEEN, INC., ET AL., CIV. CASE NO. 3-19-CV-02074-G (N.D. TEX.). |
| SCHEDULE L, PART I, LINE 1 - 8. EXCESS BENEFIT TRANSACTION: JOSEPH P DEBERGALIS, JR | FROM 2015 THROUGH EARLY 2017, JOSEPH P. DEBERGALIS, JR. WAS AN NRA DIRECTOR. FROM JANUARY 25, 2017 TO THE PRESENT, MR. DEBERGALIS HAS SERVED AS AN NRA EXECUTIVE AND OFFICER, INCLUDING AS THE EXECUTIVE DIRECTOR OF GENERAL OPERATIONS. AS SUCH, MR. DEBERGALIS MAY, AT SOME OR ALL TIMES, HAVE BEEN A DISQUALIFIED PERSON WITHIN THE INTENDMENT OF CODE SECTION 4958. TREAS. REG. SECT. 53.4958-3(C) (1), (E) (2) (IV), (V). THE NRA IS CURRENTLY REVIEWING WHETHER MR. DEBERGALIS MAY HAVE USED BUSINESS CLASS TRAVEL WITHOUT AUTHORIZATION REQUIRED UNDER THE NRA'S TRAVEL POLICY. AT THE TIME OF FILING, THE NRA IS UNABLE TO ESTIMATE THE AMOUNT OF EXCESS COSTS INCURRED, IF ANY. IF SUCH EXPENSES ARE SUBSTANTIATED, THEY WERE LIKELY NOT APPROVED NOR INTENDED TO BE COMPENSATION TO MR. DEBERGALIS BY THE NRA, AND WOULD THUS LIKELY CONSTITUTE AUTOMATIC EXCESS BENEFITS UNDER TREASURY REGULATIONS SECTION 53.4958-4(C). |
| SCHEDULE L, PART I, LINE 1 - 9. BOARD MEMBER TRAVEL | THE NRA IS CURRENTLY REVIEWING WHETHER IN 2019 AND PRIOR YEARS, VARIOUS BOARD MEMBERS MAY HAVE USED FIRST CLASS OR BUSINESS CLASS TRAVEL WITHOUT AUTHORIZATION REQUIRED UNDER THE NRA'S TRAVEL POLICY. AT THE TIME OF FILING, THE NRA IS UNABLE TO ESTIMATE THE AMOUNT OF EXCESS COSTS INCURRED, IF ANY. SUCH BOARD MEMBERS WOULD HAVE BEEN DISQUALIFIED PERSONS WITHIN THE INTENDMENT OF TREAS. REG. SECT. 53.4958-3(C)(1). IF SUCH EXCESS COSTS ARE SUBSTANTIATED, THEY WOULD THUS LIKELY CONSTITUTE EXCESS BENEFITS UNDER CODE SECTION 4958. |

SCHEDULE M
(Form 990)

Department of the Treasury
Internal Revenue Service

# Noncash Contributions

► **Complete if the organizations answered "Yes" on Form 990, Part IV, lines 29 or 30.**
► **Attach to Form 990.**
► **Go to www.irs.gov/Form990 for instructions and the latest information.**

OMB No. 1545-0047

**2019**

**Open to Public Inspection**

| Name of the organization | Employer identification number |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130 |

## Part I — Types of Property

| | | (a) Check if applicable | (b) Number of contributions or items contributed | (c) Noncash contribution amounts reported on Form 990, Part VIII, line 1g | (d) Method of determining noncash contribution amounts |
|---|---|---|---|---|---|
| 1 | Art—Works of art | ✓ | 1 | 5,000 | MARKET VALUE |
| 2 | Art—Historical treasures | | | | |
| 3 | Art—Fractional interests | | | | |
| 4 | Books and publications | | | | |
| 5 | Clothing and household goods | | | | |
| 6 | Cars and other vehicles | | | | |
| 7 | Boats and planes | | | | |
| 8 | Intellectual property | | | | |
| 9 | Securities—Publicly traded | | | | |
| 10 | Securities—Closely held stock | | | | |
| 11 | Securities—Partnership, LLC, or trust interests | | | | |
| 12 | Securities—Miscellaneous | | | | |
| 13 | Qualified conservation contribution—Historic structures | | | | |
| 14 | Qualified conservation contribution—Other | | | | |
| 15 | Real estate—Residential | | | | |
| 16 | Real estate—Commercial | | | | |
| 17 | Real estate—Other | | | | |
| 18 | Collectibles | | | | |
| 19 | Food inventory | | | | |
| 20 | Drugs and medical supplies | | | | |
| 21 | Taxidermy | | | | |
| 22 | Historical artifacts | | | | |
| 23 | Scientific specimens | | | | |
| 24 | Archeological artifacts | | | | |
| 25 | Other ► ( SEE STATEMENT ) | | | | |
| 26 | Other ► ( _____ ) | | | | |
| 27 | Other ► ( _____ ) | | | | |
| 28 | Other ► ( _____ ) | | | | |

| | | | Yes | No |
|---|---|---|---|---|
| 29 | Number of Forms 8283 received by the organization during the tax year for contributions for which the organization completed Form 8283, Part IV, Donee Acknowledgement | 29 | 0 | |

| | | | Yes | No |
|---|---|---|---|---|
| 30a | During the year, did the organization receive by contribution any property reported in Part I, lines 1 through 28, that it must hold for at least three years from the date of the initial contribution, and which isn't required to be used for exempt purposes for the entire holding period? | 30a | | ✓ |
| b | If "Yes," describe the arrangement in Part II. | | | |
| 31 | Does the organization have a gift acceptance policy that requires the review of any nonstandard contributions? | 31 | ✓ | |
| 32a | Does the organization hire or use third parties or related organizations to solicit, process, or sell noncash contributions? | 32a | ✓ | |
| b | If "Yes," describe in Part II. | | | |
| 33 | If the organization didn't report an amount in column (c) for a type of property for which column (a) is checked, describe in Part II. | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 990.     Cat. No. 51227J     Schedule M (Form 990) 2019

| Part I | Types of Property (continued) |
|---|---|

| Property Type | (a) Check If Applicable | (b) Number of contributions or items contributed | (c) Noncash contribution amounts reported on Form 990, Part VIII, line 1g | (d) Method of determining noncash contribution amounts |
|---|---|---|---|---|
| ENGRAVED CUSTOM MADE KNIFE | ✓ | 1 | 19,000 | MARKET VALUE |
| SL3 OVER/UNDER SHOTGUN | ✓ | 1 | 18,800 | MARKET VALUE |
| WINCHESTER MODEL 1873 RIFLE | ✓ | 1 | 18,300 | MARKET VALUE |
| K-20 VICTORIA SOVEREIGN GRADE & LADIES ACCESSORY PACKAGE | ✓ | 1 | 17,000 | MARKET VALUE |
| ULTIMATE FDE PACKAGE | ✓ | 1 | 15,000 | MARKET VALUE |
| 2 GUN PACKAGE - MRAD & M107 | ✓ | 2 | 12,000 | MARKET VALUE |
| CUSTOM MADE LONG RANGE RIFLE TOPPED WITH NIGHTFORCE SCOPE CERTIFICATE | ✓ | 1 | 12,000 | MARKET VALUE |
| MID ASIAN OR ALTAY IBEX HUNT FOR 1 HUNTER - SPAIN IBEX HUNT FOR 1 & IBEX MOUNT CERTIFICATE | ✓ | 1 | 10,500 | MARKET VALUE |
| NEW ZEALAND RED STAG HUNT (2 STAGS) | ✓ | 1 | 10,000 | MARKET VALUE |
| TWO CUSTOM PISTOLS & HOLSTER PACKAGE | ✓ | 2 | 9,630 | MARKET VALUE |
| SET OF TWO UPPER AR RIFLE PACKAGE IN .224 VALKYRIE AND .223 | ✓ | 1 | 8,500 | MARKET VALUE |
| RAGING HUNTER WITH ENHANCEMENS BY DARK ALLIANCE, TRIJICON SCOPE AND SHOOTING EXPERIENCE | ✓ | 1 | 8,500 | MARKET VALUE |
| TOUR PLANT, CUSTOM BUILT RIFLE PACKAGE | ✓ | 1 | 8,000 | MARKET VALUE |
| SPECIAL EDITION SWAT MODEL TWO RIFLE PACKAGE | ✓ | 1 | 8,000 | MARKET VALUE |
| MODEL 1873 LEVER ACTION RIFLE | ✓ | 1 | 8,000 | MARKET VALUE |
| NEW ZEALAND TAHR HUNT | ✓ | 1 | 8,000 | MARKET VALUE |
| GOLD PLATED AK AND ADDITIONAL AK PACKAGE | ✓ | 1 | 7,500 | MARKET VALUE |
| SPECIAL EDITION PAIR OF FAL RIFLES & CASE | ✓ | 1 | 7,500 | MARKET VALUE |
| CERTIFICATE FOR A FOOD PLOT IMPLEMENT | ✓ | 1 | 7,500 | MARKET VALUE |
| 2 DAY ALL-INCLUSIVE PHEASANT HUNT FOR 2 HUNTERS | ✓ | 1 | 7,500 | MARKET VALUE |
| HUNGARY WILD BOAR HUNT | ✓ | 1 | 7,500 | MARKET VALUE |
| CUSTOM TURNBULL EDITION M1911 PISTOL | ✓ | 1 | 7,250 | MARKET VALUE |
| ESPACAZA SPAIN RED STAG HUNT | ✓ | 1 | 7,000 | MARKET VALUE |

| Part II | Supplemental Information. Provide the information required by Part I, lines 30b, 32b, and 33, and whether the organization is reporting in Part I, column (b), the number of contributions, the number of items received, or a combination of both. Also complete this part for any additional information. |
|---|---|

| Return Reference - Identifier | Explanation |
|---|---|
| SCHEDULE M, PART I, LINE 1 - THE NUMBER OF CONTRIBUTIONS OR THE NUMBER OF ITEMS | THE NATIONAL RIFLE ASSOCIATION IS REPORTING THE NUMBER OF ITEMS RECEIVED ON PART I, COLUMN B. |
| SCHEDULE M, PART I, LINE 32B - THIRD PARTIES USED TO SOLICIT, PROCESS, OR SELL NONCASH CONTRIBUTIONS | ON OCCASION AND AS APPROPRIATE, SECURITIES AND OTHER DONATED LIQUID OR ILLIQUID ASSETS CAN BE CONVERTED INTO CASH BY THE OUTSIDE THIRD PARTY SPECIALISTS THAT PARTNER WITH THE NRA TO FULFILL THE PHILANTHROPIC INTENTIONS OF THE DONORS. |

**SCHEDULE O**
**(Form 990 or 990-EZ)**

Department of Treasury Internal Revenue Service

**Supplemental Information to Form 990 or 990-EZ**

Complete to provide information for responses to specific questions on Form 990 or 990-EZ or to provide any additional information.

▶ Attach to Form 990 or 990-EZ.

▶ Go to www.irs.gov/Form990 for the latest information.

OMB No. 1545-0047

**2019**

Open to Public Inspection

| Name of the Organization | Employer Identification Number |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130 |

| Return Reference - Identifier | Explanation |
|---|---|
| FORM 990, PART I, LINE 1 - THE ORGANIZATION'S MISSION OR MOST SIGNIFICANT ACTIVITIES | THE NRA IS A 501(C)(4) MEMBERSHIP ASSOCIATION WITH FOUR 501(C)(3) PUBLIC CHARITIES AND A SECTION 527 POLITICAL ACTION COMMITTEE (PAC) WHICH IS A SEPARATE SEGREGATED FUND. THE FOUR CHARITIES AFFILIATED WITH THE NRA ARE NRA CIVIL RIGHTS DEFENSE FUND, NRA FOUNDATION INC, NRA FREEDOM ACTION FOUNDATION, AND NRA SPECIAL CONTRIBUTION FUND DBA NRA WHITTINGTON CENTER. THE POLITICAL ACTION COMMITTEE IS NRA POLITICAL VICTORY FUND. SEE SCHEDULE R, PART II. |
| FORM 990, PART I, LINE 7A - UNRELATED BUSINESS REVENUE | THIS INFORMATIONAL NOTE REGARDS THE NRA'S UNRELATED BUSINESS INCOME. FORM 990 PAGE 1 SHOWS GROSS UNRELATED BUSINESS REVENUE ON LINE 7A AND NET UNRELATED BUSINESS TAXABLE INCOME ON LINE 7B. THE NRA DID NOT OWE UNRELATED BUSINESS INCOME TAX FOR THE YEAR 2019 BECAUSE DIRECTLY CONNECTED DEDUCTIONS WERE GREATER THAN THE ASSOCIATED INCOME IN 2019. THE MAIN SOURCES OF NRA UNRELATED BUSINESS INCOME, AS SHOWN ON 990 PART VIII, COLUMN C, ARE CERTAIN MERCHANDISE SALES FROM THE E COMMERCE PLATFORMS, ADVERTISING, AND OTHER ACTIVITIES NOT RELATED TO THE NRA'S TAX EXEMPT PURPOSES. ADDITIONAL INFORMATIONAL NOTES RELATED TO THE NRA'S TAXES ARE SHARED ON SCHEDULE C REGARDING 527(F) PROXY TAXES AND SCHEDULED REGARDING STATE AND LOCAL TAXES. THE NRA CHOOSES TO SHARE THIS EXTRA INFORMATION ABOUT THE TAXES IN ORDER TO DEMONSTRATE IN GOOD FAITH THAT THE ORGANIZATION IS A TAXPAYER IN GOOD STANDING. |
| FORM 990, PART I, LINE 8 - CONTRIBUTIONS AND GRANTS | THIS INFORMATIONAL NOTE REGARDS THE NRA'S CONTRIBUTION REVENUE. THE VAST MAJORITY OF CONTRIBUTIONS TO THE NRA COMES FROM MILLIONS OF SMALL INDIVIDUAL DONORS. GIFTS FROM COMPANIES AND EXECUTIVES IN THE FIREARMS, HUNTING, AND SHOOTING SPORTS INDUSTRIES TYPICALLY COMPRISE LESS THAN 5% OF THE NRA'S CONTRIBUTION REVENUE EVERY YEAR, AS APPLIED TO CONTRIBUTION REVENUE REPORTED ON FORM 990, PART VIII, LINE 1. |
| FORM 990, PART III, LINE 4D - OTHER PROGRAM SERVICES | THIS NOTE PROVIDES FURTHER INFORMATION ON PART III PROGRAM SERVICE ACCOMPLISHMENTS. NRA PROGRAM SERVICES ARE CENTERED ON THE NRA'S CORE MISSION OF FIREARMS SAFETY, EDUCATION, AND TRAINING, INCLUDING MESSAGING THAT PROMOTES FREEDOM AND LIBERTY. THE ADDITIONAL PROGRAM SERVICE EXPENSES OF $31,766,483 NOTED ON 990 CORE FORM PART III LINE 4D INCLUDE THE PROGRAM SERVICES COMPONENTS OF PUBLIC AFFAIRS, EXECUTIVE, AND ADVANCEMENT OPERATIONS. 990 READERS ARE ENCOURAGED TO ACCESS NRA.ORG FOR OPPORTUNITIES TO CONTINUE TO ENGAGE WITH THE NRA. |
| FORM 990, PART VI, LINE 1A - GOVERNING BODY | UNDER THE NRA'S BYLAWS, THE BOARD OF DIRECTORS ELECTS 20 DIRECTORS ANNUALLY TO SERVE ON AN EXECUTIVE COMMITTEE. THE PRESIDENT AND VICE-PRESIDENTS ALSO SERVE ON THE COMMITTEE, FOR A CURRENT TOTAL OF 23 MEMBERS. THE BYLAWS ALLOW THE COMMITTEE TO EXERCISE ALL POWERS OF THE BOARD WHEN THE BOARD IS NOT IN SESSION, WITH CERTAIN ENUMERATED EXCEPTIONS. THE LAWS OF NEW YORK GOVERNING NOT-FOR-PROFIT CORPORATIONS ALSO PROVIDE LIMITS ON THE AUTHORITY OF EXECUTIVE COMMITTEES. |
| FORM 990, PART VI, LINE 2 - FAMILY/BUSINESS RELATIONSHIPS AMONGST INTERESTED PERSONS | CARRIE LIGHTFOOT & OWEN MILLS - BUSINESS RELATIONSHIP IL LING NEW & OWEN MILLS - BUSINESS RELATIONSHIP KRISTY TITUS & SANDRA FROMAN - BUSINESS RELATIONSHIP |
| FORM 990, PART VI, LINE 2 - OFFICER, DIRECTOR, TRUSTEE, OR KEY EMPLOYEE RELATIONSHIP | SEVERAL NRA DIRECTORS ARE EMPLOYED IN THE FIREARMS INDUSTRY AS MANUFACTURERS OR SELLERS OF FIREARMS, AMMUNITION, OR COMPONENTS THEREOF. THESE BOARD MEMBERS ROUTINELY BUY AND SELL PRODUCTS FROM ONE ANOTHER IN THE ORDINARY COURSE OF BUSINESS. |
| FORM 990, PART VI, LINE 4 - SIGNIFICANT CHANGES TO ORGANIZATIONAL DOCUMENTS | THE NATIONAL RIFLE ASSOCIATION AMENDED THE BYLAWS IN 2019 TO CHANGE THE QUALIFICATIONS TO BE ON THE BOARD OF DIRECTORS. IN ADDITION TO PREVIOUS QUALIFICATIONS, THE INDIVIDUAL MUST ALSO BE A LIFETIME MEMBER OF THE ASSOCIATION FOR A MINIMUM OF FIVE YEARS AT THE TIME OF NOMINATION FOR THE BOARD OF DIRECTORS |
| FORM 990, PART VI, LINE 5 - DIVERSION OF ORGANIZATION ASSETS | THE NATIONAL RIFLE ASSOCIATION BECAME AWARE DURING 2019 OF A SIGNIFICANT DIVERSION OF ITS ASSETS DURING 2019 AND FOR PRIOR CALENDAR YEARS. SEE SCHEDULE L, PART V FOR AN EXPLANATION. IN ADDITION, A STAFF EMPLOYEE (WHO WAS NOT A DISQUALIFIED PERSON, MANAGER, KEY EMPLOYEE OR HIGHLY COMPENSATED EMPLOYEE) DIVERTED $41,820.37 FROM THE NRA BUT HAS FULLY REPAID THE ORGANIZATION, INCLUDING INTEREST, FOR A TOTAL OF $56,241.35. |
| FORM 990, PART VI, LINE 6 - CLASSES OF MEMBERS OR STOCKHOLDERS | THE NATIONAL RIFLE ASSOCIATION IS A MEMBERSHIP ASSOCIATION THAT REPRESENTS ONLY INDIVIDUAL CITIZENS. MEMBERSHIP DUES ARE PROPERLY REPORTED ON FORM 990, PART VIII, LINE 2 PURSUANT TO THE INSTRUCTIONS FOR SUCH REPORTING. |
| FORM 990, PART VI, LINE 7A - MEMBERS OR STOCKHOLDERS ELECTING MEMBERS OF GOVERNING BODY | NRA MEMBERS ELECT ALL 76 MEMBERS OF THE NRA BOARD OF DIRECTORS. 75 DIRECTORS ARE ELECTED FOR STAGGERED THREE YEAR TERMS, AND THE 76TH DIRECTOR IS ELECTED FOR ONE YEAR TERM ON THE OCCASION OF EACH ANNUAL MEETING OF MEMBERS. AT THE END OF 2019, NRA HAD 73 DIRECTORS DUE TO UNFILLED VACANCIES. |

| Return Reference - Identifier | Explanation |
|---|---|
| FORM 990, PART VI, LINE 7B - DECISIONS REQUIRING APPROVAL BY MEMBERS OR STOCKHOLDERS | CERTAIN RECOMMENDATIONS BY THE BOARD OF DIRECTORS ARE SUBJECT TO MEMBERSHIP APPROVAL PER NRA BYLAWS AND NEW YORK NOT FOR PROFIT CORPORATE LAW |
| FORM 990, PART VI, LINE 11B - REVIEW OF FORM 990 BY GOVERNING BODY | DRAFTS OF FORM 990 ARE REVIEWED BY THE EXTERNAL ACCOUNTING FIRM, PRESENTED TO THE NRA BOARD OF DIRECTORS AUDIT COMMITTEE, AND MADE AVAILABLE TO BOARD MEMBERS ATTENDING THE BOARD OF DIRECTORS MEETING. THE NRA'S ELECTED OFFICERS AND AUDIT COMMITTEE LEADERSHIP REVIEW A FINAL DRAFT BEFORE FILING. |
| FORM 990, PART VI, LINE 12C - CONFLICT OF INTEREST POLICY | THE ORGANIZATION'S CONFLICT OF INTEREST POLICY APPLIES TO OFFICERS, DIRECTORS, AND KEY EMPLOYEES OF THE FILING ORGANIZATION AND ITS AFFILIATES, AS WELL AS TO THEIR RELATIVES. RELATED PARTY TRANSACTIONS AND POTENTIAL CONFLICTS ARE SELF-REPORTED ON A QUESTIONNAIRE THAT IS DISTRIBUTED AT LEAST ANNUALLY AND REVIEWED BY THE SECRETARY AND GENERAL COUNSEL. |
| FORM 990, PART VI, LINE 15A - PROCESS TO ESTABLISH COMPENSATION OF TOP MANAGEMENT OFFICIAL | COMPENSATION OF THE NRA'S TOP MANAGEMENT OFFICIAL IS ESTABLISHED BY METHODS INCLUDING COMPENSATION SURVEYS AND STUDIES, AND COMPARABILITY DATA. COMPENSATION OF THE TOP MANAGEMENT OFFICIAL MUST BE APPROVED BY THE BOARD OF DIRECTORS, BASED ON RECOMMENDATIONS BY THE COMPENSATION COMMITTEE. ALL DECISIONS ARE PROPERLY DOCUMENTED. |
| FORM 990, PART VI, LINE 15B - PROCESS TO ESTABLISH COMPENSATION OF OTHER OFFICERS OR KEY EMPLOYEES | COMPENSATION OF SALARIED OFFICERS AND KEY EMPLOYEES OTHER THAN THE NRA'S TOP MANAGEMENT OFFICIAL IS ESTABLISHED BY METHODS INCLUDING (DEPENDING ON THE POSITION) COMPENSATION SURVEYS AND STUDIES, AND COMPARABILITY DATA. COMPENSATION OF THE SECRETARY AND THE TREASURER MUST BE APPROVED BY THE BOARD OF DIRECTORS, BASED ON RECOMMENDATIONS BY THE COMPENSATION COMMITTEE. ALL DECISIONS ARE PROPERLY DOCUMENTED. |
| FORM 990, PART VI, LINE 17 - STATES WITH WHICH A COPY OF THIS FORM 990 IS REQUIRED TO BE FILED | CO, CT, DE, FL, GA, HI, IA, ID, IL, IN, KS, KY, LA, MA, MD, ME, MI, MN, MO, MS, MT, NC, ND, NE, NH, NJ, NM, NV, NY, OH, OK, OR, PA, PR, RI, SC, SD, TN, TX, UT, VA, VT, WA, WI, WV, WY |
| FORM 990, PART VI, LINE 18 - AVAILABILITY OF 990 FOR PUBLIC INSPECTION | READERS ARE POLITELY REMINDED THE NRA WAS FOUNDED 148 YEARS AGO, IN 1871. THE NRA'S 1944 DETERMINATION LETTER FROM THE INTERNAL REVENUE SERVICE IS AVAILABLE ON GUIDESTAR.ORG AND CAN ALSO BE REQUESTED DIRECTLY FROM THE NRA AS REQUIRED BY LAW. FORMS 990 CAN BE REQUESTED DIRECTLY FROM THE NRA AS REQUIRED BY LAW. |
| FORM 990, PART VI, LINE 19 - REQUIRED DOCUMENTS AVAILABLE TO THE PUBLIC | THE ORGANIZATION'S ANNUAL REPORT (INCLUDING AUDITED FINANCIAL STATEMENTS) IS AVAILABLE UPON REQUEST. ITS ARTICLES OF INCORPORATION ARE A PUBLIC RECORD AVAILABLE FROM THE STATE OF NEW YORK, AND ITS BYLAWS ARE AVAILABLE TO MEMBERS BY MAIL UPON REQUEST. THE NRA'S CONFLICT OF INTEREST POLICY IS NOT AVAILABLE TO THE PUBLIC.. |
| FORM 990, PART VII, SECTION A, LINE 1A - THE NRA BOARD OF DIRECTORS COMPENSATION | THIS INFORMATIONAL NOTE REGARDS SERVICE ON THE NRA BOARD OF DIRECTORS, WHICH IS NOT COMPENSATED. BOARD MEMBERS WHO RECEIVED COMPENSATION IN 2019 WERE COMPENSATED FOR OTHER REASONS, NOT FOR THEIR VOLUNTARY BOARD SERVICE. MR. BUTZ, MS. HAMMER, MR. KEENE, MR. NUGENT, MR. OLSON, AND MR. SKELTON WERE COMPENSATED FOR OTHER PROFESSIONAL SERVICES THEY PERFORMED FOR THE ORGANIZATION. MR. BACH MR. BROWNELL, MR. COTTON, MS. LIGHTFOOT, MR. MILLS, MR. TED NUGENT, AND MS. WALKER RECEIVED MEMBERSHIP RECRUITING COMMISSIONS THAT WERE PAID TO THEIR COMPANIES. FOR THE PURPOSE OF DETERMINING THE COUNT OF INDEPENDENT DIRECTORS AS OF DECEMBER 31, 2019 SHOWN ON PART I LINE 3 AND PART VI LINE 1B, THE TEN DIRECTORS NOT CONSIDERED INDEPENDENT FOR 2019 WERE MR. NORTH, MS. HAMMER, MR. KEENE, MR. NUGENT, MR. BUTZ, MS. GOLOB, MR. OLSON, MR. SKELTON, MR. NOSLER, AND MR. BROWNELL |
| FORM 990, PART VII, SECTION A, LINE 5 - COMPENSATION FROM UNRELATED ORGANIZATION | THE NRA HAS COMPLETED SCHEDULE J REPORTING FOR DIRECTOR OLIVER NORTH, WHO REPORTED COMPENSATION OF $986,015 FROM AN UNRELATED ORGANIZATION, ACKERMAN MCQUEEN, INC., FOR PROFESSIONAL SERVICES RELATED TO PRODUCTION AND HOSTING OF AN ONLINE VIDEO SERIES FOR THE NRA. UPON INFORMATION AND BELIEF, THE NRA ESTIMATES THAT THIS SELF-REPORTED AMOUNT IS ONLY A FRACTION OF THE ACTUAL AMOUNT PAID BY THE NRA TO ACKERMAN MCQUEEN FOR COL. NORTH'S SERVICES, AND THAT THE TOTAL PAID EXCEEDS THE VALUE RECEIVED DUE TO (AMONG OTHER THINGS) ACKERMAN'S FAILURE TO PRODUCE ALL OF THE EPISODES FOR WHICH THE NRA CONTRACTED. THE RELATIONSHIP BETWEEN COL. NORTH, ACKERMAN MCQUEEN, AND THE NRA IS CURRENTLY THE SUBJECT OF LITIGATION IN THE CASES LISTED ON SCHEDULE L.

THE NRA HAS ALSO COMPLETED SCHEDULE J REPORTING FOR DIRECTOR JULIE GOLOB, WHO REPORTED COMPENSATION OF $16,119 FROM ACKERMAN MCQUEEN FOR PROFESSIONAL SERVICES PERFORMED ON NRA DIGITAL MEDIA PROJECTS. |
| FORM 990, PART VII, SECTION B, LINE 1 - HIGHEST COMPENSATED INDEPENDENT CONTRACTORS | THIS INFORMATIONAL NOTE PROVIDES ADDITIONAL DETAIL ABOUT AMOUNTS PAID TO OUTSIDE SERVICES PROVIDERS. THE FILING ORGANIZATION REPORTS COMPENSATION PAID TO SERVICES PROVIDERS EXCLUSIVE OF ADVERTISING AND OTHER MEDIA PLACED ON BEHALF OF THE FILING ORGANIZATION AND EXPENSES INCURRED ON BEHALF OF THE FILING ORGANIZATION. FOR EXAMPLE, THE FIGURE OF $7,317,206 STATED ON PART VII SECTION B LINE 1 REFLECTS COMPENSATION FOR SERVICES PAID TO ACKERMAN MCQUEEN INC. |

| Return Reference - Identifier | Explanation |
|---|---|
| FORM 990, PART VIII, LINE 2B - MEMBERSHIP DUES | THIS INFORMATIONAL NOTE REGARDS THE REPORTING OF MEMBER DUES ON FORM 990. LINE 1B OF THE REVENUE STATEMENT IS PROPERLY LEFT BLANK. PURSUANT TO 990 INSTRUCTIONS, MEMBERSHIP DUES THAT ARE NOT CONTRIBUTIONS BECAUSE THEY COMPARE REASONABLY WITH AVAILABLE BENEFITS ARE SHOWN ON LINE 2. THUS, ALL NRA MEMBER DUES ARE PROPERLY SHOWN ON THE 990 REVENUE STATEMENT AS PROGRAM SERVICE REVENUE ON LINE 2, OTHER THAN NRA LIFE-PLUS CONTRIBUTIONS WHICH ARE PROPERLY COUNTED AS CONTRIBUTION REVENUE IN LINE 1F OF THE 990 REVENUE STATEMENT. |
| FORM 990, PART IX, LINE 11 - FEES FOR SERVICES | THIS INFORMATIONAL NOTE REGARDS THE NRA'S PAYMENT OF FEES FOR OUTSIDE PROFESSIONAL SERVICES AS STATED ON LINE 11 OF THE 990 EXPENSE STATEMENT. LINE 11B REPORTS LEGAL FEES PAID TO OUTSIDE ATTORNEYS, SUCH AS FOR SECOND AMENDMENT CASE WORK AND RELATED LITIGATION AT THE FEDERAL AND STATE LEVELS AND FOR REGULATORY, COMPLIANCE MATTERS, AND CORPORATE LITIGATION. LINE 11C REPORTS ACCOUNTING FEES PAID TO THE OUTSIDE CPA FIRM THAT PROVIDES THE NRA'S AUDITING AND TAX SERVICES. LINE 11D REPORTS LOBBYING EXPENSE PAID TO EXTERNAL REGISTERED LOBBYISTS. LINE 11E REPORTS FUNDRAISING COSTS PAID TO THE AUTHORIZED VENDORS LISTED ON SCHEDULE G. LINE 11F REPORTS INVESTMENT MANAGEMENT FEES PAID TO INVESTMENT ADVISORS THAT MANAGE THE NRA'S PORTFOLIOS. LINE 11G SHOWS TELEMARKETING COSTS FOR MEMBERSHIP SERVICING. PROFESSIONAL SERVICES PERFORMED BY NRA EMPLOYEES (IN HOUSE COUNSEL, IN HOUSE ACCOUNTANTS, IN HOUSE LOBBYISTS, IN HOUSE FUNDRAISERS, AND IN HOUSE INVESTMENT MANAGERS, RESPECTIVELY) ARE PROPERLY REPORTED WITHIN LINES 5-7 OF THE 990 EXPENSE STATEMENT, AS REQUIRED BY 990 FORM INSTRUCTIONS. PROFESSIONAL SERVICES PERFORMED BY THE TELEMARKETING VENDOR FOR FUNDRAISING PURPOSES, RATHER THAN FOR MEMBERSHIP, ARE PROPERLY REPORTED WITHIN LINE 11E, AS REQUIRED BY 990 FORM INSTRUCTIONS. |
| FORM 990, PART IX, LINE 24E - ALL OTHER EXPENSES | THIS RESPONSE EXPLAINS $13,258,411 OF OTHER EXPENSES STATED ON LINE 24E OF THE 990, PART IX EXPENSE STATEMENT WHICH WERE NOT ACCOMMODATED BY OTHER EXPENSE LINE DESCRIPTIONS. THIS FIGURE INCLUDES $7,229,130 OF FULFILLMENT MATERIALS, $4,261,888 BANKING FEES, $1,032,468 MEMBERSHIP PREMIUMS, $328,452 OF NON-PAYROLL TAXES |
| FORM 990, PART X, LINE 15 - OTHER ASSETS | THIS INFORMATIONAL NOTE PROVIDES ADDITIONAL DETAIL ABOUT OTHER ASSETS. DUE FROM AFFILIATES INCLUDED IN ACCOUNTS RECEIVABLE IN THE PRIOR YEAR HAVE BEEN RECLASSIFIED TO OTHER ASSETS TO CONFORM WITH CURRENT YEAR PRESENTATION |
| FORM 990, PART XI, LINE 9 - OTHER CHANGES IN NET ASSETS OR FUND BALANCES | THIS RESPONSE EXPLAINS $(750,566) OF OTHER CHANGES IN THE NET ASSETS RECONCILIATION SCHEDULE. THE FIGURE INCLUDES $3,534,160 AGENCY TRANSACTIONS BETWEEN THE NRA AND NRA FOUNDATION; $2,040,070 ADOPTION OF ASC 606, AND $122,132 UNREALIZED GAIN ON DERIVATIVE INSTRUMENT, AND OTHER NET PENSION PLAN LOSS (6,446,928). THE AGENCY TRANSACTIONS FIGURE OF $3,534,160 INCLUDES ENDOWMENT CONTRIBUTIONS AND ENDOWMENT EARNINGS DESIGNATED BY NRA FOUNDATION DONORS FOR ELIGIBLE NRA PROGRAMS. |

| FORM 990, PART XI, LINE 9 - OTHER CHANGES IN NET ASSETS OR FUND BALANCES | (a) Description | (b) Amount |
|---|---|---|
| | AGENCY TRANSACTIONS BETWEEN THE NRA AND NRA FOUNDATION | 3,534,162 |
| | UNREALIZED GAIN ON DERIVATIVE INSTRUMENT | 122,132 |
| | ADOPTION OF ASC 606 | 2,040,070 |
| | OTHER NET PENSION PLAN LOSS | - 6,446,928 |

**SCHEDULE R**
**(Form 990)**

Department of the Treasury
Internal Revenue Service

# Related Organizations and Unrelated Partnerships

▶ Complete if the organization answered "Yes" on Form 990, Part IV, line 33, 34, 35b, 36, or 37.
▶ Attach to Form 990.
▶ Go to *www.irs.gov/Form990* for instructions and the latest information.

OMB No. 1545-0047

**2019**

Open to Public Inspection

Name of the organization
NATIONAL RIFLE ASSOCIATION OF AMERICA

Employer identification number
53-0116130

**Part I**  **Identification of Disregarded Entities.** Complete if the organization answered "Yes" on Form 990, Part IV, line 33.

| (a)<br>Name, address, and EIN (if applicable) of disregarded entity | (b)<br>Primary activity | (c)<br>Legal domicile (state<br>or foreign country) | (d)<br>Total income | (e)<br>End-of-year assets | (f)<br>Direct controlling<br>entity |
|---|---|---|---|---|---|
| (1) | | | | | |
| (2) | | | | | |
| (3) | | | | | |
| (4) | | | | | |
| (5) | | | | | |
| (6) | | | | | |

**Part II**  **Identification of Related Tax-Exempt Organizations.** Complete if the organization answered "Yes" on Form 990, Part IV, line 34, because it had one or more related tax-exempt organizations during the tax year.

| (a)<br>Name, address, and EIN of related organization | (b)<br>Primary activity | (c)<br>Legal domicile (state<br>or foreign country) | (d)<br>Exempt Code section | (e)<br>Public charity status<br>(if section 501(c)(3)) | (f)<br>Direct controlling<br>entity | (g)<br>Section 512(b)(13)<br>controlled<br>entity? | |
|---|---|---|---|---|---|---|---|
| | | | | | | Yes | No |
| (1) NRA FOUNDATION INC (52-1710886)<br>11250 WAPLES MILL RD, FAIRFAX, VA 22030 | CHARITABLE | DC | 501(C)(3) | 7 | NRA | ✓ | |
| (2) NRA SPECIAL CONTRIBUTION FUND (23-7367534)<br>11251 WAPLES MILL RD, FAIRFAX, VA 22031 | CHARITABLE | NM | 501(C)(3) | 7 | NRA | ✓ | |
| (3) NRA CIVIL RIGHTS DEFENSE FUND (52-1136665)<br>11252 WAPLES MILL RD, FAIRFAX, VA 22032 | CHARITABLE | VA | 501(C)(3) | 7 | NRA | ✓ | |
| (4) NRA FREEDOM ACTION FOUNDATION (26-1277941)<br>11253 WAPLES MILL RD, FAIRFAX, VA 22033 | CHARITABLE | VA | 501(C)(3) | 7 | NRA | ✓ | |
| (5) NRA POLITICAL VICTORY FUND (52-1083020)<br>11254 WAPLES MILL RD, FAIRFAX, VA 22034 | PAC/SSF | VA | 527 POL. ORG. | | NRA | ✓ | |
| (6) | | | | | | | |
| (7) | | | | | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 990.

Cat. No. 50135Y

94

11/18/2020 9:47:17 AM

Schedule R (Form 990) 2019

NATIONAL RIFLE ASSOCIATION OF AMERICA
53-0116130

Schedule R (Form 990) 2019

Page **2**

## Part III  Identification of Related Organizations Taxable as a Partnership. Complete if the organization answered "Yes" on Form 990, Part IV, line 34, because it had one or more related organizations treated as a partnership during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Direct controlling entity | (e) Predominant income (related, unrelated, excluded from tax under sections 512–514) | (f) Share of total income | (g) Share of end-of-year assets | (h) Disproportionate allocations? | | (i) Code V—UBI amount in box 20 of Schedule K-1 (Form 1065) | (j) General or managing partner? | | (k) Percentage ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Yes | No | | Yes | No | |
| **(1)** (SEE STATEMENT) | | | | | | | | | | | | |
| **(2)** | | | | | | | | | | | | |
| **(3)** | | | | | | | | | | | | |
| **(4)** | | | | | | | | | | | | |
| **(5)** | | | | | | | | | | | | |
| **(6)** | | | | | | | | | | | | |
| **(7)** | | | | | | | | | | | | |

## Part IV  Identification of Related Organizations Taxable as a Corporation or Trust. Complete if the organization answered "Yes" on Form 990, Part IV, line 34, because it had one or more related organizations treated as a corporation or trust during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Direct controlling entity | (e) Type of entity (C corp, S corp, or trust) | (f) Share of total income | (g) Share of end-of-year assets | (h) Percentage ownership | (i) Section 512(b)(13) controlled entity? | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Yes | No |
| **(1)** (SEE STATEMENT) | | | | | | | | | |
| **(2)** | | | | | | | | | |
| **(3)** | | | | | | | | | |
| **(4)** | | | | | | | | | |
| **(5)** | | | | | | | | | |
| **(6)** | | | | | | | | | |
| **(7)** | | | | | | | | | |

Schedule R (Form 990) 2019

Schedule R (Form 990) 2019

Page **3**

## Part V  Transactions With Related Organizations. Complete if the organization answered "Yes" on Form 990, Part IV, line 34, 35b, or 36.

**Note:** Complete line 1 if any entity is listed in Parts II, III, or IV of this schedule.

| | | Yes | No |
|---|---|---|---|
| **1** During the tax year, did the organization engage in any of the following transactions with one or more related organizations listed in Parts II–IV? | | | |
| **a** Receipt of **(i)** interest, **(ii)** annuities, **(iii)** royalties, or **(iv)** rent from a controlled entity | 1a | | ✓ |
| **b** Gift, grant, or capital contribution to related organization(s) | 1b | | ✓ |
| **c** Gift, grant, or capital contribution from related organization(s) | 1c | | ✓ |
| **d** Loans or loan guarantees to or for related organization(s) | 1d | | ✓ |
| **e** Loans or loan guarantees by related organization(s) | 1e | | ✓ |
| **f** Dividends from related organization(s) | 1f | | ✓ |
| **g** Sale of assets to related organization(s) | 1g | | ✓ |
| **h** Purchase of assets from related organization(s) | 1h | | ✓ |
| **i** Exchange of assets with related organization(s) | 1i | | ✓ |
| **j** Lease of facilities, equipment, or other assets to related organization(s) | 1j | | ✓ |
| **k** Lease of facilities, equipment, or other assets from related organization(s) | 1k | | ✓ |
| **l** Performance of services or membership or fundraising solicitations for related organization(s) | 1l | ✓ | |
| **m** Performance of services or membership or fundraising solicitations by related organization(s) | 1m | ✓ | |
| **n** Sharing of facilities, equipment, mailing lists, or other assets with related organization(s) | 1n | | ✓ |
| **o** Sharing of paid employees with related organization(s) | 1o | | ✓ |
| **p** Reimbursement paid to related organization(s) for expenses | 1p | | ✓ |
| **q** Reimbursement paid by related organization(s) for expenses | 1q | ✓ | |
| **r** Other transfer of cash or property to related organization(s) | 1r | ✓ | |
| **s** Other transfer of cash or property from related organization(s) | 1s | | ✓ |

**2** If the answer to any of the above is "Yes," see the instructions for information on who must complete this line, including covered relationships and transaction thresholds.

| | **(a)** Name of related organization | **(b)** Transaction type (a–s) | **(c)** Amount involved | **(d)** Method of determining amount involved |
|---|---|---|---|---|
| **(1)** | NRA FOUNDATION INC | A | 180,000 | CASH VALUE |
| **(2)** | NRA FOUNDATION INC | C | 12,073,526 | CASH VALUE |
| **(3)** | NRA FOUNDATION INC | E | 5,000,000 | CASH VALUE |
| **(4)** | NRA FOUNDATION INC | O | 11,088,682 | CASH VALUE |
| **(5)** | NRA FOUNDATION INC | Q | 4,109,204 | CASH VALUE |
| **(6)** | (SEE STATEMENT) | | | |

Schedule R (Form 990) 2019

NATIONAL RIFLE ASSOCIATION OF AMERICA
53-0116130

11/18/2020 9:47:17 AM

Schedule R (Form 990) 2019

Page **4**

## Part VI | Unrelated Organizations Taxable as a Partnership. Complete if the organization answered "Yes" on Form 990, Part IV, line 37.

Provide the following information for each entity taxed as a partnership through which the organization conducted more than five percent of its activities (measured by total assets or gross revenue) that was not a related organization. See instructions regarding exclusion for certain investment partnerships.

| (a) Name, address, and EIN of entity | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Predominant income (related, unrelated, excluded from tax under sections 512–514) | (e) Are all partners section 501(c)(3) organizations? | | (f) Share of total income | (g) Share of end-of-year assets | (h) Disproportionate allocations? | | (i) Code V—UBI amount in box 20 of Schedule K-1 (Form 1065) | (j) General or managing partner? | | (k) Percentage ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Yes | No | | | Yes | No | | Yes | No | |
| **(1)** | | | | | | | | | | | | | |
| **(2)** | | | | | | | | | | | | | |
| **(3)** | | | | | | | | | | | | | |
| **(4)** | | | | | | | | | | | | | |
| **(5)** | | | | | | | | | | | | | |
| **(6)** | | | | | | | | | | | | | |
| **(7)** | | | | | | | | | | | | | |
| **(8)** | | | | | | | | | | | | | |
| **(9)** | | | | | | | | | | | | | |
| **(10)** | | | | | | | | | | | | | |
| **(11)** | | | | | | | | | | | | | |
| **(12)** | | | | | | | | | | | | | |
| **(13)** | | | | | | | | | | | | | |
| **(14)** | | | | | | | | | | | | | |
| **(15)** | | | | | | | | | | | | | |
| **(16)** | | | | | | | | | | | | | |

Schedule R (Form 990) 2019

11/18/2020 9:47:17 AM

NATIONAL RIFLE ASSOCIATION OF AMERICA
53-0116130

**Part III**    Identification of Related Organizations Taxable as a Partnership (continued)

| (a) Name, address and EIN of related organization | (b) Primary Activity | (c) Legal domicile (state or foreign country) | (d) Direct controlling entity | (e) Predominant income (related, unrelated, excluded from tax under sections 512-514) | (f) Share of total income | (g) Share of end-of-year assets | (h) Disproportionate allocations? Yes | No | (i) Code V - UBI amount in box 20 of Schedule K-1 (Form 1065) | (j) General or managing partner? Yes | No | (k) Percentage ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (1) WBB INVESTMENTS, LLC (32-0569014) 11250 WAPLES MILL RD, FAIRFAX, VA 22030 | INVESTMENT | DE | NRA | N/A | 0 | 0 | | ✓ | | ✓ | | 99.00 |

**Part IV** Identification of Related Organizations Taxable as a Corporation or Trust (continued)

| (a) Name, address and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Direct controlling entity | (e) Type of entity (C-corp, S-corp or trust) | (f) Share of total income | (g) Share of end-of-year assets | (h) Percentage ownership | (i) Section 512(b)(13) controlled entity? Yes | No |
|---|---|---|---|---|---|---|---|---|---|
| (1) LEXINGTON CONCORD HOLDINGS LLC (83-1798978) 11250 WAPLES MILL RD, FAIRFAX, VA 22030 | DEVELOPMENT PHASE | DE | NRA | C CORPORATION | | 0 | 100.00 | ✓ | |
| (2) NRA HOLDINGS COMPANY INC (02-0558658) 11250 WAPLES MILL RD, FAIRFAX, VA 22030 | MANAGEMENT SERVICES | VA | NRA | C CORPORATION | | 0 | 100.00 | ✓ | |

**Part V** | Transactions with Related Organizations (continued)

| (a) Name of other organization | (b) Transaction type (a-s) | (c) Amount Involved | (d) Method of determining amount involved |
|---|---|---|---|
| (6) NRA CIVIL RIGHTS DEFENSE FUND | C | 652,384 | CASH VALUE |
| (7) NRA CIVIL RIGHTS DEFENSE FUND | Q | 41,831 | CASH VALUE |
| (8) NRA SPECIAL CONTRIBUTION FUND | A | 353,051 | CASH VALUE |
| (9) NRA SPECIAL CONTRIBUTION FUND | Q | 1,881,719 | CASH VALUE |
| (10) NRA POLITICAL VICTORY FUND | R | 3,952 | CASH VALUE |
| (11) LEXINGTON CONCORD HOLDINGS LLC | Q | 98,926 | CASH VALUE |
| (12) NRA FREEDOM ACTION FOUNDATION | Q | 977,377 | CASH VALUE |
| (13) NRA POLITICAL VICTORY FUND | Q | 2,908,114 | CASH VALUE |

11/18/2020 9:47:17 AM

NATIONAL RIFLE ASSOCIATION OF AMERICA
53-0116130

| Part VII | Supplemental Information. Provide additional information for responses to questions on Schedule R (see instructions). |
|---|---|

| Return Reference - Identifier | Explanation |
|---|---|
| SCHEDULE R, PART II - IDENTIFICATION OF RELATED TAX-EXEMPT ORGANIZATIONS | THE NRA IS A 501(C)(4) MEMBERSHIP ASSOCIATION WITH FOUR 501(C)(3) PUBLIC CHARITIES AND A SECTION 527 POLITICAL ACTION COMMITTEE (PAC) WHICH IS A SEPARATE SEGREGATED FUND. THE FOUR CHARITIES AFFILIATED WITH THE NRA ARE NRA CIVIL RIGHTS DEFENSE FUND, NRA FOUNDATION INC, NRA FREEDOM ACTION FOUNDATION, AND NRA SPECIAL CONTRIBUTION FUND DBA NRA WHITTINGTON CENTER. THE POLITICAL ACTION COMMITTEE IS NRA POLITICAL VICTORY FUND; NRAPVF IS A SEPARATE UNINCORPORATED PAC OF THE NRA. IN THE EVENT THAT ANY FUNDS ARE RECEIVED BY THE NRA AND EARMARKED TO THE PAC, THE NRA HAS SYSTEMS IN PLACE TO ENSURE ANY SUCH RECEIPTS ARE PROMPTLY AND IMMEDIATELY DEPOSITED INTO THE SEPARATE SEGREGATED FUND'S ACCOUNT. |
| SCHEDULE R, PART III - WBB INVESTMENTS, LLC | WBB INVESTMENTS, LLC WAS FORMED IN CONNECTION WITH A POSSIBLE TRANSACTION THAT WAS NEVER ULTIMATELY EXECUTED. A CERTIFICATE OF CANCELLATION HAS BEEN FILED AND THE ENTITY WAS DISSOLVED IN 2019. |
| SCHEDULE R, PART V, LINE 1C - GIFT, GRANT, OR CAPITAL CONTRIBUTION FROM RELATED ORGANIZATION | THIS INFORMATIONAL NOTE REGARDS QUALIFIED CHARITABLE GRANT MAKING. ALL GRANTS MADE BY NRA FOUNDATION, NRA CIVIL RIGHTS DEFENSE FUND, AND NRA FREEDOM ACTION FOUNDATION TO THE NRA ARE SUBJECT TO STRINGENT REVIEW PROCESSES REQUIRING THAT THE GRANTS BE MADE AND USED ONLY FOR QUALIFIED CHARITABLE PURPOSE PROGRAMS. THE NRA IS REQUIRED TO PROVIDE DOCUMENTATION TO THE CHARITIES THAT PROCEEDS WERE USED BY THE NRA FOR QUALIFIED CHARITABLE PURPOSES AS SET FORTH IN THE GRANT DOCUMENTS. |
| SCHEDULE R, PART V, LINE 1E - LOANS OR LOAN GUARANTEES BY RELATED ORGANIZATION | THE NRA ENTERED A SECURED LOAN AGREEMENT WITH THE NRA FOUNDATION. THE $5,000,000 LOAN IS PAYABLE TO THE NRA FOUNDATION AT A FAIR VALUE INTEREST RATE. THE NRA MAKES MONTHLY INTEREST PAYMENTS OF 7%. |

Form **8453-EO**

## Exempt Organization Declaration and Signature for Electronic Filing

For calendar year 2019, or tax year beginning _____, 2019, and ending _____, 20 _____

### For use with Forms 990, 990-EZ, 990-PF, 1120-POL, and 8868

OMB No. 1545-0047

**2019**

Department of the Treasury
Internal Revenue Service

| Name of exempt organization | Employer identification number |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA | 53-0116130 |

**Part I**   **Type of Return and Return Information** (Whole Dollars Only)

Check the box for the type of return being filed with Form 8453-EO and enter the applicable amount, if any, from the return. If you check the box on line 1a, 2a, 3a, 4a, or 5a below and the amount on that line of the return being filed with this form was blank, then leave line 1b, 2b, 3b, 4b, or 5b, whichever is applicable, blank (do not enter -0-). If you entered -0- on the return, then enter -0- on the applicable line below. **Do not** complete more than one line in Part I.

| | | | | |
|---|---|---|---|---|
| 1a | **Form 990** check here ▶ ☑ | **b** | **Total revenue,** if any (Form 990, Part VIII, column (A), line 12) . . | **1b** 291,155,464 |
| 2a | **Form 990-EZ** check here ▶ ☐ | **b** | **Total revenue,** if any (Form 990-EZ, line 9) . . . . . . . | **2b** |
| 3a | **Form 1120-POL** check here ▶ ☐ | **b** | **Total tax** (Form 1120-POL, line 22) . . . . . . . . . | **3b** |
| 4a | **Form 990-PF** check here ▶ ☐ | **b** | **Tax based on investment income** (Form 990-PF, Part VI, line 5) . | **4b** |
| 5a | **Form 8868** check here ▶ ☐ | **b** | **Balance due** (Form 8868, line 3c) . . . . . . . . . | **5b** |

**Part II**   **Declaration of Officer**

6 ☑   I authorize the U.S. Treasury and its designated Financial Agent to initiate an Automated Clearing House (ACH) electronic funds withdrawal (direct debit) entry to the financial institution account indicated in the tax preparation software for payment of the organization's federal taxes owed on this return, and the financial institution to debit the entry to this account. To revoke a payment, I must contact the U.S. Treasury Financial Agent at 1-888-353-4537 no later than 2 business days prior to the payment (settlement) date. I also authorize the financial institutions involved in the processing of the electronic payment of taxes to receive confidential information necessary to answer inquiries and resolve issues related to the payment.

☑   If a copy of this return is being filed with a state agency(ies) regulating charities as part of the IRS Fed/State program, I certify that I executed the electronic disclosure consent contained within this return allowing disclosure by the IRS of this Form 990/990-EZ/ 990-PF (as specifically identified in Part I above) to the selected state agency(ies).

Under penalties of perjury, I declare that I am an officer of the above named organization and that I have examined a copy of the organization's 2019 electronic return and accompanying schedules and statements, and, to the best of my knowledge and belief, they are true, correct, and complete. I further declare that the amount in Part I above is the amount shown on the copy of the organization's electronic return. I consent to allow my intermediate service provider, transmitter, or electronic return originator (ERO) to send the organization's return to the IRS and to receive from the IRS **(a)** an acknowledgement of receipt or reason for rejection of the transmission, **(b)** the reason for any delay in processing the return or refund, and **(c)** the date of any refund.

**Sign Here** ▶ _(signature)_   | 11/17/20   ▶ EXECUTIVE VICE PRESIDENT
Signature of officer   | Date   Title

**Part III**   **Declaration of Electronic Return Originator (ERO) and Paid Preparer** (see instructions)

I declare that I have reviewed the above organization's return and that the entries on Form 8453-EO are complete and correct to the best of my knowledge. If I am only a collector, I am not responsible for reviewing the return and only declare that this form accurately reflects the data on the return. The organization officer will have signed this form before I submit the return. I will give the officer a copy of all forms and information to be filed with the IRS, and have followed all other requirements in Pub. 4163, Modernized e-File (MeF) Information for Authorized IRS e-file Providers for Business Returns. If I am also the Paid Preparer, under penalties of perjury I declare that I have examined the above organization's return and accompanying schedules and statements, and, to the best of my knowledge and belief, they are true, correct, and complete. This Paid Preparer declaration is based on all information of which I have any knowledge.

| **ERO's Use Only** | ERO's signature ▶ | Date | Check if also paid preparer ☐ | Check if self-employed ☐ | ERO's SSN or PTIN |
|---|---|---|---|---|---|
| | Firm's name (or yours if self-employed), address and ZIP code ▶ | | | | EIN |
| | | | | | Phone no. |

Under penalties of perjury, I declare that I have examined the above return and accompanying schedules and statements, and, to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer is based on all information of which the preparer has any knowledge.

| **Paid Preparer Use Only** | Print/Type preparer's name | Preparer's signature | Date | Check if self-employed ☐ | PTIN |
|---|---|---|---|---|---|
| | Firm's name ▶ | | | Firm's EIN ▶ | |
| | Firm's address ▶ | | | Phone no. | |

For Privacy Act and Paperwork Reduction Act Notice, see back of form.    Cat. No. 36606Q    Form **8453-EO** (2019)

DocuSign Envelope ID: DEB3C135-4B18-4964-AACA-EE40E0B3DBFA

**Exhibit
NYAG 0011**
Spray

NATIONAL RIFLE ASSOCIATION OF AMERICA
11250 WAPLES MILL ROAD
FAIRFAX, VIRGINIA 22030

**2019 990 Certification**



I have examined the 2019 Form 990 return for the National Rifle Association, including accompanying schedules and statements.

To the best of my knowledge and belief, it is true, correct, and complete.

---

Carolyn D. Meadows, President

---

Charles L. Cotton, 1st Vice President

---

Willes K. Lee, 2nd Vice President

---

Wayne R. LaPierre, Executive Vice President

---

John C. Frazer, Secretary & General Counsel

---

Linda Crouch, Executive Director of Human Resources

DocuSigned by:
*Rick Tedrick*
Rick Tedrick, Managing Director of Finance

DocuSigned by:
*David Coy*
David G. Coy, Audit Comm. Vice Chair

DocuSigned by:
Anton Ouimet, Executive Director Institute for Legislative Action

DocuSigned by:
*Robert Owens*
Robert Owens, Fiscal Officer

---

William A. Brewer III, NRA Outside Counsel

---

William W Davis, NRA Board Counsel

---

Donald P. Lan, Partner, Lan Smith Sosolik Baxter-Thompson & Johnston, PLLC

**NYAG EX009**

October 26, 2020

The Audit Committee

**Exhibit 0014**

National Rifle Association of America and Affiliates
11250 Waples Mill Road
Fairfax, Virginia 22030
ATTN: Mr. Craig B. Spray, NRA CFO & Treasurer

Dear Mr. Spray:

We are pleased to confirm our understanding of the services we are to provide for **National Rifle Association of America and Affiliates** for the year ended December 31, 2020.

## I.    AUDIT SERVICES AND RELATED REPORT

We will audit the consolidated financial statements of **National Rifle Association of America and Affiliates** (the "NRA" or "Organization"), which comprise the Consolidated Statements of Financial Position as of December 31, 2020, the related Consolidated Statements of Activities and Changes in Net Assets, Functional Expenses, and Cash Flows for the year then ended, and the related notes to the consolidated financial statements, we will audit the financial statements of **National Rifle Association of America**, **The NRA Foundation, Inc.**, **NRA Civil Rights Defense Fund**, **NRA Special Contribution Fund**, and **NRA Freedom Action Foundation**, which comprise the Statements of Financial Position as of December 31, 2020, the related Statements of Activities and Changes in Net Assets, Functional Expenses, and Cash Flows for the year then ended, and the related notes to the financial statements, and we will audit the financial statements of **NRA Political Victory Fund**, which comprise the Statements of Support and Revenue Collected, Expenses Paid and Changes in Cash Arising from Cash Transactions as of December 31, 2020, and the related notes to the financial statements ("the financial statements").

Our responsibility for other information included in documents containing the Organization's audited financial statements and auditor's report does not extend beyond the financial information identified in the report.  We have no responsibility for determining whether such other information contained in such documents is properly stated.

## II.    AUDIT OBJECTIVE

The objective of our audit is the expression of an opinion (as described in this Agreement) about whether your financial statements, are fairly presented, in all material respects, in conformity with U.S. generally accepted accounting principles.  Our audit of the financial statements does not relieve you or those charged with governance of your responsibilities.  The audit of the financial statements of **NRA Political Victory Fund** will be conducted in accordance with the cash basis of accounting, which is a basis of accounting other than

**NYAG EX010**

NRA-BK-00106605

Page 2

accounting principles generally accepted in the United States of America. Our other audits will be conducted in accordance with auditing standards generally accepted in the United States of America and will include tests of your accounting records and other procedures we consider necessary to enable us to express such an opinion.

We will issue written reports upon completion of our audit of the Organization's financial statements. Our report will be addressed to the Board of Directors and Members of the **National Rifle Association of America**. We cannot provide assurance that an unmodified opinion will be expressed. Circumstances may arise in which it is necessary for us to modify our opinion or add an emphasis-of-matter or other-matter paragraph. If our opinion is other than unmodified, we will discuss the reasons with you in advance. If, for any reason, we are unable to complete the audit or are unable to form or have not formed an opinion, then in such circumstances, you understand and agree that we may decline to express an opinion and/or withdraw from the engagement and/or terminate this Agreement.

## III.    AUDIT PROCEDURES

Our procedures will include tests of documentary evidence supporting the transactions recorded in the accounts, tests of the physical existence of inventories, and direct confirmation of certain assets and liabilities by correspondence with selected individuals, funding sources, creditors, and financial institutions. We will also request written representations from your attorneys as part of the engagement and they may bill you for responding to this inquiry. At the conclusion of our audit, we will require certain written representations from you about the financial statements and related matters.

An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements; therefore, our audit will involve judgment about the number of transactions to be examined and the areas to be tested. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements. We will plan and perform the audit to obtain reasonable, but not absolute, assurance about whether the financial statements are free of material misstatement, whether from (1) errors, (2) fraudulent financial reporting, (3) misappropriation of assets, or (4) violations of laws or governmental regulations that are attributable to the Organization or to acts by management or employees acting on behalf of the Organization.

An audit is not designed to detect error or fraud that is immaterial to the financial statements. Our audit will not include a detailed audit of transactions, such as would be necessary to disclose errors or fraud that did not cause a material misstatement of the financial statements. It is important to recognize that there are inherent limitations in the auditing process. Audits are based on the concept of selective testing of the data underlying the financial statements, which involves judgment regarding the areas to be tested and the nature, timing, extent and results of the tests to be performed. Our audit is not a guarantee of the accuracy of the financial statements and supplemental information and, therefore, is subject to the limitation that material errors or fraud or other illegal acts having a direct and material financial statement impact, if they exist, may not be detected. Because of the characteristics of fraud, particularly those involving concealment through collusion, falsified documentation and management's ability to override controls, an audit designed and executed in accordance with auditing standards generally accepted in the United States of America may not detect a material fraud. Further, while effective internal control reduces the likelihood that errors, fraud or other illegal acts will occur and remain undetected, it does not eliminate that possibility. For these reasons, we cannot ensure that errors, fraud or other illegal acts if present, will be detected. However, we will communicate to you, as appropriate, any such matters that we identify during our audit.

NRA-BK-00106606

Page 3

Additionally, because of the inherent limitations of an audit, combined with the inherent limitations of internal control, and because we will not perform a detailed examination of all transactions, there is a risk that material misstatements may exist and not be detected by us, even though the audit is properly planned and performed in accordance with U.S. generally accepted auditing standards. In addition, an audit is not designed to detect immaterial misstatements or violations of laws or governmental regulations that do not have a direct and material effect on the financial statements. However, we will inform the appropriate level of management of any material errors, any fraudulent financial reporting, or misappropriation of assets that comes to our attention. We will also inform the appropriate level of management of any violations of laws or governmental regulations that come to our attention, unless clearly inconsequential. Our responsibility as auditors is limited to the period covered by our audit and does not extend to any later periods for which we are not engaged as auditors.

Our audit will include obtaining an understanding of the Organization and its environment, including internal control, sufficient to assess the risks of material misstatement of the financial statements and to design the nature, timing and extent of further audit procedures. An audit is not designed to provide assurance on internal control or to identify deficiencies in internal control. Accordingly, we will express no such opinion. However, during the audit, we will communicate to you and those charged with governance internal control related matters that are required to be communicated under professional standards.

It is understood that lawsuits with the State of New York and with the District of Columbia, filed in August 2020, will be the subject of audit procedures, and they may be material to Aronson's work to form an opinion for its report on your financial statements   With the exception of confidential, privileged (including, but not limited to, attorney-client privileged and attorney work product) or information prohibited by a court from disclosure, you agree to provide the information that we request with regard to those lawsuits.

We may from time to time, and depending on the circumstances, use third-party service providers in serving your account.  We may share confidential information about you with these service providers, but remain committed to maintaining the confidentiality and security of your information.  Accordingly, we maintain internal policies, procedures, and safeguards to protect the confidentiality of your personal information.  In addition, we will secure confidentiality agreements with all service providers to maintain the confidentiality of your information and we will take reasonable precautions to determine that they have appropriate procedures in place to prevent the unauthorized release of your confidential information to others.  In the event that we are unable to secure an appropriate confidentiality agreement, you will be asked to provide your consent prior to the sharing of your confidential information with the third-party service provider.  Furthermore, we will remain responsible for the work provided by any such third-party service providers.

Please see **EXHIBIT 1** to this engagement letter for additional information to those charged with governance on the timing and scope of our audit.

## IV.    OTHER SERVICES

We will assist in the review of the Organization's federal and state tax returns for the year ended December 31, 2020 based on information provided by you.

We will also assist in preparing the financial statements of the Organization in conformity with U.S. generally accepted accounting principles based on information provided by you.

We will perform the services in accordance with applicable professional standards, including the Statements on Standards for Tax Services issued by the American Institute of Certified Public Accountants.  The other services

CONFIDENTIAL

Page 4

are limited to the financial statement and tax services previously defined. We, in our sole professional judgment, reserve the right to refuse to perform any procedure or take any action that could be construed as assuming management responsibilities. We will advise management with regard to tax positions taken in the review of the tax returns, but management must make all decisions with regard to those matters.

## V.    MANAGEMENT RESPONSIBILITIES

As previously noted, our audit of the financial statements does not relieve you of your responsibilities.

To the extent we provide nonattest services, you agree to assume all management responsibilities, financial statement preparation assistance services, and any other nonattest services we provide; oversee the services by designating Craig Spray, an individual with suitable skill, knowledge, or experience; evaluate the adequacy and results of the services; and accept responsibility for them. In addition to the audit (an "attest" service), we will perform the following nonattest services for which, as discussed above, you are solely responsible:

1) Assistance with drafting of the financial statements and footnotes.
2) Assistance with the review of information for tax returns (referenced below).

Management is responsible for establishing policies and procedures that pertain to the maintenance of adequate accounting records, for designing, implementing, and maintaining effective internal controls, including monitoring ongoing activities and effective internal controls over financial reporting, the selection and application of U.S. generally accepted accounting principles, establishing an accounting and financial reporting process for determining fair value measurements, the authorization of receipts and disbursements, the safeguarding of assets, the proper recording of transactions in the accounting records, and for reporting financial information in conformity with accounting principles generally accepted in the United States of America.

Management is also responsible for the design and implementation of programs and controls to prevent and detect fraud, and for informing us in the management representation letter (i) about all known or suspected fraud affecting the Organization involving (a) management, (b) employees who have significant roles in internal control over financial reporting and (c) others where the fraud could have a material effect on the consolidated financial statements and supplemental information and (ii) of its knowledge of any allegations of fraud or suspected fraud affecting the Organization received in communications from employees, former employees, analysts, regulators or others.

Management is also responsible for making all financial records and related information available to us and for the accuracy and completeness of that information. You are also responsible for providing us with (1) access to all information of which you are aware that is relevant to the preparation and fair presentation of the financial statements, (2) additional information that we may request for the purpose of the audit, and (3) unrestricted access to persons within the organization from whom we determine it necessary to obtain audit evidence.

Your responsibilities include adjusting the financial statements to correct material misstatements and confirming to us in the management representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the financial statements taken as a whole. It is also the responsibility of Management to notify us of all material weaknesses, including other significant deficiencies, in the design or operation of the Organization's internal control over financial reporting that are reasonably likely to adversely affect the Organization's ability to record, process, summarize and report external financial data reliably in accordance with accounting principles generally accepted in the United States of America.

CONFIDENTIAL

Page 5

In addition, you are responsible for identifying and ensuring that the Organization complies with applicable laws and regulations.

You are required to disclose the date through which subsequent events have been evaluated and whether that date is the date the financial statements were issued or were available to be issued. You agree that you will not date the subsequent event note earlier than the date of your management representation letter.

With regard to the electronic dissemination of audited financial statements, including financial statements published electronically on your Internet website, you understand that electronic sites are a means of distributing information and, therefore, we are not required to read the information contained in those sites or to consider the consistency of other information in the electronic site with the original document.

We may issue preliminary draft financial statements to you for your review. Any preliminary draft financial statements should not be relied on or distributed.

Management is responsible for establishing and maintaining a process for tracking the status of audit findings and recommendations. Management is also responsible for identifying and providing report copies of previous financial audits, attestation engagements, performance audits, or other studies related to the objectives discussed in the Audit Objectives section of this letter. This responsibility includes relaying to us corrective actions taken to address significant findings and recommendations resulting from those audits, attestation engagements, performance audits, or studies. You are also responsible for providing management's views on our current findings, conclusions, and recommendations, as well as your planned corrective actions for the report, and for the timing and format for providing that information.

To the extent we provide nonaudit services, you will be required to acknowledge in the management representation letter that you have evaluated the adequacy of our services and have reviewed and approved the results of the services.

## VI.    ENGAGEMENT ADMINISTRATION AND OTHER

We understand that your employees will prepare all cash, accounts receivable, and other confirmations and schedules we request and will locate any documents selected by us for testing. Any failure to provide such cooperation, and to do so on a timely basis, will impede our services, and may require us to suspend our services or withdraw from the engagement.

Greg Plotts is the engagement partner and is responsible for supervising the engagement and signing the report or authorizing another individual to sign it. We expect to begin our audit on approximately November 4, 2020.

During the course of our engagement, we may request information and explanations from management regarding, among other matters, the Organization's operations, internal controls, future plans, specific transactions, and accounting systems and procedures. At the conclusion of our engagement, we will require, as a precondition to the issuance of our report, that management provide us with a written representation letter confirming some or all of the representations made during the engagement. The procedures we will perform in our engagement will be heavily influenced by the representations that we receive from management. Accordingly, false representations could cause us to expend unnecessary efforts or could cause a material error or fraud to go undetected by our procedures. In view of the foregoing, you agree that we will not be responsible for any misstatements in the Organization's financial statements that we fail to detect as a result, in whole or in part, of false or misleading representations, whether oral or written, that are made to us at any time prior to the

NRA-BK-00106609

Page 6

issuance of our report by the Organization's management or its agents. While we may assist management in the preparation of the representation letter, it is management's responsibility to carefully review and understand the representations made therein.

In connection with this engagement, we may communicate with you or others via email transmission. As emails can be intercepted and read, disclosed, or otherwise used or communicated by an unintended third party, or may not be delivered to each of the parties to whom they are directed and only to such parties, we cannot guarantee or warrant that emails from us will be properly delivered and read only by the addressee. Therefore, we specifically disclaim and waive any liability or responsibility whatsoever for interception or unintentional disclosure of emails transmitted by us in connection with the performance of this engagement. In that regard, you agree that we shall have no liability for any loss or damage to any person or entity resulting from the use of email transmissions, including any consequential, incidental, direct, indirect, or special damages, such as loss of revenues or anticipated profits, or disclosure or communication of confidential or proprietary information.

Our reports are issued with the understanding that they may be reproduced only in their entirety. Should it be desired to issue or publish summary financial statements and our name is to be used, this will constitute a separate engagement subject to our approval, which must first be secured in writing. Inclusion of the audited financial statements in any document should be done only with prior approval of the document. You are responsible for providing us with the opportunity to review such document before issuance. The approval and review requirement shall not apply to disclosure of the audited financial statements as required by law.

## VII.    TAX SERVICES

We will review the following **National Rifle Association of America and Affiliates** tax and information returns. If there are other returns you expect us to review not listed below, please inform us as soon as possible.

- National Rifle Association of America Form 990, Form 990-T, and State Return

- The NRA Foundation, Inc. Form 990

- NRA Civil Rights Defense Fund Form 990

- NRA Special Contribution Fund Form 990, Form 990-T, and State Return

- NRA Freedom Action Foundation Form 990

It is possible that the Organization may be required to file other returns in additional jurisdictions. For example, if you had a taxable presence in a state not listed above (e.g., an employee working, revenue derived from, or tangible property owned or rented, within a state), the Organization may be subject to state income or franchise tax in that state, depending on the particular facts. Ultimately, **National Rifle Association of America and Affiliates** is responsible for meeting its filing requirements, and Aronson LLC is responsible only for assisting in the review of the returns listed above unless you notify us of such circumstances and we agree to expand the scope of this engagement to cover such additional returns as may be required. It is important to us that you file all required returns, and we are available, of course, for consultation regarding your filing responsibilities. These returns will be reviewed from information you will furnish us. Except in the context of the services outlined above for the sole purpose of issuing an opinion regarding your financial statements, we will not audit, or otherwise verify, any information you provide unless we both agree in writing to such additional procedures.

Page 7

We are not responsible for detecting defalcation, irregularities, fraud or errors perpetrated or caused by others, should any exist. Nor are we responsible for any internal control deficiencies or supervision of your employees, if applicable.

This engagement does not include any services not specifically stated in this letter. However, at your written request we would be pleased to consult with you about other tax matters, such as assistance with Internal Revenue Service or state notices and examinations, proposed or completed transactions, tax projections and research in connection with such matters. We will render additional invoices for such services at our standard billing rates and such additional services are subject to the terms and conditions of this Agreement.

Aronson's services under this Agreement are subject to and will be performed in accordance with Treasury Department Circular 230, the American Institute of Certified Public Accountants (AICPA) and other professional standards applicable to tax services. We disclaim all other warranties, either express or implied.

Aronson will perform these services on the basis of the information you have provided and in consideration of the applicable tax laws, regulations and associated interpretations as of the date the services are provided. Tax laws and regulations and/or their interpretation are subject to change at any time, and such changes may be retroactive in effect and may be applicable to advice given or other services rendered before their effective dates. Aronson has no responsibility or liability for such changes occurring after the completion date of this engagement.

You acknowledge and agree that any advice, recommendations, information or work product provided by Aronson in connection with this engagement is for your sole use and may not be relied upon by any third party. Aronson has no liability or responsibility to any third parties as a result of this engagement and you agree to fully indemnify Aronson for any claim arising out of such reliance.

It is your responsibility to provide all the information required for complete and accurate returns. You should retain all the documents, canceled checks and other data that form the basis of your returns. These may be necessary to prove the accuracy and completeness of your returns to a taxing authority. Inaccuracy, incompleteness, or tardiness in the delivery of information to Aronson could have a material effect on your tax returns and the fee for services.

We understand that you are the person responsible for the tax matters of **National Rifle Association of America and Affiliates**. You have final responsibility for the returns and, therefore, you should review the returns carefully before you sign and file them. You are also responsible for timely filing of your returns and timely payment of any amounts due. To this extent, you agree to file, unaltered and with appropriate disclosure, the tax returns as reviewed by Aronson. You agree that Aronson assumes no responsibility and has no liability for any returns filed by you with the taxing jurisdiction. You are responsible for the timely filing of the returns.

If an extension of time is required, any tax that may be due with your returns must be paid with that extension. Any amounts not paid by the filing deadline are subject to interest and late payment penalties.

The Internal Revenue Code and regulations impose preparation and disclosure standards with noncompliance penalties on both the preparer of a tax return and on the taxpayer. Aronson will not be the paid preparer of your tax returns, as the NRA will have self-prepared returns which Aronson will review. To avoid exposure to these penalties, it may be necessary in some cases to make certain disclosures to you and/or in the tax return concerning positions taken on the return that do not meet these standards. Accordingly, we will advise you if we identify such a situation, and we will discuss those tax positions that may increase the risk of exposure to

NRA-BK-00106611

Page 8

penalties and any recommended disclosures before completing the preparation of the return. If we conclude that the NRA is obligated to disclose a position and you refuse to permit disclosure, we reserve the right to withdraw from the engagement. Likewise, where we disagree about the obligation to disclose a position, you also have a right to choose another professional to review your return. In either event, you agree to compensate us for our services to the date of the withdrawal. Our engagement with you will terminate upon our withdrawal.

While assisting in reviewing your returns, we will inform you of any material tax positions of which we are aware that, in our judgment, do not meet required statutory or regulatory thresholds. An undisclosed tax return position must have at least "substantial authority" (estimated to be approximately a 40% or greater likelihood of success if challenged by the IRS), and a disclosed tax position must have at least a "reasonable basis" (estimated to be approximately a 20% or greater likelihood of success if challenged by the IRS, so long as no "listed transaction" or "principal purpose transaction" is involved). You agree to inform us of any tax positions of which you are aware that would not meet these thresholds, and we reserve the right to stop work if the return cannot be completed in conformity with these standards.

You agree to assume full responsibility for the substantive outcomes of the services described above, including any findings that may result. You also acknowledge that the services described above are adequate for your purposes and that you will establish and monitor the performance of these services to ensure that they meet management's objectives. Any and all decisions involving management functions related to these services will be made by you, and you accept full responsibility for such decisions. We understand that you have designated a management-level individual to be responsible and accountable for overseeing the performance of these services and that you have determined this individual is qualified to conduct such oversight.

US Treasury Regulations require taxpayers to disclose any tax strategy or transaction that the IRS identifies as: 1) a Listed Transaction; 2) substantially similar to a Listed Transaction; or 3) any other Reportable Transaction. In addition, certain states have similar disclosure requirements. Noncompliance with these rules may result in significant penalties. You agree to inform Aronson of participation in any such transactions. The law provides significant penalties for failure to adequately disclose certain transactions designated as "reportable." A description of these transactions will be provided to you if requested. Alternatively            is available on our website. Unless otherwise notified in writing, we will review your returns with the assumption you have not engaged in any reportable transaction.

The law provides other penalties that may be imposed when taxpayers understate their tax liability or fail to timely file or pay. Additionally, you are required to maintain and retain adequate documentation to support the tax returns as filed as penalties can be imposed by taxing authorities for the failure to produce adequate documentation supporting the items included in a tax return. Aronson has no responsibility or liability for your failure to maintain adequate documentation. If you would like information on the amount or the circumstances of these penalties, please contact us.

Most tax returns require signatures, under penalty of perjury, by the taxpayer or an officer of the taxpayer affirming that the tax returns and the accompanying schedules and statements are true, correct, and complete to the best of his or her knowledge. You are responsible for understanding and agreeing with the various amounts, computations, and statements made in the tax returns and accept responsibility for the results of the tax services rendered. Aronson's services may include advice and recommendations, but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by, you. Aronson will not perform any management functions or make management decisions for you in connection with this engagement.

NRA-BK-00106612

Page 9

Certain communications involving tax advice may be privileged and not subject to disclosure to the IRS. By disclosing the contents of those communications to anyone, or by turning over information about those communications to the government, you, your employees, or agents may be waiving this privilege. To protect this right to privileged communication, please consult with us or your attorney prior to disclosing any information about our tax advice. Should you decide it is appropriate for us to disclose any potentially privileged communication, you agree to provide us with written, advance authority to make that disclosure.

Should we receive any request for the disclosure of privileged information from any third party, including a subpoena or IRS summons, we will notify you. In the event you direct us not to make the disclosure, you agree to hold us harmless from any expenses incurred in defending the privilege, including, by way of illustration only, our attorney's fees, court costs, outside adviser's costs, or penalties or fines imposed as a result of your asserting the privilege or your direction to us to assert the privilege.

The returns may be selected for review by the taxing authorities. In the event of an audit, you may be requested to produce documents, records, or other evidence to substantiate the items of income and deduction shown on a tax return. Any proposed adjustments by the examining agent are subject to certain rights of appeal. In the event of a tax examination, we will be available upon request to represent you and will render additional invoices for the time and charges incurred.

## VIII.   ENGAGEMENT FEES

Our fees are based upon the time required for the services at our regular hourly rates, which range from $150 to $600, depending upon the level of the individuals providing services. We estimate that our fees for the audit and other services, other than specific audit procedures that will be performed to address the New York and District of Columbia Attorney Generals' lawsuit, will be:

- Consolidated National Rifle Association of America and Affiliates Report - $20,500

- Audit of National Rifle Association of America - $125,000

- Audit of The NRA Foundation, Inc. - $50,000

- Audit of NRA Civil Rights Defense Fund - $15,500

- Audit of NRA Special Contribution Fund - $20,000

- Audit of NRA Freedom Action Foundation - $15,000

- Audit of NRA Political Victory Fund - $12,000

We estimate that our fees for the review of the information and tax returns will be:

- National Rifle Association of America Form 990, Form 990-T, and State Return - $6,000

- The NRA Foundation, Inc. Form 990 - $3,000

- NRA Civil Rights Defense Fund Form 990 - $2,500

CONFIDENTIAL

Page 10

- NRA Special Contribution Fund Form 990, Form 990-T, and State Return - $2,500

- NRA Freedom Action Foundation Form 990 - $1,500

You will also be billed for out-of-area travel incurred during the course of the engagement. The fee estimate is based on anticipated cooperation from your personnel and the assumption that unexpected circumstances will not be encountered during the engagement. If significant additional time is necessary, we will keep you informed of any problems we encounter and our fees will be adjusted accordingly.

You will be billed additional fees at our standard hourly rates for specific audit procedures that will be performed to address the New York and District of Columbia Attorney Generals' lawsuit.

Our invoices for these fees will be rendered each month as work progresses and are payable within 30 days from the invoice date. If you fail to pay by the due date, interest will accrue on your invoices at the rate of twelve percent (12%) per annum. If you fail to pay your invoices when they are due, and your invoices are referred to an attorney for collection, you will be responsible for reasonable attorney's fees and court costs.

Our professional fee and out-of-pocket expense estimates are based on the following assumptions:

(1) No unexpected circumstances will be encountered in the course of the engagement.

(2) We will have the full cooperation of your personnel.

(3) All of the "PBC" items will be properly completed and provided to us at the start of the scheduled audit fieldwork. If not, you will be charged an additional fee of 10-20% of the stated audit fee, depending on the significance of the "PBC" items that are not complete and ready.

(4) If the "PBC" items are not ready at the start of scheduled audit fieldwork and it is necessary to reschedule the audit, you will be charged an additional rescheduling fee of up to 10% of the stated audit fee. In addition, the rescheduled audit timing will be based on staff availability.

Furthermore, this fee quote assumes issuance of our report shortly after completion of fieldwork. To the extent this is not accomplished as a result of factors outside our control, such as untimely review of document draft, untimely presentation of the signed management representation letter (untimely being more than two business days after delivery of the draft) or lack of needed third party evidence such as confirmations or bank waivers, we will bill you for the additional time required to update our procedures to a later report date. The cost of these procedures will be billed at our hourly rates.

In accordance with our firm policies, work may be suspended if your account becomes overdue and will not be resumed until your account is paid in full. If we elect to terminate our services for nonpayment, our engagement will be deemed to have been completed upon written notification of termination, even if we have not issued our report. You will be obligated to compensate us for all time expended and to reimburse us for all out-of-pocket expenditures through the date of termination.

## IX.    STANDARD BUSINESS TERMS

a.  Original Records: At the conclusion of the engagement, we will return to you all original records you supplied to us. Your Organization records are the primary records for your operations and comprise the backup

CONFIDENTIAL

Page 11

and support for your financial reports and tax returns. Our records and files, including engagement documentation, whether kept on paper or electronic media, are our property and are not a substitute for your own records. Our firm policy calls for us to destroy our engagement files and all pertinent engagement documentation after a retention period of seven years (or longer, if required by law or regulation), after which time these items will no longer be available. We are under no obligation to notify you that our records relating to your Organization are to be destroyed. We reserve the right to modify the retention period without notifying you. Catastrophic events or physical deterioration may result in our firm's records being unavailable before the expiration of the above retention period.

    b. <u>Deliverables</u>: Unless specified in the Engagement Letter, materials specifically prepared by Aronson for the Organization as a deliverable under an Engagement Letter may, when fully paid for by the Organization, be used, copied, and distributed internally by the Organization, but solely for its internal business purposes.

Unless contemplated by the Engagement Letter or required by law, the Organization shall not, without Aronson's prior written consent, disclose to a third party, publicly quote or make reference to the Deliverables.

The documentation for this engagement, including the workpapers, is not part of the Deliverables, is the property of Aronson and constitutes confidential information. We may have a responsibility to retain the documentation for a period of time sufficient to satisfy any applicable legal or regulatory requirements for records retention. If we are required by law, regulation or professional standards to make certain documentation available to Regulators, the Organization hereby authorizes us to do so, subject to the same notice and cooperation provisions as set forth in subsection IX(e) below.

You agree that you will not modify the deliverables for or for distribution to third parties. You also understand that we may on occasion send you documents marked as draft and understand that those are for your review purpose only, should not be distributed in any way and should be destroyed as soon as possible.

    c. <u>Standards of Performance</u>: Aronson shall perform its Services (which term, as used in this Section IV, includes both audit/attest services and other non-attest services) in conformity with the terms expressly set forth in this Agreement, including all applicable professional standards. Accordingly, our Services shall be evaluated on our substantial conformance with such terms and standards. Any claim of nonconformance (and applicability of such standards) must be proven by clear and convincing evidence. The Organization acknowledges that the Services will involve the participation and cooperation of management and others of the Organization. Unless required by professional standards, the Engagement Letter, or the Organization and Aronson otherwise agree in writing, Aronson shall have no responsibility to update any of its work after its completion

    d. <u>Warranty</u>: Each party represents and warrants to the other that it has full power and authority to enter into and perform this Agreement and any Engagement Letter entered into pursuant hereto and the person signing this Agreement or such Engagement Letter on behalf of each party hereto has been properly authorized and empowered to enter into this Agreement.

Aronson will perform its services within applicable professional standards. We expressly disclaim, all warranties, express, implied or otherwise, including without limitation any implied warranties of merchantability or fitness for a particular purpose. We cannot and do not warrant computer hardware, software or services provided by other parties.

NRA-BK-00106615

Page 12

    e.   <u>Limitation on Damages and Indemnification</u>: The liability (including attorney's fees and all other costs) of Aronson and its present or former partners, principals, agents or employees related to any claim for damages relating to the services performed under this Agreement shall not exceed three times the fees paid to Aronson for the portion of the work to which the claim relates.

The limitations of liability and damages in this Section apply to the full extent allowed by law, regardless of the grounds or nature of any claim asserted, including the negligence of either party.

Additionally, in no event shall either party be liable for any lost profits, lost business opportunity, lost data, consequential, special, incidental, exemplary or punitive damages arising out of or related to this Agreement.

As Aronson is performing the Services solely for the benefit of the Organization, the Organization will indemnify Aronson, its subsidiaries and their present or former partners, principals, employees, officers and agents against all costs, fees, expenses, damages and liabilities (including attorneys' fees and all defense costs) associated with any claim of any type by any third-party (meaning any person or entity other than the Organization), based, in whole or in part, upon our failure to detect material misstatements in the Organization's financial statements, that relates to or is caused in whole or in party by false or misleading documentation provided to us, or mis-representations made to us, or knowing non-disclosure or concealment from us of fraud or information known to be related to the performance of our Services, by any member of the Organization's management or agents, or from intercompany fraud.

In the event Aronson is requested by the Organization; or required by government regulation, subpoena, or other legal process to produce its engagement working papers or its personnel as witnesses with respect to its Services rendered for the Organization, so long as Aronson is not a party to the proceeding in which the information is sought, the Organization will reimburse Aronson for its professional time and expenses, as well as the fees and legal expenses, incurred in responding to such a request.

Because of the importance of the information that Aronson requests from the Organization and that the Organization provides to Aronson with respect to Aronson's ability to perform the Services, the Organization hereby releases Aronson and its present and former partners, principals, agents and employees from any liability, damages, fees, expenses and costs, including attorney fees, relating to the Services, that arise from or relate to any information, including but not limited to representations by management, requested from or provided by the Organization, its personnel or agents, that is not complete, accurate or current.

The liability and remedy limitations in this Agreement are materially bargained for bases of this Agreement and that they have been taken into account and reflected in determining the consideration to be given by each party under this Agreement and in the decision by each party to enter into this Agreement.

The Organization accepts and acknowledges that any legal proceedings arising from or in connection with the services provided under this Agreement must be commenced within twelve (12) months after the performance of the Services for which the action is brought, without consideration as to the time of discovery of any claim.

As a result of our services to you, we may be required or requested to provide information or documents to you or a third-party in connection with governmental regulations or activities, or a legal, arbitration or administrative proceeding (including a grand jury investigation), in which we are not a party. Aronson shall notify you immediately of any such request or demand. You may, within the time permitted for our firm to respond to any request, initiate such legal action as you deem appropriate to protect information from discovery, and Aronson will reasonably cooperate with such action. If you take no action within the time permitted for us to respond

NRA-BK-00106616

Page 13

or if your action does not result in a judicial order protecting us from supplying requested information, we will construe your inaction or failure as consent to comply with the request. Our efforts in complying with such requests or demands, subject to the notice and cooperation provisions of this paragraph, will be deemed a part of this engagement and we shall be entitled to additional compensation for our time and reimbursements for our out-of-pocket expenditures (including legal fees) in complying with such request or demand.

Notwithstanding anything to the contrary in this Agreement, any duties of the NRA to disclose information and/or any rights that may accrue to Aronson in regard to the NRA's failure to disclose information, shall not apply to confidential, privileged (including, but not limited to, attorney-client privileged and attorney work product) or information prohibited by a court from disclosure.

Notwithstanding anything to the contrary in this Agreement, the terms of this Subsection (e) shall not apply to the extent damages are actually caused by the fraudulent or willful misconduct of Aronson.

    f.  Personnel: We have a significant investment in the training and development of our accountants; they are valued employees of Aronson LLC. If you should hire one of our accountants either during the audit or within one year after completion of this engagement, you agree to pay a personnel placement fee of ½ of the employee's salary at the time the offer is made to compensate Aronson LLC. Any offer of employment to members of the audit team prior to issuance of our report may impair our independence and may result in our inability to complete the engagement and issue a report.

    g.  Termination: This Agreement may be terminated by either party, with or without cause, upon thirty (30) days' written notice. In such event, we will stop providing services hereunder except on work, mutually agreed upon in writing, necessary to carry out such termination. In the event of termination; (a) you shall pay us for Services provided and expenses incurred through the effective date of termination, (b) we will provide you with all finished reports that we have prepared pursuant to this Agreement, (c) neither party shall be liable to the other for any damages that occur as a result of our ceasing to render services, and (d) we will require any new accounting firm that you may retain to execute a letter satisfactory to Aronson LLC pursuant to AU-C Section 510, Opening Balances, if applicable.

The Organization shall pay Aronson for all Services rendered and expenses incurred as of the date of termination, and shall reimburse Aronson for all reasonable costs associated with any termination.

Any rights and duties of the parties that by their nature extend beyond the expiration or termination of this Agreement, including but not limited to, limitation of liability, ownership of work product, and survival of obligations, any accrued rights to payment and remedies for breach of this Agreement shall survive the expiration or termination of this Agreement or any Engagement Letter.

    h.  Dispute Resolution: In the unlikely event that differences concerning the Services or fees should arise that are not resolved by mutual agreement, both parties agree to attempt in good faith to settle the dispute by engaging in mediation administered by the American Arbitration Association under its mediation rules for professional accounting and related services disputes before resorting to litigation or any other dispute-resolution procedure. Each party shall bear their own expenses from mediation and the fees and expenses of the mediator shall be shared equally by the parties.

If the dispute is not resolved by mediation, then the parties agree that the dispute or claim shall be settled by binding arbitration. The arbitration proceeding shall take place in the Washington, DC metropolitan area, unless the parties mutually agree to a different location. The proceeding shall be governed by the provisions of the

NRA-BK-00106617

Page 14

Federal Arbitration Act ("FAA") and will proceed in accordance with the then current Arbitration Rules for Professional Accounting and Related Disputes of the AAA, except that no pre-hearing discovery shall be permitted unless specifically authorized by the arbitrator. The arbitrator will be selected from AAA, JAMS, the Center for Public Resources, or any other internationally or nationally-recognized organization mutually agreed upon by the parties. If the parties cannot agree on the arbitration organization from which to draw the arbitrator, then they shall use AAA. Potential arbitrator names will be exchanged within 15 days of the parties' agreement to settle the dispute or claim by binding arbitration, and arbitration will thereafter proceed expeditiously. The arbitration will be conducted before a single arbitrator, experienced in accounting and auditing matters. The arbitrator shall have no authority to award non-monetary or equitable relief and will not have the right to award punitive damages. The award of the arbitration shall be in writing and shall be accompanied by a well reasoned opinion. The award issued by the arbitrator may be confirmed in a judgment by any federal or state court of competent jurisdiction. Each party shall be responsible for their own costs associated with the arbitration, except that the costs of the arbitrator shall be equally divided by the parties. The arbitration proceeding and all information disclosed during the arbitration shall be maintained as confidential, except as may be required for disclosure to professional or regulatory bodies, in litigation to enforce an arbitration award, or in a related confidential arbitration. In no event shall a demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim would be barred under the applicable statute of limitations.

The alternative dispute resolution proceedings articulated in this Subsection shall not apply to claims with a value of $25,000 or less or to actions to enforce payment of our professional invoices.

THE PARTIES WAIVE THEIR RIGHT TO A JURY TRIAL IN CONNECTION WITH ANY DISPUTE RELATED TO THIS AGREEMENT, IN ANY MANNER. Any litigation or arbitration arising out of this engagement, except actions by us to enforce payment of our professional invoices, must be asserted within one year from the date any such cause of action accrues, notwithstanding any statutory provision to the contrary.

This Agreement shall be governed by the laws of the State of Maryland, without giving effect to any conflicts of laws and principles.

    i.   Miscellaneous: In the event that any provision of this Agreement is held by a court of competent jurisdiction to be unenforceable because it is invalid or in conflict with any law of any relevant jurisdiction, the validity of the remaining provisions shall not be affected, and the rights and obligations of the parties shall be construed and enforced as if the Agreement or such Engagement Letter did not contain the particular provisions held to be unenforceable. The unenforceable provisions shall be replaced by mutually acceptable provisions which, being valid, legal and enforceable, come closest to the intention of the parties underlying the invalid or unenforceable provision. If the Services should become subject to the independence rules of the U.S. Securities and Exchange Commission, or another applicable regulatory body, with respect to the Organization, such that any provision of this Agreement would impair Aronson's independence under its rules, such provision(s) shall be of no effect.

Neither this Agreement nor any rights or licenses granted hereunder may be assigned, delegated or subcontracted by either party without the written consent of the other party. Either party may assign and transfer this Agreement to any successor that acquires all or substantially all of the business or assets of such party by way of merger, consolidation, other business reorganization, or the sale of interests or assets, provided that the party notifies the other party in writing of such assignment and the successor agrees in writing to be bound by the terms and conditions of this Agreement.

Page 15

The parties are independent contractors. Nothing herein shall be deemed to constitute either party as the representative, agent, partner or joint venture of the other.

The failure of either party at any time to enforce any of the provisions of this Agreement will in no way be construed as a waiver of such provisions and will not affect the right of the party thereafter to enforce each and every provision thereof in accordance with its terms.

The Organization acknowledges that: (i) Aronson and the Organization may correspond or convey documentation via Internet e-mail unless the Organization expressly requests otherwise, (ii) neither party has control over the performance, reliability, availability, or security of Internet e-mail, and (iii) Aronson shall not be liable for any loss, damage, expense, harm or inconvenience resulting from the loss, delay, interception, corruption, or alteration of any Internet e-mail.

Except to the extent expressly provided to the contrary, no third-party beneficiaries are intended under this Agreement.

We appreciate the opportunity to be of service to you and believe this letter accurately summarizes the significant terms of our engagement. If you have any questions, please let us know. If you agree with the terms of our engagement as described in this letter, please sign a copy and return it to us.

Sincerely,

Aronson LLC

ARONSON LLC

NRA-BK-00106619

Page 16

RESPONSE:

This letter correctly sets forth the understanding of **National Rifle Association of America and Affiliates**.

_____
Mr. Craig B. Spray


_____
NRA CFO & Treasurer

10/29/2020
_____
Date


_____
Mr. Charles L. Cotton


_____
Audit Committee Chair

10/29/2020
_____
Date

CONFIDENTIAL

Page 17

## <u>EXHIBIT 1 TO ENGAGEMENT LETTER</u>

This attachment is intended to communicate certain matters related to the planned scope and conduct of our audit of the financial statements described in the accompanying engagement agreement.

### Communication

Effective two-way communication between our audit team and those charged with governance (herein referred to as "you" or "your") is important to understanding matters related to the audit and in developing a constructive working relationship.

We will discuss with you your oversight of the effectiveness of internal control and any areas where you request additional procedures to be undertaken. We expect that you will timely communicate with us any matters you consider relevant to the audit. Such matters might include information that may significantly affect the nature, timing, and extent of audit procedures, your suspicion or detection of fraud, or any concerns you may have about the integrity or competence of your senior management.

We will timely communicate to you any fraud involving senior management and other fraud that causes a material misstatement of the financial statements, illegal acts that come to our attention (unless they are clearly inconsequential), and disagreements with management and other serious difficulties encountered in performing the audit. We will also communicate to you (and to management) any significant deficiencies or material weaknesses in internal control that become known to us during the course of the audit. Other matters arising from the audit that are, in our professional judgment, significant and relevant to you in your oversight of the financial reporting process will be communicated to you in writing after the audit.

Although we are responsible for communicating specific matters in accordance with the accompanying engagement agreement and this exhibit, management also has responsibility to communicate matters of governance interest to those charged with governance. Communication by us does not relieve management of this responsibility. Similarly, management's communication to those charged with governance does not relieve us of the responsibility to also communicate them; however, communication of those matters by management may affect the form or timing of our communication. Clear communication of specific matters required to be communicated under generally accepted auditing standards (GAAS) is an integral part of every audit; however, GAAS do not require the auditor to perform procedures specifically to identify other significant matters to communicate with those charged with governance.

### Independence

Our independence policies and procedures are designed to provide reasonable assurance that our firm and its personnel comply with applicable professional independence standards. Our policies address financial interests, business and family relationships, and non-audit services that may be thought to bear on independence. We are not aware of any circumstances that have impaired our independence with respect to our engagement as described in the accompanying engagement agreement.

### The Audit Planning Process

Our audit approach places a strong emphasis on obtaining an understanding of how your organization functions. This enables us to identify key audit components and tailor our procedures to the unique aspects of your organization.

NRA-BK-00106621

Page 18

We will obtain an understanding of internal control to assess the impact of internal control on determining the nature, timing and extent of audit procedures, and we will establish an overall materiality limit for audit purposes. We will conduct formal discussions among engagement team members to consider how and where your financial statements might be susceptible to material misstatement due to fraud or error. We will use this knowledge and understanding, together with other factors, to first assess the risk that errors or fraud might cause a material misstatement at the financial statement level. The assessment of the risks of material misstatement at the financial statement level provides us with parameters within which to design the audit procedures for specific account balances and classes of transactions. Our risk assessment process at the account-balance or class-of-transactions level consists of:

- An assessment of inherent risk (the susceptibility of an assertion relating to an account balance or class of transactions to a material misstatement, assuming there are no related controls); and
- An evaluation of the design effectiveness of internal control over financial reporting and our assessment of control risk (the risk that a material misstatement could occur in an assertion and not be prevented or detected on a timely basis by the organization's internal control).

We will then determine the nature, timing and extent of test of controls and substantive procedures necessary given the risks identified and the controls as we understand them.

An audit is not designed to provide assurance on internal control or to identify significant deficiencies or material weaknesses. Our review and understanding of the organization's internal control is not undertaken for the purpose of expressing an opinion on the effectiveness of internal control. Management is responsible for designing and maintaining an effective internal control environment.

**The Concept of Materiality in Planning and Executing the Audit**

In planning the audit, the materiality limit is viewed as the maximum aggregate amount of pretax misstatements, which if detected and not corrected, would cause us to modify our opinion on the financial statements. The materiality limit is an allowance not only for misstatements that will be detected and not corrected but also for misstatements that may not be detected by the audit. Our assessment of materiality throughout the audit will be based on both quantitative and qualitative considerations. Because of the interaction of quantitative and qualitative considerations, misstatements of a relatively small amount could have a material effect on the current financial statements as well as financial statements of future periods. At the end of the audit, we will inform you of all individual unrecorded misstatements aggregated by us in connection with our evaluation of our audit test results.

NRA-BK-00106622

citrix | **RightSignature**

**REFERENCE NUMBER**
FBE22179-FE2D-4BC0-ADEB-47782FEDF058

# SIGNATURE CERTIFICATE

**TRANSACTION DETAILS**

**Reference Number**
FBE22179-FE2D-4BC0-ADEB-47782FEDF058

**Transaction Type**
Signature Request

**Sent At**
10/29/2020 12:35 EDT

**Executed At**
10/29/2020 16:53 EDT

**Identity Method**
email

**Distribution Method**
email

**Signed Checksum**
5et49ae9e30ab961948ec22.bca5d:d47d9f97r17f2feade25#tt#e99d4b9drc

**Signer Sequencing**
Enabled

**Document Passcode**
Disabled

**DOCUMENT DETAILS**

**Document Name**
National Rifle Association Of America And Affiliates - Aronson Llc Engagement Letter

**Filename**
national_rifle_association_of_america_and_affiliates_-_aronson_llc_engagement_letter.pdf

**Pages**
18 pages

**Content Type**
application/pdf

**File Size**
585 KB

**Original Checksum**
6a9rc15r4f49dr4734*4f329#aedf9f5eadp3fe99a1.4e549#48pe5e9c5c#59cc9r

# SIGNERS

**SIGNER**

**Name**
Charles L. Cotton

**Email**
charles@cottonfamily.com

**Signer Sequence**
1

**Components**
2

**E-SIGNATURE**

**Status**
signed

**Multi-factor Digital Fingerprint Checksum**
5e`4c 3035frf`f 53390fd.daea2f9eab.f5a7f*53.4ef15f*9cfaffaab*9f

**IP Address**
73.155.168.163

**Device**
Firefox via Windows

**Typed Signature**

**EVENTS**

**Viewed At**
10/29/2020 16:52 EDT

**Identity Authenticated At**
10/29/2020 16:53 EDT

**Signed At**
10/29/2020 16:53 EDT

**Signature Reference ID**
F1E8D64D

**Name**
Craig B. Spray

**Email**
cspray@nrahq.org

**Signer Sequence**
0

**Components**
2

**Status**
signed

**Multi-factor Digital Fingerprint Checksum**
ca27e`af5f93f0.r44f9.1cf0rfac91c4954fa543c31f12aa*f9df3fsdb9ea3

**IP Address**
166.216.159.86

**Device**
Mobile Safari via iOS

**Drawn Signature**

**Signature Reference ID**
691652F1

**Signature Biometric Count**
141

**Viewed At**
10/29/2020 15:25 EDT

**Identity Authenticated At**
10/29/2020 15:26 EDT

**Signed At**
10/29/2020 15:26 EDT

# AUDITS

| TIMESTAMP | AUDIT |
|---|---|
| 10/29/2020 12:35 EDT | Angelina Tracey (atracey@aronsonllc.com) created document 'national_rifle_association_of_america_and_affiliates_ _aronson_llc_engagement_letter.pdf' on Chrome via Windows from 74.96.77.68. |
| 10/29/2020 12:35 EDT | Craig B. Spray (cspray@nrahq.org) was emailed a link to sign. |
| 10/29/2020 15:25 EDT | Craig B. Spray (cspray@nrahq.org) viewed the document on Mobile Safari via iOS from 166.216.159.86. |
| 10/29/2020 15:26 EDT | Craig B. Spray (cspray@nrahq.org) authenticated via email on Mobile Safari via iOS from 166.216.159.86. |
| 10/29/2020 15:26 EDT | Craig B. Spray (cspray@nrahq.org) signed the document on Mobile Safari via iOS from 166.216.159.86. |
| 10/29/2020 15:26 EDT | Charles L. Cotton (charles@cottonfamily.com) was emailed a link to sign. |
| 10/29/2020 16:52 EDT | Charles L. Cotton (charles@cottonfamily.com) viewed the document on Firefox via Windows from 73.155.168.163. |

| TIMESTAMP | AUDIT |
|---|---|
| 10/29/2020 16:53 EDT | Charles L. Cotton (charles@cottonfamily.com) authenticated via email on Firefox via Windows from 73.155.168.163 |
| 10/29/2020 16:53 EDT | Charles L. Cotton (charles@cottonfamily.com) signed the document on Firefox via Windows from 73.155.168.163. |

CONFIDENTIAL

Exhibit
0015

# NATIONAL RIFLE ASSOCIATION OF AMERICA
# REPORT OF THE AUDIT COMMITTEE

**Tuscan, Arizona**                                                    **October 24, 2020**

TO:  NRA BOARD OF DIRECTORS

The Audit Committee met at the NRA Headquarters, Fairfax, Virginia and via teleconference at 8 a.m. eastern, March 11, 2020.  Committee members present in-person were: Herbert A. Lanford, Jr. and those present via teleconference were: Charles L. Cotton, Chairman, David G. Coy, Vice Chairman, Curtis Jenkins and Carolyn Meadows.  Others in attendance were: John Frazer, NRA Secretary; Craig B. Spray, NRA Treasurer; David Warren, Committee Secretary; Rick Tedrick, NRA Managing Director of Finance; Sonya Rowling, Director of Accounting Operations and Financial Reporting; Robert Owens, ILA Chief Fiscal Officer; Angela St. Onge, NRA Controller, James Purtell, IS Interim Managing Director, Christina Major, Foundation Managing Director of Finance and Jean Hwang, Manager of Financial Operations, Foundation Finance.  Greg Plotts, Aronson, LLC Partner; Will Donahue, Aronson, LLC, Audit Senior Manager and Wit Davis, outside counsel were also in attendance.

**The Committee discussed many areas of interest and while not rising to the level of Board action, the following items were addressed:**

1.  The minutes from the January 9, 2020 meeting were approved.

2.  Greg Plotts and Will Donahue reviewed the overall audit process, key procedures and areas of focus, consolidated financial statement highlights and accounting updates in the industry.  There were no significant deficiencies or material weaknesses identified.

3.  Will Donahue reviewed required communications to the Audit Committee as outlined in the letter addressed to the Committee.

4.  Rick Tedrick reviewed the consolidated financial statements of the NRA and Affiliates, while also discussing variances of note from the prior year (2018) within these statements.  The Committee made the following motion, which was passed unanimously:

    "Moved, the Committee unanimously approves the NRA consolidated financial statements as presented."

5.  Receiving, investigating and resolving all instances of whistleblowing as they arise is part of the Audit Committee's business at each meeting.  There were no instances of whistleblowing reported to the Chairman of the Audit Committee, General Counsel, Human Resources Director, or the Secretary of the Audit Committee.

6.  The Committee met in executive session with counsel, Aronson management, staff and independently.

NYAG
EX011

The committee went into executive session at 9:15 a.m., and rose from executive session at 9:52 a.m., with no resolutions being adopted.

There was no further business, so the Committee adjourned at 9:43 a.m.

The Audit Committee met via teleconference and WebEx session at 10 a.m. eastern, August 21, 2020. Committee members in attendance were: Charles L. Cotton, Chairman, David G. Coy, Vice Chairman, Herbert A. Lanford, Jr., Curtis Jenkins and Carolyn Meadows. Others in attendance were: John Frazer, NRA Secretary; Craig B. Spray, NRA Treasurer; David Warren, Committee Secretary; and Willes Lee, NRA Second Vic President. William A. Brewer III, Brewer Attorneys & Counselors; Sarah Rogers, Brewer Attorneys & Counselors and Wit Davis, outside counsel were also in attendance.

**The Committee discussed many areas of interest and while not rising to the level of Board action, the following items were addressed:**

1. The minutes from the March 11, 2020 meeting were approved.

2. Receiving, investigating and resolving all instances of whistleblowing as they arise is part of the Audit Committee's business at each meeting. There were three instances of whistleblowing reported to the Committee to make them aware of the instances and that they were being addressed by legal counsel. Next steps, are to further the appropriate investigation by legal counsel and bring them to the Committee as they are completed.

3. The Committee discussed the details surrounding Kimberly Rhode, potential celebrity endorsement, and the Committee determined that these activities did not meet the criteria of a related party activity.

4. The Committee met in executive session with counsel and staff.

The committee went into executive session at 10:19 a.m., and rose from executive session at 12:40 p.m., with no resolutions being adopted.

There was no further business, so the Committee adjourned at 12:40 p.m.

The Audit Committee met via teleconference and WebEx session at 10 a.m. eastern, October 9, 2020. Committee members in attendance were: Charles L. Cotton, Chairman, David G. Coy, Vice Chairman, Herbert A. Lanford, Jr., Curtis Jenkins and Carolyn Meadows. Others in attendance were: John Frazer, NRA Secretary; Craig B. Spray, NRA Treasurer; David Warren, Committee Secretary; Willes Lee, NRA Second Vic President; Thomas R. Tedrick, NRA Managing Director of Finance, Robert Owens, Fiscal Officer ILA, Sonya Rowling, NRA Director of Finance Reporting & Accounting; Arif Rahman, NRA Manager of Tax & Accounting; Angie St. Onge, NRA Controller. Staff from Aronson, LLC in attendance were; Greg Plotts, Partner; Will Donahue, Sr. Mgr. Of Audit; Kathryn Cuddapah, Director, Tax

CONFIDENTIAL

Services and Kathryn Petrillo, EBP Partner. William A. Brewer III, Brewer Attorneys & Counselors; Sarah Rogers, Brewer Attorneys & Counselors and Wit Davis, outside counsel were also in attendance.

**The Committee discussed many areas of interest and while not rising to the level of Board action, the following items were addressed:**

1. The minutes from the August 21, 2020 meeting were approved.

2. The Committee received and discussed the details surrounding the 2019 Form 990 and the 2019 Employee benefit plan audit. Rick Tedrick discussed the key points of interest from the Form 990, along with the support from the Aronson, LLC staff; Greg Plotts, Partner; Kathryn Cuddapah, Director, Tax Services and Kathryn Petrillo, EBP Partner.

3. The Committee was presented by Greg Plotts, Partner and Will Donahue, Sr. Manager of Audit, of Aronson LLC. The scope of this presentation was to present what was new for the 2020 audit engagement, significant audit areas of focus and upcoming changes.

4. Receiving, investigating and resolving all instances of whistleblowing as they arise is part of the Audit Committee's business at each meeting. There were two prior instances of whistleblowing discussed with the Committee to update them on the progress of each investigation by counsel.

5. The Committee met in executive session with counsel, Aronson management, staff and independently.

The committee went into executive session at 10:36 a.m., and rose from executive session at 11:41 p.m., with no resolutions being adopted.

There was no further business, so the Committee adjourned at 11:45 p.m.


Respectfully submitted,


Charles L. Cotton, Chairman

NRA-BK-00106017

NATIONAL RIFLE ASSOCIATION OF AMERICA
11250 WAPLES MILL ROAD
FAIRFAX, VIRGINIA 22030

**Exhibit 0016**



March 11, 2020

Greg Plotts
Aronson LLC
111 Rockville Pike, Suite 600
Rockville, Maryland 20850

Dear Mr. Plotts:

This representation letter is provided in connection with your audit of the financial statements of **National Rifle Association of America** (NRA or the "Organization") which comprise the Statement of Financial Position as of December 31, 2019, and the related Statements of Activities, Functional Expense and Cash Flows for the year then ended, and the related notes to the financial statements, for the purpose of expressing an opinion as to whether the financial statements are presented fairly, in all material respects, in accordance with accounting principles generally accepted in the United States of America (U.S. GAAP); and with respect to the Statement of Financial Position and Statements of Activities and Changes in Net Assets, Functional Expenses, and Cash Flows for the year ended December 31, 2018, which were audited by other auditors and reported by them in their report dated March 13, 2019.

Certain representations in this letter are described as being limited to matters that are material. Items are considered material, regardless of size, if they involve an omission or misstatement of accounting information that, in light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would be changed or influenced by the omission or misstatement. An omission or misstatement that is monetarily small in amount could be considered material as a result of qualitative factors.

In regard to any assistance in preparation of footnote disclosure information and tax information services performed by you, we have:

   a)   Assumed all management responsibilities.

   b)   Designated Sonya Rowling, Director, Accounting Operations and Financial Reporting and Angela St. Onge, Controller, who have suitable skills, knowledge, and experience to perform and/or oversee the services.

   c)   Evaluated the adequacy and results of the services performed.

   d)   Accepted responsibility for the results of the services.

We confirm, to the best of our knowledge and belief, as of March 11, 2020, the following representations made to you during your audit.

**NYAG EX012**

NRA-BK-00104231

**Financial Statements**

1. We have fulfilled our responsibilities, as set out in the terms of the audit engagement letter dated November 21, 2019, including our responsibility for the preparation and fair presentation of the financial statements in accordance with U.S. GAAP.

2. The financial statements referred to above are fairly presented in conformity with U.S. GAAP.

3. We acknowledge our responsibility for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

4. We acknowledge our responsibility for the design, implementation, and maintenance of internal control to prevent and detect fraud.

5. Significant assumptions we used in making accounting estimates, including those measured at fair value, are reasonable.

   a) The measurement process used by management in determining accounting estimates is appropriate and consistent.

   b) The assumptions appropriately reflect management's intent and ability to carry out specific courses of action.

   c) The disclosures related to accounting estimates are complete and appropriate.

   d) No subsequent event has occurred that would require adjustment to the accounting estimates or disclosures included in the financial statements.

6. Related party relationships and transactions have been appropriately accounted for and disclosed in accordance with the requirements of U.S. GAAP.

7. All events subsequent to the date of the financial statements and for which U.S. GAAP requires adjustment or disclosure have been adjusted or disclosed.

8. The effects of uncorrected misstatements are immaterial, both individually and in the aggregate, to the financial statements as a whole. A list of the uncorrected misstatements is attached to the representation letter. In addition, you have proposed adjusting journal entries that have been posted to the Organization's accounts. We are in agreement with those adjustments.

9. The effects of all known pending or threatened claims, and assessments have been accounted for and disclosed in accordance with U.S. GAAP.

10. Significant estimates and material concentrations have been appropriately disclosed in accordance with U.S. GAAP.

11. Guarantees, whether written or oral, under which the Organization is contingently liable, have been properly recorded or disclosed in accordance with U.S. GAAP.

12. Receivables recorded in the financial statements represent valid claims against debtors for sales or other charges arising on or before the balance sheet date and have been reduced to their estimated net realizable value.

CONFIDENTIAL

13. Arrangements with financial institutions involving compensating balances or other arrangements involving restrictions on cash balances, lines of credit, or similar arrangements have been properly disclosed. We are in compliance with all debt covenants.

14. Provision has been made to reduce excess or obsolete inventories to their estimated net realizable value.

15. We have fully disclosed to you all sales terms, including all rights of return or price adjustments and all warranty provisions.

16. The Organization's federal income tax returns for 2016 through 2019 are subject to examination by the IRS, generally for three years after they were filed. The Organization recognizes tax benefits only to the extent that the Organization believes it is "more likely than not" that its tax positions will be sustained upon IRS examination.

17. We agree with the findings of specialists in evaluating the pension plan's discount rate and have adequately considered the qualifications of the specialist in determining the amounts and disclosures used in the financial statements and underlying accounting records. We did not give or cause any instructions to be given to specialists with respect to the values or amounts derived in an attempt to bias their work, and we are not otherwise aware of any matters that have had an effect on the independence or objectivity of the specialists.

18. We believe that the actuarial assumptions and methods used to measure pension liabilities and costs for financial accounting purposes are appropriate in the circumstances.

19. Membership dues revenues contain both elements of an exchange transaction and contribution. We believe the only substantial exchange transaction value provided to members is the net cost of the magazine subscription. Additionally, the contribution element of membership dues is recognized at fair value.

20. The information used from MemberzPlus provides reliable information for recording membership dues and contribution revenues.

21. We believe the NRA's members fully intend to support the Organization's current-period operations upon sign up. As a result, net assets correlating to members' promises to give receivables have not been time restricted.

22. Management has evaluated whether there are conditions or events that, in the aggregate, raise substantial doubt about the entity's ability to continue as a going concern within one year after the date that the financial statements are issued. We have provided you with all of the information that is relevant to our plans to mitigate the adverse effects of conditions and events that indicate there is substantial doubt about the Organization's ability to continue as a going concern for at least one year after the date the financial statements are available to be issued, including our evaluation of the likelihood that those plans can be effectively implemented. As a result, management has concluded its plans are sufficient to ensure the Organization's ability to continue as a going concern for at least one year after the date the financial statements are available to be issued.

23. The financial statements referred to above are fairly presented in conformity with U.S. GAAP.

CONFIDENTIAL

**Information Provided**

24. We have provided you with:

   a) Access to all information, of which we are aware, that is relevant to the preparation and fair presentation of the financial statements, such as records, documentation, and other matters.

   b) Additional information that you have requested from us for the purpose of the audit.

   c) Unrestricted access to persons within the Organization from whom you determined it necessary to obtain audit evidence.

   d) Minutes of the meetings of the governing board and its subcommittees, or summaries of actions of recent meetings for which minutes have not yet been prepared.

   e) Communications from regulatory agencies concerning noncompliance with, or deficiencies in, financial reporting practices.

   f) Communications from service organizations we use regarding internal control deficiencies noted in their operations.

25. All material transactions have been recorded in the accounting records and are reflected in the financial statements.

26. We have disclosed to you the results of our assessment of the risk that the financial statements may be materially misstated as a result of fraud.

27. Except as made known to you, we have no knowledge of any fraud or suspected fraud that affects the Organization and involves:

   a) Management,

   b) Employees who have significant roles in internal control, or

   c) Others where the fraud could have a material effect on the financial statements.

28. Except as made known to you, we have no knowledge of any allegations of fraud or suspected fraud affecting the Organization's financial statements communicated by employees, former employees, grantors, regulators, or others.

29. We have no knowledge of any instances of noncompliance or suspected noncompliance with laws and regulations whose effects should be considered when preparing financial statements.

30. We have disclosed to you that we are currently under investigation by the state of New York and the District of Columbia. We have also communicated that we will vigorously defend our position in these matters and believe that it is too early to predict the likelihood or extent of an unfavorable outcome. Accordingly and to the best of our knowledge, we represent there is no correlating required accrual or disclosure in the consolidated financial statements required under U.S. GAAP.

31. We have disclosed to you that we are currently in dispute with and have filed lawsuits against Ackerman McQueen. Accordingly and to the best of our knowledge, we represent there is no correlating required accrual or disclosure in the consolidated financial statements required under U.S. GAAP.

CONFIDENTIAL

32. We have no knowledge of unsettled lawsuits or disputes with current or former employees or board members, except as made known to you. Accordingly and to the best of our knowledge, we represent there is no correlating required accrual or disclosure in the consolidated financial statements required under U.S. GAAP.

33. We have disclosed to you all known pending or threatened litigation, claims, and assessments whose effects should be considered when preparing the financial statements.

34. We have disclosed to you the identity of the Organization's related parties and all the related party relationships and transactions of which we are aware.

35. The Organization has satisfactory title to all owned assets, and there are no liens or encumbrances on such assets nor has any asset been pledged as collateral, except as made known to you and disclosed in the notes to the financial statements.

36. We are responsible, except as otherwise made known to you with respect to litigation claims and investigations, and we are substantially in compliance with the laws, regulations, and provisions of contracts and grant agreements applicable to us.

37. We are responsible for assumptions and calculations of endowment assets, including the calculation of underwater endowment funds. Endowments recorded represent donor restricted gifts intended to support the programs of the Organization. Endowment investment income is allocated to donor endowments using reasonable allocation methods. We have disclosed to you all underwater endowments and are taking all measures possible to restore the original gift amount.

38. The **National Rifle Association of America** is an exempt organization under Section 501(c)4 of the Internal Revenue Code. Any activities of which we are aware that would jeopardize the Organization's tax-exempt status, and all activities subject to tax on unrelated business income or excise or other tax, have been disclosed to you. All required filings with tax authorities are up to date.

39. The basis for the allocation of functional expenses is reasonable and consistent with the prior period.

40. All transfers between classifications of net assets as reported in the financial statements were based upon the fulfillment of all donor-imposed restrictions during the period. Net assets are recorded properly as those with donor restrictions and without donor restrictions, except as disclosed to you for the uncertainty of identified restricted net assets of ILA that we will continue to review and obtain donor clarification on intent and restriction. If these ILA restricted Net Assets need to be released to those without donor restrictions net assets in the future because of error or clarification of donor intent, we do not believe it has or will have a material impact on the presentation of the financial statements or to the users of the financial statements.

41. Grants received from **The NRA Foundation, Inc.** were used for eligible 501(c)3 program activities. Direct and indirect expenses allocated to **The NRA Foundation, Inc.** are based on actual costs and reasonable estimates.

42. As disclosed in Note 1 to the financial statements, we have adopted ASU 2014-09 as of January 1, 2019 using a modified retrospective method. Revenue from contracts and customers has been appropriately accounted for and disclosed in accordance with FASB ASC 606, *Revenue from Contracts with Customers*. All contracts underlying revenue recognized in the financial statements have commercial substance and have been approved by appropriate parties. We have considered side agreements, implied promises, and unstated customary business practices in identifying performance obligations in the contracts. We have sufficient and appropriate documentation supporting all estimates and judgments underlying the amount and timing of revenue recognized in the financial

CONFIDENTIAL

statements. As a result of the modified retrospective adoption, the Organization adjusted net assets at January 1, 2019, by $2,040,070.

43. As disclosed in Note 1 to the financial statements, we have ASU 2018-08 Not-For-Profit Entities (Topic 958): *Clarifying the Scope and the Accounting Guidance for Contributions Received and Contributions Made* during the audit period. There was no effect to amounts or classifications of amounts reported as a result of the adoption.

44. As disclosed in Note 13 to the financial statements during the year ended December 31, 2019, we adopted the guidance of ASU 2017-07. As a result, net periodic pension costs other than service costs have been reclassified to nonoperating expenses in the 2019 and 2018 Statements of Activities and Changes in Net Assets.

National Rifle Association of America
**SUMMARY OF AUDIT DIFFERENCES**
Year Ended December 31, 2019

| | | Current Year Over (Under) Statement of Changes in Net assets |
|---|---|---|
| **Statement of activities misstatements:** | | |
| Current-year impact of 10-year advertising contract expensed in prior years | $ | 150,000 |
| Current-year impact of prior-year under-accrued salaries expense | $ | (415,000) |
| Impact of unrecorded estimated insurance fees | $ | (400,000) |
| Impact of unrecorded irrevocable interest in estate | $ | (280,926) |
| Cumulative impact of unrecorded accrued interest revenue on Whittington Center note receivable, recorded through current-year revenues | $ | 2,187,203 |
| **Cumulative effect of over statement of Changes in Net Assets** | $ | 1,241,277 |
| | | |
| **Statement of financial position misstatements (Including reclassifications):** | | |
| Total assets understated | $ | (2,173,314) |
| Total liabilities understated | $ | (529,888) |
| Net assets: | | |
| Beginning understated | $ | (2,884,703) |
| Ending understated | $ | (1,643,426) |

CONFIDENTIAL

Sonya Rowling
Director, Accounting Operations and Financial Reporting


Robert Owens
ILA Fiscal Officer


Angela St. Onge
Controller


Rick Tedrick
Managing Director, Finance


Craig Spray
Treasurer and CFO


John Frazer*
Secretary and General Counsel


*My signature is related to representations directly related to compliance and litigation and claims matters included in numbers 9, 29, 30, 31, 32, 33 and 36.

NRA-BK-00104237

Exhibit 0017



# National Rifle Association and Affiliates Audit Committee Meeting

October 9, 2020
Greg Plotts, CPA, Engagement Partner
Kathy Cuddapah, CPA, Director of 990 Tax
Kate Petrillo, CPA, EBP Partner
Will Donahue, CPA, Audit Sr. Manager

© Aronson LLC | aronsonllc.com |

NYAG
EX013



Agenda

- Review of 2019 Tax Returns

- Employee Benefit Plan Audit Update

- 2020 Financial Statement Audit

- Questions and Answers

aronson LLC

© Aronson LLC : aronsonllc.com



Review of 2019 Tax Returns

CONFIDENTIAL

NRA-BK-00039135



# Review of 2019 Tax Returns

- National Rifle Association of America Form 990
- National Rifle Association of America Form 990-T

- The NRA Foundation Form 990

- NRA Civil Rights Defense Fund Form 990

- NRA Special Contribution Fund Form 990
- NRA Special Contribution Fund Form 990-T
- NRA Special Contribution Fund State Return

- NRA Freedom Action Foundation Form 990

 aronson LLC

© Aronson LLC : aronsonllc.com

NRA-BK-00039136



**Employee Benefit Plan Audit Update**

CONFIDENTIAL

# Employee Benefit Plan Audit Update

### National Rifle Association of America 401(k) Plan

- Limited scope
- No significant 2019 amendments
- No changes in policies
- No difficulties or disagreements with management
- No passed adjustments
- Audit findings
- Change in presentation of stable value fund

### NRA Employee Retirement Plan

- Limited scope
- Amendment to freeze accruals
- No changes in policies – modified cash basis presentation
- No difficulties or disagreements with management
- No passed adjustments
- Audit findings
- Presentation of VCP related reimbursement

aronson LLC

© Aronson LLC | aronsonllc.com

NRA-BK-00039138



2020 Financial
Statement Audit

NRA-BK-00039139

## 2020 Financial Statement Audit- timeline

- Initial calls with finance team- September and October 2020

- Initial interviews with management and governance- September 2020

- Interim audit fieldwork- October 2020

- Final audit fieldwork- late January- February 2021

- Presentation of financial statements to the Audit Committee- March 2021



aronson LLC

© Aronson LLC | aronsonllc.com

## 2020 Financial Statement Audit- COVID 19 Considerations- from AICPA FAQ, "Issues related to COVID-19"



- **Financial reporting considerations**
  - "Due to the effects of COVID 19… the necessity for and robustness of the disclosures may require additional scrutiny by the auditor."
- **Subsequent events- assumptions and forecasts**
  - "The effects of COVID 19 may negatively impact significant estimates and exacerbate a vulnerability due to certain concentrations."
- **Fraud inquiries**
  - "For companies that have laid off key personnel and with work forces moving out of the typical office environment, there could be a breakdown in internal control. Auditors may need to adjust audit procedures as necessary to help appropriately address any potential fraud risks that could have a material effect on the financial statements."



© Aronson LLC : aronsonllc.com

CONFIDENTIAL

NRA-BK-00039141

## 2020 Financial Statement Audit- COVID 19
### Considerations- from AICPA FAQ, "Issues related to COVID-19"



- **Access to books and records**
  - "…auditors need to consider the authenticity of those records and perhaps perform additional audit procedures to be satisfied that those records are complete, accurate, and authentic."
- **Inventory observations**
  - "In some cases, clients may be able to perform the usual physical inventory counts, but auditors are unable to attend due to travel restrictions. In those cases, auditors may take advantage of technologies including camera systems with live video feeds, to observe inventory counts."
- **Internal control**
  - "If client sites are closed and auditors are unable to perform audits on site, performing walkthroughs and certain tests of internal control will be challenging. In these cases, auditors may not be able to rely on controls and may have to increase substantive testing."



© Aronson LLC : aronsonllc.com

CONFIDENTIAL

# Accounting Standards Updates

- ASU 2018-13, "Fair Value Measurement (Topic 820)"

    – In lieu of a rollforward for Level 3 fair value measurements, a nonpublic entity is required to disclose transfers into and out of Level 3 of the fair value hierarchy and purchases and issues of Level 3 assets and liabilities.

    – For investments in certain entities that calculate net asset value, an entity is required to disclose the timing of liquidation of an investee's assets and the date when restrictions from redemption might lapse only if the investee has communicated the timing to the entity or announced the timing publicly.

    – The amendments clarify that the measurement uncertainty disclosure is to communicate information about the uncertainty in measurement as of the reporting date.

- ASU 2019-03, "Not for Profit Entities (Topic 958): Updating the Definition of Collections"

    – The amendments in this Update modify the definition of the term collections and require that a collection-holding entity disclose its policy for the use of proceeds from when collection items are deaccessioned (that is, removed from a collection). If a collection-holding entity has a policy that allows proceeds from deaccessioned collection items to be used for direct care, it should disclose its definition of direct care.

    – The amendments in this Update improve GAAP because they eliminate the diversity in practice that exists today between the application of the Master Glossary's definition compared with the definition that many entities use for accreditation purposes. In addition, using proceeds from deaccessioned collection items toward direct care better aligns with many entities' missions to specifically maintain their collections. Furthermore, aligning the definition and permitting proceeds to be utilized for the care of existing collections are consistent with the basis for conclusions in Statement 116 about the care and preservation of collections. The care and preservation of collections was a foundational element of the basis for permitting entities to not recognize contributed collections.

cx aronson LLC

© Aronson LLC | aronsonllc.com



## Additional audit procedures



✓ Additional internal control and substantive testing of expenditures based on targeted sampling

Additional testing of compliance related to conflict of interest policies, related parties, contracts, and consulting agreements

Reviews of updated compensation studies

Continued communication with audit committee and review internal audit and oversight considerations

Continued review of updates policies, procedures, and internal controls

Procedures will continue to be evaluated and modified as necessary throughout the audit process

aronson LLC

© Aronson LLC | aronsonllc.com

CONFIDENTIAL



# Questions and Answers

Thank you for your time and this opportunity!

© Aronson LLC | aronsonllc.com |

Notes Summary:

No speaker notes are contained in this presentation.

CONFIDENTIAL

NRA-BK-00039146


Exhibit
0006

# NATIONAL RIFLE ASSOCIATION OF AMERICA

# REPORT OF THE OFFICERS COMPENSATION COMMITTEE

**DALLAS, TEXAS**                                **JANUARY 7, 2021**

### TO: NRA BOARD OF DIRECTORS (PRESENTED IN EXECUTIVE SESSION)

The Officers Compensation Committee (the "Committee") met in Dallas, TX on January 6, 2021 to review a proposed Employment Agreement for Wayne Lapiere ("Mr. LaPierre"), Executive Vice President of the National Rifle Association of America ("NRA"). In attendance were Charles L. Cotton, First Vice President of the NRA, Willes K. Lee, Second Vice President of the NRA, William Brewer, counsel to the NRA, and William (Wit) Davis, Counsel to the NRA Board of Directors. Carolyn D. Meadows, President of the NRA, participated by telephone. Mr. Davis served as Acting Secretary for the Committee.

The meeting was called to order at 4:45 p.m. CST.

The Committee was presented with, and considered, an Employment Agreement negotiated by counsel for the NRA and counsel for Mr. LaPierre (the "Employment Agreement"). Questions and discussion ensued.

Upon a motion duly made and seconded, the Committee unanimously recommends that the Board of Directors adopt the following resolution:

RESOLVED that the Employment Agreement between the NRA and Mr. LaPierre, be approved by the NRA Board of Directors, *add provision* and

RESOLVED, FURTHER, that Mr. Cotton is authorized to execute the Employment Agreement on behalf of the NRA.

Copies of the Employment Agreement will be made available for inspection at the Board of Directors meeting on January 7, 2021.

The meeting was adjourned at 5:20 p.m. CST.

Respectfully submitted,

*Approved w/ one abstention*

Charles L. Cotton
Vice Chairman, Officer Compensation Committee

NYAG
EX016

Add to Officer Comp motion

"subject to the addition of a choice of law
and venue provision to be negotiated between
the parties"